# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS; | ) |
| | ) |
| STATE OF ALABAMA; | ) |
| | ) |
| STATE OF GEORGIA; | ) |
| | ) |
| STATE OF IDAHO; | ) |
| | ) |
| STATE OF INDIANA; | ) |
| | ) |
| STATE OF KANSAS; | ) |
| | ) |
| STATE OF LOUISIANA; | ) |
| | ) |
| STATE OF MONTANA; | ) |
| | ) |
| STATE OF NEBRASKA; | ) |
| | ) |
| STATE OF SOUTH CAROLINA; | ) |
| | ) |
| STATE OF SOUTH DAKOTA; | ) |
| | ) |
| STATE OF UTAH; | ) |
| | ) |
| STATE OF WEST VIRGINIA; | ) |
| | ) |
| STATE OF WISCONSIN; | ) |
| | ) |
| GOVERNOR PHIL BRYANT, State of Mississippi; | ) |
| | ) |
| GOVERNOR PAUL R. LEPAGE, State of Maine; | ) |
| | ) |
| GOVERNOR PATRICK L. MCCRORY, State of North Carolina; and | ) ) |
| | ) |
| GOVERNOR C.L. "BUTCH" OTTER, State of Idaho, | ) ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| vs. | )   Case No. 1:14-cv-254 |
| | ) |

UNITED STATES OF AMERICA;                          )
                                                   )
JEH JOHNSON, Secretary of the Department of        )
       Homeland Security;                          )
                                                   )
R. GIL KERLIKOWSKE, Commissioner of U.S. Customs   )
       and Border Protection;                      )
                                                   )
RONALD D. VITIELLO, Deputy Chief of U.S. Border    )
       Patrol, U.S. Customs and Border Protection; )
                                                   )
THOMAS S. WINKOWSKI, Acting Director of U.S.       )
       Immigration and Customs Enforcement; and    )
                                                   )
LEÓN RODRÍGUEZ, Director of U.S. Citizenship and   )
       Immigration Services,                       )
                                                   )
                               *Defendants.*       )
                                                   )

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

# TABLE OF CONTENTS

Table of Authorities ................................................................................ ii

Introduction ........................................................................................... 1

Statement of the Nature of the Proceeding ............................................ 3

Statement of the Issue to be Ruled Upon by the Court ......................... 4

Summary of Argument ............................................................................ 5

Argument ............................................................................................... 6

     I.     Plaintiffs are Likely To Prevail On The Merits ...................... 6

         A.    Defendants Violated the Take Care Clause ................ 7

         B.    Defendants Violated the APA ................................... 18

     II.    Plaintiffs Will Incur Irreparable Injuries............................. 25

         A.    Plaintiffs Will Be Irreparably Harmed By Another Humanitarian Crisis ............................................... 25

         B.    Without A Preliminary Injunction, It Will Be Difficult Or Impossible To Reverse Defendants' Actions ............................. 26

     III.   The Balance of Equities Tips in PLaintiffs' Favor ............... 28

     IV.   The Public Interest Necessitates a Preliminary Injunction ................. 32

Conclusion ........................................................................................... 33

Certificate of Conference

Certificate of Service

# TABLE OF AUTHORITIES

## Cases

*Adams v. Richardson,*
    480 F.2d 1159 (D.C. Cir. 1973) ............................................................................. 21

*American Bus Ass'n v. United States,*
    627 F.2d 525 (D.C. Cir. 1980) ................................................................................. 30

*Angelus Milling Co. v. Comm'r of Internal Revenue,*
    325 U.S. 293 (1945) .................................................................................................. 18

*API v. EPA,*
    198 F.3d 275 (D.C. Cir. 2000) ................................................................................. 33

*Appalachian Power Co. v. EPA,*
    208 F.3d 1015 (D.C. Cir. 2000) ......................................................................... 29, 30

*Arizona v. United States,*
    132 S. Ct. 2492 (2012) ............................................................................................. 35

*Barrick Goldstrike Mines Inc. v. Browner,*
    215 F.3d 45 (D.C. Cir. 2000) ................................................................................... 30

*Better Gov't Ass'n v. Dep't of State,*
    780 F.2d 86 (D.C. Cir. 1986) ................................................................................... 30

*Blum v. Yaretsky,*
    457 U.S. 991 (1982) .................................................................................................. 35

*Catano v. Local Board,*
    298 F. Supp. 1183 (E.D. Pa. 1969) ......................................................................... 18

*CBS v. United States,*
    316 U.S. 407 (1942) ............................................................................................. 21, 30

*Chamber of Commerce v. DOL,*
    174 F.3d 206 (D.C. Cir. 1999) ........................................................................... 30, 31

*Chevron, U.S.A., Inc. v. NRDC,*
    467 U.S. 837 (1984) .................................................................................................. 33

*Christopher Village, Ltd. Partnership v. Retsinas,*
    190 F.3d 310 (5th Cir. 1999) ................................................................................... 37

ii

*Chrysler Corp. v. Brown,*
   441 U.S. 281 (1979) ............................................................................. 28

*Cohen v. United States,*
   578 F.3d 1 (D.C. Cir. 2009) ............................................................... 30

*Crane v. Napolitano,*
   2013 WL 1744422, No. 3:12-cv-03247-O (N.D. Tex. Apr. 23, 2013) ...................... 12

*Crowley Caribbean Transp., Inc. v. Pena,*
   37 F.3d 671 (D.C. Cir. 1994) ............................................................. 19

*Da Costa v. Nixon,*
   55 F.R.D. 145 (E.D.N.Y. 1972) .......................................................... 18

*EEOC v. Service Temps Inc.,*
   679 F.3d 323 (5th Cir. 2012) ............................................................ 13

*Ex parte Vallandigham,*
   28 F. Cas. 874 (C.C.S.D. Ohio 1863) ................................................ 16

*Fed. Express Corp. v. Holowecki,*
   552 U.S. 389 (2008) ........................................................................ 13

*FTC v. Dean Foods Co.,*
   384 U.S. 597 (1966) ........................................................................ 37

*General Elec. Co. v. EPA,*
   290 F.3d 377 (D.C. Cir. 2002) ........................................................ 29

*Hearth, Patio & Barbecue Ass'n v. U.S. Dept. of Energy,*
   706 F.3d 499 (D.C. Cir. 2013) ........................................................ 34

*Heckler v. Chaney,*
   470 U.S. 821 (1985) ................................................................... 18, 19

*INS v. Chadha,*
   462 U.S. 919 (1983) ........................................................................ 10

*Janvey v. Alguire,*
   647 F.3d 585 (5th Cir. 2011) ............................................................ 35

*Juarez-Ramos v. Gonzales,*
   485 F.3d 509 (9th Cir. 2007) ............................................................ 24

*Kendall v. United States,*
    37 U.S. (12 Pet.) 524 (1838) ........................................................ 17, 26, 27

*Medellin v. Texas,*
    552 U.S. 491 (2008) ....................................................................... 17

*Morton v. Ruiz,*
    415 U.S. 199 (1974) .................................................................. 28, 32

*National Ass'n of Farmworkers Organizations v. Marshall,*
    628 F.2d 604 (D.C. Cir. 1980) ........................................................ 34

*National Pork Producers Council v. EPA,*
    635 F.3d 738 (5th Cir. 2011) .......................................................... 30

*National Mining Ass'n v. McCarthy,*
    758 F.3d 243 (D.C. Cir. 2014) ........................................................ 32

*Nicholas v. INS,*
    590 F.2d 802 (9th Cir. 1979) .......................................................... 28

*NLRB v. HH3 Trucking, Inc.,*
    755 F.3d 468 (7th Cir. 2014) .......................................................... 26

*NRDC v. EPA,*
    643 F.3d 311 (D.C. Cir. 2011) ........................................................ 30

*Rodriguez v. United States,*
    480 U.S. 522 (1987) (per curiam) .................................................... 24

*Role Models Am., Inc. v. White,*
    317 F.3d 327 (D.C. Cir. 2003) ........................................................ 34

*Romeiro de Silva v. Smith,*
    773 F.2d 1021 (9th Cir. 1985) ........................................................ 28

*Shell Offshore Inc. v. Babbitt,*
    238 F.3d 622 (5th Cir. 2001) .......................................................... 31

*Syncor Int'l Corp. v. Shalala,*
    127 F.3d 90 (D.C. Cir. 1997) .......................................................... 30

*United States v. Allen,*
    954 F.2d 1160 (6th Cir. 1992) ........................................................ 20

*United States v. Smith,*
   27 F. Cas. 1192 (C.C.D.N.Y. 1806) .................................................. 18

*Virginian Ry. Co. v. Sys. Fed'n No. 40,*
   300 U.S. 515 (1937) ........................................................................ 42

