# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS; | ) |
| | ) |
| STATE OF ALABAMA; | ) |
| | ) |
| STATE OF ARIZONA; | ) |
| | ) |
| STATE OF ARKANSAS; | ) |
| | ) |
| STATE OF FLORIDA; | ) |
| | ) |
| STATE OF GEORGIA; | ) |
| | ) |
| STATE OF IDAHO; | ) |
| | ) |
| STATE OF INDIANA; | ) |
| | ) |
| STATE OF KANSAS; | ) |
| | ) |
| STATE OF LOUISIANA; | )   Case No. 1:14-cv-254 |
| | ) |
| STATE OF MONTANA; | ) |
| | ) |
| STATE OF NEBRASKA; | ) |
| | ) |
| STATE OF NORTH DAKOTA; | ) |
| | ) |
| STATE OF OHIO; | ) |
| | ) |
| STATE OF OKLAHOMA; | ) |
| | ) |
| STATE OF SOUTH CAROLINA; | ) |
| | ) |
| STATE OF SOUTH DAKOTA; | ) |
| | ) |
| STATE OF UTAH; | ) |
| | ) |
| STATE OF WEST VIRGINIA; | ) |
| | ) |
| STATE OF WISCONSIN; | ) |

ATTORNEY GENERAL BILL SCHUETTE, People of          )
    Michigan;                                          )
                                                   )
GOVERNOR PHIL BRYANT, State of Mississippi;          )
                                                   )
GOVERNOR PAUL R. LePAGE, State of Maine;             )
                                                   )
GOVERNOR PATRICK L. MCCRORY, State of North          )
    Carolina; and                                     )
                                                   )
GOVERNOR C.L. "BUTCH" OTTER, State of Idaho,         )
                                                   )
                     *Plaintiffs*,   )
                                                   )
vs.                                                 )
                                                   )
UNITED STATES OF AMERICA;                            )
                                                   )
JEH JOHNSON, Secretary of the Department of          )
    Homeland Security;                                 )
                                                   )
R. GIL KERLIKOWSKE, Commissioner of U.S. Customs     )
    and Border Protection;                             )
                                                   )
RONALD D. VITIELLO, Deputy Chief of U.S. Border      )
    Patrol, U.S. Customs and Border Protection;        )
                                                   )
THOMAS S. WINKOWSKI, Acting Director of U.S.         )
    Immigration and Customs Enforcement; and           )
                                                   )
LEÓN RODRÍGUEZ, Director of U.S. Citizenship and     )
    Immigration Services,                              )
                                                   )
                    *Defendants*.  )
                                                   )

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

    1.    The State of Texas, the State of Alabama, the State of Arizona, the State of Arkansas, the State of Florida, the State of Georgia, the State of Idaho, the State of Indiana, the State of Kansas, the State of Louisiana, the State of Montana, the State of Nebraska, the State of North Dakota, the State of Ohio, the State of

Oklahoma, the State of South Carolina, the State of South Dakota, the State of Utah, the State of West Virginia, the State of Wisconsin, and Attorney General Bill Schuette of Michigan, Governor Phil Bryant of Mississippi, Governor Paul R. LePage of Maine, Governor Patrick L. McCrory of North Carolina, and Governor C.L. "Butch" Otter of Idaho (collectively, "Plaintiffs" or "Plaintiff States") seek declaratory and injunctive relief against the United States and the above-named federal officials (collectively, "the Defendants") for their violations of the Take Care Clause, U.S. CONST. art. II, § 3, cl. 5, and the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*

2.    This lawsuit is not about immigration.  It is about the rule of law, presidential power, and the structural limits of the U.S. Constitution.

3.    On November 20, 2014, the President of the United States announced that he would unilaterally suspend the immigration laws as applied to 4 million of the 11 million undocumented immigrants in the United States.

4.    The President candidly admitted that, in so doing, he unilaterally rewrote the law:  "What you're not paying attention to is, *I just took an action to change the law.*"

5.    In accordance with the President's unilateral exercise of lawmaking, his Secretary of the Department of Homeland Security ("DHS") issued a directive that purports to legalize the presence of approximately 40% of the known undocumented-immigrant population, and affords them legal rights and benefits. *See* Memorandum from Jeh Charles Johnson, *Exercising Prosecutorial Discretion*

*with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents* (Nov. 20, 2014) ("DHS Directive") (attached as Ex. A).

6.     That unilateral suspension of the Nation's immigration laws is unlawful.  Only this Court's immediate intervention can protect the Plaintiffs from dramatic and irreparable injuries.

## I. THE PARTIES

7.     Plaintiffs are the State of Texas, the State of Alabama, the State of Arizona, the State of Arkansas, the State of Florida, the State of Georgia, the State of Idaho, the State of Indiana, the State of Kansas, the State of Louisiana, the State of Montana, the State of Nebraska, the State of North Dakota, the State of Ohio, the State of Oklahoma, the State of South Carolina, the State of South Dakota, the State of Utah, the State of West Virginia, the State of Wisconsin, the Attorney General of Michigan, and the Governors of Mississippi, Maine, North Carolina, and Idaho.

