# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

_____

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 1:14-CV-254 |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF THE ARGUMENTS .................................................. 1

NATURE AND STAGE OF THE PROCEEDING .......................................................... 4

I.      STATUTORY AND REGULATORY BACKGROUND .................................................. 4

        A.      The Executive Branch's Discretion in Immigration Enforcement ......................... 4

        B.      The Executive Branch's Longstanding Exercise of Its Immigration
                Enforcement Discretion Through "Deferred Action" ............................................ 7

II.     PROCEDURAL BACKGROUND ......................................................................... 11

        A.      DHS's 2014 Guidance Challenged by Plaintiffs ................................................. 11

        B.      Plaintiffs' Claims ............................................................................................... 12

STATEMENT OF THE ISSUES TO BE RULED ON BY THE COURT .................................. 12

ARGUMENT .............................................................................................................. 13

I.      THE COURT SHOULD DENY PLAINTIFFS' MOTION AND DISMISS THIS
        ACTION FOR LACK OF SUBJECT-MATTER JURISDICTION BECAUSE
        PLAINTIFFS LACK STANDING .................................................................... 13

        A.      Plaintiffs Have Failed to Demonstrate That They Will Suffer a Cognizable
                Injury Traceable to the Deferred Action Guidance .............................................. 15

                i.      Plaintiffs' Conjecture about Costs Associated with the Presence of
                        Undocumented Aliens Is Not Cognizable ................................................. 16

                ii.     Plaintiffs Cannot Base Standing on Costs Triggered by State Law .......... 21

                iii.    Even Accepting Their Claims of Harm, Plaintiffs Have Not
                        Demonstrated an Injury to Their Own Interests, as Opposed to the
                        Interests Shared by All Taxpayers ............................................................. 23

        B.      Plaintiffs Cannot Pursue This Litigation on Behalf of the Purported
                Interests of their Citizens .................................................................................... 24

        C.      Prudential Considerations Further Compel Dismissal of Plaintiffs'
                Generalized Policy Grievance in this Area of Unique Federal Control ................ 27

II.     PLAINTIFFS' CLAIMS FAIL ON THE MERITS ................................................ 30

        A.      Plaintiffs Cannot Bring an Independent Claim under the Take Care
                Clause ................................................................................................................ 30

i

B.     Deferred Action Is an Unreviewable Exercise of Enforcement Discretion .......... 31

       i.     Congress Has Not Limited DHS's Longstanding Discretion to Grant Deferred Action ..................................................................................33

       ii.    DHS's Tailored Guidance Faithfully Executes the Immigration Laws and Does Not "Abdicate" its "Statutory Responsibilities" .............37

C.     Plaintiffs' APA Claims Lack Merit ...................................................................... 44

       i.     The Deferred Action Guidance Is Exempt From the Notice-And-Comment Requirement of the APA…………….......................................44

       ii.    The Guidance Is Consistent with Congress's Intent in Enacting the INA and Delegating to the Secretary Discretion in Enforcing Its Provisions..................................................................................47

III.    PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION ..................................................................... 49

IV.    GRANTING A PRELIMINARY INJUNCTION WOULD HARM DEFENDANTS AND THE PUBLIC INTEREST............................................................ 50

    A.     The Challenged Deferred Action Guidance Promotes Congressionally-Mandated Public Safety and National Security Objectives .................................. 51

    B.     The Challenged Deferred Action Guidance Furthers Humanitarian and Other Interests. ...................................................................................... 53

    C.     Enjoining the Challenged Deferred Action Guidance Would Significantly Undermine the Public Interest .............................................................. 54

    D.     The Challenged Deferred Action Guidance and Exercises of Discretion Can Be Modified at Any Time.......................................................... 55

CONCLUSION.................................................................................................................. 55

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967)...........................................................................................28

*Adams v. Freedom Forge Corp.*,
    204 F.3d 475 (3rd Cir. 2000) ..........................................................................50

*Adams v. Richardson*,
    480 F.2d 1159 (D.C. Cir. 1973) .........................................................37, 38, 39

*Al- Aulaqi v. Obama*,
    727 F.Supp.2d 1 (D.D.C. 2010) .......................................................................48

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
    458 U.S. 592 (1982)...................................................................................23, 24

*Allen v. Wright*,
    468 U.S. 737 (1984).........................................................................15, 18, 50

*Angelus Milling Co. v. Comm'r of Internal Revenue*,
    325 U.S. 293 (1945)...........................................................................................30

*Apache Bend Apartments, LTD. v. United States*,
    987 F.2d 1174 (5th Cir. 1993) ....................................................................28, 29

*Aquifer Guardians v. Fed. Highway Admin.*,
    779 F. Supp. 2d 542 (W.D. Tex. 2011)............................................................49

*Ariz. Christian Sch. Tuition Org. v. Winn*,
    131 S. Ct. 1436 (2011).......................................................................................24

*Arizona v. United States*,
    104 F.3d 1095 (9th Cir. 1997) ..........................................................................33

*Arizona v. United States*,
    132 S. Ct. 2492 (2012)..............................................................................passim

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................................17

*Ass'n of Civilian Technicians, Inc. v. FLRA*,
    283 F.3d 339 (D.C. Cir. 2002) .........................................................................39

*Ass'n of Irritated Residents v. E.P.A.*,
    494 F.3d 1027 (D.C. Cir. 2007) ........................................ 40

*Bartholomew v. United States*,
    740 F.2d 526 (7th Cir. 1984) .......................................... 36

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................ 27, 28

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ................................................... 50

*California v. United States*,
    104 F.3d 1086 (9th Cir. 1987) ....................................... 33

*Catano v. Local Bd. No. 94 Selective Serv. Sys.*,
    298 F. Supp. 1183 (E.D. Pa. 1969) .................................. 31

*Chiles v. United States*,
    874 F. Supp. 1334 (S.D. Fla. 1994) ................................. 34

*Chiles v. United States*,
    69 F.3d 1094 (11th Cir. 1995) ................................... 33, 34

*Clapper v. Amnesty Int'l USA*,
    133 S. Ct. 1138 (2013) ......................................... passim

*Claybrook v. Slater*,
    111 F.3d 904 (D.C. Cir. 1997) ....................................... 34

*Conoco, Inc. v. Skinner*,
    970 F.2d 1206 (3d Cir. 1992) ........................................ 36

*Crane v. Napolitano*,
    2013 WL 1744422 (N.D. Tex. April 23, 2013) ...................... 36

*Crane v. Napolitano*,
    920 F. Supp. 2d 724 (N.D. Tex. 2013) ...................... 14, 16, 18

*Crowley Caribbean Transp. Inc., v. Pena*,
    37 F.3d 671 (D.C. Cir. 1994) ........................................ 41

*Cutler v. Hayes*,
    818 F.2d 879 (D.C. Cir. 1987) ................................... 38, 39

*DaCosta v. Nixon,*
    55 F.R.D. 145 (E.D.N.Y. 1972) ...................................................................... 30, 31

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) .......................................................................................... 14

*Del. Dep't of Natural Res. & Envtl. Control v. FERC,*
    558 F.3d 575 (D.C. Cir. 2009) ......................................................................... 26

*Delta Found., Inc. v. United States,*
    303 F.3d 551 (5th Cir. 2002) ...................................................................... 47, 48

*Demore v. Kim,*
    538 U.S. 510 (2003) ............................................................................................ 5

*Enter. Int'l v. Corporacion Estatal Petrolera Ecuatoriana,*
    762 F.2d 464 (5th Cir. 1985) ........................................................................... 13

*Fed'n for Am. Immigration Reform, Inc. v. Reno,*
    93 F.3d 897 (D.C. Cir. 1996) ........................................................................... 27

*Florida v. Mellon,*
    273 U.S. 12 (1927) ...................................................................................... 18, 23

*Garcia v. San Antonio Metro. Transit Auth.,*
    469 U.S. 528 (1985) .......................................................................................... 30

*Gulf Oil Corp. v. FEA,*
    391 F. Supp. 856 (W.D. Pa. 1975) .................................................................. 55

*Haitian Refugee Ctr. v. Gracey,*
    809 F.2d 794 (D.C. Cir. 1987) ......................................................................... 15

*Heckler v. Chaney,*
    470 U.S. 821 (1985) .................................................................................. passim

*Henderson v. Stalder,*
    287 F.3d 374 (5th Cir. 2002) ........................................................................... 16

*Hodges v. Abraham,*
    253 F. Supp. 2d 846 (D.S.C. 2002) ................................................................. 54

*Hotel & Rest. Employees Union, Local 25 v. Smith,*
    594 F. Supp. 502 (D.D.C. 1984) ..................................................................... 41

*Hotel & Rest. Employees Union, Local 25 v. Smith*,
  846 F.2d 1499 (D.C. Cir. 1988) ............................................................. 41

*Illinois v. City of Chicago*,
  137 F.3d 474 (7th Cir.1998) .................................................................. 22

*INS v. Errico*,
  385 U.S. 214 (1966) .............................................................................. 43

*Interstate Natural Gas Ass'n of Am. v. FERC*,
  285 F.3d 18 (D.C. Cir. 2002) ................................................................ 45

*Kalka v. Hawk*,
  215 F.3d 90 (D.C. Cir. 2000) ................................................................ 31

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
  335 F.3d 357 (5th Cir. 2003) ............................................................ 3, 13

*Kendall v. U.S. ex rel. Stokes*,
  37 U.S. 524 (1838) ............................................................................... 30

*Kenney v. Glickman*,
  96 F.3d 1118 (8th Cir. 1996) ................................................................ 41

*Kerr v. U.S. Dist. Ct. for N. Dist. of Cal.*,
  426 U.S. 394 (1976) ............................................................................. 31

*Lewis v. Casey*,
  518 U.S. 343 (1996) ............................................................................. 50

*Lexmark Int'l Inc. v. Static Control Components, Inc.*,
  134 S. Ct. 1377 (2014) .................................................................... 27, 28

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ............................................................................. 45

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973) ............................................................................. 15

*Lion Health Servs., Inc. v. Sebelius*,
  635 F.3d 693 (5th Cir. 2011) ............................................................... 50

*Little v. KPMG LLP*,
  575 F. 3d 533 (5th Cir. 2009) .............................................................. 50

*Louisiana v. Verity,*
   853 F.2d 322 (5th Cir. 1988) ............................................................. 47

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ............................................................. 2, 14, 15, 17

*Lyng v. Nw. Indian Cemetery Protective Ass'n,*
   485 U.S. 439 (1988) ............................................................. 31

*Mada-Luna v. Fitzpatrick,*
   813 F.2d 1006 (9th Cir. 1987) ............................................................. 46

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) ............................................................. 25, 26

*Massachusetts v. Mellon,*
   262 U.S. 447 (1923) ............................................................. 24, 25

*Mathews v. Diaz,*
   426 U.S. 67 (1976) ............................................................. 22, 29

*Medellin v. Texas,*
   552 U.S. 491 (2008) ............................................................. 30

*Missouri v. Illinois,*
   180 U.S. 208 (1901) ............................................................. 24

*Morton v. Ruiz,*
   415 U.S. 199 (1974) ............................................................. 46

*Munaf v. Geren,*
   553 U.S. 674 (2008) ............................................................. 2

*Nat'l Res. Def. Council, Inc. v. Pena,*
   972 F. Supp. 9 (D.D.C. 1997) ............................................................. 54

*NB ex rel. Peacock v. Dist. of Columbia,*
   682 F.3d 77 (D.C. Cir. 2012) ............................................................. 31

*New Jersey v. Sargent,*
   269 U.S. 328 (1926) ............................................................. 25

*New Jersey v. United States,*
   91 F.3d 463 (3d Cir. 1996) ............................................................. 33

*New York v. United States,*
    505 U.S. 144 (1992) ................................................................................. 15

*Nicholas v. INS,*
    590 F.2d 802 (9th Cir. 1979) .................................................................... 46

*Norton v. S. Utah Wilderness Alliance,*
    542 U.S. 55 (2004) .................................................................................... 49

*Oregon v. Mitchell,*
    400 U.S. 112 (1970) .................................................................................. 15

*Padavan v. United States,*
    82 F.3d 23 (2d Cir. 1996) .......................................................................... 33

*Pennsylvania ex rel. Shapp v. Kleppe,*
    533 F.2d 668 (D.C. Cir. 1976) ...................................................... 17, 23, 29

*People ex rel. Hartigan v. Cheney,*
    726 F. Supp. 219 (C.D. Ill. 1989) .......................................... 23, 24, 29, 30

*People of Colorado ex rel. Suthers v. Gonzales,*
    558 F. Supp. 2d 1158 (D. Colo. 2007) ............................................... 27, 33

*Perales v. Casillas,*
    903 F.2d 1043 (5th Cir. 1990) .................................................................. 33

*Plyler v. Doe,*
    457 U.S. 202 (1982) ............................................................................ 22, 29

*Prestage Farms, Inc. v. Bd. of Supervisors,*
    205 F.3d 265 (5th Cir. 2000) .................................................................... 14

*Prof'ls & Patients for Customized Care v. Shalala,*
    56 F.3d 592 (5th Cir. 1995) ................................................................ 45, 46

*Public Citizen, Inc. v. EPA,*
    343 F.3d 449 (5th Cir. 2003) .................................................................... 33

*Raines v. Byrd,*
    521 U.S. 811 (1997) ............................................................................ 14, 15

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
    ("AAADC"), 525 U.S. 471 (1999) ................................................... passim

*Riverkeeper, Inc. v. Collins,*
    359 F.3d 156 (2d Cir. 2004) ............................................................... 38

*Romeiro de Silva v. Smith,*
    773 F.2d 1021 (9th Cir. 1985) ....................................................... 46, 47

*Sanchez-Espinoza v. Reagan,*
    770 F.2d 202 (D.C. Cir. 1985) ........................................................... 48

*Sec'y of Labor v. Twentymile Coal Co.,*
    456 F.3d 151 (D.C. Cir. 2006) ........................................................... 32

*Sierra Club v. Jackson,*
    648 F.3d 848 (D.C. Cir. 2011) ........................................................... 43

*Sigmon v. Sw. Airlines Co.,*
    110 F.3d 1200 (5th Cir. 1997) ........................................................... 36

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976) ............................................................................. 18

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.,*
    549 U.S. 422 (2007) ........................................................................... 19

*Soon Bok Yoon v. INS,*
    538 F.2d 1211 (5th Cir. 1976) ........................................................... 47

*Southdown, Inc. v. Moore McCormack Res., Inc.,*
    686 F. Supp. 595 (S.D. Tex. 1988) .................................................... 51

*Star Satellite, Inc. v. City of Biloxi,*
    779 F.2d 1074 (5th Cir. 1986) ........................................................... 51

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ............................................................................. 13

*Sturgeon v. Masica,*
    768 F.3d 1066 (9th Cir. 2014) ........................................................... 26

*Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd.,*
    201 F.3d 551 (5th Cir. 2000) ............................................................. 45

*Texas v. ICC,*
    258 U.S. 158 (1922) ........................................................................... 25

*Texas v. United States,*
    106 F.3d 661 (5th Cir. 1997) ................................................................. passim

*Texas v. United States,*
    497 F.3d 491 (5th Cir. 2007) ................................................................. 15

*Town of Castle Rock v. Gonzales,*
    545 U.S. 748 (2005) ................................................................. 35

*U.S. ex rel. Knauff v. Shaughnessy,*
    338 U.S. 537 (1950) ................................................................. 4, 5

*United States ex. rel. Parco v. Morris,*
    426 F. Supp. 976 (E.D. Pa. 1977) ................................................................. 8

*United States v. 9/1 Kg. Containers,*
    854 F.2d 173 (7th Cir. 1988) ................................................................. 40

*United States v. Cox,*
    342 F.2d 167 (5th Cir. 1965) ................................................................. 32

*United States v. Escobar,*
    No. 2:14-cr-00180-AJS (W.D. Pa. Dec. 16, 2014) ................................................................. 31

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982) ................................................................. 28

*Virginia ex rel. Cuccinelli v. Sebelius,*
    656 F.3d 253 (4th Cir. 2011) ................................................................. 25

*Warth v. Seldin,*
    422 U.S. 490 (1975) ................................................................. 28

*Wayte v. U.S.,*
    470 U.S. 598 (1985) ................................................................. 40

*Webster v. Doe,*
    486 U.S. 592 (1988) ................................................................. 34

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ................................................................. 51

*Wilderness Soc'y v. Norton,*
    434 F.3d 584 (D.C. Cir. 2006) ................................................................. 45

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)........................................................................................ 13, 49

*Wyoming ex rel. Sullivan v. Lujan*,
    969 F.2d 877 (10th Cir. 1992) ................................................................... 28

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992)................................................................................... 24

*Wyoming v. U.S. Dep't of the Interior*,
    674 F.3d 1220 (10th Cir. 2012) ...................................................... 17, 24, 26

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)................................................................................... 30

