EXHIBIT 4



# ICE Enforcement and Removal Operations Report

Fiscal Year 2014

*December 19, 2014*



*U.S. Immigration and Customs Enforcement*



# Enforcement and Removal Operations

# Table of Contents

Background ........................................................................................................ 1

Discussion ........................................................................................................ 2

Appendix A ...................................................................................................... 12

Appendix B ...................................................................................................... 18

076

# I.   Background

This report summarizes U.S. Immigration and Customs Enforcement's (ICE) Fiscal Year (FY) 2014 civil immigration enforcement and removal operations.  ICE shares responsibility for enforcing the Nation's civil immigration laws with U.S. Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services (USCIS).  In executing its enforcement duties, ICE focuses on two core missions: (1) identifying and apprehending public safety threats—including criminal aliens and national security targets—and other removable individuals within the United States; and (2) detaining and removing individuals apprehended by ICE and CBP officers and agents patrolling our Nation's borders.

Each year, ICE immigration enforcement is impacted by operational factors, including the size of the removable population found in the interior and encountered at the border by CBP, appropriated resources, fluctuating migration patterns, and the legal authorities that govern ICE's activities.  In 2014, each of these factors affected ICE operations and contributed to the number of ICE's FY 2014 removals, which was 315,943, down from 368,644 in FY 2013.  This report sets forth and analyzes ICE's FY 2014 immigration enforcement statistics.

# II.    Discussion

## Shifting Migration Patterns and Demographics

In FY 2014, the surge of illegal border crossings in the Rio Grande Valley (RGV) in South Texas and significant increase in Central American migrants presented unique challenges to ICE's immigration enforcement efforts.

### The Surge in the Rio Grande Valley

In 2014, the United States experienced an unprecedented surge of illegal border crossings in the RGV, particularly by unaccompanied children and family units from Central America.  CBP apprehensions in the RGV—a sector containing just 320 miles of our 2,000 mile border with Mexico—accounted for 72.8 percent of the unaccompanied children and 76.2 percent of the family units apprehended in FY 2014.  In FY 2013, the Border Patrol apprehended a total of 21,553 unaccompanied children and 7,265 family units in the RGV.  In 2014 those numbers were 49,959 and 52,326, respectively.  In June alone, at the height of the surge, the Border Patrol apprehended 8,730 unaccompanied children and 13,370 family units in the RGV, which placed significant strain on a number of DHS resources and operations, including ICE.



078

As part of DHS's response to this unprecedented migration, and to stem the tide, in FY 2014, ICE devoted significant resources, both transportation assets and ICE Enforcement and Removal Operations (ERO) officers, to transfer 56,029 unaccompanied children apprehended at the southwest border to the Department of Health and Human Services (HHS), as the law requires. While these unaccompanied children did not occupy ICE detention space, they required ICE to reallocate resources, including officer time, to support DHS's response to this urgent humanitarian situation. For example, approximately 800 ERO officers and support personnel (over 10 percent of ERO's entire workforce) were detailed to support southwest border operations.

The significant increase in illegal migration of unaccompanied children and family units also contributed to operational challenges for ICE. ICE does not detain unaccompanied children. Under the law, ICE is required to transfer unaccompanied children to HHS, generally within 72 hours. HHS then becomes responsible for their care and is required by law to place unaccompanied minors in the least restrictive setting that is in the best interest of the child, which generally results in placement with a family member. Unlike adults apprehended at the border who are placed into expedited removal, the law requires that unaccompanied children be placed in removal proceedings before an immigration judge (as opposed to expedited removal). These cases are placed on the non-detained immigration court docket, and due to a number of factors, generally take significantly longer to be adjudicated than those of adults.

Like single adults, family units apprehended at the border may be placed into expedited removal proceedings and detained. However, this process requires ICE to maintain an increased level of family detention space, which historically has been limited to fewer than 100 beds nationwide. ICE cannot detain family units, including children, in adult detention facilities. As a result, in the summer ICE sought substantial resources and authority to build additional detention capacity to detain and remove family units, and since then ICE has opened three additional facilities for this purpose. All of these efforts required ERO officer time, support personnel, and significant funding.

