EXHIBIT 8



**Congressional Research Service**

**MEMORANDUM**                                                July 13, 2012

**To:**        Prepared for Distribution to Multiple Congressional Requesters

**From:**     Andorra Bruno, Specialist in Immigration Policy, 7-7865
              Todd Garvey, Legislative Attorney, 7-0174
              Kate Manuel, Legislative Attorney, 7-4477
              Ruth Ellen Wasem, Specialist in Immigration Policy, 7-7342

**Subject:**  **Analysis of June 15, 2012 DHS Memorandum, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children***

This Congressional Research Service (CRS) memorandum provides background and analysis related to the memorandum issued by the Department of Homeland Security (DHS) on June 15, 2012, entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*. Under the DHS directive, certain individuals who were brought to the United States as children and meet other criteria will be considered for relief from removal. Intended to respond to a variety of congressional requests on the policy set forth in the DHS memorandum, this CRS memorandum discusses the content of the June 15, 2012 memorandum, as well as the unauthorized alien student issue and related DREAM Act legislation, past administrative exercises of prosecutorial discretion to provide relief from removal, the legal authority for the actions contemplated in the DHS memorandum, and other related issues. For further information, please contact Andorra Bruno (unauthorized students and the DREAM Act), Todd Garvey (constitutional authority), Kate Manuel (other legal issues), or Ruth Wasem (antecedents of deferred departure and access to federal benefits).

## Overview of Unauthorized Alien Students

The unauthorized alien (noncitizen) population includes minors and young adults who were brought, as children, to live in the United States by their parents or other adults. These individuals are sometimes referred to as "unauthorized alien students," or, more colloquially, as "DREAM Act kids" or "DREAMers."

While living in the United States, unauthorized alien children are able to receive free public education through high school.[1] Many unauthorized immigrants who graduate from high school and want to attend

---

[1] The legal authority for disallowing state discrimination against unauthorized aliens in elementary and secondary education is the 1982 Supreme Court decision in Plyler v. Doe. See also CRS Report RS22500, *Unauthorized Alien Students, Higher Education, and In-State Tuition Rates: A Legal Analysis*, by Jody Feder.

college, however, find it difficult to do so. One reason for this is that they are ineligible for federal student financial aid.[2] Another reason relates to a provision enacted in 1996 as part of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA)[3] that discourages states and localities from granting unauthorized aliens certain "postsecondary education benefits" (referred to here as the "1996 provision").[4] More broadly, as unauthorized aliens, they are typically unable to work legally and are subject to removal from the United States.[5]

According to DHS estimates, there were 1.4 million unauthorized alien children under age 18 living in the United States in January 2011. In addition, there were 1.6 million unauthorized individuals aged 18 to 24, and 3.7 million unauthorized individuals aged 25 to 34.[6] These data represent totals and include all individuals in the specified age groups regardless of length of presence in the United States, age at time of initial entry into the United States, or educational status. Numerical estimates of potential beneficiaries of the policy set forth in DHS's June 15, 2012 memorandum are provided below.

# Legislation

Multiple bills have been introduced in recent Congresses to provide relief to unauthorized alien students. These bills have often been entitled the Development, Relief, and Education for Alien Minors Act, or the DREAM Act. A common element in these bills is that they would enable certain unauthorized alien students to obtain legal status through an immigration procedure known as *cancellation of removal*[7] and at some point in the process, to obtain legal permanent resident (LPR) status, provided they meet all the applicable requirements. Multiple DREAM Act bills have been introduced in the 112th Congress but none have seen any legislative action.[8]

## Traditional DREAM Act bills

Since the 109th Congress, "standard" DREAM Act bills have included language to repeal the 1996 provision mentioned above and to enable certain unauthorized alien students to adjust status (that is, to obtain LPR status in the United States). These bills have proposed to grant LPR status on a conditional basis to an alien who, among other requirements, could demonstrate that he or she:

---

[2] Higher Education Act (HEA) of 1965 (P.L. 89-329), as amended, November 8, 1965, 20 U.S.C. §1001 *et seq*.

[3] IIRIRA is Division C of P.L. 104-208, September 30, 1996.

[4] This provision, section 505, nominally bars states from conferring postsecondary education benefits (e.g., in-state tuition) to unauthorized aliens residing within their jurisdictions if similar benefits are not conferred to out-of-state U.S. citizens. Nevertheless, about a dozen states effectively do grant in-state tuition to resident unauthorized aliens without granting similar benefits to out-of-state citizens, and courts that have considered these provisions have upheld them.

[5] For additional information, see CRS Report RL33863, *Unauthorized Alien Students: Issues and "DREAM Act" Legislation*, by Andorra Bruno.

[6] U.S. Department of Homeland Security, Office of Immigration Statistics, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2011*, by Michael Hoefer, Nancy Rytina, and Bryan C. Baker.

[7] Cancellation of removal is a discretionary form of relief that an alien can apply for while in removal proceedings before an immigration judge. If cancellation of removal is granted, the alien's status is adjusted to that of a legal permanent resident.

[8] For additional analysis of DREAM Act legislation, see CRS Report RL33863, *Unauthorized Alien Students: Issues and "DREAM Act" Legislation*.

- was continuously physically present in the United States for at least five years preceding the date of enactment;

- was age 15 or younger at the time of initial entry;

- had been a person of good moral character since the time of initial entry;

- was at or below a specified age (age has varied by bill) on the date of enactment; and

- had been admitted to an institution of higher education in the United States or had earned a high school diploma or the equivalent in the United States.

The bills also include special requirements concerning inadmissibility,[9] and some would disqualify any alien convicted of certain state or federal crimes. After six years in conditional LPR status, an alien could have the condition on his or her status removed and become a full-fledged LPR if he or she meets additional requirements, including completing at least two years in a bachelor's or higher degree program in the United States or serving in the uniformed services[10] for at least two years. Two similar bills with these elements (S. 952, H.R. 1842)—both entitled the DREAM Act of 2011—have been introduced in the 112th Congress.

## Other Versions of the DREAM Act

Revised versions of the DREAM Act have also been introduced in Congress in recent years. In the 111th Congress, the House approved one of these DREAM Act measures as part of an unrelated bill, the Removal Clarification Act of 2010 (H.R. 5281).[11] Unlike earlier DREAM Act bills, this measure[12] did not include a repeal of the 1996 provision and proposed to grant eligible individuals an interim legal status prior to enabling them to adjust to LPR status. Under this measure, an alien meeting an initial set of requirements like those included in traditional DREAM Act bills (enumerated in the previous section) would have been granted conditional *nonimmigrant*[13] status for five years. This status could have been extended for another five years if the alien met additional requirements, including completing at least two years in a bachelor's or higher degree program in the United States or serving in the Armed Forces for at least two years. The applications to obtain conditional status initially and to extend this status would have been subject to surcharges. At the end of the second conditional period, the conditional nonimmigrant could have applied to adjust to LPR status.

---

[9] The Immigration and Nationality Act (INA) enumerates classes of inadmissible aliens. Under the INA, except as otherwise provided, aliens who are inadmissible under specified grounds, such as health-related grounds or criminal grounds, are ineligible to receive visas from the Department of State or to be admitted to the United States by the Department of Homeland Security.

[10] As defined in Section 101(a) of Title 10 of the U.S. Code, *uniformed services* means the Armed Forces (Army, Navy, Air Force, Marine Corps, and Coast Guard); the commissioned corps of the National Oceanic and Atmospheric Administration; and the commissioned corps of the Public Health Service.

[11] The Senate failed, on a 55-41 vote, to invoke cloture on a motion to agree to the House-passed DREAM Act amendment, and H.R. 5281 died at the end of the Congress.

[12] The language is the same as that in H.R. 6497 in the 111th Congress.

[13] Nonimmigrants are legal temporary residents of the United States.

Two bills in the 112th Congress—the Adjusted Residency for Military Service Act, or ARMS Act (H.R. 3823) and the Studying Towards Adjusted Residency Status Act, or STARS Act (H.R. 5869)—follow the general outline of the House-approved measure described above, but include some different, more stringent requirements. These bills would provide separate pathways for unauthorized students to obtain LPR status through military service (ARMS Act) or higher education (STARS Act). Neither bill would repeal the 1996 provision and, thus, would not eliminate the statutory restriction on state provision of postsecondary educational benefits to unauthorized aliens.

