EXHIBIT 9

DOCUMENT RESUME

ED 206 779                                          UD 021 643

AUTHOR          Moore, Charlotte J.
TITLE           Review of U.S. Refugee Resettlement Programs and
                Policies. A Report. Revised.
INSTITUTION     Library of Congress, Washington, D.C. Congressional
                Research Service.
REPORT NO       SN-052-070-05409-3
PUB DATE        80
NOTE            350p.; Prepared at the request of Senator Edward M.
                Kennedy, Chairman, Committee on the Judiciary United
                States Senate by the Congressional Research Service,
                Library of Congress, 96th Congress, 2nd Session. Not
                available in paper copy due to reproduction quality
                of original document.
AVAILABLE FROM  Superintendent of Documents, U.S. Government Printing
                Office, Washington, DC 20402 ($6.50).

EDRS PRICE      MF01 Plus Postage. PC Not Available from EDRS.
DESCRIPTORS     Cubans; *Federal Legislation; *Federal Programs;
                *Immigrants; Indochinese; *Land Settlement;
                *Refugees; *Relocation; Social Services
IDENTIFIERS     Chileans; Hungarians; Kurds; Russians

ABSTRACT
                This government report reviews U.S. refugee
resettlement programs and policies. Part I of the book provides an
overview of U.S. refugee admissions programs and discusses refugee
admissions policies for two time frames: 1945 to 1965, and 1965 to
the present. In Part II an analysis of Federal assistance programs
for domestic resettlement of refugees is found. This section
describes assistance offered to refugees resettling in the U.S. and
the legislation and programs authorizing such assistance. The Refugee
Act of 1980 is covered in Part III. Major issues of the act are
outlined along with its legislative history. The section concludes
with a section-by-section summary of the Act. Appendices contain the
complete text of the 1980 Refugee Act, a conference report and
analysis of the Act, and a report on refugee resettlement in the U.S.
by the TransCentury Foundation. The TransCentury report presents
information regarding the Cuban, Hungarian, Indochinese, Chilean,
Kurdish, and Soviet resettlement efforts, resettlement organizations,
the needs of refugees, and resettlement models of other western
nations. Recommendations are offered and suggestions are made for
refocusing efforts in some areas. (APM)

************************************************************************
*       Reproductions supplied by EDRS are the best that can be made       *
*                       from the original document.                        *
************************************************************************



96th Congress } 
2d Session }        **COMMITTEE PRINT**

# REVIEW OF U.S. REFUGEE RESETTLEMENT PROGRAMS AND POLICIES

## A REPORT

PREPARED AT THE REQUEST OF

Senator EDWARD M. KENNEDY, *Chairman*

## COMMITTEE ON THE JUDICIARY UNITED STATES SENATE

BY THE

## CONGRESSIONAL RESEARCH SERVICE LIBRARY OF CONGRESS

### NINETY-SIXTH CONGRESS

SECOND SESSION



U.S. DEPARTMENT OF EDUCATION
NATIONAL INSTITUTE OF EDUCATION
EDUCATIONAL RESOURCES INFORMATION
CENTER (ERIC)

This document has been reproduced as received from the person or organization originating it

Minor changes have been made to improve reproduction quality

● Points of view or opinions stated in this document do not necessarily represent official NIE position or policy

U.S. GOVERNMENT PRINTING OFFICE

66-439 O        WASHINGTON  1980

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402



165

2

## COMMITTEE ON THE JUDICIARY

EDWARD M. KENNEDY, Massachusetts, *Chairman*

BIRCH BAYH, Indiana
ROBERT C. BYRD, West Virginia
JOSEPH R. BIDEN, Jr., Delaware
JOHN C. CULVER, Iowa
HOWARD M. METZENBAUM, Ohio
DENNIS DeCONCINI, Arizona
PATRICK J. LEAHY, Vermont
MAX BAUCUS, Montana
HOWELL HEFLIN, Alabama

STROM THURMOND, South Carolina
CHARLES McC. MATHIAS, Jr., Maryland
PAUL LAXALT, Nevada
ORRIN G. HATCH, Utah
ROBERT DOLE, Kansas
THAD COCHRAN, Mississippi
ALAN K. SIMPSON, Wyoming

STEPHEN BREYER, *Chief Counsel*
EMORY SNEEDEN, *Minority Chief Counsel*
JERRY M. TINKER, *Counsel for Immigration and Refugee Affairs*

(II)

3



166

## FOREWORD

America has been a haven for the world's homeless since the first colonists reached these shores four centuries ago. Since then, the American people have a record of accomplishment in offering a helping hand to refugees that is unsurpassed by any other nation.

We can be proud of this record. Over many years we have responded generously and compassionately to the needs of the homeless, and our national policy of welcome has served our country and our traditions well.

But for too long our policy toward refugee assistance and resettlement lacked effective programming and planning. We admitted refugees in fits and starts because our immigration law was inadequate and out of date. Once refugees arrived, our resettlement programs and policies were inconsistent and out of touch with today's needs.

To bring some long overdue reform to our country's refugee policies and programs, Congress has enacted "The Refugee Act of 1980." As stated in the first title of the act, the objectives of the act were "to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted."

The new law accomplishes six basic objectives:

1. It repeals the previous law's discriminatory treatment of refugees by providing a new definition of a refugee—moving us away from only accepting refugees "from communism" or certain areas of the Middle East—to all who meet the test of the U N. Convention and Protocol on the Status of Refugees.

2. It raises the annual limitation on regular refugee admissions from 17,400 to 50,000 each fiscal year.

3. It provides for an orderly but flexible procedure to deal with emergency refugee situations if the resettlement needs of refugees of "special humanitarian concern" to the United States cannot be met within the regular ceiling established prior to the beginning of the fiscal year.

4. It replaces the former use of the "parole authority" contained in section 212(d) (5) of the Immigration and Nationality Act—which has been governed only by custom and practice—with new statutory language asserting congressional control (i.e., formal "consultations") over the entire process of admitting refugees.

5. It establishes an explicit asylum provision in our immigration law for the first time.

6. It provides for a full range of Federal programs to assist in the resettlement process, and statutorily creates the Office of Refugee Resettlement to monitor, coordinate, and implement refugee resettlement programs.



4

Together, these provisions will enable the United States to meet any refugee situation. anywhere. and to deal with it more effectively and efficiently. The new law ends years of ad hoc programs and differing policies toward different refugees. and puts our refugee programs on a firmer footing.

To give some perspective to this new law. I asked the Library of Congress to update an earlier study on U.S. refugee resettlement programs. and to review for the committee the evolution of U.S. refugee law and policy. A revised edition of that study has now been submitted to the committee by the Congressional Research Service and is printed in this volume, along with other background material on refugee programs and policies.

The committee hopes this report will contribute to a better public understanding of U.S. refugee programs.

