EXHIBIT 24



Congressional
Research Service
Informing the legislative debate since 1914

# Unaccompanied Alien Children: Potential Factors Contributing to Recent Immigration

**William A. Kandel, Coordinator**
Analyst in Immigration Policy

**Andorra Bruno**
Specialist in Immigration Policy

**Peter J. Meyer**
Analyst in Latin American Affairs

**Clare Ribando Seelke**
Specialist in Latin American Affairs

**Maureen Taft-Morales**
Specialist in Latin American Affairs

**Ruth Ellen Wasem**
Specialist in Immigration Policy

July 3, 2014

**Congressional Research Service**

7-5700

www.crs.gov

R43628

**CRS REPORT**
Prepared for Members and
Committees of Congress

# Summary

Since FY2008, the growth in the number of unaccompanied alien children (UAC) from Mexico, El Salvador, Guatemala, and Honduras seeking to enter the United States has increased substantially. Total unaccompanied child apprehensions increased from about 8,000 in FY2008 to 52,000 in the first 8 ½ months of FY2014. Since 2012, children from El Salvador, Guatemala, and Honduras (Central America's "northern triangle") account for almost all of this increase. Apprehension trends for these three countries are similar and diverge sharply from those for Mexican children. Unaccompanied child migrants' motives for migrating to the United States are often multifaceted and difficult to measure analytically.

Four recent out-migration-related factors distinguishing northern triangle Central American countries are high violent crime rates, poor economic conditions fueled by relatively low economic growth rates, high rates of poverty, and the presence of transnational gangs. In 2012, the homicide rate per 100,000 inhabitants stood at 90.4 in Honduras (the highest in the world), 41.2 in El Salvador, and 39.9 in Guatemala. International Monetary Fund reports show economic growth rates in the northern triangle countries in 2013 ranging from 1.6% to 3.5%, relatively low compared with other Central American countries. About 45% of Salvadorans, 55% of Guatemalans, and 67% of Hondurans live in poverty. Surveys in 2013 indicate that almost half of all unaccompanied children experienced serious harm or threats by organized criminal groups or state actors, and one-fifth experienced domestic abuse.

In 2011, Mexico passed legislation to improve migration management and ensure the rights of migrants transiting the country. According to many migration experts, implementation of the laws has been uneven. Some have questioned whether passage of such legislation has affected in some way the recent flows of unaccompanied children. However, the impact of such laws remains unclear.

Although economic opportunity may motivate some unaccompanied children to migrate to the United States, labor market conditions for low-skilled minority youth have worsened in recent years, even as industrial sectors employing low-skilled workers enjoy improved economic prospects. Educational opportunities may also provide a motivating factor to migration as perceptions of free and safe education may be widespread among the young. Family reunification is reported to be one of the key motives of unaccompanied children. Many have family members among the sizable Salvadoran, Guatemalan, and Honduran foreign-born populations residing in the United States.

While the impacts of actual and perceived U.S. immigration policies have been widely debated, it remains unclear if, and how, specific immigration policies have motivated children to migrate to the United States. Misperceptions about U.S. policies may be a contributing factor. The existence of long-standing humanitarian relief policies confounds causal links between them and the recent surge in unaccompanied children. A notable and recent exception is revised humanitarian relief provisions for unaccompanied children included in the Trafficking Victims Protection Reauthorization Act (TVPRA) of 2008, which affects asylum claims, trafficking victim protections, and eligibility for Special Immigrant Juvenile Status. Some argue that unaccompanied children and their families falsely believe they would be covered under the Deferred Action for Childhood Arrivals (DACA) initiative and legalization provisions in proposed comprehensive immigration reform (CIR) legislation.

A separate report, CRS Report R43599, *Unaccompanied Alien Children: An Overview*, by Lisa Seghetti, Alison Siskin, and Ruth Ellen Wasem, discusses the recent surge in the number of UACs encountered at the U.S. border with Mexico, as well as the processing and treatment of UACs

who are apprehended by immigration officials. Another report provides answers to frequently asked questions, CRS Report R43623, *Unaccompanied Alien Children—Legal Issues: Answers to Frequently Asked Questions*, by Kate M. Manuel and Michael John Garcia. For information on country conditions, security conditions, U.S. policy in Central America, and circumstances that may be contributing to the increase in unaccompanied alien children migrating to the United States, see CRS Report RL34112, *Gangs in Central America*, by Clare Ribando Seelke; CRS Report R41731, *Central America Regional Security Initiative: Background and Policy Issues for Congress*, by Peter J. Meyer and Clare Ribando Seelke; CRS Report R43616, *El Salvador: Background and U.S. Relations*, by Clare Ribando Seelke; CRS Report R42580, *Guatemala: Political, Security, and Socio-Economic Conditions and U.S. Relations*, by Maureen Taft-Morales; and CRS Report RL34027, *Honduras: Background and U.S. Relations*, by Peter J. Meyer.

# Contents

Introduction .................................................................................................................................... 1

Background .................................................................................................................................... 2

Conditions in Central America as Possible "Drivers" for Unaccompanied Child Migration .......... 3

    Economic Stagnation and Poverty ................................................................................................ 5

    Crime and Violence .................................................................................................................... 7

Migration Transit Zone Conditions and Mexico's Migration Policies ......................................... 10

Factors in the United States Associated with Immigration of Unaccompanied Children ............... 12

    Economic and Educational Opportunity .................................................................................... 12

    Family Reunification ................................................................................................................ 14

    U.S. Immigration Policies ....................................................................................................... 16

        Humanitarian Forms of Immigration Relief .......................................................................... 17

        Deferred Action for Childhood Arrivals (DACA) and Legalization Proposals ................... 20

Conclusion .................................................................................................................................. 21

## Figures

Figure 1. UAC Apprehensions by Country of Origin, FY2008-FY2014 ......................................... 2

Figure 2. Map of Central America and Neighboring Countries ...................................................... 4

Figure 3. Annual Percentage Change in Real Gross Domestic Product (GDP):  2007-2014 .......... 6

## Tables

Table 1. Primary Reasons Unaccompanied Children Emigrate ...................................................... 5

Table 2. Estimated Homicide Rates in Central America and Mexico: 2007-2012 ......................... 8

## Contacts

Author Contact Information .......................................................................................................... 21

# Introduction

In the past several years, and in the past year in particular, the number of unaccompanied alien children (UAC)[1] seeking to enter the United States along the U.S.-Mexico border has surged to unusually high levels. This surge is driven overwhelmingly by migration from El Salvador, Guatemala, and Honduras. Congress has expressed increasing concerns over this situation because of its implications for border security and U.S. immigration policy. Because the surge has occurred recently, and because few sources of data exist to accurately measure the characteristics and motives of these unaccompanied children, immigration observers have advanced a range of explanations for the surge.

The report is not intended to be an exhaustive review of all factors that potentially underlie the recent surge in unaccompanied children. Rather, it discusses major possible contributing factors that have been widely cited in published reports. It also emphasizes factors that may account for the recent surge in unaccompanied children, but not long-standing causes, such as wage and earnings differentials between other countries and the United States. The report distinguishes what is often referred to as "push" and "pull" factors[2] associated with the recent surge. Push factors in this case refer to forces that originate in migrant origin countries which encourage children to emigrate to other countries. Pull factors refer to elements that originate in the United States and encourage children to migrate specifically to this country.

The analytic dichotomy between push and pull factors often blurs in actual circumstances. For example, family reunification may occur after a parent from an origin country secures employment in the United States. Yet, having an employed parent in the United States may easily make a child in an origin country more susceptible to extortion or kidnapping by criminal gangs, which in turn, may motivate the child to migrate to the United States. Hence, having an employed parent in the United States ostensibly acts as a "pull" factor while the threat of violence acts as a "push" factor, but in this example, the latter would not occur without the former.

Migration to another country stems not only from macro-level circumstances such as violence and economic hardship but also personal circumstances and characteristics, such as marital status and risk tolerance. Most children have multiple motives, and how those motives influence their decisions to migrate depend on a range of factors that cannot be measured easily.

This report begins by describing the recent surge in unaccompanied child apprehensions. It discusses several factors widely associated with out-migration from El Salvador, Guatemala, and Honduras, three countries accounting for much of the recent surge of unaccompanied child migrants. These factors include economic conditions and poverty, crime and violence, and conditions related to the migration transit zone between Central America and the United States. The report then discusses three broad factors that may be attracting migrants to the United States: economic and educational opportunity, family reunification, and U.S. immigration policies. It concludes with caveats on the attribution of causes to this situation.

---

[1] In this report, we refer to unaccompanied alien children as unaccompanied children.

[2] The terms "push factor" and "pull factor" have long been used in demographic research to explain human migration.

# Background[3]

Unaccompanied alien children (UAC) are defined in statute as aliens[4] under age 18, who lack lawful immigration status in the United States, and who are without a parent or legal guardian in the United States or lack a parent or legal guardian in the United States who is available to provide care and physical custody.[5] They typically arrive at U.S. ports of entry or are apprehended along the southwestern border with Mexico. Less frequently they are apprehended in the interior and determined to be a juvenile[6] and unaccompanied.[7] Most of these children are aged 14 or older.

