EXHIBIT 25

# GUATEMALA 2013 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

*Note: This report was updated 3/18/14; see Appendix H: Errata for more information.*

Guatemala is a multi-party constitutional republic. In November 2011 Otto Perez Molina of the Patriot Party won the presidential election for a four-year term that began in January 2012. International observers considered the election generally free and fair. In some instances civilian authorities failed to maintain effective control over the security forces. Members of the security forces committed human rights abuses.

Principal human rights abuses included widespread institutional corruption, particularly in the police and judicial sectors; police and military involvement in serious crimes such as kidnapping, drug trafficking, and extortion; and societal violence, including often lethal violence, against women.

Other human rights problems also included abuse and mistreatment by National Civil Police (PNC) members; harsh and life-threatening prison conditions; arbitrary arrest and detention; prolonged pretrial detention; failure of the judicial system to ensure full and timely investigations and fair trials; and failure to protect judicial officials, witnesses, and civil society representatives from intimidation and threats. There were also killings of journalists and trade unionists; sexual harassment and discrimination against women; child abuse, including commercial sexual exploitation of children; discrimination and abuse of persons with disabilities; and trafficking in persons. Other problems included marginalization of indigenous communities and ineffective demarcation of their lands, discrimination on the basis of sexual orientation and gender identity, and ineffective enforcement of labor and child labor laws.

The government cooperated with the UN-backed International Commission Against Impunity in Guatemala (CICIG) and took steps to prosecute officials who committed abuses. Impunity, however, continued to be widespread.

Considerable violence was attributed to gangs, organized crime, and narcotics-trafficking organizations; however, corruption and inadequate investigation and prosecution of such crimes made factual attribution for crimes difficult.

## GUATEMALA

2

## Section 1. Respect for the Integrity of the Person, Including Freedom from:

### a. Arbitrary or Unlawful Deprivation of Life

The PNC and its Office of Professional Responsibility (ORP), which is the mechanism for investigating security force abuse, did not provide the total annual number of accusations of killings involving PNC agents at year's end.  There were no reports that the government committed politically motivated killings.

On August 8, a court convicted former criminal investigations director of the PNC Victor Hugo Soto Dieguez and sentenced him to 33 years in jail for the extrajudicial killing of three inmates who escaped from the El Infiernito prison in 2005 and seven inmates who escaped from the Pavon prison in September 2006.  A court also convicted and sentenced PNC agents Axel Arnoldo Martinez and Victor Manuel Ramos Molina to 25 years in jail for the same crimes.

On May 10, a three-judge panel found former dictator Efrain Rios Montt guilty of genocide and crimes against humanity and sentenced him to 80 years in prison.  On May 20, the Constitutional Court overturned the conviction on procedural grounds and returned the case to a different panel for rehearing.

According to government statistics, in the first nine months of the year, there were 4,661 violent deaths reported throughout the country, compared with 4,412 violent deaths for the same period in 2012, a 5.6 percent increase.

### b. Disappearance

There were no reports of politically motivated disappearances.

On September 21, a court convicted Israel Miranda Ramirez and sentenced him to 50 years in prison for abuse of power and the forced disappearance of four PNC investigators in March 2012.

In June 2012, authorities arrested 11 PNC agents in the kidnapping of Byron Eduardo Lopez Moreno and the attempted kidnapping of Mexican national Francisco Bravo Navarro in May 2012; the agents were members of Police District 13 in Guatemala City's Zone 10.  In October 2012, the Fifth First Instance Court closed the case citing lack of evidence, and on February 1, the Third Appeals Court confirmed that decision.

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

359

On April 22, authorities arrested five PNC agents for kidnapping a woman in 2008 in the municipality of San Pedro in San Marcos Department.

On September 20, a court convicted Hector Bol de la Cruz and Jorge Humberto Gomez Lopez and sentenced them to 40 years in jail for the 1984 forced disappearance of student leader and trade union activist Edgar Fernando Garcia.

In August 2012 judges convicted former police commander Pedro Garcia Arredondo for the 1981 forced disappearance of student Edgar Saenz Calito and sentenced Arredondo to 70 years in jail.  An appeals court upheld the sentence on May 20.

**c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment**

Although the constitution and the law prohibit torture and other cruel, inhuman, or degrading treatment or punishment, there were credible reports of abuse and other mistreatment by PNC members.

On April 5, a court convicted PNC Agent Marvis Florian Lemus and sentenced him to 61 years in jail for the rape of a 12-year-old girl he illegally detained for 11 months.

**Prison and Detention Center Conditions**

Prison conditions were harsh and life threatening, with multiple instances of killings of inmates by other inmates.  No cases were investigated or trials held in these incidents.  Sexual assault, inadequate sanitation and medical care, and gross overcrowding continued to place prisoners at significant risk.

Physical Conditions:  Prison overcrowding continued to be a problem.  According to the prison system registry, as of August 2, there were 16,244 inmates, including 1,412 women, held in facilities designed to hold 6,742 persons.  There were 876 juveniles under the custody of the Secretary of Social Welfare.

Physical conditions included wholly inadequate sanitation and bathing facilities, dental and medical care, ventilation, temperature control, and lighting.  Prisoners had difficulty accessing potable water, complained of inadequate food, and often had to pay for additional sustenance.  Illegal drug sales and use continued to be widespread.  Prison officials continued to report a loss of safety and control,

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor
360

including escape attempts, gang fights, the inability to control the flow of goods into prisons, and the fabrication of weapons.  Prisoners continued to direct criminal activity both inside and outside of prisons.  The prison guard force did not control prisoners effectively.

On February 15, inmate Byron Lima Oliva, serving a 20-year conviction for complicity in the murder of Bishop Gerardi, was arrested while out of prison. Penitentiary System Director Luis Gonzalez Perez had, without the mandatory court order, authorized Lima to visit a dentist in the morning.  A routine highway checkpoint intercepted Lima after 6 p.m.  Gonzalez was fired for the incident, and Lima remained in custody at the Pavoncito Prison.

From January to October, according to the Penitentiary System, 38 prisoners died while in prison, 34 of whom died of natural causes.  No further information was available on the causes for the other four deaths.

Conditions for male and female prisoners were usually comparable throughout the country.  The media and nongovernmental organizations (NGOs) noted, however, that female and juvenile inmates faced continuing physical and sexual abuse. Female inmates reported unnecessary body searches and verbal abuse by prison guards.  Children under three years of age could live in prison with their mothers, although the penitentiary system provided inadequate food for young children, and many suffered from illness.  Lesbian, gay, bisexual, and transgender (LGBT) rights groups noted that other prisoners often sexually assaulted gay and transgender individuals.

Occasionally, authorities held together male and female detainees in immigration facilities, held pretrial detainees with convicted prisoners, and held juveniles with adults.

