EXHIBIT 26

# Children on the Run



UNACCOMPANIED CHILDREN LEAVING CENTRAL AMERICA AND MEXICO AND THE **NEED FOR INTERNATIONAL PROTECTION**

A Study Conducted by the United Nations High Commissioner for Refugees
Regional Office for the United States and the Caribbean
Washington, D.C.



UNHCR
The UN
Refugee Agency

388

## ACKNOWLEDGMENTS

UNHCR is grateful to the 404 children who shared their personal stories with us, making this report possible and their collective voices heard.*

Pamela Goldberg revised and edited the report. Leslie Vélez and Nicole Boehner oversaw all aspects of the research and statistical analysis, provided professional expertise and guided the completion of the study and the written report. UNHCR consultants Susan Schmidt, MSSW, LGSW, and Aryah Somers, Esq., served as senior researchers and writers. UNHCR consultants Amelia Ahl and Elise Dunton, Esq., served as junior researchers. This report is based on their fieldwork.

Lindsay Jenkins, Shelly Pitterman, Buti Kale, Vincent Cochetel, Davide Torzilli, Kees Wouters, Paula Barrachina Esteban, Tina Hinh, Haris Farhad, Preeta Law, Monika Sandvik-Nylund, Luca Guanziroli, Juan Carlos Murillo, Jose Sieber Luz, Rebeca Cenalmor-Rejas, Stefano Feliciani and Alice Edwards provided valuable contributions to various aspects of the report. UNHCR thanks the following interns for their contributions: Elvis Garcia Callejas, Anna Maitland, Amy Berger, Elisabeth Doyle, Angad Dhindsa, Stephanie Rebolo and Priyanka Jethwani.

UNHCR thanks German J. Pliego Hernandez of the University of St. Thomas, Department of Computer & Information Sciences, and his student Karlyn Harrod for their assistance with the quantitative statistical analysis, as well as Bethany Eberle for creating maps depicting the places of origin of the children within each of the four countries.

For their advice on the qualitative analysis conducted and assistance with specific country condition research, UNHCR thanks Maura Busch Nsonwu of North Carolina Agricultural and Technical State University and her student Devon Malik, as well as Noël Busch-Armendariz and Laurie Cook Heffron from the Center for Social Work Research Institute on Domestic Violence & Sexual Assault, University of Texas at Austin.

We thank the many government and nongovernment experts who provided their time and expertise to the development of the methodology and questionnaire.

UNHCR thanks the U.S. Government for its full cooperation and in particular thanks the leadership and staff of the Office of Refugee Resettlement, Department of Homeland Security, and Customs and Border Protection, which provided invaluable assistance in facilitating our meetings with children at their locations.

Judi Herrmann, president and creative director of Herrmann Advertising, and her staff did the design and layout of the report.

UNHCR thanks the John D. and Catherine T. MacArthur Foundation for its support.

*All names have been changed to protect the children's confidentiality. No images of the children interviewed appear in this report, with the exception of their hands in the photo (taken by UNHCR) on page two.

389

Case 1:14-cv-00254   Document 38-26   Filed on 12/24/14 in TXSD   Page 4 of 17

# TABLE OF CONTENTS



| | |
|---|---|
| Acknowledgments | |
| Preface: UNHCR and Unaccompanied and Separated Children | 2 |
| Executive Summary | 4 |
| Overview: Purpose, Goals and Objectives of Study | 15 |
| Methodology | 18 |
| Regional Profiles: Why Are Children Leaving? | 23 |
| What the Children from Each Country Are Saying | 31 |
|     El Salvador | 31 |
|     Guatemala | 34 |
|     Honduras | 36 |
|     Mexico | 37 |
| Protection-Related Reasons for Leaving – Connecting the Dots | 41 |
| Conclusion | 49 |
| Requests and Concerns Raised by Governments, Civil Society and Other Stakeholder Participants at the UNHCR Roundtable on the Displacement of Unaccompanied and Separated Children from El Salvador, Guatemala, Honduras and Mexico | 50 |
| Recommendations | 53 |
| End Notes | 56 |
| Appendices | 60 |
|     I. Demographics | 60 |
|     II. UNHCR Guidelines on International Protection No. 8: Child Asylum Claims Under Articles 1(A)2 and 1(F) of the 1951 Convention and/or 1967 Protocol Relating to the Status of Refugees | 64 |
|     III. UNHCR Guidance Note on Refugee Claims Relating to Victims of Organized Gangs | 91 |






