EXHIBIT 27

# NO CHILDHOOD HERE

## WHY CENTRAL AMERICAN CHILDREN ARE FLEEING THEIR HOMES

### By Elizabeth Kennedy

404


AMERICAN
IMMIGRATION
COUNCIL

# NO CHILDHOOD HERE: WHY CENTRAL AMERICAN CHILDREN ARE FLEEING THEIR HOMES

## ABOUT THE AUTHOR

**Elizabeth Kennedy** is a Fulbright Fellow currently working with returned child and youth migrants from Mexico and the United States in El Salvador. Her work and research focuses on the experiences and needs of child, youth, and forced migrants. She has over a decade's experience in youth programming and organizing and co-founded and directs an internship program for undergraduates to mentor detained child migrants. She received her MSc in Refugee and Forced Migration Studies from Oxford University in 2011, and since beginning her doctoral program at San Diego State University and the University of California, Santa Barbara in 2011, has published in academic and popular press. She has also provided expert testimony in Central American asylum seekers' cases in Canada, Sweden, the United Kingdom, and the United States.

## ABOUT THE AMERICAN IMMIGRATION COUNCIL

The American Immigration Council's policy mission is to shape a rational conversation on immigration and immigrant integration. Through its research and analysis, the Immigration Council provides policymakers, the media, and the general public with accurate information about the role of immigrants and immigration policy in U.S. society. Our reports and materials are widely disseminated and relied upon by press and policymakers. Our staff regularly serves as experts to leaders on Capitol Hill, opinion-makers, and the media. We are a non-partisan organization that neither supports nor opposes any political party or candidate for office.

Visit our website at *www.immigrationpolicy.org* and our blog at *www.immigrationimpact.com*.

405

# CONTENTS

**1**   INTRODUCTION & SUMMARY

**2**   ORGANIZED CRIME, GANGS AND VIOLENCE ARE DRIVING CHILDREN FROM THEIR HOMES

**3**   IN RURAL AREAS, EXTREME POVERTY MOTIVATES SOME TO SEEK WORK

**3**   ONLY 1 IN 3 CHILDREN CITES FAMILY REUNIFICATION AS A PRIMARY REASON FOR LEAVING HOME

**4**   LEAVING THEIR COUNTRY IS OFTEN A LAST RESORT

**5**   CHILDREN AND THEIR FAMILIES DO NOT TRUST THE SALVADORAN GOVERNMENT TO HELP THEM

**6**   APPENDIX: METHODOLOGY

**7**   ENDNOTES

# INTRODUCTION & SUMMARY

Over a decade before President Barack Obama described the influx of unaccompanied child migrants to the United States as an "urgent humanitarian situation requiring a unified and coordinated Federal response,"[1] child and refugee advocates warned that children who shared experiences of years-long family separation, widespread violence in home countries, and higher rates of neglect and abuse were fleeing from South of our border in alarming numbers.[2] Then as now, over 95 percent were from Mexico and the Central American nations of El Salvador, Guatemala, and Honduras. When these children were apprehended in the U.S., the Trafficking and Victim's Protection Reauthorization Act (TVPRA)[3] required agents to ask limited and straightforward abuse questions. If the child was determined to be without a parent or legal guardian, s/he had to be transferred to Office of Refugee Resettlement (ORR) care within 72 hours.[4]

Yet, even though 8,000 to 40,000 unaccompanied child migrants were apprehended annually between 2003 and 2011, only 4,800 to 8,300 entered ORR's care each year. A 2011 report by the Appleseed Foundation documented that most Mexican child migrants did not receive TVPRA screening and thus could not transition to ORR care.[5] Instead, per an agreement between the Mexican and U.S. governments that Obama would like emulated among Central American countries, Mexican children were quickly deported.[6] Nonetheless, those from indigenous areas or areas with high levels of drug violence were able to receive the "Unaccompanied Alien Child"[7] (UAC) designation, alongside thousands from the three countries that make up the so-called Northern Triangle of Central America.[8] In 2012, nearly 14,000 UAC entered ORR care, with 88 percent from the Northern Triangle. In 2013, over 24,000 arrived, with 93 percent from the same three nations.[9] This year, as many as 60,000 could arrive,[10] and while numbers from Mexico have declined, numbers from the Northern Triangle continue rising.

What drives these children to flee their homes? What causes their parents to put them and their life's savings in the hands of smugglers?[11] What happens if they fail to reach the U.S.? Since October 2013, with funding from a Fulbright Fellowship, I have lived in El Salvador and worked toward answering these questions through my research into the causes of child migration and the effects of child deportation (see appendix).

Based on the evidence I collected and analyzed to date, violence, extreme poverty, and family reunification play important roles in pushing kids to leave their country of origin. In particular, crime, gang threats, or violence appear to be the strongest determinants for children's decision to emigrate. When asked why they left their home, 59 percent of Salvadoran boys and 61 percent of Salvadoran girls list one of those factors as a reason for their emigration. In some areas of El Salvador, however, extreme poverty is the most common reason why children decide to leave. This is particularly true for adolescent males, who hope to work half the day and study the other half in order to remit money to their families and help them move forward in life. In addition, one in three children cites family reunification as a primary reason for leaving home. Interestingly, over 90 percent of the children I interviewed have a family member in the US, with just over 50 percent having one or both parents there.[12] Most referenced fear of crime and violence as the underlying motive for their decision to reunify with family now rather than two years in the past or two years in the future. Seemingly, the children and their families had decided they must leave and chose to go to where they had family, rather than chose to leave because they had family elsewhere. Essentially, if their family had been in Belize, Costa Rica, or another country, they would be going there instead.

