## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| _____ | ) | |
| **STATE OF TEXAS,** *et al.***,** | ) | |
| | ) | |
| **Plaintiffs**, | ) | |
| | ) | **CASE No. 1:14-CV-00254** |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** *et al.***,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

*AMICI CURIAE* **BRIEF OF AMERICAN IMMIGRATION COUNCIL, AMERICAN IMMIGRATION LAWYERS ASSOCIATION, DEFINE AMERICAN, NATIONAL IMMIGRANT JUSTICE CENTER, NATIONAL IMMIGRATION LAW CENTER, NEW ORLEANS WORKERS' CENTER FOR RACIAL JUSTICE, SERVICE EMPLOYEES INTERNATIONAL UNION, SOUTHERN POVERTY LAW CENTER, AND UNITED WE DREAM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................1

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ...........................1

STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT ..........................2

ARGUMENT ...........................................................................................................................3

    I.      The Requested Injunction Would Harm The Economy...............................................3

    II.     The Requested Injunction Would Harm Individuals ..................................................6

        A. The Economic Effects On Individuals Granted Deferred Action .......................6

        B. Examples Of Benefits From Deferred Action ...................................................8

            1.  Individuals brought to the United States as children ...................................9

            2.  Parents of U.S. citizens and lawful permanent residents .............................11

CONCLUSION........................................................................................................................15

i

## <u>TABLE OF AUTHORITIES</u>

**Other Authorities**

Center for American Progress, *Executive Action on Immigration Will Benefit State Economies* ...................................................................................................................6

Fiscal Policy Institute, *President's Immigration Action Expected to Benefit Economy* ..................................................................................................................7

Roberto G. Gonzales and Veronica Terriquez, *How DACA is Impacting the Lives of Those who are now DACAmented: Preliminary Findings from the National UnDACAmented Research Project* (American Immigration Council, 2013) ...........................8

Michael Greenstone and Adam Looney, *Ten Economic Facts About Immigration*, (The Hamilton Project, Brookings Inst., Policy Memo, 2010) ...................................................4

Dr. Raul Hinojosa-Ojeda with Maksim Wynn, *From the Shadows to the Mainstream: Estimating the Economic Impact of Presidential Administrative Action and Comprehensive Immigration Reform*, Appendix A (NAID, Nov. 21, 2014) ...................................................................................................................5, 8

Patrick Oakford, *Administrative Action on Immigration Reform, The Fiscal Benefits of Temporary Work Permits* (CAP, 2014) ...........................................................5, 7

Gianmarco I.P. Ottaviano and Giovanni Peri, *Rethinking the Effects of Immigration on Wages* (Nat'l Bureau of Econ. Research, Working Paper No. 12497, 2006, revised 2008) ...................................................................................4

Giovanni Peri, *Rethinking the Effects of Immigration on Wages: New Data and Analysis from 1990-2004*, 5 Immigration Policy In Focus, No. 8 (American Immigration Law Foundation (now, American Immigration Council), Oct. 2006), ...........................................................................................................4

Giovanni Peri, *The Effect of Immigrants on U.S. Employment and Productivity*, FRBSF Econ. Letter 2010-26, Aug. 30, 2010 ....................................................3, 4

Pew Research, *As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled* ...........................................................................................2

Heidi Shierholz, *Immigration and Wages: Methodological advancements confirm modest gains for native workers* (Econ. Policy Inst., Briefing Paper No. 255, 2010) ...................................................................................................................4

Jack Strauss, *Does Immigration, Particularly Increases in Latinos, Affect African American Wages, Unemployment and Incarceration Rates?*, Dec. 8, 2012 ............................3

U.S. Chamber of Commerce, *Immigration Myths and Facts* (2013) .............................................5

White House Council of Economic Advisors, *The Economic Effects of Administrative Action on Immigration* (Nov. 2014) ......................................................4, 5, 6, 7

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amici* American Immigration Council, American Immigration Lawyers Association, Define American, National Immigrant Justice Center, National Immigration Law Center, New Orleans Workers' Center for Racial Justice, Service Employees International Union, Southern Poverty Law Center, and United We Dream oppose Plaintiffs' request for a preliminary injunction against Defendants' new deferred action initiative.  The initiative, which is described in Secretary Jeh Johnson's November 20, 2014 memorandum (Defendants' Exhibit 7), and referred to below as the "Deferred Action Initiative," should be instituted without delay.

