# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

ELIONARDO JUAREZ-ESCOBAR,

        Defendant.

Criminal No. 14-0180
ELECTRONICALLY FILED

## MEMORANDUM OPINION AND ORDER OF COURT RE: APPLICABILITY OF PRESIDENT OBAMA'S NOVEMBER 20, 2014 EXECUTIVE ACTION ON IMMIGRATION TO THIS DEFENDANT

On November 20, 2014, President Obama announced an Executive Action on immigration, which will affect approximately four million undocumented immigrants who are unlawfully present in the United States of America. This Executive Action raises concerns about the separation of powers between the legislative and executive branches of government. This core constitutional issue necessitates judicial review to ensure that executive power is governed by and answerable to the law such that "the sword that executeth the law is in it, and not above it." Laurence Tribe, *American Constitutional Law*, 630 (3ed.-Vol. 1) (2000), quoting James Harrington, *The Commonwealth of Oceana* 25 (J.G.A. Pocock ed. 1992)(originally published 1656).

The Court, in this Memorandum Opinion, addresses the applicability of this Executive Action to Elionardo Juarez-Escobar, an undocumented immigrant, who has pled guilty to re-entry of a removed alien in violation of 8 U.S.C. § 1326, and who is awaiting sentencing.

# I.     Introduction[1]

Defendant is approximately 42 years of age. He was born in Honduras and his first language is Spanish. On October 21, 2005, Defendant was arrested in Lordsburg, New Mexico, by the United States Border Patrol. He was subsequently issued an Expedited Removal Order (via an administrative procedure), and was formally removed from the United States on December 5, 2005.

During the change of plea hearing held by this Court, Defendant testified, through a court-appointed interpreter, and with the assistance of court-appointed counsel, that he returned to the United States in the following manner: At an unknown time after 2005, Defendant traveled by land from Mexico and entered into the United States through Texas. While in Texas, Defendant saw an advertisement in a local newspaper for transportation vans. Defendant responded to the advertisement and paid an individual to drive him from Texas to New York. Once in New York, a friend drove Defendant to Pittsburgh to be re-united with his brother.

Defendant's brother is a citizen of the United States and owns a landscaping business in Pittsburgh. Defendant has worked for his brother's landscaping business for at least two (2) years. He has also done painting and construction work for friends while he has resided in the United States. Defendant presumably came to the United States in an attempt to make money and in search of a better quality of life than he had in Honduras. Defendant attempted to "file" income taxes for "a couple of years," but was unable to do so because he does not have a Social Security number.

---

[1] Much of the information known about Defendant and set forth in Section "I.," *infra.*, was obtained via a Pre-Plea Presentence Investigation Report. Doc. No. 20. This Court ordered the Probation Office to prepare this Report on September 10, 2014, covering Defendant's criminal and work history. This Report, like all Presentence Investigation Reports, was filed under seal. Much of what is contained in the Report was reiterated by Defendant at his change of plea hearing. Id. Defendant communicated with his Counsel and the Court through a certified court-appointed interpreter.

On April 7, 2014, Defendant was stopped by a New Sewickley Township Police Officer after he drove his vehicle around a traffic stop. The Officer noticed open beer cans in the back seat of the vehicle and observed that Defendant might be intoxicated. Henry Gomez, a minor, was also present in the vehicle. Defendant failed field sobriety tests and submitted to a blood test at Heritage Valley Medical Center-Beaver. His blood alcohol level was .180%, which is above Pennsylvania's legal limit of alcohol of .08%. Defendant was released pending the filing of a criminal complaint. As a result of this encounter, Defendant was charged with two (2) counts of Driving under the Influence of Drugs or Alcohol, Corruption of Minors, Selling/Furnishing Liquor to a Minor, and Driving Without a License.[2] CR 208-2014/T468050-2.

On June 23, 2014, Defendant's immigration status was referred to the United States Department of Homeland Security ("Homeland Security"). Homeland Security determined that Defendant was unlawfully present in the United States because he had been removed from the United States on December 5, 2005, and had thereafter re-entered the country without the permission of the United States Attorney General or the Secretary of the Department of Homeland Security.

## II.     Procedural Posture

### A. How Defendant's Case Came to be before this Court

Defendant appears before this Court, in part, because of arguably unequal and arbitrary immigration enforcement in the United States.

As noted above, a New Sewickley Township Police Officer arrested Defendant and Homeland Security was notified of his potential undocumented status following his arrest. The

---

[2] During the October 21, 2014, change of plea hearing, Defendant denied purchasing alcohol for a minor or providing alcohol to the minor passenger. Defendant stated that the minor passenger "had not been drinking." Defendant also denied that he was driving without a license and contended that he had an international driver's license.

Commonwealth of Pennsylvania is not a "sanctuary state." There is very little "official"
information concerning "sanctuary cities" or "sanctuary states." In *Veasey v. Perry*, 13-CV-
00193, 2014 WL 5090258, *17, fn 149 (S.D. Tex. October 09, 2014), a Federal Judge for the
United States District Court for the Southern District of Texas defined "sanctuary cities" as
"cities that have refused to fund law enforcement efforts to look for immigration law violators,
leaving that to the federal government. S.J. of Tex., 82nd Leg., R.S. 8 (2011) (designating the
elimination of sanctuary cities as a legislative emergency)."

Had Defendant been arrested in a "sanctuary state" or a "sanctuary city," local law
enforcement likely would not have reported him to Homeland Security. If Defendant had not
been reported to Homeland Security, he would likely not have been indicted for one count of re-
entry of a removed alien in violation of 8 U.S.C. § 1326.

Further, neither a federal indictment nor deportation proceedings were inevitable, even
after Immigration and Customs Enforcement ("ICE"), a division of Homeland Security, became
involved. In 2013, ICE personnel declined to bring charges against thousands of undocumented
immigrants who had previous criminal convictions.[3]

Therefore, Defendant possibly would not be facing sentencing and/or deportation if he
had been arrested under the same circumstances, but in another city/state or if different ICE
personnel had reviewed his case.

---

[3] The Court notes that an Immigration Enforcement Report, for the fiscal year 2013, by ICE, indicates that
ICE reported 722,000 encounters with undocumented immigrants, most of whom came to their attention
after incarceration for a local arrest. However, this Report also notes that the ICE officials followed
through with immigration charges for only 195,000 of these individuals. Among those released by ICE,
68,000 had criminal convictions, and 36,007 of the convicted undocumented immigrants freed from ICE
custody, in many instances, had multiple convictions, some of which included: homicide, sexual assault,
kidnapping, aggravated assault, aggravated assault, stolen vehicles, dangerous drugs, drunk or drugged
driving, and flight/escape. See FY 2013 ICE Immigration Removals, December 2013 accessed through
http://www.ice.gov/removal-statistics/.

4

### B. Procedural History to Date

Defendant has been incarcerated since July 22, 2014, when he was arrested and detained by Homeland Security. On July 29, 2014, a grand jury returned an indictment against Defendant for one count of re-entry of a removed alien in violation of 8 U.S.C. § 1326. Doc. No. 1. Defendant appeared before United States Magistrate Judge Maureen P. Kelly for an Initial Appearance and, a few days later, for an Arraignment. Doc. Nos. 6, 12. Defendant, through a court-appointed interpreter, and with assistance of counsel, pled not guilty to the charge. Doc. No. 13.

The Court was informed of Defendant's decision to change his plea to guilty and proceed to sentencing in late August, 2014. The Court scheduled a hearing thereon for October 21, 2014, based upon the availability of a certified court-appointed interpreter. 09/09/2014 Text Order. The Court ordered the United States Probation Office to file a Pre-Plea Presentence Investigation Report addressing Defendant's criminal and work history in preparation for the change of plea and sentencing hearing. Doc. No. 19.

On October 21, 2014, the Court held a hearing, which Defendant, his counsel, and Assistant United States Attorney Eberle attended. Doc. No. 24. There was no plea agreement in this case.

During the hearing, the Court informed Defendant of his rights, and the consequences of waiving those rights, including potential deportation, if Defendant pled guilty. Id. The Assistant United States Attorney outlined that Defendant had been physically removed from the United States in 2005, and had been informed, at that time, that he could not re-enter the United States without obtaining permission from the United States Attorney General or the Secretary of the Department of Homeland Security prior to any re-entry into the country. Defendant was found

5

to be "in the United States" as a result of his April 7, 2014, encounter with law enforcement. Defendant did not have permission from the United States Attorney General or the Secretary of the Department of Homeland Security to be in the United States.

During the change of plea hearing, Defendant accepted responsibility for his actions, evidenced that he understood his rights, and proceeded to waive his right to a trial and pled guilty to one count of re-entry of removed alien, as charged in the indictment. Doc. No. 25. The Court asked the Assistant United States Attorney to inquire into whether Defendant's employers had reported Defendant's wages for federal tax purposes. The sentencing hearing will be scheduled by this Court.

Historically, this Court has sentenced defendants who are charged with unlawfully re-entering the United States to time-served (normally within an advisory sentencing guideline range of 0-6 months) and one (1) year supervised release with the added condition that the defendant shall not re-enter the United States, without lawful authorization. The Court also customarily orders that supervised release be suspended due to anticipated removal/deportation.

In this case, Defendant's applicable advisory guideline range, based upon an offense level of 6 and a criminal history category of I, is 0-6 months imprisonment. Doc. No. 20. The date of January 22, 2015, six (6) months after Defendant's detention by Homeland Security, marks the end of this time period. A term of supervised release of not more than one (1) year may also be imposed as part of Defendant's sentence. Id.

### C. Request for Legal Briefing by This Court

On November 24, 2014, in light of the recently announced Executive Action, the Court requested counsel for the Government and for Defendant to brief the following issues, on or before noon on December 5, 2014:

1. Does the Executive Action announced by President Obama on November 20, 2014, apply to this Defendant?

   A. If yes, please provide the factual basis and legal reasoning.

   B. If no, please provide the factual basis and legal reasoning.

2. Are there any constitutional and/or statutory considerations that this Court needs to address as to this Defendant? If so, what are those constitutional and/or statutory considerations, and how should the Court resolve these issues?

Doc. No. 26. The Court also invited any interested *amicus* to submit briefs by the same date. Id. Any party could file a response thereto on or before noon on December 11, 2014. Id.

The Government, in its four (4) page response thereto, contended that the Executive Action is inapplicable to criminal prosecutions under 8 U.S.C. § 1326(a), and argued that the Executive Action solely relates to civil immigration enforcement status. Doc. No. 30.

Defense Counsel indicated that, as to this Defendant, the Executive Action "created an additional avenue of deferred action that will be available for undocumented parents of United States citizen[s] or permanent resident children."[4] Doc. No. 31, 3. In addition, Defense Counsel noted that the United States Citizenship and Immigration Services ("USCIS") "has announced that certain citizens of Honduras living in the United States are eligible to extend their Temporary Protected Status (TPS) so as to protect them from turmoil facing the citizens of that nation." Id. at 5.

---

[4] As of this writing, it is still unknown whether this Defendant is the father or step-father of a United States citizen or permanent resident. In addition, as Defense Counsel points out in his Brief, the "parental" form of deferred action, as described by President Obama in his Executive Action, will not be available for at least 180 days. However, depending on the length of sentence imposed by this Court, and/or the options that Defendant may choose given the status of his criminal case (which will be discussed *infra.*), the 180 days may elapse before Defendant appears before an Immigration Judge in a civil removal proceeding.

7

### III.  Is President Obama's November 20, 2014 Executive Action on Immigration Constitutional or Unconstitutional?

#### A. Separation of Powers Under the Constitution

Under our system of government in the United States, Congress enacts laws and the

President, acting at times through agencies, "faithfully execute[s]" them. U.S. Const., Art. II, § 3

(the "Take Care Clause"; also known as the "Faithful Execution Clause").

In *N.L.R.B. v. Canning,* the United States Supreme Court reiterated that:

> [T]he separation of powers can serve to safeguard individual liberty . . .
> and that it is the "duty of the judicial department" – in a separation-of-
> powers case as in any other – "to say what the law is," *Marbury v.*
> *Madison,* 1 Cranch 137, 177, 2 L.Ed. 60 (1803).

573 U.S. ___, 134 S.Ct. 2550, 2559-60 (Jun. 26, 2014).

The Court requested that the parties provide briefs to assist the Court in determining

whether the Executive Action on immigration announced on November 20, 2014, would impact

the sentencing of this Defendant. Specifically, this Court was concerned that the Executive

Action might have an impact on this matter, including any subsequent removal or deportation,

and thereby requiring the Court to ascertain whether the nature of the Executive Action is

executive or legislative.

#### B. Substance of the Executive Action

On November 20, 2014, President Obama addressed the Nation in a televised speech,

during which he outlined an Executive Action on immigration. Text of Speech:

http://www.whitehouse.gov/the-press-office/2014/11/20/remarks-president-address-nation-

immigration. President Obama stated that the immigration system is "broken," in part because

some "play by the rules [but] watch others flout the rules." President Obama outlined that he had

taken actions to secure the borders and worked with Congress in a failed attempt to reach a

legislative solution. However, he stated that lack of substantive legislation necessitated that his

administration take the following actions "that will help make our immigration system more fair

and more just":

> First, we'll build on our progress at the border with additional resources for our
> law enforcement personnel so that they can stem the flow of illegal crossings, and
> speed the return of those who do cross over.

> Second, I'll make it easier and faster for high-skilled immigrants, graduates, and
> entrepreneurs to stay and contribute to our economy, as so many business leaders
> have proposed.

> Third, we'll take steps to deal responsibility with the millions of undocumented
> immigrants who already live in our country.

As to this third action, which may affect Defendant, President Obama stated that he

would prioritize deportations on "actual threats to our security." The President also announced

the following "deal":

> If you've been in America for more than five years; if you have children who are
> American citizens or legal residents; if you register, pass a criminal background
> check, and you're willing to pay your fair share of taxes -- you'll be able to apply
> to stay in this country temporarily without fear of deportation. You can come out
> of the shadows and get right with the law. That's what this deal is.

Thus, in essence, the President's November 20, 2014 Executive Action announced two

different "enforcement" policies: (1) a policy that expanded the granting of deferred action status

to certain categories of undocumented immigrants; and, (2) a policy that updated the

removal/deportation priorities for certain categories of undocumented immigrants.

## 1. Deferred Action

The first policy (on deferred action) provides that individuals who fall within each of

these proscribed categories would not be deported by President Obama's administration. ("All

we're saying is that we're not going to deport you."). According to the President, his Executive

Action does not grant citizenship, the right to permanent residence, or entitlement to benefits of

citizenship, and does not apply to individuals who: (1) have "recently" come to the United

States; or (2) those who might come in the future. However, the Executive Action does "create" substantive rights, including legal work authorization documentation, access to social security numbers, and other tangible benefits.

This Executive Action has been implemented through Memoranda by the Secretary of the Department of Homeland Security. Ex. Jeh Charles Johnson, Secretary, U.S. Department of Homeland Security, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who are the Parents of U.S. Citizens or Permanent Residents*, November 20, 2014. Under the Executive Action and applicable administrative guidance, an undocumented immigrant would be eligible for deferred action if he or she applied for deferred action and if he or she:

(1) is not an enforcement priority under Department of Homeland Security Policy;

(2) has continuously resided in the United States since before January 1, 2010;

(3) is physically present in the United States both when Homeland Security announces its program and at the time of application for deferred action;

(4) has a child who is a U.S. citizen or Lawful Permanent Residence; and

(5) presents "no other factors that, in exercise of discretion, make[] the grant of deferred action inappropriate."

Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, 38 Op. O.L.C., 25, November 19, 2014, citing Johnson Deferred Action Memorandum at 4.

