# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS,
# BROWNSVILLE DIVISION

| No. 01:14-CV-00254 |
| --- |

STATE OF TEXAS, ET AL,

Plaintiffs

v.

UNITED STATES OF AMERICA, ET AL,

Defendants

---

## BRIEF OF AMICUS CURIAE,
## IMMIGRATION REFORM LAW INSTITUTE INC., SUPPORTING
## PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION

---

Michael M. Hethmon, Esq.*
Dale L. Wilcox, Esq.*
Immigration Reform Law Institute, Inc.
25 Massachusetts Ave, NW, Suite 335
Washington, D.C.  20001
Phone:       202-232-5590
Fax:          202-464-3590

*Admission pro hac vice pending

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *Amicus Curiae* Immigration Reform Law Institute (IRLI) states the following:

IRLI is a nonprofit charitable corporation organized under the laws of the District of Columbia.  It does not have a parent corporation, no publicly held company owns any part of it, and no publicly held company has a financial interest in the outcome of this appeal.

## AUTHORITY TO FILE AND RULE 29(c)(5) STATEMENT

Pursuant to Fed. R. App. P. 29(a), an amicus curiae may "may file a brief . . . if the brief states that all parties have consented to its filing."  Counsel for the Plaintiffs and the Defendants have respectively informed IRLI that they take no position as to whether the court should grant IRLI's motion for leave to file this brief.  No counsel for a party authored this brief in whole or in part and no person or entity, other than *amicus*, its members, or its counsel, has made a monetary contribution to its preparation or submission.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

INTERESTS OF *AMICUS CURIAE* .......................................................1

INTRODUCTION ............................................................................1

ARGUMENT .....................................................................................3

I.    The controlling authority of immigration statutes over conflicting Executive Branch policymaking.............................................................................. 3

II.   The statutory framework mandated by Congress bars or displaces presidential authority to independently grant deferred action relief in the exercise of discretion.......................7

     A.    INA § 103 (Powers and Duties of the Secretary). ...................................8

     B.    INA § 101(a)(13) (Admission defined). ...........................................9

     C.    INA § 235 (Inspection by Immigration Officers). ..................................9

     D.    INA §§ 214, 211, 291. ...........................................................13

     E.    INA § 240 (Removal Proceedings). ................................................14

     F.    INA § 241 (Detention and Removal of Aliens Ordered Removed). ...................16

III.  Congress has consistently legislated to roll back executive discretion in the fields of admission and removability. ..........................................................19

     A.    Pre-INA attempts to informally authorize agency discretion over deportation.   19

     B.    Extended Voluntary Departure. ....................................................20

     C.    INA §244 (Temporary Protected Status)............................................21

     D.    Deferred Enforced Departure and the Foreign Policy Justification....................22

     E.    INA § 240B (Voluntary Departure).................................................24

i

F.      INA § 249 (Registry of certain longtime residents) and INA § 240A (Cancellation of Removal). ..................................................................................... 26

G.      INA § 212(d)(5)(A) (Parole)............................................................................. 27

CONCLUSION........................................................................................................31

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Akhbari v. INS*, 678 F.2d 575 (5th Cir. 1982) ..........................................................................21

*Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) ................................................................22

*Matter of Avetisyan*, 25 I&N Dec. 698 (BIA 2012).................................................................11

*Matter of Bahta*, 22 I&N Dec. 1381 (BIA 2000).....................................................................11

*Matter of B, 5* I&N Dec. 542 (BIA 1953) ............................................................................... 19

*Blackie's House of Beef, Inc. v. Castillo,* 659 F.2d 1211 (D.C. Cir. 1981)................................. 8

*Chamber of Commerce v. Whiting*, 131 S.Ct. 1968 (2011). ....................................................... 4

*City of Los Angeles v. Adams,* 556 F.2d 40 (D.C. Cir. 1977) .......................................................5

*Clark v. Suarez Martinez,* 543 U.S. 371 (2005). ...................................................................... 10

*Crane v. Napolitano*, 2013 U.S. Dist. LEXIS 57788 (N.D. Tex. April 23, 2013)...................9,11

*Cruz-Miguel v. Holder*, 650 F.3d 189 (2nd Cir. 2011) .......................................................... 16,29

*FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27 (1981).......................................2

*Fong Yue Ting v. United States*, 149 U.S. 698 (1893) ............................................................ 3,6

*Foti v. INS*, 375 U.S. 217 (1963) ............................................................................................ 19

*Hamdi v. Rumsfeld,* 542 U.S. 507 (2004) .................................................................................23

*Harisiades v. Shaughnessy,* 342 U.S. 580 (1952).......................................................................3

*In re Hashmi*, 24 I. & N. Dec. 785 (BIA 2009) ........................................................................ 17

*Heckler v. Chaney,* 470 U.S. 821 (1985) .................................................................................4,7

*Holder v. Martinez Gutierrez*, 132 S. Ct. 2011 (2012) ............................................................ 26

*In re Aiken County,* 725 F.3d 255 (D.C. Cir. 2013)..................................................................5,6

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ................................................................... 4,13

iii

*INS v. Chadha*, 462 U.S. 919 (1983). ..................................................................... 3

*INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984) ........................................................ 6

*Jama v. ICE*, 543 U.S. 335 (2005) ........................................................................ 24

*Karnuth v. U.S.*, 279 U.S. 231 (1929)................................................................... 19

*Kucana v. Holder*, 558 U.S. 233 (2010) ................................................................. 6

*Lincoln v. Vigil,* 508 U.S 182 (1993).......................................................................5

*Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355 (1986) ...................................... 4

*Massachusetts v. EPA*, 549 U.S. 497 (2007) .....................................................5,23

*Medellin v. Texas,* 552 U.S. 491 (2008) ...........................................................3,23

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................................. 18

*Perez v. Casilla*, 903 F.2d 1043 (5ᵗʰ Cir. 1990) ..................................................... 7

*Reno v. American-Arab Antidiscrimination Committee*, 525 U.S. 471 (1999)................ 6,11,12

*Succar v. Ashcroft*, 394 F.3d 8 (1ˢᵗ Cir. 2005) .................................................. 4,11

*United States ex rel. Brazier v. Comm'r of Immigration*, 5 F.2d 162 (2d Cir. 1924) ................ 6

*Youngstown Sheet & Tube Company v. Sawyer*, 343 U.S. 579 (1952)......................... 3

*Zivotofsky v. Clinton*, 132 S. Ct. 1421 (2012) ..................................................... 3,23

