United States District Court
Southern District of Texas
Brownsville Division

| | |
|---|---|
| STATE OF TEXAS, *ET AL.*,<br>  Plaintiffs,<br>v.<br>UNITED STATES OF<br>  AMERICA, *ET AL.*,<br>  Defendants. | Case 1:14-cv-254 |

**Brief as Friends of the Court Supporting Plaintiffs of
<u>the Cato Institute and Law Professors</u>**

THE OLSON FIRM, PLLC
Leif A. Olson
  S.D. Tex. Bar No. 33695
  Texas Bar No. 24032801
  leif@olsonappeals.com
PMB 188
4830 Wilson Road, Suite 300
Humble, Texas 77396
(281) 849-8382

<u>Of counsel:</u>

Peter Margulies
  Admission *pro hac vice* pending
  R.I. Bar No. 6261
  pmargulies@rwu.edu
Professor of Law
ROGER WILLIAMS UNIVERSITY SCHOOL OF LAW
10 Metacom Avenue
Bristol, Rhode Island 02809
(401) 254-4564

Ilya Shapiro
  Admission *pro hac vice* pending
  D.C. Bar No. 489100
  ishapiro@cato.org
CATO INSTITUTE
1000 Massachusetts Ave. NW
Washington, D.C. 20001
(202) 218-4600

# Contents

Table of Authorities ................................................................................... 3

Interest ......................................................................................................... 6

Argument: The policy is unconstitutional, and its enforcement should be enjoined. ....................................................................................................... 8

    I.    DAPA clashes with the INA's comprehensive framework. ............. 8

        A.    The INA deters unlawful entry by precluding minor citizen children from petitioning for parental visas. ............................... 8

        B.    The INA deters unlawful presence through persistent threat of enforcement. ............................................................................. 9

        C.    The INA deters unlawful presence by restricting access to lawful employment. ................................................................... 11

    II.    DAPA is subject to judicial review. ................................................. 11

    III.  Because DAPA clashes with the INA, DAPA is not entitled to judicial deference. ......................................................................... 13

    IV.  Previous exercises of discretion do not support DAPA's broad provision of benefits. ..................................................................... 14

    V.   DAPA exists at the executive's "lowest ebb." ................................ 17

Conclusion and Prayer ............................................................................... 18

## Table of Authorities

**Cases**

*Arizona v. United States*
   132 S. Ct. 2492 (U.S. 2012)..................................................................................18

*Arpaio v. Obama*, No. 14-cv-01966
   ___ F. Supp. 3d ___, 2014 WL 7278815 (D.D.C. Dec. 23, 2014)..............14

*Caribbean Transp., Inc. v. Pena*
   37 F.3d 671 (D.C. Cir. 1994)..................................................................................11

*Chevron U.S.A., Inc. v. Natural Resources Defense Council*
   467 U.S. 837 (1984) ........................................................................................ 7, 8, 13

*Crowley Caribbean Transportation, Inc. v. Pena*
   37 F.3d 671 (D.C. Cir. 1994)........................................................................7, 11, 12

*Ellison v. Connor*
   153 F.3d 247 (5th Cir. 1998) ..................................................................................11

*Faustino v. INS*
   302 F. Supp. 212 (S.D.N.Y. 1969) ......................................................................... 9

*FDA v. Brown & Williamson Tobacco Corp.*
   529 U.S. 120 (2000)....................................................................................7, 13, 14

*Heckler v. Chaney*
   470 U.S. 821 (1985) ........................................................................................11, 12

*Scialabba v. Cuellar do Osorio*
   134 S. Ct. 2191 (U.S. 2014) ..................................................................................10

*Youngstown Sheet & Tube Co. v. Sawyer*
   343 U.S. 579 (1952) ........................................................................................ 7, 17

**Statutes**

8 U.S.C. § 1103(a)................................................................................................14

8 U.S.C. § 1151(b)(2)(A)(i) ..................................................................................7, 9

8 U.S.C. § 1153(a) ........................................................................................ 15, 16

8 U.S.C. § 1182(a)(9)(B) ....................................................................................7, 10

8 U.S.C. § 1227(d) ........................................................................................ 10, 14

8 U.S.C. § 1255(a)................................................................................................10

Illegal Immigration Reform and Immigrant Responsibility Act of 1996
Pub. L. No. 104-208, 110 Stat. 3009 ......................................................11

Immigration Act of 1990
Pub. L. 101-649, 104 Stat. 4978............................................................15

