**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| vs. | ) | Case No. 1:14-cv-254 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Table of Authorities .................................................................................... iv

Table of Exhibits ....................................................................................... xv

Summary of Argument .............................................................................. 1

Argument ..................................................................................................... 3

    I.    Plaintiffs Are Likely To Prevail On The Merits ................................ 3

        A.    Defendants Violated The Take Care Clause ............................... 3

            1.    Plaintiffs' Take Care Claim Is Cognizable Under *Youngstown* ........................................................................ 3

                a.    Plaintiffs have a cause of action ............................. 3

                b.    Defendants cannot relitigate *Youngstown* ............. 4

                c.    Defendants cannot ignore *Youngstown* ................. 7

                d.    OLC agreed that *Youngstown* applies ..................... 7

            2.    Plaintiffs' Take Care Claim Is Likely To Succeed Under *Youngstown* ................................................................ 9

                a.    Congress prohibited Defendants from granting deferred action to 40% of the Nation's undocumented immigrants ...................... 9

                    i.    Parents of U.S. citizens .............................. 10

                    ii.    Parents of LPRs ........................................... 13

                 b.    Congress prohibited Defendants from granting work permits to 40% of the Nation's undocumented immigrants ................................... 14

                c.    Historical practice prohibits the DHS Directive ................................................................ 18

                d.    Congressional rejection of Defendants' legislation prohibits the DHS Directive ............... 23

3. The DHS Directive Is Lawmaking, Not Discretionary Decisionmaking .......................................... 25

 a. Plaintiffs challenge Defendants' *actions* — not their inactions ................................................. 25

 b. Rubber-stamping is not "case-by-case discretion" ............................................................ 28

 c. Theoretical revocability of deferred action cannot save the DHS Directive ............................. 32

B. Defendants Violated The APA .................................... 34

 1. The DHS Directive Is Reviewable Under The APA ........ 35

  a. The Directive is a substantive rule ...................... 36

  b. Defendants are wrong to call the Directive a non-substantive "guidance" or "policy" document ................................................. 37

 2. Defendants' Say-So Cannot Defeat Judicial Review ....... 38

 3. Plaintiffs' APA Claims Are Likely To Succeed On The Merits ...................................................... 40

C. Plaintiffs Have Standing ........................................... 42

 1. The DHS Directive Will Impose Economic Injuries On Plaintiffs' Driver's License Programs ...................... 43

  a. The States will lose money .................................. 43

  b. The States' injuries are not "self-inflicted" ........... 45

 2. Plaintiffs' Standing Follows A Fortiori From *Massachusetts v. EPA* ........................................ 49

  a. States get "special solicitude" as plaintiffs ........... 50

  b. Plaintiffs' injuries are concrete, traceable, and redressable ...................................................... 51

  c. The size of Plaintiffs' injuries is irrelevant ........... 55

  d. Defendants' counterarguments fail ....................... 56

3.      Plaintiffs Have *Parens Patriae* Standing ......................... 58

a.      States can sue to protect citizens against economic discrimination ......................................... 58

b.      States can sue DHS ................................................ 61

4.      One Plaintiff With Standing Is Sufficient To Create A "Case" Or "Controversy" .................................................. 62

II.     Plaintiffs Will Incur Irreparable Injuries ................................................. 64

III.    The Balance of Equities Tips in PLaintiffs' Favor ................................ 65

IV.     The Public Interest Necessitates a Preliminary Injunction ................. 66

Conclusion ............................................................................................................. 67

Certificate of Service

# TABLE OF AUTHORITIES

## Cases

*ABA v. FTC,*
    430 F.3d 457 (D.C. Cir. 2005) ........................................................................ 16, 17

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) ........................................................................................ 34, 35

*Adams v. Richardson,*
    356 F. Supp. 92 (D.D.C. 1973) ............................................................................ 32

*Adams v. Richardson,*
    480 F.2d 1159 (D.C. Cir. 1973) ........................................................................... 32

*ALCOA v. Bonneville Power Admin.,*
    903 F.2d 585 (9th Cir. 1989) ............................................................................... 58

*Alden v. Maine,*
    527 U.S. 706 (1999) ............................................................................................ 50

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
    458 U.S. 592 (1982) ........................................................ 2, 47, 59, 60, 61, 62

*Am. Trucking Ass'ns, Inc. v. Smith,*
    496 U.S. 167 (1990) ............................................................................................ 48

*Apache Bend Apartments, Ltd. v. United States,*
    987 F.2d 1174 (5th Cir. 1993) ............................................................................. 57

*Appalachian Power Co. v. EPA,*
    208 F.3d 1015 (D.C. Cir. 2000) ...................................................................... 37, 40

*Arizona Dream Act Coalition v. Brewer,*
    757 F.3d 1053 (9th Cir. 2014) ........................................................................ 45, 46

*Arizona v. United States,*
    132 S. Ct. 2492 (2012) ........................................................................................ 51

*Ashwander v. Tennessee Valley Auth.,*
    297 U.S. 288 (1936) ............................................................................................ 41

*Austin v. New Hampshire,*
    420 U.S. 656 (1975) ............................................................................................ 58

*Baker v. Carr,*
369 U.S. 186 (1962) ........................................................................ 44, 45

*Barlow v. Collins,*
397 U.S. 159 (1970) ............................................................................ 43

*Bell v. Hood,*
327 U.S. 678 (1946) .............................................................................. 4

*Bowen v. Massachusetts,*
487 U.S. 879 (1988) ............................................................................ 39

*Bowsher v. Synar,*
478 U.S. 714 (1986) ............................................................................ 62

*Catawba County v. EPA,*
571 F.3d 20 (D.C. Cir. 2009) .............................................................. 56

*Chamber of Commerce of U.S. v. Whiting,*
131 S. Ct. 1968 (2011) ........................................................................ 61

*Chamber of Commerce v. DOL,*
174 F.3d 206 (D.C. Cir. 1999) ............................................................ 37

*Christopher v. SmithKline Beecham Corp.,*
132 S. Ct. 2156 (2012) ........................................................................ 33

*City of Chicago v. Envtl. Def. Fund,*
511 U.S. 328 (1994) ............................................................................ 16

*Clinton v. City of New York,*
524 U.S. 417 (1998) ............................................................................ 62

*Cohens v. Virginia,*
19 U.S. (6 Wheat.) 264 (1821) ............................................................ 57

*Corley v. United States,*
556 U.S. 303 (2009) ............................................................................ 15

*Croplife v. EPA,*
329 F.3d 876 (D.C. Cir. 2003) ............................................................ 39

*Ctr. for Auto Safety, Inc. v. NHTSA,*
342 F. Supp. 2d 1 (D.D.C. 2004) ........................................................ 58

*De Canas v. Bica*,
424 U.S. 351 (1976) ................................................................................ 61

*Diamond v. Charles*,
476 U.S. 54 (1986) .................................................................................. 47

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ................................................................................ 16

*FEC v. Akins*,
524 U.S. 11 (1998) .................................................................................. 56

*Feinerman v. Bernardi*,
558 F. Supp. 2d 36 (D.D.C. 2008) .......................................................... 64

*Florida ex rel. Atty. Gen. v. HHS*,
648 F.3d 1235 (11th Cir. 2011) .............................................................. 63

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .................................................................................. 4

*Free Enterprise Fund v. PCAOB*,
561 U.S. 477 (2010) .................................................................................. 4

*Freeman v. Gonzales*,
444 F.3d 1031 (9th Cir. 2006) ................................................................ 21

*Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ........................................................................... 42, 60

*Georgia v. Pa. R. Co.*,
324 U.S. 439 (1945) ........................................................................... 51, 59

*Georgia v. Tenn. Copper Co.*,
206 U.S. 230 (1907) ................................................................................ 51

*Harper v. Virginia Bd. of Elections*,
383 U.S. 663 (1966) ................................................................................ 45

*Heckler v. Chaney*,
470 U.S. 821 (1985) ............................................................. 25, 26, 28, 32

*Hudson v. United States*,
522 U.S. 93 (1997) .................................................................................. 60

vi

*Illinois v. City of Chicago,*
    137 F.3d 474 (7th Cir. 1998) ................................................................ 49

*In re U.S.,*
    503 F.3d 638 (7th Cir. 2007) ................................................................ 32

*Japan Whaling Ass'n v. American Cetacean Soc'y,*
    478 U.S. 221 (1986) ................................................................ 34, 35

*Lockhart v. Napolitano,*
    573 F.3d 251 (6th Cir. 2009) ................................................................ 21

*Los Angeles Haven Hospice, Inc. v. Sebelius,*
    638 F.3d 644 (9th Cir. 2011) ................................................................ 57

*Mada-Luna v. Fitzpatrick,*
    813 F.2d 1006 (9th Cir. 1987) ................................................................ 40

*Maryland v. Louisiana,*
    451 U.S. 725 (1981) ................................................................ 59

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ................................2, 42, 43, 49, 50, 51, 52, 55, 56, 58, 61, 62

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ................................................................ 61

*McGowan v. Maryland,*
    366 U.S. 420 (1961) ................................................................ 45

*Mississippi v. Johnson,*
    71 U.S. (4 Wall.) 475 (1866) ................................................................ 4

*N.W. Austin Mun. Util. Dist. No. 1 v. Holder,*
    557 U.S. 193 (2009) ................................................................ 41

*Nalco Co. v. EPA,*
    786 F. Supp. 2d 177 (D.D.C. 2011) ................................................................ 64

*National Association of Home Builders v. Army Corps of Engineers,*
    417 F.3d 1272 (D.C. Cir. 2005) ................................................................ 26, 27, 28

*NFIB v. Sebelius,*
    132 S. Ct. 2566 (2012) ................................................................ 47

*Nixon v. GSA*,
    433 U.S. 425 (1977) ................................................................ 65

*NLRB v. Noel Canning*,
    134 S. Ct. 2550 (2014) ............................................................. 67

*NRDC v. EPA*,
    643 F.3d 311 (D.C. Cir. 2011) ................................................. 38

*NRDC v. FDA*,
    710 F.3d 71 (2d Cir. 2013) ...................................................... 49

*Panama Refining Co. v. Ryan*,
    293 U.S. 388 (1935) .................................................................. 4

*Pennsylvania v. West Virginia*,
    262 U.S. 553 (1923) ................................................................ 59

*Perales v. Casillas*,
    903 F.2d 1043 (5th Cir. 1990) ..................................... 9, 10, 28

*Philadelphia Co. v. Stimson*,
    223 U.S. 605 (1912) .................................................................. 4

*Philip Morris USA Inc. v. Scott*,
    131 S. Ct. 1 (2010) ................................................................. 64

*Phillips Petroleum Co. v. Johnson*,
    22 F.3d 616 (5th Cir. 1994) .................................................... 39

*Plyler v. Doe*,
    457 U.S. 202 (1982) ................................................................ 53

*Prof'ls & Patients for Customized Care v. Shalala*,
    56 F.3d 592 (5th Cir. 1995) ....................... 2, 35, 36, 37, 38, 40

*Red Lion Broad. Co. v. FCC*,
    395 U.S. 367 (1969) ................................................................ 24

*Reno v. American-Arab Anti-Discrimination Committee*,
    525 U.S. 471 (1999) ........................................................... 28, 29

*Robinson v. Napolitano*,
    554 F.3d 358 (3d Cir. 2009) .................................................... 21

*Rodriguez v. United States,*
    480 U.S. 522 (1987) ............................................................... 10

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,*
    547 U.S. 47 (2006) ................................................................. 62

*Russello v. United States,*
    464 U.S. 16 (1983) ................................................................. 13

*Scialabba v. Cuellar de Osorio,*
    134 S. Ct. 2191 (2014) ........................................................... 13

*Shaughnessy v. Pedreiro,*
    349 U.S. 48 (1955) ................................................................. 35

*Sierra Club v. Morton,*
    405 U.S. 727 (1972) ............................................................... 47

*Simmat v. U.S. Bureau of Prisons,*
    413 F.3d 1225 (10th Cir. 2005) ............................................... 4

*St. Pierre v. Dyer,*
    208 F.3d 394 (2d Cir. 2000)............................................. 48, 49

*Stomper v. Amalgamated Transit Union, Local 241,*
    27 F.3d 316 (7th Cir. 1994) ................................................... 10

*Texas Democratic Party v. Benkiser,*
    459 F.3d 582 (5th Cir. 2006) ................................................. 43

*Texas v. United States,*
    497 F.3d 491 (5th Cir. 2007) ........................................... 47, 48

*Town of Castle Rock v. Gonzales,*
    545 U.S. 748 (2005) ............................................................... 26

*United States v. Juarez-Escobar,*
    25 F. Supp. 3d 774 (W.D. Pa. 2014)....................................... 28

*United States v. Lee,*
    106 U.S. 196 (1882) ................................................................. 4

*United States v. Rutherford,*
    442 U.S. 544 (1979) ............................................................... 24

*United States v. SCRAP,*
   412 U.S. 669 (1973) ................................................................. 42, 44

*University of Texas v. Camenisch,*
   451 U.S. 390 (1981) ................................................................. 63

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977) ................................................................. 63

*Watt v. Energy Action Educ. Found.,*
   454 U.S. 151 (1981) ................................................................. 62, 63

*Whitman v. Am. Trucking Ass'ns, Inc.,*
   531 U.S. 457 (2001) ................................................................. 16, 41

*Wyeth v. Levine,*
   555 U.S. 555 (2009) ................................................................. 51

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ...................... 1, 3, 4, 6, 7, 8, 9, 12, 14, 18, 19, 23, 24, 25, 66, 67

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
   132 S. Ct. 1421 (2012) ............................................................. 57

**Federal Constitutional Provisions**

U.S. CONST. art. II, § 3 ............................................................. 1, 2, 3, 4, 5, 34

U.S. CONST. art. III .................................................................. 42, 47, 48, 56, 62, 64

**Federal Statutory Provisions**

Department of Homeland Security Appropriations Act of 2010,
   Pub. L. No. 111-83, 123 Stat. 2142 (2009) .................................. 21

Gramm-Leach-Bliley Financial Modernization Act,
   Pub. L. No. 106-102, 113 Stat. 1338 (1999) .................................. 17

Illegal Immigration Reform and Immigrant Responsibility Act,
   Pub. L. No. 104-208, 110 Stat. 3009 (1996) .................................. 12, 62

Victims of Trafficking and Violence Protection Act,
   Pub. L. No. 106-386, 114 Stat. 1464 (2000) .................................. 22

Violence Against Women Act,
   Pub. L. No. 103-322, 108 Stat. 1796 ....................................................... 22

5 U.S.C. § 553 ........................................................................................ 34, 41

5 U.S.C. § 702 ............................................................................................... 34

5 U.S.C. § 704 ................................................................................... 34, 35, 56

5 U.S.C. § 706 ........................................................................................ 34, 41

8 U.S.C. § 1103(a)(3) .............................................................................. 41, 42

8 U.S.C. § 1151(a)(1) ................................................................................... 13

8 U.S.C. § 1151(b)(2)(A)(i) .......................................................................... 11

8 U.S.C. § 1153(a)(1) ................................................................................... 13

8 U.S.C. § 1153(a)(2) ................................................................................... 13

8 U.S.C. § 1153(a)(3) ................................................................................... 13

8 U.S.C. § 1153(a)(4) ................................................................................... 13

8 U.S.C. § 1154(a)(1)(A)(iii) ........................................................................ 22

8 U.S.C. § 1154(a)(1)(A)(iv) ........................................................................ 22

8 U.S.C. § 1154(a)(1)(A)(vii) ....................................................................... 22

8 U.S.C. § 1182(a)(6)(A)(i) .......................................................................... 11

8 U.S.C. § 1182(a)(9)(B)(i)(II) ..................................................................... 11

8 U.S.C. § 1201(a) ........................................................................................ 11

8 U.S.C. § 1225 ...................................................................................... 11, 12

8 U.S.C. § 1225(a)(1) ................................................................................... 13

8 U.S.C. § 1225(b)(2)(A) .............................................................................. 12

8 U.S.C. § 1226 ............................................................................................ 12

8 U.S.C. § 1226a ................................................................................................ 12

8 U.S.C. § 1226a(a)(1) ...................................................................................... 12

8 U.S.C. § 1226(a)(3) ........................................................................................ 15

8 U.S.C. § 1226(c) ............................................................................................. 12

8 U.S.C. § 1229b(b)(1)(D) ................................................................................ 11

8 U.S.C. § 1229b(e)(1) ...................................................................................... 11

8 U.S.C. § 1231(a)(7) ........................................................................................ 15

8 U.S.C. § 1255 ................................................................................................. 11

8 U.S.C. § 1324a .............................................................................................. 14

8 U.S.C. § 1324a(a)(1)(A) ................................................................................ 14

8 U.S.C. § 1324a(h)(3) ............................................................................ 14, 15, 42

8 U.S.C. § 1430(a) ............................................................................................ 14

8 U.S.C. § 1439(a) ............................................................................................ 14

26 U.S.C. § 4980H(b) ....................................................................................... 60

26 U.S.C. § 4980H(b)(1) ................................................................................... 60

26 U.S.C. § 7121 ............................................................................................... 18

26 U.S.C. § 7122 ............................................................................................... 18

28 U.S.C. § 516 ................................................................................................... 8

28 U.S.C. § 519 ................................................................................................... 8

28 U.S.C. § 1331 .............................................................................................. 3, 4

49 U.S.C. § 30301 ............................................................................................. 44

## Federal Regulatory Provisions

Final Notice, 65 Fed. Reg. 12,818 (Mar. 9, 2000) ....................................................... 26

