# EXHIBIT 3

No. 13-16248

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

ARIZONA DREAM ACT COALITION et al.,

*Plaintiffs-Appellants*,

v.

JANICE K. BREWER et al.,

*Defendants-Appellees.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

———————————

**UNITED STATES' BRIEF AS AMICUS CURIAE
IN OPPOSITION TO REHEARING EN BANC**

———————————

JOYCE R. BRANDA
*Acting Assistant Attorney General*

JOHN S. LEONARDO
*United States Attorney*

BETH S. BRINKMANN
*Deputy Assistant Attorney General*

MARK B. STERN
LINDSEY POWELL
*(202) 616-5372*
*Attorneys, Appellate Staff*
*Civil Division, Room 7226*
*U.S. Department of Justice*
*950 Pennsylvania Ave., NW*
*Washington, DC 20530*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION AND SUMMARY ........................................................................... 1

STATEMENT ............................................................................................................... 3

1.     Federal Law ...................................................................................................... 3

2.     State Law ............................................................................................................ 5

3.     Procedural History ........................................................................................... 6

ARGUMENT ................................................................................................................ 8

       Arizona's Policy Is Preempted by Federal Law ........................................... 8

CONCLUSION ........................................................................................................... 17

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** **Page**

*Arizona v. United States,*
  132 S. Ct. 2492 (2012) .................................................................................. 3, 4, 9

*Chamber of Commerce of the U.S. v. Whiting,*
  131 S. Ct. 1968 (2011) ............................................................................... 3, 10, 11

*DeCanas v. Bica,*
  424 U.S. 351 (1976) ................................................................................... 10, 11, 13

*Hampton v. Mow Sun Wong,*
  426 U.S. 88 (1976) ................................................................................................ 9

*Lopez-Valenzuela v. Cnty. of Maricopa,*
  719 F.3d 1054 (9th Cir. 2013) .......................................................................... 10

*Mathews v. Diaz,*
  426 U.S. 67 (1976) ............................................................................................ 8, 9

*Plyler v. Doe,*
  457 U.S. 202 (1982) ........................................................................ 7, 8, 9, 11, 13

*Reno v. American-Arab Anti-Discrimination Comm.,*
  525 U.S. 471 (1999) ......................................................................................... 4, 9

*Toll v. Moreno,*
  458 U.S. 1 (1982) ................................................................................................ 9

*Vasquez de Alcantar v. Holder,*
  645 F.3d 1097 (9th Cir. 2011) .......................................................................... 14

**Statutes:**

8 U.S.C. § 1101 .................................................................................................... 3, 9

8 U.S.C. §§ 1151 *et seq.* ..................................................................................... 3, 9

8 U.S.C. §§ 1181 *et seq.* ................................................................. 3, 9

8 U.S.C. § 1227(a)(1)(A) ................................................................. 4

8 U.S.C. § 1227(a)(1)(C) ................................................................. 4

8 U.S.C. § 1182(a)(6) ................................................................. 4

8 U.S.C. § 1182(a)(7) ................................................................. 4

Immigration and Nationality Act,
   Pub. L. No. 82-414, 66 Stat. 163 ................................................. 3

REAL ID Act of 2005,
   Pub. L. No. 109-13, Div. B., § 202, 119 Stat. 231 .................... 11, 16

Ariz. Rev. Stat. Ann. § 28-3153(D) ................................... 1, 5, 12, 13

**Rule:**

Fed. R. App. P. 35(a) ................................................................. 3, 17

**Regulations:**

8 C.F.R. pt. 214 ................................................................. 3, 9

8 C.F.R. § 274a.12(a) ................................................................. 6

8 C.F.R. § 274a.12(a)(11) ................................................................. 6

8 C.F.R. § 274a.12(c) ................................................................. 6

8 C.F.R. § 274a.12(c)(9) ................................................................. 6

8 C.F.R. § 274a.12(c)(10) ................................................................. 6

8 C.F.R. § 274a.12(c)(14) ................................................................. 6

App. 0054

**Other Authorities:**

Ariz. Dep't of Transp. Policy 16.1.2 ..........................................................1, 5, 12

