# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STATE OF TEXAS, et al.,

    Plaintiffs,

v.                                    Case No. 1:14-cv-00254

UNITED STATES OF AMERICA, et al.,

    Defendants.

DECLARATION OF PATRICK A. FERNAN

STATE OF WISCONSIN    )
                      ) ss.
COUNTY OF DANE        )

I, Patrick A. Fernan, have personal knowledge of the following facts and declare:

1. I am the Administrator of the Wisconsin Department of Transportation ("WisDOT"), Division of Motor Vehicles ("DMV"). WisDOT is an administrative agency within the executive branch of the State of Wisconsin government responsible for providing a broad array of transportation services. The DMV is one of five divisions within WisDOT and is responsible for, among other things, instituting a classified driver license system that meets all federal standards under 49 U.S.C. §§ 30304(e) and

1

31301 to 31317 and 49 C.F.R. pts. 383 and 384, issuing operator's licenses to Wisconsin residents in accordance with federal and state laws, and issuing identification cards to Wisconsin residents in accordance with state laws.

2. I have held the DMV Administrator position since July 2013. The DMV Administrator position is an appointed position that provides leadership for approximately 770 DMV employees who work at approximately 92 locations throughout Wisconsin. DMV offers in-person, telephone, mail, internet, and third-party services relating to driver licensing, identification cards, vehicle title and registration, emissions testing, consumer protection, fraud prevention, and other related activities. The DMV Administrator directly supervises one Deputy Administrator and three Bureau Directors, along with other staff.

3. Before assuming my role as the DMV Administrator in July 2013, I held the DMV Deputy Administrator position since June 2007. In this position, I was responsible for administering, directing, planning, and coordinating the programs, policies, laws, rules, and activities of the DMV. I assumed the responsibilities and full authority of the then-serving the DMV Administrator in the DMV Administrator's absence.

4. I have held other positions in the DMV since February 2005.

5. In Wisconsin, operator's licenses and identification cards are available to all individuals who meet certain eligibility requirements. These requirements vary by product and are available at www.wisconsindmv.gov.

6. Currently, approximately 4,000,000 individuals hold an unexpired operator's license, and approximately 400,000 individuals hold an unexpired identification card. Most products the DMV issues are valid for eight years, and, as such, the DMV issues approximately 550,000 renewal products each year. The DMV issues approximately a total of 1,000,000 original and duplicate operator's licenses and identification cards annually, including instruction permits, probationary licenses, original Wisconsin licenses, duplicates and other products in addition to the renewal products.

7. Pursuant to Wis. Stat. § 343.14(2)(intro.), every application for an operator's license or an identification card must contain documentary proof establishing that the applicant is legally present in the United States.

8. Pursuant to Wis. Stat. § 343.14(2)(es)6., an applicant is authorized to submit, and the DMV is authorized to accept, documentary proof that the applicant has approved deferred action status to establish that the applicant is legally present in the United States.

9. On June 15, 2012, the Secretary of the United States Department of Homeland Security issued a memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United

3

States as Children" to the United States Customs and Border Protection, the United States Citizenship and Immigration Services, and the United States Immigration and Customs Enforcement. This memorandum is available at www.uscis.gov/childhoodarrivals.

10. This memorandum announced a policy known as "Deferred Action for Childhood Arrivals" ("DACA"), which sets forth a number of criteria the memorandum's recipients should consider when deciding whether to exercise prosecutorial discretion to defer removal action against a certain class of individuals who are unlawfully present in the United States.

11. This class comprises individuals who have: (1) arrived in the United States before age sixteen; (2) continuously resided in the United States for at least five years prior to June 15, 2012; (3) are current students, high school graduates, or recipients of a general education development certificate; (4) have not been convicted of a felony, significant misdemeanor, multiple misdemeanors, or otherwise pose a threat to national security or public safety; and (5) are not above age 30.

12. On October 4, 2012, in response to WisDOT's request, the Attorney General of Wisconsin issued a formal opinion to WisDOT concluding that a notice of deferred action status issued pursuant to the DACA policy constitutes satisfactory proof of legal presence under the predecessor to Wis. Stat. § 343.14(2)(es)6. The formal opinion further concluded that any

4

operator's license or identification card obtained with a notice of deferred action status issued pursuant to the DACA policy would expire two years from the date when the notice was issued, even if the product would otherwise last for a longer time period.

13. On January 15, 2013, in response to the formal opinion, the DMV created a unique code for operator's licenses and identification cards obtained with a notice of deferred action status issued pursuant to the DACA policy. The DMV determines whether an applicant is legally present in the United States when that applicant indicates on his or her application that they are not a United States citizen but rather a permanent or conditional resident. For all non-United States citizens, the DMV verifies legal presence status with the United States government using the Systematic Alien Verification of Entitlements ("SAVE") system. Each SAVE verification costs the State of Wisconsin $0.50. If the applicant's legal presence status is verified, SAVE provides a match code. There are match codes associated with a variety of legal presence statuses, including the DACA policy.

14. Between January 15, 2013, when the DMV created the unique DACA policy code, and December 12, 2014 (the "Relevant Period"), the DMV issued 5,053 customers providing a notice of deferred action status issued pursuant to the DACA policy a total of 11,860 operator's licenses and

App. 0796

identification cards. During the Relevant Period, the DMV issued a total of approximately 2,032,000 operator's licenses and identification cards.

15. Thus, customers obtaining an operator's license or identification card with a notice of deferred action status issued pursuant to the DACA policy account for approximately 0.58% of all customers obtaining an operator's license or identification card during the Relevant Period ("0.58% DACA Percentage").

