# EXHIBIT 27

App. 0894

Print    Close

"President Obama's Executive Overreach on Immigration"

Witnesses: Ronald Rotunda, Doy and Hee Henley Chair and Distinguished Professor of Jurisprudence, Chapman University, Dale E. Fowler School of Law; Jay Sekulow, Chief Counsel, American Center for Law and Justice; Thomas H. Dupree Jr., Partner, Gibson, Dunn & Crutcher LLP; Marielena Hincapie, Executive Director, National Immigration Law Center

Location: 2141 Rayburn House Office Building, Washington, D.C.

Time: 1:00 pm America/New_York, Date: Tuesday, December 2nd, 2014

Copyright © 2014 by Federal News Service, LLC, 1120 G Street NW, Suite 990, Washington, DC 20005-3801 USA. Federal News Service is a private firm not affiliated with the federal government. No portion of this transcript may be copied, sold or retransmitted without the written authority of Federal News Service, LLC. Copyright is not claimed as to any part of the original work prepared by a United States government officer or employee as a part of that person's official duties. For information on subscribing to the FNS Transcripts Database or any other FNS product, please email info@fednews.com or call 1-202-347-1400.

**REPRESENTATIVE ROBERT GOODLATTE (R-VA):** (Sounds gavel.) Good afternoon. This hearing of the Judiciary Committee will come to order. Without objection, the chair is authorized to declare recesses at -- of the committee at any time. We welcome everyone to this morning's hearing on "President Obama's Executive Overreach on Immigration."

And I will begin by recognizing myself for an opening statement, but I also want to point out to the members and to the audience in attendance today you're all welcome to be here, but Rule 11 of the House Rules provides that the chairman of the committee may punish breaches of order and decorum by censure and exclusion from the hearing.

President Obama has just announced one of the biggest constitutional power grabs ever by a president. He has declared unilaterally that, by his own estimation, almost 5 million unlawful immigrants will be free from the legal consequences of their lawless actions.

Not only that, he will, in addition, bestow upon them gifts such as work authorization and other immigration benefits. This, despite the fact that President Obama has stated over 20 times in the past that he doesn't have the constitutional power on his own and has repeatedly stated that I'm not a king.

We'll now ask that the video be rolled.

(Videotaped segment begins.)

**PRESIDENT BARACK OBAMA:** The notion that I can just suspend deportations through executive order, that's just not the case because there are laws on the books that Congress has passed. There are enough laws on the books by Congress that are very clear in terms of how we have to enforce our immigration system that, for me to simply, through executive order, ignore those congressional mandates would not conform with my appropriate role as president.

App. 0895

I can't solve this problem by myself. We're going to have to have bipartisan support in order to make it happen.

We're also a nation of laws. That's part of our tradition. And so the easy way out is to try to yell and pretend like I can do something by violating our laws.

I can't simply ignore laws that are out there. I've got to work to make sure that they are changed.

I know some here wish that I could just bypass Congress and change the law myself. (Applause.) But that's not how democracy works. See, democracy is hard, but it's right. Changing our laws means doing the hard work changing minds and changing votes one by one.

Sometimes when I talk to immigration advocates, you know, they wish I could just bypass Congress and change the law myself. But that's not how democracy works.

I swore an oath to uphold the laws on the books.

Now, I know some people want me to bypass Congress and change the laws on my own. Believe me, the idea of doing things on my own is very tempting. (Laughter.) I promise you. Not just -- not just on immigration reform. (Laughter.) But that's not how -- that's not how our system works. That's not how our democracy functions. That's not how our Constitution is written.

The problem is is that, you know, I'm the president of the United States. I'm not the emperor of the United States. My job is to execute laws that are passed. And Congress, right now, has not changed what I consider to be a broken immigration system. And what that means is is that we have certain obligations to enforce the laws that are in place even if we think that, in many cases, the results may be tragic.

We are a nation of immigrants, but we're also a nation of laws. So what I've said is we need to fix a broken immigration system. And I've done everything that I can on my own.

What I have been able to do is to make a legal argument that I think is absolutely right, which is that, given the resources we have, we can't do everything that Congress has asked us to do. What we can do is then carve out the DREAM Act folks saying young people who have basically grown up here are Americans that we should welcome. But if we start broadening that, then essentially I would be ignoring the law in a way that I think would be very difficult to defend legally. So that's not an option.

(Videotaped segment ends.)

**REP. GOODLATTE:** As The Washington Post's own fact-checker concluded, quote, "Apparently, he's changed his mind." President Obama admitted last week that "I just took an action to change the law," end quote, and I should add a jeweled crown worthy of King James of England, who precipitated the glorious revolution by dispensing with the laws passed by parliament.

The Constitution is clear. It is Congress' duty to write our nation's laws. And once they are enacted, it is the president's responsibility to enforce them. Article II, Section III of the Constitution requires the president to take care that the laws be faithfully executed.

President Obama wants a special pathway to citizenship for 11 million unlawful immigrants and without any assurance that our nation's immigration laws will be enforced in the future, and he is upset that Congress won't change America's immigration laws to his liking. Thus he has decided to act unconstitutionally under the guise of prosecutorial discretion.

While law enforcement agencies do have the inherent power to exercise prosecutorial discretion, the authority as to whether to enforce or not enforce the law against particular individuals, this power must be judiciously used.

Clinton administration INS commissioner, Doris Meissner, told her agency that prosecutorial discretion is a powerful tool that must be used responsibly and that exercising prosecutorial discretion does not lessen the INS' commitment to enforce the immigration laws to the best of our ability.

It is not an invitation to violate or ignore the law. Even President Obama's Department of Homeland Security Secretary Jeh Johnson has admitted to the committee that there are limits to the power of prosecutorial discretion and that there comes a point when something amounts to a wholesale abandonment to enforce a dually enacted constitutional law that is beyond simple prosecutorial discretion.

The Obama administration has crossed the line from any justifiable use of identity authority to a clear violation of his constitutional responsibility to faithfully execute the laws.

There is a difference between setting priorities, focusing more resources on those case deemed more serious and setting enforcement -- and setting enforcement-free zones for millions of unlawful aliens.

By boldly proclaiming that there will be no possibility of removal for millions of unlawful aliens, President Obama eliminates entirely any deterrent effect our immigration laws have. He states plainly that those laws can be ignored with impunity. Such actions will entice others around the world to come here illegally, just like his Deferred Action for Childhood Arrivals program encouraged tens of thousands of unaccompanied alien minors and families from Central America to make the dangerous trek to the United States.

The president relies on a memo prepared by his Justice Department's office of legal counsel to proclaim that his actions are constitutional, but that very memo finds that, quote, "Immigration officials' discretion in enforcing the laws is not unlimited. Limits on enforcement discretion are both implicit in and fundamental to the Constitution's allocation of governmental powers between the two political branches," end quote.

The memo admits that "The executive cannot, under the guise of exercising enforcement discretion, attempt to effectively rewrite the laws to match its policy preferences," end quote. And the memo quotes the Supreme Court's Heckler versus Cheney decision in stating that the executive branch cannot, quote, "consciously and expressly adopt a general policy that is so extreme as to amount to an abdication of its statutory responsibilities," end quote.

The memo, in fact, is an indictment of President Obama's actions. The president also mistakenly claims that his actions are nothing new. It is true that previous presidents of both parties have provided immigration relief to groups of aliens, sometimes themselves abusing the power of prosecutorial discretion. However, usually, the actions were based on emergencies in foreign countries, thereby relying upon the broad constitutional power given to a president to conduct foreign affairs.

App. 0897

For example, Chinese students were protected from deportation after the Tiananmen Square massacre in 1989. And Haitian orphans who were in the process of being adopted by U.S. citizens before the devastating Haitian earthquake of 2010 were granted humanitarian parole to come to the U.S.

What about President George H.W. Bush's family fairness policy which the White House cites to justify his power grab? Size and scope matter, and only about 80,000 aliens applied for that program.

As to the White House's claim that it covered more than 1.5 million aliens, The Washington Post's fact-checker concluded that, quote, "The 1.5 million figure is too fishy to be cited by either the White House or the media. Indeed, the 100,000 estimate that the INS gave on the day of the announcement might have been optimistic." The Washington Post assigned the White House claims three Pinocchios.

Without any crisis in a foreign country to justify his actions and in granting deferred action to a totally unprecedented number of aliens, President Obama has clearly exceeded his constitutional authority. No president has so abused and misused the power of prosecutorial discretion as has President Obama.

By acting lawlessly and assuming legislative power, the Obama administration is driving full speed ahead to a constitutional crisis, tilting the scales of our three-branch government in his favor and threatening to unravel our system of checks and balances.

President Obama has entered the realm of rewriting the laws when he can't convince Congress to change them to match his personal tastes.

As law professor David Rubenstein has written, the more broadly or generally a systematic policy applies, the more it takes on the hue of law. Rather than working constructively with the new men and women Americans elected to represent them in Congress, the president is making his relationship with Congress increasingly toxic by unconstitutionally acting on his own.

Tragically, President Obama's short-sighted actions have further set back congressional efforts to enact legislation to reform our broken immigration system. I look forward to today's hearing and the testimony of our eminent witnesses.

And now I am pleased to yield to the gentleman from Michigan, the ranking member of the committee, Mr. Conyers, for his opening statement.

**REPRESENTATIVE JOHN CONYERS (D-MI):** Thank you. Ladies and gentlemen --

**AUDIENCE MEMBER:** (Off mic.)

**REP. GOODLATTE:** (Sounds gavel.) Presently, we do not have order in the hearing room. Members of the audience must behave in an orderly fashion or else they will be removed from the hearing room. The Capitol Police will remove the disruptive members from the audience immediately.

**AUDIENCE MEMBER:** (Off mic.)

**REP. GOODLATTE:** The Capitol Police will remove the members of the audience from the hearing room.

(Audio break) -- the gentleman from Michigan for the interruption, but he is now advised to proceed with his opening statement without penalty for the delay.

**REP. CONYERS:** Mr. Chairman and members of the committee and those who have joined us here this afternoon in the House Judiciary Committee, I would respectfully disagree with a number of assertions by our chairman, Mr. Goodlatte. President Obama did not change the law, he acted within the law consistent with the Constitution and past presidents.

Now, I have not noticed that there were many Constitutional law professors on the committee, and I am certain that, when President Obama decided two weeks ago to use his authority under existing law to do what he can to fix our broken immigration system, I could have not been more pleased.

I defy any of my colleagues on this committee or anyone in Congress to tell me our immigration system is not broken. We know that it is. But I am disappointed that this Congress, like a number of them before it, has done nothing to fix the problem.

Republican leaders in the House won't allow us to vote on a bipartisan bill, S. 744, that passed the Senate last year with 68 votes out of 100. This committee has marked up a series of bills, each one of them less palatable than the next but hasn't even reported them to the floor. And so I would urge that you consider that the only bills that we've seen on the floor would have deported DREAMers and the parents of United States children, denied basic protections to children fleeing violence and persecution.

Now, faced with this congressional inaction, the president of the United States decided it was time to take action. The president's reforms will help to secure the border, focus our resources on deporting felons, not families, and require undocumented immigrants to pass a criminal background check and pay for their fair share of taxes in order to register for temporary protection from deportation.

Now, these actions will keep millions of families with United States citizen children from being torn apart, families led by hardworking mothers and fathers.

And finally, these actions are not only inappropriate -- are not only appropriate but they are lawful. There's a great deal of information available publicly to support the president.

On November 20, 11 prominent legal scholars wrote a letter explaining the president's action. Quote -- explaining that the president's actions are within the power of the executive branch and that they represent a lawful exercise of the president's authority. I ask unanimous consent to include that in the record.

**REP. GOODLATTE:** Without objection, it will be made a part of the record.

**REP. CONYERS:** Thank you.

The letter was signed by a former head of the Department of Justice Office of Legal Counsel and a person who worked in the Solicitor General's office. It was signed by liberal professors like Laurence Tribe and conservative professors like Eric Posner. Five days later, 135 immigration law professors echoed that conclusion and provided substantial constitutional, statutory and regulatory authority for these actions.

That letter also reviews the historical precedent that support the president's move. And I ask unanimous

App. 0899

consent that the letter from 135 investigative -- immigration professors be included in the record.

**REP. GOODLATTE:** Without objection, it will be made a part of the record.

**REP. CONYERS:** Thank you.

As people who were once charged with providing legal counsel to the government on this precise question, they write that, quote, "We have all studied the relevant legal parameters and wish to express our collective view that the president's actions are well within his legal authority," end quotation.

And, of course, the administration requested a formal opinion by the Office of Legal Counsel and made the document public nearly two weeks ago. And I ask unanimous consent to include in the record the office of legal counsel opinion.

**REP. GOODLATTE:** Without objection, it will be made a part of the record.

**REP. CONYERS:** I thank you again.

And, of course, the administration requested a formal -- a formal opinion by the Office of Legal Counsel and made this document public nearly two weeks ago.

Now, I know that many members on the other side of the aisle are not pleased about the president's decision. We continue to hear calls for shutting down the government. Some have even talked about censuring the president or suing the president or even worse.

But it seems to me, ladies and gentlemen, that the majority now has a choice. They can do what we were elected to do. They can come to the table and work to pass a real immigration reform bill. They can hold a vote. And that is exactly what I am prepared to do today.

I thank the chairman for his tolerance, and I yield back any time that may be remaining.

**REP. GOODLATTE:** The chair thanks the gentleman and now recognizes the gentleman from Texas, Mr. Smith, for his opening statement.

**REPRESENTATIVE LAMAR SMITH (R-TX):** OK. Thank you, Mr. Chairman. I also want to thank Mr. Gowdy, the gentleman from South Carolina, for yielding me his time.

(Audience members shouting.)

**REP. GOODLATTE:** (Sounds gavel.) The committee is not in order. The Capital Police will remove the disruptive member from the audience immediately.

(Audience members shouting.)

**REP. GOODLATTE:** You may leave now, and the Capitol Police will escort you out as soon as they return. The gentleman from Texas is recognized.

**REP. SMITH:** Thank you, Mr. Chairman.

Before he took office, President Obama swore an oath to, quote, "preserve, protect and defend the Constitution of the United States," yet he is now taking executive action to legalize millions of illegal immigrants all on his own contrary to the Constitution.

President Obama should remember his oath of office to uphold all laws, including immigration laws. This administration is undermining the separation of legislative and executive powers that our founders wrote into the Constitution to prevent tyranny. And President Obama is violating the Constitution, which explicitly reserves immigration policy for Congress.

Article 1, Section 8, Clause 4 of the Constitution provides that Congress shall have power to, quote, "establish a uniform rule of naturalization." The Supreme Court has long found that this provision of the Constitution grants Congress full power over immigration policy.

In addition, by suspending the enforcement of our immigration laws against nearly half the illegal immigrants in the United States, President Obama is violating his constitutional obligation to take care that the laws be faithfully executed.

President Obama previously described the limitations that the Constitution places on his role as president. He has explicitly stated many times, as the chairman noted, that he does not have the power to grant executive amnesty without the authorization of Congress.

For instance, on March 28th, 2011, he stated that, with respect to the notion that I can just suspend deportations through executive order, that's just not the case because there are laws on the books that Congress has passed. The executive branch's job is to enforce and implement those laws.

And constitutional scholars agree. Constitutional law professor John Hill of the Indiana University School of Law writes that, quote, "There is a word for the president's plan to issue an executive order granting residency status for up to 5 million undocumented aliens now living in the U.S. Unconstitutional. This is unquestionably lawmaking. President Obama has now apparently forgotten what any first-year law student understands, that the president cannot make a law without the consent of both houses of Congress.

Constitutional law professor Josh Blackman of the South Texas College of Law writes: It cannot be the rule of law that the president can create arbitrary criteria of where the law will not apply and then exempt anyone who meets those criteria. This is the very type of a broad policy against enforcement that is so extreme as to amount to an abdication of the president's statutory responsibilities.

And the American people themselves are opposed to President Obama's latest executive amnesty. Despite the heavy media bias in favor of amnesty, a recent NBC News-Wall Street Journal poll found that Americans oppose his executive amnesty by 48 percent to 38 percent.

The American people know the president's executive amnesty grants work permits to millions of illegal immigrants which hurts many hardworking Americans who struggle to find full-time work and good-paying jobs.

The Obama administration has placed the interest of illegal immigrants above the need of millions of

App. 0901

unemployed and underemployed Americans. This amounts to a declaration of war against American workers.

The Constitution is not a technicality. It is a document that has preserved our freedoms for more than two centuries. Every American should be very concerned about President Obama's violating the Constitution and not enforcing the laws of our nation.

Thank you, Mr. Chairman. I'll yield back.

**REP. GOODLATTE:** The chair thanks the gentleman and is pleased to recognize the ranking member of the Subcommittee on Immigration and Border Security, the gentlewoman from California, Ms. Lofgren, for her opening statement.

**REPRESENTATIVE ZOE LOFGREN (D-CA):** Thank you, Mr. Chairman.

When President Obama spoke from the East Wing of the White House two weeks ago about the steps he would take to improve our broken immigration system, he was responding to loud and sustained calls for action from people all over the country. He can't change the law, but he can take certain actions within the law.

The president recognized what we all know: our immigration system is badly broken. Millions of families face the threat of separation by deportation every day, parents from children, husbands from wives. Entrepreneurs and highly skilled immigrants from around the world want to drive innovation and create jobs and opportunities here but, instead, we erect barriers and make them go elsewhere to create their company.

Farmers rely on the work of undocumented immigrants to support their industry. We all rely on their food. I was thinking with my family at Thanksgiving how much we have to be grateful for, but I am not grateful that the farm workers who put that food on our table are living in fear.

Now, before I entered public service, I practiced and taught immigration law. And throughout my 20 years in Congress, I have worked across the aisle to enact sensible immigration reforms. And we've come close several times.

In 2006, the Senate passed a bipartisan bill but the House Republicans squandered the opportunity to close the deal and, instead, passed an enforcement-only bill.

Last year, the Senate again passed a bipartisan immigration reform bill that brought historic adversaries, the Chamber and the AFL-CIO, growers and farm workers, everybody together with a 68 vote in the Senate. And, again, we did nothing with that opportunity here on the House side.

In fact, I was part of our own group of eight here in the House where we tried to craft a bipartisan House bill. And we did actually write a bill, but in the end, we were unable to move forward. So it was only in the face of congressional inaction that the president decided to do something. He recognized there are costs to doing nothing, and he look for opportunities that's permitted in current law to avoid some of the costs.

There are many things the president can't do to fix our immigration system, and nothing the president did either alleviates the need for legislative action or prevents Congress from acting.

Now, the focus of the president's legal authority is allegedly the topic of this hearing. And I think it's important to remember that the president announced reforms in many different parts of the immigration system, including a new strategy to focus enforcement on the southern border, pay reforms for ICE personnel, several different efforts to make the immigration system work better for entrepreneurs.

I haven't heard anything -- anybody complaining about those efforts of the president. No, it's only about the families of American citizen children. And this talk of executive overreach really is about deporting, I think, the parents of U.S. citizen children, and I think it's a darn shame.

By this point, much has already been said about the legal authority. Going back to really Eisenhower in the '50s, every president has used this similar or same authority in the immigration context. The authority stems from the president's constitutional duty to take care that the laws be faithfully executed.

In Heckler v. Cheney, the Supreme Court explained that this duty does not require the president to act against each technical violation of the law. And when the Supreme Court in Arizona versus the United States struck down the majority of Arizona's SB 1070 law, the Court specifically reaffirmed that, quote, "broad discretion exercise by federal immigration officials extend to," quote, "whether it makes sense to pursue removal at all."

In 1999, members of Congress from both parties, including members who still serve on this committee, wrote to then Attorney General Janet Reno and asked her to issue specific instructions to guide in the use of prosecutorial discretion. And several years later, Congress, in the Homeland Security Act, specifically directed the secretary of homeland security to establish national immigration enforcement policies and priorities. That is precisely what Secretary Johnson has done.

Now, to the family fairness program which serves as an important historical precursor to the deferred action for parental accountability programs. President Reagan's family fairness program was announced at a 1987 hearing before the House Immigration Subcommittee, and it offered protection from deportation to certain spouses and children of persons who were legalized in the 1986 act.

When the program was expanded under George H.W. Bush in 1990, the INS commissioner estimated that as many as 1.5 million people would be eligible for protection from deportation and work authorization.

I heard the chairman's comment about Pinocchios and The Washington Post, but I've recently discovered two documents that I would ask unanimous consent to put into the record.

The first is the decision memo that announced the family fairness policy, dated February 8th, 1990, where the department estimates that the family fairness policy provides voluntary departure and employment authorization to potentially millions of individuals. And the other document, also dated February 8th, 1990, which indicates that the intent or the expectation is that greater than 1 million IRCA ineligible family members will file for the benefit.

**REP. GOODLATTE:** Without objection, those documents will be made a part of the record.

**REP. LOFGREN:** Now, when then Commissioner McNary stated in 1990 that the program would begin, he said it's vital that we enforce the law against illegal entry; however, we can enforce the law humanely. To split families encourages further violations of the law as they reunite.

He understood that a smart enforcement strategy can also be a humane enforcement strategy. And that is no different than today.

Now, if there's one key difference between the family fairness program and the deferred action program announced by the president last month, it's that President Reagan and Bush offered protection to people who were knowingly and intentionally denied protection by Congress when they passed the 1986 act.

By contrast, the president is now acting in the face of historic intransigence by House Republicans who will, if no action is taken by the end of this month, have wasted two opportunities in eight years to advance immigration reform bills.

