# EXHIBIT 35

App. 1062

Office - Supreme Court, U. S.
FILED

MAY 10 1952

CHARLES ELMORE CROPLEY
CLERK

In the

## Supreme Court of the United States

October Term, 1951

No. 744.

——◆——

The Youngstown Sheet and Tube Company, *et al.*, Republic Steel Corporation, Armco Steel Corporation, *et al.*, Bethlehem Steel Company, *et al.*, Jones & Laughlin Steel Corporation, United States Steel Company, and E. J. Lavino & Company,

*Petitioners,*

—v.—

Charles Sawyer,

*Respondent.*

——◆——

No. 745.

——◆——

Charles Sawyer,

*Petitioner,*

—v.—

The Youngstown Sheet and Tube Company, *et al.*,

*Respondents.*

## BRIEF FOR PLAINTIFF COMPANIES, PETITIONERS IN NO. 744 AND RESPONDENTS IN NO. 745.

App. 1063

# TABLE OF CONTENTS

PAGE

Opinion Below ............................................................ 1

Jurisdiction ................................................................ 2

Questions Presented ................................................. 2

Constitutional and Statutory Provisions ................. 3

Status of the Parties ................................................ 3

Statement of Facts .................................................... 4

   A.  Events Before the Seizure ................................ 4

   B.  Events After the Seizure ................................. 10

Summary of Argument ............................................. 15

What This Case Does *Not* Involve .......................... 16

ARGUMENT:

  POINT I —

     Mr. Sawyer's invasion of plaintiffs' rights is an
     arbitrary action inconsistent with, and directly
     contrary to, the remedy expressly provided by
     Congress ..................................................................... 18

    A.  Congress has provided for this precise case
       a remedy which has not been followed ............ 19

    B.  There Was and Could Be No Valid Reason
       For Disregarding the Remedy Provided by
       Congress and Adopting Instead an Entirely
       Inconsistent and Unlawful Procedure .......... 24

ii

**PAGE**

POINT II —

The seizure of plaintiffs' properties and Mr. Sawyer's other action, including that threatened with respect to wages and other conditions of employment, are unlawful and unconstitutional .. 27

A. The Necessary Background—the Successful Struggle Against the Crown Prerogative and its Culmination in the Constitution of the United States ........................................................... 30

B. The Constitution Provides No Authority for the Seizure or for Mr. Sawyer's Other Actions ................................................................... 37

C. This Seizure, Far from Being Authorized Under the Executive Responsibility to Execute the Laws, is in Conflict With the Laws as Enacted by Congress .................................... 43

D. The Seizure and Mr. Sawyer's Other Actions Cannot Be Justified Under the President's Power as Commander in Chief ....................... 52

E. The Seizure Cannot be Justified by Any Claim of an "Aggregate of Powers" or by Isolated Instances of Past Executive Action Which Were Never Legally Challenged ..................... 62

F. Mr. Sawyer's Action Violates the Fifth Amendment to the Constitution .......................... 67

G. Denial of the Sweeping Executive Power Here Claimed Will Not Leave the Government Powerless to Meet an Emergency ................ 69

iii

PAGE

POINT III —

The seizure and Mr. Sawyer's threatened action are causing and will cause the plaintiffs irreparable injury for which they have no adequate remedy at law ........................................................... 74

A. The seizure is causing serious injury to the plaintiffs and further grave injury is immediately threatened ........................................... 74

B. Money damages—assuming they could be recovered—would be wholly inadequate ............ 78

C. In any event no money damages are recoverable ..................................................................... 80

POINT IV —

The preliminary injunctions were providently issued by the District Court ..................................... 86

POINT V —

This is not a suit against the President; and the District Court had jurisdiction to grant the requested injunctions ...................................................... 90

CONCLUSION .......................................................................... 97

APPENDIX A:

Relevant Provisions of the Constitution ................ 1a

Applicable Provisions of The Labor Management Relations Act of 1947, 61 Stat. 136 *et seq.*, 29 U. S. C. Supp. IV, §§158(a)(5), 158(b)(3), 158(d), 176-180 ........................................................ 4a

iv

PAGE

The Defense Production Act, as Amended, 64
Stat. 798, 65 Stat. 132, 50 U. S. C. A., Appendix,
§§2081, 2121-23 ...................................................................  8a

The Universal Military Training and Service Act,
62 Stat. 625 *et seq.*, 50 U. S. C. A., Appendix, Sec-
tion 468 ..................................................................................  12a

## Authorities Cited

*Cases*:

Alabama v. United States, 279 U. S. 229 (1929) ........  88
American Federation of Labor v. Watson, 327 U. S.
    582 (1946) ....................................................................76, 78, 79
American National Insurance Co. v. National Labor
    Relations Board, 187 F. 2d 307 (5th Cir. 1951),
    *cert. granted,* 342 U. S. 809 (1951) ...................................  77
Ashwander v. Tennessee Valley Authority, 297 U. S.
    288 (1936) ....................................................................................  79

Bank of Columbia v. Okely, 4 Wheat. 234 (1819) ........31 fn.
Bell v. Hood, 327 U. S. 678 (1946) .......................................  78
Benson Hotel Corp. v. Woods, 168 F. 2d 694 (8th Cir.
    1948) ...............................................................................................  89
Boyce v. United States, 93 F. Supp. 866 (S. D. Iowa
    1950) ...............................................................................................  81
Bragg v. Weaver, 251 U. S. 57 (1919) ..............................  58
Britton v. Butler, 4 Fed. Cas. 177 (C. C. S. D. N. Y.
    1872) ...........................................................................................58 fn.
Brown v. United States, 8 Cranch 110 (1814) .................  58
Buscaglia v. District Court of San Juan, 145 F. 2d
    274 (1st Cir. 1944), *cert. denied,* 323 U. S. 793
    (1945) ........................................................................................87, 89

v

PAGE

Case of Proclamations, 12 Coke's Reports 74, 77
  English Reprint 1352 ....................................................... 33
Case of Prohibitions, 12 Coke's Reports 63, 77 English
  Reprint 1342 ................................................................. 33
Case of the Seven Bishops, 12 Howell's State Trials
  183 ............................................................................... 35
Case of Ship Money (The King v. John Hampden),
  3 Howell's State Trials 826 (1637) .................33, 34 fn., 35
Catlin v. United States, 324 U. S. 229 (1945) .............68, 85
Chappell v. United States, 160 U. S. 499 (1896) ............ 58
Chicago & N. W. Ry. Co. v. Dey, 35 Fed. 866 (C. C.
  S. D. Iowa 1888) ......................................................97 fn.
City of Louisville v. Louisville Home Telephone Co.,
  279 Fed. 949 (6th Cir. 1922) ......................................... 88
Coates v. United States, 181 F. 2d 816 (8th Cir. 1950)   80
Coty v. Prestonettes, Inc., 285 Fed. 501 (2d Cir. 1922)   88

Dean Milk Co. v. Madison, 340 U. S. 349 (1951) ............ 69
Dorr v. United States, 195 U. S. 138 (1904) ................. 70

Estate of Sanford v. Comm'r, 308 U. S. 39 (1939) ......81 fn.
Ex parte Milligan, 4 Wall. 2 (1866) .............................40, 54,
                                                                    56, 71
Ex parte Quirin, 317 U. S. 1 (1942) ............40, 53, 57 fn., 71

Finn v. United States, 123 U. S. 227 (1887) ....................81 fn.
Fleming v. Moberly Milk Products Co., 160 F. 2d 259
  (D. C. Cir. 1947), *cert. dismissed,* 331 U. S. 786
  (1947) ........................................................................... 94
Fleming v. Page, 9 How. 603 (1850) ................................ 54
Foster Packing Co. v. Haydel, 278 U. S. 1 (1928) ....   89
Fraser v. Geist, 1 F. R. D. 267 (E. D. Pa. 1940) ............   79

vi

PAGE

Garber v. United States, 46 Ct. Cls. 503 (1911) ...... 83

Gibbs v. Buck, 307 U. S. 66 (1939) ................................. 89

Gilchrist v. Collector of Charleston, 10 Fed. Cas. 355
    (C. C. D. S. C. 1808) ..............................................45, 46, 95

Graves v. N. Y. ex rel. O'Keefe, 306 U. S. 466 (1939).. 70


Hebert v. Louisiana Co., 272 U. S. 312 (1926) ............ 68

Hirabayashi v. United States, 320 U. S. 81 (1943) ....48, 71

Holzendorf v. Hay, 20 App. D. C. 576 (1902) ............ 92

Home Bldg. & L. Assn. v. Blaisdell, 290 U. S. 398
    (1934) ............................................................................ 70

Hooe v. United States, 218 U. S. 322 (1910) ........57, 81, 82

House v. Mayes, 219 U. S. 270 (1911) ............................ 40

Humphrey's Executor v. United States, 295 U. S. 602
    (1935) ............................................................................39 fn.

Hurley v. Kincaid, 285 U. S. 95 (1932) ........................83, 84

Hynes v. Grimes Packing Co., 337 U. S. 86 (1949) ........ 92


Ickes v. Fox, 300 U. S. 82 (1937) ................................. 91

International News Service v. Associated Press, 248
    U. S. 215 (1918) ........................................................ 78

Isbrandtsen-Moller Co. v. United States, 300 U. S.
    139 (1937) .................................................................... 48


Jackson Co. v. Gardiner Inv. Co., 200 Fed. 113 (1st
    Cir. 1912) .................................................................... 88

Jones v. United States, 89 F. Supp. 980 (S. D. Iowa
    1949) .............................................................................. 81


Ken-Rad Tube and Lamp Corp. v. Badeau, 55 F.
    Supp. 193 (W. D. Ky. 1944) ............................................ 64

Kendall v. United States, 12 Pet. 522 (1838) ................92, 93

Kessler v. Eldred, 206 U. S. 285 (1907) ............................ 79

vii

PAGE

Kilbourn v. Thompson, 103 U. S. 168 (1881) ................37 fn.
Kimball Laundry Co. v. United States, 338 U. S.
   1 (1949) ................................................................... 84
Kohl v. United States, 91 U. S. 367 (1875) ................. 82

Land v. Dollar, 330 U. S. 731 (1947) ............................78, 91
Langford v. United States, 101 U. S. 341 (1879) ............ 82
Larson v. Domestic and Foreign Commerce Corp.,
   337 U. S. 682 (1949) ...........................................82, 83, 90
Lauterbach v. United States, 95 F. Supp. 479 (W. D.
   Wash. 1951) ................................................................ 81
Lichter v. United States, 334 U. S. 742 (1948) ........40, 53
Little v. Barreme, 2 Cranch 170 (1804) ..........44, 45, 46, 95
Lord Mfg. Co. v. Stimson, 73 F. Supp. 984 (D. D. C.
   1947) ......................................................................... 92
Luckenbach S.S. Co. v. Norton, 21 F. Supp. 707 (E. D.
   Pa. 1937) ................................................................... 79

Madden v. International Union, United Mine Workers
   of America, 79 F. Supp. 616 (D. D. C. 1948) ............... 23
Madsen v. Kinsella, No. 411, October Term, 1951, de-
   cided April 28, 1952 ...................................................... 54
Marbury v. Madison, 1 Cranch 137 (1803) ................92, 93
J. B. McCrary Co. v. United States, 84 F. Supp. 368
   (Ct. Cls. 1949) ............................................................ 81
McCulloch v. Maryland, 4 Wheat. 316 (1819) ............ 70
Meccano, Ltd. v. John Wanamaker, 253 U. S. 136
   (1920) ....................................................................... 88
Mississippi v. Johnson, 4 Wall. 475 (1866) ................96, 97
Mitchell v. Harmony, 13 How. 115 (1851) ....54, 55, 56, 71
Mitchell v. United States, 267 U. S. 341 (1925) ........ 82
Munro v. United States, 303 U. S. 36 (1938) ............81 fn.

viii

PAGE

Murray's Lessee, et al. v. Hoboken Land and Improve-
  ment Co., 18 How. 272 (1855) ...................................31 fn.
Myers v. United States, 272 U. S. 52 (1926) .............39 fn.

National Labor Relations Board v. Crompton-High-
  land Mills, Inc., 337 U. S. 217 (1949) ........................   77

O'Neal v. United States, 140 F. 2d 908 (6th Cir. 1944),
  *cert. denied,* 322 U. S. 729 (1944) ...................................53, 54
Ohio Oil Co. v. Conway, 279 U. S. 813 (1929) ............   89
Ohio Tax Cases, 232 U. S. 576 (1914) ..............................   78
Old King Coal Co. v. United States, 88 F. Supp. 124
  (S. D. Iowa 1949) ................................................................   81
Osborne & Company v. Missouri Pacific Railway Com-
  pany, 147 U. S. 248 (1893) .............................................   78

Penello v. International Union, United Mine Workers
  of America, 88 F. Supp. 935 (D. D. C. 1950) ............   23
Pewee Coal Co. v. United States, 88 F. Supp. 426 (Ct.
  Cls. 1950) ...........................................................................63, 64
Philadelphia Company v. Stimson, 223 U. S. 605
  (1912) ..................................................................................   91
Pierce v. Society of Sisters, 268 U. S. 510 (1925) ....   78
Porto Rico Tel. Co. v. Puerto Rico Comm. Authority,
  189 F. 2d 39 (1st Cir. 1951), *cert. denied,* 342 U. S.
  830 (1951) ..........................................................................   84
Prize Cases, 2 Black 635 (1862) ...................................56, 57 fn.

Rindge Co. v. Los Angeles, 262 U. S. 700 (1923) ........   58
Roof v. Conway, 133 F. 2d 819 (6th Cir. 1943) ............   79

Shaffer v. Carter, 252 U. S. 37 (1920) ..............................   78
Southern Pacific v. United States, 200 U. S. 341 (1906)   78
Sterling v. Constantin, 287 U. S. 378 (1932) ............   54

ix

PAGE

Swift & Co. v. Hocking Valley Ry. Co., 243 U. S. 281
(1917) .................................................................... 81 fn.

Terrace v. Thompson, 263 U. S. 197 (1923) ................   78
Texas Co. v. Central Fuel Co., 194 Fed. 1 (8th Cir.
1912) ...........................................................................   79
Texas & N. O. R. Co. v. Brotherhood of Railway
Clerks, 281 U. S. 548 (1930) .........................................   79
Toledo, Peoria and Western R.R. v. Stover, 60 F.
Supp. 587 (S. D. Ill. 1945) .........................................   40
Toledo v. United States, 95 F. Supp. 838 (D. P. R.
1951) ...........................................................................   81
Tower Hosiery Mills, 81 N. L. R. B. 658 (1949) ........   77
Truax v. Raich, 239 U. S. 33 (1915) .............................   78

United States v. Baltimore & Ohio Railroad Company,
225 U. S. 306 (1912) ......................................................   87
U. S. v. Bethlehem Steel Corp., 315 U. S. 289 (1942)....   53
United States v. Carmack, 329 U. S. 230 (1946) ........58 fn.
United States v. Causby, 328 U. S. 256 (1946) ............   82
United States v. Corrick, 298 U. S. 435 (1936) ..............   88
United States v. General Motors Corporation, 323
U. S. 373 (1943) .............................................................   84
United States v. Goltra, 312 U. S. 203 (1941) ...........   82
United States v. Lee, 106 U. S. 196 (1882) ................ 90, 94
United States v. McFarland, 15 F. 2d 823 (4th Cir.
1926), *cert. granted*, 273 U. S. 688 (1927), *cert. re-
voked*, 275 U. S. 485 (1927) ........................................   59
United States v. Montgomery Ward & Co., 58 F. Supp.
408 (N. D. Ill. 1945), *reversed*, 150 F. 2d 369 (7th
Cir. 1945), *dismissed as moot*, 326 U. S. 690 (1945).. 57 fn.
United States v. North American Transportation &
Trading Co., 253 U. S. 330 (1920) ...............................58, 82

x

PAGE

United States v. Pacific R.R., 120 U. S. 227 (1887) ....   56

United States v. Petty Motor Co., 327 U. S. 372
  (1946) .................................................................   83

United States v. Pewee Coal Co., Inc., 341 U. S. 114
  (1951) ...........................................................63, 64,
                                              79, 84, 85

United States v. Rauers, 70 Fed. 748 (S. D. Ga. 1895)   58

United States v. Russell, 13 Wall. 623 (1871) ....54, 55, 56

United States v. Threlkeld, 72 F. 2d 464 (10th Cir.
  1934), *cert. denied*, 293 U. S. 620 (1934) ...............58 fn.

United States v. United Mine Workers of America,
  330 U. S. 258 (1947) .....................................   42

United States ex rel. T. V. A. v. Welch, 327 U. S. 546
  (1946) ..........................................................58 fn.

United States v. West Virginia Power Co., 122 F. 2d
  733 (4th Cir. 1941), *cert. denied,* 314 U. S. 683
  (1941) ..........................................................58 fn.

United States v. Western Union Telegraph Co., 272
  Fed. 311 (D. C. N. Y. 1921), *aff'd,* 272 Fed. 893
  (2d Cir. 1921) ...............................................   41

Virginia Ry. Co. v. System Federation No. 40, 300
  U. S. 515 (1937) ...........................................   79

Waite v. Macy, 246 U. S. 606 (1918) ........................   90

Walla Walla v. Walla Walla Water Co., 172 U. S. 1
  (1898) .........................................................   79

Wallace v. United States, 142 F. 2d 240 (2d Cir.
  1944), *cert. denied,* 323 U. S. 712 (1944) ...............81 fn.

Weaver v. Palmer Brothers Co., 270 U. S. 402 (1926)   69

Wickliffe v. Owings, 17 How. 47 (1854) ....................   78

Williams v. Fanning, 332 U. S. 490 (1947) ...............91, 92

Wolff Packing Co. v. Court of Industrial Relations,
  262 U. S. 522 (1923) .....................................   78

xi

PAGE

Yakus v. United States, 321 U. S. 414 (1944) ................ 89

Yick Wo v. Hopkins, 118 U. S. 356 (1886) ..................... 68

*Statutes, etc.*:

Blackstone's Commentaries, Book 1, Chapters 7 and
13 ........................................................................53 fn.

Cooley, Principles of Constitutional Law 114 (1896
Ed.) ................................................................... 95

Corwin, Liberty Against Government (1948) ............30, 31

Corwin, The President: Office and Powers 365 (3rd
Ed. 1948) ...................................31 fn., 34 fn., 66

93 Cong. Rec. 3637-3645 (1947) .......................... 22

93 Cong. Rec. 3835-3836 (1947) .......................... 21

96 Cong. Rec. 2774-2775 ....................................... 67

98 Cong. Rec. 4067 (April 16, 1952), 4159 (April 18,
1952), 4193, 4197 (April 21, 1952), 4287 (April 22,
1952) ..................................................................48 fn.

98 Cong. Rec. 4192, 4216 (April 21, 1952) ................ 48

98 Cong. Rec. 4579 (April 28, 1952), 4617 (April 29,
1952) ................................................................... 48

98 Cong. Rec. 4621, 4626 (April 29, 1952) ......... 48

Davis, The Early Stuarts 1603-1660 (1937) ................ 30

Defense Production Act of 1950, as amended, 64 Stat.
798, 799, 65 Stat. 132; 50 U. S. C. A. App. §§2081,
2121-2123:

Section 201 ...................................3, 47 fn., 49

Section 201(a) ........................................... 50

Section 201(b) ........................................... 50

Section 501 ................................................ 51

Section 502 ................................................ 51

Section 503 ................................................ 51

xii

PAGE

Department of Commerce Order 140 ...............................74 fn.
Dicey, Law of the [British] Constitution, 1920 ed.,
  at p. 33 ..................................................................   96

Emancipation Proclamation (12 Stat. 1267, 1268) ....   65
Emergency Powers Interim Continuation Act (enacted
  April 14, 1952) ......................................................   47
English Bill of Rights (1 Will. & Mary Sess. 2, c. 2
  (1688)) ................................................................   36
Executive Order:
    9934 ....................................................................26 fn.
    9934a ..................................................................26 fn.
    9939 and 9970 ...................................................26 fn.
    9959 ....................................................................26 fn.
    9964 ....................................................................26 fn.
    9987 ....................................................................26 fn.
    10106 ..................................................................26 fn.
    10340 .................................................8, 9, 26, 27, 39, 48, 59, 75

Federal Tort Claims Act, 62 Stat. 982, as amended,
  28 U. S. C. §2680-a ..............................................   80
Federalist, Nos. 47, 48, 69 ...........................................37, 52
Fortescue, De Laudibus Lebum Angliae .....................   32

H. R. Doc. No. 1, 82nd Cong. 1st Sess. (1951) ...........   59
H. R. Doc. No. 398, 69th Cong. 1st Sess. 109 (1927) ....37 fn.
H. R. Rep. No. 245, 80th Cong. 1st Sess. 5, 21 (April
  11, 1947) ..............................................................   22
H. R. Rep. No. 510, 80th Cong. 1st Sess. 43 (June 3,
  1947) ....................................................................   22
H. Rep. No. 2759, 81st Cong. 2d Sess. 4 (1950) ...........51 fn.

Labor Management Relations Act of 1947, 61 Stat. 136,
  29 U. S. C. §§176-180 .............................3, 19, 22, 25, 46, 47
    Section 101 .......................................................   3
    Section 202 .......................................................   19
    Section 206 .......................................................  3, 19

xiii

**PAGE**

Section 207 ................................................................ 3, 19

Section 208 ................................................................ 3, 19

Section 209 ............................................................3, 20, 25

Section 210 ................................................................ 3, 20

Lowenstein, The German Constitution, 1933-1937,
4 Univ. of Chi. L. Rev. 537 (1937) ...........................69 fn.

Magna Carta:
Chapter 39 .................................................... 31

Miller, Treaties, etc. of the United States, vol. 2, p. 506    65

National Defense Act of 1916, c. 134, §120, 39 Stat.
213-214 (June 3, 1916) ...............................................47 fn.

National Labor Relations Act:
Section 8(b)(3), added by the 1947 amendment    22
Section 8(d) ................................................    22

Opinion of the General Counsel of the War Labor
Board, 15 L. R. R. Man. 2578 (1944) ........................    77

Proclamation 2714, 12 Fed. Reg. 1 ...............................46 fn.

Railroad and Telegraph Lines Seizure Act of 1862,
c. 45, 12 Stat. 334 (January 31, 1862) ...............47 fn., 66

Report and Recommendations of the Wage Stabiliza-
tion Board, Appendix IV, p. 47 ...................................7 fn.

Roetter: Impact of Nazi Law, [1945] Wisc. L. Rev.
516 ................................................................69 fn.

Selective Training and Service Act of 1940, c. 720,
§9, 54 Stat. 892 (September 16, 1940) ....................47 fn.

Sen. Rep. No. 105, 80th Cong., 1st Sess. 15 (1947)..20, 22, 42

Story, The Constitution, §§1492, 1562 (Cooley's Ed.
1873) ..........................................................39 fn., 53 fn.

Supplemental Proclamation of January 1, 1863 (12
Stat. 1268) ................................................    65

xiv

PAGE

Taft, Our Chief Magistrate and His Powers, 139-140
  (1916) ................................................................... **41**

Transportation System Control Act of 1916, c. 418,
  §1, 39 Stat. 645 (August 29, 1916) ..........................47 fn.

