NO. 1:14-cv-00254

---

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

---

STATE OF TEXAS, et al.,

Plaintiffs,

v.

UNITED STATES OF AMERICA, et al.,

Defendants.

---

## STATES' MOTION FOR LEAVE TO PARTICIPATE AS
## AMICI CURIAE AND BRIEF IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

ROBERT W. FERGUSON
  *Attorney General of Washington*

Noah G. Purcell, WSBA 43492
  *Solicitor General*

Anne E. Egeler, WSBA 20258
  *Deputy Solicitor General*
  *Attorney-In-Charge*

Washington Office of Attorney General
PO Box 40100
Olympia, WA  98504-0100
360-753-6200 (office)
360-664-2963 (fax)
anneE1@atg.wa.gov

*Additional Amici Listed On Signature Page*

# TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................................1

MOTION FOR LEAVE TO FILE AMICUS BRIEF ....................................................................1

FACTUAL BACKGROUND .........................................................................................................2

ARGUMENT .................................................................................................................................4

A.      Plaintiffs Have Shown No Irreparable Injury Because Deferred Immigration Action
        Will Benefit States, Not Cause Harm ................................................................................4

        1.      Allowing Immigrants to Work Legally Provides Economic and Social
                Benefits to the States ............................................................................................5

        2.      Plaintiffs Have Failed to Show That Deferred Immigration Action Will
                Require Them to Increase Spending On Public Safety or Healthcare ....................7

B.      The Equities and Public Interest Weigh In Favor of Denying Injunctive Relief ..............11

C.      Plaintiffs Are Unlikely to Succeed On the Merits ...........................................................13

CONCLUSION ............................................................................................................................14

# TABLE OF AUTHORITIES

## Cases

*Apache Corp. v. Chevedden*
   696 F. Supp. 2d 723 (S.D. Tex. 2010) ........................................................................ 1

*Arizona Dream Act Coal. v. Brewer*
   757 F.3d 1053 (9th Cir. 2014) .................................................................................. 10

*Arizona v. United States*
   132 S. Ct. 2492 (2012) ....................................................................................... 11, 13

*Crane v. Napolitano*
   920 F. Supp. 2d 724 (N.D. Texas 2013) .................................................................. 8, 9

*Heckler v. Chaney*
   470 U.S. 821, 105 S. Ct. 1649, 84 L. Ed. 2d 714 (1985) ..................................... 13, 14

*In re Guardianship of D.S.*
   178 Wash. App. 681, 317 P.3d 489 (2013) ................................................................ 7

*Jin v. Ministry of State Sec.*
   557 F. Supp. 2d 131 (D. D.C. 2008) ......................................................................... 1

*Maples v. Thomas*
   No. 5:03-cv-2399-SLB-MHH, 2013 WL 5350669 (N.D. Ala. Sept. 23, 2013) ....... 2

*Sierra Club v. Fed. Emergency Mgmt. Agency*
   No. H-07-0608, 2007 WL 3472851 (S.D. Tex. Nov. 14, 2007) ................................ 1

*Texas v. United States*
   106 F.3d 661 (5th Cir. 1997) ............................................................................... 7, 10

*United States ex rel. Knauff v. Shaughnessy*
   338 U.S. 537, 70 S. Ct. 309, 94 L. Ed. 317 (1950) .................................................. 13

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*
   20 F. Supp. 2d 1017 (S.D. Tex. 1998) ....................................................................... 1

*United States v. Bader*
   No. 07-cr-00338-MSK, 2009 WL 2219258 (D. Colo. July 23, 2009) ....................... 1

*United States v. Louisiana*
   751 F. Supp. 608 (E.D. La. 1990) ......................................................................... 1, 2

*Whitney Nat'l Bank v. Karam*
  306 F. Supp. 2d 678 (S.D. Tex. 2004) ..................................................................... 1

*Winter v. Natural Res. Def. Council, Inc*.
  555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) ......................................... 4, 11

**Statutes**

8 U.S.C. § 1621 ........................................................................................................... 10

Pub. L. No. 99-603, 100 Stat. 3359
  (Immigration Reform and Control Act of 1986) ................................................... 3, 5

**Other Authorities**

American Immigration Council (Oct. 2014),
  *available at* http://www.immigrationpolicy.org/sites/default/files/docs/executive_
  grants_of_temporary_immigration_relief_1956-present_final_4.pdf ....................... 3

American Immigration Council, Roberto Gonzales & Angie Bautista-Chavez,
  *Two Years and Counting: Assessing the Growing Power of DACA* (June 16, 2014),
  *available at* http://www.immigrationpolicy.org/special-reports/two-years-and-
  counting-assessing-growing-power-daca........................................................... 5, 6, 9

Angela S. Garcia & David G. Keyes,
  *Life as an Undocumented Immigrant: How Restrictive Local Immigration Policies
  Affect Daily Life* (Mar. 26, 2012),
  *available at* https://www.americanprogress.org/issues/immigration/report/2012/
  03/26/11210/life-as-an-undocumented-immigrant/ ................................................. 10

Cato Inst., Alex Nowrasteh,
  *DACA Did Not Cause the Surge in Unaccompanied Children* (July 29, 2014),
  *available at* http://www.cato.org/blog/daca-did-not-cause-surge-unaccompanied-
  children ....................................................................................................................... 8

Center for American Progress,
  *Executive Action On Immigration Will Benefit Washington's Economy*,
  *available at* http://www.scribd.com/doc/247296801/Economic-Benefits-of-Executive-
  Action-in-Washington ................................................................................................. 6

Center for American Progress,
*Topline Fiscal Impact of Executive Action Numbers for 28 States*,
*available at* http://www.scribd.com/doc/248189539/Topline-Fiscal-Impact-of-
Executive-Action-Numbers-for-28-States ............................................................. 6

Dr. Raul Hinojosa-Ojeda,
*From the Shadows to the Mainstream: Estimating the Economic Impact of
Presidential Administrative Action and Comprehensive Immigration Reform* 17
(N. Am. Integration & Dev. Ctr., UCLA, Nov. 20, 2014),
*available at* http://www.naid.ucla.edu/uploads/4/2/1/9/4219226/hinojosa_-_estimat
ing_the_economic_impact_of_presidential_administrative_action_and_
comprehensive_immigration_reform_-_ucla_naid_center.pdf ............................. 5, 6

http://www.dhs.gov/immigration-action (Fixing Our Broken Immigration System) ................... 9

http://www.uscis.gov/immigrationaction (Executive Actions on Immigration) ....................... 3, 9

https://naws.jbsinternational.com/3/3status.php (graph) ............................................. 12

