# APPENDIX

APPENDIX

The appendix is listed in the order the authorities are used, with an indication as to which footnote the authority first appears in:

Note 1:     *United States v. Bader,*
            No. 07-cr-00338-MSK, 2009 WL 2219258
            (D. Colo. July 23, 2009)......................................................................... A-1

Note 1:     *Sierra Club v. Fed. Emergency Mgmt. Agency,*
            No. H-07-0608, 2007 WL 3472851
            (S.D. Tex. Nov. 14, 2007)...................................................................... A-14

Note 4:     *Maples v. Thomas,*
            No. 5:03-cv-2399-SLB-MHH, 2013 WL 5350669, *3
            (N.D. Ala. Sept. 23, 2013) .................................................................... A-18

Note 6:     http://www.uscis.gov/immigrationaction
            (Executive Actions on Immigration) ...................................................... A-22

Note 7:     Memorandum from Jeh Charles Johnson, Secretary of Homeland
            Security, to Thomas S. Winkowski, Acting Director of U.S. Immigration
            and Customs Enforcement, et al. (Nov. 20, 2014),
            *available at* http://www.dhs.gov/sites/default/files/publications/
            14_1120_memo_secure_communities.pdf .............................................. A-27

Note 8:     Memorandum from Gene McNary, INS Commissioner, to
            Regional Commissioners (Feb. 2, 1990),
            *available at* http://www.factcheck.org/UploadedFiles/2014/11/
            McNary-memo.pdf
            *(Re: Family Fairness: Guidelines for Voluntary Departure under 8 CFR
            242.5 for the Ineligible Spouses and Children of Legalized Aliens).....* A-30

Note 9:     American Immigration Council (Oct. 2014),
            *available at* http://www.immigrationpolicy.org/sites/default/
            files/docs/ executive_grants_of_temporary_immigration_relief_
            1956-present_final_4.pdf
            *(Executive Grants of Temporary Immigration Relief, 1956-Present)* ................... A-32

Note 10:    Memorandum from Paul W. Virtue, Acting Executive Associate INS
            Commissioner, to Regional Directors et al. (May 6, 1997),
            *available at* http://www.asistahelp.org/documents/resources/Virtue_
            Memo_97pdf_53DC84D782445.pdf
            *(Re: Supplemental Guidance on Battered Alien Self-Petitioning Process
            and Related Issues)* ........................................................................... A-42

Note 14:    Migration Policy Inst., Jeanne Batalova, Sarah Hooker & Randy
            Cappys, *DACA at the Two-Year Mark: A Nat'l and State Profile of
            Youth Eligible and Applying for Deferred Action* (Aug. 2014),
            *available at* http://www.migrationpolicy.org/research/daca-two-year-
            mark-national-and-state-profile-youth-eligible-and-a pplying-deferred-
            action..................................................................................................... A-52

Note 15:    American Immigration Council, Roberto Gonzales & Angie Bautista-
            Chavez, *Two Years and Counting: Assessing the Growing Power of
            DACA* (June 16, 2014),
            *available at* http://www.immigrationpolicy.org/special-reports/two-
            years-and-counting-assessing-growing-power-daca............................... A-55

Note 16:    Dr. Raul Hinojosa-Ojeda, *From the Shadows to the Mainstream:
            Estimating the Economic Impact of Presidential Administrative Action
            and Comprehensive Immigration Reform* 17 (N. Am. Integration & Dev.
            Ctr., UCLA, Nov. 20, 2014),
            *available at* http://www.naid.ucla.edu/uploads/4/2/1/9/4219226/
            hinojosa_-_estimat ing_the_economic_impact_of_presidential_admini
            strative_action_and_comprehensive_immigration_reform_-_ucla
            _naid_center.pdf
            (pages 1-11 of a 31-page document)....................................................... A-64

Note 19:    Migration Policy Inst., *National and  State Estimates of Populations
            Eligible for Anticipated Deferred Action and DACA Programs*
            (Nov. 2014) (Excel spreadsheet),
            *available at* http://www.migrationpolicy.org/sites/ default/files/
            datahub/US-State-Estimates-unauthorized-populations-executive-
            action.xlsx ........................................................................................... A-75

Note 20:    Center for American Progress, *Executive Action On Immigration Will
            Benefit Washington's Economy,*
            *available at* http://www.scribd.com/doc/247296801/Economic-Benefits-
            of-Executive-Action-in-Washington....................................................... A-79

Note 21:    Center for American Progress, *Topline Fiscal Impact of Executive
            Action Numbers for 28 States* (*Executive Action on Immigration Will
            Benefit State Economies*),
            *available at* http://www.scribd.com/doc/248189539/Topline-Fiscal-
            Impact-of-Executive-Action-Numbers-for-28-States ............................ A-81

Note 24:    *In re Guardianship of D.S.,*
            178 Wash. App. 681, 317 P.3d 489 (2013)............................................. A-85

Note 26:  Pew Research Ctr., Jeffrey S. Passel, et al., *As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled* (Sept. 3, 2014), *available at* http://www.pewhispanic.org/2014/09/03/as-growth-stalls-unauthorized-immigrant-population-becomes-more-settled/ (in relevant part) ......................................................................... A-90

Note 27:  Cato Inst., Alex Nowrasteh, *DACA Did Not Cause the Surge in Unaccompanied Children* (July 29, 2014), *available at* http://www.cato.org/blog/daca-did-not-cause-surge-unaccompanied-children .......................................................... A-93

Note 28:  Migration Policy Inst., Marc R. Rosenblum & Kristen McCabe, *Deportation and Discretion: Reviewing the Record and Options for Change* (Oct. 2014), *available at* http://www.migrationpolicy.org/research/deportation-and-discretion-reviewing-record-and-options-change ................................... A-96

Note 30:  Pew Research Ctr., Jeffrey S. Passel & D'Vera Cohn, *State Unauthorized Immigrant Populations* (Nov. 18, 2014), *available at* http://www.pewhispanic.org/2014/11/18/chapter-1-state-unauthorized-immigrant-populations/#unauthorized-immigrant-population-share (in relevant part) ......................................................................... A-98

Note 32:  same as Note 6 (see A-22)

Note 33:  http://www.dhs.gov/immigration-action (*Fixing Our Broken Immigration System*) ........................................... A-100

Note 35:  Angela S. Garcia & David G. Keyes, *Life as an Undocumented Immigrant: How Restrictive Local Immigration Policies Affect Daily Life* (Mar. 26, 2012), *available at* https://www.americanprogress.org/ issues/ immigration/ report/2012/03/26/11210/life-as-an-undocumented-immigrant/ (in relevant part) ......................................................................... A-102

Note 42:  Pew Research, Jeffrey S. Passel & D'Vera Cohn, *A Portrait of Unauthorized Immigrants in the United States* (Apr. 14, 2009), *available at* http://www.pewhispanic.org/2009/04/14/a-portrait-of-unauthorized-immigrants-in-the-united-states/ (in Relevant part) ......................................................................... A-105

Note 43:  https://naws.jbsinternational.com/3/3status.php (graph from the Nat'l Agric. Workers Survey, Dep't of Labor, Emp't & Training Admin.) ........................................................... A-107

Note 44:  same as Note 26 (see A-90)

2009 WL 2219258 (D.Colo.)

United States District Court,
D. Colorado.
UNITED STATES of America, Plaintiff,
v.
Thomas BADER, and Kevin Henry, Defendants.

Criminal Action No. 07–cr–00338–MSK.
July 23, 2009.

Gregory Hayze Rhodes, Jaime A. Pena, Tonya Shot-well Andrews, U.S. Attorney's Office, Denver, CO, for Plaintiff.

**OPINION AND ORDER GRANTING, IN PART, MOTION FOR RECONSIDERATION, AND RESERVING REMAINDER**

MARCIA S. KRIEGER, District Judge.

*1 THIS MATTER comes before the Court pursuant to the Government's Motion for Reconsideration (# 410) of the Court's April 7, 2009 oral ruling (# 401), Defendant Bader's response (# 418), the Court's April 21, 2009 Order Directing Supplemental Briefing (# 424) on several issues, the Government's supplemental brief (# 426), Mr. Bader's supplemental brief (# 432), the Government's reply brief (# 440), Mr. Bader's reply brief (# 441), and an *amicus curiae* brief by the International Academy of Compounding Pharmacists and the American Pharmacists' Association [FN1] (# 445).

> FN1. The American Pharmacists' Association has moved (# 456) to join in the International Academy of Compounding Pharmacists' *amicus* brief. That motion is granted and the American Pharmacists' Association prior motion for leave to file a separate *amicus* brief (# 442) is deemed withdrawn.

**BACKGROUND**

The Government commenced this criminal action against Mr. Bader and others on August 8, 2007. The allegations herein arise from Mr. Bader's actions, as a licensed pharmacist in the State of Colorado doing business through an entity named College Pharmacy, in which he filled prescriptions for patients whose doctors had instructed them to take human growth hormone ("HGH" or "sompatropin"). The current charging document, the Second Superseding Indictment (# 229), alleges 43 counts against Mr. Bader. Count 1, along with Counts 16 and 17, charge him with conspiracy to facilitate the sale of smuggled goods, 18 U.S.C. § 371, the "smuggled goods" being foreign-manufactured HGH—in violation of 18 U.S.C. § 371; Counts 2–11 charges him with mail fraud in violation of 18 U.S.C. § 1341, in that he made various false representations and omitted material information to patients about the HGH he was supplying them; Counts 13–15, along with Counts 21–43 charge him with distribution of HGH in violation of 21 U.S.C. § 333(e); and Counts 16 and 17 are not germane to the issues herein.

**A. The Definitional Issue**

As discussed in more detail below, the core issue in this case is whether the HGH imported by Mr. Bader was used by him as an ingredient in creating a "compounded" [FN2] drug that Mr. Bader later distributed to patients, or whether Mr. Bader simply repackaged and passed along to customers what was in essence an already a finished, consumer-usable drug. The significance of this distinction between a "compounded" drug and a finished drug relates the degree of regulation by the Food and Drug Administration ("FDA"). As discussed in more detail below, the FDA rigorously regulates the importation and distribution of finished drugs that are ready for distribution to consumers, but exercises relatively little regulatory oversight over the importation of drug ingredients to be used by pharmacists to create "compounded" drugs and over the distribution of such "compounded" drugs to consumers. Whether Mr. Bader was engaged in the act of "compounding" the HGH before distributing it raises both legal and factual issues. The charges in this case (and the defenses thereto) are predicated on the degree to which the FDA exercises a regulatory role over the HGH at issue; that question, in turn, is informed by the disparity of treatment between FDA regulation of finished drugs versus "compounded" drugs. This, then, requires assessment raises a legal issue—namely, what constitutes "compounding"?—the answer to which ultimately affects whether the Government may proceed on the charges it has asserted against Mr. Bader. Ascertaining a legal definition of the term "compounding" is the subject of this opinion. The ultimate questions of what actions Mr.

Bader performed and whether those actions meet the legal definition of "compounding" set forth herein are questions of fact that will eventually require resolution by a jury.

> FN2. Ascertaining a precise legal definition of the term "compounding" is the focus of this Opinion. The Court provides the following generalized and colloquial definition of the term, solely for purposes of context for readers who may be unfamiliar with the notion of "compounding" as it is practiced in the pharmaceutical industry.
>
> "Compounding" drugs involves a licensed pharmacist creating, from pharmaceutical ingredients, a specialized version of a particular drug in response to the specific needs of an individual patient. For example, if a patient requires drug X, but all available commercial formulations of drug X include, say, a coloring additive or binding agent that would cause allergies or other complications in the patient, a compounding pharmacist could assist the patient by creating, from scratch and using pharmaceutical ingredients, a customized version of drug X that lacked that additive or binding agent. Similarly, where a commercial drug is, say, only available in a pill form and the patient requires a liquid delivery, or where the commercial drug is available only in inappropriate dosage levels, a compounding pharmacist could create a unique version or dosage of the commercial drug that is more responsive to the patient's needs. The practice of compounding has been a cornerstone of the practice of pharmacy for centuries, and many states require all of their licensed pharmacists to have training and skill in the practice of compounding.

*2 The parties have not stipulated to the underlying facts, but in consideration of whether, as a matter of law, the Government can proceed upon its charges, the Court assumes that it would be able to establish the following [FN3]: Mr. Bader, and others, purchased HGH in bulk form from overseas suppliers. The bulk HGH shipments were routinely impounded by FDA in-

spectors at the border, who contacted Mr. Bader's agents for additional information about the shipments. In most circumstances, Mr. Bader's agents represented to the FDA inspectors that the HGH was being imported as an "active pharmaceutical ingredient" ("API") for use in drug compounding, rather than being a finished drug. This designation was important because importation of HGH as a finished drug was highly restricted, but to the extent that the HGH was an API, intended to be used by a pharmacist in the compounding of a finished drugs, it was not subject to such restrictions. Relying on the agents' representations that the HGH was being imported as an API to be used on compounded preparations, the inspectors released the shipments for delivery to Mr. Bader at College Pharmacy.

> FN3. The Court emphasizes that it is not making any factual findings regarding Mr. Bader's or others' conduct. Determination of the precise nature of the conduct that occurred will, of course, be a matter for the jury.

When a customer of College Pharmacy presented a doctor's prescription for HGH, Mr. Bader inspected the bulk HGH powder he had received for quality and potency, measured out the proper amount of bulk HGH powder into a single-dose container, separately packaged an appropriate quantity of saline for the consumer to mix with the powder, labeled and packaged the HGH dosage and the saline together, and supplied the two items to the customer. (The customer was responsible for actually mixing the saline and HGH before administering the drug.)

The gravamen of the charges in the Second Superseding Indictment is that in this activity, Mr. Bader did not "compound" the HGH; he simply repackaged it. As a consequence, the Government contends that at the time of its importation and thereafter, the HGH was a finished drug rather than an ingredient in a compounded drug. Accordingly, the "smuggled goods" counts are predicated on the assertion that Mr. Bader's agents secured the release of the impounded HGH shipments by making false representations about Mr. Bader's intentions (i.e. falsely stating he intended to treat the HGH as an API to be used in compounding, rather than admitting that he was simply going to repackage and distribute the finished drug), thus ren-

dering the released bulk HGH a "smuggled" good. The mail fraud charges allege that Mr. Bader made misrepresentations and omissions to doctors and pharmacy customers about the HGH—e.g. falsely representing it as a "compounded drug," and failing to correctly represent it as a finished drug that had not been approved by the FDA. The distribution charges entail the fairly straightforward accusation that Mr. Bader distributed finished HGH that had not been approved by the FDA.

### B. The Procedural Context

As trial approached, it became clear to the Court that there was no immediately apparent legal definition of the act of "compounding" pharmaceutical ingredients. As a result, the Court invited (# 377) the parties to brief the issue prior to trial. Both sides responded with relatively concise briefs (# 383, 384). The Government primarily relied upon *Thompson v. Western States Medical Center,* 535 U.S. 357, 377, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002), and its progeny. In *Western States,* the United States Supreme Court made reference to the notion that "compounding" involves "combin[ing], mix[ing], or alter[ing] ingredients." Mr. Bader urged the Court to adopt an unspecified definition contained in the U.S. Pharmacopoeia (a practice manual used in the pharmacy industry), or, in the alternative, to adopt the definition provided under Colorado law at C.R.S. § 12–22–102(6), which deems compounding to include such acts as simply repackaging or relabeling a drug. By oral ruling on April 7, 2009 (# 401), the Court concluded that no federal law defined compounding and therefore Colorado law would apply. In reaching that decision, the Court rejected the reference in *Western States* as being dicta, found that the U.S. Pharmacopoeia did not provide a workable definition of the term, and concluded that the FDA's traditional deference to state regulation of the practice of compounding warranted adopting a state law definition of that term.

*3 The Government then filed the instant Motion for Reconsideration (# 410), supplying additional authority and arguing that the Court's adoption of the Colorado definition—one which deemed acts as minimal as repackaging or relabeling a drug to constitute "compounding" and leave the ensuing drugs effectively unregulated by the FDA—would be in-

consistent with a definition of the term that the FDA has historically used, would be inconsistent with principles of statutory construction, would give undue effect to a state definition that was intended only to relate to issues of licensing, and would leave an unacceptable regulatory hole, among other things. If the Court nevertheless remained convinced that the Colorado definition was appropriate, the Government admitted that it would be unable to prove all but one of the HGH-related counts and requested that the Court dismiss those counts without prejudice.

Recognizing that the question of how to define the term "compounding" presented a more complex and nuanced question than the parties' initial briefing addressed, the Court directed (# 424) supplemental briefing on the Government's Motion for Reconsideration. Specifically, the Court requested that the parties address the following issues: (i) whether the operation of the Food and Drug Administration Modernization Act ("FDAMA"), 21 U.S.C. § 353a, is essential to the consideration of the charges in this case; (ii) assuming the operation of FDAMA is essential to the case, whether this Court would be required to address an issue as to the constitutionality of the act upon which other Circuit Courts have split; (iii) whether there was additional authority to consider in addressing what the appropriate definition of "compounding"; (iv) whether the absence of a meaningful definition of the term "compounding" would affect the constitutionality of FDAMA and the Government's ability to bring the charges here; and (v) if a definition of "compounding" could be ascertained, which party would have the burden of proving that the drugs at issue in this case were/were not "compounded." The Court has considered the supplemental briefs filed by the parties (# 430, 432), the parties' responses to each other's supplemental brief (# 440, 441), and an *amicus* brief filed by two pharmacy industry groups (# 445).

