

MENU

Submit Q

Tweet    Share

10

Home » Research

REPORTS | AUGUST 2014

# DACA at the Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action

By Jeanne Batalova, Sarah Hooker, and Randy Capps

Education    Adult Education & Language Learning    K-12 Education                    see more...



DOWNLOAD REPORT

Since the Obama administration launched the Deferred Action for Childhood Arrivals (DACA) program in 2012, which offers temporary relief from deportation and the right to apply for work authorization for certain unauthorized immigrants who came to the United States as children, 55 percent of the 1.2 million youth who immediately met the program's criteria have applied, according to MPI estimates. As the first two-year eligibility period draws to a close, early DACA beneficiaries have begun to apply for renewal, with nearly 25,000 renewal applications submitted as of July 20, 2014.

This report provides the most up-to-date estimates available for the size, countries of origin, educational attainment, employment, English proficiency, age, gender, and poverty rates for the DACA population nationally and for key states, based on an analysis of U.S. Census data. The report also offers DACA application rates nationally and in key states, as well as for particular national-origin groups.

The report is accompanied by a new data tool that offers estimates of the current and potentially eligible DACA populations for 41 states, as well as detailed profiles for the United States and 25 states.

The MPI researchers find that slightly more than 2.1 million unauthorized immigrants who came to the United States as children are potentially eligible for DACA—with 1.2 million having immediately met the age, education, length of residence, and other criteria when the initiative launched in 2012. Two other groups could prospectively gain DACA status: 426,000 youth who appeared to fulfill all but the education requirements as of the program's launch, and 473,000 who were too young to apply but become eligible once they reach age 15 if they stay in school or obtain a high school degree or equivalent.

The analysis provides a mixed picture of DACA's first two years. On the one hand, the sheer volume of applicants is impressive. On the other, hundreds of thousands of immigrant youth have not yet gained a status that can change their lives in measurable ways, allowing them improved job prospects, the ability to apply for driver's licenses, and more. The report examines the educational, poverty, and other barriers to DACA enrollment.

## Table of Contents

I. Introduction

A. Assessing DACA at the Two-Year Mark

B. Report Purpose and New Analysis

II. The Immediately and Potentially Eligible DACA Population

III. National Application Rates

IV. Application Rates by State, Country of Origin, Sex, and Age

A. State of Residence

B. Country of Origin

C. Sex and Age

V. Characteristics of the Immediately Eligible Population

A. Region of Birth

B. Educational Attainment

C. English Proficiency and Language Spoken at Home

D. Poverty Status and Labor Force Participation

**VI. Characteristics of Youth Who Did Not Meet DACA's Education Requirements at Program Launch**

**VII. Characteristics of Children Eligible in the Future**

**VIII. Characteristics of DACA-Eligible Population in Selected States**

A. Countries of Origin

B. Educational Attainment

C. Poverty Levels

**IX. Conclusion**

American Immigration Council                                      Programs:



# Two Years and Counting: Assessing the Growing Power of DACA

This week marks the two-year anniversary of the Deferred Action for Childhood Arrivals (DACA) Program, first in by President Obama on June 15, 2012.  This research brief presents current findings from the National UnDACA Research Project (NURP) national survey on the impact that DACA has had on some of the young people who h received it.



We find that DACA beneficiaries have experienced a pronounced increase in econor opportunities, and that these benefits appear to be the strongest for those attending year colleges and those with college degrees. In addition to the importance of postse education, our findings also highlight a strong work ethic among DACAmented youn, that has significant implications for their new status as contributors to our nation's ec Our study findings also demonstrate the important role played by community organiz assisting DACA applicants and in helping them make the most of their benefits.

While our study shows that DACA is having a positive impact on many of its benefici benefits are only partial. Based on our research, we provide recommendations aime bolstering DACA's effectiveness and more fully addressing the needs of immigrant y adults and their families.

## The National UnDACAmented Research Project

Over the last several years, as growing numbers of undocumented children have made critical transitions to your adulthood, the barriers they face to higher education and professional jobs have resulted in wasted talent. This untenable situation imposes economic and emotional costs on undocumented young people themselves and on society as a whole.  But, due to congressional inactivity on immigration, many have been forced to put their lives hold.

With the initiation of DACA in 2012, hundreds of thousands of these young people have enjoyed the benefits of v access to the American mainstream. This change in the Obama Administration's enforcement policy temporarily deportations from the U.S. for eligible undocumented youth and young adults, and grants them access to renewi year work permits and Social Security Numbers. As of March 2014, 673,417 young people have applied to the p and 553,197 have been approved.  While DACA does not offer a pathway to legalization, it has the potential to n large numbers of eligible young adults into mainstream life, thereby improving their social and economic well-bei

American Immigration Council                                              Programs

Shortly after the beginning of the program, the National UnDACAmented Research Project (NURP) was launched effort to better understand how DACAmented young adults were experiencing their new status. In 2013, the NU research team carried out a national survey of DACA-eligible young adults between the ages of 18 and 32. A tot 2,684 respondents completed the survey. NURP efforts represent the largest data collection effort to date on thi population.

NURP respondents come from 46 states and the District of Columbia, and generally reflect the demographics of undocumented immigrant population. Respondents' median age is 22.7, while 40 percent are male and 60 perce female. More than three-fourths of respondents grew up in a 2-parent household. Nearly three-fourths of respon households are low-income.

What follows is an analysis of the experiences of young people who received DACA within the first 16 months of implementation of the program. We also provide a nuanced presentation of the DACA program by presenting fin based on a subsample of eligible non-applicants—those individuals who meet the DACA qualifications, but did n The results of this study have clear implications for policy and community practice.

## Key Findings

The following discussion focuses on the 2,381 individuals in our study who had received DACA by the time they the survey.

**DACA Increases Opportunity**

Without Social Security Numbers or the ability to work legally in the United States, undocumented young adults previously have access to a wide range of resources and opportunities afforded to their legal peers. However, si receiving DACA, these young adult immigrants have become more integrated into the nation's economic and so institutions.



Figure 1. Resources Accessed by DACA Receipents

**New Jobs**

Almost 60 percent of DACA beneficiaries surveyed have obtained a new job since receiving DACA, and 45 perc[...] increased their earnings. These findings provide direct evidence of the economic boost provided by DACA. Beca[...] new jobs and increased earnings translate into a greater tax base, DACA is also providing an important boost to [...] economy.

### Internships

Our results also show that just over one-fifth of NURP respondents (21 percent) have obtained an internship sin[...] DACA, which likely provides some valuable career training not typically available for young adults with limited employment histories.

### Driver's Licenses

Additionally, 57 percent have obtained a driver's license. The ability of DACA beneficiaries to legally drive mean[...] safety for all drivers. This important form of access has also likely widened beneficiaries' educational, employme[...] other options.

> *Miguel was born in Guadalajara, Jalisco, Mexico. He came to the U.S. with his two parents and older broth[...]*
> *he was six years old. Growing up in El Monte, California, Miguel worked hard in school. He graduated from*
> *school in 2011, and started taking classes at a local community college—the first in his family to pursue hig[...]*
> *education. DACA was initiated during Miguel's first year of college. With a work permit he started working a[...]*
> *shop and was able to enroll as a full-time student. Having a driver's license also made life much easier for[...]*
> *In Southern California, one could easily spend two or more hours a day on the bus. After working for a yea[...]*
> *establishing credit, Miguel pooled his money together with his father and they opened up a cell phone stor[...]*
> *nearby La Puente.  Miguel is also hoping to start his own business as a web designer and app developer. [...]*
> *credits DACA for providing opportunities to work and drive, as he strives for a better future for himself and [...]*
> *family.*

### Bank Accounts and Credit Cards

Meanwhile, almost half of our DACA beneficiaries (49 percent) have opened their first bank account, and one-thi[...] percent) have obtained their first credit card. While undocumented immigrants are not necessarily prohibited fro[...] opening bank accounts, many banks require an identification number and a picture ID.  The new forms of identifi[...] obtained through DACA allow young people to overcome bureaucratic hurdles and to avoid sometimes awkward [...] uncomfortable situations.

### Health Care

Over one-fifth of NURP respondents (21%) obtained health care since receiving DACA. This is likely due to colle[...] enrollment or new employment-based plans. While DACA recipients are not eligible for the Affordable Care Act a[...] national level, California, Washington, Massachusetts, Minnesota, New York, and Washington, D.C. offer health [...] insurance to low-income individuals granted deferred action.

### Benefits of DACA Greatest Initially for Those with the Most Education

Economic benefits appear to be greatest for those who attend four-year colleges and have already received their[...] bachelor's degree.  Respondents who attended community and four-year colleges are more likely than their peer[...] no college experience to obtain a new job and increase their earnings. However, these economic benefits appea[...] greatest for those who have already obtained a bachelor's degree: those with bachelor's degrees were more tha[...] times more likely to obtain new jobs and increase their earnings, relative to those who never went to college. The[...] findings suggest that those with college degrees fared the best in the job market by leveraging their credentials.

American Immigration Council Programs:

Meanwhile, four-year college students were 1.6 times more likely to obtain an internship, relative to their non-col going peers. It is likely that these college students obtained internships in connection to their colleges.

Programs:

Key to their success, our DACAmented college graduates had multiple mentors in high school, they were active and in leadership roles in school, they were involved in their communities, and they were connected to organizat a result, these young people likely possess the social networks and information key to accessing job-related opportunities.

**DACA Beneficiaries Display High Propensity to Work**

Our findings underscore another important aspect of the DACA experience: DACA beneficiaries work hard. The majority of NURP respondents (86 percent) report ever having worked for pay. More than two-thirds of these you adults (67 percent) were employed at the time of the survey, and one-third of our DACA beneficiaries (34 percen indicated that they held more than one current job. Many of these young people work to contribute financially to low-income parents.

These young people work at levels comparable to or higher than their legal peers (controlling for grade-point ave ethnicity, and socio-economic status). Before DACA their choices were severely restricted. But the work permits provided by DACA ensure greater levels of contribution to the high-skilled workforce, and show us that further investments in this population that is poised to fill job shortages would go a long way.

**Access to DACA Often Turned on Connections to Community Organizations**

Organizations are vehicles for DACA implementation, and our study finds several ways in which NURP responde benefited from organizations—either through using community organization resources or being a direct member, both.

NURP respondents benefited from community organizations and civic institutions by receiving assistance in fillin and compiling the paperwork for DACA applications. They turned to organizations, legal clinics, schools, religiou institutions, and private attorneys within their communities. In fact, the overwhelming majority of our DACA bene (93 percent) received some assistance with DACA applications.

Not only were community organizations helpful in the DACA application process, they have been an important so resources and support for many individuals pre-dating DACA. It is worth noting that our respondents who particip community organizations were much more likely than those who did not to reap the job-related benefits of DACA members of such organizations, these young people have developed skills, strengthened their social networks, a acquired the information critical to accessing job-related opportunities.

## Not Everyone Eligible for DACA Chooses to Participate

While a significant share of the DACA-eligible population has applied to the program, hundreds of thousands of youngsters have yet to come forward. To shed some light on these eligible non-applicants, we now turn our atter a smaller subsample of 244 respondents within our study who meet the DACA requirements, but have not applie program.

Compared to DACA-eligible young adults in our study who applied and received DACA, eligible youth who did no to DACA have less schooling, they work longer hours, they report less trust in institutions, and they are more like have children of their own. These young people live in rural and urban communities, but are less connected to th schools and institutions in their neighborhoods.

In order to better understand the barriers they face, we asked these respondents why they had not applied to DA we might suspect, the number one barrier to applying was economic limitations. More than 43 percent of DACA-

(n.15)

non-applicants indicated that they could not afford the $465 application fee. An additional, 10 percent indicated t
American Immigration Council                                                                        Programs;
did not know how to apply. Given low family income and limited social networks, a lack of resources appears to l
large barrier for many DACA-eligible young adults.

In addition, 22 percent of our non-applicant respondents indicated that they did not apply because of missing pa
and another 17 percent did not apply because of legal concerns. These young people likely have less straightfor
DACA cases, due to length of time in the U.S., time out of school, and legal issues for which additional legal assi
and resources are required.

Importantly, nearly 15 percent of these respondents report not applying because they fear sending their persona
information to the government. And as many young people are making risk and cost to reward calculations, almc
third of this group of non-applicants (30 percent) indicated that they are waiting for better options.

## DACA's Benefits are Partial

Undoubtedly, DACA is reducing some of the challenges undocumented youth must overcome to achieve econor
social incorporation. But as an executive memorandum that shifts bureaucratic practice in U.S. Customs and Bo
Protection (CBP), U.S. Citizenship and Immigration Services (USCIS), and U.S. Immigration and Customs Enfor
(ICE), DACA has limited inclusionary power. While DACA addresses some of the needs of a critical segment of t
immigrant population, these young people do not live in isolation—they are part of families and communities that
require relief. Additionally, our findings point to demographic variations in how this diverse population of young p
able to access new resources that advance their incorporation.

