**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | |
|---|---|
| _____ ) | |
| **STATE OF TEXAS, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **CASE No. 1-14-CV-00254** |
| ) | |
| **UNITED STATES OF AMERICA, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| _____ ) | |

**AMICI CURIAE BRIEF OF MAJOR CITIES CHIEFS ASSOCIATION,**
**POLICE EXECUTIVE RESEARCH FORUM, AND INDIVIDUAL SHERIFFS AND**
**POLICE CHIEFS IN OPPOSITION TO PLAINTIFFS' MOTION**
**FOR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTEREST OF THE AMICI CURIAE AND SUMMARY OF THE ARGUMENT ....................1

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING................................3

STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT ..............................3

ARGUMENT ......................................................................................................................3

      I.     The Deferred Action Initiative Promotes the Public Interest by Enabling
           Community Cooperation with Police........................................................................4

      II.    The Deferred Action Initiative Facilitates Noncitizens' Ability to Obtain
           Valid Identification and thus Benefits Law Enforcement and Improves
           Public Safety .........................................................................................................7

CONCLUSION....................................................................................................................9

# TABLE OF AUTHORITIES

## Statutes and Regulations

8 U.S.C. § 1324a(h)(3) ................................................................................................. 7

8 C.F.R. § 274a.12(c)(14) ........................................................................................... 7

Pub.L. No. 109–13, div. B, 119 Stat. 231, 302 (2005) ............................................... 7

## Other Authorities

Sukhvir S. Brar, *Estimation of Fatal Crash Rates for Suspended/Revoked and Unlicensed Drivers in California*, California Department of Motor Vehicles (2012) ..................................................... 8

Department of Homeland Security, USICS, Instructions for I-765 Application for Employment Authorization ............................................................................................................................. 7

*Enhancing Community Policing with Immigrant Populations: Recommendations from a Roundtable Meeting of Immigrant Advocates and Law Enforcement Leaders*, U.S. Department of Justice Office of Community Oriented Policing Services (April 2010) ................................................................. 5

Anita Khashu, *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties* (Mary Malina ed., 2009) .......................................................................................... 4, 5

Natalia Lee, Daniel J. Quinones, Nawal Ammar & Leslye E. Orloff, *National Survey of Service Providers on Police Response to Immigrant Crime Victims, U Visa Certification and Language Access*, National Immigrant Women's Advocacy Project (April 2013) ............................................................... 6

Matthew Lysakowski, Albert Antony Pearsall III, and Jill Pope, *Policing in New Immigrant Communities*, U.S. Department of Justice, Office of Community Oriented Policing Services (June 2009) ..................................................................................................................................... 4, 5

*Police Executive Research Forum, Voices from Across the Country: Local Law Enforcement Officials Discuss the Challenges of Immigration Enforcement*, Police Executive Research Forum (2012) .......................................................................................................................................... 8

*Social Security Numbers For Noncitizens*, Social Security Administration, SSA Publication No. 05-10096 (Aug. 2013) .............................................................................................................................. 7

Southern Poverty Law Ctr., *Under Siege: Life for Low-Income Latinos in the South,* (Apr. 2009) ......... 5, 6

Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, Univ. of Illinois Chicago (May 2013) .................................................................. 5

Robert Wasserman, *Guidance for Building Communities of Trust*, U.S. Department of Justice, Office of Community Oriented Policing Services (2010) ............................................................................. 4

ii

**INTEREST OF THE AMICI CURIAE AND SUMMARY OF THE ARGUMENT**

*Amici* are associates of local law enforcement officials and individual current law enforcement officials. They have deep expertise in local law enforcement and, in addition, on cooperative federal-state law enforcement activities. *Amici* submit this brief to inform the Court of the harms that a preliminary injunction against Defendants' deferred action initiative would cause to local law enforcement entities and to the communities they serve. The initiative, which is described in Secretary Jeh Johnson's November 20, 2014 memorandum (Dkt. No. 38, Defs.' Ex. 7), and referred to below as the "Deferred Action Initiative," promotes the public interest and should proceed without delay.

