**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:14-CV-254 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| JANE DOE #1, JANE DOE #2, and JANE | § | |
| DOE #3, | § | |
| | § | |
| | § | |
| Proposed Defendant– | § | |
| Intervenors | § | |
| | § | |

## APPENDIX OF AUTHORITIES

Pursuant to the Court's Civil Procedures, rule 7(a), the Proposed Defendant-Intervenors Jane Doe #1, Jane Doe #2, and Jane Doe #3 hereby provide the Court with copies of the following authorities cited in support of the Proposed Defendant-Intervenors' (1) Motion to Intervene and Memorandum of Law in Support, (2) [Proposed] Joinder in Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Preliminary Injunction, and (3) Motion for Leave to Proceed Under Pseudonyms and Memorandum of Law in Support.

| NO. | AUTHORITY |
|---|---|
| 1. | *Arpaio v. Obama,* No. 14-cv-1966-BAH, at ECF No. 23 (D.D.C. Dec. 23, 2014) |
| 2. | *Friendly House v. Whiting*, No. 2:10-cv-1061-SRB, at ECF No. 212 (D. Ariz. June 21, 2010) |

| 3. | *Georgia Latino Alliance for Human Rights v. Deal*, No. 1:11-CV-1804-TWT, at ECF No. 101 (N.D. Ga. July 8, 2011) |
|---|---|
| 4. | *Keller v. City of Fremont*, No. 8:10-cv-0270-LSC-FG3, 2011 WL 41902, (D. Neb. Jan. 5, 2011) |
| 5. | *Sierra Club v. Fed. Emergency Mgmt. Agency,* No. H-07-0608, 2008 U.S. Dist. LEXIS 47405 (S.D. Tex. June 11, 2008) |
| 6. | *DHS Appropriations Act,* Pub. L. No. 111-83, 123 Stat 2142, 2149 (2009) |
| 7. | 8 C.F.R. §274.a12(c)(14) |

Dated:  January 14, 2015

LAW OFFICE OF FRANK COSTILLA, L.P.
Frank Costilla (Tex. Bar. No. 04856500)
5 E. Elizabeth Street
Brownsville, Texas 78520
Phone:  956-541-4982
Facsimile:  956-544-3152

Respectfully submitted,

MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND
By   */s/ Nina Perales*
Nina Perales (Tex. Bar No. 24005046; Southern District of Tex. Bar No. 21127)
Attorney-in-Charge
David Hinojosa (Tex. Bar No. 24010689)
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone:  (210) 224-5476 (telephone)
Facsimile:  (210) 224-5382 (facsimile)

O'MELVENY & MYERS LLP
Linda Smith (Cal. Bar No. 78238)
Adam P. KohSweeney (Cal. Bar No. 229983)
J. Jorge deNeve (Cal. Bar No. 198855)
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Phone: 310-246-6801
Facsimile: 310-246-6779

(Requests for *pro hac vice* admission to be filed)

Attorneys for the Proposed Defendant-Intervenors **JANE DOE #1**, **JANE DOE #2,** and **JANE DOE #3**

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that, on the 14th day of January 2015, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Nina Perales*

Nina Perales (Tex. Bar No. 24005046)
***Attorney for Proposed Defendant-Intervenors***

1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOSEPH ARPAIO, | |
| Plaintiff, | Civil Action No. 14-01966 (BAH) |
| v. | Judge Beryl A. Howell |
| BARACK H. OBAMA, *President, United States in his official capacity, et al.*, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

The plaintiff, the elected Sheriff of Maricopa County, brings suit against the President of the United States, and other Federal officials, alleging that certain immigration policies announced by the President in a nationwide address on November 20, 2014 are unconstitutional, otherwise illegal, and should be stopped from going into effect. *See* Pl.'s Mot. Prelim. Inj. ("Pl.'s Mot."), ECF No. 7. The plaintiff's suit raises important questions regarding the nation's immigration policies, which affect the lives of millions of individuals and their families. The wisdom and legality of these policies deserve careful and reasoned consideration. As the Supreme Court recently explained: "[T]he sound exercise of national power over immigration depends on the [Nation] meeting its responsibility to base its law on a political will informed by searching, thoughtful, rational civic discourse." *Arizona v. United States*, 132 S.Ct. 2492, 2510 (2012).

The key question in this case, however, concerns the appropriate forum for *where* this national conversation should occur. The doctrine of standing, in both its constitutional and prudential formulations, concerns itself with "'the proper—and properly limited—role of the courts in a democratic society.'" *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Warth v.*

*Seldin*, 422 U.S. 490, 498 (1975)).  Standing "ensures that [courts] act as judges, and do not engage in policymaking properly left to elected representatives."  *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2659 (2013).

The refusal to adjudicate a claim should not be confused with abdicating the responsibility of judicial review.  "Proper regard for the complex nature of our constitutional structure requires neither that the Judicial Branch shrink from a confrontation with the other two coequal branches of the Federal Government, nor that it hospitably accept for adjudication claims of constitutional violation by other branches of government where the claimant has not suffered cognizable injury."  *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 474 (1982).  A court must refrain "'from passing upon the constitutionality of an act [of the representative branches], unless obliged to do so in the proper performance of our judicial function, when the question is raised by a party whose interests entitle him to raise it.'"  *Id.* (quoting *Blair v. United States*, 250 U.S. 273, 279 (1919)) (alteration in original).  Ultimately, "[i]t is the role of courts to provide relief to claimants . . . who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution."  *Lewis v. Casey*, 518 U.S. 343, 349 (1996).

Concerns over the judicial role are heightened when the issue before the court involves, as here, enforcement of the immigration laws.  This subject raises the stakes of, among other factors, "immediate human concerns" and "policy choices that bear on this Nation's international relations."  *Arizona v. United States*, 132 S.Ct. at 2499.  "[O]ur Constitution places such sensitive immigration and economic judgments squarely in the hands of the Political Branches, not the courts."  *Fogo de Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127,

1151 n.10 (D.C. Cir. 2014); *see also United States v. Valenzuela-Bernal*, 458 U.S. 858, 864

(1982) ("The power to regulate immigration—an attribute of sovereignty essential to the

preservation of any nation—has been entrusted by the Constitution to the political branches of

the Federal Government.").

 The role of the Judiciary is to resolve cases and controversies properly brought by parties

with a concrete and particularized injury— not to engage in policymaking better left to the

political branches.  The plaintiff's case raises important questions regarding the impact of illegal

immigration on this Nation, but the questions amount to generalized grievances which are not

proper for the Judiciary to address.  For the reasons explained in more detail below, the plaintiff

lacks standing to bring this challenge to the constitutionality and legality of the immigration

policies at issue.  Accordingly, the plaintiff's motion for a preliminary injunction, ECF No. 7, is

denied and the defendants' motion to dismiss for lack of subject matter jurisdiction, ECF Nos.

13, 15, is granted.[1]

## I.    BACKGROUND

### A.    Executive Enforcement of Immigration Laws

The Immigration and Nationality Act ("INA"), codified as amended at 8 U.S.C. § 1101 *et

seq.*, establishes a comprehensive statutory scheme that governs immigration and naturalization.

The INA establishes categories of immigrants who are inadmissible to the United States in the

first instance, *see* 8 U.S.C. § 1182, and immigrants who are subject to removal from the United

States once here, *see* 8 U.S.C. § 1227.  Under the INA, "[a]liens may be removed if they were

---

[1]  The plaintiff filed a motion for preliminary injunction at ECF No. 6 and an amended, corrected motion for
preliminary injunction at ECF No. 7.  Plaintiff's counsel clarified at the motions hearing that the latter filed motion
is the operative motion.  See Rough Transcript of Preliminary Injunction Hearing (Dec. 22, 2014) ("Hrg. Tr.") at 3–
4.  Consequently, the plaintiff's motion for preliminary injunction docketed at ECF No. 6 is denied as moot.

inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set

by federal law." *Arizona*, 132 S.Ct. at 2499 (citing 8 U.S.C. § 1227).

The Secretary of the Department of Homeland Security ("DHS") is "charged with the

administration and enforcement of [the INA] and all other laws relating to the immigration and

naturalization of aliens." 8 U.S.C. § 1103(a)(1). Although charged with enforcement of the

statutory scheme, "[a]n agency generally cannot act against each technical violation of the statute

it is charged with enforcing," *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985), and indeed "[a]

principal feature of the removal system is the broad discretion exercised by immigration

officials." *Arizona*, 132 S.Ct. at 2499. Thus, to enable the "proper ordering of its priorities,"

*Heckler*, 470 U.S. at 832, and the marshalling of extant resources to address those priorities, the

INA provides the Secretary of DHS with the authority to "establish such regulations; . . . issue

such instructions; and perform such other acts as he deems necessary for carrying out his

authority under [the INA]." 8 U.S.C. § 1103(a)(3). Further, the Secretary of DHS is specifically

charged with "establishing national immigration enforcement policies and priorities," 6 U.S.C. §

202(5), to ensure that DHS's limited resources are expended in pursuit of its highest priorities in

national security, border security, and public safety.

The context in which the immigration laws are enforced bears out the need for such

prioritization. DHS estimates that approximately 11.3 million undocumented immigrants

residing in the United States are potentially eligible for removal. Pl.'s Mot., Ex. B (Karl

Thompson, Memorandum Opinion for the Sec'y of Homeland Security and the Counsel to the

President: *DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the

United States and to Defer Removal of Others* at 1, (Nov. 19, 2014) ("OLC Opinion")) at 1, ECF

No. 7-2. Of those, DHS estimates that the agency has the resources to remove fewer than

400,000 undocumented immigrants.  *Id*.  In addition, DHS faces additional challenges including: demographic shifts resulting in increased costs for managing and deterring unauthorized border crossings; increased complexity in removing aliens; congressional directives to prioritize recent border crossers and serious criminals; and the humanitarian and social consequences of separating families.  *See* OLC Opinion at 11; Defs.' Mem. Opp. Pl.'s Mot. Prelim. Inj. ("Defs.' Mem."), Ex. 21 (*Challenges at the Border: Examining the Causes, Consequences, and Responses to the Rise in Apprehensions at the Southern Border:  Hearing Before the S. Comm. on Homeland Security and Governmental Affairs*, 113th Cong. (2014) (statement of Craig Fugate, Administrator, Federal Emergency Management Agency, et al.)), ECF No. 13-21; *see also* Defs.' Mem. at 1.

To confront these challenges, the executive branch has long used an enforcement tool known as "deferred action" to implement enforcement policies and priorities, as authorized by statute.  *See* 6 U.S.C. § 202(5).  Deferred action is simply a decision by an enforcement agency not to seek enforcement of a given statutory or regulatory violation for a limited period of time. In the context of the immigration laws, deferred action represents a decision by DHS not to seek the removal of an alien for a set period of time.  In this sense, eligibility for deferred action represents an acknowledgment that those qualifying individuals are the lowest priority for enforcement.  Under long-existing regulations, undocumented immigrants granted deferred action may apply for authorization to work in the United States.  *See* 8 C.F.R. § 274a.12(c)(14). These regulations were promulgated pursuant to the Immigration Reform and Control Act of 1986 and have been in effect, as amended, since 1987.  *See* Control of Employment of Aliens, 52 Fed. Reg. 16216 (1987).  Deferred action does not confer any immigration or citizenship status or establish any enforceable legal right to remain in the United States and, consequently, may be

canceled at any time. *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483

(1999) ("At each stage, the Executive has discretion to abandon the endeavor . . . .").

For almost twenty years, the use of deferred action programs has been a staple of

immigration enforcement. The executive branch has previously implemented deferred action

programs for certain limited categories of aliens, including: certain victims of domestic abuse

committed by United States citizens and Lawful Permanent Residents;[2] victims of human

trafficking and certain other crimes;[3] students affected by Hurricane Katrina;[4] widows and

widowers of U.S. citizens;[5] and certain aliens brought to the United States as children.[6]

Programs similar to deferred action have been used extensively by the executive branch for an

even longer period of time.[7]

---

[2] Defs.' Mem., Ex. 7 (Memorandum for Regional Directors et al., from Paul W. Virtue, Acting Executive Associate Commissioner, INS, *Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* at 3 (May 6, 1997)), ECF No. 13-7.

[3] Defs.' Mem., Ex. 8 (Memorandum for Michael A. Pearson, Executive Associate Commissioner, INS, from Michael D. Cronin, Acting Executive Associate Commissioner, INS, *Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy Memorandum #2—"T" and "U" Nonimmigrant Visas* at 2 (Aug. 30, 2001)), ECF No. 13-8.

[4] Defs.' Mem., Ex. 9 (USCIS, *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ)*, at 1 (Nov. 25, 2005)), ECF No. 13-9 ("Since the Notice does not cover Katrina-impacted foreign academic students who have failed to maintain their F-1 status, such persons, and their F-2 dependents, may request a grant of deferred action and short term employment authorization based on economic necessity.").

[5] Defs.' Mem., Ex. 10 (Memorandum for Field Leadership, USCIS, from Donald Neufeld, Acting Associate Director, USCIS, *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* at 1 (Sept. 4, 2009)), ECF No. 13-10.

[6] This is the DACA program challenged by the plaintiff. *See* Pl.'s Mot., Ex. A (Memorandum for David Aguilar, Acting Commissioner, CBP, et al., from Janet Napolitano, Secretary, DHS, *Re: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 1–2 (June 15, 2012)), ECF No. 6-1.

[7] In the 1970's through the 1990's, programs similar to deferred action were used to defer enforcement against undocumented immigrants who were awaiting approval of certain professional visas, *see United States ex rel. Parco v. Morris*, 426 F. Supp. 976, 979–81 (E.D. Pa. 1977), certain nurses eligible for H-1 visas, *see Voluntary Departure for Out-of-Status Nonimmigrant H-1 Nurses*, 43 Fed. Reg. 2776, 2776 (Jan 19, 1978); nationals of certain designated foreign states, *see* Defs.' Mem., Ex. 5 (*Moore, Charlotte J.*, Cong. Research Serv., *Review of U.S. Refugee Resettlement Programs and Policies* at 12-14 (1980)), ECF No. 13-5; and spouses and children of aliens who had been granted legal status under the Immigration Reform and Control Act of 1986, *see* Defs.' Mem., Ex. 6 (Memorandum for Regional Commissioners, INS, from Gene McNary, Commissioner, INS, *Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990)), ECF No. 13-6.

Congress has acquiesced to, and even endorsed the use of, deferred action on removal of undocumented immigrants by the executive branch on multiple occasions. For example, in 2000, Congress expanded the deferred action program for certain victims of domestic abuse, permitting children over the age of twenty-one to be "eligible for deferred action and work authorization." 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV). Similarly, in 2008, Congress authorized the DHS to "grant . . . an administrative stay of a final order of removal" to individuals who could make an initial showing that they were eligible for a visa as victims of human trafficking and certain other crimes. *See* 8 U.S.C. § 1227(d)(1). Congress specifically noted that "[t]he denial of a request for an administrative stay of removal . . . shall not preclude the alien from applying for . . . deferred action." *See* 8 U.S.C. § 1227(d)(2). In Division B to the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, known by its short title of the REAL ID Act of 2005, Congress provided that state-issued driver's licenses were acceptable for federal purposes only if the state verifies that an applicant maintains evidence of lawful status, which includes evidence of "approved deferred action status." *See* Pub. L. No. 109-13, div. B, 119 Stat. 231, 302 (2005) (codified at 49 U.S.C. § 30301 note).

B.    **Challenged Immigration Programs**

Against this lengthy historical record of the use of deferred action as a tool to carry out "national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), the executive branch has more recently employed this tool in three programs, which the plaintiff challenges as unconstitutional or otherwise in violation of the Administrative Procedure Act. Specifically, the plaintiff challenges a June 15, 2012 program—known as Deferred Action for Childhood Arrivals ("DACA")—whose guidance is outlined in a memorandum by the former DHS Secretary entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States

as Children." DACA permits, on a case-by-case basis, deferred action on removal for a period of

two years for undocumented immigrants that: (1) are under the age of 31 as of June 15, 2012; (2)

were under the age of 16 at the time of arrival in the United States; (3) have continuously resided

in the United States for at least five years immediately preceding June 15, 2012; (4) were present

in the United States on June 15, 2012; (5) are in school, have graduated from high school, have

obtained a general education development certificate, or have been honorably discharged from

the Coast Guard or the Armed Forces of the United States; and (6) have not been convicted of a

felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise

pose no threat to the national security or public safety. *See* Pl.'s Mot., Ex. A (Memorandum

from Janet Napolitano, Secretary, Department of Homeland Security, to David V. Aguilar,

Acting Commissioner, U.S. Customs and Border Protection, et al., *Exercising Prosecutorial*

*Discretion with Respect to Individuals Who Came to the United States as Children* (June 15,

2012)), at 1–2 , ECF No. 7-1.

The other two programs challenged by the plaintiff are outlined in a memorandum by the

current DHS Secretary entitled "Exercising Prosecutorial Discretion with Respect to Individuals

Who Came to the United States as Children and with Respect to Certain Individuals Who Are the

Parents of U.S. Citizens or Permanent Residents." The memorandum revised the DACA

program ("2014 DACA Revisions") and also created a new program that established guidelines

for the request of deferred action by the parents of U.S. Citizens or Lawful Permanent Residents

("DAPA"). *See* Pl.'s Mot., Ex. D (Memorandum from Jeh Charles Johnson, Secretary,

Department of Homeland Security, to Leon Rodriguez, Director, U.S. Citizenship and

Immigration Services, et al., *Exercising Prosecutorial Discretion with Respect to Individuals*

*Who Came to the United States as Children and with Respect to Certain Individuals Who Are the*

*Parents of U.S. Citizens or Permanent Residents* (November 20, 2014) ("2014 Guidance Memorandum")), ECF No. 7-4.

The principal features of the 2014 DACA Revisions include: (1) removal of the age cap of 31 so that individuals may request deferred action under DACA regardless of their current age, as long as they entered the United States before the age of 16; (2) extension of the period of deferred action from two years to three years; and (3) adjustment of the relevant date by which an individual must have been in the United States from June 15, 2007 to January 1, 2010.  *See* 2014 Guidance Memorandum at 3–4.

DAPA permits, on a case-by-case basis, deferred action on removal for a period of three years for illegal aliens who are parents of U.S. citizens and Lawful Permanent Residents.  To be considered for deferred action under DAPA, an individual must meet the following guidelines: (1) have, as of November 20, 2014, a son or daughter who is a U.S. citizen or Lawful Permanent Resident; (2) have continuously resided in the United States since before January 1, 2010; (3) have been physically present in the United States on November 20, 2014 and at the time of making a request for deferred action with U.S. Citizenship and Immigration Services; (4) have no lawful status as of November 20, 2014; (5) not fall within one of the categories of enforcement priorities set forth in additional agency guidelines;[8] and (6) present no other factors that, in the exercise of discretion, make the grant of deferred action inappropriate.  *Id.*

---

[8] In a November 20, 2014 Memorandum entitled "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants," the Secretary of DHS set forth three categories of undocumented immigrants who are considered to be priorities for removal.  The first category, representing the highest priority for civil immigration authorities, concerns undocumented immigrants who are threats to national security, border security, and public safety.  The second category, representing the second-highest priority for civil immigration authorities, concerns undocumented immigrants who have committed certain misdemeanors or recently committed certain immigration violations.  The third category, representing the third-highest priority for civil immigration authorities, concerns undocumented immigrants who have been issued a final order of removal on or after January 1, 2014.  *See* Pl.'s Mot., Ex. F (Memorandum from Jeh Charles Johnson, Secretary, Department of Homeland Security, to Thomas S. Winkowski, Acting Director, U.S. Immigration and Customs Enforcement, et al., *Policies for the Apprehension,*

## C.       Procedural Background

On November 20, 2014, in a televised address, President Barack Obama announced the

principal features of the most recent deferred action programs, namely, the 2014 DACA

Revisions and DAPA. On the same day, the plaintiff filed this action seeking invalidation of

these two programs as well as DACA, which had been announced over two years earlier.

Although the plaintiff's Complaint references a preliminary injunction, the plaintiff did not

formally or separately move for a preliminary injunction, as required by the Local Civil Rules of

this Court, until December 4, 2014.  *See* Pl.'s Mot.; Local Civ. R. 65.1; Minute Order (Nov. 24,

2014).

In accordance with the Local Rules governing preliminary injunctions—which permit a

defendant seven days to respond to a motion for preliminary injunction once served—the Court

ordered the defendants to respond to the plaintiff's motion for preliminary injunction by

December 15, 2014.  Ordinarily, the Local Rules make no provision for a reply brief in a motion

for preliminary injunction and the Court did not initially permit a reply brief in this case.  *See*

Local Civ. R. 65.1.  In opposition to the motion for preliminary injunction, the defendants argued

that the plaintiff lacked standing to bring this suit and requested dismissal of the suit.  *See* Defs.'

Mem. at 14.  The defendants subsequently asked this Court to construe this opposition as a

motion to dismiss for lack of subject matter jurisdiction.  *See* Notice, ECF No. 15.  Due to the

dispositive nature of the defendants' objection, and to ensure fairness to all the parties, the Court

afforded the plaintiff the opportunity to submit a response to the defendants' objections.  In

addition, the Court permitted the plaintiff to file a supplemental declaration in support of his

standing to bring suit.  The Court heard argument from both parties on December 22, 2014.

---

*Detention and Removal of Undocumented Immigrants* (November 20, 2014)) at 3–4 , ECF No. 7-6.  The plaintiff
does not challenge the guidelines set forth in this memorandum.  *See* Hrg. Tr. at 11.

Now pending before the Court is the plaintiff's motion for a preliminary injunction and the defendants' motion to dismiss for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1).

## II.   LEGAL STANDARD

### A.   Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011))).  A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948 (2d ed. 1995)) (emphasis in original). The Supreme Court repeated this caution in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), stating that "[a] preliminary injunction is an extraordinary remedy never awarded as of right," *id.* at 24, and, again, that "injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *id.* at 22.

Authority can be found in this Circuit for the so-called "sliding scale" approach to evaluating the four preliminary injunction factors, such that "a strong showing on one factor could make up for a weaker showing on another."  *Sherley*, 644 F.3d at 392.  In particular, even if the plaintiff only "raise[s] a serious legal question on the merits," rather than a likelihood of success on the merits, a strong showing on all three of the other factors may warrant entry of

injunctive relief. *Id.* at 398; *see also Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009) ("[I]f the movant makes a very strong showing of irreparable harm and there is no substantial harm to the non-movant, then a correspondingly lower standard can be applied for likelihood of success."); *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) ("[A] court, when confronted with a case in which the other three factors strongly favor interim relief may exercise its discretion to grant a stay if the movant has made a substantial case on the merits.").

At the same time, the D.C. Circuit has acknowledged that the Supreme Court's decision in *Winter* "could be read to create a more demanding burden than the sliding-scale analysis requires." *Sherley*, 644 F.3d at 392 (internal quotations omitted).[9] Indeed, in *Winter*, the majority of the Supreme Court reversed a grant of injunctive relief, finding that the standard applied by the Ninth Circuit was "too lenient" in allowing injunctive relief on the "possibility" of irreparable injury, rather than its likelihood. *Winter*, 555 U.S. at 22; *see also Perry v. Perez*, 132 S. Ct. 934, 942 (2012) ("Plaintiffs seeking a preliminary injunction of a statute must normally demonstrate that they are likely to succeed on the merits of their challenge to that law.").

In *Aamer v. Obama*, the D.C. Circuit declined to opine about the continued viability of the "sliding scale" analysis of the four preliminary injunction factors, stating that it "remains an open question whether the 'likelihood of success' factor is 'an independent, free-standing requirement,' or whether, in cases where the other three factors strongly favor issuing an injunction, a plaintiff need only raise a 'serious legal question' on the merits." 742 F.3d at 1043; *see also Am. Meat Inst. v. U.S. Dep't of Agric.*, 746 F.3d 1065, 1074 (D.C. Cir. 2014) ("This circuit has repeatedly declined to take sides in a circuit split on the question of whether

---

[9] The plaintiff, in his briefing, notes only the sliding-scale analysis and ignores the voluminous case law describing the uncertainty regarding the continued viability of the sliding-scale analysis in this Circuit. *See* Pl.'s Mot. at 11.

likelihood of success on the merits is a freestanding threshold requirement to issuance of a preliminary injunction. . . . We need not take sides today.").

Under either approach, a court may not issue "a preliminary injunction based only on a possibility of irreparable harm . . . [since] injunctive relief [i]s an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22; s*ee also In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013) (requiring proof that all four prongs of preliminary injunction standard be met before injunctive relief can be issued). Thus, the plaintiff bears the burden of persuasion on all four preliminary injunction factors in order to secure such an "extraordinary remedy."

### B. Motion to Dismiss for Lack of Subject Matter Jurisdiction

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Indeed, federal courts are "forbidden . . . from acting beyond our authority," *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008), and, therefore, have "an affirmative obligation 'to consider whether the constitutional and statutory authority exist for us to hear each dispute.'" *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (quoting *Herbert v. National Academy of Sciences*, 974 F.2d 192, 196 (D.C. Cir. 1992)). Absent subject matter jurisdiction over a case, the court must dismiss it. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); FED. R. CIV. P. 12(h)(3).

When considering a motion to dismiss under Rule 12(b)(1), the court must accept as true all uncontroverted material factual allegations contained in the complaint and "'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the

facts alleged' and upon such facts determine jurisdictional questions." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005) (quoting *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004))). The court need not accept inferences drawn by the plaintiff, however, if those inferences are unsupported by facts alleged in the complaint or amount merely to legal conclusions. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). Moreover, in evaluating subject matter jurisdiction, the court, when necessary, may "'undertake an independent investigation to assure itself of its own subject matter jurisdiction,'" *Settles v. United States Parole Comm'n*, 429 F.3d 1098, 1107-1108 (D.C. Cir. 2005) (quoting *Haase v. Sessions*, 835 F.2d 902, 908 (D.C. Cir. 1987), and consider facts developed in the record beyond the complaint, *id. See also Herbert v. National Academy of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992) (in disposing of motion to dismiss for lack of subject matter jurisdiction, "where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."); *Alliance for Democracy v. FEC*, 362 F. Supp. 2d 138, 142 (D.D.C. 2005).

The burden of establishing any jurisdictional facts to support the exercise of the subject matter jurisdiction rests on the plaintiff. *See Hertz Corp. v. Friend*, 559 U.S. 77, 96-97 (2010); *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942); *Moms Against Mercury v. FDA*, 483 F.3d 824, 828 (D.C. Cir. 2007).

## III. DISCUSSION

The plaintiff concedes, as he must, that "he and other similarly situated state law enforcement and other officials have no authority" to enforce the immigration laws of the United States. Compl. at 19; *see also Arizona*, 132 S. Ct. at 2507. Nonetheless, the plaintiff seeks to

alter federal enforcement policy by asking the Court to halt three federal immigration programs that have the over-arching purpose of prioritizing federal enforcement efforts. *See Arizona,* 132 S. Ct. at 2499 (noting that "[a] principal feature of the removal system is the broad discretion exercised by immigration officials," who "as an initial matter, must decide whether it makes sense to pursue removal at all."). The plaintiff's inability to enforce federal immigration law is integrally related to the central question in this case: Whether the plaintiff has standing to demand changes to the "broad discretion" granted federal officials regarding removal. Despite the consequences of unlawful immigration in Maricopa County, the plaintiff cannot meet the requirements for standing to bring this suit.

## A.     The Plaintiff Lacks Standing

Article III of the Constitution restricts the power of federal courts to hear only "Cases" and "Controversies." "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (alterations in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Indeed, "'[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation on federal-court jurisdiction to actual cases or controversies.'" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (alterations in original) (internal quotations omitted).

The Supreme Court has explained, "the irreducible constitutional minimum of standing contains three elements." *Defenders of Wildlife*, 504 U.S. at 560. First, the plaintiff must have suffered an "injury in fact," i.e., "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (citations

and internal quotation marks omitted). Second, there must be "a causal connection between the injury and the conduct complained of," i.e., the injury alleged must be fairly traceable to the challenged action of the defendant. *Id.* Finally, it must be "likely" that the complained-of injury will be "redressed by a favorable decision" of the court. *Id.* at 561. In short, "[t]he plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014). Likewise, when declaratory or injunctive relief is sought—relief the plaintiff seeks here—a plaintiff "must show he is suffering an ongoing injury or faces an immediate threat of [future] injury." *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).

The plaintiff fails to meet any of the three elements of constitutional standing. Each of these requirements is addressed *seriatim* below.

### 1.    *Injury in Fact*

At the outset, the plaintiff's Complaint and motion for preliminary injunction fail to identify whether the plaintiff is bringing suit in his individual capacity or in his official capacity as the elected Sheriff of Maricopa County. *Compare* Compl. ¶ 3 (noting only that "[t]he Plaintiff Joe Arpaio is the elected Sheriff of Maricopa County, State of Arizona"), *with* ¶ 8 (detailing that each defendant was being sued "in their individual and official capacities"). The Court clarified during oral argument that the plaintiff is bringing suit in both his personal and official capacities. Hrg. Tr. at 5. Regardless of whether the plaintiff is suing in his individual or official capacity, or both, the plaintiff cannot demonstrate a cognizable injury from the challenged deferred action programs.

16

*a)    Personal Capacity*

The law is well-settled that ordinarily, "private persons . . . have no judicially cognizable interest in procuring enforcement of the immigration laws . . . ."  *Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 897 (1984) (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)).  This is merely the application of the long-standing principle that a plaintiff "raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2662 (2013) (quoting *Defenders of Wildlife*, 504 U.S. at 573–74).  As a result, a plaintiff who seeks to vindicate only the general interest in the proper application of the Constitution and laws does not suffer the type of direct, concrete and tangible harm that confers standing and warrants the exercise of jurisdiction.  Yet, this is the type of suit the plaintiff attempts to bring in his personal capacity.  *See* Supp. Decl. of Sheriff Joe Arpaio ¶ 3 ("Pl.'s Supp. Decl."), ECF No. 20-1 ("By this lawsuit, I am seeking to have the President and the other Defendants obey the U.S. Constitution and the immigration laws . . . .").

The plaintiff does offer one additional theory, however, in support of his claim of injury in his individual capacity.  The plaintiff cites press reports and press releases from his own office that undocumented immigrants have targeted him for assassination as a result of the plaintiff's "widely known stance on illegal immigration."  *See* Press Release, Bomb Threats against Sheriff Arpaio and Office on Upsurge as Another Suspect is Indicted, Maricopa County Sheriff's Office (August 21, 2013) ("Threats Press Release"), ECF No. 21-1.  Such threats are deplorable and offensive to the entire justice system.  Nevertheless, these allegations cannot confer standing on the plaintiff in his individual capacity in this case.  In requesting injunctive

relief, the plaintiff "must show he is suffering an ongoing injury or faces an immediate threat of [future] injury." *Dearth*, 641 F.3d at 501. The plaintiff has presented no evidence that these threats are ongoing. "'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'" *Defenders of Wildlife*, 504 U.S. at 564 (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974))).

Moreover, as will be discussed in detail below, even an ongoing threat to the plaintiff by undocumented immigrants would not provide the plaintiff with standing to challenge the deferred action programs at issue. The plaintiff must not only show that he is injured, but that the plaintiff's injury is fairly traceable to the challenged deferred action programs and that the injury is capable of redress by this Court in this action. The plaintiff cannot meet this showing. The challenge deferred action programs did not cause the threats to the plaintiff's life. Rather, criminal action by third-parties not before the court caused the threats to the plaintiff. Moreover, according to the plaintiff's press release, the alleged assassins were motivated by the plaintiff's "widely known stance on illegal immigration," a stance pre-existing this case and these challenged programs. *See* Threats Press Release. Furthermore, an injunction in this case would do nothing either to alter the plaintiff's views on "illegal immigration" or to redress the targeting of the plaintiff resulting from his "widely known stance on illegal immigration." This dooms the plaintiff's standing to bring this suit in his personal capacity as an ordinary citizen.

b) *Official Capacity*

Even if the plaintiff can circumvent these limitations by bringing suit in his official capacity as Sheriff of Maricopa County, the plaintiff still lacks standing.

