IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
———————————————————————————————
                                    )
STATE OF TEXAS, ET AL               )
                                    )
                                    ) CIVIL ACTION NO.
VS.                                 ) B-14-254
                                    )
UNITED STATES OF AMERICA, ET AL     )
———————————————————————————————)
```

PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE ANDREW S. HANEN
JANUARY 15, 2015

APPEARANCES:

For the Plaintiffs:         MR. ANDREW STEPHEN OLDHAM
                            MR. ADAM NICHOLAS BITTER
                            MS. ANGELA V. COLMENERO
                            MR. ARTHUR D'ANDREA
                            MR. JONATHAN F. MITCHELL
                            Texas Attorney General's Office
                            P.O. Box 12548
                            Austin, Texas  78711

For the Defendants:         MS. KATHLEEN R. HARTNETT
                            MS. KYLE R. FREENY
                            US Department of Justice
                            Civil Division
                            950 Pennsylvania Avenue
                            Washington, D.C.  20530

For the Defendants:         MR. DANIEL DAVID HU
                            U.S. Attorneys Office
                            Houston, TX

Transcribed by:             BARBARA BARNARD
                            Official Court Reporter
                            600 E. Harrison, Box 301
                            Brownsville, Texas  78520
                            (956)548-2591

1           THE COURT:  Thank you.  Be seated, please.

2       Good morning.  Welcome.  You'll see that we were trying to

3   figure out what would make our visitors from the north and from

4   the east feel at home.  And I'm sure our Mayor Tony and the

5   Chamber of Commerce got together with the weatherman and got us

6   frozen rain to make everyone feel comfortable.

7       Let me go over kind of a little bit of groundwork before we

8   start.  First of all, I appreciate everybody's cooperation with

9   no kind of photography or recording here in the courthouse.

10  Sometimes I know a lot of people say, well, why do you -- what

11  is the reason you do that?

12      Well, in this courthouse especially, we have a lot of

13  confidential informants, defendants who are cooperating with the

14  government.  We have a very -- a number of people that if

15  somebody were taking a photograph of them, those individuals or

16  their families would be immediately in danger from some of the

17  cartels, and so we appreciate everybody's cooperation in that.

18      Secondly, I appreciate the lawyers for the state for

19  coordinating with the other states in their presentation.  I

20  asked them to do that when we had kind of a preliminary

21  phonecall.

22      And I will ask everyone when they speak, at least for the

23  first time, to, one, speak from the podium, and also identify

24  yourself.

25      There are a couple housekeeping matters.  The government has

 1   filed a motion to file a -- another brief, and we'll probably

 2   need to talk about the timing of that.  And I -- Cristi informed

 3   me that we may have another plaintiff joining, and we'll talk

 4   about the timing of that too and whether it matters.

 5       With that, let me also go over just a couple things that --

 6   and I don't want to impact anybody's presentation as they want

 7   to make it.  But I will say that talking not just to me, but to

 8   anyone in Brownsville about immigration is like talking to Noah

 9   about the flood, both in legal terms and in practical terms.

10   So, I mean, we're the spearhead of the spear.  If there's any

11   tip to it, we're it.

12       And by that, we've seen the upsides of -- and downsides of

13   strict enforcement of immigration laws.  I mean, as a judge, I'm

14   compelled to sentence people who are here illegally at times

15   when I think all they are are trying to make a better life for

16   their family, and that's kind of a downside.  We see the upside

17   of it.  We see -- just last week we swore in over 100 new

18   citizens.  And we swear in thousands of new citizens a year

19   here, and we get pleasure out of that.

20       We see the upsides and downsides of what some people might

21   describe as a lax enforcement policy.  I mean, we -- probably in

22   the circumference of just several miles around this courthouse,

23   we probably have thousands of illegal aliens that are living and

24   doing nothing more than supporting their family and raising them

25   and trying to make a better life for themselves, but we've also

1   seen some of the crimes that are committed.  I mean, just

2   earlier this fall, we had a Border Patrol agent shot and killed

3   in Willacy County allegedly by illegal aliens.  So, I mean,

4   there are upsides and downsides about that, and we see that.

5        I'm not trying to impinge on either side's presentation, but

6   I'm just telling you we -- you know, we're kind of where the

7   rubber hits the road down here, so we see it.

8        I would also like to add that as far as the Court is

9   concerned, and I think truthfully as far as the public is

10  concerned, there aren't any bad guys in this.  In fact, the

11  president has actually said this in some of his statements that,

12  you know, people can have legitimate views both ways.  And,

13  quite frankly, I think if you took a poll of most people, they

14  would feel strongly both ways on some of the issues that are

15  going to be presented here.

16       But no one -- you know, no one is a evil person.  No one is

17  Xenophobic.  I mean, this is an area of legitimate debate, and I

18  wanted to make that clear.  In fact, it was -- far be it from me

19  to frequently quote John Stewart, but John Stewart had an

20  interesting comment the other day following the tragedy in Paris

21  where he said, you know, this is a stark reminder that we jab

22  and ridicule politicians and various people, and we go back and

23  forth and back and forth, but it's a conversation among what he

24  called team civilization.  And the good news about this, and,

25  quite frankly, good news, we have some people out in front of

1    the courthouse protesting.  The good news is you're allowed to

2    do that here.  And in a lot of communities, you wouldn't be

3    allowed to do that.  In a lot of countries, you wouldn't be

4    allowed to do that.

5        Having said that, though, let me bring up one other thing.

6    And the government put this in their brief.  And by "the

7    government," I mean, everybody here is a government, but I refer

8    to the state, and "the government" being the federal government.

9        The government quoted a 10th Circuit case in their brief

10   that basically said that you're not supposed to convert the

11   federal courts into a public-funded forum for the ventilation of

12   public grievances.  And I thought that was an eloquent way of

13   stating that the Southern District of Texas, we're not the

14   complaint department.  You know, we're not -- just because

15   somebody has a problem with Congress or somebody has a problem

16   with the Executive Branch, I mean, we're open for business for

17   cases and controversies, but we're not where someone necessarily

18   goes to ventilate about your latest disappointment.

19       You know, people are welcome to do that.  And that's the

20   great thing about this country is you can do it.  But

21   probably -- you know, you probably want to go down the street to

22   the Vermillion and do it over a beer and nachos with somebody,

23   but not necessarily here in this courtroom.  I mean, with

24   apologies to our friends from Wisconsin, if this Court had the

25   power to dictate certain things, I mean, J.J. Watt would be the

1   most valuable player in the NFL, but I'm probably guessing that

2   Aaron Rodgers is going to be.

3        So keeping with that in mind, the way I look at this -- and

4   I'll let the parties correct me if they think I'm off base on

5   this.  We're talking about legal issues.  We're talking about

6   standing, we're talking about constitutionality, and we're

7   talking about legality under the APA.  And those are the issues

8   that I want to focus on.  And I'm willing to focus on anything

9   else that any of the lawyers think I'm missing, but I want to

10  concentrate on those because I think those are the issues I'm

11  going to be ruling on.

12       All right.  I think the -- what I'd like to hear

13  initially -- and again, I know at least the state has a

14  presentation and a PowerPoint and everything.  Let me start with

15  you.  Mr. Oldham, will you identify yourself and the people at

16  your table maybe?

17       MR. OLDHAM:  Yes, Your Honor.  Good morning.  Andrew

18  Oldham from the Office of the Attorney General of Texas

19  appearing today on behalf of the plaintiff states.  With me at

20  counsel table, Arthur d'Andrea, Angela Colmenero, Adam Bitter

21  and Jonathan Mitchell, all from the State of Texas.

22       THE COURT:  All right.  And do we have -- is there

23  someone else going to appear for any of the other states?

24       MR. OLDHAM:  No, Your Honor.  In response to the Court's

25  request, I will be presenting on behalf of all of us.

1          THE COURT:  All right.  Mr. Hu, I'm going to pick on you

2     since I know you.  Introduce yourself and the folks at your

3     table.

4          MR. HU:  Daniel Hu, Assistant United States Attorney.

5     With me is Kathleen Hartnett from the Civil Division in

6     Washington who will be presenting argument on behalf of the

7     United States, and Kyle Freeny, also from the Civil Division in

8     Washington.

9          THE COURT:  All right.  Mr. Oldham, my sense of things

10    would be to start with you and say tell me how you get here.

11    And by "here," I mean why do you have standing to bring this

12    lawsuit?  I don't want to impact -- if you want to work your way

13    through your PowerPoint, I'm welcome -- you're welcome to do

14    that, but that's the issue I first want to focus on.

15         MR. OLDHAM:  Yes, Your Honor.  Happy to start.  Happy to

16    start with standing.  Happy to start with the PowerPoint or with

17    housekeeping, whichever would be --

18         THE COURT:  Well, let's do housekeeping last.

19         MR. OLDHAM:  Great.  So why don't we start with

20    standing.  And when we get to that point in the presentation, we

21    can skip through it at the Court's convenience.

22     But the State of Texas and the other plaintiff states that

23    are represented before the Court today have standing for three

24    independent reasons.  The first is direct economic harm.  The

25    second is what we call Massachusetts style injuries.  Those are

1    injuries to the states' healthcare systems, the states' law

2    enforcement programs, and the states' educational programs, all

3    of which the Supreme Court in the *Massachusetts versus EPA* case,

4    which was the greenhouse gas regulation case from 2007,

5    countenanced as legitimate bases for states to invoke the

6    jurisdiction of the federal courts.

7          And then the third and final is what we call parens patriae

8    standing, and the leading case on that is the *Alfred L. Snapp*

9    case in which the Court said that the Commonwealth of Puerto

10   Rico could invoke the parens patriae standing to come into

11   federal court and to vindicate the economic well being and the

12   economic interests of its residents.

13         So all three of those are independent bases for standing.

14   They all apply to the plaintiff states.  And in order to dismiss

15   this case for lack of jurisdiction, the United States would have

16   to persuade this Court that all three of those are lacking.

17         So we can walk through the first -- I'm happy to go to the

18   slides, or we can --

19               THE COURT:  However way you want to approach it is fine

20   with me.

21               MR. OLDHAM:  That's great.

22         Why don't -- for the Court's convenience, why don't we -- we

23   can walk through the slides, and if -- and standing is obviously

24   the first substantive issue that we'll deal with, and we can

25   come back if we need to.

 1          THE COURT:  All right.

 2          MR. OLDHAM:  Your Honor, if I might, I'd like to begin

 3   by acknowledging what the Court said at the opening, which is we

 4   realize that this is a case that does tread on a policy dispute,

 5   but we are not here today to talk about policy disputes or to

 6   take a position on what would be a good law if Congress passed

 7   it through the bicameralism and presentment and if the president

 8   signed it into law.  What we're here today to talk about is a

 9   legal issue that goes to the foundation of this country, the

10   foundation of the Article I and Article II and Article III,

11   separation of powers.

12          The question presented in this case is whether the president

13   can unilaterally suspend the federal immigration laws,

14   unilaterally create a massive new federal bureaucracy for

15   processing and approving deferred action applications,

16   unilaterally hand out millions of federal authorization

17   documents, and then cloak that entire new federal operation from

18   judicial review by any plaintiff in any court at any time by

19   calling it executive inaction.  And the states and officials

20   representing one half of this country submit to the Court that

21   the president cannot.

22          Now, this case, as the Court acknowledged, involves the

23   federal immigration laws.  But as we've explained in our papers

24   to a deafeningly silent response from the United States, if this

25   president can do this, then the next president can do the same

1    thing with the tax laws, with the environmental laws, with the

2    workplace protection laws, really with any law.  And if the

3    defendants have their way, the federal courts will not now or

4    ever have a chance to decide whether that unprecedented

5    conception of executive power can be squared with Article II of

6    the Constitution or the Administrative Procedure Act.

7        On the other hand, a preliminary injunction merely will

8    preserve the status quo, both in terms of the constitutional

9    separation of powers and federal law.  A preliminary injunction

10   will give the 25 plaintiff states a day in court, and a

11   preliminary injunction will vindicate a principle that is

12   literally as old as *Marbury versus Madison*; namely, that the

13   president does not get to decide what the law is.

14       Now, there's been a lot of paper filed in this case, and the

15   United States has promised to file more.  So I'd like to take a

16   step back and talk about the bigger pictures and walk through

17   about what this case is about, what it's not about, and why a

18   preliminary injunction should issue.

19       And I think the first and most important point is to explain

20   that this is a case about action; executive action, not

21   executive inaction.  And the United States has done a lot in

22   this case I think to conflate these two concepts.  So at the

23   very beginning, I'd like to clear them up and make sure that

24   we're very clear about what the state is challenging and what

25   the state is not challenging.

1    This goes back to the policy debate that Your Honor

2    mentioned at the beginning.  Then, of course, we'll answer

3    the -- any questions that the Court could have about standing

4    before turning to our two causes of action, the Take Care Clause

5    and the Administrative Procedure Act.  We'll also talk about the

6    other preliminary injunction factors that the Court has to

7    consider, and then the states' proposal for what the injunction

8    should look like.

9    So first, what do we mean by executive action?  The states

10   in this case are aggrieved by actions that the Executive Branch

11   has taken, actions that the Executive Branch is currently

12   taking; and for purposes of the preliminary injunction, we are

13   aggrieved by the actions that the president and the defendants

14   have promised to take.  So what are they?

15   The first one is unilateral lawmaking.  As the Court knows

16   and as the Court referenced earlier, the immigration laws are

17   complicated.  They're complex.  They've existed since at least

18   1952.  They've survived through 11 presidential administrations.

19   They spanned hundreds of pages of the United States Code and

20   thousands of pages of the Code of Federal Regulations.

21   And in this case, the defendants have taken all of that law

22   and they have put it aside, and they have replaced it with a

23   six-page DHS directive that applies to 40 percent of the

24   nation's undocumented population.  And it's our position that

25   that is an unlawful exercise of unilateral lawmaking.

1    They've also created a new federal bureaucracy that

2    processes forms that look like this.  This is the I-821D that

3    the defendants have used for the DACA program and promise to use

4    a similar, if not identical one, for the new program.  They've

5    opened new service centers or are in the process of opening new

6    service centers, hiring thousands of federal employees to

7    process people.  They'll promulgate new standard operating

8    procedures on how to approve these applications, and then

9    they'll hand out application approvals.

10    Again, those are things that the defendants are

11    affirmatively doing, not things that they're not doing.  So

12    we're complaining about the actions that they are taking.

13    After the 821D process, the defendants are going to hand out

14    millions of employment authorization cards.  They look like

15    this, not unlike a driver's license.  Again, separate

16    application process, separate approval process, separate

17    standard operating procedure process, approvals and cards

18    issuing.  Again, these are things they're doing, aggrieving the

19    states as we'll discuss in just a second, and things that we're

20    asking to be enjoined.

21    At the end of the EAC process, the defendants are then

22    doling out government benefits, and there are many of them at

23    both the federal and the state level.  Again, these are things

24    the defendants are doing, not things they're not doing.

25    So, for example, federal work authorizations, those EAC

1    cards that we just looked at, will give millions of people the

2    opportunity to work lawfully that they did not have before.

3    They will also give out Social Security numbers, Social Security

4    benefits, Medicare benefits, myriad tax credits, including the

5    earned income tax credit.

6              THE COURT:  What proof do I have of that?

7              MR. OLDHAM:  The defendants' own documents, Your Honor.

8    All of these things are on -- are things that the defendants

9    have either admitted to doing under DACA or promised to do under

10   DAPA or the 2014 DHS directive.  They're in the preliminary

11   injunction papers.  Pages 12 and 40 of the defendants'

12   opposition to the preliminary injunction, they've admitted that

13   they will do these same things for the new program.

14      They will also get privileges to travel as they did under

15   DACA, unemployment insurance and state licensing.  So again, all

16   of these things that you see here are things that the defendants

17   are affirmatively doing, and they have to have lawful

18   authorization to do these things.

19             THE COURT:  Don't they have some statutory authority for

20   allowing individuals to work?

21             MR. OLDHAM:  Your Honor, the -- yes, they do have

22   statutory authorization to allow individuals to work.  It is our

23   position that they do not have statutory authorization to do

24   this.  And, in fact, it's the existence of the statutory

25   authorization that proves that they don't have this authori --

 1     that they don't have the ability to do what they're doing

 2     because there's nothing in any of the provisions -- and we'll

 3     show them to the Court later.  There are, by our count,

 4     approximately 27 separate statutory provisions passed by

 5     Congress and signed by the president that govern the lawful

 6     presence of parents for U.S. citizens, the lawful presence for

 7     parents of legal permanent residents, and the lawful provision

 8     of work authorizations.  And not a single one of those says that

 9     the President of the United States can extend a work

10     authorization -- or the defendants in this case can extend work

11     authorizations to people who are not here lawfully.

12          So just take one example.  The defendants have cited in

13     their papers Ts and U visas.  For T and U visa applicants, those

14     are actually statutorily authorized to get deferred action, and

15     they're also statutorily authorized to get work permits.  But if

16     you don't have the visa, if you don't -- if you're not in the

17     process of or already having received some lawful immigration

18     status, there's nothing in the statutory code that allows the

19     defendants to grant work authorizations in those circumstances,

20     much less is there something in a mountain of restrictions that

21     authorizes them to grant work authorizations to 40 percent of

22     the nation's undocumented population.

23          And so those things, all of these things, the affirmative

24     actions that they are taking, which is our position they're not

25     lawfully authorized to do, are the things that we're seeking to

1    enjoin.

2        So why are we entitled -- I'm sorry.  I should say what

3    we're not here to talk about, the things that this case is

4    really not about.  You're going to hear from the United States

5    today things like enforcement priorities; that they're going to

6    accuse us of interfering with their enforcement priorities.

7    They'll accuse us of interfering with their prosecutorial

8    discretion.  They may reference the *Heckler versus Chaney* case,

9    which is a case in which the FDA decided not to bring an

10   enforcement action for a mislabeling of a particular drug.  And

11   you're going to hear them -- they may even bring up again what

12   they said in their PI opposition, that they accuse the state

13   of -- or the states of commandeering federal enforcement

14   prerogatives or taking a radical position that all undocumented

15   aliens must be removed.

16       These are not our positions.  Every single one of these is a

17   red herring, and none of this is what this case is about.  This

18   case is about executive action.  It's not about executive

19   inaction.

20       And so we're here today to ask for a preliminary injunction

21   that prohibits them from doing the things we say are unlawful.

22   We're not asking this Court for an injunction that requires them

23   to do things like this.

24       So why are we entitled to an injunction?  The first, as the

25   Court referenced, is standing.  And these are the three points

1    that we had mentioned at the very beginning, the three bases for

2    the states' standing:  Direct economic costs to the states,

3    Massachusetts style costs, and then the parens patriae injuries.

4    And, of course, all three of them are independent.  All three of

5    them must be defeated for the state to be -- the states to be

6    dismissed.

7         So let's start with licensing.  Now, as we've explained in

8    the papers, the DHS directive is going to impose significant

9    costs on the states, and one of the most vivid is licensing.  So

10   take, for example, the State of Texas.  The facts at law with

11   respect to our state are contained in the Joe Peters'

12   declaration.  As Mr. Peters explained, if someone shows up at a

13   Texas DPS office with a card from the Department of Homeland

14   Security that says that they're, quote, authorized to be in the

15   United States, which is the statutory term in the State of

16   Texas, then they're entitled to get a driver's license.

17             THE COURT:  Why?

18             MR. OLDHAM:  They're entitled to get a driver's license,

19   well, for two reasons.  One is what the statute says; and two is

20   what the United States says.  So the statute says "authorized to

21   be in the United States."

22             THE COURT:  Which statute?

23             MR. OLDHAM:  I'm sorry.  I'm referring to the Texas

24   Transportation Code which says that if you're authorized to be

