**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

**STATE OF TEXAS, et al.**

                    Plaintiffs,

      v.

**UNITED STATES OF AMERICA, et al.**

                  Defendants.

Case No. 1:14-cv-254

**AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY**
**INJUNCTION BY JOE ARPAIO AS SHERIFF OF MARICOPA COUNTY**

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................ii

TABLE OF AUTHORITIES.............................................................................iii

CORPORATE DISCLOSURE STATEMENT .................................................v

INTRODUCTION ............................................................................................1

INTEREST OF AMICUS CURIAE AND REASONS FOR BRIEF...............2

DECISION OF JUDGE HOWELL IN D.C. DISTRICT COURT CASE .......3

NATIONAL IMPORTANCE OF THIS CASE AND THESE ISSUES ...........9

PLAINTIFFS' COMPLAINT AND MOTION UNCONTRAVERTED ..........10

WHAT IS IN DISPUTE:  WHAT DEFENDANTS ARE ACTUALLY

DOING ...........................................................................................................12

PLAINTIFFS HAVE STANDING TO CHALLENGE VIOLATIONS OF APA .......................15

ARTICLE III JURISDICTION "STANDING"  -- REDRESSABILITY ....................17

STANDING AND TRACEABLE INJURY:  PROJECTION FROM EMPIRICAL,
REAL-WORLD EXPERIENCE AND FUTURE HARM TRACEABLY
CAUSED .......................................................................................................19

DEFENDANTS' UNSUPPORTED REFUSAL TO BELIEVE PLAINTIFFS' STANDING
MUST BE IGNORED, DUE TO LACK OF EVIDENCE .........................................25

DEFENDANTS HAVE ALL THE RESOURCES THEY REQUESTED ................28

DEFENDANTS HAVE OFFERED NO EVIDENCE OR AFFIDAVITS AND THUS
PLAINTIFFS' AFFIDAVITS AND FACTUAL RECITATIONS
ARE UNCONTROVERTED ..........................................................................32

CONCLUSION ..............................................................................................34

CERTIFICATE OF SERVICE........................................................................35

CERTIFICATE OF COMPLIANCE..............................................................35

# TABLE OF AUTHORITIES

## CASES

*Arizona v. United States*, 132 S. Ct. 2492 (2012) .................................................... 9, 24

*Arizona v. United States*, 641 F. 3d 339 (9th Cir., 2011) ............................................. 24

*Arpaio v. Obama, U.S. District Court for the District of Columbia (Case No.
1:14-cv-01966 , Dec. 23, 2014)* ........................................ 2, 3, 4, 5, 6, 10, 19, 26, 27

*Baker v. Carr*, 369 U.S. 186, 205, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ...................................... 23

*City of Los Angeles v. Adams*, 556 F.2d 40, 50 (D.C. Cir. 1977) .................................................. 29

*Ferreiro v. United States*, 350 F.3d 1318, 1324 (Fed. Cir. 2003) .................................................. 27

*Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989) .................................................. 27

*Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947) .......................................................... 28

*Mendoza v. Perez* (D.C. Cir., Record No. 13-5118, Page 9, June 13, 2014).............................. 23

*Miree v. DeKalb County, Ga.*, 433 U.S. 25, 27 n.2 (1977) ......................................... 26

*Natural Resources Defense Council v. Environmental Protection Agency*,
643 F.3d 311 (D.C. Cir. July 1, 2011) .......................................................... 20, 22

*Natural Res. Def. Council v. Envtl. Prot. Agency* (D.C. Cir., Case Nos. 98–1379, 98–1429,
98–1431, June 27, 2014) .......................................................... 21

*Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988) ................. 26, 28

*Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991) .................................................. 28

*Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) .......................................................... 26, 27

*TVA v. Hill*, 437 U.S. 153, 190 (1978) .......................................................... 30

*United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006) ....................... 27

*United States v. Elionardo Juarez-Escobar*, United States District Court
for the Western District of Pennsylvania (Criminal Case No. 14-0180,
December 16, 2014) .......................................................... 4

*United States v. Langston*, 118 U.S. 389, 394 (1886)..................................................................... 30

*Whitman, Administrator of Environmental Protection Agency, et al. v. American
Trucking Associations, Inc., et. al.,* 531 U.S. at 484-86, 121 S.Ct. 903
(February 27, 2001) ................................................................................................................. 23

## STATUTES

Article III of the U.S. Constitution ...................................................................... 26

Administrative Procedures Act ..............................................  4, 5, 9, 12, 15, 16, 17

5 U.S.C. § 500, *et seq.*............................................................................................ 12, 15,16

5 U.S. Code §§ 701-706 (Chapter 7) ........................................................................... 4

5 U.S.C. § 706(2) ............................................................................................... 16

8 U.S.C. § 1227 ................................................................................................... 19

8 U.S.C. § 1229a  ......................................................................................  1, 7, 15, 17

8 U.S.C. § 1229a(a)(3) ....................................................................................  1, 15, 17, 19

8 U.S.C. § 1231  .................................................................................................. 7, 17

42 U.S.C. § 1973c .............................................................................................. 14

## RULES

Federal Rules of Civil Procedure 12(b)(1) ....................................................... 5, 6, 26, 27

## OTHER AUTHORITIES

Federalist Papers No. 47 .................................................................................. 16

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, *Amicus Curiae* Sheriff Joe Arpaio and his counsel Freedom Watch, Inc. state the following:

Sheriff Joe Arpaio is an elected government official in Maricopa County, Arizona. Freedom Watch, Inc. is a nonprofit corporation. Neither have a parent corporation, nor does any publicly held company own any part of them, and no particular publicly held company has a direct financial interest in their participation in this case.

## I.   **INTRODUCTION**

Sheriff Joe Arpaio of Maricopa, Arizona ("Sheriff Arpaio") hereby respectfully requests

leave of court in the Court's discretion to file an *Amicus Curiae* brief in support of the Plaintiffs'

Motion for Preliminary Injunction.

Having litigated this same issue against the Defendants with the same Defendants'

counsel, *Amicus Curiae* Sheriff Arpaio can ensure that the Court is properly informed on the key

issues that are pivotal to the Court's decision and the ultimate resolution on appeal to the U.S.

Supreme Court.  Unique among all other parties in the nation and involving first-hand

knowledge exclusively available to Sheriff Arpaio and his legal team alone, the *Amicus Curiae*

can inform and advise the Court in detail where exactly the Defendants' arguments err.

As John Adams declared in the days leading up to the signing of the Declaration of

Independence, a constitutional republic that is governed by laws rather than men and the rule of

law even apart from any immigration issues is of supreme importance to the nation and its

continued existence as the most successful democracy (constitutional republic) in human history.

The statutes passed by Congress, not administrative policy, are the exclusive authority on

these questions: 8 U.S.C. § 1229a (a)(3) provides:

> **"Exclusive procedures: Unless otherwise specified in this chapter, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States."**

The statutes explicitly prohibit the Defendants' alternate "deferred action" programs here.  The

question is not abstract policy disputes, but the clear-cut requirement of statute.

Yet Defendants offer as a pretext for their end goal of granting amnesty to illegal aliens

that they will hire 1,000 new workers not to enforce current law but to process amnesty requests.

Moreover, they will conduct 6 million background checks, including the renewals coming due for nearly 1 million previous DACA beneficiaries from 2012, and issue and mail certificates of immunity to 6 million [1] illegal aliens.  This will be repeated every three years.  And all of this because they say they do not have enough resources to enforce current law.  Defendants' only legitimate remedy for insufficient resources is to request more resources from Congress, which they have not done despite being commanded under budgetary laws to inform Congress of the resources they need to carry out Congressional enactments.

## II.   **INTEREST OF *AMICUS CURIAE* AND REASONS FOR BRIEF**

Defendants presented as their Exhibit #1 in Opposition the memorandum opinion and decision in Sheriff Arpaio's lawsuit by Judge Beryl A. Howell ("Judge Howell").  Sheriff Arpaio sued in the United States District Court for the District of Columbia ("D.C. District Court"), Civil Action No. 1:14-cv-01966, President Barack Obama ("President Obama"); Secretary of Homeland Security Jeh Johnson; and Director of the U.S. Citizenship and Immigration Service ("USCIS") Leon Rodriguez to challenge Defendants' executive action amnesty for illegal aliens.

Because Defendants here cite extensively from that case to support Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction in this case, the relevance and importance of his knowledge and involvement in this issue is conceded.  That decision is on appeal in the U.S. Court of Appeals for the District of Columbia Circuit. ("D.C. Circuit").