*Winter v. NRDC,*
   555 U.S. 7 (2008) ............................................................................ 14

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ........................................................... 17, 26, 34

**Federal Constitution, Statutes, and Rules**

U.S. Const. art. II, § 3, cl. 5 ................................................................ 11, 12

26 U.S.C. § 7121(a) ............................................................................... 38

26 U.S.C. § 7122(a) ............................................................................... 38

26 U.S.C. § 7122(b) ............................................................................... 38

26 U.S.C. § 7122(d)(3) ........................................................................... 38

29 U.S.C. § 657(d) ................................................................................. 38

33 U.S.C. § 1251(f) ................................................................................ 38

33 U.S.C. § 1375 .................................................................................... 38

42 U.S.C. § 402(y) ................................................................................. 19

42 U.S.C. § 4370d ................................................................................. 38

42 U.S.C. § 7612 .................................................................................... 38

42 U.S.C. § 7661(f) ................................................................................ 38

5 U.S.C. § 553 ....................................................................................... 24

5 U.S.C. § 706(2)(a) .............................................................................. 29

5 U.S.C. § 706(2)(A) ............................................................................. 24

8 U.S.C. § 1151(b)(2)(A)(i) ....................................................... 10, 20, 30

8 U.S.C. § 1182 .................................................................................................... 10

8 U.S.C. § 1182(a)(9)(B)(i)(II) ................................................................. 10, 20, 30

8 U.S.C. § 1201(a) ................................................................................... 10, 20, 30

8 U.S.C. § 1225 ......................................................................................... 9, 20, 29

8 U.S.C. § 1225(a)(1) .............................................................................................. 9

8 U.S.C. § 1225(a)(3) .............................................................................................. 9

8 U.S.C. § 1225(b)(2)(A) ........................................................................................ 9

8 U.S.C. § 1227(a)(1) ............................................................................................ 10

8 U.S.C. § 1229b .................................................................................................... 10

8 U.S.C. § 1254 ..................................................................................................... 10

8 U.S.C. § 1255 ............................................................................................... 10, 30

8 U.S.C. § 1324a .................................................................................................... 29

8 U.S.C. § 1324a(a)(1) ........................................................................................... 10

8 C.F.R. § 274a.12 ................................................................................................. 29

**State Statutes and Rules**

16 Tex. Admin. Code § 33.10 ................................................................................ 33

37 Tex. Admin. Code § 35.21 ................................................................................ 33

Tex. Lab. Code § 207.043(a)(2) ............................................................................ 33

Tex. Rules Govern. Bar Adm'n, R.II(a)(5)(d) ...................................................... 33

Wis. Stat. § 343.12(2)(es)(6) ................................................................................. 33

Wis. Stat. § 343.14(2)(es) ..................................................................................... 33

## Other Authorities

1 THE RECORDS OF THE FEDERAL CONVENTION OF 1787
(Max Farrand rev. ed., 1966) .................................................................... 13

2 JAMES WILSON, LECTURES ON LAW PART 2, *in* COLLECTED WORKS OF
JAMES WILSON (Kermit L. Hall & Mark David Hall eds., 2007) ........................... 14

Cass Sunstein, *Standing and the Privatization of Public Law*, 88 COLUM. L. REV.
1432 (1988) ........................................................................................... 15

CHRISTOPHER N. MAY,
PRESIDENTIAL DEFIANCE OF UNCONSTITUTIONAL LAWS (1998) ............................... 14

CONG. RESEARCH SERV., *Analysis of June 15, 2012 DHS Memorandum*
(July 13, 2012) ................................................................................ 19, 22

English Bill of Rights of 1689 ...................................................................... 13

Immigration Reform and Control Act, Pub. L. 99-603, 100 Stat. 3359 (1986).......... 22

JACK RAKOVE, ORIGINAL MEANINGS (1996) .................................................... 13

Kristi Lundstrom, *The Unintended Effects of the Three- and Ten-Year
Unlawful Presence Bars*, 76 LAW & CONTEMP. PROBS. 389 (2013)................... 20, 30

Memorandum from Janet Napolitano, Secretary of the Department of Homeland
Security, *Exercising Prosecutorial Discretion with Respect to Individuals
Who Came to the United States as Children* (June 15, 2012).......................... 17, 18

Memorandum from Jeh Charles Johnson, Secretary, Department of Homeland
Security, *Exercising Prosecutorial Discretion with Respect to Individuals Who
Came to the United States as Children and with Respect to Certain Individuals
Who Are the Parents of U.S. Citizens or Permanent Residents* (Nov. 20, 2014) ...... 9

Memorandum Opinion for the Secretary of Homeland Security, from Karl R.
Thompson, Principal Deputy Assistant Attorney General, Office of Legal
Counsel, *The Department of Homeland Security's Authority to Prioritize
Removal of Certain Aliens Unlawfully Present in the United States and to
Defer Removal of Others* (Nov. 19, 2014).................................. 16, 18, 19, 21, 22, 28

Preventing Executive Overreach on Immigration Act of 2014, H.R. 5759,
113th Cong. §§ 2(2), 2(6), 3(c) (passed by the House Dec. 4, 2014) ...................... 23

Sarah Ferris, *Gutiérrez Presses 'Millions' to Get Documents Ready for Legal Status*, THE HILL (Dec. 2, 2014).............................................................. 8

Statement of Administration Policy, H.R. 5757 (Dec. 4, 2014)................................. 23

USCIS Broadcast (Dec. 1, 2014)....................................................................... 8

Wis. Atty. Gen., OAG-02-12 (Oct. 4, 2012) ................................................... 33

## INTRODUCTION

On over 20 occasions — dating as far back as March 2008 and as recently as August 2014 — the President of the United States insisted that the Constitution and the United States Code prohibit him from suspending the Nation's immigration laws.  But on November 20, 2014, he did it anyway:  the President announced that he would unilaterally legalize the presence of 40% of the 11 million undocumented immigrants in the United States.  Less than a week later, he candidly admitted that "I just took an action to change the law."  Compl. ¶ 4.

The President's action has an Alice-in-Wonderland quality — demanding that Congress pass a law to prevent him from making his own:  "[W]hen members of Congress question my authority to make our immigration system work better, I have a simple answer:  Pass a bill."  *Id.* ¶ 49.  The President has turned the Constitution on its head by suggesting that he has legislative powers and that Congress has veto powers that must be exercised to thwart his executive actions.  Indeed, it is worse than that because the President in turn would veto any immigration bill that conflicts with his policy preferences.  This is not how our system works.  The constitutional separation of powers requires Congress to pass a law and the President to execute it; the President can no more pass his own laws (or "execute" nonexistent ones) than Congress can exercise the veto or pardon powers.  *Cf. INS v. Chadha*, 462 U.S. 919 (1983).

As the President himself acknowledged more than 20 times, his unilateral lawmaking exercise violates the Take Care Clause of the U.S. Constitution and the Administrative Procedure Act ("APA").  And this Court's emergency intervention is

required because, among other reasons, it will be difficult or impossible to undo the President's lawlessness after the Defendants start granting applications for deferred action. Just this week, an 11-term member of the House Judiciary Committee publicly announced plans to "have hundreds of thousands, if not millions, [of people] with their documents, ready to submit them" at the first moment when the Defendants start accepting applications. Sarah Ferris, *Gutiérrez Presses 'Millions' to Get Documents Ready for Legal Status*, THE HILL (Dec. 2, 2014). And the Defendants have announced that they will hire 1,000 new employees for a massive new "operational center" to process those applications. *See* USCIS Broadcast (Dec. 1, 2014), *available at* http://1.usa.gov/1vmd2Uw. Once the Defendants issue "millions" of deferred action documents, it will be all-but-impossible for this Court to grant effective relief. Finally, the public interest necessitates preserving the status quo until the federal courts can decide whether this President and his successors can remake the United States Code by declining to enforce immigration, tax, environmental, and labor laws that they don't like.

Given the emergency created by Defendants' actions, Plaintiffs respectfully request a hearing on this motion by December 31, 2014, or as soon as practicable thereafter. And notwithstanding L.R. 7.3, Plaintiffs respectfully request that the Court adjust the briefing schedule accordingly.

## STATEMENT OF THE NATURE OF THE PROCEEDING

On November 20, 2014, Defendant Johnson promulgated the DHS Directive,[1] which purports to legalize the creation of the single largest deferred action program in our Nation's history, permitting 4 million undocumented immigrants to remain in the country.  Plaintiffs are 14 States and 4 Governors who will be irreparably injured by the Defendants' actions.  Plaintiffs therefore urge this Court to issue a preliminary injunction and to preserve the status quo while adjudicating whether the Defendants violated the Constitution's Take Care Clause and the APA.