8.     Defendant United States of America is sued under the Administrative Procedure Act ("APA").  *See* 5 U.S.C. § 703 ("[T]he action for judicial review may be brought against the United States.").

9.     Defendant Jeh Johnson is the Secretary of DHS.  Johnson and DHS are responsible for U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE").  Johnson authored the DHS Directive.

4

10.     Defendant R. Gil Kerlikowske is the Commissioner of CBP.  Defendant Kerlikowske shares responsibility for implementing the DHS Directive.   And Kerlikowske is Defendant Vitiello's supervisor.

11.     Defendant Ronald D. Vitiello is the Deputy Chief of U.S. Border Patrol. Vitiello authored a May 30, 2014, memorandum entitled "Unaccompanied Alien Children Transfer Process Bottleneck" ("Vitiello Memorandum"), which recognizes that Defendants' abandonment of the federal immigration laws caused and is continuing to cause crises in the Plaintiff States.

12.     Defendant Thomas S. Winkowski is the Acting Director for ICE.  ICE administers a formal program for allowing undocumented immigrants to apply for deferred action and to appeal for reconsideration if deferred action is denied.

13.     Defendant León Rodríguez is the Director of USCIS.  Rodríguez and USCIS administer the Deferred Action for Childhood Arrivals ("DACA") program. President Obama announced the DACA program on June 12, 2012, to allow undocumented immigrants to stay in the United States in violation of the Nation's immigration laws.  And USCIS is the principal agency charged with implementing the DHS Directive.

## II.  JURISDICTION AND VENUE

14.     The Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the U.S. Constitution, art. II, § 3, cl. 5, and the APA, 5 U.S.C. § 706.  The Court also has jurisdiction under 28 U.S.C. § 1346 because this is a civil action or claim against the United States.  Finally, the Court

has jurisdiction to compel an officer or employee of the above-named federal agencies to perform his or her duty under 28 U.S.C. § 1361.

15.    Venue is proper in this District under 28 U.S.C. § 1391(e) because the State of Texas is a resident of this judicial district, and a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this District.

16.    This Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the APA, 5 U.S.C. § 706, and 28 U.S.C. § 1361.

### III.  FACTUAL ALLEGATIONS

#### A.    The DREAM Act

17.    On March 26, 2009, Senator Richard Durbin and Representative Howard Berman introduced the DREAM Act in the U.S. Senate and House, respectively.  *See* DREAM Act of 2009, S. 729 (111th Cong.) (2009); American Dream Act, H.R. 1751 (111th Cong.) (2009).  Both bills would have allowed undocumented immigrants to apply for conditional permanent resident status if, among other things, (a) they entered the United States before their 16th birthdays, and (b) they had been in the United States continuously for five years.

18.    The President repeatedly and forcefully urged Congress to pass the DREAM Act.

19.    And the President consistently insisted that he could not achieve the goals of the DREAM Act on his own.  He said, for instance:

- "Comprehensive reform, that's how we're going to solve this problem. . . . Anybody who tells you . . . that I can wave a magic wand and make it happen hasn't been paying attention to how this town works."  (May 5, 2010)

- "I am president, I am not king.  I can't do these things just by myself. . . . [T]here's a limit to the discretion that I can show because I am obliged to execute the law. . . . I can't just make the laws up by myself."  (Oct. 25, 2010)

- In response to a question about whether he could stop deportation of undocumented students with an executive order:  "Well, first of all, temporary protective status historically has been used for special circumstances where you have immigrants to this country who are fleeing persecution in their countries, or there is some emergency situation in their native land that required them to come to the United States.  So it would not be appropriate to use that just for a particular group that came here primarily . . . for economic opportunity.  With respect to the notion that I can just *suspend deportations through executive order, that's just not the case*, because there are laws on the books that Congress has passed. . . . There are enough laws on the books by Congress that are *very clear in terms of how we have to enforce our immigration system* that for me to simply through executive order *ignore those congressional mandates*

would not conform with my appropriate role as President." (Mar. 28, 2011) (emphasis added)

- "I can't solve this problem by myself. . . . We're going to have to change the laws in Congress." (Apr. 20, 2011)

- "I know some here wish that I could just bypass Congress and change the law myself. But that's not how democracy works. See, democracy is hard. But it's right. Changing our laws means doing the hard work of changing minds and changing votes, one by one." (Apr. 29, 2011)

- "And sometimes when I talk to immigration advocates, they wish I could just bypass Congress and change the law myself. But that's not how a democracy works." (May 10, 2011)

- "[B]elieve me, the idea of doing things on my own is very tempting. . . . But that's not how . . . our system works. . . . That's not how our Constitution is written." (July 25, 2011)

- "Administratively, we can't ignore the law. . . . We are doing everything we can administratively. But the fact of the matter is there are laws on the books that I have to enforce." (Sept. 28, 2011)

20.     Neither congressional chamber passed the DREAM Act.

**B.     DACA**

21.     The President then asked the Department of Justice's Office of Legal Counsel ("OLC") whether he could effectuate the goals of the un-enacted DREAM Act by executive fiat. OLC said "yes," with certain conditions. In particular, OLC advised the President that he could use the concept of "deferred action for childhood

arrivals," or "DACA," to stop deporting individuals who (a) entered the United States before their 16th birthdays, and (b) had been in the United States continuously for five years. *See* Memorandum Opinion for the Secretary of Homeland Security, from Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* at 18 n.8 (Nov. 19, 2014) ("OLC Memo") (attached as Ex. B) (noting that OLC orally advised the President "[b]efore DACA was announced" in 2012). OLC further advised, however, that "it was critical that, like past policies that made deferred action available to certain classes of aliens, the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria." *Ibid.*

22.     Notwithstanding his repeated insistence that he could not stretch his executive powers any further, the President announced his unilateral creation of the DACA program on June 15, 2012.