## <u>STATUTES</u>

5 U.S.C. § 553.............................................................................................. 13, 45

5 U.S.C. § 553(b)(3)(A)...................................................................................... 45

5 U.S.C. § 702..................................................................................................... 48

5 U.S.C. § 706..................................................................................................... 13

6 U.S.C. § 202(5) ............................................................................................ 5, 48

6 U.S.C. § 2205................................................................................................... 34

8 U.S.C. § 1103................................................................................................... 48

8 U.S.C. § 1103(a) .............................................................................................. 34

8 U.S.C. § 1103(a)(1)............................................................................................ 4

8 U.S.C. § 1103(a)(3)....................................................................................... 4, 34

8 U.S.C. § 1151(b)(2)(A)(i) ........................................................................... 37, 43

8 U.S.C. § 1154(a)(1)(D)(i)(II) ........................................................................... 10

8 U.S.C. § 1154(a)(1)(D)(i)(IV) .......................................................................... 10

8 U.S.C. § 1158(b)(1)(A)....................................................................................... 5

8 U.S.C. § 1182(a)(9)(B)(i)(II) ........................................................................... 37

8 U.S.C. § 1182(d)(3) .......................................................................................... 37

8 U.S.C. § 1182(d)(5)(A)........................................................................................ 5

8 U.S.C. § 1201(a) ............................................................................................... 37

8 U.S.C. § 1225............................................................................................ 6, 37, 43

8 U.S.C. § 1225(b)(2) .......................................................................................... 36

xi

8 U.S.C. § 1225(b)(2)(A) ................................................................................ 35

8 U.S.C. § 1226a ................................................................................... 6, 43

8 U.S.C. § 1226(c) ............................................................................. 5, 6, 43

8 U.S.C. § 1227(d)(1) ................................................................................ 11

8 U.S.C. § 1227(d)(2) ................................................................................ 11

8 U.S.C. § 1229b ........................................................................................ 5

8 U.S.C. § 1229b(b)(1) ............................................................................. 43

8 U.S.C. § 1252(g) ............................................................................. 10, 34

8 U.S.C. § 1255 ......................................................................................... 37

8 U.S.C. § 1324a(h)(3) ................................................................... 8, 11, 48

8 U.S.C. § 1621 ......................................................................................... 22

49 U.S.C. § 30301 ............................................................................... 11, 22

## CONSTITUTION

U.S. Const. art. II, § 3 ........................................................................ 13, 32

## REGULATIONS

8 C.F.R. § 2.1 ........................................................................................... 34

8 C.F.R. § 274a.12 .................................................................................... 48

8 C.F.R. § 274a.12(c)(14) ................................................................. passim

## OTHER AUTHORITIES

*Consolidated Appropriations Act, 2014*,
   Pub. L. No. 113-76, 128 Stat. 5, (2014) ................................................. 43

*DHS Appropriations Act 2010*,
   Pub. L. No. 111-83, 123 Stat. 2142 (2009) ............................................. 6

*Employment Authorization to Aliens in the United Sates*,
   46 Fed. Reg. 25079 (May 5, 1981) ................................................... 43, 46

*National Defense Authorization Act for Fiscal Year 2004*,
   Pub. L. No. 108-36, 117 Stat. 1392 (2004) ............................................. 11

*REAL ID ACT of 2005*,
    Pub. L. No. 109-13, 119 Stat. 231 (2005) ......................................................................... 11, 22

*USA Patriot Act of 2001*,
    Pub. L. No. 107-56, 115 Stat. 272 (2001) ............................................................................ 11

*Voluntary Departure for Out-of-Status Nonimmigrant H-1 Nurses*,
    43 Fed. Reg. 2776 (Jan. 19, 1978) ....................................................................................... 8

Kristi Lundstrom, *The Unintended Effects of the Three- and Ten-Year Unlawful Presence Bars*,
    76 Law & Contemp. Probs., 389 (2013) ............................................................................. 44

H.R. Rep. No. 111-157 (2009) ................................................................................................. 7, 40

H.R. Rep. No. 85-1199 (1957) ..................................................................................................... 43

**INDEX OF EXHIBITS**

| EXHIBIT NO. | DOCUMENT NAME | PAGE NO. |
|---|---|---|
| 1 | *Arpaio v. Obama*, No. 14-cv-1966 (D.D.C. Dec. 23, 2014) | 1 - 33 |
| 2 | Karl Thompson, Memorandum Opinion for the Sec'y of Homeland Security and the Counsel to the President: *DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* (Nov. 19, 2014) | 34 - 66 |
| 3 | U.S. Department of Homeland Security, *Immigration Enforcement Actions: 2013, Annual Report* (Sept. 2014) | 67 – 74 |
| 4 | Immigration and Customs Enforcement (ICE), *ICE Enforcement and Removal Operations Report* (Dec. 19, 2014) | 75 - 95 |
| 5 | Memorandum from Jeh Charles Johnson, Secretary of Homeland Security, to Thomas S. Winkowski, Acting Director, ICE, *et. al.*, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants* (Nov. 20, 2014) | 96 - 101 |
| 6 | U.S. Citizenship and Immigration Services (USCIS), *Deferred Action for Childhood Arrivals (DACA) Toolkit: Resources for Community Partners* (2014) | 102 - 135 |
| 7 | Memorandum from Jeh Charles Johnson, Secretary of Homeland Security, to León Rodriguez, Director, USCIS, *et al.*, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents* (Nov. 20, 2014) | 136 - 140 |
| 8 | Andorra Bruno *et al.*, Cong. Research Serv., *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (July 13, 2012) | 141 - 163 |

| EXHIBIT NO. | DOCUMENT NAME | PAGE NO. |
|---|---|---|
| 9 | Moore, Charlotte J., Cong. Research Serv., *Review of U.S. Refugee Resettlement Programs and Policies* (1980) (Excerpt) | 164 - 189 |
| 10 | Memorandum from Gene McNary, Commissioner, INS, to Regional Commissioners, INS, *Family Fairness: Guidelines for Voluntary Departure under 8 C.F.R. 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990) | 190 - 191 |
| 11 | Memorandum from Paul W. Virtue, Acting Executive Associate Commissioner, INS, to Regional Directors *et al.*, *Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* (May 6, 1997) | 192 - 198 |
| 12 | Memorandum from Michael D. Cronin, Acting Executive Associate Commissioner, INS, to Michael A. Pearson, Executive Associate Commissioner, INS, *Victims of Trafficking and Violence Protection Act of 2000 Policy Memorandum #2 – "T" and "U" Nonimmigrant Visas* (Aug. 30, 2001) | 199 - 204 |
| 13 | USCIS, *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ)* (Nov. 25, 2005) | 205 - 213 |
| 14 | Memorandum from Donald Neufeld, Acting Associate Director, USCIS, to Field Leadership, USCIS, *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* (Sept. 4, 2009) | 214 - 221 |
| 15 | Sam Bernsen, Immigration and Naturalization Serv. (INS) General Counsel, *Legal Op. Regarding Service Exercise of Prosecutorial Discretion* (July 15, 1976) | 222 - 229 |
| 16 | Memorandum from Doris Meissner, INS Comm'r, to Regional Directors, *Exercising Prosecutorial Discretion* (Nov. 17, 2000) | 230 - 242 |

| EXHIBIT NO. | DOCUMENT NAME | PAGE NO. |
|---|---|---|
| 17 | Memorandum from William J. Howard, Principal Legal Advisor, ICE, to OPLA Chief Council, ICE, *Prosecutorial Discretion* (Oct. 24, 2005) | 243 - 251 |
| 18 | Memorandum from Julie L. Myers, Assistant Sec'y, ICE, to Field Office Directors, ICE, *Prosecutorial and Custody Discretion* (Nov. 7, 2007) | 252 |
| 19 | Memorandum from Janet Napolitano, Secretary, DHS, to David V. Aguilar, Acting Commissioner, CPB, *et al, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012) | 253 - 255 |
| 20 | President's Council of Economic Advisors, *The Economic Effects of Administrative Action on Immigration* (Nov. 2014) | 256 - 280 |
| 21 | Raul Hinojosa-Ojeda and Maksim Wynn, *From the Shadows to the Mainstream: Estimating the Economic Impact of Presidential Administrative Action and Comprehensive Immigration Reform* (Nov. 2014) | 281 - 311 |
| 22 | *Texas v. United States*, No. B-94-228 (S.D. Tex. Aug. 7, 1995) | 312 - 326 |
| 23 | *Challenges at the Border: Examining the Causes, Consequences, and Responses to the Rise in Apprehensions at the Southern Border: Hearing Before the S. Comm. on Homeland Security and Governmental Affairs* (July 9, 2014) (statement of Craig Fugate, Administrator, Federal Emergency Management Agency, *et al.*) | 327 - 332 |
| 24 | Congressional Research Service, *Unaccompanied Alien Children: Potential Factors Contributing to Recent Immigration* (July 3, 2014) | 333 - 357 |
| 25 | U.S. Department of State, Country Reports on Human Rights Practices for 2013 (excerpts from Guatemala, Honduras, and El Salvador reports) | 358 - 387 |

| EXHIBIT NO. | DOCUMENT NAME | PAGE NO. |
|---|---|---|
| 26 | United Nations High Commissioner for Refugees, *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection* (July 9, 2014) | 388 - 403 |
| 27 | Elizabeth Kennedy, *No Childhood Here: Why Central American Children Are Fleeing Their Homes* (2014) | 404 - 415 |
| 28 | USCIS, Current Statistics: Deferred Action for Childhood Arrivals: Countries of Birth (Dec. 19, 2014) | 416 - 421 |
| 29 | U.S. Customs and Border Protection (CBP), USBP Nationwide Apprehensions by Requested Citizenship FY 2010 – FY 2014 | 422 |
| 30 | NBC News, Meet the Press Transcript: Interview of Greg Abbott (Dec. 7, 2014) (excerpt) | 423 - 428 |
| 31 | USCIS, Current Statistics: Deferred Action for Childhood Arrivals: Pending, Receipts, Rejected, Approvals, Denials (Dec. 19, 2014) | 429 |
| 32 | *Review of the President's Emergency Supplemental Request: Hearing Before  Sen. Comm. on Appropriations*, 113th Cong. 2 (Jul. 10, 2014) (stmt. of Jeh C. Johnson) | 430 - 435 |
| 33 | *Open Borders: The Impact of Presidential Amnesty on Border Security: Hearing Before the H. Comm. on Homeland Security*, 113th Cong. 3-4 (Dec. 2, 2014) (stmt. of Jeh C. Johnson) | 436 - 441 |

## INTRODUCTION AND SUMMARY OF THE ARGUMENTS

The Constitution and Congress have vested the Executive Branch, and the Secretary of Homeland Security in particular, with broad discretion over the enforcement of federal immigration law—including determining whether and when to remove (or not remove) particular aliens. *See Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012). On November 20, 2014, the Secretary issued a series of integrated directives pursuant to his authority under the Immigration and Nationality Act ("INA") and the Homeland Security Act of 2002 to establish Department of Homeland Security ("DHS" or "Department") wide enforcement priorities that emphasize national security, border security, and public safety. These priorities reflect DHS's need to adopt coordinated measures to further its enforcement efforts in light of limited resources. They are based on statutory obligations and congressional priorities, as well as humanitarian factors embodied in our immigration laws. Integral to these initiatives is a DHS guidance memorandum calling for the case-by-case exercise of deferred action—a long-established form of prosecutorial discretion—for certain low-priority aliens: those present in the United States since before 2010 and who either entered as children or are the parents of U.S. citizens or Lawful Permanent Residents ("LPRs"). Designation of these two categories of aliens as potentially eligible for deferred action serves two related purposes: (1) enhancing DHS's capacity to focus its limited resources on threats to national security, border security, and public safety, and (2) reducing the humanitarian cost of enforcement efforts when doing so is consistent with these priorities.

Through the present lawsuit, twenty States, four governors, and the Attorney General of Michigan seek to overturn and effectively commandeer federal enforcement prerogatives, including through the injunction of the deferred action policies announced on November 20. This effort cannot be reconciled with the Executive's well-recognized discretionary authority under the immigration laws to prioritize enforcement resources, including through grants of

deferred action, or with the practical impossibility and humanitarian cost of removing every such alien regardless of consequence.  In any event, Plaintiffs' case fails at the threshold, because Plaintiffs lack standing.  Thus, as another federal district court ruled just yesterday in a similar challenge, this Court should dismiss this action for lack of jurisdiction and deny the motion for a preliminary injunction.  *See Arpaio v. Obama*, No. 14-cv-1966 (D.D.C. Dec. 23, 2014) (Ex. 1).

       **1.**      As an initial matter, this Court should deny the motion and dismiss this action for lack of subject matter jurisdiction because Plaintiffs lack Article III standing.  *See Munaf v. Geren*, 553 U.S. 674, 692 (2008) (finding it appropriate to "terminate the litigation" at the preliminary injunction stage if the "Government is entitled to judgment as a matter of law").  Plaintiffs themselves are not subject to the DHS deferred action guidance, and their claim that they nevertheless will be harmed by the guidance rests on multiple layers of speculation about the effect of the guidance on third parties not before the Court.  These allegations cannot support jurisdiction.  Nothing about Plaintiffs' status as States (or state executive officials) lessens the showing required to establish an Article III injury-in-fact here.  At its core, Plaintiffs' suit is a generalized disagreement about the scope of the prosecutorial discretion of the Executive Branch of the Federal Government, in the exercise of exclusive federal authority over immigration.  "[A]n injury amounting only to the alleged violation of a right to have the Government act in accordance with law [is] not judicially cognizable."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 575 (1992).

       **2.**      Even if this Court had jurisdiction, it should deny Plaintiffs' motion for the extraordinary relief of a preliminary injunction.  Plaintiffs must "'clearly carr[y] the burden of persuasion'" for each element of a preliminary injunction.  *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003).  Plaintiffs fail

to meet each element: they cannot show irreparable harm, nor a likelihood of success on the merits, nor that the balancing of the equities and the public interest favor issuance of an injunction.

      **a.**      For the same reasons that Plaintiffs lack any injury-in-fact sufficient to confer Article III standing, they cannot meet the heightened standard of irreparable harm required to obtain a preliminary injunction.  Their generalized complaints of harm are speculative, conclusory, and therefore inadequate.

      **b.**      Plaintiffs also cannot demonstrate the requisite likelihood of success on the merits.  At the outset, their lack of Article III standing is fatal to their likelihood of success.  Beyond that, Plaintiffs' claims fail on the merits.  First, contrary to Plaintiffs' claim, there is no independent cause of action under the Take Care Clause.  Second, Plaintiffs' Administrative Procedure Act ("APA") challenge to the DHS guidance conflicts with the Executive's longstanding and well-recognized authority to exercise prosecutorial discretion in the immigration context.  Indeed, the Supreme Court has made clear that the Federal Government's broad discretion in immigration enforcement includes the authority to "decide whether it makes sense to pursue removal at all," including because of "immediate human concerns."  *See Arizona*, 132 S. Ct. at 2499.  The Supreme Court has also recognized the government's "regular practice" of granting "deferred action" as an exercise of administrative discretion on the basis of "humanitarian reasons or simply for [the administration's] own convenience."  *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AAADC*"), 525 U.S. 471, 483-84 (1999).  The DHS guidance at issue here, which involves its prioritization of immigration enforcement efforts and the consideration of humanitarian factors, is thus committed to agency discretion by law and not subject to judicial review.  *See Heckler v. Chaney*, 470 U.S. 821 (1985).  Third, even if the Court

could consider the merits of Plaintiffs' procedural and substantive challenges under the APA, they would fare no better. The DHS guidance concerning deferred action is a general statement of policy statutorily exempt from the APA's notice-and-comment requirement and was issued under the Secretary's authority to administer and enforce the Nation's immigration laws.

c.      Finally, the balance of equities and the public interest weigh heavily against granting a preliminary injunction. An injunction would subvert the Executive's judgment about how best to protect border security, national security, and public safety, including its ordering of priorities to focus on the removal of aliens affecting those concerns. An injunction would also impose significant humanitarian costs and interfere with the Secretary's established authority to take into account humanitarian consequences in exercising his power to consider deferred action. *See Arizona*, 132 S. Ct. at 2499; *AAADC*, 525 U.S. at 483-84.

## NATURE AND STAGE OF THE PROCEEDING

### I.      Statutory and Regulatory Background

#### A.  The Executive Branch's Discretion in Immigration Enforcement

In the INA, Congress has charged the Secretary of Homeland Security with the administration and enforcement of the immigration laws. 8 U.S.C. § 1103(a)(1). In doing so, it has vested the Secretary with discretion over immigration matters, authorizing him to "establish such regulations; . . . issue such instructions; and perform such other acts *as he deems necessary* for carrying out his authority" under the statute. *Id*. § 1103(a)(3) (emphasis added). That broad vesting of discretionary authority reflects the longstanding recognition that immigration is "a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program." *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950).