At the height of the surge, in order to sustain ICE and CBP response efforts, the President submitted an emergency supplemental funding request to Congress to help address these unique and urgent challenges, including significantly increased ICE detention capacity for family units and ICE transportation resources for unaccompanied children. That request was not acted upon, and as a result DHS was required to reprogram funds from other key homeland security priorities. In doing so, and coupled with a broader public messaging campaign and sustained foreign counterpart engagement, DHS efforts helped contribute to dramatically reducing migration in the RGV, down to 1,491 unaccompanied children and 1,704 family units apprehended in September, the last month of the fiscal year. However, ICE

3

and DHS components remain vigilant and will continue to work with Congress and our interagency and foreign counterparts to sustain our progress.

<u>The Spike of Central Americans</u>

In addition to the surge of unaccompanied children and family units, between FY 2013 and FY 2014, ICE experienced another key demographic shift in the population of the individuals it detained and removed.  Specifically, ICE removals of Mexican nationals decreased from 66 to 56 percent of total ICE removals during this period.  At the same time, the number of aliens removed to El Salvador, Guatemala, and Honduras increased by 15 percent due to the increased share of apprehensions involving such nationals at the border.  Removals of individuals at the border from countries other than Mexico increased 26 percent.

Removal of nationals to non-contiguous countries are far more costly, take significantly more time, and require added officer resources as compared to removals of Mexican nationals.  Instead of quickly returning Mexican nationals apprehended at the border, ICE must take custody of Central Americans and other individuals from non-contiguous countries, detain them, obtain travel documents from the host country, and expend transportation and flight resources.

**FY 2014 Demographic Shift for ICE Removals**

| COUNTRY | FY 2013 | FY 2014 |
|---|---|---|
| El Salvador | 21,602 | 27,180 |
| Guatemala | 47,749 | 54,423 |
| Honduras | 37,049 | 40,695 |
| Mexico | 241,493 | 176,968 |

# Increasing Jurisdictions Declining to Honor ICE Detainers

In the interior, ICE successfully focused its enforcement actions on criminals; 85 percent of interior enforcement removals were of convicted criminals.  ICE's efforts in the interior, however, were impacted by an increasing number of state and local jurisdictions that are declining to honor ICE detainers.[1]  As a result, instead of state and local jails transferring criminal aliens in their custody to ICE for removal, such

---

[1] On November 20, 2014, Secretary Johnson issued a memorandum directing ICE to discontinue the Secure Communities program and replace it with the Priority Enforcement Program (PEP) to more effectively identify and facilitate the removal of criminal aliens in the custody of state and local law enforcement agencies.  PEP will continue to rely on fingerprint-based biometric data submitted during bookings by state and local law enforcement agencies to the Federal Bureau of Investigation for criminal background checks.  But ICE will only seek the transfer of an alien in the custody of such agencies when the alien has been convicted of certain offenses that pose the greatest threat to public safety.  *See* Secure Communities Memorandum dated November 20, 2014.  *See also* Policies for Apprehension, Detention and Removal of Undocumented Immigrants Memorandum dated November 20, 2014.

aliens were released by state and local authorities.  Since January 2014, state and local law enforcement authorities declined to honor 10,182 detainers.[2]  This required ICE to expend additional resources attempting to locate, apprehend, and remove criminal aliens who were released into the community, rather than transferred directly into custody.  These changes further contributed to decreased ICE removals.

## Refined Focus on Convicted Criminals

In recent years, ICE has increased its focus on identifying, locating, apprehending, and removing convicted criminal aliens who are at-large, requiring significantly more officers, time, money, and other resources as compared to those individuals who are in a custodial setting.  In FY 2014, while total criminal removals declined from last year, a significant percentage of ICE's interior removals—85 percent—remained focused on criminal aliens.  The substantial share of convicted criminals removed from the interior represents a steady and significant increase from 2008, when that figure was just 38 percent and 2011 when it was 67 percent.[3]  ICE's focus on criminal removals in the interior is also reflected in the total number of criminal removals:  in FY 2007 and FY 2008, ICE removed 102,024 and 114,415 convicted criminals, respectively, as compared to 216,810 in FY 2013 and 177,960 in 2014.  In addition, ICE removed 2,802 individuals in FY 2014 who were classified as suspected or confirmed gang members.  As a result, while overall removals declined in FY 2014, ICE has sustained the improved quality of its removals by focusing on the most serious public safety and national security threats.