The initial requirements for conditional nonimmigrant status under the ARMS Act are like those in the traditional DREAM Act bills discussed above. The STARS Act includes most of these requirements, as well as others that are not found in other DREAM Act bills introduced in the 112th Congress. Two new STARS Act requirements for initial conditional status are: (1) admission to an accredited four-year college, and (2) submission of the application for relief before age 19 or, in some cases, before age 21.

Under both the ARMS Act and the STARS Act, the conditional nonimmigrant status would be initially valid for five years and could be extended for an additional five years if applicants meet a set of requirements. In the case of the ARMS Act, these requirements would include service in the Armed Forces on active duty for at least two years or service in a reserve component of the Armed Forces in active status for at least four years. In the case of the STARS Act, the requirements for an extension of status would include graduation from an accredited four-year institution of higher education in the United States. After obtaining an extension of status, an alien could apply to adjust to LPR status, as specified in each bill.

# DHS Memorandum of June 15, 2012

On June 15, 2012, the Obama Administration announced that certain individuals who were brought to the United States as children and meet other criteria would be considered for relief from removal. Under the memorandum, issued by Secretary of Homeland Security Janet Napolitano, these individuals would be eligible for deferred action[14] for two years, subject to renewal, and could apply for employment authorization.[15] The eligibility criteria for deferred action under the June 15, 2012 memorandum are:

- under age 16 at time of entry into the United States;

- continuous residence in the United States for at least five years preceding the date of the memorandum;

---

[14] Deferred action is "a discretionary determination to defer removal action of an individual as an act of prosecutorial discretion." U.S. Department of Homeland Security, "Secretary Napolitano Announces Deferred Action Process for Young People Who Are Low Enforcement Priorities," http://www.dhs.gov/files/enforcement/deferred-action-process-for-young-people-who-are-low-enforcement-priorities.shtm.

[15] U.S. Department of Homeland Security, Memorandum to David V. Aguilar, Acting Commissioner, U.S. Customs and Border Protection, Alejandro Mayorkas, Director, U.S. Citizenship and Immigration Services, John Morton, Director, U.S. Immigration and Customs Enforcement, from Janet Napolitano, Secretary of Homeland Security, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*, June 15, 2012, http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

- in school, graduated from high school or obtained general education development certificate, or honorably discharged from the Armed Forces;

- not convicted of a felony offense, a significant misdemeanor offense, or multiple misdemeanor offenses, and not otherwise a threat to national security or public safety; and

- age 30 or below.

These eligibility criteria are similar to those included in DREAM Act bills discussed above. The deferred action process set forth in the June 15, 2012 memorandum, however, would not grant eligible individuals a legal immigration status.[16]

Based on these eligibility criteria, the Pew Hispanic Center has estimated that the policy set forth in the June 15, 2012 memorandum could benefit up to 1.4 million unauthorized aliens in the United States. This potential beneficiary population total includes 0.7 million individuals under age 18 and 0.7 million individuals aged 18 to 30.[17]

## Antecedents of the Policy

The Attorney General and, more recently, the Secretary of Homeland Security have had prosecutorial discretion in exercising the power to remove foreign nationals. In 1959, a major textbook of immigration law stated, "Congress traditionally has entrusted the enforcement of its deportation policies to executive officers and this arrangement has been approved by the courts."[18] Specific guidance on how prosecutorial discretion was applied in individual cases was elusive in the early years.[19] Generally, prosecutorial discretion is the authority that an enforcement agency has in deciding whether to enforce or not enforce the law against someone. In the immigration context, prosecutorial discretion exists across a range of decisions that include: prioritizing certain types of investigations; deciding whom to stop, question and arrest; deciding to detain an alien; issuing a notice to appear (NTA); granting deferred action; agreeing to let the alien depart voluntarily; and executing a removal order. (The legal authority to exercise prosecutorial discretion is discussed separately below.)

---

[16] The DHS memorandum states: "This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law." Ibid., p. 3.

[17] Pew Hispanic Center, "Up to 1.4 Million Unauthorized Immigrants Could Benefit from New Deportation Policy," June 15, 2012, http://www.pewhispanic.org/2012/06/15/up-to-1-4-million-unauthorized-immigrants-could-benefit-from-new-deportation-policy/.

[18] Charles Gordon and Harry N. Rosenfield, *Immigration Law and Procedure*, Albany, New York: Banks and Company, 1959, p. 406.

[19] For example, in 1961, an official with the former Immigration and Naturalization Service (INS) offered his insights on circumstances in which discretionary relief from removal might be provided. The first factor he cited was age: "I have always felt that young people should be treated in our proceedings as are juveniles in the Courts who have violated criminal law.... My personal opinion is that certainly someone under eighteen is entitled to extra consideration." He added that persons over 60 or 65 years of age should be given special consideration. He also emphasized length of residence in the United States as a factor, noting that "five years is a significant mark in immigration law." Other factors he included good moral character, family ties in the United States, and exceptional and unusual hardship to the alien as well as family members. Aaron I. Maltin, Special Inquiry Officer, "Relief from Deportation," *Interpreter Releases*, vol. 38, no. 21 (June 9, 1961), pp. 150-155. He also discussed refugee and asylum cases.

Over the next few decades, an official guidance on discretionary relief from removal began to take shape. A 1985 Congressional Research Service "white paper" on discretionary relief from deportation described the policies of Immigration and Naturalization Service (INS)[20] at that time.

> Currently, three such discretionary procedures are relatively routinely used by INS to provide relief from deportation. One of the procedures – stay of deportation – is defined under INS regulations; another—deferred departure or deferred action – is described in INS operating instructions; and the third – extended voluntary departure—has not been formally defined and appears to be evolving.

The CRS "white paper" further noted that the executive branch uses these three forms of prosecutorial discretion "to provide relief the Administration feels is appropriate but which would not be available under the statute."[21]

In an October 24, 2005, memorandum, William Howard, then-Principal Legal Advisor of DHS's Immigration and Customs Enforcement (ICE), cited several policy factors relevant to the need to exercise prosecutorial discretion. One factor he identified was institutional change. He wrote:

> "Gone are the days when INS district counsels... could simply walk down the hall to an INS district director, immigrant agent, adjudicator, or border patrol officer to obtain the client's permission to proceed ... Now the NTA-issuing clients might be in different agencies, in different buildings, and in different cities from our own."

Another issue Howard raised was resources. He pointed out that the Office of Principal Legal Advisor (OPLA) was "handling about 300,000 cases in the immigration courts, 42,000 appeals before the Board of Immigration Appeals (BIA or Board) and 12,000 motions to re-open each year." He further stated:

> "Since 2001, federal immigration court cases have tripled. That year there were 5,435 federal court cases. Four years later, in fiscal year 2004, that number had risen to 14,699 federal court cases. Fiscal year 2005 federal court immigration cases will approximate 15,000."[22]

Howard offered examples of the types of cases to consider for prosecutorial discretion, such as someone who had a clearly approvable petition to adjust to legal permanent resident status, someone who was an immediate relative of military personnel, or someone for whom sympathetic humanitarian circumstances "cry for an exercise of prosecutorial discretion."[23]

In November 2007, then-DHS Assistant Secretary for ICE Julie L. Myers issued a memorandum in which she clarified that the replacement of the "catch and release" procedure with the "catch and return" policy for apprehended aliens (i.e., a zero-tolerance policy for all aliens apprehended at the border) did not "diminish the responsibility of ICE agents and officers to use discretion in identifying and responding to

---

[20] Most of the immigration-related functions of the former INS were transferred to the U.S. Department of Homeland Security when it was created in 2002 by the Homeland Security Act (P.L. 107-296). Three agencies in DHS have important immigration functions in which prosecutorial discretion may come into play: Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS).

[21] Sharon Stephan, *Extended Voluntary Departure and Other Blanket Forms of Relief from Deportation*, Congressional Research Service, 85-599 EPW, February 23, 1985.