EDWARD M. KENNEDY.
*Chairman, Committee on the Judiciary.*



168

# LETTER OF SUBMITTAL

CONGRESSIONAL RESEARCH SERVICE,
THE LIBRARY OF CONGRESS,
*August 8, 1980.*

Senator EDWARD M. KENNEDY,
*U.S. Senate,*
*Washington, D.C.*

DEAR MR. CHAIRMAN : I am pleased to submit a report on U.S. refugee resettlement law and policy which was prepared at your request by the Congressional Research Service.

The report was written by Charlotte J. Moore, analyst in social legislation, of our Education and Public Welfare Division. It is a revised and updated version of a 1979 CRS paper of the same title by Catherine McHugh. Since that time, major legislation, the Refugee Act of 1980, was enacted by Congress. Ms. Moore's update focuses on the development of the Refugee Act in the context of past U.S. refugee admission and resettlement programs and policies.

We hope that this report will serve the needs of the Committee on the Judiciary, as well as the needs of other committees and Members of Congress concerned with U.S. refugee policy.

Sincerely,

GILBERT GUDE,
*Director.*

(V)



6   169

# CONTENTS

| | Page |
|---|---|
| Forward by Senator Kennedy | III |
| Letter of Submittal | v |
| Introduction | 1 |
| Part I. Overview of U.S. refugee admissions programs | 3 |
| I. Legislative and administrative actions affecting refugee admissions: 1945–65 | 7 |
| A. Presidential directive of December 22, 1945 | 7 |
| B. Displaced Persons Act of 1948 | 7 |
| C. Immigration and Nationality Act of 1952 | 7 |
| 1. Defector provision | 7 |
| 2. Parole provision | 8 |
| 3. Withholding deportation because of anticipated persecution | 8 |
| D. Act of July 29, 1953 | 8 |
| E. The Refugee Relief Act of 1953 | 8 |
| F. Hungarian refugee program | 8 |
| G. Refugee-Escapee Act | 9 |
| H. Act of September 2, 1958 | 9 |
| I. Refugee fair share law | 10 |
| II. Refugee admissions legislation and procedure after 1965 | 10 |
| A. Conditional entry | 11 |
| B. Parole | 11 |
| C. Withholding deportation | 12 |
| D. Asylum | 15 |
| E. Special legislation providing permanent resident status to refugees | 15 |
| F. Other legislation impacting on refugee admissions | 16 |
| Part II. Federal assistance for domestic resettlement of refugees | 17 |
| I. Assistance to refugees resettling in the United States: A historical overview | 19 |
| A. The involvement of the private sector | 19 |
| B. Federal involvement in assisting refugee resettlement | 19 |
| 1. State Department | 22 |
| 2. The Department of Health, Education, and Welfare | 23 |
| 3. The Department of Justice | 25 |
| 4. Other agencies offering refugee assistance | 25 |
| 5. U.S. coordinator for refugee affairs | 25 |
| II. Legislation and programs authorizing refugee resettlement assistance | 26 |
| A. Migration and Refugee Assistance Act of 1962 | 26 |
| B. Indochina Migration and Refugee Assistance Act | 26 |
| C. Indochina Refugee Children Assistance Act of 1976 | 28 |
| D. Assistance for Soviets and other refugees | 32 |
| E. Initial reception and placement grants | 33 |
| Part III. The Refugee Act of 1980 | 34 |
| I. Major issues | 35 |
| A. Definition of refugee | 36 |
| B. Numerical limitations on refugee admissions | 37 |
| C. Consultation | 38 |
| D. Entry status | 39 |
| E. The use of the parole authority to admit refugees | 41 |
| F. Domestic resettlement assistance: Administration | 42 |
| G. Coordinating office | 43 |
| H. Domestic resettlement assistance: Duration | 44 |
| I. Domestic resettlement assistance: Phasedown of the Cuban program | 45 |
| | 46 |



7

170

VIII

| | Page |
|---|---|
| Part III. The Refugee Act of 1980—Continued | |
| II. Legislative history | 47 |
| A. Senate action | 47 |
| B. House action | 48 |
| C. Conference action | 50 |
| III. Section-by-section summary of the Refugee Act of 1980 | 51 |
| A. Title I—Purpose | 51 |
| B. Title II—Admission of refugees | 51 |
| C. Title III—U.S. coordinator for refugee affairs and assistance for effective resettlement of refugees in the United States | 56 |
| D. Title IV—Social services for certain applicants for asylum | 60 |

## APPENDIX

| | Page |
|---|---|
| I. The Refugee Act of 1980 | 62 |
| II. Conference report and analysis of the Refugee Act | 80 |
| III. Refugee resettlement in the United States: Time for a new focus, a report by New TransCentury Foundation | 114 |



8                    171

# INTRODUCTION

The Refugee Act,[1] enacted March 17, 1980, is the first comprehensive Federal statute affecting the admission and resettlement of refugees. The legislation amends the Immigration and Nationality Act to set forth new procedures for the regular and emergency admission of refugees into the United States, and provides a uniform authorization for Federal resettlement assistance. The major impetus for the legislation was the need to end an ad hoc approach that had characterized U.S. refugee policy since World War II.

Refugees, as distinct from immigrants, are aliens who flee their country of nationality generally because of persecution or fear of persecution. Immigrants, in contrast, leave their country of nationality voluntarily to seek family reunification, economic, or other benefits through reestablishing permanent residence in some other country of their choice.

From the beginning of our Nation's history, the United States has been a haven for oppressed peoples. Until the 20th century, there were few restrictions on immigration, and this country was equally open to those seeking freedom and those seeking their fortune. However, significant limitations on immigration were enacted by Congress which changed this. For example, the Immigration Act of 1917[2] set forth qualitative grounds for exclusion of aliens; the Immigration Act of 1924[3] established numerical quotas, primarily based on national origin, limiting immigration. With a few exceptions, refugees were indistinct from immigrants under these immigration laws.

Millions of people were uprooted during or following World War II, which required extraordinary measures to reduce the human suffering and disruption it brought about. During the postwar years, the United States adopted a series of special refugee admissions programs outside the regular immigration law under which thousands of refugees and other persons displaced by the war become permanently resettled here.

The United States continued a largely ad hoc approach to refugee admissions into the 1970's. Although some refugees entered the United States under normal immigration procedures, the bulk of refugee admissions were authorized outside the normal immigration channels by special programs. This was true for the Hungarians in the 1950's, the Cubans in the 1960's, and the Indochinese in the 1970's. The immigration law was not sufficiently flexible to bring in large groups of refugees in emergency situations. Instead, the Attorney General's discretionary authority to parole aliens into the country temporarily became the initial vehicle for admission, and special legislation was then generally required to adjust their status to permanent resident.

---

[1] Public Law 96–212. Act of Mar. 17, 1980, 94 Stat. 102.
[2] Act of Feb. 5, 1917, 39 Stat. 874.
[3] Act of May 26 1024, 43 Stat. 153.