**Figure 1. UAC Apprehensions by Country of Origin, FY2008-FY2014**



**Source:** Prepared by Jamie L. Hutchinson, CRS Graphics Specialist. Data from Department of Homeland Security, United States Border Patrol, *Juvenile and Adult Apprehensions–Fiscal Year 2013*. (Data provided to CRS by request.)

**Notes:** FY2014 figures are October 1, 2013, to June 15, 2014, representing just over 2/3 of a fiscal year.

The number of unaccompanied children has increased in the past six years and has surged in this current year. In FY2008, the number apprehended by U.S. Customs and Border Protection (CBP)

---

[3] For information on unaccompanied alien children, see CRS Report R43599, *Unaccompanied Alien Children: An Overview*, by Lisa Seghetti, Alison Siskin, and Ruth Ellen Wasem.

[4] *Alien*, a technical term appearing throughout the Immigration and Nationality Act (INA), refers to a foreign national who is not a citizen or national of the United States. This report uses "unaccompanied alien children" and "unaccompanied children" interchangeably.

[5] 6 U.S.C. §279(g)(2).

[6] A juvenile is defined as an alien under the age of 18. 8 C.F.R. §263.3. In this report, the terms "juvenile," "child," and "minor" are used interchangeably.

[7] A juvenile is classified as *unaccompanied* if neither a parent nor a legal guardian is with the juvenile alien at the time of apprehension, or within a geographical proximity to quickly provide care for the juvenile. 8 C.F.R. §236.3(b)(1).

totaled 8,041. In the first 8½ months of FY2014, apprehensions climbed to 52,000 (**Figure 1**).[8] Nationals of Guatemala, Honduras, El Salvador, and Mexico, have accounted for almost all unaccompanied alien children apprehended at the Mexico-U.S. border during this period.

In the past three years, apprehensions of Mexican unaccompanied children, which rose substantially in FY2009, have since varied between 12,000 and 17,000. In contrast, apprehensions of unaccompanied children from Guatemala, Honduras, and El Salvador have increased considerably during this period. In FY2009, Mexicans accounted for 82% of the 19,668 unaccompanied child apprehensions, while the Central American countries accounted for 17%. By the first eight months of FY2014, the proportions had almost reversed, with Mexican apprehensions comprising only 23% of the 52,000 UAC apprehensions, and UAC from the three Central American countries comprising 75% of the total. The total increase in apprehensions in the past three years stems mainly from large increases in the number of unaccompanied children from the three Central American countries.

The similarity of the trends characterizing apprehensions of unaccompanied alien children from El Salvador, Guatemala, and Honduras, and their stark divergence from those characterizing unaccompanied Mexican children suggests that factors specific to Central America's "northern triangle"[9] underlies the sudden surge in total unaccompanied child apprehensions. What follows is a discussion of possible causes originating in the countries themselves ("push factors") and other possible causes originating in the United States ("pull factors").

# Conditions in Central America as Possible "Drivers" for Unaccompanied Child Migration

Central America is a region encompassing seven countries of the isthmus between Mexico and South America: Belize, Costa Rica, El Salvador, Guatemala, Honduras, Nicaragua, and Panama (**Figure 2**). The overwhelming majority of the unaccompanied child migrants apprehended in Mexico or at the U.S.-Mexico border have come from Guatemala, Honduras, and El Salvador, which are often referred to as the "northern triangle" countries of Central America. High violent crime rates, poor economic conditions fueled by relatively low economic growth rates, relatively high poverty rates, and the presence of transnational gangs appear to be some of the main distinguishing factors between these three northern triangle countries and other countries in the region.[10]

Unaccompanied child migrants' motives for emigrating appear to be multifaceted. In 2013, the U.N. High Commissioner for Refugees (UNHCR) conducted interviews with a representative group of about 400 unaccompanied minors from El Salvador, Guatemala, Honduras, and Mexico, all of whom had arrived in the United States since FY2012.[11] Most of the unaccompanied minors

---

[8] If extrapolated at the same rate to the end of the fiscal year, the figure would reach roughly 73,000. News reports have cited an internal DHS memorandum estimating that FY2014 apprehensions could total 90,000. Alicia A. Caldwell, Associated Press, "Border Patrol resources stretched thin as children illegally enter U.S. alone," *PBS Newshour*, *The Rundown*, June 5, 2014.

[9] This term is often used to refer to these three countries as a group.

[10] For more information, see CRS Report R41731, *Central America Regional Security Initiative: Background and Policy Issues for Congress*, by Peter J. Meyer and Clare Ribando Seelke.

[11] U.N. High Commissioner for Refugees (UNHCR), *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection*, March 12, 2014, http://www.unhcrwashington.org/sites/default/files/1_UAC_Children%20on%20the%20Run_Full%20Report.pdf, (hereinafter referred to as "UNHCR, (continued...)

provided multiple reasons for leaving their countries. Many left to reunite with family or pursue opportunities in the United States. Of those interviewed, 21% mentioned joining a family member, 51% mentioned economic opportunity, and 19% mentioned education.[12]

### Figure 2. Map of Central America and Neighboring Countries



**Source:** Prepared by Amber Hope Wilhelm, CRS Graphics Specialist.

Violence also played a large role in their decisions to emigrate. Nearly half of the children (48%) said they had experienced serious harm or had been threatened by organized criminal groups or state actors, and more than 20% had been subject to domestic abuse. As recently as 2006, only 13% of unaccompanied child migrants from Central America interviewed by UNHCR presented any indication they were fleeing societal violence or domestic abuse.

(...continued)

*Children on the Run"*). Children interviewed were part of the increase in unaccompanied children beginning in FY2012. Almost all were interviewed while in the custody of the Office of Refugee Resettlement, the agency within the U.S. Department of Health and Human Services to which they are referred after apprehension. Children were identified by a random selection process that accounted for age, nationality, sex, and date of U.S. arrival. For more on the study's methodology, see pp. 18-22. Caution must be used in generalizing a single study to the entire population of unaccompanied children.

[12] Ibid.

Endemic poverty also appears to play a role in the emigration of unaccompanied minors, as 16% of those interviewed mentioned economic deprivation as a motive. There is some variation depending on country of origin, with Salvadorans being more likely to cite societal violence and Guatemalans being more likely to cite economic deprivation as motives for emigration (see **Table 1**).[13] Other studies involving interviews with unaccompanied children yield similar results.[14]

### Table 1. Primary Reasons Unaccompanied Children Emigrate

(Percentage of minors interviewed by UNHCR in 2013 citing each factor)

| Country of Origin | Societal Violence | Domestic Abuse | Economic Deprivation or Social Exclusion | Family or Opportunities in the United States | Other |
|---|---|---|---|---|---|
| El Salvador | 66% | 20% | 7% | 80% | 35% |
| Guatemala | 20% | 23% | 29% | 84% | 39% |
| Honduras | 44% | 24% | 21% | 82% | 34% |
| Mexico | 59% | 17% | 7% | 80% | 34% |
| **Total** | **48%** | **21%** | **16%** | **81%** | **35%** |

**Source:** UNHCR, *Children on the Run.*

**Notes:** Sums exceed 100% since the majority of the children interviewed provided multiple reasons for emigrating. Column categories were grouped by source author, and more detailed reasons cannot be provided.

## Economic Stagnation and Poverty

El Salvador, Guatemala, and Honduras are each considered lower middle income economies by the World Bank. Per capita gross domestic product (GDP) in 2014 is estimated to be $4,014 in El Salvador, $3,684 in Guatemala, and $2,368 in Honduras.[15] The countries have maintained what are viewed by most economists as generally sound macroeconomic policies in recent years, and enjoyed stable economic growth until the onset of the global financial crisis and U.S. recession in 2009. At that time, the Salvadoran and Honduran economies contracted and the Guatemalan economy slowed significantly, demonstrating how all three countries are vulnerable to external shocks as a result of their open economies[16] and close ties to the United States.[17] Although all three economies have rebounded since 2010, growth rates have yet to fully recover (see **Figure 3**). El Salvador posted an economic growth rate of just 1.6% in 2013, the lowest of any country in Central America.[18]

---

[13] Ibid.

[14] See, for example, Women's Refugee Commission, *Forced from Home: The Lost Boys and Girls of Central America*, October 2012; and Elizabeth G. Kennedy, "'No Place for Children': Central America's Youth Exodus," *InSight Crime*, June 23, 2014.

[15] International Monetary Fund (IMF), *World Economic Outlook Database, April 2014*, accessed June 2014.

[16] An open economy is an economy with relatively few barriers to trade or investment (as opposed to a closed or protectionist economy). Open economies are more integrated into the international market than closed economies, and thus more vulnerable to external shocks.

[17] Close ties means the countries are heavily reliant on exports to the United States, remittances from the United States, and investment from the United States.

[18] IMF, *World Economic Outlook Database, April 2014*, accessed June 2014.