<u>Administration</u>:  The government's independent human rights ombudsman, whose responsibilities also include prisoner rights, does not have authority to act on behalf of prisoners and detainees regarding alternatives to incarceration for nonviolent offenders, circumstances of confinement of juvenile offenders, or procedural improvements to ensure prisoners do not serve beyond the maximum sentence for the charged offense.  Recordkeeping remained inadequate. Authorities used alternatives to sentencing for nonviolent offenders.

Prisoners and detainees had reasonable access to visitors and could observe their religious practices.  While the law requires authorities to permit prisoners and

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

361

detainees to submit complaints to judicial authorities without censorship and to request investigation of credible allegations of inhumane conditions, authorities failed to investigate most allegations of inhumane conditions and treatment or to document the results of such investigations in a publicly accessible manner.

Independent Monitoring:  The government permitted visits by local and international human rights groups, the Organization of American States (OAS), public defenders, and religious groups.

## d. Arbitrary Arrest or Detention

The constitution and law prohibit arbitrary arrest and detention, but there were credible reports of extrajudicial arrests, illegal detentions, and denial of timely access to a magistrate and hearing as required by law.

## Role of the Police and Security Apparatus

The PNC, overseen by the Ministry of Government and headed by a director general appointed by the ministry, has responsibility for law enforcement and maintenance of order in the country.  The military focuses primarily on operations in defense of the country; however, the army was increasingly utilized in internal security and policing.  The Ministry of National Defense oversees the military. Civilian authorities in some instances failed to maintain effective control over the PNC and the army, and the government lacked effective mechanisms to investigate and punish abuse and corruption.  There were reports of impunity involving security forces during the year.  The PNC remained understaffed, inadequately trained, and insufficiently funded, all of which substantially impeded its effectiveness.

While no active members of the military served in the police command structure, the government continued to employ the military along with police units in response to rising crime.  The level of impunity for security forces accused of committing crimes was high.  In cases in which police forces were implicated, the ORP is charged with internal investigations; the Public Ministry is responsible for external investigations.  To reform the police forces, a Police Reform Commission, established under the previous administration, has a legal mandate to make necessary changes.

Police impunity for criminal activities continued to be a serious problem.  There were credible reports that individual PNC officers and some police units or persons

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

362

## GUATEMALA

disguised as police officers stopped cars and buses to demand bribes or steal private property and in some cases kidnapped, assaulted, and raped victims. Police and immigration officials reportedly extorted and mistreated persons attempting to enter the country illegally. The PNC routinely transferred officers suspected of wrongdoing rather than investigating and punishing them.

Police continued to threaten persons engaged in commercial sexual activities with false drug charges to extort money or sexual favors and harassed LGBT persons with similar threats. Critics accused police of indiscriminate and illegal detentions when conducting anti-gang operations in some high-crime neighborhoods. Security officials allegedly arrested and imprisoned suspected gang members without warrants or on false drug charges. There were press reports of police involvement in kidnappings for ransom. The ORP and the Public Ministry reported that during the year numerous complaints were filed against PNC personnel for kidnapping.

The ORP conducted internal investigations of misconduct by police officers. In the first 10 months of the year, the ORP reported receiving 1,461 complaints alleging misconduct of police personnel.

The PNC reported it trained 2,035 cadets in human rights and professional ethics. By year's end the Ministry of National Defense had not released the number of military officers and soldiers receiving human rights training.

**Arrest Procedures and Treatment of Detainees**

The law requires presentation of a court-issued warrant to a suspect prior to arrest unless the suspect is caught in the act of committing a crime. Police may not detain a suspect for more than six hours without bringing the case before a judge. Authorities did not regularly respect this right, however, and some detainees were not promptly informed of the charges filed against them. After suspects are arraigned, the prosecutor generally has three months to complete the investigation and file the case in court, or seek a formal extension of the detention period. The law prohibits the execution of search warrants between 6:00 p.m. and 6:00 a.m. unless the government has declared a state of siege. The law provides for access to lawyers and bail for most crimes. The government provides legal representation for indigent detainees, and detainees have access to family members. A judge has the discretion to determine whether bail is necessary or permissible for pretrial detainees.

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

363

## GUATEMALA                                                           7

<u>Arbitrary Arrest</u>:  There were no reliable data on the number of arbitrary detentions, although most accounts indicated that police forces continued to ignore writs of habeas corpus in cases of illegal detention, particularly during neighborhood anti-gang operations.  No detailed reporting from ORP or NGOs was available by year's end.

<u>Pretrial Detention</u>:  The law establishes a three-month limit for pretrial detention, but authorities regularly held detainees past their legal trial or release dates. Authorities did not release some prisoners in a timely fashion after completing full sentences due to the failure of judges to issue the necessary court order or other bureaucratic problems.  As of August 14, prison system records indicated 50 percent of prisoners were in pretrial detention.

## e. Denial of Fair Public Trial

The constitution and the law provide for an independent judiciary.  The judicial system failed to provide fair or timely trials due to inefficiency, corruption, insufficient personnel, and intimidation of judges, prosecutors, and witnesses.

Judges, prosecutors, plaintiffs, and witnesses continued to report threats, intimidation, and surveillance, most often from drug-trafficking organizations.  By the end of September, the special prosecutor for crimes against judicial workers had received 213 complaints of threats or aggression against workers in the judicial branch, compared with 145 in 2012.

The Ministry of Government assigned police officers to CICIG to enhance judicial security.  The CICIG-vetted prosecutor unit, created by the Public Ministry, continued to be directly supervised by a senior prosecutor with CICIG.  According to CICIG, it participated in the investigation of 57 high-profile cases, including extrajudicial executions, extortion, trafficking in persons, improper adoptions, corruption, and drug trafficking.  CICIG prosecuted the Gasofa case, which involved a gasoline-smuggling network including PNC and customs official. Several CICIG cases culminated in convictions, such as the August 8 conviction of former chief of criminal investigations of the PNC Victor Hugo Soto Dieguez and former police investigators Axel Arnoldo Martinez Arriaza and Victor Manuel Ramos Molina.  Soto was sentenced to 33 years in jail and the others 25 years for the extrajudicial killing of 10 inmates between 2005 and 2006.  Also notable were the September 30 convictions of former police chief Baltazar Gomez, former PNC chief of antinarcotics Nelly Judith Bonilla, and police officer Fernando Carrillo

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

364

Garcia.  All three were convicted and sentenced to 16 years in jail for storing, dealing, and trafficking drugs.

There was no reporting available regarding witnesses killed during the year.

The Supreme Court continued to seek the suspension of judges and conduct criminal investigations for improprieties or irregularities in cases under its jurisdiction.  The Judicial Disciplinary Unit investigated 978 complaints of wrongdoing, held hearings for 390 complaints, and applied sanctions to several cases, ranging from written notice to 30-day suspension.