UNHCR
The UN Refugee Agency

SUPPORTED BY
MacArthur Foundation



# UNHCR and Unaccompanied and Separated Children

The United Nations High Commissioner for Refugees (UNHCR) is the sole international, intergovernmental United Nations organization entrusted by the UN General Assembly with responsibility for providing international protection to refugees and others of concern and, together with Governments, for seeking permanent solutions to their problems.[1] UNHCR would not be able to carry out its essential duties without the support, cooperation and participation of States around the globe.

UNHCR provides international protection and direct assistance to refugees throughout the world in some 125 countries. UNHCR has over 60 years of experience supervising the international treaty-based system of refugee protection and has twice received the Nobel Peace Prize for its work on behalf of refugees. UNHCR works closely with Governments and others to best ensure the *1951 Convention relating to the Status of Refugees* and its *1967 Protocol* are honored and that national and regional migration policies are sensitive to the potential protection needs of all individuals. Central to international refugee protection – and UNHCR's mandate – are to provide refugees the protection of asylum, to ensure their human rights are respected and to safeguard the fundamental principle of *non-refoulement*: the prohibition against returning any refugee to a place where she or he would face danger.[2]

The protection of children is a core priority of UNHCR at the global, regional and national levels.[3] UNHCR has long recognized both the right of children to seek asylum in their own right and their inherent vulnerability – especially those children who are unaccompanied by or have been separated from their families[4] – as well as the fact that there are certain child-specific forms of persecution that may give

rise to a claim for refugee protection. Of foremost concern to UNHCR is that all unaccompanied and separated children be consistently and appropriately screened for protection and, once identified, have full access to seek and receive international protection that takes into account their age and experiences in a child-sensitive manner.[5] A fundamental goal is to ensure that all "girls and boys are safeguarded from all forms of violence, abuse, neglect and exploitation."[6] All actions taken concerning refugee children should be guided by the principle that "the human rights of the child, in particular his or her best interests, are to be given primary consideration."[7]

Central to providing unaccompanied and separated children appropriate identification, screening and protection is the recognition that "States are primarily responsible for the protection of all children and should promote the establishment and implementation of child protection systems, in accordance with their international obligations, ensuring access to all children under their jurisdiction."[8] In addition, the *Convention on the Rights of the Child*, the fundamental international framework for the rights and protection of children, gives particular attention to the special protection needs of children deprived of their family environment and of children who are refugees or are seeking asylum, and it states that all the provisions of the *Convention* apply without discrimination to all children under the jurisdiction of a State.[9]

Many unaccompanied and separated children, including those interviewed for this study, arrive in the context of "mixed migration" movements, which include both individuals in need of international protection and migrants without international protection needs. In view of this, the *Refugee Protection and Mixed Migration 10-Point Plan of Action*, "a tool developed by UNHCR to assist Governments and other stakeholders to incorporate refugee protection considerations into migration policies," is relevant to consider.[10] The *10-Point Plan* recognizes that the number of refugees and asylum-seekers is a relatively small portion of the global movement of people and that such movement often involves human smugglers and traffickers, and it stresses that "steps must be taken to establish entry systems that are able to identify new arrivals with international protection needs and which provide appropriate and differentiated solutions for them."[11] Significantly, the *10-Point Plan* contains an entire section on "child protection systems," one on identifying women and girls at risk, and another on protecting victims of trafficking.[12]

In accordance with these priorities, the UNHCR Regional Office for the United States and the Caribbean in Washington, D.C. (UNHCR Washington), has likewise identified the vulnerability of children as a primary concern and has devoted many resources to investigating protection issues relating to children arriving to and within the United States.[13] For example, in 2012, with the full cooperation and support of the U.S. Government, UNHCR Washington began monitoring the protection screening of unaccompanied and separated children from Mexico at the southern U.S. border.[14] This report is a key component of UNHCR's work with and on behalf of unaccompanied and separated children in the region.