> **When asked why they left their home, 59 percent of Salvadoran boys and 61 percent of Salvadoran girls list crime, gang threats, or violence as a reason for their emigration.**

# ORGANIZED CRIME, GANGS AND VIOLENCE ARE DRIVING CHILDREN FROM THEIR HOMES

When asked why they left their home, 59 percent of Salvadoran boys and 61 percent of Salvadoran girls list crime, gang threats, or violence as a reason for their emigration. Whereas males most feared assault or death for not joining gangs or interacting with corrupt government officials, females most feared rape or disappearance at the hands of the same groups. While over half of Salvadoran children list more than one reason for migrating, nearly 100 list only this fear.

Of the 322 minors I interviewed, 145 have at least one gang in their neighborhood, and about half of these live in a contested gang territory. They report hearing gunshots nightly and are often afraid to walk even two or three blocks from their home since they fear crossing an always changing boundary. Those who did not note a gang presence often followed their response with "Gracias a Dios [Thank God]" or "todavía [yet]" and frequently indicated that they expect one to arrive soon. When sharing these concerns, they often mentioned either strangers arriving to where they live or criminal groups coming to their neighborhoods on an irregular basis in order to scout its potential. Three families told of their neighborhoods being taken over in exactly this manner over the past year. Another 130 said they attend a school with a nearby gang presence. This usually means that the gang either congregates in a park across the street or waits on the streets to and from the school at start and end times. One hundred attend a school with gangs inside, with marijuana or other drugs often present and school directors or teachers occasionally helping gangs recruit students. One hundred and nine have been pressured to join the gang, 22 of whom were assaulted after refusing. Seventy have quit school. While most minimize their time on the streets, saying they go only to and from school, work, or church, more than 30 said they have made themselves prisoners in their own homes; some do not even go to church. One described himself as

> **Of the 322 minors I interviewed, 145 have at least one gang in their neighborhood, and about half of these live in a contested gang territory.**

"paralyzed with fear," as he began crying. Another's mom told me that he had a psychological breakdown when she tried to get him to leave the home. She had to take him to the emergency room to calm him, and the doctor recommended that she get him out of the country as soon as possible. Four families told how their children now find numerous tasks to do around the house to excuse themselves from family outings. Another told me: "people are always dying. I never feel safe." Then, a girl stated that she felt "trapped." She is afraid to enter other neighborhoods, and her father explained that even if the gangs do not harm her, the police or military in their neighborhood could because they "shoot [their firearms] freely, and sometimes innocent people are killed in the crossfire."

To date, I have randomly selected at least one child's story from each department (similar to states in the U.S.) and searched local news reports to see whether what they said could be verified.[13] In all 14 cases, news articles supported the high crime rates they described and included names of friends and family members they mentioned as victims. For example, one girl said that her father and cousin had been killed five years apart and that three murders had taken place in her neighborhood in the past year. All three elements of her story had been reported in both La Prensa Grafica and El Diario de Hoy. Another father told me that eight murders, two of which involved children, took place in his neighborhood and the one next to it. Again, press supported his accounts.

While I believed that gang violence was primarily an urban problem before arriving to El Salvador, I have found that this violence is widespread, with children from rural and urban areas of 11 of 14 of El Salvador's departments most likely to list this as the primary cause of their emigration. In Cuscatlán and Usulután, over 85 percent flee for this reason, and in the following departments more than 50 percent flee for this reason: La Libertad (53.8%), La Paz (64.7%), La Union (67.6%), Morazán (52.6%), San Miguel (67.6%), San Salvador (65.9%), San Vicente (61.1%), Santa Ana (58.8%), and Sonsonate (67.7%).

# IN RURAL AREAS, EXTREME POVERTY MOTIVATES SOME TO SEEK WORK

The exception to this trend occurs in three of the most rural and impoverished departments in El Salvador—Ahuachapán, Cabañas, and Chalatenango. While children from these areas cite violence as their reason for leaving over 30 percent of the time, more actually cite the desire for an improved life. Over 40 percent of the children, predominantly adolescent males, hope to work half the day and study the other half in order to remit money to their families and help them move forward in life. This desire for a better life is hardly surprising, given that many of these children began working in the fields at age 12 or younger and live in large families, often surviving on less than USD $150 a month.

# ONLY 1 IN 3 CHILDREN CITES FAMILY REUNIFICATION AS A PRIMARY REASON FOR LEAVING HOME

Over 90 percent of the children I interviewed have a family member in the U.S., with just over 50 percent having one or both parents there. Despite these high numbers, only 35 percent list reunification as a reason for their emigration, although girls and younger children are more likely to list this reason.[14] Whenever children note a family member in the U.S., we ask them why they wish to see this person now instead of a few years ago or several years in the future. The responses to these questions more often than not referenced fear of crime and violence as the underlying motive. The children and their families had decided they must leave and chose to go where they had family, rather than chose to leave because they had family elsewhere. Essentially, they would be going to another country like Belize or Costa Rica if their family was there instead of in the U.S.