In this brief, *amici* supplement Defendants' brief by presenting information within their expertise that supports Defendants' position on the harms that an injunction would cause and where the public interest lies.  *Amici* demonstrate that the Deferred Action Initiative promises to have significant and widespread benefits to the U.S. economy, raising wages, increasing tax revenue, and creating new jobs.  In addition, *amici* show the benefits of the Deferred Action Initiative to individual immigrants, their families, and the communities in which they play an integral role.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

The parties to this case have addressed the nature and stage of the proceeding in their motion and opposition.  *Amici* do not agree with all of their statements, but address only two key issues here.  First, as Defendants have explained, the U.S. Department of Homeland Security ("DHS") maintains prosecutorial discretion under the Deferred Action Initiative to decide on a case-by-case basis whether to grant any particular individual's request.  Dkt. 38 at 12, 40-41. Plaintiffs are incorrect that DHS simply rubber stamps Deferred Action for Childhood Arrivals ("DACA") requests.  According to the latest statistics, almost six percent of DACA applications

were denied.  *Id.* at 41.  (It is hardly surprising that more than 90 percent of DACA applications are approved, as individuals with stronger equities have a greater incentive to pay the DACA application fee and identify themselves to the very government agency empowered to initiate removal proceedings.)  In the experience of *amici*, many of whom have been integrally involved in advising DACA applicants and their lawyers, some DACA denials are based solely on prosecutorial discretion.  That is, individuals who meet all of the DACA eligibility requirements are still denied deferred action.  Indeed, the DHS National Standard Operating Procedures for DACA contain a form used for denial of DACA applications that includes a box specifically allowing denials on the basis of discretion: "You do not warrant a favorable exercise of prosecutorial discretion because of other concerns."[1]

Second, all of the individuals who are eligible for the Deferred Action Initiative will have been in the country for at least five years.  Dkt. 38 at 11.  Accordingly, there is no reason to believe that this initiative will lead to a wave of new entries.  Indeed, following implementation of the initial DACA program, unauthorized immigration to the United States declined slightly and the average length of time that undocumented immigrants in the country have been here has increased.[2]

## STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

*Amici* agree with Defendants' presentation of the issues before the Court.  *See* Dkt. 38 at 12-13.

---

[1] The form is Appendix F on page 249, and is available at:
http://legalactioncenter.org/sites/default/files/DACA%20Standard%20Operating%20Procedures.pdf.
[2] Pew Research, *As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled*, available at: http://www.pewhispanic.org/2014/09/03/as-growth-stalls-unauthorized-immigrant-population-becomes-more-settled/.

**ARGUMENT**

*Amici* demonstrate below that a preliminary injunction would harm the U.S. economy, as well as individuals who would otherwise be granted deferred action, their families, and their communities.  Incurring this harm would also be against the public interest.

## I.     The Requested Injunction Would Harm The Economy

Numerous studies by the government, think-tanks, non-profit advocacy organizations, and academic researchers have shown that granting deferred action to the individuals covered by the November 20, 2014 executive action on immigration would have beneficial effects on the U.S. economy and U.S. workers.  Temporary work authorization for those immigrants who are eligible for deferred action will raise not only their wages, but the wages of all Americans, which will in turn increase government tax revenue and create new jobs.