## 2. Removal Deportation Priorities

The Department of Homeland Security has issued a Memorandum to reflect the priorities

for deportation referenced in President Obama's November 20, 2014 Executive Action, which

will become effective on January 5, 2015. Johnson, *Policies for the Apprehension, Detention

and Removal of Undocumented Immigrants*, November 20, 2014. Individuals who may

otherwise qualify for deferred deportation under the Executive Action, will not be permitted to

apply for deferred action if they are classified in one of the three (3) categories of individuals

who will be prioritized for deportation. The Secretary of Homeland Security provided that the

civil immigration enforcement priorities (apprehension and removal) will be as follows:

- Priority 1 (threats to national security, border security, and public safety), which
  includes those who: are engaged in or suspected or terrorism or espionage; are
  apprehended attempting to enter the United States; have been convicted of an
  offense involving gangs; have been convicted of a felony "other than a state or
  local offense for which an essential element was the alien's immigration status";
  and have been convicted of an "aggravated felony";

- Priority 2 (misdemeanants and new immigration violators), which includes those
  who have been: convicted of three or more misdemeanor offenses arising out of
  three separate incidents (other than minor traffic offenses or state or local offenses
  involving their immigration status); convicted of a "significant misdemeanor";
  apprehended after "unlawfully entering or re-entering the United States and
  cannot establish to the satisfaction of an immigration officer that they have been
  physically present in the United States continuously since January 1, 2014"; and
  found to have significantly abused the visa or visa waiver programs; and

11

- Priority 3 (other immigration violations), which includes those who have been
  issued a final order of removal on or after January 1, 2014.

Johnson, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants*
(emphasis added).

The Memorandum sets forth that individuals in all three (3) of these priority groups
should be removed from the United States <u>unless</u> they qualify for asylum or other forms of
relief.[5] Further, undocumented immigrants who are not within these categories may be removed
"provided, in the judgment of an ICE Field Office Director, removing such an alien would serve
an important federal interest." Id. All decisions regarding deportation are to be based on the
totality of the circumstances. Id.

### C. Differentiation Between Executive Action and Executive Order

Authority for Executive Actions and Orders must be based upon: (1) the Constitution; (2)
statutes or treaties; or (3) the President's inherent authority to ensure that the laws are "faithfully
executed." These powers are limited, even during times of national crisis. Tribe, *American
Constitutional Law* at 670-71. Although the Framers of the Constitution and Congress have not
defined the instruments of Presidential authority, including executive orders and executive
actions, these terms are not interchangeable. John Contrubis, *Executive Orders and
Proclamations*, Congressional Research Service Report for Congress (95-772 A)(updated March
9, 1999).

The House Government Operations Committee has provided the following description of
an Executive Order:

---

[5] The Brief submitted on behalf of Defendant noted that certain citizens of Honduras living in the United
States are eligible to extend their Temporary Protected Status ("TPS") so as to protect them from turmoil
facing the citizens of that country. Defendant is a citizen of Honduras. Doc. No. 31. Given just these
facts, this Court does not know as of this writing if Defendant would be among the individuals who would
be eligible to qualify for asylum or other forms of relief.

12

Executive orders and proclamations are directives or actions by the President. When they are founded on the authority of the President derived from the Constitution or statute, they may have the force and effect of law . . . . In the narrower sense Executive [O]rders are generally directed to, and govern actions by, Government officials and agencies. They usually affect private individuals only indirectly.

Staff of House Comm. on Government Operations, 85th Cong., 1st Sess., *Executive Orders and Proclamations: A Study on the Use of Presidential Powers* (Comm. Print 1957). Executive Orders are required to be published in the Federal Register. 44 U.S.C. § 1505.

Federal Courts can review the constitutionality of Executive Orders. In two instances, Federal Courts have found that specific Executive Orders were unconstitutional. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (the United States Supreme Court found that President Truman's Executive Order authorizing the Secretary of Commerce to control operation of the majority of the country's steel mills was unconstitutional because President Truman acted without constitutional or statutory authority); *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996), rehearing denied, 83 F.3d 442 (D.C. Cir. 1996) (the United States Court of Appeals for the District of Columbia Circuit found a 1995 Executive Order issued by President Clinton, which prevented employers who were performing under federal contracts from hiring strike breakers, to be unlawful because it impermissibly prevented employers from hiring their chosen workers).

Executive Actions do not have a legal definition. Executive Actions have been used by Presidents to call on Congress or his Administration to take action or refrain from taking action (*e.g.*, Executive Actions, issued in January 2014 by President Obama, re. boosting federal background-checks for firearm purchases). Executive Actions are not published in the Federal Register.

13

### D. President Obama's Historic Position that Executive Action/Executive Orders on Immigration Would Exceed His Executive Authority

President Obama has stated that he is constrained from issuing an Executive Action/Order on immigration because such action would exceed his executive powers as demonstrated by the following:

- America is a nation of laws, which means I, as the President, am obligated to enforce the law. I don't have a choice about that. That's part of my job. But I can advocate for changes in the law so that we have a country that is both respectful of the law but also continues to be a great nation of immigrants. . . . With respect to the notion that I can just suspend deportations through executive order, that's just not the case, because there are laws on the books that Congress has passed . . . [W]e've got three branches of government. Congress passes the law. The executive branch's job is to enforce and implement those laws. And then the judiciary has to interpret the laws. There are enough laws on the books by Congress that are very clear in terms of how we have to enforce our immigration system that for me to simply through executive order ignore those congressional mandates would not conform with my appropriate role as President. March 28, 2011, http://www.whitehouse.gov/the-press-office/2011/03/28/remarks-president-univision-town-hall

- . . . sometimes when I talk to immigration advocates, they wish I could just bypass Congress and change the law myself. But that's not how a democracy works. What we really need to do is to keep up the fight to pass genuine, comprehensive reform. That is the ultimate solution to this problem. That's what I'm committed to doing. May 10, 2011, http://www.whitehouse.gov/the-press-

14

office/2011/05/10/remarks-president-comprehensive-immigration-reform-el-paso-
texas

- Now, I swore an oath to uphold the laws on the books. . . . Now, I know some
  people want me to bypass Congress and change the laws on my own. . . . Believe
  me, the idea of doing things on my own is very tempting. I promise you. Not just
  on immigration reform. But that's not how - - that's not how our system works.
  That's not how our democracy functions. That's not how our Constitution is
  written. July 25, 2011, http://www.whitehouse.gov/the-press-
  office/2011/07/25/remarks-president-national-council-la-raza

President Obama's statements evidence that prior to November 20, 2014, he viewed an
Executive Action, similar to the one issued, as beyond his executive authority.

President Obama has also evidenced that systematic categories of delayed deportations
would be impracticable and unfair.

- [T]here are those in the immigrants' rights community who have argued
  passionately that we should simply provide those who are [here] illegally with
  legal status, or at least ignore the laws on the books and put an end to deportation
  until we have better laws. . . . I believe such an indiscriminate approach would be
  both unwise and unfair. It would suggest to those thinking about coming here
  illegally that there will be no repercussions for such a decision. And this could
  lead to a surge in more illegal immigration. And it would also ignore the millions
  of people around the world who are waiting in line to come here legally.
  Ultimately, our nation, like all nations, has the right and obligation to control its
  borders and set laws for residency and citizenship. And no matter how decent

15

> they are, no matter their reasons, the 11 million who broke these laws should be
> held accountable. July 1, 2010, http://www.whitehouse.gov/the-press-
> office/remarks-president-comprehensive-immigration-reform

While President Obama's historic statements are not dispositive of the constitutionality of his Executive Action on immigration, they cause this Court pause. The Court must examine whether this Executive Action is within the President's executive authority, and whether it would unjustly and unequally impact this Defendant in light of this Court's obligation to avoid sentencing disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6).

## E. The Obama Administration's Justification for the Executive Action

### 1. Opinion of the Office of Legal Counsel

On November 19, 2014, the Office of Legal Counsel of the United States Department of Justice issued a Memorandum Opinion for the Secretary of Homeland Security and the Counsel to the President, which addressed the following: (1) whether, in light of Homeland Security's limited resources to remove undocumented immigrants, it would be permissible for the Department to implement a policy "prioritizing the removal of certain categories of aliens over others"; and (2) whether it would be permissible for Homeland Security to extend deferred action to certain aliens who are the parents[6] of children who are present in the United States. Thompson, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, 38 Op. O.L.C ___.

---

[6] The Memorandum Opinion does not state whether grandparents are included within the term "parents." If not, such an arbitrary and anti-grandparent position demonstrates a lack of true understanding of "family."

16

The Office of Legal Counsel advised that the then proposed Executive Action would be

within the lawful scope of Homeland Security's discretion to enforce immigration laws because:

- Congress has passed legislation permitting certain classes of individuals to be eligible for deferred action (*e.g.*, immediate family of Lawful Permanent Residents who were killed on September 11, 2001), USA PATRIOT Act of 2001, Pub. L. No. 107-56 § 423(b), 115 Stat. 272, 361;

- Congressional legislation emphasizes uniting undocumented immigrants with lawfully present family members;

- Congress "has never acted to disapprove or limit" categorical deferred action;

- Congress has enacted legislation "appearing" to endorse deferred deportation programs;

- The Executive Action reflects considerations within the Agency's expertise;

- The Executive Action is of temporary duration; and

- Immigration officials retain discretion to screen undocumented immigrants on a case-by-case basis to determine whether their application for deferred deportation is approved, thereby avoiding the creation of a rule-like entitlement to immigration relief or abdicating DHS's enforcement responsibilities for a particular class of aliens.

### 2.  President Obama's Justification

President Obama contended, in his televised address, that his Executive Action is

"lawful" and akin to actions taken by other Presidents, both Republican and Democratic.  The

sole citation to authority in the President's speech was from the Old Testament. Exodus 22:21

(paraphrased by President Obama as "we shall not oppress a stranger, for we know the heart of a

stranger – we were strangers once, too.").  President Obama has stated: (1) that his Executive

Action was justified by Congressional inaction, and (2) that his Executive Action is authorized

by his prosecutorial discretion to defer immigration actions.

### F. The November 20, 2014 Executive Action on Immigration is Unconstitutional

In determining whether the Executive Action is applicable to this Defendant, this Court

must first determine whether the Executive Action is constitutional. The Court is bound to

ensure that the Constitution's structural safeguards are preserved. *N.L.R.B. v. New Vista Nursing*

*and Rehabilitation*, 719 F.3d 203, 241 (3d Cir. 2013), *citing Baker v. Carr*, 369 U.S. 186, 211

(U.S. 1962). This role cannot be shared with other branches of government "anymore than the

president can share his veto power or Congress can share its power to override vetoes." *Id. See*

*also United States v. Nixon*, 418 U.S. 683, 704-05 (1974).

#### 1. Inaction by Congress Does Not Make Unconstitutional Executive Action Constitutional

President Obama contended that although legislation is the most appropriate course of

action to solve the immigration debate, his Executive Action was necessary because of

Congress's failure to pass legislation, acceptable to him, in this regard. This proposition is

arbitrary and does not negate the requirement that the November 20, 2014 Executive Action be

lawfully within the President's executive authority. It is not.

"In the framework of our Constitution, the President's power to see that the laws are

faithfully executed refutes the idea that he is to be a lawmaker. The Constitution limits his

functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing

of laws he thinks bad." *Youngstown*, 343 U.S. at 587.

Congress's lawmaking power is not subject to Presidential supervision or control.

*Youngstown*, 343 U.S. at 587. Perceived or actual Congressional inaction does not endow

legislative power with the Executive. This measurement - - the amount/length of Congressional

inaction that must occur before the Executive can legislate - - is impossible to apply, arbitrary,

and could further stymie the legislative process.

18

The temporal limits of so called "inaction" is arbitrary because of considerations such as when the "clock" on inaction would begin and how long inaction would have to persist before otherwise unlawful legislative Executive Action would become lawful. For example, would it be permissible for a President, who was dissatisfied with a high tax rate on long term capital gains (as limiting economic growth), to instruct the IRS to only collect taxes at a rate of 15% rather than the legislative prescribed 20% rate, or defer prosecution of any taxpayer who pays at least 15% but not the full 20%, unless Congress "pass a bill" lowering the rate within a specified time period? Both this IRS scenario and the Executive Action at issue in this case violate the separation of powers.

President Obama stated that the only recourse available to those members of Congress who question his wisdom or authority in this regard would be to "pass a bill" and that "the day I sign that bill into law, the actions I take will no longer be necessary." Presidential action may not serve as a stop-gap or a bargaining chip to be used against the legislative branch. While "the power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration," it does not include unilateral implementation of legislative policies. *Utility Air Regulatory Group v. E.P.A.,* 134 S.Ct. 2427, 2446 (Jun. 23, 2014).

Further, President Obama's belief that this Executive Action is within his executive authority is not dispositive because "the separation of powers does not depend on the views of individual Presidents, nor on whether 'the encroached-upon branch approves the encroachment.'" *N.L.R.B.*, 719 F.3d at 241, *citing Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 130 S.Ct. 3138, 3155 (2010), *quoting New York v. United States*, 505 U.S. 144, 182 (1992). Likewise, Congress's alleged "failure" to pass

legislation invalidating or limiting past Executive Actions or Orders relating to deferred action does not evidence that such exercises are lawful, and does not constitute a grant of legislative authority to the Executive.

This Executive Action "cross[es] the line," constitutes "legislation," and effectively changes the United States' immigration policy. The President may only "take Care that the Laws be faithfully executed . . . "; he may not take any Executive Action that creates laws. U.S. Const., Art. II, § 3.

## 2.  Executive Action Goes Beyond Prosecutorial Discretion – It is Legislation

Presidents and certain members of their administrative agencies may exercise prosecutorial discretion over certain criminal matters on a case-by-case basis. Prosecutorial discretion, in the context of immigration, applies to a broad range of discretionary enforcement decisions, including the following:

- whether to issue, serve, file, or cancel a Notice to Appear;
- whom to stop, question, and arrest;
- whom to detain or release;
- whether to settle, dismiss, appeal, or join in a motion on a case; and
- whether to grant deferred action, parole, or a stay of removal instead of pursuing removal in a case.

Johnson, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants*.

President Obama invoked this discretion when he stated that his Executive Action allowed his administration to "prioritize" deportations on "actual threats to our security. Felons, not families. Criminals, not children. Gang members, not a mom who's working hard to provide for her kids."

20

However, President Obama's November 20, 2014 Executive Action goes beyond prosecutorial discretion because:

(a) it provides for a systematic and rigid process by which a broad group of individuals will be treated differently than others based upon arbitrary classifications, rather than case-by-case examination; and

(b) it allows undocumented immigrants, who fall within these broad categories, to obtain substantive rights.

First, the Executive Action establishes threshold eligibility criteria before undocumented immigrants can apply for deferred action status (*i.e.,* deferred deportation). The Office of Legal Counsel acknowledged that this class-based program and threshold criteria was problematic, but concluded that the program does not "in and of itself" cross the line between executing the law and "rewriting it." Despite the so-called case-by-case determination of eligibility for deferred deportation (ex. passing a criminal background check), the threshold criteria will almost wholly determine eligibility. Such formulaic application of criteria, especially given the wide breadth of the program, in essence, substantively changes the statutory removal system "rather than simply adapting its application to individual circumstances."[7] Id.

Secondly, the Executive Action goes beyond temporarily deferring deportation for specified groups of undocumented immigrants. Secretary Johnson, in his Memorandum on prosecutorial discretion, stated that deferred action is legally valid if it is on a case-by-case basis and "may be terminated at any time at the agency's discretion." Johnson, *Exercising*

---

[7] According to the White House, the Executive Action will apply to more than 4 million undocumented immigrants. http://www.whitehouse.gov/issues/immigration/immigration-action. There are an estimated 11.2 million unauthorized immigrants in the United States. Pew Research Center estimates based on residual methodology, applied to 2012 American Community Survey, accessed through http://www.pewresearch.org/fact-tank/2014/11/20/those-from-mexico-will-benefit-most-from-obamas-executive-action/.

21

*Prosecutorial Discretion*, 2. The Executive Action provides for a process by which undocumented immigrants will become quasi-United States citizens, such that the status given to those within President Obama's Executive Action could not be "terminated at any time."