## **Statutes**

8 U.S.C. § 1101(a)(13)(A) .................................................................................... 9

8 U.S.C. § 1103(a) ............................................................................................... 8

8 U.S.C. § 1181(a) ............................................................................................. 13

8 U.S.C. § 1182(d)(5)(A).................................................................................27,31

8 U.S.C. § 1182(d)(5)(B) .................................................................................... 28

8 U.S.C. § 1184(a)(1) ................................................................................ 13

8 U.S.C. § 1184(d) ..................................................................................... 13

8 U.S.C. § 1225(a)(1) ................................................................................. 9

8 U.S.C. § 1225(a)(3) .................................................................................10

8 U.S.C, § 1225(b)(2)(A) ...........................................................................10

8 U.S.C. § 1226(a) ..................................................................................... 16

8 U.S.C. § 1229a(a) ................................................................................... 14

8 U.S.C. § 1229a(c)(2) ............................................................................... 15

8 U.S.C. § 1229a(c)(4)(A) ..................................................................... 14,15

8 U.S.C. § 1229b(b)(1)(A) .......................................................................... 27

8 U.S.C. § 1229c ................................................................................... 16,17

8 U.S.C. § 1229c(a)(2)(A) .......................................................................... 25

8 U.S.C. § 1229c(a)(4) ............................................................................... 26

8 U.S.C. § 1229c(b)(1)(A) .......................................................................... 25

8 U.S.C. § 1229c)(b)(2) .............................................................................. 25

8 U.S.C. § 1229c(d)(2)(B) .......................................................................... 25

8 U.S.C. § 1229c(e) ................................................................................... 26

8 U.S.C. § 1231 .......................................................................................... 16

8 U.S.C. § 1231(a) ..................................................................................... 16

8 U.S.C. § 1231(c)(2) ................................................................................. 17

8 U.S.C. § 1252(b)(9) ................................................................................. 12

8 U.S.C. § 1252(g) ..................................................................................... 12

8 U.S.C. § 1253(a) ..................................................................................... 17

8 U.S.C. § 1253(b) ................................................................................ 17

8 U.S.C. § 1253(d) ................................................................................ 24

8 U.S.C. § 1254a(b)(1) ........................................................................ 20,21

8 U.S.C. § 1254a(g) ............................................................................. 21

8 U.S.C. § 1259 ................................................................................... 26

8 U.S.C. § 1361 ................................................................................... 13

IIRIRA §301(c) ..................................................................................... 8

IIRIRA §304(a)(3) ................................................................................ 25

IIRIRA §304(b) .................................................................................. 14,27

IIRIRA §306(a) ..................................................................................... 14

IIRIRA §308 ...................................................................................... 25,26

IIRIRA §413(e) ..................................................................................... 26

IIRIRA §602 ......................................................................................... 28

## Regulations

8 C.F.R. § 1003.2a ............................................................................... 17

8 C.F.R. § 1003.2a ............................................................................... 17

8 C.F.R. § 1240.6 ................................................................................. 17

## Other Authorities

Federation for American Immigration Reform, *President Obama's Record of Dismantling Immigration Enforcement,* FAIR Horizon Press (2014) .................................................... 1

INS Operations Instructions, O.I. § 103.1(a)(1)(ii) (1981). ................................ 21

Mailman et al., *Immigration Law & Practice*, rel. 133,(2011) ............................ 15,20

Memorandum Opinion for the Secretary of Homeland Security, from Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* (Nov. 19, 2014) .................................................. 2

Oswald, Lynda J., Extended Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters, 85 Mich. L. Rev. 152 (1985) ....................................................................13

Senate Report No. 81-1515 (1950) ......................................................................... 19

Senate Report No 89-748 (1965) ......................................................................... 28

USCIS, Policy Memorandum PM-602-0091, *Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)* (Nov. 15, 2013) ......................................................................... 29,30

## INTEREST OF *AMICUS CURIAE*

Immigration Reform Law Institute Inc. (IRLI) is America's only public interest legal education and defense organization exclusively dedicated to advocating for the interests of Americans and their communities in immigration-related matters.  Since 1987, IRLI has litigated and submitted amicus briefs in immigration related cases before federal courts and administrative agencies.  IRLI's interests are thus aligned with, but not identical to, those of the State Plaintiffs.

## INTRODUCTION

The Obama Administration has made extra-statutory amnesty the centerpiece of its immigration policy since 2009.[1]  The president has relentlessly expanded the use of policies to delay or defer removal proceedings and actual deportation for millions of aliens who are inadmissible or deportable under U.S. immigration law, under a variety of policy-based rubrics including deferred action (DA), deferred action for childhood arrivals (DACA), and deferred enforced departure (DED), and most recently deferred action for parents of arrivals (DAPA).  *See* First Amended Complaint, Docket 14, ¶¶ 21-25, 47-60 (Dec. 9, 2014).  Beneficiaries are in practice treated by the executive branch as if lawfully present and granted major benefits of legal permanent residency, but on an indefinite or renewable rather than permanent basis.  The most concise statement of the government's authority to conduct extra-statutory amnesty programs comes from a recent Legal Opinion of the Attorney General:

---

[1] *See e.g.* Federation for American Immigration Reform, *President Obama's Record of Dismantling Immigration Enforcement*, FAIR Horizon Press (2014) (the most detailed publicly available chronology of executive actions between January 2009 and September 2014 showing "how the Obama administration has carried out a policy of de facto amnesty for millions of illegal aliens through executive policy decisions."), *available at* http://www.fairus.org/DocServer/Obama Enforcement Report.pdf.

"Congress has long been aware of the practice of granting deferred action, including in its categorical variety … *and it has never acted to disapprove or limit the practice*."[2]

This key government claim is wrong.  This brief summarizes the comprehensive legislative scheme, enacted by Congress between 1980 and 2005, which restricted and rolled back the extra-statutory authority of the president and the Executive Branch to categorically grant relief from the nation's laws regulating admission and removal, on the basis of prosecutorial discretion. Every Congressional legislative act that addressed the question of agency prosecutorial discretion since 1952 has either (1) rolled back or prohibited the exercise of discretion, (2) replaced extra-statutory discretion with statutory standards for relief, or (3) enacted specific legalization or amnesty procedures.

To determine whether the Plaintiff States are likely to prevail in their claims for purposes of adjudicating the pending motion for preliminary injunction, this Court needs to first determine the specific conditions of the power to regulate immigration that has actually been delegated by Congress to the Departments of Homeland Security and Justice. Federal courts "must reject administrative constructions of the statute …that are inconsistent with the statutory mandate or that frustrate the [policies] that Congress sought to implement."  *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 31-32, (1981).

---

[2] Memorandum Opinion for the Secretary of Homeland Security, from Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* (Nov. 19, 2014), at 18 (*emphasis* added).

# ARGUMENT

## I.   The controlling authority of immigration statutes over conflicting Executive Branch policymaking.

The U.S. Constitution delegates almost all immigration-related powers to Congress. "The conditions for entry of every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based, have been recognized as matters *solely for the responsibility of the Congress*." *Harisiades v. Shaughnessy,* 342 U.S. 580, 596-97, (1952) (Frankfurter, J., concurring) (emphasis added).   The plenary authority of Congress over aliens under Art. I, § 8, cl. 4, is not open to question.   *INS v. Chadha*, 462 U.S. 919, 940 (1983).[3]

Presidential power to act in the face of Congressional opposition is evaluated under the separation of powers doctrine.   *Medellin v. Texas*, 552 U.S. 491, 524 (2008).   When presidential actions conflict with Congressional enactments, the power of the president "is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter."   *Youngstown Sheet & Tube Company v. Sawyer*, 343 U.S. 579, 637

---

[3] *See also Chae Chan Ping v. United States* (Chinese Exclusion Case), 130 U.S. 581, 604-05, 609 (1889) (recognizing *congressional plenary power* over immigration based on a cumulative range of enumerated powers over other issues, the structure of the Constitution, and the international law of sovereignty); *Fong Yue Ting v. United States*, 149 U.S. 698, 703 (1893) (stating "the power to exclude or to expel aliens ... is to be regulated by treaty or *by act of Congress*."); U.S. Const. art. I, § 9, cl. 1 ("The Migration or Importation of such Persons as any of the States now existing shall think proper to admit, shall not be prohibited *by the Congress* prior to the Year one thousand eight hundred and eight ...."); Art. I, § 8, cl. 4 (granting *Congress* the power "to establish a uniform Rule of Naturalization"); *Zivitofsky v. Clinton*, 132 S. Ct. 1421, 1436 (2012) (citing Art. I, § 8, cl. 3, granting *Congress* the power "to regulate Commerce with foreign Nations, and among the several States," as including the power to regulate the entry of persons into this country); and *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012) (citing Art. I, § 8, cl. 4 as giving rise to the power over immigration).

(1952).  In *Heckler v. Chaney*, the U.S. Supreme Court explained that "Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue."  470 U.S. 821, 833 (1985).

The Constitution confers no enumerated powers over immigration upon the president.  In contrast, Congress has exercised its plenary authority by creating a comprehensive legislative scheme, the Immigration and Nationality Act (INA), which delegates carefully circumscribed enforcement duties to the executive branch.  *Chamber of Commerce v. Whiting*, 131 S.Ct. 1968, 1973 (2011).

When confronted in the past with essentially the same claims to bureaucratic power asserted by the current president, the Supreme Court and courts of appeal have affirmed the plenary authority of Congress embodied in the INA.  Congressional delegation of discretion to the executive branch as to whether to grant relief available by statute, after application, has never included discretion to *define eligibility* for such relief.  *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 443 (1987); s*ee also Louisiana Pub. Serv. Comm'n v. FCC* 476 U.S. 355, 374 (1986) ("An executive agency's policy preference about how to enforce (or, in this case, not enforce) an act of Congress cannot trump the power of Congress: a Court may not, "simply … accept an argument that the [agency] may … take action which it thinks will best effectuate a federal policy" because "[a]n agency may not confer power upon itself"); *Succar v. Ashcroft*, 394 F.3d 8, 10 (1st Cir. 2005) ("Congress did not place the decision as to which applicants for admission are placed in removal proceedings into the discretion of the Attorney General, but created mandatory criteria. See 8 U.S.C. §§ 1225(b)(1),(2).").