Immigration and Nationality Act Amendments of 1965
Pub. L. No. 89-236, 79 Stat. 911............................................................ 9

Immigration Reform and Control Act of 1986
Pub. L. No. 99- 603, 100 Stat. 3359.................................................. 7, 11

McCarran-Walter Act, § 203(a)(2)
Pub. L. No. 82-414, 66 Stat. 163 ( June 27, 1952) .................................. 9

**Other Authorities**

Blackman, Josh
  *Gridlock and Executive Power* (Forthcoming 2015)
  http://ssrn.com/abstract=2466707......................................................17

Blackman, Josh
  *The Constitutionality of DAPA Part II: Faithfully Executing the Law*,
  19 TEX. REV. OF LAW & POL. __ (Forthcoming 2015)
  http://ssrn.com/abstract=2545558......................................................18

Blackman, Josh
  *Can a District Court Issue a Nationwide Injunction?*, JOSH
  BLACKMAN'S BLOG (Dec. 11, 2014)
  available at http://bit.ly/1s6Owf6 .......................................................... 8

Blackman, Josh
  *The Constitutionality of DAPA Part I: Congressional Acquiescence to
  Deferred Action*, 103 GEORGETOWN L.J. ONLINE __ (Forthcoming 2015)
  http://ssrn.com/abstract=2545544.................................................. 8, 15

Bush, George H.W.
  Statement on Signing the Immigration Act of 1990 (Nov. 29, 1990)
  available at http://bit.ly/1DnuoK1.......................................................15

House Committee on the Judiciary, Subcommittee on Immigration,
  Refugees, and International Law
  *Immigration Reform & Control Act of 1986 Oversight* (May 10 & 17, 1989)
  available at http://bit.ly/1zVcFTL................................................. 15, 16

Kessler, Glenn
  *Fact Checker: Obama's claim that George H.W. Bush gave relief to "40*

*percent" of undocumented immigrants,* WASH. POST (Nov. 24, 2014)
http://wapo.st/1HPNBDM..................................................................................16

Kim, Seung Min
*House Sends Obama Message with Immigration Vote*, POLITICO (Dec. 4, 2014)
http://politi.co/1xGOnzU................................................................................17

McNary, Gene, INS Commissioner
*Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990)
available at http://bit.ly/1FpWTse ................................................... 8, 15

Nash, Nathaniel C.
*Immigration Bill Approved in House*, N.Y. TIMES (Oct. 4, 1990)
available at http://nyti.ms/1xT0ubW ...................................................15

*This Week* (ABC television broadcast Nov. 23, 2014)
transcript available at http://abcn.ws/1w1nPEg....................................16

Thompson, Karl R.
Office of Legal Counsel, U.S. Dept. of Justice
*The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* (Nov. 19, 2014)
available at http://1.usa.gov/1AtB5ZD ............................... 12, 14, 15, 16

U.S. House of Representatives, Committee on the Judiciary, 104th Cong., 2d Sess.
*Report on H.R. 2202* (March 4, 1996)
available at http://1.usa.gov/1yCrcbv .............................................11, 12

U.S. Senate Committee on the Judiciary, Subcommittee on Immigration & Naturalization, 89th Cong., 1st Sess.
*Hearings on S. 500* (Feb. 10, 1965)........................................................... 9

Wildes, Leon
*The Deferred Action Program of the Bureau of Citizenship and Immigration Services: A Possible Remedy for Impossible Immigration Cases*
41 SAN DIEGO L. REV. 819 (2004).....................................................14

Wolfgang, Ben
*Next president won't dare reverse my executive action*, WASH. TIMES (Dec. 9, 2014)
available at http://bit.ly/1wW3qAw.....................................................13

## Interest

The Cato Institute was established in 1977. It is a nonpartisan public-policy research foundation dedicated to advancing individual liberty and free markets. Cato's Center for Constitutional Studies promotes the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, files briefs in the courts, and produces the *Cato Supreme Court Review*. Cato has been indefatigable in its opposition to laws and executive actions that go beyond constitutional authority, regardless of the underlying policy merits.

Josh Blackman is a law professor at the South Texas College of Law. Prof. Blackman's fields of expertise include constitutional law, executive powers, the separation of powers, and federalism.

Jeremy A. Rabkin is a professor of law at George Mason University School of Law. Prof. Rabkin's fields of expertise include administrative law, constitutional history, and statutory interpretation.