6 C.F.R. § 37.13(b)(1) ................................................................................. 44

8 C.F.R. § 214.2(f)(6) ................................................................................. 20

8 C.F.R. § 274a.12(c)(14) ............................................................. 17, 18, 46

45 C.F.R. § 152.2(8) .................................................................................. 60

## State Statutory Provisions

ARIZ. REV. STAT. ANN. § 23-212 ................................................................ 60

ARK. CODE ANN. § 11-10-511 .................................................................... 61

ARK. CODE ANN. § 27-16-1105 ................................................................. 44

MISS. CODE ANN. § 71-11-3(7)(e) ............................................................. 60

S.C. CODE ANN. § 41-8-50(D)(2) ......................................................... 60, 61

TENN. CODE ANN. § 50-1-103(d) ............................................................... 61

TEX. TRANSP. CODE § 521.142(a) .............................................................. 43

TEX. TRANSP. CODE § 521.1425(d) ............................................................ 43

TEX. TRANSP. CODE § 521.181 .................................................................. 43

TEX. TRANSP. CODE § 521.421(a) .............................................................. 43

TEX. TRANSP. CODE § 521.421(a-3) ........................................................... 43

W. VA. CODE ANN. § 21-1B-7 ................................................................... 61

## Other Authorities

Applicability of the Davis-Bacon Act to the Veterans Administration's Lease of
  Medical Facilities, 12 Op. O.L.C. 89 (1988) ................................................... 8

ARKANSAS MEDICAID, MEDICAL SERVICES POLICY MANUAL ........................................ 53

Josh Blackman, *The Constitutionality of DAPA Part I: Congressional
  Acquiescence to Deferred Action*, 103 GEORGETOWN LAW JOURNAL ONLINE __
  (forthcoming 2015) ..................................................................................... 20

CBS Los Angeles, *Long Lines Expected at DMV Friday as Undocumented
  Immigrants Apply for Licenses* (Jan. 1, 2015) .......................................... 64

Glenn Kessler,
  *Fact Checker: Obama's Claim that George H.W. Bush Gave Relief to
  '40 Percent' of Undocumented Immigrants*, WASH. POST (Nov. 24, 2014) ............. 19

Neal K. Katyal & Laurence H. Tribe, *Waging War, Deciding Guilt: Trying the
  Military Tribunals*, 111 YALE L.J. 1259 (2002) ....................................... 6

IRA J. KURZBAN, IMMIGRATION LAW SOURCEBOOK (13th ed. 2012) ............................ 13

Kristi Lundstrom, *The Unintended Effects of the Three- and Ten-Year Unlawful
  Presence Bars*, 76 LAW & CONTEMP. PROBS. 389 (2013) ............................... 11

6 C. GORDON, S. MAILMAN & S. YALE-LOEHR, IMMIGRATION
  LAW AND PROCEDURE  (1998) ..................................................................... 29

Michael D. Shear, *For Obama, Executive Order on Immigration Would be a
  Turnabout*, N.Y. TIMES (Nov. 17, 2014) .............................................. 65

Kenji Yoshino, *On Empathy in Judgment (Measure for Measure)*,
  57 CLEV. ST. L. REV. 683 (2009) ............................................................. 67

## TABLE OF EXHIBITS

| EXHIBIT | DOCUMENT NAME | APP. PAGE NO. |
|---|---|---|
| 1 | Declaration of Richard Allgeyer, Ph.D. | 0001-0046 |
| 2 | Stuart Anderson, Memorandum for Johnny N. Williams, Re: Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status (May 8, 2002) | 0047-0049 |
| 3 | *Arizona Dream Act Coalition v. Brewer*, No. 13-16248 (9th Cir.), Amicus Br. of United States in Opp'n to Reh'g En Banc | 0050-0074 |
| 4 | Declaration of Kevin D. Bailey | 0075-0078 |
| 5 | Declaration of David G. Baker | 0079-0086 |
| 6 | Jeanne Batalova et al., DACA at the Two-Year Mark, Migration Policy Institute (Aug. 2014) | 0087-0121 |
| 7 | Declaration of Michael Berndt | 0122-0125 |
| 8 | DACA Emails, Part I | 0126-0141 |
| 9 | DACA Emails, Part II | 0142-0273 |
| 10 | DACA Standard Operating Procedures | 0274-0735 |
| 11 | Declaration of Lisa Dawn-Fisher | 0736-0741 |
| 12 | Deferred Action for Childhood Arrivals Report, U.S. Citizenship and Immigration Services (Apr. 10, 2013) | 0742-0744 |
| 13 | Declaration of James Dunks | 0745-0748 |
| 14 | Declaration of Karl Eschbach, Ph.D. | 0749-0790 |
| 15 | Declaration of Patrick A. Fernan | 0791-0802 |
| 16 | Declaration of Jeffrey M. Gill | 0803-0805 |
| 17 | Bob Goodlatte & Charles E. Grassley, Letter to Jeh Johnson (Aug. 29, 2014) | 0806-0811 |

| EXHIBIT | DOCUMENT NAME | APP. PAGE NO. |
|---|---|---|
| 18 | David Hancock, *Few Immigrants Use Family Aid Program*, MIAMI HERALD (Oct. 1, 1990) | 0812-0814 |
| 19 | H.R. 5759, Preventing Executive Overreach on Immigration Act of 2014 | 0815-0821 |
| 20 | Declaration of Michael C. MacCracken, *Massachusetts v. EPA* (D.C. Cir. No. 03-1361) | 0822-0838 |
| 21 | Donald Neufeld, Memorandum for Field Leadership, Re: Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children (Sept. 4, 2009) | 0839-0847 |
| 22 | Declaration of Walt Neverman | 0848-0851 |
| 23 | Declaration of Kenneth Palinkas | 0852-0856 |
| 24 | Declaration of Joe Peters | 0857-0878 |
| 25 | Declaration of Sheri Pollock | 0879-0882 |
| 26 | President Barack Obama, Remarks by the President in Immigration Town Hall — Nashville, Tennessee (Dec. 9, 2014) | 0883-0893 |
| 27 | Hearing Transcript, President Obama's Executive Overreach on Immigration, House Judiciary Committee (Dec. 2, 2014) | 0894-0972 |
| 28 | Press Release, USCIS, USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina (Nov. 25, 2005) | 0973-0975 |
| 29 | Leon Rodriguez, Letter to Charles E. Grassley (Oct. 9, 2014) | 0976-0995 |
| 30 | Declaration of Donald M. Snemis | 0996-1003 |
| 31 | Systematic Alien Verification for Entitlements Program Documents | 1004-1022 |

| EXHIBIT | DOCUMENT NAME | APP. PAGE NO. |
|---------|---------------|---------------|
| 32 | Paul W. Virtue, Memorandum for Regional Directors et al., Re: Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues (May 6, 1997) | 1023-1030 |
| 33 | Declaration of Finis Welch, Ph.D. | 1031-1053 |
| 34 | William R. Yates, Memorandum for the Director, Vermont Service Center, Re: Centralization of Interim Relief for U Nonimmigrant Status Applicants (Oct. 8, 2003) | 1054-1061 |
| 35 | *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (No. 51-744), Brief for Petitioners | 1062-1191 |

## SUMMARY OF ARGUMENT

**I.A.** The Defendants claim they can dispense with federal law and unilaterally resolve one of the Nation's most intractable issues with a five-page DHS Directive. And they claim that their efforts are challengeable by no plaintiff, reviewable by no court, and subject to no public input under the Administrative Procedure Act. *See* Opp. 29 ("Plaintiffs' redress . . . is through the political process, not the courts."). Harry Truman was the last President to violate the Take Care Clause in such stark terms, and the Supreme Court enjoined the attempt in the *Steel Seizure Cases*. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). This Court should respond likewise.

Defendants cannot distinguish the *Steel Seizure Cases* by claiming that the DHS Directive is an unreviewable act of "discretionary non-enforcement." This is a lawsuit about what Defendants did — not what they declined to do. They unilaterally created a new entitlement program, legislated the eligibility criteria for it, and then (in the words of the USCIS union president) they "rubber-stamped" the eligible applications. Palinkas Decl. ¶¶ 6, 8 (App. 0854-55). Moreover, Defendants will issue millions of federal identification cards (called Employment Authorization Cards, or "EACs"), which will entitle their holders to myriad legal benefits under federal and state law. Whatever else might be said about Defendants' unilateral actions, they cannot be minimized as mere "inaction."

**I.B.** Plaintiffs also are likely to succeed on their APA claims. The APA's notice-and-comment and judicial-review provisions apply whenever an agency creates an entitlement program with administrative eligibility criteria that bind

agency officials and confer benefits on members of the public. *See Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 596 (5th Cir. 1995). The DHS Directive easily meets that standard because it obligates agency officials to "rubber-stamp" eligible applications, *see* Palinkas Decl. ¶¶ 6, 8 (App. 0854-55), and it confers legal rights in the form of EACs on members of the public. It is irrelevant that DHS calls the document a mere "policy" statement because federal courts must look behind the agency's label to the substance and practical effect of the agency's actions. *See Prof'ls & Patients*, 56 F.3d at 596 n.27.

**I.C.** The Plaintiffs have standing to raise their Take Care and APA claims. Unless enjoined by this Court, (1) the DHS Directive will impose millions of dollars in costs on state licensing programs; (2) the States will be forced to spend hundreds of millions of dollars on health, education, and law-enforcement programs; and (3) the Directive will distort labor markets in the Plaintiff States by making EAC-holders cheaper to hire. Those injuries are far more concrete than the States' interests in EPA's non-regulation of certain greenhouse gases, so the States' standing here is clearer than in *Massachusetts v. EPA*, 549 U.S. 497 (2007). And the Supreme Court repeatedly has held that the States have *parens patriae* standing to vindicate their sovereign interests in federal court. *E.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982).

**II-IV.** The Plaintiff States will suffer irreparable injuries without a preliminary injunction because they will be forced to spend millions of dollars to remediate the Directive's consequences. And as the President has conceded, it will

be difficult or impossible to unravel the Directive once it takes effect.  Against those injuries, the Defendants do not assert any immediate need to issue 4 million deferred action approvals and EACs.  Moreover, the *Youngstown* Court held that no emergency — not even the exigencies of the Korean War — can allow the Executive to violate the Take Care Clause.  Finally, the public interest favors preserving the status quo until the federal courts can make a considered judgment regarding the lawfulness of the Directive.  Otherwise the Executive will escape judicial enforcement of the Constitution's separation of powers simply by racing to violate it.

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

### A.    Defendants Violated The Take Care Clause

Plaintiffs' claim under the Take Care Clause, U.S. CONST. art. II, § 3, is likely to succeed for three reasons.  First, Plaintiffs have a cause of action to raise that claim, just as the steel mills did in *Youngstown*.  Second, under the legal framework established in *Youngstown*, the DHS Directive is unconstitutional because it contravenes Congress's plain statutory commands regarding undocumented immigrants' presence in the United States and their authorizations to work.  Third, Defendants cannot avoid judicial review by invoking "prosecutorial discretion" or "enforcement priorities" because this is a case about executive *action*, not inaction.

### 1.    *Plaintiffs' Take Care Claim Is Cognizable Under Youngstown*

#### a.    Plaintiffs have a cause of action

It is a rudimentary proposition of federal law that 28 U.S.C. § 1331 and the Constitution itself provide a cause of action to raise constitutional claims for

injunctive relief against federal officers.  *See, e.g., Philadelphia Co. v. Stimson*, 223 U.S. 605 (1912); *United States v. Lee*, 106 U.S. 196, 220-21 (1882).  Section 1331 gives this Court "jurisdiction of all civil actions arising under the Constitution . . . of the United States," and that is all the Plaintiffs need to seek "injunctions to protect rights safeguarded by the Constitution."  *Bell v. Hood*, 327 U.S. 678, 684 (1946); *see also Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 491 n.2 (2010) (plaintiffs have cause of action "without regard to the particular constitutional provisions at issue here"); *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (even when no statutory cause of action runs against the President, "the President's actions may still be reviewed for constitutionality"); *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1232 (10th Cir. 2005) (McConnell, J.) ("Section 1331 thus provides jurisdiction for the exercise of the traditional powers of equity in actions arising under federal law. No more specific statutory basis is required.").[1]  Defendants therefore cannot deny that there is a "judicially cognizable basis to challenge executive action under the Take Care Clause."  Opp. 30.

> b.     Defendants cannot relitigate *Youngstown*

The legal standard governing Plaintiffs' Take Care claim comes from the *Steel Seizure Cases*, which are the canonical authority governing unilateral exercises of executive power.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).  There, President Truman directed his Secretary of Commerce to seize

---

[1] Even constitutional claims generally do not run against the President himself.  *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866) (In general, "this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.").  Rather, they run against the executive officers who implement the President's unlawful instructions.  *See, e.g., Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935).

4

the Nation's steel mills, and the mill owners brought constitutional claims against the Commerce Secretary. The plaintiffs argued, among other things, that Truman unconstitutionally tried "to dispense with the laws" in violation of the Take Care Clause — just as James II did before him. Brief for Petitioners at 35-38, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (No. 51-744) (App. 1112-15) (explaining that Article II and the Take Care Clause find their roots in James II's invocation of the dispensing power).

In response, the Department of Justice defended Truman's unilateral dispensation in terms virtually identical to those it uses here. Consider this colloquy between Truman's DOJ lawyer and U.S. District Judge David Pine:

> *The Court*: So you contend the Executive has unlimited power in time of an emergency?
> *Mr. Baldridge*: He has the power to take such action as is necessary to meet the emergency.
> *The Court*: If the emergency is great, it is unlimited, is it?
> *Mr. Baldridge*: I suppose if you carry it to its logical conclusion, that is true. But I do want to point out that there are two limitations on the Executive power. One is the ballot box and the other is impeachment.
> *The Court*: Then, as I understand it, you claim that in time of emergency the Executive has this great power.
> *Mr. Baldridge*: That is correct.
> *The Court*: And that the Executive determines the emergencies and the Courts cannot even review whether it is an emergency.
> *Mr. Baldridge*: That is correct.
>
> * * *
>
> *The Court*: So, when the sovereign people adopted the Constitution, it enumerated the powers set up in the Constitution but limited the powers of the Congress and limited the powers of the judiciary, but it did not limit the powers of the Executive. Is that what you say?
> *Mr. Baldridge*: That is the way we read Article II of the Constitution.
>
> * * *
>
> It is our position that the President is accountable only to the country, and that the decisions of the President are conclusive.