Arizona Executive Order 2012-06 ................................................................. 1, 6

Charles Gordon et al., *Immigration Law and Procedure* (1998) ............................................... 4

Memorandum from Secretary Napolitano, Exercising Prosecutorial
    Discretion with Respect to Individuals Who Came to the United States
    as Children, at 1 (June 15, 2012) .............................................................. 4, 5

USCIS Form I-821D, Consideration of Deferred Action for
    Childhood Arrivals, http://www.uscis.gov/sites/default/files/files
    /form/i-821dinstr.pdf................................................................................ 5

App. 0055

## INTRODUCTION AND SUMMARY

The United States submits this brief in response to the Court's order of August 1, 2014. For the reasons set out below, the government respectfully suggests that the panel's opinion does not merit rehearing en banc.

Arizona law prohibits the issuance of a driver's license to anyone "who does not submit proof satisfactory to the department [of transportation] that the applicant's presence in the United States is authorized under federal law." Ariz. Rev. Stat. Ann. § 28-3153(D). The Arizona Department of Transportation publishes a list of acceptable documentation for establishing presence "authorized under federal law." Ariz. Dep't of Transp. Policy 16.1.2. That list previously included all employment authorization documents issued by the federal government.

On August 15, 2012, Arizona Governor Janice Brewer issued an executive order barring the Arizona Department of Transportation from accepting certain federal employment authorization documents as evidence that an applicant's presence in the United States is authorized under federal law. Arizona Executive Order 2012-06. The order targets beneficiaries of the Deferred Action for Childhood Arrivals (DACA) policy, under which the U.S. Department of Homeland Security (DHS) exercises its enforcement discretion to provide deferred action to certain aliens who came to the United States as children. In light of the executive order, the Arizona Department of Transportation revised its policy so that it no longer accepts federal employment authorization documents issued to DACA recipients as proof of

App. 0056

authorized presence in the United States. During the pendency of this litigation, the

State further revised its policy to preclude the use of federal employment

authorization documents issued to any recipient of deferred action.

The Immigration and Nationality Act and its implementing regulations,

together with the enforcement authority and discretion committed to the Executive

Branch, provide a federal scheme for alien classification and enforcement. A State

may disagree with the federal government's enactment or implementation of federal

law—as Arizona has made clear it does. But a State may not respond to that

disagreement by conditioning eligibility for driver's licenses on its own notions of

"authorized presence" and distinguishing among holders of federal employment

authorization documents for that purpose, at least without a substantial state interest.

Although States have significant discretion in determining what documentation is

appropriate to establish eligibility for a driver's license, the reasons Arizona has given

for denying licenses to DACA recipients and other deferred action grantees do not

reflect substantial state interests in that area of traditional state regulation. The

absence of a substantial state purpose supporting the distinctions Arizona seeks to

draw indicates that its regulation of driver's licenses is a regulation of immigration and

thus preempted by federal law.

The United States is of the view that review by the full Court is unwarranted.

The panel reached the correct result, although the United States bases that conclusion

on preemption principles without addressing the question of equal protection. The

App. 0057

panel's holding does not conflict with decisions of the Supreme Court, this Court, or
any other court of appeals.  And the case does not present an issue warranting review
by the full Court.  *See* Fed. R. App. P. 35(a).  The interlocutory posture of the appeal
further weighs against en banc review.  The preemption and equal protection issues
can be more fully developed on proceedings on a permanent injunction, and the
district court can additionally consider the intervening revisions to the State's policy at
that time.