16. I am aware of President Obama's recent executive action authorizing the lawful presence of certain undocumented immigrants currently in the United States as an expansion of the existing DACA policy ("Expanded DACA Policy"). My understanding is that the Expanded DACA Policy may extend to more than four (4) million people throughout the United States. Based on these estimates, DMV anticipates an increase in operation and administrative costs to support the implementation of the Expanded DACA Policy. DMV's revenues and costs generated pursuant to the current DACA policy are described in greater detail below; however, the revenues and costs discussed below do not include any forecast or other estimated amount that would account for additional revenues and costs incurred pursuant to the Expanded DACA Policy.

17. The DMV's total revenue for issuance of operator's licenses and identification cards in fiscal year 2014 is approximately $27,900,000.

18. The amount of annual revenue for issuance of operator's licenses and identification cards issued to customers providing a notice of deferred action status issued pursuant to the current DACA policy is approximately $161,820.00. DMV derived this amount by multiplying the total amount of annual revenue for issuance of operator's licenses and identification cards ($27,900,000) by the 0.58% DACA Percentage.

19. The DMV's expenditures on operator's license and identification card programs are projected for fiscal year 2015 to be approximately $33,500,000 ("Annual Expenditures").

20. The total Annual Expenditures for services rendered to customers providing a notice of deferred action status issued pursuant to the current DACA policy is approximately $194,300.00. The DMV derived this amount by multiplying the total amount of DMV Annual Expenditures ($33,500,000) by the 0.58% DACA Percentage.

21. The net annual loss for fiscal year 2015 for operator's license and identification card programs is projected to be approximately $5,600,000.00 ("Net Annual Loss"). The DMV derived this amount by subtracting the total amount of Annual Expenditures ($33,500,000) from the total amount of revenues ($27,900,000).

22. The anticipated amount of Net Annual Loss attributable to the number of operator's licenses and identification cards issued to customers

providing a notice of deferred action status issued pursuant to the current DACA policy is approximately $32,480.00. The DMV derived this number by multiplying the total amount of Net Annual Loss ($5,600,000.00) for fiscal year 2015 by the 0.58% DACA Percentage.

23. In addition to the Annual Expenditures cited above, additional costs associated with the DMV's operator's license and identification card programs include services and support from the four (4) other WisDOT Divisions and the Executive Offices: (1) Division of Transportation System Development; (2) Division of Transportation Investment Management; (3) Division of State Patrol; (4) Division of Business Management; and (5) the Executive Offices, which include the Secretary's Office, Office of Policy, Finance and Information, Office of General Counsel, Office of Public Affairs (collectively, the "Divisions"). These costs include, but are not limited to: (1) salary and fringe benefits of certain full-time WisDOT employees working exclusively on DMV operations; (2) salary and fringe benefits of certain full-time WisDOT employees working on DMV operations as a part of their work duties; (3) warehouse and other storage costs; and (4) freight costs. These costs are collectively referred to herein as "Identifiable Division Costs".

24. The Identifiable Division Costs attributable to the operator's license and identification card programs totaled approximately $3,410,516.00 for the fiscal year 2014.

25. The Identifiable Division Costs attributable to customers providing a notice of deferred action status issued pursuant to the current DACA policy is approximately $9,890.00. The DMV derived this number by multiplying the total amount of Identifiable Division Costs by the .58% DACA Percentage.

26. WisDOT annually spends approximately $2,718,939.00 for the operation of its approximately 92 service centers throughout Wisconsin and central office operations in costs attributable to operator's license and identification card programs ("Facility Costs"). The Facility Costs include costs for rent, maintenance, telephone and cable services.

27. The Facility Costs attributable to servicing customers that provide a notice of deferred action status issued pursuant to the current DACA policy is approximately $15,770.00. The DMV derived this number by multiplying the total amount of Facility Costs by the .58% DACA Percentage.

28. WisDOT annually spends an indeterminate amount on additional DMV operational costs attributable to operator's license and identification card programs, including, but not limited to: (1) human resource services; (2) training of DMV staff in general programming; (3) training of DMV staff in specialized areas (such as a new process for the Expanded DACA Policy or emergency medical training); (4) employee assistance program; (5) affirmative action/equal opportunity employment programs; (6) payroll and

App. 0800

benefit coordination; (7) worker's compensation and risk management; (8) fiscal services; (9) procurement services and support; forms and publication costs; (10) office space costs for other DMV staff and administrators within WisDOT's central office located in Madison, Wisconsin; (11) IT operation costs and equipment costs that support all of DMV's functions, programs and services, including those at its approximately 92 service centers and online; (12) supply costs, such as office supplies, janitorial supplies, furniture and other fixtures; and (13) all other costs incurred by WisDOT relating to the operation and administration of the DMV within WisDOT that are not Identifiable Division Costs and not otherwise reflected herein.

29. In sum, total annual net loss to the DMV attributable to operator's license and identification card programs, and that is attributable to customers providing a notice of deferred action status issued pursuant to the current DACA policy is approximately $58,140.00 ("Annual Total Loss Amount").

30. The DMV derived the Annual Total Loss Amount by adding: (1) the Annual Net Loss attributable to the DACA policy; (2) Identifiable Division Costs attributable to the DACA Policy; and (3) the Facility Costs attributable to the DACA policy.

31. The Annual Total Loss Amount does not include the indeterminate costs set forth in Paragraph 28 above.

32. The Annual Total Loss Amount does not include any anticipated, additional costs resulting from the Expanded DACA Policy. Any additional costs resulting from an Expanded DACA Policy are indeterminable at this time; however, upon any DMV or WisDOT action pursuant to the Expanded DACA Policy, WisDOT will incur an additional loss given that the current DACA policy already results in a loss to WisDOT.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 23, 2014.

Patrick A. Fernan