The president's actions are lawful. They're also smart because they will allow DHS to focus limited resources on serious criminals, recent arrivals and gang members.

Finally, they are consistent with basic American values like accountability, family unity and compassion.

I would note that H.R. 15 is sponsored by 201 members, both Democrats and Republicans. There is still time to take this bill to the floor for a vote. And I hope that Republicans will do so.

And finally, I just want to respond very briefly on the argument in the video that we saw of the president making various comments about the limits of his authority.

I guess if the president had said multiple times that 5 plus 5 equals 15 and then he finally said 5 plus 5 equals 10, he would not be wrong when he finally said 5 plus 5 equals 10.

Second, the timing of the president's statements were important. All of those statements were made --

**REP. GOODLATTE:** (Sounds gavel.)

**REP. LOFGREN:** -- before March --

**REP. :** Mr. Speaker -- Mr. Chairman, how many finallys can we have? We're going to run out of time here shortly to get to --

**REP. GOODLATTE:** The chair is giving some leniency because chair's own opening statement was in excess of five minutes.

**REP. LOFGREN:** I did note that, and I --

**REP. GOODLATTE:** If the gentlewoman can conclude.

**REP. LOFGREN:** I am almost through.

I would just note that the -- those statements were made before the president asked the secretary of homeland security to do a complete review of the immigration system to see what could be fixed administratively, which resulted in his memorandums and the formal opinion by the office of legal counsel.

And finally, as we will see throughout this hearing, the legal question isn't even a close one. The president has clear legal authority to defer removals when it's in the national interests. Chief Justice Roberts reaffirmed that principle just two years ago.

Our immigration laws recognize this authority. Past presidents have used this authority regularly. Our president is doing so now, and I, for one, am grateful that he is. And I yield back.

**REP. GOODLATTE:** The chair thanks the gentlewoman. Without objection, additional members' opening statements will be made a part of the record.

We thank our witnesses for joining us today. And if you would all please rise, we'll begin by swearing you in.

(The witnesses are sworn in.)

**REP. GOODLATTE:** Thank you. Let the record reflect that all of the witnesses responded in the affirmative.
Mr. Ronald D. Rotunda is the Doy and Dee Henley Chair and distinguished professor of jurisprudence at Chapman University. Prior to joining Chapman, he was a professor of law at the George Mason University School of Law and the Albert E. Jenner, Jr. professor of law at the University of Illinois. He is the co-author of the seven-volume "Treatise on Constitutional Law," the author of "Modern Constitutional Law," a leading course book on constitutional law. And he has co-authored a most widely used course book -- the most widely used course book on legal ethics, "Problems and Materials on Professional Responsibility."

Mr. Rotunda received his BA and JD from Harvard University where he was a member of the Harvard Law Review.

Mr. Jay Sekulow is the chief counsel for the American Center for Law and Justice, which advocates for the protection of constitutional and religious freedoms. A distinguished professor of law at Regent University, Mr. Sekulow has argued 12 cases before the nation's highest court, including McConnell versus FEC, where he ensured the constitutional rights of young people remained protected with a unanimous decision guaranteeing that minors can participate in political campaigns.

Mr. Sekulow received his PhD from Regent University with a dissertation on American legal history. He's an honors graduate from Mercer Law School where he served on the Mercer Law Review and an honors graduate of Mercer University.

Mr. Thomas H. Dupree is a partner in the Washington, D.C. office of Gibson, Dunn & Crutcher where he is a member of the firm's litigation department and its appellate and constitutional law practice group.

In 2013 and 2014, Chambers and Partners named Mr. Dupree one of the leading appellate lawyers in the United States. In 2014, Mr. Dupree argued and won by unanimous vote a landmark potential jurisdiction case in the United States Supreme Court.

Prior to joining Gibson Dunn, Mr. Dupree served as deputy assistant attorney general in the civil division of the Department of Justice ultimately becoming the principal deputy assistant attorney general.

Mr. Dupree graduated cum laude from Williams College and with honors from the University of Chicago

App. 0905

Law School where he served as an editor of the University of Chicago Law Review.

Marielena Hincapie is executive director of the National Immigration Law Center. She is a public-interest lawyer who specializes in protecting and advancing the right of immigrant workers, particularly those who are undocumented.

She has authored numerous publications and policy analyses, provided strategic assistance and training to thousands of legal and social service providers, labor unions and community-based organizations. She holds a juris doctorate degree from Northeastern University School of Law, served on the American Bar Association's Commission on Immigration and is currently a member of the board of directors of Jobs with Justice and Welcome.US.

I welcome all of you. I would ask that each witness summarize his testimony in five minutes or less. Your entire statement will be made a part of record.

To help you stay within that time limit, there is a timing light on your table. When the light switches from green to yellow, you will have one minute to conclude your testimony. When the light turns red, that's it - time is up - and it signals that you should finish your sentence and your statement.

So thank you all. We'll now proceed first with Mr. Rotunda.

**RONALD ROTUNDA:** Thank you, Mr. Chairman and respected members of the committee.

I think it's important to explain that I favor increased immigration to the United States. If American Indians had strict immigration laws, perhaps none of us would be here.

People want to come here for the same reason my parents wanted to come here, the land of opportunity and freedom. My parents did not know the language -- excuse me -- they did not know the customs. They were strangers in a strange land.

My mother told me years later the first night in the United States, though she was well past the age of toilet training, she had an accident. She was so excited to be here.

My father fought in World War II as a spy for the Americans. He was a good spy because he spoke Italian like a native. When he was in his 90s, I remember taking him to the VA doctor, and the doctor said, looking at the paper, so you're Italian. My father said, no, American.

And you have to realize he did not know who was president. He did not know what year it was. He did not know my name, though he knew I was a friend. But he knew he was an American. So I favor reform along the lines of president. Whether Congress exercises comprehensive immigration reform or goes one step at a time isn't important.

The government tells us there's over 11 million undocumented aliens here. We're not going to march 11 million people south of the border. Democracies just don't have mass deportations.

But we also, I think, should all agree we have to secure our borders. If a 15-year-old can across our borders, an al-Qaida agent can as well.

So the issue is not whether we agree with the president's goals. Say, in general, I share them. The issue is whether it's constitutional for the president to act unilaterally to write our immigration laws and change the status of, he says, about 5 million Americans, almost half of them who are here without papers.

The president's executive power does not give him the power to govern by decree. It does not give him the power to suspend the law.

If he can actually do this and get away with it, I guess future presidents could say that they're going to suspend more parts of the Affordable Care Act, maybe they'll suspend it all. You know, we don't need Congress to repeal it, we just need the president to say I suspend it.

The president said in his -- repeatedly over the last several years -- I think over 20 times -- he iterated and reiterated that he does not have the power to do this. And then he did it. Why? He says in his statement to the people Congress has failed.

Congress doesn't fail when it fails to enact a presidential proposal. If the Constitution were a computer program, we would not say that the separation of powers is a bug. It's a feature of the program.

The framers wanted to make it difficult to enact laws so we would have to learn to compromise. The president won't get all that he wants. Both sides of the aisle will have to compromise as well. There's going to have to be compromise.

Article 2 provides that the presidential shall take care that the laws be faithfully executed. This clause is not a general grant of power, it's actually a limitation on the power. The president must execute the laws faithfully.

A whole series of opinions of the office of legal counsel -- I'll call them OLC opinions, and I refer to them in my paper -- has said this repeatedly that the president cannot suspend the laws, that he has prosecutorial discretion for criminal acts -- to refuse to prosecute criminally but not civilly. Deportation, the Court has told us, is civil and not criminal.

The president tells us that this deal doesn't apply to anyone who comes recently. He says Congress has failed -- and then are we a nation that accepts the cruelty of ripping children from their parents' arms? Are we a family that -- a nation that values families?

Apparently, we will accept this cruelty and rip children from their parents' arms if they came here illegally before the arbitrary date of January 1, 2010. No explanation about why that's OK. Why couldn't it be January 2nd or December 31st?

The new DHS policy reads an awful lot -- it looks like a statute. It's six single-spaced pages. It's -- it talks about provisos, benefits, an arbitrary date. It grants -- apparently from the newspapers, it said repeatedly that these people will now get Social Security cards. We don't know how Social Security cards have anything to do with prosecutorial discretion.

The OLC opinion spins a theory that relies on historical incidence, not legal precedents but historical incidence. And secondly, reading a lot into a few selected segments of the statute, case law is precedent. Historical examples are not.

In any event, others have already distinguished those examples. I haven't -- they're not part of my -- about my theory. I'm not going to duplicate their efforts in any event.

No other president has said he's acted because Congress has failed and then issued an immigration order. No other president has said that he's doing something that over the last several years repeatedly said is unconstitutional.

The president should at least explain -- or the OLC opinion should explain why that was wrong. If somebody decided for years that 5 and 5 is 11 and suddenly it comes out to be 10, we'd like to know why. Was it on the road to Damascus he got hit by lightening or what made him change his mind?

We know that -- well, The New York Times says Obama, daring Congress, acts to overhaul immigration. And he does have an overall immigration reform.

The OLC opinion admits that a general policy of nonenforcement would foreclose exercise of case-by-case discretion.

**REPRESENTATIVE HANK JOHNSON (D-GA):** Mr. Chairman --

**MR. ROTUNDA:** Anyone who looks at this -- looks like a statute.

**REP. JOHNSON:** Regular order, Mr. Chairman.

**REP. GOODLATTE:** Yeah. Mr. Rotunda, if you could summarize the remainder of your statement.

**MR. ROTUNDA:** Yes. There are --

**REP. GOODLATTE:** It will all be part of the record.

**MR. ROTUNDA:** In my papers, I cite about 10 OLC opinions as well as Supreme Court opinions that say the president does not have the discretion to refuse to enforce civil law. And the OLC opinion ignored all of that. They even ignored the statements and the important footnote in the Heckler opinion on which they relied.

Thank you.

**REP. GOODLATTE:** Thank you, Mr. Rotunda.

Mr. Sekulow, welcome.

**JAY SEKULOW:** Chairman Goodlatte, Ranking Member Conyers, distinguished members of the committee, on behalf of the American Center for Law and Justice and over 75,000 of our members, thank you for allowing me to appear before you today.

Determining presidential authority is a task which must be engaged in with only one question: Does the president's actions meet constitutional scrutiny?

In this case, they do not. It is humbling for this grandson of a Russian immigrant to be before this committee today. My father is in the audience. His father, my grandfather, came to the United States in 1914. In 1929, he applied for citizenship, filed a petition for naturalization. My daughter-in-law found this online.

Two years later, a United States district court judge in Brooklyn, New York, granted Sam Sekulow his status. She found that order as well.

I believe in immigration. I'm the grandson of that Russian immigrant. I get to argue cases before the Supreme Court of the United States and appear before this committee, and it's a humbling thing.

Immigration law was complex for my grandfather in 1931, and it is still complex today. The Constitution now -- the Constitution, however, is not. Our system of government is straightforward. Congress writes the law, the president executes the law, the judiciary interprets the law.

This is the separation of powers mandated by our constitution. The president does not make the law. Now, we do respect some of the statements that have been made. The president has stated that he changed the law.

And I don't believe there's anyone on this committee that believes the president has the authority to change the law. He was being heckled at an event similar to what we experienced today. There's passions on the side of the issues. I understand it, and I think we all understand that.

I join Professor Rotunda, and I believe in significant and complete immigration reform. I believe in a pathway to citizenship. But I believe to do that through -- (audio break) -- set forth in the Constitution. And the president does not get to change the law.

He actually said that, though, that he changed the law. That was how he handled the question that was asked. He changed the law.

Presidents cannot change the law. He can't do so constitutionally. He cannot do so under Supreme Court precedent. He can't change the law to comport with his preferred public policy, much of which I share.

The president's executive action really disrupts the delicate balance of separation of powers that is the hallmark of our constitutional framework.

Justice Frankfurter stated that regarding immigration and immigration issues, talking about being the exclusive power of Congress, that the formulation of these policies is entrusted exclusively to Congress.

Now, 5 and 5 does not equal 15 no matter how many times you say it. And when 5 and 5 then equals 10, which is correct, that past constitutional wrong is not what made that correct. So this reliance that we've seen on some that President Reagan's and President Bush and even President Eisenhower made or issued executive action or executive orders, which in some cases may be clearly -- (audio break) -- because they didn't set forth a new class -- but even if they were not distinguishable, past constitutional acts do not get better with time. They are still just that, unconstitutional actions.

President Obama also misplaces his reliance on the authority generally granted to the secretary of homeland security. It's very different to utilize your resources to determine the status of your prosecutorial mandates

and how you're going to use your limited resources.

The condition of entry, though, of classes of aliens and having that denied or granted and creating a class, a new class is not what the president has the authority to do. As sympathetic as it might be to the plight of people involved, he simply doesn't have that constitutional authority.

I think that, with all the emotion we've even seen today, you have to put that aside. The question -- it comes back to the same question: Does the president have the authority?

And by the way, if you look at the OLC memo and compare it to what the president said the deal was, quoting the president's word of what the deal is, I'd ask my colleague from the Immigration Law Center if she would recommend her clients accept the deal, because the deal the president talked about did not talk about unfettered discretion with the agency that could be terminated at any time with case-by-case determination. That's not the deal the president talked about. That's not the deal the president put in place.

And I would not recommend my client to accept deal that the president has actually offered, which is very different than the deal outlined in the OLC memorandum.

I would ask that to my colleague because standardless absolute discretionary review by government agencies has been something I've been dealing with for 30 years at the Supreme Court of the United States. And it generally does not go very well for the agency.

OLC said it was required, though, for the president's actions to be deemed constitutional. As I said, I would not recommend my client to take the deal.

In conclusion, in our view, President Obama's actions are unconstitutional. President Obama's actions are unlawful. President Obama's actions violate the separation of powers.

And in conclusion, even with sympathy to the cause of immigration reform, impatient presidents may not violate the Constitution if they don't get their way.

Thank you, Mr. Chairman.

**REP. GOODLATTE:** Thank you, Mr. Sekulow.

Mr. Dupree, welcome.

**THOMAS DUPREE:** Good afternoon. Thank you for inviting me to testify and to share my thoughts on the constitutionality of the president's directive granting deferred action eligibility to approximately 5 million people who are currently here in the United States in violation of our immigration laws.

I served as principal deputy assistant attorney general under President Bush. In that role, I litigated many immigration cases and advised the White House on immigration policy and reform.

In my view, President Obama's actions exceed his authority under the Constitution. The president was correct on the many occasions where he stated that he did not have the power to do what he has now done.

App. 0910

While reasonable people can disagree over how best to fix our immigration system and while there can and should be a robust public debate about how to address the status of the approximately 11 million people who are here in this country illegally, there should be no doubt that, by unilaterally acting through executive action rather than through the Congress, the president has circumvented the process our founders envisioned.

The framers of our Constitution were well aware of the dangers of executive overreach. That is why they wrote a constitution providing for the separation of powers and why the first sentence of Article 1, Section 1 of our constitution states, quote, "All legislative powers herein granted shall be vested in a Congress of the United States."

The framers also spoke to the president's duty to enforce the laws enacted by this Congress. Article 1, Section 3 provides that the president, quote, "shall take care that the laws be faithfully executed," close quote.

In my view, President Obama's actions on immigration violate these constitutional provisions. His actions violate Article 1, Section 1 in the separation of power by rewriting the laws of the United States not through legislative amendment but through executive fiat.

They also violate Article 2, Section 3 because they amount to an abdication of the executive's duty to faithfully execute the laws of the United States.

Let me say a word about the "take care" clause. Its text makes clear the president's duty is not optional. The Constitution says that he shall take care that the laws be faithfully executed. And the Constitution's use of the word "faithfully" underscores that the president is to execute laws in a way that maintains fidelity to congressional design. It is hard to see how an order directing that federal law not be enforced as to approximately 5 million people amounts to faithful execution.

The "take care" clause does not give a president discretion to choose which laws he will enforce and which he will not. As the head of the office of legal counsel under President Clinton wrote, quote, "The Supreme Court and the attorneys general have long interpreted the 'take care' clause as standing for the proposition that the president has no inherent constitutional authority to suspend the enforcement of the laws, particularly of statutes," close quote.

The consequences of this issue are not confined to immigration. If the president may use executive authority to simply ignore laws that he does not like, then it will be possible for future presidents to unilaterally revise everything from federal criminal law to tax law to environmental law and beyond.

Of course, President Obama's directive goes beyond mere nonenforcement of the law. It has the effect of affirmatively granting benefits, including the right to apply for work permits, to those falling within its ambit.

The administration has invoked prosecutorial discretion in an attempt to justify the president's actions. Prosecutorial discretion is well established in our nation's legal traditions. In fact, the concept predates the founding and finds its root in the common law of England.

Now, no one can dispute that prosecutors in this context, executive branch officials with a constitutional duty to enforce immigration laws may exercise discretion in setting enforcement priorities and in deciding what charges to bring or whether to bring charges at all. But there are limits on prosecutorial discretion.

Generally speaking, it applies to individual cases, situations in which, in the judgment of the prosecutor, it would be unjust or otherwise inadvisable to apply the full force of the law based on the circumstances of an individual case.

When I served in the Justice Department, I can recall many instances where we or the Department of Homeland Security made a determination to exercise discretion in individual cases. Prosecutorial discretion, however, is not so elastic a concept that it can stretch to encompass what the president has done here, granting blanket relief to a potential class of 5 million people.

That is what makes President Obama's actions different from prior instances in which presidents have granted immigration relief. The scale of President Obama's directive significantly exceeds what past presidents have done. Moreover, in prior instances, the executive was acting to implement a new statute consistent with the will of Congress. Here, in contrast, the executive is taking action precisely because Congress has refused to act in the way the president wants. Indeed, the president is attempting to write into law what Congress deliberately chose not to write into law.

Finally, as many on this committee will recall, during the Bush administration we were strong advocates of immigration reform, and we sought to get a bill through Congress. When we were unsuccessful, many of us were disappointed and frustrated. But we did not attempt to achieve through executive fiat what we could not achieve through the legislative process. We respected the system the framers established.

I thank the committee for convening this hearing and look forward to your questions.

**REP. GOODLATTE:** Thank you, Mr. Dupree.

Ms. Hincapie -

**MARIELENA HINCAPIE:** Great.

**REP. GOODLATTE:** - we are pleased to have you with us as well.

**MS. HINCAPIE:** Thank you, Chairman Goodlatte, Ranking Member Conyers and members of the committee. Thank you for the opportunity to appear before you today.

My name is Marielena Hincapie. I'm the executive director of the National Immigration Law Center, an organization that is dedicated specifically to helping families, low-income immigrant families like mine, to contribute their best to our country and achieve the American dream. I'm an immigrant from Colombia. I arrived as a child to Central Falls, Rhode Island when my father was recruited to work at a textile factory there.

My parents, like the parents of those who might be eligible for deferred action under the president's executive authority, came here in pursuit of the American dream for their children. Last month President Obama announced policy changes that bring much-needed humanity and transparency to our immigration system.

The president's actions are well within the scope of his authority. He is relying on the doctrine of prosecutorial discretion, which you have heard about, which provides the Department of Homeland Security, as well as every law enforcement agency in this country, the authority to set enforcement priorities, to target resources and to shape how the law will be implemented. The doctrine of prosecutorial discretion is well

established, with solid constitutional, legal and historical grounds.

First, it is well settled in the courts that the executive officials have wide latitude in exercising this prosecutorial discretion. In the seminal case of Heckler versus Chaney, the Supreme Court held that the agency's decision to enforce or prosecute in either a civil or criminal matter is a matter of the, quote, "agency's absolute discretion," end quote.

This includes the agency's decision to prosecute or not to prosecute. In 2002, in enacting the Homeland Security Act, Congress expressly charged the executive branch with, quote, "establishing national immigration enforcement policies and priorities," end quote.

Secondly, exercising prosecutorial discretion to deprioritize the deportations for certain individuals is consistent with the Take Care clause in Article II, Section 3 of the Constitution. Again, the Supreme Court held very clearly in Chaney, in Heckler versus Chaney, that because the executive branch is rarely provided enough funding to enforce every provision of every law against every single person in our country, the executive branch must develop enforcement priorities.

The Heckler court specifically says, quote, "faithful execution of the law does not necessarily entail acting against each technical violation of the statute," end quote.

Finally, in addition to the legal authority, there is ample historic precedent to the Obama administration's actions. Again, every administration, Republican and Democrat, since President Eisenhower have exercised prosecutorial discretion to protect immigrants from deportation.

President Obama's executive actions are also good policy. Not only will the president's actions bring order and transparency to DHS's enforcement priorities, it will also add billions of dollars to our coffers. Removing the threat of retaliatory deportation for workers will also improve working conditions for American workers.

Moving workers from the informal economy to the formal economy will improve America's economy. And by creating a process by which individuals can come forward, apply, register with the government, the government will be able to refocus its enforcement priorities instead of separating families.

Most importantly, this is not about politics or abstract numbers. This is about our families. This is about our communities. It is about our country. One cannot underestimate the significant impact that this policy change will have on those who might benefit. The mothers, fathers, young immigrants who are here, who are working, who are studying, will be able to contribute even more fully to our society.

Reasonable minds might disagree on the politics or whether this is even real good policy. But what is undeniable is that the status quo is wholly unacceptable. Lupita (sp), a brave 13-year-old who is in the audience today, understands the psychological trauma the threat of deportation can cause. I met her over eight years ago when her father was detained in a large Los Angeles area raid.