Trevelyan, England Under the Stuarts (17th Ed.
  1938) ................................................................... 30

Tucker on the Constitution, Vol. 2, pp. 716-17, 886,
  seq. ...................................................................36 fn., 54

Universal Military Training and Service Act, 62
  Stat. 625; 50 U. S. C. A. App. §468:
      Section 18 ...................................................3, 47 fn., 49
28 U. S. C. §1254(1) ................................................. 2
28 U. S. C. §1346-b ...............................................80 fn.
28 U. S. C. §2680-a ...............................................80 fn.
U. S. Constitution:
      Article I ................................................................ 3
        Section 1 ........................................................... 37
        Section 8 ........................................................37, 40, 53
      Article II ...........................................................3, 38, 39
      Amendment IV ....................................................... 3
      Amendment V ......................................................3, 31 fn., 67
      Amendment IX .......................................................3, 40
      Amendment X ........................................................3, 40

War Labor Disputes Act of 1943, c. 144, §§3-6, 57
  Stat. 164-166 (June 25, 1943) ....................46, 47 fn., 57 fn.

Weimar Constitution in Germany, Article 48 ...........69 fn.

Whyte, The War Powers of the President, [1943] Wis.
  L. Rev. 205, 210 ...................................................37, 66

App. 1077

IN THE

# Supreme Court of the United States

OCTOBER TERM, 1951

No. 744.

———◆———

THE YOUNGSTOWN SHEET AND TUBE COMPANY, *et al.*, REPUB-
LIC STEEL CORPORATION, ARMCO STEEL CORPORATION, *et al.*,
BETHLEHEM STEEL COMPANY, *et al.*, JONES & LAUGHLIN
STEEL CORPORATION, UNITED STATES STEEL COMPANY, and
E. J. LAVINO & COMPANY,

*Petitioners,*

—v.—

CHARLES SAWYER,

*Respondent.*

———◆———

No. 745.

———◆———

CHARLES SAWYER,

*Petitioner,*

—v.—

THE YOUNGSTOWN SHEET AND TUBE COMPANY, *et al.*,

*Respondents.*

———◆———

## BRIEF FOR PLAINTIFF COMPANIES, PETITIONERS IN NO. 744 AND RESPONDENTS IN NO. 745.

————

### Opinion Below

The opinion of the District Court (R. 66) has not yet been
officially reported.

App. 1078

2

## Jurisdiction

The judgments of the District Court, granting preliminary injunctions in favor of the plaintiffs,* were entered on April 30, 1952 (R. 76). On the same day the defendant Sawyer* docketed an appeal in the Court of Appeals (R. 77, 442). The Court of Appeals has not acted upon that appeal. Both sides on May 2, 1952 petitioned for certiorari, plaintiffs' petition being No. 744 and Mr. Sawyer's petition being No. 745. Both petitions were granted on May 3, 1952.

Jurisdiction of this Court is invoked under 28 U. S. C. A., §1254(1).

## Questions Presented

The questions presented, which were correctly resolved by the District Court, are:

1. Whether Mr. Sawyer had any lawful right to seize the plaintiffs' properties on April 8, 1952, to retain possession of those properties and, as an incident of that possession, to impose on plaintiffs, by executive fiat, new wage scales and terms of employment.

2. Whether the Executive has "inherent power" under the Constitution to authorize seizure of private property on the claim of a "national emergency" when Congress has provided a different remedy—specifically excluding seizure—for just such a "national emergency."

3. Whether plaintiffs, faced with irreparable injury and lacking any adequate remedy at law, are entitled to equitable relief in the form of the preliminary injunctions issued by the District Court.

---

*  To prevent confusion, we shall avoid the terms "petitioner" and "respondent" and shall refer to the parties respectively as "plaintiffs" and "Mr. Sawyer".

3

## Constitutional and Statutory Provisions

The relevant constitutional provisions are Articles I and II, and Amendments IV, V, IX and X of the United States Constitution. Relevant statutory provisions are Sections 101, 206 through 210 of the *Labor Management Relations Act of 1947,* 61 Stat. 136, 29 U. S. C. A. §§158(a)(5), 158(b)3, 158(d), 176-180; Titles II and V of the *Defense Production Act of 1950,* as amended, 64 Stat. 798, 65 Stat. 132, 50 U. S. C. A. App. §§2081, 2121-2123; and *The Universal Military Training and Service Act,* 62 Stat. 625, 50 U. S. C. A. App. §468. They are set forth in Appendix A.

## Status of the Parties

All the plaintiffs except E. J. Lavino & Company are steel companies whose plants, facilities and properties were seized by Mr. Sawyer on April 8, 1952 under Executive Order 10340 (R. 6) and Mr. Sawyer's Order No. 1 (R. 22). Lavino manufactures refractories and ferro manganese and is not engaged in the manufacture or fabrication of steel (R. 192). Its plants, facilities and properties were nevertheless included in the seizure orders (R. 11, 26).

All of the plaintiffs (including Lavino) brought actions in the District Court for declaratory judgment and injunction. The cases have not been formally consolidated in this Court, but as they all present the same basic questions they are being heard together upon one printed record; and this brief is filed on behalf of all plaintiffs.*

---

* In the case of plaintiff Lavino, further grounds for the relief sought in the District Court were pleaded in its complaint and established in the affidavits of its vice presidents, Andrew Leith and George B. Gold (R. 192, 220). For example, it is not engaged in the manufacture or fabrication of steel; its labor classifications and their content are substantially different from those of the steel industry; it was not a party to the controversy before the

4,

## Statement of Facts

The true nature of Mr. Sawyer's action here challenged appears clearly upon a review of the background of the dispute which led to his seizure of the plaintiffs' properties on April 8, 1952, and of the events which have occurred since.   .

### A. *Events Before the Seizure**

Plaintiffs, like most other steel companies, had collective bargaining agreements with the United Steelworkers of America, C.I.O. (hereafter called "the Union"), which expired on December 31, 1951 (R. 81, 95). Those agreements provided that the Company and the Union should meet "not less than thirty days and not more than sixty days prior to January 1, 1952" to negotiate the terms and conditions of a new agreement. Inasmuch as the entire contract was open for negotiation for the first time in almost five years, it was apparent at the outset that there would be many issues to be negotiated.** Although the president of the

---

Wage Stabilization Board; and so forth (R. 192-198, 200-202). Because, however, of the all-inclusive grounds upon which the decision and judgment of the District Court were based, that Court did not have occasion to consider those further grounds in detail, but it did refer to them in its opinion (R. 67). Lavino joined with the other plaintiffs to ask certiorari in No. 744, and joins in this brief, but reserves its right to develop further its own special situation.

* See chronology of negotiations between plaintiff United States Steel Company and the Union, Ex. A to moving affidavit of Mr. Lohrentz (R. 92). Plaintiff Lavino's contract with the Union expired on a different date; and there are other factual differences between it and the other plaintiffs (cf. preceding footnote).

** Report and Recommendations of the Wage Stabilization Board in the Matter of United Steel Workers of America-CIO and Various Steel and Iron Ore Companies (Case No. D-18-C), p. 5. This Report is Appendix IV to affidavit of Harry Weiss, Executive Director of the Wage Stabilization Board (R. 59), and was omitted in the printed record by stipulation (R. 61, 451) since it is available as a separate printed Wage Stabilization Board document. All page references to the Report are to the Wage Stabilization Board print.

5

Union on November 1, 1951, sent to the plaintiffs a routine request for the opening of negotiations (R. 95), the Union delayed submitting its demands until November 27, 1951 (R. 92). At that time the Union enumerated some twenty-two demands in broad and general terms (R. 92). The full and complex details of the Union's demands were not submitted to any of the steel companies, however, until December 10, 1951. As of that date, the Union's proposals had grown from the twenty-two general demands to more than a hundred separate items (R. 92). As the Union's general counsel explained at the subsequent hearings before a panel established by the Wage Stabilization Board, the twenty-two proposals encompassed "literally 100 contract proposals" (R. 92). Subsequent conferences between the plaintiffs and the Union did not result in progress toward an agreement and on December 22, 1951, the Government intervened in the dispute (R. 92-93).

On that day, the President directed the Wage Stabilization Board to investigate and inquire into the issues in dispute and promptly to report to him its recommendations as to fair and equitable terms of settlement (R. 81). This was a procedure devised by the President *ad hoc*[*]; it was not pursued under any of the established statutory or other procedures. At the same time the President called upon the steel companies and the Union to maintain normal work and production schedules while the matter was before the Board (R. 93). He cited among the reasons for his action the fact that:

> "Negotiations between the Union and the steel companies are at an *impasse* and there appears to be no

---

[*] The Wage Stabilization Board has no statutory authority for dealing with labor disputes. The Board's only statutory authority is under Title IV of the Defense Production Act of 1950 which relates to problems of wage stabilization.

6

hope of settlement through mediation. Unless some means is found for breaking this *impasse* a shutdown of the steel industry at the end of this month is in prospect."*

There is no doubt that the President's action was taken for the purpose of settling a labor dispute and that he was not following statutory procedures designed to prevent work stoppages which would imperil the national health and safety.

The Board on January 3, 1952, appointed a tripartite special steel panel, consisting of two representatives each of the public, the industry, and labor, to hear the evidence and arguments in the dispute and make such reports thereon as the Board might direct (R. 93). The panel held public hearings in Washington on January 10-12, 1952, and in New York City on February 1-16, 1952, and submitted a report dated March 13, 1952, outlining the issues in dispute and summarizing the positions of the parties (R. 61, 93). On March 15, 1952, the Board again requested the parties to continue work and production to permit consideration of the report of the panel (R. 61), and again asked the parties to continue negotiations with a view to reaching a settlement

"* * * and with the understanding that the steel companies and the steelworkers will continue work and production and that if by April 4 a mutually satisfactory agreement has not been reached and the Union intends to strike thereafter it will give 96 hours prior written notice to the companies" (R. 94).**

---

* Statement of the President, dated December 22, 1951, annexed to Weiss affidavit and omitted in printed record (R. 60, 61).

** Report and Recommendations of the Wage Stabilization Board, p. 45.

7

The Board submitted its report and recommendations
on March 20, 1952 (R. 81, 94). These recommendations had
no binding authority in law; and the parties had never
agreed to be bound by them (R. 164). The Board recom-
mended a general wage increase of 12½¢ per hour effective
as of January 1, 1952, a further increase of 2½¢ per hour
effective July 1, 1952, and an additional increase of 2½¢
effective January 1, 1953, together with other increases
in fringe benefits which in all would impose on plaintiffs,
if put into effect, additional employment costs in enormous
amounts (R. 94, 164).*

The Board also recommended that the parties include
a union shop provision in their new contracts (R. 94).

The Board's recommendations were promptly accepted
by the Union (R. 94). They met in substantial part the
Union demands. As the dissenting industry members of
the Board stated:

> " The recommendations as a whole reflect a conscious
> and admitted effort to recommend terms of settlement
> which the Union would accept. No similar effort was
> made to assure that the terms would be acceptable to
> the companies involved."**

The recommendations of the Board were not acceptable to
the plaintiffs. As pointed out by the industry members of

---

\* The affidavit of John A. Stephens, Vice President of Industrial Rela-
tions of plaintiff United States Steel Company (R. 99) states that the
recommended increases, when applied to all the employees of that company,
would increase its direct employment costs in the sum of $100,400,000 in
1952, and $141,000,000 in 1953. Affidavits filed by officials of the other plain-
tiffs disclose the same situation. Thus, the employment costs, alone, of
Republic would be increased by at least $6 per ton, and the average cost of
steel products shipped by it would be increased by at least $12 per ton,
or many millions of dollars (R. 164).

\*\* Report and Recommendations of the Wage Stabilization Board, p. 28.

8

the Board, they were excessive in amount, inflationary in effect, contrary to existing stabilization regulations, and did not make clear and positive recommendations on several issues of great importance to the steel companies. They would impose staggering increases in costs upon the plaintiffs which they could not absorb without risk to the financial stability of their businesses (R. 107-110, 125, 131, 132, 141, 164). Moreover, and very importantly, the union shop recommendation involved a question of employment relationships of fundamental significance to the managements of all the companies.

After an intensive period of negotiation and mediation, the parties failed to reach agreement (R. 15, 142).

On April 4, 1952 the Union gave the previously agreed 96-hour notice of a strike call, effective at 12:01 a.m., April 9 (R. 94).

On the evening of April 8, the President of the United States issued Executive Order 10340 (R. 6, 94). This Order directed the Secretary of Commerce (Mr. Sawyer) forthwith to take possession of such of the plants, facilities and other properties of more than 80 named companies, including the plaintiffs, as he should deem necessary in the interest of national defense, and

> "to operate or to arrange for the operation thereof and to do all things necessary for, or incident to, such operation." (R. 7)

The Executive Order also provided (paragraph 3, R. 8):

> "The Secretary of Commerce shall determine and prescribe terms and conditions of employment under which the plants, facilities and other properties possession of which is taken pursuant to this order shall be operated."

9

The Executive Order stated that the seizure was made

> "by virtue of the authority vested in me by the Constitution and laws* of the United States, and as President of the United States and Commander in Chief of the armed forces of the United States * * * " (R. 7).

Likewise on the evening of April 8 and simultaneously with the issuance of the Executive Order, Mr. Sawyer issued his Order No. 1, taking possession, as of midnight that night, of all but a few of the companies listed in the Executive Order. Mr. Sawyer's order recited (R. 22) that the properties seized

> "shall include but not be limited to any and all real and personal property, franchises, rights, funds and other assets used or useful in connection with the operation of such plants, facilities and other properties and in the distribution and sale of the products thereof * * * "

excluding railroads and coal and metal mines (R. 22).

Over protest, Mr. Sawyer named the president of each seized company as "Operating Manager for the United States" and directed them to operate their companies subject to his supervision and in accordance with his regulations and orders (R. 22).

---

* In their argument in the District Court (R. 371) counsel for Mr. Sawyer specifically disclaimed any statutory authority for the seizure, and rested their claims on the Constitution alone.

10

## B. *Events After the Seizure*

Immediately after the announcement of the seizure, plaintiffs Youngstown, Republic and Bethlehem filed suits[*] against Mr. Sawyer in the United States District Court for the District of Columbia for declaratory judgments holding the seizure illegal, and for injunctions (R. 1, 154, 116).

On April 9, 1952, they applied for temporary restraining orders. Those applications were brought on the same day before Judge Holtzoff. Counsel for Mr. Sawyer opposed, urging that the Executive Branch of the Government had "power to protect the country in times of national emergency by whatever means seem appropriate to achieve the end" (R. 255), that the seizures were legal, and that plaintiffs had an adequate remedy at law. Judge Holtzoff from the bench denied the applications upon the ground that *as of that moment* plaintiffs had not shown irreparable damage (R. 263). Judge Holtzoff added, however,

> "True, plaintiff's fear that other drastic steps may be taken which would displace the management or which would supersede its control over labor relations. It seems to the Court that these possibilities are not sufficient to constitute a showing of irreparable damage. *If these possibilities arise, applications for restraining orders, if they are proper and well-founded, may be renewed and considered.*" (R. 265) (Emphasis here and in other quotations throughout this brief has been supplied)

---

[*] Republic, Youngstown, and later United States Steel, each brought *two* identical suits against Mr. Sawyer, one with a summons calling for a 60-day answer under Rule 12(a), and the other with a summons calling for a 20-day answer under the same rule.

11

Following Judge Holtzoff's decision, Mr. Sawyer proceeded to make announcements, on several occasions, which indicated his intention—in the words of Judge Holtzoff —to "supersede its [management's] control of labor relations". He proposed to do this by imposing upon the companies without their consent whatever changes in terms and conditions of employment he saw fit, and by appropriating the companies' funds to put those changes into effect (R. 103). These announcements, if carried out, would have caused irreparable damage.*

Some of the earlier of these announcements are detailed in the moving affidavits (R. 103). Others were publicly repeated almost down to the moment when this Court acted on the afternoon of Saturday, May 3.

Thus on Friday, April 18, Mr. Sawyer announced that on "Monday or Tuesday of next week." (*i.e.*, April 21 or 22) he would undertake "consideration of an action upon the terms and conditions of employment". (R. 103) On

---

* Affidavits before the Court disclosed that increased production costs which might be anticipated from the threatened wage increases could not be recovered except by increase in the selling prices of the products of the companies over and above prices authorized by the Office of Price Stabilization; that the Director of the Office of Price Stabilization had publicly announced that no such price increase would be granted; that wages constituted only a few of approximately 100 issues involved in the labor dispute; that in the experienced opinion of the officials making the affidavits it was not possible to reach a satisfactory over-all agreement by settling one issue at a time, but that successful collective bargaining depended upon a settlement of all the issues as a "package", so that if Mr. Sawyer were to increase the compensation of the employees without obtaining corresponding concessions from the Union he would permanently impair the bargaining positions of the plaintiffs; and that even if they should regain possession of their properties they would be forced to continue to pay any increased rate of compensation which he might be permitted to establish, and could not reestablish the existing wage scale altered by him without strained labor relations, turmoil, strife and strikes. See, e.g., Stephens affidavit for U. S. Steel (R. 99); Magee and Schlendorf affidavits for Republic (R. 159, 163); Watson affidavit for Youngstown (R. 16); Elliot affidavit for Jones & Laughlin (R. 140); McMath and Bromley affidavits for Bethlehem (R. 123, 130).

12

Sunday, April 20, he publicly stated categorically that "there will certainly be some wage increases granted" (R. 103).

On April 22 press reports stated that "associates" of Mr. Sawyer had indicated that "it may be another *day or two* before the Government announces a pay raise for the workers in the seized mills". Faced with these repeated threats, the three plaintiffs (Youngstown, Republic and Bethlehem) which had appeared before Judge Holtzoff on the applications for temporary restraining orders brought on motions for preliminary injunctions (R. 13, 166, 128). They were joined by the other plaintiffs (Jones and Laughlin, Armco, United States Steel and Lavino), each of which had in the meanwhile brought similar actions for declaratory judgment and injunction (R. 134, 143, 144, 153, 80, 88, 167, 184).

These motions were extensively briefed and were argued for two days (Thursday, April 24, and Friday, April 25) before Judge Pine (R. 280-427). United States Steel, although its formal motion (like those of the other plaintiffs) was for a preliminary injunction to oust Mr. Sawyer from control of its plants, on the argument limited its prayer to a request that Mr. Sawyer be restrained from changing wages or working conditions pending final hearing (R. 67). But it coupled this prayer with a proposal for "trial on the merits of this case immediately" in contrast to Mr. Sawyer's counsel's opposition to early trial (R. 411).

At the argument before Judge Pine, counsel for Mr. Sawyer declined to give any assurance that his client would not act to change wages or working conditions even while the case was *sub judice* (R. 365-366). Judge Pine thereupon proceeded to work on his opinion, which was delivered on the late afternoon on Tuesday, April 29 (R. 66).

13

He held that the seizures were illegal and without authority of law, that irreparable damage would result to the plaintiffs, and that possession should therefore be restored to the plaintiffs (R. 73-76). With regard to United States Steel Company's more limited prayer, he said that he

> "could not consistently issue such an injunction which would contemplate a possible basis for the validity of defendant's acts, in view of my opinion hereinabove expressed * * *." (R. 76)

He added:

> "If the United States Steel Company wishes to withdraw its verbal amendment and proceed on the basis of its original motion, leave will be granted for that purpose, and the same injunction issued to it as to the other plaintiffs." (R. 76)

This was accordingly done (R. 115, 439).

Immediately upon the announcement of Judge Pine's decision, the Union issued a strike call and its members started to leave the mills. By the next day (April 30) the stoppage was complete.

On April 30, counsel for Mr. Sawyer filed notice of appeal and applied to Judge Pine for a stay of the injunctions pending appeal (R. 77-78). When this was denied (R. 79), they applied on the same day to the Court of Appeals, which, by the narrow margin of 5 to 4, granted a stay effective until this Court acted on a petition for certiorari which Mr. Sawyer's counsel had stated they would file in this Court. The Court of Appeals provided that its stay would continue beyond May 2 only if such petition were filed on that day (R. 442, 444).

On May 1, by the same 5 to 4 vote, the Court of Appeals denied an application by the plaintiffs to insert a condition

14

in the stay designed to prevent Mr. Sawyer from unilaterally altering terms and conditions of employment pending disposition of Mr. Sawyer's contemplated petition for certiorari (R. 444, 446).

On Friday, May 2, plaintiffs petitioned this Court for certiorari (Docket No. 744). Soon afterwards on the same day Mr. Sawyer likewise petitioned for certiorari (Docket No. 745).

In both petitions, in the reply which each party filed to the petition of the other, and in an *amicus* brief filed by the Union, the question was raised as to a stay of the injunction pending decision by this Court. Counsel for Mr. Sawyer insisted upon an unconditional stay which would leave him free to alter wages and working conditions at any moment. Plaintiffs urged that if any stay were granted it should contain a condition to prevent this from happening.

On the morning of Saturday, May 3, 1952, the President declared that, if the steel companies and the Union did not arrive at a settlement of their labor controversy,

> "* * * the government will be prepared on Monday morning [May 5], or as soon as we can get ready, to order changes in terms and conditions of employment to be put into effect."

On the afternoon of May 3, this Court granted certiorari in both No. 744 and No. 745, set the case for argument on May 12, and issued a stay of the injunction pending its decision with the direction that Mr. Sawyer should not impose any changes in terms and conditions of employment without the consent of the Union and the companies.

Beginning on Friday afternoon, May 2, and continuing over the week-end, the Union's members started to return to work; and as this brief is written, steel production has returned approximately to normal.

App. 1091

## Summary of Argument

This is not a case where the claim can be made that the Executive Branch is compelled to act to meet a sudden and unanticipated national emergency in a situation where no statutory remedy is available. On the contrary, it is action taken for the purpose of settling a labor dispute by executive fiat, inconsistent with, and contrary to, the remedy expressly provided by Congress to meet just such a situation (*infra,* pp. 18-26).

The seizure of plaintiffs' properties and Mr. Sawyer's other action, including his threatened unilateral changes in wages and working conditions, are unlawful and completely without authority under the Constitution and laws of the United States. They are contrary to the traditions of the common law upon which the Constitution was founded. They are not warranted by the Constitution itself, —either in its terms or as construed from the beginning of the Republic until now. They cannot be justified either on the theory of executive responsibility to "take Care that the Laws be faithfully executed," or under the President's power as Commander in Chief, or on any theory of "inherent powers" (*infra,* pp. 27-73).

The seizure, and Mr. Sawyer's threatened action with respect to changing wages and working conditions, have caused and will cause plaintiffs irreparable injury for which there is no adequate remedy at law and for which money damages are not recoverable (*infra,* pp. 74-86).

The preliminary injunctions were providently issued by the District Court. Plaintiffs are entitled to injunctive relief against the seizure, or at the very minimum, to a preliminary injunction against any unilateral changes by Mr. Sawyer in the terms and conditions of employment pending final hearing (*infra,* pp. 86-89).

16

This is not a suit against the President; and the District Court had jurisdiction to grant the requested injunctions (*infra,* pp. 90-97).