Memorandum from Gene McNary, INS Commissioner, to Regional Commissioners
(Feb. 2, 1990),
*available at* http://www.factcheck.org/UploadedFiles/2014/11/McNary-memo.pdf ................ 3

Memorandum from Jeh Charles Johnson, Secretary of Homeland Security, to Thomas S.
Winkowski, Acting Director of U.S. Immigration and Customs Enforcement, et al.
(Nov. 20, 2014),
*available at* http://www.dhs.gov/sites/default/files/publications/14_1120_memo_
secure_communities.pdf ......................................................................... 3

Memorandum from Paul W. Virtue, Acting Executive Associate INS Commissioner, to
Regional Directors et al. (May 6, 1997),
*available at* http://www.asistahelp.org/documents/resources/Virtue_Memo_97pdf_
53DC84D782445.pdf ............................................................................ 3

Migration Policy Inst., Jeanne Batalova, Sarah Hooker & Randy Cappys,
*DACA at the Two-Year Mark: A Nat'l and State Profile of Youth Eligible and Applying
for Deferred Action* (Aug. 2014),
*available at* http://www.migrationpolicy.org/research/daca-two-year-mark-national-
and-state-profile-youth-eligible-and-a pplying-deferred-action ............................... 5

Migration Policy Inst., Marc R. Rosenblum & Kristen McCabe,
*Deportation and Discretion: Reviewing the Record and Options for Change*
(Oct. 2014),
*available at* http://www.migrationpolicy.org/research/deportation-and-discretion-
reviewing-record-and-options-change ....................................................... 8

iv

Migration Policy Inst., *National and State Estimates of Populations Eligible for Anticipated Deferred Action and DACA Programs* (Nov. 2014) (Excel spreadsheet) *available at* http://www.migrationpolicy.org/sites/ default/files/datahub/US-State-Estimates-unauthorized-populations-executive-action.xlsx ...................................................... 6

Pew Research Ctr., Jeffrey S. Passel & D'Vera Cohn, *State Unauthorized Immigrant Populations* (Nov. 18, 2014), *available at* http://www.pewhispanic.org/2014/11/18/chapter-1-state-unauthorized-immigrant-populations/#unauthorized-immigrant-population-share ......................................... 9

Pew Research Ctr., Jeffrey S. Passel, et al., *As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled* 4 (Sept. 3, 2014), *available at* http://www.pewhispanic.org/2014/09/03/as-growth-stalls-unauthorized-immigrant-population-becomes-more-settled/ .................................................... 8, 12

Pew Research, Jeffrey S. Passel & D'Vera Cohn, *A Portrait of Unauthorized Immigrants in the United States* (Apr. 14, 2009), *available at* http://www.pewhispanic.org/2009/04/14/a-portrait-of-unauthorized-immigrants-in-the-united-states/ ................................................... 12

APPENDIX

The appendix is listed in the order the authorities are used, with an indication as to which footnote the authority first appears in:

Note 1:      *United States v. Bader*, No. 07-cr-00338-MSK, 2009 WL 2219258 (D. Colo. July 23, 2009).................................................................. A-1

Note 1:      *Sierra Club v. Fed. Emergency Mgmt. Agency*, No. H-07-0608, 2007 WL 3472851 (S.D. Tex. Nov. 14, 2007)................................................. A-14

Note 4:      *Maples v. Thomas*, No. 5:03-cv-2399-SLB-MHH, 2013 WL 5350669, *3 (N.D. Ala. Sept. 23, 2013) ............................................. A-18

Note 6:      http://www.uscis.gov/immigrationaction (Executive Actions on Immigration) .................................................. A-22

Note 7:      Memorandum from Jeh Charles Johnson, Secretary of Homeland Security, to Thomas S. Winkowski, Acting Director of U.S. Immigration and Customs Enforcement, et al. (Nov. 20, 2014), *available at* http://www.dhs.gov/sites/default/files/publications/ 14_1120_memo_secure_communities.pdf .......................................... A-27

Note 8:    Memorandum from Gene McNary, INS Commissioner, to
           Regional Commissioners (Feb. 2, 1990),
           *available at* http://www.factcheck.org/UploadedFiles/2014/11/
           McNary-memo.pdf
           (*Re: Family Fairness: Guidelines for Voluntary Departure under 8 CFR
           242.5 for the Ineligible Spouses and Children of Legalized Aliens*)...................... A-30

Note 9:    American Immigration Council (Oct. 2014),
           *available at* http://www.immigrationpolicy.org/sites/default/
           files/docs/ executive_grants_of_temporary_immigration_relief_
           1956-present_final_4.pdf
           (*Executive Grants of Temporary Immigration Relief, 1956-Present*) ................... A-32

Note 10:   Memorandum from Paul W. Virtue, Acting Executive Associate INS
           Commissioner, to Regional Directors et al. (May 6, 1997),
            *available at* http://www.asistahelp.org/documents/resources/Virtue_
           Memo_97pdf_ 53DC84D782445.pdf
           (*Re: Supplemental Guidance on Battered Alien Self-Petitioning Process
           and Related Issues*) ................................................................................. A-42

Note 14:   Migration Policy Inst., Jeanne Batalova, Sarah Hooker & Randy
           Cappys, *DACA at the Two-Year Mark: A Nat'l and State Profile of
           Youth Eligible and Applying for Deferred Action* (Aug. 2014),
           *available at* http://www.migrationpolicy.org/research/daca-two-year-
           mark-national-and-state-profile-youth-eligible-and-a pplying-deferred-
           action......................................................................................................... A-52

Note 15:   American Immigration Council, Roberto Gonzales & Angie Bautista-
           Chavez, *Two Years and Counting: Assessing the Growing Power of
           DACA* (June 16, 2014),
           *available at* http://www.immigrationpolicy.org/special-reports/two-
           years-and-counting-assessing-growing-power-daca............................................. A-55

Note 16:   Dr. Raul Hinojosa-Ojeda, *From the Shadows to the Mainstream:
           Estimating the Economic Impact of Presidential Administrative Action
           and Comprehensive Immigration Reform* 17 (N. Am. Integration & Dev.
           Ctr., UCLA, Nov. 20, 2014),
           *available at* http://www.naid.ucla.edu/uploads/4/2/1/9/4219226/
           hinojosa_-_estimat ing_the_economic_impact_of_presidential_admini
           strative_action_and_comprehensive_immigration_reform_-_ucla
           _naid_center.pdf
           (pages 1-11 of a 31-page document)...................................................... A-64