### ANALYSIS

### A. Historical context of FDAMA

A full understanding of the issues presented here requires some appreciation of the historical context of FDA regulation as it relates to "compounded" drugs. Comprehensive federal regulation of pharmaceuticals began in 1938, with the passage of the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.* As relevant here, the FDCA purported to regulate all

"new drugs." A new drug is defined as "any drug ... the composition of which is such that such drug is not generally recognized [among experts] as safe and effective for use under the conditions prescribed." 21 U.S.C. § 301(p). Pursuant to 21 U.S.C. § 355(a), any new drug must have undergo "new drug approval" ("NDA") by the FDA before the drug can be sold in interstate commerce. That statute goes on to describe the manner in which NDA is obtained, but it is sufficient to note for purposes of this ruling that the NDA process can be extensive and prolonged.

\*4 The effect that the FDCA had on the traditional practice of compounding drugs remains a subject of significant debate. Compounded drugs, which are typically created on an *ad hoc* basis and in limited quantities for particular patients at the request of a treating physician, are not particularly susceptible to individualized regulation under the NDA paradigm. Simply put, it would be impractical for a pharmacy to have to go through the extensive NDA process each and every time a patient needed a particular drug compounded in a particular way. *See generally Medical Center Pharmacy v. Mukasey,* 536 F.3d 383, 398 & n. 31, 32 (5th Cir.2008) (discussing the unsuitability of the NDA process for compounded drugs). However, practicality aside, the FDCA contains no exception to the definition of a new drug for one that is compounded. Thus, on its face, the FDCA is susceptible to an interpretation that would require all compounded drugs to go through the NDA process. *Id.* at 397.

For half a century, practicality prevailed—the FDA simply declined to exercise any authority it might have exerted over compounded drugs, electing to defer to the state regulation of pharmacists who engaged in the practice of compounding. *Western States,* 535 U.S. at 362. However, in the 1990's, the FDA became increasingly concerned about pharmacies that "compounded" large batches of drugs for widespread, interstate sale. The FDA believed that these pharmacies were exploiting a loophole in the regulatory scheme, using the lack of federal regulatory oversight of compounded drugs to evade the NDA process, allowing the pharmacists a competitive advantage over manufacturers of similar drug products. *See e.g. Professionals and Patients for Customized Care v. Shalala,* 56 F.3d 592, 593 (5th Cir.1995); *U.S. v. Baxter Healthcare Corp.,* 901 F.2d 1401, 1402–06

(7th Cir.1990) (describing one such operation drawing the attention of the FDA).

The FDA first attempted to deal with this "compounding loophole" in 1992. The FDA issued Compliance Policy Guide ("CPG") 7132.16, a document intended to provide advice to FDA employees and industry practitioners about FDA policies. *Patients for Customized Care,* 56 F.3d at 596. Because the 1992 CPG was effectively superseded prior to the events at issue here, it is not necessary for the Court to set forth the terms of that document in detail. It is sufficient to observe that the 1992 CPG iterated the FDA's continued intention to permit pharmacies to "extemporaneously compound[ ] reasonable quantities of human drugs upon receipt of a valid prescription," subject only to the regulation and control of state authorities. But the CPG noted that the FDA would "exercise its enforcement discretion" if it concluded that the actions of a pharmacy nominally engaged in compounding drugs "raises the kind of concerns normally associated with a manufacturer." *Patients for Customized Care,* 56 F.3d at 594. The CPG went on to list nine factors that would be considered by the FDA in determining whether a pharmacy's conduct constituted "traditional compounding" or "manufacturing." Among those factors were: (i) that the drugs were compounded in significant amounts before a prescription was received; (ii) the APIs used in the compounding were not from FDA-registered suppliers; (iii) the products were being distributed to third parties for resale to customers, rather than to customers themselves; and (iv) the compounded products were essentially copies of commercially-available products.

\*5 In 1997, Congress incorporated many of the provisions of the 1992 CPG into formal legislation in the form of FDAMA, 21 U.S.C. § 353a. That statute expressly provides that certain portions of the FDCA—including the NDA provisions of § 355—"shall not apply to a drug product if the drug product is compounded for an identified individual patient based on the unsolicited receipt of a valid prescription order ... [and] if the drug product meets the requirements of this section." 21 U.S.C. § 353a(a). Thus, under FDAMA, a "compounded" drug is exempt from the NDA approval process if: (i) it is compounded by a licensed pharmacist pursuant to a

(n.1)

valid prescription issued to an individual patient (or is prepared in limited quantities in anticipation of receiving a prescription based on prior business history), 21 U.S.C. § 353(a)(1), (2); (ii) the APIs and compounding techniques used comply with industry standards set forth in the U.S. Pharmacopeia or other sources, 21 U.S.C. § 353a(b)(1)(A), (B); (iii) the compounded drug is not one that appears on an FDA list of specific drugs deemed to be unsafe, 21 U.S.C. § 353a(b)(1)(C); (iv) the compounding does not produce "inordinate amounts" of a drug that is "essentially [a copy] of a commercially available drug product," 21 U.S.C. § 353a(b)(1)(D); (v) the drug is not one that the FDA has specifically designated as being unsuitable for compounding, 21 U.S.C. § 353a(b)(3)(A); (vi) conditions are met that ensure that the pharmacy is not producing "inordinate amounts of compounded drug products," [FN4] 21 U.S.C. § 353a(b)(3)(B); and (vii) the pharmacy must refrain from advertising or promoting the compounding of any particular drug or class of drugs, 21 U.S.C. § 353a(c).[FN5]

> FN4. Specifically, the pharmacy must be in a state that has entered into a "memorandum of understanding" with the FDA concerning interstate distribution of "inordinate amounts of compounded drug products" or, in the alternative, interstate sales of compounded drugs must constitute 5% or less of the total number of prescriptions filled by the pharmacy.

> FN5. FDAMA does contain a provision entitled " 'Compounding' defined," but that definition operates by exclusion, stating that the term " 'compounding' does not include mixing, reconstituting, or other such acts that are performed in accordance with directions contained in approved labeling provided by the product's manufacturer." 21 U.S.C. § 353a(f). That definition does not appear to be of significance here.

Shortly after FDAMA's enactment, a number of pharmacists brought a First Amendment challenge against the portion of FDAMA that prohibited compounding pharmacies from advertising or promoting certain compounded drugs. In *Western States Medical Center v. Shalala*, 238 F.3d 1090 (9th Cir.2001), the Ninth Circuit found that the advertising restrictions

violated the First Amendment, concluding both that the provision failed to advance the Government's purported justifications and further, that less-restrictive alternatives could adequately serve the Government's stated interests. *Id.* at 1093–96. That Court went on to find that the constitutionally-impermissible restriction on advertising was not severable from the remainder of FDAMA, and determined that the entire act was unconstitutional. *Id.* at 1096–98.

The Supreme Court affirmed the Ninth Circuit's decision in *Thompson v. Western States Medical Center,* 535 U.S. 357, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002) (hereafter "*Western States* "), agreeing that the advertising restriction unconstitutionally abridged pharmacists' freedom to engage in commercial speech. *Id.* at 366–77. However, the Court expressly noted that the issues presented for review did not extend to the Ninth Circuit's ruling on severability, and the Court declined to address that question. *Id.* at 360. Thus, the effect of *Western States* was to affirm the conclusion that the advertising restriction in FDAMA was unconstitutional nationwide, and by operation of the Ninth Circuit ruling, FDAMA was deemed to be void in its entirety (at least in the Ninth Circuit).

*6 In response to *Western States,* the FDA quickly returned to the 1992 CPG, revising it to reflect the change in the legal landscape. In 2002, it issued CPG 460.200 [FN6] that states that "the FDA is considering the implications of [*Western States* ] and determining how it intends to regulate pharmacy compounding in the long term." The 2002 CPG was intended to detail the FDA's position with regard to regulatory enforcement against compounding pharmacists until a more formal statement of FDA policy was delivered. (The parties agree that, notwithstanding the language in the 2002 CPG, no revised policy statement has yet been issued.)

> FN6. www. fda. gov/ICECI/Com pliance-Manu-als/CompliancePolicyGuidanceManual/ucm074398.htm

In most material respects, the 2002 CPG was identical to the 1992 CPG. However, after summarizing the history described above, the 2002 CPG's "Background" section concludes with the statement that due to the Ninth Circuit's ruling, "all of [*i.e.*

(n.1)

FDAMA] is now invalid." The 2002 CPG goes on to "issue guidance to the compounding industry on what factors the Agency will consider in exercising its enforcement discretion regarding pharmacy compounding ." It emphasizes that the FDA will continue defer to state regulation of the traditional practice of compounding, but notes that "when the scope and nature of a pharmacy's activities raise the kinds of concerns normally associated with a drug manufacturer," the FDA will consider taking regulatory action. It recited the same nine factors found in the 1992 CPG, stating that the FDA will consider these factors in determining whether the pharmacy's actions constitute the traditional practice of compounding or manufacturing. *Id.; Wedgewood Village Pharmacy, Inc. v. U.S.,* 421 F.3d 263, 272 n. 11 (3d Cir.2005) (quoting the nine factors).

As relevant to the issues herein, the legal landscape regarding compounded drugs remained unchanged from the 2002 CPG until 2006. In *Medical Center Pharmacy v. Gonzales,* 451 F.Supp.2d 854 (W.D.Tx.2006), a number of compounding pharmacies, including Mr. Bader's College Pharmacy, sought a judgment declaring, among other things, the FDA lacked the authority to regulate compounded drugs because they do not fall within the "new drug" definition of the FDCA. *Id.* at 856–57. Noting that it was not bound by the Ninth Circuit's declaration that FDAMA was unconstitutional in its entirety, the trial court observed that FDAMA "exempted compounded drugs from the FDA's drug approval process." *Id.* at 861–62. Concluding that it had to independently assess the question of whether FDAMA's non-advertising provisions were severable, the court found that the unconstitutional advertising restriction was severable from the remainder of FDAMA, allowing the remainder of the statute to remain in effect. Turning to the question of what effect the viable portions of FDAMA had on the FDA's ability to regulate compounded drugs under the "new drug" provisions of the FDCA, the court explained that "Congress intended to declare that compounding is an approved and legal practice," and concluded that "any drugs created by the compounding process are authorized under [FDAMA] and are therefore implicitly exempt from the new drug approval process." *Id.* at 863. The court noted, however, that "the exemption for compounded drugs from the new drug definition is limited to compounds which are made in reasonable quantities upon receipt of a valid prescription for an individual patient from a licensed practitioner[; d]rugs that are compounded in large quantities before a prescription is received from a doctor do not fall within the narrow exemption this Court finds exists." *Id.* Thus, for all practical purposes, the trial court's ruling was that those drugs that were both: (i) compounded, and (ii) otherwise in compliance with the provisions of the now-reanimated FDAMA, were not subject to the NDA process.

**\*7** The Government appealed that decision to the Fifth Circuit Court of Appeals. In *Medical Center Pharmacy v. Mukasey,* 536 F.3d 383 (5th Cir.2008) ("*Medical Center* "), the Fifth Circuit agreed that the unconstitutional advertising restrictions in FDAMA were severable, thereby allowing the remainder of the act to be effective. *Id.* at 401–06. However, it reversed the trial court's blanket conclusion that compounded drugs (that otherwise complied with FDAMA) were *exempt* from FDA regulation. Instead, the Fifth Circuit explained that such drugs are "neither *uniformly* exempt from the new drug approval requirements nor *uniformly* subject to them. Properly construed, [the FDCA and FDAMA] create[ ] a *limited* exemption from the new drug approval requirements for compounded drugs that comply with the conditions explicitly delineated in FDAMA." *Id.* at 394 (emphasis in original). Although nominally a reversal of the trial court based upon a more nuanced analysis, the practical effect of the Fifth Circuit's conclusion is the same as that reached by the trial court: (i) FDAMA (other than the advertising restriction) remains viable in the Fifth Circuit (and, logically, in any jurisdiction outside the Ninth Circuit that finds it sufficiently persuasive on that point); and (ii) compounded drugs *that comply with the terms of FDAMA* enjoy an exemption from NDA requirements.

With this history in mind, the Court turns to the specific questions posed to the parties.

**B. Whether consideration of FDAMA is essential to this action**

The first question posed by the Court was whether the operation of the provisions of FDAMA is essential to the consideration of the charges against Mr. Bader. The Government takes the position that Mr. Bader's

HGH was imported, repackaged, and distributed by Mr. Bader to customers in an essentially unchanged, finished form. As such, the Government contends that it was a "new drug" under the FDCA, subject to NDA requirements and the penalties that accompany failure to comply with such requirements. The Government's position is that FDAMA is not germane to its view of the events, but concedes that the statute would supply Mr. Bader with a potential affirmative defense—that the drug was "compounded" and thus statutorily exempt from the NDA process—should he choose to invoke it. (The necessarily implication from the Government's position is that, because Mr. Bader has no valid defense without FDAMA, the statute is essential to Mr. Bader and he will be forced to invoke it.)

Mr. Bader's contention is also that FDAMA is irrelevant, but he reaches that conclusion from a different chain of reasoning. He notes that the conduct at issue here occurred post-*Western States* and pre-*Medical Center*—that is, a time when it appeared to all involved that FDAMA was void in its entirety. Thus, he contends that because even the FDA considered FDAMA to be invalid during the time frame at issue here, it would be improper for the Court to attempt to apply it. Furthermore, he argues that he does not need FDAMA to create a defense for him, as he was entitled to rely on the trial court's ruling in *Medical Center,* which he construes as standing for the proposition that compounded drugs are categorically exempt from the NDA requirements. [FN7]

> FN7. A necessary factual premise in Mr. Bader's argument is that his HGH was indeed "compounded", which circles back to the definition of compounding.

*8 The conduct alleged in the Second Superseding Indictment occurred over the period from roughly April 2004 to June 2007. During that period of time, the confluence of the Supreme Court and Ninth Circuit decisions in the *Western States* case had rendered FDAMA entirely void, at least within the Ninth Circuit. Mr. Bader and the *amici* contend that the FDA thereafter conceded the position that FDAMA was void nationwide, and there is at least some indication in the public 2002 CPG that the FDA informed the public that it intended to proceed as if FDAMA was void in its entirety. CPG 460.200, *supra.* ("Accordingly, all of [FDAMA] is now invalid").

Because the FDA considered FDAMA to be void during the timeframe of the conduct at issue, Mr. Bader argues that it would be improper to apply the statute in this case. Assuming, without necessarily finding, that the FDA's own view of the status of FDAMA is dispositive of the question of whether FDAMA applies, the 2002 CPG is significant evidence that FDAMA should not be given effect here. However, like the phoenix rising from its own ashes, the death of FDAMA gave rise to a new regulatory paradigm, the 2002 CPG. Any pharmacist who relied upon the 2002 CPG as proof that the FDA was laying FDAMA to rest was simultaneously put on notice that the FDA nevertheless intended to continue to administratively exercise enforcement discretion very similar to that previously reflected in statute. There are minor differences in wording between FDAMA and the 2002 CPG which give rise to slightly different obligations, but the ultimate thrust of both pronouncements are the same: drugs produced by "traditional compounding" are of little concern to the FDA, but if compounding starts to resemble "manufacturing"—*i.e.* when certain specific factors are present—the FDA will require the resultant compounded drugs to undergo the NDA process. Both documents describe a "safe harbor" to which compounding pharmacists can conform their conduct in order to avoid NDA requirements attaching to their products.

Mr. Bader argues that he needs no safe harbor because the trial court in *Medical Center* ruled that the FDA to had no authority to regulate compounded drugs in any capacity. He further argues that because both the Government (through the FDA) and he (through College Pharmacy) were parties to that action, the decision should be given preclusive effect here. This argument is misplaced for several reasons. First, the trial court's ruling was in 2006, and even assuming it could justify Mr. Bader's conduct after August 30, 2006 (the date of the trial court's decision), the ruling provides him no shelter for conduct occurring prior to that date. Many of the allegations in the Second Superseding Indictment predate such ruling.

Second, and more importantly, the argument misreads the actual holding of the trial court. The trial court's ruling in *Medical Center* was expressly premised upon the court's finding that the non-advertising provisions of FDAMA were severable, and thus re-

mained effective:

> *9 the *remaining* [severable] *provisions* of [FDAMA] demonstrate that Congress intended to declare that compounding is an approved and legal practice. The existence of *the remaining portions of the statute* permit pharmacies to compound drugs. Because pharmacies are permitted to compound, this Court finds that any drugs created by the compounding process *are authorized under [FDAMA]* and are therefore implicitly exempt from the new drug approval process....