### DACA Improves Postsecondary Access to Education

Our findings have important implications for the benefits of higher education. However, we find that DACA benef
greatest among younger college graduates. For a segment of older DACAmented adults who have been out of s
for several years, undocumented status has not allowed them to accumulate work experience in occupations tha
their educational credentials and training. As a result, they are likely to have the requisite education, but lack the
experience.

Most young adults in the U.S. aspire to some type of postsecondary education. Undocumented young adults are
different. While DACA has provided its beneficiaries an important avenue to better jobs and increased earnings t
in their college enrollment, DACA does not override current federal and state exclusions from financial aid. Giver
most American college students rely on some form of financial aid, such exclusions precipitate heavy financial ol

A large share of the DACA-eligible population experiences post-secondary education as a revolving door. Of our
respondents, 42 percent report not completing their plan of study within the normal time schedule, as limited fina
and family responsibilities forced them to leave school for significant chunks of time.

"Stopping out," or leaving college for a certain period of time with the intention of returning, is a growing, and con
trend among college students nationwide.  A majority of "stop-outs" in our study made multiple exists from colleg
Undocumented immigrant youth are three times more likely than similar youth (controlling for grade-point averag
ethnicity, and socio-economic status) to stop-out. Prior research suggests that academic preparation is the bigge
to stopping-out, but for undocumented youth, finances are the most important factor.

> *Prior to DACA, financing higher education for Elisa was an ongoing struggle. However, thanks to DACA sh*
> *pursuing a master's degree in Communication Studies and has enjoyed the most financially stress-free yea*
> *her life as a student. Being DACAmented means that Elisa can work on her university campus. This past y*
> *was able to successfully land an assistantship which not only paid her a monthly stipend, it also waived he*
> *Prior to DACA, undocumented students were not eligible for these kinds of opportunities and, as a result, fa*
> *steep barriers to graduate studies. Elisa will enter into the second year of her Master's program next year v*

hopes buoyed by DACA. She is the Academic Initiatives coordinator for the department of Housing and Re
American Immigration Council.                                                                    Programs:
        Life and will continue to have this position next year.

**DACA Improves Human Capital**

As our survey findings demonstrate, the role of community organizations is critical to the success of DACAmente
adults. Many of these young people come from low-income households with parents who did not attend college.
have also lived in an undocumented status for several years.

Additionally, as our results above indicate, individual and family resources condition the ability to maximize DAC,
benefits. Low-income, low-skilled youth are less able to reap the benefits of DACA. These findings point to an inc
of access, rather than a weakness in the program itself. And, while college-goers in general are better positioned
access DACA benefits over those who are not in higher education, community college students are not faring as
those in four-year postsecondary institutions.

DACA has opened up important legal avenues for a large number of its beneficiaries. But many of these young p
require additional supports that could assist them in gaining job skills while also helping to connect them to oppo
In particular, community organizations can assist DACA applicants to make connections to the kinds of additiona
services— transportation, child care, mentoring—they may need to access, persist, and complete education and
training programs.  Additionally, if community organizations are able to partner with adult education and occupati
training programs, they will be able to better reach the young adults who are not college bound, enabling them to
the credentials and certificates that lead to employment and to wages that will allow them to support their familie

Strengthening community organizations' capacity to better engage these institutions will help to support DACA-e
and DACAmented young adults' efforts to build important forms of human and social capital.

**Additional Relief is Needed for Families**

Importantly, DACA beneficiaries can enjoy a two-year period free from worry that they will be detained and depo
This has important psychological benefits, as these young people can more comfortably move though their daily
without having to constantly look over their shoulders. Our findings show that two-thirds of NURP respondents re
being less afraid of law enforcement and of being deported. In addition to giving young people better peace of m
likely has positive correlations with public safety as it reduces victimization and relieves individuals of the fear ov
reporting criminal activity in their communities.

However, DACAmented young adults are not alone in their experiences. They belong to families and communitie
lack important forms of access and are vulnerable to the threat of deportations and victimization because of their
undocumented status. Seventy-six percent of our respondents told us that they continued to be worried about pe
they know being deported "some" to "all of the time." These worries are connected to their firsthand experience v
deportation within their communities, as 70 percent know someone within their immediate surroundings (parents
siblings, other family members, neighbors, and co-workers) who have been deported.

**Figure 2. DACA Recipients' Connections to Deported Individuals**



American Immigration Council                                                          Programs:

Recipients

When we asked DACA beneficiaries about the effects on their families if immigration reform would pass, 90 perc
that someone in their family would benefit. More than three-fourths (76 percent) have mothers they said would be
62 percent said they have fathers who would, and 56 percent have siblings who would. Immigration is a family at
providing relief to family members is critical to the success of DACAmented young adults.

**Figure 3. Family Members Potentially Impacted by Comprehensive Immigration Reform**

The NURP survey represents the largest data collection effort to date studying DACA-eligible immigrant young a
such, our findings have important implications for policy and community practice. The responses of our nearly 2,
DACA beneficiaries provide clear evidence of DACA's success in providing benefits. Today, two years after the p
was initiated, hundreds of thousands of young people are experiencing everyday lives of widened access to their

communities, educational institutions, and the U.S. economy. As a result, they are better poised to contribute to
families, communities, and the nation as a whole.

American Immigration Council                                                                    Programs:

## Recommendations

### Broaden DACA's Impact

The DACA renewal process will soon begin. It is important that community institutions continue to avail their serv
DACAmented youth, encouraging them to reapply and providing them the assistance they need. The success of
program, and its ability to shine an important light on the importance of widened access for immigrant young adu
on communities' abilities to help DACA beneficiaries to successfully submit renewal applications.

But as communities work with young people on the renewal process, continued efforts are needed to reach the
populations of young people who have not applied. Our findings from the subsample without DACA indicate that
biggest barriers these young people face are cost and access to resources and information. DACA loan program
mobile legal clinics to resource-limited communities, and targeted outreach efforts are just a few of the efforts ne
move more young people into a DACAmented status.

### Expand Postsecondary Access to Education

Naturally, some of the program's recipients are doing better than others. We find that those in four-year colleges
faring better, and that age is positively associated with taking advantage of benefits. But there are diminishing re
DACA has likely improved educational and employment options for many of its beneficiaries, but financing
postsecondary education remains a challenge.

While DACA has certainly widened the access of its beneficiaries, many other issues are left unaddressed. In pa
DACA recipients remain locked out of opportunities to receive federal financial aid and state aid in most parts of
country. To expand relief for youth, the U.S. must address the restrictions DACAmented young adults face to fina
aid. Given the soaring costs of college, and that the majority of American students receive some form of federal
financial aid, restrictions will continue to disadvantage DACAmented students, particularly those from low-incom
families.

### Bolster Community Education and Workforce Development Initiatives

Since DACA's announcement on June 15, 2012, community-based organizations, DREAMer groups, legal clinic
schools, and religious organizations have worked tirelessly to provide information and to assist young people wit
applications. These services have been of utmost importance to potential DACA beneficiaries and their families.
addition, community organizations have provided DACA beneficiaries important sources of social capital as well
information on how to access job-related opportunities.

With additional resources, they can do more. In particular, supplemental education programs and workforce
development efforts could help to provide DACA-eligible young adults important sources of support that could as
them in pursuing higher education—as well as being competitive in the workforce by accessing programs that de
their skills and lead them to certificates and industry-recognized credentials that lead to employment. These effo
should target younger segments of the population, allowing them to experience their transitions more seamlessly
addition, workforce development efforts need to target low-income and lesser-skilled young adults, and commun
outreach efforts will need to target community colleges, where the vast majority of the college-going eligible popu
attends. And finally, these efforts should not leave behind many of the older young adults within the eligible popu
These men and women are the original intended benefactors of DREAM Act efforts, but their circumstances hav
them with few options to gain important job skills and experience needed to be competitive in the professional wo
Internships, on-the-job training, apprenticeships, and other job-training programs that engage employers could g
benefit this older segment.

**Offer Relief for Immigrant Families**
**American Immigration Council**                                                    Programs:

Although DACA is an important program, it should be seen as a partial solution. DACAmented young people hav
in the U.S. most of their lives and long to be recognized as full members. What they urgently need is a pathway t
allow them to be recognized as full members. But these young people are also members of families and commu
Their ability to lead successful lives depends greatly on the options available to their parents, siblings, and neigh
Addressing the untenable circumstances of the 11 million undocumented immigrants (young and old) living in thi
country is the best way to ensure that the investment made in the lives of these young people will realize its full

Published On: **Mon, Jun 16, 2014** | Download File



© Copyright • American Immigration Council • All Rights Reserved | **Contact Us**

"There has been ample opportunity for Congress to pass a bipartisan immigration bill that would strengthen our borders, improve the legal immigration system, lift millions of people out of the shadows so they are paying taxes and getting right by the law .... I indicated to Speaker Boehner several months ago that if, in fact, Congress failed to act, I would use all the lawful authority that I possess to try to make the system work better. And that's going to happen." President Barak Obama, Burma, November 13, 2014

# From the Shadows to the Mainstream:
## Estimating the Economic Impact of Presidential Administrative Action and Comprehensive Immigration Reform

Dr. Raul Hinojosa-Ojeda
North American Integration and Development Center
University of California, Los Angeles

With
Maksim Wynn[1]
Analyst at the North American Integration and Development Center

November 20, 2014

## 1. Introduction and Executive Summary

President Obama and the Congress stand at a historic crossroad that could significantly change decades of undocumented status for millions of immigrant workers, while also providing significant increases in output, employment, earnings and taxes, benefiting the U.S. economy as a whole. Acting within his legal and constitutional authority, President Obama can act to broaden the scope of temporary beneficiaries through expanding programs such as DACA (Deferred Action for Childhood Arrivals) instituted in 2012 and renewed in 2014. Such Presidential action would not impede Congress from voting on more permanent and comprehensive immigration reform (CIR) legislation, which in fact would generate an even greater positive impact for the U.S. economy.

In anticipation of such momentous actions, it is important that policy makers and the general public understand the dimensions of the economic impact of alternative scenarios of action open to the President and Congress. Towards these ends, this paper will provide estimates based on a variety of methodologies for the following policy alternatives:

---

[1] A special thank you to NAID Center Staff Patrick Pastor, Juan Contreras, Francisco Lopez and Verenice Garcia for all of their work on this report.

1

1. The DACA program's economic impact, compared to the impact of Congressional passage of the Dream Act.
2. Economic impact of alternative administrative action scenarios based on scaling up the size of the benefited population.
3. Economic impact of congressional passage of a Comprehensive Immigration Reform bill approved by the U.S. Senate in 2013.

1) In the two years since the President created DACA through administrative action, the program has had and will continue to have a positive economic impact on its recipients as well as the economy as a whole. However, we find that these positive outcomes are less than what would have been experienced had congress enacted the DREAM act, which was the legislative equivalent of DACA.[2] Our key findings related to DACA are:

- The DACA program of 2012-2014 appears to have spurred extraordinary growth in the earnings of DACA beneficiaries. According to the results of two recent surveys, this wage growth surpassed 240%, a number that far exceeds the expectations in the literature.
- Using much more conservative earnings growth assumptions we estimate that legalizing and educating all eligible DACA applicants (1.23 million) would generate $1.7 trillion in cumulative earnings over forty years (the average length of a professional career).
- Expanding the pool of DACA beneficiaries to individuals who are currently too young to enroll in the program, but meet all of the other requirements (for a total population of 1.7 million), would result in cumulative earnings of $2.4 trillion over 40 years.
- Congressional passage of the DREAM would allow for the inclusion of 2.15 million potential beneficiaries who would earn an estimated income of $3.7 trillion over the course of 40 years.

2) The President has the legal authority to build upon DACA's success and institute a variety of deferred action programs that would affect the earning potential[3] of millions of undocumented immigrants who are already working in the U.S. Our key findings[4] related to expanding deferred action indicate that:

---

[2] Raul Hinojosa, Paule Cruz Takash, et al., *No DREAMers Left Behind: The Economic Potential of DREAM Act Beneficiaries* (Los Angeles: UCLA NAID Center, 2010).
[3] Throughout this report we use the alternative administrative action eligible population estimates of Randy Capps, Marc R. Rosenblum, and James D. Bachmeier, *Executive Action for Unauthorized Immigrants: Estimates of the Populations That Could Receive Relief* (Washington DC: Migration Policy Institute, September 2014). For estimates of undocumented employment by sector we use Passel, Jeffrey, and D'vera Cohn. *A Portrait of Unauthorized Immigrants in the United States* (Washington, DC: Pew Research Center, 2009).
[4] Analysis of the economic impact of administrative action scenarios is based upon the methodology used in Raul Hinojosa and Marshall Fitz. *Revitalizing the Golden State: What Legalization over Deportation Could Mean to California and Los Angeles County.* (Washington, DC: Center for American Progress, April 2011).