In this brief, *amici* demonstrate that the Deferred Action Initiative will improve public safety by encouraging community cooperation with police, an essential element to effective policing and improving public safety. *Amici* also demonstrate that the Deferred Action Initiative will provide individuals with the opportunity to obtain verified and secure identification, which aids law enforcement in carrying out its day to day duties. Any delay in implementing the Deferred Action Initiative will harm important law enforcement activities.

*Amici* are:

- Major Cities Chiefs Association, which is a professional association of chiefs and sheriffs representing the largest cities in the United States, serving more than 68 million people;

- Police Executive Research Forum, which is a national membership organization of police executives from the largest city, county and state law enforcement agencies dedicated to improving policing and advancing professionalism through research and involvement in public policy debate;

- Chief Art Acevedo, City of Austin, Texas, Police Department;

- Chief Charlie Beck, Los Angeles, California, Police Department;

- Chief Richard S. Biehl, Dayton, Ohio, Police Department;

- Chief Chris Burbank, Salt Lake City, Utah, Police Department;

- Sheriff Mark C. Curran Jr., Lake County, Illinois, Sheriff's Office;

- Sheriff Tony Estrada, Santa Cruz County, Arizona, Sheriff's Office;

- Commissioner William B. Evans, Boston, Massachusetts, Police Department;

- Sheriff Adrian Garcia, Harris County, Texas, Sheriff's Office;

- Sheriff Marlin Gusman, New Orleans Parish, Louisiana, Sheriff's Office;

- Chief James Hawkins, Garden City, Kansas, Police Department;

- Chief Dwight Henninger, Vail, Colorado, Police Department;

- Chief Michael C. Koval, Madison, Wisconsin, Police Department;

- Chief Jose L. Lopez Sr., Durham, North Carolina, Police Department;

- Sheriff Leon Lott, Richland County, South Carolina, Sheriff's Department;

- Sheriff Bill McCarthy, Polk County, Iowa, Sheriff's Office;

- Chief Roy W. Minter, Jr., Peoria, Arizona, Police Department;

- Lieutenant Andy Norris, Tuscaloosa County, Alabama, Sheriff's Office;

- Chief Kathleen O'Toole, Seattle, Washington, Police Department;

- Commissioner Charles Ramsey, Philadelphia, Pennsylvania, Police Department;

- Chief Greg Suhr, San Francisco, California, Police Department;

- Chief Ron Teachman, South Bend, Indiana, Police Department;

- Chief Michael Tupper, Marshalltown, Iowa, Police Department;

- Sheriff John Urquhart, King County, Washington, Sheriff's Office;

- Sheriff Lupe Valdez, Dallas County, Texas, Sheriff's Department;

- Chief Roberto Villaseñor, Tucson, Arizona, Police Department;

2

- Chief Robert White, Denver, Colorado, Police Department;

- Sheriff Richard D. Wiles, El Paso County, Texas, Sheriff's Office.[1]

### STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

The parties to this case have addressed the nature of the state of the proceeding in their motion and opposition.

### STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

*Amici* agree with Defendants' presentation of the issues before the Court. *See* Dkt. No. 38 at 12-13.

### ARGUMENT

*Amici* demonstrate below that a preliminary injunction would harm the ability of local law enforcement authorities to effectively police and protect the communities they serve, and that a preliminary injunction would thus be against the public interest. The Deferred Action Initiative, which provides individuals with a process to register with the federal government and receive temporary relief from removal, work authorization, and other identity documents, will improve public safety in several important ways. First, the Deferred Action Initiative encourages community cooperation with police, an essential element to effective policing and improving public safety, and facilitates a shift in federal law enforcement resources away from individuals with family ties to their communities and no criminal convictions, leading to more effective and resource-conscious policing with attendant public safety benefits. Further, the Deferred Action Initiative provides individuals with the opportunity to obtain verified and secure identification,

---

[1] For individuals, affiliations are provided for identification purposes only.

including an employment authorization document, which aids law enforcement in carrying out

day to day duties.  A preliminary injunction would thus harm the public interest.