18

The plaintiff claims that the challenged deferred action programs, which provide guidance to Federal law enforcement regarding the removal or non-removal of undocumented immigrants, inhibit his ability to perform his official functions as the Sheriff of Maricopa County. The plaintiff alleges that he is "adversely affected and harmed in his office's finances, workload, and interference with the conduct of his duties" as a result of the "increases in the influx of illegal aliens motivated by [these] policies of offering amnesty." Compl. ¶ 27. As support for this allegation, he alleges that "experience has proven as an empirical fact that millions more illegal aliens will be attracted into the border states of the United States, regardless of the specific details" of the challenged policies. Compl. ¶ 30. The plaintiff further alleges that, "the experiences and records of the Sheriff's office show that many illegal aliens . . . are repeat offenders, such that Plaintiff Arpaio's deputies and other law enforcement officials have arrested the same illegal aliens for various different crimes." Compl. ¶ 31. According to the plaintiff, the "financial impact of illegal aliens in Maricopa County, Arizona was at least $9,293,619.96 in the costs of holding illegal aliens in the Sheriff's jails from February 1, 2014, through December 17, 2014, for those inmates flagged with INS 'detainers.'" Pl.'s Reply Defs.' Opp. Pl.'s Mot. Prelim. Inj. at 7 ("Pl.'s Reply"), ECF No. 19.

The plaintiff is correct that the regulation and impairment of a state officer's official functions may be sufficient to confer standing, but only in certain limited circumstances. *See, e.g.*, *Lomont v. O'Neil*, 285 F.3d 9, 13–14 (D.C. Cir. 2002) (holding that a state Sheriff and Police Chief had standing to challenge federal law permitting state police officials to provide certifications relating to the transfer of certain firearms); *Fraternal Order of the Police v. United States*, 152 F.3d 998, 1001–02 (D.C. Cir. 1998). Yet, neither *Lomont* nor *Fraternal Order of the Police* support the plaintiff's argument here, as both cases concerned the *direct regulation* of a

state officer's official duties. In contrast, the challenged deferred action programs do not regulate the official conduct of the plaintiff but merely regulate the conduct of federal immigration officials in the exercise of their official duties. Thus, even if the plaintiff's official functions could be viewed as a "legally protected interest," the challenged deferred action programs do not amount to "an invasion" of that interest in a manner that is "concrete and particularized." *Defenders of Wildlife*, 504 U.S. at 560. Indeed, it is not apparent exactly what cognizable interest and injury the plaintiff can assert since, as the plaintiff's Complaint recognizes, the plaintiff has no legal authority to enforce the immigration laws of the United States. *See* Compl. at 19.

Ultimately, the plaintiff's standing argument reduces to a simple generalized grievance: A Federal policy causes his office to expend resources in a manner that he deems suboptimal.[10] To accept such a broad interpretation of the injury requirement would permit nearly all state officials to challenge a host of Federal laws simply because they disagree with how many—or how few—Federal resources are brought to bear on local interests. Fortunately, the standing doctrine is not so limp. As the Supreme Court has repeatedly emphasized: "'a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in [the] proper application of the Constitution and laws, and seeking relief that no more directly [or] tangibly benefits him than it does the public at large—does not state an

---

[10] Although prior case law has occasionally suggested that "generalized grievances" should be analyzed as part of prudential standing, the Supreme Court recently suggested that such concerns should be considered as part of Article III standing. *See Lexmark Int'l*, 134 S. Ct. at 1387 n.3 ("While we have at times grounded our reluctance to entertain [suits concerning generalized grievances] in the 'counsels of prudence' (albeit counsels 'close[ly] relat[ed] to the policies reflected in' Article III), we have since held that such suits do not present constitutional 'cases' or 'controversies.'" (internal citations omitted) (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 475 (1982))). Although there is some dispute within this Circuit as to whether prudential standing should be considered jurisdictional, there is no dispute that where the plaintiff cannot meet the irreducible constitutional minimum of Article III standing, the court need not address whether the plaintiff has prudential standing. *See generally Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169 (D.C. Cir. 2012). Accordingly, the Court does not address whether prudential concerns prevent the plaintiff from establishing standing.

Article III case or controversy.'" *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (quoting *Lujan*, 504 U.S. at 573); *see also* Pl.'s Supp. Decl. ¶ 3 ("By this lawsuit, I am seeking to have the President and other Defendants obey the U.S. Constitution and the immigration laws . . . ."). Simply put, a state official has not suffered an injury in fact to a legally cognizable interest because a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources. *Cf. Massachusetts v. EPA*, 549 U.S. 497, 520-521 (2007) (finding standing for Massachusetts because of state's "quasi-sovereign interests" relating to its "desire to preserve its sovereign territory" not because of the increase in state expenditures resulting from federal policy concerning global warming).

Moreover, the plaintiff's alleged injury is largely speculative. The plaintiff argues that the challenged deferred action programs will create a "magnet" by attracting new undocumented immigrants into Maricopa County, some of whom may commit crimes under Arizona law. Pl.'s Mot. at 16–17; *see also* Pl.'s Mot., Ex. G, Decl. of Sheriff Joe Arpaio ¶¶ 7, 11–14, ECF No. 7-7. Yet, the decision for any individual to migrate is a complex decision with multiple factors, including factors entirely outside the United States' control, such as social, economic and political strife in a foreign country. The plaintiff reduces this complex process to a single factor: the challenged deferred action programs.

Even drawing all inferences in favor of the plaintiff, the terms of the challenged deferred action programs do not support the plaintiff's theory. The challenged deferred action programs would have no impact on *new* immigrants, as the guidance defining the programs makes clear that these programs only apply to undocumented immigrants residing in the United States prior to January 1, 2010. 2014 Guidance Memorandum at 4. Thus, it is speculative that a program,

which does not apply to future immigrants, will nonetheless result in immigrants crossing the border illegally into Maricopa County (and other borders of this country).

The plaintiff has been unable to show that the challenged deferred action programs have interfered with his official duties as Sheriff in a manner that "is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical" and has therefore failed in his burden to establish an injury in fact. *Defenders of Wildlife*, 504 U.S. at 560.

### 2. *Causation and Redressability*

The plaintiff's speculative injury is not the only infirmity in the plaintiff's standing theory. A plaintiff must not only show an "injury in fact," but must also show that the injury is fairly traceable to the allegedly harmful conduct and that the relief sought by the plaintiff will likely redress the injury. *Defenders of Wildlife*, 504 U.S. at 560. Two overarching principles apply to the causation and redressability inquiry in this case.

First, this case involves the purported "standing to challenge [an executive action] where the direct cause of injury is the independent action of . . . third part[ies]." *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1269 (D.C. Cir. 2007). Indeed, it is the actions taken by undocumented immigrants—migrating to Maricopa County and committing crimes once there—that are purportedly the direct cause of the plaintiff's injury. As will be discussed, however, "courts [only] occasionally find the elements of standing to be satisfied in cases challenging government action on the basis of third-party conduct." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 940 (D.C. Cir. 2004).[11]

---

[11] The plaintiff attempts to rely upon the doctrine of competitor standing to avoid the strict limitations imposed on cases where the source of the plaintiff's harm is the independent actions of third parties. Yet, the cases on which the plaintiff relies, *see Mendoza v. Perez*, 754 F.3d 1002, 1012–14 (D.C. Cir. 2014); *Honeywell Int'l Inc. v. EPA*, 374 F.3d 1363, 1369 (D.C. Cir. 2004); and *Washington Alliance of Tech. Workers v. U.S. Dep't of Homeland Sec.*, No. 14-cv-529, 2014 WL 6537464, at *4 (D.D.C. Nov. 21, 2014), do not support the plaintiff's standing argument in this case. Standing was found in those cases because a plaintiff suffered an injury in fact "when an agency lift[ed] regulatory restrictions on their competitors or otherwise allow[ed] increased competition." *Mendoza*, 754 F.3d at

Second, and relatedly, the programs challenged by the plaintiff do not regulate the plaintiff directly; rather, they regulate federal immigration officials. As the Supreme Court has made clear, "[w]hen . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed" to confer standing. *Defenders of Wildlife*, 504 U.S. at 562 (emphasis in original). When standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict . . . it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* (internal quotations and citations omitted); *see also id.* ("[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." (internal quotation marks omitted)).

The Court first addresses the plaintiff's failure to show causation before discussing the plaintiff's failure to demonstrate redressability.

### a) Causation

The D.C. Circuit has identified "two categories of cases where standing exists to challenge government action though the direct cause of injury is the action of a third party." *Renal Physicians*, 489 F.3d at 1275. "First, a federal court may find that a party has standing to challenge government action that permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action." *National Wrestling Coaches*, 366 F.3d at

---

1011 (quoting *La. Energy and Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998)). The doctrine of competitor standing is not implicated in this case, as the plaintiff's resources are not strained because he is forced to compete with undocumented immigrants in a limited market. Moreover, the plaintiff cannot rely on a supposed "procedural injury" because, since the plaintiff has no authority to enforce the Federal immigration laws, the plaintiff cannot demonstrate the challenged deferred action programs "threaten[] [a] concrete interest" of the plaintiff as opposed to an injury common to all members of the public. *Mendoza*, 754 F.3d at 1010.

23

940.  Importantly, in this category of cases, the challenged government conduct must authorize the specific third-party conduct that causes the injury to the plaintiff.  *See Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 440 (D.C. Cir. 1998) ("Supreme Court precedent establishes that the causation requirement for constitutional standing is met when a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries . . . .").  In the present case, the challenged agency action—the ability to exercise enforcement discretion to permit deferred action relating to certain undocumented immigrants—does not authorize the conduct about which the plaintiff complains.  The challenged deferred action programs authorize immigration officials to exercise discretion on removal; they do not authorize new immigration into the United States (let alone Maricopa County); they do not authorize undocumented immigrants to commit crimes; and they do not provide permanent status to any undocumented immigrants eligible to apply for deferred action under any of the challenged programs.  Contrary to the plaintiff's assertion that a consequence of the challenged programs will be an increase in illegal conduct by undocumented immigrants and an increase in costs to the Maricopa County Sheriff's office, these programs may have the opposite effect.  The deferred action programs are designed to incorporate DHS's enforcement priorities and better focus federal enforcement on removing undocumented immigrants committing felonies and serious misdemeanor crimes.  Since the undocumented immigrants engaging in criminal activity are the cause of the injuries complained about by the plaintiff, the more focused federal effort to remove these individuals may end up helping, rather than exacerbating the harm to, the plaintiff.

Second, standing has been found "where the record present[s] substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little

doubt as to causation and the likelihood of redress." *National Wrestling Coaches*, 366 F.3d at 941. This record is sparse regarding a link between the challenged deferred action programs and the third-party conduct. Although the plaintiff has submitted numerous press releases and letters to officials documenting Maricopa County's struggle with illegal immigration along the southern border, the plaintiff has submitted no evidence showing that the challenged deferred action programs are, or will be, the cause of the crime harming the plaintiff or the increase in immigration, much less "substantial evidence." Indeed, the plaintiff severely undermines his own argument by stating that "millions more illegal aliens will be attracted into the border states of the United States, *regardless of the specific details*" of current executive branch immigration policies. Compl. ¶ 30 (emphasis added). If the details of the challenged deferred action programs do not matter as to whether or not the plaintiff will suffer an injury, then the plaintiff's injuries cannot be fairly traceable to these programs. Similarly, the plaintiff observes that "the Executive Branch is not deporting illegal aliens in any significant numbers" and that regardless of the provision of deferred action programs "illegal aliens are very unlikely to be deported." Pl.'s Mot. at 12. Implicit in this observation is the plaintiff's admission that regardless of the challenged deferred action programs, the plaintiff is likely to continue to suffer the claimed injury.

In sum, the plaintiff has failed to demonstrate that the challenged deferred action programs are the cause of his alleged injury.

### b) Redressability

Similar to the causation requirement, "it is 'substantially more difficult' for a petitioner to establish redressability where the alleged injury arises from the government's regulation of a third party not before the court." *Spectrum Five LLC v. Fed. Commc'ns Comm'n*, 758 F.3d 254,

261 (D.C. Cir. 2014) (quoting *Nat'l Wrestling Coaches*, 366 F.3d at 933); *see also Defenders of Wildlife*, 504 U.S. at 562. The plaintiff must allege facts that are "sufficient to demonstrate a substantial likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff sought." *Renal Physicians*, 489 F.3d at 1275. In other words, the plaintiff must allege facts sufficient to demonstrate a substantial likelihood that, as a result of injunctive relief in this case, there would not be an increase in undocumented immigrants in Maricopa County and there would not be an increase in crimes committed by undocumented immigrants in Maricopa County. This is a "substantially more difficult" task. *Spectrum Five LLC*, 758 F.3d at 261.

On this point, the D.C. Circuit's decision in *National Wrestling Coaches* is instructive. There, plaintiffs challenged an interpretive rule promulgated by the Department of Education, which laid out three ways in which the Department would assess whether educational institutions had complied with Department regulations that required such institutions to select sports and levels of competition to "effectively accommodate the interests and abilities of members of both sexes.'" 366 F.3d at 934–35 (quoting 45 C.F.R. § 86.41(c)(1) and 34 C.F.R. § 106.41(c)(1)). That regulation had been promulgated pursuant to Title IX of the Education Amendments of 1972, which prohibited discrimination on the basis of sex in federally funded educational programs and activities. *See id.* at 934. The plaintiffs were "membership organizations representing the interests of collegiate men's wrestling coaches, athletes, and alumni," and their asserted injuries arose "from decisions by educational institutions to eliminate or reduce the size of men's wrestling programs to comply with the Department's interpretive rules implementing Title IX." *Id.* at 935.

Thus, in *National Wrestling Coaches*, like in the instant case, "the necessary elements of causation and redressability . . . hinge[d] on the independent choices of . . . regulated third part[ies]." *Id.* at 938. The D.C. Circuit found redressability lacking in *National Wrestling Coaches* because "nothing but speculation suggests that schools would act any differently than they do with the [challenged interpretive rule] in place" since "[s]chools would remain free to eliminate or cap men's wrestling teams and may in some circumstances feel compelled to do so to comply with the statute and the [previous Department] Regulations." *Id.* at 940. Further, the court found that "other reasons unrelated to the challenged legal requirements [*e.g.*, moral considerations, budget constraints] may continue to motivate schools to take such actions." *Id.* From this analysis, and a comprehensive review of the case law, the *National Wrestling Coaches* court concluded that "it is purely speculative whether a decision in appellants' favor would alter the process by which schools determine whether to field certain sports teams." *Id.* at 944.

The same concerns animating the outcome in *National Wrestling Coaches* drive the result in this case. Many "other reasons unrelated to the challenged legal requirements" may motivate the conduct allegedly causing harm to the plaintiff. Indeed, the motivation for any individual to come to the United States (or, once present here, to commit a crime in Maricopa County), does not rest solely upon the challenged deferred action programs. Such decisions are complicated and multi-faceted, involving both national and international factors. A ruling by this Court enjoining the challenged deferred action programs will likely not change the complex and individualized decision making of undocumented immigrants allegedly causing harm to the plaintiff. As noted, the plaintiff's briefing admits as much: "millions more illegal aliens will be attracted into the border states of the United States, *regardless of the specific details*" of the challenged deferred action programs. Compl. ¶ 30.

Moreover, the plaintiff acknowledges that the defendants only have limited resources to facilitate removal, *see* Hrg. Tr. at 14. Relief from this Court will not grant additional resources to the executive branch allowing it to remove additional undocumented immigrants or to prevent undocumented immigrants from arriving. Thus, the plaintiff's complaint regarding the large number of undocumented immigrants and the limited number of removals will not change as a result of any order by the Court in this litigation. Consequently, the plaintiff's alleged harm stemming from the expenditure of resources to deal with the large number of undocumented immigrants in Maricopa County will remain. In other words, regardless of the outcome of this case, the Court can afford no relief to the plaintiff's injury. *Cf. Bauer v. Marmara*, No. 13-ap-7081, 2014 WL 7234818, at *6 (D.C. Cir. December 19, 2014) (holding that plaintiff was "unable to satisfy the redressability prong of Article III standing because the court cannot compel the Government to pursue action to seek forfeiture of the disputed vessels").

"When redress depends on the cooperation of a third party, 'it becomes the burden of the [party asserting standing] *to adduce facts* showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.'" *U.S. Ecology v. U.S. Dep't of Interior*, 231 F.3d 20, 24–25 (D.C. Cir. 2000) (emphasis added) (quoting *Defenders of Wildlife*, 504 U.S. at 562); *see also Klamath Water v. Fed. Energy Reg. Comm'n*, 534 F.3d 735, 739 (D.C. Cir. 2008) ("In a case like this, in which relief for the petitioner depends on actions by a third party not before the court, the petitioner must demonstrate that a favorable decision would create 'a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'" (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002))). The plaintiff has been unable to meet this burden.

*        *        *

Taken together, the Court finds that the plaintiff has not and cannot show that: (1) he suffers a concrete and particularized injury (as opposed to a speculative and generalized grievance); (2) the cause of the plaintiff's injury can be fairly traced to the challenged deferred action programs; and (3) a favorable ruling by this Court would redress the plaintiff's alleged injury. A plaintiff "may be disappointed if the Government declines to pursue [enforcement], but disappointment of this sort is a far cry from the injury and redressability required to prove Article III Standing." *Bauer*, 2014 WL 7234818, at *6. As a result, the plaintiff lacks standing to bring this challenge, requiring dismissal of this lawsuit for lack of subject matter jurisdiction.

### B.   Preliminary Injunction

The plaintiff's motion for preliminary injunction likewise fails as the plaintiff can show neither a likelihood of success on the merits nor irreparable harm due to his lack of standing. As an initial matter, because "standing is a necessary predicate to any exercise of [the Court's] jurisdiction, the [plaintiff] and [his] claims have no likelihood of success on the merits," if the plaintiff lacks standing. *Smith v. Henderson*, 944 F. Supp. 2d 89, 99 (D.D.C. 2013) (internal quotations and citations omitted); *see also Kingman Park Civic Ass'n v. Gray*, 956 F. Supp. 2d 230, 241 (D.D.C. 2013) ("The first component of the likelihood of success on the merits prong usually examines whether the plaintiffs have standing in a given case." (internal quotations omitted)).

Moreover, the same problem that confronts the plaintiff's standing argument—the inability to obtain redress from an order by this Court—likewise dooms the plaintiff's ability to show irreparable harm. Indeed, "it would make little sense for a court to conclude that a plaintiff has shown irreparable harm when the relief sought would not actually remedy that harm." *Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 153 (D.D.C. 2011); *see also Navistar, Inc. v.*

*Environmental Protection Agency*, No. 11-cv-449, 2011 WL 3743732, at *3 (D.D.C. Aug. 25,

2011) (Wilkins, J.) ("Because an injunction will not redress its alleged injuries, [the plaintiff's]

claim that it will suffer irreparable harm in the absence of a preliminary injunction is tenuous at

best.").

     Nevertheless, even if the plaintiff were able to establish standing, the plaintiff would face

a number of legal obstacles to prevail and, therefore, could not demonstrate a likelihood of

success on the merits nor any of the other preliminary injunction factors.[12] While not necessary

---

[12] The plaintiff has highlighted a recently out-of-Circuit opinion from the Western District of Pennsylvania ("Pennsylvania court") to buttress his claims regarding his likelihood of success on the merits. *See* Pl.'s Notice of Suppl. Auth., ECF No. 14 (citing *United States v. Juarez-Escobar*, 2014 U.S. Dist. LEXIS 173350 (W.D. Pa. Dec. 16, 2014)). In that case, the court considered the applicability of the DAPA program to a criminal defendant (who had been arrested locally for driving under the influence with a minor present in the vehicle) in connection with the defendant's sentencing, upon his plea of guilty to illegal reentry in violation of 8 U.S.C. § 1326. *Id.* at *1–*4. Throughout the opinion, the court expresses an over-arching concern with the fairness of the prosecution in light of the uneven enforcement of the immigration laws. *See, e.g.*, *id.* at *5 ("Defendant appears before this Court, in part, because of arguably unequal and arbitrary immigration enforcement in the United States."); *id.* at *6–*7 (observing that "[h]ad Defendant been arrested in a 'sanctuary state' or a 'sanctuary city,' local law enforcement likely would not have reported him to Homeland Security" and "he would likely not have been indicted" and "would not be facing sentencing and/or deportation"); *id.* at *39–*40 (noting "an arbitrariness to Defendant's arrest and criminal prosecution" given existence of "'sanctuary cities' [where] . . . if an undocumented immigrant was arrested for a minor offense, local law enforcement would not automatically notify ICE"); *id.* at *41 (describing "Defendant's current criminal prosecution and the civil deportation hearing that will undoubtedly follow as a result of this criminal proceeding" as "arguably . . . arbitrary and random"). Consistent with this theme, the court reviewed the DAPA program to evaluate "whether it would unjustly and unequally impact this Defendant in light of this Court's obligation to avoid sentencing disparities among defendants with similar records who have been found guilty of similar conduct," citing 18 U.S.C. § 3553(a)(6). *Id.* at *24; *see also id.* at *12–*13 (expressing "concern[] that the Executive Action might have an impact on this matter, including any subsequent removal or deportation"). In other words, under the rubric of a sentencing factor that sentencing courts are required to consider under 18 U.S.C. § 3553(a), the Pennsylvania court set out to evaluate whether the DAPA program was applicable to the defendant and, if so, whether the consequences of his conviction, including deportation, would amount to an unwarranted sentencing disparity because similarly situated defendants could obtain deferred removal. *See* 18 U.S.C. § 3553(a)(6)(requiring sentencing court, "in determining the particular sentence to be imposed," to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

     The Pennsylvania court ultimately determined that the DAPA program was not applicable to the defendant for two reasons: first, the court opined that the DAPA program "is unconstitutional," *id.* at *33, *58; and, second, even if the DAPA program were constitutional, the court made critical factual findings that the defendant did not meet the eligibility criteria for DAPA's deferred action, *id.* at *45 ("The bottom line for this Defendant is that . . . he does not fall into any newly created or expanded deferment category . . . ."); *id.* at *57 ("this Defendant is possibly not entitled to the deferred action status that would enable him to defer deportation"). Despite the defendant's lack (or "possible[]" lack) of eligibility for the DAPA program, the court viewed the defendant as "more 'family' than 'felon,'" *id.* at *45, *58, due to his "close bond with his brother," who resided in the United States, *id.* at *57–*58, prompting the court to give the defendant the opportunity to withdraw his guilty plea or proceed to sentencing, *id.* at *59.

to resolve this case, the Court outlines several of these obstacles. First, with respect to the plaintiff's likelihood of success on the merits, the challenged deferred action programs continue a longstanding practice of enforcement discretion regarding the Nation's immigration laws. Such discretion is conferred by statute, *see* 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a)(3), and the manner of its exercise through deferred action on removal has been endorsed by Congress, *see, e.g.,* 8 U.S.C. § 1227(d)(2). Thus, the deferred action programs are consistent with, rather than contrary to, congressional policy. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J. concurring).

In addition, although the challenged deferred action programs represent a large class-based program, such breadth does not push the programs over the line from the faithful execution of the law to the unconstitutional rewriting of the law for the following reason: The programs

---

While fully respectful of the concern animating this decision, which focused on the fairness of the prosecution and guilty plea of the defendant for the crime of illegal reentry, this Court does not find the reasoning persuasive for at least three reasons. First, most notably, the Pennsylvania court's consideration of the constitutionality of the DAPA program flies in the face of the "'well-established principle governing the prudent exercise of [a] [c]ourt's jurisdiction that normally [a] [c]ourt will not decide a constitutional question if there is some other ground upon which to dispose of the case.'" *Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 206 (2009) (quoting *Escambia County v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam); *see also United States v. Thomas*, 572 F.3d 945, 952 (D.C. Cir. 2009) (Ginsburg J., concurring). Thus, the Pennsylvania court appears to have put the proverbial "cart before the horse" since finding the defendant likely ineligible for the DAPA program made consideration of the program's constitutionality unnecessary. Second, the purported basis for the Pennsylvania court's consideration of the DAPA program was to avoid unwarranted sentencing disparities, as required by 18 U.S.C. § 3553(a)(6). Yet, the DAPA program has no bearing on the *sentence* imposed by the Pennsylvania court since, as the Supreme Court has made clear, "[r]emoval is a civil, not criminal, matter." *Arizona*, 132 S. Ct. at 2499. To the extent that the Pennsylvania court was focused on the defendant's likely deportation following the imposition of the sentence, this collateral consequence could not result in an *unwarranted* disparity since the defendant's likely ineligibility for DAPA means that the defendant was not similarly situated to persons who are eligible. Finally, even if the Pennsylvania court's concern were correct that the defendant was subject to potentially unequal enforcement of a criminal statute and faced prosecution in the Western District of Pennsylvania when he was unlikely to face prosecution in other districts, such enforcement disparities are inherent in prosecutorial discretion and have no bearing on the analysis under § 3553(a)(6), which requires consideration of *sentence* disparities among similarly situated defendants convicted of the same offense in federal court, not *enforcement* disparities. *Accord United States v. Washington,* 670 F.3d 1321, 1327 (D.C. Cir. 2012) ("U.S. Attorney's lawful exercise of discretion in bringing a federal prosecution" rather than local prosecution, which may result in different sentences, does not support a departure under § 3553(a)(6)); *United States v. Clark*, 8 F.3d 839, 842-843 (D.C. Cir. 1993)("reject[ing] the claim that the [U.S.] government's 'arbitrary use' of its discretion to indict defendants under either federal or D.C. law could be a mitigating circumstance within the meaning of § 3553(b)" or was appropriate to consider in exercise of district court's authority to avoid unwarranted sentencing disparities under § 3553(a)(6)).

still retain provisions for meaningful case-by-case review.[13] *See* 2014 Guidance Memorandum at 4 (requiring that a DAPA applicant present "no other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate"). This case-by-case decisionmaking reinforces the conclusion that the challenged programs amount only to the valid exercise of prosecutorial discretion and reflect the reality that "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

Finally, the challenged deferred action programs merely provide guidance to immigration officials in the exercise of their official duties. This helps to ensure that the exercise of deferred action is *not* arbitrary and capricious, as might be the case if the executive branch offered no guidance to enforcement officials. It would make little sense for a Court to strike down as arbitrary and capricious guidelines that help ensure that the Nation's immigration enforcement is not arbitrary but rather reflective of congressionally-directed priorities.[14]

---

[13] Statistics provided by the defendants reflect that such case-by-case review is in operation. As of December 5, 2014, 36,860 requests for deferred action under DACA were denied and another 42,632 applicants were rejected as not eligible. Defs.' Mem., Ex. 22 (USCIS, Current Statistics: Deferred Action for Childhood Arrivals: Pending, Receipts, Rejected, Approvals, and Denials (2014)), ECF No. 13-22.

[14] The plaintiff makes three arguments in support of his motion for preliminary injunction based on the constitutional principles underlying the separation of powers. First, the plaintiff argues that the implementation of the challenged programs would use significantly all of the funds appropriated by Congress for immigration enforcement thereby frustrating the will of Congress. *See* Hrg. Tr. at 16–17; Pl.'s Mot. at 20. This is not so. "[T]he costs of administering the proposed program would be borne almost entirely by USCIS through the collection of application fees." OLC Opinion at 27; 2014 Guidance Memorandum at 5 ("Applicants will pay the work authorization and biometrics fees, which currently amount to $465."). Should Congress disagree with the enforcement priorities set out by DHS in the challenged policies, Congress has the ability to appropriate funds solely for removal and the President cannot refuse to expend funds appropriated by Congress. *See Train v. City of New York*, 420 U.S. 35 (1975). Second, the plaintiff argues that the challenged deferred action programs violate *INS v. Chadha*, 462 U.S. 919 (1983), because the programs amount to unlawful legislation and/or rulemaking. Pl.'s Mot. at 20. This argument also misses the mark. Congress has delegated authority to DHS to establish priorities for the enforcement of the nation's immigration laws, *see* 6 U.S.C. 202(5), and, as *Chadha* recognizes, DHS is acting in an Article II enforcement capacity when determining issues of deportation. *See Chadha*, 462 U.S. at 953 n.16. Third, the plaintiff contends that the challenged deferred action programs violate the non-delegation doctrine. Pl.'s Mot. at 17. Yet, a finding of excessive delegation of authority is extremely rare, given the low threshold that legislation must meet to overcome a non-delegation doctrine claim. *See United States v. Ross*, 778 F. Supp. 2d 13, 26 (D.D.C. 2011) ("[o]nly twice in [the Supreme Court's] history, and not since 1935, has [it] invalidated a statute on the ground of excessive delegation of legislative authority") (citations and quotations omitted). The Supreme Court has

Second, the plaintiff cannot demonstrate irreparable harm since the plaintiff waited two years to challenge the DACA program and because any harm to the plaintiff is likely to occur regardless of the challenged policies.

Finally, both the public interest and the balance of the equities do not support a preliminary injunction. Halting these deferred action programs would inhibit the ability of DHS to focus on its statutorily proscribed enforcement priorities (national security, border security, and public safety) and would upset the expectations of the DACA program's participants and the potentially eligible participants in the other challenged programs when none of those participants are currently before this Court.

## IV.   CONCLUSION

For the foregoing reasons, the plaintiff's motion for preliminary injunction is denied and the defendant's motion to dismiss for lack of subject matter jurisdiction is granted.

An appropriate Order accompanies this Memorandum Opinion.

Date: December 23, 2014

Digitally signed by Hon. Beryl A. Howell
DN: cn=Hon. Beryl A. Howell, o=U.S.
District Court for the District of
Columbia, ou=United States District
Court Judge,
email=Howell_Chambers@dcd.uscourt
s.gov, c=US
Date: 2014.12.23 20:30:27 -05'00'

_____
BERYL A. HOWELL
United States District Judge

---

"'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'" *Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23, 30 (D.C. Cir. 2008) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474-75 (2001)).

2

## MINUTES OF THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

*Friendly House, et al. v. Whiting, et al.*

THE HONORABLE JOHN W. SEDWICK      2:10-cv-1061 JWS

PROCEEDINGS:      **ORDER FROM CHAMBERS**      **June 21, 2010**

---

At docket 3, plaintiffs John Doe #1, Jane Doe #1 and Jane Doe #2 ask to proceed under pseudonyms. No response has been filed, but not all defendants have been served, and there are motions to intervene not yet decided. Nevertheless, given the number of parties, the number of motions already filed, the potential for a torrent of motions in the future, the nature of the motion, and the context of this litigation, the court deems it desirable to address the motion now.

John Doe #1 received political asylum as a result of persecution for opposing the policies of the Chinese government. This is disclosed in the complaint. He works in a Chinese restaurant and associates closely with others of Chinese ancestry. He fears that if his identity is disclosed, his opposition to the policies would become known resulting in loss of his job and exposure to harassment by other members of his community who support the policies of the Chinese government. Jane Doe #1 is from South Asia and is currently seeking asylum on grounds of religious persecution, facts set out in the complaint. She was subjected to degrading treatment in South Asia and fears disclosure of her identity would result in disclosure of her experiences in South Asia to her detriment including abuse from her husband who has abused her in the past. Jane Doe #2 is a family abuse victim living in transitional housing who fears, among other things, that disclosure of her identity in this lawsuit would result in physical abuse by persons who have abused her in the past.