25   in the United States, then you are authorized to get a driver's

1    license, and the state does not have the discretion to refuse

2    it.

3        So that's what our statute says.  And so --

4        THE COURT:  Wouldn't the government consider that to be

5    a self-inflicted injury?

6        MR. OLDHAM:  That's exactly right, Your Honor.  That's

7    exactly what they have said.  They have said -- presumably the

8    theory of their self-inflicted injuries is they say if you look

9    at these costs, Your Honor, on the right-hand column, 155 to

10   about $199 per driver's license.  They say:  Well, the State of

11   Texas has chosen in its Transportation Code to give driver's

12   licenses to individuals who show up with EACs, and the State of

13   Texas presumably could choose not to.

14       Now, that is a deeply troubling argument for two different

15   reasons.  First, it's definitely not true for at least three of

16   the plaintiff states.  The State of Arizona, the State of

17   Montana, and the State of Idaho all reside in the United States

18   Court of Appeals for the Ninth Circuit's jurisdiction.  And in

19   that court, Arizona tried to do exactly what the United States

20   has said they could do; namely, they changed their driver's

21   license policy.  They had a new policy that said if you show up

22   with these deferred action documents that we think are unlawful,

23   we're not going to give you a driver's license.

24       And the United States -- this is the brief.  It's in the

25   appendix to the PI reply -- went to the Ninth Circuit and said:

1    You cannot do that.  They said -- this is the quote from the

2    brief.  "That's conflict preempted by federal law, and the State

3    of Arizona should not be free to avoid the injury."

4         So it would be quite an odd self-inflicted injury if the

5    State of Arizona both can be faulted for doing it and is

6    prohibited from avoiding it.

7         Now, even outside of Arizona and Montana and Idaho, all of

8    which are in the Ninth Circuit, all of which are bound by that

9    decision that the United States helped win, the rest of us,

10   Texas and the other plaintiff states, are also injured in their

11   driver's license programs even though they're not technically

12   bound by what the Ninth Circuit did.  Because even if it were

13   true that the United States was right that these are self

14   inflicted and that we could tomorrow snap our sovereign fingers

15   and get rid of our driver's license policies, forcing us to do

16   that as a price of avoiding of penalties associated of giving

17   out the driver's licenses is itself an injury.  It's an injury

18   to the sovereignty of the state to force it to change its laws.

19        So, for example, if you think about the *Alfred L. Snapp*

20   case.  The Supreme Court of the United States said that the most

21   solemn act that the state has is creating and enforcing its

22   legal code.  And injuries to its creation and enforcement of its

23   legal code are injuries to the sovereignty of the state that

24   create Article III jurisdiction and allow the state to come to

25   federal court and to complain about infringements on its ability

1    to create and enforce its legal code.

2         So next I want to talk about our second basis for standing.

3    This is Massachusetts style costs that we referenced at the

4    beginning.  As the Court will recall in the *Massachusetts* case,

5    the Supreme Court of the United States said that states get,

6    quote, special solicitude in federal standing analysis.  And the

7    reason for that, the Court said, is because when the states

8    joined the union, they had to give up certain rights of

9    sovereignty, like the right to enact their own clean air laws

10   or, as in this case, the right to enact our own comprehensive

11   immigration system.

12        One of the things we got in return for giving up those

13   rights of sovereignty is the right to come to federal court and

14   to complain about infringements on state sovereignty.

15        So in the *Massachusetts* case, for example, the Supreme Court

16   said that the State of Massachusetts could go and sue EPA in

17   federal court to force EPA to regulate carbon emissions from new

18   cars sold in the United States.  And the basis for that

19   conclusion, the Supreme Court said, is because Massachusetts

20   should be allowed to string together the following set of

21   inferences.  Carbon emissions increase greenhouse gases.  New

22   cars emit carbon; and therefore, too many car-based carbon

23   emissions will contribute in some way to greenhouse gases that

24   will raise the global sea level and, therefore, diminish

25   Massachusetts' coastline.

1        Now, the entire basis for that set of assumptions and

2    contentions is this declaration which is taken from

3    *Massachusetts versus EPA* case from a guy -- from a scientist

4    named Michael MacCracken.  And Michael MacCracken based his

5    entire analysis on the following paragraph.  This is what he

6    said about EPA's regulation of greenhouse gases.

7        If EPA regulates greenhouse gases, quote, this would

8    discernibly and significantly reduce and delay projected adverse

9    consequences of global warming and greatly improve the

10   likelihood that there would be time for additional development

11   and use of even better technologies.  With such efforts

12   accompanied by programs in limiting other emissions, presumably

13   non-carbon and non-greenhouse gas emissions, it would be much

14   more likely that the extent of climate change could ultimately

15   be limited to levels that would avoid the most serious impacts

16   of global warming.

17       So that string of influence and speculation as to the

18   connection between what the EPA was doing in that particular

19   regulation and the effects on Massachusetts' coastline supported

20   the state's standing to come and bring a grievance about

21   something as big and generalized as global warming.

22           THE COURT:  Well, doesn't the statute, though, provide a

23   means -- specifically provide a means for people to question the

24   enforcement of certain air pollutant standard?

25           MR. OLDHAM:  The Clean Air Act.  If the question is does

1    the Clean Air Act provide a right of action, it certainly does.

2    But that's not the question that MacCracken was talking about,

3    and it's not the question that the *Massachusetts* case was

4    talking about.

5          THE COURT:  No.  But I meant --

6          MR. OLDHAM:  I'm sorry.

7          THE COURT:  -- aren't I going to hear:  Judge, the

8    *Massachusetts versus EPA* case is all great and everything and we

9    know what it says, but in that case, because the act provides a

10   means, a specific means to contest federal -- now the act, I

11   think, says federal action.  It doesn't say inaction, but that

12   was technically inaction.  You don't have an act here that gives

13   you that privilege.

14         MR. OLDHAM:  So two points in response, Your Honor.  One

15   is that, of course, the relevance of *Massachusetts* is the -- is

16   whether Massachusetts had Article III injury to come into

17   federal court, invoke jurisdiction.  So whether the statute said

18   this, that or the other thing would be irrelevant to that.

19   Massachusetts has to show -- in addition to having a statutory

20   cause of action, it has to show the irreducible constitutional

21   minimum of Article III standing.

22       So, you know, you're right.  The Clean Air Act has a special

23   provision, and this is not a Clean Air Act case.  We do have a

24   statutory right of action, both to raise the Take Care Clause

25   claim, namely Section 1331, and also to raise our APA claims,

1    namely Section 704 of the Administrative Procedure Act.

2        So we have causes of action, but the relevance of this in

3    MacCracken and all of the discussion about greenhouse gases and

4    eroding Massachusetts coastline goes to is the state injured,

5    right?  And the fact that, you know, whether there's a statute

6    or there's not a statute is a separate question.

7        And so we would submit that the United States -- you're

8    right, that is the United States' response to *Massachusetts*.

9    And we would submit that it's quite a feeble one, and it's

10   nonresponsive to really what's going on in *Massachusetts*, which

11   is, is the state injured?  And they said yes.  And can the state

12   therefore go into federal court?  And the answer to that has to

13   be also yes.

14       And we would submit to you that our case is dramatically

15   easier than what Dr. -- I'm sorry, what Mr. MacCracken did in

16   *Massachusetts* and what the Commonwealth of Massachusetts was

17   able to show with respect to greenhouse gases.

18       So in this case, we have the declaration of Dr. Eschbach,

19   who is a demographer who has talked about the fact that

20   undocumented immigration is a function of two different

21   variables.  One is undocumented people coming to the United

22   States.  And two is undocumented people who are in the United

23   States leaving the United States.

24       And on both of those variables, what the defendants have

25   done in this case increases net undocumented immigration, both

1   because folks who are here and receive benefits under the new

2   program will be more likely to stay.  And because under -- I

3   take it to be a well-established principle of demography, when

4   governments pass -- when governments use programs like we're

5   talking about here, like the -- no different really than the

6   IRCA statute from 1986, it induces additional people to come to

7   the United States illegally.  And when net undocumented

8   immigration goes up, as Dr. MacCracken has said that it will,

9   that will impose dramatic costs on the states in terms of

10  healthcare, law enforcement, education and others that are

11  specified in the briefs.

12      And we think that the causal connection between authorizing

13  the presence of millions of people, as the defendants have

14  purported to do, is much -- I'm sorry, that and the injuries to

15  the state are much tighter, much easier, much more judicially

16  cognizable than the connection between EPA's regulation or

17  failure to regulate greenhouse gases and the erosion of

18  Massachusetts' shoreline.

19          THE COURT:  Well, doesn't the action they're taking,

20  though, I mean, it only effects people that are already here, at

21  least in theory.

22          MR. OLDHAM:  So as to the people who are already here,

23  as Dr. MacCracken points -- I mean quantifies, those people

24  become dramatically less likely to leave.  You know, every given

25  year there's a certain amount of flow, people coming, people

1    going.  But once their presence is authorized, once they have

2    work permits under the -- under the DHS directive that's

3    challenged in this case, they're obviously dramatically less

4    likely to leave.

5         And so if you only thought about the folks that are actually

6    directly affected by the policy, that itself is much more

7    concrete than what happened in the *Massachusetts* case.  And

8    Dr. MacCracken goes even further and says that it's not just

9    that.  It's also the incentive to have new people come, just as

10   happened after 1986.

11        So if the Court will recall, in 1986 Congress passed an

12   amnesty program called IRCA.  And the demography literature is

13   well established that after 1986 when there was a large scale

14   amnesty program, that was approximately 3 million people.  This

15   is even bigger.  It incentivized new people to come without

16   authorization.

17        So we think that the *Massachusetts* standing is quite

18   compelling.  And I think if any doubt on sort of how compelling

19   the *Massachusetts* standing argument is could be resolved by

20   exactly the Court's observation earlier, which is that the

21   United States' only response to all of this is a nonresponsive

22   one which is to talk about a statute, not to talk about the

23   Article III injuries that the states have incurred.

24        Third and finally, I'd like to talk about parens patriae

25   standing.  So again, this is a third independent basis for

 1   standing that the states have established and that allow the

 2   states to invoke the jurisdiction of the Article III courts.

 3        This is the *Alfred L. Snapp* case, and it's the canonical

 4   leading case on parens patriae standing and the ability of

 5   states to invoke federal jurisdiction on this ground.  And in

 6   the *Alfred L. Snapp* case, the Commonwealth of Puerto Rico was

 7   allowed to come to federal court and complain about economic

 8   discrimination against its workers.

 9        In that particular case, they were citizens of Puerto Rico

10   who wanted to go work in apple orchards in Virginia, and they

11   were denied employment opportunities.  And the Commonwealth of

12   Puerto Rico sued to vindicate the rights of approximately 700

13   workers.  Approximately 700.

14        And the Supreme Court said that the state has a

15   quasi-sovereign interest in the health and well-being, both

16   physical and economic, of its residents in general.  And the

17   Court said that because Puerto Rico alleged that the

18   petitioners -- the petitioners there are the apple orchards --

19   had discriminated against Puerto Ricans in favor of foreign

20   laborers, and because those Puerto Ricans were denied the

21   benefits of access to domestic work opportunities, that the

22   INA -- again, our statute -- was designed to protect, they had

23   standing under the parens patriae doctrine to come to federal

24   court for a resolution of their grievances.

25        And that same reasoning extends to this case.  Because as

1    Dr. Welch has explained in the Welch declaration, again, in the

2    plaintiffs states' appendix, we have the exact same type of

3    discrimination here in the sense that the defendants' work

4    authorizations will make it more expensive to hire United States

5    citizens versus similarly situated non-U.S. citizens.  So that

6    economic discrimination is sufficient to allow the states -- and

7    this applies to all of the states -- to come to federal court

8    for resolution of their grievances.  Those three --

9         THE COURT:  And can they do that in a suit against the

10   federal government?

11        MR. OLDHAM:  Well, yes, Your Honor.  So this is

12   actually -- this is -- was an interesting dispute.  The United

13   States points to a footnote in the *Snapp* decision that says,

14   well, of course, you can't bring parens patriae actions against

15   the United States government.  And that was, of course, the

16   exact position that the United States Department of Justice

17   raised in the *Massachusetts versus EPA* case.  They pointed to

18   that and they said to the United States Supreme Court, well,

19   what about *Alfred L. Snapp*?  And it says you can't bring parens

20   patriae actions to -- against the United States.

21        And the Supreme Court emphatically rejected it.  Justice

22   Stevens, writing for the majority, said whatever -- whatever law

23   that -- whatever the vitality of that footnote in *Alfred L.*

24   *Snapp* used to have, it obviously doesn't have it now because

25   Massachusetts got to sue EPA just like the plaintiff states are

1    suing the Department of Homeland Security.

2         And it's also crucial to realize what Justice Stevens said

3    for the *Massachusetts versus EPA* majority.  What he said was

4    when *Alfred L. Snapp* includes this footnote about bringing

5    parens patriae actions against the federal government, what it's

6    saying is, states are not allowed to sue the government to

7    protect their citizens from operation of federal law, right?

8    That's basically the supremacy clause.  The supremacy clause

9    makes federal law applicable to the states' citizens, so you

10   can't use parens patriae to challenge that.

11        But that's, of course, not what we're doing here.  We are

12   doing the exact opposite.  The plaintiff states want the

13   protections of federal law.  The federal law that is duly

14   enacted and codified in Title 8 of the United States Code and

15   codified in the Code of Federal Regulations contains myriad

16   protections for the states.  We've relied on that for decades.

17   And it's exactly because those protections should apply to us

18   and the defendants have dispensed with them that we're

19   aggrieved.

20        So it's not only is the footnote that they've relied on from

21   *Alfred L. Snapp* all but overruled, if not explicitly overruled

22   in *Massachusetts*, but the rationale that the Court gave for

23   reaching that result applies directly to us.

24        So we would submit that all three of these are independent

25   bases for standing and that the states therefore have it.

1      So what about net effects?  On Monday, 12 states filed an

2  amicus brief, and they said states are not injured on net by the

3  defendants' actions in this case because in their view, in the

4  amici states' view, all immigration, no matter whether it's

5  legal or illegal, benefits everyone.  And it is ironic that one

6  of the states that joined that brief is the Commonwealth of

7  Massachusetts, because in the *Massachusetts* case itself, the

8  Supreme Court said that net effects are not the relevant legal

9  standard.

10      So in that case, in the *Massachusetts* case, EPA had argued

11  that Massachusetts was not injured because whatever benefits

12  they might hope to gain from regulating greenhouse gases in the

13  United States would be dramatically swamped by increased

14  emissions of greenhouse gases in other places around the world

15  like India and China.  And so this is what the -- this is what

16  the EPA had said.  "That is especially so" -- right?  That is

17  that the states aren't injured -- "because predicted increases

18  in greenhouse gas emissions from developing nations are likely

19  to offset --

20          THE COURT REPORTER:  A little slower.

21          MR. OLDHAM:  Oh, I'm sorry.

22          THE COURT:  This is my governor for when you get talking

23  too fast.  She cracks down.

24          MR. OLDHAM:  Yes, sir.  "That is especially so," EPA

25  argued, "because predicted increases in greenhouse gas emissions

1    from developing nations, particularly China and India, are

2    likely to offset any marginal domestic decrease."

3        And the Supreme Court responded to this argument, this

4    offsetting benefits argument from the United States -- from the

5    Department of Justice in the *Massachusetts* case by saying EPA

6    overstates its case.  Proceeded to say it doesn't matter if the

7    benefits are going to be swamped by some offsetting effect.

8    What matters is that the Commonwealth of Massachusetts could say

9    one molecule of increased -- I'm sorry, one molecule of carbon

10   emissions in the EPA carbon emissions regulation injures us or

11   at least contributes to the injury that we suffer; and

12   therefore, every reduction of every molecule is an Article III

13   redress -- is an Article III redress for injuries.

14       So the Supreme Court let it go there.  And it's not just

15   Supreme Court law, it's also true in the Fifth Circuit.  So if

16   you take, for example, the *Gilbert versus Donahoe* case, which

17   can be found at 751 F.3d 303.  In this case, the Fifth Circuit

18   said that net effects are not the relevant question for

19   determining whether and to what extent a plaintiff has suffered

20   an Article III injury.

21       So the Fifth Circuit described the facts of the case this

22   way.  Donahoe, who is in this case the defendant, contends that

23   Gilbert, who is in this case the plaintiff, failed to provide

24   any documentation regarding the extent of her damages.  And even

25   if she could prove damages, they would not provide redress

1  because any award would be offset by the $15,000 the plaintiff

2  had already gotten.

3      And the Fifth Circuit said that contention concerns whether

4  Gilbert has stated a claim for which relief may be granted.  In

5  this case it was a claim for money damages.  So the question is

6  whether she actually had a damages claim, not subject matter

7  jurisdiction.

8      So in our view, net effects are not the relevant question.

9  The Supreme Court has emphatically said it.  The Fifth Circuit

10  has emphatically said it.  And the plaintiffs, therefore, have

11  three independent bases for standing:  Direct economic harm,

12  *Massachusetts* style harm, parens patriae harm, all of which

13  allow the plaintiffs the right to invoke the jurisdiction of the

14  federal courts to resolve this crucial matter of constitutional

15  law.

16      Turning to the merits.  The states have --

17          THE COURT:  Why don't we wait on that, if it's all

18  right, and let me get Ms. Hartnett or whoever, the government's

19  designee to respond to standing.  Why don't we go ahead and do

20  it now.

21          MS. HARTNETT:  Thank you very much, Your Honor.

22      At the outset, I would just say that the state has the

23  inquiry at issue somewhat backwards to the extent that the state

24  is suggesting that it's our burden to disprove three types of

25  standing.  It's the states' burden on both the motion for

1    preliminary injunction and, frankly, for purposes of whether

2    there's Article III standing to maintain the case in the first

3    place.  It's the states' burden to prove the elements of

4    standing, and that's settled, settled law.

5        And taking the state's presentation in turn, it has failed

6    to establish any of the required elements for Article III

7    standing here.  And there's also prudential considerations that

8    would be at issue that come into play and further support the

9    lack of standing here.

10       At the outset, I would note that only three of the states

11   have even attempted to show some sort of an evidentiary basis

12   for their standing.  That's not really dispositive here because

13   at the end of the day, it's really the legal theory of standing

14   that's insufficient, but I just wanted to point that out.

15       I would say there's at least two overarching -- I'll

16   directly respond to some of the comments that the state has

17   made, but I -- taking a step back, I just wanted to set forth

18   what I thought are two overarching principles that frame our

19   understanding of the standing at issue here and this unique

20   situation of a state trying to sue the federal government for a

21   policy that is going to have an indirect economic effect on the

22   state.

23       And the first principle is something set forth in our brief

24   that's not unique to states.  But in general, there's no

25   standing to complain about the prosecution or lack thereof of a

1    third party.   And we cited the Supreme Court's decision in *Linda*

2    *R.S.* for that principle.   It's definitely a different context in

3    that case.   That was a child support case about a person that

4    was unhappy with the state not bringing a prosecution action

5    against somebody who was the father of the child at issue.

6        So I agree the facts of that case are different, but it's

7    part of a more general principle that in general, there's not

8    standing to complain against the government for the failure of a

9    prosecution or whether they basically regulate or not regulate

10   someone else.   And that's also set forth in the *Lujan* case, the

11   Supreme Court case where they talk about being a heavy burden to

12   establish standing if you're complaining about the unlawful

13   regulation or the lack of regulation.   It's just a --

14        THE COURT:   Let me ask you, does it make a difference,

15   though?   I mean, the United States two years ago took Arizona to

16   court and said -- because Arizona had passed some laws that they

17   deemed appropriate to protect their citizens.   And the United

18   States said:   Arizona, you can't do that.   We are the supreme --

19   you know, under the supremacy clause, immigration matters are in

20   our bailiwick, and you can't interfere with that.

21        And the Supreme Court bought that in no uncertain terms.   I

22   mean, the language is clear that they said:   No, this is federal

23   government.   This is federal government.   This is federal

24   government.   This is federal government.

25        So what happens when the federal government says:   You know,