Like this case, *Arpaio v. Obama* in the D.C. District Court arose quickly and has proceeded quickly.  Therefore, this Court now would lack a proper and full briefing of the issues without learning the position of the plaintiff in that case.  It would be unhelpful and uninformative for this Court to give undue weight to the Defendants' citations here to *Arpaio v.*

---

[1]     Both the November 20, 2014, series of programs at an estimated 4.7 to 5 million and the June 15, 2012, Deferred Action for Childhood Arrivals (DACA) at an estimated 1 to 1.5 million.

*Obama.* This *Amicus* brief is being filed now in part because the decision in *Arpaio v. Obama* did not come until December 23, 2014 and Defendants then cited to it significantly here.

Furthermore, the State of Arizona is one of the Plaintiffs in this case. *Amicus Curiae* Sheriff Arpaio is the elected Sheriff of Maricopa County, Arizona, one of the largest Sheriff's offices in the United States. Maricopa County is the most populated County in the State of Arizona with 4,009,412 citizens.[2] The County holds more than sixty percent (60%) of all of the population of the entire State of Arizona. Sheriff Arpaio's Office effectively is nearly all of the State of Arizona in terms of law enforcement. Maricopa County is the fourth most populated County in the United States by most reports. If Maricopa County by itself were a State, the County would be larger by population than twenty-four (24)[3] of the States within the United States of America and larger than Puerto Rico and more than five times larger than the entire District of Columbia.

Sheriff Arpaio suffers direct economic harm from the Defendants' executive action amnesty for illegal aliens (citizens belonging to a foreign country). On June 15, 2012, Defendants launched their DACA program. As a result, from February 1, 2014, through December 17, 2014, the financial harm from illegal aliens to the Office of the Sheriff of Maricopa County, Arizona was at least $9,293,619.96 consisting of the costs of holding illegal aliens in the Sheriff's jails, for those inmates flagged with INS "detainers." These costs of jail confinement are but one financial impact, easily quantified.

## III.   DECISION OF JUDGE HOWELL IN DISTRICT OF COLUMBIA CASE

*Amicus Curiae* believes that this Court must of necessity evaluate and reject the lower

---

[2]   **"State & County Quick Facts,"** Maricopa County, Arizona, U.S. Census Bureau, http://quickfacts.census.gov/qfd/states/04/04013.html

[3]   **"State Population by Rank, 2013"**, InfoPlease, http://www.infoplease.com/us/states/population-by-rank.html

court's decision in *Arpaio v. Obama*. For this Court to uphold standing for the Plaintiff States

here, this Court must necessarily reject the decision in *Arpaio v. Obama* in the D.C. District

Court for the same or similar reasons as that decision is on appeal. Just as Judge Beryl Howell

("Judge Howell") in that case went to great pains to identify why she would not follow the

analysis of U.S. District Judge Arthur J. Schwab, in *United States v. Elionardo Juarez-Escobar*,

in the United States District Court for the Western District of Pennsylvania (Criminal Case No.

14-0180, December 16, 2014), similarly this Court should determine that the analysis in the

decision in *Arpaio v. Obama* should not be followed here.

Defendants rely extensively upon partial snippets from the case of *Arpaio v. Obama* in

the D.C. District Court, in which the *Amicus Curiae* sued most of the same Defendants as here.

The D.C. District Court, by Judge Howell, erred by accepting the arguments of the

Defendants in a number of respects. The case was dismissed for lack of subject matter

jurisdiction in terms of standing. Accordingly, *Arpaio v. Obama* decided only the standing

question and – for now – nothing else.

A) Judge Howell viewed Sheriff Arpaio's lawsuit as addressing only a generalized

policy dispute. *Id*, But Congress *commanded* federal courts to review Executive

Branch compliance with the APA and decide litigation of APA violations. *See,* 5

U.S. Code §§ 701-706 Chapter 7. Thus, a case and controversy to be heard by federal

courts is *commanded* by congressional enactment not an *optional* election.

B) Defendants argued standing with regard to claims other than the actual claims brought

by Sheriff Arpaio, as they appear to do here to the States. Specifically, Defendants

argued – and Judge Howell adopted – a standing analysis with regard to policy

disputes between the political branches of the U.S. government, finding that Sheriff

4

Arpaio did not have standing with what she characterized inaccurately as simply a dispute between the two branches of government. Mem. Op. at 1-3, 20. Judge Howell failed, however, to analyze standing with regard to Sheriff Arpaio's actual lawsuit that the Defendants violated the Administrative Procedures Act ("APA").

Congress by statute, signed by the President, has restrained and governed the conduct of the Executive Branch through the APA, including both as to procedures for issuing new regulations and the substance of regulations in faithfulness to the authorizing statutes enacted by Congress – including their constitutionality.

Therefore, Congress has already commanded compliance with the APA by the Executive Branch. Plaintiffs' lawsuit here and Sheriff Arpaio's lawsuit are not asserting abstract policy disputes, but bright-line, light-switch compliance with the APA. Either the Defendants have complied with the APA or they have not.

C)  The Defendants simply denied the allegations of Sheriff Arpaio establishing standing, and Judge Howell fell into the same mistake. All allegations of fact, and all inferences in support of those allegations reasonably drawn therefrom, must be assumed to be true for the purposes of a Rule 12(b)(1) motion. Judge Howell followed the Defendants' analysis of merely disbelieving Sheriff Arpaio's allegations.

D)  Defendants offered conjecture and speculation against finding standing, and Judge Howell followed that trail. For example, significantly, the Defendants argue – without evidentiary support or rational explanation – that their deferred action programs granting amnesty to 6 million illegal aliens will in some mysterious fashion improve enforcement (removal) of higher-priority targets of illegal aliens and thereby "***may***" reduce the harm to Sheriff Arpaio's Office, as with Plaintiff States here.

But no evidence has been provided to substantiate this concept, even on the level of prediction.  No logical explanation has been offered here or there as to how this mysterious mechanism might work.  Yet Judge Howell leaned on this conjecture:

> "The deferred action programs are designed to incorporate DHS's enforcement priorities and better focus federal enforcement on removing undocumented immigrants committing felonies and serious misdemeanor crimes. Since the undocumented immigrants engaging in criminal activity are the cause of the injuries complained about by the plaintiff, the more focused federal effort to remove these individuals ***may end up helping***, rather than exacerbating the harm to, the plaintiff."

Mem. Op. at 24 (Emphasis added.)  However, all inferences must be drawn in favor of the plaintiff in a Rule 12(b)(1) motion to dismiss.  Judge Howell was obligated to accept, as pled, that Defendants' programs "will not" reduce the harm upon Sheriff Arpaio's Office.  Furthermore, if there are divergent impacts upon a plaintiff, whose net effect is uncertain, the existence of an impact is still sufficient for standing to take evidence on the matter at trial.

E) Defendants have not offered, here or there, any sworn declarations or affidavits to substantiate their claims against standing, and their unsupported factual assertions should have been ignored in the face of Sheriff Arpaio's two sworn declarations.

F) The Defendants are in error on the question of "redressability." Mem. Op. at 25-29. Current law requires that all illegal aliens be deported (unless eligible for some recognized category of relief, which is a different category than considered here).

Defendants' compliance with current law would remove from U.S. territory entirely a significant portion of the illegal aliens now in the United States.  If some or all of the illegal aliens now in the country were deported, they would not be here to cause financial burdens upon Sheriff Arpaio or the Plaintiff States here.

But the Defendants' new "deferred action" programs create a mechanism not to enforce current law.  The very nature of these regulatory programs is to avoid enforcement of current, governing law.

*But for* the Defendants' "deferred action" programs, current law would still govern.  Illegal aliens who will be a burden upon the Plaintiff States and Sheriff Arpaio would not be in the country at all, and therefore would not cause financial harm and burdens to the Plaintiffs.  *See, e.g.,* 8 U.S.C. §§ 1227, 1229a, 1231.

G) For the same reasons, Judge Howell extensively discussed precedents on whether harm caused more directly by third-party actors can be credited to government defendants with regard to standing.  Mem. Op. at 22-25.  Yet many of the third party actors would be physically removed from U.S. territory *but for* Defendants' unlawful attempts to repeal current, governing law.  If Defendants enforced the law Congress enacted, the third party actors would be incapable of causing financial harm or burdens to the Plaintiffs as a result of their absence from U.S. soil.

H) Furthermore, Judge Howell erred in the analysis of third party actors in standing, *id.,* because nearly all litigation by private parties challenging government regulations involve standing resulting from actions by third party actors (such as privately-owned power plants) enabled or tolerated by the government regulation.