Several of the immigration laws passed by Congress bear directly on Plaintiffs' claims in this proceeding.  Congress has provided that it is illegal for undocumented immigrants to be in the United States and has required the executive branch to remove those individuals.  Under 8 U.S.C. § 1225, every individual who is not present in the United States legally "shall" be "inspected" by immigration officers; and if the officer determines that the individual is not clearly and beyond a doubt entitled to be admitted, the individual "shall be detained" for removal proceedings.  *Id*. § 1225(a)(1), (a)(3), (b)(2)(A).  This imposes a mandatory duty on the executive branch.  *See Crane v. Napolitano*, 2013 WL 1744422, at * 8, No. 3:12-cv-03247-O (N.D. Tex. Apr. 23, 2013) (holding that 8 U.S.C. § 1225 imposes a mandatory duty and explaining that "[t]he Supreme Court has noted that Congress's use of the word 'shall' in a statute imposes a mandatory duty on an

---

[1] Memorandum from Jeh Charles Johnson, Secretary, Department of Homeland Security, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents* (Nov. 20, 2014) ("DHS Directive" or "Directive") (Compl. Ex. A).

agency to act." (citing *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 399 (2008)). This mandatory duty extends to the removal of any undocumented immigrant present in violation of federal law, unless Congress provides a specific exception. *See* 8 U.S.C. §§ 1182, 1227(a)(1), 1229b, 1254 (setting standards for inadmissibility and categories for deportability, along with limited statutory exceptions, such as cancellation of removal and temporary protected status).

Congress also has addressed when an undocumented parent of a U.S. citizen or legal permanent resident can rely on their child's immigration status to change their own. In particular, the parent must meet certain strict requirements: they must (i) wait until their child turns 21, (ii) voluntarily leave the country, (iii) wait 10 more years, and then (iv) obtain a family-preference visa from a U.S. consulate abroad. *See id*. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255. Congress also has provided that it is "unlawful" for anyone to hire an "unauthorized alien." *Id.* § 1324a(a)(1).

In promulgating the DHS Directive, Defendants failed to faithfully execute these laws, they unconstitutionally created their own, and they violated the APA by acting contrary to these and other laws enacted by Congress.

## STATEMENT OF THE ISSUE TO BE RULED UPON BY THE COURT

The issue is whether the Defendants' 2014 deferred action plan — including the 2014 DHS Directive — should be preliminarily enjoined. "[T]he question of whether to award injunctive relief is generally within the trial court's discretion." *EEOC v. Service Temps Inc.*, 679 F.3d 323, 338 (5th Cir. 2012). "A plaintiff seeking a preliminary injunction must establish [I] that he is likely to succeed on the merits,

[II] that he is likely to suffer irreparable harm in the absence of preliminary relief, [III] that the balance of equities tips in his favor, and [IV] that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Plaintiffs meet that four-part standard.

## SUMMARY OF ARGUMENT

**I.** Plaintiffs are likely to prevail on the merits. First, the President violated his obligation to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3, cl. 5. The Take Care Clause enshrines the ancient principle that the President cannot dispense with laws he dislikes. Here, Defendants have created an enormous program that will guarantee open toleration and legal benefits to millions of undocumented immigrants who meet the President's chosen eligibility criteria. They did so in contravention of statutory objectives and in the face of congressional opposition. That is a paradigmatic example of impermissible executive lawmaking, as demonstrated by Supreme Court precedent and the analysis of the President's own lawyers.

Defendants also violated the APA n two respects. The DHS Directive violated the *procedural* requirements of the APA because it was adopted without notice and comment. It also violated the *substantive* requirements of the APA because it is contrary to the statutory regime created by Congress.

**II.** Absent a preliminary injunction, Plaintiffs will be irreparably injured. First, the deferred action plan will set off another humanitarian crisis, much like the one caused by the Defendants' smaller deferred action plan in 2012. Second, it will be virtually impossible to unscramble the egg once Defendants give out lawful-

presence documents to millions of people who are not lawfully present in the United States. Plaintiffs are forced to rely on the federal government to faithfully determine an immigrant's status, and they will be harmed if the Defendants are allowed to flout that responsibility on a massive scale.

III.    The balance of equities tips in Plaintiffs' favor. The President himself has recently and repeatedly stated that he was legally prohibited from doing what he has now done. Clearly, when he made those statements there was no overwhelming need to extend deferred action unilaterally to 4 million undocumented immigrants. No principle of equity countenances such unilateral capriciousness.

IV.    Finally, the public interest necessitates a preliminary injunction. First, the Defendants' program will be virtually impossible to reverse once it goes into effect. Second, Defendants seek to reshape the separation of powers in this country, potentially allowing wholesale presidential revisions of the United States Code. The public deserves a reasoned and unhurried judicial evaluation before this vision becomes a reality. Third, a preliminary injunction would serve the public interest by protecting the statutory policy of the Legislature.

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

In the President's own words, his November 20 deferred action plan was "an action to change the law." Compl. ¶ 4. But the Constitution's Take Care Clause, U.S. CONST. art. II, § 3, cl. 5, forbids such lawmaking. And the President's

unilateralism is procedurally and substantively unlawful under the APA.   The Plaintiffs therefore are likely to succeed on the merits.

### A.   Defendants Violated the Take Care Clause

**1.**   The Take Care Clause has its roots in the dispute between King James II and Parliament in the late 17th Century.   At the time, English monarchs claimed the power to "suspend" laws of Parliament (abrogating the law completely) or to "dispense" with such laws (nullifying the law in particular cases).   King James's use of these powers infuriated Parliament, and he was overthrown in the Glorious Revolution of 1688.   The subsequent monarchs, William and Mary, agreed to the English Bill of Rights, which stripped the monarchy of all authority to suspend or dispense with laws.   *See* English Bill of Rights of 1689, art. 1 ("[T]he pretended power of suspending of laws, or the execution of laws, by regal authority, without consent of parliament, is illegal.").[2]

The Glorious Revolution had a profound influence on America's Constitutional Convention.   *See* JACK RAKOVE, ORIGINAL MEANINGS 20 (1996).   For instance, the Framers unanimously rejected a proposal to grant dispensation powers to the President.   *See* 1 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 103-104 (Max Farrand rev. ed., 1966).   And historical evidence suggests that the Take Care Clause was understood by the founding generation to expressly

---

[2] *See also, e.g., Ex parte Vallandigham*, 28 F. Cas. 874, 878-79 (C.C.S.D. Ohio 1863) ("[King] James II asserted, and attempted to exercise, what was called a 'dispensing' power — a power, namely, to dispense with the operation of an act of parliament in the case of particular individuals. But this arbitrary assumption was rebuked, and forever put to rest, by the famous Case of the Seven Bishops, 4 State Tr. 304, and cost King James the throne of his ancestors.   The declaration of rights, adopted, as a solemn covenant, when William and Mary were called to the place from which James had been expelled, condemns the 'dispensing power' in every shape and form.").

repudiate the President's ability to suspend or dispense with Acts of Congress. *See* 2 JAMES WILSON, LECTURES ON LAW PART 2, *in* COLLECTED WORKS OF JAMES WILSON 829, 878 (Kermit L. Hall & Mark David Hall eds., 2007) (explaining that the President has "authority, not to make, or alter, or dispense with the laws, but to execute and enforce the laws, which [are] established"); CHRISTOPHER N. MAY, PRESIDENTIAL DEFIANCE OF UNCONSTITUTIONAL LAWS 16 (1998) (explaining that the Take Care Clause "is a succinct and all-inclusive command through which the Founders sought to prevent the executive from resorting to any of the panoply of devices employed by English kings to evade the will of Parliament").

Supreme Court precedent makes clear that the Take Care Clause is judicially enforceable against presidential invocations of the dispensing power. For example, in *Kendall v. United States*, 37 U.S. (12 Pet.) 524 (1838), the Court affirmed mandamus to a cabinet official ordering him to settle claims with mail contractors as required by an act of Congress. The cabinet official argued that he could ignore the act because the President had an exclusive duty to execute the laws, *id.* at 545-47, 612, but the Court disagreed:

> To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the [C]onstitution and entirely inadmissible.

*Id.* at 613; *see also Medellin v. Texas*, 552 U.S. 491, 525 (2008) (President has "an array" of discretionary obligations to enforce international law, "but unilaterally converting a non-self-executing treaty into a self-executing one is not among them"); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed

or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter."); *Angelus Milling Co. v. Comm'r of Internal Revenue*, 325 U.S. 293, 296 (1945) ("[E]xplicit statutory requirements . . . must be observed and are beyond the dispensing power of Treasury officials.").[3]

2.     The Defendants have unlawfully exercised the dispensing power in violation of the Take Care Clause.   While they claim merely to exercise "prosecutorial discretion," such claims do not afford the executive a blank check to dispense with the law.   The seminal Supreme Court decision addressing prosecutorial discretion, *Heckler v. Chaney*, 470 U.S. 821 (1985), upheld one particular exercise of executive power.   But in so doing, *Chaney* makes clear that there are real and judicially enforceable limits on the President's ability to invoke prosecutorial discretion as a basis for non-enforcement.   In particular, the President cannot unilaterally, "consciously[,] and expressly adopt[] a general policy" of non-enforcement that applies across-the-board.   *Id.* at 833 n.4.