23.     At the President's direction, the DHS Secretary then suspended the Nation's immigration laws for approximately 1.7 million undocumented immigrants. *See* Memorandum from Janet Napolitano, Secretary of the Department of Homeland Security, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012) ("DACA Memo") (attached as Ex. C).

9

24.     The President and his DHS Secretary ordered federal immigration officials to extend "deferred action" to undocumented immigrants who (a) entered the United States before their 16th birthdays, and (b) had been in the United States continuously for five years.

25.     Although OLC had cautioned the President that it was "critical" to DACA's legality that the Administration evaluate every application on a case-by-case basis, the President and DHS ignored that advice.   According to the latest figures available, the Administration granted deferred action to 99.5-99.8% of DACA applicants.

### C.     *Nava-Martinez*

26.     The Executive Branch did not stop at dispensing with the Nation's immigration laws.   Rather, as this Court already has found, the Administration adopted a policy that encouraged international child smuggling across the Texas-Mexico border.   *See* Order, *United States v. Nava-Martinez*, No. 1:13-cr-00441, at 2 (S.D. Tex. Dec. 13, 2013) ("*Nava-Martinez* Order").

27.     The defendant in *Nava-Martinez*, an admitted human trafficker, was caught attempting to smuggle a ten-year-old El Salvadorean girl into the United States.   *Id.* at 1.

28.     The Court noted that this was "the fourth case with the same factual situation this Court has had in as many weeks."   *Id.* at 3.   Although the human traffickers were apprehended in each case, "the DHS completed the criminal conspiracy . . . by delivering the minors to the custody of the parent."   *Ibid.*

29.    This was done pursuant to DHS's "apparent policy . . . of completing the criminal mission of individuals who are violating the border security of the United States." *Id.* at 2.  As this Court observed, "[t]his DHS policy is a dangerous course of action." *Ibid.*  Under the policy, "instead of enforcing the laws of the United States, the Government [takes] direct steps to help the individuals who violated it." *Id.* at 3.

30.    Moreover, this Court found that DHS's policy promotes human trafficking, which in turn "help[s] fund the illegal drug cartels which are a very real danger for both citizens of this country and Mexico." *Id.* at 6.  The Court explained that citizens of the United States bear the economic brunt of this policy, because DHS "funds these evil ventures with their tax dollars." *Id.* at 8.  In addition, the policy harms the citizens of each country that suffers from the "nefarious activities of the cartels." *Ibid.*

### D.    The Defendants Cause a Humanitarian Crisis

31.    The Defendants' policies (including DACA and the policy described in *Nava-Martinez*) have had and continue to have dire consequences in the Plaintiff States.  In the summer of 2014, an enormous wave of undocumented immigrants surged across the Texas-Mexico border, creating what President Obama described as a "humanitarian crisis."  Nick Miroff & Joshua Partlow, *Central American Migrants Overwhelm Border Patrol Station in Texas*, WASH. POST (Jun. 12, 2014).

32.    As many as 90,000 undocumented children are expected to be detained this year, and as many as 140,000 may be detained in 2015.  Brett LoGiurato, *There's a Staggering Humanitarian Crisis on the US Border, and It's Only Going to*

11

*Get Worse,* BUS. INSIDER (Jun. 16, 2014).   By comparison, only 6,000 to 7,500 children were detained between 2008 and 2011, under 14,000 were detained in 2012, and only 24,000 were detained in 2013.   Alicia A. Caldwell, *Border Patrol Resources Stretched Thin As Children Illegally Enter U.S. Alone*, ASSOCIATED PRESS (Jun. 5, 2014).

33.   Law enforcement officers reported "picking up children as young as 4 without their parents and other children with Hello Kitty backpacks, cellphones and the telephone numbers of U.S. relatives on note cards."  Miroff & Partlow, *supra.*

34.   But the humanitarian crisis is by no means limited to unaccompanied children.  There is also "an unprecedented surge of families crossing illegally into the U.S."  Cindy Carcamo, *Rumors of U.S. Haven for Families Spur Rise in Illegal Immigration*, L.A. TIMES (June 6, 2014).  While immigration officials do not have an official count of such families, they acknowledge that "the numbers appear to be substantial." *Ibid.*

35.   This wave of immigration has been concentrated in the Rio Grande Valley of South Texas.  Miroff & Partlow, *supra.*  "Every day, hundreds of Central American migrants, in groups as large as 250 people, are wading across the muddy Rio Grande." *Ibid.*

36.   The crisis has imposed enormous law enforcement costs on the Plaintiff States.  For example, the Texas Department of Public Safety estimated that it was spending $1.3 million a week on troopers and resources to deal with the

immigration surge; in addition, Governor Perry deployed 1,000 National Guard troops to the border at a cost of $38 million.