The Secretary's discretion is at its apex when the removal of aliens is at issue. The INA

expressly authorizes immigration officials to grant aliens certain forms of discretionary relief from removal, including parole, 8 U.S.C. § 1182(d)(5)(A); asylum, *id.* § 1158(b)(1)(A); and cancellation of removal, *id.* § 1229b.  Indeed, "[t]he broad discretion exercised by immigration officials" is a "principal feature of the removal system."  *Arizona*, 132 S. Ct. at 2499; *see also AAADC*, 525 U.S. 471, 483-84.  At each stage of the removal process—"commenc[ing] proceedings, adjudicat[ing] cases, [and] execut[ing] removal orders"—"the Executive has discretion to abandon the endeavor." *AAADC*, 525 U.S. at 483-84.[1]  Such broad authority and discretion over immigration matters is further supported by the Executive Branch's inherent power over the admissibility and exclusion of aliens.  *See Knauff*, 338 U.S. at 542-43.

Recognizing that the immigration statutes it enacted vest the Executive Branch with broad enforcement discretion, and recognizing the Executive Branch's inherent power and need for flexibility in light of limited resources for immigration enforcement, Congress has directed the Secretary to establish "national immigration enforcement policies and priorities."  Homeland Security Act of 2002, Pub. L. No. 107-296, § 402(5), 116 Stat. 2135, 2178 (codified at 6 U.S.C. § 202(5)).  These priorities are essential:  Congress has appropriated sufficient resources for DHS to pursue only a small fraction of the violations it confronts.  In particular, recent funding provided to DHS's U.S. Immigration and Customs Enforcement ("ICE"), the component of DHS charged with enforcing the interior, has allowed the agency to annually remove only a small proportion of the estimated 11.3 million undocumented aliens living in the United States.  *See* Mem. Op. from Karl Thompson, Principal Dep'y Ass't Attorney General, Office of Legal Counsel, for the Sec'y of Homeland Security and the Counsel to the President: *DHS's Authority*

---

[1] In rare circumstances, Congress has decided to limit the Executive's discretion.  In those circumstances, in contrast to the present case, Congress has done so expressly.  *See* 8 U.S.C. 1226(c); *Demore v. Kim*, 538 U.S. 510 (2003).

*to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* at 9 (Nov. 19, 2014) ("OLC Op.") (Ex. 2).[2]   Such significant constraints require DHS to "ensure that [] its limited resources [are] devoted to the pursuit of" its highest priorities: "national security, border security, and public safety."  Mem. from Jeh Charles Johnson, Sec'y of Homeland Security, to Thomas S. Winkowski, Acting Director, ICE, *et al.*, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants* at 2 (Nov. 20, 2014) ("Prioritization Guidance") (Ex. 5).

DHS's prioritization, as reflected in the guidance challenged in this case, is consistent with and reflected in the INA itself, which emphasizes the detention and removal of recent border crossers, criminal aliens, and threats to national security.  *See, e.g.*, 8 U.S.C. § 1225 (establishing a special "expedited removal" process for aliens apprehended at the border); *id.* § 1226(c) (providing mandatory detention for aliens convicted of certain crimes); *id.* § 1226a (providing mandatory detention of suspected terrorists).  Congress has explicitly directed DHS to prioritize "the identification and removal of aliens convicted of a crime by the severity of the crime," DHS Appropriations Act 2010, Pub. L. No. 111-83, 123 Stat. 2142, 2149 (2009) (enacted as amended), and to ensure "that the government's huge investments in immigration enforcement are producing the maximum return in actually making our country safer," H.R. Rep. No. 111-157, at 8 (2009).  At the same time, it is well-settled that it is appropriate for the

[2] In light of the amount of annual appropriations and the removal priorities dictated by Congress, ICE has removed and returned between approximately 300,000 and 400,000 aliens a year.  *See* DHS Immigration Enforcement Actions: 2013 Annual Report, at 5 (Table 6; total removed),  7 (Table 10; total returned) (Ex. 3).  Many of these individuals, however, were apprehended attempting to unlawfully enter the United States rather than in the interior.  *See* ERO Report, 2014, at 7 (noting that more than two-thirds of those ICE removed were apprehended at the border) (Ex. 4).  These numbers do not include those removals and returns conducted by U.S. Customs and Border Protection ("CBP"), whose responsibilities relate solely to the border.  *See* DHS Immigration Enforcement Actions: 2013 at 8; *see also id.* at 5 (Table 6), p. 7 (Table 10).  Unlike CBP, ICE's responsibilities include removals from the interior *and* removals at the border, particularly of nationals of countries not contiguous to the United States.

Executive Branch to consider, when exercising its discretion consistent with these priorities, the humanitarian and societal impacts of removal.  "Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime."  *Arizona*, 132 S. Ct. at 2499.

### B.   The Executive Branch's Longstanding Exercise of Its Immigration Enforcement Discretion Through "Deferred Action"

In order to focus limited resources on higher priority aliens, the Executive Branch has long exercised prosecutorial discretion in the immigration context, including through "deferred action" with respect to certain classes of aliens.  *See AAADC*, 525 U.S. at 483-84 (describing "deferred action" as a "regular practice . . . of exercising . . . discretion").  Deferred action may also further other public interests beyond preserving resources and offering humanitarian relief, such as advancing foreign policy objectives, fostering economic development, and promoting administrative efficiency.  *Cf. Arizona*, 132 S. Ct. at 2499.  It does so by allowing DHS to defer, for a limited period of time subject to renewal, the removal of aliens who are low priorities for removal.  *See* U.S. Citizenship and Immigration Services ("USCIS"), *Deferred Action for Childhood Arrivals (DACA) Toolkit: Resources for Community Partners* at 16 (2014) ("DACA Toolkit") (Ex. 6).  Deferred action does not confer legal immigration status or foreclose an alien's removal, as it is both time-limited and revocable at any time.  *See id.*  Nor does it provide an independent path to LPR status or U.S. citizenship.  *See, e.g.,* Mem. from Jeh Charles Johnson, Sec'y of Homeland Security, to León Rodriguez, Director, USCIS, *et al.*, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents* at 2 (Nov. 20, 2014) ("2014 Deferred Action Guidance") (Ex. 7) ("Deferred action does not confer any form of legal status in this country, much less citizenship.").  Longstanding

regulations, based on authority granted to the Secretary and previously to the Attorney General, 8

U.S.C. § 1324a(h)(3), provide that an alien subject to deferred action may be eligible for

employment authorization.  8 C.F.R. § 274a.12(c)(14).  This ensures that when the DHS decides

not to remove an alien for a period of time, the alien is not left during that time to a choice

between seeking public support or working illegally.

For decades, the Executive Branch has implemented deferred action and other forms of

prosecutorial discretion both for individual aliens and for various classes of aliens.  For example,

during varying periods from 1956 to 1990, discretionary mechanisms similar to deferred action

were used to defer enforcement against aliens who were beneficiaries of certain approved visa

petitions,[3] nurses who were eligible for H-1 visas,[4] nationals of designated foreign states,[5] and

ineligible spouses and children of aliens who had been granted legal status under the

Immigration Reform and Control Act of 1986.[6]  *See* OLC Op. at 14.  Since the 1990s, deferred

action has been applied to additional classes of aliens, such as battered aliens who appear to

qualify for relief under the Violence Against Women Act of 1994 ("VAWA"),[7] T and U visa

applicants,[8] foreign students affected by Hurricane Katrina,[9] and widows and widowers of U.S.

---

[3] *See United States ex. rel. Parco v. Morris*, 426 F. Supp. 976, 979-80 (E.D. Pa. 1977).

[4] *See* Voluntary Departure for Out-of-Status Nonimmigrant H-1 Nurses, 43 Fed. Reg. 2776, 2776 (Jan. 19, 1978).

[5] *See* Andorra Bruno *et al.*, Cong. Research Serv., Analysis of June 15, 2012 DHS Mem., *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 20-23 (July 13, 2012) (Ex. 8); Moore, Charlotte J., Cong. Research Serv., *Review of U.S. Refugee Resettlement Programs and Policies* at 9, 12-14 (1980) (excerpt as Ex. 9).

[6] Mem. from Gene McNary, Commissioner, INS, to Regional Commissioners, INS, *Family Fairness: Guidelines for Voluntary Departure under 8 C.F.R. 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990) (Ex. 10).

[7] Mem. from Paul W. Virtue, Acting Executive Associate Commissioner, INS, to Regional Directors *et al.*, *Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* at 3 (May 6, 1997) (Ex. 11).

[8] Mem. from Michael D. Cronin, Acting Executive Associate Commissioner, INS, to Michael A. Pearson, Executive Associate Commissioner, INS, *Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy Memorandum #2 – "T" and "U" Nonimmigrant Visas* at 2 (Aug. 30, 2001) (Ex. 12).

citizens.[10]  *See id.* at 15-17.[11]  And beginning in 2012, deferred action has been available to

aliens brought to the United States as children who meet certain guidelines, including having

continuously resided in the United States since June 15, 2007, under what has been referred to as

Deferred Action for Childhood Arrivals ("DACA").  *See* Mem. from Janet Napolitano, Sec'y of

Homeland Security, to David V. Aguilar, Acting Commissioner, CBP, *et al.*, *Exercising*

*Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*

at 1 (June 15, 2012) ("2012 DACA Memo") (Ex. 19).

The Supreme Court has specifically acknowledged the Executive's prosecutorial

discretion in immigration, including through deferred action.  *See AAADC*, 525 U.S. at 483-84

("At each stage [of the removal process] the Executive has discretion to abandon the endeavor,

and at the time IIRIRA was enacted [in 1996] the INS had been engaging in a regular practice

(which had come to be known as 'deferred action') of exercising that discretion for humanitarian

reasons or simply for its own convenience.").  Moreover, the Court held in *AAADC* that 8 U.S.C.

§ 1252(g) renders unreviewable the Executive's decision not to exercise discretion in favor of

granting deferred action to an alien.  *Id.* at 483-84, 486-87.  The Supreme Court recently

---

[9] USCIS, Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ) at 1 (Nov. 25, 2005) (Ex. 13).

[10] Mem. from Donald Neufeld, Acting Associate Director, USCIS, to Field Leadership, USCIS, *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* at 1 (Sept. 4, 2009) (Ex. 14).

[11] *See also* Sam Bernsen, INS General Counsel, *Legal Op. Regarding Service Exercise of Prosecutorial Discretion* at 2 (July 15, 1976) (Ex. 15) (noting the Executive's "inherent authority" to exercise prosecutorial discretion); Mem. from Doris Meissner, INS Comm'r, to INS Regional Directors, *Exercising Prosecutorial Discretion* at 2 (Nov. 17, 2000) (Ex. 16) (directing, following the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), that prosecutorial discretion "applies not only to the decision to issue, serve, or file a Notice to Appear (NTA), but also to a broad range of other discretionary enforcement decisions," such as "granting deferred action or staying a final order"); Mem. from William J. Howard, Principal Legal Advisor, ICE, to Office of the Principal Legal Advisor (OPLA) Chief Counsel, ICE, *Prosecutorial Discretion* at 2 (Oct. 24, 2005) (Ex. 17) (recognizing that the "universe of opportunities to exercise prosecutorial discretion is large," including "in the pre-filing stage"); Mem. from Julie L. Myers, Ass't Sec'y, ICE, to Field Office Directors, ICE, *Prosecutorial and Custody Discretion* (Nov. 7, 2007) (Ex. 18) (recommending exercise of prosecutorial discretion for nursing mothers).

reaffirmed the Executive Branch's broad authority over whether to initiate or defer removal proceedings.  *See Arizona*, 132 S. Ct. at 2499.

Congress also has approved the practice of deferred action.  As noted, Congress enacted 8 U.S.C. § 1252(g) against the backdrop of the Executive's longstanding exercise of deferred action and to protect that exercise of discretion from challenge by particular aliens denied that relief.  That action by Congress reflects a general ratification of the practice of deferred action as a means of exercising enforcement discretion.  In addition, Congress expanded the Executive's VAWA deferred action program in 2000 by making eligible for "deferred action and work authorization" children who could no longer self-petition under VAWA because they were over the age of 21.  *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 1503(d)(2), 114 Stat. 1464, 1522 (codified at 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV)).  Similarly, in 2008, as part of legislation authorizing DHS to grant "an administrative stay of a final order of removal" to any individual who could make a *prima facie* showing of eligibility for a T or U visa, Congress stated that "[t]he denial of a request for an administrative stay of removal . . . shall not preclude the alien from applying for . . . deferred action."  William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 204, 122 Stat. 5044, 5060 (codified at 8 U.S.C. § 1227(d)(1), (d)(2)).[12]  Congress also has specified classes of aliens who should be made eligible for deferred action, such as certain family members of LPRs who were killed on September 11, 2001, *see* USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361, and certain family members of certain U.S. citizens killed in combat, *see* Nat'l Defense Authorization Act for Fiscal Year 2004, Pub. L. No.

---

[12] In the REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, § 202(c)(2)(B)(viii),119 Stat. 231, 302 (49 U.S.C. § 30301 note), Congress specified that proof of "approved deferred action status" constituted evidence of lawful status for the sole purpose of authorizing (but not requiring) states to issue driver's licenses to individual recipients.

108-136, § 1703(c)-(d), 117 Stat. 1392, 1694.

## II.     Procedural Background

### A.  DHS's 2014 Guidance Challenged by Plaintiffs

On November 20, 2014, the Secretary issued a series of memoranda as part of a comprehensive initiative to establish Department-wide enforcement priorities that further focus DHS resources on national security, border security, and public safety.  One of those memoranda revised three aspects of DACA and provided deferred action guidelines for certain other aliens who are a low priority for removal.  *See* 2014 Deferred Action Guidance.  First, with regard to DACA, the memorandum removed the existing age cap of 31 so that individuals could request deferred action under DACA without regard to their current age, as long as they entered the United States before the age of 16.  *Id*. at 3.  Second, it extended the period of DACA from two to three years.  *Id*.  Third, it adjusted the relevant date by which an individual must have been in the United States from June 15, 2007 to January 1, 2010.  *Id*. at 4.  USCIS was instructed to begin accepting requests under the revised DACA guidelines no later than 90 days after the date the guidance was issued, *id.*, which is February 18, 2015.

The November 2014 Deferred Action Guidance also established separate guidelines under which certain parents of U.S. citizens or LPRs will be able to request deferred action ("DAPA").  To be considered for deferred action under DAPA, an individual must:  (1) have, on November 20, 2014, a son or daughter who is a U.S. citizen or LPR; (2) have continuously resided in the United States since before January 1, 2010; (3) have been physically present in the United States on November 20, 2014, and at the time of making a request for deferred action with USCIS; (4) have had no lawful status on November 20, 2014; (5) not fall within one of the categories of enforcement priorities set forth in another memorandum issued that same day; and

(6) present no other factors that, in the exercise of discretion, make the grant of deferred action inappropriate. *Id.* at 4.  In addition, applicants are required to submit fingerprints and personal identifying information to USCIS for a background check.  *Id.*  USCIS was instructed to begin accepting requests from individuals under the DAPA guidelines no later than 180 days after the date of the policy's announcement, *id.* at 5, which is May 19, 2015.

As with DACA, DAPA requests will be assessed individually by immigration officers, who will determine whether to exercise discretion "on a case-by-case basis" considering all relevant factors.  *Id.* at 4.  Also, as with DACA, deferred action under DAPA does not confer any "substantive right, immigration status or pathway to citizenship," *id.* at 5, and it may be revoked at any time in the agency's discretion, *id.* at 2.  Individuals who request deferred action under DAPA may also be eligible for work authorization for the deferred action period of 3 years, pursuant to longstanding regulations and statutory authority.  *Id.* at 4-5; *see* 8 U.S.C. § 1324a(h)(3); 8 C.F.R. § 274a.12(c)(14).

### B.  Plaintiffs' Claims

On December 3, 2014, Plaintiffs filed this suit, challenging DHS's authority to issue the November 20, 2014 Deferred Action Guidance and seeking declaratory and injunctive relief. (ECF No. 1, 14).  Plaintiffs' Complaint includes three causes of action:  that the guidance (1) violates the Take Care Clause of the Constitution, art. II, § 3, Cl. 5; (2) fails to comply with the APA's notice-and-comment requirement, *see* 5 U.S.C. § 553; and (3) violates the APA's substantive requirements, *see* 5 U.S.C. § 706.  Plaintiffs moved for a preliminary injunction on all counts on December 4, 2014.  *See* Pls.' Mot. for Prelim. Inj. ("Pls.' Mot.") (ECF No. 5).

### STATEMENT OF THE ISSUES TO BE RULED ON BY THE COURT

Plaintiffs seek to preliminarily enjoin the 2014 Deferred Action Guidance issued by the Secretary of Homeland Security concerning the exercise of prosecutorial discretion in the form

of deferred action.  To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that a balance of equities tips in its favor; and (4) that an injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008).  "[A] preliminary injunction is 'an extraordinary remedy' which should only be granted if the party seeking the injunction has 'clearly carried the burden of persuasion' on all four requirements." *Karaha Bodas Co.*, 335 F.3d at 363.  "[I]f the movant does not succeed in carrying its burden on any one of the four prerequisites, a preliminary injunction may not issue."  *Enter. Int'l v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985).