## Reduced Use of the Alien Transfer Exit Program

Key operational changes to the Alien Transfer Exit Program (ATEP) impacted ICE's operations and the removal of Mexican nationals.  ATEP is a joint effort between ICE ERO and CBP Border Patrol in which Mexican nationals apprehended in one sector of the southwest border are transported for removal through a different sector in order to disrupt the smuggling cycle by separating migrants from their smugglers. In 2013, ICE began reallocating limited resources away from ATEP to focus on the increasing number of Central American migrants and other priorities.  In FY 2014, ICE continued to scale back ATEP and re-tasked ATEP-dedicated transportation resources to effectively manage the influx of family units and unaccompanied children apprehended in the RGV.  As a result, in FY 2014, the number of ATEP ICE removals dramatically decreased as compared to the 52,965 Mexican nationals removed through ATEP in FY 2013.  This contributed to a reduction in total ICE removals in FY 2014.  However, the Border Patrol supported ICE's reduction in ATEP transportation resources by removing or voluntarily returning those individuals who would have met the criteria for ATEP.

---

[2] ICE began collecting information on declined detainers beginning January 2014.
[3] Because ICE's crime entry screen did not exist in its systems prior to 2011, the ability to electronically capture and report criminal conviction information prior to 2011 was limited.

081

## Legal Requirements

ICE's interior operations were also challenged by federal court decisions, including the decision of the U.S. Court of Appeals for the Ninth Circuit in *Rodriguez* v. *Robbins*, 715 F.3d 1127 (9th Cir. 2013). Under *Rodriguez*, individuals who are detained while in removal proceedings, including those subject to mandatory detention, must be granted individual bond hearings within 180 days of the commencement of immigration detention, regardless of ICE's custody determination. *Rodriguez* applies throughout the Ninth Circuit, the largest federal jurisdiction. As a result, a greater number of individuals have been released on immigration judge-determined bonds and transferred from the detained docket to the non-detained docket. This has directly impacted removals in the short term because cases on the non-detained docket take longer to adjudicate, and require additional ICE resources.

In addition, ICE relies on the cooperation of foreign governments to effectuate removal of their nationals. ICE often cannot repatriate individuals within the legally prescribed time limits because their countries of origin or nationality fail to issue required travel documents in a timely manner. This occurs despite ICE and Department of State efforts to work with these countries to procure necessary documents. In these cases, ICE is generally required by law to release individuals from custody. Individuals may be released on bond or an order of supervision and may be enrolled in the Alternatives to Detention (ATD) program, which may include GPS monitoring and telephonic reporting. While ICE continues to engage countries that do not cooperate in the timely repatriation of their nationals, their failure to cooperate poses a significant challenge to removals.

In FY 2014:

- ICE conducted 315,943 removals.
- ICE conducted 102,224 removals of individuals apprehended in the interior of the United States.
  - 86,923 (85 percent) of all interior removals involved individuals previously convicted of a crime.
- ICE conducted 213,719 removals of individuals apprehended while attempting to unlawfully enter the United States.[4]
- 56 percent of all ICE removals, or 177,960, involved individuals who were previously convicted of a crime.
  - ICE apprehended and removed 86,923 criminals from the interior of the U.S.
  - ICE removed 91,037 criminals apprehended while attempting to unlawfully enter the United States.
- 98 percent of all ICE FY 2014 removals, or 309,477, clearly met one or more of ICE's stated civil immigration enforcement priorities.[5]
- Of the 137,983 individuals removed who had no criminal conviction, 89 percent, or 122,682, were apprehended at or near the border while attempting to unlawfully enter the country.[6]

**Key Term Definitions**

**Border Removal**: An individual removed by ICE who is apprehended by a CBP officer or agent while attempting to illicitly enter the United States at or between the ports of entry. These individuals are also referred to as recent border crossers.

**Criminal Offender**: An individual convicted in the United States for one or more criminal offenses. This does not include civil traffic offenses.

**Immigration Fugitives**: An individual who has failed to leave the United States based on a final order of removal, deportation, or exclusion, or has failed to report to ICE after receiving notice to do so.

**Interior Removal**: An individual removed by ICE who is identified or apprehended in the United States by an ICE officer or agent. This category excludes those apprehended at the immediate border while attempting to unlawfully enter the United States.