[22] William J. Howard, Principal Legal Advisor, U.S. Immigration and Customs Enforcement, *Prosecutorial Discretion*, memorandum to all OPLA Chief Counsel, October 24, 2005.

[23] *Ibid.*

meritorious health-related cases and caregiver issues."[24] Assistant Secretary Myers referenced and attached a November 7, 2000, memorandum entitled "Exercising Prosecutorial Discretion," which was written by former INS Commissioner Doris Meissner. The 2000 memorandum stated, in part:

> "Like all law enforcement agencies, the INS has finite resources, and it is not possible to investigate and prosecute all immigration violations. The INS historically has responded to this limitation by setting priorities in order to achieve a variety of goals. These goals include protecting public safety, promoting the integrity of the legal immigration system, and deterring violations of the immigration law.  It is an appropriate exercise of prosecutorial discretion to give priority to investigating, charging, and prosecuting those immigration violations that will have the greatest impact on achieving these goals."[25]

Meissner further stated that prosecutorial discretion should not become "an invitation to violate or ignore the law."[26]

The Meissner, Howard, and Myers memoranda provide historical context for the March 2011 memorandum on prosecutorial discretion written by ICE Director John Morton.[27] Morton published agency guidelines that define a three-tiered priority scheme that applies to all ICE programs and enforcement activities related to civil immigration enforcement.[28] Under these guidelines, ICE's top three civil immigration enforcement priorities are to: (1) apprehend and remove aliens who pose a danger to national security or a risk to public safety, (2) apprehend and remove recent illegal entrants,[29] and (3) apprehend aliens who are fugitives or otherwise obstruct immigration controls.[30]

In a June 17, 2011 memorandum, Morton spells out 18 factors that are among those that should be considered in weighing prosecutorial discretion. The factors include those that might halt removal

---

[24] Julie L. Myers, Assistant Secretary, Immigration and Customs Enforcement, *Prosecutorial and Custody Discretion,* memorandum, November 7, 2007. CRS Report R42057, *Interior Immigration Enforcement: Programs Targeting Criminal Aliens,* by Marc R. Rosenblum and William A. Kandel. (Hereafter CRS R42057, *Interior Immigration Enforcement.*)

[25] Doris Meissner, Commissioner, Immigration and Naturalization Service, *Exercising Prosecutorial Discretion,* memorandum to regional directors, district directors, chief patrol agents, and the regional and district counsels, November 7, 2000.

[26] *Ibid.*

[27] John Morton, Director, Immigration and Customs Enforcement, *Civil Immigration Enforcement Priorities for the Apprehension, Detention, and Removal of Aliens,* memorandum, March 2, 2011.

[28] ICE's mission includes the criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration; see ICE, "ICE Overview: Mission," http://www.ice.gov/about/overview/. Laws governing the detention and removal of unauthorized aliens generally fall under ICE's civil enforcement authority, while laws governing the prosecution of crimes, including immigration-related crimes, fall under ICE's criminal enforcement authority. Also see Hiroshi Motomura, "The Discretion That Matters: Federal Immigration Enforcement, State and Local Arrests, and the Civil-Criminal Line," *UCLA Law Review,* vol. 58, no. 6 (August 2011), pp. 1819-1858.

[29] The memorandum does not define "recent illegal entrants." DHS regulations permit immigration officers to summarily exclude an alien present in the United States for less than two years unless the alien expresses an intent to apply for asylum or has a fear of persecution or torture; and DHS policy is to pursue expedited removal proceedings against aliens who are determined to be inadmissible because they lack proper documents, are present in the United States without having been admitted or paroled following inspection by an immigration officer at a designated port of entry, are encountered by an immigration officer within 100 miles of the U.S. border, and have not established to the satisfaction of an immigration officer that they have been physically present in the United States for over 14 days. See CRS Report RL33109, *Immigration Policy on Expedited Removal of Aliens,* by Alison Siskin and Ruth Ellen Wasem.

[30] CRS Report R42057, *Interior Immigration Enforcement: Programs Targeting Criminal Aliens,* by Marc R. Rosenblum and William A. Kandel.

proceedings, such as whether the person's immediate relative is serving in the military, whether the person is a caretaker of a person with physical or mental disabilities, or whether the person has strong ties to the community. The factors Morton lists also include those that might prioritize a removal proceeding, such as whether the person has a criminal history, whether the person poses a national security or public safety risk, whether the person recently arrived in the United States, and how the person entered. At the same time, the memorandum states:

> "This list is not exhaustive and no one factor is determinative. ICE officers, agents and attorneys should always consider prosecutorial discretion on a case-by-case basis. The decisions should be based on the totality of the circumstances, with the goal of conforming to ICE's enforcement priorities."

The Morton memorandum would halt removal proceedings on those foreign nationals that are not prioritized for removal. The foreign nationals whose removals are halted in keeping with the Morton memorandum might be given deferred action or some other relief from removal. [31]

## Deferred Action

In 1975, INS issued guidance on a specific form of prosecutorial discretion known as deferred action, which cited "appealing humanitarian factors." The INS Operating Instructions said that consideration should be given to advanced or tender age, lengthy presence in the United States, physical or mental conditions requiring care or treatment in the United States, and the effect of deportation on the family members in the United States. On the other hand, those INS Operating Instructions made clear that criminal, immoral or subversive conduct or affiliations should also be weighed in denying deferred action.[32] Today within DHS, all three of the immigration-related agencies—ICE, U.S. Citizenship and Immigration Services (USCIS), and Customs and Border Protection (CBP)—possess authority to grant deferred action. A foreign national might be considered for deferred action at any stage of the administrative process.[33]

Because of where the foreign national may be in the process, ICE issuances of deferred action are more likely to be aliens who are detained or in removal proceedings. It is especially important to note, as mentioned above, that not all prosecutorial discretion decisions to halt removal proceedings result in a grant of deferred action to the foreign national. Voluntary departure, for example, might be an alternative outcome of prosecutorial discretion.[34]

---

[31] John Morton, Director of Immigration and Customs Enforcement, *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for Apprehension, Detention and Removal of Aliens*, memorandum to field office directors, special agents in charge, and chief counsels, June 17, 2011.

[32] Shoba Sivaprasad Wadhia, "The Role of Prosecutorial Discretion in Immigration Law," *Connecticut Public Interest Law Journal,* Spring 2010.

[33] Charles Gordon, Stanley Mailman, Stephen Yale-Loehr, *Immigration Law and Procedure*. Newark: LexisNexis, vol. 6, §72.03.

[34] Voluntary departure typically means that the alien concedes removability and departs the United States on his or her own recognizance, rather than with a final order of removal.

## Other Forms of Deferred Departure

In addition to deferred action, which is granted on a case-by-case basis, the Administration may use prosecutorial discretion, under certain conditions, to provide relief from deportation that is applied as blanket relief.[35] The statutory authority cited by the agency for these discretionary procedures is generally that portion of the INA that confers on the Attorney General the broad authority for general enforcement and the section of the law covering the authority for voluntary departure.[36]

The two most common uses of prosecutorial discretion to provide blanket relief from deportation have been deferred departure or deferred enforced departure (DED) and extended voluntary departure (EVD).[37] The discretionary procedures of DED and EVD continue to be used to provide relief the Administration feels is appropriate. Foreign nationals who benefit from EVD or DED do not necessarily register for the status with USCIS, but they trigger the protection when they are identified for deportation. If, however, they wish to be employed in the United States, they must apply for a work authorization from USCIS.

The executive branch has provided blanket or categorical deferrals of deportation numerous times over the years. CRS has compiled a list of these administrative actions since 1976 in **Appendix A**.[38] As the table indicates, most of these discretionary deferrals have been done on a country-specific basis, usually in response to war, civil unrest, or natural disasters. In many of these instances, Congress was considering legislative remedies for the affected groups, but had not yet enacted immigration relief for them. The immigration status of those who benefited from these deferrals of deportation often—but not always—was resolved by legislation adjusting their status (**Appendix A**).