2

Voluntary agencies and organizations were primarily responsible for refugee resettlement for a number of years. As the admission of large groups of refugees became more frequent, the Federal Government became increasingly responsible for providing assistance and services to aid in refugee resettlement and assimilation into our society. The special assistance programs that were enacted by the Federal Government for refugees were, like the admissions programs, designed to meet immediate needs rather than to establish a fundamental policy.

The Refugee Act of 1980 was drafted by Congress in cooperation with the Carter administration to establish by statute a permanent U.S. refugee policy. To a great extent the act reflects the experiences of the United States in recent years in coping with massive refugee migrations. It also affirms that this Nation has a fundamental commitment to providing sanctuary to refugees as part of its immigration policy.



# PART I. OVERVIEW OF U.S. REFUGEE ADMISSIONS PROGRAMS

The United States has traditionally been regarded as a place of asylum for persons fleeing religious or political persecution. It was not until World War II, however, that immigration programs were established which specifically provided for the admission of refugees. Prior to that time, refugees were subject to the same restrictions that were imposed on immigrants generally, except that persons fleeing religious or political persecution were exempted from the literacy test requirement of the law. Otherwise, admissions were limited by national origin quotas; by mental, moral and physical requirements; and by the prohibition against aliens' becoming public charges.

Immigration to the United States was relatively unrestricted until the 1880's when the first Chinese exclusion and contract labor laws were enacted. Immigration was restricted by quotas based on national origin which were established temporarily in 1921 and permanently in 1924. Although immigration law was subsequently amended, national origin quotas remained a fundamental component of the law until the enactment of the Immigration and Nationality Act Amendments of 1965.

The 1965 amendments to the Immigration and Nationality Act represented a fundamental revision of U.S. immigration policy, rejecting nationality and ethnic background as determinants of admission and substituting a system of priorities based primarily on reunification of families and on the alien's skills.[4] Built into this preference system was a permanent statutory basis for the admission of refugees, the so-called conditional entry provision of the Immigration and Nationality Act.[5]

Between World War II and 1965 there had been a series of specific programs under which refugees were admitted outside the regular immigration law. Under the 1965 amendments, with the new preference category for the conditional entry of refugees, it was the intent of Congress that such specific admissions programs would cease.

Since 1965 however, the vast majority of refugees admitted to the United States continued to do so outside the regular procedure prescribed by the Immigration and Nationality Act. There was considerable disparity in the treatment of refugees who entered the United States at different periods of time, who had come from different parts of the world, or who were fleeing from different kinds of political regimes under the irregular procedure that has governed their admission. This uneven means of admitting refugees was the major factor leading to the development of the admissions provisions of the Refugee Act.

The following section summarizes U.S. refugee admissions activities since World War II. Particular attention is devoted to the legislation

---

[4] U.S. Congress. Senate. Committee on the Judiciary. U.S. Immigration Law and Policy: 1952–1979. Committee Print. 96th Cong., 1st sess. Washington. U.S. Government Printing Office. 1979, p. 51.
[5] 8 U.S.C. 1153(a)(7).

(3)


ERIC
Full Text Provided by ERIC

*11*

174

4

and admissions procedures since 1965 which formed the backdrop for the evolution of the Refugee Act.

As an overview, table I indicates that 1,324,699 refugees were admitted to the United States for permanent residence between fiscal years 1946 and 1978 under special refugee legislation and under the conditional entry provision. Refugees whose status was not adjusted to that of permanent resident alien as of September 30, 1978, and those who were admitted under other provisions of immigration law are not included in the table. If these latter numbers are taken into account, the total number of refugees accepted by the United States for permanent resettlement since 1945 is about 2 million.

*12*



TABLE 1.—REFUGEES ADMITTED BY COUNTRY OR REGION OF BIRTH YEARS ENDED JUNE 30, 1946-76 JULY SEPTEMBER 1976 AND YEARS ENDED SEPT. 30, 1977-78

| Country or region of birth | Number admitted | Presi- dent's directive of Dec. 22. 1945 | Displaced Persons Act of 1948 — Displaced persons admitted | Displaced persons adjusting under sec. 4 | German ethnics | Refugee Relief Act of 1953 [1] | Act of July 29, 1953 (orphans) | Act of Sept 11 1957 (secs 4 and 15) | Act of July 25 1958 (Hun- garian parolees) | Act of Sept. 2 1958 (Azores and Nether- lands refugees) | Act of Sept. 22 1959 (sec. 6) (refugee relatives) | Act of July 14, 1960 (refugee- escapees) | Act of Oct. 3, 1965 (condi- tional entries by refugees) [3] | Act of Nov 2. 1966 (Cuban refugees) | Act of Oct. 30 1977, (Indo- chinese refugees) [3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| All countries | 1,324,699 | 40,324 | 352,260 | 3,670 | 53,766 | 189,021 | 466 | 29,462 | 30,751 | 22,213 | 1,820 | 19,783 | 116,397 | 370,620 | 94,146 |
| **Europe** | 778,688 | 39,802 | 349,751 | 1,794 | 53,689 | 171,689 | 140 | 16,833 | 30,712 | 9,896 | 1,376 | 15,893 | 79,499 | 7,551 | 63 |
| Austria | 16,684 | 2,015 | 6,425 | 2 | 2,529 | 4,658 | 75 | 532 | 102 | | | | | | |
| Belgium | 1,694 | 147 | 947 | 1 | | 451 | | 8 | | | | 74 | 259 | 10 | 1 |
| Bulgaria | 4,124 | 22 | 567 | 10 | 12 | 478 | | 8 | 8 | 3 | | 94 | 28 | 4 | |
| Czechoslovakia | 27,580 | 3,386 | 9,522 | 277 | 2,839 | 2,916 | | 197 | 5 | | | 515 | 2,315 | 3 | 1 |
| Denmark | 115 | 11 | 55 | | | 29 | | 53 | 180 | | | 82 | 8,321 | 3 | 1 |
| Estonia | 11,262 | 145 | 9,943 | 221 | 263 | 657 | | 8 | 1 | | | 1 | 1 | 2 | |
| Finland | 163 | 12 | 93 | 1 | | 18 | | 18 | | | | 12 | 2 | 1 | |
| France | 2,404 | 157 | 791 | | | 660 | 1 | 36 | | | | | 1 | | |
| Germany | 100,295 | 16,071 | 52,049 | 5 | 10,069 | 20,922 | 54 | 198 | 10 | | 5 | 212 | 279 | 41 | 37 |
| Greece | 29,602 | 7 | 10,272 | 3 | 2 | 16,922 | 4 | 598 | 29 | | 5 | 256 | 204 | 29 | 4 |
| Hungary | 69,684 | 885 | 12,826 | 297 | 3,504 | 9,659 | | 1,504 | 29,905 | | 7 | 397 | 80 | 367 | 25 |
| Ireland | 65 | | 31 | 2 | | 18 | | 5,172 | 12 | | 5 | 1,605 | 5,811 | 13 | |
| Italy | c?,827 | 154 | 2,217 | 12 | 19 | 57,026 | | 1,685 | 2 | | 2 | 168 | 476 | 88 | 3 |
| Latvia | 38,263 | 538 | 35,150 | 211 | 645 | 1,567 | 4 | 85 | | 2 | | 953 | | | |
| Lithuania | 27,352 | 790 | 23,202 | 18 | 1,478 | 1,681 | | 94 | | | | 47 | 9 | | |
| Netherlands | 17,608 | 116 | 53 | 2 | | 11,337 | | 1,031 | | | | 21 | 2a | 38 | 1 |
| Norway | 77 | 5 | 25 | | 5 | 20 | | | | 5,633 | | 2 | 8 | 17 | |
| Poland | 167,077 | 11,660 | 128,569 | 341 | 6,592 | 11,912 | | 3 | | | | 3 | 5 | 10 | |
| Portugal | 5,040 | 8 | 14 | 1 | | 34 | | 1,139 | 14 | 2 | | 776 | 5,806 | 464 | |
| Romania | 28,421 | 535 | 5,129 | 136 | 5,353 | 4,369 | | 125 | | 4,811 | 4 | 1 | 13 | 21 | 1 |
| Spain | 9,420 | | 31 | 1 | 5 | 123 | | 482 | 274 | 3 | 9 | 4,438 | 7,547 | 46 | |
| Sweden | 450 | 10 | 347 | | | 79 | | 173 | | 3 | | 21 | 2,602 | 6,460 | 1 |
| Switzerland | 331 | 66 | 131 | 1 | 3 | 38 | | 3 | | 4 | | | 2 | 3 | 2 |
| U.S.S.R. | 64,266 | 1,982 | 31,373 | 51 | 4,323 | 5,827 | | 59 | 1 | 3 | | 6 | 5 | 8 | 6 |
| United Kingdom | 7,834 | 183 | 1,819 | 4 | 7 | 679 | | 186 | 9 | | | 251 | 20,159 | 105 | |
| Yugoslavia | 84,110 | 736 | 17,238 | 193 | 15,936 | 17,425 | | 25 | 2 | 3 | | 21 | 75 | 11 | 5 |
| Other Europe | 6,940 | 154 | 904 | 4 | 270 | 2,184 | 2 | 3,002 | 154 | 2 | 1 | 6,443 | 22,973 | 9 | 139 |