Economic growth in the region has been inhibited by slow economic growth in major markets (Europe, China, the United States) as well as domestic factors, such as a coffee rust (roya fungus) outbreak, hurricanes and other natural disasters, and weak productivity.[19] The coffee rust epidemic, which in 2013 affected 74% of the coffee crop in El Salvador, 70% of the coffee crop in Guatemala, and 25% of the coffee crop in Honduras, led to nearly 200,000 jobs being lost across the three countries.[20] Employment and wages in the coffee sector have continued to fall over the past year, depriving many poor households of a significant source of income.[21]

**Figure 3. Annual Percentage Change in Real Gross Domestic Product (GDP): 2007-2014**



**Source:** International Monetary Fund (IMF), *World Economic Outlook Database, April 2014*, accessed June 2014.
**Note:** Growth rates for 2013 and 2014 are IMF estimates.

Central American countries are also vulnerable to other types of natural disasters. For example, a tropical storm that hit El Salvador in 2011 caused more than $800 million in damage to roads, infrastructure, and agriculture.[22]

The northern triangle countries also struggle with low productivity rates, particularly when compared to competitors in East Asia. Tariff preferences provided through the Dominican

---

[19] Economist Intelligence Unit, *Country Reports on El Salvador, Guatemala, and Honduras*, June 2014.

[20] The coffee rust epidemic is also a problem in the rest of Central America but Costa Rica, Panama, and to a certain extent, Nicaragua can handle such economic and natural disaster shocks more effectively because of their comparatively well developed economies, lower levels of poverty, and/or stronger social safety nets.

[21] International Coffee Organization, Report on the Outbreak of Coffee Leaf Rust in Central America and Action Plan to Combat the Pest, May 13, 2013, p. 3; Famine Early Warning Systems Network (FEWS NET), Coffee Producer and Laborer Income to Decline for a Second Consecutive Year, Special Report: Central America, February 2014, http://www fews net/sites/default/files/documents/reports/ FEWS%20NET%20coffee%20rust%20shock%20report%20update_2014_02_en_0.pdf.

[22] U.N. Office for the Coordination of Humanitarian Affairs, "Revision of the Flash Appeal for El Salvador 2011," press release, December 7, 2011.

Republic-Central America-United States Free Trade Agreement (CAFTA-DR) appear to be important in keeping apparel producers in those countries competitive in the U.S. market.[23]

Economic growth and slightly higher levels of social investment have led to improved social conditions in the region over the past decade. Nevertheless, poverty remains widespread. According to the U.N. Economic Commission for Latin America and the Caribbean (ECLAC), about 45% of Salvadorans, 55% of Guatemalans, and 67% of Hondurans live in poverty. Guatemala and Honduras have the highest income disparities in Central America, exacerbated by the social exclusion of indigenous people and ethnic minorities.[24] The top 10% of earners account for 47% of national income in Guatemala and 43% of national income in Honduras.[25]

## Crime and Violence

El Salvador, Guatemala, and Honduras have long struggled to address high levels of crime and violence, but the deterioration in security conditions has accelerated over the past decade.[26] Counternarcotics efforts in Colombia and Mexico have put pressure on drug traffickers in those countries, leading some to battle over territory in Central America—a region with fewer resources and weaker institutions dedicated to addressing criminal activity.[27] Increasing flows of illicit narcotics have coincided with rising levels of violence and have contributed to the corruption of government officials.

Gangs such as *Mara Salvatrucha* (MS-13) and the "18th Street" gang (M-18) also play a major role in crime and violence in the northern triangle region, but are not significantly present in other Central American countries.[28] The 18th Street gang was formed by Mexican youth in the Rampart section of Los Angeles in the 1960s who were not accepted into existing Hispanic gangs. MS-13 was created during the 1980s by Salvadorans in Los Angeles who had fled the country's civil conflict.[29] Both gangs later expanded their operations to Central America. This process accelerated after the United States began deporting illegal immigrants, many with criminal convictions, back to the northern triangle region after the passage of the Illegal Immigrant Reform and Immigrant Responsibility Act (IIRIRA) of 1996.[30] In general, Central American

---

[23] If apparel produced in Asian countries gains duty-free access to the U.S. market through the proposed Trans-Pacific Partnership agreement (TPP), it could displace apparel manufactured with U.S. fabric in Central America, causing job losses in those industries. CRS Report R42694, *The Trans-Pacific Partnership (TPP) Negotiations and Issues for Congress*, coordinated by Ian F. Fergusson; and CRS Report R42772, *U.S. Textile Manufacturing and the Trans-Pacific Partnership Negotiations*, by Michaela D. Platzer.

[24] Poverty rates are 17.8% in Costa Rica, 25.3% in Panama, and 58.3% in Nicaragua. Figures for Belize are unavailable. U.N. Economic Commission for Latin America and the Caribbean (ECLAC), *Social Panorama of Latin America 2013*, p. 50.

[25] U.N. Economic Commission for Latin America and the Caribbean (ECLAC), *Statistical Yearbook for Latin America and the Caribbean, 2013*, December 2013.

[26] For more information, see CRS Report R41731, *Central America Regional Security Initiative: Background and Policy Issues for Congress*, by Peter J. Meyer and Clare Ribando Seelke.

[27] Michael Shifter, "Central America's Security Predicament," *Current History*, February 1, 2011

[28] For background, see CRS Report RL34112, *Gangs in Central America*, by Clare Ribando Seelke.

[29] For the history and evolution of these gangs, see Tom Diaz, *No Boundaries: Transnational Latino Gangs and American Law Enforcement*, Ann Arbor, M.I.: University of Michigan Press, 2009

[30] IIRIRA expanded the categories of noncitizens subject to deportation and made it more difficult for foreign nationals to get relief from removal.

countries whose migrants did not emigrate to the Los Angeles area, such as Nicaragua or Panama, did not receive large numbers of gang-deportees in the 1990s.[31]

The MS-13 and 18th Street gangs engage in a variety of activities, such as kidnapping, extortion, and forced recruitment, which often have more of an impact on the day-to-day lives of Salvadorans, Guatemalans, and Hondurans than drug-trafficking.[32] On October 11, 2012, the Treasury Department designated the MS-13 as a significant transnational criminal organization whose assets would be targeted for economic sanctions pursuant to Executive Order (E.O.) 13581.[33] State Department officials have estimated that roughly 85,000 members of MS-13 and M-18 reside in the northern triangle countries, with the highest per capita concentration in El Salvador.[34]

**Table 2. Estimated Homicide Rates in Central America and Mexico: 2007-2012**

(Homicides per 100,000 people)

| Country | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| Belize | 33.9 | 35.1 | 32.2 | 41.8 | 39.2 | 44.7 |
| Costa Rica | 8.3 | 11.3 | 11.4 | 11.3 | 10.0 | 8.5 |
| El Salvador | 57.1 | 51.7 | 70.9 | 64.1 | 69.9 | 41.2 |
| Guatemala | 43.4 | 46.1 | 46.5 | 41.6 | 38.6 | 39.9 |
| Honduras | 50.0 | 60.8 | 70.7 | 81.8 | 91.4 | 90.4 |
| Nicaragua | 12.8 | 13.0 | 14.0 | 13.5 | 12.5 | 11.3 |
| Panama | 12.7 | 18.4 | 22.6 | 20.6 | 20.3 | 17.2 |
| Mexico | 7.8 | 12.2 | 17.0 | 21.8 | 22.8 | 21.5 |

**Source:** U.N. Office on Drugs and Crime (UNODC), *Global Study on Homicide 2013*: Trends, Contexts, Data, March 2014, http://www.unodc.org/documents/gsh/pdfs/2014_GLOBAL_HOMICIDE_BOOK_web.pdf.

**Note:** 2012 is the most recent year for which comparable data are available at this time.

Over the past decade, homicide rates have increased significantly in Honduras and remained at elevated levels in El Salvador and Guatemala. According to the U.N. Office on Drugs and Crime, in 2012 (the most recent year for which comparable data are available), the homicide rate per 100,000 inhabitants stood at 90.4 in Honduras, 41.2 in El Salvador, and 39.9 in Guatemala (see **Table 2**).[35] Although local statistics suggest that homicide rates declined slightly in each of the

---

[31] Ana Arana, "How the Street Gangs Took Central America," *Foreign Affairs*, May/June 2005.

[32] Of the unaccompanied minors interviewed by UNHCR, 27% reported that they had been harmed or threatened by gangs. This includes nearly 62% of the Salvadorans. UNHCR, 2014, op. cit.

[33] The criteria established for declaring a transnational criminal organization pursuant to Executive Order 13581 are available at http://www.whitehouse.gov/the-press-office/2011/07/25/executive-order-blocking-property-transnational-criminal-organizations. U.S. Department of the Treasury, "Treasury Sanctions Latin American Criminal Organization," press release, October 11, 2012.