## Trial Procedures

The constitution provides for the right to a fair public trial, the presumption of innocence, the right to be present at trial, and the right to counsel in a timely manner.  The law requires attorneys be provided at government expense for defendants facing criminal charges if the defendant cannot find or afford an attorney.  Defendants and their attorneys have access to government-held evidence relevant to their case, and they may confront adverse witnesses and present their own witnesses and evidence.  The law provides for plea bargaining and the right of appeal.  Three-judge panels render verdicts, and there are no trials by jury.  The law provides for oral trials and mandates language interpretation for those needing it; however, courts did not always provide language interpretation.

The Public Ministry, acting semi-independently of the executive branch, may initiate criminal proceedings on its own or in response to a complaint.  Private parties may participate in the prosecution of criminal cases as plaintiffs.  Lengthy investigations and frequent procedural motions by both defense and prosecution often led to excessively long pretrial detention, frequently delaying trials for months or years.

## Political Prisoners and Detainees

There were no reports of political prisoners or detainees.

## Civil Judicial Procedures and Remedies

Individuals and organizations had access to administrative and judicial remedies to bring lawsuits seeking damages for, or cessation of, a human rights violation or

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

365

other alleged wrongs.  While the judiciary was generally impartial and independent in civil matters, it suffered from inefficiency and institutional weaknesses.

## f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The constitution and the law prohibit such actions, and the government generally respected these prohibitions.

## Section 2. Respect for Civil Liberties, Including:

## a. Freedom of Speech and Press

The law provides for freedom of speech and press, and the government generally respected these rights; however, criminal intimidation of journalists resulted in significant self-censorship.

Press Freedoms:  Despite laws supporting freedom of the press, many journalists were the victims of threats, harassment, and violence.  Reporters covering organized crime, including its links to corrupt public officials, acknowledged practicing self-censorship, recognizing the danger investigative journalism posed to them and their families.  The independent media were active and expressed a wide variety of views, but difficulty obtaining licenses to operate community radio stations and accessing some information limited press freedom.

Violence and Harassment:  Members of the press continued to report that violence and impunity impaired the practice of free and open journalism.  The press reported that numerous threats by public officials and criminal organizations increased journalists' sense of vulnerability.

During the year unidentified assailants killed four journalists in separate attacks.  It was unclear whether the journalists were targeted because of their profession.  The government established a task force to investigate these killings and any potential linkages to the journalists' professions.

The Public Ministry reported it received 113 complaints of attacks and other acts of intimidation against journalists as of the end of September.

Censorship or Content Restrictions:  Members of the press reported receiving pressure, threats, and retribution by various public officials regarding the selection and content of their reporting.  Some owners and members of the media also

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

366

accused the government of following a discriminatory advertising policy, penalizing or rewarding print and broadcast media based upon whether news or commentary was perceived as supportive or critical of the administration.

In August Jose Ruben Zamora, director of *El Periodico* newspaper, claimed the government attempted to force the closure of his newspaper by withholding government advertising and enforcing a de facto but undeclared boycott by private sector advertisers because his paper was critical of the administration.

<u>Nongovernmental Impact</u>:  Organized crime exerted violent influence over media outlets and reporters, frequently threatening individuals for reporting on criminal activities and warning journalists not to write or publish reports about crimes.

Private companies were also accused of criminalizing the work of journalists.  On July 25, *Prensa Libre* reporter Ricardo Miranda accused the sugar plantation El Pilar of illegal intimidation and filed a complaint in a local court.  El Pilar had sued Miranda for defamation because of Miranda's reporting on El Pilar's contamination of a local river.  The defamation suit against Miranda and Miranda's countersuit remained open at year's end.

**Internet Freedom**

There were no government restrictions on access to the internet or credible reports that the government monitored e-mail or internet chat rooms without appropriate legal authority.  According to the International Telecommunication Union, 3 percent of households had access and 16 percent of the population used the internet in 2012.

**Academic Freedom and Cultural Events**

There were no government restrictions on academic freedom or cultural events.

**b. Freedom of Peaceful Assembly and Association**

The constitution provides for freedom of assembly and association, and the government generally respected these rights; however, there were reports of security forces using excessive force against demonstrators.

**Freedom of Assembly**

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

367

# HONDURAS 2013 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Honduras is a constitutional, multiparty republic. Juan Orlando Hernandez won the presidency on November 24 in an election that international observers generally recognized as transparent, credible, and reflected the will of the Honduran electorate. Civilian authorities failed at times to maintain effective control over the security forces. Members of security forces committed human rights abuses and were turned over to the civilian justice system.

Among the most serious human rights problems were corruption, intimidation, and institutional weakness of the justice system leading to widespread impunity; unlawful and arbitrary killings by security forces, organized criminal elements, and others; and harsh and at times life-threatening prison conditions.

Pervasive societal violence persisted. There continued to be reports of killings in rural areas, including the Bajo Aguan region, of indigenous people, agricultural workers, bystanders, private security guards, and security forces related to land disputes, infrastructure development projects, organized crime, and other factors. Other human rights problems included violence against detainees; lengthy pretrial detentions and failure to provide due process of law; threats against journalists; corruption in government; violence against and harassment of women; child prostitution and abuse; trafficking in persons; encroachment on indigenous lands and discrimination against indigenous and Afro-descendent communities; violence against and harassment of lesbian, gay, bisexual, and transgender (LGBT) persons; ineffective enforcement of labor laws; and child labor.

The government took steps to prosecute and punish officials who committed abuses, but corruption, intimidation, and the poor functioning of the justice system were serious impediments to the protection of human rights. There continued to be instances in which military or police officials suspected of human rights violations were not investigated or punished.

Organized criminal elements, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes in the country and committed acts of murder, extortion, kidnapping, torture, human trafficking, and intimidation of journalists and human and worker rights defenders.

## Section 1. Respect for the Integrity of the Person, Including Freedom from:

**HONDURAS**                                                                      2

## a. Arbitrary or Unlawful Deprivation of Life

There were reports that members of the security forces committed arbitrary or unlawful killings.  The Public Ministry, through the Office of the Special Prosecutor for Human Rights and other offices, directs investigations of cases in which a member of a security force has participated in the death of a civilian, and such cases are tried in civilian courts.

In March members of the military (operating pursuant to the December 2011 temporary military policing decree) responded to reports of a shooting in a neighborhood of San Pedro Sula.  A shoot-out ensued between military and armed civilians.  One civilian was killed and four persons were injured, including one soldier and three civilians.  Five military members were arrested for homicide and attempted homicide, and the case was in process through the Office of the Special Prosecutor for Human Rights in San Pedro Sula.

In August family members alleged that members of security forces beat to death 15-year-old Jose Eduardo Aguilera Gonzalez after he was detained as a suspect in the killing of a transit police officer.  At year's end the Office of the Special Prosecutor for Human Rights was investigating the case.