# EXECUTIVE SUMMARY

Since 2009, UNHCR has registered an increased number of asylum-seekers – both children and adults – from El Salvador, Honduras and Guatemala lodging claims in the Americas region.[15] The United States recorded the largest number of new asylum applications out of all countries of asylum, having receiving 85% of the total of new applications brought by individuals from these three countries in 2012. The number of requests for asylum has likewise increased in countries *other than the U.S.* Combined, Mexico, Panama, Nicaragua, Costa Rica and Belize documented a 435% increase in the number of asylum applications lodged by individuals from El Salvador, Honduras and Guatemala. In the United States, the number of adults claiming fear of return to their countries of origin to government officials upon arriving at a port of entry or apprehension at the southern border increased sharply from 5,369 in fiscal year (FY) 2009 to 36,174 in FY 2013.[16] Individuals from El Salvador, Honduras, Guatemala and Mexico account for 70% of this increase.

Beginning in October 2011, the U.S. Government recorded a dramatic rise – commonly referred to in the United States as "the surge" – in the number of unaccompanied and separated children arriving to the United States from these same three countries – El Salvador, Guatemala and Honduras. The total number of apprehensions of unaccompanied and separated children from these countries by U.S. Customs and Border Protection (CBP) jumped from 4,059 in FY 2011 to 10,443 in FY 2012 and then more than doubled again, to 21,537, in FY 2013. At the same time, a tremendous number of children from Mexico have been arriving to the U.S. over a longer period of time, and although the gap is narrowing as of

FY 2013, the number of children from Mexico has far outpaced the number of children from any one of the three Central American countries. For example, in FY 2011, the number of Mexican children apprehended was 13,000, rising to 15,709 in FY 2012 and reaching 18,754 in FY 2013. Unlike the unaccompanied and separated children arriving to the U.S. from other countries, including El Salvador, Guatemala and Honduras, most of these children were promptly returned to Mexico after no more than a day or two in the custody of the U.S. authorities, making it even more difficult to obtain a full picture of who these children were and why they were coming to the U.S.

With a grant from the John D. and Catherine T. MacArthur Foundation, UNHCR Washington undertook an extensive study to examine the reasons why children are displaced from the four countries. While recognizing a significant contextual difference between the situation in Mexico and in the Northern Triangle of Central America, the common denominator is that all four countries are producing high numbers of unaccompanied and separated children seeking protection at the southern border of the United States. UNHCR's research was to ascertain the connection between the children's stated reasons, the findings of recent studies on the increasing violence and insecurity in the region, and international protection needs.[17] UNHCR Washington conducted individual interviews with 404 unaccompanied or separated children – approximately 100 from each country – who arrived to the U.S. during or after October 2011 and, in the context of the current regional and national environments and the tremendous number of displaced children arriving to the U.S. from these four countries, analyzed the children's responses in order to answer two questions:

**Why are these children leaving their countries of origin?**
**Are any of these children in need of international protection?**

UNHCR found that the majority of children interviewed from all four of these countries provided information that clearly indicates they may well be in need of international protection.[18] The responses of these children were complex and multifaceted and in many cases included both protection-related and non-protection-related concerns. Significantly, protection-related reasons were very prominent, and this report focuses on those reasons.[19] Our data reveals that no less than 58% of the 404 children interviewed were forcibly displaced because they suffered or faced harms that indicated a potential or actual need for international protection. The study was specifically designed to be representative and statistically significant for drawing conclusions and inferences, and as such, this finding that 58% of the children raised potential international protection means that in general, 58% of all the unaccompanied and separated children in the same age range, from these four countries, arriving in the U.S. would likewise raise potential international protection needs.[20] Other findings of the study would also be reflected in the same population at large, such as, for example, the percentage of children with family members in the United States.[21] The central conclusion of this study is that given the high rate of children who expressed actual or potential needs for protection, all unaccompanied and separated children from these four countries must be screened for international protection needs.