Parents and guardians typically express great distress about weighing the risks of an incredibly dangerous journey to the U.S. versus an incredibly dangerous childhood and adolescence in El Salvador. Over and over again, I have heard that "there is no childhood here," and that "it is a crime to be young in El Salvador today." One father said he never wanted to be away from his son, but after a string of murders in their town, he worried all the time. He felt he was being selfish to keep him here longer, especially since his mother in the U.S. has been asking for him for nearly a decade. Two single mothers shared that gangs were forcibly using their homes as passageways to escape from one neighborhood to another and to stash drugs. They believed they were targeted because no adult males lived with them, and they feared that they and their teenage sons would be arrested as gang members if they reported the events, because each knew a community member who had been. Grandparents feel they are too old to fend off gang threats for their grandchildren. One grandmother stopped working in order to be better able to protect her granddaughter at home, but she felt that the gang knew they could enter her home by force to take her granddaughter at any moment. An aunt worried that keeping her nephew put her own children at risk. In all these cases, the family decided that long-term safety in the U.S. was worth the short-term—and high—risk of migrating.

The adolescents themselves referenced a decreasing risk in migrating related to their bigger and stronger bodies and an increase in danger of staying upon reaching the age of 13. They indicated that since they were more emotionally and physically mature, the risks associated with the dangerous journey to the U.S. were less than they once were, even though they had fairly accurate understanding of what could happen to them. At the same time, they indicated that while some gangs will recruit younger children, most do not recruit intensively until adolescence. Several said they had hoped to never turn 13, and a few mothers indicated that this birthday was celebrated with great sadness. Adolescents thus felt that their risk of staying increased as they aged and would continue to be high until they entered their late twenties. They often said there was nothing here for them and frequently referenced news stories on homicides, in which most victims are in their teens and twenties. They believed that the U.S. would offer them both more opportunities and safety to take advantage of them.

# LEAVING THEIR COUNTRY IS OFTEN A LAST RESORT

Importantly, the U.S. is not always the first option. Many move within El Salvador, and there are whole neighborhoods that have been abandoned.[15] According to the Central American University's Institute of Public Opinion (IUDOP) 2012 Survey,[16] approximately 130,000 Salvadorans were forced to relocate within the country in 2012. One-third had moved previously, because often, the same threats to life resurface. For example, one adolescent male who had been beat three times for not joining the gang in his neighborhood has already moved three times, and each time, the same gang has found him. Another adolescent male fleeing his neighborhood's gang had even greater problems with the rival gang when he arrived to his new neighborhood, because they assumed he was already a rival member. An adolescent girl who witnessed her mom's, brother's and boyfriend's murders by gang members has lived in six different parts of El Salvador—and even Guatemala—and

> Notably, these children are not just arriving to the U.S. in search of protection. UNHCR documented an increase of 432 percent in asylum requests in the neighboring countries of Belize, Costa Rica, Nicaragua, Panama, and Mexico.

each time, the same gang tracked her down.

Likewise, police who have asked me about my study have shared several related pieces of information. First, they are often required to move every two years because of concerns that gangs will target them for corruption or death. Second, several police and military members have sent their children to the U.S. because they feared for their lives, and the media has indeed documented increased attempts by gangs to murder these agents of the state.[17] Third, two policemen who were threatened by gangs explicitly told me that if threatened, your only option is to flee and hope for the best within the country. They both said that if the gang decided to find you, they could, and you then needed to go abroad if you wanted to survive.

Notably, these children are not just arriving to the U.S. in search of protection. UNHCR documented an increase of 432 percent in asylum requests in the neighboring countries of Belize, Costa Rica, Nicaragua, Panama, and Mexico.[18] Despite being one of the poorest countries in Latin America, Nicaragua alone saw an increase in asylum requests of 240 percent between 2012 and 2013.[19]

# CHILDREN AND THEIR FAMILIES DO NOT TRUST THE SALVADORAN GOVERNMENT TO HELP THEM

Children and their families do not feel the Salvadoran government can protect them. Press reports and government authorities in various agencies say that the two child protection agencies in El Salvador—the National Council for Childhood and Adolescence (CONNA) and the Salvadoran Institute for Childhood and Adolescence (ISNA)— infrequently respond to reported abuse[20] or parental homicide[21]. Legislation passed in 2009 makes which agency is responsible for what unclear. Neither is adequately funded nor has programs for children persecuted by gangs or for children wanting out of gangs.

There is also little confidence in the police, military, or other government agencies.[22] Only 16 child migrants who said they had experienced insecurity reported it. The police refused to write up a report for eight of those who reported problems; six said nothing

happened after they spoke to authorities, and two of the 16 who made reports said they had received increased threats. One's accused rapist still lives next door.

Fear of authorities is well-founded. Many say gangs have sources of information among police, attorney general offices, and neighborhood residents so that, as several of them told me, "You never know who is who." Three told stories of youth who made complaints and were then detained as suspected, rival gang members by police. Police beat one youth three times because he worked late and was accused of being a gang member since he was on the streets. Thus, because gangs and, at times, police target young people, a number of children and family members have again told me that El Salvador is "no place for children."