The overwhelming consensus of economists is that immigration has a positive impact on the U.S. economy.  For instance, Dr. Giovanni Peri has concluded that "immigrants expand the U.S. economy's productive capacity, stimulate investment, and promote specialization that in the long run boosts productivity," and that "there is no evidence that these effects take place at the expense of jobs for workers born in the United States."[3]  Because immigrants and native-born workers tend to fill different kinds of jobs that require different skills, they complement each

---

[3] Giovanni Peri, *The Effect of Immigrants on U.S. Employment and Productivity*, FRBSF Econ. Letter 2010-26, Aug. 30, 2010, http://www.frbsf.org/economic-research/publications/economic-letter/2010/august/effect-immigrants-us-employment-productivity; *see also* Jack Strauss, *Does Immigration, Particularly Increases in Latinos, Affect African American Wages, Unemployment and Incarceration Rates?*, Dec. 8, 2012, available at Social Science Research Network, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2186978 (finding that cities with higher levels of immigration from Latin America experience lower unemployment rates, lower poverty rates, and higher wages among African Americans).

other rather than compete.[4]  This increases the productivity, and therefore the wages, of native-born workers.[5]  Further, the increased spending power of both immigrants and native-born workers bolsters U.S. businesses, which are then able to invest in new ventures.  The end result is more jobs for more workers, as well as upward pressure on wages created by higher demand for labor.[6]

Deferred action and temporary work authorization would amplify the positive impact that immigration has on the U.S. economy.  As the White House Council of Economic Advisors ("CEA") explains, "better task specialization and occupational reallocation as a result of work authorization for undocumented workers granted deferred action would allow for greater productivity – and thus higher wages – for native workers as well."[7]  Although small, the benefits for native-born American workers are real.  CEA estimates the wage gains to be 0.3

---

[4] Giovanni Peri, *supra* n.3; *see also* Heidi Shierholz, *Immigration and Wages: Methodological advancements confirm modest gains for native workers*, at 10-11 (Econ. Policy Inst., Briefing Paper No. 255, 2010), http://www.epi.org/files/page/-/bp255/bp255.pdf; Gianmarco I.P. Ottaviano and Giovanni Peri, *Rethinking the Effects of Immigration on Wages*, at 3-4 (Nat'l Bureau of Econ. Research, Working Paper No. 12497, 2006, revised 2008), http://www.nber.org/papers/w12497.pdf; Michael Greenstone and Adam Looney, *Ten Economic Facts About Immigration*, at 5 (The Hamilton Project, Brookings Inst., Policy Memo, 2010).
[5] Giovanni Peri, *supra* n.3; *see also* Heidi Shierholz, *supra* n.4, at 19 (estimating that, from 1994 to 2007, immigration increased the wages of native-born workers by 0.4 percent); Gianmarco I.P. Ottaviano and Giovanni Peri, *supra* n.4, at 4 (estimating that, from 1990 to 2004, immigration increased the wages of native-born workers by 0.7 percent); Michael Greenstone and Adam Looney, *supra* n.4, at 5.
[6] Giovanni Peri, *Rethinking the Effects of Immigration on Wages: New Data and Analysis from 1990-2004*, 5 Immigration Policy In Focus, No. 8, at 1 (American Immigration Law Foundation (now, American Immigration Council), Oct. 2006), http://www.immigrationpolicy.org/sites/default/files/docs/IPC%20Rethinking%20Wages,%2011-2006.pdf; White House Council of Economic Advisors ("CEA"), *The Economic Effects of Administrative Action on Immigration*, at 9 (Nov. 2014), available at http://www.whitehouse.gov/sites/default/files/docs/cea_2014_economic_effects_of_immigration_executive_action.pdf.
[7] CEA, *The Economic Effects of Administrative Action on Immigration*, *supra* n.6, at 9.