Individuals who qualify under the Executive Action are invited to apply for deferred action status. Those individuals will be permitted to apply for work authorization documentation if they can demonstrate "economic necessity," and they will temporarily cease accruing "unlawful presence" for the purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I). 8 C.F.R. § 214(d)(3) cited in Thompson, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, 13. The Administration has based the Executive Action, in large part, on the "humanitarian interest in promoting family unity." Id. at 26. This overarching-value will render any rescission of the Executive Action, by legislation or withdrawal by another Administration, arguably unjust as it would violate core American familial values to abruptly deport these individuals, who are "families," not "felons," and have been allowed to deepen and strengthen already existing ties to their lawfully present American family members and the wider community.

### 3. Conclusion

President Obama's unilateral legislative action violates the separation of powers provided for in the United States Constitution as well as the Take Care Clause, and therefore, is unconstitutional.

22

## IV.    Is the Executive Action Applicable to this Defendant?

### A. The Three Priorities for Removal

On the other hand, if President Obama's Executive Action is constitutional, the Court

must determine its applicability to this Defendant. As noted above, the Department of Homeland

Security created a Memorandum, which sets forth implementation of President Obama's

Executive Action into three (3) priority groups for removal.

Priority 1 for removal does not apply to this Defendant for the following reasons: There

is no evidence that this Defendant posed or poses a threat to national security, border security,

and/or public safety, by engaging in, or being suspected of, terrorism or espionage. This

Defendant was not apprehended while attempting to enter the United States. There is no

evidence that this Defendant has ever been convicted of an offense involving gangs or is a

member of a gang. Finally, there is no evidence that he was convicted of a felony "other than a

state or local offense for which an essential element was the alien's immigration status," nor has

he been convicted of an "aggravated" felony.

Likewise, Priority 2 for removal does not appear to apply to this Defendant. Although

Priority 2 specifically referenced undocumented immigrants who had illegally re-entered the

United States, it only applies to those who have <u>not</u> been in the United States continuously since

January 1, 2014. Johnson, *Policies for the Apprehension, Detention and Removal of*

*Undocumented Immigrants.* This Defendant re-entered the United States "sometime after 2005"

and was arrested in 2014, as noted above. Thus, it is probable that Defendant has been

continuously present in the United States since January 1, 2014.

In addition, Priority 2 also indicates that the undocumented immigrant has to have been

convicted of three (3) or more misdemeanor offenses arising out of three (3) separate incidents

23

(other than minor traffic offenses or state or local offenses involving their immigration status).

Here, there is no evidence Defendant has been convicted of three (3) or more offenses arising out

of three separate incidents. Thus, Defendant does not appear to fall into the Priority 2 category.

Finally, an undocumented immigrant may fall be classified within Priority 3 if said

person has been issued a final order of removal on or after January 1, 2014. This has not yet

occurred in Defendant's case, and thus, he does not fall within Priority 3 for removal.

Therefore, if the Executive Action is constitutional, its deportation/removal priorities do

not apply to Defendant in this case. As such, once the Executive Action is fully implemented,

this Defendant arguably should not be in a "deportation mode" before this Court.[8]

## B. The Government's Position that the Executive Action Does Not Apply to Defendant

In its well-written brief, the Government argues that the November 20, 2014 Executive

Action on immigration is inapplicable this Defendant, even if Defendant is not a priority for

deportation. In short, the Government posits that the Executive Action only impacts civil

proceedings, not criminal proceedings, such as the matter at bar. In support of this argument, the

Government cites Secretary Johnson's Memorandum *Policies for Apprehension, Detention and*

*Removal of Undocumented Immigrants*, which it is "arguably relevant to the issues before [this

Court]." Doc. No. 30. The Government argues that because this particular Memorandum does

not "mention § 1326(a) proceedings" – the very proceeding this Court is conducting with respect

---

[8] Although Defendant does not appear to fall within any of the three (3) Priority Deportation Categories, under President Obama's November 20, 2014 Executive Action, he possibly is <u>not</u> eligible for deferred deportation. The Court notes that Defendant may not have any dependents living in the United States, and if so, he is not a part of the class or subcategory of undocumented immigrants that are eligible for deferred deportation under President Obama's November 20, 2014 Executive Action. This is but one example of the dichotomy between DHS policy and the President's Executive Action, which makes it difficult to discern what the law is with respect to individuals such as this Defendant.

24

to this Defendant – this Court need not consider the Memorandum, the Executive Action, or anything else that has taken place in the United States that impact immigration law.

While this Court notes that Secretary Johnson's Memoranda certainly discuss the President's new "civil" immigration policies, and while this Court is aware that this Defendant is before this Court on a criminal matter, the Court disagrees that the Executive Action (and its ten (10) supporting Memoranda) does not impact this criminal proceeding.

First, the Court notes that while deportation or removal is imposed by an immigration judge via a civil proceeding, the civil proceeding often arises after – or as a result of – the individual being convicted of a crime. In this instant matter, the civil proceeding may commence because Defendant has committed the crime of re-entry of a removed alien in violation of 8 U.S.C. §1326. Thus, this Court, which arguably has no control over the imposition of the "deportation sanction" (which is left to the civil immigration judge via a separate proceeding), cannot ignore the fact that what happens here, in this criminal proceeding, significantly and determinatively impacts what happens there, in a civil proceeding.

In addition, the United States Supreme Court has acknowledged that deportation is a "drastic measure," see *Padilla v. Kentucky*, 559 U.S. 356, 360 (2010), and described the close nexus between the findings of a federal district court judge in a criminal immigration violation proceeding, and the outcome in a civil immigration proceeding, in this manner:

> We have long recognized that deportation is a particularly severe "penalty," *Fong Yue Ting v. United States*, 149 U.S. 698, 740, 13 S.Ct. 1016, 37 L.Ed. 905 (1893); but it is not, in a strict sense, a criminal sanction. Although removal proceedings are civil in nature, see *INS v. Lopez–Mendoza*, 468 U.S. 1032, 1038, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984), deportation is nevertheless intimately related to the criminal process. Our law has enmeshed criminal convictions and the penalty of deportation for nearly a century, see Part I, *supra*, at 1478–1481. And, importantly, recent changes in our immigration law have made removal nearly an automatic result for a broad class of noncitizen offenders. Thus,

> we find it "most difficult" to divorce the penalty from the conviction in the
> deportation context. *United States v. Russell*, 686 F.2d 35, 38 (C.A.D.C.
> 1982). Moreover, we are quite confident that noncitizen defendants facing
> a risk of deportation for a particular offense find it even more difficult.
> See *St. Cyr*, 533 U.S., at 322, 121 S.Ct. 2271 ("There can be little doubt
> that, as a general matter, alien defendants considering whether to enter
> into a plea agreement are acutely aware of the immigration consequences
> of their convictions").

*Id.* at 365-66.

In light of the impact this Court's criminal proceeding may have on the civil proceeding,

and given the Supreme Court's own view on the inextricability between the two proceedings, the

Government's argument does not convince this Court that it should ignore the November 20,

2014 Executive Action merely because the President's speech and the Department's Memoranda

reference "civil" proceedings.

Moreover, as this Court has also noted, there seems to be an arbitrariness to Defendant's

arrest and criminal prosecution for violation of 8 U.S.C. § 1326. Many cities (and some states),

in the past, have declared themselves "sanctuary cities," which essentially meant if an

undocumented immigrant was arrested for a minor offense, local law enforcement would not

automatically notify ICE.

Now, one of the other ten (10) Memoranda by Secretary Johnson implementing the

Executive Action, titled "Secure Communities," actually terminates the Secure Communities

program, as follows:

> I am directing U.S. Immigration and Customs Enforcement (ICE) to
> discontinue Secure Communities. ICE should put in its place a program
> that will continue to rely on fingerprint-based biometric data submitted
> during bookings by state and local law enforcement agencies to the
> Federal Bureau of Investigation for criminal background checks.
> However, ICE should only seek the transfer of an alien in the custody of
> state or local law enforcement through the new program when the alien
> has been convicted of an offense listed in Priority 1 (a), (c), (d), and (e)
> and Priority 2 (a) and (b) of the November 20, 2014 Policies for the

26

> Apprehension, Detention and Removal of Undocumented Immigrants
> Memorandum, or when, in the judgment of an ICE Field Office Director,
> the alien otherwise poses a danger to national security. In other words,
> unless the alien poses a demonstrable risk to national security,
> enforcement actions through the new program will only be taken against
> aliens who are convicted of specifically enumerated crimes.

Johnson, *Secure Communities,* November 20, 2014, 2.

Thus, if Defendant had been arrested within the confines of a "sanctuary city," or if he

had been arrested by local police on or after the implementation of the Executive Action, ICE

would not have sought "to transfer Defendant into its custody," because this Defendant would

not have been convicted of an offense listed in Priority 1 or Priority 2.

Accordingly, Defendant's current criminal prosecution and the civil deportation hearing

that will undoubtedly follow as a result of this criminal proceeding, arguably are arbitrary and

random.

### C. Defendant's Position that the Executive Action May Apply to Him, or that He May Have Some Other Claim Enabling Him to Remain in the United States

In his Brief, Defendant's counsel concedes that the Executive Action has raised statutory

and constitutional considerations, "but not directly in regard to this criminal matter." Doc. No.

31, 6. Presumably, this statement is in line with what the Government counsel argues – that the

Executive Action has no direct bearing on this criminal proceeding. As this Court has discussed

in "IV. B." above, the impact this criminal proceeding has on the civil proceeding cannot be

ignored. Nor can the arbitrary nature and application of the Executive Action on those

undocumented immigrants who may or may not be specifically identified, either by the three (3)

Priority groups slated for speedy deportation, or by the new and newly expanded groups who

"qualify" for deferred action status, be ignored.

However, despite suggesting the Executive Action may have no direct application to these proceedings, Defendant notes that the Executive Action: (1) expands deferred action to certain childhood arrivals; (2) creates an additional "avenue of deferred action" for the undocumented parents of United States citizens and permanent resident children; and (3) sets priorities for removal among the undocumented immigrants who pose "national security, border security and public safety threats." Doc. No. 31, 3.

Defendant argues, and this Court agrees (see above at "IV. A."), that Defendant does not fall within any of the three (3) priorities (Priority 1, Priority 2, or Priority 3) announced in the Executive Action or the supporting Memoranda issued by Secretary Johnson. Doc. No. 31, 4. Defendant argues that because he does not fall within any of the Priorities, ICE can choose: (1) not to pursue his removal; (2) to grant him deferred action status; or (3) some other form of relief from potential removal from the United States.

Defendant's counsel also notes that Defendant may or may not be a parent or step-parent, but if he is, Defendant suggests that familial relationship would bolster his non-deportation and/or deferred action status request. Id. Defendant's counsel also notes that because Defendant is a citizen of Honduras, his return to that country may subject him to possibility of "torture," and if he can prove this to an immigration judge, he may be granted relief from removal pursuant to "the Convention Against Torture (8 C.F.R. 208.16-18)." Doc. No. 31, 5.

Finally, Defendant, in his Brief, notes that the Executive Action presently faces a legal challenge with regard to "the constitutionality of its policies." Doc. No. 31, 6. Presumably, Defendant is referring to the lawsuit filed by 17 States against the Federal Government and its key Administrators who oversee customs and immigration in this country. *See State of Texas et al., v. United States of America, et al.*, 1:2014cv00254 (filed December 3, 2014). Defendant

28

notes that this lawsuit challenges (*inter alia*) the President's authority to enact the "expansive grants" of deferred action status with the Executive Action.

Again, because of the effect the November 20, 2014 Executive Action has had on the rights of the undocumented immigrants such as Defendant in this case, the Court finds that the relevant law is "unsettled," and the Court has serious concerns about the impact its sentence may have on the rights of this particular Defendant.

### D.  Analysis of the Applicability of the Executive Action to Defendant

As noted many times above, while Defendant does not fall within the three (3) Priorities for deportation/removal from the United States, he likewise is not conclusively within one of the newly created and/or expanded categories for deferred action status. If Defendant were to fall within the newly created category (parents of a U.S. Citizen and/or permanent resident child), or if he were part of the expanded category (Deferred Action for Childhood Arrivals, "DACA"), he may be entitled to additional "benefits" or "rights" as an undocumented immigrant. For example, he may be entitled to the substantive work benefit and entitlements offered through the Executive Action.

The bottom line for this Defendant is that although he does not fall into any newly created or expanded deferment category, he does not fall into any of the three (3) Priority categories either. Thus, he is in "no-man's land" under the Executive Action. However, based on the information obtained by this Court so far as it pertains to this Defendant, the Court concludes he is more "family" than "felon."

### E.  Constitutional Arguments that the Executive Action Should Apply to Defendant

Not only has the Court considered whether the President exceeded his constitutional authority by issuing the November 20, 2014 Executive Action – and, as noted above, concludes

that he did -- but the Court also concludes that the Executive Action may violate the inherent and constitutional rights of some of the undocumented immigrants, such as this Defendant. *See Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Whatever his [or her] status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term. Aliens, even aliens whose presence in this county is unlawful, have long been recognized as persons guaranteed due process of law by the Fifth and Fourteenth Amendments.").

Although it may seem counterintuitive that the Constitution, a document created to protect the citizens of this Nation, can endow undocumented immigrants illegally residing in this country with any constitutional rights, the Supreme Court of the United States has ruled that these individuals are entitled to be treated humanely and, at least on a procedural level, are to be afforded with certain constitutional rights and protections.

For example, in *Padilla v. Kentucky*, 559 U.S. 356 (2010), the Supreme Court held that undocumented immigrants, who, by pleading guilty to a crime, would face the "automatic" civil penalty of deportation in a collateral proceeding, are entitled to effective assistance of counsel under the Sixth Amendment. The Supreme Court has also concluded that undocumented immigrants possess a Fifth Amendment right to due process where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction and there must be some meaningful review of the administrative proceeding. *United States v. Mendoza-Lopez*, 481 U.S. 828, 841 (1987) ("Persons charged with crime are entitled to have the factual and legal determinations upon which convictions are based subjected to the scrutiny of an impartial judicial officer.").

In *Padilla*, the Supreme Court, summarizing the Nation's legislative history with respect to the treatment of undocumented immigrants, noted that:

The Immigration Act of 1917 (1917 Act) brought "radical changes" to our law. S.Rep. No. 1515, 81st Cong., 2d Sess., pp. 54–55 (1950). For the first time in our history, Congress made classes of noncitizens deportable based on conduct committed on American soil. *Id.*, at 55. Section 19 of the 1917 Act authorized the deportation of "any alien who is hereafter sentenced to imprisonment for a term of one year or more because of conviction in this country of a crime involving moral turpitude, committed within five years after the entry of the alien to the United States . . . ." 39 Stat. 889. And § 19 also rendered deportable noncitizen recidivists who commit two or more crimes of moral turpitude at any time after entry. *Ibid.* Congress did not, however, define the term "moral turpitude."

While the 1917 Act was "radical" because it authorized deportation as a consequence of certain convictions, the Act also included a critically important procedural protection to minimize the risk of unjust deportation: At the time of sentencing or within 30 days thereafter, the sentencing judge in both state and federal prosecutions had the power to make a recommendation "that such alien shall not be deported." *Id.*, at 890.

This procedure, known as a judicial recommendation against deportation, or JRAD, had the effect of binding the Executive to prevent deportation; the statute was "consistently . . . interpreted as giving the sentencing judge conclusive authority to decide whether a particular conviction should be disregarded as a basis for deportation," *Janvier v. United States*, 793 F.2d 449, 452 (2nd Cir. 1986). Thus, from 1917 forward, there was no such creature as an automatically deportable offense. Even as the class of deportable offenses expanded, judges retained discretion to ameliorate unjust results on a case-by-case basis."

559 U.S. 361-362 (footnotes omitted).

The plurality of the Supreme Court in *Padilla* further explained:

In light of both the steady expansion of deportable offenses and the significant ameliorative effect of a JRAD, it is unsurprising that, in the wake of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Second Circuit held that the Sixth Amendment right to effective assistance of counsel applies to a JRAD request or lack thereof, see *Janvier*, 793 F.2d 449. See also *United States v. Castro*, 26 F.3d 557 (C.A.5 1994). In its view, seeking a JRAD was "part of the sentencing" process, *Janvier*, 793 F.2d, at 452, even if deportation itself is a civil action. Under the Second Circuit's reasoning, the impact of a conviction on a noncitizen's ability to remain in the country was a central issue to be resolved during the sentencing process—not merely a collateral matter outside the scope of counsel's duty to provide effective representation.