4

The president and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress over resource allocations:

> Of course, an agency is not free simply to disregard statutory responsibilities: *Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes*….

*Lincoln v. Vigil*, 508 U.S 182, 193 (1993) (*emphasis* added).

Similarly, DHS may not ignore mandates in the immigration statutes simply because Congress has not yet appropriated all of the money necessary to apply each mandate in every case. *See City of Los Angeles v. Adams*, 556 F.2d 40, 50 (D.C. Cir. 1977) (noting when a statutory mandate is not fully funded, "the agency administering the statute is required to effectuate the original statutory scheme as much as possible, within the limits of the added constraint"). Nor may the president or federal agencies rely on "political guesswork" about future congressional appropriations to justify ignoring existing legal mandates:

> Allowing agencies to ignore statutory mandates and prohibitions based on agency speculation about future congressional action — would gravely upset the balance of powers between the Branches and represent a major and unwarranted expansion of the Executive's power at the expense of Congress.

*In re Aiken County*, 25 F.3d 255, 260 (D.C. Cir. 2013).

President Obama's belief that the Executive Branch possesses inherent prosecutorial discretion to defer essentially all civil removal proceedings, notwithstanding clear INA mandates, is dangerously overbroad. Prosecutorial discretion does not include the power to disregard other statutory obligations that apply to the executive branch, such as statutory requirements to issue rules. *See Massachusetts v. EPA*, 549 U.S. 497, 527-28 (2007) (explaining the difference). Where the President is exercising his Article II prosecutorial discretion and pardon powers over *federal criminal laws that punish convicted persons*, he may do so "on any [policy] ground…." *In re Aiken County*, 725 F.3d at 266. However, "the President may

disregard a [civil] statutory mandate or prohibition [placed by Congress] on the Executive only on constitutional grounds, not on policy grounds." *Id.* (emphasis added).

The Presidents Article II prosecutorial discretion powers cannot nullify statutorily mandated admission and removal procedures because removal is a civil action and *not punishment*.  *United States ex rel. Brazier v. Commissioner of Immigration*, 5 F.2d 162, 164 (2d Cir. 1924) ("A pardon is for a crime, … *inter alia* it avoids or terminates punishment for that crime, but deportation is not a punishment, it is an exercise of one of the most fundamental rights of a sovereign a right which under our form of government is exercised by legislative authority"); *Reno v. American-Arab Antidiscrimination Committee*, 525 U.S. 471, 491(1999) (removal from the United States is not punishment, which would require the due process protections accorded to criminal defendants); *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984)(same); *Fong Yue Ting v. United States*, 149 U.S. 698 (1893)("The order of deportation is not a punishment for crime. It is not a banishment, in the sense in which that word is often applied to the expulsion of a citizen from his country by way of punishment. It is but a method of enforcing the return to his own country of an alien…")

Relief from or deferral of civil removal, whether statutory or discretionary, is an affirmative grant of an immigration benefit to the non-citizen recipient, not a punishment subject to the agency's prosecutorial discretion.  *Kucana v. Holder*, 558 U.S. 233, 246 (2010)(describing substantive forms of discretionary relief from removal provided under IIRIRA as "immigration benefits" and distinguishing them from procedural due process rights).

6

**II.      The statutory framework mandated by Congress bars or displaces presidential authority to independently grant deferred action relief.**

The comprehensive system of federal immigration laws, in particular the historic reforms to the INA enacted under the Anti-Terrorist Effective Death Penalty Act of 1996 (AEDPA),[4] the Illegal Immigration Reform and Immigrant Relief Act of 1996 (IIRIRA)[5], the Immigration Act of 1990 (IMMACT 90)[6], and the REAL ID Act of 2005, have restricted presidential authority to independently grant deferred action relief on a categorical basis. Through IIRIRA in particular, Congress indisputably intended to "to prevent delay in the removal of illegal aliens."[7] The reforms provided the executive branch with meaningful standards to administer the alien admission and removal processes which a court can assess—one of the circumstances where judicial review of agency non-enforcement actions is authorized. *Heckler v. Chaney*, 470 U.S. at 830 (judicial review unavailable "in those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.").[8] Today, this core legislative framework is codified in eight INA sections of universal application. A supporting phalanx of related statutes that bar or displace extra-

---

[4] Pub. L. No. 104-132, 110 Stat. 1214.

[5] Pub. L. No. 104-208, 110 Stat. 3009.

[6] Pub. L. No. 101-649, 104 Stat. 2099.

[7] The intent of IIRIRA §§ 301- 309 (Revision of Procedures for Removal of Aliens) was "to make it easier to deny admission to inadmissible aliens and easier to remove deportable aliens from the United States." *Tutu v. Blackman*, 9 F. Supp. 2d 534, 536-537 (E.D. Pa. 1998), *citing* H.R. Rep. 104-469 (I), 104th Cong., 2d Sess. 359, 463 (1996).

[8] In *Perez v. Casilla*, 903 F.2d 1043 (5th Cir 1990), the Fifth Circuit upheld INS nonenforcement discretion based on former INA § 244. The court called it a "permissive statute" with "no standards … that would provide courts with law to apply." *Id.* at 1048. Consistent with the *Heckler* meaningful standards holding, Congress responded in 1996 through IIRIRA by replacing former § 244 with current INA § 240B, which imposed meaningful specific restrictions on voluntary departure that are in no way "permissive." *See* discussion at III.E, *infra*.

7

statutory executive action to defer removal for distinct groups or classifications of aliens is identified in Part III.

### A.  INA § 103 (Powers and duties of the Secretary)

Under the INA, Congress has delegated two mandatory statutory responsibilities to the Secretary of Homeland Security: (1) The "power and duty" to administer and enforce all laws relating to immigration, and (2) the mandatory duty to guard against "the illegal entry of aliens." INA §§ 103(a)(1) and (5).

On the other hand, Congress limited its general grants of *discretionary* authority to the Secretary to two specific functions: (1) to establish regulations and "perform other acts," and (2) to "appoint employees."  The INA allows the Secretary to perform or delegate these duties only where the Secretary deems it "necessary" to carry out the two mandated authorities.  INA §§ 103(a)(3) and (5).[9]

The INA provisions governing the removal of aliens fall under the Secretary's mandatory "power and duty" to enforce the INA by controlling and guarding the borders against illegal entry.  Since the enactment of the INA, the primary statutory enforcement function of federal immigration officers has always been "to seek out, question, and detain suspected illegal aliens." *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1222 (D.C. Cir. 1981).  IIRIRA re-affirmed that mandate, by making illegal entrants (EWIs) inadmissible.[10]

_____

[9] Until 1996, the Attorney General could authorize the immigration courts or Bureau of Immigration Appeals (BIA) to make determinations other than deportation orders, which would arguably include discretionary deferrals of removal.  *See* former INA § 242(b), 8 U.S.C. §1252(b).  That authority was never exercised by the Attorney General, was repealed by IIRIRA in 1996, and thus could not have been transferred to DHS in 2002.

[10] IIRIRA § 301(c), amending INA § 212(a)(6)(A).

8

### B.  INA §101(a)(13) (Admission defined)

The most significant AEDPA/IIRIRA reform for the rollback of executive discretion was the replacement of physical entry into the United States as the threshold criteria for lawful presence with the inspection and admission of all previously non-admitted aliens, as "applicants for admission."[11]   IIRIRA made application for admission into the United States the fundamental obligation imposed on aliens by Congress.   Admission is defined as "a lawful entry … into the United States *after* inspection and authorization by an immigration officer."   INA § 101(a)(13)(A), 8 U.S.C. § 1101(a)(13)(A) (*emphasis* added).   In effect IIRIRA § 301 created a second virtual legal border, in addition to the traditional physical frontier, which all aliens must since 1996 individually apply for and receive permission to cross, as described below.