*Amici* submit this brief to address the separation-of-powers violations attending the policy known as Deferred Action for Parental Accountability (DAPA). As a matter of policy, *amici* support comprehensive immigration reform that provides relief to the aliens protected by DAPA (among many other purposes). It is not, however, for the president to make such legislative changes alone, in conflict with the laws passed by Congress and in other ways that go beyond the constitutionally authorized executive power.

No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amici* or their counsel made a monetary contribution to its preparation or submission.

## Summary of Argument

In the architecture of separation of powers crafted by the Framers, unilateral executive action based solely on Congress's resistance to the president's policy preferences has no place. Justice Jackson's canonical concurrence in *Youngstown Sheet & Tube* links judicial deference in separation-of-powers cases to the degree of presidential collaboration with Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952). The sweeping Deferred Action for Parental Accountability (DAPA) program, which awards reprieve from removal and work authorization to millions of unlawful entrants into the United States, fails Justice Jackson's test.

DAPA is inconsistent with the comprehensive framework that Congress established in the Immigration and Nationality Act (INA). After establishing a process for immigrant and nonimmigrant entry to the United States, taking into consideration policy criteria such as employment needs, family reunification, and humanitarian concerns, the INA implements this vast, complicated, often contradictory immigration regime through various enforcement and deterrence mechanisms.[1] At its core, this enforcement system is built on a three-legged stool that is designed to promote the orderly administration of immigration law. First, the INA deters foreign nationals from unlawfully entering the United States and relying on post-entry U.S.-citizen children to gain a legal immigration status. 8 U.S.C. § 1151(b)(2)(A)(i). Second, the INA deters foreign nationals' unlawful presence in the country through the persistent threat of removal. 8 U.S.C. § 1182(a)(9)(B). Third, Congress has sharply restricted unlawful immigrants' access to employment as a means to deter unlawful aliens from remaining. Immigration Reform and Control Act of 1986 (IRCA), Pub. L. No. 99-603, 100 Stat. 3359. DAPA knocks out each leg of the stool, and thus topples the structure of the INA.

As a "general enforcement policy," DAPA is subject to judicial review. *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994). Because DAPA contravenes long-standing congressional policies, a reviewing court should not display deference toward the program. *Chevron U.S.A., Inc. v. Natural Res. Defense Council*, 467 U.S. 837, 842–43 (1984). Indeed, it defies "common sense," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000), to believe that Congress would silently delegate to the president the power to grant substantial immigration benefits to millions

---

[1] *Amici* take existing law as given but by no means endorse the status quo of our immigration laws as a matter of policy.

of unlawful entrants with no presently viable claim to legal status. The executive branch itself disclaims that DAPA is legally binding, maintaining instead that it is an exercise of executive discretion—which by definition merits no *Chevron* deference.

Moreover, earlier deferred action programs, to the extent they comply with the law, are not appropriate analogies. Previous exercises of discretion have been ancillary to a statutory legal status.[2] They served as a *bridge* to obtaining that status, not a *tunnel* that undermines the legislative structure.[3] The Court should find that DAPA exceeds the executive branch's lawful authority and grant the plaintiffs' motion for a nationwide injunction.[4]

**Argument:
The policy is unconstitutional,
and its enforcement should be enjoined.**

### I.  DAPA clashes with the INA's comprehensive framework.

Congress has sought over decades to minimize the incentives for unlawful migration to the United States. That effort has resulted in a set of interlocking provisions that seal gaps in enforcement. Some may doubt Congress's wisdom—*amici* among them—but its constancy is not open to question.

#### A. The INA deters unlawful entry by precluding minor citizen children from petitioning for parental visas.

To deter unlawful immigrants from relying on post-entry U.S.-citizen children to gain a lawful status, Congress has required that such children be "at least 21 years of age" if they wish to sponsor parents. 8 U.S.C.

---

[2]  *See* Gene McNary, INS Commissioner, *Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990), available at http://bit.ly/1FpWTse (granting deferred action to certain immediate relatives of IRCA legalization beneficiaries).

[3]  Josh Blackman, *The Constitutionality of DAPA Part I: Congressional Acquiescence to Deferred Action*, 103 GEORGETOWN L.J. ONLINE ___ (forthcoming 2015), available at http://ssrn.com/abstract=2545544.

[4]  Josh Blackman, *Can a District Court Issue a Nationwide Injunction?*, JOSH BLACKMAN'S BLOG (Dec. 11, 2014), available at http://bit.ly/1s6Owf6 (nationwide injunction proper, particularly when many states are united in single litigation so opportunities for circuit split from multiple cases are diminished).