*Id.* at 27-28 (App. 1104-05) (internal quotation marks and citations omitted).  Judge Pine responded exactly how we are asking this Court to respond:  he rejected the Executive Branch's limitless-power argument and issued a preliminary injunction.

The Supreme Court affirmed and made clear that the President is not a law unto himself:  "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown*, 343 U.S. at 587.  And in one of the most influential concurring opinions in Supreme Court history, Justice Jackson enunciated a three-part framework for analyzing presidential pleas for deference to executive power:

> 1.    When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate.
>
> * * *
>
> 2.    When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain.
>
> * * *
>
> 3.    When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.

*Id.* at 635-38 (Jackson, J., concurring) (footnote omitted); *see also* Neal K. Katyal & Laurence H. Tribe, *Waging War, Deciding Guilt: Trying the Military Tribunals*, 111 YALE L.J. 1259, 1274 (2002) ("Justice Jackson's concurrence outlined the three now-canonical categories that guide modern analysis of separation of powers.").

c.  Defendants cannot ignore *Youngstown*

Defendants' treatment of the "now-canonical" *Youngstown* case is deeply conflicted.  On the one hand, DOJ embraces the same unbridled theory of executive power that it previously (and unsuccessfully) leveled in defense of Truman's seizure of the steel mills.  *Compare* Opp. 29 (arguing only check on Defendants' actions "is through the political process, not the courts"), *with Youngstown* Br. 28 (App. 1105) (arguing only check on executive power "is the ballot box and . . . impeachment"). On the other hand, DOJ relegates its entire discussion of *Youngstown* to a single sentence in the middle of a 349-word footnote on page 30 of its brief.  *See* Opp. 30 n.25.

And even that solitary sentence does not make sense.  Purporting to distinguish the precedent, Defendants argue:  "In *Youngstown*[,] the President conceded that he was acting outside of authority provided to him by statute." *Ibid*. If Defendants mean to suggest that the touchstone for a Take Care violation is a presidential concession of lawlessness, we have 20 of them.  The current President likewise conceded that his actions in this case exceeded the authority provided to him by statute.  *See* FAC ¶¶ 19, 44, 48 (collecting quotations).  While Defendants fail to acknowledge those concessions even once in their voluminous filing, they can no more avoid those concessions than they can avoid the Supreme Court's emphatic rejection of their unreviewable-discretion theory of executive power.

d.  OLC agreed that *Youngstown* applies

The Defendants' nonchalance toward *Youngstown* is all the more remarkable because DOJ's Office of Legal Counsel ("OLC") previously told the American public

that the decision is far from irrelevant.  *See* OLC Memo (FAC Ex. B).[2]  Rather than relegating *Youngstown* to one sentence in a 349-word footnote, OLC said the decision is critically important and puts meaningful limits on DHS's deferred action programs:  "Immigration officials' discretion in enforcing the laws is not . . . unlimited."  *Id.* at 5 (citing *Youngstown*).

In the first "zone" of the *Youngstown* framework, when DHS operates with the "express or implied authorization of Congress, [its] authority is at its maximum."  343 U.S. at 635 (Jackson, J., concurring).  At the other end of the spectrum is the third "zone":  when the Executive "takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb."  *Id.* at 637 (Jackson, J., concurring).  That is why OLC said it is "critical" to the DHS Directive's constitutionality that it enjoyed the express or implied acquiescence of Congress — *i.e.*, the Directive fell in "zone 1" of the *Youngstown* framework.  In fact, even OLC rejected part of DHS's policy proposal because OLC concluded it fell outside of "zone 1."  *See* OLC Memo 32-33 (concluding DHS cannot lawful give deferred action to *parents* of DACA beneficiaries because Congress had not authorized it).  As explained below, OLC was wrong because the entire DHS Directive falls in "zone 3" — *i.e.*, Congress has taken numerous affirmative steps to foreclose the relief unilaterally afforded by the Defendants.  But in all events, it is

---

[2] OLC provides authoritative legal advice to the President and all executive agencies.  By virtue of delegations from the Attorney General, OLC also has asserted control over the litigation positions of Executive Branch agencies, including obviously other lawyers at DOJ.  *See* 28 U.S.C. §§ 516, 519; Applicability of the Davis-Bacon Act to the Veterans Administration's Lease of Medical Facilities, 12 Op. O.L.C. 89, 93-94, 98 (1988).

remarkable that Defendants are not willing to admit what even OLC did:  namely, that *Youngstown* applies.

> 2.     *Plaintiffs' Take Care Claim Is Likely To Succeed Under Youngstown*

The DHS Directive falls under "zone 3" of the *Youngstown* framework.  That is so for four reasons:  (a) several provisions of the Immigration and Nationality Act of 1952, 8 U.S.C. §§ 1101 *et seq.* ("INA"), prohibit Defendants from unilaterally authorizing the presence of 40% of the Nation's undocumented immigrants; (b) several provisions of the INA also prohibit Defendants from unilaterally giving work permits to 40% of the Nation's undocumented immigrants; (c) deferred action programs previously blessed by Congress are inapposite because they bridged individuals from one *lawful* status to another; and (d) Defendants cannot propose immigration legislation, lose in Congress, and then exert their will to accomplish their preferred legislative result through unilateral executive action.   Plaintiffs therefore are likely to succeed on the merits of their Take Care claim.

> a.     Congress prohibited Defendants from granting deferred action to 40% of the Nation's undocumented immigrants

Congress has not expressly authorized or implicitly acquiesced to granting deferred action to 4 million undocumented immigrants.   Defendants' contrary argument is that the INA evinces a broad congressional preference for "family unity," which the Executive Branch is free to promote at all costs.  *See* Opp. 43. That is wrong for two reasons.  First, the courts have rejected the assertion that the INA is motivated by a single-minded "Congressional interest in family unification[;] an even more central purpose might be to protect American jobs."   *Perales v.*

*Casillas*, 903 F.2d 1043, 1051 (5th Cir. 1990).  Second, regardless whether the INA has one purpose or many, the DHS Directive violates the entirety of Congress's effort by throwing away the statute's carefully tailored provisions and adopting instead a blunt, across-the-board policy that renders superfluous entire portions of the INA for 40% of the Nation's undocumented population.

"Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice — and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law."  *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (per curiam); *see also Stomper v. Amalgamated Transit Union, Local 241*, 27 F.3d 316, 320 (7th Cir. 1994) (Easterbrook, J.) ("A court must determine not only the direction in which a law points but also how far to go in that direction.").  And here, Congress made very clear how far it wanted to go in authorizing the presence of parents of U.S. citizens and legal permanent residents ("LPRs").  Limiting family reunification was as important to Congress as providing for it.  The Defendants cannot simply disregard those limits, make up their own, and then claim that Congress "acquiesced" in their unilateral lawmaking.

### i.    Parents of U.S. citizens

First take the undocumented parents of U.S. citizens.  Under the INA, the undocumented parent is not lawfully present until he or she:  (A) remains in the country and evades detection until the citizen-child turns 21, (B) voluntarily leaves

the country, (C) waits 10 more years, and then (D) obtains an IR-5 immediate-relative visa from a U.S. consulate abroad.  *See* 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255.  Moreover, if the undocumented parent does not evade detection for 21 years, he or she is *statutorily inadmissible* to the United States.  *See id*. § 1182(a)(6)(A)(i).  The only way to avoid that statutory inadmissibility and remain in the country lawfully is to satisfy yet another list of rigid statutory criteria, including among other things, "that [the inadmissible parent's] removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States."  *Id*. § 1229b(b)(1)(D).  And even then, Congress has capped the number of cancellations of removal at 4,000 per year nationwide.  *See id*. § 1229b(e)(1).

It takes a rather skewed eye to see this scheme as an unbounded thrust toward "family unity."  Indeed, some have criticized the foregoing provisions as imposing draconian hurdles to the unification of undocumented parents and their citizen children.  *See* Kristi Lundstrom, *The Unintended Effects of the Three- and Ten-Year Unlawful Presence Bars*, 76 LAW & CONTEMP. PROBS. 389 (2013). Regardless whether those hurdles are good or bad policy, it is irrefutable that Congress imposed them and the Defendants ignored them.  Undocumented parents of U.S. citizens no longer have to comply with *Congress's* requirements in Sections 1151(b)(2)(A)(i), 1182(a)(6)(A)(i), and 1229b(b)(1)(D); instead, they can lawfully stay in the United States and avoid removal proceedings simply by satisfying *DHS's*

requirements in the Directive.[3]    That is the exact opposite of congressional acquiescence; it is zone-3-style executive aggrandizement.  *See Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

Defendants cannot justify that aggrandizement by misreading the statute. For example, 8 U.S.C. § 1225(b)(2)(A) creates a mandatory duty to remove undocumented immigrants.  *See* PI Mot. 3-4, 23.  It is impossible to deny that Section 1225 speaks in "mandatory" terms while conceding that Sections 1226 and 1226a *do* speak in "mandatory" terms, Opp. 43; all three use the same "shall" commands.  *See* 8 U.S.C. §§ 1225(b)(2)(A) ("[T]he alien shall be detained"); 1226(c) ("The Attorney General shall take into custody" criminals); 1226a(a)(1) ("The Attorney General shall take into custody" terrorists).

Nor can Defendants claim that Section 1225 is irrelevant because it applies only to individuals who are "seeking admission," rather than people who are already here unlawfully.  Opp. 35.  Congress specifically amended the INA to define *all* people who are here unlawfully as people "seeking admission," whether they present themselves to border authorities or have been living quietly in the country for decades.  *See* Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208 § 301, 110 Stat. 3009 (1996) ("IIRIRA").  As a leading treatise explains: "[P]ersons who enter [unlawfully] are treated as applicants for admission

---

[3] It is true that undocumented parents of U.S. citizens still must comply with Congress's statutory requirements for an adjustment of status (*e.g.*, from "deferred action" to "LPR").  *See* Opp. 36-37.  But that's irrelevant.  The statutory provisions cited above reflect the narrow circumstances under which Congress authorizes the presence of parents of U.S. citizens, and those are the requirements that the Defendants unconstitutionally disregarded in the DHS Directive.  It is irrelevant that DHS did not *also* disregard the statutory requirements for adjustments of status.

under INA § 253(a)(1), 8 U.S.C. § 1225(a)(1)."  IRA J. KURZBAN, IMMIGRATION LAW SOURCEBOOK 59 (13th ed. 2012).

### ii.    Parents of LPRs

The undocumented parents of LPRs are an even easier case.  Unlike the parents of U.S. citizens, the parents of LPRs *never* have enjoyed "family unity" preferences under the immigration laws.  *See* 8 U.S.C. §§ 1151(a)(1), 1153(a)(1)-(4). And because Congress chose not to authorize the presence of parents of LPRs and citizens on identical terms, it would frustrate Congress's purposes for DHS to nonetheless treat them equally.  *See Scialabba v. Cuellar de Osorio*, 134 S. Ct. 2191, 2212-13 (2014) (noting the equation of statutorily preferred and non-preferred immigrants "would … scramble the priority order Congress prescribed"); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks and alteration omitted)).

The Defendants offer only one justification for authorizing the presence of parents of citizens and LPRs on identical terms.  They claim that it's theoretically possible that LPR-children can become citizens after they turn 21, "at which point they too can petition to obtain visas for their parents."  OLC Memo 27.  But of course, anything is *possible*.  It is possible that every undocumented immigrant in the United States can become a naturalized citizen by marriage or through military

service.  *See* 8 U.S.C. §§ 1430(a), 1439(a).  If the mere possibility of citizenship is sufficient, as Defendants suggest, then DHS unilaterally could legalize the presence of all 11 million undocumented immigrants in the United States (rather than just 40% of them).

In short, Congress carefully considered the circumstances under which the parents of citizens and LPRs lawfully can stay in the country.  Congress then enacted an intricate and finely tuned statutory scheme — replete with eligibility criteria and numerical caps.  Defendants cannot discard that scheme, replace it, and then claim Congress's blessing of the effort.

> b. Congress prohibited Defendants from granting work permits to 40% of the Nation's undocumented immigrants

Congress likewise has not expressly authorized or implicitly acquiesced to giving employment authorization cards ("EACs") to 40% of the undocumented immigrants in the United States.  Therefore, Defendants' work-permit program also falls within *Youngstown*'s "zone 3."

Defendants' only counterargument relies on 8 U.S.C. § 1324a(h)(3).  *See* Opp. 8, 12, 48; OLC Memo 21-22.  But far from legalizing work authorization for anyone, Section 1324a makes it unlawful "to hire . . . an unauthorized alien."  8 U.S.C. § 1324a(a)(1)(A).  In a subsection entitled "Definition of unauthorized alien," Section 1324a then defines which undocumented immigrants count as "unauthorized alien[s]" who cannot be hired.  The definitional provision says, in full:

> As used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this

14

chapter or by the Attorney General [now the Secretary of Homeland Security].

*Id.* § 1324a(h)(3).  In Defendants' view, when Congress said "unauthorized alien[s]" are those not "authorized to be so employed . . . by the Attorney General," *ibid.*, it implicitly gave the Executive Branch unreviewable discretion to issue work permits for every single undocumented immigrant in the United States (or 40% of them).

In addition to its inherent implausibility, this assertion of executive authority is misplaced for three reasons.  First, Section 1324a(h)(3) is a definitional provision, not a substantive one.  It merely defines which undocumented immigrants count as "unauthorized" for work; it does not give the DHS Secretary any power to authorize work by anyone.  The DHS Secretary's power to authorize work instead comes from other provisions of the INA.  *See* 8 U.S.C. §§ 1226(a)(3) (certain LPRs), 1231(a)(7) (certain individuals who cannot be removed).  And of course, those other provisions of the INA say nothing about granting work authorizations to all (or 40%) of the undocumented immigrants in the United States.

Second, reading Section 1324a(h)(3) to authorize the DHS Secretary to grant work authorizations to whomever he pleases would render surplusage the other provisions of the INA — like Sections 1226(a)(3) and 1231(a)(7) — that grant authority limited to particular individuals in particular statutorily prescribed circumstances.  *See, e.g.*, *Corley v. United States*, 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous." (internal quotation marks omitted)).  Moreover, provisions like Sections 1226(a)(3) and 1231(a)(7) prove that Congress

knew how to authorize the DHS Secretary to grant work authorizations in particular circumstances for particular individuals; it would be absurd to suggest that the Secretary can nonetheless do whatever he wants with unreviewable discretion. *See, e.g.*, *City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 338-39 (1994) ("[I]t is generally presumed that Congress acts intentionally and purposely" when it "includes particular language in one section of a statute but omits it in another," and as a consequence, an agency cannot find administrative power where Congress omitted it).

Third, it is inconceivable that Congress would use a casual phrase in a definitional provision to give the Secretary the power to extend work authorization to all immigrants regardless of legal status.   It is a well-settled principle of statutory interpretation that Congress does not bury capacious delegations of power in small and inconspicuous places. *See, e.g.*, *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not, one might say, hide elephants in mouseholes."); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) ("Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion.").

For example, in *ABA v. FTC*, 430 F.3d 457 (D.C. Cir. 2005), the FTC claimed authority to regulate all attorneys engaged in the practice of law.  The Commission rested its claim on the capacious definition of "financial institution" included in the

Gramm-Leach-Bliley Financial Modernization Act, Pub. L. No. 106-102, 113 Stat. 1338 (1999), which, the FTC contended, gave it sweeping authority to regulate any firm that conducts "financial activities" — including law firms.   The FTC was untroubled by the fact that the Gramm-Leach-Bliley Act contained mountains of detailed provisions, none of which mentioned law firms and none of which had any conceivable application to law firms.   The D.C. Circuit rejected the FTC's arguments out of hand:

> To find [the FTC's] interpretation deference-worthy, we would have to conclude that Congress not only had hidden a rather large elephant in a rather obscure mousehole, but had buried the ambiguity in which the pachyderm lurks beneath an incredibly deep mound of specificity, none of which bears the footprints of the beast or any indication that Congress even suspected its presence.   We therefore seriously doubt that Congress intended to empower the Commission to undertake that regulation . . . .

*Id*. at 469.