## STATEMENT

### 1.  Federal Law

The Immigration and Nationality Act (INA), Pub. L. No. 82-414, 66 Stat. 163,
as amended (codified at 8 U.S.C. §§ 1101 *et seq.*), "established a comprehensive federal
statutory scheme for regulation of immigration and naturalization and set the terms
and conditions of admission to the country and the subsequent treatment of aliens
lawfully in the country." *Chamber of Commerce of the U.S. v. Whiting*, 131 S. Ct. 1968,
1973 (2011) (internal quotation marks and citation omitted).  The INA provides a
detailed and complex scheme of alien classification.  *See, e.g.*, 8 U.S.C. §§ 1101, 1151 *et
seq.*, 1181 *et seq.*  Regulations further refining these classifications and enforcement
decisions by the Executive Branch are part of the federal scheme.  *See* 8 C.F.R. pt. 214
(establishing classifications); *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012) ("A
principal feature of the [INA's] removal system is the broad discretion exercised by

App. 0058

immigration officials."); *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 (1999) (same).

Under this scheme, aliens may be removed for having entered the country without authorization. *See* 8 U.S.C. §§ 1227(a)(1)(A) & (C), 1182(a)(6) & (7). "Federal officials . . . must decide whether it makes sense to pursue removal at all," and, "[i]f removal proceedings commence," whether to grant "discretionary relief allowing [the alien] to remain in the country or at least to leave without formal removal." *Arizona*, 132 S. Ct. at 2499. One way in which such discretion is exercised is through grants of deferred action, in which, on a case-by-case basis, the U.S. Department of Homeland Security may decline to institute removal proceedings, may terminate proceedings, or may decline to execute a final order of removal. *See American Arab Anti-Discrimination Comm.*, 525 U.S. at 483-84 (1999). The practice of making such determinations has a long history, *see id.* (citing 6 Charles Gordon et al., *Immigration Law and Procedure* § 72.03[2][h] (1998)), and such decisions are an integral part of the federal immigration framework, *Arizona*, 132 S. Ct. at 2499.

Pursuant to this authority, on June 15, 2012, DHS announced the Deferred Action for Childhood Arrivals policy, which directs DHS officials to consider, on a case-by-case basis, exercising discretion in favor of certain aliens who were brought to the United States as children and who have resided here for at least five years. *See* Memorandum from Secretary Napolitano, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children, at 1 (June 15,

App. 0059

2012). The Secretary's memorandum states that if the exercise of discretion with respect to a particular alien is appropriate, DHS officials should not initiate removal proceedings or should defer for a renewable period of two years any removal proceedings already initiated. *Id.* at 2. Qualifying aliens not already in removal proceedings may also apply for this deferred action status. *Id.* at 2-3. Individuals applying for deferred action under the DACA policy are also required to apply for federal employment authorization. *See* USCIS Form I-821D, Consideration of Deferred Action for Childhood Arrivals, http://www.uscis.gov/sites/default/files/files/form/i-821dinstr.pdf ("All individuals filing Form I-821D . . . must also file Form I-765, Application for Employment Authorization[.]").

### 2. State Law

Arizona law prohibits the issuance of a driver's license to anyone "who does not submit proof satisfactory to the department [of transportation] that the applicant's presence in the United States is authorized under federal law." Ariz. Rev. Stat. Ann. § 28-3153(D). A list published by the Arizona Department of Transportation identifies the documentation that it will accept as establishing authorized presence. Ariz. Dep't of Transp. Policy 16.1.2.

Prior to the announcement of the DACA policy, the Department's list of acceptable documents included all employment authorization documents issued by the federal government. *See* Slip op. 7. On August 15, 2012, the day the DACA policy took effect, Arizona Governor Janice Brewer issued an executive order

directing state agencies to bar DACA recipients from obtaining any public benefit or state identification. Arizona Executive Order 2012-06. Following the issuance of the executive order, the Arizona Department of Transportation announced that it would not accept federal employment authorization documents issued to DACA recipients as proof of authorized presence. *See id.* at 8. The Department subsequently revised it policy, *see id.* at 9-10, to preclude the use of federal employment authorization documents issued to other recipients of deferred action, *see* 8 C.F.R. § 274a.12(c)(14). The Department continues to accept as proof of authorized presence federal employment authorization documents issued to other aliens, including applicants for adjustment of status or cancellation of removal, *see id.* § 274a.12(c)(9)-(10).[1]