During the years that followed, Lupita (sp) suffered and struggled. Most Americans understand that U.S. citizens, like Lupita (sp), need their parents to help them grow. The president's actions are good news for Lupita (sp) and her little sister Marisol (sp), because her mother Isabel (sp), who is also here today, should qualify under this new deferred-action program.

Every daughter needs their mother. And our nation's laws should support strong families rather than rip them apart. What is truly at stake here today is the fight for the soul of our nation. Are we going to continue ripping away parents from their children? Are we going to deport young immigrants who want to contribute their best to helping make America great? Or are we going to use existing law to bring order, fairness and equality to our immigration system so that immigrants with strong ties to our communities can fulfill their full human potential?

Our country can and must do better. The American people have long supported the principles behind these new immigration policies because they recognize that they are good for our nation. I trust that in your hearts and minds, you and I share a desire to do what is best for our country. And I look forward to working with you toward that end.

Thank you again for the opportunity to testify today, and I look forward to answering your questions.

**REP. GOODLATTE:** Thank you.

We'll now begin the questioning. And I'm going to reserve my questions. So at this time I recognize the gentleman from Wisconsin, Mr. Sensenbrenner, for his questions.

**REPRESENTATIVE JAMES SENSENBRENNER (R-WI):** First of all, I think I should emphasize the point that this hearing is on whether the president's - (audio break) - constitutional. The policy questions are not within the scope of this hearing and I think will end up being debated at a later point, probably ad nauseam.

What I would like to do is ask a couple of questions. First of all, why do you think the president on 22 occasions said that he didn't have the power to do what he did, and then did a 180? Maybe, Ms. Hincapie, you can start out with an answer to that.

**MS. HINCAPIE:** I would be happy to, Representative Sensenbrenner.

So unfortunately, I think the president was talking politics. He made those comments, much to our dismay, because we believed for many years now that the president did and does, in fact, have the legal authority.

The president on a number of those occasions was specifically talking about immigration reform. He has been so focused on getting immigration reform done with Congress that he continually told the immigrant rights community that he could not -

**REP. SENSENBRENNER:** OK -

**MS. HINCAPIE:** - do - he could not -

**REP. SENSENBRENNER:** Let me ask Mr. Sekulow what his opinion is on this subject.

**MR. SEKULOW:** I think the president was correct when he said he could not make the law or change the law. He was speaking correctly. I think when he made the statement that he has changed the law, he recognized also that he did something. He thought he changed the law. He doesn't think, by the way, it was simply a policy decision. He stated he changed the law.

And I don't - as I said in my testimony, Congressman, I don't believe there's anybody on this committee that believes the president has the authority to change the law. He knew he did not when he made the statement 22 times. And then he changed the law.

**REP. SENSENBRENNER:** OK.

**MR. SEKULOW:** He doesn't get to do that.

**REP. SENSENBRENNER:** Now, his own DHS secretary, Jeh Johnson, has stated there comes a point when something amounts to a wholesale abandonment to enforce a duly enacted constitutional law that is beyond simple prosecutorial discretion.

I think that at least three of our witnesses believe that the president has crossed that line. Could you be more specific? and many of the president's unilateral actions?

**MR. ROTUNDA:** The short answer, if I can be short, is prosecutorial discretion the cases refer to criminal prosecutions. The refusal to not prosecute somebody who enters the United States fraudulently in violation of its criminal laws. The Office of Legal Counsel has said -- the 1990 opinion it says the president's powers do not permit the president to determine as a matter of policy discretion which statutes to enforce. (It says ?) obviously, the president cannot refuse to enforce a statute he opposes for mere policy reasons. Now, you'd think the present OLC opinion would distinguish that. They don't even cite it, and there's a whole series of other ones where they don't cite it. We know the -- (inaudible) -- in Galvan v. Press the Supreme Court said Congress is the authority in immigration matters, not the president. The president implements that law. You'd think that the OLC opinion would try to distinguish that. They ignore it.

**REP. COBLE:** I thank you, Mr. Rotunda. Mr. Sekulow, let me bring one of the President Bushes into the court -- hearing room here. President H. W. Bush proposed that Congress should lower the tax on capital gains, you may recall. Congress did not enact his proposal. Under President Obama's assertion of executive power, could President Bush simply have ignored or instructed the IRS not to enforce the tax code on capital gains greater than 10 percent?

**MR. SEKULOW:** If President Bush would have done that he would have been exercising an unconstitutional policy that he would be implementing. It would not be legal and it would be unlawful. Having said that, I think it's a great analogy to what's happened here. I keep going back to this but the truth of the matter is the president -- you could play the 22 times the president said, I am not a king and I have to work with Congress, but the president of the United States -- and I want to read this because it addresses this -- made this exact statement.

**REP. COBLE:** (Inaudible) -- if you will be terse. I've got one more question. Go ahead.

**MR. SEKULOW:** OK. Very quickly. The president said, I just took an action to change the law, and as I keep saying no one on this committee can possibly believe that the president has that authority. He just doesn't. You couldn't do it for taxes. You can't do it for immigration.

**REP. COBLE:** I thank you, sir. Mr. Dupree and Madam, let me put this question jointly to you all. I am advised that there may be approximately 5 million who have waited in line, complied with the law who may

fall victims of double standards. Is my concern justified?

**MR. DUPREE:** I think it is. I fear and I feel badly for people who have been waiting in line, waiting their turn, and now, unfortunately, may be penalized and that they're moved farther back in the line precisely because they had the bad judgment to respect our laws and play by the rules.

**REP. COBLE:** And is 5 million an accurate account?

**MR. DUPREE:** That sounds right to me. I don't profess to have personal knowledge of that but that sounds right.

**REP. COBLE:** Madam, do you want to be heard on that question?

**MS. HINCAPIE:** Sure. I completely agree that there is a need for to address the backlog -- the visa backlog and, frankly, this is where Congress needs to act and pass immigration reform so that families can be reunited. However, we do have 11 million people in this country and what the president has done has said individuals who are parents of U.S. citizens lawful president -- residents are low level priority. However, he will continue enforcing the law based on the appropriations you have provided. So there is no abdication of his authority. Let's remember only about 4 or 5 million people are estimated to benefit from this deferred action program and other changes. There are another 6 million plus individuals who will be subject to deportation and detention under the appropriations that the president -- that the Congress has allocated.

**REP. COBLE:** I thank you. Mr. Sekulow --

**MR. SEKULOW:** Yes, sir.

**REP. COBLE:** -- I cut you off earlier. We have a few moments remaining. Do you want to be -- reclaim your time?

**MR. SEKULOW:** Yes, sir, if I may. I'm just going to -- and it's response to my colleague -- here's the problem. Under the president's plan, what lawyer would recommend to their client who was an unlawful immigrant in the United States that even fit under this plan -- what lawyer would recommend that their client register for this, knowing that to be constitutional -- (inaudible) -- said you have to have absolute discretion and that the president on his own can cut this program off at a moment's notice. So now you've disclosed yourself publicly. You may have come out of the shadows but the light at that point will be so bright you could end up in a situation worse than you were in to begin with.

**REP. COBLE:** Thank you. The red light is about to illuminate. Thank you all again -- (inaudible).

**REP. GOODLATTE:** Would the gentleman yield? Would the gentleman from North Carolina yield to the chair?

**REP. COBLE:** I'll be pleased to.

**REP. GOODLATTE:** I thank the gentleman, and without objection the gentleman is recognized for an additional 30 seconds. I just want to make one important point here. The gentlewoman, Ms. Hincapie, stated that the other 6 million be subject to deportation. But the president, at the same time he signed the executive

order that made it clear that those 5 million would be entitled to a legal -- administrative legal status also changed other rules that made it clear that the vast majority of the remaining 6 million who are already here will not be subject to action to deport them because they do not --

**REP. LOFGREN (?):** Would the gentleman yield?

**REP. GOODLATTE:** The gentlewoman -- I will recognize the gentleman for an additional 30 seconds so he can yield to the gentlewoman from California.

**REP. COBLE:** I have the time and I'll yield.

**REP. LOFGREN:** I would just note that it is indeed correct that the other 6 million have fallen into the new categories. However, we have 11 million undocumented individuals. Congress only appropriated sufficient funds to remove 400,000 a year. Surely, the chairman is not suggesting that there should be no policy on who should come first of the 400,000 of the 11 million, and I yield back.

**REP. COBLE:** Well, reclaiming my time, I'd penalize -- pick those who have complied with the law. That's where I -- that's the direction from which I was coming. I reclaim and yield back.

**REP. GOODLATTE:** The chair recognizes the gentleman from New York, Mr. Nadler, for five minutes.

**REP. NADLER:** Thank you. Thank you, Mr. Chairman. I'm glad that this is not a hearing on the -- on the policy because if it were a hearing on the policy I would point out that in the last Congress this committee reported four bills -- I'm sorry, voted for four immigration bills, none of which had report language or went to the floor. So that's how active this committee has been in -- or the House has been in trying to deal with the policy problem, which everybody agrees with. But let me ask a few very specific legal questions about the president's power.

First of all, Professor Rotunda, you quoted Heckler v. Chaney. In Heckler v. Chaney, the Supreme Court explained that, quote, "An agency's decision not to prosecute or enforce whether through civil or criminal process is a decision generally committed to an agency's absolute discretion," closed quote. In your written remarks, you distinguished Chaney by saying it really focused on standing and by saying that the law on standing has evolved significantly since that decision. But do you know how many times the court in Chaney mentioned "standing" in its opinion? Zero. The case actually had nothing to do with standing. The case involved a lawsuit against the FDA brought by prisoners who were due to be executed by lethal injection. They sued to force the FDA to ban the use of these particular drugs for executions after the FDA denied their petition from enforcement. It's hard to imagine that even the most conservative judge would find standing lacking in that situation. So given the fact -- so I don't see how you find standing there and the case does stand for the proposition that the agency's decision to prosecute or enforce is at its discretion.

**MR. ROTUNDA:** Please look at 470 U.S. --

**REP. NADLER:** I can't hear you, sir.

**MR. ROTUNDA:** Oh, sorry. Yeah, please look at 470 U.S. Page 831, the text at note four as well as -- as well as note four. In note four, the court says, we don't have a situation where it could justifiably be found that the agency has, quote, "consciously and expressly adopted a general policy," unquote, that's so extreme

as to amount to an abdication of its statutory responsibilities. It then cites with approval Adams v. Richardson -- a D.C. case in 1973 -- which found standing and ordered the agency to act. Now, I would have thought the OLC, since it relied on this case, I think, 20 times would have pointed out why somehow that footnote was irrelevant to them. Secondly, you're absolutely right -- it does not use the word standing. But it talks about the court. What it says in the paragraph before the text at footnote four is that generally the agency exercises coercive power over an individual. That's how the courts get standing. In this case --

**REP. NADLER:** Right. But the -- but the, generally, the agency may exercise coercive power of an individual at its discretion. Doesn't must -- it doesn't have to exercise coercive -- (inaudible) --

**MR. ROTUNDA:** The court says that the text --

**REP. NADLER:** -- that's what an agency has to do.

**MR. ROTUNDA:** I'm sorry. The court says at text -- at footnote four that we emphasize the decision is only presumptively unreviewable; the resumption may be rebutted where the substantive statutes provided guidelines for the agency to follow in exercising its enforcement power.

**REP. NADLER:** OK. So the court is saying that the -- that the agency has discretion and the -- in its enforcement power and the statute gives it guidelines in how to exercise that discretion.

**MR. ROTUNDA:** It says that it's presumptively unreviewable but when it's exercising power in a way that has standing it can be reviewed. I mean, that's basically what Adams v. Richardson said and then --

**REP. NADLER:** Well, can you --

**MR. ROTUNDA:** -- if I can just finish the sentence -- and if you fast forward to Massachusetts EPA where the state of Massachusetts forced the EPA to institute regulations on -- with carbon dioxide pollution and global warming -- (clears throat) -- excuse me, and the Supreme Court said --

**REP. NADLER:** But the -- excuse me -- you're wrong on that, too. Now, let me start with Mr. Dupree, be brief, and then work that way.

**MR. DUPREE:** Well, thank you, Mr. Sensenbrenner.

I think that Secretary Johnson was correct when he says that there is a line. I think in this case the president not only crossed the line, but that line is far, far, far in the distance.

**REP. SENSENBRENNER:** Well, that's kind of like the line he drew on Syria, right?

**MR. DUPREE:** I think that is an apt analogy.

**REP. SENSENBRENNER:** Thank you.

**MR. DUPREE:** And I don't know that the Constitution requires a certain number of people beyond which he could not grant deferred action to. I don't think the Constitution speaks to that degree of -

**REP. SENSENBRENNER:** OK, my time is limited.

Mr. Sekulow.

**MR. SEKULOW:** I'm going to just quote very quickly from the opinion that's been quoted by members of this committee and some of the witnesses, and that is the Chaney opinion. This is the part that's conveniently ignored. Presidential action violates the Constitution - this is a quote - "if he expressly adopts a general policy which is, in effect, an abdication of its statutory duty." And I think that's exactly what's happened here. The president changed the law.

**REP. SENSENBRENNER:** Mr. Rotunda, briefly.

**MR. ROTUNDA:** Two things. The Heckler -

**REP. SENSENBRENNER:** Please turn on your microphone.

**MR. ROTUNDA:** I'm sorry. All righty. Heckler v. Chaney does not say - it said the agency's decision not to prosecute or enforce, whether civil or criminal, is generally committed to an agency's absolute discretion. The OLC does not quote the next sentence that says basically the reason for this is because of lack of standing.

The law's standing has changed dramatically. Massachusetts v. EPA is an example. And so maybe now we'll get a test of this. But the president - it's mind-boggling that the president's supporters say that we shouldn't - when he told us earlier that he didn't have the power, he was just lying. That's politics. That was in the middle of a campaign. My jaws dropped.

**REP. SENSENBRENNER:** OK, good. Now, the final question I have - and somebody can step up and be first - is doesn't a wholesale application of prosecutorial discretion to thousands or millions or maybe several millions of people amount to a repeal of a duly enacted law? And does the president have the power to do that through prosecutorial discretion?

**MR. SEKULOW:** The president - Mr. Congressman, the president could - and certainly could pardon people. Prosecutors exercise discretion on a case by case every time.

What you don't see - you do see a situation where someone's alleged violations of SEC laws and there's a prosecutorial decision made to not move forward on that case. That's called prosecutorial discretion. What you don't see is a decision being made we're not going to enforce the SEC laws in the United States. That would be rewriting the law - (audio break) - the executive can't do.

**MR. DUPREE:** I agree with that. And I would add to it that our Constitution does confer discretion on the executive to exercise discretion in individual cases. When you do what the president has done here, you cross the line from permissive action under the executive's rights under Article II and trenches on this Congress's authority under Article I to say what the law is. It's a legislative act.

**REP. SENSENBRENNER:** Thank you.

My time's up.

**REP. GOODLATTE:** The chair recognizes the gentleman from Michigan, Mr. Conyers, for his questions.

**REP. CONYERS:** Thank you.

Attorney Hincapie, you've talked about prosecutorial discretion and whether it can really encompass a program that allows people to come forward and affirmatively apply for protection. Do you consider this a form of prosecutorial discretion, ma'am?

**MS. HINCAPIE:** Yes, Congressman. Basically, prosecutorial discretion in the immigration context - there are over 20 different types of discretion. And here what the administration has done has simply identified what the levels of priorities are and has determined that parents of U.S. citizen children and lawful permanent residents should not be deported, and they will be given an opportunity to come forward.

There's individual adjudication. This is not mass, blanket giving people work authorization simply because they're a parent of a U.S. citizen. Individuals will have to come forward. They'll have to pass a criminal background check. They'll have to show that they meet all of the eligibility criteria. And only after an individual adjudicator determines that that person merits deferred action will they be able to, under existing regulations - nothing new; existing regulations - apply for an employment authorization document.

**REP. CONYERS:** Of course. Now, let me talk about deferred action, which has existed for decades. Dating back more than 40 years, INS exercised prosecutorial discretion to grant non-priority status, based upon humanitarian consideration. But in this case, the administration says that it will also offer work authorization to people who receive deferred action - not amnesty or anything else. Can you recall any legal authority for that? And is that a break in tradition?

**MS. HINCAPIE:** So absolutely not. Again, the president has not created any new laws. The deferred action, as you mentioned yourself, Congressman, has existed - deferred action has existed for decades on the books. And, in fact, the regulations, the immigration regulations, HCFR Section 274.812 specifically say - lists out who is eligible for work authorization.

And Subsection 314 explicitly says that - I will just quote - an alien who has been granted deferred action - an act of administrative convenience to the government, which gives some cases lower priority if the alien establishes an economic necessity for employment - is eligible for work authorization.

So this is - again, this is existing regulations on the books for many years prior to the Obama administration. There's nothing new in what the president has done.

**REP. CONYERS:** Mmm hmm. Now, turning to chief counsel Sekulow, can you tell me what new statute Presidents George H.W. Bush and Clinton were implementing when they granted deferred enforced departure and employment authorization to hundreds of thousands of Salvadorans, Haitians, Liberians, after Congress chose not to extend their temporary protected status?

**MR. SEKULOW:** Mr. Conyers, the Supreme Court has recognized, when it comes to matters of foreign concern, national security, there are issues where they have allowed deferred action. However, I want to say what I - reiterate what I said at the hearing, because - in my testimony.

I don't believe - and I still believe, actually, that the actions of President Bush and President Reagan, as

President Obama's, are constitutionally suspect. And I don't think the fact that you've got a 30- or 40-year history of action that's unconstitutional doesn't get better with time.

So I don't find that there - I think it's important to point out that this is not -

**REP. CONYERS:** Well, OK -

**MR. SEKULOW:** This is an enforcement-free-zone creation here. This is different than even those cases.

**REP. CONYERS:** I get your drift. Let me ask you about whether - this goes to you, Mr. Dupree, as well. Can you tell me what new statute George H.W. Bush was implementing when he granted deferred enforcement departure and employment authorization to approximately 80,000 Chinese nationals at the Tiananmen Square massacre?

**MR. DUPREE:** Mr. Conyers, the first President Bush, I think, was doing two things in his grants of immigration relief. One is he was following on certain actions taken by his predecessor, President Reagan, in interpreting the Immigration and Reform Control Act of 1986. And I think that both Presidents Reagan and President Bush faithfully implementing the will of Congress in issuing regulations pursuant to ICRA.

With regard to particular grants either of Chinese nationals, Tiananmen Square, as Mr. Sekulow said, that is well-recognized authority, that when you have a foreign crisis, often one that generates a large number of refugees, that the president, in large part owing to his duties under the Constitution to engage in foreign affairs and oversee the nation's foreign relations, often will grant temporary protective status to persons from affected nations.

**REP. CONYERS:** Well, the answer in both these instances were none, but I appreciate your interpretation.

My time is exhausted, and I thank the chairman.

**REP. GOODLATTE:** The chair thanks the gentleman and recognizes the gentleman from North Carolina, Mr. Coble, for five minutes.

**REPRESENTATIVE HOWARD COBLE (R-NC):** Thank you, Mr. Chairman.

Good to have you all with us today.

Mr. Rotunda, let me start with you. Some defenders of the president's unilateral actions have asserted that his actions were merely an exercise of prosecutorial discretion. Are these assertions correct, or is there indeed a fundamental difference between prosecutorial discretion The holding of the court says very clearly, "We hold only that EPA must ground its reasons for action or inaction in the statute, unquote. That is if the EPA wishes to deny a petition for rulemaking, in needs to do so in a manner that is, quote, not arbitrary or capricious or otherwise not in accordance with the law. But it is its decision.

All that is saying is that it can't be arbitrary and capricious.

**MR. ROTUNDA:** If the court said that, they wouldn't say it was presumptively unreviewable. They would say it would always be unreviewable.

**REP. NADLER:** No.

**MR. ROTUNDA:** And the court reviewed --

**REP. NADLER:** All right.

**MR. ROTUNDA:** The court reviewed the EPA in Massachusetts --

**REP. NADLER:** And the -- the court said that the EPA had that discretion.

Let me ask you a different question though. The statute very clearly says that certain individuals shall, upon the order of the attorney general, be removed.

That would seem -- the key words, "upon the order of the attorney general," would seem to indicate that an executive branch official has discretion to decide whether those undocumented immigrants be deported or not.

**MR. ROTUNDA:** You're dealing with a complex statute, and you're taking out a phrase.

**REP. NADLER:** Excuse me. You're dealing with a lot of complicated court decisions and taking out phrases.

**MR. ROTUNDA:** I'm sorry. What?

**REP. NADLER:** You're dealing with a lot of complicated court decisions and taking out phrases.

**MR. ROTUNDA:** I'm pretty much dealing with holding. And when I quote from the OLC, from their prior cases where the OLC says the president doesn't have the discretion to refuse to enforce laws he disagrees with as a matter of policy, all I'm -- maybe there's a way to distinguish that.

But a good legal --

**REP. NADLER:** Let me --

**MR. ROTUNDA:** -- opinion would have done that --

**REP. NADLER:** Let me --

**MR. ROTUNDA:** -- would have mentioned these cases.

**REP. NADLER:** Let me read you from the -- from the case of Arizona versus U.S., which is probably the most recent, probably the most relevant case.

In Arizona, the Supreme Court said that -- the Supreme Court said -- the Supreme Court relied upon the broad discretion exercised by federal immigration officials. And let me read you from the decision.

"Congress has specified which aliens may be removed from the United States and the procedures for doing so." May be. "Aliens may be removed if they were inadmissible at the time of the entry, have been convicted of certain crimes or meet other criteria set by federal law ruled as a civil, not a criminal matter.