## What This Case Does *Not* Involve

This case does not involve the question whether the nation, or our troops in Korea, need uninterrupted steel production. Obviously they do. Counsel for Mr. Sawyer, in the affidavits submitted in opposition below, and in the petition for certiorari in No. 745, emphasized the vital needs of the nation in this respect. Those needs are not of recent origin; nor has Congress failed to provide lawful means for assuring continued production where the national safety so requires. Those means were available and would have been effective at any time down to the moment of the seizure. Those means were available and would have been effective even at the time the seizure was made. They are available and would be effective now. They will still be available and effective when this Court hands down its decision. Whatever that decision may be, there is no reason why it should in any way affect the production of steel. But the statutory processes have been ignored; and in this fact is found Mr. Sawyer's true intention in seizing plaintiffs' properties. Congress has not provided for compulsory arbitration of labor disputes, and has expressly excluded seizure as a means for dealing with those disputes; yet compulsory arbitration under force of seizure is what Mr. Sawyer now seeks to achieve by imposing new terms and conditions of employment upon all the plaintiffs.

Plaintiffs know as well as Mr. Sawyer the importance of the uninterrupted production of steel. Indeed their future depends upon it. Plaintiffs, like Mr. Sawyer, earnestly desire that no interruption should occur in their operations.

17

They have no intention of discontinuing operations. They stand ready today, as throughout the period of their negotiations with the Union, to bargain collectively with the Union in the manner prescribed by law.

Nor does this case involve—and we believe this Court will not be concerned with—the merits of the recommendations of the Wage Stabilization Board, or the merits of the respective positions of either the companies or the Union.

The issue, in brief, is not whether steel production must be continued, or how an interruption should be avoided. It is not whether the Union is or is not entitled to more wages, or the companies to higher prices. The sole issue which is before this Court—and which transcends all issues between the companies and the Union—is whether Mr. Sawyer may seize private property, impose by administrative fiat his own settlement of a labor dispute, and proceed to confiscate private property to carry out his views of what that settlement should be.

If arbitrary executive action to force a wage increase is lawful today, then arbitrary executive action to force a wage decrease, or longer hours, or anything else, will be equally lawful tomorrow; and the constitutional rights of all citizens—not of these plaintiffs alone—will be gravely endangered.

18

## ARGUMENT

### POINT I

**Mr. Sawyer's invasion of plaintiffs' rights is an arbitrary action inconsistent with, and directly contrary to, the remedy expressly provided by Congress.**

In their memorandum in the District Court, counsel for Mr. Sawyer stated:

> " * * * the sole reason for and object of the Presidential action herein complained of was not, as spokesmen for the steel management have insisted, to settle a labor dispute, but to insure the uninterrupted production of steel during this period of national emergency." (Memorandum, p. 1.)*

Obviously a steel strike would have the most serious consequences to the nation. Obviously, too, the Union had called a strike. The significant thing is that Congress long ago provided against the very eventuality with which we are now confronted, and with the most deliberately expressed intention specified what should and should not be done. The asserted authorization for Mr. Sawyer's actions plainly and admittedly refuses to follow the process of Congress and insists upon a wholly inconsistent process.

Whether, therefore, Mr. Sawyer's action is described as action to settle a labor dispute—which it obviously is—or action motivated by a desire to continue the production of steel—which we may certainly admit for present purposes —or both, the *fact* is that his action flies squarely in the face of a Congressional prescription *for this precise kind of an emergency.* And the development of the situation as it

---

* Page references to this memorandum throughout this brief are to the mimeographed memorandum filed on behalf of Mr. Sawyer in the District Court.

19

existed on April 8 of this year had been months in the making. The situation does not even remotely resemble some overnight catastrophe requiring executive usurpation first and legalization afterward. If, in these present circumstances, executive usurpation is warranted by some law of necessity, then the constitutional right of Congress to provide for emergencies is utterly frustrated by an executive procedure which awaits the creation of the emergency and then insists upon disregarding the means which Congress has provided and using instead a means which is fashioned exclusively by the Executive.

## A. Congress has provided for this precise case a remedy which has not been followed.

The Labor Management Relations Act of 1947* created careful procedures for avoiding disastrous consequences to the nation's economy while encouraging mutually satisfactory reconciliation of conflicting interests. By Section 206 of that Act, the President is authorized to appoint a Board of Inquiry when a threatened or actual strike or lockout, affecting an entire industry or a substantial part of it, would imperil the national health or safety. Section 207 empowers that Board to conduct hearings to ascertain the facts of the dispute. After receiving the Board's report, the President is authorized by Section 208 to direct the Attorney General to seek an injunction against the strike or lockout. While the injunction is in effect, the Federal Mediation and Conciliation Service, created by Section 202, is to assist the parties to the labor dispute in their efforts to adjust the settlement of their differences. After 60 days, if the dispute remains unsettled, the Board of Inquiry appointed by the President is to report the current position

---

* 61 Stat. 136, 29 U. S. C. A. §§176-180, *infra*, Appendix A, pp. 5a-8a.

App. 1096

20

of the parties, the efforts made for settlement, and a statement of the employer's last offer of settlement. This report is to be made available to the public *and is to be followed, within 15 days, by a secret ballot of the employees to ascertain whether they wish to accept this last offer of settlement.* (Section 209.) When the results of this ballot are certified to the Attorney General, or if a settlement has been reached by the parties, the Attorney General must then move the court to discharge its injunction. After the injunction is discharged, *the President is required to submit to Congress his report,* including the findings of the Board of Inquiry, *with his recommendations for appropriate action.* (Section 210.) There is, of course, nothing to prevent him from reporting to Congress, and asking additional legislation, at any earlier date.

Accordingly, Congress left no procedural void in its program for protecting the national interest when imperiled by a threatened strike. It did not leave for the Executive the determination of the course of action to be followed when the procedures detailed in the Act are exhausted without the dispute having been settled.

The inescapable intent of Congress was that, if the dispute was not resolved during the 80-day period in which the injunction was in effect, the President should present the situation to Congress for necessary legislation. The Senate Report states that if the dispute is not terminated during the 80-day period, "the bill provides for the President's laying the matter before Congress for whatever legislation seems necessary to preserve the health and safety of the Nation in the crisis." (Sen. Rep. No. 105, 80th Cong., 1st Sess. 15 (1947).)

The fact that subsequent emergency action was specifically left for Congress itself to take is further clearly

21

shown by the statement on the Senate floor of the author of the bill:

> "We did not feel that we should put into the law, as a part of the collective-bargaining machinery, an ultimate resort to compulsory arbitration, or to seizure, or to any other action. We feel that it would interfere with the whole process of collective bargaining. If such a remedy is available as a routine remedy, there will always be pressure to resort to it by whichever party thinks it will receive better treatment through such a process than it would receive in collective bargaining, and it will back out of collective bargaining. It will not make a bona-fide attempt to settle if it thinks it will receive a better deal under the final arbitration which may be provided.
>
> "We have felt that perhaps in the case of a general strike, or in the case of other serious strikes, after the termination of every possible effort to resolve the dispute, the remedy might be an emergency act by Congress for that particular purpose.
>
> "I have had in mind drafting such a bill, giving power to seize the plants, and other necessary facilities, to seize the unions, their money, and their treasury, and requisition trucks and other equipment; in fact, to do everything that the British did in their general strike of 1926. But while such a bill might be prepared, I should be unwilling to place such a law on the books until we actually face such an emergency, and Congress applies the remedy for the particular emergency only. Eighty days will provide plenty of time within which to consider the possibility of what should be done; and we believe very strongly that there should not be anything in this law which prohibits finally the right to strike." (93 Cong. Rec. 3835-36 (1947).)

**App. 1098**

22

At the same time Congress expressed its will against the procedure adopted by Mr. Sawyer. A *proposed amendment which would have provided for governmental seizure in the event of emergency was specifically rejected* by an overwhelming vote. (93 Cong. Rec. 3637-3645 (1947).)

Moreover, Mr. Sawyer's actions, both accomplished and threatened, destroy the plaintiffs' rights to collective bargaining conferred by Congressional legislation.

In the National Labor Relations Act, as amended by the Labor Management Relations Act of 1947, Congress made it an obligation of both employer and employee to bargain collectively. Prior to that time, only the employer was under a statutory duty to bargain collectively and the employer was not given the correlative right to require bargaining on the part of his employees.

The Act, as amended, preserves the employer's duty to bargain, but in Section 8(b)(3) it places a similar duty on the employees' bargaining representative and thus gives the employer the same right to the process and procedures of collective bargaining as is accorded to the employees' representative. In Section 8(d), also added in 1947, collective bargaining is defined as the "performance of the mutual obligation of the employer and representative of the employees."

The Congressional intent to create for both employer and employee correlative duties and rights to bargain collectively is evident throughout the Senate and House Reports.[*]

This mutual obligation will be enforced by the courts. Indeed, the courts have recognized the statutory right conferred upon the employer and have enforced the duty of a

---

[*] H. R. Rep. No. 245, 80th Cong. 1st Sess. 5, 21 (1947); Sen. Rep. No. 105, 80th Cong. 1st Sess. 22 (1947); H. R. Rep. No. 510, 80th Cong. 1st Sess. 43 (1947).

23

union to bargain collectively by granting an injunction as
requested by the National Labor Relations Board. *Penello*
v. *International Union, United Mine Workers of America,*
88 F. Supp. 935 (D. D. C. 1950); *Madden* v. *International
Union, United Mine Workers of America,* 79 F. Supp. 616
(D. D. C. 1948). And this Court has held in an analogous
situation that the duty imposed on a carrier by the Railway
Labor Act to treat with the representatives of his employees
is enforceable by injunction in a suit brought by the em-
ployees' duly accredited representative. The Court ob-
served:

> "In considering the propriety of the equitable relief
> granted here, we cannot ignore the judgment of Con-
> gress, deliberately expressed in legislation, that * * *
> the meeting of employers and employees at the con-
> ference table is a powerful aid to industrial peace.
>
> * * * *
>
> "The fact that Congress has indicated its purpose
> to make negotiation obligatory is in itself a declara-
> tion of public interest and policy which should be per-
> suasive in inducing courts to give relief." (*Virginia
> Railway Co.* v. *System Federation,* 300 U. S. 515, 551-
> 552 (1937).)

Thus the asserted authorization on which Mr. Sawyer
relies, and the action which he is taking, not only run
directly counter to the procedures which Congress has
established but, in so doing, deny and destroy the statutory
rights of the plaintiffs. Under the Congressional prescrip-
tion for this kind of emergency, the collective bargaining
rights of both parties are preserved and equality of bar-
gaining status is not disturbed by arbitrary intervention
in support of one party to the labor dispute. Should col-
lective bargaining finally fail, specific Congressional action

24

would follow with due regard for the interests of both parties.

In fact, the procedures adopted by the Executive were directly contrary to those contemplated and prescribed by the Act, as amended. The Act provides in effect for a period of 80 days of continued bargaining, unprejudiced by the appointment of a board empowered to issue recommendations or by the issuance of recommendations. The referral of the present dispute to the Wage Stabilization Board, with the request that the Board make recommendations, seriously prejudiced the bargaining, because neither side could afford to make concessions which might establish a new floor for the recommendations which the Board would issue. After the recommendations were issued they caused further bargaining difficulties which Congress had foreseen and had attempted to avoid by providing for a board of inquiry *without* power to make recommendations.

## B. There Was and Could Be No Valid Reason For Disregard- ing the Remedy Provided by Congress and Adopting In- stead an Entirely Inconsistent and Unlawful Procedure.

It was asserted in the District Court, and it may be asserted here, that the President is not required by law to set in motion in any given case the procedure prescribed by the Labor Management Relations Act. But it does not follow that by failing to use the procedure provided by Congress the Executive can thereby create for itself a right to invoke unwarranted emergency procedures altogether contrary both to the Constitution and to the plain intent of Congress.

In the District Court, the chief excuse advanced for not following the procedure laid down by Congress was that during the period from the commencement of negotiations in November 1951 to their breakdown in April 1952 the

App. 1101

25

Union had voluntarily allowed its members to remain at work for more than the 80-day "cooling-off period" prescribed by the Labor Management Relations Act. It is not claimed that this voluntary abstention by the Union operated to bar the Government, on any theory of estoppel, from using the remedies provided by Congress; and during this voluntary abstention period there was of course no resort to the procedures laid down by the Act, including particularly the provision for a secret ballot of the employees to ascertain whether they wished to accept the last offer of settlement made by management.

It has also been suggested that resort, either at the time of the seizure or now, to the remedy provided by Congress might be futile, since it might simply postpone the problem for another 80 days. This is sheer speculation. Among other things, the argument leaves out of account (i) that during the 80 days there might be a settlement, (ii) that the members of the Union by secret ballot under §209 of the Act—an opportunity denied to them under the present procedure—might choose to accept management's last offer, and (iii) that within the 80 days there would be ample time for Congress to provide the necessary remedies along the lines already mentioned (*supra,* pp. 20-21). The mere claim that the remedy provided by Congress *might* not work is no excuse for disregarding it and resorting instead to entirely extra-legal action.

The assertion was also made below that when the seizure was made on April 8, a strike call was already out and it would have been too late to obtain an injunction under the Act in order to prevent a shutdown. All other considerations apart, this argument overlooks the fact that under the arrangements made before the Wage Stabilization Board the Union had agreed to give, and actually gave, 96 hours notice of its strike call. In at least one previous case (the Longshoremen's strike of August 1948, noted

26

below*) a four-day period was adequate to set in motion the entire emergency machinery of the Act, down to and including the issuance of an injunction.

When Mr. Sawyer, in justifying his action here, relies on Executive Order 10340 to the exclusion of the remedy provided by Congress, he poses for the Court's resolution a square conflict between the word of Congress and the will of the Executive. To resolve that conflict, the Constitution, and centuries of struggle against the dominion of executive power, will point the way.

---

* The emergency machinery of the Labor Management Relations Act has been invoked on at least nine occasions since its passage. In six of these, injunctions were secured by the Attorney General. These cases were:

March 1948, *Carbide & Carbon Chemical Corporation*—Exec. Order No. 9934, 13 Fed. Reg. 1259. Injunction issued. Dispute settled by direct negotiation between the parties with assistance of the Federal Mediation and Conciliation Service.

March 1948, *United Packing House Workers of America (Meat Packers' strike)*—Exec. Order No. 9934A, 13 Fed. Reg. 1375. Board appointed but no injunction issued.

March and June 1948, *United Mine Workers of America (coal strike,—two cases)*—Exec. Orders 9939 and 9970, 13 Fed. Reg. 1579, 3333. Temporary restraining order and injunction issued. Dispute as to pension fund settled in collateral court proceeding and other issues settled by direct negotiation between the parties.

May 1948, *American Union of Telephone Workers (American Telephone and Telegraph Company)*—Exec. Order No. 9959, 13 Fed. Reg. 2707. Board appointed but no injunction issued.

June 1948, *Shipping strike*—Exec. Order No. 9964, 13 Fed. Reg. 3009. Injunction issued.

August 1948, *Longshoremen's strike*—Exec. Order No. 9987, 13 Fed. Reg. 4779. Injunction issued. This instance illustrates the rapidity with which the emergency machinery can operate. The President appointed a statutory board of inquiry on August 17, 1948. The board held hearings on August 18 and reported back to the President on August 19. An injunction was issued on August 21.

February 1950, *United Mine Workers of America (coal strike)*—Exec. Order No. 10106, 15 Fed. Reg. 649. Temporary restraining order issued five days after the appointment of the board of inquiry, which had reported back to the President on the day the order was issued.

August 1951, *Non-ferrous metal strike*—Exec. Order No. 10283, 16 Fed. Reg. 8873. Injunction issued. Dispute settled by direct negotiation between the parties.

27

## POINT II

**The seizure of plaintiffs' properties and Mr. Sawyer's other action, including that threatened with respect to wages and other conditions of employment, are unlawful and unconstitutional.**

Mr. Sawyer's seizure and control of plaintiffs' plants and other facilities, including his threatened action with respect to terms and conditions of employment, are based on the claimed authority of Executive Order No. 10340. The Order by its terms purports to be issued under the "Constitution and laws of the United States." In fact, the Order and Mr. Sawyer's action thereunder find support in no constitutional provision or law of the United States.

As is clear from the memorandum filed on Mr. Sawyer's behalf in the District Court, the asserted right to seize and exercise control over the steel industry—including the right to supplant the steel companies in collective bargaining and to change terms of employment—rests solely upon a claimed prerogative or "inherent power" of the President as Chief Executive and as Commander in Chief of the armed forces. These purported rights are claimed to inure to the Executive simply by virtue of his office. Under Mr. Sawyer's position the President may exercise virtually unlimited powers in any field where he chooses to say that an emergency exists. For, in his counsel's view, the Executive declaration of emergency is non-reviewable and, once the emergency is proclaimed, the Executive action is beyond the control of the Courts.

This position was thus stated by Mr. Sawyer's counsel in the argument before Judge Pine:

> "*The Court*: So you contend the Executive has unlimited power in time of an emergency?

28

*Mr. Baldridge*: He has the power to take such action as is necessary to meet the emergency.

*The Court*: If the emergency is great, it is unlimited, is it?

*Mr. Baldridge*: I suppose if you carry it to its logical conclusion, that is true. But I do want to point out that there are two limitations on the Executive power. One is the ballot box and the other is impeachment.

*The Court*: Then, as I understand it, you claim that in time of emergency the Executive has this great power.

*Mr. Baldridge*: That is correct.

*The Court*: And that the Executive determines the emergencies and the Courts cannot even review whether it is an emergency.

*Mr. Baldridge*: That is correct." (R. 371-372)

* * * * *

"*The Court*: So, when the sovereign people adopted the Constitution, it enumerated the powers set up in the Constitution but limited the powers of the Congress and limited the powers of the judiciary, but it did not limit the powers of the Executive.

Is that what you say?

*Mr. Baldridge*: That is the way we read Article II of the Constitution." (R. 377)

* * * * *

"It is our position that the President is accountable only to the country, and that the decisions of the President are conclusive." (R. 380)

This concept of unbridled and unchecked executive power is presented in its most extreme posture by the ac-

29

tion here challenged. The seizure reflects a complete disregard of the statutory machinery established by Congress, in keeping with its responsibility under the Constitution, for the handling of the labor dispute in the steel industry. Again, in flat disregard of the Congressional mandate guaranteeing an employer the right to bargain collectively with his employees, Mr. Sawyer has announced his intention to increase the wages of plaintiffs' employees and has declined to give any assurance that he would not do this while the case was *sub judice*. In essential analysis, this is an attempt, without any vestige of statutory authority and solely on the assertion of inherent executive power, to appropriate plaintiffs' funds for payment of wages in whatever amounts Mr. Sawyer may choose to establish.

Before considering the pertinent provisions of the Constitution, and the scope of the powers it confers on the respective branches in our tripartite system of government, it would appear in order to review briefly the English common law background which so strongly affected the form of our government and had so direct a causal connection to the guarantees of liberty established in the Constitution. For this claim of an inherent overriding power in the Executive to act by fiat in disregard of the law is not a new one. It is precisely the claim which was at the root of centuries of bloody struggle to overcome the absolutism of the English Crown. It was precisely the threat against which the Founding Fathers established safeguards by specifically limiting executive power in framing the Constitution of the United States.

30

### A. The Necessary Background—the Successful Struggle Against the Crown Prerogative and its Culmination in the Constitution of the United States.

We have no intention of burdening the Court with an extended account of the continuous controversy in 17th century England over the royal prerogative. This is a story known in detail by the Founding Fathers, known in basic outline by most Americans and well documented elsewhere. See, *e.g.,* Trevelyan, *England Under the Stuarts* (17th Ed. 1938); Davis, *The Early Stuarts 1603-1660* (1937); Corwin, *Liberty Against Government* (1948). But a brief discussion of that controversy, and its effect on the content of the Constitution of the United States, is singularly pertinent here. For here we have a striking example of the maxim that history repeats itself.

The present claim of the Executive to an inherent right to do whatever he considers necessary for what he views as the common good—without consulting the legislature and without any authority under law—is not a new claim. It is precisely that which was made more than three centuries ago by James I of England when he claimed for himself the right to make law by proclamation and asserted that it was treason to maintain that the King was under the law. It is precisely the claim for which Charles I lost his life and James II his throne. Most importantly, it is precisely the claim for which George III lost his American colonies. In short, it was the continued effort of the English Crown to exercise unfettered prerogative that culminated in the War of Independence and the establishment of the United States under the form of government provided in the Constitution.

The controversies over the prerogative of the English King demonstrate two significant propositions which em-

31

phasize the restricted scope of the responsibilities conferred upon the President in the United States Constitution.

First, the prerogative of the English Crown, as understood at the time our Constitution was drafted, embodied no such rights of arbitrary control over private property as those now asserted under the Executive Order.

Second, the Founding Fathers—fresh from the successful struggle of the American colonies against the Crown and fully mindful of the long and bitter struggle that had been required to place that Crown under the law—made it clear that, in establishing the office of the Presidency, they were creating a position of far more circumscribed powers than those then attributed to the Crown.*

The development of the citizen's right in English-speaking countries to protection against arbitrary acts of the Executive is summarized in chapter 2 of Corwin's *Liberty against Government* (1948). The story is as old as Magna Carta.

Chapter 39** of Magna Carta says:

---

* See, *e.g.*, Corwin, The President: Office and Powers 365 (3d Ed. 1948).

** Chapter 39 of Magna Carta was copied verbatim in some of the early State Constitutions. In *Bank of Columbia* v. *Okely*, 4 Wheat. 234, 242 (1819), this Court held that it was

"intended to secure the individual from the arbitrary exercise of the powers of Government, unrestrained by the established principles of private rights and distributive justice."

And in *Murray's Lessee, et al.* v. *Hoboken Land and Improvement Co.*, 18 How. 272, 276 (1855), interpreting the Fifth Amendment to the Constitution, this Court said:

"The words, 'due process of law,' were undoubtedly intended to convey the same meaning as the words, 'by the law of the land,' in *Magna Charta*. Lord Coke, in his commentary on those words (2 Inst. 50), says they mean due process of law."

32

> "No freeman shall be taken, or imprisoned, or be *disseised* of his freehold, or liberties, or free customs, or be outlawed, or exiled, or any otherwise destroyed; nor will we not pass upon him, nor will we send upon him, but by lawful judgment of his peers, or by the law of the land."

At least five other articles in the Great Charter (Nos. 28, 30, 31, 52 and 56) deal with wrongful seizures of private property by the Crown, and give assurances that they will not be repeated and that property unlawfully taken will be restored.

As Professor Corwin points out, these provisions of Magna Carta were absorbed into the principles of the common law. They were well established as a part of that law when Sir John Fortescue, for 18 years Chief Justice of the King's Bench, somewhere around the year 1468 wrote his famous treatise *De Laudibus Legum Angliae.* The whole thesis of that book was to contrast the limited constitutional powers of the British Crown as they existed even as early as the Wars of the Roses, with the arbitrary powers of continental rulers. In Chapter 9 (and again in Chapter 36) Fortescue points out that the King of England

> "can neither make any alteration, or change in the laws of the realm without the consent of the subject, nor burden them, against their wills, with strange impositions, so that a people governed by such laws as are made by their own consent and approbation enjoy their properties securely and without the hazard of being deprived of them, either by the King or any other."