Note 19:   Migration Policy Inst., *National and  State Estimates of Populations
           Eligible for Anticipated Deferred Action and DACA Programs*
           (Nov. 2014) (Excel spreadsheet),
           *available at* http://www.migrationpolicy.org/sites/ default/files/
           datahub/US-State-Estimates-unauthorized-populations-executive-
           action.xlsx ................................................................................................. A-75

Note 20:    Center for American Progress, *Executive Action On Immigration Will Benefit Washington's Economy*, *available at* http://www.scribd.com/doc/247296801/Economic-Benefits-of-Executive-Action-in-Washington ...................................................................... A-79

Note 21:    Center for American Progress, *Topline Fiscal Impact of Executive Action Numbers for 28 States* (*Executive Action on Immigration Will Benefit State Economies*), *available at* http://www.scribd.com/doc/248189539/Topline-Fiscal-Impact-of-Executive-Action-Numbers-for-28-States ............................................. A-81

Note 24:    *In re Guardianship of D.S.*, 178 Wash. App. 681, 317 P.3d 489 (2013) ........................................................... A-85

Note 26:    Pew Research Ctr., Jeffrey S. Passel, et al., *As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled* (Sept. 3, 2014), *available at* http://www.pewhispanic.org/2014/09/03/as-growth-stalls-unauthorized-immigrant-population-becomes-more-settled/ (in relevant part) ........................................................................................ A-90

Note 27:    Cato Inst., Alex Nowrasteh, *DACA Did Not Cause the Surge in Unaccompanied Children* (July 29, 2014), *available at* http://www.cato.org/blog/daca-did-not-cause-surge-unaccompanied-children ........................................................................ A-93

Note 28:    Migration Policy Inst., Marc R. Rosenblum & Kristen McCabe, *Deportation and Discretion: Reviewing the Record and Options for Change* (Oct. 2014), *available at* http://www.migrationpolicy.org/research/deportation-and-discretion-reviewing-record-and-options-change ................................................... A-96

Note 30:    Pew Research Ctr., Jeffrey S. Passel & D'Vera Cohn, *State Unauthorized Immigrant Populations* (Nov. 18, 2014), *available at* http://www.pewhispanic.org/2014/11/18/chapter-1-state-unauthorized-immigrant-populations/#unauthorized-immigrant-population-share (in relevant part) ........................................................................................ A-98

Note 32:    same as Note 6 (see A-22)

Note 33:    http://www.dhs.gov/immigration-action (*Fixing Our Broken Immigration System*) ........................................................... A-100

Note 35:    Angela S. Garcia & David G. Keyes, *Life as an Undocumented Immigrant: How Restrictive Local Immigration Policies Affect Daily Life* (Mar. 26, 2012), *available at* https://www.americanprogress.org/ issues/ immigration/ report/2012/03/26/11210/life-as-an-undocumented-immigrant/ (in relevant part) ........................................................................................ A-102

Note 42:    Pew Research, Jeffrey S. Passel & D'Vera Cohn, *A Portrait of Unauthorized Immigrants in the United States* (Apr. 14, 2009), *available at* http://www.pewhispanic.org/2009/04/14/a-portrait-of-unauthorized-immigrants-in-the-united-states/ (in Relevant part) ................................................................................ A-105

Note 43:    https://naws.jbsinternational.com/3/3status.php (graph from the Nat'l Agric. Workers Survey, Dep't of Labor, Emp't  & Training Admin.) ................................................................ A-107

Note 44:    same as Note 26 (see A-90)

## INTRODUCTION

Unhappy with the federal government's recent immigration directives, Plaintiffs ask this Court to step in. They claim that the directives exceed the President's legal authority, will irreparably harm states, and that the equities and public interest weigh in their favor. None of these claims is true. In particular, Plaintiffs' speculative allegation that the directives will harm states is both unsupported and inaccurate. The truth is that the directives will substantially benefit states, will further the public interest, and are well within the President's broad authority to enforce immigration law. There is thus no legal basis for issuing a preliminary injunction. The amici States respectfully ask that the Court grant leave to file this brief and deny Plaintiffs' motion for preliminary injunction.

## MOTION FOR LEAVE TO FILE AMICUS BRIEF

The States of Washington, California, Connecticut, Hawaii, Illinois, Iowa, Maryland, Massachusetts, New Mexico, New York, Oregon, and Vermont, and the District of Columbia (the moving States) respectfully move, pursuant to the Court's inherent authority, for leave to file a brief as amicus curiae.

Whether to permit amicus participation lies within the Court's inherent authority.[1] "Generally, courts have exercised great liberality in permitting an amicus curiae to file a brief in a pending case," as evidenced by this Court's historic practice of permitting amici participation.[2] There are no prerequisites to qualify for amicus status; rather, one seeking to appear as amicus "must merely make a showing that his participation is useful to or otherwise desirable by the

---

[1] *See, e.g.*, *United States v. Bader*, No. 07-cr-00338-MSK, 2009 WL 2219258 (D. Colo. July 23, 2009); *Jin v. Ministry of State Sec.*, 557 F. Supp. 2d 131, 136 (D. D.C. 2008); *Sierra Club v. Fed. Emergency Mgmt. Agency*, No. H-07-0608, 2007 WL 3472851, at *3 (S.D. Tex. Nov. 14, 2007).

[2] *United States v. Louisiana*, 751 F. Supp. 608, 620 (E.D. La. 1990); *see, e.g.*, *Apache Corp. v. Chevedden*, 696 F. Supp. 2d 723 (S.D. Tex. 2010); *Whitney Nat'l Bank v. Karam*, 306 F. Supp. 2d 678 (S.D. Tex. 2004); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017 (S.D. Tex. 1998).

court."[3] An amicus brief may be of considerable help if it "brings to the attention of the Court relevant matter not already brought to its attention by the parties[.]"[4]

Applying these standards, the Court should accept this brief. The moving States are well-positioned to file an amicus brief because they have direct experience with and helpful evidence to add as to the impacts of immigration and federal immigration enforcement. Unfortunately, the Plaintiffs in this case have painted a distorted picture of the impacts of the federal government's recent immigration directives. In reality, those directives will substantially benefit states—not harm them. The proposed amicus brief will rebut Plaintiffs' speculative assertions of harm, providing specific information that will aid the Court in determining whether Plaintiffs have met their burden of persuasion on each element of the preliminary injunction standard.[5]

Counsel for amici has contacted the parties concerning the filing of the amicus brief. Neither Plaintiffs nor Defendants object to the filing of this amicus brief.