451 F.Supp.2d at 863 (emphasis added). Mr. Bader may wish that the court had concluded that the FDCA's "new drug" definition did not apply to compounded drugs under any circumstance, but it is clear that the trial court concluded that *only* those compounded drugs that complied with the safe harbor language of FDAMA avoided the NDA process. *Id.* ("[d]rugs that are compounded in large quantities before a prescription is received from a doctor do not fall within the *narrow exemption* this Court finds exists") (emphasis added). Thus, contrary to Mr. Bader's argument that the trial court's decision stands for the proposition that "regardless of the status of FDAMA, ... compounded drugs were not new drugs," this Court understands the trial court's decision in *Medical Center* to be more limited—*that only drugs compounded in compliance with the restrictions set forth in FDAMA fall outside FDA regulation and the NDA process.*[FN8]

> FN8. Assuming that the trial court's decision in *Medical Center* swept as broadly as Mr. Bader contends, there remains the question of how that ruling applies to the conduct at issue here in light of the 5th Circuit's subsequent reversal. Although Mr. Bader has cited to some authority loosely standing for the proposition that charges of criminal conduct are assessed in the light of the law that existed at the time, there remains an unsettled question of the extent to which he would be permitted to rely on the trial court's opinion in *Medical Center* while the appeal of that decision was pending before the 5th Circuit. The parties were not asked to brief the question of when a criminal defendant is entitled to rely upon a court ruling that is undergoing

a pending appeal, and the Court confesses that its research reveals no clear answer on that point. Nevertheless, in light of its analysis here, the Court need not attempt to resolve this issue.

Because the trial court opinion in *Medical Center* does not sweep as broadly as Mr. Bader contends, the Court concludes that the law in effect at the time of the conduct herein exempted compounded drugs from the NDA process only when those drugs were *both*: (i) compounded, and (ii) created within the limitations contained in FDAMA/the 2002 CPG.[FN9] The second prong of that test makes clear that Mr. Bader's conduct must comply with the safe harbor provisions of FDAMA/the 2002 CPG in order to avoid FDA regulation through the NDA process. Accordingly, *either* FDAMA *or* the 2002 CPG [FN10] are essential to the definition of whether a practice constitutes compounding. Only those compounded drugs that fall within the specific provisions of FDAMA or the 2002 CPG are exempt from the NDA regulation process.

> FN9. Mr. Bader extensively argues that both legislative history from negotiations over FDAMA and a 1989 "smoking gun memo" from the FDA support the proposition that the FDA *never* had any power to regulate compounded drugs, whether "traditionally compounded" or "manufactured." This evidence might be fascinating to a legal historian attempting to answer the question of whether such power existed prior to FDA-MA, but they are not persuasive in the post-FDAMA context. Notwithstanding any uncertainty it may have harbored in 1989, the 1992 CPG clearly advised the public that the FDA believed it had the authority to exert regulatory power over certain compounded drugs. Any lingering doubts on that question were resolved in 1997 by the passage of FDAMA, whose very operation implicitly affirms the notion that the FDA possesses the power to regulate compounded drugs; no FDAMA-described safe harbor would have been necessary if the FDA indeed lacked the power to regulate compounded drugs. *See e.g. Medical Center*, 536 F.3d at 400 ("with only the original FDCA's text ... and uncer-

tain evidence of congressional intent, this might have been a difficult [issue]. A subsequent amendment to the FDCA *[i.e.* FDAMA] however, makes it easy").

FN10. Because the provisions of FDAMA and the 2002 CPG are so similar, it is not essential at this time for the Court to conclusively determine which one actually applied to the conduct at issue here. The Court is confident that resolution of that question one way or the other will have only imperceptible effects on how the jury is instructed, and indeed, anticipates that the question is so insignificant in its effect that the parties may be able to reach an agreement as to which document's terms control.

### C. Whether FDAMA's provisions are severable

Mr. Bader's initial position is that because he does not consider it appropriate for the Court to apply the terms of FDAMA to this case, it is unnecessary for the Court to reach the question of whether the unconstitutional advertising restriction is severable from the rest of FDAMA. However, he offers an alternative argument on the substantive issue, asserting that *Medical Center* provides the proper analysis and conclusion on the issue of severability. Thus, the Court understands that him to contend that the advertising restriction is severable and that the remainder of FDAMA retains constitutionally viable.

As can be expected when faced with an unresolved circuit split, the Government's position on this question is stated with a degree of nuance: it asserts that the FDA deems the *Medical Center* analysis—that FDAMA is severable and largely viable—to apply to pharmacies operating in the Fifth Circuit, as well as those pharmacies outside the Fifth Circuit that were nevertheless parties to the *Medical Center* case.[FN11] Because Mr. Bader was one of those parties, the Court understands the Government's position here to be that FDAMA is severable. Thus, the parties are in agreement on this point, and the Court sees nothing in the *Medical Center* decision that is so palpably incorrect that applying its rule would clearly be error. Accordingly, to the extent it is necessary for the Court to reach the severability question in this case, it would adopt the *Medical Center* analysis and conclude that the non-advertising portions of FDAMA are viable.

FN11. As to all other pharmacies, the FDA's position is that the 2002 CPG controls.

### D. Definition of "compounding"

*10 Thus, at long last, the analysis reaches the pivotal question of whether, under federal law, there is a controlling definition of the term "compounding." To sharpen the dispute somewhat, the Court notes that the Government contends that Mr. Bader's actions were not "compounding" because they were little more the simple "repackaging" of the bulk HGH.[FN12] Thus, the fundamental question is whether the definition of the term "compounding," as that term is used in either FDAMA or the 2002 CPG, sufficiently encompasses actions as simple as mere "repackaging" of bulk HGH.

FN12. Once again, the Court emphasizes that it makes no factual findings in this Order. The Court is cognizant that in this discussion, it often oversimplifies the parties' positions, but it does so knowingly, and for the purpose of highlighting the fundamental aspect of the dispute.

In consideration of the initial submissions by the parties on this question, the Court concluded that federal law did not define compounding and therefore concluded that state law—in this case, C.R.S. § 12–22–102(6)—provided the appropriate definition of the term. Compounding, under Colorado law, includes "[re]packaging" of a drug product. C.R.S. § 12–22–102(6) The Government argues that this conclusion is in error, and that a definition that deems "compounding" to occur only when a pharmacist actually mixes or combines multiple ingredients to create a finished drug is more appropriate. Using its preferred definition, the Government reasons that Mr. Bader's mere repackaging an otherwise finished drug does not constitute "compounding."

The Court will not restate its prior reasoning rejecting the Government's contention that rejected any purported definition contained in *Western States*. The Court also finds that the Government's supplemental arguments in favor of its preferred definition without merit. It is undisputed that Congress could have, but did not ever affirmatively define the term "compounding." Neither the FDCA nor FDAMA purport to contain an affirmative definition of the term "compounding." Indeed, the Government points to no par-

ticular evidence suggesting that Congress even entertained a specific understanding of the meaning of that term. Nor does it appear that the FDA adopted a formal definition for purposes of enforcement. The 1992 CPG, the forefather of FDAMA, contained none. The best that can be said is that the 1992 CPG, like FDAMA, defined the term only by negative implication, identifying those acts that were not consistent with the notion of "compounding." Unfortunately, none of the specifically-identified acts shed light on the key issue here: whether simply repackaging a drug constitutes "compounding."

The Government's supplemental briefing raises two additional major arguments in favor of its definition of "compounding": (i) "compounding" is a "term of art," having a clear and uniform meaning understood both by the FDA (as embodied in certain FDA publications dating back to 2003, as well as in 20 "warning letters" sent by the FDA to compounding pharmacies between March 2006 and December 2008) and those in the pharmacy industry, and that the Court can assume that Congress intended to adopt that settled definition; and (ii) that the term "compounding" has a "common and ordinary meaning," ascertainable from dictionaries, and that Congress intended to adopt that common meaning. The Court has carefully considered these arguments, but finds them to be without merit for two reasons. First, it is incumbent upon Congress to state its understanding of the terms it uses and improper for a court to speculate as to its intentions, especially where there is none evident in the legislative history and Congress as well as the FDA deferred to the states in regulation of the practice. Second, as is highlighted in the *amici,* the contention that there is a universally-understood definition of compounding within the industry, is belied by the fact that states have promulgated varying definitions. For example, Alabama defines "compounding" in the conjunctive, apparently requiring a pharmacist to "prepar[e], mix[ ], assembl[e], package[ ], *and* label[ ] a drug." Ala.Code § 34–23–150(3) (emphasis added); *see also* Oh. Rev.Code § 4729.01(C). Other states, including Colorado, use a similar definition phrased disjunctively, apparently deeming a pharmacy to be "compounding" any time it performs *any* of the listed acts (*e.g.* when merely repackaging). C.R.S. § 12–22–102(6); *see also* Ak. Stat. § 08.08.480(3);

Ga.Code § 26–4–5(4); Mt. Stat. § 37–7–101(7); N.D. Stat. § 43–15–01(24). Kentucky uses an entirely different definition—"compounding" is the "the preparation or labeling of a drug," which, in turn, can include simple repackaging or reconstitution of a finished drug. K.R.S. § 315.010(5). Simply put, in many states, a pharmacist who simply repackages or relabels a drug is engaged in the act of "compounding." The variances among definitions stand in sharp contrast to the Government's contention that there is a single, commonly-accepted industry or common definition of the term "compounding," and even more forcefully refutes the contention that any commonly-accepted definition necessarily excludes simple repackaging.[FN13]

> FN13. The Court is also unpersuaded that the FDA materials cited by the Government reflect a purposeful regulatory definition of the term "compounding." The various FDA surveys cited in the Government's brief do contain the language quoted by the Government, but in a context that is not particularly apropos of the remainder of the document and does not purport to be setting forth a definition intended to guide pharmacies in conforming their behavior. The warning letters issued by the FDA specifically cite *Western States* as the authority for its definition of the term, a citation this Court has already found to be dicta. Moreover, to the extent that these documents can be said to reflect a consistent FDA interpretation of the term "compounding," the Court notes that these documents all post-date *Western States,* suggesting that the FDA, like the Government here, has attributed more weight to the "definition" in that case than such dicta can bear.

*11 Recognition of state-law definitions of the term "compounding" is entirely consistent with the FDA's decades-long practice of deferring to state regulation of compounded drugs. Indeed, even when the FDA became concerned in the 1990s that some pharmacies were abusing the compounding loophole, the FDA did not attempt to close that loophole in part by promulgating a definition of "compounding" to prevent pharmacies in Alaska, Colorado, Kentucky,

(n.1)

and elsewhere from merely repackaging finished drugs and calling it "compounding.". To the contrary, the 1992 CPG expressly noted the FDA's intention to continue the practice of deferring to the states to define and regulate the compounding of drugs, and purported to flex the FDA's regulatory muscle only in specifically-defined category of situations in which the compounding in question carried certain specific indicia of "manufacturing." Similarly, FDAMA underscores the FDA's willingness to continue to allow states to take the lead role in regulating drug compounding. *See e.g.* 21 U.S.C. § 353a(3)(B)(i) (allowing states to enter into a "memorandum of understanding" in which the state, not the FDA, will be responsible to investigate complaints of excessive interstate shipments of purportedly "compounded" drugs). The FDA's longstanding policy of deferring to state regulation of compounded drugs—a history reaffirmed by the FDA in the 1992 and 2002 CPGs and by Congress in FDAMA—strongly suggests that state law is the appropriate place to look for a legal definition of the term "compounding" as used in FDAMA.

Accordingly, the Court, having reconsidered the issue in light of the parties' supplemental briefing, nevertheless concludes that the appropriate definition of "compounding" remains that provided by C .R.S. § 12–22–102(6).[FN14]

> FN14. The Court acknowledges that deference to state definitions of the term theoretically result in awkward situations. It results in a patchwork regulatory framework, where acts in one state might constitute "compounding" and thus likely be exempt from FDA scrutiny, while those same acts would not enjoy such deference in another state. Moreover, the Court acknowledges the Government's concern that some states define the term so broadly that nearly every action by a pharmacist constitutes "compounding," removing nearly all federal regulatory oversight from the commercial drug distribution process. But these effects are the direct result of the FDA's decision to defer to state regulation of  drug compounding. Leaving a matter to the states for regulation invariably will result in a variety of different regulatory approaches with varying degrees of strictness. In any event, the most egregious forms of abuse contemplated by the Government can be prevented by the FDA simply by invoking the terms of the CPG/FDAMA as discussed *infra.*

That is not the end of the inquiry, however. Although the FDA may have deferred wholesale to state regulation of compounded drugs for half a century, it is clear that the FDA began to chip away the edges of that deference by the 1990s. The 1992 CPG, FDAMA, and the 2002 CPG all make clear that the FDA is content to allow "traditional compounding" to remain the subject of state regulation, but that the FDA intends to regulate "manufacturing" conducted under the guise of compounding. There is no reason why the state definition of "compounding" and the CPG/FDAMA definition of circumstances that subject even "compounded" drugs to federal regulation cannot simultaneously co-exist. The CPG/FDAMA specifically define those circumstances in which a pharmacy may be nominally complying with state laws governing compounding but has nevertheless crossed over into the realm of "manufacturing," thus warranting FDA scrutiny.

In other words, the CPG/FDAMA operates as a limited revocation of the FDA's deference to state regulation of "compounded" drugs. Those drugs which are "compounded" under state law nevertheless may be regulated if they fall within one or more of the criteria set forth in the CPG/FDAMA. In such event, although they are "compounded" (but not "traditionally compounded"), they nevertheless also bear indicia of "manufacturing" that is clearly within the bailiwick of FDA regulation. As a consequence, they lose the exemption from the NDA process that "traditionally compounded" drugs enjoy. *Accord Medical Center,* 536 F.3d at 405. Although the precise contours of the boundary between "traditional compounding" and "manufacturing" are slightly different, depending on whether the controlling enactment is FDAMA or the CPG, Mr. Bader has long been on notice of the criteria by which the FDA would determine whether a nominally "compounded" drug would cross that boundary and the consequences (i.e. loss of the NDA exemption) that will flow from crossing that line.

A-11                                                     (n.1)

*12 Thus, with regard to the question of compounding, the jury will be instructed in two phases: (i) that "compounding" is defined according to the terms of Colorado law as set forth in C.R.S. § 12–22–102(6); and (ii) that a drug that is otherwise "compounded" according to that definition may still be subject to NDA requirements and other regulatory burdens if it runs afoul of the terms of the CPG/FDAMA (whichever the Court ultimately concludes in applicable). Because the Colorado definition of "compounding" is so broad, it is likely that Mr. Bader may succeed on the first prong. But if the evidence establishes that in the course of compounding the HGH (under the Colorado definition), Mr. Bader used unapproved APIs, or compounded inordinate amounts of drug products that were copies of a commercially-available product, or otherwise strayed into one of the categories of prohibited activity specified in the CPG/FDAMA, the jury may find that he crossed the line from "traditional compounding" to "manufacturing" under federal law. In that circumstance, they may find that he was subject to the NDA process and various other aspects of FDA regulation.

The Government identified those claims that would be affected if the Court concluded that "compounding" was defined by state law, but that identification was apparently based on the conclusion that the definitional question was a binary one. Where both the state definition of "compounding" and the provisions of the CPG/FDAMA can apply simultaneously, the Government's position may be different. Indeed, the Government's response (# 440) to Mr. Bader's supplemental brief suggests that it believes it can prove that even if Mr. Bader was "compounding" under Colorado law, his actions are not exempt from FDA regulation because he was simultaneously violating the provisions of the CPG/FDAMA. *Docket # 440 at 2* (suggesting it can prove that Mr. Bader's compounding activities were not undertaken pursuant to a valid prescription, and thus, ran afoul of 21 U.S.C. § 353a(a)(1), and that Mr. Bader was regularly compounding a drug that was a copy of a commercially-available HGH product, thus violating 21 U.S.C. § 353a(b)(1)(D)). Accordingly, the Court will not simply assume that its (re-)adoption of the Colorado definition of "compounding" compels dismissal of any Counts at this time. Rather, the Court will conduct

a hearing on **July 31, 2009** at **8:30 a.m.,** where the parties will address the consequences of this ruling on the counts in the Second Superseding Indictment.

**E. Effect of an inadequate definition**

Because the Court has concluded that there is an adequate definition for the term "compounding," it does not reach the parties' arguments as to the consequences that would flow from such a term being undefined. The Court concludes that both FDAMA and the 2002 CPG put Mr. Bader on sufficient notice that certain types of compounded drugs could nevertheless be subject to NDA requirements and FDA regulation.

**F. Burden of proof on issue of "compounding"**

*13 The final issue on which the Court requested supplemental briefing was which party would bear the burden of proving that the drugs in question were or were not "compounded." Both the Government and Mr. Bader agree that, to the extent the operation of FDAMA is germane to this action, it operates as an affirmative defense on which Mr. Bader will bear the burden of proof by a preponderance of the evidence. Thus, if the Government carries its burden of showing that the drugs distributed by Mr. Bader fall within the FDCA's "new drug" definition and NDA requirements, the burden will shift to Mr. Bader to establish his affirmative defense: that the drugs were "compounded" as that term is defined in Colorado law and, further, that such compounding took place within the boundaries established by the CPG/FDAMA—*e.g.* in response to a valid prescription (or in reasonable anticipation of future prescriptions), using approved ingredients, not regularly copying a commercially-available product, etc.