(n.16)

- All scenarios for increasing the scope of potential beneficiaries would generate significant economic growth, benefiting not only immigrants, but also the U.S. economy as a whole. These positive economic outcomes increase in proportion to the number and characteristics of immigrants to whom deferred action is extended.
- If deferred action were extended to the between 500,000 and one million undocumented immigrants who are parents or legal guardians of DACA recipients, it would generate a $1.39 billion increase in labor income; 32,000 jobs through an increase in direct, indirect and induced employment; and $511 million in new tax revenue (estimated as a two year short term impact). The $42 billion in GDP that these undocumented workers add to the economy would also be formalized, ending the technical illegality of the value they currently add to U.S. economy.
- If deferred action were extended to the 3.7 million undocumented immigrants who are parents or legal guardians of minors that are U.S. citizens, legal permanent residents (LPRs), or are DACA eligible, it would generate a short term $6.8 billion increase in labor income, more than 160,000 jobs and $2.5 billion in new tax revenue. It would also formalize the $210.2 billion in value that this population adds to the economy, thus ending the technical illegality of their employment and production.
- If deferred action were extended to the 6.6 million undocumented immigrants who have been present in the U.S. for at least ten years, it would generate a short-term $12.3 billion increase in labor income, more than 289,000 jobs and $4.5 billion in new tax revenue. $379 billion of GDP would also be legalized and formalized as a result of granting deferred action to this population.
- If deferred action were extended to the 9.7 million undocumented immigrants who have been present in the U.S. for at least five years, it would generate a short-term $18 billion increase in labor income, more than 422,900 jobs and $6.6 billion in new tax revenue. This would also formalize $553.8 billion dollars in GDP, bringing it out of the shadows of technical illegality.

3) While, the potential economic benefits of deferred action are significant, they can be enhanced though the passing of a permanent comprehensive immigration reform bill. Our key findings[5] related to the economic impact of CIR are:

- The CIR legislation passed by the senate, SB 744, has two key components that determine its economic impact. First, how the bill addresses the undocumented

---

[5] These findings are based upon: Raul Hinojosa, *Raising the Floor for American Workers: The Economic Benefits of Comprehensive Immigration Reform* (Center for American Progress and Immigration Policy Center, January 2010). Raul Hinojosa, *The Economic Benefits of Comprehensive Immigration Reform* (CATO Institute, Winter 2012). These findings align closely with the methodology and conclusions of: Congressional Budget Office, *The Economic Impact of S. 744, the Border Security, Economic Opportunity, and Immigration Modernization Act* (Washington, DC: June 18, 2013)

population that is currently living in the US. Second, the legal framework that it creates to absorb future immigration flows.

- A CIR bill that grants legal status to all current immigrants would generate a short term $63.19 billion increase in labor income, more than 1.4 million jobs and $23.2 billion in new tax revenue.
- A CIR bill would also create legal avenues for new immigrants projected to be needed by the U.S. economy and would generate over $1.5 trillion in additional GDP growth over the next ten years.

This report will first review the available data for comparing the size and economic contributions of the undocumented populations that would be affected by various immigration reform policy alternatives, including the DACA program, a series of proposed administrative action scenarios and comprehensive immigration reform. Second, we will review the methodological approaches used to analyze the impact of DACA (dynamic human capital growth modeling), alternative administrative actions (short term input-output IMPLAN modeling) and CIR (long term CGE modeling and short term input-output IMPLAN modeling). Third, the report will estimate and compare the economic impact of administrative action that President Obama has already taken (DACA), the alternative forms that future administrative action might take, as well as the projected economic impact of future comprehensive immigration reform scenarios.

Researchers have used a number of methodologies to analyze the economic impact of immigration policy reforms. The optimal choice of methodologies used depends on the nature and characteristics of the policy initiative in question. In this report, we will analyze results derived from three of these methodologies. The first methodological tool, computable general equilibrium (CGE) modeling, is especially useful for predicting the dynamic effects of an economic shock over time and at the multi-sectoral level.[6] A second tool, input output modeling (IMPLAN), is more useful for analyzing the short-term impact of a labor market policy shift within the current structure of the economy.[7] Third, we will discuss a methodology that we have devised specifically to adjust our IMPLAN-based findings so that they better reflect the unique characteristics of immigration reforms that are directed towards childhood arrivals.[8] Specifically, this third methodology was devised to measure the economic impact of reforms that explicitly encourage educational attainment and affect a younger demographic.

It is critically important that policy makers and the general public understand the positive economic impact of administrative action, while also recognizing that these benefits are dwarfed by the potential impact of comprehensive immigration reform, and especially by a reform bill that includes a path to citizenship. Drawing on this analysis we can discern what lessons can be

---

[6] See: Hinojosa, *The Economic Benefits of Comprehensive Immigration Reform*.
[7] See: Hinojosa, Raul and Marshall Fitz. *Revitalizing the Golden State: What Legalization over Deportation Could Mean to California and Los Angeles County*. Washington, DC: Center for American Progress, April 2011.
[8] See: Hinojosa and Takash, *No DREAMers Left Behind*.

learned from this policy comparison, and provide policy recommendations for maximizing the effectiveness of administrative action going forward.

## 2. Data On Undocumented Population and their Economic Contributions

This section compares the size and economic contributions of the undocumented populations that can be affected by alternative immigration reform policies.  These policy alternatives are CIR, a series of proposed administrative actions, and the DACA program.

**Table 1**

| Population for Reform Scenario | Population | Employed Population‡ |
|---|---|---|
| Total Population | 11,700,000* | 8,300,000 |
| 5 Years in the U.S. | 9,696,000* | 6,762,000 |
| 10 Years in the U.S. | 6638000* | 4,629,000 |
| Parents of Citizens, LPRs, DACA Eligible | 3680000* | 2,566,000 |
| Parents of DACA Recipients | 750000† | 523,000 |

\* Population Estimates: Randy Capps, Marc R. Rosenblum, and James D. Bachmeier, *Executive Action for Unauthorized Immigrants: Estimates of the Populations That Could Receive Relief* (Washington DC: Migration Policy Institute, September 2014).

† Population Estimate: Coalition for Humane Immigrant Rights of Los Angeles CHIRLA, "CHIRLA Memo to DHS Secretary," (2014).

‡ Ratio of Total Undocumented to Employed Undocumented: Jeffrey Passel and D'Vera Cohn, *A Portrait of Unauthorized Immigrants in the United States* (Pew Research Center, 2009).

**Figure 1**

(n.16)



### Value Added by Reform Scenario

The methodology used for this economic impact analysis is described in: Raul Hinojosa and Marshall Fitz. *Revitalizing the Golden State: What Legalization over Deportation Could Mean to California and Los Angeles County.* (Washington, DC: Center for American Progress, April 2011).

The source of the methodology is: IMPLAN 2009, http://implan.com

The population data is derived from: Randy Capps, Marc R. Rosenblum, and James D. Bachmeier, *Executive Action for Unauthorized Immigrants: Estimates of the Populations That Could Receive Relief* (Washington DC: Migration Policy Institute, September 2014). AND Coalition for Humane Immigrant Rights of Los Angeles CHIRLA, "CHIRLA Memo to DHS Secretary," (2014).

**Figure 2**

## Undocumented Workers by Sector



- Agriculture, forestry, fishing/hunting
- Mining
- Construction
- Manufacturing
- Wholesale and retail trade
- Transportation and utilities
- Information
- Financial activities
- Professional and business services
- Educational and health services
- Leisure and hospitality
- Other services
- Public administration

Karina Fortuny, Randy Capps, and Jeffrey S. Passel, *The Characteristics of Unauthorized Immigrants in California, Los Angeles County, and the United States* (Washington, DC: The Urban Institute, March 2007).

## Comprehensive Immigration Reform

(n.16)

There are an estimated 11.7 million undocumented immigrants living in the US of which 8.3 million are employed (see table 1). For our analysis of CIR, and throughout the rest of the paper, we have used the MPI's undocumented population estimates, and the Pew Hispanic Center's estimates of the ratio of total undocumented immigrants to employed undocumented immigrants.[9]

Figure 1 shows that the estimated total 8.3 million undocumented workers contribute over $679 billion in total value added per year to the U.S. economy as a whole. While we assume that the total undocumented population would be subject to comprehensive immigration reform legislation, and that the total affected population would be subject to administrative actions, in this report we focus on the *employed* undocumented population in order to determine the economic contributions and impact of alternative policies (see table 1). We use CGE and IMPLAN modeling to quantify this impact, and these methodologies require estimating the ratio of employed to total undocumented workers, as well as the distribution of immigrants by sector (see figure 2), as estimated by the Urban Institute's Fortuny, Capps and Passel.[10]

### Administrative Action

The economic impact of any new Presidential administrative action program will be a function of the criteria for eligibility that is chosen to determine how many undocumented immigrants will qualify. The Obama administration has a great deal of flexibility in terms of shaping the program, so for the sake of comparison we have analyzed the economic impact of a broad set of scenarios. These scenarios are:

1. Individuals present in the U.S. for at least five years (9.7 million - MPI)
2. Individuals present in the U.S. for at least ten years (6.6 million - MPI)
3. Parents of minor U.S. citizens, LPRs or DACA eligible (3.6 million - MPI)
4. Parents or legal guardians of DACA recipients (750,000 - CHIRLA)

For the first three of these scenarios, the Migration Policy Institute (MPI) estimated the general range of eligible applicants,[11] while the Coalition for Humane Immigrant Rights of Los Angeles (CHIRLA) estimated the range of eligible applicants for the fourth scenario (see table 1).[12]

---

[9] Population Estimate: Capps, Rosenblum, and Bachmeier, *Executive Action for Unauthorized Immigrants*. Ratio of Undocumented to Employed Undocumented: Passel and Cohn, *A Portrait of Unauthorized*.

[10] Karina Fortuny, Randy Capps, and Jeffrey S. Passel, *The Characteristics of Unauthorized Immigrants in California, Los Angeles County, and the United States* (Washington, DC: The Urban Institute, March 2007).

[11] Randy Capps, Marc R. Rosenblum, and James D. Bachmeier, *Executive Action for Unauthorized Immigrants: Estimates of the Populations That Could Receive Relief* (Washington DC: Migration Policy Institute, September 2014).

[12] Coalition for Humane Immigrant Rights of Los Angeles CHIRLA, "CHIRLA Memo to DHS Secretary," (2014).

The populations that would be affected by administrative action currently make important contributions to the US economy, despite the illegality of their employment. As figure 1 shows, the total undocumented populations produces more than $679.7 billion dollars in GDP annually, while those who have been present in the U.S. for at least five years add more than $553 billion in value. Undocumented immigrants present in the U.S. for at least ten years add $379 billion in GDP each year, while Parents of minors that are US citizens, LPRs or DACA eligible add $210 billion. In addition, the parents or legal guardians of DACA recipients add $42 billion in GDP annually. Providing these populations with legal work authorization would formalize the value they add to the economy, while bringing their productivity and income out of the shadows of technical illegality.

## DACA

The DACA program of 2012 has a number of requirements that limit the size of the eligible population. The program requires applicants to have come to the US before the age of sixteen, to have been present in the country as of June 15, 2012, and to have lived here continuously for at least five years before that date.  In addition, they must be between the ages of fifteen and thirty-one at the time of their application, and either have received a high school diploma or its equivalent, be currently enrolled in school, or be honorably discharged veterans of the US armed forces or Coast Guard. They must not have a serious criminal record.[13]

**Table 2**

### DACA Population Data

| | |
|---|---|
| Immediately Eligible | 1,200,000 |
| Did Not Meet Age Requirement | 500,000 |
| DACA Beneficiaries To-Date | 587,000 |

Jeanne Batalova et al., *DACA At The Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action* (Washington DC: Migration Policy Institute, August 2014).

Table 2 shows that to date over 1.2 million childhood arrivals meet these requirements, while and additional 500,000 meet all but the age requirement, for a total of 1.7 million eligible and soon to be eligible DACA applicants. So far 587,366 applicants have received the protections afforded by DACA.[14]

## Data on Relationship Between Legal Status and Wages, and Economic Activity

---

[13] Jeanne Batalova et al., *DACA At The Two-Year Mark* (Washington DC: Migration Policy Institute, August 2014).