I.      **The Deferred Action Initiative Promotes the Public Interest by Enabling Community Cooperation With Police**

Law enforcement cannot successfully protect a community without the cooperation of

those individuals who make up the community. At both the federal and state level, community

policing—the cooperative approach under which law enforcement and community members

work together to combat crime—has resulted in better and more efficient policing, and has thus

become a cornerstone of modern law enforcement. Because community policing is an approach

where police officers engage communities in a working partnership to reduce crime and promote

public safety, it requires police to interact with neighborhood residents in a manner that will

build trust and improve the level of cooperation with the police department.[2]

One barrier to the development of trust required for effective community policing is the

fact that individuals subject to deportation or removal may fear that interactions with local and

state law enforcement could result in scrutiny of one's immigration status, or the status of their

family members or neighbors. For example, a domestic violence victim who doesn't have legal

status may not call police for fear that she or her abuser will be deported.[3] A recent survey

showed that 44 percent of surveyed Latinos are less likely to contact police officers if they have

---

[2] *See* Anita Khashu, *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties*, at 24 (Mary Malina ed., 2009), *available at* http://www.policefoundation.org/sites/g/files/ g798246/f/Khashu%20%282009%29%20-%20The%20Role%20of%20Local%20Police.pdf; *see also* Robert Wasserman, *Guidance for Building Communities of Trust*, at 7, U.S. Department of Justice, Office of Community Oriented Policing Services (2010), *available at* http://www.cops.usdoj.gov/files/RIC/ Publications/e071021293_BuildingCommTrust.pdf.
[3] *See* Matthew Lysakowski, Albert Antony Pearsall III, and Jill Pope, *Policing in New Immigrant Communities*, U.S. Department of Justice, Office of Community Oriented Policing Services (June 2009), *available at* http://www.vera.org/sites/default/files/resources/downloads/e060924209-New ImmigrantCommunities.pdf

been the victim of a crime because they fear that police officers could use the interaction as an opportunity to inquire into their immigration status or that of people they know; 45 percent of Latinos stated that they are less likely to voluntarily offer information about crimes, and 45 percent are less likely to report a crime because they are afraid the police will ask them or people they know about their immigration status; and 70 percent of undocumented immigrants reported they are less likely to contact law enforcement authorities if they were victims of a crime.[4] Fear of immigration enforcement preventing cooperation with police would extend to authorized immigrants living in mixed-status households who fear contact with police could lead to deportation of family members and other loved ones.[5]

An avoidance of law enforcement makes immigrants especially vulnerable to all types of crime and civil violations; for example, domestic violence, sexual assault, gang activity, human trafficking, nonpayment by employers, and financial scams.[6] Criminals are known to target immigrants because their reluctance to report crimes is well-known, and some employers take advantage of undocumented immigrants' labor and refuse to pay wages, knowing that the workers won't report them to police or other authorities.[7] One report showed that 41 percent of surveyed migrant workers had experienced wage theft where they were not paid for work performed.[8] Furthermore, many immigrant laborers become prime targets for robbery and other

---

[4] Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, at 5-6, Univ. of Illinois Chicago (May 2013), *available at* http://www.academia.edu/4738588/Insecure_Communities_Latino_Perceptions_of_Police_Involvement_in_Immigration_Enforcement.

[5] *See* Khashu, *supra* note 2, at 24 (estimating that 85% of immigrants live in mixed-status families) (citation omitted).

[6] *See Enhancing Community Policing with Immigrant Populations: Recommendations from a Roundtable Meeting of Immigrant Advocates and Law Enforcement Leaders*, at 16, U.S. Department of Justice Office of Community Oriented Policing Services (April 2010), *available at* http://www.cops.usdoj.gov/Publications/e041016266-Enhancing-CP-Immigrant-Populations_b.pdf.

[7] *See* Lysakowski, Pearsall, and Pope, *supra* note 3 at 4.