According to the Ninth Circuit a trial court evaluating whether a party may proceed anonymously should consider five factors: (1) severity of threatened harm; (2) reasonableness of fearing harm; (3) vulnerability to retaliation; (4) prejudice to opposing parties; and (5) the public interest. *Doe v. Kamehameha Schools/Bernice Pauahi Bishop Estate*, 596 F.3d 1036, 1042 (9th Cir. 2010). Here the threatened harm

includes loss of employment and physical abuse; both are serious. The circumstances disclosed in the supporting declarations show it is reasonable to fear the harm threatened. Each of the Doe plaintiffs is in a vulnerable position. In a case involving a score of named plaintiffs as well as three unnamed plaintiffs which does not seek damages for specific plaintiffs but only common declaratory and injunctive relief, the prejudice to defendants of allowing three individuals to proceed anonymously appears insignificant, at least until such point as it might be determined that none of the named parties has standing. Finally, while the public interest always weighs in favor of public disclosure of litigant identities, it weighs less heavily here than in many cases because of the large number of named plaintiffs and the fact that the nature of the unnamed plaintiffs' interest in the litigation is discernible without knowing their identities.

The Ninth Circuit has said that striking an appropriate balance between a party's need to proceed anonymously and the strong interest in completely open judicial proceedings may change during the course of litigation. *Does I Thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000). At this very early stage, the court finds the balance of relevant factors favors allowing the Doe plaintiffs to proceed anonymously. If circumstances change any party may seek disclosure of the identities, at which time the court might require the Doe plaintiffs to choose between continued participation in the lawsuit and disclosure of their identities.

The motion at docket 3 is GRANTED as follows: Pending any further order which might require choosing between proceeding as an identified party and being dismissed, John Doe #1, Jane Doe #1, and Jane Doe #2 may proceed anonymously.

_____

3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GEORGIA LATINO ALLIANCE
FOR HUMAN RIGHTS, et al.,

    Plaintiffs,

      v.

NATHAN DEAL
Governor of the State of Georgia, in
his official capacity, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:11-CV-1804-TWT

<u>ORDER</u>

This is a constitutional challenge to Georgia's new immigration law. It is before the Court on the Plaintiffs' Motion for Leave to Proceed Under Pseudonyms [Doc. 3]. No response to the motion has been filed and it is treated as unopposed pursuant to Local Rule 7.1. The Plaintiffs' Motion for Leave to Proceed Under Pseudonyms [Doc. 3] is GRANTED.

SO ORDERED, this 8 day of July, 2011.


                /s/Thomas W. Thrash
                THOMAS W. THRASH, JR.
                United States District Judge

4

Westlaw.

Not Reported in F.Supp.2d, 2011 WL 41902 (D.Neb.)
**(Cite as: 2011 WL 41902 (D.Neb.))**

H

Only the Westlaw citation is currently available.

United States District Court,
D. Nebraska.
Fred H. KELLER, Jr., Juan Armenta, Juan Doe,
Juana Doe and Juana Doe # 2, Plaintiffs,
v.
CITY OF FREMONT, Defendant.
Mario Martinez, Jr., Paula Mercado, Martin Mer-
cado, Jane Doe, Maria Roe, Steven Dahl, ACLU
Nebraska Foundation, and United Food and Com-
mercial Workers Union, Local 22, Plaintiffs,
v.
City Of Fremont; Dean F. Skokan, Jr., in his offi-
cial capacity as Fremont City Attorney; and
Timothy Mullen, in his official capacity as Fremont
Chief of Police, Defendants.

Nos. 8:10–cv–0270–LSC–FG3,
4:10–cv–3140–LSC–FG3.
Jan. 5, 2011.

Cynthia V. Dixon, Nicholas D. Espiritu, Mexican
American Legal Defense & Educational Fund, Los
Angeles, CA, Shirley A. Mora James, Mora James
Law, Alan E. Peterson, Amy A. Miller, American
Civil Liberties Union Foundation of Nebraska,
Michelle L. Sitorius, Terry R. Wittler, Cline, Willi-
ams Law Firm, Lincoln, NE, Jennifer Chang
Newell, Lucas E. Guttentag, American Civil Liber-
ties Union Foundation, San Francisco, CA, Michael
A. Nelsen, Marks, Clare Law Firm, Omaha, NE,
Tanaz Moghadam, American Civil Liberties Union
Foundation, New York, NY, for Plaintiffs.

Garrett R. Roe, Washington, DC, Kris W. Kobach,
Kansas City, KS, for Defendant.

**ORDER**

F.A. GOSSETT, III, United States Magistrate
Judge.

**\*1** At issue in these consolidated cases is the
legality of an ordinance placed on the ballot by ini-

tiative FN1 and adopted June 21, 2010 by the
voters of the City of Fremont. The city ordinance,
No. 5165, makes it unlawful for any person or busi-
ness entity in Fremont to knowingly or recklessly
lease or rent property to an illegal alien unless ex-
pressly permitted by federal law; requires tenants
and occupants to obtain an occupancy license from
the Fremont Police Department prior to occupying
any leased or rented dwelling unit; requires the Fre-
mont Police Department to contact the federal gov-
ernment to determine whether each potential occu-
pant is lawfully present in the country; and requires
all businesses in Fremont to register with the
"E–Verify Program." FN2 On July 27, 2010, the
Fremont City Council passed a resolution suspend-
ing the implementation and enforcement of Ordin-
ance No. 5165 until 14 days after final decision is
entered in these consolidated cases.

> FN1. *See* Neb. Const. art. III, § 2, and
> Neb.Rev.Stat. §§ 18–2501 through
> 18–2538.

> FN2. The content of the ordinance was dis-
> cussed in *City of Fremont v. Kotas,* 279
> Neb. 720, 781 N.W.2d 456 (2010) (holding
> that the city's substantive constitutional
> challenges to the initiative were not justi-
> ciable before the initiative was approved
> by the voters).

Plaintiffs Juan Doe, Juana Doe, Juana Doe # 2,
Jane Doe and Maria Roe challenge the constitution-
ality of the Fremont ordinance and seek leave of the
court to proceed under pseudonym in these cases.
The evidentiary materials necessary to support the
plaintiffs' motions, i.e., the movants' declarations
and documents reflecting the language of the ordin-
ance, were filed in conjunction with their motions
for a preliminary injunction and temporary restrain-
ing order . FN3

> FN3. The court located the declarations of
> Juan Doe, Juana Doe and Juana Doe # 2 at-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 41902 (D.Neb.)
**(Cite as: 2011 WL 41902 (D.Neb.))**

tached as Exhibits D, E, and F to the "Plaintiffs' Memorandum of Law in Support of Their Motion for a Preliminary Injunction," Filing # 8 in Case No. 8:10–cv–270. The declarations of Jane Doe and Maria Roe were filed as Exhibits 5 and 6 to the plaintiffs' Evidence Index, Filing # 15, in Case No. 4:10–cv3140. The legislation at issue appears in "Proposed Ordinance No. 5165," which was attached as Exhibit A to the "Plaintiffs' Memorandum of Law in Support of Their Motion for a Preliminary Injunction," Filing # 8 in Case No. 8:10–cv–270, and filed as Exhibit A to the "Declaration of Charlotte Silver Authenticating Government Records Regarding Fremont Immigration Ordinance," Filing # 15–2 in Case No. 4: 10–cv–3140.

In general, the title of a civil complaint "must name all the parties," *Fed.R.Civ.P. 10(a),* and there is a "strong presumption against allowing parties to use a pseudonym." *W.G.A. v. Priority Pharmacy, Inc.,* 184 F.R.D. 616, 617 (E.D.Mo.1999) (citations omitted). This presumption reflects a First Amendment interest in public proceedings, which is furthered by identifying the parties to a lawsuit. *See id.; see also Roe v. St. Louis University,* 2009 WL 910738, Case No. 08–1474 (E.D.Mo. Apr. 2, 2009).

In summary, the movants wish to proceed under fictitious names because they or members of their families cannot demonstrate their lawful presence in the United States or are currently in immigration proceedings. The movants state that compliance with the ordinance would cause them to be evicted from their apartments and prevented from obtaining other housing in Fremont, deported from the United States, and subjected to racial slurs, harassment, and hate crimes.

The decision whether to permit a plaintiff to proceed anonymously is within the court's discretion. *W.G.A. v. Priority Pharmacy, Inc.,* 184 F.R.D. at 617; *Heather K. v. City of Mallard,* 887 F.Supp. 1249, 1255 (N.D.Iowa 1995). Although there is no

binding precedent on this issue, other federal courts have identified several relevant factors. In essence, "the court must ascertain whether the plaintiff, 'has a substantial privacy right which outweighs the customary constitutionally-embedded presumption of openness in judicial proceedings.' " *Roe v. St. Louis University,* 2009 WL 910738 at *3 (quoting *Doe v. Frank,* 951 F.2d 320, 323 (11th Cir.1992)); *Doe v. Hartz,* 52 F.Supp.2d 1027, 1047 (N.D.Iowa 1999).

**\*2** In *Lozano v. City of Hazleton,* 496 F.Supp.2d 477 (M.D.Pa.2007), *vacated in part on other grounds,* 620 F.3d 170 (3d Cir.2010), *petition for cert. filed* Dec. 8, 2010, the district court allowed several plaintiffs to proceed anonymously in a lawsuit challenging the validity of municipal ordinances regulating the rental housing and employment of undocumented aliens. The anonymous plaintiffs in *Lozano* had "an uncertain immigration status." *Lozano v. City of Hazleton,* 496 F.Supp.2d at 505. In a thorough discussion of the case law, the district court noted that other courts had articulated factors weighing in favor and against the use of pseudonyms, including

"(1) the extent to which the identity of the litigant has been kept confidential; (2) the bases upon which disclosure is feared or sought to be avoided, and the substantiality of these bases; (3) the magnitude of the public interest in maintaining the confidentiality of the litigant's identity; (4) whether, because of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigant's identities; (5) the undesirability of an outcome adverse to the pseudonymous party and attributable to his refusal to pursue the case at the price of being publicly identified; and (6) whether the party seeking to sue pseudonymously has illegitimate ulterior motives." ... Factors against use of pseudonyms are: "(1) the universal level of public interest in access to the identities of the litigants; (2) whether, because of the subject matter of the litigation, the status of the litigant as a public figure, or otherwise, there is a particularly

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 41902 (D.Neb.)
**(Cite as: 2011 WL 41902 (D.Neb.))**

strong interest in knowing the litigant's identities, beyond the public's interest which is normally obtained; and (3) whether the opposition to pseudonym by counsel, the public, or the press is illegitimately motivated."

*Lozano v. City of Hazleton,* 496 F.Supp.2d at 506 (citations omitted). The court also noted that "federal courts have recognized that inquiries into immigration status can have an *in terrorem,* effect, limiting the willingness of plaintiffs to pursue their rights out of fears of the consequences of an exposure of their position." *Id.* at 513–14 (citing *Topo v. Dhir,* 210 F.R.D. 76, 78 (S.D.N.Y.2002); *Zeng Liu v. Donna Karan International, Inc.,* 207 F.Supp.2d 191, 193 (S.D.N.Y.2002)). The court's determination that the plaintiffs should be permitted to proceed pseudonymously was affirmed by the Third Circuit:

In deciding whether to permit those Plaintiffs with concerns about the legality of their immigration status to proceed anonymously, the district court ... identified nine separate factors courts have used to decide whether anonymity is appropriate. *See Lozano [v. City of Hazleton,* 496 F.Supp.2d 477, 506 (M.D.Pa.2007) ]. The court then engaged in a thorough analysis of each of these factors, and concluded that the factors favoring anonymity outweighed those favoring disclosure. Specifically, the court found that ethnic tensions had escalated in Hazleton since enactment of the ordinances, and that the named Plaintiffs had been harassed and intimidated for their involvement in this litigation. *See id.* at 508–10. The court concluded that the Doe Plaintiffs, because of their unlawful status, would face an "exponentially greater" risk of harassment, and even physical danger, if their identities were revealed. *Id.* at 510. The court also noted that the litigation was in the public interest, and reasoned that the Doe Plaintiffs, as well as prospective litigants lacking lawful status, would be deterred from bringing cases clarifying constitutional rights, if doing so required alerting federal immigration authorities to their presence. *See id.*

at 511–12. Finally, the court explained that because the Doe Plaintiffs' identity information was not central to their claims, restricting Hazleton's access to that information would not be prejudicial. *See id.* at 513. We agree with each of these conclusions, and think it clear that given the environment in Hazleton following enactment of these ordinances, the court did not abuse its discretion in permitting the Doe Plaintiffs to proceed using pseudonyms.

**\*3** The very same factors are present in these cases, and no party responded or objected to plaintiffs' motions for permission to proceed pseudonymously. In the absence of any objection, and considering the factors discussed in *Lozano v. City of Hazleton,* together with the movants' evidentiary submissions, I find that the plaintiffs' motions to proceed pseudonymously should be granted.

**IT IS ORDERED:**

1. The motion of Juan Doe, Juana Doe and Juana Doe # 2 for leave to proceed under fictitious names (Doc. 6 in 8:10–cv–270) is granted, and the movants may proceed under fictitious names or anonymously.

2. The motion of Jane Doe and Maria Roe for leave to proceed under pseudonym (Doc. 10 in 4:10–cv–3140) is granted, and the movants may proceed under fictitious names or anonymously.

3. To the extent that any of the movants request the entry of a protective order governing discovery, the issue must be raised by separate motion.

D.Neb.,2011.
Keller v. City of Fremont
Not Reported in F.Supp.2d, 2011 WL 41902 (D.Neb.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

5





Positive
As of: Jan 14, 2015

SIERRA CLUB, Plaintiff, VS. FEDERAL EMERGENCY MANAGEMENT
AGENCY, et al., Defendants.

CIVIL ACTION NO. H-07-0608

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
TEXAS, HOUSTON DIVISION

*2008 U.S. Dist. LEXIS 47405*; *70 Fed. R. Serv. 3d (Callaghan) 1291*

June 11, 2008, Decided
June 11, 2008, Filed

**PRIOR HISTORY:** *Sierra Club v. FEMA, 2007 U.S. Dist. LEXIS 84230 (S.D. Tex., Nov. 14, 2007)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a national nonprofit environmental club, filed suit under the National Flood Insurance Act, *42 U.S.C.S. § 4104(g)*, appealing a final flood elevation determination by defendant Federal Emergency Management Agency (FEMA) for Harris County, Texas, and incorporated areas. A landowner/private developer moved to intervene under *Fed. R. Civ. P. 24(a)(2), (b)*. FEMA moved to stay proceedings.

**OVERVIEW:** In 2004, FEMA published a preliminary flood insurance study (FIS) proposing base flood elevations for a watershed in northwest Harris County. FEMA later raised the flood elevations on thousands of acres targeted for a community planned by the developer, who had appealed the preliminary FIS pursuant to *42 U.S.C.S. § 4104(b)*. The environmental club protested,

alleging technical deficiencies in FEMA's analysis of potential flooding in the affected watershed. FEMA proceeded with its map with the knowledge that parts of it would likely be changed after the fact to correct inaccuracies. The club sued, and the developer sought intervention as of right. FEMA sought a stay until the county flood control district submitted a letter of map revision (LOMR). The court held that (1) the developer's motion to intervene as of right was timely under *Fed. R. Civ. P. 24(a)(2)*, and *(2)* the developer's interests would not be represented by either the club or by FEMA because changes in the flood plain elevations would require the developer to add fill to the affected areas at great cost. The court deferred ruling on FEMA's motion to stay because the county's LOMR had not been filed on the promised date.

**OUTCOME:** The court granted the developer's motion to intervene as a matter of right and deferred deciding FEMA's motion to stay pending further information as to the status and content of the expected revised LOMR. The court ordered the parties to file by a date certain

2008 U.S. Dist. LEXIS 47405, *; 70 Fed. R. Serv. 3d (Callaghan) 1291

written submissions stating whether the LOMR had been submitted, the extent of its changes, and the impact of any filing on FEMA's motion to stay.

**LexisNexis(R) Headnotes**

*Administrative Law > Agency Adjudication > Review of Initial Decisions*
*Administrative Law > Judicial Review > Reviewability > General Overview*
*Insurance Law > Property Insurance > Flood Insurance*
[HN1] Under the National Flood Insurance Act, any owner or lessee of real property within the community who believes his property rights to be adversely affected by the Federal Emergency Management Agency's (FEMA's) determination of projected flood elevations may appeal the determination through an administrative review process. *42 U.S.C.S. § 4104(b)*. The application for administrative review must be filed within 90 days after FEMA publishes the proposed flood elevation determination. The application must challenge the scientific or technical basis for the determination. The Act provides for judicial review of final agency determinations in the administrative review. Any appellant aggrieved by any final determination of the director upon administrative appeal, as provided by *§ 4104(b)*, may appeal such determination to the United States district court for the district within which the community is located not more than 60 days after receipt of notice of such determination. *§ 4104(g)*.

*Civil Procedure > Parties > Intervention > Right to Intervene*
[HN2] See *Fed. R. Civ. P. 24(a)*.

*Civil Procedure > Parties > Intervention > Right to Intervene*
[HN3] *Fed. R. Civ. P. 24(a)(2)* has been interpreted to require that (1) an intervention application be timely; (2) the applicant have an interest relating to the property that is the subject of the action; (3) the applicant is so situated that the disposition may, as a practical matter, impair or impede his ability to protect that interest; and (4) the applicant's interest is inadequately represented by the existing parties.

*Civil Procedure > Parties > Intervention > Permissive Interventions*
[HN4] See *Fed. R. Civ. P. 24(b)(1)*.

*Civil Procedure > Parties > Intervention > Permissive Interventions*
[HN5] Permissive intervention under *Fed. R. Civ. P. 24(b)(1)* is appropriate when (1) timely application is made by an intervenor, (2) the intervenor's claim or defense and the main action have a question of law or fact in common, and (3) intervention will not unduly delay or prejudice the adjudication of the rights of the original parties. District courts should also consider whether the existing parties adequately represent the proposed intervenor's interests and whether the intervenor's presence is likely to contribute significantly to the development of underlying factual issues.

*Civil Procedure > Parties > Intervention > Right to Intervene*
[HN6] To determine timeliness under *Fed. R. Civ. P. 24(a)(2)*, courts consider (1) the length of time during which a would-be intervenor actually knew or reasonably should have known of its interest in the case before it petitioned for leave to intervene; (2) the extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as it knew or reasonably should have known of its interest in the case; (3) the extent of the prejudice that the would-be intervenor may suffer if intervention is denied; and (4) the existence of unusual circumstances militating either for or against a determination that the application is timely. The analysis is contextual; absolute measures of timeliness should be ignored. Courts have discretion to allow intervention where no one would be hurt and greater justice could be obtained.

*Civil Procedure > Parties > Intervention > Right to Intervene*
[HN7] The U.S. Court of Appeals for the Fifth Circuit has rejected the notion that the date on which a would-be intervenor became aware of the pendency of the action should be used to determine whether it acted promptly under *Fed. R. Civ. P. 24(a)(2)*. A better gauge of promptness is the speed with which the would-be intervenor acted when it became aware that its interests would no longer be protected by the original parties. The

Case 1:14-cv-00254   Document 91-3   Filed on 01/14/15 in TXSD   Page 50 of 114

Page 3
2008 U.S. Dist. LEXIS 47405, *; 70 Fed. R. Serv. 3d (Callaghan) 1291

first factor of the timeliness analysis focuses on the time lapse between the applicant's receipt of actual or constructive knowledge of his interest in the litigation and the filing of his motion for intervention. Filing a motion to intervene before entry of judgment favors finding that the motion was timely.


*Civil Procedure > Parties > Intervention > Right to Intervene*

[HN8] Timeliness for intervention under *Fed. R. Civ. P. 24(a)(2)* is not determined solely by the length of time that passes before a motion to intervene is made. The more important question is not the mere length of time but the possibility of prejudice to existing parties that the delay may cause. This consideration is to be evaluated against the liberal treatment that is to be accorded applications for intervention of right. Where there is no prejudice to existing parties, courts have allowed intervention after an applicant's extended delay in filing.


*Civil Procedure > Parties > Intervention > Right to Intervene*

[HN9] Under *Fed. R. Civ. P. 24(a)(2)*, the practical impairment standard does not require a proposed intervenor to show that it will be bound by the disposition of the action. The ability of a party seeking intervention to raise its concerns in future proceedings is not sufficient to ensure that the party is able to protect its interests because the task of reestablishing the status quo in later proceedings can be difficult and burdensome. Intervention is appropriate where a non-party faces potential consequences in the interim period after entry of judgment. An intervenor's interest may also be practically impaired by the stare decisis effect of the district court's judgment on subsequent proceedings.


*Civil Procedure > Judicial Officers > Judges > Discretion*
*Evidence > Procedural Considerations > Burdens of Proof > General Overview*
*Governments > Courts > Authority to Adjudicate*

[HN10] The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. The power to stay calls for the exercise of judgment, which must weigh competing interests and maintain an even balance. A court must not abuse its inherent power

to stay. Generally, the moving party bears a heavy burden to show why a stay should be granted absent statutory authorization. To meet this burden, the moving party should show that its motion is supported by genuine necessity. A court should not decide a motion to stay based on a party's speculative concerns.


COUNSEL:  [*1] For Sierra Club, Plaintiff: James B Blackburn, Jr, LEAD ATTORNEY, Blackburn Carter PC, Houston, TX; David Alfred Kahne, Attorney at Law, Houston, TX.

For Federal Emergency Management Agency, Director R David Paulison, Regional Director William E. Peterson, Defendants: Charmaine Michele Aarons Holder, LEAD ATTORNEY, Office of the US Attorney, Houston, TX.

For GGP Bridgeland L.P., Movant: Lewis Steven Wiener, LEAD ATTORNEY, Sutherland Asbill and Brennan, Washington, DC; Craig Alan Olsen, Sutherland Asbill & Brennan LLP, Houston, TX.

R D Smith, President, CCFCC, Amicus, Pro se, Cypress, Tx.


JUDGES:  Lee H. Rosenthal, United States District Judge.

OPINION BY: Lee H. Rosenthal

OPINION


MEMORANDUM AND ORDER

The Sierra Club, a national nonprofit environmental organization, filed this suit under *Section 4104(g)* of the National Flood Insurance Act, *42 U.S.C. § 4104(g)*, appealing a final flood elevation determination by the Federal Emergency Management Agency (FEMA) for Harris County, Texas and incorporated areas. (Docket Entry No. 1). GGP Bridgeland L.P., a landowner and developer, has moved to intervene under *Federal Rule of Civil Procedure 24(a)(2)* and *(b)*. (Docket Entry No. 28). The Sierra Club opposed the motion, (Docket [*2] Entry No. 31), and GGP replied to the opposition, (Docket Entry No. 37). FEMA filed a Statement of Qualified No Opposition, (Docket Entry No. 36), in which it later clarified to state that it opposed intervention as a matter of right but did not object to permissive intervention. (Docket Entry No. 38). GGP responded to FEMA's

filings. (Docket Entry No. 39).

FEMA has also moved to stay the proceedings, asserting that the Digital Flood Insurance Rate Map ("DFIRM") currently contested by the Sierra Club will soon change when the Harris County Flood Control District ("HCFCD") submits a revised Letter of Map Revision ("LOMR"). (Docket Entry No. 46). GGP responded to the motion to stay. (Docket Entry Nos. 48, 52).

Based on a careful review of the motions, responses, and replies, and the applicable law, this court grants GGP's motion to intervene as a matter of right and defers deciding FEMA's motion to stay pending further information as to the status and content of the expected revised LOMR. No later than **July 10, 2008,** the parties must file a written submission stating whether the LOMR has been submitted, the extent of its changes, and the impact of any filing on the motion to stay.

The reasons [*3] are explained in detail below.

## I. Background

On September 30, 2004, FEMA published a preliminary version of the Flood Insurance Study ("FIS") report, with the DFIRM, proposing base flood elevations for Harris County. (Docket Entry No. 16 at 6; *id.,* Ex. A at 2). FEMA published the proposed base flood elevations in the local general circulation daily newspaper, the *Houston Chronicle,* on December 16, 2004 and December 23, 2004, and in the Federal Register on July 8, 2005. (Docket Entry No. 16 at 6; *id.,* Ex. A at 2). The notices invited the public, including potentially affected landowners, to submit written comments on the accuracy of the DFIRM. (Docket Entry No. 16 at 6; *id.,* Ex. A at 2).

[HN1] Under the National Flood Insurance Act, "any owner or lessee of real property within the community who believes his property rights to be adversely affected" by FEMA's determination of projected flood elevations "may appeal" the determination through an administrative review process. *42 U.S.C. § 4104(b).* [1] The application for administrative review must be filed within ninety days after FEMA publishes the proposed flood elevation determination. The application must challenge the scientific or technical [*4] basis for the determination. *Id.* The Act provides for judicial review of final agency determinations in the administrative review. "Any

appellant aggrieved by any final determination of the Director upon administrative appeal, as provided by this section, may appeal such determination to the United States district court for the district within which the community is located not more than sixty days after receipt of notice of such determination." *Id.* at *§ 4104(g).*

> 1   The National Flood Insurance Act also authorizes suits against the government "upon the disallowance by the Director of any [claims for the payment or adjustment of flood insurance claims]." *42 U.S.C. § 4072.* This lawsuit does not involve the denial of flood insurance claims.

GGP owns approximately 11,500 acres in the Upper Cypress Creek area of northwest Harris County and is developing a planned community to be known as Bridgeland. (Docket Entry No. 28 at 2). GGP plans to develop Bridgeland over a twenty-year period. (*Id.*). When completed, the development will include over 20,000 homes and have a population projected at more than 65,000 residents. (*Id.*). Approximately 8,300 acres of the Bridgeland development fall within [*5] the Upper Cypress Creek watershed area. (*Id.* at 2-3).

GGP appealed FEMA's preliminary DFIRM under the National Flood Insurance Act, *42. U.S.C. § 4104(b),* alleging that the map did not account for improvements to Bridgeland that had raised the land elevation in certain areas. (*Id.* at 3). FEMA accepted the appeal and revised the flood plain to reflect elevation changes to GGP's property. (*Id.*). Although the final DFIRM increased the total area of Bridgeland falling within the flood plain, GGP was satisfied with the revised map and was prepared to proceed with its development activities. (*Id.*).

The Sierra Club and the Houston Voters Against Flooding ("HVAF") filed a formal administrative appeal with FEMA on March 23, 2005, within the ninety-day period set by the Act. The Sierra Club and the HVAF protested the proposed base flood elevations in the part of the map along the Cypress Creek watershed. (Docket Entry No. 1 at 8-10; Docket Entry No. 16 at 6-8; *id.,* Ex. A at 3-4). In the application for administrative review, the Sierra Club and the HVAF asserted that there were technical deficiencies in FEMA's analysis and modeling of the Cypress Creek watershed and that FEMA's base flood elevation [*6] determinations were premised on flawed scientific and technical evidence. (Docket Entry No. 1 at 8-10; Docket Entry No. 16 at 6-8; *id.,* Ex. A at 2-4).

Case 1:14-cv-00254   Document 91-3   Filed on 01/14/15 in TXSD   Page 52 of 114

Page 5

2008 U.S. Dist. LEXIS 47405, *6; 70 Fed. R. Serv. 3d (Callaghan) 1291

In the administrative appeal, FEMA found that the submitted data did not demonstrate that the proposed flood elevations were scientifically or technically incorrect. (Docket Entry No. 16 at 8-9; *id.,* Ex. A at 4-5). FEMA also denied an appeal filed by the Cypress Creek Flood Control Coalition ("CCFCC"), which raised the same objections. (Docket Entry No. 16 at 7; *id.,* Ex. A at 3-5).

On January 3, 2006, the HCFCD sent a letter to FEMA acknowledging a modeling problem with respect to areas that were part of the DFIRM and stating that the HCFCD would address the problem and provide new data. (Docket Entry No. 16 at 10). Both the HCFCD and the CCFCC agreed that even after the proposed FEMA map and base flood elevation determinations became effective, changes could be made through an LOMR. An LOMR could also change the determination that specific pieces of property fell within the flood plain. (Docket Entry No. 16 at 4, 10).

On December 18, 2006, FEMA issued a Letter of Final Determination adopting the DFIRM issued for Harris County, with an [*7] anticipated effective date of June 18, 2007. (Docket Entry No. 16 at 11; *id.,* Ex. A at 7). FEMA decided to proceed with the map with the knowledge that parts of it would likely be changed after the fact to correct inaccuracies. The HCFCD and CCFCC continued to work on the modeling problem, intending to seek map revisions through an LOMR. (Docket Entry No. 16 at 10-11).

The Sierra Club filed suit seeking judicial review of FEMA's final base flood elevations and DFIRM for the Upper Cypress Creek watershed area. (Docket Entry No. 1). GGP moved to intervene under *Federal Rule of Civil Procedure 24*. (Docket Entry No. 28). GGP submitted the affidavit of Joseph H. Necker, Jr., Vice President of Development of Bridgeland GP, LLC, in support of its intervention motion. (Docket Entry No. 28, Ex. A). GGP asserted that it is entitled to intervention as a matter of right because: (1) its application is timely; (2) it has a significant property interest relating to the subject of the action; (3) the action's disposition could impair or impede GGP's ability to protect that interest; and (4) neither the Sierra Club nor FEMA adequately represent GGP's interests. (Docket Entry No. 28 at 1). In the alternative, [*8] GGP asserted that it satisfies the standard for permissive intervention because: (1) its application is timely and will not result in prejudice to the existing

parties; (2) its claims raise issues of law and fact identical to the issues currently pending before the court; and (3) it is likely to contribute to the development of the factual issues. (*Id.*). The Sierra Club opposed GGP's motion to intervene. (Docket Entry No. 31).

On March 6, 2008, FEMA filed a Clarification and Court Advisory objecting to the intervention and suggesting that the court "hold all proceedings in this matter in abeyance pending final resolution of the LOMR, which would then be published in the Federal Register and would then be subject to administrative or judicial challenge by Sierra Club, GGP, or any other eligible party." (Docket Entry No. 38 at 4). FEMA attached a letter from HCFCD dated February 11, 2008, stating that HCFCD was in the process of reevaluating the Upper Cypress Creek watershed and that its "submittal should be ready by March 28, 2000." (Docket Entry No. 38, Ex. A). GGP's response stated that FEMA had failed to meet the legal standards for a stay and had improperly filed its request. (Docket [*9] Entry No. 39 at 5). On April 15, 2008, GGP notified the court that HCFCD had not submitted its LOMR to FEMA as anticipated on March 28, 2008. (Docket Entry No. 44).

FEMA now moves to stay this litigation pending final resolution of the HCFCD LOMR through its administrative appeal process. (Docket Entry No. 46). FEMA attached a letter from HCFCD dated April 18, 2008, stating that the LOMR, "with any subsequent changes, will be ready to submit to FEMA on or before June 9, 2008." (Docket Entry No. 46, Ex. A). GGP argued that FEMA has not presented valid grounds for its motion, (Docket Entry No. 48), and that the original basis for the motion no longer exists because FEMA has filed an administrative record, (Docket Entry No. 52).

Both motions are analyzed below.

## II. The Motion to Intervene

### A. The Legal Standards

*Rule 24(a)* provides:

[HN2] On timely motion, the court must permit anyone to intervene who (1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action,

Case 1:14-cv-00254   Document 91-3   Filed on 01/14/15 in TXSD   Page 53 of 114

Page 6

2008 U.S. Dist. LEXIS 47405, *9; 70 Fed. R. Serv. 3d (Callaghan) 1291

and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, [*10] unless existing parties adequately represent that interest.

*FED. R. CIV. P. 24(a)*. The courts have interpreted [HN3] *Rule 24(a)(2)* to require that: (1) the intervention application be timely; (2) the applicant have an interest relating to the property that is the subject of the action; (3) the applicant is so situated that the disposition may, as a practical matter, impair or impede his ability to protect that interest; and (4) the applicant's interest is inadequately represented by the existing parties. *See Sierra Club v. City of San Antonio, 115 F.3d 311, 314 (5th Cir. 1997)* (citing *Sierra Club v. Glickman, 82 F.3d 106, 108 (5th Cir. 1996))*.