```
 1   it's our bailiwick.  We're going to -- but we're not doing it.
 2   We're abdicating.  We're completely -- we're not -- we know what
 3   the law says.  The law is telling us to do this, but we refuse
 4   to do it.  And, oh, by the way, state, you can't protect
 5   yourself because it's our job to do it.  And even though we're
 6   not doing the job, we're going to let them do it.  We're not
 7   letting you do it, I mean.
 8          MS. HARTNETT:  Well, Your Honor, that's not what's
 9   happening here.  I guess I would just say that to begin with,
10   and I'm happy to discuss further --
11          THE COURT:  Well, wait a minute.  Why isn't it what's
12   happening here?
13          MS. HARTNETT:  Well, Your Honor --
14          THE COURT:  Let me --
15          MS. HARTNETT:  Please.
16          THE COURT:  Let me ask, because -- and I'll let you
17   respond because I want you to.  I mean, the statutes say that
18   undocumented aliens shall be deported, okay?  And this program
19   is saying we're not deporting them at least for three years.  So
20   you're clearly not doing what the statute -- and I think the
21   statute says "shall."  I mean, I -- we can look it up, but, I
22   mean, it says "you shall do it."  And what the government has
23   decided to do is:  Well, I know the statute says "shall," but
24   we're not.  And, oh, by the way, state, you can't do it either.
25          MS. HARTNETT:  Your Honor, I think there's two different
```

1    questions.  One is what does "shall" mean and how does that

2    operate?  How does that statute operate?

3        And there's a second question of whether there's been an

4    overall abdication here.  And again, I'll explain to you why our

5    position is there clearly has not been.

6        But just on the "shall" point, it's long been a feature of

7    the immigration enforcement efforts, including against a

8    backdrop of various provisions that say "shall," and I think it

9    includes 8 U.S.C. 1225(a) I think is what you're referring to

10   there, that there's a -- there's discretion even against that

11   background, that backdrop.  The Supreme Court has recognized

12   both in the *Triple ADC* case and Arizona that there is discretion

13   at the federal level at every step of the removal process.  And

14   in *Triple ADC*, for example, that was expressly about removal.

15   That was about whether to initiate, whether to continue, whether

16   to pursue.

17       So there's one question about whether there's -- does that

18   actually mean -- do the immigration statutes mean, as the state

19   has argued under 1225(a) and other provisions, that we have to

20   deport every person that we come across and encounter if they

21   even -- if they conceivably could be removed under the law?  And

22   I think it's settled precedent under the Supreme Court's reading

23   in *Arizona* and in *Triple ADC* that no, we don't.  That shall --

24   and the -- specifically we make some -- we explain in our brief

25   how the provision they're talking about there really is a -- is

1    a provision that applies to those who are seeking admission at

2    the border as opposed to the more broad category of people who

3    are applicants for emission, (sic) which includes all the people

4    that are here unlawfully present.  So I think that response to

5    the specific contention of whether -- whether the federal

6    government has a legal obligation to deport every person who

7    could conceivably be deported.  Now, this --

8         THE COURT:  But the reason I -- and I know we're kind of

9    slopping over into the merits a little bit there --

10         MS. HARTNETT:  Yeah.

11         THE COURT:  -- but the reason I bring it up -- and I'm

12    jumping to, I think, the states' second argument, this parens

13    patriae argument.  Because isn't that what *Massachusetts versus*

14    *EPA* says?  And, I mean, in fact, in the dissent by Judge

15    Roberts, doesn't he say it's ironic the Court today adopts a new

16    theory?  And the new theory was based on the fact that the

17    federal government has supremacy over a certain area that the

18    states can't regulate.  And apparently according to both sides,

19    both the majority opinion and the dissent in *Massachusetts*

20    *versus EPA*, that means the state has standing.

21         MS. HARTNETT:  Your Honor, as we've explained in our

22    brief and are happy to discuss further, *Massachusetts versus EPA*

23    truly is a different -- a different type of standing, a

24    different theory of standing, and a different reason.  It's one

25    of the cases where there's a rare -- the rare situation where

1    the state is not being directly regulated by the federal

2    government and yet was able to maintain a cause of action.

3         And I'll point out the most salient -- to begin with, the

4    state -- *Massachusetts versus EPA* did not overrule that critical

5    language in *Snapp* -- in the -- *in the Snapp* case which states

6    very clearly in *Snapp*, "A state does not have standing as parens

7    patriae to bring an action against the federal government."

8         What mattered in *Massachusetts*, was there Massachusetts was

9    bringing a claim for harm on the basis of its sovereign interest

10   as a landowner.  That was the theory of harm in the case.  What

11   the EPA was arguing was even -- they didn't concede at some

12   level there was a theoretical effect on Massachusetts, but they

13   were saying that it was too attenuated in order to support a

14   claim of standing there.

15        And what the Supreme Court found once they were recognizing

16   in the situation of state as landowner being able to maintain a

17   cause of action.  They also, as Your Honor directed the state

18   to, that the critical point that there was actually a

19   authorization for this type of action under the Clean Air Act.

20   I'm sorry, the Clean Water Act.  In that -- in the -- the

21   language used by the Supreme Court there said that the statutory

22   cause of action was critical, of critical importance to the

23   standing inquiry.

24        So again, I think they're overreading *Massachusetts versus*

25   *EPA* to kind of undercut many of the longstanding principles,

 1   which is that a state is not generally able to bring a claim

 2   against the federal government for the indirect economic

 3   effects, not effects as the sovereign landowner, but indirect

 4   economic effects on the state.

 5        THE COURT:  Haven't they proven, at least the State of

 6   Texas and maybe one other state, haven't they proven direct

 7   economic damage?

 8            MS. HARTNETT:  No, they haven't, Your Honor.

 9            THE COURT:  Tell me why that's true.  That's --

10        MS. HARTNETT:  Right.  So I guess there's two -- there's

11   at least two theories of economic harm that are at issue.  One

12   is the harm that is allegedly flowing from the benefits that

13   would be provided under state law to people who receive deferred

14   action.  I think that's one set of economic harms that are being

15   claimed.

16     At the outset -- I mean, there's several problems with that

17   theory in addition to the theoretical problem of being able to

18   claim a harm based on the indirect economic effects of the

19   federal regulation.  But here it truly is the case that these

20   are self inflicted -- I don't mean to be pejorative about that.

21   They're choice -- choices made by the state.  There's a federal

22   statute, 8 U.S.C. 1621, that basically stripped all state

23   benefits flowing for certain categories of illegally present

24   people.  And then they said to the states:  States, if you want

25   to give benefits to those people, you'll have to affirmatively

1    enact those into law.

2         And so for example of the driver's licenses and the other

3    state benefits that are being complained of by the three states

4    that have been specific about their complaint, those are all

5    benefits that the state has chosen to give to its -- the people

6    that are in its state based on, in this case, deferred action.

7         THE COURT:  So it's all right with the federal

8    government and y'all are willing to stipulate here today that

9    the states can say:  We're not giving driver's license to DAPA

10   people?

11        MS. HARTNETT:  Your Honor, I don't -- yes, with the

12   caveat --

13        THE COURT:  Yes or no?

14        MS. HARTNETT:  Yes, with the caveat that it would depend

15   on how the state did it.  I think what's important in the

16   Arizona dream case is that the way that the state in Arizona was

17   doing it was saying:  We're going to track.  If you're

18   authorized to be present under federal law, you can get a

19   driver's license.  And they said:  If you have an EAD, the

20   employment authorization card, you can get a driver's license.

21   But then from that group, they carved out and said certain of

22   those EADs we don't accept as true proof of that.

23        I think what our point for preemption purposes was in that

24   brief is that the state is not free to redefine a category and

25   then in taking --

1          THE COURT:  But they took the category that y'all

2     defined.  They used your definition and they say:  All right.

3     Anybody that qualifies and got permission to stay in the United

4     States and, you know, use the DAPA, is what I've been calling

5     it, but six factors, we're not giving a driver's license to that

6     person.

7        I'm not suggesting that's a good idea.  I'm just saying does

8     the state have the right to do that?

9          MS. HARTNETT:  As a matter of preemption.  There's a

10    separate -- there's a separate claim being made in that Arizona

11    dream case on equal protection grounds that we do not take a

12    position on.  But as a purpose of preemption, the federal

13    government's position is that a state could exclude the group of

14    people that --

15         THE COURT:  But you're not willing to say that it

16    violates the equal protection law or it doesn't?

17         MS. HARTNETT:  Your Honor, I just -- I'm here -- I think

18    that we did -- our point is one of -- our interest was one of

19    preemption and making sure that the state wasn't taking a

20    federal immigration classification and redefining it.

21         THE COURT:  But I know.  It's the same point, though,

22    you made with the statute you just referenced that strips all

23    the state benefits.  It's fine that statute exists, but the

24    Supreme Court has ordered the states to provide education,

25    medical care, all these expenses that they're not being

1    compensated for.

2           MS. HARTNETT:  On that point, Your Honor, I just want to

3    distinguish that from the other -- from the -- that's not as

4    a -- that's not as a consequence of them being a deferred action

5    recipient, though.  That's a critical point.  All of the other

6    economic harms are ones that are more based on the presence of

7    unauthorized aliens here in the state.  And that's something

8    that we would argue -- we would say that the presentation is

9    simply too -- it is too speculative.

10      I know Your Honor has expressed, you know, views on the

11   topic of kind of the many causes of having the migratory

12   patterns and the immigration across the border, and it is a

13   complicated --

14          THE COURT:  Well, no.  Let me -- let me address that

15   since you brought it up.  The views -- and I know the State of

16   Texas cited my own opinion back to me which is always -- a judge

17   faces always with trepidation, you know, when they get cited

18   back to them.  But the two opinions that I have written recently

19   that have been critical of immigration policy were both policies

20   that endangered people.  They were people -- they were

21   encouraging people to work with the cartels to come into the

22   United States.  And if you live in this part of the United

23   States, you know how dangerous the cartels are.  In fact,

24   Congressman Vela just wrote a letter to Vice-president Biden

25   about how the cartels have basically wreaked havoc on our way of

1    life down here, No. 1.

2        And the other one I wrote is I wrote an opinion that

3    basically said giving asylum or -- this wasn't technically an

4    asylum case, but allowing gang members who have committed

5    multiple felonies to stay in the United States is not a good

6    idea, which the government did.  And -- and those are the only

7    two opinions I can think of recently that I have even commented.

8        Now, I will go one step further and say in both of those

9    opinions, I wrote those opinions after the case, and in both of

10   them I ruled for the government.

11            MS. HARTNETT:  So, Your Honor --

12            THE COURT:  So --

13            MS. HARTNETT:  Well, we're -- I'm aware of that, and I

14   just meant to say that we're aware of your opinions and take

15   them obviously quite seriously.  I guess I was also making some

16   reference to -- some comments that --

17            THE COURT:  Well, one of the things that we're charged

18   with under Title 18, United States 3553(a), as your local AUSAs

19   will back me up on this, is that one of the things the

20   government -- the judge has to sit on is we protect the public

21   from future crimes of the defendant, and that's one of our

22   worries.  But go ahead.

23            MS. HARTNETT:  No, absolutely.  And I was also thinking

24   of some of your comments and questions at the Orly Taitz hearing

25   which were, you know, thoughtful questions about what is -- what

1    is bringing people across the border, why is this happening.

2    And I -- to your point, though, about the priorities, I don't

3    want to bleed beyond into the merits prematurely, but I would

4    make clear to the Court at the outset, we don't -- jumped right

5    into standing.  The reason for this policy is to continue to

6    help focus the Department of Homeland Security's efforts on its

7    priorities.  And the priorities are -- are clear.  It's to stop

8    the border crossings and to remove the threats to our nation.

9    And those are criminal aliens, national security threats, and

10   other public safety threats.

11       And, Your Honor, the reason for this -- and we can get into

12   the merits of the program at the appropriate juncture, but I

13   would just say that this entire policy is animated by trying to

14   direct our federal resources in a thoughtful way and a kind of

15   inefficient way, one that doesn't require having to intercept an

16   alien each time and figure out where they belong and how they

17   should be sorted, but rather finding a way to take certain low

18   priority cases that do not provide a public safety threat, put

19   them to the side, and allow the limited resources, resources

20   that would allow us to deport up to only about 400,000 of the

21   11 million people legally (sic) present and really focus those

22   on the cases that matter most to the safety of the nation.

23       But just back to standing.  I guess just to be clear on the

24   Arizona dream point, because I'm actually not trying at all to

25   be evasive on that point.  I think the government's position is

1    that a state is not required to provide a driver's license to a

2    deferred action recipient, but it would depend on how the state

3    frames that regulation or statute, whether it's actually

4    superseding or otherwise trying to conflict with a federal

5    definition.  And in the Arizona case, the problem there was they

6    were saying we'll take everyone who's authorized, except we're

7    going to deem some people not authorized.  If they had defined

8    their statute differently, that would have presented a different

9    question, at least for federal preemption purposes.

10        Just -- I don't -- kind of taking back to -- I had made the

11   general point about kind of whether you have a standing or the

12   uphill battle you would face for standing to challenge the

13   prosecution or lack therefore of another.  I think a second

14   general principle which is addressed by some of the material

15   that the states' counsel was addressing is just in general the

16   state doesn't have an ability to complain of an indirect

17   economic effect.  And that's both through the parens patriae

18   doctrine.  I think it's pretty well established that the state

19   does not have a parens patriae type standing vis-a-vis the

20   federal government.

21        And then the question is, well, what about if it's an

22   indirect economic effect making some things in the state more

23   expensive?  And we've been -- I've been telling you some of my

24   thoughts on, you know, at some level it's a self-inflicted

25   injury, so there's -- that's more of a traceability issue or

 1    causation.  But there's also just a more general principle even

 2    before whether or not they have to spend more money on driver's

 3    licenses if they choose to maintain the law the way it is.  It's

 4    just that -- the indirect cost of a federal regulation to a

 5    state itself is not really a cognizable injury for Article III

 6    purposes.  And that -- we discussed the *Kleppe* case in our brief

 7    as well as the *Hartigan* case.

 8         THE COURT:  Does it matter in this case -- and I didn't

 9    ask Mr. Oldham this, but I will before we're done today, so --

10    but I'll start with you because you're -- does it matter, No. 1,

11    we're not dealing with a regulation that has gone through notice

12    and comment?  And does it matter, secondly, and it may not have

13    any significance at all, that we're not even dealing with an

14    executive order here?  We have nothing, as far as I can tell,

15    from the president.  All we have is a memorandum issued by

16    Secretary Johnson.  Does -- do those distinctions mean anything?

17         MS. HARTNETT:  I think -- well, for the Article III

18    standing purpose, I think they would have to have an injury no

19    matter what, so that's kind of where we're -- at the outset.  I

20    think then there's the *Heckler v Chaney* doctrine that comes into

21    play.  I think that properly viewed, as we've explained, and the

22    way that's appropriate to view this, because what is at issue

23    here is a directive of the Department of Homeland Security's

24    secretary, is that this is a challenge essentially under the

25    Administrative Procedures Act, if at all, for whether the agency

1    action was contrary to law.  That's the proper way to view this

2    case.  Because otherwise -- and this cuts into the kind of

3    whether this is actually a Take Care free standing claim or an

4    APA claim, any -- any -- any agency action or, you know, an

5    action which someone disagrees with, they could cite the Take

6    Care Clause to the extent they saw that action as not being a

7    sufficient execution of the law.

8         THE COURT:  To raise an APA claim, they would have to

9    prove -- the states would have to prove, one, constitutional

10   standing, prudential standing and APA standing.

11        MS. HARTNETT:  That's correct, Your Honor.  And not

12   so -- and I -- lest I didn't -- lest I direct the state to the

13   APA and then immediately say the APA is unavailable, that is the

14   argument here, and it's correct under *Heckler v Chaney* because

15   it is a general statement of enforcement policy.  This is not

16   the adjudication of any person's rights or benefits.  And at the

17   end of the day, deferred action doesn't even provide a right.

18   It provides a temporary ability to stay here and to work if

19   the -- assuming the employment authorization is granted.

20       But I think what's important here is *Heckler v Chaney* is an

21   important next step after the standing argument, because what it

22   says is that to the extent that there's an agency enforcement

23   policy, that's within the agency's discretion.  And it's not the

24   appropriate subject of judicial review at some extent, with the

25   important exceptions there when you get to the *Heckler v Chaney*

1    point, assuming you get past standing.  And that is both

2    Congress hasn't provided for the discretion in a certain way,

3    that we're not acting contrary to that, and that there hasn't

4    been a total abdication.  And I think under both of those tests,

5    which I'm happy to discuss now or after, at the appropriate

6    time --

7            THE COURT:  Let's wait.

8            MS. HARTNETT:  Right.  There hasn't been an abdication

9    here.

10        And I think *Texas versus the United States* I think is an