I) Judge Howell adopted the Defendants' confusion between past harm from similar government actions as an empirical basis for predicting increased or new harm in the future.  Mem. Op. at 18-19, 21. Where Sheriff Arpaio emphasized his many years of real-world experience with the burdens caused by a failure to enforce the law against illegal aliens as a sound basis for predicting increased harm from Defendants' new

programs, the Defendants argued that Sheriff Arpaio alleged only past harm or harm from past failure to enforce immigration laws, that is, harm not traceable to the Defendants' new programs.  Judge Howell assumed only past harm, not future.

Judge Howell adopted the Defendants' argument that future harm cannot be predicted from empirical experience to establish standing.  But, on the contrary, nearly all private party challenges to government regulation are brought, and survive standing challenges, in advance of those regulations going into effect.

J)   The Defendants and Judge Howell lean heavily on the idea that the Executive Branch has engaged in "deferred action" programs in the past.  Mem. Op. at 3-7.  However, Executive Branch past examples do not carry precedential authority like judicial decisions.  Executive Branch practices do not become valid by repeated abuses.  The Court must still look to any original authority to justify the actions.

K)   The Defendants and Judge Howell point to occasions when Congress has endorsed the use of "deferred action" in certain circumstances.  Mem. Op. at 7.  Fatal to this argument, however, is that Congress has not done so here, for this situation.

L)   Throughout, Judge Howell's analysis and decision falls into the trap laid by the Defendants of misconstruing what Sheriff Arpaio's case is about, what he is claiming and contesting. Judge Howell wrote at page 20:  **"Ultimately, the plaintiff's standing argument reduces to a simple generalized grievance: A federal policy causes his office to expend resources in a manner that he deems suboptimal."**

However, even if this were a correct statement of Sheriff Arpaio's case (and Plaintiffs' case here), this admits that there is standing while confusing two entirely different concepts.  Judge Howell's summary statement concedes that there is an

8

impact upon the Sheriff's Office, but pre-judges whether Defendants' approach is "optimal" or "sub-optimal." Judge Howell rejects Sheriff Arpaio's place to evaluate whether the U.S. government's actions and decisions are the right ones. But that is different from whether or not the U.S. government's actions will have a negative impact upon Sheriff Arpaio's Office. That speaks to the merits, not standing.

M) Judge Howell rejected as "conjecture" the claim that giving amnesty to one group of illegal aliens will create a "magnet" for millions more illegal aliens hoping to be part of the next, future group of amnesty beneficiaries. Mem. Op. at 21-22. However, (a) Judge Howell was obligated to take Sheriff Arpaio's allegations and inferences therefrom as true, and (b) Judge Howell ignored the evidentiary basis for this prediction grounded in Sheriff Arpaio's years of experience in dealing with the fall-out of the U.S. government's non-compliance with federal law. Judge Howell converted prediction from real-world, empirical experience into mere "conjecture."

N) Again, *Amicus Curiae* Sheriff Arpaio, by counsel, believes that Judge Howell's analysis of the merits is *dicta* once a lack of standing was found.

## IV.  <u>NATIONAL IMPORTANCE OF THIS CASE AND THESE ISSUES</u>

Nevertheless, Judge Howell did identify the great national importance of these issues, although failing to recognize that Congress has already spoken, both to immigration and to compliance of the Executive Branch with the APA:

> The plaintiff's suit raises important questions regarding the nation's immigration policies, which affect the lives of millions of individuals and their families. The wisdom and legality of these policies deserve careful and reasoned consideration. As the Supreme Court recently explained: "[T]he sound exercise of national power over immigration depends on the [Nation] meeting its responsibility to base its law on a political will informed by searching, thoughtful, rational civic discourse." *Arizona v. United States*, 132 S. Ct. 2492, 2510 (2012).

> The key question in this case, however, concerns the appropriate forum for *where* this national conversation should occur. The doctrine of standing, in both its constitutional and prudential formulations, concerns itself with "'the proper—and properly limited—role of the courts in a democratic society.'" *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Standing "ensures that [courts] act as judges, and do not engage in policymaking properly left to elected representatives." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2659 (2013).
>
> ⁎⁎⁎
>
> Ultimately, "[i]t is the role of courts to provide relief to claimants . . . who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution." *Lewis v. Casey*, 518 U.S. 343, 349 (1996).
>
> ⁎ ⁎ ⁎
>
> The plaintiff's case raises important questions regarding the impact of illegal immigration on this Nation, but the questions amount to generalized grievances which are not proper for the Judiciary to address. For the reasons explained in more detail below, the plaintiff lacks standing to bring this challenge to the constitutionality and legality of the immigration policies at issue.
>
> ⁎ ⁎ ⁎

However, Judge Howell overlooks in these moving words that Congress has already enacted laws, signed by the President, that govern these questions. The issue is not the need to have yet one more "conversation" in the nature of a child attempting to avoid bedtime. The issue is obeying the law as written. Thus, the federal courts are not the place to undertake a policy discussion, but they are the place to enforce the decisions already enacted into law.

## V.   PLAINTIFFS' COMPLAINT AND MOTION UNCONTRAVERTED

Initially, as Sheriff Arpaio's counsel learned first-hand in the December 23, 2014, hearing in the D.C. District Court, in *Arpaio v. Obama*, Defendants actually agree with the Plaintiffs here in this case. Therefore, a Preliminary Injunction and Judgment should be granted.

Because the Defendants' programs are neither genuine enforcement discretion nor

genuine prosecutorial discretion, the Defendants' extensive arguments and justification of enforcement discretion and prosecutorial discretion are simply entirely irrelevant.

In a classic "straw man" argument, Defendants falsely portray the Plaintiffs' lawsuit as challenging the discretion of the Executive Branch to plan or organize its enforcement work, including in prioritizing which illegal aliens to enforce first. That is an inexcusable misrepresentation. Yet nearly the entirety of Defendants' Opposition consists of misrepresenting what the Plaintiffs are claiming. Defendants attempt to redefine the case in order to respond to an argument they think they can win instead of the argument the Plaintiffs are making. But the parties are actually in agreement, once the Court understands the questions at issue and properly arranges the components of the matter. Defendants merely organizing their work is not at issue.

Actually, *nothing in this case requests this Court to restrain, restrict, or enjoin genuine enforcement discretion or prosecutorial discretion by the Defendants.* What the Defendants justify – internally scheduling their work according to priorities – is not in dispute here. The Plaintiffs are not challenging the Executive Branch's discretion to decide which illegal aliens to deport first and which illegal aliens to deport later or where to focus their resources.

By enforcement discretion, Defendants mean setting priorities and policies as to where to concentrate law enforcement resources to achieve the most results with limited resources.

By prosecutorial discretion, Defendants refer to the handling of an actual case against a particular individual after law enforcement has encountered an individual alleged to have violated the laws. Disposition and resolution of that individual case can include decisions under prosecutorial discretion to craft an individually-tailored outcome such as a plea deal, probation, community service, treatment, diversion programs, a compromise result or *nolle prosequi.* Prosecutorial discretion is driven mainly by the ability of a prosecutor to prove the case.

Defendants publicly released an opinion by the OLC at the U.S. Department of Justice. *See*, Exhibit B to the Complaint. Yet Defendants are doing what the OLC Opinion warned Defendants not to do. Defendants are not doing what the OLC Opinion says would be lawful. Although Defendants publicly tout the legal advice of OLC, they are not following that legal advice in the design or operation of the challenged programs.

Defendants' programs are neither enforcement discretion nor prosecutorial discretion but the creation of regulatory programs conferring amnesty and other affirmative benefits on around 6 million beneficiaries who meet the generalized criteria in violation of the requirements of the APA governing the exercise of quasi-legislative authority delegated from Congress.

## VI.   WHAT IS IN DISPUTE:  WHAT DEFENDANTS ARE ACTUALLY DOING

Defendants' efforts to legally justify their new programs simply have no relevance to what they are actually doing. It bears repeating: *Nothing in this case asks this Court to restrain, restrict, or enjoin genuine enforcement discretion or prosecutorial discretion by the Defendants.*

Plaintiffs are contesting Defendants' sweeping, new regulatory programs, established in violation of the APA , 5 U.S.C. 500, *et seq.,* which confer amnesty, immunity, and affirmative benefits upon 6 million illegal aliens.

But Defendants have offered no response, defense, opposition, or dispute in reply to Plaintiffs' challenge to Defendants' new regulatory programs.

On June 15, 2012, at President Obama's orders, then Secretary of Homeland Security Janet Napolitano created a new "deferred action" program called DACA. On November 20, 2014, on President Obama's orders including through a public speech, created new amnesty or deferred action programs. These programs confer affirmative benefits including

- An affirmative grant of immunity from deportation, detention, or prosecution.