While the Department of Justice's Office of Legal Counsel attempted to defend the DHS Directive as an exercise of prosecutorial discretion, its analysis

---

[3] *See also, e.g.*, *United States v. Smith*, 27 F. Cas. 1192, 1230 (C.C.D.N.Y. 1806) ("The president of the United States cannot control the statute, nor dispense with its execution."); *Da Costa v. Nixon*, 55 F.R.D. 145, 146 (E.D.N.Y. 1972) (Once a bill was passed by Congress and signed by the President, "[n]o executive statement denying efficacy to the legislation could have either validity or effect."); *Catano v. Local Board*, 298 F. Supp. 1183, 1188 (E.D. Pa. 1969) ("The President is not at liberty to repeal Congressional enactments."); Cass Sunstein, *Standing and the Privatization of Public Law*, 88 COLUM. L. REV. 1432, 1471 (1988) ("[T]he President's discretion, and the 'take Care' clause in general, do not authorize the executive branch to violate the law through insufficient action any more than they authorize it to do so through overzealous enforcement.   If administrative action is legally inadequate or if the agency has violated the law by failing to act at all, there is no usurpation of executive prerogatives in a judicial decision to that effect.").

actually proves that the President and his officers violated the Take Care Clause. *See* Memorandum Opinion for the Secretary of Homeland Security, from Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* at 30 (Nov. 19, 2014) ("OLC Memo") (Compl. Ex. B).  In fact, the Defendants have violated no fewer than three legal rules articulated in the OLC Memo and supported by case law, any of which would be sufficient to invalidate the DHS Directive.

a.      First, the Defendants violated the Take Care Clause by unilaterally creating a massive federal program that is divorced from individualized, case-by-case enforcement discretion.  It is well-settled that a federal agency can make a "*single-shot* non-enforcement decision . . . in the context of an individual case." *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994).  But it is equally well-settled that the President cannot adopt a "general policy" of non-enforcement.  *Chaney*, 470 U.S. at 833 n.4.  That is why OLC concedes that the 2012 Deferred Action for Childhood Arrivals ("DACA") program would be unlawful if DHS simply rubber-stamped applications to it.  *See* OLC Memo at 18 n.8.  As OLC explained to the President, "it was *critical* that . . . the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria." *Id*. (emphasis added).

In formalizing the 2012 DACA program, Defendants heeded the law in form but ignored it in substance. The DHS Secretary purported to provide "criteria" that were "to be considered" in the "exercise of prosecutorial discretion." *See* Memorandum from Janet Napolitano, Secretary of the Department of Homeland Security, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 1, 2 (June 15, 2012) ("DACA Memo") (Compl. Ex. C). In practice, however, DHS all-but-automatically approved the DACA applications. According to the most recent statistics available, the Defendants approved *99.5-99.8%* of DACA applicants. *See* Compl. ¶ 25. Obviously, any government program with an approval rate that rounds to 100% is not dependent on case-by-case analysis. *See, e.g.*, *United States v. Allen*, 954 F.2d 1160, 1166 (6th Cir. 1992) (evidence of "rubber stamping" vitiates any claim of prosecutorial discretion).

And the President has promised that DHS will continue rubber-stamping applications under the 2014 DHS Directive. In announcing the deferred action program in his primetime address to the Nation, the President promised "a deal": "[I]f you've taken responsibility, you've registered, undergone a background check, you're paying taxes, you've been here for five years, you've got roots in the community — *you're not going to be deported*." Compl. ¶ 50 (emphasis added). He did not say that his Administration would carefully consider applications on a case-by-case basis; he offered instead a quid-pro-quo where the quid is satisfying

eligibility criteria specified in the DHS Directive, and the quo is an entitlement to stay in the United States.

Likewise, the DHS Directive confirms that Defendants will continue rubber-stamping applications.  The Directive purports to give DHS "discretion," but it does so in virtually identical terms to those that proved meaningless in the DACA Memo. *Compare* DHS Directive at 4, *with* DACA Memo at 1, 2.  The Directive says nothing about what factors might counsel against DHS's avowed discretion to award deferred action; by contrast, the eligibility criteria are spelled out with precision.  And the new program could not bring undocumented immigrants "out of the shadows" if the promise of deferred action was empty.

The Defendants' only counterargument is that the mere mention of "discretion" in the DHS Directive renders it lawful — even if no discretion is ever actually exercised.  *See* OLC Memo at 29; DHS Directive at 4.  The Defendants can cite no authority for that conclusion.  And the law is squarely to the contrary.  As the Supreme Court has emphasized, "[t]he particular label [used by the agency] is not necessarily conclusive, for it is the substance of what the [agency] has purported to do and has done which is decisive."  *CBS v. United States*, 316 U.S. 407, 416 (1942).

**b.**     Second, the Defendants cannot hide behind enforcement discretion when they openly tolerate violations of federal law and reward those violations with legal benefits.  *See, e.g.*, *Adams v. Richardson*, 480 F.2d 1159, 1164 (D.C. Cir. 1973) (en banc) (federal agency cannot use enforcement discretion to openly tolerate

violations of federal law and reward them with federal funds).  That is why OLC concedes that it "is not, in our view, insignificant" that the DHS Directive "expressly communicat[es] to the alien that his or her unlawful presence will be tolerated for a prescribed period of time."  OLC Memo at 20-21.  Indeed, OLC cites no authority — and Plaintiffs are aware of none — that allows the government to use "enforcement discretion" as cover for awarding legal benefits (like the Title VI funds in *Adams*) to individuals who are openly violating federal law.

Under the DHS Directive, however, deferred action recipients will earn federal work permits, Medicare, and Social Security.  *See* Compl. ¶ 61.  DHS's provision of Social Security benefits is particularly problematic because Congress expressly denied them to immigrants who are not "lawfully present in the United States."  42 U.S.C. § 402(y).[4]  Thus, the Defendants can award Social Security to undocumented immigrants only by legalizing their presence — and even OLC concedes that step cannot be characterized as "prosecutorial discretion."  *See* OLC Memo at 21 (DHS Directive is cloaked by enforcement discretion only to the extent it does not confer "lawful" status).

**c.**     Third, OLC admits that a class-based deferred action program like the DHS Directive is legal only if it enjoys some form of congressional approval.  Indeed, the lack of such approval led OLC to conclude that DHS could *not* legalize the presence of parents of DACA beneficiaries.  *See* OLC Memo at 31-33.  As it turns

---

[4] *See also* CONG. RESEARCH SERV., *Analysis of June 15, 2012 DHS Memorandum* at 19 (July 13, 2012) ("CRS DACA Report") (explaining that under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Pub. L. No. 104-193), unauthorized immigrants such as DACA recipients are barred from all federal public benefits except emergency services and other expressly listed programs).

out, however, that concession is fatal to the entirety of the Defendants' actions in this case. That is because, far from acquiescing in Defendants' efforts to "keep[] families of United States citizens and immigrants united," *id*. at 26 (internal quotation marks omitted), Congress *expressly adopted the opposite* objective.

At least for the 4 million people who will benefit from the DHS Directive, Congress has taken several steps to curtail the reunification of undocumented immigrants and their documented family members. The undocumented parent of a U.S. citizen or legal permanent resident generally can stay in the United States only by (i) waiting until their child turns 21, (ii) leaving the country, (iii) waiting 10 more years, and then (iv) obtaining a family-preference visa from a U.S. consulate abroad. *See* 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255. Congress adopted those statutory restrictions precisely because it was concerned that undocumented immigrants would have children in the U.S. and use those children to obtain lawful status for themselves. *See, e.g.*, Kristi Lundstrom, *The Unintended Effects of the Three- and Ten-Year Unlawful Presence Bars*, 76 LAW & CONTEMP. PROBS. 389, 395 (2013) (noting that Section 1182(a) made "major changes in the United States' previously profamily immigration policy" and "focused on deterrence of overstays and punishment for immigration violations" "instead of focusing on family reunification"). By extending deferred action and legal benefits to millions of immigrants whose children are citizens or lawful permanent residents, the Defendants have directly thwarted that Congressional objective and rewarded the very behavior Congress sought to inhibit.