37. This crisis was caused by the immigration policies of the federal government, including the policy that this Court has already held to be unlawful. As Defendant Vitiello explained in his May 30th memorandum, "[i]f the U.S. government fails to deliver adequate consequences to deter aliens from attempting to illegally enter the U.S., the result will be an even greater increase in the rate of recidivism and first-time illicit entries."   And the Obama Administration acknowledges that there is a "growing perception minors are crossing the border because they feel they will not be deported by the administration."   LoGiurato, *supra*.  Indeed, a research report commissioned by DHS revealed that "[w]ord had spread in Central America about a 'lack of consequences' for illegal entry" and that "[s]mugglers were exploiting the system."  Susan Carroll, *Report Warned of Child Migrant Crisis*, Houston Chron. (Jun. 17, 2014).

38. The President himself predicted this outcome.  On July 1, 2010, he explained that it would be "both unwise and unfair" to "ignore the laws on the books and put an end to deportation" because it "would suggest to those thinking about coming here illegally that there will be no repercussion for such a decision."  That in turn "could lead to a surge in more illegal immigration."   As the President concluded, "no matter how decent they are, no matter their reasons, the 11 million who broke these laws should be held accountable."

39.    The Defendants, however, have contributed to the surge of illegal immigration by refusing to enforce the laws on the books.  On average, only 1,600 unaccompanied children are removed each year; in 2013, there were over 20,000 detentions of unaccompanied children from Guatemala, Honduras, and El Salvador, but only 496 unaccompanied children from those countries were repatriated. Carroll, *supra*.  And the total number of undocumented children deported by the Obama Administration in 2013 was only 1,669 — an 80 percent reduction from 2008.  Brian Bennett, *Deportation Data Won't Dispel Rumors Drawing Migrant Minors to U.S.*, L.A. TIMES (July 5, 2014).

40.    Similarly, adults with children who are detained at the border are routinely released and allowed to travel within the United States.  Carcamo, *supra*. And while they may be instructed to show up for a follow-up appointment, "ICE officials said they couldn't guarantee that they would pursue all cases in which immigrants do not show up for follow-up appointments."  *Ibid*.  Tellingly, the immigrants arrested for illegally entering the U.S. refer to ICE's Notice to Appear documents as "*permisos*," or permits.  Byron York, *On Immigrant Surge, White House Story Falls Apart*, WASH. EXAMINER (Jun. 16, 2014).

41.    Unsurprisingly, the undocumented immigrants crossing the border are motivated primarily by the belief that they will not be deported.  The federal government's own analysis demonstrates as much.  When Border Patrol agents recently questioned 230 undocumented immigrants about why they came, "the results showed overwhelmingly that the immigrants, including those classified as

. . . unaccompanied children, were motivated by the belief that they would be allowed to stay in the United States." *Ibid*.

42. Multiple reports indicate that undocumented immigrants are counting on federal officials for help in reuniting with their friends or family in the U.S. Hundreds of Central American migrants "turn[] themselves in to the Border Patrol" on a daily basis. Miroff & Partlow, *supra*. One undocumented immigrant stated that she and her group "had looked forward to being caught . . . at one point even waving down federal helicopters . . . because of the welcoming treatment they had assumed they would receive." Carcamo, *supra*. Another planned to surrender to Border Patrol because she had heard "that the Americans are helping Hondurans right now," especially women and children. Miroff & Partlow, *supra*. All of the 230 undocumented immigrants interviewed by Border Patrol agents for their recent report "stated that they had family members or, to a lesser extent, friends already living in the U.S." York, *supra*.

43. And the Defendants have conceded that their failure to enforce the federal immigration laws has increased the flow of illegal immigration across the Texas-Mexico border. *See* Vitiello Memorandum. The effects of that failure have caused acute crises in the Plaintiff States.

### E. The President "Change[s] the Law"

44. Between his 2012 DACA announcement and the midterm elections in November 2014, the President repeatedly acknowledged that his non-enforcement efforts already had reached the outer limit of his administrative powers, and that

any further transformation of the immigration system would have to be accomplished by legislation.  He said, for instance:

- "[A]s the head of the executive branch, there's a limit to what I can do. . . . [U]ntil we have a law in place that provides a pathway for legalization and/or citizenship for the folks in question, we're going to continue to be bound by the law." (Sept. 20, 2012)

- "We are a nation of immigrants. . . . But we're also a nation of laws.  So what I've said is, we need to fix a broken immigration system.  And I've done everything that I can on my own." (Oct. 16, 2012)

- In response to a question about the possibility of a moratorium on deportations for non-criminals:  "I'm not a king.  I am the head of the executive branch of government.  I'm required to follow the law." (Jan. 30, 2013)