## ARGUMENT

### I.     THE COURT SHOULD DENY PLAINTIFFS' MOTION AND DISMISS THIS ACTION FOR LACK OF SUBJECT-MATTER JURISDICTION BECAUSE PLAINTIFFS LACK STANDING

The Court should deny Plaintiffs' motion for preliminary injunction without reaching the merits because Plaintiffs lack Article III standing.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).  The Court should further dismiss Plaintiffs' claims for lack of subject matter jurisdiction, consistent with the decision by a federal district court yesterday in a local official's challenge to the 2014 Deferred Action Guidance, *see Arpaio*, Slip Op. at 3, and with the decision of the only other court to have addressed a state's standing to challenge Defendants' deferred action policies.  *See Crane v. Napolitano*, 920 F. Supp. 2d 724, 745-46 (N.D. Tex. 2013) (concluding that Mississippi lacked standing to challenge the 2012 DACA Memo), *appeal pending*, No. 14-10049 (5th Cir.) (oral argument to be heard Feb. 3, 2015); *cf. Prestage Farms, Inc. v. Bd. of Supervisors of Noxubee Cnty.*, 205 F.3d 265, 267 (5th Cir. 2000) (vacating preliminary injunction and dismissing case for lack of standing).

Federal courts sit to decide cases and controversies, not to resolve disagreements about

policy or politics.  Indeed, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (citation and internal quotation omitted).  Article III standing "is an essential and unchanging part of the case-or-controversy requirement." *Lujan*, 504 U.S. at 560.  To establish standing, a plaintiff bears the burden of demonstrating, by competent proof, that it suffers an injury that is (1) "concrete, particularized, and actual or imminent"; (2) "fairly traceable to the challenged action"; and (3) "redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (internal quotation marks and citation omitted).  Where standing is premised on a projected future injury, Article III demands not merely a possibility of injury, but a showing that the threatened future injury is "*certainly* impending." *Id.* at 1147.

The standing inquiry is "especially rigorous" where, as here, a plaintiff asks a federal court "to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997).  Because standing requirements serve an "overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere," courts must take care to "put aside the natural urge to proceed directly to the merits of [an] important dispute and to 'settle' it for the sake of convenience and efficiency." *Id.* at 820.

Plaintiffs have failed to demonstrate that any state, let alone every state joined in this action, has standing to seek to enjoin the 2014 Deferred Action Guidance.  *Cf. Allen v. Wright*, 468 U.S. 737, 752 (1984) (standing limitations are designed "to ascertain whether the *particular*

-14-

*plaintiff* is entitled to an adjudication of the *particular claims* asserted") (emphasis added).[13]

### A. Plaintiffs Have Failed to Demonstrate That They Will Suffer a Cognizable Injury Traceable to the Deferred Action Guidance

The challenged guidance does not itself command the States to take, or refrain from taking, any action.  Accordingly, this case is unlike the most common situation in which states have been found to have standing to challenge federal law.  *See, e.g.*, *New York v. United States*, 505 U.S. 144 (1992); *Oregon v. Mitchell*, 400 U.S. 112 (1970); *Texas v. United States*, 497 F.3d 491, 496-97 (5th Cir. 2007) (Texas "suffered the injury of being compelled to participate in an invalid administrative process").  Instead, Plaintiffs complain of injury "from the government's allegedly unlawful regulation (or lack of regulation) of someone else," making standing "substantially more difficult to establish."  *See Lujan*, 504 U.S. at 562.  Furthermore, allowing Plaintiffs to challenge the DHS prosecutorial discretion guidance to which they are not themselves subject would conflict with the fundamental principle that "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution."  *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *see also Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 804-807 (D.C. Cir. 1987) (applying principle to immigration context); *cf. Henderson v. Stalder*, 287 F.3d 374, 384 (5th Cir. 2002) (Jones, J., concurring) ("As a general proposition, a plaintiff who complains merely that a benefit has been unconstitutionally granted to others is asserting only a 'generalized grievance' that does not allow the plaintiff standing").  States have no more of a cognizable interest in the Federal Government's exercise of prosecutorial discretion under the INA than do their citizens.

Plaintiffs nonetheless seek to challenge the Secretary's exercise of discretion based on

---

[13] For all but two states – Texas and Wisconsin – Plaintiffs make no specific attempt to demonstrate any injury.  Although no Plaintiff here has standing for the reasons discussed herein, nearly all Plaintiffs should be summarily dismissed for not even attempting to establish their standing.

conjecture about the indirect or incidental consequences that allegedly will flow from the 2014 Deferred Action Guidance.  Even assuming that a citizen or state could overcome the constraint on standing articulated in *Linda R.S.*, Plaintiffs' allegations fail to demonstrate that the challenged policy—which will allow DHS to increase its focus on border security and on criminal and dangerous aliens—will result in an injury for any of the States, much less that an injury is "*certainly* impending."  *Clapper*, 133 S. Ct. at 1147; *see also Arpaio*, Slip Op. at 20 (rejecting "such a broad interpretation of the injury requirement" that "would permit nearly all state officials to challenge a host of Federal laws simply because they disagree with how many—or how few—Federal resources are brought to bear on local interests").

### i. Plaintiffs' Conjecture about Costs Associated with the Presence of Undocumented Aliens Is Not Cognizable

Plaintiffs' first theory of harm is that the 2014 Deferred Action Guidance will increase the presence of undocumented aliens in the Plaintiff States, forcing them to spend "substantial resources" on law enforcement, emergency healthcare, and other public welfare services that are available under state or federal law to indigent individuals (including any undocumented aliens present within a state).  Am. Compl. ¶¶ 61-65 (ECF No. 14).  The district court in *Crane* already correctly rejected, as conjectural, a similar theory of harm offered by the State of Mississippi (a plaintiff in this case) in its challenge to the 2012 DACA Memo.  *Crane*, 920 F. Supp. 2d at 745 ("[T]he Court finds that Mississippi's asserted fiscal injury is purely speculative because there is no concrete evidence that the costs associated with the presence of illegal aliens in the state of Mississippi have increased or will increase as a result of the [DACA] Directive.").  Conclusory allegations that a state's budget or tax revenues will be harmed in some general way by a federal

policy are not sufficient to support standing.[14] *See, e.g.*, *Pennsylvania ex rel. Shapp v. Kleppe*, 533 F.2d 668, 672-73 (D.C. Cir. 1976); *Wyoming v. U.S. Dep't of the Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (courts need not accept "naked assertion[s] devoid of further factual enhancement"); *Lujan*, 504 U.S. at 562 (noting heightened burden to adduce facts where harm is tied to third-party actions).

Plaintiffs' conjecture about increased spending on public welfare and emergency services also runs counter to the terms of the DACA and DAPA initiatives. To receive DACA or DAPA under the 2014 Deferred Action Guidance, individuals must already have been present in the country for at least five years. Accordingly, any temporary deferral of deportation under the guidance would not be expected to *increase* demand for services provided to undocumented aliens, because the affected individuals are already present. *See Wyoming*, 674 F.3d at 1234 (rejecting standing where state would incur cost regardless of federal policy). Indeed, DACA and DAPA may logically be expected to *decrease* covered aliens' need to rely on state social welfare programs,[15] by facilitating recipients' ability (pursuant to existing regulations) to work lawfully during the period of deferred action. If anything, deferred action will have a positive

---

[14] Although Plaintiffs have failed to demonstrate a concrete injury as a result of *any* action by Defendants, the present inquiry before the Court is not whether an alleged harm is fairly traceable to the conduct of Defendants as a general matter, but rather whether it is "fairly traceable to *the challenged action*," *i.e.*, the 2014 Deferred Action Guidance. *See Clapper*, 133 S. Ct. at 1147 (emphasis added). Accordingly, Plaintiffs' general allegations of harm from what they contend is Defendants' "lax attitude toward the immigration laws," Am. Compl. ¶ 62, or from the "immigration policies of the federal government" in general, *id.* ¶ 37, are wholly irrelevant here.

[15] Plaintiffs have separately failed to demonstrate redressability – another essential element of Article III standing – because enjoining the 2014 Deferred Action Guidance would not redress any alleged harms caused by the presence of eligible individuals, in light of existing limitations on DHS's removal resources and the fact an injunction would not compel the removal of any individual. *See Crane*, 920 F. Supp. 2d at 745 ("Even if it is true that many illegal immigrants are permitted to remain in the state of Mississippi pursuant to the Directive and the Morton Memorandum, Plaintiffs have offered only conclusory allegations that those illegal aliens who are permitted to remain would otherwise have been removed."). An injunction would prevent any such aliens from working legally, effectively forcing them instead to work illegally or seek public support.

economic effect,[16] but, in any event, Plaintiffs have wholly failed to support their contention that the 2014 Deferred Action Guidance will be a net drain on state resources.

Plaintiffs also speculate that the challenged policy will encourage a "new wave" of undocumented aliens to cross the border illegally—even though all aliens who arrive in the future are categorically foreclosed from receiving deferred action under DACA or DAPA.   Am. Compl. ¶¶ 61-65.  The Supreme Court has repeatedly rejected similar attempts to base standing on a theory that a federal policy somehow "encourages" complained-of third-party conduct.  *See, e.g.*, *Florida v. Mellon*, 273 U.S. 12, 18 (1927) (rejecting as "remote and indirect" Florida's theory that challenged law would induce citizens to remove property from the State and thereby diminish its revenues); *Allen*, 468 U.S. at 758-59; *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).  Another court in this District likewise concluded that alleged costs associated with the presence of undocumented aliens in the state did not give Texas standing to challenge federal immigration enforcement.  *See Texas v. United States*, No. B-94-228, at *7 (S.D. Tex. Aug. 7, 1995) (Ex. 22) (agreeing with federal defendants that the decision to cross the border illegally results from the "conscious actions of aliens" rather than the actions or inactions of the U.S. Government), *aff'd on other grounds*, 106 F.3d 661 (5th Cir. 1997).[17]

Plaintiffs' speculation that the 2014 Deferred Action Guidance will increase illegal

---

[16] *See* President's Council of Economic Advisors, *The Economic Effects of Administrative Action on Immigration* (Nov. 2014) (Ex. 20) (estimating that the 2014 Deferred Action Guidance may, among other things, result in significant growth for economic measures); Raul Hinojosa-Ojeda and Maksim Wynn, *From the Shadows to the Mainstream: Estimating the Economic Impact of Presidential Administrative Action and Comprehensive Immigration Reform* (Nov. 2014) (Ex. 21) (concluding that DACA "has had and will continue to have a positive economic impact on its recipients as well as the economy as a whole").

[17] On appeal, the Fifth Circuit "assum[ed], without deciding," that Texas had standing and proceeded to reject its claim on other non-justiciability grounds, including that an "agency's decision not to take enforcement actions is unreviewable under the Administrative Procedure Act."  106 F.3d at 664 n.2, 667; *cf. Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (reiterating principle that courts generally may not reach merits of dispute before determining existence of jurisdiction but have discretion in the sequencing of threshold non-merits issues).

immigration is also belied by the terms of the guidance itself, which specifically excludes recent or future arrivals from consideration.  *See Arpaio*, Slip Op. at 21-22 (determining that it "is speculative that a program, which does not apply to future immigrants, will nonetheless result in immigrants crossing the border illegally into . . . borders of this country").  Aliens cannot be considered for DACA or DAPA unless they have "continuously resided in the United States since before January 1, 2010."  *See* 2014 Deferred Action Guidance at 4.  In contrast, those apprehended at the border are among DHS's highest enforcement priorities.  *See* Prioritization Guidance at 4.  Any potential misconceptions that undocumented aliens may have about the scope of DACA and DAPA, *see* Am. Compl. ¶ 41, also cannot support standing, which requires a showing "that the defendant's *actual* action has caused" the alleged harm.  *See Clapper*, 133 S. Ct. at 1150 n.5 (emphasis added).  The challenged policy is expressly designed to deter—not encourage—future illegal border crossings.  Moreover, the Government has undertaken substantial efforts to dispel potential misconceptions about immigration benefits in the United States.  *See, e.g.*, *Challenges at the Border: Examining the Causes, Consequences, and Responses to the Rise in Apprehensions at the Southern Border: Hr'g Before the S. Comm. on Homeland Security and Governmental Affairs* at 4-5 (Jul. 9, 2014) (stmt. of Craig Fugate, Administrator, Federal Emergency Management Agency, *et al.*) ("Fugate statement") (Ex. 23).

Plaintiffs' assertion that the 2012 DACA Memo "led directly to a flood of immigration across the Texas-Mexican border," Am. Compl. ¶ 62, is similarly conclusory and insufficient to establish standing.  Aliens who crossed the border, including during a recent surge of immigration in the summer of 2014, were not eligible for deferred action under the 2012 DACA Memo issued two years earlier, and any misconception they might have had to the contrary is not fairly traceable to that guidance.  Plaintiffs' conclusory claim of causation further ignores the

varied and complex factors that influence immigration, including many that are wholly outside the United States' control. *See, e.g.*, *Arpaio*, Slip Op. at 21 ("[T]he decision for any individual to migrate is a complex decision with multiple factors, including factors entirely outside the United States' control, such as social, economic and political strife in a foreign country"); Cong. Research Serv. Report, *Unaccompanied Alien Children: Potential Factors Contributing to Recent Immigration*, Summary (July 3, 2014) (observing that "[u]naccompanied child migrants' motives for migrating to the United States are often multifaceted," including a desire to escape poverty and violence and concluding that "it remains unclear if, and how, specific immigration policies have motivated children to migrate to the United States") (Ex. 24).[18]  Notably, DHS data show that Mexican nationals constitute the vast majority of DACA beneficiaries, but since the 2012 DACA Memo was issued, the number of Mexican nationals apprehended by Border Patrol at or near the border has decreased, not increased. *Compare* USCIS, Current Statistics: Deferred Action for Childhood Arrivals: Countries of Birth (Dec. 19, 2014) (Ex. 28) (showing that Mexican nationals make up 78% of DACA grants) *with* CBP, USBP Nationwide Apprehensions by Requested Citizenship FY 2010 – FY 2014 (Ex. 29) (demonstrating that illegal migration by Mexican nationals has decreased since 2012).  This further reveals the attenuated and speculative nature of the claim of causation on which Plaintiffs rely.

Finally, and perhaps most fundamentally, Plaintiffs' attempt to link the 2014 Deferred Action Guidance to a predicted future increase in immigration ignores the reality that the

---

[18] State Department country reports confirm the existence of significant unrest and difficult living conditions in the countries from which many recent immigrants have come. *See* State Dep't Country Report, Guatemala; State Dep't Country Report, Honduras; State Dep't Country Report, El Salvador (excerpts at Ex. 25). *Accord* United Nations High Commissioner for Refugees, *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection* (July 9, 2014) (excerpt at Ex. 26); Elizabeth Kennedy, *No Childhood Here: Why Central American Children Are Fleeing Their Homes* (Am. Immigration Council, 2014) (Ex. 27).

challenged guidance *promotes* border security and a reduction of new illegal entrants.  Congress has not provided DHS with resources to remove all undocumented aliens present in the United States; DHS thus must make choices about how to allocate its limited enforcement resources.  By deferring the removal of individuals with significant community ties and no significant criminal records, DACA and DAPA free up limited resources so that federal authorities can more singularly focus on border security and recent illegal border-crossers, among other things.  *See* Prioritization Guidance at 3.  Accordingly, enjoining the 2014 Deferred Action Guidance would likely *exacerbate*, not redress, any alleged harm the Plaintiffs claim they will suffer as a result of illegal border crossings.

### ii.  Plaintiffs Cannot Base Standing on Costs Triggered by State Law

Plaintiffs have identified only one alleged harm that they contend will "follow specifically from the extension of deferred action":  costs associated with the grant of professional licenses and other state benefits that are triggered under state law by an individual's receipt of deferred action and/or work authorization.  Am. Compl. ¶ 66 (citing Texas law); Pls' Mot. at 27 (citing Texas and Wisconsin law).  These hypothetical future costs are not traceable to the 2014 Deferred Action Guidance, which does not require States to provide any state benefits to deferred action recipients; whether to provide such benefits is a decision made by the States.  In fact, federal law establishes a presumption that certain categories of aliens, including the recipients of deferred action, are "not eligible for any State or local public benefits," including professional and commercial licenses, public housing, and unemployment benefits, *unless* a state affirmatively elects to provide those benefits.  8 U.S.C. § 1621.  Federal law also contemplates that States may take federal alien classifications into account in administering their driver's licensing schemes.  *See* REAL ID Act of 2005, Pub. L. No. 109-13, Div. B., § 202, 119 Stat.

231, 312 (49 U.S.C. § 30301 note).  The States thus have leeway in administering these schemes

as long as they do not intrude on the federal power to classify on the basis of alien status.[19]

Accordingly, costs associated with processing and providing state licenses or other state benefits

to deferred action recipients are "self-inflicted injuries" that are not cognizable under Article III.