**Other Removable Alien**: An individual who is not a confirmed convicted criminal, recent border crosser, or other ICE civil enforcement priority category. This category may include individuals removed on national security grounds or for general immigration violations.

**Previously Removed Alien**: An individual previously removed or returned who has re-entered the country illegally.

**Reinstatement of Final Removal Order**: The removal of an alien based on the reinstatement of a prior removal order, where the alien departed the United States under an order of removal and illegally reentered the United States (INA § 241(a)(5)). The alien may be removed without a hearing before an immigration court.

**Removal**: The compulsory and confirmed movement of an inadmissible or deportable alien out of the United States based on an order of removal. An individual who is removed may have administrative or criminal consequences placed on subsequent reentry because of the removal. ICE removals also include voluntary returns, voluntary departures, and withdrawals of admission for cases managed by ICE officers and agents.

---

[4] Approximately 96 percent of these individuals were apprehended by CBP Border Patrol agents and then processed, detained, and removed by ICE. The remaining individuals were apprehended by CBP officers at ports of entry.
[5] As defined in the March 2011 ICE Memorandum: Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens.
[6] ICE defines criminality via a recorded criminal conviction obtained by ICE officers and agents from certified criminal history repositories. These individuals include recent border crossers, immigration fugitives, and repeat immigration violators.

- The leading countries of origin for removals were Mexico, Guatemala, Honduras, and El Salvador.
- 2,802 individuals removed by ICE were classified as suspected or confirmed gang members.[7]

## Border Removals

In FY 2014, ICE continued to prioritize border security, partnering with CBP to process and remove individuals apprehended while attempting to unlawfully enter the United States.

In FY 2014, ICE conducted 213,179 removals of recent border crossers.  Many of those apprehended along the border had prior criminal or civil immigration violations in the United States.  Of these recent border crosser removals, 91,037 involved individuals with at least one criminal conviction.

| FY 2014 ICE Border Removals by Apprehending Program and Priority | | | |
|---|---|---|---|
| **Apprehending CBP Office** | **Level/Priority** | | **Removals** |
| **Office of Border Patrol (OBP)** | Convicted Criminal | Level 1 | 17,772 |
| | | Level 2 | 19,733 |
| | | Level 3 | 49,948 |
| | Immigration Fugitives | | 1,776 |
| | Repeat Immigration Violators | | 54,115 |
| | Other Border Removals | | 61,714 |
| | **Total OBP** | | **205,058** |
| **Office of Field Operations (OFO)** | Convicted Criminal | Level 1 | 1,490 |
| | | Level 2 | 866 |
| | | Level 3 | 1,228 |
| | Immigration Fugitives | | 56 |
| | Repeat Immigration Violators | | 995 |
| | Other Border Removals | | 4,026 |
| | **Total OFO** | | **8,661** |

---

[7] Gang affiliation is documented as part of the intake process in the Risk Classification Assessment (RCA).

084

# Changing Border Apprehension Demographics

In FY 2014, ICE carried out 110,021 border removals of individuals from countries other than Mexico, a 26 percent increase over the 90,461 such individuals removed by ICE in FY 2013.  Given this shift in border apprehension demographics, ICE was required in FY 2014 to use more of its detention and removal resources for recent border crossers from countries other than Mexico and Canada—as CBP must rely on ICE to effectuate the removal of individuals from countries that are not contiguous with the United States.

In FY 2014, Mexico continued to be the leading country of origin for individuals removed, followed by Guatemala, Honduras, and El Salvador.

| FY 2014 Top 10 Countries of ICE Removal by Citizenship | |
|---|---|
| **Citizenship** | **Total** |
| Mexico | 176,968 |
| Guatemala | 54,423 |
| Honduras | 40,695 |
| El Salvador | 27,180 |
| Dominican Republic | 2,130 |
| Ecuador | 1,565 |
| Nicaragua | 1,266 |
| Colombia | 1,181 |
| Jamaica | 938 |
| Brazil | 850 |
| **Total** | **307,196** |

# Interior Apprehensions and Removals

In FY 2014, ICE conducted 102,224 removals of individuals apprehended in the interior of the United States.  ICE focused interior enforcement operations on individuals with criminal convictions, emphasizing those convicted of the most serious crimes.  Notably, 85 percent of all removals from the interior of the United States involved individuals who were previously convicted of a criminal offense, while 76 percent of the convicted criminals removed from the interior were convicted of an ICE Level 1 or Level 2 offense.