## Two Illustrative Examples

Several of the categorical deferrals of deportation that were **not** country-specific bear some similarities to the June 15, 2012 policy directive. Two examples listed in **Appendix A** are summarized below: the "Silva letterholders" class and the "family fairness" relatives. Both of these groups receiving discretionary relief from deportation were unique in their circumstances. While each group included many foreign nationals who would otherwise be eligible for LPR visas, they were supposed to wait in numerically-limited visa categories. These wait times totaled decades for many of them. Congress had considered but not enacted legislation addressing their situations. Ultimately, their cases were resolved by provisions folded into comprehensive immigration legislation.[39]

---

[35] In addition to relief offered through prosecutorial discretion, the INA provides for Temporary Protected Status (TPS). TPS may be granted under the following conditions: there is ongoing armed conflict posing serious threat to personal safety; a foreign state requests TPS because it temporarily cannot handle the return of nationals due to environmental disaster; or there are extraordinary and temporary conditions in a foreign state that prevent aliens from returning, provided that granting TPS is consistent with U.S. national interests. CRS Report RS20844, *Temporary Protected Status: Current Immigration Policy and Issues*, by Ruth Ellen Wasem and Karma Ester.

[36] §240 of INA, 8 U.S.C. §1229a; §240B, 8 U.S.C. §1229c.

[37] As TPS is spelled out in statute, it is not considered a use of prosecutorial discretion, but it does provide blanket relief from removal temporarily.

[38] **Appendix A** only includes those administrative actions that could be confirmed by copies of official government guidance or multiple published accounts. For example, reports of deferred action after Hurricane Katrina or the September 11, 2001, terrorist attacks could not be verified, though it seems likely that the Administration did provide some type of temporary reprieve.

[39] These policies and legal provisions pre-date the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (referenced above), which added substantial new penalties and bars for illegal presence in the United States.

The "Silva letterholders" were foreign nationals from throughout the Western Hemisphere who were in the United States without legal authorization. In 1976, the Attorney General opined that the State Department had been incorrectly charging the visas for Cuban refugees against the Western Hemisphere numerical limits from 1966 to 1976. A class action case named for Mr. Refugio Silva was filed to recapture the 145,000 LPR visas given to Cubans for foreign nationals with approved petitions from other Western Hemisphere nations. Apparently many of the aliens involved in the case were already in the country, out-of-status, even though they had LPR petitions pending. In other words, they had jumped the line. In 1977, the Attorney General temporarily suspended the expulsion while the class action case moved forward. Class members were allowed to apply for work authorization. Meanwhile, Congress passed amendments to the INA in 1978 that put the Western Hemisphere nations under the per-country cap, which further complicated their situation, by making visa availability more difficult for some but not all of the Western Hemisphere countries. The courts ruled for the Silva class, but the 145,000 recaptured visas were inadequate to cover the estimated 250,000 people who had received letters staying their deportation and permitting them to work. When the dependents of the Silva letterholders were included, the estimated number grew to almost half a million. Most of those in the Silva class who did not get one of the recaptured visas were ultimately eligible to legalize through P.L. 99-603, the Immigration Reform and Control Act (IRCA) of 1986.

Another example are the unauthorized spouses and children of aliens who legalized through IRCA. As Congress was debating IRCA, it weighed and opted not to provide a legalization pathway for the immediate relatives of aliens who met the requirements of IRCA unless they too met those requirements. As IRCA's legalization programs were being implemented, the cases of unauthorized spouses and children who were not eligible to adjust with their family came to the fore. In 1987, Attorney General Edward Meese authorized the INS district directors to defer deportation proceedings where "compelling or humanitarian factors existed." Legislation addressing this population was introduced throughout the 1980s, but not enacted. In 1990, INS Commissioner Gene McNary issued a new "Family Fairness" policy for family members of aliens legalized through IRCA, dropping the where "compelling or humanitarian factors existed" requirement. At the time, McNary stated that an estimated 1.5 million unauthorized aliens would benefit from the policy. The new policy also allowed the unauthorized spouses and children to apply for employment authorizations. Ultimately, the Immigration Act of 1990 (P.L. 101-649) provided relief from deportation and employment authorization to them so they could remain in the United States until a family-based immigration visa became available. P.L. 101-649 also provided additional visas for the family-based LPR preference category in which they were waiting.

## Legal Authority Underlying the June 15, 2012 Memorandum

The Secretary of Homeland Security would appear to have the authority to grant both deferred action and work authorization, as contemplated by the June 15 memorandum, although the basis for such authority is different in the case of deferred action than in the case of work authorization. The determination as to whether to grant deferred action has traditionally been recognized as within the prosecutorial discretion of immigration officers[40] and, thus, has been considered an inherent power of the executive branch, to which

---

[40] *See, e.g.*, Matter of Yauri, 25 I. & N. Dec. 103 (2009) (characterizing a grant of deferred action as within the prosecutorial discretion of immigration officers); Doris Meissner, Commissioner, Immigration and Naturalization Service, *Exercising Prosecutorial Discretion*, Nov. 7, 2000, at 2 (listing "granting deferred action or staying a final order of removal" among the determinations in which immigration officers may exercise prosecutorial discretion).

the Constitution entrusts decisions about whether to enforce particular cases.[41] While it could perhaps be argued that decisions to refrain from fully enforcing a law might, in some instances, run afoul of particular statutes that set substantive priorities for or otherwise circumscribe an agency's power to discriminate among the cases it will pursue, or run afoul of the President's constitutional obligation to "take care" that the law is faithfully executed, such claims may not lend themselves to judicial resolution.[42] In contrast, when it enacted the Immigration Reform and Control Act of 1986, Congress delegated to the Attorney General (currently, the Secretary of Homeland Security) the authority to grant work authorization to aliens who are unlawfully present.[43]

## Authority to Exercise Prosecutorial Discretion

The established doctrine of "prosecutorial discretion" provides the federal government with "broad" latitude in determining when, whom, and whether to prosecute particular violations of federal law.[44] The decision to prosecute is one that lies "exclusively" with the prosecutor.[45] This doctrine, which is derived from the Constitution's requirement that the President "shall take Care that the Laws be faithfully executed,"[46] has traditionally been considered to be grounded in the constitutional separation of powers.[47] Indeed, both federal and state courts have ruled that the exercise of prosecutorial discretion is an executive function necessary to the proper administration of justice. Thus, prosecutorial discretion may be appropriately characterized as a constitutionally-based doctrine.

### *Prosecutorial Discretion Generally*

In granting discretion to enforcement officials, courts have recognized that the "decision to prosecute is particularly ill-suited to judicial review," as it involves the consideration of factors—such as the strength of evidence, deterrence value, and existing enforcement priorities—"not readily susceptible to the kind of analysis the courts are competent to undertake."[48] Moreover, the Executive Branch has asserted that "because the essential core of the President's constitutional responsibility is the duty to enforce the laws, the Executive Branch has exclusive authority to initiate and prosecute actions to enforce the laws adopted by Congress."[49]

---

[41] *See, e.g.*, United States v. Armstrong, 517 U.S. 456, 464 (1996) (noting that the Attorney General and the United States Attorneys have wide latitude in enforcing federal criminal law because "they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed'").

[42] *See infra* notes 66-85 and accompanying text.

[43] P.L. 99-603, 100 Stat. 3359 (Nov. 6, 1986) (codified, as amended, at 8 U.S.C. §§1324a-1324b).

[44] United States v. Goodwin, 457 U.S. 368, 380 (1982). *See also* Exercising Prosecutorial Discretion, *supra* note 40, at 2 (defining prosecutorial discretion as "the authority of an agency charged with enforcing a law to decide whether to enforce, or not enforce, the law against someone").

[45] *See* United States v. Nixon, 418 U.S. 683, 693 (1974) (citing the *Confiscation Cases*, 7 Wall. 454 (1869) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case…")).

[46] U.S. Const. art. II, §3 ("[H]e shall take Care that the Laws be faithfully executed…").

[47] *See, e.g.*, *Armstrong*, 517 U.S. at 464.

[48] Wayte v. United States, 470 U.S. 598, 607 (1985).