See footnotes at end of table



TABLE I.—REFUGEES ADMITTED BY COUNTRY OR REGION OF BIRTH YEARS ENDED JUNE 30, 1946–76, JULY SEPTEMBER 1976, AND YEARS ENDED SEPT. 30, 1977–78—Continued

| Country or region of birth | Number admitted | President's directive of Dec. 22, 1945 | Displaced Persons Act of 1948 — Displaced persons admitted | Displaced persons adjusting under sec 4 | German ethnics | Refugee Relief Act of 1953 [1] | Act of July 29 1953 (orphans) | Act of Sept. 11 1957 (sec. 4 and 15) | Act of July 25, 1958 (Hungarian parolees) | Act of Sept. 2, 1958 (Azores and Netherlands refugees) | Act of Sept. 22, 1959 (sec. 6) (refugee relatives) | Act of July 14, 1960 (refugee escapees) | Act of Oct. 3, 1965 (conditional entries by refugees) [2] | Act of Nov. 2, 1966 (Cuban refugees) | Act of Oct. 30, 1977 (Indochinese refugees) [3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Asia: | 172,586 | 416 | 2,157 | 1,848 | 11 | 16,333 | 324 | 10,869 | 4 | 12,262 | 431 | 795 | 32,078 | 1,041 | 94,017 |
| China and Taiwan | 28,692 | 284 | 909 | 1,729 | 2 | 6,903 | 3 | 2,820 | | | 115 | 23 | 15,047 | 620 | 223 |
| India | 140 | 4 | 7 | 1 | | 46 | 2 | 21 | | 7 | | 3 | 36 | 9 | 3 |
| Indonesia | 15,995 | | 2 | | 4 | 3,148 | | 612 | | 12,133 | 1 | | 92 | 1 | 2 |
| Israel | 870 | | 16 | 8 | | 521 | | 210 | 1 | | 2 | 2 | 96 | 14 | |
| Japan | 4,384 | 3 | 9 | 2 | 2 | 2,268 | 287 | 1,505 | | 3 | 269 | 1 | 13 | 11 | 11 |
| Korea | 4,482 | | | | | 630 | 4 | 3,733 | 1 | | | 2 | 9 | 6 | 37 |
| Palestine | 1,098 | 40 | 77 | 46 | | 607 | | 170 | | | 3 | 30 | 106 | 10 | 1 |
| Philippines | 472 | 3 | 19 | 3 | | 121 | 15 | 187 | | 4 | 2 | | 7 | 26 | 85 |
| Other Asia | 116,453 | 82 | 1,118 | 59 | 2 | 2,089 | 18 | 1,551 | 3 | 100 | 39 | 726 | 16,672 | 344 | 93,655 |
| North America | 363,081 | 50 | 228 | 3 | 57 | 486 | | 191 | 35 | 22 | 11 | 2 | 836 | 361,128 | 32 |
| Canada | 134 | 3 | 17 | | 8 | 15 | | 7 | 1 | | 4 | | 1 | 72 | 6 |
| Mexico | 317 | | 3 | 1 | | 5 | | 1 | | | | | 2 | 315 | 10 |
| West Indies | 361,399 | 5 | 1 | 1 | 1 | 50 | | 164 | | 18 | 4 | 1 | 825 | 360,318 | 11 |
| Cuba | 360,772 | | | | | | | | | | | | 818 | 359,953 | 1 |
| Other West Indies | 627 | 5 | 1 | 1 | | 50 | | 164 | | 18 | | 1 | 7 | 365 | 10 |
| Central America | 327 | 4 | 3 | | 1 | 7 | | 3 | | 1 | 1 | | 3 | 302 | 3 |
| Other North America | 884 | 38 | 204 | 1 | 47 | 409 | | 16 | 34 | 4 | 2 | 1 | 5 | 121 | 2 |
| South America | 998 | 24 | 15 | | 4 | 43 | | 22 | | 9 | 2 | 1 | 14 | 855 | 9 |
| Africa | 9,126 | 15 | 78 | 25 | 4 | 405 | 1 | 1,492 | | 1 | | 3 091 | 3,960 | 40 | 14 |
| Other countries | 220 | 17 | 31 | | 1 | 65 | 1 | 55 | | | 23 | | 1 | 10 | 5 | 11 |

¹ Includes 6,130 Hungarian refugees.
² Includes 102,217 aliens who conditionally entered the United States and 14,180 refugees whose status was adjusted to permanent residents after 2 yr continuous physical presence in the United States. The 102,217 conditional entrants include those who have been accorded lawful permanent resident status.
³ Includes 3,566 for Cambodia, 4,205 for Laos and 85,651 for Vietnam.