[34] U.S. Department of State, "Gangs, Youth, and Drugs – Breaking the Cycle of Violence," Remarks by William R. Brownfield, Assistant Secretary, Bureau of International Narcotics and Law Enforcement Affairs, at the Institute of the Americas, press release, October 1, 2012. In 2012, the U.N. Office on Drugs and Crime (UNODC) estimated total MS-13 and M-18 membership in Guatemala, El Salvador, and Honduras at a more modest 54,000. UNODC, *Transnational Organized Crime in Central America and the Caribbean: a Threat Assessment*, September 2012.

[35] By comparison, the rates for Belize, Costa Rica, Nicaragua, and Panama were 45, 9, 11 and 17. UNODC, *Global Study on Homicide 2013: Trends, Contexts, Data*, March 2014, http://www.unodc.org/documents/gsh/pdfs/2014_GLOBAL_HOMICIDE_BOOK_web.pdf.

three countries in 2013, they remain among the highest in the world. Moreover, there are indications that the homicide rate has begun to climb once again in El Salvador as the gang truce that has been in effect since 2012 has unraveled.[36] Other crimes, such as theft and extortion, also remain at elevated levels. In 2012, 29% of Salvadorans, 34% of Guatemalans, and 32% of Hondurans reported that someone in their household had been the victim of some form of crime within the previous 12 months.[37]

Many children also must contend with violence at home. Although domestic abuse—including physical, emotional, and sexual abuse—often goes unreported and undocumented, it is believed to be widespread in the region.[38] According to scholars, Central American cultural norms legitimize the use of violence in interpersonal relationships, including physical discipline of children and violence against women.[39] Studies have found that children who are left behind as a result of one or both parents migrating abroad are more vulnerable to abuse. This is especially true of children whose mothers have migrated.[40]

---

### Unaccompanied Migrant Children: Why Not from the Rest of Central America?

In FY2012, the number of unaccompanied children apprehended at the U.S. border originating from the northern triangle countries ranged from about 3,000 to 4,000 per country. That same year, there were only 4 unaccompanied children from Belize, 5 from Costa Rica, 43 from Nicaragua, and none from Panama.[41]

Many observers speculate that children are not migrating from Belize, Costa Rica, Nicaragua, and Panama because those countries have experienced greater economic growth and/or less crime and violence than the northern triangle countries. In 2013, the International Monetary Fund (IMF) estimated that economic growth rates in the northern triangle countries ranged from 1.6% to 3.5%. Most of the other countries' rates were indeed higher: Belize grew by an estimated 1.6%, Costa Rica grew by an estimated 3.5%, Nicaragua grew by an estimated 4.2%; and Panama grew by an estimated 8%.[42] Per capita gross domestic product (GDP) in three of these four countries is higher than in the northern triangle as well: Belize's per capita GDP is $4,659, Costa Rica's is $10,892, and Panama's is $11,824. About 18% of Costa Rica's population and 25% of Panama's live in poverty, the lowest poverty rates in the isthmus.[43] Although Nicaragua's per capita GDP is lower than all the other Central American countries, at $1,929, and its poverty rate of 58% is closer to that of Guatemala (55%), it has social welfare programs that provide many services to mitigate its poverty to some degree. The Nicaraguan economy has also been expanding in recent years.

Most of these non-northern triangle countries can also be characterized as less violent than their neighbors. Costa Rica, Nicaragua, and Panama have the lowest levels of homicides in Central America (although Belize has the second-highest rate in the region) (see **Table 2**). None of the four countries has the same degree of problems with gangs tied to larger and more organized U.S. gangs that their neighbors have; their gangs are more local.[44]

---

[36] CRS Report R43616, *El Salvador: Background and U.S. Relations*, by Clare Ribando Seelke; Carlos Martínez and José Luis Sanz, "Gobierno Desmantela la Tregua y los Homicidios Alcanzan 30 en un Día," *El Faro*, May 24, 2014.

[37] By comparison, the figures for Belize, Costa Rica, Nicaragua, and Panama were 15%, 34%, 25%, and 11%, respectively. Mitchell A. Seligson, Amy Erica Smith, and Elizabeth J. Zechmeister, eds., *The Political Culture of Democracy in the Americas, 2012: Towards Equality of Opportunity*, LAPOP, January 25, 2013, p. 144.

[38] Isabel Aguilar Umaña and Jeanne Rikkers, *Nine Strategies to Prevent Youth Violence in Central America*, Interpeace, April 2012, p.9.

[39] World Bank, *Crime and Violence in Central America*, September 2010, p. 54.

[40] Caroline Bakker, Martina Elings-Pels, and Michele Reis, *The Impact of Migration on Children in the Caribbean*, U.N. Children's Fund (UNICEF), Paper No. 4, August 2009, p. 8.

[41] U.S. Border Patrol, "Unaccompanied Children (Age 0-17) Apprehensions, FY2008 through FY2012," February 4, 2013.

[42] U.N. Economic Commission for Latin America and the Caribbean (ECLAC), *Social Panorama of Latin America 2013*, p. 50. (In this section, Belize is not listed if data for it were unavailable.)

[43] ECLAC, *Social Panorama of Latin America 2013*, p.17.

[44] See CRS Report RL34112, *Gangs in Central America*, by Clare Ribando Seelke, pp. 3-4.

# Migration Transit Zone Conditions and Mexico's Migration Policies

Conditions of migration facing unaccompanied children likely play a considerable role in determining whether they emigrate to the United States. While the persistence of economic stagnation, poverty, and criminal violence may explain why flows of unaccompanied minors have increased, the journey through Central America and Mexico to the United States has become more costly and dangerous. Unauthorized migrants from Central America, often lacking legal protection in Mexico because of their immigration status, have reportedly become increasingly vulnerable to human trafficking, kidnapping, and other abuses.[45] Corrupt Mexican officials have been found to be complicit in activities such as robbery and abuse of authority.[46] While Mexico has stepped up immigration enforcement in some areas (see below), enforcement along train routes frequently used by Central American child migrants continues to be lacking.[47]

As U.S. border security has tightened, more unauthorized Central American migrants have reportedly turned to smugglers (*coyotes*),[48] who in turn must pay money to transnational criminal organizations (TCOs) such as Los Zetas, to lead them through Mexico and across the U.S.-Mexico border.[49] The Administration has estimated that 75-80% of unaccompanied child migrants are now traveling with smugglers.[50] Some smugglers have reportedly sold migrants into situations of forced labor or prostitution (forms of human trafficking) in order to recover their costs; other smugglers' failure to pay Los Zetas has reportedly resulted in massacres of groups of migrants.[51] Mass grave sites where migrants have been executed by TCOs have been recovered in recent years.

The Mexican government appears to be attempting to balance enforcement and humanitarian concerns in its migration policies. Implementation of its new laws and policies has been criticized both by those who favor more enforcement and those who favor more migrants' rights.[52] In addition to stepping up efforts against human trafficking and passing new laws to stiffen penalties for alien smuggling (2010) and human trafficking (2012), Mexico enacted a comprehensive migration reform law in 2011 and secondary legislation to implement that law in 2012. Previously, Mexico's immigration law, the General Population Act (GPA) of 1974, limited legal immigration and restricted the rights of foreigners in Mexico, with unauthorized migrants subject to criminal penalties. In 2008, the Mexican Congress reformed the GPA to decriminalize simple

---

[45] Steven Dudley, *Transnational Crime in Mexico and Central America: Its Evolution and Role in International Migration*, Woodrow Wilson International Center for Scholars & Migration Policy Institute, November 2012, http://www.wilsoncenter.org/sites/default/files/transnational_crime_mexico_centralamerica.pdf.

[46] Adam Isacson, Maureen Meyer, and Gabriela Morales, *Mexico's Other Border: Security, Migration, and the Humanitarian Crisis as the Line with Central America*, Washington Office on Latin America (WOLA), June 2014, available at http://www.wola.org/news/new_wola_report_mexicos_other_border (hereinafter referred to as WOLA, *Mexico's Other Border Security*.)

[47] Ibid.

[48] Human smuggling typically involves the provision of a service, generally procurement or transport, to people who knowingly consent to that service in order to gain illegal entry into a foreign country. For more information, see CRS Report RL34317, *Trafficking in Persons: U.S. Policy and Issues for Congress*, by Alison Siskin and Liana Rosen.

[49] See Caitlin Dickson, "How Mexico's Cartels are Behind the Border Kid Crisis," *The Daily Beast*, June 23, 2014.

[50] White House, Office of the Vice President, "Remarks to the Press with Q&A by Vice President Joe Biden in Guatemala," press release, June 20, 2014.

[51] Oscar Martinez, "How the Zetas Tamed Central America's 'Coyotes,'" *Insight Crime*, May 1, 2014.

[52] WOLA, *Mexico's Other Border Security*.

migration offenses, making unauthorized migrants subject to fines and deportation, but no longer subject to imprisonment. In May 2011, it passed a broader reform of the GPA.[53]

Contrary to some media reports, Mexico's 2011 law did not create a transit visa for migrants crossing through Mexico, as civil society groups had been advocating. As a result of the law, Mexico now requires visas for Central Americans entering its territory (aside from those on temporary work permits or those possessing a valid U.S. visa).