In June a civilian trial began against members of the military charged in the May 2012 killing of 15-year-old Ebed Jassiel Yanes Caceres and the crime's cover-up.  The Office of the Special Prosecutor for Human Rights charged Eleazar Abimael Rodriguez of the First Infantry Battalion with homicide and abuse of authority, and Felipe de Jesus Rodriguez of the First Infantry Battalion and Josue Antonio Sierra of the First Special Forces Battalion with obstruction of justice and dereliction of duty.  Several members of military leadership also were implicated in the cover-up, and pretrial proceedings began against them in June.  Authorities accused Jesus Alberto Marmol Yanes, Raynel Enrique Funez Ponce, Juan Ruben Giron Reyes, Mariano Mendoza Maradiaga, Juan Jose Flores Alvares, and Jose Emiliano Novoa Funez of cover-up and abuse of authority.  At year's end all were subject to court-ordered measures in lieu of imprisonment, with the exception of Eleazar Abimael Rodriguez, who was incarcerated pending trial.

In October the Public Ministry and police detained five current and former members of the National Police as suspects in the December 2012 homicide of Eduardo Alejandro Coello Chavez, the son of the former Honduran ambassador to the Organization of American States.

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor
369

In August a court convicted four former police officers of the high-profile 2011 killings of university students Carlos David Pineda and Rafael Alejandro Vargas Castellanos and the ensuing cover-up.  As of November two additional suspects in the killing remained at large, and charges against the other two suspects were pending.

On November 5, a court found Marvin Noel Andino guilty of the killing of anticorruption activist and antinarcotics advisor Alfredo Landaverde in 2011.  At year's end the investigation continued in search of the intellectual authors of the crime.

Violence related to land conflicts and criminal interests in the Bajo Aguan region continued, but the number of violent deaths decreased to an estimated 16 as of September, from an estimated 40 in 2012, according to government statistics.  The regional Office of the Special Prosecutor for Human Rights in La Ceiba was investigating three of five allegations of human rights abuse in the Aguan region from 2012, and two cases were in judicial proceedings.  Human rights organizations in the region stated that victims often did not file complaints of abuse due to fear of repercussions.  Investigators pointed to a lack of resources and obstruction by field workers and some human rights nongovernmental organizations (NGOs) as causes for the lack of progress in investigations.  A military task force continued operations to restore order in the region by confiscating illegal weapons and drugs, and executing legal property eviction orders.

## b. Disappearance

There were no reports of politically motivated disappearances.  In May the press reported five cases in which suspected gang members disappeared after encounters with police.  At year's end police were investigating the disappearances.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

Although the constitution and law prohibit such practices, human rights NGOs reported receiving complaints of police abuse both on the street and in municipal detention centers.  The special prosecutor for human rights reported receiving 16 complaints of torture by members of security forces.  As of September

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

370

investigations continued in 12 of those cases, one case was closed, and three were in judicial processing.

**Prison and Detention Center Conditions**

Prison conditions did not meet international standards and were harsh and life threatening due to overcrowding, insufficient access to food and water, violence, abuses by prison officials, and the influence of organized crime.

<u>Physical Conditions</u>:  Overcrowding was a significant risk to prisoner welfare.  The country had 24 prisons, 23 of them for men.  As of September the total prison population was 12,969 in a system with a designed capacity of 8,603.  There were 521 women in prison.

Authorities generally held female prisoners in a separate facility under conditions similar to those of male prisoners, but held some in separate areas of men's prisons.  Children up to the age of three could stay with their mothers in prison.

Four juvenile detention centers operated under the supervision of the Institute of the Child and Family.  The government did not implement reforms approved in 2012 intended to replace the institute with a different entity due to charges of widespread corruption.  The number of minors in juvenile detention centers increased from 240 in 2012 to 356 as of September.  Judges tended to place minors in the centers due to lack of educational or reform programs outside the juvenile detention system.

Authorities often held pretrial detainees together with convicted prisoners.

In September court proceedings began against the former director of the Comayagua prison and three penitentiary police for culpability in the 2012 fire that killed 358 prisoners.

Prisoners suffered from severe overcrowding, malnutrition, lack of adequate sanitation and medical care, and, in some prisons, lack of adequate ventilation and lighting.  Due to budget cuts, authorities provided prisons the equivalent of 50 cents per prisoner per day for food.  In most prisons access to potable water was limited to prisoners who purchased bottled water or had water filters in their cells.  Due to overcrowding and lack of adequate training of prison staff, prisoners were subject to various abuses, including rape by other inmates.  Prisons lacked trained personnel to ensure the psychological and physical well-being of inmates, and

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

371

## HONDURAS 5

some prisons lacked sufficient security personnel.  The media reported multiple prison riots and violent confrontations between gang members throughout the year.

The ready access of prisoners to weapons and other contraband, impunity for inmates who attacked other inmates, inmate escapes, and threats by inmates and their associates outside prison against prison officials and their families contributed to an unstable and dangerous environment in the penitentiary system.  Authorities held prisoners from rival gangs in separate facilities or in separate areas of the same prison to reduce gang violence.  In some facilities prisoners themselves controlled their own areas while prison staff provided security outside the perimeter of each living unit and facility.

In August the military began to monitor the outer perimeters of the two largest prisons following the killing of three gang-affiliated prisoners by nonaffiliated prisoners who used AK-47s and grenades in the attack.

There were credible reports from human rights organizations that prison officials used excessive force against prisoners, including beatings, in addition to isolation and threats.

Persons with mental illnesses, as well as those with tuberculosis and other infectious diseases, were held with the general prison population.  Authorities at the National Penitentiary in Tamara reported that their facility was the only prison in the country with an antiretroviral treatment program, but it did not have necessary materials to test for or diagnose HIV/AIDS, tuberculosis, or diabetes.  In addition the surgical unit lacked anesthesia, surgical gloves, and needles.

<u>Administration</u>:  In December 2012 the National Congress passed a prison reform law, which, among other things, created the National Penitentiary Institute, an autonomous institution linked to the Secretariat of State of Interior, to manage the country's prisons.  Public defenders and judges assisted in seeking alternatives to incarceration for nonviolent offenders to alleviate overcrowding; addressing the status and circumstances of confinement of juvenile offenders; and improving pretrial detention, bail, and recordkeeping procedures to ensure that prisoners did not serve beyond the maximum sentence for the charged offense.  The legal department of every prison also handled recordkeeping, but recordkeeping procedures were inadequate and resulted in some prisoners serving time in prison longer than their sentence.

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

372

**HONDURAS**                                                                 6

Prisoners could transmit concerns directly to the director of the prison in which they were incarcerated, who transferred the complaints to the director of the National Penitentiary Institute.  The national human rights commissioner also received complaints and conducted investigations.  The 2012 prison law created a department of human rights and an inspector general office within the new institute.  NGO and official investigation results were available to the public.