Two overarching patterns of harm related to potential international protection needs emerged: violence by organized armed criminal actors and violence in the home. Forty-eight percent of the displaced children interviewed for this study shared experiences of how they had been personally affected by the augmented violence in the region by organized armed criminal actors, including drug cartels and gangs or by State actors. Twenty-one percent of the children confided that they had survived abuse and violence in their homes by their caretakers. A third category of harm giving rise to potential international protection needs arose only among

### CHARACTERISTICS OF THE CHILDREN INTERVIEWED

- Country of origin and number of children:

|  | Boys | Girls |
|---|---|---|
| El Salvador (104): | 69 | 37 |
| Guatemala (100): | 79 | 21 |
| Honduras (98): | 69 | 29 |
| Mexico (102): | 98 | 4 |
| **Total (404):** | **313** | **91** |

- Between Ages 12-17
- Entered the U.S. during or after October 2011
- Held at some point in U.S. federal custody
- Gender distribution mirroring that represented in ORR custody by nationality
- Those in U.S. Government shelters present for more than five days in order to acclimate
- Randomly selected within these parameters and voluntarily participated

### CHILDREN FROM EACH COUNTRY WITH POTENTIAL INTERNATIONAL PROTECTION NEEDS

| | |
|---|---|
| El Salvador: | 72% |
| Guatemala: | 38% |
| Honduras: | 57% |
| Mexico: | 64% |
| **Total:** | **58%** |

6    CHILDREN ON THE RUN

395

the children from Mexico: recruitment into and exploitation by the criminal industry of human smuggling – that is, facilitating others in crossing into the United States unlawfully. Thirty-eight percent of the children from Mexico fell into this category.²² Eleven percent of the children reported having suffered or being in fear of both violence in society and abuse in the home.

UNHCR found that these types of serious harm raised by the children are clear indicators of the need to conduct a full review of international protection needs consistent with the obligations to ensure that unaccompanied and separated children are not returned to situations of harm or danger.

EXECUTIVE SUMMARY



Children's Reasons for Leaving Home

## The Meaning of International Protection

Because the potential need for international protection of so many of these children is a core finding of this study, "international protection" is defined here to ensure that its meaning is clearly understood. It is the responsibility of States to protect their citizens. When Governments are unwilling or unable to protect their citizens, individuals may suffer such serious violations of their rights that they are forced to leave their homes and often even their families to seek safety in another country. Since, by definition, the Governments of their home countries no longer protect the basic rights of these individuals, the international community must step in to ensure that those basic rights, as articulated in numerous international and regional instruments, are respected. The principal means for providing international protection to individuals unable to receive protection in their countries of origin is the *1951 Convention relating to the Status of Refugees* and its *1967 Protocol*. To receive protection under these instruments, an individual must satisfy the definition of "refugee," and there must not be any reason, as articulated in the *1951 Convention*, to exclude an individual from such protection. Once an individual is found to be a refugee, protection under the *1951 Convention* and *1967 Protocol* must be granted. The foremost protection is the guarantee against return to danger or *non-refoulement* – the cornerstone of international refugee protection – and the ability to remain lawfully in the country of asylum. Other fundamental human rights as articulated in these and other international and regional instruments, among them the rights to livelihood, education and exercise of religious beliefs, must also be respected.