# THOSE WHO ARE RETURNED FROM THE U.S. FACE ADDITIONAL THREATS OF VIOLENCE

Four families I met were hoping to return to their lives in the United States. All of them had resided with their children there for more than seven years. They elected voluntary departure, and upon arriving to El Salvador, decided to start small businesses. Each of them was extorted for large amounts of money (more than $3,000 per month) within six months of opening. They believed that besides having their businesses, they also stood out because their homes were nicer, and they dressed differently. Unable to pay, and afraid to report the crime to authorities, they were fleeing. They were so afraid that they did not plan to sleep in their homes that evening after being deported from Mexico on their way to the U.S. and were instead looking for a hostel before embarking again the next day.

I also met two men in their early twenties who were fleeing with their adolescent sisters. In both cases, the brothers had received numerous threats in El Salvador and had fled to the U.S. in the previous year. Upon reaching the U.S., they tried to seek asylum. One was told inside the detention center where he was kept that since he was not "black or Muslim," he could not do so. They both stated they were returned against their will and without every talking to a lawyer. Within days of their return, the gangs began forcibly recruiting their sisters to be "girlfriends[23]". Where both lived, girls who refused such advances had been kidnapped and never heard from again or found murdered, which I cross referenced with a Twitter site called Angel Desaparecido.[24] With their families, they decided to accompany their sisters to the U.S., but neither had much hope for their or their sister's prospects of obtaining protection.

**The most common cause of UAC's exodus from Central America has been and continues to be increasing gang and cartel violence that disproportionately affects them as young people.**

Within this context, many children report that their parents who had planned to return to El Salvador after paying for their education now fear doing so because of high violence and these kinds of stories. At least once a month, local news report the homicide of a recent deportee from the U.S.,[25] and several of the Salvadoran families I have met here indicated that they were extorted because of the remittances they receive from relatives in the U.S.

My study is taking place in El Salvador, but I visited Guatemala and Honduras in October 2013 and know over 100 UAC from each country. The initial findings presented in this piece are common in the other two nations, as is reported in aforementioned publications by KIND, UNHCR, UCCSB, and the WRC. Primarily, while family reunification, poverty, and lack of opportunities are common considerations in UAC's decision to emigrate, the most common cause of UAC's exodus from Central America has been and continues to be increasing gang and cartel violence that disproportionately affects them as young people.

As a result, U.S. and regional response must realize that the majority of these children have significant protection needs. Thus, they should continue to receive access to the services and due process guaranteed them in the Flores Settlement Agreement and TVPRA, should have access to free legal counsel, and should await their immigration hearings with family. Whether they remain in the U.S. or return to their home countries, they must have access to services that assist them in transitioning successfully, which would ideally offer them career and educational development and health services alongside mechanisms for better participating in transnational families. Most broadly, in home countries, emphasis must shift from militaristic solutions to those that invest in economic and social development. In doing so, the influence of gangs would likely decrease as they have alternative opportunities, and fewer children will emigrate.

As a final note, I am in contact with 20 UAC who arrived to the U.S. from 2011 to 2013. They now live in different parts of the country, Guatemala, Honduras, and Mexico and have various legal statuses. Their experiences migrating to the U.S. and transitioning from that journey have deeply affected them and me. Even those who are happy in the U.S. greatly miss their home countries. If they could return and live in them safely, most would. At the same time, they are incredibly motivated and talented youth, and whichever nation gets them should make a minimal front-end investment to maximize the return we get from them.

# APPENDIX: METHODOLOGY

My subjects have been local, regional, and national government officials; the press; and children and their families, who have told horror stories of violence and despair.[26] I have met hundreds of people fleeing areas where their neighbors, family, or friends have been extorted, threatened, or killed. Many were on their way to the U.S. for the first time, but a few hoped to return to their life in the U.S. since their decision to voluntarily depart in the past year put them and their families in danger within months.

To reach the U.S., Central Americans must traverse Mexico, and an increasing number are being detained and deported there before reaching the U.S. border.[27] Children apprehended below Mexico City are deported by bus to San Salvador twice per week; children detained above Mexico City are deported by commercial plane to the international airport in San Luis Talpa on an as-needed basis. When I began interviewing children deported by bus in January, between five and 15 came two days per week, but between 60 and 80 now arrive each of these two days.[28] Through June, I have completed nearly 500 interviews with these children and their waiting family members, over half of whom intended to attempt migrating again. Indeed, in paying the smuggler, each received three chances for that price that was sometimes equivalent to 20 years' salary. For this piece, I analyzed the 322 interviews I completed between January 27 and May 1, 2014. Within that group of children, 106 (33%) were females, and 216 (67%) were males. Nearly 80 percent (78.5) were between the ages of 13 and 17.[29] The largest numbers come from the departments of San Salvador (41), Santa Ana (34), San Miguel (34), and La Unión (34). The top four destinations in the United States were: New York (39), Los Angeles (38), Houston (38), and Virginia (31).[30]

Through May, I went to the migrant return center on both days that children were deported. There, family members await their children for hours, and I arrived early to talk with them before the bus came. Often, I had the chance to interview the family prior to the bus's arrival and the child after completing her migration interview. In April, I recruited and trained a Salvadoran assistant due to an increase in arrivals. During these first five months, our goal was to complete interviews with at least half of child migrants if together and with at least one quarter if alone. Starting this June, my assistant goes one day per week, and I go the other day. Our goal now is to interview a statistically representative sample based upon sex, age, and origin, and I have begun follow-up interviews by phone.