4

percent over the next ten years as a result of all of the executive actions (including that

concerning highly-skilled workers); 0.1 percent of these gains is attributable to deferred action.[8]

The federal government, as well as state and local governments, will enjoy higher tax

revenues as a result of the Deferred Action Initiative.  Not only will previously unauthorized

workers be brought into the formal workforce, with much higher rates of tax compliance, but

they will also be able to obtain better jobs and earn higher wages.  Estimates vary, but all agree

that the effect on tax revenue will be substantial.  The North American Integration and

Development Center ("NAID") at the University of California, Los Angeles, estimates that if 3.8

million people are eligible to receive deferred action, tax revenues would increase by

approximately $2.6 billion over the first two years.[9]  Similarly, the Center for American Progress

("CAP") estimates that if 4.7 million individuals are eligible to receive deferred action, payroll

tax revenues will increase by $2.87 billion in the first year and $21.24 billion over the first five

years.[10]  The effects on individual states are striking.  For instance, CAP estimates that in Texas

[8] *Id.* at 9-11; *see also* U.S. Chamber of Commerce, *Immigration Myths and Facts*, at 4-5 (2013), available at
https://www.uschamber.com/sites/default/files/legacy/reports/Immigration_MythsFacts.pdf.
(discussing 10-year projections (2010-2020) for retirement and economic growth, which make immigration "invaluable" in sustaining the U.S. work force).
[9] Dr. Raul Hinojosa-Ojeda with Maksim Wynn, *From the Shadows to the Mainstream: Estimating the Economic Impact of Presidential Administrative Action and Comprehensive Immigration Reform*, Appendix A at 32 (NAID, Nov. 21, 2014),
http://www.naid.ucla.edu/uploads/4/2/1/9/4219226/ucla_naid_center_report_-_estimating_the_economic_impact_of_presidential_administrative_action_and_comprehensive_immigration_reform.pdf.
[10] Patrick Oakford, *Administrative Action on Immigration Reform, The Fiscal Benefits of Temporary Work Permits*, at 9 (CAP, 2014), http://cdn.americanprogress.org/wp-content/uploads/2014/09/OakfordAdminRelief.pdf.

alone, granting deferred action and a temporary work permit to those individuals who would be eligible would result in a $338 million increase in tax revenues over five years.[11]

As a result of these particular benefits, deferred action will have the effect of growing the economy generally.  Researchers predict that over the next 10 years the executive actions will have the effect of increasing GDP by at least 0.4 percent ($90 billion) or as much as 0.9 percent ($210 billion).[12]  The CEA explains that this growth will be the result of (1) "An expansion in the size of the American labor force by nearly 150,000 workers over the next ten years, largely as a result of higher labor force participation"; and (2) "An increase in the productivity of American workers, both because of increased labor market flexibility and reduced uncertainty for workers currently in the United States and because of increased innovation from high-skilled workers."[13]  Moreover, as a result of high GDP and higher tax revenue, the CEA estimates that the executive actions on immigration will decrease federal deficits by between $25 and $60 billion over the next 10 years.[14]

## II.     The Requested Injunction Would Harm Individuals

### A.  The Economic Effects On Individuals Granted Deferred Action

The Deferred Action Initiative will create access to better jobs and improve the working conditions of many undocumented individuals now employed in the United States.  Because undocumented immigrants seek out jobs that minimize their risk of being identified and deported, they often do not work in jobs that best fit their skills and abilities, which would

---

[11] Center for American Progress, *Executive Action on Immigration Will Benefit State Economies*, available at http://www.scribd.com/doc/248189539/Topline-Fiscal-Impact-of-Executive-Action-Numbers-for-28-States, at 3.
[12] CEA, *The Economic Effects of Administrative Action on Immigration*, *supra* n.6, at 2.
[13] *Id.*
[14] *Id.*

maximize their earning potential.[15]  Making workers eligible for deferred action and work permits will allow them greater occupational mobility, enabling them to seek out a wider range of potential jobs.  Moreover, as CAP has explained, "[t]he interaction between our broken immigration system and employment and labor laws have made undocumented workers more susceptible to exploitation in the workplace, leading them to earn lower wages than they otherwise could."[16]  Eliminating the fear of retaliatory reporting and potential deportation will allow these workers to better protect their own workplace rights, leading to higher real wages and fewer violations of employment and labor laws and regulations.[17]

The increased wage benefit to those eligible for deferred action will be much larger. CAP estimates that "[t]emporary work permits would increase the earnings of undocumented immigrants by about 8.5 percent as they are able to work legally and find jobs that match their skills."[18]  Similarly, the Fiscal Policy Institute estimates that wages for those eligible for legal work status will increase by 5 to 10 percent.[19]  Overall, one estimate suggests that the individuals

---

[15] Patrick Oakford, *supra* n.10, at 6.