31

> However, the JRAD procedure is no longer part of our law. Congress first
> circumscribed the JRAD provision in the 1952 Immigration and
> Nationality Act (INA), and in 1990 Congress entirely eliminated it, 104
> Stat. 5050. In 1996, Congress also eliminated the Attorney General's
> authority to grant discretionary relief from deportation, 110 Stat. 3009–
> 596, an authority that had been exercised to prevent the deportation of
> over 10,000 noncitizens during the 5–year period prior to 1996, *INS v. St.*
> *Cyr*, 533 U.S. 289, 296, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). Under
> contemporary law, if a noncitizen has committed a removable offense
> after the 1996 effective date of these amendments, his removal is
> practically inevitable but for the possible exercise of limited remnants of
> equitable discretion vested in the Attorney General to cancel removal for
> noncitizens convicted of particular classes of offenses. See 8 U.S.C. §
> 1229b. Subject to limited exceptions, this discretionary relief is not
> available for an offense related to trafficking in a controlled substance. See
> § 1101(a)(43)(B); § 1228.

*Id.* at 363-64 (footnotes omitted).

This historical review of the legislation enacted by Congress demonstrates that neither

this Court, nor any executive, can "cancel" an undocumented immigrant's removal/deportation

from this country if that non-citizen commits a removable offense. However, the *Padilla* Court

recognized that when Congress stripped the JRAD procedure from immigration law, an

undocumented immigrant's right to effective assistance of counsel under the Sixth Amendment

grew in importance. Thus, the *Padilla* Court concluded:

> It is our responsibility under the Constitution to ensure that no criminal
> defendant – whether a citizen or not – is left to the "mercies of
> incompetent counsel." *Richardson*, 397 U.S., at 771, 90 S.Ct. 1441. To
> satisfy this responsibility, we now hold that counsel must inform her client
> whether his plea carries a risk of deportation. Our longstanding Sixth
> Amendment precedents, the seriousness of deportation as a consequence
> of a criminal plea, and the concomitant impact of deportation on families
> living lawfully in this country demand no less.

*Id.* at 374.

Having discerned that an undocumented immigrant's right under the Sixth Amendment to

counsel appears well-settled, this Court next turns its attention to the due process rights afforded

to undocumented immigrants under the Fifth Amendment.[9] The Supreme Court in *Mendoza-Lopez*, 481 U.S. 828 (1987), held that a person – even an undocumented immigrant – who stands charged with a crime is entitled to have the factual and legal determinations upon which his or her conviction is based, subjected to the scrutiny of an impartial judicial officer.

In the *Mendoza-Lopez* case, the Supreme Court concluded that Congress did not intend the validity of a deportation order to be contestable under 8 U.S.C. § 1326 (setting forth the penalties for re-entry of removed aliens). 481 U.S. at 837 ("That Congress did not intend the validity of the deportation order to be contestable in a § 1326 prosecution does not end our inquiry.") The Supreme Court noted that in all other aspects of our justice system, when a determination, made in an administrative proceeding, plays a "critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding." *Id.*, at 837-38, *citing Estep v. United States*, 327 U.S. 114, 121–122 (1946); *Yakus v. United States*, 321 U.S. 414, 444, (1944); *cf. McKart v. United States*, 395 U.S. 185, 196–197 (1969).

More recently, in reliance upon the Supreme Court's decision in *Mendoza-Lopez*, the United States Court of Appeals for the Tenth Circuit and the United States District Court of the Southern District of New York have concluded that if an underlying deportation order violates a

---

[9] In *Mathews v. Diaz*, the Supreme Court framed the scope of Due Process rights afforded to undocumented immigrants as follows:

> There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law. *Wong Yang Sung v. McGrath*, 339 U.S. 33, 48-51, 70 S.Ct. 445, 453-455, 94 L.Ed. 616, 627-629; *Wong Wing v. United States*, 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140, 143; see *Russian Fleet v. United States*, 282 U.S. 481, 489, 51 S.Ct. 229, 231, 75 L.Ed. 473, 476. Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection. *Wong Yang Sung, supra*; *Wong Wing, supra*.

*Matthews,* 426 U.S. 67, 77 (1976).

33

defendant's due process rights, that underlying order cannot form the basis for the prior deportation element in the illegal re-entry charge. *See U.S. v. Perez-Madrid*, 71 Fed.Appx. 795, 798 (10th Cir. 2003) ("[T]o prevail on a collateral challenge to a prior deportation hearing the defendant has the burden to demonstrate "that the deportation hearing was fundamentally unfair, and that it deprived him of a direct appeal."); *United States v. Nieto-Ayala*, 05 CR. 203 (LMM), 2005 WL 2006703, *5 (S.D.N.Y. August 18, 2005) ("[T]he underlying deportation order violated defendant's due process rights and therefore cannot be the basis for the prior deportation element in the illegal reentry charge.").

Turning to the facts of this case, it is important to note that on October 21, 2014, this Defendant pled guilty to the felony offense of re-entry of a removed alien in violation of 8 U.S.C. § 1326. He was represented by his current counsel, Alonzo Burney, a well-respected criminal defense lawyer, appointed to represent Defendant pursuant to the Criminal Justice Act. On November 20, 2014, the Executive Action on immigration was announced by President Obama. On November 24, 2014, the Court ordered the parties in this case to brief the impact, if any, the Executive Action of November 20, 2014 would have on this Defendant. Doc. No. 26. On December 3, 2014, Defendant's counsel, Attorney Burney, filed a Motion to Appoint Counsel specifically stating that "counsel has need of expert assistance in immigration law to file such a brief and continue competent representation of the defendant." Doc. No. 28. The Motion also stated, "[h]erein counsel does not possess the necessary background in immigration law to file the brief [ordered by the Court at document 26]." Id. The Court promptly granted the Defendant's request for assistance and an immigration attorney was appointed.[10]

---

[10] This request by Attorney Burney, a criminal defense lawyer, who sought – and was given – assistance from an immigration attorney underscores Justice Alito's concurrence in *Padilla, supra.*, where he noted that a "criminal defense attorney should not be required to provide advice on immigration law, a complex specialty that generally lies outside the scope of a criminal defense attorney's expertise. On the other

34

Given the statements made by Attorney Burney in his Motion to Appoint Counsel, the

Executive Action has changed the legal landscape and accomplished criminal counsel, such as

Attorney Burney, are recognizing the need to consult with attorneys experienced in immigration

matters. Because the Executive Action was announced shortly after this Defendant's change of

plea hearing, this Court is willing to consider a request to withdraw his guilty plea, should

Defendant choose to file the same.

Moreover, while this Court fully acknowledges that in 2002, when Congress created the

Department of Homeland Security and charged this new Department with the responsibility for

prioritizing the removal of certain undocumented immigrants,[11] Congress did not leave the

Department totally devoid of any guidelines as to how to prioritize deportation among the

millions of undocumented immigrants. As the Supreme Court noted in *Arizona v. United States*:

> Federal governance of immigration and alien status is extensive and
> complex. Congress has specified categories of aliens who may not be
> admitted to the United States. See 8 U.S.C. § 1182. Unlawful entry and
> unlawful reentry into the country are federal offenses. §§ 1325, 1326.
> Once here, aliens are required to register with the Federal Government and
> to carry proof of status on their person. See §§ 1301–1306. Failure to do
> so is a federal misdemeanor. §§ 1304(e), 1306(a). Federal law also
> authorizes States to deny noncitizens a range of public benefits, § 1622;
> and it imposes sanctions on employers who hire unauthorized workers, §
> 1324a.

132 S.Ct. 2492, 2499 (2012).

---

hand, any competent criminal defense attorney should appreciate the extraordinary importance that the
risk of removal might have in the client's determination whether to enter a guilty plea." 559 U.S. at 387-
88. It also underscores the inextricable nexus between criminal proceedings for the crime of "reentry of a
removed alien" that occur in the federal district courts and which nearly always result in guilty pleas, and
the subsequent deportation of person through an administrative proceeding, which generally takes place
outside the purview of the district courts.

[11] See Homeland Security Act of 2002, Pub. L. No. 107-296, § 402(5), 116 Stat. 2135, 2178 (codified at 6
U.S.C. § 202(5)).

However, the Executive Action issued by the President on November 20, 2014 essentially conferred deferred action status[12] on a group of undocumented immigrants who were parents to legal permanent residents or citizens of the United States. Deferment action recipients may apply for a work authorization documentation if they can demonstrate an "economic necessity for employment" (8 C.F.R. § 274a.12(c)(14); see 8 U.S.C. § 1324a(h)(3)), and they will temporarily cease accruing "unlawful presence" for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I). 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2). Thus, by creating a subgroup of undocumented immigrants who were parents to legal permanent residents or citizens of the United States, and instructing that they be given deferred action status, the Executive Action endowed this "parent-group" with greater rights than this Defendant.

As noted above, Defendant does not fall into any of the three (3) Priorities outlined in the Department of Homeland Security's Memorandum regarding *Policies for the Apprehension Detention and Removal of Undocumented Immigrants*. Thus, under the Executive Action, he is not a person that the Department would necessarily wish to deport in an expedited fashion.

However, this Defendant, possibly is not "a parent" as defined in a different Department of Homeland Security's Memorandum (*Exercising Prosecutorial Discretion with Respect to Individuals who Came to the United States as Children and with respect to Certain Individuals Whose are the Parents of U.S. Citizens or Permanent Residents*), also dated November 20, 2014. Therefore, this Defendant is possibly not entitled to the deferred action status that would enable him to defer deportation.

---

[12] "Deferred action" as explained by the Supreme Court in *Reno v. American-Arab Anti-Discrimination Committee,* "developed without express statutory authorization" and was originally "known as nonpriority and is now designated as deferred action." 525 U.S. 471, 484 (1999). The Supreme Court Court went on to note that "[a]pproval of deferred action status means that, for the humanitarian reasons described below, no action will thereafter be taken to proceed against an apparently deportable alien, even on grounds normally regarded as aggravated." *Id.*

36

Although this Court recognizes that the Memorandum providing the basis for the Executive Action on immigration has opined that the Executive branch can create such subcategories of undocumented immigrants, the Court has concerns that some familial bonds are treated differently than others.

Here, this Defendant appears to have been in the United States – and possibly continuously – from 2005 to the present. He works for and has a close bond with his brother. In light of the fact that Defendant does not fall into any of the three (3) Priority removal categories, this Court concludes that he is more "family" than "felon," and consistent with the over-arching sentiment behind the Executive Action, Defendant may be eligible for deferred action status and its substantial rights and benefits.

## V. Conclusion

This Court must determine the applicability, if any, of the Executive Action upon this Defendant. Thus, first the Court must determine whether the Executive Action is constitutional.[13] The Court holds that the Executive Action is unconstitutional because it violates the separation of powers and the Take Care Clause of the Constitution. If, however, the Executive Action is lawful, the Court must determine if the Executive Action applies to this Defendant, who does not fall within one of the three (3) Priorities requiring deportation. The record is undeveloped as to whether Defendant falls among the newly created "parent" category for deferred action or has some other argument for deferred action. Thus, the Court sets forth the following schedule:

---

[13] The Court has not discussed any issues relating to the application of the Administrative Procedure Act ("APA") to this Executive Action.

37

## VI.  Order of Court

AND NOW, this 16th day of December, 2014, IT IS HEREBY ORDERED THAT:

1. On or before January 6, 2015, Defendant shall file a notice/motion (with supporting brief) of his decision to proceed in one of the following manners:

   a. Seek to withdraw his guilty plea in light of the Executive Action;

   b. Continue to sentencing on or before January 22, 2015, to time-served (approximately six (6) months imprisonment (the high end of the guideline range)) – with one year of supervised release to be served in the United States, so that he may pursue his rights (if any) pursuant to the Executive Action, or otherwise; or

   c. Continue to sentencing on or before January 22, 2015, to time-served, with suspended supervised release, and with instruction to the United States Marshal Service to deliver Defendant to ICE.

2. The Government shall file a Response to Defendant's notice/motion on or before January 12, 2015; and

3. This Order does not impinge the right to file any other request or motion.

<div align="center" style="margin-left:40%">

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

</div>

cc:    All Registered ECF Counsel and Parties

38

# EXHIBIT 2

*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| **CHRISTOPHER L. CRANE et al.,** | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:12-cv-03247-O** |
| | § | |
| **JANET NAPOLITANO,** *in her official* | § | |
| *capacity as Secretary of Homeland Security,* | § | |
| **et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiffs' Application for Preliminary Injunctive Relief (ECF No. 24),

Brief in Support of Plaintiffs' Application for Preliminary Injunctive Relief (ECF No. 26),

Defendants' Opposition to Plaintiffs' Application for Preliminary Injunctive Relief (ECF No. 34),

Plaintiffs' Reply Brief in Support of Plaintiffs' Application for Preliminary Injunctive Relief (ECF

No. 36), and Appendix to Plaintiffs' Reply in Support of Application for Preliminary Injunction

(ECF No. 37). The Court held a hearing on this matter on April 8, 2013. *See* Electronic Minute

Entry, Apr. 8, 2013, ECF No. 53. For the reasons set forth below, the Court concludes that Plaintiffs

are likely to succeed on the merits of their claim that the Directive and related provisions of the

Morton Memorandum violate 8 U.S.C. § 1225(b)(2)(A), but the Court defers ruling on Plaintiffs'

Application for Preliminary Injunction (ECF No. 24) until the parties have provided the Court with

additional briefing.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

The United States Department of Homeland Security ("DHS") is a Cabinet-level department of the United States government created in 2002 for the purpose of coordinating and unifying national homeland security efforts. Creation of the Department of Homeland Security, http://www.dhs.gov/creation-department-homeland-security (last visited Apr. 23, 2013). Defendant Janet Napolitano is the current Secretary of DHS. Pls.' Am. Compl. ¶ 22, ECF No. 15. DHS is charged with, among other things, protecting our nation's border security, cybersecurity, and economic security, preventing human trafficking and terrorism, and safeguarding civil rights and civil liberties. Topics, http://www.dhs.gov/topics (last visited Apr. 23, 2013). DHS is also responsible for overseeing citizenship and immigration in the United States. *Id.* The United States Citizenship and Immigration Services ("USCIS") oversees lawful immigration in the United States. Citizenship & Immigration Overview, http://www.dhs.gov/topic/citizenship-and-immigration-overview (last visited Apr. 23, 2013). Defendant Alejandro Mayorkas is the current Director of USCIS. Pls.' Am. Compl. ¶ 24, ECF No. 15. USCIS grants immigration and citizenship benefits, promotes an awareness and understanding of citizenship, and ensures the integrity of our immigration system. Citizenship & Immigration Overview, http://www.dhs.gov/topic/citizenship-and-immigration-overview (last visited Apr. 23, 2013). The United States Immigration and Customs Enforcement ("ICE") is the principal investigative arm of DHS, and its primary mission is to promote homeland security and public safety through the criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration. Overview, http://www.ice.gov/about/overview (last visited Apr. 23, 2013). Defendant John Morton is the current Director of ICE. Pls.' Am. Compl. ¶ 23, ECF No. 15. ICE receives an annual appropriation

2

from Congress to remove individuals who are unlawfully present in the United States. Immigration Enforcement Overview, http://www.dhs.gov/topic/immigration-enforcement-overview (last visited Apr. 23, 2013).

On June 17, 2011, Defendant Morton issued a Memorandum entitled "Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens" (the "Morton Memorandum"). Pls.' Am. Compl. ¶ 28, ECF No. 15. The Morton Memorandum provides ICE personnel "guidance on the exercise of prosecutorial discretion to ensure that the agency's immigration enforcement resources are focused on the agency's enforcement priorities," which include "the promotion of national security, border security, public safety, and the integrity of the immigration system." Morton Mem. at 1, 2, *available at* http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf. The Morton Memorandum sets out several factors that ICE officers, agents, and attorneys should consider when determining whether an exercise of prosecutorial discretion may be warranted for a particular alien. *See* Morton Mem. at 4–5, *available at* http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf.