### C.  INA § 235 (Inspection by immigration officers)

Congress has mandated strict non-discretionary standards for the universal inspection of aliens, to include a determination of each alien's admissibility.   The INA clarifies that "an alien present in the United States who has *not* been admitted *shall be* deemed for purposes of this Act an *applicant* for admission."[12]   INA § 235(a)(1), 8 U.S.C. § 1225(a)(1) (*italics* added).   The

---

[11] AEDPA § 414 (April 24, 1996) provided that an alien "found" in the United States who has not been inspected and admitted is subject to examination and exclusion (expedited removal) proceedings, created by AEDPA § 422.  EWIs as designated applicants for admission were thus subject to "summary exclusion" and no longer eligible for Suspension of Deportation.  IIRIRA repealed AEDPA §§ 414 and 4222.  IIRIRA § 301 then replaced  the definition of entry in INA § 101 with a new definition, *see* § 101(a)(13) (Treating persons present in the United States without Authorization as not Admitted), which defined admission/admitted to mean "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."

[12] When a statute "uses the word 'shall', Congress has imposed a mandatory duty upon the subject of the command."  *U.S. v. Monsanto*, 491 U.S. 600, 607 (1989); *see also Lopez v. Davis*, 531 U.S. 230, 241 (2001) (noting Congress' "use of a mandatory 'shall' … to impose discretionless obligations"); and *Crane v. Napolitano*, 2013 U.S. Dist. LEXIS 57788 (N.D. Tex. April 13, 2013) (finding Congress circumscribed ICE's power to exercise discretion when

concepts of "unlawful admission" or "lawful deferred admission" are nonsensical, and do not exist in any form under federal immigration law.

A second related fundamental duty imposed on all aliens by this section is to appear in person before an immigration officer for inspection. *Clark v. Suarez Martinez*, 543 U.S. 371, 373 (2005). Prior to 1996, the INA required inspection only for "aliens arriving at ports ... at the *discretion* of the Attorney General." 8 U.S.C. § 1225(a)(1995) (emphasis added). In 1996, Congress amended the INA to mandate that DHS inspect *every* alien applicant for admission as to their eligibility for admission to the United States: "All aliens ... who are applicants for admission ... *shall be inspected* by immigration officers." INA § 235(a)(3), 8 U.S.C. § 1225(a)(3) (added by IIRIRA § 302). Neither the president nor his appointed officials have legal authority to waive or decline to comply with the congressional mandate of universal inspection of alien applicants for admission. *Clark v. Suarez Martinez*, 543 U.S. at 373 ("An alien arriving in the United States *must* be inspected by an immigration official.") (emphasis added).

In 1996, Congress imposed a third fundamental duty under this section that requires all immigration officers to detain aliens for removal proceedings who are not clearly and beyond a doubt entitled to be admitted:

> [I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not *clearly and beyond a doubt* entitled to be admitted, the alien *shall be detained for a* [removal] *proceeding* under [INA] section 240.

---

determining against which "applicants for admission" it will initiate removal proceedings by using the mandatory term "shall" in 8 U.S.C. § 1225(b)(2)(A)).

INA § 235(b)(2)(A), 8 U.S.C. § 1225(b)(2)(A) (enacted by IIRIRA § 302(a), P.L. 104-208 (1996)).[13]

In *Crane v. Napolitano*, the Northern District of Texas was asked to examine the mandatory nature of this provision. 2013 U.S. Dist. LEXIS 57788 (N.D. Tex. April 23, 2013). Defendant Napolitano, then Secretary of DHS, argued that the word "shall" does not always mean "shall." Specifically, she contended that she possessed the prosecutorial discretion to instruct her officers to ignore the provision's command to place aliens not *clearly and beyond a doubt* entitled to be admitted into removal proceedings. The court disagreed. "Given the use of the mandatory term 'shall,' the structure of *Section 1225(b)* as a whole, and the defined exceptions to the initiation of removal proceedings located in *Sections 1225(b)(2)(B)* and *(C)*," the court found "that *Section 1225(b)(2)(A)* imposes a mandatory duty on immigration officers to initiate removal proceedings whenever they encounter an 'applicant for admission' who 'is not clearly and beyond a doubt entitled to be admitted.'" *Id.* at *39.[14]

Nonetheless, DHS has asserted that the executive branch retains extra-regulatory discretion to not commence INA § 240 removal proceedings, by failing to file the required paperwork with the immigration court. *See*, *e.g.*, *Matter of Avetisyan*, 25 I&N Dec. 698, 690-91 (BIA 2012); *Matter of Bahta*, 22 I&N Dec. 1381, 1391-92 (BIA 2000) (citing the jurisdiction-stripping provision INA §242(g), 8 U.S.C. §1252(g), and *Reno*, 525 U.S. at 484). The plain language of the INA, however, forecloses the argument that a loophole in the current statutory

---

[13] *See Richardson v. Reno*, 162 F.3d 1338, 1348 (11th Cir. 1998) (noting IIRIRA created new stringent custody rules for aliens).

[14] *See* footnote 12, *supra. See also Succar*, 394 F.3d at 10, *supra*; *Roach v. Dep't of Homeland Sec.*, 2007 U.S. Dist. LEXIS 96731, *13 (D. Ariz. 2007) (stating, pursuant to INA § 235(b)(2)(A), an "inadmissible alien *must* be detained during the pendency of their removal proceedings") (emphasis added).

scheme allows the government to circumvent at will the congressional mandate.  The INA expressly presents the executive with one of three statutory alternatives: lawful admission, parole, or placement in removal proceedings.  Specifically, § 235(b)(2)(A) contains a double mandate; (1) the unadmitted applicant "shall be detained" and (2) such detention shall be "for a [section 240] proceeding."  Second, service of a Notice to Appear (NTA) under INA § 239(a)(1) is mandatory, and cannot be construed to countenance NTA service on an alien outside of, prior to, or in the absence of removal proceedings.  Examining the congressional intent behind INA §§ 235 and 239, there exists absolutely no legislative history to support the view that Congress intended or was aware that the filing of an NTA with the immigration court would be an independent discretionary agency action, distinct from the clear mandates in INA § 235(b)(2)(A) and INA § 239(a)(1).

Defendants' reliance on the INA § 242 court-stripping provision is also readily distinguishable.  INA § 242(g) does not nullify the mandates of Congress restricting prosecutorial discretion during the exclusion process.  IIRIRA did circumscribe the authority of federal courts to hear appeals of agency decisions to remove an inadmissible alien, but only for "any cause or claim *by or on behalf of any alien* arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or executive removal orders …." 8 U.S.C. § 1252(g) (emphasis added).  The Supreme Court in *Reno* held that the § 242(g) bar is construed narrowly.  525 U.S. at 487.  Similarly, IIRIRA's "zipper clause" restriction on judicial review only applies by its explicit terms to "any action taken or proceeding *brought to remove an alien* from the United States."  INA § 242(b)(9),  8 U.S.C. § 1253(b)(9).  The plain language of the two clauses only restricts judicial review for (1) claims brought *by* aliens, and (2) actions

*brought to remove* an alien, neither of which applies to the deferred action amnesty programs challenged by the State Plaintiffs.

### D.  INA §§ 214, 211, 291

In three closely related statutes Congress has restricted the authority of the president or any other executive agency official to assume or waive the alien's statutory burden to establish immigrant status, or entitlement to admission in some other status:

1.  INA § 214 (Admission of nonimmigrants)  mandates that

Every alien... (other than a nonimmigrant described in subparagraph (L) or (V) of section 101(a)(15) … and any provision of section 101(a)(15)(H)(i) except subclause (b1) of such section *shall be presumed* to be an immigrant until he establishes to the satisfaction of … the immigration officers, *at the time of application for admission*, that he is entitled to a nonimmigrant visa under section 101(a)(15).

INA § 214(b), 8 U.S.C. § 1184(d).  Section 214 also mandates admission of "any alien as a nonimmigrant" may only be "for such time and under such conditions as the Attorney General [now Secretary of Homeland Security] may *by regulations prescribe*…."  INA § 214(a)(1), 8 U.S.C. § 1184(a)(1).

2.  INA § 211 (Admission of immigrants to the United States) categorically mandates that

Except as provided … *no immigrant shall be admitted into the United State unless* at the time of application for admission he (1) has a valid unexpired immigrant visa … and, (2) present a valid unexpired passport or other suitable travel document ….

INA § 211(a), 8 U.S.C. § 1181(a).