§ 1151(b)(2)(A)(i). This age requirement has been a fixture of U.S. immigration law for more than 60 years. *See* McCarran-Walter Act, § 203(a)(2), Pub. L. No. 82-414, 66 Stat. 163 (82nd Cong., 2nd Sess.) (June 27, 1952) (granting eligibility for visa to "Parents of *adult* citizens of the United States") (emphasis added). The 1965 Immigration Act continued this restriction. *See* Immigration and Nationality Act Amendments of 1965, Pub. L. No. 89-236, § 201(b), 79 Stat. 911 (providing that for parent to qualify as "immediate relative" of a citizen, citizen "must be at least twenty-one years of age"). Senator Sam Ervin warned that omitting this language in an early draft of the bill was "unwise." *Faustino v. INS*, 302 F. Supp. 212, 215–16 (S.D.N.Y. 1969). Senator Ervin feared that, absent the provision, "Foreigners can come here as visitors and then have a child born here, and they would become immediately eligible for admission." *Id.* Senator (and former Attorney General) Robert Kennedy seconded Ervin's concern, describing the omission as a "technical mistake in … the drafting." *Id.* at 215. Echoing the senators' assessment at a subsequent hearing session, Assistant Attorney General Norbert Schlei suggested an amendment that restored the language, pronouncing the change necessary "to preclude an inadvertent grant of … immigrant status to aliens to whom a child is born while in the United States."[5] This longstanding pillar of the INA provides a clear signal to visitors and unlawful entrants that they cannot rely on post-entry U.S.-citizen children to gain immigration benefits.

DAPA's operation is accordingly contrary to both the text of the statute and legislative intent. As noted, the statute contemplates only a limited petitioning mechanism for the parents of citizen children. Beyond this textual point, the history of this limitation reveals that Congress *explicitly rejected* the exact type of expansive family-unity principle that DAPA is enacting administratively.

### B. The INA deters unlawful presence through persistent threat of enforcement.

The INA also strongly discourages the unlawful entry and presence of foreign nationals. Individuals are unlawfully present in the United States if they lack a currently valid legal status and have no currently pending claim

---

[5] U.S. Senate Cmte. on the Judiciary, Subcmte. on Immig. & Naturalization, 89th Cong., 1st Sess., *Hearings on S. 500*, at 270 (Feb. 10, 1965).

for such status. *See* 8 U.S.C. § 1182(a)(9)(B).[6] Under the INA, an individual who has been unlawfully present for one year or more and then departs the United States is barred from readmission for ten years. *See* 8 U.S.C. § 1182(a)(9)(B)(i)(II).

This reinforces another section of the statute, which requires foreign nationals who entered without inspection to leave the country to become eligible for lawful permanent resident (LPR) status. *See* 8 U.S.C. § 1255(a) (foreign national is eligible for LPR status *only* if national has been inspected, admitted, or paroled into the United States). The departure from the country of an alien who was unlawfully present for a year or more triggers the unlawful-presence bar, requiring that individual to wait *10 years* before seeking legally reentry. These provisions present virtually insurmountable barriers for unlawful entrants who wish to use post-entry U.S.-citizen children to obtain a legal status.

While the INA allows DHS to waive the unlawful presence bar, the provisions of the waiver reinforce Congress's policy of deterring entry without inspection by adult foreign nationals who later seek to gain a lawful status through post-entry U.S.-citizen children. The waiver, 8 U.S.C. § 1182(a)(9)(B)(v), is limited to *spouses* and *children* of U.S. citizens or LPRs; it has no provision for *parents*. The omission of parents of either U.S. citizens or LPRs is not a clerical error. It buttresses longstanding congressional policy that deters unlawful entrants from relying on post-entry U.S.-citizen children to gain a lawful status.

In sum, unlawful entrants in this situation have no presently viable prospect for a legal status; they can expect to wait up to 21 years from the birth of a U.S.-citizen child, with 10 years of that time spent abroad. The Supreme Court has recently observed that *legal* immigration often "takes time." *See Scialabba v. Cuellar do Osorio*, 134 S. Ct. 2191, 2199 (U.S. 2014). Congress has deliberately engineered the INA to place far more substantial obstacles in the way of unlawful entrants whose only prospect for legal status stems from a post-entry U.S.-citizen child.

---

[6] By statute, a foreign national is not "unlawfully present" and is eligible for deferred action if he is applying for a legal status authorized by statute, such as political asylum; a T visa, available to victims of human trafficking; or a U visa, available to a foreign national who has been a victim of crime and provides information useful in a criminal prosecution. *Cf.* 8 U.S.C. § 1227(d)(2).