Here, the elephant is larger, the mousehole more obscure, and the mound of specificity more imposing.   The INA — as amended by scores of statutes over more than 50 years — makes the Gramm-Leach-Bliley Act look banal.   And the INA has spawned tens of thousands of pages of regulatory text, promulgated by eleven presidential administrations and covering every conceivable immigration topic. Nowhere in any of those sources of federal immigration law is there even the faintest hint that Congress intended for the President to give out 4 million EACs with unilateral and unreviewable discretion.

Defendants argue that none of this matters because DHS's power to issue EACs comes "from pre-existing legal authority."   Opp. 37 (citing 8 C.F.R.

§ 274a.12(c)(14)).    That regulation purports to allow DHS to grant work authorizations to "[a]n alien who has been granted deferred action," 8 C.F.R. § 274a.12(c)(14) — but so what?  For all of the reasons given above, DHS can point to no statutory authorization for that regulation.  And even if it could, that would prove nothing.  For example, the Internal Revenue Code gives the IRS preexisting legal authority to settle tax disputes for $0, *see* 26 U.S.C. §§ 7121-7122; that does not allow the IRS to create a unilateral federal program that erases 40% of American taxpayers' liabilities.  *See* PI Mot. 32.  And in all events, if the work-authorization regulation could be interpreted to allow DHS to grant EACs to 40% of America's undocumented population, it too is unconstitutional for all of the reasons given above.

> c.    Historical practice prohibits the DHS Directive

Defendants cannot escape *Youngstown*'s "zone 3" by searching for "congressional acquiescence" in previous deferred action programs by previous presidents.  As the Defendants concede, the DHS Directive is constitutional under *Youngstown* only insofar as it is rooted in congressional precedent.  *See* Opp. 8-9 (citing OLC Memo 14).  But those other programs are nothing like the DHS Directive in kind or scale.

For example, OLC conceded that it could find no evidence of any deferred action program in the history of the country that came close to affording legal benefits to 4 million people.  *See* OLC Memo 31.  But it took some comfort in the 1990 "Family Fairness" program, which "made a comparable fraction of undocumented aliens — approximately four in ten — potentially eligible for

discretionary extended voluntary departure relief." *Ibid.* Because Congress later codified a similar (though different) program in the Immigration Act of 1990, OLC concluded that the "Family Fairness" program constituted a tacit congressional approval of an altogether different program implemented a quarter-century later under different circumstances. *Ibid.* Defendants likewise rely on that precedent here. *See* Opp. 8, 42.

It is difficult to overstate the fallaciousness of that logic. The fact that a previous Congress approved a previous program 25 years ago on different terms and with a different scope and scale says nothing about whether this DHS Directive falls within *Youngstown*'s first or third zone. As it turns out, however, the fallaciousness of the Defendants' position is the least of their worries because their factual claims about the Family Fairness program are false. Far from legalizing the presence of 40% of the undocumented population, the 1990 Family Fairness program authorized *approximately 1%*. *See* David Hancock, *Few Immigrants Use Family Aid Program*, MIAMI HERALD, at B1 (Oct. 1, 1990) (App. 0813) (noting that, according to official INS statistics, only 46,821 of the Nation's 3.5 million undocumented immigrants applied for discretionary relief under the Family Fairness program); *see also* Glenn Kessler, *Fact Checker: Obama's Claim that George H.W. Bush Gave Relief to '40 Percent' of Undocumented Immigrants*, WASH. POST (Nov. 24, 2014), http://wapo.st/11Ouk5k (giving "Three Pinocchios" to Defendants' contrary claim).

Nor can the Defendants find congressional acquiescence in four other deferred action programs that were even smaller than Family Fairness:  (1) foreign students affected by Hurricane Katrina; (2) widows of U.S. Citizens; (3) T and U visa applicants; and (4) deferred action for VAWA self-petitioners.  *See* Opp. 8-9.  Each of those programs involved classes of immigrants who Congress — not the Executive — already had decided could remain lawfully in the United States.  Deferred action was used as a stop-gap measure while the immigrants transitioned to a lawful status that had been provided by *Congress*.  In granting deferred action status to those immigrants, the Executive Branch was implementing Congress's will — not exercising its own by brute force.  *See* Josh Blackman, *The Constitutionality of DAPA Part I: Congressional Acquiescence to Deferred Action*, 103 GEORGETOWN LAW JOURNAL ONLINE __ (forthcoming 2015), *available at* ssrn.com/abstract=2545544.

Let's walk through each of the Defendants' examples.  The first arose when Tulane University and many others along the Gulf Coast cancelled their fall semesters after Hurricane Katrina.  This left 2,000 foreign students in limbo because the terms of their student visas required them to pursue a "[f]ull course of study."  8 C.F.R. § 214.2(f)(6).  Congress already had welcomed all 2,000 of those students into the country.  Rather than deport them on account of a natural disaster, USCIS granted them deferred action for a few months, until they could enroll at another university (and thus maintain their student-visa status).  *See* Press Release, USCIS, USCIS Announces Interim Relief for Foreign Students

Adversely Impacted by Hurricane Katrina (Nov. 25, 2005) (App. 0974-75).  Deferred action was a bridge from one lawful immigration status to another.

The program for widows of U.S. citizens was similar.  It gave a few months of deferred action to non-citizen spouses who were married for less than two years when their citizen spouse died.  At the time, because of delays in processing visa applications and because of USCIS's interpretation of a then-existing statute, non-citizen widows and widowers became removable upon the death of their spouses because they were no longer "immediate relatives" under the INA.  *See Robinson v. Napolitano*, 554 F.3d 358, 367 (3d Cir. 2009) (agreeing with USCIS's interpretation); *but see Lockhart v. Napolitano*, 573 F.3d 251, 255-62 (6th Cir. 2009) (rejecting USCIS's interpretation); *Freeman v. Gonzales*, 444 F.3d 1031, 1034-43 (9th Cir. 2006) (same).  Rather than deport widows and widowers, USCIS granted them deferred action for several months until the agency could process their applications.  Donald Neufeld, Memorandum for Field Leadership, Re: Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children at 1 (Sept. 4, 2009) (App. 0840).  Once again, a few months of deferred action served as a bridge from one legal status to another.  And a few months after the deferred action program was announced, Congress amended the statute to solve the problem.  *See* Department of Homeland Security Appropriations Act of 2010, Pub. L. No. 111-83, § 568(c), 123 Stat. 2142, 2186 (2009).

The final two instances of deferred action cited by Defendants are T and U visa applicants (victims of human trafficking) and self-petitioners under the

Violence Against Women Act ("VAWA"), Pub. L. No. 103-322, tit. IV, 108 Stat. 1796, 1902.   Both programs involved noncitizens whose prospect for obtaining lawful status was imminent, and who needed only a few months' forbearance so USCIS could process the paperwork.   For example, VAWA authorized noncitizens who had been abused by U.S. citizen or LPR spouses or parents to self-petition for lawful immigration status, without having to rely on their abusive family members to petition on their behalf.   *See* 8 U.S.C. §§ 1154(a)(1)(A)(iii)-(iv), (vii).   Consistent with congressional will, USCIS granted deferred action to these noncitizens whenever their visa applications had been approved but the visa itself was not immediately available — usually because the approval came near the end of the year, when the statutory cap on VAWA visas had been reached.   *See* Paul W. Virtue, Memorandum for Regional Directors et al., Re: Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues at 3 (May 6, 1997) (App. 1026).   Rather than deport these noncitizens, who Congress had invited to apply for lawful status, USCIS offered them deferred action until a visa became available.   *Ibid.*

For similar reasons, USCIS has granted deferred action to victims of human trafficking who applied for T and U visas.   Through the Victims of Trafficking and Violence Protection Act ("VTVPA"), Pub. L. No. 106-386, 114 Stat. 1464 (2000), Congress directed USCIS to give lawful status to victims of human trafficking and other crimes.   *See ibid.* (imposing annual limit of 5,000 T visas and 10,000 U visas).   Consistent with Congress's instructions, USCIS told immigration officers to grant deferred action or stays of removal to any VTVPA applicant who made a "prima

facie" or "bona fide" showing of eligibility.  Stuart Anderson, Memorandum for Johnny N. Williams, Re: Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status at 1 (May 8, 2002) (App. 0048); William R. Yates, Memorandum for the Director, Vermont Service Center, Re: Centralization of Interim Relief for U Nonimmigrant Status Applicants at 5 (Oct. 8, 2003) (App. 1059).  Like all other instances of deferred action, this program was created for the benefit of immigrants with existing lawful status in the U.S. or at very least the immediate prospect of such status.  And, like in all the other cases, the program was intended as a temporary bridge to another form of lawful status for which the aliens had already established eligibility.

The DHS Directive, of course, looks nothing like these past programs because it involves immigrants who are here unlawfully, who have no prospect of lawful status, and who Congress has never even invited to apply for lawful status.[4]  And although it should go without saying, Congress's approval of deferred action for 2,000 lawfully present Katrina victims does nothing to approve deferred action for 4 million immigrants who were not legally present to begin with.

> d.  Congressional rejection of Defendants' legislation prohibits the DHS Directive

Finally, if there were any doubt whether the DHS Directive falls within *Youngstown*'s "zone 3," it is resolved by the fact that the Defendants promulgated

---

[4] The Defendants think this is a *benefit* of their unilateral action because it somehow makes their conduct less lawless.  *See* Opp. 12, 34, 36-37 (emphasizing that the DHS Directive does not bridge anyone's immigration status).  But by conceding that the DHS Directive does not provide a bridge to lawful status, Defendants also have conceded that the Directive is fundamentally different from the deferred action programs that preceded it.

the Directive because Congress refused to do it for them.  It is true that unenacted legislation sometimes is an unreliable indicator of congressional intent.  *See Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381 n.11 (1969).  But it is equally true that, "once an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned."  *United States v. Rutherford*, 442 U.S. 544, 554 n.10 (1979); *accord Red Lion*, 395 U.S. at 381.

In this case, that intent could not be clearer.  The President of the United States emphatically and repeatedly brought his interpretation of the INA to the attention of the public and Congress in 2012 when he said he could not help the "DREAMers" without the DREAM Act.  *See* FAC ¶ 19 (collecting citations).  And he emphatically and repeatedly brought his interpretation of the INA to the attention of the public and Congress in 2014 when he said he could not accomplish comprehensive immigration reform without a new law from Congress.  *See id*. ¶ 44 (collecting citations).  Then, after the President unilaterally "took an action to change[] the law," *id*. ¶ 48, the House swiftly rebuked the DHS Directive as unlawful, *see* H.R. 5759, Preventing Executive Overreach on Immigration Act of 2014 (App. 0816-21).  Thus, this case is the paradigmatic example of *Youngstown*'s third zone.  And just as Judge Pine rejected President Truman's plea for unreviewable discretion there, this Court should do so with the Defendants' identical plea here.

3.  *The DHS Directive Is Lawmaking, Not Discretionary Decisionmaking*

Having failed to insulate the DHS Directive from judicial review under *Youngstown*, the Defendants offer a fallback plea for immunity from judicial review. In particular, they argue at length that the Directive is an act of unreviewable "discretionary non-enforcement" under *Heckler v. Chaney*, 470 U.S. 821 (1985). *See* Opp. 31-44. That's a red herring. No one is challenging what the Defendants *failed* to do. *Cf. Chaney*, 470 U.S. at 832 (prosecutorial discretion involves "[a]n agency's decision not to take enforcement action" in a particular case). Rather, Plaintiffs are challenging what Defendants *did*. Specifically, Defendants created a new federal program for granting legal benefits to 4 million or more undocumented immigrants. And Defendants' own employees and documents prove that the new federal program will operate according to strict, across-the-board eligibility criteria — not case-by-case discretionary decisionmaking. That's the stuff of lawmaking, and it is judicially reviewable as such.

a.  Plaintiffs challenge Defendants' *actions* — not their inactions

DOJ can find no case in the history of the Nation that allows the Executive to use "prosecutorial discretion" as the pretense for unilaterally creating a new entitlement program that doles out government benefits to millions of people. Given DOJ's concerted efforts to conflate "discretion" (which it can sometimes wield) and "entitlements" (which it cannot unilaterally create), we will be very precise about what those terms mean and what they don't.

First, the Supreme Court has held that private plaintiffs generally do not have a right to demand that the government enforce a particular statute against a particular person.  For example, in *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005), the Supreme Court held that a particular woman did not have a Due Process right to demand that police enforce a particular restraining order against her violent husband.  The Court concluded that because of "insufficient resources," "sheer physical impossibility," or "practical necessity," the police have discretion not to enforce criminal laws against particular violators.  *Id*. at 760-62 (internal quotation marks omitted).  The Court reached a similar conclusion in *Chaney*, in which it held that particular death-row prisoners did not have rights under the APA to demand that the FDA enforce certain misbranding and mislabeling provisions against the manufacturers of lethal-injection drugs.  *See* 470 U.S. at 823-24.  The Court again emphasized that agencies can set enforcement priorities and allocate available resources to high-priority cases and away from particular low-priority ones.  *Id*. at 831-32.

Second, and by contrast, an agency cannot hide behind discretion when it creates legal benefits for members of the public.  Take for example *National Association of Home Builders v. Army Corps of Engineers*, 417 F.3d 1272 (D.C. Cir. 2005).  In that case, "[t]he Corps d[id] not have the resources to develop a method to quantify potential cumulative and indirect impacts that may result from activities authorized by [certain water permits]."  Final Notice, 65 Fed. Reg. 12,818, 12,827 (Mar. 9, 2000).  Given those resource constraints, and as a matter of its priority-

setting discretion, the Corps created certain "streamline[d]" permits for low-level polluters.  The court held that those permits were legal benefits — *i.e.*, they were entitlements to discharge waste into the water — and as such, they were judicially reviewable.   It was irrelevant that the Corps issued them as a matter of enforcement discretion, and it was irrelevant that the Corps necessarily decided not to enforce the Clean Water Act against some polluters.  *See* 417 F.3d at 1281 ("Here the appellants challenge not the Corps' failure to act . . . ; instead, they attack the [permits] the Corps *did* issue.").

So here.  Our claim is that the DHS Directive creates a massive new permitting scheme, which gives 4 million people permits to reside and work lawfully in the United States.  It is of course true that "discretionary non-enforcement" allows DHS to *save* resources by declining to prosecute particular individuals; but it's equally of course true that "non-enforcement" does not allow DHS to *spend* hundreds of millions of dollars to hire thousands of new employees and to open new service centers to process millions of deferred action applications under new DHS-created eligibility requirements and to dole out millions of EACs.  Indeed, internal emails obtained from USCIS show that it affirmatively reorganized its operations and allocated additional resources to prioritize DACA applicants.  *See, e.g.*, DACA Emails (App. 0129) (describing changes USCIS had to make "to accommodate the additional work coming in from DACA-related shifts of resources"); DACA Emails (App. 0180-82) (similar).  That's not resource conservation.  And whatever else might be said about the new program DHS has created, it cannot be said that

Defendants' efforts qualify as the kind of "agency inaction" held unreviewable in *Chaney*. *See* 470 U.S. at 846 (Marshall, J., concurring).

That is why Defendants are wrong to rely on *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) ("*AAADC*"), and *Perales*. Both cases noted that the Executive Branch has discretion not to enforce a particular immigration statute in particular cases. *See AAADC*, 525 U.S. at 484-85; *Perales*, 903 F.2d at 1047-48. For example, *Perales* held that an undocumented immigrant cannot challenge DHS's refusal to give out work permits: "An agency's inaction in such a situation is necessarily exempt from judicial review because there are no meaningful standards against which to judge the agency's exercise of discretion." 903 F.2d at 1047 (citing *Chaney*). But this case is the exact opposite. When the government *does* act — for example, when it erects a new entitlement program, replete with eligibility criteria and identification cards for permit-holders — there is ample "law to apply." *See Nat'l Ass'n of Home Builders*, 417 F.3d at 1281; *United States v. Juarez-Escobar*, 25 F. Supp. 3d 774, 786-88 (W.D. Pa. 2014) (applying that law and striking down the Directive as unconstitutional).