### 3. Procedural History

Plaintiffs filed suit in the U.S. District Court for the District of Arizona, urging that Arizona's policy of denying driver's licenses to DACA recipients is preempted by federal law and inconsistent with principles of equal protection. The district court denied plaintiffs' motion for a preliminary injunction, holding that plaintiffs were

---

[1] Eligibility for federal employment authorization documents is not limited to the above-referenced individuals. Many other aliens may apply for and obtain such documents, 8 C.F.R. § 274a.12(c), and some individuals are entitled to such documents as an incident to their immigration status, *id.* § 274a.12(a). Arizona continues to accept all federal employment authorization documents as proof of authorized presence except for those issued to recipients of deferred action or deferred enforced departure, *id.* § 274.12(a)(11).

6

likely to succeed on the merits of their equal protection claim but unlikely to suffer
irreparable harm if the policy remained in effect during the pendency of the litigation.

A unanimous panel of this Court reversed and remanded with instructions to
enter a preliminary injunction. The panel first suggested that plaintiffs could likely
prevail on their preemption claim if they could adequately develop the record. Slip
op. 13-15. It further held that Arizona's policy is likely inconsistent with principles of
equal protection because the State has offered no justification for treating DACA
recipients differently from similarly situated individuals with federal employment
authorization documents. *Id.* at 18-19. Relying on many of the same observations
that underlie a preemption analysis, the panel concluded that Arizona's policy could
not withstand review because there was no support in federal law for the State's
disparate treatment of similarly situated aliens. *Id.* at 21. Instead, Arizona had
"assume[d] for itself the federal prerogative of classifying noncitizens—despite the
fact that '[t]he States enjoy no power with respect to the classification of aliens.'" *Id.*
(quoting *Plyler v. Doe*, 457 U.S. 202, 225 (1982)). The panel also rejected the State's
other proffered grounds for denying driver's licenses to deferred action recipients,
holding that none served to explain the distinction drawn by the State. *Id.* at 23-25.
After further concluding that the likelihood of irreparable harm and other preliminary
injunction factors weighed in plaintiffs' favor, the Court held that plaintiffs were
entitled to a preliminary injunction. *Id.* at 26-28.

App. 0062

Judge Christen filed a concurring opinion stressing that, in her view, plaintiffs had already demonstrated a likelihood of success on their preemption claim. Slip op. 29. The concurrence observed that "Arizona's newly-crafted definition of 'authorized presence' is unmoored from and unsupported by federal law." *Id.* Arizona has thus "ventured into an area—the creation of immigration classifications—that is the exclusive domain of the federal government." *Id.* The panel majority indicated its agreement with the substance of this analysis. *See id.* at 16-17 n.3.

## ARGUMENT

### Arizona's Policy Is Preempted by Federal Law

The panel reached the correct result in this case. Although the United States bases that conclusion on preemption principles without addressing equal protection, much of the panel's equal protection analysis supports a holding for plaintiffs on their preemption claim. The district court will have the opportunity to consider the preemption and equal protection arguments further on proceedings on a permanent injunction. Accordingly, review by the full Court is not warranted at this time.

**A.** The federal government's exclusive authority to establish immigration classifications is not controverted. *See Plyler v. Doe*, 457 U.S. 202, 225 (1982); *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). That power is plainly "committed to the political branches of the Federal Government." *Plyler*, 457 U.S. at 225 (quoting *Mathews*, 426 U.S. at 81). Drawing upon its "plenary authority with respect to foreign relations and international commerce, and upon the inherent power of a sovereign to close its

8

borders, Congress has developed a complex scheme governing admission to our Nation and status within our borders." *Id.*; *see, e.g.*, 8 U.S.C. §§ 1101, 1151 *et seq.*, 1181 *et seq.* Regulations further refining these classifications, as well as enforcement decisions by the Executive Branch, are part of the federal scheme. *See* 8 C.F.R. pt. 214 (establishing classifications); *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012). The Executive Branch has long exercised its discretion to decline to pursue removal of particular aliens based on humanitarian concerns, resource constraints, and other policy considerations. *See Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 (1999).