"A principle feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all," close quote. QED, end of discussion.

**MR. ROTUNDA:** I wonder why the president, for six years, thought --

**REP. NADLER:** And I'm not interested -- excuse me. I asked you about the Supreme Court ruling.

The president may have been mistaken, he may not have studied the issue. That's not the point.

The point is the Supreme Court has told us that federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all. A principle feature of the removal system is the broad discretion exercised by immigration officials.

That would seem, right there, to justify almost any discretionary feature that isn't -- any discretionary program that isn't arbitrary and capricious.

**MR. ROTUNDA:** Yeah. I --

**REP. GOODLATTE:** The time of the gentleman has expired.

The gentleman may briefly answer the question.

**MR. ROTUNDA:** Yeah. I would have thought the OLC would have, at some point, rather than sitting on its haunches and vegetate, tell the president, for the last six years, you've been wrong.

**REP. NADLER:** But you didn't answer what the Supreme Court just said here.

**REP. GOODLATTE:** The time of the gentleman has expired.

**MR. ROTUNDA:** I wish I could.

**REP. GOODLATTE:** The chair recognizes himself for his questions and will give the gentleman, Mr. Rotunda, an additional few seconds to respond again to that.

**MR. ROTUNDA:** Galvin v. Press, page 531 of Volume 347, the court said: In the enforcement of these immigration policies -- and I'm quoting now -- the executive branch of the government must respect the procedural safeguards of due process. But the formulation of these policies is entrusted exclusively to Congress. That has become about as firmly embedded in legislative and judicial issues of our body politic as any aspect of our government.

Now, maybe you can distinguish that too, but I thought --

**REP. GOODLATTE:** Let me -- let me buttress your argument here. In Arizona versus U.S., the Supreme Court said discretion in the enforcement of immigration law embraces immediate human concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers remember aliens who commit a serious crime.

But it goes on to say: The equities of an individual case may turn on many factors, including whether the alien has children born in the United States, long ties to the community, et cetera, et cetera.

So the issue here really is: What is the meaning of prosecutorial discretion? Has the president abused that discretion when he applies it --

**REP. :** Mr. Chairman --

**REP. GOODLATTE:** -- in a blanket way to 5 million people or does --

**REP. :** Mr. Chairman --

**REP. GOODLATTE:** For what purpose does the gentleman seek recognition?

**REP. :** To make a 30 second comment on what you just said.

**REP. GOODLATTE:** I can yield to you. I'm going to ask my questions of the gentleman.

**MR. ROTUNDA:** The president has dispensed the law, suspended the law until he says otherwise. That's -- that is not what you normally think of as prosecutorial discretion, which typically involves suspensions of the criminal law, not the -- not immigration laws -- at least the civil aspects of immigration.

**REP. GOODLATTE:** And President Obama cites an opinion of the Justice Department's office of legal counsel to justify his executive legalization of millions of unlawful aliens.

Isn't it true that the office of legal counsel doesn't have a particularly great track record when it comes to questions of executive power?

For example, in 2012, the Obama administration touted an OLC opinion justifying the president's controversial recess appointments. Didn't the Supreme Court subsequently rule that those appointments were unconstitutional in a unanimous, 9-to-nothing ruling?

**MR. ROTUNDA:** He lost 9 to 0.

**REP. GOODLATTE:** The Justice Department's office of legal counsel states that the salient feature of class-based deferred action programs, the establishment of an affirmative application process with test -- with threshold eligibility criteria does not in and of itself cross the line between executing the law and rewriting it.

This is because each program has also left room for case-by-case determinations, giving immigration officials discretion to deny applications even if the applicant fulfills all of the program criteria.

This feature of the proposed program ensures that it does not create a categorical entitlement to deferred

App. 0924

action that could raise concerns that DHS is either impermissibly attempting to rewrite or categorically declining to enforce the law with respect to a particular group of undocumented aliens.

However, in President Obama's Deferred Action for Childhood Arrivals DACA program, executive legalization for illegal immigrants who came to the U.S. as minors, the promise of discretion for adjudicators is mere pretense.

In reality, DHS has admitted to the Judiciary Committee that, if an alien applies and meets the DACA eligibility criteria, they will receive deferred action. In reality, immigration officials do not have discretion to deny DACA applications if applicants fulfill the criteria.

Thus, by the office of legal counsel's own admission, the president's DACA program is constitutional suspect. The rules of the game --

**REP. CONYERS:** Mr. Chairman, parliamentary inquiry?

**REP. GOODLATTE:** Yes, sir?

**REP. CONYERS:** Are you using your own time?

**REP. GOODLATTE:** I am using my own time.

**REP. CONYERS:** Oh. I'm glad that you announced that. Thank you very much.

**REP. GOODLATTE:** The rules of the game will most assuredly be the same for President Obama's latest executive legalization. Thus, isn't it true that the OLC would also clearly find the president's latest gambit constitutionally suspect, Mr. Sekulow?

**MR. SEKULOW:** Well, I think here's the situation. When you read the OLC memorandum and the justification for the case-by-case individual analysis, it goes on to state -- and I wish some of the people that were protesting would have stayed for the rest of this and see if they really like this deal so well that the -- the deal the president put forward because, as he said, as we've previously noted, deferred action confers no lawful immigration status, provides no path to lawful permanent residency or citizenship and is revocable at the -- at any time in the agency's discretion.

Now, that is markedly different than what the president told the 4 million people to come out of the shadows from what he actually told them to what OLC said he can do. And when you look at the OLC memo, on the individual case-by-case determination and you look at it in the context of reality, there is no way that it can be handled on a case-by-case basis.

So it's either a blanket exemption across the board or it's not.

**REP. GOODLATTE:** Thank you.

Mr. Dupree, did you want to add to that?

**MR. DUPREE:** I agree with that. I think the language in there referring to the purported case-by-case

analysis is simply window dressing and tend to confer a -- (inaudible) -- of constitutional legitimacy on this policy which is plainly unconstitutional

**REP. GOODLATTE:** It's a blanket --

**MR. DUPREE:** Mm-hmm.

**REP. GOODLATTE:** The chair recognizes the gentleman from Virginia, Mr. Scott, for his questions.

**REP. SCOTT:** Thank you, Mr. Chairman.

Mr. Chairman, we could put an end to this debate by passing some kind of comprehensive immigration reform. Apparently, many in this -- on both sides of this -- on the aisle agree with the policy.

And so instead of arguing process, let's get on with comprehensive immigration reform.

But meanwhile, it's been acknowledged that about 11 million people are potentially subject now to deportation. Congress has spoken and has not appropriated anywhere close to enough money to deport everyone, as my colleague from California has said.

And so, Ms. Hincapie, we have to establish some policy as to priority. What's wrong with the policies articulated by the president?

**MS. HINCAPIE:** So there's nothing wrong with the policies announced by the president. In fact, they are based on Congress' will over the years to say that we should respect family unity and that the fact that the administration has decided to focus on the parents of U.S. citizens and lawful permanent residents is good policy. And the administration gets to decide. They have that executive discretion to decide who is a low-level priority so that they then can use and follow the law, the appropriations that have been provided by Congress to focus on serious criminals, individuals who pose national security threats, et cetera.

**REP. SCOTT:** Thank you.
Professor Sekulow, if the administration said, in states where the states have eliminated prohibitions against marijuana, that they're not going to prosecute any low-level marijuana cases, would that be constitutional?

**MR. SEKULOW:** Well, I think the supremacy clause - if there's a federal law on marijuana use, the state can't override it.

**REP. SCOTT:** That's right, absolutely right. Can the - if the president says, notwithstanding that reality, they're not going to prosecute cases, would that be constitutional?

**MR. SEKULOW:** On a case-by-case basis, utilizing prosecutorial discretion, he could do that. What he could not do, though, Congressman Scott, would be say we are no longer going to enforce the drug laws in the United States, or even particularly the marijuana laws in the United States. That individual case-by-case determination is critical. But it's in this memo because it was the only way to justify the president's actions.

**REP. SCOTT:** The - so it would not be constitutional to not prosecute in those states?

**MR. SEKULOW:** If you - if the president were to determine, as a matter of executive action -

**REP. SCOTT:** Right.

**MR. SEKULOW:** - that he was not going to enforce the laws against utilization of marijuana as a criminal act, I believe that that would not be within his authority.

**REP. SCOTT:** In those -

**MR. SEKULOW:** Saying, on an - in those states. Saying, on an individual basis, he wants to exercise discretion, you can do that on an individual basis.

**REP. SCOTT:** And if you disagree with that, then that's pretty much where we are on this debate.

**MR. SEKULOW:** Pretty much.

**REP. SCOTT:** OK. Now, the family fairness program - I understand that President Bush covered about 42 percent of the undocumented population. The Obama administration - this executive order covers about 35 percent. If - can you explain, Mr. Sekulow, how President Reagan, Bush, Clinton and Bush - can you remind us how they can do something, but all of a sudden President Obama can't do essentially the same thing?

**MR. SEKULOW:** As I said in the written testimony, Congressman Scott, and as I said in my opening statement, I don't believe that President Bush, President Clinton, President Bush, President Obama have the constitutional authority to do what they did. And the fact that it's been done for four administrations and over 25 or 30 years - as I said, constitutional violations don't get better with time.

I mean, some have argued that there's statutory determination distinctions that are at play here. I don't take that position. I take the position that if you look at it just constitutionally, was there a constitutional basis upon which those actions were taken? And frankly, I don't see it. And I'm sympathetic to what they were doing. It's just - I don't see it to be done that way. And the percentages should make no - constitutionality is not determined by the percentage of violation. If there's a violation of 1 percent, it's as bad as a violation of 99.

**REP. SCOTT:** Is there any constitutional legal distinction from a general deferment and a country-specific action?

**MR. SEKULOW:** Yes, because of the president's inherent - and the Supreme Court has recognized this - his inherent ability to deal with matters of foreign affairs and national affairs of the country.

**REP. SCOTT:** And if there is a violation, who has standing to complain?

**MR. SEKULOW:** The great question, the standing question. You know, I think some of the states are going to try to have standing in this particular case. Standing is always difficult in these kind of challenges.

**REP. SCOTT:** If the president had just done it without talking about it, what would be the result there?

**MR. SEKULOW:** He would have been found out. You can't do it to 4 million people. And I'll be, again,

brutally honest here, as someone who's in favor of comprehensive immigration reform. As a lawyer, I would not recommend my client take a deal where their status is revocable at any time at the agency's discretion. So maybe he would have done it. I question how many people are going to actually take part in this.

**REP. SCOTT:** Thank you, Mr. Chairman.

**REP. GOODLATTE:** I thank the gentleman.

The chair recognizes the gentleman from Alabama, Mr. Bachus, for five minutes.

**REPRESENTATIVE SPENCER BACHUS (R-AL):** Thank you.

I think maybe - listening to everyone on the panel, I think - and most of the members on the dais - we all agree that our country, its citizens, and even our immigrants need comprehensive immigration reform. And Mr. Dupree said you've been frustrated for years over our inaction.

So let's agree on that, just for purposes of argument. Does that make what the president did constitutional if it's unconstitutional?

**MR. SEKULOW:** Well, in my view, Congressman, no, it would not. And I think, to Congressman Scott's point, I think it actually has hurt the debate, because as you see here and you hear, there's a lot of agreement of the need for constitutional - you know, a constitutional path, a legal path of immigration reform.

And, look, when I hold my grandfather's naturalization papers up, it means a lot to me. When they call my name at the Supreme Court and say Mr. Sekulow, we'll now hear from you, and I'm the grandson of that Russian immigrant, I get it. But the process has to be right. And I think, unfortunately, the president's action, which I still think is not only constitutionally suspect, but dangerous for the potential client, I don't think that advanced the debate, because we're talking about - as Congressman Scott said, we're talking about this instead of getting real comprehensive immigration reform through -

**REP. BACHUS:** Right. And let me -

**MR. SEKULOW:** - which would include border security.

**REP. BACHUS:** Yeah. And I think, you know - I know Mr. Sensenbrenner said we're here to figure out why he did what he did. I don't think that's helpful at all. I mean, we could - we would probably come up with a hundred different variations on why he did it. I don't think that's material. I think it's whether it's constitutional or unconstitutional. And I think we go back to, you know, this little book here, "How Our Laws Are Made" - you know, fifth grade. And I want to introduce this.

**REP. GOODLATTE:** Without objection, it will be made a part of the record.

**REP. BACHUS:** And then we back that up with not only Section 1 of Article I, but Section 8, which actually says to establish uniform rules of naturalization. And it didn't give it to the president. It clearly and simply gave it to the Congress.

Now, some of us may disagree with that, but it's the Constitution.

**MR. ROTUNDA:** Just a brief comment. Justice Jackson, in Youngstown Sheet & Tube v. Sawyer, said the president's power is at its lowest when he's acting contrary to the express or implied will of Congress. And the president has basically admitted the implied will of Congress, if not the express, is not to act in this area, at least not yet. So his power should be at the lowest.

Justice Jackson - Justice Frankfurter, rather, in that opinion also said that we're not dealing with a situation where there is a temporary emergency and the president is acting until he can persuade Congress to act. It ends on its own.

**REP. BACHUS:** Thank you.

**MR. ROTUNDA:** Neither one of those statements was discussed in the OLC opinion.

**REP. BACHUS:** And let me say this. You know, the question has been asked - and I think it's answered in the question - can the president create, amend, suspend or ignore an act of Congress? I think the answer is right there, an act of Congress.

**MR. DUPREE:** I would also point out -

**REP. BACHUS:** And the answer - the answer is no.

**MR. DUPREE:** One of the many grievances articulated against British rule in the Declaration of Independence was the king's propensity to suspend or disregard the lawful enactments of Parliament. And so it really goes back to the very foundations of our country.

**REP. BACHUS:** Right.

**MR. DUPREE:** And, in fact, I think it was Mr. Scott who referred to let's discuss policy rather than process. But the point is, process matters. It mattered to our founders, and it should matter to (this Congress ?).

**REP. BACHUS:** And let me tell you why it ought to matter to those who are in our country without legal status. Many of them came here because there was no rule of law in their countries. And they came here because we have rule of law. And to come, or even for us to allow them to come and start with a violation of rule of law actually degrades not only our citizens, but those who are here, who we all - the protection of our laws, whether you agree or disagree with them, are for everyone's benefit. And they are.

Liberty, liberty, liberty - that's what they talked about when they wrote these things. And this is a loss of liberty. And it just doesn't matter why the president did this or his motivation or whether we think it's reasonable. It's not - it violates the rule of law.

Does anyone disagree with that?

**MS. HINCAPIE:** I respectfully disagree, Congressman Bachus. And the reason, again, is I think we're going back and forth between is the president following the Constitution and -

**REP. BACHUS:** Well, let me ask you this.

**MS. HINCAPIE:** - (inaudible).

**REP. GOODLATTE:** The gentleman -

**REP. BACHUS:** Does the president have the right -

**REP. GOODLATTE:** The gentleman's time has expired. He can state his question very quickly, and you can respond very quickly.

**REP. BACHUS:** Does the president have the right to create an act of Congress, to amend an act of Congress, or to suspend an act of Congress, or to ignore an act of Congress? And, you know, this is 50 pages.

**REP. GOODLATTE:** That's a question.

**MS. HINCAPIE:** Absolutely not. And that is not what the president is doing here. The president is continuing to follow the act of Congress by enforcing and using the appropriations for 400,000 deportations a year, and secondly, exercising prosecutorial discretion.

**REP. BACHUS:** So he has the power to legalize what is illegal.

**MS. HINCAPIE:** No, he is not providing any legal status to individuals. This is simply temporary reprieve from deportation. There's no legal status that is being conferred.

**REP. GOODLATTE:** The committee is advised that we have three votes on the floor, and we will stand in recess and we will reconvene immediately after those votes. It's my understanding that Mr. Rotunda has some concerns with a flight delay - a flight that he doesn't want to miss and the committee will certainly work with him to accommodate that. If you can stay as long as possible, great, but if you need to leave during this vote period, which is going to last at least a half an hour, we understand.

And the committee will stand in recess.

(Recess.)

**REP. GOODLATTE:** OK, we're going to call this hearing back to order. Thank you for waiting. I apologize. I don't think we'll have any more interruptions. And the chair now recognizes the congresswoman from California, Mrs. Lofgren.

**REP. LOFGREN:** Well, thank you very much, Mr. Chairman, and I'm glad that the - obviously the last votes of the hour have resulted in a much smaller panel back from the vote so we will not be here that much longer. I do want to make a couple of comments. First, since all of this is submitted to the record under oath, I want to make a correction that I'm sure was inadvertent. Mr. Sekulow, in your written testimony, on page 5, footnote 22, you assert that there was a provision that allowed for - in the statute that allowed for humanitarian relief for family members.

Well, I read that and I thought, did I get this wrong? So I went and I re-read IRCA and I want to correct the record because it's exactly incorrect The statute - well, let me just read what the committee said when they passed the vote. This is the committee report for IRCA. It is the intent of the committee that the families of

App. 0930

legalized aliens will obtain no special petitioning right by virtue of the legislation. They will be required to wait in line in the same manner as immediate family members of other new resident aliens.

The provision that you reference in the footnote relates to humanitarian waiver, but only for those individuals, if you look at 8 U.S. Code 1401, who are ineligible for other reasons. And so it specifically does not provide relief to individuals who were made intentionally ineligible for relief under the statute. I'm sure that was inadvertent but I would ask unanimous consent to put the public record into the record.

I also wanted to question, I guess, an issue in footnote 21 on your testimony. You mentioned the CRS report about granting relief. I think it's important, and I would ask unanimous consent to place into the record the Congressional Research Service report that's referenced, that that, according to CRS, was the first time, or at least the most notable time, that the grant of blanket extended voluntary departure was made for domestic policy considerations rather than a crisis in a foreign national's homeland. And I think that's an important issue because I think you, sir, and also Mr. Dupree have indicated that prior grants of relief were related to the president's inherent foreign policy position. That clearly hasn't been the case for many decades.

Finally - well, I guess it's not finally because I don't want to be corrected by my colleague from California, but I'm sorry that Mr. Rotunda has had to leave because I did want to comment on a couple of the points that he made. He mentioned that the - now I've lost my notes here. Now let me go to you, Mr. Dupree. You mentioned in your written testimony a former head of the Office of Legal Counsel under President Clinton, and we've researched who was that person, and it turns out it's - unless there were two individuals who made the exact same comment - that it was Walter Dellinger.

And it occurred to me that although you're quoting him, Mr. Dellinger is one of the 10 legal scholars who's written to us, saying that although they differ on the merits of immigration reform, they do not disagree on the power of the president, and that they have reached the opinion that the president's actions most recently are completely lawful and consistent with governing law and with the policies the Congress has expressed in the statutes that it has enacted.

In fact, when he was making the take-care clause comment, it was in reference to a request or an opinion regarding whether the constitution limits the authority of the federal government to submit to binding arbitration. And the OLC opinion concluded that there was no such constitutional prohibition. As the Supreme Court in Heckler v Chaney had indicated, the faithful execution law does not necessarily entail acting against each technical violation of the statute, but this case cited really has nothing to do, in my judgment, with the points that you are making relative to the immigration matters.

I am wondering, since we only provide sufficient funds to deport about 4 percent of the undocumented population a year, and since the statute itself charges the Homeland Security secretary to establish national immigration enforcement policies and priorities, how would it lead you to a conclusion that establishing those priorities to fit within the funding made available would somehow be impermissible?

**REP. CONYERS:** Mr. Chairman, I ask unanimous consent that the gentlelady be granted two additional minutes.

**REP. LOFGREN:** Mr. Dupree?

**REP. GOODLATTE:** One minute.

**MR. DUPREE:** Congresswoman, my view is that there is no question that the executives in the Department of Homeland Security have the constitutional power to set enforcement priorities. In my view, the setting of enforcement priorities is inherent in the concept of discretion, and it is something that is committed by our Congress to the executive.

Where I think that President Obama has gone awry is, number one, in indicating that he essentially is going to abandon enforcement as to a very significant percentage of the affected population; and number two, is that this really goes beyond a mere statement of saying we are not going to remove you. This amounts to a determination that will enable potentially 5 million people to claim benefits under federal law --

**REP. LOFGRE:** If I -- if I may, there are no benefits. And I would like to think, Mr. Sekulow, we don't agree on the constitutional question.

But you do note that Section 274A(h)(3), of the Immigration and Nationality Act --

**REP. GOODLATTE:** The congresswoman's time has expired.

**REP. LOFGREN:** May I ask unanimous consent to put some things into the record, sir?

**REP. GOODLATTE:** Yes. I was going to ask you that, if you wanted to put some documents in.

**REP. LOFGREN:** I would ask unanimous consent to put the following statements into the record: statements by the National Hispanic Christian Leadership Conference, the Lutheran Immigration Refugee Service, the Episcopal Church, the Church World Service, the AFL-CIO, American Federation of State, County and Municipal Employees, the American Federation of Teachers, the Asian-Pacific American Labor Alliance, the arc (ph), the Coalition of Black Trade Unionists, the Economic Policy Institute, the Communication Workers of America, Jobs with Justice, the Labor Council for Latin American Development, the Laborers International Union of North America, the National Education Association, the United Auto Workers, the United Food and Commercial Workers, the United Steel Workers, Asian-Americans Advancing Justice, the American Civil Liberties Union, the American Immigration Council, the American Immigration Lawyers Association, Appleseed, Common Cause, Farmer Worker Justice, Fair Immigration Reform Movement, the Latino Victory Project, Latino-American Working Group, the National Council of La Raza, One America, and We Belong Together, along with 10 stories compiled by United We Dream.