Centuries later it was to Magna Carta, and to Fortescue, that Coke appealed when he and the other judges of England declared

33

> " * * * that the King hath no prerogative, but that which the law of the land allows him." (*Case of Proclamations*, 12 Coke's Reports 74, 77 English Reprint 1352, 1354.)

and that

> "The common law has so limited the prerogatives of the King that they shall not take away or prejudice anyone's inheritance." (*i.e.*, anyone's private property.) (2 Inst. 63; 3 Inst. 84.)

And in the *Case of Prohibitions*, 12 Coke's Reports 63, 77 English Reprint 1342, 1343, the Judges laid down that the King could not take upon himself the power to give judgment in any case, since that was a matter for the courts—

> " * * * with which the King was greatly offended, and said, that then he should be under the law, which was treason to affirm, as he said; to which I said, that Bracton said, *quod Rex non debet esse sub homine, sed sub Deo et lege*."

The controversies between the Crown and Parliament came to a head under Charles I in the celebrated *Case of Ship Money (The King v. John Hampden)*, reported in 3 Howell's State Trials 826 (1637). What is particularly interesting about that case in the present connection is that the Crown lawyers based their claims squarely upon the claims of "national emergency," "common defense" and "inherent powers of the Commander in chief."

After proclamations had been made reciting that although England was then at peace there were wars raging on the continent of Europe, that the seas were unsafe, and that England was in danger of losing control of the sea and

34

of invasion, the King required various counties forthwith to provide ships for the common defense. One citizen (John Hampden) resisted. His case was heard in the Exchequer Chamber before all twelve judges of the three common-law courts.

The Solicitor General and Attorney General, appearing for the Crown, put their arguments squarely on the inherent emergency powers of the King as Commander in Chief, and argued that in time of emergency even Magna Carta and statutes must give way to those "inherent powers."

A majority of the judges accepted the King's views. Mr. Justice Crawley, in words surprisingly similar to the contentions advanced on behalf of Mr. Sawyer in the case at bar, said:

> "It doth appear by this record, that the whole kingdom is in danger, both by sea and land, of ruin and destruction, dishonor and oppression, and that the danger is present, imminent and instant, and greater than the king can, without the aid of his subjects, well resist: Whether must the King resort to Parliaments? No. We see the danger is instant and admits of no delay." (3 Howell's State Trials at 1087.)

In the same vein, other judges asserted that any statute which attempted to bind the King's prerogative as Commander in Chief was invalid, that Parliament moved too slowly in emergencies, and that the King was the sole judge of the necessity.*

---

\* Professor Corwin (The President: Office and Powers 494, fn. 70) says:
"The classic expression of Stuart theory is Justice Vernon's statement in the Ship Money Case: 'The King *pro bono publico* may charge his subjects for the safety and defense of the kingdom, notwithstanding any act of Parliament, and a statute derogatory from the prerogative doth not bind the king, and the king may dispense with any law in cases of necessity.' *Rex* v. *Hampden,* 3 S. T. 825 (1637)."

35

A minority of judges, headed by Croke, voted against the King. But the aftermath was interesting. In 1640 Mr. Justice Crawley (author of the statement above quoted) and some of his colleagues who had voted for the King were impeached for having

> " * * * traitorously and wickedly endeavored to subvert the fundamental laws and established government of the realm of England; and instead thereof, to introduce an arbitrary and tyrannical government against law * * * " (3 Howell's State Trials 1283).

The judgment in the *Ship Money* case itself was directed by Parliament to be cancelled as being

> " * * * against the laws of the realm, the subject's right of property, and contrary to former resolutions in Parliament and to the Petition of Right" * (3 Howell's State Trials 1261).

In the reign of James II the controversy broke out afresh. The King claimed the power in cases of urgent necessity to dispense with the laws. Finally, when he pushed the matter too far by indicting for seditious libel those who opposed his views, there was a reaction; and in the *Case of the Seven Bishops* (12 Howell's State Trials 183) Mr. Justice Powell declared that the claimed royal prerogative "amounts to an abrogation and utter repeal of all the laws" and that:

> "If this be once allowed of, there will need no parliament; all the legislature will be in the king, which is a thing worth considering." (12 Howell's State Trials 427.)

---

* 3 Car. I, c. 1 (1628).

36

The culmination was the exile of James II and the passage under his successors of the English Bill of Rights (1 Will. & Mary Sess. 2, c. 2 (1688)), from which many of the provisions of our own Bill of Rights are taken. That document specifically limited the powers of the Crown in the following respects:

"1. That the pretended power of suspending of laws, or the execution of laws, by regal authority, without consent of parliament, is illegal.

"2. That the pretended power of dispensing with laws, or the execution of laws by regal authority, as it hath been assumed and exercised of late, is illegal."

Thus, by the start of the 18th century, the English people, after a long and frequently bloody struggle, finally established that the Crown was under the law. It was clear that the seizure of property by the Crown without authority of Parliament was illegal.

In the decades preceding the War of Independence the American colonists were faced with their own struggle against the actions of George III and his ministers. Throughout the struggle, the colonists constantly appealed to their fundamental rights as Englishmen under Magna Carta and the English Bill of Rights.* In cataloging the grievances of the colonists against the King, the Declaration of Independence states that he "has kept among us, in times of peace, standing Armies without the consent of our legislature" and "has affected to render the military independent of and superior to, the Civil Power." Various attempts of British generals at the beginning of the Revolution to enforce martial rule were denounced by the legislatures of the various colonies as tyrannical and despotic.

---

* See, *e.g.*, Resolutions of the First Continental Congress quoted in 2 Tucker on the Constitution 886 et seq.

37

See Whyte, *The War Powers of the President* [1943] Wis. L. Rev. 205, 210.

It was against this background that the Founding Fathers drafted our Constitution. The constitutional debates, as reported in Madison's Journal, reveal with graphic clarity that the delegates had firmly in mind the recent excesses of the English Crown against the colonies and the long and costly struggle that had been waged by the people of England and of other European countries, such as Holland, before the royal power had been circumscribed and placed under the law.* It was in this framework that the delegates—all men who knew at first hand the evil resulting from the unfettered exercise of the royal prerogative, and many of them lawyers deeply read in the constitutional history of the mother country—drafted our own Constitution. It is against this real fear of uncontrolled executive action that the provisions of the Constitution must be considered.

### B. The Constitution Provides No Authority for the Seizure or for Mr. Sawyer's Other Actions.

As is well known, the framers of the Constitution believed firmly that in a tripartite form of government lay one of the surest safeguards of the people's liberties.** They took especial care, therefore, to prevent any concentration of executive and legislative powers in the same hands.

Article I, sec. 1 of the Constitution unequivocally vests in Congress alone all legislative powers granted. Article I, sec. 8 enumerates powers granted to Congress—includ-

---

* Madison's Journal, reprinted in H. R. Doc. No. 398, 69th Cong., 1st Sess. 109 (1927), at, *e.g.*, 132-133, 149-151, 397, 417-421.

** See, *e.g.* Madison in The Federalist, Nos. 47 and 48; and compare *Kilbourn* v. *Thompson*, 103 U. S. 168 (1881).

38

ing the power to "lay and collect Taxes, Duties, Imports and Excises, to pay the debts and provide for the common Defense and general Welfare of the United States" [cl. 1]; "to regulate commerce * * *" [cl. 3]; and several powers relating to the declaration and waging of war [cl. 11-16]. Section 8 concludes with the authorization "To make all Laws which shall be necessary and proper for carrying into execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof" [cl. 18]. In this clear-cut fashion the Constitution places in Congress the exclusive power to enact all laws necessary for the welfare and defense of the nation. The responsibility for legislation to cope with emergencies, both military and otherwise, is categorically vested in Congress.

The office of the Presidency is covered in Article II. It opens with a provision [sec. 1, cl. 1] that "The executive Power shall be vested in a President of the United States of America" and proceeds to define that power. The responsibilities assigned to the President, in keeping with the division of powers basic to the tripartite system of government, are intrinsically executive and administrative. The provisions of the Article upon which Mr. Sawyer apparently relies as authority for his actions, in addition to the clause just quoted, are these:

> "Section 2.  The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States; * * *
>
> "Section 3.  * * * he [the President] shall take Care that the Laws be faithfully executed * * *"

The duty to execute the laws is by its terms an executive function—to implement and administer the laws enacted

39

by Congress.* It is equally clear, as a matter of both history and settled judicial interpretation, that the President's military power as Commander in Chief is limited to a command or executive function—the direction of the armed forces. The President's military functions do not encompass any power to legislate on war or related questions.

Although the Executive, as is apparent from Executive Order 10340, claimed in this case to be acting pursuant to a power asserted to exist in a national emergency, it will be observed that the Constitution nowhere confides in the Executive any express power to take such undefined action as he deems best for the public interest, either in an emergency or otherwise. On the contrary, Article II, Section 3, provides that from time to time the President *shall* "give to the Congress Information as to the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient" and *may* "on extraordinary occasions"** convene both Houses or either of them.

Thus the power to frame measures and provide legal remedies, on both ordinary and extraordinary occasions, is reposed exclusively in the Legislative Branch.

---

* This provision, together with the provision in section 1 that "the executive Power shall be vested in a President," grants to the President the incidental authority required to insure the functioning of the Executive Branch of the Government. See *Myers* v. *United States*, 272 U. S. 52, 163-164 (1926), where the Court in holding that the President may remove a postmaster without the assent of the Senate, stated "Article II grants to the President the executive power of the Government, i.e., the general administrative control of those executing the laws, including the power of appointment and removal of executive officers * * *" Certain broad language in the *Myers* case with regard to executive power was expressly disapproved in *Humphrey's Executor* v. *United States*, 295 U. S. 602, 626 (1935).

** *Cf.* Story, The Constitution, §1562 (Cooley's Ed. 1873) where the author justifies and explains this provision by stating:

"Occasions may arise in the recess of Congress requiring the Government [*i.e.*, the President and Congress together] * * * *to provide adequate means to mitigate or overcome unexpected calamities.*"

40

If there is any such thing as a "residuum of powers" inherent in the Federal government under the Constitution, it is in Congress, and not in the President, under Article I, Section 8, Clause 18, quoted *supra,* p. 38. That any "residuum of power" not conferred expressly upon either the President or Congress is reserved to the States or to the people, and therefore is not vested in the President, is made clear by Amendments IX and X.

It is axiomatic that each branch of our Government is under, and not above, the Constitution. The President, like Congress, possesses no power not derived from the Constitution. *Ex parte Quirin,* 317 U. S. 1, 25 (1942); *Ex parte Milligan,* 4 Wall. 2, 136-137 (1866); *Lichter* v. *United States,* 334 U. S. 742, 779 (1948); *House* v. *Mayes,* 219 U. S. 270, 281-282 (1911).

As this Court said in the *Lichter* case:

> "In peace or in war it is essential that the Constitution be scrupulously obeyed, and particularly that the respective branches of the Government keep within the powers assigned to each by the Constitution." (334 U. S. at 779.)

If executive action is not authorized under these constitutional provisions or taken pursuant to Congressional statute, it is invalid. There is no place under the Constitution for the concept, familiar both to monarchy and dictatorship, of "inherent powers" or a "residuum of powers" beyond those specifically granted by the charter. As stated in *Toledo, Peoria and Western R. R.* v. *Stover,* 60 F. Supp. 587, 593 (S. D. Ill. 1945):

> "The executive department of our government cannot exceed the powers granted to it by the Constitution and the Congress, and if it does exercise a power not granted to it, or attempts to exercise a power not

41

granted to it, or attempts to exercise a power in a manner not authorized by statutory enactment, such executive act is of no legal effect."

In *United States* v. *Western Union Telegraph Co.*, 272 Fed. 311 (D. C. N. Y. 1921), *aff'd*, 272 Fed. 893 (2d Cir. 1921), remanded by stipulation for dismissal of bill without prejudice, 260 U. S. 754 (1922), Judge Augustus N. Hand rejected the contention that the President possesses inherent or other power to legislate in the public interest. In holding that the President had no power to prevent a domestic cable company from landing its cable in the United States, although presidents had asserted the executive power to regulate this matter independently of statute for fifty years, Judge Hand said:

"The implications of the power contended for by the government are very great. If the President has the right, without any legislative sanction, to prevent the landing of cables, why has he not a right to prevent the importation of opium on the ground that it is a deleterious drug, or the importation of silk or steel because such importation may tend to reduce wages in this country and injure the national welfare?" (272 Fed. at 315.)

See, to similar effect, William Howard Taft's study of the Presidency. Taft, *Our Chief Magistrate and His Powers*, 139-140 (1916):

"The true view of the Executive functions is, as I conceive it, that *the President can exercise no power which cannot be fairly and reasonably traced to some specific grant of power or justly implied and included within such express grant as proper and necessary to its exercise.* Such specific grant must be either in the

42

Federal Constitution or in an act of Congress passed in pursuance thereof.

*There is no undefined residuum of power which he can exercise because it seems to him to be in the public interest,* and there is nothing in the Neagle case and its definition of a law of the United States, or in other precedents, warranting such an inference. The grants of Executive power are necessarily in general terms in order not to embarrass the Executive within the field of action plainly marked for him, but his jurisdiction must be justified and vindicated by affirmative constitutional or statutory provision, or it does not exist."

It is against this constitutional framework, so carefully wrought by the Founding Fathers to insure lasting protection of the citizen's liberties, that this seizure must be tested.

As Mr. Justice Frankfurter said in his concurring opinion in *United States* v. *United Mine Workers of America,* 330 U. S. 258, 307 (1947):

"The historic phrase 'a government of laws and not of men' epitomizes the distinguishing character of our political society. When John Adams put that phrase into the Massachusetts Declaration of Rights he was not indulging in a rhetorical flourish. He was expressing the aim of those who, with him, framed the Declaration of Independence and founded the Republic. 'A government of laws and not of men' was the rejection in positive terms of rule by fiat, *whether by the fiat of governmental or private power.* Every act of government may be challenged by an appeal to law, as finally pronounced by this Court."

So challenged, this seizure cannot be squared with the Constitution and is necessarily invalid. Far from finding

43

support in the Constitution, it is a classic example of precisely the type of rule by fiat which can have no place in a government of laws and not of men.

### C. This Seizure, Far from Being Authorized Under the Executive Responsibility to Execute the Laws, is in Conflict With the Laws as Enacted by Congress.

The present proceeding involves a continuing problem—the handling of labor disputes of national importance—plainly within the province of Congress. Procedures to be followed in dealing with these disputes call for Congressional action. There can be no argument about this. And Congress has acted. After extensive consideration and mature deliberation Congress enacted, in the Labor Management Relations Act of 1947, detailed legislation governing labor disputes affecting the national health or security.

The Constitution charges the President with the faithful execution of the laws. In the present controversy he has failed to discharge this responsibility and has refused to apply the Labor Management Relations Act. The applicable procedures provided in the Act have been ignored. Instead Mr. Sawyer, under the purported authority of the Executive Order, has seized plaintiffs' private property and supplanted plaintiffs in their collective bargaining with their employees, and now threatens to use plaintiffs' funds to pay wages at whatever scale he chooses to adopt. Seizure—precisely the disruptive and undemocratic action which Congress rejected as a means of handling labor disputes—has been applied by executive fiat. On its face this action cannot be defended as the execution of the laws of the United States; it is precisely the reverse.

In the first years of the Republic, this Court firmly established that under the Constitution there could be no execu-

44

tive encroachment on authority vested by the Constitution in Congress. In *Little* v. *Barreme*, 2 Cranch 170 (1804), this Court, speaking through Chief Justice Marshall, sharply rejected the attempt by the President to usurp Congressional power.

That case involved an act passed by Congress in 1799 suspending commercial intercourse between the United States and France during the undeclared naval war between the two nations. The act provided that no American vessel should be permitted to proceed to any French port under penalty of forfeiture. A further provision authorized the President to instruct commanders of United States armed vessels to stop and examine any American vessels on the high seas suspected of engaging in the prohibited traffic and authorized the seizure of any such vessels sailing *to* any French ports. President Adams sent copies of the statute to the commanders of United States vessels, accompanied by written instructions directing them to seize all American ships bound *to* or *from* French ports. Acting under these presidential instructions, Captain Little stopped and seized on the high seas a vessel bound *from* a French port.

This Court unanimously affirmed an order which restored the seized vessel to its owner and directed Captain Little to pay damages for the seizure. The Court, after first posing the question whether the President would have had the power in the absence of Congressional action to order the seizure of vessels engaged in the illicit traffic, pointed out that Congress had prescribed by its legislation the manner in which seizures were to be carried into execution and had excluded the seizure of any vessel bound *from* rather than *to* a French port.* The Court held that, even though the

---

\* This Court there said, 2 Cranch 170, 177: "It is by no means clear that the President of the United States, whose high duty it is to 'take care that the laws be faithfully executed,' and who is commander in chief

45

executive construction (extending the power of seizure to
vessels bound from as well as to French ports) was calcu-
lated to increase the effectiveness of the legislation, the
Executive had no right, either under his general power as
Commander in Chief or under the guise of faithfully exe-
cuting the laws, to expand the law as enacted by Congress.

Only a few years after the decision in *Little* v. *Barreme,*
a similar holding was made by Mr. Justice Johnson of this
Court, sitting on Circuit, and District Judge Bee in *Gilchrist*
v. *Collector of Charleston,* 10 Fed. Cas. 355 (C. C. D. S. C.,
1808). There the Embargo Acts of the Jefferson Adminis-
tration had forbidden American vessels to trade with foreign
ports, but permitted coastwise shipping to continue. One
provision of law authorized Collectors of Customs to de-
tain vessels ostensibly bound on a coastwise voyage, "when-
ever, in their opinion, the intention is to violate or evade"
the Embargo Act. The Secretary of the Treasury, under
instructions from President Jefferson, instructed the Col-
lector of Customs at Charleston to detain all vessels carry-
ing specified cargoes, regardless of where they were bound
or whether the Collector had any reason to believe that there
was an intention to evade the Act.

---

of the armies and navies of the United States, might not, without any special
authority for that purpose, in the then existing state of things, have em-
powered the officers commanding the armed vessels of the United States, to
seize and send into port for adjudication, American vessels which were for-
feited by being engaged in this illicit commerce. But when it is observed that
the general clause of the first section of the 'act, which declares that such
vessels may be seized, and may be prosecuted in any district or circuit court,
which shall be holden within or for the district where the seizure shall be
made,' obviously contemplates a seizure within the United States; and that
the 5th section gives a special authority to seize on the high seas, and limits
that authority to the seizure of vessels bound, or sailing to, a French port,
the legislature seems to have prescribed that the manner in which this law
shall be carried into execution was to exclude a seizure of any vessel not
bound to a French port."

46

The Court rejected this attempted expansion, by Presidential order, of the detention provisions laid down by statute, and issued a mandamus against the Collector to compel him to clear the vessels which he had detained under Presidential instructions.*

The basic constitutional principles which caused the judiciary to strike down the executive encroachment are as controlling today as they were in the time of *Little* v. *Barreme* and *Gilchrist* v. *Collector*. There the basic principle that the executive must stay within the bounds of law was held to require the rejection of executive action which might plausibly be said to be compatible with the Acts of Congress and adapted to carrying out their general intent. Here, even such conceivable basis for the executive action is plainly lacking. By no stretch of the imagination can Mr. Sawyer's actions be said to be calculated to give effect to the laws passed by Congress covering emergency labor disputes.

The Labor Management Relations Act was enacted by Congress on June 23, 1947, just one week before the expiration of the War Labor Disputes Act.**

---

* Following the decision in *Gilchrist* v. *Collector,* the report (10 Fed. Cas. at 357) quotes in full an opinion rendered by the Attorney General to President Jefferson on the subject, in which the Attorney General argued that the courts had no authority to interfere by mandamus with an Executive Order, and that the responsibility of the President was "to the court of impeachment and to the nation" and not to the courts. Mr. Justice Johnson thereupon placed on record (10 Fed. Cas. at 359 *seq.*) an explanation of his opinion and an answer to the Attorney General. His views are particularly apposite, since they anticipate, and demolish, substantially every argument made by Mr. Sawyer's counsel in the case at bar.

** The War Labor Disputes Act, which had authorized the President under certain specified conditions to seize facilities necessary for prosecution of the war, expired by its terms six months after the declaration by the President of the cessation of hostilities in World War II, *i.e.*, on June 30, 1947, the Presidential declaration having been made on December 31, 1946 (Proclamation 2714, 12 Fed. Reg. 1).

The authorization of seizure in particular cases and within limits laid down by law is not new or unfamiliar to Congress. At many times in the past, and

47

The pattern established by Congress in the Labor Management Relations Act is unmistakably clear. If the labor dispute cannot be resolved during the 80-day period provided by the Act, the President is to report the emergency problem to Congress for its action. Seizure was not authorized. Congress, when the device of seizure was proposed, firmly and formally rejected its use in dealing with the problem (*supra,* p. 22).

The Executive Order and Mr. Sawyer's action must be considered in the framework of this unequivocal Congressional action. It is difficult to conceive of Executive action more directly inconsistent with Congressional intent.

On every proper occasion which has arisen since this seizure, Congress has expressed its opposition. In passing the Emergency Powers Interim Continuation Act, which authorized a short-term extension of certain designated emergency statutes, Congress pointedly provided that nothing contained in the Act

> "shall be construed to authorize seizure by the government, under the authority of any act herein extended, of any privately owned plants or facilities which are

even now, Congress has authorized seizure as a method of dealing with specific problems affecting the national interest. Outstanding examples of Congressional authorization of seizure are as follows:

Railroad and Telegraph Lines Seizure Act of 1862, c. 45, 12 Stat. 334 (January 31, 1862);

National Defense Act of 1916, c. 134, §120, 39 Stat. 213-214 (June 3, 1916);

Transportation System Control Act of 1916, c. 418, §1, 39 Stat. 645 (August 29, 1916);

Selective Training and Service Act of 1940, c. 720, §9, 54 Stat. 892 (September 16, 1940);

War Labor Disputes Act of 1943, c. 144, §§3-6, 57 Stat. 164-166 (June 25, 1943);

Universal Military Training and Service Act of 1948, c. 625, Title 1, §18, 62 Stat. 625 (June 24, 1948);

Defense Production Act of 1950, c. 932, Title 2, §201, 64 Stat. 799 (September 8, 1950); c. 275, Title 1, §102(b), 65 Stat. 132 (July 31, 1951).

not public utilities." (Pub. L. No. 313, 82nd Cong., 2d Sess. § 5, April 14, 1952.)

Similarly the Senate, in passing on the Third Supplemental Appropriations Act of 1952, specifically provided that none of the funds appropriated shall be used for the purpose of enforcing Executive Order 10340. See 98 Cong. Rec. 4192, 4216 (April 21, 1952). In at least two later instances the Senate has reiterated its view by placing this same prohibition on appropriation measures. Treasury and Post Office Departments Appropriations, 1953, 98 Cong. Rec. 4579 (April 28, 1952), 4617 (April 29, 1952); Labor-Federal Security Appropriation, 1953, 98 Cong. Rec. 4621, 4626 (April 29, 1952).