## FACTUAL BACKGROUND

On November 20, 2014, the Department of Homeland Security released a series of directives announcing a shift in the focus of removal of undocumented immigrants. The directives expand the 2012 Deferred Action for Childhood Arrivals Program for persons who entered the United States as children and have been present in the United States since January 1, 2010, and create a new deferred immigration action program for undocumented parents of U.S. citizens and parents of lawful permanent residents who have been in the United States since January 1, 2010. To qualify, undocumented immigrants must come forward to register, submit biometric data, pass background checks, pay fees, and show that their child was born before the

---

[3] *Louisiana*, 751 F. Supp. at 620.

[4] *Maples v. Thomas*, No. 5:03-cv-2399-SLB-MHH, 2013 WL 5350669, *3 (N.D. Ala. Sept. 23, 2013).

[5] *Id.* at *2-3.

deferral was announced. Up to 4.4 million people are expected to be eligible for these programs. Individuals who qualify for a temporary deferral will not obtain authority to remain in the United States permanently. Rather, they will be authorized to work for three years, subject to renewal, if they comply with all laws and pay their taxes.[6] The deferred immigration action will be coupled with focusing enforcement efforts on deportation of persons posing the highest threat to national security and public safety—including gang members, felons, and other serious criminals.[7]

The recent directives are consistent with a long pattern of presidential exercises of enforcement discretion within the bounds of immigration law to protect families and defer deportation. For example, following passage of the Immigration Reform and Control Act of 1986, President Reagan and President George H.W. Bush deferred deportations for family members of immigrants who were in the process of obtaining legal status.[8] These deferrals impacted over 40% of undocumented immigrants.[9] President Clinton similarly deferred action for immigrant women and children who have been abused by a U.S. citizen or legal permanent resident.[10]

---

[6] http://www.uscis.gov/immigrationaction (Executive Actions on Immigration).

[7] Memorandum from Jeh Charles Johnson, Secretary of Homeland Security, to Thomas S. Winkowski, Acting Director of U.S. Immigration and Customs Enforcement, et al. (Nov. 20, 2014), *available at* http://www.dhs.gov/sites/default/files/publications/14_1120_memo_secure_communities.pdf.

[8] Pub. L. No. 99-603, 100 Stat. 3359; Memorandum from Gene McNary, INS Commissioner, to Regional Commissioners (Feb. 2, 1990), *available at* http://www.factcheck.org/UploadedFiles/2014/11/McNary-memo.pdf (*Re: Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens*).

[9] American Immigration Council (Oct. 2014), *available at* http://www.immigrationpolicy.org/ sites/default/files/docs/executive_grants_of_temporary_immigration_relief_1956-present_final_4.pdf (*Executive Grants of Temporary Immigration Relief, 1956-Present*).

[10] Memorandum from Paul W. Virtue, Acting Executive Associate INS Commissioner, to Regional Directors et al. (May 6, 1997), *available at* http://www.asistahelp.org/documents/resources/Virtue_Memo_97pdf_ 53DC84D782445.pdf (*Re: Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues*).

## ARGUMENT

To obtain a preliminary injunction, a plaintiff must establish a likelihood of irreparable harm in the absence of preliminary relief, likelihood of success on the merits, that the balance of equities tips in his or her favor, and that an injunction is in the public interest.[11]

Plaintiffs are unable to satisfy any of these elements. Contrary to Plaintiffs' speculation, the data show that allowing persons who are already in the country to work legally benefits, rather than harms, the states. The equities and public interest also support this approach. Moreover, Plaintiffs cannot succeed on the merits given the courts' consistent recognition of the executive branch's broad discretion to make decisions regarding immigration priorities.

### A. Plaintiffs Have Shown No Irreparable Injury Because Deferred Immigration Action Will Benefit States, Not Cause Harm

To obtain a preliminary injunction, Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction."[12] Awarding a preliminary injunction "based only on a possibility of irreparable harm is inconsistent" with the Supreme Court's "characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."[13]

Here, the only harm Plaintiffs assert from the immigration directives is speculative and unsupported. And the data show that allowing immigrants to work legally substantially benefits states. Plaintiffs are thus unable to show irreparable harm.

---

[11] *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008).

[12] *Id.* at 22.

[13] *Id.*

**1.      Allowing Immigrants to Work Legally Provides Economic and Social Benefits to the States**

Although Plaintiffs speculate that the immigration directives will cause them "drastic injuries," their dire predictions directly conflict with available data. Programs deferring immigration action are not new. Past experience demonstrates that suspending deportation and providing work authorization benefits families and state economies by authorizing work, increasing earnings, and growing the tax base.

The most recent example of the benefits provided by allowing immigrants to work legally is the 2012 Deferred Action for Childhood Arrivals Program (DACA). DACA offered temporary relief to more than 2.1 million undocumented immigrants who came to the United States as children.[14] DACA participation resulted in almost 60% of respondents obtaining new jobs,[15] and surveys of DACA beneficiaries found that wages increased by over 240%.[16]

The statistics regarding DACA are consistent with findings on the economic impact of the Immigration Reform and Control Act of 1986 (IRCA), which provided legal status to 3 million undocumented immigrants.[17] Research has consistently shown that, as occurred with IRCA, when immigrants are able to work legally—even for a limited time—wages increase,

---

[14] Migration Policy Inst., Jeanne Batalova, Sarah Hooker & Randy Cappys, *DACA at the Two-Year Mark: A Nat'l and State Profile of Youth Eligible and Applying for Deferred Action* (Aug. 2014), *available at* http://www.migrationpolicy.org/research/daca-two-year-mark-national-and-state-profile-youth-eligible-and-a pplying-deferred-action.

[15] American Immigration Council, Roberto Gonzales & Angie Bautista-Chavez, *Two Years and Counting: Assessing the Growing Power of DACA* (June 16, 2014), *available at* http://www.immigrationpolicy.org/special-reports/two-years-and-counting-assessing-growing-power-daca.