*CONCLUSION*

For the foregoing reasons, the Government's Motion for Reconsideration (# 410) is **GRANTED IN PART.** Upon reconsideration, the Court modifies its April 7, 2009 oral ruling as follows: the term "compounding," as used in FDAMA, is defined by state law—in this case, C.R.S. § 12–22–102(6). However, because the parties agree that the non-advertising provisions of FDAMA are severable and constitutional, FDAMA operates as a limited revocation of the FDA's deference to state regulation of compounded drugs, such that any otherwise "compounded" drug that fails to meet the requirements of FDAMA is

(n.1)

subject to FDA regulation, including NDA require-
ments. The parties agree that Mr. Bader will have the
burden of proof at trial to show both that his actions
constituted "compounding" under state law and that
his conduct does not violate the terms of FDAMA.
The motion is **DENIED IN PART,** insofar as the
Court **RESERVES RULING** on that portion that
requests dismissal of some of the charges in light of
this definition. The Court will conduct a hearing on
**July 31, 2009** at **8:30 a.m.,** at which the parties shall
be prepared to address which claims, if any, are af-
fected by this ruling. The American Pharmacists' As-
sociation Motion to Join (# **456**) in the previously filed
*amicus* brief is **GRANTED,** and the American
Pharmacists' Association prior Motion for Leave to
File an *amicus* brief (# **442**) is deemed **WITH-
DRAWN.**

(n.1)

2007 WL 3472851 (S.D.Tex.)

Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas,
Houston Division.
Sierra CLUB, Plaintiff,
v.
FEDERAL EMERGENCY MANAGEMENT
AGENCY, et al., Defendants.

Civil Action No. H-07-0608.
Nov. 14, 2007.

James B. Blackburn, Jr., Blackburn Carter PC, David Alfred Kahne, Attorney at Law, Houston, TX, for Plaintiff.

Charmaine Michele Aarons Holder, Assistant U.S. Attorney, Houston, TX, for Defendants.

### MEMORANDUM AND ORDER
LEE H. ROSENTHAL, District Judge.

*1 The Sierra Club, a national nonprofit environmental organization, filed this suit under Section 4104(g) of the National Flood Insurance Act, 42 U.S.C. § 4104(g). The Sierra Club is appealing the denial of their administrative appeal of a final flood elevation determination for the Cypress Creek watershed made by the Federal Emergency Management Agency (FEMA) for Harris County, Texas and incorporated areas. (Docket Entry No. 1). FEMA also denied the administrative appeal filed by the Cypress Creek Flood Control Coalition ("CCFCC"), which raised the same objections as the Sierra Club's appeal. (Docket Entry No. 16 at 6-7; *id.*, Ex. A at 3-5). Unlike the Sierra Club, CCFCC did not file suit to seek judicial review of FEMA's flood elevation determinations. Instead, CCFCC decided to seek revisions of various flood elevations determinations through an administrative revision process. (Docket Entry No. 16 at 10-11). The timetable for that work is uncertain.

CCFCC seeks leave to file an *amicus curiae* brief in the action filed by the Sierra Club. CCFCC asserts that its participation will help the court understand the complex issues relating to flooding and flood elevation determinations and provide valuable local information about the potential impacts of mistakes in those determinations. (Docket Entry No. 22). The defendants oppose CCFCC's motion to file an *amicus curiae* brief on the same grounds that provided the basis for their earlier motion to dismiss, that this court lacks subject matter jurisdiction because the United States has not waived its sovereign immunity and the plaintiffs lack standing. (Docket Entry No. 25). These defendants' motion to dismiss was denied.

"The extent, if any, to which an *amicus curiae* should be permitted to participate in a pending action is solely within the broad discretion of the district court." *Waste Mgmt. of Pa., Inc. v. City of York,* 162 F.R.D. 34, 36 (M.D.Pa.1995); *see also United States ex rel. Gudur v. Deloitte Consulting L.L.P.,* Civil Action No. H-00-1169, 2007 WL 836935, at *6 (S.D.Tex. March 15 2007); *Hoptowit v. Ray,* 682 F.2d 1237, 1260 (9th Cir.1982); *Concerned Area Residents for the Env't v. Southview Farm,* 834 F.Supp. 1410, 1413 (W.D.N.Y.1993); *United States v. Gotti,* 755 F.Supp. 1157, 1158 (E.D.N.Y.1991); *Pa. Envtl. Def. Found. v. Bellefonte Borough,* 718 F.Supp. 431, 434 (M.D.Pa.1989); *Leigh v. Engle,* 535 F.Supp. 418, 420 (N.D.Ill.1982). One court has cautioned that "a district court lacking joint consent of the parties should go slow in accepting, and even slower in inviting, an *amicus* brief unless, as a party, although short of a right to intervene, the *amicus* has a special interest that justifies his having a say, or unless the court feels that existing counsel may need supplementing assistance." *Strasser v. Dooley,* 432 F.2d 567, 569 (1st Cir.1970).

"No statute, rule, or controlling case defines a federal district court's power to grant or deny leave to file an *amicus* brief." *Gudur,* 2007 WL 836935, at *6. District courts commonly seek guidance from Federal Rule of Appellate Procedure 29, which establishes standards for filing an *amicus* brief in the United States Courts of Appeals.[FN1] *Id.* A district court must keep in mind the differences between the trial and appellate court forums in determining whether it is appropriate to allow an *amicus curiae* to participate. Chief among those differences is that a district court resolves fact issues. *Leigh v. Engle,* 535 F.Supp. 418, 422 (N.D.Ill.1982). "An *amicus* who argues facts

should rarely be welcomed." *Strasser,* 432 F.2d at 569. An *amicus* may be useful at the appellate level but not in the district court. *Yip,* 606 F.Supp. at 1568; *Leigh,* 535 F.Supp. at 422.

FN1. Rule 29 of the Federal Rules of Appellate Procedure provides:

(a) When Permitted. The United States or its officer or agency, or a State, Territory, Commonwealth, or the District of Columbia may file an amicus-curiae brief without the consent of the parties or leave of court. Any other amicus curiae may file a brief only by leave of court or if the brief states that all parties have consented to its filing.

(b) Motion for Leave to File. The motion must be accompanied by the proposed brief and state:

(1) the movant's interest; and

(2) the reason why an amicus brief is desirable and why the matters asserted are relevant to the disposition of the case.

(c) Contents and Form. An amicus brief must comply with Rule 32. In addition to the requirements of Rule 32, the cover must identify the party or parties supported and indicate whether the brief supports affirmance or reversal. If an amicus curiae is a corporation, the brief must include a disclosure statement like that required of parties by Rule 26.1. An amicus brief need not comply with Rule 28, but must include the following:

(1) a table of contents, with page references;

(2) a table of authorities-cases (alphabetically arranged), statutes and other authorities-with references to the pages of the brief where they are cited;

(3) a concise statement of the identity of the amicus curiae, its interest in the case, and the source of its authority to file;

(4) an argument, which may be preceded by a summary and which need not include a statement of the applicable standard of review; and

(5) a certificate of compliance, if required by Rule 32(a)(7).

(d) Length. Except by the court's permission, an amicus brief may be no more than one-half the maximum length authorized by these rules for a party's principal brief. If the court grants a party permission to file a longer brief, that extension does not affect the length of an amicus brief.

(e) Time for Filing. An amicus curiae must file its brief, accompanied by a motion for filing when necessary, no later than 7 days after the principal brief of the party being supported is filed. An amicus curiae that does not support either party must file its brief no later than 7 days after the appellant's or petitioner's principal brief is filed. A court may grant leave for later filing, specifying the time within which an opposing party may answer.

(f) Reply Brief. Except by the court's permission, an amicus curiae may not file a reply brief.

(g) Oral Argument. An amicus curiae may participate in oral argument only with the court's permission.

*2 A district court should consider whether the information offered through the *amicus* brief is "timely and useful" or otherwise necessary. *Id.* A court should also consider whether the individual or organization seeking to file the *amicus* brief is an advocate for one of the parties. *Southview Farm,* 834 F.Supp. at 1413. While federal appellate courts often permit the submission of highly partisan *amicus* briefs, *see Leigh,* 535 F.Supp. at 422, there is significant variance in the extent to which district courts are willing to permit the participation of an *amicus* who acts primarily as an advocate for one party. Some district courts express strong reservations about permitting the submission of *amicus* briefs that strongly favor one side over the other. In *Leigh v. Engle,* the court denied the Secretary of Labor's motion for leave to file an *amicus* brief supporting the plaintiffs' ERISA claim. The Secretary had not submitted the memorandum as an *amicus curiae* but rather as an *"amicus petit,"* or "friend of the plaintiff." *Id.* The court stated that the defendants were "entitled to have their contentions and arguments on the summary judgment motions considered without having the weight of the

United States, speaking through the Secretary of Labor, joining plaintiffs in the assertion that there are no issues of material fact, that defendants have violated the provisions of ERISA, and thus are liable to a judgment ordering them to disgorge profits they have made from alleged breaches of trust." *Id.* The *Leigh* court also pointed to the lack of complexity or ambiguity in the law as a reason for denying the motion. *Id.*

The district court in *United States v. Gotti* refused to permit the submission of an *amicus* brief for similar reasons. In *Gotti,* the court did not allow the New York Civil Liberties Union to file an *amicus* in part because "[r]ather than seeking to come as a "friend of the court" to provide the court with an "objective, dispassionate, neutral discussion of the issues, it is apparent that the NYCLU has come as an advocate for one side, having only the facts of one side at the time." 755 F.Supp. at 1159. Other considerations also weighed against permitting the *amicus,* including that the parties had not jointly consented to the filing, the parties were well represented and their counsel did not need assistance, the brief did not raise new issues, and the NYCLU did not comply with the Rule 29 requirements. *Id.* at 1158-59.

In *Yip v. Pagano,* the district court echoed the concerns about partisan *amici* laid out in *Leigh* and *Gotti,* stating, "Where a petitioner's attitude toward the litigation is patently partisan, he should not be allowed to appear as *amicus curiae.*" *Yip v. Pagano,* 606 F.Supp. 1566, 1568 (D.N.J.) (quoting *Casey v. Male,* 63 N.J.Super. 255, 164 A.2d 374, 377 (N.J.Super.Ct.1960)). However, the court in *Yip* took a somewhat more permissive approach than the *Leigh* court and allowed a group of congressmen to file an *amicus* brief supporting the immunity claim of a defendant sued for making defamatory remarks during a congressional hearing. *Id.* at 1568-69. The court distinguished *Leigh* on the ground that in *Leigh* the would-be *amicus* had waited until three years into the proceedings to file his motion and that granting the motion would cause further delay. *Id.* at 1568. Faced with what the *Leigh* court had described as an *"amicus petit,"* the *Yip* court did not find the congressmen's brief to be so "patently partisan" that it would be inappropriate to allow the group to participate as an *amicus curiae.*

*3 Other courts routinely permit organizations to file *amicus* briefs when their interests are closely aligned with those of one party. Courts that take this approach stress that "[t]here is no rule ... that *amici* must be totally disinterested," *Hoptowit,* 682 F.2d at 1260, and that "by the nature of things an *amicus* is not normally impartial," *Strasser,* 432 F.2d at 569. [FN2] In *Concerned Area Residents for the Env't v. Southview Farm,* 834 F.Supp. at 1413, the district court permitted a private organization to file an *amicus* brief despite having contributed at least $10,000 to defray the defendants' legal costs. In *Hoptowit v. Ray,* 682 F.2d at 1260, the Ninth Circuit upheld the district court's appointment of the United States Department of Justice and the United States Attorney for the Eastern District of Washington as *amicus curiae* in a lawsuit challenging conditions at a state prison despite the fact that "the United States Attorney acted exclusively on behalf of the points of view taken by the inmates." The Ninth Circuit emphasized that there was no indication "that *amicus* controlled the litigation, or that the inmates were mere strawmen to confer standing so that *amicus* could litigate its views." *Id.*

> FN2. One court recounts how one attorney, when asked for his response to the argument of an *amicus,* responded, "That fellow isn't any more a friend of the court than I am." *Strasser,* 432 F.2d at 569 n. 2.

In this case, the defendants opposed CCFCC's motion to file an *amicus curiae* brief. (Docket Entry No. 25). No party has consented to the filing. The parties are sophisticated and ably represented by counsel. It is unclear what new perspective or information CCFCC could provide. CCFCC has the same interests and policy objectives as the Sierra Club. There is no reason to think that CCFCC has access to greater technical, scientific, or legal expertise than the Sierra Club. It appears that CCFCC seeks to litigate fact issues; such a role is generally inappropriate for an *amicus. Strasser,* 432 F.2d at 569.

The partisanship of CCFCC also weighs against permitting it to participate as *amicus curiae.* CCFCC filed an administrative appeal raising the same objections as this lawsuit. (Docket Entry No. 16 at 6-7; *id.,* Ex. A at 3-5). Not only are CCFCC's interests in this litigation squarely aligned with those of the Sierra Club, but CCFCC has as much of a stake in the outcome as the Sierra Club. CCFCC's organizational

interests will be directly affected by any court ruling on a substantive matter.

Finally, CCFCC made a deliberate decision to forgo litigating. Rather than appeal FEMA's denial of their administrative appeal of the final flood elevation determinations for the Cypress Creek watershed, CCFCC elected to work within the administrative process for revising final flood elevation determinations. (Docket Entry No. 16 at 10-11). CCFCC does not have standing to litigate because it did not comply with the administrative requirements for filing suit. *See* 42 U.S.C. § 4104(g). Having decided not to seek judicial review as a party, the CCFCC should not be able to proceed in court as an amicus.

*4 CCFCC's motion for leave to file an *amicus curiae* brief is denied.

A-17

(n.1)

2013 WL 5350669 (N.D.Ala.)

Only the Westlaw citation is currently available.

United States District Court,
N.D. Alabama,
Northeastern Division.
Cory R. MAPLES, Petitioner,
v.
Kim T. THOMAS, Commissioner of the Alabama
Department of Corrections, Respondent.

No. 5:03–CV–2399–SLB–MHH.
Sept. 23, 2013.

Gregory Garre, J. Scott Ballenger, Jessica Phillips,
Katya Georgieva, Latham & Watkins LLP, Washington, DC, Gary Alexion, The Legal Aid Society,
New York, NY, John G. Butler, Jr., Huntsville, AL,
Kathy E. Brewer, Becker & Poliakoff PA, Fort
Lauderdale, FL, for Petitioner.

J. Clayton Crenshaw, John C. Neiman, Jr., Office of
the Attorney General, Montgomery, AL, Jess Randall
Nix, Spotswood Sansom & Sansbury LLC, Birmingham, AL, for Respondent.

### *MEMORANDUM OPINION*
SHARON LOVELACE BLACKBURN, Chief Judge.

*1 This is a petition for writ of habeas corpus
brought by a person in custody under a capital conviction and sentence of death from a court of the State
of Alabama. 28 U.S.C. § 2254. The court has before it
motions for leave to file a brief as amicus curiae from
three organizations: The Constitution Project, (doc. 63
FN1 & 64),FN2 Alabama Criminal Defense Lawyers
Association, (doc. 66), and Alabama Appellate Court
Justices and Bar Presidents, (doc. 69), along with
proposed briefs. After review, the court finds that the
amici's proposed briefs, while skillfully written, will
not be helpful in this case because they cover arguments already discussed in the briefs of the parties.

> FN1. Reference to a document number,
> ("Doc.____"), refers to the number assigned
> to each document as it is filed in the court's
> record. The page cited refers to the page

number of the entire document (Page ____ of
____).

> FN2. The same motion was filed twice.
> Hereinafter citations to the motion and brief
> will be to doc. 64.

Last year this case was on appeal to the Supreme
Court of the United States, where the Court found that
petitioner had shown cause to excuse a procedural
default in state court that would otherwise bar federal
review. *Maples v. Thomas,* ―― U.S. ――, ――, 132
S.Ct. 912, 917, 181 L.Ed.2d 807 (2012). On remand,
this court is to decide whether petitioner can show
prejudice as well, as required in an ineffective assistance of counsel claim by *Strickland v. Washington,*
466 U.S. 668, 697, 104 S.Ct. 2052, 80 L.Ed.2d 674
(1984). *Maples,* 132 S.Ct. at 927–928. Petitioner has
filed a 112–page brief detailing his arguments for why
he was denied effective assistance of counsel and thus
prejudiced by the procedural default. (Doc. 60.) Petitioner has also filed a 77–page reply brief, (doc. 73), in
response to respondent's brief, (doc. 70). The parties'
briefs argue whether petitioner's trial counsel: made
inconsistent arguments on guilt and intoxication between the guilt phase and the sentencing phase, (doc.
60 at 52–62; doc. 70 at 48–56, 92–97), failed to investigate or argue an intoxication defense to capital
murder, (doc. 60 at 62–75; doc. 70 at 56–68), and
failed to investigate or develop a more complete picture of mitigating factors in the sentencing phase,
(doc. 60 at 75–95; doc. 70 at 68–92). In addition, the
briefs discuss Alabama's system of appointing and
compensating attorneys for indigent capital defendants, (doc. 60 at 20–25, 95–97; doc. 74 at 7–8), and
argue whether all these factors show that petitioner
was prejudiced by the procedural default, (doc. 60 at
97–108; *see generally* doc. 70).

On January 18, 2013, The Constitution Project
filed a motion for leave to file a brief as amicus curiae,
(doc. 64), attaching a proposed brief, (doc. 64–1), and
a 1997 report on Alabama's indigent defense system in
capital cases from the Equal Justice Initiative, (doc.
64–2). "The Constitution Project is an independent,
not-for-profit organization that promotes and defends
constitutional safeguards and seeks consensus solutions to difficult legal and constitutional issues, such
as the right to counsel in criminal trials." (Doc. 64 at
2.) In 2009, it released a report on its examination of

state court systems for providing counsel to indigent criminal defendants. (*Id.* at 4.) Respondent objects to this brief, arguing that the issues it addresses "can easily be covered in the parties' briefs." (Doc. 71 at 5.)