[14] Batalova, *DACA at the Two-Year Mark.*

Researchers studying the economic impact of immigration reform have consistently noted that legalization increased the wages of the newly legalized and total native population. However, formalizing undocumented immigrants' productivity and remuneration is not an all or nothing proposition. Total economic benefits increase in proportion to the number of undocumented that are offered inclusion. In addition, the greater the scope of that financial, social and political inclusion, the greater the individual and total economic benefits. For example, temporary work permits induce moderate wage growth for those that received them, while permanent legalization fosters greater wage growth for the legalized, and citizenship would lead to maximum wage growth.

Researchers have debated the degree to which these various legal statuses' positively impact wages. For our analysis of administrative action in this report we have used a conservative estimate of the wage effect. The Princeton sociologists Douglas S. Massey and Kerstin Gentsch have stated that undocumented immigrants make 20% percent less than legal immigrants and that those with temporary work permits make 13% less (see table 4).[15] Rather that applying the 20% legalization increase to the wages of those affected by administrative action, we have instead assumed that the wage affect will be equivalent to that of a temporary work program.

Looking back at the Immigration Reform and Control Act of 1986 (IRCA) is the logical way to begin any analysis of immigration reform's affect on the economy, and specifically on wages. In all roughly 3 million unauthorized immigrants were legalized under IRCA, and in the short term this had a positive impact on their wages and on the US economy as a whole.

**Table 3**
Economic Impact of Legalization

| IRCA | Total Wage Increase | Male Wage Increase | Female Wage Increase |
|---|---|---|---|
| US Department of Labor | 15% | 13% | 20% |
| Rivera-Batiz | n/a | 8.4% | 13% |
| Amuedo-Dorantes et al. | n/a | 9.3% | 2.1% |

Roger G. Kramer, Audrey Singer, Shirley G. Smith. *Characteristics and Labor market Behavior of the Legalized Population Five Years Following Legalization.* Washington, DC: U.S. Department of Labor, May 1996.

Catalina Amuedo-Dorantes, Cynthia Bansak, and Steven Raphael, "Gender Differ- ences in the Labor Market: Impact of IRCA," *American Economic Review* 97 (2) (2007): 412-416.

Franciso L. Rivera-Batiz, "Undocumented Workers in the Labor Market: An Analysis of the Earnings of Legal and Illegal Mexican Immigrants in the United States," *Journal of Population Economics* 12 (1) (1999): 91-116

A number of government agencies and economists have quantified this impact, and while their findings are not uniform they generally agree that, as a result of legalization, the wages of the

---

[15] Douglas S. Massey and Kerstin Gentsch, "Undocumented Migration to the United States and the Wages of Mexican Immigrants," *International Migration Review* 48, no. 2 (June 2014): 482–99, doi:10.1111/imre.12065.

newly legalized increased. In a widely cited report based on surveys five years after the implementation of IRCA, US Department of Labor Survey of Legalized population reported that overall the wages of the recently legalized rose by 15% in the four to five years following legalization (see table 3).[16] In his analysis of IRCA the economist Francisco Rivera-Batiz found that the wages of male IRCA beneficiaries increased 8.4 percent while their female counterparts increased by 13 percent (see table 3). He found that these increases were the direct effect of legalization and were independent of any wage increase that may have resulted from acquiring more education and further mastery of English among other factors.[17] In 2007, the economists Catalina Amuedo-Dorantes, Cynthia Bansak and Stephen Raphael also found that IRCA had generated wage growth for its recipients. Controlling for broad changes in the US economy, they found that the real wages of male IRCA beneficiaries had increased by 9.3 percent; while for women the increase was 2.1 percent (see table 3).[18]

Legalization also incentivizes the newly legalized to invest in themselves and their community and this leads to wage as well as macroeconomic growth. Kossoudji and Cobb-Clark have shown that the wages of unauthorized workers do not reflect their skill levels because their lack of legal status pushes them into the lowest wage sectors and into the informal economy.[19] Legalization encourages them to seek work that is commensurate with their skill level and to increase that skill level in order to obtain higher wages. This investment in their human capital, and the social mobility it affords, has a far-reaching and positive impact on the economy as a whole.

In order to gauge the wage impact of a diverse range of immigration reform scenarios we have relied upon the findings of Massey and Gentsch. They argue that undocumented Mexican immigrants make twenty percent less on average that do those with legal status, while those with temporary work permits make thirteen percent less than those with legal status (see table 4).[20] Massey and Gentsch were only describing undocumented Mexican immigrants, but since this population constitutes an overwhelming plurality of the total undocumented population,[21] we

---

[16] Roger G. Kramer, Audrey Singer, Shirley G. Smith. *Characteristics and Labor market Behavior of the Legalized Population Five Years Following Legalization*. Washington, DC: U.S. Department of Labor, May 1996.
[17] Franciso L. Rivera-Batiz, "Undocumented Workers in the Labor Market: An Analysis of the Earnings of Legal and Illegal Mexican Immigrants in the United States," *Journal of Population Economics* 12 (1) (1999): 91-116

[18] Catalina Amuedo-Dorantes, Cynthia Bansak, and Steven Raphael, "Gender Differ- ences in the Labor Market: Impact of IRCA," *American Economic Review* 97 (2) (2007): 412-416.

[19] Sherrie A. Kossoudji and Deborah A. Cobb- Clark, "Coming.out of the Shadows: Learning about Legal Status and Wages from the Legalized Population," *Journal of Labor Economics* 20, no. 3 (July 2002): 598–628, doi:10.1086/339611.

[20] Massey and Gentsch, "Undocumented Migration to the United States."
[21] Mexican immigrants constitute 7 million of the 11.9 million undocumented living in the US according to the Pew Hispanic Center's *A Portrait of Unauthorized Immigrants in the United States*.

assume that Massey and Gentsch's figures are roughly representative of undocumented wages generally.

The impact of citizenship provides even greater economic benefits than does simple legal status (see Table 4). For example, immigrants with legal status earn significantly less than their naturalized citizen counterparts. Manuel Pastor and Justin Scoggins have shown that the citizenship naturalization of those with legal status fosters significant wage growth, which leads to economic growth generally. Specifically they found that, "after controlling for many of the characteristics that predict individual wages", there is an 8 to 11 percent "earnings premium" associated with naturalization.[22]

**Table 4**
Income Impact by Legal Status

|  | % Greater Than Undocumented |
|---|---|
| Temporary Work Permit* | 7% |
| Legal Permanent Resident* | 20% |
| Naturalized Citizen† | 29.5% |

*Douglas S. Massey and Kerstin Gentsch, "Undocumented Migration to the United States and the Wages of Mexican Immigrants," International Migration Review 48, no. 2 (June 2014): 482–99, doi:10.1111/imre.12065.

†Manuel Pastor and Justin Scoggins, *Citizen Gain: The Economic Benefits of Naturalization for Immigrants and the Economy* (Center for the Study of Immigrant Integration, December 2012).

Obtaining legal employment authorization provides the undocumented with labor market mobility, allowing them to find work that is commiserate with their skills and to improve those skills, which subsequently leads to increased earning power (see table 4). In addition, by gaining the ability to move between jobs, the undocumented are able to maximize their productivity and income, which increases the value they add to the economy (GDP) and the taxes they pay. Increased GDP, labor income, and tax revenue result in job creation both in the public and private sectors. These positive economic outcomes increase in proportion to the number of people who are offered legal authorization to work, and the more complete their legal, social and economic inclusion is. As a result, while administrative action has a positive economic impact and granting temporary work authorization to all undocumented is even better; the impact of granting legal status to undocumented immigrants through a CIR bill would produce the best outcomes, especially if it includes a path to citizenship.

---

[22] Manuel Pastor and Justin Scoggins, *Citizen Gain: The Economic Benefits of Naturalization for Immigrants and the Economy* (Center for the Study of Immigrant Integration, December 2012).

**National and State Estimates of Populations Eligible for Anticipated Deferred Action a**

| State | Parents Eligible for Anticipated New Deferred Action Program | Immediately El Original 2012 DACA population |
|---|---|---|
| United States | 3,712,000 | 1,198,000 |
| California | 1,116,000 | 358,000 |
| Texas | 560,000 | 149,000 |
| New York | 234,000 | 80,000 |
| Illinois | 199,000 | 66,000 |
| Florida | 163,000 | 72,000 |
| New Jersey | 137,000 | 54,000 |
| Georgia | 122,000 | 40,000 |
| North Carolina | 117,000 | 33,000 |
| Arizona | 97,000 | 32,000 |
| Washington | 77,000 | 23,000 |
| Virginia | 62,000 | 26,000 |
| Colorado | 67,000 | 20,000 |
| Maryland | 55,000 | 20,000 |
| Nevada | 49,000 | 14,000 |
| Massachusetts | 40,000 | 20,000 |
| Oregon | 49,000 | 12,000 |
| Pennsylvania | 35,000 | 17,000 |
| Tennessee | 38,000 | 11,000 |
| Utah | 36,000 | 10,000 |
| Michigan | 32,000 | 10,000 |
| Indiana | 33,000 | 9,000 |
| Connecticut | 28,000 | 12,000 |
| Minnesota | 30,000 | 9,000 |
| South Carolina | 30,000 | 9,000 |
| Oklahoma | 29,000 | 9,000 |
| Wisconsin | 24,000 | 9,000 |
| New Mexico | 25,000 | 8,000 |
| Ohio | 24,000 | 8,000 |
| Kansas | 26,000 | 7,000 |
| Alabama | 25,000 | 6,000 |
| Arkansas | 20,000 | 6,000 |
| Missouri | 20,000 | 6,000 |
| Kentucky | 15,000 | 4,000 |
| Idaho | 15,000 | 3,000 |
| Nebraska | 15,000 | 4,000 |
| Louisiana | 13,000 | 4,000 |
| Iowa | 14,000 | 3,000 |
| Rhode Island | 9,000 | 3,000 |

A-75                        (n.19)

| Delaware | 8,000 | 3,000 |
|---|---|---|
| Mississippi | 7,000 | 2,000 |
| Hawaii | 4,000 | 2,000 |
| District of Columbia | 4,000 | 2,000 |

*Notes:* Because a certain number of individuals could appear in more than one category, these estimates m
parents exclude individuals eligible for DACA.

*Sources:* For DACA estimates: Migration Policy Institute (MPI) analysis of U.S. Census Bureau data from the
Program Participation (SIPP) by James Bachmeier of Temple University and Jennifer Van Hook of The Penns
new deferred action program for parents: MPI analysis of 2008-2012 ACS data, pooled, and 2008 SIPP data
the Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action (Washing

For more on unauthorized immigrant populations nationally and by state, including size of the overall popul
MPI data tool with detailed profiles for the U.S., 41 states and the District of Columbia: http://migrationpolic
immigrant-population-profiles.

nd DACA Programs

| gible for DACA New Program (Original DACA with 2014 Expansions) | Total Eligible for Anticipated Deferred Action and DACA Programs |
|---|---|
| 1,489,000 | 5,201,000 |
| 456,000 | 1,572,000 |
| 183,000 | 743,000 |
| 104,000 | 338,000 |
| 81,000 | 280,000 |
| 90,000 | 253,000 |
| 67,000 | 204,000 |
| 48,000 | 170,000 |
| 38,000 | 155,000 |
| 39,000 | 136,000 |
| 28,000 | 105,000 |
| 30,000 | 92,000 |
| 23,000 | 90,000 |
| 25,000 | 80,000 |
| 18,000 | 67,000 |
| 25,000 | 65,000 |
| 15,000 | 64,000 |
| 20,000 | 55,000 |
| 12,000 | 50,000 |
| 12,000 | 48,000 |
| 13,000 | 45,000 |
| 11,000 | 44,000 |
| 15,000 | 43,000 |
| 11,000 | 41,000 |
| 10,000 | 40,000 |
| 10,000 | 39,000 |
| 10,000 | 34,000 |
| 9,000 | 34,000 |
| 10,000 | 34,000 |
| 8,000 | 34,000 |
| 7,000 | 32,000 |
| 7,000 | 27,000 |
| 7,000 | 27,000 |
| 5,000 | 20,000 |
| 4,000 | 19,000 |
| 4,000 | 19,000 |
| 5,000 | 18,000 |
| 4,000 | 18,000 |
| 4,000 | 13,000 |

A-77

(n.19)

| | 3,000 | 11,000 |
| | 2,000 | 9,000 |
| | 3,000 | 7,000 |
| | 3,000 | 7,000 |

odel for the overlap.  The estimates for the new deferred action program for

2012 American Community Survey (ACS) and the 2008 Survey of Income and
ylvania State University, Population Research Institute. For estimates of the
by Bachmeier and Van Hook. For more detail on the methodology, see DACA at
ton, DC: MPI, 2014).

ation, countries of origin, top languages, and more, check out a unique new
cy.org/programs/us-immigration-policy-program-data-hub/unauthorized-



Center for American Progress

1333 H Street, NW, 10th Floor
Washington, DC 20005
Tel: 202.682.1611 • Fax: 202.682.1867

www.americanprogress.org

**Executive Action on Immigration Will Benefit Washington's Economy**

Everyone agrees that our immigration system is broken and needs reform. While only Congress has the power to fix the immigration system once and for all, until it acts, there are important steps the president can take that will start fixing our system while also increasing tax revenues, and strengthening our economy. Today, there are **214,000 undocumented immigrants living in Washington** . Enabling even a portion of these immigrants to register with the government, request a reprieve from removal, and apply for a temporary work permit would increase Washington's tax revenues by **$57 million,** over five years, and lead to a cascade of economic benefits.