[8] Southern Poverty Law Ctr., *Under Siege: Life for Low-Income Latinos in the South,* at 6 (Apr. 2009), *available at* http://www.splcenter.org/sites/default/files/downloads/UnderSiege.pdf.

crimes because they lack the ability to open bank accounts (in part due to identification issues discussed below in Part II), and thus criminals know they are more likely than others to be carrying large sums of cash.[9]

The Deferred Action Initiative encourages immigrant cooperation with police and benefits community policing by removing the fear of detention and removal for the millions of eligible individuals who, due to their length of time in the United States and citizen children, are already members of the communities which local law enforcement serve. The Deferred Action Initiative supports community policing by legitimizing the presence of otherwise law-abiding immigrants with already strong ties to their neighborhoods, and reassuring them that their cooperation with law enforcement will not separate them from their lives and families in the United States. In contexts where individuals would not fear removal due to the availability of an immigration benefit, for example the U-visa, a form of immigration relief created by Congress as part of the Violence Against Women Act of 2000 offering temporary legal immigration status to immigrants who have been victims of certain criminal activities, communities have noted increased rates of reports made to, and participation with, local law enforcement.[10]

The Deferred Action Initiative thus improves public safety for the entire community and allows *amici* to effectively do their jobs. Additionally, the Deferred Action Initiative guidelines help the federal government to focus its removal efforts on criminals and threats to national security and public safety. (Dkt. No. 38 at 51.) This shift in priorities at the federal level will in

---

[9] *Id*. at 25 (noting that immigrant laborers have "been dubbed walking ATMs").
[10] *See* Natalia Lee, Daniel J. Quinones, Nawal Ammar & Leslye E. Orloff, *National Survey of Service Providers on Police Response to Immigrant Crime Victims, U Visa Certification and Language Access*, at 6-7, National Immigrant Women's Advocacy Project (April 2013), available at http://www.niwap.org/reports/Police-Response-U-Visas-Language-Access-Report-4.6.13.pdf (citing prior research finding that "the rate at which immigrant victims called the police for help and were helpful or willing to be helpful in the detection, investigation, prosecution, conviction or sentencing of a perpetrator was extremely high (99.45%) among U Visa applicants and recipients").

turn help local law enforcement keep communities safer by shifting focus away from individuals with long-standing ties to the community. A preliminary injunction would thus harm the efforts of local law enforcement to build trust with community members, and would adversely affect public safety.

## II.     The Deferred Action Initiative Facilitates Noncitizens' Ability to Obtain Valid Identification and thus Benefits Law Enforcement and Improves Public Safety

As explained in Defendants' Memorandum (Dkt. No. 38 at 11-12), individuals under the Deferred Action Initiative would be granted deferred action from removal and may be eligible for a federal employment authorization document ("EAD"), which comes in the form of a card issued by the United States Citizenship and Immigration Services, and includes the recipient's photograph.[11] Individuals who receive employment authorization would also be eligible to obtain a Social Security number and card.[12] Deferred action is a longstanding form of relief that is included specifically in the federal REAL ID Act as a lawful status that would permit the issuance of a driver's license under state law that is federally recognized, valid during the period of authorized stay in the U.S.[13] While a grant of deferred action would not provide access to a state driver's license automatically, most recipients who obtain an employment authorization document and a Social Security number, would be able to obtain a state license under state law. Studies have provided strong evidence that unlicensed drivers are much more hazardous on the

---

[11] *See* 8 U.S.C. § 1324a(h)(3); 8 C.F.R. § 274a.12(c)(14); *see also* Department of Homeland Security, USICS, Instructions for I-765 Application for Employment Authorization, *available at* http://www.uscis.gov/sites/default/files/files/form/i-765instr.pdf (describing EAD as a "card" and requiring two passport-style photos).

[12] *See Social Security Numbers For Noncitizens*, Social Security Administration, SSA Publication No. 05-10096 (Aug. 2013), *available at* http://www.ssa.gov/pubs/EN-05-10096.pdf.