*Rule 24(b)(1)* provides:

> [HN4] On timely motion, the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact.

*FED. R. CIV. P. 24(b)*. [HN5] Permissive intervention is appropriate when: "(1) timely application is made by the intervenor, (2) the intervenor's claim or defense and the main action have a question of law or fact in common, and (3) intervention will not unduly delay or prejudice the adjudication of the rights [*11] of the original parties." *League of United Latin Am. Citizens, Council No. 4434 v. Clements, 884 F.2d 185, 189 n.2 (5th Cir. 1989)*. District courts should also consider whether the existing parties adequately represent the proposed intervenor's interests and whether the intervenor's presence is likely to contribute significantly to the development of underlying factual issues. *Id. at 189*.

## B. Analysis

### 1. Intervention as a Matter of Right

GGP asserts that it is entitled to intervention as a matter of right because: (1) its application is timely; (2) it has a significant property interest relating to the subject of the action; (3) the disposition of the action could impair or impede its ability to protect that interest; and (4) neither the Sierra Club nor FEMA adequately

represent GGP's interests. (Docket Entry No. 28 at 1). The Sierra Club opposes intervention as a matter of right, asserting that GGP's application is untimely and that disposition of this action will not impair or impede GGP's ability to protect its interests. (Docket Entry No. 31 at 7). Specifically, the Sierra Club argues that GGP had a two-year opportunity -- between January 2006 to January 2008 -- to participate in computer [*12] modeling work done by HCFCD, and that GGP will have the administrative option of appealing any changes to flood elevation levels under *42 U.S.C. § 4104* and *44 C.F.R. § 67*. (Docket Entry No. 31 at 5). FEMA opposes GGP's motion to intervene as a matter of right, agreeing with the Sierra Club that the result in this case will not impair or impede GGP's ability to protect its interest because it has these administrative review rights. (Docket Entry No. 38 at 1).

GGP argues that the timeliness analysis should focus on postcomplaint conduct. (Docket Entry No. 37 at 4-5). GGP also argues that the availability of posttrial administrative options through which it could theoretically challenge revised flood elevations is irrelevant in light of the practical impairment standard. (*Id.*).

[HN6] To determine timeliness under *Rule 24(a)(2)*, courts consider: "(1) [t]he length of time during which the would-be intervenor actually knew or reasonably should have known of its interest in the case before it petitioned for leave to intervene; (2) the extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as [*13] it knew or reasonably should have known of its interest in the case; (3) the extent of the prejudice that the would-be intervenor may suffer if intervention is denied; and (4) the existence of unusual circumstances militating either for or against a determination that the application is timely." *Sierra Club v. Espy, 18 F.3d 1202, 1205 (5th Cir. 1994)* (citing *Stallworth v. Monsanto Co., 558 F.2d 257, 264-66 (5th Cir. 1977))*. "The analysis is contextual; absolute measures of timeliness should be ignored." *Id.* Courts have discretion to allow intervention "where no one would be hurt and greater justice could be obtained." *Id.* (quoting *McDonald v. E.J. Lavino Co., 430 F.2d 1065, 1074 (5th Cir. 1970))*.

[HN7] The Fifth Circuit has "rejected the notion that the date on which the would-be intervenor became aware

2008 U.S. Dist. LEXIS 47405, *13; 70 Fed. R. Serv. 3d (Callaghan) 1291

of the pendency of the action should be used to determine whether it acted promptly." *Espy, 18 F.3d at 1206*; *Stallworth, 558 F.2d at 264*. "A better gauge of promptness is the speed with which the would-be intervenor acted when it became aware that its interests would no longer be protected by the original parties." *Espy, 18 F.3d at 1206*. The first factor of the timeliness analysis "focuses [*14] on the time lapse between the applicant's receipt of actual or constructive knowledge of his interest in the litigation and the filing of his motion for intervention." *Edwards v. City of Houston, 78 F.3d 983, 1000 (5th Cir. 1996)*. Filing a motion to intervene before entry of judgment favors finding that the motion was timely. *Id. at 1001* (citations omitted).

[HN8] "Timeliness is not determined solely by the length of time that passes before a motion to intervene is made." *Ass'n of Prof'l Flight Attendants v. Gibbs, 804 F.2d 318, 321 (5th Cir. 1986)*. "[T]he more important question is not the mere length of time but the possibility of prejudice to existing parties that the delay may cause. This consideration is to be evaluated against the liberal treatment that is to be accorded applications for intervention of right." *Diaz v. S. Drilling Corp., 427 F.2d 1118, 1126 (5th Cir. 1970)*. Where there is no prejudice to existing parties, courts have allowed intervention after an applicant's extended delay in filing. *See id. at 1125-26* (one-year delay not untimely where intervenor's timing caused no prejudice because "few legally significant events" had occurred).

The Sierra Club filed its complaint on [*15] February 15, 2007. (Docket Entry No. 1). The court denied FEMA's motion to dismiss and motion for summary judgment on October 29, 2007. (Docket Entry No. 26). GGP moved to intervene on January 14, 2008. Although GGP waited eleven months to file its motion from the time it reasonably should have known of its interest in the case, its intervention at this stage will not cause prejudice to the Sierra Club or FEMA. *See Diaz, 427 F.2d at 1125-6*. If denied intervention, GGP may suffer prejudice because of its property interests relating to the subject of the action.

The Sierra Club asserts that the fact that GGP had a two-year opportunity to participate in HCFCD's computer modeling is an unusual circumstance weighing against finding that the intervention motion was timely. (Docket Entry No. 31 at 5). The period before the litigation is not relevant to the timeliness of the motion to intervene; GGP

neither knew nor should have known of its interest in this litigation before the litigation was filed. GGP's motion to intervene was timely, satisfying the first factor.

The parties do not dispute that GGP has significant property interests relating to the subject of the action. (Docket Entry No. [*16] 31 at 5). The Sierra Club and FEMA assert that this action's disposition will not impair or impede GGP's ability to protect its interests because it may file an administrative appeal of any future flood plain elevation determinations under *42 U.S.C. § 4104* and *44 C.F.R. § 67*. (Docket Entry No. 31 at 5; Docket Entry No. 38 at 4). [HN9] The practical impairment standard does not require a proposed intervenor to show that it will be bound by the disposition of the action. *Edwards, 78 F.3d at 1004-05*. The ability of a party seeking intervention to raise its concerns in future proceedings is not sufficient to ensure that the party is able to protect its interests because "the task of reestablishing the status quo" in later proceedings can be "difficult and burdensome." *Fund for Animals, Inc. v. Norton, 355 U.S. App. D.C. 268, 322 F.3d 728, 735 (D.C. Cir. 2003)* (finding that the ability to reverse an unfavorable ruling by bringing a separate lawsuit did not as a practical matter mean that a party seeking to intervene could protect its interests when its revenue losses during any interim period would be substantial and likely irreparable); *see also Natural Res. Def. Council v. Costle, 183 U.S. App. D.C. 11, 561 F.2d 904, 910 (D.C. Cir. 1977)* [*17] ("[I]t is not enough to deny intervention under *24(a)(2)* because applicants may vindicate their interests in some later, albeit more burdensome, litigation."). Courts have found intervention appropriate where a nonparty faces potential consequences in the interim period after entry of judgment. *See, e.g., Fund for Animals, Inc., 322 F.3d at 735* (holding that the possibility of substantial lost revenues during an interim period warranted intervention). An intervenor's interest may also be practically "impaired by the stare decisis effect of the district court's judgment" on subsequent proceedings. *Espy, 18 F.3d at 1207* (quoting *Ceres Gulf v. Cooper, 957 F.2d 1199, 1204 (5th Cir. 1992))*.

Joseph Necker's affidavit states that the flood plain elevation changes requested by the Sierra Club would require GGP to locate and move more than 5.5 million cubic yards of fill to the affected areas, at a cost estimated at $ 28 million. (Docket Entry No. 28, Ex. A, P11). Regardless of the availability of an administrative appeal, the results of this case may adversely GGP's interests in

2008 U.S. Dist. LEXIS 47405, *17; 70 Fed. R. Serv. 3d (Callaghan) 1291

the interim. *See Fund for Animals, Inc., 322 F.3d at 735*. The disposition of this case may also affect GGP's ability [*18] to protect its interests in subsequent administrative proceedings. *See Espy, 18 F.3d at 1207*. The potential for such effects on GGP's interests supports granting intervention as a matter of right.

The Sierra Club and FEMA do not suggest that they adequately represent GGP's interests in this action. The Sierra Club's position is directly opposed to that of GGP, while FEMA is a government agency representing the public interest. (Docket Entry No. 28 at 13). GGP's unique position as the owner and developer of Bridgeland satisfies the fourth prong of the intervention inquiry. All four factors supporting intervention as a matter of right are satisfied; GGP is entitled to intervene.

Even if GGP was not entitled to intervene as a matter of right, permissive intervention would be warranted. As discussed above, GGP's motion was timely. The Sierra Club and FEMA do not suggest that GGP's intervention will prejudice the adjudication of their rights. Nor do the Sierra Club or FEMA claim to represent GGP's interests. Because GGP's property falls within the Upper Cypress Creek watershed area, GGP will raise issues of law and fact consistent with those presently before the court. As a private land developer, [*19] GGP occupies a different position and has different interests than the Sierra Club and FEMA. GGP is in a position to provide evidence of the impact of modified flood elevation levels on private land development in the area, evidence that neither the Sierra Club nor FEMA have an incentive or even ability to develop or submit.

GGP's intervention motion is granted.

### III. The Motion to Stay

### A. The Legal Standard

[HN10] "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co., 299 U.S. 248, 254, 57 S. Ct. 163, 81 L. Ed. 153 (1936)*. The power to stay "calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Id. at 254-55*. A court must not abuse its inherent power to stay. *Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co., Inc., 761 F.2d 198, 204 n.6 (5th Cir. 1985)*. "Generally, the moving

party bears a heavy burden to show why a stay should be granted absent statutory authorization." *Id.* To meet this burden, the moving party should show that its motion is supported by "genuine necessity." *Id.* A court should not [*20] decide a motion to stay based on a party's speculative concerns. *See, e.g., Provencio v. Vazquez, No. 07-CV-0069-AWI-TAG, 2007 U.S. Dist. LEXIS 40380, 2007 WL 1614827, at *2-4 (E.D. Cal. June 4, 2007)* (recommending that defendant's motion to stay be granted where plaintiff raised only speculative concerns in opposition); *Crosetto v. Heffernan, No. 88-C-433, 1990 U.S. Dist. LEXIS 3053, 1990 WL 32310, at *2 (N.D. Ill. February 22, 1990)* (granting defendant's motion to stay where defendant raised issues based on "more than mere speculation").

### B. Analysis

FEMA moves for a stay of eight months after HCFCD's submission of a complete LOMR and/or until the LOMR issues are finally resolved. (Docket Entry No. 46 at 8). FEMA points to HCFCD's February 1, 2008 letter to show that the not-yet-submitted LOMR will contain "a better calibration" of high water mark and flow data for the Upper Cypress Creek watershed. (Docket Entry No. 46 at 6; Docket Entry No. 38, Ex. A). FEMA asserts that "[i]t would be a waste of resources for all parties to litigate Sierra Club's claim on the current DFIRM that will most likely be changed," particularly because future issues can be resolved through its administrative appeal process. (Docket Entry No. 46 at 5-6).

GGP responds [*21] that FEMA has not demonstrated a genuine necessity for a stay and that it is unnecessary because FEMA has already filed its administrative record. (Docket Entry No. 48 at 4-5; Docket Entry No. 52). GGP also argues that the motion "is based purely on speculation" about the timing and results of HCFCD's pending LOMR. (Docket Entry No. 48 at 4-5). GGP objects to the length of the stay requested and asserts that the results of any later possible administrative action are irrelevant to the issue of whether the current action should be stayed. (*Id.* at 6).

HCFCD did not submit a revised LOMR to FEMA as anticipated on March 28, 2008. (Docket Entry No. 44). HCFCD now expects to submit the LOMR near June 9, 2008. (Docket Entry No. 46, Ex. A). The results are unknown. Decision on the motion to stay is deferred. No later than **July 10, 2008,** the parties must file a written

2008 U.S. Dist. LEXIS 47405, *21; 70 Fed. R. Serv. 3d (Callaghan) 1291

submission stating whether the LOMR has been submitted, the extent of its changes, and the impact of any filing on the motion to stay.

**IV. Conclusion**

GGP's motion to intervene as a matter of right is granted. FEMA's motion to stay is deferred, subject to reviewing the parties' submissions on the expected

LOMR.

SIGNED on June 11, [*22] 2008, at Houston, Texas.

/s/ Lee H. Rosenthal

Lee H. Rosenthal

United States District Judge

6

UNITED STATES PUBLIC LAWS
111th Congress - First Session
Convening January 04, 2009

Additions and Deletions are not identified in this database.
Vetoed provisions within tabular material are not displayed
Vetoes are indicated by ~~Text~~ ;
stricken material by **Text** .

PL 111–83 [HR 2892]
October 28, 2009
DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS ACT, 2010

An Act Making appropriations for the Department of Homeland Security for the fiscal year ending September 30, 2010, and for other purposes.

*it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*
That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the Department of Homeland Security for the fiscal year ending September 30, 2010, and for other purposes, namely:

TITLE I

DEPARTMENTAL MANAGEMENT AND OPERATIONS

Office of the Secretary and Executive Management

Necessary expenses of the Office of the Secretary of Homeland Security, as authorized by section 102 of the Homeland Security Act of 2002 (6 U.S.C. 112), and executive management of the Department of Homeland Security, as authorized by law, $147,818,000: *Provided*, That not to exceed $60,000 shall be for official reception and representation expenses, of which $20,000 shall be made available to the Office of Policy solely to host Visa Waiver Program negotiations in Washington, DC: *Provided further*, That $15,000,000 shall not be available for obligation for the Office of Policy until the Secretary submits an expenditure plan for the Office of Policy for fiscal year 2010: *Provided further*, That all official costs associated with the use of government aircraft by Department of Homeland Security personnel to support official travel of the Secretary and the Deputy Secretary shall be paid from amounts made available for the Immediate Office of the Secretary and the Immediate Office of the Deputy Secretary.

Office of the Under Secretary for Management

For necessary expenses of the Office of the Under Secretary for Management, as authorized by sections 701 through 705 of the Homeland Security Act of 2002 (6 U.S.C. 341 through 345), $254,190,000, of which not less than $1,000,000 shall be for logistics training; and of which not to exceed $3,000 shall be for official reception and representation expenses: *Provided*, That of the total amount made available under this heading, $5,500,000

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

shall remain available until expended solely for the alteration and improvement of facilities, tenant improvements, and relocation costs to consolidate Department headquarters operations at the Nebraska Avenue **2143 Complex; and $17,131,000 shall remain available until expended for the Human Resources Information Technology program.

### Office of the Chief Financial Officer

For necessary expenses of the Office of the Chief Financial Officer, as authorized by section 103 of the Homeland Security Act of 2002 (6 U.S.C. 113), $60,530,000, of which $11,000,000 shall remain available until expended for financial systems consolidation efforts: *Provided*, That of the total amount made available under this heading, $5,000,000 shall not be obligated until the Chief Financial Officer or an individual acting in such capacity submits a financial management improvement plan that addresses the recommendations outlined in the Department of Homeland Security Office of Inspector General report OIG–09–72, including yearly measurable milestones, to the Committees on Appropriations of the Senate and the House of Representatives: *Provided further*, That the plan described in the preceding proviso shall be submitted not later than January 4, 2010.

### Office of the Chief Information Officer

For necessary expenses of the Office of the Chief Information Officer, as authorized by section 103 of the Homeland Security Act of 2002 (6 U.S.C. 113), and Department-wide technology investments, $338,393,000; of which $86,912,000 shall be available for salaries and expenses; and of which $251,481,000, to remain available until expended, shall be available for development and acquisition of information technology equipment, software, services, and related activities for the Department of Homeland Security: *Provided*, That of the total amount appropriated, not less than $82,788,000 shall be available for data center development, of which not less than $38,540,145 shall be available for power capabilities upgrades at Data Center One (National Center for Critical Information Processing and Storage): *Provided further*, That the Chief Information Officer shall submit to the Committees on Appropriations of the Senate and the House of Representatives, not more than 60 days after the date of enactment of this Act, an expenditure plan for all information technology acquisition projects that: (1) are funded under this heading; or (2) are funded by multiple components of the Department of Homeland Security through reimbursable agreements: *Provided further*, That such expenditure plan shall include each specific project funded, key milestones, all funding sources for each project, details of annual and lifecycle costs, and projected cost savings or cost avoidance to be achieved by the project.

### Analysis and Operations

For necessary expenses for intelligence analysis and operations coordination activities, as authorized by title II of the Homeland Security Act of 2002 (6 U.S.C. 121 et seq.), $335,030,000, of which not to exceed $5,000 shall be for official reception and representation expenses; and of which $190,862,000 shall remain available until September 30, 2011: *Provided*, That none of the funds provided in this or any other Act shall be available to commence operations of the National Immigration Information Sharing Operation or any follow-on entity until the Secretary certifies that such program **2144 complies with all existing laws, including all applicable privacy and civil liberties standards, the Comptroller General of the United States notifies the Committees on Appropriations of the Senate and the House of Representatives and the Secretary that the Comptroller has reviewed such certification, and the Secretary notifies the Committees on Appropriations of the Senate and the House of Representatives of all funds to be expended on operations of the National Immigration Information Sharing Operation or any follow-on entity pursuant to section 503 of this Act.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Office of the Federal Coordinator for Gulf Coast Rebuilding

For necessary expenses of the Office of the Federal Coordinator for Gulf Coast Rebuilding, $2,000,000.

Office of Inspector General

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978 (5 U.S.C. App.), $113,874,000, of which not to exceed $150,000 may be used for certain confidential operational expenses, including the payment of informants, to be expended at the direction of the Inspector General.

TITLE II

SECURITY, ENFORCEMENT, AND INVESTIGATIONS

U.S. Customs and Border Protection

SALARIES AND EXPENSES

For necessary expenses for enforcement of laws relating to border security, immigration, customs, agricultural inspections and regulatory activities related to plant and animal imports, and transportation of unaccompanied minor aliens; purchase and lease of up to 4,500 (4,000 for replacement only) police-type vehicles; and contracting with individuals for personal services abroad; $8,064,713,000, of which $3,226,000 shall be derived from the Harbor Maintenance Trust Fund for administrative expenses related to the collection of the Harbor Maintenance Fee pursuant to section 9505(c)(3) of the Internal Revenue Code of 1986 (26 U.S.C. 9505(c)(3)) and notwithstanding section 1511(e)(1) of the Homeland Security Act of 2002 (6 U.S.C. 551(e)(1)); of which not to exceed $45,000 shall be for official reception and representation expenses; of which not less than $309,629,000 shall be for Air and Marine Operations; of which such sums as become available in the Customs User Fee Account, except sums subject to section 13031(f)(3) of the Consolidated Omnibus Budget Reconciliation Act of 1985 (19 U.S.C. 58c(f)(3)), shall be derived from that account; of which not to exceed $150,000 shall be available for payment for rental space in connection with preclearance operations; of which not to exceed $1,000,000 shall be for awards of compensation to informants, to be accounted for solely under the certificate of the Secretary of Homeland Security; and of which not more than $800,000 shall be for procurement of portable solar charging rechargeable battery systems: *Provided*, That for fiscal year 2010, **\*2145** the overtime limitation prescribed in section 5(c)(1) of the Act of February 13, 1911 (19 U.S.C. 267(c)(1)) shall be $35,000; and notwithstanding any other provision of law, none of the funds appropriated by this Act may be available to compensate any employee of U.S. Customs and Border Protection for overtime, from whatever source, in an amount that exceeds such limitation, except in individual cases determined by the Secretary of Homeland Security, or the designee of the Secretary, to be necessary for national security purposes, to prevent excessive costs, or in cases of immigration emergencies: *Provided further*, That of the total amount provided, $1,700,000 shall remain available until September 30, 2011, for the Global Advanced Passenger Information/Passenger Name Record Program.

AUTOMATION MODERNIZATION

For expenses for U.S. Customs and Border Protection automated systems, $422,445,000, to remain available until expended, of which not less than $227,960,000 shall be for the development of the Automated Commercial Environment: *Provided*, That of the total amount made available under this heading, $50,000,000 may not be

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

obligated for the Automated Commercial Environment program until 30 days after the Committees on Appropriations of the Senate and the House of Representatives receive a report on the results to date and plans for the program from the Department of Homeland Security.

## BORDER SECURITY FENCING, INFRASTRUCTURE, AND TECHNOLOGY

For expenses for border security fencing, infrastructure, and technology, $800,000,000, to remain available until expended: *Provided*, That of the total amount made available under this heading, $75,000,000 shall not be obligated until the Committees on Appropriations of the Senate and the House of Representatives receive and approve a plan for expenditure, prepared by the Secretary of Homeland Security, reviewed by the Government Accountability Office, and submitted not later than 90 days after the date of the enactment of this Act, for a program to establish and maintain a security barrier along the borders of the United States, of fencing and vehicle barriers where practicable, and of other forms of tactical infrastructure and technology, that includes--

(1) a detailed accounting of the program's implementation to date for all investments, including technology and tactical infrastructure, for funding already expended relative to system capabilities or services, system performance levels, mission benefits and outcomes, milestones, cost targets, program management capabilities, identification of the maximum investment, including life-cycle costs, related to the Secure Border Initiative program or any successor program, and description of the methodology used to obtain these cost figures;

(2) a description of how specific projects will further the objectives of the Secure Border Initiative, as defined in the Department of Homeland Security Secure Border Plan, and how the expenditure plan allocates funding to the highest priority border security needs;

(3) an explicit plan of action defining how all funds are to be obligated to meet future program commitments, with the planned expenditure of funds linked to the milestone-based **\*2146** delivery of specific capabilities, services, performance levels, mission benefits and outcomes, and program management capabilities;

(4) an identification of staffing, including full-time equivalents, contractors, and detailees, by program office;

(5) a description of how the plan addresses security needs at the Northern border and ports of entry, including infrastructure, technology, design and operations requirements, specific locations where funding would be used, and priorities for Northern border activities;

(6) a report on budget, obligations and expenditures, the activities completed, and the progress made by the program in terms of obtaining operational control of the entire border of the United States;

(7) a listing of all open Government Accountability Office and Office of Inspector General recommendations related to the program and the status of Department of Homeland Security actions to address the recommendations, including milestones to fully address such recommendations;

(8) a certification by the Chief Procurement Officer of the Department including all supporting documents or memoranda, and documentation and a description of the investment review processes used to obtain such certifications, that--

(A) the program has been reviewed and approved in accordance with the investment management process of the Department, and that the process fulfills all capital planning and investment control requirements and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

reviews established by the Office of Management and Budget, including as provided in Circular A–11, part 7;

(B) the plans for the program comply with the Federal acquisition rules, requirements, guidelines, and practices, and a description of the actions being taken to address areas of non-compliance, the risks associated with such actions, together with any plans for addressing these risks, and the status of the implementation of such actions; and

(C) procedures to prevent conflicts of interest between the prime integrator and major subcontractors are established and that the Secure Border Initiative Program Office has adequate staff and resources to effectively manage the Secure Border Initiative program and all contracts under such program, including the exercise of technical oversight;

(9) a certification by the Chief Information Officer of the Department including all supporting documents or memoranda, and documentation and a description of the investment review processes used to obtain such certifications that--

(A) the system architecture of the program has been determined to be sufficiently aligned with the information systems enterprise architecture of the Department to minimize future rework, including a description of all aspects of the architectures that were or were not assessed in making the alignment determination, the date of the alignment determination, and any known areas of misalignment together with the associated risks and corrective actions to address any such areas;

(B) the program has a risk management process that regularly and proactively identifies, evaluates, mitigates, **\*2147** and monitors risks throughout the system life-cycle and communicates high-risk conditions to U.S. Customs and Border Protection and Department of Homeland Security investment decision-makers, as well as a listing of all the program's high risks and the status of efforts to address such risks; and

(C) an independent verification and validation agent is currently under contract for the projects funded under this heading;

(10) a certification by the Chief Human Capital Officer of the Department that the human capital needs of the Secure Border Initiative program are being addressed so as to ensure adequate staff and resources to effectively manage the Secure Border Initiative; and

(11) an analysis by the Secretary for each segment, defined as not more than 15 miles, of fencing or tactical infrastructure, of the selected approach compared to other, alternative means of achieving operational control, including cost, level of operational control, possible unintended effects on communities, and other factors critical to the decisionmaking process:

*Provided further*, That the Secretary shall report to the Committees on Appropriations of the Senate and the House of Representatives on the progress of the program, and obligations and expenditures for all outstanding task orders, as well as specific objectives to be achieved through the award of current and remaining task orders planned for the balance of available appropriations, at least 15 days before the award of any task order requiring an obligation of funds in an amount greater than $25,000,000 and before the award of a task order that would cause cumulative obligations of funds to exceed 50 percent of the total amount appropriated: *Provided further*, That none of the funds made available under this heading may be obligated unless the Department has complied with section 102(b)(1)(C)(i) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 1:14-cv-00254   Document 91-3   Filed on 01/14/15 in TXSD   Page 63 of 114

U.S.C. 1103 note), and the Secretary certifies such to the Committees on Appropriations of the Senate and the House of Representatives: *Provided further*, That none of the funds made available under this heading may be obligated for any project or activity for which the Secretary has exercised waiver authority pursuant to section 102(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1103 note) until 15 days have elapsed from the date of the publication of the decision in the Federal Register.

### AIR AND MARINE INTERDICTION, OPERATIONS, MAINTENANCE, AND PROCUREMENT

For necessary expenses for the operations, maintenance, and procurement of marine vessels, aircraft, unmanned aircraft systems, and other related equipment of the air and marine program, including operational training and mission-related travel, and rental payments for facilities occupied by the air or marine interdiction and demand reduction programs, the operations of which include the following: the interdiction of narcotics and other goods; the provision of support to Federal, State, and local agencies in the enforcement or administration of laws enforced by the Department of Homeland Security; and at the discretion of the Secretary of Homeland Security, the provision of assistance to Federal, State, **\*2148** and local agencies in other law enforcement and emergency humanitarian efforts, $519,826,000, to remain available until expended: *Provided*, That no aircraft or other related equipment, with the exception of aircraft that are one of a kind and have been identified as excess to U.S. Customs and Border Protection requirements and aircraft that have been damaged beyond repair, shall be transferred to any other Federal agency, department, or office outside of the Department of Homeland Security during fiscal year 2010 without the prior approval of the Committees on Appropriations of the Senate and the House of Representatives.

### CONSTRUCTION AND FACILITIES MANAGEMENT

### << 6 USCA § 214 NOTE >>

For necessary expenses to plan, construct, renovate, equip, and maintain buildings and facilities necessary for the administration and enforcement of the laws relating to customs, immigration, and border security, $319,570,000, to remain available until expended; of which $39,700,000 shall be for constructing and equipping the Advanced Training Center; and of which not more than $3,500,000 shall be for acquisition, design, and construction of U.S. Customs and Border Protection Air and Marine facilities at El Paso International Airport, Texas: *Provided*, That for fiscal year 2011 and thereafter, the annual budget submission of U.S. Customs and Border Protection for "Construction and Facilities Management" shall, in consultation with the General Services Administration, include a detailed 5–year plan for all Federal land border port of entry projects with a yearly update of total projected future funding needs delineated by land port of entry.

### U.S. Immigration and Customs Enforcement

### SALARIES AND EXPENSES

For necessary expenses for enforcement of immigration and customs laws, detention and removals, and investigations; and purchase and lease of up to 3,790 (2,350 for replacement only) police-type vehicles; $5,342,134,000, of which not to exceed $7,500,000 shall be available until expended for conducting special operations under section 3131 of the Customs Enforcement Act of 1986 (19 U.S.C. 2081); of which not to exceed $15,000 shall be for official reception and representation expenses; of which not to exceed $1,000,000 shall be for awards of compensation to informants, to be accounted for solely under the certificate of the Secretary of Homeland Security; of which not less than $305,000 shall be for promotion of public awareness of the child pornography tipline

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

and anti-child exploitation activities; of which not less than $5,400,000 shall be used to facilitate agreements consistent with section 287(g) of the Immigration and Nationality Act (8 U.S.C. 1357(g)); and of which not to exceed $11,216,000 shall be available to fund or reimburse other Federal agencies for the costs associated with the care, maintenance, and repatriation of smuggled aliens unlawfully present in the United States: *Provided, That none of the funds made available under this heading shall be available to compensate any employee for overtime in an annual amount in excess of $35,000, except that the Secretary, or the designee of the Secretary, may waive that amount as necessary for national security purposes and in cases of immigration emergencies: Provided further*, That of the total amount provided, $15,770,000 shall **\*2149** be for activities in fiscal year 2010 to enforce laws against forced child labor, of which not to exceed $6,000,000 shall remain available until expended: *Provided further*, That of the total amount available, not less than $1,500,000,000 shall be available to identify aliens convicted of a crime who may be deportable, and to remove them from the United States once they are judged deportable, of which $200,000,000 shall remain available until September 30, 2011: *Provided further*, That the Secretary, or the designee of the Secretary, shall report to the Committees on Appropriations of the Senate and the House of Representatives, not later than 45 days after the end of each quarter of the fiscal year, on progress in implementing the preceding proviso and the funds obligated during that quarter to make that progress: *Provided further*, That the Secretary shall prioritize the identification and removal of aliens convicted of a crime by the severity of that crime: *Provided further*, That funding made available under this heading shall maintain a level of not less than 33,400 detention beds through September 30, 2010: *Provided further*, That of the total amount provided, not less than $2,545,180,000 is for detention and removal operations, including transportation of unaccompanied minor aliens: *Provided further*, That of the total amount provided, $7,300,000 shall remain available until September 30, 2011, for the Visa Security Program: *Provided further*, That none of the funds provided under this heading may be used to continue a delegation of law enforcement authority authorized under section 287(g) of the Immigration and Nationality Act (8 U.S.C. 1357(g)) if the Department of Homeland Security Inspector General determines that the terms of the agreement governing the delegation of authority have been violated: *Provided further*, That none of the funds provided under this heading may be used to continue any contract for the provision of detention services if the two most recent overall performance evaluations received by the contracted facility are less than "adequate" or the equivalent median score in any subsequent performance evaluation system: *Provided further*, That nothing under this heading shall prevent U.S. Immigration and Customs Enforcement from exercising those authorities provided under immigration laws (as defined in section 101(a)(17) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(17))) during priority operations pertaining to aliens convicted of a crime: *Provided further*, That none of the funds provided under this heading may be obligated to collocate field offices of U.S. Immigration and Customs Enforcement until the Secretary of Homeland Security submits to the Committees on Appropriations of the Senate and the House of Representatives a plan for the nationwide implementation of the Alternatives to Detention Program that identifies: (1) the funds required for nationwide program implementation; (2) the timeframe for achieving nationwide program implementation; and (3) an estimate of the number of individuals who could be enrolled in a nationwide program.

AUTOMATION MODERNIZATION

(INCLUDING TRANSFER OF FUNDS)

For expenses of immigration and customs enforcement automated systems, $90,000,000, to remain available until expended: *Provided*, That of the funds made available under this heading, **\*2150** $10,000,000 shall not be obligated until the Committees on Appropriations of the Senate and the House of Representatives receive an expenditure plan prepared by the Secretary of Homeland Security: *Provided further*, That of the total amount provided under this heading, up to $10,000,000 may be transferred to U.S. Immigration and Customs Enforce-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ment "Salaries and Expenses" account for data center migration.

## CONSTRUCTION

For necessary expenses to plan, construct, renovate, equip, and maintain buildings and facilities necessary for the administration and enforcement of the laws relating to customs and immigration, $4,818,000, to remain available until expended: *Provided*, That none of the funds made available in this Act may be used to solicit or consider any request to privatize facilities currently owned by the United States Government and used to detain aliens unlawfully present in the United States until the Committees on Appropriations of the Senate and the House of Representatives receive a plan for carrying out that privatization.