11   important Fifth Circuit case that I would want to draw your

12   attention to which is kind of bridging the gap between the

13   Article III standing inquiry and between the *Heckler* inquiry.

14        But there in that case, and it's really quite contrary to

15   what the state is trying to argue here.  Real or perceived

16   inadequate enforcement of the immigration laws does not

17   reconstitute a reviewable abdication of duty.

18        Now, the Texas case was different in that the states there

19   were challenging both Congress and the Executive Branch saying

20   collectively you all weren't enforcing the law correctly.  But I

21   think *Texas versus United States*, 1997 Fifth Circuit precedent,

22   supports us both on our standing points and on our point about

23   *Heckler v Chaney*, and that even if there were some arguable

24   Article III injury here, it's just inappropriate for -- in the

25   context of a enforcement policy, for the state to be able to

1   bring a substantive legal challenge to that under the APA.

2       I guess one other point I would make just -- I -- I -- I

3   understand Your Honor is likely aware of this, but just to

4   make -- to make sure that our position is clear, I talked about

5   the benefits that would flow under state law through the states'

6   choice to people that have received deferred action and why that

7   isn't a proper theoretical basis for standing, even if there is

8   some actual cost, which again, we were -- understood the basis

9   that today's hearing was not really a chance to get into the --

10  any kind of factual disputes, so we don't think you need to

11  address any factual disputes.

12      But also I would just point out with the larger question

13  about whether there would be a larger flow of people in that

14  might get other benefits.  That wouldn't be deferred action

15  recipients, but rather just kind of a general influx.  Our

16  position on that is that the state has really failed to

17  substantiate that in any concrete way which they would have to

18  do for purposes of standing.

19      And again, the policies at issue here only apply to people

20  that have been here since 2010.  And therefore, it would really

21  be contrary to the face of the policy for someone to come here

22  on the expectation of receiving deferred action because they

23  wouldn't.  They would be turned back.

24          THE COURT:  And I assume the next logical extension of

25  that argument is then that any damage that the state -- is

1   inflicted upon the state by new arrivals is too attenuated from

2   this process to be caused by it?

3        MS. HARTNETT:  That's correct.  I mean, there is

4   definitely the first step of speculation which is that somehow

5   these specific policies, not immigration policies at large, but

6   these specific policies, not the 2012 deferred action, but these

7   policies cause some specific influx.  But even if you got past

8   that step of speculation, there is an important principle in the

9   case law about the independent actions of third parties.  Really

10  at the end of the day, that's a choice, a conscious choice of

11  the alien, as Judge Vela had put it in the *Texas versus United*

12  *States* case when it was in the district court.  And also like

13  *Florida versus Mellon* we cite is an important case where there

14  was some predicted behavior of Florida landowners based on a new

15  federal policy about taxation.  And there the Supreme Court said

16  that the standing is lacking because it really just requires too

17  attenuated of a connection to base claimed harms by the state on

18  predicted behavior of people that might be in the state.

19       I guess I covered most of the -- those are most of our

20  Article III points.  There's also a redressability point which I

21  don't want to dwell on too much, but I think it kind of follows

22  from the same point that there's not really a specific injury

23  that's traceable to the policies --

24       *(Court reporter interrupts.)*

25       MS. HARTNETT:  Anyway, the point we want to make is that

1    both on the -- I think for the same reason, there's a lack of

2    actual injury and a lack of causation, the redressability does

3    become an issue as well because it's hard to see how an order

4    enjoining whatever the state is seeking to enjoin -- I noted

5    that the PowerPoint is slightly different than what the

6    presentation was is in the briefing, and we want a chance to

7    respond to that, but that the order of this Court would really

8    not stem a lot of the harms that the state is claiming,

9    particularly the ones related to the broader issues of flow of

10   immigrants.

11       And then finally we do cite some cases that are important

12   principles of prudential standing.  And that would be both

13   the -- you know, the *Valley Forge* case and the zone of interest

14   line of cases that to the extent that this really is an APA

15   claim at the end of the day, the -- and, frankly, even under the

16   immigration laws themselves, those are not the -- the intended

17   beneficiaries or regulated parties in those laws are not the

18   state.

19          THE COURT:  Let me go -- let me talk to you for a minute

20   about that because if -- let's go back to my -- it's not a

21   hypothetical.  I guess it's just -- it's a fact.  We have a

22   decision from the United States Supreme Court saying that:

23   States, you don't have any business doing anything with

24   immigration.  Only the federal government can do that.  And that

25   was the position that the federal government took, and the

1  Supreme Court upheld that position.

2      So the states are now powerless, if you will, to do anything

3  in that regard.  And the federal government, rightfully or

4  wrongfully, decides on a policy that impacts the state.  Doesn't

5  that put them, for prudential standing, into a zone of interest?

6  They can't -- they can't fix it.  They're stuck with whatever

7  you guys do.  Doesn't that give them at least a zone of interest

8  under prudential standing?

9          MS. HARTNETT:  Your Honor, I would -- I don't think so.

10  Actually at the end of the day, the zone of interest, you look

11  at both the APA and -- most importantly here is the INA because

12  those are the underlying legal provisions that are -- kind of

13  would be flowing through an APA claim.  And those are really

14  directed as the relationship as between the federal government

15  and the aliens that are being regulated.

16      And so although I appreciate your point about some

17  incidental effects on the states due to not just these policies,

18  but, frankly, a wide range of federal policies that the state

19  doesn't have standing necessarily to challenge, that does not

20  place them in the zone of interest as a legal matter.  I think

21  what the state would need to show is some sort of a concrete

22  harm that was directly traceable to the policy either being

23  directly regulated in some way by the policy which the state is

24  not -- or something more concrete than --

25          THE COURT:  So wonder -- wonder -- let me do this.  This

1    is a hypothetical obviously, but I'm the Department of Homeland

2    Security.  I'm in charge of border security.  And I just say:

3    You know, I'm going to conserve resources, and I can do that

4    better by protecting only 49 of the 50 states, and so I'm not

5    going to protect the border in Texas.  And I say:  Anybody that

6    wants to come in, come on in.

7         Texas has no standing to do anything about that?  They can't

8    stop it, because the Supreme Court has already told them they

9    can't stop it.

10        MS. HARTNETT:  Well, I just -- to be clear about it, I'm

11   just kind of -- you know, as a general matter, the policy at

12   issue here is not a complete abdication.  We're deporting

13   400,000 people a year, and we're otherwise using all the funds

14   available.  So that just is a place of holder.

15        But to your hypothetical, I think that would implicate

16   different issues in the sense of the sovereignty and the

17   territorial integrity of the state.  This is not -- this is not

18   a policy that's about encouraging or incentivizing flow --

19   massive flows and abdication at the border.  I mean, there's a

20   question of Article III standing there.  And you're correct,

21   it's some of the principles that I'm setting forth here which

22   say that would be a very hard case for the state to make.

23        But there's also the *Heckler v Chaney* doctrine that would

24   say if there was a complete abdication here or if there is a

25   dereliction of direct Congressional command, that the state

1   would be able to get past *Heckler v Chaney* and make an APA

2   claim.

3       So I'm saying in the very different hypothetical of that

4   case where you're essentially positing the federal government

5   having no presence at the border, not allowing -- letting people

6   flow freely in, and --

7       THE COURT:  They can have a presence there.  They can

8   just say:  We're using our discretion.  We've just decided not

9   to prosecute anybody that comes into Texas.

10      MS. HARTNETT:  Your Honor, that would be a wildly

11  different case than what we face today and I think would present

12  a much harder argument for the government with respect to

13  standing.  And that's -- the reason why we're making both a

14  standing argument and a merits argument here is, of course, not

15  because we don't fully support the merits of the policy, but

16  here this is a policy that really is not having a direct impact

17  on the state itself as a state.  And that's one of the few cases

18  where states are able to bring the unique case, the

19  *Massachusetts v EPA* or the set of cases where the states are

20  being directly regulated by the federal government.  That's when

21  a state has a right to come into court and complain.

22      But that's not what we have here today.  And I think it's

23  really important that the state -- that the Court, as the Court

24  has recognized, you know, apply the Article III principles'

25  guide for caution in allowing a state to come in before there is

1    that situation of true egregious abandon -- failure to execute

2    the law.  And I think that's where the *Texas versus United*

3    *States* case from the Fifth Circuit is quite instructive, because

4    there the states made I guess what you could -- made a, you

5    know, credible or at least they made an arguable claim that they

6    were feeling a -- the burden of a enforcement of the law in a

7    way that they would not prefer; but nonetheless, the Court held

8    that would not be -- that's not a basis for standing and not a

9    basis to be able to challenge the policy.

10        THE COURT:  All right.  Mr. Oldham, you want to reply to

11   any of that?  And specifically let's look at how is the state --

12   touch -- walk me through, connect the dots for me.  How is the

13   state directly damaged?

14        MR. OLDHAM:  Yes, Your Honor.

15        THE COURT:  And you understand that Ms. Hartnett's

16   argument about, well, we have to pay medical care and we have to

17   pay educational expenses and stuff.  Well, these -- you know,

18   she's right for the most part.  These aliens are already here.

19   We're already paying that, so the new policy doesn't make one

20   bit of difference as to that.  So what -- how is the state

21   directly damaged?

22        MR. OLDHAM:  Yes, Your Honor.  So let's start with

23   exactly that population of people that you just asked about, so

24   for folks who are already here without documents who will

25   benefit from this policy.  Once they get that employment

authorization card that we looked at on the screen earlier and

only because they have that employment authorization card that

we saw on the screen earlier, they can go to a driver's license

office, for example, and they can get a driver's license that

will cost the state money.  Now, that is a direct economic harm

on the state, not just Texas, but all the states that we've

explained in the PI brief.

THE COURT:  All right.  And her argument is you don't

have to give them a driver's license.

MR. OLDHAM:  And that is -- it's remarkable, because the

way I understood Ms. Hartnett earlier this morning, her response

to you about whether and to what extent the state can change its

policies is the exact opposite of what both the United States

said in the brief that we looked at, but also what the Ninth

Circuit held as applied to Arizona, Montana and Indiana -- I'm

sorry, and Idaho.

So as to those three states, what the Ninth Circuit said is

that when the United States -- when the Department of Homeland

Security issues these employment authorization cards and when

they grant deferred action to folks who are in the United

States, the purpose of that is they want to let them work.  They

want to allow them, empower them to work in the United States.

And you frustrate the purpose of that by denying them a driver's

license.

And the United States said in that brief that we just looked

 1   at that's in the appendix to the reply brief:  That's right.

 2   You can't deny them a driver's license because it's going to

 3   frustrate the purpose, and it's going to create an obstacle to

 4   the purpose and frustrate the purpose of the federal policy.

 5       So it's, quite frankly, troubling, that that -- that is

 6   exactly the opposite of what they said to the Ninth Circuit.

 7   And regardless again of what the State of Texas can do, it

 8   should be undisputed that Arizona can't do that.  I mean,

 9   Arizona is under an injunction from the Ninth Circuit ordering

10   them to issue these driver's licenses as a cost to the state, as

11   is Idaho, as is Montana.  And again, even if it were true that

12   we could avoid it, we would still have to do the avoiding, and

13   that itself is an injury.  So I think those are --

14       THE COURT:  Could Arizona have said:  Look, we're not

15   going to make a distinction between DACA and DAPA folks that are

16   applying for a driver's license.  We're just going to say:  All

17   right.  From now on, no alien that's in the country illegally

18   gets a driver's license regardless.

19       Can they do that?

20       MR. OLDHAM:  Well, to be fair, I mean, I think that's

21   what Governor Brewer had tried to do in Arizona.  In her view --

22   I mean, I think this is the rub with the United States.  I mean,

23   in her view, she said:  I don't recognize the legality of these

24   deferred action programs.  So in my view, these people are here

25   unlawfully.

1        And the United States told her:  No.  In our view, the

2   United States' view -- and as Your Honor pointed out, you know,

3   preempting basically the Arizona's ability to talk about

4   immigration status.  They said, you know, in the federal

5   government's view, they are here legally; and, therefore, you

6   can't deny them a driver's license.  So the short answer to your

7   question is no.

8        THE COURT:  Wasn't it partly because, though, they were

9   just basically in the view of the Ninth Circuit at least, they

10  were discriminating against two classes of aliens?

11       MR. OLDHAM:  Well, my understanding -- so the short

12  answer again I think is no in the sense that -- in the following

13  sense.  What Governor Brewer did initially is -- in the State of

14  Arizona is she said:  First I'm going to deny driver's licenses

15  to people who have deferred action under this new DACA program.

16  And then she amended that and said:  No, I'm just going to deny

17  it for all deferred action.

18       And the United States said:  Well, that's preemptive.  And

19  why?  Well, it's because when we give deferred action to folks

20  and we give them employment authorization documents, they should

21  be able to work; and they have to drive to work, and, therefore,

22  you can't deny them a driver's license.

23       So that's -- that's the analysis in the Ninth Circuit.  And

24  it's the analysis that the United States in that brief told

25  the -- the full en banc Ninth Circuit to accept, and they did.

And so -- and the Supreme Court has now denied cert on that

cert, denied a stay of that six to three.  And so that is the

rule as we sit here today at least in those three plaintiff

states.

So it's -- I just don't understand how those three states

could possibly avoid what the Ninth Circuit has told them to do

at the United States' behest.

And as to the rest of us, again, simply having to choose are

we going to create a driver's license program that denies

driver's licenses to everyone in the state?  Are we going to

choose a driver's license program and just hope that it's not

preempted to deny driver's licenses to people who are here on --

you know, they had deferred action under Katrina or had a visa

program under the U or T program.  Are we going to create a

driver's license program that somehow discriminates in classes

of people based on their presence in the United States and just

hope that the United States won't come in and say that it's

preempted?  That itself, putting the state to that choice, is an

infringement on the state's sovereignty, and it's more than

sufficient, I think, to trigger an Article III injury.  So I

think that all of the self-inflicted wound, to borrow the United

States --

THE COURT:  Well, get me to the cost of it.  Let's say,

okay, you have to give driver's licenses to deferred action

people, including the DAPA and DACA people.  So what?  You're

1     already doing driver's license to everybody else.

2          MR. OLDHAM:  So the Joe Peters' declaration, which is

3     included in the exhibit, points out that the costs associated

4     with doing -- with producing driver's licenses is not covered by

5     the usage fee.  So as the Court would be aware, the usage fee

6     for driver's licenses is $24 in the State of Texas, and the

7     costs are somewhere between 155 to $199, depending on volume.

8     And that goes to, you know, hiring new people to process the

9     applications, building new facilities, getting new computer

10    terminals, getting new cards, getting new database searches

11    which, incidentally, the United States charges the State of

12    Texas every single time we have to authenticate a deferred

13    action document through the SAVE system which is administered by

14    DHS.  So every single time someone walks in with a deferred

15    action document, the State of Texas has to verify the validity

16    of the document with the United States, and they charge us

17    100 percent of the cost.

18          THE COURT:  Why do you have to do that?

19          MR. OLDHAM:  Federal law requires it.

20          THE COURT:  That you verify?

21          MR. OLDHAM:  Yes, Your Honor, through the SAVE system.

22    I think it's called the Systematic Alien Verification for

23    Entitlements provision.  And it's in -- it's in -- it's part of

24    the modern statutory post 9/11 amendments to Title 8.  So every

25    single time someone presents themselves to a DPS office in the

1    state, they have to verify those documents.

2        And the thing I think is really important, to go back to the

3    very beginning of your question, is that if someone walks in

4    today right before this program has gone into effect and they do

5    not have that little EAC card, they don't get a driver's

6    license.  They don't cost the state $155 per driver's license,

7    much less $199.  They're not eligible.

8        But if the states don't get an injunction and if they get

9    these cards that the United States wants to give them, then they

10   can show up and they will get them.  So it is the tightest

11   conceivable nexus between the thing we say is unlawful and the

12   injuries that it will impose upon the plaintiff states.

13       And it's a direct concrete economic harm on the states that

14   cannot be avoided for at least three of us, and can only be

15   avoided for the rest of us even only hypothetically.  Because

16   given the shifting positions from the United States, we could

17   only guess what the rule is going to be the next time we try to

18   avoid this allegedly self-inflicted injury.

19       But even that we would have to exercise all of the machinery

20   and levers of sovereign lawmaking to do.  And that itself,

21   forcing us to do that as opposed -- you know, to avoid that cost

22   is itself an injury.  So I think -- I think the driver's license

23   point is open and shut; that is, it is -- it is directly

24   traceable to this policy, it is directly economic, and it is

25   only because the United States will give out these cards that we