- Issuing a written certificate of immunity from deportation including through use of a USCIS Form I-797C "Notice of Action" (also used for other purposes). Therefore, while claiming they do not have the resources to obey the Congressional command to deport the approximately 11.3 million citizens of other countries, Defendants propose to process, prepare, and mail to approximately 6 million illegal [4] aliens a certificate assuring those 6 million people that they are immune from deportation or prosecution.  To do this, they will have to conduct 6 million criminal and risk assessment background checks. Furthermore, this workload will need to be repeated every three years, because status is subject to renewal in three years. And Defendants justify all this massive undertaking on the basis that they do not have enough resources to do what the law commands instead.

- The right to keep the fruits of the crime committed, by being allowed to stay in the United States, which is fundamentally different from not being prosecuted and punished for violating the law *per se*.  The Defendants' program is amnesty because violators are allowed to keep everything they sought to obtain by breaking the law from the start.  In addition to not being punished for violating the law, they are rewarded by the end result they broke the law to achieve.

- A work permit in the form of an "Employment Authorization Card" (which does not disclose whether the holder is an illegal immigrant under amnesty).

---

[4]    This 6 million person estimate includes a little over 900,000 who have already applied for the June 15, 2012, DACA status, and in most cases received DACA status.  However, those recipients are now applying for renewal of the two-year DACA status (now to be changed to three years starting February 19, 2015).  Therefore, the Defendants must process the almost 1 million renewals of DACA status in addition to the new beneficiaries.

- The right to get a driver's license in using the "Employment Authorization Card" (which will not identify that the holder was an illegal alien).

- Although voting is not authorized by law, an official invitation and opportunity to register to vote under the companion "Motor Voter" law, since the "Motor Voter" law prominently invites recipients of a driver's license to register to vote and gives the appearance of official approval for these persons to register to vote. *See* 42 U.S.C. § 1973c, "The National Voter Registration Act" (NVRA). The documents or cards issued do not identify their citizenship status.

- The opportunity to commit three (3) criminal misdemeanors arising from three (3) different, unrelated incidents without forfeiting their deferred action status, pursuant to the Defendants priorities announced on November 20, 2014. *See* Memorandum, November 20, 2014, from Homeland Security Secretary Jeh Charles Johnson titled *"Policies for the Apprehension, Detention and Removal of Undocumented Immigrants"* to USCIS, Immigration and Customs Enforcement ("ICE") and Customs and Border Protection, attached as Exhibit F to the Plaintiffs' Complaint, Page 3. There are a few exceptions of severe misdemeanors specified, including sentences of actual days in jail – not counting suspended sentences or alternative punishments – exceeding 90 days.

Genuine prosecutorial discretion normally does not involve a criminal retaining the fruits of the crime. For example, with a trespassing or breaking and entering defendant, if the witnesses are not credible enough to sustain a conviction, the defendant does not acquire the right to live in the house in question because a prosecutor drops the case. A trespassing defendant does not acquire a tenancy in the real estate through prosecutorial discretion. Thus,

14

the Defendants' new programs are fundamentally different from prosecutorial discretion.

## VII.   PLAINTIFFS HAVE STANDING TO CHALLENGE VIOLATIONS OF APA

Defendants err by analyzing Plaintiffs' standing as being in relation to disputes over policy rather than Plaintiffs having standing for the actual lawsuit that they brought to challenge statutory violations of the APA, as a law prescribed by Congress to govern and restrain the Executive Branch's actions.  The Defendants push the straw man that the Court should not decide abstract policy disputes between the other branches.

Fatal to the Defendants' argument, however, the APA, 5 U.S.C. 500, *et seq.* governs the exercise of Congressional authority delegated to the Executive Branch, and specifically commands the federal courts to review the Executive Branch's exercise of delegated authority.

Thus, this case is simply not a policy dispute.  This case is a bright-line, night-versus-day, application of the APA.  Under the APA, the validity of a regulation or agency action – including its unconstitutionality – is a bright-line review commanded upon the federal courts by the APA enacted by Congress.  It is of great importance to recognize that the Court is not being asked to engage in an *optional* exercise of policy, but is fulfilling a statutory *command* by reviewing the legality, validity, procedural compliance, and constitutionality of agency actions pursuant to the clear rules of the APA.  Specifically:

- Congressional enactment is the exclusive authority on these questions: 8 U.S.C. § `
    1229a(a)(3) provides **"Exclusive procedures: Unless otherwise specified in this
    chapter, a proceeding under this section shall be the sole and exclusive
    procedure for determining whether an alien may be admitted to the United
    States or, if the alien has been so admitted, removed from the United States."**

Thus, congressional enactment explicitly prohibits the Defendants' alternate "deferred action" programs here.  The question is not abstract policy disputes, but the clear-cut requirement of statute.

- The Executive Branch has no legislative authority to set policy other than by employing the authority delegated to it by Congress. See Federalist Papers No. 47 - ("The magistrate in whom the whole executive power resides cannot of himself make a law, though he can put a negative on every law; nor administer justice in person, though he has the appointment of those who do administer it," tracing the origins of the U.S. Constitution within the English Constitution.)

- The Defendants' claim that the case is a policy dispute is an admission and confession that they are setting policy, which they have no inherent authority to do apart from the terms of authority delegated to them from Congress by statute (whether explicitly or by the necessity of filling in gaps left by Congress within statutes).

- The exercise of authority delegated from Congress must comply with the procedural requirements of the APA.  *See,* 5 U.S.C. § 500, *et seq.*

- Defendants have not complied with the APA.

- It is not an abstract policy agreement whether the APA has been violated or followed: Either the APA has been violated or not.  This is a "light switch" question, on or off.

- Second, pursuant to 5 U.S.C. § 706(2) of the APA, this Court must hold unlawful and set aside any agency action that is

> "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) ***contrary to constitutional right, power, privilege, or immunity***; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

> (Emphasis added.)

16

- Therefore, it is mandatory, by statute, upon the Defendants that they conform their exercise of delegated authority to the statutory terms and the APA in substance, including with regard to compliance substantively with the U.S. Constitution.
- Faithfulness and adherence to the underlying statutes is a review commanded by Congress under the APA. The issue is grounded in the APA, not in policy disputes.

## VIII.   ARTICLE III JURISDICTION "STANDING" -- REDRESSABILITY

The issue arises as to whether the Plaintiffs have "standing" specifically focused on the concept of "redressability."  That is, if the Court granted Plaintiffs' Motion for Preliminary Injunction and/or granted judgment on the Complaint, would the Court's action favorable to the Plaintiffs' actually relieve or reduce the injury to the Plaintiffs?

Defendants' objections on redressability boil down to this:  Defendants argue that they will not obey an order of the Federal Judiciary and will continue to defy current, governing law. That is, an order of this Court will not remedy the harm to the Plaintiffs because Defendants will continue to refuse to deport citizens of other countries illegally in the county.

In fact, if the Court granted the Plaintiffs' Motion for Preliminary Injunction, current law would continue to govern.  Current law mandates that the Executive Branch remove (deport) 100% of all illegal aliens (that is, citizens of a foreign country who belong in their own country and are illegally present in the United States). *See, e.g.,* 8 U.S.C. §§ 1227, 1229a, 1231.  If Defendants deported the illegal aliens – as they are commanded by law to do – those illegal aliens would not be in the country to cause harm and burden to the Plaintiffs.  Therefore, the Court has the power to redress Plaintiffs' injuries.

In this consideration, the Court must base the analysis on current law, not upon unsubstantiated assertions or speculation about how effective complying with current law might

be. Current law is the considered judgment of the United States Congress. Defendants err by arguing that Plaintiffs' injury could not be redressed through favorable court action. On the contrary, enforcement of current law would reduce or eliminate the harm which Plaintiffs sued on because at least some of the illegal aliens in question would no longer be in the country at all.

Defendants' programs are schemes for Defendants to avoid complying with current law. Therefore, Defendants' "deferred action" programs are the direct and proximate cause of harm to the Plaintiffs. Current law commands the deportation of citizens of foreign countries illegally present in the United States. Defendants' programs suspend the enforcement of current, governing law. As a result, 11 to 20 million illegal aliens who should not be in the country at all will remain due to the Defendants' "deferred action" programs and burden the Plaintiffs in their budgets and otherwise.

The Defendants and the Executive Branch have been commanded by the statutes enacted by Congress, primarily the Immigration and Naturalization Act of 1952 (as amended), to deport back to their own countries of citizenship an estimated 11 to 20 million citizens of foreign countries who are illegally present inside the United States of America contrary to its laws.