And even if Congress had not expressly foreclosed the DHS Directive, Defendants still could not rely on congressional "purpose" to shield their unilateral actions.  As illustrated by the 10-year unlawful presence ("ULP") bar that Congress enacted in Section 1182(a)(9)(B)(i)(II), the purposes behind the Nation's immigration laws are complicated and inconsistent over time.  *See* Lundstrom, *supra* (noting the ULP provisions broke from Congress's pre-1996 pro-family purposes); *Juarez-Ramos v. Gonzales*, 485 F.3d 509, 511 (9th Cir. 2007) (the ULP provision "reflects a congressional intent to sever an alien's ties to this country," regardless of mitigating circumstances).  Thus, Defendants cannot pick one of Congress's purposes, use it as cover to dispense with *all* of Title 8 as applied to 40% of the undocumented immigrants in the United States, and then claim that Congress somehow "acquiesced" in the result.  *Cf. Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (per curiam) ("[I]t frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.").

Nor can the Defendants claim congressional approval by arguing that previous Congresses acquiesced in previous deferred action programs by previous Presidents.  *See* OLC Memo at 31.  First, as the Administration itself recognized, the DHS Directive differs by orders of magnitude in both scope and scale from those that came before it.  On the difference in scope, the President said it best in response to the question whether he could use unilateral enforcement discretion to stop deportations of undocumented students:

Well, first of all, temporary protective status historically has been used for *special circumstances* where you have immigrants to this country who are fleeing persecution in their countries, or there is some emergency situation in their native land that required them to come to the United States. *So it would not be appropriate to use that just for a particular group that came here primarily . . . for economic opportunity. With respect to the notion that I can just suspend deportations through executive order, that's just not the case, because there are laws on the books that Congress has passed. . . .* There are enough laws on the books by Congress that are very clear in terms of how we have to enforce our immigration system that for me to simply through executive order ignore those congressional mandates would not conform with my appropriate role as President.

Compl. ¶ 19.[5]

And on the difference in scale, even OLC conceded: "We recognize that the proposed program would likely differ in size from [every] prior deferred action program[]." OLC Memo at 30. That is a dramatic understatement; the DHS Directive would afford new legal rights to 4 million people — a much larger endeavor than the largest amnesty that Congress ever enacted. *See* Immigration Reform and Control Act, Pub. L. 99-603, 100 Stat. 3359 (1986) (legalizing 2.7 million people). Congress cannot be said to acquiesce in a unilateral executive program that dwarfs anything that Congress itself ever did using bicameralism and presentment. And the fact that previous Congresses approved previous amnesties and previous deferred action programs says nothing about whether this Congress approves of this one. *See, e.g.*, *NLRB v. HH3 Trucking, Inc.*, 755 F.3d 468, 471 (7th

---

[5] The Congressional Research Service has made the same distinction: "[M]ost of these [previous, class-based] discretionary deferrals have been done on a country-specific basis, usually in response to war, civil unrest or natural disasters. In many of these instances, Congress was considering legislative remedies for the affected groups, but had not yet enacted immigration relief for them. The immigration status of those who benefited from these deferrals of deportation often . . . was resolved by legislation adjusting their status." CRS DACA Report at 9 & App'x A.

Cir. 2014) (Easterbrook, J.) (congressional enactments "have stopping points as well as general objectives").

Of course, the Defendants know that this Congress does not approve of this deferred action program. *See* Compl. ¶ 46.  That is the very reason the Defendants have acted unilaterally and dared Congress to "pass a bill" if they disagree.  *Id.* ¶ 49.  And disagree they did.  On December 4, 2014, the House passed a bill finding that the DHS Directive "is without any constitutional or statutory basis"; rejecting Defendants' claims of "prosecutorial discretion"; and declaring the DHS Directive "null and void."  *See* Preventing Executive Overreach on Immigration Act of 2014, H.R. 5759, 113th Cong. §§ 2(2), 2(6), 3(c) (passed by the House Dec. 4, 2014).  Instead of appreciating the power of the bill he dared Congress to pass, the President dismissed it because its "objective is clearly to block implementation of the [DHS Directive]."  Statement of Administration Policy, H.R. 5757 (Dec. 4, 2014).

As the Supreme Court has held, however, Article II does not "vest[] in the President a dispensing power, which has no countenance for its support in any part of the constitution; and . . . would be clothing the President with a power entirely to control the legislation of congress, and paralyze the administration of justice."  *Kendall*, 37 U.S. (12 Pet.) at 613; *see also Youngstown*, 343 U.S. at 587 ("[T]he President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.").  The President's acknowledgement that he is "chang[ing] the law" because Congress refused to change it, Compl. ¶ 4 — combined with his repeated acknowledgements that such unilateralism is unlawful, *id.* ¶¶ 19, 44 — is

more than sufficient to show the Defendants are attempting "to control the legislation of [C]ongress," *Kendall*, 37 U.S. (12 Pet.) at 613.

Plaintiffs therefore are likely to succeed on the merits of their claim under the Take Care Clause.

### B.    Defendants Violated the APA

Shortly after the President's announcement, his DHS Secretary formally directed agency personnel to legalize the presence of four million undocumented immigrants.   *See* DHS Directive (Compl. Ex. A).   If the DHS Directive is a "legislative rule" under the APA, then it must comply with specific procedural and substantive requirements.   Procedurally, an agency in general cannot promulgate a rule without notice-and-comment rulemaking — which requires the agency to publish a notice of proposed rulemaking in the *Federal Register* and to accept and consider public comments on its proposal.   *See* 5 U.S.C. § 553.   Substantively, an agency cannot promulgate a rule that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" — that is, the agency's rule cannot conflict with what Congress has said.   *Id.* § 706(2)(A).

Thus, the Plaintiffs have two APA claims.   First, the DHS Directive is a "legislative rule" to which the APA's notice-and-comment requirements apply; accordingly, even Defendants must concede it is unlawful because they failed to follow the APA's notice-and-comment procedures.   Second and independently, the Directive is also unlawful substantively because it conflicts with the immigration statutes.

1.     The Directive is a "legislative" rule, and as such, it must comply with the APA's procedural and substantive requirements.  *See Nicholas v. INS*, 590 F.2d 802, 807-08 (9th Cir. 1979).[6]  That is so for four independent reasons.

First, the DHS Directive "affect[s] individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 301-03 (1979); *Morton v. Ruiz*, 415 U.S. 199, 232 (1974).  In *Ruiz*, for example, the Supreme Court held that the Bureau of Indian Affairs could not create "eligibility requirements" for allocating funds to Native Americans without complying with the APA.  *Id.* at 230.  The Court reasoned that, if the BIA wanted to deny funds to Native Americans living outside of reservations, its efforts would affect the individual rights of Native Americans — and hence must be done in accordance with the APA:

> It is essential that the legitimate expectation of these needy Indians not be extinguished by what amounts to an unpublished ad hoc determination of the agency that was not promulgated in accordance with . . . the Administrative Procedure Act. . . . Before benefits may be denied to these otherwise entitled Indians, the BIA must first promulgate eligibility requirements according to established procedures.

*Id.* at 236.  Like the BIA, the DHS created eligibility "criteria."  DHS Directive at 4. And the DHS criteria have a more profound effect: rather than simply affecting access to money, the DHS Directive determines the right of millions of people to remain in the United States.  If funding eligibility triggers the APA, it follows a fortiori that lawful-presence eligibility does.

---

[6]  *Nicholas* held that INS's 1978 "instructions" regarding deferred action constituted a substantive rule.  The Ninth Circuit later held that INS's 1981 deferred action "instructions" were non-substantive.  *Romeiro de Silva v. Smith*, 773 F.2d 1021, 1024 (9th Cir. 1985).  For the reasons that follow, DHS's current deferred action directive plainly falls on the substantive side of the line.