- In response to the question whether he could do for "an undocumented mother of three" what he did for DACA recipients: "I'm not a king. . . . [W]e can't simply ignore the law.  When it comes to the dreamers we were able to identify that group. . . . But to sort through all the possible cases of everybody who might have a sympathetic story to tell is very difficult to do.  This is why we need comprehensive immigration reform. . . . [I]f this was an issue that I could do unilaterally I would have done it a long time ago. . . . The way our system works is Congress has to pass legislation.  I then get an opportunity to sign and implement it." (Jan. 30, 2013)

16

- "This is something I've struggled with throughout my presidency. The problem is that you know I'm the president of the United States, I'm not the emperor of the United States. . . . And what that means is that we have certain obligations to enforce the laws that are in place. . . . [W]e've kind of stretched our administrative flexibility as much as we can." (Feb. 14, 2013)

- "I think that it's very important for us to recognize that the way to solve this problem has to be legislative. . . . And we've been able to provide help through deferred action for young people and students. . . . But this is a problem that needs to be fixed legislatively." (July 16, 2013)

- "[M]y job in the executive branch is supposed to be to carry out the laws that are passed. Congress has said 'here is the law' when it comes to those who are undocumented, and they've allocated a whole bunch of money for enforcement. . . . What we can do is then carve out the DREAM Act, saying young people who have basically grown up here are Americans that we should welcome. . . . *But if we start broadening that, then essentially I would be ignoring the law in a way that I think would be very difficult to defend legally. So, that's not an option.*" (Sept. 17, 2013) (emphasis added)

- "[I]f in fact I could solve all these problems without passing laws in Congress, then I would do so. But we're also a nation of laws. That's part of our tradition. And so the easy way out is to try to yell and pretend like

I can do something by violating our laws.  And what I'm proposing is the harder path, which is to use our democratic processes to achieve the same goal." (Nov. 25, 2013)

- "[W]hat I've said in the past remains true, which is until Congress passes a new law, then I am constrained in terms of what I am able to do.  What I've done is to use my prosecutorial discretion. . . . What we've said is focus on folks who are engaged in criminal activity, focus on people who engaged in gang activity.  Do not focus on young people, who we're calling DREAMers. . . . That already stretched my administrative capacity very far.  But I was confident that that was the right thing to do.  But at a certain point the reason that these deportations are taking place is, Congress said, 'you have to enforce these laws.'  They fund the hiring of officials at the department that's charged with enforcing.  *And I cannot ignore those laws any more than I could ignore, you know, any of the other laws that are on the books*." (Mar. 6, 2014) (emphasis added)

45.    Accordingly, the President repeatedly called on Congress to pass an immigration reform bill.  On June 27, 2013, the Senate passed a bill that, among other things, would have created a pathway to citizenship for undocumented immigrants.  *See* Border Security, Economic Opportunity, & Immigration Modernization Act, S. 744 (113th Cong.) (2013).  The House, on the other hand, did not pass similar legislation.

46.     Before the midterm elections in November 2014, Democrats in the Senate urged the President not to act unilaterally because it "could be so politically damaging in their states that it would destroy their chances to hold control of the Senate."  Michael D. Shear & Julia Preston, *Obama Pushed 'Fullest Extent' of His Powers on Immigration Plan*, N.Y. TIMES (Nov. 28, 2014).  The President honored that request.

47.     On November 20, 2014, the President announced that he would unilaterally create legal protections for approximately 4 million undocumented immigrants.  Under the President's plan, the undocumented parents of U.S. citizens and legal permanent residents would receive deferred action status, as well as work permits and tolling of their unlawful presence in the United States.  The President also expanded DACA to hundreds of thousands of additional undocumented immigrants.

48.     The President candidly admitted that his plan was unilateral legislation:  "What you're not paying attention to is, *I just took an action to change the law*."

49.     The President further admitted that he was changing the law because Congress chose not to:  "[W]hen members of Congress question my authority to make our immigration system work better, I have a simple answer:  Pass a bill. . . . And the day I sign that bill into law, the actions I take will no longer be necessary."

50.     The President also made clear that he was "offer[ing] the following deal":  "[I]f you've taken responsibility, you've registered, undergone a background

19

check, you're paying taxes, you've been here for five years, you've got roots in the community — you're not going to be deported. . . . If you meet the criteria, you can come out of the shadows, you can get right with the law."

### F.    The DHS Directive

51.    The President's new policies were effectuated through Defendant Johnson's DHS Directive.  The DHS Directive closely resembled, and purported to "supplement[] and amend[]," the DACA Memo.  *See* Exs. A & C.

52.    In particular, Johnson instructed USCIS "to expand DACA as follows:" by "[r]emov[ing] the age cap" that had previously applied, by "[e]xtend[ing] DACA renewal and work authorization to three-years [sic]" from the previous two, and by "[a]djust[ing] the date-of-entry requirement" from June 15, 2007, to January 1, 2010.  DHS Directive at 3-4.

53.    Johnson also "direct[ed] USCIS to establish a process, similar to DACA" for extending deferred action to the parents of citizens or lawful permanent residents.  *Id.* at 4.  In addition, the beneficiaries of deferred action are eligible to apply for federal work authorization.