*See Clapper*, 133 S. Ct. at 1152; *see also Illinois* 137 F.3d at 476 (holding that Illinois could not

base standing on harms caused by state statute, *even if* "the balance of political power in Illinois

may render [amendment of the statute] impossible at the moment"); *cf. Texas*, 106 F.3d at 666

(rejecting argument that Federal Government commandeered Texas's financial resources by

causing them to expend funds incarcerating undocumented aliens, because the "State's

correctional expenses stem from its enforcement of its own penal laws, not federal laws").[20]

---

[19] As we have elsewhere explained, a State may not selectively deny driver's licenses to some recipients of deferred action based on the State's own classification of aliens.  *See* Amicus Br. of United States in Opp'n to Reh'g En Banc, *Ariz. Dream Act Coalition v. Brewer*, No. 13-16248 (9th Cir.) (filed Sept. 30, 2014); *see Plyler v. Doe*, 457 U.S. 202,225 (1982); *Mathews v. Diaz*, 426 U.S. 67, 80, 85 (1976).  But it does not follow that States must provide driver's licenses to deferred action recipients as Wisconsin has done.  Thus, to the extent that Wisconsin's claimed injury is an economic one flowing from the costs of providing driver's licenses, the injury is of Wisconsin's own making through the way it has structured its driver's licensure scheme.  And to the extent Wisconsin's alleged injury is based instead on its policy opposition to providing driver's licenses to DACA or DAPA recipients, Wisconsin has no legally cognizable interest in a dispute about immigration policy.  *See* Part I.C, *supra*; *see also Illinois v. City of Chicago*, 137 F.3d 474, 478 (7th Cir. 1998) ("A role as lawmaker does not confer a role as litigant in federal court.")

[20] In addition to this fundamental defect, Plaintiffs have also failed to establish that "the cost of processing and issuing additional licenses and [state] benefits" to DACA and DAPA recipients, Am. Compl. ¶ 68, would result in a net loss of revenue to the Plaintiff States.  The costs of processing additional licenses could (and may already) be recouped through fees levied on the individual recipients.  And any other hypothetical costs may be offset by an increase in income or sales tax revenues resulting from the legal employment of DACA and DAPA recipients who already reside in the Plaintiff States and who, without employment authorization, could only work illegally.  *Cf. supra*, pp. 17-18 & n. 16.  In analogous circumstances, the Supreme Court has declined to engage in the conjecture that would be required to conclude that a federal policy that does not operate against a state will nevertheless result in harm to the state's public fisc.  *See Florida*, 273 U.S. at 18 (rejecting Florida's claim that federal policy would lead to diminution of tax revenues, because, *inter alia*, it was possible that the deficiency could "readily be made up by an increased rate of taxation").

### iii. Even Accepting Their Claims of Harm, Plaintiffs Have Not Demonstrated an Injury to Their Own Interests, as Opposed to the Interests Shared by All Taxpayers

In addition to the foregoing defects, Plaintiffs fail to demonstrate an injury sufficient to confer standing because their generalized allegations of harm to the state fisc and general welfare are not injuries to Plaintiffs themselves, but to the taxpayers. *See People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 225 (C.D. Ill. 1989) (concluding that alleged decrease in state revenue and increase in social spending did not confer standing on Illinois because they "fall on the taxpayers and citizens of Illinois and not on the state *qua* state"). And as explained further in Part I.B below, Plaintiffs cannot pursue litigation against the Federal Government on the basis of injuries to their citizens.

To be sure, a direct and genuine injury to a State's own proprietary interests may give rise to standing. *See Alfred L. Snapp & Son*, *Inc. v. Puerto Rico*, 458 U.S. 592, 602 (1982). But "neither the impairment of the state's ability to look after its citizens nor the diminution of its tax revenues" as an indirect result of actions by the Federal Government constitutes a legally cognizable "injury to state proprietary interests." *Kleppe*, 533 F.2d at 672-73. For this reason, and in light of the "unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers," general diminutions of state revenue or increases in expenditures incidental to some federal policy are routinely found insufficient to establish state standing.[21] *See, e.g.*, *id.*; *Hartigan*, 726 F. Supp. at

---

[21] Indeed, if the Court were to deem Plaintiffs' generalized allegations of the harm sufficient for injunctive relief, it is difficult to see how such logic could be cabined. There are countless ways in which any given federal action may have some incidental intersection with state law. If Plaintiffs' theory of injury were accepted, states would have standing to challenge any decision to grant citizenship, lawful immigration status, asylum, or virtually any form of humanitarian relief, simply because such individuals could be eligible for benefits under state law. *See Arpaio*, Slip Op. at 20 (rejecting a "broad

221-22.  *Compare Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) (finding cognizable injury where the effect of challenged state statute on specific tax revenues was direct and undisputed).  In short, even if Plaintiffs had stated a fiscal injury traceable to the 2014 Deferred Action Guidance—which they have not—that injury would not fall on the States themselves and therefore cannot establish standing for the Plaintiffs as states.  *See Hartigan*, 726 F. Supp. at 221-22; *cf. Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436 (2011) (discussing presumption that taxpayers do not have standing to challenge government expenditures).

### B.  Plaintiffs Cannot Pursue This Litigation on Behalf of the Purported Interests of their Citizens

Plaintiffs cannot overcome their failure to demonstrate that they have standing in their own right by framing their claimed standing based on a *parens patriae* theory of representing the asserted rights of their citizens.  *See* Am. Compl. ¶ 69 (asserting that Plaintiffs seek "to vindicate [the] interests . . . of their citizens").  "A State does not have standing as *parens patriae* to bring an action against the Federal Government."  *Alfred L. Snapp & Son,* 458 U.S. at 610 n.16 (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923), and *Missouri v. Illinois*, 180 U.S. 208, 241 (1901)).  As the Court explained in *Mellon*, "it is no part of [a state's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government."  262 U.S. at 485-86.  In this regard, the Court emphasized, "it is the United States, and not the state, which represents [its citizens] as *parens patriae*."  *Id.*  Thus, while states may institute proceedings against private entities on behalf of their citizens, they may not sue "to protect citizens of the United States from the operation" of federal law.  *Id.*  This limitation is rooted in the proper allocation of authority between the state and federal governments:  "[w]hen a state brings a suit

---

interpretation of the injury requirement [that] would permit nearly all state officials to challenge a host of Federal laws"; "Fortunately, the standing doctrine is not so limp.").

seeking to protect individuals from [federal law], it usurps [the] sovereign prerogative of the federal government and threatens the general supremacy of federal law." *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011) (quotation marks and citation omitted).

This well-settled principle controls here.  As in *Mellon*, Plaintiffs call upon this Court " to adjudicate, not rights of person or property, not rights of dominion over physical domain, not quasi sovereign rights actually invaded or threatened, but abstract questions of political power, of sovereignty, of government."  262 U.S. at 484-85.  Such claims do not present a justiciable issue. *Id.*; *see also New Jersey v. Sargent*, 269 U.S. 328, 337 (1926) (allegations that provisions of federal law "go beyond the power of Congress and impinge on that of the state . . . do not suffice as a basis for invoking an exercise of judicial power"); *Texas v. ICC*, 258 U.S. 158, 162-63 (1922) (state's claim of infringement upon state sovereignty was merely "an abstract question of legislative power," not a justiciable case or controversy).

In their Complaint, Plaintiffs appear to suggest that *Massachusetts v. EPA* ("*Massachusetts*"), 549 U.S. 497 (2007), supports their effort to litigate on behalf of the interests of their citizens.  *See* Am. Compl. ¶ 69.  That case does not support standing here.  In *Massachusetts*, the Supreme Court held that Massachusetts could challenge EPA's rejection of a petition for rulemaking to regulate greenhouse gases emitted by new motor vehicles.  In doing so, the Court first assured itself that Massachusetts had demonstrated a cognizable injury-in-fact to its own proprietary or quasi-sovereign interests:  *viz.*, a particularized injury "in its capacity as a landowner" of a "substantial portion of the state's coastal property," which was already being eroded by the "rising seas."  549 U.S. at 522 (citation omitted).  The Court further deemed Congress's authorization in the Clean Air Act of the exact type of challenge brought by Massachusetts "of critical importance to the standing inquiry."  *Id.* at 516.  Although the Court

indicated that it was according Massachusetts "special solicitude in [the] standing analysis," it did so not only on account of the plaintiff's status as a "sovereign State," but also because Massachusetts was suing under a federal statute that secured it both a procedural right and a cause of action. *Id.* at 519-20. In determining that Massachusetts had standing in light of these specific circumstances, the Supreme Court also reaffirmed that its decision in *Mellon* "prohibits" a state from suing federal defendants "to protect her citizens from the operation of federal statutes." *Id.* at 520 n.17.

Because Plaintiffs have failed to satisfy the predicate requirement of an injury-in-fact to their own interests, and because there is no federal statute providing Plaintiffs a right and cause of action, *Massachusetts* does not apply here. In recognizing Massachusetts' ability to sue under the unique facts of that case, the Court did not "eliminate [a] state [plaintiff's] obligation to establish a concrete injury." *Del. Dep't of Natural Res. & Envtl. Control v. FERC*, 558 F.3d 575, 579 n.6 (D.C. Cir. 2009); *see also Sturgeon v. Masica*, 768 F.3d 1066, 1074 (9th Cir. 2014) (holding that "evidence of actual injury is still required"); *Wyoming*, 674 F.3d at 1238. To the contrary, Massachusetts had demonstrated such an injury in its capacity as landowner. 549 U.S. at 522. Accordingly, whatever effect the "special solicitude" employed in *Massachusetts* may have on the final standing analysis—an issue that is subject to considerable uncertainty in the lower courts—it cannot excuse Plaintiffs' failure here to allege a cognizable injury to their own interests. *See Wyoming*, 674 F.3d at 1238 ("Because [Wyoming has] failed to establish a concrete injury, we need not determine the parameters of 'special solicitude' in this case.").

Moreover, because Congress has not authorized the type of challenge brought by Plaintiffs—as it had for the Clean Air Act claim at issue in *Massachusetts*—Plaintiffs cannot take advantage of that "special solicitude" in any event. *See People of Colorado ex rel. Suthers v.*

*Gonzales*, 558 F. Supp. 2d 1158, 1165 (D. Colo. 2007) (rejecting state's standing to challenge alleged deficiencies in federal enforcement of immigration laws, because it "failed to identify any recognition, by Congress or otherwise, of its right to challenge the actions that the Government has taken"). In enacting the INA—and in particular, the provisions of the INA addressing removal authority—Congress did not intend to permit states to police the Federal Government's enforcement efforts.[22] *See, e.g.*, *Arizona*, 132 S. Ct. at 2505-07 (holding that Congress did not intend to allow states to countermand decisions by federal officials about whether to prosecute immigration violations); *cf. Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 902 (D.C. Cir. 1996) ("The immigration context suggests the comparative improbability of any congressional intent to embrace as suitable challengers in court all who successfully identify themselves as likely to suffer from the generic negative features of immigration."). Thus, unlike Massachusetts, which undisputedly had a sovereign interest in its shoreline, the Plaintiff States maintain no sovereign interest in directing immigration policy, which is uniquely and exclusively entrusted to the federal government. To the extent there are sovereign interests implicated by this case, they are the sovereign interests of the United States, which are not subject to policing by the States. *See Arizona*, 132 S. Ct. at 2506.

### C. Prudential Considerations Further Compel Dismissal of Plaintiffs' Generalized Policy Grievance in this Area of Unique Federal Control

Prudential considerations about the "the proper—and properly limited—role of the courts in a democratic society" further demonstrate that this Court may not review Plaintiffs' challenge

---

[22] For this reason, Plaintiffs' claims under the INA are also separately subject to dismissal because Plaintiffs do not fall with the INA's "zone-of-interests." *See Bennett v. Spear*, 520 U.S. 154, 161-62 (1997); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388-89 & n.5 (2014) (holding that the "zone of interests" test, while non-jurisdictional in at least some circumstances, remains focused on whether the statute is intended to protect the class of persons encompassing the plaintiff from the harm that has occurred as a result of the alleged statutory violation).

to the Secretary's administration and enforcement of the immigration laws.  *Bennett*, 520 U.S. at

162 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  Among other things, such

considerations restrain courts from "adjudicating abstract questions of wide public significance

which amount to generalized grievances, pervasively shared and most appropriately addressed in

the representative branches."  *Valley Forge Christian Coll. v. Ams. United for Separation of

Church & State, Inc.*, 454 U.S. 464, 475 (1982) (internal quotations omitted).  The Supreme

Court has recently suggested that this limitation, although commonly couched as a question of

"prudential standing," is an essential constraint on Article III jurisdiction.  *See Lexmark Int'l*,

134 S. Ct. at 1387 n.3.  It rests on the proposition that the "political branches of government are

generally better suited to resolving disputes involving matters of broad public significance."

*Apache Bend Apartments, Ltd. v. United States*, 987 F.2d 1174, 1176 (5th Cir. 1993) (en banc).[23]

   These constraints bar Plaintiffs' policy-driven suit, which Plaintiffs themselves

characterize as ultimately "not about immigration," but "about the rule of law, presidential

power, and the structural limits of the U.S. Constitution," Am. Compl. ¶ 2.[24]  *See Apache Bend*,

987 F.2d at 1179 (rejecting on prudential standing grounds a constitutional challenge by

taxpayers to a congressional act that provided favored tax exemptions to a small number of

individuals).  Like the constitutional challenge to the tax code that the *en banc* Fifth Circuit

declined to entertain in *Apache Bend*, Plaintiffs' claim would inject this Court into abstract issues

---

[23] Prudential concerns also appropriately bear on a district court's exercise of its traditional discretion to entertain an equitable action and to grant (or deny) injunctive and declaratory relief.  *See*, *e.g.*, *Abbott Labs.* v. *Gardner*, 387 U.S. 136, 148 (1967); 5 U.S.C. § 702.

[24] The Texas Attorney General confirmed this view in a recent television appearance, responding to a question about the nature of the harms for which the State had filed the instant lawsuit:  "Sure.  Because we're not suing for that economic harm.  It's the way that Texas has been impacted that gives us standing.  What we're suing for is actually the greater harm, and that is harm to the constitution by empowering the president of the United States to enact legislation on his own without going through Congress."  *See* Meet the Press Transcript – Dec. 7, 2014 (excerpt at Ex. 30).

of "wide public significance" appropriately left to the political branches.  *See id.*  States "may not convert the federal courts into publicly funded forums for the ventilation of public grievances." *Wyoming v. Lujan*, 969 F.2d 877, 881 (10th Cir. 1992) (internal quotation marks omitted).

The fact that the Plaintiff States seek judicial intervention that would reshape immigration policy—a uniquely federal prerogative—warrants strict adherence to this limitation. *See Arpaio*, Slip Op. at 2 ("Concerns over the judicial role are heightened when the issue before the court involves, as here, enforcement of the immigration laws.").  Where a state's suit threatens "state interference with the exercise of federal powers," it presents "an important argument against standing" not present in private litigation.  *Kleppe*, 533 F.2d at 678.  This concern is particularly acute in the context of immigration, which is committed to the plenary authority of the federal government.  *See Arizona*, 132 S. Ct. at 2499; *see also Mathews*, 426 U.S. at 81-82 (1976) ("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government"); *Plyler*, 457 U.S. at 225 (1982) (states "enjoy no power with respect to the classification of aliens").

These considerations make clear that states may not invoke the jurisdiction of the federal courts to advance their preferences regarding how the federal government should execute federal immigration laws and set enforcement policy, particularly based on the alleged indirect consequences from the federal government's application of the immigration statutes to third parties.  Plaintiffs' redress concerning their policy disagreement with the Deferred Action Guidance, or with federal immigration policy more generally, is through the political process, not the courts.  *Cf. Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 552 (1985) ("State sovereign interests . . . are more properly protected by procedural safeguards inherent in the

structure of the federal system than by judicially created limitations on federal power.").

## II.   PLAINTIFFS' CLAIMS FAIL ON THE MERITS

Regardless of how Plaintiffs' claim on the merits is framed, the result is the same: a challenge to the Executive's exercise of discretion in enforcing the Nation's immigration laws is not subject to judicial review.  In any event, as explained below, even if the 2014 Deferred Action Guidance were subject to judicial review, Defendants have acted within and consistent with the APA and the broad authority provided by the INA.