Level 1 offenders are aliens convicted of (1) an "aggravated felony," as defined in § 101(a)(43) of the Immigration and Nationality Act, or (2) two or more crimes each punishable by more than one year, commonly referred to as "felonies."  Level 2 offenders are aliens convicted of any other felony or three or more crimes each punishable by less

than one year, commonly referred to as "misdemeanors." Level 3 offenders are aliens convicted of "misdemeanor" crime(s) punishable by less than one year.

| FY 2014 ICE Interior Criminal Removals by Level | | |
|---|---|---|
| Level 1 | 43,897 | 50.5 percent |
| Level 2 | 22,191 | 25.5 percent |
| Level 3 | 20,835 | 24 percent |
| Total | 86,923 | 100 percent |

Almost two thirds of individuals with criminal convictions who were removed from the interior of the United States also fell into other ICE priority categories. For example, 62 percent of ICE's interior criminal alien removals were previously removed from the United States or were immigration fugitives, and 65 percent of all interior Level 3 removals had been previously removed or were immigration fugitives.

| FY 2014 ICE Interior Removals by Priority | | |
|---|---|---|
| **Threat Level/Priority** | | **Removals** |
| Convicted Criminal | Level 1 | 43,897 |
| | Level 2 | 22,191 |
| | Level 3 | 20,835 |
| Immigration Fugitives | | 1,629 |
| Repeat Immigration Violators | | 7,206 |
| Other Removals | | 6,466 |
| Total | | 102,224 |



FY 2014 Level 3 Interior Removals
Total: 20,835

- 1,653 — Immigration Fugitives
- 11,820 — Repeat Immigration Violators
- 7,362 — Other Removable Aliens

10

## Criminal Alien Removals

In FY 2014, approximately 56 percent (177,960) of all ICE removals involved individuals with criminal convictions.  Overall, in FY 2014, 63,159 of the convicted criminal removals were Level 1 offenders, 42,790 were Level 2 offenders, and 72,011 were Level 3 offenders.

The majority of Level 1 and Level 2 offenders—62 percent—were apprehended in the interior of the United States.  Conversely, 71 percent of all Level 3 offenders were apprehended at or near the border.

## Non-Criminal Removals

The vast majority of ICE non-criminal removals in FY 2014 involved individuals encountered by CBP agents and officers while trying to unlawfully enter the United States.  Specifically, 89 percent (122,682) of ICE's 137,983 non-criminal removals involved individuals attempting to unlawfully enter the United States.  A full 95 percent of ICE's non-criminal removals involved recent border crossers, repeat immigration violators, or immigration court fugitives.

# III. Appendix A:  FY 2014 Removals by Citizenship

| FY 2014 ICE Removals by Citizenship ||
|----------------------------|--------|
| **Citizenship** | **Total** |
| Mexico | 176,968 |
| Guatemala | 54,423 |
| Honduras | 40,695 |
| El Salvador | 27,180 |
| Dominican Republic | 2,130 |
| Ecuador | 1,565 |
| Nicaragua | 1,266 |
| Colombia | 1,181 |
| Jamaica | 938 |
| Brazil | 850 |
| Peru | 678 |
| China | 534 |
| Canada | 457 |
| Haiti | 382 |
| India | 359 |
| Philippines | 302 |
| Nigeria | 261 |
| Costa Rica | 245 |
| United Kingdom | 213 |
| Poland | 159 |
| Trinidad and Tobago | 158 |
| South Korea | 154 |
| Venezuela | 153 |
| Romania | 143 |
| Guyana | 136 |
| Belize | 123 |
| Spain | 121 |
| Kenya | 113 |
| Russia | 112 |
| Bahamas | 110 |
| Saudi Arabia | 105 |
| Argentina | 101 |
| Pakistan | 98 |
| Ukraine | 96 |