[49] *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. Off. Legal Counsel 101, 114 (1984). This traditional conception, however, may have been qualified in some respects following the Supreme Court's decision in *Morrison v. Olson,* in which the Court upheld a congressional delegation of prosecutorial power to an "independent counsel" under the Ethics in Government Act [49] In sustaining the validity of the statute's
(continued...)

An agency decision to initiate an enforcement action in the *administrative* context "shares to some extent the characteristics of the decision of a prosecutor in the executive branch" to initiate a prosecution in the *criminal* context.[50] Thus, just as courts are hesitant to question a prosecutor's decisions with respect to whether to bring a criminal prosecution, so to are courts cautious in reviewing an agency's decision not to bring an enforcement action. In the seminal case of *Heckler v. Cheney*, the Supreme Court held that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."[51] The Court noted that agency enforcement decisions, like prosecution decisions, involve a "complicated balancing" of agency interests and resources—a balancing that the agency is "better equipped" to evaluate than the courts.[52] The *Heckler* opinion proceeded to establish the standard for the reviewability of agency non-enforcement decisions, holding that an "agency's decision not to take enforcement action should be presumed immune from judicial review."[53] That presumption however, may be overcome "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers,"[54] as is discussed below.

### Prosecutorial Discretion in the Immigration Context

In *Reno v. American-Arab Anti-Discrimination Committee*, a majority of the Supreme Court found that the various prudential concerns that prompt deference to the executive branch's determinations as to whether to prosecute criminal offenses are "greatly magnified in the deportation context,"[55] which entails civil (rather than criminal) proceedings. While the reasons cited by the Court for greater deference to exercises of prosecutorial discretion in the immigration context than in other contexts reflect the facts of the case, which arose when certain removable aliens challenged the government's decision *not* to exercise prosecutorial discretion in their favor,[56] the Court's language is broad and arguably can be construed to

---

(...continued)

appointment and removal conditions, the Court suggested that although the independent counsel's prosecutorial powers—including the "no small amount of discretion and judgment [exercised by the counsel] in deciding how to carry out his or her duties under the Act"—were executive in that they had "typically" been performed by Executive Branch officials, the court did not consider such an exercise of prosecutorial power to be "so central to the functioning of the Executive Branch" as to require Presidential control over the independent counsel. 487 U.S. 654 (1988). While the ultimate reach of *Morrison* may be narrow in that the independent counsel was granted only limited jurisdiction and was still subject to the supervision of the Attorney General, it does appear that Congress may vest certain prosecutorial powers, including the exercise of prosecutorial discretion, in an executive branch official who is independent of traditional presidential controls.

[50] Heckler v. Cheney, 470 U.S. 821, 832 (1985).

[51] *Id*. at 831. Accordingly, such decisions are generally precluded from judicial review under the Administrative Procedure Act (APA). 5 U.S.C. §701 (establishing an exception to the APA's presumption of reviewability where "agency action is committed to agency discretion by law.").

[52] *Heckler*, 470 U.S. at 831.

[53] *Id*. at 832.

[54] *Id*. at 833.

[55] 525 U.S. 471, 490 (1999). *See also* United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 543 (1950) (noting that immigration is a "field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program").

[56] Specifically, the Court noted that any delays in criminal proceedings caused by judicial review of exercises of prosecutorial discretion would "merely … postpone the criminal's receipt of his just desserts," while delays in removal proceedings would "permit and prolong a continuing violation of United States law," and could potentially permit the alien to acquire a basis for changing his or her status. *Reno*, 525 U.S. at 490. The Court further noted that immigration proceedings are unique in that they can implicate foreign policy objectives and foreign-intelligence techniques that are generally not implicated in criminal (continued...)

encompass decisions to favorably exercise such discretion. More recently, in its decision in *Arizona v. United States*, a majority of the Court arguably similarly affirmed the authority of the executive branch not to seek the removal of certain aliens, noting that "[a] principal feature of the removal system is the broad discretion entrusted to immigration officials," and that "[r]eturning an alien to his own country may be deemed inappropriate even where he has committed a removable offense or fails to meet the criteria for admission."[57] According to the majority, such exercises of prosecutorial discretion may reflect "immediate human concerns" and the "equities of … individual case[s]," such as whether the alien has children born in the United States or ties to the community, as well as "policy choices that bear on … international relations."[58]

In addition to such general affirmations of the executive branch's prosecutorial discretion in the immigration context, other cases have specifically noted that certain decisions are within the prosecutorial discretion afforded first to INS and, later, the immigration components of DHS. These decisions include:

- whether to parole an alien into the United States;[59]

- whether to commence removal proceedings and what charges to lodge against the respondent;[60]

- whether to cancel a Notice to Appear or other charging document before jurisdiction vests in an immigration judge;[61]

- whether to grant deferred action or extended voluntary departure;[62]

- whether to appeal an immigration judge's decision or order, and whether to file a motion to reopen;[63] and

- whether to impose a fine for particular offenses.[64]

The recognition of immigration officers' prosecutorial discretion in granting deferred action is arguably particularly significant here, because the June 15 memorandum contemplates the grant of deferred action to aliens who meet certain criteria (e.g., came to the United States under the age of sixteen).

---

(...continued)

proceedings. *Id*. at 491. It also found that the interest in avoiding selective or otherwise improper prosecution in immigration proceedings, discussed below, is "less compelling" than in criminal proceedings because deportation is not a punishment and may be "necessary to bring to an end *an ongoing violation* of United States law." *Id*. (emphasis in original).

[57] No. 11-182, Opinion of the Court, slip op. at 4-5 (June 25, 2011). Justice Scalia's dissenting opinion, in contrast, specifically cited the June 15 memorandum when asserting that "there is no reason why the Federal Executive's need to allocate *its* scarce enforcement resources should disable Arizona from devoting *its* resources to illegal immigration in Arizona that in its view the Federal Executive has given short shrift." Opinion of Scalia, J., slip op., at 19 (June 25, 2011).

[58] No. 11-182, Opinion of the Court, slip op. at 4-5.

[59] *See, e.g.*, Matter of Artigas, 23 I. & N. Dec. 99 (2001).

[60] *See, e.g.*, Matter of Avetisyan, 25 I. & N. Dec. 688 (2012).

[61] *See, e.g.*, Matter of G-N-C, 22 I. & N. Dec. 281 (1998).

[62] *See, e.g.*, Matter of Yauri, 25 I. & N. Dec. 103 (2009) (deferred action); Hotel & Rest. Employees Union Local 25 v. Smith, 846 F.2d 1499, 1510-11 (D.C. Cir. 1988), *aff'g*, 563 F. Supp. 157 (D.D.C. 1983) (extended voluntary departure).

[63] *See, e.g.*, Matter of Avetisyan, 25 I. & N. Dec. 688 (2012); Matter of York, 22 I. & N. Dec. 660 (1999).

[64] *See, e.g.*, Matter of M/V Saru Meru, 20 I. & N. Dec. 592 (1992).

## Limitations on the Exercise of Prosecutorial Discretion

While the executive branch's prosecutorial discretion is broad, it is not "unfettered,"[65] and has traditionally been exercised pursuant to individualized determinations. Thus, an argument could potentially be made that the permissible scope of prosecutorial or enforcement discretion is exceeded where an agency utilizes its discretion to adopt a broad policy of non-enforcement as to particular populations in an effort to prioritize goals and maximize limited resources. It would appear, especially with respect to agency enforcement actions, that the invocation of prosecutorial discretion does not create an absolute shelter from judicial review, but rather is subject to both statutory and constitutional limitations.[66] As noted by the U.S. Court of Appeals for the District of Columbia Circuit: "the decisions of this court have never allowed the phrase 'prosecutorial discretion' to be treated as a magical incantation which automatically provides a shield for arbitrariness."[67] While it is apparent, then, that the exercise of prosecutorial discretion is subject to certain restrictions, the precise boundaries beyond which the executive may not cross remain unclear. Moreover, even if existing statutory or constitutional restrictions were conceivably applicable to the June 15 memorandum, standing principles would likely prevent judicial resolution of any challenge to the memorandum on these grounds.[68]

### *Potential Statutory Limitations on the Exercise of Prosecutorial Discretion*

With respect to statutory considerations, the presumption following the Supreme Court's decision in *Heckler v. Cheney* has been that agency decisions not to initiate an enforcement action are unreviewable. However, *Heckler* expressly held that this presumption against the reviewability of discretionary enforcement decisions can be overcome "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers."[69] Consistent with *Heckler*, a court may be willing to review a broad agency non-enforcement policy where there is evidence that Congress intended to limit enforcement discretion by "setting substantive priorities, or by otherwise circumscribing the agency's power to discriminate among issues or cases it will pursue."[70] The *Heckler* opinion also suggested that scenarios in which an agency has "'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities" may be subject to a different standard of review.[71]

---

[65] United States v. Batchelder, 442 U.S. 114, 125 (1979).