Source: U.S. Department of Justice, Immigration and Naturalization Service.



7

# I. LEGISLATIVE AND ADMINISTRATIVE ACTIONS AFFECTING REFUGEE ADMISSIONS: 1945–65

## A. *Presidential Directive of December 22, 1945*

In 1945, President Truman announced new administrative procedures would be instituted to facilitate the immigration of displaced persons under existing immigration quotas, with emphasis on reestablishing European consular operations disrupted by World War II. This program was carried out through June 10, 1948, when the Displaced Persons Act went into effect.

## B. *Displaced Persons Act of 1948*

In his state of the Union message to Congress in January 1947, President Truman referred to the inadequacy of the attempt to admit displaced persons within the existing immigration quotas. He proposed emergency legislation which was eventually enacted in the Displaced Persons Act of 1948, the first significant refugee legislation in U.S. history.

The Displaced Persons Act of 1948 as amended [6] provided for the admission of over 400,000 displaced persons through December 31, 1951. This was accomplished by charging the admissions of displaced persons to the national immigration quotas of their country of origin and, if oversubscribed, the admission was charged to the future annual quotas of the country in question, or "mortgaged."

The Displaced Persons Act originally provided for the admission of 100,000 persons uprooted during or following World War II, 3,000 orphans, and 2,000 Czechs who fled the 1948 Communist coup, through June 30, 1950; and provided for the adjustment to permanent resident status of 15,000 displaced persons already in the United States. In 1950, the categories of eligible aliens were expanded, possible admissions under the Displaced Persons Act were increased to 415,000, and the act was extended through June 30, 1951, except for certain provisions concerning orphans and persons of German ethnic origin which were effective through June 30, 1952. In 1951, the Displaced Persons Act was extended again, through December 31, 1951

In order to be admitted under the Displaced Persons Act, an alien had to provide assurances that he would be able to obtain employment and housing without displacing an American, and that he would not become a public charge. Regular immigration requirements were imposed, as well as other eligibility requirements designed to keep out politically undesirable aliens, such as Communists. The assurances needed by aliens seeking admission to the United States were generally provided by private nonprofit voluntary agencies. The admission of refugees under the sponsorship of voluntary agencies has remained one of the principal features of U.S. refugee programs.

## C. *Immigration and Nationality Act of 1952*

One of the primary purposes of the Immigration and Nationality Act of 1952 [7] was to consolidate previous immigration laws into one statute. Although the Immigration and Nationality Act has been amended substantially since 1952, it remains the basic law governing immigration to the United States.

---

[6] Act of June 25, 1948, 62 Stat 1009; as amended by act of June 16, 1950, 64 Stat 219; and act June 28, 1951, 65 Stat 96
[7] Act of June 27, 1952, 66 Stat. 163.



**8**

As originally enacted, the Immigration and Nationality Act did not specifically provide for the admission of refugees. Three of its provisions which remain in effect today and relate to the admission of refugees are discussed below.

*1. Defector provision.*—Section 212(a)(28)(I)(ii) of the Immigration and Nationality Act permits the immigration of former Communist Party members or other persons affiliated with proscribed organizations if they can demonstrate that their membership was involuntary and was terminated at least 5 years prior to application for a visa. Without this provision, certain persons fleeing communism would be unable to enter the United States.

*2. Parole provision.*—The parole provision of the Immigration and Nationality Act, section 212(d)(5), incorporated into statutory law a provision authorizing the temporary parole of aliens into the United States, which had been an administrative practice of long standing. This provision authorizes the Attorney General in his discretion to parole any alien into the United States temporarily, under such conditions as the Attorney General may prescribe, in emergencies or for reasons deemed strictly in the public interest. Parole is not regarded as admission to the United States. When the purposes of parole have been served, the alien returns to the status from which he was paroled and is dealt with in the same manner as any other applicant for admission to the United States. Congress originally intended that parole would be used on a case-by-case basis on behalf of individual aliens. Parole has since been used as the primary basis for entry of large numbers of refugees. Section 212(d)(5) was amended by the Refugee Act to limit its use for the admission of refugees.

*3. Withholding deportation because of anticipated persecution.*—The Internal Security Act of 1950 [8] authorized withholding the deportation of an alien to any country where the Attorney General finds the alien would be subject to physical persecution. This provision was incorporated into the Immigration and Nationality Act as section 243(h).

Section 243(h) was subsequently amended,[9] most recently by the Refugee Act of 1980, expanding the grounds for relief from deportation.

### D. Act of July 29, 1953

The act of July 29, 1953,[10] permitted the entry of 500 orphans adopted, or coming to be adopted, by certain U.S. citizens.

### E. The Refugee Relief Act of 1953

At the height of the Cold War and after the expiration of the Displaced Persons Act, Congress enacted the Refugee Relief Act of 1953 primarily to expedite the admission into the United States of refugees escaping Iron Curtain countries.

The act, as amended,[11] authorized the admission of 214,000 refugees and was in force between August 7, 1953 and December 31, 1956. In contrast to the Displaced Persons Act, the admissions were authorized

---

[8] Act of Sept. 23, 1950, 64 Stat. 987
[9] Section 243(h) was amended by the 1965 amendments to the Immigration and Nationality Act (Act of Oct. 3, 1965, 79 Stat. 913) in part to conform with the language of the conditional entry provision adopted at that time
[10] 67 Stat. 229.
[11] Act of Aug. 7, 1953, 67 Stat. 400, as amended by the act of Aug. 31, 1954, 68 Stat. 1044.



---

10

Section 4 of the Refugee-Escapee Act provided for the admission outside immigration quotas through June 30, 1959, of certain orphans adopted, or to be adopted by U.S. citizens. The legislation also removed the mortgages on immigration quotas imposed as a result of the Displaced Persons Act.

*II. Act of September 2, 1958*

The act of September 2, 1958,[15] made visas available outside existing immigration quotas for nationals of the Netherlànds displaced from Indonesia because of political events, and Portuguese nationals who were unable to return to their homes in the Azores because of earthquakes and volcanic eruptions, and the spouses and children of such aliens. The termination of this program was extended from June 30, 1960, to June 30, 1962, by the Refugee Fair Share Law, which also increased the number of admissible refugees.

*1. Refugee Fair Share Law*

By 1960 a large number of refugees and displaced persons from World War II remained in camps in Europe under the mandate of the United Nations High Commissioner for Refugees. The so-called Refugee Fair Share Law, enacted July 14, 1960, was passed to provide a temporary program for the admission into the United States of a portion of the refugees in the camps.

The Fair Share Law gave the Attorney General a specific mandate to use his parole authority under section 212(d)(5) of the Immigration and Nationality Act to admit eligible "refugee-escapees" (the same definition as used in the Refugee-Escapee Act described above) until July 1, 1962, in a number not to exceed 25 percent of the total number of refugee-escapees under the mandate of the U.N. High Commissioner who had been resettled in other countries since July 1, 1959. It is noteworthy that this was congressional sanctioning of the use of the parole authority to admit groups of aliens.