According to many migration experts, implementation of Mexico's 2011 migration law has been uneven. While some purges of corrupt staff within the National Migration Institute (INM) in the Interior Ministry have occurred in the past year, implementation of the migration law has been hindered by the government's failure to more fully overhaul INM.[54] Some experts maintain that Mexico lacks the funding and institutions to address traditional migration flows, much less the increasing numbers of U.S.-bound unaccompanied children that its agents are detaining. Mexico has only two shelters for migrant children and no foster care system in which to place those who might be granted asylum.

Despite provisions to improve migrants' rights included in the 2011 migration law, the Mexican government also continues to remove large numbers of Central American adult migrants, arrest smugglers of those migrants, and return unaccompanied child migrants to Central America.[55] According to INM, Mexico detained 86,929 foreigners in 2013, 80,079 of whom were removed (79,416 people were removed in 2012). Of those who were removed, some 97.4% originated in the northern triangle countries of Central America. In the first four months of 2014, Mexico removed some 24,000 people from the northern triangle countries, 9% more than during that period in 2013.[56] Child protection officers from INM accompanied 8,577 children to their countries of origin in 2013 and 6,330 from January through May 2014; 99% of those children originated in northern triangle countries.[57]

With U.S. support, the Mexican government in 2013 started implementing a southern border security plan that has involved the establishment of 12 naval bases on the country's rivers and three security cordons that stretch more than 100 miles north of the Mexico-Guatemala and Mexico-Belize borders.[58]

---

[53] Mexico's 2011 migration reform was aimed at (1) guaranteeing the rights and protection of all migrants in Mexico; (2) simplifying Mexican immigration law in order to facilitate legal immigration; (3) establishing the principles of family reunification and humanitarian protection as key elements of the country's immigration policy; and (4) concentrating immigration enforcement authority within the National Migration Institute (INM) in the Interior Ministry in order to improve migration management and reduce abuses of migrants by police and other officials. For a general description of the law in English, see Gobierno Federal de México, "Mexico's New Law on Migration," September 2011, available at http://usmex.ucsd.edu/assets/028/12460.pdf.

[54] Reforms that migration experts have recommended include raising hiring standards for immigration agents, regulating how migrants should be treated, and strengthening internal and external controls over migration agents. Sonja Wolf et. al., *Assessment of the National Migration Institute: Towards an Accountability System for Migrant Rights in Mexico*, INSYDE, 2014.

[55] From January through May 2014, the Mexican government arrested 431 people for breaking provisions in the migration law; most of those individuals were accused of smuggling-related crimes. Gobierno de Mexico, Sistema Institucional de Información Estadística (SIIE), "Incidencia Delictiva del Fuero Federal, 2014."

[56] Gobierno de Mexico, Secretaría de Gobernación, Instituto Nacional de Migración, *Boletín de Estadística* Migratorias, 2013. 2014 statistics are available at http://www.politicamigratoria.gob mx/.

[57] Gobierno de Mexico, Secretaría de Gobernación, Instituto Nacional de Migración, *"Reintegra INM a Más de 14 Mil Niños Migrantes con sus Familias,"* Boletín 31/14, June 11, 2014.

[58] The State Department has provided $6.6 million of mobile Non-Intrusive Inspection Equipment (NIIE) and approximately $3.5 million in mobile kiosks, operated by Mexico's National Migration Institute, that capture the (continued...)

# Factors in the United States Associated with Immigration of Unaccompanied Children

Forces that potentially attract unaccompanied children to the United States may be more subjective than forces that cause them to leave their home countries. Unlike the prevalence of actual violence or deprivation associated with daily economic hardship, for instance, the perception of economic opportunity or the chance to obtain legal authorization to live in the United States may often conflict with what is legally and actually possible. Several reports suggest that migrant smugglers prey on potential migrants' desperation by misleading them with false information about such possibilities.[59]

Immigration observers have made numerous, sometimes conflicting assertions of the importance of one or another pull factor, relying on a range of empirical evidence. Despite considerable public attention, the precise combination of motives driving unaccompanied children to migrate to the United States remains unclear. The discussion below considers three widely cited motivations: economic and educational opportunity, family reunification, and recent U.S. immigration policies.

## Economic and Educational Opportunity[60]

Unaccompanied children regularly cite economic opportunity in the United States as a reason for their emigration north.[61] Since almost all are school-aged children, it remains unclear how this stated aspiration should be interpreted. Given endemic poverty in northern triangle countries, slow economic growth, and the large and long-standing income disparity between the triangle countries and the United States, it remains unclear the extent to which fluctuations in economic conditions in the United States actually affect children's migration decisions.

In the United States, current employment levels for minority youth are low relative to all other labor market groups.[62] In the immediate term, the potential for unaccompanied children to participate in the U.S. labor market is constrained in most cases by lack of English language skills, limited educational attainment, and, given their age, the extent to which U.S. laws permit their labor force participation.[63] Assuming they found employment, such constraints would likely relegate them to low-skilled, low-wage sectors of the U.S. economy.

---

(...continued)

biometric and biographic data of individuals transiting southern Mexico. Total State Department support is likely to reach at least $86.6 million. The U.S. Department of Defense (DOD) has also provided training to troops patrolling the border, communications equipment, and support for the development of Mexico's air mobility and surveillance capabilities. WOLA, op. cit. U.S. Department of State, Bureau of International Narcotics and Law Enforcement Affairs, "INL Assistance for Mexico's Southern Border Strategy," fact sheet, June 2014. For background, see CRS Report R41349, *U.S.-Mexican Security Cooperation: The Mérida Initiative and Beyond*, by Clare Ribando Seelke and Kristin Finklea.

[59] The White House, Office of the Vice President, "Readout of the Vice President's Meetings on Unaccompanied Minors and Immigration Reform," press release, June 26, 2014; and "Under-age and on the move: A wave of unaccompanied children swamps the debate over immigration," *The Economist*, June 28, 2014.

[60] Craig Elwell, Specialist in Macroeconomic Policy, Government and Finance Division, and Michael Garcia, Attorney in the American Law Division, both contributed to this section.

[61] UNHCR, *Children on the Run*.

[62] CRS Report R42519, *Youth and the Labor Force: Background and Trends*, by Adrienne L. Fernandes-Alcantara.

[63] The Fair Labor Standards Act (FLSA) sets 14 years of age as the minimum age for employment, and limits the (continued...)

Apart from what unaccompanied children cite as pull factors, U.S. labor market conditions likely affect their parents and relatives residing in the United States, which in turn, may play a critical role in the recent surge. Improving employment prospects, for instance, could more readily provide parents with the means to afford the expense of their children's migration to this country and lead to greater desire for family reunification as discussed below.[64]

At a national level, macroeconomic data on the U.S. economy indicate that despite overall improvement, considerable slack remains in labor markets, with labor force participation remaining weak and the unemployment rate and other measures of labor force utilization remaining well above most estimates of the long-run sustainable rate.[65]

Labor market conditions for low-skilled workers are especially challenging. Bureau of Labor Statistics (BLS) employment data by educational attainment show that employment for workers with less than a high school diploma[66] fell by about 5 million jobs between 2007 and 2014.[67] Thus, despite some indications of economy-wide recovery and U.S. labor market improvement, the demand for low-skill workers has not recovered over the same period that has witnessed the surge of unaccompanied children.

Regarding unauthorized workers, while extensive academic scholarship has analyzed their role, impact, and prospects in the U.S. labor force, government reporting is hindered by data limitations. Government statistics, as a rule, do not capture legal status of the foreign-born workforce. Therefore, assessing how U.S. economic conditions serve as a magnet for typically low-skilled and often unauthorized workers cannot be measured directly and is usually estimated or inferred by assessing the employment outlook of industrial sectors most likely to employ low skilled and unauthorized workers.

Research from the Pew Hispanic Center, which produces authoritative statistics on the unauthorized population, suggests that unauthorized workers concentrate in four low-skilled industrial sectors: farming; building, grounds-keeping and maintenance; construction; and food preparation and serving.[68] With the exception of farming, the BLS projects that these occupations are expected to grow close to or above the average rate of all occupations in the coming decade.[69]

---

(...continued)

number of hours worked by minors under the age of 16. Unauthorized minors who file affirmatively for asylum may apply for work authorization after six months. For more information on asylum, see CRS Report RL32621, *U.S. Immigration Policy on Asylum Seekers*, by Ruth Ellen Wasem.

[64] Smuggling an unauthorized migrant from Central America can cost as much as $10,000. See United Nations Office on Drugs and Crime, *Smuggling of migrants: the harsh search for a better life*, 2014, http://www.unodc.org/toc/en/crimes/migrant-smuggling.html, accessed by CRS on June 27, 2014; and Bryan Roberts, Gordon Hanson, and Derekh Cornwell, et al., *An Analysis of Migrant Smuggling Costs along the Southwest Border*, Department of Homeland Security, Office of Immigration Statistics, Working Paper, November 2010.

[65] CRS Report R43476, *Returning to Full Employment: What Do the Indicators Tell Us?*, by Marc Labonte.