Authorities generally permitted inmates to have access to visitors, including in some cases women in prostitution, and religious services of their choice.  They also permitted inmates to submit complaints to judicial authorities without censorship and to request investigation of inhumane conditions.  The director of prisons held meetings with human rights organizations.

Independent Monitoring:  The government generally permitted prison visits by independent local and international human rights observers, including the International Committee of the Red Cross (ICRC).

Improvements:  The Secretariat of State of Security continued a major prison reform program begun in 2010 involving the construction of new facilities to reduce overcrowding, separate the most dangerous prisoners from nonviolent offenders, and promote rehabilitation.  The ICRC undertook programs to improve water and electrical systems at some prisons.

**d. Arbitrary Arrest or Detention**

The constitution and law prohibit arbitrary arrest and detention, but human rights NGOs reported that authorities at times failed to enforce these prohibitions effectively.

**Role of the Police and Security Apparatus**

The Secretariat of State of Security oversees most police operations, including those of the National Police, National Preventive Police, Criminal Investigation Division, Transit Police, Border Police, and Tourist Police.  The National Police maintain internal security.  The armed forces are responsible for external security but also have some domestic security responsibilities.  A December 2011 decree grants the military policing powers for a 90-day period under special circumstances, including at the request of the secretary of state for security.  Authorities continued to renew this power at the end of each 90-day period following the enactment of the decree.  In August the government created a new

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor
373

## HONDURAS

military police unit, which reported to military authorities but conducted operations approved by civilian security and defense officials.  The training program for the new military police included human rights training.

Corruption and impunity continued to be serious problems within the security forces.  Some members of the police participated in crimes with local and international criminal organizations.  The Directorate General for the Investigation and Evaluation of the Police Career (DIECP) was responsible for police oversight.  By the end of 2012, there were 687 administrative and criminal complaints against members of police forces related to allegations of conduct not befitting an officer, abuse of authority, police brutality, robbery, and homicide.  Of those complaints, the DIECP concluded investigations in 280 cases as of July 30.  The DIECP transmitted 44 of the 280 cases to the Public Ministry, which began judicial proceedings in 26 of the 44 cases.  The remaining 407 complaints remained under investigation.  Very few investigations were resolved.

The secretary of state of security took some steps to reform security forces.  As of August the secretariat implemented background checks of more than 800 police officers, stopped paying more than 2,000 phantom police officers, removed from supervisory positions a number of officers across all sections of the police, and introduced global positioning system (GPS) technology to monitor police movements.  Despite these steps, NGOs continued to criticize the Secretariat of State of Security for failing to remove hundreds of officers who failed background checks.  Some NGOs collaborated with the Public Security Reform Commission, established in 2012 to recommend reforms to the criminal justice system, to propose reforms including police training curricula focused on human rights and a police code of ethics.

As of August the Police Education System and the Criminal Investigation School provided approximately 200 hours of human rights-related training to members of the National Police at all levels.

**Arrest Procedures and Treatment of Detainees**

The law provides that police can arrest a person only with a court order unless the arrest is made during the commission of a crime, there is strong suspicion that a person has committed a crime and may evade criminal prosecution, a person is caught with evidence related to a crime, or a prosecutor has ordered the arrest.  The law requires police to inform a person of the grounds for arrest and bring the detainee before a competent authority within 24 hours.  It stipulates that the

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

374

## HONDURAS                                                                    8

prosecutor has 24 hours to decide if there is probable cause for indictment.  A judge then has 24 hours to decide whether to issue a temporary detention order that may last up to six days, by which time the judge must hold a pretrial hearing to examine probable cause and decide whether pretrial detention should continue.  The law provides for bail for persons charged with some felonies and the right of prisoners to have prompt access to family members.  The law allows suspected criminals to be released pending formal charges with the provision that the suspect periodically report to authorities.  Authorities generally respected these provisions.  Although the law also provides prisoners the right of prompt access to a lawyer of their choice, and, if indigent, to government-provided counsel, authorities did not always follow these requirements.

Pretrial Detention:  Judicial inefficiency, corruption, and insufficient resources delayed proceedings in the criminal justice system, and lengthy pretrial detention was a serious problem.  As of September 50 percent of prison inmates were formally sentenced.  The law mandates the release of a detainee whose case has not come to trial and whose time in detention has exceeded the maximum prison sentence for the crime of which he is accused.  As a result of trial delays, many pretrial detainees already served time in prison equivalent to the maximum allowable for their crime.  Many prisoners remained in jail after acquittal or completion of their sentences due to the failure of officials to process their releases.

## e. Denial of Fair Public Trial

Although the constitution and law provide for an independent judiciary, the justice system was poorly funded and staffed, inadequately equipped, often ineffective, and sometimes subject to intimidation, patronage, corruption, and political influence.

Low wages and the lack of internal controls rendered judicial officials susceptible to bribery.  Powerful special interests exercised influence in the outcomes of some court proceedings.

In December 2012 the National Congress removed from office four of five magistrates of the Constitutional Chamber of the Supreme Court.  Some legislators and NGOs maintained that congress acted unconstitutionally because the constitution lists incapacity, resignation, and death as the only reasons for an early end to a magistrate's term of office.  Congressional leaders stated publicly that they had the legal authority to act.  Congress elected four new magistrates in

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

375

December.  In April congress determined that the performance of the Public Ministry was unacceptable and suspended the attorney general and his deputy, both of whom resigned in June.  Congress elected their replacements in September in a process some NGOs criticized for not adhering fully to the selection procedures established by the nominating committee.

## Trial Procedures

The law recognizes that an accused person is presumed innocent.  Jury trials are not used, but the accused has the right to receive an initial hearing by a judge, ask for bail, consult with legal counsel in a timely manner, have a lawyer provided by the state if necessary, and request an appeal.  The law provides for the right to a fair public trial, permits defendants to confront or question witnesses and to present witnesses and evidence on their behalf, and grants defendants access to government evidence relevant to their cases.  These rights generally were respected.

Common challenges to criminal prosecutions included a lack of credible evidence presented by the prosecution, lack of witness protection, widespread public distrust of the legal system, and judicial corruption.

## Political Prisoners and Detainees

There were no reports of political prisoners or detainees.

## Civil Judicial Procedures and Remedies

The law establishes an independent and impartial judiciary in civil matters, including access to a court to seek damages for human rights violations.  A litigant can bring civil charges when the criminal court determines that he may seek damages.  Citizens may file complaints with the Inter-American Commission on Human Rights.

## f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

Although the constitution and law generally prohibit such actions, a legal exception allows entry into a private residence at any time in an emergency or to prevent the commission of a crime.  There were credible complaints that police occasionally failed to obtain the required authorization before entering a private home and that government entities were monitoring correspondence.