There may be individuals who are found not to meet the refugee definition contained in the *1951 Convention* or *1967 Protocol* but are nevertheless in need of international protection due to their lack of safety or security and their inability to receive State protection in their countries of origin. Some of these individuals may fall within the broader refugee definitions contained in the *Organization of African Unity Convention* or the *Cartagena Declaration*. Others may not meet one of these broader refugee definitions or may be in a location where neither of these broader definitions applies. In general, these are persons fleeing armed conflict, serious internal disorder, massive human rights violations, generalized violence or other forms of serious harm with no link to a refugee protection ground as contained in the international refugee definition. Such individuals should be given access to a process to review their eligibility for a formal, legal – complementary or subsidiary – status, with defined rights and obligations, for the period of time necessary to safeguard their safety and security.



## Summary of Key Findings by Country of Origin

A closer examination of the responses of the children from each of the four countries reveals the similarities and differences in their situations in relation to these prevailing types of harm.

## El Salvador

Of the 104 children from El Salvador UNHCR interviewed, 72% provided responses that raised potential international protection needs. Sixty-six percent of the children cited violence by organized armed criminal actors as a primary motivator for leaving, and 21% percent discussed abuse in the home. Fifteen percent of the children discussed both violence in the society and abuse in the home. Seven percent pointed to situations of deprivation. Only one child mentioned the possibility of benefiting from immigration reform in the U.S. Twenty-eight percent of these children did not mention any serious harm as a reason for leaving.

The predominant narrative of harm suffered by the children of El Salvador was that of violence and threats of violence by organized armed criminal actors. The children described their everyday challenges of evading extortion; witnessing murders; and navigating threats to themselves and their families, friends and neighbors. Children who had not yet been victims of violence spoke of their own fears and their families' fear with the same inevitability. The girls shared their fears of sexual violence.

## Guatemala

Thirty-eight percent of the 100 children from Guatemala raised international protection concerns. Overall, the three dominant themes that emerged were deprivation, discussed by 29% of the children; abuse in the home, discussed by 23%; and violence in society, discussed by 20%. Almost half of the children interviewed, 48%, were members of an indigenous population, yet they represented 55% of the Guatemalan children who discussed issues of deprivation, 30% of



**Children's Reasons for Leaving Home – El Salvador**

> I am here because the gang threatened me. One of them "liked" me. Another gang member told my uncle that he should get me out of there because the guy who liked me was going to do me harm. In El Salvador they take young girls, rape them and throw them in plastic bags. My uncle told me it wasn't safe for me to stay there. They told him that on April 3, and I left on April 7. They said if I was still there on April 8, they would grab me, and I didn't know what would happen.... My mother's plan was always for the four of us – her, my two sisters and me – to be together. But I wasn't sure I wanted to come. I decided for sure only when the gang threatened me.
>
> **MARITZA, EL SALVADOR, AGE 15**

> My step-father used to beat me. He would get angry at me and hit me with a belt, punch me, or beat me with a metal pipe.
> I would protect my mother and he would get angry at me.
>
> **JOSÉ, MEXICO, AGE 17**

EXECUTIVE SUMMARY



**Children's Reasons for Leaving Home – Guatemala**

> Gangs in a nearby neighborhood wanted to kill me and some other people. They wanted me to give them money, but what money was I supposed to give them? I didn't have any. They asked me a bunch of questions, like who was my father, and who was my family. I told them my father was dead. They told me to say goodbye because I was going to join my father. They asked me if I knew who they were, if I could identify them. I said no, because I knew if I said yes they would kill me. They held my cousin and me for three hours, tied up. My cousin was able to untie the rope and he helped me untie mine. We heard gun shots and we ran. They kept looking for us, but we escaped.
>
> **DAVID, GUATEMALA, AGE 16**

> My grandmother wanted me to leave. She told me: "If you don't join, the gang will shoot you. If you do join, the rival gang will shoot you—or the cops will shoot you. But if you leave, no one will shoot you."
>
> **KEVIN, HONDURAS, AGE 17**

those who discussed abuse in the home and 25% of those who discussed violence in society. Five percent of the Guatemalan children reported that they had been victims of both violence in society and abuse in the home. Sixty-two percent of the children did not mention serious harm as a reason for leaving. Eighty-four percent of the children shared hopes for family reunification, better opportunities for work or study, or helping their families as a reason for coming to the U.S.