Interviews have a mixture of closed and open questions and usually take 10 to 30 minutes to complete.[31] We begin by collecting basic demographic information like age, gender and with whom the child lives (including age and relationship of each person in the home). We then ask where they live and what living there is like, with follow up questions about gang, police and military presence, religious involvement, land ownership, and remittances. Before transitioning to where the child's mother and father are (which is always sensitive since some have a father who was not active), in what each parent or guardian works, and where and with whom they wanted to live in the U.S., we ask if they ever lived anywhere else. If so, we want to know where and why they moved. Then, we ask if they were actively studying, what grade they last completed, how they performed academically, what type of school they attended, and if not studying, why they quit when they did. We ask a similar set of questions about if they are actively working. After that, we explicitly ask them why they wanted to leave the country, and depending on the reason(s) they give, a series of follow up questions specific to that reason. For example, if they say they fear for their life, we ask them why; whether they, their family or friends have been threatened, and if so, when the threats began and with what frequency they have occurred; how many murders or other crimes have occurred where they live; names of anyone they know who has been killed; and whether or not they reported these crimes. Finally, we ask with whom they traveled (smuggler, family, friends, other, or alone), whether they will try to reach the U.S. again, and what they hope to do in the U.S. if they arrive. At the end, we share with them possible legal options to travel to or stay in the U.S., if any exist, and answer their questions. All are given my contact information and encouraged to follow up with me if they would like. Over 30 have done so.

The interviews have four major limitations. First, we cannot complete interviews with children alone,[32] so our questions about abuse, mistreatment, or negligence likely yield underestimates. Just 3.1 percent report migrating for this reason to us, but upward of 20 percent from El Salvador reported migrating for this reason to KIND[33] and UNHCR[34] in 2013. Second, because we conduct interviews at the migrant return centers, finding privacy can be difficult, and some child migrants and their families are afraid to talk openly. On more than 10 occasions, they have followed up with me by email after leaving the center to share a much more detailed history. Third, the later the busses arrive, the fewer interviews we can complete since migrants and their families are in a hurry to leave before dark. The return center is in a very bad neighborhood (Colonia Quiñonez): it was named one of 10 municipalities in El Salvador where taxis normally will not go in March[35], and in April, two people were murdered on the only street that can be used to exit.[36] Finally, some speculate that migrants may tell their stories strategically since I am from the U.S. While this may occasionally occur, I have nearly a decade's experience conducting qualitative interviews with children in the Spanish language (and more experience performing youth work with the same population). I am adept at noticing such things and note when I suspect withholding information. Importantly, when my assistant and I conducted interviews with the same children on her first two days, we received similar responses. Then, my field interviews are consistent with what other groups like KIND[37], UNHCR, the United States Conference of Catholic Bishops[38], and the Women's Refugee Commission[39] have reported in the last two years—rampant violence has made it unsafe to be a child in Central America.

# ENDNOTES

¹ The White House Office of the Press Secretary, "Presidential Memorandum -- Response to the Influx of Unaccompanied Alien Children Across the Southwest Border," (2014), available at: http://www.white-house.gov/the-press-office/2014/06/02/presidential-memorandum-response-influx-unaccompanied-alien-children-acr.

² See reporter Sonia Nazario's six-part series about a Honduran unaccompanied child migrant hoping to reunify with his mom and leave a life of instability and crime with the Los Angeles Times here: http://dlib.nyu.edu/undercover/enriques-journey-sonia-nazario-los-angeles-times. It became a full-length book, Enrique's Journey (2006).

Also see Administration for Children and Families, "Annual ORR Reports to Congress - 2003," (2003), available here: http://archive.acf.hhs.gov/programs/orr/data/arc_03.htm, which states: "[m]ost Unaccompanied Alien Children (UAC) in ORR's care are Central American males between the ages of 15 and 17 who come to the U.S. to join family and work. They are fleeing poor socioeconomic conditions, gang victimization, abuse, neglect, abandonment, or other trauma in their home countries." Prior to FY 2003, the UAC program did not exist. See also reporter Melissa del Bosque's stories for The Texas Observer: "Children of the Exodus" (4 November 2010) at http://www.texasobserver.org/children-of-the-exodus/ and "Central America's Lost Boys" (30 April 2012) at http://www.texasobserver.org/central-americas-lost-boys/.