[16] *Id.* at 5.  Additionally, deferred action will not have a negative impact on employment for native-born workers.  The CEA explains: "Theory suggests that these policy changes would not have an effect on the long-run employment (or unemployment) rate . . . as the additional demand associated with the expanded economy would offset the additional supply of workers. . . . Consistent with the theory, much of the academic literature suggests that changes in immigration policy have no effect on the likelihood of employment for native workers."  CEA, *The Economic Effects of Administrative Action on Immigration*, *supra* n.6, at 9.

[17] Indeed, enabling undocumented workers to better protect their workplace rights will have a positive effect on all U.S. workers.  Not only will more workers have the opportunity to bring employers' violations to light, but diminishing the exploitation of these workers will prevent a race-to-the-bottom in workplace conditions.  *See* Patrick Oakford, *supra* n.10, at 6.

[18] *Id.* at 3.

[19] Fiscal Policy Institute, *President's Immigration Action Expected to Benefit Economy*, http://fiscalpolicy.org/presidents-immigration-action-expected-to-benefit-economy.

eligible to receive deferred action through this initiative "will experience a labor income increase of $7.1 billion dollars."[20]

The benefits of the Deferred Action Initiative for upward mobility are apparent from the impact of the initial DACA program, announced in June 2012.  According to the findings of a national survey of 1,402 young adults across the country who were approved for DACA through June 2013:

> Since receiving DACA, young adult immigrants have become more integrated into the nation's economic institutions.  Approximately 61% of DACA recipients surveyed have obtained a new job since receiving DACA.  Meanwhile, over half have opened their first bank account, and 38% have obtained their first credit card.[21]

In short, DACA created greater levels of contribution to the workforce by educated individuals who previously had limited employment opportunities.

### B.  Examples Of Benefits From Deferred Action

The stories of the individuals described below highlight the benefits of permitting the Executive Branch to roll out the Deferred Action Initiative unimpeded by judicial intervention. As Defendants have explained, the Deferred Action Initiative allows DHS to focus its limited resources on such priorities as national security and public safety.  Dkt. 38 at 51-53.  The initiative does so by identifying individuals who are low priority – because they were brought to the United States as children or have long-standing ties to the country and to U.S. citizen and lawful permanent resident children, and have no history of serious crimes – and allowing them to submit an application (including a fee) to remain in the country for a limited period of time,

---

[20] Dr. Raul Hinojosa-Ojeda with Maksim Wynn, supra n.9, Appendix A at 32.
[21] Roberto G. Gonzales and Veronica Terriquez, *How DACA is Impacting the Lives of Those who are now DACAmented: Preliminary Findings from the National UnDACAmented Research Project* (American Immigration Council, 2013), http://www.immigrationpolicy.org/just-facts/how-daca-impacting-lives-those-who-are-now-dacamented.

thereby freeing up enforcement resources for high priorities.  *See* Defendants' Exhibit 7.  The following are descriptions of some individuals who stand to benefit from deferred action.

## 1.  Individuals brought to the United States as children

Expanded DACA, like its predecessor, is designed to allow individuals who were brought to the United States as children, pursued educational opportunities, and lack a viable means to legalize their status, to apply for a temporary reprieve from deportation and obtain work authorization.  The eligible individuals often know only the United States as their home but, despite having been raised and educated here, lack the ability to work legally.  The original DACA program limited relief to individuals who were under age 31 as of June 15, 2012.  This cut-off date excluded numerous individuals.