On June 15, 2012, Defendant Napolitano issued a Directive entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (the "Directive"). Pls.' Am. Compl. ¶¶ 2, 29, ECF No. 15; Pls.' Am. Compl. Ex. 1 (Directive), ECF No. 15-1. The Directive sets forth to what extent, in the exercise of prosecutorial discretion, DHS should enforce immigration laws "against certain young people who were brought to this country as children and know only this country as home." Pls.' Am. Compl. Ex. 1 (Directive), at 1, ECF No. 15-1. The Directive instructs ICE officers to refrain from placing certain aliens who are unlawfully

3

present in the United States into removal proceedings. It also directs ICE officers to facilitate

granting deferred action to aliens who are unlawfully present in the United States and are already in

removal proceedings but not yet subject to a final order of removal. Pls.' Am. Compl. ¶ 2, ECF No.

15; Pls.' Am. Compl. Ex. 1 (Directive), at 2, ECF No. 15-1. The Directive also instructs USCIS to

accept applications to determine whether the individuals who receive deferred action are qualified

for work authorization during the period of deferred action. Pls.' Am. Compl. ¶ 2, ECF No. 15;

Pls.' Am. Compl. Ex. 1 (Directive), at 3, ECF No. 15-1. To qualify for deferred action under the

Directive, the alien must satisfy the following criteria:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for at least five years preceding the date of [the Directive] and is present in the United States on the date of [the Directive];
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.

Pls.' Am. Compl. Ex. 1 (Directive), at 1, ECF No. 15-1.

In July 2012, DHS issued the "ERO Supplemental Guidance: Exercising Prosecutorial

Discretion with Respect to Individuals Who Came to the United States as Children," which directs

DHS personnel to implement the terms of the Directive. Pls.' Am. Compl. ¶ 30, ECF No. 15. In

early August 2012, DHS issued a document entitled "National Standard Operating Procedures

(SOP): Deferred Action for Childhood Arrivals (DACA) (Form I-821D and Form I-765)," which

explains how DHS will process applications for deferred action under the Directive. *Id.* ¶ 31. On

4

August 15, 2012, DHS began accepting requests for consideration of deferred action and applications for employment authorization pursuant to the Directive. *Id.* ¶ 32.

Several ICE Deportation Officers and Immigration Enforcement Agents[1] filed this lawsuit on August 23, 2012, to challenge the constitutional and statutory validity of the Directive and the Morton Memorandum. *See generally* Pls.' Compl., ECF No. 1; Pls.' Am. Compl., ECF No. 15. Plaintiffs assert that the Directive violates (1) federal statutes requiring the initiation of removals; (2) federal law by conferring a non-statutory form of benefit—deferred action—to more than 1.7 million aliens, rather than a form of relief or benefit that federal law permits on such a large scale; (3) the constitutional allocation of legislative power to Congress; (4) the Article II, Section 3, constitutional obligation of the Executive to take care that the laws are faithfully executed; and (5) the Administrative Procedure Act through conferral of a benefit without regulatory

---

[1] Plaintiff Christopher L. Crane is an ICE Deportation Officer in West Valley City, Utah. Pls.' Am. Compl. ¶ 9, ECF No. 15. Plaintiff David A. Engle is an ICE Immigration Enforcement Agent in Dallas, Texas. *Id.* ¶ 10. Plaintiff Anastasia Marie Carroll is an ICE Immigration Enforcement Agent in El Paso, Texas. *Id.* ¶ 11. Plaintiff Ricardo Diaz is an ICE Immigration Enforcement Agent in El Paso, Texas. *Id.* ¶ 12. Plaintiff Lorenzo Garza is an ICE Immigration Enforcement Agent in Los Fresnos, Texas. *Id.* ¶ 13. Plaintiff Felix Luciano is an ICE Immigration Enforcement Agent in San Diego, California. *Id.* ¶ 14. Plaintiff Tre Rebstock is an ICE Immigration Enforcement Agent in Huntsville, Texas. *Id.* ¶ 15. Plaintiff Fernando Silva is an ICE Immigration Enforcement Agent in El Paso, Texas. *Id.* ¶ 16. Plaintiff Samuel Martin is an ICE Immigration Enforcement Agent in El Paso, Texas. *Id.* ¶ 17. Plaintiff James D. Doebler is an ICE Deportation Officer in Dover, Delaware. *Id.* ¶ 18. The State of Mississippi, by and through Governor Phil Bryant, was originally an additional plaintiff in this lawsuit, but the Court dismissed its claims for lack of standing. *See* Order, Jan. 24, 2013, ECF No. 41. The Court found that the State of Mississippi lacked standing because its asserted fiscal injury was conclusory and based on purely speculative economic data. *Id.* at 32. In contrast, the Court found that the individual plaintiffs satisfied the constitutional requirements of standing with respect to the Directive and related provisions of the Morton Memorandum that instruct them to violate what they believe to be their statutory obligations, and they face a sufficiently concrete threat of disciplinary action if they violate the commands of the Directive by arresting or issuing a Notice to Appear in removal proceedings to a Directive-eligible alien. *Id.* at 21–22. Accordingly, this Order will address Plaintiffs' Application for Preliminary Injunction only as it pertains to the ICE Deportation Officers and ICE Immigration Enforcement Agents (collectively, "Plaintiffs").

5

implementation.[2] Pls.' Am. Compl. ¶¶ 67–80, 92–116, ECF No. 15. Plaintiffs challenge the

portions of the Directive and Morton Memorandum that require ICE officers to exercise

prosecutorial discretion and defer action against aliens who satisfy the Directive's criteria.

Plaintiffs contend that the Directive commands ICE officers to violate federal law and to

violate their oaths to uphold and support federal law.[3] *Id.* ¶¶ 4, 37–46. As a result, Plaintiffs have

expressed their desire not to follow the Directive, but they believe they will be disciplined or suffer

other adverse employment consequences if they arrest or issue a Notice to Appear in removal

proceedings ("NTA")[4] to an alien who satisfies the factors for deferred action set out in the Directive.

*Id.* ¶ 49. Plaintiffs seek a declaratory judgment from this Court finding the Directive unlawful and

in violation of the Constitution. Pls.' Am. Compl. ¶¶ A–E, ECF No. 15. Plaintiffs correspondingly

request the Court to vacate the Directive and relevant provisions of the Morton Memorandum. *Id.*

Plaintiffs ultimately seek a permanent injunction preventing the implementation of the Directive and

preventing DHS from taking any adverse action against Plaintiffs for failure to follow the Directive.

*Id.* ¶ F.

Plaintiffs filed their Application for Preliminary Injunction on November 28, 2012, asking

the Court to preliminarily enjoin Defendants from implementing and enforcing the Directive and

---

[2] In their Amended Complaint, Plaintiffs additionally allege that the Directive violates federal law by conferring the legal benefit of employment authorization without any statutory basis and under the false pretense of "prosecutorial discretion." Pls.' Am. Compl. ¶ 81–91, ECF No. 15. However, the Court dismissed this cause of action for lack of standing. *See* Order, Jan. 24, 2013, ECF No. 41. Accordingly, this Order will address Plaintiffs' Application for Preliminary Injunction only as it pertains to the remaining causes of action.

[3] The specific provisions of federal law at issue will be discussed later in this Order. *See infra* Part III.A.1.

[4] An NTA is a legal document that initiates removal proceedings against an alien. *See* 8 U.S.C. § 1229; 8 C.F.R. § 239.1.

6

related provisions of the Morton Memorandum. *See generally* Pls.' Appl. Prelim. Inj., ECF No. 24.

Defendants filed their Opposition on December 19, 2012, and Plaintiffs filed their Reply on January

2, 2013. *See generally* Defs.' Opp'n Appl. Prelim. Inj., ECF No. 34; Pls.' Reply Appl. Prelim. Inj.,

ECF No. 36. The Court held an evidentiary hearing on April 8, 2013.[5] *See* Electronic Minute Entry,

Apr. 8, 2013, ECF No. 53. Accordingly, the issues have been briefed by the parties and this matter

is ripe for determination.

## II. LEGAL STANDARD

To obtain preliminary injunctive relief, a movant "must establish that he is likely to succeed

on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v.*

*Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Nichols v. Alcatel USA, Inc.*, 532

F.3d 364, 372 (5th Cir. 2008); *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).

A preliminary injunction "is an extraordinary and drastic remedy, not to be granted routinely, but

only when the movant, by a clear showing, carries the burden of persuasion." *White v. Carlucci*, 862

F.2d 1209, 1211 (5th Cir. 1989) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992,

997 (5th Cir. 1985)); *see also Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas*

*Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003). If the movant fails to carry its burden on any one

of the four elements, the court must deny the request for preliminary injunctive relief. *See*

*Gonannies, Inc. v. Goaupair.com, Inc.*, 464 F. Supp. 2d 603, 607 (N.D. Tex. 2006). Even when the

---

[5] The Court delayed consideration of Plaintiffs' Application for Preliminary Injunction while it examined the complicated issue of standing. *See generally* Order, Jan. 24, 2013, ECF No. 41. Additionally, counsel for Defendants sought a delay based on personal obligations. *See* Unopposed Mot. Reschedule Date Pls.' Prelim. Inj. Hr'g, ECF No. 48; Order Setting Hr'g, Feb. 11, 2013, ECF No. 49.

7

movant carries its burden of persuasion on all of the four factors for obtaining a preliminary injunction, the decision to grant or deny preliminary injunctive relief is left to the sound discretion of the district court. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) (citing *Canal*, 489 F.2d at 572). "The decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Id.* A movant who obtains a preliminary injunction must post a bond to secure the non-movant against any wrongful damages it suffers as a result of the injunction. Fed. R. Civ. P. 65(c).

## III. ANALYSIS

Plaintiffs filed their Application for Preliminary Injunction on November 28, 2012. Plaintiffs seek an injunction preventing Defendants from implementing and enforcing the Directive and related provisions of the Morton Memorandum until the Court fully decides the lawfulness of those documents. Pls.' Appl. Prelim. Inj. 1–2, ECF No. 24. The Court will address each element required to obtain a preliminary injunction in turn.

### A. Likelihood of Success on the Merits

To secure a preliminary injunction, Plaintiffs must establish that there is a substantial likelihood that they will succeed on the merits of their claims. *See Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). "It is not necessary for Plaintiffs to prove to an absolute certainty that they will prevail on the merits." *Placid Oil Co. v. U.S. Dep't of Interior*, 491 F. Supp. 895, 905 (N.D. Tex. 1980). Rather, Plaintiffs must raise "questions going to the merits so serious, substantial, and difficult and doubtful, as to make them a fair ground for litigation." *Id.* (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)). They must present a prima facie case, but need not show they are certain to win. *See Janvey*, 647 F.3d at 595–96 (citing 11A Charles Alan

8

Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.3 (2d ed. 1995)).

A "more than negligible chance of success" is sufficient to obtain a preliminary injunction. *Compact Van Equip. Co. v. Leggett & Platt, Inc.*, 566 F.2d 952, 954 (5th Cir. 1978). The Court will begin with an analysis of what Section 1225 of the Immigration and Nationality Act ("INA")[6] requires, because that statute is central to all of Plaintiffs' causes of action.

## 1. 8 U.S.C. § 1225

Plaintiffs assert that the Directive and related provisions of the Morton Memorandum expressly violate federal statutes requiring the initiation of removal proceedings. Br. Supp. Pls.' Appl. Prelim. Inj. 3–7, ECF No. 26. Specifically, Plaintiffs assert that the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") requires immigration officers to initiate removal proceedings when they encounter illegal immigrants who are not "clearly and beyond a doubt entitled to be admitted," and that any "prosecutorial discretion" can only be exercised *after* removal proceedings have been initiated. *See* 8 U.S.C. § 1225; Br. Supp. Pls.' Appl. Prelim. Inj. 4, 5, ECF No. 26. Plaintiffs assert that Defendant Napolitano's authority under 8 U.S.C. § 1103(a)(5) as Secretary of Homeland Security to enforce the immigration laws cannot be construed to authorize her to order her employees to violate the requirements of federal law in 8 U.S.C. § 1225. *Id.* at 5. Defendants respond that 8 U.S.C. § 1225(b)(2)(A) only applies to aliens arriving in the United States at a port of entry, rather than to any illegal alien that immigration officers encounter

---

[6] The statutory provision at issue in the present case is Section 1225 of Title 8 of the United States Code. Title 8 of the United States Code contains the provisions of the INA. This particular statutory provision corresponds to Section 235 of the INA, and it is often referred to as Section 235 in opinions from the Board of Immigration Appeals and in the immigration regulations located in Title 8 of the Code of Federal Regulations. The United States Supreme Court, in contrast, provides citations to the United States Code when it addresses immigration law. *See, e.g.*, *Arizona v. United States*, 132 S. Ct. 2492, 2502 (2012). For simplicity and clarity, the Court will refer to this provision of the INA as "Section 1225."

who has not been lawfully admitted to the United States. Defs.' Opp'n Appl. Prelim. Inj. 17–19, ECF No. 34. Defendants further argue that the INA grants broad discretion to the Executive Branch, including the decision whether to initiate removal proceedings, so even if 8 U.S.C. § 1225(b)(2)(A) applies at places other than a port of entry, it still does not mandate the initiation of removal proceedings. *Id.* at 14. The Court finds that 8 U.S.C. § 1225(b)(2)(A) is not limited to aliens arriving in the United States at a port of entry, and it mandates the initiation of removal proceedings whenever an immigration officer encounters an illegal alien who is not "clearly and beyond a doubt entitled to be admitted."

### a. The Scope of 8 U.S.C. § 1225(b)(2)(A)

Section 1225 states: "An alien present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed for purposes of this chapter an applicant for admission." 8 U.S.C. § 1225(a)(1). In the INA, the terms "admission" and "admitted" mean "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." *Id.* § 1101(a)(13)(A). An alien "who has not been admitted," therefore, is an alien who has not lawfully entered into the United States "after inspection and authorization by an immigration officer." *See id.* By the Directive's terms, any Directive-eligible alien would be one "who has not been admitted" and is therefore deemed an "applicant for admission" for purposes of Section 1225. *See generally* Pls.' Am. Compl. Ex. 1 (Directive), ECF No. 15-1. Section 1225 further provides that "[a]ll aliens . . . who are applicants for admission . . . shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(3). Subject to certain exceptions not relevant to the present case, when an immigration officer encounters "an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt

10

entitled to be admitted, the alien *shall* be detained for a proceeding under [S]ection 1229a of this title." *Id.* § 1225(b)(2)(A) (emphasis added). The proceedings under Section 1229a are removal proceedings in the United States Immigration Courts.[7] *Id.* § 1229a.

Defendants contend that Section 1225(b)(2)(A)'s statement that the "alien shall be detained" applies only to applicants for admission who are "seeking admission" to the United States, as distinguished from aliens who are already present and merely encounter an immigration officer in the course of the officer carrying out his regular duties. Defs.' Opp'n Appl. Prelim. Inj. 17, ECF No. 34 (quoting 8 U.S.C. § 1225(b)(2)(A)). They assert that, while "aliens who are present in the United States and have not been admitted are deemed 'applicants for admission' pursuant to 8 U.S.C. § 1225(a)(1), they are not necessarily 'seeking admission' for purposes of [S]ection 1225(b)(2)." *Id.* at 17–18. Defendants contend that the phrase "alien seeking admission" means only those aliens coming or attempting to come into the United States at a port of entry. *Id.* at 18. The Court finds that the phrase "alien seeking admission" in Section 1225(b)(2)(A) is not limited to aliens arriving in the United States at a port of entry.

When construing a statute, the starting point should be the language of the statute itself, "for 'if the intent of Congress is clear, that is the end of the matter.'" *Arif v. Mukasey*, 509 F.3d 677, 681 (5th Cir. 2007) (quoting *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409–10 (1993)). Because the meaning of certain words or phrases "may only become evident when placed in context . . . , the words of a statute must be read in their context and with a view to their place in the overall statutory

---

[7] Service of an NTA initiates removal proceedings against an alien. *See* 8 U.S.C. § 1229; 8 C.F.R. § 239.1. Once an NTA is issued, the government determines whether to detain the alien or release him on bond or his own recognizance. The issues presented in this case concern only the issuance of an NTA and do not involve the decision to detain an alien or release him on bond or his own recognizance.