3.  INA § 291 (Burden of proof upon alien) mandates (to ensure that aliens and immigration officers fulfill their respective duties under the inspection and examination statutes) that

*Whenever any person* makes application for admission, or otherwise attempts to enter the United States, the burden of proof shall be on such person to establish that he is eligible to receive [a] visa … or is not inadmissible *under any provision* of this Act… nor shall such person be admitted to the United States unless he establishes to the satisfaction of

13

the Attorney General that he is not inadmissible under any provision of this Act ….  If such burden of proof is not sustained, such person *shall be presumed to be in the United States in violation of law*.

INA § 291, 8 U.S.C. § 1361 (emphasis added).

The statutory burden of proof established under the mandatory enforcement matrix created by these three INA provisions is a required precondition for admission, and thus cannot be waived or excused by an agency exercise of prosecutorial authority or deferred action.  *See INS v. Cardoza-Fonseca*, 480 U.S. at 443.  Read together, the INA § 235 mandates of application for admission and inspection, the burden of proof unequivocally placed upon the alien applicant for admission by §§ 211, 214, and 291, and the § 291 presumption that aliens who fail to comply with those mandates are unlawfully present jointly confirm, in unambiguous terms, that inspection is a non-discretionary duty, imposed on both alien applicants for admission and federal immigration officers.

**E.  INA § 240 (Removal proceedings)**

In addition, Congress established a fourth major statutory restraint on the authority of the president to grant discretionary deferrals or other relief from removal proceedings.  INA § 240(a)(1), 8 U.S.C. § 1229a(a)(1), mandates that "an immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien."  The same section mandates that "a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States."  INA § 240(a)(3) (emphasis added).  This section also expressly limits the exercise of discretion regarding relief from removal during the removal proceeding to immigration judges. INA § 240(c)(4)(A)(ii) (stating alien must submit evidence

14

that he or she "merits a favorable exercise of discretion" to an immigration judge.) (emphasis added).

Through IIRIRA, Congress imposed unmistakable restraints upon and repeals of executive discretion to provide relief from removal. IIRIRA repealed the former authority of the Attorney General to authorize determinations other than deportation. *See* IIRIRA § 306(a), P.L. 104-208 (1996) (repealing former INA § 242(b), 8 U.S.C. § 1252(b)). IIRIRA circumscribed the pre-1996 discretion of the immigration judge to grant relief from removal. IIRIRA §§ 304(b) (repealing INA § 212(c)) and 308 (repealing INA § 244(a)).

Congress also shifted the burden of proof of eligibility for admission or relief from the executive branch to the alien. IIRIRA imposed new and exacting burdens of proof on an alien in proceedings to establish his or her eligibility for admission or relief from removal. *See* INA § 240(c)(2), 8 U.S.C. § 1229a(c)(2) ("in the proceeding the alien has the burden of establishing – (A) if the alien is an applicant for admission, that the alien is clearly and beyond doubt entitled to be admitted and is not inadmissible under [INA] section 212; or (B) by clear and convincing evidence, that the alien is lawfully present in the United States pursuant to a prior admission."). "Beyond doubt" is a higher standard of proof than that required for even the most serious criminal convictions, which typically require "beyond a reasonable doubt." Mailman et al., *Immigration Law & Practice*, rel. 133, § 64.03[2][b] (2011).

In 2005, Congress further restricted the authority of the president or DHS to independently determine removability, including eligibility for "any form of relief granted in the exercise of discretion." The REAL ID Act clarified that the alien—and not the government—has the burden of proof to establish *during* removal proceedings that with respect to "*any form of relief that is granted in the exercise of discretion*, that the alien merits a favorable exercise of

15

discretion." INA § 240(c)(4)(A), 8 U.S.C. § 1229a(c)(4)(A) (enacted by REAL ID Act § 101(d), P.L. 109-13) (emphasis added).

### F. INA § 241 (Detention and removal of aliens ordered removed)

For aliens in federal custody whose status awaits final adjudication in a removal proceeding, Congress in 1996 restricted the exercise of discretion by DHS over detention to one of three choices: (1) continue to detain the alien, (2) release the alien on a bond with security and conditions approved by the Secretary, or (3) release the alien under the very restricted terms of a "conditional parole." INA § 236(a), 8 U.S.C. § 1226(a).[15] Not until the illegal alien has reached the ultimate stage of a removal proceeding, after the immigration judge has issued a final order of removal, has Congress delegated any significant discretion to DHS.[16] IIRIRA shifted authority over the detention and release of aliens with final removal orders back to DHS. INA § 241, 8 U.S.C. § 1231. "When an alien is [finally] ordered removed, the [Secretary of DHS] shall remove the alien from the United States within a period of 90 days (in this section referred to as the 'removal period')." INA § 241(a)(1)(A). During the 90 day removal period, continued detention is mandatory. INA § 241(a)(2). DHS can also permit most aliens, including likely DREAM Act beneficiaries, to voluntarily depart the United States at the alien's own expense in

---

[15] A grant of conditional parole is "in the nature of a voluntary stay of the agency's [removal] mandate *pendente lite* ..." and does not defer removal proceedings. *Velasco-Gutierrez v. Crossland*, 732 F.2d 792, 795 (10th Cir. 1984). As with bail release in criminal cases, conditional parole merely permits an alien to remain at liberty based upon a determination that he poses no risk of danger or flight while his removal is actively sought. *Cruz-Miguel v. Holder*, 650 F.3d 189, 198 (2nd Cir. 2011). Similarly, deferred *inspection*, a regulatory variant of § 1226(a)(2)(B) conditional parole, only allows the alien applicant for admission who is not a flight risk to complete his inspection before a different Immigration and Customs Enforcement (ICE) office or Customs and Border Protection (CBP) port-of-entry. 8 C.F.R. § 1235.2.

[16] For a criminal alien within one of the categories described in INA § 236(c), detention during removal proceedings is mandatory and not discretionary. INA § 236, 8 U.S.C. § 1226.

lieu of removal proceedings, but after IIRIRA can only delay departure for up to 120 days.  INA § 240B, 8 U.S.C. § 1229c.  *See* Part III.E (Voluntary Departure), *infra*.

After the removal period has commenced, Congress restricted the discretionary authority of the Secretary of DHS to two actions: (a) To release certain aliens detained beyond the statutory removal period under an order of supervision, *see* INA § 241(a)(6), or (b) to *stay the removal order* if immediate removal is "not practical" for an alien detained upon arrival at a port of entry.  INA § 241(c)(2), 8 U.S.C. § 1231(c)(2).[17]  DHS may in this phase administratively select the combination of fines, prison sentences, and suspension of such sentences that will most efficiently effect the removal or voluntary departure of such aliens.  *See*, *e.g.*, INA §§ 243(a) (Penalty for failure to depart) and 243(b), 8 U.S.C. §§ 1253(a)-(b) (Willful failure to comply with terms of release under supervision); and INA § 240B(c), 8 U.S.C. § 1229c (Voluntary departure).

When enacting IIRIRA, Congress did not disturb the existing limited discretionary authority of the immigration courts to manage removal caseloads, in accordance with the immigration judge's perceived need to conserve resources and to provide procedural flexibility to aliens for humanitarian reasons.  Although the INA does not contain specific statutory authority for the adjudication of motions to continue removal proceedings, immigration judges derive their broad discretionary authority to manage their caseloads using continuances from regulations.  *In re Hashmi*, 24 I. & N. Dec. 785, 788 (BIA 2009).  The immigration judge—not DHS—retains discretion to delay proceedings through grant of motion for a continuance.  *See* 8 C.F.R. § 1003.2a (stating "the Immigration Judge may grant a continuance for good reason shown"); *see also* 8 C.F.R. § 1240.6 (2008) (providing that an Immigration Judge may grant a

---

[17] *See also* 8 C.F.R. § 241.6.

17

reasonable adjournment either at his or her own instance or, for good cause shown, upon application by the respondent or DHS).

Today, no provision of the INA authorizes extra-statutory deferrals of removal, or deferred action, by any executive agency, including DHS and DOJ. The phrase "deferred action" appears in just two subsections of the INA and in one other uncodified provision.[18] None of these very specific provisions corresponds to or supports the exercise of deferred action as agency prosecutorial discretion, as implemented by the 2011 Morton Memoranda, the 2012 Napolitano DACA Directive, and the November 2014 Johnson memoranda. The narrow specificity of these three enactments, when contrasted with the absence of the term "deferred action" from the rest of the INA and uncodified federal immigration law, instead supports application of the statutory construction canon, *expressio unius est exclusio alterius*, that is, the one is exclusion of the other. *See Nken v. Holder*, 556 U.S. 418, 430 (2009) (citing *Cardoza-Fonseca*, 480 U.S. at 432) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

To summarize, through the reforms to the INA enacted between 1986 and 2005 reviewed above, Congress has consistently barred or displaced executive authority to defer removal actions on a group or categorical basis solely as an exercise of prosecutorial discretion.