### C. The INA deters unlawful presence by restricting access to lawful employment.

In addition to deterring unlawful presence and the use of U.S.-citizen children to gain immigration status, Congress has also repeatedly sought to neutralize the "primary magnet for illegal immigration": U.S. jobs. *See* U.S. House of Representatives, Cmte. on the Judiciary, 104th Cong., 2d Sess., *Report on H.R. 2202*, available at http://1.usa.gov/1yCrcbv, at 126 (March 4, 1996) . In 1986, Congress passed the Immigration Reform and Control Act (IRCA), which granted legalization to millions of undocumented aliens and imposed sanctions on employers who hired undocumented workers. Pub. L. No. 99-603, 100 Stat. 3359. This congressional commitment to neutralizing the magnet of U.S. jobs was also evident 10 years after IRCA, when Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009. The House Judiciary Committee's report on that act identified inadequate enforcement of IRCA's employer-sanctions program as a cardinal reason for the "failure" of U.S. immigration policy. *Report on H.R. 2202* at 110.

DAPA clashes with the INA by providing work authorization and a reprieve from removal to millions of unlawful adult entrants who have post-entry U.S.-citizen children. DAPA does not entitle recipients to LPR status. But work authorization and a reprieve from removal are substantial benefits that undercut Congress's goals of deterring unlawful entry, precluding parents' leveraging of post-entry U.S.-citizen children, and neutralizing the magnet of U.S. work.

## II. DAPA is subject to judicial review.

DAPA is subject to judicial review because its broad eligibility criteria make it a "general enforcement policy." *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994). General policies are reviewable because they entail analysis of purely legal questions, such as the "commands of the substantive statute." A general enforcement policy's consistency with statutory commands is a "meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *Ellison v. Connor*, 153 F.3d 247, 251 (5th Cir. 1998). Courts are well-suited to conduct that legal analysis. Moreover, judicial review of general enforcement policy is a salutary check on arbitrariness and overreaching in agency decisionmaking. Sweeping decisions on enforcement policy may

constitute an agency's "abdication of … statutory responsibilities." *Crowley*, 37 F.3d at 677, citing *Heckler*, 470 U.S. at 833 n.4. Judicial review reduces this risk.

DAPA is a "general enforcement policy" with a modest role for "case-by-case" factors. The eligibility criteria are extremely broad (entry into U.S. by certain date and U.S. citizen or LPR children). The disqualifying criteria (such as a criminal record) are extremely narrow. The Office of Legal Counsel's opinion supporting DAPA seeks to cast DAPA as "case-by-case" decisionmaking,[7] but DAPA's broad criteria will in reality operate as a blanket grant of immigration benefits. Approving these applications is an exercise not of prosecutorial discretion, but of clerical approval. Courts can readily test DAPA against the policies outlined in the INA. There is no presumption of unreviewability.

Abdication is a special concern where the general policy involves not just agency "refusal to institute proceedings" against individuals who have violated a statute, *Heckler*, 470 U.S. at 835, but also the blanket grant of benefits to statute violators. Giving benefits to individuals who have disregarded core tenets of a congressional scheme creates a special risk of undercutting legislative commands. For example, Congress has consistently articulated the view that the "employment of illegal aliens … causes deleterious effects for U.S. workers." See [Report on H.R. 2202 at 126](). But DAPA grants illegal aliens employment authorization.

When deferred action, including employment authorization, serves as a bridge to a *statutory* legal status—as has traditionally been the case—the statutory scheme is not undermined. Deferred action in these cases serves the INA's purposes by encouraging individuals to apply for a legal status that is authorized by Congress. Deferred action in those circumstances simply preserves, like a stay in ordinary litigation, the *status quo ante*.[8] Under

---

[7] *See* Karl R. Thompson, Office of Legal Counsel, U.S. Dept. of Justice, *Dept. of Homeland Security's Auth. to Prioritize Removal of Certain Aliens Unlawfully Present in the U.S. and to Defer Removal of Others*, available at http://1.usa.gov/1AtB5ZD, at 11 (Nov. 19, 2014) .

[8] This policy strengthens the case for granting the plaintiffs' motion for a nationwide preliminary injunction, in order to maintain the ex ante status quo and preserve the laws designed by Congress. Otherwise, benefits conferred on DAPA beneficiaries would amount to irreparable harm, rendering future corrections extremely difficult. Even President Obama acknowledged that a future president is unlikely to

DAPA, though, benefits flow to individuals who have little or no realistic prospect of obtaining a legal immigration status.