### b.    Rubber-stamping is not "case-by-case discretion"

Nor can Defendants rubber-stamp 99.5%-94.4% of deferred action applications and call it "a discretionary, case-by-case" process. Opp. 41. As OLC previously conceded, it "[i]s critical" to the legality of deferred action programs that they rely on genuine "case-by-case" discretion, "*rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria.*" OLC Memo 18 n.8 (emphasis added). OLC's concession was a wise one; as the Supreme

Court has held, the *sine qua non* of prosecutorial discretion is genuine case-by-case decisionmaking, rather than across-the-board policymaking.  *See, e.g.*, *AAADC*, 525 U.S. at 484 & n.8 (deferred action decisions must be made on "case-by-case basis").[5] But as explained below, it is now undisputed that the Defendants have given DACA to *every* person who satisfied their threshold eligibility criteria.  And it is also undisputed that the Defendants plan to take the same rubber-stamp approach under the DHS Directive.  *See* Opp. 12, 40 (conceding deferred action applications under the Directive will be processed the same way DHS processed DACA applications).  That undisputed proof of rubber-stamping renders the Directive unlawful.

As we previously explained, USCIS statistics show that the Defendants rubber-stamped 99.5% of DACA applications.  *See* FAC ¶ 25; Deferred Action for Childhood Arrivals Report, U.S. Citizenship and Immigration Services (Apr. 10, 2013) (App. 0743); Palinkas Decl. ¶ 8 (App. 0855).  Defendants proudly respond that, no, they only approved 94.4% of DACA applications.  *See* Opp. 41.  Even assuming that 94.4% is the correct number of DACA approvals, Defendants cannot claim that the remaining 5.6% "were denied for failure to meet eligibility criteria *or*

---

[5] Defendants' reliance on *AAADC* is puzzling because they claim it gives them "broad authority" to grant deferred action on a limitless scale and for unreviewable reasons.  Opp. 3-5.  *AAADC* does nothing of the sort; the case hinged on whether the INA deprived federal courts of jurisdiction over claims that undocumented immigrants were unfairly prosecuted, not whether decisions to defer action — *i.e.*, to *not* prosecute — are justiciable.  Moreover, the entirety of the Supreme Court's discussion of deferred action is based on a background description from an immigration treatise, *see* 525 U.S. at 484-85 (citing 6 C. GORDON, S. MAILMAN & S. YALE-LOEHR, IMMIGRATION LAW AND PROCEDURE § 72.03[2][h] (1998) ("IMMIGRATION LAW AND PROCEDURE")), and that treatise says that deferred action decisions must be based on extraordinary factors, identified by careful case-by-case analysis, and individually approved by high-ranking USCIS personnel.  *See* IMMIGRATION LAW AND PROCEDURE § 72.03[2][h], at 72-75 (2011) (noting, *e.g.*, case-by-case decisions must be "made by the district director in a personally signed recommendation to the regional commissioner").

*for other discretionary reasons.*"  *Ibid.* (emphasis added).   As far as the record reveals, every denied application was denied for failure to meet eligibility criteria; none were denied "for other discretionary reasons."

It's not for lack of opportunity that Defendants can identify zero examples of DACA applications denied "for other discretionary reasons."  Members of Congress have been pressing the Defendants for that evidence for months (if not years).  And far from providing it, Defendants admitted it does not exist:  DHS "admitted to the [House] Judiciary Committee that, if an alien applies and meets the DACA eligibility criteria, they will receive deferred action.  In reality, immigration officials do not have discretion to deny DACA applications if applicants fulfill the criteria." Hrg. Tr. at 31, President Obama's Executive Overreach on Immigration, House Judiciary Comm., Dec. 2, 2014 (App. 0925) (statement of Rep. Goodlatte).  Over four months ago, Congress asked the DHS Secretary to identify any discretionary reasons that his Department used to deny DACA applications.  *See* Letter from Bob Goodlatte & Charles E. Grassley to Jeh Johnson at 2 (Aug. 29, 2014) (App. 0808) ("Judiciary Committees' Letter").  DHS could point to none.  *See* Letter from Leon Rodriguez to Charles E. Grassley, Enclosure 1 at 1 (Oct. 9, 2014) (App. 0978) ("Rodriguez Letter") (noting 42,906 DACA applications were denied and listing as reasons only (1) failure to use the correct form, (2) failure to sign the form, (3) failure to pay the required fee, and (4) filing the form at the wrong time).[6]

---

[6] The Migration Policy Institute conducted an exhaustive analysis of DACA data, and it did not identify a single exercise of individualized "discretion" (as opposed to rote application of DHS's eligibility criteria).  *See* Jeanne Batalova et al., DACA at the Two-Year Mark, Migration Policy Institute (Aug. 2014) (App. 0088-0121).

The absence of even a single case that was denied for "discretionary reasons" is unsurprising given the way the Defendants set up the DACA program (and the way they've promised to follow suit under the 2014 Directive). As explained by the USCIS union president, "USCIS management has taken several steps to ensure that DACA applications receive rubber-stamped approvals rather than thorough investigations." Palinkas Decl. ¶ 6 (App. 0854). The Defendants have "prevented immigration officers from conducting case-by-case investigations of DACA applications" by routing those applications to service centers and preventing investigators from interviewing applicants. *Id.* ¶ 8 (App. 0855). That "guarantee[s] that applications will be rubber-stamped for approval, a practice that virtually guarantees widespread fraud and places public safety at risk." *Ibid.*

Internal USCIS documents offer further proof that the Defendants have divested their field agents of the ability to investigate DACA applications. DHS has publicly "assur[ed] potential DACA applicants that USCIS has no plans to actually verify the validity of any evidentiary documents submitted in support of an application." Judiciary Committees' Letter at 1 (App. 0807). USCIS has directed its staff to "**NOT** deny a DACA request" unless DHS's internal records contain sufficient evidence to support a denial under the Directive's eligibility criteria — *e.g.*, because the applicant flunks the criminal-background check. DACA Standard Operating Procedures (App. 0318). Finally, USCIS has explained why it strictly applies the eligibility criteria and does not give its officers enforcement discretion. An internal powerpoint presentation says that the DHS Secretary already has

exercised the requisite "discretion" in setting the DACA eligibility criteria, and all that is left for USCIS officers to do is to use a series of "templates" to ensure that the Secretary's Directive is "applied consistently."   DACA Standard Operating Procedures (App. 0444).

But when it comes to abandoning duly enacted statutes, consistency is a vice not a virtue.  For example, in *Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973) (per curiam) (en banc), the Department of Health, Education, and Welfare ("HEW") gave Title VI funds to 74 of 113 noncompliant school districts (an unlawful-funding rate of 65%).   *See* 356 F. Supp. 92, 95 (D.D.C. 1973).   HEW justified its administrative action by invoking prosecutorial discretion — in particular, it argued that the court should not interfere because the agency was "still seeking voluntary compliance through negotiation and conciliation."  *Ibid.*; *cf. In re U.S.*, 503 F.3d 638, 642 (7th Cir. 2007) (Easterbrook, C.J.) (negotiation is an integral part of prosecutorial discretion).   The D.C. Circuit nonetheless held that the federal government's 65% unlawful-action rate was tantamount to "a general policy which is in effect an abdication of its statutory duty."  *Adams*, 480 F.3d at 1162; *see also Chaney*, 470 U.S. at 833 n.4 (clarifying that its holding does not apply on *Adams*' facts).  Even using Defendants' most-conservative estimates, this case is easier than *Adams*.

       c.      Theoretical revocability of deferred action cannot save the DHS Directive

Against all of this, Defendants argue that the Directive is shrouded from review by any court at any time because deferred action documents are not worth

the paper they're printed on.  *See* Opp. 34-35.  Their idea seems to be the Directive is an act of "enforcement discretion" because deferred action does not confer "any legal status"; it "can be revoked at any time"; Defendants can change their minds for any reason or no reason; and therefore, deferred action does not actually prevent anyone from being deported ever.  *Ibid.*  Those are troubling assertions because the President and Defendant Rodriguez have urged undocumented immigrants across the United States to "come out of the shadows" and promised them that they "will not be deported" if they do so.  FAC ¶¶ 50, 55.  Either that promise was false, or DOJ's representations to this Court should be dismissed as "nothing more than a convenient litigating position."  *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (internal quotation marks omitted).

Data provided to Congress suggest it's the latter.  Defendants confirmed that they revoke DACA the same way they deny it:  extremely rarely and never for "discretionary" reasons.  In particular, out of 591,555 DACA approvals, Defendants have revoked only 113 (a rate of 0.0191%).  *See* Rodriguez Letter, Enclosure 1 at 1-2 (App. 0978-79).  And every one of them was revoked because (1) USCIS made an error and subsequently "determined the requestor did not satisfy all DACA guidelines at the time of filing," or (2) the DACA recipient subsequently violated an eligibility criterion (by, for example joining a gang or committing aggravated assault).  *Ibid.*  None was for "discretionary" reasons.  Moreover, even if Defendants could prove that one person lost his or her deferred action document and EAC with the snap of executive fingers, those documents still would constitute legal benefits

until they are revoked.  Whichever way you slice it, the Directive carries legal effect — and the Take Care Clause forecloses the Defendants from creating those legal effects unilaterally.

### B.   Defendants Violated The APA

Even if Plaintiffs' Take Care claim fails, a preliminary injunction still should issue because Plaintiffs are likely to succeed on the merits of their two, independent claims under the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.* ("APA"). Ever since Congress enacted the statute in 1946, the APA has presumptively applied to all federal agency actions, and it is the federal agency's burden to prove by "clear and convincing evidence of legislative intention" that Congress wanted to override that presumption.  *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986); *accord Abbott Labs. v. Gardner*, 387 U.S. 136, 140-41 (1967) (collecting cases).  Where the agency fails to carry that burden, the APA requires the agency to publish its proposed action ("notice"), allow members of the public to offer feedback ("comment"), and then publish a final decision ("rule") that considers public input and reaches a reasoned, non-arbitrary decision.  *See* 5 U.S.C. § 553.  Persons aggrieved by the agency's decision then can challenge it in federal court.  *See id.* §§ 702, 704, 706.

Here, Plaintiffs' APA claims are likely to succeed for three reasons.  First, the APA applies to the DHS Directive.  Second, Defendants cannot unilaterally label the Directive a "policy" statement and escape judicial review; the contrary result would contravene *Japan Whaling* and a half-century of precedent under the APA. Third, Defendants tacitly concede that they will lose if the Court reaches the merits

because they undisputedly failed to comply with the APA's notice-and-comment requirements; the Directive is also arbitrary, capricious, and contrary to law.

### 1.    The DHS Directive Is Reviewable Under The APA

The APA applies to any "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.  The Supreme Court has held that the APA is a "seminal act" that "manifests a congressional intention that it cover a broad spectrum of administrative actions." *Abbott Labs.*, 387 U.S. at 140.   The Court further "has echoed that theme by noting that the Administrative Procedure Act's 'generous review provisions' must be given a 'hospitable' interpretation," *id.* at 140-41 (quoting *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955)), under which the APA applies unless the agency proves that Congress intended otherwise, *see Japan Whaling*.

Following those instructions, the lower federal courts have developed a number of doctrines that demarcate those "agency actions" that must comply with the APA from those few that need not.  The only doctrine at issue here is the one that makes "substantive rules" subject to the APA's notice-and-comment and judicial-review provisions. *See Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995) (describing the doctrine).  A "substantive rule" is one that "impose[s] any rights and obligations," or "binds" the hands of agency officials and does not leave them "free to exercise discretion."  *Ibid.* (internal quotation marks omitted).   Contrariwise, a "non-substantive rule" (also called a "policy statement" or "guidance" document) merely "announces the agency's tentative intentions for the future."  *Id.* at 596 (internal quotation marks omitted).  "The key

inquiry" in distinguishing between substantive and non-substantive rules "is the extent to which the challenged policy leaves the agency free to exercise its discretion to follow or not to follow that general policy in an individual case, or on the other hand, whether . . . upon application one need only determine whether a given case is within the rule's criteria." *Ibid.*

a.   The Directive is a substantive rule

The DHS Directive easily qualifies as a "substantive rule" because there is nothing tentative about it.  To the contrary, it uses a series of *shalls* and *musts* to bind immigration officers and force them to apply the Directive's eligibility criteria. And if applicants fail to satisfy one of the eligibility requirements, the officers have no discretion to grant a reprieve: the officer instead must follow pre-written steps and check a "standard" denial box in a template.   DACA Standard Operating Procedures (App. 0382-83).  The reasons for denial which are listed on the template include only failures to meet various eligibility requirements and failures to cooperate in the processing of the application; the template gives officers no "discretionary" box to check.  DACA Standard Operating Procedures (App. 0595); *see also* Part I.A.3, *supra* (DHS Directive leaves no room for case-by-case "discretion").

That is by design.  Defendants constructed their deferred action regime so that "upon application" an immigration officer "need only determine whether a given case is within the rule's criteria." *Prof'ls & Patients*, 56 F.3d at 596.  As the USCIS union president has explained, Defendants have "prevented immigration officers from conducting case-by-case investigations of DACA applications," and

have "guarantee[d] that applications will be rubber-stamped for approval, a practice that virtually guarantees widespread fraud and places public safety at risk." Palinkas Decl. ¶ 8 (App. 0855).   DHS forbids immigration officers to exercise any case-by-case discretion because they fear that the bureaucracy might fail to treat like cases alike.  *See* DACA Standard Operating Procedures (App. 0444) (officials should use "templates" in "checkbox format" to ensure DHS Directive is "applied consistently").  And as a consequence, it is undisputed that the Directive has yielded a 99.5-94.4% approval rate — which is more than sufficient to show that it is a "substantive," "binding" rule.  *Chamber of Commerce v. DOL*, 174 F.3d 206, 208, 212 (D.C. Cir. 1999) (70%-90% rate sufficient).

Such predictability is a laudable goal for a sweeping entitlement program, but it does not make for a "non-binding" "policy statement."  *See Prof'ls & Patients*, 56 F.3d at 596-97; *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021-22 (D.C. Cir. 2000) (holding agency can evade APA only where it can prove that a "guidance" document or "policy statement" is "not binding in practical sense").  Because the Directive commands and dictates, it is a "substantive rule" and therefore must comport with the APA.

        **b.**    **Defendants are wrong to call the Directive a non-substantive "guidance" or "policy" document**

Defendants' counterargument is that the APA is inapplicable because the Directive serves only to "advise the public" and does not "impose any rights and obligations."   Opp. 45.   These statements rest uncomfortably alongside the Defendants' later claims that enjoining the DHS Directive will "impact[] the lives of

37

many people," will "disrupt," "interfere," and "impede" the work of DHS, and will "halt[] policies" that promote "national security" and "humanitarian concerns." *Id.* at 54. The statements also rest uncomfortably alongside the Defendants' acknowledgments that "DHS officials have been instructed to implement . . . [the DHS Directive] within 180 days," and that "[a] preliminary injunction would prevent DHS from timely implementation of [the Directive]." *Compare id.* at 45, *with id.* at 54. Defendants are wrong to suggest that those substantive effects could stem from enjoining a precatory, non-substantive policy statement. Because policy statements are by definition legally meaningless, an agency can implement and follow them "just as if the policy statement had never been issued." *Prof'ls & Patients*, 56 F.3d at 596 (internal quotation marks omitted).

Moreover, Defendants cannot deny the substantive effect of a Directive that confers benefits on members of the public. *See, e.g.*, *id.* at 602; *NRDC v. EPA*, 643 F.3d 311, 321 (D.C. Cir. 2011) (APA applies when agency purports to "confer benefits" (internal quotation marks omitted)). Here, both lawful presence and work permits constitute benefits that DHS conferred through the Directive. That alone is sufficient to trigger the APA.