While it is "'a routine and normally legitimate part' of the business of the Federal Government to classify on the basis of alien status, and to 'take into account the character of the relationship between the alien and this country,' only rarely are such matters relevant to legislation by a State." *Plyler*, 457 U.S. at 225 (quoting *Mathews*, 426 U.S. at 80, 85). As a general matter, "[t]he States enjoy no power with respect to the classification of aliens." *Id.*; *Toll v. Moreno*, 458 U.S. 1, 10 (1982) ("[O]ur cases have . . . been at pains to note the substantial limitations upon the authority of the States in making classifications based upon alienage."); *see also Hampton v. Mow Sun Wong*, 426 U.S. 88, 100 (1976) (recognizing the "overriding national interests which justify selective federal legislation that would be unacceptable for an individual State"). Accordingly, under the Supremacy Clause, States may not establish classifications that distinguish among aliens whom the federal government has treated similarly, or that

App. 0064

are not otherwise supported by federal law. *See Lopez-Valenzuela v. Cnty. of Maricopa*, 719 F.3d 1054, 1070-71 (9th Cir. 2013). Doing so effectively creates a new classification and intrudes on this exclusively federal prerogative.

It is of course not the case that "every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted" by the federal power to regulate immigration. *DeCanas v. Bica*, 424 U.S. 351, 355 (1976). "[S]tanding alone, the fact that aliens are the subject of a state statute does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *Id.* The States retain power to regulate in areas that do not directly bear on immigration, even when they touch on that subject or in the course of their administration borrow certain standards from the federal scheme.

When the Supreme Court has sustained state laws that indirectly bear upon immigration, it has emphasized that the statutes at issue incorporate existing federal classifications of alien status and do not create new ones. For example, in upholding an Arizona law that directed courts to suspend or revoke the business licenses of in-state employers that employ unauthorized aliens, the Court in *Chamber of Commerce of the United States v. Whiting*, 131 S. Ct. 1968, 1981 (2011), emphasized that the State had been careful to "ensur[e] that its law closely track[ed] IRCA's provisions in all material respects." As the Court observed, the licensing law at issue in that case "beg[an] by adopting the federal definition of who qualifies as an 'unauthorized alien.'" *Id.*; *see also*

**App. 0065**

*Phyler*, 457 U.S. at 226 (acknowledging that "[t]he State may borrow the federal classification."). In considering whether state regulations are preempted, the Supreme Court has also looked to the strength of the state interest being vindicated. *See, e.g.*, *DeCanas*, 424 U.S. at 356-57. A state law that serves a substantial state interest in an area of traditional state concern is less likely to encroach on federal immigration law.

**B.** States generally enjoy substantial leeway in setting policies for licensing drivers within their jurisdiction. The provision of state driver's licenses is not an area of "dominant federal concern," *Whiting*, 131 S. Ct. at 1983, and most state regulations of driver's licenses do not impinge on the implementation of federal law. This may be true even if a state licensing scheme distinguishes among classes of aliens, at least if the classifications are borrowed from federal law and further a substantial state purpose. *See id.* at 1981; *cf. Phyler*, 457 U.S. at 226. Indeed, federal law contemplates that States may take federal alien classifications into account in administering their licensing schemes. *See* REAL ID Act of 2005, Pub. L. No. 109-13, Div. B., § 202, 119 Stat. 231, 312 (49 U.S.C. § 30301 note).

Where, however, a State makes the operation of its licensing scheme depend on new alien classifications not supported by federal law, the preemption analysis is different. The broad authority States enjoy in regulating pursuant to their police power does not extend to the creation of alien classifications in furtherance of those interests. *Phyler*, 457 U.S. at 225 ("The States enjoy no power with respect to the classification of aliens."). Because the power to enact alien classifications is exclusive

11

App. 0066

to the federal government, even State laws relating to matters otherwise within the core of the police power will generally be preempted where they distinguish among aliens in ways inconsistent with federal law so as to effectively establish novel classifications.