**REP. GOODLATTE:** Without objection, those documents will be entered for the record.

The chair now recognizes the congressman from California, Mr. Issa.

**REP. ISSA:** Thank you, Mr. Chairman.

Mr. Sekulow, you're familiar with Youngstown versus Ohio?

**MR. SEKULOW:** Yes.

**REP. ISSA:** Is there any question in anyone's mind whether or not the basic question of the president is relying on his constitutional authority and not on any statutory authority in this case?

**MR. SEKULOW:** Well, he believes he's relying on his constitutional authority.

**REP. ISSA:** So --

**MR. SEKULOW:** Under Youngstown Steel, I don't think he meets that standard at all. It would be at the lowest step, they said.

**REP. ISSA:** But presuming that he does --

**MR. SEKULOW:** Yeah.

**REP. ISSA:** -- presuming that he is relying clearly not on the intent of Congress, clearly when he talks about work permits and so on going well beyond any statutory visas that exist, he has only his constitutional authorities.

Let me ask a series of questions, and I'll first ask it to you and then the other witnesses.

**MR. SEKULOW:** OK.

**REP. ISSA:** If the president decided to expand his current definition to include all persons with health issues, would there be any difference in that basis?

If he decided -- and I'll go through a quick series. If he decided that any person who had a means of support, any person who had gainful employment, any person who had a life-threatening disease, any person who was unable to find a job in their home country, any person who, in fact, had been here more than five years period, wouldn't all of those arbitrary categories be just as binding and just as legitimate as the one that he has created in order to create roughly 5 million or almost half of all illegals becoming legal?

**MR. SEKULOW:** If the president's constitutional analysis was correct, that would be correct, Mr. Chairman.

**REP. ISSA:** So if we allow this authority to be left unchecked, the president could at any time pick any category, any group of people and allow them all to stay here simply under the basis that he created a list of requirements that, if they met them, they could stay?

**MR. SEKULOW:** Yes. And under his theory, at any time, he could change his mind the next day and say now you all have to leave. That's the problem.

**REP. ISSA:** And let's go into that because I think for all of you I want this question.

Back in 2003, I authored the Alien Accountability Act. That allowed for a six-year hiatus in deportation of any individuals who were -- who came forward, voluntary submitted themselves, and stood up for a procedure in which they would only be guaranteed a temporary work permit if they could show that they were gainfully employed. And then they would be subject at the end of the six years, if not renewed by some other work permit, to then leave.

The interesting thing about that was it looks a lot like the president's act. The difference, of course, is that it would have lasted for more than just a president's time. But in this case, when the president's term expires,

the next president can be just as arbitrary -- or even this president, as you said, could be just as arbitrary.

So the reason I couldn't get a single Democratic co-sponsor, including my dear friend, Howard Berman, when he was here, was that the interest groups that were just named by my colleague from California all said they'll never sign up for this because, in fact, they would come out of the shadows, expose themselves and at any time could be deported.

From a practical standpoint, are there two truisms, which is, one, if you can name this category as broadly as you do, can't you name any category?

**MR. SEKULOW:** Yes.

**REP. ISSA:** And, two, if, in fact, you want people to come out and disclose themselves, on what basis would this lack of full force of a binding agreement for more than the whim of the president's next morning coffee -- why would this cause people to actually come from the shadows?

Lastly, to the gentlelady, I want to know if, in fact, if people don't come from the shadows under this act, has the president still given them complete immunity? Or is this contingent in any way on whether or not they turn themselves in? Because that's something the president hasn't said.

And if somebody hasn't signed up within the period he specified, would they then be subject to deportation?

I'll get to you last.

But please, Mr. Sekulow, I know I gave you the questions. But the questions I have are broader than the answers the president gave.

**MR. SEKULOW:** Thank you. Well, I would point to the administration's justification under the OLC document where they say that ultimately that the only way that this is constitutional is that it is revocable at any time. And that -- your proposal -- your legislation, which would have been based on law as passed, would have had a concrete -- not only constitutional but a statutory basis upon which to respond to a real situation.

What the president has done -- that's why I said, if I'm the lawyer representing some of these clients, I would be very hesitant to say come out of the shadows under the whim of what would be changed literally the next day. There is no guarantee in this whatsoever.

This does not solve the serious problem that we have in this country on immigration.

**REP. ISSA:** And then probably the second question, just because my time has expired.

**REP. GOODLATTE:** Quickly please, because the congressman's time has expired. But go ahead and answer the question.

**MS. HINCAPIE:** Sure. So --

**REP. ISSA:** But I do have 1200 unanimous consent requests coming up too.

No, just kidding.

Please.

**MS. HINCAPIE:** So if people -- if I understand the question, Congressman, if people don't come forward, will they still be subject to deportation; is that correct?

**REP. ISSA:** If somebody is apprehended not having signed up under the president's plan, he's silent on the question of is Homeland Security simply going to ignore them, or is it contingent on signing up? Because the president implied that it was contingent on signing up, but I could find nothing in his order that actually convinced me that it was.

**MS. HINCAPIE:** So assuming that if somebody doesn't come -- let's say it's a parent of a U.S. citizen child and they, for whatever reason, don't come forward and --

**REP. ISSA:** Like they're smart and know that it's arbitrary and could be --

**MS. HINCAPIE:** They are --

**REP. ISSA:** -- gotten rid of at any time.

**MS. HINCAPIE:** -- nine months from now to say -- and they are potentially subject to deportation. They may be considered a low priority. So the immigration agent, maybe in your district, for example, may decide, no, this is a parent of a U.S. citizen child, I'm not going to deport them because I've got somebody who's a national security threat.

So those discretionary decisions will be made on a day-to-day basis, individualized on an ongoing -- just as they --

**REP. ISSA:** But in the case of DACA, the discretion never sent anyone out, right?

**REP. GOODLATTE:** The gentleman's time has expired.

The chair now recognizes Congresswoman Jackson Lee from Texas.

**REP. JACKSON LEE:** As I said earlier this morning in other hearing on this topic, I thank, in this instance, the chairman and ranking member for an important discussion that is the responsibility of the United States Congress.

And in that discussion, I think it is well clear that different opinions are to be presented. I also think it is important for the record for many who are not members of this panel to understand that, when a particular party is in the majority, it gives them the right to have the dominant opinion on the panel.

The three persons arguing against the executive order are only reflective of the opinion of the majority. 120215mh.ht

To understand that when a particular party is in the majority, it gives them the right to have the dominant

opinion on the panel. The three persons arguing against executive order are only reflective of the opinion of the majority. They are not reflective of the broad-based legal thought across America.

I represent to you that there are now 135 law professors and others of prominent law schools, from Harvard to Columbia to Washington University, to individuals from various law firms, prominent, who completely disagree with the remaining two members of the panel, which I hope gives us a basis for making an intelligent decision, which really speaks to what all of us would like to do, is to have legislation passing comprehensive immigration reform. But my dear friends who are there, who I thank for being here, are not the final statement. They are a representative sample of the opposition. We have exactly one witness and those of us who have a different perspective.

So I would like to quickly put into the record a statement from Dr. Sharon Stanley Ray (ph 1:10), Christian Church Disciples. I come at it from a humanitarian perspective. I think the executive order is narrowly drawn. But she says, I come with hands full of faith statements like my own, from dozens of faith communities that repeatedly name our values for people over politics, community safety over partisan strategies, family unity and welcome over fears of foreigners, and humanitarian compassion for children and families above rhetoric and rancor.

I ask unanimous consent to put her entire statement in the record.

**REP. :** Without objection.

**REP. JACKSON LEE:** I believe the Arizona case in 2012, Mr. Sekulow - I completely disagree with your interpretation. Executive orders are narrowly drawn. The executive order the president issued is clear on its face, and therefore, the example of my good friend from California about people who have different reasons for possibly coming out are clearly not in the executive order. It lists the priorities according to terrorism, felons, multiple misdemeanors. It is written out very clearly.

And in this case it clearly indicates that the Supreme Court has said that discretion in the enforcement of immigration law embraces immediate human concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime. The equities of an individual case may turn on many factors, including whether the alien has children born in the United States. Clearly what the president has enunciated.

So in essence, although you are dynamic legal scholars, and those of us who have gone to law school relish your cerebral ability, but you are making a mountain out of a molehill and you are wrong. You are absolutely wrong. It is based on emotion, it is based on opposition to immigration, despite your constitutional prowess, and I say that globally. I'm not point out any names here. Because we have a Supreme Court decision that says that this executive order is within the confines of its discretion.

Let me ask Ms. Hincapie this question, and I have a question for Mr. Dupree, quickly if I can. If you would, Ms. Hincapie, we have been hearing about stay under the covers, don't come out. That's frightening people, and again, just putting people in a box. What is your thought about continually telling people that as a lawyer I would advise my client not to take advantage of this defining executive order.

And then I just quickly want to ask Mr. Dupree, that he quoted from one of the counsel from Bill Clinton, I want to ask him who that counsel was and what was the approach of his citing that person.

**MS. HINCAPIE:** So thank you for the question, Congresswoman, and for your leadership on immigration for many years. The National Immigration Law Center has been very involved in the implementation of the deferred action for childhood arrivals program. The new program announced by the president, the deferred action for parental accountability, is very similar and premised on the same thing.

As lawyers, as a legal organization we do advise individuals of what the risks are and the fact that this is an individualized adjudication that someone at USCIS is going to review the application, look at all the evidence, are you eligible for the criteria, do you meet the criteria. And only at that point will the Department of Homeland Security decide whether the person merits deferred action.

However, the reason we do advise that individuals come forward is because the status quo is unacceptable, as I shared in my testimony, and parents, the mother who was here earlier, Isabel (ph 4:44), is - prefers to come out of the shadows to make sure that she's there for her daughter at the end of the day. So they will take that risk, even if a future administration may terminate this -

**REP. JACKSON LEE:** Mr. Chairman, would you yield to Mr. Dupree to answer the question that I did get on the record, please? I'd ask for courtesy.

**REP. :** You have 30 seconds, sir.

**MR. DUPREE:** Absolutely.

**REP. JACKSON LEE:** Who were you citing from?

**MR. DUPREE:** It was Walter Dellinger's opinion. I believe Congresswoman Lofgren was correct. It was the opinion on the federal government's ability to enter binding arbitration.

**REP. JACKSON LEE:** Then you are aware that he has said that this executive order is consistent with governing law, with the policies that Congress has expressed in the statutes?

**MR. DUPREE:** Yes, and if I could address that. Look, Congresswoman Jackson Lee, I like law professors. I have been known to associate with law professors, but the day that we choose to elevate the opinions of the law professoriate over the text of the Constitution is the day that I fear for the republic.

**REP. JACKSON LEE:** I doubt that that is the case, but he was in the Office of Legal Counsel and I imagine he had to read the Constitution. But we will disagree but not be disagreeable. Thank you so very much, Mr. Chairman. I yield back.

**REP. :** The chair recognizes Congressman King.

**REPRESENTATIVE STEVE KING (R-IA):** Thank you, Mr. Chairman. I thank the witnesses for your testimony and your patience for us to come back to this Congress after our votes on the floor. I would first ask if each of you have read the 33-page OLC guiding document. Is that true for each of the witnesses? And let the record reference that they nodded or affirmed yes to that.

And so I would take you back to a time in my memory when then-Secretary of Homeland Security Janet

Napolitano sat at the very table and we had a discussion about the lack of constitutionality of the Morton memos and daca (ph 6:24) and I promised her that day that she would face litigation, and of course they have drug out, as we likely expected.

But I also recall in that foundational document that she referenced on an individual basis only seven times in a 1 1/3 page document. And so it came to my attention when I was reading through this 33-page OLC component of advice for the president that purports to rationalize how the president can conduct himself in a constitutional fashion. I put it through my word processor and I came up, when I used these phrases: case by case, discretion, individual. Those three searches, and I came up with 152 incidents of it in this 33-page document. Which caused me to think that I know that they were preparing for the litigation in the Morton memo that had seven mentions of individual basis in it. But I didn't realize how paranoid they were about the litigation that's bound to come on the 33-page document here of the OLC, so - the Office of Legal Counsel.

I'd also like to put into the record a few things that I've picked out of here. I mean, I read this - not the full thing studiously like you all did, but I got through the first third of it pretty well and I concluded there's enough advice here that says no to the president that if I had been he, I would not have followed it any longer. I would have decided, well, I guess maybe I was right the 22 times I told the public I didn't have the authority to do this.

And so here is one thing I think that's important out of the OLC opinion. Deferred action does not confer any lawful immigration status. Put that one up in the record. Another one, DHS' decision not to seek alien removal, that's just an underlying component but I continue, may apply for authorization to work in the United States under certain circumstances, that being a discretionary decision of the executive branch of government, as I understand it.

I skipped to page 6, where this document says that the executive cannot, under the guise of exercising enforcement discretion, attempt to effectively rewrite the laws to match its policy preferences. And continuing, an agency's enforcement decision should be consonant with rather than contrary to the congressional policy underlying the statutes the agency is charged with administering.

And further, in the same paragraph, I might add on page 6, when the president takes measures incompatible with the express or implied will of Congress, his power is at its lowest ebb. There's more. In fact, I think I'll continue. On page 7 it says, third, the executive branch ordinarily cannot, as the court put it in Chaney, consciously and expressly adopt a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.

There's more. This is - in the first third of this at least is a devastating article if you're the president trying to defend your action. And so I'd start first with Mr. Sekulow, and could you begin to explain to me what I'm missing as I read this OLC document.

**MR. SEKULOW:** The president's lawyers clearly advised him that in order for his executive order and their - or executive action - in their opinion to meet constitutional scrutiny, there would have to be individual, case-by-case determination, which was revocable at any time at the agency's discretion, which is markedly different than the deal the president offered when he gave the speech.

**REP. KING:** And so on an individual basis only, would that be a class or a group of 5 million people perhaps?

**MR. SEKULOW:** Well, that's - the reality is, an individual determination on a case-by-case basis with 5 million people cannot happen.

**REP. KING:** Mr. Dupree, would you care to comment?

**MR. DUPREE:** Congressman King, I shared your reading of that memo and that's the thing that struck me as remarkable is that the memo lays out certain legal premises. Correctly, in my view. Many of them are correct. But then the conclusion it draws from those legal premises is profoundly flawed. The people at OLC are very smart and I think they understand what the law is and I think, as I said, in portions of the memo they accurately state the law but I think they completely misfired in advising the president that what he was proposing was constitutional. It plainly is not.

**REP. KING:** And I thank you, and I did read the concluding paragraph and I'd just put that into the record. It says, in sum, for the reasons set forth above, we conclude that the DHS' proposed prioritization policy and its proposed deferred action program for parents of U.S. citizens and lawful permanent residents would be legally permissible -- I would say that's inconsistent with at least the first seven or eight pages -- but that the proposed deferred action program for parents of DACA recipients would not be permissible. When I read that I think, could it be that they've said that the DACA recipients came here due to no fault of their own so it has to be somebody else's fault? Would that be the parents or the DACA recipients, Ms. --

**REP. GOODLATTE:** The gentleman's time has expired. You can answer the question.

**REP. KING:** Can I ask the witness to answer the question, please, Mr. Chairman?

**MS. HINCAPIE:** Sure, really quickly. I think the -- of course, I most definitely disagree with my colleagues here to the right, which is that the OLC memo is very carefully written and it lays out what the president's limitations are and clearly states that the program that the president has announced falls within those legal limits and it -- (inaudible) -- the way that the current DACA program exists is individualized adjudication. I tell you that because I, personally, have assisted individually young immigrants who qualify for DACA and put their applications together so that they can be -- (inaudible) -- and some -- (inaudible).

**REP. KING:** But could it be that the parents were the ones at fault? (Inaudible) -- are the parents at fault?

**REP. GOODLATTE:** OK. The gentleman's time has expired. His documents will be entered into the record. The chair now recognizes Mr. Cohen.

**REP. LOFGREN:** Mr. Chairman, could I ask unanimous consent to put two things in the record?

**REP. GOODLATTE:** Go ahead.

**REP. LOFGREN:** There's been a lot of discussion about --

**REP. GOODLATTE:** Quickly, please.

**REP. LOFGREN:** -- authorized employment so I would like to put Section 274(a)(h)(3) of the Immigration Nationality Act along with the regulation providing that those aliens who have deferred action may receive

work authorization in the code.

**REP. GOODLATTE:** Without objection. Mr. Cohen, you're up.

**REP. :** Mr. Chairman, can -- could I just ask unanimous consent to, instead of five minutes, that we just submit the entire immigration and naturalization code to the record so that we don't have to continue to go through piece by piece?

**REP. GOODLATTE:** I have no objection -- (inaudible).

**REP. :** (This -- (inaudible) -- this law is being ignored and I believe is law ?).

**REP. COHEN:** Thank you. Ms. Hincapie, let me ask you a question. I believe you've said that you believe the president's actions are lawful. Is that correct?

**MS. HINCAPIE:** That is correct, yes.

**REP. COHEN:** And it's because he has discretion -- prosecutorial discretion. Some people have asked that he had said in the past about some set of facts or laws that he didn't have this authority and he changed his opinion and you gave a reason for that. But let me -- was the -- and I don't recall -- I don't know if somebody here does -- what were the facts upon which when the president said he didn't have the authority? Were they the same limited situation as he's got going now where he's just doing deferred prosecution (with ?) the other responses to people that wanted to get a fast track to citizenship and some other things that are not part of this program?

**MS. HINCAPIE:** So that's a very good question, Congressman. What the president was responding to was, basically, demands from the immigrant rights community, from grass roots organizations and from immigrants themselves to stop all deportations and that was a consistent demand which he often said, no, I cannot do that. And then the second piece, which I tried to explain in my testimony earlier, the context -- the timing of when the president was making those comments was always because he was specifically focused on getting comprehensive immigration reform done through legislation.

Now, I should share, on March 14th of earlier this year I sat across from the president and specifically talked to him about the need for him to exercise his legal authority and even there he said, I agree but I'm focused on immigration reform and all of you immigrant advocates also need to be focused on immigration reform, and he disagreed with the extent of authority that we believe he has and one of those examples is parents of DACA or workers. We believe at the National Immigration Law Center that workers who have been here for over five years who meet certain criteria should potentially be eligible. So this administration has decided by consulting the Office of Legal Counsel to take a much more conservative approach about what kind of discretion they're willing to take on and also have set forth the specific enforcement priorities.

**REP. COHEN:** And, Mr. Sekulow, you agree that -- well, first, let me finish up with Ms. Hincapie. The foundation upon which the president acted that you believe is constitutional is the same foundation that President Reagan and President George Herbert Walker Bush acted upon. Is that correct?

**MS. HINCAPIE:** Absolutely. They have all -- every administration, Republican and Democrat, including Presidents Reagan and President Bush, Sr., used prosecutorial discretion to provide -- at the time it was

voluntary departure and here it's the same thing. It's deferred action. It's simply a different type of prosecutorial discretion, a different type of deferred action.

**REP. COHEN:** And thank you. Mr. Sekulow, you said you agreed that, and maybe differed a little bit in degree, but that President Bush and Reagan and you threw in Clinton and maybe Bush the Second, that they also were wrong and that four wrongs don't make a right.

**MR. SEKULOW:** And I -- basically, what I said was constitutional violations don't get better with time and I don't see an underlying -- this is my view -- I don't see an underlying statutory base. I can be sympathetic with what they were trying to do, as I am with the president, but that doesn't mean there's a constitutional base on which to do it. So --

**REP. COHEN:** Well, let me ask you this, and I know you're not a politician. But why is that in all those other four instances nobody came out and questioned the president's authority from either side --

**MR. SEKULOW:** Yeah.

**REP. COHEN:** -- and nobody came out and filed a lawsuit and nobody even questioned -- suggested a possibility of impeaching Presidents Bush, Reagan, Clinton -- they did get to Clinton for whatever else -- but and then Bush? What's the difference? Why is this president -- (inaudible) -- pass over different from all other presidents?

**MR. SEKULOW:** I think -- I'm sorry.

**REP. COHEN:** Yeah.

**MR. SEKULOW:** I think, Congressman, you answered it. It's -- there is a political element to it and it's the sheer numbers and scope of what we're dealing with. You're dealing with 5 million people and, you know, when you ask about the question, which I think was a good one, about was the president talking about deportations or was he talking about something else, that's a good question. But let me read you the exact quote. He was at a speech. He was giving a speech. He had hecklers, much like we saw today, that were concerned about this and they -- and they were saying, stop the deportations, and the president said, now, you're absolutely right that there have been significant numbers of deportation -- that's true -- but what you're not paying attention to is the fact that I just took an action to change the law. So the president views what he did, even though OLC doesn't say that, but the president viewed it as stopping deportations, and he said he took action to change the law. So I don't think what any of these presidents have done is more than constitutional framework. That's in my view.

**REP. COHEN:** Ms. Hincapie, do you believe -- and you're not a politician either --

**MS. HINCAPIE:** I am not.

**REP. COHEN:** -- that the reason why the response to this has been so different under this president -- do you believe that just because of the number or do you believe that there's some other reason that makes this president different from all other presidents?

**MS. HINCAPIE:** I would have to say that I do believe this is different. He is the first African-American

president. He is being attacked for a number of issues and, historically, every single president, Republican and Democrat, since Eisenhower has used their prosecutorial discretion and used their executive authority. I would also add that when Bush Sr. exercised that prosecutorial discretion they too believed that they were going to be covering about 40 percent of the undocumented population at the time and it was after Congress expressly said that they were not going to cover the children and spouses of immigrants who were legalized under URCA (ph) there was Senator -- late Senator Chaffee had an amendment that was expressly denied and defeated that would have done what President Bush decided to do anyway.