The situation is precisely the converse of that in which unauthorized and illegal executive action has on occasion been deemed ratified by the subsequent appropriation of funds for the particular purpose. See, *e.g., Isbrandtsen-Moller Co.* v. *United States,* 300 U. S. 139, 147 (1937). Consistent with the dignity of our tripartite system of government,* Congress has taken issue with and expressed its objection to the unwarranted seizure.

The unauthorized action of the Executive in this instance must also be contrasted with the joint exercise of the war powers by Congress and the President, exemplified by the wartime curfew program upheld in *Hirabayashi* v. *United States,* 320 U. S. 81 (1943). There, in affirming a conviction of violation of a statute making it a misdemeanor to dis-

---

* A strong deterrent to additional formal Congressional action against Mr. Sawyer's unconstitutional exercise of the executive power has been the realization that the unwarranted executive action should be handled by the judiciary in the exercise of its responsibilities under the Constitution. This salutary attitude that the interests of our form of Government are best served by having constitutional rights protected by the courts has been constantly reiterated in Congress since the seizure of plaintiffs' properties under the purported authority of the Executive Order. See, *e.g.,* 98 Cong. Rec. 4067 (April 16, 1952), 4159 (April 18, 1952), 4193, 4197 (April 21, 1952), 4287 (April 22, 1952).

49

obey curfew orders promulgated by military commanders pursuant to an executive order, this Court concluded that the statute had ratified and confirmed the executive order. The Court, after emphasizing that the statute on which the conviction was based contemplated and authorized the curfew order, pointed out that in essence the case involved the cooperative action of Congress and the Executive.

The Executive action under scrutiny here lies at precisely the opposite end of the spectrum. Congress has explicitly refused to authorize the use of seizure in the type of situation here presented. And rather than to take advantage of the emergency machinery provided by Congress in the Labor Management Relations Act—under which Congress and the Executive would operate smoothly within their respective spheres of responsibility—the Executive chose to follow a quite different and contrary course.

The inquiry remains whether any other law of the United States furnishes authority for the seizure of plaintiffs' properties. The only laws which authorize seizure of any production facilities by the President are Section 18 of the Universal Military Training and Service Act (62 Stat. 625; 50 U. S. C. A. App. §468) and Section 201 of the Defense Production Act of 1950, as amended (64 Stat. 799, 65 Stat. 132; 50 U. S. C. A. App. §2081). See Appendix, *infra.*

Mr. Sawyer's counsel in their memorandum in the District Court (p. 62), and again on oral argument (R. 371), freely admitted that the Executive Order and the action taken under it are not based on these or any other statutes. Even brief consideration of these two statutes demonstrates conclusively that no claim could be made to the contrary.

Section 18 of the *Universal Military Training and Service Act* provides that, upon the President's determination that it is in the interest of the national security to obtain prompt delivery of any articles or materials, the procure-

50

ment of which has been authorized by Congress exclusively for the use of the armed forces or the Atomic Energy Commission, the United States is authorized to place orders for such articles or materials. The order must specifically state that it is being placed pursuant to the provisions of the section. If the person with whom such an order is placed refuses or fails to fill it, the President is authorized to take immediate possession of that person's plant and to operate it for the production of such articles or materials as may be required by the United States. Plaintiffs have received no order placed pursuant to the provisions of this section.*

Section 201(a) of the *Defense Production Act of 1950*, as amended, not only is not applicable, but also demonstrates the policy of Congress against unrestricted seizure of real and personal private industrial property during even this time of urgent preparation for defense.

It authorizes the President to requisition only *personal* property, and then only (i) after a determination that the property is essential for the national defense and that all other means of obtaining its use have been exhausted, and (ii) upon fixing the value of the personal property requisitioned and payment of its value. The section specifically forbids the President to requisition real property.

Section 201(b) excludes executive seizure of real estate, by providing that, if its acquisition is necessary in the interest of national defense, the President is confined to the institution of regular condemnation proceedings in the courts.

---

\* Uncontroverted sworn statements of the plaintiffs' executives disclose that this is true as to U. S. Steel (R. 83); Bethlehem (R. 119); Republic (R. 163); and Youngstown (R. 17). There is no contrary claim as to any of the other plaintiffs.

51

Moreover, in Title V of the Defense Production Act, Congress expressed its intent "that there be effective procedure for the settlement of labor disputes affecting the national defense." (Section 501.) The Act goes on to authorize mediation and conciliation facilities, and authorizes the President to initiate voluntary conferences between management, labor and representatives of the public. (Section 502.)* Congress expressly provided, however, that in connection with labor disputes affecting national defense no action inconsistent with the provisions of the Labor Management Relations Act of 1947 or other applicable laws should be taken under Title V. (Section 503.)

The 1951 amendments to the Defense Production Act of 1950 are worth noting. That Act, prior to the 1951 amendments, authorized the President to requisition real estate as well as personal property. By the Amendment of July 31, 1951 (65 Stat. 132) the President's authority to requisition real estate was taken away, and he was given instead the much more limited authority merely to institute condemnation proceedings in the courts.**

The President has made no determination pursuant to any provisions of the Defense Production Act and has taken no action to acquire either real or personal property thereunder.

---

* The provisions of Title V have not thus far been implemented with respect to the settlement of labor disputes.

** That Congressional policy against seizure has steadily become more stringent is clear. With respect to the earlier and more drastic provisions (now eliminated), H. Rep. No. 2759, 81st Cong., 2d Sess. 4 (1950) said:

"The power to requisition is a drastic exercise of the sovereign power. The committee is desirous of reducing to the minimum the effect of requisitioning upon the public. Provisions have therefore been inserted, requiring that the authority cannot be exercised unless the President has been unable to obtain the property on fair and reasonable terms * * * "

52

We have, then, a situation where this seizure not only is unauthorized by any existing act of Congress but is flatly contrary to the procedures specifically laid down by Congress in every applicable statute for dealing with just the present situation.

### D. The Seizure and Mr. Sawyer's Other Actions Cannot Be Justified Under the President's Power as Commander in Chief.

Paralleling the responsibility as Chief Executive for the execution of the laws passed by Congress is the President's military function as Commander in Chief of the Army and Navy. The Constitutional Convention, with the grievances of the colonies against the English King and his generals firmly in mind, conferred upon the President the limited function of direction of military operations. As stated in the *Federalist,* No. 69:

> "In this respect his authority would be nominally the same with that of the king of Great Britain, but in substance much inferior to it. It would amount to nothing more than the supreme command and direction of the military and naval forces * * * ; while that of the British king extends to the *declaring* of war and to the *raising* and *regulating* of fleets and armies, —all which, by the Constitution under consideration, would appertain to the legislature." *

---

\* Several of the "war powers" which the Constitution entrusted specifically to Congress and not to the President were, by contemporary practice, still claimed and exercised by the British Crown as Commander in Chief. Thus, according to Blackstone it was the King and not the Parliament which had power to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water. Likewise according to Blackstone, it was still a part of the Crown's prerogative to organize and arm the militia, to make rules for the government and regulation of the land and naval forces, and possibly even to raise armies. Even the power of compulsory military service (in the form of impressment of seamen, particularly distasteful, by

53

As we have seen, the power to enact laws relating to the defense of the nation, the prosecution of war, and the support of the armed forces, was specifically placed in Congress under Art. I, sec. 8 of the Constitution. The President's power is purely military in nature and is directly related to the direction of the armed forces. Laws relating to the conduct of war and the maintenance of our defenses are within the sole domain of Congress. As was said in *U. S. v. Bethlehem Steel Corp.*, 315 U. S. 289, 309 (1942), "if the Executive is in need of additional laws by which to protect the nation against war profiteering, the Constitution has given to Congress, not to this Court, the power to make them." See also *Lichter v. United States,* 334 U. S. 742, 765-766 (1948); *Ex parte Quirin,* 317 U. S. 1, 26 (1942); *O'Neal v. United States,* 140 F. 2d 908, 911 (6th Cir. 1944), *cert. denied,* 322 U. S. 729 (1944). As the Court said in the *O'Neal* case, in pointing out that such powers as the right to allocate defense materials and facilities and to establish rationing are legislative rather than executive:

> "While the war power in this country is conferred on the Congress and on the President, Kiyoski Hirabayashi v. United States, 320 U. S. 81, 93, 63 S. Ct. 1375, 87 L. Ed. 1774, the principal war power of the President arises as Commander-in-Chief of the Army and Navy and does not include any war power legislative in its nature * * * Such drastic power [to allocate, ration, etc.] necessarily falls within the 'legislative power' with which the Congress is invested

---

actual experience, to the American colonists) was declared by Blackstone to be in the King independent of Parliamentary authority. See, generally, Blackstone's Commentaries, Book 1, Chapters 7 and 13. It is noteworthy that all of these powers, regarded as part of the executive prerogative in England, were specifically transferred in the Constitution to the legislative branch.

See also Story, The Constitution, § 1492 (Cooley's Ed. 1873).

54

(Art. I, Section 1, U. S. Constitution)." (140 F. 2d at 911.)*

The limits on the power of the President as Commander in Chief have been clearly delineated by this Court. It has long been settled that under this authority, which is strictly military in character, the President has the power to control civilian activity only where the emergency is so imminent and the threat of military danger to the nation so pressing that the slightest delay would lead to disaster; and even then his action is subject to court review. *Fleming* v. *Page,* 9 How. 603, 615 (1850); *Mitchell* v. *Harmony,* 13 How. 115 (1851); *Ex parte Milligan,* 4 Wall. 2 (1866); *United States* v. *Russell,* 13 Wall. 623 (1871); *Sterling* v. *Constantin,* 287 U. S. 378, 400-401 (1932).

In *Mitchell* v. *Harmony, supra,* where it was held that the President's war power did not justify the seizure of plaintiff's property,** this Court placed the following

---

* See also 2 Tucker, The Constitution 716 where it is said *inter alia:*

"The Commander in Chief is subordinate to Congress in all respects, and he cannot use his military power to the injury of the country, except with the concurrence and consent of Congress."

Compare *Madsen* v. *Kinsella,* No. 411, October Term, 1951, decided April 28, 1952, dealing with the power of the President as Commander in Chief to provide for trial by military courts in occupied areas, where Congress had not deprived such courts of existing jurisdiction which they possessed on August 29, 1916, when Congress revised the Articles of War. But see also *Ex Parte Milligan,* 4 Wall. 2 (1866).

** Harmony was a private trader who accompanied an American Expeditionary Force into Mexico during the Mexican War with a wagon train of goods. After progressing some distance into enemy territory, Harmony tried to return, whereupon the appellant, Colonel Mitchell, compelled him to remain with the troops and used his wagon train for military service. Subsequently the American Army retreated and the wagon train was captured by the Mexicans. Harmony sued Colonel Mitchell for substantial damages, and the award of damages by the jury was affirmed by this Court.

55

limitation on the exercise of the Presidential power as
Commander in Chief:

> "There are, without doubt, occasions in which private
> property may lawfully be taken possession of or de-
> stroyed to prevent it from falling into the hands of the
> public enemy; and also where a military officer,
> charged with a particular duty, may impress private
> property into the public service or take it for public
> use * * *

> "But we are clearly of opinion, that in all of these
> cases the danger must be immediate and impending;
> or the necessity urgent for the public service, such as
> will not admit of delay, and where the action of the
> civil authority would be too late in providing the
> means which the occasion calls for * * *

> "Our duty is to determine under what circumstances
> private property may be taken from the owner by a
> military officer in a time of war. And the question
> here is, whether the law permits it to be taken to
> insure the success of any enterprise against a public
> enemy which the commanding officer may deem it
> advisable to undertake. And we think it very clear
> that the law does not permit it." (13 How. at 134-135.)

This stringent requirement for the exercise of military
power over civilian activity and civilian property was re-
emphasized in *United States* v. *Russell,* 13 Wall. 623
(1871) where this Court again made it apparent that ex-
treme public danger, making recourse to normal govern-
mental processes impossible, must be established. There
the Court said:

> "Extraordinary and unforeseen occasions arise, how-
> ever, beyond all doubt, in cases of extreme necessity

56

in time of war or of immediate and impending public danger, in which private property may be impressed into the public service, or may be seized and appropriated to the public use, or may even be destroyed without the consent of the owner. * * * Where such an extraordinary and unforeseen emergency occurs in the public service in time of war no doubt is entertained that the power of the government is ample to supply for the moment the public wants in that way to the extent of the immediate public exigency, but the public danger must be immediate, imminent, and impending, and the emergency in the public service must be extreme and imperative, and such as will not admit of delay or a resort to any other source of supply, and the circumstances must be such as imperatively require the exercise of that extreme power in respect to the particular property so impressed, appropriated, or destroyed. Exigencies of the kind do arise in time of war or impending public danger, but it is the emergency, as was said by a great magistrate, that gives the right, and it is clear that the emergency must be shown to exist before the taking can be justified." (13 Wall. at 627-628.)

Moreover, the power as Commander in Chief, being strictly military in character, is designed for exercise only within the theatre of war. See *Mitchell* v. *Harmony,* 13 How. 115 (1851); *Ex parte Milligan,* 4 Wall. 2 (1866). Indicative of the proper scope of the power is the sustaining by the courts of such action as destruction, by military commanders in the field, of railroad bridges during a war (*United States* v. *Pacific R. R.,* 120 U. S. 227 (1887)) and the seizure, when confronted with armed rebellion, of neutral vessels running a blockade (*Prize*

57

*Cases,* 2 Black 635 (1862).* The nationwide properties of the steel industry situated throughout the continental United States and seized indiscriminately regardless of what proportion or type of products were designed for military use, certainly cannot be characterized as being within a theatre of military operations.**

Although the Presidential power as Commander in Chief justifies the taking or destruction of property when the stringent requirements for its exercise are present, it does not encompass the function of eminent domain. When, as in the present situation, there is no foundation for interference with private property under the President's military power, any taking of property must be made under the Congressional power of eminent domain. Taking of property for public use is a power of the legislature; the right of the executive department to take property by eminent domain must be based on Congressional authorization. "The taking of private property by an officer of the United States for public use, without being authorized, expressly or by necessary implication, to do so by some act of Congress, is not the act of the Government." *Hooe* v. *United States,* 218 U. S. 322, 336 (1910). See, also,

---

* Significant factors in the *Prize Cases,* in addition to the armed rebellion, were that President Lincoln was acting not only as Commander in Chief but also under the express authority of an early statute authorizing him to use armed force to suppress insurrection, and that Congress had passed legislation specifically ratifying the declaration of the blockade.

** Cf. *United States* v. *Montgomery Ward & Co.,* 58 F. Supp. 408 (N. D. Ill. 1945) (holding seizure of Ward plants not justified under President's power as Commander in Chief since plants outside the "theatre of war"), reversed on ground that the seizure was justified under section 3 of the War Labor Disputes Act, 150 F. 2d 369 (7th Cir. 1945), *dismissed as moot,* 326 U. S. 690 (1945). It is recognized that, under certain circumstances, the continental United States may be considered within the theatre of war. Cf. *Ex Parte Quirin,* 317 U. S. 1 (1942) (trial by military tribunal of saboteurs clearly members of foreign army engaged in acts of war on United States soil).

58

*United States* v. *North American Transportation & Trading Co.*, 253 U. S. 330, 333 (1920); *United States* v. *Rauers,* 70 Fed. 748 (S. D. Ga. 1895); *Rindge Co.* v. *Los Angeles,* 262 U. S. 700, 709 (1923); *Bragg* v. *Weaver,* 251 U. S. 57, 58 (1919); *Chappell* v. *United States,* 160 U. S. 499, 510 (1896).*

Moreover, although it is settled law that upon the breaking out of war enemy property found within our territory is subject to seizure and confiscation, it has been consistently held that this power can be exercised only by or under the direction of Congress, and that the Executive has no inherent power to make or order such seizures without Congressional legislation. *Brown* v. *United States,* 8 Cranch 110, 129 (1814) in which this Court said:

> "It appears to the Court, that the power of confiscating enemy property is in the legislature, and that the legislature has not yet declared its will to confiscate property which was within our territory at the declaration of war." **

The very nature of the President's military power as Commander in Chief requires that its use be restricted to those instances of immediate public danger which can-

---

* The principle that eminent domain may be exercised only pursuant to act of Congress is so long and thoroughly established that in recent years the principal inquiry by the courts has been limited to whether the "taking" was within the scope of congressional authority. See, *e.g., United States* v. *Carmack,* 329 U. S. 230 (1946); *United States ex rel. T. V. A.* v. *Welch,* 327 U. S. 546 (1946); *United States* v. *Threlkeld,* 72 F. 2d 464 (10th Cir. 1934), *cert. denied,* 293 U. S. 620 (1934); *United States* v. *West Virginia Power Co.,* 122 F. 2d 733 (4th Cir. 1941), *cert. denied,* 314 U. S. 683 (1941).

** To the same effect see *Britton* v. *Butler,* 4 Fed. Cas. 177, 180 (C. C. S. D. N. Y. 1872), in which it was held, citing *Brown* v. *United States:*

> "Under the constitution of the United States, the power of confiscating enemy property and debts due to an enemy is in congress alone."

59

not be handled by normal governmental action. In *United States v. McFarland*, 15 F. 2d 823 (4th Cir. 1926), *cert. granted*, 273 U. S. 688 (1927), *cert. revoked*, 275 U. S. 485 (1927), the Court emphasized the salutary standard as to "how careful the courts are to restrict the exercise of this power [the President's power as Commander in Chief] within narrow bounds." (15 F. 2d at 826.)

In the case at bar there is no longer a state of war remaining from World War II. The Treaty of Peace with Japan, to which the Senate gave its advice and consent on March 20, 1952, was ratified by the President on April 15th, and formally took effect after the ministerial act of depositing such ratification with the Department of State on April 28. In fact Mr. Sawyer's counsel both in their memorandum in the District Court (p. 58) and on oral argument (R. 371) expressly disclaimed any idea of justifying the seizure on any claim of a technical state of war remaining from World War II.

The preamble clauses of Executive Order No. 10340 refer to the hostilities in Korea and "our national defense and the defense of those joined with us in resisting aggression" (R. 7). There should be no need to say that plaintiffs have no argument with the fact that our nation must take steps necessary to resist aggression. The inescapable fact remains that the Constitution and our form of government do not visualize this problem being met, in the present situation, under the President's power as Commander in Chief.

In January, 1951, the President, in his message on the State of the Union* placed major emphasis on the threat of aggression and the need to present a strong national defense. The Korean hostilities have continued for close to two years. It is clear beyond argument that the present

---

* H. R. Doc. No. 1, 82nd Cong., 1st Sess. (1951).

60

controversy does not present a situation of a sudden emergency.

The affidavits submitted in opposition to the applications for injunctive relief (R. 27-62) are themselves the most eloquent testimony that the present controversy can, by no stretch of the imagination, be said to involve the sudden and imminent threat of military disaster which justifies the exercise of presidential power as Commander in Chief. Those affidavits clearly reveal that what is involved here is a problem of more than two years' standing. The problem of securing necessary steel for military equipment, for the production of civilian vehicles and other transport facilities, for Atomic Energy Commission construction programs and for petroleum industry expansion is a broad and continuing question within the province of Congress. And Congress has shown no hesitation or reluctance to legislate in this area whenever particular authority was desirable. As for the basic question of the relation of labor disputes to the supply of vital materials and other aspects of our defense effort, we have seen that this question—which is necessarily a continuing one in any period of national stress—has been with us, and received extensive consideration, as long ago as 1947.

Patently, these continuing problems, which have been in existence for periods ranging from a minimum of several months to a number of years, present no basis for any sudden exercise of the military power of the President as Commander in Chief. Any contention that Mr. Sawyer's seizure and other action can be based on the President's military power is based on a completely indefensible perversion of that authority as provided in the Constitution and delineated by the courts.

The "war powers" of the United States are those of Congress and the President, not those of the President

61

alone. It is for Congress, and not for the President, "to raise and support Armies", and for the President to direct them. Under the President's power as Commander in Chief, as the courts have uniformly held, property can be seized or destroyed only in the course of battle in order that our arms may prevail. This is a far cry from a contention that the power extends in any way to a continuing domestic problem involving a major aspect of our economy. The present controversy does not present a problem arising in a campaign in the field. It is a question of broad legislative import which must be—and has been—dealt with by Congress.

Constitutional guarantees would be meaningless if the President, after ignoring the procedures provided by Congress and after failing to request Congress for authority to take other action which he might deem desirable, could then claim the existence of an emergency justifying seizure of an entire industry.

Above all, there can be found no basis in the Executive's military power for any action by Mr. Sawyer with respect to the terms and conditions of employment of plaintiffs' employees. Entirely aside from the absence of power for defendant's seizure of plaintiffs' properties, there clearly can be no basis in the President's power as Commander in Chief for placing in effect, in accordance with the announced and repeated threats of Mr. Sawyer, wage increases and other changes in terms and conditions of employment, or for the forcible appropriation of plaintiffs' funds to carry out those changes.

62

### E. The Seizure Cannot be Justified by Any Claim of an "Aggregate of Powers" or by Isolated Instances of Past Executive Action Which Were Never Legally Challenged.

At the argument before Judge Pine Mr. Sawyer's counsel argued squarely that the President had both an unreviewable discretion to decide whether an emergency existed and an unlimited power to deal with it (*cf. supra,* pp. 27-29). In his concluding statement the following colloquy occurred:

> "The Court: Well, we have had crises before in this country, and we have had governmental machinery that was adequate to cope with it.
>
> You are arguing for expediency. Isn't that it?
>
> Mr. Baldridge: Well, you might call it that if you like. *But we say it is expediency backed by power"* (R. 420).

Although counsel in their petition for certiorari now expressly repudiate this appalling claim (the assertion of which fully justified the strong language of Judge Pine's opinion), their basic argument remains unchanged.

Despite the fact that the memorandum filed on behalf of Mr. Sawyer in the District Court, and his petition for certiorari here, pay lip service to the requirement that the President's power must be found somewhere in the Constitution, the argument below proceeded specifically, and the argument here proceeds by necessary implication, upon the nebulous theory of a "broad residuum of powers" in the President and of his "aggregate" of powers.

In essential analysis, this theory boils down to a claim that executive action which is not authorized under any specific provision of the Constitution or any law of the United States, and is indeed inconsistent with every specific existing statute, somehow achieves validity when all provi-

63

sions of the Constitution and statutes are considered to-gether.

We respectfully submit that the Executive Order and action purportedly taken thereunder, being without authority under any constitutional or statutory provision, cannot be validated by the application of labels such as "broad residuum" or "aggregate" of powers.

Closely related to the foregoing contention is the suggestion that the Executive Order and Mr. Sawyer's action are justified by various instances in which Presidents in the past have apparently acted without constitutional or legislative authority. For example, the memorandum in the District Court lists 12 properties seized by President Roose-velt prior to the passage of the War Labor Disputes Act under his purported powers as President. For a variety of reasons, the lawfulness of none of these seizures was ever put to judicial test.

It must also be emphasized that, despite the extended parade of citations presented in the opposing memorandum below, there is no judicial authority supporting the actions here attacked. It would unduly extend this brief to con-sider individually every case advanced. Brief considera-tion of a few random examples, however, demonstrates the complete lack of precedent or support for the present action.