[16] Dr. Raul Hinojosa-Ojeda, *From the Shadows to the Mainstream: Estimating the Economic Impact of Presidential Administrative Action and Comprehensive Immigration Reform* 17 (N. Am. Integration & Dev. Ctr., UCLA, Nov. 20, 2014), *available at* http://www.naid.ucla.edu/uploads/4/2/1/9/4219226/hinojosa_-_estimat ing_the_economic_impact_of_presidential_administrative_action_and_comprehensive_immigration_reform_-_ucla _naid_center.pdf.

[17] *Id.* at 9.

workers are encouraged to seek work compatible with their skill level, and workers receive incentive to increase their skills to obtain higher wages.[18]

Allowing immigrants to work legally and increase their wages has far-reaching, positive impacts on state and local economies. In Washington, for example, approximately 105,000 people are anticipated to be eligible for deferred immigration action.[19] Assuming that even a portion of the eligible undocumented immigrants register, request a reprieve from deportation, and obtain a temporary work permit, it is estimated that Washington's tax revenues will grow by $57 million over the next five years.[20]  California's tax revenues are estimated to grow by $904 million over the next five years with an anticipated 1,214,00 people eligible for deferred immigration action. [21] The tax consequences for the Plaintiff States are similarly positive. For example, if the estimated 594,000 undocumented immigrants eligible for deferred action in Texas receive temporary work permits, it will lead to an estimated $338 million increase in the state tax base over five years.[22]

In addition to increasing state and local tax coffers, deferred immigration action has numerous social benefits. Many DACA beneficiaries, for example, used their increased wages to help support their families, many of which live in poverty.[23] Allowing parents of U.S. citizens and lawful permanent residents to increase their earnings by working legally will increase their

---

[18] Hinojosa-Ojeda at 9-10.

[19] Migration Policy Inst., *National and  State Estimates of Populations Eligible for Anticipated Deferred Action and DACA Programs* (Nov. 2014) (Excel spreadsheet), *available at* http://www.migrationpolicy.org/sites/default/files/datahub/US-State-Estimates-unauthorized-populations-executive-action.xlsx.

[20] Center for American Progress, *Executive Action On Immigration Will Benefit Washington's Economy*, *available at* http://www.scribd.com/doc/247296801/Economic-Benefits-of-Executive-Action-in-Washington.

[21] Center for American Progress, *Topline Fiscal Impact of Executive Action Numbers for 28 States*, *available at*  http://www.scribd.com/doc/248189539/Topline-Fiscal-Impact-of-Executive-Action-Numbers-for-28-States.

[22] *Id.*

[23] Gonzales & Bautista-Chavez at 5.

ability to support their U.S. citizen children, reducing the cost of state social service benefits. In addition, deferred deportation assists State social service agencies in keeping children with their families. When fit parents are deported, it can be difficult for the State to find the parents and reunite them with their children. The existence of fit parents—even if they have been deported— can also prevent the State from seeking alternative placement options for a child, such as a guardianship or adoption by another family member or third party.[24] Deferred deportation allows families to remain together, even if only temporarily.

If a preliminary injunction is granted, the States will be deprived of the demonstrated economic and social benefits of allowing established immigrants to remain with their families, seek legal work, and contribute to their communities.

## 2. Plaintiffs Have Failed to Show That Deferred Immigration Action Will Require Them to Increase Spending On Public Safety or Healthcare

Plaintiffs' contentions that they will be "forced" to expend large sums on public safety and health care as a result of "new waves of illegal immigration" are unsupported both legally and factually. *See* Pls.' Mot. at 26; Pls.' Compl. ¶ 65. As a matter of law, the Fifth Circuit has already held that "state expenditures on medical and correctional services for undocumented immigrants are not the result of federal coercion," but rather of state choice.[25] Moreover, as a factual matter, Plaintiffs' claims are refuted by the data.

Most generally, Plaintiffs claim that deferred immigration action will lead to an influx of undocumented immigrants is baseless. As the nation's experience with the DACA program shows, there is no reason to believe that deferring deportation for persons who have been in the

---

[24] *See, e.g.*, *In re Guardianship of D.S.*, 178 Wash. App. 681, 317 P.3d 489 (2013) (inability to return a child to a deported parent in the near future does not justify a guardianship if there are no other parental deficiencies).

[25] *Texas v. United States*, 106 F.3d 661, 666 (5th Cir. 1997).

country for five years will increase the number of new undocumented immigrants. In reality, the population of undocumented immigrants has remained stable since 2009, despite the DACA program.[26] Seeking to give a contrary impression, Plaintiffs misleadingly focus on one sub-category of undocumented immigrants—minor children—to claim that DACA has caused a surge of immigrants. But this is just untrue, as their own amici have acknowledged. The Cato Institute, which has submitted an amicus brief in support of the plaintiff States (ECF No. 61-2), has concluded: "Few facts of the unaccompanied children (UAC) surge are consistent with the theory that DACA caused the surge."[27] Moreover, there is no reason to expect the directives to significantly alter the number of undocumented immigrants who successfully remain present in the country, because those eligible under the directives were unlikely to be removed before. More than 95% of undocumented immigrants who were removed before the new directives were convicted of crimes, had disobeyed immigration court orders, or were recent arrivals.[28]

There is also no evidence that deferred immigration action will cause increased state spending. In considering a recent challenge to DACA, a Texas district court found that Mississippi was unable to provide evidence to back its allegations that immigration deferral resulted in fiscal injury to the State.[29] The Plaintiffs have similarly fallen short of establishing imminent harm here. For example, Plaintiffs claim that Texas "spends millions of dollars every

---

[26] Pew Research Ctr., Jeffrey S. Passel, et al., *As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled* 4 (Sept. 3, 2014), *available at* http://www.pewhispanic.org/2014/09/03/as-growth-stalls-unauthorized-immigrant-population-becomes-more-settled/.

[27] Cato Inst., Alex Nowrasteh, *DACA Did Not Cause the Surge in Unaccompanied Children* (July 29, 2014), *available at* http://www.cato.org/blog/daca-did-not-cause-surge-unaccompanied-children.

[28] Migration Policy Inst., Marc R. Rosenblum & Kristen McCabe, *Deportation and Discretion: Reviewing the Record and Options for Change* (Oct. 2014), *available at* http://www.migrationpolicy.org/research/deportation-and-discretion-reviewing-record-and-options-change.