*2 On January 23, 2013, Alabama Criminal Defense Lawyers Association filed a motion for leave to file a brief as amicus curiae and included a proposed brief. (Doc. 66.) "The Alabama Criminal Defense Lawyers Association ('ACDLA') is a non-profit association, through which criminal defense lawyers express their positions on legislation, court reform, cases affecting rights of defendants, and other matters affecting criminal justice in Alabama." (*Id.* at 2.) Respondent makes the same objection to ACDLA's brief. (Doc. 71 at 5.)

On February 1, 2013, Alabama Appellate Court Justices and Bar Presidents filed a motion for leave to file a brief as amicus curiae, (doc. 69), and attached a proposed brief, (doc. 69–1). "The amici are former members of the Alabama Supreme Court and Alabama Court of Criminal Appeals, as well as former Presidents of the Alabama State Bar." (Doc. 69 at 2.) In their motion they assert that they "are perhaps better situated than any party in this litigation to inform this Court concerning the sate of the administration of the death penalty Alabama...." (*Id.* at 3.) Respondent makes the same objection to this brief. (Doc. 71 at 3.)

### STANDARD OF REVIEW

In opposing the amici's motions, respondent cites Seventh Circuit precedent. (Doc. 71.) In that circuit "whether to allow the filing of an *amicus curiae* brief is a matter of 'judicial grace.' ' *Voices for Choices v. Illinois Bell Telephone Co.,* 339 F.3d 542, 544 (7th Cir.2003) (quoting *National Organization for Women, Inc. v. Scheidler,* 223 F.3d 615, 616 (7th Cir.2000)). Thus, "rote permission to file such a brief" is disfavored and "permission to file an amicus brief that essentially duplicates a party's brief" will be denied. *Voices for Choices,* 339 F.3d at 544. Amicus briefs are particularly helpful, however, in cases where:

a party is inadequately represented; or in which the would-be amicus has a direct interest in another case that may be materially affected by a decision in this case; or in which the amicus has a unique perspective or specific information that can assist the court beyond what the parties can provide.

*Id.* at 545 (citing Scheidler, 223 F.3d at 616–617).

There is no procedural rule pertaining to the filing of amicus briefs in federal district court. However, rules concerning such filings can be found in Federal Rules of Appellate Procedure 29 and Supreme Court Rule 37.1. *See Mobile Cnty. Water, Sewer & Fire Prot. Auth., Inc. v. Mobile Area Water & Sewer Sys., Inc.,* 567 F.Supp.2d 1342, 1344 (S.D.Ala.2008) ("District courts have inherent authority to appoint or deny *amici* which is derived from Rule 29 of the Federal Rules of Appellate Procedure."). FED. R. APP. P. 29(b)(1) and (2) require that the proposed brief state "the movant's interest" and "the reason why an amicus brief is desirable and why the matters asserted are relevant to the disposition of the case." Movants that "do[ ] not meet the requirements of (a) an adequate interest, (b) desirability, and (c) relevance" should not be granted leave to file amicus briefs. *Neonatology Assoc., P.A. v. C.I.R.,* 293 F.3d 128, 131 (3rd Cir.2001). Relevance is further explained in SUP. CT. R. 37.1:

*3 An amicus curiae brief that brings to the attention of the Court relevant matter not already brought to its attention by the parties may be of considerable help to the Court. An amicus curiae brief that does not serve this purpose burdens the Court, and its filing is not favored.

Ultimately, "it is within a district court's discretion whether to permit the filing of an amicus brief." *Abu–Jamal v. Horn,* No. CIV.A.99–5089, 2000 WL 1100784, at *3 (E.D.Pa.2000).

### DISCUSSION

Amici in this case are organizations with interest in the questions that this case presents. They are staffed by prominent experts in the field and each brief is well-written and contains detailed arguments. Nothing in this opinion speaks to the merits of either the proposed briefs or petitioner's claims.

However, as explained above, the briefs before the court from the parties are substantial. If the court would benefit from additional briefs, they should meet one of the qualifications listed in *Voices for Choices,* 339 F.3d at 545. Amici do not contend that they have a "direct interest in another case that may be materially affected by a decision in this case," nor could anybody deny that petitioner is adequately represented at this point. *Id.* Seven lawyers from four different law firms are currently representing him on his petition, and one

firm, The Legal Aid Society, has represented him since his collateral appeal was deemed untimely filed by the Alabama Court of Criminal Appeals. Instead, each amicus brief relies on the ability of amici to provide "a unique perspective or specific information that can assist the court beyond what the parties can provide." *Id.* After review, however, the court agrees with respondents that the parties have already addressed the issues presented in the proposed briefs. Therefore, the court finds that consideration of the proposed briefs would not be helpful.

### 1. The Constitution Project

The proposed amicus brief of The Constitution Project focuses on the argument that Alabama's indigent defense system provided underpaid and inexperienced capital counsel during the relevant time period. (Doc. 64–1 at 3–14.) It falls under the same headline as an argument petitioner has briefed. (Doc. 60 at 3.) In introducing his claims, petitioner discusses at length Alabama's low requirements for and compensation of attorneys appointed to represent indigent defendants in capital cases. (Doc. 60 at 20–25.) Justice Ginsburg devoted a section in the Court's opinion to acknowledging the facts underlying this argument. *Maples*, 132 S.Ct. at 917–18.

The proposed brief argues that petitioner's trial counsel could not prepare a proper case for him because of financial constraints. *(See, e.g.,* doc. 64–1 at 12) ("[A]t Alabama's rates, it would have been almost impossible for any attorney, including Mr. Maples' counsel, to sustain the level of work required to mount an adequate capital murder defense while still maintaining a separate practice and earning his or her cost of living.... [T]he Alabama capital defense system had a 'built-in disincentive for thorough representation [.]' "). Petitioner, likewise, argues that the system's underfunding, low eligibility requirements for capital counsel, and failure to provide capital defense training "highlight the need for meaningful federal habeas review" and "necessarily curtail" the "preparation and defense" of "[e]ven well-meaning and conscientious counsel." (Doc. 60 at 24.) Both briefs stress a simple fact: Alabama paid trial counsel only $20 per hour, and no more than $1,000 total, for out-of-court work for indigent defendants in capital cases. (Doc. 64–1 at 10; doc. 60 at 95–96.)

### 2. The Alabama Defense Lawyers Association

*4 The proposed amicus brief of the Alabama Criminal Defense Lawyers Association covers matters already argued at length by the parties. It duplicates one of petitioner's main arguments: that trial counsel should have investigated and presented intoxication as a defense and mitigator during the guilt and sentencing phase of trial. *(See* doc. 60 at 46–61, 87–90.) While it cites a significant number of academic sources for the proposition that alcohol is a facilitator of violence, *(see, e.g.,* doc. 66 at 17), the actual effect of alcohol is not particularly relevant to a claim of ineffective assistance of counsel. Petitioner has addressed the extent to which his use of alcohol was legally relevant to his defense, and thus his showing of prejudice. *(See, e.g.,* doc. 60 at 65–66.) To allow additional filings about the effects of alcohol would likely require unnecessary responses and would not give the court "specific information that can assist the court beyond what the parties can provide." *Voices for Choices v. Illinois Bell Telephone Co.,* 339 F.3d 542, 545 (7th Cir.2003).

### 3. The Alabama Appellate Court Justices and Bar Presidents

The proposed amicus brief of the Alabama Appellate Court Justices and Bar Presidents also duplicates the main arguments about social and mental health mitigating factors addressed at length by the parties. (Doc. 60 at 12–28, 49–81.) It reiterates the facts underlying the "broken indigent defense system" that petitioner depended upon for trial counsel. (Doc. 69–1 at 13.) Like petitioner's brief, (doc. 60 at 52–62), it criticizes trial counsel's failure to provide a "coherent and consistent presentation on" petitioner's guilt and intoxication in both phases of his trial, (doc. 69–1 at 25). It explains in detail how expert testimony could have emphasized certain aspects of petitioner's history to the jury as mitigating evidence, (doc 69–1 at 26–30), but petitioner has not overlooked his need for expert testimony, (doc. 60 at 16 & 40), nor the effect that his history of abuse and depression could have had on a jury, *(id.* at 36–41, 86–90).

The proposed brief also presents information concerning matters that are not relevant to petitioner's case. For instance, the proposed brief states that in 1997, there was no statute in Alabama pertaining to fees and expenses for an indigent defendant's experts, but notes that there was a provision that allowed counsel to be reimbursed for reasonable expenses

incurred if approved in advance by the trial court. It then observes that the cap on such "expert fees, including psychiatric evaluations," was only $500.00. (Doc. 69–1 at 20.) Petitioner has not alleged that his counsel were ineffective because they were unable to retain an expert, much less that they were hamstrung by a $500.00 financial cap. In fact, the trial record shows that petitioner's trial counsel sought expenses for an investigator, independent DNA testing, and the services of Dr. Shealy, a forensic psychologist. In each instance, the trial court granted counsel reimbursement for the expenditure. In the case of an investigator, counsel requested and the court awarded $2,000.00. (R. Vol. 6 at 221.) In the case of independent DNA testing, counsel requested and were awarded $6,000.00. (R. Vol. 3 at 431.) In the case of Dr. Shealy, counsel requested and were awarded up to $4,500.00. *(Id.* at 428.) Petitioner's counsel have already made the relevant arguments regarding his lack of expert testimony. *(See* doc. 60 at 16, 40, & 65; doc. 73 at 33, 48–49, 53.)

**\*5** Finally, the proposed brief argues that political pressure on elected Alabama judges to favor the death penalty resulted in "an extra-heavy duty on the defense team." (Doc. 69–1 at 24). This information is not relevant to the constitutional questions before the court and does not help the court in analyzing the claims in this habeas petition.[FN3]

> FN3. While the proposed brief faults the trial judge (who was also the post-conviction judge) for signing the State's proposed order denying Maples's Rule 32 petition, the same proposed brief points out that as of July 2011, Maples's trial judge "had overridden a jury's recommendation for life imprisonment only once in his sixteen years on the bench" and that "a jury recommendation for life in Maples' [s] case would have resulted in a sentence of life. (Doc. 69–1, at 14 n. 4 & 42.)

*CONCLUSION*

It is unsurprising that petitioner's and the amici's briefs resemble each other, since the authors of each are experienced advocates who can recognize important issues in this case. However, petitioner's counsel have presented comprehensive arguments for the points raised in the amici's proposed briefs. The amici will not be prejudiced if the court only considers the parties' briefs in this case. *See Ryan v. Commodity Futures Trading Comm'n,* 125 F.3d 1062, 1063 (7th Cir.1997) (finding that amicus briefs should be allowed if "the amicus has an interest in some other case that may be affected by the decision in the present case (though not enough affected to entitle the amicus to intervene)").

For the foregoing reasons, the motions for leave to file a brief as amicus curiae by The Constitution Project, (doc. 63 & 64), Alabama Criminal Defense Lawyers Association, (doc. 66), and Alabama Appellate Court Justices and Bar Presidents, (doc. 69), are **DENIED** .



**U.S. Citizenship and Immigration Services**

## Executive Actions on Immigration

Español

On November 20, 2014, the President announced a series of executive actions to crack down on illegal immigration at the border, prioritize deporting felons not families, and require certain undocumented immigrants to pass a criminal background check and pay taxes in order to temporarily stay in the U.S. without fear of deportation.

These initiatives include:

- Expanding the population eligible for the Deferred Action for Childhood Arrivals (DACA) program to young people who came to this country before turning 16 years old and have been present since January 1, 2010, and extending the period of DACA and work authorization from two years to three years | Details
- Allowing parents of U.S. citizens and lawful permanent residents who have been present in the country since January 1, 2010, to request deferred action and employment authorization for three years, in a new Deferred Action for Parents of Americans and Lawful Permanent Residents* program, provided they pass required background checks | Details
- Expanding the use of provisional waivers of unlawful presence to include the spouses and sons and daughters of lawful permanent residents and the sons and daughters of U.S. citizens | Details
- Modernizing, improving and clarifying immigrant and nonimmigrant programs to grow our economy and create jobs | Details
- Promoting citizenship education and public awareness for lawful permanent residents and providing an option for naturalization applicants to use credit cards to pay the application fee | Details

**Important notice:** These initiatives have not yet been implemented, and USCIS is not accepting any requests or applications at this time. Beware of anyone who offers to help you submit an application or a request for any of these actions before they are available. You could become a victim of an immigration scam. Subscribe to this page to get updates when new information is posted.

*Also known as Deferred Action for Parental Accountability.

Return to top

## Next steps

USCIS and other agencies and offices are responsible for implementing these initiatives as soon as possible. Some initiatives will be implemented over the next several months and some will take longer.

Over the coming months, USCIS will produce detailed explanations, instructions, regulations and forms as necessary. The brief summaries provided below offer basic information about each initiative.

While USCIS is not accepting requests or applications at this time, if you believe you may be eligible for one of the initiatives listed above, you can prepare by gathering documents that establish factors such as your:

- Identity;
- Relationship to a U.S. citizen or lawful permanent resident; and
- Continuous residence in the United States over the last five years or more.

We strongly encourage you to subscribe to receive an email whenever additional information on these initiatives is available on our website. We will also post updates on Facebook and Twitter.

Share this page with your friends and family members. Remind them that the only way to be sure to get the facts is to get them **directly from USCIS.** Unauthorized practitioners of immigration law may try to take advantage of you by charging a fee to submit forms to USCIS on your behalf or by claiming to provide other special access or expedited services which do not exist. To learn how to get the right immigration help, go to the Avoid Scams page.

Below are summaries of major planned initiatives by USCIS, including:

- **Who** is eligible
- **What** the initiative will do
- **When** you can begin to make a request
- **How** to make a request

Return to top

1. Deferred Action for Childhood Arrivals (DACA) program

A-22

(n.6)

### 1. Deferred Action for Childhood Arrivals (DACA) program

| | |
|---|---|
| Who | • Current DACA recipients seeking renewal and new applicants, including individuals born prior to June 15, 1981, who meet all other DACA guidelines. |
| What | • Allows individuals born prior to June 15, 1981, to apply for DACA (removing the upper age restriction) provided they meet all other guidelines.<br>• Requires continuous residence in the United States since January 1, 2010, rather than the prior requirement of June 15, 2007.<br>• Extends the deferred action period and employment authorization to three years from the current two years. |
| When | • Approximately 90 days following the President's November 20, 2014, announcement. |
| How | • Go to the Consideration of Deferred Action for Childhood Arrivals (DACA) page for instructions which will be updated over the next several months. Subscribe to this page to receive updates by email. |

Return to top

### 2. Deferred action for parents of U.S. citizens and lawful permanent residents

| | |
|---|---|
| Who | • An undocumented individual living in the United States who, on the date of the announcement, is the parent of a U.S. citizen or lawful permanent resident and who meets the guidelines listed below. |
| What | • Allows parents to request deferred action and employment authorization if they:<br>  ◦ Have continuous residence in the United States since January 1, 2010;<br>  ◦ Are the parents of a U.S. citizen or lawful permanent resident born on or before November 20, 2014; and<br>  ◦ Are not an enforcement priority for removal from the United States, pursuant to the November 20, 2014, Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum.<br><br>Notes: USCIS will consider each request for Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) on a case-by-case basis. Enforcement priorities include (but are not limited to) national security and public safety threats. |
| When | • Approximately 180 days following the President's November 20, 2014, announcement. |
| How | • Subscribe to this page to receive updates by email. |

Return to top

### 3. Provisional waivers of unlawful presence

| | |
|---|---|
| Who | • Undocumented individuals who have resided unlawfully in the United States for at least 180 days **and** who are:<br>  ◦ The sons and daughters of U.S. citizens; and<br>  ◦ The spouse and sons or daughters of lawful permanent residents. |
| What | • Expands the provisional waiver program announced in 2013 by allowing the spouses, sons or daughters of lawful permanent residents and sons and daughters of U.S. citizens to get a waiver if a visa is available. There may be instances when the qualifying relative is not the petitioner.<br>• Clarifies the meaning of the "extreme hardship" standard that must be met to obtain a waiver.<br><br>Notes: Currently, only spouses and minor children of U.S. citizens are allowed to apply to obtain a provisional waiver if a visa is available. For more information about the waivers program, go to the Provisional Unlawful Presence Waivers page which will be updated over the next several months. |
| When | • Upon issuing of new guidelines and regulations. |
| How | • Subscribe to this page to receive updates by email. |

Return to top

**4. Modernize, improve and clarify immigrant and nonimmigrant programs to grow our economy and create jobs**

Who    • U.S. businesses, foreign investors, researchers, inventors and skilled foreign workers.

USCIS will:

- Work with the Department of State to develop a method to allocate immigrant visas to ensure that all immigrant visas authorized by Congress are issued to eligible individuals when there is sufficient demand for such visas.
- Work with the Department of State to modify the Visa Bulletin system to more simply and reliably make determinations of visa availability.
- Provide clarity on adjustment portability to remove unnecessary restrictions on natural career progression and general job mobility to provide relief to workers facing lengthy adjustment delays.
- Clarify the standard by which a national interest waiver may be granted to foreign inventors, researchers and founders of start-up enterprises to benefit the U.S economy.
What  • Authorize parole, on a case-by-case basis, to eligible inventors, researchers and founders of start-up enterprises who may not yet qualify for a national interest waiver, but who:

  ◦ Have been awarded substantial U.S. investor financing; or
  ◦ Otherwise hold the promise of innovation and job creation through the development of new technologies or the pursuit of cutting-edge research.