Expanding deferred action will permit undocumented immigrants to work legally. Temporary work permits will provide these workers with the ability to secure jobs that match their skill set and enhance their productivity. As immigrants get on the books and work legally, their earnings will rise, and so too will their tax contributions. Executive action on immigration is a step toward fixing our broken system, and for Washington, it is a step toward a stronger fiscal and economic future.

**Fiscal Benefits of Executive Action in Washington:**

There are **82,000 undocumented immigrants** in Washington who are potentially eligible for deferred action under President Obama's recent executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to **a $57 million increase in tax revenues** for Washington, over five years. **Economic**

**Benefits of Executive Action:**

Expanding deferred action will significantly strengthen Washington's economy. When undocumented immigrants can work legally, they are able to shield themselves against workplace exploitation and move freely across the labor market to find jobs just like anyone else. Combined, this leads to an **8.5% increase in their earnings.** For the average undocumented immigrant that means they are taking home an additional $1,872 each year. As these extra earnings are spent throughout the economy, demand for goods and services rises, spurring job creation and raising the wages of all American workers.

**About the Analysis:**

Tax benefits were calculated using the average annual income of undocumented immigrants, as estimated by CAP; effective tax rates for Washington, as calculated by the Institute on Taxation and Economic Policy; and estimated wage increases due to receiving a temporary work permit. The calculated tax benefits reflect the extra revenue that results from some undocumented immigrants filing taxes for the first time, in addition to the taxes paid by all undocumented immigrants on their increased earnings. The analysis applied state-specific labor force and employment participation rates for undocumented immigrants as reported by the Migration Policy Institute. The analysis also accounts for the fact that an estimated 38% of undocumented immigrants are already paying income taxes, nationally. In 2010, 3.02 million undocumented immigrants filed income taxes using an Individual Tax Identification Number, nearly 38% of the 8.0 million undocumented workers. It is assumed that the same share of immigrants at the state level are currently filing taxes. The estimated number of undocumented immigrants includes parents of children (who are US citizen or have Legal Permanent Resident status), and those individuals covered under DACA expansion. The estimate isn't confined to those parents who have been in the US for longer than 5 years.



**Center for American Progress**

1333 H Street, NW, 10ᵗʰ Floor
Washington, DC 20005
Tel: 202.682.1611 • Fax: 202.682.1867

www.americanprogress.org

### Executive Action on Immigration Will Benefit State Economies

Alabama:25,000 undocumented are eligible for deferred action under thepresident'sNovember 20 thexecutive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$38.6 million increase in tax revenues , over five years.

Arizona:104,000 undocumented are eligible for deferred action under thepresident'sNovember 20 thexecutive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$100 million increase in tax revenues , over five years.

California:1,214,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$904 million increase in tax revenues , over five years.

Colorado:70,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$180 million increase in tax revenues , over five years.

Connecticut:30,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$31 million increase in tax revenues , over five years.

Florida:181,000 undocumented immigrants are eligible for deferred action under the pres ident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$102 million increase in tax revenues , over five years.

Georgia:130,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$190 million increase in tax revenues , over five years.

Illinois:214,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$347 million increase in tax revenues , over five years.

Indiana:34,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$66 million increase in tax revenues , over five years.

Iowa:14,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$23 million increase in tax revenues , over five years.

Kansas:26,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$22 million increase in tax revenues , over five years.

Kentucky:15,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$31 million increase in tax revenues , over five years.

Maryland:60,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$114 million increase in tax revenues , over five years.

Michigan:35,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$49.3 million increase in tax revenues , over five years.

Minnesota:31,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$42 million increase in tax revenues , over five years.

Missouri:21,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$27 million increase in tax revenues , over five years.

Nebraska:15,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$16 million increase in tax revenues , over five years.

Nevada:53,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$21 million increase in tax revenues , over five years.

New Jersey:150,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$136 million increase in tax revenues , over five years.

New York:258,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$184 million increase in tax revenues , over five years.

North Carolina:122,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$197 million increase in tax revenues , over five years.

Ohio:25,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$41 million increase in tax revenues , over five years.

Oklahoma:29,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$26 million increase in tax revenues , over five years.

Pennsylvania:38,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$75 million increase in tax revenues , over five years.

Texas:594,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$338 million increase in tax revenues , over five years.

Virginia:66,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$106 million increase in tax revenues , over five years.

Washington:82,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$57 million increase in tax revenues , over five years.

Wisconsin:25,000 undocumented immigrants are eligible for deferred action under thepresident'sNovember 20th executive actions on immigration. If these immigrants are able to receive a temporary work permit, it would lead to a$19 million increase in tax revenues , over five years.

178 Wash. App. 681, 317 P.3d 489

Court of Appeals of Washington,
Division 3.
In re GUARDIANSHIP OF D.S.

No. 30981–9–III.
Dec. 3, 2013.
Publication Ordered Jan. 9, 2014.

**Background:** Department of Family and Child Services filed a petition to appoint a guardian for child found to be a dependent child. The Chelan Superior Court, Bart Vandegrift, J., granted petition. Child's father appealed.

**Holding:** The Court of Appeals, Kulik, J., held that evidence did not support finding that there was little likelihood that conditions will be remedied.

Vacated and remanded.

**\*\*489** Stephanie Sellers, Attorney at Law, Wenatchee, WA, Eric J. Nielsen, David Bruce Koch, Christopher Gibson, Nielsen Broman & Koch PLLC, Seattle, WA, for Appellant.

Tomas S. Caballero, Attorney General of Washington, Wenatchee, WA, for Respondent.

Judges KULIK, SIDDOWAY and FEARING.

KULIK, J.

**\*682 ¶ 1** Guardianship is a statutory alternative to termination of parental rights. Guardianship is designed to establish permanency for children in foster care through the appointment of a guardian and dismissal of the dependency. RCW 13.36.010. The Department of Family and Child Services (Department) filed a petition to appoint a guardian for D.S. Prior to the petition, the Department's permanency plan for D.S. was reunification with his father, H.S. However, once H.S. was deported to Mexico, the Department's plan changed to guardianship. H.S., who remains in Mexico, contested the petition. Ultimately, the trial

court ordered guardianship on the basis that it was in the best interests of D.S. because conditions could not be remedied so that D.S. could be returned to H.S. in the near future. H.S. appeals. He contends that the best interests of the child standard is unconstitutionally vague. He also contends that substantial evidence does not support the finding that "[t]here is little likelihood that conditions will be remedied so that the child can be returned to the parent **\*683** [ ]in the near future," as required by RCW 13.36.040(2)(c)(v), because he no longer has parental conditions to be remedied that would prohibit D.S. from being returned to his care.

**\*\*490 ¶ 2** We conclude that because the father has remedied his parental deficiencies, D.S. can be returned to his father's care in the near future. Accordingly, we vacate the guardianship and remand for reinstatement of the dependency.

## FACTS

**¶ 3** C.B. gave birth to a son, D.S., in September 2005. D.S.'s father, H.S., was present at the birth, but was deported to Mexico one year later. D.S. lived with his mother until April 2009. At that time, the Department removed D.S. from her care. H.S. was given custody of D.S. in June 2009.

**¶ 4** H.S.'s custody lasted about one year. In June 2010, H.S. was hospitalized for drag-related hallucinations. The Department removed D.S. from his care. H.S. agreed to a dependency order, engaged in voluntary services, and visited D.S. regularly. In the meantime, the Department placed D.S. with C.B.'s father, Randall Batchelor, and stepmother, Karen Batchelor. D.S. was just under five years old when the Department found him dependent as to both parents on August 12, 2010.

**¶ 5** The Department planned to reunify H.S. and D.S. in the early fall of 2010. However, H.S. was arrested for a driving while under the influence in October 2010 and deported. The Batchelors began proceedings to obtain third party nonparental custody of D.S. The Department supported the Batchelors' efforts, but did not consider terminating H.S.'s parental rights because of D.S.'s continued relationship with H.S.

**¶ 6** H.S. returned to the United States in February 2011. He wished to resume visits with D.S. and continue with services. He completed drug treatment and gave clean random urinalysis (UA) samples. H.S.

never tested positive *684 for drugs and never missed an appointment. H.S. visited D.S. regularly, with approximately three supervised visits per week. After six months of good progress, social worker John Plotz recommended reunification. At a review hearing, the court found that "[p]arental deficiencies of father have been eliminated and the legal presumption is that the child should be returned to the father." Ex. 6. In September, the Department changed D.S.'s permanency plan from third party custody to reunification with H.S.

¶ 7 However, in late October, H.S. was detained by Homeland Security during a visit with D.S. H.S. was deported again. H.S. could not lawfully return to the United States for 20 years. He decided to make a home in Mexico rather than return to the United States. Since the deportation, H.S. has remained in contact with his social worker at the Department, speaking to him about every two weeks. H.S. also has continued to contact D.S. by telephone approximately twice per week.

¶ 8 In February 2012, the Department filed a petition to appoint the Batchelors guardians of D.S. The guardian ad litem's report supported the guardianship, stating that D.S. had been dependent for too long, and H.S. was unable to parent because he lived in Mexico and had no plans to return to the United States.

¶ 9 A guardianship hearing was held on May 30, 2012. H.S. appeared by telephone and with the help of an interpreter. H.S. testified that he wanted to provide D.S. "all my love and a good life" in Mexico. Report of Proceedings (RP) at 194. He said that the home he shared with his mother, sister, and adult son was ready for D.S.'s arrival. H.S. intended to enroll D.S. in school, sports, and counseling. He had also arranged for his sister to provide childcare while he worked on the family farm. Additionally, H.S. had been seeing a chemical dependency counselor and presented evidence of clean UAs.

¶ 10 Mr. Plotz and D.S.'s mental health counselor, William Layman, also testified. Mr. Layman explained that a *685 was important for children to have a stable and consistent environment. Mr. Plotz added that children whose attachments to adults are disrupted can become withdrawn, angry, fearful, and developmentally stunted. He further explained that those children often become dysfunctional adults.

¶ 11 Both men agreed that D.S. was doing well in the Batchelors' home. Mr. Layman believed that D.S. had a stable environment **491 and was thriving there. Mr. Layman also observed that D.S. was reluctant to leave the Batchelors although he was attached to H.S. Additionally, Mr. Layman noted that D.S. expressed sadness and grief when his father was deported. Mr. Plotz said that D.S.'s resiliency was a testament to the stable environment that the Batchelors had provided.

¶ 12 Mr. Plotz and Mr. Layman also testified about how D.S. should be transitioned to his father's care. Mr. Layman explained that a gradual process would be needed. He said that D.S. should be introduced to his family in Mexico using Skype and social media. He also recommended that D.S. be given a couple of months to say goodbye to his family and life in the United States. Mr. Plotz explained that supervised visits in Mexico would be necessary.

¶ 13 They also testified about whether such a transition could occur within D.S.'s "near future." When asked what D.S.'s near future was, Mr. Layman explained, "if something was happening soon he would have a concept of what next week would be like, next month would be like, or two months, or before the next school year. I think beyond that it gets a little vague for a child's sense of time." RP at 27. Mr. Plotz testified that the process would take longer than two months and longer than D.S.'s near future.

¶ 14 Both men opined that it was in D.S.'s best interests to remain with the Batchelors and that transitioning to H.S.'s care would be "traumatic." RP at 21, 171. Mr. Layman indicated that it was possible for D.S. to do well in Mexico, but it was also possible for him to do poorly. He indicated *686 that, because D.S. was doing well with the Batchelors, placing him with H.S. was not worth the risk. Mr. Plotz recommended the guardianship because it "is a permanent plan for [D.S.], while still recognizing the relationship with [H.S.]." RP at 156.

¶ 15 DIF, Mexico's equivalent to the Department, performed a study of the home where D.S. would live with his father. This study found that the home provided good hygiene, adequate bathrooms, and that other family members lived there. DIF found no "red flags." RP at 37. Mr. Plotz testified that the Department received a positive home study from DIF.