[13] Congress provided that state-issued driver's licenses were acceptable for federal purposes only if the state verifies that an applicant maintains evidence of lawful status, which includes evidence of "approved deferred action status." *See* Pub.L. No. 109–13, div. B, 119 Stat. 231, 302 (2005) (codified at 49 U.S.C. § 30301 note).

road than are validly licensed drivers.[14] Thus, the increase in motorists who are trained, tested, licensed, and insured will improve road safety overall.

To the extent the Deferred Action Initiative facilitates the issuance of identification to undocumented immigrants, including an employment authorization document, a social security card, and state driver's licenses, the program would greatly assist law enforcement officers' ability to properly identify individuals in everyday interactions, making the jobs of those officers easier and more effective. For example, officers engaged in active investigations need to be able to verify the identity of witnesses to, or victims of, crimes. Daily tasks such as making a stop for a driving infraction are made easier when an officer can identify the individual in question and issue a citation. If an officer stops a motorist who does not have a license or other form of identification, the officer may have no other option than to arrest the individual, bring him to the station, and obtain fingerprint information in order to securely identify the individual.[15] Such situations take time and unnecessarily divert resources away from true threats to public safety, such as investigations and responses to violent offenses.[16]

---

[14] *See, e.g.*, Sukhvir S. Brar, *Estimation of Fatal Crash Rates for Suspended/Revoked and Unlicensed Drivers in California*, California Department of Motor Vehicles (2012), *available at* http://www.dol.wa.gov/about/docs/UnlicensedDriverStudy.pdf.

[15] *See Police Executive Research Forum, Voices from Across the Country: Local Law Enforcement Officials Discuss the Challenges of Immigration Enforcement*, at 15-16, Police Executive Research Forum (2012), available at http://www.policeforum.org/assets/docs/Free_Online_Documents/ Immigration/voices%20from%20across%20the%20country%20%20local%20law%20enforcement%20of ficials%20discuss%20the%20challenges%20of%20immigration%20enforcement%202012.pdf (citing officer stating that "[w]hen we stop cars and the driver doesn't have a driver's license, there are very few options for the officers and troopers. If there is no other source of identification, we're going to use fingerprint identification. That means the person has to be put in the police car and taken to jail so we can find out who they are.").

[16] *Id.* (quoting officer stating that "[t]he question is an economic one for police, because every time we stop somebody who has no identification, it takes a lot of manpower to try to identify that person. An officer will spend up to two to three hours to determine who an arrestee is. . . . They don't have the resources to start dealing with the problem.").

The ability of millions of individuals to obtain identification, including a federal employment authorization document, a social security number and card, and a driver's license under state law, through the Deferred Action Initiative will greatly benefit local law enforcement officers' ability to conduct their jobs effectively, and a preliminary injunction would cause significant harms and would injure the public interest.

## CONCLUSION

The Deferred Action Initiative will improve public safety by encouraging community cooperation with police and by providing individuals with a greater opportunity to obtain verified and secure identification, which would aid law enforcement in carrying out its day to day duties. The population included in the Deferred Action Imitative is one with long-standing ties to the communities served by *amici*, and a preliminary injunction would harm this population and law enforcement's ability to effectively protect the public. For the reasons in Defendants' brief and the reasons set forth above, the preliminary injunction should be denied.


Dated: January 12, 2015                      Respectfully submitted,

                                             /s/ Chirag G. Badlani


                                             MATTHEW J. PIERS*
                                             CHIRAG G. BADLANI (admitted *pro hac vice*)
                                                   IL State Bar No. 6308523
                                                   Attorney-in-Charge for *Amici*
                                             Hughes Socol Piers Resnick & Dym, Ltd.
                                             70 West Madison St., Suite 4000
                                             Chicago, IL 60602
                                             Telephone: (312) 580-0100
                                             cbadlani@hsplegal.com

                                             *Counsel for Amici*

                                             * Not admitted in this jurisdiction

9

**CERTIFICATE OF SERVICE**

I hereby certify that service of the foregoing motion and proposed brief will be delivered electronically on January 12, 2015, to counsel for Plaintiffs and Defendants through the District's Electronic Case Filing system.

/s/ Chirag G. Badlani