Transportation Security Administration

## AVIATION SECURITY

For necessary expenses of the Transportation Security Administration related to providing civil aviation security services pursuant to the Aviation and Transportation Security Act (Public Law 107–71; 115 Stat. 597; 49 U.S.C. 40101 note), $5,214,040,000, to remain available until September 30, 2011, of which not to exceed $10,000 shall be for official reception and representation expenses: *Provided*, That of the total amount made available under this heading, not to exceed $4,358,076,000 shall be for screening operations, of which $1,116,406,000 shall be available for explosives detection systems; and not to exceed $855,964,000 shall be for aviation security direction and enforcement: *Provided further*, That of the amount made available in the preceding proviso for explosives detection systems, $778,300,000 shall be available for the purchase and installation of these systems, of which not less than 28 percent shall be available for the purchase and installation of certified explosives detection systems at medium--and small-sized airports: *Provided further*, That any award to deploy explosives detection systems shall be based on risk, the airport's current reliance on other screening solutions, lobby congestion resulting in increased security concerns, high injury rates, airport readiness, and increased cost effectiveness: *Provided further*, That of the total amount provided, $1,250,000 shall be made available for Safe Skies Alliance to develop and enhance research and training capabilities for Transportation Security Officer improvised explosive recognition training: *Provided further*, That security service fees authorized under section 44940 of title 49, United States Code, shall be credited to this appropriation as offsetting collections and shall be available only for aviation security: *Provided further*, That the sum appropriated under this heading from the general fund shall be reduced on a dollar-for-dollar basis as such offsetting collections are received during fiscal year 2010, so as to result in a final fiscal year appropriation from the general fund estimated at not more than $3,114,040,000: *Provided further*, That any security service fees collected in excess **\*2151** of the amount made available under this heading shall become available during fiscal year 2011: *Provided further*, That Members of the United States House of Representatives and United States Senate, including the leadership; the heads of Federal agencies and commissions, including the Secretary, Deputy Secretary, Under Secretaries, and Assistant Secretaries of the Department of Homeland Security; the United States Attorney General and Assistant Attorneys General and the United States attorneys; and senior members of the Executive Office of the President, including the Director of the Office of Management and Budget; shall not be exempt from Federal passenger and baggage screening.

## SURFACE TRANSPORTATION SECURITY

For necessary expenses of the Transportation Security Administration related to providing surface transportation security activities, $110,516,000, to remain available until September 30, 2011.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

## TRANSPORTATION THREAT ASSESSMENT AND CREDENTIALING

For necessary expenses for the development and implementation of screening programs of the Office of Transportation Threat Assessment and Credentialing, $171,999,000, to remain available until September 30, 2011.

## TRANSPORTATION SECURITY SUPPORT

For necessary expenses of the Transportation Security Administration related to providing transportation security support and intelligence pursuant to the Aviation and Transportation Security Act (Public Law 107–71; 115 Stat. 597; 49 U.S.C. 40101 note), $1,001,780,000, to remain available until September 30, 2011: *Provided*, That of the funds appropriated under this heading, $20,000,000 may not be obligated for headquarters administration until the Secretary of Homeland Security submits to the Committees on Appropriations of the Senate and the House of Representatives detailed expenditure plans for air cargo security, and for checkpoint support and explosives detection systems refurbishment, procurement, and installations on an airport-by-airport basis for fiscal year 2010: *Provided further*, That these plans shall be submitted no later than 60 days after the date of enactment of this Act.

## FEDERAL AIR MARSHALS

For necessary expenses of the Federal Air Marshals, $860,111,000.

### Coast Guard

## OPERATING EXPENSES

For necessary expenses for the operation and maintenance of the Coast Guard, not otherwise provided for; purchase or lease of not to exceed 25 passenger motor vehicles, which shall be for replacement only; purchase or lease of small boats for contingent and emergent requirements (at a unit cost of no more than $700,000) and repairs and service-life replacements, not to exceed a total of $26,000,000; minor shore construction projects not **\*2152** exceeding $1,000,000 in total cost at any location; payments pursuant to section 156 of Public Law 97–377 (42 U.S.C. 402 note; 96 Stat. 1920); and recreation and welfare; $6,805,391,000, of which $581,503,000 shall be for defense-related activities, of which $241,503,000 is designated as being for overseas deployments and other activities pursuant to sections 401(c)(4) and 423(a)(1) of S. Con. Res. 13 (111th Congress), the concurrent resolution on the budget for fiscal year 2010; of which $24,500,000 shall be derived from the Oil Spill Liability Trust Fund to carry out the purposes of section 1012(a)(5) of the Oil Pollution Act of 1990 (33 U.S.C. 2712(a)(5)); of which not to exceed $20,000 shall be for official reception and representation expenses; and of which $3,600,000 shall be available until expended for the cost of repairing, rehabilitating, altering, modifying, and making improvements, including customized tenant improvements, to any replacement or expanded Operations Systems Center facility: *Provided*, That none of the funds made available by this or any other Act shall be available for administrative expenses in connection with shipping commissioners in the United States: *Provided further*, That none of the funds made available by this Act shall be for expenses incurred for recreational vessels under section 12114 of title 46, United States Code, except to the extent fees are collected from yacht owners and credited to this appropriation: *Provided further*, That the Coast Guard shall comply with the requirements of section 527 of Public Law 108–136 with respect to the Coast Guard Academy: *Provided further*, That of the funds provided under this heading, $50,000,000 shall be withheld from obligation for Headquarters Directorates until: (1) the fiscal year 2010 second quarter acquisition report required by Public Law 108–7 and the fiscal year 2008 joint explanatory statement accompanying Public Law 110–161; (2) the Revised Deepwater Implementa-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 1:14-cv-00254   Document 91-3   Filed on 01/14/15 in TXSD   Page 67 of 114

tion Plan; and (3) the future-years capital investment plan for fiscal years 2011–2015 are received by the Committees on Appropriations of the Senate and the House of Representatives: Provided further, That funds made available under this heading for overseas deployments and other activities pursuant to sections 401(c)(4) and 423(a)(1) of S. Con. Res. 13 (111th Congress), the concurrent resolution on the budget for fiscal year 2010, may be allocated by program, project, and activity, notwithstanding section 503 of this Act.

## ENVIRONMENTAL COMPLIANCE AND RESTORATION

For necessary expenses to carry out the environmental compliance and restoration functions of the Coast Guard under chapter 19 of title 14, United States Code, $13,198,000, to remain available until expended.

## RESERVE TRAINING

For necessary expenses of the Coast Guard Reserve, as authorized by law; operations and maintenance of the reserve program; personnel and training costs; and equipment and services; $133,632,000.

## ACQUISITION, CONSTRUCTION, AND IMPROVEMENTS

### << 14 USCA § 663 NOTE >>

For necessary expenses of acquisition, construction, renovation, and improvement of aids to navigation, shore facilities, vessels, **2153** and aircraft, including equipment related thereto; and maintenance, rehabilitation, lease and operation of facilities and equipment, as authorized by law; $1,537,080,000, of which $20,000,000 shall be derived from the Oil Spill Liability Trust Fund to carry out the purposes of section 1012(a)(5) of the Oil Pollution Act of 1990 (33 U.S.C. 2712(a)(5)); of which $121,000,000 shall be available until September 30, 2014, to acquire, repair, renovate, or improve vessels, small boats, and related equipment; of which $129,500,000 shall be available until September 30, 2012, for other equipment; of which $27,100,000 shall be available until September 30, 2012, for shore facilities and aids to navigation facilities, including not less than $300,000 for the Coast Guard Academy Pier and not less than $16,800,000 for Coast Guard Station Cleveland Harbor; of which $105,200,000 shall be available for personnel compensation and benefits and related costs; and of which $1,154,280,000 shall be available until September 30, 2014, for the Integrated Deepwater Systems program: Provided, That of the funds made available for the Integrated Deepwater Systems program, $269,000,000 is for aircraft and $730,680,000 is for surface ships: Provided further, That the Secretary of Homeland Security shall submit to the Committees on Appropriations of the Senate and the House of Representatives, in conjunction with the President's fiscal year 2011 budget, a review of the Revised Deepwater Implementation Plan that identifies any changes to the plan for the fiscal year; an annual performance comparison of Integrated Deepwater Systems program assets to pre-Deepwater legacy assets; a status report of such legacy assets; a detailed explanation of how the costs of such legacy assets are being accounted for within the Integrated Deepwater Systems program; and the earned value management system gold card data for each Integrated Deepwater Systems program asset: Provided further, That the Secretary shall submit to the Committees on Appropriations of the Senate and the House of Representatives, in conjunction with the fiscal year 2011 budget request, a comprehensive review of the Revised Deepwater Implementation Plan, and every 5 years thereafter, that includes a complete projection of the acquisition costs and schedule for the duration of the plan: Provided further, That the Secretary shall annually submit to the Committees on Appropriations of the Senate and the House of Representatives, at the time that the President's budget is submitted under section 1105(a) of title 31, United States Code, a future-years capital investment plan for the Coast Guard that identifies for each capital budget line item--

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 1:14-cv-00254   Document 91-3   Filed on 01/14/15 in TXSD   Page 68 of 114

(1) the proposed appropriation included in that budget;

(2) the total estimated cost of completion;

(3) projected funding levels for each fiscal year for the next 5 fiscal years or until project completion, whichever is earlier;

(4) an estimated completion date at the projected funding levels; and

(5) changes, if any, in the total estimated cost of completion or estimated completion date from previous future-years capital investment plans submitted to the Committees on Appropriations of the Senate and the House of Representatives:

*Provided further*, That the Secretary shall ensure that amounts specified in the future-years capital investment plan are consistent, to the maximum extent practicable, with proposed appropriations necessary to support the programs, projects, and activities of the **\*2154** Coast Guard in the President's budget as submitted under section 1105(a) of title 31, United States Code, for that fiscal year: *Provided further*, That any inconsistencies between the capital investment plan and proposed appropriations shall be identified and justified: *Provided further*, That subsections (a) and (b) of section 6402 of the U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act, 2007 (Public Law 110–28) shall apply to fiscal year 2010.

## ALTERATION OF BRIDGES

For necessary expenses for alteration or removal of obstructive bridges, as authorized by section 6 of the Truman–Hobbs Act (33 U.S.C. 516), $4,000,000, to remain available until expended: *Provided*, That of the amounts made available under this heading, $4,000,000 shall be for the Fort Madison Bridge in Fort Madison, Iowa.

## RESEARCH, DEVELOPMENT, TEST, AND EVALUATION

For necessary expenses for applied scientific research, development, test, and evaluation; and for maintenance, rehabilitation, lease, and operation of facilities and equipment; as authorized by law; $24,745,000, to remain available until expended, of which $500,000 shall be derived from the Oil Spill Liability Trust Fund to carry out the purposes of section 1012(a)(5) of the Oil Pollution Act of 1990 (33 U.S.C. 2712(a)(5)): *Provided*, That there may be credited to and used for the purposes of this appropriation funds received from State and local governments, other public authorities, private sources, and foreign countries for expenses incurred for research, development, testing, and evaluation.

## RETIRED PAY

For retired pay, including the payment of obligations otherwise chargeable to lapsed appropriations for this purpose, payments under the Retired Serviceman's Family Protection and Survivor Benefits Plans, payment for career status bonuses, concurrent receipts and combat-related special compensation under the National Defense Authorization Act, and payments for medical care of retired personnel and their dependents under chapter 55 of title 10, United States Code, $1,361,245,000, to remain available until expended.

United States Secret Service

## SALARIES AND EXPENSES

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 1:14-cv-00254   Document 91-3   Filed on 01/14/15 in TXSD   Page 69 of 114

For necessary expenses of the United States Secret Service, including: purchase of not to exceed 652 vehicles for police-type use for replacement only; hire of passenger motor vehicles; purchase of motorcycles made in the United States; hire of aircraft; services of expert witnesses at such rates as may be determined by the Director of the Secret Service; rental of buildings in the District of Columbia, and fencing, lighting, guard booths, and other facilities on private or other property not in Government ownership or control, as may be necessary to perform protective functions; payment **2155** of per diem or subsistence allowances to employees where a protective assignment during the actual day or days of the visit of a protectee requires an employee to work 16 hours per day or to remain overnight at a post of duty; conduct of and participation in firearms matches; presentation of awards; travel of United States Secret Service employees on protective missions without regard to the limitations on such expenditures in this or any other Act if approval is obtained in advance from the Committees on Appropriations of the Senate and the House of Representatives; research and development; grants to conduct behavioral research in support of protective research and operations; and payment in advance for commercial accommodations as may be necessary to perform protective functions; $1,478,669,000, of which not to exceed $25,000 shall be for official reception and representation expenses; of which not to exceed $100,000 shall be to provide technical assistance and equipment to foreign law enforcement organizations in counterfeit investigations; of which $2,366,000 shall be for forensic and related support of investigations of missing and exploited children; and of which $6,000,000 shall be for a grant for activities related to the investigations of missing and exploited children and shall remain available until expended: *Provided*, That up to $18,000,000 for protective travel shall remain available until September 30, 2011: *Provided further*, That up to $1,000,000 for National Special Security Events shall remain available until expended: *Provided further*, That the United States Secret Service is authorized to obligate funds in anticipation of reimbursements from Federal agencies and entities, as defined in section 105 of title 5, United States Code, receiving training sponsored by the James J. Rowley Training Center, except that total obligations at the end of the fiscal year shall not exceed total budgetary resources available under this heading at the end of the fiscal year: *Provided further*, That none of the funds made available under this heading shall be available to compensate any employee for overtime in an annual amount in excess of $35,000, except that the Secretary of Homeland Security, or the designee of the Secretary, may waive that amount as necessary for national security purposes: *Provided further*, That none of the funds made available to the United States Secret Service by this Act or by previous appropriations Acts may be made available for the protection of the head of a Federal agency other than the Secretary of Homeland Security: *Provided further*, That the Director of the United States Secret Service may enter into an agreement to perform such service on a fully reimbursable basis: *Provided further*, That of the total amount made available under this heading, $33,960,000, to remain available until expended, is for information technology modernization: *Provided further*, That none of the funds made available in the preceding proviso shall be obligated to purchase or install information technology equipment until the Chief Information Officer of the Department of Homeland Security submits a report to the Committees on Appropriations of the Senate and the House of Representatives certifying that all plans for such modernization are consistent with Department of Homeland Security data center migration and enterprise architecture requirements: *Provided further*, That none of the funds made available to the United States Secret Service by this Act or by previous appropriations Acts may be obligated for the purpose of opening a new permanent domestic or overseas office or location unless the Committees on Appropriations of the **2156** Senate and the House of Representatives are notified 15 days in advance of such obligation.

ACQUISITION, CONSTRUCTION, IMPROVEMENTS, AND RELATED EXPENSES

For necessary expenses for acquisition, construction, repair, alteration, and improvement of facilities, $3,975,000, to remain available until expended.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

TITLE III

PROTECTION, PREPAREDNESS, RESPONSE, AND RECOVERY

National Protection and Programs Directorate

MANAGEMENT AND ADMINISTRATION

For salaries and expenses of the Office of the Under Secretary for the National Protection and Programs Direct-orate, support for operations, information technology, and the Office of Risk Management and Analysis, $44,577,000: *Provided*, That not to exceed $5,000 shall be for official reception and representation expenses.

INFRASTRUCTURE PROTECTION AND INFORMATION SECURITY

For necessary expenses for infrastructure protection and information security programs and activities, as author-ized by title II of the Homeland Security Act of 2002 (6 U.S.C. 121 et seq.), $899,416,000, of which $760,155,000 shall remain available until September 30, 2011: *Provided*, That of the amount made available un-der this heading, $161,815,000 may not be obligated for the National Cyber Security Division program and $12,500,000 may not be obligated for the Next Generation Networks program until the Committees on Appro-priations of the Senate and the House of Representatives receive and approve a plan for expenditure for each of these programs that describes the strategic context of the program, the specific goals and milestones set for the program, and the funds allocated to achieving each of those goals and milestones: *Provided further*, That of the total amount provided, no less than: $20,000,000 is for the National Infrastructure Simulation and Analysis Cen-ter; $1,000,000 is for Philadelphia infrastructure monitoring; $3,500,000 is for State and local cyber security training; $3,000,000 is for the Power and Cyber Systems Protection, Analysis, and Testing Program at the Idaho National Laboratory; $3,500,000 is for the Cyber Security Test Bed and Evaluation Center; $3,000,000 is for the Multi–State Information Sharing and Analysis Center; $500,000 is for the Virginia Operational Integration Cy-ber Center of Excellence; $100,000 is for the Upstate New York Cyber Initiative; and $1,000,000 is for interop-erable communications, technical assistance, and outreach programs.

FEDERAL PROTECTIVE SERVICE

The revenues and collections of security fees credited to this account shall be available until expended for neces-sary expenses related to the protection of federally-owned and leased buildings and for the operations of the Federal Protective Service: *Provided*, **\*2157** That the Secretary of Homeland Security and the Director of the Office of Management and Budget shall certify in writing to the Committees on Appropriations of the Senate and the House of Representatives no later than December 31, 2009, that the operations of the Federal Protective Service will be fully funded in fiscal year 2010 through revenues and collection of security fees, and shall adjust the fees to ensure fee collections are sufficient to ensure that the Federal Protective Service maintains not fewer than 1,200 full-time equivalent staff and 900 full-time equivalent Police Officers, Inspectors, Area Commanders, and Special Agents who, while working, are directly engaged on a daily basis protecting and enforcing laws at Federal buildings (referred to as "in-service field staff").

UNITED STATES VISITOR AND IMMIGRANT STATUS INDICATOR TECHNOLOGY

For necessary expenses for the development of the United States Visitor and Immigrant Status Indicator Techno-logy project, as authorized by section 110 of the Illegal Immigration Reform and Immigrant Responsibility Act

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

of 1996 (8 U.S.C. 1365a), $373,762,000, to remain available until expended: *Provided*, That of the total amount made available under this heading, $75,000,000 may not be obligated for the United States Visitor and Immigrant Status Indicator Technology project until the Committees on Appropriations of the Senate and the House of Representatives receive a plan for expenditure, prepared by the Secretary of Homeland Security, not later than 90 days after the date of enactment of this Act that meets the statutory conditions specified under this heading in Public Law 110–329: *Provided further*, That not less than $28,000,000 of unobligated balances of prior year appropriations shall remain available and be obligated solely for implementation of a biometric air exit capability.

Office of Health Affairs

For necessary expenses of the Office of Health Affairs, $139,250,000, of which $30,411,000 is for salaries and expenses: *Provided*, That $108,839,000 shall remain available until September 30, 2011, for biosurveillance, BioWatch, medical readiness planning, chemical response, and other activities, including $5,000,000 for the North Carolina Collaboratory for Bio–Preparedness, University of North Carolina, Chapel Hill: *Provided further*, That not to exceed $3,000 shall be for official reception and representation expenses.

Federal Emergency Management Agency

MANAGEMENT AND ADMINISTRATION

For necessary expenses for management and administration of the Federal Emergency Management Agency, $797,650,000, including activities authorized by the National Flood Insurance Act of 1968 (42 U.S.C. 4001 et seq.), the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.), the Cerro Grande Fire Assistance Act of 2000 (division C, title I, 114 Stat. 583), the Earthquake Hazards Reduction Act of 1977 (42 U.S.C. 7701 et seq.), the Defense Production Act of 1950 (50 U.S.C. App. 2061 et seq.), sections 107 and 303 of the National **\*2158** Security Act of 1947 (50 U.S.C. 404, 405), Reorganization Plan No. 3 of 1978 (5 U.S.C. App.), the Homeland Security Act of 2002 (6 U.S.C. 101 et seq.), and the Post–Katrina Emergency Management Reform Act of 2006 (Public Law 109–295; 120 Stat. 1394): *Provided*, That not to exceed $3,000 shall be for official reception and representation expenses: *Provided further*, That the President's budget submitted under section 1105(a) of title 31, United States Code, shall be detailed by office for the Federal Emergency Management Agency: *Provided further*, That of the total amount made available under this heading, not to exceed $36,300,000 shall remain available until September 30, 2011, for capital improvements at the Mount Weather Emergency Operations Center: *Provided further*, That of the total amount made available under this heading, $32,500,000 shall be for the Urban Search and Rescue Response System, of which not to exceed $1,600,000 may be made available for administrative costs; and $6,995,000 shall be for the Office of National Capital Region Coordination: *Provided further*, That for purposes of planning, coordination, execution, and decision-making related to mass evacuation during a disaster, the Governors of the State of West Virginia and the Commonwealth of Pennsylvania, or their designees, shall be incorporated into efforts to integrate the activities of Federal, State, and local governments in the National Capital Region, as defined in section 882 of Public Law 107–296, the Homeland Security Act of 2002.

STATE AND LOCAL PROGRAMS

(INCLUDING TRANSFER OF FUNDS)

For grants, contracts, cooperative agreements, and other activities, $3,015,200,000 shall be allocated as follows:

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(1) $950,000,000 shall be for the State Homeland Security Grant Program under section 2004 of the Homeland Security Act of 2002 (6 U.S.C. 605): *Provided*, That of the amount provided by this paragraph, $60,000,000 shall be for Operation Stonegarden: *Provided further*, That notwithstanding subsection (c)(4) of such section 2004, for fiscal year 2010, the Commonwealth of Puerto Rico shall make available to local and tribal governments amounts provided to the Commonwealth of Puerto Rico under this paragraph in accordance with subsection (c)(1) of such section 2004.

(2) $887,000,000 shall be for the Urban Area Security Initiative under section 2003 of the Homeland Security Act of 2002 (6 U.S.C. 604), of which, notwithstanding subsection (c)(1) of such section, $19,000,000 shall be for grants to organizations (as described under section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax section 501(a) of such code) determined by the Secretary of Homeland Security to be at high risk of a terrorist attack.

(3) $35,000,000 shall be for Regional Catastrophic Preparedness Grants.

(4) $41,000,000 shall be for the Metropolitan Medical Response System under section 635 of the Post–Katrina Emergency Management Reform Act of 2006 (6 U.S.C. 723).

(5) $13,000,000 shall be for the Citizen Corps Program.

(6) $300,000,000 shall be for Public Transportation Security Assistance and Railroad Security Assistance, under sections **\*2159** 1406 and 1513 of the Implementing Recommendations of the 9/11 Commission Act of 2007 (Public Law 110–53; 6 U.S.C. 1135 and 1163), of which not less than $20,000,000 shall be for Amtrak security: *Provided*, That such public transportation security assistance shall be provided directly to public transportation agencies.

(7) $300,000,000 shall be for Port Security Grants in accordance with 46 U.S.C. 70107, notwithstanding 46 U.S.C. 70107(c).

(8) $12,000,000 shall be for Over-the-Road Bus Security Assistance under section 1532 of the Implementing Recommendations of the 9/11 Commission Act of 2007 (Public Law 110–53; 6 U.S.C. 1182).

(9) $50,000,000 shall be for Buffer Zone Protection Program Grants.

(10) $50,000,000 shall be for the Driver's License Security Grants Program in accordance with section 204 of the REAL ID Act of 2005 (49 U.S.C. 30301 note).

(11) $50,000,000 shall be for the Interoperable Emergency Communications Grant Program under section 1809 of the Homeland Security Act of 2002 (6 U.S.C. 579).

(12) $60,000,000 shall be for grants for Emergency Operations Centers under section 614 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5196c) to remain available until expended, of which no less than the amount specified for each Emergency Operations Center shall be provided as follows: $500,000, Benton County Emergency Management Commission, Iowa; $100,000, Brazoria County Emergency Management, Texas; $800,000, Butte–Silver Bow, Montana; $338,000, Calvert County Department of Public Safety, Maryland; $425,000, City of Alamosa Fire Department, Colorado; $600,000, City of Ames, Iowa; $250,000, City of Boerne, Texas; $500,000, City of Brawley, California; $300,000, City of Brigantine, New Jersey; $350,000, City of Brookings, Oregon; $1,000,000, City of Chicago, Illinois; $1,000,000, City of Com-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

merce, California; $300,000, City of Cupertino, California; $1,000,000, City of Detroit, Michigan; $750,000, City of Elk Grove, California; $400,000, City of Green Cove Springs, Florida; $600,000, City of Greenville, North Carolina; $300,000, City of Hackensack, New Jersey; $800,000, City of Hartford, Connecticut; $250,000, City of Hopewell, Virginia; $254,500, City of La Habra, California; $600,000, City of Las Vegas, Nevada; $750,000, City of Lauderdale Lakes, Florida; $750,000, City of Minneapolis, Minnesota; $375,000, City of Monterey Park, California; $400,000, City of Moreno Valley, California; $1,000,000, City of Mount Vernon, New York; $1,000,000, City of Newark, New Jersey; $900,000, City of North Little Rock, Arkansas; $350,000, City of Palm Coast, Florida; $750,000, City of Port Gibson, Mississippi; $500,000, City of Scottsdale, Arizona; $750,000, City of Sunrise, Florida; $500,000, City of Tavares, Florida; $400,000, City of Torrington, Connecticut; $900,000, City of Whitefish, Montana; $500,000, City of Whittier, California; $500,000, City of Wichita, Kansas; $500,000, Columbia County, Oregon; $500,000, County of Union, New Jersey; $400,000, Dorchester County, South Carolina; $200,000, Fulton County (Atlanta) Emergency Management Agency, Georgia; $250,000, Howell County Emergency Preparedness, Missouri; $500,000, Jackson County Sheriff's Office, Missouri; **2160** $750,000, Johnson County, Texas; $500,000, Kentucky Emergency Management, Kentucky; $800,000, Lake County, Florida; $600,000, Lea County, New Mexico; $1,000,000, Lincoln County, Washington; $250,000, Lycoming County, Pennsylvania; $250,000, Macomb County Emergency Management and Communications, Michigan; $300,000, Mercer County Emergency Management Agency, Kentucky; $1,000,000, Middle Rio Grande Development Council, Texas; $250,000, Minooka Fire Protection District, Illinois; $800,000, Mobile County Commission, Alabama; $200,000, Monroe County, Florida; $1,000,000, Morris County, New Jersey Office of Emergency Management, New Jersey; $750,000, New Orleans Emergency Medical Services, Louisiana; $1,000,000, North Carolina Office of Emergency Management, North Carolina; $500,000, North Hudson Regional Fire and Rescue, New Jersey; $980,000, North Louisiana Regional, Lincoln Parish, Louisiana; $1,500,000, Ohio Emergency Management Agency, Columbus, Ohio; $250,000, Passaic County Prosecutor's Office, New Jersey; $980,000, City of Providence, Rhode Island; $800,000, San Francisco Department of Emergency Management, California; $300,000, Sarasota County, Florida; $650,000, Scotland County, North Carolina; $500,000, Somerset County, Maine; $1,500,000, State of Maryland, Maryland; $158,000, City of Maitland, Florida; $500,000, Tohono O'odham Nation; $75,000, Towamencin Township, Pennsylvania; $275,000, Town of Harrison, New York; $500,000, Town of Shorter, Alabama; $750,000, Township of Irvington, New Jersey; $500,000, Township of Old Bridge, New Jersey; $247,000, Township of South Orange Village, South Orange, New Jersey; $500,000, Upper Darby Township Police Department, Pennsylvania; $165,000, Village of Elmsford, New York; $350,000, Washington Parish Government, Louisiana; $900,000, Westmoreland County Department of Public Safety, Pennsylvania; $1,000,000, Williamsburg County, South Carolina; and $20,000, Winston County Commission, Alabama.

(13) $267,200,000 shall be for training, exercises, technical assistance, and other programs, of which--

(A) $164,500,000 shall be for the National Domestic Preparedness Consortium in accordance with section 1204 of the Implementing Recommendations of the 9/11 Commission Act of 2007 (6 U.S.C. 1102), of which $62,500,000 shall be for the Center for Domestic Preparedness; $23,000,000 shall be for the National Energetic Materials Research and Testing Center, New Mexico Institute of Mining and Technology; $23,000,000 shall be for the National Center for Biomedical Research and Training, Louisiana State University; $23,000,000 shall be for the National Emergency Response and Rescue Training Center, Texas A&M University; $23,000,000 shall be for the National Exercise, Test, and Training Center, Nevada Test Site; $5,000,000 shall be for the Natural Disaster Preparedness Training Center, University of Hawaii, Honolulu, Hawaii; $5,000,000 shall be for surface transportation emergency preparedness and response training to be awarded under full and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

open competition;

(B) $1,700,000 shall be for the Center for Counterterrorism and Cyber Crime, Norwich University, Northfield, Vermont; and

**\*2161**

(C) $3,000,000 shall be for the Rural Domestic Preparedness Consortium, Eastern Kentucky University:

*Provided*, That 4 percent of the amounts provided under this heading shall be transferred to the Federal Emergency Management Agency "Management and Administration" account for program administration, and an expenditure plan for program administration shall be provided to the Committees on Appropriations of the Senate and the House of Representatives within 60 days after the date of enactment of this Act: *Provided further*, That notwithstanding section 2008(a)(11) of the Homeland Security Act of 2002 (6 U.S.C. 609(a)(11)), or any other provision of law, a grantee may use not more than 5 percent of the amount of a grant made available under this heading for expenses directly related to administration of the grant: *Provided further*, That for grants under paragraphs (1) through (5), the applications for grants shall be made available to eligible applicants not later than 25 days after the date of enactment of this Act, that eligible applicants shall submit applications not later than 90 days after the grant announcement, and that the Administrator of the Federal Emergency Management Agency shall act within 90 days after receipt of an application: *Provided further*, That for grants under paragraphs (6) through (11), the applications for grants shall be made available to eligible applicants not later than 30 days after the date of enactment of this Act, that eligible applicants shall submit applications within 45 days after the grant announcement, and that the Federal Emergency Management Agency shall act not later than 60 days after receipt of an application: *Provided further*, That for grants under paragraphs (1) and (2), the installation of communications towers is not considered construction of a building or other physical facility: *Provided further*, That grantees shall provide reports on their use of funds, as determined necessary by the Secretary: *Provided further*, That (a) the Center for Domestic Preparedness may provide training to emergency response providers from the Federal Government, foreign governments, or private entities, if the Center for Domestic Preparedness is reimbursed for the cost of such training, and any reimbursement under this subsection shall be credited to the account from which the expenditure being reimbursed was made and shall be available, without fiscal year limitation, for the purposes for which amounts in the account may be expended, and (b) the head of the Center for Domestic Preparedness shall ensure that any training provided under (a) does not interfere with the primary mission of the Center to train State and local emergency response providers.

FIREFIGHTER ASSISTANCE GRANTS

For necessary expenses for programs authorized by the Federal Fire Prevention and Control Act of 1974 (15 U.S.C. 2201 et seq.), $810,000,000, of which $390,000,000 shall be available to carry out section 33 of that Act (15 U.S.C. 2229) and $420,000,000 shall be available to carry out section 34 of that Act (15 U.S.C. 2229a), to remain available until September 30, 2011: *Provided*, That not to exceed 5 percent of the amount available under this heading shall be available for program administration, and an expenditure plan for program administration shall be provided to the Committees on Appropriations of the Senate and the House of Representatives within 60 days of the date of enactment of this Act.

**\*2162**

EMERGENCY MANAGEMENT PERFORMANCE GRANTS

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

For necessary expenses for emergency management performance grants, as authorized by the National Flood Insurance Act of 1968 (42 U.S.C. 4001 et seq.), the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.), the Earthquake Hazards Reduction Act of 1977 (42 U.S.C. 7701 et seq.), and Reorganization Plan No. 3 of 1978 (5 U.S.C. App.), $340,000,000: *Provided*, That total administrative costs shall not exceed 3 percent of the total amount appropriated under this heading, and an expenditure plan for program administration shall be provided to the Committees on Appropriations of the Senate and the House of Representatives within 60 days of the date of enactment of this Act.