```
 1        have to do it.

 2            If I might very quickly touch on three other points that

 3        Ms. Hartnett mentioned earlier.  As we mentioned in the opening,

 4        the United States is continuing to conflate this concept of

 5        inaction and action and predicably invoked the Heckler case and

 6        wants to talk about enforcement priorities and focusing, you

 7        know, budget priorities, et cetera, on things the Department of

 8        Homeland Security thinks are important.  And --

 9                  THE COURT:  I guess maybe I'm missing -- and I've

10        realized you had a slide or two in your PowerPoint about action

11        versus inaction, but why does it matter?  If it's an exercise of

12        discretion whether to act or to inact, why does it matter?

13                  MR. OLDHAM:  Well, it matters in the following sense.

14        It matters in a couple senses.  One, Ms. Hartnett is correct

15        that if the State of Texas was coming in and saying to this

16        Court:  Your Honor, we would like the United States to bring an

17        enforcement action against a particular individual.  Or if we

18        were coming to this Court and we were saying:  Your Honor, we

19        would like an injunction that would require to use -- the absurd

20        hypothetical from the opposition to the PI motion:  We would

21        like the United States to deport every person who lives in the

22        United States without documents immediately.  That would be a

23        very different case because it would implicate notions of

24        prosecutorial discretion, it would suggest that the states were

25        trying to interfere with budget priorities, and it would raise a
```

1    lot of these justiciability concerns that the Supreme Court has

2    talked about in cases like *Heckler versus Chaney*.

3        And so what I wanted to do at the very beginning, and I

4    don't think we can talk about this enough today, because it is a

5    reoccurring theme from them to try to conflate these two

6    concepts because they know that when they're doing action, they

7    have to have a legal basis for it.  They have to be able to

8    point to this Court and say:  We have authorization to give out

9    4 million employment authorization cards.  We have a statutory

10   or a constitutional basis to do it, and here it is.

11       And the reason that -- I think it goes really to the heart

12   of the merits of the case, but it also, I think, goes to the

13   justiciability of the question presented.  And so I think that's

14   why -- why we want to point it out.

15       And so they have said, well, look at Section 1255(a), and

16   it's a mandatory "shall" language.  And you're absolutely

17   correct.  It says, "You shall -- the aliens shall be removed,"

18   and they're doing the exact opposite of that.

19       Now, why is that relevant?  Is it relevant because we're

20   demanding that all 11 million who are in the United States be

21   removed today?  No.  The reason that it's relevant is because

22   for -- really for two reasons.  One, the Supreme Court in the

23   *Heckler* case itself said that when the statutory commands are

24   phrased in "shall" language as 1255(a) is, the *Heckler* concerns

25   don't apply.  In fact, they distinguish the *Dunlop* case in

1    *Heckler* itself because the statutory commands in *Dunlop* were

2    "shall" as opposed to "may" or "the secretary is authorized" to

3    do this, that or the other.

4         So just the text of 1255, as Your Honor quoted it earlier,

5    distinguishes this case from *Heckler* and makes all of their

6    reliance on prosecutorial discretion and setting priorities and

7    inaction inapposite.

8         But it's also relevant in the following sense, and that is,

9    Congress has specifically said in 1255 and 26, at least 26 by

10   our current research count, at least 26 other specific statutory

11   provisions like the one that Your Honor mentioned, here are the

12   ways you have to do this.  These are the ways you have to do it.

13   If you want to authorize the presence of the parent of a U.S.

14   citizen, this is how.  These are what the rules are going to be.

15   It's going to involve this particular visa application, this

16   amount of waiting, this particular place at a consular office

17   where you have to apply, this many -- this particular unlawful

18   presence bar.  This is how old the child who petitions on your

19   behalf is going to have to be.

20        If you want to authorize the presence of the parent of a LPR

21   or a legal permanent resident, these are the provisions you're

22   going to have to follow.  And if you want to authorize work for

23   someone who is in the United States without documents, these are

24   the provisions you're going to have to apply.  And there's like

25   ten or 12 or more of them, and they're all in that slot.  And we

1   have copies for the Court's convenience.  All of them say these

2   are the ways you do it.

3       And the Department of Justice, the Department of Homeland

4   Security, and the defendants in this case have said it does not

5   matter what is in those 27 provisions.  We're going to do it our

6   way.  And we're going to have a six-page memorandum that creates

7   our own eligibility criteria that have no basis in the statute,

8   and we're going to follow that process instead.  And we're going

9   to do it under the auspices of priority setting.  That's one of

10  the buzz words that Your Honor will hear.  It runs throughout

11  the papers.

12      And the two really important points that we want the Court

13  to be aware of and to emphasize today is that, one, Congress is

14  the person -- is the entity that sets the priorities.  And

15  two -- and they have in those 27 provisions.

16      And the second point is that it is an awfully and odd

17  priority setting to say:  Well, these are low priority cases, so

18  we're not going to bring an enforcement action.  That's one set

19  of -- you know, one way you could handle it, and we're not

20  challenging that.

21      What we're challenging instead is here's a set of low

22  priority cases, and we're going to spend resources.  We're going

23  to spend millions of dollars.  We're going to create new

24  buildings, hire new people, create new forms, process new

25  applications, grant new authorizations, give new rubber stamped

1  approvals, give new identification cards.  We're going to spend

2  money on these allegedly low priority cases.

3      So we think that what the defendants are doing and have

4  promised to do belies this entire suggestion that this is all

5  based on enforcement discretion or focusing resources away from

6  low priority cases.  In fact, those low priority cases are

7  getting the resources.

8      And we've actually pointed to emails in reply to the -- in

9  support of the preliminary injunction motion where members of

10 the Department of -- I'm sorry, employees of the Department of

11 Homeland Security have diverted resources away from other things

12 to these allegedly low priority cases.

13     The third point, speculation.  We heard a little bit from

14 Ms. Hartnett this morning about how the states' injuries are

15 allegedly speculative and that the independent actions of

16 undocumented individuals should not figure in to the standing

17 analysis.

18     So a couple points about this.  One, we are not -- you know,

19 we have an independent basis over and above what independent

20 actions of independent undocumented aliens will do.  And that

21 is, as to the people who are not -- I'm sorry, who are here

22 lawfully -- I'm sorry, unlawfully now.  All right.  So for the

23 approximately four to five million people who will be benefited

24 by this program who are in the United States and meet the

25 eligibility criteria that were unilaterally created by the

1    defendants, we're not relying on the independent actions of

2    third parties.  They made those individuals categorically

3    eligible for a new slew -- for a whole slew of new government

4    benefits.

5            THE COURT:  Such as?

6            MR. OLDHAM:  Well, all of the ones that we talked about

7    before.  So that's Social Security numbers, Social Security

8    benefits, Medicare, earned income tax credit.

9            THE COURT:  But those are all federal benefits, aren't

10   they?  How is the state harmed by that?

11           MR. OLDHAM:  So this is a slightly separate concept.

12   One of them is how is the state injured by it?  And the second

13   is did the defendants take affirmative actions?  So all of those

14   things were affirmative actions, and they have concomitant costs

15   upon the states.  So some of those are things like licensing,

16   but some of them also are things like healthcare, law

17   enforcement and education.  So if we talk about the later

18   category for a second --

19           THE COURT:  Ms. Hartnett's point is you're already

20   having to provide that --

21           MR. OLDHAM:  So --

22           THE COURT:  -- before DACA was -- before

23   November 20th or whatever the date was.  On November 19th before

24   this thing was issued, say that Texas was already obligated to

25   do that.  Supreme Court makes you do that.

1           MR. OLDHAM:  That's right.  And so -- that's absolutely

2      correct, Your Honor, and it has been that way for years, even

3      since the *Texas versus United States* case that Ms. Hartnett

4      referenced earlier.  But this is the bottom line point.  If you

5      compare on November 19th, 2014, before the DAPA announcement,

6      every individual who is in the United States and undocumented

7      and imposing the costs that we've talked about through

8      healthcare, education, et cetera, on the State of Texas had some

9      probability of leaving the United States.  And Dr. Eschbach has

10     pointed to statistics from the demography literature that

11     it's -- you know, it's a quarter of the population at some --

12     different -- somewhere between 20 percent and a quarter of the

13     population that could emigrate in any given year.  And those

14     people now have no reason to emigrate because they now have a

15     piece of paper and an authorization card from the United States

16     that lets them stay and to continue imposing those costs, right?

17          So whatever we would talk about the speculative -- they want

18     to call it speculative.  We would submit that it's no more

19     speculative than greenhouse gas emissions.  But whatever is

20     going to happen with respect to the new people who will come,

21     there should be no dispute as to the people who are here and who

22     now are authorized to be here, who are now authorized by the

23     federal government to continue imposing those costs on the

24     states.  And those costs are millions and millions and millions

25     of dollars or billions of dollars, in fact, and are documented

1    in declarations attached in the PI papers.

2         So I think that the speculation argument, it falls apart in

3    two different ways, right?  This is one way, the way in the

4    sense that there are people who are here and who now do not have

5    to go and who can stay lawfully in the United States with their

6    federal identification card who would continue imposing those

7    costs.

8         And it also falls apart in the sense that whatever new

9    inducements might come for new people to come based on the fact

10   that, you know, in the last two years alone -- I mean, this is

11   the second time they've done this, right?  In 2012 they said,

12   well, no one would have any oppor -- you know, reason to come in

13   response to DACA because it only applies to people who have been

14   here.  But, of course, now two years later, they expand it and

15   they say:  Well, no, don't worry about that.  Now there's no

16   reason to come because of DAPA because it only applies to people

17   who are here.

18        But as Dr. Eschbach has explained, every time the government

19   does this, it does create an incentive because the people will

20   think:  Well, they've done it twice in two years.  Maybe they'll

21   do it again in 2016.  And that chain of causation between the

22   government policy, the incentives it creates and the costs it

23   imposes upon the state is dramatically tighter than what

24   happened in *Massachusetts versus EPA*.

25        And I recognize that the Justice Department lost in

1    *Massachusetts versus EPA*, and they argued forcefully that that

2    is a speculative chain between regulating emissions from

3    carbon -- from the tailpipes of cars, just new cars sold in the

4    United States, all the way up to and through and including other

5    emission controls, other countries in the way they might

6    regulate greenhouse gases, all the way up to and including

7    international treaty obligations, et cetera, all the way up to

8    atmospheric mixing of the greenhouse gases, all the way to

9    global warming and then raising the sea tide and then eroding

10   centimeters from the Massachusetts' shoreline.  That is a

11   dramatically more tenuous connection of causation than what

12   we're talking about undocumented in the Eschbach declaration.

13   So I think the speculation concerns should be rejected on that

14   basis.

15       And the last -- the last rebuttal point that I would like to

16   offer is this zone of interests argument that Ms. Hartnett

17   mentioned earlier.  And I think this argument is problematic for

18   a couple different reasons.  One is that if you look at the APA,

19   the APA does give us a right to procedural regularity from our

20   federal government.  It gives every affected individual a right

21   of procedural regularity from the federal government.  That's

22   the entire point of that statute ever since it was codified in

23   1946.

24       The entire point is to ensure that when people are aggrieved

25   by the way that the government is making legislative rules, that

1    we have an opportunity to have public comment and that they

2    reach a reasoned, nonarbitrary and non-capricious decision that

3    takes in -- that takes into account the views of affected

4    people.  So that's the APA.

5        But it's also true as to the INA.  The *Perales* case, which

6    is a Fifth Circuit decision from 1992 and is cited in both their

7    papers and ours, says that one of the purposes, one of the key

8    purposes of the INA is to protect workers.  And it's not just

9    the *Perales* case.  *Alfred L. Snapp* says the same thing.  That's

10   also an INA case.  And it's also, as an aside, a case where the

11   Commonwealth of Puerto Rico was allowed to come into federal

12   court to talk about that.

13       And so you can't -- they can't simply say, well, these are

14   interests that, you know, the state was not designed to protect.

15   And *Perales* says that it matters to workers.  *Alfred L. Snapp*

16   says states are allowed to vindicate their workers' rights

17   through parens patriae actions.

18       And so both of those I think do away with the zone of

19   interest inquiry, and that's even assuming -- that's even

20   assuming that the zone of interests inquiry does any work for

21   them after *Lexmark*.  Because as the Court will recall, the

22   Supreme Court of the United States in the *Lexmark* decision

23   talked a lot about what the zone of interest inquiry does.

24           THE COURT:  Texas hasn't made any argument or any of the

25   other states that they're here representing the rights of their

1  workers, are they?

2       MR. OLDHAM:  Oh, yes, Your Honor, we have.  I think

3  that's exactly what the Dr. Welch declaration is designed to do,

4  which is to say that as -- because of the way that they have

5  structured this program and because of the way that they've

6  structured other federal programs, U.S. workers will be more

7  expensive to hire compared to similarly situated non-U.S.

8  citizens.  And so -- and that is exactly the sort of discrim --

9  economic discrimination that gives -- that would -- that was at

10  issue.  I mean, *Perales* talks about it.  But it's also exactly

11  what was at issue in *Alfred L. Snapp*.  And I think that's the

12  basis for our third -- our third standing argument is the

13  effects on the labor markets created by what the United States

14  has done.

15       THE COURT:  Okay.  All right.  I didn't understand that.

16    Here's what I want to do.  Let's take about a ten-minute

17  break, stretch break, and let's come back and talk about the

18  merits.

19    *(Recess taken from 11:35 to 11:49.)*

20       THE COURT:  All right.  Be seated.

21    Mr. Oldham, let's talk about merits.

22       MR. OLDHAM:  Yes, Your Honor.  The states have two

23  claims in this case.  The first is the Take Care Clause, and the

24  second is really two separate claims under the APA.  But we'll

25  group them together under the Administration Procedure Act, and

1    we urge the Court to find that we're likely to succeed on both.

2        Let's start with the Take Care Clause.  On the merits of

3    this claim, it's the states' position that this case is

4    materially identical to *Youngstown Pipe and Tube versus Sawyer*,

5    which is the 1952 case in which President Truman attempted to

6    seize the nation's steel mills.  Both of these cases arose when

7    the president went to Congress and asked for authority to do

8    something of national importance.  And in both cases Congress

9    refused the president's request.

10       In *Youngstown*, as in this case, the president nonetheless

11   acted unilaterally.  In *Youngstown*, as in this case, the

12   president invoked precedent from prior administrations.  And in

13   *Youngstown*, as in this case, the president demanded unfettered

14   unilateral power to do what he pleased without the supervision

15   or any authority to check in federal court.

16       Both cases, we would submit, should end in the same way,

17   namely with the federal court enjoining the unlawful action.

18   And as we go through these following slides and we talk about

19   the *Youngstown* case and you see the eerie parallels between what

20   happened in 1952 and what happened in 2014 and is happening

21   today, it is remarkable that the position of the United States

22   is that *Youngstown* is so irrelevant that it merits only a single

23   sentence in a 349 note footnote on page 30 of its opposition.

24       So let's start with this case.  As the Court will know, the

25   president told the nation that he took an action to change the

federal immigration laws unilaterally because he was tired of waiting for Congress to reform the immigration system. And he said that if anyone in Congress disagreed with what he had done, they should, quote, pass a bill. This is what the president said.

"When members of Congress question my authority to make our immigration system work better, I have a simple answer: Pass a bill. And the day I sign that bill into law, the actions I take will no longer be necessary."

Now, President Truman did the exact same thing. In April of 1952, he sent two letters to Congress. They appear on these two pages of the Congressional Record.

And in the left-most pane, you can see that he wrote the following words. This is after he seized the steel mills. "The Congress can, if it wishes, reject the course of action I have followed in this matter. And if it does, the Congress should pass affirmative legislation to provide a constructive course of action looking toward a solution of this matter which will be in the public interest."

And in response to these two letters in 1952, no less than in response to the president's "pass a bill" order in 2014, Congress refused. And in both cases, *Youngstown*, like the one before you today, the president acted anyway.

Now, in order to act unilaterally after asking Congress for the authority and being told no, both the presidents had to

1    ignore an enormous amount of statutory law.  We've touched upon

2    this a little bit earlier, and now I'd like to go through it in

3    a little greater detail.

4        As to parens --

5        THE COURT:  Before I let you go further, I asked

6    Ms. Hartnett this, but let me ask you this.  Does it matter to

7    either side, the argument of either side that we don't have an

8    executive order here?  In fact, as far as this Court knows,

9    President Obama has not done anything.  All we have is a memo

10   from the Secretary of Homeland Security.  Am I right?  First of

11   all, am I right, that's all we have?

12       MR. OLDHAM:  Yes, Your Honor.

13       THE COURT:  And does that matter to either side's

14   argument?

15       MR. OLDHAM:  In our -- in our view, it only makes this

16   more lawless in the sense that all we have is a procedurally

17   irregular -- that is just a memo fired off by the Secretary of

18   DHS -- ordering officials at DHS to do things that we argue are

19   contrary to the statutory provisions that we'll talk about in a

20   second.

21       But legally as to sort of whether the claims are cognizable

22   or who are the proper parties or any of those sorts of concerns,

23   then no, it really doesn't because as the Court will know, there

24   was an executive order in the steel seizure case, in the

25   *Youngstown* case.  And the suit was nonetheless styled steel

 1  mills, that's *Youngstown Pipe and Tube versus Sawyer*, who is the

 2  Secretary of Commerce, not President Truman.  And that's for a

 3  variety of federal courts reasons, many of which are -- which

 4  apply both under the Take Care Clause cause and also under the

 5  APA that the president himself is not a proper party to these

 6  disputes for reasons that go to Article II, but --

 7          THE COURT:  Okay.  Go ahead.

 8          MR. OLDHAM:  So as to parents of U.S. citizens, myriad

 9  statutory provisions that talk about how Congress -- again,

10  these are duly enacted statutes.  These are the provisions that

11  talk about how Congress wants to authorize the presence of

12  parents of U.S. citizens, parents of legal permanent residents,

13  and the circumstances under which Congress has given the

14  Executive Branch the authority to grant work permits; 27 by our

15  count.  And these are all of the ways that Congress would like

16  this matter to be handled.

17      And in order to do what the defendants have done and in

18  order to do the things that we say are unlawful, the president

19  and the Department of Homeland Security had to take all 27 of

20  these, put them aside, and then write their own criteria, their

21  own eligibility criteria for when parents of United States

22  citizens can stay, for when parents of legal permanent residents

23  can stay, and when work permits can issue.

24      Likewise in *Youngstown*, Congress imposed lots and lots of

25  limits on the president's power to seize industrial property.

1    And I'm not going to go through it in great detail, but I do

2    think it's highly interesting and relevant, directly relevant to

3    these legal questions.  That in appendix 1 of Justice

4    Frankfurter's concurring opinion, he collected a ten-page table

5    of all of the various statutory provisions, the statute, the

6    duration, the scope of authority to conduct seizures, the

7    limitations on its exercise, and he went through each one of

8    them and said:  This is what Congress has said.  When we want

9    the president to have the power to do what he did, these are the

10   circumstances in which they can be done.  And nowhere in that

11   table did he find authority for the president to seize the

12   nation's steel mills in the middle of the Korean War.

13       And here, as in *Youngstown*, the fact that Congress fought

14   about all of these circumstances and put all of these limits and

15   did not give the president the power he claimed, that itself is

16   proof that Congress intended to prohibit what the president has

17   done.

18       That is, the fact that Congress fought about the issue and

19   imposed these restrictions means that the president cannot

20   simply pretend that the restrictions don't exist, and much less

21   can he find in the myriad restrictions, those 27 statutory

22   provisions that we just showed you, can he pretend that hidden

23   in those restrictions is an authorization to grant benefits to

24   4 million people.

25       As Justice Frankfurter concluded, it's one thing to draw an

intention of Congress from general language and to say that

Congress would have explicitly written what is inferred, but

Congress has not addressed itself to that topic.  It is quite

impossible, however, when Congress did specifically address

itself to a problem as Congress did to that of seizure to find

secreted in the interstices of legislation the very grant of

power which Congress consciously withheld.  To find authority so

explicitly withheld is not merely to disregard in a particular

instance the clear will of Congress.  It is to disrespect the

whole legislative process and the constitutional division of

authority between President and Congress.

Now, the defendants surely will protest here, as they did in

the *Youngstown* case, that previous presidents have gotten away

with what they want to do; and therefore, they should too.  Two

crucially important points on this topic.

First, the Supreme Court, again in the *Youngstown* case, said

that such presidential pleas to precedent are irrelevant.  This

is from the majority opinion written by Justice Black where he

said, "It is said that other presidents without congressional

authority have taken possession of private business enterprises

in order to settle their labor disputes.  But even if this be

true, Congress has not thereby lost its exclusive constitutional

authority to make laws necessary and proper to carry out the

powers vested by the constitution and the government of the

United States."

1    And the second point, not only is it irrelevant, but the

2    second point is it's also quite astounding to look at the extent

3    to which the Justice Department in the *Youngstown* case, like the

4    Justice Department in this case, is willing to stretch those

5    analogies to historical precedent.

6    So this is another appendix to the Frankfurter opinion.

7    Again, I won't go through it in great detail, but it is highly

8    relevant to show that in the *Youngstown* case, when President

9    Truman and the Department of Justice went to the Supreme Court

10   to justify seizing this nation's steel mills, they pointed to

11   these examples of previous precedents.  In World War II

12   President Roosevelt, but also prior to President Roosevelt,

13   President Wilson had invoked previous plants and facilities that

14   they had seized and then gave all of these examples about how

15   this was -- these -- the properties had been seized and whether

16   it was lawful.

17   And in *Youngstown*, Justice Frankfurter goes through all of

18   those and points out:  You know what?  Not only are these

19   irrelevant, but they're also distinguishable because not one of

20   them involved a president who said that he could seize all of

21   the steel mills unilaterally.

22   The same stretching of analogies is true here.  So take, for

23   example, one of the Justice Department's favorite examples that

24   it has trotted out both in the OLC memo that they used to

25   justify the legality of this program, and also again in their

1  briefing before this court.  And that is a previous presidential

2  administration granted deferred action to students affected by

3  Hurricane Katrina.

4      Now, the students affected by Hurricane Katrina, a few

5  thousand, were already in the United States lawfully.  They had

6  visas.  This is from the Department of Homeland Security's own

7  documents, all right?  The people affected, the Katrina impacted

8  foreign academic students were already visa holders.  But an act

9  of God, that is a massive natural disaster in the form of

10 Hurricane Katrina, forced them into noncompliance with the

11 conditions of these F-1 visas, because the universities in

12 Louisiana and surrounding environs closed after Hurricane

13 Katrina, and the students, therefore, were no longer enrolled

14 full time in college.

15     So because they were already here lawfully, the Department

16 of Homeland Security gave them two months.  The date of the

17 memo, the 25th of 2000 -- November 25th, 2005, to

18 February 1st of 2006, to transition from a lawful F-1 visa

19 status to another lawful visa status.

20     Now, it should go without saying that nothing in a precedent

21 involving a few thousand students who are already here lawfully

22 in the United States pursuant to a Congressional program

23 statutorily authorized granting them a few months to move from

24 that to another lawful status because an act of God had pushed

25 them out bears no resemblance at all to, as the defendants

themselves have described this program, millions of people,