Because Congress has consistently appropriated more money for immigration enforcement than requested by the Executive Branch *(see below)*, mere speculation cannot be considered as a matter of legal analysis whether the Defendants could successfully return to their own countries of citizenship large numbers of these citizens of other countries.

In fact, Defendants are hiring 1,000 new DHS workers to process applications for amnesty, rather than hiring 1,000 workers to comply with existing law. The <u>Washington Times</u> reports from government documents that the Obama Administration has already posted job openings –formal requests for applications – for 1,000 new government workers with salaries up

to $157,000 per year to process amnesty requests for approximately 6 million illegal aliens. [5]
DHS has already leased office work space in Crystal City (Arlington, Virginia).  The
constitutionality and legality of these programs should be decided first.

But instead of complying with governing law, the Defendants have created these
programs to assist them in creating excuses for not enforcing laws they do not want to comply
with.  *But for* these "deferred action" programs, millions of illegal aliens – at least a substantial
number – would not be present in the country.

## IX.     STANDING AND TRACEABLE INJURY:  PROJECTION FROM EMPIRICAL, REAL-WORLD EXPERIENCE AND FUTURE HARM TRACEABLY CAUSED

Defendants reject a wholesale, traditional and proper standing analysis.  Defendants'
approach here would require the federal courts to reject all challenges by private citizens or
environmental groups to environmental regulations promulgated by the U.S. government, and
nearly all other challenges to any type of U.S. government regulation.

A correct analysis of standing in the regulatory context nearly always involves: (a) past
experience of harm provides an empirical basis for projecting future harm from new regulations;
(b) a challenge nearly always filed before the new regulations legally take effect; and (c)
plaintiffs' projection from empirical experience in the past of an increased harm in the future.

Yet, here, Defendants intentionally misunderstand and ask the Court to misunderstand the
empirical experience of the Plaintiffs as State governments which is predictive of future harm
directly traceable to the Defendants' programs.

Plaintiffs here, like Sheriff Arpaio in *Arpaio v. Obama*, have years of real-world

---

[5]      **"Homeland Security already hiring 1,000 employees to carry out Obama amnesty,"**
by Stephen Dinan, The Washington Times, Deember 3, 2014,
http://www.washingtontimes.com/news/2014/dec/3/dhs-hiring-1000-employees-carry-out-obama-amnesty/

experience in how the federal policy of the Executive Branch of the U.S. government on illegal immigration causes financial harm and other burdens to their state governments. Based on that empirical evidence from real-world experience, Plaintiffs provide a sound projection of future harm that will be strongly traceable to the Defendants' new programs that Plaintiffs challenge.

However, Defendants dismiss the harm and burdens inflicted upon the Plaintiffs as State governments by Defendants' new regulatory programs as (1) conjecture, (2) not traceable to as caused by the Defendants' programs, and (3) documenting only past harm not relevant to their new regulatory programs. Defendants' approach is drastically at odds with nearly all standing analysis normally conducted.

Defendants three main objections to standing are a fragmentation of proper standing analysis flowing from their fundamental error. Past empirical experience is nearly always used as a sound basis for projecting future harm, and in particular an increase in the harm from new government efforts against the backdrop of prior harm from past government actions.

Contrary to the assertions of the Defendants, a reasonable inference or prediction of an injury satisfies standing. There, a regulation allowed EPA the *option*, yet not the certainty, of potentially approving alternative methods "not less stringent" than prior, existing regulations.

> "According to NRDC, the Guidance exacerbates these injuries by delaying or suspending future air quality improvements. Any such effect, EPA counters, is purely hypothetical because it may never approve an alternative."

*Natural Resources Defense Council v. Environmental Protection Agency*, 643 F.3d 311 (D.C. Cir. July 1, 2011).

In the 2011 *NRDC v. EPA* case, the plaintiff NRDC claimed that members living in air quality non-attainment areas could be harmed. The members alleged – but could not possibly prove to the standards of proximate causation – that ambient air quality affected their health. The

plaintiffs there could not prove either individually nor to any medical diagnosis or medical certainty that they were in fact harmed. The EPA further objected that it was highly speculative to claim that allowing an alternative means of attaining air quality that would necessarily be "not less stringent" could cause any harm to the plaintiffs.

Nevertheless, the experienced D.C. Circuit only three years ago found standing to challenge agency action. One should also note that the regulation, as here, involved allowing third parties as independent actors to use techniques that the plaintiffs there complained of. That is, no harm to the plaintiffs would flow from the regulations, being only words on paper. Rather, the harm alleged for standing purposes was that the regulations might conceivably allow third party actors to engage in techniques "not less stringent" than current regulatory standards, which the plaintiffs alleged would be relatively more polluting than existing techniques.

Furthermore, it is clear that only a partial contribution making a problem worse is sufficient for standing. *Id.* Making an existing problem worse clearly establishes standing. *Id.*

For example, in *Natural Res. Def. Council v. Envtl. Prot. Agency* (D.C. Cir., 2014) *Natural Res. Def. Council v. Envtl. Prot. Agency* (D.C. Cir., Case Nos. 98–1379, 98–1429, 98–1431, June 27, 2014), Plaintiffs were persons living in the general region around third-party, independent actor power plants that might conceivably switch to the fuels challenged under the challenged administrative rule, but it was unknown if any of the plants actually would use the fuels in question:

> "Once EPA promulgated the Comparable Fuels Exclusion, it was " 'a hardly-speculative exercise in naked capitalism' " to predict that facilities would take advantage of it to burn hazardous-waste-derived fuels rather than more expensive fossil fuels. *Id.* (inferring that "motor carriers would respond to the hours-increasing provisions by requiring their drivers to use them and work longer days" (quoting *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach,* 469 F.3d 129, 135 (D.C. Cir. 2006))).

21

Therefore, a predictive "inference" that harm will result to the Plaintiff from the agency action is routinely held to be sufficient to constitute standing. The D.C. Circuit found standing from a prediction grounded purely in "'a hardly-speculative exercise in naked capitalism'" that private actors, third parties acting independently, in the energy industry probably would switch to less expensive hazardous-waste-derived fuels.

The regulation allowing this change did not mandate that any private company switch fuels, it merely allowed the switch by third-party independent actors. Once again, no harm would result from the regulation, but only what the regulation might allow private, third-party actors to do. The regulation had not yet gone into effect. There was no empirical data to support the prediction – derived purely from an understanding of 'naked capitalism' that privately-run companies acting as independent third parties could be expected to probably switch from more expensive fuels to lower-cost hazardous-waste-derived fuels.

While there is a long-standing problem with the Executive Branch's flagrant refusal to obey or enforce the law, the fact that Defendants' programs will make the problem worse is sufficient for standing. As explained in the D.C. Circuit in *Natural Resources Defense Council v. Environmental Protection Agency*, 643 F.3d 311 (D.C. Cir. July 1, 2011):

> "In any event, even assuming that a resulting program were perfectly equivalent, the delay in improving air quality would still injure NRDC members."

So mere delay in enforcement is sufficient to establish standing as to persons living vaguely in the vicinity of plants which might or might not choose to use the alternative fuel, who might or might not be medically affected in ways that cannot be proven medically or as proximate causation.

Furthermore, the D.C. Circuit in 2011 considered in its standing analysis whether anyone else would have standing: "Were EPA to prevail, although NRDC might well have standing to bring an as-applied challenge to any particular "not less stringent" determination, no one would have standing to challenge EPA's authority to allow alternatives in the first place. Especially given that Congress enacted Subpart 2 for the very purpose of curtailing EPA discretion, *see Whitman, Administrator of Environmental Protection Agency, et al. v. American Trucking Associations, Inc., et. al.,* 531 U.S. at 484-86, 121 S. Ct. 903 (February 27, 2001), it would be ironic indeed if the application of standing doctrine allowed EPA to effectively maintain that very discretion. Neither precedent nor logic requires us to adopt such a counterintuitive approach to standing." *Id.*

Under the law, an injury constituting standing need not be a total, all-or-nothing light switch with regard to the Plaintiffs' rights. Allegations that even just one voter's vote might be diluted by the unequal treatment of other voters is sufficient standing. Of course, dilution of a voter's vote can never be known for certain, even after the fact. Yet it is sufficient for standing. *Baker v. Carr*, 369 U.S. 186, 205, 82 S. Ct. 691, 7 L.Ed.2d 663 (1962) explained.