Second, the DHS Directive is a legislative rule because it is binding on DHS officials.  A rule is substantive (and hence must comply with the APA) "if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *General Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (citation omitted).  And the DHS Directive meets both of those criteria.  "[F]rom beginning to end [it] reads like a ukase.  It commands, it requires, it orders, it dictates." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000).  For example, Secretary Johnson wrote:

- "*I hereby direct* USCIS to expand DACA," DHS Directive at 3;
- "DACA *will apply* [under certain circumstances]," *id.*;
- "That restriction *will no longer apply*," *id.*;
- "[Certain time periods] *will be* extended to three-year increments, rather than the current two-year increments," *id.*;
- "This change *shall apply*," *id.*;
- "*I hereby direct* USCIS to establish a process," *id.* at 4;
- "*Applicants must* file the requisite applications for deferred action pursuant to the new criteria described above," *id.*;
- "*Applicants must also submit biometrics* for USCIS to conduct background checks," *id.*;
- "Each person who applies for deferred action pursuant to the criteria above *shall also be eligible* to apply for work authorization," *id.*;
- "Deferred action granted pursuant to the program *shall be* for a period of three years," *id.* at 5;
- "Applicants *will pay* the work authorization and biometrics fees, which currently amount to $465," *id.*;
- "There *will be no* fee waivers," *id.*;
- "As with DACA, *the above criteria are to be considered for all individuals*," *id.*;
- "ICE and CBP *are instructed to immediately* begin identifying persons," *id.*;
- "ICE *is further instructed* to review pending removal cases," *id.*;

- "USCIS *is instructed* to implement this memorandum," *id.*; and

- "The USCIS process *shall also be available* to individuals subject to final orders of removal who otherwise meet the above criteria," *id.*

(All italics added.)[7]   Moreover, there is no doubt that Secretary Johnson's edicts will bind his agents as a practical matter; the last time a DHS Secretary issued a deferred-action directive, it guaranteed deferred action to 99.5-99.8% of applicants. Compl. ¶ 25.   Indeed, DHS cannot do anything less; after all, the President promised that if you meet his unilaterally created eligibility criteria, "*you're not going to be deported.*"  Compl. ¶ 50 (emphasis added).  That is more than sufficient to prove that Defendants' actions have bound and will bind their agents with the force of law.[8]

Third, the DHS Directive is a legislative rule because it "puts a stamp of agency approval or disapproval on a given type of behavior."  *Chamber of Commerce v. DOL*, 174 F.3d 206, 212 (D.C. Cir. 1999) (internal quotation marks and alteration

---

[7] It is true that the DHS Directive ends with a disclaimer that purports to negate any legal entitlement that any undocumented immigrant might claim under it.  *See* DHS Directive at 5.  That disclaimer, however, is meaningless when it comes to determining whether the Directive must comply with the APA.  *See Appalachian Power*, 208 F.3d at 1023 (finding analogous disclaimer irrelevant); *accord CBS*, 316 U.S. at 416.

[8] *See also, e.g.*, *Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 755-56 (5th Cir. 2011) ("guidance" document constitutes final agency action reviewable under Section 704 insofar as it restrains administrative staff's discretion); *NRDC v. EPA*, 643 F.3d 311, 319-20 (D.C. Cir. 2011) (same); *Cohen v. United States*, 578 F.3d 1, 7 (D.C. Cir. 2009) (IRS "guidance" document subject to judicial review because it used "mandatory words like 'will' instead of permissive words like 'may'" to describe how the agency's staff would process refund claims); *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000) ("That the issuance of a guideline or guidance may constitute final agency action has been settled in this circuit for many years." (citing, *inter alia*, *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86 (D.C. Cir. 1986))); *Better Gov't*, 780 F.2d at 93 (rejecting proposition that agency can escape judicial review under Section 704 by labeling its rule an "informal" guidance document); *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) ("The primary distinction between a substantive rule — really any rule — and a general statement of policy . . . turns on whether an agency intends to bind itself to a particular legal position."); *American Bus Ass'n v. United States*, 627 F.2d 525, 532 (D.C. Cir. 1980) (similar).

omitted).   In *Chamber of Commerce*, the Court of Appeals held that the Labor Department promulgated a substantive rule when it told employers that they could avoid 70-90% of workplace inspections if they participated in a new "Cooperative Compliance Program."   *Id.* at 208.   So too here; the Defendants have told every undocumented immigrant in the Nation that they can avoid 99.5-99.8% of deportations if they meet the Directive's "criteria."   Moreover, the Defendants have put their "stamp of approval" on violations of the Nation's immigration laws — so long as those violations are committed by people who came to the United States before their 16th birthday, are parents of U.S. citizens, or are parents of legal permanent residents.   *See* OLC Memo at 20 (noting that DHS is "openly tolerat[ing]" illegal immigration).

Finally, the DHS Directive is a legislative rule because it cannot possibly be construed as an *interpretive* rule.   "Generally speaking, it seems to be established that 'regulations,' 'substantive rules,' or 'legislative rules' are those which create law; whereas interpretive rules are statements as to what the administrative officer thinks the statute or regulation means."   *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 628 (5th Cir. 2001) (internal quotation marks omitted).   There is no conceivable argument that the DHS Directive rests on an *interpretation* of anything.   At no point does the DHS Secretary even purport to interpret any law.   To the contrary, the whole point of the DHS Directive is that the defendants wanted to create a new law because Congress has not done so.   In the President's own words:  "I just took an action to change the law."  Compl. ¶ 4.

Because the DHS Directive is a legislative rule, it must comply with the APA's procedural requirements. *E.g.*, *Ruiz*, 415 U.S. at 230. But the Directive is procedurally unlawful because DHS promulgated it without notice-and-comment rulemaking — a prerequisite for rules that create substantive rights and duties. *See, e.g.*, *National Mining Ass'n v. McCarthy*, 758 F.3d 243, 251-52 (D.C. Cir. 2014).

**2.** Even if the Defendants did comply with the APA's notice-and-comment requirements, they *still* could not lawfully promulgate the DHS Directive. That is because the Defendant's actions are not "in accordance with" the laws enacted by Congress. 5 U.S.C. § 706(2)(a). Contrary to 8 U.S.C. § 1225's requirements, the Defendants have now mandated that immigration officers shall *not* "inspect[]" or institute "removal proceedings" against four million of the eleven million undocumented immigrants in the United States. Put another way, the Defendants have disabled the operation of 8 U.S.C. § 1225 for nearly 40% of its coverage. The Defendants have attempted to accomplish this, in significant part, by widely expanding the limited circumstances in which Congress allows undocumented parents of U.S. citizens or legal permanent residents to remain in the United States. To make matters worse, the Defendants have simply announced that all 4 million of these undocumented immigrants will receive work permits, without following the mandatory procedures for classifying a category of undocumented immigrants as work-eligible. *See, e.g.*, 8 U.S.C. § 1324a (barring any hiring of an "unauthorized alien"); 8 C.F.R. § 274a.12 (providing, by regulation, narrowly defined "[c]lasses of aliens authorized to accept employment"). Categorically

authorizing work for millions of otherwise-unauthorized individuals abuses any statutorily granted discretion Defendants have to issue work permits, is contrary to Defendants' other statutory duties to remove these undocumented immigrants, and is quintessentially "arbitrary and capricious" decision-making.

Moreover, Congress has enacted a specific and finely tuned statutory scheme *limiting* the lawful presence of undocumented parents of U.S. citizens. *See, e.g.*, 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255. The APA prohibits the agency from turning around and authorizing the very thing that Congress foreclosed. *See, e.g.*, *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

And even if Congress did not foreclose DHS's attempts to authorize the presence of 4 million undocumented immigrants, the Directive is still unlawful. At a minimum, the aforementioned provisions of Title 8 specify a precise mechanism by which parents of U.S. citizens may apply to stay in the country lawfully. Congress's specification of that particular mechanism forecloses DHS from creating its own. *See, e.g.*, *API v. EPA*, 198 F.3d 275, 278 (D.C. Cir. 2000) ("[I]f Congress makes an explicit provision for apples, oranges and bananas, it is most unlikely to have meant grapefruit."). Moreover, it is undeniable that the 3- and 10-year ULP provisions in Section 1182 were intended to break from the pro-family policies previous Congresses embraced in the past. *See* Lundstrom, *supra*. That is enough to foreclose the agency from adopting the policy that Congress rejected. *See, e.g.*,

*Hearth, Patio & Barbecue Ass'n v. U.S. Dept. of Energy*, 706 F.3d 499, 504-07 (D.C. Cir. 2013).

In short, the Defendants' actions are unlawful under both the U.S. Constitution and the APA.  And under either claim, the appropriate remedy is a preliminary injunction against the DHS Directive and the Defendants' reliance on it.  *See, e.g.*, *Youngstown*, 343 U.S. at 584 (appropriate remedy for Take Care violation is preliminary injunction); *Nat'l Ass'n of Farmworkers Organizations v. Marshall*, 628 F.2d 604, 606 (D.C. Cir. 1980) (appropriate remedy for procedural APA claim is preliminary injunction); *Role Models Am., Inc. v. White*, 317 F.3d 327, 328-29 (D.C. Cir. 2003) (appropriate remedy for substantive and procedural APA claim is preliminary injunction).

## II.   PLAINTIFFS WILL INCUR IRREPARABLE INJURIES

In the absence of this Court's emergency intervention, the States will suffer two categories of irreparable injuries:  (A) the 2014 DHS Directive will cause a humanitarian crisis along Texas's southern border and elsewhere, just as the 2012 plan did; and (B) once the Defendants legalize the presence of 4 million people, that result will be virtually irreversible.  Both forms of irreparable injury are more than sufficient to establish the States' standing and to warrant a preliminary injunction.