54.    The DHS Directive sets out a series of explicit criteria for who will be eligible for this expansion of deferred action.  It requires applicants to "file the requisite applications for deferred action" and "submit biometrics for USCIS to conduct background checks."  *Ibid.*  USCIS is instructed to "begin accepting applications from eligible applicants no later than one hundred and eighty (180) days" from the date of the Directive.  *Id.* at 5. Moreover, USCIS, ICE, and CBP are directed to consider the new deferred action criteria "for all individuals [they]

encounter[]," including individuals in their custody, and individuals whose removal is pending. *Ibid.*

55.     The Defendants have made clear that the DHS Directive will operate like the DACA program that came before it — namely, as an entitlement to relief for virtually every applicant who meets DHS's eligibility criteria.  That is evident from the President's statement that the DHS Directive provides a "deal" to ensure that eligible applicants "will not be deported"; from the DHS Directive itself, which creates an application process and eligibility criteria in mandatory terms (like "shall" and "must"); and from the 99.5-99.8% acceptance rate for DACA applicants.

56.     The purported legal justification for the DHS Directive is contained in the OLC Memo.  *See* Ex. B.  In relevant part, the memo analyzed two DHS proposals.  The first proposal, which the Administration adopted, was the extension of deferred action status to parents of U.S. citizens and lawful permanent residents.  The second proposal, which the Administration has not yet adopted, was the extension of deferred action status to parents of DACA recipients.   OLC concluded that the first proposal would be a lawful exercise of enforcement discretion, but the second would not.

57.     The OLC Memo acknowledged that there are three important differences between the proposed programs and exercises of enforcement discretion.  *Id.* at 20-21.  First, deferred action is not merely a "decision not to prosecute an individual for past unlawful conduct"; instead, it is "a decision to openly tolerate an undocumented alien's continued presence in the United

States." *Id.* at 20.  Second, deferred action carries legal benefits beyond non-enforcement, such as the right to seek employment authorization.  *Ibid.*  Third, class-based deferred action programs, like the ones at issue here, "do not merely enable individual immigration officials to select deserving beneficiaries," but instead "set forth certain threshold eligibility criteria and then invite individuals who satisfy these criteria to apply for deferred action status."  *Ibid.*  In spite of all this, OLC concluded that the programs could potentially constitute exercises of enforcement discretion.

58.    OLC then considered whether the proposals would be lawful under *Heckler v. Chaney*, 470 U.S. 821 (1985), a seminal enforcement-discretion case.  OLC acknowledged that *Chaney* imposes four limitations on enforcement discretion.  First, enforcement decisions must rely on factors that are within the agency's expertise; second, the executive cannot effectively rewrite the laws under the guise of enforcement discretion; third, the executive cannot adopt a general policy that amounts to an abdication of its statutory responsibilities; and finally, enforcement discretion generally requires case-by-case decisionmaking.  OLC Memo at 6-7.

59.    OLC concluded that the first DHS proposal, which concerned the parents of citizens and legal permanent residents, met this test.  *Id.* at 26-31.  OLC based that conclusion, in part, on much smaller and more targeted deferred action programs that previous Congresses approved.  In particular, OLC found probative that Congress previously approved deferred action for victims of violence and

trafficking, family members of U.S. citizens killed in combat, and family members of individuals killed in the September 11 attacks. *Id.* at 29-30.  In OLC's view, those previous congressional approvals legalized DHS's unilateral effort to create the single largest deferred action program in our Nation's history, permitting 4 million undocumented immigrants to remain in the country.

60.    OLC reached the opposite conclusion with respect to the second DHS proposal, which concerned deferred action for parents of DACA recipients. Although OLC acknowledged that the two proposals had significant similarities, it nevertheless rejected the second proposal as unlawful because it was not "consistent with the congressional policies and priorities embodied in the immigration laws." *Id.* at 33.

### G.    The DHS Directive Harms Plaintiffs

61.    The DHS Directive will substantially increase the number of undocumented immigrants in the Plaintiff States.  At the most basic level, the Directive is a promise to openly tolerate entire classes of undocumented immigrants.  In addition, the Directive offers affirmative legal inducements to stay, such as work authorization and the tolling of unlawful presence.  White House officials also have stated that the beneficiaries of deferred action are eligible for Social Security and Medicare.  The removal of the deportation threat, combined with the incentives to stay, will make remaining in the United States far more attractive for the affected classes of undocumented immigrants.

62.     Moreover, the DHS Directive is certain to trigger a new wave of undocumented immigration.  As explained above, DACA led directly to a flood of immigration across the Texas-Mexico border and a "humanitarian crisis" in Texas. The federal government itself recognized that its lax attitude toward the immigration laws caused this wave.  *See* Vitiello Memorandum.  The DHS Directive is a much larger step than DACA, and it will trigger a larger response.