### A.  Plaintiffs Cannot Bring an Independent Claim under the Take Care Clause

Plaintiffs seek to state a separate cause of action under the Take Care Clause, but they cannot do so.  None of the cases cited by Plaintiffs suggests there is judicially cognizable basis to challenge executive action under the Take Care Clause, separate and apart from an APA or statutory claim that the Executive acted outside of statutory authority.[25]   Moreover, any claim that the President has failed to "take Care that the Laws be faithfully executed" requires at least a

---

[25] None of the cases cited by Plaintiffs supports the proposition that their Take Care Clause claim is judicially cognizable as an independent basis for a challenge to whether the Executive acted within statutory authority; to the extent the Take Care Clause arose in those cases, it was in the context of an affirmative defense.  *See* Pls.' Mot at 8-9.  In *Kendall v. United States*, the Supreme Court addressed the effect of a statute establishing a "precise, definite act, purely ministerial; and about which the postmaster general had no discretion whatever."  37 U.S. (12 Pet.) 524, 613 (1838).  In *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), the President conceded that he was acting outside of authority provided to him by statute.  In *Medellin v. Texas*, 552 U.S. 491 (2008), the Supreme Court addressed, in the context of a non-self-executing treaty, whether a Presidential memorandum preempted state law in the absence of Congressional ratification.  *Angelus Milling Co. v. Comm'r of Internal Revenue*, 325 U.S. 293, 296 (1945), recites the truism that the Executive must follow the law, notwithstanding that the Court held in that case that the IRS could lawfully exercise its discretion in refusing to waive the formal requirements of the authorized Treasury regulations.  *Id.* at 295, 299.  Likewise, in *DaCosta v. Nixon*, 55 F.R.D. 145 (E.D.N.Y. 1972), the court concluded that the ordering of plaintiff to return to his active service in Vietnam did not violate the Military Procurement Authorization Act of 1971 because "[t]he legislation . . . gave a very wide discretion to the President."  *Id.* at 146.  Finally, *Catano v. Local Bd. No. 94 Selective Serv. Sys.*, 298 F. Supp. 1183, 1184-86 (E.D. Pa. 1969)—a mandamus case in which the court ordered a draft board to grant a deferment under a statutory provision—is not applicable here; Plaintiffs have not made any argument (nor could they) that they would be entitled to the "drastic" relief of mandamus, which is "to be invoked only [for] extraordinary situations."  *Kerr v. U.S. Dist. Ct. for N. Dist. of Cal.*, 426 U.S. 394, 402 (1976).

showing that the Executive has acted inconsistently with the statutes Congress has enacted, and thus cannot be divorced from a statutory claim.

Plaintiffs' attempt to bring an independent cause of action under the Take Care Clause is also belied by the fact that they rely on *Heckler v. Chaney* for that cause of action. *See* Pls.' Mot. at 9. In *Chaney*, the Supreme Court addressed under the APA whether the FDA acted consistent with its statutory authority in exercising prosecutorial discretion. 470 U.S. at 821. The Court held that an agency's decision not to exercise its enforcement authority, or to exercise it in a particular way, is "presumed" to be "immune from judicial review under § 701(a)(2)" of the APA. *Id.* at 832. Although the Supreme Court referred to the Take Care Clause in its analysis, *id*. at 832, it ultimately confined its analysis to the justiciability of a challenge to the exercise of discretion in the enforcement of a statutory scheme.

Plaintiffs thus cannot bring an independent cause of action under the Take Care Clause; the APA provides the proper framework for this Court's analysis.[26] *Cf. Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445-46 (1998) (courts should avoid addressing unnecessary constitutional issues).

### B.  Deferred Action Is an Unreviewable Exercise of Enforcement Discretion

The Secretary of Homeland Security's exercise of enforcement discretion through the

---

[26]  Plaintiffs' citation to the recent decision in *United States v. Escobar*, No. 2:14-cr-00180-AJS (W.D. Pa. Dec. 16, 2014), offers no additional support for their claims. *See Arpaio*, Slip Op. at 30 n.13. First, despite the fact that (1) both parties informed the *Escobar* Court that the November 20, 2014 immigration-related enforcement guidance memoranda were not at issue, and (2) the constitutionality of these policies was not addressed in either side's briefs, the *Escobar* Court reached the issue. *See Escobar*, ECF Nos. 30, 31, 32. This overreach by the *Escobar* Court was inappropriate and incorrect. Indeed, in issuing its decision, the *Escobar* Court flouted two vitally important principles of federal jurisdiction: first, the obligation of federal courts "not [to] decide constitutional questions unless it is necessary to do so," *Kalka v. Hawk*, 215 F.3d 90, 97 (D.C. Cir. 2000), and second, the rule that federal court "jurisdiction is limited to actual cases or controversies between proper litigants." *NB ex rel. Peacock v. Dist. of Columbia*, 682 F.3d 77 (D.C. Cir. 2012) (internal citations omitted).

deferred action guidance at issue here is not subject to judicial review.  The decision to prosecute—or not to prosecute—is an exercise of Executive power, and it follows, consistent with the constitutional separation of powers, that courts should not interfere with such discretionary decisions.  *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965) (en banc); *cf. Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 157 (D.C. Cir. 2006) (noting that "the traditional nonreviewability" of prosecutorial discretion applies to administrative enforcement).

The *Chaney* Court noted at least three reasons why agency enforcement decisions generally are not reviewable.  First, an agency's enforcement strategy "often involves a complicated balancing of a number of factors which are peculiarly within its expertise," and the "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities."  470 U.S. at 831-32.  Second, an agency's decision not to exercise its enforcement authority "generally does not [involve the] exercise [of] *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect."  *Id.* at 832.  Third, an agency's exercise of enforcement discretion "shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'"  *Id.* (quoting U.S. Const. art. II, § 3).

The Court of Appeals for this Circuit has held that "[r]eview of agency nonenforcement decisions is permissible *only* where statutory language sets constraints on the agency's discretion."  *Perales v. Casillas*, 903 F.2d 1043, 1048 (5th Cir. 1990) (emphasis added); *see also Public Citizen, Inc. v. EPA*, 343 F.3d 449, 464 (5th Cir. 2003) (finding non-justiciable challenge to EPA's decision whether to issue a notice of deficiency for air pollution because Clean Air Act

did not "provide[] meaningful standards for defining the limits of that discretion"). "Such standards are not present" here. *See id.* To the contrary, the Federal Government's immigration enforcement efforts are not subject to judicial review. *See Texas*, 106 F.3d at 667 (holding that "[r]eal or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty").[27]

### i. Congress Has Not Limited DHS's Longstanding Discretion to Grant Deferred Action

The Supreme Court has repeatedly and explicitly recognized that the INA grants broad discretion to the Executive Branch, including the decision whether to initiate removal proceedings or grant deferred action: "A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." *Arizona*, 132 S. Ct. at 2499 (internal citation omitted); *see also AAADC*, 525 U.S. at 483-84 ("At each stage" of the removal process, "the Executive has discretion to abandon the endeavor"). The Supreme Court has also recognized "deferred action" as such an exercise of administrative discretion. In *AAADC*, it explained that, as of 1996, "the INS had been engaging in a regular practice (which had come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience." *Id.* The Supreme Court recounted the roots of this "commendable" practice: "To ameliorate a harsh and unjust outcome, the INS may decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation." *Id.* at 484. And the Supreme

---

[27] Courts have consistently rejected similar challenges brought by states challenging the Federal Government's enforcement of immigration laws. *See Arizona v. United States*, 104 F.3d 1095, 1096 (9th Cir. 1997); *California v. United States*, 104 F.3d 1086, 1090-95 (9th Cir. 1987); *New Jersey v. United States*, 91 F.3d 463, 466-71 (3d Cir. 1996); *Padavan v. United States*, 82 F.3d 23, 26-30 (2d Cir. 1996); *Chiles v. United States*, 69 F.3d 1094, 1095-97 (11th Cir. 1995); *People of Colo. ex rel. Suthers*, 558 F. Supp. 2d at 1162.

Court found that Congress enacted 8 U.S.C. § 1252(g) "to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations." *Id.* at 485.

The Secretary's discretion to grant deferred action draws upon the Secretary's broader discretion in enforcing the Nation's immigration laws.  Through the INA, Congress has authorized the Secretary to "establish such regulations; . . . issue such instructions; and perform such other acts *as he deems necessary* for carrying out his authority" under the statute.  8 U.S.C. § 1103(a)(3) (emphasis added); *see also* 6 U.S.C. § 2205 (directing the Secretary to establish "national immigration enforcement policies and priorities"); *Chiles v. United States*, 874 F. Supp. 1334, 1340-41 (S.D. Fla. 1994) (emphasizing that 8 U.S.C. § 1103(a) indicates that the "decision not to undertake enforcement action in certain situations is . . . committed to agency discretion" and hence unreviewable under the APA), *aff'd*, 69 F.3d 1094, 1096 n.5 (11th Cir. 1995) (stating that § 1103(a) "would not justify even an allegation of complete abdication of statutory duties to go to trial"); 8 C.F.R. § 2.1.[28]  The Supreme Court has found that similar language commits action to agency discretion by law.  *See Webster v. Doe*, 486 U.S. 592, 600 (1988); *see also Claybrook v. Slater*, 111 F.3d 904, 909 (D.C. Cir. 1997).

Deferred action is one longstanding means by which federal immigration authorities exercise such discretion.  *See, e.g.*, *AAADC*, 525 U.S. at 483-84.  Individuals who receive deferred action are not granted any legal immigration status.  *See* 2014 Deferred Action Guidance at 2.  Deferred action does not provide citizenship, or even an independent path to citizenship.  *Id.*  Rather, deferred action is a temporary deferral of an alien's removal, which can

---

[28] 8 C.F.R. § 2.1, the regulation implementing 8 U.S.C. § 1103, states that "[a]ll authorities and functions of the Department of Homeland Security to administer and enforce the immigration laws are vested in the Secretary of Homeland Security," and the Secretary may "in his discretion" delegate his authority and may, through "regulation, directive, memorandum or other means deemed as appropriate," announce principles "in the exercise of the Secretary's discretion."

be revoked at any time in the agency's discretion.  *See id.*  Moreover, the 2014 Deferred Action

Guidance challenged by Plaintiffs does not itself grant deferred action to anyone, but rather

provides a framework for individualized determinations of whether certain persons should

receive deferred action, after a case-by-case assessment.  *Id.*

Rather than citing any statutory provision that conflicts with the 2014 Deferred Action

Guidance (because there is none), Plaintiffs erroneously claim that two separate provisions of the

INA provide limits on deferred action.  *See* Pls.' Mot. at 23-24.  First, Plaintiffs argue that the

Secretary can *never* exercise prosecutorial discretion concerning removal.  They assert that 8

U.S.C. § 1225(b)(2)(A) creates a "mandatory duty" to remove "any undocumented immigrant

present in violation of federal law, unless Congress provides a specific exception."  *See* Pls.'

Mot. at 3-4, 23.  But this provision relates to detention and removal procedures for those

"seeking admission"—rather than to aliens who, like aliens eligible for DACA or DAPA, have

maintained a long term physical presence in the United States—and certainly does not mandate

removal.  Plaintiffs also undermine their argument by acknowledging that the Secretary has

discretion as to whether to pursue removal in individual cases.  *See* Pls.' Mot. at 10.

Plaintiffs' radical position that all undocumented aliens must be removed is foreclosed by

more than half a century of prosecutorial discretion and controlling precedent; it also would yield

absurd results.  *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005) (recognizing

"[t]he deep-rooted nature of law-enforcement discretion, even in the presence of seemingly

mandatory legislative commands").  The Supreme Court has recognized that "a principal feature

of the removal system is the broad discretion exercised by immigration officials."  *Arizona*, 132

S. Ct. at 2499 ("Federal [immigration] officials, as an initial matter, must decide whether it

makes sense to pursue removal at all.").  This discretion is critical to the effective operation of

the immigration system.  "Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime." *Id*. at 2499. And, removing an alien to a home country that is "mired in civil war" could "create a real risk that the alien or his family will be harmed upon return."  *Id*.  "The dynamic nature of relations with other countries [also] requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities."  *Id*.  This Court should reject Plaintiffs' invitation, through their Section 1225 argument, to upset a central aspect of the immigration laws and to force the Executive, automatically and regardless of consequence, to remove any alien it encounters who is here illegally unless an express exemption applies.[29]  *See Bartholomew* v. *United States*, 740 F.2d 526, 531 (7th Cir. 1984) (suggesting that a court should consider whether "a mandatory construction would yield harsh or absurd results"); *accord Sigmon* v. *Sw. Airlines Co*., 110 F.3d 1200, 1206 (5th Cir. 1997); *Conoco, Inc*. v. *Skinner*, 970 F.2d 1206, 1225 (3d Cir. 1992).

Second, Plaintiffs incorrectly claim that the statutory provisions that set forth requirements for parents of U.S. citizens to become LPRs somehow control the Secretary's exercise of enforcement discretion regarding the deferral of removal proceedings for a limited period of time, as in DACA and DAPA.  *See* Pls.' Mot. at 14 (citing 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255).  As described above, individuals receiving deferred action do *not* obtain the LPR status that an adult U.S. citizen child may seek

---

[29] Plaintiffs rely on *Crane v. Napolitano*, No. 3:12-cv-03247, 2013 WL 1744422 (N.D. Tex. Apr. 23, 2013), for the proposition that 8 U.S.C. § 1225(b)(2) creates a mandatory duty for DHS to commence removal proceedings.  *See* Pls.' Mot. at 3-4.  That interpretation of the statute cannot be reconciled with controlling law for the reasons discussed above.  And even the *Crane* Court, which ultimately dismissed the case for lack of jurisdiction, acknowledged that the Executive has discretion at each subsequent stage of the removal process, including the ability to dismiss removal proceedings after they are initiated. *Crane*, 2013 WL 1744422, at *13.

for his or her parent or any other enduring legal immigration status.[30]   *See* 2014 Deferred Action

Guidance at 2.  Moreover, any consequence that follows from receiving deferred action flows

from pre-existing legal authority.  *See, e.g.*, 8 C.F.R. § 274a.12(c)(14).

> ### ii.  DHS's Tailored Guidance Faithfully Executes the Immigration Laws and Does Not "Abdicate" its "Statutory Responsibilities"

Plaintiffs' suggestion that the Secretary's exercise of prosecutorial discretion is a total

abdication, and thus not subject to the presumption of non-reviewability under *Chaney*, is based

on a misunderstanding of the INA and the challenged Deferred Action Guidance.  Plaintiffs take

language out of context from *Chaney* to suggest that the standard for review is whether the

Executive has "'consciously[,] and expressly [adopted] a general policy' of non-enforcement."

*See* Pls.' Mot. at 9 (citing *Chaney*, 470 U.S at, 833 n.4).  But the situation referred to in *Chaney*,

based on the D.C. Circuit's decision in *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir.

1973) (en banc), is when "the agency has 'consciously and expressly adopted a general policy'

that is so extreme *as to amount to an abdication of its statutory responsibilities*."[31]  *Chaney*, 470

U.S at, 833 n.4 (emphasis added).

---

[30] Further, Congress has recognized—not limited—the Executive's use of deferred action as a tool to temporarily prevent the removal of individuals who ultimately may later be entitled to lawful status.  *See supra*, pp. 10-11 (identifying instances where Congress has codified the use of deferred action for individuals who had a prospective, but not then-existing, entitlement to T or U visas, or to self-petitioner status under VAWA).  Hence, the fact that the INA gives the parents of U.S. citizens a potential prospective entitlement to lawful status makes the grant of deferred action to such individuals accord more, not less, with Congress's understanding of the permissible use of such discretion.  Plaintiffs' claims to the contrary based on inapposite portions of the INA should be rejected, and the presumption against judicial reviewability of the Executive's enforcement discretion stands.  *See Texas*, 106 F.3d at 667 (finding that a "court has no workable standard against which to judge the agency's exercise of discretion" in immigration enforcement).  Further, even the statutory provisions Plaintiffs cite recognize discretion in the immigration context.  *See, e.g.*, 8 U.S.C. § 1182(d)(3) (providing discretion to grant waivers of inadmissibility to certain aliens applying for nonimmigrant visas).

[31] Recognizing the high bar this sets, the Second Circuit noted in 2004 that "[n]o party has directed us to, nor can we locate, a decision by a court of appeals that has found, in performing the *Chaney* analysis, a federal agency to have abdicated its statutory duties."  *Riverkeeper, Inc. v. Collins*, 359 F.3d 156, 170-71 n.17 (2d Cir. 2004).

The Fifth Circuit has rejected a previous attempt by Texas to equate a perceived inadequacy in federal immigration enforcement with a statutory abdication.  *See Texas*, 106 F.3d at 667 ("We reject out-of-hand the State's contention that the federal defendants' alleged systemic failure to control immigration is so extreme as to constitute a reviewable abdication of duty.").  "Congress has not given [DHS] an inflexible mandate to bring enforcement actions against all violators of the [immigration laws]."  *Cutler v. Hayes*, 818 F.2d 879, 893 (D.C. Cir. 1987) (distinguishing *Adams*, 480 F.2d at 1161); *see also Texas*, 106 F.3d at 667 (finding that a "court has no workable standard against which to judge the agency's exercise of discretion" in immigration enforcement).