088

| FY 2014 ICE Removals by Citizenship | |
|---|---|
| **Citizenship** | **Total** |
| Ghana | 91 |
| Italy | 91 |
| France | 87 |
| Bolivia | 85 |
| Israel | 83 |
| Korea | 83 |
| Jordan | 80 |
| Germany | 77 |
| Cambodia | 75 |
| Panama | 73 |
| Indonesia | 71 |
| Chile | 69 |
| Bangladesh | 66 |
| Somalia | 65 |
| Portugal | 64 |
| Micronesia | 63 |
| Egypt | 62 |
| Hungary | 60 |
| Turkey | 60 |
| Bosnia-Herzegovina | 53 |
| Lebanon | 53 |
| Thailand | 52 |
| Albania | 50 |
| Vietnam | 48 |
| Uruguay | 45 |
| Nepal | 44 |
| Morocco | 43 |
| South Africa | 42 |
| Australia | 41 |
| Netherlands | 39 |
| Uzbekistan | 39 |
| Czech Republic | 34 |
| Japan | 34 |
| Bulgaria | 33 |
| Ireland | 33 |
| Latvia | 32 |
| Ethiopia | 31 |

| FY 2014 ICE Removals by Citizenship | |
|---|---|
| **Citizenship** | **Total** |
| Lithuania | 31 |
| Marshall Islands | 31 |
| Sri Lanka | 31 |
| Tanzania | 31 |
| Armenia | 30 |
| Cameroon | 30 |
| Greece | 30 |
| Iraq | 29 |
| Taiwan | 29 |
| Tonga | 29 |
| Moldova | 26 |
| Cuba | 24 |
| Iran | 23 |
| Kazakhstan | 23 |
| Mongolia | 23 |
| Afghanistan | 22 |
| Georgia | 22 |
| Uganda | 22 |
| Malaysia | 21 |
| Kyrgyzstan | 20 |
| St. Vincent Grenadines | 19 |
| Belarus | 18 |
| Fiji | 18 |
| New Zealand | 18 |
| Senegal | 18 |
| Liberia | 17 |
| St. Kitts-Nevis | 17 |
| Sweden | 17 |
| Barbados | 16 |
| Dominica | 16 |
| Mali | 16 |
| Slovakia | 16 |
| Unknown | 16 |
| Antigua-Barbuda | 15 |
| Hong Kong | 15 |
| Palau | 15 |
| Yemen | 15 |

| FY 2014 ICE Removals by Citizenship | |
|---|---|
| **Citizenship** | **Total** |
| Sudan | 14 |
| Angola | 13 |
| Guinea | 13 |
| Grenada | 12 |
| Macedonia | 12 |
| Paraguay | 12 |
| Serbia | 12 |
| Sierra Leone | 12 |
| Singapore | 12 |
| St. Lucia | 12 |
| Tunisia | 12 |
| Ivory Coast | 11 |
| Libya | 11 |
| Congo | 10 |
| Kosovo | 10 |
| Niger | 10 |
| Zambia | 10 |
| Zimbabwe | 10 |
| Azerbaijan | 9 |
| Belgium | 9 |
| Cape Verde | 9 |
| Czechoslovakia | 9 |
| Samoa | 9 |
| South Sudan | 9 |
| Syria | 9 |
| Estonia | 8 |
| British Virgin Islands | 7 |
| Gambia | 7 |
| Mauritania | 7 |
| Montenegro | 7 |
| Norway | 7 |
| Tajikistan | 7 |
| Bermuda | 6 |
| Burkina Faso | 6 |
| Dem Rep of the Congo | 6 |
| Denmark | 6 |
| Kuwait | 6 |

15

091

| FY 2014 ICE Removals by Citizenship | |
|---|---|
| **Citizenship** | **Total** |
| Switzerland | 6 |
| Togo | 6 |
| Benin | 5 |
| Burma | 5 |
| Croatia | 5 |
| Slovenia | 5 |
| Suriname | 5 |
| Yugoslavia | 5 |
| Algeria | 4 |
| Austria | 4 |
| Burundi | 4 |
| Equatorial Guinea | 4 |
| Gabon | 4 |
| Malawi | 4 |
| Oman | 4 |
| Botswana | 3 |
| Cayman Islands | 3 |
| Finland | 3 |
| Iceland | 3 |
| Laos | 3 |
| Namibia | 3 |
| Netherlands Antilles | 3 |
| Turkmenistan | 3 |
| Turks and Caicos Islands | 3 |
| Chad | 2 |
| Cyprus | 2 |
| Mauritius | 2 |
| Rwanda | 2 |
| United Arab Emirates | 2 |
| USSR[8] | 2 |
| Andorra | 1 |
| Bahrain | 1 |
| Comoros | 1 |
| Eritrea | 1 |

---

[8] Denotes aliens subject to removal who are nationals of countries that were member states of the Union of Soviet Socialist Republics (USSR), but who did not become citizens of the Russian Federation after the dissolution of the USSR.