[66] Nader v. Saxbe, 497 F.2d 676, 679 (D.C. Cir. 1974) ("It would seem to follow that the exercise of prosecutorial discretion, like the exercise of Executive discretion generally, is subject to statutory and constitutional limits enforceable through judicial review.")

[67] *Id*. at 679 (citing *Medical Committee for Human Rights v. SEC*, 432 F.2d 659 (D.C. Cir. 1970)).

[68] In order to satisfy constitutional standing requirements, a prospective plaintiff must have suffered a personal and particularized injury that is "fairly traceable" to the defendant's conduct and is likely to be redressed by the relief requested from the court. *See, e.g.*, Allen v. Wright, 468 U.S. 737 (1984). It is difficult to envision a potential plaintiff who has been adequately injured by the issuance of the June 15 memorandum such that the individual could satisfy the Court's standing requirements. Standing is a threshold justiciability requirement. Thus, unless a plaintiff can attain standing to challenge the DHS directive, it would not appear that a court would have the opportunity to evaluate the directive's validity.

[69] 470 U.S. 821, 833 (1985).

[70] *Id*.

[71] *Id*. at 833 n.4 ("Nor do we have a situation where it could justifiably be found that the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities. *See, e.g.*, Adams v. Richardson, 480 F.2d 1159 (1973) (en banc). Although we express no opinion on whether such decisions would be unreviewable (continued...)

Reviewability of the policy underlying the June 15 memorandum might, however, be limited even under a broad reading of *Heckler*, in part, because the INA does not generally address deferred action,[72] much less provide guidelines for immigration officers to follow in exercising it. Some commentators have recently asserted that amendments made to Section 235 of the INA by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 removed immigration officers' discretion as to whether to bring removal proceedings against aliens who unlawfully entered the Untied States.[73] Specifically, this argument holds that, pursuant to Section 235, as amended:

1) any alien present in the United States who has not been admitted (i.e., aliens who entered unlawfully) "shall be deemed … an applicant for admission;"

2) all aliens who are applicants for or otherwise seeking admission "shall be inspected by immigration officers;" and

3) in the case of an alien who is an applicant for admission, if the examining immigration officer determines that the alien is not clearly and beyond a doubt entitled to be admitted, the alien "shall be detained" for removal proceedings.[74]

It appears, however, that this argument may have been effectively foreclosed by the majority opinion in *Arizona*, where the Supreme Court expressly noted the "broad discretion exercised by immigration officials" in the removal process.[75] Moreover, the argument apparently relies upon a construction of the word "shall" that has generally been rejected in the context of prosecutions and immigration enforcement actions.[76] Rather than viewing "shall" as indicating mandatory agency actions, courts and the Board of Immigration Appeals (BIA), the highest administrative body responsible for interpreting and applying immigration law in removal cases, have instead generally found that prosecutors and enforcement officers

---

(…continued)

under §701(a)(2), we note that in those situations the statute conferring authority on the agency might indicate that such decisions were not 'committed to agency discretion.'").

[72] The INA uses the phrase "deferred action" only three times, in very specific contexts, none of which correspond to the proposed grant of deferred action contemplated by the June 15 memorandum. *See* 8 U.S.C. §1151 note (addressing the extension of posthumous benefits to certain surviving spouses, children, and parents); 8 U.S.C. §1154(a)(1)(D)(i)(IV) ("Any [victim of domestic violence] described in subclause (III) and any derivative child of a petition described in clause (ii) is eligible for deferred action and work authorization."); 8 U.S.C. §1227(d)(2) (providing that the denial of a request for an administrative stay of removal does not preclude the alien from applying for deferred action, among other things). However, INS and, later, DHS policies have long addressed the use of deferred action in other contexts on humanitarian grounds and as a means of prioritizing cases. *See, e.g.*, Leon Wildes, *The Deferred Action Program of the Bureau of Citizenship and Immigration Services: A Possible Remedy for Impossible Immigration Cases*, 41 SAN DIEGO L. REV. 819, 821 (2004) (discussing a 1970's INA Operations Instruction on deferred action). This Instruction was rescinded in 1997, but the policy remained in place. *See, e.g.*, Charles Gordon, Stanley Mailman, & Stephen Yale-Loehr, 6-72 IMMIGR. L. & PROC. §72.03 (2012).

[73] *See, e.g.*, Kris W. Kobach, *The "DREAM" Order Isn't Legal*, NEW YORK POST, June 21, 2012, http://www.nypost.com/p/news/opinion/opedcolumnists/the_dream_order_isn_legal_4WAYaqJueaEK6MS0onMJCO.

[74] Arizona v. United States, No. 11-182, *Amicus Curiae* Brief of Secure States Initiative in Support of Petitioners, at 8-9 (quoting 8 U.S.C. §1225(a)(1), (a)(3), and (b)(2)(A)).

[75] No. 11-182, Opinion of the Court, slip op. at 4-5.

[76] *Cf.* Exercising Prosecutorial Discretion, *supra* note 40, at 3 ("[A] statute directing that the INS 'shall' remove removable aliens would not be construed by itself to limit prosecutorial discretion.").

retain discretion to take particular actions even when a statute uses "shall" or "must" when discussing these actions.[77]

It is also unclear that the actions contemplated by the June 15 memorandum conflict with any substantive priorities set by Congress, or are "so extreme as to amount to an abdication" of DHS's responsibilities under the INA. For example, it appears that an argument could potentially be made to the contrary that the policy comports with the increased emphasis that Congress has placed upon the removal of "criminal aliens" with amendments made to the INA by IRCA, IIRIRA, and other statutes.[78] The June 15 memorandum expressly excludes from eligibility for deferred action persons who have been convicted of a felony, a significant misdemeanor, or multiple misdemeanors,[79] thereby potentially allowing immigration officers to focus their enforcement activities upon the "criminal aliens" who were identified as higher priorities for removal in earlier Obama Administration guidance on prosecutorial discretion.[80] In addition, Congress has funded immigration enforcement activities at a level that immigration officials have indicated is insufficient for the removal of all persons who are present in the United States without authorization. This level of funding figures prominently in the Obama Administration's rationale for designating certain aliens as lower priorities for removal,[81] and could potentially be said to counter any assertion that the Obama Administration's policy amounts to an "abdication" of its statutory responsibilities.

## *Potential Constitutional Limitations on the Exercise of Prosecutorial Discretion*

With respect to constitutional considerations, it is clear that executive branch officials may not exercise prosecutorial discretion in a manner that is inconsistent with established constitutional protections or other constitutional provisions. Selective prosecution cases commonly illustrate such an abuse of prosecutorial discretion. These cases typically arise where certain enforcement determinations, such as whether to prosecute a specific individual, are made based upon impermissible factors, such as race or religion.[82] A separate constitutional argument may be forwarded, however, in situations where the

---

[77] *See, e.g.*, Matter of E-R-M & L-R-M, 25 I. & N. Dec. 520, 523 (2011) (finding that determinations as to whether to pursue expedited removal proceedings (as opposed to removal proceedings under Section 240 of the INA) are within ICE's discretion, even though the INA uses "shall" in describing who is subject to expedited removal). The Board here specifically noted that, "in the Federal criminal code, Congress has defined most crimes by providing that whoever engages in certain conduct 'shall' be imprisoned or otherwise punished. But this has never been construed to require a Federal prosecutor to bring charges against every person believed to have violated the statute." *Id.* at 522.