Under this program, the Attorney General was authorized to parole up to 500 "difficult to resettle" refugees, with the assurance of a voluntary agency that any such refugee could become self-supporting, or would be supported by his family.

An alien paroled into the United States under this legislation could adjust his status to that of an alien admitted for permanent residence after 2 years in the United States. Refugees adjusting their status under this legislation were exempted from the documentary requirements of immigration law. This Fair Share Law provision was the forerunner of the conditional entry procedure.

The Immigration and Nationality Act's permanent adjustment of status provision under section 245(c)[16] was amended by this enactment to extend eligibility for adjustment of status to aliens paroled into the United States.

The Refugee Fair Share Law was more comprehensive than previous refugee admission programs; it was not designed to assist refugee of a particular nationality or to meet a particular emergency, but to provide an ongoing mechanism for the admission of refugees, although for a statutorily limited period of time. In 1962 the Refugee

[15] 72 Stat. 1712.
[16] 8 U.S.C. 1255(c)



18

181

11

Fair Share Law was extended indefinitely by a provision of the Migration and Refugee Assistance Act.[17]

The Immigration and Nationality Act Amendments of 1965 established a permanent statutory provision for the admission of refugees, and terminated the refugee parole program authorized by the Refugee Fair Share Law.

# II. REFUGEE ADMISSIONS LEGISLATION AND PROCEDURE AFTER 1965

## A. Conditional entry

The 1965 amendments to the Immigration and Nationality Act included a permanent statutory authority for the admission of refugees, the so-called conditional entry provision.[18] This authority remained in force until its repeal by the Refugee Act.

The conditional entry provision, section 203(a)(7) of the Immigration and Nationality Act, was established as part of the new immigrant visa preference system for the Eastern Hemisphere created by the 1965 amendments to the act. A numerical ceiling of 170,000 persons per year was imposed on immigration from the Eastern Hemisphere, with a 20,000 per country limit. Seven immigrant visa preference categories were established, each allocated a portion of the annual ceiling. The seventh preference category was for the conditional entry of refugees and was allocated 6 percent of the ceiling, one-half of which could be used for aliens in the United States 2 years who were adjusting their status. In 1976 the preference system was amended and extended to the Western Hemisphere, under a separate numerical ceiling on Western Hempshire immigration. In 1978 the Eastern Hemisphere and Western Hemisphere numerical ceilings were combined into a single worldwide ceiling on immigration, making 17,400 conditional entry numbers available to refugees each year.

In order to be eligible for entry under section 203(a)(7) aliens had to be examined by an Immigration and Naturalization Service (INS) officer in a non-Communist country, and meet the criteria of the section which were the same as the definition of refugee-escapee in the 1957 Refugee-Escapee Act (see page CRS-12). These criteria were as follows:

> that (i) because of persecution or fear of persecution on account of race, religion, or political opinion they have fled (I) from any Communist or Communist-dominated country or area, or (II) from any country within the general area of the Middle East, and (ii) are unable or unwilling to return to such country or area on account of race, religion, or political opinion, and (iii) are not nationals of the countries or areas in which their application for conditional entry is made; or (B) that they are persons uprooted by catastrophic natural calamity as defined by the President who are unable to return to their usual place of abode.

---

[17] Act of June 28, 1962, 76 Stat. 121
[18] Act of Oct. 3, 1965, 79 Stat. 913, as amended by the act of Oct. 20, 1976, 90 Stat. 2705, and the act of Oct. 5, 1978, 92 Stat. 907



13

182

12

As of 1979, the Immigration and Naturalization Service conducted conditional entry examinations in Frankfurt, Hong Kong, Rome, Vienna and Athens. Conditional entry was never used to admit victims of natural disasters.

Conditional entry, as the name implies, was not admission for permanent residence. A permanent provision for the adjustment of status of conditional entrants to that of permanent resident alien was included as sections 203 (g) and (h) of the Immigration and Nationality Act. The language of these adjustment of status sections was similar to that contained in the Refugee Fair Share Law. To obtain permanent resident status, the alien had to be admissible as an immigrant, except for documentary requirements, and he must have been in the United States for 2 years. Adjustment of status was effective retroactively to the date of the alien's arrival in the United States.

Table II indicates the number of conditional entries of refugees since 1965. The Refugee Act repealed the conditional entry provision.

TABLE II  *Conditional entries of refugees under sec. 203(a)(7)*

| | |
|---|---|
| 1965–66 | 3,191 |
| 1967–68 | 13,267 |
| 1969–70 | 30,339 |
| 1971–72 | 20,894 |
| 1973–74 | 10,099 |
| 1975–76 | 17,778 |
| 1977–78 | 20,720 |
| | ——— |
| Total | 126,288 |
| Average per year | 9,020 |

SOURCE.—U.S. Congress. Senate. Committee on the Judiciary. The Refugee Act of 1979. Report to accompany S 643, Senate Report No. 96 256, 96th Cong., 1st sess. Washington, U.S. Government Printing Office. 1979. p. 6

*B. Parole*

The parole provision, section 212(d)(5) of the Immigration and Nationality Act of 1952 authorizes the Attorney General in his discretion to parole any alien into the United States temporarily, under such conditions as the Attorney General may prescribe, in emergencies or for reasons deemed strictly in the public interest.[19] The flexibility of the parole provision has enabled the United States to respond to a variety of refugee situations by accepting groups of refugees for resettlement outside normal immigration channels.

When the conditional entry provision was established in 1965, Congress intended that thereafter the parole provision would be administered solely on a case-by-case basis. As stated in the report of the Senate Committee on the Judiciary on the Immigration and Nationality Act Amendments of 1965:

> Inasmuch as definite provision has now been made for refugees, it is the express intent of the committee that the parole provisions of the Immigration and Nationality Act, which remain unchanged by this bill, be administered in accordance with the original intention of the drafters of that legislation. The parole provisions were designed to authorize the Attorney General to act only in emergency, individual, and isolated situations, such as the case of an alien who requires immedi-

---

[19] Act of Jun. 27, 1952, 66 Stat. 188.



20

183

13

ate medical attention, and not for the immigration of classes or groups outside of the limit of the law.[20]

Because of the limitations of the conditional entry provision, however, parole continued to be used as the major authority for the entrance of groups of refugees into the United States.

Cuban refugees, for example, began to be paroled into the United States in 1961 when diplomatic relations between the United States and Cuba were severed. As Western Hemisphere natives, Cubans were not eligible for conditional entry when that provision became law, since it applied only to the Eastern Hemisphere. After the Cuban airlift program was announced by President Johnson in 1965, the number of these refugees admitted under the parole authority increased dramatically. Between 1962 and the end of May 1979, over 690,000 Cubans entered the United States under the Attorney General's parole authority, the largest number of refugees from a single nationality ever accepted into the United States.