[66] Half of all Central American foreign-born adults living in the United States lacked a high school diploma in 2010. See CRS Report R41592, *The U.S. Foreign-Born Population: Trends and Selected Characteristics*, by William A. Kandel, p. 18.

[67] U.S. Department of Labor, Bureau of Labor Statistics, *Current Population Survey*, Table A-4, available at http://www.bls.gov/webapps/legacy/cpsatab4.htm.

[68] These four sectors accounted for an estimated 73% of all unauthorized worker employment. Pew Hispanic Center, *A Portrait of Unauthorized Immigrants in the United States*, by Jeffrey S. Passel, and D'Vera Cohn, April 14, 2009.

[69] U.S. Department of Labor, Bureau of Labor Statistics, Employment Projections: 2012-2022 Summary, December 19, 2013, http://www.bls.gov/news release/ecopro.nr0 htm, accessed June 27, 2014.

Hence, the economic prospects for low-skilled, low-wage, and typically unauthorized workers appears mixed. While employment in low-skilled sectors of the economy has suffered more and recovered less than that of other sectors in the past seven years since the economic downturn, the employment prospects for the economic sectors most likely to employ such workers appears on par with or above the national average. Nonetheless, perceptions of opportunities may have greater impact than fluctuations in U.S. economic and labor market conditions.

Unaccompanied children also cite educational opportunity in the United States as a reason for their emigration north.[70] Unauthorized aliens in the United States are able to receive free public education through high school. In 1982, the Supreme Court's decision in Plyler v. Doe prohibited states from restricting access of children to public elementary and secondary education on the basis of immigration status.

The Court's ruling did not concern access to higher education, however, and both the federal government and some states have adopted measures that limit unlawfully present aliens' eligibility for admission to public institutions of higher education, in-state tuition, or financial aid.[71]

## Family Reunification

Family reunification is often cited as a primary reason for the recent large-scale migration of unaccompanied children to the United States.[72] Surveyed unaccompanied children cite family reunification as one of the main reasons for migrating to the United States.[73] The desire to reunite with family stems from family separation that occurs when one or both parents migrate to a destination country for more remunerative employment. Prior to the mid-1990s, migrants from Mexico and Central America who worked in the United States often returned regularly to be with their families in their origin countries.[74] Increased border enforcement in the mid-1990s gradually made unauthorized entry into the United States more difficult and expensive, which had the unintended consequence of creating a "caging effect" by encouraging unauthorized aliens to settle permanently in the United States rather than working temporarily and regularly returning home.[75]

Demographic and survey data provide evidence of sizable linkages between the three countries dominating the recent spike in unaccompanied child apprehensions and their foreign-born

---

[70] UNHCR, *Children on the Run*.

[71] For more information, see CRS Report RL33863, *Unauthorized Alien Students: Issues and "DREAM Act" Legislation*, by Andorra Bruno; and "Noncitizens and Eligibility for HEA Federal Student Aid Programs" in CRS Report R43302, *Postsecondary Education Issues in the 113th Congress*, coordinated by David P. Smole.

[72] See for instance, Muzaffar Chishti and Faye Hipsman, "Dramatic Surge in the Arrival of Unaccompanied Children Has Deep Roots and No Simple Solutions," *Migration Information Source*, June 13, 2014; and "Under-age and on the move: A wave of unaccompanied children swamps the debate over immigration," *The Economist*, June 28, 2014.

[73] UNHCR, *Children on the Run*.

[74] Such migration patterns are fairly universal. See for example, "When Mothers and Fathers Migrate North: Caretakers, Children, and Child Rearing in Guatemala," by Michelle J. Moran-Taylor, in *Latin American Perspectives*, (Vol. 35, No. 4, July, 2008), pp. 79-95; for a broader treatment, see Douglas S. Massey, "World in Patterns and Processes of International Migration in the 21st Century," Paper prepared for Conference on African Migration in Comparative Perspective, Johannesburg, South Africa, June 4, 2003.

[75] CRS Report R42138, *Border Security: Immigration Enforcement Between Ports of Entry*, by Lisa Seghetti. For more on how U.S. immigration policy affected migration flows, see Wayne Cornelius, "Evaluating Recent US Immigration Control Policy: What Mexican Migrants Can Tell Us," in *Crossing and Controlling Borders: Immigration Policies and Their Impact on Migrants' Journeys*, ed. Mechthild Baumann, Astrid Lorenz, and Kerstin Rosenhow (Farmington, MI: Budrich Unipress Ltd, 2011); Douglas S. Massey, Jorge Durand, and Nolan J. Malone, *Beyond Smoke and Mirrors: Mexican Immigration in an Era of Economic Integration* (Russell Sage Foundation, 2002).

350

populations living in the United States. In 2012, the foreign-born populations from El Salvador (1,254,501), Guatemala (880,869), and Honduras (535,725) ranked as the 6th, 10th, and 16th largest groups, respectively, of all foreign born groups.[76] From the perspective of the source country, U.N. survey data indicate that sizable percentages of children residing in these three countries have at least one parent living in the United States.[77] Were data available on other relatives living in the United States, such as siblings or extended relatives, these percentages would be higher.

The desire for family reunification is also driven by the perception that children who are not immediately returned to their home countries can reside with their family members for periods extending several years, as discussed below under "**U.S. Immigration Policies**." Upon apprehension, unaccompanied children are immediately given a *Notice to Appear* (NTA) before an immigration judge who will adjudicate their case to remain in the United States.[78] Receipt of an NTA indicates the start of immigration proceedings.

Yet, by law, persons apprehended by Customs and Border Patrol (CBP) and whom CBP determines to be unaccompanied children from countries other than Mexico and Canada, must be turned over to the care and custody of Health and Human Services (HHS), Office of Refugee Resettlement (ORR) while they await their removal hearing.[79] Unaccompanied children are moved from the custody of the law enforcement agency that apprehended them to a human services agency experienced with child welfare and family reunification. ORR is required to place these children in the least restrictive setting possible that accounts for the child's best interests.[80] In an estimated 90% of these cases, children are placed with parents, siblings, and extended relatives who currently reside in the United States.[81]

The Immigration and Nationality Act (INA) contains provisions allowing foreign nationals to reside lawfully in the United States if they are sponsored by parents and siblings who are U.S. citizens or Lawful Permanent Residents.[82] However, sizable proportions of these family members are estimated to be unauthorized aliens.[83] According to DHS, the estimated unauthorized

---

[76] Other Central American countries ranked considerably lower: Nicaraguans were 31st, Panamanians were 55th, Costa Rican were 67th, and Belizians were 86th. Mexicans represent the largest foreign-born population residing in the United States. For El Salvador, the population residing in the United States is one fifth the size of population living in El Salvador (6.3 million). Source: 2012 American Community Survey (ACS) Public Use Micro Sample (PUMS).

[77] The figure is 49% in El Salvador, 27% in Guatemala and 47% in Honduras. By comparison, the figure for Mexico is 22%. Source: UNHCR, *Children on the Run*.

[78] For more information on the processing of unaccompanied alien children, see CRS Report R43599, *Unaccompanied Alien Children: An Overview*, by Lisa Seghetti, Alison Siskin, and Ruth Ellen Wasem.

[79] The Homeland Security Act of 2002 (HSA; P.L. 107-296) divided responsibilities for the processing and treatment of UAC between the newly created Department of Homeland Security (DHS) and the Department of Health and Human Services' (HHS) Office of Refugee Resettlement (ORR). The Trafficking Victims Protection Reauthorization Act of 2008 (P.L. 110-457, Section 235) differentiated treatment according to whether or not unaccompanied children originated from the contiguous countries of Mexico and Canada. Unaccompanied alien children from Mexico and Canada may also be turned over to HHS-ORR if they are determined to be victims or potential victims of trafficking, if they claim asylum, or if they do not consent to return voluntarily.

[80] The TVPRA directed HHS to ensure that unaccompanied children "be promptly placed in the least restrictive setting that is in the best interest of the child." §§235(a)-235(d) of TVPRA; 8 U.S.C. §1232(b)(2). See also "What is the "best interest of the child" standard, and how does it apply to immigration detention and removal decisions?" in CRS Report R43623, *Unaccompanied Alien Children—Legal Issues: Answers to Frequently Asked Questions*, by Kate M. Manuel and Michael John Garcia.

[81] Administration for Children and Families, Office of Refugee Resettlement, *Unaccompanied Alien Children Program*, U.S. Department of Health and Human Services, Fact Sheet, May 2014.

[82] See CRS Report R43145, *U.S. Family-Based Immigration Policy*, by William A. Kandel.