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor
376

Ethnic minority-rights leaders continued to complain that the government failed to redress actions by private and public security forces, which had dislodged farmers and indigenous groups claiming ownership of lands based on land reform laws or ancestral titles to property (see section 6, Indigenous People).

## Section 2. Respect for Civil Liberties, Including:

### a. Freedom of Speech and Press

The constitution and laws provide for freedom of speech and press, and the government generally respected these rights. A small number of powerful business magnates with intersecting commercial, political, and family ties owned most of the major news media and in some cases influenced the reporting in their outlets.

In February the National Congress amended the penal code to sanction anyone who publicly or through the media incites discrimination, hate, repression, or violence against a person or group for reasons of their sex, gender, age, sexual orientation, gender identity, political opinion, marital status, race or origin, nationality, religion, language, disability, family or economic situation, or physical appearance or health.

Violence and Harassment:  Reports of harassment of journalists and social communicators (persons who are not employed as journalists, but serve as bloggers or conduct public outreach for NGOs) continued to rise.

Three journalists were killed during the year, compared with four in 2012, and there was one attempted killing.  It is unclear whether these killings were motivated by the victims' status as journalists or simply products of generalized violence.  There also were multiple reports of intimidation of members of the media and their families.  Government officials at all levels denounced violence and threats of violence against members of the media and social communicators.  The Human Rights Office of the Ministry of Security provided protective measures to journalists, social communicators, and other members of civil society who received threats.

During the year the efforts of the Special Victims Task Force created in 2011 to address violent crimes against vulnerable communities, including journalists, led to three indictments in cases involving killings of journalists and social communicators.  Since its creation the task force has investigated the homicides of

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

377

# EL SALVADOR 2013 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

*Note: This report was updated 3/21/14; see Appendix H: Errata for more information.*

El Salvador is a constitutional multi-party republic. In 2009 voters elected Carlos Mauricio Funes Cartagena of the Farabundo Marti National Liberation Front (FMLN) as president for a five-year term in generally free and fair elections. Free and fair legislative assembly and municipal elections took place in March 2012. Authorities failed at times to maintain effective control over the security forces. Security forces committed human rights abuses.

The principal human rights problems were widespread corruption; weaknesses in the judiciary and the security forces that contributed to a high level of impunity; and abuse, including domestic violence, discrimination, and commercial sexual exploitation against women and children.

Other human rights problems included isolated unlawful killings and cruel treatment by security forces; lengthy pretrial detention; harsh and life-threatening prison conditions; some restrictions on freedom of speech and press; trafficking in persons; and discrimination against persons with disabilities and persons with HIV/AIDS. There was also widespread discrimination and some violence against lesbian, gay, bisexual, and transgender (LGBT) persons. Child labor and inadequate enforcement of labor laws also were problems.

Impunity persisted despite the government taking steps to dismiss some officials who committed abuses in the penitentiary system and within the police force.

## Section 1. Respect for the Integrity of the Person, Including Freedom from:

## a. Arbitrary or Unlawful Deprivation of Life

During the year there were no verified reports that the government or its agents committed politically motivated killings; however, there were reports of security force involvement in unlawful killings. As of August, the Office of the Ombudsman for Human Rights (PDDH) received 15 complaints of alleged unlawful killings committed by security, military, and other public officials. Three of the killings took place in the prison system and one in a police detention center.

## EL SALVADOR                                                                    2

The PDDH has the authority to investigate (but not prosecute) human rights abuses and refers all human rights abuse cases to the Office of the Attorney General (FGR).  Although the PDDH defines all killings by government personnel as "extrajudicial killings," there were no verifiable reports of deliberate, unlawful killings carried out by order of the government or with its complicity.  As of June, the Office of the Inspector General (IG) of the National Civilian Police (PNC) reported that 14 PNC officers were accused of homicide during the year but did not specify whether the perpetrators committed the killings while on duty.

On March 2, the PNC detained two officers for the killing of prisoner Mario Alexander Reyes Chavez, who was being held in a police detention center in Los Planes de Renderos as a protected witness to a drug trafficking case.  A PNC commissioner said Chavez was shot between 25 and 28 times.  On March 7, nine of the 14 police officers who were working in the detention center were jailed and were awaiting trial.  Reyes Chavez had alerted the PNC that he had received death threats.  The media reported that prior to the killing, intelligence officials had notified PNC authorities three times about visits of strangers to the detention center and encouraged authorities to increase security, yet the PNC did not take action.  On October 10, a judge absolved a gang member accused of being the mastermind of the murder.

### b. Disappearance

There were no reports of politically motivated disappearances.  The nongovernmental organization (NGO) Association for the Search for Missing Children (Pro-Busqueda) received seven new complaints regarding children who disappeared during the 1980-1992 civil war.  As of July it continued to investigate 538 cases and resolved 14 other cases.

### c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The law prohibits such practices.  The PDDH, however, received 89 complaints of torture or cruel, inhumane, or degrading treatment or punishment perpetrated by public officials, involving 58 complaints against PNC officials and 13 against members of the armed forces.  The PDDH also received 445 complaints about violations of human integrity, 324 against PNC officers and 44 against members of the armed forces.  The PDDH received complaints of unauthorized searches, mistreatment, physical abuse, insults, and harassment committed by the military in their conduct of joint patrols with the PNC.  The Ministry of Defense alleges it

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor
379

investigated all cases against members of the armed forces, but released no results of the investigations publicly.

On June 1, doctors reported that a severely beaten prisoner in Apanteos Prison died during a subsequent surgery.  The victim's mother accused the prison guards of beating her son.  The doctors in the hospital where he was being treated alerted the FGR of the case.  The hospital reported he died of pneumonia, not as a result of his severe injuries.

NGOs reported that public officials, including police, engaged in violence and discrimination against sexual minorities.  Persons from the LGBT community stated that the agencies in charge of processing identification documents, the PNC and FGR, harassed transgender and gay individuals when they applied for identification cards or reported cases of violence against LGBT persons.  The LGBT community reported that authorities harassed LGBT persons through strip searches and questioning their gender in a degrading manner.  The government responded to these abuses primarily through PDDH reports that publicized specific cases of violence and discrimination against sexual minorities.

**Prison and Detention Center Conditions**

Prison and detention center conditions remained harsh and life threatening.