## Honduras

Of the 98 children from Honduras, 57% raised potential international protection concerns. Forty-four percent of these displaced children were threatened with or were victims of violence by organized armed criminal actors. Twenty-four percent of the children reported abuse in the home. Eleven percent reported that they had been victims of both violence in society and abuse in the home. Forty-three percent of the Honduran children did not mention serious harm as a reason for leaving. Twenty-one percent of the children discussed situations of deprivation. Similar to the children from Guatemala, 80% of the Honduran children shared their hopes for family reunification, better opportunities to work or study, or to help their families as a reason for leaving, but very few gave one of these as the only reason.



**Children's Reasons for Leaving Home – Honduras**

## Mexico

Out of the 102 Mexican children interviewed, 64% raised potential international protection needs. Thirty-two percent spoke of violence in society, 17% spoke of violence in the home and 12% spoke of both. Seven percent discussed situations of deprivation. Unlike children from the other three countries, Mexican children are frequently recruited by organized crime and other criminal actors to work as guides in the human smuggling industry. In addition to their smaller size and greater tolerance for risk taking, it is widely understood that if these children are caught, they will simply be returned to Mexico. A striking 38% of the children from Mexico had been recruited into the human smuggling industry – precisely because of their age and vulnerability.[23] These children have a unique set of potential protection needs that includes entrapment in criminal conduct, the worst forms of child labor, and exposure to dangerous situations that are harmful to their safety and well-being. Given these children's youth, the rampant poverty, the lack of opportunity and often unchecked crime-related violence in at least some parts of Mexico, serious questions are raised as to the coercion and exploitation of these children and whether, even among those children who indicated they became involved in human smuggling by their own decision, they were able to make a truly informed and voluntary decision to participate in this often dangerous criminal activity. Some of these children explicitly stated they were recruited under false pretenses, and others made it clear that, however they first became involved, they were forced to continue even if they expressed a desire to stop.

## Conclusion

The responses of the 404 children from El Salvador, Guatemala, Honduras and Mexico interviewed for this study lead to several significant conclusions. First, the reasons these children have for leaving their countries of origin are complex and interrelated and can be understood only when examined from a child-sensitive perspective and taken as a whole and in context. Related to this multiplicity of reasons, there is no single dominant place of origin within or among the different countries from where these children are coming. Second, across the broad array of their responses, these children also clearly share commonalities within and among all four countries. Third, the many compelling narratives gathered in this study – only some of which are relayed in this report – demonstrate unequivocally that many of these displaced children faced grave danger and hardship in their countries of origin. Fourth, there are significant gaps in the existing protection mechanisms currently in place for these displaced children. The extent of these gaps is not fully known because much of what happens to these children is not recorded or reported anywhere. As such, it is reasonable to infer that the gaps may be even wider than what the available data indicates. By all accounts, children arriving to the U.S. from these four countries continue to rise in numbers as do the numbers among them with potential international protection needs.

Through the children's own words, the critical need for enhanced mechanisms to ensure that these displaced children are identified, screened and provided access to international protection is abundantly clear. The question now is how the five States, civil society and UNHCR can work together to best ensure that these children are carefully screened and provided the protection they so desperately need and deserve.

**Children's Reasons for Leaving Home – Mexico**





# Requests and Concerns Raised by Governments, Civil Society and Other Stakeholder Participants at the UNHCR Roundtable on the Displacement of Unaccompanied and Separated Children from El Salvador, Guatemala, Honduras and Mexico

Before providing its recommendations to the Governments of El Salvador, Guatemala, Honduras, Mexico and the United States, UNHCR wishes to acknowledge a number of the requests and concerns raised by Government representatives, civil society and other stakeholder participants from these countries at the Roundtable on the Displacement of Unaccompanied and Separated Children, hosted by UNHCR in San Juan, Puerto Rico, 22-23 January 2014, which reflect issues of great importance but are beyond the scope of the findings and conclusions of this study. These include:

**Providing Essential Services and Access to Justice for Children by**

Creating, strengthening and promoting comprehensive child protection mechanisms, including children's access to justice, on the national and local levels that meet the general protection needs of children in their home communities, those who are displaced – within and outside their countries of origin – and those who are repatriated to their countries of origin.