³ U.S. State Department, "U.S. Laws on Trafficking in Persons," http://www.state.gov/j/tip/laws/

⁴ Prior to 1997, UAC were placed in Immigration and Naturalization Services detention facilities with adults, where a number of abuses occurred. A class action suit was brought, and after nine years of litigation, the Flores Settlement Agreement was negotiated. Under it, UAC must be transferred from adult care within 72 hours to the "least restrictive setting appropriate" in facilities meeting state standards for children in foster care. Paramount to their care is "dignity, respect and special concern for their particular vulnerability as minors," as is assuring their appearance at immigration courts. Facilities for UAC must, at a minimum, have: safe and sanitary conditions, toilets and sinks, drinking water and food, medical assistance in cases of emergency, adequate temperature control and ventilation, adequate supervision to protect minors from others, contact with family members, and separation from unrelated adults. For those who have special needs, including health, mental or physical conditions requiring special services or treatment by staff, those needs must be met whenever possible, in licensed programs. While only 25 of these shelters existed in 2005, we have over 90 today.

See Flores v. Meese - Stipulated Settlement Agreement (1997) at https://www.aclu.org/immigrants-rights/flores-v-meese-stipulated-settlement-agreement.

⁵ See Cavendish, Betsy and Cortazar, Maru, "Children at the Border: The Screening, Protection and Repatriation of Unaccompanied Mexican Minors," Appleseed Foundation (2011), available at: http://appleseednetwork.org/wp-content/uploads/2012/05/Children-At-The-Border1.pdf.

See also Kennedy, Elizabeth, "US immigration bill: silence on the deportation of children," openDemocracy 50.50 (2013), available at: http://www.opendemocracy.net/5050/elizabeth-kennedy/us-immigration-bill-silence-on-deportation-of-children. Since 2005, over 150,000 unaccompanied child migrants from Mexico have been deported in contradiction of U.S. law, as laid out in the TVPRA and the 1997 Flores Settlement Agreement.

⁶ Mexican officials assert their ability to provide all services and support that Mexican unaccompanied minors need and thus ask that their youth be repatriated as quickly as possible per these agreements. However, their statements clash with overflowing orphanages in Mexican border towns and accounts of these youth being targeted for both drug and human trafficking (see del Bosque 2010). Then, despite assumptions by Mexican and US officials that these minors have families willing to support them, my conversations with advocates lead us to believe that as many as 20 percent of unaccompanied minors lived on the streets prior to emigrating and will once again find themselves destitute if deported.

See Ryan, Kevin, "Stop the Murders of Street Kids," Huffington Post (2012), available at: http://www.huffingtonpost.com/kevin-m-ryan/honduras-children-violence_b_1574086.html.

⁷ The Homeland Security Act amended the United States Code in 6 USC §279(g)(2) to define UAC as those who: (a) have no lawful immigration status in the US; (b) are under the age of 18; and (c) have no parent or legal guardian either present or available to provide care and physical custody in the U.S.

⁸ The Northern Triangle is composed of the three Central American nations of El Salvador, Guatemala and Honduras who share economic, political and social characteristics. In 1991, Guatemala and El Salvador signed a free trade agreement, which Honduras signed in 1992. While the Northern Triangle originally designated the free trade area the three share, it is now known as the world's deadliest region because of its high homicide and crime rates. To learn more, you can read ICESI University's background note here: http://www.icesi.edu.co/blogs/icecomex/2008/10/17/triangulo-norte-centroamericano/.

⁹ See Immigration Task Force, "Issue Brief: Child Migration by the Numbers," Bipartisan Policy Center (2014), available at: http://bipartisanpolicy.org/library/research/child-migration-numbers.

¹⁰ Prior to this year, neither Customs and Border Patrol (CBP), who apprehends UAC, nor ORR, who houses them, willingly released their numbers. In an unexplained move, CBP officials changed course in 2014 and became much more vocal about the increasing number of child arrivals. They have consistently estimated to the public that from 60,000 to 90,000 children will arrive, but they are not differentiating between accompanied and unaccompanied child migrants or Mexican and non-Mexican children. Differentiation is critical since accompanied and Mexican children rarely enter ORR care, meaning those who have entered ORR care in 2014 are likely markedly lower than the recently released 47,000 number.

¹¹ As was painstakingly portrayed in the film, Under the Same Moon

(2008), even young children may decide to migrate without telling their families. It could be days before families know where their children are and how to get them.

[12] 54 percent of KIND's Central American children had one parent living in the U.S. UNICEF found that children in kinship care in Africa were more vulnerable to increased poverty, abuse, neglect, exploitation, and unequal treatment in the household. See Roby, Jini L. "Children in Informal Alternative Care, Discussion Paper," UNICEF Child Protection Section. June 2011. UCCSB additionally found that children with family in the U.S. are vulnerable for two reasons: they are more likely to lack a stabilizing element in the home and can become targets for extortion since gangs are able to acquire lists of who receives remittances.

[13] Before concluding this investigation, I will do this for each child's story. I am hoping to create a public database of these articles and several interactive maps of the violence.

[14] 46.7 percent of girls list this reason, compared to 30.5 percent of boys. Nearly all children younger than 12 years old list reunification as a motivating factor.

[15] See Valencia Caravantes, Daniel, "La legión de los desplazados [The legion of the Displaced]," El Faro (2012), available at http://www.especiales.elfaro.net/es/salanegra_desplazados/.

[16] Central American University's Institute of Public Opinion (IUDOP) 2012 Survey (Spanish), Instituto Universitario de Opinión Pública Universidad Centroamericana "José Simeón Cañas" San Salvador, El Salvador, Diciembre de 2012; available at http://www.uca.edu.sv/publica/iudop/archivos/informe131.pdf.