**Jose Antonio Vargas.**  For example, Jose Antonio Vargas, who is now age 33, arrived in the United States at the age of 12 from Antipolo, Philippines.  He currently lives in California.  Jose Antonio is a well-known journalist and filmmaker who was part of the *Washington Post* team that won the Pulitzer Prize for coverage of the Virginia Tech shootings in 2011.  He is also a filmmaker and founder of the nonprofit media and culture campaign, "Define American," which seeks to elevate the immigration conversation in the United States.  Jose Antonio discovered he was undocumented at the age of 16 when he attempted to apply for a driver's license.  He is the only undocumented member of his family.  He missed the age cutoff for the original DACA program by a few months.  Jose Antonio is already an American entrepreneur and business owner who has made tremendous contributions to society through his films and advocacy work.  He has created numerous jobs for U.S. citizens despite lacking his own work

authorization, for which the expanded DACA initiative would finally allow Jose Antonio to apply.[22]

**Aly.**  Aly has lived in the United States for 25 years.  He arrived in 1985 from Dakar, Senegal at the age of 8.  He currently lives in Syracuse, New York, where he is an established community organizer.  He originally came to the United States as the son of a diplomat who worked at the United Nations.  He eventually traded his diplomatic visa for a student visa, graduated from Georgetown Preparatory School, attended the University of Pennsylvania, and completed his studies with a Bachelor of Arts in Political Science from Le Monye College in Syracuse.  He missed the age cutoff for the original DACA program, but would be able to apply under the recent expansion.[23]

**Juan Carlos.**  Juan Carlos is 21 years old and lives in North Carolina.  He is originally from El Salvador but came to the United States when he was 15 years old.  He was detained while crossing into the United States in 2008 and has a final order of removal.  Following his high school graduation in June 2012, Juan Carlos was accepted into five colleges.  However, he could not afford to attend because North Carolina does not provide in-state tuition for undocumented students.  To make ends meet, Juan Carlos started working with his father in construction.  After he fell on his third day of work, he did not return to that job because he knew that if he suffered a more serious workplace injury, he would not be able to afford the medical costs.

Juan Carlos is a community organizer who serves on the National Coordinating Committee of United We Dream and is a part of the Dream Organizing Network.  He was not eligible for the original DACA program because he came to the United States in 2008, but he

---

[22] Information on file with Karen Tumlin, NILC.
[23] Information on file with Karen Tumlin, NILC.

would qualify for the Deferred Action Initiative under the November 20, 2014 memorandum. Receiving deferred action would not only remove the constant fear of deportation that Juan Carlos faces but also would allow him to pursue higher education, to follow his dream of becoming an architect, and to better support his parents through lawful employment.[24]

**Dani.** Dani entered the U.S. lawfully from the Philippines at the age of 13 with her mother, who had a visa to work in a domestic capacity for a World Bank employee. She has lived in the United States since November 2008, attended school in the United States, and received her diploma from a high school in the District of Columbia. Despite having good grades, Dani could not qualify for financial aid due to her immigration status. The original announcement of DACA did not help Dani as she entered after the June 15, 2007 cutoff. She met the other eligibility criteria for DACA at that time. The recent expansion of DACA to those who entered between June 15, 2007, and January 1, 2010, would allow Dani to apply.[25]

### 2. Parents of U.S. citizens and lawful permanent residents

Certain other individuals with strong ties to the United States will become eligible for deferred action based on the immigration status of their children.

**Nery.** For example, Nery is a 33-year-old citizen of El Salvador who has been in the United States since 2007 and currently resides in Illinois. He is the father of two U.S. citizen sons, one of whom has been diagnosed with Fragile X syndrome, developmental delays, and a heart murmur. Nery's son is completely dependent on therapy, constant care, and access to hospitals and cardiologists in the United States. His son cannot communicate his needs, cannot feed himself, and has limited mobility.

---

[24] *See* Letter from Julieta Garibay, Co-founder and Deputy Advocacy Director of United We Dream, to Karen Tumlin, NILC (Dec. 29, 2014) (on file with NILC).

[25] *See* Letter from Andres C. Benach, Esq., to Melissa Crow, American Immigration Council (Dec. 29, 2014) (on file with Immigration Council).