11

scheme." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000)). With respect to the INA, the Secretary of Homeland Security has the power to administer the statutory scheme, which includes the power to pass regulations elucidating specific provisions of the INA. *See* 8 U.S.C. § 1103(a)(1), (3); *see also Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984). "[I]f the statute is silent or ambiguous with respect to the specific issue," the court must determine if the agency has provided an interpretation or clarification of the statute. *See Chevron*, 467 U.S. at 843–44. If the agency has provided such an interpretation, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

Defendants ask the Court to construe Section 1225(b)(2)(A) as only applying to aliens who are coming or attempting to come into the United States at a port of entry. *See* Defs.' Opp'n Appl. Prelim. Inj. 18, ECF No. 34. Defendants have not provided the Court with the statutory construction analysis that would lead to such a conclusion.[8] *See id.* at 17–19. Accordingly, the Court will proceed with its own statutory construction analysis.

_____

[8] Given their cursory analysis of the issue, the Court questions whether Defendants have sufficiently presented the statutory construction issue to the Court for determination. For example, Defendants mention in a footnote that Section 1225 typically applies to aliens encountered at a port of entry or near the border, while Section 1226 applies to aliens encountered in the interior of the United States, but they do not provide citations to any sources that would lead the Court to that conclusion. *See* Defs.' Opp'n Appl. Prelim. Inj. 17 n.14. Defendants also state that the phrase "alien seeking admission" has been interpreted to mean "only those aliens coming or attempting to come into the United States at a port of entry," but they again fail to cite any sources that would lead the Court to that conclusion. *See id.* at 18 (inviting the Court to compare Section 1225(b)(1)(A)(i) with Section 1225(b)(1)(A)(iii), but providing no analysis). In the Fifth Circuit, a party waives any issues that are inadequately briefed. *United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001); *Regmi v. Gonzales*, 157 F. App'x 675, 676 (5th Cir. 2005) (per curiam). The parties must provide citations to relevant authority in support of their propositions. *See Castro v. McCord*, 259 F. App'x 664, 666 (5th Cir. 2007). Given the importance of the issue, the Court will address Defendants' arguments in spite of their minimal analysis and citations in support of their proposed construction of Section 1225(b)(2)(A).

12

The Court finds that the language of the statute itself does not limit the application of Section 1225(b)(2)(A) to aliens coming or attempting to come into the United States at a port of entry. Section 1225(b) applies generally to "applicants for admission," which includes aliens "present in the United States who [have] not been admitted." 8 U.S.C. § 1225(a)(1), (b). Section 1225(b)(1) applies to two categories of aliens: First, "aliens arriving in the United States," and second, aliens who have not been admitted or paroled into the United States and who have not affirmatively shown that they have been physically present in the United States continuously for two years prior to the date that an immigration officer determines they are inadmissible. *Id.* § 1225(b)(1)(A)(i), (iii). Section 1225(b)(2) applies to a separate category of aliens, described simply as "other aliens." *Id.* § 1225(b)(2). Section 1225(b)(2)(A) states that "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained." *Id.* § 1225(b)(2)(A). Nothing in the language of Section 1225 limits the application of Section 1225(b)(2)(A) to aliens who are coming or attempting to come into the United States at a port of entry, and the Court has been unable to locate a statute providing a definition of the phrase "alien seeking admission." Because the language of the statute itself does not shed light on the meaning of "alien seeking admission," the Court will turn to relevant regulations that the Secretary of Homeland Security has promulgated in an effort to interpret Section 1225.

Regulations located at 8 C.F.R. §§ 235.1–235.12 relate to Section 1225 of the INA. Defendants rely specifically on 8 C.F.R. § 235.3(c) to support their proposition that Section 1225(b)(2)(A) applies only to aliens coming or attempting to come into the United States at a port of entry. *See* Defs.' Opp'n Appl. Prelim. Inj. 18–19, ECF No. 34. That regulation states that "any

13

arriving alien who appears to the inspecting officer to be inadmissible, and who is placed in removal proceedings pursuant to [8 U.S.C. § 1229a] shall be detained in accordance with [8 U.S.C. § 1225(b)]." 8 C.F.R. § 235.3(c). An "arriving alien" is defined as "an applicant for admission coming or attempting to come into the United States at a port of entry." 8 C.F.R. § 1.2. While this regulation *applies* Section 1225(b) to "arriving aliens," it does not *limit* the application of Section 1225(b)(2)(A) to "arriving aliens."[9] Notably, throughout the INA and related regulations, the terms "arriving alien" and "alien arriving in the United States" are used to refer to aliens coming or attempting to come into the United States at a port of entry. If Congress intended to limit the application of Section 1225(b)(2)(A) to aliens coming or attempting to come into the United States at a port of entry, it would have used the term "arriving alien" or "alien arriving in the United States" instead of the term "seeking admission." Because Congress has not done so, the Court rejects Defendants' proposed interpretation of Section 1225(b)(2)(A) and finds that Section 1225(b)(2)(A) applies to "applicants for admission"—that is, aliens who have not lawfully entered the United States after inspection and authorization by an immigration officer—whether they are arriving in the United States at a port of entry or are encountered by immigration officers elsewhere in the United States.

Next, the Court must determine whether Section 1225(b)(2)(A) requires immigration officers to initiate removal proceedings (i.e., issue an NTA) against aliens who are not "clearly and beyond

---

[9] The Court has also found several cases in which the government relied on Section 1225(b)(2)(A) to justify the detention of aliens who were encountered while coming or attempting to come into the United States at a port of entry. *See, e.g., Bautista v. Sabol*, 862 F. Supp. 2d 375, 377, 379 (M.D. Pa. 2012); *Nadarajah v. Gonzales*, 443 F.3d 1069, 1073, 1076 (9th Cir. 2006); *Mejia v. Ashcroft*, 360 F. Supp. 2d 647, 649–50 (D.N.J. 2005); *Tineo v. Ashcroft*, 350 F.3d 382, 387–88 (3d Cir. 2003); *Ferreras v. Ashcroft*, 160 F. Supp. 2d 617, 622–23 (S.D.N.Y. 2001). However, the Court has been unable to locate any statutory provisions, regulations, or cases limiting the application of Section 1225(b)(2)(A) to aliens coming or attempting to come into the United States at a port of entry, and the Court finds it inappropriate to impose such a limitation. Again, Defendants have not provided the Court with citations to or substantive analysis of relevant statutes, regulations, and case law that would support such a limitation.

14

a doubt entitled to be admitted," or whether the statute leaves room at that level for the exercise of prosecutorial discretion.

### b. Whether 8 U.S.C. § 1225(b)(2)(A) is Mandatory

Plaintiffs contend that Section 1225(b)(2)(A) creates a mandatory duty for immigration officers to initiate removal proceedings against aliens who are not "clearly and beyond a doubt entitled to be admitted." Br. Supp. Pls.' Appl. Prelim. Inj. 5, ECF No. 26. Plaintiffs assert that the INA eliminates ICE's discretion to enforce the immigration laws because Section 1225 "requires the agency to enforce the Act [and] also sets forth specific enforcement procedures." *Id.* at 6 (quoting *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (en banc)). Defendants contend that the Executive Branch has long exercised prosecutorial discretion in the immigration context, often in the form of deferred action. Defs.' Opp'n Appl. Prelim. Inj. 5–6, 14, ECF No. 34 (citing *Reno v. Am.-Arab Anti-Discrimination Comm. ("AAADC")*, 525 U.S. 471, 483–84 (1999), *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012), and *Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997)). Defendants also assert that the word "shall" does not impose a mandatory duty on immigration officers to initiate removal proceedings. *Id.* at 19, 19 n.17 (citing *In re E-R-M & L-R-M*, 25 I. & N. Dec. 520, 522 (B.I.A. 2011), *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 760–62 (2005), and *City of Chi. v. Morales*, 527 U.S. 41, 62 n.32 (1999)). The Court finds that Congress's use of the word "shall" in Section 1225(b)(2)(A) imposes a mandatory obligation on immigration officers to initiate removal proceedings against aliens they encounter who are not "clearly and beyond a doubt entitled to be admitted."

The Supreme Court has noted that Congress's use of the word "shall" in a statute imposes a mandatory duty on an agency to act. *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 399 (2008)

15

(citing 29 U.S.C. § 629(d) and noting that "[t]he [EEOC's] duty to initiate formal dispute resolution processes upon receipt of a charge is mandatory in the ADEA context"); *Lopez v. Davis*, 531 U.S. 230, 241 (2001) (noting that Congress's use of the word "shall" indicates an intent to "impose discretionless obligations"). In contrast, Congress's use of the word "may" in a statute merely imposes a permissive duty, and it leaves the agency with discretion to determine when to act. *See Lopez*, 531 U.S. at 421. Application of these basic rules leads the Court to conclude that Section 1225(b)(2)(A)'s use of the word "shall" imposes a mandatory duty on immigration officers to initiate removal proceedings whenever they encounter "applicants for admission" who are not "clearly and beyond a doubt entitled to be admitted." *See* 8 U.S.C. § 1225(b)(2)(A). Nevertheless, Defendants cite several cases in support of their proposition that the term "shall" in Section 1225(b)(2)(A) does not impose a mandatory obligation on immigration officers, but instead leaves the decision to initiate removal proceedings subject to an immigration officer's prosecutorial discretion. Defs.' Opp'n Appl. Prelim. Inj. 13, 19, 19 n.17, ECF No. 34 (citing *Heckler v. Chaney*, 470 U.S. 821, 833 (1985); *In re E-R-M & L-R-M*, 25 I. & N. Dec. at 522; *Gonzales*, 545 U.S. at 760–62; *Morales*, 527 U.S. at 62 n.32).

The Court acknowledges that immigration law is an area of law where DHS and ICE have traditionally had discretion to prioritize their enforcement efforts to promote the efficient use of their limited financial resources and further their goal of ensuring public safety in the United States. As recently as last year, the Supreme Court acknowledged that "[a] principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 132 S. Ct. at 2499. "Discretion in the enforcement of immigration law embraces immediate human concerns," including the desire to be near one's family, an alien's ties to the community, an alien's military service, and

16

international relations. *Id.* Concerns that justify executive discretion in the criminal law context apply in the immigration law context as well. *Reno*, 525 U.S. at 489–91. Generally, the Executive must consider "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *Id.* at 490. Judicial review of executive decisions to enforce criminal or immigration laws could result in unnecessary delays of proceedings, "chill[ing] law enforcement by subjecting the prosecutor's [or immigration official's] motives and decisionmaking to outside inquiry," and "undermin[ing] prosecutorial effectiveness." *Id.* The Supreme Court, speaking generally with regard to immigration law, has noted that "Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all," and ICE "may decline to institute proceedings, terminate proceedings, or decline to execute a final order of removal" "to ameliorate a harsh and unjust outcome." *Arizona*, 132 S. Ct. at 2499; *Reno*, 525 U.S. at 484. The Supreme Court has also approved of ICE's utilization of "deferred action," which may occur "at any stage of the administrative process." *Reno*, 525 U.S. at 484. While DHS and ICE generally have the discretion to determine when to initiate removal proceedings, the Supreme Court has noted that "Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Heckler*, 470 U.S. at 833. The Court finds that Congress, by using the mandatory term "shall" in Section 1225(b)(2)(A), has circumscribed ICE's power to exercise discretion when determining against which "applicants for admission" it will initiate removal proceedings. *See* 8 U.S.C. § 1225(b)(2)(A).

17

The Court does not find Defendants' cited cases where the word "shall" left room for discretion controlling. First, in *In re E-R-M & L-R-M*, the Board of Immigration Appeals found that the use of the term "shall" in Section 1225(b)(1)(A)(i) did not limit the prosecutorial discretion of DHS to place arriving aliens in removal proceedings under Section 1229a, rather than expedited removal proceedings. 52 I. & N. Dec. at 520. In that case, the government initiated removal proceedings against the respondents under Section 1229a when they arrived in the United States from Cuba. *Id.* at 520–21. The respondents were subject to expedited removal proceedings under Section 1225(b)(1)(A)(i), but they were also entitled to Section 1229a removal proceedings under Section 1225(b)(2)(A). *Compare* 8 U.S.C. § 1225(b)(1)(A)(i) ("If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States . . . is inadmissible under [S]ection 1182(a)(6)(C) or 1182 (a)(7) of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [S]ection 1158 of this title or a fear of persecution."), *with id.* § 1225(b)(2)(A) ("[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under [S]ection 1229a of this title."). The Immigration Judge found that it lacked jurisdiction over the Section 1229a removal proceedings because the respondents were subject to mandatory expedited removal proceedings under Section 1225(b)(1)(A)(i). *In re E-R-M & L-R-M*, 25 I. & N. Dec. at 521.

Presented with mutually exclusive mandatory provisions, the Board of Immigration Appeals vacated the Immigration Judge's decision and determined that, when there is a choice between two avenues of removal proceedings, both of which contain the word "shall," the "shall" in Section

18

1225(b)(1)(A)(i) concerning expedited removal proceedings can be interpreted as "may." *Id.* at 522–24.

In the present case, Directive-eligible aliens would fall under Section 1225(b)(2)(A)'s instruction that immigration officers "shall" initiate removal proceedings under Section 1229a. Even if Directive-eligible aliens were encountered upon arrival in the United States (perhaps after a brief departure from the country) so that Section 1225(b)(1)(A)(i)'s expedited removal proceedings would also apply, the Government's discretion could only be exercised to determine whether to proceed under Section 1225(b)(1)(A)(i)'s expedited removal proceedings or the removal proceedings under Section 1229a. Nothing in *In re E-R-M & L-R-M* suggests that DHS and ICE have discretion to refrain from initiating removal proceedings at all.

In *Heckler v. Chaney*, the Supreme Court found that the Federal Food, Drug, and Cosmetic Act's ("FDCA") section on criminal sanctions did not impose a mandatory duty on the Food and Drug Administration ("FDA") to prosecute every violation of the Act, even though the statute provided that "any person who violates the Act's substantive prohibitions 'shall be imprisoned . . . or fined.'" 470 U.S. at 835 (quoting 21 U.S.C. § 333). The Supreme Court found that this seemingly mandatory language did not require prosecution of every violation of the Act, "particularly since the Act charges the Secretary only with recommending prosecution," and "any criminal prosecutions must be initiated by the Attorney General." *Id.* The Supreme Court found that the Act's enforcement provisions, on the whole, committed "complete discretion to the Secretary to decide how and when they should be exercised." *Id.* The INA, in contrast, is not structured in such a way that DHS and ICE have complete discretion to decide when to initiate removal proceedings. Instead, Section 1225(b)(2)(A) of the INA requires immigration officers to initiate removal proceedings

19

whenever they encounter applicants for admission who are not "clearly and beyond a doubt entitled to be admitted," and nothing in the INA or related regulations suggests that Congress's use of the term "shall" imposes anything other than a mandatory duty.

In *City of Chicago v. Morales*, the Supreme Court addressed the constitutionality of an Illinois city ordinance that stated: "Whenever a police officer observes a person whom he reasonably believes to be a criminal street gang member loitering in any public place with one or more other persons, he shall order all such persons to disperse and remove themselves from the area." 527 U.S. at 47 n.2. The Supreme Court found that the ordinance was unconstitutionally vague because it did not "provide sufficiently specific limits on the enforcement discretion of the police 'to meet constitutional standards for definiteness and clarity.'" *Id.* at 64. The Supreme Court also noted that the word "shall" was not mandatory, because the City—the legislative body that drafted the ordinance—conceded that "police officers must use some discretion in deciding when and where to enforce city ordinances." *Id.* at 62 n.32. Similarly, in *Town of Castle Rock, Colorado v. Gonzales*, the respondent filed suit under 42 U.S.C. § 1983 alleging that the Town of Castle Rock, Colorado violated her due process rights when its police officers failed to respond to her reports that her estranged husband had taken their children in violation of her restraining order against him. 545 U.S. at 751, 754. Colorado law provided in relevant part:

> (a) . . . A peace officer shall use every reasonable means to enforce a restraining order.
> (b) A peace officer shall arrest, or, if an arrest would be impractical under the circumstances, seek a warrant for the arrest of a restrained person when the peace officer has information amounting to probable cause that:
> (I) The restrained person has violated or attempted to violate any provision of a restraining order; and

> (II) The restrained person has been properly served with a copy of the
> restraining order or the restrained person has received actual notice
> of the existence and substance of such order.
> (c) . . . A peace officer shall enforce a valid restraining order whether
> or not there is a record of the restraining order in the registry.