---

[18] First, 8 U.S.C. § 1154(a)(1)(D)(i)(IV) provides that "[a]ny [victim of domestic violence] described in subclause (III) and any derivative child of a petition described in clause (ii) is eligible for deferred action and work authorization." Second, 8 U.S.C. § 1227(d)(2) provides that denial of a request for an administrative stay of removal does not preclude the alien from applying for deferred action or certain other immigration benefits. Thirdly, 8 U.S.C. § 1151 note, of Title 8, P.L. 108-136, § 1703, addresses the extension of posthumous benefits to certain surviving spouses, children, and parents.

18

### III.    Congress has consistently legislated to rollback executive discretion in the fields of admission and removals.

Well aware of the statutory void in which the deferred action amnesty programs operate, the Administration and many immigration lawyers point to a 'tradition' of immigration agency programs which they claim condones current deferred action practices.[19]  This motif of agency authority to act in the face of Congressional acquiescence is essentially a legal fantasy.  In all major areas of relief from removal, the historical record shows Congress consistently acting to eliminate or roll back the exercise of executive discretion based on such extra-statutory practices.

#### A.    Pre-INA attempts to informally authorize agency discretion over deportation.

"The various acts of Congress since 1916 evince a progressive policy of restricting immigration."  *Karnuth v. U.S.*, 279 U.S. 231, 242 (1929).  For example, the Immigration Act of 1924 repealed statutory time limits on deportations.  "Prior to 1940, the Attorney General had no discretion with respect to the deportation of an alien who came within the defined category of deportable persons.  The expulsion of such a person was mandatory; his only avenue of relief in a hardship case was by a private bill in Congress."  *Foti v. INS*, 375 U.S. 217, 222 (1963).

Various bureaucratic attempts to circumvent the intent of Congress to restrict relief by statute developed prior to 1952, under the general rubric of pre-examination.  In 1952, enactment of the INA ended these informal practices.  *Matter of B*, 5 I & N Dec. 542 (1953).  The Senate had criticized the scope of pre-examination practices as excessive in providing extra-statutory relief for excludable or deportable aliens in the United States. *See* S. Rep. No. 81-1515, at 384

---

[19] *See*, *e.g.*, Thomas, OLC Memorandum Opinion, at 13 ("Although the practice of granting deferred action 'developed without express statutory authorization, it has become a regular feature of the immigration removal system ….")  *See* footnote 2, *supra*.

(1950).  In its place, Congress in 1952 enacted more restrictive statutory options for relief, notably INA § 212(c) (waiver of deportability), INA § 244(a) (suspension of deportation), INA § 244(b) (voluntary departure), and INA § 245 (adjustment of status).

      **B.**      **Extended Voluntary Departure.**

After passage of the INA, the Attorney General in the late 1950s developed an *ad hoc* categorical variant of deferred action, Extended Voluntary Departure (EVD), to provide non-statutory relief from removal to *groups* of aliens present in the United States, on the basis of nationality.  EVD was granted administratively to at least fifteen nationalities over a period of more than twenty years, before the enactment of the Temporary Protected Status (TPS) statute, in 1990.[20]  Although EVD beneficiaries were deportable aliens, they were designated for categorical relief on the basis of nationality, rather than individual evaluations of the risk of harm from dangerous conditions within the designated foreign state.[21]

No statute or regulation ever explicitly authorized or sanctioned blanket grants of EVD. Under former INA §242(b), 8 U.S.C. § 1252(b), the Attorney General arguably had authority to authorize individual administrative grants of EVD or other discretionary relief  by the former INS, the immigration courts, or the BIA,  But even that authority was repealed by IIRIRA in 1996 and never transferred to DHS.

The exercise of extra-statutory prosecutorial discretion practices by INS officials in *individual* civil deportation proceedings was first publicly disclosed by the former INS in 1975, under the rubric of a "non-priority program."[22]  Between 1976 and 1985, appellate courts noted

---

[20] INA § 244 (1990), codified at 8 U.S.C.§ 1254a, as amended.
[21] Gordon & Rosenfeld, *Immigration Law & Practice* (IL&P), Vol 1A, §5.3e(6a) (1981)
[22] *See Lennon v. INS,* 527 F. 2d 187, 189 (2nd Cir 1975); *Lennon v. U.S.,* 378 F. Supp. at 42 n.11 (S.D.N.Y. 1974).

that INS was asserting two inconsistent justifications for authority to grant non-priority status—humanitarian factors and administrative convenience—while at the same time rejecting alien claims that deferred action was a due process right.[23]   Reacting to a decision in the Ninth Circuit characterizing non-priority relief as a humanitarian right subject to due process protections, the INS in November 1979 rescinded its deferred action policy. *Akhbari v. INS*, 678 F.2d 575, 576 (5th Cir. 1982).   In 1981 the INS issued a revised deferred action "Operations Instruction" which stated affirmatively that grants of deferred action status were an administrative choice by the agency, and in no way constituted a humanitarian "entitlement" to the noncitizen.[24]

Finally, in 1997 the INS rescinded its 1981 deferred action OI, due to its conflict with AEDPA and IIRIRA.[25]   Rescission of the OI is important evidence that the Clinton administration recognized and accepted that IIRIRA had restricted federal discretion to defer removal proceedings for illegal entrants.

**C.     INA §244 (Temporary Protected Status).**

The enactment of Temporary Protected Status (TPS) in 1990 created a single statutory procedure for the executive to address the problem of foreign nationals whose repatriation would "pose a serious threat to their personal safety" due to "ongoing armed conflict," or constitute a "substantial, but temporary disruption of living conditions in the area affected" due to an

---

[23] *See, e.g., Soon Bok Yoon v. INS,* 538 F.2d 1211 (5th Cir. 1976); *David v. INS,* 548 F.2d 219 (8th Cir. 1977); *Nicholas v. INS*, 590 F.2d 802 (9th Cir. 1979).

[24] INS Operations Instructions, O.I. §103.1(a)(1)(ii) (1981).  As rewritten, the 1981 OI read: "The district director may, at his discretion, recommend consideration of deferred action, *an act of administrative choice* to give some cases lower priority and in no way an entitlement, in appropriate cases …." (emphasis added). The rewritten OI was never subjected to any public notice or hearing process.

[25] Memorandum from Paul W. Virtue, Acting Executive Associate Commissioner, Immigration and Naturalization Service, *INS Cancellation of Operations Instructions* (June 27, 1997), available at 2 Bender's Immigr. Bull. 867.

"environmental disaster in the state," or which would occur when "there exist extraordinary and temporary conditions in the foreign state that prevent aliens of the state from returning to the state in safety …."  INA § 244(b)(1).[26]

Importantly, Congress expressly mandated that TPS was to be an "*exclusive remedy*," displacing temporary discretionary relief on the basis of nationality for both illegal aliens and parolees:

> Except as otherwise specifically provided, this section shall constitute the exclusive authority of the Attorney General under law to permit aliens who are or may become otherwise deportable or have been paroled into the United States to remain in the United States temporarily because of their particular nationality or region of foreign state of nationality.

INA § 244(g).

### D.  Deferred Enforced Departure and the foreign policy justification.

Despite its restriction under the TPS statute, the practice of extended agency deferrals of departure for favored nationalities has continued on an extra-legal basis.  The Bush I administration revived the practice in 1990 and renamed it Deferred Enforced Departure (DED).  When the Clinton, Bush II, and Obama administrations implemented DED group deferrals by memorandum, they mischaracterized the actions as a "grant" under authority asserted to be the president's "constitutional authority to conduct the foreign relations of the United States."[27]  Although the president has "the lead role … in foreign policy," *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003), that role "does not allow [the judiciary] to set aside first principles [of separation of powers].  The president's authority to act, as with the exercise of any governmental

---

[26] Former INA § 244A, 8 U.S.C. § 1254a (1952) was amended by, *inter alia*, IMMACT90, P.L. 101-649 (Nov. 29, 1990) and redesignated as INA § 244 by IIRIRA, P.L. 104-208, § 308 (Sep. 30, 1996).
[27] *See*, *e.g.,* President Obama, Memorandum Extending Deferred Enforced Departure for Liberians (Aug. 6, 2011).

power, "must stem either from an act of Congress or from the Constitution itself." *Medellin v. Texas*, 552 U.S. at 523.