DAPA is not a bridge, but a tunnel under the legislative structure—and also a detour that bypasses the normal operation of the law Congress has enacted. Proceeding with deferred action and work authorizations, despite these evident risks, amounts to a "conscious" abdication of statutory obligations.

### III. Because DAPA clashes with the INA, DAPA is not entitled to judicial deference.

Under *Chevron*, the agency receives no deference if the statute is unambiguous. To assess ambiguity, a court must interpret "the words of a statute … in their context and with a view to their place in the overall statutory scheme." *Brown & Williamson*, 529 U.S. at 133. The court must "fit, if possible, all parts [of the statute] into an harmonious whole" and use "common sense" to determine the scope of Congress's delegation to an agency. *Id*.

The INA's provisions, read together as the Supreme Court requires, are unambiguous in rejecting DAPA's blanket grant of immigration benefits to a substantial percentage of undocumented adults in the United States. Awarding work authorization, as well as a reprieve from removal, to millions of foreign nationals undermines Congress's careful three-pronged approach. Rather than deterring leveraging of post-entry U.S. citizen children and entry without inspection, DAPA rewards this conduct with the very lure—employment in the U.S.—that Congress has repeatedly sought to neutralize.

DAPA also defies the Supreme Court's requirement to construe legislative delegations using common sense. "Common sense" requires a correlation between the magnitude of the effects of an agency action and the specificity of the statutory authorization for that action. *Brown & Williamson*, 529 U.S. at 133. To fit the dictates of "common sense," a change of enormous legal and "political magnitude" wrought by an agency must be authorized by specific statutory language. *Id.* In *Brown & Williamson*, for example, the Supreme Court rejected the Food and Drug Administration's attempt to use generic statutory language on issuing regulations to regulate the tobacco in-

---

undo DAPA. Ben Wolfgang, *Next president won't dare reverse my executive action*, WASH. TIMES (Dec. 9, 2014), http://bit.ly/1wW3qAw .

dustry. That generic language was insufficient evidence that Congress intended to delegate to the FDA authority to affect the U.S. economy in such a substantial fashion, given repeated congressional acknowledgment of tobacco's economic importance. *Id.* at 137.

The INA's language on the role of the relevant agency highlights both the individualized nature of executive discretion and the need to adhere to the statutory framework. *See* 8 U.S.C. § 1103(a)(3) (attorney general should "establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority *under the provisions of this Act*") (emphasis added). In assessing DAPA's legality, the Court should read the INA as the Supreme Court read analogous statutory language in *Brown & Williamson*, which precludes exercises of discretion beyond the interstitial measures in which Congress had acquiesced.

## IV. Previous exercises of discretion do not support DAPA's broad provision of benefits.

Previous exercises of discretion, to the extent they are both legal and relevant, have typically been far narrower than DAPA. Many have been ancillary to statutory grants of status, such as deferred action for individuals seeking visas as victims of crime. *See* 8 U.S.C. § 1227(d)(2). Other cases are based on compelling individual equities, such as extreme youth or age, physical infirmity, or mental illness. *See* Leon Wildes, *The Deferred Action Program of the Bureau of Citizenship & Immig. Svcs.: A Possible Remedy for Impossible Immig. Cases*, 41 SAN DIEGO L. REV. 819 (2004). A third category is predicated on foreign-policy concerns, including mitigating risk from natural disasters abroad. The four primary deferred actions identified by the OLC Opinion[9]—involving VAWA self-petitioners, T- and U-visa applicants, foreign students affected by Hurricane Katrina, and widows and widowers

---

[9] The first federal district court to uphold DAPA cited the OLC Opinion's superficial analysis almost verbatim, without any discussion of what other varieties of deferred action actually entailed, and how they differ from DAPA. *Arpaio v. Obama*, No. 14-cv-01966, __ F. Supp. 3d __, 2014 WL 7278815 *3 (D.D.C. Dec. 23, 2014) ("The executive branch has previously implemented deferred action programs for certain limited categories of aliens, including: certain victims of domestic abuse committed by United States citizens and Lawful Permanent Residents; victims of human trafficking and certain other crimes; students affected by Hurricane Katrina; widows and widowers of U.S. citizens; and certain aliens brought to the United States as children.") (citations omitted).

of U.S. citizens—acted as a *temporary bridge* from one status to another, where benefits were construed as *immediately* arising post-deferred action.[10]

As an example of deferred action that was a bridge to a statutory grant of legal status, consider the Family Fairness program implemented in the Reagan and George H.W. Bush administrations, which OLC cited in justifying DAPA. *See* OLC Opinion at 14. IRCA allowed for the legalization of millions of undocumented noncitizens. Within a discrete period after IRCA beneficiaries became LPRs, the INA allowed them to sponsor immediate relatives such as spouses and children for an immigrant visa. *See* 8 U.S.C. § 1153(a)(2). Removing people who would within a relatively short time qualify for a visa seemed both pointless and harsh.