### 2. *Defendants' Say-So Cannot Defeat Judicial Review*

Next the Defendants urge the Court to ignore substance and embrace form. *See* Opp. 45 (arguing that the Court should give weight to the Defendants' own "characterization of the rule" as "a general statement of policy"). But courts in the Fifth Circuit and beyond do not allow agencies to evade judicial review through mislabeling. *See, e.g.*, *Prof'ls & Patients*, 56 F.3d at 596 ("The label that the

38

particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather, it is what the agency does in fact."); *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616, 619 (5th Cir. 1994), *modified on other grounds*, No. 93-1377, 1994 WL 484506 (Sept. 7, 1994) (rejecting an agency's attempt "to avoid the notice and comment requirements of the APA by mischaracterizing a legislative rule as a mere 'yardstick' and 'policy guideline'"); *Croplife v. EPA*, 329 F.3d 876, 882 (D.C. Cir. 2003) (holding that an EPA "press release" announced a legislative rule and therefore that the EPA could not escape notice-and-comment and judicial review); *see id.* ("[A]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding.").

It is not surprising that courts care less about what agencies say than what they do.  Congress passed the APA to bring agency decisions under the supervision of the federal courts.  *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (APA's "central purpose" is to "provid[e] a broad spectrum of judicial review of agency action").  It would defy that purpose to allow the agency to use its own intention (or characterization of the rule) as an excuse for evading judicial review.  Courts should be especially watchful for agency self-aggrandizement where, as here, the underlying dispute pits congressional prerogatives against an allegedly overreaching Executive.

It is irrelevant that the Ninth Circuit held that much more modest deferred action "instructions" from the 1980s were non-substantive.  Opp. 46.  The Ninth

Circuit merely held that those old instructions did not create a "binding norm" and instead left agency officials free to make "discretionary" and "individualized determinations," *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013-14 (9th Cir. 1987); that says nothing about whether *this* Directive is similarly non-substantive. Indeed, Defendants themselves concede that the DHS Directive is unprecedented, *see* OLC Memo 30, and even OLC does not contend that the deferred action "instructions" from the 1980s justify the radical expansion of deferred action in the DHS Directive.  Nor could it.  *See Prof'ls & Patients*, 56 F.3d at 596 n.27 ("[T]he fact that we previously found another FDA compliance policy guide to be a policy statement is not dispositive whether CPG 7132.16 is a policy statement.").

Nor can Defendants evade judicial review by bolting on a "no-rights" paragraph at the end of the DHS Directive.  The Directive contains paragraph after paragraph of non-discretionary commands and bright-line eligibility criteria that bind the hands of DHS officials in service centers across the country.  Then, at the very end, it says:  "This memorandum confers no substantive right . . . ."  FAC Ex. A at 5.  EPA included a similar boilerplate paragraph at the end of its "guidance" document in *Appalachian Power*, and the Court of Appeals held that the APA applied anyway:  "[T]he entire Guidance, from beginning to end — except the last paragraph — reads like a ukase.  It commands, it requires, it orders, it dictates." 208 F.3d at 1023.  So too here.

3.    *Plaintiffs' APA Claims Are Likely To Succeed On The Merits*

If the Directive is a substantive rule (rather than a policy statement), it is uncontested that the Defendants will lose because they issued it in violation of the

APA's notice-and-comment requirements. *See* 5 U.S.C. § 553. Beyond that violation of the APA's procedural requirements, the Directive also is arbitrary, capricious, and contrary to law because it violates Congress's clear statutory commands. *See id.* § 706; Part I.A.2, *supra*.

Defendants' only defense of the Directive on the merits is that it somehow comports with vacuous statutory provisions — such as the DHS Secretary's authority to "perform such other acts as he deems necessary for carrying out his authority" under the INA. 8 U.S.C. § 1103(a)(3). First, the as-he-deems-necessary clause gives Secretary Johnson power to "carry[] out his authority" under the INA; it does not give him power to violate the INA or render entire portions of it superfluous. *See* Part I.A.2, *supra* (Defendants violated clear statutory commands by legalizing the presence of and giving work permits to 4 million people).

And second, it would raise serious constitutional concerns to read Section 1103(a)(3) as giving the DHS Secretary authority to ignore the entire statute when "he deems [it] necessary." Courts go to great lengths when reading federal statutes to avoid constitutional difficulties. *See Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); *N.W. Austin Mun. Util. Dist. No. 1 v. Holder*, 557 U.S. 193 (2009). And the Constitution forbids Congress to delegate its lawmaking authority to the Executive Branch absent an "intelligible principle." *Am. Trucking*, 531 U.S. at 474-76. Defendants' interpretation of Section 1103(a)(3) tests those constitutional limits because it fails to articulate any intelligible principle for Congress's delegation of limitless lawmaking power to DHS. Those

constitutional concerns are even graver under Defendants' interpretation of 8 U.S.C. § 1324a(h)(3), which they invoke as the statutory basis to grant 4 million EACs.   As explained above, Section 1324a(h)(3) is a definitional provision and delegates nothing — much less does it unconstitutionally purport to delegate limitless lawmaking power.  *See* Part I.A.2.b, *supra*.  The canon of constitutional avoidance therefore requires reading both Section 1103(a)(3) and Section 1324a(h)(3) narrowly and to disallow DHS's limitless discretion.

## C.    Plaintiffs Have Standing

For all of its complexities, the point of the standing doctrine is simple:  to ensure that at least one plaintiff before this Court has "[t]he requisite personal interest" to create a "Case" or "Controversy" under Article III.  *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).  The Plaintiffs here have several personal interests:  (1) the DHS Directive will impose millions of dollars of costs on state licensing programs; (2) the Directive will force the States to spend hundreds of millions of dollars on health, education, and law-enforcement programs; and (3) the Directive will distort labor and employment markets in the Plaintiff States.  Those interests are dramatically more concrete, personal, and judicially cognizable than an interest in "breath[ing] the air," a generalized concern over "global warming," or a desire to go fishing — all of which were sufficient to support standing.  *See United States v. SCRAP*, 412 U.S. 669, 678 (1973) (breathing air); *Massachusetts v. EPA*, 549 U.S. 497, 505 (2007) (global warming); *Friends of the Earth*, 528 U.S. at 181-82 (fishing).  The Defendants must defeat all of these to win dismissal; they can defeat none.

      1.    *The DHS Directive Will Impose Economic Injuries On Plaintiffs' Driver's License Programs*

      a.    The States will lose money

As the Defendants appear to concede, Plaintiff States can establish standing by showing that "[t]he costs of processing additional [driver's] licenses" are not "recouped through fees levied on the individual recipients." Opp. 22 n.20. That concession was a wise one because "economic injury is a quintessential injury upon which to base standing." *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) (citing *Barlow v. Collins*, 397 U.S. 159, 163-64 (1970)). And the economic injuries associated with state driver's license programs certainly are "concrete and particularized," *Massachusetts*, 549 U.S. at 517; they are concrete in that they can be measured in dollars and cents, and they are particularized in that no one other than the States will incur them.

In Texas, for example, an individual "who is not a citizen of the United States must present to the [Department of Public Safety ("DPS")] documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States before the applicant may be issued a driver's license." Tex. Transp. Code § 521.142(a). Section 521.1425(d), in turn, provides that DPS "may not deny a driver's license to an applicant who provides documentation described by Section 521.142(a) based on the duration of the person's authorized stay in the United States, as indicated by the documentation presented under Section 521.142(a)." And if the applicant pays the required fee, DPS "shall issue" a driver's license. *Id.* § 521.181. The fee is $24. *Id.* § 521.421(a), (a-3).

That fee does not come close to covering the State's costs for issuing driver's licenses under the DHS Directive.  Texas's undocumented population numbers at least 1.6 million.  *See* Eschbach Decl. ¶ 33 (App. 0767).  If only one-third of them apply for driver's licenses under the DHS Directive, it will cost the State $198.73 per license, at a net loss of $174.73 per license.  *See* Peters Decl. ¶ 8 (App. 0860-61).  Even if only 2% of the undocumented population applies, it will cost the State $154.89 per license, at a net loss of $130.89 per license.  *See ibid.*  Those costs are understated because they do not include the costs of license renewals.  *Ibid.*  Moreover, federal law requires every State to verify every deferred action document before issuing a license, and DHS forces the State to pay for 100% of every verification[7] — but those charges also are not included in the per-license figures quoted above.  *Id.* ¶ 9 (App. 0861-62).  Texas is not unique.  *See, e.g.*, Fernan Decl. (App. 0792-0802); Snemis Decl. (App. 0997-1003); ARK. CODE ANN. § 27-16-1105 (requiring the issuance of driver's licenses to deferred action beneficiaries).[8]  Those injuries are way more than the "identifiable trifle [that] is sufficient for standing."  *SCRAP*, 412 U.S. at 689 n.14; *see also ibid.* ("We have allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote, a $5 fine and costs, and a $1.50 poll tax." (citing *Baker v. Carr*,

---

[7] *See* 6 C.F.R. § 37.13(b)(1) (States must verify using DHS's "Systematic Alien Verification for Entitlements," "SAVE," system); 49 U.S.C. § 30301 note (State must enter a "memorandum of understanding" ("MOU") with DHS to use the SAVE system); Systematic Alien Verification for Entitlements Program Documents ¶ IV.B.3 (App. 0869-70) (Texas's MOU, which requires the State to pay 100% of the cost for every SAVE query); App. 1018 (Arizona's MOU).

[8] And the States' costs are not limited to driver's licenses.  The DHS Directive will impose costs on the States' other licensing programs, too.  *See, e.g.*, Berndt Decl. (App. 0123-25); Neverman Decl. (App. 0849-51).

369 U.S. 186 (1962), *McGowan v. Maryland*, 366 U.S. 420 (1961), and *Harper v. Virginia Bd. of Elections*, 383 U.S. 663 (1966))).

> b.    The States' injuries are not "self-inflicted"

Defendants cannot dismiss those injuries as "self-inflicted."   Before this Court, Defendants repeatedly insist that federal law does "not requir[e] [S]tates to issue driver's licenses to" deferred action beneficiaries.   Opp. 10 n.12; *see also id*. at 21 ("[F]ederal law establishes a presumption that certain categories of aliens, including the recipients of deferred action, are 'not eligible for any State or local public benefits.'"); *id*. at 22 (States have a choice to issue driver's licenses to deferred action beneficiaries, so the costs of doing so are "self-inflicted injuries"). But just a few short months ago, the United States argued the opposite to the Ninth Circuit.   *See* Amicus Br. of United States in Opp'n to Reh'g En Banc at 8-17, *Arizona Dream Act Coalition v. Brewer*, No. 13-16248 (9th Cir.) (filed Sept. 30, 2014) (App. 0063-72).

*Arizona Dream Act* arose when Governor Brewer amended the State's policies to deny driver's licenses to DACA beneficiaries; the State then further amended its policies to deny licenses to all deferred action beneficiaries (not just DACA recipients).   *See id*. at 6.   But the Ninth Circuit enjoined the State from making the changes, both because the changes were preempted by federal law and because the changes violated the U.S. Constitution.   *See Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1062 (9th Cir. 2014).   The Ninth Circuit concluded that DHS wanted DACA beneficiaries to work; that "the ability to drive may be a virtual necessity for people who want to work in Arizona"; and that therefore, "conflict preemption"

principles would require Arizona to give driver's licenses to *all* deferred action beneficiaries — including DACA beneficiaries and presumably those under the DHS Directive. *Ibid.*[9] The United States successfully defended that conclusion and argued that federal law preempted the State's effort to change its licensing policy — even where the State was willing as Arizona was to deny licenses to *all* deferred action beneficiaries (DACA and non-DACA alike). *See Arizona Dream Act* Amicus Br. 12 (App. 0067).

It is troubling that the United States now urges this Court to find that these injuries are "self-inflicted" because the Plaintiffs could change state law, refuse to issue driver's licenses under the DHS Directive, and thus frustrate DHS's efforts to allow 4 million undocumented immigrants to drive to work. *See* Opp. 21-22. That is unquestionably untrue for Plaintiffs Arizona, Idaho, and Montana — all of which are in the Ninth Circuit and are therefore bound by DOJ's victory in *Arizona Dream Act*.

Moreover, all of the Plaintiff States are harmed by the Defendants' new-and-improved view of the law. As Defendants now describe it, the States are free to deny driver's licenses to deferred action beneficiaries — as long as the States deny them to all deferred action beneficiaries. *See* Opp. 22 n.19 ("[A] State may not selectively deny driver's licenses to some recipients of deferred action."); *compare*

---

[9] The Ninth Circuit did not need to reach the preemption claim at the preliminary injunction phase because it found that Arizona's revised driver's license policy violated the Equal Protection Clause. But the Court of Appeals held that "[i]f Plaintiffs can ultimately show adequate proof of the link between driver's licenses and the ability to work in Arizona, we agree that [Arizona's] policy would be conflict-preempted." 757 F.3d at 1062. The court rested that conclusion on its interpretation of 8 C.F.R. § 274a.12(c)(14), *see id.*, which is the same provision that the Defendants have invoked to provide work permits under the DHS Directive, *see supra* p.18.

*Arizona Dream Act* Amicus Br. 14 (App. 0069).  That is, the Defendants now say the Plaintiffs face an all-or-nothing choice:   extend driver's licenses to all deferred action recipients (and bear the costs described above) or eliminate driver's licenses for all deferred action recipients (including the victims of torture, Hurricane Katrina, child trafficking, and 9/11).   But that sort of coercive all-or-nothing choice is itself an Article III injury.  *Cf. NFIB v. Sebelius*, 132 S. Ct. 2566, 2602-07 (2012) (opinion of Roberts, C.J.) (holding all-or-nothing choice under the Affordable Care Act's Medicaid expansion was unconstitutionally coercive).

Moreover, even if the Plaintiff States could change their laws to avoid giving licenses to DHS Directive beneficiaries, the obligation to change state law would constitute an Article III harm that is traceable to the Directive.  As the Supreme Court has held, "'the power to create and enforce a legal code, both civil and criminal' is one of the quintessential functions of a State," and as a result, "the State has [a] 'direct stake' . . . in defending the standards embodied in that code." *Diamond v. Charles*, 476 U.S. 54, 65 (1986) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982), and *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972)).  It follows that the State is injured when it is forced to exercise its sovereign prerogative and change its legal code upon pain of paying a financial penalty.

The Fifth Circuit has reached that conclusion on even harder facts.  In *Texas v. United States*, the Kickapoo Traditional Tribe of Texas sued the State for refusing to enter a Class III gaming compact with the tribe.  497 F.3d 491, 495 (5th Cir.

2007).  Texas invoked its sovereign immunity; that sovereign act triggered dismissal of the tribe's lawsuit, but it also triggered a dispute-resolution process under regulations promulgated by the Secretary of the Interior.  *Ibid.*  Texas then filed its own lawsuit to have the Secretary's regulations declared unlawful, and the Fifth Circuit held the State was injured merely by being forced to go through an administrative process it alleged was unlawful.  *Id.* at 496-98.  Moreover, the Fifth Circuit rejected the Secretary's claim that "Texas brought the injury on itself by invoking a sovereign immunity defense" because Texas could not be forced to choose between forfeiting that defense and submitting to an unlawful regulatory process. *Id.* at 498.  This is an easier case because forcing the States to change their laws is an even greater affront to their sovereignty than merely inviting them to participate in a dispute-resolution process.  And Plaintiffs' injuries are even less self-inflicted because when they passed their driver's licenses statutes, the States never could have guessed that a President would one day commandeer dozens of driver's licenses programs and demand that the States pay for millions of licenses under unlawful pretenses.  *Cf. Am. Trucking Ass'ns, Inc. v. Smith*, 496 U.S. 167, 181 (1990) (States have legally cognizable reliance interests in preexisting federal law).  The States incur Article III injury when they rely on federal law and the federal government unconstitutionally changes it.