Arizona has established classifications that find no support in federal law. As Judge Christen's concurrence observed, "Arizona did not merely *borrow* a federal immigration classification; it created a new one." Slip op. 29; *see id.* at 21. Arizona law prohibits the issuance of a driver's license or a nonoperating identification license to anyone "who does not submit proof satisfactory to the department that the applicant's presence in the United States is authorized under federal law." Ariz. Rev. Stat. Ann. § 28-3153(D). Although the state statute does not define what it means for an applicant's "presence" to be "authorized," Arizona Department of Transportation policy provides that federal employment authorization documents constitute "proof satisfactory" to establish such presence for some individuals but not for others. Ariz. Dep't of Transp. Policy 16.1.2. Since August 2012, the Department has not accepted employment authorization documents issued to DACA recipients as proof of authorized presence, even as it continues to accept employment authorization documents issued to other aliens, including applicants for adjustment of status or cancellation of removal, as proof sufficient to make the required showing. By drawing such distinctions, the State has impermissibly "assume[d] for itself the federal prerogative of classifying noncitizens." Slip op. 21.

App. 0067

The State has urged that its scheme merely incorporates federal law because its statute conditions eligibility for a license on a showing that an applicant's presence is "authorized *under federal law*." Ariz. Rev. Stat. Ann. § 28-3153(D) (emphasis added). Federal law does not, however, include a classification of persons with "authorized presence." Arizona has sought to give content to that concept by treating federal employment authorization documents, among other documentation, as sufficient evidence of "authorized presence." But by selectively incorporating aspects of federal law, Arizona has engaged in a "sub-classification of aliens lacking lawful status into two new groups," Slip op. 31 (Christen, J., concurring), and impermissibly intruded on the exclusive domain of the federal government to make and administer alien classifications.

**C.** In considering state laws that touch on immigration, courts also look to the strength of the state interest being vindicated. *See, e.g.*, *DeCanas*, 424 U.S. at 356-57. Where a State law serves a substantial state interest in an area of traditional state concern, a court is less likely to find that it encroaches on federal immigration law and its implementation by the Executive Branch. Accordingly, a State wishing to regulate in this area must identify a substantial state interest and show that its regulation is "reasonably adapted to the purposes for which the state desires to use it." *Phyler*, 457 U.S. at 226 (emphasis and internal quotation marks omitted). Arizona has failed to make that showing in this case.

App. 0068

There is no dispute that the State has granted tens of thousands of driver's licenses to aliens based on their provision of federal employment authorization documents. The State has failed to identify any reason why the same documents should not similarly suffice for plaintiffs. As the panel concluded, it is not apparent why, if such documents are sufficient to establish that some bearers are currently authorized to be present in the United States, they are not adequate to make that showing for all bearers. Slip op. 21.

The State endeavors to justify its distinction on the ground that individuals with pending applications for adjustment of status or cancellation of removal are "'on a path to lawful status,' while DACA recipients are not." Slip op. 20. But this proffered justification simply reflects another state judgment about the classification of aliens. As the panel observed, the State has not "defined 'a path to lawful status' in a meaningful way," *id.*, and certainly not in a way that finds support in federal law. Individuals with pending applications for adjustment of status or cancellation of removal "are not in the United States pursuant to any statutory provision while their applications are pending." *Id.* at 18. This Court has previously observed with regard to adjustment of status that "the submission of an application does not connote that the alien's immigration status has changed, as the very real possibility exists that the INS will deny the alien's application altogether." *Id.* (quoting *Vasquez de Alcantar v. Holder*, 645 F.3d 1097, 1103 (9th Cir. 2011)). Arizona has not explained how the potential for future relief relates to a current classification of "authorized presence."