**REP. COHEN:** Thank you -- (inaudible). Thank you, Mr. Chair.

**REP. GOODLATTE:** Chair recognizes Congressman Franks.

**REP. FRANKS:** Well, thank you, Mr. Chairman, and thank all of you as witnesses for being here today. Mr. Chairman, of all of the relevant premises I think we could consider, perhaps the most foundational would be to simply read the oath that President Barack Obama made when he laid his hand upon the Lincoln Bible almost six years ago -- I do solemnly swear that I will faithfully execute the office of president of the United States and will to the best of my ability preserve, protect and defend the Constitution of the United States. Mr. Chairman, I believe the recent executive action by the president on illegal immigration is categorically incompatible with that oath. I am also convinced that there are very few things the president can do more dangerous to a republic such as ours. If American presidents in the future should consider these days precedence and consider themselves unconstrained to the Constitution as a matter of routine, the rule of law in America will be no more, and so much of what so many men and women have die on dark battlefields to protect will be undone. These are not light issues, Mr. Chairman.

And so, Mr. Sekulow, my first question is to you, sir. Justice of the Supreme Court James Wilson once explained that the take-care clause meant that the president has the, quote, "authority not to make or alter or dispense with the laws but to execute and act the laws which are established," unquote.
So, sir, do you believe in that president's recent actions comport with Mr. Wilson's conclusions? And is the president refusing to adhere to the "take care" clause in an attempt to evade the will of Congress?

**MR. SEKULOW:** I think that's the fundamental question, and it's not the policy issue of whether it is good or bad as far as immigration reform goes. This is: Is the president's action moored in constitution authority?

In my view, it is not.

**REP. FRANKS:** All right. Mr. Dupree, let me ask you.

You state in your testimony that, when President Bush was unable to get comprehensive immigration reform through Congress, quote, "that he -- we did not attempt to achieve through executive fiat what we could not achieve through the legislative process. We respected the system the framers established," unquote.

That's your testimony.

Do you believe that this administration is respecting the Constitution when it grants deferred action to a class of millions of unlawful immigrants?

**MR. DUPREE:** I do not, Congressman. I do not think that the president's actions are consistent with the

system that our framers established. And I would point out that one of the ironies is that the Bush administration, and particularly the Justice Department in which I served, was often criticized for excessive assertions of executive power. And yet when it came to immigration, we held back. We did not act through executive fiat, we did not act through executive order but rather we deferred to the Congress. We respected the congressional role under Article 1, Section 8, which confers the power to grant -- make immigration laws on this Congress. And we held back.

**REP. FRANKS:** Thank you.

Mr. Sekulow, let me ask you: If a president holds himself unconstrained to the Constitution, what are the implications to a republic like ours?

**MR. SEKULOW:** It could end up with lawlessness. I mean, the real problem here -- and I said this in my testimony earlier and we said is in our written submission -- is that, under the president's lawyer's interpretation of this executive action, the president could wake up tomorrow morning and say, you know what, that executive action I took two days ago, I don't want to do that anymore. And then you've now had these people apply for something that doesn't exist.

And I think that's part of the problem here. If you're not moored in the Constitution, the danger to the republic is the separation of powers becomes meaningless, which was a major -- it's our entire constitutional framework.

**REP. FRANKS:** Yeah. Well, Mr. Chairman, I guess I would just suggest to you that the issue that we're dealing with here in the central consideration is one of profound significance. And if we allow the rule of law to be jettisoned, which it appears that we may be on that road, then I'm afraid we would all owe Great Britain a pretty profound apology for that little unpleasantness we had with them a few centuries back.

**REP. JACKSON LEE:** Would the gentleman yield?

**REP. FRANKS:** And with that, I would yield back.

**REP. JACKSON LEE:** Would the gentleman yield?

**REP. FRANKS:** I would yield.

**REP. JACKSON LEE:** I thank the gentleman.

I started by acknowledging that there are differences of opinion but I really think we can work through this. And I would only say to the gentleman, an executive order -- and both of the gentleman here -- is limited by the president's tenure. It is temporary. The president knows that. I think that's a bogus argument.

But what we can do is we can pass, Mr. Franks, with you, immigration law by this Congress.

**REP. GOODLATTE:** (Sounds gavel.)

**REP. JACKSON LEE:** And I hope we'll do that.

App. 0943

With that, I yield back, Mr. Chairman.

**REP. FRANKS:** Thank you, Mr. Chairman.

**REP. GOODLATTE:** The chair now recognizes Congressman Johnson.

**REP. JOHNSON:** Thank you, Mr. Chairman.

It should serve as no surprise to anybody in this room that the first hearing of this committee that we would have after our return from our August break -- excuse me -- after our return from Thanksgiving -- we've had so many breaks that I'm getting confused about it.

But, you know, our very first hearing, we only have two more weeks to go, and this is a messaging hearing as opposed to a substantive oversight hearing of a presidential action.

This is -- this is just another example of the strategy that Republicans have employed since the very moment that President Obama was sworn in to office. And that is to obstruct everything that the president sets out to do.

Now, they won't give the president credit for being the deporter in chief. I mean, he has deported, under his administration, more people than any president in history.

Do you think you would ever hear a Republican give him praise for that? No. They will find something to obstruct that process.

So it doesn't matter what it is, it's just we're going to say no to it. And so then you get a group of lawyers together. My wife is a lawyer, by the way. I mean, we've been married for 34 years, and we've been lawyers the whole time.

And, man, we sit down. Whatever I say, she's going to take issue with from a legal perspective. (Laughter.) Any legal issue that we start discussing, she's automatically going to take the opposite side. And she's going to argue it earnestly and convincingly.

And you three, along with the fourth gentleman who was here, have done the same thing. And I believe that you feel earnest about the topic here today. But I also know that you're lawyers, and lawyers can argue either side of an issue and do so compellingly.

And so my hat is off to you because all three of you all are top-notch lawyers, litigators. And that's what lawyers do. And lawyers also take abstract principles of law, apply them to the facts that a client will present to you. And then you will give the client the options. You won't select the option for the client. You won't direct the client to do this. But you'll give the client a range of options, and the client will decide for him or herself which option to take.

And then, if you want to retain that client because that client pays well, you're going to go to court and you're going to argue for whatever position that client decided upon and you're going to do so very earnestly. And you're going to do it convincingly. And you may be fortunate enough to win the case. And that's what lawyers do, and that's what you all are doing.

And I -- that's what I used to do. I still do it when I argue with my wife.

But this, ladies and gentlemen, is not a courtroom. This is a legislative chamber. And our power as a legislature comes out of the Article 1 of our constitution. And so we're sitting here talking about Article 2, and there's not one thing that us legislators here with Article 1 power can do about Article 2 power other than to sue the president.

And we don't have to have this hearing to do that. We don't even have to have a hearing for the Republicans to decide that they're going to impeach the president or that we're going to file a lawsuit on him or we're going to prosecute him. We don't need that.

So what this body is doing is actually wasting time when we could be passing comprehensive legislative -- comprehensive immigration reform, just like the Senate did almost two years ago. And then we're refusing to do our obligation to the people that they elected us to do.

This is the most do-nothingest Congress in the history of mankind. And we're doing nothing today other than what we've always done in this Congress under Republican leadership. And that is to say "no," obstruct the president.

And so I don't have any questions. I think each one of you all are -- have argued your positions admirably. And if I were the judge, I would be deciding -- I would be deciding this case -- my ruling would go in favor of the minority, the underdog

**REP. GOODLATTE:** The gentleman's time has expired.

The chair now recognizes Congressman Gowdy.

**REP. GOWDY:** I thank the gentleman. I thank Mr. Chairman.

Ms. Hincapie, among many limitations in life is my inability to glean other people's motives or be able to read their minds. I could have sworn, in response to a question you received from Mr. Cohen, you suggested race with the basis for why we may have this constitutional perspective.

Did I understand you correctly?

**MS. HINCAPIE:** I believe I was responding to the question about is there -- is there an explanation about why --

**REP. GOWDY:** Well, let me offer another explanation to you. OK? Not a single Republican who is here right now ever served under a Republican president. Not one.

So I hope I do live long enough to hold a Republican president to the exact same standard that I am holding this one.

But for you to run to race as the explanation for why we hold the position that we do -- Harry Reid had a very different perspective on recess appointments when there was a Texan in the White House, and none of us

accused him of geographic discrimination.

In fact, hell, for that matter, Senator Obama had a different perspective on executive overreach than President Obama. And nobody wants to (raise us ?) an explanation for that.

So I would just caution you to be careful when you try to import motives to people. With that, what are the limits of prosecutorial discretion?

**MS. HINCAPIE:** So among the limits of prosecutorial discretion is that the president must comply with existing statues such as the appropriations. So the president can't simply stop deporting everybody. And in fact what they've done here is they've listed new priorities. So --

**REP. GOWDY:** So we can't stop deporting everybody. I mean, what are the limits? So as long as he deports one person, then that's a proper exercise of prosecutorial discretion?

**MS. HINCAPIE:** No, under the current appropriations the --

**REP. GOWDY:** I'm not talking about appropriations. I'm talking about constitutional doctrine of prosecutorial discretion, which if you marry up with the pardon clause means no -- you don't have to enforce it and if they do break it you can pardon them for it.

**MS. HINCAPIE:** Right, so under the constitutional doctrine, we should take two pieces. One is you've got the take-care clause, which says that the president must take care to enforce the law --

**REP. GOWDY:** Ms. Hincapie, I -- your answer is much more complex than my question. What are the limits of the doctrine of prosecutorial discretion?

**MS. HINCAPIE:** The limits are that the president must enforce the laws based on statute, so one is --

**REP. GOWDY:** I thought he just announced he wasn't going to do that, that he was carving out categories and exceptions --

**MS. HINCAPIE:** In addition --

**REP. GOWDY:** -- and not only case-by-case basis too, for entire categories.

**MS. HINCAPIE:** No, he is not stopping -- he's not -- he's not saying that he is not going to enforce the law whatsoever vis-à-vis those individuals. He is saying he is creating a program by which individuals can come forward if they meet certain criteria and they will be held accountable to apply, pay a fee, pass a criminal background check --

**REP. GOWDY:** But that's not the current law, right?

**MS. HINCAPIE:** That is -- that is what is possible under deferred action, and that is what he has -- he has developed. That's correct.

**REP. GOWDY:** Well, I want to talk to you for a second about that background check. And I want to get into the policies a little bit. Can you tell me what a non-serious criminal is? Because when I look at the White

House talking points, they're interested in serious criminals. So tell me what a non-serious criminal is.

**MS. HINCAPIE:** It could include somebody, for example, who has been detained for shoplifting, let's say a -- I don't know, a 22-year-old who takes lipstick, and that's a misdemeanor, and she --

**REP. GOWDY:** So just misdemeanors? A non-serious criminal refers to misdemeanor convictions?

**MS. HINCAPIE:** Right. And in fact there are certain misdemeanors that are considered serious criminals under the recent memos from the Department of Homeland Security as well.

**REP. GOWDY:** How about domestic violence? How many domestic violence convictions can you have and still remain?

**MS. HINCAPIE:** I believe domestic violence is considered a serious crime under the new --

**REP. GOWDY:** It wasn't under the comprehensive senate immigration bill, which I have heard lots and lots of my colleagues embrace. I think you could have up to three domestic violence convictions and still remain on the path to something under the Senate version.

How about recidivist DUI?

**MS. HINCAPIE:** I believe DUI completely disqualifies you as well.

**REP. GOWDY:** A single DUI conviction --

**MS. HINCAPIE:** Conviction, correct.

**REP. GOWDY:** -- is considered a serious criminal even though it's a misdemeanor?

**MS. HINCAPIE:** That's my understanding -- that is my understanding, yes.

**REP. GOWDY:** Well, where could I go to find out whether or not that understanding is correct or not? It wasn't on the White House talking points. They talked about gang members. But I'm not aware of a federal crime for being a member of a gang. Is there one? I know it's a sentencing enhancement. Is there a crime for being a member of a gang?

**MS. HINCAPIE:** Well, in fact that is some of the concerns that some advocates have. But if it's simply if you are being considered a gang member because you live in a certain ZIP code and you're being associated or is it really --

**REP. GOWDY:** Well, I understand that your -- I understand your concern is that it might catch too many people. My concern is the opposite, that it won't catch the right people. So it's not a crime to be a member of a gang; you have to commit another underlying offense, and then it's a sentence enhancement.

So how are you going to determine who the gang members are?

**MS. HINCAPIE:** Well, there are gang databases that exist? We assume -- again --

**REP. GOWDY:** So if you're in a gang database, will you be deported?

**MS. HINCAPIE:** We don't have enough information from the administration yet, right. Remember, this is just --

**REP. GOWDY:** Well, I've got the talking points that gang members are going to be deported.

**MS. HINCAPIE:** But the talking points are not sufficient. They will be issuing guidelines with respect to how they will implement the program.

**REP. GOWDY:** Who's "they"?

**MS. HINCAPIE:** The administration, the White House; and the Department of -- the Department of Homeland Security.

**REP. GOWDY:** Thank you, Mr. Chairman.

**REP. :** Chair recognizes Dr. Chu.

**REPRESENTATIVE JUDY CHU (D-CA):** Ms. Hincapie, I want to address this claim that President Reagan and Bush only did a deferred action as a clean-it (ph) measure for laws there were already agreed upon by congress. And that is IRCA, of course.

However, isn't it true that Congress actually considered whether the spouses and the children of persons who obtain legal status through IRCA should be granted special protection under the law and explicitly chose not to do so and that both President Reagan and Bush chose to expand this law anyway with deferred action and work authorization?

**MS. HINCAPIE:** Yes, Congresswoman, and thank you for your leadership, particularly on the POWER Act. Yes, absolutely. The big difference between what Presidents Reagan and Bush Sr. did versus what President Obama has done -- they exercised prosecutorial discretion, they're using existing statute to provide deferred action and allowed people to get work authorization; however, both under IRCA, the -- Congress considered and rejected the fact that children and spouses who didn't meet certain criteria would not be eligible. And then after IRCA was passed (with ?) the quote, unquote, "cleanup," there were a number of amendments that were introduced at different points -- the Family Fairness Act -- also -- that failed. One was with cloture. The cloture vote failed. And then secondly, on October 7th of '87, the late Senator Chafee introduced an amendment specifically to amend the Immigration National Act, to waive the continuous residence requirement under the legalization program for spouses and children of qualified legal aliens. And that also was defeated.

Despite the fact that those different attempts by Congress -- and this is a Republican senator -- to address this issue, Presidents Reagan and Bush Sr. decided this was unfair to deport the children and spouses of people who were legalized under IRCA; and secondly, they recognized they had the legal authority to exercise that discretion and provide voluntary departure for those individuals and eventually work authorization as well.

**REP. CHU:** So both President Bush and Reagan acted in contrast to Congress, not in conjunction with

Congress.

**MS. HINCAPIE:** Correct. They acted against congressional will and exercised their legal authority, which was well established and continues to be well established today.

**REP. CHU:** OK. It has also been said repeatedly today that this deferred action is unfair because the beneficiaries would jump in line before millions of others who are waiting in line.

Why is this incorrect, Ms. Hincapie?

**MS. HINCAPIE:** So unfortunately, again, this is incorrect because there's a lot of misinformation about what the deferred action program is. People are not getting onto any path to citizenship. They are not becoming lawful permanent residents. They are simply getting a temporary reprieve from deportation and will be able to work because the regulations allow them to get work authorization if they get deferred action.

So we still have a need, and as Congressman Johnson was just saying a few minutes ago, there's a need for comprehensive immigration reform to address the needs of the individuals who are waiting in line. This -- nothing that the president has done changes in any way that need for immigration reform. And my understanding is H.R. 15 is still pending in Congress. There are still a few weeks left in the session. And I have been very comforted by the -- by the number of comments many people made today about the support for comprehensive immigration reform. And I would urge every single one of you to use the remaining days in this session to pass H.R. 15.

**REP. CHU:** So, Ms. Hincapie, it's been also said repeatedly today that this deferred action creates a class of individuals who are considered for deferral of deportation a blanket -- that this is a blanket non-enforcement program.

Is this a blanket non-enforcement program? And for instance, with DACA have there been denials of the applications? Can you tell me how many of them there have been? Because I've read that it's 1,377 requests that have been denied.

**MS. HINCAPIE:** Right. So yes, this is -- this is not a blanket amnesty or a blanket program whatsoever. DACA, the program that's been in existence for the last two years, as well as the new program are -- is based on individual adjudications. And so again, individuals have to put forth the evidence that they meet all of the criteria. And I must say to you, Representative Chu, I mean, we have held large clinics for DACA where young immigrants have come with reams, volumes and volumes, of evidence documenting all of their continuing residence, everything from report cards to immunization records, the student-of-the-month records; the certificates, letters, et cetera, from the school. They have come forward with a lot of evidence. And that is why it has been a successful program, because the majority of them have been able to meet the criteria required.

That said, there are many who have also been denied. And in fact most recently with the DACA renewal program, we've seen an increase in rejections of DACA applications, which we continually raise to the administration to understand the reasons for those rejections.

**REP. :** Would the gentlelady yield?

**REP. CHU:** Yes.

**REP. :** I'd like --

**REP. :** Gentlewoman's time has expired.

**REP. :** I wanted to make a unanimous consent request.

**REP. :** Should we just do a blanket unanimous consent?

**REP. :** No, this is --

**REP. :** Please, go ahead.

**REP. :** The -- my good friend, the chairman of the subcommittee, had a number of questions about eligibility for the deferred action --

**REP. :** My good friend, the chairman of the subcommittee, had a number of questions about eligibility for the deferred-action program, which is specified in the memorandum dated November 20th. Those who are priorities for removal, which includes the misdemeanors and the like, are specified in that memo. And I'd like to, since there were questions about that, put this memo in the record so people will understand who is eligible and who is not eligible.

**REP. :** Without objection.

The chair now recognizes Congressman Labrador.

**REPRESENTATIVE RAUL LABRADOR (R-ID):** Thank you very much.

Ms. Hincapie, I'd like to join my good friend from South Carolina and advise you and all the other members of this committee - I actually have a question for you. When the Congress went after President Clinton and they - were they racist when they were against his policies?

**MS. HINCAPIE:** I don't recall what you're - I'm not sure what you're referring to.

**REP. LABRADOR:** Just any time that the Congress objected to President Clinton's policies, were they being racist?

**MS. HINCAPIE:** I'm not - it's out of context, but I take - your point is well taken, both of your points.

**REP. LABRADOR:** When President Clinton was impeached, was it because the members of Congress were being racist?

**MS. HINCAPIE:** No.

**REP. LABRADOR:** When the Democrats filed articles of impeachment against President Bush, was it because they were being racist?

**MS. HINCAPIE:** No, Congressman.

**REP. LABRADOR:** It was because they disagreed with his policies, wasn't it? And they thought that he has exceeded his authority as president of the United States, and they thought that he had committed impeachable offenses.

I disagreed with them. And that's why no one on this side has filed articles of impeachment against this president. But I just get -

**REP. :** (Off mic.)

**REP. LABRADOR:** I think you guys might, but I don't think any Republican wants to do that. I think you might try to do it under Republican hands. But no one's talking about impeachment here. No one's talking about anything like that. And we disagree with his policies. We disagree with everything he has done on immigration. But to assert here in a hearing, in an open hearing, under oath, that it might be racism why we're disagreeing with the president's policies, I think, is beyond the pale.

Now, let's talk about some of these facts that are happening here. You did not answer the question about what the president's - the limit to the president's authority might be under deferred adjudication. Are there any limits to his authority?

**MS. HINCAPIE:** The limits to his authority have to do with the statutory limitations. And so, again -

**REP. LABRADOR:** But you said he created a program. There is no statutory program that allows him to do this program. You said it in your own testimony that he created a program that now we're using, according to you, in individualized adjudication. But he created that program, right?

**MS. HINCAPIE:** Creation of the program is - so under the Homeland Security Act, Congress has charged the executive branch, and specifically the secretary of the Homeland - of Department of Homeland Security -

**REP. LABRADOR:** I understand that. And then you're going to argue that it's because we don't have enough appropriations. If the Homeland Security Department started deporting more people than they have funds for, can't they just come to Congress and ask for more money to start deporting people?

**MS. HINCAPIE:** Yes, they could definitely do that. But that was actually not the argument I was going to make. The argument I was going to make was simply that, under the Homeland Security Act, the Department of Homeland Security has identified priorities for who is considered a high-level priority, who is a low-level priority.

**REP. LABRADOR:** But they don't get to set those priorities.

**MS. HINCAPIE:** Excuse me?

**REP. LABRADOR:** They don't get to set those priorities. The Congress has set those priorities for them. They have said that there's a certain class of people that are here unlawfully and without documents, and they should be deported. It's not the Department of Homeland Security that gets to set those premises.

**MS. HINCAPIE:** So it's a combination of the two, Congressman. So under 6 USC Code Section 202, Subsection 5, the statute is very clear that the secretary of homeland security shall be responsible for the following - Subsection 5, quote - "establishing national immigration enforcement policies and priorities." So the executive -

**REP. LABRADOR:** But those priorities are in memos, not in statutes. Isn't that correct?

**MS. HINCAPIE:** Well, the statute says the department gets to decide what those priorities are. And then, secondly, as any administrative agency, any executive agency, then gets to decide, based on resources, based on policy priorities, based on what is considered good public policy, et cetera, they determine a combination of - it's the same way that -

**REP. LABRADOR:** So if I run for president and I decide that I don't like any EPA regulations - I don't like the EPA and I don't want to enforce any of those regulations - can I, under prosecutorial discretion, decide not to enforce any of the EPA rules?