1. Counsel referred below (see p. 57 of their Memoran-dum) to *United States* v. *Pewee Coal Co., Inc.*, 341 U. S. 114 (1951), as confirming the existence of a constitutional power in the President to seize property during a national emer-gency. This assertion was made in the face of the incon-trovertible fact that the legality of the taking—*i.e.*, the question of the power of the Executive to seize the prop-erty—was not an issue in the case, as specifically stated by the Court of Claims. See *Pewee Coal Co.* v. *United States*,

64

88 F. Supp. 426, 430 (Ct. Cls. 1950). The briefs of both parties in the *Pewee* case were in complete agreement that the legality of the seizure was not in issue;[*] and on the argument before Judge Pine Mr. Sawyer's counsel so conceded (p. 184).

2. The cases cited involving seizures of facilities during wartime (*e.g.*, *Ken-rad Tube and Lamp Corp.* v. *Badeau*, 55 F. Supp. 193 (W. D. Ky. 1944)), although presented as justification for inherent executive power to take property, actually involved seizures made under the specific authority of the War Labor Disputes Act, as Judge Pine pointed out (R. 71).

3. Counsel now assert (petition for certiorari in No. 745) that the principles embodied in the decision below, if contemporaneously applied, would have gone so far as to prevent President Jefferson from making the Louisiana Purchase and President Lincoln from issuing the Emancipation Proclamation. This is sheer nonsense.

All that President Jefferson did was to negotiate a treaty on April 30, 1803 (8 Stat. 208) with the Government of France. That treaty under accepted constitutional principles did nothing more than give the President an option to buy Louisiana, subject to ratification by the Senate and

---

[*] The brief of the United States (Docket No. 168, October Term 1950) stated at page 10:

> "Neither party has challenged the validity of these particular actions, the Executive Order, or the Secretary's general action under the Order."

And again in the same brief at page 89:

> "In both cases, the administrative regulations have not been challenged by either party, and their validity is not in dispute. * * * In these circumstances, it is both procedurally proper and substantively just to make the same assumption in this Court, * * *."

And see also Pewee's brief on the merits, p. 36.

65

to the appropriation of the purchase price by both Houses. The conditions of the option were duly fulfilled. The Senate ratified the treaty on October 20, 1803.* On October 31, 1803 both Houses authorized the President to occupy the Louisiana territory pursuant to the treaty; and ten days later they appropriated the necessary sums for payment (2 Stat. 245-265).

The Emancipation Proclamation (12 Stat. 1267, 1268) was purely a war measure, *flagrante bello*. It recited that it was to operate solely against enemy property in Confederate territory. The Supplemental Proclamation of January 1, 1863 (12 Stat. 1268), by which the original Proclamation was put into effect, specifically excepted all of Tennessee and West Virginia as well as the portions of Louisiana and Virginia then occupied by Federal troops. Slaves in those areas, as well as in the border States (Kentucky, Delaware, Maryland and Missouri), did not receive their legal freedom until the Thirteenth Amendment. The Proclamation of January 1, 1863 recited that it was "a fit and necessary war measure for suppressing said rebellion" (12 Stat. 1268). Constitutionally, it was no different from Sherman's destruction of property in enemy territory on his march to the sea.

4. In their petition for certiorari Mr. Sawyer's counsel cite among the "precedents" of Executive action "the seizure by President Lincoln during the Civil War of the railroads and telegraph lines between Washington and Annapolis". This seizure, again, was made *flagrante bello* at a time in early 1861 when the area in question was actually in the theatre of hostilities and the capital itself was in danger of being isolated. Congress subsequently passed a statute which in effect ratified this seizure and specifically gave the President control of all railroads and

---

* 2 Miller, Treaties, etc. of the United States 506.

66

telegraph lines. The Act in terms provided that it was to remain in force only so long as was "necessary for the suppression of this rebellion." (Act of Jan. 31, 1862, c. 15; 12 Stat. 334.)

5.  Mr. Sawyer's counsel below, citing from Corwin's *The President: Office and Powers,* p. 190, finds support for his action in President Theodore Roosevelt's "stewardship theory" as exemplified by his consideration of the possible seizure of coal mines during a strike to prevent a coal shortage.  Counsel neglected to point out, however, that Corwin in the very next paragraph of his study had this to add:

> "One fact 'T.R.' omits to mention, and that is that Attorney General Knox advised him that his 'intended' step would be illegal and unconstitutional.  For some reason the opinion is still buried among similar arcana of the Department of Justice" (p. 191).

Past executive acts of doubtful validity can furnish no support for sustaining the Executive Order and defendant's past and threatened actions.  As a recent commentator observed:

> "Acts based on this law of necessity and assumed probability of excuse or of subsequent ratification do not pretend to be supported by constitutional authority and are, of course, of no value as precedents establishing the existence of constitutional power." Whyte, *The War Powers of the President,* [1943] Wis. L. Rev. 205, 211-212.

There could be no more dangerous principle—nor one more foreign to the Constitution—than a rule that past illegality can through some legerdemain serve as authority to legalize present illegality.

67

Indeed, if Executive construction is to be accorded any validity, a most recent example is directly in our favor. During the coal strike of 1950 the President invoked the Labor Management Relations Act; and on March 3, 1950, he sent a message to Congress reciting the steps taken *and specifically requesting Congressional authorization for the seizure of the coal mines.*[*]

Mr. Sawyer's counsel now claim that the President has, and has always had, an "inherent power" to effect seizures. In their memorandum before Judge Pine (p. 60-A) they went so far as to assert that this "inherent power" could not be diminished or limited by Congress. The fact that the present Chief Executive, in an almost identical recent situation, thought it necessary to ask Congressional authorization for seizure seems clearly inconsistent with the existence of any such "inherent power".

### F. Mr. Sawyer's Action Violates the Fifth Amendment to the Constitution.

In view of the complete lack of authority under the Constitution and laws of the United States for Mr. Sawyer's action, it is clear that the seizure and other interference with plaintiffs' property and rights deprive them of due

---

[*] The message appears in 96 Cong. Rec. 2774-2775 (1950). It concludes with these words:

> "The coal industry is a sick industry. Temporary seizure by the Government, though it may be necessary under present circumstances, cannot produce a cure. *I am recommending seizure authority* because I believe we now have no alternative. But I urge that it be accompanied by a positive and constructive effort to get at the root of the trouble. This is in the interest of the men who work the mines. It is equally in the interest of their employers. Above all, it is in the interest of the American people.
>
> *I urge the Congress, therefore, to act immediately on legislation to authorize the Government to take possession of and operate the mines,* and then to turn its attention to legislation looking toward a solution of the basic difficulties of the coal industry."

68

process in violation of the Fifth Amendment. But even if it were to be assumed that the Executive could under some circumstances authorize action of the kind here challenged, despite the utter lack of statutory basis, the seizure and other action necessarily contravene the due process clause.

The argument advanced on behalf of Mr. Sawyer ignores the guaranty of the Fifth Amendment that no person shall be deprived of property without due process of law. The seizure of property by Executive fiat, leaving the plaintiffs literally at the mercy of Mr. Sawyer's discretion, is completely incompatible with that requirement (Cf. *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369-370 (1886)), which, as this Court has said, embraces the "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions". *Hebert* v. *Louisiana Co.,* 272 U. S. 312, 316 (1926). Moreover, the due process clause and the just compensation provision of the Fifth Amendment are not alternatives. Unless both are satisfied, the taking under purported governmental authority is unconstitutional. Cf. *Catlin* v. *United States,* 324 U. S. 229, 241 (1945).

Furthermore, there are readily available other and far less drastic means for dealing with the problem posed by the controversy between the plaintiffs and the Union— means which carefully safeguard the rights of both sides to the controversy, encourage maximum possible resort to the processes of collective bargaining, and permit the ultimate and extreme action, in the event of an impasse, only after the considered and deliberate participation of both the Executive and the Legislative Branch. It is apparent that these methods for dealing with the problem are designed to protect all interests—those of the nation and those of all parties—and to minimize the disruption of private rights to the extent most feasible in the particular circumstances of a particular emergency. With these alternative

69

means readily available, the choice by the Executive of the drastic and inherently arbitrary course selected in this case violates the Fifth Amendment. Compare *Dean Milk Co.* v. *Madison,* 340 U. S. 349, 354-355 (1951); *Weaver* v. *Palmer Brothers Co.,* 270 U. S. 402 (1926).

### G. Denial of the Sweeping Executive Power Here Claimed Will Not Leave the Government Powerless to Meet an Emergency.

Negation of the sweep of executive power which is here claimed for Mr. Sawyer's actions would not result in a sterile construction of the Constitution or leave the Government powerless to deal with emergencies within the framework of the Constitution. It is true that the Constitution is a dynamic and continuously operative charter of government which is capable of meeting the varying demands of our society; but it does not follow from that that the executive action here challenged must be recognized as valid. The executive is not the only branch of the Government which is concerned in the matter. As the District Court stated, in pointing out the role of Congress:

> " * * * our procedures under the Constitution can stand the stress and strains of an emergency today as they have in the past, and are adequate to meet the test of emergency and crisis." (R. 75)

The idea of a strong and unreviewable executive power, easily available to deal with real or imagined emergencies as deemed expedient, has a deceptive simplicity and certainty which should not lull us, as it has other nations,[*]

---

[*] Article 48 of the late Weimar Constitution in Germany provided that in an emergency the President could "take any measures necessary to restore public safety and order". It was by the use of this provision, following the Reichstag fire in 1933, that Hitler established the legal basis for his dictatorship. Roetter: *Impact of Nazi Law*, [1945] Wisc. L. Rev. 516; Lowenstein, *The German Constitution, 1933-1937,* 4 Univ. of Chi. L. Rev. 537, 539 (1937).

70

into forgetting that it is alien to our fundamental concept of a government of laws and not of men, or blind us to the fact that the Constitution created a government of limited powers, consisting of those powers expressly granted and those reasonably to be implied therefrom, all other powers being reserved to the people or to the States by the Ninth and Tenth Amendments. Cf. *McCulloch* v. *Maryland,* 4 Wheat. 316, 420 (1819); *Dorr* v. *United States,* 195 U. S. 138, 140 (1904); *Graves* v. *N. Y. ex rel. O'Keefe,* 306 U. S. 466, 477 (1939).

As Chief Justice Hughes said for this Court in *Home Bldg. & L. Assn.* v. *Blaisdell,* 290 U. S. 398, 425-426 (1934):

"Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. The Constitution was adopted in a period of grave emergency. Its grants of power to the Federal Government and its limitations of the power of the States were determined in the light of emergency and they are not altered by emergency. What power was thus granted and what limitations were thus imposed are questions which have always been, and always will be, the subject of close examination under our constitutional system.

"While emergency does not create power, emergency may furnish the occasion for the exercise of power. 'Although an emergency may not call into life a power which has never lived, nevertheless emergency may afford a reason for the exertion of a living power already enjoyed.' *Wilson* v. *New,* 243 U. S. 332, 348. The constitutional question presented in the light of an emergency is whether the power possessed embraces the particular exercise of it in response to particular conditions. Thus, the war power of the

71

Federal Government is not created by the emergency of war, but it is a power given to meet that emergency. It is a power to wage war successfully, and thus it permits the harnessing of the entire energies of the people in a supreme cooperative effort to preserve the nation. But even the war power does not remove constitutional limitations safeguarding essential liberties.[5] * * * "

"[5] See *Ex Parte Milligan*, 4 Wall. 2, 120-127; *United States* v. *Russel*, 13 Wall. 623, 627; *Hamilton* v. *Kentucky Distilleries & Warehouse Co.*, 251 U. S. 146, 155; *United States* v. *Cohen Grocery Co.*, 255 U. S. 81, 88."

In accordance with the views thus expressed, this Court has not hesitated on various occasions to consider the sufficiency of circumstances on the basis of which drastic executive action was assertedly taken, even where that action was supported by statute. See, *e.g., Hirabayashi* v. *United States*, 320 U. S. 81, 91-95, 101-102 (1943); *Ex Parte Quirin*, 317 U. S. 1, 24-25, 29 (1942). See also *Ex Parte Milligan*, 4 Wall. 2, 120-122, 124-127 (1866); *cf. Mitchell* v. *Harmony*, 13 How. 115, 133-135 (1851). Accordingly there is clearly no merit to the contention advanced in the memorandum for Mr. Sawyer in the District Court, at pages 19-22 and 59, that the nature of the "emergency" is not subject to judicial review.

What is the emergency which is here claimed? It is that stoppage of steel production, as the result of a labor dispute, would be catastrophic to the civilian economy and the military needs of the nation. No one denies that such a stoppage, if continued for any substantial time, would have disastrous consequences. That in substance is all that the Executive Order and the affidavits in opposition assert (R. 6-9, 27-62). Nowhere in those affidavits is there

72

any intimation that the challenged seizure is the only way, or even that it is the way, in which to avoid the stoppage of steel production. The Executive Order states merely that it is necessary to take possession of and operate the properties of plaintiffs to assure the continued availability of steel.

Moreover, the claimed emergency did not arise suddenly, or over night. The threat to continued steel production posed by the labor dispute between plaintiffs and the Union had been clear even before the contracts expired on December 31, 1951.

When the foregoing characteristics of the claimed emergency are laid along side of the tools which Congress has provided to deal with such a situation—namely the Labor

---

* Typical examples are the following statements from the affidavit of the Secretary of Defense (R. 29, 31):

"The cessation of production of steel for any prolonged period of time would be catastrophic.

\*     \*     \*     \*     \*

"A work stoppage in the steel industry will result immediately in serious curtailment of production of essential weapons and munitions of all kinds; if permitted to continue, it would weaken the defense effort in all critical areas and would imperil the safety of our fighting men and that of the Nation."

Similarly, the affidavit of the Administrator of the Defense Production Administration states (R. 34):

"The continued production and fabrication of steel and the elements thereof is necessary to the national defense."

The affidavit of the Administrator of the National Production Authority is somewhat more detailed but even it states (R. 36):

" * * * Information is not presently available to indicate the particular shapes and forms of steel products and the particular steel alloys the production of which would not be interrupted by said work stoppage. The statements as to the disruptive effects of the stoppage as set forth below are subject to the qualification that they would be alleviated to the extent that the productive capacity of the operating iron and steel mills could be used to meet the requirements of a particular program."

73

Management Relations Act of 1947, the seizure provisions of Section 18 of the Universal Military Training and Service Act, and the requisitioning authority conferred by Section 201 of the Defense Production Act of 1950, as amended—and are tested against the principle that emergency does not create power, we submit that there can be only one answer—that Mr. Sawyer's actions are wholly without warrant of law. Any other conclusion would have the most ominous implications for our constitutional system and for the rights which it protects.*

This conclusion of course does not mean that the Government is powerless to deal with the threat to steel production which arises from the current labor dispute. As stated above, the Executive has been provided with various means by Congress for dealing with the matter. And, if those means should not prove adequate—which cannot be said to be the case when they have not even been tried—Congress can legislate appropriately and specifically to protect the nation from threatened disaster. As the District Court stated (R. 175), there is no reason to believe that Congress would fail in that regard.

---

* We do not argue that when the Executive has a choice of constitutional alternatives for dealing with a situation the courts may review the wisdom or control the discretion involved in that choice. We do say, however, that the Executive is never free to resort to an unconstitutional procedure, and this Court has the duty and the power to determine whether the procedure taken is constitutional.

74

## POINT III

**The seizure and Mr. Sawyer's threatened action are causing and will cause the plaintiffs irreparable injury for which they have no adequate remedy at law.**

### A. The seizure is causing serious injury to the plaintiffs and further grave injury is immediately threatened.

Mr. Sawyer's seizure of the properties and business of the plaintiffs at once caused a most serious injury to plaintiffs. While plaintiffs' own executive personnel were not displaced from office—but were told to run their properties subject to Mr. Sawyer's orders—it at once became impossible for plaintiffs to continue to run those properties in a normal way. There are few if any businesses as complex as steel, as demanding upon the managerial judgment of executives, as dependent upon meshing each day's decisions with plans for the morrow. The seizure leaves the managers of the plants in an ambiguous position and the several boards of directors in a quandary. Mr. Sawyer has already set up a comprehensive governmental machinery, so organized as to enable him to coordinate and control the entire steel industry.* Any present assurance from Mr. Sawyer of "business as usual" is qualified by a reservation of his power to issue any orders he may see fit on any phase of the business at any time. Management can act only from day to day in accordance with tentative decisions, hedged always against the possibility that they cannot be carried through, or that the assumptions of future events on which they are based will be upset by some supervening edict of Mr. Sawyer.

An example of the impossible position in which plaintiffs find themselves is revealed by the situation of the United

---

* See Department of Commerce Order 140, quoted in Stephens affidavit (R. 100-101).

App. 1151

75

States Steel Company, with a huge new steel plant, The Fairless Works, less than half completed (R. 97-98). Decisions affecting investment and operations must be made every day. A seizure which leaves the owners and managers in a morass of uncertainty and exposed at any moment to forced revision or revocation of any decision they may make, is a far more immediate and grievous injury than many types of damage, such as clouds on title, which have always moved courts of equity.

In any case, there is immediately in prospect, save for this Court's protection, an order by Mr. Sawyer under the purported authority of paragraph 3 of Executive Order 10340 (R. 8) which will alter the terms and conditions of employment prevailing in the plaintiffs' plants (R. 103, 126, 141). The President himself had announced, just before this Court ordered otherwise, that such action would be taken, and taken at once, unless the plaintiffs and the Union came to an agreement (*supra*, p. 14).

If that action were to adopt the recommendations made by the Wage Stabilization Board it would involve hundreds of millions of dollars of additional employment costs annually, to be paid out of the private funds of the plaintiffs to hundreds of thousands of employees.* Precisely what Mr. Sawyer would do if the present injunctive protection were removed, the plaintiffs cannot tell (R. 105). But it is of no great significance whether he would impose the recommendations of the Wage Stabilization Board in whole or only in part. In any case injury, and serious injury, there would be, for he himself has stated that there would certainly be wage increases (R. 103); and the entire focus of Mr. Sawyer and of those acting with him since the seizure has been upon the grant of concessions to the Union.

---

* See footnote, p. 7, *supra.*

76

Moreover the Wage Stabilization Board recommended—and it would be open to Mr. Sawyer to impose—the union shop (R. 94, 104, 125) which not only would drastically affect the plaintiffs' labor costs but would alter the pattern of employer-employee relations in a manner which could never be undone. In *American Federation of Labor* v. *Watson,* 327 U. S. 582, 593-595 (1946), this Court asserted that impairment of collective labor relationships by governmental outlawry of the closed shop is in itself an irreparable injury warranting the interposition of a court of equity. The principle of that decision is applicable here.

Finally, but certainly not of least importance, consummation of Mr. Sawyer's threat to alter the terms and conditions of employment would most gravely damage the plaintiffs in their bargaining position with the Union.

There is a far reaching controversy between the plaintiffs and the Union in connection with the formulation of a new and comprehensive collective bargaining agreement. Over 100 issues are in dispute between the parties (R. 103, 160). Extensive as were the recommendations of the Wage Stabilization Board, even they did not deal with all the issues. It is a basic principle of labor negotiations that all outstanding issues be resolved together (R. 104, 161). In the present case outstanding unresolved issues of vital concern to management include those having a direct effect upon the efficiency of operation (R. 103-104, 160).

Whatever may be the order which Mr. Sawyer is even now prepared to issue—whether it be the full Wage Stabilization Board recommendations, or something less (R. 103, 142)—the result will be to create a new and higher floor for the Union in its continued and future negotiations with the plaintiffs. The Union has already made that abundantly clear to this Court in its *amicus* brief filed in connection with the petitions for certiorari. There, at pp. 5-6,

77

the Union said that, "when the mills are restored to their [the plaintiffs'] possession they will have the right and it will again be their duty to bargain with the Union concerning *the then current* wages and working conditions."

As a practical matter, once new terms and conditions are prescribed, it would be impossible to turn back the clock and ever to negotiate from the respective positions of the parties as they now are. Government-imposed terms and conditions always have their consequences beyond the period of a government seizure. That is why the War Labor Board, under the War Labor Disputes Act, made it a practice to consult with the owners of a plant when passing upon proposals of a government agency for a change in working conditions, for the Board recognized "the likelihood that the period of governmental operation may be short and the effect of the changes may last beyond this period." *Opinion of the General Counsel of the War Labor Board,* 15 L. R. R. Man. 2578 (1944).

Moreover, as the affidavit of R. E. McMath shows (R. 126), the owners of coal mines seized in 1946 under the War Labor Disputes Act were required to assume the so-called Krug-Lewis Agreement as a condition to the return of their properties. And it must be recognized that it may be argued that, once the seizure is ended, the steel companies would not have the right under the National Labor Relations Act unilaterally to restore the terms and conditions of employment which existed prior to the seizure without first exhausting the collective bargaining process. *National Labor Relations Board* v. *Crompton-Highland Mills, Inc.,* 337 U. S. 217, 224-225 (1949); *American National Insurance Co.* v. *National Labor Relations Board,* 187 F. 2d 307, 309 (5th Cir. 1951), *cert. granted,* 342 U. S. 809 (1951); *Tower Hosiery Mills,* 81 N. L. R. B. 658 (1949).

Consequently, Mr. Sawyer's threatened action would be injurious to plaintiffs not only in the immediate dollars and

78

cents damage consequent upon increased wages but also in the weakening of the plaintiffs' bargaining position today with respect to all the unresolved issues in the labor dispute with the Union and—of equal or even greater importance—in the weakening of the plaintiffs' bargaining position at all times in the future with respect to any and all issues which will be faced at the end of the seizure period and thereafter. *American Federation of Labor* v. *Watson,* 327 U. S. 582 (1946) ; *cf. Wolff Packing Co.* v. *Court of Industrial Relations,* 262 U. S. 522 (1923).

### B. Money damages—assuming they could be recovered—would be wholly inadequate.

A simple cloud on title has always moved equity to grant relief because no other remedy is complete or adequate. *Wickliffe* v. *Owings,* 17 How. 47, 50 (1854) ; *Southern Pacific* v. *United States,* 200 U. S. 341, 352 (1906) ; *Ohio Tax Cases,* 232 U. S. 576, 587 (1914) ; *Shaffer* v. *Carter,* 252 U. S. 37, 48 (1920). The seizure of the properties and business of the plaintiffs, with its host of uncertainties and legal and practical problems arising from the ambiguous position in which the owners are left, should appeal to equity at least as strongly as a cloud on title. In these circumstances, any remedy at law would necessarily be inadequate. See *Osborne & Company* v. *Missouri Pacific Railway Company,* 147 U. S. 248, 258 (1893) ; *Land* v. *Dollar,* 330 U. S. 731, 738 (1947) ; *cf. Truax* v. *Raich,* 239 U. S. 33, 38 '(1915) ; *International News Service* v. *Associated Press,* 248 U. S. 215, 236-237 (1918) ; *Terrace* v. *Thompson,* 263 U. S. 197, 214-215 (1923) ; *Pierce* v. *Society of Sisters,* 268 U. S. 510, 534-536 (1925) ; see also *Bell* v. *Hood,* 327 U. S. 678, 684 (1946).