[29] *Crane v. Napolitano*, 920 F. Supp. 2d 724, 744-45 (N.D. Texas 2013).

year to provide uncompensated healthcare for undocumented immigrants." Pls.' Mot. at 26. But the only evidence cited is Plaintiffs' complaint, which says only that in 2014, "Texas counties reported over $23 million in indigent health care expenditures." Pls.' Compl. ¶ 65. Plaintiffs provide no evidence as to what portion of this indigent care went to undocumented immigrants, who make up a small fraction of the State's population.[30] Moreover, the data clearly show that allowing immigrants to work legally makes it significantly more likely that they will obtain healthcare via their employer or be able to pay for coverage themselves.[31] There is thus no plausible evidence that deferred immigration action will actually increase state expenditures on indigent health care.

There is also no data to suggest that State expenditures on public safety will increase as a result of deferred immigration action. The immigration directives specifically exclude those who pose a public safety risk.[32] Deferral applications will be assessed on a case-by-case basis, and applicants will be required to come out of the shadows and "undergo a thorough background check of all relevant national security and criminal databases, including [Homeland Security] and FBI databases."[33] If anything, public safety will be improved by focusing Homeland Security's limited resources on deportation of terrorists, felons, and other serious criminals.[34] Moreover, granting deferred action will reduce the fear and hesitation many undocumented immigrants have about reporting crimes, serving as witnesses, or cooperating with law

---

[30] Pew Research Ctr., Jeffrey S. Passel & D'Vera Cohn, *State Unauthorized Immigrant Populations* (Nov. 18, 2014), *available at* http://www.pewhispanic.org/2014/11/18/chapter-1-state-unauthorized-immigrant-populations/#unauthorized-immigrant-population-share.

[31] Gonzales & Bautista-Chavez at 4.

[32] http://www.uscis.gov/immigrationaction (Executive Actions on Immigration).

[33] http://www.dhs.gov/immigration-action (Fixing Our Broken Immigration System).

[34] *Cf. Crane*, 920 F. Supp. 2d at 745 (rejecting Plaintiff's claim that DACA would have no public safety benefits).

enforcement generally, further improving public safety and benefitting states.[35] If there is an increase in state spending on correctional expenses, it will "stem from [the State's] enforcement of its own penal laws, not federal laws . . . ."[36]

Finally, Plaintiffs' contention that provision of unemployment benefits, driver's licenses, and professional licenses will cause irreparable injury is also meritless. Pls.' Mot. at 26-27. The immigration directives do not require States to provide state benefits, even for immigrants who obtain authorization to work legally. The States retain full authority to make or amend their laws to limit the availability of State benefits and licenses.[37] The plaintiff States argue, misleadingly, that they will be forced to provide benefits like driver's licenses under *Arizona Dream Act Coalition*[38] (Reply Mem. ECF No. 64, at 45-47). But that case merely held that when a state gives driver's licenses to one group of deferred-action recipients, it cannot—without a rational basis—deny the same licenses to recipients of other kinds of deferred action.[39] Having to comply with the constitutional prohibition against irrational discrimination cannot be considered an irreparable injury.

In short, Plaintiffs have failed to show irreparable injury. In reality, the evidence shows that Plaintiffs and other states will benefit—not suffer—from deferred immigration action.

---

[35] Angela S. Garcia & David G. Keyes, *Life as an Undocumented Immigrant: How Restrictive Local Immigration Policies Affect Daily Life* (Mar. 26, 2012), *available at* https://www.americanprogress.org/issues/immigration/report/2012/03/26/11210/life-as-an-undocumented-immigrant/.

[36] *Texas*, 106 F.3d at 666 (rejecting claim for reimbursement of State expenses allegedly caused by inadequate federal enforcement of immigration laws).

[37] 8 U.S.C. § 1621.

[38] *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1062 (9th Cir. 2014).

[39] *Id.*

**B.     The Equities and Public Interest Weigh In Favor of Denying Injunctive Relief**

Plaintiffs treat the equity and public interest prongs of the preliminary injunction test as virtual afterthoughts, providing not a single citation to a case or reference to other authority in addressing them. Pls.' Mot. at 28-33. But these prongs are important. The Court must weigh the competing claims of injury and "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."[40] Here, the equities and public interest tip decisively in favor of denying the preliminary injunction.

As to the equities, the United States has already explained in detail the harms it will suffer if the Court grants injunctive relief. U.S. Br. at 50-54. Forcing the Department of Homeland Security to spend resources processing and deporting immigrants who pose no public safety or other risk wastes scarce resources that could and should be devoted to targeting those undocumented immigrants who do pose risks.[41] On the other side of the balance, Plaintiffs cite nothing whatsoever, instead quoting page after page of statements by the President. Pls.' Mot. at 28-31. Plaintiffs' apparent anger at the President is not a relevant equity. Instead, Plaintiffs have to demonstrate real harms they will suffer if an injunction is denied, and they have utterly failed, as explained above.

As to the public interest, Plaintiffs' argument is even less persuasive. Their primary argument is that if injunctive relief is denied, "future presidents will be able to remake the United States code" through various hypothetical enforcement decisions. Pls.' Mot. at 32-33. Even if that absurd claim were true, it would not justify preliminary relief. There is more than enough

---

[40] *Winter*, 555 U.S. at 24 (internal quotation marks omitted).

[41] *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012) ("Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime.").

time for this Court to issue a final ruling on the merits (and even for subsequent appeals) before any "future president" could begin "remaking" the law.

In any event, Plaintiffs ignore the massive public interests weighing on the other side. As detailed above, states stand to benefit substantially from the directives at issue as immigrants are allowed to come out of the shadows, pursue legal work, and pay more in taxes. States also will not face as many difficult decisions about what to do with U.S. citizen children whose parents have been deported, and will benefit from the federal government's increased focus on deporting undocumented immigrants who commit crimes or otherwise threaten public safety. Additionally, state economies will benefit substantially from the temporary reprieve the directives grant. Undocumented immigrants are a sizable portion of the workforce in many industries, including in the Plaintiff states.[42] In agriculture and construction, for example, undocumented immigrants make up a large share of the workforce,[43] and many states—including plaintiff states—depend on these industries. It is at best specious and at worst hypocritical for Plaintiffs to complain about granting temporary relief from deportation for workers on whom their economies depend.

Also to be considered is the public interest of the families who will benefit from deferred action. The millions of people who will be eligible to remain in the United States temporarily under the immigration directives are mothers and fathers, sons and daughters. Many have been here for decades—the median length of residence for undocumented immigrants in the United

---

[42] *See, e.g.*, Pew Research, Jeffrey S. Passel & D'Vera Cohn, *A Portrait of Unauthorized Immigrants in the United States* (Apr. 14, 2009), *available at* http://www.pewhispanic.org/2009/04/14/a-portrait-of-unauthorized-immigrants-in-the-united-states/ (showing that undocumented immigrants make up roughly 10% of the workforce in Arizona and 8% in Florida and Texas).