- Finalize a rule to provide work authorization to the spouses of certain H-1B visa holders who are on the path to lawful permanent resident status.
- Work with Immigration and Customs Enforcement (ICE) to develop regulations for notice and comment to expand and extend the use of optional practical training (OPT) for foreign students, consistent with existing law.
- Provide clear, consolidated guidance on the meaning of "specialized knowledge" to bring greater clarity and integrity to the L-1B program, improve consistency in adjudications, and enhance companies' confidence in the program.

When  • Upon issuing necessary guidance and regulations.

How   • Subscribe to this page to receive updates by email.

Return to top

**5. Promote the naturalization process**

Who    • Lawful permanent residents eligible to apply for U.S. citizenship

- Promote citizenship education and public awareness for lawful permanent residents.
- Allow naturalization applicants to use credit cards to pay the application fee.
What  • Assess potential for partial fee waivers in the next biennial fee study.

Notes: Go to the U.S. Citizenship page to learn about the naturalization process and visit the Citizenship Resource Center to find naturalization test preparation resources. You can also visit the N-400, Application for Naturalization, page.

When  • During 2015

How   • Subscribe to this page to receive updates by email.

Return to top

## Key Questions and Answers

**Q1: When will USCIS begin accepting applications related to these executive initiatives?**

A1:  While USCIS is not accepting applications at this time, individuals who think they may be eligible for one or more of the new initiatives may prepare now by gathering documentation that establishes factors such as their:

- Identity;
- Relationship to a U.S. citizen or lawful permanent resident; and

A-24                                                                                                (n.6)

- Continuous residence in the United States over the last five years or more.

USCIS expects to begin accepting applications for the:

- Expanded DACA program approximately 90 days after the President's November 20, 2014, announcement; and
- Deferred action for parents of U.S. citizens and lawful permanent residents (Deferred Action for Parents of Americans and Lawful Permanent Residents) approximately 180 days after the President's November 20, 2014, announcement.

Others programs will be implemented after new guidance and regulations are issued.

We strongly encourage you to subscribe to receive an email whenever additional information is available on the USCIS website. Remember that the only way to get official information is directly from USCIS. Unauthorized practitioners of immigration law may try to take advantage of you by charging a fee to submit forms to USCIS on your behalf or by claiming to provide other special access or expedited services which do not exist. To learn how to get the right immigration help, visit www.uscis.gov/avoidscams for tips on filing forms, reporting scams and finding accredited legal services.

**Q2: How many individuals does USCIS expect will apply?**

A2: Preliminary estimates show that roughly 4.9 million individuals may be eligible for the initiatives announced by the President. However, there is no way to predict with certainty how many individuals will apply. USCIS will decide applications on a case-by-case basis and encourages as many people as possible to consider these new initiatives. During the first two years of DACA, approximately 60 percent of potentially eligible individuals came forward. However, given differences among the population eligible for these initiatives and DACA, actual participation rates may vary.

**Q3: Will there be a cutoff date for individuals to apply?**

A3: The initiatives do not include deadlines. Nevertheless, USCIS encourages all eligible individuals to carefully review each initiative and, once the initiative becomes available, make a decision as soon as possible about whether to apply.

**Q4: How long will applicants have to wait for a decision on their application?**

A4: The timeframe for completing this new pending workload depends on a variety of factors. USCIS will be working to process applications as expeditiously as possible while maintaining program integrity and customer service. Our aim is to complete all applications received by the end of next year before the end of 2016, consistent with our target processing time of completing review of applications within approximately one year of receipt. In addition, USCIS will provide each applicant with notification of receipt of their application within 60 days of receiving it.

**Q5: Will USCIS need to expand its workforce and/or seek appropriated funds to implement these new initiatives?**

A5: USCIS will need to adjust its staffing to sufficiently address this new workload. Any hiring will be funded through application fees rather than appropriated funds.

**Q6: Will the processing of other applications and petitions (such as family-based petitions and green card applications) be delayed?**

A6: USCIS is working hard to build capacity and increase staffing to begin accepting requests and applications for the initiatives. We will monitor resources and capacity very closely, and we will keep the public and all of our stakeholders informed as this process develops over the course of the coming months.

**Q7: What security checks and anti-fraud efforts will USCIS conduct to identify individuals requesting deferred action who have criminal backgrounds or who otherwise pose a public safety threat or national security risk?**

A7: USCIS is committed to maintaining the security and integrity of the immigration system. Individuals seeking deferred action relief under these new initiatives will undergo thorough background checks, including but not limited to 10-print fingerprint, primary name and alias name checks against databases maintained by DHS and other federal government agencies. These checks are designed to identify individuals who may pose a national security or public safety threat, have a criminal background, have perpetrated fraud, or who may be otherwise ineligible to request deferred action. No individual will be granted relief without passing these background checks.

In addition, USCIS will conduct an individual review of each case. USCIS officers are trained to identify indicators of fraud, including fraudulent documents. As with other immigration requests, all applicants will be warned that knowingly misrepresenting or failing to disclose facts will subject them to criminal prosecution and possible removal from the United States.

**Q8: What if someone's case is denied or they fail to pass a background check?**

A8: Individuals who knowingly make a misrepresentation, or knowingly fail to disclose facts, in an effort to obtain deferred action or work authorization through this process will not receive favorable consideration for deferred action. In addition, USCIS will apply its current policy governing the referral of individual cases to Immigration and Customs Enforcement (ICE) and the issuance of Notices to Appear before an immigration judge. If the background check or other information uncovered during the review of a request for deferred action indicates that an individual's presence in the United States threatens public safety or national security, USCIS will deny the request and refer the matter for criminal investigation and possible removal by ICE, consistent with existing processes.

**Q9: If I currently have DACA, will I need to do anything to receive the third year of deferred action and work authorization provided by the executive initiatives?**

A9: The new three-year work authorization timeframe will be applied for applications currently pending and those received after the President's announcement. Work authorizations already issued for a two-year period under the current guidelines will continue to be

valid through the validity period indicated on the card. USCIS is exploring means to extend previously issued two-year work authorization renewals to the new three-year period.

**Q10: Will the information I share in my request for consideration of deferred action be used for immigration enforcement purposes?**

A10: Information provided in your request is protected from disclosure to Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings unless you meet the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance. Individuals who are granted deferred action will not be referred to ICE. The information may be shared, however, with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including:

- Assisting in the consideration of the deferred action request;
- To identify or prevent fraudulent claims;
- For national security purposes; or
- For the investigation or prosecution of a criminal offense.

This policy covers family members and guardians, in addition to you.

**Q11: What is USCIS doing to assist dependents of U.S. armed services personnel?**

A11: USCIS is working with the Department of Defense to determine how to expand parole authorization to dependents of certain individuals enlisting or enlisted in the U.S. armed services. For information on the existing parole-in-place policy for military personnel, please read this policy memorandum.

Return to top

## Glossary

- **Continuous residence:** For a detailed explanation, go to the USCIS Policy Manual, Chapter 3: Continuous Residence.
- **DACA:** Deferred Action for Childhood Arrivals, a program launched in 2012. For more information, go to the Consideration of Deferred Action for Childhood Arrivals (DACA) page.
- **Deferred action:** A use of prosecutorial discretion to not remove an individual from the country for a set period of time, unless the deferred action is terminated for some reason. Deferred action is determined on a case-by-case basis and only establishes lawful presence but does not provide immigration status or benefits of any kind. DACA is one type of deferred action.
- **Parole in place:** Immigration and Nationality Act section 212(d)(5)(A) gives the Secretary the discretion, on a case-by-case basis, to "parole" for "urgent humanitarian reasons or significant public benefit" an alien applying for admission to the United States. Although it is most frequently used to permit an alien who is outside the United States to come into U.S. territory, parole may also be granted to aliens who are already physically present in the U.S. without inspection or admission. This latter use of parole is sometimes called "parole in place."
- **Prosecutorial discretion:** The legal authority to choose whether or not to take action against an individual for committing an offense.
- **Provisional waiver:** Waiver for individuals who are otherwise inadmissible due to more than 180 days of unlawful presence in the United States, based on a showing of extreme hardship to certain U.S. citizen or lawful permanent resident family members, which allows the individual to return after departure for an immigrant visa interview at a U.S. embassy or consulate. For more information, go to the Provisional Unlawful Presence Waivers page.

You can find definitions of other terms used on our website in Glossary of Terms.

Last Reviewed/Updated: 12/05/2014

*Secretary*
U.S. Department of Homeland Security
Washington, DC 20528



## Homeland Security

November 20, 2014

MEMORANDUM FOR:  Thomas S. Winkowski
Acting Director
U.S. Immigration and Customs Enforcement

Megan Mack
Officer
Office of Civil Rights and Civil Liberties

Philip A. McNamara
Assistant Secretary for Intergovernmental Affairs

FROM:  Jeh Charles Johnson
Secretary

SUBJECT:  **Secure Communities**

The Secure Communities program, as we know it, will be discontinued.

The goal of Secure Communities was to more effectively identify and facilitate the removal of criminal aliens in the custody of state and local law enforcement agencies. But the reality is the program has attracted a great deal of criticism, is widely misunderstood, and is embroiled in litigation; its very name has become a symbol for general hostility toward the enforcement of our immigration laws. Governors, mayors, and state and local law enforcement officials around the country have increasingly refused to cooperate with the program, and many have issued executive orders or signed laws prohibiting such cooperation. A number of federal courts have rejected the authority of state and local law enforcement agencies to detain immigrants pursuant to federal detainers issued under the current Secure Communities program.

The overarching goal of Secure Communities remains in my view a valid and important law enforcement objective, but a fresh start and a new program are necessary. As recommended by the Homeland Security Advisory Council Task Force, Secure Communities "must be implemented in a way that supports community policing and sustains the trust of all elements of the community in working with local law enforcement."

A-27                                        (n.7)

Accordingly, I am directing U.S. Immigration and Customs Enforcement (ICE) to discontinue Secure Communities. ICE should put in its place a program that will continue to rely on fingerprint-based biometric data submitted during bookings by state and local law enforcement agencies to the Federal Bureau of Investigation for criminal background checks. However, ICE should only seek the transfer of an alien in the custody of state or local law enforcement through the new program when the alien has been convicted of an offense listed in Priority 1 (a), (c), (d), and (e) and Priority 2 (a) and (b) of the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum, or when, in the judgment of an ICE Field Office Director, the alien otherwise poses a danger to national security. In other words, unless the alien poses a demonstrable risk to national security, enforcement actions through the new program will only be taken against aliens who are convicted of specifically enumerated crimes.

Further, to address the increasing number of federal court decisions that hold that detainer-based detention by state and local law enforcement agencies violates the Fourth Amendment,[1] I am directing ICE to replace requests for detention (*i.e.,* requests that an agency hold an individual beyond the point at which they would otherwise be released) with requests for notification (*i.e.,* requests that state or local law enforcement notify ICE of a pending release during the time that person is otherwise in custody under state or local authority).

If in special circumstances ICE seeks to issue a request for detention (rather than a request for notification), it must specify that the person is subject to a final order of removal or there is other sufficient probable cause to find that the person is a removable alien, thereby addressing the Fourth Amendment concerns raised in recent federal court decisions.

---

[1] *See, e.g., Miranda-Olivares*, 2014 WL 1414305, at *11 (D. Ore. Apr. 11, 2014) (holding that county violated the Fourth Amendment by relying on an ICE detainer that did not provide probable cause regarding removability); *Morales v. Chadbourne*, 996 F. Supp. 2d 19, 29 (D.R.I. 2014) (concluding that detention pursuant to an immigration detainer "for purposes of mere investigation is not permitted"). *See also Moreno v. Napolitano*, Case No. 11 C 5452, 2014 WL 4814776 (N.D. Ill. Sept. 29, 2014) (denying judgment on the pleadings to the government on plaintiffs' claim that ICE's detainer procedures violate probable cause requirements); *Gonzalez v. ICE*, Case No. 2:13-cv-0441-BRO-FFM, at 12-13 (C.D. Cal. July 28, 2014) (granting the government's motion to dismiss, but allowing plaintiffs to file an amended complaint and noting that plaintiffs "have sufficiently pleaded that Defendants exceeded their authorized power" by issuing "immigration detainers without probable cause resulting in unlawful detention"); *Villars v. Kubiatoski*, --- F. Supp. 2d ----, 2014 WL 1795631, at * 10 (N.D. Ill. May 5, 2014) (rejecting dismissal of Fourth Amendment claims concerning an ICE detainer issued "without probable cause that Villars committed a violation of immigration laws"); *Galarza v. Szalczyk*, Civ. Action No. 10-cv-06815, 2012 WL 1080020, at *14 (E.D. Penn. March 30, 2012) (denying qualified immunity to immigration officials for unlawful detention on an immigration detainer issued without probable cause), rev'd and remanded on other grounds, 745 F.3d 634 (reversing district court's finding of no municipal liability); *Uroza v. Salt Lake City*, No. 2:11CV713DAK, 2013 WL 653968, at *6-7 (D. Utah Feb. 21, 2013) (denying dismissal on qualified immunity grounds where plaintiff claimed to have been held on an immigration detainer issued without probable cause). *Cf. Makowski v. United States*, --- F. Supp. 2d ---, 2014 WL 1089119, at *10 (N.D. Ill. 2014) (concluding that plaintiff stated a plausible false imprisonment claim against the United States where he was held on a detainer without probable cause).

This new program should be referred to as the "Priority Enforcement Program" or "PEP."

Nothing in this memorandum shall prevent ICE from seeking the transfer of an alien from a state or local law enforcement agency when ICE has otherwise determined that the alien is a priority under the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum and the state or locality agrees to cooperate with such transfer. DHS will monitor these activities at the state and local level, including through the collection and analysis of data, to detect inappropriate use to support or engage in biased policing, and will establish effective remedial measures to stop any such misuses.[2] I direct the Office of Civil Rights and Civil Liberties to develop and implement a plan to monitor state and local law enforcement agencies participating in such transfers.

Finally, acquainting state and local governments, and their law enforcement components, with this policy change will be crucial to its success. I therefore direct the Assistant Secretary for Intergovernmental Affairs to formulate a plan and coordinate an effort to engage state and local governments about this and related changes to our enforcement policies. I am willing to personally participate in these discussions.

---

[2] *See* Homeland Security Advisory Council, *Task Force on Secure Communities Findings and Recommendations*, September 2011.

(n.7)

INTERPRETER RELEASES, February 5, 1990

164

Appendix I

# Memorandum



C-1588-P

| Subject Family Fairness:  Guidelines For Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens | Date FEB  2 1990 |
|---|---|

To                                                    From

> Regional Commissioners          Office of the
>       Eastern                   Commissioner
>       Northern
>       Southern
>       Western

On November 13, 1987, the Service implemented guidelines on granting voluntary departure to the ineligible spouses and children of legalized aliens, the so-called "family fairness" policy.

The Service is likely to face the issue of family fairness for several more years, because of the length of time needed for newly legalized aliens to acquire lawful permanent resident status and then to wait for a visa preference number to become available for family members.  Accordingly, the Service is clarifying its family fairness policy, to assure uniformity in the granting of voluntary departure and work authorization for the ineligible spouses and children of legalized aliens.

Effective February 14, 1990, the following policy is to be implemented by all district directors in determining the eligibility for voluntary departure of ineligible spouses and children of legalized aliens.

1.    Voluntary departure will be granted to the spouse and to unmarried children under 18 years of age, living with the legalized alien, who can establish that they have been residing in the United States since on or before November 6, 1986, if

> - the alien is admissible as an immigrant, except for documentary requirements;

> - the alien has not been convicted of a felony or three misdemeanors committed in the United States;

> - the alien has not assisted in the persecution of any person or persons on account of race, religion,

INTERPRETER RELEASES, February 5, 1990

165

Appendix I, continued

---

nationality, membership in a particular social group or
political opinion.

2.   Voluntary departure will be granted for a one-year
     period to aliens who meet these requirements.  Cases
     will be reviewed on an annual basis thereafter by
     district directors to determine whether extensions of
     voluntary departure should be issued.

     - A grant of voluntary departure based on family
     fairness will be terminated if the legalized family
     member loses his or her status.

     - A grant of voluntary departure based on family
     fairness will be terminated if the alien fails to
     maintain the requirements outlined in Paragraph 1.

     - A grant of voluntary departure issued pursuant to
     this policy shall not be terminated for the sole
     reasons that the legalized family member has become a
     lawful permanent resident.

3.   Documentary evidence must be submitted to establish

     - the family relationship, through marriage
     certificates for spouses and birth or baptismal
     certificates for children and

     - residence with the legalized alien, through a sworn
     affidavit, under penalty of perjury, by the legalized
     alien.

4.   Work authorization will be granted to aliens who
     qualify for voluntary departure under Paragraph One and
     as provided in Paragraph Two.

5.   In the case of a child born after November 6, 1986, no
     deportation proceedings shall be instituted as long as
     a parent maintains his or her status as a legalized
     alien.

The Legalization and Special Agricultural Worker Programs will
eventually bring permanent lawful immigration status to nearly 3
million aliens.  It is critical that the Service continue to
respond to the needs of these aliens and their immediate family
members in a consistent and humanitarian manner.