However, he also testified that the home study was inadequate because it did not specify what resources were available in the community. Mr. Plotz wanted the Department to have supervision of D.S. in Mexico.

¶ 16 As for H.S., Mr. Plotz testified that H.S. completed all services necessary to correct his parenting deficiencies. At the time of trial, H.S. had been clean for almost two years. H.S. continued submitting clean UAs after deportation, including the random testing by DIF. Despite this clean record and graduation from substance abuse treatment, Mr. Plotz testified that he was still concerned about H.S.'s ability to stay sober because there was always a risk for relapse. Ultimately, Mr. Plotz stated that the only thing that changed regarding H.S. is that he was unavailable to parent because he is no longer in Washington.

¶ 17 The court ultimately granted the guardianship petition. It explained that it was "more likely to produce a positive outcome for the child" and "better than terminating parental rights ... because the child's relationship with his father is of benefit to the child and should be maintained." Clerk's Papers (CP) at 17. The court gave the most weight to the testimony of Mr. Layman and Mr. Plotz. The court noted that stability was extremely important for D.S.'s development and that the Batchelors have provided him with a stable home since July 2010. It also noted that D.S. had *687 thrived in the Batchelors' care and had bonded to their family.

¶ 18 The court also explained that denying the petition was risky. On one hand, it was possible that transitioning to H.S.'s care would be successful. The court acknowledged that D.S. was bonded to H.S., H.S. spoke regularly and lovingly to D.S. over the telephone, H.S.'s home was suitable, H.S. was clean and sober, and H.S. had employment. But on the other hand, D.S.'s ability to form attachments to a new family and adjust to a new language and environment was unknown. Moreover, H.S. had not been consistent in the past, left an older son in Mexico to work in the United States, and H.S. had been deported so many times that **492 he might go to prison if deported again. The court further found that the near future for D.S. was two to three months and D.S. could not be transitioned to H.S. within that time frame.

¶ 19 H.S. appeals the trial court's order granting guardianship. H.S. contends that the "child's best

interests" standard in RCW 13.36.040(2)(a) is unconstitutional under the void-for-vagueness doctrine. He also contends that the trial court erred by finding that there was little likelihood that conditions will be remedied so that D.S. can return to H.S. in the near future, as contained in RCW 13.36.040(2)(c)(v).

ANALYSIS

¶ 20 In 2010, the legislature created a separate guardianship statute as an alternative route to permanency for dependent children. Laws of 2010, ch. 272, § 1. Chapter 13.34 RCW established permanency through the appointment of a guardian and dismissal of the dependency. RCW 13.36.010. Under RCW 13.36.040(2), a guardianship shall be established if:

(a) *The court finds by a preponderance of the evidence that it is in the child's best interests to establish a guardianship,* *688 rather than to terminate the parent-child relationship and proceed with adoption, or to continue efforts to return custody of the child to the parent; and*

....

(c)(i) The child has been found to be a dependent child under RCW 13.34.030;

(ii) A dispositional order has been entered pursuant to RCW 13.34.130;

(iii) At the time of the hearing on the guardianship petition, the child has or will have been removed from the custody of the parent for at least six consecutive months following a finding of dependency under RCW 13.34.030;

(iv) The services ordered under RCW 13.34.130 and 13.34.136 have been offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been offered or provided;

(v) *There is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future;* and

(vi) The proposed guardian has signed a statement acknowledging the guardian's rights and responsibilities toward the child and affirming the guardian's understanding and acceptance that the guardianship is a commitment to provide care for the child until the child reaches age eighteen.

(Emphasis added.)

¶ 21 A guardian maintains physical and legal custody of a child. RCW 13.36.050(2). Also, a

guardian has the right to give consent for the child in health care and educational matters, as well as the duty to protect, feed, clothe, nurture, discipline, and educate the child. RCW 13.36.050(2)(a)-(d). The parent retains a right of contact with the child as determined by the court. RCW 13.36.050(1)(d).

¶ 22 The legislature found that guardianship was an appropriate plan for a dependent child who cannot safely be reunited with his or her parents. RCW 13.36.010. However, the legislature also expressed its concern "that parents not *689 be pressured by the department into agreeing to the entry of a guardianship when further services would increase the chances that the child could be reunified with his or her parents." RCW 13.36.010.

¶ 23 H.S. contends that substantial evidence does not support the trial court's finding there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. He maintains that without any conditions to be remedied, the court cannot enter such a finding as required by RCW 13.36.040(2)(c)(v). H.S. is correct.

¶ 24 To grant a guardianship petition, the court must find that "[t]here is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.36.040(2)(c)(v). The "little likelihood" finding in RCW 13.36.040(2)(c)(v) parallels the same required finding in termination proceedings. *Compare* RCW 13.36.040(2)(c)(v) *with* **493RCW 13.34.180(1)(e). In termination proceedings, the little likelihood finding is based on whether the outstanding parental deficiencies can be remedied in the near future. *In re Dependency of T.R.,* 108 Wash.App. 149, 165, 29 P.3d 1275 (2001).

[1] ¶ 25 A prerequisite to the little likelihood finding is an outstanding parental deficiency to be corrected. Without a parental deficiency, there is no condition to be remedied. In H.S.'s situation, in the September 2011 review hearing, the trial court specifically found that H.S.'s parental deficiencies had been remedied, and that the legal presumption was that D.S. should be returned to his father. Also, in the guardianship proceeding, the trial court found that H.S. complied with all services recommended for him in the dependency action. DSHS did not challenge this finding of fact. Accordingly, it is a verity on appeal.

*Robel v. Roundup Corp.,* 148 Wash.2d 35, 42, 59 P.3d 611 (2002).

[2] ¶ 26 The Department concedes that H.S. complied with all required services and that H.S. was clean and sober. However, the Department argues that this finding does not *690 end the inquiry by the trial court. The Department's position focuses on the second part of the required finding that D.S. could be returned in the near future. It contends that H.S.'s compliance with services was too late to allow a reunification with D.S. in Mexico because reunification could not be accomplished in the near future. The trial court found that the near future for D.S. was two to three months and that it would take longer than that to effectuate a transition into H.S.'s home.

¶ 27 The Department misreads the required "little likelihood" factor in RCW 13.36.040(2)(c)(v). This section states in full, "There is little likelihood that conditions will be remedied *so* that the child can be returned to the parent in the near future." RCW 13.36.040(2)(c)(v) (emphasis added). As explained in *In re Dependency of T.R.,* the "little likelihood" factor concerns whether the parental deficiencies can be remedied in the near future. 108 Wash.App. at 165, 29 P.3d 1275 (quoting RCW 13.34.180(1)(e)). Absent a parental deficiency that is in need of correction, the factor does not inquire into logistical steps that would need to be taken to relocate the child. In other words, the fact that the child cannot be returned in the near future is irrelevant unless the parent has an outstanding deficiency that is preventing the return.

¶ 28 The use of the conditional conjunction "so" in the "little likelihood" factor indicates that the timeliness of the return of the child is dependent on the correction of parental deficiencies. Had the legislature intended to divorce the two issues, it could have done so. For instance, the statute could have read, "There is little likelihood that conditions will be remedied *and* that the child can be returned to the parent in the near future." The use of "so" instead of "and" is crucial to the reading of the factor.

[3] ¶ 29 Here, evidence does not support the trial court's finding that "[t]here is little likelihood that conditions will be remedied so that the child can be returned to the parent[ ] in the near future." CP at 17. Instead, a prior review hearing *691 established that H.S. corrected all of his parental deficiencies. The

court found that H.S. complied with all services recommended for him in the dependency action and was clean and sober. Thus, parental deficiencies are not preventing D.S. from being returned to H.S. in the near future.[FN1] The order granting guardianship is vacated.

> FN1. This case is not controlled by the outcome of *In re the Dependency of J.B.S.,* 123 Wash.2d 1, 863 P.2d 1344 (1993). In *J.B.S.,* the Department sought to place J.B.S. with his father in Mexico after the Department believed the mother had abandoned the child. *Id.* at 3, 863 P.2d 1344. However, expert testimony established that J.B.S. would be seriously harmed if he was severed from contact with his foster parents, mother, and siblings. *Id.* at 9, 863 P.2d 1344. The Supreme Court reversed the superior court, concluding that the best interests of the child was paramount and had not been established by the evidence. Here, D.S.'s situation is different because it involves a guardianship and not a dependency. The goal of a dependency hearing is to determine the welfare of the child and his or her best interests. *In re Welfare of Becker,* 87 Wash.2d 470, 476, 553 P.2d 1339 (1976). However, to establish guardianship, the best interests of the child is not the only requirement that needs to be established. The court must find the remaining requirements in RCW 13.36.040(2)(c). While D.S.'s guardianship petition satisfied the best interests of the child requirement in RCW 13.36.040(2)(a), it did not establish the requirement in RCW 13.36.040(2)(c)(v). Therefore, unlike *J.B.S.'s* dependency determination, the trial court's finding of the best interests of the child requirement does not control the outcome of the guardianship petition.

**494 ¶ 30 The court erred by finding that there was little likelihood that conditions will be remedied so that D.S. could return to H.S. in the near future.

¶ 31 Given our disposition of this issue, we need not address H.S.'s other contentions. We vacate the guardianship and remand for reinstatement of the dependency.

¶ 32 A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

WE CONCUR: SIDDOWAY, A.C.J., and FEARING, J.

**ORDER GRANTING MOTION TO PUBLISH**

KEVIN M. KORSMO, Chief Judge.

The court has considered H.S.'s motion to publish the court's opinion of December 3, 2013, and the record and file herein and is of the opinion the motion to publish should be granted. Therefore,

IT IS ORDERED the motion to publish is granted. The opinion filed by the court on December 3, 2013, shall be modified on page 1 to designate it is a published opinion and on page 14 by deletion of the following language:

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to ROW 2.06.040.

(n.24)

# Pew Research
# Hispanic Trends Project

SEPTEMBER 3, 2014

# As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled

BY JEFFREY S. PASSEL (HTTP://WWW.PEWHISPANIC.ORG/AUTHOR/JPASSEL/) , D'VERA COHN
(HTTP://WWW.PEWHISPANIC.ORG/AUTHOR/DCOHN/) , JENS MANUEL KROGSTAD
(HTTP://WWW.PEWHISPANIC.ORG/AUTHOR/JKROGSTAD/) AND ANA GONZALEZ-BARRERA
(HTTP://WWW.PEWHISPANIC.ORG/AUTHOR/AGONZALEZBARRERA/)

FIGURE 1

## Growth in Unauthorized Immigration Has Leveled Off

*In millions*



Note: Shading surrounding line indicates low and high points of the estimated 90% confidence interval. White data markers indicate that the change from the previous estimate shown is statistically significant (for example, for 1995 change is significant from 1990). Data labels are for 1990, odd years from 1995-2011, 2012, 2013.

Source: Table A1, derived from Pew Research Center estimates based on residual methodology, applied to March Supplements of the Current Population Survey for 1995-2004 and 2013, and the American Community Survey for 2005-2012. Estimates for 1990 from Warren and Warren (2013). See Methodology.

PEW RESEARCH CENTER

(http://www.pewhispanic.org/2014/09/03/as-growth-stalls-unauthorized-immigrant-population-becomes-more-settled/ph-2014-09-03-immigration-01/) The number of unauthorized immigrants living in the United States has stabilized since the end of the Great Recession and shows no sign of rising, according to new Pew Research Center estimates. The marked slowdown in new arrivals means that those who remain are more likely to be long-term residents, and to live with their U.S.-born children.

There were 11.3 million unauthorized immigrants living in the U.S. in March 2013, according to a preliminary Pew Research Center estimate, about the same as the 11.2 million in 2012 and unchanged since 2009. The population had risen briskly for decades before plunging during the Great Recession of 2007 to 2009.

As growth of this group has stalled, there has been a recent sharp rise in the median length of time that unauthorized immigrants have lived in the U.S. In 2013, according to a preliminary estimate, unauthorized immigrant adults had been in the U.S. for a median time of nearly 13 years—meaning that half had been in the country at least that long. A decade earlier, in 2003, the median for adults was less than eight years.

FIGURE 2

## As Unauthorized Immigrant Population Growth Has Slowed, Median Length of Residence Has Grown

*Adult median duration of residence in U.S.*



Note: 2013 figure is preliminary. Data labels are for 1995, 2007 and 2013.

Source: Table A1, derived from Pew Research Center estimates based on residual methodology, applied to March Supplements of the Current Population Survey for 1995-2003 and 2013, and the American Community Survey for 2005-2012. See Methodology.