## RADIOLOGICAL EMERGENCY PREPAREDNESS PROGRAM

The aggregate charges assessed during fiscal year 2010, as authorized in title III of the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1999 (42 U.S.C. 5196e), shall not be less than 100 percent of the amounts anticipated by the Department of Homeland Security necessary for its radiological emergency preparedness program for the next fiscal year: *Provided*, That the methodology for assessment and collection of fees shall be fair and equitable and shall reflect costs of providing such services, including administrative costs of collecting such fees: *Provided further*, That fees received under this heading shall be deposited in this account as offsetting collections and will become available for authorized purposes on October 1, 2010, and remain available until expended.

## UNITED STATES FIRE ADMINISTRATION

For necessary expenses of the United States Fire Administration and for other purposes, as authorized by the Federal Fire Prevention and Control Act of 1974 (15 U.S.C. 2201 et seq.) and the Homeland Security Act of 2002 (6 U.S.C. 101 et seq.), $45,588,000.

## DISASTER RELIEF

## (INCLUDING TRANSFERS OF FUNDS)

For necessary expenses in carrying out the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.), $1,600,000,000, to remain available until expended: *Provided*, That the Federal Emergency Management Agency shall submit an expenditure plan to the Committees on Appropriations of the Senate and the House of Representatives detailing the use of the funds for disaster readiness and support within 60 days after the date of enactment of this Act: *Provided further*, That the Federal Emergency Management Agency shall submit to such Committees a quarterly report detailing obligations against the expenditure plan and a justification for any changes in spending: *Provided further*, That of the total amount provided, $16,000,000 shall be transferred to the Department of Homeland Security Office of Inspector General for audits and investigations related to disasters, subject to section 503 of this Act: *Provided further*, That **\*2163** $105,600,000 shall be transferred to Federal Emergency Management Agency "Management and Administration" for management and administration functions: *Provided further*, That the amount provided in the previous proviso shall not be available for transfer to "Management and Administration" until the Federal Emergency Management Agency submits an expenditure plan to the Committees on Appropriations of the Senate and the House of Representatives: *Provided further*, That the Federal Emergency Management Agency shall submit the monthly "Disaster Relief" report, as specified in Public Law 110–161, to the Committees on Appropriations of the Senate and the House of Representatives, and include the amounts provided to each Federal agency for mission assignments: *Provided further*, That for any request for reimbursement from a Federal agency to the Department of Homeland Security to cover expenditures under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 1:14-cv-00254   Document 91-3   Filed on 01/14/15 in TXSD   Page 76 of 114

seq.), or any mission assignment orders issued by the Department for such purposes, the Secretary of Homeland Security shall take appropriate steps to ensure that each agency is periodically reminded of Department policies on--

(1) the detailed information required in supporting documentation for reimbursements; and

(2) the necessity for timeliness of agency billings.

### DISASTER ASSISTANCE DIRECT LOAN PROGRAM ACCOUNT

For activities under section 319 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5162), $295,000 is for the cost of direct loans: *Provided*, That gross obligations for the principal amount of direct loans shall not exceed $25,000,000: *Provided further*, That the cost of modifying such loans shall be as defined in section 502 of the Congressional Budget Act of 1974 (2 U.S.C. 661a).

### FLOOD MAP MODERNIZATION FUND

For necessary expenses under section 1360 of the National Flood Insurance Act of 1968 (42 U.S.C. 4101), $220,000,000, and such additional sums as may be provided by State and local governments or other political subdivisions for cost-shared mapping activities under section 1360(f)(2) of such Act (42 U.S.C. 4101(f)(2)), to remain available until expended: *Provided*, That total administrative costs shall not exceed 3 percent of the total amount appropriated under this heading.

### NATIONAL FLOOD INSURANCE FUND

For activities under the National Flood Insurance Act of 1968 (42 U.S.C. 4001 et seq.) and the Flood Disaster Protection Act of 1973 (42 U.S.C. 4001 et seq.), $146,000,000, which shall be derived from offsetting collections assessed and collected under section 1308(d) of the National Flood Insurance Act of 1968 (42 U.S.C. 4015(d)), which is available as follows: (1) not to exceed $38,680,000 for salaries and expenses associated with flood mitigation and flood insurance operations; and (2) no less than $107,320,000 for flood plain management and flood mapping, which shall remain available until September 30, 2011: *Provided*, That any additional fees collected pursuant to section 1308(d) of the **\*2164** National Flood Insurance Act of 1968 (42 U.S.C. 4015(d)) shall be credited as an offsetting collection to this account, to be available for flood plain management and flood mapping: *Provided further*, That in fiscal year 2010, no funds shall be available from the National Flood Insurance Fund under section 1310 of that Act (42 U.S.C. 4017) in excess of: (1) $85,000,000 for operating expenses; (2) $969,370,000 for commissions and taxes of agents; (3) such sums as are necessary for interest on Treasury borrowings; and (4) $120,000,000, which shall remain available until expended for flood mitigation actions, of which $70,000,000 is for severe repetitive loss properties under section 1361A of the National Flood Insurance Act of 1968 (42 U.S.C. 4102a), of which $10,000,000 is for repetitive insurance claims properties under section 1323 of the National Flood Insurance Act of 1968 (42 U.S.C. 4030), and of which $40,000,000 is for flood mitigation assistance under section 1366 of the National Flood Insurance Act of 1968 (42 U.S.C. 4104c) notwithstanding subparagraphs (B) and (C) of subsection (b)(3) and subsection (f) of section 1366 of the National Flood Insurance Act of 1968 (42 U.S.C. 4104c) and notwithstanding subsection (a)(7) of section 1310 of the National Flood Insurance Act of 1968 (42 U.S.C. 4017): *Provided further*, That amounts collected under section 102 of the Flood Disaster Protection Act of 1973 and section 1366(i) of the National Flood Insurance Act of 1968 shall be deposited in the National Flood Insurance Fund to supplement other amounts specified as available for section 1366 of the National Flood Insurance Act of 1968, notwithstanding 42 U.S.C. 4012a(f)(8), 4104c(i), and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

4104d(b)(2)–(3): *Provided further*, That total administrative costs shall not exceed 4 percent of the total appropriation.

## NATIONAL PREDISASTER MITIGATION FUND

For the predisaster mitigation grant program under section 203 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5133), $100,000,000, to remain available until expended and to be obligated as detailed in the joint explanatory statement accompanying this Act: *Provided*, That the total administrative costs associated with such grants shall not exceed 3 percent of the total amount made available under this heading.

## EMERGENCY FOOD AND SHELTER

To carry out the emergency food and shelter program pursuant to title III of the McKinney–Vento Homeless Assistance Act (42 U.S.C. 11331 et seq.), $200,000,000, to remain available until expended: *Provided*, That total administrative costs shall not exceed 3.5 percent of the total amount made available under this heading.

## TITLE IV

## RESEARCH AND DEVELOPMENT, TRAINING, AND SERVICES

### United States Citizenship and Immigration Services

For necessary expenses for citizenship and immigration services, $224,000,000, of which $50,000,000 is for processing applications for asylum or refugee status; of which $5,000,000 is for the processing of military naturalization applications; and of which $137,000,000 is for the basic pilot program (E–Verify Program), **\*2165** as authorized by section 402 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1324a note), to assist United States employers with maintaining a legal workforce: *Provided*, That the amounts made available for the basic pilot program (E–Verify Program), $30,000,000 shall remain available until September 30, 2011: *Provided further*, That notwithstanding any other provision of law, funds available to United States Citizenship and Immigration Services may be used to acquire, operate, equip, and dispose of up to five vehicles, for replacement only, for areas where the Administrator of General Services does not provide vehicles for lease: *Provided further*, That the Director of United States Citizenship and Immigration Services may authorize employees who are assigned to those areas to use such vehicles to travel between the employees' residences and places of employment: *Provided further*, That none of the funds made available under this heading may be obligated for processing applications for asylum or refugee status unless the Secretary of Homeland Security has published a final rule updating part 103 of title 8, Code of Federal Regulations, to discontinue the asylum/refugee surcharge: *Provided further*, That none of the funds made available under this heading may be obligated for development of the "REAL ID hub" until the Committees on Appropriations of the Senate and the House of Representatives receive a plan for expenditure for that program that describes the strategic context of the program, the specific goals and milestones set for the program, and the funds allocated for achieving each of these goals and milestones: *Provided further*, That none of the funds made available in this Act for grants for immigrant integration may be used to provide services to aliens who have not been lawfully admitted for permanent residence.

### Federal Law Enforcement Training Center

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

## SALARIES AND EXPENSES

<< 42 USCA § 3771 NOTE >>

For necessary expenses of the Federal Law Enforcement Training Center, including materials and support costs of Federal law enforcement basic training; the purchase of not to exceed 117 vehicles for police-type use and hire of passenger motor vehicles; expenses for student athletic and related activities; the conduct of and participation in firearms matches and presentation of awards; public awareness and enhancement of community support of law enforcement training; room and board for student interns; a flat monthly reimbursement to employees authorized to use personal mobile phones for official duties; and services as authorized by section 3109 of title 5, United States Code; $239,356,000, of which up to $47,751,000 shall remain available until September 30, 2011, for materials and support costs of Federal law enforcement basic training; of which $300,000 shall remain available until expended for Federal law enforcement agencies participating in training accreditation, to be distributed as determined by the Federal Law Enforcement Training Center for the needs of participating agencies; and of which not to exceed $12,000 shall be for official reception and representation expenses: *Provided*, That the Center is authorized to obligate funds in anticipation of reimbursements from agencies receiving training sponsored by the Center, except that total obligations at the end of the fiscal year shall not exceed **\*2166** total budgetary resources available at the end of the fiscal year: *Provided further*, That section 1202(a) of Public Law 107–206 (42 U.S.C. 3771 note), as amended by Public Law 110–329 (122 Stat. 3677), is further amended by striking "December 31, 2011" and inserting "December 31, 2012": *Provided further*, That the Federal Law Enforcement Training Accreditation Board, including representatives from the Federal law enforcement community and non-Federal accreditation experts involved in law enforcement training, shall lead the Federal law enforcement training accreditation process to continue the implementation of measuring and assessing the quality and effectiveness of Federal law enforcement training programs, facilities, and instructors: *Provided further*, That the Director of the Federal Law Enforcement Training Center shall schedule basic or advanced law enforcement training, or both, at all four training facilities under the control of the Federal Law Enforcement Training Center to ensure that such training facilities are operated at the highest capacity throughout the fiscal year.

## ACQUISITIONS, CONSTRUCTION, IMPROVEMENTS, AND RELATED EXPENSES

For acquisition of necessary additional real property and facilities, construction, and ongoing maintenance, facility improvements, and related expenses of the Federal Law Enforcement Training Center, $43,456,000, to remain available until expended: *Provided*, That the Center is authorized to accept reimbursement to this appropriation from government agencies requesting the construction of special use facilities.

Science and Technology

## MANAGEMENT AND ADMINISTRATION

For salaries and expenses of the Office of the Under Secretary for Science and Technology and for management and administration of programs and activities, as authorized by title III of the Homeland Security Act of 2002 (6 U.S.C. 181 et seq.), $143,200,000: *Provided*, That not to exceed $10,000 shall be for official reception and representation expenses.

## RESEARCH, DEVELOPMENT, ACQUISITION, AND OPERATIONS

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

For necessary expenses for science and technology research, including advanced research projects; development; test and evaluation; acquisition; and operations; as authorized by title III of the Homeland Security Act of 2002 (6 U.S.C. 181 et seq.); $863,271,000, of which $713,083,000, to remain available until September 30, 2012; and of which $150,188,000, to remain available until September 30, 2014, solely for Laboratory Facilities: *Provided*, That not less than $20,865,000 shall be available for the Southeast Region Research Initiative at the Oak Ridge National Laboratory: *Provided further*, That not less than $3,000,000 shall be available for Distributed Environment for Critical Infrastructure Decisionmaking Exercises: Provided further, That not less than $12,000,000 shall be for construction expenses of the Pacific Northwest National Laboratory: *Provided further*, That not less than $2,000,000 shall be for the Cincinnati Urban Area partnership established through the Regional Technology Integration Initiative: *Provided further*, **\*2167** That not less than $10,000,000 shall be available for the National Institute for Hometown Security, Kentucky: *Provided further*, That not less than $2,000,000 shall be available for the Naval Postgraduate School: *Provided further*, That not less than $1,000,000 shall be available to continue a homeland security research, development, and manufacturing pilot project: *Provided further*, That not less than $500,000 shall be available for a demonstration project to develop situational awareness and decision support capabilities through remote sensing technologies: *Provided further*, That not less than $4,000,000 shall be available for a pilot program to develop a replicable port security system that would improve maritime domain awareness: *Provided further*, That $32,000,000 shall be for the National Bio--and Agro-defense Facility, of which up to $2,000,000 may be obligated for the National Academy of Sciences to complete the Letter Report required in section 560(b) of this Act.

Domestic Nuclear Detection Office

## MANAGEMENT AND ADMINISTRATION

For salaries and expenses of the Domestic Nuclear Detection Office as authorized by title XIX of the Homeland Security Act of 2002 (6 U.S.C. 591 et seq.) as amended, for management and administration of programs and activities, $38,500,000: *Provided*, That not to exceed $3,000 shall be for official reception and representation expenses.

## RESEARCH, DEVELOPMENT, AND OPERATIONS

For necessary expenses for radiological and nuclear research, development, testing, evaluation, and operations, $324,537,000, to remain available until September 30, 2012.

## SYSTEMS ACQUISITION

For expenses for the Domestic Nuclear Detection Office acquisition and deployment of radiological detection systems in accordance with the global nuclear detection architecture, $20,000,000, to remain available until September 30, 2012: *Provided*, That none of the funds appropriated under this heading in this Act or any other Act shall be obligated for full-scale procurement of Advanced Spectroscopic Portal monitors until the Secretary of Homeland Security submits to the Committees on Appropriations of the Senate and the House of Representatives a report certifying that a significant increase in operational effectiveness will be achieved by such obligation: *Provided further*, That the Secretary shall submit separate and distinct certifications prior to the procurement of Advanced Spectroscopic Portal monitors for primary and secondary deployment that address the unique requirements for operational effectiveness of each type of deployment: *Provided further*, That the Secretary shall continue to consult with the National Academy of Sciences before making such certifications: *Provided further*, That none of the funds appropriated under this heading shall be used for high-risk concurrent develop-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ment and production of mutually dependent software and hardware.

**\*2168**

TITLE V

GENERAL PROVISIONS

(INCLUDING RESCISSIONS OF FUNDS)

SEC. 501. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 502. Subject to the requirements of section 503 of this Act, the unexpended balances of prior appropriations provided for activities in this Act may be transferred to appropriation accounts for such activities established pursuant to this Act, may be merged with funds in the applicable established accounts, and thereafter may be accounted for as one fund for the same time period as originally enacted.

SEC. 503. (a) None of the funds provided by this Act, provided by previous appropriations Acts to the agencies in or transferred to the Department of Homeland Security that remain available for obligation or expenditure in fiscal year 2010, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the agencies funded by this Act, shall be available for obligation or expenditure through a reprogramming of funds that: (1) creates a new program, project, or activity; (2) eliminates a program, project, office, or activity; (3) increases funds for any program, project, or activity for which funds have been denied or restricted by the Congress; (4) proposes to use funds directed for a specific activity by either of the Committees on Appropriations of the Senate or the House of Representatives for a different purpose; or (5) contracts out any function or activity for which funding levels were requested for Federal full-time equivalents in the object classification tables contained in the fiscal year 2010 Budget Appendix for the Department of Homeland Security, as modified by the joint explanatory statement accompanying this Act, unless the Committees on Appropriations of the Senate and the House of Representatives are notified 15 days in advance of such reprogramming of funds.

(b) None of the funds provided by this Act, provided by previous appropriations Acts to the agencies in or transferred to the Department of Homeland Security that remain available for obligation or expenditure in fiscal year 2010, or provided from any accounts in the Treasury of the United States derived by the collection of fees or proceeds available to the agencies funded by this Act, shall be available for obligation or expenditure for programs, projects, or activities through a reprogramming of funds in excess of $5,000,000 or 10 percent, whichever is less, that: (1) augments existing programs, projects, or activities; (2) reduces by 10 percent funding for any existing program, project, or activity, or numbers of personnel by 10 percent as approved by the Congress; or (3) results from any general savings from a reduction in personnel that would result in a change in existing programs, projects, or activities as approved by the Congress, unless the Committees on Appropriations of the Senate and the House of Representatives are notified 15 days in advance of such reprogramming of funds.

(c) Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Department of Homeland Security by this Act or provided by previous appropriations Acts may be **\*2169** transferred between such appropriations, but no such appropriation, except as otherwise specifically provided, shall be increased by more than 10 percent by such transfers: *Provided*, That any transfer under this section shall be treated as a reprogramming of funds under subsection (b) and shall not be available for obligation unless the Committees on Ap-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

propriations of the Senate and the House of Representatives are notified 15 days in advance of such transfer.

(d) Notwithstanding subsections (a), (b), and (c) of this section, no funds shall be reprogrammed within or transferred between appropriations after June 30, except in extraordinary circumstances that imminently threaten the safety of human life or the protection of property.

<< 31 USCA § 501 NOTE >>

SEC. 504. The Department of Homeland Security Working Capital Fund, established pursuant to section 403 of Public Law 103–356 (31 U.S.C. 501 note), shall continue operations as a permanent working capital fund for fiscal year 2010: *Provided*, That none of the funds appropriated or otherwise made available to the Department of Homeland Security may be used to make payments to the Working Capital Fund, except for the activities and amounts allowed in the President's fiscal year 2010 budget: *Provided further*, That funds provided to the Working Capital Fund shall be available for obligation until expended to carry out the purposes of the Working Capital Fund: *Provided further*, That all departmental components shall be charged only for direct usage of each Working Capital Fund service: *Provided further*, That funds provided to the Working Capital Fund shall be used only for purposes consistent with the contributing component: *Provided further*, That such fund shall be paid in advance or reimbursed at rates which will return the full cost of each service: *Provided further*, That the Working Capital Fund shall be subject to the requirements of section 503 of this Act.

SEC. 505. Except as otherwise specifically provided by law, not to exceed 50 percent of unobligated balances remaining available at the end of fiscal year 2010 from appropriations for salaries and expenses for fiscal year 2010 in this Act shall remain available through September 30, 2011, in the account and for the purposes for which the appropriations were provided: *Provided*, That prior to the obligation of such funds, a request shall be submitted to the Committees on Appropriations of the Senate and the House of Representatives for approval in accordance with section 503 of this Act.

SEC. 506. Funds made available by this Act for intelligence activities are deemed to be specifically authorized by the Congress for purposes of section 504 of the National Security Act of 1947 (50 U.S.C. 414) during fiscal year 2010 until the enactment of an Act authorizing intelligence activities for fiscal year 2010.

SEC. 507. None of the funds made available by this Act may be used to make a grant allocation, grant award, contract award, Other Transaction Agreement, a task or delivery order on a Department of Homeland Security multiple award contract, or to issue a letter of intent totaling in excess of $1,000,000, or to announce publicly the intention to make such an award, including a contract covered by the Federal Acquisition Regulation, unless the Secretary of Homeland Security notifies the Committees on Appropriations of the Senate and the House of Representatives at least 3 full business days in advance of making such an award or issuing such a letter: *Provided*, That if the Secretary of Homeland Security **\*2170** determines that compliance with this section would pose a substantial risk to human life, health, or safety, an award may be made without notification and the Committees on Appropriations of the Senate and the House of Representatives shall be notified not later than 5 full business days after such an award is made or letter issued: *Provided further*, That no notification shall involve funds that are not available for obligation: *Provided further*, That the notification shall include the amount of the award, the fiscal year for which the funds for the award were appropriated, and the account from which the funds are being drawn: *Provided further*, That the Federal Emergency Management Agency shall brief the Committees on Appropriations of the Senate and the House of Representatives 5 full business days in advance of announcing publicly the intention of making an award under "State and Local Programs".

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 1:14-cv-00254   Document 91-3   Filed on 01/14/15 in TXSD   Page 82 of 114

SEC. 508. Notwithstanding any other provision of law, no agency shall purchase, construct, or lease any additional facilities, except within or contiguous to existing locations, to be used for the purpose of conducting Federal law enforcement training without the advance approval of the Committees on Appropriations of the Senate and the House of Representatives, except that the Federal Law Enforcement Training Center is authorized to obtain the temporary use of additional facilities by lease, contract, or other agreement for training which cannot be accommodated in existing Center facilities.

SEC. 509. None of the funds appropriated or otherwise made available by this Act may be used for expenses for any construction, repair, alteration, or acquisition project for which a prospectus otherwise required under chapter 33 of title 40, United States Code, has not been approved, except that necessary funds may be expended for each project for required expenses for the development of a proposed prospectus.

SEC. 510. Sections 519, 520, 522, 528, 530, and 531 of the Department of Homeland Security Appropriations Act, 2008 (division E of Public Law 110–161; 121 Stat. 2072, 2073, 2074, 2082) shall apply with respect to funds made available in this Act in the same manner as such sections applied to funds made available in that Act.

SEC. 511. None of the funds made available in this Act may be used in contravention of the applicable provisions of the Buy American Act (41 U.S.C. 10a et seq.).

SEC. 512. None of the funds made available in this Act may be used to amend the oath of allegiance required by section 337 of the Immigration and Nationality Act (8 U.S.C. 1448).

SEC. 513. None of the funds appropriated by this Act may be used to process or approve a competition under Office of Management and Budget Circular A–76 for services provided as of June 1, 2004, by employees (including employees serving on a temporary or term basis) of United States Citizenship and Immigration Services of the Department of Homeland Security who are known as of that date as Immigration Information Officers, Contact Representatives, or Investigative Assistants.

SEC. 514. (a) The Assistant Secretary of Homeland Security (Transportation Security Administration) shall work with air carriers and airports to ensure that the screening of cargo carried on passenger aircraft, as defined in section 44901(g)(5) of title 49, United States Code, increases incrementally each quarter until the requirement of section 44901(g)(2)(B) of title 49 is met.

**\*2171**

(b) Not later than 45 days after the end of each quarter, the Assistant Secretary shall submit to the Committees on Appropriations of the Senate and the House of Representatives a report on air cargo inspection statistics by airport and air carrier detailing the incremental progress being made to meet the requirement of section 44901(g)(2)(B) of title 49, United States Code.

(c) Not later than 180 days after the date of the enactment of this Act, the Assistant Secretary shall submit to the Committees on Appropriations of the Senate and the House of Representatives, a report on how the Transportation Security Administration plans to meet the requirement for screening all air cargo on passenger aircraft by the deadline under section 44901(g) of title 49, United States Code. The report shall identify the elements of the system to screen 100 percent of cargo transported between domestic airports at a level of security commensurate with the level of security for the screening of passenger checked baggage.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

SEC. 515. Within 45 days after the end of each month, the Chief Financial Officer of the Department of Homeland Security shall submit to the Committees on Appropriations of the Senate and the House of Representatives a monthly budget and staffing report for that month that includes total obligations, on-board versus funded full-time equivalent staffing levels, and the number of contract employees for each office of the Department.

SEC. 516. Except as provided in section 44945 of title 49, United States Code, funds appropriated or transferred to Transportation Security Administration "Aviation Security", "Administration" and "Transportation Security Support" for fiscal years 2004, 2005, 2006, 2007, and 2008 that are recovered or deobligated shall be available only for the procurement or installation of explosives detection systems, air cargo, baggage, and checkpoint screening systems, subject to notification: *Provided*, That quarterly reports shall be submitted to the Committees on Appropriations of the Senate and the House of Representatives on any funds that are recovered or deobligated.

SEC. 517. Any funds appropriated to Coast Guard "Acquisition, Construction, and Improvements" for fiscal years 2002, 2003, 2004, 2005, and 2006 for the 110–123 foot patrol boat conversion that are recovered, collected, or otherwise received as the result of negotiation, mediation, or litigation, shall be available until expended for the Replacement Patrol Boat (FRC–B) program.

SEC. 518. (a) None of the funds provided by this or any other Act may be obligated for the development, testing, deployment, or operation of any portion of a human resources management system authorized by section 9701(a) of title 5, United States Code, or by regulations prescribed pursuant to such section, for an employee, as that term is defined in section 7103(a)(2) of such title.

(b) The Secretary of Homeland Security shall collaborate with employee representatives in the manner prescribed in section 9701(e) of title 5, United States Code, in the planning, testing, and development of any portion of a human resources management system that is developed, tested, or deployed for persons excluded from the definition of employee as that term is defined in section 7103(a)(2) of such title.

SEC. 519. Section 532(a) of Public Law 109–295 (120 Stat. 1384) is amended by striking "2009" and inserting "2010".

**\*2172**

SEC. 520. The functions of the Federal Law Enforcement Training Center instructor staff shall be classified as inherently governmental for the purpose of the Federal Activities Inventory Reform Act of 1998 (31 U.S.C. 501 note).

SEC. 521. (a) Except as provided in subsection (b), none of the funds appropriated in this or any other Act to the Office of the Secretary and Executive Management, the Office of the Under Secretary for Management, or the Office of the Chief Financial Officer, may be obligated for a grant or contract funded under such headings by any means other than full and open competition.

(b) Subsection (a) does not apply to obligation of funds for a contract awarded--

(1) by a means that is required by a Federal statute, including obligation for a purchase made under a mandated preferential program, including the AbilityOne Program, that is authorized under the Javits–Wagner–O'Day Act (41 U.S.C. 46 et seq.);

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(2) pursuant to the Small Business Act (15 U.S.C. 631 et seq.);

(3) in an amount less than the simplified acquisition threshold described under section 302A(a) of the Federal Property and Administrative Services Act of 1949 (41 U.S.C. 252a(a)); or

(4) by another Federal agency using funds provided through an interagency agreement.

(c)(1) Subject to paragraph (2), the Secretary of Homeland Security may waive the application of this section for the award of a contract in the interest of national security or if failure to do so would pose a substantial risk to human health or welfare.

(2) Not later than 5 days after the date on which the Secretary of Homeland Security issues a waiver under this subsection, the Secretary shall submit notification of that waiver to the Committees on Appropriations of the Senate and the House of Representatives, including a description of the applicable contract and an explanation of why the waiver authority was used. The Secretary may not delegate the authority to grant such a waiver.

(d) In addition to the requirements established by subsections (a), (b), and (c) of this section, the Inspector General of the Department of Homeland Security shall review departmental contracts awarded through means other than a full and open competition to assess departmental compliance with applicable laws and regulations: *Provided*, That the Inspector General shall review selected contracts awarded in the previous fiscal year through means other than a full and open competition: *Provided further*, That in selecting which contracts to review, the Inspector General shall consider the cost and complexity of the goods and services to be provided under the contract, the criticality of the contract to fulfilling Department missions, past performance problems on similar contracts or by the selected vendor, complaints received about the award process or contractor performance, and such other factors as the Inspector General deems relevant: *Provided further*, That the Inspector General shall report the results of the reviews to the Committees on Appropriations of the Senate and the House of Representatives no later than February 5, 2010.

SEC. 522. Except as provided in paragraphs (1) and (2) of this section, none of the funds provided by this or previous appropriations Acts shall be used to fund any position designated as **2173** a Principal Federal Official, or any successor position, for any Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.) declared disasters or emergencies--

(1) The Secretary of Homeland Security may waive the application of this section provided that any field position appointed pursuant to this waiver shall not hold the title of Principal Federal Official, shall functionally report through the Federal Coordinating Officer appointed under section 302 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5143), and shall be subject to the provisions of subsection (c) of section 319 of title 6, United States Code. The Secretary may not delegate the authority to grant such a waiver.

(2) Not later than 10 business days after the date on which the Secretary of Homeland Security issues a waiver under this section, the Secretary shall submit notification of that waiver to the Committees on Appropriations of the Senate and the House of Representatives, the Transportation and Infrastructure Committee of the House of Representatives, and the Homeland Security and Governmental Affairs Committee of the Senate explaining the circumstances necessitating the waiver, describing the specific role of any officials appointed pursuant to the waiver, and outlining measures taken to ensure compliance with subsection (c) of section 319 and subsections (c)(3) and (c)(4)(A) of section 313 of title 6, United States Code.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

SEC. 523. None of the funds made available in this or any other Act may be used to enforce section 4025(1) of Public Law 108–458 unless the Assistant Secretary of Homeland Security (Transportation Security Administration) reverses the determination of July 19, 2007, that butane lighters are not a significant threat to civil aviation security.

SEC. 524. Funds made available in this Act may be used to alter operations within the Civil Engineering Program of the Coast Guard nationwide, including civil engineering units, facilities design and construction centers, maintenance and logistics commands, and the Coast Guard Academy, except that none of the funds provided in this Act may be used to reduce operations within any Civil Engineering Unit unless specifically authorized by a statute enacted after the date of the enactment of this Act.

SEC. 525. None of the funds provided in this Act shall be available to carry out section 872 of the Homeland Security Act of 2002 (6 U.S.C. 452).

SEC. 526. None of the funds made available in this Act may be used by United States Citizenship and Immigration Services to grant an immigration benefit unless the results of background checks required by law to be completed prior to the granting of the benefit have been received by United States Citizenship and Immigration Services, and the results do not preclude the granting of the benefit.

SEC. 527. None of the funds made available in this Act may be used to destroy or put out to pasture any horse or other equine belonging to the Federal Government that has become unfit for service, unless the trainer or handler is first given the option to take possession of the equine through an adoption program that has safeguards against slaughter and inhumane treatment.

**\*2174**

SEC. 528. None of the funds provided in this Act under the heading "Office of the Chief Information Officer" shall be used for data center development other than for Data Center One (National Center for Critical Information Processing and Storage) until the Chief Information Officer certifies that Data Center One is fully utilized as the Department's primary data storage center at the highest capacity throughout the fiscal year.

SEC. 529. None of the funds in this Act shall be used to reduce the United States Coast Guard's Operations Systems Center mission or its government-employed or contract staff levels.

SEC. 530. None of the funds appropriated by this Act may be used to conduct, or to implement the results of, a competition under Office of Management and Budget Circular A–76 for activities performed with respect to the Coast Guard National Vessel Documentation Center.

SEC. 531. Section 831 of the Homeland Security Act of 2002 (6 U.S.C. 391) is amended--

<< 6 USCA § 391 >>

(1) in subsection (a), by striking "Until September 30, 2009" and inserting "Until September 30, 2010,"; and

<< 6 USCA § 391 >>

(2) in subsection (d)(1), by striking "September 30, 2009," and inserting "September 30, 2010,".

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

SEC. 532. The Secretary of Homeland Security shall require that all contracts of the Department of Homeland Security that provide award fees link such fees to successful acquisition outcomes (which outcomes shall be specified in terms of cost, schedule, and performance).

SEC. 533. None of the funds made available to the Office of the Secretary and Executive Management under this Act may be expended for any new hires by the Department of Homeland Security that are not verified through the basic pilot program (E–Verify Program) under section 401 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1324a note).

SEC. 534. None of the funds made available in this Act for U.S. Customs and Border Protection may be used to prevent an individual not in the business of importing a prescription drug (within the meaning of section 801(g) of the Federal Food, Drug, and Cosmetic Act) from importing a prescription drug from Canada that complies with the Federal Food, Drug, and Cosmetic Act: *Provided*, That this section shall apply only to individuals transporting on their person a personal-use quantity of the prescription drug, not to exceed a 90–day supply: *Provided further*, That the prescription drug may not be--

(1) a controlled substance, as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802); or

(2) a biological product, as defined in section 351 of the Public Health Service Act (42 U.S.C. 262).

SEC. 535. None of the funds made available in this Act may be used by the Secretary of Homeland Security or any delegate of the Secretary to issue any rule or regulation which implements the Notice of Proposed Rulemaking related to Petitions for Aliens To Perform Temporary Nonagricultural Services or Labor (H–2B) set out beginning on 70 Fed. Reg. 3984 (January 27, 2005).