extendible periods of deferred action for people who are not

here lawfully today and won't be here lawfully at the end of the

program.

Finally, the defendants in *Youngstown*, like the ones before

you today, insisted that none of these legal niceties really

matter.  What they said is that they cannot be forced to answer

to any plaintiff, whether it's a state or otherwise, in any

courtroom ever.  This is how the DOJ lawyer explained it in

*Youngstown*.  He told the federal district court in the District

of Columbia that as far as the Courts go, the president's power

is, quote-unquote, unlimited.  And it's also, quote-unquote,

conclusive.

Truman argued that the only powers on his limit -- on his

executive authority to seize the nation's steel mills were the

ballot box and impeachment.

Now, in this case what the defendants argue is that their

powers are also unlimited and that this Court can do nothing to

stop them.  And they base that assertion on this canard which

you've already heard today of executive discretion or

enforcement setting.  And they say that deferred action is like

a decision not to prosecute somebody.  And because a decision

not to prosecute somebody is generally immune from judicial

review, well, then, so too should the creation of a new federal

program to give out 4 million authorization documents to people

1    should also be immune from judicial review.

2         Now, as we've already explained, this directive in its

3    scope, its scale and its substance bears no resemblance to a

4    decision not to prosecute an individual person because the

5    defendants are doling out benefits under state and federal law

6    that they do not have the legal authority to do.

7         But it also bears no resemblance to discretion.  So this is

8    the template that the USCIS has used for denying deferred action

9    to DACA beneficiaries.  And I apologize for the quality of the

10   reproduction.  It's been scanned multiple times.  But if you can

11   look closely, you can see on the left-hand side of the printout

12   a series of little check boxes where if you want to deny

13   deferred action to somebody, you can check a little box.

14        So what are the reasons?  They're all eligibility criteria.

15   These are not from statute.  These are not from the 27

16   provisions that Congress gave.  They're not from the regulations

17   that have been -- that people have opportunities to challenge

18   through notice and comment.  These are things that they

19   unilaterally created on their own in a six-page memorandum.

20   It's things like you have failed to establish that you came to

21   the United States under the age of 16.  Or you have failed to

22   pay the fee for your application.  So these are their criteria.

23        And this form does not contain a box that says:  Well, using

24   our discretion, even though you meet our eligibility criteria,

25   we're nonetheless going to deny you deferred action.  And, of

1    course, even if -- even if they were to add a box that said:

2    Oh, well, we could also deny it for any reason or no reason at

3    all, they have pointed to not one piece of evidence, not one

4    case, not one planned case where they ever have or plan to deny

5    a single person for purely discretionary reasons; that is, for

6    reasons that have nothing to do with the eligibility criteria

7    that they unilaterally created, and that is by design.

8        The -- as the USCIS union president himself has explained,

9    these deferred action programs were not created to use

10   case-by-case or discretionary decisions the way a prosecutor

11   would decide not to prosecute someone.  Rather, these are

12   government entitlement programs.  And the vast majority of

13   applications, far in excess of 90 percent, are simply rubber

14   stamped.  And the others are denied for failure to meet the

15   defendant's eligibility criteria.

16       So to just give an illustration.  If Bill Gates applies for

17   a means tested entitlement program like Medicaid, his

18   application will obviously be denied, but it would be denied

19   because he fails to meet the means tested eligibility criteria.

20   It's not going to be denied for discretionary reasons.

21       And the exact same thing is true in this case.  The only

22   difference is that the eligibility criteria for Medicaid come

23   from Congress.  They come from statutes that were enacted the

24   way Article I and Article II and Article III contemplated.  And

25   the eligibility criteria for this program come from the will of

1   the Executive Branch alone.  They've usurped the power of

2   Congress.  They have acted outside of the bounds of Article II.

3   And therefore, we submit that the plaintiff states are likely to

4   succeed on the merits of their Take Care Clause claim.

5        Turning to the APA.  We have two basic reasons that we'll

6   succeed on the APA claim we would submit to the Court.  The

7   first is that the DHS directive or the DAPA memorandum from 2014

8   is what is called a substantive rule.  And the second is that

9   substantive rule is unlawful both procedurally and

10  substantively.

11       Now, what is a substantive rule?  As the Court will recall,

12  the APA gives us the right of judicial review when an agency

13  promulgates what's called a substantive rule.  And a substantive

14  rule, as the D.C. Circuit has said in the *Appalachian Power*

15  case, which is one of the leading authorities on the question,

16  is one that orders, commands and dictates; that is, speaks in

17  authoritative terms, not tentative ones.  And this directive has

18  commands, orders, and dictates from the very beginning to the

19  very end.

20       So here's a sampling of them.  The Secretary of the

21  Department of Homeland Security directs these provisions will

22  apply.  These other provisions will no longer apply.  Certain

23  time periods will be extended.  This program shall do this.

24  Applicants will pay that.  There will be no fee waivers for the

25  other thing.  On and on and on from the first page to the last

1    page.

2         And there can be no doubt and the defendants have pointed to

3    no case that suggests anything that looks like this can possibly

4    be something -- I'm sorry, anything other than a substantive

5    rule.

6         So to just take an example from the *Appalachian Power* case

7    which we just talked about.  In that case EPA was issuing

8    guidance documents.  They were just letters that said:  Here are

9    the criteria that we intend will apply.  And they went into the

10   federal court and they said:  Well, we should be able to do this

11   without having to comply with the APA because this is just a

12   statement to the public.  We're just advising folks about how we

13   intend to handle these applications.

14        And the D.C. Circuit resoundingly rejected that argument.

15   It doesn't matter what they want to call it.  It doesn't matter

16   if they want to come to this court and say they're just -- this

17   is a statement of intention.  This is merely us telling you what

18   we plan to do in the future.

19        Because these provisions here speak in unqualified shalls,

20   musts, wills and will nots, it is a legislative rule or a

21   substantive rule, and it therefore must comply with the APA.

22        Now, once it's a substantive rule, then it triggers a whole

23   host of remedies for the plaintiffs under the Administrative

24   Procedure Act.  First, the notice and comment requirements are

25   quite easy and straightforward for the Court in the sense that

1    the United States has conceded that they did not issue this

2    directive through notice and comment.  The State of Texas, none

3    of the plaintiff states, none of the members of the public has

4    ever had a chance to offer public input into what the defendants

5    have done, much less have they responded in a notice and comment

6    on rule making to the public input that the states would have

7    offered if we had been given the opportunity.

8         And as a consequence -- for that reason alone, for that

9    reason alone it's procedurally invalid under Section 553 of the

10   Administrative Procedure Act.

11        And it's also substantively unlawful, that is under Section

12   706 of the APA, because it's arbitrary, capricious and contrary

13   to all 27 of the provisions that we gave before.  So we've

14   pointed out in the brief there's long lines of precedent from

15   the D.C. Circuit, the Fifth Circuit and the Supreme Court that

16   say when Congress specifically speaks to a topic, as they

17   obviously have here for both people who -- for authorizing the

18   presence of parents for U.S. citizens and LPRs, and also for

19   work permits, then the Executive Branch cannot take agency

20   action that's contrary to those provisions.  And since Congress

21   specifically legislated to the topic, there is no gap for the

22   agency to fill.

23        So what's left after the merits of the APA claim?  Well,

24   there are -- as the Court knows, there are three remaining

25   preliminary injunction factors.  So I would submit that it's

1    difficult to contest that the plaintiffs' injuries are

2    irreparable in the sense that we will have to make investments

3    that we cannot recover through healthcare, education, law

4    enforcement, et cetera.  And once the defendants start issuing

5    these employment authorization cards, once those driver's

6    license-like documents start issuing and circulating, it will be

7    almost impossible to recover them and unring that bell.

8         And both because those EACs will be in circulation and also

9    because once individuals have those EACs, they'll be able to

10   qualify for all manner of things like marriage licenses,

11   driver's licenses, professional licenses, like to be a member of

12   the bar, and all of those things would have to be revoked.

13        So the defendants cannot explain or have not explained how

14   those things could be undone, and they definitely have not

15   explained how the Court could undo all of those things, both

16   with respect to the cards, but also the benefits that people get

17   with those cards, including things like marriage licenses,

18   driver's licenses, professional licenses without imposing

19   serious harm on the people who are holding them.

20        So I think that the irreparable injury prong is satisfied

21   for that reason.

22        On the balance of the equities --

23             THE COURT:  Let me go over something real quickly here.

24             MR. OLDHAM:  Sure.

25             THE COURT:  You said irreparable harm on the people who

1    are holding the cards.  But don't I have to have irreparable

2    harm to the state if you're the one suing?

3          MR. OLDHAM:  Oh, yes, Your Honor.  But these are -- I

4    mean, these are things that the state is providing to people.

5    These are programs that the state administers, right?  So if the

6    state has people, for example -- you know, if the Bar of Texas

7    has people that are on its rolls with employment authorization

8    cards, I mean, those are injuries to the state.  They're

9    injuries both to the state, but also to the person who holds the

10   card.

11         So I don't think that there's a way to extricate the injury

12   to the person who holds it, which is obviously significant, from

13   the injury of the state, which is the one that gave it.  So I

14   think on both sides of that inquiry the injuries are irreparable

15   in the sense that they cannot be easily undone.  The cards

16   cannot be clawed back, at least not easily.  And the United

17   States certainly hasn't explained how it could be to the

18   contrary.

19         The balance of the equities.  The United States has not

20   explained also what exactly is the emergency that requires

21   changing the status quo.  So as Ms. Hartnett explained earlier,

22   the status quo has existed for a long time.  And even if

23   everyone could agree that it was broken and that there was a

24   problem with it, the status quo -- since the status quo is as it

25   is today, the United States is the one that wants to change it,

1    and they can't point to an exigency that would require changing

2    it before the conclusion of judicial proceedings and the

3    opportunity for the plaintiff states to have their day in court.

4         And, of course, even if they could point to an emergency

5    that would require issuing these documents right now, as they

6    have promised to do within a month or so, the United States

7    Supreme Court has also said that even the exigencies of the

8    Korean War -- I mean, President Truman seized steel mills in

9    1952 while U.S. service members were fighting abroad.  And even

10   those exigencies, even the need for steel for airplanes and

11   boats could not justify a transgression of the Take Care Clause.

12        And so I'm not -- I think the balance of the equities

13   clearly tips in favor of preserving the status quo, just as long

14   as the plaintiffs and this Court need to resolve the merits of

15   the claims that are presented.

16        Finally on the public interest prong, we think it's been

17   satisfied for several reasons.  The one that I would highlight

18   again are -- is the tax example.  As you've seen from the way

19   President Truman justified seizing the steel mills and the way

20   the current president has justified his unilateral action in

21   this case, the practice of the Executive Branch over the course

22   of decades is to use previous precedents to justify future

23   incursions of executive power.

24        And the next president will be able to look at this program

25   and say:  I've been working with Congress to amend the tax code.

1    I think taxes are too high, and I would like to reduce them, but

2    Congress refuses a comprehensive overhaul of the tax code.  And

3    therefore, because my Secretary of the Internal Revenue

4    Service -- I mean, I'm sorry, the Commissioner of the Internal

5    Revenue Service has discretion in how to enforce it and because,

6    quite frankly, we're resource strapped and we can only audit one

7    percent of tax returns that are filed every year, I'm going to

8    direct my secretary -- I'm sorry, my commissioner of the

9    Internal Revenue Service to create a program to hand out to

10   40 percent of American taxpayers little cards.  And they can use

11   those cards to pay lower taxes, to pay no taxes, to forgive back

12   taxes, or to forgive taxes in the future.

13       And that program, which would -- the next president can

14   apply to taxes could also apply to the environmental laws, could

15   also apply to the workplace protection laws.  There really is no

16   limit.  And the only way to stop it is to do what District Judge

17   David Pine did in 1952, and that is to issue an injunction,

18   allow the federal courts to look at the legality of what has

19   happened here, ensure that it comports with Article II of the

20   Constitution, ensure that it is procedurally and substantively

21   regular under the Administrative Procedure Act, and to give the

22   plaintiffs a day in court.

23       So after the preliminary injunction factors, all that's

24   really left is the injunction itself.  And I want to talk a

25   little bit about what the injunction would look like, what the

1    plaintiffs propose the injunction should look like, and I want

2    to return to what I think is going to be a theme for today.  It

3    already has been from Ms. Hartnett this morning.  And that is

4    what exactly the plaintiffs want and what we won't want, or what

5    is it we're not asking for really.

6        So let's talk again about the *Youngstown* case.  So in the

7    *Youngstown* case, the president obviously took an action, right,

8    just like we were saying the president has taken action here.

9    And the action he took there was to seize the steel mills.  And

10   as I mentioned, Judge Pine issued an injunction, and this is

11   what it looked like.

12       It said, "Adjudged and ordered that pending this final

13   hearing and determination of this cause, the defendants,"

14   et cetera, et cetera, et cetera, "are hereby enjoined and

15   restrained from continuing seizure, possession of the plants,"

16   blah, blah, blah, "and from acting under the purported authority

17   of Executive Order No. 10340."

18       So similarly here, we request an injunction that would say

19   what the defendants have done and promise to do under the

20   authority of two memoranda that are substantively and

21   procedurally unlawful should be enjoined.

22       And so this -- the text of this proposal comes straight out

23   of what the district court did in the steel seizure case, and it

24   is exactly what would redress the injuries that the plaintiffs

25   have proffered in their pleadings here.  And you will see in

1   this injunction, we are asking that the defendants do not

2   solicit, accept, approve applications for or otherwise grant

3   deferred action and employment authorizations.  That is that

4   they're not -- they're restrained from doing something, not that

5   they actually go out and do anything.

6        Thank you, Your Honor.

7        THE COURT:  Let me ask one question.  And really I'm

8   asking this to both you and Ms. Hartnett.  This Court has been

9   working under the assumption that DACA, D-A-C-A, is not in front

10  of it.  Am I -- am I correct in that?

11       MR. OLDHAM:  Yes, Your Honor.  We have not.

12       THE COURT:  Ms. Hartnett, you agree with that?

13       MS. HARTNETT:  It's not part of our claim.

14       THE COURT:  All right.  I just wanted to make sure.

15  I -- that's the assumption I was working under.

16       MR. OLDHAM:  And, Your Honor, if I might just explain.

17  The reason that we talk a lot about DACA is because the -- it's

18  really two reasons.  One, we know how DACA operates, at least in

19  broad brush strokes, because it's been implemented for two

20  years.  So we actually have documents, we have evidence about

21  what the defendants have done under DACA.

22      And the second is that on pages 12 and 40 of the opposition

23  to the PI -- the opposition to the PI motion that the defendants

24  filed, on pages 12 and 40 of their brief, they have promised us

25  that DAPA will operate exactly the same way that DACA did.  So

1    we think -- you know, we can both -- we can talk about them

2    together only so that the Court understands what the relevant

3    facts are and the relevant legal principles are, even though as

4    the Court has acknowledged -- has pointed out and we agree, we

5    are not challenging the DACA program.

6          THE COURT:  All right.

7          MR. OLDHAM:  Thank you, Your Honor.

8          THE COURT:  Ms. Hartnett?

9          MS. HARTNETT:  Thank you, Your Honor.

10   And just to be clear on that last point, the memoranda

11   that -- the memorandum, there's one directive that the

12   plaintiffs are challenging in the complaint, and that both is

13   directed toward the DAPA program, but also is a expansion or

14   revision of the DACA program.  So to the extent that there's a

15   revision or expansion of the group that would be eligible to

16   apply for that, we do understand the plaintiffs to be

17   challenging that.

18         THE COURT:  The increase in years?

19         MR. OLDHAM:  Your Honor --

20         MS. HARTNETT:  They ask to have you direct and enjoin,

21   and that directive would allow the revisions to the DACA program

22   that we described in our brief.

23         MR. OLDHAM:  Yes, Your Honor.  I'm sorry.  When I said

24   that the DACA program, I was referring to 2012 DACA action.  We

25   are challenging the series of executive actions that were taken

1    on November 20th, 2014.

2              THE COURT:  Okay.

3         MS. HARTNETT:  And just to that point, Your Honor, I

4    would just add I didn't want to unduly object to the

5    presentation today, the PowerPoint, but it does contain a -- not

6    only additional argument, but the injunction that's proposed

7    there is different from the one they propose in their papers.

8    And to that -- the comment that was just made that there are

9    several executive actions being allegedly challenged, there was

10   one directive that was the subject of the complaint, and that's

11   what we've been briefing this case around, which is the one

12   about deferred action.

13             THE COURT:  And I'm going to give you a chance to file a

14   reply anyway, so that's -- I'm saving my housekeeping matters

15   for the end, but I know you have a motion on that.

16        MS. HARTNETT:  Yeah.  We just wanted to be able to make

17   sure we were clearly responding to that.  Although I would note

18   that much of the same logic and argument that the counsel for

19   state has been putting forth here today would not -- would

20   appear to apply to any exercise of discretion by the Department

21   of Homeland Security, including the routine use of deferred

22   action in individual cases not even part of any larger effort.

23        I would like to turn to *Heckler versus Chaney* again just

24   because that does frame our merits argument, but I first would

25   like to start with the *Youngstown* points that the counsel for

1   the state was making because at some level, they're really just

2   quite flawed.

3        This case is not materially identical to *Youngstown* in any

4   respect.  And I would say the first and foremost was in

5   *Youngstown*, the president was -- it was a presidential executive

6   order.  That's a distinction.  We've talked about whether how

7   much of a difference it makes.  But more importantly, the

8   president conceded there was not statutory authority for his

9   action in that case.

10       In this case, the Department of Homeland Security is

11  invoking and the Secretary of the Department of Homeland

12  Security is invoking his authority under the INA.  And I know

13  that counsel for the state had the -- on the slide several

14  different provisions of the INA that they were focused on, that

15  they claim preclude the authority being issued here or being

16  exercised here.  But they ignored some of the critical

17  provisions that are key to our understanding of what the

18  secretary's powers are.  And that includes 8 U.S.C. 1103(a)

19  which gives the secretary a broad power to take actions

20  necessary as he deems necessary to execute that law.

21       And then 6 U.S.C. 2205, which these are cited in our brief,

22  directs the secretary to establish national immigration

23  enforcement policies and priorities.

24       In addition to those -- and there's -- we can cite other

25  parts of the INA that support our general principle that what

1    the government is doing here is consistent with what Congress

2    intended, which was to direct our enforcement authorities where

3    they are needed most.

4         But there's also the Supreme Court precedent which acts --

5    which was conspicuously absent from the slide show, including

6    the Arizona case and the *Triple ADC* case.  Again, they weren't

7    about the specific type of program, but they did endorse the

8    general notion that the executive has discretion in the removal

9    of aliens.

10        And I would take -- the state also kind of suggested that

11   somehow we were hiding the ball in *Youngstown* in our

12   presentation.  We weren't.  They cited a couple of times in

13   their opening brief and made their reply brief about it.  The

14   reason why we didn't dwell on it is because this is not really a

15   case in which we're defending the president's actions or the

16   actions of the Executive Branch under the Take Care Clause.

17   Because as I noted, this is a case where statutory authority

18   provides the framework for understanding the powers of the

19   Secretary of Homeland Security.

20        The state also made some comments about the president's

21   remarks about wanting to get legislative change and alleging

22   that when he didn't get that, he just did the same thing

23   administratively.  That is simply wrong.

24             THE COURT:  Well, isn't that -- he said that, didn't he?

25             MS. HARTNETT:  Well, I think it's --

1          THE COURT:  I mean --

2          MS. HARTNETT:  No.

3          THE COURT:  I mean, the President of the United States

4    has said that publicly.

5          MS. HARTNETT:  I think it's important to focus on what

6    was being said, though.  What the president was pushing for was

7    comprehensive immigration reform that would include a path to

8    citizenship for certain groups of people that are illegally

9    present.

10      Deferred action, he did not try to effectuate that through

11   executive action.

12         THE COURT:  No, but he said if you don't do it, I'm

13   going to do it, and now he's done it.

14         MS. HARTNETT:  I think the "it" matters there, Your

15   Honor.  And the "it" here is doing what he can do within the

16   bounds of the authority that he has, and meaning he obviously

17   announced the executive actions.  The Department of Homeland

18   Security is responsible for this -- this statute and for this

19   program.  And my point is simply that what they've done is --

20   and they sought counsel from their -- the office of legal

21   counsel.  And what they've done is, within the bounds of their

22   legal authority, sought to address a problem that's a serious

23   national issue.

24      And Your Honor has -- you know, we've spoken about this.

25   The border security crisis is a real one, and the sheer number

1  of illegally present people with not enough resources to remove

2  them all is a real one.  That's why there's been a press for

3  some change, legislative change.  Legislative change did not

4  occur.  The fact that the president or the administration or the

5  Secretary of Homeland Security most specifically used the

6  available authorities to try to address the problem consistent

7  with the advice of their counsel, I think that should be

8  something that is not -- is not a point of criticism, but

9  actually a point of trying to effectively address the problem

10  with every tool that's available.  And that's why it really is

11  just different from *Youngstown*.  We go to a case where the

12  president conceded that there was no statutory authority for the

13  action.  And that was not a case in which the plaintiff --

14      THE COURT:  What statutory authority does the Secretary

15  of Homeland Security have for allowing 4 million plus aliens to

16  stay in the country for three years?

17      MS. HARTNETT:  I mean, it's the main powers I would

18  suggest -- I mean, it's --

19      THE COURT:  Are the ones -- I mean are the ones you've

20  already told me.

21      MS. HARTNETT:  Correct, and -- I mean as -- as

22  interpreted by -- I mean, those -- those statutes existed at the

23  time that -- and removal, as the Supreme Court said in -- you

24  know, in the *Triple ADC* case, the way that the Supreme Court

25  described the use of deferred Court action there, if I might, is

1    that it was a regular practice.  That was as -- as of 1996.

2    They described a regular practice which would become to be known

3    as deferred action.  They noted in -- the Supreme Court noted

4    that the executive has the discretion to abandon the endeavor,

5    removal, at every stage of the case.

6         And then in the Arizona case, which was less specifically

7    about deferred -- it wasn't about deferred action per se, but

8    there it talked about broad discretion.  It talked about whether

9    it makes sense to pursue removal at all.  My point just being

10   that the *Youngstown* -- I appreciate that -- obviously --

11        THE COURT:  No, I understand your point.

12        MS. HARTNETT:  Right, that all these executive actions

13   are informed by all the provisions of the constitution.

14        THE COURT:  Mr. Oldham is arguing the case that's most

15   favorable to him, and you're arguing the case most favorable to

16   you.  That's to be expected.

17        MS. HARTNETT:  That's true.

18        But I think another important point of that case, there was

19   actually a seized steel mill which provided a party that had

20   obviously a standing to be in the case as well.  But I think

21   that, you know, in short, the statutory authorities where we

22   look to, and that's why we believe the actions here are lawful.

23        I also would just point to the other -- the other sources of

24   statutory authority -- Your Honor has already referenced them --

25   for the employment authorization documents.  That is not a

1    legislative dictate of the memoranda from November what the --

2    the employment authorization document is authorized by a

3    statute, 8 U.S.C. 1324.  And there's a longstanding regulation

4    that implements that statute, allows the secretary -- I also

5    would note that that -- that provision of the INA which allows