> A federal court cannot 'pronounce any statute, either of a state or of the United States, void, because irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies.' Liverpool, N.Y. & P. Steamship Co. v. Commissioners of Emigration, 113 U.S. 33, 39, 5 S. Ct. 352, 355, 28 L.Ed. 899. Have the appellants alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions? This is the gist of the question of standing. It is, of course, a question of federal law.
> * * *
>
> The complaint was filed by residents of Davidson, Hamilton, Knox, Montgomery, and Shelby Counties. Each is a person allegedly qualified to vote for members of the General Assembly representing his county.23 These appellants sued 'on their own behalf and on behalf of all qualified voters of their respective counties, and further, on behalf of all voters of the State of

Tennessee who are similarly situated * * *.'24

*Id.*

The Plaintiffs have standing under the precedent in the D.C. Circuit of *Mendoza v. Perez*

(D.C. Cir., Record No. 13-5118, Page 9, June 13, 2014)

> The requirements for standing differ where, as here, plaintiffs seek to enforce procedural (rather than substantive) rights. When plaintiffs challenge an action taken without required procedural safeguards, they must establish the agency action threatens their concrete interest. *Fla. Audubon Soc'y,* 94 F.3d at 664. It is not enough to assert "a mere general interest in the alleged procedural violation common to all members of the public." *Id.*
>
> Once that threshold is satisfied, the normal standards for immediacy and redressability are relaxed. *Lujan,* 504 U.S. at 572 n.7. Plaintiffs need not demonstrate that but for the procedural violation the agency action would have been different. *Ctr. for Law & Educ. v. Dep't of Educ.,* 396 F.3d 1152, 1160 (D.C. Cir. 2005). Nor need they establish that correcting the procedural violation would necessarily alter the final effect of the agency's action on the plaintiffs' interest. *Id.* Rather, if the plaintiffs can "demonstrate a causal relationship between the final agency action and the alleged injuries," the court will "assume[] the causal relationship between the procedural defect and the final agency action." *Id.*

Indeed, if we applied the Defendants' approach to standing on this point, then the U.S.

government did not have standing to challenge Arizona's SB1070 law in *Arizona v. United*

*States*, 132 S. Ct. 2492 (2012), with standing explained at 641 F. 3d 339 (9th Cir. 2011).  One of

the harms to the State Plaintiffs here is no different from the speculative possibility that

Arizona's state law SB1070 might potentially restrain the U.S. government's free range of

decisions and operations.  Defendants' actions here infringe upon the unfettered operation of the

State governments and create an obstacle to the conduct of the States' duties and obligations

(standing being a separate question from whether the interference is legally justified).

SB1070 did not have any direct impact upon the U.S. government.  SB1070 merely

assisted the federal government in identifying illegal aliens and turning them over to the federal

government for whatever action it might then decide to take.  There, Arizona's SB1070 law did

not prohibit the U.S. government from taking any action nor require the U.S. government to do anything by Arizona's state-level statute. Yet speculation that the U.S. government might be encouraged to more faithfully execute existing laws in its enforcement activities by SB 1070 gave the U.S. government standing to sue the State of Arizona.

Indeed, severely challenging Defendants' opposition here, they argued in *Arizona* that SB1070 might detain individual illegal aliens whom federal personnel might not detain, even though it would be the federal government's discretionary decision whether to then release or deport those persons. That is, SB1070 merely handed illegal aliens over to the U.S. government to decide what to do with them, and gave the U.S. government the opportunity to determine if detainees were high-risk or high-priority or not.

Assuming that brief inconvenience is cognizable legally, inconvenience to an individual illegal alien could not and did not confer standing upon the U.S. government to contest Arizona's SB1070 law. The fact that an individual detained might have standing does not mean the U.S. government has standing. Yet the Executive Branch sued on the basis that SB1070 interfered with the Executive Branch's choices to ignore and disregard the commands of Congressional enactments. To follow this precedent, we must similarly here acknowledge that Defendants' interference with the operation of the Plaintiff State governments is an injury to the free operations and prerogatives of the Plaintiff States here.

At all times the U.S. government remained 100% free to ignore illegal aliens detained by Arizona or at least no more constrained to act than required by current federal law. SB1070 made no attempt to force the U.S. government to act, nor prevent it from acting.

Here, in the same way, the Executive Branch's 2012 and 2014 deferred action programs directly infringe upon, interfere with, and disrupt the government operations of the states and

have a deleterious effect more tangible than that identified in *Arizona*.

## X.    DEFENDANTS' UNSUPPORTED REFUSAL TO BELIEVE PLAINTIFFS' STANDING MUST BE IGNORED, DUE TO LACK OF EVIDENCE

Defendants simply deny Plaintiffs' allegations in their Complaint of the harm to them

from Defendants' programs although the Federal Rules of Civil Procedure require the Court to

take as true the allegations of the complaint and all inferences that may reasonably be drawn in

the Plaintiffs' favor for the purposes of a Federal Rules of Civil Procedure Rule 12(b)(1) motion

to dismiss for lack of standing.

In reviewing the sufficiency of the complaint pursuant to a motion to dismiss for lack of

standing under Rule 12(b)(1), the court must presume that the factual allegations establishing

standing included in the complaint are true. *Miree v. DeKalb County, Ga.*, 433 U.S. 25, 27 n.2

(1977); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

The relevant issue presented by a motion to dismiss under FRCP Rule 12(b)(1)

challenging standing "'is not whether a Plaintiffs will ultimately prevail but whether the claimant

is entitled to offer evidence to support the claims.'" *Patton v. United States,* 64 Fed. Cl. 768, 773

(2005) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974), *abrogated on other grounds by*

*Harlow v. Fitzgerald,* 457 U.S. 800 (1982)).  In considering the issue of subject matter

jurisdiction (from standing), this court must presume all undisputed factual allegations to be true

and construe all reasonable inferences in favor of the plaintiff. *Scheuer,* 416 U.S. at 236;

*Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed. Cir. 1988).

The Defendants here and in *Arpaio v. Obama* merely wish to disbelieve the factual

allegations of the Plaintiffs that establish Article III standing for the Plaintiffs to prosecute the

case and controversy in this Court.  Defendants offer nothing but their raw opinions to contest

the factual bases for Plaintiffs' standing.

However, when deciding a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the FRCP, the court must assume that all of the Plaintiffs' factual allegations as pled in the complaint are true and must further draw all reasonable inferences in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800*, 814-19 (1982); *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006); *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989).

The D.C. District Court Judge – whose opinion the Defendants here rely upon – in *Arpaio v. Obama,* erred by entertaining the Defendants unsubstantiated wish to disbelieve Sheriff Arpaio's allegations and Sheriff Arpaio's sworn affidavits establishing standing, including harm to the Sheriff's Office of Maricopa County, Arizona, and the connection between the Defendants' June 15, 2012, DACA program and the projected results grounded in empirical, real-world experience of the November 20, 2014, programs.  In a Minute Order by Judge Howell in that case on December 18, 2014, at 10:44 EDT, denying live testimony, Judge Howell stated –

> **"at this stage of the proceedings, in opposition to the defendants' motion to dismiss, the Court need not make any credibility determinations and must accept as true the factual allegations made by the plaintiff."**

Yet, the Defendants here, as there, focus their arguments on merely disbelieving the well-pleaded allegations of the Plaintiffs' Complaint in violation of this rule for Rule 12(b)(1). Defendants' unsupported opinions are, with respect, irrelevant and must be ignored.

Defendants further ask the Court to engage in assumptions and inferences against standing, whereas the law requires the Court to adopt all inferences in support of Plaintiffs' allegations supporting standing on a Rule 12(b)(1) motion.

However, if the Court finds disputed allegations of fact unresolved for the purpose of determining standing, the Court should order evidentiary hearings and discovery necessary to

determine the foundational facts.  In considering a motion to dismiss for lack of subject matter jurisdiction which challenges the truth of jurisdictional facts alleged in the complaint, the court may make findings of fact pertinent to its jurisdiction. *Ferreiro v. United States*, 350 F.3d 1318, 1324 (Fed. Cir. 2003) (citing *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999). "In determining whether a motion to dismiss should be granted, the Claims Court may find it necessary to inquire into jurisdictional facts that are disputed." *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991).  In making findings of fact pertinent to its jurisdiction, the court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including declarations or affidavits. *Rocovich*, 933 F.2d at 994 (citing *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947), and *Reynolds*, 846 F.2d at 747.

## XI.  **DEFENDANTS HAVE ALL THE RESOURCES THEY REQUESTED**

The primary legal authority the Defendants assert to discard the immigration laws of the United States is that the Congress has not given the Executive Branch sufficient resources to fully enforce the immigration laws.

Fatal to the Defendants' case, however, is the undeniable fact that the Executive Branch has never requested more funding or resources to be able to fully enforce the immigration laws (that is, at least in recent, relevant time periods).