### A.   Plaintiffs Will Be Irreparably Harmed By Another Humanitarian Crisis

As the Defendants themselves have admitted, their decisions to dispense with federal immigration law have had dramatic consequences in the Plaintiff

States.  *See* Compl. ¶ 37.  And as the President acknowledged, an expansion of DACA will cause new waves of illegal immigration.  *See id*. ¶ 38.

Those new waves will impose drastic injuries on the Plaintiff States, just as the President's previous wave did.  For example, this past summer, the State of Texas paid almost $40 million for Operation Strong Safety to clean up the consequences of the Defendants' actions.  *See id*. ¶ 36.  And the State spends millions of dollars every year to provide uncompensated healthcare for undocumented immigrants.  *See id*. ¶ 65.  That is the paradigmatic irreparable injury, *see, e.g.*, *Janvey v. Alguire*, 647 F.3d 585, 600-01 (5th Cir. 2011), and it is more than sufficient to necessitate a preliminary injunction now that the Defendants have announced their intention to implement a much larger program than DACA.  As the Supreme Court has held, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief."  *Blum v. Yaretsky*, 457 U.S. 991, 1000 (1982) (internal quotation marks omitted).

### B.  Without A Preliminary Injunction, It Will Be Difficult Or Impossible To Reverse Defendants' Actions

The Plaintiffs' injuries do not stop there.  The Supreme Court has held that the federal government has a virtual monopoly on determining who is lawfully present in the United States, *see Arizona v. United States*, 132 S. Ct. 2492 (2012), which means that the States must rely on the Defendants to faithfully determine an immigrant's status.  Once the Defendants abandon that responsibility and hand out lawful-presence documents to millions of people who are not lawfully present in the United States, it will be difficult or impossible for anyone to unscramble the egg.

In Texas, for example, evidence of lawful presence and/or federal work permits qualifies undocumented immigrants for, among other things:

- Unemployment benefits, *see* TEX. LAB. CODE § 207.043(a)(2);
- Alcoholic beverage licenses, *see* 16 TEX. ADMIN. CODE § 33.10;
- Licensure as private security officers, *see* 37 TEX. ADMIN. CODE § 35.21; and
- Licensure as attorneys, *see* TEX. RULES GOVERN. BAR ADM'N, R.II(a)(5)(d).

In Wisconsin, evidence of lawful presence qualifies undocumented immigrants for driver licenses.   *See* WIS. STAT. § 343.14(2)(es) (giving licenses to an otherwise qualified applicant who is "a citizen or national of the United States or an alien lawfully admitted for permanent or temporary residence").   Under Wisconsin law, an "alien lawfully admitted" includes an alien with "[a]pproved deferred action status."   *See id.* § 343.12(2)(es)(6).   And in 2012, the Wisconsin Attorney General issued an opinion explaining that the phrase "approved deferred action status" required the Wisconsin Department of Transportation ("WisDOT") to issue driver licenses to otherwise qualified individuals who had obtained deferred action status through DACA.   *See* Wis. Atty. Gen., OAG-02-12 (Oct. 4, 2012).   And WisDOT, in turn, issued a policy explaining that it "will issue driver licenses to qualified applicants who prove their legal presence with valid Deferred Action notices as required by law."   http://www.dot.wisconsin.gov/drivers/apply/doc/daca.htm. WisDOT is therefore required to issue driver licenses based on deferred action status, which will include the status resulting from the new DHS Directive.

Once 4 million individuals take advantage of those benefits, it is difficult to imagine how the process could be reversed.   *See FTC v. Dean Foods Co.*, 384 U.S.

597, 606 n.5 (1966) (difficulty in "unscramb[ing]" egg justifies injunctive relief); *cf.*

*Christopher Village, Ltd. Partnership v. Retsinas*, 190 F.3d 310, 314-15 (5th Cir.

1999) (finding dispute moot where only requested relief "would amount to an

impossible request for this court to 'unscramble the eggs'").  Therefore, the Plaintiff

States will be irreparably injured.

## III.   THE BALANCE OF EQUITIES TIPS IN PLAINTIFFS' FAVOR

The defendants cannot claim a countervailing injury from a preliminary

injunction to preserve the status quo.  On more than 20 separate occasions between

2008 and August 2014, the President *defended* the status quo by admitting that he

has no authority to do what he just did.  To take just a few examples, the President

admitted:

- "[T]here are those in the immigrants' rights community who have argued passionately that we should simply provide those who are [here] illegally with legal status, or at least ignore the laws on the books and put an end to deportation until we have better laws. . . . I believe such an indiscriminate approach would be both unwise and unfair.  It would suggest to those thinking about coming here illegally that there will be no repercussions for such a decision.  And this could lead to a surge in more illegal immigration.  And it would also ignore the millions of people around the world who are waiting in line to come here legally.  Ultimately, our nation, like all nations, has the right and obligation to control its borders and set laws for residency and citizenship.  And no matter how decent they are, no matter their reasons, the 11 million who broke these laws should be held accountable."  (July 1, 2010)

- "I am president, I am not king.  I can't do these things just by myself.  We have a system of government that requires the Congress to work with the Executive Branch to make it happen.  I'm committed to making it happen, but I've got to have some partners to do it. . . .  [T]he most important thing that we can do is to change the law because the way the system works — again, I just want to repeat, I'm president, I'm not king.  If Congress has laws on the books that says that people who are here who are not documented have to be deported, then I can exercise some flexibility in terms of where we deploy our resources, to focus on people who are really causing problems as a

opposed to families who are just trying to work and support themselves. *But there's a limit to the discretion that I can show because I am obliged to execute the law. That's what the Executive Branch means. I can't just make the laws up by myself. So the most important thing that we can do is focus on changing the underlying laws.*" (Oct. 25, 2010)

- "America is a nation of laws, which means I, as the President, am obligated to enforce the law. I don't have a choice about that. That's part of my job. But I can advocate for changes in the law so that we have a country that is both respectful of the law but also continues to be a great nation of immigrants. . . . With respect to the notion that I can just suspend deportations through executive order, that's just not the case, because there are laws on the books that Congress has passed. . . . [W]e've got three branches of government. Congress passes the law. The executive branch's job is to enforce and implement those laws. And then the judiciary has to interpret the laws. *There are enough laws on the books by Congress that are very clear in terms of how we have to enforce our immigration system that for me to simply through executive order ignore those congressional mandates would not conform with my appropriate role as President.*" (Mar. 25, 2011)

- "I can't solve this problem by myself. . . . [W]e're going to have to have bipartisan support in order to make it happen. . . . I can't do it by myself. We're going to have to change the laws in Congress, but I'm confident we can make it happen." (Apr. 20, 2011)

- "I know some here wish that I could just bypass Congress and change the law myself. But that's not how democracy works. See, democracy is hard. But it's right. Changing our laws means doing the hard work of changing minds and changing votes, one by one." (Apr. 29, 2011)

- "Sometimes when I talk to immigration advocates, they wish I could just bypass Congress and change the law myself. But that's not how a democracy works. What we really need to do is to keep up the fight to pass genuine, comprehensive reform. That is the ultimate solution to this problem. That's what I'm committed to doing." (May 10, 2011)

- "I swore an oath to uphold the laws on the books . . . . Now, I know some people want me to bypass Congress and change the laws on my own. Believe me, *the idea of doing things on my own is very tempting. I promise you. Not just on immigration reform. But that's not how our system works. That's not how our democracy functions. That's not how our Constitution is written.*" (July 25, 2011)

- "So what we've tried to do is within the constraints of the laws on the books, we've tried to be as fair, humane, just as we can, recognizing, though, that the laws themselves need to be changed. . . . The most important thing for your viewers and listeners and readers to understand is that in order to change our laws, we've got to get it through the House of Representatives,

which is currently controlled by Republicans, and we've got to get 60 votes in the Senate. . . . *Administratively, we can't ignore the law.* . . . I just have to continue to say this notion that somehow I can just change the laws unilaterally is just not true.    *We are doing everything we can administratively.  But the fact of the matter is there are laws on the books that I have to enforce.  And I think there's been a great disservice done to the cause of getting the DREAM Act passed and getting comprehensive immigration passed by perpetrating the notion that somehow, by myself, I can go and do these things.  It's just not true.* … We live in a democracy.  You have to pass bills through the legislature, and then I can sign it.  And if all the attention is focused away from the legislative process, then that is going to lead to a constant dead-end.  We have to recognize how the system works, and then apply pressure to those places where votes can be gotten and, ultimately, we can get this thing solved."  (Sept. 28, 2011)