63.     The DHS Directive will increase human trafficking in the Plaintiff States.  Such trafficking is largely controlled by the Mexican drug cartels, which are the most significant organized crime threat to the State of Texas.  *See* Texas Department of Public Safety, *Texas Public Safety Threat Overview* at 2, 23 (Feb. 2013).  By boosting undocumented immigration, the DHS Directive will bolster the business of the cartels and greatly exacerbate the risks and dangers imposed on Plaintiffs by organized crime.  *See Nava-Martinez* Order at 6 (explaining that human trafficking "help[s] fund the illegal drug cartels which are a very real danger for both citizens of this country and Mexico").

64.     The Plaintiff States will be forced to expend substantial resources on law enforcement, healthcare, and education.  Some of these expenditures are required or coerced by federal law.  For instance, the Supreme Court has held that States are constitutionally obligated to provide free education to children of undocumented immigrants.  *Plyler v. Doe,* 457 U.S. 202 (1982).  Similarly, both Medicare and Medicaid require provision of emergency services, regardless of

documented immigration status, as a condition of participation. *See* 42 U.S.C. § 1395dd; 42 C.F.R. § 440.225.

65. Other expenditures are required by state law. For example, Texas law requires local governments to provide healthcare for the indigent. *See* Indigent Health Care and Treatment Act, TEX. HEALTH & SAFETY CODE §§ 61.001 *et seq*. In FY2014, Texas counties reported over $23 million in indigent health care expenditures. Texas law also requires nonprofit hospitals to provide unreimbursed care for the indigent as a condition of maintaining their nonprofit status. *See* TEX. HEALTH & SAFETY CODE § 311.043.

66. Other costs follow specifically from the extension of deferred action status. For instance, federal work authorization functions as a precondition for certain professional licenses in the Plaintiff States. *See, e.g.*, 16 TEX. ADMIN. CODE § 33.10 (requiring applicants for an alcoholic beverage license to be "legally authorized to work in the United States"); 37 TEX. ADMIN. CODE § 35.21 (requiring employees of private security companies to submit application, including a copy of a current work authorization card); TEX. RULES GOVERN. BAR ADM'N, R. II(a)(5)(d) (making individuals who are "authorized to work lawfully in the United States" eligible to apply for admission as licensed attorneys).

67. Texas and other Plaintiff States also rely on Defendants' evidence of lawful presence for certain benefits under their respective state laws. *See, e.g.*, TEX. LAB. CODE § 207.043(a)(2) (extending unemployment benefits to individuals who were "lawfully present for purposes of performing the services"); TEX. FAM. CODE

§ 2.005(b)(4) (allowing an "Employment Authorization Card" to be used as proof of identity for the purposes of a marriage license application).

68.     By authorizing a large class of undocumented immigrants to work in the United States, the DHS Directive will expose Texas to the cost of processing and issuing additional licenses and benefits.  Moreover, it will cause Texas to issue such licenses and benefits to individuals who are not legally authorized to be in the country (or to take on the burdensome task of attempting to figure out which undocumented immigrants have bona fide deferred action status and which ones benefited from the unlawful DHS Directive).

69.     If the Plaintiff States had the sovereign power to redress these problems, they would.  *See Massachusetts v. EPA*, 549 U.S. 497, 519 (2007) (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982)).  But the Supreme Court has held that authority over immigration is largely lodged in the federal government.  *See, e.g., Arizona v. United States,* 132 S. Ct. 2492 (2012).  Accordingly, litigation against the federal government is the only way for the States to vindicate their interests and those of their citizens.

## IV.  CLAIMS FOR RELIEF

## COUNT ONE

## Violation Of The Take Care Clause, Art. II, § 3, Cl. 5

70.     The allegations in paragraphs 1-69 are reincorporated herein.

71.     The DHS Directive violates the President's constitutional duty to "take Care that the Laws be faithfully executed."  U.S. CONST. art. II, § 3, cl. 5.

72.    The Supreme Court has made clear that the Take Care Clause is judicially enforceable against presidential invocations of the dispensing power. *See, e.g., Kendall v. United States*, 37 U.S. (12 Pet.) 524, 612-13 (1838); *Angelus Milling Co. v. Comm'r of Internal Revenue*, 325 U.S. 293, 296 (1945).

73.    The Take Care Clause limits the President's power and ensures that he will faithfully execute Congress's laws — not rewrite them under the guise of executive "discretion."

74.    In this case, the President admitted that he "took an action to change the law." The Defendants could hardly contend otherwise because a deferred action program with an acceptance rate that rounds to 100% is a de facto entitlement — one that even the President and OLC previously admitted would require a change to the law.

75.    The Defendants have rewritten several laws passed by Congress. Congress has provided that it is illegal for undocumented immigrants to be in the United States and has required the executive branch to remove those individuals. Under 8 U.S.C. § 1225, every individual who is not present in the United States legally "shall" be "inspected" by immigration officers; and if the officer determines that the individual is not clearly and beyond a doubt entitled to be admitted, the individual "shall be detained" for removal proceedings. *Id.* § 1225(a)(1), (a)(3), (b)(2)(A). This imposes a mandatory duty on the executive branch. *See Crane v. Napolitano*, 2013 WL 1744422, at * 8, No. 3:12-cv-03247-O (N.D. Tex. Apr. 23, 2013) (holding that 8 U.S.C. § 1225 imposes a mandatory duty

and explaining that "[t]he Supreme Court has noted that Congress's use of the word 'shall' in a statute imposes a mandatory duty on an agency to act." (citing *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 399 (2008)). This mandatory duty extends to the removal of any undocumented immigrant present in violation of federal law, unless Congress provides a specific exception. *See* 8 U.S.C. §§ 1182, 1227(a)(1), 1229b, 1254 (setting standards for inadmissibility and categories for deportability, along with limited statutory exceptions, such as cancellation of removal and temporary protected status).