DHS's effort to prioritize the removal of persons who present a risk to public safety, national security, and border security over those who present no such risk and have long ties to this country is fully consistent with congressional priorities.  Concurrent with the Secretary's determination to further dedicate CBP's and ICE's limited enforcement resources to high-priority targets, *see* Prioritization Guidance at 1, the 2014 Deferred Action Guidance helps prevent the unwise and inefficient expenditure of removal resources on the lowest priority aliens by having a different agency—USCIS—implement DACA and DAPA through fees paid by the deferred action requestors.   Indeed, DHS's allocation of enforcement priorities stands in stark contrast to the statutory abdication that the D.C. Circuit found in *Adams*, which predated *Chaney*.  *See, e.g.*, *Ass'n of Civilian Technicians, Inc. v. FLRA*, 283 F.3d 339, 344 (D.C. Cir. 2002) (describing *Adams* as a case in which "the Secretary of Health, Education, and Welfare declined to enforce an entire statutory scheme, Title VI of the Civil Rights Act of 1964"); *see also Adams*, 480 F.2d at 1162 (concluding that agency was not exercising bona fide prosecutorial discretion because it was "actively supplying" racially segregated institutions "with federal funds, contrary

-38-

to the expressed purposes of Congress").

Congress has expressly recognized that DHS must set priorities to do its work effectively and consistent with the public interest, and both Congress and the Supreme Court have recognized deferred action as one such mechanism for exercising prosecutorial discretion. *See supra*, pp. 8-9. DACA and DAPA allow for deferral of the removal of certain low-priority aliens, including so that removal resources can be directed at higher priority aliens. Because no alien is automatically entitled to deferred action under DACA and DAPA—and because those who receive deferred action may have it revoked at any time—these policies do not negate any past violations of immigration laws Congress enacted. Such administrative postponement or deferment of enforcement is not a basis for judicial intervention. *Cutler*, 818 F.2d at 894.

Congress's funding choices further reinforce the point. DHS's limited resources will always constrain how many aliens can be removed. DHS has the appropriated resources to remove only a small proportion of illegal aliens present in the country. *See* OLC Op. at 9; *see also supra*, pp. 5-6 n.2. Given this reality, DHS must determine how best to utilize its limited resources for high-priority targets. *See* Prioritization Guidance at 1.

Thus, any suggestion by Plaintiffs that a statutory abdication can be found based solely on the number of those eligible for deferred action, *see* Pls.' Mot. at 15-17, ignores the constraints on the resources Congress has provided, which set the parameters against which DHS must make enforcement decisions. Based largely on these resource constraints, Congress has instructed DHS to not "simply round[] up as many illegal immigrants as possible, which is sometimes achieved by targeting the easiest and least threatening among the undocumented population," but to ensure "that the government's huge investments in immigration enforcement are producing the maximum return in actually making our country safer." H.R. Rep. No. 111-

-39-

157, at 8.  That is precisely the object of DACA and DAPA.

Further, to ensure that grants of deferred action are consistent with the agency's enforcement priorities, the Secretary reaffirmed that the revised DACA and DAPA policies would continue the case-by-case, individualized consideration that has characterized DACA since its inception in 2012, to ensure that each requestor is not an enforcement priority and does not possess a characteristic that would make deferred action inappropriate.  *See* 2014 Deferred Action Guidance at 2, 4-5; *see also* 2012 DACA Memo at 2.

There is also no merit to Plaintiffs' suggestion that DACA and DAPA are inappropriate because they are directed at groups meeting certain criteria, as agencies may establish frameworks for the exercise of discretion to reduce the risk that such discretion is exercised arbitrarily.  *See Arpaio*, Slip Op. at 32 (guidance "helps to ensure that the exercise of deferred action is *not* arbitrary and capricious"); *see, e.g.*, *Chaney*, 470 U.S. at 824 (challenge to a general enforcement policy regarding the use of drugs in executions); *Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027 (D.C. Cir. 2007) (holding non-reviewable a broad agreement between the agency and an entire industry, which deferred agency enforcement for several years); *United States v. 9/1 Kg. Containers*, 854 F.2d 173, 178 (7th Cir. 1988) (endorsing FDA "non-enforcement policy"); *cf. Wayte v. United States*, 470 U.S. 598, 604, 609-10 (1985) (upholding categorical selective service non-enforcement policy applicable to 99.96% of violators—only 274 out of an estimated 674,000 violators were eligible for possible prosecution—against challenge of selective prosecution).[32]

---

[32] *See also Hotel & Rest. Employees Union, Local 25 v. Smith*, 594 F. Supp. 502, 505 (D.D.C. 1984) (holding that Attorney General's discretionary determination to grant "extended voluntary departure" to certain classes of aliens was valid exercise of prosecutorial discretion), *aff'd per curiam by an equally divided court*, 846 F.2d 1499 (D.C. Cir. 1988) (en banc); *Hotel & Rest. Employees Union*, 846 F.2d at 1510 (separate opinion of Mikva, J.) ("We agree . . . that where, as here, Congress has not seen fit to limit

The 2014 Deferred Action Guidance appropriately provides a framework for the exercise of prosecutorial discretion with respect to two groups, while specifying that each request for deferred action must be assessed on a discretionary, case-by-case basis.[33]  *See Arpaio*, Slip Op. at 32.  Without providing any source for their statistics, Plaintiffs assert that 99.5-99.8% of DACA requests have been granted.  Pls.' Mot. at 11; Am. Compl. ¶ 25.  Based on these unsupported assertions, they incorrectly claim that the program is "rubber-stamping" applicants.  *See* Pls.' Mot. at 10-12.  But, in reality, approximately six percent of adjudicated DACA requests have been denied, not counting the six percent of filed requests that were initially rejected when filed.  Specifically, as of December 19, 2014, of the 723,358 individuals who made initial requests for deferred action under DACA, 42,919 requests were rejected for not meeting an administrative requirement of the application.  *See* USCIS, Current Statistics: Deferred Action for Childhood Arrivals: Pending, Receipts, Rejected, Approvals, and Denials (2014) (Ex. 31).  Of the 674,404 requests that have been adjudicated, 38,080 (5.6%) were denied for failure to meet eligibility criteria or for other discretionary reasons and 636,324 (94.4%) were granted.  *Id.*  And these non-approval numbers do not even factor in the commonsense logic that an individual who may not merit deferred action, *e.g.*, one who has repeated arrests—is unlikely to apply in the

---

the agency's discretion to suspend enforcement of a statute as to particular groups of aliens, we cannot review facially legitimate exercises of that discretion."); *id.* at 1519-20 (separate opinion of Silberman, J.) (decisions to "suspend enforcement over a broad category of cases" are the kind "of policy choices and allocations left to the Executive Branch").

[33] Plaintiffs cite *Crowley Caribbean Transp. Inc., v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994), for the proposition that prosecutorial discretion usually arises in the context of a "*single-shot* non-enforcement decision." *See* Pls.' Mot. at 10.  But the D.C. Circuit used that language to distinguish prosecutorial discretion from a situation where an enforcement policy is based on a "direct interpretation[] of the commands of the substantive statute."  *Crowley*, 37 F.3d at 677; *cf. Kenney v. Glickman*, 96 F.3d 1118, 1124 (8th Cir. 1996) (finding underlying statute established standards to assess an agency's compliance scheme for poultry processing).  There is no contention in this case that the Secretary is attempting to interpret a particular statutory provision of the INA as establishing deferred action.  Nor does the INA establish a meaningful standard to review the Secretary's exercise of prosecutorial discretion through deferred action.  In any event, each decision on whether to grant deferred action to a DACA or DAPA requestor is "single shot," as the determination is made on a case-by-case basis.

first place.

Plaintiffs' effort to portray the 2014 Deferred Action Guidance as a statutory abdication also ignores the Executive's long history of exercising prosecutorial discretion through the identification of certain discrete groups of aliens who may be eligible for an exercise of discretion. *See Arpaio*, Slip Op. at 31 (explaining that "the challenged deferred action programs continue a longstanding practice of enforcement discretion regarding the Nation's immigration laws," including through "a large class-based program"); OLC Op. at 14-18 (providing examples). This approach dates back to the 1950s. *See id*. at 14. More recently, under the "Family Fairness" program in 1990, the Executive granted "extended voluntary departure" and provided work authorization for certain aliens who were ineligible for legal status under the Immigration Reform and Control Act of 1986 but who were the spouses and children of aliens who qualified for legal status under the Act. *See id*. at 14-15. Since the 1990s, the Executive has also used deferred action for battered aliens who were waiting for visas to become available under VAWA, applicants for nonimmigrant status or visas made available under the Victims of Trafficking and Violence Protection Act of 2000, foreign students affected by Hurricane Katrina, and widows and widowers of U.S. citizens. *See id.* at 14-18. Further, longstanding regulations allow for deferred action recipients to be eligible for employment authorization. 8 C.F.R. § 274a.12(c)(14).[34]

Not only has Congress not limited the Executive's use of deferred action, but DACA and

---

[34] Plaintiffs claim that deferred action creates benefits, including work authorization. *See* Pls.' Mot. at 12-14. But there is nothing in the 2014 Deferred Action Guidance that provides any benefit beyond what is already provided for by statute or regulation. For example, regulations promulgated in 1981 codified existing procedures for granting employment authorization, including to deferred action recipients. *See Employment Authorization to Aliens in the United Sates*, 46 Fed. Reg. 25079, 25080-81 (May 5, 1981). In 1986, Congress enacted 8 U.S.C. § 1324a(h)(3), which confirmed the Attorney General's authority to grant work authorization. *See* OLC Op. at 21 n.11 ("This statutory provision has long been understood to recognize the authority of the Secretary to grant work authorization to particular classes of aliens.").

DAPA mirror the particular priorities Congress has established.  *Cf. Sierra Club v. Jackson*, 648 F.3d 848, 856 (D.C. Cir. 2011).  The INA clearly prioritizes the detention and removal of threats to border security, national security, and public safety.  *See, e.g.*, 8 U.S.C. § 1225 (establishing "expedited removal" for aliens apprehended at the border); *id.* § 1226(c) (providing mandatory detention for certain criminal aliens); *id.* § 1226a (providing mandatory detention of suspected terrorists); *see also* Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, Div. F., Tit. II, 128 Stat. 5, 251 (2014) (requiring DHS to "prioritize the identification and removal of aliens convicted of a crime by the severity of that crime").

At the same time, numerous provisions of the INA reflect a concern for promoting family unity among U.S. citizens and their undocumented families.  *See INS v. Errico*, 385 U.S. 214, 220 n.9 (1966) ("'The legislative history of the Immigration and Nationality Act clearly indicates that the Congress . . . was concerned with the problem of keeping families of United States citizens and immigrants united.'") (quoting H.R. Rep. No. 85-1199, at 7 (1957)).  Plaintiffs suggest that recent changes in the INA deter family reunification, Pls.' Mot. at 14, but neglect to acknowledge that the INA is replete with examples to the contrary.  *See, e.g.*, 8 U.S.C. § 1151(b)(2)(A)(i) (placing no limits on number of immigrant visas available for parents of U.S. citizens older than 21); § 1229b(b)(1) (giving discretion to Attorney General to cancel removal for certain nonpermanent resident aliens who, *inter alia*, show that their removal would pose significant difficulty to certain immediate family members who are U.S. citizens or LPRs).[35]

The Supreme Court has explicitly recognized that the Executive's enforcement of immigration laws can and should take into account humanitarian and other interests:

---

[35] Even the article that Plaintiffs rely upon to argue that limitations have been placed on family reunifications acknowledges that "Congress continues to demonstrate its support of family unification in immigration legislation."  *See* Kristi Lundstom, *The Unintended Effects of the Three- and Ten-Year Unlawful Presence Bars*, 76 Law & Contemp. Probs. 389, 394 (2013).

> Discretion in the enforcement of immigration law embraces immediate human concerns.  Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime.  The equities of an individual case may turn on many factors, including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service.  Some discretionary decisions involve policy choices that bear on this Nation's international relations.

*Arizona*, 132 S. Ct. at 2499; *see also AAADC*, 525 U.S. at 483-84 (describing long-recognized humanitarian rationale as well as administrative convenience for deferred action).  Both DACA and DAPA appropriately reflect these concerns.  *See, e.g.*, 2014 Deferred Action Guidance at 3 (recognizing that most individuals considered for DACA and DAPA "are hard-working people who have become integrated members of American society").

In short, both DACA and DAPA are part of a long tradition of enforcement prioritization and discretion by the Executive, grounded in its statutory and constitutional authority to determine how best to use the limited resources available to enforce the Nation's immigration laws.  *See Arizona*, 132 S. Ct. at 2499.  Plaintiffs' claim that the Secretary's 2014 Deferred Action Guidance constitutes an abdication of a statutory duty must be rejected.

### C.  Plaintiffs' APA Claims Lack Merit

Even if Plaintiffs' challenges to the 2014 Deferred Action Guidance were subject to judicial review—which they are not—Plaintiffs' claims of procedural and substantive APA violations lack merit.

#### i.  The Deferred Action Guidance Is Exempt From the Notice-And-Comment Requirement of the APA

Plaintiffs claim that, in issuing the challenged guidance, DHS failed to comply with the APA's notice-and-comment requirement, 5 U.S.C. § 553.  This claim fails as a matter of law, because the 2014 Deferred Action Guidance is statutorily "exempt from notice-and-comment

requirements" as a general statement of policy.  *See Lincoln v. Vigil*, 508 U.S. 182, 197 (1993);

*Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd.*, 201 F.3d 551, 556 (5th Cir. 2000)

(explaining that a challenged policy was "a list of investment guidelines; it therefore required no

notice and comment").  Congress has explicitly exempted from the notice-and-comment

requirement any "general statements of policy," 5 U.S.C. § 553(b)(3)(A).  The Supreme Court in

turn has defined such statements of policy as "statements issued by an agency to advise the

public prospectively of the manner in which the agency proposes to exercise a discretionary

power."  *Vigil*, 508 U.S. at 197 (citation omitted).

   The 2014 Deferred Action Guidance fits squarely within this definition and is therefore

exempt from notice-and-comment requirements.  The Fifth Circuit has held that, in determining

whether an agency pronouncement is a statement of policy, "the starting point is 'the agency's

characterization of the rule.'"  *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592,

596 (5th Cir. 1995).[36]  Defendants have consistently maintained that the Deferred Action

Guidance is not a rule, but a policy that "supplements and amends . . . guidance" for the use of

deferred action.  *See* 2014 Deferred Action Guidance at 1, 2.  Further, unlike substantive rules, a

general statement of policy is one "that does not impose any rights and obligations" and that

"genuinely leaves the agency and its decisionmakers free to exercise discretion."  *Prof'ls &*

*Patients for Customized Care*, 56 F.3d at 595.  Here, the deferred action guidance "confers no

---

[36] Plaintiffs argue that it is "meaningless" that the 2014 Deferred Action Guidance makes clear that it is
not intended to confer any substantive right, immigration status, or pathway to citizenship.  But in the
Fifth Circuit, courts may consider the agency's characterization as evidence of the nature of the
pronouncement.  *See id.*; *see also, e.g.*, *Wilderness Soc'y v. Norton*, 434 F.3d 584, 595 (D.C. Cir. 2006).
The agency's characterization may, in some circumstances, even be a "key factor[]."  *See Interstate*
*Natural Gas Ass'n of Am. v. FERC*, 285 F.3d 18, 59 (D.C. Cir. 2002).

substantive right,[37] immigration status or pathway to citizenship." 2014 Deferred Action

Guidance at 2. Further, as demonstrated above, *see supra*, pp. 40-41, the deferred action

guidance provides for an individualized decision concerning the exercise of prosecutorial

discretion. *See* 2014 Deferred Action Guidance at 4.

      The Ninth Circuit found that legacy INS operating instructions from 1987 and 1981

providing guidance on deferred action were "general policy statements" that were exempt from

notice-and-comment. *See Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013, 1017 (9th Cir. 1987)

(noting that general policy statements "inform[] the public concerning the agency's future . . .

priorities for exercising its discretionary power" and "provide direction to the agency's personnel

in the field, who are required to implement its policies and exercise its discretionary power in

specific cases"); *see also Romeiro de Silva v. Smith*, 773 F.2d 1021, 1024-25 (9th Cir. 1985).

Ignoring *Mada-Luna*, Plaintiffs incorrectly rely on an earlier Ninth Circuit case, *Nicholas v. INS*,

590 F.2d 802, 807-08 (9th Cir. 1979), *see* Pls.' Mot. at 19, which did not involve a notice-and-

comment challenge and which predated both *Chaney* and *Vigil*.[38] In any event, "[m]ost other

courts that . . . considered this issue . . . concluded that the 1978 Operations Instruction [was] an

intra-agency guideline which confer[red] no substantive benefit on aliens seeking inclusion in the

deferred action category." *Romeiro de Silva*, 773 F.2d at 1023. Notably, in considering whether

an alien had a substantive right to request deferral of removal, the Fifth Circuit found that the

---

[37] Plaintiffs' claim that the 2014 Deferred Action Guidance "[c]ategorically authorize[es] work for
millions of otherwise-unauthorized individuals," Pls.' Mot. at 23-24, is based on a false premise; there is
nothing in the 2014 Deferred Action Guidance that provides any benefit beyond what is already provided
for by statute or regulation. As discussed above, *see supra*, p. 42 n. 34, regulations promulgated in 1981
codified existing procedures for granting employment authorization, including to deferred action
recipients. *See* 46 Fed. Reg. at 25080-81. Plaintiffs do not challenge this regulation, but in any event, it
was adopted after notice-and-comment rulemaking and is fully compliant with the APA.