16

| FY 2014 ICE Removals by Citizenship ||
| Citizenship | Total |
| --- | --- |
| French Guiana | 1 |
| Guadeloupe | 1 |
| Guinea-Bissau | 1 |
| Macau | 1 |
| Madagascar | 1 |
| Malta | 1 |
| Monaco | 1 |
| Montserrat | 1 |
| Papua New Guinea | 1 |
| San Marino | 1 |
| **Total** | **315,943** |

17

# Appendix B:  Methodology

## **Data Source:**

Data used to report ICE statistics are obtained through the ICE Integrated Decision Support (IIDS) system data warehouse.

## **Data Run Dates**

FY 2014: IIDS v1.16 run date 10/05/2014; ENFORCE Integrated Database (EID) as of 10/03/2014

FY 2013: IIDS v1.14 run date 10/06/2013; EID as of 10/04/2013

FY 2012: IIDS v1.12 run date 10/07/2012; EID as of 10/05/2012

FY 2011: IIDS run date 10/07/2011; EID as of 10/05/2011

FY 2010: IIDS run date 10/05/2010; EID as of 10/03/2010

FY 2009: Removals and Returns are an adjusted historical number of an IIDS run date of 8/16/2010 (EID as of 8/14/10) and will remain static.

## **Removals**

Removal data is historical and remains static. Removals include Returns. Returns include Voluntary Returns, Voluntary Departures, and Withdrawals Under Docket Control.

In FY 2009, ICE began to "lock" removal statistics on October 5 at the end of each fiscal year, and counted only aliens whose removal or return was already confirmed. Aliens removed or returned in that fiscal year but not confirmed until after October 5 were excluded from the locked data, and thus from ICE statistics.  To ensure an accurate and complete representation of all removals and returns, ICE will count removals and returns confirmed after October 5 toward the next fiscal year.  FY 2012 removals, excluding FY 2011 "lag," were 402,919.  FY 2013 removals, excluding FY 2012 "lag," were 363,144. FY 2014 removals, excluding FY 2013 "lag," were 311,111.

Fiscal Year Data Lag/Case Closure Lag is defined as the physical removal of an alien occurring in a given month; however, the case is not closed in EARM until the fiscal year after the data is locked. Since data from the previous fiscal year are locked, the removal is recorded in the month the case was closed and reported in subsequent fiscal year removals.  This will result in a higher number of recorded removals in a fiscal year than actual departures.

18

Any voluntary return on or after June 1, 2013 without an ICE intake case will not be recorded as an ICE removal.

ERO Removals include aliens processed for Expedited Removal (ER) and turned over to ERO for detention. Aliens processed for ER and not detained by ERO are primarily processed by Border Patrol. CBP should be contacted for those statistics.

Gang affiliation is documented as part of the intake process in the Risk Classification Assessment (RCA).
FY 2012 – FY 2013 Removals include ATEP removals.

## __Criminality__

ICE Levels reflect priorities outlined in the June 2010 memorandum entitled "ICE Civil Immigration Enforcement Priorities effective October 1, 2010."  Since FY 2011, ICE has defined criminality as a recorded criminal conviction from certified criminal history repositories. To prioritize the removal of convicted criminal aliens, ICE personnel refer to the following offense levels:  Level 1, Level 2, and Level 3 offenders.  Level 1 offenders are aliens convicted of "aggravated felonies," as defined in § 101(a)(43) of the Immigration and Nationality Act, or two or more crimes, each punishable by more than one year, commonly referred to as "felonies."  Level 2 offenders are aliens convicted of any other felony or three or more crimes, each punishable by less than one year, commonly referred to as "misdemeanors." Level 3 offenders are aliens convicted of "misdemeanor" crime(s) punishable by less than one year.  Prior to FY 2011, ICE used Secure Communities (SC) Levels 1, 2, and 3 for prioritization purposes.