[78] *See, e.g.*, IRCA, P.L. 99-603, §701, 100 Stat. 3445 (codified, as amended, at 8 U.S.C. §1229(d)(1)) (making the deportation of aliens who have been convicted of certain crimes an enforcement priority by requiring immigration officers to "begin any deportation proceeding as expeditiously as possible after the date of … conviction"); IIRIRA, P.L. 104-208, div. C, 110 Stat. 3009-546 to 3009-724 (expanding the definition of "aggravated felony," convictions for which can constitute grounds for removal, and creating additional criminal grounds for removal).

[79] Janet Napolitano, Secretary of Homeland Security, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children, June 15, 2012, http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

[80] *See, e.g.*, John Morton, Director, U.S. ICE, Civil Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens, Mar. 2, 2011, at 1-2, http://www.ice.gov/doclib/news/releases/2011/110302washingtondc.pdf.

[81] *Id.*, at 1 (estimating that ICE has resources to remove annually less than four percent of the noncitizens who are in the United States without authorization).

[82] Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978) (holding that a decision may not be "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification"). *But see Reno*, 525 U.S. at 488 *(*"[A]s a general matter … an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his (continued...)

executive branch has, in effect, broadly refused to enforce a duly enacted statute by implementing a blanket ban on enforcement such that the agency has "expressly adopted a general policy which is in effect an abdication of its statutory duty."[83] By refusing to fully enforce certain aspects of a statutory provision, such an action may exceed the permissible scope of prosecutorial discretion and violate the President's duty that the "laws be faithfully executed."[84] However, CRS was unable to find a single case in which a court invalidated a policy of non-enforcement founded upon prosecutorial discretion on the grounds that the policy violated the Take Care clause. Moreover, it is unclear whether the June 15 memorandum would constitute an absolute non-enforcement policy so as to amount to an "abdication" of a statutory obligation, as discussed previously. Though establishing a department-wide policy regarding a group of individuals who meet certain criteria, the directive suggests that the listed criteria should be "considered" in each individual case. Thus, the directive could be interpreted as setting forth criteria for consideration in each individual exercise of prosecutorial discretion, rather than implementing a ban on deportation actions for qualified individuals.[85]

## Authority to Grant Work Authorization

The INA grants the Secretary of Homeland Security arguably wide latitude to issue work authorization, including to aliens who are unlawfully present. Since the enactment of IRCA in 1986, federal law has generally prohibited the hiring or employment of "unauthorized aliens."[86] However, the definition of "unauthorized alien" established by IRCA effectively authorizes the Secretary to grant work authorization to aliens who are unlawfully present by defining an "unauthorized alien" as one who:

> with respect to the employment of an alien at a particular time, … is not either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General [currently, Secretary of Homeland Security].[87]

Regulations promulgated by INS and DHS further provide that aliens who have been granted deferred action and can establish an "economic necessity for employment" may apply for work authorization.[88]

When first promulgated in 1987,[89] these regulations were challenged through the administrative process on the grounds that they exceeded INS's statutory authority.[90] Specifically, the challengers asserted that

---

(...continued)

deportation.").

[83] *See* Adams v. Richardson, 480 F.2d 1159, 1162 (D.C. Cir. 1973).

[84] U.S. Const. art. II, §3.

[85] As is discussed elsewhere in this memorandum, there have been other instances where deferred action or extended voluntary departure was granted to individuals who were part of a more broadly defined group (e.g., persons from Nicaragua, surviving spouses and children of deceased U.S. citizens, victims and witnesses of crimes).

[86] *See* 8 U.S.C. §§1324a-1324b.

[87] 8 U.S.C. §1324a(h)(3).

[88] 8 C.F.R. §274a.12(c)(14). Under these regulations, the "basic criteria" for establishing economic necessity are the federal poverty guidelines. *See* 8 C.F.R. §274a.12(e).

[89] *See* INS, Control of Employment of Aliens: Final Rule, 52 Fed. Reg. 16216 (May 1, 1987).

[90] INS, Employment Authorization; Classes of Aliens Eligible, 52 Fed. Reg. 46092 (Dec. 4, 1987) (denying a petition for rulemaking submitted by the Federation for American Immigration Reform, which sought the rescission of certain regulations pertaining to employment authorization for aliens in the United States).

the statutory language referring to aliens "authorized to be … employed by this chapter or by the Attorney General" did not give the Attorney General authority to grant work authorization "except to those aliens who have already been granted specific authorization by the Act."[91] Had this argument prevailed, the authority of INS and, later, DHS to grant work authorization to persons granted deferred action would have been in doubt, because the INA does not expressly authorize the grant of employment documents to such persons. However, INS rejected this argument on the grounds that the:

> only logical way to interpret this phrase is that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined "unauthorized alien" in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the regulatory process, in addition to those who are authorized employment by statute.[92]

Subsequent case law has generally affirmed that immigration officials have broad discretion in determining whether to deny or revoke work authorizations to persons granted deferred action, or in other circumstances.[93] These cases would appear to suggest that, by extension, immigration officials have similarly broad discretion to grant work authorization provided any requisite regulatory criteria (e.g., economic necessity) are met.

## Corollary Policy Implications: Access to Federal Benefits

Many observers characterize foreign nationals with relief from removal who obtain temporary work authorizations as "quasi-legal" unauthorized migrants.[94] They may be considered "lawfully present" for some very narrow purposes under the INA (such as whether the time in deferred status counts as illegal presence under the grounds of inadmissibility) but are otherwise unlawfully present. Foreign nationals to whom the government has issued temporary employment authorization documents (EADs) may legally obtain social security numbers (SSNs).[95] Possession of a valid EAD or SSN issued for temporary employment, however, does not trigger eligibility for federal programs and services. In other words, foreign nationals who are granted deferred action may be able to work but are not entitled to federally-funded public assistance, except for specified emergency services.[96]

---

[91] *Id.*

[92] *Id.*

[93] *See, e.g.,* Perales v. Casillas, 903 F.2d 1043, 1045 (5th Cir. 1990) ("[T]he agency's decision to grant voluntary departure and work authorization has been committed to agency discretion by law."); Chan v. Lothridge, No. 94-16936, 1996 U.S. App. LEXIS 8491 (9th Cir. 1996) (finding that INS did not abuse its discretion in denying interim work authorization to the petitioner while his application for asylum was pending); Kaddoura v. Gonzales, No. C06-1402RSL, 2007 U.S. Dist. LEXIS 37211 (W.D. Wash. 2007) (finding that the court lacked jurisdiction to hear a suit seeking to compel U.S. Citizenship and Immigration Services to grant work authorization because such actions are discretionary acts).

[94] The "quasi-legal" unauthorized aliens fall in several categories. The government has given them temporary humanitarian relief from removal, such as Temporary Protected Status (TPS). They have sought asylum in the United States and their cases have been pending for at least 180 days. They are immediate family or fiancées of LPRs who are waiting in the United States for their legal permanent residency cases to be processed. Or, they have overstayed their nonimmigrant visas and have petitions pending to adjust status as employment-based LPRs. These are circumstances in which DHS issues temporary employment authorization documents (EADs) to aliens who are not otherwise considered authorized to reside in the United States.

[95] For further background, see CRS Report RL32004, *Social Security Benefits for Noncitizens*, by Dawn Nuschler and Alison Siskin.

[96] CRS Report RL34500, *Unauthorized Aliens' Access to Federal Benefits: Policy and Issues*, by Ruth Ellen Wasem.

Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) of 1996 (P.L. 104-193) established comprehensive restrictions on the eligibility of all noncitizens for means-tested public assistance, with exceptions for LPRs with a substantial U.S. work history or military connection. Regarding unauthorized aliens, Section 401 of PRWORA barred them from any federal public benefit except the emergency services and programs expressly listed in Section 401(b) of PRWORA. This overarching bar to unauthorized aliens hinges on how broadly the phrase "federal public benefit" is implemented. The law defines this phrase to be

> (A) any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; and (B) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States.[97]

So defined, this bar covers many programs whose enabling statutes do not individually make citizenship or immigration status a criterion for participation.