The vast majority of over 360,000 Indochinese refugees who entered the United States between 1975 and mid-1980 did so under a series of parole authorizations. In the spring of 1975, at the time of the U.S. withdrawal from Vietnam, about 130,000 refugees were evacuated from Indochina. Most of these refugees were resettled in the United States, entering the country under the parole provision. Subsequent to the Communist takeovers in Vietnam, Cambodia, and Laos, Indochinese refugees were also eligible to enter the United States under the conditional entry provision, but the number of conditions entries available did not approach the number of refugees the United States chose to accept. Indochinese refugee parole programs were authorized or extended by the Attorney General 10 times: three times in 1975, once in 1976, once in 1977, three times in 1978, twice in 1979.

The original parole criteria in 1975 were fairly specific, designed to expedite the admission of certain Vietnamese relatives of U.S. citizens and permanent resident aliens. As the evacuation continued, the parole criteria were expanded, almost on a daily basis, to respond to the emergency situation. In addition to various categories of Vietnamese, the parole of certain Cambodians evacuated by the United States was authorized at this time.

In August 1975 two parole programs were authorized, one for additional Vietnamese and Cambodian refugees, and another to assist allies of the United States from Laos. A major parole program was authorized, one for additional Vietnamese and Cambodian refugees, and another to assist allies of the United States from Laos. A major parole program was authorized in May 1976 to accommodate 11,000 refugees who had escaped from Vietnam, Cambodia, and Laos, primarily persons with relatives in the United States, and persons who had been associated with the United States or governments friendly to the United States. Refugees had begun to escape from Vietnam by boat, and these so-called boat people were encountering considerable difficulty in finding safe-havens. Some boat people were included in the 1976 parole program, but a continuing exodus of substantial numbers of refugees from Indochina was not generally anticipated at this time.

[20] U.S. Congress. Senate Committee on the Judiciary Amending the Immigration and Nationality Act, and for other purposes. Report to accompany H.R. 2580. Senate Report No. 748, 89th Cong., 1st sess. Washington, U.S. Government Printing Office, 1965. p. 17.



184

21

---

14

Some Members of Congress and the Ford administration concluded that relying on the parole provision was not a desirable means of formulating U.S. refugee policy. Accordingly, the Ford administration agreed not to authorize additional parole programs until legislation establishing new, systematic refugee admission procedures was enacted.

In 1977 conditional entry numbers were beginning to be used for boat people, but the magnitude of this problem was greater than the conditional entry provision could accommodate. In part because of the increasing numbers of refugees, a 1977 parole program was established for 15,000 refugees, including boat cases and refugees who had escaped by land to Thailand. Although the Carter administration agreed with the need for new refugee legislation, it did not feel that it was obligated to conform to the Ford administration's agreement not to use the parole authority until such legislation was enacted.

Three Indochinese refugee parole programs were authorized in 1978, for 7,000 refugees in January, 25,000 refugees in June, and 21,875 refugees in December. The parole provision was also being used extensively on behalf of refugees from other parts of the world. The December Indochinese refugee parole program was designed in part in response to two congressional enactments calling for the parole of additional refugees from Cambodia.[21]

In April 1979 the Attorney General authorized the parole of 40,000 Indochinese refugees through September 30, 1979. In reaction to the refugee crisis caused by tens-of-thousands of boat people fleeing Vietnam, President Carter announced, in late June 1979, that the rate under which we were admitting Indochinese under the parole authority would double to 14,000 per month. This rate continued under another parole authorization that was required pending the enactment of the Refugee Act.

After 1972 parole was also used to an increasing extent to supplement the conditional entry provision to expedite the entrance of Soviet and other Eastern European refugees. In January 1977 the parole of 4,000 Soviet refugees was authorized by the Attorney General; the parole of 5,000 additional Soviet refugees was authorized in December 1977; and the parole of 12,000 more refugees from the Soviet Union and other East European countries was authorized in June 1978. The parole of 25,000 Soviet and other Eastern European refugees, through September 30, 1979, was authorized in April 1979. Until the enactment of the Refugees Act, the United States continued the parole of Soviet and Eastern European refugees at the rate of 3,000 per month.

Many of the refugees the United States has accepted have not been admissible under the conditional entry provision because of its ideological and geographic limitations. Refugees who are fleeing from non-Communist countries or from countries outside the Middle East are ineligible for conditional entry, and the parole provision has been used to assist them. Table III prepared by the Senate Judiciary Committee, summarizes the use of the Attorney General's parole authority to admit refugees.

[21] One provision of the fiscal year 1979 Department of Justice Appropriations Act, Public Law 95-431, Act of Oct. 10, 1978 expressed the sense of the Congress that the Attorney General should parole an additional 15,000 Cambodian refugees into the United States over a 2 year period. One provision of the fiscal year 1979 Department of Justice Authorization Act, Public Law 95-624, Act of Nov. 9, 1978 directed the Attorney General to develop parole eligibility criteria to enable a large number of Cambodian refugees to qualify for the then current Indochinese refugee parole program.



22

185

15

TABLE III —HISTORICAL SUMMARY OF REFUGEE PAROLE ACTION

| Year | Country and class of people | Total |
|---|---|---|
| 1956 | Orphans from Eastern European countries | 925 |
| 1956–57 | Refugees from Hungary | 38, 045 |
| 1960–65 | Refugee escapees from Eastern European countries | 19, 754 |
| 1962 | Chinese refugees from Hong Kong and Macao | 14, 741 |
| 1962 through May 31, 1979 | Refugees from Cuba | 692, 219 |
| 1973 through May 31, 1979 | Refugees from the Soviet Union | 35, 758 |
| 1975 through May 31, 1979 | Indochinese refugees | 208, 200 |
| 1975–77 | Chilean detainees | 1, 310 |
| 1975–77 | Chilean refugees from Peru | 112 |
| 1976–77 | Latin American refugees (Chileans, Bolivians, and Uruguayans) | 343 |
| 1978–79 | Lebanese refugees | ¹ 1, 000 |
| 1979 | Cuban prisoners and families | ¹ 15, 000 |
| | Total | 1, 027, 407 |
| | Average per year | 44, 670 |

¹ Authorized.

Source  U.S. Congress, Senate, Committee on the Judiciary, Senate Report No. 96–256, p. 6.

The Refugee Act limited the use of parole for the admission of
refugees.

## C. Withholding deportation because of anticipated persecution

Section 243(h) of the Immigration and Nationality Act authorizes
the Attorney General to withhold deportation of an alien to any
country where the alien would be subject to persecution on account of
race, religion, or political opinion.²² This provision originally au-
thorized relief from deportation because of physical persecution only,
but the scope of section 243(h) was expanded in 1965. Section 243(h)
is applicable only to aliens who are in the United States and who
are deportable under the terms of the Immigration and Nationality
Act. Section 243(h) was amended by the Refugee Act.

## D. Asylum

In 1968, the United States became a party to the 1967 U.N. Pro-
tocol Relating to the Status of Refugees, which incorporates by ref-
erence provisions of the 1951 United Nations Convention Relating to
the Status of Refugees. The Protocol and Convention do not require
a country to accept refugees, but they insure that refugees within the
country will have certain legal and political rights and protections.