[83] As a policy, ORR does not inquire as to the legal status of the family member with whom the unaccompanied child is (continued...)

populations in 2012 of Salvadorans, Guatemalans, and Hondurans living in the United States was 690,000, 560,000, and 360,000, respectively, representing 55%, 64%, and 67% of all foreign-born residents from those three countries living in the United States.[84]

The length of time unaccompanied children can expect to wait until their removal hearing may play a role for incentivizing their migration to the United States. As of March 2014, the average wait time nationwide for all immigration proceedings was 19 months.[85] However, the length of time until a final judgment occurs varies widely depending on appeals and individual circumstances.[86] Surges in caseloads, such as that caused by the current influx of unaccompanied children, can also tax the limited resources of the immigration court system, further extending wait times for removal hearings, and possibly fostering a perception among foreign nationals that a unique opportunity exists to exploit this administrative backlog. Rumors of these backlogs and the potential for being reunited with family—even if temporarily—reportedly have reached emigrant-sending communities in Central America.[87]

## U.S. Immigration Policies

The possible relationship between U.S. immigration policies (actual policies as well as perceptions of policies) and the surge in arrivals of unaccompanied children has been the subject of heated discussion among immigration observers and policy makers. It is not known if, and how, specific immigration policies may have influenced decisions to try to enter the United States unlawfully. News reports, however, suggest that perceptions of unspecified U.S. policies toward alien minors may have played a role. According to a June 2014 *New York Times* article:

> [C]hildren, parents, immigration officials, lawyers and activists interviewed say that there has been a subtle shift in the way the United States treats minors.
>
> That perception has inspired parents who have not seen their children for years to hire so-called coyotes, guides often associated with organized crime, to bring them north. It has prompted other parents to make the trip with toddlers in tow, something rarely seen before in the region.[88]

---

(...continued)

placed.

[84] Bryan Baker and Nancy Rytina, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2012*, Department of Homeland Security, Office of Immigration Statistics, March 2013. For comparison, the unauthorized proportion of the total foreign-born population for Mexico is 58%. These figures do not account for considerable numbers of U.S.-born children whose parents were born in these countries. For more on the demographics of legal status among the foreign-born, see CRS Report R41592, *The U.S. Foreign-Born Population: Trends and Selected Characteristics*, by William A. Kandel.

[85] This figure is based upon an analysis by the Transactional Records Access Clearinghouse (TRAC) of data obtained from the U.S. Department of Justice's Executive Office for Immigration Review (EOIR) for all immigration cases, not just those involving unaccompanied children. See TRAC Immigration data, http://trac.syr.edu/phptools/immigration/court_backlog, accessed June 2014.

[86] The 19 month figure is an average for all immigration courts, and comprises a range of periods, some of which extend far beyond 19 months.

[87] Jennifer Scholtes, "CBP Chief: Policies may be Fueling Spike in Minors Crossing Border Illegally," *CQ Roll Call*, April 2, 2014; Julia Preston, "Hoping for Asylum, Migrants Strain U.S. Border," *New York Times*, April 10, 2014; David Nakamura, "Influx of Minors across Texas Border Driven by Belief They will be Allowed to Stay in U.S.," *Washington Post*, June 13, 2014.

[88] Frances Robles, "Wave of Minors on Their Own Rush to Cross Southwest Border," *New York Times*, June 4, 2014, (hereinafter cited as Robles, *New York Times).*

Similarly, a June 2014 article by the Migration Policy Institute makes reference to "some evidence of a growing perception among Central Americans that the U.S. government's treatment of minors, as well as minors traveling in family units, has softened in recent years."[89] As discussed below, there have been recent changes in the treatment of unaccompanied children who arrive in the United States, in accordance with the Trafficking Victims Protection Reauthorization Act of 2008.

Much of the debate about the possible role of U.S. immigration policy in the surge has focused on specific policies and proposals that some may believe can offer unaccompanied children the prospect of a period of stay in the United States or U.S. lawful permanent resident status. A March 2014 *Miami Herald* article, after noting that many arriving children are fleeing gang violence, stated:

> But children are also being sent by families who believe they could qualify for immigration reform—if Congress ever acts on it—or for President Barack Obama's 2012 Deferred Action for Childhood Arrivals program known as DACA.[90]

For its part, the Obama Administration maintains that the driving force behind the surge "is what's happening in [the unaccompanied minors'] home countries."[91] The Administration has stated, however, that misinformation about U.S. policies has been a contributing factor. White House Domestic Policy Council Director Cecilia Muñoz, as reported by Bloomberg News in June 2014, blamed the increase in unaccompanied children attempting to cross the border in part on 'misinformation' about immigration law and administration actions regarding minors that "is being deliberately promulgated by criminal networks' involved in smuggling aliens into the U.S."[92] Other observers who reject the argument that Administration policies are responsible for the surge in unaccompanied child arrivals point to "Obama's aggressive deportation policy since ... 2009."[93]

U.S. immigration policies and proposals – both legislative and administrative – that have been widely cited as possible factors in the surge or that are relevant to the treatment of unaccompanied children who arrive in the United States are discussed here.

## Humanitarian Forms of Immigration Relief

As discussed above, child migrants report that they are fleeing violence, deprivation, abuse, or other hardships in their home countries as well as reuniting with family already in the United States. At issue is whether U.S. immigration policies that provide humanitarian relief to those who are fleeing such situations may serve as a magnet to foreign nationals. These humanitarian policies include asylum, relief for trafficking victims, and special immigrant status for juveniles.[94]

---

[89] Muzaffar Chishti and Faye Hipsman, "Dramatic Surge in the Arrival of Unaccompanied Children Has Deep Roots and No Simple Solutions," *Migration Information Source*, June 13, 2014, http://www migrationpolicy.org/article/dramatic-surge-arrival-unaccompanied-children-has-deep-roots-and-no-simple-solutions.

[90] Chardy, Alfonso, "Number of Unaccompanied Minors Arriving Illegally in U.S. Is Rising," *Miami Herald*, March 29, 2014. Newly arriving children would not, in fact, benefit from DACA or the Senate-passed comprehensive immigration reform bill (S. 744) in the 113th Congress.

[91] Quoted in Robles, *New York Times*, op.cit.

[92] Dorning, Mike, "Obama Boosts Border Security as Unaccompanied Minors Rise," Bloomberg News, June 20, 2014.

[93] Richard Cowen, "Waves of Immigrant Minors Present Crisis for Obama, Congress," Reuters.com, May 28, 2014.

[94] Another possible form of relief, Temporary Protective Status (TPS), is not discussed in this report because it currently does not apply to unaccompanied children arriving from the northern triangle. For information on TPS, see CRS Report RS20844, *Temporary Protected Status: Current Immigration Policy and Issues*, by Ruth Ellen Wasem and Karma Ester.

As these policies on humanitarian relief have been in place for many years, it is difficult to make a causal link between them and the recent surge in unaccompanied children from Central America. The only notable and recent revisions to the policies on humanitarian relief for unaccompanied children were included in the Trafficking Victims Protection Reauthorization Act (TVPRA) of 2008, as discussed below.

## Asylum

Many immigration observers expect that a large proportion of unaccompanied children seeking immigration relief in the United States will apply for asylum. The United States has long held to the principle that it will not return a foreign national to a country where his or her life or freedom would be threatened. This principle is embodied in several provisions of the INA, most notably in provisions defining refugees and asylees that the Refugee Act of 1980 added to the INA.[95]

In 2008, the TVPRA revised the procedures and policies for those unaccompanied children who file for asylum, most notably requiring that unaccompanied children from contiguous countries (i.e., Canada and Mexico) be screened for possible asylum claims. Subsequently, DHS opted to screen all unaccompanied children for possible asylum claims.[96] In addition, the TVPRA gives U.S. Citizenship and Immigration Services (USCIS) asylum officers "initial jurisdiction over any asylum application filed by" an unaccompanied child.[97]

To receive asylum, foreign nationals must demonstrate a well-founded fear that if returned home, they will be persecuted based upon one of five characteristics: race, religion, nationality, membership in a particular social group, or political opinion. Because "fear" is a subjective state of mind, assessing the merits of an asylum case rests in large part on the credibility of the claim and the likelihood that persecution would occur if the alien is returned home.

Asylum claims for the current surge of unaccompanied children may be complicated by uncertainty as to whether their circumstances meet the criteria established by the INA for asylum seekers. It remains to be seen the extent to which this legal option would offer immigration relief to the many unaccompanied children who claim asylum on the basis of feared persecution due to

---

[95] CRS Report R41753, *Asylum and "Credible Fear" Issues in U.S. Immigration Policy* , by Ruth Ellen Wasem.

[96] 8 U.S.C. §1101 et seq. Within 48 hours DHS personnel must screen the unaccompanied child to determine that he or she has not been a victim of a severe form of trafficking in persons and that there is no credible evidence that the minor is at risk should the minor be returned to his country of nationality or of last habitual residence; that the unaccompanied child does not have a possible claim to asylum; and that the unaccompanied child is able to make an independent decision to voluntarily return to his country of nationality or of last habitual residence.