Physical Conditions:  Overcrowding was a serious threat to prisoners' health and lives.  In many facilities, provisions for sanitation, potable water, ventilation, temperature, medical care, and lighting were inadequate.  As of September 3, the Prison Directorate reported 26,672 prisoners held in 23 correctional facilities and one secure hospital ward that had a combined appropriate capacity of 8,328.  The prison population included 20,454 convicted prisoners and 6,218 inmates held in pretrial detention.  As of September, there were 2,598 female prisoners.  As of September, there were 701 inmates in four prisons for juvenile offenders with a total appropriate capacity of 460 inmates.  According to the director general of the prison system, as of September prison overcrowding was at 320 percent.  Due to prison overpopulation, police authorities held some pretrial detainees in small detention centers at police stations.  As of August police authorities held over 3,000 detainees in police station detention centers with a combined appropriate capacity of 1,200.  Approximately 78 percent of these pretrial detainees were in detention centers longer than the 72 hours permitted by law before a suspect must be presented to court.

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

380

**EL SALVADOR**                                                            4

Due to the lack of holding cells, authorities often held pretrial detainees in regular prisons with violent criminals.  Men were separated from women within the prisons.  A separate women's prison in Ilopango was generally clean and allowed inmates' children under age five to stay with their mothers.

As of September 3, prison authorities reported that 36 prisoners died during the year due to natural causes, homicide, and suicide.

Gang activities in prisons and juvenile-holding facilities remained a serious problem.  Detention center facilities held 10,576 inmates who were current or former gang members.  Officials separated gang members from the regular prison population when possible, but gangs continued to exercise influence within the prisons and judicial system.

Prisoners reportedly conducted criminal activities from their cells, at times with the complicity of prison guards.  Smuggling of weapons, drugs, and other contraband such as cell phones and cell-phone SIM cards was a major problem in the prisons.  As of September 3, prison authorities removed three guards from prisons for carrying illegal objects and sanctioned 100 guards for misconduct.  There were no reported patterns of abuse of persons with disabilities in prisons, although the government's National Council for Comprehensive Attention to Persons with Disability (CONAIPD) reported isolated incidents, including sexual abuse.

Administration:  Prison authorities kept detailed electronic records of all prisoners.  Authorities allowed release on bail for some nonviolent offenders.  The Solicitor's Office implemented a mediation program, principally for cases related to family disputes.  The Attorney General's Office and the courts also have mediation programs and other alternative dispute resolution programs.  In certain misdemeanor cases related to damages, judges suspended the judicial process when the defendant admitted guilt and adequately compensated the victim.  Although there is no prison ombudsman, the PDDH oversees the rights of inmates and responded to complaints.  Prisoners and detainees had reasonable access to visitors and religious observance.

Prison authorities permitted prisoners and detainees to submit complaints to judicial authorities without censorship and to request investigation of credible allegations of inhumane conditions.  Prison authorities investigated such allegations, although investigators did not always document results in a publicly accessible manner.

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor
381

<u>Independent Monitoring</u>:  The government investigated and monitored prison and detention center conditions and permitted prison-monitoring visits by independent human rights observers, NGOs, and the media.  Church groups, the Central American University's Human Rights Institute, and other groups visited prisons during the year.

## d. Arbitrary Arrest or Detention

Although the constitution prohibits arbitrary arrest and detention, there were complaints that the PNC arbitrarily arrested and detained persons.  The PDDH reported receiving 137complaints of illegal detentions.

## Role of the Police and Security Apparatus

The PNC, overseen by the ministry of justice and public security, is responsible for maintaining public security and the ministry of defense for maintaining national security.  The military is tasked with securing the international border and conducting patrols jointly with the PNC.  Military personnel assigned to assist the PNC do not have arrest authority.  President Funes renewed the decree authorizing military involvement in police duties through May 2014.

On May 17, the Supreme Court ruled unconstitutional the appointments of retired general Francisco Ramon Salinas Rivera as PNC director and retired general David Munguia Payes as Minister of Justice and Public Security due to their ties with the military.  The constitution separates public security functions from the military.

Inadequate training, lack of enforcement of the administrative police career law, arbitrary promotions, insufficient government funding, failure to effectively enforce evidentiary rules, and instances of corruption and criminality limited the PNC's effectiveness.  As of September 12, the IG reported that authorities charged 14 police officers with homicide.  The IG also received 1,163 complaints of alleged police misconduct, referred 473 of these cases to the FGR, and sanctioned 1,006 officers in response to complaints filed during the year and in prior years.  These sanctions included 121 officers dismissed for misconduct and 677 suspended without pay.  As of August 28, the FGR investigated 217 accusations against police officers, resulting in 29 cases resolved through mediation and two convictions.

The IG reported that most PNC officers and police academy cadets received human rights awareness training during the year, including training by the

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor
382

**EL SALVADOR**                                                                     6

Salvadoran Institute for the Development of Women (ISDEMU), the Human
Rights Institute of the University of Central America, and the Inter-American
Institute of Human Rights.  The PNC reported that as of July, 2,728 police officers
received training on human rights.

**Arrest Procedures and Treatment While in Detention**

The constitution requires a written warrant for arrest, except in cases where an
individual is arrested in the act of committing a crime.  Authorities apprehended
persons with warrants based on evidence and issued by a duly authorized official.
The constitution grants detainees the right to a prompt judicial determination of the
legality of their detention, and authorities generally respected this right.  Police
generally informed detainees promptly of charges against them.

The law permits release on bail for detainees who are unlikely to flee or whose
release would not impede the investigation of the case.  The bail system functioned
adequately in most cases.  The courts generally enforced a ruling that interrogation
without the presence of counsel is coercive and that evidence obtained in such a
manner is inadmissible.  As a result PNC authorities generally delayed questioning
until a public defender or an attorney arrived.  Family members are allowed
prompt access to detainees.  Detainees generally had prompt access to counsel of
their choice or to an attorney provided by the state.

The constitution permits the PNC to hold a person for 72 hours before presenting
the suspect to court, after which the judge may order detention for an additional 72
hours to determine if an investigation is warranted.  The law allows up to six
months for investigation of serious crimes before requiring either a trial or
dismissal of the case.  In exceptionally complicated cases, the prosecutor may ask
an appeals court to extend the deadline for three or six months, depending on the
seriousness of the crime.  Many cases were not completed within the legally
prescribed period.  In March the UN Working Group on Arbitrary Detention issued
a report indicating that at the time of their 2012 visit to El Salvador, 7,376
detainees were in preventive detention, 937 of whom had exceeded the maximum
one-year period of preventive detention allowed by law before sentencing must
occur.

<u>Arbitrary Arrest</u>:  The PDDH reported 137 complaints of arbitrary detention.

<u>Pretrial Detention</u>:  Lengthy pretrial detention was a significant problem.  At year's
end, 24 percent of the prison population was in pretrial detention.  Lengthy legal

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor
383

procedures, large numbers of detainees, judicial inefficiency, corruption, and staff shortages caused trial delays.  Because it may take several years for a case to come to trial, some detainees were incarcerated longer than the maximum legal sentences for their alleged crimes.  In such circumstances, detainees could request a Supreme Court review of their continued detention.