Establishing formal bilateral and multilateral agreements on repatriation that include mechanisms to facilitate the safe return and reintegration of unaccompanied and separated children when such return is formally determined to be in the best interests of the child.

Developing capacity for reception and social reintegration, especially for family reunification, access to psychosocial services and education, and employment and training opportunities appropriate for young people and their families.

**Ensuring Liberty by**

Refraining from practices that unnecessarily restrict children's liberty. This is particularly important with regard to detention, given the continued harm and detrimental impact of detention on the well-being of the child. Detention also impedes access to asylum and other forms of international protection, and may also be used as a tool to illegitimately discourage a child from seeking international protection.

# Recommendations

Regarding the potential or actual international protection needs of unaccompanied and separated children from El Salvador, Guatemala, Honduras and Mexico, UNHCR recommends that the Governments of El Salvador, Guatemala, Honduras, Mexico and the United States:

**Recognize Newly Emerging Forms of Displacement in Central America and the Emergence of International Protection Issues**

1. Recognize that the violence and insecurity within El Salvador, Guatemala, Honduras and Mexico, as well as across their borders, have led to the displacement of children and others in the region; have implications as foreign policy and political issues; and have connections with international protection needs.

2. Recognize the international protection needs – actual and potential – at stake and the need to ensure that these displaced children are provided safety upon arrival, screened for any international protection needs, and provided access to the assessment and provision of international protection.

3. Bring the international protection needs of these displaced children to the forefront and ensure their inclusion to the fullest extent possible in all national and regional efforts.

4. Incorporate formally the international protection needs of these displaced children into the official discussions concerning displaced children in the region and incorporate them into the final guidelines to be published by the Regional Conference on Migration.

**Strengthen and Harmonize Regional and National Frameworks for Ensuring International Protection**

5. Establish and promote more uniform responses and approaches to displaced children in the region through the development of regional protocols for addressing the international protection needs of children that incorporate the principle and practice of determining the best interests of the child at all decision points that affect the well-being of the child, beginning with the first encounter of authorities with the child.

6. Ensure that the principle of the best interests of the child is a central component of all responses, approaches, guidelines and tools concerning the protection needs of children, including the assessment of a claim for refugee status, asylum or any other form of international protection.

7. Enhance capacity, through increased staff and training and other mechanisms, to ensure the systematic identification of children with potential international protection needs, in particular children in high-risk situations; appropriate referrals for their care and assessment of their international protection needs; and access to guardians and legal representation.

8. Develop and disseminate common tools to support the government function of screening for international protection needs, with special attention paid to methods and practices that promote a child-sensitive environment.

9. Harmonize national legislation, policies and practices with the resulting regional framework and tools.

10. Develop and implement mandatory training for all authorities engaged in activities relating to the protection and other assistance of children with potential or actual international protection needs on the basic norms and principles of international human rights and refugee law, including the fundamental principles of nondiscriminatory treatment, best interests of the child, non-refoulement, family unity, due process of law, and non-detention or other restriction of liberty.

11. Strengthen collaboration, exchange of information and sharing of best practices relating to the identification, referral and assessment of children with potential international protection needs between Governments and UNHCR and between Governments and civil society.

**Address Root Causes**

12. Undertake measures both regionally and nationally to address the root causes of flight of these displaced children, in an effort to reduce – if not eliminate – the factors that lead to their forced displacement.

13. Engage the Commission on Security for Central America of the Central American Integration System to address the issues of children displaced due to violence and insecurity in further support of State efforts concerning these issues.