[17] Servir, proteger, y sobrevivir, March 27, 2011 available at: http://www.elfaro.net/es/201103/fotos/3775/ Castro, Ángela, "Mareros torturan y matan a policía en Soyapango," Elsalvador.com, January 26, 2014, available at: http://www.elsalvador.com/mwedh/nota/nota_completa.asp?idCat=47859&idArt=8509092 Hernández, Carlos, "Al menos 37 asesinatos se reportan durante el fin de semana," La Página, February 16, 2014, available at: http://www.lapagina.com.sv/nacionales/92873/2014/02/16/Al-menos-28-asesinatos-se-reportan-durante-el-fin-de-semana

[18] UNHCR, Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection (2014), available at: http://unhcrwashington.org/children

[19] Dara Lind, "The Central American migrant crisis isn't just a US problem, in one chart," Vox, June 24, 2014, available at: http://www.vox.com/2014/6/24/5839236/the-central-american-migrant-crisis-isnt-just-a-us-problem-in-one

[20] Flores, Ricardo. "Quien protege a Monica? [Who protects Monica?]" La Prensa Grafica 7 July 2013 http://www.laprensagrafica.com/-quien-protege-a-monica

[21] Ramirez, Sigfredo. "El pais de los huerfanos [The country of orphans]." La Prensa Grafica 6 April 2014. http://www.laprensagrafica.com/2014/04/06/el-pais-de-los-huerfanos

[22] Numerous reports have documented widespread impunity in El Salvador, including Amnesty International, Human Rights Watch, the United Nations Office of Drug and Crime, the United States Department of State.

[23] While one gang member will typically request a girl to be his girlfriend, after a certain period of time, she is viewed as property of the entire gang. She essentially becomes a prostitute for the gang.

[24] Alerta Angel Desparecido, Twitter, available at: https://twitter.com/AlertaAngelsv.

[25] La Prensa Grafica, "La tragedia de todo un país," June 15, 2014, available at: http://www.laprensagrafica.com/2014/06/15/la-tragedia-de-todo-un-pais

La Prensa Grafica, "Asesinan a pandillero deportado de EUA en Tejutla," May 21, 2014, available at: http://www.laprensagrafica.com/2014/05/21/asesinan-a-pandillero-deportado-de-eua-en-tejutla

Elsalvador.com, "Matan a una mujer por pleito entre pandilleros," April 29, 2014, available at: http://www.elsalvador.com/mwedh/nota/nota_completa.asp?idCat=47859&idArt=8741481.

El Salvador.com, "Matan a pandillero deportado de EE. UU.," January 24, 2014, available at: http://www.elsalvador.com/mwedh/nota/nota_completa.asp?idCat=47859&idArt=8503815.

[26] Kennedy, Elizabeth, "'No place for children': Central America's Youth Exodus" InSight Crime (2014), available at: http://insightcrime.org/news-analysis/no-place-for-children-central-americas-youth-exodus .

[27] This trend is concerning in historical perspective, because the United States provided funding and training to Mexican migration officials to return more Central Americans to their home countries when people from those nations fled civil war in the 1970s, 1980s, and 1990s.

[28] Through May, only four Salvadoran children have been deported by plane from the U.S., as reported through private communication with El Salvador's government. This number is likely to increase substantially if the U.S. decides to expedite immigration proceedings for child migrants. See Gilha, Lori Jane and Amin, Sameen, "El Salvador ambassador: US proposed child-only migrant flights," Al Jazaeera America (2014), available at: http://america.aljazeera.com/watch/shows/america-tonight/articles/2014/6/25/u-s-proposed-childonlymigrantflightssayselsalvadorambassador.html.

For the month of July, I will spend the day at the airport four days a week to conduct interviews with Salvadoran children deported by plane from Mexico and the U.S. I have not done so earlier because the airport is over an hour from the capital city where I reside, and I always received no notice or too little notice to arrive in time to complete interviews.

[29] An equal number of girls as boys traveled until age 14, and then sometimes four times as many boys traveled as girls at ages 15, 16, and 17.

[30] Outside of California and Texas, children and their families were rarely able to name cities within the states. Thus, while they knew where they wanted to go in the first two states, they were sometimes unaware that Virginia, for example, was not the name of a city.

[31] Closed questions are those with simply a yes or no answer, and open questions are those that require elaboration and individual response.

414

[32] In 2009, the Salvadoran government passed a new law for child protection: the Integrated Protection Law for Childhood and Adolescence (LEPINA). See Asamblea Legislativa de El Salvador, Centro de Documentación Legislativa, April 16, 2009; available at: http://www.asamblea.gob.sv/eparlamento/indice-legislativo/buscador-de-documentos-legislativos/ley-de-proteccion-integral-de-la-ninez-y-adolecencia.

It created a new governing body for this purpose, the National Council for Childhood and Adolescence (CONNA) but did not terminate the existence of the previous National Institute for Childhood and Adolescence (ISNA) or make clear what each organization's role would be under the LEPINA. Whereas ISNA used to perform the intake interviews with deported children, no one from either office currently attends return centers. Because migration officials fear they lack expertise to adequately meet children's needs and vulnerabilities, they place the child with her waiting family member as soon as she disembarks from the bus. They believe this is in the best interest of the child. As a result, neither I, the migration officials, nor anyone else completes an interview with the child alone. This is problematic for a number of reasons, not least of which is that the child is not effectively screened for past abuse, mistreatment, or negligence.