In 2008, Nery was in a car accident in which another driver hit his car. Because Nery did not have a driver's license, he was arrested and subsequently transferred to immigration custody. On the day of his immigration court hearing, his wife went into labor. Birth complications made it impossible for Nery to leave his wife's side. He contacted his attorney who incorrectly advised him that he could stay with his wife during her labor. As a result, he received an *in absentia* order of removal.

In 2011, Nery was arrested after being pulled over for speeding when he was driving his sick son to the hospital. The police took Nery, but left his wife and two children on the curb with no way to get to the hospital for timely medical help. With the assistance of the National Immigrant Justice Center in Chicago, Nery was able to benefit from a temporary exercise of prosecutorial discretion. However, Nery still needs to renew his status and could be deported at any time, which would have a disastrous impact on his family. Nery is eligible to apply for deferred action and work authorization, which would enable him to provide for his family with more stability and a reduced fear of separation.[26]

**Denis and Reina.** Denis has lived in the U.S. for eleven years. His wife, Reina, has lived in the U.S. since 2007. Both are from Honduras. Denis left Honduras in 2003 because he feared for his life. His grandmother was murdered in front of their home in retaliation for filing a police complaint, and he was afraid that he would also be targeted.

Denis has lived in the New Orleans area since Hurricane Katrina devastated the Gulf Coast South. A skilled roofer and construction worker, he came to the city to contribute to the rebuilding of New Orleans after the storm. Denis and Reina are the parents of a one-year-old son who is a U.S. citizen. Unfortunately, their young son has been diagnosed with respiratory

---

[26] *See* Letter from Charles Roth, Esq., to Karen Tumlin, NILC (Dec. 29, 2014) (on file with NILC).

complications that require regular physician visits as well as emergency care.  Denis' income is the family's main source of financial support, and multiple physicians have advised him that his continued presence in the United States is critical to ensuring that his son receives adequate medical care.  Denis is subject to a final removal order, which was issued following proceedings that he did not adequately understand and at which he was forced to represent himself.  Reina has had no contact with immigration authorities.  Neither Denis nor Reina has a criminal record.

Last year, Denis was arrested during an immigration sweep at an apartment complex where the couple was searching for a new home.  Denis was granted a temporary stay of removal, for which he must reapply every few months, leaving him and his family in constant fear that he will be deported.  The Deferred Action Initiative would protect Denis and Reina from deportation, allowing their family to remain together and maximizing the chances for a safe, healthy future for their son.  Moreover, deferred action would enable them to continue to contribute to the economy and their community.  If granted deferred action, Denis plans to expand his construction business, and Reina plans to open a coffee and pastry business. Deferred action would also allow the couple to continue their work as leading members of the New Orleans Workers' Center for Racial Justice and its community project, the Congress of Day Laborers.[27]

**Rebeca.**  Rebeca (a pseudonym to protect her identity) entered the United States from Mexico in 2000 and currently resides in Indiana.  She has six children, four of whom are U.S. citizens.  One of her children has DACA.  During her time in the United States, Rebeca suffered years of physical and verbal abuse at the hands of her domestic partner.  Her abuser, who was often drunk, would yell at her and beat her in front of her children.  On one occasion he punched

---

[27] *See* Letter from Yihong "Julie" Mao, Esq., to Karen Tumlin, NILC (Dec. 29, 2014) (on file with NILC).

her in the stomach while she was pregnant; on another occasion, he threatened her with a knife. The abuser was arrested for felony battery and eventually deported.  As the mother of U.S. citizen children, Rebeca could benefit from deferred action, which would enable her to continue to raise her children in the only country they have ever known.[28]

**Rosa Maria.**  Rosa Maria is 61 years old and was born in Hermosillo, Mexico.  She came to the United States more than 15 years ago on a tourist visa to visit California.  She stayed after her visa expired hoping that she could improve her life by earning a better living and helping her children get access to a good education.  She originally came to the United States alone without her children, who remained in Mexico in the care of her adult children.  Her youngest daughter, Dulce, came to join her in July 2000 and they moved to Arizona.