*Id.* at 752 (quoting Colo. Rev. Stat. § 18-6-803.5(3) (Lexis 1999)). The Supreme Court found that

this statute did not create a mandatory duty for police officers to enforce restraining orders. *Id.* at

760. The Supreme Court stated that "[a] well established tradition of police discretion has long

coexisted with apparently mandatory arrest statutes." *Id.* at 760. However, the Supreme Court noted

that the legislature may override normal police discretion by providing "a true mandate[, which]

would require some stronger indication . . . than 'shall use every reasonable means to enforce a

restraining order' (or even 'shall arrest . . . or . . . seek a warrant')." *Id.* at 760–61.

The Supreme Court in *City of Chicago v. Morales* was examining the city ordinance to

determine whether it provided sufficient notice of what constituted prohibited conduct. *Morales*,

527 U.S. at 59–60. The Supreme Court in *Town of Castle Rock, Colorado v. Gonzales* was

examining the statute to determine whether it conferred a property right for purposes of the Due

Process Clause of the Fourteenth Amendment. *Gonzales*, 545 U.S. at 766. Here, the Court must

determine what Section 1225 requires and whether the Directive and related provisions of the

Morton Memorandum directly conflict with those statutory requirements. Accordingly, the Court's

analysis in the present case is different from the Supreme Court's analysis in *Morales* and *Gonzales*.

Considering Section 1225 as a whole, the Court finds that Congress has used language indicating

an intent to impose a mandatory duty on immigration officers in Section 1225(b)(2)(A). Specifically,

the statute sets out a detailed scheme for the initiation of removal proceedings. For example, Section

1225(b)(1) applies expedited removal proceedings to particular aliens, while Section 1225(b)(2)

21

applies traditional removal proceedings to another class of aliens. *Compare* 8 U.S.C. § 1225(b)(1), *with id.* § 1225(b)(2). Sections 1225(b)(2)(B) and (C) also provide specific exceptions to the initiation of removal proceedings required by Section 1225(b)(2)(A). Given the use of the mandatory term "shall," the structure of Section 1225(b) as a whole, and the defined exceptions to the initiation of removal proceedings located in Sections 1225(b)(2)(B) and (C), the Court finds that Section 1225(b)(2)(A) imposes a mandatory duty on immigration officers to initiate removal proceedings whenever they encounter an "applicant for admission" who "is not clearly and beyond a doubt entitled to be admitted."

### c. Whether the Court Can Still Uphold DHS's Discretion

When the Executive "takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb," and "[c]ourts can sustain exclusive [executive] control in such a case" only if that particular subject matter "is within [the Executive's] domain and beyond control by Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–40 (1952) (Jackson, J., concurring). Because Section 1225(b)(2)(A) expressly requires immigration officers to initiate removal proceedings against applicants for admission who are not "clearly and beyond a doubt entitled to be admitted," the Court can uphold DHS's discretion to refrain from initiating removal proceedings under those circumstances only if Congress does not have power to legislate in the area of immigration law with regard to the removal of aliens.

Congress's power over immigration is rooted in the Constitution, is inherent in the powers of sovereign nations, and is an incident of international law. U.S. Const. art. I, § 8, cl. 4 ("The Congress shall have power . . . [t]o establish an uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies throughout the United States."); *Chae Chan Ping v. United States*,

22

130 U.S. 581, 603–07 (1889) ("That the government of the United States, through the action of the legislative department, can exclude aliens from its territory is a proposition which we do not think open to controversy."); *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892) ("It is an accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe."); *Fong Yue Ting v. United States*, 149 U.S. 698, 707 (1893) ("The right of a nation to expel or deport foreigners who have not been naturalized, or taken any steps towards becoming citizens of the country, rests upon the same grounds, and is as absolute and unqualified, as the right to prohibit and prevent their entrance into the country."); *Harisiades v. Shaughnessy*, 342 U.S. 580, 596–97 (1952) (Frankfurter, J., concurring) ("The conditions for entry of every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based, have been recognized as matters solely for the responsibility of the Congress . . . ."); *Arizona*, 132 S. Ct. at 2498 ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."). Congress unquestionably has the ability to legislate in the area of immigration law with regard to the removal of aliens. Because immigration law is not "within [the Executive's] domain and beyond control by Congress," Congress has the ability to eliminate DHS's discretion with respect to when to initiate removal proceedings against an alien, and DHS cannot implement measures that are incompatible with Congressional intent.[10] *See Heckler*, 470 U.S. at 833

---

[10] At the April 8, 2013 hearing, Defendants asserted that "as a statutory matter" Congress has the ability to require every immigration officer that encounters an alien who is not "clearly and beyond a doubt entitled to be admitted" to issue an NTA to such alien, but Congress may not have the ability to do so "as

23

("Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue.").

Because Congress has the power to legislate in the area of immigration law and has expressed its intent to require the initiation of removal proceedings against aliens when the requirements of Section 1225(b)(2)(A) are satisfied, the Court finds that DHS does not have discretion to refuse to initiate removal proceedings when the requirements of Section 1225(b)(2)(A) are satisfied. However, DHS's ability to exercise its discretion at later stages in the removal process by, for example, cancelling the Notice to Appear or moving to dismiss the removal proceedings, is not at issue in the present case, and nothing in this Order limits DHS's discretion at later stages of the removal process. *See* 8 C.F.R. § 239.2(a) (providing for cancellation of a Notice to Appear prior to jurisdiction vesting with an immigration judge); *id.* § 239.2(c) (providing for a motion to dismiss removal proceedings after jurisdiction vests with an immigration judge); *In re G-N-C*, 22 I. & N. Dec. 281, 283–84 (B.I.A. 1998) (noting that, pursuant to 8 C.F.R. § 239.2(a), an immigration officer "authorized to issue a Notice to Appear has complete power to cancel such notice prior to jurisdiction vesting with the Immigration Judge"). Through the exercise of discretion at these later stages in the removal proceedings, DHS appears capable of prioritizing its removal objectives and conserving its limited resources.

---

a constitutional matter." *See* Hr'g Tr. Defendants argued that Congress might not have the ability to impose such a mandatory duty "as a constitutional matter" because Congress's implementation of a mandatory duty might infringe on the Executive's ability to use its discretion in the immigration law context to "take Care that the Laws be faithfully executed." *Id.*; *see* U.S. Const. art. II, § 3. The Court finds this argument unavailing given the Supreme Court's recognition of Congress's broad power in the area of immigration law. *See supra* Part III.A.1.c. (discussing congressional power in the area of immigration law).

24

Having determined that 8 U.S.C. § 1225(b)(2)(A) requires the initiation of removal proceedings whenever an immigration officer encounters an "applicant for admission" who is not "clearly and beyond a doubt entitled to be admitted," the Court now turns to the issue of whether relief is available under the Declaratory Judgment Act.

## 2. Declaratory Judgment Act

Plaintiffs ultimately seek a declaratory judgment to the effect that the Directive and related provisions of the Morton Memorandum are unlawful and in violation of various statutes and the Constitution of the United States, along with an injunction preventing Defendants from implementing or enforcing the Directive or taking any adverse action against Plaintiffs for not following the Directive. Pls.' Am. Compl. ¶¶ A–F, ECF No. 15. The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Declaratory Judgment Act is not an independent source of subject matter jurisdiction, but merely provides additional remedies. *See Earnest v. Lowentritt*, 690 F.2d 1198, 1203 (5th Cir. 1982). It permits an award of declaratory relief only when there is another basis for jurisdiction present. *TTEA v. Ysleta del Sur Pueblo*, 181 F.3d 676, 681 (5th Cir. 1999). The existence of an "actual controversy" in a constitutional sense is necessary to sustain jurisdiction under the Declaratory Judgment Act. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–40 (1937); *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997). The district court must determine "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to

25

warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118,

127 (2007). The plaintiff must have suffered "an invasion of a legally protected interest," which is

"traditionally thought to be capable of resolution through the judicial process," and is currently fit

for judicial review. *Magaw*, 132 F.3d at 280 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

560 (1992), and *Flast v. Cohen*, 392 U.S. 83, 97 (1968)).

The Court previously determined that Plaintiffs have suffered an invasion of a legally

protected interest that is capable of resolution through the judicial process, because they face the

threat of disciplinary action if they issue an NTA to a Directive-eligible alien.[11] *See* Order 18–24,

22 n.5, Jan. 24, 2013, ECF No. 41; *see also* Pls.' Am. Compl. ¶ 50, ECF No. 15; App. Pls.' Resp.

---

[11] The Code of Federal Regulations provides that "[a]ny immigration officer, or supervisor thereof, performing an inspection of an arriving alien at a port-of-entry may issue a notice to appear to such alien." 8 C.F.R. § 239.1(a). In addition, a specific list of "officers, or officers acting in such capacity, may issue a notice to appear" at locations other than a port-of-entry. *Id.* Immigration enforcement agents and deportation officers are not specifically listed as having authority to issue NTAs. *See generally id.* However, subsection 41 states that "[o]ther officers or employees of the Department or of the United States who are delegated the authority as provided by 8 C.F.R. 1.2 to issue notices to appear" may issue NTAs. *Id.* § 239(a)(41). In 8 C.F.R. § 235.6, the Secretary of DHS has specifically delegated "immigration officers" the authority to issue a Form I-862, which is an NTA, "[i]f, in accordance with the provisions of [8 U.S.C. § 1225(b)(2)(A)], the examining immigration officer detains an alien for a proceeding before an immigration judge under [8 U.S.C. § 1229a]." 8 C.F.R. § 235.6(a)(1)(i). This regulation specifically gives immigration enforcement agents and deportation officers the authority to issue NTAs in the circumstances described in Section 1225(b)(2)(A). *See* 8 C.F.R. § 1.2 (defining the term "immigration officer" to include immigration enforcement agents and deportation officers).

Defendants assert that Plaintiffs are not harmed by the Directive and related provisions of the Morton Memorandum because immigration enforcement agents and deportation officers are not authorized to issue NTAs. Defs.' Opp'n Appl. Prelim. Inj. 10, ECF No. 34. At the hearing on Plaintiffs' Application for Preliminary Injunction, Defendants presented a December 5, 2011 Memorandum by Gary Mead discussing the delegation of authority to issue NTAs. *See* Gov't Ex. 4 (Mead Memorandum). However, this memorandum relates to Section 287(g) agreements with state governments and is inapplicable to the issues presented in the present case. *See generally id.*; *see also* 8 U.S.C. § 1357(g). In their opposition to Plaintiffs' Application for Preliminary Injunction and at the April 8, 2013 hearing, Defendants provided no authority indicating that immigration enforcement agents and deportation officers do not have authority to issue NTAs pursuant to Section 1225(b)(2)(A). *See generally* Defs.' Opp'n Appl. Prelim. Inj., ECF No. 34; Hr'g Tr. (At the April 8, 2013 hearing, the Court gave the parties as much time as they thought they needed to present their arguments and supporting authority.).

26

Mot. Dismiss Ex. 3 (Doebler Aff.) ¶¶ 2–9, ECF No. 31; *id.* Ex. 2 (Engle Aff.) ¶¶ 8, 20; Defs.' Opp'n Appl. Prelim. Inj. Attachment G (Ellis Decl.), Ex. B (Doebler Notice of Proposed Suspension), ECF No. 34-7; *id.* Attachment G (Ellis Decl.), Ex. C (Doebler Decision on Proposed Suspension). Accordingly, the only thing left to determine is whether the issues are currently fit for judicial review.

In *Abbott Laboratories v. Gardner*, the Supreme Court permitted the petitioner drug companies and their association to challenge regulations promulgated by the Commissioner of Food and Drugs designed to implement labeling provisions of the Federal Food, Drug, and Cosmetic Act. 387 U.S. 136, 152 (1967). The Supreme Court held that the issues presented were "appropriate for judicial resolution at this time" because "the issue tendered was a purely legal one," and "the impact of the regulations upon the petitioners [was] sufficiently direct and immediate." *Id.* at 148, 152. The Supreme Court allowed the petitioners to pursue relief under the Declaratory Judgment Act even though none of them had been prosecuted for failure to comply with the challenged regulations. *Id.* at 152–54; *see also Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1965) (finding claims sufficiently ripe for judicial review where the issues involved purely legal questions and the threat of harm was "certainly impending").

The Court finds the present situation analogous to that presented in *Gardner*. Plaintiffs' causes of action require an analysis of whether the Directive and related portions of the Morton Memorandum are consistent with (1) federal law, (2) the separation-of-powers doctrine, (3) the Executive's duty under the Constitution to take care that the laws are faithfully executed, and (4) the Administrative Procedure Act. *See* Pls.' Am. Compl. ¶¶ 67–80, 92–116, ECF No. 15. These causes of action present primarily legal issues that are the appropriate subject matter of a declaratory

27

judgment action. Additionally, the impact of the Directive and related portions of the Morton Memorandum is "sufficiently direct and immediate," because Plaintiffs face the threat of disciplinary action if they issue an NTA to a Directive-eligible alien. *See* Order 18–24, 22 n.5, Jan. 24, 2013, ECF No. 41; *see also* Pls.' Am. Compl. ¶ 50, ECF No. 15; App. Pls.' Resp. Mot. Dismiss Ex. 3 (Doebler Aff.) ¶¶ 2–9, ECF No. 31; *id.* Ex. 2 (Engle Aff.) ¶¶ 8, 20; Defs.' Opp'n Appl. Prelim. Inj. Attachment G (Ellis Decl.), Ex. B (Doebler Notice of Proposed Suspension), ECF No. 34-7; *id.* Attachment G (Ellis Decl.), Ex. C (Doebler Decision on Proposed Suspension). Accordingly, the Court finds that the issues presented are "fit for judicial review," and relief pursuant to the Declaratory Judgment Act is available to Plaintiffs.[12] The Court will now turn to the issue of this Court's jurisdiction under the Administrative Procedure Act to review the Directive and the Morton Memorandum.

### 3. Administrative Procedure Act

Plaintiffs argue that the Directive and related provisions of the Morton Memorandum violate the Administrative Procedure Act ("APA") by conferring a benefit without appropriate regulatory implementation. Br. Supp. Pls.' Appl. Prelim. Inj. 15–22, ECF No. 26. Specifically, Plaintiffs contend that the Directive's establishment of criteria for exception from removal and definition of a class with affirmative eligibility for benefits is essentially a "rule" under the APA that must be promulgated through the formal rulemaking procedure. *Id.* at 16. Plaintiffs argue that because the

---

[12] While the Court has found that relief pursuant to the Declaratory Judgment Act is available to Plaintiffs on all their remaining causes of action, this Order only addresses the issuance of a preliminary injunction based on Plaintiffs' likelihood of success on the merits of their first and sixth causes of action. *See* Pls.' Am. Compl. ¶¶ 67–73, ECF No. 15 (asserting that the Directive and related provisions of the Morton Memorandum violate federal statutes requiring the initiation of removal proceedings); *id.* ¶¶ 110–16 (asserting that the Directive and related provisions of the Morton Memorandum violate the Administrative Procedure Act).