"[W]hile the President has broad authority in foreign affairs, that authority does not extend to the refusal to execute domestic laws." *Massachusetts v. EPA*, 549 U.S. 497, 534 (2007). The authority over immigration admissions and removals delegated to the president by Congress "in the international realm cannot be said to invite" domestic agency action concerning aliens. *Medellin v. Texas*, 552 at 529. This limitation is particularly applicable to deferred action applicants and beneficiaries. All of these aliens by definition must have been physically residing in the United States for years, and thus fall under the domestic administrative jurisdiction of the Departments of Homeland Security and Justice.

Where as in this case the language of the statutes and discretionary agency action conflict, the third or "lowest ebb" *Youngstown* analysis of executive power requires Defendants to demonstrate that the executive foreign affairs power they invoke is "exclusive." The Supreme Court recently explained that where the question is whether Congress or the Executive is "aggrandizing its power at the expense of another branch," the proper approach is to determine whether federal statutes "impermissively encroach on the President's "exclusive power." *Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1428 (2012).[28]

But the Supreme Court has never held that the scope of the president's lead foreign policy role includes an "exclusive" extra-statutory executive power over immigration removals. To the contrary, Congress in 1996 provided a very specific way for DHS to "avoid removals that

---

[28] Justice Souter recognized the dangers of reliance by the president on a naked assertion of executive discretion. *See e.g. Hamdi v. Rumsfeld*, 542 U.S. 507, 543 (2004) (Souter, *concurring*) ("To appreciate what is most significant, one must only recall that the internments of the 1940s were accomplished by Executive action ….")

are likely to ruffle diplomatic feathers." *Jama v. ICE*, 543 U.S. 335, 348 (2005) (explaining 8

U.S.C. § 1231(b), as amended by IIRIRA § 305(a), designating countries to which aliens may be

removed).   IIRIRA also directly restricted executive branch foreign policy discretion in the

sensitive area of noncooperation in repatriations by the home nations of aliens with final orders

of removal.   Congress directed that the executive branch act on the basis of comity, by restricting

the issuance of U.S. visas to nationals of non-cooperating nations.   INA § 243(d), 8 U.S.C.

1253(d) (Discontinuing granting visas to nationals of country denying or delaying accepting

alien).[29]

### E.  INA § 240B (Voluntary Departure).

A second theory as to the legal authority for EVD looked "within the [pre-IIRIRA]

provisions which empower the Attorney General with discretionary authority to grant voluntary

departure."[30]   But as with TPS, Congress eliminated extra-statutory agency discretion in this area

of removal law.   Prior to 1996, the INA and related regulations had contained no limitation on

the time period in which an alien subject to deportation orders could be permitted to remain in

the United States pending voluntary departure:

> In the discretion of the Attorney General and under such regulations as he may prescribe,
> *deportation proceedings... need not be required* in the case of any alien who admits to
> belonging to a class of aliens who are deportable … *if such alien voluntarily departs from*

---

[29] Enacted as IIRIRA §307(d) (1996).  If the Secretary of Homeland Security notifies the
Secretary of State that the government of the foreign country in which the alien is a citizen,
subject, national or resident has "unreasonably delay[ed]" acceptance of the alien, the Secretary
of State "shall order" U.S. consular officers to discontinue granting visas to citizens, subjects,
nationals or residents of that country, until the foreign country has accepted the alien.  This
underutilized authority has been shown to be a remarkably efficient use of agency resources.
Denial of U.S. visitor visas to the political classes of uncooperative nations (*e.g.*, Guyana) has
produced almost immediate cooperation with removals.

[30] Oswald, Lynda J., Extended Voluntary Departure: Limiting the Attorney General's
Discretion in Immigration Matters, 85 Mich. L. Rev. 152,156 (1985).

*the United States at his own expense*, or is removed at Government expense as hereinafter authorized.

*Former* INA § 244(b), 8 U.S.C. § 1252(b) (1995) (emphasis added).  Regulations authorized INS

District Directors to grant such extensions.[31]

However, Congress repealed former § 244 and replaced it with tight restrictions on the

Attorney General's formerly unfettered discretion to extend voluntary departure orders, and

imposed sweeping sanctions on aliens who failed to voluntarily depart as ordered.  IIRIRA, P.L.

104-208, § 308 (repealing § 244), § 304(a)(3) (enacting INA § 240B, 8 U.S.C. § 1299c).

Permission to depart voluntarily in lieu of or prior to the conclusion of INA § 240 removal

proceedings is now restricted to a maximum of 120 days.  INA § 240B(a)(2)(A).  Discretion to

grant voluntary departure at the conclusion of a removal proceeding has been limited to 60 days.

INA § 240B(b)(2).[32]  Aliens who were not physically present in the United States for at least one

year prior to service of the NTA are now categorically ineligible for relief.   INA §

240B(b)(1)(A).

IIRIRA stripped federal executive agencies of discretion to grant, for a period of 10

years, "any further relief" for any alien who has failed to depart within the statutory time

restrictions.  This rollback included bars to such discretionary relief as cancellation of removal

(INA § 240A), adjustment of status to permanent resident alien (INA § 245), a change to another

nonimmigrant classification (INA § 248), or admission for permanent residence under the

registry statute (INA § 249).  INA § 240B(d)(2)(B).  Arriving aliens, *i.e.,* those aliens who would

---

[31] *See* former 8 C.F.R. §§ 244.1, 244.2.  An extra-statutory INA Operations Instruction permitted *nunc pro tunc* extensions for aliens possessing a valid travel document and confirmed travel reservation.  *See* former OI 242.10(e) (1995) (rescinded,1997).
[32] Since IIRIRA, all aliens requesting the privilege of voluntary departure are required to post a departure bond.  INA 240B §§ (a)(3), (b)(3).

have been subject to exclusion proceedings prior to IIRIRA, are now categorically excluded from voluntary departure eligibility.   INA § 240B(a)(4).   Congress only granted DHS authority to impose categorical *restrictions* on eligibility for extended departure "for any class or classes of aliens" by regulation.   INA § 240B(e).   Today, nowhere does the INA provide any discretion to any executive official, including the president or the BIA, to extend eligibility for voluntary departure, or to create discretionary administrative substitutes for this statutory reform.

F.  **INA § 249 (Registry of certain long-time residents) and INA § 240A (Cancellation of removal).**

An additional Obama administration policy justification for the grant of deferred action, and in particular DACA designation, is that beneficiaries are long-time residents of the United States who merit special favorable treatment due to their illegal tenure.   But the INA shows that Congress considered this issue in 1986 and 1996, and in response enacted legislation (the "registry" statute) that restricts the categorical grant of discretionary relief from removal on the basis of extended physical presence to aliens who have continuously resided in the United States since January 1, 1972.   INA § 249, 8 U.S.C. § 1259.   Congress advanced the eligibility date to 1972 under IRCA.   P.L. 99-603, § 203 (1986).   In 1996, Congress made changes to the registry statute, but did not change the date.   IIRIRA § 308(g)(10)(C), §413(e).

IIRIRA also repealed the suspension of deportation statute, INA § 212(c), which granted relief from deportation without numerical limits to certain deportable aliens who had been continuously present for extended periods, and replaced it with cancellation of removal (COR). *Holder v. Martinez Gutierrez*, 132 S. Ct. 2011, 2015 (2012) (discussing INA § 240A(e)(1), 8 U.S.C. § 1229b(e)(1)).   Congress enacted COR as the default procedure for aliens who have eluded inspection in the interior for many years to request discretionary relief from removal.   The exercise of agency discretion in COR cases is now *far more circumscribed* than under the pre-

26

1996 suspension of deportation statutes.   COR requires that the alien first concede inadmissibility or deportability, and with few exceptions is subject to a quota of 4,000 eligible aliens per year.   IIRIRA § 304, repealing INA § 212(c).   Inadmissible or deportable nonimmigrant aliens are ineligible until they have been continuously present in the United States for not less than ten years.  INA § 240A(b)(1)(A), 8 U.S.C. § 1229b(b)(1)(A).