Soon after IRCA's passage, immigration officials began a temporary program that provided blanket protection to children of IRCA beneficiaries, and relief from removal for spouses who could show compelling circumstances. *See* House Cmte. on the Judiciary, Subcmte. on Immig., Refugees, and Intl. Law, *Immig. Reform & Control Act of 1986 Oversight*, available at http://bit.ly/1zVcFTL, at 459 (May 10 & 17, 1989) (*IRCA Oversight*) (testimony of INS Commissioner Alan C. Nelson). Leading members of Congress urged immigration officials to do even more to protect spouses of IRCA beneficiaries from removal. *See id.* at 463 (committee chairman urging reprieve from removal for "immediate family members" of IRCA beneficiaries, who "are of the class of people we generally try to make it easy to have join their family members"). Despite disagreements about the economics of the bill, "few dispute[d] the humanitarian aim of uniting families."[11] Immigration officials acquiesced to these legislators' suggestions in February 1990, extending blanket relief to spouses of IRCA beneficiaries.[12] That exercise of discretion was quickly ratified only nine months later in the Immigration Act of 1990.[13]

---

[10]   Blackman, *Constitutionality Part I*, 103 Georgetown L.J. Online at ___.
[11]   Nathaniel C. Nash, *Immigration Bill Approved in House*, N.Y. Times (Oct. 4, 1990), available at http://nyti.ms/1xT0ubW.
[12]   *See* McNary, *Family Fairness Guidelines*, at 1.
[13]   Pub. L. 101-649, 104 Stat. 4978; *see also* President George H.W. Bush, Stmt. on Signing the Immig. Act of 1990 (Nov. 29, 1990), available at http://bit.ly/1DnuoK1 (The Act "accomplishes what this Administration sought from the outset of the immigration reform process: a complementary blending of our tradition of family reunification….").

In addition to being ancillary to Congress's grant of legal status to IRCA beneficiaries, Family Fairness was also far smaller than the millions of people eligible to apply for DAPA. As of 1989, only 10,644 people had applied for relief under the Reagan program. *See* IRCA Oversight at 403. In 1990, new INS Commissioner Gene McNary estimated that the expanded Family Fairness policy would assist roughly 100,000—*not* 1.5 million—spouses and children of IRCA beneficiaries.[14]

In contrast with Family Fairness, DAPA offers work authorization and relief from removal to cohorts that have far more protracted and uncertain pathways to legal status. Consider parents of post-entry U.S.-citizen children. Under the INA, this cohort may need to wait up to 21 years to petition for a visa and spend 10 of those years outside the United States. That is a far cry from the discrete waiting period required of the spouses and children of IRCA beneficiaries. DAPA also offers work authorization and relief from removal to parents of LPRs, who have *no* ability under current law to petition for a parental visa.[15] A visa remains an impossibility for most and a potentially prolonged slog for the remainder.

Perhaps because DAPA is both far larger than Family Fairness and not ancillary to a statutory grant of legal status, no similar consensus in Congress has accompanied DAPA. Indeed, the House of Representatives recently

---

[14]   The OLC Opinion repeated an oft-cited, but incorrect statistic that "Family Fairness" deferred the deportation of 1.5 million, *see* OLC Opinion at 14, a statistic that has been repeated by the President. *This Week* (ABC television broadcast Nov. 23, 2014), transcript available at http://abcn.ws/1w1nPEg ("If you look, every president—Democrat and Republican—over decades has done the same thing. George H W Bush—about 40 percent of the undocumented persons, at the time, were provided a similar kind of relief as a consequence of executive action."). The actual estimate was roughly 100,000. Glenn Kessler, *Fact Checker: Obama's Claim that George H.W. Bush Gave Relief to "40 percent" of Undocumented Immigrants*, Wash. Post Online (Nov. 24, 2014), available at http://wapo.st/1HPNBDM. The origin of this false number is subject to some dispute, and seems to be based on an error in congressional testimony. McNary himself stated, "I was surprised it was 1.5 million when I read that. I would take issue with that. I don't think that's factual." Ultimately, by October 1, 1990, INS had received *only 46,821 applications*. *Id*. The next month, President Bush signed the Immigration Act of 1990, which ended the temporary program.