Finally, Defendants' entire conception of "self-inflicted" injuries is suspect.  An injury is self-inflicted so as to defeat standing "only if . . . the injury is so completely due to the plaintiff's own fault as to break the causal chain." *St. Pierre*

*v. Dyer*, 208 F.3d 394, 402 (2d Cir. 2000).  Thus, in *NRDC v. FDA*, 710 F.3d 71 (2d

Cir. 2013), the Court of Appeals held that the plaintiff had standing to challenge

FDA's failure to regulate a hand-soap chemical even if its members could have

avoided the soap through other means (*e.g.*, by buying chemical-free soap or by

asking their employers to remove the chemical-containing soap).  *Id*. at 84-85.  The

court emphasized that the plaintiff could establish standing simply by showing that

the agency's failure to regulate the chemical was a "contributing factor" to the

injury.  *Id*. at 85.  And there can be no doubt that the Defendants' conduct here is a

"contributing factor" to the States' injuries; without the Directive, the States will

not be forced to pay for millions of driver's licenses or to change their laws.  That

but-for causation is more than sufficient to show standing.  *See ibid*.[10]

> 2.   *Plaintiffs' Standing Follows A Fortiori From Massachusetts v. EPA*

Independently, the States have standing under *Massachusetts v. EPA*, 549

U.S. 497 (2007).  In that case, the Supreme Court held that Massachusetts had

Article III standing to sue a federal agency for failing to regulate greenhouse gases

based on a string of inferences.  In particular, Massachusetts alleged that: (i) EPA's

failure to regulate carbon dioxide and other molecules contributed in some small

way to the "greenhouse effect" in the Earth's atmosphere; (ii) the increase in the

"greenhouse effect," however minor, might eventually cause some unknowable rise

---

[10] *Illinois v. City of Chicago*, 137 F.3d 474 (7th Cir. 1998), is not to the contrary.  In that "odd duck" case, the State of Illinois "attack[ed] the validity of its own statute," insofar as it delegated to the City of Chicago the power to enter certain interstate compacts relating to airports.  *Id*. at 476.  Of course, if Illinois delegated its powers to a subordinate political subdivision (Chicago), the State had only itself to blame for the consequences.  This case is the polar opposite:  the Plaintiff States cannot control what the federal government does to them (or their driver's license programs).

in sea levels; and (iii) the potential rise in sea levels could erode some indeterminate number of centimeters of Massachusetts' shoreline. This is an *a fortiori* case.

### a. States get "special solicitude" as plaintiffs

First, the *Massachusetts* Court emphasized that States are owed "special solicitude in our standing analysis." 549 U.S. at 520; *see also id.* at 518 (noting "the special position and interest of Massachusetts"); *ibid.* ("It is of considerable relevance that the party seeking review here is a sovereign State and not . . . a private individual."). Even "before the creation of the modern administrative state, [the Supreme Court has] recognized that States are not normal litigants for the purposes of invoking federal jurisdiction." *Ibid.* That is because federal courts or federal jurisdiction would not exist but for the States' willingness to join together and cede some of their sovereignty to the Union. *Id.* at 519; *see also, e.g.*, *Alden v. Maine*, 527 U.S. 706, 726-27 (1999). For example, when it joined the Union, Massachusetts gave up its pre-founding sovereign rights to "invade Rhode Island to force reductions in greenhouse gas emissions," to "negotiate an emissions treaty with China or India," and to exercise "its police powers to reduce in-state motor-vehicle emissions" without fear of federal preemption. *Massachusetts*, 549 U.S. at 519. But what it got in return was special rights to vindicate its sovereign prerogatives in federal court. *Id.* at 519-20. As Justice Holmes put it:

> When the States by their union made the forcible abatement of outside nuisances impossible to each, they did not thereby agree to submit to whatever might be done. They did not renounce the possibility of making reasonable demands on the ground of their still remaining *quasi*-sovereign interests; and the alternative to force is a suit in [federal] court.

*Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907); *Georgia v. Pa. R. Co.*, 324 U.S. 439, 450 (1945) ("Trade barriers, recriminations, intense commercial rivalries had plagued the colonies.  The traditional methods available to a sovereign for the settlement of such disputes were diplomacy and war.  Suit in this Court was provided as an alternative." (footnote omitted)).

Just so here.  Border States cannot force their neighbors to reduce illegal immigration; States cannot negotiate and sign immigration treaties with foreign Nations; and much of the States' power over immigration issues has been preempted.[11]  *See Arizona v. United States*, 132 S. Ct. 2492 (2012).  But that does not mean that the States lack sovereign or quasi-sovereign interests in the integrity of their borders, their property, and their treasuries.  To the contrary, the whole premise of the federal system is that the States retain their sovereign and quasi-sovereign interests — they just agree to vindicate those interests through the federal courts rather than through self-help.  *See Massachusetts*, 549 U.S. at 520.

      b.      Plaintiffs' injuries are concrete, traceable, and redressable

The Plaintiffs' injuries here are at least as concrete as those in *Massachusetts*.  In *Massachusetts*, the State submitted the declaration of a scientist who testified that "[t]he atmospheric concentration" of greenhouse gases like carbon dioxide "have been increasing since about 1750 as a result of human activities."

---

[11] The very premise of the Supremacy Clause, of course, is that state law must give way to conflicting, and validly-enacted, federal laws, the creation of which the States participated in through their representatives in Congress.  But when the "law" at issue is unilateral executive action of the sort at issue here, the Executive is purporting to effect preemption while circumventing Congress and the representative process it embodies.  This too injures the States.  *See Wyeth v. Levine*, 555 U.S. 555, 583-88 (2009) (Thomas, J., concurring).

Declaration of Michael C. MacCracken ¶ 5(a), *Massachusetts v. EPA* (D.C. Cir. No. 03-1361) (filed June 14, 2004) (App. 0826-27).  MacCracken explained that human activities over the last 250 years made "major contributions to the rise in global sea level by 10-20 cm (4 to 8 inches) observed over the past century."  *Id*. ¶ 5(c) (App. 0827).   And "in the absence of policy change, atmospheric concentrations of greenhouse gases will continue to rise steadily throughout this century," which in turn would cause global sea levels to rise 4-35 inches by 2100.  *Id.* ¶ 5(b), 5(d) (App. 0827-28).  MacCracken conceded that greenhouse gases have myriad sources in the U.S. and globally, and that the entire U.S. transportation sector was responsible for only 7% of global fossil fuel emissions.  *Id*. ¶ 31 (App. 0837).  He did not explain how any global-warming costs or harms could be attributed to those 7% of global emissions, much less did he explain how any global-warming costs or harms could be traced to the much narrower dispute before the EPA (namely, whether new cars sold in the U.S. should have to comply with regulations that reduce but do not eliminate carbon emissions).  Rather, he concluded that, "[i]f the U.S. takes steps to reduce motor vehicle emissions, other countries are very likely to take similar actions," and when combined with "progress in limiting other emissions," the collective global response "would discernibly and significantly reduce and delay projected adverse consequences of global warming."  *Id*. ¶ 32 (App. 0837).  The Supreme Court held that MacCracken's declaration was sufficient to establish the State's standing to challenge EPA's inaction.  *See Massachusetts*, 549 U.S. at 521-23.

This case is much easier because inferences are not required to show that illegal immigration imposes billions of dollars in costs on the Plaintiff States. For example, in the last two years for which data are available, the State of Texas spent approximately $1.313 billion in uncompensated medical care for undocumented immigrants. *See* Allgeyer Decl. ¶ 11 (App. 0006). Moreover, Texas spent approximately $303 million to provide Emergency Medicaid services to undocumented immigrants over the last four years for which data are available. *Id*. ¶ 8 (App. 0004-05). Texas spent approximately $106 million to provide CHIP Perinatal Coverage to undocumented immigrants over the last three years for which data are available. *Id*. ¶ 10 (App. 0005). Texas spent approximately $5.2 million to provide Family Violence Program services to undocumented immigrants over the last four years for which data are available. *Id*. ¶ 9 (App. 0005). And it costs the State of Texas approximately $9,473 per year to educate each undocumented child in its school system. *See* Dawn-Fisher Decl. ¶ 9 (App. 0739); *Plyler v. Doe*, 457 U.S. 202 (1982) (States are constitutionally required to educate undocumented children). Those costs will increase if additional undocumented immigrants come to Texas. *See* Allgeyer Decl. ¶ 12 (App. 0006); Dawn-Fisher Decl. ¶ 12 (App. 0740). Again, Texas is not unique. *See, e.g.*, Bailey Decl. ¶ 5 (App. 0078); ARKANSAS MEDICAID, MEDICAL SERVICES POLICY MANUAL § B-250 (regarding coverage of prenatal care for undocumented immigrants); *id.* § B-500 (concerning coverage of emergency care for undocumented immigrants).

And the causal connection between the DHS Directive and increases in undocumented immigration is dramatically tighter than the link between EPA's refusal to regulate carbon emissions from new cars sold in the U.S. and the loss of Massachusetts' coastline.  MacCracken could only speculate that an EPA rule governing new cars in the U.S. might prompt other nations to take similar actions that, when combined with "progress in limiting other emissions," might slow the pace of global warming in some unspecified way and to some unspecified extent. MacCracken Decl. ¶ 32 (App. 0837).  Whereas here, one of the Defendants conceded that Defendants' immigration policies are causing increases in illegal immigration. FAC ¶¶ 37, 43, 62.  Moreover, first-hand reports reveal that individuals illegally crossing the border think that the Defendants will give them "'*permisos*,' or passes that grant them permission to remain in the United States indefinitely."  Dunks Decl. ¶ 6 (App. 0747-48).  Undocumented immigrants have reported to Texas officials that they came to the United States illegally "because they have seen flyers in their home countries promoting the federal government's favorable immigration policies." *Ibid.*  And since the Defendants implemented DACA, it has cost the State of Texas $26.9 million in law-enforcement resources to deal with what the President himself has characterized as a "humanitarian crisis" on Texas's border.  FAC ¶ 31; Baker Decl. ¶¶ 5, 8 (App. 0081-82).  "These expenditures reflect costs associated with employee overtime, travel, aviation, and other expenses that [Texas] would not have incurred but for this emergency operation."  Baker Decl. ¶ 8 (App. 0082). Finally, if there was any doubt about the cause-and-effect relationship between

Defendants' policies and undocumented immigration, that doubt is eliminated by Plaintiffs' expert demographer, who affirmed that the DHS Directive will "discernibly and significantly" increase undocumented immigration. Eschbach Decl. ¶ 5(a) (App. 0752-53).

c.   The size of Plaintiffs' injuries is irrelevant

The *Massachusetts* Court held it was irrelevant that the State had no idea whether or how action by EPA would affect climate change on a global scale. 549 U.S. at 524. The Court held that *any* step — however "small," "tentative," or efficacious — is sufficient. *Ibid.* Correlatively, the Court held it was irrelevant to Massachusetts' injuries whether any benefits from U.S. regulation would be more than offset by increased pollution in "developing countries such as China and India." *Id*. at 525-26. All that mattered, the Court held, is that the reduction of even one emitted carbon-dioxide molecule "would slow the pace of global emissions increases, no matter what happens elsewhere." *Id*. at 526.

Again, this case is much easier. It is undisputable — and Defendant Vitiello already has conceded in principle — that illegal immigration increases when Defendants announce to the world that 40% of the undocumented population can stay and work in the United States. *See* FAC ¶¶ 37, 43, 62; Dunks Decl. ¶ 6 (App. 0747-48); Eschbach Decl. ¶ 5(a) (App. 0752-53). Moreover, it is undisputable that the DHS Directive incentivizes undocumented immigrants to stay in the United States when they otherwise would choose not to. *See* Eschbach Decl. ¶¶ 5(a), 17 (App. 0752-53, 0759). Either way, invalidating the DHS Directive would slow the

pace of growth in undocumented immigration by at least one person.  And that's all that Article III requires.  *See Massachusetts*, 549 U.S. at 526.

> d.   Defendants' counterarguments fail

Against all of this, Defendants offer four unpersuasive counterarguments.

First, they claim that *Massachusetts* is irrelevant because Congress authorized that State to sue under the Clean Air Act, whereas "Congress has not authorized the type of challenge brought by Plaintiffs."  Opp. 26.  That is wrong; the Administrative Procedure Act provides a right of review precisely because no other statute does.  *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute *and final agency action for which there is no other adequate remedy in a court* are subject to judicial review." (emphasis added)).  And it is hornbook administrative law that the same standards apply under both statutes.  *See Catawba County v. EPA*, 571 F.3d 20, 41 (D.C. Cir. 2009) (per curiam) ("[W]e apply the same standard of review under the Clean Air Act as we do under the Administrative Procedure Act." (internal quotation marks omitted)).

Second, Defendants claim that the problems associated with undocumented immigration are a "generalized grievance" of "wide public significance."  Opp. 27-30.  But the exact same thing could have been said — in fact, *was* said — about global warming.  And the Supreme Court rejected it as irrelevant:  "That these climate-change risks are 'widely shared' does not minimize Massachusetts' interest in the outcome of this litigation."  *Massachusetts*, 549 U.S. at 522; *see also FEC v. Akins*, 524 U.S. 11, 24 (1998) ("[W]here a harm is concrete, though widely shared, the

Court has found 'injury in fact.'"). For all of the reasons given above, the States' injuries here are at least as concrete as Massachusetts' were there.

Third, Defendants are wrong to suggest that the "prudential standing" doctrine somehow bars the federal courts from adjudicating issues of "'broad public significance.'" Opp. 28 (quoting *Apache Bend Apartments, Ltd. v. United States*, 987 F.2d 1174, 1176 (5th Cir. 1993) (en banc)). To the contrary, the Supreme Court has held that "the Judiciary has a responsibility to decide cases properly before it, even those it "'would gladly avoid.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427 (2012) (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)). The only exception is a "narrow" one called the political question doctrine. *Ibid*. And notably, Defendants do not claim that this case fits within that exception. Moreover, Defendants cannot explain how this case somehow involves issues of "broad[er] public significance" than worldwide carbon emissions (*Massachusetts*), the President's power to seize the steel mills in the middle of the Korean War (*Youngstown*), or for that matter, the standing of 27 States to challenge the constitutionality of the Affordable Care Act (*NFIB*).

Finally, Defendants speculate that the costs imposed on the States by the DHS Directive "may be offset" by an increase in sales or income tax revenues. *See* Opp. 22 n.20. For three reasons, such speculation cannot defeat standing. First, the expenditure of money is an injury, no matter when or whether that expenditure is offset. *See, e.g.*, *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 657 (9th Cir. 2011) ("[S]o long as Haven Hospice can point to some concrete harm

57

logically produced by [the regulation], it has standing to challenge the hospice cap regulation even though in a prior, current, or subsequent fiscal year it may also have enjoyed some offsetting benefits from the operation of the current regulation."); *ALCOA v. Bonneville Power Admin.*, 903 F.2d 585, 590 (9th Cir. 1989) ("There is harm in paying rates that may be excessive, no matter what the California utilities may have saved.").  Indeed, there can be little doubt that economic productivity associated with greenhouse-gas emissions offset some or all of Massachusetts' injuries, but that did not figure into the Court's analysis at all.  *Cf.* 549 U.S. at 524 (holding irrelevant whether benefits from EPA rule would be "offset" by carbon emissions in China).  Second, the Defendants cannot meet hard numbers with hunches about what "may be."  *Ctr. for Auto Safety, Inc. v. NHTSA*, 342 F. Supp. 2d 1, 10 (D.D.C. 2004) ("Speculation . . . is insufficient to defeat standing.").  Lastly, even if the Defendants could prove that the Plaintiffs will eventually recoup their costs, the Plaintiffs still would have standing because deprivation of the time value of money is an injury of its own.  *See Austin v. New Hampshire*, 420 U.S. 656, 659 n.4 (1975) (holding that plaintiffs had standing, even though their income tax payments to New Hampshire were eventually refunded by their home States because the plaintiffs had to wait for the refund).