14

App. 0069

The other bases for the distinction offered by the State similarly fail to demonstrate that the denial of driver's licenses to plaintiffs relates to a substantial state purpose and does not intrude on federal immigration law. Arizona has suggested that if the DACA policy were rescinded, it might be necessary for the State to revoke driver's licenses issued to DACA recipients. The State further urges that if these individuals were subsequently removed from the country, persons injured by their conduct might be left without recourse. But, as the panel concluded, that logic applies with equal force to individuals with pending applications for adjustment of status or cancellation of removal, whose applications may be denied at any time, and yet the State has determined to provide licenses to such individuals if they can present federal employment authorization documents. Slip op. 23-24.

Other explanations offered by the State are at odds with the record. For example, although Arizona expressed concern that DACA recipients may use a driver's license to improperly access state benefits for which they are ineligible, state officials admitted that they have no basis for believing that might happen. Slip op. 23. Similarly, there is no apparent basis for the State's assertion that issuing licenses to DACA recipients might expose the State to legal liability for 80,000 unauthorized immigrant drivers. The State has not identified what the basis for legal liability would be. Although the State has already issued approximately 47,500 licenses to holders of federal employment authorization documents, it has not identified a single instance in which it has faced liability for issuing a license to a noncitizen. *Id.* In addition, the

**App. 0070**

reference to "80,000" is significantly at variance with the fact that fewer than 15,000 Arizonans had applied for deferred action under the DACA policy at the time of the panel's decision. *Id.*

The foregoing suggests that Arizona's policy is motivated by disagreement with federal immigration policy. This is not a legitimate state interest. Arizona may not substitute its judgment for the federal government's when it comes to establishing classifications of alien status. This is all the more true in these circumstances, where Congress, through the REAL ID Act, has expressed its judgment that "approved deferred action status" is "lawful status" that affords a period of "authorized stay" for purposes of issuing identification. The Act establishes minimum standards for participating States to adopt in order for state-issued driver's licenses to satisfy federal security criteria. Under the Act, approved deferred action status is listed among the "lawful status[es]" for which participating States may issue licenses. Pub. L. No. 109-13, Div. B., § 202(c)(2)(B) (capitalization omitted). The Act additionally provides that, for individuals with temporary status, like deferred action grantees, States should issue a temporary license that "shall be valid only during the period of time of the applicant's *authorized stay* in the United States." *Id.* § 202(c)(2)(C)(ii) (emphasis added). That States are not required to participate in this program does not detract from Congress's judgment for these purposes that deferred action recipients are "authorized" to stay in the United States for the period of the deferral. Under these circumstances, a State must at the very least advance a substantial justification in an

**App. 0071**

area of traditional state concern in order to justify classifications different from those

proposed by Congress. Arizona has not done so here.

In sum, the result reached by the panel is correct; its holding does not conflict

with any decision of the Supreme Court, this Court, or another court of appeals; and

the case does not present an issue warranting review by the full Court. The petition

for rehearing en banc therefore should be denied. *See* Fed. R. App. P. 35(a).

## CONCLUSION

For the foregoing reasons, the full Court should not rehear this case.

Respectfully submitted,

JOYCE R. BRANDA
  *Acting Assistant Attorney General*

JOHN S. LEONARDO
  *United States Attorney*

BETH S. BRINKMANN
  *Deputy Assistant Attorney General*

MARK B. STERN
s/ Lindsey Powell
LINDSEY POWELL
  *(202) 616-5372*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7226*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., NW*
  *Washington, DC 20530*

SEPTEMBER 2014

17

**App. 0072**

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief for the United States as Amicus Curiae

contains 4,158 words according to the count of this office's word processing system.


s/ Lindsey Powell
LINDSEY POWELL
Counsel for the United States

# CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2014, I filed the foregoing by causing a digital version to be filed electronically via the CM/ECF system. Counsel will be automatically served by the CM/ECF system.

s/ Lindsey Powell
LINDSEY POWELL
Counsel for the United States

App. 0074