**MS. HINCAPIE:** You could, except the legal limitation, again, would be if there is a statute that requires you - it requires the EPA to specifically enforce certain parts of it.

**REP. LABRADOR:** Well, there's a statute that requires them to specifically enforce immigration laws. Now, if I decide that I don't like tax laws, can I decide, as president, that I don't want to enforce the tax laws?

**MS. HINCAPIE:** But again, that is not - Congressman, with all due respect, that is not what this administration is doing.

**REP. LABRADOR:** That is exactly what this administration is doing. I was an immigration lawyer.

**MS. HINCAPIE:** Mmm hmm.

**REP. LABRADOR:** You can do an individualized adjudication. And I had many of my clients who I asked for deferred adjudication for. And I said they have a set of facts that makes them eligible for deferred adjudication. And usually it was because there was nothing in the law that allowed them to stay in the United States legally. Correct? And I think you've done that as an immigration lawyer as well.

**MS. HINCAPIE:** Mmm hmm.

**REP. LABRADOR:** But in the end, you ask for an individualized adjudication -

**MS. HINCAPIE:** Right.

**REP. LABRADOR:** - not for a whole class of people. You didn't just say I want every one of my clients who has lived in the United States for five years to have deferred adjudication.

**MS. HINCAPIE:** With all due respect, that, again, is not what the administration is saying. The administration is saying there's going to be accountability. Individuals who meet certain criteria can come forward -

**REP. LABRADOR:** There is no accountability.

**REP. :** The gentleman's time has expired.

The chair now recognizes Congressman Deutch.

**REPRESENTATIVE TED DEUTCH (D-FL):** Thanks.

Ms. Hincapie, would you like to finish your answer?

**MS. HINCAPIE:** Thank you, Congressman.

I was just saying that there - again, what the administration is doing is simply saying here are the low-level priorities. This is the criteria. Individuals still need to come forward individually and affirmatively, and only at that point are they considered for deferred action. There is no blanket. Every mother and father, come today and get a work authorization document.

**REP. DEUTCH:** Thank you. Thanks.

So I just wanted to take a moment. We're discussing President Obama's so-called executive overreach. But I fear that the characterization makes light of what is a very sad reality that law enforcement agencies face every day, which is there are limited resources. Officials must pick and choose which crimes and which charges to pursue.

Every law enforcement agency, from the FBI to your local police department, chooses where to focus their resources. A state prosecutor makes choices. Perhaps they direct their staff to focus more on prosecuting domestic violence and less on marijuana possession. DOJ makes choices. The administration has to determine where to focus its resources. Officials ask themselves questions. Do we spend more prosecuting corruption of the banking sector or do we focus more on Medicare fraud?

In fact, right on down to the most basic level of law enforcement, every day police officers exercise discretion when enforcing our laws. They let some speeding drivers go with a warning. They charge others with reckless driving.

Likewise, when it comes to immigration enforcement, there's no way for the Department of Homeland Security to deport more than 11 million undocumented immigrants in the United States, even if that's the goal of some in Congress.

Mr. Rotunda, when he was here earlier, made it clear democracies just don't have mass deportations. So in an era of limited resources, DHS has to prioritize. The administration is merely articulating something that law enforcement offices do every day - the FBI, the CIA, DOJ, the state prosecutors, all the way down to city cops.

How else can immigration enforcement officials exercise their discretion and prioritize which of the approximately 11 million undocumented immigrants should be searched for, rounded up, detained and deported?

The president's executive orders on immigration made clear that DHS should direct their limited resources toward deporting those undocumented immigrants who commit serious felonies or significant misdemeanors. This enforcement prioritization based on available funding sources will ensure that undocumented immigrants who pose a serious risk to the safety of our communities will be deported, while those who have been residing in the U.S. for many years and who have worked and who have contributed to our communities can remain.

And I want to give you a practical example. Beatrice Perez (sp) has lived in the United States for 22 years. She and her four children live in my home state of Florida. A trained teacher in Mexico, she avoided going into her field here out of fear of deportation, instead making a living for her four children by selling fishing nets. Lourdes (sp), 24, and Jaciel (sp), 22, both qualified for delayed deportation status under the president's DACA policy. Mariel (sp), 16, and Karen (sp), 15, are both American citizens.

The question is, should Beatrice Perez (sp) be deported and separated from her children? Should the Department of Homeland Security make this hard-working mother of four children, including two American children, a priority for deportation?

I ask for unanimous consent to submit a summary of the Perez (sp) family into the record.

**REP. :** Without objection.

**REP. DEUTSCH:** Thank you.

Exercising prosecutorial discretion for our nation's immigration laws should ensure that law enforcement resources are used in a fiscally prudent manner and prevents us from unnecessarily taking people away from their families and stowing them in extremely expensive detention centers, which is the last point I'd like to touch on.

Here's the problem. For more than a decade, this Congress has required, in the Department of Homeland Security appropriations bill, that Immigration and Customs Enforcement maintain an average daily detention population. This required daily detention population, the detention bed mandate, has increased over the years to 34,000 people. It is an unprecedented restriction in law enforcement. It is costly financially. It takes a significant toll on families living in our communities.

Congress requires that 34,000 people be kept in detention facilities and provides more than $2 billion a year to hold undocumented immigrants in detention facilities. That's $5 ½ million a day. It costs $159 to hold a person in detention. Less costly alternatives to detention cost between 70 cents and $17 per day. Decreasing our nation's costly detention population could free up the funds that ICE could direct toward other critical responsibilities.

The detention bed mandate is unprecedented. No other law enforcement agency has a quota on the number of people they must keep in jail, none of them, nowhere in this country. Providing ICE with discretion to fill detention beds based on need and not a number imposed by Congress would be consistent with the best practices of law enforcement.

To satisfy the daily bed quota, ICE officials are forced to find and remove undocumented immigrants from

their families, even if they've committed no serious crime, even if they pose no flight risk to appear for immigration proceedings. And many undocumented immigrants have been living in the U.S. for years and are productive members of our communities. Removing them from their families to satisfy the bed mandate creates and enormous toll on our families.

Mr. Chairman, as we go through the rest of this discussion, let's bear in mind that this Congress has some things that we can do. We can pass immigration reform. And I'm heartened to hear so many of my Republican colleagues talk about the need to do so, or seemingly, their willingness to do so, and it's been so hard to have a vote. But let's also remember that we should stop taking away the discretion of law enforcement --

**REP. GOODLATTE:** The gentleman's time has expired. The gentleman's time has expired.

**REP. :** -- by requiring we spend $2 billion of taxpayer funds to keep people in detention facilities.

**REP. GOODLATTE:** The chair recognizes Mr. Farenthold.

**REPRESENTATIVE BLAKE FARENTHOLD (R-TX):** Thank you very much, Mr. Chairman.

We've already seen what happens when the administration telegraphs what they are and aren't going to do with respect to enforcing our immigration laws, and that's the crisis on the southwest border. And I'm a south Texas representative. Last summer, I was down there and witnesses firsthand the problems caused by a bunch of children, in some cases completely unaccompanied, some cases with their parents, crossing the border, based on a mistaken belief that if they got here, they're going to get to stay. We set this -- the president's policy as a date certain in there, but these dates tend to flip. And we're telegraphing that we really do not have a serious intent to enforce our immigration laws. This -- not only is this damaging to the balance of power between Congress and the White House, they're also going to damage border security and open us up to a similar crisis in the future.

And I want to ask Ms. Hincapie if you think this action is going to cause more people to try to cross the border illegally.

**MS. HINCAPIE:** No, Congressman, and for two reasons. One is the deferred action program that the administration has announced specifically says that it only covers individuals who have continuously resided in the United States since January 1st of 2010. So that's the last five years. So for any individual who comes tomorrow or today, they're not eligible.

**REP. FARENTHOLD:** Yeah, but didn't we, under Reagan, say that we were only going to grant a legal status to those folks that were here on a certain date, and here we are doing something similar again? It seems like we're wasting our time doing anything before the border is secure.

Mr. Dupree, do you think we're going to see more people coming and attempting to cross the border illegally as a result of this policy?

**MR. DUPREE:** I think we absolutely will. I think that the administration's policies are followed very closely outside the United States and I think we saw that with the episode that you referred to a minute ago. And I think there also is, as you alluded to, there really has been kind of a sense of mission creep. I mean, it's been

kind of a one-way ratchet in which the administrations -- and Republican as well as Democrat administrations -- say we'll provide limited relief. And guess which way that relief gradually goes? It expands and it expands.

**REP. FARENTHOLD:** It also frustrates me that the president's action is going to make it more difficult for Congress to find a path forward on both securing the border and dealing with immigration reform. You know, we've got issues with high-tech workers. We've got issues with agricultural workers. We've got -- we've got a ton of issues that we need to deal with with immigration. And it seems like the president is driving a wedge between the White House and Congress in doing this.

My understanding, you worked with the Bush administration on immigration reform. From your work trying to pass immigration reform, do you think this is going to damage the prospects of Congress acting?

**MR. DUPREE:** Well, to say the least. If the president asserts the power, in my view, unconstitutionally, to act unilaterally, it's basically saying to Congress, good riddance. I don't need you. Regardless of whether you pass a law, regardless of whether you don't pass a law, I'm going to make immigration law myself. So it's -- you all are the ultimate judges of this, but from my perspective, it's very hard for me to see how this would enhance the likelihood of cooperation from Congress.

**REP. FARENTHOLD:** And Ms. Hincapie has argued for very broad interpretation of prosecutorial discussion.

Mr. Sekulow, do you believe that this broad of interpretation -- I mean, does that leave us anything with the Take Care Clause, or has this just become an orphan clause in the Constitution that it has no meaning if we take this broad of a definition?

**MR. SEKULOW:** I think it's what the court and Cheney said, that when you have non-enforcement on such a broad-based scale, that you are, in essence, not enforcing the existing law. I mean, I don't know what is so confusing about prosecutorial discretion. A lot of you all have been prosecutors. I was a government lawyer. Prosecutorial --

**REP. FARENTHOLD:** I learned it in law school. You don't arrest somebody for speeding to the hospital or you prosecute --

**MR. SEKULOW:** Yeah, or -- and I was a tax lawyer for a treasury and we had cases and sometimes we'd say, you know, what? Just based on our resources, we're not going to do that particular case. But we didn't say every case involving that particular industry, we're not going to prosecute. That would not be prosecutorial discretion. That would be suspending the enforcement of the law.

**REP. FARENTHOLD:** And my friend, Mr. Labrador, said he had one other question. I'll yield the remainder of my time to him.

**REP. LABRADOR:** Thank you.

Mr. Dupree, were you working in the White House and -- with the White House on June 6th of 2007?

**MR. DUPREE:** Yes, I was.

App. 0956

**REP. LABRADOR:** OK. Do you remember what happened in the Senate -- because I'm tired of hearing that President Obama has been working so long for immigration reform? Do you remember what happened in the Senate when then-Senator Obama decided to vote for poison pill amendments that killed the entire immigration bill that you guys were working in the --

**MR. DUPREE:** It was immensely frustrating. The way that that played out was immensely frustrating for many of us who had labored for months, in some cases years, to effect immigration reforms.

**REP. LABRADOR:** And in fact, President Obama, who at the time was a senator, had gone to the White House, looked at George W. Bush in the eye and said that he would work for immigration reform and then he went to the Senate floor and he killed immigration reform. And then he promised the American people the first thing he was going to do as president was going to do immigration reform. Had a Congress, a House and a Senate in democratic hands and did absolutely nothing. I think Ms. Hincapie said it right; this has always been a political issue for this president. It has never been a policy issue.

Thank you very much.

**REP. GOODLATTE:** Congressman Gutierrez is recognized.

**REPRESENTATIVE LUIS GUTIERREZ (D-IL):** Thank you, Mr. Chairman.

A segue to prosecutorial discretion, I'm just going to sit up here. I didn't have the -- thank you so much. I didn't have the good fortune of being able to go to law school. I never met Thomas Jefferson or James Madison or Ben Franklin or George Washington. I read about them, and sometimes the lawyers kind of take us down memory lanes like they're your first cousins once removed. But not having met any of them, I admit to that and I haven't gone to law school, so I'm a little not as prepared as the gentleman might be on the questions of law. But I supported and I've worked harder than anyone here, at least as hard as or harder than anyone here in working with Republicans. And you know what? They keep inviting me. They say it'll be next week, Luis, and you know, here's our principles. And then they go, just kidding; I really didn't mean it. You know, they keep testing us and teasing us about immigration reform. We're going to do it; we're just not ready right now.

The fact is that the speaker called the president of the United States in June of this year and he said despite all your great efforts, Mr. President, and mine, we're not going to call a vote on immigration reform. So let's just put aside the fallacy that somehow this is disruptive to a system. It's almost as though you're coming here to tell us, oh, we were on the pinnacle of success and had the president not acted, we'd all be convened here to do comprehensive immigration reform. The fact is that that's just not reality.

So let's deal with reality. The fact is that when you and I and others were working in the Senate to pass the bill, we passed a bill here, the Sensenbrenner bill. That was immigration reform in the House of Representatives when they controlled it, that criminalized every priest, every teacher, every doctor. That was the response to the Senate bill. So let's get it very, very clear here. Every time we have sat at the table and we have said, look, tell us what it's going to take, they refused to act. It is now 23 months into the year and we have not seen any legislation taken from this committee to the House floor that isn't taking 800,000 young people and making them illegals once again, in the words of my colleagues.

So you know, not having met any of them, I just want to say that I did meet a few other people that I've had

the privilege and the honor of meeting and working with. So I can't go back 200, 300 years or 400 years, when you guys suggest that prosecutorial discretion was well established in the law. I can go back to November 4th of 1999, and here it is. And I'm just going to try to read a little bit of it.

It says: There has been widespread agreement that some deportations were unfair and resulted in unjustified hardship. If the facts substantiate the presentations that have been made to us, we must ask why the INS pursued removal in such cases when so many other more serious cases existed.

We write to you because we believe people -- you know that discretion to alleviate some of the hardship. It says: The principle of prosecutorial discretion is well established. Indeed, INS general counsel and regional counsel have taken the position apparent well grounded in case law. The INS has prosecutorial discretion in the initiation and termination of removal proceedings.

Furthermore, a number of press reports indicate the INS already employed discretion in some cases. True hardship cases call for the exercise of such discretion.

And over the past year, many members of Congress have urged the INS to develop guidelines for the use of prosecutorial discretion. Guidelines for the use of prosecutorial discretion.

Let me just suggest to you -- I never met George Washington. I never met Benjamin Franklin. You know, I know you guys like taking us down memory lane, right, with the founders.

But I'll tell you what. I did meet Henry Hyde. I did meet Lamar Smith. I did meet Mr. McCullough. I did meet all of these gentlemen that have signed this.

And let me just say that Henry Hyde, Lamar Smith, McCullough and others that have signed this are from open borders, kind of friendly-to-immigrant policy kind of members of Congress. I think we could suggest that.

And yet what did they say? They wrote the attorney general and the INS commissioner and said prepare guidelines.

Let me just suggest to you that Idaho has 1.6 million people. We deport 400,000 a year. It would take us -- if we just spent all of our life in Idaho, it would take us the next four years. We'd have to deport -- we are not going to deport ourselves out of the issue of immigration reform. We are going to have to find a solution.

And instead of here arguing as though we're the Supreme Court and you guys are some, I don't know, solicitor generals telling us what is constitutional or not constitutional, I think we should roll up our sleeves and begin to do the work of fixing the immigration problem because we have not put one more person on the border to secure our borders, nor have we helped one more family.

And I would just end with this.

Mr. Chairman, you know, I didn't go to law school. But it just seem to me that justice is about compassion too. It's about fairness. It's about looking and weighing the equities that people have.

And I think 4 million American citizen children we should take into consideration because, guess what, tonight, my grandson, he's going to be taken and my daughter is going to go to a school and go check out his

report card. She's going to be able to take him to the library. She's going to be able to help him with his homework. She's going to be able to do a lot of things, take him to soccer.

**REP. GOODLATTE:** (Sounds gavel.)

**REP. GUTIERREZ:** There's millions of undocumented immigrants that can't do that for their American citizen children.

So let's stop. We're not -- nothing has been resolved here.

**REP. GOODLATTE:** The gentleman's time has expired.

**REP. GUTIERREZ:** Let's get back to -- thank you so much, Mr. Chairman. Thank you for your indulgence and generosity.

**REP. GOODLATTE:** Congressman Collins, you're next.

**REP. COLLINS:** Thank you, Mr. Chairman.

And I'll -- probably the one part I would just agree with with my friend just now is the fact that, you know, amazingly enough, after a wonderful speech at the -- carried by many of the -- everything was supposed to be solved a couple of weeks ago because the president acted. Undoubtedly, we're far from that.

This is concerning on many levels. And the problem that I have is -- the biggest part here is the fact that we're -- this has gotten mixed up into immigration, and we're using immigration and we're using the stories of hardships. And I can understand that.

But the problem is here is a fundamental -- take the issue away. Remove the issue, remove immigration, remove drug enforcement, remove -- and just go back to the simple idea of what the structure of government is. And that's the problem that I'm having here.

And also, as a reminder, one, if we -- and I heard it mentioned from across the aisle that we had passed bills in which we had, they had never moved out of this committee. I'm not sure why my friends across the aisle were concerned. They didn't vote for any of them in this committee. So they wouldn't have worried about them on the floor of the House. So I'm not sure why that.

And also, as my friend from Idaho mentioned just a few moments ago, the reason that most of us believe that this is a really political issue for this president is because, when he chose to overhaul the health care system, when he chose to go after the big banks, too-big-to-fail, when he chose a lot of other priorities, you know what he didn't choose as a priority, he did not choose illegal immigrants. He did not choose the immigrant community. He did not.

So we can complain all we want about differences of opinion and what did and not move. So the issue comes is now I can do, I'm in my last term, and I don't like what Congress has or has not done.

My question also is this. And I'm just sitting here pondering this. Because I did sit through law school, and I'm proud that I did sit through law school. And I haven't met George Washington either.

But the books and stories have told me a lot about how this history was founded and the folks who strived to come here. And rule of law matters. And if you come from a country in which rule of law does not matter and the reason you're coming is you want to find rule of law, what does it say when we're going avoid the rule of law in this country?

Take immigration off of it and just look at the balance of power.

Ms. Hincapie, let me just ask a question.

You used the term -- define for me "policy change."

**MS. HINCAPIE:** Policy change?

**REP. COLLINS:** Yes. You use it quite regularly in your brief.

**MS. HINCAPIE:** Sure. Under the -- again, what the Department of Homeland Security has done has said in the past we are deporting parents of U.S. citizen children.

**REP. COLLINS:** Is an executive order a policy change or is it prosecutorial discretion?

**MS. HINCAPIE:** It's prosecutorial discretion.

So what the --

**REP. COLLINS:** So you're saying policy change, to not do something, is -- would be captured under executive --

**MS. HINCAPIE:** Prosecutorial --

**REP. COLLINS:** Prosecutorial discretion?

**MS. HINCAPIE:** Right. So just to -- just technically, the president has not issued an executive order. He has issued executive action. All these are directives by the Department of Homeland Security identifying what their policies and priorities are, again, completely consistent with the Homeland Security Act.

**REP. COLLINS:** In looking at this, take it away -- and I know you can't because this is also a -- it's a cause for you, and I get that.

Take immigration out of this.

**MS. HINCAPIE:** Mm-hmm.

**REP. COLLINS:** What is the limit here?

And you sort of blew off my colleague who said about tax law and about other things. Well, you came across that way.

So you just say, well, no, it can't happen. Tell me why it can't. Because many people who have sat in this body 40, 50 years ago on different issues -- or even 20 years ago -- would have sat here and said, well, there's no way a president would just blanketly take a group and just do away with it in a sense and then put up -- you know, and hide it under a -- here's an ally.

Why is it now not conspiracy theory to think that any president, Republican or Democrat, can use this as precedent?

**MS. HINCAPIE:** So, again, I believe that the president is actually following the law, the Constitution, statutory, regulatory framework. And what the president has done here is the same that previous administrations have done.

In the future, taking the immigration issue out of this, if it were tax law, if it were environmental, if it were labor, employment laws --

**REP. COLLINS:** Why didn't he do it before the election?

**MS. HINCAPIE:** -- it's the same --

**REP. COLLINS:** Why didn't he do it before the election? Why didn't he do it before the election? Why didn't he do it six years ago? Because he knew it's a political issue. He knew it would cost his party politically. He chose to go after the election. It's political.

Standing, Mr. Sekulow, states -- would you say at least in a short answer states have at least a good argument for standing on this?

**MR. SEKULOW:** I would say, of the -- of the potential plaintiffs, they probably have the best argument. But standing is always a difficult task.

**REP. COLLINS:** Very quickly. Also those who are currently legally in line and it's taking forever to process their legal applications and now the same officers are going to have to deal with the deferred action program, would they have standing?

**MR. SEKULOW:** Possibly, especially --

**REP. COLLINS:** So they're being heard? They're in damages. That is another legal term.

**MR. SEKULOW:** Right.

**REP. COLLINS:** Damages have to be found.

**MR. SEKULOW:** Right.

**REP. COLLINS:** Also with reference to the gentleman from Illinois, the letter that he stated, minor detail here, wasn't dealing with illegals. It was dealing with legal permanent residents and developing a process for them. He was not dealing with illegals. It was legal permanent residents.