Even if plaintiffs were to sue at law for damages, and the suit were to be entertained, the problem of proof of damages would be severe. The diversity of opinion in

79

*United States* v. *Pewee Coal Company*, 341 U. S. 114 (1951), suggests the problem. On one theory or another, it might be necessary to speculate as to the course of events that would have occurred had there been no seizure: Would there have been a strike of any significant duration? Would there have been a change in employment conditions in connection with the settlement of such a strike? The need to wrestle with such questions, and the speculation to which they lead, have always been thought by equity to warrant its interposition. A prospective suit for damages which can be proved only by such a process is not an adequate remedy. *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 322 (1936); *Kessler* v. *Eldred,* 206 U. S. 285, 290 (1907); *Walla Walla* v. *Walla Walla Water Co.,* 172 U. S. 1, 11-12 (1898); *Roof* v. *Conway,* 133 F. 2d 819, 826-827 (6th Cir. 1943); *Texas Co.* v. *Central Fuel Oil Co.,* 194 Fed. 1, 11 (8th Cir. 1912); *Fraser* v. *Geist,* 1 F. R. D. 267, 269 (E. D. Pa. 1940); *Luckenbach S. S. Co.* v. *Norton,* 21 F. Supp. 707, 709 (E. D. Pa. 1937).

Moreover the greater part of the damage here cannot possibly be translated into monetary terms. The impairment of plaintiffs' bargaining position will have its consequences in the settlement of every one of the issues yet unresolved in the present controversy, and in the settlement of issues yet to come in the next round of negotiation with the Union. No judgment could fix reparation for this damage—a damage, furthermore, which would abide in some degree for as long as the plaintiffs and the Union have any relationship with each other. Nor could there be any possible monetary measure for the imposition of conditions such as the union shop, which are within Mr. Sawyer's purported powers. Compare *American Federation of Labor* v. *Watson,* 327 U. S. 582, 593-595 (1946); *Virginia Ry. Co.* v. *System Fed-*

80

*eration No. 40,* 300 U. S. 515, 550-553 (1937); *Texas & N. O. R. Co.* v. *Brotherhood of Railway Clerks,* 281 U. S. 548, 568-569 (1930).

## C. In any event no money damages are recoverable.

No adequate money damages, of course, could be recovered from Mr. Sawyer personally, even for that portion of the injuries which might be measured in money. His individual wealth could not approach the amount of damage which this industry will suffer.

There remains only the question whether money damages would be recoverable against the United States, as Mr. Sawyer's counsel has suggested. It is plain that they would not.

The United States has consented to be sued for damages (i) under the Federal Tort Claims Act and (ii) in a suit for just compensation in the Court of Claims. Neither remedy is available.

(i) *The Federal Tort Claims Act is obviously unavailable.*

Mr. Sawyer's counsel suggested, in the District Court, that a suit thereunder would lie (R. 380) ; but this suggestion has not been pursued in the petition for certiorari in No. 745 and is hardly to be taken seriously. The plain words of the Act,* and its legislative history, exclude any such suit. *Coates* v. *United States,* 181 F. 2d 816, 818-819 (8th Cir.

---

* 28 U. S. C. §1346-b permits action against the United States for injury "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." If the seizure was unlawful, as we contend, Mr. Sawyer was not acting "within the scope of his office or employment." In any event 28 U. S. C. §2680-a expressly excludes from the scope of the Tort Claims Act claims based upon acts or omissions of Government employees "in the execution of a statute or regulation, whether or not such statute or regulation be valid".

81

1950). See also, *Old King Coal Co.* v. *United States,* 88 F. Supp. 124 (S. D. Iowa 1949); *Jones* v. *United States,* 89 F. Supp. 980 (S. D. Iowa 1949); cf. *Lauterbach* v. *United States,* 95 F. Supp. 479 (W. D. Wash. 1951); *Toledo* v. *United States,* 95 F. Supp. 838 (D. P. R. 1951); *Boyce* v. *United States,* 93 F. Supp. 866 (S. D. Iowa 1950); *J. B. McCrary Co.* v. *United States,* 84 F. Supp. 368 (Ct. Cls. 1949).

(ii) *It is equally obvious that there is no remedy in the Court of Claims.*

The argument in support of such a remedy necessarily assumes that the seizure was lawful. Indeed Mr. Sawyer's counsel expressly so conceded before Judge Pine (R. 380).* If the seizure was unlawful, as we insist, Mr. Sawyer's action was not a "taking" by the United States for which just compensation is recoverable.

Decisions of this Court make that proposition clear. Thus in *Hooe* v. *United States,* 218 U. S. 322, 335-336 (1910), this Court said:

> "The constitutional prohibition against taking private property for public use without just compensation is directed against the government, and not against individual or public officers proceeding without the authority of legislative enactment. The taking of private

---

* The various attempts of that counsel in the District Court to "concede" that plaintiffs have an adequate remedy by way of a suit in the Court of Claims are not binding on the Government. It is well established that attorneys for the United States do not have power to waive or concede defenses available to the Government. *Munro* v. *United States,* 303 U. S. 36, 41 (1938); *Finn* v. *United States,* 123 U. S. 227, 233 (1887); *Wallace* v. *United States,* 142 F. 2d 240, 242-243 (2d Cir. 1944), *cert. denied,* 323 U. S. 712 (1944). Moreover, the concessions were concessions as to the law, which are not binding on a court. *Estate of Sanford* v. *Comm'r,* 308 U. S. 39, 51 (1939); *Swift & Co.* v. *Hocking Valley Ry. Co.,* 243 U. S. 281, 289 (1917).

> property by an officer of the United States for public
> use, without being authorized, expressly or by neces-
> sary implication, to do so by some act of Congress, is
> not the act of the government."

As pointed out above, the present seizure not only is not
authorized by any act of Congress, but is squarely in con-
flict with the will of Congress as expressed in existing
legislation.

In *United States* v. *North American Transportation and
Trading Co.*, 253 U. S. 330, 333 (1920), this Court restated
the rule that:

> "In order that the Government shall be liable it must
> appear that the officer who has physically taken pos-
> session of the property was duly authorized so to do,
> either directly by Congress or by the official upon whom
> Congress conferred the power."

See also *United States* v. *Goltra*, 312 U. S. 203, 208-209
(1941); *Mitchell* v. *United States*, 267 U. S. 341, 345 (1925);
*Langford* v. *United States*, 101 U. S. 341, 345-346 (1879).

Mr. Sawyer's counsel cited to the District Court various
cases said to support a claimant's right to compensation
under the Fifth Amendment "even in the absence of express
statutory provision." The cases he referred to involve the
exercise by Government officials of the power of eminent
domain conferred upon them by the legislature. In *Kohl* v.
*United States,* 91 U. S. 367, 374-5 (1875), this Court asserted
that the provisions of the act of Congress in question mani-
fested " * * * a clear intention to confer upon the Secretary
of the Treasury power to acquire the grounds needed by the
exercise of the national right of eminent domain. * * * "
Again, in *United States* v. *Causby,* 328 U. S. 256 (1946), the
claimant was allowed to pursue his remedy in the Court of

83

Claims for a taking authorized by the Civil Aeronautics Act. And in the recent case of *Larson* v. *Domestic and Foreign Commerce Corp.*, 337 U. S. 682, 695 (1949), this Court stated explicitly that the actions of the sovereign were compensable *only because they were in accordance with the terms of valid statutory authority.* Indeed, the opinion asserts, citing *Hooe* v. *United States*, 218 U. S. 322:

> "There is no claim that [the administrator's] action constituted an unconstitutional taking. * * * There could not be since the respondent admittedly has a remedy, in a suit for breach of contract, in the Court of Claims. * * * *Only if the Administrator's action was within his authority could such a suit be maintained.*" (337 U. S. 682, 703 and n. 27.)

The distinction between these cases and that now before this Court is obvious. Where a Government official takes private property pursuant to statutory authority, the property owner may sue for just compensation even though the taking may not comply fully with the statutory procedure. As pointed out in footnote 11 on page 17 of the memorandum on behalf of Mr. Sawyer in the District Court, that type of illegality "does not go to the essence of the taking." See *Hurley* v. *Kincaid*, 285 U. S. 95, 104 (1932). But where the taking itself is utterly devoid of authority, the very illegality of which the plaintiffs complain also deprive them of any remedy in a suit for just compensation under the Fifth Amendment.

This clear and repeatedly asserted rule is a basic proposition in a legal system, such as ours, in which private rights are not at the mercy of unfettered executive action. For were the rule otherwise—were compensation at law available for a wholly unauthorized taking, and the doors of equity thereby closed to the private interest—not only

84

would the Federal Treasury be exposed to incalculable expense, but citizens would be exposed to arbitrary action by governmental officials to an extent altogether startling in its consequences. Compare *Garber* v. *United States,* 46 Ct. Cls. 503, 507-508 (1911).

No one would contend—least of all the courts—that the minimum constitutional compensation contemplated by the Fifth Amendment is adequately compensatory in any practical sense. Thus in *United States* v. *Petty Motor Co.,* 327 U. S. 372, 377-378 (1946), this Court stated that "evidence of loss of profits, damage to good-will, the expense of relocation and other such consequential losses are refused in federal condemnation proceedings." Business losses and various consequential damages were said in *United States* v. *General Motors Corporation,* 323 U. S. 373, 379, 383 (1943), not to be compensable under the Fifth Amendment. Again in *United States* v. *Pewee Coal Co., Inc.,* 341 U. S. 114, 117 (1951), this Court recognized the inability properly to compensate one whose property was taken and referred to the "difficult problems inherent in fixing the value of the use of a going concern".

It is no wonder, therefore, that the courts do not treat the remedy of monetary compensation in the Court of Claims as an available remedy where a taking is without color of legal authority. It may well be the price of living in an organized society to have to submit to monetary damages where the taking is lawful (*Kimball Laundry Co.* v. *United States,* 338 U. S. 1, 5 (1949)) or where the only dispute as to authority revolves about some incidental question—such as the time when damages will be paid, as in *Hurley* v. *Kincaid,* 285 U. S. 95, 104 (1932). It is quite another thing to say that property rights may be taken quite lawlessly, and the owner left to monetary claims

85

which can never, in any realistic sense, replace the rights lost.

It is doubtless this consideration which leads the courts so meticulously to make certain that full opportunity to question the legality of a taking must be assured, as a constitutional right, before the government may take any action, pursuant to a "taking" of property, which will impair the owner's use of his property in any way. See *Porto Rico Tel. Co.* v. *Puerto Rico Comm. Authority*, 189 F. 2d 39 (1st Cir. 1951), *cert. denied*, 342 U. S. 830 (1951). In *Catlin* v. *United States*, 324 U. S. 229, 241 (1945), this Court put the matter thus:

> "The alternative construction, that title passes irrevocably, leaving the owner no opportunity to question the taking's validity or one for which the only remedy would be to accept the compensation which would be just if the taking were valid, would raise serious question concerning the statute's validity."

And it was doubtless this consideration also which led Congress to provide in the Defense Production Act of 1950 (*supra*, p. 50) that personal property could be requisitioned for defense use only after a previous valuation and tender of payment, and that real property could not be requisitioned at all, but could be taken only by condemnation proceedings in the courts.

The chief reliance of Mr. Sawyer's counsel for the proposition that money damages are available in the Court of Claims has been the citation of *United States* v. *Pewee Coal Co., Inc.*, 341 U. S. 114 (1951). But in that case, as already noted (*supra*, pp. 63-64), both the decision of the Court of Claims and the briefs of both sides in this Court made it

86

plain that the legality of the seizure was not in issue and was not decided, as Mr. Sawyer's counsel conceded in the District Court (R. 388).

## POINT IV

### The preliminary injunctions were providently issued by the District Court.

While this case involves an order of the District Court granting preliminary injunctions, it is apparent both from the opinion of that Court and from the petition filed here on behalf of Mr. Sawyer that the vital issue of the legality of the seizure is now ripe for final determination. In order to put an end to uncertainty prejudicial not only to the parties but to the public interest, that paramount issue should be finally resolved.

Page 11 of the petition filed on behalf of Mr. Sawyer in No. 745 states:

> "The uncertainty which necessarily adheres in the present status of these cases overshadows all other considerations and requires an immediate resolution in the public interest of the substantive issues which were sweepingly decided below."

Again, on p. 21, the same petition recognizes:

> "As long as the ultimate disposition of these cases is in doubt, the respective rights and obligations of all parties affected will be uncertain and the ability of the United States to take steps necessary to protect the nation against any further cessation or impairment of steel production will be a matter of potential controversy."

87

In these circumstances, and in view of the irreparable and continuing injury to which plaintiffs are exposed, the District Court, on the motions for preliminary injunctions, decided "the fundamental issue" whether the seizure was authorized by law. (Opinion of Judge Pine, R. 68) Recognizing that the matter had been thoroughly presented on the ultimate merits, the Court asserted:

> "Nothing that could be submitted at such trial on the facts would alter the legal conclusion I have reached." (R. 74)

Accordingly, nothing could be gained by the formality of a final hearing in the District Court on the constitutional issue there decided.

Even where an appellate court has power to review only a final decision of a lower court, it will decide the ultimate merits on an appeal from an order issuing a preliminary injunction where—as in the present case—the lower court "in fact fully adjudicated rights" in question. *Buscaglia* v. *District Court of San Juan,* 145 F. 2d 274, 281 (1st Cir. 1944), *cert. denied,* 323 U. S. 793 (1945). And this Court said in *United States* v. *Baltimore & Ohio Railroad Company,* 225 U. S. 306, 326 (1912):

> " * * * we must not be understood as deciding or in any way implying that the duty would not exist to examine the merits of a preliminary order of the general character of the one before us in a case where it plainly, in our judgment, appeared that the granting of the preliminary order was in effect a decision by the court of the whole controversy on the merits, or where it was demonstrable that grave detriment to the public interest would result from not considering and finally disposing of the controversy without remanding to enable the court below to do so."

88

See *Coty* v. *Prestonettes, Inc.*, 285 Fed. 501, 516 (2d Cir. 1922) ; *Jackson Co.* v. *Gardiner Inv. Co.*, 200 Fed. 113, 115, 119 (1st Cir. 1912) ; cf. *City of Louisville* v. *Louisville Home Telephone Co.*, 279 Fed. 949, 957 (6th Cir. 1922).

The only reason advanced on behalf of Mr. Sawyer in the petition in No. 745 against the propriety of the issuance of the preliminary injunction—except for the argument on the validity of the Executive Order—is that constitutional issues should be avoided until the last possible moment. This argument is singularly inconsistent with the same petition's insistence upon the importance of an immediate disposition of the constitutional issues in this case. *Supra,* p. 86. Moreover the argument ignores the fact that plaintiffs are faced with immediate and continuing irreparable injury. Were Mr. Sawyer permitted to proceed pending a final hearing, no possible decree could restore the *status quo* and make the plaintiffs whole for the impairment of their bargaining position and the loss incident to terms and conditions of employment foisted upon them by Mr. Sawyer.

Consequently even if this Court were to feel it inappropriate finally to determine the constitutional issues at this stage, the preliminary injunction should not be disturbed. An order granting or denying a preliminary injunction will not be reversed in the absence of a clear showing that it was improvidently granted. *United States* v. *Corrick*, 298 U. S. 435, 437-438 (1936) ; *Alabama* v. *United States,* 279 U. S. 229, 231 (1929); *Meccano, Ltd.* v. *John Wanamaker,* 253 U. S. 136, 141 (1920); *City of Louisville* v. *Louisville Home Telephone Co.,* 279 Fed. 949, 956 (6th Cir. 1922). A preliminary injunction is warranted where there is serious doubt as to the validity of the action sought to be enjoined and a showing that an act is threatened which will destroy the *status quo* and cause

89

the complainant irreparable injury. *Gibbs* v. *Buck,* 307 U. S. 66, 77-78 (1939); *Ohio Oil Co.* v. *Conway,* 279 U. S. 813, 815 (1929); *Foster Packing Co.* v. *Haydel,* 278 U. S. 1 (1928); *Buscaglia* v. *District Court of San Juan,* 145 F. 2d 274, 281 (1st Cir. 1944), *cert. denied,* 323 U. S. 793 (1945); *Benson Hotel Corp.* v. *Woods,* 168 F. 2d 694, 696 (8th Cir. 1948).

At the very least, if this Court should not uphold the present injunction, a preliminary injunction should be continued in the terms prescribed by this Court in issuing its stay. A final hearing obviously would come on promptly. There can be no disputed issues of fact. Mr. Sawyer has been altogether candid in stating his intentions to act, and the public statement of the President on May 3 with respect to the government's prospective action is even more blunt. A final hearing and decision would be consummated within a few days after any remand by this Court. The considerations leading this Court unanimously to require maintenance of the *status quo* pending this Court's review would be fully applicable to a continuation of that restraint for a short time longer. In these circumstances the *obiter dicta* in *Yakus* v. *United States,* 321 U. S. 414, 440 (1944), even were they otherwise applicable to a case of this kind, would have no relevance; no public inconvenience has resulted from the stay issued by this Court and none could result from a brief continuance thereof.

90

## POINT V

**This is not a suit against the President; and the District Court had jurisdiction to grant the requested injunctions.**

It was argued below that although the President was not named as a party, the action was in substance against him, since the defendant Sawyer was (in the phrase of his counsel) the *"alter ego* of the President", and that therefore no injunction could issue.

There is no substance to this claim. The only question for decision here is whether Mr. Sawyer is acting unlawfully. If he is, Presidential orders are no defense.

This Court has consistently recognized that officers of the executive branch may be sued when their conduct is unauthorized by any statute, exceeds the scope of constitutional authority, or is pursuant to an unconstitutional enactment. In these instances, the uniform course of judicial decision holds that the United States is not an indispensable party and that the relief sought is not against the Sovereign. *Waite* v. *Macy*, 246 U. S. 606 (1918); *cf. United States* v. *Lee,* 106 U. S. 196 (1882).

Recently, in *Larson* v. *Domestic and Foreign Commerce Corp.*, 337 U. S. 682, 701-702 (1949), this Court reviewed the precedents and announced its adherence to the rule that

" * * * the action of an officer of the sovereign (be it holding, taking or otherwise legally affecting the plaintiff's property) can be regarded as so 'illegal' as to permit a suit for specific relief against the officer as an individual only if it is not within the officer's statutory powers or, if within those powers, only if the powers, or their exercise in the particular case, are constitutionally void."

App. 1167

91.

Similarly in *Land* v. *Dollar,* 330 U. S. 731, 738 (1947), this Court observed:

> "But public officials may become tort-feasors by exceeding the limits of their authority. And where they unlawfully seize or hold a citizen's realty or chattels, recoverable by appropriate action at law or in equity, he is not relegated to the Court of Claims to recover a money judgment."

The principles which are followed in determining whether a suit will lie against a Federal officer are necessarily those which govern the problem of indispensable parties. Thus, in *Ickes* v. *Fox,* 300 U. S. 82 (1937), this Court had for consideration the question whether the Secretary of the Interior could be enjoined from enforcing an order issued under the Reclamation Act of 1902. This Court asserted that, if the United States was an indispensable party defendant, the suit must fail, regardless of its merits, but held that the United States was not an indispensable party in a suit to enjoin enforcement by a government official of an order which would illegally deprive the plaintiff of vested property rights. This Court granted relief on the "recognized rule" set forth in *Philadelphia Company* v. *Stimson,* 223 U. S. 605, 619 (1912).

That the President is not an indispensable party here and that the suit is not directed against him is further demonstrated by *Williams* v. *Fanning,* 332 U. S. 490 (1947). That was a suit to enjoin a local postmaster from carrying out a postal fraud order of the Postmaster General. It was held that the Postmaster General was not an indispensable party. In language peculiarly pertinent to the present situation, this Court stated that equitable relief could be granted against the subordinate without joining his superior in situations where "the decree which is

92

entered will effectively grant the relief desired by expending itself on the subordinate official who is before the court." (332 U. S. at 494.)   See also, *Hynes* v. *Grimes Packing Co.,* 337 U. S. 86, 96-97 (1949); *Lord Mfg. Co.* v. *Stimson,* 73 F. Supp. 984, 987 (D. D. C. 1947).

Therefore, this Court need never reach the question whether the President could be directly enjoined by the judiciary. There is here no attempt to compel Mr. Sawyer to take any affirmative action. Thus *Holzendorf* v. *Hay,* 20 App. D. C. 576 (1902), cited by Mr. Sawyer's counsel to the District Court, is not in point. There the court held that a mandatory injunction would not be granted to compel the Secretary of State to take affirmative action involving the conduct of relations with foreign governments. Here, on the contrary, the plaintiffs seek only the *restraint* of unlawful action which will result in irreparable injury.

The theory implicit in this branch of the argument on behalf of Mr. Sawyer is, however, worthy of more detailed attention. For the argument is apparently advanced that the courts can take no action whatever to thwart a President's will even though the judicial restraint is directed to a subordinate official. Cited to the District Court for this remarkable proposition were the *Holzendorf* case discussed above, and others, among them *Kendall* v. *United States,* 12 Pet. 522 (1838), and *Marbury* v. *Madison,* 1 Cranch 137 (1803). In the *Kendall* case,—in which, by the way, a mandamus was issued against the Postmaster General to compel him to observe an act of Congress—this Court observed on the page cited:

> "The executive power is vested in a President; *and so far as his powers are derived from the Constitution* he is beyond reach of any other department * * * " (12 Pet. at 610.)

93

> "It was urged at the bar, that the postmaster-general was alone subject to the direction and control of the president, with respect to the execution of the duty imposed upon him by this law; and this right of the president is claimed, as growing out of the obligation imposed upon him by the constitution, to take care that the laws be faithfully executed. This is a doctrine that cannot receive the sanction of this court. It would be vesting in the president a dispensing power, which has no countenance for its support, in any part of the constitution; and is asserting a principle, which, if carried out in its results, to all cases falling within it, would be clothing the president with a power entirely to control the legislation of congress, and paralyze the administration of justice.
>
> "To contend, that the obligation imposed on the president to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution and entirely inadmissible. * * * " (12 Pet. at 612-613)

Similarly a quotation from *Marbury* v. *Madison,* relied upon by Mr. Sawyer's counsel, is directed toward the discretion of the President in the exercise of the specific political powers with which he is invested by the Constitution. (1 Cranch at 165-166). It has no bearing on the power of the Federal Courts to restrain an executive officer whose actions are completely beyond the constitutional powers of the Executive.