[43] *See, e.g.*, *id.*; https://naws.jbsinternational.com/3/3status.php (graph from the Nat'l Agric. Workers Survey, Dep't of Labor, Emp't & Training Admin.).

States is 13 years[44]—and have been working hard, paying taxes, and contributing to their communities. Deporting such individuals harms their families, their communities, and their states. These are real public interests weighing against injunctive relief, not the speculative hyperbole offered by Plaintiffs.

In short, the equities and public interest weigh heavily in favor of denying preliminary relief. The Plaintiffs' claims of injury are at best speculative, while the amici States have shown real benefits of the immigration directives. And as the agency charged with balancing the factors that must be considered in making immigration enforcement decisions, Homeland Security is "far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities."[45] The Court should not intervene.

## C.    Plaintiffs Are Unlikely to Succeed On the Merits

The United States has detailed at length why Plaintiffs' claims are unlikely to succeed on the merits, and the amici States will not rehash those compelling arguments here. Amici add only that, as the chief law enforcement officers for their various states, the Attorneys General who have prepared this brief are deeply familiar with the notion of enforcement discretion. No government agency has the resources to pursue every violation within its purview. Decisions must be made and priorities adopted. In the immigration realm, federal law decisively places those decisions in the hands of the executive branch.[46] And the U.S. Supreme Court has repeatedly held that it is not the place of courts to second guess these sorts of enforcement

---

[44] Pew Research Ctr., Jeffrey S. Passel, et al., *As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled* 4 (Sept. 3, 2014), *available at* http://www.pewhispanic.org/2014/09/03/as-growth-stalls-unauthorized-immigrant-population-becomes-more-settled/.

[45] *Heckler v. Chaney*, 470 U.S. 821, 831-32, 105 S. Ct. 1649, 84 L. Ed. 2d 714 (1985).

[46] *See, e.g.*, *Arizona*, 132 S. Ct. at 2499; *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543, 70 S. Ct. 309, 94 L. Ed. 317 (1950) (stating that immigration is "a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program") (internal quotation marks omitted).

decisions, which are "generally committed to an agency's absolute discretion."[47] This Court should reject Plaintiffs' invitation to ignore this long line of decisions and insert itself into the executive branch's lawful exercise of enforcement discretion.

## CONCLUSION

Granting a preliminary injunction will prevent no harm to Plaintiffs but will hurt the amici States and the broader public. There is no legal basis to do so. The amici States ask that the Court accept their amicus brief and deny Plaintiffs' motion for preliminary injunction.

RESPECTFULLY SUBMITTED this 12th day of January 2015.

ROBERT W. FERGUSON
*Attorney General of Washington*

Noah G. Purcell, WSBA 43492
*Solicitor General*

*/s Anne E. Egeler*

Anne E. Egeler, WSBA 20258
*Deputy Solicitor General*
*Attorney-In-Charge*

Washington Office of Attorney General
PO Box 40100
Olympia, WA   98504-0100
360-753-6200 (office)
360-664-2963 (fax)
anneE1@atg.wa.gov

KAMALA D. HARRIS
California Attorney General
1300 I Street
Sacramento, CA   95814

George Jepsen
Connecticut Attorney General
55 Elm Street
Hartford, Ct   06106

---

[47] *Heckler*, 470 U.S. at 831 (1985) (citing *United States v. Batchelder*, 442 U.S. 114, 123-24, 99 S. Ct. 2198, 60 L. Ed .2d 755 (1979); *United States v. Nixon*, 418 U.S. 683, 693, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974); *Vaca v. Sipes*, 386 U.S. 171, 182, 87 S. Ct. 903, 17 L. Ed. 2d 842 (1967)).

14

Russell A. Suzuki
Hawai'i Attorney General
425 Queen Street
Honolulu, Hawaii   96813

Lisa Madigan
Illinois Attorney General
100 W Randolph Street   12th Floor
Chicago, IL   60601

Thomas J. Miller
Iowa Attorney General
1305 E Walnut Street
Des Moines, IA   50319

Brian E. Frosh
Maryland Attorney General
200 Saint Paul Place
Baltimore, MD   21202

Martha Coakley
Massachusetts Attorney General
One Ashburton Place
Boston, MA   02108

Hector H. Balderas
New Mexico Attorney General
PO Drawer 1508
Santa Fe, NM   87504-1508

Eric T. Schneiderman
New York Attorney General
The Capitol
Albany, NY   12224

Ellen F. Rosenblum
Oregon Attorney General
1162 Court Street NE
Salem, Oregon   97301

William H. Sorrell
Vermont Attorney General
109 State Street
Montpelier, VT   05609-1001

Karl A. Racine
District of Columbia Attorney General
One Judiciary Square
441 4th Street NW   Suite 1145 North
Washington, D.C.   20001

15

**CERTIFICATE OF SERVICE**

I hereby certify that service of the foregoing Amicus Brief Of The States Of Washington, California, Connecticut, Hawaii, Illinois, Iowa, Maryland, Massachusetts, New Mexico, New York, Oregon, and Vermont, and the District of Columbia In Support Of Defendants will be delivered electronically January 12, 2015, to counsel for plaintiffs and defendants through the District's Electronic Case Filing system.