GENE MCNARY
Commissioner

A-31                                                    (n.8)

# AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

October 2014

## Executive Grants of Temporary Immigration Relief, 1956-Present

Much has been made of President Obama's Deferred Action for Childhood Arrivals (DACA) program, through which he deferred deportation for young adults brought to the U.S. as children. But as immigration legal scholar Hiroshi Motomura has noted, the president has broad executive authority to shape the enforcement and implementation of immigration laws, including exercising prosecutorial discretion to defer deportations and streamline certain adjudications. In fact, the history books reveal that President Obama's action follows a long line of presidents who relied on their executive branch authority to address immigration challenges.

A chart of these decisions below makes clear that presidents have ample legal authority—and abundant historical precedent—supporting their discretion to take action in immigration matters. Since at least 1956, every U.S. president has granted temporary immigration relief to one or more groups in need of assistance. This chart collects 39 examples, which span actions large and small, taken over many years, sometimes by multiple administrations.[1] Some presidents announced programs while legislation was pending. Other presidents responded to humanitarian crises. Still others made compelling choices to assist individuals in need when the law failed to address their needs or changes in circumstance.

Perhaps the most striking historical parallel to today's immigration challenges is the "Family Fairness" policy implemented by Presidents Ronald Reagan and George Bush, Sr. The story behind the fairness policy begins on November 6, 1986, when President Reagan signed the 1986 Immigration Reform and Control Act (IRCA), which gave up to 3 million unauthorized immigrants a path to legalization if they had been "continuously" present in the U.S. since January 1, 1982. But the new law excluded their spouses and children who didn't qualify and forced them to wait in line, creating "split-eligibility" families, as they were called. The U.S. Catholic bishops and immigration groups criticized President Reagan for separating families.

In 1987, Reagan's Immigration and Naturalization Service (INS) commissioner announced a blanket deferral of deportation (logistically similar to today's DACA program) for children under 18 who were living in a two-parent household with both parents legalizing, or with a single parent who was legalizing. Then, in July 1989, the Senate passed legislation to protect a bigger group—prohibiting deportation of all spouses and children of those who were legalizing under IRCA.

But the legislation stalled in the House, and in 1990 President Bush Sr. administratively implemented the Senate bill's provisions. His INS commissioner, saying "We can enforce the law humanely," expanded the blanket deferral to as many as 1.5 million spouses and children of immigrants who were legalizing, provided they met certain criteria. President Bush thus protected over 40 percent of the then-unauthorized population from deportation. The House then passed legislation, and President Bush signed it later that year.

# AMERICAN
# IMMIGRATION
# COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

The Family Fairness program is only one example of the common characteristics of presidential decisions to act on immigration. Several decisions were large-scale actions potentially affecting hundreds of thousands or millions of immigrants. Some presidents focused on the necessity of keeping families together. And other presidents acknowledged the absurdity of trying to deport people for whom major legislation in Congress was pending. Some of these examples include:

- **Large-scale actions:** In addition to Family Fairness, other large-scale actions include paroles of up to 600,000 Cubans in the 1960s and over 300,000 Southeast Asians in the 1970s, President Carter's suspension of deportations for over 250,000 visa-holders, and President Reagan's deferral of deportations for up to 200,000 Nicaraguans.

- **Family-based actions:** Other actions to protect families include the suspended deportations of families of visa-holders (Carter), parole of foreign-born orphans (Eisenhower, Obama), deferred action to widows of U.S. citizens and their children (Obama), and parole-in-place to families of military members (Obama).

- **Actions while legislation was pending:** Other actions taken while legislation was pending include parole of Cuban asylum seekers fleeing Castro (Nixon, Kennedy, Johnson), deferred action to battered immigrants whom the Violence Against Women Act (VAWA) would protect (Clinton), parole of orphans (Eisenhower), and DACA (Obama).

## Endnotes

[1] This data is compiled from Marshall Fitz, *What the President Can Do on Immigration If Congress Fails to Act* (Washington, DC: Center for American Progress, July 2014), http://www.americanprogress.org/issues/immigration/report/2014/07/01/93042/what-the-president-can-do-on-immigration-if-congress-fails-to-act/; Andorra Bruno, Todd Garvey, Kate Manuel, and Ruth Ellen Wasem, *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (Washington, DC: Congressional Research Service, July 13, 2012), http://edsource.org/wp-content/uploads/Deferred-Action-Congressional-Research-Service-Report.pdf; Arthur C. Helton, "Immigration Parole Power: Toward Flexible Responses to Migration Emergencies," *Interpreter Releases* 71, no. 1637 (December 12, 1994); John W. Guendelsberger, "Family Fairness: A Status Report," *In Defense of the Alien* 15 (1992):45-57, http://www.jstor.org/stable/23143114; and other media reports, press releases, and articles, linked to here where publicly available.



AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

## Executive Grants of Temporary Immigration Relief, 1956-Present

| Year(s) | 1956 | 1956-58 | 1959-72 | 1962-65 | 1975-79 |
|---|---|---|---|---|---|
| **Relief Covered:** | 923 orphans were paroled into the custody of military families seeking to adopt them, pending Congressional legislation providing them permanent resident status | Parole of Hungarians who escaped after 1956 uprising against Soviets failed | Parole for Cuban asylum seekers fleeing Cuban revolution | Executive parole of Chinese who fled to Hong Kong in early 1962 | Executive parole of Indochinese from Vietnam, Cambodia, and Laos, in 10 authorizations or extensions from 1975-79 |
| **# Affected:** | 923 | 31,915 granted parole. | 621,403 received, vast majority granted parole | 15,100 paroled | 360,000 arrived in US, most under parole authorization |
| **President(s):** | Eisenhower | Eisenhower | Eisenhower, Kennedy, Johnson, Nixon | Kennedy, Johnson | Ford, Carter |
| **Other Notes:** | Press release, Oct. 26, 1956: "The Secretary of State and the Attorney General have just reported to me that this can be done." | | Legislation was pending during this time (i.e. the Cuban Adjustment Act of 1966). In FY 1972, a total of 17,109 Cuban asylum seekers were paroled into the U.S. via airlift | | Some also eligible under conditional entry, but since not enough entries statutorily available, most were paroled. Most of 130,000 refugees who were evacuated during 1975 U.S. withdrawal from Vietnam were paroled |

3



AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| Year(s): | 1976 | 1977 | 1977-82 | 1977-1980 | 1978 |
|---|---|---|---|---|---|
| Relief Covered: | Extended Voluntary Departure (EVD) for Lebanese | AG temporarily suspended expulsion of "Silva letterholders," who were suing because the State Department incorrectly calculated a visa cap, while their litigation and legislation moved forward | Extended Voluntary Departure (EVD) for Ethiopians | Parole for Soviet refugees | Extended Voluntary Departure (EVD) for Ugandans |
| # Affected: | Unknown (although 14,000 fled Lebanon to US) | Ultimately 250,000 (500,000 including dependents) | 15,000+ | 50,000 + (9,000 in Jan. and Dec. 1977; 12,000 in June 1978; 36,000 in 1979) | Unknown |
| President(s): | Ford | Carter | Carter, Reagan | Carter | Carter |
| Other Notes: | Extended Voluntary Departure (EVD) is an administrative process by which designated nationals of a country were protected from deportation and provided work authorization. See 563 F. Supp. 157 (D.D.C. 1983) | | Reagan extended this policy in 1982, after Reps. Dixon (D-CA) and Kemp (R-NY) cosponsored resolution | From 1972-on, parole was used frequently for Soviet refugees when not enough conditional entries were statutorily available | |

4



AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| Year(s): | 1979 | 1979 | 1980 | 1980 | 1981-1987 |
|---|---|---|---|---|---|
| Relief Covered: | Extend Voluntary Departure (EVD) for Nicaraguans | Extended Voluntary Departure (EVD) for Iranians | Extended Voluntary Departure (EVD) for Afghans | Parole of Cubans and Haitians during Mariel boatlift | Extended Voluntary Departure (EVD) for Poles |
| #Affected: | 3,600 | Unknown | Unknown | 123,000 paroled in US by 1981 | 7,000 (as of 1987) |
| President(s): | Carter | Carter | Carter | Carter | Reagan |
| Other Notes: | | In response to Iranian Revolution against Shah. | | | In response to Polish Communist government declaring martial law in 1981, after crackdown on Solidarity strikes. Initiated in 1981, extended in 1984 and 1987 |

5

(n.9)



AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| | 1987 | 1987 | 1989 | 1989 | 1990 |
|---|---|---|---|---|---|
| **Years(s):** | | | | | |
| **Relief Covered:** | AG Meese directed INS not to deport Nicaraguans and to grant them work authorizations, if they demonstrated a "well-founded fear of persecution," even if denied asylum | Unauthorized children of some noncitizens who applied to legalize after 1986 immigration reform | Executive directive of deferred action for Chinese nationals following Tiananmen Square | Parole of Soviets and Indochinese, even though denied refugee status | Further executive order formalizing Deferred Enforced Departure (DED) for Chinese nationals following Tiananmen Square |
| **# Affected:** | Up to 200,000 | More than 100,000 families | 80,000 | 2,225 Indochinese in 1989; 5,000 Soviets as of 1989 | 80,000 |
| **President(s):** | Reagan | Reagan | Bush Sr. | Bush Sr. | Bush Sr. |
| **Other Notes:** | Legislation was pending. Ultimately, the Nicaraguan Adjustment and Central American Relief Act (NACARA) passed | Reagan's AG Meese also authorized INS to defer deportation proceedings for "compelling or humanitarian factors" | Visa overstays had to report to INS to benefit from deferred action and apply for work authorization. Bush: "I reemphasize my commitment... to never allow any action that would force the return of Chinese students if their lives or liberty are at risk." | | "Deferred Enforced Departure" is a stay of deportation, and often provision of work authorization, within the President's foreign relations power. Bush's executive order suspended deportations, provided work authorization for all Chinese nationals in the US as of 6/5/89, and waived a regulation to allow adjustment of status |

6



AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| Year(s) | 1990 | 1991 | 1992 | 1994 | 1997 |
|---|---|---|---|---|---|
| **Relief Covered:** | Deferred deportation of unauthorized spouses *and* children of individuals legalized under 1986 Immigration Reform and Control Act (IRCA) | President directed AG to grant deferred enforced departure (DED) to Persian Gulf evacuees who were airlifted to US after 1990 Kuwait invasion | Bush Administration granted DED to certain El Salvadorans, even though and because their statutory TPS grant expired | Parole of further Cubans into the US. | Deferred Enforced Departure (DED) for Haitians in the US since before 1995 |
| **# Affected:** | Up to 1.5 million | 2,227 | 190,000 | ~28,000 | 40,000 |
| **President(s):** | Bush Sr. | Bush Sr. | Bush Sr., Clinton | Clinton | Clinton |
| **Other Notes:** | Bush INS Commissioner issued blanket "Family Fairness" policy, and dropped "compelling or humanitarian factors" requirement in prior executive order. Legislation had passed the Senate, but not the House, providing similar relief | Criteria: Those who had US citizen relatives or harbored US citizens during the invasion. Allowed evacuees to apply for permanent residency. A Kuwaiti doctor said, "I feel the President has finally put a happy ending on this tragic story." | President Clinton subsequently extended the DED grant until Dec. 31, 1994 | Included Cubans on the immigrant visa waiting list, unmarried sons and daughters of Cubans issued immigrant visas or granted refugee status, and family members who reside in the same household. Also paroled Cubans detained at Guantanamo and Panama | Legislation was pending to help these Haitians (Haitian Refugee Immigration Fairness) Act of 1998 allowed these Haitians to obtain green card) |

7



AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| Year(s) | 1997 | 1998 | 1999 | 2002 | 2005 |
|---|---|---|---|---|---|
| Relief Covered: | Deferred action to noncitizens who might gain relief through Violence Against Women Act (VAWA), if it passed | Attorney General temporarily suspended deportations to El Salvador, Guatemala, Honduras, and Nicaragua, in response to Hurricane Mitch | Deferred Enforced Departure (DED) for Liberians for 1 year | Executive order of expedited naturalization for green card holders who enlisted in military | Deferred action for foreign academic students who were affected by Hurricane Katrina |
| # Affected: | Unknown | 150,000 | 10,000 | Unknown | Unknown |
| President(s): | Clinton | Clinton | Clinton | Bush | Bush |
| Other Notes: | VAWA legislation was pending. Criteria: Battered noncitizens with approved LPR self-petitions, and their derivative children | | | Order eliminated a three-year wait, let the soldiers seek citizenship immediately and applied to anyone on active duty as of Sept. 11, 2001. Included Lance Cpl. José Gutiérrez, a Guatemalan who received U.S. status through SIJ and died in Iraq | Bush also suspended employer verification rules. Congress was considering legislation at the time |

8

(n.9)



AMERICAN IMMIGRATION COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| | 2006 | 2007 | 2009 | 2009 | 2010 |
|---|---|---|---|---|---|
| Year(s) | | | | | |
| Relief Covered: | Established Cuban Medical Parole Program, to allow Cuban doctors conscripted abroad to apply for parole at US embassies | Deferred Enforced Departure (DED) for Liberians in 2007, whose TPS had statutorily expired | Extended Deferred Enforced Departure (DED) for qualified Liberians | Extended deferred action to widows and widowers of U.S. citizens, and their unmarried children under 21 | Parole-in-place to spouses, parents, and children of U.S. citizen military members |
| # Affected: | 1,574 as of Dec. 2010 | 3,600 | Unknown | Unknown | Unknown |
| President(s): | Bush | Bush | Obama | Obama | Obama |
| Other Notes: | Program still in place | | | | Granted on case-by-case basis. First grant of parole-in-place was under Bush Administration |

9

A-40

(n.9)



**AMERICAN IMMIGRATION COUNCIL**

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| Year(s) | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|
| **Relief Covered:** | Parole to Haitian orphans who were in the process of being adopted by U.S. citizens | Extended Liberian DED through March 2013 | Deferred action for childhood arrivals (DACA) | Revised parole-in-place policy to spouses, parents, and children of U.S. citizen military members |
| **# Affected:** | Unknown | 3,600 | Up to 1.8 million | Unknown |
| **President(s):** | Obama | Obama | Obama | Obama |
| **Other Notes:** | Actions followed Haitian earthquake on January 12, 2010 | | Legislation was pending (i.e. the DREAM Act). Provided for a two-year renewable reprieve from deportation, and work authorization, for those meeting certain criteria. USCIS took significant actions to process applications | Revised policy so that "ordinarily" granted |

10



| Subject | | Date |
|---|---|---|
| Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues | | MAY - 6 1997 |

| To | From |
|---|---|
| Regional Directors<br>District Directors<br>Officers-in-Charge<br>Service Center Directors | Office of Programs |

This memorandum outlines changes in the handling of I-360 self-petitions for immigrant status filed by battered spouses and children of U.S. citizens and permanent residents aliens and addresses related issues.  It should be read as a supplement to the guidance issued by the Office of Programs on April 16, 1996.

## Background

The issue of domestic violence and its potential impact on spouses and children who would normally be entitled to immigration benefits under the I-130 petitioning process was first addressed by Congress in the Violence Against Women Act ("VAWA") which was enacted as part of the Violent Crime Control Act of 1994 ("Crime Bill").  The VAWA contains provisions to limit the ability of an abusive U.S. citizen ("USC") or lawful permanent resident ("LPR") to utilize the spouse' or child's immigration status in order to perpetuate the abuse.  The Service published an interim rule on March 26, 1996 (59 FR 13061-13079) establishing the procedures for qualified abused spouses and children to self-petition for immigrant classification using the Form I-360. This rule was accompanied by extensive field instructions in the Office of Programs' memorandum of April 16, 1996.

In the autumn of 1996, Congress enacted various new provisions relating to battered aliens, in both the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA" or "the welfare law") and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA" or "the immigration bill").  <u>None of these new provisions directly affect the legal standards applicable to adjudication of I-360 applications.</u> The new provisions do, however, provide additional benefits and protections for battered aliens, and have created the need for INS to restructure how we handle this category of very sensitive cases.  This memorandum outlines those changes, and instructs field offices on the handling of pending cases and new cases received.

Guidance on Battered Alien Issues
Page 2

## Centralization at the Vermont Service Center

On April 7, 1997, the Service published a notice in the Federal Register at 16607-08 establishing the Vermont Service Center as the direct mail filing location for all Forms I-360 filed by self-petitioning battered spouses and children (Attachment A). This centralization was necessitated by the new welfare provisions which make certain battered aliens -- including self-petitioners and others -- eligible for public benefits. In addition to adjudicating I-360 self-petitions, the Vermont Service Center will serve as a central "clearinghouse" for inquiries from federal, state and local benefit-granting agencies regarding pending or recently-adjudicated cases, as discussed in more detail in the Verification section, below. Finally, as an alien may be eligible for public benefits not only upon the approval of the relevant immigrant status, but also upon having filed a petition which makes a prima facie case for such status, the Vermont Service Center will also begin making prima facie determinations pursuant to an interim rule expected to be published in the Federal Register prior to June 1, 1997.

While these are sensitive cases which require special handling, the move to centralized filing is expected to have only minimal impact on caseloads in the district offices. Since the beginning of the fiscal year, according to G-22 statistics, fewer than 500 cases have been filed Servicewide. Centralization allows the Service to have a small corps of officers well-versed in the complexity and sensitivity of VAWA adjudications, and will also allow for better monitoring of the caseload and any fraud trends.