**PEW RESEARCH CENTER**

(http://www.pewhispanic.org/2014/09/03/as-growth-stalls-unauthorized-immigrant-population-becomes-more-settled/ph-2014-09-03-immigration-02/) The new estimates are based mainly on data from the U.S. Census Bureau's American Community Survey and Current Population Survey, using the widely accepted "residual methodology" employed by the center for many years.[1] The estimates of the total population, as well as regarding the share of unauthorized immigrants with U.S. citizen children and length of residence in the U.S., update previously published estimates.[2]

There is renewed interest in unauthorized immigrants who are long-time residents of the United States and have U.S.-born children because they are among those to whom President Obama reportedly is considering offering a temporary reprieve from deportation (Los Angeles Times, 2014 (http://www.latimes.com/nation/nationnow/la-na-nn-obama-immigration-policy-20140829-story.html) ). Obama reiterated in late August that he would prefer that Congress pass major legislation to overhaul the immigration system, but because Congress has not done so, he may take executive action on his own (White House, 2014 (http://www.whitehouse.gov/the-press-office/2014/08/28/statement-president) ).

Among the nation's 10.4 million unauthorized adults, a shrinking share have been in the country for less than five years—15% in 2012, compared with 38% in 2000. A rising share have lived in the U.S. for a decade or more—62% in 2012, compared with 35% in 2000. About a fifth (21%) had been in the U.S. for two decades or more as of 2012.



# CATO AT LIBERTY

JULY 29, 2014 3:41PM

# DACA Did Not Cause the Surge in Unaccompanied Children

*By* ALEX NOWRASTEH

In June, 2012 the Obama Administration announced that it had authored a memo deferring the deportation of unauthorized immigrant childhood arrivals in the United States, a program known as deferred action for childhood arrivals (DACA). The memo directed then Secretary of the Department of Homeland Security to practice prosecutorial discretion toward a small number of unauthorized immigrants who fulfilled a specific set of characteristics. In essence, some unauthorized immigrants who had come to the United States as children were able to legally stay and work—at least temporarily.

**Did DACA Cause the UAC Surge?**

Some politicians contend that DACA is primarily responsible for the surge in unaccompanied child (UAC) migrants across the border in recent years. A recent House Appropriations Committee one-pager stated that, "The dire situation on our Southern border has been exacerbated by the President's current immigration policies." Proponents of this theory argue that DACA sent a message to Central Americans that if they came as children then the U.S. government would legalize them, thus giving a large incentive for them to come in the first place. Few facts of the unaccompanied children (UAC) surge are consistent with the theory that DACA caused the surge.

(n.27)

First, the surge in UAC began long before the June 15, 2012 announcement of DACA. It is true that DACA had been discussed in late May 2012 but the surge was underway by that time. From October 2011 through March 2012, there was a 93 percent increase in UAC apprehensions over the same period in Fiscal Year 2011. Texas Governor Rick Perry warned President Obama about the rapid increase in UAC at the border in early May 2012 – more than a full month before DACA was announced. In early June 2012, Mexico was detaining twice as many Central American children as in 2011. The surge in unaccompanied children (UAC) began *before* DACA was announced.

Second, the children coming now are not legally able to apply for DACA. A recipient of DACA has to have resided in the United States continuously from June 15, 2007 to June 15, 2012, a requirement that excludes the unaccompanied children coming now.

Third, if DACA was such an incentive for UAC to come from Central America, why are so few Nicaraguan children coming? They would benefit in the same way as unaccompanied children from El Salvdaor, Honduras, and Guatemala. The lack of Nicaraguans points to other causes of the surge.

The timing, legal exclusion of the UAC from DACA, and lack of Nicaraguans indicate that DACA was not a primary cause of the surge. Of the 404 UAC interviewed by the United Nations High Commissioner for Refugees since 2011, only 9 mentioned that U.S. laws influenced their decision to come to the United States. Other American laws could have influenced the unaccompanied children to come but DACA is not the main culprit.

**Details on DACA**

The DACA beneficiaries, at the time of the memo, would have to fulfill all of these requirements to have their deportations deferred:

- Under the age of 31,

- Arrived to the United States before reaching their 16th birthday,

- Entered the United States without inspection or overstayed a visa prior to June 15, 2012,

- Continuously resided in the United States from June 15, 2007 to the time of the memo,

- Physically present in the United States on June 15, 2012, as well as at the time of requesting deferred action from United States Citizenship and Immigration Services (USCIS),

- Been in school at the time of application, or have already graduated or obtained a certificate of completion from high school, or have obtained a general education development (GED) certificate, or are an honorably discharged veteran of the U.S. Coast Guard or the U.S. Armed Forces

- Not been convicted of a felony, significant misdemeanor, or three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

Beneficiaries of DACA were also allowed to apply for employment authorization according to the Code of Federal Regulations. There is a debate amongst legal scholars over whether the administration's grant of deferred action was legal. Those who argue that DACA was illegal contend that the President overstepped his constitutional authority to defer the deportation of some unauthorized immigrants. Those who argue that DACA was legal point to the general power of the Secretary of the Department of Homeland Security to defer enforcement action. They argue that the Supreme Court has ruled that decisions to initiate or terminate enforcement proceedings fall within the authority of the Executive – an enforcement power used since the early 1970s. Here is more of their argument. This disagreement has not been settled.

By the end of September, 2013, 580,000 requests for DACA were accepted by the U.S. government and 514,800, or 89 percent, were approved. Seventy-six percent of the requests came from Mexicans. Twenty-nine percent of the requests were filed from California, 16 percent from Texas, and 6 percent from Illinois.



MENU

Tweet    Share                    29

Home » Research

REPORTS  OCTOBER 2014

# Deportation and Discretion: Reviewing the Record and Options for Change

By Marc R. Rosenblum and Kristen McCabe

Border Security    Border Enforcement    Illegal Immigration & Interior Enforcement          see more...



DOWNLOAD REPORT

Since Congress revamped the immigration enforcement system in 1996, the United States has formally deported ("removed") more than 4.6 million noncitizens, with about 3.7 million of these occurring since the creation of the Department of Homeland Security (DHS) in 2003. While the administrations of both George W. Bush and Barack Obama have actively increased formal removals and the criminal prosecution of immigration violations, the Obama administration in particular has undertaken a series of measures to focus enforcement efforts on certain high-priority cases.

The result has been an increase of removals within the interior of noncitizens convicted of crimes, with criminal removals accounting for 80 percent of interior removals during FY 2011-13. Another result of this focus has been a steep rise in border removals, which represented 70 percent of all removals in FY 2013.

This report provides analysis of the U.S. Immigration and Customs Enforcement

**Click to Enlarge**

Figure 2. ICE Interior Removals by Most Serious Lifetime Criminal Conviction, FY 2003-13

200,000
180,000

(ICE) database of all formal removals for fiscal 2003-2013 in which the agency played a role, as well as those carried out solely by U.S. Customs and Border Protection (CBP). The report offers a profile of deportees and examines how removal trends



changed during and between the Bush and Obama administrations as well as how closely the deportations adhere to current DHS enforcement priorities. It also outlines some of the scenarios for executive action said to be under consideration by the Obama administration, examining how potential changes to enforcement policy could affect the number of deportations.

The report's key findings include:

- The largest category of convictions for criminal deportees was immigration crimes, accounting for 18 percent of criminal removals between FY 2003-13 (279,000 out of 1.5 million cases). The three next largest crime categories were FBI Part 1 crimes (a definition that includes homicide, aggravated assault and burglary, 15 percent of criminal removals during the period), FBI Part 2 crimes identified by MPI as violent offenses (14 percent) and FBI Part 2 crimes identified by MPI as nonviolent offenses (14 percent).
- In the FY 2003-13 period, 95 percent of all DHS removals fell into one or more of the current enforcement priority categories, which reflect long-standing and broadly defined goals for DHS and previously the Immigration and Naturalization Service (INS)
- There would have been about 191,000 fewer deportations over this period had DHS exercised discretion by foregoing removal for all cases not falling into the designated enforcement priorities
- Interior removals of noncriminals fell sharply under the Obama administration, from 77,000 (43 percent) in FY 2009 to 17,000 (13 percent) in FY 2013.
- Ninety-one percent of all removals during FY 2003-13 were from Mexico or the Northern Triangle countries of Central America (El Salvador, Guatemala, and Honduras). By comparison, about 73 percent of all unauthorized immigrants are from Mexico or Central America.
- Deportations disproportionately affect men, who make up 91 percent of those removed even as they account for 53 percent of the overall unauthorized population.

At a pivotal moment in the U.S. immigration debate, characterized by deadlock and crisis, this analysis contributes to the debates by addressing key questions surrounding immigration enforcement since 2003, namely: who is being removed, where are noncitizens being apprehended and how are they

# PewResearch
# Hispanic Trends Project

NOVEMBER 18, 2014

UNAUTHORIZED IMMIGRANT TOTALS RISE IN 7 STATES, FALL IN 14

## Chapter 1: State Unauthorized Immigrant Populations

BY JEFFREY S. PASSEL (HTTP://WWW.PEWHISPANIC.ORG/AUTHOR/JPASSEL/) AND D'VERA COHN
(HTTP://WWW.PEWHISPANIC.ORG/AUTHOR/DCOHN/)

FIGURE 1.3

## States with Largest Shares of Unauthorized Immigrants in the Population, 2012

*Unauthorized immigrants % of total state population*



| State | Value |
|-------|-------|
| Nevada | 7.6 |
| California | 6.3 |
| Texas | 6.3 |
| New Jersey | 5.8 |
| Florida | 4.8 |
| Arizona | 4.6 |
| Maryland | 4.3 |
| Georgia | 3.9 |
| New York | 3.8 |
| Illinois | 3.7 |
| North Carolina | 3.6 |
| Utah | 3.6 |
| Colorado | 3.5 |
| Connecticut | 3.5 |
| Virginia | 3.5 |

Note: Percentages calculated from unrounded numbers. Differences between consecutive ranks may not be statistically significant. States with the same shares are shown alphabetically.

Source: Table A3, derived from Pew Research Center estimates based on augmented 2012 American Community Survey data from Integrated Public Use Microdata Series (IPUMS).

**PEW RESEARCH CENTER**

(http://www.pewhispanic.org/2014/11/18/unauthorized-immigrant-totals-rise-in-7-states-fall-in-14/ph_2014-11-18_unauthorized-immigration-09/) Unauthorized immigrants accounted for 3.5% of the U.S. population of nearly 316 million in 2012, down from a peak of 4.0% in 2007. The share varied from less than 1% in 10 states to 7.6% in Nevada. California (6.3%) and Texas (6.3%) also are among the top-ranked states in this regard.

Most of the states with the largest numbers of unauthorized immigrants also have relatively high shares of unauthorized immigrants. The six states with the largest unauthorized immigrant populations—California, Florida, Illinois, New Jersey, New York and Texas—also are among the

(n.30)

 Official website of the Department of Homeland Security

Home   News   In Focus   Immigration Action

Share / Email

**News**
Blog
Data
Events
Fact Sheets
In Focus
   Acción Ejecutiva
   sobre Inmigración
   Beyond the Border
   Ebola Response
   Immigration
   Action
      Immigration
      Information and
      Assistance
      Southern Border
      Joint Task Force
      Unaccompanied
      Children
Media Contacts
Multimedia
National Terrorism
Advisory System
Press Releases
Comunicados de
Prensa
Publications
Social Media
Speeches
Testimony

# Fixing Our Broken Immigration System Through Executive Action - Key Facts

(En español)

The President asked Secretary Johnson and Attorney General Eric Holder to undertake a rigorous and inclusive review to inform recommendations on reforming our broken immigration system through executive action. This review sought the advice and input from the men and women charged with implementing the policies, as well as the ideas of a broad range of stakeholders and Members of Congress from both sides of the aisle. Our assessment identified the following ten areas where we, within the confines of the law, could take action to increase border security, focus enforcement resources, and ensure accountability in our immigration system.

If you have questions about the new DHS enforcement priorities, the expanded deferred action programs or believe you are eligible for one of the new initiatives, please click here for assistance and additional information.

## Executive Actions

### Strengthen Border Security

DHS will implement a Southern Border and Approaches Campaign Strategy to fundamentally alter the way in which we marshal resources to the border. This new plan will employ DHS assets in a strategic and coordinated way to provide effective enforcement of our laws and interdict individuals seeking to illegally enter the United States across land, sea, and air. To accomplish this, DHS is commissioning three task forces of various law enforcement agencies. The first will focus on the southern maritime border. The second will be responsible for the southern land border and the West Coast. The third will focus on investigations to support the other two task forces. In addition, DHS will continue the surge of resources that effectively reduced the number of unaccompanied children crossing the border illegally this summer. This included additional Border Patrol agents, ICE personnel, criminal investigators, additional monitors, and working with DOJ to reorder dockets in immigration courts, along with reforms in these courts.