SEC. 536. The Secretary of Homeland Security, in consultation with the Secretary of the Treasury, shall notify the Committees on Appropriations of the Senate and the House of Representatives of any proposed transfers of funds available under subsection (g)(4)(B) of title 31, Unites States Code (as added by Public Law **2175** 102–393) from the Department of the Treasury Forfeiture Fund to any agency within the Department of Homeland Security: *Provided*, That none of the funds identified for such a transfer may be obligated until the Committees on Appropriations of the Senate and the House of Representatives approve the proposed transfers.

SEC. 537. None of the funds made available in this Act may be used for planning, testing, piloting, or developing a national identification card.

SEC. 538. If the Assistant Secretary of Homeland Security (Transportation Security Administration) determines that an airport does not need to participate in the basic pilot program (E–Verify Program) under section 402 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1324a note), the Assistant Secretary shall certify to the Committees on Appropriations of the Senate and the House of Representatives that no security risks will result from such non-participation.

SEC. 539. (a) Notwithstanding any other provision of this Act, except as provided in subsection (b), and 30 days after the date that the President determines whether to declare a major disaster because of an event and any appeal is completed, the Administrator shall submit to the Committee on Homeland Security and Governmental Affairs of the Senate, the Committee on Homeland Security of the House of Representatives, the Committee on Transportation and Infrastructure of the House of Representatives, the Committees on Appropriations of the Senate and the House of Representatives, and publish on the website of the Federal Emergency Management

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Agency, a report regarding that decision, which shall summarize damage assessment information used to determine whether to declare a major disaster.

(b) The Administrator may redact from a report under subsection (a) any data that the Administrator determines would compromise national security.

(c) In this section--

(1) the term "Administrator" means the Administrator of the Federal Emergency Management Agency; and

(2) the term "major disaster" has the meaning given that term in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122).

SEC. 540. Notwithstanding any other provision of law, should the Secretary of Homeland Security determine that the National Bio- and Agro-defense Facility be located at a site other than Plum Island, New York, the Secretary shall have the Administrator of General Services sell through public sale all real and related personal property and transportation assets which support Plum Island operations, subject to such terms and conditions as necessary to protect government interests and meet program requirements: *Provided*, That the gross proceeds of such sale shall be deposited as offsetting collections into the Department of Homeland Security Science and Technology "Research, Development, Acquisition, and Operations" account and, subject to appropriation, shall be available until expended, for site acquisition, construction, and costs related to the construction of the National Bio- and Agro-defense Facility, including the costs associated with the sale, including due diligence requirements, necessary environmental remediation at Plum Island, and reimbursement of expenses incurred by the General Services Administration which shall not exceed 1 percent of the sale price or $5,000,000, whichever is greater: *Provided further*, That after **\*2176** the completion of construction and environmental remediation, the unexpended balances of funds appropriated for costs in the preceding proviso shall be available for transfer to the appropriate account for design and construction of a consolidated Department of Homeland Security Headquarters project, excluding daily operations and maintenance costs, notwithstanding section 503 of this Act, and the Committees on Appropriations of the Senate and the House of Representatives shall be notified 15 days prior to such transfer.

SEC. 541. The explanatory statement referenced in section 4 of Public Law 110–161 for "National Predisaster Mitigation Fund" under Federal Emergency Management Agency is deemed to be amended--

(1) by striking "Dalton Fire District" and all that follows through "750,000" and inserting the following:

"Franklin Regional Council of Governments, MA....................250,000

Town of Lanesborough, MA....................175,000

University of Massachusetts, MA....................175,000";

(2) by striking "Santee and";

(3) by striking "3,000,000" and inserting "1,500,000";

(4) by inserting after the item relating to Adjutant General's Office of Emergency Preparedness the following:

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

"Town of Branchville, SC 1,500,000";

and

(5) by striking "Public Works Department of the City of Santa Cruz, CA" and inserting "Monterey County Water Resources Agency, CA".

SEC. 542. Any official that is required by this Act to report or certify to the Committees on Appropriations of the Senate and the House of Representatives may not delegate such authority to perform that act unless specifically authorized herein.

<< 42 USCA § 5133 >>

SEC. 543. Section 203(m) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5133(m)) is amended by striking "September 30, 2009" and inserting "September 30, 2010".

SEC. 544. (a) Not later than 3 months after the date of enactment of this Act, the Secretary of Homeland Security shall consult with the Secretaries of Defense and Transportation and develop a concept of operations for unmanned aircraft systems in the United States national airspace system for the purposes of border and maritime security operations.

(b) The Secretary of Homeland Security shall report to the Committees on Appropriations of the Senate and the House of Representatives not later than 30 days after the date of enactment of this Act on any foreseeable challenges to complying with subsection (a).

SEC. 545. From unobligated amounts that are available to the Coast Guard for fiscal year 2008 or 2009 for "Acquisition, Construction, and Improvements" for shoreside facilities and aids to navigation at Coast Guard Sector Buffalo, the Secretary of Homeland Security shall use such sums as may be necessary to make improvements to the land along the northern portion of Sector **2177** Buffalo to enhance public access to the Buffalo Lighthouse and the waterfront.

<< 5 USCA § 9701 NOTE >>

SEC. 546. For fiscal year 2010 and thereafter, the Secretary may provide to personnel appointed or assigned to serve abroad, allowances and benefits similar to those provided under chapter 9 of title I of the Foreign Service Act of 1990 (22 U.S.C. 4081 et seq.).

<< 8 USCA § 1324a NOTE >>

SEC. 547. Section 401(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1324a note) is amended by striking "at the end of the 11–year period beginning on the first day the pilot program is in effect." and inserting "on September 30, 2012.".

<< 8 USCA § 1153 NOTE >>

SEC. 548. Section 610(b) of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993 (8 U.S.C. 1153 note) is amended by striking "for 15 years" and inserting "until September 30, 2012".

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

<< 8 USCA § 1254b >>

SEC. 549. (a) In addition to collection of registration fees described in section 244(c)(1)(B) of the Immigration and Nationality Act (8 U.S.C. 1254a(c)(1)(B)), fees for fingerprinting services, biometric services, and other necessary services may be collected when administering the program described in section 244 of such Act.

(b) Subsection (a) shall be construed to apply for fiscal year 1998 and each fiscal year thereafter.

<< 6 USCA § 121 NOTE >>

SEC. 550. Section 550(b) of the Department of Homeland Security Appropriations Act, 2007 (Public Law 109–295; 6 U.S.C. 121 note) is amended by striking "three years after the date of enactment of this Act" and inserting "on October 4, 2010".

<< 8 USCA § 1324a NOTE >>

SEC. 551. (a)(1) Sections 401(c)(1), 403(a), 403(b)(1), 403(c)(1), and 405(b)(2) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (division C of Public Law 104–208; 8 U.S.C. 1324a note) are amended by striking "basic pilot program" each place that term appears and inserting "E-Verify Program".

<< 8 USCA § 1324a NOTE >>

(2) The heading of section 403(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 is amended by striking "Basic Pilot" and inserting "E-Verify".

<< 8 USCA § 1324a NOTE >>

(b) Section 404(h)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (Public Law 104–208; 8 U.S.C. 1324a note) is amended by striking "under a pilot program" and inserting "under this subtitle".

SEC. 552. (a) None of the funds made available in this or any other Act may be used to release an individual who is detained, as of June 24, 2009, at Naval Station, Guantanamo Bay, Cuba, into the continental United States, Alaska, Hawaii, or the District of Columbia, into any of the United States territories of Guam, American Samoa (AS), the United States Virgin Islands (USVI), the Commonwealth of Puerto Rico and the Commonwealth of the Northern Mariana Islands (CNMI).

(b) None of the funds made available in this or any other Act may be used to transfer an individual who is detained, as of June 24, 2009, at Naval Station, Guantanamo Bay, Cuba, into the continental United States, Alaska, Hawaii, or the District of Columbia, into any of the United States territories of Guam, American Samoa (AS), the United States Virgin Islands (USVI), the Commonwealth of Puerto Rico and the Commonwealth of the Northern Mariana Islands (CNMI), for the purpose of detention, except as provided in subsection (c).

**\*2178**

(c) None of the funds made available in this or any other Act may be used to transfer an individual who is detained, as of June 24, 2009, at Naval Station, Guantanamo Bay, Cuba, into the continental United States, Alaska, Hawaii, or the District of Columbia, into any of the United States territories of Guam, American Samoa (AS),

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

the United States Virgin Islands (USVI), the Commonwealth of Puerto Rico and the Commonwealth of the Northern Mariana Islands (CNMI), for the purposes of prosecuting such individual, or detaining such individual during legal proceedings, until 45 days after the plan described in subsection (d) is received.

(d) The President shall submit to Congress, in classified form, a plan regarding the proposed disposition of any individual covered by subsection (c) who is detained as of June 24, 2009. Such plan shall include, at a minimum, each of the following for each such individual:

(1) A determination of the risk that the individual might instigate an act of terrorism within the continental United States, Alaska, Hawaii, the District of Columbia, or the United States territories if the individual were so transferred.

(2) A determination of the risk that the individual might advocate, coerce, or incite violent extremism, ideologically motivated criminal activity, or acts of terrorism, among inmate populations at incarceration facilities within the continental United States, Alaska, Hawaii, the District of Columbia, or the United States territories if the individual were transferred to such a facility.

(3) The costs associated with transferring the individual in question.

(4) The legal rationale and associated court demands for transfer.

(5) A plan for mitigation of any risks described in paragraphs (1), (2), and (7).

(6) A copy of a notification to the Governor of the State to which the individual will be transferred, to the Mayor of the District of Columbia if the individual will be transferred to the District of Columbia, or to any United States territories with a certification by the Attorney General of the United States in classified form at least 14 days prior to such transfer (together with supporting documentation and justification) that the individual poses little or no security risk to the United States.

(7) An assessment of any risk to the national security of the United States or its citizens, including members of the Armed Services of the United States, that is posed by such transfer and the actions taken to mitigate such risk.

(e) None of the funds made available in this or any other Act may be used to transfer or release an individual detained at Naval Station, Guantanamo Bay, Cuba, as of June 24, 2009, to the country of such individual's nationality or last habitual residence or to any other country other than the United States or to a freely associated State, unless the President submits to the Congress, in classified form, at least 15 days prior to such transfer or release, the following information:

(1) The name of any individual to be transferred or released and the country or the freely associated State to which such individual is to be transferred or released.

**\*2179**

(2) An assessment of any risk to the national security of the United States or its citizens, including members of the Armed Services of the United States, that is posed by such transfer or release and the actions taken to mitigate such risk.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(3) The terms of any agreement with the country or the freely associated State for the acceptance of such individual, including the amount of any financial assistance related to such agreement.

(f) None of the funds made available in this Act may be used to provide any immigration benefit (including a visa, admission into the United States or any of the United States territories, parole into the United States or any of the United States territories (other than parole for the purposes of prosecution and related detention), or classification as a refugee or applicant for asylum) to any individual who is detained, as of June 24, 2009, at Naval Station, Guantanamo Bay, Cuba.

(g) In this section, the term "freely associated States" means the Federated States of Micronesia (FSM), the Republic of the Marshall Islands (RMI), and the Republic of Palau.

(h) Prior to the termination of detention operations at Naval Station, Guantanamo Bay, Cuba, the President shall submit to the Congress a report in classified form describing the disposition or legal status of each individual detained at the facility as of the date of enactment of this Act.

<< 49 USCA § 44903 >>

SEC. 553. Section 44903(j)(2)(C) of title 49, United States Code, is amended by adding at the end the following new clause:

"(v) INCLUSION OF DETAINEES ON NO FLY LIST.--The Assistant Secretary, in coordination with the Terrorist Screening Center, shall include on the No Fly List any individual who was a detainee held at the Naval Station, Guantanamo Bay, Cuba, unless the President certifies in writing to Congress that the detainee poses no threat to the United States, its citizens, or its allies. For purposes of this clause, the term 'detainee' means an individual in the custody or under the physical control of the United States as a result of armed conflict.".

<< 6 USCA § 469a >>

SEC. 554. For fiscal year 2010 and thereafter, the Secretary of Homeland Security may collect fees from any non-Federal participant in a conference, seminar, exhibition, symposium, or similar meeting conducted by the Department of Homeland Security in advance of the conference, either directly or by contract, and those fees shall be credited to the appropriation or account from which the costs of the conference, seminar, exhibition, symposium, or similar meeting are paid and shall be available to pay the costs of the Department of Homeland Security with respect to the conference or to reimburse the Department for costs incurred with respect to the conference: *Provided*, That in the event the total amount of fees collected with respect to a conference exceeds the actual costs of the Department of Homeland Security with respect to the conference, the amount of such excess shall be deposited into the Treasury as miscellaneous receipts: *Provided further*, That the Secretary shall provide a report to the Committees on Appropriations of the Senate and the House of Representatives not later than January 5, 2011, providing the level of collections and a **\*2180** summary by agency of the purposes and levels of expenditures for the prior fiscal year, and shall report annually thereafter.

SEC. 555. For purposes of section 210C of the Homeland Security Act of 2002 (6 U.S.C. 124j) a rural area shall also include any area that is located in a metropolitan statistical area and a county, borough, parish, or area under the jurisdiction of an Indian tribe with a population of not more than 50,000.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

SEC. 556. None of the funds made available in this Act may be used for first-class travel by the employees of agencies funded by this Act in contravention of sections 301–10.122 through 301.10–124 of title 41, Code of Federal Regulations.

SEC. 557. None of the funds made available in this Act may be used to propose or effect a disciplinary or adverse action, with respect to any Department of Homeland Security employee who engages regularly with the public in the performance of his or her official duties solely because that employee elects to utilize protective equipment or measures, including but not limited to surgical masks, N95 respirators, gloves, or hand-sanitizers, where use of such equipment or measures is in accord with Department of Homeland Security policy, and Centers for Disease Control and Prevention and Office of Personnel Management guidance.

SEC. 558. None of the funds made available in this Act may be used to employ workers described in section 274A(h)(3) of the Immigration and Nationality Act (8 U.S.C. 1324a(h)(3)).

SEC. 559. (a) Subject to subsection (b), none of the funds appropriated or otherwise made available by this Act may be available to operate the Loran–C signal after January 4, 2010.

(b) The limitation in subsection (a) shall take effect only if:

(1) the Commandant of the Coast Guard certifies that the termination of the operation of the Loran–C signal as of the date specified in subsection (a) will not adversely impact the safety of maritime navigation; and

(2) the Secretary of Homeland Security certifies that the Loran–C system infrastructure is not needed as a backup to the Global Positioning System or to meet any other Federal navigation requirement.

(c) If the certifications described in subsection (b) are made, the Coast Guard shall, commencing January 4, 2010, terminate the operation of the Loran–C signal and commence a phased decommissioning of the Loran–C system infrastructure.

(d) Not later than 30 days after such certifications pursuant to subsection (b), the Commandant shall submit to the Committees on Appropriations of the Senate and House of Representatives a report setting forth a proposed schedule for the phased decommissioning of the Loran–C system infrastructure in the event of the decommissioning of such infrastructure in accordance with subsection (c).

(e) If the certifications described in subsection (b) are made, the Secretary of Homeland Security, acting through the Commandant of the Coast Guard, may, notwithstanding any other provision of law, sell any real and personal property under the administrative control of the Coast Guard and used for the Loran–C system, by directing the Administrator of General Services to sell such real and personal property, subject to such terms and conditions that the Secretary believes to be necessary to protect government interests and program requirements of the Coast Guard: *Provided*, That the proceeds, less the costs of sale incurred by the General **\*2181** Services Administration, shall be deposited as offsetting collections into the Coast Guard "Environmental Compliance and Restoration" account and, subject to appropriation, shall be available until expended for environmental compliance and restoration purposes associated with the Loran–C system, for the costs of securing and maintaining equipment that may be used as a backup to the Global Positioning System or to meet any other Federal navigation requirement, for the demolition of improvements on such real property, and for the costs associated with the sale of such real and personal property, including due diligence requirements, necessary environmental remediation, and reimbursement of expenses incurred by the General Services Administration: *Provided further*, That after

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 1:14-cv-00254   Document 91-3   Filed on 01/14/15 in TXSD   Page 93 of 114

the completion of such activities, the unexpended balances shall be available for any other environmental compliance and restoration activities of the Coast Guard.

SEC. 560. (a) None of the funds made available by this Act may be obligated for construction of the National Bio- and Agro-defense Facility on the United States mainland until 30 days after the later of:

(1) the date on which the Secretary of Homeland Security submits to the Committee on Appropriations of the Senate and the House of Representatives a site–specific bio–safety and bio–security mitigation risk assessment, which includes an integrated set of analyses using plume modeling and epidemiologic impact modeling, to determine the requirements necessary to ensure safe operation of the National Bio- and Agro-defense Facility at the approved Manhattan, Kansas, site identified in the January 16, 2009, record of decision published in Federal Register Vol. 74, Number 11, and the results of the National Academy of Sciences' review of the risk assessment as described in paragraph (b): *Provided*, That the integrated set of analyses is to determine the extent of the dispersion of the foot-and-mouth virus following a potential laboratory spill, the potential spread of foot-and-mouth disease in the surrounding susceptible animal population, and its economic impact: *Provided further*, That the integrated set of analyses should also take into account specific local, State, and national risk mitigation strategies; or

(2) the date on which the Secretary of Homeland Security, in coordination with the Secretary of Agriculture, submits to the Committees on Appropriations of the Senate and the House of Representatives a report that:

(A) describes the procedure that will be used to issue the permit to conduct foot-and-mouth disease live virus research under section 7524 of the Food, Conservation, and Energy Act of 2008 (21 U.S.C. 113a note; Public Law 110–246); and

(B) includes plans to establish an emergency response plan with city, regional, and State officials in the event of an accidental release of foot-and-mouth disease or another hazardous pathogen.

(b) With regard to the integrated set of analyses included in the mitigation risk assessment required under paragraph (a)(1), the Secretary of Homeland Security shall enter into a contract with the National Academy of Sciences to evaluate the mitigation risk assessment required by subsection (a)(1) of this section and to submit a Letter Report: *Provided*, That such contract shall be **\*2182** entered into within 90 days from the date of enactment of this Act, and the National Academy of Sciences shall complete its assessment and submit its Letter Report within four months after the date the Department of Homeland Security concludes the risk assessment.

<< 46 USCA § 101 NOTE >>

SEC. 561. (a) SHORT TITLE.--This section may be cited as the "American Communities' Right to Public Information Act".

<< 46 USCA § 70103 >>

(b) IN GENERAL.--Section 70103(d) of title 46, United States Code, is amended to read as follows:

"(d) NONDISCLOSURE OF INFORMATION.--

"(1) IN GENERAL.--Information developed under this section or sections 70102, 70104, and 70108 is not required to be disclosed to the public, including--

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

"(A) facility security plans, vessel security plans, and port vulnerability assessments; and

"(B) other information related to security plans, procedures, or programs for vessels or facilities authorized under this section or sections 70102, 70104, and 70108.

"(2) LIMITATIONS.--Nothing in paragraph (1) shall be construed to authorize the designation of information as sensitive security information (as defined in section 1520.5 of title 49, Code of Federal Regulations)--

"(A) to conceal a violation of law, inefficiency, or administrative error;

"(B) to prevent embarrassment to a person, organization, or agency;

"(C) to restrain competition; or

"(D) to prevent or delay the release of information that does not require protection in the interest of transportation security, including basic scientific research information not clearly related to transportation security.".

(c) CONFORMING AMENDMENTS.--

<< 49 USCA § 114 >>

(1) Section 114(r) of title 49, United States Code, is amended by adding at the end thereof the following:

"(4) LIMITATIONS.--Nothing in this subsection, or any other provision of law, shall be construed to authorize the designation of information as sensitive security information (as defined in section 1520.5 of title 49, Code of Federal Regulations)--

"(A) to conceal a violation of law, inefficiency, or administrative error;

"(B) to prevent embarrassment to a person, organization, or agency;

"(C) to restrain competition; or

"(D) to prevent or delay the release of information that does not require protection in the interest of transportation security, including basic scientific research information not clearly related to transportation security.".

<< 49 USCA § 40119 >>

(2) Section 40119(b) of title 49, United States Code, is amended by adding at the end thereof the following:

"(3) Nothing in paragraph (1) shall be construed to authorize the designation of information as sensitive security information (as defined in section 15.5 of title 49, Code of Federal Regulations)--

"(A) to conceal a violation of law, inefficiency, or administrative error;

"(B) to prevent embarrassment to a person, organization, or agency;

*2183

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

"(C) to restrain competition; or

"(D) to prevent or delay the release of information that does not require protection in the interest of transportation security, including basic scientific research information not clearly related to transportation security.".

SEC. 562. Section 4 of the Act entitled "An Act to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes" (commonly known as the Federal Switchblade Act) (15 U.S.C. 1244) is amended--

<< 15 USCA § 1244 >>

(1) by striking "or" at the end of paragraph (3);

<< 15 USCA § 1244 >>

(2) by striking the period at the end of paragraph (4) and inserting "; or" and

<< 15 USCA § 1244 >>

(3) by adding at the end the following:

"(5) a knife that contains a spring, detent, or other mechanism designed to create a bias toward closure of the blade and that requires exertion applied to the blade by hand, wrist, or arm to overcome the bias toward closure to assist in opening the knife.".

SEC. 563. (a) APPLICABLE ANNUAL PERCENTAGE RATE OF INTEREST.--Section 44(f)(1) of the Federal Deposit Insurance Act (12 U.S.C. 1831u(f)(1)) is amended--

<< 12 USCA § 1831u >>

(1) in the matter preceding subparagraph (A), by inserting "(or in the case of a governmental entity located in such State, paid)" after "received, or reserved"; and

(2) in subparagraph (B)--

<< 12 USCA § 1831u >>

(A) in the matter preceding clause (i), by striking "nondepository institution operating in such State" and inserting "governmental entity located in such State or any person that is not a depository institution described in subparagraph (A) doing business in such State";

<< 12 USCA § 1831u >>

(B) by redesignating clause (ii) as clause (iii);

(C) in clause (i)--

(i) in subclause (III)--

<< 12 USCA § 1831u >>

(I) in item (aa), by adding "and" at the end;

<< 12 USCA § 1831u >>

(II) in item (bb), by striking ", to facilitate" and all that follows through "2009"; and

<< 12 USCA § 1831u >>

(III) by striking item (cc); and

<< 12 USCA § 1831u >>

(ii) by adding after subclause (III) the following:

"(IV) the uniform accessibility of bonds and obligations issued under the American Recovery and Reinvestment Act of 2009;"; and

<< 12 USCA § 1831u >>

(D) by inserting after clause (i) the following:

"(ii) to facilitate interstate commerce through the issuance of bonds and obligations under any provision of State law, including bonds and obligations for the purpose of economic development, education, and improvements to infrastructure; and".

(b) RULE OF CONSTRUCTION.--Section 44(f)(2) of the Federal Deposit Insurance Act (12 U.S.C. 1831u(f)(2)) is amended--

<< 12 USCA § 1831u >>

<< 12 USCA § 1831u >>

(1) by redesignating subparagraphs (A) and (B) as clauses (i) and (ii), respectively, and moving the margins 2 ems to the right;

<< 12 USCA § 1831u >>

(2) by striking "No provision" and inserting the following:

"(A) IN GENERAL.--No provision"; and

(3) by adding at the end the following:

**\*2184**

<< 12 USCA § 1831u >>

"(B) APPLICABILITY.--This subsection shall be construed to apply to any loan or discount made, or

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

note, bill of exchange, financing transaction, or other evidence of debt, originated by an insured depository institution, a governmental entity located in such State, or a person that is not a depository institution described in subparagraph (A) doing business in such State.".

<< 12 USCA § 1831u NOTE >>

(c) EFFECTIVE PERIOD.--The amendments made by this section shall apply with respect to contracts consummated during the period beginning on the date of enactment of this Act and ending on December 31, 2010.

<< 5 USCA § 101 NOTE >>

SEC. 564. (a) SHORT TITLE.--This section may be cited as the "OPEN FOIA Act of 2009".

<< 5 USCA § 552 >>

(b) SPECIFIC CITATIONS IN STATUTORY EXEMPTIONS.--Section 552(b) of title 5, United States Code, is amended by striking paragraph (3) and inserting the following:

"(3) specifically exempted from disclosure by statute (other than section 552b of this title), if that statute--

"(A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

"(ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

"(B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.".

<< 5 USCA § 552 NOTE >>

SEC. 565. (a) SHORT TITLE.--This section may be cited as the "Protected National Security Documents Act of 2009".

(b) Notwithstanding any other provision of the law to the contrary, no protected document, as defined in subsection (c), shall be subject to disclosure under section 552 of title 5, United States Code or any proceeding under that section.

(c) DEFINITIONS.--In this section:

(1) PROTECTED DOCUMENT.--The term "protected document" means any record--

(A) for which the Secretary of Defense has issued a certification, as described in subsection (d), stating that disclosure of that record would endanger citizens of the United States, members of the United States Armed Forces, or employees of the United States Government deployed outside the United States; and

(B) that is a photograph that--

(i) was taken during the period beginning on September 11, 2001, through January 22, 2009; and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

     (ii) relates to the treatment of individuals engaged, captured, or detained after September 11, 2001, by the Armed Forces of the United States in operations outside of the United States.

    (2) PHOTOGRAPH.--The term "photograph" encompasses all photographic images, whether originals or copies, including still photographs, negatives, digital images, films, video tapes, and motion pictures.

(d) CERTIFICATION.--

    (1) IN GENERAL.--For any photograph described under subsection (c)(1), the Secretary of Defense shall issue a certification if the Secretary of Defense determines that disclosure of that **\*2185** photograph would endanger citizens of the United States, members of the United States Armed Forces, or employees of the United States Government deployed outside the United States.

    (2) CERTIFICATION EXPIRATION.--A certification and a renewal of a certification issued pursuant to subsection (d)(3) shall expire 3 years after the date on which the certification or renewal, is issued by the Secretary of Defense.

    (3) CERTIFICATION RENEWAL.--The Secretary of Defense may issue--

       (A) a renewal of a certification at any time; and

       (B) more than 1 renewal of a certification.

    (4) NOTICE TO CONGRESS.--The Secretary of Defense shall provide Congress a timely notice of the Secretary's issuance of a certification and of a renewal of a certification.

(e) RULE OF CONSTRUCTION.--Nothing in this section shall be construed to preclude the voluntary disclosure of a protected document.

(f) EFFECTIVE DATE.--This section shall take effect on the date of enactment of this Act and apply to any protected document.

SEC. 566. The administrative law judge annuitants participating in the Senior Administrative Law Judge Program managed by the Director of the Office of Personnel Management under section 3323 of title 5, United States Code, shall be available on a temporary reemployment basis to conduct arbitrations of disputes as part of the arbitration panel established by the President under section 601 of division A of the American Recovery and Reinvestment Act of 2009 (Public Law 111–5; 123 Stat. 164).

SEC. 567. (a) IN GENERAL.--Any company that collects or retains personal information directly from individuals who participated in the Registered Traveler program shall safeguard and dispose of such information in accordance with the requirements in--

    (1) the National Institute for Standards and Technology Special Publication 800–30, entitled "Risk Management Guide for Information Technology Systems"; and

    (2) the National Institute for Standards and Technology Special Publication 800–53, Revision 3, entitled "Recommended Security Controls for Federal Information Systems and Organizations,";

    (3) any supplemental standards established by the Assistant Secretary, Transportation Security Administra-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion (referred to in this section as the "Assistant Secretary").

(b) CERTIFICATION.--The Assistant Secretary shall require any company through the sponsoring entity described in subsection (a) to provide, not later than 30 days after the date of the enactment of this Act, written certification to the sponsoring entity that such procedures are consistent with the minimum standards established under paragraph (a)(1–3) with a description of the procedures used to comply with such standards.

(c) REPORT.--Not later than 90 days after the date of the enactment of this Act, the Assistant Secretary shall submit a report to Congress that--

(1) describes the procedures that have been used to safeguard and dispose of personal information collected through the Registered Traveler program; and

(2) provides the status of the certification by any company described in subsection (a) that such procedures are consistent **\*2186** with the minimum standards established by paragraph (a)(1–3).

SEC. 568. (a) SPECIAL IMMIGRANT NONMINISTER RELIGIOUS WORKER PROGRAM AND OTHER IMMIGRATION PROGRAMS.--

<< 8 USCA § 1101 >>

(1) EXTENSION.--Subclauses (II) and (III) of section 101(a)(27)(C)(ii) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(27)(C)(ii)) are amended by striking "September 30, 2009," each place such term appears and inserting "September 30, 2012,".

(2) STUDY AND PLAN.--Not later than 180 days after the date of the enactment of this Act, the Director of United States Citizenship and Immigration Services shall submit a report to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives that includes--

(A) the results of a study conducted under the supervision of the Director to evaluate the Special Immigrant Nonminister Religious Worker Program to identify the risks of fraud and noncompliance by program participants; and

(B) a detailed plan that describes the actions to be taken by United States Citizenship and Immigration Services to improve the integrity of the program.

(3) PROGRESS REPORT.--Not later than 240 days after the submission of the report under paragraph (2), the Director of United States Citizenship and Immigration Services shall submit a report to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives that describes the progress made in implementing the plan described in clause (a)(2)(B) of this section.

<< 8 USCA § 1182 NOTE >>

(b) CONRAD STATE 30 J–1 VISA WAIVER PROGRAM.--Section 220(c) of the Immigration and Nationality Technical Corrections Act of 1994 (8 U.S.C. 1182 note) is amended by striking "September 30, 2009" and inserting "September 30, 2012".

(c) RELIEF FOR SURVIVING SPOUSES.--

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

<< 8 USCA § 1151 >>

(1) IN GENERAL.--The second sentence of section 201(b)(2)(A)(i) of the Immigration and Nationality Act (8 U.S.C. 1151(b)(2)(A)(i)) is amended by striking "for at least 2 years at the time of the citizen's death".

<< 8 USCA § 1151 NOTE >>

(2) APPLICABILITY.--

(A) IN GENERAL.--The amendment made by paragraph (1) shall apply to all applications and petitions relating to immediate relative status under section 201(b)(2)(A)(i) of the Immigration and Nationality Act (8 U.S.C. 1151(b)(2)(A)(i)) pending on or after the date of the enactment of this Act.

(B) TRANSITION CASES.--

(i) IN GENERAL.--Notwithstanding any other provision of law, an alien described in clause (ii) who seeks immediate relative status pursuant to the amendment made by paragraph (1) shall file a petition under section 204(a)(1)(A)(ii) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)(A)(ii)) not later than the date that is 2 years after the date of the enactment of this Act.

(ii) ALIENS DESCRIBED.--An alien is described in this clause if--

**\*2187**

(I) the alien's United States citizen spouse died before the date of the enactment of this Act;

(II) the alien and the citizen spouse were married for less than 2 years at the time of the citizen spouse's death; and

(III) the alien has not remarried.

(d) SURVIVING RELATIVE CONSIDERATION FOR CERTAIN PETITIONS AND APPLICATIONS.--

<< 8 USCA § 1154 >>

(1) AMENDMENT.--Section 204 of the Immigration and Nationality Act (8 U.S.C. 1154) is amended by adding at the end the following:

"(l) SURVIVING RELATIVE CONSIDERATION FOR CERTAIN PETITIONS AND APPLICATIONS.--

"(1) IN GENERAL.--An alien described in paragraph (2) who resided in the United States at the time of the death of the qualifying relative and who continues to reside in the United States shall have such petition de-scribed in paragraph (2), or an application for adjustment of status to that of a person admitted for lawful per-manent residence based upon the family relationship described in paragraph (2), and any related applications, adjudicated notwithstanding the death of the qualifying relative, unless the Secretary of Homeland Security de-termines, in the unreviewable discretion of the Secretary, that approval would not be in the public interest.