6    the secretary to grant work authorization to certain aliens who

7    are -- who are here unlawfully but otherwise -- but have been --

8    but are in a deferred action category, that was not on there.

9    Their side is one of the work authorization provisions.  But

10   it's an important one because in 19 -- in 1986 when Congress

11   passed IRCA, they were legislating against the background of

12   a -- at that time a DOJ regulation that allowed for deferred

13   action recipients to get work authorization.  So the memorandum

14   from November did not create work authorization.  Independent

15   statutory authority provides for that.

16       I did address *Heckler versus Chaney*.  I did address *Heckler*

17   *versus Chaney* in the -- in my first presentation, so I won't

18   dwell on that here, but I do think it's an important framing of

19   the merits.  Because even if you get to the point of finding

20   Article III and prudential standing, the next question would be

21   whether this is the appropriate type of action to be reviewable

22   under the APA.

23       I would just point out that some of the discussion of

24   inaction versus action is really not -- I don't think that's the

25   touchstone for any of the inquiries along the way.  But in

1   *Heckler versus Chaney*, the question is really one -- is it an

2   enforcement policy?  Is it a policy about the agency's exercise

3   of discretion?  And I think this fits comfortably within *Chaney*.

4   And as we've discussed, there is no Congressional mandate not to

5   do deferred action.  To the contrary, there's been Congressional

6   acceptance of the practice and including --

7           THE COURT:  There's no Congressional authorization

8   anywhere of deferred action, is there?

9           MS. HARTNETT:  There's Congressional authorization to

10  the department to take broad actions as they deem -- as he

11  deems --

12          THE COURT:  No.  But, I mean, there's no -- there's no

13  act that's called the Deferred Action Act that says the

14  Secretary of Homeland Security or the Attorney General is hereby

15  authorized to give deferred action to anybody you want to.

16          MS. HARTNETT:  Nothing that broad, Your Honor.  There

17  have been a few times where the Executive Branch has undertaken

18  to give deferred action to a certain group, and Congress has

19  later memorialized that.  There have been a couple other

20  instances where Congress has asked us to specifically target a

21  couple of groups for deferred action.  And I think it's the Real

22  ID Act is an actual -- it's pretty significant indicia of

23  Congressional intent in this area when they allowed but did not

24  require a state to allow those in deferred action who have

25  received deferred action to have proof of being lawfully present

1    for the purpose of state driver's licenses.  And so there they

2    actually incorporated the concept of deferred action as a

3    category.

4         But, no, there's not a broader statute on point.  And the

5    reason why is that this is flowing from the prosecutorial

6    discretion that's inherent in the --

7         THE COURT:  I want to talk about discretion, but let me

8    back into something, I guess --

9         MS. HARTNETT:  Okay.

10        THE COURT:  -- just to eliminate things.  I mean,

11   Mr. Oldham argued -- and I'm asking you this because I think you

12   will agree with this -- is that if the APA applies and if the

13   states have a ripe standing to sue under the APA, I mean, the

14   injunction is good, isn't it?  I mean, y'all haven't gone

15   through the notes of the publication and comment procedure that

16   would otherwise if the APA applies.

17        MS. HARTNETT:  Well, there's one other step in the

18   analysis that's separate from standing, and then there's

19   *Heckler*, which is a broader point about any APA review.  And

20   then there's the question about what has to go through notice

21   and comment.  And that's covered by 5 U.S.C. 553(b), and we've

22   covered this in our brief.  This is the *Lincoln versus Vigil*

23   case as well as the -- there's a Fifth Circuit case that's in

24   the same vein called *Patients for Customized Care*.

25        And both of those cases stand for the proposition that if

 1  the document or directive at issue from the agency is something

 2  that -- I'm quoting from *Lincoln*.  Is something that advises the

 3  public prospectively in the manner -- of the manner in which the

 4  agency proposes to exercise a discretionary power, that that

 5  would be a general statement of policy that's exempt.

 6          THE COURT:  General guidance.

 7          MS. HARTNETT:  Right.  So that -- that's a separate --

 8  that would be regardless of whether it's like in the enforcement

 9  paradigm of *Heckler*, that would be the type of general policy

10  guidance that would be immune from notice and comment.

11          THE COURT:  Okay.

12          MS. HARTNETT:  And it's important to note here that

13  no -- no decisions have yet been made.  That's -- I think

14  that's -- the way to understand this is truly guidance and not

15  something else is because the -- no applications have yet been

16  taken.  No decisions have been made.  That is where -- that will

17  be where agency decision making occurs.

18          THE COURT:  Well, let's talk about that for a minute.

19          MS. HARTNETT:  Yes.

20          THE COURT:  I mean, the secretary has laid out six

21  factors that one has to comply with to be eligible for this

22  deferred action, right?

23          MS. HARTNETT:  Yes, for the DAPA.

24          THE COURT:  All right.  And if I comply and fit into all

25  those six factors, do I get DAPA?

1          MS. HARTNETT:  Not necessarily.

2          THE COURT:  And why is that?

3          MS. HARTNETT:  I think that -- well, I'll start with the

4     DAPA, and then I'll backtrack into one point about DACA.  They

5     made a slide that was not completely presented.

6          For DAPA, one of the six factors is that the alien presents

7     no other -- I'm quoting from the -- what's Exhibit 7 to our

8     opposition, but it's the November 20th memorandum about the

9     deferred action.  That the applicant must present no other

10    factors that, in the exercise of discretion, makes the grant of

11    deferred action inappropriate.

12         And then later in the memo --

13         THE COURT:  And so, I mean, aren't you trying to find

14    discretion by using discretion?  I mean, if I -- if have a son

15    or daughter that's a lawful permanent resident or U.S. citizen,

16    I've been here since 2009, I'm physically present when they need

17    to see, I haven't committed any crime, and you're telling me

18    that the -- the agent on the street, the person processing this

19    can turn him down?  I mean, because, you know, there are a lot

20    of probably people in this county that would want to know that

21    if they comply with all the rules and regulations and they still

22    get turned down?

23         MS. HARTNETT:  Yes, Your Honor.  And that's a

24    consequence --

25         THE COURT:  Has it happened in DACA?

1           MS. HARTNETT:  It has, Your Honor.

2           THE COURT:  All right.  How many people has that

3    happened to?

4           MS. HARTNETT:  We have the exact numbers in our brief,

5    but about six percent.  This is not discretionary.

6           THE COURT:  No, I want to know how many people not --

7    they fill out all the right forms, they pay all their money,

8    they've done everything just the way the government has told

9    them to do in DACA, and they've been turned down.  How many?

10          MS. HARTNETT:  I can't give you an exact number.  I can

11   tell you --

12          THE COURT:  Have there been any?

13          MS. HARTNETT:  Yes, there have.

14          THE COURT:  How many?

15          MS. HARTNETT:  Some -- we can provide -- we will be

16   happy to address that issue in our --

17          THE COURT:  And I want to know what they were turned

18   down for.

19          MS. HARTNETT:  I can tell you that some of it has to do

20   with uncharged criminal conduct or criminal --

21          THE COURT:  Then they didn't comply with the memo then.

22          MS. HARTNETT:  They did comply with the memo, Your

23   Honor.  Your Honor, to be clear, this is a case-by-case

24   adjudication by a duly empowered USCIS official.  It's at a

25   service center.  They complained about that being not at the

1   local office.  That's just exactly how the Valo (sic) ones are

2   handled.  That's how the U-visa ones are handled.  This is not

3   unique that they're doing it that way.  And it's a feature of

4   the program that they're trying to standardize it and make sure

5   that it is a -- it is --

6       THE COURT:  If it's standardized, it's not

7   discretionary, is it?

8       MS. HARTNETT:  It is both.  It is simply both, Your

9   Honor.  It's to try to minimize the -- minimize the unfairness

10  that would come from arbitrary denials, but at the same time

11  ensure that there is a person --

12      THE COURT:  I mean, the program itself is arbitrary,

13  isn't it?

14      MS. HARTNETT:  Not at all.  That's a key -- that's a key

15  factor.

16      THE COURT:  Well, wait a minute.  Let me -- let me --

17  have continuously resided in the United States since January 1,

18  2010.  Why not January 1, 2009, or January 1, 2011?

19      MS. HARTNETT:  I think Your Honor -- Your Honor, that's

20  exactly the type of question I have to say the Court is not --

21  is not in the position to answer because it's not -- this is --

22  this is exactly the reason why, A, *Heckler* precludes the Court

23  from looking at an enforcement policy.  But even once you do get

24  there, you have a general statement of enforcement policy here.

25      And the reasons that *Heckler* actually -- if the -- *Heckler*

1     is not itself an arbitrary decision.  The reason why *Heckler*

2     stands for the principle it does is that it recognizes that it's

3     uniquely within the agency's judgment about matters such as

4     resources, priorities, and its overall execution of the overall

5     statutory scheme to determine what groups of people or what

6     individual cases should be treated.

7          THE COURT:  So if I'm an agent and I have Joe Blow come

8     in off the street, and he has everything except he's only

9     resided in the United States since January 31st of 2010 instead

10    of January 1st of 2010, does he have the discretion to allow

11    that person in?

12         MS. HARTNETT:  He does actually, yes, more generally

13    because there's always discretion to allow deferred action.  But

14    as a part of this program, I think the point of this is to not

15    incentivize people to apply if they're not going to meet the

16    general contours and have people be denied if there's not -- but

17    the point is, yes --

18         THE COURT:  Wait, wait, wait.  Go back and answer my

19    question.

20         MS. HARTNETT:  Yes.  Yes.  The answer is yes.

21         THE COURT:  Under this program, does the agent have

22    discretion to say, no, January 1 is not magic.  If you're here

23    February 1, that's fine.

24         MS. HARTNETT:  No, I think the discretion from that --

25    that -- and for this program.  But whether the agent could then

1    grant --

2         THE COURT:  And that's the root of my question.  And it

3    still may be prosecutorial discretion, and I'm not necessarily

4    fussing with you on that.  But hasn't the discretion already

5    been exercised?  Hasn't Secretary Johnson decided this is what

6    the program is going to look like?

7         MS. HARTNETT:  To a degree, yes.  And there is actually

8    nothing legally wrong with the secretary at a more top level

9    making some judgments about --

10        THE COURT:  I'm not -- I'm not fussing with you on that.

11   But I'm --

12        MS. HARTNETT:  But yes.

13        THE COURT:  I mean, he's the one who's decided what the

14   criteria are.

15        MS. HARTNETT:  He has made -- he has taken some steps

16   toward discretion, that is true.  A lot of the major ones, by

17   setting forth the criteria that are at issue in the program, I'm

18   not going to dispute that some discretion is being implemented

19   at that level, and that's not legally problematic.  But what

20   also comes through is that each of these criteria themselves

21   include some discretion.

22       For example, the continuously resided.  That's not -- that

23   question is not itself always clear, so I would not say the

24   January 1st is probably where the wiggle room there is.  But I

25   think there's going to be some question about continuously

1   resided in some cases.

2       And frankly the six criteria here is a real genuine duly

3   issued criteria that provides for the individual officer's

4   enforcement.  And it's reinforced, lest it be viewed as just a

5   bullet point that's kind of hidden among other things.  Under

6   the next page it says --

7       THE COURT:  Tell me -- tell me what kind of

8   investigation that's going to go into this.

9       MS. HARTNETT:  I think that the DAPA -- this program, as

10  the Court is aware, the memorandum directs the agency to have it

11  stood up by no later than May, so it's still in the process of

12  being stood up.  I think that using the DACA experience, which

13  we are happy to provide more information to the Court if it's

14  useful, would be that --

15      THE COURT:  I would like it.

16      MS. HARTNETT:  Yes.  We'll make sure we address that in

17  our -- in our brief following the hearing.  But there -- we --

18  there is actually a process that's set forth in the FAQs on the

19  website and as part of the internal --

20      THE COURT:  I'll read the FAQs.

21      MS. HARTNETT:  And the directives where they -- the

22  service center gets the application in the first place.  If they

23  have questions or need additional information, they can make

24  those requests, and people at the field office level can do an

25  interview if necessary.

1            THE COURT:  But if I go through this checklist and I'm

2       the -- I'm the agent on the street, the person that's having to

3       interview this person, whether it's in a service center or

4       wherever, I don't really care what building it's in, and someone

5       comes in to me and I don't see any other factor, they haven't

6       committed a felony or a misdemeanor with moral turpitude,

7       they've been physically in the country on the date of the

8       memorandum, and at the time of making the request they've

9       continually resided in the United States before January 1st,

10      2010, and they have a son or a daughter who's a U.S. citizen or

11      a legal permanent resident, do I have to give that person a

12      deferred action card, if you will?

13           MS. HARTNETT:  No.

14           THE COURT:  So I can turn him down because they have red

15      hair or because they're Irish; and like me, I think we have too

16      many Irishmen here or for whatever reason?

17           MS. HARTNETT:  Well, that -- those would be -- that

18      would be probably -- the Irish part would be a probably improper

19      reason for doing that.  The red hair would be sounding somewhat

20      arbitrary to me.  But I think the point is I think the way the

21      process is working currently, I believe, although we can confirm

22      that in our brief, that those cases would be elevated to ensure

23      that they were being -- that there was some reason.

24          But the reasons -- like, for example, I mean, these are --

25      and I had the fortune of seeing a -- you know, an outpost

1   yesterday.  These are professionals who are trained to detect

2   when there is a potential issue.  And so it could be an indicia

3   of potential gang affiliation from something that's being said

4   in the emission. (sic)

5        THE COURT:  How is that -- how is it -- tell me how this

6   is saving money.

7        MS. HARTNETT:  Well, I would make the point -- I was

8   going to respond to the states' contention this is spending

9   money.  This is a self-funded endeavor.  This will pay for

10  itself.  That's how it's been designed because it obviously

11  would not really be worth it if we were spending all the money

12  to do this.

13       THE COURT:  So that Congress -- you're not going to have

14  to reallocate any resources to it.  Congress is not going to

15  have to allocate any money to it.  This is solely funded by the

16  people that are applying for it?

17       MS. HARTNETT:  It is designed to be funded by the fees

18  that are going to be collected for it, yes.

19       THE COURT:  And so what this really ought to do is free

20  up ICE to really man the border now.

21       MS. HARTNETT:  That's our point, Your Honor.  Well,

22  actually to also deal with internal removals.  So there's a lot

23  of -- there's that need for us at the border due to the Central

24  American migration, but there's also a need to focus our

25  enforcement in the -- in the interior.  That's the point.

1         THE COURT:  Well --

2         MS. HARTNETT:  Also just one point just to flag an

3    exhibit that was presented.  I'm not sure if you -- this is

4    page 595 of their appendix.  And they put up something, a DACA

5    form, and they said that -- that it basically was a check box

6    and there was nowhere that discretion was even allowed under

7    DACA.

8         There is one of the -- one of the several check boxes there

9    talks about you don't otherwise warrant a favorable exercise

10   because of national security or public safety concerns.  And I

11   think those are the types of -- that was the framework through

12   which these --

13        THE COURT:  Why didn't -- why didn't the secretary let

14   all 11.3 million people, or at least that's the number that

15   keeps getting thrown around.  I don't know how we know how many

16   illegal aliens are in the United States, but that's the number

17   in the briefs.  Why don't we just let them all in?  That would

18   really free up everybody to go enforce the border.

19        MS. HARTNETT:  Your Honor, without -- I think the

20   Secretary of the Homeland Security is trying his best to enforce

21   the laws, the INA in a smart and effective manner.  It seems

22   hard to fathom how that would be smart or effective.  I think

23   what he's trying to do is remove.  That would include, under

24   your hypothetical, having people that are national security or

25   public safety threats.

1          THE COURT:  No, no.  I meant using this criteria, why

2     not all 11.3 million?

3          MS. HARTNETT:  That's -- I mean, that's a decision

4     that's frankly committed to the discretion of the agency to

5     determine how to -- how to figure out what its priorities are.

6     But what I --

7          THE COURT:  Okay.  So that's something that the --

8     according -- I mean, it's your position that if the secretary

9     wanted to do that, he could do that.

10         MS. HARTNETT:  To grant deferred action to everyone?

11         THE COURT:  Yeah.

12         MS. HARTNETT:  I -- it's hard to see -- I think that

13    would be a much harder case.  I think what they -- that's just

14    not the case we have here where you have --

15         THE COURT:  Why is that harder?

16         MS. HARTNETT:  Well, I think -- why is it hard?

17         THE COURT:  Why is it harder than these?

18         MS. HARTNETT:  Well, deferred action needs to be

19    informed.  It's -- there's -- deferred action is not a free form

20    concept that we can apply to anything and do whatever we want

21    with.  It's something that's informed by its past practice.  The

22    OLC opinion is helpful here.  It sets forth factors that are to

23    be kind of considered by the executive when -- in forming its

24    use of its discretion.  One of them is is what you're doing

25    consistent with the overall statutory aim?  And we -- is it

1    consistent --

2         THE COURT:  The statutory aim is that if you're in the

3    country illegally, you need to be deported.

4         MS. HARTNETT:  Well, that's -- and that's an interesting

5    point, Your Honor, because they have taken issue with us

6    characterizing their view as somehow meaning that they have to

7    deport everyone.  That is exactly what page 3 of their PI motion

8    says.  They cited 8 U.S.C. 1225, and they said every person who

9    is not presently legal shall be inspected; and if they're

10   determined to be here or not clearly and beyond a doubt entitled

11   to be admitted, they shall be detained for removal proceedings.

12   So under their position, they want us to pick up everyone.

13   That's just not possible.

14        THE COURT:  I didn't say it was possible.

15        MS. HARTNETT:  No, I know.

16        THE COURT:  I'm not claiming that it's possible.

17        MS. HARTNETT:  But I think it would be --

18        THE COURT:  But it is what the statute says.

19        MS. HARTNETT:  Well, I think we face a very different

20   case if we had endless resources and the ability to remove

21   11 million people.  We don't.  But I also think that even --

22   even if that were the situation, you would -- of course, always

23   still inherent in the enforcement of the law is some --

24        THE COURT:  How is the government paying for all these

25   training manuals and stuff they're coming up with right now?

1    There hasn't been any fees collected.

2         MS. HARTNETT:  That's correct.

3         THE COURT:  Well, so that aliens aren't paying for

4    everything.

5         MS. HARTNETT:  Well, they will.  And I think the point

6    is I don't have the -- I can -- we're happy to address the

7    more -- the details of the USCIS budget.  That's an agency that

8    runs as a fee-funded agency.

9         THE COURT:  Well, let me give you another -- let me give

10   you a couple hypotheticals.  Can -- one of the things that's

11   committed to the discretion of the Executive Branch is the

12   administration of the Civil Rights Act.  Can the Attorney

13   General or the Deputy of Homeland Security say:  You know, we

14   didn't get the funding we wanted.  We don't have all the lawyers

15   we need to go prosecute these people, so we're -- we're going to

16   come up with a level of or a criteria for people that would

17   otherwise be defendants under the Civil Rights Act, and we're

18   not going to prosecute them.

19       So if you're, you know, native born in the United States and

20   you want to go -- and you're over the age of 30 or whatever the

21   criteria may be, and you want to, you know, violate somebody's

22   civil rights, we're going to use our prosecutorial discretion

23   not to enforce the Civil Rights Act as to you.  And I lay out

24   the whole system just like here.  Can I do that?

25         MS. HARTNETT:  Your Honor, I think it would depend on

 1   how you -- that would be a system of prosecutorial discretion by

 2   an agency within a framework that is otherwise in charge of

 3   enforcement.  I look to the *Adams versus Richardson* case which

 4   we cite in our brief.  That was a case in which the courts found

 5   an abdication because that was a case in which Title 6 of the

 6   1964 Civil Rights Act was essentially -- the agency determined

 7   that it simply would not enforce that.  It would actively supply

 8   segregated institutions with federal funds.

 9       And so the Court there made the point that if you're talking

10   about discretion in the context of an otherwise effective

11   enforcement program -- it was called the generally effective

12   program, that would be one thing.  In *Adams* you actually had --

13   that was not what you had.  What you had was a decision just not

14   to implement a certain statute in a certain context.

15       I think it's very clear here that we have -- a choice is

16   being made about enforcement discretion in an otherwise

17   generally effective program.  And when I say that, I --

18           THE COURT:  Wait, wait.  Define generally effective

19   program.

20           MS. HARTNETT:  One that is removing as many people as

21   possible with the money that we have and the resources we have.

22   Every --

23           THE COURT:  You're not wasting any resources?

24           MS. HARTNETT:  We're trying to waste even fewer.  And I

25   think that the point is that the point -- it's never a waste, of

1    course, to try to execute the law properly.  But I think the

2    point being made is that we are -- that the agency is removing

3    as many people as it can remove with the resources it has.  It

4    has a lot of other people left over.  And how can it more

5    effectively get to the worst of the ones to remove?

6         THE COURT:  Let's do a simpler one.  I'm -- you know,

7    robbing a national bank is a federal crime.  Wonder if I'm --

8    I'm the Attorney General, and I said:  All right.  We're no

9    longer going to prosecute any bank robbers.  People can rob

10   banks at will.  Can they do that?

11        MS. HARTNETT:  If the federal --

12        THE COURT:  If I'm the Attorney General and I say it's

13   an exercise of my discretion.  I'm not going to enforce bank

14   robbery laws.

15        MS. HARTNETT:  Again, I think the legal -- I mean, I

16   think the legal -- yeah, I think the OLC opinion actually

17   provide the place -- if that were ever to be proposed, which it

18   clearly isn't, I think someone would have to look to the same

19   factors that -- and the Executive Branch was deciding how are we

20   going to behave here, we would look to the OLC opinion that we

21   have here.  And that was four principles about the permissible

22   scope of enforcement discretion for an agency.  Are the factors

23   within the agency's expertise?  Are the --

24        THE COURT:  Okay.  Well, that would be fine with bank

25   robbers.

1          MS. HARTNETT:  Is it consonant from the -- with the

2     Congressional policies from the statutes at issue?  Can the

3     policy -- is the policy so extreme -- extreme as to be an

4     abdication of the statutory duties?

5          THE COURT:  Okay.  And that's what you're hanging your

6     hat on, I guess, is that would be that extreme?

7          MS. HARTNETT:  I guess you would have to -- if everyone

8     is just sitting around and the FBI agents were not doing

9     anything other than -- but sitting around --

10          THE COURT:  They're out capturing other bad guys.

11          MS. HARTNETT:  I guess that would be part of the

12     inquiry.  And then finally it would say -- the OLC opinion also

13     points out that it's most comfortably in this posture if you

14     were doing a case-by-case review.  It didn't find it necessary,

15     but found it most comfortably there.  And I think in your -- in

16     the situation you're suggesting, it might not actually allow for

17     that case-by-case review.

18     I'd also point out that as fanciful as the tax hypothetical

19     the state was suggesting might be, the footnote 12 of the OLC

20     opinion does note other places where the federal government has

21     made -- made their -- some discreet examples where the

22     government has said to certain subsets of potential antitrust

23     violaters, potential tax violaters.  And this is a -- the

24     fugitive safe surrender program where someone might be actually

25     in violation of the law but telling them please let us know, and

1    we will find a way to potentially not prosecute you or not

2    enforce against you.  So this is not -- this is not an un --

3    unprecedented --

4            THE COURT:  But it's also not going to 4 million people.

5            MS. HARTNETT:  Well, to be clear, that's the people that

6    may be eligible for it, but the DACA numbers were lower in the

7    end of the day than the four million.

8        I mean, the point -- the point overall being, though, that

9    here it is -- it is undisputed that the agency simply does not

10   have the resources to remove all the people in the country.  And

11   it's -- I believe it's undisputed that top priority should be

12   national security threats, public safety threats and border --

13   recent border crossers.  And the policies that are here today

14   were designed to be both not impose a cost on those efforts,

15   they're self-funded, and they're also --

16           THE COURT:  If I'm sitting in my office in Denver,

17   Colorado, wherever I am, and I'm an agent, and I don't have any

18   national security people to go arrest right now, and I don't

19   have any criminals to go arrest.  Can I -- if I go and arrest or

20   take into custody, however you want to phrase it, but can I go

21   get someone that would fall under this program and have them

22   deported?

23           MS. HARTNETT:  I mean, I think a separate memo that was

24   promulgated the same day as the general enforcement priorities

25   memo, and so that sets forth the top priorities and --