First, if the Department does not have sufficient resources to fully enforce the nation's laws, its remedy is to request those resources, not to create an entirely new and different regulatory scheme, while refusing to enforce the laws on the books.  The Executive Branch has a remedy:  Request the necessary funding from Congress to fully enforce the law, including to deport all illegal aliens from the United States back to their country of citizenship.

Second, each federal department and agency is required under the Budget and

Accounting Act of 1921 (as amended)[6] to forward its projected needs for carrying out its mission to the Office for Management and Budget in the Executive Office of the President.  OMB then submits a consolidated budget request for the entire federal government to the U.S. Congress.

The U.S. Congress appropriated about $814 million more for ICE than the DHS requested in and since fiscal year 2006.

The U.S. Congress appropriated nearly $465 million more for USCIS than DHS requested in and since fiscal year 2006.[7]

Since the Executive Branch is under a legal command to inform Congress of the funding needed to fully enforce the law and carry on all its operations, the fact that the Defendants never asked for more funding to enforce the immigration laws more fully is fatal now to their entire argument and the factual claims that they assert.

As a result, the Defendants cannot rewrite the immigration laws of the country claiming a lack of resources they never asked for.  Clearly, considering that the Congress already appropriated more than asked for,[8] if the Executive Branch asked for more resources to secure the border and enforce the laws, the Congress would appropriate the resources needed.

Federal courts have recognized that Congress often appropriates money on a step-by-step basis, especially for long-term projects. Federal agencies may not ignore statutory mandates simply because Congress has not yet appropriated all of the money necessary to complete a project. *See City of Los Angeles v. Adams*, 556 F.2d 40, 50 (D.C. Cir. 1977) (When statutory mandate is not fully funded, "the agency administering the statute is required to effectuate the

---

[6]     31 U.S.C. 1101, et seq.; See also, OMB Circular No. A–11 (2014) Section 15:  Basic Budget Laws, http://www.whitehouse.gov/sites/default/files/omb/assets/a11_current_year/s15.pdf
[7]     See affidavit of Jonathon Moseley, attached.  Budget information submitted to Congress by the U.S. Department of Homeland Security is posted at http://www.dhs.gov/dhs-budget .
[8]     In relevant time periods here.

original statutory scheme as much as possible, within the limits of the added constraint.").

Moreover, as the Supreme Court has explained, courts generally should not infer that Congress has implicitly repealed or suspended statutory mandates based simply on the amount of money Congress has appropriated. *See TVA v. Hill*, 437 U.S. 153, 190 (1978) (doctrine that repeals by implication are disfavored "applies with even greater force when the claimed repeal rests solely on an Appropriations Act"); *United States v. Langston*, 118 U.S. 389, 394 (1886) ("a statute fixing the annual salary of a public officer at a named sum . . . should not be deemed abrogated or suspended by subsequent enactments which merely appropriated a less amount for the services of that officer for particular fiscal years"); cf. 1 GAO, Principles of Federal Appropriations Law at 2-49 (3d ed. 2004) ("A mere failure to appropriate sufficient funds will not be construed as amending or repealing prior authorizing legislation.").

Finally, the Defendants are not even using the resources they have available now.   John Morton, then Chief of ICE within DHS, started issuing policy changes set forth in the so-called Morton Memos, referring to a set of memoranda dated March 2, 2011; June 17, 2011; Nov. 17, 2011; and Dec. 21, 2012. Together, the Morton Memos undermined the enforcement of several key immigration laws, basically making it much harder for federal officials to deport immigrants in the U.S. illegally.  (The popular name for these memos continued after Morton's replacement.).  Key memos, which are admissible as admissions by party opponents, are:

- **March 2, 2011:** Limits the enforcement of immigration laws to a subset of illegal aliens who have been convicted of crimes.[9]

- **June 17, 2011 (I):** Discourages ICE Agents from enforcing our immigration laws against certain segments of the illegal alien population, including aliens who

---

[99]   Available at:  http://www.ice.gov/doclib/news/releases/2011/110302washingtondc.pdf ,
accessible from http://www.fairus.org/morton-memos#Aug

qualify for the DREAM Act.[10]

- **June 17, 2011 (II):** Discourages ICE Agents from enforcing our immigration laws against crime victims, witnesses to crime, and "individuals pursuing legitimate civil rights complaints," defined very broadly.[11]

- **August 18, 2011 (Napolitano letter to Sen. Harry Reid):** Announces a case-by-case review of all aliens currently in or will be entering deportation proceedings in order to determine which ones the Administration will grant administrative amnesty.[12]

- **November 17, 2011 (Memo with two attachments I and II):** Sets strict guidelines ICE attorneys must follow when reviewing all deportation cases; announces a pilot program for the review of all pending deportation cases.[13]

- **December 29, 2011:** Announced in press release, ICE shifts the agency to a "post-conviction" deportation model by creating a new provision on its detainer form allowing ICE agents to consider the detainer operative only upon the alien's conviction.[14]

- **April 27, 2012:** Limits the Secure Communities program to meet the Administration's enforcement priorities by stating the agency will no longer be

---

[10]   Available at: http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf , accessible from http://www.fairus.org/morton-memos#Aug

[11]   Available at: http://www.ice.gov/doclib/secure-communities/pdf/domestic-violence.pdf , accessible from http://www.fairus.org/morton-memos#Aug

[12]   Available at: http://democrats.senate.gov/uploads/2011/08/11_8949_Reid_Dream_Act_response_08.18.11.pdf , accessible from http://www.fairus.org/morton-memos#Aug

[13]   Available at: http://www.fairus.org/DocServer/case-by-case-review-incoming-certain-pending-cases-memorandum.pdf , accessible from http://www.fairus.org/morton-memos#Aug

[14]   Available at: http://content.govdelivery.com/bulletins/gd/USDHSICE-23b1e1 , accessible from http://www.fairus.org/morton-memos#Aug

enforcing the law against illegal aliens apprehended for "minor traffic offenses" and encouraging local agencies not to submit fingerprints to the FBI or DHS for individuals arrested for "minor offenses."[15]

- **December 21, 2012:** Limits the circumstances under which ICE agents can issue detainers and take custody of illegal aliens in the hands of local law enforcement officials; also cuts the 287(g) immigration enforcement program in half.[16]

In response to the Executive Branch's refusal to employ the resources already provided by Congress to enforce the nation's immigration laws, ten ICE agents sued Janet Napolitano, then Secretary of Homeland Security, for not allowing them to do their jobs of immigration enforcement and causing them to participate in law-breaking by the Obama Administration. *Crane v. Napolitano*, 920 F. Supp. 2d 724 (N.D. Tex. 2013). The lawsuit was viewed largely by the Court as the Executive Branch suing itself, and thereby creating problems with standing. That dismissal of the case is on appeal. The Court may take judicial notice of this litigation.

Accordingly, the Defendants' disingenuous pretext of a lack of resources requiring them to rewrite the nation's immigration laws by Memorandum fiat is (1) unsupported by any evidence before this Court and (2) belied by the Defendants own statements and actions.

## XII. <u>DEFENDANTS HAVE OFFERED NO EVIDENCE OR AFFIDAVITS AND THUS PLAINTIFFS' AFFIDAVITS AND FACTUAL RECITATIONS ARE UNCONTROVERTED</u>

Defendants have not offered sworn declarations or evidence in support of their Opposition to a Preliminary Injunction. Thus the Plaintiffs' arguments are uncontroverted and must at this stage of the proceeding be accepted as true.

---

[15]   Available at:  http://www.ice.gov/doclib/secure-communities/pdf/hsac-sc-taskforce-report.pdf , accessible from http://www.fairus.org/morton-memos#Aug

[16]   Available at: http://www.ice.gov/doclib/detention-reform/pdf/detainer-policy.pdf , accessible from http://www.fairus.org/morton-memos#Aug

Defendants contest the factual underpinnings of Plaintiffs' standing. However, Defendants have offered no evidence – despite having access to all the information across the U.S. government – in support of their challenge to standing.

Thus, the Defendants effectively concede the factual allegations of the Plaintiffs supported by sworn declarations.

Furthermore, the Defendants' positions in their Opposition to Preliminary Injunction, in the operative Memoranda orders, and the OLC legal opinion depend extensively upon unsupported assertions of facts and effects that they contend will or will not occur. The majority of Defendants' Opposition consists of simply arguing, "I don't believe it."

Significantly, Defendants assert that their deferred action programs will in some mysterious way, never explained, free up resources to allow the Defendants to deport more high-priority targets. However, this assertion is unsupported by any facts, evidence, sworn declarations or even the barest explanation as to how or why the assertion should be believed.