- "We are a nation of immigrants. . . . But we're also a nation of laws.  So what I've said is, we need to fix a broken immigration system.  *And I've done everything that I can on my own.*"  (Oct. 16, 2012)

- In response to a question about the possibility of a moratorium on deportations for non-criminals: "I'm not a king.  I am the head of the executive branch of government.  I'm required to follow the law."  (Jan. 30, 2013)

- In response to the question of whether he could do for "an undocumented mother of three" what he did for DACA recipients: "I'm not a king. . . . [W]e can't simply ignore the law.  When it comes to the dreamers we were able to identify that group. . . . But to sort through all the possible cases of everybody who might have a sympathetic story to tell is very difficult to do.  This is why we need comprehensive immigration reform. . . . *[I]f this was an issue that I could do unilaterally I would have done it a long time ago.* . . . The way our system works is Congress has to pass legislation.  I then get an opportunity to sign and implement it."  (Jan. 30, 2013)

- "This is something I've struggled with throughout my presidency.  The problem is that I'm the president of the United States, I'm not the emperor of the United States. . . . And what that means is that we have certain obligations to enforce the laws that are in place. . . . *[W]e've kind of stretched our administrative flexibility as much as we can.*"  (Feb. 14, 2013)

- "I think that it's very important for us to recognize that the way to solve this problem has to be legislative. . . . And we've been able to provide some help through deferred action for young people and students. . . . But this is a problem that needs to be fixed legislatively."  (July 16, 2013)

- "[M]y job in the executive branch is supposed to be to carry out the laws that are passed.  Congress has said 'here is the law' when it comes to those who are undocumented, and they've allocated a whole bunch of money for

enforcement. . . . What we can do is then carve out the DREAM Act, saying young people who have basically grown up here are Americans that we should welcome. . . . *But if we start broadening that, then essentially I would be ignoring the law in a way that I think would be very difficult to defend legally.  So, that's not an option*." (Sept. 17, 2013)

- "[I]f in fact I could solve all these problems without passing laws in Congress, then I would do so.  But we're also a nation of laws.  That's part of our tradition.  *And so the easy way out is to try to yell and pretend like I can do something by violating our laws.*  And what I'm proposing is the harder path, which is to use our democratic processes to achieve the same goal." (Nov. 25, 2013)

- "*[W]hat I've said in the past remains true, which is until Congress passes a new law, then I am constrained in terms of what I am able to do.*  What I've done is to use my prosecutorial discretion . . . .  What we've said is focus on folks who are engaged in criminal activity, focus on people who engaged in gang activity.  Do not focus on young people, who we're calling dreamers . . . .  *That already stretched my administrative capacity very far.*  But I was confident that that was the right thing to do.  *But at a certain point the reason that these deportations are taking place is, Congress said, you have to enforce these laws.  They fund the hiring of officials at the department that's charged with enforcing.  And I cannot ignore those laws any more than I could ignore, you know, any of the other laws that are on the books.*" (Mar. 6, 2014)

(All italics added.)  When the President uttered those statements, the status quo obviously was not so intolerable as to require him to unilaterally legalize the presence of almost 40% of the undocumented immigrants in the United States.

So what has changed?  Neither the President nor the defendants has offered any explanation.  There is no new law that the President is charged with executing, as Presidents Reagan and George H.W. Bush were charged in the 1980s and 90s.  There is no international emergency like the Mariel Boatlift, to which President Carter was forced to respond.  The only thing that appears to have changed is the President's appetite for working with Congress to seek legislative enactment of his preferred immigration policies.  Surely that does not justify insulating a unilateral act of lawmaking that the voters and Congress have rejected.

31

## IV.   THE   PUBLIC   INTEREST   NECESSITATES   A   PRELIMINARY INJUNCTION

Finally, the public interest strongly warrants a preliminary injunction.   It will be difficult to unravel the President's deferred action plan if the defendants are allowed to implement it.   *See* Part II.B, *supra*.   And if this President gets away with this deferred action program, future presidents will be able to remake the United States Code by declining to enforce it.   Take just a few examples:

- Because the Internal Revenue Service can audit only 1% of tax returns every year, the President could announce a "deal" in which favored classes of taxpayers could avoid up to $50,000 in taxes a year with impunity;

- Because the Environmental Protection Agency can inspect only 18,000 sites every year, the President could announce a "deal" in which favored businesses need not comply with the environmental laws; and

- Because the Occupational Safety and Health Administration can inspect only 0.5% of all workplaces every year, the President could announce a "deal" in which all employers with fewer than 500 employees may disobey the occupational-safety laws with impunity.

Each of those actions would be at least as well grounded in congressional policy choices as the DHS Directive.[9]   And in reality, the Defendants' actions are even more aggressive than those hypothetical examples.   The Defendants are rewarding

---

[9] On tax, see, *e.g.*, 26 U.S.C. § 7122(a) (authorizing the Secretary to "compromise any civil or criminal case arising under the internal revenue laws"); *id.* § 7122(b) (providing that no General Counsel opinion is needed to justify a compromise of less than $50,000); *id.* § 7122(d)(3) (stating that IRS must not reject compromise offers from low-income taxpayers on the basis of the offer's amount); *id.* § 7121(a) (empowering the Secretary to "enter an agreement in writing with any person relating to the liability of such person").   On the environment, see, *e.g.*, 42 U.S.C. § 7612 (Clean Air Act's requirement of a "comprehensive [cost benefit] analysis"); 33 U.S.C. § 1375 (Clean Water Act's requirement of a biennial "comprehensive study on costs"); *id.* § 1251(f) (establishing "national policy" favoring "the best use of available manpower and funds"); 42 U.S.C. § 7661(f) (making a variety of accommodations for small businesses and enabling the Administrator to "reduce any fee required under this chapter to take into account the financial resources of small business statutory sources"); *id.* § 4370d (providing for favorable treatment of "organizations owned by socially and economically disadvantaged individuals").   On occupational safety, see, *e.g.*, 29 U.S.C. § 657(d) (Occupational Safety and Health Act's requirement that government officials impose "a minimum burden upon employers, especially those operating small businesses").

unlawful behavior with more than mere non-enforcement of criminal laws; they are also giving undocumented immigrants federal benefits like work permits, Social Security, and Medicare.

If accepted, the idea that the Constitution allows such unilateral lawmaking would permanently and profoundly reshape the separation of powers in this country. Before the Defendants are allowed to walk us down that road, a preliminary injunction is necessary to allow the federal courts an opportunity to make reasoned decisions about the lawfulness of the path.

Finally, a preliminary injunction would serve the public interest by protecting the statutory policy of the Legislature. As the Supreme Court has held, that "is in itself a declaration of the public interest." *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937).

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be granted.

Respectfully submitted.

LUTHER STRANGE
*Attorney General of Alabama*

SAMUEL S. OLENS
*Attorney General of Georgia*

LAWRENCE G. WASDEN
*Attorney General of Idaho*

JOSEPH C. CHAPELLE
PETER J. RUSTHOVEN
*Counsel for the State of Indiana*

DEREK SCHMIDT
*Attorney General of Kansas*

JAMES D. "BUDDY" CALDWELL
*Attorney General of Louisiana*

TIMOTHY C. FOX
*Attorney General of Montana*

JON C. BRUNING
*Attorney General of Nebraska*

ALAN WILSON
*Attorney General of South Carolina*

MARTY J. JACKLEY
*Attorney General of South Dakota*

SEAN D. REYES
*Attorney General of Utah*

PATRICK MORRISEY
*Attorney General of West Virginia*

J.B. VAN HOLLEN
*Attorney General of Wisconsin*

GREG ABBOTT
*Attorney General of Texas*

DANIEL T. HODGE
*First Assistant Attorney General*

JAMES D. BLACKLOCK
*Deputy Attorney General for Legal Counsel*

ANDREW S. OLDHAM
*Deputy Solicitor General*
    Attorney-in-Charge
    State Bar No. 24081616

Office of the Attorney General of Texas
P.O. Box 78711
Austin, Texas 78711-2548
512-936-1700

*additional counsel on the following page*

34

DREW SNYDER
*Counsel for the Governor of Mississippi*

PAUL R. LEPAGE
*Governor of Maine*

ROBERT C. STEPHENS
*Counsel for the Governor of North
     Carolina*

TOM C. PERRY
CALLY YOUNGER
*Counsel for the Governor of Idaho*

## CERTIFICATE OF CONFERENCE

I certify that I conferred with counsel for the Defendants and they oppose this motion.

/s/ Andrew S. Oldham
ANDREW S. OLDHAM

## CERTIFICATE OF SERVICE

I certify that I served a copy of this motion on the following counsel for the Defendants via Federal Express, next day service:

Adam Kirschner
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7126
Washington D.C. 20001

/s/ Andrew S. Oldham
ANDREW S. OLDHAM