76.     At least for the 4 million people who will benefit from the DHS Directive, Congress has taken several steps to curtail the reunification of undocumented immigrants and their documented family members.   The undocumented parent of a U.S. citizen or legal permanent resident generally can stay in the United States only by (i) waiting until their child turns 21, (ii) leaving the country, (iii) waiting 10 more years, and then (iv) obtaining a family-preference visa from a U.S. consulate abroad.   *See* 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255.  The Defendants cannot faithfully execute the law by directly contravening Congress's objectives.

77.     Accordingly, the Defendants' actions violate the Take Care Clause.

## COUNT TWO

**Violation of the APA, 5 U.S.C. § 553**

78.     The allegations in paragraphs 1-77 are reincorporated herein.

79.     The APA requires this Court to hold unlawful and set aside any agency action taken "without observance of procedure required by law."   5 U.S.C. § 706(2)(D).

80.     DHS is an "agency" under the APA.  5 U.S.C. § 551(1).

81.     The DHS Directive is a "rule" under the APA.  5 U.S.C. § 551(4).

82.     With exceptions that are not applicable here, agency rules must go through notice-and-comment rulemaking.  5 U.S.C. § 553.

83.     The Defendants promulgated and relied upon the DHS Directive without authority and without notice-and-comment rulemaking.   It is therefore unlawful.

## COUNT THREE

### Violation of the APA, 5 U.S.C. § 706

84.     The allegations in paragraphs 1-83 are reincorporated herein.

85.     The APA requires this Court to hold unlawful and set aside any agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

86.     The DHS Directive purports to create legal rights for millions of undocumented immigrants.  And it does so by rewriting the immigration laws and contradicting the priorities adopted by Congress.  *See, e.g.*, ¶¶ 75-76, *supra*.

87.     As such, the DHS Directive violates the aforementioned provisions in 5 U.S.C. § 706, and it is therefore unlawful.

## V.  DEMAND FOR JUDGMENT

Plaintiffs respectfully request the following relief from the Court:

A.    A declaratory judgment and injunction that the Defendants' deferred action program violates the Take Care Clause;

B.    A declaratory judgment and injunction that the Defendants' deferred action program is procedurally unlawful under the APA;

C.    A declaratory judgment and injunction that the Defendants' deferred action program is substantively unlawful under the APA; and

D.    All other relief to which the Plaintiffs may show themselves to be entitled.

Respectfully submitted.

LUTHER STRANGE
*Attorney General of Alabama*

THOMAS C. HORNE
*Attorney General of Arizona*

DUSTIN MCDANIEL
*Attorney General of Arkansas*

PAMELA JO BONDI
*Attorney General of Florida*

SAMUEL S. OLENS
*Attorney General of Georgia*

LAWRENCE G. WASDEN
*Attorney General of Idaho*

JOSEPH C. CHAPELLE
PETER J. RUSTHOVEN
*Counsel for the State of Indiana*

DEREK SCHMIDT
*Attorney General of Kansas*

JAMES D. "BUDDY" CALDWELL
*Attorney General of Louisiana*

TIMOTHY C. FOX
*Attorney General of Montana*

JON C. BRUNING
*Attorney General of Nebraska*

WAYNE STENEHJEM
*Attorney General of North Dakota*

MICHAEL DEWINE
*Attorney General of Ohio*
ERIC E. MURPHY
*Co-counsel for the State of Ohio*

GREG ABBOTT
*Attorney General of Texas*

DANIEL T. HODGE
*First Assistant Attorney General*

JAMES D. BLACKLOCK
*Deputy Attorney General for Legal Counsel*

ANDREW S. OLDHAM
*Deputy Solicitor General*
    Attorney-in-Charge
    State Bar No. 24081616

Office of the Attorney General of Texas
P.O. Box 78711
Austin, Texas 78711-2548
512-936-1700

E. SCOTT PRUITT
*Attorney General of Oklahoma*

ALAN WILSON
*Attorney General of South Carolina*

MARTY J. JACKLEY
*Attorney General of South Dakota*

SEAN D. REYES
*Attorney General of Utah*

PATRICK MORRISEY
*Attorney General of West Virginia*

J.B. VAN HOLLEN
*Attorney General of Wisconsin*

BILL SCHUETTE
*Attorney General for the People of
    Michigan*

DREW SNYDER
*Counsel for the Governor of Mississippi*

PAUL R. LEPAGE
*Governor of Maine*

ROBERT C. STEPHENS
*Counsel for the Governor of North
    Carolina*

TOM C. PERRY
CALLY YOUNGER
*Counsel for the Governor of Idaho*

Dated:  December 9, 2014