[38] Plaintiffs also rely on *Morton v. Ruiz*, 415 U.S. 199, 232 (1974), but *Morton* did not consider whether
the "general statement of policy" exemption applied.

INS's procedures for granting deferred action did not create a right of application, let alone a right to receive the benefit. The court held that "[t]he decision to grant or withhold nonpriority status . . . lies within the particular discretion of the INS, and we decline to hold that the agency has no power to create and employ such a category for its own administrative convenience without standardizing the category and allowing applications for inclusion in it." *Soon Bok Yoon v. INS*, 538 F.2d 1211, 1213 (5th Cir. 1976).

Because the 2014 Deferred Action Guidance is a "general statement of policy," it is exempt from the APA's notice-and-comment requirements.

> **ii.  The Guidance Is Consistent with Congress's Intent in Enacting the INA and Delegating to the Secretary Discretion in Enforcing Its Provisions**

Plaintiffs fail to raise any cognizable basis on which this Court could invalidate the 2014 Deferred Action Guidance under the APA. Plaintiffs assert, without discussion of case law, that the challenged guidance is "arbitrary and capricious," but this unsubstantiated argument is based solely on inaccurate characterizations of several provisions of the INA. These easily refuted suggestions do not meet the high bar for relief. When determining whether agency action is arbitrary, capricious or not in accordance with law, the Court's "scope of review . . . is very narrow." *Louisiana v. Verity*, 853 F.2d 322, 327 (5th Cir. 1988). The Court must "determine whether the agency decision was based on a consideration of the relevant factors and whether there was a clear error of judgment." *Delta Found., Inc. v. United States*, 303 F.3d 551, 563 (5th Cir. 2002) (quotation omitted). This standard of review is highly deferential. The "agency's decision need not be ideal, so long as it is not arbitrary or capricious, and so long as the agency gave at least minimal consideration to relevant facts contained in the record." *Id*.

As an initial matter, even if Plaintiffs' claim was justiciable, this Court should still

decline to review such a claim under the APA because the enforcement of immigration law is a core executive power. *See Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985) (finding that under the APA, 5 U.S.C. § 702, courts should decline to review matters on equitable grounds that intrude into core executive powers); *see also Al- Aulaqi v. Obama*, 727 F. Supp. 2d 1, 42 (D.D.C. 2010) (rejecting interjection into "sensitive" foreign affairs matters).

Regardless, the 2014 Deferred Action Guidance was issued in accordance with Congress's broad and explicit vesting of authority in the Secretary, charging him with "the administration and enforcement of [the INA and all other laws] relating to the immigration and naturalization of aliens," *see* 8 U.S.C. § 1103, and the obligation to "[e]stablish[] national immigration enforcement policies and priorities." 6 U.S.C. § 202(5). With respect to removal decisions in particular, the Supreme Court has recognized that "the broad discretion exercised by immigration officials" is a "principal feature of the removal system" under the INA. *Arizona*, 132 S. Ct. at 2499. Further, as explained above, no section of the INA conflicts with the Secretary's Deferred Action Guidance. *See supra*, pp. 35-37. And, Plaintiffs' challenge to the provision of employment authorization under independent operation of law and regulation, *see* 8 U.S.C. § 1324a(h)(3) and 8 C.F.R. § 274a.12, is misplaced, because aliens who are granted deferred action have long been eligible for work authorization based on independent provisions of law. *See* 8 C.F.R. § 274a.12(c)(14). Plaintiffs do not challenge the legality of these provisions.

The APA does not contemplate "pervasive oversight by federal courts over the manner and pace of agency compliance with [broad] congressional directives[.]" *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 67 (2004). Here, Plaintiffs seek exactly the kind of judicial entanglement in discretionary policy decisions that the APA precludes. This claim, and

-48-

Plaintiffs' derivative claim under the Take Care Clause, must therefore be rejected.

### III.   PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

Because Plaintiffs have failed to establish that they will suffer any cognizable injury at all, they have necessarily failed to show that they will suffer an irreparable injury absent the injunction.  The Supreme Court has made clear that a preliminary injunction cannot be entered only on a "possibility" of irreparable harm; "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter*, 555 U.S. at 22 (citations omitted).  "The *Winter* standard requires [Plaintiffs] to demonstrate that irreparable harm is real, imminent, and significant—not merely speculative or potential—with admissible evidence."  *Aquifer Guardians v. Fed. Highway Admin.*, 779 F. Supp. 2d 542, 574 (W.D. Tex. 2011).

Here, for the same reasons Plaintiffs lack an injury-in-fact, and even more so in light of the heightened standard for irreparable harm, Plaintiffs fall well short of demonstrating the harm required for preliminary injunctive relief.  Their claim of irreparable harm rests on their speculation that the 2014 Deferred Action Guidance will cause a "humanitarian crisis along Texas's southern border and elsewhere" and "will be virtually irreversible" if DHS is allowed to implement it.  Pls.' Mot. at 25.  Nothing but speculation suggests that the guidance will cause these alleged injuries.  As discussed above, these claimed future injuries are entirely contingent on the action of third parties not before the Court—individuals outside the country—and thus are purely speculative.  *See, e.g.*, *Allen*, 468 U.S. at 758-59; *Little v. KPMG, LLP*, 575 F. 3d 533, 541 (5th Cir. 2009) ("[C]laim of injury depends on several layers of decisions by third parties . . . and is too speculative[.]").

Plaintiffs also speculate that the 2014 Deferred Action Guidance will lead "4 million

individuals [to] take advantage of" state benefits.  Pls.' Mot. at 27.  Not so.  The 2014 Deferred

Action Guidance does not itself require the States to provide any state benefits to deferred action

recipients; that is a decision of the States.  Although Plaintiffs identify some state benefits

contingent on proof of work authorization, *see* Pls.' Mot. at 27, the 2014 Deferred Action

Guidance itself does not itself confer any substantive right or immigration status to those whose

requests are approved; recipients are simply not deported for a limited amount of time at the

Secretary's discretion.  In any event, it is entirely speculative that recipients of deferred action

will apply for, and will be granted, any state benefits.  And even assuming that some will be

granted benefits, Plaintiffs have not shown that a preliminary injunction is necessary to prevent

such alleged harm;[39] states have power over their own laws and action taken pursuant to them.[40]

## IV.   GRANTING A PRELIMINARY INJUNCTION WOULD HARM DEFENDANTS AND THE PUBLIC INTEREST

Finally, Plaintiffs have failed to demonstrate—as they must—that the threatened

irreparable injury outweighs the threatened harm that the injunction would cause Defendants and

unrepresented third parties, and that granting the injunction would not "be adverse to public

interest."  *Star Satellite, Inc. v. City of Biloxi*, 779 F.2d 1074, 1079 (5th Cir. 1986); *Southdown,*

*Inc. v. Moore McCormack Res., Inc.*, 686 F. Supp. 595, 596 (S.D. Tex. 1988) (petitioner has

---

[39] *See supra*, pp. 17-18 & n. 16 (discussing economic benefits of DACA).

[40] Plaintiffs' requested injunction is also entirely disproportionate to their alleged irreparable harm.  While Plaintiffs seek a *nationwide* injunction, only Texas and Wisconsin have attempted to show irreparable harm by identifying state laws allegedly providing benefits to future recipients of deferred action under DAPA and DACA, and only Texas claims specific costs allegedly caused by illegal immigration.  Pls.' Mot. at 26-27.  As a "general principle 'injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'"  *Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693, 703 (5th Cir. 2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).  Even setting aside all other defects with their Motion, Plaintiffs have entirely failed to show entitlement to the nationwide injunction they seek.  *See, e.g., Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3rd Cir. 2000); *Lewis v. Casey*, 518 U.S. 343, 357 (1996).  At the same time, the Constitution's vesting of immigration power exclusively in the Federal Government, and the constitutionally grounded interest in national uniformity in administration of the immigration laws, weigh heavily against an injunction regarding enforcement of federal immigration laws in one state.  *Arizona*, 132 S. Ct. at 2498-99.

-50-

burden to show injunction will cause "no disservice to unrepresented third parties").  Courts

should "pay particular regard for the public consequences in employing the extraordinary remedy

of injunction."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982) (citation omitted).

"[E]ven though irreparable injury may otherwise result to plaintiff," courts may postpone issuing

an injunction "until a final determination of the rights of the parties" if the injunction would

"adversely affect a public interest[.]"  *Id.*   Here, the balance of equities and the public interest

weigh heavily against Plaintiffs' requested preliminary injunction.  As established above,

Plaintiffs' alleged harms are entirely speculative and disconnected from the guidance they seek

to enjoin.  In contrast, preventing DHS from implementing the 2014 Deferred Action Guidance

would cause serious harm and disruption.  It would undermine DHS's comprehensive efforts to

focus on its top enforcement priorities: national security, border security, and public safety, while

simultaneously resulting in undue and needless humanitarian harm.

### A.  The Challenged Deferred Action Guidance Promotes Congressionally-Mandated Public Safety and National Security Objectives

Congress has directed DHS, an agency with limited resources, to prioritize the removal of

aliens who pose a threat to national security, border security, and public safety.  *See supra*, pp. 6-

7, 42-43.  As explained above, that is precisely what the 2014 Deferred Action Guidance helps

DHS accomplish.  Individuals who may participate include high school graduates and parents of

U.S. citizens or LPRs, all of whom have lived in the United States for at least five years and are

determined on a case-by-case basis not to pose a threat to national security or public safety, or

otherwise to present a factor that makes deferred action inappropriate.  2014 Deferred Action

Guidance at 3-4.  By creating a mechanism to efficiently identify these aliens who are a low

priority for removal, these guidelines help the government to focus its removal efforts on

criminals, threats to national security, and more recent border crossers, while recognizing

important humanitarian considerations.  Documents provided through deferred action, for instance, allow immigration officials conducting enforcement actions to quickly distinguish recent border crossers and other enforcement priorities—who may be removed more quickly under existing statutory authority—from lower-priority aliens whose cases may impose additional burdens on already backlogged immigration courts.

The need for these guidelines is especially acute given recent developments affecting the removal of persons from the United States.  At the border, for example, recent and sizable demographic shifts necessitate a significant realignment in the Department's approach to border enforcement.  For example, the U.S. Border Patrol is apprehending an increasing number of nationals from Central American countries at the border (paired with a decrease in the apprehension of Mexican nationals).  *See* U.S. Customs and Border Protection, *USBP Nationwide Apprehensions by Requested Citizenship FY 2010 – FY 2014* (Ex. 27).  This shift requires both: (1) a significant transfer of ICE resources to assist with the removal of aliens apprehended by the Border Patrol who are not immediately removable to a contiguous country, and (2) the expenditure of increased overall resources, as the removal of persons to non-contiguous countries is far more resource-intensive.  *See* ICE, ERO Annual Report: FY 2014 at 4, 9 (Ex. 4).  In addition, restrictions on ICE's use of detainers with state and local law enforcement agencies, and the backlog in the immigration courts, have made the removal of aliens, including criminal aliens, from the interior of the country more difficult and resource-intensive.  *Id.* at 4-5; *Review of the President's Emergency Supplemental Request: H'ng Before Sen. Comm. on Appropriations*, 113th Cong. 2 (Jul. 10, 2014) (stmt. of Jeh Johnson) (Ex. 32).

The Government continues to undertake substantial and successful efforts to stem illegal immigration across the Mexican border.  This summer, for example, DHS shifted significant

resources from across the Department to the border.  *See, e.g.*, *Open Borders: The Impact of Presidential Amnesty on Border Securit*y: *Hearing Before the H. Comm. on Homeland Security*, 113th Cong. 3-4 (Dec. 2, 2014) (stmt. of Jeh C. Johnson) (Ex. 33).  And in recent months the U.S. Government has held high-level discussions with Mexico and Central American countries, provided millions of dollars in aid to those countries, and initiated a large-scale public affairs campaign to explain to people in these countries the dangers of making the long journey to the United States, attempt to dissuade them from making the journey, and inform them that individuals, regardless of age, apprehended crossing the U.S. border will be priorities for deportation.  *See, e.g.*, Fugate statement at 4-6 (Ex. 23).

Due to these and other challenges in removing high-priority aliens, consistent with congressional mandates, DHS has had to further realign its resources away from non-priority aliens where possible.  The 2014 Deferred Action Guidance provides crucial support for this effort.  By actively inducing individuals who are not removal priorities to come forward, submit to background checks, and pay fees that fund the cost of investigating and processing their requests for deferred action from USCIS, DHS is better able to identify priority aliens and concentrate CBP's and ICE's enforcement resources on such aliens.

### B.  The Challenged Deferred Action Guidance Furthers Humanitarian and Other Interests

The public interest is also advanced by other equities from the discretion entailed in the 2014 Deferred Action Guidance.  As the Court in *Arizona* acknowledged, "[d]iscretion in the enforcement of immigration law embraces immediate human concerns."  132 S. Ct. at 2499.  Such discretion may properly recognize the difference between "[u]nauthorized workers trying to support their families" and "alien smugglers" or those "who commit a serious crime."  *Id.*  The Court also specifically suggested that family unity is an appropriate factor for DHS to consider in

exercising its enforcement discretion.  *See id.* at 2499 ("The equities of an individual case may turn on many factors, including whether the alien has children born in the United States[.]").  The 2014 Deferred Action Guidance furthers these important goals.  The injunction Plaintiffs seek would harm the public by halting policies that not only promote public safety and national security, but also humanitarian concerns and family unification.  Deferred action impacts the lives of many people.  For example, as of December 19, 2014, approximately 636,324 individuals have been granted deferred action under DACA.  DHS, Current Statistics: Deferred Action for Childhood Arrivals: Pending, Receipts, Rejected, Approvals, and Denials (2014) (Ex. 31).  Moreover, Plaintiffs' requested injunction would disrupt the effective enforcement of the laws, interfere with the orderly implementation of the mechanisms for considering some non-priority cases for deferred action under the 2014 Deferred Action Guidance, and impede the harmonization of enforcement priorities among DHS's component immigration agencies.

### C. Enjoining the Challenged Deferred Action Guidance Would Significantly Undermine the Public Interest

DHS officials have been instructed to implement the DACA modifications within 90 days and DAPA within 180 days.  2014 Deferred Action Guidance at 4-5.  A preliminary injunction would prevent DHS from the timely implementation of this guidance.  It is not in the public interest to delay a policy that promotes public safety, national security, administrative efficiency, and humanitarian concerns.  *See, e.g., Nat'l Res. Def. Council, Inc. v. Pena*, 972 F. Supp. 9, 20 (D.D.C. 1997); *Hodges v. Abraham*, 253 F. Supp. 2d 846, 873 (D.S.C. 2002); *Gulf Oil Corp. v. FEA*, 391 F. Supp. 856, 864 (W.D. Pa. 1975).  As explained further above, the 2014 Deferred Action Guidance is part of DHS's broader efforts to more effectively administer and enforce our Nation's immigration laws, including by allowing enforcement resources to be focused on high-priority aliens, thereby promoting national security and public safety, while at the same time

-54-

addressing the human concerns properly the subject of immigration enforcement efforts.

Moreover, because DACA and DAPA are fully funded through the fees paid by requestors, these

goals are being accomplished effectively and without cost to DHS.  These initiatives also

advance the public interest by allowing individuals already been present in the country for many

years to work legally and thereby pay taxes like everybody else.

### D.  The Challenged Deferred Action Guidance and Exercises of Discretion Can Be Modified at Any Time

Plaintiffs contend that a preliminary injunction is justified because "it [would] be difficult

or impossible to reverse Defendants' Actions[.]"  Pls.' Mot. at 26.  Plaintiffs are wrong.

Deferred action confers "no substantive right, immigration status or pathway to citizenship."

2014 Deferred Action Guidance at 5.  And deferred action can be revoked at any time in the

agency's discretion.  *Id.* at 2.

### CONCLUSION

For all the foregoing reasons, this Court should deny Plaintiffs' motion for preliminary

injunction and dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction.

Dated: December 24, 2014                     Respectfully submitted,

KENNETH MAGIDSON                             JOYCE R. BRANDA
United States Attorney                       Acting Assistant Attorney General

DANIEL DAVID HU                              KATHLEEN R. HARTNETT
Assistant United States Attorney             Deputy Assistant Attorney General
Deputy Chief, Civil Division

                                             DIANE KELLEHER
                                             Assistant Branch Director

                                              */s/ Kyle R. Freeny*
                                             KYLE R. FREENY (Cal. Bar No. 247857)
                                              Attorney-in-Charge
                                             HECTOR G. BLADUELL
                                             BRADLEY H. COHEN
                                             ADAM D. KIRSCHNER

JULIE S. SALTMAN
Civil Division, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883
Washington, D.C.  20044
Tel.: (202) 514-5108
Fax: (202) 616-8470
Kyle.Freeny@usdoj.gov
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Preliminary Injunction has been delivered electronically on December 24, 2014, to counsel for Plaintiffs via the District's ECF system.

*/s/ Kyle R. Freeny*
Counsel for Defendants