Thus, beneficiaries of the June 15, 2012 policy directive will be among those "quasi-legal" unauthorized migrants who have EADs and SSNs—but who are not otherwise authorized to reside in the United States.

---

[97] §401(c) of PRWORA, 8 U.S.C. §1611.

# Appendix. Past Administrative Directives on Blanket or Categorical Deferrals of Deportation

## Selected Major Directives, 1976-2011

| Year | Type of Action | Class of Aliens Covered | Estimated Number | Commentary |
|---|---|---|---|---|
| 1976 | Extended voluntary departure (EVD) for Lebanese on a case-by-case basis | Otherwise deportable Lebanese in the United States. | NA | Lebanese received TPS from 1991 to 1993. |
| 1977 | EVD for Ethiopians | Otherwise deportable Ethiopians in the United States. | NA | P.L. 100-204 contained a special extension of the legalization program established by the Immigration Reform and Control Act (IRCA) of 1986 to include otherwise eligible aliens who had been granted EVD status during a time period that included the Ethiopians. |
| 1977 | The Attorney General temporarily suspended the expulsion of certain natives of Western Hemisphere countries, known as the "Silva Letterholders." They were granted stays and permitted to apply for employment authorization. | A group of aliens with approved petitions filed a class action lawsuit to recapture about 145,000 visas assigned to Cubans. | 250,000 | Many of these cases were not resolved until the passage of IRCA. |
| 1978 | EVD for Ugandans | Otherwise deportable Ugandans in the United States. | NA | P.L. 100-204 contained a special extension of the legalization program established by IRCA to include otherwise eligible aliens who had been granted EVD status during a time period that included the Ugandans. |
| 1979 | EVD for Nicaraguans | Otherwise deportable Nicaraguans in the United States. | NA | EVD ended in September 1980. |
| 1979 | EVD for Iranians | Otherwise deportable Iranians in the United States. | NA | EVD ended in December 1979, and they were encouraged to apply for asylum. |

| Year | Type of Action | Class of Aliens Covered | Estimated Number | Commentary |
|------|----------------|-------------------------|------------------|------------|
| 1980 | EVD for Afghans | Otherwise deportable Afghans in the United States. | NA | P.L. 100-204 contained a special extension of the legalization program established by IRCA to include otherwise eligible aliens who had been granted EVD status during a time period that included the Afghans. |
| 1984 | EVD for Poles | Otherwise deportable Poles in the United States. | NA | P.L. 100-204 contained a special extension of the legalization program established by IRCA to include otherwise eligible aliens who had been granted EVD status during a time period that included the Poles. |
| 1987 | Memorandum from Attorney General Edward Meese directing the Immigration and Naturalization Service (INS) not to deport any Nicaraguans and to grant them work authorizations. | Nicaraguans who demonstrated a "well-founded fear of persecution," who had been denied asylum, or had been denied withholding of deportation. | 150,000 to 200,000 | Legislation to grant stays of deportation to Nicaraguans as well as Salvadorans had received action by committees in both chambers during the 1980s. Congress ultimately enacted legislation legalizing the Nicaraguans, the Nicaraguan Adjustment and Central American Relief Act (P.L. 105-100). |
| 1987 | Attorney General Edward Meese authorized INS district directors to defer deportation proceedings of certain family members of aliens legalized through IRCA. | This policy directive applied where "compelling or humanitarian factors existed" in the cases of families that included spouses and children ineligible to legalize under IRCA. | NA | Legislation to enable the immediate family of aliens legalized through IRCA to also adjust status had been introduced. (See 1990 "Family Fairness" directive below.) |
| 1989 | Attorney General Richard Thornburgh instructed INS to defer the enforced departure of any Chinese national in the United States through June 6, 1990. | Chinese nationals whose nonimmigrant visas expired during this time were to report to INS to benefit from this deferral and to apply, if they wished, for work authorizations. | 80,000 | Legislation that included provisions to establish Temporary Protected Status (TPS) was moving through Congress at that time. |

| Year | Type of Action | Class of Aliens Covered | Estimated Number | Commentary |
|------|----------------|-------------------------|------------------|------------|
| 1990 | Executive Order 12711 of April 11, 1990, provided temporary protection for certain nationals of the People's Republic of China (PRC) and their dependents. It permitted temporary deferral of enforcement of the departure from the United States and conferred eligibility for certain other benefits through January 1, 1994. | Chinese nationals and dependents who were in the U.S. on or after June 5, 1989, up to and including the date of Executive Order 12711. | 80,000 | The Chinese Student Protection Act of 1992 (CSPA) (P.L. 102-404) enabled Chinese with deferred enforced departure to become lawful permanent residents. |
| 1990 | INS Commissioner Gene McNary issued a new "Family Fairness" policy for family members of aliens legalized through IRCA. The policy dropped the where "compelling or humanitarian factors existed" requirement and allowed the family members to apply for employment authorizations. | Unauthorized spouses and children of aliens legalized under IRCA. | 1.5 million | P.L. 101-649 provided relief from deportation and employment authorization to an eligible alien who was the spouse or unmarried child of a legalized alien holding temporary or permanent residence pursuant to IRCA. |
| 1991 | Presidential directive to Attorney General instructing him to grant deferred enforced departure to Persian Gulf evacuees who were airlifted to the United States after the invasion of Kuwait in 1990 | Aliens who had U.S. citizen relatives or who harbored U.S. citizens during the invasion, largely persons originally from Palestine, India, and the Philippines. | 2,227 | It is not clear how these cases were handled. |
| 1992 | President George H.W. Bush instructed the Attorney General to grant deferred enforced departure (DED) to Salvadorans | Unauthorized Salvadorans who had fled the civil war in the 1980s. | 190,000 | Congress had passed a law in 1990 giving Salvadorans TPS for 18 months. |
| 1997 | President William J. Clinton instructed the Attorney General to grant DED to Haitians for one year. | Haitians who were paroled into the United States or who applied for asylum before December 1, 1995. | 40,000 | Haitians had been provided TPS from 1993-1997. Legislation enabling Haitians to adjust their status passed at the close of the 105th Congress (P.L. 105-277) in 1998. |

| Year | Type of Action | Class of Aliens Covered | Estimated Number | Commentary |
|---|---|---|---|---|
| 1997 | INS General Counsel Paul Virtue issues guidelines for deferred action for certain foreign nationals who might gain relief through the Violence Against Women Act. | Battered aliens with approved LPR self-petitions, and their derivative children listed on the self-petition. | NA | Regulations to implement the U visa portions of P.L. 106-386 were promulgated in 2007. |
| 1998 | Attorney General Janet Reno temporarily suspended the deportation of aliens from El Salvador, Guatemala, Honduras, and Nicaragua. | Unauthorized aliens from El Salvador, Guatemala, Honduras, and Nicaragua. | NA | This relief was provided in response to Hurricane Mitch. Guatemalans and Salvadorans had their stays of removal extended until March 8, 1999. TPS was given to Hondurans and Nicaraguans. |
| 1999 | President William J. Clinton instructed the Attorney General to grant DED to Liberians for one year. | Liberian nationals with TPS who were living in the United States. | 10,000 | Liberians had been provided TPS from 1991 through 1999; they were given TPS again in 2002. |
| 2007 | President George W. Bush directed that DED be provided to Liberians whose TPS expired. | Liberian nationals who had lived in the United States since October 1, 2002, and who had TPS on September 30, 2007. | 3,600 | |
| 2011 | President Barack Obama extended Liberian DED through March 2013. | | | |

**Source:** CRS review of published accounts, archived CRS materials, and government policy documents.

**Notes:** Excludes aliens with criminal records or who "pose a danger to national security." *Estimated Number* refers to estimated number of beneficiaries at time of issuance of directive. *NA* means "not available." Other countries whose nationals had some form of deferred deportation prior to 1976 include Cambodia, Cuba, Chile, Czechoslovakia, Dominican Republic, Hungary, Laos, Rumania, and Vietnam.