Two provisions which relate to asylum are articles 32 and 33 of
the Convention. Article 32 prohibits the expulsion of a refugee law-
fully in a country except for reasons of national security or public
safety, and provides that expulsion must be in accordance with due
process of law. Article 33 prohibits the expulsion or return of a refu-
gee to any country where his life or freedom would be threatened on
account of race, religion, nationality, social group, or political opin-
ion, except for reasons of the host country's national security or public
safety.

Before the enactment of the Refugee Act there was no asylum per
se in the Immigration and Nationality Act, beyond withholding of
deportation under section 243(h), discussed above. When the United
States became a party to the Protocol, Congress and the administra-
tion believed that the United States could comply with its provisions
without having to amend the Immigration and Nationality Act, and
no immediate change was made in U.S. immigration policy or pro-

²² Act of June 27, 1952. 66 Stat  214 , as amended by the Act of Oct  3, 1965, 79 Stat. 918.



186

cedures. However, a 1970 incident involving the return of a Lithuanian
seaman who was attempting to enter the United States was seen by
many as a particularly dramatic illustration of the need to establish
specific asylum procedures. Soon thereafter, interim instructions re-
garding the handling of requests for asylum were issued by the De-
partment of State.

In 1972 the Department of State issued a policy statement regard-
ing the handling of requests for asylum. In 1973 the Immigration and
Naturalization Service issued regulations designed in part to meet
obligations imposed by other provisions of the Protocol regarding
refugee travel documents.

In 1974 the Immigration and Naturalization Service issued asylum
regulations as part of 108 of title 8 of the Code of Federal Regula-
tions, under the general authority of section 103 of the Immigration
and Nationality Act. The asylum regulations were revised in May
1979. The Refugee Act required new asylum regulations to be devel-
oped by June 1, 1980.[23]

### E. Special legislation providing permanent resident status to refugees

Of our four refugee procedures, conditional entry, parole, withhold-
ing deportation because of anticipated persecution, and asylum, only
conditional entry was a component of the normal immigration ad-
mission process. As mentioned above, refugees granted conditional
entry were able to obtain permanent resident status after 2 years in
the United States under the special adjustment of status procedures
authorized by sections 203 (g) and (h) of the Immigration and Na-
tionality Act.

Refugees granted parole may be admitted for permanent residence
under the general adjustment of status procedures authorized by sec-
tion 245 of the Immigration and Nationality Act, but they must do so
within the numerical limitations and other restrictions imposed on
immigration generally. For this reason, special adjustment of status
legislation was enacted to enable Hungarian, Cuban, and Indochinese
refugees paroled into the United States to be admitted for permanent
residence outside normal immigration channels. More recently, legis-
lation was enacted as part of Public Law 95–412[24] to enable refugees
paroled into the United States who were not otherwise eligible for
such special refugee adjustment of status benefits to be granted perma-
nent resident status without numerical limitation.

The special legislation providing adjustment of status for the Hun-
garian refugees has been previously noted (see page CRS–13).

During the mid-1960's, the Immigration and Nationality Act did not
permit the adjustment of status of Western Hemisphere natives. The
Act of November 2, 1966,[25] enabled Cuban refugees to adjust their
status to that of permanent residents. Eligible refugees must have been
in the United States for at least 2 years (amended to 1 year by the
Refugee Act). Adjustment of status is retroactive to the date of the
alien's arrival in the United States or to 30 months prior to the date
of enactment, whichever is later. The Immigration and Nationality
Act Amendments of 1976 specified, in part, that Cuban refugees who

[23] Interim asylum regulations were published by the cutoff date and were open to
comment until July 31, 1980 U S Department of Justice. Aliens and Nationality. Refugee
and Asylum Procedures Federal Register v 45, No 107, June 2, 1980, p 37392
[24] Act of Oct. 5, 1978, 92 Stat 907
[25] 80 Stat 1161



187

adjust their status will not be charged against the numerical ceiling on Western Hemisphere immigration, thus enacting into law an administrative practice that had been under way since September 1976.

To facilitate the adjustment of status of Indochinese refugees, title I of Public Law 95 145 [26] authorized the creation of a record of permanent residence for certain aliens from Vietnam, Cambodia, and Laos who were in the United States at the time of the evacuation from Vietnam or who were paroled into the United States prior to January 1, 1979, at the discretion of the Attorney General. Refugees in the United States at least 2 years (amended to 1 year by the Refugee Act) can obtain permanent residence status retroactive to March 31, 1975 or the date of their arrival in the United States, whichever is later. Adjustment of status under this act is not subject to the Immigration and Nationality Act's numerical limitations, and aliens are exempted from the exclusion provisions relating to labor certification, public charges, documentary requirements, literacy requirements, and foreign medical graduates.

A provision of Public Law 95 412 [27] enabled aliens paroled into the United States prior to September 30, 1980, to adjust their status without numerical limitation, to that of permanent resident after 2 years in the United States. The adjustment of status provision of Public Law 95-412 was of particular importance to refugees from the Soviet Union because of the increased use of the parole provision on behalf of such refugees. The provision's eligibility date was changed to April 1, 1980, by the Refugee Act and the required period for residence was reduced to 1 year.

The procedures for withholding deportation because of anticipated persecution, and asylum, do not provide for admission to the United States. When deportation is withheld or asylum is granted, another provision of the Immigration and Nationality Act must be used to enable the alien to acquire a status which will enable him to remain in the United States. For example, the alien may be granted voluntary departure status, or paroled into the United States, for a specified period of time.

### F. Other legislation impacting on refugee admissions

The Immigration and Nationality Act Amendments of 1976, Public Law 94-571. [28] extended the immigrant visa preference system to the Western Hemisphere. This resulted in the authorization of 7,200 conditional entries from the Western Hemisphere per year.

In addition to its adjustment of status provisions discussed above, Public Law 95 412 combined the Eastern and Western Hemisphere immigration ceilings into one worldwide ceiling of 290,000. This resulted in an annual allocation of 17,400 for the conditional entry provision. Because few Western Hemisphere natives had been able to meet the conditional entry provision's ideological or geographic requirements, the Western Hemisphere's numbers had been largely unused. One effect of the imposition of the worldwide ceiling was to make conditional entry numbers that would have otherwise been allocated to the Western Hemisphere only, available to refugees all over the world who meet the eligibility requirements.

---

[26] Act of Oct. 28, 1977, 91 Stat. 1223
[27] Act of Oct. 5, 1978, 92 Stat. 907.
[28] Act of Oct. 20, 1976, 90 Stat. 2703.


ERIC
Full Text Provided by ERIC

18

Public Law 95–412 also established a Select Commission on Immigration and Refugee Policy to review that policy and make administrative and legislative recommendations. The report of the Commission is due March 1, 1981.

26



189