[97] §§235(a) – 235(d) of TVPRA; 8 U.S.C. §1232. Prior to the TVPRA revisions, the unaccompanied children who sought asylum did so during a removal proceeding before an immigration judge in the Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR). USCIS guidelines require that the asylum officer conduct "child-appropriate interviews taking into account age, stage of language development, background, and level of sophistication." The guidelines also note that the child's age may affect the analysis of his or her asylum status (e.g., in considering whether the harm the child suffered amounts to persecution, in evaluating the child's possibly limited knowledge of events, etc.). Where a child is unable to identify all relevant motives for the persecution, the guidelines state that "a nexus can still be found if the objective circumstances support the child's claim that the persecutor targeted the child based on one of the protected grounds. If the Asylum Officer decides that an unaccompanied children in removal proceedings is not eligible for a grant of asylum, case processing will depend on the status of the unaccompanied child's case before EOIR. The Asylum Office coordinates with Immigration and Customs Enforcement (ICE) for the transfer of the files of the unaccompanied children not granted asylum back to ICE. Joseph E. Langlois, "Updated Procedures for Minor Principal Applicant Claims, Including Changes to RAPS," Interoffice Memorandum, USCIS Refugee, Asylum, and International Operations Directorate, August 14, 2007, p. 6-7; and Joseph E. Langlois, " Implementation of Statutory Change Providing USCIS with Initial Jurisdiction over Asylum Applications Filed by Unaccompanied Alien Children," Interoffice Memorandum, March 29, 2009

354

gang-related violence.[98] Data on the percentage of unaccompanied alien children who receive asylum is not available.[99]

## Trafficking Victims

Unaccompanied children who arrive at the U.S. border may have valid claims for immigration relief on the basis of being trafficking victims.[100] Foreign nationals who are victims of severe forms of trafficking are eligible for T nonimmigrant status and ultimately lawful permanent residence if they meet certain conditions.[101] U.S. statute defines severe forms of trafficking to mean: (A) sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age; or (B) the recruitment, harboring, transportation, provision or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.[102]

In addition to requiring that unaccompanied children from contiguous countries be screened for possible asylum claims, the TVPRA of 2008 requires that they be screened to determine that the unaccompanied child has not been a victim of a severe form of trafficking in persons.

In March 2009, DHS issued a policy that essentially made the trafficking screening provisions applicable to all unaccompanied children.[103] Immigration judges generally issue a relatively small number of T "visas" (856 in FY2013), and the number of unaccompanied alien children among these is unknown.

## Special Immigrant Juveniles

More than two decades ago, Congress created an avenue for unauthorized children who become dependents of the court to become lawful permanent residents (LPRs).[104] Any child or youth who was born in a foreign country; who lives without legal authorization in the United States; who has experienced abuse, neglect, or abandonment; and who meets other specified eligibility criteria may be eligible for the LPR classification of special immigrant juvenile (SIJ).

---

[98] See "Can UACs obtain asylum due to gang violence in their home countries?" in CRS Report R43623, *Unaccompanied Alien Children—Legal Issues: Answers to Frequently Asked Questions*, by Kate M. Manuel and Michael John Garcia.

[99] Discussion with Executive Office of Immigration Review (EOIR), Legislative and Public Affairs, June 4, 2014.

[100] For more information on the difference between human trafficking, which involves forms of involuntary coercion, and human smuggling, which involves knowing consent, see CRS Report RL34317, *Trafficking in Persons: U.S. Policy and Issues for Congress*, by Alison Siskin and Liana Rosen.

[101] To qualify for the "T" visa, the victim of trafficking must also be: physically present in the United States, American Samoa, the Commonwealth of the Northern Mariana Islands, or a U.S. port of entry because of such trafficking, or to participate in investigative or judicial processes associated with such trafficking; have complied with any reasonable request for assistance to law enforcement in the investigation or prosecution of acts of trafficking unless unable to do so due to physical or psychological trauma, or be under the age of 18; and be likely to suffer extreme hardship involving unusual and severe harm upon removal. CRS Report RL34317, *Trafficking in Persons: U.S. Policy and Issues for Congress*, by Alison Siskin and Liana Rosen.

[102] §103(8) of P.L. 106-386; 22 U.S.C. 7102.

[103] U.S. Congress, Senate Committee on the Judiciary, "Trafficking Victims Protection Reauthorization Act: Renewing the Commitment to Victims of Human Trafficking," testimony of DHS Acting Deputy Assistant Secretary Kelly Ryan, September 13, 2011.

[104] The provision was initially aimed at children of unauthorized aliens who had been abused, neglected or abandoned.

355

Among other things, TVPRA of 2008 amended the SIJ eligibility provisions to 1) remove the requirement that a juvenile court deem a juvenile eligible for long-term foster care and 2) replace it with a requirement that the juvenile court find reunification with one or both parents not viable. According to USCIS legal guidance, an eligible SIJ would include the following:

> [An unauthorized child] who has been declared dependent on a juvenile court; whom a juvenile court has legally committed to, or placed under the custody of, an agency or department of a State; or who has been placed under the custody of an individual or entity appointed by a State or juvenile court. Accordingly, petitions that include juvenile court orders legally committing a juvenile to or placing a juvenile under the custody of an individual or entity appointed by a juvenile court are now eligible.[105]

SIJ status is one of the few forms of immigration relief in the INA that specifically takes into account the best interests of the child. By statute, ORR must consent to any court having jurisdiction to determine the custody status or placement of a juvenile alien in ORR custody for SIJ status.[106] It is not known how many unaccompanied children have ultimately obtained SIJ status.[107]

## Deferred Action for Childhood Arrivals (DACA) and Legalization Proposals

Some observers have singled out the Obama Administration's Deferred Action for Childhood Arrivals (DACA) initiative and legalization provisions in proposed comprehensive immigration reform (CIR) legislation as possible factors in the surge of unaccompanied child arrivals. The DACA initiative provides temporary protection from removal to certain individuals who were brought to the United States before age 16 and meet other criteria. Among the criteria is continuous residence in the United States since June 15, 2007.[108] Although new arrivals would not be eligible for DACA, some argue that unaccompanied children and their families falsely believe that they would be covered.[109]

CIR legislation introduced in Congress in recent years typically has included provisions to enable certain unauthorized aliens to become lawful permanent residents of the United States. In 2013, the Senate passed a CIR bill (the Border Security, Economic Opportunity, and Immigration Modernization Act; S. 744) that would establish a general legalization program for unauthorized aliens who have been continuously physical present in the United States since December 31, 2011, and meet other criteria; dependent spouses and children of principal applicants would have to have maintained continuous physical presence in the United States since December 31, 2012, and meet other requirements. S. 744 would provide a special pathway to LPR status for successful applicants under the general legalization program who entered the United States before age 16 and satisfy other requirements.[110] Newly arriving unaccompanied children would not be eligible for the S. 744 legalization programs.

---

[105] Letter from Donald Neufeld, Acting Associate Director, Domestic Operations, and Pearl Chang, Acting Chief, Office of Policy, to USCIS Field Leadership, March 9, 2009, http://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/2009/TVPRA_SIJ.pdf.

[106] INA 101(b)(27)(J)(iii)(I).

[107] CRS Report RL34500, *Unauthorized Aliens' Access to Federal Benefits: Policy and Issues*, by Ruth Ellen Wasem, pp. 6-7.

[108] See CRS Report RL33863, *Unauthorized Alien Students: Issues and "DREAM Act" Legislation*, by Andorra Bruno.

[109] Muzaffar Chishti and Faye Hipsman, "Dramatic Surge in the Arrival of Unaccompanied Children Has Deep Roots and No Simple Solutions," *Migration Information Source*, June 13, 2014.

[110] See CRS Report R43097, *Comprehensive Immigration Reform in the 113th Congress: Major Provisions in Senate-Passed S. 744*, by Ruth Ellen Wasem.

356

# Conclusion

This report has conceptualized possible factors contributing to the recent and sizable increase in unaccompanied children into "push" and "pull" forces. The former comprise conventional and long-standing forces such as endemic poverty and lack of economic opportunity, as well as recent causes, such as the rise of gangs and drug trafficking organizations that have destabilized El Salvador, Guatemala, and Honduras and severely limited these countries' ability to protect their youth. The latter include more subjective factors, such as aspirations for employment and education, the desire to reunite with family members, and perceptions related to U.S. immigration policies.

With information relatively scare, and circumstances changing rapidly, it becomes challenging to accurately measure or gauge which factors are the most important drivers of the current surge. For example, surveys by organizations with distinct goals may sometimes yield findings that place substantially more emphasis on one factor over another. Absent full scale representative information, it may be difficult to draw conclusions about the magnitude of any single factor or its relative strength over another. As noted above, the division between push and pull factors blurs as multiple factors affect individuals making personal decisions to migrate.

## Author Contact Information

William A. Kandel, Coordinator
Analyst in Immigration Policy
wkandel@crs.loc.gov, 7-4703

Andorra Bruno
Specialist in Immigration Policy
abruno@crs.loc.gov, 7-7865

Peter J. Meyer
Analyst in Latin American Affairs
pmeyer@crs.loc.gov, 7-5474

Clare Ribando Seelke
Specialist in Latin American Affairs
cseelke@crs.loc.gov, 7-5229

Maureen Taft-Morales
Specialist in Latin American Affairs
mtmorales@crs.loc.gov, 7-7659

Ruth Ellen Wasem
Specialist in Immigration Policy
rwasem@crs.loc.gov, 7-7342

357