## e. Denial of Fair Public Trial

Although the constitution provides for an independent judiciary, the judiciary suffered from inefficiency, corruption, political infighting, and insufficient resources.  Substantial corruption in the judicial system contributed to a high level of impunity, undermining the rule of law and the public's respect for the judiciary.  The criminal conviction rate was less than 5 percent.  An ineffective public security strategy, inadequate government funding and training of the PNC, and ineffective senior-level leadership made it difficult to identify, arrest, and prosecute perpetrators of human rights abuses and other crimes, thus diminishing public confidence in the justice system.  Intimidation and killing of police officers, crime victims, and witnesses created a climate of fear, complicating investigation of violent crime and other alleged human rights abuses.

The Legislative Assembly did not always comply with Supreme Court rulings.  On January 24, the Supreme Court Constitutional Chamber ruled that the nominations of three individuals by the Legislative Assembly to the Court of Accounts were unconstitutional due to political party affiliation.  On March 20, the Legislative Assembly disregarded this ruling by re-nominating two of these individuals and a replacement.  The Supreme Court again ruled the nominations unconstitutional.  On July 25, the Legislative Assembly finally nominated three new individuals not subsequently challenged.

On June 20, a UN special rapporteur issued a report criticizing the Legislative Assembly for not complying with the Supreme Court's rulings during the 2012 constitutional crisis.

As of July, the PNC was providing protection to 52 victims and 89 witnesses.  However, some judges denied anonymity to witnesses at trial, and gang intimidation and violence against witnesses contributed to a climate of impunity from criminal prosecution.

During the year, the FGR received three complaints against judges, and the Supreme Court dismissed two judges as of June.  During the year the FGR

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

384

investigated one complaint against a prosecutor for misconduct.  No convictions were reported as of October.

## Trial Procedures

Although juries were used for specific charges, including environmental pollution and certain misdemeanors, judges decided most cases.  By law, juries hear only cases that the law does not assign to sentencing courts.  After the jury's determination of innocence or guilt, a tribunal decides the sentence.

Defendants have the right to be present in court, question witnesses, and present witnesses and evidence.  The constitution further provides for the presumption of innocence, the right to be informed promptly and in detail of charges, the right to a fair and public trial without undue delay, the right to a trial by jury, protection from self-incrimination, the right to communicate with an attorney of choice, the right to adequate time and facilities to prepare a defense, freedom from coercion, the right to confront adverse witnesses and present one's own witnesses and evidence, the right to appeal, access for defendants and their attorneys to government-held evidence relevant to their cases, and government-provided legal counsel for the indigent.  These legal rights and protections, however, were not always respected.  Although a jury's verdict is final, a judge's verdict can be appealed.  Trials are public.  The law extends these rights to all citizens.

## Political Prisoners and Detainees

There were no reports of political prisoners or detainees.

## Civil Judicial Procedures and Remedies

The law provides for access to the courts, enabling litigants to bring civil lawsuits seeking damages for, as well as cessation of, human rights violations.  Domestic court orders generally were enforced.

## Regional Human Rights Court Decisions

Individuals or organizations may submit petitions for cases involving violations of an individual's human rights to the Inter-American Commission on Human Rights, which in turn may submit the case to the Inter-American Court of Human Rights.  The court can order civil remedies including fair compensation to the individual injured.

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

385

On May 29, in response to a petition filed by the Inter-American Commission on Human Rights on behalf of a woman pregnant with a non-viable fetus whose doctors diagnosed as at risk of dying due to pregnancy complications from pre-existing conditions, the Inter-American Court of Human Rights ordered the government to adopt necessary measures to protect the woman's health.  On June 4, the Health Ministry allowed a premature caesarian section and reported the baby died five hours after the procedure.

**f. Arbitrary Interference with Privacy, Family, Home, or Correspondence**

The constitution prohibits such actions, and the government generally respected these prohibitions in practice.

**Section 2. Respect for Civil Liberties, Including:**

**a. Freedom of Speech and Press**

The constitution provides for freedom of speech and press, and the government generally respected these rights in practice.  However, some restrictions on the freedom of speech and press occurred throughout the year.  The law permits the executive branch to use the emergency broadcasting service to take over all broadcast and cable networks temporarily to televise political programming.  The president occasionally used this law to highlight his accomplishments.

Freedom of Speech:  Individuals could criticize the government publicly or privately without reprisal, and in most cases the government did not interfere with such criticism.  On June 26, the Legislative Assembly issued a decree prohibiting individuals from expressing opinions that would defame presidential candidates.  Responding to pressure from civil society, President Funes vetoed this decree on July 16.

Press Freedoms:  The independent media were active and expressed a wide variety of views with some restrictions.  There was no significant restriction by the government to the publication of books.  On October 23, the Supreme Electoral Tribunal (TSE) determined that media companies had disseminated three political television advertisements that constituted "dirty campaigning," and established sanctions for those media companies.  There is no legal provision for the TSE to sanction media companies.  The media companies complained the ruling was discriminatory and a violation of freedom of speech.

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

386

<u>Violence and Harassment</u>:  On June 4, construction workers in San Miguel threatened channel 12 reporter Angel Lemus, forcibly took his camera, and physically prevented him from leaving his car for 20 minutes.  Lemus and Geovanny Giron were filming construction machinery belonging to the San Miguel municipality being used at the private residence of the San Miguel mayor.  The PNC arrested 14 construction workers following the incident.  The case was under investigation.

<u>Censorship or Content Restrictions</u>:  Government advertising accounted for a significant portion of press advertising income, although exact data was not publicly available.  Newspaper editors and radio directors occasionally discouraged journalists from reporting on topics that the owners or publishers might not view favorably.  According to the Salvadoran Association of Journalists (APES), the media practiced self-censorship, especially in its reporting on gangs and narcotics trafficking.  APES stated that many members of the media were afraid to report in detail on these subjects due to fear of retaliation from gangs and narcotics trafficking groups.

<u>Nongovernmental Impact</u>:  APES noted that journalists reporting on gangs and narcotics trafficking were subject to threats and intimidation, which led to media self-censorship.

**Internet Freedom**

There were no government restrictions on access to the internet or credible reports that the government monitored e-mail or internet chat rooms without appropriate legal authority.  Individuals and groups could engage in the expression of views via the internet, including by e-mail.  Internet access was available in public places throughout the country.  The International Telecommunication Union reported that 25.5 percent of Salvadorans used the internet in 2012.

**Academic Freedom and Cultural Events**

There were no government restrictions on academic freedom or cultural events.

**b. Freedom of Peaceful Assembly and Association**

The constitution provides for freedom of assembly and association, and the government generally respected these rights in practice.

Country Reports on Human Rights Practices for 2013
United States Department of State • Bureau of Democracy, Human Rights and Labor

387