[33] In February 2013, Kids in Need of Defense (KIND) released *The Time is Now* (at http://www.supportkind.org/en/about-us/resources) which drew upon a random sample of over 100 UAC cases they represented. It began: "[a] child migrating alone signals a much deeper protection issue that has caused them to leave their homes, family, and community." It pointed to the lack of "robust national child protection systems" in the Northern Triangle, which resulted in most of their child clients fleeing gang violence or long-term domestic violence by their caregivers. Children reported that police could not be trusted to protect them, moving within the country or region did not offer protection, having family in the U.S. and receiving remittances make one a target for extortion, and not paying extortion demands could result in serious harm or death.

[34] See UNHCR, *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection* (2014), available at: http://unhcrwashington.org/children.

In March, UNHCR released their results of extensive interviews with 404 detained UAC. Among UAC, they found that no less than 58 percent were forcibly displaced and potentially in need of international protection: 48 percent had personally experienced cartel or gang violence, and 22 percent had survived abuse in the home. UNHCR also reported that since 2009, more and more Central American adults and children have been requesting asylum in the United States and in Belize, Costa Rica, Mexico, Nicaragua, and Panama, where their requests have increased by a combined 432 percent.

[35] See "Los 10 principales sitios donde taxistas no van por miedo [The top 10 places where taxis won't go because of fear]" *El Diario de Hoy* (2014), available at: http://www.elsalvador.com/mwedh/nota/nota_completa.asp?idCat=47673&idArt=8602296.

[36] See "Hallan cadaveres de dos jovenes [Two youths' bodies found]," *El Diario de Hoy* (2014), available at: http://www.elsalvador.com/mwedh/nota/nota_completa.asp?idCat=47859&idArt=8706438.

[37] See also University of California, Hastings Center for Gender and Refugee Studies and Kids in Need of Defense, A Treacherous Journey: Child Migrants Navigating the U.S. Immigration System, (2014), available at: http://www.supportkind.org/en/about-us/resources. In

February 2014, KIND and UC-Hastings teamed to release a report on challenges UAC face while navigating the U.S. system. In calling for legal and policy reforms to ensure basic protections for UAC, it also highlighted that while many UAC seek to reunite with family once in the U.S., their migration is frequently motivated by violence rather than family separation.

[38] See United States Conference of Catholic Bishops (USCCB), Mission to Central America: The Flight of Unaccompanied Children to the United States, (2013), available at: http://www.usccb.org/about/migration-policy/upload/Mission-To-Central-America-FINAL-2.pdf.

Based upon three weeks in the Northern Triangle, while this report noted the absence of economic and educational opportunities, the strong desire to reunify with family, and a breakdown in the rule of law so significant that all three nations have a "culture of fear and hopelessness." At the macro level, it discussed increasing interaction between Central American gangs and drug cartels, partially evidenced by the U.S. Department of Treasury's decision to designate MaraSalvatrucha 13 as a significant Transnational Criminal Organization in October 2012 (See U.S. Department of Treasury, "Treasury Sanctions Latin American Criminal Organization," Executive Order (E.O.) 13581.). It then commented on regional skepticism around the gang truce and noted that whether or not it actually existed, it did demonstrate the gangs' emerging roles as political actors, capable of sitting at the table with government officials and controlling crime rates.

See Archibald, RC, "Gangs' Truce Buys El Salvador a Tenuous Peace" *New York Times* 27 August 2013 and Farah, Douglas, "What the Kids are Fleeing: Gang Violence Spikes in Central America," *Fusion* (2014), available at: http://fusion.net/justice/story/guns-drugs-money-anti-socials-form-social-order-807005.

I have yet to meet any researcher or citizen in El Salvador or Central America that has faith in the truce. They often indicate that even when homicide rates were initially halved, disappearance, extortion, kidnapping, and robbery increased. Then, many large clandestine graves are being found this year and last so that many speculate they were just better at hiding the bodies. Finally, homicide rates now exceed pre-truce levels. In May, 401 people were murdered, which is a daily average of 12 in a nation of only six million people.

[39] See Jones, Jessica and Podkul, Jennifer, Forced From Home: The Lost Boys and Girls of Central America, Women's Refugee Commission (2012), available at: http://womensrefugeecommission.org/forced-from-home-press-kit.

Based upon interviews with 146 detained child migrants from Mexico and the Northern Triangle, The report found that the extent and scale of rising crime, systemic state corruption and entrenched economic inequality were culminating, allowing for growing influence of gangs and cartels, which most listed as their reason for leaving. Specifically, many were threatened by gangs to join or die, saw dead bodies regularly, and lived in constant fear. They were so desperate for safety, that even after enduring horrendous journeys through Mexico that often included abuse, assault, inconsistent access to food or water and witnessing or experiencing death, drowning, kidnapping, maiming or rape, most said they would do it again. The report surmised that until these countries change substantially, the upward trend would become "the new norm," which has proven true in the two years that followed.