Living in the United States has allowed Rosa Maria's daughter to get a good education and to succeed professionally.  Dulce graduated from Arizona State University in 2009 with a degree in electrical engineering and has been a leader in the Arizona Dream Act Coalition, which helps promote the rights of undocumented youth in Arizona.  However, living in the United States has also been challenging for Rosa Maria, who has been separated from her family in Mexico.  Because of her lack of immigration status, she has had to miss the funerals of three of her siblings and one of her parents as well as the university graduation of one of her children. Rosa Maria has U.S. citizen siblings, and her daughter Dulce is now a lawful permanent resident, which qualifies Rosa Maria to apply for the Deferred Action Initiative.  If granted deferred action, Rosa Maria would be in a better position to support her family.[29]

---

[28] *See* Letter from Charles Roth, Esq., to Karen Tumlin, NILC (Dec. 29, 2014) (on file with NILC).

[29] Information on file with Nora Preciado, NILC.

**Sara and Juan.**  Sara and Juan are the parents of four children, two of whom are U.S. citizens.  They currently live in Austin, Texas, where they are involved in their church.  Sara and Juan are originally from Guanajuato, Mexico, and have lived in the United States for 12 years and 14 years, respectively.  Both of them would be eligible to apply for deferred action because of their two U.S. citizen children.  If Sara and Juan are approved for deferred action, their children would no longer have to worry about the possibility that their parents might be deported while they are at school or merely going about their daily activities.  To Sara and Juan, having deferred action would mean a sense of peace and opportunity for their family.  They would also finally feel able to invest in a home without the fear of losing it.[30]

These stories illustrate the strong benefits the Deferred Action Initiative will provide to our nation's families, communities, and economy.  These benefits, as well as those Defendants discuss, demonstrate that a preliminary injunction would cause significant harms and would be against the public interest.

## CONCLUSION

For the reasons in Defendants' brief and the reasons above, the preliminary injunction should be denied.

Dated: December 29, 2014                                Respectfully submitted,

                                                        /s/ Jonathan Weissglass

                                                        STEPHEN P. BERZON*
                                                        JONATHAN WEISSGLASS (*pro hac vice*
                                                          admission pending)
                                                          Cal. State Bar No. 185008
                                                          Attorney-in-Charge for *Amici*
                                                        ERIC P. BROWN*

---

[30] *See* Letter from Julieta Garibay, Co-founder and Deputy Advocacy Director of United We Dream, to Karen Tumlin, NILC (Dec. 29, 2014) (on file with NILC).

Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
jweissglass@altshulerberzon.com

JUDITH A. SCOTT*
DEBORAH L. SMITH*
Service Employees International Union
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
Telephone: (202) 730-7455

*Counsel for Service Employees International Union*

MELISSA CROW*
American Immigration Council
Suite 200, 1331 G Street, NW
Washington, DC  20005
Telephone: (202) 507-7523

LINTON JOAQUIN*
KAREN C. TUMLIN*
NICHOLAS ESPIRITU*
NORA A. PRECIADO*
MELISSA S. KEANEY*
ALVARO M. HUERTA*
National Immigration Law Center
3435 Wilshire Blvd., Suite 2850
Los Angeles, CA 90010
Telephone: (213) 639-3900

*Counsel for American Immigration Council,
American Immigration Lawyers Association, Define
American, National Immigrant Justice Center,
National Immigration Law Center, New Orleans
Workers' Center For Racial Justice, Southern
Poverty Law Center, and United We Dream*

16

JENNIFER J. ROSENBAUM *
YIHONG "JULIE" MAO*
New Orleans Workers' Center For Racial Justice
217 N. Prieur Street
New Orleans, LA 70112
Telephone: (504) 309-5165

*Counsel for New Orleans Workers' Center For Racial Justice*

\* Not admitted in this jurisdiction

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing motion and the proposed order will be delivered electronically on December 29, 2014, to counsel for Plaintiffs and Defendants through the District's Electronic Case Filing system.

/s/ Jonathan Weissglass