28

Secretary of Homeland Security has not complied with the APA's rulemaking procedure, the Directive and Morton Memorandum violate the APA. Defendants argue that this Court lacks jurisdiction to review Plaintiffs' APA claims because the decision whether to initiate removal proceedings is a matter committed to agency discretion. Defs.' Opp'n Appl. Prelim. Inj. 12–16, ECF No. 34. Defendants also contend that the Directive and Morton Memorandum reflect general statements of policy by the agency, which are not subject to notice and comment and the requirements of the rulemaking process. *Id.* at 21. Defendants additionally argue that the Directive and Morton Memorandum do not confer any benefits, but simply provide guidance on situations where deferred action would be appropriate.

### a. Whether the Court Has Jurisdiction Under the APA

The Court must first address its jurisdiction to review the Directive and the Morton Memorandum under the APA. Defendants argue that this Court lacks jurisdiction because the INA grants broad discretion to the Executive Branch, including the decision to initiate removal proceedings. Defs.' Opp'n Appl. Prelim. Inj. 14, ECF No. 34. Plaintiffs recognize that the Executive Branch has discretion to determine its immigration law enforcement priorities, but they contend judicial review is available in the present case because Congress has explicitly removed the Executive's discretion to initiate removal proceedings in 8 U.S.C. § 1225. Pls.' Reply Appl. Prelim. Inj. 4–6, ECF No. 36. The Court finds that jurisdiction exists to review the Directive and related provisions of the Morton Memorandum.

The Supreme Court addressed "the extent to which a decision of an administrative agency to exercise its 'discretion' not to undertake certain enforcement actions is subject to judicial review" under the APA in *Heckler*, 470 U.S. at 823. The APA's provisions for judicial review of agency

29

actions are contained in 5 U.S.C. §§ 701–706. *See id.* at 828. "Any person 'adversely affected or

aggrieved' by agency action . . . , 'including a failure to act,' is entitled to 'judicial review thereof,'

as long as the action is a 'final agency action for which there is no other adequate remedy in a

court.'" *Id.* (quoting 5 U.S.C. §§ 702, 704). Section 706 governs the standards a court is to apply

when reviewing agency actions. *See* 5 U.S.C. § 706. "But before any review at all may be had, a

party must first clear the hurdle of § 701(a)." *Heckler*, 470 U.S. at 828. Section 701 states that the

chapter on judicial review "applies, according to the provisions thereof, except to the extent that--

(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."

5 U.S.C. § 701(a). When the statute at issue does not expressly preclude judicial review of agency

actions, the court must analyze whether judicial review is available under Section 701(a)(2). "[E]ven

where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn

so that a court would have no meaningful standard against which to judge the agency's exercise of

discretion." *Heckler*, 470 U.S. at 830. An agency's decision not to take enforcement action is

"presumed immune from judicial review under § 701(a)(2)." *Id.* at 832. However, this presumption

may be rebutted "where the substantive statute has provided guidelines for the agency to follow in

exercising its enforcement powers." *Id.* at 832–33. If Congress has "indicated an intent to

circumscribe agency enforcement discretion, and has provided meaningful standards for defining the

limits of that discretion, there is 'law to apply' under § 701(a)(2), and courts may require that the

agency follow that law." *Id.* at 834–35. If Congress has not done so, "then an agency refusal to

institute proceedings is a decision 'committed to agency discretion by law' within the meaning of"

Section 701(a)(2), and judicial review is unavailable. *Id.* at 835.

In *Dunlop v. Bachowski*, a union employee brought suit under the Labor Management Reporting and Disclosure Act ("LMRDA") asking the Secretary of Labor to investigate and file suit to set aside a union election. 421 U.S. 560, 563–64 (1975). The LMRDA provided that, upon filing of a complaint by a union member, "[t]he Secretary shall investgate such complaint and, if he finds probable cause to believe that a violation . . . has occurred . . . he shall . . . bring a civil action . . . ." 29 U.S.C. § 482. The Supreme Court held that judicial review of the Secretary's decision not to bring a civil action was available, because "the language of the LMRDA indicated that the Secretary was required to file suit if certain 'clearly defined' factors were present." *Heckler*, 470 U.S. at 834 (quoting *Bachowski v. Brennan*, 502 F.2d 79, 87–88 (3d Cir. 1974)); *see Dunlop*, 421 U.S. at 567–68. The statute at issue in *Dunlop* "quite clearly withdrew discretion from the agency and provided guidelines for exercise of its enforcement power." *Heckler*, 470 U.S. at 834. Therefore, judicial review was available. *Id.*

In *Heckler v. Chaney*, the Supreme Court addressed the extent to which determinations by the Food and Drug Administration ("FDA") not to exercise its enforcement authority over the use of drugs in interstate commerce may be judicially reviewed. *Id.* at 828. The Federal Food, Drug, and Cosmetic Act ("FDCA") contained a general enforcement provision providing that "'[t]he Secretary is *authorized* to conduct examinations and investigations . . . .'" *Id.* at 835 (quoting 21 U.S.C. § 372). The provision addressing injunctions provided "no indication of when an injunction should be sought," and the provision providing for seizures of offending food, drug, or cosmetic articles stated that the offending items "'shall be liable to be proceeded against.'" *Id.* (quoting 21 U.S.C. §§ 332, 334). The provision providing for criminal sanctions provided that "any person who violates the Act's substantive prohibitions 'shall be imprisoned . . . or fined.'" *Id.* (quoting 21 U.S.C.

31

§ 333). The Supreme Court held that this language did not mandate criminal prosecution of every person who violated the FDCA, "particularly since the Act charge[d] the Secretary only with recommending prosecution," and any criminal prosecutions had to be initiated by the Attorney General. *Id.* Unlike the statute at issue in *Dunlop*, the statute in *Heckler* did not "clearly [withdraw] discretion from the agency and provide[] guidelines for exercise of its enforcement power." *Id.* at 834–37.

In the present case, Plaintiffs are challenging DHS and ICE's decision not to issue NTAs and initiate removal proceedings against aliens who satisfy the criteria set out in the Directive and the Morton Memorandum. Because the INA does not expressly preclude judicial review over the agency's decision not to initiate removal proceedings, the Court must determine whether there is "law to apply" under Section 701(a)(2) so that the Court has jurisdiction "to require that the agency follow that law." *See Heckler*, 470 U.S. at 834–35. The Court finds the statute at issue in the present case akin to the one at issue in *Dunlop*.

As discussed previously, the Court finds that Section 1225(b)(2)(A) clearly defines when inspecting immigration officers are required to initiate removal proceedings against an alien. *See supra* Part III.A.1.b. Congress has used the mandatory term "shall" to describe immigration officers' duty to initiate removal proceedings, and the statute sets out a detailed scheme for when initiation of removal proceedings is required.[13] *Compare* 8 U.S.C. § 1225(b)(1) *with id.* § 1225(b)(2). The specific exceptions to the initiation of removal proceedings required by Section 1225(b)(2)(A)

---

[13] At the hearing on Plaintiffs' Application for Preliminary Injunction, Defendants did not dispute that the use of the term "shall" is typically used to impose a mandatory duty. *See* Hr'g Tr. However, Defendants argued that Section 1225(b)(2)(A) did not provide specific enough standards to remove DHS's discretion with regard to when to initiate removal proceedings. *See id.*

32

further define when immigration officers must initiate removal proceedings. *See id.* § 1225(b)(2)(B),

(C). Given the use of the mandatory term "shall," the structure of Section 1225(b) as a whole, and

the defined exceptions to the initiation of removal proceedings located in Sections 1225(b)(2)(B) and

(C), the Court finds that Section 1225(b)(2)(A) provides clearly defined factors for when inspecting

immigration officers are required to initiate removal proceedings against an alien, just as the statute

at issue in *Dunlop* provided certain clearly defined factors for when the Secretary of Labor was

required to file a civil action. *See Heckler*, 470 U.S. at 834 (quoting *Bachowski*, 502 F.2d at 87–88);

*Dunlop*, 421 U.S. at 567–68. Accordingly, the Court finds that there is "law to apply" so that

judicial review is available to ensure that DHS complies with the law pursuant to 5 U.S.C.

§ 701(a)(2). *See Heckler*, 470 U.S. at 834–35.

### b. Whether Plaintiffs Are Entitled to Relief Under the APA

Having found that Plaintiffs have cleared the jurisdictional hurdle of Section 701(a), the

Court must now determine if Plaintiffs are entitled to relief pursuant to the APA. As stated

previously, "[a]ny person 'adversely affected or aggrieved' by agency action . . . , 'including a failure

to act,' is entitled to 'judicial review thereof,' as long as the action is a 'final agency action for which

there is no other adequate remedy in a court.'" *Heckler*, 470 U.S. at 828 (quoting 5 U.S.C. §§ 702,

704). Once those statutory requirements are satisfied, the court reviewing the agency's action shall:

> hold unlawful and set aside agency action, findings, and conclusions
> found to be—
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in
> accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or
> short of statutory right;
> (D) without observance of procedure required by law;

> (E) unsupported by substantial evidence in a case subject to
> [S]ections 556 and 557 of this title or otherwise reviewed on the
> record of an agency hearing provided by statute; or
> (F) unwarranted by the facts to the extent that the facts are subject to
> trial de novo by the reviewing court.

5 U.S.C. § 706(2).

The Court has already determined that Plaintiffs are adversely affected or aggrieved by the Directive and Morton Memorandum. *See* Order 21–22, Jan. 24, 2013, ECF No. 41. For agency action to be "final," two conditions must be satisfied. *Bennett v. Spear*, 520 U.S. 154, 177 (1997). "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* at 177–78 (internal citation omitted). Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 178 (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). The Court finds that the Directive and related provisions of the Morton Memorandum are sufficiently final to warrant judicial review. First, DHS has already begun implementing the Directive and related provisions of the Morton Memorandum by granting deferred action to individuals who satisfy the criteria set forth in the Directive. *See* Pls.' Ex. 10 (Deferred Action for Childhood Arrivals Process); Pls.' Ex. 14 (Nat'l Standard Operating Procedures (SOP) Deferred Action for Childhood Arrivals (DACA)). This indicates that the Directive and related provisions of the Morton Memorandum are not "merely tentative or interlocutory" in nature. *See Bennett*, 520 U.S. at 177–78. Second, the Directive sets forth specific criteria that must be satisfied before an individual is considered for an exercise of prosecutorial discretion. *See* Pls.' Am. Compl. Ex. 1 (Directive), at 1, ECF No. 15-1. If the criteria of the Directive are satisfied, ICE agents are instructed to defer action against the alien "for a period

34

of two years, subject to renewal." *Id.* at 2. Legal consequences flow from a grant of deferred action, because "an individual whose case has been deferred is not considered to be unlawfully present during the period in which deferred action is in effect." Mot. Supplement R. on Appl. Prelim. Inj. Attach. 1 (Jung Decl.), Ex. A (USCIS Frequently Asked Questions), at 2, ECF No. 39-1. Additional legal consequences flow from the Directive and related provisions of the Morton Memorandum, because if Plaintiffs comply with Section 1225 and issue an NTA to a Directive-eligible alien, they face the threat of disciplinary action. *See* Order 18–24, 22 n.5, Jan. 24, 2013, ECF No. 41; *see also* Pls.' Am. Compl. ¶ 50, ECF No. 15; App. Pls.' Resp. Mot. Dismiss Ex. 3 (Doebler Aff.) ¶¶ 2–9, ECF No. 31; *id.* Ex. 2 (Engle Aff.) ¶¶ 8, 20; Defs.' Opp'n Appl. Prelim. Inj. Attachment G (Ellis Decl.), Ex. B (Doebler Notice of Proposed Suspension), ECF No. 34-7; *id.* Attachment G (Ellis Decl.), Ex. C (Doebler Decision on Proposed Suspension). Accordingly, the Court finds that the Directive and related provisions of the Morton Memorandum constitute "final agency action" for which judicial review is available. *See* 5 U.S.C. § 704.

As explained below, the Court cannot determine the threshold issue of whether "there is no other adequate remedy in a court" at this time. The Court will complete its analysis of the merits of Plaintiffs' APA claims after the parties have addressed the remaining jurisdictional issues before the Court.

## B. Threat of Irreparable Harm in the Absence of Preliminary Relief

To obtain a preliminary injunction, Plaintiffs must demonstrate a "likelihood of substantial and immediate irreparable injury." *See O'Shea v. Littleton*, 414 U.S. 488, 502 (1974). They must demonstrate that irreparable injury is *likely* in the absence of an injunction, rather than a mere possibility. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). There must be a

35

showing of a real or immediate threat that the plaintiffs will be wronged in the future. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

Defendants contend that this Court lacks jurisdiction over Plaintiffs' claims because Plaintiffs have essentially alleged federal employment disputes that may proceed only under the Civil Service Reform Act ("CSRA"). Defs.' Opp'n Appl. Prelim. Inj. 16, ECF No. 34 (citing 5 U.S.C. § 7103(a)(9)(C)(ii)). Defendants previously raised this issue in a footnote in their Motion to Dismiss and addressed the argument further in their reply brief. *See* Defs.' Mot. Dismiss 11 n.3, ECF No. 23; Defs.' Reply Mot. Dismiss 5, ECF No. 33. They again addressed this issue in their opposition to Plaintiff's Application for Preliminary Injunctive Relief, but in no greater detail than at the motion to dismiss stage. *See* Defs.' Opp'n Appl. Prelim. Inj. 16, ECF No. 34. At the hearing on Plaintiffs' Application for Preliminary Injunction, the parties presented new facts that bear on the application of the CSRA, including details about Plaintiff Crane issuing a demand to bargain under Collective Bargaining Agreement 2000, to which Plaintiffs are parties. *See* Hr'g Tr.; *see also* Defs.' Opp'n Appl. Prelim. Inj. Attach. G (Ellis Decl.), Ex. A (Agreement 2000 Between U.S. Immigration and Naturalization Service and National Immigration and Naturalization Service Council), ECF No. 34-7.

This is an inadequate way to address the Court's jurisdiction. The Court previously criticized Defendants' failure to adequately raise the issue of whether the CSRA precludes this Court's jurisdiction in its Order Granting in Part and Denying in Part Defendants' Motion to Dismiss. *See* Order 32–33, Jan. 24, 2013, ECF No. 41. Presenting piecemeal arguments in a footnote in their motion to dismiss, in their reply brief, in their opposition to Plaintiffs' Application for Preliminary Injunction, and then entirely new arguments at an evidentiary hearing is an inappropriate way to

36

challenge jurisdiction. In the Fifth Circuit, a party waives any issues that are inadequately briefed. *United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001); *Regmi v. Gonzales*, 157 F. App'x 675, 676 (5th Cir. 2005) (per curiam). However, the issue of a federal court's subject matter jurisdiction cannot be waived. *See* Fed. R. Civ. P. 12(h)(3); *Coury v. Prot*, 85 F.3d 244, 248 (5th Cir. 1996) (citing *City of Indianapolis v. Chase Nat'l Bank*, 314 U.S. 63, 76 (1941)). The CSRA issue could affect the Court's determination of whether "there is no other adequate remedy in a court" so that relief is available under the APA, whether there is a threat of irreparable harm in the absence of preliminary relief, thus making a preliminary injunction appropriate, and whether the Court has jurisdiction to hear this case at all. While ordinarily the issue would be waived, because the CSRA could potentially affect jurisdiction the Court finds it necessary to address the issue and require additional briefing from the parties.[14]

## IV. CONCLUSION

Accordingly, the Court hereby defers ruling on Plaintiffs' Application for Preliminary Injunction until the parties have submitted additional briefing.

It is hereby **ORDERED** that the parties must submit supplemental briefs, not to exceed 15 pages in length, addressing the effect of the Collective Bargaining Agreement and the CSRA on the Court's jurisdiction to hear the case. The parties must provide citations to relevant authority in support of their propositions, including citations to the relevant provisions of the Collective Bargaining Agreement. *See Castro v. McCord*, 259 F. App'x 664, 666 (5th Cir. 2007) (requiring citations to relevant authority). The parties shall file their respective briefs on or before **May 6, 2013**.

---

[14] The Court will address the third and fourth factors required to obtain a preliminary injunction—whether the balance of equities tips in Plaintiffs' favor and whether an injunction is in the public interest—after the Court addresses the CSRA's effect on jurisdiction.

**SO ORDERED** on this **23rd day** of **April, 2013**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

38