Since IIRIRA, Congress has repeatedly considered legislation to address the status of aliens remaining illegally in the United States for extended periods and has repeatedly chosen *not* to enact laws to change their status. *See*, *e.g.*, Comprehensive Immigration Reform Act of 2007, S. 1348 (2007); A Bill to Provide for Comprehensive Immigration Reform and Other Purposes, S. 1639 (2007); DREAM Act of 2010, H.R. 5281 (2010); and Border Security, Economic Opportunity, and Immigration Modernization Act, S. 744 (2013).

In short, Congress has considered the long-term illegal resident policy argument and either addressed it legislatively, through IRCA and the 245(i) amnesties, or kept current policy in place for aliens who are now being offered executive amnesty through deferred action.  But the (changing) dates for deferred action eligibility based on continuous presence in the Obama Administration's memoranda are all in facial conflict with the statutory standard.

### G.    INA § 212(d)(5)(A) (Parole).

Finally, the record of Congressional action in the area of parole authority follows the same restrictive pattern.  Prior to the Refugee Act in 1980, the INA authorized the parole of aliens into the United States without a grant of admission, but only for (1) emergency reasons or (2) reasons deemed strictly in the public interest. INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A)(1979).  Even in that era, Congressional intent was unambiguous:

The parole provisions [of the INA] were designed to authorize the Attorney General to act only in emergent, individual, and isolated situations, such as the case of an alien who

27

requires immediate medical attention, and not for the immigration of classes or groups outside of the limit of the law.[33]

However, in practice the INS emphasized the absence of express statutory restrictions on categorical grants of parole.  For example, between 1959 and 1961, more than 20,000 Cubans were paroled into the United States, as opposed to being admitted as refugees fleeing political persecution under the Refugee Act.

In the 1980 Refugee Act, Congress reacted to what was perceived as an institutional abuse of discretion by prohibiting the discretionary exercise of parole for any "alien who is a refugee," unless the Attorney General made an individualized determination that "compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 207."   INA § 212(d)(5)(B), 8 U.S.C. § 1182(d)(5)(B) (1980).[34]

In 1996 Congress moved again to restrict excessive agency discretion in parole actions.  IIRIRA extended the prohibition on blanket or categorical parole to all aliens, by restricting § 212(d)(5)(A) to authorize parole "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."   IIRIRA § 602.  The legislative history indicates that Congress mandated this statutory prohibition on the categorical exercise of agency discretion out of

---

[33] Senate Rep. No 89-748, at 17 (1965); accord H.R. No. 89-745, at 15-16 (1965).

[34] P.L. 96-212 § 203(f).  For certain specified ethnic groups, including Soviet Jews, Laotians, and Cambodians, in 1990 Congress did provide a "public interest parole," (the "Lautenberg Amendment"), which allowed members of these ethnic groups who did not qualify as refugees under the 1980 Act to be paroled into the United States and granted adjustment of status, as if they had been admitted as refugees.  P.L. 101-167 (1990).  This limited loophole has been extended on annual basis as part of the Foreign Operations Appropriations Act.  Kurzban, at 615.

"concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy."[35]

Parole in Place (PIP) is a bureaucratic practice formulated post-IIRIRA, along with the formulation of categorical prosecutorial discretion theory under Clinton-era Attorney General Reno and INS Commissioner Meissner. It has no statutory or regulatory status. The practice gained broad public attention in November 2013, when USCIS issued a policy memorandum directing USCIS to provide

> consistent adjudication of parole requests made on behalf of aliens who are present
> without admission or parole and who are spouses, children, and parents of those serving
> on active duty in the U.S. armed forces [as well as veterans and certain reservists].[36]

The Policy Memorandum claims that "the legal authority for granting parole-in-place was formally recognized by the then-Immigration and Nationality Service (INS) General Counsel in a 1998 opinion."[37]  That 1998 Legal Opinion concluded that the interaction of two IIRIRA amendments had, authorized parole for unadmitted aliens. First, it argued that IIRIRA § 302(a) had amended INA § 235 to classify aliens present in the United States without admission or parole as "applicants for admission."[38]  Second, it noted that IIRIRA § 301(c) made aliens who have not been admitted or paroled inadmissible.[39]  INS General Counsel Paul Virtue concluded

---

[35] *Cruz-Miguel v. Holder*, 650 F.3d 189, 198-200 (2nd Cir. 2011) (citing H.R. Rep. No. 104-169, pt.1, at 140-41 (1996)).

[36] USCIS, Policy Memorandum PM-602-0091, *Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)* (Nov. 15, 2013).

[37] PM-602-0091, at 2, citing Virtue, *Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens*, HQCOU 120/17-P, Legal Opinion 98-01 (August 21, 1998), *available* at 1998 WL 1806685.

[38] *See* INA § 235(a)(1), 8 U.S.C. § 1225(a)(1).

[39] *See* INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i).

that this expansion of the definition of "applicant for admission" had thus created a loophole for unadmitted aliens in the United States, who were not "arriving aliens" as defined in INA § 235(a)(1), making them eligible for parole under § 212(d)(5)(A).

The November 2013 Policy Memorandum ignored the legislative history of parole to assert that a grant of parole in place for applicants for admission who are not arriving aliens would make such aliens collectively eligible for very favorable new benefits as a consequence of the loophole.  It claimed that "when an alien who entered without inspection subsequently receives parole" … "[s]uch an alien will no longer be inadmissible" under INA § 212(a)(6)(A)(i), either for being present in the United States without being admitted or paroled" or for  being an alien "who arrives in the United States at any time or place other than as designated …."[40]  Adding a third level of extra-regulatory interpretation, the PM argued that the asserted automatic waiver of § 212(a)(6)(A)(i) inadmissibility "overcomes" two key eligibility requirements for adjustment of status under INA § 245(a); that an alien be "admissible" and have been "inspected and admitted or paroled."[41]

As with the other illegitimate variants of deferred action discussed above, this policy-driven interpretation of the relevant statutes (1) has no case precedent to support it, (2) directly contradicts the legislative history of parole summarized above, and (3) facially contradicts the plain language of the statute.

First, the PM claimed without authority that group status as a spouse, child or parent of an active duty or reserve member of the U.S. Armed Forces "ordinarily weighs heavily in favor of parole in place."  This presumptive characterization of a group of otherwise illegal aliens as

---

[40] PM-602-0091, at 4-5.
[41] *Id.* at 5-6.

intended beneficiaries facially contradicts the plain language of the statute as imposed by IIRIRA, that parole can only be exercised on a "case-by-case basis."[42]

Second, it is not the inadmissibility criteria in § 212(a)(6)(A)(i) alone that bar parolees from eligibility for admission or status-based immigration benefits.  The parole statute also expressly restricts subsequent reclassification of the parolee into any other category than an applicant for admission:

> [W]hen … the purposes of such parole shall … have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission.

INA § 212(d)(5)(A).  The plain language of the statute thus bars the Obama Administration from reclassifying a parolee as a beneficiary of discretionary deferred action, or adjusting a parolees status to any other legal immigration status, all of which require lawful admission.

## CONCLUSION

The plain language of federal immigration law, and its interpretation by the judiciary as identified in this brief make it likely that the State Defendants will succeed in their claim that the actions taken by the President and other executive officials named as Defendants violate the Administrative Procedure Act, 5 U.S.C.§ 706(2)(A) through (D), as arbitrary, not in accordance with law, contrary to constitutional power, in excess of statutory jurisdiction, and promulgated without notice or comment.  This honorable court should thus GRANT Plaintiff's motion for a preliminary injunction.

---

[42] *Id.* at 3.  *See* INA § 235(d)(5)(A).

Respectfully Submitted,

Michael M. Hethmon, Esq.*
Dale L. Wilcox, Esq.**
Attorneys for *Amicus Curiae*
Immigration Reform Law Institute, Inc.
25 Massachusetts Ave. NW, Suite 335
Washington, D.C.  20001
Phone:     (202) 232-5590
Fax:        (202) 464-3590
e-mail:    info@irli.org

\* Admitted in Maryland and DC
\*\* Admitted in Indiana
*Admission PHV pending.*

32