[15]   *See* 8 U.S.C. § 1153(a) (not listing parents of LPRs among family members eligible for immigrant visas).

passed a resolution opposing the measure.[16] In sum, Family Fairness is not an apt precedent for DAPA's sweeping relief.

### V.     DAPA exists at the executive's "lowest ebb."

A president's efforts to use executive powers to enact substantive policies in the face of congressional intransigence must be viewed skeptically.[17] The president is sidestepping Congress because the legislative branch has refused to enact his preferred policies. However, the architecture of separation of powers, outlined by Justice Jackson in *Youngstown*, has no place for unilateral executive action based solely on Congress's resistance to presidential preferences, even if those preferences reflect sound policy choices. 343 U.S. at 634 (Jackson, J., concurring).

As a result, DAPA finds refuge in *none* of *Youngstown*'s three tiers :

- *First*, the president is not acting in concert with Congress: Congress rejected or failed to pass immigration reform bills reflecting this policy several times.

- *Second*, Congress has not acquiesced in a pattern of analogous executive actions. Congress has instead approved and even encouraged much narrower uses of deferred action, such as the "Family Fairness" program. But previous uses were typically ancillary to statutory grants of lawful status or responsive to extraordinary equities based on the extreme youth, age, or infirmity of the recipient. And there is no murky "twilight" about congressional intent; the House recently passed a resolution opposing the policy.

- *Third*, the president is not resisting a rebellion or foreign invasion that poses an imminent threat; on domestic matters, he cannot rely on his commander-in-chief powers. Nor is he exercising other powers under Article II of the Constitution. DAPA stems only from the president's desire to achieve legislative goals in the face of legislative gridlock.

---

[16]   Seung Min Kim, *House Sends Obama Message with Immigration Vote*, POLITICO (Dec. 4, 2014), http://politi.co/1xGOnzU.

[17]   Josh Blackman, *Gridlock and Executive Power* (forthcoming 2015), http://ssrn.com/abstract=2466707.

The president fails to take care that the laws be faithfully executed when he expressly declines to execute the laws as Congress wrote them.[18] DAPA, in its full scope, stems from the president's interest in enacting his agenda. That agenda may well be appropriate as a policy matter, but the pathway designed by the Framers for implementing it is clear: it goes through the halls of Congress.

## Conclusion and Prayer

Because of the executive's disregard toward the congressionally designed framework of the INA and the separation of powers, this court should find that DAPA is precluded by the INA and grant the Plaintiff's motion for a nationwide preliminary injunction.

Respectfully submitted,

THE OLSON FIRM, PLLC

/s/ Leif A. Olson

Leif A. Olson
  S.D. Tex. Bar No. 33695
  Texas Bar No. 24032801
  leif@olsonappeals.com
PMB 188
4830 Wilson Road, Suite 300
Humble, Texas 77396
(281) 849-8382

Of counsel:
Peter Margulies
  Admission *pro hac vice* pending
  R.I. Bar No. 6261
  pmargulies@rwu.edu
Professor of Law
ROGER WILLIAMS UNIVERSITY SCHOOL OF LAW

---

[18] *Arizona v. United States*, 132 S. Ct. 2492, 2521 (2012) (Scalia, J., dissenting) ("But there has come to pass, and is with us today, the specter that Arizona and the States that support it predicted: A Federal Government that *does not want to enforce the immigration laws as written*, and leaves the States' borders unprotected against immigrants whom those laws would exclude.") (emphasis added). *See* Josh Blackman, *The Constitutionality of DAPA Part II: Faithfully Executing the Law*, 19 TEX. REV. OF LAW & POL. ___ (forthcoming 2015), http://ssrn.com/abstract=2545558.

10 Metacom Avenue
Bristol, Rhode Island 02809
(401) 254-4564

Ilya Shapiro
  Admission *pro hac vice* pending
  D.C. Bar No. 489100
  ishapiro@cato.org
CATO INSTITUTE
1000 Massachusetts Ave. NW
Washington, D.C. 20001
(202) 218-4600

## Certificate of Service

On January 7, 2015, I served a copy of this brief on all counsel of record through the Court's CM/ECF system.

/s/ Leif A. Olson