   3. *Plaintiffs Have Parens Patriae Standing*

     a. States can sue to protect citizens against economic discrimination

All of the Plaintiff States have a third, independent, and well-established basis for standing:  the *parens patriae* doctrine.  "*Parens patriae* means literally

'parent of the country,'" and it is a common-law doctrine that provides standing for States to vindicate their "quasi-sovereign" interests in federal court. *Alfred L. Snapp*, 458 U.S. at 600. One of the quasi-sovereign interests that gives a State federal-court standing is the protection of its citizens' "economic well-being." *Id.* at 605; *see Maryland v. Louisiana*, 451 U.S. 725, 738-39 (1981) (Maryland has *parens patriae* standing to ensure that its citizens have access to natural gas on non-discriminatory terms); *Pennsylvania v. West Virginia*, 262 U.S. 553, 592 (1923) (Pennsylvania has *parens patriae* standing to ensure its access to natural gas produced in West Virginia because it is important to economic well-being of Pennsylvania's citizens); *Georgia v. Pa. R. Co.*, 324 U.S. at 450-51 (Georgia has *parens patriae* standing to challenge antitrust conspiracy operating against Georgia's shippers).

For example, in *Alfred L. Snapp*, the Commonwealth of Puerto Rico brought suit in federal district court against a group of apple orchards for discriminating against Puerto Rican workers and instead hiring Jamaican workers. The Commonwealth argued that the INA prohibited such discrimination against U.S. workers. The Supreme Court held that the Commonwealth had *parens patriae* standing to seek declaratory and injunctive relief: "Just as we have long recognized that a State's interests in the health and well-being of its residents extend beyond mere physical interests to economic and commercial interests, we recognize a similar state interest in securing residents from the harmful effects of discrimination" by employers. 458 U.S. at 609.

Likewise here, the DHS Directive discriminates against U.S. citizens by making it more expensive for employers to hire them vis-à-vis the deferred action beneficiaries.  In particular, deferred action beneficiaries are ineligible to purchase subsidized health insurance on the Affordable Care Act exchanges.  *See* 45 C.F.R. § 152.2(8).  That means employers subject to the so-called "employer mandate" in 26 U.S.C. § 4980H(b) can hire EAC beneficiaries, not afford them "minimum essential coverage," and not pay a penalty.  *See id*. § 4980H(b)(1).  Contrariwise, if the same employer hired an unemployed citizen in the Plaintiff States, it would be subject to the employer mandate and would pay penalties for failing to offer required coverage.  Thus, the DHS Directive effectively gives such employers a waiver from the Affordable Care Act as long as they hire EAC-holders.  That waiver will make employers substantially more likely to hire EAC-holders instead of citizens in the Plaintiff States.  *See* Welch Decl. ¶¶ 25-26 (App. 1039); *Friends of the Earth*, 528 U.S. at 185 ("'[A]ll civil penalties have some deterrent effect.'" (quoting *Hudson v. United States*, 522 U.S. 93, 102 (1997))).  And economic discrimination against Plaintiffs' citizens in the employment context is precisely the economic harm that the Supreme Court held sufficient to create *parens patriae* standing in *Alfred L. Snapp*.  *See* 458 U.S. at 609.

The Plaintiff States' quasi-sovereign interests — and hence their bases for *parens patriae* standing — do not stop there.  Several Plaintiffs have state laws that prohibit employers in their States from hiring undocumented immigrants.  *See*, *e.g.*, ARIZ. REV. STAT. ANN. § 23-212; MISS. CODE ANN. § 71-11-3(7)(e); S.C. CODE ANN.

§ 41-8-50(D)(2); TENN. CODE ANN. § 50-1-103(d) (2008); W. VA. CODE ANN. § 21-1B-7. And the Supreme Court has twice held that those statutes are valid exercises of the States' "broad authority under their police powers to regulate the employment relationship to protect workers within the State." *De Canas v. Bica*, 424 U.S. 351, 356 (1976); *see also Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968 (2011) (reaffirming that result). Because the Defendants' actions would change those employment relationships and the scope of the States' police powers, the States have *parens patriae* standing. *See Massachusetts*, 549 U.S. at 519 (States have *parens patriae* standing where they could "exercise [their] police powers" but for federal law).[12]

### b.    States can sue DHS

It is no answer to claim that "'[a] State does not have standing as *parens patriae* to bring an action against the Federal Government.'" Opp. 24 (quoting *Alfred L. Snapp*, 458 U.S. at 610 n.16 (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923))). As the Supreme Court subsequently held, neither *Alfred L. Snapp* nor *Mellon* precludes States from suing federal agencies, full-stop. *See Massachusetts*, 549 U.S. at 520 n.17. Rather, those cases merely prevent a State from suing "to protect her citizens from the operation of federal statutes." *Ibid.* (internal quotation marks omitted). Of course, nothing in this suit seeks to protect the Plaintiffs' citizens from the operation of federal statutes. To the contrary, as in

---

[12] Moreover, the Directive will cause other distortions in the States' labor markets by making new workers eligible for unemployment insurance, which is paid exclusively by employers in the Plaintiff States. *See, e.g.*, Gill Decl. (App. 0804-05); Pollock Decl. (App. 0880-82); ARK. CODE ANN. § 11-10-511 (requiring the payment of unemployment benefits to aliens who are lawfully present for the purpose of performing services or otherwise residing in the United States under color of law).

*Alfred L. Snapp* and *Massachusetts*, the Plaintiff States are suing to force the Defendants to comply with federal statutes like the INA, IIRIRA, and the APA.

> 4. *One Plaintiff With Standing Is Sufficient To Create A "Case" Or "Controversy"*

Officials from 25 different States have joined this lawsuit to challenge the unlawfulness of the President's unilateralism, and all of the Plaintiffs have standing for at least one of the reasons given above. It is well-settled, however, that this Court need only find that one plaintiff has standing; that is all Article III requires to create a "Case" or "Controversy." As the Supreme Court has held:

> Once it is determined that a particular plaintiff is harmed by the defendant, and that the harm will likely be redressed by a favorable decision, that plaintiff has standing — regardless of whether there are others who would also have standing to sue. Thus, we are satisfied that both of these actions are Article III "Cases" that we have a duty to decide.

*Clinton v. City of New York*, 524 U.S. 417, 434-36 (1998). The Supreme Court has reaffirmed that proposition time and time again. *See, e.g., Massachusetts*, 549 U.S. at 518 ("Only one of the petitioners needs to have standing to permit us to consider the petition for review."); *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) (The Court need "not determine whether the other plaintiffs have standing because the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) ("It is clear that members of the Union, one of whom is an appellee here, will sustain injury by not receiving a scheduled increase in benefits. . . . We therefore need not consider the standing issue as to the Union or Members of Congress."); *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160

(1981) ("Because we find California has standing, we do not consider the standing of the other plaintiffs."); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977) ("Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain suit.").

Notwithstanding the foregoing, DOJ raised the same all-plaintiffs-must-have-standing argument in the Affordable Care Act litigation — which was the last time a nationwide, multi-State coalition lawsuit challenged the lawfulness of the federal government's actions.   The Eleventh Circuit rejected DOJ's argument as contrary to the "abundantly clear" law.   *Florida ex rel. Atty. Gen. v. HHS*, 648 F.3d 1235, 1243 (11th Cir. 2011) ("The law is abundantly clear that so long as at least one plaintiff has standing to raise each claim — as is the case here — we need not address whether the remaining plaintiffs have standing."), *rev'd in part on other grounds*, 132 S. Ct. 2566 (2012).   And DOJ did not revive the argument before the Supreme Court — presumably because it is foreclosed by decades of precedent.[13]

*   *   *

In short, for all of the reasons given above, at least one Plaintiff State will suffer a concrete and particularized injury from the DHS Directive, and a favorable

---

[13] The foregoing constitutes just a sample of the Plaintiff States' injuries from the Directive, but that sample is plainly sufficient to justify a preliminary injunction:  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.  Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.  A party thus is not required to prove his case in full at a preliminary-injunction hearing."  *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  Either through jurisdictional discovery or a trial on the merits, Plaintiffs could (and if necessary would) offer still more evidence of injuries from still more Plaintiff States.

decision enjoining that Directive will redress that injury in whole or in part.  That is all that Article III requires.  And on the merits, the Defendants have no answers to the statutory provisions prohibiting the Directive or the unbroken line of judicial precedent requiring the Directive to comport with the APA.  Plaintiffs therefore are likely to succeed on the merits.

## II.     PLAINTIFFS WILL INCUR IRREPARABLE INJURIES

Once DHS begins implementing its Directive, the States will suffer irreparable injury for at least three reasons.  First, unless the Court issues a preliminary injunction, the States must prepare to issue hundreds of thousands of new driver's licenses to deferred action beneficiaries, which will cost millions of dollars.  *See* Part I.C.1, *supra*; *see also* CBS Los Angeles, *Long Lines Expected at DMV Friday as Undocumented Immigrants Apply for Licenses* (Jan. 1, 2015), *available at* http://cbsloc.al/141FFAj ("The Department of Motor Vehicles expects big crowds on Friday, the first day undocumented immigrants in California can officially apply for a driver's license.  The DMV has hired more than 1,000 workers and opened four new centers to handle the rush.").

Second, the States will have to pay millions of dollars to remediate the problems created by the Directive — including healthcare, law-enforcement, and education.  *See* Part I.C.2, *supra*.  It will be difficult or impossible to recover those costs from the federal government. *See, e.g.*, *Philip Morris USA Inc. v. Scott*, 131 S. Ct. 1, 4 (2010) (Scalia, J., in chambers); *Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011); *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008).

Third, as the President himself confessed, it will be difficult or impossible to unwind the DHS Directive after it goes into effect.  *See* President Barack Obama, Remarks by the President in Immigration Town Hall — Nashville, Tennessee (Dec. 9, 2014) (App. 0887) ("It's true that theoretically a future administration could do something that I think would be very damaging.  It's not likely, politically, that they'd reverse everything that we've done.").

## III.    THE BALANCE OF EQUITIES TIPS IN PLAINTIFFS' FAVOR

Defendants cannot claim any countervailing injury from delaying the implementation of their new entitlement program by a few months.  First, the status quo has existed "for years."  Michael D. Shear, *For Obama, Executive Order on Immigration Would be a Turnabout*, N.Y. TIMES (Nov. 17, 2014), *available at* http://nyti.ms/1uGy9oI ("For years, he has waved aside the demands of Latino activists and Democratic allies who begged him to act on his own, and he insisted publicly that a decision to shield millions of immigrants from deportation without an act of Congress would amount to nothing less than the dictates of a king, not a president.").

Second, the United States and its amici offer a heartfelt defense of the President's motives for unilateral lawmaking, and the Plaintiff States share their humanitarian concerns.  But "[s]urely if ever there were a case for 'balancing' and giving weight to the asserted 'national interest' to sustain governmental action, it was in the Steel Seizure Cases."  *Nixon v. GSA*, 433 U.S. 425, 560 (1977) (Rehnquist, J., dissenting).  During the Korean War, a well-meaning President Truman seized steel mills because "a work stoppage would immediately jeopardize

and imperil our national defense . . . and would add to the continuing danger of our soldiers, sailors, and airmen engaged in combat in the field." *Youngstown*, 343 U.S. at 590-91.  But the Supreme Court upheld the district court's preliminary injunction against the President's actions, charging the federal judiciary with policing even benevolent abuses of executive power:

> It is not a pleasant judicial duty to find that the President has exceeded his powers and still less so when his purposes were dictated by concern for the Nation's wellbeing . . . .  But it would stultify one's faith in our people to entertain even a momentary fear that the patriotism and the wisdom of the President and the Congress, as well as the long view of the immediate parties in interest, will not find ready accommodation for differences on matters which, however close to their concern and however intrinsically important, are overshadowed by the awesome issues which confront the world.

*Id.* at 614 (Frankfurter, J., concurring); *see also id.* at 629 (Douglas, J., concurring) ("There can be no doubt that the emergency which caused the President to seize these steel plants was one that bore heavily on the country.  But the emergency did not create power; it merely marked an occasion when power should be exercised."). So even with the Nation at war and with soldiers' lives on the line, the President is not allowed to defend executive overreach by arguing that gains outweigh harms, or that ends justify means.

## IV.   THE PUBLIC INTEREST NECESSITATES A PRELIMINARY INJUNCTION

The United States tacitly concedes that the question presented in this case is whether the President can rewrite entire sections of the U.S. Code through unilateral executive action and without any judicial review whatsoever.   Under Defendants' view of the world, future presidents can affirmatively authorize

taxpayers not to pay their taxes, companies not to comply with environmental laws, and employers not to comply with workplace-safety statutes. *See* PI Mot. 32. That is a dangerous path to go down because in some ways "an unenforced law is worse than no law at all." Kenji Yoshino, *On Empathy in Judgment (Measure for Measure)*, 57 CLEV. ST. L. REV. 683, 685 (2009).

Once the Executive Branch starts down that path, it uses each previous step to justify the next one. *Compare* OLC Memo 15-19 (using past instances of deferred action to justify DHS Directive), *with NLRB v. Noel Canning*, 134 S. Ct. 2550, 2592 (2014) (Scalia, J., concurring in the judgment) (criticizing DOJ's "adverse-possession theory of executive authority"). Only the courts can prevent the Executive's self-aggrandizement:

> It is said that other Presidents without congressional authority have taken possession of private business enterprises in order to settle labor disputes. But even if this be true, Congress has not thereby lost its exclusive constitutional authority to make laws necessary and proper to carry out the powers vested by the Constitution . . . . The Founders of this Nation entrusted the law making power to the Congress alone in both good and bad times.

*Youngstown*, 343 U.S. at 588-89 (Frankfurter, J. concurring).

If the courts want to reconsider the lines drawn in *Youngstown*, they are free to do so. But that reconsideration should be conducted carefully and before the Executive Branch redraws the lines on its own.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be granted.

Respectfully submitted.

LUTHER STRANGE
*Attorney General of Alabama*

MARK BRNOVICH
*Attorney General of Arizona*

DUSTIN MCDANIEL
*Attorney General of Arkansas*

PAMELA JO BONDI
*Attorney General of Florida*

SAMUEL S. OLENS
*Attorney General of Georgia*

LAWRENCE G. WASDEN
*Attorney General of Idaho*

JOSEPH C. CHAPELLE
PETER J. RUSTHOVEN
*Counsel for the State of Indiana*

DEREK SCHMIDT
*Attorney General of Kansas*

JAMES D. "BUDDY" CALDWELL
*Attorney General of Louisiana*

TIMOTHY C. FOX
*Attorney General of Montana*

JON C. BRUNING
*Attorney General of Nebraska*

WAYNE STENEHJEM
*Attorney General of North Dakota*

MICHAEL DEWINE
*Attorney General of Ohio*
ERIC E. MURPHY
*Co-counsel for the State of Ohio*

KEN PAXTON
*Attorney General of Texas*

CHARLES E. ROY
*First Assistant Attorney General*

JAMES D. BLACKLOCK

/s/ Andrew S. Oldham
ANDREW S. OLDHAM
*Deputy Solicitor General*
    Attorney-in-Charge
    State Bar No. 24081616

J. CAMPBELL BARKER
*Deputy Solicitor General*

ARTHUR C. D'ANDREA
*Assistant Solicitor General*

ANGELA V. COLMENERO
ADAM N. BITTER
*Assistant Attorneys General*

Office of the Attorney General of Texas
P.O. Box 78711
Austin, Texas 78711-2548
512-936-1700

(additional counsel on following page)

E. Scott Pruitt
*Attorney General of Oklahoma*

Alan Wilson
*Attorney General of South Carolina*

Marty J. Jackley
*Attorney General of South Dakota*

Sean D. Reyes
*Attorney General of Utah*

Patrick Morrisey
*Attorney General of West Virginia*

Brad D. Schimel
*Attorney General of Wisconsin*

Bill Schuette
*Attorney General for the People of
    Michigan*

Drew Snyder
*Counsel for the Governor of Mississippi*

Paul R. LePage
*Governor of Maine*

Robert C. Stephens
*Counsel for the Governor of North
    Carolina*

Tom C. Perry
Cally Younger
*Counsel for the Governor of Idaho*

## CERTIFICATE OF SERVICE

I certify that I served a copy of this pleading on the following counsel for the Defendants via this Court's CM/ECF system:

Adam Kirschner
Kyle R. Freeny
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7126
Washington, D.C. 20001

Daniel David Hu
U.S. Attorney's Office
1000 Louisiana, Suite 2300
Houston, Texas 77002

/s/ Andrew S. Oldham
ANDREW S. OLDHAM