With that, Mr. Chairman, this -- I yield back.

**REP. GOODLATTE:** The chair recognizes Congressman Jeffries.

**REP. JEFFRIES:** I thank you, Mr. Chair.

And I thank the witnesses for their presence here today.

Let me just start with Mr. Sekulow.

There are approximately 11 million undocumented immigrants in the country right now, correct?

**MR. SEKULOW:** That's the number I understand, yes.

**REP. JEFFRIES:** OK. And Congress appropriates resources to the Department of Homeland Security, correct?

**MR. SEKULOW:** Yes, sir.

**REP. JEFFRIES:** And those resources are used in part to undertake the deportation of undocumented immigrants, true?

**MR. SEKULOW:** That's correct.

**REP. JEFFRIES:** OK. Now, the Department of Homeland Security does not have the resources based on what Congress has allocated to it to deport those 11 million undocumented immigrants, correct?

**MR. SEKULOW:** Absolutely correct.

**REP. JEFFRIES:** OK. So since we've established factually there's no way that DHS can deport 11 million undocumented immigrants because it does not have the resources to do so, it's got to establish priorities as it relates to deportation, true?

**MR. SEKULOW:** Absolutely correct.

**REP. JEFFRIES:** OK. Now, who actually has the authority to establish those priorities? Isn't it the secretary of Homeland Security and, therefore, the president who appoints him?

**MR. SEKULOW:** The secretary of Homeland Security is authorized on a case-by-case basis. Prosecutors are authorized on a case-by-case basis. That's markedly different from a group exemption. REP. JEFFRIES: Right. So -- but we can't -- first of all, this is not a group exemption. And I think that's just been a blanket misrepresentation. I think many of my colleagues have actually corrected it.

But there's at least five factors that individuals will have to prove, right? Present since 2010.

**MR. SEKULOW:** Right.

**REP. JEFFRIES:** Documentation will be required --

**MR. SEKULOW:** Right.

**REP. JEFFRIES:** -- to demonstrate that.

**MR. SEKULOW:** Right.

**REP. JEFFRIES:** You can't just show up and make that representation.

**MR. SEKULOW:** That puts you in the class.

**REP. JEFFRIES:** Reclaiming my time. I'm not finished.

**MR. SEKULOW:** I'm sorry.

**REP. JEFFRIES:** Qualifying child. You have got to demonstrate that.

**MR. SEKULOW:** Correct.

**REP. JEFFRIES:** Birth certificate, perhaps, passport, whatever the case may be.

**MR. SEKULOW:** Right.

**REP. JEFFRIES:** Documentation.

Continuing presence. Again, it's going to require documentation.

**MR. SEKULOW:** Right.

**REP. JEFFRIES:** Four, not an enforcement priority. And then, five, of course, you have to pass a criminal background check.

**MR. SEKULOW:** Right.

**REP. JEFFRIES:** Those are all individual factors that will be assessed by the Department of Homeland Security to determine eligibility, correct?

**MR. SEKULOW:** To determine if you're eligible for the class. That does not constitute an individual determination.

**REP. JEFFRIES:** OK. Well, we disagree on that.

Now, in terms of -- sir?

**MR. SEKULOW:** Yes, sir.

App. 0963

**REP. JEFFRIES:** I'm on the dias. You're answering questions.

**MR. SEKULOW:** Yep.

**REP. JEFFRIES:** We appreciate whatever authority you are bringing --

**MR. SEKULOW:** I appreciate that.

**REP. JEFFRIES:** -- to this discussion, but you are not the definitive authority. In fact, you know, what the Supreme Court has said -- and let's touch on that. You know, the Arizona v. United States case has been brought up.

Are you familiar with that case?

**MR. SEKULOW:** Yes, sir.

**REP. JEFFRIES:** And do you believe that this case in any way contributes to the debate as to whether the president has discretion to defer deportation?

**MR. SEKULOW:** S.B. 10, the real conclusion of the Supreme Court was, of course, that the federal government has the authority and the states cannot override immigration authority that's federally enunciated.

**REP. JEFFRIES:** Right. OK. Justice Kennedy stated in the majority opinion: A principle feature of the removal system is the broad discretion exercised by immigration officials. Federal officials as an initial matter must decide whether it makes sense to pursue removal at all.

**MR. SEKULOW:** Right.

**REP. JEFFRIES:** Correct?

**MR. SEKULOW:** Yes.

**REP. JEFFRIES:** That's what Justice Kennedy stated.

**MR. SEKULOW:** Federal officials.

**REP. JEFFRIES:** OK. Now, we've already established that the resources don't exist for the Department of Homeland Security to remove all 11 million undocumented immigrants, true?

**MR. SEKULOW:** Yes.

**REP. JEFFRIES:** So immigration officials, it seems to me, consistent with the Supreme Court decision, which was written in 2012, on immigration, not on FDA matters, not on other collateral matters, on immigration, establishes clearly that the Department of Homeland Security and this president has the ability to make priority determinations related to deportation. Isn't that clear?

**MR. SEKULOW:** Over a state determination. It involved the constitutionality of S.B. 10. It -- this is a very different situation, with due respect, Congressman, to a situation where there's going to be a blanket creation of a class that is now protected outside of congressional authority.

**REP. JEFFRIES:** OK.

**MR. SEKULOW:** The answer to your question is: Pass a law.

**REP. JEFFRIES:** Since President -- I agree with that. The president agrees with that.

Since President Eisenhower in 1956, 39 occasions there's been executive action related to deferred enforcement connection with immigration, correct?

**MR. SEKULOW:** Yes.

**REP. JEFFRIES:** Thirty-nine occasions.

**MR. SEKULOW:** Yep.

**REP. JEFFRIES:** Right. It happened under Eisenhower and Kennedy related to approximately 900,000 Cubans.

**MR. SEKULOW:** Right.

**REP. JEFFRIES:** It happened under Ford with approximately 200,000 Vietnamese. It happened under President Reagan, I think, as it relates to approximately 200,000 Nicaraguans. It happened under George Bush 43 as it relates to Liberians. And, of course, it happened under the first President Bush with respect to 1.5 million undocumented immigrants, correct?

**MR. SEKULOW:** Yes.

**REP. JEFFRIES:** But you don't believe this president has the authority?

**MR. SEKULOW:** I'm not sure -- I've stated it very clearly, I thought, that I'm not convinced in all of those cases -- some of those cases were involving foreign policy issues where the president does have authority.

But I've stated consistently in my testimony that I believe that, especially as it related to the situation with President Bush 41 as well as with President Reagan that I think it is constitutionally suspect, as I think this is as well.

**REP. JEFFRIES:** Right. My time is expired. I yield back.

**REP. GOODLATTE:** The chair recognizes Congressman Gohmert.

**REP. GOHMERT:** Thank you, Mr. Chairman.

And thank you for being here in this filibuster-style proceeding.

You know, you've heard the president -- his proclamation. And he said that, in essence, since Congress didn't do anything, that he had to act. And I just want to set the record straight.

In July, we had a bill to deal with border issues that was viciously fought within our party and there were massive changes and corrections that were made. And if we didn't have everybody, we had close to everybody in the Republican Party vote for the bill about 10:00 or 10:30 p.m. on Friday night at the end of July.

So we did pass a border bill. And I'm hoping whoever advises the president will be able to tell him that.

But they've got these pesky fences between us and getting to the president. I've advised the head of our CIS that -- and Secret Service was here testifying recently -- that since we're told fences don't work on our southern border, we really need to remove the fences at the White House. If they don't work, they don't work. Take down the fences at the White House.

But I -- I've been perplexed. The president also said that, in essence, if you've been violating our laws for five years or more, you're our kind of people, we want you here. If you're new at violating the law, you hadn't been violating it for a full five years, you're not our kind of people. We want longstanding lawbreakers.

Can anybody explain to me why we should have a preference for people that violated the law more than five years as opposed to maybe new lawbreakers?

**MS. HINCAPIE:** I'll take a crack at that.

**REP. GOHMERT:** What's the advantage of having longstanding lawbreakers?

**MS. HINCAPIE:** I think the rationale behind it is that individuals who have been here for a long time have deep ties to a community, have U.S. citizen children, are paying taxes, property taxes -- many of them are small-business owners, et cetera.

They're contributing to the country and our country in many ways and have U.S. citizen children. They're invested in our country. They want to be Americans, but there aren't any legal channels to do so.

And because of the conversation we've been having so far about the lack of -- there are 11 million people. This administration has been deporting more people than any others -- any previous administration. Two million people have been deported under the Obama administration --

**REP. GOHMERT:** OK. So you're saying that those things don't apply to people that have been here less than five years? If you hadn't been violating immigration laws for five years, then you really don't want to be a citizen, you don't want to have the advantages here?

**MS. HINCAPIE:** No. The administration is simply saying that they are going to consider recent entrants a higher-level priority. Whether I agree or not, that's what the administration has decided at --

**REP. GOHMERT:** OK.

**MS. HINCAPIE:** -- their discretion as the executive branch, again, under the Homeland Security Act and the appropriations that Congress has provided. It needs to balance a number of factors.

So unequivocally --

**REP. GOHMERT:** Well --

**MS. HINCAPIE:** -- the administration has --

**REP. GOHMERT:** My time is short, and I'm just still looking for the rationale for saying people violated the law more than five years or more are our kind of people.

But the five-year figure triggered a remembrance as well. My friend Steve King and I had gone to meet with immigration officials in England in recent years, and we were told they have a firm-standing law in the UK that until you have paid into their British system for five years, you're not entitled to any British benefits at all.

Would there be a constitutional issue that any of you can think of if we were to pass such a law?

**MR. :** No. I think that the Congress has the authority -- the Supreme Court has recognized -- the comprehensive authority to set standards both for naturalization -- the Constitution says that and the Supreme Court has said, with regard to immigration, that it vests exclusively with Congress.

I think you could set standards. We have in the past. The country has done that.

**MR. :** I completely agree. That's Congress' job.

**MS. HINCAPIE:** Congress can make -- change the law.

**REP. GOHMERT:** And you wouldn't see a problem if we passed a law like that? You've got to pay into the system for the five years before you can participate?

**MS. HINCAPIE:** And I would add that actually the majority of people who are here have been paying into the system. They pay approximately 8 billion (dollars), $9 billion into our Social Security system --

**REP. GOHMERT:** Well -- and that begs --

**MS. HINCAPIE:** -- a year.

**REP. GOHMERT:** -- the question, though. There's plenty of evidence here lately, like the child tax credit where people are getting much more back than they paid in.

But since my time's just expired, I would urge lawyers that are in the room a potential area for litigation since the president thinks that he has the constitutional right to do this and he was a constitutional professor in Chicago, it seems like maybe his students have a legitimate class action for their money back.

I yield back.

**REP. GOODLATTE:** The chair recognizes Congressman Cicilline.

**REP. CICILLINE:** Thank you, Mr. Chairman.

I want to first say the witnesses have described this action by the president as unilateral and also claim that the fact that it could be removed at any moment somehow undermines its legitimacy.

Of course, every executive order by a president is unilateral. That's the definition of an executive order. So the notion that this is somehow not legitimate because it's unilateral is it seems to me a completely specious argument.

Similarly, the fact that it could be repealed by another president or by this president is also the exact same thing that happens in every single executive order. So I think those arguments that have been advanced by members of this panel are completely specious. I think you would agree, Mr. Sekulow, that the president's executive authority is neither enlarged nor limited by the words of the president. It's actually dictated by the Constitution and by decisions of the Supreme Court of the United States, correct?

**MR. SEKULOW:** Yes, but executive action, though, incorporates what the president said in this particular case -

**REP. CICILLINE:** But the constitutionality of the action is not determined by the description by any president. It's by what the Constitution permits and what - the decisions of the Supreme Court, correct?

**MR. SEKULOW:** Yes.

**REP. CICILLINE:** OK, and so the Supreme Court actually spoke to discretion in Arizona v. the United States, and they said, a principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials as an initial matter must decide whether it makes sense to pursue removal at all. They go on to say, discretion in the enforcement of immigration law embraces immediate human concerns - unauthorized workers trying to support their families, for example, likely pose a less danger than alien smugglers or aliens who commit a serious crime.

The equities of an individual case may turn on many factors, including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service. So the United States Supreme Court in the most recent decision about the use of discretion in the context of immigration sets forth both the right of the federal government to exercise prosecutorial discretion, and even suggested some factors to consider in the exercise of that discretion.

You have said in your testimony, you keep using this term blanket approval. But in fact what the president did in his executive order is articulate a series of factors which, if satisfied, would entitle that person to deferral of deportation action. And that means an individualized determination as to each of those factors. The fact that in fact those are a common set of characteristics doesn't make it a blanket. It makes that it still requires an individual case-by-case determination, which is all that is required in the exercise of discretion.

Now Mr. Dupree, you've said in both your written testimony and in your testimony today that what disturbs you is the scale of this and also that it is different from past uses by other presidents because it's not

consistent with the will of Congress. Even Mr. Sekulow agrees the scale is irrelevant. It's either constitutional or not, and in fact when you look at scale, it's actually less in scale than President Bush's, which covered 42 percent of undocumented people. This covers 35. So the scale argument doesn't work.

Secondly, you say that it is inconsistent with the will of Congress, when in fact in the Bush - in President Bush's use of the executive order it was in the face of clear, express congressional disapproval of what the executive order did. And in this case President Obama is acting in the absence of any expression of congressional action. So the two bases for your argument have been clearly undermined, correct?

No, no, this isn't to you. This is your testimony. You say here the scale of President Obama's directive significantly exceeds what past presidents has done - untrue. You then go on, moreover, in prior instances the executive was acting to implement a new statute consistent with the will of Congress. Also not true.

MR. DUPREE (?): I disagree. Let me take scale on first. My view as to scale is that if you had an instance in which a president said, or the secretary of Homeland Security said, I am exercising my discretion not to remove this one individual, clearly a permissible exercise of discretion -

**REP. CICILLINE:** That's not true.

MR. DUPREE (?): -- scale means.

**REP. CICILLINE:** You're not talking about whether individually. You're talking about the scale of what is being done here in terms of the quantity or number of individuals followed. The point of it is, the scale of this is considerably less than even the most recent action by President Bush. And the reality is, this hearing is not about the authority of the president to do this.

What we're really doing is delaying action by this Congress and trying to really - to persuade the American people not to pay attention to the fact that this Congress has failed to pass comprehensive immigration reform, and rather than having a hearing where we're talking about what to do about that, we have a bipartisan bill that's passed the Senate, that if it came to the House floor would pass. Instead we've spent four or five hours where legal experts can pontificate about their own opinion about whether this is permissible, when it's very clear from every legal scholar I've read that this is permissible, that there's precedent for it.

And I would ask unanimous consent to enter into the record a letter from the two general counsels of the United States Citizenship and Immigration Service, as well as general counsel for the Immigration and Naturalization Service, which conclude that they have studied the relevant legal parameters and wish to express their collective view that the president's actions are well within his legal authority, and with that I yield back.

**REP. :** Without objection. The chair recognizes Congressman DeSantis.

**REP. DESANTIS:** You know, we hear that, well, Congress hasn't acted so then the president needs to act. But let me ask you, Mr. Dupree, because you were in the Bush White House, if Congress declines to enact a bill that the president wants, is there anything in the text, history or structure of the Constitution that says that because Congress refused to act that the president's Article 2 power is somehow augmented, where he can go around Congress?

**MR. DUPREE:** No, sir.

**REP. DESANTIS:** That's totally foreign to our system of separated powers, correct?

**MR. DUPREE:** That's correct. Completely antithetical.

**REP. DESANTIS:** And Bush would have never said, well, Congress voted down my bill, I'm going to go ahead and legalize people on my own, or grant work permits, correct?

**MR. DUPREE:** That's correct. We were faced with virtually the same situation as President Obama was faced with and we acted very differently.

**REP. DESANTIS:** I mean, the thing is, the House - we actually considered - we did a hearing on this giving of aid bill and it didn't have a lot of support on our side because the Congressional Budget Office said you'd have millions of more illegal immigrants under that bill. One estimate was 7.5 million more. So that problem was not solved at all. The ICE union said it actually made it worse and the Congressional Budget Office actually said that it would lower wages and increase unemployment for U.S. citizens. So there was a lot of reasons why that was something. And the senators who voted for that, most of them lost this past election year.

Let me ask you this, Mr. Sekulow. Prosecutorial discretion. So I'm a federal prosecutor. I may go after the heroin dealer, I'm probably not going to go after the pot smoker. But what I don't do is issue the pot smoker a permit to where he can then keep smoking pot. And how does this idea of conferring positive benefit on somebody fit into the idea of prosecutorial discretion? Yes, you may not have resources, you may have to set priorities about who you actually enforce the law against, but where in that doctrine does it now come from where you're going to issue a work permit and a Social Security number without statutory authority?

**MR. SEKULOW:** Well, the grant of a subsequent benefit takes it out of what's classical prosecutorial discretion. I mean, you're absolutely correct on that. And in the context here, it is one thing to do prosecutorial discretion, as you said on a particular offense, in a particular case. It's quite another, as you just said, to then award a particular benefit.

In this particular case the granting of work authorization is a substantive benefit which is allowed in certain circumstances but this is not one of the categories upon which these work permits, if you will, are authorized. That would take an act of the United States Congress because, despite everybody's protestations on both sides of this, the reality is there's been a creation of a class here. And I'd just like to say for the record, those five criteria are the criteria for determining class, not the individual discretion as to whether in fact someone would be admitted. Because that discretion, according to the OLC memo, rests completely with the agency, not with the president.

**REP. DESANTIS:** And I was struck by footnote 8 of the OLC opinion, where OLC, when the DACA program was going to be instituted, Obama a year before said he couldn't do it, they advised him orally. They didn't actually put it in writing, which I thought was interesting. And then in the footnote they say, hey, it's got to be case-by-case. But the statistics on that is the approval rate is 95-plus percent. So how is that case-by-case if it's 95-plus percent? I think the way it's been implemented actually conflicts with the OLC footnote, even on the administrator, the mini-amnesty that was done in 2012.

App. 0970

**MR. SEKULOW:** The structure of our constitution does not allow for government by executive action only. It requires statutory action from the legislative branch, period, especially on an issue like this, where it's in the purview of Congress.

**REP. DESANTIS:** Ms. Hincapie, is it your understanding that under the president's new policy that people who quality for deferred adjudication will be eligible for Social Security and Medicare benefits? Because the White House had said if they pay in then they will receive Social Security?

**MS. HINCAPIE:** So under the existing regulations, and I just - since this is related to what my colleague has just said, the class that's been created is - under the regulations it's the class of aliens who are eligible for work authorization. The regulations, not the Obama administration, have determined. The regulations say individuals who have deferred action - that is, 274A.12, subsection C14, specifically say individuals who have deferred action. So that is the class. There is no new class being created.

**REP. DESANTIS:** But Social Security, so they are - they will receive Social Security and Medicare?

**MS. HINCAPIE:** Once they get a work authorization and plenary (ph 9:57) authorization document, they will be eligible -

**REP. DESANTIS:** And that obviously they would not have been eligible for that but for the president's action, so he is -

**MS. HINCAPIE:** No, but for the immigration regulations and the statute -they would not have been eligible for that, but for the president's action. So he is -

**MS. HINCAPIE:** No, but for the immigration regulations in the statute -

**REP. DESANTIS:** Well, right, but that may be -

**MS. HINCAPIE:** - (inaudible).

**REP. DESANTIS:** - the background regulation, but his action to put them into that situation is now - are they - it's my understanding that they are not eligible for "Obamacare" subsidies. Is that your understanding?

**MS. HINCAPIE:** They're not eligible for "Obamacare," nor are they eligible for federal -

**REP. DESANTIS:** The problem, though -

**MS. HINCAPIE:** - (inaudible).

**REP. DESANTIS:** - with the "Obamacare" thing is that, yeah, there's not going to be subsidies, but they're actually exempt under the statute from "Obamacare's" employer mandate, which means that they don't count to that 50-employee limit. And so if you have, say, a naturalized U.S. citizen applying for a job versus somebody who's illegally in the country, qualifies under the president's executive order, that business actually - it's about a $3,000 discount to hire the person who's here illegally over the person who is a U.S. citizen, even if they're naturalized.

And so, you know, you said that you're an immigrants' rights activist. But it seems to me what the president's doing is he's driving a wedge between illegal immigrants and legal immigrants. Legal immigrants and naturalized citizens are going to be made worse off as a result of this.

And I yield back.

**REP. :** Thank you.

I have not asked my questions. I'm going to ask you if you care to respond to my question in writing - it doesn't have to be that long - any of you.

I'm going to switch gears here. I want to know what Congress can do to have the United States Supreme Court hear argument on and give parameters or a ruling on executive orders, executive privilege. I know that we can sue the president, no matter who it is, on a case-by-case basis. But my research tells me that the Supreme Court has been punting that back to us, saying it's a political issue; it's a procedural issue. And I'm just hoping that some time perhaps the Supreme Court will take that executive order or executive authority with regard to what we've been seeing with Republican and Democrat presidents. So if you care to answer that, love to read it.

This concludes today's hearing. We thank all of our witnesses for joining us. I thank you for being so patient.

Without objection, all members will have five legislative days to submit additional written questions for the witnesses or additional materials for the record.

This hearing is adjourned. Thank you.

(END)