In *Marbury* v. *Madison,* moreover, this Court observed (1 Cranch at 164-165):

> "Is it to be contended that the heads of departments are not amenable to the laws of their country? Whatever the practice on particular occasions may be, the

94

theory of this principle will certainly never be maintained. No act of the legislature confers so extraordinary a privilege, nor can it derive countenance from the doctrines of the common law. After stating that personal injury from the king to a subject is presumed to be impossible, Blackstone (vol. 3, p. 255), says, 'but injuries to the rights of property can scarcely be committed by the crown without the intervention of its officers; for whom the law, in matters of right, entertains no respect or delicacy; but furnishes various methods of detecting the errors and misconduct of those agents, by whom the king has been deceived and induced to do a temporary injustice.' ''

Eloquent affirmation of the power of the Federal Courts to restrain unconstitutional action by officers of the executive department was given in *Fleming* v. *Moberly Milk Products Co.,* 160 F. 2d 259 (D. C. Cir. 1947), *cert. dismissed,* 331 U. S. 786 (1947). The suggestion that such restraint is beyond the power of the judiciary was characterized as a doctrine which "would spell executive absolutism, a concept unknown to our law." The Court concluded:

"If the judiciary has no power in such matter, the only practical restraint would be the self-restraint of the executive branch. Such a result is foreign to our concept of the division of the powers of government." (160 F. 2d at p. 265.)

And in *United States* v. *Lee,* 106 U. S. 196, 220 (1882), this Court declared:

"No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it."

95

Nor has the judiciary in the past felt itself powerless to declare the illegality of Presidential orders. In *Little v. Barreme,* 2 Cranch 170, 179 (*supra,* p. 44) this Court observed of an unlawful seizure order issued by the President to a naval officer

> " * * * the instructions cannot change the nature of the transaction, nor legalize an act which, without those instructions, would have been a clear trespass."

This Court further held that since the President's order was illegal, it furnished no protection to any naval officer who acted under it, and that Captain Little was therefore personally liable for damages. The case is noteworthy as a decision rendered by a great Federalist Chief Justice (speaking for a unanimous Court) declaring invalid a wartime order issued by the very Federalist President who had appointed him to the bench. It is cited in Cooley, *Principles of Constitutional Law* 114 (1896 Ed.) for the proposition that:

> "As commander, while war prevails the President has all the powers recognized by the laws and usages of war, but at all times he must be governed by law, and his orders which the law does not warrant will be no protection to officers acting under them."

And in *Gilchrist* v. *Collector*, 10 Fed. Cas. 355 (*supra,* p. 45) the court, in the face of arguments substantially identical with those presented here, and over the strong protests of the Attorney General, entered a mandamus to compel a subordinate official to disregard an unlawful order of the President.

The doctrine that obedience to the unlawful orders of a superior is no defense lies at the heart of Anglo-American

96

constitutional principles. As laid down by Professor Dicey
(Law of the [British] Constitution, 1920 ed., p. 33):

> "Indeed every action against a constable or collector
> of revenue enforces the greatest of all such principles,
> namely, that obedience to administrative orders is no
> defense to an action or prosecution for acts done in
> excess of legal authority".

Counsel for Mr. Sawyer now seek to overturn this
basic principle, and in so doing to destroy the rule of law.
The assertion that because this Court *may not* be able to
enjoin the President in person, it therefore *cannot* enjoin
any subordinate official of the Executive Branch, no matter
how unlawfully he may act, is indeed startling.

Counsel for Mr. Sawyer cite, as substantially their sole
authority on this branch of the argument, *Mississippi* v.
*Johnson,* 4 Wall. 475 (1866). That decision held only that
the President of the United States could not be restrained
by injunction from carrying into effect an Act of Congress
(the Reconstruction Act) alleged to be unconstitutional,
and that a bill for that purpose in which the President was
named as a defendant could not be filed.

This was described in the opinion (4 Wall. at 498) as
"the single point which requires consideration." At the
same page, the Court was careful to avoid laying down
any absolute rule of Presidential immunity from suit. After
commenting on its lack of power to restrain the enactment
of an unconstitutional law, the Court observed:

> " * * * and yet how can the right to judicial interposition
> to prevent such an enactment, when the purpose is evi-
> dent and the execution of that purpose certain, be dis-
> tinguished, in principle, from the right to such inter-
> position against the execution of such a law by the
> President?" (4 Wall. at 500.)

97

Analysis of this keystone decision in opposing counsel's argument demonstrates the fallacy of their conclusion. The plaintiffs no more attempt here, in seeking to enjoin the action of a Government official, to restrain the President directly in the performance of his duties, than does one who attacks the constitutionality of a statute seek to impede the functioning of Congress.*

Neither *Mississippi* v. *Johnson* nor any other case in this Court has ever held, or can be twisted into meaning, that this Court cannot perform its historic duty of holding subordinate officials of the Government to account for their unlawful or unconstitutional acts.

## CONCLUSION

Whether the position be baldly stated as in the District Court—or an effort made superficially to present it in less extreme form—the conclusion remains inescapable that counsel for Mr. Sawyer rely on a doctrine of Executive immunity from constitutional limitations and judicial restraints. They seek to justify a seizure, clearly without any vestige of support in the Constitution, on the ground that because an emergency has been declared by the Executive any action thereunder is sacrosanct. This doctrine is presented in its most extreme form in the present case where the "emergency" has been created by the device of ignoring the detailed statutory machinery specifically designed by the Congress for use in precisely the situation here presented. If the present Executive can seize properties and appropriate funds to force an increase in wages, a clear precedent will be established by which some future Executive can by similar arbitrary action force a decrease in wages or compel workers to labor for whatever hours

---

* See the analysis of *Mississippi* v. *Johnson*, by Brewer, *J.*, in *Chicago & N. W. Ry. Co.* v. *Dey*, 35 Fed. 866, 872 (C. C. S. D. Iowa 1888).

**App. 1174**

98

and under whatever conditions he may choose to impose. It is not the rights of these plaintiffs alone which are at stake here. Our system of government has no place for any such concept of arbitrary power which, if once established, must be fatal to our liberties.

The judgments of the District Court in each of these cases should be affirmed.

Dated: May 10, 1952.

Respectfully submitted,

JOHN W. DAVIS
*Counsel for United States Steel Company*
15 Broad Street
New York 5, N. Y.

NATHAN L. MILLER
JOHN LORD O'BRIAN
ROGER M. BLOUGH
THEODORE KIENDL
PORTER R. CHANDLER
HOWARD C. WESTWOOD
LEROY L. LEWIS
*Of Counsel*

BRUCE BROMLEY
*Counsel for Bethlehem Steel Company*
15 Broad Street
New York 5, N. Y.

E. FONTAINE BROUN
JOHN H. PICKERING
*Of Counsel*

LUTHER DAY
*Counsel for Republic Steel Corporation*
1759 Union Commerce Building
Cleveland, Ohio

TOM F. PATTON
EDMUND L. JONES
HOWARD BOYD
JOHN C. GALL
*Of Counsel*

99

JOHN C. BANE, JR.
*Counsel for Jones & Laughlin Steel Corporation*
747 Union Trust Building
Pittsburgh 19, Pa.

H. PARKER SHARP
STURGIS WARNER
CARL E. GLOCK, JR.
WALTER T. McGOUGH
ROBERT W. BANKS
    *Of Counsel*

JOHN C. GALL
*Counsel for The Youngstown Sheet and Tube
Company, et al.*
1625 K Street, N. W.
Washington, D. C.

JOHN J. WILSON
J. E. BENNETT
    *Of Counsel*

CHARLES H. TUTTLE
*Counsel for Armco Steel Corporation and
Sheffield Steel Corporation*
15 Broad Street
New York 5, N. Y.

WINFRED K. PETIGRUE
JOSEPH P. TUMULTY, JR.
    *Of Counsel*

RANDOLPH W. CHILDS
*Counsel for E. J. Lavino & Company*
1528 Walnut Street
Philadelphia 2, Pa.

EDGAR S. McKAIG
JAMES CRAIG PEACOCK
    *Of Counsel*

App. 1176

# APPENDIX A

## Relevant Provisions of the Constitution.

### ARTICLE I.

Section 1.  All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.

Section 8.  [Clause 1.]  The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; * * *

[Clause 11.]  To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water;

[Clause 12.]  To raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years;

[Clause 13.]  To provide and maintain a Navy;

[Clause 14.]  To make Rules for the Government and Regulation of the land and naval Forces;

[Clause 15.]  To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions;

[Clause 16.]  To provide for organizing, arming, and disciplining the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress;

2a

[Clause 18.]  To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

## Article II.

Section 1.  The executive Power shall be vested in a President of the United States of America. * * *.

Section 2.  [Clause 1.]  The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States; he may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices, and he shall have Power to grant Reprieves and Pardons for Offences against the United States, except in Cases of Impeachment.

Section 3.  He shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient; he may, on extraordinary Occasions, convene both Houses, or either of them, and in Case of Disagreement between them, with Respect to the Time of Adjournment, he may adjourn them to such Time as he shall think proper; he shall receive Ambassadors and other public Ministers; he shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States.

## Amendment 4.

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches

3a

and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

### Amendment 5.

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

### Amendment 9.

The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

### Amendment 10.

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

4a

Applicable Provisions of The Labor Management Relations Act of 1947, 61 Stat. 136 *et seq.*, 29 U. S. C. Supp. IV, §§158(a)(5), 158(b)(3), 158(d), 176-180.

Sec. 8.  (a) It shall be an unfair labor practice for an employer—

* * * * *

(5)  to refuse to bargain collectively with the representatives of his employees, subject to the provisions of Section 9(a) of this title.

(b) It shall be an unfair labor practice for a labor organization or its agents—

* * * * *

(3)  to refuse to bargain collectively with an employer, provided it is the representative of his employees subject to the provisions of section 9(a) of this title;

* * * * *

(d)  For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: * * *

5a

Sec. 206. Whenever in the opinion of the President of the United States, a threatened or actual strike or lock-out affecting an entire industry or a substantial part thereof engaged in trade, commerce, transportation, transmission, or communication among the several States or with foreign nations, or engaged in the production of goods for commerce, will, if permitted to occur or to continue, imperil the national health or safety, he may appoint a board of inquiry to inquire into the issues involved in the dispute and to make a written report to him within such time as he shall prescribe. Such report shall include a statement of the facts with respect to the dispute, including each party's statement of its position but shall not contain any recommendations. The President shall file a copy of such report with the Service and shall make its contents available to the public.

Sec. 207. (a) A board of inquiry shall be composed of a chairman and such other members as the President shall determine, and shall have power to sit and act in any place within the United States and to conduct such hearings either in public or in private, as it may deem necessary or proper, to ascertain the facts with respect to the causes and circumstances of the dispute.

(b) Members of a board of inquiry shall receive compensation at the rate of $50 for each day actually spent by them in the work of the board, together with necessary travel and subsistence expenses.

(c) For the purpose of any hearing or inquiry conducted by any board appointed under this title, the provisions of sections 9 and 10 (relating to the attendance of witnesses and the production of books, papers, and documents) of the Federal Trade Commission Act of September 16, 1941, as

**App. 1181**

6a

amended (U. S. C. 19, title 15, secs. 49 and 50, as amended), are made applicable to the powers and duties of such board.

Sec. 208. (a) Upon receiving a report from a board of inquiry the President may direct the Attorney General to petition any district court of the United States having jurisdiction of the parties to enjoin such strike or lock-out or the continuing thereof, and if the court finds that such threatened or actual strike or lock-out—

(i) affects an entire industry or a substantial part thereof engaged in trade, commerce, transportation, transmission, or communication among the several States or with foreign nations, or engaged in the production of goods for commerce; and

(ii) if permitted to occur or to continue, will imperil the national health or safety, it shall have jurisdiction to enjoin any such strike or lock-out, or the continuing thereof, and to make such other orders as may be appropriate.

(b) In any case, the provisions of the Act of March 23 1932, entitled "An Act to amend the Judicial Code and to define and limit the jurisdiction of courts sitting in equity, and for other purposes", shall not be applicable.

(c) The order or orders of the court shall be subject to review by the appropriate United States court of appeals and by the Supreme Court upon writ of certiorari or certification as provided in sections 239 and 240 of the Judicial Code, as amended (U. S. C., title 29, secs. 346 and 347).

Sec. 209. (a) Whenever a district court has issued an order under section 208 of this title enjoining acts or practices which imperil or threaten to imperil the national

7a

health or safety, it shall be the duty of the parties to the labor dispute giving rise to such order to make every effort to adjust and settle their differences, with the assistance of the Service created by this chapter. Neither party shall be under any duty to accept, in whole or in part, any proposal of settlement made by the Service.

(b) Upon the issuance of such order, the President shall reconvene the board of inquiry which has previously reported with respect to the dispute. At the end of a sixty-day period (unless the dispute has been settled by that time), the board of inquiry shall report to the President the current position of the parties and the efforts which have been made for settlement, and shall include a statement by each party of its position and a statement of the employer's last offer of settlement. The President shall make such report available to the public. The National Labor Relations Board, within the succeeding fifteen days, shall take a secret ballot of the employees of each employer involved in the dispute on the question of whether they wish to accept the final offer of settlement made by their employer as stated by him and shall certify the results thereof to the Attorney General within five days thereafter.

Sec. 210. Upon the certification of the results of such ballot or upon a settlement being reached, whichever happens sooner, the Attorney General shall move the court to discharge the injunction, which motion shall then be granted and the injunction discharged. When such motion is granted, the President shall submit to the Congress a full and comprehensive report of the proceedings, including the findings of the board of inquiry and the ballot taken by the National Labor Relations Board, together with such recommendations as he may see fit to make for consideration and appropriate action.

8a

**The Defense Production Act, as Amended, 64 Stat. 798,
65 Stat. 132, 50 U. S. C. A., Appendix, §§2081, 2121-2123.**

Sec. 201. (a) Whenever the President determines (1)
that the use of any equipment, supplies, or component parts
thereof, or materials or facilities necessary for the manu-
facture, servicing, or operation of such equipment, supplies
or component parts, is needed for the national defense,
(2) that such need is immediate and impending and such
as will not admit of delay or resort to any other source
of supply, and (3) that all other means of obtaining the
use of such property for the defense of the United States
upon fair and reasonable terms have been exhausted, he
is authorized to requisition such property or the use thereof
for the defense of the United States upon the payment
of just compensation for such property or the use thereof
to be determined as hereinafter provided. The President
shall promptly determine the amount of the compensation
to be paid for any property or the use thereof requisitioned
pursuant to this title but each such determination shall
be made as of the time it is requisitioned in accordance
with the provision for just compensation in the fifth amend-
ment to the Constitution of the United States. If the per-
son entitled to receive the amount so determined by the
President as just compensation is unwilling to accept the
same as full and complete compensation for such property
or the use thereof, he shall be paid promptly 75 per centum
of such amount and shall be entitled to recover from the
United States, in an action brought in the Court of Claims
or, without regard to whether the amount involved ex-
ceeds $10,000, in any district court of the United States,
within three years after the date of the President's award,
an additional amount which, when added to the amount

9a

so paid to him, shall be just compensation. No real property (other than equipment and facilities, and buildings and other structures, to be demolished and used as scrap or secondhand materials) shall be acquired under this subsection.

(b) Whenever the President deems it necessary in the interest of national defense, he may acquire by purchase, donation, or other means of transfer, or may cause proceedings to be instituted in any court having jurisdiction of such proceedings to acquire by condemnation, any real property, including facilities, temporary use thereof, or other interest therein, together with any personal property located thereon or used therewith, that he deems necessary for the national defense, such proceedings to be in accordance with the Act of August 1, 1888 (25 Stat. 357), as amended, or any other applicable Federal statute. Before condemnation proceedings are instituted pursuant to this section, an effort shall be made to acquire the property involved by negotiation unless, because of reasonable doubt as to the identity of the owner or owners, because of the large number of persons with whom it would be necessary to negotiate, or for other reasons, the effort to acquire by negotiation would involve, in the judgment of the President, such delay in acquiring the property as to be contrary to the interest of national defense. In any condemnation proceeding instituted pursuant to this section, the court shall not order the party in possession to surrender possession in advance of final judgment unless a declaration of taking has been filed, and a deposit of the amount estimated to be just compensation has been made, under the first section of the Act of February 26, 1931 (46 Stat. 1421), [40 U. S. C. §258a], providing for such declarations. Unless title is in dispute, the court, upon application, shall promptly pay to the owner at least 75 per centum of the amount

10a

so deposited, but such payment shall be made without prejudice to any party to the proceeding. Property acquired under this section may be occupied, used and improved for the purposes of this section prior to the approval of title by the Attorney General as required by section 355 of the Revised Statutes, as amended [33 U. S. C. §733; 34 U. S. C. §520; 40 U. S. C. §255; 50 U. S. C. A., Appendix, §175].

(c) Whenever the President determines that any real property acquired under the title and retained is no longer needed for the defense of the United States, he shall, if the original owner desires the property and pays the fair value thereof, return such property to the owner. In the event the President and the original owner do not agree as to the fair value of the property, the fair value shall be determined by three appraisers, one of whom shall be chosen by the President, one by the original owner, and the third by the first two appraisers; the expenses of such determination shall be paid in equal shares by the Government and the original owner.

(d) Whenever the need for the national defense of any personal property acquired under this title shall terminate, the President may dispose of such property on such terms and conditions as he shall deem appropriate, but to the extent feasible and practicable he shall give the former owner of any property so disposed of an opportunity to reacquire it (1) at its then fair value as determined by the President or (2) if it is to be disposed of (otherwise than at a public sale of which he is given reasonable notice) at less than such value, at the highest price any other person is willing to pay therefor: Provided, That this opportunity to reacquire need not be given in the case of fungibles or items having a fair value of less than $1,000.

11a

### TITLE V.—SETTLEMENT OF LABOR DISPUTES.

Sec. 501. It is the intent of Congress, in order to provide for effective price and wage stabilization pursuant to title IV of this Act and to maintain uninterrupted production, that there be effective procedures for the settlement of labor disputes affecting national defense.

Sec. 502. The national policy shall be to place primary reliance upon the parties to any labor dispute to make every effort through negotiation and collective bargaining and the full use of mediation and conciliation facilities to effect a settlement in the national interest. To this end the President is authorized (1) to initiate voluntary conferences between management, labor, and such persons as the President may designate to represent government and the public, and (2) subject to the provisions of section 503 to take such action as may be agreed upon in any such conference and appropriate to carry out the provisions of this title. The President may designate such persons or agencies as he may deem appropriate to carry out the provisions of this title.

Sec. 503. In any such conference, due regard shall be given to terms and conditions of employment established by prevailing collective bargaining practice which will be fair to labor and management alike, and will be consistent with stabilization policies established under this Act. No action inconsistent with the provisions of the Fair Labor Standards Act of 1938, as amended [29 U. S. C. §201 et seq.], other Federal labor standards statutes, the Labor Management Relations Act, 1947 [29 U. S. C. §141 et seq.], or with other applicable laws shall be taken under this title.

12a

**The Universal Military Training and Service Act. 62 Stat. 625 *et seq.*, 50 U. S. C. A. Appendix, Section 468.**

Sec. 18. (a) Whenever the President after consultation with and receiving advice from the National Security Resources Board determines that it is in the interest of the national security for the Government to obtain prompt delivery of any articles or materials the procurement of which has been authorized by the Congress exclusively for the use of the armed forces of the United States, or for the use of the Atomic Energy Commission, he is authorized, through the head of any Government agency, to place with any person operating a plant, mine, or other facility capable of producing such articles or materials an order for such quantity of such articles or materials as the President deems appropriate. Any person with whom an order is placed pursuant to the provisions of this section shall be advised that such order is placed pursuant to the provisions of this section. Under any such program of national procurement, the President shall recognize the valid claim of American small business to participate in such contracts, in such manufactures, and in such distribution of materials, and small business shall be granted a fair share of the orders placed, exclusively for the use of the armed forces or for other Federal agencies now or hereafter designated in this section. For the purpose of this section, a business enterprise shall be determined to be "small business" if (1) its position in the trade or industry of which it is a part is not dominant, (2) the number of its employees does not exceed 500, and (3) it is independently owned and operated.

(b) It shall be the duty of any person with whom an order is placed pursuant to the provisions of subsection (a), (1) to give such order such precedence with respect to all other orders (Government or private) theretofore

13a

or thereafter placed with such person as the President may prescribe, and (2) to fill such order within the period of time prescribed by the President or as soon thereafter as possible.

(c)  In case any person with whom an order is placed pursuant to the provisions of subsection (a) refuses or fails—

(1)  to give such order such precedence with respect to all other orders (Government or private) theretofore or thereafter placed with such person as the President may have prescribed;

(2)  to fill such order within the period of time prescribed by the President or as soon thereafter as possible as determined by the President;

(3)  to produce the kind or quality of articles or materials ordered; or

(4)  to furnish the quantity, kind, and quality of articles or materials ordered at such price as shall be negotiated between such person and the Government agency concerned; or in the event of failure to negotiate a price, to furnish the quantity, kind, and quality of articles or materials ordered at such price as he may subsequently be determined to be entitled to receive under subsection (d) the President is authorized to take immediate possession of any plant, mine, or other facility of such person and to operate it, through any Government agency, for the production of such articles or material as may be required by the Government.

(d)  Fair and just compensation shall be paid by the United States (1) for any articles or materials furnished pursuant to an order placed under subsection (a), or (2) as rental for any plant, mine, or other facility of which possession is taken under sub-section (c).

**App. 1189**

14a

(e)  Nothing contained in this section shall be deemed to render inapplicable to any plant, mine, or facility of which possession is taken pursuant to subsection (c) any State or Federal laws concerning the health, safety, security, or employment standards of employees.

(f)  Any person, or any officer of any person as defined in this section, who willfully fails or refuses to carry out any duty imposed upon him by subsection (b) of this section shall be guilty of a felony and, upon conviction thereof, shall be punished by imprisonment for not more than three years, or by a fine of not more than $50,000, or by both such imprisonment and fine.

(g)  (1) As used in this section—

(A)  The term "person" means any individual, firm, company, association, corporation, or other form of business organization.

(B)  The term "Government agency" means any department, agency, independent establishment, or corporation in the Executive branch of the United States Government.

(2)  For the purposes of this section, a plant, mine, or other facility shall be deemed capable of producing any articles or materials if it is then producing or furnishing such articles or materials or if the President after consultation with and receiving advice from the National Security Resources Board determines that it can be readily converted to the production or furnishing of such articles or materials.

(h)  (1) The President is empowered, through the Secretary of Defense, to require all producers of steel in the United States to make available, to individuals, firms,

15a

associations, companies, corporations, or organized manu-
facturing industries having orders for steel products or
steel materials required by the armed forces, such per-
centages of the steel production of such producers, in
equal proportion deemed necessary for the expeditious
execution of orders for such products or materials. Com-
pliance with such requirement shall be obligatory on all
such producers of steel and such requirement shall take
precedence over all orders and contracts theretofore placed
with such producers. If any such producer of steel or the
responsible head or heads thereof refuses to comply with
such requirement, the President, through the Secretary
of Defense, is authorized to take immediate possession of
the plant or plants of such producer and, through the ap-
propriate branch, bureau, or department of the armed
forces, to insure compliance with such requirement. Any
such producer of steel or the responsible head or heads
thereof refusing to comply with such requirement shall be
deemed guilty of a felony and upon conviction thereof shall
be punished by imprisonment for not more than three years
and a fine not exceeding $50,000.

(2) The President shall report to the Congress on the
final day of each six-month period following the date of
enactment of this Act the percentage figure, or if such in-
formation is not available, the approximate percentage
figure, of the total steel production in the United States
required to be made available during such period for the
execution of orders for steel products and steel materials
required by the armed forces, if such percentage figure is in
excess of 10 per centum.