*/s Anne E. Egeler*

Anne E. Egeler
  *Deputy Solicitor General*

# APPENDIX

APPENDIX

The appendix is listed in the order the authorities are used, with an indication as to which footnote the authority first appears in:

Note 1: *United States v. Bader*,
   No. 07-cr-00338-MSK, 2009 WL 2219258
   (D. Colo. July 23, 2009)..........................................................................A-1

Note 1: *Sierra Club v. Fed. Emergency Mgmt. Agency*,
   No. H-07-0608, 2007 WL 3472851
   (S.D. Tex. Nov. 14, 2007)....................................................................A-14

Note 4: *Maples v. Thomas*,
   No. 5:03-cv-2399-SLB-MHH, 2013 WL 5350669, *3
   (N.D. Ala. Sept. 23, 2013) ...................................................................A-18

Note 6: http://www.uscis.gov/immigrationaction
   (Executive Actions on Immigration) ...................................................A-22

Note 7: Memorandum from Jeh Charles Johnson, Secretary of Homeland
   Security, to Thomas S. Winkowski, Acting Director of U.S. Immigration
   and Customs Enforcement, et al. (Nov. 20, 2014),
   *available at* http://www.dhs.gov/sites/default/files/publications/
   14_1120_memo_secure_communities.pdf ...........................................A-27

Note 8: Memorandum from Gene McNary, INS Commissioner, to
   Regional Commissioners (Feb. 2, 1990),
   *available at* http://www.factcheck.org/UploadedFiles/2014/11/
   McNary-memo.pdf
   (*Re: Family Fairness: Guidelines for Voluntary Departure under 8 CFR
   242.5 for the Ineligible Spouses and Children of Legalized Aliens*)......................A-30

Note 9: American Immigration Council (Oct. 2014),
   *available at* http://www.immigrationpolicy.org/sites/default/
   files/docs/ executive_grants_of_temporary_immigration_relief_
   1956-present_final_4.pdf
   (*Executive Grants of Temporary Immigration Relief, 1956-Present*) ...................A-32

Note 10: Memorandum from Paul W. Virtue, Acting Executive Associate INS
   Commissioner, to Regional Directors et al. (May 6, 1997),
   *available at* http://www.asistahelp.org/documents/resources/Virtue_
   Memo_97pdf_ 53DC84D782445.pdf
   (*Re: Supplemental Guidance on Battered Alien Self-Petitioning Process
   and Related Issues*) ...............................................................................A-42

Note 14:   Migration Policy Inst., Jeanne Batalova, Sarah Hooker & Randy
          Cappys, *DACA at the Two-Year Mark: A Nat'l and State Profile of
          Youth Eligible and Applying for Deferred Action* (Aug. 2014),
          *available at* http://www.migrationpolicy.org/research/daca-two-year-
          mark-national-and-state-profile-youth-eligible-and-a pplying-deferred-
          action ............................................................................................................. A-52

Note 15:   American Immigration Council, Roberto Gonzales & Angie Bautista-
          Chavez, *Two Years and Counting: Assessing the Growing Power of
          DACA* (June 16, 2014),
          *available at* http://www.immigrationpolicy.org/special-reports/two-
          years-and-counting-assessing-growing-power-daca ................................. A-55

Note 16:   Dr. Raul Hinojosa-Ojeda, *From the Shadows to the Mainstream:
          Estimating the Economic Impact of Presidential Administrative Action
          and Comprehensive Immigration Reform* 17 (N. Am. Integration & Dev.
          Ctr., UCLA, Nov. 20, 2014),
          *available at* http://www.naid.ucla.edu/uploads/4/2/1/9/4219226/
          hinojosa_-_estimat ing_the_economic_impact_of_presidential_admini
          strative_action_and_comprehensive_immigration_reform_-_ucla
          _naid_center.pdf
          (pages 1-11 of a 31-page document) ....................................................... A-64

Note 19:   Migration Policy Inst., *National and  State Estimates of Populations
          Eligible for Anticipated Deferred Action and DACA Programs*
          (Nov. 2014) (Excel spreadsheet),
          *available at* http://www.migrationpolicy.org/sites/ default/files/
          datahub/US-State-Estimates-unauthorized-populations-executive-
          action.xlsx ...................................................................................................... A-75

Note 20:   Center for American Progress, *Executive Action On Immigration Will
          Benefit Washington's Economy*,
          *available at* http://www.scribd.com/doc/247296801/Economic-Benefits-
          of-Executive-Action-in-Washington ........................................................... A-79

Note 21:   Center for American Progress, *Topline Fiscal Impact of Executive
          Action Numbers for 28 States* (*Executive Action on Immigration Will
          Benefit State Economies*),
          *available at* http://www.scribd.com/doc/248189539/Topline-Fiscal-
          Impact-of-Executive-Action-Numbers-for-28-States ............................. A-81

Note 24:   *In re Guardianship of D.S.*,
          178 Wash. App. 681, 317 P.3d 489 (2013) ............................................. A-85

Note 26:   Pew Research Ctr., Jeffrey S. Passel, et al., *As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled* (Sept. 3, 2014), *available at* http://www.pewhispanic.org/2014/09/03/as-growth-stalls-unauthorized-immigrant-population-becomes-more-settled/ (in relevant part) .................................................................................................... A-90

Note 27:   Cato Inst., Alex Nowrasteh, *DACA Did Not Cause the Surge in Unaccompanied Children* (July 29, 2014), *available at* http://www.cato.org/blog/daca-did-not-cause-surge-unaccompanied-children ................................................................................ A-93

Note 28:   Migration Policy Inst., Marc R. Rosenblum & Kristen McCabe, *Deportation and Discretion: Reviewing the Record and Options for Change* (Oct. 2014), *available at* http://www.migrationpolicy.org/research/deportation-and-discretion-reviewing-record-and-options-change ..................................................... A-96

Note 30:   Pew Research Ctr., Jeffrey S. Passel & D'Vera Cohn, *State Unauthorized Immigrant Populations* (Nov. 18, 2014), *available at* http://www.pewhispanic.org/2014/11/18/chapter-1-state-unauthorized-immigrant-populations/#unauthorized-immigrant-population-share (in relevant part) .................................................................................................... A-98

Note 32:   same as Note 6 (see A-22)

Note 33:   http://www.dhs.gov/immigration-action (*Fixing Our Broken Immigration System*) ........................................................... A-100

Note 35:   Angela S. Garcia & David G. Keyes, *Life as an Undocumented Immigrant: How Restrictive Local Immigration Policies Affect Daily Life* (Mar. 26, 2012), *available at* https://www.americanprogress.org/ issues/ immigration/ report/2012/03/26/11210/life-as-an-undocumented-immigrant/ (in relevant part) .................................................................................................... A-102

Note 42:   Pew Research, Jeffrey S. Passel & D'Vera Cohn, *A Portrait of Unauthorized Immigrants in the United States* (Apr. 14, 2009), *available at* http://www.pewhispanic.org/2009/04/14/a-portrait-of-unauthorized-immigrants-in-the-united-states/ (in Relevant part) .................................................................................................... A-105

Note 43:   https://naws.jbsinternational.com/3/3status.php (graph from the Nat'l Agric. Workers Survey, Dep't of Labor, Emp't & Training Admin.) .................................................................................. A-107

Note 44:   same as Note 26 (see A-90)