Although the direct mail notice allows self-petitioners to continue to file locally until May 7, INS field offices and the other service centers are encouraged to forward to the Vermont Service Center those I-360s for which review/adjudication has not been initiated. All I-360 self-petitions received on or after May 7 shall be forwarded to the Vermont Service Center, but the 30 day transition period requires that no office refuse to receive an I-360 submitted before June 6, 1997. Immediate relatives, who were previously able to file concurrent I-360 self-petitions and I-485 adjustment applications, should be advised to retain their I-485s pending the Vermont Service Center's adjudication of the I-360 self-petition. The battered alien I-360s are to be mailed to:

> INS Vermont Service Center
> Attn: Family Services Product Line (VAWA)
> 75 Lower Weldon Street
> St. Albans, VT  05479-0001

As inquiries from benefit-granting agencies can be expected in many cases, offices are encouraged to expedite handling of all pending cases which they do not forward to the Vermont Service Center. Nothing in this move to centralize direct mail filing changes the ability of the Vermont Service Center to transfer I-360s to district offices when an interview or investigation of suspected fraud is merited.

Guidance on Battered Alien Issues
Page 3

## Deferred Action and Employment Authorization

In the April 16 memorandum, INS offices were encouraged to utilize voluntary departure and deferred action in order to provide approved VAWA self-petitioners with employment authorization pending the availability of a visa number.  Since that time, in IIRIRA, Congress has limited grants of voluntary departure to no more than 120 days, and INS regulations no longer allow for work authorization during any period of voluntary departure.

Starting June 1, when the Vermont Service Center approves a VAWA self-petition, it will then also assess, on a case-by-case basis, whether to place the alien in deferred action status pursuant to new deferred action guidelines in the Interim Enforcement Procedures (a forthcoming document which will be available on the 96Act bulletin board, as well as in printed versions).  By their nature, VAWA cases generally possess factors that warrant consideration for deferred action.  In an unusual case, there may be factors present that would militate against deferred action;  cases should therefore receive individual scrutiny.  Although the Vermont Service Center is not required to obtain Regional Director approval for deferred action, it will report all grants of deferred action to the Eastern Regional Office for statistical and tracking purposes.  In addition, a process for periodic review of the deferred action decisions made by the Vermont Service Center is planned.

If the alien is placed in deferred action, the Vermont Service Center will notify the alien that he or she may submit an I-765, Application for Employment Authorization.   After the initial deferred action decision and issuance of a one-year employment authorization document, the Vermont Service Center will hold these files and review the deferred action decision upon each application for extension of work authorization.  When the Vermont Service Center is notified by the National Visa Center or by an INS district office that the alien is seeking a visa abroad or has filed an adjustment application, the Vermont Service Center will forward the file to the appropriate office.

In cases where the I-360 was approved prior to April 1, many aliens may have current grants of voluntary departure.  Upon expiration of voluntary departure, and for other cases adjudicated before June 1, district offices are strongly encouraged to utilize deferred action to provide work authorization pending the availability of a visa.  As described in more detail below, battered aliens are now eligible for certain public benefits, which are often necessary for the victim to be able to leave the abusive situation.  To deny such aliens work authorization when they are able to obtain public assistance is counter to the spirit of welfare reform.  Moreover, for many individuals, the ability to work is necessary in order to save the funds necessary to pay for the adjustment application and the penalty fee.  As it has already been determined that these aliens face extreme hardship if returned to the home country and as removal of battered aliens is not an INS priority, the exercise of discretion to place these cases in deferred action status will almost always be appropriate.

Guidance on Battered Alien Issues
Page 4

## Non-Disclosure Provisions and Other Limitations in IIRIRA § 384

Section 384 of IIRIRA strictly prohibits the release of <u>any</u> information relating to a VAWA self-petitioner, and also precludes any INS officer from making an adverse determination of admissibility or deportability based solely on information furnished by an abusive relative. Any violation of this section can subject an INS officer to disciplinary action and a fine of up to $5,000. This provision is discussed in more detail in IIRIRA Implementation Memo #96act.036 (Attachment B).

## Verification of Status for Benefit-Granting Agencies

Section 501 of IIRIRA amends the welfare law to provide that certain battered aliens are "qualified aliens" for purposes of eligibility for some public benefits. This includes not only those aliens who can self-petition for immigrant status under the VAWA provisions, but also other aliens who have been abused by a member of their household. In cases other than VAWA self-petitioning cases, it is the benefit-granting agency, not the INS, which will assess the claims of abuse. Benefit providers, however, will request that INS verify the alien's status or the fact that a petition is pending on behalf of the alien. Detailed procedures for verification of these and other categories of qualified aliens under welfare law are being provided to benefit-granting agencies by the Department of Justice in a document entitled "Interim Guidance on Verification," which is expected to be published in the Federal Register later this month. An INS field directive designed for immigration status verifiers will be issued in conjunction with publication of the Interim Guidance on Verification.

Although some verification inquiries relating to battered aliens will be handled through the normal status verification channels, many of the inquiries will fall outside the type of inquiries which status verifiers typically handle. For example, because of the dynamics of abusive relationships, the abuse victim will not always have access to approval notices or other documentation relating to their cases. Moreover, because aliens can be eligible for public benefits upon filing a petition which makes a prima facie case for status, benefit providers will sometimes be seeking information on pending cases, including a determination as to whether the petition makes a prima facie case for eligibility for the status sought.

The Vermont Service Center will serve as the "clearinghouse" for these unusual types of inquiries, which will be submitted by fax using an inquiry format patterned on the sample at Attachment C. It is anticipated that the Vermont Service Center will be able to handle the vast majority of inquiries, which should pertain to cases pending there or in one of the other service centers. For those inquiries which pertain to cases pending in district offices or sub-offices, the Vermont Service Center will forward the inquiries by fax to the attention of a designated Service

Guidance on Battered Alien Issues
Page 5

Center liaison officer in each district or sub-office.   Each district and sub-office should complete the liaison designation form at Attachment D and fax to Lisa Batey at 202/514-9262 prior to May 20 (the list of designees will be shared with INS regional offices and all four Service Centers). The designated liaison should ensure that a response is provided to the requesting agency, with a copy to the Vermont Service Center, within five working days.  Information on pending or completed cases should not be given over the telephone, but rather should be sent via facsimile.

As you will note, the sample inquiry format includes a limited waiver of the non-disclosure provisions of IIRIRA § 384.  At present, such a waiver is necessary before INS can provide any information relating to a VAWA self-petitioner, even to another governmental entity for purposes of determining eligibility for public benefits.  Because of IIRIRA § 642, no waiver is necessary in other categories of cases, such as where the alien seeking benefits is the beneficiary of a spousal I-130 petition, but has suffered abuse at the hands of another household member.  If there is any doubt as to whether a waiver is required, the officer should seek guidance from his or her district counsel.  If there are waiver questions which cannot be resolved locally, please contact Lisa Batey of the Headquarters Office of Programs, at 202/514-9089.

## Providing Information on Filing of I-360 Self-Petitions

Some battered aliens who are eligible to self-petition have chosen not to do so, instead relying upon the I-130 petition filed by their abuser.   This not only allows the abuser to continue to control the spouse's or child's immigration status by withdrawing the petition, but also places a battered spouse at risk should the abuser subsequently obtain a divorce before the spouse is able to adjust status.  For these and other reasons, such as easier determinations as to welfare eligibility and employment authorization, an immigration officer who deals with a battered alien should inform that alien about the process for self-petitioning, despite the fact that an I-130 petition is still pending on his or her behalf.  The Interim Guidance on Verification similarly urges benefit agency caseworkers to give such aliens the number for the INS Forms Line [1-800-870-3676] and for the National Domestic Violence Hotline [1-800-799-7233] for assistance in preparing self-petitions.

## Making Prima Facie Determinations

As noted above, Section 501 of IIRIRA includes in the definition of "qualified alien" for public benefit purposes those aliens who have filed a self-petition, or are the beneficiary of a spousal or parental petition, which sets forth a prima facie case for immigrant status under a variety of provisions.  Specifically, those with approved petitions or pending petitions which make a prima facie case for status under any of the following Immigration and Nationality Act ("INA") provisions are included:

Guidance on Battered Alien Issues
Page 6

◆      spouse or child of a USC under 204(a)(1)(A)(i)

◆      spouse, child or unmarried son or daughter of an LPR under 204(a)(1)(B)(i)

◆      widow(er) of a USC under 204(a)(1)(A)(ii)

◆      self-petitioning battered spouse or child of a USC or LPR under 204(a)(1)(A)(iii)-(iv) or
       204(a)(1)(B)(ii)-(iii)

In all but the latter category, battery or abuse will not be part of the INS adjudication, but rather
will be assessed by the benefit-granting agency pursuant to the Interim Guidance on Verification.

       In the case of self-petitioning battered spouses and children, the Vermont Service Center
will begin making prima facie determinations no later than June 1, 1997, following publication of
an interim rule in the Federal Register.  If the self-petition and accompanying documentation are
adequate, the self-petitioner will receive a decision or a Notice of Prima Facie Determination
("NPFD") within three weeks of filing.  The approval notice or NPFD may be presented to benefit
granting agencies as evidence of the applicant's status as a "qualified alien".   The NPFD will be
valid for 150 days, to allow time for the submission of any supplemental evidence and for
adjudication of the self-petition.

       In those cases which are not handled by the Vermont Service Center, benefit-granting
agencies will be expecting decisions or prima facie determinations within a similar three-week
time frame.   As the non-VAWA cases are simpler adjudications based purely on family
relationship, there are no plans to define what would constitute a prima facie case.  Instead, when
a benefit-granting agency inquires about a pending case, INS offices should expedite the
adjudication of the case in order to minimize the time during which the alien is unable to receive
public assistance for which he or she may be eligible.

## Aliens Seeking Issuance of Notices to Appear

       An individual may also be eligible for public benefits if he or she makes a prima facie case for
cancellation of removal as a battered spouse or child under INA § 240A(b)(2).   INS district offices
shall promptly issue a Notice to Appear to any alien who makes a credible request to be placed in
proceedings in order to raise a claim for cancellation of removal under section 240A(b)(2).   District
offices may want to do a search of the CLAIMS system to determine if a self-petition was filed and
denied.  It is important to note, however, that some individuals who are ineligible for status pursuant
to the self-petitioning provisions will be eligible for cancellation (e.g., where the marriage has been
terminated).  Once proceedings have been initiated, the alien can contact the immigration court to
seek a determination that he or she has demonstrated a prima facie case for cancellation of removal.

Guidance on Battered Alien Issues
Page 7

## Other District Office Issues

While centralizing I-360 adjudications was motivated in part by the goal of having a small corps of officers well-trained in domestic violence issues, district adjudications officers will still interact with self-petitioners during the adjustment process.  The nature of domestic violence and the sensitivity needed in dealing with victims are topics to which few INS officers will have had exposure.  District offices are strongly encouraged to identify two or more officers (depending upon the size of the district) to handle all adjustments following from I-360 approvals.  The designated officers should have the experience, discretion and communications skills to be able to balance sensitivity in dealing with true victims with vigilance against fraud, and would ideally also serve as the designated Service Center liaison officer described at pages 4-5, above.

Recognizing the need for more training on complex and subtle domestic violence issues, Headquarters is looking into opportunities to provide informational materials and perhaps training sessions.  In addition, a number of reputable non-profit organizations throughout the country provide training for personnel who work with domestic violence victims, and are willing to share their expertise with INS offices.  Last year, for example, training for San Francisco adjudicators was provided by representatives of the Family Violence Prevention Fund.  The training was well-received by district personnel, and was given at no cost to the district.  Managers interested in obtaining materials or in fostering contacts with local organizations which work with victims of domestic violence should contact either of the persons named below for information about organizations active in their area.

\*       \*       \*       \*       \*

The Office of Field Operations concurs with this memorandum.  Addressees are strongly encouraged to distribute copies of this memorandum widely, particularly to adjudications and investigations officers.  Questions about this policy or about the interim rule published in the Federal Register may be directed to Lisa Batey, Headquarters Office of Programs, 202/514-9089, or Karen FitzGerald, Headquarters Benefits Division, at 202/305-4904.

Paul W. Virtue
for   Acting Executive Associate Commissioner

[sample only – request to be submitted on letterhead of requesting agency]

Fax Request Form – from Benefit Agency to INS

To: INS Vermont Service Center, fax 802/527-3252
Attn: Battered Alien Review Unit    This fax consists of ____ pages.

This request is being submitted by:
Name (printed): _____ Tit_____
Agency name and address: _____
_____
Fax number: _____
Agency case tracking number: _____

Item 1: An alien applicant is seeking _____ bene____ from the agency _____ified above, pursuant
to recent welfare reform legi_____ this app_____ fa___ to c_____ two categories:

____ a) believes an INS Fo_____0, Pe___ for _____ status, was filed on the
applicant's beh_____ (i_____ ard_____ h___self-petitioned as a
widow(er) us_____ Fo___ _60, P_____ fo_____ ien, Widow or Special
Immigrant (co___ rt A___ low);

____ b) has self____ed as a____tered _____ se or ch___ using ___ Form I-360, Petition for
Am____, W___, or _____al Imm_____ (complete ___ B, below).

Item 2: The ___c __ fin___ed ___ is requ____ ___ INS:  (please check ___ one)
□ Verify th__ ___e att___ed doc____ is a val___ ___py of the I-797 appro___ notice, prima facie
dete____ation or recei___ ___ice.
□ Make a prim___ ____ ___ c____ __e adjudication of the petition and notify the
requesti_____
□ Update the stat___ ___ ___ ___cy's _____ (insert date) request for a prima
facie determination or ___ding adjudication.  (Requesting agency should allow three
weeks from the request f___ prima facie determination or filing of a petition before
making this request.)
□ Determine whether the ___ ___ has filed a petition or whether a petition has been filed on his
or her behalf under (a) or (b), as indicated above.  If so, please make a prima facie
determination or expedited adjudication of the applicant's petition and notify the
requesting agency of the outcome.

Date: _____    Agency Signature: _____

A-49                                                        (n.10)

**PART A:** For an Applicant Who Is the Beneficiary of a Petition Filed by Spouse or Parent, or Who Has Self-Petitioned as a Widow(er)

**Step 1:** Does the alien applicant have a copy of an INS Form I-797 indicating that an I-130 was filed on his/her behalf?    [If applicant has self-petitioned as a widow(er), check "No" and proceed to Step 2]

Yes _____ → Attach a copy of the I-797 to this form (you need not complete Step 2)

No _____ → If the applicant has no documentation, or has documentation other than a Form I-797, proceed to Step 2

**Step 2:** If the applicant does not have a Form I-797, please fill out the following information. All blanks, except that noted "if available", must be completed.

. Benefit Applicant's full name:

Benefit Applicant's date of birth:

Benefit Applicant's best guess as to the location where it filed: _____

Benefit Applicant's best guess as to the _____ _____ (mo/yr) with which INS office petition was filed:

Petitioner's full name:

Petitioner is Applicant's spouse ___ parent ___ self [widow(er)]   (check one)

Petitioner is a ___ U.S. citizen or ___ lawful permanent resident ("green card holder")

Petitioner's date of ___

Petitioner's Alien Registration Number, if available: A _____

Petitioner's address at the ___ filing the ___: _____

___ street address, ___) _____

**PART B:** For an Applicant Who Has Self-Petitioned as a Battered Spouse or Child

**Step 1:** Attach a copy of the receipt notice or other documentation evidencing that a Form I-360 has been filed with the INS.   If that documentation does not include the following information, please complete the blanks:

Applicant/self-petitioner's full name: _____

Applicant/self-petitioner's date of birth: _____

Date I-360 was filed: _____

Location (city) of INS office where filed: _____

**Step 2:** A waiver signed by the alien appears b_____

This waiver authorizes release of information _____ _____ _____ _____ determining eligibility for federal, state or local _____ _____ _____ _____ _____ release of information to relatives of the _____ _____ any _____ _____ than those specified in paragraph (3), below.

**(1)** My name is (print full na_____ _____

**(2)** My date of birth is _____ 19____

**(3)** I hereby waive _____ restriction on the _____ of _____ relating to me under section 384 of the Illegal Immigration _____ and Immigra_____ Resp_____ility Act of 1996 (the "Immigration _____) t_____ _____ _____ _____ permit the Immigration and Naturalization Service ("INS") (or/or _____ successor _____ Office of Immigration Re_____ ("EOIR") to provide in wri_____ to any federal _____ local _____private benefit-granting en_____ seeking to verify my immigration status, the _____lo_____ infor_____ required to determine my eligibility for federal, state or local pub_____ ben_____ under the Personal Responsibility and Work Opportunity _____ _____ _____ _____, as amended by the Immigration Act:  (a) whether an applicant_____ _____ _____ _____ been filed by me or on my behalf under section 204(a)(1)(A) (i_____ _____ _____ 204(a)(1)(B) (ii) or (iii), section 216(c)(4)(C), section 244(a)(3) as in effect pri_____ to April 1, 1997, or section 240A(b)(2) of the Immigration and Nationality Act, and (b) w_____ether INS or EOIR has made a prima facie determination or final determination c_____ eligibility for relief under any of the above provisions, and, if so, the outcome of those _____terminations.

I declare, under penalty of perjury, that the foregoing is true and correct, and that I have executed this waiver knowingly and voluntarily.

Executed on (date): _____

_____
Signature of Applicant

A-51                                                                (n.10)