- Executive Action: Strengthen Border Security (1.5 MB PDF)

### Revise Removal Priorities

DHS will implement a new department-wide enforcement and removal policy that places top priority on national security threats, convicted felons, gang members, and illegal entrants apprehended at the border; the second-tier priority on those convicted of significant or multiple misdemeanors and those who are not apprehended at the border, but who entered or reentered this country unlawfully after January 1, 2014; and the third priority on those who are non-criminals but who have failed to abide by a final order of removal issued on or after January 1, 2014. Under this revised policy, those who entered illegally prior to January 1, 2014, who never disobeyed a prior order of removal, and were never convicted of a serious offense, will not be priorities for removal. This policy also provides clear guidance on the exercise of prosecutorial discretion.

- Executive Action: Revise Removal Priorities (3.2 MB PDF)

### End Secure Communities and Replace it with New Priority Enforcement Program

DHS will end the Secure Communities program, and replace it with the Priority Enforcement Program (PEP) that will closely and clearly reflect DHS's new top enforcement priorities. The program will continue to rely on fingerprint-based biometric data submitted during bookings by state and local law enforcement agencies and will identify to law enforcement agencies the specific criteria for which we will seek an individual in their custody. The list of largely criminal offenses is taken from Priorities 1 and 2 of our new enforcement priorities. In addition, we will formulate plans to engage state and local governments on enforcement priorities and will enhance Immigration and Customs Enforcement's (ICE) ability to arrest, detain, and remove individuals deemed threats to national security, border security, or public safety.

- Executive Action: End Secure Communities and Replace it with New Priority Enforcement Program (1.5 MB PDF)

### Personnel Reform for ICE Officers

Related to these enforcement and removal reforms, we will support job series realignment and premium ability pay coverage for ICE ERO officers engaged in removal operations. These measures are essential to bringing ICE agents and officers pay in line with other law enforcement personnel.

- Executive Action: Personnel Reform for ICE Officers (1.0 MB PDF)

### Expand Deferred Action for Childhood Arrivals (DACA) Program

(n.33)

We will expand eligibility for DACA to encompass a broader class of children.  DACA eligibility was limited to those who were under 31 years of age on June 15, 2012, who entered the U.S. before June 15, 2007, and who were under 16 years old when they entered.  DACA eligibility will be expanded to cover all undocumented immigrants who entered the U.S. before the age of 16, and not just those born after June 15, 1981.  We will also adjust the entry date from June 15, 2007 to January 1, 2010.  The relief (including work authorization) will now last for three years rather than two.

- Executive Action: Expand Deferred Action for Childhood Arrivals (DACA) Program (2.8 MB PDF)

## Extend Deferred Action to Parents of Americans and Lawful Permanent Residents (DAPA)

DHS will extend eligibility for deferred action to individuals who (i) are not removal priorities under our new policy, (ii) have been in this country at least 5 years, (iii) have children who on the date of this announcement are U.S. citizens or lawful permanent residents, and (iv) present no other factors that would make a grant of deferred action inappropriate.  These individuals will be assessed for eligibility for deferred action on a case-by-case basis, and then be permitted to apply for work authorization, provided they pay a fee.  Each individual will undergo a thorough background check of all relevant national security and criminal databases, including DHS and FBI databases. With work-authorization, these individuals will pay taxes and contribute to the economy.

- Executive Action: Extend Deferred Action to Parents of U.S. Citizens and Lawful Permanent Residents (2.8 MB PDF)

## Expand Provisional Waivers to Spouses and Children of Lawful Permanent Residents

The provisional waiver program DHS announced in January 2013 for undocumented spouses and children of U.S. citizens will be expanded to include the spouses and children of lawful permanent residents, as well as the adult children of U.S. citizens and lawful permanent residents.  At the same time, we will further clarify the "extreme hardship" standard that must be met to obtain the waiver.

- Executive Action: Expand Provisional Waivers to Spouses and Children of Lawful Permanent Residents (1.0 MB PDF)

## Revise Parole Rules

DHS will begin rulemaking to identify the conditions under which talented entrepreneurs should be paroled into the United States, on the ground that their entry would yield a significant public economic benefit.  DHS will also support the military and its recruitment efforts by working with the Department of Defense to address the availability of parole-in-place and deferred action to spouses, parents, and children of U.S. citizens or lawful permanent residents who seek to enlist in the U.S. Armed Forces. DHS will also issue guidance to clarify that when anyone is given "advance parole" to leave the country – including those who obtain deferred action - they will not be considered to have departed.  Undocumented aliens generally trigger a 3- or 10-year bar to returning to the United States when they depart.

- Executive Action: Revise Parole Rules - Entrepreneurs (2.6 MB PDF)
- Executive Action: Revise Parole Rules - Parole-in-Place and Deferred Action (711 KB PDF)
- Executive Action: Revise Parole Rules - Advance Parole (690 KB)

## Promote the Naturalization Process

To promote access to U.S. citizenship, we will permit the use of credit cards as a payment option for the naturalization fee, and expand citizenship public awareness. It is important to note that the naturalization fee is $680, currently payable only by cash, check or money order.  DHS will also explore the feasibility of expanding fee waiver options.

- Executive Action: Promote the Naturalization Process (1 MB PDF)

## Support High-skilled Business and Workers

DHS will take a number of administrative actions to better enable U.S. businesses to hire and retain highly skilled foreign-born workers and strengthen and expand opportunities for students to gain on-the-job training.  For example, because our immigration system suffers from extremely long waits for green cards, we will amend current regulations and make other administrative changes to provide needed flexibility to workers with approved employment-based green card petitions.

- Executive Action: Support High-skilled Business and Workers (2.6 MB PDF)

## Additional Information

- The White House: Fixing the System
- U.S. Citizenship and Immigration Services: Immigration Action | En español
- U.S. Immigration and Customs Enforcement: Immigration Action

*Last Published Date: January 5, 2015*

# Center for American Progress

# Life as an Undocumented Immigrant

## How Restrictive Local Immigration Policies Affect Daily Life



SOURCE: AP/Charles Rex Arbogast

Immigrants react to legal threats and hostile reception by going underground: They hold negative perceptions of local law enforcement, associate routine activities such as driving and walking with anxiety and the risk of deportation, and develop strategies of avoidance and fitting in to mitigate the discovery of their unauthorized status.

**By Angela S. García and David G. Keyes | March 26, 2012**

Download this report (pdf)

Download the introduction and summary (pdf)

Read the report in your web browser (Scribd)

What happens to undocumented immigrants after the passage of anti-immigrant state laws such as Arizona's S.B. 1070 and Alabama's H.B. 56 or restrictive local ordinances such as those in Prince William County, Virginia,

(n.35)

or Freemont, Nebraska? What is life like for unauthorized immigrants in these areas, and how do they mitigate the harshness of these ordinances? On the flip side, what happens to the larger communities—documented and not, immigrant and not—and how do these laws impact the ability of law enforcement professionals to keep our communities safe?

Many studies have focused on the fiscal and economic ramifications of anti-immigrant legislation, but little work has been done on the harmful effects these laws have on everyday life in our communities. That is the focus of this report.

This report presents one of the first studies of immigrants' responses to local restrictions and enforcement. We demonstrate that exclusionary policies and ramped-up federal enforcement inhibit immigrant incorporation into their communities. Immigrants react to legal threats and hostile reception by going underground: They hold negative perceptions of local law enforcement, associate routine activities such as driving and walking with anxiety and the risk of deportation, and develop strategies of avoidance and fitting in to mitigate the discovery of their unauthorized status.

These avoidance strategies can lead to several problems for larger communities:

- Immigrants who do not interact with police limit the efficacy of policing measures.

- Immigrants who are reluctant to accompany their children to school are a barrier to effective education.

- Immigrants who are afraid to leave their houses foster less vibrant and civically unengaged neighborhoods for immigrants and nonimmigrants alike.

These anxieties affect documented and undocumented immigrants alike. According to a 2009 Pew Hispanic Center report, 53 percent of undocumented immigrants live in mixed-status families, where one or more family member is undocumented. Because authorized immigrants fear that their friends and loved ones could be deported when in contact with officials, many ultimately use the same strategies of avoidance.

Compounding state and local action is a perception among immigrants that local law enforcement is working hand-in-hand with immigration officials. Over the past decade, the increase in enforcement at the federal level has meant that local police and the immigration bureaucracy are closer than ever before. Some of these collaborations—such as the agreement between

A-103                                                    (n.35)

Immigration and Customs Enforcement and the City of Escondido, or the Border Patrol mandate allowing action up to 100 miles into the country, which enables agents to conduct routine searches for unauthorized migrants in the area without probable cause or warrants— bring a physical presence of immigration agents onto the streets in places like North County near San Diego, California.

Other forms of immigration enforcement—particularly the Secure Communities program—do not explicitly put immigration officers into local communities but nevertheless complicate the everyday lives of undocumented immigrants and make them equally fearful about interacting with local police.

The Secure Communities program checks the immigration status of immigrants booked into county jails in participating jurisdictions. The government justifies Secure Communities as a way of ensuring that dangerous criminals are prioritized for removal from the country. In May 2009 San Diego County became the first jurisdiction in the state of California to join the Secure Communities program.

> Compounding state and local action is a perception among immigrants that local law enforcement is working hand-in-hand with immigration officials.

In theory, since the program checks anyone who is booked in a participating county jail, it should not allow for discrimination based on race or racial profiling. But in practice, Secure Communities can become a vehicle for pretextual arrest, whereby people who look "foreign" are detained for minor traffic violations, charged, and run through the Secure Communities databases. Recent studies find that the majority of people Secure Communities catches in studied jurisdictions are young male Hispanics, and more often than not, they were picked up for only minor traffic offenses such as driving without a taillight.

# PewResearch
# Hispanic Trends Project

APRIL 14, 2009

# A Portrait of Unauthorized Immigrants in the United States

BY JEFFREY S. PASSEL (HTTP://WWW.PEWHISPANIC.ORG/AUTHOR/JPASSEL/) AND D'VERA COHN
(HTTP://WWW.PEWHISPANIC.ORG/AUTHOR/DCOHN/)

## I. Overview

Unauthorized immigrants living in the United States are more geographically dispersed than in the past and are more likely than either U.S. born residents or legal immigrants to live in a household with a spouse and children. In addition, a growing share of the children of unauthorized immigrant parents—73%—were born in this country and are U.S. citizens.

These are among the key findings of a new analysis by the Pew Hispanic Center, a project of the Pew Research Center, which builds on previous work estimating the size and growth of the U.S. unauthorized immigrant population. A 2008 report by the Center estimated that 11.9 million unauthorized immigrants lived in the United States; it concluded that the undocumented immigrant population grew rapidly from 1990 to 2006 but has since stabilized.[1] In this new analysis, the Center estimates that the rapid growth of unauthorized immigrant workers also has halted; it finds that there were 8.3 million undocumented immigrants in the U.S. labor force in March 2008.

Based on March 2008 data collected by the Census Bureau, the Center estimates that unauthorized immigrants are 4% of the nation's population and 5.4% of its workforce. Their children, both those who are unauthorized immigrants themselves and those who are U.S. citizens, make up 6.8% of the students enrolled in the nation's elementary and secondary schools.

About three-quarters (76%) of the nation's unauthorized immigrant population are Hispanics. The majority of undocumented immigrants (59%) are from Mexico, numbering 7 million. Significant regional sources of unauthorized immigrants include Asia (11%), Central America (11%), South America (7%), the Caribbean (4%) and the Middle East (less than 2%).

## State Settlement Patterns



Figure 4
Unauthorized Immigrant Workers in
U.S. Civilian Labor Force, 2003-08
*(millions)*

Source: Pew Hispanic Center tabulations from augmented March
Current Population Surveys. See text for details.

Among states, the proportion of unauthorized workers varies widely: They constitute roughly 10%
or more of the labor force in Arizona, California and Nevada, but less than 2.5% in most Midwest
and Plains states. They are especially likely to hold low-skilled jobs and their share of some of those
occupations has grown. In 2008, 17% of construction workers were undocumented, an increase
from 10% in 2003. One in four farmworkers is an unauthorized immigrant.



Figure 5
Occupations with High Shares of Unauthorized Immigrants, 2008
*(% unauthorized immigrants of workers in occupation)*

Source: Pew Hispanic Center tabulations from augmented March 2008 Current Population
Survey. See text for details.

(n.42)

Home

## Table 2. Farm Worker Demographics Continued:
## Current Status

Farm worker Tables | Table 2: Current Status

### Current Status
Chart | Data

Summary
How well do you
speak English?
How well do you
read English?
Country of Birth &
Ethnicity
Years since first
arrival to the U.S., if
foreign born
*Current Status*



Source: National Agricultural Workers Survey, DOL, Employment and Training Administration