"(2) ALIEN DESCRIBED.--An alien described in this paragraph is an alien who, immediately prior to the death of his or her qualifying relative, was--

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

"(A) the beneficiary of a pending or approved petition for classification as an immediate relative (as described in section 201(b)(2)(A)(i));

"(B) the beneficiary of a pending or approved petition for classification under section 203 (a) or (d);

"(C) a derivative beneficiary of a pending or approved petition for classification under section 203(b) (as described in section 203(d));

"(D) the beneficiary of a pending or approved refugee/asylee relative petition under section 207 or 208;

"(E) an alien admitted in 'T' nonimmigrant status as described in section 101(a)(15)(T)(ii) or in 'U' nonimmigrant status as described in section 101(a)(15)(U)(ii); or

"(F) an asylee (as described in section 208(b)(3)).".

<< 8 USCA § 1154 NOTE >>

(2) CONSTRUCTION.--Nothing in the amendment made by paragraph (1) may be construed to limit or waive any ground of removal, basis for denial of petition or application, or other criteria for adjudicating petitions or applications as otherwise provided under the immigration laws of the United States other than ineligibility based solely on the lack of a qualifying family relationship as specifically provided by such amendment.

<< 8 USCA § 1183a >>

(e) CONFORMING AMENDMENT TO AFFIDAVIT OF SUPPORT REQUIREMENT.--Section 213A(f)(5) of the Immigration and Nationality Act (8 U.S.C. 1183a(5)) is amended by striking clauses (i) and (ii) and inserting:

"(i) the individual petitioning under section 204 of this Act for the classification of such alien died after the approval of such petition, and the Secretary of Homeland Security has determined for humanitarian **\*2188** reasons that revocation of such petition under section 205 would be inappropriate; or

"(ii) the alien's petition is being adjudicated pursuant to section 204(l) (surviving relative consideration).".

SEC. 569. Notwithstanding any other provision of this Act, none of the funds appropriated or otherwise made available by this Act may be used to pay award or incentive fees for contractor performance that has been judged to be below satisfactory performance or performance that does not meet the basic requirements of a contract.

SEC. 570. None of the funds appropriated or otherwise made available by this Act may be used by the Department of Homeland Security to enter into any federal contract unless such contract is entered into in accordance with the requirements of the Federal Property and Administrative Services Act of 1949 (41 U.S.C. 253) or Chapter 137 of title 10, United States Code, and the Federal Acquisition Regulation, unless such contract is otherwise authorized by statute to be entered into without regard to the above referenced statutes.

SEC. 571. (a) Funds made available by this Act solely for data center migration may be transferred by the Secretary between appropriations for the same purpose, notwithstanding section 503 of this Act.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(b) No transfer described in (a) shall occur until 15 days after the Committees on Appropriations of the Senate and the House and Representatives are notified of such transfer.

SEC. 572. Specific projects contained in the report of the Committee on Appropriations of the House of Representatives accompanying this Act (H. Rept. 111–157) that are considered congressional earmarks for purposes of clause 9 of rule XXI of the Rules of the House of Representatives, when intended to be awarded to a for-profit entity, shall be awarded under a full and open competition.

SEC. 573. From unobligated balances for fiscal year 2009 made available for Federal Emergency Management Agency "Trucking Industry Security Grants", $5,572,000 are rescinded.

SEC. 574. From the unobligated balances of prior year appropriations made available for "Analysis and Operations", $2,358,000 are rescinded.

SEC. 575. From the unobligated balances of prior year appropriations made available for National Protection and Programs Directorate "Infrastructure Protection and Information Security", $8,000,000 are rescinded.

SEC. 576. From the unobligated balances of prior year appropriations made available for Science and Technology "Research, Development, Acquisition, and Operations", $6,944,148 are rescinded.

SEC. 577. From the unobligated balances of prior year appropriations made available for Domestic Nuclear Detection Office "Research, Development, and Operations", $8,000,000 are rescinded.

SEC. 578. From the unobligated balances of prior year appropriations made available for Transportation Security Administration "Research and Development", $4,000,000 are rescinded.

SEC. 579. From the unobligated balances of prior year appropriations made available for Coast Guard "Acquisition, Construction, and Improvements", $800,000 are rescinded: *Provided*, That these rescissions shall be taken from completed projects.

**\*2189**

SEC. 580. Of the amounts available under the heading "Counterterrorism Fund", $5,600,000 are rescinded.

This Act may be cited as the "Department of Homeland Security Appropriations Act, 2010".

Approved October 28, 2009.

PL 111-83, 2009 HR 2892

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

7

Westlaw.

▷

**Effective: November 28, 2011**

Code of Federal Regulations Currentness
   Title 8. **Aliens** and Nationality
      Chapter I. Department of Homeland Security
      (Refs & Annos)
         Subchapter B. Immigration Regulations
            Part 274A. Control of **Employment** of
            **Aliens** (Refs & Annos)
               Subpart B. **Employment Authoriza-tion**
                  → **§ 274a.12 Classes of aliens au-thorized to accept employment.**

(a) **Aliens authorized employment** incident to
status. Pursuant to the statutory or regulatory refer-
ence cited, the following **classes** of **aliens** are **au-
thorized** to be **employed** in the United States
without restrictions as to location or type of **em-
ployment** as a condition of their admission or sub-
sequent change to one of the indicated **classes**. Any
**alien** who is within a **class** of **aliens** described in
paragraphs (a)(3), (a)(4), (a)(6)–(a)(8),
(a)(10)–(a)(15), or (a)(20) of this section, and who
seeks to be **employed** in the United States, must ap-
ply to U.S. Citizenship and Immigration Services
(USCIS) for a document evidencing such **employ-
ment authorization**. USCIS may, in its discretion,
determine the validity period assigned to any docu-
ment issued evidencing an **alien's authorization** to
work in the United States.

   (1) An **alien** who is a lawful permanent resid-
   ent (with or without conditions pursuant to sec-
   tion 216 of the Act), as evidenced by Form
   I–551 issued by the Service. An expiration date
   on the Form I–551 reflects only that the card
   must be renewed, not that the bearer's work au-
   thorization has expired;

   (2) An alien admitted to the United States as a
   lawful temporary resident pursuant to sections
   245A or 210 of the Act, as evidenced by an
   employment authorization document issued by
   the Service;

   (3) An alien admitted to the United States as a
   refugee pursuant to section 207 of the Act for
   the period of time in that status, as evidenced
   by an employment authorization document is-
   sued by the Service;

   (4) An alien paroled into the United States as a
   refugee for the period of time in that status, as
   evidenced by an employment authorization
   document issued by the Service;

   (5) An alien granted asylum under section 208
   of the Act for the period of time in that status,
   as evidenced by an employment authorization
   document, issued by USCIS to the alien. An
   expiration date on the employment authoriza-
   tion document issued by USCIS reflects only
   that the document must be renewed, and not
   that the bearer's work authorization has ex-
   pired. Evidence of employment authorization
   shall be granted in increments not exceeding 5
   years for the period of time the alien remains in
   that status.

   (6) An alien admitted to the United States as a
   nonimmigrant fiancé or fiancée pursuant to
   section 101(a)(15)(K)(i) of the Act, or an alien
   admitted as a child of such alien, for the period
   of admission in that status, as evidenced by an
   employment authorization document issued by
   the Service;

   (7) An alien admitted as a parent (N–8) or de-
   pendent child (N–9) of an alien granted per-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

manent residence under section 101(a)(27)(I) of the Act, as evidenced by an employment authorization document issued by the Service;

(8) An alien admitted to the United States as a nonimmigrant pursuant to the Compact of Free Association between the United States and of the Federated States of Micronesia, the Republic of the Marshall Islands, or the Republic of Palau;

(9) Any **alien** admitted as a nonimmigrant spouse pursuant to section 101(a)(15)(K)(ii) of the Act, or an **alien** admitted as a child of such **alien**, for the period of admission in that status, as evidenced by an **employment authorization** document, with an expiration date issued by the Service;

(10) An **alien** granted withholding of deportation or removal for the period of time in that status, as evidenced by an **employment authorization** document issued by the Service;

(11) An **alien** whose enforced departure from the United States has been deferred in accordance with a directive from the President of the United States to the Secretary. **Employment** is **authorized** for the period of time and under the conditions established by the Secretary pursuant to the Presidential directive;

(12) An **alien** granted Temporary Protected Status under section 244 of the Act for the period of time in that status, as evidenced by an **employment authorization** document issued by the Service;

(13) An **alien** granted voluntary departure by the Attorney General under the Family Unity Program established by section 301 of the Immigration Act of 1990, as evidenced by an em-

ployment authorization** document issued by the Service;

(14) An **alien** granted Family Unity benefits under section 1504 of the Legal Immigrant Family Equity (LIFE) Act Amendments, Public Law 106–554, and the provisions of 8 CFR part 245a, Subpart C of this chapter, as evidenced by an **employment authorization** document issued by the Service;

(15) Any **alien** in V nonimmigrant status as defined in section 101(a)(15)(V) of the Act and 8 CFR 214.15;

(16) An **alien authorized** to be admitted to or remain in the United States as a nonimmigrant **alien** victim of a severe form of trafficking in persons under section 101(a)(15)(T)(i) of the Act. **Employment authorization** granted under this paragraph shall expire upon the expiration of the underlying T–1 nonimmigrant status granted by the Service;

(17) [Reserved by 72 FR 53041]

(18) [Reserved by 72 FR 53041]

(19) Any **alien** in U–1 nonimmigrant status, pursuant to 8 CFR 214.14, for the period of time in that status, as evidenced by an **employment authorization** document issued by USCIS to the **alien**.

(20) Any **alien** in U–2, U–3, U–4, or U–5 nonimmigrant status, pursuant to 8 CFR 214.14, for the period of time in that status, as evidenced by an **employment authorization** document issued by USCIS to the **alien**.

(b) **Aliens authorized** for **employment** with a spe-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

cific employer incident to status. The following **classes** of nonimmigrant **aliens** are **authorized** to be **employed** in the United States by the specific employer and subject to the restrictions described in the section(s) of this chapter indicated as a condition of their admission in, or subsequent change to, such classification. An **alien** in one of these **classes** is not issued an **employment authorization** document by the Service:

(1) A foreign government official (A–1 or A–2), pursuant to § 214.2(a) of this chapter. An **alien** in this status may be **employed** only by the foreign government entity;

(2) An employee of a foreign government official (A–3), pursuant to § 214.2(a) of this chapter. An **alien** in this status may be **employed** only by the foreign government official;

(3) A foreign government official in transit (C–2 or C–3), pursuant to § 214.2(c) of this chapter. An **alien** in this status may be **employed** only by the foreign government entity;

(4) [Reserved]

(5) A nonimmigrant treaty trader (E–1) or treaty investor (E–2), pursuant to § 214.2(e) of this chapter. An **alien** in this status may be **employed** only by the treaty-qualifying company through which the **alien** attained the status. **Employment authorization** does not extend to the dependents of the principal treaty trader or treaty investor (also designated "E–1" or "E–2"), other than those specified in paragraph (c)(2) of this section;

(6) A nonimmigrant (F–1) student who is in valid nonimmigrant student status and pursuant to 8 CFR 214.2(f) is seeking:

(i) On-campus employment for not more than twenty hours per week when school is in session or full-time employment when school is not in session if the student intends and is eligible to register for the next term or session. Part-time on-campus employment is authorized by the school and no specific endorsement by a school official or Service officer is necessary;

(ii) [Reserved]

(iii) Curricular practical training (internships, cooperative training programs, or work-study programs which are part of an established curriculum) after having been enrolled full-time in a Service approved institution for one full academic year. Curricular practical training (part-time or full-time) is authorized by the Designated School Official on the student's Form I–20. No Service endorsement is necessary.

(iv) An employment authorization document under paragraph (c)(3)(i)(C) of this section based on a 17–month STEM Optional Practical Training extension, and whose timely filed employment authorization request is pending and employment authorization issued under paragraph (c)(3)(i)(B) of this section has expired. Employment is authorized beginning on the expiration date of the authorization issued under paragraph (c)(3)(i)(B) of this section and ending on the date of USCIS' written decision on the current employment authorization request, but not to exceed 180 days; or

(v) Pursuant to 8 CFR 214.2(h) is seeking H–1B nonimmigrant status and whose duration of status and employment authorization have been extended pursuant to 8 CFR 214.2(f)(5)(vi).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 1:14-cv-00254   Document 91-3   Filed on 01/14/15 in TXSD   Page 107 of 114

(7) A representative of an international organization (G–1, G–2, G–3, or G–4), pursuant to § 214.2(g) of this chapter. An alien in this status may be employed only by the foreign government entity or the international organization;

(8) A personal employee of an official or representative of an international organization (G–5), pursuant to § 214.2(g) of this chapter. An alien in this status may be employed only by the official or representative of the international organization;

(9) A temporary worker or trainee (H–1, H–2A, H–2B, or H–3), pursuant to § 214.2(h) of this chapter. An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional H–2B athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after acquisition by the new organization, within which time the new organization is expected to file a new Form I–129 to petition for H–2B classification. If a new Form I–129 is not filed within 30 days, employment authorization will cease. If a new Form I–129 is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease;

(10) An information media representative (I), pursuant to § 214.2(i) of this chapter. An alien in this status may be employed only for the sponsoring foreign news agency or bureau. Employment authorization does not extend to the dependents of an information media representative (also designated "I");

(11) An exchange visitor (J–1), pursuant to § 214.2(j) of this chapter and 22 CFR part 62. An alien in this status may be employed only by the exchange visitor program sponsor or appropriate designee and within the guidelines of the program approved by the Department of State as set forth in the Form DS–2019, Certificate of Eligibility, issued by the program sponsor;

(12) An intra-company transferee (L–1), pursuant to § 214.2(1) of this chapter. An alien in this status may be employed only by the petitioner through whom the status was obtained;

(13) An alien having extraordinary ability in the sciences, arts, education, business, or athletics (O–1), and an accompanying alien (O–2), pursuant to § 214.2(o) of this chapter. An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional O–1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after the acquisition by the new organization, within which time the new organization is expected to file a new Form I–129 petition for O nonimmigrant classification. If a new Form I–129 is not filed within 30 days, employment authorization will cease. If a new Form I–129 is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease.

(14) An athlete, artist, or entertainer (P–1, P–2, or P–3), pursuant to § 214.2(p) of this chapter. An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional P–1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after the acquisition by the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

new organization, within which time the new organization is expected to file a new Form I–129 for P–1 nonimmigrant classification. If a new Form I–129 is not filed within 30 days, employment authorization will cease. If a new Form I–129 is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease;

(15) An international cultural exchange visitor (Q–1), according to § 214.2(q)(1) of this chapter. An alien may only be employed by the petitioner through whom the status was obtained;

(16) An alien having a religious occupation, pursuant to § 214.2(r) of this chapter. An alien in this status may be employed only by the religious organization through whom the status was obtained;

(17) Officers and personnel of the armed services of nations of the North Atlantic Treaty Organization, and representatives, officials, and staff employees of NATO (NATO–1, NATO–2, NATO–3, NATO–4, NATO–5 and NATO–6), pursuant to § 214.2(o) of this chapter. An **alien** in this status may be **employed** only by NATO;

(18) An attendant, servant or personal employee (NATO–7) of an **alien** admitted as a NATO–1, NATO–2, NATO–3, NATO–4, NATO–5, or NATO–6, pursuant to § 214.2(o) of this chapter. An **alien** admitted under this classification may be **employed** only by the NATO **alien** through whom the status was obtained;

(19) A nonimmigrant pursuant to section 214(e) of the Act. An **alien** in this status must be engaged in business activities at a professional level in accordance with the provisions of Chapter 16 of the North American Free Trade Agreement (NAFTA);

(20) A nonimmigrant **alien** within the **class** of **aliens** described in paragraphs (b)(2), (b)(5), (b)(8), (b)(9), (b)(10), (b)(11), (b)(12), (b)(13), (b)(14), (b)(16), and (b)(19) of this section whose status has expired but who has filed a timely application for an extension of such stay pursuant to §§ 214.2 or 214.6 of this chapter. These **aliens** are **authorized** to continue **employment** with the same employer for a period not to exceed 240 days beginning on the date of the expiration of the **authorized** period of stay. Such **authorization** shall be subject to any conditions and limitations noted on the initial **authorization**. However, if the district director or service center director adjudicates the application prior to the expiration of this 240 day period and denies the application for extension of stay, the **employment authorization** under this paragraph shall automatically terminate upon notification of the denial decision;

(21) A nonimmigrant **alien** within the **class** of **aliens** described in 8 CFR 214.2(h)(1)(ii)(C) who filed an application for an extension of stay pursuant to 8 CFR 214.2 during his or her period of admission. Such **alien** is **authorized** to be **employed** by a new employer that has filed an H–2A petition naming the **alien** as a beneficiary and requesting an extension of stay for the **alien** for a period not to exceed 120 days beginning from the "Received Date" on Form I–797 (Notice of Action) acknowledging receipt of the petition requesting an extension of stay, provided that the employer has enrolled in and is a participant in good standing in the E–Verify program, as determined by USCIS in its discretion. Such authorization will be subject to any conditions and limitations noted on

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

the initial authorization, except as to the employer and place of employment. However, if the District Director or Service Center director adjudicates the application prior to the expiration of this 120–day period and denies the application for extension of stay, the employment authorization under this paragraph (b)(21) shall automatically terminate upon 15 days after the date of the denial decision. The employment authorization shall also terminate automatically if the employer fails to remain a participant in good standing in the E–Verify program, as determined by USCIS in its discretion;

(22) An alien in E–2 CNMI Investor nonimmigrant status pursuant to 8 CFR 214.2(e)(23). An alien in this status may be employed only by the qualifying company through which the alien attained the status. An alien in E–2 CNMI Investor nonimmigrant status may be employed only in the Commonwealth of the Northern Mariana Islands for a qualifying entity. An alien who attained E–2 CNMI Investor nonimmigrant status based upon a Foreign Retiree Investment Certificate or Certification is not employment-authorized. Employment authorization does not extend to the dependents of the principal investor (also designated E–2 CNMI Investor nonimmigrants) other than those specified in paragraph (c)(12) of this section;

(23) A Commonwealth of the Northern Mariana Islands transitional worker (CW–1) pursuant to 8 CFR 214.2(w). An alien in this status may be employed only in the CNMI during the transition period, and only by the petitioner through whom the status was obtained, or as otherwise authorized by 8 CFR 214.2(w). An alien who is lawfully present in the CNMI (as defined by 8 CFR 214.2(w)(1)(v)) on or before November 27, 2011, is authorized to be employed in the CNMI, and is so employed in the CNMI by an employer properly filing an application under 8 CFR 214.2(w)(14)(ii) on or

before such date for a grant of CW–1 status to its employee in the CNMI for the purpose of the alien continuing the employment, is authorized to continue such employment on or after November 27, 2011, until a decision is made on the application; or

(24) An alien who is authorized to be employed in the Commonwealth of the Northern Mariana Islands for a period of up to 2 years following the transition program effective date, under section 6(e)(2) of Public Law 94–241, as added by section 702(a) of Public Law 110–229. Such alien is only authorized to continue in the same employment that he or she had on the transition program effective date as defined in 8 CFR 1.1 until the earlier of the date that is 2 years after the transition program effective date or the date of expiration of the **alien's employment authorization**, unless the **alien** had unrestricted **employment authorization** or was otherwise **authorized** as of the transition program effective date to change employers, in which case the **alien** may have such **employment** privileges as were **authorized** as of the transition program effective date for up to 2 years.

(c) **Aliens** who must apply for **employment authorization**. An **alien** within a **class** of **aliens** described in this section must apply for work **authorization**. If **authorized**, such an **alien** may **accept employment** subject to any restrictions stated in the regulations or cited on the **employment authorization** document. USCIS, in its discretion, may establish a specific validity period for an **employment authorization** document, which may include any period when an administrative appeal or judicial review of an application or petition is pending.

(1) An **alien** spouse or unmarried dependent child; son or daughter of a foreign government official (A–1 or A–2) pursuant to 8 CFR 214.2(a)(2) and who presents an endorsement

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

from an **authorized** representative of the Department of State;

(2) An **alien** spouse or unmarried dependent son or daughter of an **alien** employee of the Coordination Council for North American Affairs (E–1) pursuant to § 214.2(e) of this chapter;

(3) A nonimmigrant (F–1) student who:

(i)(A) Is seeking pre-completion practical training pursuant to 8 CFR 214.2(f)(10)(ii)(A)(1)–(2);

(B) Is seeking authorization to engage in post-completion Optional Practical Training (OPT) pursuant to 8 CFR 214.2(f)(10)(ii)(A)(3); or

(C) Is seeking a 17–month STEM OPT extension pursuant to 8 CFR 214.2(f)(10)(ii)(C);

(ii) Has been offered employment under the sponsorship of an international organization within the meaning of the International Organization Immunities Act (59 Stat. 669) and who presents a written certification from the international organization that the proposed employment is within the scope of the organization's sponsorship. The F–1 student must also present a Form I–20 ID or SEVIS Form I–20 with employment page completed by DSO certifying eligibility for employment; or

(iii) Is seeking employment because of severe economic hardship pursuant to 8 CFR 214.2(f)(9)(ii)(C) and has filed the Form I–20 ID and Form I–538 (for non–SEVIS schools), or SEVIS Form I–20 with employment page completed by the DSO certifying eligibility, and any other supporting materials such as affidavits which further detail the unforeseen economic circumstances that require the student to seek employment authorization.

(4) An alien spouse or unmarried dependent child; son or daughter of a foreign government official (G–1, G–3 or G–4) pursuant to 8 CFR 214.2(g) and who presents an endorsement from an authorized representative of the Department of State;

(5) An alien spouse or minor child of an exchange visitor (J–2) pursuant to § 214.2(j) of this chapter;

(6) A nonimmigrant (M–1) student seeking employment for practical training pursuant to 8 CFR 214.2(m) following completion of studies. The alien may be employed only in an occupation or vocation directly related to his or her course of study as recommended by the endorsement of the designated school official on the I–20 ID;

(7) A dependent of an alien classified as NATO–1 through NATO–7 pursuant to § 214.2(n) of this chapter;

(8) An alien who has filed a complete application for asylum or withholding of deportation or removal pursuant to 8 CFR part 208, whose application:

(i) Has not been decided, and who is eligible to apply for employment authorization under § 208.7 of this chapter because the 150-day period set forth in that section has expired. Employment authorization may be granted according to the provisions of § 208.7 of this chapter in increments to be determined by the Commis-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

sioner and shall expire on a specified date; or

(ii) Has been recommended for approval, but who has not yet received a grant of asylum or withholding or deportation or removal;

(9) An alien who has filed an application for adjustment of status to lawful permanent resident pursuant to part 245 of this chapter. For purposes of section 245(c)(8) of the Act, an alien will not be deemed to be an "unauthorized alien" as defined in section 274A(h)(3) of the Act while his or her properly filed Form I–485 application is pending final adjudication, if the alien has otherwise obtained permission from the Service pursuant to 8 CFR 274a.12 to engage in employment, or if the alien had been granted employment authorization prior to the filing of the adjustment application and such authorization does not expire during the pendency of the adjustment application. Upon meeting these conditions, the adjustment applicant need not file an application for employment authorization to continue employment during the period described in the preceding sentence;

(10) An alien who has filed an application for suspension of deportation under section 244 of the Act (as it existed prior to April 1, 1997), cancellation of removal pursuant to section 240A of the Act, or special rule cancellation of removal under section 309(f)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, enacted as Pub.L. 104–208 (110 Stat. 3009–625) (as amended by the Nicaraguan Adjustment and Central American Relief Act (NACARA)), title II of Pub.L. 105–100 (111 Stat. 2160, 2193) and whose properly filed application has been accepted by the Service or EOIR;

(11) An alien paroled into the United States

temporarily for emergency reasons or reasons deemed strictly in the public interest pursuant to § 212.5 of this chapter;

(12) An alien spouse of a long-term investor in the Commonwealth of the Northern Mariana Islands (E–2 CNMI Investor) other than an E–2 CNMI investor who obtained such status based upon a Foreign Retiree Investment Certificate, pursuant to 8 CFR 214.2(e)(23). An alien spouse of an E–2 CNMI Investor is eligible for employment in the CNMI only;

(13) [Reserved]

(14) An alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority, if the alien establishes an economic necessity for employment;

(15) [Reserved]

(16) Any alien who has filed an application for creation of record of lawful admission for permanent residence pursuant to part 249 of this chapter;

(17) A nonimmigrant visitor for business (B–1) who:

(i) Is a personal or domestic servant who is accompanying or following to join an employer who seeks admission into, or is already in, the United States as a nonimmigrant defined under sections 101(a)(15)(B), (E), (F), (H), (I), (J), (L) or section 214(e) of the Act. The personal or domestic servant shall have a residence abroad which he or she has no intention of abandoning and shall demonstrate at least one year's experience as a personal or domestic ser-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

vant. The nonimmigrant's employer shall demonstrate that the employer/employee relationship has existed for at least one year prior to the employer's admission to the United States; or, if the employer/employee relationship existed for less than one year, that the employer has regularly employed (either year-round or seasonally) personal or domestic servants over a period of several years preceding the employer's admission to the United States;

(ii) Is a domestic servant of a United States citizen accompanying or following to join his or her United States citizen employer who has a permanent home or is stationed in a foreign country, and who is visiting temporarily in the United States. The employer/employee relationship shall have existed prior to the commencement of the employer's visit to the United States; or

(iii) Is an employee of a foreign airline engaged in international transportation of passengers freight, whose position with the foreign airline would otherwise entitle the employee to classification under section 101(a)(15)(E)(i) of the Immigration and Nationality Act, and who is precluded from such classification solely because the employee is not a national of the country of the airline's nationality or because there is no treaty of commerce and navigation in effect between the United States and the country of the airline's nationality.

(18) An alien against whom a final order of deportation or removal exists and who is released on an order of supervision under the authority contained in section 241(a)(3) of the Act may be granted employment authorization in the discretion of the district director only if the alien cannot be removed due to the refusal of all countries designated by the alien or under section 241 of the Act to receive the alien, or be-

cause the removal of the alien is otherwise impracticable or contrary to the public interest. Additional factors which may be considered by the district director in adjudicating the application for employment authorization include, but are not limited to, the following:

(i) The existence of economic necessity to be employed;

(ii) The existence of a dependent spouse and/or children in the United States who rely on the alien for support; and

(iii) The anticipated length of time before the alien can be removed from the United States.

(19) An alien applying for Temporary Protected Status pursuant to section 244 of the Act shall apply for employment authorization only in accordance with the procedures set forth in part 244 of this chapter.

(20) Any alien who has filed a completed legalization application pursuant to section 210 of the Act (and part 210 of this chapter).

(21) A principal nonimmigrant witness or informant in S classification, and qualified dependent family members.

(22) Any alien who has filed a completed legalization application pursuant to section 245A of the Act (and part 245a of this chapter). Employment authorization shall be granted in increments not exceeding 1 year during the period the application is pending (including any period when an administrative appeal is pending) and shall expire on a specified date.

(23) [Reserved by 76 FR 53796]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(24) An alien who has filed an application for adjustment pursuant to section 1104 of the LIFE Act, Public Law 106–553, and the provisions of 8 CFR part 245a, Subpart B of this chapter.

(25) An immediate family member of a T–1 victim of a severe form of trafficking in persons designated as a T–2, T–3 or T–4 nonimmigrant pursuant to § 214.11 of this chapter. Aliens in this status shall only be authorized to work for the duration of their T nonimmigrant status.

(d) An alien lawfully enlisted in one of the Armed Forces, or whose enlistment the Secretary with jurisdiction over such Armed Force has determined would be vital to the national interest under 10 U.S.C. 504(b)(2), is authorized to be employed by that Armed Force in military service, if such employment is not otherwise authorized under this section and the immigration laws. An alien described in this section is not issued an employment authorization document.

(e) Basic criteria to establish economic necessity. Title 45--Public Welfare, Poverty Guidelines, 45 CFR 1060.2 should be used as the basic criteria to establish eligibility for employment authorization when the alien's economic necessity is identified as a factor. The alien shall submit an application for employment authorization listing his or her assets, income, and expenses as evidence of his or her economic need to work. Permission to work granted on the basis of the alien's application for employment authorization may be revoked under § 274a.14 of this chapter upon a showing that the information contained in the statement was not true and correct.

[53 FR 8614, March 16, 1988; 53 FR 46855, Nov. 21, 1988; 54 FR 16, Jan. 3, 1989; 54 FR 48577, Nov. 24, 1989; 55 FR 5576, Feb. 16, 1990; 55 FR 25935, 25936, June 25, 1990; 56 FR 624, Jan. 7, 1991; 56 FR 23496, 23499, May 22, 1991; 56 FR 41782, 41786, 41787, Aug. 23, 1991; 56 FR 55616, Oct. 29, 1991; 57 FR 6462, Feb. 25, 1992; 57 FR 31956, July 20, 1992; 57 FR 42884, Sept. 17, 1992; 58 FR 48780, Sept. 20, 1993; 58 FR 69217, Dec. 30, 1993; 59 FR 42487, Aug. 15, 1994; 59 FR 47063, Sept. 14, 1994; 59 FR 52894, Oct. 20, 1994; 59 FR 62302, Dec. 5, 1994; 60 FR 14353, March 17, 1995; 60 FR 21976, May 4, 1995; 60 FR 44271, Aug. 25, 1995; 60 FR 66067, 66069, Dec. 21, 1995; 61 FR 46537, Sept. 4, 1996; 62 FR 10389, March 6, 1997; 62 FR 18514, April 16, 1997; 62 FR 39425, July 23, 1997; 62 FR 46553, Sept. 3, 1997; 63 FR 1334, Jan. 9, 1998; 63 FR 27833, May 21, 1998; 63 FR 63597, Nov. 16, 1998; 64 FR 25773, May 12, 1999; 64 FR 27881, May 21, 1999; 65 FR 14780, March 17, 2000; 65 FR 15844, 15846, 15854, March 24, 2000; 65 FR 43680, July 14, 2000; 66 FR 29681, June 1, 2001; 66 FR 42595, Aug. 14, 2001; 66 FR 46704, Sept. 7, 2001; 67 FR 4803, Jan. 31, 2002; 67 FR 38350, June 4, 2002; 67 FR 76280, Dec. 11, 2002; 69 FR 45557, July 30, 2004; 69 FR 47763, Aug. 6, 2004; 72 FR 53041, Sept. 17, 2007; 73 FR 18956, April 8, 2008; 73 FR 76914, Dec. 18, 2008; 74 FR 7995, Feb. 23, 2009; 74 FR 26515, June 3, 2009; 74 FR 55111, Oct. 27, 2009; 74 FR 55740, Oct. 28, 2009; 75 FR 47701, Aug. 9, 2010; 75 FR 58990, Sept. 24, 2010; 75 FR 79277, Dec. 20, 2010; 76 FR 53796, Aug. 29, 2011; 76 FR 55538, Sept. 7, 2011]

SOURCE: 52 FR 16221, May 1, 1987; 52 FR 43052, Nov. 9, 1987; 53 FR 8612, March 16, 1988; 55 FR 5576, Feb. 16, 1990; 57 FR 6462, Feb. 25, 1992; 57 FR 42884, Sept. 17, 1992; 64 FR 47101, Aug. 30, 1999; 66 FR 42595, Aug. 14, 2001; 66 FR 46704, Sept. 7, 2001; 68 FR 10923, March 6, 2003; 68 FR 35275, June 13, 2003; 73 FR 10136, Feb. 26, 2008; 74 FR 55739, Oct. 28, 2009; 75 FR 79277, Dec. 20, 2010, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1324a; 48 U.S.C. 1806; 8 CFR part 2.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

8 C. F. R. § 274a.12, 8 CFR § 274a.12

Current through Jan. 8, 2015; 80 FR 1328.

© 2015 Thomson Reuters.
END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.