```
 1              THE COURT:  I've gone down my priorities.  I'm now down

 2    to priority four.  Can I go do that?

 3              MS. HARTNETT:  Yes.  I think the framework -- the

 4    frameworks that exist allow you to do that.  I think the --

 5              THE COURT:  Okay.  And so -- and this -- and the person

 6    I went and arrested would not have a, for lack of a better term,

 7    an affirmative defense that:  Hey, wait a minute.  I qualify

 8    under DAPA.  I'm not a criminal.  I've been here working my

 9    whole life, everything except I was not born here.  I've got a

10    kid that's a U.S. citizen.  You know, I comply with all this,

11    and I'm getting deported now because a guy worked through his

12    priority list, and he got to me.

13              MS. HARTNETT:  That person -- I mean, assuming that was

14    an ICE agent, that he would -- the person he was encountering

15    may not have been the USCIS which processes the DACA

16    applications.  I assume that person could try to still submit

17    one and see what happens.  But I think the more important point

18    there is there's no right.  These memoranda do not create a

19    right for anyone.

20              THE COURT:  Okay.  That's not what I was asking you.

21              MS. HARTNETT:  Right.

22              THE COURT:  I was asking you would he be able to say:

23    Wait a minute.  Don't deport me.  I qualify under DAPA?

24              MS. HARTNETT:  No, sorry.  I was trying to be

25    responsive.  It says that he would probably have a good like --
```

1          THE COURT:  Well, I mean, I called it an affirmative

2     defense.  That was careless language.

3          MS. HARTNETT:  Yeah.  No, I just meant to say that he

4     probably -- he might have a good point he can try to make to DHS

5     and show why he may have some -- have not been -- if he -- if he

6     was a -- somebody who should in his judgment not be captured by

7     the way they're enforcing.  On the other hand, he really has no

8     right or ability to mount that argument in any legal way.  He

9     simply would be at the agency's discretion.

10          THE COURT:  And is that going to be a -- is that going

11     to be the agency's policy?

12          MS. HARTNETT:  I think the agency's policy is from the

13     top down to try its best to implement all the policies that were

14     coming out on November 20th, and that included not only the

15     deferred action, but the closely related, although independent

16     and prosecutorial discretion, the border security initiates, and

17     so --

18          THE COURT:  Do I have an exhibit -- let me ask y'all

19     from either side.  I keep reading that there was ten

20     November 20th memos.  Is that right?

21          MS. HARTNETT:  Yes.

22          THE COURT:  Do I have all ten of them?

23          MS. HARTNETT:  They may be here, and they may be not in

24     one place.  I think we've -- you know, that there's two that are

25     most relevant.  We can direct you to -- there's a website that

120

1    has them all.  We can provide them all to the Court.  Many of

2    them don't --

3            THE COURT:  Okay.  I keep reading ten, and I only have

4    two that I know of.

5            MS. HARTNETT:  Yeah.  The two that are most relevant are

6    the deferred action and the prosecutorial discretion, but there

7    are several others.  And I think it's important, though, to

8    see -- I mean, we -- I think the context is important because

9    this is not just a -- this is a part of a consolidated effort to

10   try the best the agency can with the authorities it has to

11   focus.  I mean, as you know from last summer, that was a

12   troubling time, and there's been a -- an effort at the highest

13   levels to make sure at the Department of Homeland Security that

14   the border is being secured and that we're putting all the

15   resources available to the border and to the removal of dangers

16   to the nation.  And this program here is both legally authorized

17   and an important part of the overall picture of what the agency

18   is trying to accomplish.

19       I guess at that, just turning, if you would like, to

20   irreparable harm because that makes me --

21            THE COURT:  Go ahead.

22            MS. HARTNETT:  -- lead into it.  You know, A, it's

23   really their burden to -- the idea of -- the test is not should

24   we preserve the status quo.  It really is for a preliminary

25   injunction, which is extraordinary relief, showing both

1    irreparable harm to the state as a state and showing a

2    likelihood of success on the merits.

3        I think we set forth in our -- you know, we just discussed

4    the likelihood of success on the merits, we discussed the

5    failings in the states' claims of injury, which to the extent

6    there is no injury, there is -- it follows that there would not

7    be irreparable harm.

8        On the balance of the equities, again, I think I just go

9    back to what I was talking about, which is the public interest

10   is served by trying to most effectively enforce the immigration

11   laws, and this is an important component of that.  And so, you

12   know, again, this, in the agency's judgment, will continue to

13   advance the goal of helping to free up resources that are

14   available to remove the threats to the nation and also to repel

15   the recent entrants to the border.

16       As you know, one of the enforcement priorities is anyone who

17   is a recent border crosser are at the utmost of our priorities.

18   And so to that extent, the public interest would be served by

19   allowing this to take effect.

20       But again, the true test here is have they established all

21   four elements required for preliminary injunction, and the

22   answer is no.  And therefore, it should be denied.

23       On the scope of the relief, I guess I would ask, although we

24   don't think any injunction should be granted, that we just for

25   the first time this morning seen the proposed injunction, and we

1    would like an opportunity to respond to that.

2           THE COURT:  Well, let's -- before we do that, any reply,

3    Mr. Oldham?

4           MR. OLDHAM:  Yes, Your Honor.

5           THE COURT:  Let me ask a question.  And it's outside the

6    record, but just my own curiosity.  Yesterday the house voted --

7    what did they vote?  Not to fund this?

8           MR. OLDHAM:  I saw the news stories, Your Honor, but I'm

9    not familiar with the particulars.

10          THE COURT:  I mean, I'm a little confused.  If it's self

11   funding, why does it matter if the house votes?

12          MR. OLDHAM:  As I say, Your Honor, I'm not exactly

13   familiar with what the house did yesterday.  I do -- I am

14   familiar with two facts, though.  One is that the house did vote

15   overwhelmingly to repudiate the lawfulness of the November 20th

16   directives.  And the bill that the house passed to that effect

17   is included in our appendix materials.

18      And the second is that the USCIS union president, Kenny

19   Palinkas, whose declaration is in the plaintiffs' reply

20   materials as well, says that there's actually -- that they're

21   granting fee waivers for the -- for the fee applications.  So

22   it's not clear to us either how it's self funding.

23      And perhaps a third point is that even if they weren't

24   granting fee waivers and even if they were requiring people to

25   pay 400-some-odd dollars for the applications, it's just simply

1    not true that they're not diverting resources away from other

2    parts of USCIS because that's documented in emails that are

3    attached to the plaintiffs' reply brief.

4        So, and those --

5        THE COURT:  That doesn't really have much to do with

6    this case.  I was just curious to why it was a big deal.  If it

7    was going to be self funding, they could keep all their money.

8        MR. OLDHAM:  Yes, Your Honor.

9        THE COURT:  Go ahead.  You wanted to reply to comments

10   of Ms. Hartnett.

11       MR. OLDHAM:  Sure.  Very quickly, just two points to the

12   Take Care Clause and then three to the APA.

13       The first on the Take Care Clause, we heard again from

14   the -- from the government that they have this sort of broad

15   reaching delegations of authority and then sort of the principal

16   provisions of the INA that gives them the ability just to

17   dispense with all of the other provisions of the statute and to

18   just execute as they see fit, and that could include creating

19   new government programs to dole out benefits to formally enroll,

20   as Your Honor asked, perhaps 11 million.

21       THE COURT:  That happens all the time, doesn't it?  I

22   mean, I'm not being facetious, but Congress passes stuff, and

23   agencies come up with new programs all the time that pass out

24   benefits.

25       MR. OLDHAM:  Well, Your Honor, that would be very --

1    you're absolutely right, and that's why I want to be very clear

2    about what the complaint is and what the facts and law are.

3        The complaint is not that they have -- that they have broad

4    discretion to decide how to set enforcement priorities and to

5    set -- you know, and decide who gets removed and who doesn't.

6    The complaint is that Congress does not hide elephants in mouse

7    holes.  And what I mean by that is that Congress would not use a

8    provision like "The secretary shall enforce the provisions of

9    the INA" and then bury underneath of it some capacious

10   delegation to say what really what we mean by that is we're

11   getting ready to give you 500 provisions of statutory text --

12   500 pages of statutory text, but you really don't have to follow

13   any of it.  You can just literally ignore all of it and make up

14   your own rules.

15       And that is just -- that is a fundamental principle of

16   statutory interpretation.  It's a fundamental principle of

17   administrative law.  And the -- we pointed this out, and we have

18   not heard a response from the United States today as to how it

19   could possibly be that some generalized description about

20   enforcement authority at the beginning of the INA can render

21   superfluous really all of the rest that comes after it as

22   applied to 40 percent or 100 percent of the undocumented

23   population.

24       And on that fact, with the Court's indulgence, we have

25   printed up copies of the relevant provisions with respect to

125

1    work authorizations.  These were the provisions that were cited

2    in the slide earlier today.  I have two for the Court, if I

3    might hand them up.

4          THE COURT:  Just hand them to Cristi.

5          MR. OLDHAM:  And we've highlighted the provisions in

6    Title 8 that authorize the Attorney General or now the Secretary

7    of the Department of Homeland Security to grant work

8    authorizations, and there are several of them.  There are many

9    of them.  And they imply -- and they include lots of temporary

10   protected statuses and temporary -- and other temporary statuses

11   under the immigration laws; for example, T visas and U visas and

12   a lot of the precedents we've talked about.

13      I think what the Department of Justice is arguing to the

14   Court and the proposition that they would like this case to

15   stand for is that even though Congress has passed all of these

16   statutory provisions and said here are the circumstances where

17   you can grant work authorization, all of this, everything I just

18   handed you is complete surplusage because really the thing

19   that's doing the work is the general provision at the beginning

20   of the statute that says, "You shall enforce the law."  And you

21   don't have to follow any of these.  These aren't restrictions.

22      These are just like:  We would like you to give out work

23   authorizations in these circumstances, but we don't mean this to

24   be an exclusive -- exclusive of your opportunity to give out

25   work authorizations to literally everyone.  Literally everyone

126

1    in the United States is their view, and that just can't possibly

2    be.  The Supreme Court has rejected that time and time again,

3    both with respect to just general statutory interpretation

4    principles, but also in particular with respect to

5    administrative law.  That is not how agencies faithfully

6    interpret their laws or promulgate regulations underneath of it.

7        The second I think Take Care argument is we've heard yet

8    again about the *Heckler versus Chaney* case.  And our friends

9    from the Justice Department have said:  Oh, well, if you look at

10   the OLC memo, the OLC memo is so helpful.

11       And we agree actually that there are portions of the OLC --

12   we think it obviously gets the answer wrong on the merits.  But

13   we have quoted a provision of the OLC memo that I believe Ms.

14   Hartnett misunderstood, misinterpreted earlier this morning.

15   And it's quoted in full on page 28 of the plaintiffs' reply

16   brief.

17       And it says, "According to OLC, it is, quote, critical to

18   the legality of deferred action programs that they rely on

19   genuine case-by-case discretion rather than" -- and this is the

20   key language, "rather than granting deferred action

21   automatically to all applicants who satisfy the threshold

22   eligibility criteria."

23       Critical.  It's absolutely critical, according to OLC, that

24   it's genuine case by case and not rote application of the

25   eligibility criteria.  So Your Honor says to Ms. Hartnett or

1    asks to Ms. Hartnett, "So can you provide an example of a person

2    who has been denied, after meeting all of the eligibility

3    criteria, meets all the eligibility criteria, and yet gets

4    denied?"

5         You are not the first person to ask for that information.

6    Congress has been pressing the Department of Homeland Security

7    for that information for years, and we've included that

8    correspondence in the reply brief.  I'm sorry, as an attachment

9    to the reply brief.  And they have pointed to no case.  No case.

10        They've been doing this now for two years.  They've granted

11   hundreds of thousands of these under DACA using the same idea.

12   This is OLC talking about the legality of the DACA program.  The

13   DHS was told it was critical to do it case by case, critical to

14   do more than simply apply the eligibility criteria, and they

15   didn't do it.  Or at least they haven't been able to show

16   anybody that they did, and that Congress has been asking for

17   years.

18        So I think we agree that OLC -- you know, that it is

19   critical that it be genuine case by case.  We do agree that it

20   not be rote application of the eligibility criteria.  We agree

21   that if they really want to make this sound like it's not --

22   like it's *Heckler versus Chaney* and they're making these sort of

23   individualized determinations, it cannot be like Bill Gates

24   applying for Medicaid, right?  It can't be that the people that

25   they point to for their denials, their 5 percent or .5 percent

1    or whatever the number is that's been denied is simply because,

2    well, you know, they don't have a child who is here or they got

3    here too late or they don't -- they didn't sign the form

4    correctly or they didn't pay the application fee.

5         Turning to the APA, they say again, well, this is just

6    general policy guidance.  This is like the *Vigil* case or the

7    *Prof'ls versus Patient* -- *Prof'ls* and -- *Professionals and*

8    *Patients* case.  And they can point to no case.  It's certainly

9    not *Professionals and Patients.*  It's certainly not *Vigil.*  And

10   it's certainly no case that I've seen from the D.C. Circuit, the

11   Fifth Circuit or any other court of appeals that has interpreted

12   administrative law principles that has said that it is merely a

13   guidance document; that it is merely just a preparatory

14   statement of general advisement to the public that looks like

15   the one we showed you today that says, "I direct, you shall, you

16   shall not, you may, you may not," over and over and over again.

17        And I think one of those is particularly -- I want to call

18   this to the Court's attention too because it goes to the

19   hypothetical that the Court asked about, the hypothesized ICE

20   agent in his office in Denver, Colorado.  So I get through -- I

21   go through all of my priorities.  I get all the way down to the

22   bottom, and I decide I'm going to go look for somebody who may

23   qualify for DAPA.

24        In fact, that hypothesized ICE agent never even gets that

25   far because the directive specifically says that ICE is

1    instructed to review pending removal cases and seek

2    administrative closure or termination of those cases, right?  So

3    even if you went out and found a person and said:  Oh, well, you

4    know, I've gotten all the way.  I didn't have any, you know,

5    drug dealers or other criminals or other things.  I got all the

6    way to my lowest priority cases and you're it.  Sorry.

7         THE COURT:  If you find somebody who doesn't have any

8    drug dealers, they're welcome to come down here.

9         MR. OLDHAM:  But even in the hypothetical ICE agent

10   example, he never even gets that far.  And the reason he doesn't

11   get that far is precisely because this document, this DHS

12   directive that they promulgated unilaterally and they

13   desperately want to shield from any amount of judicial review

14   commands, directs and speaks with authoritative instruction to

15   ICE agents across the country.  And because it does that, under

16   *Vigil, Professionals and Patients, Appalachian Power,* and

17   unrefuted line of cases that we have offered in both of our

18   preliminary injunction papers, it has to comply with the APA.

19        So you said well, what about arbitrary decision making?

20   What about -- what if -- you know, it says this date.  Why

21   couldn't it have been a day earlier or a year earlier or a year

22   later?  Well, what if -- what if the Department of Homeland

23   Security wanted to deny an application, even though it met all

24   the eligibility criteria, but they wanted to deny it because the

25   applicant had red hair?

 1          The most important part, if we could leave the Court with

 2     only this, is that the Justice Department wants you to say the

 3     proposition that is going to be embodied in this case in their

 4     view is that even that is not subject to judicial review.

 5          All right.  So Ms. Hartnett says, oh, well, that sounds

 6     arbitrary.  But, of course, the whole proposition that the

 7     Justice Department has put forward here is that no one of these

 8     cases is subject to judicial review ever.

 9          So even if it was pernicious, even it if was discriminatory,

10     and even if it was arbitrary, it would be clouded -- it would be

11     shrouded from judicial review under their theory.  And it is

12     vital, vital, vital, vital to say that the entire point of the

13     Administrative Procedure Act is to make those arbitrary

14     government decisions, whether it's picking a date or whether

15     it's selecting a category of people and saying these are the

16     people that we're going to just give out government benefits to,

17     is to make those nonarbitrary, to allow people to see them, to

18     allow people to comment and to force Executive Branch agencies

19     to reconcile their views about what they would like to do with

20     the levers of governmental power, with the statute that Congress

21     dually enacted.

22          We would ask the preliminary injunction be issued.

23          THE COURT:  Okay.  Let's do our housekeeping.

24     Mr. Oldham, you had, as I understand, another state wishing to

25     join?

1      MR. OLDHAM:  Yes, Your Honor.  We wanted to advise on

2  the record -- and we're not sure exactly how the Court and the

3  Department of Justice would like us to handle this.  But after

4  we filed the preliminary injunction motion, the State of

5  Tennessee, through its Attorney General, noticed us of its

6  intent to join the lawsuit as an additional party plaintiff.  So

7  we did not want to interrupt the preliminary injunction

8  proceedings by amending and then having a new amended PI and

9  et cetera, so we talked to them and conferred with them to make

10  sure they were comfortable and told them that we would -- we

11  would raise it with you.  So we're happy to file a new complaint

12  and make the PI apply to it, whatever would be of convenience.

13      THE COURT:  Ms. Hartnett, what's the -- what's your

14  druthers?  I mean, I don't see any reason to make them file a

15  new complaint.  If they just want to file a supplemental

16  pleading that says "me too" by Tennessee if that's all they're

17  doing.  If they're going to raise something new, then I want

18  to -- that's a different sorry.

19      MS. HARTNETT:  Your Honor, I think we would agree in

20  general.  I think the point would be that in order to -- they

21  would have to show harm obviously to be a proper plaintiff and

22  then as far as any -- not that we're going to get to the point

23  of any kind of injunctive relief, but we would just want to make

24  clear that, you know, they would have to make whatever showings

25  are required, and we would want to respond to anything they

1    filed that would be Tennessee specific.

2          THE COURT:  All right.  Why don't you file a

3    supplemental complaint so you don't have to amend your whole

4    complaint and just add Tennessee.  If you'll do that by next

5    Friday, the 23rd.  And then if the government, if you feel any

6    need to add anything to your answer, you can have until the next

7    Friday, the 30th.  I mean, I don't see this as being -- unless

8    you're going to tell me that there's something different about

9    Tennessee.  I mean, the way I look at it, you know, they either

10   just hitched a ride on the, you know, Queen Elizabeth or the

11   Titanic, depending on how I rule.

12       But, you know, as far as you know, Mr. Oldham, they don't

13   have anything unique or unusual about their position?

14          MR. OLDHAM:  As I -- as I stand here today, I'm unaware

15   that they would have anything in addition to the three bases

16   we've heard.

17          THE COURT:  All right.  If something comes up then,

18   let's -- we'll revisit it.  But right now if you'll just file a

19   supplemental complaint joining Tennessee by the 23rd, and the

20   government can file a supplemental answer, to the extent they

21   need it, by the 30th.

22          MR. OLDHAM:  Yes, Your Honor.

23          THE COURT:  All right.  That takes care of your problem.

24   Now let's talk about yours.

25          MS. HARTNETT:  Okay.

1          THE COURT:  I'm a little concerned about how much time

2    you asked for.  If I give you until the 28th, can you work with

3    that?

4          MS. HARTNETT:  Let me confer with my co-counsel, but I

5    believe so.

6      Your Honor, in part we're just discussing about the need to

7    respond to some of the voluminous factual material.  If we could

8    have until the 30th, that Friday, that would be preferable.

9          THE COURT:  Okay.  And then what is the -- I guess to

10   preempt Mr. Oldham when I ask him does he have any problem with

11   that, he's going to want to know what's happening when?

12         MS. HARTNETT:  And we set this -- we did file yesterday

13   afternoon, Your Honor.

14         THE COURT:  I can't find it.

15         MS. HARTNETT:  My apologies.

16         THE COURT:  No, no.  It's here.  I just buried it with

17   all my paper.

18         MS. HARTNETT:  In that document we reiterated that no

19   applications for the revised DACA -- this is not even DAPA --

20   revised DACA would be accepted until the 18th of February, and

21   that no action would be taken on any of those applications until

22   March the 4th.

23         THE COURT:  And nothing is happening on DAPA?

24         MS. HARTNETT:  So the memorandum said that DAPA should

25   be implemented no sooner than mid May, so DACA is really the

```
 1    first -- the revised DACA is the first deadline.

 2              THE COURT:  Okay.  Then you can have until the 30th.

 3              MS. HARTNETT:  Okay.  Thank you.

 4              THE COURT:  Wait, wait.  You're being flagged.

 5              MS. HARTNETT:  Oh, sorry.  Just to be clear, I meant no

 6    later than.  So the memorandum provides that by mid May, DAPA

 7    will be stood up.

 8              THE COURT:  Okay.

 9              MS. HARTNETT:  But the main -- the driver here would

10    be --

11              THE COURT:  But as far as you know, nothing is going to

12    happen in the next three weeks?

13              MS. HARTNETT:  No, Your Honor.

14              THE COURT:  Okay.  On either.

15              MS. HARTNETT:  In terms of accepting applications or

16    granting any up or down applications.

17              THE COURT:  Okay.

18              MS. HARTNETT:  For revised DACA, just to be totally

19    clear.

20              THE COURT:  All right.  Let me talk about ruling on

21    this.  I'm going to rule as soon as I can.  Now, that's -- I

22    guess every judge says that, but both y'all know I have a

23    substantial criminal docket.  And both of you, if you didn't

24    know before, you know now that we're one judge short down here.

25    So we're awaiting confirmation hopefully of some help coming,
```

135

1    but -- so those are my constraints, so I'm dealing with a more

2    than usual criminal docket and the civil docket as well.

3        So I will try to rule as expeditiously as I can.  Obviously

4    I'm not going to do anything before the 30th when y'all file

5    your brief.

6        If there becomes a problem with the addition of Tennessee,

7    what I would like you to do, Ms. Hartnett, is write the Court a

8    letter.  Normally I don't do it this way.  I mean, it's -- file

9    it.  I mean, it's going to be filed.  It's not a private

10   correspondence or anything.  But write a letter, copy the state,

11   and tell me what the problem is so I can figure it out, and

12   we'll probably just have a phone hearing to resolve whatever we

13   do with that.  Otherwise, you know, you can just file your

14   answer by the end of the month.

15       MS. HARTNETT:  Yes, Your Honor.  If they simply add

16   Tennessee like they did with the states that didn't have any

17   additional factual submissions, we would assume there would be

18   no problem.

19       THE COURT:  And that's what I'm assuming at the moment

20   too.

21       MS. HARTNETT:  Yes.

22       THE COURT:  So I'm granting the addition of Tennessee

23   kind of with that understanding.

24       MS. HARTNETT:  Thank you.

25       THE COURT:  All right.  Anything else we need to cover?

1          MR. OLDHAM:  Your Honor, we have a -- I just want to

2     explain the states' concerns on timing.  It's not related to

3     Tennessee.  It's related to giving the Justice Department until

4     the 30th of January to file a supplemental pleading in this

5     case.

6        And the concern that we have is that they have told us that

7     they will start accepting applications and standing up this

8     program on the 18th of February.  And if they file -- and I

9     should also say they have not told us what they -- what exactly

10    the need for this filing is at the end of this month.  So we

11    don't know if it's simply --

12         THE COURT:  Well, they want to reply to your reply,

13    which I'm okay with.  We had some additional things come up

14    during the hearing that they want to reply to.

15         MR. OLDHAM:  Oh, and that's certainly -- we certainly

16    don't begrudge that.  What we're concerned about is that if they

17    introduce additional factual information in a surreply, then we

18    may need the opportunity for an evidentiary hearing.

19         THE COURT:  In that case you can send me a letter and

20    copy Ms. Hartnett.

21         MR. OLDHAM:  Well, yes, Your Honor.

22         THE COURT:  And we'll resolve that by phonecall.

23         MS. HARTNETT:  I would just add, much of the material

24    that was submitted in the reply could have been submitted in the

25    initial motion.  They're the typical types of, you know,

1    declarations purporting to establish standing for preliminary

2    injunction purposes.  But we will try to streamline our -- we

3    will try to streamline our response on the 30th to the extent

4    possible.

5            THE COURT:  Okay.

6            MR. OLDHAM:  We just want to be sure that with them

7    filing on the 30th, if we need to have an evidentiary hearing to

8    cross-examine declarants to do additional fact finding to be

9    right back here where we started, that we'll have an opportunity

10   to do that in a way that would still preserve our rights to have

11   a resolution of it before the program goes into effect.

12           THE COURT:  If anybody thinks there's going to have to

13   be an evidentiary hearing of any kind, that's something I need

14   to know ASAP.  Because I was operating on the assumption from

15   the phonecall we had that that was not going to be necessary and

16   that both sides had agreed to that.

17           MR. OLDHAM:  And it's certainly our view as we sit here

18   today that there is no need for it.  But what I'm concerned

19   about --

20           THE COURT:  You're covering your bases, and I'm okay

21   with that.  We'll cross that bridge when we get to it.  But for

22   right now, let's leave it like that.

23        All right then.  Anything else?  Thank y'all for being here.

24           MR. OLDHAM:  Thank you, Your Honor.

25           MS. HARTNETT:  Thank you, Your Honor.

1    *(Court adjourned.)*

2                              *   *   *

3        (End of requested transcript)

4                              -oOo-

5        I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above matter.

7

8    Date:  January 20, 2015

9

10

11                                /s/_____
                                  Signature of Court Reporter
12                                Barbara Barnard

13

14

15

16

17

18

19

20

21

22

23

24

25