Thus, the Court is obligated to ignore this argument. The fact is that illegal aliens are encountered randomly, not presorted into convenient categories. The Executive Branch could not know in advance whether an illegal alien is a high-priority, low-priority, or medium-priority removal target until after encountering the individual and having the opportunity to investigate them and determining their circumstances. Granting amnesty to approximately 6 million illegal aliens will not provide any more resources toward deporting more high-priority removal targets.

The only way that focusing on high-priority removal targets could free up resources from low-priority removal targets to deport more high-priority targets is if the Defendants already had a master list of all illegal aliens prepared, ready, and available with complete profiles on each illegal alien. In that case, Defendants could consult their master list to deport the worst criminal

offenders and other risks first by visiting the high-priority targets first. Furthermore, the best way to free up resources would be to simply do nothing with regard to lower-priority targets, not to process 6 million applications (and renewals) for immunity and amnesty.

In fact, however, law enforcement does not know whom they will encounter before they encounter them. As a result, efforts at enforcement for high priority removal targets cannot benefit from granting amnesty to 6 million of the total universe. There is no mechanism identified nor possible by which the Defendants' amnesty (deferred action) programs will in any way assist in the deportation (removal) of illegal aliens who rank as the highest priority threats or targets. In an event, the Defendants have offered no evidence the Court may rely upon in support of the disingenuous assertions.

## XIII.  **CONCLUSION**

For all of these compelling reasons, the Court should not follow or give any weight to the December 23, 2014 Order of Judge Howell and enter a Preliminary Injunction forthwith in favor of the Plaintiffs herein, who stand in an almost identical "standing" posture as Sheriff Joe Arpaio.

Dated: January 16, 2015                    Respectfully submitted,

Larry Klayman, Esq.
Washington, D.C. Bar No. 334581
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com
Of Counsel
*(Pro Hac Vice Application Pending)*

Jonathon Moseley, Esq.

Virginia State Bar No. 41058
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com
Attorney for Plaintiff
Pro Hac Vice Approved

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing motion and proposed brief will be delivered electronically on January 16, 2015, to counsel for Plaintiffs and Defendants through the District's Electronic Case Filing system.

Jonathon Moseley, Esq.

## CERTIFICATE OF COMPLIANCE

I hereby certify that On January 12, 2015, at 2:40 PM EST, I sent a draft copy of the

*Amicus Curiae*'s proposed brief and motion for leave to file a brief to the counsel of record for

the parties in this case asking if they opposed or consented with the filing of the brief.  On

January 13, 2015, at 10:14 PM EST, I received an email from Mr. Kyle Freeny "Defendants take

no position on your motion for leave to file.  Regards."  I received no other response.  I emailed

a copy of the final brief at noon EST on January 16, 2015, asking if the parties had any other

response.  I have not received any further response.

Jonathon Moseley, Esq.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Mr. JOE ARPAIO, Elected SHERIFF of
Maricopa County, State of Arizona

                Plaintiff,

    v.

Mr. BARACK HUSSEIN OBAMA, acting
as President of the United States of America

        and

Mr. JEH CHARLES JOHNSON, acting as Secretary
of the U.S. Department of Homeland Security

        and

Mr. LEON RODRIQUEZ, acting as Director
of the U.S. Citizenship and Immigration Services

            Defendants.

Case 1:14-cv-01966

**DECLARATION OF JONATHON MOSELEY, FREEDOM WATCH,
IN SUPPORT OF PLAINTIFF'S MOTION FOR INJUNCTION**

Pursuant to 28 U.S.C. §1746, I, Jonathon Moseley, hereby declare under penalty of perjury that

the following is true and correct:

1) I am over the age of 18 years old and mentally and legally competent to make this

   affidavit sworn under oath.

2) I searched the publicly released budget information for the United States Immigration

   and Customs Enforcement (ICE) and United States Citizenship and Immigration

   Services (USCIS) components of the United States Department of Homeland

   Security, at the websites of the Office of Management and Budget and the

   Department of Homeland Security.

3) The published budgets and budget requests of the U.S. Department of Homeland Security, technically admissions by a party-opponent, report the following information which was submitted to Congress by the U.S. Department of Homeland Security and now posted on the Department's website at http://www.dhs.gov/dhs-budget.

4) Those segments of the President's budgetary request to Congress applying to ICE and to USCIS for each fiscal year recites the amount of funding requested by the Department for ICE and USCIS and the amount actually appropriated by Congress in the prior fiscal year.

5) The U.S. Congress appropriated nearly $465 million more for USCIS than the U.S. Department of Homeland Security requested in and since fiscal year 2006.

## Immigration and Customs Enforcement (ICE)

| | | | |
|---|---|---|---|
| 2006 Budget Request: | $4,364,270,000 | Congress Appropriated | $3,879,443,000 |
| 2007 Budget Request: | $4,696,932,000 | Congress Appropriated | $4,726,641,000 |
| 2008 Budget Request: | $5,014,500,000 | Congress Appropriated | $5,576,080,000 |
| 2009 Budget Request: | $5,676,085,000 | Congress Appropriated | $5,948,210,000 |
| 2010 Budget Request: | $5,762,800,000 | Congress Appropriated | $5,741,752,000 |
| 2011 Budget Request: | $5,835,187,000 | Congress Appropriated | $5,748,339,000 |
| 2012 Budget Request: | $5,822,576,000 | Congress Appropriated | $5,862,453,000 |
| 2013 Budget Request: | $5,644,061,000 | Congress Appropriated | $5,879,064,000 |
| 2014 Budget Request: | $5,341,722,000 | Congress Appropriated | $5,610,663,000 |

## U.S. Citizenship and Immigration Services (USCIS)

| | | | |
|---|---|---|---|
| 2006 Budget Request: | $1,854,000,000 | Congress Appropriated | $1,887,850,000 |

| 2007 Budget Request: | $1,985,990,000 | Congress Appropriated | $1,985,990,000 |
|---|---|---|---|
| 2008 Budget Request: | $2,568,872,000 | Congress Appropriated | $2,619,173,000 |
| 2009 Budget Request: | $2,689,726,000 | Congress Appropriated | $2,690,926,000 |
| 2010 Budget Request: | $2,867,232,000 | Congress Appropriated | $2,859,997,000 |
| 2011 Budget Request: | $2,812,357,000 | Congress Appropriated | $3,029,829,000 |
| 2012 Budget Request: | $2,906,865,000 | Congress Appropriated | $3,078,465,000 |
| 2013 Budget Request: | $3,005,383,000 | Congress Appropriated | $3,005,383.000 |
| 2014 Budget Request: | $3,219,466,000 | Congress Appropriated | $3,217,236,000 |

6) I am engaged as an independent contractor performing occasional legal services part-time for the Plaintiff Freedom Watch, Inc.

7) I am familiar with the budgetary information and historical tables published by the Office of Management and Budget, a part of the Executive Office of the President, including as posted on the website of OMB.

8) I earned a Bachelors of Science in Business Administration with a major in Finance from the University of Florida in Gainesville, Florida.

9) I studied an additional year of post-graduate accounting at the University of Florida.

10) I worked from 1987 through 1992 as a management analyst in the United States Department of Education (USED).

11) While working at USED, I became directly familiar as part of my work with the budget of the United States and the budgeting process for the Federal Departments.

12) In fact, I was "hired" to work at OMB on the basis of being detailed from USED to OMB while remaining on the USED payroll, but the use of a Full Time Equivalent (FTE) slot to detail me to OMB was not approved by the Office of Management.

13) While working in the Executive Office of the Office of Bilingual Education and

Minority Languages Affairs (OBEMLA), I prepared the budget requests for

OBEMLA to the United States Congress to be forwarded through OMB, including

the briefing books to prepare the Director of OBEMLA, Alica Coro, to testify in

support of the budget request in Congress, under the delegation and direction of the

Executive Officer of OBEMLA.

14) I left the U.S. Department of Education in 1992 to attend George Mason University

School of Law in Arlington, Virginia.

15) As a result, I am directly familiar from my professional work with the budgetary

process for Federal Departments, the budget requests prepared and submitted to

Congress, and the historical budgetary tables and reports of the U.S. Government.

I hereby swear under oath and penalty of perjury that the foregoing facts are true and

correct to the best of my knowledge and belief:

Jonathon Moseley, Esq.

Dated:  December 1, 2014

Freedom Watch, Inc.
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800

204 South Main Avenue #3
Lake Placid, Florida 33852
Cell:   (703) 656-1230
Fax: (703) 783-0449
Contact@JonMoseley.com