# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

|  |  |
|---|---|
| **STATE OF TEXAS, et al.** | |
| Plaintiffs, | |
| v. | Case No. 1:14-cv-254 |
| **UNITED STATES OF AMERICA, et al.** | |
| Defendants. | |

**APPENDIX TO BRIEF FOR AMICI CURIAE THE MAYORS OF NEW YORK AND LOS ANGELES, THE MAYORS OF THIRTY-ONE ADDITIONAL CITIES, THE UNITED STATES CONFERENCE OF MAYORS, AND THE NATIONAL LEAGUE OF CITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Authorities in this Appendix are arranged in the order in which they appear in the referenced Brief for Amici Curiae.

MIGRATION POLICY INSTITUTE, *Unauthorized Immigrant Population Profiles*, http://www.migrationpolicy.org/programs/us-immigration-policy-program-data-hub/unauthorized-immigrant-population-profiles.......................................................................... A1

City of Atlanta, *Mayor Kasim Reed and City of Atlanta join Welcoming America Initiative*, Oct. 22, 2013, http://www.atlantaga.gov/index.aspx?page=672&recordid=2368 ..........A6

City of Austin, *Austin Promotes Immigrant-Friendly, Welcoming Environment*, June 27, 2013, http://austintexas.gov/news/austin-promotes-immigrant-friendly-welcoming-environment ......................................................................................................................................A11

Office of Pittsburgh Mayor William Peduto, *Mayor William Peduto launches Welcoming Pittsburgh Initiative*, May 28, 2014, http://pittsburghpa.gov/mayor/release?id=3112..................A13

Claudia Dreifus, *A Surgeon's Path From Migrant Fields to Operating Room*, N.Y. TIMES, May 13, 2008, *available at* http://www.nytimes.com/2008/05/13/science/13conv.html?_r=0 ................................................A15

Dr. Q's Quest, *Dr. Q's Story: A Doctor Without Borders*, http://doctorqmd.com/dr-q-s-story---a-doctor-without-borders/ ...................................................................................................A18

Avis Thomas-Lester, *What It Takes: From Salvadoran immigrant to millionaire owner of Todos Supermarkets*, WASH. POST, Sept. 27, 2010, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2010/09/24/AR2010092406003.html ...........................................................A22

Janean Chun, *Carlos Castro, Founder of Todos Supermarket, Says Business Climate Much Harsher For Immigrants Today*, HUFFINGTON POST, June 27, 2012, *available at* http://www.huffingtonpost.com/2012/06/27/carlos-castro-todos-supermarket-former-undocumented-immigrant-starts-business_n_1597663.html ..........................................................A24

Marc Fisher, *From journalism to activism: Jose Antonio Vargas's life on the run*, WASH. POST, Nov. 23, 2014, *available at* http://www.washingtonpost.com/lifestyle/style/jose-antonio-vargas-isnt-running-from-his-biggest-secret-anymore-so-what-is-he-running-toward/2014/11/23/09606800-6042-11e4-8b9e-2ccdac31a031_story.html. ................................A33

GIOVANNI PERI, FRBSF ECON. LETTER, FEDERAL RESERVE BANK OF SAN FRANCISCO, The EFFECT OF IMMIGRANTS ON U.S. EMPLOYMENT AND PRODUCTIVITY (Aug. 30, 2010), http://www.frbsf.org/economic-research/publications/economic-letter/2010/august/effect-immigrants-us-employment-productivity/. ....................................................................................A48

i

U.S. CHAMBER OF COMMERCE, IMMIGRATION MYTHS AND FACTS (2013), https://www.uschamber.com/sites/default/files/legacy/reports/Immigration_MythsFacts.pdf. ...................................................................................................................A53

HEIDI SHIERHOLZ, ECON. POLICY INST. BRIEFING PAPER NO. 255, IMMIGRATION AND WAGES: METHODOLOGICAL ADVANCEMENTS CONFIRM MODEST GAINS FOR NATIVE WORKERS (Feb. 4, 2010), http://www.epi.org/files/page/-/bp255/bp255.pdf ..............................A73

GIANMARCO I.P. OTTAVIANO & GIOVANNI PERI, NAT'L BUREAU OF ECONOMIC RESEARCH, NBER WORKING PAPER SERIES 12497, RETHINKING THE EFFECTS OF IMMIGRATION ON WAGES (2006, revised 2008), http://www.nber.org/papers/w12497..............A102

JACK STRAUSS, IMMIGRATION POLICY CENTER, AMERICAN IMMIGRATION COUNCIL, ALLIES, NOT ENEMIES: HOW LATINO IMMIGRATION BOOSTS AFRICAN AMERICAN EMPLOYMENT AND WAGES (June 2013), http://www.immigrationpolicy.org/sites/default/files/docs/allies_not_enemies.pdf ..................A156

ROBERT W. FAIRLIE, Partnership FOR A NEW AMERICAN ECONOMY, OPEN FOR BUSINESS: HOW IMMIGRANTS ARE DRIVING SMALL BUSINESS CREATION IN THE UNITED STATES (Aug. 2012), http://www.renewoureconomy.org/sites/all/themes/pnae/openforbusiness.pdf. ........................A163

AMERICAS SOCIETY/COUNCIL OF THE AMERICAS & FISCAL POLICY INSTITUTE, BRINGING VITALITY TO MAIN STREET: HOW IMMIGRANT SMALL BUSINESSES HELP LOCAL ECONOMIES GROW (Jan. 2015), http://fiscalpolicy.org/wp-content/uploads/2015/01/Bringing-Vitality-to-Main-Street.pdf..................................................A203

DR. RAUL HINOJOSA-OJEDA & MAKSIM WYNN, FROM THE SHADOWS TO THE MAINSTREAM: ESTIMATING THE ECONOMIC IMPACT OF PRESIDENTIAL ADMINISTRATIVE ACTION AND COMPREHENSIVE IMMIGRATION REFORM (2014), http://www.naid.ucla.edu/uploads/4/2/1/9/4219226/ucla_naid_center_report_-_estimating_the_economic_impact_of_presidential_administrative_action_and_compreh ensive_immigration_reform.pdf. ...............................................................................A245

PATRICK OAKFORD, CENTER FOR AMERICAN PROGRESS, ADMINISTRATIVE ACTION ON IMMIGRATION REFORM, THE FISCAL BENEFITS OF TEMPORARY WORK PERMITS (2014), http://cdn.americanprogress.org/wp-content/uploads/2014/09/OakfordAdminRelief.pdf. .........A279

*President's Immigration Action Expected to Benefit Economy*, NEWS FROM THE FISCAL POLICY INSTITUTE, Nov. 21, 2014, http://fiscalpolicy.org/presidents-immigration-action-expected-to-benefit-economy. ...................................................................................A305

Roberto G. Gonzales & Veronica Terriquez, How DACA is Impacting the Lives of Those who are now DACAmented: Preliminary Findings from the National UnDACAmented Research Project (2013), http://www.immigrationpolicy.org/just-facts/how-daca-impacting-lives-those-who-are-now-dacamented. ............................................A307

Nik Theodore, Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement (2013), http://www.academia.edu/4738588/Insecure_Communities_Latino_Perceptions_of_Police_Involvement_in_Immigration_Enforcement ...........................................................................A311

Major Cities Chiefs Immigration Committee, Recommendations: For Enforcement of Immigration Laws by Local Police Agencies (2006), http://www.houstontx.gov/police/pdfs/mcc_position.pdf .............................................A339

Amy Braunschweiger, *Nashville Immigrants Too Scared to Call the Police*, Human Rights Watch, May 19, 2014, http://www.hrw.org/news/2014/05/19/nashville-immigrants-too-scared-call-police ................................................................................A350

Anita Khashu, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties (Mary Malina ed. 2009), http://www.policefoundation.org/content/role-of-local-police. ...................................A354

Melissa Russo, *More than 50,000 Sign Up to Enroll in City's New Municipal Identification Program in First Week*, NBC New York, Jan. 16, 2015, http://www.nbcnewyork.com/news/local/IDNYC-Municipal-Identification-Card-Immigrant-New-York-Wait-Time-311-Appointment-New-York-City-288871711.html. ..........A611

Kalina Brabeck et al., Report for the Inter-American Human Rights Court, The Psychosocial Impact of Detention and Deportation on U.S. Migrant Children and Families (Aug. 2013), http://www.bc.edu/content/dam/files/centers/humanrights/doc/IACHR%20Report%20on%20Pyschosocial%20Impact%20of%20Detention%20%20Deportation-FINAL%208-16-13.pdf ...........................................................................................A616

Joanna Dreby, Center for American Progress, How Today's Immigration Enforcement Policies Impact Children, Families, and Communities (Aug. 2012), http://cdn.americanprogress.org/wp-content/uploads/2012/08/DrebyImmigrationFamiliesFINAL.pdf ................................A631

Applied Research Center, Shattered Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare System (Nov. 2011), http://www.atlanticphilanthropies.org/learning/report-shattered-families-perilous-intersection-immigration-enforcement-and-child-welfare-s .......................................A671

Urban Institute, Facing Our Future: Children in the Aftermath of Immigration Enforcement (Feb. 2010) http://www.urban.org/uploadedpdf/412020_FacingOurFuture_final.pdf ...................A736

INT'L HUMAN RIGHTS LAW CLINIC AT UNIVERSITY OF CALIFORNIA, BERKELEY SCHOOL OF LAW, ET. AL., IN THE CHILD'S BEST INTEREST? THE Consequences OF LOSING A LAWFUL IMMIGRANT PARENT TO DEPORTATION, March 2010, http://www.law.berkeley.edu/files/Human_Rights_report.pdf .................................................. A832

Hirokazu Yoshikawa & Carola Suarez-Orozco, *Deporting Parents Hurts Kids*, N.Y. TIMES, April 20, 2012, *available at* http://www.nytimes.com/2012/04/21/opinion/deporting-parents-ruins-kids.html?_r=0 ............. A858

Seth Freed Wessler, *U.S. Deports 46K Parents with Citizen Kids in Just Six Months*, COLORLINES, November 3, 2011, *available at* http://colorlines.com/archives/2011/11/shocking_data_on_parents_deported_with_citizen _children.html. ................................................................................................................. A861

WOMEN'S LEGAL DEFENSE AND EDUCATION FUND, READING BETWEEN THE LINES: WOMEN'S POVERTY IN THE UNITED STATES (2010), http://www.legalmomentum.org/sites/default/files/reports/reading-between-the-lines.pdf ........ A864

MIGRATION POLICY INSTITUTE, *As Many as 3.7 Million Unauthorized Immigrants Could Get Relief from Deportation under Anticipated New Deferred* Action *Program*, Nov. 20, 2014, http://migrationpolicy.org/news/mpi-many-37-million-unauthorized-immigrants-could-get-relief-deportation-under-anticipated-new ................................................................. A868



MENU

Like · Tweet Share

Home » Programs » Data Hub

# Unauthorized Immigrant Population Profiles

Learn about the estimated 11.4 million unauthorized immigrants living in the United States. Where do they live? When did they arrive in the United States, and from which origin countries? What are their levels of education, top industries of employment, incomes, parental and marital status, health care coverage, and more? And how many are potentially eligible for relief from deportation via deferred action? This unique data tool provides detailed sociodemographic profiles for the U.S., 41 states and D.C., and 94 counties with the largest unauthorized populations.

### Hover over a state for data, and for dark teal states, click on state for detailed profile



## COUNTY PROFILES

To access detailed data profiles for the 94 counties in the United States with the largest unauthorized populations, click on the state of interest below to display individual profiles. For topline estimates of the total unauthorized population and numbers potentially eligible for deferred action, download the spreadsheets at right.

Arizona

California

Colorado

Connecticut

Florida

Georgia

Illinois

Indiana

Maryland

Massachusetts

Minnesota

Nevada

New Jersey

New York

North Carolina

Oklahoma

Oregon

Rhode Island

Tennessee

Texas

Utah

Virginia

Washington

Wisconsin

### Acknowledgments

This data tool is based on a methodology that imputes unauthorized status using U.S. Census Bureau 2008-12 American Community Survey and 2008 Survey of Income and Program Participation data. James Bachmeier at Temple University analyzed the data on legal status of immigrants that provide the basis for these estimates. Jennifer Van Hook at The Pennsylvania State University advised in developing the methodology.

## About the Data Hub

The Data Hub showcases the most current national and state-level demographic, social, and economic facts about immigrants to the U.S.; as well as stock, flow, citizenship, net migration, and historical data for countries in Europe, North America, and beyond.

Contact the Data Hub manager at data@migrationpolicy.org.

## Links

- **State-Level Estimates on DACA & DAPA Populations**
- **County-Level Estimates on DACA & DAPA Populations**
- **Press Release on National and State Profiles**
- **Press Release on County Profiles**

## IN THE SPOTLIGHT

**Frequently Requested Statistics on Immigrants and Immigration in the United States**



This feature presents the latest, most sought-after data on immigrants in the United States—by origin, residence, legal status, deportations, languages spoken, and more—in one easy-to-use resource.

READ ARTICLE

A3

# Experts

 Michael Fix is President of the Migration Policy Institute. Full Bio >

 Randy Capps is Director of Research for U.S. Programs at the Migration Policy Institute. Full Bio >

Jeanne Batalova

# Media Contact

Michelle Mittelstadt
202-266-1910
mmittelstadt@migrationpolicy.org



A4

1400 16th St NW, Suite 300, Washington, DC 20036
ph. 202-266-1940 | fax. 202-266-1900

     

Copyright © 2001-2015 Migration Policy Institute. All rights reserved.

CONTACT  |  SITE MAP  |  EXPERTS  |  SIGN UP  |  SUPPORT

# Press Releases

## Mayor Kasim Reed Announces Results of Welcoming Atlanta Working Group

Posted Date:        9/17/2014 3:00 PM



### Mayor's Office of Communications
55 Trinity Avenue, Suite 2500 • Atlanta, Georgia 30303

Anne Torres, Director    Melissa Mullinax, Deputy Director

404-330-6423, office       404-330-6756, office

404-904-2618, cell         404-825-2430, cell

amtorres@atlantaga.gov     mjmullinax@atlantaga.gov

FOR IMMEDIATE RELEASE: 09/17/2014

## News Release

### Mayor Kasim Reed Announces Results of Welcoming Atlanta Working Group

Mayor Reed announces city's commitment to recommendations provided by the Working Group to ensure that Atlanta's newly arrived communities are integrated and supported

ATLANTA – Mayor Kasim Reed and members of the Welcoming Atlanta Group announced today the recommendations being implemented to foster a welcoming environment in the City of Atlanta for all individuals regardless of race, ethnicity, or place of origin. The 20 recommendations will focus on community engagement, developing and harnessing talent, and public safety. The announcement was made during National Welcoming Week which highlights the contributions of immigrants from across the globe and their instrumental impact on the day to day lives of all Americans. Metro Atlanta boosts the second fastest growing foreign-born population in the country, second only to Baltimore.

"As Atlanta positions itself to be a global leader, attracting and retaining talent is imperative," said Mayor Reed. "The Welcoming Atlanta initiative builds upon the existing priorities for the city – public safety, welfare, economic development, civic engagement and education – and in so doing, will not only create an environment that is welcoming to new arrivals, but a stronger community for all Atlantans."

Earlier this year, Mayor Reed announced the creation of the Welcoming Atlanta Working Group. The 20-member group was tasked with developing recommendations to ensure that Atlanta's newly arrived

communities are being integrated and supported. Over the course of the summer, Welcoming Group co-chairs Jeffrey Tapia, executive director of the Latin American Association, and Charles Kuck, managing partner of Kuck Immigration Partners, met regularly with subcommittees to discuss key areas of immigrant integration including: ensuring equitable access to services; expanding educational opportunities; facilitating economic empowerment; enhancing public safety and fostering a connected community; and building immigrant civic engagement and leadership.

"We are thrilled to be a part of Mayor Reed's historic commitment to the immigrant and refugee communities," said Co-Chair Charles Kuck. "It's been an honor to be entrusted with the responsibility to advise our city's leader on the issues that we work on day in and day out and we are confident that the lives of all Atlantans will be enriched as we welcome America's newest communities."

In August, the Welcoming Atlanta Working Group presented recommendations to Mayor Reed. The City of Atlanta now commits to implementing the following recommendations proposed by the Welcoming Atlanta Working Group:

Community Engagement Recommendations

Goal: To reduce barriers to full civic participation while fostering positive relationships between the receiving community and new arrivals. To achieve the City of Atlanta will:

1. Create an Office of Multicultural Affairs with a Director who is part of the Mayor's executive team.
2. Establish a Welcoming Atlanta Advisory Committee.
3. Create a website dedicated to the Welcoming Atlanta initiative.
4. Establish a citywide inclusive certification program.
5. Organize city dialogues with immigrant and refugee communities and groups in receiving communities.
6. Establish a My City Academy educational program.
7. Partner with Invest Atlanta and the Atlanta Beltline to expand pre-public notification of affordable housing options to include immigrant and refugee communities.
8. Partner with U.S. Citizenship and Immigration Services (USCIS) to establish citizenship corners in Atlanta-Fulton public libraries.
9. Enlist well-known celebrities within the foreign-born communities to promote Welcoming Atlanta with an emphasis on the benefits of citizenship and community engagement.
10. Provide free booths for partner nonprofits to conduct voter registration and outreach at City of Atlanta festivals.
11. Assess current use of cultural competency training for all city employees and partner with nonprofits that specialize in cultural competency to develop a resource list and develop and implement curriculum.
12. Evaluate the city's capacity to effectively serve immigrants and refugees by contracting a third party to conduct an internal and external needs assessment of public safety and customer service-oriented agencies, including a customer service assessment component.

Developing and Harnessing Talent Recommendations

Goal: To better harness the talents of, and provide opportunities for, today's willing and able workers and develop a strong multicultural workforce for tomorrow. To achieve the City of Atlanta will:

13. Partner with non-traditional facilities to fund and expand opportunities for adult English language learning in the communities where immigrants and refugees live.

14. Use the Atlanta Workforce Development Agency (AWDA) to create targeted programming that recruits, trains and connects foreign-born workers to fill jobs critical to Atlanta's economic competitiveness.

15. Assess and increase minority participation in the Small Business Enterprise Program.

16. Create a web-based one-stop shop for all entrepreneurs that clearly outlines the process, steps and requirements for starting a business in the city in multiple languages.

17. Address food deserts through immigrant entrepreneurship by providing incentives and assistance to grocers to open markets in food deserts.

18. Augment the findings of the disparity study with a survey of best practices to strengthen Atlanta's Equal Business Opportunity Program.

Public Safety Recommendations

Goal: To foster a community of trust between Atlanta's foreign-born population and the officers entrusted with protecting our streets. To achieve the City of Atlanta will:

19. Launch an initiative within APD and the City Prosecutor's office to investigate and prosecute individuals who prey on immigrants (e.g., tax, credit card and other scams).

20. Create a Multicultural Liaison Unit in APD through scaling and expanding the existing Hispanic Liaison Unit.

In October 2013, the City of Atlanta joined the Welcoming Cities and Counties, an initiative of Welcoming America – a national, grassroots-driven collaborative that works to promote mutual respect and cooperation between foreign-born and native-born Americas. As one of 41 U.S. cities participating in the initiative, Atlanta has access to new tools and resources to help advance welcoming resolutions, initiatives and strategies, receive support for efforts to foster more vibrant, inclusive, and welcoming communities and participate in national and translantic learning exchanges that highlight best practices from globally competitive cities. Americas Society/Council of the Americas (AS/COA), an international business and policy organization working in new immigrant gateway cities around the country, is also serving as a strategic partner for the Welcoming Atlanta initiative as is the Partnership for a New American Economy, an organization that brings together leaders from all sectors to make the case for sensible immigration reform as a way to boost economic growth and create jobs for Americans.

On Thursday, as part of National Welcoming Week, Mayor Reed will join Welcoming America and officials from Detroit, MI and Dayton, OH on a national press call to further discuss Atlanta's commitment to

achieving global competitiveness by being welcoming.

**Members of the Welcoming Atlanta Working Group include:**
• Co-Chair: Jeffrey Tapia, Executive Director, The Latin American Association
• Co-Chair: Charles Kuck, Managing Partner, Kuck Immigration Partners
• Rudy Beserra, Vice President of Latin Affairs, The Coca-Cola Company
• Alejandro Coss, President, Latin American Chamber of Commerce
• Walter Dukes, Metro Atlanta Region Senior Vice President, Georgia Power
• Jason Esteves, Board Member, Atlanta Public School Board of Education
• Jerry Gonzalez, Executive Director, Georgia Association of Latino Elected Officials
• Helen Kim Ho, Executive Director, Asian American Legal Advocacy Center
• Eloisa Klementich, Managing Director Business Development, Invest Atlanta
• Stefanie Jehlitschka, Vice President, German American Chamber of Commerce
• Pedro Marin, Representative, House District 96
• Z. Ileana Martinez, Partner, Thompson Hine
• Chuck Meadows, Vice President of Public Policy, Metro Atlanta Chamber of Commerce
• Kathy Palumbo, Director of Community Partnerships, The Community Foundation for Greater Atlanta
• Emily Pelton, Chair, Coalition of Refugee Serving Agencies
• Hon. Ricardo Cámara Sánchez, Consul General, Consulate General of Mexico, Atlanta
• Liz Sanford, Manager of Community Engagement, Atlanta Regional Commission
• Ivan Shammas, General Manager, Telemundo
• Tisha Tallman, President & CEO, Georgia Hispanic Chamber of Commerce
• Ambassador Geoffrey Teneilabe, Consul General, Consulate General of Nigeria, Atlanta

Strategic Partners
Richard Andre, Americas Society/Council of the Americas
Kate Brick, Americas Society/Council of the Americas
David Lubell, Welcoming America
Rachel Peric, Welcoming America
Dan Wallace, Partnership for a New American Economy

### ###

For more information about the City of Atlanta, please visit http://www.atlantaga.gov or watch City Channel 26. Follow the City of Atlanta on Facebook and Twitter @CityofAtlanta. Follow Mayor Reed on Facebook and Twitter @Kasim Reed

Austin promotes immigrant-friendly, welcoming environment | AustinTexas.gov - The Official Website of the City of Austin



the official website of the City of Austin

Department » Economic Development » Media » Austin promotes immigrant-friendly, welcoming environment



Economic Development Department



## CITY OF AUSTIN

FOR IMMEDIATE RELEASE
Release Date: Jun. 27, 2013
Contact: Natalie Betts    512-974-7833    Email

## AUSTIN PROMOTES IMMIGRANT-FRIENDLY, WELCOMING ENVIRONMENT

Austin's hospitable reputation precedes itself once again with its new initiative designed to ease the transition to life in Austin for international newcomers.

The City of Austin's International Welcome Program, has joined the ranks of the Welcoming Cities and Counties Initiative by Welcoming America, as one of 14 innovative cities leading the nation in promoting immigrant-friendly, welcoming environments.

Welcoming America, a national grassroots-driven collaborative, works to promote mutual respect and cooperation in communities to help immigrants integrate into the social fabric of their adopted hometowns, and has also been recognized as a 2013 Clinton Global Initiative Commitment to Action.

"Austin's immigrant population is a key driver of our economic prosperity and an asset to our entire community," said Natalie Betts, the City of Austin's Acting International Economic Development Program Manager. "It is imperative for our continued success that new immigrants feel welcome and at home in Austin, and I'm thrilled to be joining this national initiative to learn new welcoming strategies from other communities."

Welcoming Cities and Counties affiliates will share promising practices with each other and serve as a model to help communities across the nation learn from their local level innovations that support economic development and create vibrant global communities that are great places to live, work and do business.

Welcoming Cities and Counties Affiliates include:

A11

Case 1:14-cv-00254 Document 127 Filed on 01/30/15 in TXSD Page 17 of 879

Allegheny County, Pennsylvania
Austin, Texas
Baltimore, Maryland
Boise, Idaho
Chicago, Illinois
Columbus, Ohio
Dayton, Ohio
High Point, North Carolina
Lincoln, Nebraska
Macomb County, Michigan
Montgomery County, Maryland
Philadelphia, Pennsylvania
St. Louis, Missouri (city)
St. Louis, Missouri (county)

The City's International Economic Development Program within the Economic Growth and Redevelopment Services Office hosts the International Welcome Program. These quarterly orientation sessions serve as information and resource fairs, and convene representatives from City agencies and community partners to provide valuable information to new residents. Information on everything from how to connect utilities, or start a business to access City resources such as libraries is shared.

The Program also offers a Welcome Ambassadors service which matches international newcomers with local volunteers who familiarize newcomers with Austin and act as their point of contact for questions about life in the United States and Austin. In partnership with GlobalAustin, the program also developed an online portal for all things international in Austin, www.internationalaustin.org, which will soon include a robust online Newcomer's Guide.

For information about the City of Austin International Welcome Program, visit http://austintexas.gov/internationalwelcome.

<div align="center">###</div>

City of Austin International Economic Development Program
The City of Austin International Economic Development Program is housed within the Economic Growth and Redevelopment Services Office and is dedicated to promoting Austin's position in the global marketplace to create a sustainable cultural and economic environment for the community that enhances the livability and economic vitality of Austin.

Share   Communications and Public Information Office 301 W. 2nd Street, Austin, TX 78701

A12



Office of Mayor William Peduto » Mayor Peduto Launches News

Home | Mayor | City Council | City Controller | Public Safety | City Directory | 311 | Resources | AskPGH | Search

## OFFICE OF MAYOR WILLIAM PEDUTO

# Mayor William Peduto launches Welcoming Pittsburgh Initiative

City joins nationwide effort to boost quality of life and economic prosperity for immigrants and native born residents

PITTSBURGH, PA - With more than 100 community leaders in attendance, Mayor William Peduto today launched Welcoming Pittsburgh, an effort to improve quality of life and economic prosperity for immigrants and native born residents alike.

The initiative is part of Welcoming America, a national and grassroots-driven collaborative that promotes mutual respect and cooperation between foreign-born and U.S.-born Americans.

Through Welcoming Pittsburgh the city will support efforts such as resettling refugees eager to build new homes in the city; working with organizations including the Allegheny Conference on Community Development, Global Pittsburgh, and Vibrant Pittsburgh to support efforts that keep international students in the city and their contributions to the city's economy; reviving its Sister Cities program with the help of the World Affairs Council; and supporting job growth of all kinds, from small businesses to manufacturing to high-tech.

"Pittsburgh has long been home to generations of immigrants -- it drew my family here and so many others -- but there is much more we can do, especially in supporting business opportunities and innovation among all our residents, old and new. While we celebrate our immigrant past, we need to build on a welcoming future," Mayor Peduto said.

Studies show Pittsburgh lags behind most peer cities in net immigration, yet the immigrants it does host are among the highest-educated in the nation.

As of early 2013, the had more than 1300 Bhutanese, nearly 500 Burmese, almost 200 Iraqi, and over 260 Somali who resettled in Pittsburgh. Also the landscape is changing for the region's Latinos -- across the county, there are 24,000 Hispanics, most of which live in the city.

"It was our great honor to host Mayor Peduto's kickoff of Welcoming Pittsburgh," said CEED Executive Director Rufus Idris. "As an immigrant from Nigeria and someone who works directly with this population, I see firsthand every day the numerous contributions the immigrant community is making in Pittsburgh through innovative startups and new business ventures."

Welcoming Pittsburgh will work to bring those communities out from the shadows and let them know that their stories matter. The city is currently taking applications for those seeking to join a Welcoming Pittsburgh Advisory Council to contribute to the rollout of the effort's implementation plan and set key initiatives. Policies will also be shaped with the guidance of this core team. The Council will also be tapped to lead a listening tour to engage community members every step of the way.

Those interested in joining the Welcoming Pittsburgh Advisory Council may apply at: http://pittsburghpa.gov/personnel/jobs/pittsburgh_advisory_council The application will remain open until June 20.

Additionally, the fall 2014 class of the city's Civic Leadership Academy is set to include half new Americans/immigrant leaders, totaling roughly 10 to 15 people of the 25 to 30 enrolled in the class. Depending on the interest from the community, next year the city may launch a CLA class specifically for new Americans to further open the doors of local government to all of Pittsburgh

June is Immigrant Heritage Month, and speakers at the Welcoming Pittsburgh event

### Published:
**Wednesday, May 28, 2014**

### Contacts
**Timothy McNulty**
Communications Manager
City of Pittsburgh
Cell: 412-660-1999
Email

### Tools


### More Education & Neighborhood Reinvestment articles

Chief Education & Neighborhood Reinvestment Officer Ends City Government Service
Jan 16, 2015

Mayor William Peduto Appointed Co-Chair of National League of Cities Council on Youth, Education and Families
Jan 16, 2015

Mayor William Peduto Addressing White House Summit on Early Education
Dec 10, 2014

Pittsburgh and Allegheny County Take Next Steps in "My Brother's Keeper" Initiative
Oct 24, 2014

Mayor's Education Task Force to Hold Fourth Meeting Tuesday Evening
Oct 20, 2014

📁 Archive

### Links
Home
Biography
◄ Executive Team
◄ Transition Teams
Feedback Form
Group Proclamation Form
Individual Proclamation Form
Boards, Authorities & Commissions
servePGH

### Communications
Press Releases
Letter of Support Request Form
Executive Orders

### Stay Updated
 


### Share this page


### Stay Connected




talked about the Global Great Lakes conference coming to the city June 12, and a
regional Puerto Rico outreach strategy that includes a concert by El Gran Combo on
June 22. Both are free events and open to the public.

Wednesday's ceremony included remarks from: CEED Program Officer Lavender
Wachira; City of Pittsburgh Nonprofit and Faith-Based Manager Betty Cruz;
philanthropist and community leader Cecile Springer; Latino Family Center Executive
Director Rosamaria Ponciano; immigration attorney and former diplomat Kamana
Mathur; Vibrant Pittsburgh CEO Melanie Harrington; and Allegheny Conference
Executive Vice President, Corporate Relations, Bill Flanagan.

In addition to community leaders who spoke to their immigrant story, attendees enjoyed
performances by the Balafon West African Dance Ensemble, led by Artistic Director
Kadiatou Conte-Forte, and Bésame with Jorge Delgado on guitar, Paul Cindric on sax,
Melissa Alliston on percussion, and Roger Day on tuba. The musicians set the tone for
the day by adding a cultural feel spanned the globe. Light refreshments were provided
by Kenyan-owned Lydia's Coffeehouse.

###

A14

Case 1:14-cv-00254 Document 127 Filed on 01/30/15 in TXSD Page 20 of 879




May 13, 2008

A CONVERSATION WITH ALFREDO QUIÑONES-HINOJOSA

# A Surgeon's Path From Migrant Fields to Operating Room

By CLAUDIA DREIFUS

Correction Appended

At the Johns Hopkins School of Medicine, Alfredo Quiñones-Hinojosa has four positions. He is a neurosurgeon who teaches oncology and neurosurgery, directs a neurosurgery clinic and heads a laboratory studying brain tumors. He also performs nearly 250 brain operations a year. Twenty years ago, Dr. Quiñones-Hinojosa, now 40, was an illegal immigrant working in the vegetable fields of the Central Valley in California. He became a citizen in 1997 while at Harvard.

Q. WHERE DID YOU GROW UP?

A. Mexicali. My father had a small gas station. The family's stability vanished when there was a devaluation of the Mexican peso in the 1980s. My father lost the gas station, and we had no money for food. For a while, I sold hot dogs on the corner to help.

As the economic crisis deepened, there seemed no possibility for any future in Mexico. I had big dreams and I wanted more education. So in 1987, when I was 19, I went up to the border between Mexicali and the United States and hopped the fence.

Some years later, I was sitting at a lunch table with colleagues at Harvard Medical School. Someone asked how I'd come to Harvard. "I hopped the fence," I said. Everyone laughed. They thought I was joking.

Q. AFTER YOU CROSSED THE BORDER, WHAT KIND OF WORK DID YOU FIND?

A. I was a farm laborer in the San Joaquin Valley, seven days a week, sunup to sundown. I lived in this little trailer I paid $300 a month for. It didn't take long to see that farm work was a dead end.

After a year of it, I moved to Stockton, where I found a job loading sulfur and fish lard onto railroad freight cars. My eyes burned from the sulfur, and my clothes smelled from fish lard, but it paid me enough so that I was able to go to night classes at San Joaquin Delta Community College. There, I met this wonderful human being, Norm Nichols, the speech and debate coach. He took me into his family and mentored me. Norm helped me apply for and get accepted to the University of California, Berkeley.

Once at Berkeley, I took a lot of math and science classes to up my G.P.A. Science and math are their own language. You didn't need to write in perfect English to do well in them. I pulled straight A's in science. In my senior year, someone told me to go see this guy, Hugo Mora, who helped Hispanics with science talent. I brought him my transcript and he said: "Wow! With grades like these, you should be at Harvard Medical

School." That's how I got to Harvard. All along, I had much luck with mentors.

Q. DID YOU FIND HARVARD TOUGH?

A. Not really. Compared to working in the fields, it was easy. The question was what kind of doctor should I become? For a while, I thought I'd be a pediatric oncologist, because I wanted to help children. But then I thought, I'm good with my hands. Maybe I should do surgery.

One day, I was walking through Brigham and Women's Hospital and I saw Dr. Peter Black, the chairman of neurosurgery. I introduced myself, and he invited me that day to come to watch him do an operation. As it happened, he was doing an "awake" surgery, where the patient's brain is exposed and the patient is awake so that the surgeon can ask questions. As I watched that, I fell in love with brain surgery.

Q. WHAT ABOUT IT SPOKE TO YOU?

A. Imagine, the most beautiful organ of our body, the one that we know least about, the one that makes us who we are, and it was in Dr. Black's hand. It was in front of me. It was pulsating! I realized I could work with my hands and touch this incredible organ, which is what I do now. I cannot conceive of a much more intimate relationship than that. A patient grants you the gift of trusting you with their lives, and there is no room for mistakes.

Dr. Peter Black, he was a very humble person. And he took me under his wing. So here again, I was very fortunate with mentorship.

Q. I'M TOLD THAT YOU DO SOMETHING THAT NOT ALL SURGEONS DO: YOU SPEND A LOT OF TIME WITH PATIENTS BEFORE AN OPERATION. WHY?

A. I meet them several times, and their families. They don't know if they are going to wake up after the operation. Not all the time am I successful. I do about 230 to 240 brain tumor operations a year. The majority make it. Some have complications. And some — 2 to 3 percent — it takes awhile for the patients to wake up. I need to meet everyone so that they know the risks. But getting to know these patients, it's the most painful part.

I was at a funeral yesterday. This was a 21-year-old man with a young wife, pregnant. Three surgeries, and the tumor kept growing and growing. And he told me, "There's no possible way I'll give up." He fought so hard. He trusted me with his life. Not once, several times. I owed him my presence.

Q. HOW DO YOU HANDLE SUCH LOSSES?

A. One of the ways I work it out is through research, the laboratory. I'm trying to learn about the causes of these recurring tumors. The patients, they can donate tissue, which we will examine.

My hypothesis is — and there are quite a few scientists who believe this — there are within these brain tumors a small subset of cells that can keep growing, even when you think you've taken them all out. We call them brain stem cells. They can keep making themselves, and they can make "daughter cells" that can become anything else in the brain. They have the ability to go to sleep for a little bit and then wake up and

A16

do it again. So we're trying to identify this small subset of cells we may be leaving behind when we make these beautiful surgeries.

Q. HAVE YOU ACTUALLY FOUND THEM?

A. Yes, but only in the laboratory. When we've found them, they may be a product of the experimental conditions of the laboratory. We haven't found them yet in live patients. The next challenge is to see if they truly exist in the human brain while the patient is alive.

Q. WHEN YOU HEAR ANTI-IMMIGRANT EXPRESSIONS ON TALK RADIO AND CABLE TELEVISION, HOW DO YOU FEEL?

A. It bothers me. Because I know what it was that drove me to jump the fence. It was poverty and frustration with a system that would have never allowed me to be who I am today.

As long as there is poverty in the rest of the world and we export our culture through movies and television, people who are hungry are going to come here. There's no way to stop it.

This article has been revised to reflect the following correction:

Correction: May 14, 2008
An article on Tuesday about a neurosurgeon who came to the United States as an illegal immigrant 21 years ago misstated the doctor's given name in some copies. He is Alfredo Quiñones-Hinojosa, not Alberto.

Copyright 2008 The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map

Home   >   Dr Q's Story – A Doctor Without Borders

## DR-Q'S STORY

### A Doctor Without Borders

From the humblest beginnings in Mexicali, Mexico, Dr. Quiñones-Hinojosa literally jumped the border fence into the United States for a better future. With a drive and passion unparalleled, he worked to become an internationally renowned neuroscientist and neurosurgeon at Johns Hopkins Hospital in Baltimore, Maryland. Whether he's comforting a patient, in the operating room, or working on his cutting-edge research, Dr. Q is always approachable, inventive, and driven.

He enters an exam room in the Johns Hopkins Outpatient Center, sits down on an easy-rolling chair, and greets his patient and their loved ones with a sincere smile and a warm handshake. With an accent endearing and a presence comforting and confident, Dr. Alfredo Quiñones-Hinojosa begins every patient consultation the same way—with a modest personal query. "How's your family," he'll say to a post-op patient. Or to someone he's meeting for the first time a more open-ended "tell me about yourself." Dr. Quiñones, or Dr. Q as his patients know him, believes that the personal interaction he has with his patients is what makes his job so special. "You can literally train a monkey to do what we do. The challenge in what we do is not in the surgery—it's in the emotional connection you form with the patients."

Dr. Quiñones started out as the first-born child of six, growing up outside Mexicali, Mexico. Always the advanced go-getter, he started working at the age of five, selling food to drivers at gas stations to make some extra money for his family. Though they were a poor family, Q himself did exceptionally well in public schools, and graduated with a teaching license from a local college by the time he was 18. He then decided that it was time to join his extended family up north, to advance his career and return to help his family and his country. But that soon became a false dream for young Alfredo.

In 1987, at the age of 19, Alfredo Quiñones-Hinojosa



literally jumped the border fence between Mexico and the United States. Border police caught him and sent him back, but later that day he tried again, and succeeded. This however was only the beginning, for he had no money, and at the time couldn't speak English.

"I knew the risks," he said. "I had big dreams, and I would rather risk my life than stay in Mexico...I never felt like my life was hard though. It was a privilege for me to be here. I enjoyed every step because I knew it was all leading to something bigger."

Quiñones made his way to Fresno, California where he worked for two years as a cotton picker, painter, and welder. His home was a trailer patched together with plywood, and he later shared a one-room apartment with five other members of his family. One day in the fields he told his cousin he wanted to go to school, learn English, and have a better future, but his cousin looked at him in amazement and said "this is your future! You came to this country to work in the fields just like us." Refusing to accept this, Alfredo began putting himself through school, learning English, tutoring other Spanish-speaking students in math and science, practicing his language skills on the debate team, and working as a welder for a railroad company.

It was around this time that he almost died. Still an illegal immigrant, Q was working for the railroad crew on April 14, 1989, when, at just 21 years of age, he fell into an empty petroleum tank, a fall of about 18 feet. Alive, he began climbing up a rope tossed down by his coworkers and watched his whole life flash before his life. As he reached the top and grabbed a hand to help pull him up, Alfredo was overcome by fumes and fell back into the tank once more, this time waking up in an intensive care unit in a nearby hospital.

"I've always felt that everything that has happened since then has been a gift. I don't think I was meant to go beyond that." It was a miraculous wake-up call, an experience that he tries to give to his patients every day in surgery: you are lucky to be alive, now live your life to its fullest potential.

In 1992, Quiñones happily quit his railroad job for good, and received a scholarship to University of California Berkeley where he majored in psychology. Though he

A19

struggled with speaking and writing assignments, Alfredo took many calculus, physics, and chemistry courses to keep his grade point average up. There he found a mentor in the psychology department—Joe Martinez and his neurobiology lab. It captured Q's imagination. He had big plans. While deciding between law school and medical school he thought of his grandmother. She was a curandera, or village healer, back in Mexicali, Mexico and inspired him to choose medicine. Q did an honors thesis on neuroscience, and was encouraged by Martinez and his other mentor, director of UC Berkeley's Hispanic Center of Excellence Hugo Mora, to apply to Harvard Medical School, where he was accepted.

At Harvard Alfredo was introduced to Ed Kravitz and his famous neurobiology lab by Martinez. Kravitz was a Bronx street kid who had made Harvard professor by 30 and he and Quiñones bonded instantly. Q himself became very distinguished not only academically, but for his outreach activities helping less fortunate students by giving them a place to stay. His years at Harvard included large amounts of research fellowships and academic honors, his American citizenship, the birth of his daughter, and finally graduating cum laude (with honors) and giving the commencement speech for his Harvard med class of 1999.

For the next six years Dr. Quiñones (as he now officially was) did his internship, residency, and some post-doctoral work at the University of California San Francisco. Over this time he found his true calling as a neurosurgeon and in 2005 came to Johns Hopkins as a professor and surgeon specializing in brain cancer and pituitary tumors. His official titles today include Associate Professor of Neurological Surgery, Associate Professor of Oncology, Director of the Brain Tumor Surgery Program at Johns Hopkins Bayview Medical Center, and Director of the Pituitary Surgery Program at Johns Hopkins Hospital.

When he's not teaching or in the operating room, Dr. Quiñones is in the lab working on his research to try and cure cancer. He believes that there are natural stem cells in the brain that, if put in just the right spot, could halt the spread of cancerous cells in the brain, working more effectively naturally than any surgery or radiation

A20

treatment currently in use. There is still a lot of work to be done, but Dr. Quiñones-Hinojosa looks forward to a day when he no longer has to feel like he is entering the brain illegally, and cancer becomes an illness no more troublesome than the common cold.

---

LEARN MORE ABOUT DR Q IN THE VIDEO SECTION OF

THIS WEBSITE !

A21

# The Washington Post

## What It Takes: From Salvadoran immigrant to millionaire owner of Todos Supermarkets

Advertisement

By Avis Thomas-Lester
Washington Post Staff Writer
Monday, September 27, 2010; 30

Northern Virginia entrepreneur Carlos Castro was a 24-year-old factory worker living in poverty in San Salvador when he decided to try his luck at coming to the United States more than 30 years ago.

It was 1980 and El Salvador was in the midst of a political conflict that would lead to 12 years of bloody civil war. Castro, then the father of a young daughter and son, left his country on a warm January day, with his cousin, among a group of men and women escorted by a man hired to get people into the U.S. illegally. The trip took two weeks, from Central America through the rugged terrain of Mexico, across the Rio Grande River to El Paso. Minutes after the group arrived, a van in which they were riding was pulled over by border patrol agents. Everyone inside was carted off to a detention center and later deported. A few weeks later, Castro and his cousin headed north again and this time made it to California where he worked odd jobs before heading east to the District.

His first local job was scrubbing toilets at a bar in Adams Morgan. He worked as a cook and dishwasher. He stood with other day laborers on street corners to compete for jobs to send money home to his family. After his wife, Gladis, entered the United States in 1982, he focused on starting a business. In 1985, he bought his first car and started a company doing odd jobs. He later started a small construction company. In 1990, 10 years after he left El Salvador, he opened the first Todos Supermarket, in Woodbridge.

Today, Castro, 55, is a U.S. citizen -- and a millionaire whose company was named one of the Fantastic 50 businesses by the Virginia Chamber of Commerce for three years straight beginning in 2005 and business of the year in 2007 by the Virginia Merchant and Retailers Association. He operates Todos (the Spanish word for "everybody") in Woodbridge and Dumfries, which specializes in foods and services for people from Latin America, the Caribbean and parts of Africa. In January, he will relocate his 16,000-square foot Prince William Plaza store to 53,000 square feet of space in a former Giant supermarket in nearby Marumsco Plaza. He also owns an insurance company and provides services including money transfer, a notary public and tax preparation to his customers.

Castro said he feels fortunate, despite seeing a slowdown in his business over the last year because of the economic crisis. He slashed his advertising budget, reduced his profit margin on some products, sliced his salary in half, froze pay raises, left vacant jobs unfilled and renegotiated prices with suppliers to cut costs.

"We are slowly recovering some of the ground we lost with the economic bust," he said. "We are seeing some increase in sales."

Castro is also an advocate for illegal immigrants who came to this country seeking opportunity. Now the

father of three grown children and a 12-year-old son, he said he knows their struggle.

"It was difficult when I had to leave my wife and family behind to come to the United States. We were all living at my mother's house, and I had to provide for my wife, my mother and father and my family," he said. "I worked at restaurants so I could have coffee and muffins in the morning and a free lunch. I didn't eat the lunch -- I saved it for dinner. That saved me a lot of money. I also had part-time jobs in the evenings cleaning offices. With the two salaries, I was making $180 per week. I was able to send home $100. That was a lot of money in El Salvador back then."

[View all comments](#) that have been posted about this article.

---

**Post a Comment**

View all comments that have been posted about this article.

Comments that include profanity or personal attacks or other inappropriate comments or material will be removed from the site. Additionally, entries that are unsigned or contain "signatures" by someone other than the actual author will be removed. Finally, we will take steps to block users who violate any of our posting standards, terms of use or privacy policies or any other policies governing this site. Please review the full rules governing commentaries and discussions. You are fully responsible for the content that you post.

---



Sponsored Links

**American Express Travel**
Explore Great Travel Offers When Booking With American Express.
americanexpress.com/Travel

**Travel Guard® Insurance**
Get Travel Insurance Coverage for Your Vacation!
www.travelguard.com

**Bermuda 50% Off Pink Sale**
Save with 50% on Bermuda Hotels. Book Now & Travel Through April 30th.
www.GoToBermuda.com

Buy a link here

© 2010 The Washington Post Company

(http://www.huffingtonpost.com/small-business)

Edition: U.S. ▾    Like  13k    Follow     Newsletters     Huffington Post Search

**FRONT PAGE**     **POLITICS**     **WORLDPOST**     **BU**
**(HTTP://WWW.HUFFINGTONPOST.COM) (HTTP://WWW.HUFFINGTONPOST.COM/POLITICS/) (HTTP://WWW.HUFFINGTONPOST.COM/THEWORLDPOST/) (HTTP://WWW.HUFFIN**

Business (http://www.huffingtonpost.com/business/)   Small Business (http://www.huffingtonpost.com/small-business/)

- Success Stories (http://www.huffingtonpost.com/news/small-business-success-stories/)
- News and Trends (http://www.huffingtonpost.com/news/small-business-news-and-trends/)
- What is Working: Small Businesses (http://www.huffingtonpost.com/news/what-is-working-small-businesses/)   •   Build A Biz (http://www.huffingtonpost.com/news/buildabiz/)
- C-Suite (http://www.huffingtonpost.com/news/c-suite/)   •   Financial Education (http://www.huffingtonpost.com/news/financial-education/)
- Small Business Voices (http://www.huffingtonpost.com/news/small-business-voices/)

Sponsored Links

 LifeLock® Official Site
Confidence in a Connected World: LifeLock Ultimate Plus™.
LifeLock.com

 Bermuda 50% Off Pink Sale
Save with 50% on Bermuda Hotels. Book Now & Travel Through April 30th.
www.GoToBermuda.com

 Janean Chun (/janean-chun/)    Become a fan    (/users/login/)
(/users/becomeFan.php?of=hp_blogger_Janean_Chun)
janean.chun@huffingtonpost.com
(mailto:janean.chun@huffingtonpost.com)

# Carlos Castro, Founder Of Todos Supermarket, Says Business Climate Much Harsher For Immigrants Today

Posted: 06/27/2012 11:28 am EDT   |   Updated: 06/27/2012 3:48 pm EDT



Todos Supermarket

ADVERTISEMENT

Carlos Castro thought coming to America would free him from life in war-torn El Salvador. But after paying someone $800 to help him cross the border in 1979, Castro was caught by immigration officers and spent 45 days in a detention facility. "My dreams of being in the U.S. or being safe were suddenly cut off," Castro said.

He kept trying. Castro went on to not only realize those dreams, but to attain the so-called American Dream. Soon after being deported, he returned to the U.S. in 1980, became a citizen in 1990 and started Todos Supermarket (http://todossupermarket.com/), which specializes in Hispanic foods and services. Today his company earns $18 million annually and employs 140 people.

Immigrants are now twice as likely to start a new business as someone born in the U.S. (http://www.huffingtonpost.com/2012/05/08/immigrants-new-businesses_n_1499719.html) But would Castro be able to achieve his level of success if he immigrated today, given the government crackdown on undocumented immigrants, passage of strict state rules in light of the lack of federal immigration reform and the Supreme Court's recent split ruling on Arizona's controversial immigration law (http://www.huffingtonpost.com/2012/06/25/arizona-immigration-law-ruling_n_1614067.html?flv=1)?

"Conditions are much worse. I don't think I would have had the same opportunities that luckily I had 30-something years ago," Castro said. "I believe nothing is impossible, but it would be nearly impossible the way things are now."

## SUGGESTED FOR YOU

- 2. Man Protests Arrest With Unforgettable Mug Shot



...to the country that gave him a new life, and how current laws restrain his ability to create jobs.

**What was it like growing up in El Salvador?**

My family had 10 children living in a two-room house without running water or a sewer system. We had to work from an early age, running errands for neighbors. After sixth grade, I attended school at night so I could work as a laborer during the day.

**How did you escape that cycle of poverty?**

My father told us that to succeed, we needed to read a lot, because knowledge was already in books. The book "You Can Become The Person You Want To Be" [by Robert H. Schuller] convinced me that success was a matter of how much effort I put into my life. I graduated from high school with honors. And I was extremely happy with my job as a technician.

Coming to the U.S. was never in my plans. But the [Salvadoran civil] war was taking a turn for worse. There were kidnappings, and my town was taken over by guerrillas. You could feel bullets flying around you. Being immersed in that environment for so many years was getting to be too much. A family friend offered to help me with the expenses to come to the U.S. I found someone bringing people from El Salvador all the way to Texas, but we got stopped on the way to L.A.

**How did you come back?**

Someone was helping my cousin come this way, so I tagged along. I am a man of faith and I knew that God would provide us the way if he wanted us to get through. We crossed the border to Tijuana and from there went to L.A, then Washington [D.C.], where I worked for an architect as a laborer, then a carpenter, then a foreman. The architect sponsored my wife as a maid, and it was through my wife that me and my kid got residency in 1985. We went back to El Salvador to see the consulate and then had to ask the U.S government for forgiveness. After five years of being residents, we became U.S. citizens.

**How did you feel becoming a U.S. citizen?**

A big sense of pride. Here, your vote, your voice counts, and you can get anything accomplished. I thought, this is a great opportunity to make the best of this. I set up a remodeling company, then started the grocery store so my wife could run it rather than cleaning houses. In 1992, I abandoned my construction business to run the grocery store. We predicted that because of the low cost of housing and the proximity to D.C., this area would become a hub for immigrants. We started at 2,500 square feet, then because of the demand we moved to 5,000 square feet in 1996, then again in 2001 to 18,000 square feet. Our final move to 52,000 square feet was to serve the entire community, not just my Hispanic customer base.

**Did owning a business feel like the American Dream?**

Absolutely. By age 48, I owned a house and owned a business, which gave me the opportunity to help others achieve their dreams, the way I was helped by other people. I'm on the board of the community college and the hospital, and I'm involved in the political world, making sure we can represent the Hispanic community. I always prayed to God that if I had the opportunity to make money, to keep me humble and give me the strength to help other people.

**Do you think recent state laws targeting immigrants are stifling those kinds of opportunities?**

I think they're creating confusion. I've seen people change from seeing Latinos' potential to being suspicious. One day I was walking out of a pharmacy, and somebody said to me, "You guys are up to no good." She didn't know I was a U.S. citizen. She just put that label on me. We're made to feel that we're an underclass, even if we're successful professionals. Although I have always tried to ignore it, it's there.

**How are you participating politically in this issue?**

I have mainly given my opinion to legislators, participating in forums or town hall meetings in hopes that one day we'll find a magic bullet that will bring about a solution. Hopefully before the election, one of the candidates will come up with a plan that works.

**How do immigration policies affect your hiring? Are you able to help others the way the architect helped you?**

a day ago huffingtonpost.com The Huffington Post Huffington Post Mobile David Moye David Moye Most Popular on HuffPost

- 1. Guess Who This Little Cutie Grew Up To Be



21 hours ago huffingtonpost.com The Huffington Post Huffington Post Mobile mandy moore throwback thursday

3. Feminist, Body-Positive Pin-Ups Are Unbelievably Gorgeous



3 days ago huffingtonpost.com The Huffington Post Huffington Post Mobile Nina Bahadur Nina Bahadur Most Popular on HuffPost

- 4. Bikini'd Miley Cyrus Has Some Fun In The Sun With Patrick Schwarzenegger



a day ago huffingtonpost.com The Huffington Post Huffington Post Mobile Stephanie Marcus Stephanie Marcus Most Popular on HuffPost

- 5. #TBT: Sofia Vergara's Life Before 'Modern Family' Was Very Different



3 days ago huffingtonpost.com The Huffington Post Entertainment Huffington Post Mobile The Huffington Post Carolina Moreno Carolina Moreno Most Popular on HuffPost

- 6. Simple Experiment Debunks Theory About Dino-Killing Asteroid



6 hours ago huffingtonpost.com The Huffington Post HuffingtonPost.com (AOL) Macrina Cooper-White Macrina Cooper-White Most Popular on HuffPost

- 7. South Korean Girls Try American Snacks, Are Promptly Grossed Out

2 days ago huffingtonpost.com The Huffington Post Huffington Post Mobile Taylor Trudon Taylor Trudon Most Popular on HuffPost

- 8. Saudi Arabia To Delay Activist's Flogging For Second Time

In this article, there are people that would have become citizens, but I can't do that because of new regulations. I want to go out tomorrow and hire 10 people. I just can't because of the laws in place.

I interviewed a young lady this week and determined she didn't have a work permit or social security. I had to explain to her that my hands are tied. It was hard -- I came here illegally and had to tell her I couldn't hire her because she [didn't have documentation]. It's something we run into every day. It's very difficult, knowing there are good people who want jobs to feed their kids, and chances are, they can't get a job. It breaks my heart to know these people can't get jobs.

**Entrepreneur Spotlight**

Name: Carlos Castro
Company: Todos Supermarket
Age: 57
Location: Two locations in Woodbridge and Dumfries, Va.
Founded: 1990
Employees: 140
2012 Projected Revenue: $18 million
Website: todossupermarket.com (http://todossupermarket.com/)

ALSO ON THE HUFFINGTON POST

Carlos Castro, Owner of Todos Supermarket        1 of 5   ‹ Close ›



Todos Supermarket

      Next

MORE: Success Stories, Hispanic Supermarket, Immigrant Entrepreneurs, Immigrant Success Stories, Todos Supermarket, Carlos Castro, Entrepreneur Spotlight, Immigrant Business Owners

Suggest a correction

Share
(https://www.facebook.com/sharer/sharer.php?u=%3A%2F%2Fwww.huffingtonpost.com%2F2012%2F06%2F27%2Fcarlos-castro-todos-supermarket-former-undocumented-immigrant-starts-business_n_1597663.html)

(https://www.linkedin.com/cws/share?url=http://www.huffingtonpost.com/2012/06/27/carlos-castro-todos-supermarket-former-undocumented-immigrant-starts-business_n_1597663.html)


a day ago huffingtonpost.com The Huffington Post AOL Forex Eline Gordts Eline Gordts Most Popular on HuffPost

9. Thanks To John Kerry, Israel Stunt Backfires On Boehner



FOLLOW HUFFPOST

Email Address                Sign me up!

☑ The Morning Email    ☑ Small Business

Get top stories and blog posts emailed to me each day..

SuperGrains Oatmeal+
REAL FRUIT, REAL NUTS & SUPERGRAINS
BANANA WALNUT
REAL MEDLEYS OATMEAL+
Learn More Now

You May Like



- 1. [This Is The Least Sexy Thing You Can Do On A First Date](#) 4 months ago [live.huffingtonpost.com](#) [HuffingtonPost.com (AOL)](#) hpldiscover



- 2. [After Hearing This, You May Want To Quit Your Job And Go Work For...](#) 10 months ago [live.huffingtonpost.com](#) [HuffingtonPost.com (AOL)](#) technology news



Sponsored Links

 **Buy LifeLock® Protection**
LifeLock Ultimate Plus™ With New Data Breach Notifications
LifeLock.com

 **TaxSlayer**
Max your refund with TaxSlayer.
https://www.taxslayer.com

 **New York's NEW RULE**
New Car Insurance Rule in New York Has Drivers Furious!
SmarterLifeDaily.com

Around the Web



Todos Super Market - UVA Darden (http://www.darden.virginia.edu/web/Tayloe-Murphy-Center/Resilience/Todos-Super-Market/)

Business Leaders, Local Politicians Celebrate Store Opening ... (http://woodbridge-va.patch.com/articles/business-leaders-local-politicians-celebrate-store-opening)

Todos Super Market Named as Finalist in UVA's Resilience Award ... (http://www.prlog.org/11618660-todos-super-market-named-as-finalist-in-uvas-resilience-award-competition.html)

## Conversations

| Add a comment... |

☑ Also post on Facebook          Posting as Sonia Lin ▾     [Comment]

Facebook social plugin

**54 people** are discussing this article with **117 comments**

## Comments are closed on this entry.

[Highlighted](#)  [Most Recent](#)  [Oldest](#)  [Most Faved](#)  [My Conversations](#)

 mikennz (/social/mikennz?action=comments)     13
325 Fans

(/social/mikennz) It is the old "end-around" for getting citizenship. When he got deported (which was

A27

action=comments) think to get their children right 127 o get their children

and get citizenship? Nope. Why? Because it was "easier" to just run across the border. We have got to stop this. I don't care how successful a businessman he is now. I'm sure there are plenty of future successful businessman/women sitting it their native countries right now waiting to enter the country LEGALLY. Oh, I'll get the bleeding heart responses to this comment. We're making citizenship a joke.

28 JUN 2012 8:45 AM (HTTP://WWW.HUFFINGTONPOST.COM/SOCIAL/MIKENNZ/CARLOS-CASTRO-TODOS-SUPERMARKET-FORMER-UNDOCUMENTED-IMMIGRANT-STARTS-BUSINESS_N_1597663_164442756.HTML)

FAVE    SHARE    MORE

---



IMD89 (/social/IMD89?action=comments)    3
195 Fans

(/social/IMD89?
action=comments) Mikennz, execellent post we have had immigration laws on the books for years that have not been followed. The stance this administration has taken on this issue as we all know is nothing but a means to increase their voting base. Action's taken by them should make all of those who followed the law very angry.

28 JUN 2012 10:57 AM (HTTP://WWW.HUFFINGTONPOST.COM/SOCIAL/IMD89/CARLOS-CASTRO-TODOS-SUPERMARKET-FORMER-UNDOCUMENTED-IMMIGRANT-STARTS-BUSINESS_N_1597663_164476332.HTML)

FAVE    SHARE    MORE

---

4 PEOPLE IN THE CONVERSATION    Read Conversation ⟶

---



jss1220 (/social/jss1220?action=comments)    3
37 Fans    · En boca cerrada no entran moscas.

(/social/jss1220?
action=comments) Great article! I think it has a lot of interesting points. It seems that people arguing against more just immigration laws like the DREAM Act frequently leave out the many cases like Carlos Castro's. If immigrants are twice as likely to start a business here in the U.S., how can people argue that they are "stealing American jobs"? If we deported all of the people who were here illegally, (just like Carlos Castro once was) we'd be shipping out people with the potential to funnel as much money into our economy and create as many jobs as he has.

27 JUN 2012 12:48 PM (HTTP://WWW.HUFFINGTONPOST.COM/SOCIAL/JSS1220/CARLOS-CASTRO-TODOS-SUPERMARKET-FORMER-UNDOCUMENTED-IMMIGRANT-STARTS-BUSINESS_N_1597663_164236136.HTML)

FAVE    SHARE    MORE

---



Tich_Tran (/social/Tich_Tran?action=comments)    5
SUPER USER · 28 Fans

(/social/Tich_Tran?
action=comments) Hey Carlos baby we aren't against (legal) immigrant but ILLEGAL ALIENS. And you're now a businessman thank to BEING LEGAL. Illegal CAN'T LEGALLY own a business here. What part of LEGAL don't you comprehend?!

27 JUN 2012 4:09 PM (HTTP://WWW.HUFFINGTONPOST.COM/SOCIAL/TICH_TRAN/CARLOS-CASTRO-TODOS-SUPERMARKET-FORMER-UNDOCUMENTED-IMMIGRANT-STARTS-BUSINESS_N_1597663_164293829.HTML)

FAVE    SHARE    MORE

---

4 PEOPLE IN THE CONVERSATION    Read Conversation ⟶

---

ctyankee21 (/social/ctyankee21?action=comments)    12
2 Fans

(/social/ctyankee21?
action=comments) Setho a racist by his own words and actions

"In the past, we could hire people and apply for certifications the way my wife and I became citizens, but I can't do that because of new regulations. I want to go out tomorrow and hire 10 people -- I just can't because of the laws in place." ... what no white,black or asians looking for work where you live??

"I interviewed a young lady this week and determined she didn't have a work permit or social security. I had to explain to her that my hands are tied. It was hard -- I came here illegally and had to tell her I couldn't hire her because she [didn't have documentation]. It's something we run into every day. It's very difficult, knowing there are good people who deserve a job, need to raise their kids, and chances are, they can't get a job. It brings tears to my eyes. "

There are plenty of American born citizens, black, white and latino who deserve a job, need to raise their kids and yet this man crys cause he can't hire an Illegal

A28

this double standard brings tears to my eye!

28 JUN 2012 8:40 AM (HTTP://WWW.HUFFINGTONPOST.COM/SOCIAL/CTYANKEE21/CARLOS-CASTRO-TODOS-SUPERMARKET-FORMER-UNDOCUMENTED-IMMIGRANT-STARTS-BUSINESS_N_1597663_164441910.HTML)

FAVE     SHARE     MORE

---

jmac8577 (/social/jmac8577?action=comments)
0 Fans

(/social/jmac8577?action=comments) his so right there are so many Americans of all races looking for work and he would hire illegal's instead of people who were born her and do you know why? because he can pay them the lowest pay possible. this needs to stop if the government just enforced the laws that are there now this country would be better off. but no our government carters to everyone who comes in the wrong why. why should illegals from all over the world come heir and rep the rewards that we as Americans can't get like FREE SCHOOLING FOR OUR KIDS, FREE MEDICAL, AND NOT HAVE TO PAY THERE FAIR SHARE. don't get me wrong if an illegal comes here and is doing the right thing by working on the books, obeying the laws, then there should be a system in place to help them become citizens but not only good hard working people come here don't for get that repast's, thief's, molesters, junkeys, and all other sorts of criminals come here to so don't be to sympathetic to all immigrants.

28 JUN 2012 10:38 AM (HTTP://WWW.HUFFINGTONPOST.COM/SOCIAL/JMAC8577/CARLOS-CASTRO-TODOS-SUPERMARKET-FORMER-UNDOCUMENTED-IMMIGRANT-STARTS-BUSINESS_N_1597663_164468757.HTML)

FAVE     SHARE     MORE

---

Norma G.  (casinolover91) (/social/casinolover91?action=comments)     8
135 Fans

(/social/casinolover91?action=comments) People can be one of a few illegals who reached the 'american dream' and run with it. Yes there are those who made it big - but - it's more of an exception than a rule! Show me where ALL 12/20 million illegals in our mist have done what this man did. I will be waiting. Entering the USA ILLEGALLY is breaking the law! We are either a country of laws or we are not - NO EXCEPTIONS!

27 JUN 2012 12:42 PM (HTTP://WWW.HUFFINGTONPOST.COM/SOCIAL/CASINOLOVER91/CARLOS-CASTRO-TODOS-SUPERMARKET-FORMER-UNDOCUMENTED-IMMIGRANT-STARTS-BUSINESS_N_1597663_164234216.HTML)

FAVE     SHARE     MORE

---

jmac8577 (/social/jmac8577?action=comments)
0 Fans

(/social/jmac8577?action=comments) his so right and why not make the law that any employer who hires illegals pay $50,000 per head and then lets see if we can bring our people back to work and boost our economy but make the fine stick not less if anything more

28 JUN 2012 10:45 AM (HTTP://WWW.HUFFINGTONPOST.COM/SOCIAL/JMAC8577/CARLOS-CASTRO-TODOS-SUPERMARKET-FORMER-UNDOCUMENTED-IMMIGRANT-STARTS-BUSINESS_N_1597663_164471224.HTML)

FAVE     SHARE     MORE

---

5 PEOPLE IN THE CONVERSATION          | Read Conversation ⟶ |

---

Charley V.  (charleyvldm9) (/social/charleyvldm9?action=comments)     3
SUPER USER · 310 Fans     ·     He thinks outside the box.

(/social/charleyvldm9?action=comments) Lay down, work hard, save invest and you can make it here, so why do 42 million Americans choose to remain poor? They live happy on govt. handouts.

28 JUN 2012 4:20 PM (HTTP://WWW.HUFFINGTONPOST.COM/SOCIAL/CHARLEYVLDM9/CARLOS-CASTRO-TODOS-SUPERMARKET-FORMER-UNDOCUMENTED-IMMIGRANT-STARTS-BUSINESS_N_1597663_164596194.HTML)

FAVE     SHARE     MORE

---



Pam512 (/social/Pam512?action=comments)     1
120 Fans

(/social/Pam512?action=comments) I'm going to guess that this guy got some kind of help from the government. I am a 50 year-old white female and I can't get any kind of assistance. And I'm so glad you think that poor people are happy. You are living in a dream world.

28 JUN 2012 8:31 PM (HTTP://WWW.HUFFINGTONPOST.COM/SOCIAL/PAM512/CARLOS-CASTRO-TODOS-SUPERMARKET-FORMER-UNDOCUMENTED-IMMIGRANT-STARTS-

FAVE     SHARE     MORE

7 PEOPLE IN THE CONVERSATION            Read Conversation ⟶



**Dan Crabtree**  (Dan_Crabtree) (/social/Dan_Crabtree?action=comments)     5
SUPER USER  ·  743 Fans

(/social/Dan_Crabtree?action=comments)Employing people is great.. how-ever hispanics employ only hispanics...mexican migrants employ only mexican llaborers..hispanic contractors employ only hispanic laborers..hispanic roofing companies employ only hispanic employees and hispanic lawn care and landscaping employs yep you guessed it hispanic workers..last but certainly not least hispanics vote for only hispanic canidates just as son as they can get one on a ballot.. there-fore turning this nation into there old nation they left.So in reality all you accomplsh here is giving america away to hispanic people..The sad truth here is there is only one race that is allowed illegal entry into this nation ..hispanics...

28 JUN 2012 12:35 PM (HTTP://WWW.HUFFINGTONPOST.COM/SOCIAL/DAN_CRABTREE/CARLOS-CASTRO-TODOS-SUPERMARKET-FORMER-UNDOCUMENTED-IMMIGRANT-STARTS-BUSINESS_N_1597663_164513399.HTML)

FAVE     SHARE     MORE



**BiggpussJr** (/social/BiggpussJr?action=comments)     2
485 Fans   ·  pissin em off one comment at a time.

(/social/BiggpussJr?action=comments)Hispanic is not a race, but other than that you are spot on. And once an American becomes a latino that place will become all latino. They have already ruined their own countries so now it our turn. We had a good 400 years, well except for the slavery part.

28 JUN 2012 4:46 PM (HTTP://WWW.HUFFINGTONPOST.COM/SOCIAL/BIGGPUSSJR/CARLOS-CASTRO-TODOS-SUPERMARKET-FORMER-UNDOCUMENTED-IMMIGRANT-STARTS-BUSINESS_N_1597663_164605291.HTML)

FAVE     SHARE     MORE

3 PEOPLE IN THE CONVERSATION            Read Conversation ⟶



**Robert_DeFrank** (/social/Robert_DeFrank?action=comments)     3
SUPER USER  ·  8 Fans

(/social/Robert_DeFrank?action=comments)I wonder how "immigrants" are able to start a business so easily. I was born in this country and would love to start/own a business, but it seems like it is easier when you come from another country...

28 JUN 2012 9:54 AM (HTTP://WWW.HUFFINGTONPOST.COM/SOCIAL/ROBERT_DEFRANK/CARLOS-CASTRO-TODOS-SUPERMARKET-FORMER-UNDOCUMENTED-IMMIGRANT-STARTS-BUSINESS_N_1597663_164455986.HTML)

FAVE     SHARE     MORE



**buddys14** (/social/buddys14?action=comments)     2
14 Fans

(/social/buddys14?action=comments)Maybe you should try harder. Don't think about failing, just make it happen for yourself

28 JUN 2012 11:32 AM (HTTP://WWW.HUFFINGTONPOST.COM/SOCIAL/BUDDYS14/CARLOS-CASTRO-TODOS-SUPERMARKET-FORMER-UNDOCUMENTED-IMMIGRANT-STARTS-BUSINESS_N_1597663_164489886.HTML)

FAVE     SHARE     MORE

6 PEOPLE IN THE CONVERSATION            Read Conversation ⟶



**prov2thet** (/social/prov2thet?action=comments)
0 Fans

(/social/prov2thet?action=comments)Do immigrants in the United States have to pay the same business taxes as Americans?

28 JUN 2012 2:21 PM (HTTP://WWW.HUFFINGTONPOST.COM/SOCIAL/PROV2THET/CARLOS-CASTRO-TODOS-SUPERMARKET-FORMER-UNDOCUMENTED-IMMIGRANT-STARTS-BUSINESS_N_1597663_164553398.HTML)

FAVE     SHARE     MORE

Dan Crabtree  (Dan_Crabtree) (/social/Dan_Crabtree?action=comments)
SUPER USER · 743 Fans                                                                    4

(/social/Dan_Crabtree?action=comments) Of course immigrants who are here retain the right to sponsor members of there
nation that includes uncles aunts brothers parents and grand
parents..your accepted automatically...same for the dream act if and when is is
assed or declared legal from the dictator now running this nation....

28 JUN 2012 4:17 PM (HTTP://WWW.HUFFINGTONPOST.COM/SOCIAL/DAN_CRABTREE/CARLOS-
CASTRO-TODOS-SUPERMARKET-FORMER-UNDOCUMENTED-IMMIGRANT-STARTS-
BUSINESS_N_1597663_164595145.HTML)

FAVE       SHARE       MORE

---

4 PEOPLE IN THE CONVERSATION                          [ Read Conversation ⟶ ]

---

mspat44417 (/social/mspat44417?action=comments)
186 Fans     · Rock it if ya got it...Music                                              5

(/social/mspat44417?action=comments) So this guy only wants to hires Illegals..... That's pretty sad...And not very
American....So much for wanting to come here to be an "American"...He wants to
break the law...Just yet another reason why deportation is a good thing...

28 JUN 2012 10:54 PM (HTTP://WWW.HUFFINGTONPOST.COM/SOCIAL/MSPAT44417/CARLOS-
CASTRO-TODOS-SUPERMARKET-FORMER-UNDOCUMENTED-IMMIGRANT-STARTS-
BUSINESS_N_1597663_164709381.HTML)

FAVE       SHARE       MORE

---

lifehub (/social/lifehub?action=comments)
377 Fans     · I don't answer (to) libs.

(/social/lifehub?action=comments) HP ? also conveniently omits the word 'illegal' in their description, "....$800 to help
him cross the border in 1979."

29 JUN 2012 5:57 AM (HTTP://WWW.HUFFINGTONPOST.COM/SOCIAL/LIFEHUB/CARLOS-CASTRO-
TODOS-SUPERMARKET-FORMER-UNDOCUMENTED-IMMIGRANT-STARTS-
BUSINESS_N_1597663_164754991.HTML)

FAVE       SHARE       MORE

---

2 PEOPLE IN THE CONVERSATION                          [ Read Conversation ⟶ ]

---

dsh1007155 (/social/dsh1007155?action=comments)
185 Fans                                                                                 4

(/social/dsh1007155?action=comments) TYPICAL illegal aliens.

28 JUN 2012 9:05 AM (HTTP://WWW.HUFFINGTONPOST.COM/SOCIAL/DSH1007155/CARLOS-
CASTRO-TODOS-SUPERMARKET-FORMER-UNDOCUMENTED-IMMIGRANT-STARTS-
BUSINESS_N_1597663_164446053.HTML)

FAVE       SHARE       MORE

---

buddys14 (/social/buddys14?action=comments)
14 Fans

(/social/buddys14?action=comments) He's an illegal

28 JUN 2012 11:32 AM (HTTP://WWW.HUFFINGTONPOST.COM/SOCIAL/BUDDYS14/CARLOS-
CASTRO-TODOS-SUPERMARKET-FORMER-UNDOCUMENTED-IMMIGRANT-STARTS-
BUSINESS_N_1597663_164489998.HTML)

FAVE       SHARE       MORE

---

5 PEOPLE IN THE CONVERSATION                          [ Read Conversation ⟶ ]

---

Load 10 more conversations                                          1-10 of 45

[ Huffington Post Search ]

Advertise (Http://Advertising.Aol.Com/Brands/Huffington-Post/)
Log In (/Users/Login/)    Make HuffPost Your Home Page (/Makehome/)
RSS (/Syndication)    Careers (/Jobs/)    FAQ (/Faq/)
User Agreement (/Terms.Html)    Privacy (Http://Privacy.Aol.Com/)
Comment Policy (/Comment/Policy/)    About Us (P/Huffington-Post.Html)
About Our Ads (Http://Adinfo.Aol.Com/About-Our-Ads/)    Contact Us (/Contact/)

Copyright @2015 TheHuffingtonPost, Inc.    |    "The Huffington Post" is a registered trademark of TheHuffingtonPost.com, Inc. All rights reserved.

Style

# From journalism to activism: Jose Antonio Vargas's life on the run

**By Marc Fisher**  November 23, 2014

Jose Antonio Vargas is running. He's fresh off the red-eye from California to Dulles — his third overnight flight in as many weeks — to deliver yet another speech. He grabs his backpack and goes, delivering nearly 300 talks in 44 states over the past three years. He has moved, in just five years, from Washington to New York to San Francisco. He's in a hurry to convince his fellow Americans that people like him should be considered fellow Americans.

Vargas, 33, has always been running, since he found out at 16 that he was in the United States illegally, and before that too, as a child whose mother put her 12-year-old on a plane from the Philippines to California, telling him that if anyone asked where he was going, he should say "Disneyland." He hasn't seen her since.

He runs because it got him to where he is. When he was a 27-year-old reporter at The Washington Post, his editors assigned him to cover the 2008 presidential campaign because they thought he could see what young voters were thinking. ABC's Diane Sawyer called him "one of the most successful young men in this country." Arianna Huffington hired him to help her Huffington Post staff connect with digital natives.

He runs because he never knows when the immigration authorities or the Border Patrol or any cop in the land might grab him, as they did this summer in Texas, tossing him in a cell

for eight hours. Vargas has never had a valid visa or green card; he used to travel with an illegally obtained driver's license and, after 2011, a Philippines passport. Now, he has been ordered to pass through Transportation Security Administration checkpoints using the oddest of travel documents, a "Warrant for Arrest of Alien" on U.S. Border Patrol letterhead. It says Vargas is "within the country in violation of the immigration laws and is liable to being taken into custody." He keeps it in his backpack. He calls the document "my first American papers."

Vargas runs because he has much to prove, even after a meteoric rise as a reporter; even after he achieved his golden ambition, a piece in the New Yorker; even after a sudden flip from journalism to activism and instant celebrity in that field — the cover of Time, live coverage on CNN of his arrest in July. And yes, even after Thursday night, when President Obama announced his move to at least temporarily lift the threat of deportation from millions of illegal immigrants, including Vargas.

"So now I get a real work permit for the first time in my life?" he says a few hours after the president's address to the nation. "I get a driver's license? I get to see my mom? Is that how it works? It feels real to me, even if it's temporary."

He runs even now, because there are millions of undocumented immigrants whose status remains unchanged by Obama's executive action. He runs because he misses his mother and has no idea when he will be able to see her. And because if he slows down, his secrets might catch up to him. And because to stop would be to face the depths of his loneliness.

Joseiswriting. That's his Twitter handle. He tweets, e-mails, writes essays, scripts, speeches and stories. It's 6:17 a.m. and Vargas is flying from Chicago — where he'd been for 36 hours, giving two talks about immigration — to San Francisco, where he'll be for 18 hours before another red-eye to Washington, where he'll spend eight hours, then jump on Amtrak to New York.

A34

"I have a lot on my mind and feel compelled to share some thoughts with you," he writes me from his eighth flight of the week. "I've been running since I was 16, since my Lolo [grandpa] told me my papers were fake, when he said, 'You're not supposed to be here.' But … since I am here, I better contribute and I better prove to people that I am here — hence my journalism. …"

He arrived in Los Angeles on Aug. 3, 1993, to live with his grandfather, a security guard, and his grandmother, a food server. He had 37 relatives in this country and he was the only one among them who was not here legally. He didn't know that until he went to the DMV to apply for a driver's permit. He showed his green card and was informed it was a fake.

"I spent all of my 20s being scared s---less: scared of the government, scared of myself," he writes. "I didn't know if I could keep going, if I could keep lying."

He writes about the places he would visit if he were free to travel: the beaches of the province where he grew up; Prince Edward Island in Canada, where his favorite movie, "Anne of Green Gables," was filmed; Paris, where his hero James Baldwin wrote.

He writes now about how Americans see him — not as a journalist, not even as a gay man (he came out in high school, in history class), but as an illegal immigrant: "We were terrorized in 9/11. Then we started terrorizing each other, with the immigrant — the illegal, the alien — as the quintessential 'other' in America."

He writes now about himself: "I feel like my life — my real life, a more honest life, a more fulfilling life — started three summers ago, when I 'outed' myself as undocumented."

But what Vargas thought would liberate him turns out to have hemmed him in. "Instead of feeling freer and relieved, I've watched him now become so burdened," says a longtime close friend, Nathalie Wade. "Ironically, because he's become this symbol of

undocumented Americans, all these judgments are imposed upon him and he's lost his ability to be himself, to be unafraid. He's ended up something he never meant to be."

Vargas resists the idea that he has become a political animal: "I had a career before, and I intend to have one after," he says one day. "I am more than an immigration activist."

Two weeks later, in another conversation, he tries on a different hat: "In the detention cell, I realized this is now my life. Maybe my plan to do this for three years wasn't right. But I can't do this forever. I'm still running. But I'm not running away anymore. I'm running toward something."

Jose Vargas is pushing.

In July, Vargas went to the Texas-Mexico border to film scenes of large numbers of children arriving from Central America. He knew before he went that people within 100 miles of the border were subject to a check of their immigration status. At the airport in McAllen, Tex., as he was heading home, Vargas was stopped, questioned and taken into custody. A local reporter, tipped off by immigration activists that Vargas would be trying to get onto a plane, shot video of the encounter.

The story went viral. Some accused Vargas of staging a provocation, seeking attention for himself as much as for his cause.

"Some people in the media say it was a stunt," Vargas says, "but I needed to get out of there. And I feel like my job is to expose all the cracks in the system."

He spent eight hours in a cell with some of the children who had been pouring over the border.

Vargas calls his decision to go to McAllen an exercise in "radical transparency," of a kind with the time he called immigration authorities to ask what they intended to do with him

A36

(they had no answer).

Since his stint in detention, Vargas has worn his cordovan oxford shoes loose, with empty eyelets, because the guards took away his laces and he wants to remember his humiliation and anger.

"Undocumented people get arrested all the time," he says. "I get arrested, and it's front-page news. I feel guilt."

Even if the president's initiative stands and the threat of deportation is lifted for some, the politics of immigration remain volatile and Vargas's future is still uncertain, all of which leaves him eager to keep confronting the system. "I want to be as creatively disruptive as possible," he says. "I want to be radically transparent in a way that isn't showboating."

He is writing a memoir and recently announced a deal with MTV to direct a documentary on what it means to be young and white in America.

Some longtime activists on immigration issues "want Jose to be even more disruptive, more confrontational," says Gaby Pacheco, a veteran of the movement who has grown close to Vargas. "He would get pushback from kids who see him as privileged — he has a career, success, awards, famous friends."

But Vargas is more comfortable viewing his activism as an art form or an act of journalism. With Ryan Eller, a Baptist preacher who heard Vargas speak at a college in Indiana, he runs Define American, a nonprofit group that pushes for more liberal immigration law.

"My job is taking the artistic brilliance of Jose Vargas, this unhinged willingness to do something that feels like jumping off a bridge, and use it to build support for immigrants," says Eller. "Every day, we get requests to have Jose walk at the front of a march, join a boycott, get arrested at the Capitol. But that's not who Jose is."

A37

Vargas's split identity has won over many activists who initially worried that his approach was too soft. "People saw that he could get our message out in such sophisticated ways," Pacheco says. "We've been preaching to the choir for so long, and Jose comes along and gets on 'Colbert' … and 'O'Reilly' and talks to white America. Because he is a prize-winning journalist, he has access that no immigrant had."

Jose Vargas is hiding.

In high school in Mountain View, Calif., he did everything — choir, debate, plays, student government, newspaper.

Soon after he learned about his immigration problem, Vargas started keeping a list of the things he needed to do to be successful. He wanted to direct a show; make a movie; write for the Wall Street Journal, Washington Post or New York Times. He wanted to win a journalism prize, cover a presidential campaign and, above all, be published in the New Yorker, which he'd discovered at the public library.

Before he turned 30, he'd done nearly everything on his list.

"That list was going to be the solution," Vargas says. "But I did all those things, and it wasn't better."

He built his supercharged escalator to success with energy, smarts, creativity, deceit and outright lies. Beginning in high school, Vargas hid his immigration status from each of his employers as he rose through his profession, winning over editors who were hungry for young talent.

"We were behind the curve on all things digital and along came Jose," says Peter Perl, a Washington Post editor who was in charge of hiring when Vargas was a summer intern in 2003. Vargas quickly established himself as an innovative, energetic reporter.

He was hired into a full-time position and became "the voice of youth in the newsroom," Perl says. "He's charming and charismatic."

But within a year of arriving at The Post, Vargas, shaking and evidently troubled, approached Perl and asked him to walk over to Lafayette Park. On a bench there, Vargas told the editor what he had not told anyone at his previous jobs, what no one at The Post had detected — that, according to the law, he didn't belong there.

"He was unburdening himself to a father figure," Perl says. "He didn't ask for anything."

For seven years, Perl who has since retired from The Post, told Vargas's secret to no one but his wife. (In 2011, when Vargas came clean, Perl was reprimanded, but he has no regrets about keeping silent to protect Vargas's career.)

Some of Vargas's colleagues saw in him a vital energy and a comfort with the digital world that eludes some veteran print journalists. But others felt suspicious or at least mystified.

"Jose is a man of so many layers, so many secrets," says his friend and former roommate, Ernesto Londoño, a former Post reporter who now works at the New York Times. When Londoño, a native of Colombia, first came to The Post, the newspaper sponsored his application for a work permit and Londoño confided in Vargas about "how anxious I was and how this was a shaky way to start a career." Vargas only listened.

After the two had been living together in the District for eight months, Londoño invited Vargas to travel to Colombia with him for a vacation. Vargas awkwardly demurred.

"I don't like travel," he said.

"I said, jokingly, 'Are you not here legally?' " Londoño recalls.

Vargas remembers the moment: "Ernesto was about to make a left at the McDonald's on

A39

U Street, and I heard myself lie. A week or so later, I moved out. I hated that I lied to him."

Londoño recalls his roommate coming to him and saying, abruptly, "'I can't live with you anymore.' He was very clearly overwhelmed."

Secrets shaped his friendships and his work. In 2004, Vargas wrote a story in The Post's Style section about spouses who kept big secrets from one another for years. "Secrets come in many forms," he wrote, "from the trivial to the consequential. . . ."

At The Post, Vargas was part of a team that won the Pulitzer Prize for coverage of the shootings at Virginia Tech. But to protect his secret, he turned down a chance to cover the war in Iraq. When he had to interview a State Department official, he panicked about being caught at the building's security checkpoint; he called the source and asked, "Can we do the interview at Caribou [coffee shop]?"

He left The Post in 2009, worked at Huffington Post and in 2010, he landed the story that would tick off the last item on his high school list. He got Mark Zuckerberg to cooperate on a profile for the New Yorker. Vargas and the Facebook founder took a long walk in Menlo Park, Calif., "and Mark turns to me and says, 'So where are you from?'" Vargas recalls. "I stopped and looked at him. The simple answer was I was from the town next to there. The full answer was, 'I can't talk to my mom. I'm interviewing you, and I'm not supposed to be here.'

Advertisement

"I didn't say that. Instead, I gave him a blank look and continued the interview."

In December 2010, the Senate voted down the Dream Act, which would have created a path to citizenship for young people brought to the country illegally as children. Vargas went out for a long walk to the Brooklyn Bridge, listening to Rachmaninoff's Piano

Concerto No. 2 — by turns delicate, melodramatic, overbearing. By the time he got back to his apartment, he says he knew he would end the lies. He hadn't seen his mother in 16 years.

"It must seem strange that somebody who seems so social and friendly could keep secrets for so long," Vargas told me. "I don't know how the hell I managed it. The moment you tell someone, you feel guilty, because you're endangering them. I was a coward. A ticking time bomb. Either someone was going to out me, or I would out myself, or I would have to shut the f--- up for the rest of my life."

He set out to write a first-person piece for his old employer, this newspaper, in which he would come out as an illegal immigrant. The Post assigned a team of editors to check the story rigorously; a story about lies had to be airtight.

In the end, The Post's editor at the time, Marcus Brauchli, decided not to publish the story. Vargas offered it to the New York Times, which put it on the cover of its Sunday magazine. Brauchli says he has nothing to add to his original explanation, which said: "We made a judgment not to run the piece."

Vargas says he thinks The Post bailed out because he had a second illegally obtained driver's license that he hadn't mentioned in his first draft. But he says he was committed to telling all and gladly added any fact the editors wanted.

Some fellow journalists read the Times story and felt as if they'd been made unwitting parties to a lie.

"I was duped," wrote Phil Bronstein, editor of the San Francisco Chronicle, where Vargas had worked at the start of his career. "Jose lied to me and everyone else he worked for, and that's not kosher."

The Post's ombudsman then, Patrick Pexton, wrote that Vargas had a reputation in the

newsroom "for being tenacious and talented but also for being a relentless self-promoter whom many colleagues didn't trust." Pexton concluded that Vargas had now "crossed the line from journalist to advocate."

Advertisement

The Times story would liberate Vargas from the constant elisions and deceptions, but not from life on the run. Soon after the piece appeared, Washington state revoked his driver's license, which he had obtained illegally (he had never lived in the state). These days, he gets around by cadging rides from friends and supporters. He takes a lot of taxis.

When a student attending a speech at American University asks him where he lives now, he replies, "On Delta Air Lines."

Jose Vargas is charming.

Wade, his friend since freshman year of high school, remembers coming home to find Vargas on her couch — he had a key to her house — watching videotapes of figure skater Michelle Kwan that her mother had recorded for Jose.

"He was really building a family for himself," Wade says, "reaching out to adults to be mother figures."

Pat Hyland, Vargas's high school principal, first focused on him as he fell into crisis after coming out as gay in school, leading his grandfather to throw him out of the house. Now, as Vargas lived from couch to couch, walking five miles a day because he didn't have money for a bus pass, the principal says she saw him survive "by making people around him feel like the center of the world."

"His head tilts like a puppy, and he's listening and asking good questions," says Hyland, now dean of students at Foothill College in Los Altos Hills, Calif. "At the same time, he

had this constant, nagging sense that he was not good enough. He would constantly seek affirmation. That can get tedious. But he's so inquisitive, so resourceful — and so fearful. If everything you've got about yourself is a secret, you're pretty lonely."

Vargas's fellow interns watched as he impressed his editors. "He had a way to ingratiate himself to people in authority to stay afloat," Londoño says. "It's what he's always done to survive. He has this huge desire to belong, because there was this big part of him that didn't."

Marcia Davis, who edited Vargas in the Style section and became a close friend, says some bosses mistook his fear about his fragile immigration status for being manipulative.

Advertisement

"He connects to a Don Graham, an Arianna Huffington, a Mark Zuckerberg, because he lives in a world of big ideas and he's got the passion of a young person," she says. "This idea of him being a self-promoter: I really think issues of race and class factored into people saying that about him. There's anxiety in Jose, there's self-doubt, and it can all be exhausting. But he's passionate about telling stories, so full of wanting to get things done."

Vargas arrives at American University to give a speech. Stopping by the student TV station, he checks his hair ("I learned early on that I can't look like I'm stressed out," he says), and then, when a young woman tells him he inspired her to open up about her undocumented status, he lowers his voice, tilts his head and spends 30 seconds with her as if there weren't 11 other people in the room.

In a quiet moment between speeches, he says he collected parental figures — for a purpose.

"I traffic in empathy," Vargas says. "I try to be vulnerable with people so they can be vulnerable back. I've always been searching for empathy in other people. It's when I feel

A43

most not alone."

Vargas is running, still. He came out as gay and still felt compelled to run. Came out as undocumented — still running. He finally admitted to himself that he has a mother (for years, he'd refused her request to be listed as his parent on Facebook, for fear that people would ask questions — "Do you miss her? Why don't you go see her?" He kept a shoe box full of her letters, unopened). As yet, no rest.

Even now, he holds secrets, about things he did as a young man, about his family, about why he runs. In his mind, he keeps a catalogue of which friends he's told which secrets. He's not sure he remembers who knows what.

His hardest moment so far was reconnecting with his mother, Emelie Salinas. Vargas spent nearly three years working on his film, "Documented," which ends with an extended passage about his first visit with his mother via Skype. (She has applied three times for a tourist visa to visit her son. She has been turned down each time.)

Footage of his mother did not appear in early cuts of the movie. Now, he sees, "she is the film. She's this mother who put me on a plane. She and I meet on film."

After he finally decided that the movie could not be fully honest without her, Vargas spent weeks working with the 10 hours of footage his crew brought back from the Philippines. As soon as he finished editing his mother into the film, he did something he'd thought about for a decade: He went to see a therapist.

"I've become a little more open in the past few months about depression," he says.

These days, mother and son chat on Facebook from time to time. The conversation is not easy. The anger he felt toward her for sending him away has subsided, but there's only so much he can repair from 7,000 miles away.

A44

He remains afraid of the dark. He doesn't sleep — just short bits here and there. He keeps no pictures of himself.

Vargas is forever coming out, revealing himself layer by layer, yet always holding something in reserve.

Londoño, his former roommate, came to believe that Vargas is a good man imprisoned by his silence. "His secrets came to dominate and poison every aspect of his life," says Londoño, who remains on good terms with Vargas. "He could never let anybody get close. It kept him from having a real romantic relationship. He was lonely, hugely lonely."

Vargas confirms he has never had a serious partner. "I just never really allowed that," he says. "It would be unfair to impose that on someone else."

In high school, after his grandfather kicked him out, he lived for a time with a middle-aged man he'd met at a coffee shop, his first steady relationship. He says the relationship was not abusive, but consensual and convenient.

"If he was taking advantage of me, I was also taking advantage of him," Vargas says. "I had a place to sleep, right?"

He didn't tell even his closest friends about the man. "I didn't want them to know," he says. "What am I supposed to do, tell them I'm sleeping with a man to have somewhere to sleep? That's putting a lot on them."

Even now, his old friend Nathalie Wade says: "Jose will come to a point where he pushes people away if somebody gets too close. It's hard to let somebody love you when you don't think as highly of yourself as you could."

In his apartment, Vargas keeps a globe, a symbol of the places he wants to see someday.

A45

Hyland, his high school principal, hopes Vargas will finally come to rest: "He's on a race with no particular end. He thinks if he just talks to enough people, they'll see the problem. That's just not going to work. Does he have the energy to sustain the work without seeing progress? I don't know. You begin to repeat yourself."

Advertisement

She's not optimistic that he can stop. "No one has the authority to tell him to take a timeout," she says. "It would scare him."

Wade sent Vargas a note after she saw his documentary. She said she understood now "why you are the way you are. Of course, someone with something to prove, someone who constantly needs to show that he belongs … would need to achieve, and surpass, and impress to no end. …

"You are constantly striving to find ways … to be loved by more and more people around you when the most important person, the one person who would make you feel whole again … is separated from you by such deep geographical, emotional and especially political lines."

In every Skype conversation, his mother assures her son that he is worthy, good, accepted. In his movie, she tells the film crew he sent that "more than anything else, I want to be able to, like any mom, embrace my child, even without words. I just want to be able to hug him, like I did before."

Her son wants the same thing, and now he believes it will happen. He called her on Skype after Obama's speech. It was a short conversation with a simple message. "I'm going to try to see you," he said, "and there would be no cameras. No, no, no, no, no."

Marc Fisher, a senior editor, writes about most anything. He's been The Post's enterprise editor, local columnist and Berlin bureau chief, and he's covered politics, education, pop

culture, and much else in three decades on the Metro, Style, National and Foreign desks.

# FRBSF ECONOMIC LETTER

2010-26 | August 30, 2010

# The Effect of Immigrants on U.S. Employment and Productivity

BY GIOVANNI PERI

The effects of immigration on the total output and income of the U.S. economy can be studied by comparing output per worker and employment in states that have had large immigrant inflows with data from states that have few new foreign-born workers. Statistical analysis of state-level data shows that immigrants expand the economy's productive capacity by stimulating investment and promoting specialization. This produces efficiency gains and boosts income per worker. At the same time, evidence is scant that immigrants diminish the employment opportunities of U.S.-born workers.

Immigration in recent decades has significantly increased the presence of foreign-born workers in the United States. The impact of these immigrants on the U.S. economy is hotly debated. Some stories in the popular press suggest that immigrants diminish the job opportunities of workers born in the United States. Others portray immigrants as filling essential jobs that are shunned by other workers. Economists who have analyzed local labor markets have mostly failed to find large effects of immigrants on employment and wages of U.S.-born workers (see Borjas 2006; Card 2001, 2007, 2009; and Card and Lewis 2007).

This *Economic Letter* summarizes recent research by Peri (2009) and Peri and Sparber (2009) examining the impact of immigrants on the broader U.S. economy. These studies systematically analyze how immigrants affect total output, income per worker, and employment in the short and long run. Consistent with previous research, the analysis finds no significant effect of immigration on net job growth for U.S.-born workers in these time horizons. This suggests that the economy absorbs immigrants by expanding job opportunities rather than by displacing workers born in the United States. Second, at the state level, the presence of immigrants is associated with increased output per worker. This effect emerges in the medium to long run as businesses adjust their physical capital, that is, equipment and structures, to take advantage of the labor supplied by new immigrants. However, in the short run, when businesses have not fully adjusted their productive capacity, immigrants reduce the capital intensity of the economy. Finally, immigration is associated with an increase in average hours per worker and a reduction in skills per worker as measured by the share of college-educated workers in a state. These two effects have opposite and roughly equal effect on labor productivity.

## The method

A major challenge to immigration research is the difficulty of identifying the effects of immigration on economic variables when we do not observe what would have happened if immigration levels had been different, all else being equal. To get around this problem, we take advantage of the fact that the increase

Case 1:14-cv-00254   Document 127   Filed on 01/30/15 in TXSD   Page 54 of 879

in immigrants has been very uneven across states. For example, in California, one worker in three was foreign born in 2008, while in West Virginia the comparable proportion was only one in 100. By exploiting variations in the inflows of immigrants across states at 10-year intervals from 1960 to 2000, and annually from 1994 to 2008, we are able to estimate the short-run (one to two years), medium-run (four years), and long-run (seven to ten years) impact of immigrants on output, income, and employment.

To ensure that we are isolating the effects of immigrants rather than effects of other factors, we control for a range of variables that might contribute to differences in economic outcomes. These include sector specialization, research spending, openness to trade, technology adoption, and others. We then compare economic outcomes in states that experienced increases in immigrant inflows with states that did not experience significant increases.

As a further control for isolating the specific effects of immigration, we focus on variations in the flow of immigrants that are caused by geographical and historical factors and are not the result of state-specific economic conditions. For example, a state may experience rapid growth, which attracts a lot of immigrants and also affects output, income, and employment. In terms of geography, proximity to the Mexican border is associated with high net immigration because border states tend to get more immigrants. Historical migration patterns also are a factor because immigrants are drawn to areas with established immigrant communities. These geography and history-driven flows increase the presence of immigrants, but do not reflect state-specific economic conditions. Hence, economic outcomes associated with these flows are purer measures of the impact of immigrants on economic variables.

### The short- and the long-run effects of immigrants

Immigration effects on employment, income, and productivity vary by occupation, job, and industry. Nonetheless, it is possible to total these effects to get an aggregate economic impact. Here we attempt to quantify the aggregate gains and losses for the U.S. economy from immigration. If the average impact on employment and income per worker is positive, this implies an aggregate "surplus" from immigration. In other words, the total gains accruing to some U.S.-born workers are larger than the total losses suffered by others.

Figures 1 and 2 show the response of key economic variables to an inflow of immigrants equal to 1% of employment. Figure 1 shows the impact on employment of U.S.-born workers and on average income per worker after one, two, four, seven, and ten years. Figure 2 shows the impact on the components of income per worker: physical capital intensity, as measured by capital per unit of output; skill intensity, as measured by human capital per worker; average hours worked; and total factor productivity, measuring productive efficiency and technological level. Some interesting patterns emerge.



**Figure 1**
**Employment and income**

% response of income per worker

% response of U.S.-born worker employment

Years until response

Case 1:14-cv-00254   Document 127   Filed on 01/30/15 in TXSD   Page 55 of 879

First, there is no evidence that immigrants crowd out U.S.-born workers in either the short or long run. Data on U.S.-born worker employment imply small effects, with estimates never statistically different from zero. The impact on hours per worker is similar. We observe insignificant effects in the short run and a small but significant positive effect in the long run. At the same time, immigration reduces somewhat the skill intensity of workers in the short and long run because immigrants have a slightly lower average education level than U.S.-born workers.



**Figure 2**
**Capital intensity, hours per worker, and total factor productivity**

Second, the positive long-run effect on income per U.S.-born worker accrues over some time. In the short run, small insignificant effects are observed. Over the long run, however, a net inflow of immigrants equal to 1% of employment increases income per worker by 0.6% to 0.9%. This implies that total immigration to the United States from 1990 to 2007 was associated with a 6.6% to 9.9% increase in real income per worker. That equals an increase of about $5,100 in the yearly income of the average U.S. worker in constant 2005 dollars. Such a gain equals 20% to 25% of the total real increase in average yearly income per worker registered in the United States between 1990 and 2007.

The third result is that the long-run increase in income per worker associated with immigrants is mainly due to increases in the efficiency and productivity of state economies. This effect becomes apparent in the medium to long run. Such a gradual response of productivity is accompanied by a gradual response of capital intensity. While in the short run, physical capital per unit of output is decreased by net immigration, in the medium to long run, businesses expand their equipment and physical plant proportionally to their increase in production.

### How can these patterns be explained?

The effects identified above can be explained by adjustments businesses make over time that allow them to take full advantage of the new immigrant labor supply. These adjustments, including upgrading and expanding capital stock, provide businesses with opportunities to expand in response to hiring immigrants.

This process can be analyzed at the state level (see Peri and Sparber 2009). The analysis begins with the well-documented phenomenon that U.S.-born workers and immigrants tend to take different occupations. Among less-educated workers, those born in the United States tend to have jobs in manufacturing or mining, while immigrants tend to have jobs in personal services and agriculture. Among more-educated workers, those born in the United States tend to work as managers, teachers, and nurses, while immigrants tend to work as engineers, scientists, and doctors. Second, within industries and specific businesses, immigrants and U.S.-born workers tend to specialize in different job tasks. Because those born in the United States have relatively better English language skills, they tend to specialize in communication tasks. Immigrants tend to specialize in other tasks, such as manual labor.

Case 1:14-cv-00254   Document 127   Filed on 01/30/15 in TXSD   Page 56 of 879

Just as in the standard concept of comparative advantage, this results in specialization and improved production efficiency.

If these patterns are driving the differences across states, then in states where immigration has been heavy, U.S.-born workers with less education should have shifted toward more communication-intensive jobs. Figure 3 shows exactly this. The share of immigrants among the less educated is strongly correlated with the extent of U.S.-born worker specialization in communication tasks. Each point in the graph represents a U.S. state in 2005. In states with a heavy concentration of less-educated immigrants, U.S.-born workers have migrated toward more communication-intensive occupations. Those jobs pay higher wages than manual jobs, so such a mechanism has stimulated the productivity of workers born in the United States and generated new employment opportunities.



**Figure 3**
**Communication/manual skills among less-educated workers**

Note: The data on average communication/manual skills by state are from Peri and Sparber (2009), obtained from the manual and communication intensity of occupations, weighted according to the distributional occupation of U.S.-born workers.

To better understand this mechanism, it is useful to consider the following hypothetical illustration. As young immigrants with low schooling levels take manually intensive construction jobs, the construction companies that employ them have opportunities to expand. This increases the demand for construction supervisors, coordinators, designers, and so on. Those are occupations with greater communication intensity and are typically staffed by U.S.-born workers who have moved away from manual construction jobs. This complementary task specialization typically pushes U.S.-born workers toward better-paying jobs, enhances the efficiency of production, and creates jobs. This task specialization, however, may involve adoption of different techniques or managerial procedures and the renovation or replacement of capital equipment. Hence, it takes some years to be fully realized.

## Conclusions

The U.S. economy is dynamic, shedding and creating hundreds of thousands of jobs every month. Businesses are in a continuous state of flux. The most accurate way to gauge the net impact of immigration on such an economy is to analyze the effects dynamically over time. Data show that, on net, immigrants expand the U.S. economy's productive capacity, stimulate investment, and promote specialization that in the long run boosts productivity. Consistent with previous research, there is no evidence that these effects take place at the expense of jobs for workers born in the United States.

*Giovanni Peri is an associate professor at the University of California, Davis, and a visiting scholar at the Federal Reserve Bank of San Francisco.*

## References

Borjas, George J. 2006. "Native Internal Migration and the Labor Market Impact of Immigration." *Journal of Human Resources* 41(2), pp. 221–258.

Card, David. 2001. "Immigrant Inflows, Native Outflows, and the Local Labor Market Impacts of Higher Immigration." *Journal of Labor Economics* 19(1), pp. 22–64.

Card, David. 2007. "How Immigration Affects U.S. Cities." University College London, Centre for Research and Analysis of Migration Discussion Paper 11/07. http://www.econ.ucl.ac.uk/cream/pages/CDP/CDP_11_07.pdf

Card, David. 2009. "Immigration and Inequality." *American Economic Review, Papers and Proceedings* 99(2), pp. 1–21.

Card, David, and Ethan Lewis. 2007. "The Diffusion of Mexican Immigrants during the 1990s: Explanations and Impacts." In *Mexican Immigration to the United States*, ed. George J. Borjas. Chicago: The University of Chicago Press.

Peri, Giovanni. 2009. "The Effect of Immigration on Productivity: Evidence from U.S. States." NBER Working Paper 15507. www.nber.org/papers/w15507

Peri, Giovanni, and Chad Sparber. 2009. "Task Specialization, Immigration, and Wages." *American Economic Journal: Applied Economics* 1(3), pp. 135–169.

### Recent issues of *FRBSF Economic Letter* are available at

### http://www.frbsf.org/publications/economics/letter/

| | | |
|---|---|---|
| 2010-25 | Financial Market Imperfections and Macroeconomics: Conference Summary<br>http://www.frbsf.org/publications/economics/letter/2010/el2010-25.html | Swanson |
| 2010-24 | Future Recession Risks<br>http://www.frbsf.org/publications/economics/letter/2010/el2010-24.html | Berge / Jordà |
| 2010-23 | Stock-Market-Based Measures of Sectoral Shocks and the Unemployment Rate<br>http://www.frbsf.org/publications/economics/letter/2010/el2010-23.html | Chehal / Loungani / Trehan |
| 2010-22 | Mortgage Prepayments and Changing Underwriting Standards<br>http://www.frbsf.org/publications/economics/letter/2010/el2010-22.html | Hedberg / Krainer |
| 2010-21 | Lifecycle Investment Decisions and Labor Income Risk<br>http://www.frbsf.org/publications/economics/letter/2010/el2010-21.html | Benzoni / Goldstein |
| 2010-20 | Fiscal Crises of the States: Causes and Consequences<br>http://www.frbsf.org/publications/economics/letter/2010/el2010-20.html | Gerst / Wilson |
| 2010-19 | Challenges in Economic Capital Modeling<br>http://www.frbsf.org/publications/economics/letter/2010/el2010-19.html | Lopez |
| 2010-18 | The Fed's Exit Strategy for Monetary Policy<br>http://www.frbsf.org/publications/economics/letter/2010/el2010-18.html | Rudebusch |
| 2010-17 | The "Inflation" in Inflation Targeting<br>http://www.frbsf.org/publications/economics/letter/2010/el2010-17.html | Dennis |

Opinions expressed in *FRBSF Economic Letter* do not necessarily reflect the views of the management of the Federal Reserve Bank of San Francisco or of the Board of Governors of the Federal Reserve System. This publication is edited by Sam Zuckerman and Anita Todd. Permission to reprint portions of articles or whole articles must be obtained in writing. Please send editorial comments and requests for reprint permission to Research.Library.sf@sf.frb.org.





**U.S. CHAMBER OF COMMERCE**
Labor, Immigration & Employee Benefits

# IMMIGRATION
## MYTHS AND FACTS



October 24, 2013

Dear Reader,

Despite the numerous studies and carefully detailed economic reports outlining the positive effects of immigration, there is a great deal of misinformation about the impact of immigration. It is critical that policymakers and the public are educated about the facts behind these fallacies.

The U.S. Chamber of Commerce's Labor, Immigration & Employee Benefits Division last prepared this pamphlet in May 2011 to refute many of the most common myths about immigrants coming to our country. This report updates our 2011 pamphlet and examines new myths and facts that have emerged during the current immigration reform debate. We summarize the facts on the relationship of immigrants to Jobs, Wages, Taxes, Entrepreneurship, Population, Crime, Integration, Welfare, and Border Security.

Our compilation shows that immigrants significantly benefit the U.S. economy by creating new jobs, and complementing the skills of the U.S. native workforce, with a net positive impact on wage rates overall.

Recognizing that legislative solutions are difficult, the U.S. Chamber is also working to promote regulatory and policy reforms at the relevant federal executive agencies. We hope that these administrative reforms along with much needed legislation that overhauls our broken immigration system, will lead to concrete improvements so that our country can reap the full benefits of immigration.

The U.S. Chamber of Commerce will continue to champion common-sense immigration reforms, and we urge you to join us in our efforts.

Randel K. Johnson

Senior Vice President
Labor, Immigration & Employee Benefits

2

**U.S. CHAMBER OF COMMERCE**
Labor, Immigration & Employee Benefits

# JOBS

**MYTH:** **Every job filled by an immigrant is a job that could be filled by an unemployed American.**

**FACT:** **Immigrants typically do not compete for jobs with native-born workers and immigrants create jobs as entrepreneurs, consumers, and taxpayers.**

Employment is not a "zero-sum" game.[1] The U.S. economy does not contain a fixed number of jobs for which immigrants and native-born workers compete. For instance, if the eight million undocumented immigrant workers now in the United States[2] were removed from the country, there would not be eight million job openings for unemployed Americans.[3] The reason for this is two-fold. First, removing eight million undocumented workers from the economy would also remove eight million entrepreneurs, consumers, and taxpayers. This would cause the U.S. economy to lose jobs. Secondly, native-born workers and immigrant workers tend to possess different skills that often complement one another, and are therefore not interchangeable.[4]

One of the principal ways in which immigrants create jobs is through the businesses they establish. Immigrants to our country join native-born Americans in being risk takers. According to the Kauffman Index of Entrepreneurial Activity, "immigrants were more than twice as likely to start businesses each month in 2010 than were the native-born." This reflects an upward trend in immigrant entrepreneurship since 2006.[5] Using

census data, the Partnership for a New American Economy estimates that immigrant-owned businesses "generate more than $775 billion in revenue, $125 billion in payroll, and $100 billion in income, employing one out of every 10 workers along the way." Moreover, "immigrants started 28 percent of all new U.S. businesses in 2011."[6]

Immigrants play an important role in job creation in both small and large businesses. A report from the Fiscal Policy Institute found that immigrant-owned small businesses employed 4.7 million people and had $776 billion in receipts in 2007, the last year for which data are available. In addition, 18 percent of all small business owners in the United States are immigrants, higher than the immigrant share of the population (13 percent) or labor force (16 percent).[7] With respect to large businesses, a report from the Partnership for a New American Economy estimated that Fortune 500 companies founded by immigrants account for 18 percent (or 90) of all Fortune 500 companies, generate $1.7 trillion in annual revenue, and employ 3.7 million workers worldwide. These companies include AT&T, Verizon, Procter & Gamble, Pfizer, Kraft, Comcast, Intel, Merck, DuPont, Google, Cigna, Kohl's, Colgate-Palmolive, PG&E, Sara Lee, Sun Microsystems, United States Steel, Qualcomm, eBay, Nordstrom, and Yahoo![8] Similarly, a 2008 study found that one-quarter of all engineering and technology-related companies established in the United States between 1995 and 2005 had an immigrant founder or co-founder, and that these companies had $52 billion in sales and 450,000 employees as of 2005.[9]

Immigrants also create jobs as consumers. Immigrant workers spend their wages buying food,

3

# IMMIGRATION
## MYTHS AND FACTS

clothes, appliances, cars, and other products and services from U.S. businesses.[10] Further, businesses respond to the presence of new immigrant workers by investing in new restaurants, stores, and production facilities.[11] The end result is more jobs for more workers. For instance, a study by the University of Nebraska, Omaha, estimated that spending by immigrants generated roughly 12,000 jobs for the state of Nebraska in 2006—including more than 8,000 jobs in the Omaha and Lincoln metropolitan areas.[12]

Leaving aside the role that immigrants play in job creation, the fact remains that most immigrant and native-born workers are not competing with each other, even in times of high unemployment.[13] Most foreign-born workers differ from most native-born workers in terms of what occupations they work in, where in the country they live, and how much education they have. Even among less-educated workers, immigrants and native-born workers tend to work in different occupations and industries. If they do work in the same occupation or industry—or even the same business—they usually specialize in different tasks, with native-born workers taking higher-paid jobs that require better English-language skills than many immigrant workers possess. In other words, immigrants and native-born workers usually complement each other rather than compete.[14]

This dynamic is illustrated by the fact that cities experiencing high levels of immigration tend to have relatively low or average unemployment rates for African Americans. A 2012 analysis of census data by Saint Louis University economist Jack Strauss found that cities with greater immigration from Latin America experience lower unemployment rates, lower poverty rates, and higher wages among

African Americans. Latino immigrants and African Americans fill complementary roles in the labor market—they are not simply substitutes for one another. In addition, cities that have suffered the effects of declining population are rejuvenated by an inflow of Latino immigrants.[15]

Immigrants do not "steal" jobs from American workers. Immigrants come to the United States to fill jobs that are available, or to establish their own businesses. Research has found that there is no correlation between immigration and high unemployment at the regional, state, or county level.[16] Nor is there any correlation between immigration and high unemployment among minorities.[17] Immigrants go where the jobs are, or they create jobs on their own.

# WAGES

**MYTH: Immigrants drive down the wages of American workers.**

**FACT: Immigrants give a slight boost to the average wages of Americans by increasing their productivity and stimulating investment.**

Immigrant workers increase the wages of native-born workers in two ways. First, immigrants and natives tend to differ in the amount of education they have, the occupations in which they work, and the skill sets they possess. The jobs which immigrants and natives perform are often interdependent. This increases the productivity of natives, which increases their wages. Second, the addition of immigrant workers to the labor force



stimulates new investment in the economy, which in turn increases the demand for labor, exerting upward pressure on wages.[18]

The average wage increase that native-born workers experience as a result of immigration is measurable. A 2010 report from the Economic Policy Institute estimated that, from 1994 to 2007, immigration increased the wages of native-born workers by 0.4 percent. The amount of the wage gain varied slightly by the education level of the worker. College graduates received a boost of 0.4 percent; workers with some college 0.7 percent; high school graduates 0.3 percent; and workers without a high school diploma 0.3 percent.[19] Similarly, economist Giovanni Peri has estimated that, from 1990 to 2006, immigration increased the wages of native-born workers by 0.6 percent. College graduates experienced an increase of 0.5 percent, workers with some college 0.9 percent, high school graduates 0.4 percent, and workers without a high school diploma 0.3 percent.[20]

Local-level studies have reached similar conclusions about the positive impact of immigration on wages. Studies of two communities that experienced a large influx of immigrants over a short time period (Dawson County, Nebraska,[21] and Miami, Florida[22]) found that wages increased—even for lesser-skilled workers who were most likely to be in competition for jobs with new immigrants. Likewise, a study of more than 100 cities by economist David Card found that the wages of natives tend to be higher in cities with large immigrant populations.[23]

# ECONOMY

**MYTH: The sluggish U.S. economy doesn't need more immigrant workers.**

**FACT: Immigrants will replenish the U.S. labor force as millions of Baby Boomers retire.**

The U.S. economy is facing a demographic crisis. Roughly 77 million Baby Boomers (one-quarter of the U.S. population) are now starting to reach retirement age.[24] This wave of aging over the next two decades will have a profound economic impact. Our Social Security and Medicare systems will be stretched to the breaking point. Labor-force growth will fall. And a smaller number of workers and taxpayers will support a growing number of retirees. Under these circumstances, immigrants will play a critical role in replenishing the labor force and, therefore, the tax base.[25]

As the native-born population grows older and the Baby Boomers retire, immigration will prove invaluable in sustaining the U.S. labor force. Projections by the Bureau of Labor Statistics (BLS) indicate that, between 2010 and 2020, the U.S. population age 55 and older will increase by 21.7 million—reaching 96.3 million, or 36.6 percent of all people in the country.[26] As a result, "replacement needs"—primarily retirements—will generate 33.7 million job openings between 2010 and 2020. On top of that, economic growth is expected to create 21.1 million additional job openings.[27] In other words, demand for workers will increase. Yet as more and more older Americans retire, labor-force growth will actually slow, averaging only 0.7 percent between 2010 and 2020 (even with calculating current rates of immigration).[28] The

5

# IMMIGRATION
## MYTHS AND FACTS

rate of labor-force growth would be even lower over the coming decade if not for the influx of new immigrants into the labor market.[29]

Immigrant workers will do more than replace retiring native-born workers in the labor force. They will also look after the retirees themselves. BLS expects that the aging of the U.S. population will generate a high demand for healthcare workers of all kinds, both high-skilled and lesser-skilled.[30] Between 2010 and 2020, employment is projected to increase by 34.5 percent in healthcare support occupations, 25.9 percent in healthcare practitioner and technical occupations, and 26.8 percent in personal care and service occupations.[31] Many of these healthcare workers will, of necessity, be immigrants.

## UNEMPLOYMENT

**MYTH: At a time of high unemployment, the U.S. economy does not need temporary foreign workers.**

**FACT: Temporary workers from abroad fill specialized needs in specific sectors of the U.S. economy.**

Although the unemployment rate for the United States as a whole remains relatively high, the demand for specific kinds of workers in particular sectors of the economy remains high as well. For instance, farm workers, nurses, high-skilled manufacturing workers, and high-skilled technology workers continue to be in short supply.[32] Unemployment for Americans in some of these areas remains remarkably low. For

example, unemployment for the native-born is particularly low in science, technology, engineering, and mathematics (STEM) occupations, such as petroleum engineers (0.1 percent), computer network architects (0.4 percent), nuclear engineers (0.5 percent), environmental scientists and geoscientists (1.2 percent), database administrators (1.3 percent), statisticians (1.6 percent), engineering managers (1.6 percent), and aerospace engineers (1.9 percent).[33] Under these circumstances, the U.S. economy would benefit from channels of legal immigration that are flexible enough to respond to labor shortages in particular occupations at a particular time and place. Temporary worker programs provide just the sort of flexibility that is required in many industries.[34] Moreover, evidence indicates that expanding the supply of temporary workers from abroad would not undermine wages or job prospects of native-born workers. This is true at both the high-skilled and lesser-skilled ends of the occupational spectrum.

Among the many types of temporary worker visas, the largest category is the "H," which includes one subcategory for highly skilled workers and two for lesser-skilled workers. The H-1B is for highly educated and skilled professionals and is capped by Congress at 65,000 per year with an additional 20,000 visas available for immigrants with graduate degrees from U.S. universities. The H-2B program is intended for nonagricultural seasonal, peak load, or intermittent workers (landscaping, forestry, amusement parks, etc.) and is capped at a maximum of 66,000 per year. And the H-2A program is designed for seasonal farm workers. While this last program is not subject to any numerical cap, it is too cumbersome to respond to the often rapid fluctuations in agricultural labor

6



**U.S. CHAMBER OF COMMERCE**
Labor, Immigration & Employee Benefits

demand and is little used. Given that the kinds of work covered by the H-2A and H-2B programs require jobs that are seasonal or temporary in nature, they most clearly demand a temporary work force. However, in the case of all three programs, demand fluctuates with the condition of the U.S. economy—rising when times are good and falling when they are bad. The caps placed on the H-1B and H-2B programs have proven to be grossly inadequate when economic conditions are favorable.[35] For example, this year the H-1B cap was met within the first few days of the filing period preceding the fiscal year, and for several years the H-1B cap has been met before, or early in, the fiscal year.[36]

Regardless of skill level, where U.S. employers first test the labor market to locate qualified and available workers already here, temporary workers from abroad fill gaps in the U.S. labor force and do not harm the employment prospects of native-born workers. In the case of the H-2A and H-2B programs, the lesser-skilled workers who obtain these visas find themselves in direct competition with few native-born Americans. A 2013 study by the American Enterprise Institute and ImmigrationWorks USA notes that the rising educational attainment of native-born workers suggests that few of them are in the market for the kinds of less-skilled seasonal jobs filled by H-2A and H-2B visa holders. According to this study, "in 1950, more than half of U.S.-born workers had not completed high school. Today the figure is less than 5 percent—compared to nearly one-quarter of immigrant workers." In addition, less-skilled immigrant workers tend to work in different fields than less-skilled native-born workers. The study observes that "low-skilled Americans are twice as likely as low-skilled immigrants to work in

offices or administrative support jobs. They're also twice as likely as immigrants to work in sales. In contrast, low-skilled immigrants are three times more likely than low-skilled Americans to fill farming, fishing and forestry jobs."[37]

Moreover, BLS projects that 29.5 percent of job openings from 2010 to 2020 will not require a high-school diploma, while an additional 39.7 percent will require no more than a high school education.[38] In other words, there will be too few less-educated native-born workers willing and able to fill all of the lesser-skilled jobs the U.S. economy creates. Lesser-skilled immigrant workers will fill this gap.[39]

At the other end of the spectrum, the high-skilled recipients of H-1B visas fill available jobs in STEM occupations without "crowding out" or reducing wages for their native-born counterparts.[40] According to a 2013 report by researchers from The Brookings Institution, "evidence suggests that the H-1B program does help fill a shortage in labor supply for the occupations most frequently requested by employers. Most of these are for STEM occupations." The report also found that for "occupations with the most H-1B requests, recent wage growth has been much higher than the national average." On average, in the 100 largest metropolitan areas in the United States, 46 percent of job openings requiring significant STEM knowledge go unfilled for one month or longer. In San Jose, California, for example, two-thirds of job vacancies that remain unfilled after one month, despite advertising the positions, are for STEM occupations. In many other metropolitan areas, that share remains close to half.[41] Significantly, the American Enterprise Institute has found that

7

# IMMIGRATION
## MYTHS AND FACTS

each approved H-1B worker is associated with an additional 1.83 jobs among native-born American workers.[42]

A 2013 report from Regional Economic Models, Inc. (REMI) explores the outcomes of an expansion of high-skilled (H-1B) and lesser-skilled (H-2A and H-2B) visas.[43] The report finds that overall economic effects of the policy changes would be positive, increasing gross domestic product (GDP) for the entire country and gross state product (GSP) for each state, as well as increasing net new jobs across industries. Specifically, employment and GSP is estimated to increase for all states and in all years as a result of an H-1B high-skilled program expansion. Nationwide, this would amount to 1.3 million jobs and a GDP increase of more than $158 billion by 2045. An increase in H-2A agricultural visas would result in total employment increases of around 39,600 by 2045. Fully utilizing the H-2B seasonal worker visas up to the cap would increase total U.S. employment by around 24,000–25,000 over the next 30 years. The creation of a lesser-skilled, nonseasonal temporary worker program would lead to a total gain of about 365,000 jobs by 2045, and a rise in GDP of $31 billion.

# HIGH-TECH WORKERS

**MYTH: There is no shortfall of native-born Americans for open positions in the natural sciences, engineering, and computer science and thus no need for foreign-born high-tech workers.**

**FACTS: Job openings are expanding at educational levels where demographic data show too few native-born students, so we can expect these shortfalls to persist in the future. Moreover, relative to other economic indicators, wages are increasing in STEM jobs requiring higher education.**

Some claim that job creation in STEM fields cannot properly be viewed as outstripping the supply of qualified Americans since higher than desirable unemployment persists for American workers in some STEM occupations, and plenty of STEM grads work in non-STEM positions. Three critical facts belie this approach. First of all, this outlook ignores the fact that over 35 percent of STEM jobs are those that require less than a Bachelor's degree, while immigration reform efforts target, in particular, the approximately 20 percent of STEM jobs that require a Master's degree or higher. Secondly, job growth in positions requiring graduate level STEM training is exploding, far outpacing the American STEM training pipeline. Currently, the number of American students pursuing STEM fields is growing at less than one percent per year, and by 2018 there will be more than 230,000 advanced degree STEM jobs that will not be filled even if every new American STEM grad finds a job.[44] Thirdly, data shows that wages are increasing in STEM jobs requiring



higher education, with wage increases an accepted indicator that the number of qualified Americans is insufficient to fill jobs being created.

First, in assessing which job openings in STEM areas have sufficient numbers of qualified Americans and where there is a shortfall, it is important to be specific about what types of jobs, requiring what type of skills and education, employers are having difficulty filling with sufficient numbers of Americans. For example, in the computer science and mathematical occupations, more than 35 percent of jobs, and some of the STEM job growth, including many production manufacturing jobs, is in jobs that require less than a bachelor's degree. The job distribution in computer science and mathematical jobs is: 6.9 percent of jobs are filled by workers with high school diploma–level skills or less, 18.7 percent with skills based on some college, 10.5 percent with associate-level skills, 43.8 percent with bachelor-level skills, 17.7 percent with master-level skills, 0.8 percent professional degree–level skills, and 1.7 percent doctorate-level skills.[45]

Furthermore, the Bureau of Labor Statistics has projected that 22 percent of new job openings through 2020 will require a master's degree or higher.[46] At the same time that one-fifth of new jobs will require individuals with graduate degrees, there are one-quarter more foreign-born graduate degree holders in the U.S. than native-born. In order to fill these job openings in our economy, employers will be faced with a situation where 10.6 percent of the foreign born in the U.S. age 25 to 34 have earned master's, professional, or doctoral degrees, while 8.5 percent of the native-born population of the same age have the same credentials.[47] Moreover, to the extent job

duties are best filled by individuals with STEM degrees, more than 40 percent of master's and doctoral degrees in STEM fields awarded by U.S. universities go the foreign born.[48] With respect to bachelor-level STEM degrees, a notable disparity is displayed among the native-born as compared to foreign-born degree holders. About 19 percent of the native-born pursue bachelor's degrees in STEM fields, while about 35 percent of the foreign born residing in the United States possess a STEM bachelor's, most often earned abroad.[49]

Lastly, wages reflect the existence of a shortfall with regard to the supply of qualified professionals to fill STEM jobs requiring higher education. Engineer wages have risen by seven percent relative to all other occupations since 2003 and by three percent since 2008.[50] Longer-term trends suggest a similar point. For example, from 1999 to 2011, wages grew by 54 percent for computer and information research scientists, 38 percent for computer programmers, 40 percent for software applications engineers, 52 percent for systems software engineers, 31 percent for computer support specialists, and 47 percent for database administrators.[51] Meaningfully, from 1999 to 2011, the consumer price index increased by 36 percent while the average wage for computer and mathematical occupations increased 44 percent.[52]

9



# COMMUNITY IMPACT

**MYTH: Immigrants hurt communities that are struggling economically.**

**FACT: Immigrants have economically revitalized many communities throughout the country.**

In addition to boosting the national economy and strengthening America's global competitiveness, immigrants and immigrant entrepreneurs are important for metropolitan regional economies.[53] This is true not only in San Jose and Silicon Valley, but in many regions across the country. In Texas, San Antonio and Austin have built knowledge economies around the universities and research industries located there. Houston attracts high-skilled workers for the area's oil industry. In South Carolina, Greenville and Spartanburg have attracted industries that need high-skilled workers. In Boise, Idaho, knowledge-based employment has spurred the local economy and population growth. The universities and research organizations of the North Carolina piedmont, in Raleigh, Greensboro, and the Research Triangle area, create a high demand for high-skilled workers.

Long-term research shows that in addition to bringing more jobs and higher salaries to communities where they cluster, the impact of innovative industries has a profound multiplier effect on localities.[54] Jobs in the innovation economy generate a disproportionate number of local jobs in other industries. An analysis of 11 million American workers in 320 metropolitan areas shows that each new high-tech job in a metropolitan area creates five additional long-term local jobs outside of the high-tech sector.[55]

Furthermore, the five new jobs created for each new high-tech job benefits a diverse group of workers: two new jobs for professional workers such as attorneys and doctors, and three new positions in nonprofessional occupations such as service industry jobs.[56] In many U.S. metropolitan areas, the innovation economy, and the high-skilled jobs related to it, drive prosperity for a broader base of workers living in the region.[57]

Beyond the Silicon Valleys and Research Triangles of the United States, immigrants and immigrant entrepreneurs are making significant contributions to local economies and communities across America's heartland. In many places, the need for foreign talent is critical. For decades, large numbers of U.S. workers have been migrating from "Rustbelt" cities to the "Sunbelt." The cities and towns experiencing a decline in native-born populations must find ways to maintain a viable workforce. As a result, an increasing number of local communities are recognizing the need to be receptive to immigrants and are officially becoming places of welcome that encourage openness to immigration and support immigrant integration.

In Michigan, for example, while only six percent of the state's population is foreign-born, immigrants founded about one-third of the high-tech companies in the state over the past decade.[58] The state, through its "Welcoming Michigan" campaign of building immigrant-friendly communities, clearly sees the need to attract immigrants to the area.[59] Detroit also recognizes this need. In 2010, the city released the "Global Detroit" report, which documents a start-up rate for immigrant-founded high-tech firms in Michigan that is six times the rate for the native-born population.[60]



Additionally, cities such as Dayton, Ohio[61] have passed "welcoming resolutions"—formal proclamations by local elected leaders expressing their recognition of the importance of immigration to their local economy, and their openness to the continued contributions of immigrants.[62] In Minnesota, local leaders also acknowledge the positive contributions of immigrants. As a member of the Minnesota Chamber of Commerce stated, "Immigrants aren't just an asset because they numerically increase the workforce. They are also playing a key role as entrepreneurs in Minnesota and have transformed neighborhoods in both Minneapolis and St. Paul while helping revitalize downtowns in several regional centers around our state."[63]

# TAXES

## MYTH: Undocumented immigrants do not pay taxes.

### FACT: Undocumented immigrants pay billions of dollars in taxes each year.

Undocumented immigrants pay sales taxes, just like every other consumer in the United States. Undocumented immigrants also pay property taxes—even if they rent housing. More than half of undocumented immigrants have federal and state income, Social Security, and Medicare taxes automatically deducted from their paychecks. However, undocumented immigrants working "on the books" are not eligible for any of the federal or state benefits that their tax dollars help to fund.[64] As a result, undocumented immigrants provide an enormous subsidy to the Social Security system in particular. Each year, Social Security taxes are

withheld from billions of dollars in wages earned by workers whose names and Social Security numbers do not match the records of the Social Security Administration (SSA). According to the SSA, undocumented immigrants paid $13 billion in payroll taxes into the Social Security Trust Fund in 2010 alone.[65]

Tax payments by undocumented immigrants and their families are also sizable at the state and local levels. The Institute for Taxation and Economic Policy (ITEP) estimates that households headed by undocumented immigrants paid $10.6 billion in state and local taxes in 2010. That included $1.2 billion in personal income taxes, $1.2 billion in property taxes, and $8.1 billion in sales taxes. The states receiving the most tax revenue from households headed by undocumented immigrants were California ($2.2 billion), Texas ($1.6 billion), New York ($744.3 million), Florida ($706.3 million), and Illinois ($562.1 million).[66]

Other studies have yielded similar findings. The Texas State Comptroller estimated that undocumented immigrants in Texas generate $1.6 billion per year in state tax revenue.[67] In Georgia, the annual tax contributions of undocumented immigrants are estimated at $215.6 million to $252.5 million.[68] In Colorado, undocumented immigrants pay between $159 million and $194 million.[69] In Oregon, they pay between $134 million and $187 million—plus, employers in Oregon pay between $97 million and $136 million in taxes on behalf of undocumented workers.[70] In Iowa, undocumented immigrants pay $40 million to $62 million—and their employers contribute $50 million to $77.8 million on their behalf.[71]

The tax payments of now-undocumented

# IMMIGRATION
## MYTHS AND FACTS

immigrants would be significantly greater if they had legal status. According to ITEP, if undocumented immigrants were allowed to work legally in the United States, they would pay $12.7 billion in state and local taxes—an increase of $2.1 billion over what they pay now. This would amount to $2.8 billion in income taxes (an increase of $1.6 billion), $1.3 billion in property taxes (an increase of $76.1 million), and $8.5 billion in sales taxes (an increase of $420.5 million).[72]

## WELFARE

**MYTH: Immigrants come to the United States for welfare benefits.**

**FACT: Undocumented immigrants are not eligible for federal public benefit programs, and even legal immigrants face stringent eligibility restrictions.**

Undocumented immigrants are not eligible for federal public benefits such as Social Security, Supplemental Security Income, Temporary Assistance for Needy Families, Medicaid, Medicare, and food stamps. Even most legal immigrants cannot receive these benefits until they have been in the United States for five years or longer, regardless of how much they have worked or paid in taxes.[73] Given these restrictions, it is not surprising that U.S. citizens are more likely to receive public benefits than are noncitizens.[74]

A number of state studies have demonstrated that, on average, immigrants pay more in taxes than they receive in government services and benefits. For instance, a study in Arizona found that the state's immigrants generate $2.4 billion in tax revenue per year, which more than offsets the $1.4 billion worth of educational, healthcare, and law enforcement resources they utilize.[75] A study in Florida estimated that, on a per capita basis, immigrants in the state pay nearly $1,500 more in taxes than they receive in public benefits.[76]

Nonetheless, some studies have sought to demonstrate that households headed by immigrants make costly use of public-benefits programs. Invariably, most of the "costs" calculated by such studies are for programs utilized by the native-born, U.S.-citizen children of immigrants. These children are counted as a "cost" of immigration if they are under 18, but as part of the native-born population if they are working, taxpaying adults. Yet all people are "costly" as children who are still in school and have not yet entered the workforce. Economists view expenditures on healthcare and education for children as investments that pay off later, when those children become workers and taxpayers. Healthy, well-educated children are more productive, earn higher wages, and pay more in taxes as adults.[77]

**U.S. CHAMBER OF COMMERCE**
Labor, Immigration & Employee Benefits

# INTEGRATION

**MYTH: Today's immigrants are not assimilating into U.S. society.**

**FACT: Today's immigrants are buying homes, becoming U.S. citizens, and learning English.**

Throughout U.S. history, each new wave of immigrants has been accused of not "assimilating" into U.S. society. The Italian, Polish, and Eastern European immigrants who came here at the end of the nineteenth century faced this accusation, and subsequently proved it wrong as they and their children learned English, bought homes, got better jobs, became U.S. citizens, and integrated into their communities in many other ways. The Latin American and Asian immigrants who have come here more recently now face the same accusation. As with their predecessors, they are proving that accusation to be false and are integrating into U.S. society and climbing the socioeconomic ladder over time.[78]

A study by demographer Dowell Myers demonstrates the integration and socioeconomic progress of immigrants over the course of two decades. Myers focuses on those immigrants who came to the United States between 1985 and 1989. He uses census data to take a socioeconomic snapshot of these long-term immigrants in 1990 and again in 2008—after they had lived in the United States for 18 years. The data indicate that, since coming here, a growing number of long-term immigrants have bought homes, earned higher wages, and become U.S. citizens. Between 1990 and 2008, the share of these immigrants who owned homes jumped from 16 percent to 62 percent. The share who earned incomes above

the "low-income" level rose from 35 percent to 66 percent. The share who were U.S. citizens grew from seven percent to 56 percent.[79]

Likewise, data from the Office of Immigration Statistics at the Department of Homeland Security (DHS) reveal that the number of immigrants applying for U.S. citizenship has been growing for decades. A DHS report found that the average number of immigrants naturalizing each year increased from fewer than 120,000 during the 1950s and 1960s, to 210,000 during the 1980s, 500,000 during the 1990s, and 680,000 between 2000 and 2009. The number of naturalizations grew from 619,913 in 2010, to 694,193 in 2011, to 757,434 in 2012.[80] Moreover, immigrants today are naturalizing at a faster rate than in the past.[81] According to a 2008 DHS report, "approximately one third of immigrants who obtained LPR [legal permanent resident] status from the mid-1970s through the mid-1980s naturalized within 10 years, whereas nearly half the immigrants who obtained status in the mid-to-late-1990s did so."[82]

The economic and social integration of immigrants is an ongoing process that will continue over the decades to come. In a 2011 report, Myers concludes that the share of immigrants who own homes is projected to increase from 25.5 percent in 2000 to 72 percent in 2030. The share that speak English "well" or "very well" is projected to grow from 57.5 percent to 70.3 percent over the same period. And the share living in poverty is projected to decrease from 22.8 percent to 13.4 percent.[83] In other words, immigrants are not settling into "ethnic enclaves" that exist apart from mainstream America. Rather, they are becoming progressively more "American" in every sense of the word.

13

# IMMIGRATION
## MYTHS AND FACTS

Integration and upward mobility are most apparent among the children of immigrants. For instance, according to surveys by the Pew Research Center, "adults in the second generation are doing better than those in the first generation in median household income ($58,000 versus $46,000); college degrees (36 percent versus 29 percent); and homeownership (64 percent versus 51 percent). They are less likely to be in poverty (11 percent versus 18 percent) and less likely to have not finished high school (10 percent versus 28 percent)."[84] A study by economist James P. Smith found that the wages and educational attainment of Latino men increase significantly from generation to generation, with wages increasing 15 percent from the first generation and in between the second and third generations, an additional 5.6 percent.[85]

## CRIME

**MYTH: Immigrants are more likely to commit crimes than native-born Americans.**

**FACT: Immigration does not cause crime rates to rise, and immigrants are actually less likely to commit crimes or be behind bars than native-born Americans.**

High levels of immigration are not associated with more crime. Between 1990 and 2010, the foreign-born share of the U.S. population grew from 7.9 percent to 12.9 percent[86] and the number of unauthorized immigrants tripled from 3.5 million to 11.2 million.[87] During the same period, FBI data indicates that the violent crime

rate declined 45 percent and the property crime rate fell 42 percent.[88] Likewise, a report from the conservative Americas Majority Foundation found that crime rates are lowest in states with the highest immigration growth rates. In 2006, the 10 states with the most pronounced, recent increases in immigration had the lowest rates of crime in general and violent crime in particular.[89]

Moreover, immigrants are much less likely to be behind bars than native-born Americans. A study by sociologist Rubén Rumbaut found that, among young men, incarceration rates are lowest for immigrants. This holds true regardless of ethnicity or educational attainment, even for Mexicans, Salvadorans, and Guatemalans who comprise a majority of the undocumented population. In 2000, the incarceration rate for young immigrant men was only 0.7 percent—five times lower than the 3.5 percent incarceration rate among young native-born men.[90] A study by the Public Policy Institute of California yielded similar results. The study found that, in 2005, the incarceration rate for foreign-born adults in California was 297 per 100,000—compared to 813 per 100,000 for native-born adults. Moreover, immigrants made up 35 percent of California's adult population, but only 17 percent of the state prison population.[91]

Similarly, economists Kristin Butcher and Anne Morrison Piehl used data from the 1980, 1990, and 2000 censuses to demonstrate that, during the 1990s, "those immigrants who chose to come to the United States were less likely to be involved in criminal activity than earlier immigrants and the native born." The analysis by Butcher and Piehl established that the lower incarceration rate for immigrants could not be explained away with the argument that there are fewer immigrants in prison because so many of

14

**U.S. CHAMBER OF COMMERCE**
Labor, Immigration & Employee Benefits

them are deported. Nor could it be dismissed on the grounds that harsher immigration laws are deterring immigrants from committing crimes because they are afraid of getting deported.[92]

These studies are only the most recent in a very long line of research demonstrating that immigrants are *less* likely than native-born Americans to commit crimes or to be incarcerated.[93]

# BORDER SECURITY

## MYTH: Reforming the legal immigration system will not help secure the border.

## FACT: Immigration reform is an integral part of any effective border security strategy.

Since 1986, after passage of the Immigration Reform and Control Act, the federal government has spent an estimated $186.8 billion on immigration enforcement.[94] Yet during that time, the unauthorized population has tripled in size to 11 million.[95] This did not occur because $186.6 billion was not enough to get the job done. It occurred because this money was spent trying to enforce immigration laws that have consistently failed to match either the U.S. economy's demand for workers or the natural desire of immigrants to be reunited with their families. Therefore, enforcement coupled with commonsense reforms to our legal immigration system is one of the most effective ways to enhance national security. Immigration reform that includes a pathway to legal status for undocumented immigrants

already living in the country, with the creation of flexible avenues for future immigration (through temporary worker programs), and mandatory employment verification, would enhance border security and reduce illegal immigration.

Broad immigration reform in the 113th Congress would enhance border security in multiple ways. To begin with, reform would reduce the flow of undocumented immigrants by providing a mechanism for them to legally come and work in the United States by creating more flexible legal limits on employment-based immigration. Workers admitted under employment-based visa programs would be screened against law enforcement databases prior to entering the country. Paired with a workable employment verification system, once their visas expire, these new temporary workers would be unable to work in the United States.

Further, an earned lawful status program for the undocumented would also have a comparable impact on national security as the undocumented come out of the shadows, register with the federal government, and undergo background checks. Additionally, an earned lawful status program for the undocumented would reduce the lucrative fraudulent document and smuggling industry that currently persists as well as "shrink the haystack," allowing law enforcement to concentrate on removing individuals with criminal backgrounds rather than those entering the country legitimately to work.[96]

15

# IMMIGRATION
## MYTHS AND FACTS

# ENDNOTES

1. See Madeline Zavodny, *Immigration and American Jobs* (Washington, DC: American Enterprise Institute for Public Policy Research and the Partnership for a New American Economy, 2011), <http://www.aei.org/files/2011/12/14/-immigration-and-american-jobs_144002688962.pdf>.

2. Jeffrey S. Passel and D'Vera Cohn, *Unauthorized Immigrant Population: National and State Trends, 2010* (Washington, DC: Pew Hispanic Center, February 1, 2011), p. 17, <http://pewhispanic.org/files/reports/133.pdf#page=18>.

3. See testimony of Daniel Griswold, Director, Center for Trade Policy Studies, Cato Institute, before the U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Immigration Policy and Enforcement, January 26, 2011, p. 4, <http://judiciary.house.gov/hearings/pdf/Griswold01262011.pdf#page=4>.

4. See Raúl Hinojosa-Ojeda, *Raising the Floor for American Workers: The Economic Benefits of Comprehensive Immigration Reform* (Washington, DC: Immigration Policy Center of the American Immigration Council and the Center for American Progress, January 2010), <http://www.immigrationpolicy.org/sites/default/files/docs/Hinojosa%20-%20Raising%20the%20Floor%20for%20American%20Workers%20010710.pdf#page=14>; The Perryman Group, An Essential Resource: An Analysis of the Economic Impact of Undocumented Workers on Business Activity in the U.S. with Estimated Effects by State and by Industry (Waco, TX: April 2008), <http://www.immigrationpolicy.org/sites/default/files/docs/ipc/Impact%20of%20the%20Undocumented%20Workforce%20April%2015%202008.pdf>.

5. Robert W. Fairlie, *Kauffman Index of Entrepreneurial Activity, 1996–2010* (Kansas City, MO: Ewing Marion Kauffman Foundation, March 2011), p. 9, <http://www.kauffman.org/uploadedFiles/KIEA_2011_report.pdf#page=11>.

6. Robert W. Fairlie, *Open for Business: How Immigrants Are Driving Small Business Creation in the United States* (New York, NY: Partnership for a New American Economy, August 2012), p. 3, <http://www.renewoureconomy.org/wp-content/uploads/2013/07/openforbusiness.pdf#page=5>.

7. David Dyssegaard Kallick, *Immigrant Small Business Owners: A Significant and Growing Part of the Economy* (New York, NY: Fiscal Policy Institute, June 2012), p. 1, <http://www.fiscalpolicy.org/immigrant-small-business-owners-FPI-20120614.pdf#page=5>.

8. Partnership for a New American Economy, *The "New American" Fortune 500* (New York, NY: June 2011), pp. 1–3, <http://www.renewoureconomy.org/sites/all/themes/pnae/img/new-american-fortune-500-june-2011.pdf>; see also Stuart Anderson, *American Made 2.0: How Immigrant Entrepreneurs Continue to Contribute to the U.S. Economy* (Arlington, VA: National Venture Capital Association, 2013), <http://www.nvca.org/index.php?option=com_content&view=article&id=254&Itemid=103>; David Bier, *America Still Needs a True Entrepreneurship Visa: Senate and House Immigration Bills Fall Short in Attracting Entrepreneurs to America* (Washington, DC: Competitive Enterprise Institute, 2013), <http://cei.org/sites/default/files/David%20Bier%20-%20America%20Needs%20a%20True%20Entrepreneurship%20Visa.pdf>.

9. Wadhwa, et al., "Skilled Immigration and Economic Growth," *Applied Research in Economic Development* 5, no. 1 (May 2008), pp.6–14, <http://www.soc.duke.edu/globalengineering/papers_skilledimmigrants.php>.

10. Heidi Shierholz, *Immigration and Wages: Methodological Advancements Confirm Modest Gains for Native Workers* (Washington, DC: Economic Policy Institute, February 4, 2010), p. 22, <http://epi.3cdn.net/7de74e-e0cd834d87d4_a3m6ba9j0.pdf#page=22>.

11. Michael Greenstone and Adam Looney, *Ten Economic Facts about Immigration* (Washington, DC: The Hamilton Project, Brookings Institution, September 2010), p. 5, <http://www.brookings.edu/~/media/Files/rc/reports/2010/09_immigration_greenstone_looney/09_immigration.pdf#page=7>.

12. Christopher S. Decker, *Nebraska's Immigrant Population: Economic and Fiscal Impacts* (Omaha, NE: Office of Latino/Latin American Studies, University of Nebraska at Omaha, October 2008), p. 1, <http://www.unomaha.edu/ollas/Econ%20Im%20Report/EconImpact.pdf#page=9>.

13. See Madeline Zavodny, *Immigration and American Jobs* (Washington, DC: American Enterprise Institute for Public Policy Research and the Partnership for a New American Economy, 2011), <http://www.aei.org/files/2011/12/14/-immigration-and-american-jobs_144002688962.pdf>; Madeline Zavodny and Tamar Jacoby, *Filling the Gap: Less-Skilled Immigration in a Changing Economy* (Washington, DC: American Enterprise Institute and ImmigrationWorks USA, 2013), <http://www.aei.org/files/2013/06/10/-zavodny-filling-the-gap-immigration-report_140631709214.pdf>; Demetrios G. Papademetriou and Madeleine Sumption, *The Role of Immigration in Fostering Competitiveness in the United States* (Washington, DC: Migration Policy Institute, 2011), <http://www.migrationpolicy.org/pubs/competitiveness-us.pdf>; Giovanni Peri, "The Effect of Immigrants on U.S. Employment and Productivity," *FRBSF Economic Letter 2010-26* (San Francisco, CA: Federal Reserve Bank of San Francisco, August 30, 2010), <http://www.frbsf.org/economic-research/publications/economic-letter/2010/august/effect-immigrants-us-employment-productivity/>; Michael Fix, Demetrios G. Papademetriou, and Madeleine Sumption, *Immigrants in a Changing Labor Market: Responding to Economic Needs* (Washington, DC: Migration Policy Institute, 2013), <http://www.migrationpolicy.org/bookstore/labormarkets.php>.

14. Michael Greenstone and Adam Looney, *Ten Economic Facts about Immigration* (Washington, DC: The Hamilton Project, Brookings Institution, September 2010), p. 5, <http://www.brookings.edu/~/media/Files/rc/reports/2010/09_immigration_greenstone_looney/09_immigration.pdf#page=7>.

15. Jack Strauss, *Does Immigration, Particularly Increases in Latinos, Affect African American Wages, Unemployment and Incarceration Rates?* (Social Science Research Network, December 8, 2012), <http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2186978>.

16. Rob Paral & Associates, *The Unemployment and Immigration Disconnect: Untying the Knot, Part I of III* (Washington, DC: Immigration Policy Center, American Immigration Law Foundation, May 2009), pp. 4–6, <http://www.immigrationpolicy.org/sites/default/files/docs/Part%201%20-%20Unemployment%20Disconnect%20%2005-19-09.pdf>.

17. Rob Paral & Associates, *Immigration and Native-Born Unemployment across Racial/Ethnic Groups: Untying the Knot, Part II of III* (Washington, DC: Immigration Policy Center, American Immigration Law Foundation, May 2009), p. 7, <http://www.immigrationpolicy.org/sites/default/files/docs/Part%202%20-%20Unemployment%20Race%20Disconnect%20 2005-19-09.pdf>.

18. Giovanni Peri, *Rethinking the Effects of Immigration on Wages: New Data*

**U.S. CHAMBER OF COMMERCE**
Labor, Immigration & Employee Benefits

*and Analysis from 1990–2004* (Washington, DC: Immigration Policy Center, American Immigration Law Foundation, October 2006), p. 1, <http://www.immigrationpolicy.org/sites/default/files/docs/IPC%20Rethinking%20Wages,%2011-2006.pdf>.

19. Heidi Shierholz, *Immigration and Wages: Methodological Advancements Confirm Modest Gains for Native Workers* (Washington, DC: Economic Policy Institute, February 4, 2010), p. 12, <http://epi.3cdn.net/7de74e-e0cd834d87d4_a3m6ba9j0.pdf#page=12>.

20. Gianmarco I. P. Ottaviano and Giovanni Peri, *Immigration and National Wages: Clarifying the Theory and the Empirics*, NBER Working Paper No. 14188 (Cambridge, MA: National Bureau of Economic Research, July 2008), p.58, <http://www.nber.org/papers/w14188>. See Giovanni Peri, *The Impact of Immigrants in Recession and Economic Expansion*, MPI Immigrants in a Changing Labor Market (Washington, DC: Migration Policy Institute, March 2013).

21. Örn Bodvarsson and Hendrik Van den Berg, "The Impact of Immigration on a Local Economy: The Case of Dawson County, Nebraska," *Great Plains Research* 13, no. 2 (Fall 2003), pp.291–309, <http://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1663&context=greatplainsresearch>.

22. Örn B. Bodvarsson, Joshua J. Lewer, and Hendrik F. Van den Berg, *Measuring Immigration's Effects on Labor Demand: A Reexamination of the Mariel Boatlift*, IZA Discussion Paper No. 2919 (Bonn, Germany: IZA-Institute for the Study of Labor, July 21, 2007), <http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1001215>.

23. David Card, *How Immigration Affects U.S. Cities*, CReAM Discussion Paper No 11/07 (London, England: Center for Research and Analysis of Migration, June 2007), <http://www.econ.ucl.ac.uk/cream/pages/CDP/CDP_11_07.pdf>.

24. Dixie Sommers and James C. Franklin, "Overview of Projections to 2020," *Monthly Labor Review*, January 2012, p. 10, <http://www.bls.gov/opub/mlr/2012/01/art1full.pdf#page=8>.

25. See Dowell Myers, *Immigrants and Boomers: Forging a New Social Contract for the Future of America* (New York, NY: Russell Sage Foundation, 2007), <https://www.russellsage.org/publications/immigrants-and-boomers-0>; John Pitkin and Dowell Myers, *Projections of the U.S. Population, 2010–2040, by Immigrant Generation and Foreign-Born Duration in the U.S.* (Los Angeles, CA: Population Dynamics Research Group, School of Policy, Planning, and Development, University of Southern California, 2011), <http://www.usc.edu/schools/price/futures/pdf/2011_Pitkin-Myers_Projections-Immigrant-Generations-and-Foreign-Born.pdf>.

26. Mitra Toossi, "Labor Force Projections to 2020: A More Slowly Growing Workforce," *Monthly Labor Review*, January 2012, p. 47, <http://www.bls.gov/opub/mlr/2012/01/art3full.pdf#page=5>.

27. C. Brett Lockard and Michael Wolf, "Occupational Employment Projections to 2020," *Monthly Labor Review*, January 2012, p. 102, <http://www.bls.gov/opub/mlr/2012/01/art5full.pdf#page=19>.

28. Mitra Toossi, "Labor Force Projections to 2020: A More Slowly Growing Workforce," *Monthly Labor Review*, January 2012, p. 56, <http://www.bls.gov/opub/mlr/2012/01/art3full.pdf#page=14>.

29. Mitra Toossi, "Labor Force Projections to 2020: A More Slowly Growing Workforce," *Monthly Labor Review*, January 2012, p. 63, <http://www.bls.gov/opub/mlr/2012/01/art3full.pdf#page=21>.

30. C. Brett Lockard and Michael Wolf, "Occupational Employment Projections to 2020," *Monthly Labor Review*, January 2012, p. 85, 90,<http://www.bls.gov/opub/mlr/2012/01/art5full.pdf#page=2>.

31. C. Brett Lockard and Michael Wolf, "Occupational Employment Projections to 2020," *Monthly Labor Review*, January 2012, p. 89, <http://www.bls.gov/opub/mlr/2012/01/art5full.pdf#page=6>.

32. Darrell M. West, *The Paradox of Worker Shortages at a Time of High National Unemployment* (Washington, DC: The Brookings Institution, April 2013), p. 2, <http://www.brookings.edu/~/media/research/files/papers/2013/04/10%20worker%20shortage%20immigration%20west/west_paradox%20of%20worker%20shortages.pdf#page=2>.

33. Census/Bureau of Labor Statistics, *Current Population Survey* (Washington, DC: Department of Labor, pooled January through December 2011 data).

34. Alexander Nowrasteh, *How to Make Guestworker Visas Work* (Washington, DC: Cato Institute, 2013), <http://object.cato.org/sites/cato.org/files/pubs/pdf/pa719_1.pdf>.

35. Demand for the H-1B and H-2B programs are not driven by the cap, instead demand for these programs are based on employer new hiring and the inability of employers to find American workers in sufficient numbers. For example, in 2001 through 2003, the H-1B cap of 195,000 visas was never reached. Jill H. Wilson, *Immigration Facts: Temporary Foreign Workers* (Washington, DC: The Brookings Institution, June 18, 2013), <http://www.brookings.edu/research/reports/2013/06/18-temporary-workers-wilson>.

36. See U.S. Citizenship and Immigration Services, "H-1B Fiscal Year (FY) 2014 Cap Season," April 15, 2013, <http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=4b-7cdd1d5fd37210VgnVCM100000082ca60aRCRD&vgnextchannel=73566811264a3210VgnVCM100000b92ca60aRCRD>.

37. Madeline Zavodny and Tamar Jacoby, *Filling the Gap: Less-Skilled Immigration in a Changing Economy* (Washington, DC: American Enterprise Institute and ImmigrationWorks USA, June 2013), pp. 1–3, <http://www.aei.org/files/2013/06/10/-zavodny-filling-the-gap-immigration-report_140631709214.pdf >.

38. C. Brett Lockard and Michael Wolf, "Occupational Employment Projections to 2020," *Monthly Labor Review*, January 2012, p. 106, <http://www.bls.gov/opub/mlr/2012/01/art5full.pdf#page=23>.

39. Madeline Zavodny and Tamar Jacoby, *Filling the Gap: Less-Skilled Immigration in a Changing Economy* (Washington, DC: American Enterprise Institute and ImmigrationWorks USA, 2013), <http://www.aei.org/files/2013/06/10/-zavodny-filling-the-gap-immigration-report_140631709214.pdf>; Demetrios G. Papademetriou and Madeleine Sumption, *The Role of Immigration in Fostering Competitiveness in the United States* (Washington, DC: Migration Policy Institute, 2011), <http://www.migrationpolicy.org/pubs/competitiveness-us.pdf>.

40. Stuart Anderson, *H-1B Visas Essential to Attracting and Retaining Talent in America* (Arlington, VA: National Foundation for American Policy, 2013), <http://www.nfap.com/pdf/NFAP%20Policy%20Brief%20H-1B%20Visas%20May%202013.pdf>.

41. Jonathan T. Rothwell and Neil G. Ruiz, *H-1B Visas and the STEM Shortage: A Research Brief* (Washington, DC: The Brookings Institution, 2013), pp. 1–3, <http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2262872>; see also Giovanni Peri, Kevin Shih, and Chad Sparber, "STEM Workers, H-1B Visas and Productivity in U.S. Cities," *Norface Migration Discussion Paper No. 2013-09* (London: Norface Research Programme on Migration, 2013), <http://www.norface-migration.org/publ_uploads/NDP_09_13.pdf>.

# IMMIGRATION
## MYTHS AND FACTS

42. Madeline Zavodny, *Immigration and American Jobs* (Washington, DC: American Enterprise Institute for Public Policy Research and the Partnership for a New American Economy, 2011), p.11. <http://www.aei.org/files/2011/12/14/-immigration-and-american-jobs_144002688962.pdf>.

43. Frederick R. Treyz, Corey Stottlemyer, and Rod Motamedi, *Key Components of Immigration Reform: An Analysis of the Economic Effects of Creating a Pathway to Legal Status, Expanding High-Skilled Visas, and Reforming Lesser-Skilled Visas* (Amherst, MA: Regional Economic Models, Inc., 2013), <http://www.remi.com/immigration-report>.

44. McKinsey Global Institute, *An Economy that Works: Job Creation and America's Future*, (June 2011), http://www.mckinsey.com/Insights/MGI/Research/Labor_Markets/An_economy_that_works_for_US_job_creation

45. *American Community Survey*, data from 2008. <www.census.gove/acs>.

46. *Bureau of Labor Statistics Employment Projections 2010-2020* (Washington, DC: Department of Labor, February 1, 2012), table 9.

47. *U.S. Census Educational Attainment for the Population 25 Years and Over* (Washington, DC: Department of Commerce, December 10, 2012), Table 1.

48. *Help Wanted* (Washington, DC: the Information Technology Industry Council, the Partnership for a New American Economy, the U.S. Chamber of Commerce, November 2012), <http://www.immigrationresearch-info.org/report/us-chamber-commerce/help-wanted-role-foreign-workers-innovation-economy>.

49. *American Community Survey*, data from 2009-2011. <www.census.gov/acs>. See also Gordon Hanson (UC San Diego) and Matthew Slaughter (Dartmouth), *Talent, Immigration, and U.S. Economic Competitiveness* (Washington, DC: National Bureau of Economic Research, May 2013), <http://irps.ucsd.edu/assets/001/504703.pdf>.

50. Bureau of Labor Statistics, *Occupational Employment Statistics* (Washington, DC: Department of Labor), <http://www.bls.gov/oes/current/oes_nat.htm>.

51. Id.

52. See, Gordon Hanson (UC San Diego) and Matthew Slaughter (Dartmouth), *Talent, Immigration, and U.S. Economic Competitiveness* ((Washington, DC: National Bureau of Economic Research, May 2013), at p. 31-32 and See section 3 footnotes for methodology, <http://irps.ucsd.edu/assets/001/504703.pdf>.

53. Jacob L. Vigdor, *Immigration and the Revival of American Cities: From Preserving Manufacturing Jobs to Strengthening the Housing Market* (Washington, DC: Americas Society/Council of the Americas and Partnership for a New American Economy, 2013), <http://www.as-coa.org/sites/default/files/ImmigrationUSRevivalReport.pdf>; see also Tamar Jacoby, *U.S. Economic Competitiveness at Risk: A Midwest Call to Action on Immigration Reform* (Chicago, IL: The Chicago Council on Global Affairs, 2013), <http://www.thechicagocouncil.org/UserFiles/File/Task%20Force%20Reports/2013_ImmigrationTaskForce_Final.pdf>.

54. Mark Muro, *Multiplier Effects: Connecting the Innovation and Opportunity Agendas* (Washington, DC: The Brookings Institution, August 23, 2012), <http://www.brookings.edu/blogs/the-avenue/posts/2012/08/23-multiplier-effects-muro>.

55. Enrico Moretti, *The New Geography of Jobs* (New York, NY: Houghton Mifflin, 2012), <http://tinyurl.com/mplov9k>.

56. Id.

57. Jonathan Rothwell, *Regional Inequality and 'The New Geography of Jobs'* (Washington, DC: The Brookings Institution, August 7, 2012), <http://www.brookings.edu/blogs/the-avenue/posts/2012/08/07-regional-inequality-rothwell>.

58. The Chicago Council, *U.S. Economic Competitiveness at Risk: A Midwest Call to Action on Immigration Reform* (Chicago, IL: The Chicago Council on Global Affairs, February 2013), <http://www.thechicagocouncil.org/UserFiles/File/Task%20Force%20Reports/2013_ImmigrationTaskForce_Final.pdf>.

59. Welcoming Michigan, <http://www.welcomingmichigan.org/content/learn-more>.

60. *Global Detroit, Global Detroit: Final Report* (Detroit, MI: 2010), <http://www.globaldetroit.com/wp-content/files_mf/1327697728Global_Detroit_Study.full_report.pdf>.

61. Welcome Dayton, <http://www.welcomedayton.org/>.

62. Welcoming America: Building a Nation of Neighbors, <http://www.welcomingamerica.org/about-us/accomplishments/>.

63. Bill Blazar, Senior Vice President of Public Affairs and Business Development, Minnesota Chamber of Commerce, quoted in The Chicago Council, *U.S. Economic Competitiveness at Risk: A Midwest Call to Action on Immigration Reform* (Chicago, IL: The Chicago Council on Global Affairs, February 2013), <http://www.thechicagocouncil.org/UserFiles/File/Task%20Force%20Reports/2013_ImmigrationTaskForce_Final.pdf>.

64. The White House, *Economic Report of the President*, February 2005, p. 107, <http://www.gpoaccess.gov/eop/2005/2005_erp.pdf>.

65. Stephen Goss, et al., "Effects of Unauthorized Immigration on the Actuarial Status of the Social Security Trust Funds," *Actuarial Note* no. 151 (Baltimore, MD: Office of the Chief Actuary, Social Security Administration, April 2013), p. 3, <http://www.socialsecurity.gov/OACT/NOTES/pdf_notes/note151.pdf#page=3>.

66. Institute on Taxation and Economic Policy, *Undocumented Immigrants' State and Local Tax Contribution* (Washington, DC: July 2013), <http://www.itep.org/immigration/>.

67. Carole Keeton Strayhorn, Texas Comptroller, *Special Report: Undocumented Immigrants in Texas: A Financial Analysis of the Impact to the State Budget and Economy* (Austin, TX: December 2006), p. 1, <http://window.state.tx.us/specialrpt/undocumented/undocumented.pdf#page=3>.

68. Sarah Beth Coffey, *Undocumented Immigrants in Georgia: Tax Contribution and Fiscal Concerns* (Atlanta, GA: Georgia Budget and Policy Institute, January 2006), p. 1, <http://www.gbpi.org/pubs/garevenue/20060119.pdf>.

69. Robin Baker and Rich Jones, *State and Local Taxes Paid in Colorado by Undocumented Immigrants* (Denver, CO: The Bell Policy Center, June 30, 2006), p. 1, <http://www.thebell.org/PUBS/IssBrf/2006/06ImmigTaxes.pdf#page=2>.

70. Oregon Center for Public Policy, *Undocumented Workers Are Taxpayers, Too* (Silverton, OR: April 10, 2007), p. 4 <http://www.ocpp.org/cgi-bin/display.cgi?page=issue070410immig>.

71. Beth Pearson and Michael F. Sheehan, *Undocumented Immigrants in Iowa: Estimated Tax Contributions and Fiscal Impact* (Mount Vernon, IA: Iowa Policy Project, October 2007), pp. 30–31, <http://www.iowafiscal.org/2007docs/071025-undoc.pdf#page=30>.

**U.S. CHAMBER OF COMMERCE**
Labor, Immigration & Employee Benefits

72. Institute on Taxation and Economic Policy, *Undocumented Immigrants' State and Local Tax Contribution* (Washington, DC: July 2013), <http://www.itep.org/immigration/>.

73. National Immigration Law Center, *Overview of Immigrant Eligibility for Federal Programs* (Washington, DC: October 2010), <http://www.nilc.org/pubs/guideupdates/tbl1_ovrvw-fed-pgms-rev-2010-10-07.pdf>.

74. National Immigration Law Center, *Facts about Immigrants' Low Use of Health Services and Public Benefits* (Washington, DC: September 2006), p. 2 <http://www.nilc.org/immspbs/research/imms&publicservices_2006-9-12.pdf#page=2>.

75. Judith Gans, *Immigrants in Arizona: Fiscal and Economic Impacts* (Tucson, AZ: Udall Center for Studies in Public Policy, University of Arizona, 2007), p. 3, <http://udallcenter.arizona.edu/immigration/publications/impactofimmigrants08.pdf#page=10>.

76. Emily Eisenhauer, et al., *Immigrants in Florida: Characteristics and Contributions* (Miami, FL: Research Institute for Social and Economic Policy, Florida International University, May 2007), pp. 7, 34, <http://www.risep-fiu.org/wp-content/uploads/2009/03/immigrants_spring_2007_reduced.pdf>.

77. Michael Greenstone and Adam Looney, *Ten Economic Facts about Immigration* (Washington, DC: The Hamilton Project, Brookings Institution, September 2010), p. 6, <http://www.brookings.edu/~/media/Files/rc/reports/2010/09_immigration_greenstone_looney/09_immigration.pdf#page=8>.

78. Tomás R. Jiménez, *Immigrants in the United States: How Well Are They Integrating into Society?* (Washington, DC: Migration Policy Institute, May 2011), <http://www.migrationpolicy.org/pubs/integration-jimenez.pdf >.

79. Dowell Myers and John Pitkin, *Assimilation Today: New Evidence Shows the Latest Immigrants to America Are Following in Our History's Footsteps* (Washington, DC: Center for American Progress, September 1, 2010), p. 16, <http://www.americanprogress.org/issues/2010/09/pdf/immigrant_assimilation.pdf#page=19>.

80. James Lee, *U.S. Naturalizations: 2012* (Washington, DC: Department of Homeland Security, Office of Immigration Statistics, March 2013), p. 2, <http://www.dhs.gov/sites/default/files/publications/ois_natz_fr_2012.pdf#page=2>.

81. Tomás R. Jiménez, *Immigrants in the United States: How Well Are They Integrating into Society?* (Washington, DC: Migration Policy Institute, May 2011), p. 12, <http://www.migrationpolicy.org/pubs/integration-jimenez.pdf >.

82. Bryan C. Baker, *Trends in Naturalization Rates: 2008 Update* (Washington, DC: U.S. Department of Homeland Security, Office of Immigration Statistics, June 2009), p. 2, <http://www.dhs.gov/xlibrary/assets/statistics/publications/ois_natztrends_fs_2008.pdf>.

83. Dowell Myers and John Pitkin, *Assimilation Tomorrow: How America's Immigrants Will Integrate by 2030* (Washington, DC: Center for American Progress, November 2011), p. 2, <http://www.americanprogress.org/wp-content/uploads/issues/2011/11/pdf/dowell_assimilation_report.pdf#page=5>.

84. Pew Research Center, *Second-Generation Americans: A Portrait of the Adult Children of Immigrants* (Washington, DC: February 7, 2013), p. 9, <http://www.pewsocialtrends.org/files/2013/02/FINAL_immigrant_generations_report_2-7-13.pdf#page=9>.

85. James P. Smith, "Assimilation across the Latino Generations," *American Economic Review* 93, no. 2 (Washington, DC, May 2003), pp.315–319, <http://econpapers.repec.org/article/aeaaecrev/v_3a93_3ay_3a2003_3ai_3a2_3ap_3a315-319.htm>.

86. Elizabeth M. Grieco, et al., *The Size, Place of Birth, and Geographic Distribution of the Foreign-Born Population in the United States: 1960 to 2010* (Washington, DC: U.S. Census Bureau, October 2012), p. 19, <http://www.census.gov/population/foreign/files/WorkingPaper96.pdf#page=19>.

87. Jeffrey S. Passel and D'Vera Cohn, *Unauthorized Immigrant Population: National and State Trends, 2010* (Washington, DC: Pew Hispanic Center, February 1, 2011), p. 23, <http://www.pewhispanic.org/files/reports/133.pdf#page=24>.

88. FBI, Uniform Crime Reports, prepared by the National Archive of Criminal Justice Data, Date of download: July 16, 2013, <http://www.ucrdatatool.gov/>.

89. Richard Nadler, *Immigration and the Wealth of States* (Overland Park, KS: Americas Majority Foundation: January 2008), p. 9, <http://immigrationworksusa.org/uploaded/file/ImmigrationandWealth.pdf#page=11>.

90. Rubén G. Rumbaut and Walter A. Ewing, *The Myth of Immigrant Criminality and the Paradox of Assimilation: Incarceration Rates among Native and Foreign-Born Men* (Washington, DC: Immigration Policy Center, American Immigration Law Foundation, Spring 2007), pp. 6–10, <http://www.immigrationpolicy.org/sites/default/files/docs/Imm%20Criminality%20(IPC).pdf#page=8>.

91. *Immigrants and Crime* (San Francisco, CA: Public Policy Institute of California, June 2008), <http://www.ppic.org/content/pubs/jtf/JTF_ImmigrantsCrimeJTF.pdf>.

92. Kristin F. Butcher and Anne Morrison Piehl, *Why Are Immigrants' Incarceration Rates So Low? Evidence on Selective Immigration, Deterrence, and Deportation*, Working Paper 2005-19 (Chicago, IL: Federal Reserve Bank of Chicago, November 2005), p. 2, <http://www.chicagofed.org/digital_assets/publications/working_papers/2005/wp2005_19.pdf#page=5>.

93. During the last period of large-scale immigration at the beginning of the twentieth century, three federal commissions reached this conclusion along with the U.S. Commission on Immigration Reform in a 1994 report. And so have academic researchers using data from the 1980, 1990, and 2000 Census; the National Longitudinal Study of Adolescent Health; and community studies in Chicago, San Diego, El Paso, and Miami. See Rubén G. Rumbaut and Walter A. Ewing, *The Myth of Immigrant Criminality and the Paradox of Assimilation: Incarceration Rates among Native and Foreign-Born Men* (Washington, DC: Immigration Policy Center, American Immigration Law Foundation, Spring 2007), pp. 13–14, <http://www.immigrationpolicy.org/sites/default/files/docs/Imm%20Criminality%20(IPC).pdf#page=15>.

94. Doris Meissner, Donald M. Kerwin, Muzaffar Chishti, and Claire Bergeron, *Immigration Enforcement in the United States: The Rise of a Formidable Machinery* (Washington, DC: Migration Policy Institute, January 2013), p. 3, <http://www.migrationpolicy.org/pubs/enforcementpillars.pdf#page=9>.

95. Jeffrey S. Passel and D'Vera Cohn, *Unauthorized Immigrant Population: National and State Trends, 2010* (Washington, DC: Pew Hispanic Center, February 1, 2011), p. 23, <http://pewhispanic.org/files/reports/133.pdf#page=24>.

96. Terry Goddard, *How to Fix a Broken Border: A Three Part Series* (Washington, DC: Immigration Policy Center, American Immigration Council, September 2011, February 2012, and May 2012), <http://www.immigrationpolicy.org/perspectives/how-fix-broken-border-three-part-series>.

19

A71



**U.S. CHAMBER OF COMMERCE**
Labor, Immigration & Employee Benefits

1615 H Street, NW | Washington, DC 20062



# EPI BRIEFING PAPER

ECONOMIC POLICY INSTITUTE • FEBRUARY 4, 2010 • BRIEFING PAPER #255

# IMMIGRATION AND WAGES
## Methodological advancements confirm modest gains for native workers

BY HEIDI SHIERHOLZ

## Executive summary

In the ongoing debate on immigration, there is broad agreement among academic economists that it has a small but positive impact on the wages of native-born workers *overall*: although new immigrant workers add to the labor supply, they also consume goods and services, which creates more jobs.

The real debate among researchers is whether a large influx of a *specific type* of worker (say, workers with a particular level of education or training) has the potential to have a negative impact on the wages of existing workers of that *same type*. Some research argues that immigrant competition is quite costly to certain groups of native-born U.S. workers, while other research finds that native workers—even those who have levels of education and experience similar to new immigrants—may actually reap modest benefits from immigration.

We begin this paper with a review of the scholarly literature on immigration's effect on wages, focusing on recent methodological advancements. We then use Current Population Survey (CPS) data from 1994 to 2007 to conduct our own empirical analysis of immigration's effect on wages over this period, incorporating these recent methodological advancements. Our analysis finds little evidence that immigration negatively impacts native-born workers.

*A key result from this work is that the estimated effect of immigration from 1994 to 2007 was to raise the wages of U.S.-born workers, relative to foreign-born workers, by 0.4% (or $3.68 per week), and to lower the wages of foreign-born workers, relative to U.S.-born workers, by 4.6% (or*

### TABLE OF CONTENTS

Executive summary ..........................................................1
Introduction ....................................................................2
Basic trends in immigration and wages ...................4
A brief look at the recent advancements in
 the research ...............................................................9
Estimates of the effect of immigration on wages ............11
Conclusion.....................................................................22
Appendix A: Data .......................................................24
Appendix B: Methodology .......................................25
Appendix C......................................................................27

www.epi.org

ECONOMIC POLICY INSTITUTE • 1333 H STREET, NW • SUITE 300, EAST TOWER • WASHINGTON, DC 20005 • 202.775.8810 • WWW.EPI.ORG

*$33.11 per week)*. In other words, any negative effects of new immigration over this period were felt largely by the workers who are the most substitutable for new immigrants—that is, earlier immigrants.

Additional key results from this analysis:

- For workers with less than a high school education, the relative wage effect of immigration was similar to the overall effect. U.S.-born workers with less than a high school education saw a relative 0.3% increase in wages (or $1.58 per week), while foreign-born workers with less than a high school education saw a relative 3.7% decrease in wages (or $15.71 per week). *In other words, immigration among workers with less than a high school degree served to lower the relative wages of other immigrant workers with less than a high school degree, not native workers with less than a high school degree.*

- The wages of male U.S.-born workers with less than a high school education were largely unaffected by immigration over this period, experiencing a relative decline of 0.2% due to immigration (or $1.37 per week). Female U.S.-born workers with less than a high school education experienced a relative increase in wages of 1.1% due to immigration ($4.19 per week).

- Around 3% of the increase from 1994 to 2007 in wage inequality between workers with less than a high school degree and workers with a college degree or more can be attributed to immigration.

- This analysis finds no evidence that young workers in particular are adversely affected by immigration.

- While the methodology used in this paper does not allow for a racial breakdown of the effect of immigration on U.S.-born workers in different education groups, we find that the overall effect of immigration on wages is similar for white non-Hispanic U.S.-born workers (+0.5%) and black non-Hispanic U.S.-born workers (+0.4%) .

- From 1994 to 2007, the effect of immigration on wages did not vary greatly over periods of very different labor demand, in part, because immigra-

tion flows respond strongly to the conditions of the U.S. economy.

- An analysis of the four states with the highest immigration over this period—California, Florida, New York, and Texas—revealed some interesting departures from the national average. In these states, like at the national level, the overall relative effect of immigration was positive on native workers. However, some subgroups in these states fared worse—particularly male workers with less than a high school degree.

## Introduction

In the ongoing debate over immigration policy in the United States, the impact of immigrants on the wages of native-born workers has been a central point of disagreement. There is broad agreement among academic economists on one point: that immigration has a small but positive impact on the wages of native-born workers overall. Although new immigrant workers add to the labor supply, they also consume goods and services, creating more jobs. In other words, as the labor force expands (as it is always doing, due to both native population growth and immigration), the economy adjusts and expands with it, and *average* wages are not hurt.

The actual heart of the debate is whether a large influx of a specific type of worker (say, workers with a particular level of education or training) has the potential to have a negative impact on the wages of existing workers of that type. Some parties in the debate argue that immigrant competition is quite costly to some native-born U.S. workers, particularly workers with low levels of education, among whom immigrant inflows have been relatively high. Others argue that a simple supply/demand framework may lead to that conclusion, the real world is more complicated. In fact, native workers who have similar levels of education and experience to new immigrants may even reap modest benefits from immigration.

This more-nuanced research has gained sway in recent years. It argues that it is not simply the increased supply of one group of workers that determines outcomes for another group. Were that so, then there would be little to argue about: a disproportionate increase in the supply of foreign-born workers of a certain type would lower

the wages of native-born workers who are also of that type. Instead, the characteristics of the added workers, and the specific role they play in the economy, make a big difference.

In the language of economics, it matters a great deal whether immigrant workers are *substitutes for* or *complements to* native-born workers. The terms refer to how employers use workers in the production of their goods and services. If native workers are indistinguishable in this process from immigrants—if they are substitutes—it follows that a large influx of immigrant labor may hurt natives' earnings prospects. But if natives and immigrants fulfill different roles in the production process, then they may play complementary roles, and it is less likely that the supply shock in one group will hurt the other group, and it may in fact help them.

The economic literature, as described below, finds evidence to support both of these scenarios, and is thus somewhat ambiguous. This analysis, which uses Current Population Survey (CPS) data from 1994 to 2007 and incorporates recent advancements in the methodology used to estimate the effect of immigration on relative wages, finds little evidence of negative impacts on subgroups of workers.

Note that we are only able to look at the effect on native wages of increases in *foreign-born* workers. Foreign-born workers may be naturalized U.S. citizens, permanent residents, temporary visa-holders, refugees, or undocumented workers. While naturalized U.S. citizens are identified in the CPS, if a foreign-born worker is not a citizen, it is impossible to determine whether he or she is a permanent resident, temporary visa-holder, refugee, or undocumented worker. This unfortunately limits the policy relevance of the research presented here, since we are unable to determine the effect of various subgroups of foreign-born workers on native labor market outcomes. We cannot, for example, answer the question of whether the H1B temporary visa program is suppressing the wages of high tech workers, or whether undocumented farm workers are suppressing wages in agriculture. What we estimate is the effect of increases in the foreign-born labor supply on the relative wages of native-born workers overall and by education level, gender, and age. In this analysis, we find little evidence

of large negative impacts, though we acknowledge that this may be masking very different outcomes in certain localities, industries, and occupations.

The methodology used in this analysis is explained in detail below. Note that we do not estimate the absolute effect of immigration on wages—instead, throughout this paper, we estimate the effect of immigration on the wages of subgroups of workers relative to other subgroups. A key result from this work is that the estimated effect of immigration from 1994 to 2007 was to raise the wages of U.S.-born workers, relative to foreign-born workers, by 0.4% (or $3.68 per week), and to lower the wages of foreign-born workers, relative to U.S.-born workers, by 4.6% (or $33.11 per week). *In other words, any negative effects of new immigration over this period were felt largely by those workers who are the most substitutable for new immigrants—earlier immigrants.*

Additional key results from this analysis:

- For workers with less than a high school education, the relative wage effect was similar to the overall effect. U.S.-born workers with less than a high school education saw a relative 0.3% increase in wages, which translates into an increase in weekly wages of $1.58 for this group, while foreign-born workers with less than a high school education saw a relative 3.7% decrease in wages, or $15.71 per week. *In other words, the surge in immigration among workers with less than a high school degree served to lower the relative wages of other immigrant workers with less than a high school degree, but not native workers with less than a high school degree.* This story is retold in each education category—U.S.-born workers see small positive relative wage effects and foreign-born workers see sizeable negative relative wage effects.

- The wages of male U.S.-born workers with less than a high school education were largely unaffected by immigration over this period, experiencing a relative decline of 0.2% due to immigration, or $1.37 per week. Female U.S.-born workers with less than a high school education experienced a relative increase in wages of 1.1% due to immigration, or $4.19 per week.

- Around 3% of the increase from 1994 to 2007 in wage inequality between workers with less than a high school degree and workers with a college degree or more can be attributed to immigration.

- This analysis finds no evidence that young workers in particular are adversely affected by immigration.

- While the methodology used in this paper does not allow for a racial breakdown of the effect of immigration on U.S.-born workers in different education groups, we find that the overall effect of immigration on wages is similar for white non-Hispanic U.S.-born workers (+0.5%) and black non-Hispanic U.S.-born workers (+0.4%).

- Immigration flows respond to the conditions of the U.S. economy. From 1994 to 2000, when labor demand was very high and job growth averaged 2.5% per year, 941,000 immigrant workers entered the United States annually. From 2000 to 2003, when labor demand was weak and employment declined 0.5% per year, immigration flows plummeted to 342,000 new immigrants per year. From 1994-2000, a period of high labor demand and high immigration, immigration increased the relative wages of U.S.-born workers without a high school degree by 0.02% annually. From 2000-03, a period of low labor demand and low immigration, immigration decreased the relative wages of U.S.-born workers without a high school degree by 0.04% annually. The fact that the relative effect of immigration on wages does not vary greatly over periods of dramatically different labor demand offers some limited evidence that the immigrant-flow response to labor demand in the United States helps to smooth the effects of immigration on native wages across periods of strength and weakness in the U.S. labor market.

- An analysis of the four states with the highest immigration over this period—California, Florida, New York, and Texas—revealed some interesting departures from the national average. In these states, the overall relative effect of immigration was positive on native workers, around 0.7%, which was higher than the overall effect on native workers nationally,

which was 0.4%. However, some subgroups in these high immigrant states fared worse—particularly male workers with less than a high school degree. Research by Jeffrey Passel and D'Vera Cohn at the Pew Research Center (Passel et al. 2009) could perhaps shed some light on this finding. In particular, their work shows that unauthorized immigrants make up a particularly large portion of the workforce in these four states relative to other states. Since, as shown in their work, unauthorized immigrants are more likely than other workers to be male and also more likely than other workers to be without a high school degree, a larger inflow of unauthorized immigrant workers, who are easily exploited by employers, may put downward pressure on the wages of similar native workers in these states, a pressure that is largely masked in estimates at the national level.

## Basic trends in immigration and wages

**Figure A** shows the share of the U.S. population between 1900 and 2007 that is foreign-born. In 1910, the peak immigrant share of the last century, immigrants made up 14.7% of the U.S. population. The immigrant share declined dramatically, to 4.7%, over the six decades from 1910 to 1970. In the last 40 years, however, immigration has been on a steady upward climb—by 2007, 12.6% of the population was foreign born.

As immigrant flows have surged in the last few decades, interest in the effect of immigration on the labor market outcomes of native workers has, unsurprisingly, increased dramatically.

This section focuses on the 14-year period from 1993 to 2007. The data used are from the Current Population Survey (CPS), which started tracking immigration status in 1994. (Because respondents are asked information about the previous year, data since 1993 are available. A full description of the data used is given in Appendix A.)

**Figure B** shows the immigrant share of total hours worked each year. In 1993, immigrants contributed 9.9% of total hours worked in this country; by 2007, immigrants were contributing 15.8%. This increase was driven



**FIGURE A**

**Foreign-born population as a share of total U.S. population, 1900 to 2007**

**SOURCE:** 900-90 data from Bureau of the Census "We the American...Foreign Born"; 1995-2004 data from Bureau of the Census Foreign Born Population Annual Data Tables; 2005-07 data from American Community Survey Tables.



**FIGURE B**

**Immigrant share of total hours worked each year, 1993 to 2007**

**SOURCE:** EPI analysis of CPS data.

A77



**FIGURE C**

**Immigrant share of total annual hours worked by gender, 1993 to 2007**

SOURCE: EPI analysis of CPS data.

by the addition of 9.6 million foreign-born workers over this period.

### Gender

There have been increases in both female and male immigration: from 1993 to 2007, 3.8 million female immigrant workers and 5.8 million male immigrant workers were added to the U.S. workforce. **Figure C** shows the immigrant share of total hours worked among men and women separately. Immigrants make up a somewhat larger share of the male workforce, and the difference had been growing up to 2004. Since then, the difference has narrowed slightly. By 2007, immigrants made up 13.8% of the labor supply among women and 17.3% of the labor supply among men.

### Education levels

The inflow of immigrants has been unequal across detailed education categories, a fact of key importance in the debate on the labor market effects of immigration. **Figure D**

shows the immigrant share of total hours worked among workers with less than a high school degree, a high school degree but no additional schooling, some college training but no college degree, and a college degree or more. Immigrants make up a much larger and faster-growing share of the less-than-high-school category in comparison to other education categories. The immigrant share among workers with less than a high school degree rose from 28.4% in 1993 to 47.5% in 2007, while the immigrant share among workers with a college degree or more rose from 9.9% to 14.8% from 1993 to 2007.

It is important to note that because workers with less than a high school degree make up a small (and shrinking) portion of the labor force (9.9% in 2007), high immigrant shares in this category do not actually represent a disproportionate *number* of new immigrants relative to other categories. And similarly, since workers with a college degree make up a relatively large (and growing) portion of the labor force (32.8% in 2007), low immigrant shares in this category represent a surprisingly large number



**FIGURE D**

**Immigrant share of total annual hours worked by level of education, 1993 to 2007**

SOURCE: EPI analysis of CPS data.

of new immigrants. From 1993 to 2007, there was an increase of 2.2 million immigrants with less than a high school degree, an increase of 2.5 million with exactly a high school degree, an increase of 1.4 million with some college training, and an increase of 3.5 million with a college degree.

**Table 1** gives, by education category, the percentage increase from 1993 to 2007 in hours worked that was due to new immigrants (or the increase from 1993 to 2007 in

hours worked by immigrants relative to the total hours worked by immigrants and natives in 1993). Immigration led to a 21.2% increase in total labor supply among workers with less than a high school degree, an 11.9% increase among those with a college degree, and much smaller percentage increases among workers with education levels in between. That is, immigration patterns into the United States are marked by high immigration at very low levels

**TABLE 1**

**Percentage increase in hours worked due to immigration by education, 1993 to 2007**

|  | Increase in hours worked due to immigration | | Increase in hours worked due to immigraion |
|---|---|---|---|
| *Less than high school* | 21.2 | | |
| *High school* | 6.9 | High school or less | 10.2 |
| *Some college* | 4.6 | | |
| *College* | 11.9 | More than high school | 8.3 |

SOURCE: EPI analysis of CPS data.



**FIGURE E**

**Average real weekly wages of native workers by level of education, 1993-2007**

**SOURCE:** EPI analysis of CPS data.

of education, high immigration at very high levels of education, and much less immigration between those poles.

The right half of Table 1 shows a further aggregation by education. When breaking workers into just two education categories, high school or less and more than high school, we see that immigration has been quite balanced over these two categories over the last 15 years, with "high school or less" seeing an increase in labor supply of 10.2% due to immigration, and "more than high school" seeing an increase of 8.3%. Perhaps surprisingly, immigration over the last 15 years has been roughly the same among "low schooling" and "high schooling" workers.

**Figure E** shows the average real (inflation-adjusted) weekly wage from 1993 to 2007 by education category. Native-born workers with less than a high school degree made an average of $456 per week in 1993, and that increased by less than 8% to $489 per week in 2007. Workers with a college degree or more made an average of $1,129 per week in 1993, and that increased by nearly 25% to $1,404 per week in 2007. Workers with a college

degree saw much greater gains over this period than any other group—in 1993, the average college-educated worker made 2.5 times what a worker without a high school degree made, but by 2007, the ratio had risen to 2.9. One question addressed in this paper is how much of this increased inequality can be attributed to immigration.

**Figure F** shows average weekly wages for native workers over time by gender for just two education groups, workers with less than a high school education and workers with a college degree or more. In both education categories over this period, the female average weekly wage is roughly two-thirds of the male average weekly wage. Inequality has increased among both men and women—in 1993, the average college-educated female made 2.6 times what a female worker without a high school degree made, and the ratio was 2.5 among men. By 2007, the ratio had risen to 3.0 for both. The methodology used later in this paper will allow us to examine the effects of immigration on wages by gender, including its impact on inequality among both men and women.



**FIGURE F**

**Average weekly wages for native workers: gender and education level comparison, 1993-2007**

SOURCE: EPI analysis of CPS data.

# A brief look at the recent advancements in the research

There is currently no consensus in the economic literature on the effect of immigration on the labor market outcomes of various groups of native workers. In fact, there is considerable disagreement among reputable researchers. Raphael et al. (2007) provide a very readable review of the literature on the effects of immigration on native labor market outcomes, and a more detailed review of the literature pertaining to the two advancements in the literature discussed below can be found in Ottaviano and Peri (2008).

## *Area vs. national*

Broadly speaking, there have been two main methodological strategies for studying the effect of immigration on the wages of native workers. The "area approach," dominated by the work of David Card, exploits the fact that there are large differences across regions of the United States in the relative size of the immigrant population. Essentially, this approach compares the wages of native workers in U.S. metropolitan areas with small immigrant inflows to the wages of native workers in U.S. metropolitan areas with large immigrant inflows. Research using this approach (see, for example, Card (2001) and Card (2007)) generally finds very modest, and sometimes modestly positive, effects of immigration on the wages of native workers, including workers with low levels of education.

The second main approach in this literature is the "national approach." Scholars using this approach often contend that it is impossible to suitably account for the fact that there may be movement of capital and native-born labor between metropolitan areas in response to immigration, and that this means that an analysis of the effect of immigration on native wages must use national-level data. This approach is dominated by the work of George Borjas, and tends to use a production function framework that combines workers of different skills, estimates the degree of substitutability between workers of different skills using national data, and simulates the

impact on wages of relative labor supply shifts due to immigration. Historically, research using this approach (see, for example, Borjas, Freeman, and Katz (1997) and Borjas (2003)) found relatively large negative effects of immigration on the wages of native workers, especially those with low levels of education.

### Two advancements in the national approach

Until recently, that is where the main divide in the literature stood, with researchers using the "area approach" finding no or little effect of immigration on the wages of native workers, including workers with low levels of education, and with those researchers using the "national approach" finding a relatively large negative effect, especially on workers with low levels of education. However, in the last couple of years there have been two important advancements in the literature on immigration and wages that help shed light on the differences in results between these two approaches. Both are somewhat complicated to derive but are extremely intuitive conceptually. This paper provides the intuition; see Ottaviano and Peri (2008) for a more detailed explanation.

Both advancements have to do with what economists refer to as "elasticities of substitution." In a labor market context, essentially what an elasticity of substitution measures is how substitutable one type of labor is for another. For example, consider a firm that hires graphic designers. To the employer, left-handed designers may be perfectly substitutable for right-handed designers, meaning that the elasticity of substitution between left-handed and right-handed designers is very large or infinite. Conversely, a graphic designer who does not know the graphic design software the firm uses is likely not very substitutable for one who does, so that the elasticity of substitution between these two types of workers is small. In other words, the more substitutable two types of workers are, the higher the elasticity of substitution between them.

Elasticities of substitution have enormous importance in estimates of changes in labor supply on wages (which include estimates of the effect of increased immigrant labor supply on native wages). If two types of workers are very substitutable for one another—if the elasticity of substitution between them is high—then an increase in the

labor supply of one type can cause a reduction in wages not just in that type but also in the type that they are substitutes for. On the other hand, if two types of workers are not good substitutes, then an increase in the labor supply of one type will likely not cause a reduction in wages of the other. In fact, it may *increase* the wages of the other if the two types of workers are complements in some way so that as the supply of one type increases, the demand for the other type increases as well (for example, an increase in the supply of taxi drivers may cause an increase in demand for dispatchers, and therefore bid up the wages of dispatchers).

***Immigrant/native substitutability.*** The first recent advancement in the immigration and wages literature has been the identification of a small but detectable level of imperfect substitution between immigrant and native workers who have the same levels of education and experience (see, for example, Ottaviano and Peri (2008), Card (2009), Manacorda et al. (2005) and D'Amuri et al. (2008)). In other words, immigrant and native workers with the same levels of education and experience are not perfectly substitutable. This may arise, for example, among workers with low levels of education if native workers are more likely to be concentrated in jobs that require strong English skills and immigrant workers are more likely to be more concentrated in jobs that do not (for example, waitstaff versus line cooks). Previous national approach estimates of the effect of immigration on wages have assumed that immigrants and natives of similar education and experience levels are perfectly substitutable. Correctly characterizing the elasticity of substitution between immigrants and natives is of enormous importance, because, as explained above, if natives and immigrants are perfectly substitutable, an increase in immigration in a particular education/experience class will tend to reduce the wages in the entire education/experience class, including native workers in that class. However if, as has been shown to be the case, immigrants and natives within the same education/experience class are imperfect substitutes, then an increase in immigration in a particular class will have a strong adverse effect on the wages of *earlier immigrants* in that class—since they are direct substitutes, or competitors—but have a smaller effect on the native workers in that class.

***Substitutability by educational attainment.*** The second recent advancement has been the application to the immigration and wages literature of something that was already accepted as fact in the rest of the labor economics literature: that the elasticity of substitution is not constant across education categories. To understand the intuition behind this, consider a broad grouping of workers by education level: workers with a high school education or less and workers with more than a high school education. The labor economics literature has long established (see, for example, Katz and Murphy (1992)) that these two groups are not good substitutes for each other—workers with a high school degree or less tend to do different jobs than workers with more than a high school degree.

Now consider a subgrouping of the high school or less category into two additional groups—workers with no high school degree and workers with exactly a high school degree. There is a much greater degree of substitutability between these two types of workers. Workers with less than a high school degree are more likely to do similar jobs as those with exactly a high school degree. These comparisons suggest that the elasticity of substitution between two education categories varies depending on which two education categories are being considered.

Previous national approach estimates of the effect of immigration on wages have essentially assumed that the elasticity of substitution between workers in two different education categories is the same regardless of which pair of education categories is being considered. But it turns out that incorporating different elasticities of substitution between different pairs of education categories is enormously important to estimates of the effect of immigration on native wages. The main problem with ignoring this point arises with what it implies—that workers without a high school degree and workers with a high school degree have very low levels of substitutability. This is strongly refuted by the literature (see, for example, Ottaviano and Peri (2008) and Card (2009)). Both of these studies show empirically that there is a relatively high degree of substitutability between workers without a high school degree and workers with exactly a high school degree.[1]

Ignoring this fact distorts the estimated effects of immigration on workers without a high school degree, since it suggests that an increase in immigration among workers without a high school degree affects only workers without a high school degree, which is a very small portion of the labor force (9.9% in 2007), so that essentially the entire impact of "less-than-high-school" immigration is assumed to be felt by the relatively small number of "less-than-high-school" workers. If, on the other hand, we recognize that workers without a high school degree are relatively substitutable for workers with a high school degree, then the impact of "less-than-high-school" immigration is more diffused across the much larger share of the workforce that has a high school degree or less (38.7% in 2007), greatly reducing the impact on the least-educated American workers.

These new innovations in the national approach literature essentially solve the earlier divide between the national approach and the area approach. When the key elasticities of substitution are correctly accounted for in the national approach methodology, the results using that approach come in line with the results from the area approach, namely that the effects of immigration on native workers is modest, including the effect on native workers with low levels of education.

# Estimates of the effect on immigration on wages
## *Methodology for computing this effect*

This analysis computes the effect of immigration on wages using an approach outlined in Ottaviano and Peri (2008), which is based on standard practice in the national approach literature on immigration and wages but incorporates the two advancements described above. Within that general approach, we use consensus estimates from the labor economics literature of the relevant elasticities, along with our own calculations of changes in immigrant and native labor supply using the CPS data described in Appendix A. We then simulate the impact of immigration on relative wages using these components. As is standard with this approach, there are no confidence intervals for the estimates; the methodology employed here does not easily lend itself to calculating standard errors. To ensure that sample sizes are large enough for our estimations of the effect of immigration on wages, we pool 1993 and 1994 data for a "year 1994" sample, and pool 2006 and 2007 data for a "year 2007" sample. We then calculate

the impact of immigration over the resulting 13-year period. A more detailed description of the methodology is given in Appendix B.

It is important to note that the methodology employed here estimates only the *relative* wage effects of immigration (for example, how immigration affects native high school dropouts compared to other workers,) and not the absolute wage effects of immigration. The framework we use (and that is used in the "national approach" more generally) *assumes* that the economy adjusts to absorb new immigrants and that the overall real wage effect of immigration in the long run is zero. Note that the results in, for example, Table 2 show that the overall impact is zero; this is an assumption, not an estimate. Our estimates are in the *relative* impacts found between subgroups—in how much immigration affects one subgroup of workers compared to another.

## Education

**Table 2** presents the impact of immigration from 1994-2007 on the wages of U.S.- and foreign-born workers separately and for all workers combined. For each group (U.S.-born, foreign-born, and all) there are three columns representing different sets of elasticities. The different sets reflect the fact that for each relevant elasticity, there is a range of estimates in the labor literature. (The ranges are given in Appendix B, along with an explanation of how these elasticities are generally estimated.) The column "low" assumes that the substitutability of workers in different education categories is at the low end of the

range, and that the substitutability of natives and immigrants within the same education/experience class is at the high end of the range, both of which, as discussed above, will give the gloomiest outlook for the effect of immigration on the wages of natives with low levels of schooling. Conversely, the column "high" assumes that the substitutability of workers in different education categories is at the high end of the range, and that the substitutability of natives and immigrants within the same education/experience class is at the low end of the range, both of which will give the rosiest outlook for the effect of immigration on the wages of natives with low levels of schooling. The column "typical" assumes a typical set of elasticities, neither at the high end or low end of their respective ranges, and these columns represent the estimates we believe to be the most accurate.

Looking first at the "All" category, we find that the effect of immigration from 1994 to 2007 was to reduce the wages of workers with less than a high school degree, relative to other workers, by somewhere between -1.4% and -0.4%, most likely by -0.7%. But looking at the breakdown by immigration status, we find that the burden of these losses is shouldered entirely by foreign-born workers, who saw a relative reduction in wages of -3.7%, compared to a modest increase of 0.3% among native workers. *In other words, the surge in immigration among workers with less than a high school degree served to lower the wages of earlier immigrant workers with less than a high school degree, not native workers with less than a high school degree.*

| | **U.S.-born** | | | **Foreign-born** | | | **All** | | |
|---|---|---|---|---|---|---|---|---|---|
| | *Low* | *High* | *Typical* | *Low* | *High* | *Typical* | *Low* | *High* | *Typical* |
| *Less than high school* | -0.7% | 1.0% | 0.3% | -3.3% | -4.3% | -3.7% | -1.4% | -0.4% | -0.7% |
| *High school* | 0.3 | 0.4 | 0.3 | -2.9 | -6.1 | -4.5 | 0.1 | -0.1 | 0.0 |
| *Some college* | 0.6 | 0.8 | 0.7 | -1.9 | -4.3 | -3.1 | 0.5 | 0.4 | 0.4 |
| *College* | 0.2 | 0.5 | 0.4 | -3.8 | -7.4 | -5.6 | -0.2 | -0.2 | -0.2 |
| **All** | **0.3** | **0.6** | **0.4** | **-3.2** | **-6.0** | **-4.6** | **0.0** | **0.0** | **0.0** |

**TABLE 2**

### Impact of immigration on wages from 1994 to 2007 by education level

**SOURCE:** EPI analysis of CPS data.

| TABLE 3 | | | |
|---|---|---|---|
| **Results using incorrectly characterized elasticities** | | | |
| | **U.S.-born** | **Foreign-born** | **All** |
| *Less than high school* | -6.2% | -6.1% | -6.2% |
| *High school* | 1.2 | 1.2 | 1.2 |
| *Some college* | 1.9 | 1.9 | 1.9 |
| *College* | -1.1 | -1.1 | -1.1 |
| **All** | **0.1** | **-0.9** | **0.0** |

**SOURCE:** EPI analysis of CPS data.

This story is retold in each education category—the impact on overall wages in each category is modest, but when looking at breakdowns by immigration status, we find that immigrants in the category see sizeable negative effects and natives see small positive effects. Looking at all education categories combined, we find that the overall effect of immigration from 1994-2007 was to reduce the wages of the foreign-born population by 4.6%, relative to an increase in the wages of the U.S.-born population of 0.4%.

## Mischaracterized elasticities

**Table 3** demonstrates the importance of correctly characterizing the elasticities. This table shows what the estimates would be if we were (incorrectly) to assume that the elasticity of substitution is constant across education categories, and that immigrants and natives within the same education/experience class are perfect substitutes. Results in the table would suggest that the burden of increased immigration over these 13 years was shouldered largely by workers without a high school degree, and in

| TABLE 4 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Impact of immigration on wages by education level, 1994-2007** | | | | | | | | | |
| | **U.S.-born** | | | **Foreign-born** | | | **All** | | |
| | *Low* | *High* | *Typical* | *Low* | *High* | *Typical* | *Low* | *High* | *Typical* |
| **Female** | | | | | | | | | |
| *Less than high school* | 0.6% | 1.7% | 1.1% | -1.8% | -3.1% | -2.5% | 0.1% | 0.6% | 0.3% |
| *High school* | 1.5 | 1.2 | 1.1 | -1.0 | -3.9 | -2.6 | 1.3 | 0.8 | 0.9 |
| *Some college* | 0.1 | 0.4 | 0.3 | -2.5 | -4.8 | -3.6 | -0.1 | 0.1 | 0.1 |
| *College* | -0.4 | 0.2 | 0.0 | -5.1 | -9.3 | -7.1 | -0.8 | -0.7 | -0.7 |
| **All** | **0.3** | **0.6** | **0.4** | **-3.2** | **-6.3** | **-4.7** | **0.0** | **0.0** | **0.0** |
| **Male** | | | | | | | | | |
| *Less than high school* | -1.5% | 0.5% | -0.2% | -4.3% | -5.1% | -4.4% | -2.3% | -1.0% | -1.4% |
| *High school* | -0.5 | -0.2 | -0.2 | -4.2 | -7.7 | -5.8 | -0.8 | -0.7 | -0.6 |
| *Some college* | 1.0 | 1.0 | 0.9 | -1.4 | -3.9 | -2.7 | 0.8 | 0.7 | 0.7 |
| *College* | 0.6 | 0.8 | 0.7 | -2.8 | -6.2 | -4.6 | 0.3 | 0.2 | 0.2 |
| **All** | **0.3** | **0.6** | **0.4** | **-3.1** | **-5.9** | **-4.5** | **0.0** | **0.0** | **0.0** |

**SOURCE:** EPI analysis of CPS data.

particular that native workers in this category have experienced large negative wage impacts. What this exercise demonstrates is that the large negative values found in the traditional "national" approach to estimating the effect of immigration on wages are due primarily to incorrect characterizations of key elasticities.

## Gender

**Table 4** shows the results (once again with appropriately characterized elasticities) separately for men and women. Looking first at the overall effect for U.S.-born workers by gender, we find that both men and women have seen a relative increase in wages of 0.4% due to immigration from 1994 to 2007, compared to a loss by earlier immigrants of around 4.6%. However, the breakdowns by education are somewhat different. U.S. women with lower levels of education gain more from immigration than female workers with higher levels of education, whereas U.S. men with lower levels of education see modest declines compared to male workers with higher levels of education (who have seen modest increases). In particular, we find that the effect of immigration from 1994 to 2007 was to increase the wages of U.S.-born women with less than a high school degree, relative to other workers, by somewhere between 0.6% and 1.7%, most likely by 1.1%, and to

change the wages of U.S.-born men with less than a high school degree, relative to other workers, by somewhere between -1.5% and 0.5%, most likely by -0.2%.

**Table 5** can shed some light on this difference. Table 5 is similar to Table 1, which shows increased hours worked from 1993 to 2007 due to immigration, but it is broken out by gender. While the increase in hours worked due to immigration is fairly balanced between "less than or equal to high school" and "more than high school," there are gender differences. Among women, there have been slightly greater increases in hours in the more-educated group than in the less-educated group, whereas among men, there have been somewhat greater increases in hours in the less-educated group than in the more highly educated group. These differences help explain why native women with lower levels of education gain due to immigration (1.1% increase in wages), whereas native men with lower levels of education see modest declines (-0.2% decrease in wages).

## Inequality

The estimates presented above show that immigration from 1994 to 2007 had a modest positive effect on the overall wages of both male and female native workers (0.4% relative increase). Within that overall change, women with less than a high school education experienced a nontrivial

---

### TABLE 5

#### Impact of immigration on wages from 1994 to 2007 by gender and education

| | Increase in hours worked due to immigration | | Increase in hours worked due to immigraion |
|---|---|---|---|
| **Female** | | | |
| *Less than high school* | 16.4% | High school or less | 7.3% |
| *High school* | 5.1 | | |
| *Some college* | 5.0 | More than high school | 9.0 |
| *College* | 13.6 | | |
| | | | |
| **Male** | | | |
| *Less than high school* | 23.6% | High school or less | 12.2% |
| *High school* | 8.3 | | |
| *Some college* | 4.3 | More than high school | 7.7 |
| *College* | 10.8 | | |

**SOURCE:** EPI analysis of CPS data.

| TABLE 6 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **How much of the increasing wage inequality from 1994 to 2007 can be explained by immigration?** | | | | | | | | |
| | U.S.-born | | | Foreign-born | | | All | | |
| | *All* | *Female* | *Male* | *All* | *Female* | *Male* | *All* | *Female* | *Male* |
| Growth in less than high school wages | 7.2% | 3.9% | 8.1% | 9.9% | 10.4% | 9.2% | 5.4% | 5.0% | 4.6% |
| Growth in college wages | 24.3 | 19.7 | 31.2 | 29.4 | 26.2 | 33.5 | 24.6 | 20.1 | 31.0 |
| Difference in growth rates | 17.2 | 15.7 | 23.1 | 19.5 | 15.9 | 24.3 | 19.2 | 15.1 | 26.3 |
| | | | | | | | | | |
| Growth in less than high school wages due to immigration | 0.3% | 1.1% | -0.2% | -3.7% | -2.5% | -4.4% | -0.7% | 0.3% | -1.4% |
| Growth in college wages due to immigration | 0.4 | 0.0 | 0.7 | -5.6 | -7.1 | -4.6 | -0.2 | -0.7 | 0.2 |
| Difference in growth due to immigration | 0.1 | -1.2 | 0.9 | -1.9 | -4.6 | -0.1 | 0.5 | -0.9 | 1.5 |
| | | | | | | | | | |
| Portion of difference in growth rates that is due to immigration | 0.3% | -7.5% | 3.9% | -9.7% | -29.0% | -0.6% | 2.8% | -6.1% | 5.8% |

**SOURCE:** EPI analysis of CPS data.

increase (1.1%), while women with a college degree saw no change due to immigration, so immigration likely decreased inequality among women over this period. On the other hand, men with less than a high school education experienced a modest decline (-0.2%), while men with a college degree saw a modest increase (0.7%), so immigration likely was a factor in increasing inequality among men over this period.

**Table 6** uses the estimates of the relative wage impacts of immigration to quantify how much of the growth over this period in wage inequality between workers with less than a high school degree and workers with a college degree or more can be explained by immigration. The table shows the difference in wage growth rates from 1994-2007 for workers with less than a high school degree and workers with a college degree or more, and it shows the difference in the effect of immigration on wages for both groups (the latter taken from the "typical" estimates in Tables 2 and 4, above). The final row shows the difference in growth rates due to immigration divided by the difference in wage growth rates—in other words, it gives the share of the difference in wage growth rates that is due to immigration. This is the measure we use of the amount of increased inequality over this period that can be attributed to immigration.

For native workers, only 0.1 percentage point of the 17.2 percentage-point difference in growth rates between "less than high school" and "college or more" can be explained by immigration. However, this overall effect masks differences by gender. Immigration decreased inequality among native women—the differences in growth rates between the two education groups would have been 7.5% higher in the absence of female immigration. Among men, 0.9 percentage points of the 23.1 percentage-point difference in growth rates between the two education categories can be explained by immigration.

For foreign-born workers of both genders, but particularly for women, immigration caused larger wage declines among college workers than among less than high school workers, so new immigration reduced inequality among immigrants. However, because immigration is nevertheless concentrated at the high end and low end of the overall wage distribution, increased immigration increases overall wage inequality. We find that immigration contributed 2.8% of the increase in inequality overall, though the effect was concentrated among men. Among women, the difference in wage growth rates between the two education groups would have been 6.1% higher without immigration, but immigration contributed 5.8% of the overall increased inequality among men. In sum, immigration has

| TABLE 7 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Impact of immigration on wages from 1994 to 2007 by gender, education, and age** | | | | | | | | | |
| | **U.S.-born** | | | **Foreign-born** | | | **All** | | |
| | *All* | *Female* | *Male* | *All* | *Female* | *Male* | *All* | *Female* | *Male* |
| **Less than high school** | | | | | | | | | |
| *All* | 0.3% | 1.1% | -0.2% | -3.7% | -2.5% | -4.4% | -0.7% | 0.3% | -1.4% |
| *18-27* | 1.8 | 3.0 | 1.2 | -0.3 | 1.8 | -1.1 | 1.2 | 2.7 | 0.4 |
| *28-37* | 0.5 | 2.0 | -0.4 | -2.6 | -0.1 | -3.8 | -0.5 | 1.4 | -1.5 |
| *38-47* | -0.9 | -0.2 | -1.3 | -6.2 | -5.4 | -6.9 | -2.3 | -1.6 | -2.8 |
| *48-57* | 0.4 | 0.6 | 0.1 | -5.8 | -5.2 | -6.4 | -0.6 | -0.5 | -0.9 |
| **High school** | | | | | | | | | |
| *All* | 0.3% | 1.1% | -0.2% | -4.5% | -2.6% | -5.8% | 0.0% | 0.8% | -0.6% |
| *20-29* | 0.5 | 1.3 | 0.0 | -3.1 | -2.0 | -3.7 | 0.2 | 1.1 | -0.3 |
| *30-39* | 0.4 | 1.3 | -0.1 | -3.9 | -1.5 | -5.5 | 0.2 | 1.1 | -0.5 |
| *40-49* | 0.2 | 1.1 | -0.5 | -4.8 | -2.5 | -6.8 | -0.2 | 0.8 | -0.9 |
| *50-59* | 0.2 | 0.8 | -0.3 | -6.9 | -5.4 | -8.0 | -0.2 | 0.4 | -0.7 |
| **Some college** | | | | | | | | | |
| *All* | 0.7% | 0.3% | 0.9% | -3.1% | -3.6% | -2.7% | 0.4% | 0.1% | 0.7% |
| *22-31* | 1.2 | 0.9 | 1.4 | 0.1 | -0.1 | 0.2 | 1.1 | 0.8 | 1.3 |
| *32-41* | 0.9 | 0.5 | 1.2 | -1.6 | -2.3 | -1.0 | 0.8 | 0.4 | 1.0 |
| *42-51* | 0.4 | 0.1 | 0.6 | -5.5 | -5.2 | -5.9 | 0.1 | -0.3 | 0.2 |
| *52-61* | -0.2 | -0.9 | 0.3 | -8.4 | -10.9 | -6.4 | -0.7 | -1.5 | -0.1 |
| **College** | | | | | | | | | |
| *All* | 0.4% | 0.0% | 0.7% | -5.6% | -7.1% | -4.6% | -0.2% | -0.7% | 0.2% |
| *24-33* | 0.6 | 0.2 | 0.9 | -5.1 | -6.7 | -4.0 | 0.2 | -0.3 | 0.5 |
| *34-43* | 0.6 | 0.1 | 0.9 | -4.2 | -6.1 | -3.2 | 0.2 | -0.4 | 0.5 |
| *44-53* | 0.4 | -0.1 | 0.7 | -5.3 | -6.5 | -4.6 | -0.1 | -0.7 | 0.2 |
| *54-63* | -1.0 | -1.6 | -0.6 | -10.9 | -14.1 | -9.1 | -2.0 | -2.8 | -1.4 |
| **All** | | | | | | | | | |
| *All* | 0.4% | 0.4% | 0.4% | -4.6% | -4.7% | -5.9% | 0.0% | 0.0% | 0.0% |
| *Age Group 1* | 0.8 | 0.7 | 0.8 | -2.7 | -3.3 | -2.5 | 0.5 | 0.4 | 0.5 |
| *Age Group 2* | 0.6 | 0.6 | 0.7 | -3.4 | -3.6 | -3.3 | 0.3 | 0.3 | 0.3 |
| *Age Group 3* | 0.3 | 0.3 | 0.3 | -5.4 | -5.1 | -5.6 | -0.2 | -0.2 | -0.2 |
| *Age Group 4* | -0.3 | -0.3 | -0.2 | -8.5 | -9.1 | -7.9 | -1.0 | -1.0 | -0.9 |

**SOURCE:** EPI analysis of CPS data.

not been a significant contributor to wage inequality among native workers, but about 3% of the overall increase in inequality from 1994 to 2007 between college educated workers and high school dropouts can be attributed to immigration.

## Age

One question that arises in the debate on immigration and wages is the effect of immigration on the wages of young workers, especially young men with low levels of education. **Table 7** breaks down the effect of immigration on wages by age category and gender. Here and for the rest of the paper, unless otherwise noted, results are shown for the "typical" set of elasticities. Also note that, as is common practice in the labor economics literature, definitions of age categories are slightly different across education categories to reflect the fact that, for example,

**TABLE 8**

### Education shares by age, gender, and race for non-Hispanic native workers, 2007

|  | White non-Hispanic U.S.-born workers | | | Black non-Hispanic U.S.-born workers | | |
|  | *All* | *Female* | *Male* | *All* | *Female* | *Male* |
|---|---|---|---|---|---|---|
| *All* | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| *Less than high school* | 5.3 | 4.1 | 6.4 | 9.9 | 8.1 | 12.0 |
| *High school* | 28.3 | 25.9 | 30.3 | 35.1 | 32.3 | 38.3 |
| *Some college* | 30.1 | 32.0 | 28.5 | 33.7 | 36.0 | 31.0 |
| *College* | 36.3 | 38.0 | 34.8 | 21.4 | 23.6 | 18.7 |

**SOURCE:** EPI analysis of CPS data.

a worker with only a high school education is generally available to start work four years earlier than a worker with a college degree. The categories thus represent 10-year groupings of "potential labor market experience."

The results show that in fact *older* native workers face bigger impacts of the increasing foreign-born workforce over this period. Native workers with 31 to 40 years of potential labor market experience (age group 4) saw a modest decline of 0.3% in wages relative to native workers with one to 10 years of potential experience (age group 1) who saw a modest increase in wages due to immigration of 0.8%. The overall pattern generally holds across education categories, in particular, for native workers without a high school degree, 18-27-year olds of both genders gained due to immigration while it was middle-aged workers—workers age 38-47—who saw modest declines. These results provide no evidence that younger workers in any category are being particularly hard-hit by immigration relative to older workers.

### Race

The methodology used in this paper does not allow for a breakdown of the effect of immigration on U.S.-born workers in different education groups separately by race. However, using the estimated wage effects of immigration by education and experience group, we can aggregate the results separately for white and black native workers to look at the overall impact of immigration on these two groups. The differences in the overall effects by race will essentially reflect the fact that educational breakdowns are different for blacks and whites. Education breakdowns for 2007 for native blacks and native whites are given in **Table 8**. They show that native blacks have somewhat lower educational attainment than native whites, with a higher percentage of black native workers than white native workers not having a high school degree (9.9% vs. 5.3%), and a lower percentage of black native workers than white native workers having a college degree (21.4% vs. 36.3%). However, since (as Table 4 shows) the positive

**TABLE 9**

### Aggregate impact of immigration on wages from 1994 to 2007 of native workers by race

|  | White non-Hispanic U.S.-born workers | | | Black non-Hispanic U.S.-born workers | | |
|  | *Low* | *High* | *Typical* | *Low* | *High* | *Typical* |
|---|---|---|---|---|---|---|
| *All* | 0.3% | 0.6% | 0.5% | 0.3% | 0.6% | 0.4% |
| *Female* | 0.4 | 0.6 | 0.5 | 0.3 | 0.5 | 0.4 |
| *Male* | 0.2 | 0.5 | 0.4 | 0.3 | 0.6 | 0.4 |

**SOURCE:** EPI analysis of CPS data.

impact of immigration does not rise monotonically across education groups, it is not *a priori* obvious what the aggregate impact will be.

The overall impacts by race are given in **Table 9**. They show that in the aggregate, immigration has essentially the same relative effect on native blacks as it has had on native whites—a small positive relative impact on wages. These results reflect the fact that there is not a great deal of variation across education categories in the relative impact of immigration on wages, so even though blacks and whites have different education breakdowns, in aggregate the effect of immigration on wages is similar.

### Does the impact of immigration on wages vary with overall labor demand?

Over the period from 1994 to 2007, labor demand varied widely—in particular, from 1994-2000, the labor market was much stronger than it was in the later period. From 1994-2000, job growth averaged 2.5% per year, whereas from 2000 to 2003, which captures the period of job loss associated with the recession of 2001, employment declined 0.5% per year. From 2003 to 2007, employment growth picked up somewhat, growing at an average of 1.4% per year.

Immigration flows, unsurprisingly, respond to the conditions of the U.S. economy: from 1994 to 2000, 941,000 immigrant workers entered the United States each year, but from 2000 to 2003, the number plummeted to 342,000, and then picked up somewhat to an average of 502,000 per year from 2003 to 2007.

Was the impact of immigration on wages different over these three periods of very different overall labor demand? **Table 10** shows the impact of immigration on wages by gender and education separately for these three

| **TABLE 10** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|

**Average annual impact of immigration on wages for periods of different overall labor demand**

| | U.S.-born | | | Foreign-born | | | All | | |
|---|---|---|---|---|---|---|---|---|---|
| | *All* | *Female* | *Male* | *All* | *Female* | *Male* | *All* | *Female* | *Male* |
| **1994-2000** | | | | | | | | | |
| *Less than high school* | 0.02% | 0.03% | 0.01% | -0.37% | -0.42% | -0.36% | -0.08% | -0.08% | -0.08% |
| *High school* | 0.02 | 0.03 | 0.01 | -0.42 | -0.35 | -0.48 | -0.01 | 0.00 | -0.02 |
| *Some college* | 0.07 | 0.05 | 0.07 | -0.27 | -0.27 | -0.27 | 0.04 | 0.03 | 0.05 |
| *College* | 0.04 | 0.03 | 0.04 | -0.50 | -0.51 | -0.50 | -0.01 | -0.02 | -0.01 |
| *All* | 0.04 | 0.04 | 0.04 | -0.42 | -0.41 | -0.43 | 0.00 | 0.00 | 0.00 |
| **2000-03** | | | | | | | | | |
| *Less than high school* | -0.04% | 0.04% | -0.10% | -0.28% | -0.09% | -0.39% | -0.13% | 0.00% | -0.21% |
| *High school* | -0.05 | 0.04 | -0.10 | -0.22 | -0.17 | -0.25 | -0.06 | 0.02 | -0.12 |
| *Some college* | 0.06 | 0.03 | 0.07 | -0.03 | -0.05 | -0.02 | 0.05 | 0.03 | 0.06 |
| *College* | 0.04 | 0.01 | 0.06 | -0.14 | -0.32 | -0.04 | 0.02 | -0.03 | 0.05 |
| *All* | 0.02 | 0.02 | 0.02 | -0.16 | -0.21 | -0.13 | 0.00 | 0.00 | 0.00 |
| **2003-07** | | | | | | | | | |
| *Less than high school* | 0.04% | 0.15% | -0.04% | -0.05% | 0.10% | -0.14% | 0.00% | 0.13% | -0.09% |
| *High school* | 0.04 | 0.15 | -0.04 | -0.15 | 0.06 | -0.30 | 0.02 | 0.14 | -0.07 |
| *Some college* | 0.03 | -0.01 | 0.06 | -0.17 | -0.24 | -0.11 | 0.01 | -0.02 | 0.04 |
| *College* | 0.01 | -0.02 | 0.04 | -0.23 | -0.33 | -0.16 | -0.02 | -0.06 | 0.02 |
| *All* | 0.03 | 0.02 | 0.03 | -0.18 | -0.19 | -0.17 | 0.00 | 0.00 | 0.00 |

**SOURCE:** EPI analysis of CPS data.

periods. It should be noted that unlike the other tables in this paper, which report the impact over the entire period from 1994-2007, this table gives the average impact per year over each period for ease of comparison.

The results show that the main effect of the different periods is felt by immigrants themselves, who faced much larger negative effects during the period of greater immigration in the 1990s. For native workers overall, there was not large variation in the impact of immigration over the three periods, though the gains were greatest during the 90s, since immigration was higher. For workers with less than a high school education, there were some small differences: these workers experienced a modest relative decline of 0.04% per year due to immigration during the downturn of the early 2000s, compared to a modest relative increase in the other periods (0.02% in the 1990s and 0.04% from 2003-07). By gender, the differences are slightly larger—male workers with a high school education or less saw a relative decline of 0.1% per year due to immigration from 2000-03, whereas women with a high school education or less experienced a relative gain of 0.04% per year over this period.

The fact that the relative effect of immigration on wages does not vary dramatically over periods of dramatically different labor demand offers some limited evidence that immigrant-flow response to labor demand in the United States helps to smooth the effects of immigration on native wages across periods of strength and weakness in the U.S. labor market. While we do not have data that allow us to conduct our simulation on the current economic downturn, this analysis suggests that it is likely that the relative impact of immigration on the wages of native workers during the 2008/2009 recession will not be out of line with the relative impact experienced in earlier periods.

## The effect of immigration in high-immigration states

Immigrant flows vary widely by state. (**Table C1** in Appendix C shows immigrant flows by state from 1993 to 2007.) Here we examine the four states that have seen the largest increase in numbers of immigrant workers: California, Florida, New York, and Texas. Together, these four states represent 46% of all increases in immigrant workers over this period, though they made up only 32%

of all workers in 2007. California saw an increase of 1.7 million immigrants from 1993 to 2007, Florida saw 824,000 new immigrants, New York 811,000, and Texas 1.1 million. Because these are the four largest states, we are able to conduct an analysis separately for each of these states without running into major sample size issues.

**Table 11** shows the results by education category and gender for these four states. In these high immigrant states, the overall effect of immigration is similar to the effect at the national level—small positive effects for native workers and nontrivial negative effects for earlier immigrant workers. By education category, however, there is some variation. In particular, in California and Texas, immigration has led to a decline in the relative wages of U.S.-born workers with less than a high school education—by 1.6% in California and by 1.7% in Texas. These effects were concentrated among men, with males without a high school education in California seeing an estimated relative wage decline of 2.9% due to immigration, and males without a high school education in Texas seeing an estimated relative wage decline of 1.8% due to immigration (while "less than high school" women gained 0.8% in California and lost 0.6% in Texas). Native workers without a high school education are essentially unaffected as a group in New York (relative decline of 0.1%), but there was a gender imbalance, with "less than high school" women gaining 1.7%, while "less than high school" men lost 1.3%. In Florida, workers with less than a high school education gained 1.2% due to immigration, but those gains were entirely among women, who saw a 2.9% relative increase in wages.

In sum, in these very high immigrant states, the overall relative effect of immigration is positive on native workers, around 0.7%, which is higher than the overall effect on native workers nationally, which was 0.4%. Thus, on average, native workers in these high immigrant states gain somewhat more than the national average due to immigration. However, some subgroups in these high immigrant states fare worse, as described above, particularly male workers with less than a high school degree. Research by Jeffrey Passel and D'Vera Cohn at the Pew Research Center (Passel et al. 2009) could perhaps shed some light on this finding. Their work shows that unauthorized immigrants make up a large portion of the

**TABLE 11**

### Impact of immigration on wages from 1994 to 2007 in states by gender and education

|  | U.S.-born | | | Foreign-born | | | All | | |
|---|---|---|---|---|---|---|---|---|---|
|  | *All* | *Female* | *Male* | *All* | *Female* | *Male* | *All* | *Female* | *Male* |
| **United States** | | | | | | | | | |
| *Less than high school* | 0.3% | 1.1% | -0.2% | -3.7% | -2.5% | -4.4% | -0.7% | 0.3% | -1.4% |
| *High school* | 0.3 | 1.1 | -0.2 | -4.5 | -2.6 | -5.8 | 0.0 | 0.8 | -0.6 |
| *Some college* | 0.7 | 0.3 | 0.9 | -3.1 | -3.6 | -2.7 | 0.4 | 0.1 | 0.7 |
| *College* | 0.4 | 0.0 | 0.7 | -5.6 | -7.1 | -4.6 | -0.2 | -0.7 | 0.2 |
| *All* | 0.4 | 0.4 | 0.4 | -4.6 | -4.7 | -5.9 | 0.0 | 0.0 | 0.0 |
| **California** | | | | | | | | | |
| *Less than high school* | -1.6% | 0.8% | -2.9% | -1.9% | 0.9% | -3.6% | -1.8% | 0.9% | -3.4% |
| *High school* | -0.4 | 2.2 | -2.0 | -3.0 | 0.0 | -4.9 | -0.9 | 1.8 | -2.6 |
| *Some college* | 1.2 | 0.6 | 1.6 | -1.7 | -2.6 | -1.1 | 0.8 | 0.1 | 1.2 |
| *College* | 0.9 | 0.0 | 1.4 | -2.9 | -5.1 | -1.3 | 0.1 | -1.0 | 0.9 |
| *All* | 0.7 | 0.6 | 0.7 | -2.5 | -2.6 | -2.5 | 0.0 | 0.0 | 0.0 |
| **Florida** | | | | | | | | | |
| *Less than high school* | 1.2% | 2.9% | -0.4% | -1.0% | 2.0% | -2.5% | 0.6% | 2.6% | -1.0% |
| *High school* | 1.3 | 3.0 | -0.1 | -3.9 | -0.8 | -6.6 | 0.7 | 2.4 | -0.9 |
| *Some college* | 0.9 | 0.2 | 1.4 | -2.6 | -2.7 | -0.8 | 0.4 | -0.2 | 1.1 |
| *College* | 0.3 | -0.4 | 0.8 | -6.9 | -9.2 | -5.4 | -0.7 | -1.7 | -0.1 |
| *All* | 0.8 | 0.7 | 0.7 | -4.3 | -4.2 | -3.9 | 0.0 | 0.0 | 0.0 |
| **New York** | | | | | | | | | |
| *Less than high school* | -0.1% | 1.7% | -1.3% | -3.3% | -1.6% | -4.9% | -1.3% | 0.4% | -2.6% |
| *High school* | -0.1 | 1.5 | -1.5 | -3.7 | -1.0 | -5.7 | -0.7 | 1.1 | -2.2 |
| *Some college* | 1.2 | 0.6 | 1.7 | -1.6 | -2.3 | -0.8 | 0.9 | 0.3 | 1.4 |
| *College* | 0.8 | 0.2 | 1.4 | -3.9 | -6.2 | -2.3 | 0.1 | -0.7 | 0.8 |
| *All* | 0.6 | 0.6 | 0.6 | -3.4 | -3.6 | -3.3 | 0.0 | 0.0 | 0.0 |
| **Texas** | | | | | | | | | |
| *Less than high school* | -1.7% | -0.6% | -1.8% | -5.1% | -5.2% | -5.2% | -3.0% | -1.9% | -3.2% |
| *High school* | -1.6 | -0.6 | -1.7 | -11.6 | -9.2 | -12.8 | -2.0 | -1.1 | -2.2 |
| *Some college* | 1.6 | 1.2 | 1.7 | -3.8 | -5.9 | -5.0 | 1.4 | 1.0 | 1.4 |
| *College* | 1.3 | 0.9 | 1.5 | -4.1 | -6.7 | -3.0 | 0.8 | 0.2 | 1.1 |
| *All* | 0.5 | 0.6 | 0.6 | -5.4 | -6.7 | -5.0 | 0.0 | 0.0 | 0.0 |

**SOURCE:** EPI analysis of CPS data.

workforce in these four states relative to other states. They estimate that in the United States in 2008, unauthorized immigrants made up 5.4% of the labor force. However, they found that in California, for example, 9.9% of the workforce was an unauthorized immigrant, which was the largest percent of the workforce in any state except Nevada. Since, as shown in their work, unauthorized immi-grants are more likely than other workers to be male and also more likely than other workers to be without a high school degree, a larger inflow of unauthorized immigrant workers, who are easily exploited by employers, may put downward pressure on the wages of similar native workers in these states, a pressure that is largely masked in estimates at the national level.

### The impact of immigration on wages in dollar terms

This paper has presented results in terms of percentage relative wage gains or losses due to immigration. However, because there is a great deal of variation in average weekly wages for different subgroups, a similar percentage effect of immigration on wages may have very different effects by subgroup in terms of actual dollars gained or

lost. (Table C2 in Appendix C gives the average weekly wages for 2007 for all of the subgroups in Table 11.) Based on average weekly wages in 1994, along with the relative wage effect of immigration in Table 11, Table 12 gives, in dollar terms, the relative effect of immigration from 1994 to 2007 on the average weekly wages in 2007.

**Table 12** shows that at the national level, the effect of immigration from 1994 to 2007 on wages of native

| TABLE 12 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Dollar impact of immigration on wages from 1994 to 2007** | | | | | | | | |
| | U.S.-born | | | Foreign-born | | | All | | |
| | *All* | *Female* | *Male* | *All* | *Female* | *Male* | *All* | *Female* | *Male* |
| **United States** | | | | | | | | |
| *Less than high school* | $1.58 | $4.19 | -$1.37 | -$15.71 | -$8.78 | -$20.47 | -$3.48 | $0.93 | -$7.37 |
| *High school* | 2.16 | 5.87 | -1.82 | -26.13 | -12.86 | -37.98 | 0.07 | 4.26 | -4.56 |
| *Some college* | 5.21 | 1.93 | 8.39 | -23.25 | -22.33 | -23.18 | 3.33 | 0.37 | 6.25 |
| *College* | 4.46 | -0.48 | 9.13 | -64.46 | -64.85 | -60.03 | -2.17 | -6.34 | 2.23 |
| *All* | 3.68 | 2.78 | 4.32 | -33.11 | -28.53 | -46.92 | 0.00 | 0.00 | 0.00 |
| **California** | | | | | | | | |
| *Less than high school* | -$8.79 | $3.52 | -$18.52 | -$7.97 | $3.02 | -$16.43 | -$8.17 | $3.17 | -$16.89 |
| *High school* | -3.03 | 13.32 | -17.15 | -16.21 | 0.20 | -27.84 | -6.51 | 10.19 | -20.20 |
| *Some college* | 10.53 | 4.08 | 16.29 | -12.91 | -16.87 | -9.26 | 6.85 | 1.00 | 12.07 |
| *College* | 11.96 | -0.21 | 21.59 | -33.82 | -48.79 | -16.95 | 1.90 | -10.79 | 13.06 |
| *All* | 6.65 | 5.04 | 7.98 | -16.74 | -15.32 | -17.83 | 0.00 | 0.00 | 0.00 |
| **Florida** | | | | | | | | |
| *Less than high school* | $5.90 | $9.69 | -$2.13 | -$3.67 | $6.43 | -$9.61 | $2.63 | $8.66 | -$4.78 |
| *High school* | 8.15 | 14.54 | -0.98 | -19.51 | -3.48 | -37.92 | 3.92 | 11.62 | -6.34 |
| *Some college* | 6.54 | 1.51 | 12.34 | -19.54 | -16.62 | -7.00 | 2.68 | -1.18 | 9.50 |
| *College* | 3.41 | -4.00 | 11.35 | -76.37 | -83.40 | -68.15 | -8.56 | -15.52 | -0.88 |
| *All* | 6.12 | 4.81 | 6.46 | -29.69 | -24.27 | -30.41 | 0.00 | 0.00 | 0.00 |
| **New York** | | | | | | | | |
| *Less than high school* | -$0.53 | $7.12 | -$8.12 | -$15.24 | -$5.78 | -$26.25 | -$6.49 | $1.66 | -$15.27 |
| *High school* | -1.07 | 8.45 | -12.26 | -24.23 | -5.42 | -42.81 | -5.29 | 5.91 | -17.84 |
| *Some college* | 9.70 | 4.13 | 16.13 | -10.59 | -13.61 | -6.04 | 6.90 | 1.74 | 13.02 |
| *College* | 10.79 | 2.05 | 20.58 | -45.57 | -59.27 | -30.06 | 1.56 | -7.23 | 11.83 |
| *All* | 5.97 | 4.90 | 6.76 | -26.54 | -22.84 | -29.07 | 0.00 | 0.00 | 0.00 |
| **Texas** | | | | | | | | |
| *Less than high school* | -$7.46 | -$2.10 | -$9.42 | -$20.73 | -$15.27 | -$22.47 | -$13.02 | -$6.01 | -$15.61 |
| *High school* | -9.60 | -2.86 | -12.48 | -57.10 | -44.63 | -63.94 | -12.46 | -5.28 | -15.69 |
| *Some college* | 12.33 | 7.34 | 14.89 | -23.84 | -29.66 | -34.67 | 10.49 | 5.75 | 12.06 |
| *College* | 16.05 | 8.83 | 20.89 | -45.60 | -55.96 | -37.55 | 9.80 | 1.91 | 14.58 |
| *All* | 4.39 | 3.43 | 5.34 | -32.00 | -34.17 | -31.98 | 0.00 | 0.00 | 0.00 |

**SOURCE:** EPI analysis of CPS data.

workers was modest—it raised the relative average weekly wage of native-born U.S. workers by $3.68. However, the impact varied somewhat across education category and gender. For workers without a high school education, immigration increased the weekly wages of women by $4.19 and reduced the weekly wages of men by $1.37. Earlier immigrants, on the other hand, experienced large declines due to new immigration. On average, immigration from 1994 to 2007 reduced the relative weekly wages of immigrants by $33.11.

For high immigration states, some of the effects on native workers were more dramatic. In California, male workers with less than a high school education saw a relative decline in weekly wages of $18.52 due to immigration, while in Florida, New York, and Texas, their losses were $2.13, $8.12, and $9.42, respectively. Female workers without a high school education in California, Florida, and New York saw increases of $3.52, $9.69, and $7.12, respectively, while they experienced declines of $2.10 in Texas.

## Conclusion

The methodology used in this paper follows the latest developments in the "national approach" to analyzing the effect of immigration on wages. In contrast to the "area approach," the national approach has traditionally found relatively large negative effects of immigration on the wages of native workers, especially native workers with low levels of education. However, when recent developments in the national-approach methodology are incorporated, the results are very similar to those found in the area approach—that recent immigration has had little effect on the relative wages of native workers, including workers with low levels of education. A key finding in the results is that the workers who stand to lose the most from new immigration are those workers most substitutable for new immigrants, namely earlier immigrants.

To those unfamiliar with the scholarly literature on the effect of immigration on native labor market outcomes, the findings of little relative impact on native wages may come as a surprise. The immigrant share of total hours worked rose from 9.9% in 1993 to 15.8% in 2007. How is it possible that economists have been unable to find more evidence of adverse effects on native workers?

An important thing to keep in mind is that the labor force is growing all the time. All else equal, more people, including more foreigners, do not mean lower wages or higher unemployment. If they did, every time a baby was born or a new graduate entered the labor force, they would hurt existing workers. But new workers do not just have supply-side impacts, they also affect demand. Those new graduates buy food and cars and pay rent. In other words, while new workers add to the supply of labor, they also consume goods and services, creating more jobs. An economy with more people does not mean lower wages and higher unemployment, it is simply a bigger economy. Just because New York is bigger than Los Angeles does not in and of itself mean workers in New York are worse off than workers in Los Angeles.

However, a large influx of a particular type of worker has the potential to have a negative impact on the wages of existing workers who are also of that type; workers who are highly substitutable for new immigrants stand to lose when there is a large influx of new immigrants. The immigrant share of total hours worked by workers with less than a high school education rose from 28.4% in 1993 to 47.5% in 2007. How is it that this has not caused large negative effects on native-born workers with less than a high school education?

There are two factors that largely shelter native-born workers with less than a high school education from these negative impacts. The first is their relatively high degree of substitutability with workers with a high school education. While these two types of workers are likely not perfect substitutes, the fact that their substitutability is relatively high means that the impact of an influx of less-than-high-school immigrants is not shouldered entirely by the 9.9% of the U.S. workforce that has less than a high school degree, but that it is to some extent diffused across the much larger share of the workforce—38.7% in 2007—that has a high school degree or less. This greatly reduces the impact on the least-educated American workers.

The other key factor is that even when considering workers within the same education/experience "class," native-born workers and immigrants are not perfect substitutes. In other words, substituting immigrant workers for native workers who have the same level of education and experience is possible, but limited due to the different

characteristics of these two types of workers, including fluency in English. The workers who are the most substitutable for new immigrants are earlier immigrants, so this is the group that ends up shouldering much of the impact of new immigration, rather than native-born workers. Native-born workers in a given education/experience "class," on the other hand, can in fact be helped by immigration, if, for example, their language advantage means they are more likely to be given a supervisory role when there is a large influx of immigrants with their same general level of education and experience.

There are a few limitations of the research presented in this paper that are important to mention. First, this analysis looks at the effect of immigration on wages, not on employment. However, the limited effect we find of immigration on native wages suggests there is also likely a limited effect on native employment. Second, the approach used here does not allow for a separate estimation of the effect of immigration on different racial and ethnic subgroups by education level. While the empirical challenges are nontrivial, further research into the effect of immigration on non-Hispanic black U.S.-born workers by educational attainment is warranted. Third, we are only able to look at the relative effect on native wages of increases in *foreign-born* workers. Foreign-born workers may be naturalized U.S. citizens, permanent residents, temporary visa-holders, refugees, or undocumented workers. If a foreign-born worker is not a naturalized citizen, it is impossible to determine with our data whether he or she is a permanent resident, temporary visa-holder, refugee, or undocumented worker. This unfortunately limits the policy-relevance of the research presented here, since we are unable to determine the effect of various subgroups of foreign-born workers on native labor market outcomes. Better data are needed to further investigate the effect of different types of foreign-born workers, in particular unauthorized immigrants and temporary visa holders.

Finally, this paper estimates the long-run effect of immigration on wages, assuming the economy has fully adjusted to absorb new immigrants and that the overall real wage effect of immigration is zero. It is important to note that, since it takes time for capital to adjust to increases in the labor force, a large unexpected increase in the labor force will likely depress wages temporarily, something not accounted for here. Ottaviano and Peri (2008) find, for example, a 0.3% long-run relative wage increase of workers with less than a high school education due to immigration from 1990-2006, but a 0.7% short-run relative wage decrease. To give an idea of the speed of the effect of capital adjustment, they find that after five years, about 40% of the distance between the short-run effects and long-run effects has been eliminated, with the medium-term effect of immigration from 1990-2006 on the wages of workers with less than a high school degree being a decrease of 0.4%.

Except perhaps for male U.S.-born workers with no high school degree in California (where we find immigration from 1994-2007 has led to a 2.9% relative real wage decline), we find little evidence that recent immigration has had sizeable adverse effects on the wages of U.S.-born workers. Instead, it has generally had modest positive effects. Declining job quality for the least-educated American workers is due to a host of factors aside from immigration, including declining unionization rates, the eroding real value of the minimum wage, and trade practices that expose U.S. workers with low levels of education to competition from much lower wage workers around the globe. While it remains crucial to reform our broken immigration system, a larger economic agenda that will spur growth, reduce economic insecurity, and provide broadly shared prosperity is more central to improving their economic status.

—*We thank Lawrence F. Katz of Harvard University, Ray Marshall of the University of Texas at Austin, and David Dyssegaard Kallick of the Fiscal Policy Institute for extremely helpful comments and discussions. We also thank Anna Turner for excellent research assistance. We gratefully acknowledge funding from the Carnegie Corporation of New York and the Evelyn and Walter Haas, Jr. Fund. The statements made and views expressed are solely the responsibility of the author.*

# Appendix A: Data

The data used are from the March supplement to the Current Population Survey, which asks detailed demographic and labor market questions about the previous year. We are using March supplement data because with these data we can compute the total hours worked in a year for each worker, which offers the most comprehensive measure of labor supply.

Note that these data do not distinguish between documented and undocumented immigrants; survey respondents are not questioned about their legal status. While undocumented immigrants are included in the survey sample, it is widely considered likely that there is higher survey non-response among undocumented immigrants than among others in the sample. In any event, we are unable to distinguish between the effects of documented and undocumented immigrant flows on native workers.

Following standard practice, we restrict the sample in the following way: 1) we restrict to workers who are at least 18 years old; 2) we define "potential labor market experience" as age minus 17 for workers without a high school degree, age minus 19 for workers with exactly a high school degree, age minus 21 for workers with some college training but no college degree, and age minus 23 for workers with a college degree or more, and restrict the sample to workers with between one and 40 years of potential experience; and 3) we define annual hours worked as weeks worked in a year times hours worked per week and drop people who have zero annual hours. When calculating average weekly wages, we further restrict the sample to people who report positive annual wage and salary income. To compute average weekly wages, we divide annual wage and salary income by weeks worked in a year, and calculate a mean weighted by the CPS person weight times annual hours (in order to properly account for varying hours worked across workers).

To ensure that the sample sizes are large enough in each cell for our estimations of the effect of immigration on wages, we pool 1993 and 1994 data for a "year 1994" sample, and pool 2006 and 2007 data for a "year 2007" sample. For the section that conducts the impact analysis separately by time period (1994-2000, 2000-03, and 2003-07), we additionally

pool 1999 and 2000 together for "year 2000" data and pool 2002 and 2003 together for "year 2003" data.

# Appendix B: Methodology

We compute the effect of immigration on wages using an approach outlined in Ottaviano and Peri (2008), in which they simulate the impact of immigration on wages based on a production function structure which combines workers of different education and experience levels. There are two main education groups, "high school or less" and "more than high school." There are two education subgroups within each main education group, "less than high school," "exactly high school," "some college," and "college or more." There are eight experience groups, 1-5 years, 6-10 years, 11-15 years, 16-20 years, 21-25 years, 26-30 years, 31-35 years, and 36-40 years.

Let $w_{Dbkjt}$ be the average weekly wage of native workers in main education group $b$, education subgroup $k$, experience group $j$, at time $t$, and similarly, let $w_{Fbkjt}$ be the average weekly wage of immigrant workers in main education group $b$, education subgroup $k$, experience group $j$, at time $t$. Let $F_{bkjt}$ be the total hours worked by immigrants in main education group $b$, education subgroup $k$, experience group $j$, at time $t$, and $\Delta F_{bkjt}$ be the change between the two periods in total hours worked by immigrants in main education group $b$, education subgroup $k$, and experience group $j$. Let $s_{Fbkjt}$ be the share of total wages (both immigrant and native) in year $t$ paid to immigrant workers in main education group $b$, education subgroup $k$, and experience group $j$. Let $s_{bkjt}$ be the share of total wages in year $t$ paid to workers in main education group $b$, education subgroup $k$, and experience group $j$. The elasticity of substitution between the two main education groups is given by $\sigma_{HL}$, the elasticity of substitution between two education subgroups is given by $\sigma_{bb}$, the elasticity of substitution between workers within the same education subgroup with different experience levels is given by $\sigma_{EXP}$, and the elasticity of substitution between immigrants and natives within the same education/experience group is given by $\sigma_{immi}$.

The percentage change in the wages of native worker with education level $k$ and experience level $j$ due to immigration

$$\left(\frac{\Delta\omega_{Dbkjt}}{\omega_{Dbkjt}}\right)^{Total} = \frac{1}{\sigma_{HL}}\sum_{c\in B}\sum_{q\in E}\sum_{i=1}^{8}\left(s_{Fcqit}\frac{\Delta F_{cqit}}{F_{cqit}}\right) + \left(\frac{1}{\sigma_{bb}}-\frac{1}{\sigma_{HL}}\right)\left(\frac{1}{s_{bt}}\right)\sum_{q\in k}\sum_{i=1}^{8}\left(s_{Fbqit}\frac{\Delta F_{bqit}}{F_{bqit}}\right)$$
$$+\left(\frac{1}{\sigma_{EXP}}-\frac{1}{\sigma_{bb}}\right)\left(\frac{1}{s_{bkt}}\right)\sum_{i=1}^{8}\left(s_{Fbkit}\frac{\Delta F_{bkit}}{F_{bkit}}\right)+\left(\frac{1}{\sigma_{immi}}-\frac{1}{\sigma_{EXP}}\right)\left(\frac{1}{s_{bkjt}}\right)\left(s_{Fbkjt}\frac{\Delta F_{bkjt}}{F_{bkjt}}\right)$$

is given by equation (25) in Ottaviano and Peri (2008). Assuming long run effects (i.e., ignoring the term that accounts for capital adjustment), it is

$$\left(\frac{\Delta\omega_{Fbkjt}}{\omega_{Fbkjt}}\right)^{Total} = \frac{1}{\sigma_{HL}}\sum_{c\in B}\sum_{q\in E}\sum_{i=1}^{8}\left(s_{Fcqit}\frac{\Delta F_{cqit}}{F_{cqit}}\right) + \left(\frac{1}{\sigma_{bb}}-\frac{1}{\sigma_{HL}}\right)\left(\frac{1}{s_{bt}}\right)\sum_{q\in k}\sum_{i=1}^{8}\left(s_{Fbqit}\frac{\Delta F_{bqit}}{F_{bqit}}\right)$$
$$+\left(\frac{1}{\sigma_{EXP}}-\frac{1}{\sigma_{bb}}\right)\left(\frac{1}{s_{bkt}}\right)\sum_{i=1}^{8}\left(s_{Fbkit}\frac{\Delta F_{bkit}}{F_{bkit}}\right)+\left(\frac{1}{\sigma_{immi}}-\frac{1}{\sigma_{EXP}}\right)\left(\frac{1}{s_{bkjt}}\right)\left(s_{Fbkjt}\frac{\Delta F_{bkjt}}{F_{bkjt}}\right)-\frac{1}{\sigma_{immi}}\frac{\Delta F_{bkjt}}{F_{bkjt}}$$

Similarly, the percentage change in the wages of immigrant worker with education level $k$ and experience level $j$ due to immigration, assuming long run effects, is given by

All of the wage and hours terms in the above equations are calculated using CPS data as described in Appendix A. The different sets of elasticities we use, presented in **Table B1**, are taken from the literature (see Ottaviano and Peri (2008) and Card (2009) for detailed discussions). These elasticities of substitution are generally estimated by regressing the relative wage between two groups on their relative labor supply, exploiting variation over time and (where applicable) between education and/or experience categories. The intuition behind this methodology is the following: if an increase

in the labor supply of group A relative to group B leads to very little decline in the wage of group A relative to group B, then the two groups are highly substitutable, and the elasticity of substitution between them is high. Conversely, if an increase in the labor supply of group A relative to group B leads to a large decline in the wage of group A relative to group B, then the two groups are not good substitutes, and the elasticity of substitution between them is low.

Using the percentage wage changes due to immigration in each education/experience group identified above, we aggregate to various levels (education, education by four experience groups, and overall) using sums weighted by the share of total wages in each group, as outlined in Appendix A of Ottaviano and Peri (2008). For the aggregations by race, we weight using wage shares by race.

To compute breakdowns of wage impacts by gender, we use the elasticities in **Table B1** but calculate all other components separately by gender. Finally, to compute breakdowns of wage impacts for the four high-immigration states,

| TABLE B1 | | | | |
|---|---|---|---|---|
| **Elasticities** | | | | |
| | *Low* | *High* | *Typical* | *Table 3* |
| $\sigma_{HL}$ | 1.4 | 2 | 2 | 2 |
| $\sigma_{HH}$ | 10 | 10 | 10 | 2 |
| $\sigma_{LL}$ | 10 | 50 | 20 | 2 |
| $\sigma_{EXP}$ | 3.3 | 10 | 5 | 5 |
| $\sigma_{immi}$ | 30 | 15 | 20 | $\infty$ |

we use the elasticities in Table B1 but calculate all other components separately by state.

### TABLE C1

## Immigration by state

| State | Immigrant share of workers, 1993 | Immigrant share of workers, 2007 | Increase in number of immigrant workers (thousands) | State | Immigrant share of workers, 1993 | Immigrant share of workers, 2007 | Increase in number of immigrant workers (thousands) |
|---|---|---|---|---|---|---|---|
| California | 28.9% | 34.7% | 1668.4 | Iowa | 2.2% | 6.7% | 69.0 |
| Texas | 12.0 | 20.0 | 1088.0 | Missouri | 2.0 | 4.1 | 63.0 |
| Florida | 17.5 | 23.6 | 823.5 | Kentucky | 0.4 | 3.7 | 60.4 |
| New York | 18.3 | 26.6 | 811.1 | Kansas | 2.8 | 7.1 | 58.3 |
| New Jersey | 17.4 | 27.7 | 448.4 | Arkansas | 1.1 | 5.4 | 56.9 |
| Georgia | 5.8 | 13.2 | 400.9 | Louisiana | 2.7 | 5.4 | 50.7 |
| Illinois | 11.8 | 16.6 | 352.8 | New Mexico | 6.7 | 10.6 | 44.1 |
| Virginia | 7.6 | 16.2 | 349.0 | Nebraska | 2.2 | 6.7 | 42.5 |
| Maryland | 7.6 | 19.7 | 325.7 | Connecticut | 11.9 | 13.5 | 39.5 |
| Arizona | 11.4 | 18.2 | 294.6 | Mississippi | 1.0 | 3.6 | 32.1 |
| North Carolina | 2.7 | 8.0 | 248.5 | Delaware | 3.6 | 10.6 | 28.8 |
| Nevada | 11.2 | 24.9 | 216.9 | Idaho | 4.3 | 7.4 | 26.0 |
| Washington | 7.4 | 12.7 | 212.4 | Hawaii | 17.9 | 20.0 | 24.4 |
| Colorado | 4.1 | 10.9 | 198.1 | New Hampshire | 4.0 | 6.4 | 21.8 |
| Massachusetts | 11.9 | 18.0 | 179.1 | Rhode Island | 13.0 | 15.6 | 17.8 |
| Ohio | 1.7 | 4.7 | 159.5 | Oklahoma | 4.7 | 5.1 | 9.5 |
| Pennsylvania | 3.5 | 6.1 | 155.1 | Washington, D.C. | 15.6 | 17.4 | 8.9 |
| Oregon | 5.7 | 13.1 | 151.1 | Alaska | 5.2 | 6.8 | 7.7 |
| Tennessee | 1.2 | 6.3 | 141.9 | South Dakota | 2.2 | 3.4 | 5.9 |
| Minnesota | 3.5 | 7.9 | 124.6 | Montana | 0.7 | 1.7 | 4.6 |
| Utah | 3.4 | 12.2 | 116.5 | Wyoming | 1.5 | 2.7 | 3.3 |
| Michigan | 4.3 | 6.7 | 114.4 | West Virginia | 0.7 | 1.1 | 3.0 |
| Wisconsin | 1.6 | 5.2 | 100.9 | Maine | 2.5 | 2.8 | 2.4 |
| Alabama | 1.0 | 6.1 | 94.4 | North Dakota | 2.0 | 2.6 | 2.3 |
| South Carolina | 1.1 | 5.3 | 85.8 | Vermont | 3.4 | 3.3 | -0.4 |
| Indiana | 1.7 | 4.2 | 72.4 | | | | |

**SOURCE:** EPI analysis of CPS data.

| TABLE C2 |
|---|

## Average weekly wages in 2007

| | U.S. Born | | | Foreign-born | | | All | | |
|---|---|---|---|---|---|---|---|---|---|
| | *All* | *Female* | *Male* | *All* | *Female* | *Male* | *All* | *Female* | *Male* |
| **United States** | | | | | | | | | |
| *Less than high school* | $535.13 | $399.28 | $611.55 | $467.95 | $374.57 | $504.78 | $502.91 | $388.90 | $557.30 |
| *High school* | 731.55 | 571.05 | 842.30 | 618.26 | 509.37 | 682.68 | 716.05 | 563.27 | 819.30 |
| *Some college* | 855.71 | 704.74 | 991.53 | 779.78 | 662.28 | 877.93 | 848.60 | 700.90 | 980.55 |
| *College* | 1,504.79 | 1,145.65 | 1,808.55 | 1,470.66 | 1,116.21 | 1,723.81 | 1,499.76 | 1,141.65 | 1,795.25 |
| *All* | 1,027.82 | 813.88 | 1,197.82 | 876.53 | 727.29 | 966.43 | 1,003.79 | 801.92 | 1,157.42 |
| **California** | | | | | | | | | |
| *Less than high school* | $608.63 | $456.01 | $689.53 | $476.82 | $367.60 | $520.40 | $504.19 | $388.94 | $553.09 |
| *High school* | 825.34 | 680.72 | 917.60 | 624.09 | 514.12 | 683.11 | 752.92 | 624.89 | 829.75 |
| *Some college* | 973.23 | 812.29 | 1,115.81 | 824.04 | 757.80 | 877.21 | 940.68 | 800.89 | 1,061.90 |
| *College* | 1,778.79 | 1,419.41 | 2,070.12 | 1,480.83 | 1,142.27 | 1,776.26 | 1,696.29 | 1,340.44 | 1,990.72 |
| *All* | 1,249.24 | 1,024.24 | 1,424.59 | 852.66 | 746.41 | 917.22 | 1,109.17 | 935.25 | 1,233.46 |
| **Florida** | | | | | | | | | |
| *Less than high school* | $535.44 | $428.11 | $587.48 | $429.83 | $350.65 | $461.71 | $485.21 | $393.74 | $525.87 |
| *High school* | 722.08 | 596.43 | 813.38 | 579.06 | 488.16 | 644.18 | 688.31 | 571.03 | 773.25 |
| *Some college* | 864.52 | 688.55 | 1,021.50 | 723.96 | 600.26 | 852.17 | 839.98 | 672.13 | 993.68 |
| *College* | 1,452.34 | 1,118.03 | 1,748.19 | 1,335.11 | 980.61 | 1,628.22 | 1,426.65 | 1,088.77 | 1,721.26 |
| *All* | 1,003.39 | 804.87 | 1,164.55 | 824.57 | 666.62 | 942.45 | 961.99 | 774.01 | 1,111.66 |
| **New York** | | | | | | | | | |
| *Less than high school* | $508.36 | $361.84 | $581.36 | $464.47 | $395.51 | $501.85 | $484.21 | $380.82 | $538.19 |
| *High school* | 770.97 | 605.27 | 882.88 | 674.37 | 540.81 | 757.25 | 741.78 | 586.49 | 844.03 |
| *Some college* | 887.24 | 767.26 | 996.39 | 847.35 | 726.20 | 951.06 | 879.55 | 759.55 | 987.44 |
| *College* | 1,645.04 | 1,219.04 | 2,065.09 | 1,346.21 | 1,095.30 | 1,551.38 | 1,571.27 | 1,190.70 | 1,929.63 |
| *All* | 1,143.58 | 912.28 | 1,337.84 | 898.57 | 762.45 | 994.48 | 1,075.58 | 873.61 | 1,237.19 |
| **Texas** | | | | | | | | | |
| *Less than high school* | $509.04 | $381.58 | $590.67 | $460.01 | $336.52 | $499.71 | $480.46 | $360.60 | $532.97 |
| *High school* | 708.50 | 544.29 | 820.87 | 560.35 | 428.97 | 642.44 | 686.70 | 528.10 | 793.80 |
| *Some college* | 834.46 | 706.75 | 950.34 | 748.77 | 588.04 | 848.97 | 827.61 | 698.98 | 940.96 |
| *College* | 1,478.70 | 1,112.44 | 1,780.94 | 1,434.92 | 1,059.65 | 1,696.07 | 1,471.99 | 1,105.00 | 1,767.11 |
| *All* | 976.43 | 772.73 | 1,137.70 | 747.75 | 608.71 | 816.04 | 932.46 | 748.01 | 1,066.16 |

**SOURCE:** EPI analysis of CPS data.

# Appendix C

## Endnotes

1. The finding that high school graduates and high school dropouts are close substitutes is a new historical phenomenon. It was not true in the first half of the 20th century, when there was, instead, a big divide in production between high school graduates and those without a high school degree. The historical evidence can be found in Chapter 8 of The Race between Education and Technology (Goldin and Katz 2008).

## References

Borjas, George. 1994. The economics of immigration. *Journal of Economic Literature*. Vol. 32, No. 4, pp. 1667-1717.

Borjas, George. 2003. The labor demand curve is downward sloping: reexamining the impact of immigration on the labor market. *Quarterly Journal of Economics*. Vol. 118, No.4, pp. 1335-1374.

Borjas, George. 2006. Native internal migration and the labor market impact of immigration. *Journal of Human Resources*. Vol. 41, No. 2, pp. 221-258.

Borjas, George and Lawrence Katz. 2007. The evolution of the Mexican-born workforce in the United States. In Borjas, George, ed., *Mexican Immigration to the United States*. Cambridge: National Bureau of Economic Research Conference Report.

Borjas, George, Jeffrey Grogger and Gordon Hanson. 2008. "Imperfect substitution between immigrants and natives: a reappraisal." National Bureau of Economic Research, Working Paper No. 13887. Cambridge, Mass.: NBER.

Borjas, George, Richard Freeman, and Larry Katz. 1997. How much do immigration and trade affect labor market outcomes? *Brookings Papers on Economic Activity 1997*. No. 1, pp. 1-90.

Card, David. 1990. The impact of the Mariel Boatlift on the Miami labor market. *Industrial and Labor Relation Review*. Vol. 43, No. 2, pp.245-257.

Card, David. 2001. Immigrant inflows, native outflows and the local labor market impacts of higher immigration. *Journal of Labor Economics*. Vol. 19, No. 1, pp. 22-64.

Card, David. 2007. "How immigration affects U.S. cities." CReAM Discussion Paper No. 11/07.

Card, David, and John DiNardo. 2000. "Do immigrant inflows lead to native outflows?" National Bureau of Economic Research, Working Paper No. 7578. Cambridge, Mass.: NBER.

Card, David. 2009. Immigration and inequality. *American Economic Review*. Vol. 99, No. 2, pp. 1-21.

D'Amuri, Francesco, Gianmarco Ottaviano, and Giovanni Peri. 2008. "The Labor Market Impact of Immigration in Western Germany in the 1990s." National Bureau of Economic Research, Working Paper No. 13851. Cambridge, Mass.: NBER.

Friedberg, Rachel, and Jennifer Hunt. 1995. The impact of *immigrants on host country wages, employment and growth. Journal of Economic Perspectives*. Vol. 9, No. 2, pp. 23-44.

Friedberg, Rachel. 2001. The impact of mass migration on the Israeli labor market. *Quarterly Journal of Economics*. Vol. 116, No. 4, pp. 1373-1408.

Goldin, Claudia, and Lawrence F. Katz. 2008. *The Race Between Education and Technology*. Cambridge, Mass.: Harvard University Press.

Katz, Larry, and Kevin Murphy. 1992. Changes in relative wages 1963-1987: supply and demand factors. *Quarterly Journal of Economics*. Vol. 107, No. 1, pp. 35-78.

Longhi, Simonetta, Peter Nijkamp, and Jacques Poot. 2005. A meta-analytic assessment of the effect of immigration on wages. *Journal of Economic Surveys*. Vol. 86, No. 3, pp. 451-477.

Marco, Manacorda, Alan Manning, and John Wadsworth. 2006. "The Impact of Immigration on the Structure of Male Wages: Theory and Evidence from Britain." IZA Discussion paper No. 2352. Bonn, Germany.

Marshall, Ray. 2009. *Immigration for Shared Prosperity: A Framework for Comprehensive Reform*. Washington, D.C.: EPI.

Passel, Jeffrey S., and D'Vera Cohn. 2009. *A Portrait of Unauthorized Immigrants in the United States*. Washington, D.C.: Pew Research Center.

Ottaviano, Gianmarco I.P. and Giovani Peri. 2006a. "Rethinking the Effect of Immigration on Wages." National Bureau of Economic Research, Working Paper No. 12496. Cambridge, Mass.: NBER.

Ottaviano, Gianmarco I.P. and Giovani Peri. 2007. "The Effect of Immigration on U.S. Wages and Rents: A General Equilibrium Approach." CReAM Discussion Paper No. 13/07. London, UK.

Ottaviano, Gianmarco I.P. and Giovani Peri. 2008. "Immigration and National Wages: Clarifying the Theory and the Empirics." Working Paper No. 14188. Cambridge, Mass.: NBER.

Peri, Giovanni, and Chad Sparber. 2008. "Task Specialization, Immigration, and Wages." CReAM Discussion Paper No. 02/08. London, UK.

Raphael, Steven, and Lucas Ronconi. 2007. "The Effect of Labor Market Competition with Immigrants on the Wages and Employment of Natives: What Does Existing Research Tell Us?" Working Paper. http://gsppi.berkeley.edu/faculty/sraphael/du-bois-review-january-2007.pdf

A101

NBER WORKING PAPER SERIES

RETHINKING THE EFFECTS OF IMMIGRATION ON WAGES

Gianmarco I.P. Ottaviano
Giovanni Peri

Working Paper 12497
http://www.nber.org/papers/w12497

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
August 2006

We thank John Kennan and one anonymous referee for their useful suggestions in revising the paper. Joshua Aizenman, Christian Broda, David Card, Kenneth Chay, Robert Feenstra, Gordon Hanson, Hilary Hoynes, Larry Katz, Robert A. Moffitt, Francesc Ortega, Michele Tertilt, Giorgio Topa, participants to seminars at UC Berkeley, UC Davis, Stanford University, UC Santa Cruz, University of Munich, the Philadelphia Fed, the New York Fed, University of Tuebingen, the Bank of England and the NBER-ITI group provided very helpful comments and suggestions. Peri gratefully acknowledges funding from the John D. and Catherine T. MacArthur Foundation. Errors are ours.

© 2006 by Gianmarco I.P. Ottaviano and Giovanni Peri. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

Rethinking the Effects of Immigration on Wages
Gianmarco I.P. Ottaviano and Giovanni Peri
NBER Working Paper No. 12497
August 2006, Revised May 2008
JEL No. F22,J31,J61

## ABSTRACT

This paper asks the following question: what was the effect of surging immigration on average and individual wages of U.S.-born workers during the period 1990-2004? We emphasize the need for a general equilibrium approach to analyze this problem. The impact of immigrants on wages of U.S.-born workers can be evaluated only by accounting carefully for labor market and capital market interactions in production. Using such a general equilibrium approach we estimate that immigrants are imperfect substitutes for U.S.- born workers within the same education-experience-gender group (because they choose different occupations and have different skills). Moreover, accounting for a reasonable speed of adjustment of physical capital we show that most of the wage effects of immigration accrue to native workers within a decade. These two facts imply a positive and significant effect of the 1990-2004 immigration on the average wage of U.S.-born workers overall, both in the short run and in the long run. This positive effect results from averaging a positive effect on wages of U.S.-born workers with at least a high school degree and a small negative effect on wages of U.S.-born workers with no high school degree.

Gianmarco I.P. Ottaviano
University of Bologna
Dip Scienze Economiche
Strada Maggiore 45, 40125 Bologna
ITALY
ottavian@economia.unibo.it

Giovanni Peri
Department of Economics
University of California, Davis
One Shields Avenue
Davis, CA 95616
and NBER
gperi@ucdavis.edu

# 1   Introduction

During the last three and a half decades the United States has experienced a remarkable surge in immigration. The share of foreign-born workers in the labor force has steadily grown from 5.3% in 1970 to 14.7% in 2005[1], progressively accelerating; in the period between 1990 and 2005, almost one million immigrants entered the country each year. In parallel to this surge, the debate about the economic effects of immigrants on U.S. natives, and particularly on their wages, has gained momentum both inside academia and in the policy and media arenas. Two facts have contributed to feeding the debate. On the one hand, the proportion of uneducated workers (without a high school degree) has become increasingly large among recent immigrants and it is estimated that an increasing share of these workers is comprised of undocumented immigrants, mainly from Mexico and Central America[2]. On the other hand, the real wage of uneducated U.S.-born workers has performed very poorly: it even declined in real terms during recent decades (see, for example, Autor, Katz and Kearney, 2005). However, when scrutinizing the poor wage performance of uneducated U.S. workers in the context of labor market competition from immigrants the recent empirical literature has provided a mixed set of results.

Ten years ago an influential survey by Friedberg and Hunt (1995) summarized the literature, concluding that, "the effect of immigration on the labor market outcomes of natives is small." Since then, a number of studies have re-examined the issue, refining the estimates by accounting for important problems related to the endogeneity of immigrant inflow and the internal migration of U.S. workers. Even with more accurate and sophisticated estimates at hand, a consensus has yet to be reached: some economists identified only small effects of immigration on wages (Card, 2001) while others found larger negative effects (Borjas, Friedman and Katz, 1997)[3]. Recently, the latter view of a significant negative impact of immigration on wages, particularly of uneducated workers, seems to have gained momentum. An influential article by George Borjas (2003), followed by Borjas and Katz (2007) and Borjas (2006) who use a similar empirical method, argues using national data from five decennial U.S. Censuses (1960-2000) that U.S. workers lost, on average, about 3% of the real value of their wages due to immigration over the period 1980-2000 and that this loss reached almost 9% for native workers without a high school degree (Borjas, 2003, Table IX, page 1369), at least in the short run.

Our paper builds on the model presented in Borjas (2003), and takes a fresh look at some critical issues which imply significant revisions of several results. The key idea is that the effects of immigration on wages can only be measured within a *general equilibrium* framework. More specifically, a study on the effects of immigration on wages of workers who differ by education, experience, nativity and gender should build on a production function that describes how these different types of workers interact with each other and with

---

[1] Authors' calculations using 1 percent Integrated Public Use Microdata Series (IPUMS) data for the year 1970 and Current Population Survey March Supplement, Ruggles et al (2006), for the year 2005.

[2] See for instance Passel (2006).

[3] We are aware of only one previous paper, Friedberg (2001), that finds a positive *partial* effect of immigration on native wages. In most cases, however, that effect is not significant.

physical capital to produce output. Then, one can derive the demand for each type of labor, which depends on the productivity and employment of the other labor types as well as on physical capital. Finally, market clearing conditions can be used to obtain wage equations from the labor demands and supplies, and these can be used to estimate empirically the elasticities of substitution (relative wage elasticities) between workers. Going back to the production function, these estimates can then be used to assess the effect of immigration (a change in the supply of different types of workers) on wages (the marginal productivity of different types of workers). In contrast, several existing empirical studies directly estimate a reduced-form wage equation for native workers with certain characteristics (such as educational or occupational groups) obtaining the elasticity of wages with respect to new immigrants in the same group. Such an approach only provides the "partial" effect of immigration on wages (as it omits all cross-interactions with other types of workers and with capital) and as such is uninformative on the overall effect of immigrants on wages.

The *general equilibrium* approach is accompanied by two novel features of our analysis. First, we remove the usual assumption that foreign- and U.S.-born workers are perfect substitutes within the same education-experience-gender group. Whether it is because immigrants tend to choose a different set of occupations, because they are a selected group, or because they have some culture-specific skills, it seems reasonable to allow them to be imperfect substitutes for natives even within an education-experience-gender group and to let the data estimate the corresponding elasticities of substitution. While acknowledging that in principle "[im]migrants may complement some native factors in production... and overall welfare may rise" (Friedberg and Hunt, 1995, page 23), most studies thus far have focused on the partial effects of immigrants on the wages of those native workers who are their closest substitutes (i.e., within the same occupation, education-experience or skill groups). By modeling labor as a differentiated input in general equilibrium, we enlarge the picture to better capture the effects of immigration within and between different groups.

The second novel feature of our analysis is a more careful consideration of the response of physical capital to immigration. Since physical capital complements labor it is important to account for its adjustment in the short and in the long run. In particular, when evaluating the "short run" response of wages to immigration it seems rather artificial to maintain a fixed stock of capital, while accumulating immigration flows occurring over ten or twenty years, as is currently done in the literature. Immigration happens gradually over time (not at the beginning of the decade) and investors respond continuously, although with sluggishness, to increased marginal productivity of capital caused by immigration. As for the long run response of capital, any model of growth (Solow, 1956; Ramsey, 1928), and the empirical evidence as well, implies that capital adjusts in order to maintain a constant real return (and capital output ratio). For the short run, we use estimates of the speed of adjustment of capital taken from the growth and the real business cycle literature to evaluate the average wage impact of immigration. We are also able to assess how long it takes for full adjustment to take place. Rather

than reporting the effects of fourteen years of immigration for fixed capital and for fully adjusted capital, we are able to estimate the effect of immigration during the 1990-2004 period as of 2004, and then we show that within the following 5 years the largest part of "the long run effect" has set in.

Once we account for the aforementioned effects, we significantly revise several commonly estimated effects of immigrants on the wages of U.S. natives. First, in the long run the average wage of U.S.-born workers experienced a *significant increase* (+1.8%) as a consequence of immigration during the 1990-2004 period. Even in the short run (as of 2004) the average wage of U.S. native workers increased moderately (+0.7%) because of immigration. This result stems from the imperfect substitutability between U.S.- and foreign-born workers so that immigration increases the wages of U.S.-born workers at the expense of a decrease in wages of foreign-born workers (namely, previous immigrants). Second, the group of least educated U.S.-born workers *suffers a smaller wage loss than previously calculated*. In the long run native workers only lost 1.1% of their real wage due to the 1990-2004 immigration. Even in the short run (as of 2004) the negative impact was a moderate 2.2% real wage loss. The methodology used in the previous literature would estimate larger losses, around -8% in the short run and -4.2% in the long run. The fact that uneducated foreign-born do not fully and directly substitute for (i.e., compete with) uneducated natives is the reason for this attenuation. Third, *all other groups of U.S.-born workers* (with at least a high school degree), accounting for 90% of the U.S.-born labor force in 2004, *gained from immigration.* Their real wage gains in the long run range between 0.7% and 3.4% while even in the short run they either gain (high school graduates) or have essentially no wage change (college graduates). Finally, considering only the *relative effect* of immigration on real wages of natives, namely its contribution to the widening of the college graduates-high school dropouts wage gap and of the college graduates-high school graduates wage gap, we find only a small contribution of immigration to the first and a negative contribution (i.e., reduction of the gap) to the second for the 1990-2004 period. The group whose wage was *most negatively affected by immigration* is, in our analysis, *the group of previous immigrants;* however, it is they who probably receive the largest non-economic benefits from the immigration of spouses, relatives or friends, making them more willing to sustain those losses.

The remainder of the paper is organized as follows. Section 2 summarizes the relevant literature. Section 3 introduces the aggregate production function, derives the demand for each type of labor and identifies the key parameters for calculating the elasticity of wages to the inflow of immigrants. Section 5 presents the data, illustrates some preliminary evidence of differences between native and foreign-born workers in the labor market and produces the key estimates of the relevant elasticities. Using those estimates, Section 6.1 evaluates the effect of immigration on the wages of U.S. natives for the period 1990-2004. We revisit, in Section 6.2, the distinction between short and long run analysis and consider the short run effects (as of year 2004) and the long run effects (during the following five years and with full capital adjustment) and we compare our results to

previous findings on the effects of immigration. Finally, in Section 6.4, we analyze by how much immigration contributed to the increased wage dispersion during the period 1990-2004. Section 7 concludes the paper.

# 2   Review of the Literature

There is a long list of contributions in the literature dealing with the impact of immigrants on the wages of natives[4]. Some of these studies explicitly consider the contribution of immigration to increased wage dispersion and to the poor performance of real wages of the least educated since 1980. Two questions are typically analyzed by the existing literature. The first is imbued with a "macro" flavor: Does the inflow of foreign-born workers have a positive or negative net effect on the average productivity and wages of U.S.-born workers? This question requires that we aggregate the wages of heterogeneous workers. The second question is more "micro" in focus: How are the gains and losses from immigration distributed across U.S.-born workers with different levels of education? The consensus emerging from the literature is that the first (macro) effect on average U.S. wages is negligible in the long run, as capital accumulates to restore the pre-migration capital-labor ratio. However, for fixed capital in the short run there can be a large depressing effect of immigration on wages. Most of the literature represents immigration as an increase in labor supply for a given capital stock (Borjas, 1995, 2003), and consequently finds a negative impact of immigration on average wages (in the short run) and a positive impact of immigration on the return to capital due to complementarities between the two factors. The recent debate, however, has focused on the effects of immigration on the *relative* wages of more and less educated U.S.-born workers. Some economists argue for a large, adverse impact on less educated workers (Borjas, 1994, 1999, 2003, 2006; Borjas, Freeman and Katz, 1997), while others favor a smaller, possibly insignificant, effect (Butcher and Card, 1991; Card, 1990; Card, 2001; Friedberg 2001; Lewis, 2005; National Research Council, 1997). The size and significance of the estimated relative wage effects from immigration remain controversial, and possibly depend at least in part on the use of local versus national data.

The present article uses a framework from which both the "macro" (average) and the distributional (relative) effects of immigration can be derived. We argue that only within such a framework, based on the aggregate production function and general equilibrium outcomes, can one measure and discuss either of these effects. Our approach builds on the model employed in Section VII of Borjas (2003) and uses national data in performing estimations. This approach avoids the problems arising from internal migration of natives and from endogenous location choice and attenuation bias when using metropolitan or state data[5].

The modern analysis of the effects of immigrant inflows on the wages of natives began with studies that treated foreign-born as a single homogeneous group of workers (Grossman, 1982; Altonji and Card, 1991),

---

[4]This review does not intend to be exhaustive. For a recent and articulate overview of the estimates of the effect of immigration on wages see Longhi, Nijkamp and Poot (2005).

[5]See Borjas (2006) and Borjas, Freeman and Katz (1997) for a discussion of these issues.

imperfectly substitutable with U.S.-born workers. A number of studies on the relative supply of skills and relative wages of U.S.-born workers made clear, however, that workers with different levels of schooling and experience are better considered as imperfectly substitutable factors (Katz and Murphy, 1992; Welch, 1979; Card and Lemieux, 2001). As a consequence, more recent analysis has been carried out partitioning workers among imperfectly substitutable groups (by education and experience) while assuming perfect substitution of native- and foreign-born workers within each group (Borjas, 2003). The present article combines the two approaches in the sense that both can be seen as special cases nested in our more general framework. Specifically, we assume the existence of an aggregate production function that combines workers and physical capital, while using education, experience, gender and place of origin (U.S. versus elsewhere) to categorize imperfectly substitutable groups. Following Borjas (2003), we choose a constant elasticity of substitution (CES) technology but, differently from that article, we treat the two groups of U.S.- and foreign-born workers as not perfectly substitutable and we partition them across eight experience levels and four educational attainment classes. We also allow males and females to be imperfectly substitutable in order to check whether within education-experience cells the gender composition of immigrants affected the gender-specific wage of natives. Within this framework we estimate three sets of elasticities: (i) between U.S.- and foreign-born workers within education-experience groups, separately for males and females as well as together; (ii) between experience levels within education groups; and (iii) between education groups. There is scant literature estimating the first set of elasticity parameters. Often, however, imperfect substitution between natives and immigrants has been cited as the reason for finding small wage effects of immigration on natives and larger negative effects on wages of previous immigrants (see Longhi, Nijkamp and Poot, 2005, page 468-469 for a discussion of this issue). We are only aware of two studies that explicitly estimate the elasticity of substitution between natives and immigrants, namely Jaeger (1996) which only used 1980-1990 metropolitan data and whose estimates may be susceptible to attenuation bias and endogeneity problems related to the use of local data[6], and Cortes (2006) who considers low-skilled workers and uses metropolitan area data to find a rather low elasticity of substitution between U.S.- and foreign-born workers[7]. The other two sets of elasticities (between experience and between education groups) have been estimated in several studies (Card and Lemieux, 2001; Katz and Murphy, 1992; Angrist, 1995; Ciccone and Peri, 2005) and are found to be around 2 (across education groups) and around 4 (across experience groups).

As for physical capital, we explicitly consider its contribution to production and treat its accumulation as driven by market forces that equalize its real returns in the long run. In particular, we revise the usual approach that considers capital as fixed in short run simulations. The growth literature (Islam, 1995; Caselli, et al. 1996) and real business cycle literature (e.g. Romer, 2006, Chapter 4) has estimated, using yearly data

---

[6]Jaeger (1996) is also the only previous work we know of that considers male and female workers separately when analyzing the substitutability between U.S.- and foreign-born.

[7]A recent paper by Manacorda, et al. (2006) applies a similar framework as this paper to British data and finds values of the elasticity of substitution between natives and immigrants similar to those found in the present paper.

on capital accumulation and different types of shocks, the speed of adjustment of capital to deviations from its long run growth path. Adopting 10% per year as a reasonable estimate of the speed of adjustment of physical capital in the U.S. (confirmed by our own estimates for the 1960-2004 period) we analyze the impact of yearly immigration on average wages as capital adjusts. We can evaluate the effect of immigration that occurred in the period 1990-2004 on average wages as of 2004, and we can evaluate its effects after five or ten more years. This is an important departure from the literature, which has not paid much attention to the response of physical capital to immigration. When evaluating the wage effects of immigration, the prevalent assumption has been that of a fixed capital stock in the short run (Borjas, 1995; Borjas, 2003, Borjas, Freeman and Katz, 1997; Borjas and Katz, 2007).

Some studies on the effects of immigration on wages have specifically focussed on immigration (along with trade) as a proposed explanation for the worsening of income distribution in the U.S. during the years following 1980. In particular, Borjas, Friedman and Katz (1997) found that immigration contributed to the widening of the wage gap between high school dropouts and high school graduates during the 1980-1995 period but did not contribute to the widening of the college graduate-high school graduate wage gap. In light of new studies (notably Autor, Katz and Kearney, 2005, 2006) that further document the evolution of college graduate-high school graduate and high school graduate-high school dropout wage gaps during the 1990-2005 period, and in light of our new results that reduce the adverse impact of immigration on wage distribution, we revisit this arm of the literature by calculating the contribution of immigration to wage dispersion for the 1990-2004 period.

Finally, as mentioned earlier, several studies on the *relative* wage effects of immigrants have analyzed local data (e.g., for metropolitan areas) accounting for the internal migration response of U.S. natives (Card, 2001; Card and Di Nardo, 2000; Lewis, 2005) and correcting for the endogeneity of immigrant location choice (both factors would cause an attenuation bias in the estimates). These studies find a small negative partial effect of immigrants on wages. On the other hand, our recent work (Ottaviano and Peri, 2005, 2006, 2007) and recent work by David Card (Card 2007) points out a *positive and significant* effect of immigration on the average wage of U.S. natives across U.S. states and metropolitan areas. This positive and significant effect survives 2SLS estimation, using instruments that should be exogenous to city-specific unobservable productivity shocks. The complementarities in production illustrated in this paper are able to reconcile the negative partial effects of immigrants on wages estimated in previous studies (such as Borjas 2003) with the positive average effect of immigration on native wages at the local level[8].

---

[8]The city model is developed in greater detail in Ottaviano and Peri (2007).

# 3   Theoretical Framework

In order to evaluate the effects of immigrants on the wages of natives and other foreign-born workers when each group differs by education, experience and gender we need a model of how the marginal productivity of a given type of worker changes in response to changes in the supply of other types. At the same time, it is important to account for the response of physical capital to immigration. A simple and popular way of doing this is to assume an aggregate production function in which aggregate output (the final good) is produced using a combination of physical capital and different types of labor.

## 3.1   Production Function

Following Borjas (2003) who builds on Card and Lemieux (2001), we choose a nested CES production function, in which physical capital and different types of labor are combined to produce output. Labor types are first grouped according to education and experience characteristics; experience groups are nested within educational groups, that are in turn nested into a labor composite. U.S.-born and foreign-born workers and, within each of those groups, men and women are allowed a further degree of imperfect substitutability within the same education and experience cell. While the nested CES function imposes restrictions on the elasticities of substitution across skill groups it has the advantage of being parsimonious in parameters and widely used. Moreover, it yields results easily comparable with a large body of articles in the labor and macro literature. The aggregate production function we use is given by the following expression:

$$Y_t = A_t L_t^\alpha K_t^{1-\alpha} \tag{1}$$

where $Y_t$ is aggregate output , $A_t$ is total factor productivity (TFP), $K_t$ is physical capital, $L_t$ is a CES aggregate of different types of labor (described below), and $\alpha \in (0,1)$ is the income share of labor. All variables, as indicated by the subscripts, are relative to year $t$. The production function is a constant returns to scale (CRS) Cobb-Douglas combination of capital $K_t$ and labor $L_t$. Such a functional form has been widely used in the macro-growth literature (recently, for instance, by Jones, 2005 and Caselli and Coleman, 2006) and is supported by the empirical observation that the share of income going to labor, $\alpha$, is reasonably constant in the long run and across countries (Kaldor, 1961; Gollin, 2002). The labor aggregate $L_t$ is defined as:

$$L_t = \left[ \sum_{k=1}^{4} \theta_{kt} L_{kt}^{\frac{\delta-1}{\delta}} \right]^{\frac{\delta}{\delta-1}} \tag{2}$$

where $L_{kt}$ is an aggregate measure of workers with educational level $k$ in year $t$; $\theta_{kt}$ are education-specific productivity levels (standardized so that $\sum_k \theta_{kt} = 1$ and any common multiplying factor can be absorbed in the

TFP term $A_t$). As is standard in the labor literature, we group educational achievements into four categories so that $k = 1$ denotes high school dropouts $(HSD)$ , $k = 2$ denotes high school graduates $(HSG)$, $k = 3$ college dropouts $(COD)$ and $k = 4$ college graduates $(COG)$. The parameter $\delta > 0$ measures the elasticity of substitution between workers with different educational achievements. Within each educational group we assume that workers with different experience levels are also imperfect substitutes. In particular, following the specification used in Card and Lemieux (2001), we write:

$$L_{kt} = \left[ \sum_{j=1}^{8} \theta_{kj} L_{kjt}^{\frac{\eta-1}{\eta}} \right]^{\frac{\eta}{\eta-1}} \tag{3}$$

where $j$ is an index spanning experience intervals of five years between 0 and 40, so that $j = 1$ captures workers with $0 - 4$ years of experience, $j = 2$ those with $5 - 9$ years, and so on. The parameter $\eta > 0$ measures the elasticity of substitution between workers in the same education group but with different experience levels and $\theta_{kj}$ are experience-education specific productivity levels (standardized so that $\sum_j \theta_{kj} = 1$ for each $k$ and assumed invariant over time, as in Borjas, 2003). Since we expect workers within an education group to be closer substitutes than workers across different education groups, our prior (consistent with the findings of the literature) is that $\eta > \delta$. Distinct from most of the existing literature, we define $L_{kjt}$ as a CES aggregate of U.S.-born and foreign-born workers. Denoting the number of workers with education $k$ and experience $j$ who are, respectively, U.S.-born and foreign-born, by $H_{kjt}$ and $F_{kjt}$, and the elasticity of substitution between them by $\sigma > 0$, our assumption is that:

$$L_{kjt} = \left[ \theta_{Hkjt} H_{kjt}^{\frac{\sigma-1}{\sigma}} + \theta_{Fkjt} F_{kjt}^{\frac{\sigma-1}{\sigma}} \right]^{\frac{\sigma}{\sigma-1}} \tag{4}$$

The terms $\theta_{Hkjt}$ and $\theta_{Fkjt}$ measure the specific productivity levels of foreign- and U.S.-born workers and they may vary across groups and years (in the empirical identification we impose a systematic structure on their time variations) . They are standardized so that $(\theta_{Hkjt} + \theta_{Fkjt}) = 1$. Foreign-born workers are likely to have different abilities pertaining to language, quantitative skills, relational skills and so on. These characteristics, in turn, are likely to affect their choices of occupation and their abilities in the labor force, therefore foreign-born workers are differentiated enough to be imperfect substitutes for U.S.-born workers, even within the same education and experience group. Different productive characteristics between men and women could also imply imperfect substitutability between genders within the groups of native and foreign-born workers. While the gender gap literature does not explicitly explore the possibility that men and women are imperfect substitutes in production, recent studies emphasize the use of different skills and different task performances between men and women (Bacolod and Blum, 2006; Black and Spitz-Oener, 2007). Hence in Section 5 below, we test the degree of substitutability between U.S.-born men and women and foreign-born men and women allowing any

degree of substitutability between men and women within education-experience-nationality cells. In practice, we allow each of the terms $H_{kjt}$ and $F_{kjt}$ to be CES aggregates of gender-specific labor units that can be represented as:

$$H_{kjt} = (\theta_{HMkjt}H_{Mkjt}^{\frac{\lambda-1}{\lambda}} + \theta_{HWkjt}H_{Wkjt}^{\frac{\lambda-1}{\lambda}})^{\frac{\lambda}{\lambda-1}} \; , F_{kjt} = (\theta_{FMkjt}F_{Mkjt}^{\frac{\lambda-1}{\lambda}} + \theta_{FWkjt}F_{Wkjt}^{\frac{\lambda-1}{\lambda}})^{\frac{\lambda}{\lambda-1}} \qquad (5)$$

where $H_{Mkjt}$ and $F_{Mkjt}$ measure male employment and $H_{Wkjt}$ and $F_{Wkjt}$ measure female employment among natives and immigrants, respectively, and the terms $\theta_{HMkjt}$, $\theta_{HWkjt}$ $\theta_{FMkjt}$ $\theta_{FWkjt}$ capture their respective productivity. In the empirical part we test whether the restriction $1/\lambda = 0$, which would imply perfect substitution between men and women, is rejected by the data or not. Ultimately, we allow the empirical analysis to reveal whether U.S.-born workers and foreign-born workers within the same education and experience group are perfect substitutes or not and whether their substitutability depends on their gender or only on their foreign origin.[9]

A simplification adopted here is that the elasticity of substitution between U.S.- and foreign-born, $\sigma$, is taken to be equal across education and experience groups. Such a simplification seems empirically sound– in fact in Ottaviano and Peri (2006) we allowed different elasticities between different education groups (namely $\sigma_k$, for $k = HSD, HSG, COD, COG$) and we could never reject the restriction of identical values across groups ($\sigma_k = \sigma$). At the same time such a restriction allows us to estimate much more precisely the parameter $\sigma$ since we can pool observations from all education and experience groups.

## 3.2   Physical Capital Adjustment

Physical capital adjustment to immigration may not be immediate. However, investors respond continuously to inflows of labor and to the consequent increase in the marginal productivity of capital; how fast they respond is an empirical question. Further, immigration is not an unexpected and instantaneous shock. It seems odd, therefore, to treat the short run effect as the impact of immigration with a fixed capital stock, which prompts the question: for how long is capital fixed and why? Immigration is an ongoing phenomenon, distributed over years, predictable and rather slow. Despite the acceleration in legal and illegal immigration after 1990, the inflow of immigrants measured less than 0.6% of the labor force each year between 1960 and 2004. It is reasonable, therefore, to think of this issue more dynamically with investments continuously responding to the flow of immigrant workers. In a dynamic context the relevant parameter in order to evaluate the impact of immigration on average wages is the speed of adjustment of capital. In the long run, on the balanced growth path, such as in the Ramsey (1928) or the Solow (1956) models, the variable $\ln(K_t/L_t)$ follows a constant

---

[9]The standard assumption in the literature has been, so far, to impose that $L_{kjt} = H_{kjt} + F_{kjt}$, i.e., that once we control for education and experience, foreign-born and natives of either gender are workers of identical type.

positive trend growth determined only by total factor productivity ($\ln A_t$) and is not affected by the size of $L_t$. Therefore the average wage in the economy, which depends on $K_t/L_t$, does not depend on immigration in the long run. Shocks to $L_t$, such as immigration, however, may temporarily affect the value of $K_t/L_t$, causing it to be below its long run trend. How much and for how long $\ln(K_t/L_t)$ remains below trend as a consequence of immigration depends on the yearly inflow of immigrants and on the yearly rate of adjustment of physical capital. The theoretical and empirical literature on the speed of convergence of a country's capital per worker to its own balanced growth path (Islam, 1995; Caselli et al. 1996), as well as the business cycle literature on capital adjustment (Romer, 2006), provide estimates for such speed of adjustment that we can use together with data on total yearly immigration to obtain the effect of immigration over 1990-2004 on average wages in 2004 and in the subsequent 5 to 10 years as capital continues to adjust. We devote the next section, 3.2.1, to showing in detail the connection between average wages and the capital-labor ratio. In our empirical analysis we first focus on the long run effects of immigration (Section 6.1), allowing for full capital adjustment, as a natural reference. Then in Section 6.2 we use the estimated speed of capital adjustment to show the effect of fourteen years of immigration (1990-2004) on wages as of the year 2004, and we compare those results with the traditional way of computing "short run" effects on wages.

### 3.2.1   Partial Adjustment, Total Adjustment and Wages

Given the production function in (1) the effect of physical capital $K_t$ on the wages of individual workers operates through the effect on the marginal productivity of the aggregate $L_t$. Let us call $w_t^L$ the compensation to the composite factor $L_t$, which is equal to the average wage in the economy[10]. In a competitive market it equals the marginal productivity of $L_t$, hence:

$$w_t^L = \frac{\partial Y_t}{\partial L_t} = \alpha A_t \left(\frac{K_t}{L_t}\right)^{1-\alpha} \tag{6}$$

Assuming either international capital mobility or capital accumulation along the balanced growth path of the Ramsey (1928) or Solow (1956) models, the real interest rate $r$ and the aggregate capital-output ratio $K_t/Y_t$ are both constant in the long run and the capital-labor ratio $K_t/L_t$ grows at a constant rate equal to $\frac{1}{1-\alpha}$ times the growth rate of technology $A_t$. This assertion is also supported in the data, as the real return to capital and the capital-output ratio in the U.S. did not exhibit any trend in the long run while the capital-labor ratio grew at a constant rate (Kaldor, 1961). In particular, this is true for our period of consideration 1960-2004. As depicted in Figure 1 the capital-output ratio ($K_t/Y_t$) shows small deviations around a constant mean over the 44 years considered. Moreover, the de-trended log capital-labor ratio, $\ln(K_t/L_t)$, shown in Figure 2 exhibits

---

[10]The "average wage" $w_t^L$ is obtained by averaging the wages of each group (by education, skill and nativity), weighting them by the share of the group in total employment.

remarkably fast mean reversion, as evidenced by the fact that the path of the variable crosses the mean (equal to 0) eleven times in the sample. This suggests that deviations from the trend do not take more than 4 years, on average, to be eliminated[11]. In order to show the effect of different patterns of capital adjustment on the average wage ($w_t^L$) it is useful to write the capital stock as $K_t = \kappa_t L_t$, where $\kappa_t$ is the capital-labor ratio. Hence $w_t^L$ (from equation 6) can be expressed in the following form:

$$w_t^L = \alpha A_t (\kappa_t)^{1-\alpha} \tag{7}$$

Calculating the marginal productivity of capital and equating it to the interest rate, $r$ augmented by capital depreciation $\delta$, we obtain the expression for the balanced growth path capital-labor ratio, $\kappa_t^* = \left( \frac{1-\alpha}{r+\delta} \right)^{\frac{1}{\alpha}} A_t^{\frac{1}{\alpha}}$. Substituting it into equation (7) implies that the average wage in balanced growth path, $\left( w_t^L \right)^* = \alpha \left( \frac{1-\alpha}{r+\delta} \right)^{\frac{1-\alpha}{\alpha}} A_t^{\frac{1}{\alpha}}$ does not depend on the total supply of workers $L_t$. Hence, in the short run, the change in labor supply due to immigration affects average wages only if (and by the amount that) it affects the capital-labor ratio. Assuming that the technological progress ($\Delta A_t / A_t$) is exogenous to the immigration process, the percentage change in average wages due to immigration can be expressed as a function of the percentage response of $\kappa_t$ to immigration. Taking partial log changes of (7) relative to immigration we have:

$$\frac{\Delta w_t^L}{w_t^L} = (1-\alpha) \left( \frac{\Delta \kappa_t}{\kappa_t} \right)_{immigration} \tag{8}$$

where $(\Delta \kappa_t / \kappa_t)_{immigration}$ is the percentage deviation of the capital-labor ratio from $k_t^*$ due to immigration. With full capital adjustment and the economy in balanced growth path, $(\Delta \kappa_t / \kappa_t)_{immigration}$ equals 0. At the same time, if one assumes fixed total capital, $K_t = \overline{K}$, then $(\Delta \kappa_t / \kappa_t)_{immigration}$ equals the negative percentage change of employment due to immigration: $-\frac{\Delta F_t}{L_t}$, where $\Delta F_t$ is the increase in foreign-born workers in the period considered and $L_t$ is the labor aggregate at the beginning of the period. In the extreme case in which we keep capital unchanged over fourteen years of immigration, 1990-2004, the inflow of immigrants, equal to roughly 11% of the initial labor force, combined with a  capital share $(1-\alpha)$ equal to 0.34, implies a negative effect on average wages of 3.5 percentage points.

Accounting for the sluggish yearly response of capital and for yearly immigration flows, however, we can estimate the *actual* response of  the capital-labor ratio to immigration flows in the 1990-2004 period without the extreme assumption that capital be fixed for 14 years. We do this in Section 6.2 when we revisit the short run/long run analysis.

---

[11]We analyze the capital data and their dynamic behavior empirically in section 6.2.

### 3.3   Effects of Immigration on Wages

We use the production function (1) to calculate the demand functions and wages for each type of labor at a given point in time. Choosing output as the numeraire good, in a competitive equilibrium the (natural logarithm of) the marginal productivity of U.S.-born workers ($H$) in group $k, j$, equals (the natural logarithm of) their wage:

$$\ln w_{Hkjt} = \ln\left(\alpha A_t \kappa_t^{1-\alpha}\right) + \frac{1}{\delta}\ln(L_t) + \ln\theta_{kt} - \left(\frac{1}{\delta}-\frac{1}{\eta}\right)\ln(L_{kt}) + \ln\theta_{kjt} - \left(\frac{1}{\eta}-\frac{1}{\sigma_k}\right)\ln(L_{kjt}) + \ln\theta_{Hkjt} - \frac{1}{\sigma_k}\ln(H_{kjt})$$

$$(9)$$

To keep notation less cumbersome and because men-women differences are not the focus of this paper, in the current section we maintain the aggregate male-female notation within education-experience-nativity groups. Hence $H_{kjt}$ ($F_{kjt}$) represents the total input of male and female U.S.-born (foreign-born) workers of education $k$ and experience $j$ and $w_{Hkjt}$ ($w_{Fkjt}$) represents the average wage of the group. In general $H_{kjt}$ and $F_{kjt}$ are the aggregates described by (5). However if men and women of the same education, experience and place of birth are perfectly substitutable the aggregates $H_{kjt}$ and $F_{kjt}$ are simply the sum of male and female U.S.-born (foreign-born) workers in the group[12]. We assume that the relative efficiency parameters, as well as total factor productivity $A_t$, depend on technological factors and are therefore independent from the supply of foreign-born.

We denote the change in the supply of foreign-born due to immigration between two censuses in group $k, j$ as $\Delta F_{kjt} = F_{kjt+10} - F_{kjt}$. We can use the demand function (9) to derive the effect of immigration on native wages. The overall impact of immigration on natives with education $k$ and experience $j$ can be decomposed into three effects that operate through $L_{kjt}$, $L_{kt}$ and $L_t$. First, a change in the supply of foreign-born workers with education $k$ and experience $j$ affects the wage of natives with identical education and experience by changing each one of the terms $L_{kjt}$, $L_{kt}$ and $L_t$ in expression (9). Second, a change in the supply of foreign-born workers with education $k$ and experience $i \neq j$ affects the wage of natives with identical education $k$ but different experience $j$ by changing the terms $L_{kt}$ and $L_t$. Third, a change in the supply of foreign-born workers with education $m \neq k$ affects native workers with different education $k$ only through a change in $L_t$. Aggregating the changes in wages resulting from immigration in each skill group, as well as the response of the capital-labor ratio $\kappa_t$, yields the wage change due to immigration for each U.S.-born worker[13].

Before expressing the formula for the *total* effect of immigration on the wage of a U.S.-born worker of education $k$ and experience $j$, let us show the formula for a *partial* effect of the type emphasized in the large part of the previous literature. If we only consider the impact of immigrants with education $k$ and experience $j$ on the wages of natives with identical education and experience, keeping the aggregates $L_{kt}$, $L_t$ and $\kappa_t$ constant, we obtain what much of the previous literature calls the "effect of immigrants on wages". This, in fact, measures

---

[12]This, in fact, seems to be the empirically relevant case as we show in section 5.1.

[13]The exact expression for each of the effects described above is provided in Appendix 1 of Ottaviano and Peri (2006).

a *partial* effect, keeping supply in all other skill groups constant and keeping constant the aggregates $L_{kt}$ and $L_t$. Such effects have been estimated in the existing literature by regressing the wage of natives $\ln(w_{Hkjt})$ on the total number of immigrants in the same group $k, j$ in a panel across groups over census years, controlling for year-specific effects (absorbing the variation of $L_t$) and education-by-year specific effects (absorbing the variation of $L_{kt}$) (e.g., Borjas 2003). The resulting partial elasticity, expressed as the percentage variation of native wages $(\Delta w_{Hkjt}/w_{Hkjt})$ in response to the percentage variation of foreign employment in the group $(\Delta F_{kjt}/F_{kjt})$, is given by the following expression:

$$\varepsilon_{kjt}^{partial} = \left.\frac{\Delta w_{Hkjt}/w_{Hkjt}}{\Delta F_{kjt}/F_{kjt}}\right|_{L_{kt}, L_t \text{ constant}} = \left[\left(\frac{1}{\sigma} - \frac{1}{\eta}\right)\left(\frac{s_{Fkjt}}{s_{kjt}}\right)\right] \tag{10}$$

The variable $s_{Fkjt}$ is the share of overall wages paid in year $t$ to foreign workers in group $k, j$, namely $s_{Fkjt} = \frac{w_{Fkjt}F_{kjt}}{\sum_m \sum_i (w_{Fmit}F_{mit} + w_{Hmit}H_{mit})}$. Analogously, $s_{kjt} = \frac{w_{Fkjt}F_{kjt} + w_{Hkjt}H_{kjt}}{\sum_m \sum_i (w_{Fmit}F_{mit} + w_{Hmit}H_{mit})}$ is the share of the total wage bill in year $t$ accounted for by all workers in group $k, j$.

By construction, the elasticity $\varepsilon_{kjt}^{partial}$ captures only the effect of immigration on native wages operating through the term $\left(\frac{1}{\eta} - \frac{1}{\sigma}\right)\ln(L_{kjt})$ in (9). According to the standard assumption in the existing literature, U.S.- and foreign-born workers are perfect substitutes within group $k, j$ ($\sigma = \infty$) and share the same efficiency ($\theta_{kjHt} = \theta_{kjFt}$) which implies $s_{Fkjt}/s_{kjt} = \varkappa_{Fkjt}/\varkappa_{kjt}$, where $\varkappa_{Nkjt}$ denotes the share of total employment represented by workers of nativity $N$ ($= H, F$), education $k$, experience $j$ in year $t$, namely $\varkappa_{Fkjt} = \frac{F_{kjt}}{\sum_m \sum_i (F_{mit} + H_{mit})}$. Given these assumptions, expression (10) simplifies to $\varepsilon_{kjt}^{partial} = -\frac{1}{\eta}$: the harder it is to substitute between workers with different levels of experience (i.e., the lower $\eta$), the stronger is the negative impact that immigrants have on the wages of natives with similar education and experience. In the general case that we consider ($0 < \sigma < \infty$), $\varepsilon_{kjt}^{partial}$ is still negative but smaller in absolute value than $\frac{1}{\eta}$, the reason being that the negative wage effect of immigrants on natives is partly attenuated by their imperfect substitutability.

Using estimates of the parameters $\sigma$ and $\eta$, as well as data on wages and employment, the *partial* elasticity $\varepsilon_{kjt}^{partial}$ can be easily calculated (see Section 5.3 below). The problem is that this elasticity does not provide *any* indication of the total effect of immigration on the wages of natives in group $k, j$. The reason is that in order to calculate the total effect we also need to account for the changes in $L_{kt}$ and $L_t$ produced by immigration, as well as for the fact that immigration alters the supply of foreign-born workers in all other education and experience groups and, finally, for the response of $\kappa_t$ to immigration. Once we do so, and aggregate all the effects, the total effect of immigration on the wages of native workers in group $k, j$ is given by the following expression:

14

$$\left(\frac{\Delta w_{Hkjt}}{w_{Hkjt}}\right)^{Total} = \frac{1}{\delta}\sum_m\sum_i\left(s_{Fmit}\frac{\Delta F_{mit}}{F_{mit}}\right) + \left(\frac{1}{\eta}-\frac{1}{\delta}\right)\left(\frac{1}{s_{kt}}\right)\sum_i\left(s_{Fkit}\frac{\Delta F_{kit}}{F_{kit}}\right) + \tag{11}$$
$$+ \left(\frac{1}{\sigma}-\frac{1}{\eta}\right)\left(\frac{1}{s_{kjt}}\right)\left(s_{Fkjt}\frac{\Delta F_{kjt}}{F_{kjt}}\right) + (1-\alpha)\left(\frac{\Delta\kappa_t}{\kappa_t}\right)_{immigration}$$

It is easy to provide intuition for each term in expression (11) by referring to the labor demand equation (9). The term $\frac{1}{\delta}\sum_m\sum_i\left(s_{Fmit}\frac{\Delta F_{mit}}{F_{mit}}\right)$ is the positive, total effect on the productivity of workers in group $k,j$ due to the increase in supply of all types of labor; that is, home labor benefits from the increase in aggregate labor caused by imperfectly substitutable workers. This effect operates through $\frac{1}{\delta}\ln(L_t)$ in (9) which is positive for $\delta > 0$. The term $\left(\frac{1}{\eta}-\frac{1}{\delta}\right)\left(\frac{1}{s_{kt}}\right)\sum_i\left(s_{Fkit}\frac{\Delta F_{kit}}{F_{kit}}\right)$ is the additional negative effect on productivity generated by the supply of immigrants within the same education group. Since those immigrants are closer substitutes for natives in group $k,j$ than workers in other education groups, they have an additional depressing effect on their wage. This effect operates through the term $\left(\frac{1}{\delta}-\frac{1}{\eta}\right)\ln(L_{kt})$ in (9) which is negative if $\eta > \delta$. The term $\left(\frac{1}{\sigma}-\frac{1}{\eta}\right)\left(\frac{1}{s_{kjt}}\right)\left(s_{Fkjt}\frac{\Delta F_{kjt}}{F_{kjt}}\right)$ is the additional negative effect due to the supply of immigrants with the same education and experience as natives in group $k,j$. This effect operates through $\left(\frac{1}{\eta}-\frac{1}{\sigma}\right)\ln(L_{kjt})$ in (9) and it is exactly the partial effect $\varepsilon_{kjt}^{partial}$ multiplied by the percentage change $\frac{\Delta F_{kjt}}{F_{kjt}}$. Finally, the term $(1-\alpha)\left(\Delta\kappa_t/\kappa_t\right)_{immigration}$ is the wage change due to imperfect capital adjustment and operates through $\ln(\alpha A_t\kappa_t^{1-\alpha})$ in (9). Clearly, since the *total* effect aggregates the *partial* effect plus 40 other cross-effects (32 in the double summation and 8 in the single summation) and a capital-adjustment term, it will typically be very different from $\varepsilon_{kjt}^{partial} * \frac{\Delta F_{kjt}}{F_{kjt}}$. In fact, when immigration is large in groups with education and experience different from $k$ and $j$, the effect $\left(\frac{\Delta w_{Hkjt}}{w_{Hkjt}}\right)^{Total}$ tends to be positive, while when immigration is large in the group with the same education and experience as $k$ and $j$, the effect $\left(\frac{\Delta w_{Hkjt}}{w_{Hkjt}}\right)^{Total}$ tends to be negative. In contrast, the effect $\varepsilon_{kjt}^{partial} * \frac{\Delta F_{kjt}}{F_{kjt}}$ would *always* be negative for reasonable parameters values.

As they are not perfect substitutes for U.S.-born workers, the impact of immigrants on wages of foreign-born workers would be somewhat different. The percentage change in wages of foreign-born of education $k$ and experience $j$ as a consequence of total immigration is:

$$\left(\frac{\Delta w_{Fkjt}}{w_{Fkjt}}\right)^{Total} = \frac{1}{\delta}\sum_m\sum_i\left(s_{Fmit}\frac{\Delta F_{mit}}{F_{mit}}\right) + \left(\frac{1}{\eta}-\frac{1}{\delta}\right)\left(\frac{1}{s_{kt}}\right)\sum_i\left(s_{Fkit}\frac{\Delta F_{kit}}{F_{kit}}\right) + \tag{12}$$
$$+ \left(\frac{1}{\sigma}-\frac{1}{\eta}\right)\left(\frac{1}{s_{kjt}}\right)\left(s_{Fkjt}\frac{\Delta F_{kjt}}{F_{kjt}}\right) + (1-\alpha)\left(\frac{\Delta\kappa_t}{\kappa_t}\right)_{immigration} - \frac{1}{\sigma}\frac{\Delta F_{kjt}}{F_{kjt}}$$

The first four terms of expression (12) are identical to those in (11). Immigration in all other skill groups (and capital adjustment) has the same effect on the wages of U.S.- and foreign-born workers in group $k,j$.

15

However, immigrants in the $k, j$ group itself have an extra negative impact on the wages of foreign-born in the same group, represented by the final term $-\frac{1}{\sigma}\frac{\Delta F_{kjt}}{F_{kjt}}$. This term is negative for $\sigma > 0$. Immigrants compete in occupations, sectors and jobs with previous immigrants more than natives and this causes an additional negative effect on the wage of foreign-born workers. For $\sigma = \infty$, the effects of immigration on the wages of workers in group $k, j$ would be identical, independent of their nativity.

Using the percentage change in wages for each skill group, we can then aggregate and find the effect of immigration on several representative wages. The average wage for the whole economy in year $t$, inclusive of U.S.- and foreign-born workers, is given by the following expression: $\overline{w}_t = \sum_k \sum_j (w_{Fkjt} \varkappa_{Fkjt} + w_{Hkjt} \varkappa_{Hkjt})$. Similarly, the average wage of U.S.-born and foreign-born workers can only be expressed as weighted averages of individual group wages: $\overline{w}_{Ht} = \sum_k \sum_j (w_{Hkjt} \varkappa_{Hkjt}) / \sum_k \sum_j \varkappa_{Hkjt}$ and $\overline{w}_{Ft} = \sum_k \sum_j (w_{Fkjt} \varkappa_{Fkjt}) / \sum_k \sum_j \varkappa_{Fkjt}$, respectively (recall that the variables $\varkappa_{Nkjt}$ represent shares in total employment). The percentage change in the average wage of native workers as a consequence of changes in each group's wage due to immigration is given by the following expressions:

$$\frac{\Delta \overline{w}_{Ht}}{\overline{w}_{Ht}} = \frac{\sum_k \sum_j (\frac{\Delta w_{Hkjt}}{w_{Hkjt}} \frac{w_{Hkjt}}{\overline{w}_{Ht}} \varkappa_{Hkjt})}{\sum_k \sum_j \varkappa_{Hkjt}} = \frac{\sum_k \sum_j (\frac{\Delta w_{Hkjt}}{w_{Hkjt}}) s_{Hkjt}}{\sum_k \sum_j s_{Hkjt}} \qquad (13)$$

where $\frac{\Delta w_{Hkjt}}{w_{Hkjt}}$ represents the percentage change in the wage of U.S.-born in group $k, j$ due to immigration, and its expression is given in (11). Similarly, the percentage change in the average wage of foreign-born workers is:

$$\frac{\Delta \overline{w}_{Ft}}{\overline{w}_{Ft}} = \frac{\sum_k \sum_j (\frac{\Delta w_{Fkjt}}{w_{Fkjt}} \frac{w_{Fkjt}}{\overline{w}_{Ft}} \varkappa_{Fkjt})}{\sum_k \sum_j \varkappa_{Fkjt}} = \frac{\sum_k \sum_j (\frac{\Delta w_{Fkjt}}{w_{Fkjt}}) s_{Fkjt}}{\sum_k \sum_j s_{Fkjt}} \qquad (14)$$

Finally, by aggregating the total effect of immigration on the wages of all groups, native and foreign, we can obtain the effect of immigration on average wages:

$$\frac{\Delta \overline{w}_t}{\overline{w}_t} = \sum_k \sum_j \left( \frac{\Delta w_{Fkjt}}{w_{Fkjt}} \frac{w_{Fkjt}}{\overline{w}_{Ft}} \varkappa_{Fkjt} + \frac{\Delta w_{Hkjt}}{w_{Hkjt}} \frac{w_{Hkjt}}{\overline{w}_{Ht}} \varkappa_{Hkjt} \right) = \sum_k \sum_j \left( \frac{\Delta w_{Fkjt}}{w_{Fkjt}} s_{Fkjt} + \frac{\Delta w_{Hkjt}}{w_{Hkjt}} s_{Hkjt} \right)$$
$$(15)$$

Recall that the variables $s_{Nkjt}$ represent the share in total wages and notice that the correct weighting to obtain the percentage change on *average wages* is the share in the wage bill and not the share in employment. Due to constant returns to scale of the aggregate production function (1), while some of the wage changes are positive and others negative, when weighted by their wage shares the summation of these changes equals 0 once capital has adjusted fully (i.e., in the long run); hence, the change in the overall average wage in (15) is approximately 0 in the long run. However, if U.S.- and foreign-born workers are not perfectly substitutable,

the overall effect on the wage of U.S.-born workers (13) need not be 0 but will be positive instead and the effect on the average wage of foreign-born workers (14) will be negative. We also adopt the same averaging procedure (weighting percentage changes by wage shares) in calculating the effect of immigration on specific groups of U.S.-born and foreign-born workers. For instance, the changes in average wages of college educated, U.S.-born workers is calculated as $\sum_j \left( \frac{\Delta w_{HCOGjt}}{w_{HCOGjt}} s_{HCOGjt} \right) / \sum_j s_{HCOGjt}$ and the change in average wages of foreign-born, high school dropouts is calculated as: $\sum_j \left( \frac{\Delta w_{FHSDjt}}{w_{FHSDjt}} s_{FHSDjt} \right) / \sum_j s_{FHSDjt}$, and so on.

## 4   Data Description and Preliminary Evidence

The data we use are from the integrated public use microdata samples (IPUMS) of the U.S. Decennial Census and of the American Community Survey (Ruggles et al, 2005). In particular, we use the general (1%) sample for Census 1960, the 1% State Sample, Form 1, for Census 1970, the 5% State sample for the Censuses 1980 and 1990, the 5% Census Sample for year 2000 and the 1/239 American Community Survey (ACS) Sample for the year 2004. Since those are all weighted samples we use the variable "personal weight" to construct all the average and aggregate statistics below. We consider people aged 17 to 65 not living in group quarters, who worked at least one week in the previous year and earned a positive amount in salary income. We convert the current wages to constant wages (in 2000 U.S. $) using the C.P.I.-based deflator across years. We define the four schooling groups using the variable that identifies the highest grade attended (called "HIGRADEG" in IPUMS) for Censuses 1960 to 1980, while we use the categorical variable (called "edu99" in IPUMS) for Censuses 1990 and 2000 and ACS 2004. Years of experience are effectively years of potential experience. They are calculated using the variable "age" and assuming that people without a high school degree enter the labor force at age 17, people with high school degree enter at 19, people with some college enter at 21 and people with a college degree enter at 23. Finally, yearly wages are based on the variable salary and income wage (called "INCWAGE" in IPUMS). Weekly wages are obtained by dividing that value by the number of weeks worked[14]. The status of "foreign-born" is given to those workers whose place of birth (variable "BPL") is not within the USA (or its territories overseas) and did not have U.S. citizenship at birth (variable "CITIZEN")[15]. Gender is indicated as $M$ (male) and $W$ (female). The average wage for workers in a cell, (the variable $w_{NGkjt}$ for $G = \{M, W\}$, $N = \{H, F\}$, $k = \{HSD, HSG, COD, COG\}$ and $j = \{1, 2..., 8\}$) is calculated as the weighted average of individual wages in the cell using the personal weight ("PERWT") assigned by the U.S. Census. The total number of workers in each cell ($H_{Mkjt}$ $F_{Mkjt}$, $H_{Wkjt}$ and $F_{Wkjt}$) is calculated as the weighted sum of workers belonging to that cell. These data also allow us to construct the variables $\varkappa_{Nkjt}$ and $s_{Nkjt}$, the

---

[14]For the Census 1960 and Census 1970 only a categorical variable that measures weeks worked exists and is called "WKSWRK2". Individuals are assigned the middle value of the variable in the interval.

[15]The variable CITIZEN is not available in Census 1960. For that year we consider all people born outside the U.S. as foreign-born.

share of each group in the total wage bill and in total employment for each represented year $t$. These data are used to estimate the parameters $\delta$, $\eta$, $\sigma$ and $\lambda$ needed to calculate the effects of immigration on the wage of each type of worker. When estimating the structural parameters $\delta$, $\eta$, $\sigma$ and $\lambda$ we always use the whole panel of data, 1960-2004. When we simulate the effects of immigration on real wages we focus on the most recent period, 1990-2004. Before proceeding with the econometric analysis, let us present some salient features of the immigration and wage data as well as some simple statistics suggesting the plausibility of the hypothesis of imperfect substitutability between U.S.- and foreign-born workers with similar education and experience.

Table A1 in the Appendix reports the share of foreign-born workers in each education-experience group for each of the years considered, pooling men and women together. In the rows marked as "All Experience Levels" we report the share of foreign-born for the whole educational group. One fact emerges even from a cursory look at the table. The distribution of foreign-born across educational groups has been uneven (and increasingly so) over the period considered. In 2004, almost 35% of the workers with no degree were foreign-born, with some experience sub-groups counting more than 40% foreign-born. Following this group, college graduates represent the second highest concentration of foreign-born: almost 15% in the overall group, reaching 18% in some experience sub-groups. In contrast, the group of college dropouts contained only 9.5% of foreign-born workers and, in some experience sub-groups, they were less than 8% of the total. Foreign-born were, and increasingly are, over-represented among the groups of workers with the lowest and highest education levels and are under-represented among the two intermediate groups.

Table A2 in the Appendix reports the real weekly wages (in 2000 U.S. $) for U.S. native workers in each education and experience group in each of the years considered. The wages for each group are calculated as described above. The fact that emerges from Table 2 is the poor performance of real weekly wages of U.S.-born workers without a high school degree, especially during the last two and a half decades. In contrast, the performance of real wages of college educated workers has been very strong, particularly during the last two and a half decades, with the two intermediate schooling groups performing in between.

A synthetic and effective representation of the two facts described above, focussing on the most recent 14 years, is presented in two figures. Figure 3 illustrates the percentage growth of immigrant employment for each of the four educational groups. The lightly shaded columns represent immigrants for the 1990-2000 period as a percentage of 1990 employment in each education group. The darkly shaded columns represent immigration flows during the 1990-2004 period as a percentage of initial employment. The graph confirms the U-shaped distribution of immigrants along the educational spectrum, with a more pronounced U-shape when we consider the longer period 1990-2004. Figure 4, on the other hand, shows the growth rate of real wages of native workers by education group. The lightly shaded columns represent the real percentage change of yearly wages in the 1990-2000 period and the darkly shaded columns represent the 1990-2004 change. One sees very clearly the

negative performance of real wages for the least educated (almost one percentage point loss in real wage each year) and the exceptional performance of real wages of college graduates (more than one percentage point gain each year). The natural questions stemming from these facts are: (i) How much of the negative performance in the wage of native dropouts is due to the large immigration flow in that group? (ii) How much of the college-high school dropout wage gap widening is due to immigration? (iii) Given that the average wages of U.S. natives grew by around 12.5% in the 1990-2004 period, and overall immigration increased employment by almost 12%, would overall wage growth have been larger without the increase in labor supply due to immigration? We will address these questions in Section 6.

Before presenting the estimates of the structural parameters of our model, let us put forward some observations and facts that seem to suggest imperfect substitutability between U.S.- and foreign-born workers in production. Even considering workers who have identical measurable human capital (education and experience) and gender, foreign- and U.S.-born workers differ in several respects that are relevant to the labor market. First, immigrants are a selected group from their original populations and have skills, motivations and tastes that may set them apart from natives. Second, in manual and intellectual work they have culture-specific skills (e.g., cooking, crafting, opera singing, soccer playing) as well as limits (knowledge of English language or American culture), creating comparative advantages in some jobs and comparative disadvantages in other jobs[16]. Third, due to comparative advantages, migration networks or historical accidents, foreign-born tend to choose different occupations than natives, even for given education and experience levels. In particular, new immigrants tend to work disproportionately in those occupations where foreign-born are already over-represented. This should imply stronger wage competition (substitution) in those jobs compared to other jobs primarily held by natives. Since services of different occupations are imperfectly substitutable, this would imply imperfect substitutability between natives and foreign-born even in the same education-experience group[17].

Differences in the occupational choices of natives and foreign-born with the same education are illustrated in Table 1. Following Welch (1990) and Borjas (2003) we calculate the "index of congruence" in the choice of 180 occupations (from the variable "occupation 1950" homogenized across Census definitions), between the group of native workers and the group of foreign-born workers that share the same education group. The index of congruence is calculated by constructing a vector of shares in each occupation for each group and computing the centered correlation coefficient between these vectors for the two groups. A value of the index equal to 1 implies an identical distribution of workers among occupations for the two groups, a value equal to -1 implies an exactly "complementary" distribution. The first column in the table reports the U.S.-foreign-born occupational congruence within each education group. By way of comparison, the remaining columns report the indices of

---

[16]Peri and Sparber (2007) develops and tests this story of different comparative advantages in production tasks between U.S.- and foreign-born workers.

[17]Evidence in support of this fact is presented in Ottaviano and Peri (2006). There we find a positive and very significant correlation between the initial share of immigrants in an occupation and the inflow of new immigrants in that occupation over the subsequent decade.

congruence between natives in different education groups. The index of congruence between U.S.- and foreign-born with identical education is between 0.6 and 0.7, a value comparable to the congruence between native high school dropouts and native high school graduates (a value of 0.68 reported in the second column of Table 3). Also (see Welch, 1979), these index values are comparable to the congruence between U.S.-born workers with different experience levels. Hence, given that an extensive literature shows imperfect substitutability between U.S. workers with different education and experience (Welch, 1979; Card and Lemieux, 2001), if part of imperfect substitutability is due to occupational choice we would also expect it to hold for natives and foreign-born with similar education.

## 5   Parameter Estimates

### 5.1   Estimates of $\lambda$ and $\sigma$

The model developed in Section (3.1) provides us with the framework to estimate the parameters $\lambda$ and $\sigma$. Calculating the natural logarithm of the ratio of the wages of male and female workers within the same nativity ($N = H, F$) and skill ($k, j$) group we obtain the following relation:

$$\ln(w_{NMkjt}/w_{NWkjt}) = -\frac{1}{\lambda}\ln(N_{Mkjt}/N_{Wkjt}) \ + \ln(\theta_{NMkjt}/\theta_{NWkjt}) \ \text{ for } \ N = H, F \tag{16}$$

Similarly, the natural logarithm of the ratio of wages of U.S. to foreign-born workers within the same skill ($k, j$) group for men ($M$) is:

$$\ln(w_{HMkjt}/w_{FMkjt}) = -\frac{1}{\sigma}\ln(H_{kjt}/F_{kjt}) - \frac{1}{\lambda}\ln(H_{Mkjt}/F_{Mkjt}) + \ln(\theta_{Hkjt}/\theta_{Fkjt}) \tag{17}$$

while for women ($W$) it is:

$$\ln(w_{HWkjt}/w_{FWkjt}) = -\frac{1}{\sigma}\ln(H_{kjt}/F_{kjt}) - \frac{1}{\lambda}\ln(H_{Wkjt}/F_{Wkjt}) + \ln(\theta_{Hkjt}/\theta_{Fkjt}) \tag{18}$$

Equation (16) defines the relative male-female labor demand within each $N, k, j$ group, while equations (17) and (18) define the relative labor demand for male and female (respectively) foreign- and U.S.-born workers in group $k, j$. The first equation can be used to estimate the coefficient $\frac{1}{\lambda}$ which can then be substituted into (17) and (18), and those can then be used to estimate $\frac{1}{\sigma}$. In each case the estimates are consistent as long as we identify a source of variation in the relative supply of $\ln(N_{Mkjt}/N_{Wkjt})$ and of $\ln(H_{kjt}/F_{kjt})$ that is independent of the variation of relative male-female productivity $\ln(\theta_{NMkjt}/\theta_{NWkjt})$ and of the U.S.-foreign-born productivity levels $\ln(\theta_{Hkjt}/\theta_{Fkjt})$.

Our estimation strategy proceeds as follows. Due to technological reasons such as skill-biased technical change, sector-biased technical change, increased international competition, and other reasons over the period 1960-2004, the profiles of the returns to education and to experience have changed differently across occupations. Accordingly, we allow the relative male-female and U.S.-foreign-born efficiencies to have a systematic component that may vary by education and experience over time. We control for education-year fixed effects ($D_{kt}$), and experience-year fixed effects ($D_{jt}$). At the same time, different education-experience groups may include male-female and U.S.- and foreign-born workers of systematically heterogeneous quality; hence, we control for experience-education fixed effects ($D_{kj}$). Conditional on these controls, we assume that the residual decennial changes in relative male-female and U.S.-foreign-born employment within each education-experience cell over time are due to random supply shocks such as demographic factors in the U.S. and in the immigrants' home countries. Using the IPUMS data from 1960 through 2004 we first estimate the following regression:

$$\ln(w_{NMkjt}/w_{NWkjt}) = D_{kj} + D_{kt} + D_{jt} - \frac{1}{\lambda}\ln(N_{Mkjt}/N_{Wkjt}) + u_{kjt} \tag{19}$$

where $u_{kjt}$ is a residual, random, zero-mean disturbance. We estimate the regression separately for U.S.-born ($N = H$) and foreign-born ($N = F$) workers using 192 observations in each case (8 experience by 4 education groups over 6 years: 1960, 1970, 1980, 1990, 2000, 2004) and then pooling U.S.- and foreign-born for a total of 384 observations. The variables $w_{HMkjt}$, $w_{FMkjt}$, $w_{HWkjt}$, $w_{FWkjt}$, $H_{Mkjt}$, $F_{Mkjt}$, $H_{Wkjt}$ and $F_{Wkjt}$ are constructed as described in Section 4 above. Table 2 reports the estimates of the parameter $\frac{1}{\lambda}$. The first row is estimated by pooling cells of U.S.- and foreign-born workers, the second is estimated on cells of U.S.-born workers only and the third on cells of foreign-born workers only. All specifications use weighted least squares as the estimation method (weighting each observation by the total employment in the cell). Specifications in Column 2 omit year 2004 (not a census year) and specifications in Column 3 omit year 1960, since immigration was extremely low before 1960. Robust standard errors are clustered by education-experience groups. Two results emerge clearly from all specifications. First, the estimates of $\frac{1}{\lambda}$ are always negative and small in absolute value. Second, they are never statistically significant. A test of $\frac{1}{\lambda} = 0$ against $\frac{1}{\lambda} > 0$ never rejects the null at any confidence level. While the estimates using foreign-born only are quite imprecise, those on U.S. natives and on all individuals are rather precise. Considering the pooled sample, not only are we unable to rule out $\frac{1}{\lambda} = 0$, but we can reject at a standard confidence level the hypothesis that $\frac{1}{\lambda} = 0.04$ against the alternative of $\frac{1}{\lambda} < 0.04$. These results imply that even rather small degrees of imperfect substitutability between men and women are ruled out by the data. Essentially, men and women in the same education-experience-nativity cell are close-to-perfect substitutes. Hence, using $\frac{1}{\lambda} = 0$, equations (17) and (18) can be simplified into a single estimating equation:

$$\ln(w_{Hkjt}/w_{Fkjt}) = D_{kj} + D_{kt} + D_{jt} - \frac{1}{\sigma}\ln(H_{kjt}/F_{kjt}) + u_{kjt} \tag{20}$$

where $H_{kjt} = H_{Mkjt} + H_{Wkjt}$ and $F_{kjt} = F_{Mkjt} + F_{Wkjt}$ and the fixed effects and the error terms are defined as in (19). Table 3 reports the estimates of the parameter $\frac{1}{\sigma}$ obtained using weighted least squares on (20). To confirm the results of Table 2 and check that gender composition does not affect the elasticity of substitution between U.S.- and foreign-born workers, $\sigma$, we implement regression (20) alternatively on all workers (first row of Table 3) or, separately, on men workers only (second row) and on women workers only (third row). We also regress relative U.S.-foreign male wages on relative U.S.-foreign female employment (fourth row) or relative U.S.-foreign female wages on relative U.S.-foreign male employment (fifth row).

The basic specifications in Column 1 of Table 3 use yearly wages, are estimated using weighted least squares (weighting each observation by the total employment in the cell) and include observations from years 1960, 1970, 1980, 2000 and 2004. Specifications in Column 2 use weekly wages. In Column 3 we do not weight the observations and simply use OLS, in column 4 we omit the observations from 2004 (not a census year) and in Column 5 we omit the observations from 1960, a year with very few foreign-born workers. The estimates of $\frac{1}{\sigma}$ are significantly different from zero in each estimate. They are quite stable across specifications and, except for two cases, they are always between 0.09 and 0.21. The specifications using weekly wages tend to produce somewhat smaller estimates (between 0.05 and 0.14), while those using yearly wages give estimates between 0.13 and 0.21. Interestingly, this implies that a portion of U.S.-born workers' adjustment in response to the complementarities of foreign-born workers is reflected in an increase in their weeks worked, which is consistent with higher relative productivity of natives in cells with higher relative supply of immigrants. The standard errors are generally around 0.04. There are no systematic differences in the estimates across rows so that the gender dimension does not seem to play a relevant role in estimating the elasticity of substitution between natives and foreign-born workers. This is consistent with the previous literature that did not, in general, find differences in the impact of immigrants across genders, once skill level is controlled for (see the discussion on page 468 of the meta-study by Longhi, Nijkamp and Poot, 2005). Let us also emphasize that there is an extremely high correlation across education-experience groups between relative U.S.-foreign- born employment calculated for both genders, $H_{kjt}/F_{kjt}$, and the relative U.S.-foreign-born employment for males only $(H_{Mkjt}/F_{Mkjt})$ or females only $(H_{Wkjt}/F_{Wkjt})$[18]. Hence the relative U.S.-foreign-born supply faced by natives in each education-experience group is similar whether they are men or women.

Table 4 is devoted to performing some further robustness checks in estimating $\frac{1}{\sigma}$. First, by grouping U.S.- and foreign-born individuals according to their years of working experience, one could be classifying incorrectly the

---

[18]The partial $R^2$ of the regression of $\ln(H_{Mkjt}/F_{Mkjt})$ on $\ln(H_{kjt}/F_{kjt})$ after controlling for all the dummies is 0.95 and for $\ln(H_{Wkjt}/F_{Wkjt})$ on $\ln(H_{kjt}/F_{kjt})$ it is 0.93.

effective skills of foreign-born, assigning them to a group that is not their most natural category for comparison. Employers may value differently work experience accrued in the U.S. market from that accrued abroad. Hence we re-classify foreign-born workers by splitting the years of working experience between experience in the U.S. and experience abroad and then we use the "conversion" factors between foreign and U.S. experience calculated in Borjas (2003)[19]. Once we have calculated the effective experience we group foreign workers in the usual 8 groups (0 to 40 years by 5-years cells) using this new variable. The estimates of $\frac{1}{\sigma}$ using foreign-born workers grouped by effective experience are reported in the first row of Table 4. Specification 1 through 5 mirror the corresponding specifications in Table 3. The estimates range between 0.12 and 0.18 with standard errors around 0.05. Specifications in the second row of Table 4 consider total weeks worked in each cell (rather than total employment) as the measure of labor supply. This measure accounts for possible changes in the individual labor supply decisions. The estimates are still in the $0.14 - 0.20$ range and very significant. Finally, in the last row of Table 4 we estimate $\frac{1}{\sigma}$, restricting the data to only the groups of workers with no high school diploma or with just a high school diploma. These are the groups with the least education and are certainly those with the largest number of undocumented immigrants. One might be concerned that mismeasurement due to low coverage of undocumented immigrants could bias our estimates. Alternatively, complementarities between U.S. and foreign-born workers in these groups could be weaker than within other groups. These issues would result in significantly different estimates of $\frac{1}{\sigma}$ when we restrict our sample to these groups. The estimates in the third row of Table 4 are never significantly different from those obtained using all workers, and the point-estimates are slightly above those. This seems to indicate that the Census data do not suffer from significant mismeasurement of undocumented workers and that the degree of U.S.-foreign-born complementarity is not very different within different education groups.

The estimates of $\frac{1}{\sigma}$ as a whole strongly support the idea of imperfect substitutability between U.S.- and foreign-born workers. Moreover, in general, the estimates imply a value of $\sigma$ between 5 and 10. Hence, we observe imperfect substitutability but, reasonably, not to the extent observed between educational groups (usually credited with a $1.5 - 2.5$ elasticity of substitution) and only slightly above that observed between experience groups for U.S. natives (estimated between 3 and 5)[20].

## 5.2   Estimates of $\eta$ and $\delta$

We can use equation (20) to infer the systematic component of the efficiency terms $\theta_{Hkjt}$ and $\theta_{Fkjt}$. In particular, those terms can be obtained using the estimates of the fixed effects $\widehat{D}_{kj}$, $\widehat{D}_{kt}$ and $\widehat{D}_{jt}$ from equation (20) as

---

[19]Those factors are based on a wage regression that calculates (pooling 1980-1990 data) the wage growth associated with one year of work experience abroad, relative to the growth of wages associated with one year of work experience in the U.S. Specifically, for immigrants who worked abroad, the years of experience abroad are multiplied by a factor of 0.4 while the years of experience in the U.S. are multiplied by a factor of 1.6 (Borjas, 2003, page 1356). This implies an "under-accumulation" of useful skills per year when working abroad and an over-accumulation (catching up) during the years of U.S. work experience.

[20]See section 5.2 below for those estimates in our paper and in the literature.

follows:

$$\widehat{\theta}_{Hkjt} = \frac{\exp(\widehat{D}_{kj})\exp(\widehat{D}_{kt})\exp(\widehat{D}_{jt})}{1 + \exp(\widehat{D}_{kj})\exp(\widehat{D}_{kt})\exp(\widehat{D}_{jt})}, \widehat{\theta}_{Fkjt} = \frac{1}{1 + \exp(\widehat{D}_{kj})\exp(\widehat{D}_{kt})\exp(\widehat{D}_{jt})} \quad (21)$$

where we have imposed the standardization that the two efficiency terms add up to one. Using the values of $\widehat{\theta}_{Hkjt}$ and $\widehat{\theta}_{Fkjt}$ from above and the estimate $\widehat{\sigma}$ we can construct the aggregate labor input, following (4), as $\widehat{L}_{kjt} = \left[\widehat{\theta}_{Hkjt}H_{kjt}^{\frac{\widehat{\sigma}-1}{\widehat{\sigma}}} + \widehat{\theta}_{Fkjt}F_{kjt}^{\frac{\widehat{\sigma}-1}{\widehat{\sigma}}}\right]^{\frac{\widehat{\sigma}}{\widehat{\sigma}-1}}$. Indeed, the production function (1) and marginal pricing imply the following relationship between the compensation going to the composite labor input $L_{kjt}$ and its supply:

$$\ln(\overline{W}_{kjt}) = \ln\left(\alpha A_t^{\frac{1}{\alpha}}\kappa_t^{\frac{1-\alpha}{\alpha}}\right) + \frac{1}{\delta}\ln(L_t) + \ln\theta_{kt} - \left(\frac{1}{\delta} - \frac{1}{\eta}\right)\ln(L_{kt}) + \ln\theta_{kj} - \frac{1}{\eta}\ln(L_{kjt}) \quad (22)$$

where $\overline{W}_{kjt} = w_{Fkjt}(F_{kjt}/L_{kjt}) + w_{Hkjt}(H_{kjt}/L_{kjt})$ is the average wage paid to workers in the education-experience group $k$, $j$ and can be considered as the compensation to one unit of the composite input $L_{kjt}$[21]. Equation (22) provides the basis for estimating the parameter $\frac{1}{\eta}$, which measures the elasticity of relative demand for workers with identical education and different experience levels. Empirical implementation is achieved by rewriting it as:

$$\ln(\overline{W}_{kjt}) = D_t + D_{kt} + D_{kj} - \frac{1}{\eta}\ln(\widehat{L}_{kjt}) + e_{kjt} \quad (23)$$

where five-period fixed effects $D_t$ control for the variation of $\ln\left(\alpha A_t^{\frac{1}{\alpha}}\kappa_t^{\frac{1-\alpha}{\alpha}}\right) + \frac{1}{\delta}\ln(L_t)$, time by education fixed effects $D_{kt}$ control for the variation of $\ln\theta_{kt} - \left(\frac{1}{\delta} - \frac{1}{\eta}\right)\ln(L_{kt})$ and education by experience fixed effects $D_{kj}$ capture the terms $\ln\theta_{kj}$ that we assume are constant over time. Once we control for these systematic shifts in demand our identifying assumption, closely tracking Borjas (2003), is that the remaining variation in employment of foreign-born workers is due to supply shifts. Under this assumption, we consistently estimate the coefficient $-\frac{1}{\eta}$ in regression (23) by 2SLS, using $\ln(F_{kjt})$, the supply of foreign-born workers in each group, as an instrument for the variable $\ln(\widehat{L}_{kjt})$. Table 5 reports the estimated values of $\frac{1}{\eta}$. The first row of Table 5 reports the estimates based on yearly wages, while the second row uses weekly wages. Specification 1 and 2 use the value $\sigma = 1/(0.16) = 6.25$ and $\widehat{\theta}_{Hkjt}, \widehat{\theta}_{Fkjt}$ estimated from the basic specification in the first row of column 1 of Table 3 to construct $\overline{W}_{kjt}$ and $\widehat{L}_{kjt}$. To check whether the gender of workers interacts with the elasticity of substitution across experience groups, specification 1 of Table 5 includes all workers in the calculation of $\overline{W}_{kjt}$ and $\widehat{L}_{kjt}$ while specification 2 uses male workers only. Finally, in specifications 3 and 4, in order to check how sensitive the estimate of $\eta$ is to imperfect substitutability between U.S.- and foreign-born workers, we also re-estimate the parameter $\eta$ assuming $\sigma = \infty$ in the construction of $\widehat{L}_{kjt}$. All the estimated values of $\frac{1}{\eta}$ are significantly different from zero and between 0.25 and 0.3, with standard errors below 0.10. This implies a point estimate of $\eta$ between 3.3 and 4. These values are very similar to those previously estimated in the literature;

---

[21]The wage $\overline{W}_{kjt}$ is an average of the wages paid to U.S.- and foreign-born workers in group $k, j$. The averaging weights are equal to the employment of each group relative to the composite $L_{kjt}$, which are very close to their share of the employment of group $k, j$.

the parameter $\eta$ was first estimated in Card and Lemieux (2001). Their preferred estimates of $1/\eta$ for the United States over the period 1970-1995 (as reported in their Table III, columns 1 and 2) are between 0.2 and 0.26, thus implying a value of $\eta$ between 4 and 5. Borjas (2003) also produces an estimate of $1/\eta$ using immigration as a supply shifter and assuming perfect substitutability between U.S.- and foreign-born workers. His estimate is equal to 0.288 (with standard error 0.11), implying a value of $\eta$ equal to 3.5.

Aggregating one level further, we can construct the CES composite $\widehat{L}_{kt}$. We obtain the estimates $\widehat{\theta}_{kj}$ from the experience by education fixed effects in regression (23), as follows: $\widehat{\theta}_{kj} = \exp(\widehat{D}_{kj})/\sum_j \exp(\widehat{D}_{kj})$. Then we use the estimated values of $\eta$ to construct, according to formula (3), $\widehat{L}_{kt} = \left[\sum_{j=1}^{8} \widehat{\theta}_{kj} L_{kjt}^{\frac{\widehat{\eta}-1}{\widehat{\eta}}}\right]^{\frac{\widehat{\eta}}{\widehat{\eta}-1}}$. The production function chosen, together with marginal cost pricing, implies that the compensation going to the labor input $L_{kt}$ and its supply satisfies the following expression:

$$\ln(\overline{W}_{kt}) = \ln\left(\alpha A_t^{\frac{1}{\alpha}} \kappa_t^{\frac{1-\alpha}{\alpha}}\right) + \frac{1}{\delta}\ln(L_t) + \ln\theta_{kt} - \frac{1}{\delta}\ln(L_{kt}) \tag{24}$$

where $\overline{W}_{kt} = \sum_j \left(\frac{L_{kjt}}{L_{kt}}\right) \overline{W}_{kjt}$ is the average wage in education group $k$[22]. Following the same strategy that we used before, we use the above expression as the basis for the estimation of $\frac{1}{\delta}$. In so doing, we rewrite (24) as follows:

$$\ln(\overline{W}_{kt}) = D_t + (Time\ Trend)_k - \frac{1}{\delta}\ln(\widehat{L}_{kt}) + e_{kt} \tag{25}$$

where the time dummies $D_t$ absorb the variation of the terms $\ln\left(\alpha A_t^{\frac{1}{\alpha}} \kappa_t^{\frac{1-\alpha}{\alpha}}\right) + \frac{1}{\delta}\ln(L_t)$ and the terms $(Time\ Trend)_k$ are education-specific time trends. These trends control for the systematic component of the efficiency terms $\ln\theta_{kt}$ that are assumed to follow a time trend specific to each educational group. Conditional on these controls, our identifying assumption is that any other change in employment of foreign-born within a group is a supply shift. Hence, we can estimate equation (25) by 2SLS using $\ln(F_{kt})$ ( where $F_{kt} = \sum_j F_{kjt}$ is used as an instrument for $\ln(L_{kt})$). Table 6 reports the estimates of $\frac{1}{\delta}$. The first row uses yearly wages in the calculations, while the second uses weekly wages. Specifications 1 and 2 of Table 6 use the estimated values of $\widehat{\eta}$ and of $\widehat{\theta}_{kj}$ from specifications 1 and 2 of Table 5 to construct $\widehat{L}_{kt}$ and $\overline{W}_{kt}$. Specifications 3 and 4 use $\eta = \infty$ and symmetric weights $\theta_{kj}$ to construct $\widehat{L}_{kt}$ and $\overline{W}_{kt}$. Independently of specification and workers' gender, the estimated values are between 0.4 and 0.52 (with standard errors generally below 0.15), consistent with an elasticity of substitution across education groups around 2. The parameter $\delta$ is certainly the most analyzed in the literature. Its key role in identifying the impact of increased educational attainment (as well as of skill-biased technological change) on wages made it the object of analysis in Katz and Murphy (1992),

---

[22]The weight for the wage of each group equals the size of the composite input for that education-experience cell, $L_{kjt}$, relative to the size of the composite input for the whole education group $L_{kt}$. This is very similar to the share of group $k, j$ in the employment of educational group $k$.

25

through Angrist (1995), Murphy et al. (1998), Krusell et al. (2000) and Ciccone and Peri (2005). The estimates for the parameter range between 1.4 and 2.5. Our estimates of $1/\delta$ fall between 0.4 and 0.5 and imply a $\delta$ in the vicinity of 2, which is consistent with previous estimates.

## 5.3   Partial Effects of Immigration on Wages

Before using the estimated values of the parameters $\lambda, \delta, \eta$ and $\sigma$ and the formulas derived in Section 3.3 to calculate the effects of immigration on wages, let us use those estimates to point out an important corollary to our analysis. Most existing empirical studies on the effect of immigration on wages, (including Borjas, Freeman and Katz, 1997; Card, 2001; Friedberg, 2001; Section IV–but not Section VII–of Borjas, 2003; and Borjas, 2006) carefully estimate the partial elasticity of native wages to immigration within the same skill group (expressed in our equation (10)) and treat it as "the effect of immigration on wages"[23]. As we illustrated in Section 3.3, this is simply a partial effect uninformative of the actual overall effect of immigration on wages unless we consider the whole distribution of immigrant skills, the cross effects among groups and the effect of capital adjustment. More importantly, the partial elasticity (10) is likely to be negative in any reasonable model as long as immigrants are closer substitutes to natives in the same group (education-experience) than they are to natives in other skill groups. Considering men and women within groups as perfectly substitutable and using estimates from Tables 3 and 5, the term $\left(\frac{1}{\sigma} - \frac{1}{\eta}\right)$ is calculated to be negative and between $-0.05$ and $-0.20$. This implies, for instance, that the percentage change in the wage of native workers in group $k, j$, $\Delta w_{Hkjt}/w_{Hkjt}$, would be between -0.5% and -2.2% in response to an inflow of immigrants equal to 11% of the initial employment in the group[24]. We use 11% since this equals the inflow of immigrants over the 1990-2004 period as a percentage of total initial employment. If one fails to notice the *partial* nature of the elasticity used in the calculations above, one could be tempted to generalize these findings, interpreting them as saying that immigration caused a negative 0.5 to 2.2 percent change (1990-2004) in average wages of natives and that groups such as high school dropouts, for which the inflow of immigrants was as high as 20% of initial employment, lost as much as 4.4% of their wage. No such generalization is possible, however, as expression (10) only accounts for the effect on wages of immigrants in the same skill group and omits all the cross-group effects from immigrants in other skill groups. In fact (as we see in Section 6.1 below), while sharing the same negative partial elasticity $\left(\frac{1}{\sigma} - \frac{1}{\eta}\right)$, the wages of natives across groups have very different responses to immigration, some positive and others negative, due to the relative sizes of skill groups and the relative strength of cross-group effects. Limiting our attention

---

[23]Even the recent meta-study by Longhi, Nijcamp and Poot (2005) considers this partial effect as the relevant estimate across studies. They find a representative value of -0.11 that is in our range of -0.05 to -0.20.

[24]This value is calculated using formula (10) and multiplying the two sides by $\Delta F_{kjt}/F_{kjt}$ so that we obtain: $\Delta w_{Hkjt}/w_{Hkjt} = \left[\left(\frac{1}{\sigma_k} - \frac{1}{\eta}\right)\left(\frac{s_{Fkjt}}{s_{kjt}}\right)\frac{\Delta F_{kjt}}{F_{kjt}}\right]$. Then, notice that the term $\left(\frac{s_{Fkjt}}{s_{kjt}}\right)\frac{\Delta F_{kjt}}{F_{kjt}}$ is approximately equal to $\frac{\Delta F_{kjt}}{H_{kjt}+F_{kjt}}$ if the share of wages of foreign-born in group $k, j$ is similar to its share of employment in that group. Using $\frac{\Delta F_{kjt}}{H_{kjt}+F_{kjt}} = 11\%$ and $-0.2 < \left(\frac{1}{\sigma_k} - \frac{1}{\eta}\right) < -0.1$ we obtain a real wage change of $-2.2\% < \Delta w_{Hkjt}/w_{Hkjt} < -1.1\%$.

to the elasticity $\varepsilon_{kjt}^{partial}$, or emphasizing this effect too much would be misleading in evaluating the effect of immigration on wages.

# 6   Immigration and Wages: 1990-2004

We are now ready for the third and final step in calculating the effects of immigration on wages of U.S.- and foreign-born workers. The first step of the procedure (Section 3) required specifying a production function and deriving labor demand curves and the elasticity of wages to immigration of workers with different skills. The second step (Section 5) required estimation of the relevant structural parameters (elasticities of substitution). The third step (this section) uses these estimates and the actual flow of immigrants by group during the 1990-2004 period in the formulas previously derived to calculate the effects of immigrants on wages of U.S.- and foreign-born workers in individual groups as well as overall.

## 6.1   The Long Run Effects of Immigration on Wages

Table 7 contains the relevant simulation results, relative to the impact of immigration for the 1990-2004 period on wages of U.S.- and foreign-born workers in the long run. We focus on the 1990-2004 period as it is the most recent covered by available Census and ACS data and it is the period of largest immigration in recent U.S. history. To obtain the simulated effects we proceed in five steps. First, in light of the result of perfect substitutability between men and women within cells ($\frac{1}{\lambda} = 0$), we aggregate across genders as follows: $H_{kjt} = H_{Mkjt} + H_{Wkjt}$ and $F_{kjt} = F_{Mkjt} + F_{Wkjt}$. Second, using formulas (11) and (12), the estimated parameters $\delta$, $\eta$ and $\sigma$ as well as the percentage change in foreign-born workers by skill group ($\Delta F_{kj,1990-2004}/ F_{kj,1990}$), we calculate the percentage change in real wages for U.S.-born and foreign-born workers in each skill group ($k, j$). Third, we obtain the average wage change in each education group for foreign- and U.S.-born by weighting the percentage change of each experience sub-group by its wage share in the education group. This provides the entries in rows 1 to 4 and 6 to 9 in Table 7. Fourth, we average the changes across education groups for U.S.- and foreign-born separately, again weighting them by their wage shares as described in formulas (13) and (14). Those values are reported in rows 5 and 10 (those in bold fonts). Finally, we average the changes for the two groups ( U.S.- and foreign-born workers), still using wage-share weights (as described in formula (15)), to obtain the overall wage change reported in the last row, number 11, also in bold fonts. Rows 1 to 5 of Table 7 can be compared to the results obtained in the previous literature that mostly focuses on the effect of immigration on wages of U.S.-born workers. The lower part of Table 7 reports the effects of immigration on the wages of foreign-born, rarely considered in the previous literature. The table reports the "long run" effects, namely the wage effects once capital has fully adjusted, $(\Delta \kappa_t/\kappa_t)_{immigration} = 0$. In Section 6.2 below we focus on the effects as of

year 2004 and on how long it will take for full adjustment to set in. The four columns of Table 7 are reported in order to better understand the differences with the traditional estimates implied by our new findings of imperfect substitutability between U.S.- and foreign-born workers. Specification 4 calculates the effects under the traditional assumptions of perfect substitutability between U.S.- and foreign-born workers in each group $k, j$. Proceeding leftward, Columns 3, 2 and 1 introduce imperfect substitutability between U.S.- and foreign-born workers, where column 3 uses the highest estimate of $\sigma = 10$, Column 2 uses the median estimate $\sigma = 6.6$, and column 1 uses the lowest estimate $\sigma = 5$.

Let us begin focussing on the effect of immigration on the wages of natives (upper part of Table 7). The introduction of our novel feature (imperfect substitutability) has two important effects: first, it modifies the effect of immigration on average wages of natives from null (0.1%) to positive (between 1.2% and 2.3%), and second, it reduces the adverse distributional effect of immigrants on wages of U.S.-born workers. Both effects are stronger the lower the substitutability between U.S.- and foreign-born workers. Considering the median estimate of $\sigma = 6.6$, our estimates imply a positive long run effect of immigration on wages of workers with at least a high school degree. In particular, college graduates benefit from immigration (+0.7% in wages), while under perfect substitutability they were hurt by it (as shown by the -1.5% in Column 4 ) and high school graduates benefit up to 3.5% point in their real wage growth. Considering native workers with no high school degree, their long run real wage loss due to immigration was evaluated by Borjas and Katz (2007), Table 11 at -4.8%[25]. Column 4 of Table 7 reproduces that negative result obtaining a 4.2% loss in real wages for high school dropouts when we impose perfect substitutability between U.S.- and foreign-born workers. Our preferred estimates, however, shown in column 2 of Table 7, report only a small negative effect (-1.1%) on wages of native dropouts. Overall our results show in the long run a significant positive effect of immigration on average U.S. wages, and on each group of workers with at least a high school degree, and only a small negative effect on wages of workers without a high school degree.

In our preferred specification 2 of Table 7, the group whose wages are hurt most by immigration are foreign-born workers, i.e., previous immigrants. On average they lost 19% of their real wages while some groups (i.e., college graduates) lost up to 24% of their wage. Recall that, due to the assumption of constant returns to scale in the aggregate production function, once capital fully adjusts to immigration the average overall wage (last row) does not change. Hence, our hypothesis of imperfect substitutability simply shifts the distributional effects of immigration by increasing the wage competition effect of immigrants on other foreign-born workers and decreasing it for U.S.-born workers. If the negative effect on wages of foreign-born workers seems large, this is due to the massive inflow of immigrants over 1990-2004 relative to the initial size of foreign-born employment. Immigrants in the labor force have more than doubled in the period 1990-2004; in particular, foreign-born

---

[25]The Borjas and Katz (2007) estimates refer to the effects of immigration between 1980 and 2000.

workers have increased by 140% ($\Delta F_{1990-2004}/F_{1990} = 1.4$) during that period. Hence, even with a wage elasticity for that group relative to the U.S.-born group equal to 0.10 (in column 3, $\sigma = 10$, hence the relative wage elasticity $\frac{1}{\sigma} = 0.1$), one obtains a relative wage change of around 14%, split, as we see in column 3, into an increase of native wages of 1.2% and a decrease in wages of foreign-born of 13.3%. Notice that if $\sigma = \infty$ the effects of immigration on wages are identical for U.S.- and foreign-born in the same education-experience group. The small differences reported in column 4 between the effects on U.S.- and foreign-born wages are due to the different composition in employment distribution by experience and education between the two groups.

Are the effects of foreign-born workers on wages reasonable? First of all, simply considering the relative U.S.- to foreign-born wages, reported in table A3, there are some skill groups that experienced large immigrant inflows and a substantial deterioration of their wage relative to natives. For instance, among high school dropouts between 20 and 24 years of experience, until 1970 wages of U.S.- and foreign-born workers were almost identical, while in 2004 U.S.-born were earning 12-16% more than foreign-born workers. At the same time, among workers with no high school degree, those with 0 to 4 years of experience did not experience a large increase in the share of foreign-born and the relative U.S.- to foreign-born wages in this group did not deteriorate. The worsening of wages of foreign-born relative to U.S.-born (see for instance Borjas 1999, page 27), which is usually attributed to worsening in the quality of immigrants, is interpretable in light of our results as an effect of increased wage competition between foreign-born in those occupations that overwhelmingly employ immigrants. Moreover, the reason that we do not observe larger native-foreign wage differentials in all skill groups is probably that immigrants choose sectors/occupations/jobs with booming demand so that the systematic components of $\theta_{Fkjt}$ by year and skill (which we controlled for in equation (20)) partly offset the negative effect of increased supply. Another reason why the efficiency term $\theta_{Fkjt}$ may vary, in its systematic part, to offset the increase in supply of foreign-born, $\Delta F_{kj,1990-2004}$, has been proposed by Lewis (2005) and Card and Lewis (2007): sectors/jobs where immigrants' skills (in terms of education and experience) are more abundant induce technological choices "biased" towards those skills and use them more effectively, which increases the relative efficiency $\theta_{Fkjt}$. The negative effects on wages of other foreign-born are, therefore, in part offset by systematic improvements in relative efficiency. Finally, the simulation in Table 7 is done for *a given level of employment* of native workers. The actual relative wages observed in Table A3 result from changes in employment of foreign-born as well as changes in employment of natives. Due to the estimated complementarities, this second change mitigates the negative wage impact on immigrants.

Finally, let us provide an explanation for an apparent puzzle raised by our results. In light of our analysis, previous immigrants are the group whose wages suffer most due to the arrival of new immigrants. Why, then, are they consistently among the strongest supporters of more open immigration policies (see e.g., Hatton and Williamson, 2005 and Mayda, 2006)? Obviously, while they may forego as much as 1% wage growth per

year due to new immigrants, they are also the group that gains most from a non-economic point of view. Since immigration (legal and illegal) in the U.S. works mostly through family reunions, network connections and personal ties, new immigrants are likely to be spouses, siblings, friends and acquaintances of foreign-born residents in the U.S. and hence are likely to have huge personal, affective and amenity value to them, well above the negative wage effect that we identified.

## 6.2   Reconsidering the Short Run Effects with Yearly Capital Adjustment

How long does it take for physical capital to adjust and restore its long run returns? And in the presence of sluggish adjustment of capital what are the effects of immigration on wages in the short run? As illustrated in Section 3.3, accounting for capital adjustment simply adds a non-zero term, $(1 - \alpha) \left( \frac{\Delta \kappa_t}{\kappa_t} \right)_{immigration}$, to the change in the wage of each group. Hence the short run wage response for each group and for the averages will differ from the long run response by a common constant, due to the chosen Cobb-Douglas structure in which $\kappa_t$ only affects marginal productivity of workers through the overall average wage. A popular way to analyze the deviation of $\ln(\kappa_t)$ from its balanced growth path trend, used in the growth and business cycle literature, is to represent its time-dynamics in the following way:

$$\ln(\kappa_t) = \beta_0 + \beta_1 \ln(\kappa_{t-1}) + \beta_2 (trend) + \gamma \frac{\Delta F_t}{L_t} + \varepsilon_t \tag{26}$$

where the term $\beta_2 (trend)$ captures the balanced growth path trajectory of $\ln(\kappa_t)$ equal to $\frac{1}{\alpha} \ln \left( \frac{1-\alpha}{r+\delta} A_t \right)$ and the term $\beta_1 \ln(\kappa_{t-1})$ captures the sluggishness of yearly adjustment to shocks. The parameter $(1 - \beta_1)$ is commonly called "speed of adjustment" since it is the share of the deviation from the balanced growth path (trend) eliminated each year. Finally, $\frac{\Delta F_t}{L_t}$ are the yearly immigration shocks and $\varepsilon_t$ are other shocks. Assuming that immigration shocks cause a proportional decrease in $\kappa_t$ for the same year ($\gamma = -1$), in order to calculate the effect of immigration on $\kappa_t$ over, say, the 1990-2004 period, one needs an estimate of the parameter $\beta_1$. Once we know $\beta_1$ and the sequence of yearly immigration flows, $\frac{\Delta F_t}{L_t}$, one can use (26) to obtain an impulse response of $\ln(\kappa_t)$ and its deviation from trend as of 2004 (short run), as well as for later years (long run). The previous migration literature has essentially assumed $\beta_1 = 0$ in the short run calculations cumulating the $\frac{\Delta F_t}{L_t}$ over one or two decades for fixed capital (implying a very large deviation from the trend). On the other hand, it has assumed $\beta_1 = 1$, (full adjustment) in the long run calculations. The recent empirical growth literature (Islam, 1995; Caselli et al., 1996) and the recent business cycle literature (Romer, 2006, chapter 4), to the contrary, provide model-based and empirical estimates of $\beta_1$. The recent growth literature usually estimates a 10% speed of convergence of capital to the own balanced growth path for advanced (OECD) economies (Islam, 1995; Caselli et al., 1996), implying $\beta_1 = 0.9$. Similarly, the business cycle literature calculates speed of convergence of capital around 10% (Romer, 2006, Chapter 4) for closed economies and faster for open economies. Hence $\beta_1 = 0.9$ seems

a reasonable estimate. We estimated a simple AR(1) process with trend for $\ln(\kappa_t)$. We constructed the variable $\kappa_t = (K_t/L_t)$, dividing the stock of U.S. capital at constant prices (Net Stock of Private and Government Fixed Assets from the Bureau of Economic Analysis, 2006) by the total non-farm employment from the Bureau of Labor Statistics (2006) for each year during the period 1960-2004. We estimated several specifications including changes in total employment as shock $\left(\frac{\Delta L_t}{L_t}\right)$, or immigrants only $\left(\frac{\Delta F_t}{L_t}\right)$ as shock and instrumented those with changes in population (to correct for endogeneity of employment)[26]. All estimates of $\beta_1$ ranged between 0.8 and 0.9 (speed of adjustment of 10 to 20% a year) with standard errors ranging between 0.02 and 0.08. We could never reject $\beta_1 = 0.9$, and we could always reject $\beta_1 = 1$ (no adjustment). Hence we consider 10% a reliable and, if anything, conservative estimate of the yearly speed of capital adjustment. Using the series of immigration rates over 1990-2004 and the estimated parameters of capital adjustment $\beta_1 = 0.9, \gamma = -0.9$ (assuming that capital adjustment begins the same year as immigrants are received) the recursive equation (26) allows us to calculate $(\Delta \kappa_{1990-2004}/\kappa_{1990})_{immigration}$ as of year 2004 and the share of the deviation from trend that remains in 2009. Using formula (8) we can calculate the effect of $\Delta \kappa$ on the average wage and on each group's wage. Recall that assuming no adjustment of capital in the short run ( $\beta_1 = 1, \gamma = -1$), since the cumulated inflow of immigrants during the 1990-2004 period was 11% of the employment in 1990, this implies an effect of immigration on average real wages equal to $(0.33) * (-11\%) = -3.6\%$, as of 2004. Using the actual 10% speed of adjustment of capital each year, however, we obtain only a $-3.4\%$ effect of immigration on the capital-labor ratio corresponding to a mere $-1.1\%$ ($= 0.33 * 3.4\%$) effect on real wages as of 2004, and in five more years (2009) the negative effect on wages is reduced to $-0.6\%$. Table 8 uses these adjustments of the capital-labor ratio and shows the effects of immigration on wages as of year 2004 (column 1) and as of year 2009 (column 2). Those columns use the same parameter values as column 2 of Table 7, i.e., the median and preferred estimates of $\sigma$. We also report in column 3 the long run effects for full capital adjustment (identical to column 2 of Table 7) and, for comparison, the "short run" effects calculated assuming fixed capital (as in the previous literature) in column 4. Finally, the short run effects with fixed capital and perfect substitutability between U.S.- and foreign-born workers are shown in column 5. Hence column 1 reports the newly calculated "short run" effects of immigration while column 5 reports those calculated using the methods prevailing in the previous literature. The differences are remarkable. The average wage of U.S.-born workers increased by 0.7% in our estimates as of 2004, rather than experiencing a decrease of 3.5%. U.S. workers with no degree experience a loss of 2.2% of their real wage rather than a loss of almost 8%. College educated, U.S.-born workers have essentially no change in their wage (rather than a 5% loss) and the groups of high school graduates and college dropouts experience, even in the short run, significant gains rather than significant losses in their real wages.

---

[26]We constructed $\Delta F_t$, for each year from 1960 to 2004, using the following procedure. From the U.S. Department of Justice, Immigration and Naturalization Service (2004) we obtain the number of (legal) immigrants for each fiscal year 1960-2004. We then distribute the net change of foreign-born workers in each decade (measured from census data and from the American Community Survey, which includes illegal immigrants as well as legal ones) over each year in proportion to the gross yearly flows of legal immigrants.

31

A133

The benefits of immigration are already realized for most workers in the short run and certainly most benefits are enjoyed by 2009, with an average wage gain of more than 1% distributed as gains for the three groups with at least a high school degree and a small loss for high school dropouts. The wage losses, in the short run as well as in the long run, are concentrated among previous immigrants who experience most of the competition from new immigrants and undergo sizeable wage losses as a consequence.

## 6.3   Robustness Checks

Table 9 shows the changes in the calculated long run effects when we use different values for the parameters $\delta$ and $\eta$ in the simulations. While the values used in Table 8, equal to 2 and 4 respectively, seem to be right in the middle of the estimated range for these parameters (both in our estimates and in previous ones), some scholars report values of $\delta$ as low as 1.5 and as high as 2.5, while the range for $\eta$ is between 3 and 5. We reproduce simulations from columns 1-3 of Table 8 using, respectively, the low estimates of $\delta$ and $\eta$ (columns 1-3 in Table 9) and the high estimates of $\delta$ and $\eta$ (columns 4-6 in Table 9). While the average effects on wages of native and foreign-born workers are not sensitive to changes in those parameters, the distributional effects between education groups become stronger when we use lower estimates of $\delta$ and $\eta$. Considering columns 2 and 5 as references, since they use the median estimate of $\sigma$, we see that the wage loss of U.S.-born high school dropouts can be as large as $-2.5\%$, when $\delta = 1.5$. Still, this number is much smaller than the previous estimates. On the other hand, if we use the higher elasticity of substitution estimates ($\delta = 2.5$ and $\eta = 5$), unskilled natives barely suffer a loss in wages ($-0.3\%$) from immigration. A similar widening of the distributional effects of wages of foreign-born workers across education groups takes place using the lower estimates. The widening distributional effects would also be observed if we lowered $\delta$ and $\eta$ in the simulation with $\sigma = \infty$.

## 6.4   Contribution of Immigration to the Average Wage and Wage Dispersion of U.S.-Born Workers

The differences in the real wage effects of immigration on natives shown in Table 8 between specification 1 (our preferred one) and specification 5 (representative of previously estimated short run effects) are important. In order to put them in perspective, it is instructive to compare them with the actual changes in average wages of U.S.-born workers during the 1990-2004 period and with changes in the measures of their wage dispersion during the same period. Specification 1 in Table 8 implies an effect on average U.S. real wages 4.2% points larger than the usually estimated short run effects reported in column 5 of Table 10 (+0.7% vs. -3.5%). This is a large difference even when compared to the average growth rate of wages of U.S.-born workers in the period, which equals 12.5%, and is even more notable if compared to the typical changes of real wages over the business cycle (amounting, on average, to less than 0.5%). Roughly 60% of the difference between specifications is due to

the hypothesis of yearly capital adjustment, while about 40% is due to the imperfect substitutability between U.S.- and foreign-born workers.

Even more interestingly, since immigration has been connected to increased wage dispersion (e.g., Freeman, Borjas and Katz 1997 and several others), we can inquire as to the fraction of that increase that could be due to immigration. There are several ways of measuring wage dispersion across educational groups, depending on which group we focus on. Columns 1 and 2 of Table 10 provide some standard measures of increased wage dispersion across educational groups during the period 1990-2004. In particular, Column 2 reports, in the first four rows, the percentage variation in the real wage for each of the four groups relative to the average real increase in wages[27] and, in the last 2 rows, the table shows the real increase in the college/high school dropout wage premium and in the college/high school wage premium. All numbers are calculated for U.S.-born workers only. Column 1 reports the actual percentage changes for each real wage group (not net of the average) showing that high school dropouts actually experienced a real wage loss in the period. Notice, first of all, that wage dispersion increased between any two groups, since lower wage groups (lower education groups) had lower growth rates of wages. The performance of U.S.-born high school dropouts has been particularly bad, with wages dropping by 24.4% relative to the average during the period. Also sub-average (but much less so) were the performances of wages of high school graduates (6.1% lower than average) and college dropouts (4.1% lower than average). On the other hand, wages of college graduates substantially out-performed the average (8.9% better). As a consequence, the wage premium (as a ratio) between college graduates and high school dropouts increased by 33% during the period and the college/high school wage premium increased by 15%. These statistics are calculated using Census and American Community Survey IPUMS data on wages of all U.S.-born workers as defined in Section 4. Column 3 shows the percentage changes in real wages attributed to immigration by our model (specification 2 of Table 7) and column 4 shows the share they represent of the actual 1990-2004 change. Looking at the first four rows, immigration actually decreased wage dispersion for three groups (HSG, COD and COG), in that it helped the first two groups which performed worse than average, and hurt the last one that performed better. This is noted in Table 10 by the caption "attenuate dispersion" under the corresponding figures. As for native high school dropouts, immigration contributed to wage dispersion but it explains less than one eighth (0.12) of the difference in the performance of this group's wage with respect to the average wage. Moreover, immigration does not contribute at all to explaining the increased college/high school wage premium; if anything, immigration caused a reduction in that premium as the last row of column 4 shows, and immigration only explains one twentieth (0.05) of the increase in the college/high school dropout premium (second-to-last row of column 4). These numbers seem to show that immigration cannot be considered

---

[27]The average increase is calculated by weighting the percentage wage increases of each group by the average wage share of that group in the 1990-2004 period. It is different from the change in the average wage which also includes the effect of changes in educational shares.

as an important candidate in explaining increased wage dispersion. Even giving immigration the best shot at causing wage dispersion by adopting the old assumption of $\sigma = \infty^{28}$ (column 5 and 6) one still obtains the result that immigration *attenuated* wage dispersion for three groups (helping those which are under-performing, and hurting those outperforming, the mean) while it only contributed to the under-performance of high school dropout wages. However, even in this scenario, only one sixth (0.17) of the growth differential with respect to the average wage, and less than one tenth (0.087) of the increase in the college/high school dropout premium can be attributed to immigration.

# 7   Conclusions

The main message of this paper is that only within a model that specifies the interactions between workers of different skills and between labor and physical capital (in a production function) can we derive marginal productivity, labor demands and analyze the effects of immigration on the wages of different types of workers. The existing literature on immigration has paid much attention to the estimates of the partial effect of immigrants on wages of U.S.-born workers with similar skills. Those estimates are *partial* in that they assume a constant supply of all other groups and of physical capital and therefore are not informative of the actual overall effects of immigration on wages. In taking the general equilibrium approach instead, one realizes that the substitutability between U.S.- and foreign-born workers with similar schooling and experience, as well as the investment response to changes in the supply of skills are important parameters in evaluating the short and long run effects of immigration on wages. We therefore carefully tackle the tasks of estimating the elasticity of substitution between U.S.- and foreign-born workers within education-experience and gender cells and we account for physical capital adjustment in the short and long run. We find robust evidence that U.S.- and foreign-born workers are not perfect substitutes within an education-experience-gender group. This fact, and the yearly adjustment of capital to immigration, imply that average wages of natives benefit from immigration, even in the short run. These average gains are, in the short and long run, distributed as a small wage loss to the group of high school dropouts and wage gains for all the other groups of U.S. natives. The group suffering the biggest loss in wages is the contingent of previous immigrants, who compete with new immigrants for similar jobs and occupations. Finally, our model implies that it is hard to claim that immigration has been a significant determinant in the deterioration of the wage distribution of U.S.-born workers during the period 1990-2004.

---

[28]Assumptions on capital adjustment do not have any impact on relative wages but only on the average wage. Hence the relative changes in specifications 3 and 5 of Table 10 could be either for fixed or for fully adjusted capital.

# References

Altonji, Joseph, and David Card. 1991. The Effects of Immigration on the Labor Market Outcomes of Less-Skilled Natives. in John M. Abowd and Richard Freeman eds, *Immigration, Trade and the Labor Market*, Chicago, the University of Chicago Press.

Angrist, Joshua. 1995. The Economic Returns to Schooling in the West Bank and Gaza Strip. *American Economic Review* 85, no. 5:1065-1087.

Autor, David, Lawrence Katz, and Melissa Kearney. 2005. Trends in U.S. Wage Inequality, Re-Assessing the Revisionists. NBER Working Paper no 11627, Cambridge, Ma.

Autor, David, Lawrence Katz, and Melissa Kearney. 2006 The Polarization of the U.S. Labor Market. *American Economic Review Papers and Proceedings* 96, no.2: 189 - 194.

Bacolod, Marigee, and Bernardo Blum. 2006. Two Sides of the Same Coin: US Residual Inequality and the Gender Gap. Manuscript, University of Toronto, Toronto, Canada.

Black, Sandra, and Spitz-Oener, Alexandra. 2007. Explaining Women's Success: Technological Change and the Skill Content of Women's Work. NBER Working Paper, no.13116, Cambridge Ma.

Bureau of Economic Analysis. 2006. Interactive NIPA Tables and Interactive Fixed Assets Tables. http://www.bea.gov/bea/dn/home/gdp.htm.

Bureau of Labor Statistics. 2006. National Employment Data. http://www.bls.gov/bls/employment.htm.

Borjas, George. 1994. The Economics of Immigration. *Journal of Economic Literature* 32, no. 4:1667-1717.

Borjas, George. 1995. The Economic Benefits from Immigration. *Journal of Economics Perspectives* 9, no.2: 3-22.

Borjas, George. 1999. Heaven's Door. Princeton University Press, Princeton and Oxford, 1999.

Borjas, George. 2003. The Labor Demand Curve is Downward Sloping: Reexamining the Impact of Immigration on the Labor Market. *Quarterly Journal of Economics* 118, no. 4: 1335-1374.

Borjas, George. 2006. Native Internal Migration and the Labor Market Impact of Immigration. *Journal of Human Resources* 41, no.2: 221-258.

Borjas, George, and Katz, Larry. 2007. The Evolution of the Mexican-Born Workforce in the United States. in Borjas, George, editor *"Mexican Immigration to the United States"* National Bureau of Economic Research Conference Report, Cambridge Ma.

Borjas, George, Freeman, Richard and Katz, Larry. 1997. How Much Do Immigration and Trade Affect Labor Market Outcomes?. *Brookings Papers on Economic Activity* 1997, no1: 1-90

Butcher, Katrin and Card, David. 1991. Immigration and Wages: Evidence from the 1980s. *American Economic Review Papers and Proceedings* 81, no. 2: 292-296.

Card, David. 1990. The Impact of the Mariel Boatlift on the Miami Labor Market. *Industrial and Labor Relation Review* 43, no 2: 245-257.

Card, David. 2001. Immigrant Inflows, Native Outflows, and the Local Labor Market Impacts of Higher Immigration. *Journal of Labor Economics* 19, no. 1: 22-64.

Card, David. 2007. How Immigration Affects U.S. Cities. CReAM Discussion Paper, no. 11/07.

Card, David, and John Di Nardo. 2000. Do Immigrant Inflows Lead to Native Outflows? NBER Working Paper, no. 7578, Cambridge, Ma.

Card, David, and Thomas Lemieux. 2001. Can Falling Supply Explain the Rising Returns to College for Younger Men? A Cohort Based Analysis. *Quarterly Journal of Economics* 116, no.2: 705-746.

Card, David, and Ethan Lewis. 2007. The Diffusion of Mexican Immigrants During the 1990s: Explanations and Impacts.  in Borjas, George , editor *Mexican Immigration to the United States*. National Bureau of Economic Research Conference Report, Cambridge Ma.

Caselli, Francesco, Gerardo Esquivel, and Fernando Lefort. 1996. Reopening the Convergence Debate; A New Look at Cross-Country Growth Empirics. *Journal of Economic Growth* 1, no.3: 363-389.

Caselli, Francesco, and Wilbur Coleman. 2006. The World Technology Frontier. *American Economic Review* 96, no.3: 499-522.

Ciccone, Antonio, and Giovanni Peri. 2005. Long-Run Substitutability between More and Less Educated Workers: Evidence from U.S. States 1950-1990. *Review of Economics and Statistics* 87, no. 4: 652-663.

Cortes, Patricia. 2006. The Effect of Low-Skilled Immigration on US Prices:  Evidence from CPI Data. Manuscript. Massachussetts Institute of Technology, Cambridge, MA.

Friedberg, Rachel, and Jennifer Hunt. 1995. The Impact of Immigrants on Host Country Wages, Employment and Growth. *Journal of Economic Perspectives* 9, no. 2: 23-44.

Friedberg, Rachel. 2001. The Impact of Mass Migration on the Israeli Labor Market. *Quarterly Journal of Economics* 116, no. 4: 1373-1408.

Gollin, Douglas. 2002. Getting Income Shares Right. *Journal of Political Economy* 100, no 2: 458-474.

Grossman, Jean. 1982. The Substitutability of Natives and Immigrants in Production. *Review of Economics and Statistics* 64, no.4: 596-603.

Jones, Charles. 2005. The Shape of Production Functions and the Direction of Technical Change. *Quarterly Journal of Economics* 120, no2: 517-549.

Hatton, Timothy, and Jeffrey Williamson. 2005. A Dual Policy Paradox: Why Have Trade and Immigration Policies Always Differed in Labor-Scarce Economies? NBER Working Paper no. 11866. Cambridge, MA.

Islam, Nasrul. 1995. Growth Empirics: A Panel Data Approach. *Quarterly Journal of Economics* 110, no.4: 1127-1170.

Jaeger, David. 1996. Skill Differences and the Effect of Immigrants on the Wages of Natives. U.S. Bureau of Labor Statistics, Economic Working Paper no.273. Washington D.C.

Kaldor, Nicholas. 1961. Capital Accumulation and Economic Growth in the Theory of Capital. F. A. Lutz and D.C. Hague Editors. New York, St. Martins.

Katz, Larry, and Kevin Murphy. 1992. Changes in Relative Wages 1963-1987: Supply and Demand Factors. *Quarterly Journal of Economics* 107, no.1: 35-78.

Krusell, Per, Lee Ohanian, Victor Rios-Rull and Giovanni Violante. 2000. Capital-Skill Complementarity and Inequality: A Macroeconomic Analysis. *Econometrica* 68, no. 5: 1029-53.

Lewis, Ethan. 2005. Immigration, Skill Mix, and the Choice of Technique. Federal Reserve Bank of Philadelphia Working Paper no. 05-08 Philadelphia, PA.

Longhi, Simonetta, Peter Nijkamp, and Jacques Poot . 2005. A Meta-Analytic Assessment of the Effect of Immigration on Wages *Journal of Economic Surveys* 86, no. 3 451-477.

Manacorda Marco, Alan Manning and John Wadsworth (2006) The Impact of Immigration on the Structure of Male Wages: Theory and Evidence from Britain IZA Discussion paper 2352. Bonn, Germany.

Mayda, Anna Maria. 2006. Who is Against Immigration? A Cross-Country Investigation of Individual Attitudes toward Immigrants. *Review of Economics and Statistics* 88, no.3: 510-530.

Murphy, Kevin, Craigh Riddle and Paul Romer.1998. Wages, Skills and Technology in the United States and Canada. in General Purpose Technology and Economic Growth. Elhanan Helpman Editor, Cambridge, MA.

37

National Research Council. 1997. The New Americans: Economic, Demographic, and Fiscal Effects of Immigration. National Academy Press, Washington D.C..

Ottaviano, Gianmarco, and Giovanni Peri. 2005. Cities and Cultures. *Journal of Urban Economics* 58, no.2: 304-307.

Ottaviano, Gianmarco, and Giovanni Peri. 2006. The Economic Value of Cultural Diversity: Evidence from U.S. Cities. *Journal of Economic Geography* 6, no1: 9-44.

Ottaviano, Gianmarco, and Giovanni Peri. 2007. The Effect of Immigration on U.S. Wages and Rents: A General Equilibrium Approach. CReAM Discussion Paper no 13/07 London, UK.

Passel, Jeffrey. 2006. The Size and Characteristics of the Unauthorized Immigrant Population. PEW Hispanic Center,Washington D.C.

Peri, Giovanni, and Chad Sparber, 2007. Task Specialization, Comparative Advantages, and the Effects of Immigration on Wages. NBER Working Paper, no. 13389. Cambridge, Ma.

Ramsey, Frank. 1928. A Mathematical Theory of Saving. *Economic Journal* 38, no.152: 543-559.

Romer, David. 2006. Advanced Macroeconomics. McGraw-Hill, Third Edition. New York, NY.

Ruggles, Steven , Matthew Sobek, Trent Alexander, Catherine A. Fitch, Ronald Goeken, Patricia Kelly Hall, Miriam King, and Chad Ronnander. 2005.. *Integrated Public Use Microdata Series*: Version 3.0 [Machine-readable database]. Minneapolis, MN: Minnesota Population Center [producer and distributor]. http://www.ipums.org.

Solow, Robert. 1956. A Contribution to the Theory of Economic Growth. *Quarterly Journal of Economics* 70: 65-94.

U.S. Department of Justice Immigration and Naturalization Service. 2004. Statistical Yearbook of the Immigration and Naturalization Service, Year 2004. Washington, DC.

Welch, Finis. 1979. Effects of Cohort Size on Earnings: The Baby Boom Babies Financial Boost. *Journal of Political Economy* 87, no. 5: 65-97.

Welch, Finis. 1990. In Defense of Inequality. *American Economic Review* 89, no.2: 1-17.

# Tables and Figures

### Table 1
### Index of Congruence in the Choice of Occupations, Census 2004

| Index of Congruence | Foreign, Same Education | Natives HSD | Natives HSG | Natives COD | Natives COG |
|---|---|---|---|---|---|
| **Natives, HSD** | 0.65 | 1 | | | |
| **Natives, HSG** | 0.68 | 0.68 | 1 | | |
| **Natives, COD** | 0.61 | -0.25 | 0.22 | 1 | |
| **Natives, COG** | 0.70 | -0.73 | -0.91 | 0.35 | 1 |

**Note:** The Index of Congruence between the two groups (row and column headers) is calculated as the centered correlation coefficient using 180 different occupations and data from the 2004 American Community Survey in Ruggles et al. (2006). The exact definition of the index is provided in the main text. The index ranges between -1 and +1.

**Table 2**
**Relative Male-Female Wage Elasticity within Education-Experience Cells**

| Table entries:<br>$1/\lambda$ (male-female relative wage elasticity) | **1**<br>**Basic** | **2**<br>**Omit 2004** | **3**<br>**Omit 1960** |
|---|---|---|---|
| All Workers | -0.04 | -0.05 | -0.04 |
| | (0.04) | (0.04) | (0.05) |
| US-born only | -0.03 | -0.05 | -0.02 |
| | (0.04) | (0.04) | (0.04) |
| Foreign-Born Only | -0.10 | -0.09 | -0.12 |
| | (0.08) | (0.08) | (0.07) |

**Note:** All Regressions include education-by-experience fixed effects, education-by-year fixed effects and experience-by-year fixed effects. The reported standard errors are heteroskedasticity robust and clustered by education-experience. The dependent variable is the natural logarithm of relative male-female weekly wage of workers in the same education-experience –nativity group, the explanatory variable is the relative labor supply of female to male workers in the same education-experience-nativity group. The first row includes in the regression education-experience cells for U.S.- and foreign-born workers. This implies a total of 384 observations for column 1 and 320 for columns 2 and 3. The second row only includes cells with US-born workers and the third row only includes cells with foreign-born workers. This implies 192 observations for column 1 and 160 for columns 2 and 3. Observations are weighted by the total employment in the cell, in all specifications.

**Table 3**
**Relative U.S.-Foreign-Born Wage Elasticity within Education-Experience Cells, Overall and by Gender**

| Dependent Variable and Explanatory variable: | 1<br>Basic | 2<br>Weekly Wages | 3<br>Non weighted | 4<br>Omit 2004 | 5<br>Omit 1960 |
|---|---|---|---|---|---|
| $1/\sigma$ (US-Foreign born relative wage elasticity) Overall estimates and by gender groups | | | | | |
| Relative Wage and Employment U.S./Foreign Born, All Workers | 0.16** (0.04) | 0.14** (0.03) | 0.14** (0.05) | 0.14** (0.04) | 0.18** (0.04) |
| Relative Wage and Employment U.S./Foreign Born , Male Workers | 0.16** (0.05) | 0.09** (0.03) | 0.15** (0.07) | 0.15** (0.05) | 0.17** (0.06) |
| Relative Wage and Employment U.S./Foreign Born , Female Workers | 0.18** (0.03) | 0.05** (0.01) | 0.13** (0.04) | 0.20** (0.05) | 0.20** (0.03) |
| $1/\sigma$ (US-Foreign born relative wage elasticity)  Estimates across gender groups | | | | | |
| Relative Wage of U.S./Foreign Born , Male Workers and Relative Employment of U.S./Foreign Born , Female | 0.15** (0.04) | 0.09* (0.03) | 0.12** (0.06) | 0.13** (0.04) | 0.17** (0.04) |
| Relative Wage of U.S./Foreign Born Female Workers and Relative Employment of U.S./Foreign Born Male workers | 0.17** (0.04) | 0.05** (0.02) | 0.13** (0.06) | 0.21** (0.06) | 0.20** (0.05) |
| Observations | 192 | 192 | 192 | 128 | 128 |

**Note:** All Regressions include seducation-by-experience fixed effects, education-by-year fixed effects and experience-by-year fixed effects. Errors are heteroskedasticity robust and clustered by education-experience. The dependent variable is natural logarithm of relative wage of US and foreign born workers in the same education and experience group, the explanatory variable is the relative employment of US and foreign-born workers in the same education experience group. Results in the first row are relative to regressions that use all workers to calculate employment and wages, results in the second row use male workers only, and results in the third row use female workers only. The fourth row uses relative wages of male workers and relative employment of female workers. The fifth row uses relative wages of female workers and relative employment of male workers. Observations are weighted by total employment in the cell, in all specifications except for 3. Specifications 1 to 3 are estimated using observations for 1960, 1970, 1980, 1990, 2000 and 2004.

41

**Table 4**
**Relative U.S.-Foreign-Born Wage Elasticity within Education-Experience Cells: Robustness Checks**

| Table entries: 1/σ (US-Foreign born relative wage elasticity) | 1 Basic | 2 Weekly Wages | 3 Non weighted | 4 Omit 2004 | 5 Omit 1960 |
|---|---|---|---|---|---|
| Using Effective Experience to construct Education-experience cells | 0.17** (0.05) | 0.12** (0.04) | 0.16** (0.05) | 0.16** (0.06) | 0.18** (0.05) |
| Using weeks-Person as measure of labor supply | 0.14** (0.04) | 0.20** (0.03) | 0.12** (0.06) | 0.14** (0.05) | 0.14 (0.04) |
| Restricted to the groups of workers with at most a high school degree | 0.20** (0.03) | 0.18** (0.03) | 0.19** (0.04) | 0.19** (0.02) | 0.22** (0.03) |

**Note**: All regressions include education-by-experience fixed effects, education-by-year fixed effects and experience-by-year fixed effects. Errors are heteroskedasticity robust and clustered by education-experience. The dependent variable is the natural logarithm of relative wage of US and foreign born workers in the same education and experience group, the explanatory variable is the relative labor supply of US and foreign-born workers in the same education experience group. In the first row the effective experience for foreign-born workers is calculated by converting years of experience abroad into years of US experience. The period considered is 1970-2004, since in 1960 there is no information on the year when immigrants entered the country. In the second row we use week-person as measure of labor supply of each group and 1960, 1970, 1980, 1990, 2000 and 2004 as years. In the third row we select only the education-experience groups within the two educational groups HSD (high school dropouts) and HSG (high school graduates) for a total of 96 observations.

42

**Table 5**
**Estimates of $1/\eta$ : Relative Wage Elasticity across Experience Cells**

| Entries are estimates of $1/\eta$ | CES Foreign-U.S.- Born Using Estimated σ | | Simple Sum Foreign- U.S.-Born (imposing σ=∞ ) | |
|---|---|---|---|---|
| **Specification** | **1** | **2** | **3** | **4** |
| **Sample** | **All workers** | **Male only** | **All Workers** | **Male Only** |
| Yearly Wages | 0.30** | 0.30** | 0.26** | 0.25** |
| | (0.09) | (0.10) | (0.06) | (0.07) |
| Weekly Wages | 0.29** | 0.29** | 0.25** | 0.25** |
| | (0.09) | (0.10) | (0.07) | (0.08) |
| Observations | 192 | 160 | 192 | 160 |

**Note**:  Method of estimation is 2SLS using the log of foreign-born employed in the education-experience group as instrument for the variable $\ln(L_{kjt})$ that is constructed as described in the text. All regressions include education by experience fixed effects and education by year fixed effects.  Specifications 2 and 4 use male workers only to calculate the wages and employment. In parenthesis we report the Heteroskedasticity Robust Standard error clustered by education group.

**Table 6**
**Estimates of $1/\delta$ : Relative Wage Elasticity Across Education Cells**

| Entries are estimates of $1/\delta$ | CES across Experience Groups, estimated η | | Simple Sum Across Experience Groups ( imposing η=∞ ) | |
|---|---|---|---|---|
| **Specification** | **1** | **2** | **3** | **4** |
| **Sample** | **All workers** | **Male Only** | **All workers** | **Male Only** |
| Yearly wages | 0.45** | 0.46** | 0.51** | 0.52** |
| | (0.12) | (0.14) | (0.14) | (0.16) |
| Weekly Wages | 0.40** | 0.40** | 0.44** | 0.44** |
| | (0.09) | (0.10) | (0.11) | (0.12) |
| Observations | 24 | 20 | 24 | 20 |

**Note:** Method of estimation is 2SLS using the log of foreign-born employed in the education group as instrument for the variable ln($L_{kt}$) that is constructed as described in the text. All regressions include 5 time fixed effects and 4 education-specific time trends. Specifications 2 and 4 include male individuals only in calculating wages and employment. Specifications 1 and 3 use all individuals in each education and experience group. In parenthesis we report the Heteroskedasticity Robust Standard error clustered by education group.

44

**Table 7**
**Calculated Percentage Changes in Real Wages Due to Immigrant Inflows: 1990-2004.**
**Long Run Effects ($\Delta \kappa / \kappa = 0$)**

| Specification<br>Estimates of $\sigma$ | 1<br>Low<br>$\sigma=5$ | 2<br>Median<br>$\sigma=6.6$ | 3<br>High<br>$\sigma=10$ | 4<br>$\sigma$ , imposed = $\infty$ |
|---|---|---|---|---|
| **% Real Wage Change of Us Born Workers Due to Immigration, 1990-2004** | | | | |
| 1) HS dropouts US-born | -0.2% | -1.1% | -2.1% | -4.2% |
| 2) HS graduates, US-born | +2.9% | +2.4% | +2.0% | +1.0% |
| 3) CO dropouts, US-born | +3.7% | +3.4 | +3.1% | +2.4% |
| 4) CO graduates, US-born | +1.4% | +0.7% | 0.0% | -1.5% |
| **5) Average, US-born** | **+2.3%** | **+1.8%** | **+1.2%** | **+0.1%** |
| **% Real Wage Change of Foreign  Born Workers  Due to Immigration, 1990-2004** | | | | |
| 6) HS dropouts Foreign-born | -20.2% | -16.3% | -12.3% | -4.4% |
| 7) HS graduates, Foreign-born | -31.7% | -23.5% | -15% | +1.0% |
| 8) CO dropouts, Foreign-born | -17.4% | -12.3% | -7.3% | +2.4% |
| 9) CO graduates, Foreign-born | -31.6% | -24.2% | -16% | -1.6% |
| **10) Average Foreign-born** | **-26.3%** | **-19.8%** | **-13.3%** | **-0.9%** |
| **11) Overall Average:<br>Native and US-Born** | **0%** | **0%** | **0%** | **0%** |

**Note:** Values of the other parameters used in the estimation: $\delta=2$, $\eta=4$, $\alpha=0.66$. The inflow of immigrants in the period 1990-2004 as a percentage of initial employment in the group were as follows: High School Dropouts: 20%, High School Graduates: 9.9%, College Dropouts: 6.5%, College Graduates: 14.1%, Overall 11.0%. The percentage change for the wage of each worker in group k, j is calculated using the formula (11) for US-born and (12) for foreign-born. Then percentage wage changes are averaged across experience groups using the wage-share of the group in 1990 to obtain the Table entries. The averages for US- and Foreign-born are obtained averaging the wage change of each education group weighted by its share in the wage (as described in formulas 13 and 14). The overall average wage change adds the change of US- and foreign-born weighted for the relative wage shares in 1990 (equal to 8.5% for foreign-born and 91.5% for US-born).

45

**Table 8**
**Calculated Percentage Changes in Real Wages Due to Immigrant Inflows: 1990-2004.**
**Short Run Effects, Accounting for Yearly Capital Adjustment.**

| Specification Estimates of σ | 1 As of 2004 (short run) | 2 As of 2009 | 3 Long Run | 4 Fixed K (Traditional Short Run) | 5 Fixed K and σ, imposed = ∞ |
|---|---|---|---|---|---|
| **% Real Wage Change of US-Born Workers Due to Immigration, 1990-2004** | | | | | |
| HS dropouts US-born | -2.2% | -1.7% | -1.1% | -4.8% | -7.9% |
| HS graduates, US-born | +1.3% | +1.8% | +2.4% | -1.2% | -2.6% |
| CO dropouts, US-born | +2.3% | +2.8% | +3.4 | -0.2% | -1.2% |
| CO graduates, US-born | -0.4% | +0.1% | +0.7% | -2.9% | -5.2% |
| **Average, US-Born** | **+0.7%** | **+1.2%** | **+1.8%** | **-1.9%** | **-3.5%** |
| **% Real Wage Change of Foreign Born Workers Due to Immigration, 1990-2004** | | | | | |
| HS dropouts Foreign-born | -17.4% | -16.9% | -16.3% | -19.9% | -8.1% |
| HS graduates, Foreign-born | -24.6% | -24.1% | -23.5% | -27.1% | -2.6% |
| CO dropouts, Foreign-born | -13.4% | -12.9% | -12.3% | -15.9% | -1.2% |
| CO graduates, Foreign-born | -25.3% | -24.8% | -24.2% | -27.8% | -5.3% |
| **Average Foreign-born** | **-20.9%** | **-20.4%** | **-19.8%** | **-23.4%** | **-4.7%** |
| **Overall Average: Native and US-Born** | **-1.1%** | **-0.6%** | **0%** | **-3.6%** | **-3.6%** |

**Note:** Values of the other parameters used in the estimation of columns 1, 2, 3 and 4: σ=6.6, δ=2, η=4, α=0.66. Column 5 assumes : σ=∞, δ=2, η=4, α=0.66.   The inflow of immigrants in the period 1990-2004 as a percentage of initial employment in the group were as follows: High School Dropouts: 20%, High School Graduates: 9.9%, College Dropouts: 6.5%, College Graduates: 14.1%, Overall 11.0%. The formulas used to obtain single entries and averages are identical to those used in Table 9.  The method used to construct the percentage changes in wages is identical to the one used in Table 9. The change in the capital-labor ratio due to immigration as of 2004 and 2009 is calculated using yearly immigration flows and the recursive formula (26) in the text. The effect of immigration 1990-2004 on the capital-labor ratio as of 2004 (column 1) is -3.4% and it is -2.0% as of 2009 (column 2). To the contrary, the effect assuming fixed capital (column 4 and 5) is -11%.

**Table 9**
**Calculated Percentage Changes in Real Wages Due to Immigrant Inflows: 1990-2004.**
**Long Run Effects. Robustness Checks, for Different Values of δ, η.**

| Value of δ | 1.5 | | | 2.5 | | |
|---|---|---|---|---|---|---|
| Value of η | 3 | | | 5 | | |
| Specification | **1** | **2** | **3** | **4** | **5** | **6** |
| Value of σ$_k$ | **Low** | **Median** | **High** | **Low** | **Median** | **High** |
| | σ=5 | σ=6.6 | σ=10 | σ=5 | σ=6.6 | σ=10 |
| **% Real Wage Change of US-Born Workers Due to Immigration, 1990-2004** | | | | | | |
| HS dropouts US-born | -1.6% | -2.5% | -3.5% | +0.6% | -0.3% | -1.3% |
| HS graduates, US-born | +3.3% | +2.8% | +2.3% | +2.7% | +2.2% | +1.8% |
| CO dropouts, US-born | +4.6% | +4.2% | +3.9% | +3.2% | +2.9% | +2.6% |
| CO graduates, US-born | 0.9% | +0.2% | -0.6% | +1.7% | +1.0% | -0.2% |
| **Average, US-Born** | **+2.3%** | **+1.8%** | **+1.2%** | **+2.3%** | **+1.8%** | **+1.2%** |
| **% Real Wage Change of Foreign -Born Workers  Due to Immigration, 1990-2004** | | | | | | |
| HS dropouts Foreign-born | -21.0% | -17.8% | -14.0% | -19.3% | -15.3% | -11.4% |
| HS graduates, Foreign-born | -31.2% | -23.3% | -15.0% | -31.5% | -23.4% | -15.3% |
| CO dropouts, Foreign-born | -16.1% | -11.2% | -6.4% | -17.5% | -12.7% | -7.8% |
| CO graduates, Foreign-born | -32% | -24.8% | -17% | 31.1% | -23.8% | -16% |
| **Average Foreign-born** | **-26%** | **-19.6%** | **-13.6%** | **-26%** | **-19.6%** | **-13.6%** |
| **Overall  Average: Native and Foreign-Born** | **0%** | **0%** | **0%** | **0%** | **0%** | **0%** |

**Note:** Inflow of immigrants in the period 1990-2004 as a percentage of initial employment in the group: High School Dropouts: 20%, High School Graduates: 9.9%, College Dropouts: 6.5%, College Graduates: 14.1%, Overall 11.0%. The formulas used to obtain single entries and averages are identical to those used in Table 9.  The method used to construct the percentage changes in wages is identical to the one used in Table 9.

**Table 10**
**Effect of Immigrants on Real Wage Dispersion of US Natives, 1990-2004**

| | 1 Actual Percentage Change 1990-2004 | 2 Percentage Change Relative to the Average | 3 Percentage Change (Relative to the Average Change) Due to Immigration, Our Model σ=6.6 | 4 Share of (2) Explained by (3) | 5 Percentage Change (Relative to the Average Change) Due to Immigration σ= ∞ | 6 Share of (2) Explained by (5) |
|---|---|---|---|---|---|---|
| **Real Percentage Changes in Wages of Education Groups 1990-2004** | | | | | | |
| **Real Wage of US-born,  HS dropouts** | -11.9% | -24.4% | -2.9% | 0.12 | -4.3% | 0.17 |
| **Real Wage of  US-born HS graduates** | 6.5% | -6.1% | +0.6% | -0.098 (Attenuate Dispersion) | +0.9% | -0.15 (Attenuate Dispersion) |
| **Real Wage of  US-born CO dropouts,** | 8.5% | -4.1% | +1.4% | -0.34 (Attenuate Dispersion) | +2.3% | -0.56 (Attenuate Dispersion) |
| **Real Wage of US-born, CO graduates** | 21.5% | +8.9% | -1.1% | -0.12 (Attenuate Dispersion) | -1.4% | -0.015 (Attenuate Dispersion) |
| **Real Percentage Changes in Wage Premia, 1990-2004** | | | | | | |
| **College/High School Dropout Wage Premium** | +33.3% | +33.3% | +1.8% | 0.05 | +2.9% | 0.087 |
| **College/High School Graduates Wage Premium** | +15% | +15% | -1.7% | -0.11 (Attenuate Dispersion) | -2.3% | -0.15 (Attenuate Dispersion) |

**Note:**   The wages for each group are calculated considering all US-born workers between the ages of 17 and 65, from the IPUMS Census 1990 and the IPUMS American Community Survey 2004 as described in the main text. The CPI deflator is used to convert the wages to constant 2000 $. The average growth of real wages between 1990 and 2004 was 12.5%. It is calculated weighting the percentage increases in real wages of each education group by their average wage shares in the period 1990-2004.

48

## Figure 1
## Capital-Output Ratio



**US Capital-Output ratio, 1960-2004**

## Figure 2
## De-Trended Log Capital-Labor Ratio



log Capital-Labor Ratio, de-trended, 1960-2004

49

### Figure 3
### Immigration and Employment Growth, 1990-2004

**Immigrants during the period as percentage of initial Employment, by Education Group**



### Figure 4
### Growth of Real Yearly Wages of US Natives: 1990-2004.

**Percentage Change of Real Yearly Wage by Education Group**



A152

# Appendix
## Table A1:
## Share of Foreign-Born Workers by Education and Experience

| Group | | Year | | | | | |
|-------|--|------|--|--|--|--|--|
| Education | Experience | 1960 | 1970 | 1980 | 1990 | 2000 | 2004 |
| **High School Dropouts** | 0 to 4 | 0.039 | 0.036 | 0.058 | 0.101 | 0.119 | 0.116 |
| | 5 to 9 | 0.061 | 0.060 | 0.138 | 0.264 | 0.375 | 0.354 |
| | 10 to 14 | 0.058 | 0.066 | 0.166 | 0.252 | 0.426 | 0.472 |
| | 15 to 19 | 0.056 | 0.072 | 0.143 | 0.262 | 0.416 | 0.493 |
| | 20 to 24 | 0.058 | 0.070 | 0.132 | 0.270 | 0.364 | 0.442 |
| | 25 to 29 | 0.055 | 0.061 | 0.124 | 0.222 | 0.363 | 0.377 |
| | 30 to 34 | 0.083 | 0.061 | 0.101 | 0.179 | 0.358 | 0.382 |
| | 34 to 40 | 0.122 | 0.058 | 0.086 | 0.161 | 0.281 | 0.345 |
| | **All Experience Levels** | **0.07** | **0.060** | **0.109** | **0.205** | **0.306** | **0.341** |
| **High School Graduates** | 0 to 4 | 0.019 | 0.025 | 0.032 | 0.057 | 0.095 | 0.107 |
| | 5 to 9 | 0.025 | 0.028 | 0.038 | 0.062 | 0.125 | 0.148 |
| | 10 to 14 | 0.028 | 0.033 | 0.046 | 0.057 | 0.118 | 0.167 |
| | 15 to 19 | 0.036 | 0.035 | 0.047 | 0.057 | 0.100 | 0.157 |
| | 20 to 24 | 0.035 | 0.037 | 0.051 | 0.062 | 0.085 | 0.119 |
| | 25 to 29 | 0.046 | 0.041 | 0.050 | 0.059 | 0.082 | 0.105 |
| | 30 to 34 | 0.065 | 0.040 | 0.051 | 0.060 | 0.081 | 0.097 |
| | 34 to 40 | 0.108 | 0.049 | 0.054 | 0.055 | 0.072 | 0.097 |
| | **All Experience Levels** | **0.038** | **0.034** | **0.044** | **0.059** | **0.095** | **0.124** |
| **College Dropouts** | 0 to 4 | 0.030 | 0.031 | 0.046 | 0.062 | 0.084 | 0.081 |
| | 5 to 9 | 0.042 | 0.047 | 0.051 | 0.071 | 0.097 | 0.104 |
| | 10 to 14 | 0.048 | 0.054 | 0.058 | 0.066 | 0.103 | 0.110 |
| | 15 to 19 | 0.055 | 0.058 | 0.065 | 0.063 | 0.095 | 0.117 |
| | 20 to 24 | 0.048 | 0.054 | 0.070 | 0.065 | 0.084 | 0.101 |
| | 25 to 29 | 0.052 | 0.058 | 0.065 | 0.070 | 0.076 | 0.087 |
| | 30 to 34 | 0.076 | 0.046 | 0.067 | 0.074 | 0.074 | 0.077 |
| | 34 to 40 | 0.099 | 0.057 | 0.067 | 0.072 | 0.077 | 0.076 |
| | **All Experience Levels** | **0.052** | **0.048** | **0.057** | **0.067** | **0.088** | **0.095** |
| **College Graduates** | 0 to 4 | 0.035 | 0.035 | 0.042 | 0.070 | 0.121 | 0.114 |
| | 5 to 9 | 0.045 | 0.064 | 0.062 | 0.090 | 0.143 | 0.173 |
| | 10 to 14 | 0.053 | 0.069 | 0.080 | 0.094 | 0.153 | 0.178 |
| | 15 to 19 | 0.056 | 0.060 | 0.097 | 0.087 | 0.138 | 0.160 |
| | 20 to 24 | 0.052 | 0.053 | 0.088 | 0.093 | 0.120 | 0.149 |
| | 25 to 29 | 0.064 | 0.058 | 0.073 | 0.107 | 0.105 | 0.126 |
| | 30 to 34 | 0.071 | 0.056 | 0.072 | 0.095 | 0.105 | 0.104 |
| | 34 to 40 | 0.088 | 0.070 | 0.072 | 0.088 | 0.125 | 0.122 |
| | **All Experience Levels** | **0.054** | **0.056** | **0.070** | **0.089** | **0.128** | **0.146** |

**Note:** Individuals included in calculations are those between 17 and 65 years, not living in group quarters who received non-zero income and worked at least one week during the previous year. Foreign-born are workers born outside of the US who are not citizens at birth. Sources: Authors' calculations on individual data from Census IPUMS and ACS from Ruggles, et al (2006).

51

**Table A2:**
**Weekly Wages of U.S. Natives in Constant 2000 U.S. $ by Education and Experience**

| Group | | Year | | | | | |
|---|---|---|---|---|---|---|---|
| Education | Experience | 1960 | 1970 | 1980 | 1990 | 2000 | 2004 |
| | 0 to 4 | 207 | 246 | 207 | 180 | 214 | 179 |
| | 5 to 9 | 324 | 384 | 370 | 358 | 406 | 357 |
| | 10 to 14 | 377 | 442 | 415 | 423 | 480 | 446 |
| **High School Dropouts** | 15 to 19 | 403 | 452 | 444 | 455 | 507 | 489 |
| | 20 to 24 | 401 | 468 | 471 | 476 | 554 | 548 |
| | 25 to 29 | 403 | 486 | 482 | 500 | 579 | 549 |
| | 30 to 34 | 399 | 470 | 494 | 522 | 594 | 599 |
| | 34 to 40 | 402 | 463 | 500 | 521 | 608 | 585 |
| | **All Experience Levels** | **374** | **431** | **495** | **402** | **424** | **400** |
| | 0 to 4 | 307 | 355 | 334 | 313 | 350 | 325 |
| | 5 to 9 | 404 | 476 | 439 | 437 | 485 | 457 |
| | 10 to 14 | 454 | 526 | 487 | 504 | 553 | 567 |
| **High School Graduates** | 15 to 19 | 472 | 538 | 526 | 537 | 606 | 631 |
| | 20 to 24 | 484 | 546 | 544 | 559 | 642 | 645 |
| | 25 to 29 | 486 | 551 | 552 | 596 | 658 | 658 |
| | 30 to 34 | 485 | 565 | 560 | 606 | 665 | 681 |
| | 34 to 40 | 476 | 556 | 558 | 587 | 681 | 673 |
| | **All Experience Levels** | **463** | **501** | **478** | **507** | **579** | **576** |
| | 0 to 4 | 354 | 402 | 365 | 359 | 388 | 374 |
| | 5 to 9 | 473 | 565 | 495 | 522 | 571 | 570 |
| | 10 to 14 | 543 | 639 | 573 | 604 | 665 | 686 |
| **College Dropouts** | 15 to 19 | 574 | 672 | 631 | 656 | 731 | 755 |
| | 20 to 24 | 583 | 694 | 649 | 708 | 775 | 794 |
| | 25 to 29 | 573 | 706 | 660 | 749 | 805 | 846 |
| | 30 to 34 | 567 | 715 | 670 | 757 | 836 | 820 |
| | 34 to 40 | 572 | 669 | 666 | 731 | 855 | 832 |
| | **All Experience Levels** | **516** | **593** | **537** | **600** | **685** | **693** |
| | 0 to 4 | 469 | 573 | 477 | 569 | 658 | 645 |
| | 5 to 9 | 611 | 763 | 639 | 786 | 904 | 976 |
| | 10 to 14 | 728 | 908 | 798 | 932 | 1155 | 1230 |
| **College Graduates** | 15 to 19 | 779 | 983 | 906 | 1024 | 1287 | 1349 |
| | 20 to 24 | 776 | 1036 | 964 | 1147 | 1318 | 1357 |
| | 25 to 29 | 779 | 1038 | 992 | 1203 | 1340 | 1365 |
| | 30 to 34 | 789 | 996 | 997 | 1213 | 1430 | 1347 |
| | 34 to 40 | 782 | 950 | 953 | 1178 | 1413 | 1336 |
| | **All Experience Levels** | **693** | **863** | **761** | **950** | **1170** | **1201** |

**Note:** Individuals included in calculations are those between 17 and 65 years, not living in group quarters, which received non-zero income and worked at least one week during the previous year. Wages are in real US Dollars calculated using the CPI deflator with 2000 as base year. Natives are workers born within the US or who are US citizens at birth. Sources: Authors' calculations on individual data from Census IPUMS and ACS from Ruggles, et al (2006).

**Table A3:**
**Relative Weekly Wages Foreign-Born/ US-Born Workers by Education and Experience**

| Group | | Year | | | | | |
|---|---|---|---|---|---|---|---|
| Education | Experience | 1960 | 1970 | 1980 | 1990 | 2000 | 2004 |
| | 0 to 4 | 1.172 | 1.147 | 1.304 | 1.463 | 1.756 | 1.442 |
| | 5 to 9 | 0.969 | 1.003 | 0.956 | 0.984 | 1.082 | 1.624 |
| | 10 to 14 | 0.969 | 1.030 | 0.942 | 0.904 | 1.062 | 1.031 |
| **High School** | 15 to 19 | 0.987 | 1.024 | 0.954 | 0.937 | 0.936 | 0.980 |
| **Dropouts** | 20 to 24 | 1.009 | 0.996 | 0.959 | 0.991 | 0.947 | 0.874 |
| | 25 to 29 | 1.008 | 0.966 | 0.925 | 0.868 | 1.038 | 0.859 |
| | 30 to 34 | 1.055 | 1.046 | 0.892 | 0.933 | 0.935 | 1.027 |
| | 34 to 40 | 1.075 | 1.007 | 0.882 | 0.909 | 0.859 | 0.921 |
| | **All Experience Levels** | 1.030 | 1.027 | 0.977 | 0.999 | 1.077 | 1.095 |
| | 0 to 4 | 0.936 | 1.046 | 1.008 | 1.000 | 1.070 | 1.056 |
| | 5 to 9 | 0.948 | 0.977 | 0.918 | 0.988 | 0.961 | 0.970 |
| | 10 to 14 | 0.885 | 0.963 | 0.961 | 1.030 | 1.004 | 0.909 |
| **High School** | 15 to 19 | 0.984 | 1.011 | 0.962 | 1.037 | 1.057 | 0.938 |
| **Graduates** | 20 to 24 | 1.032 | 0.971 | 0.947 | 1.027 | 0.949 | 0.986 |
| | 25 to 29 | 1.063 | 0.965 | 0.962 | 0.982 | 0.988 | 0.905 |
| | 30 to 34 | 1.043 | 1.058 | 0.902 | 0.930 | 0.936 | 0.953 |
| | 34 to 40 | 1.060 | 1.022 | 0.961 | 0.976 | 0.980 | 1.142 |
| | **All Experience Levels** | 0.994 | 1.002 | 0.953 | 0.996 | 0.993 | 0.982 |
| | 0 to 4 | 0.963 | 0.985 | 0.948 | 1.114 | 0.997 | 0.964 |
| | 5 to 9 | 0.920 | 0.966 | 0.955 | 1.013 | 1.053 | 1.142 |
| | 10 to 14 | 0.915 | 1.002 | 0.976 | 0.980 | 0.969 | 0.931 |
| **College** | 15 to 19 | 0.976 | 0.928 | 0.962 | 1.017 | 0.986 | 0.982 |
| **Dropouts** | 20 to 24 | 1.054 | 0.950 | 0.950 | 1.018 | 1.023 | 1.105 |
| | 25 to 29 | 1.011 | 0.919 | 0.954 | 0.952 | 0.967 | 0.915 |
| | 30 to 34 | 1.059 | 1.034 | 0.910 | 0.980 | 0.978 | 1.042 |
| | 34 to 40 | 1.005 | 1.053 | 0.953 | 1.026 | 0.959 | 0.967 |
| | **All Experience Levels** | 0.988 | 0.980 | 0.951 | 1.012 | 0.992 | 1.006 |
| | 0 to 4 | 0.959 | 0.984 | 0.995 | 1.011 | 1.163 | 1.141 |
| | 5 to 9 | 0.929 | 0.917 | 0.959 | 0.934 | 1.120 | 1.002 |
| | 10 to 14 | 0.927 | 0.909 | 0.977 | 1.006 | 1.017 | 1.020 |
| **College** | 15 to 19 | 0.946 | 0.966 | 1.005 | 1.047 | 0.945 | 0.967 |
| **Graduates** | 20 to 24 | 0.980 | 0.991 | 0.956 | 1.014 | 0.946 | 0.905 |
| | 25 to 29 | 0.994 | 0.941 | 0.989 | 1.083 | 1.049 | 0.951 |
| | 30 to 34 | 1.021 | 1.011 | 0.933 | 0.996 | 0.973 | 0.965 |
| | 34 to 40 | 0.976 | 1.008 | 0.899 | 1.017 | 0.918 | 0.905 |
| | **All Experience Levels** | 0.966 | 0.966 | 0.964 | 1.013 | 1.016 | 0.982 |

**Note:** Individuals included in calculations are those between 17 and 65 years, not living in group quarters, which received non-zero income and worked at least one week during the previous year. The entries are equal to the ratio of foreign-born to native weekly wages. Natives are workers born within the US or who are US citizens at birth. Foreign-born are workers born outside the US and who are not citizens at birth. Sources: Authors' calculations on individual data from Census IPUMS and ACS from Ruggles, et al (2006).

53

A155

IMMIGRATION POLICY CENTER
AMERICAN IMMIGRATION COUNCIL

Perspectives



# Allies, Not Enemies

## How Latino Immigration Boosts African American Employment and Wages

by Jack Strauss

June 2013

# ALLIES, NOT ENEMIES:

# HOW LATINO IMMIGRATION BOOSTS AFRICAN

# AMERICAN EMPLOYMENT AND WAGES

### JUNE 2013

### BY JACK STRAUSS

**ABOUT PERSPECTIVES ON IMMIGRATION**

The Immigration Policy Center's *Perspectives* are narratives written by leading academics, researchers, and advocates who bring a wide range of multi-disciplinary knowledge to the issue of immigration policy.

**ABOUT THE AUTHOR**

Professor Jack Strauss is the Simon Chair of Economics at Saint Louis University and Director of the Simon Center for Regional Forecasting. He is currently an adviser to the St. Louis Steering Committee on Immigration. The taskforce, backed by both Mayor Slay and County Executive Dooley, is exploring avenues to promote a more proactive and friendly immigration policy in the St. Louis region. Dr. Strauss was the keynote speaker at the conference that kick-started the immigration taskforce, and his paper has shown that immigration can produce significant positive economic effects to the St. Louis region. He is the author of more than three dozen refereed articles in economics in top journals.

**ABOUT THE IMMIGRATION POLICY CENTER**

The Immigration Policy Center, established in 2003, is the policy arm of the American Immigration Council. IPC's mission is to shape a rational conversation on immigration and immigrant integration. Through its research and analysis, IPC provides policymakers, the media, and the general public with accurate information about the role of immigrants and immigration policy on U.S. society. IPC reports and materials are widely disseminated and relied upon by press and policymakers. IPC staff regularly serves as experts to leaders on Capitol Hill, opinion-makers, and the media. IPC is a non-partisan organization that neither supports nor opposes any political party or candidate for office. Visit our website at www.immigrationpolicy.org and our blog at www.immigrationimpact.com.

A comprehensive analysis of Census data from hundreds of U.S. metropolitan areas indicate that immigration from Latin America improves wages and job opportunities for African Americans.[1] This analysis serves to dispel the common myth that African Americans are negatively impacted by the immigration of less-skilled workers from Mexico and elsewhere in Latin America. It is often assumed that Latino immigrants and African Americans are locked in ruinous competition for the same jobs, resulting in lower wages and higher unemployment rates for African Americans. In fact, Latino immigrants and African Americans fill complementary roles in the labor market—they are not simply substitutes for one another. In addition, cities which have suffered the effects of declining population are rejuvenated by an inflow of Latino immigrants who increase the labor force, tax base, consumer base, etc. To the extent that there really is a "black-brown" divide, it is rooted in politics and perception—not economics.

## The Economic Impact of Latino Immigration on African Americans

Our analysis uses a cross-section of 907 Metropolitan Statistical Areas (MSAs) in 2010, and 455 Metros in 2005, making it the largest economic examination of immigration's effect on African Americans in terms of wages and employment.[2] The statistical tests carefully control for simultaneity (cause and effect). The evidence shows that cities with greater immigration from Latin America experience:

1. Higher wages for African Americans. For every 1% increase in a city's share of Latinos, African median and mean wages increase by 3%. This relationship is large. Consider St. Louis, which has 1.5% of its population from Latin America. If St. Louis were to have a Latino population share as large as other large metropolitan areas, African American wages would be approximately 30% higher.[3]

2. Lower shares of African Americans in poverty (less than $20,000) and greater shares of African Americans who are well-off (incomes exceeding $60,000). For every 1% increase in a city's share of Latinos, the city experiences a 1.6% increase in relatively well-off African Americans and fall in poor African Americans.[4]

3. Less poverty across different African American age groups. A 1% increase in a city's young (ages 18-24), middle aged (25-34) and more mature Latinos (35-64) yields approximately 1.1-2.3% fewer African Americans in poverty in the same age cohorts. At the same time, more young, middle-aged, and older Latinos lead to more African Americans of similar cohorts with incomes exceeding $60,000.

4. Lower African American unemployment. This finding is significant at the 99% level across different age cohorts. For instance, cities with a 1% increase in Latinos ages 20-24 leads to a .26% decrease in unemployment rates among African Americans ages 20-24; a

rise in Latinos ages 25-34 implies even greater declines in African Americans unemployment with ages 25-34.

5. More jobs among all African American age cohorts. A 1% rise in Latino immigration contributes to a 1.4% increase in employment rates among African Americans, and increases in young Latinos (20-24) contribute to 0.5% increase in employment among young African Americans.

The positive economic impact of Latino immigration is related to population. Many metros, particularly in the Midwest, including Cleveland, Dayton, Detroit, and St. Louis, are not experiencing vibrant population growth.[5] Instead, aging baby boomers and negative net migration are leading to a hallowing out of cities, declining school revenue, falling housing prices, big businesses moving their headquarters, and a dearth of small businesses. St. Louis, for instance, has experienced a sharply declining population, and at the same time, very little Latino immigration. As a result, Saint Louis has closed more than a dozen schools in recent years, which has cost the jobs of hundreds of African American teachers, administrators, and staff. Our research shows that an increase in immigration from Latin America would have sustained St. Louis's population, tax base, school enrollment, and most of the lost African American jobs. Further, it would have reduced crime among young African American men by giving them more economic opportunities.

Why are population size and composition so important for economic development? Edward Glaeser and Joshua Gottlieb argue that larger cities are successful because they have thriving clusters of people and companies working together.[6] More people from Latin America increases the vibrancy of a city, its culture, and the opportunities it offers. Further, research shows that specialization by encouraging different skill patterns leads to higher wages and more jobs.[7] After all, as Adam Smith and David Ricardo pointed out long ago, specialization and comparative advantage improve economic efficiency. *The Economist* likens immigration to international trade which "benefits countries by letting workers specialize in activities in which they are relatively more productive, raising output. And the larger market created by trade spreads the fixed costs of innovation more thinly, encouraging the development of new goods and ideas."[8] From this perspective, Latinos are not substitutes for, but complements to, African American workers—and an essential component of competition and capitalism.

## Deficiencies in the Existing Literature

The impact of Latino immigration on the African American labor market is a critical but scarcely addressed topic in the economic literature. The examination of the economic consequences of immigration, particularly from Latin America—and explicitly on African Americans—is rooted not in economic analysis, but in the popular perception that both ethnic groups tend to have large numbers of low-skilled workers who possess similar education and demographic profiles, live predominantly in urban areas, and sometimes compete directly for the same jobs. There is also a prevailing view that immigrants, including Latinos, are willing to work for less, and

therefore have taken jobs away from African Americans. As a result, widely reported tensions between African Americans and Latinos have emerged, and been extensively covered by policy institutes, political science and sociology journals, as well as the popular press.[9] Although these strains are widely perceived as economic in nature, they have paradoxically received no recent attention in the economic literature.

What are the effects of increases in Latino immigration on African American wages, employment, and unemployment? A number of recent studies have begun to document, in rising levels of detail, the tension that has emerged between immigrant groups and lower-skilled American natives, a high proportion of whom are African American.[10] The studies attribute these tensions to "economic competition among ethnic groups."[11] Claudine Gay focuses specifically on African American and Latino economic rivalry: "the trend is disturbing: anti-Latino sentiment among the black mass public may undermine elite efforts to build black-Latino alliances, putting at risk the group's future political and economic status...most accounts of the conflict identify the competition over scarce resources as a central force in Black-immigrant relations."[12] According to Leticia Saucedo: "Much has been written about the tensions between African Americans and immigrants, especially Latino immigrants. For civil rights advocates and African-American communities, the issue of immigration brings with it concerns about the impact of immigration on African Americans, who are concentrated in the domestic low-wage work force and are often said to face the greatest competition from modern migrant flows into the United States."[13]

Although a perceived "brown versus black" conflict may exist, it is not based on economics. Rather, it stems from political competition for representation and, at times, misinformation. Claudia Sandoval surveys the recent literature on interethnic competition and discusses how Latinos and African Americans compete for social status and political power.[14] The rapid rise of Latinos carries with it the implication that they do not need African Americans for political support, which might lead to an erosion of African American political power.

## Conclusion

This paper provides extensive evidence that African Americans in MSAs with more Latino immigration experience significantly higher wages, lower unemployment, and higher job creation. The effect is typically very significant and robust across different age groups and income levels. Cities experiencing Latino immigration have fewer African Americans in poverty and more with higher incomes. Statistical tests that control for simultaneity and causality further show that Latino immigration leads to/or causes improved African American economic outcomes.

## *Comments on Methodology*

A central problem with many studies of immigration is the failure to determine causality. Cities where an economic boom is occurring may simultaneously attract immigrants, who are drawn to the jobs there, but who do not create them. In this case, increases in immigration will be related to higher wages and job creation, but not contribute to or cause these improving economic outcomes. To mitigate this "simultaneity," this study adopts a method called GMM (Generalized Methods of Moments), uses demographic/educational control variables identified by the literature, controls for domestic migration of native-born Americans from other states, and uses Granger Causality tests. If the simultaneity issue is relevant (and a driving factor generating spurious significance), a significant relationship should occur between domestic migration and improving economic outcomes, as well as between native and foreign-born migration patterns, since both should respond similarly to economic incentives. However, this is not the case.

The statistical evidence documents that there is little relationship between native and foreign-born migration (including migration of Latinos), that domestic migration is not substantially correlated to economic activity, and that Latino immigration and African American economic activity are significantly, positively related. Further, controlling for native-born migration does not affect the results since there is no relationship between native-born and foreign-born inflows to a city. Overall then, there is significant evidence against the booming cities hypothesis. The evidence instead shows that increases in foreign-born workers from Latin America, not increases in native-born workers from other states, lead to significantly higher African American wages, wage growth, and job growth. Granger Causality results reveal that increases in Latino immigration result in higher wages and more jobs for African Americans, and lower rates of African American unemployment and incarceration. Improved economic outcomes in the African American community have no significant impact on Latino immigration. Therefore, one-way causation exists from Latino immigration to improved African American opportunities. Lastly, the results are robust across different sample sizes, different years, and different specifications, including immigration shares of the population and changes in these shares. Overall, there is significant evidence that Latinos contribute to an economic boom in a city, and are not simply innocent or lucky bystanders.

## Endnotes

[1] Jack Strauss, *Does Immigration, Particularly Increases in Latinos, Affect African American Wages, Unemployment and Incarceration Rates?* (Social Science Research Network, December 8, 2012).

[2] More complete results with detailed tables and methodology can be found in Jack Strauss, *Does Immigration, Particularly Increases in Latinos, Affect African American Wages, Unemployment and Incarceration Rates?* (Social Science Research Network, December 8, 2012).

[3] The response is significant at the 99.9% level.

[4] The response is significant at the 99.9% level.

[5] At the same time, cities in the South with both large Hispanic and African American communities including Charlotte, Dallas, Houston and Memphis are experiencing faster economic growth and lower unemployment among all its residents; further, African American unemployment in the North Central and Midwest Regions average more than 25% higher than the Southwest and Southeast Regions, which have considerably more Latino immigration.  Latinos are not replacing African American workers.

[6] Edward Glaeser and Joshua Gottlieb, "The Wealth of Cities: Agglomeration Economies and Spatial Equilibrium in the United States," *Journal of Economic Literature* 47, no. 4 (2009): 983–1028.

[7] David Card and John Dinardo, "Do Immigrant Inflows Lead to Native Outflows?" *American Economic Review* 90, no. 2 (May 2000): 360-367; David Card, "Immigrant Inflows, Native Outflows, and the Local Labor Market Impacts of Higher Immigration," *Journal of Labor Economics* 19, no. 1 (2001): 22–64; David Card, *How Immigration Affects U.S. Cities* (London: University College London, Centre for Research and Analysis of Migration, Discussion Paper 11/07, June 2007); David Card and Ethan G. Lewis, *The Diffusion of Mexican Immigrants in the 1990s: Patterns and Impacts* (Berkeley: UC Berkeley Center for Labor Economics Working Paper, February 2005); Maude Toussaint-Comeau, "The Occupational Assimilation of Hispanic Immigrants: Evidence from Panel Data," *International Migration Review* 40, no. 6  (2006); Heidi Shierholz, *Immigration and Wages: Methodological Advancements Confirm Modest Gains for Native Workers* (Washington, DC: Economic Policy Institute, 2010).

[8] "Giant Low-Hanging Fruit," *The Economist*, November 15, 2012.

[9] Leticia Sancedo, "African American Immigrant Tension: Myths, Realities and Political Implications," *Berkeley Law Review* (2008).

[10] Paula D. McClain, et al., "Racial Distancing in a Southern City: Latino Immigrants' Views of Black Americans," *Journal of Politics* 68, no. 3 (July 2006): 571-584; Clare Jean Kim, *Bitter Fruit: The Politics of Black-Korean Conflict in New York City* (New Haven: Yale University Press, 2000); Nicolas C. Vaca, *The Presumed Alliance: The Unspoken Conflict Between Latinos and Blacks and What it Means for America* (New York: HarperCollins, 2004); Charles Hirschman, Philip Kasinitz, and Josh DeWind, eds., *The Handbook of International Migration: The American Experience* (New York: Russell Sage Foundation, 1999).

[11] See Edna Bonacich, "A Theory of Ethnic Antagonism: The Split Labor Market," *American Sociological Review* 37 (1972): 547-559; Edna Bonacich, "Advanced Capitalism and Black/White Race Relations in the United States: A Split Labor Market Interpretation," *American Sociological Review* 41 (1976): 34-51; Scott Cummings, "Racial Prejudice and Political Orientations among Blue-collar Workers," *Social Science Quarterly* 57 (1977): 907-920; Scott Cummings, "White Ethnics, Racial Prejudice and Labor Market Segmentation," *American Journal of Sociology* 90 (1980): 938-950; Scott Cummings and Thomas Lambert, "Anti-Hispanic and Anti-Asian Sentiments among African-Americans," *Social Science Quarterly* 78, no. 2 (1997): 338-353; H. Donald Forbes, *Ethnic Conflict: Commerce, Culture and the Contact Hypothesis* (New Haven: Yale University Press, 1997); Susan Olzak, *The Dynamics of Ethnic Competition and Conflict* (Palo Alto: Stanford University Press, 1992).

[12] Claudine Gay, "Seeing Difference: The Effect of Economic Disparity on Black Attitudes toward Latinos," *American Journal of Political Science* 50, no. 4 (2006): 982-997.

[13] Leticia Sancedo, "African American Immigrant Tension: Myths, Realities and Political Implications," *Berkeley Law Review* (2008).

[14] Claudia Sandoval, "Allies or Aliens? Black-Latino Relations and Perceptions of Political Membership in the U.S." (Chicago: University of Chicago, Center for the Study of Race, Politics and Culture, Workshop Paper, Fall 2010).



# OPEN FOR BUSINESS

### HOW IMMIGRANTS ARE DRIVING
### SMALL BUSINESS CREATION IN THE UNITED STATES

**A REPORT BY
THE PARTNERSHIP FOR A NEW AMERICAN ECONOMY**

— AUGUST 2012 —



The Partnership for a New American Economy brings together more than 450 Republican, Democratic, and Independent mayors and business leaders who support immigration reforms that will help create jobs for Americans today. The Partnership's members include mayors of more than 35 million people nationwide and business leaders of companies that generate more than $1.5 trillion and employ more than 4 million people across all sectors of the economy, from Agriculture to Aerospace, Hospitality to High Tech, and Media to Manufacturing. Partnership members understand that immigration is essential to maintaining the productive, diverse, and flexible workforce that America needs to ensure prosperity over the coming generations.

Learn more at: www.renewoureconomy.org

**REPORT AUTHORED BY ROBERT W. FAIRLIE**
Professor of Economics
University of California, Santa Cruz

# OPEN FOR BUSINESS

**HOW IMMIGRANTS ARE DRIVING SMALL BUSINESS CREATION IN THE UNITED STATES**

**Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

1   **Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

2   **Immigrant Entrepreneurs Start Businesses at Growing Rates
    While Native-Born Entrepreneurship Falters** . . . . . . . . . . . . . . . . . . . . .6

3   **Immigrant-Owned Firms Drive the U.S. Export Economy** . . . . . . . . . . .10

4   **Immigrant-Owned Businesses Generate Substantial Business Income and Revenue** . . . . . . . . . . .12

5   **Immigrant-Owned Businesses Create Millions of Jobs
    and Pay Out Billions of Dollars in Employee Salaries** . . . . . . . . . . . . .14

6   **Immigrant-Owned Businesses Power Many Sectors of the American Economy** . . . . . . . . . . . .16

7   **Immigrants Punch Above Their Weight in States Across the Country** . . . . . . . . . .20

8   **Immigrant Entrepreneurs in the United States Come from Around the World** . . . . . . . . .22

9   **Immigrants of All Education Levels Are Contributing to Business Creation and Growth** . . . . . . . . .24

**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

**Appendices** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

**References** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

# EXECUTIVE SUMMARY

**THE AXIOM THAT SMALL BUSINESSES DRIVE JOB GROWTH IS NOT QUITE CORRECT. IT IS YOUNG BUSINESSES THAT DRIVE JOB GROWTH.**

Businesses under five years old are responsible for all net job creation over the past three decades in America.[1] Unfortunately, the rate of new-business generation is declining: In 2010, it reached the lowest rate in the 30-year history of recorded data.[2] So as America attempts to grow its way out of the recession and create more jobs for American workers, new-business generation should be one of, if not the, primary focus of our economic strategy.

This report examines and assesses a critical driver of new business creation in America: entrepreneurial immigrants. Leaving one's home and immigrating to a new country to start a new life is itself an entrepreneurial act, so it is perhaps unsurprising that immigrants are disproportionately entrepreneurial.

Previous research has shown how greatly we depend on immigrant entrepreneurs. The Partnership for a New American Economy found that immigrants or their children founded more than 40 percent of America's Fortune 500 companies, and the Fiscal Policy Institute recently reported that immigrants now own more than 18 percent of all incorporated businesses in the United States.

This report shows that the prevalence of immigrant entrepreneurs and their importance to the U.S. economy are only growing. Over the last 15 years, while native-born Americans have become less likely to start a business, immigrants have steadily picked up the slack. Immigrants are now more than twice as likely as the native-born to start a business and were responsible for more than one in every four (28 percent) U.S. businesses founded in 2011, significantly outpacing their share of the population (12.9 percent).

Relying on the American Community Survey, the Current Population Survey, and the Survey of Business Owners, this report analyzes the expanding role that immigrant entrepreneurs play in our economy. While their businesses tend to be smaller than those started by their native-born counterparts, collectively immigrant businesses are having an enormous impact on the U.S. economy. Immigrant-owned businesses now employ one out of every ten U.S. workers at privately owned-companies and add more than $775 billion dollars of revenue to the U.S. gross domestic product.

From new laundromats in the neighborhood to new listings on NASDAQ, immigrants are making their mark – playing an ever-increasing role in starting new businesses, creating jobs, increasing exports, and growing the economy. Even more remarkable, immigrant entrepreneurship is increasing at a time when the economy has lagged. As the country looks for ways to generate economic growth and new jobs, any serious discussion must include the growing impact of immigrants as drivers of new-business creation.

# KEY FINDINGS

**Immigrants are increasingly likely to start a business, while the rate of new-business generation among the native-born is declining:** The rate at which immigrants start new businesses grew by more than 50 percent between 1996 and 2011. During the same period, the business-formation rate for the native-born declined by 10 percent.

**Immigrants are more than twice as likely to start a business as the native-born.** In 2011, the immigrant business-formation rate was 550 new businesses per month for every 100,000 immigrants, while the native-born rate was only 270 new businesses per month for every 100,000 native-born.

**Immigrants started 28 percent of all new U.S. businesses in 2011, despite accounting for just 12.9 percent of the U.S. population.** Just a decade and a half earlier, in 1996, only 15 percent of new U.S. businesses were founded by immigrants.

**Immigrant businesses are smaller than those started by the native-born, but their collective impact on the U.S. economy is huge and growing.** Over the last decade the income generated by native-owned businesses increased just 14 percent and failed to keep pace with inflation. Income from immigrant-owned businesses, meanwhile, increased by more than 60 percent. Immigrant-owned firms now generate more than $775 billion in revenue, $125 billion in payroll, and $100 billion in income, employing one out of every 10 workers along the way.

**Immigrants start more than 25 percent of all businesses in seven of eight sectors of the economy that the U.S. government expects to grow the fastest over the next decade.** From 2007 to 2011, immigrants founded an outsized share of new businesses in health care and social assistance (28.7 percent),  professional and business services (25.4 percent), construction (31.8 percent), retail trade (29.1 percent), leisure and hospitality (23.9 percent), educational services (28.7 percent), "other services" (28.2 percent), and transportation and utilities (29.4 percent).



## INTRODUCTION

Alex Torrenegra saw a computer for the first time at his grandfather's office in Bogota, Colombia when he was 4 years old, and he knew immediately that he needed to have one. Computers were not prevalent in Colombia at the time, so it took Alex until he was 14 years old to obtain one. But it didn't take him long to figure out how to use it. The same year he got a computer he founded his first computer business to offer IT solutions to small and mid-sized Colombian companies. By the time he was 19 he already had 20 employees working for him.

Alex left Colombia with his family in 1998 for security reasons and came to the United States, where he found not only safety, but also a ripe environment to put his entrepreneurial savvy to work. The first computer company he founded in the United States hired six employees in its first year. That success inspired Alex to become a serial entrepreneur founding roughly a dozen companies that together transact about $35 million each year.

Alex's latest venture, VoiceBunny.com, uses patented technology to connect voiceover artists with companies that need them. VoiceBunny already employs 11 people in the United States, has a pool of over 100,000 voiceover artists using the site, and has clients that include the movie giant Pixar. The company even engages in what is effectively reverse-outsourcing, since many of its clients are overseas companies that hire American voiceover artists to promote their products.[3]

Alex's story is repeated throughout the economy every day. From Vietnamese immigrant Nancy Nguyen's burgeoning Sweet T Salon in Raleigh, North Carolina to the empire that Belgian immigrant Liz Claiborne launched with her eponymous fashion line, more than four thousand immigrants start new businesses in America every day.[4] Their path to come here is often fraught with legal, economic, and social obstacles, but the entrepreneurial opportunities that await them in America are enough to draw many of the most creative, risk-taking individuals in the world. As the findings of this report demonstrate, millions of Americans have their jobs today because of businesses founded by immigrants, and more than $100 billion dollars in income is generated each year by immigrant-owned businesses.

## THE START-UP RATE OF IMMIGRANTS HAS GROWN BY 50% WHEREAS THE RATE OF U.S.-NATIVES DECLINED 10%

CURRENT POPULATION SURVEY (1996-2011)



Past research has shown that immigrants play an enormous role in founding American businesses, including a recent study by the Fiscal Policy Institute that found that immigrants own 18 percent of incorporated businesses.[5] As this report explains, U.S. dependence on immigrant entrepreneurs is only increasing, while native-born entrepreneurialism has faltered. As the U.S. attempts to grow its way out of the recession, new-business creation by native-born Americans has hit a 30-year low. But immigrant entrepreneurs are filling the gap and starting more businesses, creating more jobs, and bringing more revenue to the economy, facts that should be critical to policymakers looking for viable ways to promote economic recovery.

To quantify the rise of immigrant entrepreneurship, this report relies on three nationally representative datasets – the 2006-2010 American Community Survey (ACS), the 2007-2011 Current Population Survey (CPS), and the 2007 Survey of Business Owners (SBO). These datasets allow for analysis of the role that immigrants and the native-born have in starting businesses, generating business revenue and income, employing workers, and growing our export economy.[6] And to better understand who the new immigrant entrepreneurs are and in what regions and industries they are having the most impact, the report also examines where immigrant business owners come from, what sectors of the economy they contribute to most, and which states are the most impacted by their contributions.

The findings demonstrate that immigrant entrepreneurs like Alex Torrenegra are playing a large and increasing role in creating American jobs, exporting goods, and driving the U.S. economy.



## IMMIGRANT ENTREPRENEURS START BUSINESSES AT GROWING RATES WHILE NATIVE-BORN ENTREPRENEURSHIP FALTERS

Young businesses are essential to job creation. After reviewing 30 years of Census Bureau business data, the Kauffman Foundation found that startups create an average of 3 million new jobs in their first year, and that without them, "there would be no net job growth in the U.S. economy."[7] Reforms to encourage startup activity are central to the job growth strategies of both Republican and Democratic leaders. A recent example is the Jumpstart Our Business Startups (JOBS) Act, a bill to make it easier to finance new startups that was introduced by House Republicans and signed into law by President Obama in April of 2012, out of a belief that "small businesses and startups are driving the recovery and job creation."[8]

Unfortunately, the rate of new startups in the U.S. has fallen dramatically since 2006, and in 2010 reached the lowest rate in 30 years of recorded data.[9] But even as the overall startup rate declines, immigrant entrepreneurs are playing an increasingly important role in new-business creation across the United States, and many are stepping up to fill that role at a crucial time for our economy.

### KEY FINDINGS

The business startup rate of immigrants has increased by more than 50 percent since 1996, while the business startup rate of the native-born has decreased by 10 percent over the same time period.

28 percent of all new small businesses started in the United States in 2011 were founded by immigrants.

Immigrants are now more than twice as likely to start a business as their native-born counterparts.

**28%** OF U.S. SMALL BUSINESSES STARTED IN 2011
WERE FOUNDED BY IMMIGRANTS
CURRENT POPULATION SURVEY (1996-2011)



U.S. Census data makes clear that we are increasingly relying on immigrant entrepreneurs to drive new business growth in America. Twenty-eight percent of all new businesses started in the United States in 2011 had immigrant founders. Not only does this number far outpace the immigrant share of the U.S. population (12.9 percent) and the U.S. workforce (16.3 percent), but it also represents a substantial jump over the role immigrant entrepreneurs played in the U.S. just 15 years earlier. In 1996 immigrant entrepreneurs started 15 percent of all new businesses in America, which exceeded their share of the population at the time (roughly 9 percent[10]). While some of the growth experienced from 1996 to 2011 was the result of immigrants' increasing share of the workforce and population, most of the growth was due to the fact that immigrants are becoming increasingly entrepreneurial. In 1996 the business-formation rate for immigrants was 360 businesses started per month for every 100,000 immigrants. By 2011 this number had jumped to 550 businesses per month for every 100,000 immigrants, an increase of more than 50 percent.

An increase in the business-formation rate of immigrants could not have come at a better time, considering that the native-born population became less likely to start a business over the 15-year period from 1996 to 2011. The native-born business formation rate declined 10 percent during that period, dropping from 300 new businesses per month per 100,000 native-born to just 270 new businesses monthly. So while immigrants were 20 percent more likely to start a business in 1996, their increasing business-formation rate and the declining native-born business-formation rate meant that by 2011, immigrants were more than twice as likely to start a business as the native-born.

# ROHIT ARORA

## HELPING MORE ENTREPRENEURS
## ACHIEVE THE AMERICAN DREAM

Rohit Arora, an immigrant entrepreneur from India, noticed something surprising in the mid-2000s, when he was working at Deloitte Consulting in New York City: Despite small businesses being among banking institutions' most profitable loan clients, many entrepreneurs and small business owners from South Asia and India seemed to be having trouble securing bank loans—even though such entrepreneurs boasted low default rates. In some less desirable neighborhoods, the problem was particularly acute, inhibiting the success of local businesses like gas stations, grocery stores, and medical practices. "Like any global entrepreneur," Arora says, "I wanted to do something that would have a big impact." So in 2007, Arora and his brother Ramit, who had long dreamed of founding a business together, started Biz2Credit, a New York City-based firm that helps match small business owners with banking loans, credit reports, and other financial products.

Much like Arora imagined, his company is already dramatically changing the way many immigrant entrepreneurs access bank loans. Biz2Credit's online platform lets small business owners—both immigrants and non-immigrants — upload information online that can be viewed by the company's nationwide network of more than 1,000 financial institutions. Monthly subscribers are also able to tap into additional benefits like financial advice or in-person meetings with Biz2Credit's loan specialists.

Arora says that by connecting small businesses with the capital they need to expand, Biz2Credit has contributed to the creation of more than 11,000 new jobs since its founding in 2007. The firm is on target this year to facilitate $600 million in new business loans, up from $200 million just two years ago. "The work," Arora says, "is incredibly fulfilling."

The company has also created its own jobs. Biz2Credit currently employs about 25 people in the United States, many of them highly experienced loan specialists, and the business continues to expand. Arora, a native of Delhi, says he's proud of what he has built in the United States, a country he moved to in 2003 to pursue an MBA degree at Columbia University. But he frequently meets would-be immigrant entrepreneurs, however, who head home after being unable to secure visas. "Our business has created real opportunities for people in America," Arora says, "but many entrepreneurs never have that chance."[11]

These two factors – the increase in entrepreneurialism of immigrants combined with the decrease in entrepreneurialism of the native-born – resulted in immigrants owning a growing share of all businesses in America. In the year 2000, when immigrants accounted for 11.1 percent of the U.S. population, they owned 12 percent of all U.S. businesses, roughly equal to their share of the population. But by 2010, when the immigrant share of the U.S. population had risen to 12.9 percent, their share of business ownership greatly exceeded it, and they left the decade owning a full 20 percent of all U.S. businesses.



# IMMIGRANT-OWNED FIRMS
# DRIVE THE U.S. EXPORT ECONOMY

Perhaps the part of the economy benefitting most from the increased prominence of immigrant-started U.S. businesses has been U.S. exports. Over the past three decades, exports as a percentage of GDP have increased by 20 percent, growing from 10.1 percent to 12.6 percent of GDP,[12] and the value of U.S. exports has increased by 60 percent in the last decade alone.[13]

This is important because, as think tanks like the CATO Institute have argued, exports are a good proxy for the state of our economy and job growth.[14] When exports increase, so do economic output and job creation. When they decrease, our economy tends to shrink and we tend to shed jobs. In 22 of the 25 years from 1983 to 2007, GDP, trade, and job creation all increased together or decreased together.[15] Increasing exports helps alleviate the large U.S. trade imbalance with the rest of the world and, more importantly, helps create U.S. jobs. By 2008, there were more than 10 million jobs in the United States supported by exports.[16] And these exports are driving the recent, limited growth of the U.S. economy. While exports account for only about one-eighth of the nation's economy, they have accounted for about half of the nation's economic growth in recent years.[17]

Worryingly, exports have declined in recent years. According to the Bureau of Labor Statistics, U.S. exports fell 2.1 percent between June 2011 and June 2012, the largest yearly decline since the period right after the stock market crashed, October 2008 to October 2009.[18] Fortunately. mmi-grant-owned businesses helped cushion this fall. As the economists Giovanni Peri and Francisco Requena-Silvente have shown, "[t]hrough business and social networks, expatriates increase the diffusion of information and reduce the cost of doing business with their 'mother' country."[19] To the extent that immigrant-owned businesses can export to their home countries or elsewhere, they can help stem the decline in U.S. exports, expand total revenues coming into the country, and create jobs for American workers.

The data establishes that immigrant-owned firms have a powerful role in promoting the U.S. export economy. Immigrant-owned businesses are more than 60 percent more likely to export than are non-immigrant owned businesses. And this is not surprising. Immigrants often face lower barriers of entry to foreign markets because they have established networks in their home countries, an understanding of local markets, and shared languages and culture.[20] Only 4.4 percent of non-immigrant firms export, compared with 7.1 percent of immigrant firms. For high-exporting companies, immigrants play an even more dominant role. While just 1.2 percent of non-immigrant-owned firms export more than 20 percent of their sales, 3.2 percent of immigrant-owned firms do, making immigrant firms more than two and a half times more likely to be high-exporting companies.

## KEY FINDINGS

Immigrant-owned businesses are more than 60 percent more likely to export than non-immigrant owned businesses.

Immigrant-owned businesses are more than two and a half times more likely to be high-exporting companies.

# METTA MURDAYA

## BRINGING THE INGREDIENTS OF HOME TO THE BEAUTY BUSINESS

Metta Murdaya, the co-founder of the beauty firm Juara Skincare, says she's always had an appreciation for the unique virtues of Eastern and Western culture. Born in Indonesia, her parents decided to send her to live with an aunt in America when she was just seven years old, hoping she'd receive a better education and more opportunities in the United States.

Murdaya says she loved American culture and quickly acclimated, but she also went back to Indonesia to visit her family each summer, developing a fondness for many of the health tonics, flowers, and body treatments so ubiquitous there. "It's a culture with an innate understanding of beauty traditions," Murdaya explains. "I was intrigued by the rituals they've developed over hundreds of years."

It wasn't until after she obtained an MBA degree, however, that Murdaya saw her fascination as the seed of a potential business idea. In 2004, intent on breaking from their corporate jobs, she and three female friends founded Juara Skincare, a company that uses the ingredients and remedies commonly found in Indonesia and Bali — such as candlenut and turmeric—to make organic, all-natural beauty products like face masks, perfumes, and body scrubs.

The company launched with just three products, and Murdaya says one of her partners trekked out in the snow to convince the first store to carry their brand, a small pharmacy chain in New York City. Within a year, the high-end Los Angeles boutique Fred Segal was carrying Juara. Today, Murdaya says more than 100 stores in the U.S. and Canada stock the company's 30-product line, which has also appeared on the QVC shopping network. It's a fitting result for Juara — a company whose name literally means "winner" or "champion" in Indonesian.

Murdaya says that just as her immigrant experience helped her found the company, it will also help it grow. Immigrant-owned businesses are more than 60 percent more likely than non-immigrant owned firms to export their goods and services, and Juara is certainly no exception. "As an immigrant," Murdaya says, "you always view the world as your marketplace, instead of the city or country you happen to be in." From the beginning, her team made sure all their ingredients were compliant with European Union standards. And later this year, Murdaya says the company's products will begin to appear in South America and Indonesia for the first time.[23]

Data on the exports of immigrant-owned firms were not collected until 2007,[21] so the extent to which we are dependent on the growth in exports from these firms cannot be precisely made. But the data do show that immigrants are increasingly starting businesses and that those businesses are far more likely to export. And that means that policy makers need to think about immigrant-owned firms when they think about reviving our export economy. America was the world's leading exporter for the half-century after World War II, until surpassed early this century by Germany and more recently by China.[22] If America is again to lead the world in exports, immigrant entrepreneurs — with knowledge of, and access to, foreign markets— will need to play a crucial role.

| IMMIGRANT SHARE OF EXPORT ECONOMY: IMMIGRANTS ACCOUNT FOR A HIGHER PERCENTAGE OF HIGH-EXPORT COMPANIES | |
| --- | --- |
| SPECIAL TABULATIONS FROM SURVEY OF BUSINESS OWNERS (2007) | |
| PERCENTAGE OF TOTAL SALES EXPORTED OUTSIDE OF THE U.S. | PERCENT OF FIRMS THAT ARE OWNED BY IMMIGRANTS |
| None | 12.7% |
| Less than 1% | 11.1% |
| 1% to 4% | 14.7% |
| 5% to 9% | 17.1% |
| 10% to 19% | 20.2% |
| 20% to 49% | 24.8% |
| 50% to 99% | 35.1% |
| 100% | 50.5% |
| Total Reporting | 13.0% |

Note: The sample includes firms that are classified by the IRS as sole proprietorships, partnerships, 1120 corporations, or employers, and that have sales of $1000 or more. Excludes publicly held and other firms not classifiable by owner status.



## IMMIGRANT-OWNED BUSINESSES GENERATE SUBSTANTIAL BUSINESS INCOME AND REVENUE

The toll that the recession took on our GDP and our national fiscal health was severe. The U.S. government estimates that the GDP shrank by more than eight percent in the last quarter of 2008 and an additional four percent in the first quarter of 2009.[24] To put that in context, it has been 50 years since the GDP shrank by four percent or more in two successive fiscal quarters.[25] U.S. GDP has recovered slowly since, but our fiscal situation has remained unstable. Until 2008, the U.S. had never before run a budget deficit of $1 trillion. Since 2008, the U.S. budget deficit has exceeded $1 trillion in every single year, according to the Congressional Budget Office.[26] When the loss of tax revenues, the spending and tax cuts included in the stimulus, the bank bailouts, and other recession-related expenses are taken into account, the recent recession added an estimated $4.2 trillion to the federal deficit.[27]

Our GDP and our fiscal health present worrisome economic trends, but the data from this report plainly show that immigrant business owners have helped prevent a far worse economic picture. While immigrants are not starting massive companies at the same rate as their native-born counterparts, they are far more prolific in starting small businesses. And these businesses collectively generated $779.8 billion in revenue and $109.1 billion in income in 2010,[28] strengthening U.S. GDP, paying taxes to help balance the budget, and creating ripple effects throughout the broader economy due to higher consumption of goods and services by the companies and their employees.[29]

## KEY FINDINGS

Immigrant-owned businesses generated more than $775 billion in sales and more than $100 billion in income in 2010.

The $109 billion in business income generated by immigrant-owned firms in 2010 was a 60 percent increase over 2000. This growth greatly outpaced the increase in business income generated by native-owned firms, whose 14 percent rise failed to outpace inflation.

## BUSINESSES INCOME GENERATED BY IMMIGRANTS (2000 VS 2010)

**IMMIGRANT-OWNED BUSINESSES GENERATE A GROWING PERCENTAGE OF ALL BUSINESS INCOME GENERATED IN THE U.S. ECONOMY.**



| TOTAL SALES FOR IMMIGRANT AND NON-IMMIGRANT OWNED FIRMS | | |
| --- | --- | --- |
| SPECIAL TABULATIONS FROM SURVEY OF BUSINESS OWNERS (2007) | | |
| OWNERSHIP | NUMBER OF FIRMS | TOTAL SALES (THOUSANDS) |
| Immigrant (majority foreign-born) | 1,798,541 | $779,833,279 |
| Non-immigrant (majority native-born) | 11,578,280 | $7,047,737,009 |
| Total immigrant and non-immigrant | 13,376,821 | $7,827,570,287 |
| Equally foreign- and native-born | 244,070 | $102,760,238 |
| Foreign-born status indeterminate | 12,673,969 | $3,019,131,351 |

Note: The sample includes firms that are classified by the IRS as sole proprietorships, partnerships, 1120 corporations, or employers, and that have sales of $1,000 or more. Excludes publicly held and other firms not classifiable by owner status.

Data on income from immigrant-owned businesses are available for both 2000 and 2010,[30] allowing for a comparison of how our economic dependence on immigrant-owned businesses is changing over time. And the data show that during the last decade, when native-owned business income stagnated and even declined in inflation-adjusted dollars, immigrant-owned business income soared.

Between 2000 and 2010, the business income generated by native-owned firms increased from $510.8 billion to $584.1 billion, an increase of 14.4 percent and lagging far behind the 26.6 percent increase that would have been required to keep pace with inflation.[31] The income of immigrant-owned businesses, however, grew from $67.0 billion in 2000 to $109.1 billion in 2010, an increase of more than 60 percent that far outpaced inflation. In fact, this jump of $42.1 billion in business income from immigrant-owned businesses accounted for a full 36 percent of the entire growth in business income in the United States during that decade. As a result, the share of national business income from immigrant-owned businesses increased, rising from 11.6 percent of national business income at the beginning of the decade to 15.8 percent by the decade's end.[32]

Immigrant-owned businesses continue to have lower average incomes per business than their native-born counterparts — $49,779 in income on average per year, compared with $62,695 for non-immigrants— but businesses started by several specific immigrant groups, including those from India ($91,237 average annual income), Iran ($83,555), Canada ($83,132), Germany ($66,678), and Italy ($65,004), significantly outperform the national average.



## IMMIGRANT-OWNED BUSINESSES CREATE MILLIONS OF JOBS AND PAY BILLIONS OF DOLLARS IN EMPLOYEE SALARIES

The U.S. economy lost nearly 9 million jobs during the recent recession.[33] Unemployment reached 10 percent, a figure seen in only one other brief period over the last sixty years.[34] Long term unemployment – defined as persons out of works for 27 weeks or more– reached 4.4 percent in early 2009, dwarfing its previous high of 2.6 percent in the early 1980s.[35] And even though some jobs have returned, more than 12 million Americans are still unemployed, and millions more left the labor force entirely.[36]

One fact, however, is abundantly clear. But for the recent increase in business startup activity among immigrants, the economic situation facing millions of Americans would be markedly worse. Immigrants are starting companies that are smaller on average than the native-born in terms of payroll and number of employees, but they are starting these companies in increasingly large numbers and these small companies collectively create millions of jobs and pay out billions upon billions of dollars in payroll to workers in America.[37] One out of every 10 workers at privately-owned U.S. companies[38] now works at an immigrant-owned company. While immigrant-owned businesses with employees each hire eight employees on average, as compared to 12 employees hired by businesses owned by the native-born – millions of workers in America have their jobs today because of immigrants. Altogether, immigrant-owned businesses have collectively created four million jobs that exist today in the United States.

Similarly, although the average payroll generated by immigrant businesses is smaller than that of businesses owned by the native-born – $252,758 on average for immigrant-owned businesses compared with $428,546 for businesses owned by the native-born – their aggregate contribution to the U.S. payroll is massive in scale. Immigrant-owned businesses pay out more than $126 billion per year in payroll.

## KEY FINDINGS

▎ One in every 10 people employed at a privately-owned U.S. company works at an immigrant-owned firm.

▪ Immigrant-owned businesses pay out $126 billion in payroll per year.

# SERGIO BERMUDEZ

**BUILDING A FAMILY GROCERY EMPIRE
CATERING TO MEXICAN TASTES**

Sergio Bermudez, the President and CEO of the El Mezquite Market chain in New Mexico, emigrated from the Mexican state of Sonora with his five siblings in the late 1980s and early 1990s. They quickly found work in a wide array of construction jobs in Arizona — including concrete pouring and steel working. But observing some cousins who owned a meat market in Phoenix, the siblings began dreaming of having their own store.

By 1998, they'd sold off family cars and borrowed money from family members to buy a small, 3,000-square-foot space in Albuquerque, New Mexico. They renovated it themselves — commuting in from Arizona on nights and weekends — and bought used equipment on monthly installments. "It was hard," Bermudez says. But Bermudez says his family learned the virtues of hard work in Mexico, a country with little social support. "We're used to an environment where if you don't work hard, you don't eat."

And their hard work paid off. The first El Mezquite store, which sold thin Mexican cuts of meat, as well as imported delicacies like goats' milk candy, tomatillo sauces, and fresh papayas, did so well with the local Latino population that the family was able to open a second store by the end of 1998. Today, their six large markets, decorated with piñatas and dotted throughout central New Mexico, serve 40,000 customers per week and provide a wide array of services needed by their largely Latino customer base. On-site restaurants let customers sit down for a leisurely lunch, and phone cards are sold in-house. "People are very comfortable with us, and they trust us," Bermudez says. "That's incredibly important to our success."

Today, El Mezquite is one of the fastest growing Latino immigrant-owned businesses in New Mexico, employing a staff of more than 220 people. "I never would've imagined we'd grow so fast," says Bermudez, who never formally trained in the grocery business. His success has inspired others in the community: Although just two Latino-focused grocery stores existed in Albuquerque when his store opened, now there are at least 18. He and his siblings are now trying to help the next generation. In the last four years, his company has provided scholarships to 54 immigrant students attending the University of New Mexico.[39]

| EMPLOYMENT AND PAYROLL FOR IMMIGRANT AND NON-IMMIGRANT OWNED FIRMS SPECIAL TABULATIONS FROM SURVEY OF BUSINESS OWNERS (2007) | | | |
|---|---|---|---|
| OWNERSHIP | NUMBER OF EMPLOYER FIRMS | TOTAL EMPLOYMENT | TOTAL PAYROLL (THOUSANDS) |
| Immigrant (majority foreign-born) | 501,973 | 3,997,977 | $126,877,578 |
| Non-immigrant (majority native-born) | 3,049,698 | 36,426,585 | $1,306,936,752 |
| Total immigrant and non-immigrant | 3,551,671 | 40,424,562 | $1,433,814,330 |
| Equally foreign- and native-born | 74,006 | 642,138 | $21,106,032 |
| Foreign-born status indeterminate | 1,564,291 | 15,559,855 | $485,652,582 |

Note: The sample includes firms that are classified by the IRS as sole proprietorships, partnerships, 1120 corporations, or employers, and that have sales of $1000 or more. Excludes publicly held and other firms not classifiable by owner status.



# IMMIGRANT-OWNED BUSINESSES POWER MANY SECTORS OF THE AMERICAN ECONOMY

As important as the frequency with which immigrants are starting businesses is the diversity of fields in which they are starting them. Past research has highlighted the role that immigrant entrepreneurs have had in isolated sectors of the economy such as technology,[40] but the data from this report make clear that immigrant entrepreneurs are founding companies all over the economy, particularly in sectors that the U.S. government expects to be the fastest growing in the next decade.[41]

In seven of the eight industries that the U.S. Bureau of Labor Statistics estimates will grow fastest this decade, immigrants start an outsized share of all new companies. From 2007 to 2011, immigrants founded 28.7 percent of health care and social assistance companies,[42] 25.4 percent of professional and business services, 31.8 percent of construction firms, 29.1 percent of retail trade companies,[43] 23.9 percent of leisure and hospitality companies, 28.7 percent of educational services,[44] 28.2 percent of "other services,"[45] and 29.4 percent of transportation and utilities firms.

In each of these sectors, immigrants are founding an even larger share of new companies than the share they currently own in them. For instance, while immigrants already own an impressive 17 percent of businesses in construction, they started 31.8 percent of all new construction businesses from 2007 to 2011. Unless immigrant businesses in construction fail at a much higher rate than those of their native-born counterparts — data that were not available for the purposes of this report[46] — their share of construction companies will only increase. Similar patterns are observed across the top growth sectors — from wholesale and retail trade to transportation and utilities, to educational and health services — all fields where immigrants in recent years have been responsible for nearly 30 percent of all new businesses start ups, far higher than their current share of business ownership.[47]

## KEY FINDINGS

Immigrants start more than 25 percent of all businesses in seven of the eight sectors of the economy that the U.S. government expects to grow fastest over the next decade.

Immigrant-owned businesses generate more than 20 percent of all income in the retail trade; transportation; health care and social assistance; and accommodation, recreation and entertainment sectors.

## IMMIGRANTS CREATED AN OUTSIZE SHARE OF BUSINESSES IN THE FASTEST GROWING SECTORS OF THE ECONOMY

CURRENT POPULATION SURVEY (2007–2011)

LEISURE AND HOSPITALITY

**23.9%**

PROFESSIONAL AND BUSINESS SERVICES

**25.4%**

OTHER SERVICES

**28.2%**

HEALTH CARE AND SOCIAL ASSISTANCE

**28.7%**

EDUCATIONAL AND HEALTH SERVICES

**28.7%**

WHOLESALE AND RETAIL TRADE

**29.1%**

TRANSPORTATION AND UTILITIES

**29.4%**

CONSTRUCTION

**31.8%**

0%                                    50%                                    100%

## NUMBER OF NEW IMMIGRANT BUSINESS OWNERS PER MONTH BY INDUSTRY
CURRENT POPULATION SURVEY (2007-2011)

| INDUSTRY | NEW IMMIGRANT BUSINESS OWNERS | | | ALL NEW BUSINESS OWNERS | |
|---|---|---|---|---|---|
| | NUMBER | PERCENT OF IMMIGRANT TOTAL | PERCENT OF U.S. INDUSTRY TOTAL | NUMBER | PERCENT OF U.S. TOTAL |
| All industries | 138,697 | 100.0% | 24.9% | 556,470 | 100.0% |
| Agriculture and mining | 1,245 | 0.9% | 2.7% | 46,107 | 8.3% |
| Construction | 38,872 | 28.0% | 31.8% | 122,279 | 22.0% |
| Manufacturing | 2,742 | 2.0% | 16.6% | 16,490 | 3.0% |
| Wholesale and retail trade | 16,206 | 11.7% | 29.1% | 55,783 | 10.0% |
| Transportation and utilities | 5,856 | 4.2% | 29.4% | 19,889 | 3.6% |
| Information | 1,466 | 1.1% | 16.5% | 8,857 | 1.6% |
| Financial Activities | 5,624 | 4.1% | 16.0% | 35,144 | 6.3% |
| Professional and business services | 28,911 | 20.8% | 25.4% | 113,598 | 20.4% |
| Educational and health services | 18,265 | 13.2% | 28.7% | 63,547 | 11.4% |
| Leisure and hospitality | 8,848 | 6.4% | 23.9% | 36,963 | 6.6% |
| Other services | 10,661 | 7.7% | 28.2% | 27,812 | 6.8% |

Notes: The sample includes individuals who do not own a business in the first survey month and report starting a business in the second survey month with 15 or more hours worked per week.
All reported estimates use sample weights provided by the CPS.

# TASHITAA TUFAA

## ACHIEVING A CHILDHOOD DREAM BY BUILDING A SUCCESSFUL TRANSPORTATION COMPANY

Tashitaa Tufaa grew up on a farm in Ethiopia with 13 brothers and sisters and a dream of coming to America. "It was such a powerful country in our minds," Tufaa says, "an almost imaginary place where people were safe and achieving their dreams." By the age of 24, Tufaa had immigrated to the U.S. as a political refugee. Despite holding a college degree in history, Tufaa says he was thrilled when he got his first job working as a hotel dishwasher making just $5.35 per hour. In the 1990s and early 2000s, he was often employed at multiple places at once, doing everything from school disciplinary work to taxi driving. "Working eight hours a day," he says, "that was nothing to me." The hard work has paid off, and Tufaa is now a transportation entrepreneur whose Minnesota-based company, Metropolitan Transportation Network, will employ 350 people during the upcoming school year. The firm also owns 300 school buses.

Tufaa took the first steps to achieving his dream of owning a company in 2003 when he began a tireless campaign going door-to-door, trying to convince Minneapolis-area hospitals and schools to let his newly formed, one-person company shuttle needy patients or students back and forth from health care facilities or schools. "Some people simply laughed at me," he recalls, "but one person was willing to take a chance." That person, a school district transportation director, agreed to let Tufaa use his taxi cab to drive three homeless students to school who couldn't fit into the normal bus schedule. Eight years later, that one car company has turned into a growing business with nearly $8 million in annual revenues.

Tufaa credits his entrepreneurial success to his high standards and focus on his employees. "We want everyone in our company to be treated the same — from top management down to drivers," Tufaa says. He says his driving jobs are well paid for the industry, and he himself still drives one van of special needs children to school daily — just to show his workers "driving isn't a leftover, undesirable job." He's particularly proud of having taken a chance on a young, inexperienced war veteran who applied for a job as a mechanic several years ago — that person is his head mechanic today. "America is a place where even the poorest children can succeed," Tufaa says. "I wanted to pay back this society for all it has given me." [48]

Similar to the story of immigrant businesses generally, the businesses that immigrants are starting in these eight sectors tend to be smaller than those of their native-born counterparts but these businesses collectively generate enormous amounts of business income. Immigrant-owned businesses in professional services and health care and social assistance each generated more than $20 billion on average per year from 2006 to 2010. Immigrant-owned businesses also generated substantial business income in construction (more than $16 billion in business income per year), retail trade (more than $11 billion), finance (more than $9 billion), accommodation, recreation, and entertainment (more than $9 billion), transportation (more than $6 billion), wholesale trade (more than $5 billion), and manufacturing (just shy of $5 billion). In many cases, immigrant-owned businesses contribute more than 20 percent of all income in the sector, including sectors as diverse as retail trade; transportation; health care and social assistance; and accommodation, recreation, and entertainment. The billions upon billions of dollars generated in these industries generate tax revenue, higher payroll, more employment, and increased consumption for the economy.

It is evident that immigrant-owned businesses are going to play a central role in economic growth in the coming decade. Economic growth is predicted to depend, in part, on these sectors, and in each of these sectors immigrants play an increasingly important part in starting new businesses and generating income. Taken together, these companies will earn billions upon billions of dollars, generate new tax revenue, expand payroll, create new jobs, and increase consumption across the economy.



**SEVEN**

## IMMIGRANTS PUNCH ABOVE THEIR WEIGHT IN STATES ACROSS THE COUNTRY

The impact of the businesses that immigrants are starting is felt all over the country. In states that are large enough for data to be available, immigrants are starting businesses at rates that greatly exceed their share of the population.

In California, immigrants make up 27.2 percent of the population[49] but own 36.6 percent of all businesses – 676,537 in total – and start 44.6 percent of all new businesses.[50] The same can be said for New York, where immigrants make up 22.2 percent of the population, own 31.2 percent of businesses, and are now starting 42.0 percent of new businesses. Similar stories exist for states like New Jersey (immigrants make up 21.0 percent of population, own 28.6 of businesses, and start 35.2 percent of new businesses), Florida (19.4 percent of population; own 29.7 percent of businesses, and start 36.7 percent of new businesses), Texas (16.4 percent of population; own 24.9 percent of businesses, and start 31.3 percent of new businesses)), Illinois (13.7 percent of population; own 20.3 percent of businesses, and start 32.1 percent of new businesses), Arizona (13.4 percent of population; own 19.6 percent of businesses, and start 31.5 percent of new businesses), and Georgia (9.7 percent of population; own 15.5 percent of businesses, and start 29.5 percent of new businesses). Provided that the rate that immigrant-owned businesses fail does not dramatically exceed the failure rate for businesses owned by the native-born – data that is not available for this report[51] – the findings suggests that immigrant business-ownership rates will only continue to increase.

To provide context for what this increase in business generation will mean to the income generated by theses states, consider that immigrant-owned businesses already produce more than $34 billion per year in California alone, constituting 28.1 percent of all business income produced in the state and 4.2 percent of all business income in the United States. In Florida the total income of immigrant business owners represents nearly one-fourth of all business income in the state. And in New York, New Jersey, and Hawaii, immigrant-owned businesses already produce 20 percent or more of the state's income.

## TOM SZAKY

### TURNING TRASH INTO TREASURE

Tom Szaky, a green energy entrepreneur, credits his immigrant experience with helping him see a business opportunity few others did — and having the motivation to pursue it. Szaky, who was born in Hungary, fled the country at the age of four with his family. Settling in Toronto, Canada, Tom says he and his parents were quickly amazed by the things they saw neighbors casually throwing out in the trash, including fully-functioning televisions, a true luxury in a country as poor as Hungary. Away from the Iron Curtain, young Tom also quickly developed an admiration for the success that self-made entrepreneurs could achieve in the Western world. "The idea of going from nothing to everything in a lifetime," he says, "was inspiring to me."

So it's little surprise that Tom soon began exploring entrepreneurship. By age 14, he had a small but successful graphic design business. Five years later, while a sophomore in college in the United States, Szaky dropped out of college to run TerraCycle, a New Jersey-based company he founded that recycles materials previously viewed as unrecyclable. It also upcycles other items of trash — turning refuse like candy and gum wrappers into products like backpacks, stereo speakers, and pencil cases. The 120-person company, which collects trash in 22 countries and two-thirds of public schools in America, says it has rescued three billion pieces of garbage that would otherwise be in a landfill. It projects it will earn $18.5 million in revenues this year.

Szaky says he sees much bigger things in store. This winter, TerraCycle is planning to launch a recycling program that will allow dirty diapers to be recycled into park benches — a powerful idea considering that in the U.S. alone disposable diapers account for 3.7 million tons of municipal waste each year.[52] Szaky says he sees a multibillion-dollar market in his unique corner of the recyclables industry. "I want to wake up at the end of my life and know I've created a truly substantial business," Szaky says. The way things are going, he's already well on his way to achieving that dream.[53]

# IMMIGRANTS ARE DRIVING BUSINESS AND BUSINESS GROWTH IN MANY STATES

**CURRENT POPULATION SURVEY (2007-2011) AND AMERICAN COMMUNITY SURVEY (2006-2010)**

**CALIFORNIA**

| | |
|---|---|
| IMMIGRANTS' SHARE OF BUSINESS OWNERS | 36.6% |
| IMMIGRANTS' SHARE OF NEW BUSINESSES | 44.6% |

**NEW YORK**

| | |
|---|---|
| IMMIGRANTS' SHARE OF BUSINESS OWNERS | 31.2% |
| IMMIGRANTS' SHARE OF NEW BUSINESSES | 42.0% |

**FLORIDA**

| | |
|---|---|
| IMMIGRANTS' SHARE OF BUSINESS OWNERS | 29.7% |
| IMMIGRANTS' SHARE OF NEW BUSINESSES | 36.7% |

**NEW JERSEY**

| | |
|---|---|
| IMMIGRANTS' SHARE OF BUSINESS OWNERS | 28.6% |
| IMMIGRANTS' SHARE OF NEW BUSINESSES | 35.2% |

**ILLINOIS**

| | |
|---|---|
| IMMIGRANTS' SHARE OF BUSINESS OWNERS | 20.3% |
| IMMIGRANTS' SHARE OF NEW BUSINESSES | 32.1% |



## THE IMMIGRANTS STARTING BUSINESSES IN THE UNITED STATES COME FROM ALL OVER THE WORLD

There is no one country of origin for the immigrants driving new-business creation in America. The largest number of immigrants starting new businesses come from Mexico, whose expatriates start more than 50,000 new U.S. businesses every month. There are now more than 570,000 U.S. businesses that are owned by immigrants from Mexico, constituting more than 1 in every 25 businesses in this country. But the immigrants starting new businesses in the United States hail from all over the world. Immigrants from Guatemala, Cuba, Korea, El Salvador, India, Dominican Republic, Honduras, Vietnam, and China all start more than 2,500 U.S. businesses per month.[54] More than 20 percent of Koreans, Iranians, Brazilians, and Italians currently living in the United States own a business, compared to 9.6 percent of native-born Americans. Immigrants from Poland (15.6 percent of whom own a business), Cuba (14.8 percent), Canada (14.2 percent), Vietnam (14.0 percent), Germany (13.3 percent), Colombia (13.1 percent), Peru (12.1 percent), Honduras (11.2 percent), Guatemala (10.6 percent), and China (10.0 percent) all own businesses at higher rates than their native-born counterparts. This diversity opens up new economic opportunities, bringing outside knowhow to the U.S. and providing language skills and cultural understanding that allow American businesses to grow and service customer bases both here and abroad.

The businesses that these immigrant groups start are generating billions of dollars in income for the U.S. economy. Immigrants from Mexico provide the largest contribution to total U.S. business income at nearly $17 billion per year (2.1 percent of total business income), but immigrants from India ($9.1 billion in business income), Korea ($7.1 billion), Canada ($4.8 billion), Vietnam ($4.3 billion), China ($3.9 billion), Iran ($3.8 billion), Cuba ($3.7 billion), the Philipines ($3.3 billion), Germany ($2.4 billion), El Salvador ($2.2 billion), and Poland ($2.2 billion) also make large contributions to U.S. business income.

## NUMBER OF NEW BUSINESS OWNERS PER MONTH BY COUNTRY OF ORIGIN
CURRENT POPULATION SURVEY (2007-2011)

| GROUP | NEW BUSINESS OWNERS | | BUSINESS FORMATION RATE | |
| --- | --- | --- | --- | --- |
| | NUMBER PER MONTH | PERCENT OF U.S. TOTAL | PERCENT | NUMBER PER 100,000 |
| U.S. Total | 556,470 | 100.00% | 0.32% | 318 |
| U.S.-Born Total | 417,773 | 75.08% | 0.28% | 283 |
| Immigrant Total | 138,697 | 24.92% | 0.51% | 507 |
| Mexico | 53,963 | 9.70% | 0.62% | 624 |
| Guatemala | 5,245 | 0.94% | 1.08% | 1079 |
| Cuba | 4,438 | 0.80% | 0.56% | 557 |
| Korea | 4,429 | 0.80% | 0.75% | 752 |
| El Salvador | 4,262 | 0.77% | 0.51% | 513 |
| India | 3,689 | 0.66% | 0.28% | 282 |
| Dominican Republic | 3,328 | 0.60% | 0.55% | 553 |
| Honduras | 3,068 | 0.55% | 0.92% | 920 |
| Vietnam | 3,029 | 0.54% | 0.39% | 391 |
| China | 2,641 | 0.47% | 0.26% | 263 |

Notes: The sample includes non-business owners who do not own a business in the first survey month. The total sample size is 3,306,803. Business formation is defined as those individuals who report starting a business in the second survey month with 15 or more hours worked per week. The reported immigrant groups represent the largest 10 groups based on the number of new businesses.

## NUMBER OF BUSINESS OWNERS BY COUNTRY OF ORIGIN
AMERICAN COMMUNITY SURVEY (2006-2010)

| GROUP | BUSINESS OWNERS | | TOTAL WORKFORCE | | BUSINESS OWNERSHIP RATE |
| --- | --- | --- | --- | --- | --- |
| | NUMBER | PERCENT OF U.S. TOTAL | NUMBER | PERCENT OF U.S. TOTAL | |
| U.S. Total | 13,385,470 | 100.00% | 136,472,990 | 100.00% | 9.8% |
| U.S.-Born Total | 10,950,850 | 81.81% | 114,299,860 | 83.75% | 9.6% |
| Immigrant Total | 2,434,620 | 18.19% | 22,173,130 | 16.25% | 11.0% |
| Mexico | 570,170 | 4.26% | 6,754,700 | 4.95% | 8.4% |
| Korea | 123,770 | 0.92% | 535,750 | 0.39% | 23.1% |
| India | 99,830 | 0.75% | 1,056,150 | 0.77% | 9.5% |
| Vietnam | 98,950 | 0.74% | 706,630 | 0.52% | 14.0% |
| China | 75,530 | 0.56% | 757,010 | 0.55% | 10.0% |
| Cuba | 75,050 | 0.56% | 506,410 | 0.37% | 14.8% |
| El Salvador | 73,540 | 0.55% | 767,480 | 0.56% | 9.6% |
| Canada | 57,650 | 0.43% | 406,900 | 0.30% | 14.2% |
| Philippines | 55,450 | 0.41% | 1,095,930 | 0.80% | 5.1% |
| Guatemala | 52,840 | 0.39% | 496,900 | 0.36% | 10.6% |
| Colombia | 49,670 | 0.37% | 379,490 | 0.28% | 13.1% |
| Brazil | 47,060 | 0.35% | 224,290 | 0.16% | 21.0% |
| Iran | 45,330 | 0.34% | 186,150 | 0.14% | 24.4% |
| Dominican Republic | 41,110 | 0.31% | 446,940 | 0.33% | 9.2% |
| Poland | 40,870 | 0.31% | 262,460 | 0.19% | 15.6% |
| Germany | 35,540 | 0.27% | 266,910 | 0.20% | 13.3% |
| Honduras | 32,950 | 0.25% | 293,200 | 0.21% | 11.2% |
| Jamaica | 31,890 | 0.24% | 407,570 | 0.30% | 7.8% |
| Peru | 31,320 | 0.23% | 259,580 | 0.19% | 12.1% |
| Italy | 30,750 | 0.23% | 152,630 | 0.11% | 20.1% |

Notes: The sample includes all workers with 15 or more hours worked per usual week. The total sample size is 6,644,017. All reported estimates use sample weights provided by the ACS. The reported immigrant groups represent the largest 20 groups based on the number of business owners.



## IMMIGRANTS OF ALL EDUCATION LEVELS ARE CONTRIBUTING TO BUSINESS CREATION AND GROWTH

While much attention has been given to highly-educated immigrant entrepreneurs in the tech and other high-skilled sectors, the fact is that less-educated immigrant entrepreneurs are making an equally important mark on the U.S. economy. More than 37 percent of new immigrant business owners lack a high school diploma, roughly equivalent to the 37 percent of new immigrant business owners who have some college or a college degree. This stands in contrast to native-born new-business owners, only 16.4 percent of whom lack a high school diploma and 54.0 percent of whom have some college or a college degree. To a large degree, this difference tracks the different educational profile of immigrants and native-born generally.[55] This data also gives reason to think that immigrant entrepreneurs may have the largest impact on America's most distressed communities. Communities with lower educational attainment levels often have the fewest job opportunities and the highest unemployment rates.[56] Immigrant entrepreneurs, who frequently move into neighborhoods that have little economic activity[57] and are far more likely to start a business even when they themselves are less-educated, can play an outsized role in creating new jobs in some of these areas most in need of new economic opportunities.

### NUMBER OF NEW IMMIGRANT BUSINESS OWNERS PER MONTH BY EDUCATION LEVEL
CURRENT POPULATION SURVEY (2007-2011)

| GROUP | NEW IMMIGRANT BUSINESS OWNERS | | | TOTAL WORKFORCE | |
| | NUMBER | PERCENT OF IMMIGRANT TOTAL | PERCENT OF U.S. EDUCATION TOTAL | NUMBER | PERCENT OF U.S. TOTAL |
|---|---|---|---|---|---|
| All education levels | 138,697 | 100.0% | 24.9% | 556,470 | 100.0% |
| Less than high school | 52,160 | 37.6% | 57.0% | 91,470 | 16.4% |
| High school graduate | 35,160 | 25.4% | 21.3% | 164,842 | 29.6% |
| Some college | 20,438 | 14.7% | 15.0% | 136,192 | 24.5% |
| College graduate | 30,939 | 22.3% | 18.9% | 163,966 | 29.5% |

Notes: The sample includes individuals who do not own a business in the first survey month and report starting a business in the second survey month with 15 or more hours worked per week. All reported estimates use sample weights provided by the CPS.

# SHUKRI ALI AND MAHAMED MAHAMUD

## REVITALIZING DOWNTOWN LEWISTON WITH THE TASTE OF HOME

Shukri Ali and her husband Mahamed Mahamud were realizing a dream when they opened The Taste of Three One Café in Lewiston, Maine in 2008.  The couple, both of whom fled Somalia during the chaos of the 1990s, arrived in Lewiston in 2002. By the following year Ali had already begun working double shifts as an interpreter in the community — sometimes putting in as many as 18 hours per day — so that she and her husband, a hospital chef, could open their own restaurant. Five years later, they debuted The Taste of Three One Cafe, a small, homey spot downtown that serves Somali food, as well as Caribbean, East African, and other international fare. "We wanted to create a restaurant where everyone was welcome, a real community space," Ali says. And they quickly achieved that: By early this year as many as 200 people were cycling through the beloved 15-seat restaurant on its busiest days, enjoying everything from curried goat to spaghetti with muufa, or Somali flatbread.[58]

Ali's story is part of a long history of Somali immigrants in Lewiston, Maine. Somali immigrants began arriving in the community in 2002, and now make up almost one in 10 residents. After some initial community tension — most notably, the decision by an outside white supremacist church to hold a rally protesting the Somali migration in 2003 — immigrants from the war-torn East African country began contributing heavily to Lewiston's economic revitalization and growth in the last five years. Somali-owned businesses now crowd Lisbon Street, a stretch of downtown Lewiston once plagued by high vacancy rates and empty store fronts. "It used to be the kind of place people were afraid to go to at night," says Ismail Ahmed, who used to work with newly arrived immigrants in the community, "but the Somali businesses changed it." [59]



Politicians are looking to entrepreneurs to create the companies that are going to help America grow its way out of the recession and create jobs to put the millions of unemployed back to work. As this report shows, immigrant entrepreneurs are central to new-business creation in this country, creating businesses at an increasing rate at a time when the rate of native-born business-generation is declining. Nearly three in every 10 businesses founded in the United States in 2011 was started by an immigrant, and millions of Americans—roughly one in every 10 workers at privately-owned companies — have their jobs today because of immigrant business owners. In addition to creating jobs, the businesses that immigrants start also create revenue to boost our GDP, exports to alleviate our trade imbalance, taxes to fund our deficit, and new consumption that fuels our economy.

So as policy makers consider measures to increase job growth, politicians may disagree on spending more or cutting taxes, protecting or opening markets, or the value of various regulations. But one thing should be beyond argument: any serious plan on job growth must recognize and welcome immigrant entrepreneurs, who in the coming years will play an out-sized role across the country and across industries in starting new businesses, creating new jobs, and driving economic growth.

# Appendix A.
# Data and
# Methodology

This study uses all three of the nationally representative Census Bureau datasets with large enough sample sizes to study immigrant business owners in detail.

Two of the datasets are household surveys — the American Community Survey and the Current Population Survey — and provide information on business ownership, startup activity and business income.

The third dataset is a business-level survey — the Survey of Business Owners — and provides information on business sales, employment, payroll and exports. The datasets also provide detailed information on immigrant owners such as source country, skill level, state of residence, and industry of business.

## ACS: American Community Survey
(2006–2010)

The primary sample used to examine immigrant business ownership and net business income is the 2006-2010 ACS. The ACS microdata include 11.6 million observations for adults. The sample is large enough to allow the exploration of differences in business income across states, industries, skill-level, and country-of-origin amongst immigrant and native-born business owners.

Using the ACS data, business ownership is determined by the class-of-worker question that refers to the respondent's main job or business activity (i.e., activity with the most hours) at the time of the interview. Business owners are individuals who report that they are 1) "self-employed in own not incorporated business, professional practice, or farm," or 2) "self-employed in own incorporated business, professional practice, or farm." This definition includes owners of all types of businesses—incorporated, unincorporated, employer, and non-employer firms. The samples used in this analysis include all business owners age 18 and over who work 15 or more hours per week at their businesses. To rule out very small-scale businesses, disguised unemployment, or casual sellers of goods and services, only business owners with 15 or more hours worked are included.[60] Fifteen hours per week is chosen as the cutoff because it represents a reasonable amount of work effort in the business, about two days per week. Note that self-employed business ownership is defined as the individual's main job activity, thus removing the potential for counting side businesses owned by wage-and-salary workers.

## CPS: Current Population Survey
## (2007–2011)

Although research on entrepreneurship is growing rapidly, very few national datasets provide information on recent trends in business formation. This report derives a measure to study immigrant business startup activity from matched data from the 2007-2011 Current Population Surveys (CPS). The measure captures the rate of business creation at the individual owner level. The underlying datasets used to create the entrepreneurship or business formation measure are the basic monthly files of the CPS. Although the CPS is commonly used as cross-sectional data, longitudinal data can be created by linking the CPS files over time. The surveys, conducted monthly by the U.S. Bureau of the Census and the U.S. Bureau of Labor Statistics, are representative of the entire U.S. population and contain observations for more than 130,000 people. Combining the 2007 to 2010 monthly data creates a sample size of 3.8 million adult observations.

Households in the CPS are interviewed each month over a four-month period. Eight months later they are re-interviewed in each month of a second four-month period. Thus, individuals who are interviewed in January, February, March, and April of one year are interviewed again in January, February, March, and April of the following year. The rotation pattern of the CPS thus allows for matching information on individuals monthly for 75 percent of all respondents to each survey. To match these data, the report uses the household and individual identifiers provided by the CPS and removes false matches by comparing race, sex, and age codes from the two months. All non-unique matches are also removed from the dataset. Monthly match rates are generally between 94 and 96 percent, and false positive rates are very low.

The business-formation rate is estimated by first identifying all individuals who do not own a business as their main job in the first survey month, then matching CPS files to determine whether they own a business as their main job (with 15 or more usual hours worked per week) in the following survey month. The business formation rate is thus defined as the percentage of the population of non-business owners who start a business each month. To identify whether they are business owners in each month, the survey uses information on their main job, defined as the one with the most hours worked. Thus, individuals who start side or casual businesses are not counted if they are working more hours on a wage-and-salary job.

## SBO: Survey of Business Owners
## (2007)

Estimates of business ownership and formation rates and of the net business income of owners are available using Census and CPS microdata, but another source of information is provided by business-level data, where the business, rather than the owner, is the focus of the analysis. The main advantage of business-level data is that they typically provide more information on business performance than individual-level data, but the main disadvantage is that they do not include information on the demographic characteristics of the owner.[61] The only large nationally representative business-level data set in which the immigrant status of the owner is identifiable is the 2007 SBO. For the first time since 1992 (then called the Characteristics of Business Owners), the U.S. Census Bureau in 2007 collected information on the immigrant status of business owners in its main database of the ownership characteristics of U.S. businesses. The SBO is conducted by the U.S. Census Bureau every five years to collect statistics that describe the composition of U.S. businesses by gender, race, and ethnicity. The universe for the most recent survey is all firms operating during 2007 with receipts of $1,000 or more that filed tax forms as individual proprietorships, partnerships, employers or any type of corporation.

The 2007 SBO includes information on whether the business owner is an immigrant which is determined by whether the owner is foreign-born vs. U.S.-born. Following the convention used by the Census Bureau in reporting business statistics by race, immigrant-owned businesses are defined as those with majority foreign-born ownership (51% or more). Similarly, non-immigrant businesses are defined as those with majority U.S.-born ownership (51% or more). Equally-owned firms are also reported in the tables presented below but are not included in calculating the immigrant shares.

The 2007 SBO also includes information on the sales, employment, payroll and exports of the business. Unfortunately, however, only business and employer firm counts by foreign-born status were reported in published reports by the Census Bureau. Instead, the author commissioned the U.S. Census Bureau to conduct special runs using the 2007 SBO that provide information on the sales, employment, payroll and exports of immigrant-owned businesses and non-immigrant owned businesses.[62]

# Appendix B.

**NUMBER OF IMMIGRANT BUSINESS OWNERS BY INDUSTRY**
AMERICAN COMMUNITY SURVEY (2006-10)

| INDUSTRY | IMMIGRANT BUSINESS OWNERS | | | ALL BUSINESS OWNERS | |
| --- | --- | --- | --- | --- | --- |
| | NUMBER | PERCENT OF IMMIGRANT TOTAL | PERCENT OF U.S. INDUSTRY TOTAL | NUMBER | PERCENT OF U.S. TOTAL |
| All industries | 2,434,607 | 100.0% | 18.2% | 13,385,470 | 100.0% |
| Agriculture | 26,750 | 1.1% | 4.1% | 654,830 | 4.9% |
| Extraction | 1,290 | 0.1% | 3.9% | 32,770 | 0.2% |
| Construction | 417,540 | 17.2% | 17.1% | 2,439,020 | 18.2% |
| Manufacturing | 78,640 | 3.2% | 15.4% | 509,810 | 3.8% |
| Wholesale trade | 79,560 | 3.3% | 20.3% | 391,330 | 2.9% |
| Retail trade | 263,250 | 10.8% | 22.6% | 1,116,500 | 8.7% |
| Transportation | 143,110 | 5.9% | 27.1% | 528,530 | 3.9% |
| Information | 19,880 | 0.8% | 11.1% | 179,440 | 1.3% |
| Finance | 133,500 | 5.5% | 11.4% | 1,166,170 | 8.7% |
| Professional services | 406,970 | 16.7% | 15.5% | 2,620,140 | 19.6% |
| Educational services | 24,580 | 1.0% | 14.1% | 176,350 | 1.3% |
| Health Care and Social Assistance | 237,580 | 9.8% | 20.0% | 1,190,410 | 8.9% |
| Accommodation, Recreation, and Entertainment | 207,670 | 8.5% | 25.4% | 816,960 | 6.1% |
| Other services | 394,017 | 16.2% | 26.0% | 1,513,200 | 11.3% |

Notes: The sample includes all business owners with 15 or more hours worked per usual week. All reported estimates use sample weights provided by the ACS.

### TOTAL NET BUSINESS INCOME OF IMMIGRANT BUSINESS OWNERS BY INDUSTRY
AMERICAN COMMUNITY SURVEY (2006-2010)

| INDUSTRY | IMMIGRANT BUSINESS OWNERS | | | ALL BUSINESS OWNERS | |
|---|---|---|---|---|---|
| | TOTAL BUSINESS INCOME (THOUSANDS) | PERCENT OF IMMIGRANT TOTAL | PERCENT OF U.S. INDUSTRY TOTAL | TOTAL BUSINESS INCOME | PERCENT OF U.S. TOTAL |
| All industries | $121,192,740 | 100.0% | 15.0% | 807,756,996 | 100.0% |
| Agriculture | $1,140,354 | 0.9% | 3.7% | 30,928,391 | 3.8% |
| Extraction | $119,190 | 0.1% | 3.7% | 3,254,884 | 0.4% |
| Construction | $16,326,888 | 13.5% | 13.8% | 118,107,884 | 0.4% |
| Manufacturing | $4,995,256 | 4.1% | 14.8% | 33,669,541 | 14.6% |
| Wholesale trade | $5,181,506 | 4.3% | 17.0% | 30,426,138 | 3.8% |
| Retail trade | $11,369,322 | 9.4% | 20.1% | 56,548,071 | 7.0% |
| Transportation | $6,650,261 | 5.5% | 22.2% | 29,992,721 | 3.7% |
| Information | $1,170,723 | 1.0% | 10.9% | 10,723,739 | 1.3% |
| Finance | $9,615,241 | 7.9% | 9.9% | 96,716,145 | 12.0% |
| Professional services | $22,043,620 | 18.2% | 11.2% | 196,518,675 | 24.3% |
| Educational services | $928,106 | 0.8% | 13.2% | 7,043,089 | 0.9% |
| Health Care and Social Assistance | $22,613,813 | 1.7% | 20.2% | 111,712,047 | 13.8% |
| Accommodation, Recreation, and Entertainment | $9,329,834 | 7.7% | 24.6% | 37,941,267 | 4.7% |
| Other services | $9,708,628 | 8.0% | 22.0% | 44,144,676 | 5.5% |

Notes: The sample includes all business owners with 15 or more hours worked per usual week. All reported estimates use sample weights provided by the ACS. Income estimates are reported in 2010 dollars.

PARTNERSHIP FOR A NEW AMERICAN ECONOMY

## NUMBER OF IMMIGRANT BUSINESS OWNERS BY STATE
AMERICAN COMMUNITY SURVEY (2006-2010)

| INDUSTRY | NEW IMMIGRANT BUSINESS OWNERS | | | ALL BUSINESS OWNERS | | INDUSTRY | NEW IMMIGRANT BUSINESS OWNERS | | | ALL BUSINESS OWNERS | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | NUMBER | PERCENT OF IMMIGRANT TOTAL | PERCENT OF STATE TOTAL | NUMBER | PERCENT OF U.S. TOTAL | | NUMBER | PERCENT OF IMMIGRANT TOTAL | PERCENT OF STATE TOTAL | NUMBER | PERCENT OF U.S. TOTAL |
| **U.S. Total** | 2,434,607 | 100.0% | 18.2% | 13,385,470 | 100.0% | Missouri | 11,414 | 0.5% | 4.6% | 248,920 | 1.9% |
| Alabama | 7,968 | 0.3 | 4.6 | 172,830 | 1.3 | Montana | 1,061 | 0.0% | 1.5% | 69,350 | 0.5% |
| Alaska | 3,394 | 0.1% | 10.1% | 33,720 | 0.3% | Nebraska | 3,905 | 0.2% | 3.9% | 99,770 | 0.7% |
| Arizona | 50,706 | 2.1% | 19.6% | 259,040 | 1.9% | Nevada | 20,000 | 0.8% | 20.7% | 96,740 | 0.7% |
| Arkansas | 6,171 | 0.3% | 5.0% | 122,640 | 0.9% | New Hampshire | 4,253 | 0.2% | 5.7% | 74,550 | 0.6% |
| California | 676,537 | 27.8% | 36.6% | 1,850,810 | 13.8% | New Jersey | 101,251 | 4.2% | 28.6% | 354,110 | 2.6% |
| Colorado | 27,645 | 1.1% | 9.7% | 283,680 | 2.1% | New Mexico | 11,440 | 0.5% | 12.6% | 90,500 | 0.7% |
| Connecticut | 31,320 | 1.3% | 18.5% | 169,730 | 1.3% | New York | 261,140 | 10.7% | 31.2% | 835,900 | 6.2% |
| Delaware | 3,320 | 0.1% | 10.5% | 31,590 | 0.2% | North Carolina | 33,120 | 1.4% | 8.4% | 394,800 | 2.9% |
| D.C. | 4,003 | 0.2% | 19.2% | 20,850 | 0.2% | North Dakota | 381 | 0.0% | 1.0% | 39,830 | 0.3% |
| Florida | 286,144 | 11.8% | 29.7% | 962,050 | 7.2% | Ohio | 20,768 | 0.9% | 5.1% | 407,610 | 3.0% |
| Georgia | 63,342 | 2.6% | 15.5% | 409,390 | 3.1% | Oklahoma | 11,983 | 0.5% | 6.9% | 174,320 | 1.3% |
| Hawaii | 15,997 | 0.7% | 23.2% | 68,940 | 0.5% | Oregon | 22,216 | 0.9% | 10.7% | 207,590 | 1.6% |
| Idaho | 4,051 | 0.2% | 4.9% | 82,060 | 0.6% | Pennsylvania | 38,799 | 1.6% | 8.2% | 470,980 | 3.5% |
| Illinois | 99,810 | 4.1% | 20.3% | 491,410 | 3.7% | Rhode Island | 6,478 | 0.3% | 14.4% | 44,890 | 0.3% |
| Indiana | 11,995 | 0.5% | 5.2% | 230,190 | 1.7% | South Carolina | 11,869 | 0.5% | 6.7% | 176,990 | 1.3% |
| Iowa | 4,823 | 0.2% | 3.1% | 155,110 | 1.2% | South Dakota | 606 | 0.0% | 1.2% | 50,760 | 0.4% |
| Kansas | 7,378 | 0.3% | 5.7% | 129,940 | 1.0% | Tennessee | 15,369 | 0.6% | 5.8% | 264,480 | 2.0% |
| Kentucky | 6,143 | 0.3% | 3.8% | 162,000 | 1.2% | Texas | 256,849 | 10.5% | 24.9% | 1,032,100 | 7.7% |
| Louisiana | 14,726 | 0.6% | 8.2% | 179,790 | 1.3% | Utah | 9,229 | 0.4% | 8.5% | 108,450 | 0.8% |
| Maine | 2,711 | 0.1% | 3.2% | 85,040 | 0.6% | Vermont | 1,700 | 0.1% | 3.7% | 45,730 | 0.3% |
| Maryland | 50,028 | 2.1% | 21.2% | 236,050 | 1.8% | Virginia | 53,709 | 2.2% | 17.5% | 306,640 | 2.3% |
| Massachusetts | 50,778 | 2.1% | 17.5% | 290,360 | 2.2% | Washington | 45,696 | 1.9% | 15.0% | 304,930 | 2.3% |
| Michigan | 30,223 | 1.2% | 8.3% | 365,190 | 2.7% | West Virginia | 1,486 | 0.1% | 2.7% | 54,270 | 0.4% |
| Minnesota | 15,001 | 0.6% | 5.7% | 261,030 | 2.0% | Wisconsin | 10,342 | 0.4% | 4.3% | 239,610 | 1.8% |
| Mississippi | 4,534 | 0.2% | 4.2% | 107,020 | 0.8% | Wyoming | 809 | 0.0% | 2.6% | 31,180 | 0.2% |

Notes: The sample includes all business owners with 15 or more hours worked per usual week.
All reported estimates use sample weights provided by the ACS.

## TOTAL NET BUSINESS INCOME OF IMMIGRANT BUSINESS OWNERS BY STATE
AMERICAN COMMUNITY SURVEY (2006-2010)

| INDUSTRY | NEW IMMIGRANT BUSINESS OWNERS | | | ALL BUSINESS OWNERS | | INDUSTRY | NEW IMMIGRANT BUSINESS OWNERS | | | ALL BUSINESS OWNERS | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL BUSINESS INCOME (THOUSANDS) | PERCENT OF IMMIGRANT TOTAL | PERCENT OF STATE TOTAL | TOTAL BUSINESS INCOME (THOUSANDS) | PERCENT OF U.S. TOTAL | | TOTAL BUSINESS INCOME (THOUSANDS) | PERCENT OF IMMIGRANT TOTAL | PERCENT OF STATE TOTAL | TOTAL BUSINESS INCOME (THOUSANDS) | PERCENT OF U.S. TOTAL |
| **U.S. Total** | $121,192,740 | 100.0% | 15.0% | $807,756,996 | 100.0% | Missouri | $650,043 | 0.5% | 5.0% | $12,944,268 | 1.6% |
| Alabama | $337,298 | 0.3% | 3.4% | $9,848,572 | 1.2% | Montana | $44,083 | 0.0% | 1.4% | $3,148,001 | 0.4% |
| Alaska | $160,452 | 0.1% | 7.8% | $2,066,323 | 0.3% | Nebraska | $126,155 | 0.1% | 2.7% | $4,726,479 | 0.6% |
| Arizona | $2,185,123 | 1.8% | 14.2% | $15,395,685 | 1.9% | Nevada | $1,134,154 | 0.9% | 16.8% | $6,737,466 | 0.8% |
| Arkansas | $286,727 | 0.2% | 4.7% | $6,064,221 | 0.8% | New Hampshire | $252,262 | 0.2% | 5.8% | $4,344,390 | 0.5% |
| California | $34,310,456 | 28.3% | 28.1% | $121,889,173 | 15.1% | New Jersey | $6,220,997 | 5.1% | 22.4% | $27,772,582 | 3.4% |
| Colorado | $1,221,867 | 1.0% | 7.3% | $16,681,092 | 2.1% | New Mexico | $388,780 | 0.3% | 8.9% | $4,361,555 | 0.5% |
| Connecticut | $2,051,211 | 1.7% | 15.0% | $13,670,931 | 1.7% | New York | $12,637,581 | 10.4% | 22.6% | $55,963,281 | 6.9% |
| Delaware | $261,258 | 0.2% | 12.6% | $2,074,398 | 0.3% | North Carolina | $1,665,318 | 1.4% | 7.7% | $21,532,068 | 2.7% |
| D.C. | $242,333 | 0.2% | 10.8% | $2,243,227 | 0.3% | North Dakota | $20,648 | 0.0% | 1.0% | $2,119,841 | 0.3% |
| Florida | $13,299,475 | 11.0% | 23.8% | $55,946,379 | 6.9% | Ohio | $1,278,864 | 1.1% | 5.7% | $22,383,638 | 2.8% |
| Georgia | $2,920,530 | 2.4% | 12.3% | $23,662,673 | 2.9% | Oklahoma | $476,515 | 0.4% | 5.3% | $8,911,407 | 1.1% |
| Hawaii | $771,663 | 0.6% | 19.8% | $3,902,680 | 0.5% | Oregon | $1,079,448 | 0.9% | 9.8% | $11,019,656 | 1.4% |
| Idaho | $191,547 | 0.2% | 4.7% | $4,098,994 | 0.5% | Pennsylvania | $2,175,029 | 1.8% | 7.6% | $28,738,393 | 3.6% |
| Illinois | $5,404,305 | 4.5% | 16.5% | $32,800,599 | 4.1% | Rhode Island | $360,125 | 0.3% | 13.0% | $2,769,586 | 0.3% |
| Indiana | $721,603 | 0.6% | 5.6% | $12,935,951 | 1.6% | South Carolina | $521,896 | 0.4% | 5.3% | $9,792,601 | 1.2% |
| Iowa | $215,793 | 0.2% | 2.8% | $7,637,181 | 0.9% | South Dakota | $13,137 | 0.0% | 0.5% | $2,625,394 | 0.3% |
| Kansas | $351,433 | 0.3% | 5.0% | $7,037,337 | 0.9% | Tennessee | $850,604 | 0.7% | 5.6% | $15,094,881 | 1.9% |
| Kentucky | $450,916 | 0.4% | 5.4% | $8,399,602 | 1.0% | Texas | $10,038,746 | 8.3% | 16.7% | $60,102,102 | 7.4% |
| Louisiana | $690,922 | 0.6% | 6.7% | $10,336,436 | 1.3% | Utah | $387,788 | 0.3% | 6.1% | $6,353,397 | 0.8% |
| Maine | $119,688 | 0.1% | 3.3% | $3,680,696 | 0.5% | Vermont | $84,000 | 0.1% | 3.8% | $2,201,572 | 0.3% |
| Maryland | $2,750,312 | 2.3% | 16.3% | $16,843,132 | 2.1% | Virginia | $3,022,260 | 2.5% | 14.9% | $20,255,140 | 2.5% |
| Massachusetts | $2,818,756 | 2.3% | 14.0% | $20,174,706 | 2.5% | Washington | $2,415,906 | 2.0% | 13.1% | $18,436,686 | 2.3% |
| Michigan | $1,844,369 | 1.5% | 9.2% | $20,033,611 | 2.5% | West Virginia | $138,755 | 0.1% | 5.1% | $2,719,038 | 0.3% |
| Minnesota | $771,888 | 0.6% | 5.1% | $14,996,055 | 1.9% | Wisconsin | $589,060 | 0.5% | 4.6% | $12,756,994 | 1.6% |
| Mississippi | $181,050 | 0.1% | 3.2% | $5,722,364 | 0.7% | Wyoming | $59,612 | 0.0% | 3.3% | $1,804,562 | 0.2% |

Notes: The sample includes all business owners with 15 or more hours worked per usual week.
All reported estimates use sample weights provided by the ACS.

# References

Borjas, G. 1986. The self-employment experience of immigrants. *Journal of Human Resources*, 21, Fall: 487 506.

Bradford, William D. 2003. "The Wealth Dynamics of Entrepreneurship for Black and White Families in the U.S.," Review of Income and Wealth, 49(1): 89-116.

Bucks, Brian K., Arthur B. Kennickell, and Kevin B.Moore. 2006. "Recent Changes in U.S. Family Finances: Evidence from the 2001 and 2004 Survey of Consumer Finances," Federal Reserve Bulletin, Washington, D.C.: Board of Governors of the Federal Reserve System.

Clark, Kenneth and Stephen Drinkwater. 2000. "Pushed out or pulled in? Self-employment among ethnic minorities in England and Wales." *Labour Economics.* 7, pp.603-628.

Clark, Kenneth and Stephen Drinkwater. 2006. "Changing Patterns of Ethnic Minority Self-Employment in Britain: Evidence from Census Microdata," IZA Discussion Papers 2495, Bonn, Germany: Institute for the Study of Labor (IZA).

Fairlie, Robert W. 2006. "Entrepreneurship among Disadvantaged Groups: An Analysis of the Dynamics of Self-Employment by Gender, Race and Education," Handbook of Entrepreneurship, Volume 2, eds. Simon C. Parker, Zoltan J. Acs, and David R. Audretsch, Kluwer Academic Publishers, 437-478.

Fairlie, Robert W. 2008. Estimating the Contribution of Immigrant Business Owners to the U.S. Economy, U.S. Small Business Administration, Office of Advocacy, Washington, D.C.

Fairlie, Robert W. and Alicia M. Robb. 2008. *Race and entrepreneurial success: Black-, Asian-, and White-owned businesses in the United States.* Cambridge, MA: MIT Press.

Fairlie Robert W., Julie Zissimopoulos, and Harry A. Krashinsky. 2010. The international Asian business success story: A comparison of Chinese, Indian, and other Asian businesses in the United States, Canada, and United Kingdom. *International differences in entrepreneurship*, in Josh Lerner and Antoinette Shoar, eds. University of Chicago Press and National Bureau of Economic Research, 179-208.

Haltiwanger, John, Ron S Jarmin, and Javier Miranda. 2011. "Who Creates Jobs? Small vs. Large vs. Young," University of Maryland Working Paper.

Headd, B., and R. Saade. 2008. *Do business definition decisions distort small business results?* Washington, D.C. : U.S. Small Business Administration, Office of Advocacy working paper.

Herander, Mark G., and Luz A. Saavedra. 2005. "Exports and the Structure of Immigrant-Based Networks: The Role of Geographic Proximity," 87(2): 323-335.

Hunt, Jennifer, and Marjolaine Gauthier-Loiselle. 2010. "How much does immigration boost innovation?" American Economic Journal: Macroeconomics, 2(2): 31−56.

Kerr, William R., and William F. Lincoln. 2010. "The Supply Side of Innovation: H-1B Visa Reforms and U.S. Ethnic Invention", Journal of Labor Economics, 28(3): 473-508.

Lofstrom, Magnus. 2002. "Labor market assimilation and the self-employment decision of immigrant entrepreneurs", Journal of Population Economics, 15(1), January, 83-114.

OECD (2005). SME and Entrepreneurship Outlook − 2005 Edition, Organisation for Economic Co-operation and Development Press.

Partnership for a New American Economy and the Partnership for New York City. 2012. Not Coming to America: Why the U.S. is Falling Behind in the Global Race for Talent.

Reynolds, Paul. 2005. Entrepreneurship in the US: The Future is Now. Springer.

Saxenian, A. 1999. Silicon Valley's new immigrant entrepreneurs, San Francisco: Public Policy Institute of California.

Saxenian, A. 2000. Networks of immigrant entrepreneurs. In The Silicon Valley edge: A habitat for innovation and entrepreneurship. C. Lee, W. F. Miller, and H. S. Rowen, eds. Stanford: Stanford University Press.

Schuetze, H. J., and H. Antecol. 2007. Immigration, entrepreneurship and the venture start-up process. The life cycle of entrepreneurial ventures: International handbook series on entrepreneurship, vol. 3, S. Parker, ed. Springer: New York.

Singer, Audrey. 2012. Immigrant Workers in the U.S. Labor Force, Brookings Institute and Partnership for a New American Economy Report.

U.S. Department of Homeland Security. 2011. 2010 yearbook of immigration statistics, Washington, D.C.: Office of Immigration Statistics, http://www.dhs.gov/xlibrary/assets/statistics/yearbook/2010/ois_yb_2010.pdf.

U.S. Department of Homeland Security. 2012. EB-5 Immigrant Investor, http://www.uscis.gov.

U.S. Small Business Administration, Office of Advocacy. 2011. Research and Statistics, http://www.sba.gov/advocacy/847.

Wadhwa, V. A. Saxenian, B. Rissing, and G. Gereff. 2007. America's new immigrant entrepreneurs. Durham, NC: Duke University.

# End Notes

1    Tim Kane, Ewing Marion Kauffman Foundation, The Importance of Startups in Job Creation and Job Destruction (2010), http://www.kauffman.org/uploadedfiles/firm_formation_importance_of_startups.pdf.

2    Press Release, Ewing Marion Kauffman Foundation, Number of New Firms Continues to Slide, According to New Census Bureau Data (May 2, 2012), http://www.kauffman.org/newsroom/number-of-firms-continues-to-slide-according-to-new-census-bureau-data.aspx.

3    All individual stories in this report come from interviews conducted by Angela Marek Zeitlin and Hanna Siegel of the Partnership for a New American Economy, June-August, 2012.

4    *See infra*, section 6.

5    Fiscal Policy Institute, Immigrant Small Business Owners: A Significant and Growing Part of the American Economy (2012), http://fiscalpolicy.org/wp-content/uploads/2012/06/immigrant-small-business-owners-FPI-20120614.pdf. Research has shown that immigrants in many developed countries around the world, including the United States, United Kingdom, Canada, and Australia, have higher business ownership rates than their native-born counterparts. See: G.J. Borjas, The Self-Employment Experience of Immigrants, Journal of Human Resources, 21, Fall: 487-506 (1986); Magnus Lofstrom, Labor Market Assimilation and the Self-Employment Decision of Immigrant Entrepreneurs, Journal of Population Economics, 15(1), January: 83-114 (2002); Kenneth Clark and Stephen Drinkwater, Pushed Out or Pulled In? Self-Employment among Ethnic Minorities in England and Wales, Labour Economics, 7: 603-628 (2000); Clark and Drinkwater, Changing Patterns of Ethnic Minority Self-Employment in Britain: Evidence from Census Microdata, IZA Discussion Papers 2495, Institute for the Study of Labor (2006); H. J. Schuetze and H. Antecol, Immigration, Entrepreneurship and the Venture Start-Up Process, The Life Cycle of Entrepreneurial Ventures: International Handbook Series on Entrepreneurship, Vol. 3 (2007); Robert W. Fairlie, et al., The International Asian Business Success Story: A Comparison of Chinese, Indian, and Other Asian Businesses in the United States, Canada, and United Kingdom, International Differences in Entrepreneurship, University of Chicago Press and National Bureau of Economic Research: 179-208 (2010). Their impact has been especially well documented in certain sectors such as technology and engineering, where they play a disproportionately large role in founding companies and inventing the products that lead to companies. Immigrants found 50 percent of Silicon Valley companies and are behind more than three out of every four patents from the top U.S. universities. See: Vivek Wadhwa, et al., America's New Immigrant Entrepreneurs (2007), http://people.ischool.berkeley.edu/~anno/Papers/Americas_new_immigrant_entrepreneurs_I.pdf; A. Saxenian, Silicon Valley's New Immigrant Entrepreneurs, Public Policy Institute of California (1999); Saxenian, Networks of Immigrant Entrepreneurs, The Silicon Valley Edge: A Habitat for Innovation and Entrepreneurship, Stanford University Press (2000); Partnership for a New American Economy and the Partnership for New York City, Not Coming to America: Why the U.S. is Falling Behind in the Global Race for Talent (2012), http://www.renewoureconomy.org/sites/all/themes/pnae/not-coming-to-america.pdf. This impact of immigrants on innovation has even been found to have positive spillover effects in increasing the patenting rate of the native-born as well. See: Jennifer Hunt and Marjolaine Gauthier-Loiselle, How much Does Immigration Boost Innovation? American Economic Journal: Macroeconomics, 2(2): 31–56 (2010); William R. Kerr and William F. Lincoln, The Supply Side of Innovation: H-1B Visa Reforms and U.S. Ethnic Invention, Journal of Labor Economics, 28(3): 473-508 (2010). In recognition of the positive benefits of immigrant entrepreneurship, many developed countries have created special visas and entry requirements for immigrant entrepreneurs. See: Schuetze and Antecol (2006); Partnership for a New American Economy (2012).

6    The ACS is the only nationally representative dataset with a large enough sample size to examine business ownership among immigrant groups, and the SBO is the only business-level dataset with information on a large sample of immigrants. Matching consecutive months of CPS data creates the only longitudinal data source, which is needed to study business formation, with large enough immigrant samples. The full methodology is explained in greater detail in Appendix A. The results presented here build on an earlier related study using the 2000 Census 5 percent PUMS, 1996-2007 CPS and 1992 Characteristics of Business Owners. See: Robert W. Fairlie, U.S. Small Business Administration, Office of Advocacy, Estimating the Contribution of Immigrant Business Owners to the U.S. Economy (2008).

7    Tim Kane, Ewing Marion Kauffman Foundation, The Importance of Startups in Job Creation and Job Destruction (2010), http://www.kauffman.org/uploadedfiles/firm_formation_importance_of_startups.pdf.

8    Press Release, White House, President Obama To Sign Jumpstart Our Business Startups (JOBS) Act (April 5, 2012), http://www.whitehouse.gov/the-press-office/2012/04/05/president-obama-sign-jumpstart-our-business-startups-jobs-act. Another recent examples is the "STARTUP 2.0" bill introduced by Democratic Senators Mark Warner and Chris Coons and Republican Senators Jerry Moran and Marco Rubio in May of 2012 that would create a visa for foreign entrepreneurs, provide tax credits for research and development at young startups, and make permanent a capital gains exemption to help draw investment to new startups. See: Press Release, Senator Marco Rubio, Sens. Rubio, Coons, Moran, and Warner, Offer Bipartisan Job Creation Plan (May 22, 2012), http://www.rubio.senate.gov/public/index.cfm/press-releases?ID=d8319a4a-b008-4b7e-98f4-1c0339c78bd5.

9    John Haltiwanger, Ron Jarmin, and Javier Miranda, Ewing Marion Kauffman Foundation, Where Have All the Young Firms Gone? (May 2012), http://www.census.gov/ces/pdf/BDS_StatBrief6_Young_Firms.pdf.

10   The American Community Survey, which provides annual data on immigrant share of the population, was not fully implemented until 2005. For prior years, data was only available from the decennial censuses. According to the census, immigrants accounted for 7.9 percent of the population in 1990 and 11.1 percent in 2000.

11   Telephone Interview with Rohit Arora (Jul 12, 2012).

12   The World Bank, World Development Indicators, http://data.worldbank.org/country/united-states (last accessed Aug 8, 2012).

13   *Id.*

14   Made in America: Increasing Jobs through Exports and Trade, Testimony of Daniel J. Ikenson of the Cato Institute to the Subcommittee on Commerce, Manufacturing, and Trade (Mar 16, 2011), http://www.cato.org/publications/congressional-testimony/made-america-increasing-jobs-through-exports-trade.

15   *Id.*

16   U.S. Department of Commerce, International Trade Administration, Exports Play a Vital Role in Supporting U.S. Employment (May 2010), http://trade.gov/publications/ita-newsletter/0510/itu_0510.pdf.

17   Tyler Cowen, What Export-Oriented America Means, The American Interest (May/June 2012), http://www.the-american-interest.com/article.cfm?piece=1227.

18   United States Department of Labor, Bureau of Labor Statistics, Import and Export Price Indexes (July 2012), http://www.bls.gov/news.release/ximpim.nr0.htm (last accessed Aug 8, 2012).

19   Giovanni Peri and Francisco Requena-Silvente, Do Immigrants Create Exports? Evidence From Spain, Vox (Jan 26, 2010), http://www.voxeu.org/article/do-immigrants-create-exports-new-evidence-spain.

20   Mark G. Herander and Luz A. Saavedra, Exports and the Structure of Immigrant-Based Networks: The Role of Geographic Proximity, The Review of Economics and Statistics, 87(2): 323-335 (2005).

21   The data used to calculate exports come from the 2007 Survey of Business Owners which, for the first time, included information on both owner's immigrant status and exports. Tabulations of export levels for immigrant and non-immigrant businesses from the 2007 SBO were commissioned specifically for the research in this report. Similar to sales, employment and payroll these data are not available for immigrant businesses in published reports by the Census Bureau. The reported percentages represent the share of total sales of goods and services represented by exporters outside of the United States.

22   Tyler Cowen, What Export-Oriented America Means, The American Interest (May/June 2012), http://www.the-american-interest.com/article.cfm?piece=1227.

23   Telephone Interview with Metta Murdaya (Jun 24, 2012).

24   United States Department of Commerce, Bureau of Economic Analysis, National Data: Gross Domestic Product, http://www.bea.gov/national/index.htm#gdp (last accessed Aug 8, 2012).

25   *Id.*

26   Congressional Budget Office, Federal Budget Deficit for Fiscal Year 2011: $1.3 Trillion (Nov 8, 2011), http://www.cbo.gov/publication/42573; Congressional Budget Office, Recap of Fiscal Year 2010 Budget Results (Nov 5, 2010) http://www.cbo.gov/publication/25114; Congressional Budget Office, Federal Budget Deficit Totals $1.4 Trillion in Fiscal Year 2009 (Nov 6, 2009), http://www.cbo.gov/publication/24992.

27   Recession Cost Uncle Sam $4.2 Trillion, Wall Street Journal, April 21, 2011, http://articles.marketwatch.com/2011-04-21/commentary/30746730_1_stimulus-spending-tax-cuts-unemployment-benefits.

28   This number actually undersells the revenue generated by immigrant-owned firms because it does not include any revenue from the 12.5 million firms in American where the founder's status—immigrant and otherwise—is indeterminate, a group of companies that generate more than $3 trillion in sales annually.

29   In the income generated by immigrant-owned businesses is measured by using the American Community Survey to examine the contribution of immigrant business owners to total business income generated by all U.S. business owners. This measure captures the owner's income from the business and does not capture what is paid to employees (which was examined later). The revenue generated by immigrant-owned businesses is measured by examining the total sales and receipts by immigrant-owned businesses. As noted above, however, published estimates from the SBO do not report sales for immigrant business owners. Instead, estimates from specially commissioned tabulations from the SBO are reported. The SBO is the only large nationally representative business-level dataset that provides information on immigrant status. Total sales information in the SBO is based on administrative data collected by the Census Bureau from tax reporting. Total sales data do not subtract out total expenses or payroll expenses, and thus do not represent profits of the business. Total sales represent a gross measure and not a measure of the productivity of the firm. But, total sales captures the total gross flow of revenues to the business, and thus represent a good measure of business contributions to the economy. As noted above, following the convention used by the Census Bureau in reporting business statistics by race, immigrant-owned businesses are defined as those with majority foreign-born ownership (51% or more) and non-immigrant businesses are defined as those with majority U.S.-born ownership (51% or more).

OPEN FOR BUSINESS

30  The data on revenue from immigrant-owned businesses is not available from 2000, so the analysis of changes in business revenue over time cannot be made.

31  U.S. Department of Labor, Bureau of Labor Statistics, Consumer Price Index, ftp://ftp.bls.gov/pub/special.requests/cpi/cpiai.txt (last accessed Aug 8, 2012).

32  As estimated in the 2000 Census 5 Percent PUMS data. See: Fairlie (2008).

33  Mortimer B. Zuckerman, The Great Jobs Recession Goes On, U.S. News and World Report, Feb 11, 2011, http://www.usnews.com/opinion/mzuckerman/articles/2011/02/11/the-great-jobs-recession-goes-on.

34  United States Department of Labor, Bureau of Labor Statistics, The Recession of 2007-2009 (Feb 2012), http://www.bls.gov/spotlight/2012/recession/

35  Id.

36  Press Release, U.S. Department of Labor, Bureau of Labor Statistics, The Employment Situation—2012 (Aug 3, 2012), http://www.bls.gov/news.release/pdf/empsit.pdf.

37  Estimates of employment for immigrant-owned businesses are derived from specially-commissioned tabulations of the Survey of Business Owners, which is the only dataset with employment information for a large nationally representative sample of immigrant-owned businesses.

38  "Privately-owned companies" excludes the government, nonprofits, public companies, which have no one person or group of people that can be called the "owner," and any other company where the owner is not identifiable.

39  Telephone Interview with Sergio Bermudez (Jul 24, 2012).

40  For example, research by Vivek Wadhwa has found that immigrants founded more than 25 percent of technology companies nationwide, and more than 50 percent of such companies in Silicon Valley. See: Wadhwa et al. (2007).

41  Press Release, U.S. Department of Labor, Bureau of Labor Statistics, Employment Projections—2010-20 (Feb 1, 2012), http://www.bls.gov/news.release/pdf/ecopro.pdf.

42  The CPS data from which the immigrant share of new companies is derived only exists for the category of "education and health services" and is not broken up precisely into "health care and social assistance" and "educational services," which BLS lists as two separate categories.

43  The CPS data from which the immigrant share of new companies is derived gives data from "wholesale and retail trade," and not specifically for "retail trade."

44  The CPS data from which the immigrant share of new companies is derived only exists for the category of "education and health services" and is not broken up precisely into "health care and social assistance" and "educational services," which BLS lists as two separate categories.

45  The Bureau of Labor Statistics uses the industry sector of "Other Services" to "comprise[] establishments engaged in providing services not specifically provided for elsewhere in the classification system. Establishments in this sector are primarily engaged in activities, such as equipment and machinery repairing, promoting or administering religious activities, grantmaking, advocacy, and providing drycleaning and laundry services, personal care services, death care services, pet care services, photofinishing services, temporary parking services, and dating services." See: U.S. Department of Labor, Bureau of Labor Statistics, Description of Other Services (except Public Administration): NAICS 81, http://www.bls.gov/iag/tgs/iag81.htm (last accessed Aug 10, 2012).

46  The lack of available data has made it very difficult to conclusively analyze the failure rates of immigrant and native-owned businesses, and there are no conclusive studies on the subject. Some anecdotal evidence has suggested that immigrant startups fail at a slightly higher rate than those of the native-born. Conversely, a few studies have shown that some specific immigrant groups have lower failure rates than their native-born counterparts, such as Korean and Chinese retail storeowners, who were found to have failure rates more than 40 percent lower than both native-born white and African-American retail storeowners. See: Timothy Bates, Race, Self-Employment and Upward Mobility, Woodrow Wilson Center Press: 215 (1997). Evidence from other countries is equally inconclusive, but does seem to suggest that immigrants are in fact slightly less likely to have their startups succeed. In France, for example, researchers found that immigrant-owned startups failed at higher rates during growth periods (54 percent of native-owned startups were still in existence after three years, compared with 40 percent for immigrant-owned startups), but that in periods of slow economic growth the failure rates of the two groups were equivalent. See: Maria Vincenza Desiderio and John Salt, Main Findings of the Conference on Entrepreneurship and Employment Creation of Immigrants in OECD Countries, Organisation for Economic Co-operation and Development, Paris (June 9-10, 2010), http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=3&ved=0CFsQFjAC&url=http%3A%2F%2Fwww.oecd.org%2Fmigration%2F46424942.doc&ei=JMsjUJqlN6X40gHJ24DgDw&usg=AFQjCNE5obqcJmU1TZosBNkRQFSGKLOqww.

47  Immigrants already own more than one-quarter of all businesses in the transportation and more than 20 percent of all businesses in retail trade, wholesale trade, and health care and social assistance.

48  Telephone Interview with Tashitaa Tufaa (Jul 16, 2012).

49  The immigrant population numbers come from an analysis of the 2010 census conducted by the Migration Policy Institute.  See: Migration Policy Institute, 2010 American Community Survey and Census Data on the Foreign Born by State, http://www.migrationinformation.org/datahub/acscensus.cfm (last accessed Aug 10, 2012).

50  This is consistent with previous findings on the importance of immigrants in California and the Silicon Valley. See: Saxenian (1999 & 2000); and Wadhwa et al. (2006).

51  See discussion of failure rates in footnote 46.

52  Alex Goldmark, Terracycle to Turn Dirty Diapers Into Park Benches, Fast Company, August 27, 2011, http://www.fastcoexist.com/1679425/terracycle-to-turn-dirty-diapers-into-park-benches.

53  Telephone Interview with Tom Szaky (Mar 30, 2012).

54  Estimates of immigrant-owned business starts are reported only for the 10 largest immigrant groups because sample sizes are not large enough. Although the number of non-business owners is large for each source country, the number of new business owners per month recorded in the data is relatively small (0.28 percent).

55  According to past research by the Brookings Institution and the Partnership for a New American Economy, Roughly 29 percent of immigrants would launch a high school diploma compared with just 7.4 percent of the native-born. See: Brookings Institution & Partnership for a New American Economy, Slideshow: Immigrant Workers in the U.S. Labor Force (Mar 2012), http://www.renewoureconomy.org/brook_slideshow#3.

56  Unemployment in the U.S. tends to track educational attainment. In 2011, high school dropouts had an unemployment rate of 14.1 percent. The unemployment rate dropped to 9.4 percent for those with a high school degree, 4.9 percent for those with a college degree, 3.6 percent for those with a masters, and 2.5 percent for those with a PhD. New businesses in communities where many or most residents lack a high school diploma should therefore be a key priority of our economic recovery. And, to the extent that people in the United States tend to live in communities with people of similar educational attainment, the data suggest that immigrants are disproportionately poised to start new businesses among communities with the highest unemployment. See: U.S. Department of Labor, Bureau of Labor Statistics, Employment Projections (Mar 23, 2012), http://www.bls.gov/emp/ep_chart_001.htm/ (last accessed Aug 9, 2012).

57  See: U.S. Chamber of Commerce, Immigrant Entrepreneurs: Creating Jobs and Strengthening the Economy, www.uschamber.com/sites/default/files/reports/Immigrant%20Entrepreneur%20final%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.pdf; Wall Street Journal, Migrants Keep Small-Business Faith, (Jun 13, 2012), http://online.wsj.com/article/SB10001424052702303410404577464853249366254.html; and Immigrant Learning Center, Immigrant Entrepreneurs and Neighborhood Revitalization, http://www.ilctr.org/wp-content/uploads/2009/09/immigrant_entrepreneur.pdf.

58  Telephone Interview with Shukri Ali (Jul 15, 2012).

59  Telephone Interview with Ismail Ahmed (Jul 11, 2012).

60  Some unemployed individuals may report being self-employed if they sell a small quantity of goods or services while not working at their regular jobs.

61  For more discussion on the comparison between individual-level and business-level data on entrepreneurship, see: B. Headd and R. Saade, Do Business Definition Decisions Distort Small Business Results? U.S. Small Business Administration, Office of Advocacy working paper (2008); and Robert W. Fairlie and Alicia M. Robb, Race and Entrepreneurial Success: Black-, Asian-, and White-Owned Businesses in the United States, MIT Press, (2008).

62  Published data from the Census Bureau also only report foreign-born owners and not businesses (which is why no sales, employment, payroll and export information is reported). Nonetheless, research by Robert W. Fairlie finds  that published estimates for the SBO report show a very similar ratio of foreign-born owners to foreign-born and U.S. born owners.

© 2012. ALL RIGHTS RESERVED

# BRINGING VITALITY TO

# MAIN STREET

## How Immigrant Small Businesses Help Local Economies Grow




**About Americas Society/Council of The Americas**

Americas Society and Council of the Americas (AS/COA) unite opinion leaders to exchange ideas and create solutions to the challenges of the Americas today.

Americas Society (AS) is the premier forum dedicated to education, debate and dialogue in the Americas.[1] Council of the Americas (COA), affiliate organization to AS, is the premier international business organization with a membership that consists of leading international companies representing a broad spectrum of sectors including banking and finance, consulting services, consumer products, energy and mining, manufacturing, media, technology, and transportation.[2]

The positions and opinions expressed in this publication do not represent those of Americas Society and Council of the Americas members or the boards of directors of either organization.

This report was made possible with support from the Rockefeller Brothers Fund. The opinions and views of the authors do not necessarily state or reflect those of the Fund.

For further information about AS/COA, visit AS/COA Online at **www.as-coa.org**

**About the Fiscal Policy Institute**

The Fiscal Policy Institute (**www.fiscalpolicy.org**) is an independent, non-partisan, non-profit research and education organization committed to improving public policies and private practices to better the economic and social conditions of all New Yorkers. Founded in 1991, FPI works to create a strong economy in which prosperity is broadly shared. FPI's Immigration Research Initiative examines the role of immigrants in the New York State economy and beyond. The Immigration Research Initiative receives core funding from the Carnegie Corporation of New York, the Ford Foundation and the Open Society Foundations for its role in the State Priorities Partnership (coordinated by the Center on Budget and Policy Priorities). Opinions expressed here do not necessarily reflect the views of the foundations that support this work.

*No part of this publication may be reproduced in any form without permission in writing from Americas Society/Council of the Americas and the Fiscal Policy Institute.*

1  Americas Society is a tax-exempt public charity described in 501(c)(3) and 509(a)(1) of the Internal Revenue Code of 1986.

2  Council of the Americas is a tax-exempt business league under 501(c)(6) of the Internal Revenue Code of 1986, and as such, actively pursues lobbying activities to advance its purpose and the interests of its members.

# BRINGING VITALITY TO

## MAIN STREET

## How Immigrant Small Businesses Help Local Economies Grow

*—January 2015*

**David Dyssegaard Kallick**, director of the Immigration Research Initiative at the Fiscal Policy Institute, prepared this report. He gratefully acknowledges the constant research support of **James Parrott**, FPI's chief economist, review from **Ron Deutsch**, FPI's interim executive director, and invaluable data analysis by FPI research associates **Hui Liu** and **Eloy Fisher**. The Immigration Research Initiative's research advisory panel provided valuable input and review, and the report is deeply indebted to interviewees in Philadelphia, Minneapolis–St. Paul and Nashville, too numerous to name here. Both the advisory committee and interviewees are acknowledged at **www.fiscalpolicy.org/Acknowledgements**.

**At Americas Society/Council of the Americas**,
**Kate Brick**, policy manager, leads the AS/COA Immigration and Integration Initiative, under which this report was produced. **Steven McCutcheon Rubio**, policy associate, helps oversee the organization's immigration work. **Susan Segal**, president and CEO, supports and guides the organization's immigration work. **Richard André**, former policy manager at AS/COA, played a fundamental role in the development of this report, which was also supported by the work of policy intern **Zachary Bleckner**.

**Paula Daneze** designed this publication.

ALL PHOTOS BY DAVID DYSSEGAARD KALLICK

# TABLE OF CONTENTS

**2** Executive Summary

**4** Introduction

**5** Part 1: Immigrants and Small Business Ownership: An Outsize Role on Main Street

**14** Part 2: Lessons from the Field: Philadelphia, Minneapolis–St. Paul, and Nashville

**34** Conclusion & Best Practices: A Toolkit for Supporting Immigrant Business Growth

**37** Methodology

# EXECUTIVE SUMMARY

Over the past decade, several studies have shown that immigrants are more likely than their U.S.-born counterparts to be business owners. Less well known, however, is the outsize role immigrants are playing among "Main Street" businesses—the shops and services that are the backbone of neighborhoods around the country.

Immigrants' role in Main Street businesses is striking. While accounting for 16 percent of the labor force nationally and 18 percent of business owners, immigrants make up 28 percent of Main Street business owners. And, immigrants play an even bigger role in certain Main Street businesses. Data from 2013, the most recent year available, show that in the U.S. as a whole immigrants make up 61 percent of all gas station owners, 58 percent of dry cleaners owners, 53 percent of grocery store owners, 45 percent of nail salon owners, 43 percent of liquor store owners, 38 percent of restaurant owners, and 32 percent of both jewelry and clothing store owners.

And, immigrants make up a bigger proportion of Main Street business owners in metropolitan areas with large immigrant populations. Immigrants make up fully 64 percent of all Main Street business owners in the Los Angeles metro area, 61 percent in metro San Jose, 56 percent in metro Washington, D.C., and 54 percent in metro Miami.

Main Street businesses make a direct contribution to the economy, but they also leverage that contribution by playing a critical role in making neighborhoods attractive places to live and work. A restaurant comes into a part of town that has had boarded-up storefronts and—while mainly serving local customers at first—starts to attract a clientele from around the city before long. A grocery store opens nearby, a few clothes stores, and maybe a barber or a beauty salon. More eyes on the street mean safer streets, and before long the neighborhood becomes a place more people

want to come and live. What may have been an area in disrepair becomes more vibrant and more economically viable, with an increased tax base, more local spending, and more local jobs.

The statistics here include all immigrants, including undocumented immigrants, refugees and high-skilled visa holders. There are important distinctions among these groups, but there are business owners among all of them, in varying proportions.

The role of immigrants and immigrant Main Street business owners in neighborhood revitalization and local economic development should be of

## IMMIGRANTS MAKE UP 28 PERCENT OF MAIN STREET BUSINESS OWNERS.

particular interest to cities that saw significant population decline in the 1950s, 1960s and 1970s and are eager to bring about a rebound in population today—cities such as Baltimore, St. Louis, Detroit, Pittsburgh, and Chicago. Over the past several decades, immigrants have given a critical population boost to cities with population decline. Among the 50 cities that had the largest populations in 1970, all of those cities with low levels of immigration have seen a total population decline from their mid-20th century peak.

Offering a welcoming environment and a supportive infrastructure for immigrant communities is a smart strategy

for cities and states. And paying particular attention to immigrant Main Street business owners can be a very valuable part of that strategy, boosting neighborhood growth and often helping U.S.-born business owners along the way.

Case studies from three metro areas that have experienced population rebound or growth yield some important lessons about realistic ways to help nurture immigrant Main Street business ownership and the economic revitalization it can spur.

In Philadelphia, city government and non-profit groups have focused on supporting the integration of immigrant businesses into the commercial corridors around the city, helping to boost their revival and to ease tensions with existing communities.

In Minneapolis–St. Paul, a range of non-profit groups, together with support from a federal tax credit program, foundations and corporations developed a series of mall-sized markets that are both incubators for new businesses and neighborhood development projects in their own right.

In Nashville, a broad coalition of business, labor, community, and political leaders came together to push back against a referendum that was seen to be anti-immigrant, in the process creating a lasting set of relationships that have helped set a positive tone around immigrant integration in the city. And, in all of the areas there were innovations in small

business financing, culturally competent approaches to providing business services and classes, and a rethinking of how small businesses relate to city agencies.

Immigrants are not magic ingredients to an economic development strategy, but they are an asset to the cities they join. When that asset is underutilized, it is a loss to the local economy. Finding ways to maximize the potential of immigrant Main Street business owners while creating a positive climate for U.S.-born business owners should be an important project for cities seeking to leverage the contribution of their immigrant populations.

Some of the recommendations from our research are:

- Create a government office to address immigrant integration.

- Provide culturally competent business training and services.

- Make sure programs are open to all.

- Make financing innovative and community-based.

- Strengthen incubators—especially commercial kitchens.

- Improve (and clarify) licensing and inspection processes for everyone.

# INTRODUCTION

**D**espite the growing body of research on the economic impact of immigrants, few studies have focused on the outsize role that immigrants have played in "Main Street" businesses—the shops that give a neighborhood its character, such as restaurants, grocery stores, clothing boutiques, and beauty salons. Even less research has looked at how various programs and initiatives can support immigrant small business owners, or the impact of removing barriers to immigrant entrepreneurship on a city's economic development.

This reports aims to address that gap. It seeks to uncover and quantify the valuable role immigrants play as business owners in cities around the country, and to highlight—through in-depth looks into three metro areas that are gateways for immigrants—how local government, civil society and the private sector can work together to support this population.

Part One presents a quantitative analysis of the impressive role immigrants are playing among Main Street businesses in the U.S., looking at Main Street business ownership in the country's 50 largest metro areas. It looks at the particular challenge of central cities with declining populations and considers the role Main Street businesses play in revitalizing neighborhoods and rebuilding central city business districts.

> **FEW STUDIES HAVE FOCUSED ON THE OUTSIZE ROLE THAT IMMIGRANTS HAVE PLAYED IN MAIN STREET BUSINESSES.**

Part Two combines quantitative analysis with a qualitative study of immigrant Main Street businesses—and efforts of local governments and non-profits to support them—in Philadelphia, Minneapolis–St. Paul and Nashville. In Philadelphia and Minneapolis–St. Paul, it examines the role immigrant businesses have played in reversing decades of population decline, and, in particular, how these businesses helped re-establish a commercial base for neighborhoods that were in disrepair, giving them new character and a critical economic boost. And, in Nashville, it shows how the vibrancy of immigrant neighborhoods have helped fill in and transform areas that were the less expensive parts of town, in some cases spurring the interest of a new generation of hipsters and foodies who now come to visit or to live in neighborhoods they might previously have overlooked.

# PART I: IMMIGRANTS AND SMALL BUSINESS OWNERSHIP: AN OUTSIZE ROLE ON MAIN STREET

Of the the country's 4.9 million business owners, 900,000 are immigrants.[1] While representing 16 percent of the labor force overall, they represent 18 percent of business owners (**FIGURE 1**).[2] This differential of two percentage points means immigrants are about 10 to 15 percent more likely to be business owners than their U.S.-born counterparts.[3]

More striking than the modest overrepresentation of immigrants among all business owners, however, is the outsize role that immigrants are playing among "Main Street" businesses. While immigrants make up 18 percent of business owners overall, they make up fully 28 percent of the owners of Main Street businesses. Main Street businesses are defined here as those which fall into three broad sectors: Retail (from jewelry stores to florists to grocery stores), Accommodation and Food Services (restaurants, bars and hotels), and Neighborhood Services (beauty salons, barber shots, nail salons, dry cleaning, and car washes). The first two are standard industry categories, while the third is the majority of what is generally called "Other Services."

Immigrants make up 61 percent of gas station owners, 58 percent of dry cleaners owners, 53 percent of grocery store owners, 45 percent of nail salon owners, 43 percent of liquor store owners, 38 percent of restaurant owners, and 32 percent of both jewelry and clothing store owners.[4]

The owners of Main Street businesses make up a substantial share of the country's business owners overall. Of the 4.9 million business owners in the U.S., Main Street business owners make up 900,000. Not only are immigrants important to Main Street businesses, Main Street businesses are also important to immigrants. Because the total number of immigrant business owners in the country is coincidentally also 900,000, the country's 255,000 immigrant Main Street business owners make up 28 percent of all Main Street business, and they

also make up 28 percent of all immigrant business owners (**FIGURES 2 AND 3**).[5]

Because Main Street businesses generally do not generate goods and services that are sold around the country or globally—unlike the high-tech sector, for example—they are infrequently the focus of economic development efforts. Yet, Main Street businesses present an important opportunity not only for residents who start out with little; they are also often a first business for immigrants and a source of first jobs for people in the community. And, they play an important role in generating neighborhood-level economic growth by making areas attractive places to live and work. Main Street businesses increase the tax base, and they spark further economic activity through increased consumer spending.

These are often businesses with a thin profit margin. Main Street business owners represent 18 percent of all business owners but take home only 13 percent of business earnings. Nonetheless, the earnings of Main Street business owners are significant, totaling $50 billion—$37 billion for U.S.-born business owners and $13 billion for immigrants (**FIGURE 4**).



**FIGURE 1.**
### 28 Percent of Main Street Business Owners are Immigrants
Fiscal Policy Institute (FPI) analysis of American Community Survey (ACS) 2013 5-year data.

**FIGURE 2.**

## Immigrants Make Up a Very High Share of Nearly All Main Street Business Owners

FPI analysis of ACS 2013 5-year data.
Business types with the highest concentration of immigrants shown first.

| | ALL | FOREIGN-BORN | FOREIGN-BORN SHARE |
|---|---|---|---|
| **Neighborhood Services** | **145,777** | **45,220** | **31%** |
| Dry cleaning and laundry services | 19,605 | 11,343 | 58% |
| Nail salons and other personal care services | 30,874 | 13,963 | 45% |
| Car washes | 8,336 | 1,861 | 22% |
| Beauty salons | 78,107 | 16,312 | 21% |
| Barber shops | 8,854 | 1,742 | 20% |
| **Accommodation and Food Services** | **237,224** | **84,748** | **36%** |
| Traveler accommodation | 15,944 | 6,440 | 40% |
| Restaurants and other food services | 204,252 | 76,828 | 38% |
| Drinking places, alcoholic beverages | 13,973 | 1,301 | 9% |
| RV parks and camps, and rooming and boarding houses | 3,055 | 178 | 6% |
| **Retail** | **517,079** | **125,282** | **24%** |
| Gasoline stations | 19,002 | 11,508 | 61% |
| Grocery stores | 49,715 | 26,116 | 53% |
| Beer, wine and liquor stores | 12,964 | 5,531 | 43% |
| Specialty food stores | 16,618 | 5,813 | 35% |
| Jewelry, luggage and leather goods stores | 16,892 | 5,437 | 32% |
| Clothing stores | 23,429 | 7,385 | 32% |
| Health and personal care stores, except drugstores | 17,029 | 5,169 | 30% |
| Department and discount stores | 3,117 | 871 | 28% |
| Radio, TV and computer stores | 16,389 | 4,164 | 25% |
| Electronics stores | 3,929 | 996 | 25% |
| All other | 337,996 | 52,293 | 15% |
| **Total** | **900,080** | **255,250** | **28%** |

**Source:** FPI analysis of 2013 5-year ACS data. Business types with the highest concentration of immigrants shown first.

**FIGURE 3.**

## Of 4.9 Million Business Owners, 18 Percent Have Main Street Businesses

FPI analysis of ACS 2013 5-year data.

| | TOTAL | FOREIGN-BORN |
|---|---|---|
| **Main Street Business Owners** | **900,080** | **255,250** |
| All business owners | 4,913,811 | 895,793 |
| Main Street share | 18% | 28% |

**6** BRINGING VITALITY TO MAIN STREET:
HOW IMMIGRANT SMALL BUSINESSES HELP LOCAL ECONOMIES GROW

## PART I: IMMIGRANTS AND SMALL BUSINESS OWNERSHIP

Main Street businesses are also more likely to be medium-sized employers. Analysis by the Fiscal Policy Institute (FPI) using the Survey of Business Owners (SBO) shows that while, overall, businesses are most likely to have 10 or fewer employees, Main Street businesses are a little more likely to have 11–49 employees. This is driven in large part by the accommodation and food services businesses (**FIGURE 5**).[6]

The overwhelming majority of U.S.-born Main Street business owners are white. Just four percent are black, five percent Hispanic and one percent Asian—far less than their share of the labor force. Among immigrant Main Street business owners the very prominent place of Asians stands out: Asians make up 49 percent of all immigrant Main Street business owners, playing an especially big role in restaurants, dry cleaners and nail salons. Whites are 26 percent of immigrant Main Street business owners, Hispanics 20 percent and blacks 3 percent (**FIGURE 6**). Twelve percent of immigrant Main Street Business owners were born in Korea, 10 percent in India, 10 percent in Mexico, and 8 percent in Vietnam—yet the top 10 countries combined make up only 59 percent of the total, with immigrants from around the world playing a role.

## Immigrants, Main Street Businesses and Economic Growth

**A**s immigration has grown, so has overall immigrant business ownership, with Main Street businesses playing an important part in that growth. This is a reassuring finding since it helps explain why studies have repeatedly found that immigrant workers are absorbed into the economy with only modest displacement of some categories of U.S.-born workers and no displacement overall: Immigrants are not just workers; they are also entrepreneurs. Their arrival expands the overall economy through new business development as well as through added investment and consumer spending.

Looking at the growth in business ownership in the U.S. and in the country's 50 largest metropolitan areas, we see that immigrants are not only playing a very



**FIGURE 4.**
**Main Street Businesses Brought $13 Billion in Earnings to Immigrant Business Owners**
FPI analysis of ACS 2013 5-year data.

U.S.-BORN
FOREIGN-BORN

$335
$65
$37
$13

All Business Owners
Main Street Business Owners

big part in the growth of Main Street business ownership, but also in the growth of business ownership overall. Between 2000 and 2013, immigrants accounted for 48 percent of overall growth of business ownership in the U.S. During this time, the number of U.S.-born business owners grew by 400,000, while immigrant-owned businesses grew by 370,000.

At the same time, immigrants accounted for all of the growth in Main Street businesses. The total number of U.S.-born Main Street business owners actually declined by 30,000, while immigrant Main Street business owners increased by 90,000, for a total net gain of 60,000.

As in the country as a whole, immigrants accounted for all of the growth in Main Street businesses in 31 of the country's 50 largest metropolitan areas (**FIGURE 7**). Immigrants made up an impressive share of the increase in the remaining 19 metro areas as well, from 28 percent in Sacramento, 33 percent in Austin and 36 percent in Denver to over 90 percent in Philadelphia, Miami, San Diego, and San Francisco—96, 95, 92, and 91 percent, respectively.

The number of immigrant Main Street business owners increased even in the seven metro areas that saw an overall decline in the number of Main Street business owners: Detroit, Birmingham, Columbus, Cleveland, Milwaukee, Pittsburgh, and Providence,

**FIGURE 5.**

### There Are More Medium-Sized Employers Among Main Street Businesses than Among Private Businesses Overall

FPI analysis of Survey of Business Owners (SBO) 2007. Foreign born-owned refers to businesses in which half or more of the owners are foreign born.



**MAIN STREET BUSINESSES**

■ 50 EMPLOYESS OR ABOVE
■ 11–49 EMPLOYEES
■ 10 OR FEWER EMPLOYEES

Foreign Born-Owned: 2%, 17%, 81%
U.S. Born-Owned: 4%, 24%, 72%

**ALL PRIVATELY OWNED BUSINESSES**

Foreign Born-Owned: 2%, 17%, 83%
U.S. Born-Owned: 4%, 19%, 77%

**FIGURE 6.**

### Main Street Business Owners by Race and Nativity

FPI analysis of ACS 2013 5-year data.



■ U.S.-BORN
■ FOREIGN-BORN

White: 88%, 26%
Black: 4%, 3%
Hispanic/Latino: 5%, 20%
Asian: 1%, 49%

## PART I: IMMIGRANTS AND SMALL BUSINESS OWNERSHIP



**FIGURE 7.**
**The 31 Metro Areas in Which Immigrants Make Up All Growth in Main Street Business Ownership**
Growth in Business Ownership in Metro Areas from 2000 to 2013 FPI analysis of Census 2000 and ACS 2013 5-year data.



CHANGE IN NUMBER OF U.S.–BORN BUSINESS OWNERS

CHANGE IN NUMBER OF FOREIGN-BORN BUSINESS OWNERS

though often by small numbers. There were 500 more immigrant Main Street business owners in Providence in 2013 than in 2000, 400 in Detroit and Columbus, and numbers too small to be measured with reliability in the other areas.

**FIGURE 8** shows a different dimension: the change in immigrant share of business owners in each metro area over the same period. There we can see not just the growth, but the overall importance of immigrants as Main Street business owners. Impressively, immigrants make up 64 percent of Main Street business owners in metro Los Angeles today (up from 57 percent in 2000), 61 percent in metro San Jose (up from 45 percent), 56 percent in metro Washington, D.C. (up from 43 percent), and 54 percent in metro Miami (up from 46 percent).

Immigrants who own a business generally do better than other immigrants, just as U.S.-born business owners do better than other U.S.-born workers. Main Street businesses are less capital intensive, small-scale, and more locally oriented, giving them in general lower profit margins. Owners of Main Street businesses generally earn about the same as the overall median for the labor force—in some metro areas a little more and in some a little less. Nationally, the median earnings for immigrants overall are $35,000, with immigrant business owners making considerably more ($49,000) and immigrant Main Street business owners making just a little more ($37,000). U.S.-born earners tend to make more in all categories, but the pattern is roughly the same, with the median earnings for U.S.-born Main Street business owners slightly below the median for all workers at the national level (**FIGURE 9**).

The big numbers of immigrant Main Street business owners are all the more impressive when we consider that would-be immigrant entrepreneurs face a host of challenges,

**FIGURE 8.**
## Immigrants Make Up a Big and Growing Share of Main Street Businesses
50 Largest Metropolitan Statistical Areas
Across Metro Areas, Immigrant Share of Main Street Business Owners Grew Between 2000 and 2013



**FIGURE 9.**
## Main Street Business Owners Earn Less than Other Business Owners
FPI analysis of Census, ACS 2013 5-year data. Median earnings are for people who worked full-time and year-round.

| Importance of Small Business Owners | |
|---|---|
| Earnings of Business Owners as a Share of the Earnings of All in the Civilian Labor Force | 6% |
| Earnings of Main Street Business Owners as a Share of Earnings of All Business Owners | 15% |
| **Foreign Born** | |
| Median Earnings in the Civilian Labor Force | $35,000 |
| Median Earnings of Business Owners | $49,000 |
| Median Earnings of Main Street Business Owners | $37,000 |
| **U.S. Born** | |
| Median Earnings in the Civilian Labor Force | $45,000 |
| Median Earnings of Business Owners | $60,000 |
| Median Earnings of Main Street Business Owners | $44,000 |

from linguistic and cultural barriers to institutional ones. To cite one example, immigrant small businesses often encounter difficulties associated with not having a credit history and with a lack of familiarity with the American banking system.[7]

When immigrants try to get start-up capital to open a business, for both Main Street businesses and in general, they are more likely than their U.S.-born counterparts to rely on savings and less likely to get a bank loan (**FIGURE 10**).

**10** BRINGING VITALITY TO MAIN STREET:
HOW IMMIGRANT SMALL BUSINESSES HELP LOCAL ECONOMIES GROW

# PART I: IMMIGRANTS AND SMALL BUSINESS OWNERSHIP



■ IMMIGRANT SHARE IN 2000
■ IMMIGRANT SHARE IN 2013



The lower level of reliance on—or access to—bank loans is all the more pronounced in the sectors with the largest share of Main Street businesses—Retail, Accommodation and Food Services (which includes restaurants and hotels). For startup capital in retail businesses, the share of businesses to receive bank loans was 18 percent for immigrants and 28 percent for U.S.-born owners. In accommodation and food services, it was 21 percent for immigrants and 34 percent for U.S.-born owners.

## Urban Population Rebound: Immigration Is a Characteristic of Growth

Metropolitan areas—cities plus their surrounding suburban counties—have with rare exception been increasing in population over the course of the past half century, albeit at very different rates of growth.

The central cities that lie at the core of these regions, however, have seen a very different pattern. In many cases, cities saw a dramatic decline in population in the 1950s as suburbanization took off. These declines often accelerated in the 1960s and 1970s with "white flight" from "inner cities."

A number of the cities whose political leaders have made a particular effort to make their hometowns attractive to immigrants are among those that saw significant population decline in those years—Baltimore, St. Louis, Detroit, Pittsburgh, and Chicago, for example.

Immigrants have been a significant factor affecting the demographic fortunes of cities that saw their mid-20th century population loss slow, stop and reverse course.

By the same token, of the 50 cities with the largest populations in 1970, all cities with low immigration have seen a total population decline from their mid-20th century peak. None of the cities with a decline in immigrant population saw their overall population grow or rebound between 1970 and 2013. In fact, no cities with low net growth of 10,000 immigrants or less saw a population increase or rebound.[8]

New York may be the most striking example of population rebound. New York City had a relatively stable population of about eight million in the early post-WWII period. That changed in the 1970s when the

population declined precipitously by one million residents. Photographs from that period look similar to photos of abandoned properties in Detroit today.

What is rarely recognized is that, although New York's population rebounded dramatically and has today reached a new peak of over 8 million, the U.S.-born population is about the same as it was at the city's decennial census low point of 1980: 5.3 million (**FIGURE 11**). The entire arithmetic difference between then and now is the increase of the immigrant population from 1.7 to 3.1 million. Immigrants now account for 37 percent of the city's population. They—along with people who stuck it out in depopulated neighborhoods and a mixture of other newcomers—helped revive neighborhood after neighborhood, playing an important role in making New York the global city it is today.[9]

New York is not the only example of a city where an overall population decline was checked and eventually reversed by immigration gain. Seventeen of the 50 cities with the largest population in 1950 followed this pattern of decline and then rebound, with immigrants playing an important role and not infrequently making up the difference between growth and decline. Among them are San Francisco, Washington, D.C., Boston, Seattle, Kansas City, and Atlanta as well as Philadelphia, Minneapolis–St. Paul—cities that will receive detailed attention in Part Two of this report.

For a city, a bigger population is not always better, but a steeply declining population is almost always worse. Cities that are several hundred thousand people smaller than they were at their population peaks wrestle with a fundamental structural problem. They have to maintain infrastructure such as school buildings, roads and water supply on a tax base that is much smaller than the one it was originally designed to serve. The result is a seeming paradox: high tax rates and low tax revenues.

Population growth certainly has its own attendant challenges—from managing gentrification and controlling suburban sprawl to ensuring a strong floor in the labor market. But, as leaders in any city with a declining population will acknowledge, these are challenges you want to have.

Main Street businesses are only one modest aspect of population rebound, but they are an often underappreciated part of the story. Indeed, an influx of immigrants and, by extension, immigrant-owned Main Street businesses often plays an important role in the revitalization of neighborhoods and cities. Immigrants often get a foothold in this country by opening small businesses in run-down areas, which also have immigrant residents. A Dominican, Kurdish, or African immigrant may have a better sense of what their compatriots in the area would like to buy in a grocery or clothing store, or what would entice them to a restaurant. Often these stores and restaurants begin to attract others from the community to that neighborhood, and they

> [IMMIGRANTS] HELPED REVIVE NEIGHBORHOOD AFTER NEIGHBORHOOD [...] MAKING NEW YORK THE GLOBAL CITY IT IS TODAY.

eventually break out and begin attracting the general population. Gradually, the neighborhood becomes more interesting, and with more "eyes on the street" it starts to feel safer. Before long, a vibrant neighborhood takes root, and the challenges may be more about rising rents than dangerous streets.[10]

The lesson of these past 50 years is that cities that expect to grow should also expect a growing immigrant population and would do well to help make sure that immigrants who come to an area will thrive. There are many ways that cities can welcome immigrants, but supporting immigrant entrepreneurship is one good place to start.

## PART I: IMMIGRANTS AND SMALL BUSINESS OWNERSHIP

**FIGURE 10.**
**Immigrants Are Less Likely to Get Bank Loans
and More Likely to Rely on Savings**
FPI analysis of SBO 2007.



**FIGURE 11.**
**New York City Population Drop and Rebound, 1950 to 2013**
FPI analysis of Census and ACS data.



**Source:** FPI analysis of Census historical data, ACS and the State of the Cities data system of the U.S. Department of Housing and Urban Development.

# PART 2: LESSONS FROM THE FIELD: PHILADELPHIA, MINNEAPOLIS–ST. PAUL AND NASHVILLE

To get a clearer picture of the role immigrants are playing at the local level as well as the ways that role can be supported and boosted to enhance growth further, we looked at three places: Philadelphia, Minneapolis–St. Paul, and Nashville—one in the Northeast, one in the Midwest and one in the South.

These three areas are all in the middle range of the country's experience with immigration. Nationally, the immigrant share of the population is 13 percent. Only the city of St. Paul, with an immigrant share of 19 percent, has a substantially higher share than that—in Philadelphia it is 13 percent, in Minneapolis 16 percent and in Nashville 12 percent.

All three metropolitan areas have seen fast growth in immigration over the past two decades. In 1990, all were well below the national average in immigrant share of population. In the Brooking Institution's categorization of immigrant gateways, Philadelphia and Minneapolis–St. Paul are "re-emerging gateways," places with a history of substantial immigration in the early 20th century that have only recently regained that role. Nashville is a "pre-emerging gateway," an area with little immigration in the past century, but with an immigrant population that grew very quickly in recent years.[11]

In Minneapolis–St. Paul and Nashville, refugee resettlement played a significant role in seeding the immigrant communities that grew around them. Secondary migration also played a role—immigrants who first settled in other parts of the U.S. but then moved, often to join others from their country or ethnic group who had gained a footing in the local economy. Refugees have also been a part of the story in Philadelphia.

The populations of all four cities would be falling if immigration were removed from the equation. This is not necessarily to say that if immigrants hadn't come no one else would have, but it is clear that for a time immigrants in these cities offset a decline in the U.S.-born population.

In all three places immigrants have also played a big part in business growth. Between 2000 and 2013, immigrants represented 18 percent of overall growth in the number of small business owners in Philadelphia, 16 percent in Minneapolis–St. Paul and 32 percent in Nashville. In all three metro areas immigrants represented an even bigger share of growth in Main Street business owners: 96 percent in Philadelphia, 68 percent in Minneapolis–St. Paul and all of the growth in Nashville.

Some commonalities emerge. In each area there is a level of government support and messaging that signals that immigrants are welcome. In Philadelphia and Nashville in particular, the current mayors have been strong advocates for immigrants, and both established mayor's offices to address immigrant and multicultural issues. There is also a strong network of nonprofit groups supporting immigrant small business development.

These three places—Philadelphia, Minneapolis–St. Paul and Nashville—were chosen because the support systems in place for immigrant business owners provide good case studies of how to foster growth. That is not to say that the infrastructure is fully developed or that settlement is easy for immigrants. But, what follows are examples of how, when supported properly, immigrant small businesses—and particularly Main Street businesses—can play a significant role in neighborhood-level development. The ways that these cities support their immigrant population offer important best practices that can be replicated in cities that are considering how to leverage the contributions of their immigrant population.



Street scene in
Philadelphia's
9th Street
Italian Market.

## PHILADELPHIA
### Economic Integration Strategy: Revitalizing the Commercial Corridors

When the newly elected Mayor of Philadelphia, Michael Nutter, promised in his 2008 inaugural address to increase the population of the city, more than a few observers raised their eyebrows. Philadelphia's population reached a peak in 1950 and had fallen ever since—most dramatically in the 1970s, but with significant declines continuing through the 2000 Census. Hoping for a rebound seemed optimistic, to say the least.

But, a little-noticed change had begun to take place in the 1990s that made the mayor's prediction realistic: for the first time since the early 20th century, Philadelphia was seeing an increase in immigration. By 2000, there were 32,000 more immigrants living in the city than a decade earlier. This influx was not enough to stop the overall decline in population on its own, but it did temper the loss. In the 2000s, the decline in U.S.-born population slowed and the increase in immigration picked up. By 2013, the city's total population had grown by a modest 36,000 over its 2000 level, with an increase of 60,000 immigrants offsetting a decline of 24,000 U.S.-born residents. This increase in total population, though small, was a new phenomenon for the city (**FIGURE 12**).

### Immigrants and Main Street Business
As the growing immigrant population began to occupy residential neighborhoods, immigrant small businesses started to fill the city's commercial corridors. In 1990, immigrants made up five percent of the population, five percent of the labor force and eight percent of small business owners in the Philadelphia metro area. By 2013, FPI's data analysis of ACS data shows that immigrants made up 10 percent of the population, 12 percent of the labor force and 14 percent of business owners (**FIGURE 13**).

And, in Philadelphia, as at the national level, immigrant business owners are highly concentrated in "Main Street" businesses. Immigrants make up 28 percent of the area's Main Street business owners, including 23 percent of retail store owners and 34 percent of restaurant owners.

In Philadelphia, where a number of immigrants are in comparatively well-paying jobs, the median earnings for immigrants overall are $42,000—higher than the corresponding national median for immigrants of $35,000 cited above. On the other hand, median earnings for immigrant Main Street business owners are about the same in Philadelphia ($36,000) as around the country ($37,000). Here as elsewhere, Main Street businesses are small businesses with narrow profit margins, so it is not surprising that the earnings of Main Street business owners are not very high. At the same time, they are a good starting point for entrepreneurs, and a real help to neighborhood development. The annual earnings of Main Street business owners in metro Philadelphia are $1 billion, of which immigrant Main Street business owners earn $295 million. This money, like the wages paid to employees, expands the local consumer base. And, particularly where storefronts had previously gone unused, these small businesses help build the local tax base (**FIGURE 14**).

Our analysis does not allow us to get a statistically significant breakdown of the country of birth of Main Street business owners in metro Philadelphia. But, we can see that of the 13,000 immigrant business owners overall in metro Philadelphia, 1,800 were born in India—the largest single country of birth for immigrant business owners. Metro Philadelphia's next biggest group of immigrant business owners come from Korea, followed by Greece, China, Vietnam, Ukraine, Italy, Pakistan, Mexico, and Iran.

### Revitalizing Philadelphia's Commercial Corridors
Immigrants' strong representation as independent business owners—and their equally strong contribution to neighborhood-level economic growth—is perhaps nowhere more visible than in the 9th Street Italian Market. Jennifer Rodriguez, Executive Director of the Mayor's Office of Immigrant and Multicultural Affairs (MOIMA), explains that immigration has played a major role in revitalizing the market. "Ten years ago, the Italian Market was in decline," she recalls. In the 1980s and 1990s, Italian and Irish shopkeepers

## PART 2: LESSONS FROM THE FIELD

**FIGURE 12.**
**Philadelphia Population 1900 to 2013: Growth, Decline and Rebound**
FPI analysis of Census data from decennial Census and ACS. In 2013, immigrants made up 13 percent of the population of the city of Philadelphia, the same share as in the United States overall.



**FIGURE 13.**
**Immigrants Make Up 28 Percent of Main Street Business Owners**
Philadelphia Metropolitan Area
FPI analysis of ACS 2013 5-year data.



tortilla shops, bakeries, restaurants that have sprung up and filled in the area."

The 9th Street Italian Market is one of 265 commercial corridors identified by the City Planning Commission. Reviving and expanding these corridors is an integral part of the city's economic development plans.

While the revitalization of the 9th Street Italian Market took place somewhat organically with the increase of the immigrant population, in recognizing the success of this model, a more concerted effort to spur similar development is underway on the 5th Street corridor, which has become known as El Centro de Oro.

In the 1950s and 1960s, 5th Street was bustling with businesses owned mostly by German immigrants and their descendants, as well as some Italian, Polish and Irish, according to Gilberto Alfaro, Jr., the city appointed Business District Manager for the Centro de Oro corridor today. In the wake of the area's decline in the 1970s and 1980s, it has been repopulated by mostly Latino immigrants—at first mostly by Puerto Ricans, and later by Dominicans. Today it is home to a varied mix that includes Mexicans, Guatemalans, Hondurans, Chileans,

were retiring, and the stores started to close. Since that time, Rodriguez notes, "Mexicans, then Vietnamese, Cambodian, Indonesian, [and] lately Bhutanese immigrants have been starting businesses, and you see a new mix of barber shops,

**FIGURE 14.**
## Immigrant Business Owners' Contribution to the Economy
Philadelphia Metropolitan Area
FPI analysis of Census, ACS 2013 5-year data. Median earnings
are for people who worked full-time and year-round.

| Role of Immigrants as Small Business Owners (in millions) | |
|---|---|
| Total Earnings of Business Owners | $8,716 |
| Earnings of Foreign-Born Business Owners | $1,027 |
| Total Earnings of Main Street Business Owners | $1,065 |
| Earnings of Foreign-Born Main Street Business Owners | $295 |
| **Foriegn Born** | |
| Median Earnings in the Civilian Labor Force | $42,000 |
| Median Earnings of Business Owners | $51,000 |
| Median Earnings of Main Street Business Owners | $36,000 |
| **U.S. Born** | |
| Median Earnings in the Civilian Labor Force | $52,000 |
| Median Earnings of Business Owners | $69,000 |
| Median Earnings of Main Street Business Owners | $47,000 |

Venezuelans, and other immigrant groups.

In the 1970s, Taller Puertorriqueño was founded as a cultural center that helped anchor the neighborhood. A number of groups came together to try to combat the proliferation of drugs, gangs and other problems. Following this, in 1982, the Hispanic Association of Contractors & Enterprises (HACE) formed to help counter the decline of the area and to foster neighborhood growth. In addition to several services, including constructing and rehabilitating homes and offering guidance to neighborhood residents on purchasing or renting homes, HACE focuses on the commercial revitalization of the corridor.

Today, the city has designated HACE as the official Business District Manager of the Centro de Oro commercial corridor—a task Alfaro carries out with funding from the city as well as other funds raised by HACE. "My job is to help anyone who comes in our doors," Alfaro says. He helps individual businesses—or groups of businesses—form partnerships with the police department, understand zoning regulations, find a small-business loan, and other small-scale, day-to-day needs. "A lot of it is being the bridge," Alfaro points out. It's more about helping people get access

to services and opportunities that exist than it is about bringing new resources to the table. Once in a while, however, HACE serves as an organizational node for the district to come together to lift its profile or make improvements—for example, a largely successful effort to create a "feel" for the district by installing a wavy golden strip in the sidewalk linking the neighborhood stores, and creating coordinated signage related to El Centro de Oro's golden theme.

### Helping Immigrant and U.S.-Born Business Owners While Easing Racial Tensions
Like so many other American cities, before the recent influx of immigrants, Philadelphia was largely divided into African American and white sections.[12] As immigrant businesses began springing up in districts that were previously primarily white or black, tensions and complex racial dynamics between the newcomers and the existing residents and shop owners often followed. Newcomers brought new foot traffic to the corridors, but they also competed with the existing stores. Immigrants refreshed the mix of goods and services available, but they also changed the look and feel of the old neighborhoods.

**18** BRINGING VITALITY TO MAIN STREET:
HOW IMMIGRANT SMALL BUSINESSES HELP LOCAL ECONOMIES GROW

## PART 2: LESSONS FROM THE FIELD

**FIGURE 15.**
**52nd Street Merchants**
Welcoming Center for New Pennsylvanians' own data collection, 2009.



**52ND STREET MERCHANTS**

- AFRICAN AMERICAN — 31%
- EAST ASIAN — 40%
- AFRICAN — 9%
- CARIBBEAN — 6%
- LATINO — 4%
- WHITE — 4%
- SOUTH ASIAN — 6%

**52ND STREET BUSINESSES**

- BEAUTY & DAYCARE SERVICES — 26%
- FOOD SERVICES & DRINKING ESTABLISHMENTS — 19%
- PROVIDE GENERAL MERCHANDISE — 11%
- PROFESSIONAL SERVICES — 7%
- HEALTH CARE & SOCIAL ASSISTANCE — 5%
- FINANCE & INSURANCE — 3%
- HEALTH & PERSONAL CARE — 3%
- REAL STATE & LEASING — 3%

The area frequently called West Philadelphia's Main Street—52nd Street—offers an interesting case study of how various groups are addressing these tensions. Like other corridors, the area was hit hard by decline in the 1970s and 1980s. By the 1980s, the area had become a primarily African American neighborhood. The influx of immigrants in recent decades has helped to revive businesses in the district but has also created new tensions—not only between new businesses and African Americans in the community, but also between store owners and the growing number of street vendors. (See **FIGURE 15** for a racial and ethnic profile of 52nd Street businesses.)

Revitalization of the area has involved cross-sector efforts of the city government (including some funding from state and federal sources), the Enterprise Center Community Development Corporation, the 52nd Street Business Association, the Philadelphia Local Initiatives Support Corporation (LISC),

the Philadelphia Vendors Association, and a number of other stakeholders.

The Welcoming Center for New Pennsylvanians, a nonprofit group founded in 2003, has been closely involved in the efforts on 52nd Street since 2007. The Welcoming Center has roughly 25 full-time staff members who provide a range of services to immigrants and U.S.-born residents, including help finding employment, English language programs, and classes in how to start or expand a small business. The Welcoming Center's annual budget of about $1.6 million comes from government contracts for workforce development and education, private foundations, and some corporate and individual donors.

Recognizing the tensions in the area, which could at times be intense, the Welcoming Center set out to ensure that the interests of longtime residents were addressed as part of the "two-way street" of immigrant integration.

This strategy, coupled with the

**BRINGING VITALITY TO MAIN STREET:**
HOW IMMIGRANT SMALL BUSINESSES HELP LOCAL ECONOMIES GROW   **19**

center's reputation as an "honest broker," contributed to several successes in the effort to bring both the area's immigrant and receiving communities closer together. For example, the Welcoming Center was instrumental in aiding the area's existing business association's successful outreach—after many frustrated attempts—to the corridor's immigrant business owners. The Welcoming Center also played a role, together with many other partners, in helping to establish a Community Development Corporation to receive city funds and house a corridor manager.

The services the Welcoming Center offers, such as workshops for small business owners and those who aspire to launch a business, serve the entire community. While started with the intention of helping immigrants, it became clear that the need for this kind of education was community-wide. The curriculum developed to help small-scale, often first-time entrepreneurs get started—which covers everything from drawing up a business plan to navigating city regulations—is accessible to everyone. Today, the Welcoming Center reports that roughly 70 percent of the people served by the small business team are immigrants and 30 percent are U.S. born.

### Direct Engagement with the Community

As a business association and a vendor's association were established, the Welcoming Center hired Herman Nyamunga, a Kenyan immigrant with an MBA from Eastern University, to help business owners along the 52nd Street Corridor—immigrants and non-immigrants alike. Nyamunga lets business owners know about government assistance for businesses, helps them navigate regulations, connects them with good professional service providers and sources of financing, and mentors them based in part on his own business experience.

Nyamung's job is to help businesses, but it is also to build trust. "There is a lot of mistrust among the players here," Nyamunga explains, and that has stood in the way of coming up with compromises that would help move the area forward. "Gaining their trust has not been easy." Since Nyamunga has been working on 52nd Street,



Immigrant businesses have diversified and revitalized a section of the 9th Street Market that had fallen into disuse.

however, he has been able to ease the way around difficult issues such as the removal of a street-long awning, or ongoing issues around how to accommodate both street vendors and shopkeepers.

Recognizing the time it has taken Nyamunga to develop relationships and encourage the many small steps that can add up to neighborhood change might lead to questions about how this type of initiative can be expanded city-wide. The Welcoming Center works in a handful of commercial corridors, and additional groups work in others. The modest investment the Welcoming Center has made in hiring Nyamunga to engage directly with the community seems to be paying off. But really bringing it to scale—in Philadelphia or elsewhere—requires a big step up in both staffing and resources.

"The work is very labor intensive," acknowledges Amanda Bergson-Shilcock, vice president for policy and evaluation for the Welcoming Center, noting for example that it often takes three visits before business owners will tell Welcoming Center staff whether they have paid employees. "Many people have admired the success of this program and said that's great, what's the short-cut? There isn't one. You can't sit behind your desk and send out emails and expect that it will magically result in economic growth."

### Financing Immigrant Businesses

Access to financial services is crucial for small business development. National data presented in Part One of this report show

## PART 2: LESSONS FROM THE FIELD

that immigrants are somewhat less likely than U.S.-born business owners to get a bank loan as a source of start-up capital, and more likely to rely on other sources such as savings, family loans or credit cards. Relying on these sources, however, might mean waiting longer to start a business than someone who can get a bank loan. And, borrowing on a credit card—or, indeed, from a bank that charges usurious interest rates—can be a high cost to businesses.

Consequently, Community Development Financial Institutions (CDFIs) have an important role to play in small business development in general, and in immigrant small business development in particular. In Philadelphia, there are several nonprofit Community Development Financial Institutions that help fill this need. FINANTA, a leading CDFI in the region, provides loans at below-market rates, often linked with business services such as assistance with credit building, accounting, legal issues, filing taxes, or creating a business plan. Furthermore, its staff is fully bilingual in Spanish and English. The group started by providing services in the Lower Kensington neighborhood—"Girard Street used to be the south boundary; banks didn't use to make loans north of Girard eighteen years

ago," FINANTA's founder and president, Luis Mora, explains. Today, the group works city-wide with a budget of $1.5 million and staff of 15. It has made 235 loans to businesses in its target areas, many of them run by Latinos.

FINANTA looks for the same qualities in a borrower as traditional banks—character, capacity, capital, credit, and collateral. But, as a mission-driven nonprofit, it works harder to understand how these "5 Cs" apply—sometimes in non-traditional ways—in low-income communities, communities of color and immigrant communities.

This can include reaching out to lending circles—a way communities can pool money together to invest in a business or buy a home. Called *tandas* or *cundinas* in Latin America, *susu* in West Africa and the Caribbean, and *hui* in China, lending circles have a similar basic structure—people who



**Above: Gilberto Alfaro, Jr.,** business district manager for the *Centro de Oro.* **Right:** A golden ribbon on the sidewalk creates a unifying design for the district.

A226

know and trust each other put their funds together and take turns using the capital for a big expense. The first payment from the members stays with the manager of the circle to pay for the work he or she does, and also to help cover costs in case one of the members defaults.

Several problems stem from the fact that lending circles generally deal in cash. There are risks in simply having so much cash on hand. And, these transactions are not reported to the credit bureaus, so they do not help members build a credit history. When FINANTA first offered to manage the lending circles of some of these groups—collecting the money and dispersing it in exactly the way the group did, but with the added benefit that transactions would be registered with the major credit agencies and that members could take out loans and make their payments without having large sums of cash on hand—it also proposed a Plan B. Instead of waiting their turn to get the money, members could all borrow as of the first month and then pay the money back the same way they would have otherwise. This plan makes the lending circle effectively the same as a regular bank loan, with the exception that the risk is shared among a group of people who trust each other.

To date, every single lending circle has chosen the Plan B, Mora reports. "People use the loans to buy inventory; they use it to pay for a city permit, or to pay their taxes—it is a big help to a lot of businesses." And, doing it through a formal rather than an informal system "helps them to see their credit as an asset rather than a liability." As of late 2014, FINANTA has served 24 affinity groups with a total of 448 loans totaling $2.25 million. The two oldest groups have each gone through four cycles of borrowing—starting at $1,700 and reaching $15,000 by the fourth cycle—with no losses.

So far, the system has been functioning very well, as long as the groups are formed before they come to FINANTA. The types of lending circle that FINANTA has found do not work are those that try to group strangers together.

But, if these are sound loans—and FINANTA prides itself on being cautious to protect its borrowers as well as itself—why don't other banks make them? "This doesn't make money; it's risky. We're

lending to a population that no one lends to," Mora explains. As a nonprofit, FINANTA operates in a margin that requires profitability, or at least precludes losses that are bigger than the contributions it gets. But, it does not have to maximize profitability. If FINANTA takes too much risk, it will soon have to close its doors, but it can take on risks on a different basis than a commercial bank: focus on smaller loans, evaluate creditworthiness in a more time-consuming way and make sure it has bilingual staff, for example, so that people who present sound business opportunities don't get overlooked because they don't fit the traditional mold of borrowers.

## The Role of City Government: Setting the Tone

In 2013, Philadelphia established the Mayor's Office of Immigrant and Multicultural Affairs (MOIMA), which is currently headed by Jennifer Rodriguez.

MOIMA is not very big. It has a staff of three and has about a $500 thousand annual budget to provide translation and interpretation services. But MOIMA tries to set a tone for the city's relationship to immigrant communities and works as a kind of internal consultant to city agencies to help them better reach out to and serve those communities.

Rodriguez stresses the importance of cultural competency across the board for city agencies as a way of engaging immigrants, and also as a way of being more effective in all of their operations. Cultural competency, the notion that institutions should learn how to work effectively with people from a wide range of cultural backgrounds, starts of course with language. But it is also considerably more than that and requires an understanding of different cultural norms. For instance, Rodriguez explains, "[Department of] Licensing and Inspection staff are taught not to accept any gifts from customers. But, in many cultures, people want to offer something as a thank you. How do you communicate with them in a way that is culturally appropriate? You have to learn to say thank you, but no thank you. You want to be clear, without seeming to be rejecting them, or making them feel like they did something wrong."

A focus on cultural competency

PART 2: LESSONS FROM THE FIELD

may be prompted by the need to serve multicultural communities, but it often winds up achieving an even larger goal. "In trying to be intentional about including immigrants […] you end up really thinking about the process and products and programs you've developed," Rodriguez observes. "The barriers that immigrants are facing are often the same that residents are facing, but for one reason or another they have not been addressed."

"What I often say," Rodriguez adds, "is that what's good for immigrants is good for everyone."

## MINNEAPOLIS–ST. PAUL
### Economic Development Strategy: Real Estate as an Incubator that Spurs Revitalization

The population trends in the cities of Minneapolis–St. Paul echo those of Philadelphia, though the population decline ended earlier and the rebound has a longer history. But, as in Philadelphia, the population rebound has been driven by immigrants.

In Minneapolis, the total population was 519,000 in 1950. By 1990, it had fallen to a lowpoint of 368,000—a drop of 29 percent. From 1990 to 2013, the city population grew by 32,000 to a total of 400,000. But, the number of immigrants grew by 42,000, while the number of U.S.-born residents fell by 10,000.

Across the river in St. Paul, the basic story is similar, though the city's population bottomed out a decade earlier and the total population decline from 1950 through the 1980 lowpoint was less extreme (a drop of 13 percent). The rebound, however, has been largely the same. Since 1980, St. Paul's total population has grown by 25,000, and its immigrant population has grown by 42,000, offsetting a decline of 17,000 in the U.S.-born population. In Minneapolis–St. Paul, the U.S.-born population is lower today than it was in each city's respective total population trough (**FIGURE 16**).

Mexico is the largest single country of origin for immigrants in Minneapolis–St. Paul today, but to a greater degree than Philadelphia or Nashville, immigration in the Twin Cities has been shaped by refugee resettlement. The largest refugee communities are East African and Hmong (an ancestry group that includes immigrants from Laos, Vietnam, China, and Thailand). There is also a population of non-Hmong refugees from Laos and Vietnam, a significant number of refugees from the former Soviet Union, and other refugees from hot spots around the world—from Burma to Iraq. Today, Mexicans make up 15 percent of the immigrant population of the Twin Cities metro area, followed by Laos (7 percent), India (7 percent), Vietnam (5 percent), China (5 percent), and Thailand (4 percent).[13]

### Immigrants and Main Street Businesses
Immigrants in the Minneapolis–St. Paul metro area make up 10 percent of the population, 11 percent of the labor force, and 8 percent of business owners. This is one of the few metro areas where immigrants make up a smaller share of business owners than of the labor force—perhaps because of the significant refugee portion of the immigrant population, with people facing multiple barriers to starting a business. Yet, even here, immigrants are well represented among Main Street business owners, making up 13 percent of all Main Street business owners (**FIGURE 17**).

In the Minneapolis–St. Paul metro area, as in metro Philadelphia, a good number of immigrants are in higher-paying jobs, and the overall median earnings for immigrants here are above the median for their counterparts nationally—$39,000 compared to $35,000. The median for Main Street business owners is the same in Minneapolis–St. Paul as at the national level ($37,000). These small, neighborhood-oriented businesses bring in $547 million overall in the Minneapolis–St. Paul metro area, and $50 million of that to immigrant Main Street business owners. Main Street business earnings in turn boost local consumer demand and tax revenues, particularly in neighborhoods that formerly had empty real estate (**FIGURE 18**).

Looking at country of birth among immigrant business owners overall—since, again, the data do not allow a statistically significant analysis of immigrant



Becky George and Earlsworth Baba Letang, who work for the Neighborhood Development Center (NDC) as managers of the Midtown Global Market.

Main Street business owners—in the Minneapolis–St. Paul metro area, there are 5,700 immigrant business owners, with the largest numbers coming from China, Canada, Vietnam, India, and Mexico. In a separate analysis, we considered the Hmong community, registered in Census data as an ancestry rather than a place of birth, and found roughly 400 small business owners of Hmong descent, almost all of them foreign-born.

### Building on Twin Cities Immigrants' Entrepreneurial Potential

In Philadelphia, nonprofit groups and government agencies provide support to small businesses, reaching out in particular to immigrant and minority communities in a patchwork fashion that is centered around that city's historic commercial corridors. In contrast, in Minneapolis–St. Paul there are a number of examples of nonprofit groups acting as large-scale developers to help restructure the environment in which local businesses operate.

A prime example of this approach is the Midtown Global Market, a multi-million dollar development undertaken by a consortium of four nonprofit groups—the Neighborhood Development Center, the Latino Economic Development Center, the African Development Center, and the Cultural Wellness Center—that came together to buy part of an enormous abandoned property.

The project started in 2005 around the idea of transforming a central part of the Midtown Exchange—formerly a retail and distribution center for Sears Roebuck and Company—into a multicultural market. The 1.2-million-square-foot property had been abandoned since 1994, and the site had become a dangerous island of urban decay. It was not an area most Twin City residents wanted to visit, and its presence cast a pall on the surrounding neighborhood along Lake Street, one of the most ethnically and racially diverse in the city. Ryan Properties, a private developer, bought the property from the city, and in the end divvied up the space into an area for mixed-income housing, space for a major health care company and the 80,000 square feet that became the Midtown Global Market.

The nonprofit consortium was able to put together the modest amount of money

## PART 2: LESSONS FROM THE FIELD

**FIGURE 16.**
### Minneapolis–St. Paul Population Rebound 1950 to 2013
FPI analysis of Census data from decennial Census and ACS. Additional data for St. Paul in 1970 and 1980 State of the Cities Data Systems of the U.S. Department of Housing and Urban Development. In 2013, immigrants made up 16 percent of the Minneapolis and 19 percent of the St. Paul population.



needed to buy the space—about $200,000. Raising the $18 million needed to renovate the space was a much bigger challenge. About half of the money was pieced together from two federal tax credit programs (for new markets and historic rehabilitation). Another $3 million came in the form of equity equivalent loans, and the rest was accounted for by long list of foundation grants and corporate contributions.

The Neighborhood Development Center (NDC), which now runs the project together with the Cultural Wellness Center, had significant experience with this kind of real-estate-centered development. Established in 1993, NDC currently has a staff of 26 and an annual budget of $2.5 million. Together with an interlocking set of institutional and community partners, NDC has played a role in a variety of major real estate developments that also serve as business

**FIGURE 17.**
### Immigrants Make Up 13 Percent of Main Street Business Owners
Minneapolis-St. Paul Metropolitan Area
FPI analysis of ACS 2013 5-year data.



incubator spaces. These include Plaza Verde, a four-story, 43,000-square-foot building that has a combination of retail, office and arts spaces; Frogtown Square, a series of low-rise

**FIGURE 18.**
**Immigrant Business Owners' Contribution to the Economy**
Minneapolis–St. Paul Metropolitan Area
FPI analysis of Census, ACS 2013 5-year data. Median earnings
are for people who worked full-time and year-round.

| Role of Immigrants as Small Business Owners (in millions) | |
|---|---|
| Total Earnings of Business Owners | $5,800 |
| Earnings of Foreign-Born Business Owners | $402 |
| Total Earnings of Main Street Business Owners | $547 |
| Earnings of Foreign-Born Main Street Business Owners | $50 |
| **Foriegn Born** | |
| Median Earnings in the Civilian Labor Force | $39,000 |
| Median Earnings of Business Owners | $51,000 |
| Median Earnings of Main Street Business Owners | $37,000 |
| **U.S. Born** | |
| Median Earnings in the Civilian Labor Force | $39,000 |
| Median Earnings of Business Owners | $51,000 |
| Median Earnings of Main Street Business Owners | $43,000 |

buildings that house retail, restaurants and service businesses as well as housing; and Mercado Central, a 30,000-square-foot space run by the Project for Pride in Living, NDC, and a cooperative of tenants.

The scale of the Midtown Global Market is substantial—there are some 40 stores and stands of varying size—and it has a feel of commercial vitality that is rare in a nonprofit venture.

To get a workable mix of businesses, the nonprofit owners set up a leasing committee, which thought in terms of three categories, according to Earlsworth Baba Letang, market manager for the Midtown Global Market. "One was first-time business owners. This is an incubator of new businesses. Two was second-location businesses—places that had been growing in another area. And three was anchor tenants, places like Holy Land and Produce Exchange," Letang says, referring to a popular Middle Eastern specialty store and a fruit and vegetable market—two of the bigger renters in the space. Some businesses have a long-term lease, others rent month to month, and newcomers who want to test out an idea without making a commitment can rent a "day table."

Stores in the market have access to ongoing support from the NDC's business services, including classes in the basement and consulting on specific issues they face. The market managers are also very active in suggesting improvements, trying to keep things fresh and current-looking.

"We work with people who don't have access to other classes and programs," says Becky George, cultural events and property manager for the Midtown Global Market. Language is one important reason—"we have classes in Oromo [the language of many East African refugees], English, Spanish, Hmong, Somali, and maybe Farsi."

The Neighborhood Development Center also has a loan program, providing start-up capital or enabling business owners to invest in a new refrigerator or a new product idea, with an average loan of $16,000.

**Financing Immigrant Businesses: Culturally Competent Credit**

Cultural competency is deeply ingrained in everything NDC does. It provides training classes in the neighborhoods and in the languages of the communities it works with. So, when Somali immigrants participating in a training class discussed the challenges of running a business while maintaining their Muslim beliefs about

PART 2: LESSONS FROM THE FIELD

not paying interest, NDC stepped up to the challenge. NDC hired a Palestinian immigrant well versed in finance to help develop a loan product that was *reba* free—an arrangement where no interest is charged—as is commonly available in Middle Eastern countries. Now, there are others that provide these loans as well. Nasibu Sareva, interim executive director of the African Development Center, another lender that provides *reba*-free loans, explains how the process works: "We buy the asset. We add profit, and sell it to you. You then pay us on a monthly basis. At the end of the day, the result is the same," but clients have not been paying interest; they have been buying an asset.

NDC won an award for this innovation, the first program of its kind tailored to the Muslim community in the United States. As of 2014, Brian Singer, director of lending for NDC, says more than 100 loans have been made through this program to about 60 or 70 small businesses. Repayment rates are generally strong, and some businesses have come back more than once. The program has been highly successful and has attracted attention from around the country. For all its success, however, there are also limitations. "You can't finance everything this way," Singer notes. "You can't finance

working capital, for instance—there has to be something to buy and resell."

### The Importance of Being on the Ground: The role of trust

"We start from the premise that all low-income communities include entrepreneurial people," says Mihailo Temali, NDC's founder and chief executive officer. "We look for people who have talent and try to remove the barriers that prevent them from succeeding." The NDC works with placed-based Community Development Corporations—partnerships with community-based organizations that can help "bring talented entrepreneurs out of the woodwork and help us gain their trust." NDC runs 20-week training classes in their neighborhoods, in community organizations' offices, and in multiple languages. "We're in the background," Temali says of the NDC's role. "Everything is under the auspices of the community group."

There is the "business lab," which provides a range of business services and consulting to entrepreneurs. And there is "the connection of all of this back to the neighborhoods—we want as many of these people as possible to open businesses in their own neighborhoods, and we think the successful small business people



On the map: A coffeeshop in Midtown Global Market.

**FIGURE 19.**

Alumni of NDC Business Training in Frogtown Neighborhood

A study by the independent firm Wilder Research, commissioned by the NDC, mapped 65 businesses in the Frogtown neighborhood, with an estimated 576 full- and part-time employees (including the business owners). Payroll is estimated at about $5 million, and property taxes paid at $800,000. Wilder Research, 2013.



can become important leaders in their communities." The Center prides itself on its long-term relationships with individuals and with communities.

There is also the question of financing. "A certain percent of people who complete the classes are ready to start a business, but no bank will finance them," Temali explains. Like Luis Mora of FINANTA, Temali talks about the 5 Cs of lending, and how his group can do better than a traditional bank at assessing risk, allowing them to make loans where traditional banks wouldn't. "One of the Cs of lending is character," Temali explains. "But we have a way of gauging character that no bank will ever have: we've seen people in our classes for 20 weeks. Did they take advice; did they follow through? And, of course, they have a connection to us," making it all the more likely they will go the extra mile to repay the loan.

The scale is at the level of the block and the neighborhood. The Center and its partners and parallel organizations (such as the African Development Center or the Latino Economic Development Center) are having slow, but real, long-term impacts on local areas where crime and abandoned properties were serious problems.

The effect of this type of work is beginning to be felt, even at the city-wide level. The above-referenced FPI analysis of ACS data shows that there are 67,000 business owners in the Minneapolis–St. Paul metro area, 5,700 of them immigrants. A 2013 evaluation showed that the NDC alone helped 410 entrepreneurs who have businesses that were still in operation as of the study date in 2013. Of the 198 who were surveyed, about half had employees. More than half of the businesses were in buildings that were formerly vacant—a hugely important statistic for neighborhood revitalization. These are not big businesses, but they are businesses that, together, are changing neighborhoods.[14] (See **FIGURE 19** for the density of businesses that received NDC training in the Frogtown neighborhood.)

PART 2: LESSONS FROM THE FIELD

# NASHVILLE-DAVIDSON COUNTY
## Economic Integration Strategy: Welcome, Connect, Incubate, Repeat

In terms of its demographic trends, Nashville stands in contrast to Philadelphia and the Twin Cities in two important ways.

First, the immigrant population in Nashville has been growing at an exceptionally fast pace. Although Nashville today has an immigrant share that is the same as the nation as a whole, it has experienced some of the fastest rates of growth in the nation. Immigrants made up just two percent of the population as recently as 1990, growing quickly to 7 and then 12 percent in 2000 and 2013. As a result, the change seems dramatic: many people living in Nashville today can remember a time when there were few immigrants in the city, and now the percentage of immigrants matches the national average.

And, second, the Nashville metro area did not see a mid-twentieth-century population decline. Comparable data for Nashville–Davidson are not available for 1950 and 1960 since the consolidated government was created in 1963. But from 1970 until today, both U.S.-born and immigrant populations have been growing. Looking at Davidson County as a whole allows for an apples-to-apples comparison back to 1950. Unlike in Philadelphia, Minneapolis or St. Paul, the trend has been continuous population growth (**FIGURE 20**).

### Immigrants and Main Street Businesses

In the larger Nashville metro area,[15] immigrants make up 8 percent of the population, 9 percent of the labor force, and 9 percent of business owners. But immigrants make up a whopping 29 percent of Main Street business owners— a vastly disproportionate role (**FIGURE 21**).

Immigrant Main Street business owners in Nashville are also doing considerably better economically than immigrants in the labor force overall. In the Nashville metro area, the median earnings for immigrants overall are $30,000—well below the national

median for immigrants of $35,000—with many immigrants working in lower-wage occupations. Yet, immigrant Main Street business owners still earn about the same in Nashville as nationally and in the other metro areas—$36,000 (equivalent to metro Philadelphia, just one thousand dollars less than the national median and the median in the Twin Cities). The aggregate earnings of immigrant Main Street business owners is $52 million, out of a total of $220 million to Main Street business owners overall (**FIGURE 22**).

Countries of birth for immigrant business owners in general in Nashville (not just Main Street business owners) include India, Mexico, Korea, El Salvador, and Canada. East African, Kurdish, and Hmong refugees also make up notable fraction of immigrant business owners. Of immigrant business owners in the Nashville metro area, 21 percent are from India, and 9 percent are from Mexico, El Salvador, Guatemala, Panama or Colombia, though it is difficult to give statistically reliable data with this level of detail in a metro area that is considerably smaller than Philadelphia or Minneapolis-St. Paul.[16]

### Putting Out the Welcoming Mat

In any conversation about immigration in Nashville, one of the first things to come up is the 2009 referendum on an amendment to the charter of the metro government that would have prohibited government officials from using any language other than English in their work. The amendment failed, 43 percent to 57 percent. But the very fact that it was proposed and stood a chance of passing galvanized and brought together a range of actors: business, labor, religious, and immigrant leaders, as well as community leaders in general.

Garrett Harper, research director for the Nashville Area Chamber of Commerce, stresses the potential economic damage the English-Only initiative could have caused. "There was a high level of concern in the chamber and among business leaders," Harper says. Looking back at what happened in Arizona, where business leaders deeply regretted not having been more engaged in the effort to prevent passage of SB1070, that state's "show me your papers" law,[17] Harper notes: "Nashville has some

**FIGURE 20.**

### Nashville–Davidson County Population, 1950 to 2012

FPI analysis of Census data from decennial Census and ACS. The Nashville-Davidson Metropolitan Government was formed in 1963, so comparable data for 1950 and 1960 are not available. County data from the Nashville Area Metropolitan Planning Organization. In 2013, the immigrant share of the Nashville–Davidson population was 14 percent.



**DAVIDSON COUNTY**



**FIGURE 21.**

### Immigrants Make Up 13 Percent of Main Street Business Owners

Nashville Metropolitan Area
FPI analysis of ACS 2013 5-year data.



history of doing the right thing for the city, not having a knee-jerk reaction to issues."

Growth in the economy and growth in immigration are clearly compatible, Harper points out, making the English-Only proposal seem out of step with economic reality. Stephanie Teatro, interim co-director of the Tennessee Immigrant and Refugee Rights Coalition (TIRRC), a group that played a key role in the opposition, also stresses the role of groups like the chamber. "The business sector really threw down and committed themselves to stopping this bill," she reports.

Howard Gentry, as criminal-court clerk, the African American with the highest elected position in metro government who narrowly missed winning an election for mayor, argues that the bill was a turning point in Nashville's social climate. "We

PART 2: LESSONS FROM THE FIELD

actually embarrassed ourselves," Gentry says. "Everyone was like: What? Where did that come from? […] That absolutely was a good thing. The aftermath is that now we have an army of people who voice up anytime something like this occurs. Some will say: there's still a lot of hate and discrimination out here. There certainly is. I feel it every day." But, Gentry concludes, "This was a forced opportunity for us to become better with each other."

In September 2014, Nashville established the Mayor's Office of New Americans. In many respects, this office is an outgrowth of the work to oppose the English-Only initiative. Shanna Singh Hughey, the director of the new office, said "the Mayor was very concerned that passing an English-Only law would have put up a 'go away' sign at the city border."

Although it is still in development, this office will expand on current city programs, such as MyCity Academy—which aims to help immigrants access and participate in city government—and will rely on its New Americans Advisory Council. This council represents Nashville's diverse immigrant communities and has held monthly meetings with the mayor since 2009.

Judging from the reaction of the business community, being perceived as "anti-immigrant" can put a damper on the economy. But, can being perceived as welcoming spur growth? Many Nashvillians think so.

Nashville never went through the depopulation of Philadelphia or the Twin Cities, so it never saw sections of the city with abandoned stores. Residents will frequently point to three areas, however, where immigrants and refugees have concentrated as places that have benefited from immigrant Main Street business growth: Nolensville Road, Murfreesboro Road and Antioch. All three tend to be a bit more run-down, and they are less expensive than many parts of the city. But, today, rather than declining as older people moved out, they have seen a transformation—what is sometimes called an ethnic succession. And they are surely growing more diverse.

Nolensville Road is where visitors will find Casa Azafrán, an inviting and colorful building that was bought and renovated by Conexión Américas, a group that works to aid immigrant integration.



Stephanie Teatro, interim co-executive director of the Tennessee Immigrant and Refugee Rights Coalition, with a sign from the 2009 opposition to an English-Only amendment proposed for Nashville.

Today, Conexión Américas has an annual budget of about $1.3 million and a staff of about a dozen people. But when it started in the 1990s, José Gonzalez, a co-founder, explains, it was just three people. Gonzalez, who was a recent transplant to Nashville himself, witnessed the explosive growth of the Latino community.

Nashville had some experience integrating refugees—Kurds, Vietnamese, Laotians, Cambodians, and Bhutanese. But, before the 1990s there was not much immigration besides refugee resettlement, and very few Latinos in the region.

The first program Conexión Américas started was Negocio Próspero ("successful business"), a kind of "Business 101." It covered the basics: making a business plan, accounting, taxes, and so on. "People were coming through our doors who were great tradesmen," Gonzalez says, "but they had run into a problem. An assessment that they hadn't paid, taxes they hadn't filed, licensing issues, marketing." It was the basics, but Conexión Américas could help. And, they could offer the services in Spanish, which no one else was doing.

Conexión Américas also addresses the issues undocumented immigrants often face. Help in properly filing income tax returns—



for immigrants who are undocumented, using an Individual Taxpayer Identification Number (ITIN) rather than a Social Security number—is important to establishing your income for bank loans, and for undocumented immigrants it is an important way to show good citizenship in the hopes of eventually gaining legal status.

Being without legal status is a huge challenge that cuts through the immigrant community in Nashville, as elsewhere. Conexión Américas makes a point of helping immigrants, regardless of status, apply for and often get loans to buy a home by working with local banks and credit unions who give W-7 loans, which can be processed using information from tax forms filed with an ITIN.[18] Buying a home is not directly a support to businesses, but of course it brought many potential entrepreneurs into their networks. It is also true that starting or expanding a business, particularly getting a loan to do so, is much easier if you have some collateral.

Negocio Próspero, home ownership services and taxpaying classes all brought potential entrepreneurs into Conexión Américas's orbit. And the three programs

Mark Janbakhsh (right), developer of Plaza Mariachi, and a view (above) of the Plaza while under construction.

all fed into a similar virtuous cycle: people who own a home found it easier to start a business; people who paid taxes found it was easier to get a loan; and all of the programming put people on a sounder social and financial footing.

In its 2014 annual report, Conexión Américas reports having had 70 entrepreneurs go through its Negocio Próspero program, resulting in four new or expanded businesses and six new jobs.

Renata Soto, co-founder and executive director, describes a project in their newly developed space that seems to be going particularly well: the Mesa Komal commercial kitchen. "One of the things we saw from our students is that many were interested in food-related businesses, but the costs of entry are pretty high," Soto

## PART 2: LESSONS FROM THE FIELD

**FIGURE 22.**
**Immigrant Business Owners' Contribution to the Economy**
Nashville Metropolitan Area
FPI analysis of ACS 2013 5-year data. Median earnings are restricted to
people working full-time and year-round.

| Role of Immigrants as Small Business Owners (in millions) | |
|---|---|
| Total Earnings of Business Owners | $2,021 |
| Earnings of Foreign-Born Business Owners | $141 |
| Total Earnings of Main Street Business Owners | $220 |
| Earnings of Foreign-Born Main Street Business Owners | $52 |
| **Foreign Born** | |
| Median Earnings in the Civilian Labor Force | $30,000 |
| Median Earnings of Business Owners | $43,000 |
| Median Earnings of Main Street Business Owners | $36,000 |
| **U.S. Born** | |
| Median Earnings in the Civilian Labor Force | $43,000 |
| Median Earnings of Business Owners | $36,000 |
| Median Earnings of Main Street Business Owners | $45,000 |

explains. "There's only so much you can do from your house, and it's very difficult to get a home kitchen up to the requirements to pass a health inspection."

When Conexión Américas moved from their old space to the new one, they set up the kitchen so that students from the Negocio Próspero classes could have an affordable place to rent. The kitchen, it turned out, also attracted a range of hipsters, foodies and people in general looking for a space to start out. While the construction-related businesses were started by men, the food-related businesses were primarily run by women. So far, 14 food entrepreneurs have launched or expanded their businesses in the kitchen.

Like everything at Casa Azafrán, there was also cross-pollination. Mesa Komal doesn't just provide a kitchen space; it also provides opportunities for parties that introduced people's food to new audiences, help with marketing and help finding staff. Some people just rented the space; others got a range of business services support.

Casa Azafrán is itself an economic development project, helping to revitalize the Nolensville Road area. In addition to Conexión Américas and Mesa Komal, the building houses several other nonprofits.[19]

A great deal of trading ideas and supporting each other goes on among these groups, spurring new projects and reinforcing existing ones.

As with all of the major capital projects in this report, Casa Azafrán was financed with funds that were pieced together from multiple sources, taking advantage of support from foundations and individual donors as well as unexpected opportunities that came up for funding—in this case, FEMA support for rebuilding after Tennessee's 2010 floods.

At a much larger scale is the for-profit development Plaza Mariachi. In some ways similar to the Midtown Global Market in St. Paul, Plaza Mariachi is a 60,000-square-foot indoor space that is meant to feel like an outdoor market. The Plaza is being developed by Mark Janbakhsh, an Iranian immigrant who came to Nashville as a child and whose wife is Mexican.

The Plaza is expected to open sometime in 2015, so it is too soon to judge its success. The very planning of it, however, seems to be a testament to the vibrancy of the Latino neighborhood as it has developed. And, of course, the hope is that the project's success will also help bring a new level of foot traffic and customers to the area.

# CONCLUSION & BEST PRACTICES: A TOOLKIT FOR SUPPORTING IMMIGRANT BUSINESS GROWTH

Immigrants are playing an important role in the revitalization and growth of cities around the country. They are a key part of the story of reversing the decline in population of a number of cities, sometimes despite a continued decline in U.S.-born populations. That's a good thing for cities that have a hard time supporting their infrastructure without an adequate tax base. Immigrant business owners also play an outsize role on Main Street and are often at the center of revitalizing business corridors, drawing a new consumer base to previously dilapidated areas, and giving new life and character to cities that had previously been in decline. This was certainly the case in the three metro areas that were the focus of this report: Philadelphia, Minneapolis–St. Paul, and Nashville. In all three, immigrants made important contributions to neighborhood-level economic development and overall city growth.

We have also seen that the contributions immigrants make to their cities through Main Street business ownership can be maximized when local efforts work to support them. In Philadelphia and Minneapolis–St. Paul, where immigrants were a driving force in neighborhood-level revitalization, programs aimed at helping immigrant business development—and along the way helping U.S.-born business owners as well—have played a role in easing the transition as newcomers arrive, and have removed numerous barriers to small business startups and growth. In Nashville, where even low-income neighborhoods never declined to the point of having boarded-up storefronts, there has been more of a transformation than a revitalization, with businesses growing as the population grows and changing character as the demographics of an area change. There, the overall climate toward immigrants has been an important factor, and modest-scale supports from nonprofit groups have also been a boost.

In all three metro areas, what quickly becomes clear is that what's good for immigrants is also good for the rest of the population. English language ability, trust in institutions, knowledge of American systems and processes, and questions of legal status are particularly salient for immigrants. But, when immigrants have a hard time understanding how city forms should be filled out, or how to negotiate a lease, or what exactly health inspectors are looking for, it's likely there are plenty of others with the same problem.

Immigrants are not magic ingredients to an economic development strategy, but they are an asset to the cities they join. When that asset is underutilized, it is a loss to the local economy. Finding ways to maximize the potential of immigrant small business owners, and to do so in a way that also creates a positive climate for U.S.-born business owners, is an important project for anyone focused on city-based economic development.

The initiatives described here are all relatively small. Even the biggest pale in comparison to major economic development projects in cities such as building a stadium or luring a major company with tax breaks. The benefit of these programs being small, while perhaps difficult to bring to a much larger scale, is that they are often low-hanging fruit. For a very modest investment, a great deal can be achieved that can help a city's neighborhoods and its overall economic growth.

What can cities and states looking to maximize the economic benefit of their immigrant communities learn from these three case studies?

**Establish a climate of welcoming.** The first rule of welcoming is to do no harm. Business leaders in Nashville breathed a collective sigh of relief when that city's controversial 2009 "English Only" referendum did not pass. Indeed, the coalitions and campaigns welcoming immigrants became a point of pride among many Nashvillians, and Mayor

Karl Dean has made a point of stressing that "embracing [...] diversity only makes [Nashville] stronger."[20] Leadership from the top makes an enormous difference, but so does a well-organized coalition, especially one that goes beyond the usual suspects and includes the private sector.

**Create a government office to address immigrant integration.** In Philadelphia there is a Mayor's Office of Multicultural and Immigrant Affairs, and in Nashville a newly created Mayor's Office of New Americans. About a dozen other cities and states have similar offices. These generally have a staff of only a few people, but they can serve an important role in bringing together city agencies and helping them understand how to better address an area's increasingly multicultural population, and how to better serve newcomers to the area. The symbolism of an official office is also powerful: having a representative of the government at a meeting or issuing a statement on official letterhead can have a significant impact.

**Provide culturally competent business training and services.** Opportunities to learn about American business practices can be very valuable for immigrants. How to make a business plan, what licensing is required, how to do accounting and the like are the basics of Business 101. But, there is a huge difference when these services can be provided in the language of immigrants, in their neighborhoods, and by people who understand their traditions. Helping people to think of what they are already doing as businesses (cleaning carpets, providing daycare) and to formalize and expand those as "real" businesses can also be an important benefit of classes.

**Make sure programs are open to all.** Immigrants are not the only ones who may need help in understanding how to navigate licensing procedures or apply for a bank loan. Finding out where immigrants face a barrier in starting a business often puts a spotlight on areas

that plenty of U.S.-born residents have trouble with as well. Proactively supporting communities that have historically not had a big share of business ownership should be a part of this process.

**Be attentive to the challenges undocumented immigrants face.** At a time when there are an estimated 11 million undocumented immigrants in the U.S. and any permanent federal solution seems remote, it makes sense for states and cities to do what they can to remove barriers for undocumented immigrants living in their communities. Some are business owners, and with help can formalize many aspects of their businesses. And, with President Obama's recently announced executive action, many will now have work permits as well, opening the door to further opportunities for their own advancement and for economic growth in the places they live.

**Take advantage of the valuable services refugee resettlement agencies offer.** There are federal government resources to aid refugees in their resettlement, though funds are modest and extremely time-limited, and these are often supplemented by private or state funds. Workforce development is generally a central component of what resettlement agencies do; working with them to develop and expand entrepreneurship programs can be a significant way to expand the base of immigrant entrepreneurship.

**Make financing innovative and community-based.** Banks with a staff that understands the communities they're working with can often make loans that do a lot better than traditional banks. Speaking the language helps. Knowing the level of responsibility potential borrowers showed in a training class, as the Neighborhood Development Center does, allows for a different kind of evaluation of character, one of the 5 Cs of lending. And, being creative can help overcome barriers—such

as bringing community lending circles into the world of formal banking, providing the option of *reba*-free loans to Muslim borrowers, or helping undocumented immigrants apply for loans using Individual Taxpayer Identification Numbers as they attempt to adjust their legal status.

**Link financing to training and business support.** Applying for bank financing for a business idea is a great way to identify where a business plan may still need work. What helps less experienced entrepreneurs most is when financing sources can be linked to business services that help improve their business plans.

**Establish some incubators, especially commercial kitchens.** Just as financing can be linked to business services, so can where you rent a space. Incubators provide below-market rate places to work, but good ones also provide help with marketing, staffing, accounting, making a business plan, financing, and other services as needed. Commercial kitchens seem to be a type of incubator that is in particular demand because of the large number of immigrant-related food businesses and the challenges of meeting health inspection requirements in a home kitchen.

**Improve licensing and inspections for everyone.** A constant refrain among people who work in small business development is that there is confusion and red tape that seems unnecessary around licensing and inspection issues. When cities have made improvements aimed at making the process clearer to immigrants, it has often also resulted in an improved process for everyone.

**Use place-based development strategies to help Main Street businesses build neighborhoods.** Immigrant residents and businesses often cluster in certain neighborhoods, so placed-based strategies for business development are particularly well suited to immigrant entrepreneurs. The commercial corridor work in Philadelphia, the Midtown Global Market in St. Paul and the for-profit Plaza Mariachi in Nashville are three very different but useful models for development that takes advantage of the geographic patterns of immigrant business formation.

**Expand the reach of chambers of commerce and trade or interest groups.** Ethnic chambers of commerce, city chambers of commerce and associations such as a vendors' association can help organize interests in ways that make it easier for businesses to deal with government, to deal with each other, and to increase their own level of business sophistication.

**Help manage cultural and economic tensions.** While immigrant entrepreneurship is good for a city and a neighborhood, it is important not to turn a blind eye to the problems that can arise. Cultural and economic tensions with businesses, customers and residents can be based on both real grievances and traditional resistance to change. Both types of tension should be met honestly and taken seriously.

**Pay attention to wages for workers.** Many Main Street businesses don't have many employees or employ only family members. But an important part of business development is to make sure that businesses move toward a solid footing in paying decent wages to workers and that they are compliant with wage and hours laws just as they are with health inspections.

# METHODOLOGY

The statistical analysis in this report is based on two sources for data about immigrant business owners: the American Community Survey (ACS) and the Survey of Business Owners (SBO).

When using the ACS, our unit of analysis is business owners. Business owners are defined as people who own an incorporated business, and whose main job is to run that business. To allow for detailed analysis, we pool the five most recent years of data available, from 2009 to 2013, and call it "2013 5-year data." The terms "immigrant" and "foreign-born" are used interchangeably, and refer to anyone currently living in the United States who was born in another country. This includes undocumented immigrants, naturalized citizens and refugees, among others.

In using the SBO, our unit of analysis is businesses. Since many businesses have more than one owner, we define immigrant-owned businesses as those in which half or more of the owners were born in another country. We use the most recent year for which data is available, 2007. The SBO has a very large sample, but in using these data to look at immigrant business ownership it is important to note that there is a high non-response rate to questions about nativity. The analysis is based on cases with responses.

When using the ACS, we define Main Street businesses owners as those who own a business in the Retail Trade or the Accommodations and Food Services sectors. Also included are a subset of the Other Services sector: drycleaning and laundry services, nail salons and other personal care services, car washes, beauty salons, and barber shops. We call this grouping Neighborhood Services. When using the SBO, we define Main Street businesses in the same way, except that all "other services" are included because data limitations do not allow us to focus just on neighborhood services.

The author spent several days in each of the three metro areas over the course of six months in 2014, making site visits to programs that were identified as particularly good examples of work supporting immigrant entrepreneurship. In each metro area, he conducted interviews with over a dozen people, including government and private sector representatives and nonprofit service providers. He also spoke to researchers at universities, the Federal Reserve Bank and in the private sector. A full list of interviewees is avilable at www.fiscalpolicy.org/Acknowledgements.

# Endnotes

1  Immigrants in this analysis include all people born in a foreign country residing in the United States. In Part 2, where possible, the report addresses distinctions between undocumented immigrants and those with legal status, and between refugees and non-refugee immigrants.

2  According to a Fiscal Policy Institute analysis of the most recent Census statistics (American Community Survey 2013; the five-year data sample is used to give detailed results). Business owners are, in our analysis of this data set, defined as people who own an incorporated business—not publicly traded corporations—and whose full-time job is to run that business.

3  Some reports have shown far more substantial differentials between immigrant and U.S.-born business starts, although they show about the same differential in business ownership. There is some question about whether there may or may not be significantly more churn among immigrant businesses, but there is widespread agreement that immigrants are about 10 to 15 percent more likely to be small business owners. For a more detailed discussion of the findings on immigrant business ownership, see www.fiscalpolicy.org/ImmigrantEntrepreneurs

4  The first two sectors are standard definitions in the North American Industry Classification System (NAICS). "Neighborhood Services" are those types of businesses listed above, all of which fall in the NAICS "Other Services" category.

5  Main Street is not the only place immigrant business owners are playing a disproportionate role. In health care and social services, immigrants make up 21 percent of the business owners, including 27 percent of the private offices of physicians. In wholesale trade, with its connections to both servicing retail and to import-export, immigrants make up 23 percent of business owners. And, immigrants are playing a big and often well-known role in high-tech businesses—as seen, for example, in the manufacturing of computer and peripheral equipment (31 percent), aerospace products and parts (27 percent), or medical equipment and supplies (26 percent).

6  See the Methodology regarding differences between data from the Survey of Business Owners (SBO), which takes businesses as its unit of analysis and is conducted only every five years, and the American Community Survey (ACS), which takes as its unit of analysis people whose full-time job is running their own business. Where the SBO is used, Main Street Businesses are defined to include all "other services" rather than just some. SBO data are from the most recent year available, 2007.

7  Among the first empirical works with chapter-length discussions of these factors were A. Portes & R. Bach, *Latin Journey* (UC Press 1985) and G. DeFreitas, Inequality At Work: Hispanics in the U.S. Labor Force (Oxford U. Press, 1991).

8  For details see the interactive chart available at www.fiscalpolicy.org/50Cities

9  See, for example, David Dyssegaard Kallick, "Immigration and Economic Growth in New York City," in *One Out of Three*, Nancy Foner, editor (New York: New York University Press, 2013). For an interesting look at crime data, see Jacob L. Vigdor, "Immigration and New York City: The Contributions of Foreign-born Americans to New York's Renaissance, 1975–2013," (New York: America's Society, April 2014).

10  Other studies that have addressed this story of neighborhood growth include: Sharon Zukin's *Naked City: The Death and Life of Authentic Urban Places* (New York: Oxford University Press, 2010), Ivan Light and Steven Gold's *Ethnic Economies* (San Diego: Academic Press,

2000), and Timothy Bates's *Race, Self-Employment and Upward Mobility: An Elusive American Dream* (Baltimore: Johns Hopkins University Press, 1997).

11  The most recent Brookings report with this categorization outlined and updated is "The Geography of Immigrant Skills: Educational Profiles of Metropolitan Areas," (Washington, D.C.: Brookings Institution, 2011). An earlier classification categorized Philadelphia as a former gateway, but recent levels of immigration have shifted it to a re-emerging gateway.

12  In the course of the twentieth century, the city's Quaker, Jewish, Italian, Irish, and German populations maintained distinct identities, but also saw themselves clearly—and arguably primarily—as white.

13  Cumulative data about refugee arrivals in Minnesota is available at www.health.state.mn.us/divs/idepc/refugee/stats/refcumm.pdf. This does not include the effects of secondary migration and does not include deaths since arrival.

14  See "Neighborhood Development Center Outcomes Evaluation," (St. Paul: Wilder Research, 2013), available on the center's website at www.ndc-mn.org/sites/default/files/NDC%20Outcomes%20Evaluation%20-%20April%202013.pdf (accessed September 28, 2014).

15  "Nashville–Davidson," or just "Nashville," refers here to the areas that were combined in 1963 to form the Nashville–Davidson Metro Government. The Nashville metro area refers to the Metropolitan Statistical Area that is used by the Census Bureau to give statistics about a central city and its suburbs—effectively, a local labor market.

16  Galen Hull, a longtime activist and researcher around immigrant small business development in Nashville, developed a profile of Hispanic, East Indian, Somali, Kurdish, Bhutanese, and Nigerian small business owners in "Immigrant Entrepreneurs: The Face of the New Nashville," published online in *iBusiness*, 2010, 2: 1-30.

17  See David Dyssegaard Kallick, "Arizona Business Leaders: An Anti-Immigrant Reputation Hurts Our Economy," *Huffington Post*, April 16, 2014.

18  Gonzalez notes that the financial crisis dramatically dampened the home ownership program. "Where before the crisis we were doing eight to ten a month, now we've done maybe ten this year." One big reason: "the downpayment requirements have gone from 3 percent to 35 percent."

19  These include the Tennessee Immigrant and Refugee Coalition; the American Center for Outreach, representing Tennessee's Muslim community; the American Muslim Advisory Council, which works to create a bridge between Muslim communities and law enforcement and other government agencies; Family and Children's Services, a center for families in crisis; the Financial Empowerment Center, which helps people open bank accounts, manage bills, deal with debt collectors, improve credit, and create a budget; the Global Education Center, which gives classes "from African drumming to ballet to folkloric dance, and Zumba;" and the nonprofit United Neighborhood Health Services Clinic.

20  The contrast to Arizona after it passed the "show me your papers" law, SB1070, is striking: "Six million media hits, almost all of them negative," Denise Resnick, then marketing chair for the Greater Phoenix Economic Development Council, said recently. "What does that do to your brand as a welcoming, diverse state?" (See David Dyssegaard Kallick, "Arizona Business Leaders: An Anti-Immigrant Reputation Hurts Our Economy," *Huffington Post*, April 16, 2014.)

"There has been ample opportunity for Congress to pass a bipartisan immigration bill that would strengthen our borders, improve the legal immigration system, lift millions of people out of the shadows so they are paying taxes and getting right by the law …. I indicated to Speaker Boehner several months ago that if, in fact, Congress failed to act, I would use all the lawful authority that I possess to try to make the system work better. And that's going to happen."  President Barack Obama, Burma, November 13, 2014

# From the Shadows to the Mainstream:
## Estimating the Economic Impact of Presidential Administrative Action and Comprehensive Immigration Reform

Dr. Raul Hinojosa-Ojeda

North American Integration and Development Center
University of California, Los Angeles


With


Maksim Wynn
Analyst at the North American Integration and Development Center

November 21, 2014


## 1. Introduction and Executive Summary

President Obama and the Congress stand at a historic crossroad that could significantly change decades of undocumented status for millions of immigrant workers, while also providing significant increases in output, employment, earnings and taxes, benefiting the U.S. economy as a whole.[1]  Acting within his legal and constitutional authority, President Obama can act to broaden the scope of temporary beneficiaries through expanding programs such as DACA (Deferred Action for Childhood Arrivals) instituted in 2012 and renewed in 2014. Such Presidential action would not impede Congress from voting on more permanent and comprehensive immigration reform (CIR) legislation, which in fact would generate an even greater positive impact for the U.S. economy.

In anticipation of such momentous actions, it is important that policy makers and the general public understand the dimensions of the economic impact of alternative scenarios of action open

---

[1] A special thank you to Patrick Pastor and Juan Contreras for all of their work on this report.

1

to the President and Congress. Towards these ends, this paper will provide estimates based on a variety of methodologies for the following policy alternatives:

1. The DACA program's economic impact, compared to the impact of Congressional passage of the Dream Act.
2. Economic impacts of alternative administrative action scenarios based on scaling up the size of the benefited population.
3. Economic impact of congressional passage of a Comprehensive Immigration Reform bill approved by the U.S. Senate in 2013.

**The President has now taken administrative action and our analysis of the initiative's economic impact can be found in Appendix A and here: http://naid.ucla.edu/estimating-the-economic-impact-of-presidential-administrative-action-and-comprehensive-immigration-reform.html**

1) In the two years since the President created DACA through administrative action, the program has had and will continue to have a positive economic impact on its recipients as well as the economy as a whole. However, we find that these positive outcomes are less than what would have been experienced had congress enacted the DREAM act, which was the legislative equivalent of DACA.[2] Our key findings related to DACA are:

- The DACA program of 2012-2014 appears to have spurred extraordinary growth in the earnings of DACA beneficiaries. According to the results of two recent surveys, this wage growth surpassed 240%, a number that far exceeds the expectations in the literature.
- Using much more conservative earnings growth assumptions we estimate that legalizing and educating all eligible DACA applicants (1.23 million) would generate $1.7 trillion in cumulative earnings over forty years (the average length of a professional career).
- Expanding the pool of DACA beneficiaries to individuals who are currently too young to enroll in the program, but meet all of the other requirements (for a total population of 1.7 million), would result in cumulative earnings of $2.4 trillion over 40 years.
- Congressional passage of the DREAM would allow for the inclusion of 2.15 million potential beneficiaries who would earn an estimated income of $3.7 trillion over the course of 40 years.

---

[2] Raul Hinojosa, Paule Cruz Takash, et al., *No DREAMers Left Behind: The Economic Potential of DREAM Act Beneficiaries* (Los Angeles: UCLA NAID Center, 2010).

2

2) The President has the legal authority to build upon DACA's success and institute a variety of deferred action programs that would affect the earning potential[3] of millions of undocumented immigrants who are already working in the U.S. Our key findings[4] related to expanding deferred action indicate that:

- All scenarios for increasing the scope of potential beneficiaries would generate significant economic growth, benefiting not only immigrants, but also the U.S. economy as a whole. These positive economic outcomes increase in proportion to the number and characteristics of immigrants to whom deferred action is extended.

-  If deferred action were extended to the between 500,000 and one million undocumented immigrants who are parents or legal guardians of DACA recipients, it would generate a $1.39 billion increase in labor income; 32,000 jobs through an increase in direct, indirect and induced employment; and $511 million in new tax revenue (estimated as a two year short term impact). The $42 billion in GDP that these undocumented workers add to the economy would also be formalized, ending the technical illegality of the value they currently add to U.S. economy.

- If deferred action were extended to the 3.7 million undocumented immigrants who are parents or legal guardians of minors that are U.S. citizens, legal permanent residents (LPRs), or are DACA eligible, it would generate a short term $6.8 billion increase in labor income, more than 160,000 jobs and $2.5 billion in new tax revenue. It would also formalize the $210.2 billion in value that this population adds to the economy, thus ending the technical illegality of their employment and production.

- If deferred action were extended to the 6.6 million undocumented immigrants who have been present in the U.S. for at least ten years, it would generate a short-term $12.3 billion increase in labor income, more than 289,000 jobs and $4.5 billion in new tax revenue. $379 billion of GDP would also be legalized and formalized as a result of granting deferred action to this population.

- If deferred action were extended to the 9.7 million undocumented immigrants who have been present in the U.S. for at least five years, it would generate a short-term $18 billion increase in labor income, more than 422,900 jobs and $6.6 billion in new tax revenue. This would also formalize $553.8 billion dollars in GDP, bringing it out of the shadows of technical illegality.

---

[3] Throughout this report we use the alternative administrative action eligible population estimates of Randy Capps, Marc R. Rosenblum, and James D. Bachmeier, *Executive Action for Unauthorized Immigrants: Estimates of the Populations That Could Receive Relief* (Washington DC: Migration Policy Institute, September 2014).  For estimates of undocumented employment by sector we use Passel, Jeffrey, and D'vera Cohn. *A Portrait of Unauthorized Immigrants in the United States* (Washington, DC: Pew Research Center, 2009).
[4] Analysis of the economic impact of administrative action scenarios is based upon the methodology used in Raul Hinojosa and Marshall Fitz. *Revitalizing the Golden State: What Legalization over Deportation Could Mean to California and Los Angeles County.* (Washington, DC: Center for American Progress, April 2011).

3

3) While, the potential economic benefits of deferred action are significant, they can be enhanced though the passing of a permanent comprehensive immigration reform bill. Our key findings[5] related to the economic impact of CIR are:

- The CIR legislation passed by the senate, SB 744, has two key components that determine its economic impact. First, how the bill addresses the undocumented population that is currently living in the US. Second, the legal framework that it creates to absorb future immigration flows.
- A CIR bill that grants legal status to all current immigrants would generate a short term $63.19 billion increase in labor income, more than 1.4 million jobs and $23.2 billion in new tax revenue.
- A CIR bill would also create legal avenues for new immigrants projected to be needed by the U.S. economy and would generate over $1.5 trillion in additional GDP growth over the next ten years.

This report will first review the available data for comparing the size and economic contributions of the undocumented populations that would be affected by various immigration reform policy alternatives, including the DACA program, a series of proposed administrative action scenarios and comprehensive immigration reform. Second, we will review the methodological approaches used to analyze the impact of DACA (dynamic human capital growth modeling), alternative administrative actions (short term input-output IMPLAN modeling) and CIR (long term CGE modeling and short term input-output IMPLAN modeling). Third, the report will estimate and compare the economic impact of the administrative action that President Obama has already taken (DACA), the alternative forms that future administrative action might take, as well as the projected economic impact of future comprehensive immigration reform scenarios.

Researchers have used a number of methodologies to analyze the economic impact of immigration policy reforms.  The optimal choice of methodologies used depends on the nature and characteristics of the policy initiative in question. In this report, we will analyze results derived from three of these methodologies. The first methodological tool, computable general equilibrium (CGE) modeling, is especially useful for predicting the dynamic effects of an economic shock over time and at the multi-sectoral level.[6]  A second tool, input output modeling (IMPLAN), is more useful for analyzing the short-term impact of a labor market policy shift

---

[5] These findings are based upon: Raul Hinojosa, *Raising the Floor for American Workers: The Economic Benefits of Comprehensive Immigration Reform* (Center for American Progress and Immigration Policy Center, January 2010). Raul Hinojosa, *The Economic Benefits of Comprehensive Immigration Reform* (CATO Institute, Winter 2012). These findings align closely with the methodology and conclusions of: Congressional Budget Office, *The Economic Impact of S. 744, the Border Security, Economic Opportunity, and Immigration Modernization Act* (Washington, DC: June 18, 2013)

[6] See: Hinojosa, *The Economic Benefits of Comprehensive Immigration Reform.*

within the current structure of the economy.[7] Third, we will discuss a methodology that we have devised specifically to adjust our IMPLAN-based findings so that they better reflect the unique characteristics of immigration reforms that are directed towards childhood arrivals.[8] Specifically, this third methodology was devised to measure the economic impact of reforms that explicitly encourage educational attainment and affect a younger demographic.

It is critically important that policy makers and the general public understand the positive economic impact of administrative action, while also recognizing that these benefits are dwarfed by the potential impact of comprehensive immigration reform, and especially by a reform bill that includes a path to citizenship. Drawing on this analysis we can discern what lessons can be learned from this policy comparison, and provide policy recommendations for maximizing the effectiveness of administrative action going forward.

## 2. Data On Undocumented Population and their Economic Contributions

This section compares the size and economic contributions of the undocumented populations that can be affected by alternative immigration reform policies.  These policy alternatives are CIR, a series of proposed administrative actions, and the DACA program.

**Table 1**

| Population for Reform Scenario | Population | Employed Population‡ |
|---|---|---|
| Total Population | 11,700,000* | 8,300,000 |
| 5 Years in the U.S. | 9,696,000* | 6,762,000 |
| 10 Years in the U.S. | 6638000* | 4,629,000 |
| Parents of Citizens, LPRs, DACA Eligible | 3680000* | 2,566,000 |
| Parents of DACA Recipients | 750000† | 523,000 |

* Population Estimates: Randy Capps, Marc R. Rosenblum, and James D. Bachmeier, *Executive Action for Unauthorized Immigrants: Estimates of the Populations That Could Receive Relief* (Washington DC: Migration Policy Institute, September 2014).

† Population Estimate: Coalition for Humane Immigrant Rights of Los Angeles CHIRLA, "CHIRLA Memo to DHS Secretary," (2014).

‡ Ratio of Total Undocumented to Employed Undocumented: Jeffrey Passel and D'Vera Cohn, *A Portrait of Unauthorized Immigrants in the United States* (Pew Research Center, 2009).

---

[7] See: Hinojosa, Raul and Marshall Fitz. *Revitalizing the Golden State: What Legalization over Deportation Could Mean to California and Los Angeles County.* Washington, DC: Center for American Progress, April 2011.
[8] See: Hinojosa and Takash, *No DREAMers Left Behind.*

**Figure 1**

## Value Added by Reform Scenario



The methodology used for this economic impact analysis is described in: Raul Hinojosa and Marshall Fitz. *Revitalizing the Golden State: What Legalization over Deportation Could Mean to California and Los Angeles County.* (Washington, DC: Center for American Progress, April 2011).

The source of the methodology is: IMPLAN 2009, http://implan.com

The population data is derived from: Randy Capps, Marc R. Rosenblum, and James D. Bachmeier, *Executive Action for Unauthorized Immigrants: Estimates of the Populations That Could Receive Relief* (Washington DC: Migration Policy Institute, September 2014). <u>AND</u> Coalition for Humane Immigrant Rights of Los Angeles CHIRLA, "CHIRLA Memo to DHS Secretary," (2014).

**Figure 2**

6



Karina Fortuny, Randy Capps, and Jeffrey S. Passel, *The Characteristics of Unauthorized Immigrants in California, Los Angeles County, and the United States (*Washington, DC: The Urban Institute, March 2007).

**Comprehensive Immigration Reform**

There are an estimated 11.7 million undocumented immigrants living in the US of which 8.3 million are employed (see table 1). For our analysis of CIR, and throughout the rest of the paper, we have used the MPI's undocumented population estimates, and the Pew Hispanic Center's estimates of the ratio of total undocumented immigrants to employed undocumented immigrants.[9]

Figure 1 shows that the estimated total 8.3 million undocumented workers contribute over $679 billion in total value added per year to the U.S. economy as a whole. While we assume that the total undocumented population would be subject to comprehensive immigration reform legislation, and that the total affected population would be subject to administrative actions, in this report we focus on the *employed* undocumented population in order to determine the economic contributions and impact of alternative policies (see table 1).  We use CGE and IMPLAN modeling to quantify this impact, and these methodologies require estimating the ratio of employed to total undocumented workers, as well as the distribution of immigrants by sector (see figure 2), as estimated by the Urban Institute's Fortuny, Capps and Passel.[10]

---

[9] Population Estimate: Capps, Rosenblum, and Bachmeier, *Executive Action for Unauthorized Immigrants*. Ratio of Undocumented to Employed Undocumented: Passel and Cohn, *A Portrait of Unauthorized.*
[10] Karina Fortuny, Randy Capps, and Jeffrey S. Passel, *The Characteristics of Unauthorized Immigrants in California, Los Angeles County, and the United States (*Washington, DC: The Urban Institute, March 2007).

**Administrative Action**

The economic impact of any new Presidential administrative action program will be a function of the criteria for eligibility that is chosen to determine how many undocumented immigrants will qualify. The Obama administration has a great deal of flexibility in terms of shaping the program, so for the sake of comparison we have analyzed the economic impact of a broad set of scenarios. These scenarios are:

1. Individuals present in the U.S. for at least five years (9.7 million - MPI)
2. Individuals present in the U.S. for at least ten years (6.6 million - MPI)
3. Parents of minor U.S. citizens, LPRs or DACA eligible (3.6 million - MPI)
4. Parents or legal guardians of DACA recipients (750,000 - CHIRLA)

For the first three of these scenarios, the Migration Policy Institute (MPI) estimated the general range of eligible applicants,[11] while the Coalition for Humane Immigrant Rights of Los Angeles (CHIRLA) estimated the range of eligible applicants for the fourth scenario (see table 1).[12]

The populations that would be affected by administrative action currently make important contributions to the US economy, despite the illegality of their employment. As figure 1 shows, the total undocumented populations produces more than $679.7 billion dollars in GDP annually, while those who have been present in the U.S. for at least five years add more than $553 billion in value. Undocumented immigrants present in the U.S. for at least ten years add $379 billion in GDP each year, while Parents of minors that are US citizens, LPRs or DACA eligible add $210 billion. In addition, the parents or legal guardians of DACA recipients add $42 billion in GDP annually. Providing these populations with legal work authorization would formalize the value they add to the economy, while bringing their productivity and income out of the shadows of technical illegality.

**DACA**

The DACA program of 2012 has a number of requirements that limit the size of the eligible population. The program requires applicants to have come to the US before the age of sixteen, to have been present in the country as of June 15, 2012, and to have lived here continuously for at least five years before that date.  In addition, they must be between the ages of fifteen and thirty-one at the time of their application, and either have received a high school diploma or its

---

[11] Randy Capps, Marc R. Rosenblum, and James D. Bachmeier, *Executive Action for Unauthorized Immigrants: Estimates of the Populations That Could Receive Relief* (Washington DC: Migration Policy Institute, September 2014).
[12] Coalition for Humane Immigrant Rights of Los Angeles CHIRLA, "CHIRLA Memo to DHS Secretary," (2014).

8

equivalent, be currently enrolled in school, or be honorably discharged veterans of the US armed forces or Coast Guard. They must not have a serious criminal record.[13]

**Table 2**

| DACA Population Data | |
|---|---|
| Immediately Eligible | 1,200,000 |
| Did Not Meet Age Requirement | 500,000 |
| DACA Beneficiaries To-Date | 587,000 |

Jeanne Batalova et al., *DACA At The Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action* (Washington DC: Migration Policy Institute, August 2014).

Table 2 shows that to date over 1.2 million childhood arrivals meet these requirements, while and additional 500,000 meet all but the age requirement, for a total of 1.7 million eligible and soon to be eligible DACA applicants. So far 587,366 applicants have received the protections afforded by DACA.[14]

**Data on Relationship Between Legal Status and Wages, and Economic Activity**

Researchers studying the economic impact of immigration reform have consistently noted that legalization increased the wages of the newly legalized and total native population. However, formalizing undocumented immigrants' productivity and remuneration is not an all or nothing proposition. Total economic benefits increase in proportion to the number of undocumented that are offered inclusion. In addition, the greater the scope of that financial, social and political inclusion, the greater the individual and total economic benefits. For example, temporary work permits induce moderate wage growth for those that received them, while permanent legalization fosters greater wage growth for the legalized, and citizenship would lead to maximum wage growth.

Researchers have debated the degree to which these various legal statuses' positively impact wages. For our analysis of administrative action in this report we have used a conservative estimate of the wage effect. The Princeton sociologists Douglas S. Massey and Kerstin Gentsch have stated that undocumented immigrants make 20% percent less than legal immigrants and

---

[13] Jeanne Batalova et al., *DACA At The Two-Year Mark* (Washington DC: Migration Policy Institute, August 2014).

[14] Batalova, *DACA at the Two-Year Mark*.

9

that those with temporary work permits make 13% less (see table 4).[15] Rather that applying the 20% legalization increase to the wages of those affected by administrative action, we have instead assumed that the wage affect will be equivalent to that of a temporary work program.

Looking back at the Immigration Reform and Control Act of 1986 (IRCA) is the logical way to begin any analysis of immigration reform's affect on the economy, and specifically on wages. In all roughly 3 million unauthorized immigrants were legalized under IRCA, and in the short term this had a positive impact on their wages and on the US economy as a whole.

**Table 3**

Economic Impact of Legalization

| IRCA | Total Wage Increase | Male Wage Increase | Female Wage Increase |
|------|--------------------|--------------------|---------------------|
| US Department of Labor | 15% | 13% | 20% |
| Rivera-Batiz | n/a | 8.4% | 13% |
| Amuedo-Dorantes et al. | n/a | 9.3% | 2.1% |

Roger G. Kramer, Audrey Singer, Shirley G. Smith. *Characteristics and Labor market Behavior of the Legalized Population Five Years Following Legalization.* Washington, DC: U.S. Department of Labor, May 1996.

Catalina Amuedo-Dorantes, Cynthia Bansak, and Steven Raphael, "Gender Differ- ences in the Labor Market: Impact of IRCA," *American Economic Review* 97 (2) (2007): 412-416.

Franciso L. Rivera-Batiz, "Undocumented Workers in the Labor Market: An Analysis of the Earnings of Legal and Illegal Mexican Immigrants in the United States," *Journal of Population Economics* 12 (1) (1999): 91-116

A number of government agencies and economists have quantified this impact, and while their findings are not uniform they generally agree that, as a result of legalization, the wages of the newly legalized increased. In a widely cited report based on surveys five years after the implementation of IRCA, US Department of Labor Survey of Legalized population reported that overall the wages of the recently legalized rose by 15% in the four to five years following legalization (see table 3).[16] In his analysis of IRCA the economist Francisco Rivera-Batiz found that the wages of male IRCA beneficiaries increased 8.4 percent while their female counterparts increased by 13 percent (see table 3). He found that these increases were the direct effect of legalization and were independent of any wage increase that may have resulted from acquiring more education and further mastery of English among other factors.[17]  In 2007, the economists Catalina Amuedo-Dorantes, Cynthia Bansak and Stephen Raphael also found that IRCA had generated wage growth for its recipients. Controlling for broad changes in the US economy, they

---

[15] Douglas S. Massey and Kerstin Gentsch, "Undocumented Migration to the United States and the Wages of Mexican Immigrants," *International Migration Review* 48, no. 2 (June 2014): 482–99, doi:10.1111/imre.12065.

[16] Roger G. Kramer, Audrey Singer, Shirley G. Smith. *Characteristics and Labor market Behavior of the Legalized Population Five Years Following Legalization.* Washington, DC: U.S. Department of Labor, May 1996.

[17]  Franciso L. Rivera-Batiz, "Undocumented Workers in the Labor Market: An Analysis of the Earnings of Legal and Illegal Mexican Immigrants in the United States," *Journal of Population Economics* 12 (1) (1999): 91-116

found that the real wages of male IRCA beneficiaries had increased by 9.3 percent; while for women the increase was 2.1 percent (see table 3).[18]

Legalization also incentivizes the newly legalized to invest in themselves and their community and this leads to wage as well as macroeconomic growth. Kossoudji and Cobb-Clark have shown that the wages of unauthorized workers do not reflect their skill levels because their lack of legal status pushes them into the lowest wage sectors and into the informal economy.[19] Legalization encourages them to seek work that is commensurate with their skill level and to increase that skill level in order to obtain higher wages. This investment in their human capital, and the social mobility it affords, has a far-reaching and positive impact on the economy as a whole.

In order to gauge the wage impact of a diverse range of immigration reform scenarios we have relied upon the findings of Massey and Gentsch. They argue that undocumented Mexican immigrants make twenty percent less on average that do those with legal status, while those with temporary work permits make thirteen percent less than those with legal status (see table 4).[20] Massey and Gentsch were only describing undocumented Mexican immigrants, but since this population constitutes an overwhelming plurality of the total undocumented population,[21] we assume that Massey and Gentsch's figures are roughly representative of undocumented wages generally.

The impact of citizenship provides even greater economic benefits than does simple legal status (see Table 4). For example, immigrants with legal status earn significantly less than their naturalized citizen counterparts. Manuel Pastor and Justin Scoggins have shown that the citizenship naturalization of those with legal status fosters significant wage growth, which leads to economic growth generally. Specifically they found that, "after controlling for many of the characteristics that predict individual wages", there is an 8 to 11 percent "earnings premium" associated with naturalization.[22]

**Table 4**

---

[18] Catalina Amuedo-Dorantes, Cynthia Bansak, and Steven Raphael, "Gender Differ- ences in the Labor Market: Impact of IRCA," *American Economic Review* 97 (2) (2007): 412-416.

[19] Sherrie A. Kossoudji and Deborah A. Cobb Clark, "Coming out of the Shadows: Learning about Legal Status and Wages from the Legalized Population," *Journal of Labor Economics* 20, no. 3 (July 2002): 598–628, doi:10.1086/339611.

[20] Massey and Gentsch, "Undocumented Migration to the United States."
[21] Mexican immigrants constitute 7 million of the 11.9 million undocumented living in the US according to the Pew Hispanic Center's *A Portrait of Unauthorized Immigrants in the United States.*

[22] Manuel Pastor and Justin Scoggins, *Citizen Gain: The Economic Benefits of Naturalization for Immigrants and the Economy* (Center for the Study of Immigrant Integration, December 2012).

## Income Impact by Legal Status

|  | % Greater Than Undocumented |
| --- | --- |
| Temporary Work Permit* | 7% |
| Legal Permanent Resident* | 20% |
| Naturalized Citizen† | 29.5% |

*Douglas S. Massey and Kerstin Gentsch, "Undocumented Migration to the United States and the Wages of Mexican Immigrants," International Migration Review 48, no. 2 (June 2014): 482–99, doi:10.1111/imre.12065.

†Manuel Pastor and Justin Scoggins, *Citizen Gain: The Economic Benefits of Naturalization for Immigrants and the Economy* (Center for the Study of Immigrant Integration, December 2012).

Obtaining legal employment authorization provides the undocumented with labor market mobility, allowing them to find work that is commiserate with their skills and to improve those skills, which subsequently leads to increased earning power (see table 4). In addition, by gaining the ability to move between jobs, the undocumented are able to maximize their productivity and income, which increases the value they add to the economy (GDP) and the taxes they pay. Increased GDP, labor income, and tax revenue result in job creation both in the public and private sectors. These positive economic outcomes increase in proportion to the number of people who are offered legal authorization to work, and the more complete their legal, social and economic inclusion is. As a result, while administrative action has a positive economic impact and granting temporary work authorization to all undocumented is even better; the impact of granting legal status to undocumented immigrants through a CIR bill would produce the best outcomes, especially if it includes a path to citizenship.

## 4. Methodologies for Estimating Economic Impacts of Immigration Policy

Researchers have used a number of methodologies to analyze the economic impact of immigration policy reforms.  The optimal choice of methodologies used depends on the nature and characteristics of the policy initiative in question. In this report, we will analyze results derived from three of these methodologies. The first methodological tool, computable general equilibrium (CGE) modeling, is especially useful for predicting the dynamic effects of an economic shock over time and at the multi-sectoral level.  A second tool, input output modeling (IMPLAN), is more useful for analyzing the short-term impact of a labor market policy shift within the current structure of the economy.  Third, we will discuss a methodology that we have devised specifically to adjust our IMPLAN-based findings so that they better reflect the unique characteristics of immigration reforms that are directed towards childhood arrivals. Specifically, this third methodology was devised to measure the economic impact of reforms that explicitly encourage educational attainment and affect a younger demographic.

12

**CGE Models**

CGE modeling has been used extensively to predict the economic impact of comprehensive immigration reform. In an earlier report, published by the Center for American Progress (CAP) and the CATO Institute, we used CGE modeling to predict comprehensive immigration reform's impact on future immigration flows and the GDP growth that the equilibrium affects of these flows would create. In other words, CGE modeling is very good at tracking the effects of new immigrants entering the workforce and the affects of these new workers on the economic ecosystem. However, while such dynamism is one of CGE modeling's most positive attributes, in the context of this paper it presents a challenge. Here, we are attempting to compare both comprehensive immigration reform and administrative relief scenarios, and these two types of reform affect future immigration flows in very different ways. To mitigate these differences we will include CGE findings only in our discussion of CIR. We will not include CGE findings in our analysis of administrative action since this analysis focuses on the undocumented who are currently in the US, their contributions to the current US economy, and how a change in their immigration status would affect their current and future contributions.

**Input-Output IMPLAN Modeling**

We have based our analysis of administrative action, which would not impact future flows, and our comparison of administrative action to CIR, which would impact future flows, on IMPLAN and Census data, rather than a CGE model. IMPLAN is an input output measurement based on the current structure of the US economy, and is a more appropriate tool for comparing administrative action and CIR scenarios, their respective impact on the economy and the role of immigrants within it. Using IMPLAN data we are able to quantify the labor income, tax contributions and productivity of undocumented immigrants and illustrate the economic impact of formalizing their role in the economy.

**Educational Attainment**

Using the IMPLAN model to analyze the economic impact of DACA is presents a challenge because the IMPLAN model does not account for the relatively high level of educational attainment that DACA encourages its beneficiaries to acquire. Instead, this model assumes that DACA recipients' possess the same education and skills as the general undocumented population. Because of DACA's educational requirements, DACA beneficiaries have on average a higher level of educational attainment than does the rest of the undocumented population. Therefore, DACA recipients can expect to receive a greater average income boost from legalization than can the remainder of the undocumented population. This

13

means that an analysis based on the IMPLAN model understates the true financial impact of DACA. In light of these differences, the benefits described by an analysis based on IMPLAN should be taken as a baseline. DACA beneficiaries are able to find work that is commensurate with their education, and the program incentivizes educational attainment. Analyzing the increased earning power that this aspect of DACA affords beneficiaries leads to a more accurate representation of the program's economic impact.

In order to adjust the IMPLAN based analysis to represent the economic benefits of DACA's educational requirement we have devised a methodology that is designed to account for the characteristics of DACA, and the DACA eligible population, that are unique. First, we calculate the highest degree earned by individuals that are eligible for DACA, or have received it, and who have completed high school, a high school equivalent, or a post secondary degree program.  We then project this distribution onto the population that is still enrolled in school. By multiplying the totals in each educational attainment category by the Census' median income by educational attainment data, we are able to project the single year and 40-year income of the DACA eligible population adjusted for educational attainment.

## 5. Results of Economic Impact Analysis

Potential DACA beneficiaries are a unique demographic within the undocumented population. They are younger than the general undocumented population and, as a result of DACA's educational requirement, are more likely to possess a higher level of educational attainment. Therefore, in order to quantify the economic impact of the program, we have developed a methodology that reflects the unique characteristics of DACA and of its potential beneficiaries (see section 4).  In order to measure the increased earning potential that DACA's education requirement facilitates, we must first calculate DACA's affect on educational attainment.

**Figure 3**

14

A258



Source: 1. Jeanne Batalova et al., DACA At The Two Year Mark (Washington DC: Migration Policy Institute, August 2014).

The MPI, in their report *DACA at the Two Year Mark,* have estimated that 2.1 million childhood arrivals could potentially qualify for the benefits offered by the DACA program.[23] Within that population they distinguish between the childhood arrivals who currently meet all of the DACA program's requirements (the *immediately eligible* population), and those that are *potentially eligible,* either because they did not meet the program's education requirements or because are not yet old enough to apply.

The MPI report breaks down the *immediately eligible* population into four more categories: those that have obtained a postsecondary degree, those that have completed high school and are enrolled in some form of postsecondary education, those that have completed high school but are not enrolled in some form of postsecondary education, and those that are still enrolled in high school. Among the population that has earned some form of postsecondary degree, 43 percent earned an Associate's degree, 48 percent earned a Bachelor's degree, and 9 percent earned an advanced degree (see figure 3).[24] If we project this distribution onto the DACA eligible population who are still enrolled in either high school or a postsecondary program, as well as the population that meets all but the age requirement, and then adjust for the percent of high school graduates who are projected not to continue on with their education, we can more accurately estimate the program's long-term impact on its beneficiaries' earnings.

---

[23] Jeanne Batalova et al., *DACA At The Two-Year Mark* (Washington DC: Migration Policy Institute, August 2014).

[24] Jeanne Batalova et al., *DACA At The Two-Year Mark* (Washington DC: Migration Policy Institute, August 2014).

15

**Table 5**

Breakdown of Educational Attainment Projections

| Current Level of Educational Attainment | Projected Highest Level of Educational Attainment | | | | Total |
|---|---|---|---|---|---|
| | High School or Equivalent | Associates | Bachelors | Advanced | |
| Completed Post-Secondary Degree | n/a | 43,000 | 48,000 | 9,000 | 99,000 |
| Enrolled in Post-Secondary Program | n/a | 107,283 | 119,758 | 22,455 | 247,000 |
| Completed High School or Equivalent | 510,000 | n/a | n/a | n/a | 510,000 |
| Have Not Yet Complete Highschool | 155,800 | 97,380 | 108,703 | 20,382 | 380,000 |
| Met all Requirements but Age | 253,611 | 94,337 | 105,307 | 19,745 | 473,000 |
| Total | 919,411 | 342,000 | 381,768 | 71,581 | 1,709,000 |

The methodology used to estimate educational attainment is described in: Raul Hinojosa, Paule Cruz Takash, and et al., No DREAMers Left Behind: The Economic Potential of DREAM Act Beneficiaries (Los Angeles: UCLA NAID Center, 2010).

The data used to project this educational attainment is described in: Jeanne Batalova et al., DACA At The Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action (Washington DC: Migration Policy Institute, August 2014).

Table 6 shows the projected educational attainment of those that currently meet DACA's education requirement, and that nearly 800,000 individuals within this population can be expected to earn some sort of post-secondary degree (see table 5). Those that do so can be expected to have a much higher income than the just over 919,000 students who are expected to complete only high school.[25]

**Table 6**

---

[25] While some of the DACA eligible population can be expected to drop out of high school, some of the potentially eligible population that did not meet the education requirement can be expected to re-enroll and qualify for DACA. We expect that these two cohorts to be nearly the same size, and to mitigate each others affect on the total economic impact of the program.

16

Projected Single and 40-Year Income

| | Projected Highest Level of Educational Attainment | | | | Total |
|---|---|---|---|---|---|
| | High School or Equivalent | Associates | Bachelors | Advanced | |
| Projected Educational Attainment | 919,411 | 342,000 | 381,768 | 71,581 | 1,709,000 |
| Median Income (2011-2013 ACS 3-year) | $27,346 | $32,995 | $49,964 | $65,791 | n/a |
| Projected Yearly Income ($ Millions) | $25,142 | $11,284 | $19,074 | $4,709 | $60,210 |
| Projected 40-Year Income Total ($ Millions) | $1,005,688 | $451,371 | $762,985 | $188,376 | $2,408,421 |

The methodology used to estimate educational attainment is described in: Raul Hinojosa, Paule Cruz Takash, and et al., No DREAMers Left Behind: The Economic Potential of DREAM Act Beneficiaries (Los Angeles: UCLA NAID Center, 2010).
The data used to project this educational attainment is described in: Jeanne Batalova et al., DACA At The Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action (Washington DC: Migration Policy Institute, August 2014).
Median Income is from: US Census, ACS 3-Year Survey 2011-2013

Table 6 reveals that educational attainment has a significant impact on the future wages of the potentially eligible population (excluding those that do not meet the educational requirement). We predict that the share of this population who complete a postsecondary degree will collectively earn more than $35 billion a year. Those who earn advanced degrees will collectively earn over $4.7 Billion a year, while those with associates and bachelor's degrees are expected to earn a collective annual income of more than $11.2 and $19 billion dollars respectively. Those that are projected to earn a high school diploma or the equivalent are expected to collectively earn more than $25.1 billion annually. In all this population will collectively earn more than $60.2 billion annually.

The very nature of DACA not only insures that its recipients are, on average, more educated than the general undocumented population, it also insures that they are younger. DACA's age requirement means that recipients have either just entered the work force or have yet to do so. Because of this we have estimated their earnings over the course of forty years, or about the length of the average career. Table 6 shows that over forty years the cumulative earnings of this population will top $2.4 trillion.

17

**Table 7**

Economic Impact of DACA

| | |
|---|---|
| **Labor Income Increase (in $ millions)** | $8,098 |
| **Total Tax Increase (in $ millions)** | $1,672 |
| Business Taxes | $711 |
| Personal Taxes | $398 |
| Sales Taxes | $564 |
| **Total Employment Gain** | 190,039 |
| Direct Employment Gain | 104,942 |
| Indirect Employment Gain | 38,489 |
| Induced Employment Gain | 46,608 |

The methodology used for this economic impact analysis is described in: Raul Hinojosa and Marshall Fitz. *Revitalizing the Golden State: What Legalization over Deportation Could Mean to California and Los Angeles County.* (Washington, DC: Center for American Progress, April 2011).

The source of the methodology is: IMPLAN 2009, http://implan.com

The population data is derived from: Batalova, Jeanne, Sarah Hooker, Randy Capps, and James D. Bachmeier. *DACA At The Two Year Mark.* Washington DC: Migration Policy Institute, August 2014.

Table 5 reveals that DACA has, and will continue to, spur job growth and create new tax revenue (see table 7). If all 1.7 million potential applicants who currently meet the education requirement enter the workforce (see table 2), their collective wages will be roughly $8 billion dollars higher than they would have been before DACA. These increased earnings would directly generate almost 105,000 new jobs. The resulting increase in indirect employment---which is a change in employment in one industry being caused by a change in another, as a result of interaction between the two---would account for more than 38,000 new jobs. Induced employment, which is a change in employment based on changes in household spending, would increase by more than 46,000 jobs. In all the increase in labor income would generate more 106,000 new jobs. In addition, this wage growth would bring in more than $1.6 billion dollars in new business, personal and sales tax revenue (see table 7).

**Table 8**

Wage Impact by DACA Beneficiary Survey

| Survey | Survey Respondents | Wage Growth |
|---|---|---|
| NAID Center | 167 | 246% |
| CHIRLA | 309 | 176% |

Two recent surveys, one conducted by the NAID center, and another by CHIRLA crystalize DACA's potential for an even greater impact on earnings. The survey conducted by the NAID Center found that the wages of 167 DACA beneficiaries increased by an average of 246 percent

18

(see table 8). Even when counting only those who were employed before and after receiving DACA, thereby ignoring some of the most educated respondents, this cohort still experienced a 76 percent increase in wages. Another survey, conducted by CHIRLA, found that the wages of its 309 respondents were 277 percent greater than they were before DACA (see table 8). This wage growth is much stronger than that projected by the educational attainment model. Therefor the job and tax growth projected by the educational attainment model should also be understood as a very conservative estimate. Based on this survey data, we assume that DACA's actual economic impact is much greater than any of the estimates we have proposed in this section.

DACA's economic impact is significant, but it is less than what would be generated by far reaching administrative action, and much less than what would be generated by a comprehensive immigration reform bill. This reflects the findings of the IRCA literature, and our earlier NAID center research,[26] which show that the economic benefits of immigration reform increase in relation to the number of undocumented affected and the level of inclusion they are offered. While a comprehensive immigration reform bill that would extend legalization to all undocumented immigrants would have a far greater impact, this does not negate DACA's positive affect on the lives of its recipients and on the economy as a whole.

## Administrative Action Results

Any upcoming administrative action will generate less wage growth per person affected than DACA because DACA affected young people, many of whom were still in school, and are therefore able the earn a relatively higher wage in the job market. However, if administrative action affects a large cohort of working age adults the economic impact could still be great. The size of the population affected is therefor of the upmost importance. The boldness of President Obama's action will determine the relative size of the economic impact in terms of labor income gain (see figure 4), increased tax revenue (see figure 5) and direct, indirect and induced job growth (see figure 6).

**Figure 4**

---

[26] See: Hinojosa, *The Economic Benefits* <u>AND</u> Raul Hinojosa, *Raising the Floor.*

19



### Labor Income Gain by Administrative Action Scenario

The methodology used for this economic impact analysis is described in: Raul Hinojosa and Marshall Fitz. *Revitalizing the Golden State: What Legalization over Deportation Could Mean to California and Los Angeles County.* (Washington, DC: Center for American Progress, April 2011).

The source of the methodology is: IMPLAN 2009, http://implan.com

The population data is derived from: Randy Capps, Marc R. Rosenblum, and James D. Bachmeier, *Executive Action for Unauthorized Immigrants: Estimates of the Populations That Could Receive Relief* (Washington DC: Migration Policy Institute, September 2014).

AND Coalition for Humane Immigrant Rights of Los Angeles CHIRLA, "CHIRLA Memo to DHS Secretary," (2014).

**Figure 5**

### Tax Revenue Increase by Administrative Action Scenario

The methodology used for this economic impact analysis is described in: Raul Hinojosa and Marshall Fitz. *Revitalizing the Golden State: What Legalization over Deportation Could Mean to California and Los Angeles County.* (Washington, DC: Center for American Progress, April 2011).

The source of the methodology is: IMPLAN 2009, http://implan.com

The population data is derived from: Randy Capps, Marc R. Rosenblum, and James D. Bachmeier, *Executive Action for Unauthorized Immigrants: Estimates of the Populations That Could Receive Relief* (Washington DC: Migration Policy Institute, September 2014).

AND Coalition for Humane Immigrant Rights of Los Angeles CHIRLA, "CHIRLA Memo to DHS Secretary," (2014).

**Figure 6**

20

A264



**Employment Growth by Administrative Action Scenario**

The methodology used for this economic impact analysis is described in: Raul Hinojosa and Marshall Fitz. *Revitalizing the Golden State: What Legalization over Deportation Could Mean to California and Los Angeles County.* (Washington, DC: Center for American Progress, April 2011).

The source of the methodology is: IMPLAN 2009, http://implan.com

The population data is derived from: Randy Capps, Marc R. Rosenblum, and James D. Bachmeier, *Executive Action for Unauthorized Immigrants: Estimates of the Populations That Could Receive Relief* (Washington DC: Migration Policy Institute, September 2014).

AND Coalition for Humane Immigrant Rights of Los Angeles CHIRLA, "CHIRLA Memo to DHS Secretary," (2014).

The most ambitious of the potential administrative reform scenarios, granting deferred action to the nearly 9.7 million undocumented immigrants who have been in the US for five years or more, would have the greatest economic and humanitarian impact. As Massey and Gentsch noted temporary workers earn 7% higher wages than do the undocumented.[27] If the affected population experienced this 7% wage increase, their collective labor income would increase by more than $18 billion (see figure 4). This wage growth would create nearly 423,000 jobs (see figure 5) and bring in more $6.6 billion in new taxes (see figure 6).

More cautious action on the part of the administration would still generate significant economic growth, but that this growth would be considerably less than what would have been created by a more far-reaching reform. Extending deferred action to the more than 6.6 million undocumented immigrants who have lived in the US for ten years or more would boost this population's yearly wages by more than $12.3 billion (see figure 4). This labor income increase would generate 289,560 jobs (see figure 5) and over $4.5 billion in new tax revenue (see figure 6).

Our analysis of the economic impact of extending deferred action to the 3.7 million parents of children that are either US citizens, LPRs or DACA eligible emphasizes the importance of bold administrative action If these 3.7 million parents apply for and receive deferred action, their

---

[27] Massey and Gentsch, "Undocumented Migration and the Wages."

collective income will increase by $6.8 billion (see figure 4). This wage growth would than generate 160,528 jobs (see figure 5), and more than $2.5 million in new taxes (see figure 6). While this scenario would still generate significant economic growth, this growth could potentially be less than what DACA would generate at full enrollment.

Should the White House extend deferred action to only the parents of DACA recipients, estimated to be between 500,000 and 1,000,000, the economic outcomes would be positive if somewhat limited. For our analysis of this scenario we have split the difference between the high and low population estimates and assumed that deferred action would be extended to a population of 750,000. This scenario would generate a labor income increase of $1.3 billion (see figure 4). Such limited wage growth would generate around 32,000 jobs (see figure 5), and just $511 million in new taxes (see figure 6).

Comparing these four administrative action scenarios illustrates why it is critically important that the Obama administration take bold and far-reaching action. There is a wide gulf between the economic impact of the most ambitious scenario and that of the least ambitious. Extending deferred action to those that have been in the US for five years or more would generate around thirteen times the wage, employment, and tax growth than would extending deferred action only to the parents of DACA recipients. The difference between granting deferred action to undocumented that have been in the US for five years and those that have either been here for ten years, or are the parents of US citizens, LPRs, and/or DACA recipients is not as stark but it is still significant. In the case of the former comparison, granting deferred action to undocumented immigrants who have been in the country for five years or more would generate fifty percent more wage, job and tax growth than would extending it to the population that has been here for ten years or more. In the case of the latter comparison, granting deferred action to the population that has been here for five years or more would generate two and half times the wage, job and tax growth.

## Comprehensive Immigration Reform

The IRCA literature suggests that the economic impact of reform increases in proportion to the number of people who are affected, and in proportion to the completeness of their legal, social and economic inclusion. This would mean that while bold and far-reaching administrative action on immigration reform would generate positive economic outcomes, these outcomes would not be as positive as those that a comprehensive immigration reform bill would generate.

Our CGE analysis of comprehensive immigration reform supports this conclusion. In an earlier report, published by the Center for American Progress (CAP) and the CATO institute, we laid out three reform scenarios. They are:

> 1) Comprehensive immigration reform that creates a pathway to legal status for

22

unauthorized immigrants in the United States and establishes flexible limits on permanent and temporary immigration that respond to changes in U.S. labor demand in the future.

2) A program for temporary workers only that does not include a pathway to permanent status or more flexible legal limits on permanent immigration in the future.

3) Mass deportation to expel all unauthorized immigrants and effectively seals the U.S.-Mexico border.[28]

**Figure 7**



The methodology used for this analysis and the findings are described in: Raul Hinojosa, *Raising the Floor for American Workers: The Economic Benefits of Comprehensive Immigration Reform* (Center for American Progress and Immigration Policy Center, January 2010).

AND Raul Hinojosa, *The Economic Benefits of Comprehensive Immigration Reform* (CATO Institute, Winter 2012).

---

[28] See Hinojosa, *Raising the Floor* <u>AND</u> Hinojosa, *The Economic Benefits.*

23

Our CGE analysis of these scenarios (published in 2010 and 2012) clearly illustrates the advantages of full legalization over a temporary worker program, and the disastrous impact of mass deportation. CIR with full legalization would generate GDP growth of $1.5 trillion over ten years while a bill that extends temporary work authorization to all undocumented immigrants would generate only $792 billion over the same time period (see figure 7). These findings a closely aligned with those of a Congressional Budget Office report from 2013.[29] On the other hand, mass deportation would cause the economy to contract by $2.6 trillion (see figure 7). This would cripple the US economy and set off a deep and lasting depression.[30]

Our IMPLAN based analysis of CIR reaffirms the positive economic impact of extending some form of legal status to the entire undocumented population. It also reaffirms that the scale of positive outcomes increases in proportion the completeness of the undocumented population's social, economic, and political inclusion. To illustrate this point we have slightly altered the CIR scenarios we studied. Our IMPLAN-based analysis examined the following scenarios:

1) Comprehensive immigration reform that creates a pathway to legal status for unauthorized immigrants in the United States.

2) Comprehensive immigration reform that creates a pathway to citizenship for unauthorized immigrants in the United States.

3) A program for temporary workers only that does not include a pathway to permanent status or citizenship.

---

[29] Congressional Budget Office, *The Economic Impact of S. 744, the Border Security, Economic Opportunity, and Immigration Modernization Act.* (Washington, DC: June 18, 2013).

[30] Hinojosa, *Raising the Floor.*

24

**Figure 8**

## Labor Income Gain by CIR Scenario



The methodology used for this economic impact analysis is described in: Raul Hinojosa and Marshall Fitz. *Revitalizing the Golden State: What Legalization over Deportation Could Mean to California and Los Angeles County.* (Washington, DC: Center for American Progress, April 2011).

The source of the methodology is: IMPLAN 2009, http://implan.com

The population data is derived from: Randy Capps, Marc R. Rosenblum, and James D. Bachmeier, *Executive Action for Unauthorized Immigrants: Estimates of the Populations That Could Receive Relief* (Washington DC: Migration Policy Institute, September 2014).
<u>AND</u> Coalition for Humane Immigrant Rights of Los Angeles CHIRLA, "CHIRLA Memo to DHS Secretary," (2014).

**Figure 9**

## Tax Revenue Increase by CIR Scenario

The methodology used for this economic impact analysis is described in: Raul Hinojosa and Marshall Fitz. *Revitalizing the Golden State: What Legalization over Deportation Could Mean to California and Los Angeles County.* (Washington, DC: Center for American Progress, April 2011).

The source of the methodology is: IMPLAN 2009, http://implan.com

The population data is derived from: Randy Capps, Marc R. Rosenblum, and James D. Bachmeier, *Executive Action for Unauthorized Immigrants: Estimates of the Populations That Could Receive Relief* (Washington DC: Migration Policy Institute, September 2014).
<u>AND</u> Coalition for Humane Immigrant Rights of Los Angeles CHIRLA, "CHIRLA Memo to DHS Secretary," (2014).

**Figure 10**



The methodology used for this economic impact analysis is described in: Raul Hinojosa and Marshall Fitz. *Revitalizing the Golden State: What Legalization over Deportation Could Mean to California and Los Angeles County.* (Washington, DC: Center for American Progress, April 2011).

The source of the methodology is: IMPLAN 2009, http://implan.com

The population data is derived from: Randy Capps, Marc R. Rosenblum, and James D. Bachmeier, *Executive Action for Unauthorized Immigrants: Estimates of the Populations That Could Receive Relief* (Washington DC: Migration Policy Institute, September 2014). AND Coalition for Humane Immigrant Rights of Los Angeles CHIRLA, "CHIRLA Memo to DHS Secretary," (2014).

As Massey and Gentsch noted, immigrants with legal status earn 20% more than their undocumented counterparts, and 13% more than immigrants with temporary work permits.[31] Therefore, a CIR bill that legalized the entire undocumented population would generate economic growth well in excess of that generated by administrative action, since the latter extends only temporary work permits, and does so to smaller cohort of undocumented immigrants. If the wages of the 8.3 million employed undocumented grew by twenty percent it would precipitate a $63.19 billion increase in labor income (see figure 8). This wage growth would generate over 1,483,000 jobs nationwide (see figure 9) and a combined $23.2 billion in new personal, business and sales taxes (see figure 10).

Comprehensive Immigration Reform with a path to Citizenship would generate the best economic outcomes both for immigrants and for the US economy. As noted earlier, Pastor and Scoggins found that naturalized citizens earn 8 to 11.5 percent more than legal immigrants.[32] If

---

[31] Massey and Gentsch, "Undocumented Migration to the United States."

[32] Pastor and Scoggins, *Citizen Gain.*

all employed undocumented immigrants eventually became naturalized citizens, they would experience a collective income increase of over $93 billion dollars (see figure 8). These increased earnings would directly generate over 1.2 million new jobs. The resulting increase in indirect employment would account for 443,063 new jobs. Induced employment would increase by 536,522 jobs (see figure 9). This economic activity would also create over $34.2 billion in new tax revenue (see figure 10).

Comprehensive immigration reform that grants temporary work permits to the undocumented would also generate a significant increase in labor income, and subsequently spur job growth and create additional tax revenue, however these gains would be far less than what we see in either of the other CIR scenarios. This is significant because this scenario is the one that most closely resembles the proposals for administrative action. The gains are tempered by the fact that, again according to Massey and Gentsch, temporary workers make seven percent more than the undocumented but thirteen percent less than fully legalized immigrants.[33] If the 8.3 million working undocumented were to experience an average wage increase of seven percent, it would constitute a $22.1 billion increase in overall labor income (see figure 8). This would create over 519,000 new jobs (see figure 9) and over $8.1 billion in new taxes (see figure 10).

---

[33] Massey and Gentsch, "Undocumented Migration to the United States"

# 6. Conclusion

**Figure 11**



The methodology used for this economic impact analysis is described in: Raul Hinojosa and Marshall Fitz. *Revitalizing the Golden State: What Legalization over Deportation Could Mean to California and Los Angeles County.* (Washington, DC: Center for American Progress, April 2011).

The source of the methodology is: IMPLAN 2009, http://implan.com

The population data is derived from: Randy Capps, Marc R. Rosenblum, and James D. Bachmeier, *Executive Action for Unauthorized Immigrants: Estimates of the Populations That Could Receive Relief* (Washington DC: Migration Policy Institute, September 2014). <u>AND</u> Coalition for Humane Immigrant Rights of Los Angeles CHIRLA, "CHIRLA Memo to DHS Secretary," (2014).

28

**Figure 12**



The methodology used for this economic impact analysis is described in: Raul Hinojosa and Marshall Fitz. *Revitalizing the Golden State: What Legalization over Deportation Could Mean to California and Los Angeles County.* (Washington, DC: Center for American Progress, April 2011).

The source of the methodology is: IMPLAN 2009, http://implan.com

The population data is derived from: Randy Capps, Marc R. Rosenblum, and James D. Bachmeier, *Executive Action for Unauthorized Immigrants: Estimates of the Populations That Could Receive Relief* (Washington DC: Migration Policy Institute, September 2014).
AND Coalition for Humane Immigrant Rights of Los Angeles CHIRLA, "CHIRLA Memo to DHS Secretary," (2014).

29

**Figure 13**



The methodology used for this economic impact analysis is described in: Raul Hinojosa and Marshall Fitz. *Revitalizing the Golden State: What Legalization over Deportation Could Mean to California and Los Angeles County.* (Washington, DC: Center for American Progress, April 2011).

The source of the methodology is: IMPLAN 2009, http://implan.com

The population data is derived from: Randy Capps, Marc R. Rosenblum, and James D. Bachmeier, *Executive Action for Unauthorized Immigrants: Estimates of the Populations That Could Receive Relief* (Washington DC: Migration Policy Institute, September 2014).
AND Coalition for Humane Immigrant Rights of Los Angeles CHIRLA, "CHIRLA Memo to DHS Secretary," (2014).

# Appendix A:

**The Economic Impact of the President's Administrative Action Plan**

**Table 8**

| Population for Reform Scenario | Population | Employed Population‡ |
|---|---|---|
| Total Population | 11,700,000* | 8,300,000 |
| 5 Years in the U.S. | 9,696,000* | 6,762,000 |
| 10 Years in the U.S. | 6,638,000* | 4,629,000 |
| Parents of Citizens, LPRs, DACA Eligible | 3,680,000* | 2,566,000 |
| Parents of DACA Recipients | 750,000† | 523,000 |
| **Population Affected by President Obama's Action** | **3,830,000*** | **2,671,000** |

\* Population Estimates: Randy Capps, Marc R. Rosenblum, and James D. Bachmeier, *Executive Action for Unauthorized Immigrants: Estimates of the Populations That Could Receive Relief* (Washington DC: Migration Policy Institute, September 2014).

† Population Estimate: Coalition for Humane Immigrant Rights of Los Angeles CHIRLA, "CHIRLA Memo to DHS Secretary," (2014).

‡ Ratio of Total Undocumented to Employed Undocumented: Jeffrey Passel and D'Vera Cohn, *A Portrait of Unauthorized Immigrants in the United States* (Pew Research Center, 2009).

The administrative action announced by President Obama will not affect the parents of DACA beneficiaries. Instead, the administration will extend deferred action to the 3.33 million[34] undocumented immigrants who are parents of citizens or lawful permanent residents (LPRs), and who have been in the country since at least January 1st 2010.

In addition, the administration will also expand the pool of eligible DACA applicants by removing the maximum age requirement, which formally required applicants to be under 30, and the education requirement, which formerly required applicants to be enrolled in school, be honorably discharged veterans, or have earned a high school diploma or equivalent. The Migration Policy Institute has estimated that removing the age requirement would expand the DACA eligible cohort by 200,000 potential applicants, while eliminating the education requirement would expand that cohort by 430,000 potential applicants.[35] Since we assume there

---

[34] Randy Capps, Marc R. Rosenblum, and James D. Bachmeier, *Executive Action for Unauthorized Immigrants: Estimates of the Populations That Could Receive Relief* (Washington DC: Migration Policy Institute, September 2014).

[35] Capps, Rosenblum, and Bachmeier, *Executive Action for Unauthorized Immigrants*.

31

will be some overlap between these two populations we have estimated that 500,000 new childhood arrivals will now be eligible for deferred action.

Based on this new information, we have calculated the economic impact of extending deferred action to 3,830,000 undocumented immigrants. As a result of the President's decision, this population will experience a labor income increase of $7.1 billion dollars. This wage growth will generate over 167,000 new jobs and more than $2.6 billion in new tax revenue. It will also formalize the $15.8 billion in GDP that this population contributes annually.

# **Bibliography**

Amuedo-Dorantes, Catalina, and Cynthia Bansak. "The Impact of Amnesty on Labor Market Outcomes: A Panel Study Using the Legalized Population Survey." *Industrial Relations: A Journal of Economy and Society* 50, no. 3 (2011): 443–71.

Batalova, Jeanne, Sarah Hooker, Randy Capps, and James D. Bachmeier. *DACA At The Two Year Mark*. Washington DC: Migration Policy Institute, August 2014.

Benìtez-Silva, Hugo, Eva Cárceles-Poveda, and Selçuk Eren. *Effects of Legal and Unauthorized Immigration on the U.S. Social Security System*. University of Michigan Retirement Research Center, n.d.

BLS. *Consumer Expenditure Survey: Table 2200. Hispanic or Latino Origin of Reference Person: Annual Expenditure*. Bearau of Labor Studies, n.d.

Capps, Randy, Marc R. Rosenblum, and James D. Bachmeier. *Executive Action for Unauthorized Immigrants: Estimates of the Populations That Could Receive Relief*. Washington DC: Migration Policy Institute, September 2014.

CHIRLA, Coalition for Humane Immigrant Rights of Los Angeles. "CHIRLA Memo to DHS Secretary," August 8, 2014.

Congressional Budget Office, *The Economic Impact of S. 744, the Border Security, Economic Opportunity, and Immigration Modernization Act.* Washington, DC: June 18, 2013.

Dixon, Peter B., Martin Johnson, and Maureen T. Rimmer. "Economy-Wide Effects of Reducing Illegal Immigrants in U.S. Employment." *Contemporary Economic Policy* 29, no. 1 (January 2011): 14–30. doi:10.1111/j.1465-7287.2010.00208.x.

Dixon, Peter B., Maureen T. Rimmer, and Bryan W. Roberts. "Restricting Employment of Low-Paid Immigrants: A General Equilibrium Assessment of the Social Welfare Implications for Legal U.S. Wage-Earners." *Contemporary Economic Policy* 32, no. 3 (July 2014): 639–52. doi:10.1111/coep.12008.

FIRM, Fair Immigration Reform Movement. "FIRM Administrative Relief Recommendations to the Domestic Policy Council," August 2014.

Fitz, Marshall. *What the President Can Do on Immigration If Congress Fails to Act*. Center for American Progress, July 2014.

Fortuny, Karina, Capps, Randy, Passel, Jeffrey S., *The Characteristics of Unauthorized Immigrants in California, Los Angeles County, and the United States.* Washington, DC: The Urban Institute, March 2007.

Gonzales, Roberto G., and Angie M. Bautista-Chavez. *Two Years and Counting: Assessing the Growing Power of DACA*. American Immigration Council, June 2014. http://www.bakkenlaw.com/s/two_years_and_counting_assessing_the_growing_power_of_daca_final.pdf

Gonzalez, Roberto G., Veronica Terriquez, and Stephen Ruszczyk. "Becoming DACAmented: Assessing Short-term Benefits of Deferred Action for Childhood Arrivals (DACA)." *American Behavioral Scientist,* October, 2014.

Hinojosa, Raul. *Raising the Floor for American Workers: The Economic Benefits of Comprehensive Immigration Reform*. Center for American Progress and Immigration Policy Center, January 2010.

Hinojosa, Raul and Marshall Fitz. *Revitalizing the Golden State: What Legalization over Deportation Could Mean to California and Los Angeles County.* Washington, DC: Center for American Progress, April 2011.

Hinojosa, Raul and Paule Cruz Takash, and et al. *No DREAMers Left Behind: The Economic Potential of DREAM Act Beneficiaries*. Los Angeles: UCLA NAID Center, 2010.

Hinojosa, Raul, *The Economic Benefits of Comprehensive Immigration Reform.* Washington, DC: CATO Institute, 2012.

Kissam, Ed. "Presentation on DACA Strategy-4 Freedoms Fund Panel." San Francisco, November 5, 2013.

Kugler, Adriana, and Mutlu Yuksel. *Effects of Low-Skilled Immigration on US Natives: Evidence from Hurricane Mitch*. National Bureau of Economic Research, 2008. http://www.nber.org/papers/w14293.

Lynch, Robert, and Patrick Oakford. *The Economic Effects of Granting Legal Status and Citizenship to Undocumented Immigrants*. Center for American Progress, March 20, 2013.

Massey, Douglas S., and Kerstin Gentsch. "Undocumented Migration to the United States and the Wages of Mexican Immigrants." *International Migration Review* 48, no. 2 (June 2014): 482–99. doi:10.1111/imre.12065.

33

Orrenius, Pia, and Madeline Zavodny. "The Economic Consequences of Amnesty for Unauthorized Immigrants." *Cato Journal* 32, no. 1 (2012). http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2245015.

Passel, Jeffrey, and D'Vera Cohn. *A Portrait of Unauthorized Immigrants in the United States*. Pew, 2009.

Pastor, Manuel, Enrico A. Marcelli, Vanessa Carter, and Jared Sanchez. *What's at Stake For the State: Undocumented Californians, Immigration Reform, and Our Future Together*. Center for the Study of Immigrant Integration, May 2013.

Passel, Jeffrey, and D'vera Cohn. *A Portrait of Unauthorized Immigrants in the United States*. Washington, DC: Pew Research Center, 2009.

Pastor, Manuel, and Justin Scoggins. *Citizen Gain: The Economic Benefits of Naturalization for Immigrants and the Economy*. Center for the Study of Immigrant Integration, December 2012.

U.S. Department of Labor. Characteristics and Labor market Behavior of the Legalized Population Five Years Following Legalization. Washington, DC: Effects of the Immigration Reform and Control Act.

Wong, Tom K., and et al. *Undocumented No More: A Nationwide Analysis of Deferred Action for Childhood Arrivals, or DACA*. Center for American Progress, September 2013.



# Administrative Action on Immigration Reform

## The Fiscal Benefits of Temporary Work Permits

By Patrick Oakford    September 2014

WWW.AMERICANPROGRESS.ORG



# Administrative Action on Immigration Reform

## The Fiscal Benefits of Temporary Work Permits

By Patrick Oakford    September 2014

# Contents

1 **Introduction and summary**

4 **Putting millions of workers
and employers on the tax rolls**

5 **Higher wages for workers,
increased tax revenues for America**

8 **Estimating fiscal benefits
of administrative action**

12 **Conclusion**

14 **Appendix**

21 **Endnotes**

# Introduction and summary

In the coming months, President Barack Obama is expected to announce a series of administrative actions on immigration.[1] These actions will come after more than a decade of inaction on immigration reform in Congress, including the House of Representatives' recent refusal to vote on the bipartisan immigration reform bill, S. 744, passed by the Senate last summer.[2] The Congressional Budget Office estimated that S. 744 would significantly reduce our nation's deficit and spur economic growth.[3]

Although any executive action adopted by the president will pale in comparison to the economic and fiscal impact of a comprehensive legislative solution such as S. 744, such actions can nonetheless deliver significant fiscal benefits. This report examines the fiscal impact of a variety of scenarios in which undocumented immigrants are temporarily protected from deportation and authorized to work in the interim.

Confronted by a deteriorating immigration system and continued paralysis in Congress, President Obama requested Secretary of Homeland Security Jeh Johnson and Attorney General Eric Holder to identify which administrative actions could be adopted to begin the process of fixing our immigration system. One of the significant administrative steps the president can take is expanding a policy authorizing undocumented immigrants who are deemed to be low enforcement priorities to affirmatively request deferred action. Deferred action is a temporary, discretionary reprieve from deportation that enables the government to focus its limited resources on high-priority enforcement targets while bringing low-priority individuals out of the shadows. In addition to the obvious enforcement and security benefits that flow from expanding the universe of individuals eligible to register and request this exercise of discretion, enabling these individuals to work lawfully, albeit temporarily, also triggers significant fiscal benefits in the form of additional payroll tax revenues.

Granting deferred action with work permits would increase the amount of payroll tax revenue collected each year. First, by allowing undocumented immigrants to work legally, many workers and employers will be able to emerge from the underground economy and pay payroll taxes for the first time. Today, slightly more than one-third of undocumented workers and their employers are contributing payroll taxes.[7] Providing work permits would create a legal avenue for workers and employers to contribute taxes.

Second, allowing undocumented immigrants to work legally will lead to higher wages. Providing work authorization to eligible undocumented immigrants would equip them with a shield against workplace exploitation and enable them to move freely across the labor market to find jobs that best match their skills. Consequently, undocumented immigrants will observe an increase in their earnings. And as workers' wages rise, so too will their payroll tax contributions.

The magnitude of the tax revenue gains, however, varies based on the number of immigrants eligible for deferred action. There are a number of criteria that President Obama could choose from when determining who will be eligible for deferred action. For example, deferred action may only be available to those who have been in the United States for at least 10 years. Alternatively, the president could extend deferred action to those who would have been able to apply for legal status and citizenship under the immigration reform bill, S. 744, passed by the Senate in June 2013.

In the following analysis, the Center for American Progress estimates the fiscal impact of a deferred action program for each of these groups:

- Undocumented immigrants who have lived in the United States for at least five years.
- Undocumented immigrants who have lived in the United States for at least 10 years.
- Undocumented immigrants who have a minor child living in the United States.

## Deferred action

The president has the legal authority and a great deal of latitude when deciding how to enforce our immigration laws in the most efficient and effective way. Just like a local police chief has the ability to decide whether to focus resources on ticketing people for jay walking or arresting people for driving while intoxicated, the president has the legal authority to determine which individuals are a priority for immigration enforcement. This is known as prosecutorial discretion.

One type of prosecutorial discretion policies in the immigration context is "deferred action," which was formerly recognized by the Immigration and Naturalization Services in 1975.[4] A deferred action policy identifies low-priority individuals, such as non-criminals, who are not the target of immigration enforcement efforts, and creates a process for them to come forward and affirmatively apply for temporary relief from deportation. Most recently, this form of discretion was utilized in the Deferred Action for Childhood Arrivals, or DACA, program. DACA was announced in June 2012 and extends to undocumented immigrants who have entered the United States before the age of 16 and meet education requirements such as graduating high school.[5] To date, DACA has successfully allowed the U.S. Department of Homeland Security, or DHS, to better focus its resources on higher priorities by granting temporary reprieves from deportation to nearly 600,000 individuals.[6]

**TABLE 1**
## Fiscal benefits from deferred action

Increase in payroll tax revenues by criteria of eligibility

| | Number of eligible undocumented immigrants, in millions | Payroll tax gain in first year, in billions | Cumulative payroll tax gains over five years, in billions |
|---|---|---|---|
| U.S. residency for at least 5 years | 9.95 | $6.08 | $44.96 |
| U.S. residency for at least 10 years | 7.4 | $4.52 | $33.44 |
| Undocumented immigrants with a minor child in the United States | 4.7 | $2.87 | $21.24 |

Source: Author's calculations. See Methodology.

The analysis shows that the United States stands to gain a significant amount of new revenue from a deferred action program. Most striking is that the payroll tax revenue gains would be realized immediately—within the first year—and only grow over time as more immigrants apply for relief under the program and receive a work permit. The analysis finds:

- Temporary work permits would increase the earnings of undocumented immigrants by about 8.5 percent as they are able to work legally and find jobs that match their skills.

- A deferred action program that allows undocumented immigrants who have lived in the United States for at least five years to apply for a temporary work permit would increase payroll tax revenues by $6.08 billion in the first year alone and increase revenues by $44.96 billion over five years.

- If President Obama instead extends deferred action to a smaller number of undocumented immigrants then the payroll tax revenue gains would not be as high.

This report begins with a discussion of why deferred action would trigger an increase in tax revenues. It then presents the findings of the CAP analysis that quantifies the increase in payroll tax revenues that would result from extending deferred action to undocumented immigrants.

# Putting millions of workers and employers on the tax rolls

Our broken immigration system has created a situation in which millions of undocumented immigrants are working, yet none of them have a legal avenue to contribute payroll taxes.[8] Thus, billions of dollars are lost every year in tax revenues. A deferred action program, which allows undocumented immigrants to apply for a temporary work permit, would correct these inadequacies of our current system and increase payroll tax revenues by increasing the number of people paying taxes.

There are currently 8 million undocumented immigrants in the United States who are working in a variety of industries, from agriculture to manufacturing.[9] While these workers are vital to our economy and workforce, there is no legal way for them to pay payroll taxes: Given their unlawful status and inability to work legally, these workers are unable obtain a Social Security number and therefore cannot file payroll taxes like other American workers.[10]

Despite this structural shortcoming, the Social Security Administration, or SSA, has estimated that about 3 million undocumented workers and their employers paid payroll taxes in 2010, or about 38 percent of the estimated 8 million undocumented workers.[11] According to the SSA, many of these workers likely pay payroll taxes through the use of false Social Security numbers.[12] While these workers' contributions have been significant, they are far less than what they could be if the United States created the opportunity for undocumented workers to both legally work and pay taxes.

Under a deferred action program, undocumented immigrants whose applications for a work permit have been approved would receive an Employment Authorization Card, or EAC.[13] These cards contain a unique nine-digit number. Similar to a Social Security number, an EAC proves that an individual is eligible to work legally and allows him or her to fill out the needed IRS forms with an employer to contribute payroll taxes. Given that only a minority of undocumented workers and their employers are currently paying payroll taxes, providing undocumented immigrants with EACs would lead to a significant increase in the number of workers and employers contributing payroll taxes. Ultimately, extending a work permit to undocumented immigrants will create a path for those already working in the United States to come forward and pay taxes.

> Ultimately, extending a work permit to undocumented immigrants will create a path for those already working in the United States to come forward and pay taxes.

# Higher wages for workers, increased tax revenues for America

In addition to putting more employers and workers on the books, tax revenues would increase because the acquisition of a temporary work permit would likely increase the earnings of undocumented immigrants for two main reasons:

- It enables workers to shed the negative effect their immigration status has on their earnings.
- It allows undocumented workers to have full access to the labor market, enabling them to find jobs that match their skills and maximize their earnings.

Since payroll tax contributions are based on an employee's wages, as an employee's earnings increase, their tax contributions generally increase as well.[14]

## Eliminating negative wage effects of undocumented status

The interaction between our broken immigration system and employment and labor laws have made undocumented workers more susceptible to exploitation in the workplace, leading them to earn lower wages than they otherwise could.

Undocumented immigrants, while not legally allowed to work in the United States, are still covered by many U.S. employment and labor laws, such as minimum-wage requirements and the right to organize a union.[15] Despite having the same workplace rights as other American workers, undocumented immigrants in practice are not able to execute their workplace rights, making them more vulnerable to exploitation.[16] Given that in recent history, immigration officials have conducted enforcement actions in the interior of the country at workplaces or roadside checkpoints, rather than just at the border, many undocumented workers are fearful of coming forward and identifying employer wrongdoing.[17] Similarly, employers use their duty to check workers' immigration status under IRCA as a tool to deter employment complaints or to retaliate against undocumented immigrants who file such complaints.[18] Thus, unscrupulous employers are able to take advantage of undocumented immigrants with minimal fear of being caught or penalized for their unlawful employment practices.

A286

As a result of this tension between our immigration and employment laws, researchers have found that undocumented immigrants are nearly two times more likely to be paid below minimum wage than native-born workers.[19] Similarly, a study of undocumented workers in Chicago found that these workers were three times more likely than documented immigrants to experience wage theft—such as nonpayment or underpayment of wages[20]—and 1.8 times more likely to work in unsafe conditions.[21]

Providing a temporary work permit would remove the vulnerability associated with unlawful immigration status and diminish the likelihood of employers exploiting undocumented workers. Moreover, in the event that workers are still exploited, they will be better positioned to exert their workplace rights, since they will not be afraid that invoking their rights will result in deportation. In short, allowing undocumented immigrants to work legally decreases their workplace vulnerability, and their earnings will likely rise as a result.

## Increasing undocumented immigrants' labor-market mobility

There are millions of undocumented immigrants already working in our economy in a variety of jobs. Their experience in the labor market at large, however, is very different than that of legal workers. Since it is illegal for employers to knowingly hire an undocumented immigrant, these workers often self-select into jobs that minimize their risk of being detected as an undocumented immigrant and ultimately deported.[22] The result is that undocumented workers frequently find themselves in low-wage jobs with little opportunity for upward occupational mobility.[23] Unlike other workers in the labor market who can maximize their earnings by finding jobs that best match their skills and abilities, undocumented immigrants cannot do this and therefore ultimately earn less than they otherwise could.[24]

For example, higher levels of education generally lead to higher earnings: A person with a high school degree is likely able to make more money than a person who has not graduated from high school, and so on. The relationship between education and earnings, however, is drastically different for undocumented

### Undermining undocumented immigrants' workplace rights harms all workers

In the United States, labor and employment laws are most effective when everyone covered by these laws are able to execute their rights. Stifling undocumented workers employment rights, therefore, means that all workers are at a greater risk of being victims of unlawful employment practices. Most employment investigations are initiated by individual workers filing complaints against their employers. Thus, if undocumented immigrants are not able to report an employer's illegal practices, then all workers who are victims of this wrongdoing are less likely to receive relief. In addition, penalties imposed on employers aim not only to correct a specific instance of wrongdoing but also to deter other businesses from engaging in similar unlawful practices. The likelihood of other employers engaging in unlawful actions against American workers, therefore, increases as the deterrence effect of enforcing labor and employment laws is weakened by undocumented immigrants' inability to file formal complaints.

immigrants than it is for legal immigrants.[25] One study found that legal Mexican immigrants' wage returns on education attainment were double the returns observed by undocumented Mexican immigrants.[26]

A temporary work permit would give undocumented workers greater labor-market mobility, allowing them to realize the wage potential of their skills. The ability to work legally allows undocumented immigrants to access jobs that value their human capital and compensate them fairly for it.

A288

# Estimating the fiscal benefits of administrative action

It is clear from the discussion above that deferred action would increase payroll tax revenues, but by how much?

If President Obama takes administrative action, there are many groups of undocumented immigrants who might benefit from deferred action. For example, the president could extend a deferred action program to undocumented immigrants who have been in the United States for at least five years, or he could extend the program to a smaller group, such as undocumented immigrants with minor children in the United States. In the following analysis, CAP estimates fiscal benefits if a deferred action program were available to three different groups of undocumented immigrants. (see Table 2)

After considering the wage effects of acquiring legal status and analyzing current wage gaps between undocumented and legal immigrants, it is reasonable to expect undocumented immigrants' wages to increase by about 8.5 percent under a deferred action program. (see the Appendix for a full discussion of the wage effects of deferred action) Moreover, the analysis assumes that undocumented immigrants who receive a work permit would have similar labor-force participation and employment rates as legal, noncitizen immigrants. Finally, since 38 percent of undocumented immigrants are already paying payroll taxes, the analysis assumes that the remaining 62 percent of undocumented workers will go on the books for the first time. (see the Appendix for a full discussion of the methodology)

A289

**TABLE 2**
**Fiscal benefits from deferred action**

Increase in payroll tax revenues by criteria of eligibility

| | Number of eligible undocumented immigrants, in millions | Payroll tax gain in first year, in billions | Cumulative payroll tax gains over five years, in billions |
|---|---|---|---|
| U.S. residency for at least 5 years | 9.95 | $6.08 | $44.96 |
| U.S. residency for at least 10 years | 7.4 | $4.52 | $33.44 |
| Undocumented immigrants with a minor child in the United States | 4.7 | $2.87 | $21.24 |

Source: Author's calculations. See Methodology.

This analysis shows that the United States would observe significant increases in payroll tax revenues if any of these groups were eligible for work permits under a deferred action program. Most notably, the analysis illustrates that benefits would begin accruing immediately. Within the first year of a program being established, U.S. tax revenues would increase by $6.08 billion, if undocumented immigrants with at least five years of U.S. residency were eligible to apply.[27] Since not all eligible individuals will be able to apply and receive a permit within the first year, the tax gains will continue to rise as more immigrants receive their temporary work permit. Over five years, the benefits would only continue to grow to an estimated total of $44.96 billion.[28]



**FIGURE 1**
**Payroll tax revenue gains from deferred action**

First-year increase in payroll tax revenues by number of eligible immigrants

4.7 million undocumented immigrants with a minor child in the United States would contribute **$2.87 billion.**

7.4 million undocumented immigrants who have lived in the United States for at least 10 years would contribute **$4.52 billion.**

9.95 million undocumented immigrants who have lived in the United States for at least five years would contribute **$6.08 billion.**

Payroll tax contributions, in billions

Number of eligible undocumented immigrants, in millions

Cumulative payroll tax revenue gains over five years by number of eligible undocumented immigrant

4.7 million undocumented immigrants with a minor child in the United States would contribute **$21.24 billion.**

7.4 million undocumented immigrants who have lived in the United States for at least 10 years would contribute **$33.44 billion.**

9.95 million undocumented immigrants who have lived in the United States for at least five years would contribute **$44.96 billion.**

Cumulative payroll tax contributions, in billions

Number of eligible undocumented immigrants, in millions

Source: Author's calculations. See Methodology.

Similarly, if undocumented immigrants with minor children in the United States were able to apply for deferred action, tax revenues would increase by an estimated $2.87 billion in the first year and grow to an estimated $21.24 billion over five years.[29] These findings indicate that the larger the number of undocumented immigrants who are covered by a deferred action program, the larger the tax revenue gains will be. Therefore, it would be in the United States' financial interest to ensure that as many immigrants as possible who are eligible for a deferred action program are able to apply and receive work permits as soon as possible.

## Impact of deferred action on American workers

The impact of providing temporary work permits to undocumented immigrants would not negatively affect American workers' job opportunities or their wages. While an undocumented immigrant will have greater access to the labor market and be able to apply for a wider range of jobs, this will not increase labor-market competition for native-born workers. This is because undocumented immigrants—despite greater mobility in the labor market—will not be applying for the same jobs as native-born workers. For a better understanding of why providing work permits to undocumented immigrants will not increase competition for native-born workers, consider the current labor-market relationship between legal immigrant workers and the native born.

Researchers have long found that immigrants at large—not just undocumented immigrants—and native-born workers do not compete for the same jobs; instead, they often complement each other in the workforce as immigrants and native-born workers tend to work in different industries.[30] Even when they do work in the same industries, immigrants and native-born workers often occupy different jobs.[31] For example, immigrants make up 31 percent of all workers in the accom-

modation sector,[32] but these workers are not distributed evenly across jobs within the industry. Instead, the majority of immigrants work within only five occupations in the accommodation industry and fill 53 percent of all housekeeping jobs in the sector. Conversely, the majority of native-born workers are concentrated in higher skilled jobs and account for nearly 90 percent of all desk clerks in the industry.[33]

The experience of the broader, legal immigrant population in the labor force indicates that providing greater labor-market mobility to immigrants would not take jobs away from Americans but instead would allow them to enter jobs that complement the work of native-born workers.

Similarly, undocumented immigrants' increase in earnings will not have a negative wage effect on native-born workers. The reasoning is straightforward: As immigrants earn more, they will spend more, leading to greater demand for goods and services and potentially higher profits for businesses. This will likely result not only in job creation but also in higher wages for all workers as the economy grows.[34]

The fiscal benefits of providing deferred action are significant, but they are far less than the fiscal and economic benefits of legislative immigration reform. As the analysis shows, the fiscal benefits of deferred action stem in part from the increase in earnings it would generate for undocumented immigrants. While deferred action will lead to an estimated 8.5 percent increase in wages, another CAP study shows that legislative reform that provides a pathway to citizenship would result in a 25 percent boost in earnings—meaning tax contributions and economic growth would be larger.[35] The reason why legislative reform provides a higher wage increase is simple: The permanent nature of this reform creates an incentive for immigrants to invest in their education, which subsequently raises wages further. Moreover, researchers have found that the acquisition of citizenship is associated with a 10 percent increase in wages.[36] Comprehensive reform that includes a pathway to citizenship will, therefore, further boost immigration earnings, leading to bigger fiscal and economic impacts.

# Conclusion

A deferred action program that provides both a temporary reprieve from deportation and a work permit for millions of undocumented immigrants would offer much needed relief to American families and would mark an important step toward fixing our broken immigration system. But it isn't just immigrant families that would benefit from this program: All Americans would be better off as the program would increase U.S. tax revenues.

Our current broken immigration system has pushed undocumented work underground and resulted in the loss of billions of dollars in payroll taxes every year. A deferred action program would help fix this problem by allowing undocumented immigrants to apply for a temporary work permit, work legally, and move freely around the labor market to find jobs that best suit their skills. This would result in more workers being on the books and paying taxes, in addition to earning higher wages, resulting in a further boost in payroll tax revenues.

In the first year of a deferred action program alone, the United States stands to gain $6.08 billion in payroll taxes.[37] While these gains are significant, they are far less than the fiscal and economic benefits of full legislative reform. A pathway to citizenship would provide a greater increase in undocumented immigrants earnings and therefore generate a greater cascade of fiscal and economic benefits. In fact, the Congressional Budget Office has estimated that the Senate's immigration reform bill S. 744 would reduce the nation's deficit by $135 billion over 10 years.[38] The analysis in this report shows that it is in all Americans' best interest for President Obama to establish an expanded deferred action program to begin to fix our broken immigration system.

## About the author

Patrick Oakford is a Policy Analyst in the Economic and Immigration Policy departments, where he has helped lead the organization's analysis on the economic and fiscal impacts of immigration reform. His research focuses on issues relating to U.S. immigration policy, the labor force, and demographic changes in the United States. Patrick holds an M.Sc. in migration studies from the University of Oxford and a B.S. in industrial and labor relations from Cornell University. Prior to joining American Progress, Patrick spent time researching state-level immigration laws and the intersection of immigration and employment law as a research fellow at Cornell.

## Acknowledgment

The author would like to thank Angela Maria Kelley, Marshall Fitz, Robert Lynch, Philip E. Wolgin, and Zach Fields for their assistance in preparing this report.

A294

# Appendix

......................................................................................................

## Methodology

### Estimating the wage gains of a temporary work permit

In general, the effects of legalization on undocumented immigrants' wages are the function of three things:

- Changes in characteristics and human capital
- Changes in the returns on human capital
- The removal of discriminatory effect of one's undocumented status

Under a deferred action program, one would expect wages to increase due to the last two factors: A temporary work permit would increase labor-market mobility and would remove undocumented immigrants' vulnerability to exploitation. It should be noted, however, that a temporary work permit may spur undocumented immigrants to invest in their human capital. In this analysis, we do not account for that effect as there is not a good indication of how much investment might occur.

In this report's analysis, CAP assumes that deferred action would increase the undocumented immigrants' wages by 8.5 percent. This estimate is the midpoint between two different estimates of wage increases that might occur under a deferred action program. While no one can be completely certain about what will happen to undocumented immigrants' future earnings, we considered likely increases under two approaches:

- Historical: We can use the experience of immigrants in previous legalization programs to glean what might happen to undocumented immigrants' earnings under a deferred action program.

- Current disparities: The current wage differentials between undocumented immigrants and legal immigrants serve as a good indication of how much a worker's wages would increase as a result of receiving a temporary work permit.

*Lessons from the Immigration Reform and Control Act*

The United States passed the Immigration Reform and Control Act, or IRCA, in 1986, which legalized nearly 3 million undocumented immigrants in the United States.[39] In the years following the enactment of IRCA, the United States conducted an extensive survey of recipients of legal status. Through this survey, researchers were able to identify the wage gains undocumented immigrants experienced after receiving legal status. The Department of Labor estimated that on average, immigrants' earnings increased by 15 percent.[40] Similarly, Rivera-Batiz found that on average, immigrants' earnings increased by 17.7 percent. This wage gain, however, is not just the result of correcting the negative consequences of a worker's undocumented status; it also reflects undocumented immigrants' investments in their human capital, such as increasing their level of education.

While a deferred action program would likely increase undocumented immigrants' wages, the temporary nature of the program may not create the same incentive for undocumented immigrants to invest in their human capital. Thus, using immigrants' wage gains under IRCA as an estimate of the potential increase in earnings under a deferred action program requires isolating the increase in wages that were due to immigrants' change in legal status alone.

Through the use of a Blinder-Oaxaca wage decomposition,[41] researchers have been able to identify which share of the wage increase under IRCA is attributed to immigrants' change in legal status and how much is due to changes in human capital and other characteristics. Francisco Rivera-Batiz found that 40 percent of the observed wage gain by undocumented immigrant under IRCA was due to changes in their education attainment, language skills, and other measurable characteristic, while 60 percent of the boost in earnings cannot be explained.[42] In describing this portion of the wage gap, Rivera-Batiz writes that the unexplained wage gains "strongly suggest that the change in the legal status of [undocumented] immigrants had a strong positive effect on their earnings."[43] In other words, the unexplained portion of the wage decomposition can be viewed as a proxy for the increase in earnings due to a change in legal status. Thus, under IRCA, undocumented immigrants observed a 10.5 percent wage increase as a result of acquiring legal status.

Similar to the immigrants who received legal status through IRCA, undocumented immigrants who could apply for deferred action would be able to shed the negative wage effects of their unlawful immigration status. Thus, Rivera-Batiz's analysis of undocumented immigrants' experiences under IRCA provides a good

estimate of how much the earnings of undocumented immigrants would increase if they were eligible for deferred action. To be sure, some of the unobservable wage increases in Rivera-Batiz's analysis may be due to less easily measurable changes in characteristics such as health outcomes. However, the changes that occurred as a result of changes in legal status under IRCA would likely also occur under deferred action as well.

### Current wage disparities between undocumented immigrants and legal immigrants

A second approach to estimating the wage increase of undocumented immigrants if they received a temporary work permit is to identify the current wage penalty for being undocumented.

Using the American Community Survey, or ACS, CAP first identified likely undocumented Mexican immigrants and legal noncitizen Mexican immigrants through an augmented residual method.[44] Specifically, CAP used year of entry, government employee status, recipient of welfare benefits, veteran status, occupation, health insurance coverage, and other indicators to identify likely undocumented Mexican immigrants in the ACS. CAP then estimated that the wage gap between undocumented Mexican immigrants and legal noncitizen Mexican immigrants is 9.89 percent. CAP conducted a Blinder-Oaxaca wage decomposition to identify which portion of the wage gap is due to difference in measurable characteristics between the two groups. In the analysis, we controlled for the following: age, sex, marital status, number of children, English language abilities, education attainment, recent entry into the United States, self-employment status, and average hours of work.

CAP found that differences in measurable characteristics can explain 34 percent of the 9.89 percent wage gap, meaning that there is a 3.4 percent wage gap between undocumented Mexican immigrants and legal noncitizen Mexican immigrants as a result of difference in group characteristics.[45]

Most importantly, however, the wage decomposition illustrated that 66 percent of the 9.89 percent wage gap between the two groups cannot be explained by measurable characteristics. In other words, there is a 6.5 percent wage gap between undocumented Mexican immigrants and legal noncitizen Mexican immigrants due to reasons not explained by measurable characteristics. This 6.5 percent wage gap is

a reasonable estimate of the negative wage impact that undocumented immigrants experience due to their legal status.[46] These findings are consistent with other studies. For example, Mathew Hall and his co-researchers found that, when controlling for other characteristics, legal status was associated with a 2.73 percent wage advantage for Mexican women and a 7.42 percent wage advantage for Mexican men.[47]

CAP selected to use a Blinder-Oaxaca wage decomposition for two reason: First, to ensure that the approach was similar and consistent with that used by Rivera-Batiz; but more importantly, because it is a common approach when attempting to quantify the wage impact of discrimination in the workplace. Similar to discrimination based on race or sex, the negative wage effects of an undocumented status are the result of discrimination and or exploitation by employers on the basis of a worker's immigration status. Therefore, the use of a Blinder-Oaxaca wage decomposition is a reasonable way to quantify the negative wage impact of a workers unlawful status.

Similar to the conclusions that can be drawn from Rivera-Batiz's study, CAP's analysis indicates that undocumented Mexican immigrants' wages will increase by about 6.5 percent with the acquisition of a temporary work permit, as it would eliminate the negative wage effects associated with their undocumented status.

## Estimating payroll tax contributions

CAP estimated the increase in payroll tax revenues contributed by undocumented immigrants and their employers by identifying which share of undocumented immigrants already pay payroll taxes, estimating undocumented immigrants' earnings, and the wage increase that would result from acquiring a temporary work permit. The analysis assumes that 38 percent of undocumented immigrants already pay taxes, meaning that 62 percent of undocumented immigrant would contribute payroll taxes for the first time. Using the sample of likely undocumented Mexican immigrants, CAP estimates that the average earnings of undocumented workers is $22,029. The analysis assumes that earnings of undocumented immigrants would increase by 8.5 percent. This number is the midpoint between the wage gains estimated under the two approaches discussed above.

Under this analysis, CAP utilized the application rates observed under DACA and assumes that similar application rates would occur under a deferred action program. Specifically, CAP utilized a 62 percent application rate in the first year and raised it to 68 percent by the second year based on DACA. Recognizing that

applications would be filed over the course of two years, CAP phased in the acquisition of temporary work permits over the first two years, meaning the payroll tax benefits are also phased in. Moreover, CAP applied the labor-force participation rate and unemployment rates of noncitizen immigrants to the undocumented population under deferred action.

## Literature review

There are multiple studies that have considered IRCA's effect on the wages of formerly undocumented immigrants. A review of the literature below is divided into studies that identify the wage impact of legalization and wage disparities between undocumented workers and legal workers.

### Wage impact of legalization

#### Department of Labor (1996)

Charged by Congress to investigate the social and economic characteristics of undocumented immigrants who were legalized under IRCA, the Department of Labor, or DOL, released a report in 1996 that, in part, identified what happened to the earnings of formerly undocumented immigrants five years after legalization. Specifically in this study, the DOL compared the earnings of undocumented immigrants at the time they applied for legal status to their earnings in 1992. The report found that legalized workers' earnings rose on average by 15 percent. The DOL utilized the Legalized Population Survey to make these estimates and only studied those immigrants who received legal status under section 245A of the Immigration and Nationality Act.[48]

#### Sherrie A. Kossoudji and Deborah A. Cobb-Clark (2002)

In this study, Kossoudji and Cobb-Clark aimed to determine whether observed changes in formerly undocumented immigrants' wages were the result of the acquisition of legal status or merely changes in the labor market, which affect wages. In order to answer this question, the authors compared the changes in undocumented immigrants' earnings in the Legalization Population Survey, or LPS, to a group of legal workers in the National Longitudinal Survey of Youth. The authors first found that legalization lead to a change in the wage determinants of formerly undocumented immigrants. Specifically, they found that lack of English language ability after legalization led to higher wage penalties. They also

found that post legalization, workers received higher returns on their education levels, with the greatest increase on returns occurring for those with higher than a high school education. When taking into account the changes that occurred to the wages of the comparison group between 1986 and 1992, the authors concluded that the earnings of undocumented immigrants increased by 6 percent as a result of changes in returns on human capital. This estimate does not include increases in earnings as a result of changes in human capital.[49]

### Francisco L. Rivera-Batiz (1999)

As described in the report above, Rivera-Batiz compared undocumented workers' wages before legalization to their earnings after they acquired legal status. Rivera-Batiz utilized the LPS to conduct this analysis. Similar to the DOL study, he found that wages of formerly undocumented men increased by 14.8 percent and the wages of women increased by 20.6 percent. On average, he found that 40 percent of the wage gains were due to changes in human capital and other characteristics.[50]

## Wage disparity

Similar to the analysis CAP performed to identify the wage disparity between legal and undocumented immigrants, there are other studies that have compared the earnings of legal workers to that of undocumented workers. The following is a brief review of the most recent literature.

### Sherrie A. Kossoudji and Deborah A. Cobb-Clark (2002)

In addition to looking at legalization's impact on earnings, Kossoudji and Cobb-Clark also identified the wage gaps between undocumented and legal workers prior to legalization. The authors compared earnings of undocumented immigrants as reported in the LPS survey to those of legal workers—both immigrants and natives—in the National Longitudinal Youth Survey. The authors found that if undocumented immigrants had received the wage returns of legal workers, their earnings would be 14 percent to 26 percent higher. It should be noted, however, that the authors were comparing undocumented immigrants to both legal immigrants—citizens and noncitizens—in addition to native-born workers. The authors' comparison group is much broader than that used in CAP's analysis, and therefore the result from this study is expected to be larger than that of CAP's since both legal status and citizenship are associated with higher earnings.[51]

### *Mathew Hall and others (2010)*

This study's authors compared the wage disparity between legal Mexican immigrants to undocumented Mexican immigrants as reported in the Survey of Income and Program Participation. Additionally, the authors identified differences in wage determinants between these two groups. Similar to Kossoudji and Cobb-Clark, this study also found that undocumented workers received lower returns on their human capital, specifically education, than legal immigrants. With respect to the authors' analysis of wage disparities, they found that after controlling for human capital, undocumented men earned 7.5 percent less than legal immigrant men, and women earned 3.8 percent less than legal immigrant women.[52]

## Endnotes

1 The White House, "Remarks by the President on Border Security and Immigration Reform," Press release, June 30, 2014, available at http://www.whitehouse.gov/the-press-office/2014/06/30/remarks-president-border-security-and-immigration-reform.

2 U.S. Senate, "U.S. Senate Roll Call Votes 113th Congress 1st Session," available at http://www.senate.gov/legislative/LIS/roll_call_lists/roll_call_vote_cfm.cfm?congress=113&session=1&vote=00167 (last accessed August 2014).

3 See Letter from Douglas W. Elmendorf to the Honorable Patrick J. Leahy, July 3, 2013 available at http://www.cbo.gov/sites/default/files/cbofiles/attachments/s744aspassed.pdf.

4 (Legacy) Immigration and Naturalization Service, Operations Instructions, O.I. § 103.1(a) (1)(ii) (1975).

5 U.S. Citizenship and Immigration Services, " Consideration of Deferred Action for Childhood Arrivals (DACA)," available at http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-daca (last accessed August 2014).

6 U.S. Citizenship and Immigration Services, "Data Set: Deferred Action for Childhood Arrivals," available at http://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-deferred-action-childhood-arrivals (last accessed August 2014).

7 The Social Security Administration estimates that 3 million undocumented immigrants contribute payroll taxes. This suggests that of the 8 million undocumented immigrants who are working in the United States, 38 percent are paying payroll taxes. Stephen Goss and others, "Effects of Unauthorized Immigration on the Actuarial Status of the Social Security Trust Funds" (Baltimore: Social Security Administration, 2013), available at http://www.socialsecurity.gov/oact/NOTES/pdf_notes/note151.pdf; Pew estimates that there are 8 million undocumented workers. Jeffrey S. Passel and D'Vera Cohn, "Unauthorized Immigrant Population: National and State Trends, 2010" (Washington: Pew Research Hispanic Trends Project, 2011), available at http://www.pewhispanic.org/2011/02/01/v-workers/.

8 Under the Immigration Reform and Control Act, it is unlawful for employers to knowingly hire undocumented immigrants (8 USC Sec 1324 a). Despite this prohibition, many undocumented immigrants have found work, but given their unlawful status, they do not have a valid Social Security card and therefore cannot file payroll taxes. It should be noted, however, that self-employed undocumented immigrants can file payroll taxes by utilizing an Individual Tax Identification Number. See Social Security Administration, "Self-Employment Tax (Social Security and Medicare Tax)," available at http://www.irs.gov/Businesses/Small-Businesses-&-Self-Employed/Self-Employment-Tax-Social-Security-and-Medicare-Taxes (last accessed August 2014).

9 Passel and Cohn, "Unauthorized Immigrant Population: National and State Trends, 2010."

10 Social Security Administration, "Social Security Numbers for Noncitizens" (2013), available at http://www.ssa.gov/pubs/EN-05-10096.pdf. Again, it should be noted that self-employed undocumented immigrants are able to file payroll taxes through the use of an Individual Tax Identification Number. See Social Security Administration, "Self-Employment Tax (Social Security and Medicare Tax)."

11 Goss and others, "Effects of Unauthorized Immigration on the Actuarial Status of the Social Security Trust Funds."

12 Ibid.

13 National Immigration Law Center, "Frequently Asked Questions: DACA and Your Workplace Rights" (2014).

14 It should be noted that there is a limit on the amount of earnings that are subject to payroll taxes. In 2014, the cap on earnings that can be taxed was $117,000. See Social Security Administration "Contributions and Benefit Base," available at http://www.ssa.gov/oact/cola/cbb.html (last accessed August 2014).

15 In the United States, most labor and employment laws, such as the Fair Labor Standards Act or the National Labor Relations Act, cover any worker who is an "employee." In *Rutherford Food Corp v. McComb* (331 U.S. 722), the Supreme Court ruled that when determining whether or not a worker qualifies as an "employee," courts need only consider the day-to-day interaction between the worker and the employer. Thus, a worker's immigration status has no bearing on whether or not they are an "employee" under U.S. labor and employment laws. For a complete discussion of undocumented immigrants protections under U.S. employment and labor law, see Kati Griffith, "U.S. Migrant Worker Law: The Intersticies of Immigration Law and Labor and Employment Law," *Comparative Labor Law and Policy Journal* 125 (31) (2009).

16 Adriana Kugler and Patrick Oakford, "Comprehensive Immigration Reform Will Benefit American Workers" (Washington: Center for American Progress, 2013), available at http://www.americanprogress.org/issues/immigration/report/2013/09/12/74014/comprehensive-immigration-reform-will-benefit-american-workers/.

17 Shannon Gleeson, "Labor Rights for All? The Role of Undocumented Immigrant Status for Worker Claims Making," *Law and Social Inquiry* 35 (3) (2010): 561–602, available at http://onlinelibrary.wiley.com/doi/10.1111/j.1747-4469.2010.01196.x/abstract.

18 For a discussion on how employers use their immigration duties to stifle workers' employment rights, see Kugler and Oakford, "Comprehensive Immigration reform Will Benefit American Workers."

19 Annette Bernhardt and others, "Broken Laws, Unprotected Workers: Violations of Employment and Labor Laws in America's Cities" (Washington: National Employment Law Project, 2010), available at http://www.unprotectedworkers.org/index.php/broken_laws/index.

20 Chirag Mehta and others, "Chicago's Undocumented Immigrants: An analysis of Wages, Working Condition, and Economic Contributions" (Chicago: Center for Urban Economic Development, 2002), available at http://www.williamperezphd.com/articles/mehta-theodore-mora-wade-2002.pdf.

21 Ibid.

22 Sherrie A. Kossoudji and Deborah A. Cobb-Clark, "Coming out of the Shadows: Learning about Legal Status and Wages from the Legalized Population," *Journal of Labor Economics* 20 (3) (2002): 598–628.

A302

23  For a discussion of wage mobility of undocumented immigrants and a review of literature on the occupational mobility of undocumented immigrants, see Marta Tienda and Audrey Singer "Wage Mobility of Undocumented Workers in the United States," *International Migration Review* 29 (1) (1995): 112–138. For a breakdown of which industries undocumented immigrants work in see, Jeffrey S. Passel and D'Vera Cohn, "A Portrait of Unauthorized Immigrants in the United States" (Washington: Pew Hispanic Center, 2009).

24  Kossoudji and Cobb-Clark estimate that if undocumented immigrants had the same return on human capital as legal immigrants, their earnings would be 14 percent higher. See Kossoudji and Cobb-Clark, "Coming out of the Shadows."

25  Matthew Hall, Emily Greenman, and George Farkas, "Legal Status and Wage Disparities for Mexican Immigrants," *Social Forces* 89 (2) (2010): 491–513, available at http://muse.jhu.edu/journals/social_forces/summary/v089/89.2.hall.html.

26  Ibid.

27  Author's calculations. See Appendix for full methodology.

28  Author's calculations. See the Appendix for full methodology.

29  Author's calculations. See the Appendix for full methodology.

30  Gianmarco Ottaviano and Giovanni Peri, "Rethinking the Effect of Immigration on Wages," *Journal of the European Economic Association* 10 (1) (2012): 152–197, available at http://onlinelibrary.wiley.com/doi/10.1111/j.1542-4774.2011.01052.x/abstract. In this piece, the authors not only estimate the wage impact of immigrants on native-born workers but also identify that immigrants and natives are imperfect substitutes.

31  Audrey Singer, "Immigrant Workers in the U.S. Labor Force" (Washington: The Brookings Institution, 2012), available at http://www.brookings.edu/~/media/research/files/papers/2012/3/15%20immigrant%20workers%20singer/0315_immigrant_workers_singer.pdf.

32  Ibid.

33  Ibid.

34  For a review of the literature on the impact of immigrants on the wages of native-born workers, see Heidi Shierholz "Immigration and Wages: Methodological advancements confirm modest gains for native workers" (Washington: Economic Policy Institute, 2010). Shierholz also found in this study, through an original analysis, that native-born workers had a slight increase in earnings as a result of immigration.

35  Robert Lynch and Patrick Oakford, "The Economic Effects of Granting Legal Status and Citizenship to Undocumented Immigrants" (Washington: Center for American Progress, 2013), available at http://www.americanprogress.org/issues/immigration/report/2013/03/20/57351/the-economic-effects-of-granting-legal-status-and-citizenship-to-undocumented-immigrants/.

36  Ibid. Other researchers have found a similar increase in earnings with the acquisition of citizenship. For example, Heidi Shierholz found that naturalized citizens had family incomes that were 15 percent higher than that of noncitizen immigrants. Heidi Shierholz, "The Effects of Citizenship on Family Income and Poverty" (Washington: Economic Policy Institute, 2010).

37  Author's calculations. See the Appendix for full methodology

38  Congressional Budget Office, "Senate Bill 744, Estimated Impact on the Federal Budget for 2014 through 2023" (2013), available at http://www.cbo.gov/sites/default/files/cbofiles/attachments/s744aspassed.pdf.

39  U.S. Department of Labor, *Characteristics and Labor market Behavior of the Legalized Population Five Years Following Legalization* (1996).

40  U.S. Department of Labor, *Characteristics and Labor market Behavior of the Legalized Population Five Years Following Legalization* (1996).

41  For more information on the Blinder-Oaxaca wage decomposition, see Ben Jann, "The Blinder-Oaxaca decomposition for linear regression models," *The Stata Journal* 8 (4) (2008): 453–479, available at http://ageconsearch.umn.edu/bitstream/122615/2/sjart_st0151.pdf.

42  Francisco L Rivera-Batiz, "Undocumented workers in the labor market: An analysis of the earning of legal and illegal Mexican immigrants in the United States," *Journal of Population Economics* 12 (2) (1999): 91–116, available at http://www.jstor.org/discover/10.2307/20007616?uid=3739584&uid=2129&uid=2&uid=70&uid=4&uid=3739256&sid=21104585315823.

43  Ibid.

44  Bureau of the Census, *American Community Survey, 2012* (U.S. Department of Commerce, 2012).

45  Author's calculations based on 2012 American Community Survey.

46  Ibid.

47  Hall, Greenman, and Farkas, "Legal Status and Wage Disparities for Mexican Immigrants."

48  U.S. Department of Labor," *Effects of the Immigration Reform and Control Act: Characteristics and Labor Market Behavior of the Legalized Population Five Years following Legalization*" (1996).

49  Kossoudji and Cobb-Clark, "Coming out of the Shadows."

50  Rivera-Batiz, "Undocumented workers in the labor market."

51  Kossoudji and Cobb-Clark "Coming out of the Shadows."

52  Hall, Greenman, and Farkas, "Legal Status and Wage Disparities for Mexican Immigrants."

A303

The Center for American Progress is a nonpartisan research and educational institute dedicated to promoting a strong, just and free America that ensures opportunity for all. We believe that Americans are bound together by a common commitment to these values and we aspire to ensure that our national policies reflect these values. We work to find progressive and pragmatic solutions to significant domestic and international problems and develop policy proposals that foster a government that is "of the people, by the people, and for the people."

Center for American Progress



# News from the
# Fiscal Policy Institute

November 21, 2014
**For immediate release**

**Contact**
David Dyssegaard Kallick, Director of the Fiscal Policy Institute's Immigration Research Initiative
212-721-7164 (desk), 646-284-1240 (cell)

## *President's Immigration Action Expected to Benefit Economy*
### *Higher Tax Revenues Expected, and Positive Impact on U.S.-Born Workers*

In response to President Obama's announcement that he will use the power of the executive office to shield about 5 million people from deportation and give them authorization to work, the Fiscal Policy Institute has prepared answers to the following questions.

**What are the economic implications of administrative relief?**

The Fiscal Policy Institute expects a 5 to 10 percent increase in wages for the roughly 5 million workers expected to be eligible for legal work status. A number of studies have looked at the economic benefits of gaining full legal status. In 2013, the Fiscal Policy Institute did a meta-study of these analyses, and found that they converged around the conclusion that the wage gain is about 10 percent.

David Dyssegaard Kallick, director of the Fiscal Policy Institute's Immigration Research Initiative, explains the reason for the wage gain: "Administrative relief should help currently unauthorized immigrants to find a better job match, and they will be less likely to be taken advantage of by employers."

"We're talking about immigrants who are already here, so the issue is not new workers competing with existing ones," adds Jared Bernstein, senior fellow of the Center on Budget and Policy Priorities. "In fact, bringing these workers out of the shadows will not only boost their wages, it could also bring some improvement for other workers. After all, if you find yourself working next to a group of workers who can be taken advantage of by your employer, that's bad for them but it's bad for you, too."

**What about the impact on taxes and spending?**

The net fiscal implications are expected to be clearly positive.

Immigrants who gain this status will be paying taxes, and they will pay them on somewhat higher earnings than they have today. This will not change eligibility for programs such as SNAP (Food Stamps) or Temporary Assistance for Needy Families, and the newly registered immigrants are specifically excluded from subsidies in the Affordable Care Act.

State and local tax revenues would increase as a result of administrative relief. The Institute on Taxation

and Economic Policy (ITEP) modeled a closely related question in 2013, and provides a state-by-state breakdown. Tax revenues would go up for two reasons. First, immigrants would be paying taxes on higher wages (see above). And second, they would be brought into full compliance in paying taxes.

The ITEP analysis considered a scenario in which all of the estimated 11 million unauthorized immigrants were given legal status. Administrative reform would be available to a little less than half that number, and wage gains would also be lower, so we estimate the gains in state and local tax revenues to be correspondingly lower. How much less? About a third to a half the size, at a first very rough approximation. The main reason is that administrative relief is expected to cover fewer people.

Looking at the cumulative gain in state and local taxes in all 50 states, Matt Gardner, executive director of the Institute on Taxation and Economic Policy, concludes: "President Obama's executive action could raise nearly a billion dollars a year in new state and local tax revenue—and our research suggests that if Congress were to enact a more comprehensive approach to legalizing undocumented families, the states could bring in twice that amount."

In New York State, for example, the net gain due to administrative relief would be about $100 million in added state and local revenues per year.

**What about federal taxes and spending?**

Even before this action, roughly half of unauthorized immigrants had payroll taxes withheld (which account for the biggest tax payment for all low-wage workers), and about the same share filed income tax returns. Immigrants granted administrative relief would be brought into full compliance on both payroll and income taxes.

The Council of Economic Advisors put out a report today that estimates that the federal deficit would be reduced by $25 billion over the next 10 years as a result of the administrative relief.

**Is this the immigration reform we've been waiting for?**

This is a major step forward. But, it is not a full immigration reform. It leaves an estimated 6 million unauthorized immigrants in the shadows. It does not address a system for workplace IDs. And, it does not address the question of future flows of legal immigrants. To implement a full immigration reform, as envisioned for example in the Senate bill passed in 2013, requires either that the House of Representatives vote on S.744, or that both houses pass a new immigration reform bill.

"It's a very good moment for the president to be doing this," Kallick adds. "There has been comparatively little unauthorized immigration in recent years. The next obvious step is for Congress to pass a bill that will not just be a stopgap measure but will address this problem permanently."

*The Fiscal Policy Institute (www.fiscalpolicy.org) is an independent, nonpartisan, nonprofit research and education organization committed to improving public policies and private practices to better the economic and social conditions of all New Yorkers. FPI's Immigration Research Initiative looks at immigration issues in New York State, and around the country.*

August 2013

# How DACA is impacting the lives of those who are now DACAmented:
## Preliminary Findings from the National UnDACAmented Research Project

Roberto G. Gonzales, Harvard Graduate School of Education
Veronica Terriquez, University of Southern California

As Congress continues to debate immigration reform, August 15th marks the one-year anniversary of the Deferred Action for Childhood Arrivals (DACA) program. While not granting a path to legalization and citizenship, DACA provides an opportunity for a segment of the undocumented immigrant population to remain in the country without fear of deportation, allows them to apply for work permits, and increases their opportunities for economic and social incorporation. This research summary presents preliminary findings on the impact that DACA has had on some of the young people who have received it.

We find that the DACA recipients we surveyed experienced a pronounced increase in economic opportunities, such as getting a new job, opening their first bank account, and obtaining their first credit card. Many seek further social integration beyond DACA. In fact, almost all DACA recipients indicate that they would apply for U.S. citizenship if given the opportunity. Our study also shows that DACA recipients are often fearful that family members and friends could be deported at any time. Overall, our research indicates that although DACA opens up some economic opportunities for young aspiring Americans, it does not address the constant threat of deportation still facing those closest to them, including mothers, fathers, and siblings.

The findings from this research summary come from the National UnDACAmented Research Project (NURP), a longitudinal mixed-methods study of the impact of DACA on the educational, labor market, health, and civic engagement outcomes of young adult immigrants. The analysis presented here draws from a national survey of 1,402 young adults ages 18-31 who were approved for DACA through June 2013. While DACA eligibility is open to minors, our study focuses on young adult DACA recipients.

**DACA contributes to the economic and social incorporation of young adult immigrants**. Since receiving DACA, young adult immigrants have become more integrated into the nation's economic institutions. Approximately 61% of DACA recipients surveyed have obtained a new job since receiving DACA. Meanwhile, over half have opened their first bank account, and 38% have obtained their first credit card. Additionally, 61% have obtained a driver's license, which

has likely widened educational, employment, and other options for these young adult immigrants {Figure 1}.

**Figure 1: Economic and Social Incorporation Since Receiving DACA**



**DACA recipients would likely become U.S. citizens if given the opportunity.** Ninety-four percent of survey respondents indicated that they would apply for citizenship if ever eligible. This finding suggests that DACA recipients seek to be further integrated into U.S. society.

**Although DACA recipients are experiencing its benefits, they continue to encounter hardships related to the blocked pathway to legalization of their families and communities.** Over the last several years, enforcement efforts have heightened levels of anxiety in immigrant communities and torn apart families. Survey results indicate that 49% of respondents worry "all of the time" or "most of the time" that friends and family members will be deported.

**Nearly 2/3 of DACA recipients personally know someone who has been deported.** Approximately 14% of DACA recipients in this study have experienced the deportation of a parent or sibling. These young adults are likely to have suffered significant stress and family hardships as a result of the forced departure of a close family member. Notably, nearly another third (31%) of respondents report that other family members have been deported. Almost half report that they know a neighbor, coworker, friend, or other acquaintance who has been deported {Figure 2}.

**Figure 2: DACA Recipients' Connections to Deported Individuals**



**Comprehensive immigration reform that provides a pathway to legalization could benefit close family members of most DACA recipients.** Approximately 86% of DACA recipients reported that their mother could potentially benefit from comprehensive immigration reform. Meanwhile, 74% said their fathers could benefit, and 62% said their siblings could benefit from such a change in federal immigration policy {Figure 3}.[1]

**Figure 3: Family Members Potentially Impacted by Comprehensive Immigration Reform**



**Description of Study Participants**. NURP Survey respondents are slightly more diverse in terms of national origin when compared to all DACA recipients to date. Although nearly two-thirds come from Mexico, DACA recipients

---

[1] These results are based on a subsample of 850 survey participants.

from other parts of Latin America and the Caribbean, as well as Asia and the Pacific Islands, are well-represented in the sample. Survey respondents average 23 years of age, and women comprise 59% of the sample.



The NURP web survey was collected in collaboration with community-based, educational, and campus organizations that serve immigrant populations. To date the survey contains DACA recipients from 38 states. The survey results presented here do not rely on probability sampling and cannot be used to develop population estimates for all DACA recipients. However, findings provide important insights into how some DACA recipients are benefiting from temporary documentation, but continue to face challenges.

This study is funded by the MacArthur, James Irvine, and Heising-Simons Foundations.

This report is published by the IPC in collaboration with the Center for the Study of Immigrant Integration (CSII) at the University of Southern California.



# Insecure Communities:
# Latino Perceptions of Police Involvement in Immigration Enforcement

Nik Theodore
Department of Urban Planning and Policy
University of Illinois at Chicago

May 2013

# Research Team:

Lake Research Partners:
Celinda Lake, Josh Ulibarri, Cornelia Treptow, Dom Bartkus

PolicyLink:
Angela Glover Blackwell, Milly Hawk Daniel

University of Illinois at Chicago:
Nik Theodore, Robby Habbans

This research was supported by a grant from the Ford Foundation

# Executive Summary

This report presents findings from a survey of Latinos regarding their perceptions of law enforcement authorities in light of the greater involvement of police in immigration enforcement. Lake Research Partners designed and administered a randomized telephone survey of 2,004 Latinos living in the counties of Cook (Chicago), Harris (Houston), Los Angeles, and Maricopa (Phoenix). The survey was designed to assess the impact of police involvement in immigration enforcement on Latinos' perceptions of public safety and their willingness to contact the police when crimes have been committed.  The survey was conducted in English and Spanish by professional interviewers during the period November 17 to December 10, 2012.

Survey results indicate that the increased involvement of police in immigration enforcement has significantly heightened the fears many Latinos have of the police, contributing to their social isolation and exacerbating their mistrust of law enforcement authorities.  Key findings include:

- 44 percent of Latinos surveyed reported they are less likely to contact police officers if they have been the victim of a crime because they fear that police officers will use this interaction as an opportunity to inquire into their immigration status or that of people they know.

- 45 percent of Latinos stated that they are less likely to voluntarily offer information about crimes, and 45 percent are less likely to report a crime because they are afraid the police will ask them or people they know about their immigration status.

- 70 percent of undocumented immigrants reported they are less likely to contact law enforcement authorities if they were victims of a crime.

- Fear of police contact is not confined to immigrants.  For example, 28 percent of US-born Latinos said they are less likely to contact police officers if they have been the victim of a crime because they fear that police officers will use this interaction as an opportunity to inquire into their immigration status or that of people they know.

- 38 percent of Latinos reported they feel like they are under more suspicion now that local law enforcement authorities have become involved in immigration enforcement.  This figure includes 26 percent of US-born respondents, 40 percent of foreign-born respondents, and 58 percent of undocumented immigrant respondents.

- When asked how often police officers stop Latinos without good reason or cause, 62 percent said very or somewhat often, including 58 percent of US-born respondents, 64 percent of foreign-born respondents, and 78 percent of undocumented immigrant respondents.

i

These findings reveal one of the unintended consequences of the involvement of state and local police in immigration enforcement – a reduction in public safety as Latinos' mistrust of the police increases as a result of the involvement of police in immigration enforcement.  The following conclusions can be drawn from the survey findings:

1.  **Isolation and disconnectedness from police:** Many Latinos feel isolated from the law enforcement officers who are sworn to protect them.  More than four in ten say that because police are more involved in enforcing immigration laws they have become less likely to volunteer information about crimes because they fear getting caught in the web of immigration enforcement themselves or bringing unwanted attention to their family or friends.

2.  **Withdrawal:** Many Latinos feel isolated and admit to withdrawing from their community. A large share feels under suspicion and is afraid to leave their homes.  This sense of withdrawal by a substantial portion of Latinos in the counties surveyed has short- and long-term negative consequences for public safety and community life.  In the short term, crimes become more difficult to solve as the social distance between police and residents increases.  Over the long term, a significant segment of the population may withdraw and develop a fear of law enforcement authorities.

3.  **Diminished sense of public safety:** Rather than feeling safer because of increased police involvement in immigration enforcement, many Latinos feel less safe.  Many Latinos say criminals are moving into their neighborhoods, making them and their neighbors less safe, because criminals know residents are less likely to report them to police given the increased involvement of police in immigration enforcement.  Few feel safer because of the increased focus on immigration by local law enforcement.

The findings presented here indicate that the greater involvement of police in immigration enforcement has significantly heightened the fears many Latinos have of the police, contributing to their social isolation and exacerbating their mistrust of law enforcement authorities.  This fear, isolation and mistrust, in turn, has led to a reduction in public safety, a serious negative consequence of the involvement of police in immigration enforcement.

# Introduction: The Role of State and Local Police in Immigration Enforcement

This report presents findings from a survey of Latinos regarding their perceptions of the police in light of state and local law enforcement's increasing involvement in immigration enforcement.[1]   A randomized telephone survey of 2,004 Latinos living in the counties of Cook (Chicago), Harris (Houston), Los Angeles, and Maricopa (Phoenix) was conducted to assess the impact of police involvement in immigration enforcement on Latinos' perceptions of public safety and their willingness to contact the police when crimes have been committed.

Survey results indicate that the greater involvement of police in immigration enforcement has significantly heightened the fears many Latinos have of the police, contributing to their social isolation and exacerbating their mistrust of law enforcement authorities.  The results show that substantial numbers of Latinos are less likely to voluntarily contact the police if they are the victim of a crime, or to provide information about a crime, because they are afraid the police will ask them or persons they know about their immigration status.   These findings highlight one of the unintended consequences of the involvement of state and local police in immigration enforcement – a reduction in public safety as residents' mistrust of the police increases as a result of the involvement of police in immigration enforcement.

******

Historically, the control of migration to the United States has fallen under the purview and authority of the federal government.  The U.S. Supreme Court has repeatedly affirmed that the federal government has broad and exclusive powers to regulate immigration and to set immigration policy. Nevertheless, over the past two decades, state and local law enforcement authorities have increasingly been drawn into the enforcement of immigration laws.  There now exists a patchwork of federal, state and local laws, as well as numerous formal and informal agreements, that call on state and local law enforcement agencies to actively participate in immigration enforcement (see Meissner et al., 2013; Rodríquez et al., 2010; Varsanyi, 2010).

These new provisions have not been without controversy.   Concerns have been raised that the increasing involvement of state and local police in immigration enforcement will increase the mistrust immigrant communities have towards the police, thereby reducing public safety.   More specifically, concerns have been raised that by increasing the priority given to investigating immigration matters, law enforcement resources will be directed away from important public safety objectives; police may resort to racial profiling or be prone to violating the civil liberties of possible suspects; the financial costs of immigration enforcement will come at the expense of other public-safety priorities; undocumented immigrants may be victimized in greater numbers because they will be fearful of police contact; and the trust between police and communities that is essential for effective policing will be

---

[1] Numerous studies have identified a gap in the research literature on Latino perceptions of policing and public safety, noting the paucity of studies that examine Latino perceptions and interactions with the police.  See for example, Correia (2010); Menjívar and Bejarano (2004); Rosenbaum et al. (2005); Weitzer and Tuch (2005).

1

undermined (Capps et al., 2011; International Association of Chiefs of Police, 2007; Khashu, 2009; Meissner et al., 2013; Stepick et al., 2013).

The clearest expression of the desire to see greater collaboration between federal immigration authorities and state and local law enforcement agencies can be seen in the 287(g) program and the Secure Communities program.  In 1996, Congress enacted legislation that formally expanded the role of state and local law enforcement authorities in immigration enforcement.  The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) amended the Immigration and Nationality Act of 1952 to allow the Immigration and Naturalization Service to deputize state and local law enforcement officials in the event of a "mass influx" of immigrants, provided that the state or local law enforcement agency consents to this new role.[2]

IIRIRA also revised Section 287(g) of the Immigration and Nationality Act to authorize the U.S. Attorney General to enter into written memoranda of understanding (MOUs) with state and local law enforcement authorities to formally involve them in immigration enforcement.[3]   The IIRIRA states that "the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension or detention of aliens in the United States …, may carry out such function at the expense of the State or political subdivision and to extent consistent with State and local law."[4]   Should a state or local law enforcement agency consent to entering into an MOU, officers must receive training in federal immigration law, the agency must provide written certification that officers are trained in immigration law, and any officer who engages in immigration enforcement is subject to the direction and supervision of the US Department of Homeland Security.  According to US Immigration and Customs Enforcement (ICE), as of December 31, 2012, more than 1,300 state and local law enforcement officers in 19 states have been trained and certified to enforce immigration law, and the budget devoted to 287(g) agreements has increased from $5 million in fiscal year 2006 to $68 million in fiscal year 2012 (ICE, 2013a,b).

The Secure Communities program began in 2008 as a pilot initiative in 14 jurisdictions, but subsequently expanded to nearly all of the nation's 3,181 jails and prisons under President Barack Obama.   Through the program, law enforcement authorities submit the fingerprints of arrestees to immigration databases, allowing ICE access to information about persons who are being held by authorities.  A number of concerns have been raised about Secure Communities, including that "many of the immigrants who have been identified and deported through the program are not serious or violent criminals, do not pose a threat to public safety, and may not have any criminal history at all;" it may lead to unnecessary detentions; and it might deter

---

[2] Pub. L. No. 104-208, 110 Stat. 3009-646 (1996) 8 U.S.C. § 1103(a)(10).  In 2003, the responsibilities of the Immigration and Naturalization Service were transferred to three entities within the US Department of Homeland Security: US Citizenship and Immigration Services, US Immigration and Customs Enforcement, and U.S. Customs and Border Protection.  US Immigration and Customs Enforcement is the entity that currently is empowered to enter into MOUs with state and local law enforcement agencies.

[3] 8 U.S.C. § 1357(g).

[4] 8 U.S.C. § 1357(g)(1).

witnesses from coming forward while also contributing to a loss of trust of the police by local residents (Waslin, 2011: 8, 14, 12-13; see also Stepick et al., 2013).

However, according to ICE (2013b), "By working together, local and federal officers can better identify and remove criminal aliens – a tremendous benefit to public safety." But does the involvement of state and local law enforcement agencies in immigration enforcement actually contribute to an improvement of public safety? Analyzing arrest and detention records for the Secure Communities program in Miami-Dade County, Florida, Alex Stepick and colleagues (2013: 7-8) found that only 18 percent of those targeted by the program were high-priority risks to public safety, and that "the majority of removals [deportations] are individuals who pose little or no risk to public safety." The authors conclude, "ICE's detention and deportation of immigrants for minor crimes, ordinary misdemeanors, and non-offense incidents reduces trust of law enforcement" (Ibid., 3).

A report published by the Police Foundation (Khashu, 2009: 23) raised similar concerns about the impact of police involvement in immigration enforcement stating, "local police involvement in immigration enforcement could have a chilling effect on immigrant cooperation [with the police]... Without this cooperation, law enforcement will have difficulty apprehending and successfully prosecuting criminals, thereby reducing overall public safety for the larger community." Such concerns stem from the recognition that it is exceedingly difficult for law enforcement authorities to investigate crimes, apprehend criminals, and deter criminal activity without the trust and active participation of local residents. Moreover, it is not only immigrants who are affected. Approximately 85 percent of immigrant families are mixed-status families that include a combination of citizens, authorized immigrants, and undocumented immigrants (Morawetz and Das, 2009). Therefore, the family and community dynamics that are set in motion by state and local law enforcement's involvement in immigration policing affects immigrants and non-immigrants alike.

The remainder of this report presents the results of a survey that was designed to measure how and to what extent police involvement in immigration enforcement has affected Latinos' perceptions of the police and public safety. The next section describes the methodology used for conducting the survey. This is followed by a presentation of survey findings, and an analysis of factors associated with Latinos' propensity to report crimes.

# Survey Methodology

A telephone survey of Latinos was designed and implemented by Lake Research Partners, a public opinion research firm with extensive experience in administering telephone surveys. Professional interviewers administered the survey during the period November 17 to December 10, 2012. The survey reached 501 Latinos in each of the following counties: Cook (Chicago), Harris (Houston), Los Angeles, and Maricopa (Phoenix). In total, 2,004 surveys were conducted. Seventy-nine percent of interviews were conducted in Spanish. All interviewers were bilingual and were capable of handling the interviews in Spanish or English. As will be explained in greater detail below, the survey explored Latinos' perceptions and experiences with law enforcement authorities in light of the increasing involvement of police in immigration enforcement.

The survey sample was identified using random digit dialing (RDD) methods that targeted high-density Latino census tracts, where Latinos represented 70 percent or more of the population in Cook, Harris, and Los Angeles Counties, and 50 percent or more of the population in Maricopa County (this lower threshold was used because of the relatively lower Latino population density in Maricopa County). By using RDD, interviewers were able to reach respondents with unlisted telephone numbers. The cell phone sample was pulled by county and then screened for city, ethnicity, and zip code. All respondents were screened for Latino or Hispanic ethnicity, but not for immigrant or citizenship status.

The averages represented in this report are composite averages, where each of the four cities represents 25 percent of the total. Population samples are subject to possible sampling error; that is, the results of a survey may differ from those that would be obtained if the entire population were interviewed. The size of the sampling error depends upon both the total number of respondents in the survey and the percentage distribution of responses to a particular question. The margin of error for the 2,004 respondent averages is ±2 percent, while for each county individually it is ±4.4 percent.

4

# Latinos' Perceptions of the Police: A Summary of Findings

The survey instrument was designed to assess the impact of police involvement in immigration enforcement on public safety and on police-community relations. Respondents were asked a randomized series of questions that explored (a) their willingness to contact law enforcement authorities to report crimes or provide information about criminal activities, and (b) their perceptions of personal and public safety in light of increasing police involvement in immigration enforcement. This was followed by a second set of questions pertaining to the nature of respondents' contact with law enforcement authorities and their knowledge of contact that their friends and family members have had with law enforcement authorities in their area.

Responses to the survey questions reveal a clear and consistent pattern: a substantial portion of the Latino populations in Cook, Harris, Los Angeles, and Maricopa Counties are reluctant to voluntarily contact the police to report a crime or to provide information about crimes specifically *because they fear that police officers will inquire about the immigration status of themselves, their friends, or their family members.*

## Willingness to Contact the Police

Figure 1 reports the responses to four statements that explore the willingness of Latinos to contact law enforcement authorities and volunteer information about criminal activities. Respondents were asked whether they strongly agree, somewhat agree, somewhat disagree, or strongly disagree with the statements. This section of the report presents data on aggregated responses, combining the strongly agree and somewhat agree categories, as well as the somewhat disagree and strongly disagree categories.

**Figure 1: Latinos' willingness to contact law enforcement authorities**

| I am less likely to contact police officers if I have been a victim of a crime for fear they will ask me or other people I know about our immigration status | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Total | 44% | 50% | 6% |
| US Born | 28% | 68% | 4% |
| Foreign Born | 49% | 46% | 6% |
|     Undocumented | 70% | 26% | 4% |

| I am less likely to voluntarily offer information about crimes I know have been committed because I am afraid the police officers will ask me or other people I know about our immigration status | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Total | 45% | 49% | 6% |
| US Born | 29% | 66% | 5% |
| Foreign Born | 50% | 44% | 6% |
|     Undocumented | 67% | 28% | 5% |

5

| I am less likely to report a crime to law enforcement officers because I am afraid the police officers will ask me or other people I know about our immigration status | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Total | 45% | 50% | 5% |
| US Born | 26% | 70% | 4% |
| Foreign Born | 50% | 44% | 5% |
|    Undocumented | 67% | 28% | 5% |

| Since local law enforcement has become involved in immigration if I am a victim or a witness to a crime I am more likely to tell my church or community leader about it than I am to tell local law officers | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Total | 49% | 44% | 7% |
| US Born | 32% | 63% | 5% |
| Foreign Born | 54% | 39% | 8% |
|    Undocumented | 68% | 26% | 7% |

The responses to these statements indicate that because police increasingly are involved in enforcing immigration laws, a substantial share of the Latino population in the surveyed counties is less likely to initiate contact with local law enforcement authorities, even if they have been the victim of a crime. Forty-four percent of Latinos surveyed reported they are less likely to contact police officers if they have been the victim of a crime because they fear that police officers will use this interaction as an opportunity to inquire into their immigration status or that of people they know. Undocumented immigrants were especially fearful of such contacts (70% reported they are less likely to contact law enforcement authorities if they were victims of a crime), but this fear is not confined to immigrants; 28 percent of US-born Latinos expressed the same view.

Similarly, 45 percent of Latinos stated that they are less likely to voluntarily offer information about crimes, and 45 percent are less likely to report a crime because they are afraid the police will ask them or people they know about their immigration status. Again, undocumented immigrants were more likely to express such fears. Two-thirds (67%) of undocumented immigrants surveyed reported that they would be less likely to offer information or report a crime because they are afraid that police will ask them or someone they know about their immigration status. Among US-born Latinos, 29 percent reported they are less likely to voluntarily offer information about crimes they know have been committed, and 26 percent indicated they are less likely to report a crime, because they fear that police will ask them or someone they know about their immigration status.

The findings here show that Latinos increasingly are afraid to contact the police to report crimes and criminal activity because they are worried that law enforcement officers will use this contact as an opportunity to investigate the immigration status of respondents or of people they know. In addition, a substantial proportion of Latinos said that they are more likely to tell their church or community leader about crimes than they are to report this information to the police. Nearly half of Latinos surveyed (49%) agreed with this statement, as did nearly one-third (32%) of US-born Latinos, more than half (54%) of all foreign-born Latinos, and more than two-thirds (68%) of undocumented immigrant Latinos. This suggests that Latinos' lack of trust centers on local law enforcement authorities and not on community institutions or public figures in general.

6

It is notable that when considering Latinos' willingness to contact law enforcement authorities, differences between the counties in the sample are relatively modest. Overall, Latinos in Maricopa County tend to report greater social distance between themselves and law enforcement authorities, while in Cook County a smaller proportion tends to express such views. This perhaps is unsurprising given that Arizona has enacted new laws that require police to become more involved in immigration enforcement. But rather than marked differences between the cities, what stands out in the survey results is how closely respondents' views converge around issues of fear, isolation, and the growing social distance between police and Latino residents that is occurring as a result of police involvement in immigration enforcement.

Figure 2 reports the responses to the statements above for each of the four

**Figure 2: Latinos' willingness to contact law enforcement authorities, by county**

| I am less likely to contact police officers if I have been a victim of a crime for fear they will ask me or other people I know about our immigration status | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Cook County | 39% | 53% | 8% |
| Harris County | 47% | 48% | 5% |
| Los Angeles County | 40% | 55% | 5% |
| Maricopa County | 50% | 45% | 5% |

| I am less likely to voluntarily offer information about crimes I know have been committed because I am afraid the police officers will ask me or other people I know about our immigration status | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Cook County | 42% | 50% | 8% |
| Harris County | 45% | 50% | 5% |
| Los Angeles County | 44% | 51% | 6% |
| Maricopa County | 49% | 47% | 5% |

| I am less likely to report a crime to law enforcement officers because I am afraid the police officers will ask me or other people I know about our immigration status | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Cook County | 39% | 55% | 5% |
| Harris County | 44% | 52% | 5% |
| Los Angeles County | 44% | 50% | 6% |
| Maricopa County | 52% | 44% | 4% |

| Since local law enforcement has become involved in immigration if I am a victim or a witness to a crime I am more likely to tell my church or community leader about it than I am to tell local law officers | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Cook County | 48% | 43% | 8% |
| Harris County | 51% | 44% | 5% |
| Los Angeles County | 44% | 47% | 8% |
| Maricopa County | 52% | 42% | 6% |

7

counties. In Maricopa County, fully half of Latinos surveyed (50%) reported that they are less likely to contact police officers if they have been the victim of a crime because they fear that law enforcement authorities will ask them or people they know about their immigration status. This compares to 39 percent of Latinos in Cook County, 47 percent in Harris County, and 40 percent in Los Angeles County.

Reponses were similar when Latinos were asked about their willingness to voluntarily offer information about crimes they know

have been committed: 49 percent of Latinos surveyed in Maricopa County; 42 percent surveyed in Cook County, 45 percent surveyed in Harris County, and 44 percent surveyed in Los Angeles County indicate they are less likely to offer information to the police because they fear law enforcement authorities will ask about the immigration status of themselves or someone they know. Finally, when asked whether they agreed with the statement about whether they are less likely to report a crime to law enforcement officers because they are afraid the police officers will ask them or people

**Figure 3: Latinos' perceptions of personal and public safety in light of police involvement in immigration enforcement**

| I feel safer knowing local law enforcement is involved in immigration enforcement | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Total | 37% | 56% | 7% |
| US Born | 45% | 47% | 8% |
| Foreign Born | 35% | 59% | 7% |
| Undocumented | 40% | 55% | 5% |

| There are fewer crimes committed in this area because of an increased police focus on immigration enforcement | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Total | 41% | 48% | 10% |
| US Born | 34% | 54% | 12% |
| Foreign Born | 44% | 47% | 10% |
| Undocumented | 50% | 42% | 8% |

| Criminals and drug dealers have actually begun moving into my neighborhood because they know we are afraid to report them now that law officers are more involved in immigration enforcement | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Total | 45% | 43% | 12% |
| US Born | 31% | 60% | 10% |
| Foreign Born | 49% | 38% | 12% |
| Undocumented | 63% | 28% | 10% |

| I feel less safe because local law enforcement is more involved in immigration enforcement | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Total | 43% | 51% | 6% |
| US Born | 29% | 67% | 5% |
| Foreign Born | 47% | 47% | 6% |
| Undocumented | 65% | 31% | 5% |

8

they know about their immigration status, 52 percent of respondents in Maricopa County, 39 percent in Cook County, 44 percent in Harris County, and 44 percent in Los Angeles County agreed with that statement.

In each of the four counties, a large share of Latinos indicated they were more likely to tell a church or community leader about a crime than they were to contact the police. Approximately half of the survey respondents agreed with this statement in Cook (48%), Harris (51%) and Maricopa (52%) Counties, as did 44 percent of respondents in Los Angeles County.

These responses show that the increased involvement by the police in immigration enforcement has contributed to a fear of the police by a substantial share of Latino residents in the four counties where the survey was administered. This fear has led residents to become less likely to volunteer information about criminal activities, even when they themselves have been the victims of a crime. This suggests that police involvement in immigration enforcement has contributed to a growing mistrust of the police by Latinos, increasing the social distance between the police and the communities they serve.

**Personal and public safety**

Survey responses exploring the impact of local law enforcement authorities' involvement in immigration enforcement show that Latinos are divided about whether they are safer as a result of this involvement in immigration enforcement. Figure 3 reports the responses to four statements concerning personal and public safety. Again, respondents were asked whether they strongly agree, somewhat agree, somewhat disagree, or strongly disagree with the statements, and the results here report aggregated agree/disagree responses.

Thirty-seven percent of respondents in the four

counties agreed with the statement that they feel safer knowing local law enforcement is involved in immigration enforcement, while 56 percent disagreed with this statement. Forty-one percent of respondents agreed with the statement that fewer crimes are committed because of increased police focus on immigration enforcement, though 48 percent disagreed with this statement. At the same time, 45 percent of respondents agreed that criminals and drug dealers have been moving into their neighborhoods because they know that residents are afraid to report them to law enforcement officers because police are more involved in immigration enforcement; and 43 percent indicated they feel less safe because law enforcement is more involved in immigration enforcement.

Figure 4 reports the responses to the statements above for each of the counties included in this study. Responses show remarkable consistency across the four counties.

Responses to the set of statements in this section of the report reveal a mixed reaction to local law enforcement's involvement in immigration enforcement. On the one hand, more than one-third of respondents feel safer knowing local law enforcement is involved in immigration enforcement, and 41 percent agree with the statement that fewer crimes are committed because of this focus on immigration enforcement. On the other hand, 43 percent indicate they feel less safe, and 45 percent report that criminals and drug dealers are moving into their neighborhood, because local law enforcement's involvement in immigration enforcement has caused residents to be more afraid of police contact. Immigration status partly explains these disparities. Undocumented immigrants are more likely to indicate they feel less safe and to say that criminals are moving into their neighborhood because police are involved in immigration enforcement. But these views are shared by nearly one-third of US-born Latinos

9

**Figure 4: Latinos' perceptions of personal and public safety in light of police involvement in immigration enforcement, by county**

| I feel safer knowing local law enforcement is involved in immigration enforcement | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Cook County | 37% | 54% | 9% |
| Harris County | 42% | 52% | 6% |
| Los Angeles County | 33% | 59% | 8% |
| Maricopa County | 37% | 57% | 6% |

| There are few crimes committed in this area because of an increased police focus on immigration enforcement | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Cook County | 41% | 49% | 10% |
| Harris County | 44% | 47% | 9% |
| Los Angeles County | 43% | 48% | 10% |
| Maricopa County | 39% | 49% | 12% |

| Criminals and drug dealers have actually begun moving into my neighborhood because they know we are afraid to report them now that law officers are more involved in immigration enforcement | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Cook County | 44% | 43% | 12% |
| Harris County | 45% | 44% | 11% |
| Los Angeles County | 45% | 44% | 12% |
| Maricopa County | 45% | 41% | 14% |

| I feel less safe because local law enforcement is more involved in immigration enforcement | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Cook County | 39% | 54% | 7% |
| Harris County | 44% | 50% | 6% |
| Los Angeles County | 41% | 53% | 6% |
| Maricopa County | 47% | 47% | 5% |

and nearly half of all immigrant Latinos as well, suggesting that concerns about the negative influence of police involvement in immigration enforcement are widespread and not simply based on citizenship.

**Social Isolation**

Figure 5 reports the responses to two statements that explore issues of social isolation. Respondents were asked whether they strongly agree, somewhat agree,

somewhat disagree, or strongly disagree with the statements. Again, responses were aggregated, combining the strongly agree and somewhat agree categories, as well as the somewhat disagree and strongly disagree categories.

Survey responses reveal that police involvement in immigration enforcement has resulted in a substantial share of Latinos feeling socially isolated. Thirty-eight percent of respondents agreed with the statement that they are afraid

10

A324

**Figure 5: Latinos' feelings of social isolation as a result of police involvement in immigration enforcement**

| I feel afraid to leave my home because local law enforcement officials are more involved in immigration enforcement | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Total | 38% | 56% | 6% |
| US Born | 22% | 73% | 5% |
| Foreign Born | 43% | 51% | 6% |
|    Undocumented | 61% | 34% | 5% |

| I feel more isolated because local law enforcement is more involved in immigration enforcement | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Total | 42% | 51% | 7% |
| US Born | 27% | 67% | 6% |
| Foreign Born | 47% | 46% | 7% |
|    Undocumented | 62% | 31% | 7% |

to leave their home because police are involved in immigration enforcement, and 42 percent agreed that they feel more isolated because of police involvement in immigration matters. Again, undocumented immigrants were more likely to agree with these statements (61% and 62%, respectively), but they were not alone. More than one in five US-born Latinos agreed that they were afraid to leave their home, and more than one-quarter (27%) agreed they felt more isolated, because of this change in policing priorities.

Figure 6 shows that feelings of isolation affect many Latinos in Cook, Harris, Los Angeles and Maricopa Counties. Approximately one-third of respondents agreed that they are afraid to leave their homes in Cook (32%) and Los Angeles (38%) Counties. This figure rises to 40 percent in Harris County and to 43 percent in Maricopa County. When asked whether they felt more isolated because law enforcement authorities are more involved in immigration enforcement, 38 percent of Latinos in Cook County, 43 percent in Harris

**Figure 6: Latinos' feelings of social isolation as a result of police involvement in immigration enforcement, by county**

| I feel afraid to leave my home because local law enforcement officials are more involved in immigration enforcement | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Cook County | 32% | 60% | 8% |
| Harris County | 40% | 54% | 6% |
| Los Angeles County | 36% | 58% | 6% |
| Maricopa County | 43% | 52% | 4% |

| I feel more isolated because local law enforcement is more involved in immigration enforcement | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Cook County | 38% | 54% | 8% |
| Harris County | 43% | 50% | 7% |
| Los Angeles County | 37% | 55% | 8% |
| Maricopa County | 50% | 44% | 5% |

11

County, 37 percent in Los Angeles County, and 50 percent in Maricopa County agreed with this statement.

**Mistrust of the Police**

Figure 7 reports the responses to one statement and one question concerning their trust in the police.

Thirty-eight percent of respondents agreed that they feel like they are under more suspicion now that local law enforcement authorities have become involved in immigration enforcement. This figure includes 26 percent of US-born respondents, 40 percent of foreign-born respondents, and 58 percent of undocumented immigrant respondents.

When asked how often police officers stop Latinos without good reason or cause, 62 percent said very or somewhat often, including 58 percent of US-born respondents, 64 percent of foreign-born respondents, and 78 percent of undocumented immigrant respondents.

Figure 8 reveals few differences in response rates in Cook, Harris and Los Angeles Counties, where about one-third of respondents in each county agreed that they feel they are under more suspicion now that police are involved in immigration enforcement, and approximately 60 percent thought that police stop Latinos without good reason or cause. Response rates to these questions were even higher in Maricopa County, where 45 percent perceived that they are under more suspicion, and fully 70 percent stated that police officers stop Latinos without good reason or cause.

**Figure 7: Latinos' mistrust of the police**

| Since local law enforcement has become involved in immigration enforcement I have begun to feel like I am under more suspicion | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Total | 38% | 56% | 6% |
| US Born | 26% | 68% | 6% |
| Foreign Born | 40% | 53% | 7% |
| Undocumented | 58% | 36% | 6% |

| How often do you think police officers stop Latinos and Hispanics on the streets of your city without good reason or cause? | | | |
|---|---|---|---|
| | Very/somewhat often | Not very/not often | Don't Know |
| Total | 62% | 29% | 8% |
| US Born | 58% | 32% | 10% |
| Foreign Born | 64% | 28% | 8% |
| Undocumented | 78% | 19% | 4% |

12

**Figure 8: Latinos' mistrust of the police, by county**

| Since local law enforcement has become involved in immigration enforcement I have begun to feel like I am under more suspicion | | | |
|---|---|---|---|
| | Agree | Disagree | Don't Know |
| Cook County | 33% | 59% | 8% |
| Harris County | 34% | 58% | 8% |
| Los Angeles County | 34% | 59% | 7% |
| Maricopa County | 45% | 51% | 4% |

| How often do you think police officers stop Latinos and Hispanics on the streets of your city without good reason or cause? | | | |
|---|---|---|---|
| | Very/somewhat often | Not very/not often | Don't Know |
| Cook County | 61% | 31% | 8% |
| Harris County | 58% | 33% | 9% |
| Los Angeles County | 62% | 30% | 8% |
| Maricopa County | 70% | 22% | 9% |

13

# Influences on Latinos' Propensity to Report Crimes to Police

The previous section presented results showing that a substantial portion of Latinos surveyed are less likely to voluntarily contact law enforcement authorities when they have been the victim of a crime or if they have information about a crime that has been committed, because they fear that police will ask them or people they know about their immigration status.  To further explore the association between an individual's propensity to contact police and his or her traits with respect to demographic characteristics, previous experiences with law enforcement, and immigration and documentation status, we performed a multivariate ordinary least squares regression, with the respondent's propensity to report crimes to the police serving as the dependent variable.  To develop a more reliable measure of underlying feelings toward the police and public safety, a multi-item scale was constructed by converting the mean of four individual Likert-scaled survey items into a single interval variable ranging from 0 to 1.[5]  The original items are:

- I am less likely to contact police officers if I have been a victim of a crime for fear they will ask me or other people I know about our immigration status.

- I am less likely to voluntarily offer information about crimes I know have been committed because I am afraid the police officers will ask me or other people I know about our immigration status.

- I am less likely to report a crime to law enforcement officers because I am afraid

the police will ask me or people I know about our immigration status.

- Since local law enforcement has become involved in immigration if I am a victim or a witness to a crime I am more likely to tell my church or community leader about it than I am to tell local law officers.

Two additional scales were constructed in a similar manner to assess the respondent's attitudes about law enforcement. The first measures the respondent's feelings of social isolation as a result of law enforcement, while the second measures the respondent's feelings about the association between law enforcement and public safety. These scales, a set of demographic variables, and additional variables pertaining to the nature of immigration and documentation status, were added to the model as independent variables (Figure 9).  The results of the model are presented in Figure 10.

The model explained 63 percent of the variance in responses, and both of the focal variables (*ISOLATED* and *SAFETY*) were statistically significant at the .05 level and had the expected influence on the unwillingness of Latinos to contact police to report a crime or to provide information about a crime.  The results suggest Latinos with high levels of social isolation have a weaker propensity to voluntarily contact the police.  Likewise, Latinos who are concerned about a decline in public safety as a result of police involvement in immigration enforcement also are less likely to contact the police.  In addition to these factors,

---

[5] This scale was then tested for internal reliability using Cronbach's Alpha, **α** = .844.

**Figure 9: Description of variables**

| Variable Name | Description |
|---|---|
| *ISOLATED* | Scale to measure respondent's association between a sense of isolation and law enforcement, constructed from the following items: <br><br> I feel more isolated because local law enforcement is more involved in immigration enforcement <br><br> I feel afraid to leave my house because local law enforcement officials are more involved in immigration enforcement <br><br> α = .716 |
| *SAFETY* | Scale to measure respondent's association between law enforcement and public safety, constructed from the following items: <br><br> I feel less safe because local law enforcement is more involved in immigration enforcement <br><br> I feel afraid to leave my house because local law enforcement officials are more involved in immigration enforcement <br><br> Criminals and drug dealers have actually begun moving into my neighborhood because they know we are afraid to report them now that law officers are more involved in immigration enforcement. <br><br> α = .699 |
| *AGE1829* | Respondent is between the ages of 18 to 29 |
| *AGE4564* | Respondent is between the ages of 45 to 64 |
| *AGE65up* | Respondent is 65 years or older |
| *HSGRAD* | Respondent is a high school graduate |
| *IMMIG* | Respondent is foreign-born |
| *COLLGRAD* | Respondent is a college graduate |
| *UNEMP* | Respondent is currently unemployed |
| *CHILD* | Respondent has children under the age of 18 |
| *DEPORT* | Respondent knows someone who has been deported |
| *UNDOC* | Respondent is an undocumented immigrant |
| *UNDOCASSOC* | Respondent has family, friends, or other associates who are undocumented |
| *MALE* | Respondent is male |

15

**Figure 10: Influence of perceptions of public safety and social isolation on the willingness to voluntarily contact the police to report crimes**

| | B | SE |
|---|---|---|
| *ISOLATED* | -.378 | .027*** |
| *SAFETY* | -.413 | .030*** |
| *AGE1829* | .025 | .024 |
| *AGE4564* | .008 | .018 |
| *AGE65up* | -.012 | .029 |
| *HSGRAD* | -.021 | .011 |
| *IMMIG* | -.044 | .014** |
| *COLLGRAD* | .018 | .020 |
| *UNEMP* | .001 | .018 |
| *CHILD* | .025 | .011* |
| *DEPORT* | -.035 | .012** |
| *UNDOC* | -.022 | .015 |
| *UNDOCASSOC* | -.026 | .012* |
| *MALE* | -.008 | .010 |
| Constant | .948 | .018*** |

*N= 1,472*
*Adjusted $r^2$ = .629*
*\*p<.05, \*\*p<.01, \*\*\*p<.001*

the following were found to be associated with Latinos' reluctance to voluntarily contact the police:

- Being an immigrant

- Having friends or family who have been deported

- Having friends or family who are undocumented immigrants

Conversely, parents of children under the age of 18 are more likely to voluntarily contact the police with information about crimes that have been committed.

While these results are exploratory, they support the notion that, even when controlling for strong negative feelings about the impact of police enforcement of immigration laws on social isolation and public safety, Latinos who are immigrants, those who who have family or friends who are undocumented immigrants, and those who have family or friends who have been deported report a lower predisposition to report crimes to the police. This finding is an indication of how immigration status and high levels of deportation can affect perceptions of the police, by both immigrant and non-immigrant Latinos, as well as by Latino citizens and noncitizens. These factors are undoubtedly related, with deportation policies leading to the increasing social distance between police and Latinos. The large share of "mixed status" families that include undocumented immigrants, authorized immigrants, and US citizens is likely a factor here as well; deportation policies frequently result in family separation, and many Latinos perceive police contact as placing themselves or their family members and friends at risk. As a result, they are less like to voluntarily contact police to report crimes.

16

# Conclusion

The conventional wisdom in law enforcement circles is that for effective police-community relations to be developed and maintained, police must forge bonds of trust with the communities they serve. The willingness of residents to voluntarily contact the police when they have been the victim of or a witness to a crime depends on these bonds of trust. For this reason, law enforcement agencies proactively engage in efforts to foster closer working relationships with the communities they serve, including the widespread implementation of community policing initiatives. To the extent that law enforcement practices undermine bonds of trust with segments of the population, these aspects of policing are typically viewed as problematic and in need of reform.

State and local law enforcement authorities increasingly are involved in immigration enforcement, whether under the 287(g) program, the Secure Communities program, or various state laws. This report has identified an important unintended consequence of police involvement in immigration enforcement: a substantial portion of the Latino populations in Cook, Harris, Los Angeles, and Maricopa Counties are reluctant to voluntarily contact the police to report a crime or to provide information on crimes, specifically because they fear that police officers will inquire about the immigration status of themselves, their friends, or their family members. The survey findings indicate that:

1. **Isolation and disconnectedness from police:** Many Latinos feel isolated from the law enforcement officers who are sworn to protect them. More than four in ten would be more likely to turn to a church or community leader than to law enforcement authorities if they are victims of or witness to a crime, for fear they would call attention to their own immigration status or that of someone they know. Similarly, more than four in ten say that because police are more involved in enforcing immigration laws they have become less likely to volunteer information about crimes because they fear getting caught in the web of immigration enforcement themselves or bringing unwanted attention to their family or friends.

2. **Withdrawal:** Many Latinos feel isolated and admit to withdrawing from their community. A large share feels under suspicion and is afraid to leave their homes. This sense of withdrawal by a substantial portion of Latinos in the counties surveyed – especially those younger and raising children – has short- and long-term negative consequences for public safety and community life. In the short term, crimes become more difficult to solve as the social distance between police and residents increases. Over the long term, a significant segment of the population may withdraw and develop a fear of law enforcement authorities.

3. **Diminished sense of public safety:** Rather than feeling safer because of increased police involvement in immigration enforcement, many Latinos feel less safe. Many Latinos say criminals are moving into their neighborhoods, making them and their neighbors less safe, because criminals know residents are less likely to report them to police given the increased involvement of police in immigration enforcement. Few feel safer because of the increased focus on immigration by local law enforcement.

17

The findings presented here indicate that the greater involvement of police in immigration enforcement has significantly heightened the fears many Latinos have of the police, contributing to their social isolation and exacerbating their mistrust of law enforcement authorities.  This fear, isolation and mistrust, in turn, has led to a reduction in public safety, a serious negative consequence of the involvement of police in immigration enforcement.

# References

Capps, Randy, Marc R. Rosenblum, Cristina Rodriquez, and Muzaffar Chisti (2011) Delegation and Divergence: A Study of 287(g) State and Local Immigration Enforcement. Washington, DC: Migration Policy Institute.

Correia, Mark E. (2010) "Determinants of Attitudes Toward Police of Latino Immigrants and Non-immigrants," Journal of Criminal Justice 38: 99-107.

ICE [U.S. Immigration and Customs Enforcement] (2013a) Fact Sheet: Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act, accessed at: http://www.ice.gov/news/library/factsheets/287g.htm.

ICE [U.S. Immigration and Customs Enforcement] (2013b) Fact Sheet: Updated Facts on ICE's 287(g) Program, accessed at: http://www.ice.gov/news/library/factsheets/287g-reform.htm.

ICE [U.S. Immigration and Customs Enforcement] (2012) ICE Total Removals accessed at: https://www.ice.gov/doclib/about/offices/ero/pdf/ero-removals.pdf.

International Association of Chiefs of Police (2007) Police Chiefs Guide to Immigration Issues. Alexandria, VA: International Association of Chiefs of Police.

Khashu, Anita (2009) The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties. Washington, DC: Police Foundation.

Meissner, Doris, Donald M. Kerwin, Muzaffar Chisti, and Claire Bergeron (2013) Immigration Enforcement in the United States: The Rise of a Formidable Machinery. Washington, DC: Migration Policy Institute.

Menjívar, Cecilia and Cynthia L. Bejarano (2004) "Latino Immigrants' Perceptions of Crime and Police Authorities in the United States: A Case Study from the Phoenix Metropolitan Area," Ethnic and Racial Studies 27(1): 120-148.

Morawetz, Nancy and Alina Das (2009) "Legal Issues in Local Police Enforcement of Federal Immigration Law," in Khashu, Anita The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties, Appendix B, pp. 69-90. Washington, DC: Police Foundation.

Rosenbaum, Dennis P., Amie M. Schuck, Sandra K. Costello, Darnell F. Hawkins, and Marianne K. Ring (2005) "Attitudes Toward the Police: The Effects of Direct and Vicarious Experience," Police Quarterly 8(3): 343-365.

Stepick, Alex, Steve Held, Cynthia S. Hernandez, Cheryl Little, and Susana Barciela (2013) False Promises: The Failure of Secure Communities in Miami-Dade County. Miami and Washington, DC: Research Institute on Social & Economic Policy, Center for Labor Research & Studies, Florida International University and Americans for Immigrant Justice.

Varsanyi, Monica W. (2010) Taking Local Control: Immigration Policy Activism in U.S. Cities and States. Stanford, CA: Stanford University Press.

Waslin, Michele (2011) The Secure Communities Program: Unanswered Questions and Continuing Concerns. Washington, DC: Immigration Policy Center.

Weitzer, Ronald and Steven A. Tuch (2004) "Race and Perceptions of Police Misconduct," Social Problems 51(3): 305-325.

# Notes:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

21

# Notes:

Department of Urban Planning and Policy
University of Illinois at Chicago

# M.C.C. IMMIGRATION COMMITTEE RECOMMENDATIONS

## For Enforcement of Immigration Laws By Local Police Agencies



## Adopted by:
# Major Cities Chiefs
### June 2006

# Prepared By:

# M.C.C.  IMMIGRATION COMMITTEE MEMBERS:



**Craig E. Ferrell, Jr., (M.C.C. General Counsel),
Chairman of Immigration Committee,  Houston Police Department**

**Leroy D. Baca, Los Angeles County Sheriff's Department
William J. Bratton, Los Angeles Police Department
Ella M. Bully-Cummings, Detroit Police Department
Raymond W. Kelly, New York City Police Department
Gil Kerlikowske, Seattle Police Department
Richard Miranda, Tucson Police Department
Robert Parker, Miami-Dade Police Department
Richard D. Wiles, El Paso Police Department**

2

# M.C.C. NINE (9) POINT POSITION STATEMENT

## ENFORCEMENT OF IMMIGRATION LAWS BY LOCAL POLICE AGENCIES

## A.   STATEMENT OF ISSUE

Illegal immigration is a problem that faces our nation and society as a whole and one, which must be dealt with at the national level.  It is absolutely critical that our country develop a consistent unified national plan to deal with immigration and this plan must include the critical component of securing our borders to prevent illegal entry into the United States.

Since the horrendous attacks of September 11, 2001, local law enforcement has been called upon to do its part in protecting the nation from future terrorist attacks.  The response of local law enforcement to the call to protect the homeland has been tremendous.  Today, local police agencies stand as the first line of defense here at home to prevent future attacks.  Local law enforcement's unending efforts include providing additional training and equipment to officers, increasing communication and coordination with federal agencies, gathering, assessing and sharing intelligence, modifying patrol methods and increasing security for potential targets such as power plants, airports, monuments, ports and other critical facilities and infrastructure.  Much of these efforts have been at a high cost to local budgets and resources.

The federal government and others have also called upon local police agencies to become involved in the enforcement of federal immigration laws as part of the effort to protect the nation.  This issue has been a topic of great debate in the law enforcement community since September 11.  The call for local enforcement of federal immigration laws has become more prominent during the debate over proposed immigration reform at the national level.

Major city police departments have a long undeniable history of working with federal law enforcement agencies to address crime in the United States whether committed by citizens, visitors, and/or illegal immigrants.  Local police agencies have not turned a blind eye to crimes related to illegal immigration.  They have and continue to work daily with federal agencies whenever possible and to the extent allowable under state criminal law enforcement authority to address crimes such as human trafficking and gang violence which have a nexus with illegal immigration.

How local agencies respond to the call to enforce immigration laws could fundamentally change the way they police and serve their communities.  Local enforcement of federal immigration laws raises many daunting and complex legal, logistical and resource issues for local agencies and the diverse communities they serve.  Some in local law enforcement would embrace

3

A341

immigration enforcement as a means of addressing the violation of law represented by illegal immigration across our borders.  Many others recognize the obstacles, pitfalls, dangers and negative consequences to local policing that would be caused by immigration enforcement at the local level.

It is important for Major Cities Chiefs [M.C.C.] as a leader and representative of the local law enforcement community develop consensus on this important subject.  The purpose of this position statement is to evaluate and address the impact and potential consequences of local enforcement of federal immigration laws and highlight steps, which if taken might allow local agencies to become involved in immigration enforcement.  It is hoped that this statement will help to draw attention to the concerns of local law enforcement and provide a basis upon which to discuss and shape any future national policy on this issue.  In this regard it is absolutely critical that M.C.C. be involved in all phases of this debate from developing this official position statement to demanding input and involvement in the development of any national initiatives.

## B.   <u>OVERVIEW OF IMMIGRATION AND IMMIGRANT STATUS</u>

The federal government has the clear authority and responsibility over immigration and the enforcement of immigration laws.  With this authority, the federal government has enacted laws, such as the Immigration and Naturalization Act (INA), that regulate a person's entry into the United States, his or her ability to remain in the country, and numerous other aspects of immigration.  The federal government has given federal agencies such as Immigration and Customs Enforcement [I.C.E.] the specific authority to investigate a person's immigration status and deport individuals who have no legal status or authority to be in the United States.

Under the current immigration laws there exists various immigration status classifications.  The immigration status of any particular person can vary greatly.   The most common status classifications include the following:

1) **<u>Legal Immigrants</u>** are citizens of other countries who have been granted a visa that allows them to live and work permanently in the United States and to become naturalized U.S. citizens. Once here, they receive a card, commonly referred to as a "green card" from the federal government indicating they are permanent residents.  Some legal immigrants are refugees who fear persecution based on race, religion, nationality, membership in a particular social group, or political opinion in their home countries. Refugees are resettled every year in the United States after their requests for asylum have been reviewed and granted.

2) **<u>Nonimmigrant Visa Holders</u>** are persons who are granted temporary entry into the United States for a specific purpose, such as visiting, working, or studying. The U.S. has 25 types of nonimmigrant visas, including A1 visas for ambassadors, B2 visas for tourists, P1 visas for foreign sports stars who play on U.S. teams and TN visas for Canadians and Mexicans entering the U.S. to work under NAFTA**.**   Visa Holders are allowed to stay in the U.S. as long as they meet the terms of their status.

4

3) **Illegal Immigrants** are citizens of other countries who have entered or remained in the U.S. without permission and without any legal status. Most illegal immigrants cross a land or sea border without being inspected by an immigration officer.  Some person falls into illegal status simply by violating the terms of a legal entry document or visa.

4) **Absconders** are persons who entered the United States legally but have since violated the conditions of their visa and who have had a removal, deportation, or exclusion hearing before an immigration judge and are under a final order of deportation and have not left the United States.

Currently there are between 8-12 million illegal immigrants living in the U.S., with another estimated 800,000 illegal immigrants entering the country every year.  These immigrants by their sheer numbers have become a significant part of local communities and major cities in our nation.  Some major urban areas estimate that their immigrant communities, regardless of immigration status, comprise 50%-60% of the local population and other areas report similar trends.  The reality for major local police agencies throughout the nation is that the communities they serve and protect are diverse and include significant immigrant communities including documented and undocumented immigrants.

# C.   CONCERNS WITH LOCAL ENFORCEMENT OF FEDERAL IMMIGRATION LAWS

Local police agencies must balance any decision to enforce federal immigration laws with their daily mission of protecting and serving diverse communities, while taking into account: limited resources; the complexity of immigration laws; limitations on authority to enforce; risk of civil liability for immigration enforcement activities and the clear need to foster the trust and cooperation from the public including members of immigrant communities.

**1)  Undermine Trust and Cooperation of Immigrant Communities**

Major urban areas throughout the nation are comprised of significant immigrant communities. In some areas the immigrant community reaches 50-60 percent of the local population.  Local agencies are charged with protecting these diverse populations with communities of both legal and illegal immigrants.  The reality is that undocumented immigrants are a significant part of the local populations major police agencies must protect, serve and police.

Local agencies have worked very hard to build trust and a spirit of cooperation with immigrant groups through community based policing and outreach programs and specialized officers who work with immigrant groups.  Local agencies have a clear need to foster trust and cooperation with everyone in these immigrant communities.   Assistance and cooperation from immigrant communities is especially important when an immigrant, whether documented or undocumented, is the victim of or witness to a crime.  These persons must be encouraged to file reports and come forward with information.  Their cooperation is needed to prevent and solve crimes and maintain public order, safety, and security in the whole community.  Local

5

police contacts in immigrant communities are important as well in the area of intelligence gathering to prevent future terroristic attacks and strengthen homeland security.

Immigration enforcement by local police would likely negatively effect and undermine the level of trust and cooperation between local police and immigrant communities. If the undocumented immigrant's primary concern is that they will be deported or subjected to an immigration status investigation, then they will not come forward and provide needed assistance and cooperation. Distrust and fear of contacting or assisting the police would develop among legal immigrants as well.  Undoubtedly legal immigrants would avoid contact with the police for fear that they themselves or undocumented family members or friends may become subject to immigration enforcement.  Without assurances that contact with the police would not result in purely civil immigration enforcement action, the hard won trust, communication and cooperation from the immigrant community would disappear.  Such a divide between the local police and immigrant groups would result in increased crime against immigrants and in the broader community, create a class of silent victims and eliminate the potential for assistance from immigrants in solving crimes or preventing future terroristic acts.

## 2) Lack of Resources

The budgets and resources of local police agencies are not unlimited.  Local police agencies struggle every year to find the resources to police and serve their respective communities. Since the events of September 11, local agencies have taken on the added duty of serving as the first line of defense and response to terrorist attacks for our country.  These efforts on the local level to deter and prevent another terrorist attack and to be prepared to respond to the aftermath of an attack have stretched local resources even further.  Since the creation of the Homeland Security Department, federal funding for major city police departments has been greatly reduced.  Local agencies have also had to take on more responsibilities in areas that have traditionally been handled by the F.B.I. whose investigative resources are now more focused on counter-terrorism efforts.  Local agencies are forced to fill the gap left by the shift of federal resources away from investigating white-collar crimes and bank robberies; areas traditionally handled by federal agencies.

Enforcement of federal immigration laws would be a burden that most major police agencies would not be able to bear under current resource levels.  The cost in terms of personnel, facilities and equipment necessary for local agencies to address the 8-12 million illegal immigrants currently living in the United States would be overwhelming.  The federal government which has primary authority to enforce immigration laws has itself failed to provide the tremendous amount of resources necessary to accomplish such enforcement to its own agencies specifically charged with that responsibility.  Local communities and agencies have even fewer resources to devote to such an effort than the federal government given all the numerous other demands on local police departments.

Local police agencies must meet their existing policing and homeland security duties and can not even begin to consider taking on the added burden of immigration enforcement until federal assistance and funding are in place to support such enforcement.  Current calls for local police agencies to enforce immigration come with no clear statement or guarantee to provide

6

A344

adequate federal funding.  Local agencies also fear that the call for local enforcement of immigration laws signals the beginning of a trend towards local police agencies being asked to enter other areas of federal regulation or enforcement.

### 3)  Complexity of Federal Immigration Law

Federal immigration laws are extremely complicated in that they involve both civil and criminal aspects.  The federal government and its designated agencies such as I.C.E. and the Department of Justice have clear authority and responsibility to regulate and enforce immigration laws.  It is these federal agencies who have the authority to determine if a person will be criminally prosecuted for their violations of immigration laws or be dealt with through a civil deportation process. Based on their authority, training, experience and resources available to them, these federal agencies and the federal courts are in the best position to determine whether or not a person has entered or remained in the country in violation of federal regulations and the applicability of criminal sanctions.

Immigration violations are different from the typical criminal offenses that patrol officers face every day on their local beats.  The law enforcement activities of local police officers revolve around crimes such as murder, assaults, narcotics, robberies, burglaries, domestic violence, traffic violations and the myriad of other criminal matters they handle on a regular basis.  The specific immigration status of any particular person can vary greatly and whether they are in fact in violation of the complex federal immigration regulations would be very difficult if not almost impossible for the average patrol officer to determine.  At this time local police agencies are ill equipped in terms of training, experience and resources to delve into the complicated area of immigration enforcement.

### 4)  Lack of Local Authority and State Law Limitations of Authority

The federal government has clear authority over immigration and immigration enforcement. Federal law does not require the states or local police agencies to enforce immigration laws nor does it give the states or local agencies the clear authority to act in the area of immigration.

Laws in their respective states define the authority of local police officers. The authority of local police officers to act to enforce against criminal acts is clear and well established. However, federal immigration laws include both civil and criminal process to address immigration violations.  It is within the authority of federal agencies such as I.C.E. and the Department of Justice to determine if an immigration violation will be dealt with as a criminal matter or through a civil process. Given the complexity of the immigration laws, it would be difficult for local police agencies to determine if a particular violation would result in criminal charges or purely civil proceedings and regulation.  This duality in immigration law creates a gap in authority for local police officers who generally are limited to acting only in criminal matters.

In addition state laws may restrict a local police officer's authority to act even in criminal matters in such a way that it would prevent or hinder the officer's ability to investigate, arrest or detain a person for immigration violations alone.  Federal agents are specifically authorized to stop persons and conduct investigations as to immigration status without a warrant.  Local police

officers may be constrained by local laws that deal with their general police powers such as the ability to arrest without a warrant, lengths of detention and prohibitions against racial profiling.

An example of this conflict between the civil nature of immigration enforcement and the established criminal authority of local police exists in the federal initiative of placing civil immigration detainer notices on the N.C.I.C. system. The N.C.I.C. system had previously only been used to notify law enforcement of strictly criminal warrants and/or criminal matters. The civil detainers being placed on this system by federal agencies notify local officers that the detainers are civil in nature by including a warning that local officers should not act upon the detainers unless permitted by the laws of their state. This initiative has created confusion due to the fact that these civil detainers do not fall within the clear criminal enforcement authority of local police agencies and in fact lays a trap for unwary officers who believe them to be valid criminal warrants or detainers.

## 5) Risk of Civil Liability

In the past, local law enforcement agencies have faced civil litigation and liability for their involvement in immigration enforcement. For example, the Katy, Texas Police Department participated in an immigration raid with federal agents in 1994. A total of 80 individuals who were detained by the police were later determined to be either citizens or legal immigrants with permission to be in the country. The Katy police department faced suits from these individuals and eventually settled their claims out of court.

Because local agencies currently lack clear authority to enforce immigration laws, are limited in their ability to arrest without a warrant, are prohibited from racial profiling and lack the training and experience to enforce complex federal immigration laws, it is more likely that local police agencies will face the risk of civil liability and litigation if they chose to enforce federal immigration laws.

# D.   M.C.C. NINE (9) POINT POSITION STATEMENT

**Based upon a review, evaluation and deliberation regarding the important and complex issue of local enforcement of federal immigration laws, the members of M.C.C., who are the 57 Chief Executive Officers of police departments located within a metropolitan area of more than 1.5 million population and which employs more than 1,000 law enforcement officers, hereby set forth our consensus position statement, which is comprised of nine crucial components.**

**1)      SECURE THE BORDERS**

**Illegal immigration is a national issue and the federal government should first act to secure the national borders to prevent illegal entry into the United States. We support further and adequate funding of the federal agencies responsible for border security and immigration enforcement so they can accomplish this goal. We also support consideration of all possible solutions including construction of border fences where appropriate, use of surveillance technologies and increases in the number of border patrol agents.  Only when the federal government takes the necessary steps to close the revolving door that exists at our national borders will it be possible for local police agencies to even begin to consider dedicating limited local resources to immigration enforcement.**

**2)      ENFORCE LAWS PROHIBITING THE HIRING OF ILLEGAL IMMIGRANTS**

**The federal government and its agencies should vigorously enforce existing immigration laws prohibiting employers from hiring illegal immigrants. Enforcement and prosecution of employers who illegally seek out and hire undocumented immigrants or turn a blind eye to the undocumented status of their employees will help to eliminate one of the major incentives for illegal immigration.**

**3)      CONSULT AND INVOLVE LOCAL POLICE AGENCIES IN DECISION MAKING**

**Major Cities Chiefs and other representatives of the local law enforcement community such as the International Association of Chiefs of Police and local district attorneys and prosecutors should be consulted and brought in at the beginning of any process to develop a national initiative to involve local police agencies in the enforcement of federal immigration laws.  The inclusion of local law enforcement at every level of development would utilize their perspective and experience in local policing, address their concerns and likely result in a better program that would be more effectively implemented.**

**4)      COMPLETELY VOLUNTARY**

**Any initiative to involve local police agencies in the enforcement of immigration laws should be completely voluntary.  The decisions related to how local law enforcement agencies allocate their resources, direct their workforce and define the duties of their employees to best serve and protect their communities should be left in the control of state and local governments.  The decision to enter this area of enforcement should be left to the local government and not mandated or forced upon them by the federal government through the threat of sanctions or the withholding of existing police assistance funding.**

**5)      INCENTIVE BASED APPROACH WITH FULL FEDERAL FUNDING**

Any initiative to involve local police agencies in the enforcement of immigration laws should be an incentive based approach with full federal funding to provide the necessary resources to the local agencies that choose to enforce immigration laws.  Federal funds should be available to participating local agencies to cover the costs associated with enforcement such as expenditures on equipment and technology, training and educational programs and costs of housing, caring for and transporting immigrants prior to their release to federal authorities.

6)  NO REDUCTION OR SHIFTING OF CURRENT ASSISTANCE FUNDING

The funding of any initiative to involve local police agencies in the enforcement of immigration laws **should not** be at the detriment or reduction directly or indirectly of any current federal funding or programs focused on assisting local police agencies with local policing or homeland security activities.  Local police agencies are currently working on strained budgets and limited resources to meet local policing needs and strengthening homeland security and in fact need increased funding and grant assistance in these areas.  Merely shifting or diverting federal funding currently available for local policing and homeland security activities to any new immigration enforcement initiative would only result in a detrimental net loss of total resources available to local police agencies to police their neighborhoods and strengthen homeland security.

7)  CLARIFICATION OF AUTHORITY AND LIMITATION OF LIABILITY

The authority of local police agencies and their officers to become involved in the enforcement of immigration laws should be clearly stated and defined.  The statement of authority should also establish liability protection and an immunity shield for police officers and police agencies that take part in immigration enforcement as authorized by clear federal legislation.

8)  REMOVAL OF CIVIL IMMIGRATION DETAINERS
    FROM THE N.C.I.C. SYSTEM

Until the borders are secured and vigorous enforcement against employers who hire illegal immigrants has taken place and the concerns regarding lack of authority and confusion over the authority of local agencies to enforce immigration laws and the risk of civil liabilities are adequately addressed, M.C.C. strongly requests that the federal agencies cease placing civil immigration detainers on N.C.I.C. and remove any existing civil detainers currently on the system.  The integrity of the system as a notice system for criminal warrants and/or criminal matters must be maintained.  The inclusion of civil detainers on the system has created confusion for local police agencies and subjected them to possible liability for exceeding their authority by arresting a person upon the basis of a mere civil detainer.

**M.C.C. would encourage the federal agencies to seek federal criminal warrants for any person they have charged criminally with violations of immigration laws and submit those criminal warrants on the N.C.I.C. system so the warrants can be acted upon by local police officers within their established criminal enforcement authority and training.**

**9)   COMMITMENT OF CONTINUED ENFORCEMNT AGAINST CRIMINAL VIOLATORS REGARDLESS OF IMMIGRATION STATUS**

**M.C.C. member agencies are united in their commitment to continue arresting anyone who violates the criminal laws of their jurisdictions regardless of the immigration status of the perpetrator. <u>Those immigrants, documented and/or undocumented, who commit criminal acts will find no safe harbor or sanctuary from their criminal violations of the law within any major city but will instead face the full force of criminal prosecution</u>.**

11



HUMAN RIGHTS WATCH

عربي   中文   English   Français   Deutsch   日本語   Русский   Español   More +    **Get Involved**

| Home | Our Work | News | Publications | Multimedia | About Us | | Donate |

**NEWS**    News Releases    Commentary    Letters    Q & A's    Dispatches

AVAILABLE IN: _Español_    Print    Share

Amy Braunschweiger

Follow @amybrauns

Tweet 134   Like 182   EMAIL

## Nashville Immigrants Too Scared to Call the Police

MAY 19, 2014

Author(s):   Amy Braunschweiger
Published in:   New American Media

For years Claudia lived a clandestine life in Nashville's Clairmont Apartment complex – a clutch of buildings on the city's south side that had become home to hundreds of low-income immigrants. Claudia rarely ventured outside the lines of daily routine, prepping her three children for school, getting herself to work, and then quickly back home in the evening. An undocumented immigrant, Claudia lives in fear of US authorities. She is desperate to remain in the United States, as she fled Honduras after the father of her two daughters was murdered by gangs who also threatened Claudia and her girls.

US Immigration and Customs Enforcement agents detain a woman in Phoenix, Arizona on August 17, 2013.
© 2014 Reuters

Claudia's deliberately quiet life in Nashville ended when her daughter Adriana, then 10 years old, was assaulted in an isolated stairwell.

Claudia and her neighbors heard Adriana scream. Claudia raced to the stairwell. The man who assaulted Adriana tried to run, but neighbors captured him. At that moment, despite her horror of what happened, Claudia didn't want to call the police.

"One always has this fear of being illegal," she said.

Across Nashville and the rest of the United States, undocumented immigrants like Claudia are often terrified of the police – to the point that they hope to avoid officers even when they desperately need police protection. In Nashville and elsewhere, Human Rights Watch has interviewed immigrants who suffered assault, sexual

SUPPORT HUMAN RIGHTS DONATE NOW

CHARITY NAVIGATOR   Four Star Charity

BBB ACCREDITED CHARITY   bbb.org/charity

SIGN UP FOR OUR NEWSLETTER
email address   sign up

FOLLOW US

**LATEST NEWS**

Central African Republic: Multimedia Feature Recounts 2014 Violence
DECEMBER 30, 2014   Press release

Top Five Human Rights Watch Videos of 2014
DECEMBER 26, 2014   Commentary

Indonesia: Joint Inquiry Needed Into Papua Killings:
Credible Impartial Investigation, Witness Protection Crucial
DECEMBER 24, 2014   Press release

Civilians Despair as Both Sides Break the Rules in East Ukraine
DECEMBER 24, 2014   Commentary

Russia: Mass Terror Verdict
Strong Evidence Defendants Tortured, But No Investigation
DECEMBER 24, 2014   Press release

Top Human Rights Stories of 2014
DECEMBER 23, 2014   Commentary

Human Rights Watch Daily Brief, 22 December 2014
Syria, Pakistan, North Korea, Cambodia, Journalists, Ukraine, Top Tweets of 2014
DECEMBER 23, 2014   Commentary

Syria: Escalating Assault on Rebel-Held District
Indiscriminate Attacks, Increased Restrictions in Homs
DECEMBER 23, 2014   Press release

MORE NEWS »

harassment, labor violations, being kidnapped, or robbed and were still scared to call the police. Some are terrified of calling an ambulance in an emergency. Not only does this mean immigrant communities may not receive the help that they need – it also means more violent criminals will likely remain free, staking out new victims.

This fear, which permeates entire immigrant communities, became more pronounced when local police officers in many cities like Nashville began working in tandem with the US agency that enforces immigration law and deportations, Immigration and Customs Enforcement (or "ICE"). Since 2007, Nashville has taken part in two such programs which, to varying extents, mandated that law enforcement work together with ICE. Both these programs have seriously damaged the relationship between immigrants and the police.

Yet Nashville, like many places within the United States, has had an evolving and contradictory relationship with their growing immigrant populations. Some local law enforcement officials have called for crackdowns on immigrants and collaborated with harsh federal immigration enforcement policies. At the same time, Nashville launched "El Protector," an outreach program established in 2004 where police actively seek to build ties and trust with the city's immigrants. And Nashville's local nongovernmental organizations along with concerned citizens have pushed for greater tolerance and dialogue. All these factors work together to form the essential relationship between authorities and immigrants – ties that, if made correctly, could help keep people safe.

Nashville is emblematic in the debate over how the United States interacts with undocumented immigrants. During the 2000s, Nashville's foreign-born population doubled, soaring from 58,539 in 2000 to 118,126 in 2010 – becoming 7.4 percent of Nashville's total population. By the mid-2000s, the state of Tennessee began to clamp down, barring unauthorized immigrants from obtaining drivers' licenses and creating barriers to social services such as healthcare for low-income people.

The first program in which Nashville police collaborated with ICE was called "287(g)," a reference to the relevant section of the Immigration and Nationality Act. Under this program, specially trained local law enforcement officers are authorized by the federal government to identify and detain deportable immigrants they encounter in the course of their daily duties. In other words, any run-in with police could lead to deportation for any immigrant – even if he or she was not charged with a crime and had no criminal record.

The assault against Claudia's daughter happened in 2010, when Nashville was still part of 287(g), which helps explain Claudia's reluctance to call the police.

Under political pressure and the threat of lawsuits, the Davidson County Sheriff in Nashville announced in 2012 that 287(g) would no longer be necessary because "the program was not having significant impact" in the community. Police officers for the city of Nashville told Human Rights Watch they understood the program had created a "culture of fear" in the community and hoped the end of 287(g) would mean "new ways to engage with law enforcement." Unfortunately, when the 287(g) program ended, Nashville had already begun participating in another program, "Secure Communities" (which ICE claims is mandatory and is in effect across the United States). Under this program, immigrants are flagged for possible deportation through a database whenever their fingerprints are taken. If the program is implemented as intended, fingerprints of people in police custody submitted by local law enforcement to the FBI for background checks are automatically searched against immigration databases. If ICE determines that a person may be deportable it requests that local law enforcement detain him or her for transfer to ICE and possible deportation.

A worrying byproduct of both programs is the chilling effect they have had on crime victims' willingness to report crimes and collaborate with law enforcement. Despite efforts to improve outreach to immigrants, with Secure Communities still in place and without congressional action on immigration reform, deep fears that contacting the police could trigger deportation persist.

They appear to be well-founded. Between August 2010 and May 31, 2013, Nashville's Davidson County identified 9,632 people as "matches" with ICE databases and likely flagged them for deportation via Secure Communities. These figures appear quite similar to those from the 287(g) program. According to ICE, from 287(g)'s inception in April 2007 through August 2012, 10,785 people were identified for deportation.

In Claudia's case, her neighbors ultimately convinced her that the police should be called. The man who assaulted her daughter needed to be stopped from hurting others, they said. After Claudia relented, a neighbor called the police.

Claudia even agreed that her daughter could testify at the trial. She was told that she and her daughter likely now qualified for a U visa, created for crime victims. But during the trial, local police together with ICE raided Claudia's building, searching for suspected gang members. Her terror of deportation took hold, and she fled the next day, as did many of her neighbors. She purposefully isolated herself, missed court dates for Adriana's assailant's trial, and was even too afraid to meet with lawyers about the potential visas.





She fled because, ultimately, living underground in the United States was better than going back to Honduras, where she feared for her own and her daughters' lives.

Claudia and her neighbors weren't wrong in assuming that a run-in with Nashville's police in 2010 could lead to deportation. The 287(g) program, implemented in Nashville from 2007 to 2012, was supposed to weed out serious criminals in the immigrant community. But this isn't what happened.

During this time, unauthorized immigrants who were caught fishing without a license or driving without a taillight had deportation proceedings brought against them. A study by the American Civil Liberties Union (ACLU) shows that before 287(g), the percentage of people in Nashville's Davidson County who were arrested and then deported for driving without a license is 18 percent. After 287(g) began, that number skyrocketed to 43 percent.

During our research in Nashville in 2013, the unauthorized immigrants Human Rights Watch interviewed all had knee-jerk reactions in wanting to keep officers far away. Ultimately, however, most did call the police. But this may not always be the case.

A 2008 study by the National Council of La Raza and the Tennessee Immigrant and Refugee Rights Coalition compared how African Americans and Latinos responded to crime. Their information showed that only 4 percent of Black respondents said they knew of a crime that had not been reported to the police. However, a massive 42 percent of Latinos answered the same way. Also telling: while 27 percent of Blacks said they would not call the police to report a crime, 54 percent of Latinos would not.

Elena's story illustrates why this fear of contacting authorities wasn't unfounded. Elena, living in Nashville but originally from Mexico, had just given birth to her son, Luis. She had been home from the hospital for four days when she heard a knock on her door and found a woman posing as an immigration official, saying that Elena was to be deported and her children taken into government custody. The woman tried to force her way into Elena's home, and in the struggle, she stabbed Elena 12 times, then kidnapped her baby boy.

Yet even in the wake of this horrific attack, Elena recalls that her immediate response to cries by neighbors to call 911 was to say "No."

"I still think about it ... I was more concerned about my legal status," she said. "Even when I was in the ambulance, bleeding, the thing I kept thinking was 'Who will take care of my children when I am deported?'"

Elena's assailant was apprehended in Alabama. But instead of having her kidnapped child and her other children returned, they were all taken into temporary custody by child-protective service officials, while the FBI and police investigated a claim by the kidnapper that Elena had agreed to sell her baby. It took weeks before Elena regained custody of her four children. The assailant later pled guilty to kidnapping and was sentenced to 20 years in prison.

Ultimately, many in Nashville acknowledged the rift 287(g) created between the police and the immigrant community – a divide that makes Nashville a more dangerous city, as criminals are not necessarily properly apprehended – and some hoped the switch to Secure Communities would help heal the divide. But even that program still effectively intermingles federal immigration enforcement with public safety and feeds mistrust between police and the community.

Nashville is still dealing with people who are terrified of reporting crimes, and they're haunted by memories of families and friends being treated as criminals, or even deported, when they did so. Much of the terror is related to fall-out from 287(g), but some goes even deeper. Many immigrants come from countries where police are corrupt – and even violent – and not to be trusted. It can be a challenge to temper these inherent fears.

Nashville's El Protector program has helped. Under El Protector, officers conduct community meetings, go door-to-door in commercial strips, host youth camps, health fairs and sponsor community festivals. They also maintain a network of volunteer translators who are given dedicated cell phones and are on call to help when police are faced with a non-English-speaking victim or subject of a law enforcement stop. They work on improving their relationships with the community and on educating people on the importance of reporting crimes.

But Nashville, indeed the state of Tennessee and other states and localities across the nation, should go further in repairing their relationships with immigrant communities and in treating immigrants fairly under the law. California, for example, passed the TRUST Act in October 2013, under which local law enforcement may respond to a request from immigration authorities to hold a flagged immigrant only if the immigrant has been convicted or arrested for certain serious offenses. Similarly, a Chicago ordinance prohibits local law enforcement from detaining individuals for immigration authorities except in certain instances, such as when individuals are charged with or convicted of felonies. A federal court in Oregon recently found that counties

A352



could not detain people solely for ICE without violating their constitutional rights.  In the wake of the decision, over a dozen Oregon counties announced that they would no longer comply with ICE "holds" or requests that a non-citizen be held.

State bills similar to California's have been proposed in Massachusetts and Maryland while in other places governors and local officials have acted to break the link between public safety and immigration enforcement. These laws and policies are not perfect. They still expose some immigrants to the harsh federal immigration regime that fails to consider family or community ties.  However, they have the potential to begin to rebuild the trust of immigrant communities in law enforcement and ensure that all crime victims and witnesses can have recourse to the police.

As Elena explains, the stakes, in terms of ensuring the safety of immigrants and citizens alike couldn't be higher: "I feel tranquil now because I have my child and I am alive. But do I feel secure? Never."

(pseudonyms used to protect the privacy and identities of interviewees)

ALSO AVAILABLE IN: Español

SHARE : FACEBOOK   LINKEDIN   EMAIL   REDDIT   STUMBLEUPON   TWITTER   GOOGLE +

MORE REPORTING ON: Unfair Immigration Policies, United States, US Domestic Policy

| Home | Our Work | News | Publications | Multimedia | About Us | Contact Us | Film Festival | Donate |

**BROWSE BY REGION**
Africa
Americas
Asia
Europe/Central Asia
Middle East/N. Africa
United States

**BROWSE BY COUNTRY**

**BROWSE BY TOPIC**
Arms
Business
Children's Rights
Counterterrorism
Disability Rights
Environment

ESC Rights
Free Speech
Health
International Justice
LGBT Rights
Migration

Refugees
Terrorism
Torture
United Nations
Women's Rights

Human Rights Watch
350 Fifth Avenue, 34th Floor
New York, NY 10118-3299
USA
Tel: 1-(212) 290-4700

**Contact Us - Global Offices**
**Film Festival**
**Employment**

| Site Map | Privacy Policy | Corrections | Permissions |
© Copyright 2014, Human Rights Watch

# The Role of Local Police

Striking a Balance
Between Immigration Enforcement
and Civil Liberties





POLICE
FOUNDATION

# The Role of Local Police:

## Striking a Balance Between Immigration Enforcement and Civil Liberties

### by Anita Khashu

April 2009



Washington, DC

The Police Foundation is a national, nonpartisan, nonprofit organization dedicated to supporting innovation and improvement in policing. Established in 1970, the foundation has conducted seminal research in police behavior, policy, and procedure, and works to transfer to local agencies the best information about practices for dealing effectively with a range of important police operational and administrative concerns. Motivating all of the foundation's efforts is the goal of efficient, humane policing that operates within the framework of democratic principles and the highest ideals of the nation.

©2008 by the Police Foundation. All rights, including translation into other languages, reserved under the Universal Copyright Convention, the Berne Convention for the Protection of Literary and Artistic Works, and the International and Pan American Copyright Conventions. Permission to quote is readily granted.

ISBN   1-884614-23-X
       978-1-884614-23-1

Library of Congress Control Number: 2009924868



**1201 Connecticut Avenue, NW**
**Washington, DC 20036-2636**
**(202) 833-1460 voice**
**(202) 659-9149 fax**
**pfinfo@policefoundation.org**
**www.policefoundation.org**

An executive summary and the full report of *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties* are available online at http://www.policefoundation.org/strikingabalance/.

# Table of Contents

**Contributors** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **vi**

**Foreword** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **vii**

**Acknowledgments** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **x**

**Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **xi**

**About the Project** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**History of the Role of Local Police in Immigration Enforcement** . . . . . . . . . . . . . . . . . . . . **2**

**The Call for Greater Enforcement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

    Demographic changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

    Perceptions of immigrant criminality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

    Economic costs and benefits of migration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

    Political pressure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

    Counterterrorism . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

**Do Local and State Police Have Legal Authority** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**
**to Enforce Federal Immigration Law?**

**Is Immigration Enforcement a Federal or Local Responsibility?** . . . . . . . . . . . . . . . . . . . . **17**
**The Local Police Perspective**

**The Various Ways in Which Local Law Enforcement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**
**and Federal Immigration Officials Collaborate**

**State and Local Law Enforcement of Immigration Law:** . . . . . . . . . . . . . . . . . . . . . . . . . . **21**
**Benefits and Costs**

    BENEFITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

    Reduce jail population and save detention costs . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

    Deterrent to unauthorized immigration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

    Criminal enforcement tool . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

    Counterterrorism . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

    Access to federal databases to verify identity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

    Immigration violators are lawbreakers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

    COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

    Reduced trust and cooperation in immigrant communities. . . . . . . . . . . . . . . . . . . . **23**
      would undermine public safety

    Increased victimization and exploitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**
      of undocumented immigrants

    Police misconduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

    Large financial costs of immigration enforcement . . . . . . . . . . . . . . . . . . . . . . . . . **26**
      diverts resources from traditional law enforcement activities

    Complexity of federal immigration law and difficulty in verifying . . . . . . . . . . . . . . **27**
      immigration status

    Racial profiling and other civil litigation costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

    Immigrants will fear accessing other municipal services . . . . . . . . . . . . . . . . . . . . . **30**

## Table of Contents

**Striking a Balance Between Immigration Enforcement** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**
**and Civil Liberties: Recommendations**

The costs of the 287(g) program outweigh the benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

Police officers should be prohibited from arresting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**
and detaining persons to solely investigate immigration
status in the absence of probable cause of an independent crime

If a local agency enters the 287(g) program, it should limit . . . . . . . . . . . . . . . . . . . . . . . . . . **32**
participation to serious criminal offenders and jail-based programs

Implement policies and procedures for monitoring and . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**
enforcing racial profiling violations

Involve community members in developing immigration policies . . . . . . . . . . . . . . . . . . . . . . . **32**

Evaluation research should be conducted of the 287(g) program . . . . . . . . . . . . . . . . . . . . . . **33**
and other local immigration enforcement initiatives

Employ community-policing and problem-solving tactics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**
to improve police-community relations with immigrant communities
and resolve tension caused by expanding immigration

The federal government must enact comprehensive border security . . . . . . . . . . . . . . . . . . . **34**
and immigration reforms

**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**

**Notes** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**

**References** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**

**Appendices** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **40**

A.  *Focus Group Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **41**
ANITA KHASHU

B.  *Legal Issues in Local Police Enforcement of Federal Immigration Law* . . . . . . . . . . . . . . **69**
NANCY MORAWETZ AND ALINA DAS

C.  *Making Civil Liberties Matter in Local Immigration Enforcement* . . . . . . . . . . . . . . . . . . . **91**
RAQUEL ALDANA

D.  *Undocumented Immigration and Rates of Crime and Imprisonment:* . . . . . . . . . . . . . . **119**
*Popular Myths and Empirical Realities*
RUBÉN G. RUMBAUT

E.  *Why Integration Matters: The Case of Undocumented Immigrant Youth* . . . . . . . . . . . . **140**
*and Moving Beyond Enforcement*
ROBERTO G. GONZALES

F.  *Local Enforcement of Immigration Laws:* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **155**
*Evolution of the 287(g) Program and Its*
*Potential Impacts on Local Communities*
RANDOLPH CAPPS

G.  *Immigration and Local Policing: Results from a National Survey* . . . . . . . . . . . . . . . . . . **169**
*of Law Enforcement Executives*
SCOTT H. DECKER, PAUL G. LEWIS, DORIS MARIE PROVINE, AND MONICA W. VARSANYI

## Table of Contents

H.   *Law Enforcement Executive Views: Results from the Conference Survey*  . . . . . . . . . . . **180**
     KAREN L. AMENDOLA, KRISTIN N. WILLIAMS, EDWIN E. HAMILTON,
     and VERONICA PURYEAR

I.   *Unauthorized Immigrants: Trends, Characteristics, and Surprises*  . . . . . . . . . . . . . . . . . . **184**
     JEFFREY S. PASSEL

J.   *Conference Keynote Address* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **188**
     PHIL GORDON

K    *Collier County Sheriff's Office Criminal Alien Task Force* . . . . . . . . . . . . . . . . . . . . . . . . . **194**
     *An Overview of the 287(g) Program: Strategy, Outcomes,*
     *and Benefits of the Partnership*
     DON HUNTER

L.   *Fear, Crime, and Community Trust: Community Perspectives* . . . . . . . . . . . . . . . . . . . . . . **199**
     *on Immigration Enforcement by Local Police*
     KAREEM SHORA

M.   *Remarks*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **204**
     JULIE ERFLE

N.   Conference Agenda and Presenters' Bios  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **205**

O.   Sample Police Department Policies on Immigration Enforcement  . . . . . . . . . . . . . . . . . . **215**

**Illustrations**

FIGURES

1.   Immigrant numbers keep growing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

2.   New immigration growth centers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

3.   Unauthorized number high . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

4.   Percentage of police departments that typically check immigration status  . . . . . . . . . . . **18**
     and/or contact ICE, when encountering possible unauthorized
     immigrants in these situations

5.   1990-2000 immigration growth patterns and location . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**
     of 287(g) programs across the states

6.   Likelihood of crime perpetration and victimization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

TABLES

1.   Highest ranked agency concerns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

A359

## Contributors

**RAQUEL ALDANA**
Professor of Law
William S. Boyd School of
    Law
University of Nevada
Las Vegas, Nevada

**KAREN L. AMENDOLA**
Chief Operating Officer
Research, Evaluation, and
    Professional Services
Police Foundation
Washington, DC

**RANDOLPH CAPPS**
Demographer and Senior
    Policy Analyst
Migration Policy Institute
Washington, DC

**ALINA DAS**
Immigrant Defense Fellow
New York University School
    of Law
New York, New York

**SCOTT H. DECKER**
Professor and Director of
    the School of Criminology
    and Criminal Justice
Arizona State University
Tempe, Arizona

**ROBERTO G. GONZALES**
Acting Assistant Professor
School of Social Work
University of Washington
Seattle, Washington

**EDWIN E. HAMILTON**
Professional Services
    Director
Police Foundation
Washington, DC

**ANITA KHASHU**
Former Director
Center on Immigration and
    Justice
The Vera Institute of Justice
New York, New York

**PAUL G. LEWIS**
Associate Professor of
    Political Science
Arizona State University
Tempe, Arizona

**NANCY MORAWETZ**
Professor of Clinical Law
New York University School
    of Law
New York, New York

**JEFFREY S. PASSEL**
Senior Demographer
Pew Hispanic Center
Washington, DC

**DORIS M. PROVINE**
Professor
School of Justice and Social
    Inquiry
Arizona State University
Tempe, Arizona

**VERONICA PURYEAR**
Senior Research Associate
Police Foundation
Washington, DC

**RUBÉN G. RUMBAUT**
Professor of Sociology
University of California
Irvine, California

**MONICA W. VARSANYI**
Associate Professor of
    Government
John Jay College of
    Criminal Justice
New York, New York

**KRISTIN N. WILLIAMS**
Research & Administrative
    Coordinator
Police Foundation
Washington, DC

---

**EDITOR:**

**MARY MALINA**
Communications Director
Police Foundation
Washington, DC

## Foreword

AMERICA'S EFFORTS TO FIND EFFECTIVE solutions to its undocumented immigration problem resulted in a series of debates at the federal, state, and local levels. These debates revealed the emotional intensity surrounding the issue and disclosed divisions in the political and social fabric of the country, all within the backdrop of a presidential election.

The failure of Congress to move forward with the development of a comprehensive national solution to this problem prompted states and localities to act unilaterally in passing legislation to curb immigration by penalizing employers who hire immigrants, prohibiting undocumented immigrant access to government benefits and services, and intensifying enforcement of immigration laws. These measures generated so much fear and uncertainty that large numbers of immigrants simply uprooted, leaving communities where they had lived for years.

This "immigration emergency" and demographic shift of the undocumented population resulted in an expansion of the role of federal immigration officials from maintaining the security of the borders to the enforcement of immigration laws in cities, towns, and villages throughout the United States. The relocation of immigrants from farming communities and predominately rural areas to cities and suburban communities has resulted in a cultural clash and generated a backlash against immigrants, who look different, speak foreign languages, and do not fit well within the social and political milieu of communities.

The influx of the immigrant population into cities and suburban communities has caused the federal government to reallocate a higher percentage of its resources to these areas and to encourage greater cooperation and support from state and municipal law enforcement agencies. Prior to 1996, the role of local police in immigration enforcement had been limited to such things as sharing information, providing back-up support for field operations, coordinating efforts, and holding and transferring prisoners. In 1996, when the Illegal Immigration Reform and Immigrant Responsibility Act added Section 287(g) to the Immigration and Nationality Act, local police, upon entry into a memorandum of agreement with the U.S. Department of Homeland Security (DHS), were granted the authority to enforce federal immigration laws.

Pursuant to Section 287(g) agreements, police who meet the requisite federal training standards are authorized to enforce federal immigration law under the supervision of DHS. Local police are provided direct access to DHS databases and authorized to initiate the deportation process. This enables local police to remove serious criminal offenders from the community more expeditiously and in a less costly manner by leveraging federal resources to deport them. Notwithstanding the benefits derived from Section 287(g), only a fraction of a percentage of police and sheriffs' departments has opted to participate.

There are good reasons for this. Police chiefs know that to be effective at crime control in this community-policing era, they must have public support. If local police are perceived as immigration enforcement officers, immigrants—both documented and undocumented—will avoid contact with police because of fear of arrest and deportation of themselves or a family member; 85 percent of immigrants in the U.S. live in mixed-status families. During our focus groups, representatives of the immigrant community told us that they avoided going outside of their homes whenever immigration authorities were in town. One mother said that she would not even go to the store to buy milk for her baby due to fear of arrest and deportation.

## Foreword

The reluctance of local police to enforce immigration law grows out of the difficulty of balancing federal and local interests in ways that do not diminish the ability of the police to provide for public safety, which depends heavily on public trust. In communities where people fear the police, very little information is shared with officers, undermining the police capacity for crime control and quality service delivery. As a result, these areas become breeding grounds for drug trafficking, human smuggling, terrorist activity, and other serious crimes.  As a police chief in one of the focus groups asked, "How do you police a community that will not talk to you?"

In order to overcome these obstacles, police departments should take appropriate measures to improve relationships with immigrant communities.  They can do so by learning more about the cultures and traditions of immigrants who live within their jurisdictions.  They should develop the capacity to communicate with immigrants more effectively by encouraging officers to become more proficient in Spanish and ensuring that department representatives who can speak other languages are available.  The police need to pursue these goals so that they can tap into the wealth of information and knowledge about things that are going on within the immigrant community.  This in turn facilitates their ability to control crime, maintain public safety, and provide meaningful support to DHS in its efforts to prevent another terrorist attack within the United States.

Local police chiefs recognize the importance of mutually cooperative and supportive relationships among law enforcement authorities, especially in efforts to remove violent offenders from communities.  They understand such cooperation strengthens the capacity of government at all levels to ensure that our communities and our nation remain safe and secure.  Nevertheless, the states, in establishing a federal government, determined immigration enforcement to be a federal responsibility.  Hence, the enforcement of federal laws do not supersede the responsibilities of local police to enforce state statutes and provide for the public safety as derived from the police powers embodied within the reserve clause of the Tenth Amendment to the United States Constitution.

As the role of local police shifts from a concentration on public safety issues to immigration enforcement, the perception that immigrants have of police presence changes from protection and service to arrest and deportation.  Police chiefs must carefully weigh and balance these divergent responsibilities to ensure that the primary mission and purpose of the police department is not compromised by the voluntary assumption of immigration enforcement responsibilities.  Therefore, the question for local police is not merely what they do, but how they do it.  To the degree that police departments can support the efforts of DHS without sending a message to the public that local police have become immigration enforcement officers and that contacts with them could result in deportation, mutual cooperation can be beneficial to all parties.

When local police execute the powers of immigration enforcement officers—as is the case when they check for green cards at roadblocks, or stop people for motor vehicle violations and request documentation or information associated with immigration status—they execute an immigration enforcement function in contacts with the general public. As a result, they assume all of the attendant risks and consequences associated with such activities. These risks are diminished considerably when the exercise of police authority does not involve contacts with the general public, such as would be the case when officers are processing prisoners in connection with

## Foreword

DHS to determine whether there are any outstanding warrants or holds against those individuals, or when transferring prisoners with warrants or holds into the custody of DHS.

Finally, local police are part of our nation's framework of institutions and organizations that insure the strength of our democratic republic by maintaining safe and secure communities. The effectiveness of the police is heavily dependent upon the nature of the relationship they have with the general public and the degree to which the police and community are able to work collaboratively to resolve crime problems. Every effort should be made to establish a mutually cooperative and supportive working relationship between local police and the immigrant communities they serve. Police departments that opt to enforce federal immigration law should do so in a manner that does not erode their relationship with immigrant communities or subordinate municipal interests to those of the federal government.

**HUBERT WILLIAMS**
President
Police Foundation

# Acknowledgments

As in any large-scale project, the Police Foundation owes a debt of gratitude to many people who shared their time, talent, insight, support, and experience to ensure its success. We are grateful to the Ford Foundation for its support and guidance. An advisory board of distinguished members of the legal, academic, and public policy communities guided the project from its inception and we gratefully acknowledge the following members for their contributions:

Pablo Alvarado
Executive Director
National Day Laborer Organizing Network

Professor Robert L. Bach
Center for Homeland Defense and Security
Naval Postgraduate School

George H. Bohlinger III
Managing Partner
Hanover Partners, LLP

Muzaffar Chishti
Director, Migration Policy Institute
at New York University School of Law

Professor David D. Cole
Georgetown University Law Center

Wade Henderson
Executive Director
Leadership Conference on Civil Rights

Professor Alex Piquero
Department of Criminology and Criminal Justice
University of Maryland-College Park

Honorable Vanessa Ruiz
District of Columbia Court of Appeals

Kareem Shora
National Executive Director
American-Arab Anti-Discrimination Committee

We learned a tremendous amount from the generous participation of all those who took part in our focus groups and especially thank the following law enforcement executives who organized participation in each of the sites: Chief Theron Bowman, Arlington (TX) Police Department; Sheriff Don Hunter, Collier County (FL) Sheriff's Office; Chief Ron Miller, Topeka (KS) Police Department; and Chief Richard Wiles, El Paso (TX) Police Department.

We thank the scholars, policy makers, law enforcement professionals, and immigrant community representatives from across the U.S. who participated in our national conference and greatly appreciate the distinguished assembly of conference presenters whose contributions informed both the conference and this report. The conference agenda and presenter information can be found in Appendix N. We appreciate Raquel Manso's work on the project, especially her efforts in coordinating the focus group process. We owe a special thanks to Anita Khashu, who carefully reviewed volumes of project material, data, and external resources to create both the focus group summary and final report narrative. We are grateful to Mary Malina, who served as editor and oversaw the production of the report.

Finally, this project, like all foundation projects, reflects the enormous talent, effort, and commitment of the staff of the Police Foundation.

**Hubert Williams**
President
Police Foundation

## Executive Summary

In recent years, the United States has experienced historically high rates of immigration. Not only has the population of immigrants increased four-fold since the 1970s, in the last fifteen to twenty years immigrants have also settled away from traditional gateway cities and into new destinations throughout the country that have had very little experience with integrating new immigrants. The immigrant population has also grown more diverse, originating from all parts of the globe, in particular Latin America and Asia versus the predominantly Caucasian European migration of the early twentieth century. These demographic shifts have produced racial tensions, particularly in new destination communities, and given rise to contentious debate about the nation's immigration policies and practices, with longstanding resident communities demanding that government—federal, state, and local—more aggressively enforce immigration laws.

Traditionally, the prevailing view was that the responsibility for enforcing federal immigration laws was solely in the purview of the federal government. In recent years, however, local law enforcement agencies throughout the country have been drawn into the middle of the immigration debate, especially since 9/11, through pressure placed on them by their elected leaders, their communities, and the media to engage in federal immigration enforcement, a responsibility that has not traditionally been part of their organizational mandate. Beginning in the 1990s, federal immigration agencies, overwhelmed by the enormity of the task of apprehending, detaining, and deporting the country's almost twelve million unauthorized immigrants, launched programs and initiatives to induce the cooperation and assistance of the nation's approximately 18,000 state and local law enforcement agencies in identifying and deporting unauthorized immigrants living in the interior of the country. Prior to 1996, these programs

were mostly directed at improving cooperation between local law enforcement and federal immigration authorities with respect to criminal detainees. In 1996, however, Congress passed legislation expanding the role of local law enforcement in federal immigration enforcement. The most well-known program is the U.S. Immigration and Customs Enforcement's (ICE) 287(g) program, which authorizes federal officials to enter into written agreements with state and local law enforcement agencies to carry out the functions of immigration officers, including investigation, apprehension, and detention.

While local law enforcement agencies collaborate with federal immigration authorities in a wide range of activities, most of this project's discussions focused on the ICE 287(g) program. Police executives have felt torn between a desire to be helpful and cooperative with federal immigration authorities and a concern that their participation in immigration enforcement efforts will undo the gains they have achieved through community oriented policing practices, which are directed at gaining the trust and cooperation of immigrant communities. Police are also concerned about the impact of local law enforcement of immigration law on already strained state and local resources, and particularly on the ability of local law enforcement to maintain its core mission of protecting communities and promoting public safety.

With support from the Ford Foundation, the Police Foundation launched a national effort to bring together law enforcement agencies, public officials, and community stakeholders to collaboratively examine the implications of local law enforcement of immigration laws. The main goal of the project was to provide local law enforcement with a venue to debate and disseminate their perspectives on the issue of their role in immigration enforcement so that they may have an influence in the national policy

## Executive Summary

debate. A central project component was a series of focus groups held across the country that included local police, public officials, and representatives of immigrant communities and designed to elicit the perspectives and insights of those directly impacted by the issues surrounding immigration. The conversations and questions raised in the focus groups influenced the development of the agenda for a national conference in Washington in August 2008, at which scholars, policy makers, law enforcement professionals, and immigrant community representatives from across the U.S. participated in facilitated discussions and presented data and research on the issues involved in the debate. Finally, a short written survey was distributed to law enforcement executives who attended the national conference.

Although there were clearly differences of opinion among the diverse group of law enforcement representatives participating in the various project activities regarding the costs and benefits of local law enforcement participation in federal immigration enforcement, a majority of police chiefs seem to regard the costs of participation in civil immigration enforcement efforts, where there is no criminal nexus, as outweighing the potential benefits. In particular, many police executives were concerned with the impact on the relationship between immigrant communities and police and the probability of reduced cooperation of witnesses and victims of crime, thereby having a negative overall impact on public safety. They were also concerned about increased victimization and exploitation of immigrants, a possible increase in police misconduct, the fiscal impact on law enforcement budgets, the high possibility of error given the complexity of immigration law, the possibility of racial profiling and other civil lawsuits, and the effect on immigrant access to other municipal services. It also became clear, despite a healthy

level of debate over specific issues, that certain recommendations and policy positions listed below were widely held among the group.

■ The costs of participating in the U.S. Immigration and Customs Enforcement's (ICE) 287(g) program outweigh the benefits.

■ Police officers should be prohibited from arresting and detaining persons to solely investigate immigration status in the absence of probable cause of an independent state criminal law violation.

■ If a local agency nevertheless enters the 287(g) program, its participation should be focused on serious criminal offenders and should be limited to verifying the immigration status of criminal detainees as part of the 287(g) Jail Enforcement Officer program.

■ Local and state authorities participating in federal immigration enforcement activities should develop policies and procedures for monitoring racial profiling and abuse of authority.

■ In order to preserve the trust that police agencies have built over the years by aggressively engaging in community oriented policing activities, local law enforcement agencies should involve representatives of affected communities in the development of local immigration policies.

■ There is a need for empirical research on ICE's 287(g) program and other methods of police collaboration with federal immigration authorities so that we have more objective data by which to better understand the way in which these programs are carried out in the field and their impact on public safety and civil liberties.

■ Local law enforcement agencies should employ community-policing and problem-solving tactics to improve relations with immigrant communities and resolve tension caused by expanding immigration.

## Executive Summary

■ Local law enforcement leaders and policing organizations should place pressure on the federal government to comprehensively improve border security and reform the immigration system, because the federal government's failure on both issues has had serious consequences in cities and towns throughout the country.

While much of the dialogue generated during the project centered on the specific benefits and costs of local law enforcement participation in immigration enforcement, the conversation often reverted to discussions about the core role of police and general principles of community policing. Local police must serve and protect *all* residents regardless of their immigration status, enforce the criminal laws of their state, and serve and defend the Constitution of the United States. As police agencies move away from their core role of ensuring public safety and begin taking on civil immigration enforcement activities, the perception immigrants have of the role of police moves from protection to arrest and deportation, thereby jeopardizing local law enforcement's ability to gain the trust and cooperation of immigrant communities. "How can you police a community that will not talk to you?" asked one police chief participating in the project. Without the cooperation of immigrant witnesses and victims of crime, local law enforcement's ability to identify, arrest, and prosecute criminals is jeopardized.

Over the past fifteen years, the community-policing movement has made significant gains in making communities safer, and police executives participating in the project expressed concern that local immigration enforcement efforts threaten to undo these gains. The community-policing movement has demonstrated that the effectiveness of police is heavily dependent on the relationships the police have with the communities they serve. Therefore, in developing and monitoring local immigration policies, it is critical that local law enforcement regularly communicate with affected communities and make every effort to establish a mutually cooperative and supportive relationship with immigrant communities.

The final project report presents the most salient arguments, positions, points of consensus, and recommendations that arose during the focus groups, conference presentations and discussions, and survey responses. Also included, as appendices to the report, are a comprehensive summary of the focus group discussions, results of the conference law enforcement executive survey, the conference agenda, presenters' bios, selected presentations, sample police department policies on immigration enforcement, and six papers (abstracts below) prepared specifically for the national conference by scholars from various academic disciplines.

### Abstracts of Papers Prepared for This Project

*Legal Issues in Local Police Enforcement of Federal Immigration Law*
 **by Nancy Morawetz and Alina Das, New York University School of Law**

As local police consider taking on enforcement of federal immigration law, they should carefully consider the legal complexity of their role and legal constraints on methods of enforcement in a legal and institutional system that operates quite differently from local criminal justice systems. Local police enforcement of federal immigration law must account for local, state, and federal laws that govern the rights of community residents and

## Executive Summary

the obligations of localities. It must also account for the civil nature of most immigration violations. Most importantly, it must be conducted in a way that avoids several common misconceptions about the supposed targets of immigration law enforcement, including confusion over their rights, status, and place in the community. The risk of error is high, and already several localities have been subject to lawsuits over unlawful arrests and detentions, the use of racial profiling in enforcement, poor conditions of confinement, and other violations of law. This paper discusses the legal complexities of federal immigration law enforcement in the local setting and the changing demographics of communities. Risks of liability provide yet another factor for police departments to consider before making a decision about whether to tread into this new field of enforcement.

### Making Civil Liberties Matter in Local Immigration Enforcement
#### by Raquel Aldana, William S. Boyd School of Law, University of Nevada-Las Vegas

The exponential rise in local law enforcement involvement in the enforcement of immigration laws raises significant questions regarding a state's source of power to enforce a traditionally federal power. As well, this trend presents local police with new challenges on how to protect the civil liberties and retain the trust of immigrant communities. In this paper, the author explains the unresolved controversy of the source and scope of local powers to enforce federal immigration laws and details the civil liberties concerns that arise from local law enforcement's involvement in immigration enforcement. The author then offers recommendations for ensuring greater civil rights compliance by

local law enforcement agencies that still choose to enforce immigration laws, as well as explains immigrants' rights during these police encounters.

### Undocumented Immigration and Rates of Crime and Imprisonment: Popular Myths and Empirical Realities
#### by Rubén G. Rumbaut, University of California-Irvine

The perception that the foreign-born, especially "illegal aliens," are responsible for higher crime rates is deeply rooted in American public opinion and is sustained by media anecdote and popular myth. In the absence of rigorous empirical research, stereotypes about immigrants and crime often provide the underpinnings for public policies and practices, and shape public opinion and political behavior. These perceptions, however, are not supported empirically; in fact, they are refuted by the preponderance of scientific evidence. In addition to reviewing previous literature on immigrant criminality, Rumbaut looks at national violent and property crime rates since the early 1990s, during the period of highest immigration. He then analyzes incarceration rates of young men eighteen to thirty-nine, comparing differences between the foreign-born and the U.S.-born by national origin and by education, and, among the foreign-born, by length of residence in the U.S. Rumbaut also examines findings from two major surveys (IIMMLA and CILS) in Southern California, the region of greatest immigrant concentration in the United States, and focuses comparative attention on those nationalities representing distinct modes of incorporation.

## Executive Summary

*Why Integration Matters: The Case of Undocumented Immigrant Youth and Moving Beyond Enforcement*
**by Roberto G. Gonzales, University of Washington-Seattle**

Today's immigration debates have brought to the fore conflicting visions within the United States over how to address a population of eleven to twelve million undocumented immigrants. However, contemporary debates have yet to catch up to current realities and complexities of undocumented families and thus do not account, for the most part, for a growing population of undocumented children educated in the United States. Drawing upon three and a half years of fieldwork and over one hundred life histories with adult children of undocumented immigrants in Southern California, this paper seeks to address the complicated realities of contemporary immigration by examining the experiences of undocumented youth in the larger community context. It argues that while enforcement efforts are counterproductive, police and other community officials have an important role to play in the integration process of undocumented youth.

*Local Enforcement of Immigration Laws: Evolution of the 287(g) Program and Its Potential Impacts on Local Communities*
**by Randolph Capps, Migration Policy Institute**

By August 2008, sixty-two state and local agencies had entered into 287(g) agreements with U.S. Immigration and Customs Enforcement (ICE), although most were signed since 2005. Most of the jurisdictions adopting agreements are in southeastern and southwestern states, in conservative political areas, and in locations where recent growth in unauthorized immigration has been rapid. This paper begins with a brief timeline and overview of the 287(g)

program and discusses some of the broad outlines of how it has been implemented to date. Then, for further background, population and political trends that underlie the adoption of 287(g) programs across the country are discussed. The third section of the paper relates preliminary findings about the implementation of 287(g) in Arkansas, based on a site visit there in June 2008. The site visit to the adjacent communities of Rogers and Springdale, Arkansas, confirmed that 287(g) officers there were checking immigration status in a variety of operations, including: routine traffic stops, worksite investigations, drug raids, and at the county jails in both communities. Several hundred immigrants had been arrested, detained, and sent into the custody of ICE for deportation over the course of the first six months. Latino community leaders who had originally supported the program in Springdale had withdrawn their support due to the wide net that the 287(g) officers had cast, and the program's broad impacts on local residents, including schoolchildren. The paper ends with policy recommendations and general observations about potential impacts of 287(g) operations on cities, immigrant communities, and children.

*Immigration and Local Policing: Results from a National Survey of Law Enforcement Executives*
**by Scott H. Decker, Paul G. Lewis, Doris Marie Provine, Arizona State University, and Monica W. Varsanyi, John Jay College of Criminal Justice**

One of the most important challenges for law enforcement agencies in many communities is how to respond to immigration and the presence of undocumented residents. Departments often face conflicting pressures from local politicians, federal authorities, community groups, and the private sector. Yet they have

## Executive Summary

little available information to help them make sound policy decisions. This paper reports on the results of a recent nationwide survey of police executives on several issues, including differences between departments and communities and their attitudes about immigration and local law enforcement; relationships with federal immigration and customs enforce-ment authorities; and the range of policies on immigration policing being developed by cities and departments. The survey also explores levels of commitment to community policing practices and the potential for conflict with enforcement of immigration laws by local police.

## About the Project

IN RECENT YEARS, THE UNITED STATES HAS EXPERIENCED HISTORIC LEVELS OF IMMIGRATION. During this time, not only did the immigrant[1] population increase significantly but it also became more dispersed. Prior to 1990, immigrants tended to settle in the major gateway cities; beginning in the 1990s, they began moving to regions that have not been traditional draws for immigration. In addition, unlike the last great period of immigration in the early twentieth century, when the vast majority of immigrants were of European origin, the current immigrant population arrives from all parts of the globe and they bring with them a host of new languages and cultures. As these demographic shifts started changing the racial and cultural landscape of communities throughout the country and as local governments were struggling to deal with the challenges of integrating these new immigrants into their communities, the public began to demand government do more to enforce immigration laws.

Even prior to the terrorist attacks of September 11, 2001, proponents of tightening immigration control measures have argued that greater investment in immigration reform will improve public safety by reducing crime, despite significant evidence to the contrary. Following the 9/11 attacks, public debate has become even more rancorous and has led to calls for greater involvement of local and state governments in immigration control. As the federal government struggles to resolve the complex and difficult issues surrounding immigration, local police are faced with a serious dilemma regarding their role and responsibility in this area. On the one hand, the federal government is telling them that the enforcement of immigration laws by state and local governments will assist the nation in controlling undocumented immigration. On the other hand, they realize that enforcing immigration laws could undermine their efforts to build trust with immigrant communities, whose cooperation they need to effectively provide public safety and policing services.

To address the dilemma facing so many local police agencies about how to balance civil rights protections, community-policing priorities, and immigration enforcement, the Police Foundation launched a national effort to bring together law enforcement leaders, public officials, scholars, and community stakeholders to collaboratively examine the implications of local law enforcement of immigration laws. The goals of the project were to review practices, constitutional issues, and budgetary factors; to provide state and local agencies with data and recommendations to inform policy; and to facilitate dialogue between immigrant communities and law enforcement in order to reduce fear and mistrust and enhance cooperation and improve public safety.

To accomplish these goals, the foundation hosted four sets of focus groups across the country that included law enforcement personnel, elected public officials, members of immigrant communities, and other interested groups. The hope was that by bringing immigrant communities together with local police to begin a dialogue on the role of police in immigration enforcement, we would also help to open up channels of communication and establish improved working relationships between local police and the immigrant communities they serve. A total of thirty-three local and state law enforcement agencies were represented in the four focus groups (see appendix A for a summary of focus group conversations).

The information derived from the focus groups was used to design an agenda for a national conference that was an invitation-only event at which over two hundred law enforcement leaders, policy makers, scholars, and community leaders participated in facilitated discussions geared toward generating concrete recommendations for how local law enforcement can strike a balance

between civil liberties and immigration enforcement. (Photos from the conference illustrate this report. See appendix N for the conference agenda and presenters' bios.) National conference attendees included over one hundred law enforcement executives, many of whom were police chiefs or elected sheriffs, as well as fourteen federal, state, and local government representatives. The foundation also invited scholars and other immigration experts to present papers on specific topics relating to the role of local and state police in immigration enforcement. The topics of the papers included the rights of undocumented immigrants and the legal framework for the enforcement of immigration laws, demographic research, immigration and criminality, evaluation of federal efforts to collaborate with local police on immigration enforcement (287(g) program), a national survey of local police immigration policies, and the experience of undocumented youth (see appendices B-G).

The foundation also distributed a survey to law enforcement executives who attended the conference. Fifty-four attendees completed the survey: forty police chiefs, nine deputy or assistant police chiefs, two sheriffs, one police superintendent, a major, and a respondent who is both a sheriff and police chief. Most of the participants were from urban agencies (n=29), while many were from urban/suburban areas (n=19). The remaining six were from rural type areas. The size of the jurisdictions ranged from just under fifteen thousand to more than four million. Also, the majority of respondents (n=47) were from municipal or local law enforcement agencies, while one was from a county police department, four were from sheriffs' offices, one was from an urban county metropolitan area, and one was from both a sheriff's office and a municipal department (Amendola, Williams, Hamilton, and Puryear 2008) (see appendix H).



**Police Foundation President Hubert Williams and Phoenix Mayor Phil Gordon share a moment before the conference convenes.**

This report presents an accumulation of the conversations, findings, and recommendations derived from the focus groups, conference sessions, and academic papers prepared for the conference. The goal of the report is to discuss the implications of local police enforcing immigration laws with respect to building constructive relationships with minority communities, and to provide state and local law enforcement agencies with information and recommendations for reviewing their immigration law enforcement policies. Underlying the design of this project and report is a belief that encouraging dialogue between police and communities will enhance public trust in state and local law enforcement and promote a balanced approach to providing police services and protecting civil rights. The capacity of the police to prevent and respond to crime, including acts of terrorism, requires public cooperation that is anchored in public trust of the police.

## History of the Role of Local Police in Immigration Enforcement

In 1952, Congress defined the nation's immigration laws in the Immigration and Nationality Act (INA), which contains both civil and criminal enforcement measures. Federal law, however, has never been clear about the role of local and state authorities in immigration enforcement; until recently, the prevailing position in the policing and immigration fields has been that enforcement of civil immigration laws is solely in the purview of the federal government and that local and state police have authority to make arrests for only a small subset of criminal immigration violations (Appleseed 2008, 11).

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

# Federal law has never been clear about the role of local and state authorities in immigration enforcement.

The trend towards greater cooperation between local law enforcement and federal immigration officials began years before September 11, 2001, in the 1990s, when the United States began to experience historic levels of immigration. Overwhelmed by the task of detecting, arresting, and detaining the growing population of unauthorized immigrants in the United States, federal immigration authorities and proponents of greater immigration control began advocating for greater cooperation between local police and federal immigration authorities. Proponents argued that the nation's approximately 700,000 local and state police officers would be an effective "force-multiplier;" that is, they could dramatically increase the number of law enforcement officials who could detect undocumented immigrants in the interior of the country. In addition, proponents such as Alabama Senator Jeff Sessions argued that the failure of police to enforce immigration law created an incentive for greater inflows of unauthorized immigration into the United States (Venbrux 2006, 320).

Prior to legislative reforms of 1996, federal efforts towards increasing local law enforcement's role in immigration matters were limited to increasing communication and assistance to states regarding criminal detainees in violation of immigration law. For instance, in 1991, the legacy Immigration and Naturalization Service (INS) established the Alien Criminal Apprehension Program to foster greater cooperation between police and immigration authorities to deport criminal aliens. Under this program, state and local law enforcement officials would notify federal immigration officials of foreign-born nationals who had committed a crime and were taken into state or local custody (Seghetti, Viña, and Ester 2004, 3). Subsequently, in 1994, California politicians began advocating with the federal government for reimbursement of funds the state was expending to apprehend and incarcerate criminal aliens who had illegally reentered the country following a final order of deportation. Congress, in response to this advocacy, funded a program to reimburse states for costs incurred in the apprehension and incarceration of foreign nationals who had committed crimes (Appleseed 2008, 14).[2] Congress also appropriated funds to create the Law Enforcement Support Center (LESC) (Aldana 2008, 3).[3] The LESC's mission is to provide federal, state, and local law enforcement with information on immigration status of individuals arrested, suspected, or detained for a criminal offense. The LESC has operators working twenty-four hours a day, seven days a week answering inquiries from law enforcement. These operators use information gathered from various Department of Homeland Security (DHS) databases, the FBI's national database, and state criminal history databases (Appleseed 2008, 21).

In 1996, Congress expanded the role for state and local law enforcement in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). Section 439 of the AEDPA amended federal immigration law to provide authority to states to arrest and detain an immigrant who had a previous order of deportation and had been previously convicted of a crime, to the extent authorized by state law (Appleseed 2008, 15). The law also required that state or local officials confirm immigration status with INS and prohibited detention for a period longer than necessary to transfer to federal custody (Appleseed 2008, 15). In addition, Section 372 of IIRIRA amendments to the INA provided authority to INS to deputize local and state law enforcement officials in the event of a mass influx of immigrants (Appleseed 2008, 15). IIRIRA also added section 287(g) to the INA, which authorized federal officials to

# The trend toward greater involvement of state and local officials in federal immigration enforcement gained significant momentum after the terrorist attacks of September 11, 2001.

enter into written agreements with state and local law officials to carry out the functions of an immigration officer, including investigation, apprehension, and detention "at the expense of the State or political subdivision and to the extent consistent with State and local law" (ICE Fact Sheet: 287(g)). Moreover, by expanding the categories of criminal offenses that would subject immigrants (legal and unauthorized) to mandatory detention and deportation, IIRIRA reforms resulted in an increase in the number of criminal detainees subject to immigration deportation or removal proceedings (Chishti 2006, 462-463).

In 1999, INS Interior Enforcement Strategy included the tactic of developing partnerships with local and state law enforcement agencies to assist the INS with their interior immigration enforcement efforts (Chishti 2002, 372). In this same year, Congress appropriated funds for INS to create Quick Response Teams that responded to requests from state and local law enforcement officers who believed they had an unauthorized immigrant in custody. The INS established Quick Response Teams in regions that had experienced increases in the unauthorized immigrant population (Seghetti, Viña, and Ester 2004, 3).

The trend toward greater involvement of state and local officials in federal immigration enforcement gained significant momentum after the terrorist attacks of September 11, 2001, when federal, state, and local officials began to promote efforts at tightening immigration control as a counterterrorism measure (Venbrux 2006, 317). The most significant change that occurred in the aftermath of September 11 was the U.S. Department of Justice (DOJ) Office of Legal Counsel's (OLC) reversal of its long-standing position that involvement of state and local authorities in immigration enforcement should be limited, declaring that state and local police had inherent authority to make arrests for civil immigration violations (Chishti 2006, 467). Prior to 2002, DOJ officials had made statements and drafted memoranda arguing that state and local police did not have authority to enforce federal civil immigration law. In 1978, for instance, DOJ released a statement that, "INS officers are uniquely prepared for this law enforcement responsibility because of their special training, and because of the complexities and fine distinctions of immigration laws" (Appleseed 2008, 13). In 1983, the Reagan Justice Department encouraged a little more cooperation but limited that role to primarily informing INS about suspected deportable immigrants taken into police custody for state criminal violations (Seghetti, Viña, and Ester 2004, 7-8). The Reagan DOJ position also stated that where "state law authorizes local officers to enforce criminal provisions of federal law, "state and local police could exercise their authority to enforce criminal provisions of federal immigration law" (Appleseed 2008, 13). This position was confirmed as late as 1996, when the DOJ OLC issued an opinion concluding that state and local police do not have the authority to enforce civil immigration law violations (Seghetti, Viña, and Ester, 8). At a 2002 press conference, however, Attorney General John Ashcroft announced a reversal of DOJ's long-standing opinion, stating that state and local officials have inherent authority to enforce federal immigration law (Seghetti, Viña, and Ester, 8).

After September 11, in an effort to increase assistance from state and local police in the identification of unauthorized immigrants, DOJ also began putting information on civil immigration violations into the FBI's National Crime Information Center (NCIC) database. The NCIC database is a computerized index of criminal justice information operated by the FBI. In 1930, Congress first authorized the DOJ to maintain a clearinghouse for fingerprint records, rap sheets, and warrants (Gladstein, Lai, Wagner, and Wishnie 2005, 6-7). Over time, Congress has expanded the categories of records that can be included in the NCIC database. For the first time, in 1996, Congress authorized the entry of immigration records relating to previously deported felons (Gladstein et al. 2005, 6-7). Congress has never authorized entry of civil immigration records other than those relating to previously deported felons into the NCIC database (Gladstein et al. 2005, 6-7). Yet, as stated earlier, soon after September 11 the federal government began entering thousands of absconder records, most of which are purely civil violations. In December 2003, DHS officials stated intention to include student visa violators and persons deported for minor criminal offenses into NCIC (Gladstein et al. 2005, 6-7). Understanding that state and local law enforcement are the entities that mostly query the NCIC database, and given the federal government's interest in increasing involvement of state and local law enforcement as a "force multiplier" in immigration enforcement, it seems that the government's purpose in adding these immigration records to the database was a form of inducing local and state police to enforce immigration law when they routinely check the database in the course of regular police work (Kalhan 2008, 10). Policing organizations such as the International Association of Chiefs of Police (IACP) and the Major Cities Chiefs Association (MCCA) have criticized DOJ's decision to include civil warrants in the NCIC database because most state and local law enforcement agencies do not have authority to arrest for federal civil law violations according to state law governing the scope of their authority (IACP 2004, 4; MCC 2006, 10).

Since the 1996 immigration reforms, the federal government has had the authority to enter into agreements with state and local law enforcement agencies to train and then deputize local officers to perform immigration enforcement functions. However, prior to September 11, 2001, no state or local law enforcement agency had chosen to enter into such an agreement with the INS. Immediately after the terrorist attacks of September 11, the Florida State Police signed a memorandum of agreement with INS to train and deputize their officers. Since then, sixty-three law enforcement agencies in the country have taken advantage of the 287(g) program (ICE Fact Sheet: 287(g)).

For years, counter-balancing the movement toward greater federal/state/local cooperation on immigration enforcement, several states and municipalities throughout the country have passed local and state ordinances and laws limiting state and local government employees' ability to collaborate with federal immigration officials in the identification of unauthorized immigrants. In 1996, Congress passed two laws explicitly to counter such policies, by disallowing a federal, state, or local government entity from prohibiting their employees from communicating with federal immigration officials regarding the immigration status of any individual (Aldana 2008, 13). The legislative history, however, makes it clear that the purpose of this provision was not to require local or state governments to communicate with federal officials regarding immigration status (Pham 2005, 15). Since 1996, state and local governments have continued to limit their employees' ability to cooperate with federal immigration entities; however, rather than prohibiting communication with the federal government regarding immigration status, these state and local laws limit when employees can question individuals regarding their immigration status (Pham 2005, 23; Seghetti, Viña, and Ester 2004, 21). These municipalities have been labeled by many as "sanctuary cities." But as several conference participants argued, this term is

a misnomer because these communities do not and cannot provide sanctuary for individuals from federal immigration enforcement officials. Moreover, many local and state law enforcement agencies not only do not provide sanctuary from federal immigration agents but indeed collaborate with federal officials to deport criminal aliens.

## The Call for Greater Enforcement

During discussions, conference workshops, and presentations, participants provided various theories of factors influencing the movement towards greater participation in immigration enforcement by state and local officials. Some of these reasons are described below.

### *Demographic Changes*

As stated early in this report, in the last fifteen to twenty years, the United States has experienced historically high levels of immigration. The immigrant population has quadrupled since 1970. In the 1990s, the size of the foreign-born population grew by 57.4 percent (Singer 2004, 1). By March 2008, the foreign-born population reached a historic high of 37.4 million people, or 12.5 percent of the population (Passel 2008) (see figure 1).

**FIGURE 1. IMMIGRANT NUMBERS KEEP GROWING —PERCENT APPROACHES HISTORIC HIGHS**



Source: *Unauthorized Immigrants: Trends, Characteristics, and Surprises.* Jeffrey S. Passel, Pew Hispanic Center. Presentation prepared for Police Foundation conference, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties, Washington, DC, August 21, 2008 (see appendix I).

Not only is the number of immigrants in the United States reaching historically high levels, the population is also becoming more dispersed and areas of the country with no history of immigration are experiencing large influxes of immigrants (Singer 2007). In 1990, the top six immigrant states had 75 percent of the immigrant population. In 2008, these six states had merely 65 percent of the immigrant population (Passel 2008) (see figure 2).

The United States has also experienced great increases in the unauthorized population in recent years. Undocumented immigrants currently make up 30 percent of the foreign-born popu-

**FIGURE 2. NEW IMMIGRATION GROWTH CENTERS**



Source: *Unauthorized Immigrants: Trends, Characteristics, and Surprises.* Jeffrey S. Passel, Pew Hispanic Center. Presentation prepared for Police Foundation conference, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties, Washington, DC, August 21, 2008 (see appendix I).

lation. Almost twelve million unauthorized immigrants were living in the United States in March 2008, constituting approximately four percent of the total U.S. population. Since the beginning of this decade, the unauthorized immigrant population increased by forty percent (Passel and Cohn 2008, i) (see figure 3).

The new emerging destination gateways tend to have immigrants who are from Asia and Mexico, are poorer than the native-born population, have low English proficiency, and lower rates of citizenship than traditional gateway cities that have longer-residing immigrant populations (Singer 2004, 1). New growth states are also seeing particularly high levels of unauthorized immigrants. Eighty percent of the undocumented population lived in six traditional immigrant gateway states in 1990, whereas in 2006 this percentage decreased to 60 percent (Passel 2008) (see appendix I).

In recent years, the average inflow of unauthorized immigrants appears to have slowed from 800,000 a year from 2000 to 2004 to approximately 500,000 yearly from 2005 to 2008. Yet, four out of ten unauthorized immigrants arrived in the United States since 2000. While growth of the unauthorized population may have slowed in recent years, the legal immigrant population inflow has now surpassed the undocumented population inflow, and thus communities continue to receive new immigrants (Passel and Cohn 2008, i-ii). The unauthorized population is largely Latino, with four out of five unauthorized immigrants originating from Latin America (Passel and Cohn 2008, iii).

A377

**FIGURE 3. UNAUTHORIZED NUMBER HIGH — TREND UNCERTAIN, BUT SLOWING (?)**



Source: *Unauthorized Immigrants: Trends, Characteristics, and Surprises.* Jeffrey S. Passel, Pew Hispanic Center. Presentation prepared for Police Foundation conference, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties, Washington, DC, August 21, 2008 (see appendix I).

As the size of the immigrant population grows and immigrants move to new destination regions that have little or no experience with immigration, states and localities are struggling to figure out how to integrate these new residents. In the absence of a comprehensive and effective federal immigration policy, immigration becomes a local policy challenge (Chishti 2006, 464). Moreover, as the racial and cultural landscape of these communities change as a result of these new demographic trends, long-standing resident communities have begun to put pressure on local government, including police, to take measures to reduce levels of unauthorized immigration.

A biannually conducted national survey of the non-institutionalized English-speaking population in the United States (General Social Survey) administered in 2000 confirmed that perceptions of increasing minority population size influenced attitudes towards immigration. The survey found that respondents tended to overstate the size of the minority population; roughly half of the respondents stated that Whites had become a numerical minority in the United States. Residents of rural areas were more likely to exaggerate minority-group size than urban residents. The survey also showed that perceptions of immigration issues



**A significant share of unauthorized families can be characterized as "mixed status" in which there is one or more unauthorized parent and one or more children who are U.S. citizens by birth, according to Dr. Jeffrey Passel of the Pew Hispanic Center.**

become more unfavorable as the perception of group size moves away from Whites as a majority. In other words, the larger the non-Hispanic White population perceives minority-group size, the more it supports greater immigration restrictions. Moreover, respondents that overstated minority-group size also tended to believe that Blacks and Hispanics are more violent than other racial groups (Alba, Rumbaut, and Marotz 2005).

Law enforcement executives participating in the focus groups and the conference agreed that the changing demographics were driving the pressure from communities for a greater role for local police in federal immigration enforcement. As one police executive in the Arlington, Texas, session stated:

> **I don't think, generally speaking, people are complaining about the fact that someone is here in this country without official legal authorization to be here . . . All of a sudden their community is becoming more heavily populated with people who are different from them, who enjoy doing things that are unlike what other people in the community have historically done. And so rather than addressing the uneasy feeling about differences among the newcomers, they just cast this label "illegal immigration" over that, and then they want us to enforce immigration laws to get rid of the people who are different from what they are accustomed.**

Providing concrete evidence of the argument that racial tensions are underlying the anti-immigrant sentiment, one Dallas-Fort Worth Metroplex chief recounted that the morning of the focus group he received a complaint about a Puerto Rican family that had moved into his community and set up a landscaping business that they ran out of their home. Throughout the day, Puerto Rican workers were coming in and out of the house. Some neighbors complained to the police requesting that the police do something to deport these new residents. The community members clearly did not understand that these new residents were U.S. citizens. The chief provided this example to demonstrate that the problem with this family was not their immigration status but rather their race or ethnicity that disturbed other community members.

Several other participants in the focus groups and conference also strongly believed that attacks against "illegal immigration" are often motivated by racial discrimination. An El Paso participant stated, "It's been easy for them to hide this whole racism that is happening against the immigrant Mexicans, especially Latin America people, with the issue of the legality or illegality." As stated by a police chief from New Jersey:

> **Where I see it is [when] people come to council meetings and talk about [undesirable] people out in front of their homes or hanging out in a public park in a particular neighborhood. My question is, well, how do you define who is undesirable? And essentially what it comes down to when you cut through the veneer of the issue is there are people in front of their homes and in the parks who speak a different language, have different customs, and then also engage in some problematic behavior.**

Some participants expressed concern that racial tensions were going beyond mere pressure to control immigration into potentially violent and threatening behavior from a public safety perspective. In his conference keynote address (see appendix J), Phoenix Mayor Phil Gordon reported that public protests over immigration are a regular occurrence in Arizona and participants are sometimes armed with knives and guns, thereby requiring a strong police presence to ensure that demonstrations do not spin out of control and turn violent. He displayed a protester's sign with a swastika at the bottom that stated: "Hooray for the slaughtering of the illegals. Boo to the Beaners!!"



**Phoenix Mayor Phil Gordon shows conferees an anti-immigrant sign, which says, "Hooray for the slaughtering of the illegals. Boo to the Beaners!!".**

Mayor Gordon also reported an incident in which a United States Marine, in full uniform, was harassed, insulted, and called a traitor by a group of protestors, who shouted at the marine, "It's too bad you didn't die in the war; you're a disgrace to your uniform. Go back to your own country." Mayor Gordon added:

> **Well, this American hero of Hispanic heritage is in his own country. He fought for this country. These stories have nothing to do with green cards. They have everything to do with brown skin. They were about racism and nothing else.**

Mayor Gordon also warned that if the federal government fails to reform the immigration system, communities in the interior of the country would begin to experience the racial tension they do on the border. In fact, communities throughout the nation are already experiencing a rise in hate crimes. Recently in Patchogue, New York, for instance, an Ecuadorian man was murdered by a group of teenagers looking for Latino immigrants to beat up (Macropoulos 2008). At the conference, a representative of the National Council of La Raza, Clarissa Martinez De Castro, stated that in recent years the organization has observed a rise in anti-immigration groups with direct links to hate groups.

### *Perceptions of Immigrant Criminality*

Despite considerable empirical evidence to the contrary, much of the public believes that immigrants are more prone to engage in criminal behavior than the native-born population, which many project participants contended influenced the debate on the role of police in immigration enforcement. Seventy-three percent of respondents to the 2000 General Social Survey believed that immigration is causally related to more crime (Rumbaut 2008, 1). Stereotypes of immigrant criminality are enforced through the media, in particular coverage of singular criminal events involving immigrant perpetrators (Rumbaut 2008, 1). Several focus group participants provided examples of singular criminal events or actors resulting in community pressure on local police to "do something about the immigration issue." For example, a Dallas-Fort Worth Metroplex chief gave the example of a drug-trafficking cartel setting up base in his city, and the public's outrage that immigration had brought this problem to their community.

Several studies, however, have demonstrated evidence contrary to this perspective (Rumbaut 2008, Butcher and Piehl 2007, Nadler 2008). Rubén Rumbaut, professor of sociology at the University of California at Irvine, presented findings from his research on immigrants and crime

at the national conference (see appendix D). He argued that empirical evidence has consistently refuted the popular myth that influxes of immigrants lead to increases in crime. Since the early 1990s, over the same time period as legal and especially illegal immigration was reaching and surpassing historic highs, crime rates have *declined*, both nationally and most notably in cities and regions of high immigrant concentration (including cities with large numbers of undocumented immigrants such as Los Angeles and border cities like San Diego and El Paso, as well as New York, Chicago, and Miami). The FBI Uniform Crime Reports showed a decline in both violent and property crime during the era of mass migration of the 1990s. Data from the National Crime Victimization Survey showed even more significant decreases in violent crime during this period of time (Rumbaut 2008).

This period of time also coincided with an era of mass incarceration; the number of incarcerated adults in U.S. federal or state prisons quadrupled from 500,000 in 1980 to over 2.2 million in 2006. The incarcerated population is composed of mostly young men from ethnic minority groups, who are low-wage workers and have low levels of education. These characteristics are also common among the immigrant population in the United States, in particular the undocumented population; and thus logic would suggest that immigrants would have higher incarceration rates. To the contrary, Rumbaut's analysis of incarceration rates of males between the age of eighteen and thirty-nine who were in federal or state prisons at the time of the 2000 U.S. Census showed lowest rates of incarceration for the foreign-born population. The incarceration rate for the U.S.-born population (3.51 percent) was five times the rate of the foreign-born (.68 percent). The foreign-born incarceration rate was less than half the incarceration rate for non-Hispanic Whites (1.71 percent). Rumbaut's research also points out that in the state of California, which has higher overall incarceration rates than the rest of the country (4.5 versus 3.4 percent) and the largest percentage foreign-born population, the foreign-born incarceration rates are lower than they are nationally (.4 to 1.0 percent) (Rumbaut 2008). A study of the Americas Majority Foundation disaggregated data by states, finding that from 1999 to 2006 the total crime rate declined 13.6 percent in the nineteen highest immigration states as compared to a 7.1 percent decline in the other thirty-two states (Nadler 2008, 9).



Although deeply rooted in American public opinion and sustained by media anecdote and popular myth, the perception that the foreign-born, especially "illegal aliens," are responsible for higher crime rates is not supported empirically, according to research by Professor Rubén Rumbaut and others.

Further evidence was presented at the national conference by Mayor John Cook of El Paso, who pointed out that El Paso—with its large immigrant population and proximity to the border—has been named the second safest city with 500,000 or more people in the United States.

### Economic Costs and Benefits of Migration

One of the arguments put forth by proponents of immigration enforcement is that immigration, and in particular undocumented immigration, places financial burdens on government services because undocumented immigrants do not pay their fair share of taxes. In Collier County, Florida, participants cited the costs of undocumented immigration to include the drains to school budgets to support bilingual education, emergency medical costs for undocumented who are uninsured, and law enforcement costs. One participant stated that because the vast majority of undocumented he arrests do not have social security numbers, he assumed they did not pay taxes.

**Professor Stephen Legomsky presented an overview of undocumented immigration and Professor Raquel Aldana discussed civil liberties concerns that arise from local law enforcement's involvement in immigration enforcement.**



At the conference, Professor Stephen Legomsky of Washington University School of Law, in his overview of the current debate surrounding immigration, argued that, to the contrary, studies show that a majority of undocumented immigrants do pay income taxes, although they pay a below-average amount because of their relatively low incomes. He explained they can pay taxes using either a false social security number or under an individual tax identification card.

A tax attorney who was a participant in the Topeka focus group confirmed that he often prepares tax returns for undocumented immigrants without social security numbers. Additionally, the U.S. Social Security Administration has estimated that three quarters of undocumented immigrants pay payroll taxes, and that they contribute six to seven billion dollars in social security funds that they will be unable to claim (Capps and Fix 2005; Porter 2005).

Experts have also argued that undocumented immigrants pay the same real estate taxes—whether as homeowners or through their rent payments—and the same sales and other consumption taxes as everyone else (Immigration Policy Center 2007). Most state and local services, such as schooling, are paid through these taxes.

A study by the Americas Majority Foundation showed that regions with high resident population growth and high inflows of immigrants tend to have high levels of growth in gross state product, personal income, per capita personal income, disposable income, per capita disposable income, median household income, and median per capita income. By 2006, high immigrant jurisdictions also had lower rates of unemployment, individual poverty, and total crime than other states (Nadler 2008, 7-9).

### *Political Pressure*

Conference and focus group law enforcement participants spoke openly about the political pressures that politicians and communities place on local police to enforce immigration law. Some participants attributed the rise in this political pressure in part to the media's sensationalized coverage of immigration issues. Other commentators have noted that conservative media's coverage of immigration and its ability to connect with the public's frustration on the issue have been particularly influential in pushing for stronger enforcement policies (Rodriguez, Chishti, and Nortman 2007, 2).

A study conducted by a media watchdog organization of three conservative news programs, Lou Dobbs Tonight, The O'Reilly Factor, and Glenn Beck, showed that during 2007 the allegation that undocumented immigrants drain social services and/or do not pay taxes was discussed on seventy-one episodes of Lou Dobbs Tonight, thirteen episodes of Glenn Beck, and eight episodes of The O'Reilly Factor. Dobbs and Beck have also repeatedly discussed two myths—that there are plans to construct a NAFTA superhighway running from Mexico to Canada, and there are plans to join Mexico, Canada, and the U.S. into a North American Union. Dobbs discussed the North American Union on fifty-six separate programs during the past two years (Media Matters Action Network 2008).

Media pressure and the public's frustration with the federal government's inability to control unauthorized immigration have led to elected officials placing pressure on their police chiefs to

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

# Media pressure and the public's frustration with the federal government's inability to control unauthorized immigration have led to elected officials placing pressure on their police chiefs to enforce federal immigration law.

enforce federal immigration law. Law enforcement participants noted that while some of these politicians are merely responding to the political pressures they are facing from the public and media, others cynically use the immigration issue to gain votes. One participant recounted an incident in which a local politician in his community "was quoted in the media as saying that we should sit at the border and shoot the illegal immigrants as they come across the border." Another participating police chief noted:

**Immigration was not such a big problem until the last national election . . . when the Republicans were worried about losing control of Congress. Then, all of a sudden, we have this big problem and we need to fix it and they were thinking, where are we going to find the people to do it because we do not have the people in the federal government. Oh, we will get state and local law enforcement involved.**

Another law enforcement participant in the Arlington, Texas, focus group explained:

**In my city and in other cities around here, [people] are getting elected and unelected on this issue alone. It's that big . . . So people at the municipal level are running scared on this issue and are just trying to find their way, regardless of what their personal beliefs are . . . You have to figure out how far you are willing to go and what you are willing to get fired for on this issue.**

Seventy-four percent of participants responding to the conference survey (Amendola et al. 2008) stated that they are facing changing expectations and new demands as a result of the immigration issue, and forty-four percent stated that they are responding to political pressure in their communities as a result of the immigration issue. While few law enforcement agencies represented in the focus groups and conference were in favor of entering agreements with federal immigration officials to deputize their officers to perform immigration enforcement functions, many explained that they have increased collaboration with DHS in recent years because of the politics surrounding the immigration issue. For instance, one Texas police chief explained that his agency has had a policy of asking detainees their citizenship status since 1991 to ensure compliance with consular notification requirements. If they would encounter someone who they believed was illegally present in the United States, they would on an ad hoc basis check the NCIC database for possible detainers. Occasionally, they would find a detainer and contact immigration officials. More recently, because there has been so much focus on the department's immigration policy, they formalized the process of questioning persons arrested and detained in the jail about whether they are U.S citizens or were born in the U.S.; if the detainee answers "no" to either question, they check the NCIC database. In sum, it seems as if many police departments have begun to formalize their processes of checking status of arrestees due to political pressure and media attention being paid to the immigration issue.

## Since the terrorist attacks of September 11, 2001, the federal government has made use of immigration law as a tool to identify or investigate suspected terrorists.

A survey of police chiefs in large and medium-sized jurisdictions (60,000 residents or more), conducted by researchers at Arizona State University (ASU) and presented at the conference, provides some insight into the reasoning behind the political pressure police are under to engage in civil immigration enforcement and why they are more resistant than many of their communities and politicians to engage in immigration enforcement. The survey found that on the question of immigration enforcement, there was a difference of opinion between community members and police, with police executives more frequently responding that immigration was a controversial topic within their community versus within the department. The survey also found that, according to police executives, community members are more likely than police to believe that it is simple to determine a person's immigration status. Finally, chiefs also reported that gaining the trust of unauthorized immigrants is a much greater priority for their department than for their community (Decker, Lewis, Provine, and Varsanyi 2008) (see appendix G).



**Professors Scott Decker, Doris Marie Provine, Paul Lewis, and Monica Varsanyi present findings from their national survey of law enforcement executives on immigration and local policing.**

### Counterterrorism

Prior to September 11, 2001, economic and social concerns were driving the debate about unauthorized immigration. After the terrorist attacks, however, with immigration law becoming a tool in the fight against terrorism, those who had long opposed rising levels of immigration from Latin America reframed their arguments in terms of the counterterrorism and national security objectives (Harris 2006, 19).

Since the terrorist attacks of September 11, 2001, the federal government has made use of



Clarissa Martínez De Castro, National Council of La Raza, and Kareem Shora, American-Arab Anti-Discrimination Committee, discuss the community impact of local immigration enforcement.

immigration law as a tool to identify or investigate suspected terrorists. Because violations of civil immigration law are not criminal, the government does not have to respect the same constitutional protections they would for a criminal defendant and thus can detain suspects while seeking removal, without any proof of involvement in terrorist activities. However, according to Kareem Shora, national director of the American-Arab Anti-Discrimination Committee, who presented at the conference, federal counterterrorism programs using immigration tools have in practice become just another tool in immigration law enforcement of noncriminal members of particular nationalities (see appendix L).

### Do Local and State Police Have Legal Authority to Enforce Federal Immigration Law?

While the proposition that Congress has exclusive authority to regulate immigration is uncontroverted, courts have had few opportunities to address the authority of state and local officials in the realm of immigration enforcement (Venbrux 2006, 312-313). Many legal experts believe that federal immigration law preempts local police from engaging in immigration enforcement (Rodriguez, Chishti, and Nortman 2007, 34-35). While Congress has never explicitly prohibited state or local involvement in federal immigration enforcement, these experts contend that where Congress demonstrates intent to preempt a field of legislation, state and local governments may be preempted from acting on this area of legislation (Appleseed 2008, 12). These experts argue that Congress's express delegation of authority to state and local officials to enforce immigration law under a narrow set of circumstances implicitly preempt state and local enforcement of immigration violations (civil and criminal) that fall outside this narrow scope (Rodriguez, Chishti, and Nortman 2007, 35).

Congress has expressly authorized state and local police to arrest for violations of certain criminal violations of the Immigration and Nationality Act (INA). Specifically, they can make arrests for the federal immigration crimes of smuggling, transporting, or harboring illegal immigrants (§ 274 of the INA) and illegal reentry after a final order of removal (§ 276 of the INA) (Aldana 2008, 2-3). Congress has also authorized federal immigration officials to deputize state and local law enforcement in the event of a mass influx of immigrants (§ 103 of the INA) Aldana 2008, 2-3). As stated earlier, in the AEDPA of 1996 Congress authorized state and local law enforcement to arrest and detain an individual who is illegally present in the United States and has been previously convicted of a felony and deported or left the United States after such conviction (§ 8 U.S.C. § 1252c) (Seghetti, Viña, and Ester 2004). Finally, the 1996 IIRIRA reforms amended the INA to include section 287(g) that gave the legacy INS authority to

# Whether or not local police have inherent authority under federal law to enforce immigration laws, they must still abide by state laws regarding the scope of their arrest authority.

enter into formal agreements with state and local law enforcement agencies to train and deputize some of their officers to perform immigration enforcement functions (Rodriguez, Chishti, and Nortman 2007, 34). Given these statutory provisions, legal experts have argued that state and local activity that extends beyond the scope of these narrow express delegations of authority are likely preempted (Rodrigez, Chishti, and Nortman 2007, 34-35). Courts, however, have diverged on the question of whether state and local authorities have inherent authority to arrest apart from these express grants of authority (Seghetti, Viña, and Ester 2004, 9-13).[4] But even the attorney general, who in his 2002 legal opinion reversing the long-standing opinion of the federal government that civil immigration enforcement was solely a federal function, argued that local police's inherent authority to arrest is limited to a narrow set of circumstances. According to the attorney general's public statement in 2002:

> **When federal, state and local law enforcement officers encounter an alien of national security concern who has been listed on the NCIC for violating immigration law, federal law permits them to arrest that person and transfer him to the custody of the INS. The Justice Department's Office of Legal Counsel has concluded that this narrow, limited mission that we are asking state and local police to undertake voluntarily—arresting aliens who have violated criminal provisions of the Immigration and Nationality Act or civil provisions that render an alien deportable, and who are listed on the NCIC—is within the inherent authority of states (Seghetti, Viña, and Ester 2004, 8).**

Much of the police activity in the realm of immigration enforcement occurs in the course of routine policing duties, rather than in the course of patrolling for immigration violators. Under such circumstances, police typically stop or arrest an individual upon suspicion of violation of a state law, and thus they do not need to rely on inherent authority to arrest or detain for violations of immigration law (Aldana 2008, 4). It is important to note, however, that such inquiries must not prolong the duration of detention beyond that necessary for criminal law enforcement purposes (unless the federal government places a detainer on the detainee), and individuals have the right to refuse to answer police questions and to request an attorney (Rodriguez, Chishti, and Nortman 2007, 36).

Whether or not local police have inherent authority under federal law to enforce immigration laws, they must still abide by state laws regarding the scope of their arrest authority. For this reason, many state attorneys general have issued legal memoranda on the issue of the authority of police working within their state to make arrests for immigration violations. The New York attorney general, for example, opined that state law on warrantless arrests would apply to the realm of federal immigration enforcement, which requires that criminal immigration offenses occur in the presence of the officer in order to make a warrantless arrest. The New York attorney general also stated that police in New York State do not have authority to arrest for purely civil violations. The

Ohio attorney general concluded that Ohio sheriff offices may arrest and detain someone for violation of criminal provisions of federal immigration law but not for purely civil violations, based on an interpretation of state law defining the general powers and duties of a county sheriff. South Carolina's attorney general concluded that state law authorizes law enforcement officers to enforce state criminal laws, and thus no inherent authority to enforce immigration law exists in the state of South Carolina. (Aldana 2008, 6-7).

## Is Immigration Enforcement a Federal or Local Responsibility?
## The Local Police Perspective

While there is clearly a significant difference of opinion among this nation's approximately 18,000 law enforcement agencies regarding whether state and local police share responsibility for immigration enforcement, a majority of police chiefs seem to regard immigration enforcement as the responsibility of the federal government.

The ASU study found that 72 percent of police chiefs surveyed stated immigration enforcement was a responsibility of the federal government (Decker et al. 2008, 8). Some policing experts believe that strains on local policing budgets, particularly as homeland security responsibilities have increased and as state and local budgets have shrunk, have contributed to this opposition (Harris 2006, 7). But much of the opposition is due to a shift in the policing field in the past fifteen to twenty years towards more community- or problem-oriented policing, which requires the cooperation and participation of communities in ensuring public safety (Harris 2006, 7). While the number of 287(g) agreements has increased in recent years, the number (sixty-three) (ICE Fact Sheet: 287(g)) is still very small compared with the total number of law enforcement agencies in the country (nearly 18,000). Most police chiefs believe that local police activity in the realm of immigration enforcement would make communities less safe (Harris 2006, 37).

The majority of respondents to the conference survey felt that local law enforcement should not even be partially responsible for enforcement of immigration laws (54 percent), whereas 24 percent said they should. The remaining 22 percent neither agreed nor disagreed that local law enforcement had at least partial responsibility. However, the majority (62 percent) of law enforcement leaders believed that officers should ask for documentation of citizenship status when in contact with those who break the law (including those violating traffic laws). Only 17 percent agreed they should do so when in contact with crime witnesses, and even fewer (15 percent) when in contact with crime victims. While 13 percent of respondents felt such decisions should be at the discretion of officers, just 7 percent said that officers should *never* ask for proof of citizenship (Amendola et al. 2008).

## The Various Ways in Which Local Law Enforcement
## and Federal Immigration Officials Collaborate

Most conversations and dialogues on the role of state and local police in immigration enforcement during the focus groups, at the conference, and in the media have focused on ICE's 287(g) program of deputizing local and state police to perform immigration enforcement functions. However, as we learned from project participants, state and local police collaborate with federal immigration officials in a wide range of activities. Some of these activities only incidentally involve immigration enforcement, while having a principally criminal law enforcement purpose (such as joint anti-gang task forces), while other methods of collaboration involve local and state officials performing in the role of immigration enforcement agents (such as the 287(g) program). Some agencies collaborate with federal immigration officials in a formal program,

**FIGURE 4. PERCENTAGE OF POLICE DEPARTMENTS THAT TYPICALLY CHECK IMMIGRATION STATUS AND/OR CONTACT ICE WHEN ENCOUNTERING POSSIBLE UNAUTHORIZED IMMIGRANTS IN THESE SITUATIONS**



Source: *Immigration and Local Policing: Results from a National Survey of Law Enforcement Executives* (Decker et al. 2008). Presentation prepared for Police Foundation conference, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties, Washington, DC, August 22, 2008 (see appendix G).

whereas others collaborate more informally and in a more ad hoc manner.

The most common forms of collaboration take place in the regular course of criminal law enforcement. Either on a formal or informal basis, most agencies participating in the Police Foundation project check the status of individuals arrested and detained for a criminal law offense and inform ICE when they encounter noncitizens. Feedback at the conference suggests that this form of collaboration has always existed to some extent but not in such a systematic or formalized manner as in recent years. Participants cited political pressure as the reason behind the trend towards formalization of the process of verification of immigration status of criminal detainees. They also stated that this political pressure sometimes is sparked by media attention on cases where unauthorized immigrants have committed serious crimes after being released upon a prior arrest.

The ASU survey of police executives found that the more serious the violation of criminal law, the more likely responding agencies were to contact ICE regarding criminal detainees in violation of immigration law (see figure 4 ). Thus, for instance, only slightly more than 20 percent of respondent agencies check immigration status of traffic violators, whereas over 80 percent check immigration status of those arrested for a violent crime.

Only state and local agencies that participate in the 287(g) program have direct access to DHS immigration databases. However, non-participating state and local law enforcement officials can contact the LESC to query its databases to check the status of an arrestee. In the El Paso law enforcement focus group, one small police agency with few resources mentioned it has on occasion also called U.S. Customs and Border Protection (CBP) to run a check on an arrestee or detainee because the agency does not have access to criminal justice databases and needs to confirm identity. This has on occasion resulted in deportation. In addition, as described above in the section describing the history of local law enforcement's role in immigration, many law enforcement officers do not make an affirmative decision to cooperate with federal immigration

efforts but end up doing so as a result of running a check on criminal detainees in the FBI's NCIC database.

Some law enforcement agencies, such as the Phoenix Police Department, have chosen to embed ICE officers within the police department, rather than have the local police be responsible for verification of immigration status and other immigration enforcement functions. At the conference, Mayor Gordon of Phoenix contended that in terms of cost and effectiveness, this model of collaboration makes more sense than turning police officers into immigration agents. Many departments, such as the Houston Police Department, have also collaborated with ICE on interagency task forces, such as the Houston Police Department's collaboration with ICE and other federal agencies on an anti-gang task force. The federal government has also signed on state and local police in various joint operations, such as the Absconder Apprehension Initiative, in which local police assist DHS in identifying and arresting individuals with outstanding removal orders (Seghetti, Viña, and Ester 2004, 3).

DHS also collaborates with state and local law enforcement to address criminal activity associated with border security. Some of the participants in the El Paso focus group discussed DHS's Border Enforcement Security Task Force initiative (BEST), whose mission is to disrupt criminal organizations posing threats to border security. Operation Community Shield, an ICE antitransnational gang initiative, also sometimes engages local police in joint operations (ICE Fact Sheet: Operation Community Shield).

Finally, the most intensive immigration enforcement role for state and local law enforcement occurs as part of the ICE 287(g) program. As discussed above, this section authorizes DHS to enter into formal agreements with state and local law enforcement agencies to deputize local and state officers to perform immigration law enforcement functions, under the supervision of sworn ICE officers. Each agency that enters the 287(g) program must sign a memorandum of agreement (MOA) that defines the scope and limitations of the authority designated to the local or state officers. These agreements also must articulate a supervisory and monitoring structure for the program. Section 287(g) also requires that state and local officers are trained in the enforcement of immigration laws (ICE Fact Sheet: 287(g)).

Not until after September 11, 2001, did any state or local agency sign a 287(g) agreement with the federal government. In 2002, the Florida State Police became the first 287(g) partner (Capps 2008, 4) (see appendix F). Florida described the intent behind the agreement as to "address the counter-terrorism and domestic security needs of the nation and the state of Florida by enhancing those efforts through the authorization of selected state and local law enforcement officers ... to perform certain functions of an immigration officer." In 2003, the Florida MOA eliminated the emphasis on counterterrorism in favor of greater emphasis on general domestic security (Appleseed 2008, 23).

In 2003, the state of Alabama followed Florida, and then there were a half dozen more agreements signed in 2005 and 2006 in Arizona, California, and North Carolina. The number of local and state agencies joining the 287(g) program started to increase more rapidly in 2007 when twenty-six law enforcement agencies signed MOAs, and during the first seven months of 2008 when twenty-eight more agencies entered agreements with ICE (Capps 2008, 4). Currently, there are sixty-three local and state law enforcement agencies participating in the 287(g) program. The program has identified more than 70,000 people suspected of violating immigration law and trained more than 840 officers (ICE Fact Sheet: 287(g)).

Geographically, agencies that have chosen to join the 287(g) program seem to be disproportionately located in regions with large immigrant populations or are emerging gateways that

have recently begun seeing large influxes of immigrants. Forty-one out of sixty-two programs (as of August 2008) were located in the twenty-two new immigrant destination states (see figure 5).

**FIGURE 5. 1990–2000 IMMIGRATION GROWTH PATTERNS AND LOCATION OF 287(G) PROGRAMS ACROSS THE STATES**



Source: *Local Enforcement of Immigration Laws: Evolution of the 287(g) Program and Its Potential Impacts on Local Communities*. Randolph Capps, The Urban Institute. Presentation prepared for Police Foundation conference, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties, Washington, DC, August 21, 2008 (see appendix F).

These new growth states tend to also have large unauthorized immigrant populations, high numbers of Latin American immigrants, and fewer citizens. In August 2008, thirty-seven of the 287(g) participating agencies were located in the Southeastern part of the United States, eighteen in the Southwest, five in the Northeast, and two in the Midwest (Capps 2008, 8-9).

The 287(g) program has two categories of agreements or classes of trained officers, Jail Enforcement Officers (JEO) and Task Force Officers (TFO). JEOs are trained solely to verify legal status of detainees in local jails, whereas TFOs can verify legal status of persons encountered in their regular policing duties and can participate with ICE in joint enforcement operations. As of August 2008, there were twenty-three law enforcement agencies with Task Force agreements, twenty-seven with Jail Enforcement agreements, and twelve with joint Task Force/Jail Enforcement agreements (Capps 2008, 7).

Conference presenter Raquel Aldana, a University of Nevada Professor of Law, reviewed thirty-four of fifty-five 287(g) agreements. Aldana found that the agreements varied in nature and scope. Some granted a broad range of powers to local officers, while others were more restrictive (see appendix C for descriptions of these powers) (Aldana 2008, 8-10).

Forty-six percent of respondents to the ASU survey reported that their local government had

no official policy on immigration enforcement, while 12 percent reported that their local government expects that the police take a proactive role in immigration enforcement. Four percent of respondents reported that they had an agreement with ICE for local police officers to investigate and arrest immigration law violators and three percent had jail-based 287(g) programs. Eight percent reported that they had ICE officers embedded within one or more unit of the police department. Only 4 percent of chiefs reported that their local governments have openly declared themselves as "sanctuary cities" for unauthorized migrants who are not engaged in criminal activities, while another 15 percent report that their cities unofficially operate under a "don't ask-don't tell" policy (Decker et al. 2008).

## State and Local Law Enforcement of Immigration Law: Benefits and Costs

During the conference and the focus groups, there was a healthy level of debate over the role of local law enforcement in enforcing federal immigration law. Law enforcement participants, community members, elected officials, and researchers presented varying arguments on the benefits and costs associated with immigration enforcement. The great majority of comments made during the focus groups and at the conference opposed local law enforcement's participation in purely civil immigration enforcement. However, some participants in the Collier County focus group and at the conference also articulated some of the benefits of state and local law enforcement sharing responsibility with the federal government for immigration enforcement. Below we describe the main arguments for and against local participation in federal immigration enforcement that were raised during project activities.

*Benefits*



Sheriff Don Hunter discusses his agency's participation as a 287(g) partner.

**1. Reduce Jail Population and Save Detention Costs**

Sheriff Don Hunter of Collier County, Florida, stated that Collier County decided to participate in the 287(g) program as part of their overall strategy to reduce jail crowding. The sheriff's office had conducted a study of its jail population and found that 25 percent were removable aliens. Twenty-seven officers from the sheriff's office were trained to identify, arrest, and detain immigration law violators. As a result, Sheriff Hunter argued, the jail population had dropped 14 percent between July 2007 and July 2008 (the program did not begin until October 2007) (see appendix K). It is not clear if there were other factors contributing to the decline in jail population.

**2. Deterrent to Unauthorized Immigration**

One argument mentioned during the focus groups in favor of local participation in federal immigration efforts, in particular the 287(g) program, is that communities where agencies participate in the program receive a lot of media attention as places where unauthorized immigration is not tolerated. This reputation, they argue, could serve as a deterrent to unauthorized immigrants settling in the area and/or could lead to unauthorized immigrants moving out of these regions. But as one Collier County focus group participant pointed out, this deterrent effect would merely displace unauthorized immigrants from a pro-enforcement community to one in which the police and local government do not engage in immigration enforcement. For this reason, the participant argued, there is a need for a nationally consistent policy or approach.

Another project participant, who favored local participation in immigration enforcement,

stated that the size of the undocumented population in the United States is simply too large for federal law enforcement agencies to manage; therefore, without the assistance of state and local police, the federal government will never be able to solve its undocumented immigration problem. One law enforcement conference participant challenged this argument, stating, "If you have people who are undocumented but are good, law-abiding, contributing citizens, I'm not sure all the negative impacts of this issue are worth removing a law-abiding person. There are other ways to work with federal agents than to use 287(g) to arrest otherwise good citizens."

### 3. Criminal Enforcement Tool

Proponents of local police participation in immigration enforcement, such as some of the Collier County focus group participants, argue that immigration enforcement, and in particular the 287(g) program, could serve as a criminal enforcement tool. A Collier County participant argued that when sophisticated criminals successfully evade criminal prosecution, an agency could use immigration enforcement as a tool to rid that community of the individual if he or she is unauthorized to be present in the United States. James Pendergraph, executive director of ICE's Office of State and Local Coordination, also asserted that deportation of a person who has previously committed a crime would reduce overall crime rates. Conference survey participants were also asked to describe the advantages and disadvantages of local participation in immigration enforcement; merely nine stated that it would help fight crime (Amendola et al. 2008).

### 4. Counterterrorism

Proponents of increased immigration enforcement, such as Kris Kobach, former counsel to Attorney General John Ashcroft, have argued that because several of the September 11 terrorist attackers had overstayed their visas without significant interference from federal or local law enforcement, the abuse of U.S. immigration laws was responsible for the deaths resulting from those attacks (Olivas 2007, 47). Others have criticized this argument, stating that the real failure, as pointed out by the bipartisan 9/11 Commission, was the failure of the federal government's various intelligence offices to collaborate and to take seriously radical Islamic movements following the earlier bombing of the World Trade Center in New York (Olivas 2007, 50).

These proponents argue that increased local immigration enforcement may identify individuals suspected of engaging in terrorist activities. For instance, in the course of routine policing, police may encounter an immigrant with an individual warrant in the NCIC database, and who may have plans at some point to engage in terrorist activities. However, as stated by Kareem Shora during his presentation at the national conference, a local department's participation in immigration enforcement efforts may result in isolating communities, making them less willing to provide intelligence to police on possible terrorist and other criminal activity (see appendix L).

### 5. Access to Federal Databases to Verify Identity

Some participants who favored local police immigration enforcement argued that participation in the 287(g) program has the advantage of giving local agencies access to federal databases to verify identity of suspects. One participant claimed that undocumented immigrants often give false names but that through the use of federal immigration databases it might be possible to accurately identify a suspect. As James Pendergraph noted, an agency has access to the various federal immigration databases only if it is a 287(g) partner. However, a non-participating agency can always contact the LESC if it needs additional information, and ICE is currently piloting an integration of the NCIC database with federal immigration databases so that when an agency runs a check on NCIC, it automatically searches federal immigration databases as well (Carroll 2008).

# Policing experts and project participants have expressed concern that local police involvement in immigration enforcement could have a chilling effect on immigrant cooperation.

### 6. Immigration Violators are Lawbreakers

A common argument heard in the media and mentioned during project conversations is that, like criminal law violators, those individuals who have violated federal immigration law are lawbreakers. Some participants argued that police are bound to enforce federal immigration laws just as they are violations of criminal law and cannot pick and choose which laws to enforce. Conference participants engaged in lively discussion about whether police have discretion to choose which laws to enforce. While some argued police have no discretion, others disagreed, maintaining that police everyday make choices about which laws to enforce. Furthermore, some pointed out, police officers take an oath to uphold state not federal law.

## Costs

### 1. Reduced Trust and Cooperation in Immigrant Communities Would Undermine Public Safety

Policing experts and project participants have expressed concern that local police involvement in immigration enforcement could have a chilling effect on immigrant cooperation. Immigrant witnesses and victims of crime, many of whom already bring with them fear and mistrust of police due to experiences with authorities in their home countries, would be less likely to report crimes and cooperate as witnesses. Without this cooperation, law enforcement will have difficulty apprehending and successfully prosecuting criminals, thereby reducing overall public safety for the larger community. Immigrants need assurances that they will not be subject to deportation proceedings if they cooperate with police.

To demonstrate the fragility of the relationship between the police and immigrants, one midwestern police chief recounted an incident where an unauthorized immigrant was a witness to a crime and agreed to testify in a criminal case. The witness's name appeared on a witness list in preparation for the trial. As the court began to vet the background of this witness, defense attorneys revealed that he was an undocumented alien. A few days after the witness testified in the court case, ICE arrested him and initiated deportation proceedings. Word of this incident rapidly spread throughout the immigrant community and, as a result, the police have had difficulty securing the cooperation of other immigrant witnesses. Even residents who were victimized and exploited feared approaching the police because trust between the immigrant community and the police had been destroyed.

El Paso focus group participants and Mayor John Cook in his conference presentation also reported a similar experience. Years earlier, the El Paso Police Department had a practice of conducting joint patrol operations with CBP in El Paso City. They later discontinued this practice because the joint operations had a chilling effect on immigrant communities. In particular, in the context of domestic violence, they found a troubling decrease in reports.



Mayor John Cook of El Paso, where the population is over 80% Hispanic and there are 8.3 million pedestrian border crossings annually between the U.S. and Juarez, Mexico.

The Police Foundation has done much of the research that led to a new view of policing—one emphasizing a *community* orientation—that is widely embraced today, and has played a principal role in the development of community policing research, training, and technical assistance. Over the past fifteen to twenty years, community policing and problem-solving policing initiatives—a philosophy of policing that requires significant collaboration and cooperation with community members—have become increasingly commonplace in the policing profession (Harris 2006, 7). Community policing is an approach to policing where police officers engage communities in a working partnership to reduce crime and promote public safety. It thus requires police to interact with neighborhood residents in a manner that will build trust and improve the level of cooperation with the police department (Moore 1992, 123). Proponents of community policing have expressed concern that policies and practices that sanction police officers to act as immigration agents will undo the successes they have gained over years of developing police relations with immigrant communities (Appleseed 2008, 8). As pressure for local police to proactively get involved with immigration enforcement increases, the public safety gains achieved through the community-policing movement are placed in jeopardy, particularly in communities and cities with significant immigrant populations.

The majority of respondents to the conference survey indicated that aggressive enforcement of immigration law would have a negative impact on community relationships by decreasing (1) community trust of the police (74 percent), (2) trust between community residents (70 percent), and (3) reporting of both crime victimization (85 percent) and criminal activity (83 percent). Adding to those concerns are beliefs that aggressive enforcement of immigration laws would weaken (1) public trust initiatives (77 percent), (2) community-policing efforts (77 percent), (3) youth outreach (74 percent), (4) intelligence/information gathering (63 percent), (5) criminal investigations (67 percent), and (6) even recruitment (31 percent), thereby impacting operations significantly (Amendola et al. 2008).

Project participants expressed concerns that the loss of trust and cooperation would not be limited to undocumented immigrants. Eighty-five percent of immigrant families are mixed-status families, families with a combination of citizens, undocumented immigrants, and documented immigrants (Morawetz and Das 2008, 10). The loss of cooperation resulting from local police involvement in immigration enforcement would extend to authorized immigrants living in mixed-status households who fear contact with police would lead to deportation of family members and other loved ones (Harris 2006, 39). A recent Pew Hispanic Center survey found that the majority of Latinos in the United States worry about deportation of themselves, a family member, or a close relative (Lopez and Minushkin 2008, ii).

## 2. Increased Victimization and Exploitation of Undocumented Immigrants

Many law enforcement participants also emphasized their duty as police executives to ensure public safety for all community members, regardless of legal status, and expressed their concerns that criminal predators take advantage of undocumented immigrants' fear and tendency not to report crimes. As one northeastern city police chief stated:

> They [undocumented immigrants] refer to themselves as walking ATMs because everybody knows that they don't have documentation enough to get bank accounts, checking accounts, and those kinds of things, and that their savings and whatever they have is on their person, not anywhere else. First of all, they live in an apartment with eight other people, so you can't leave it behind. They carry it with them and the people who seek to victimize them take advantage of that.

Fifty-three percent of respondents to the ASU survey stated that undocumented immigrants are more likely to be victims of theft or robbery (Decker et al. 2008). Similarly, respondents to the conference survey were asked whether undocumented immigrants were likely or unlikely to be crime perpetrators and crime victims. As figure 6 shows, respondents believed that undocumented immigrants were more likely to be crime victims (81 percent) than crime perpetrators (39 percent) (Amendola et al. 2008).

Any police actions that result in exacerbating fear of police in immigrant communities could lead to increased victimization and exploitation of immigrants as perpetrators of crime take advantage of heightened immigrant fear to target them for criminal activity. At least one El Paso focus group participant believed that more enforcement would specifically lead to more human trafficking, as smugglers or traffickers are more able to use the threat of deportation to coerce undocumented immigrants into situations of forced labor. Several participants also believed there would be an aggravation of employer abuse and exploitation of undocumented immigrants.

Participants' perceptions of immigrant victimization were confirmed by research conducted in Memphis, Tennessee, on victimization of undocumented immigrants and their interaction with police. The study found that



FIGURE 6. LIKELIHOOD OF CRIME PERPETRATION AND VICTIMIZATION

Source: *Law Enforcement Executive Views: Results from the Conference Survey* (Amendola et al. 2008) (see appendix H).

undocumented workers experienced high rates of victimization, yet they were unlikely to report the crimes to law enforcement officials. The study also found perceived deportation risk to be a factor driving both undocumented workers' particular risk of victimization and their reluctance to report crimes. Memphis is a city that reports interactions with undocumented victims and perpetrators to immigration officials (Bucher, Tarasawa, and Manasse 2007).

### 3. Police Misconduct

For similar reasons that immigration enforcement by local police could lead to increased victimization and exploitation of undocumented immigrants (fear of police and deportation), some participants expressed concern that it could lead to an increase in police misconduct. As one El Paso focus group law enforcement executive stated, "I might have issues out in the field with officers who are doing things they're not supposed to be doing, but people are afraid to tell us, simply because they're afraid." At the conference, Professor Raquel Aldana also argued that the extremely limited application of the exclusionary remedy in immigration court proceedings creates an additional risk of abuses of power not subject to judicial review and oversight (Aldana 2008, 14). In another project that brought together police officials from the New York/New Jersey metropolitan area, one police official working in a jurisdiction that in the past collaborated with federal immigration officials confirmed that his agency's prior involvement in immigration enforcement had indeed led to corruption and extortion (King 2006, 25).

### 4. Large Financial Costs of Immigration Enforcement Divert Resources from Traditional Law Enforcement Activities

In recent years, police departments throughout the country have experienced budget cuts because of the diversion of federal funds from traditional law enforcement funding streams, such as the Office of Community Oriented Police Services (COPS) and Bureau of Justice Assistance (BJA) Byrne grants, to homeland security programs, while simultaneously their workloads have increased as a result of current homeland security and counterterrorism responsibilities (Harris 2006, 12). In addition to having to take on additional counterterrorism responsibilities, local law enforcement has to make up for reductions in federal law enforcement manpower that was previously devoted to federal criminal enforcement, such as drug trafficking and bank robbery (MCC 2006, 6). In this fiscal environment, local law enforcement simply does not have the resources to add immigration enforcement responsibilities (MCC 2006, 10). As one participant stated, "Law enforcement is struggling just to keep up with the things [we] need to do every day. So taking on an additional responsibility is probably impossible."

Federal immigration enforcement agencies contend they do not have adequate resources to accomplish their immigration enforcement mandate. Local agencies have even fewer resources given all their competing demands (MCC 2006, 6). Moreover, focus group participants warned that were the federal government to change its current practice and begin funding local agencies to collaborate in immigration enforcement, those resources should not come at the expense of traditional crime fighting resources, such as what little is left in the COPS and BJA Byrne grant funding streams.

Indeed, respondents to the conference survey ranked resources as their highest agency concern, followed by staffing. Immigration ranked merely seven after the concerns listed above (see table 1) (Amendola et

> **TABLE 1. HIGHEST RANKED AGENCY CONCERNS**
>
> In general, what do you consider to be the most critical issues facing you and your agency? Please list them in priority order, from highest to lowest.
>
> 1. Resources
> 2. Staffing
> 3. Violent Crime
> 4. Gangs
> 5. Community Relations; Drugs (tie)
> 6. Property Crime
> 7. Immigration Issues
>
> Rankings were based on a weighted scoring system. Those ranked first were given a score of 5, second scored 4, third scored 3, and so forth.
>
> Source: *Law Enforcement Executive Views: Results from the Conference Survey* (Amendola et al. 2008) (see appendix H).

# Federal immigration law is very complicated, technical, and constantly changing.

al. 2008). One of the biggest concerns discussed in policing today—as confirmed by the choice of staffing as the second most urgent agency concern—is the challenge of police officer recruitment (Raymond, Hickman, Miller, and Wong 2005). Therefore, even if the federal government provided financial resources for local immigration enforcement, many police agencies would have difficulty hiring quality police recruits to meet the additional workload demands of enforcing immigration law.

Because of the resource issues above, opponents of local law enforcement participation in federal immigration enforcement contend that there could be a diversion of police resources away from criminal investigations to immigration enforcement (Seghetti, Viña, and Ester 2004, 25). Financial costs listed by conference and focus group participants included the patrol resources and overtime costs resultant from arresting and processing immigration detainees, costs of providing temporary detention space, transportation costs, and potential medical costs incurred during detention. This diversion of resources, participants argued, could have a negative public safety impact. Mayor Gordon gave the example of the immigration enforcement initiatives of the Maricopa County Sheriff's Office being responsible for its failure to investigate at least thirty violent crimes, including a dozen sexual assaults, in the past year in a small city of 32,000 people. "He [sheriff of Maricopa County] allows sexual assaults, homicides, and other serious crimes to go unsolved, by arresting victims and witnesses and sending them to jail for violating immigration statutes. That's a direction that makes our community less safe."

### 5. Complexity of Federal Immigration Law and Difficulty in Verifying Immigration Status

One of the arguments articulated against local participation in federal immigration enforcement is that federal immigration law is very complicated, technical, and constantly changing. Indeed, it has often been compared to the tax code in complexity (Harris 2006, 36). A conference participant who supports local enforcement of immigration law argued that police are used to enforcing all types of laws and that immigration would be no different. However, IACP has stated that immigration enforcement would require specialized knowledge of "suspect's status and visa history and the complex civil and criminal aspects of the federal immigration law and their administration. This is different from identifying someone suspected of the type of criminal behavior that local officers are trained to detect" (IACP 2004, 4). MCCA has also said that immigration law is very complicated and nothing like criminal violations, such as murder, assaults, narcotics, robberies, burglaries, and so forth (MCC 2006, 7). If police departments employ insufficiently trained officers to perform federal immigration enforcement duties, they may also risk exposing themselves to substantial civil liability (Venbrux 2006, 330).

At the conference, Nancy Morawetz, New York University Professor of Clinical Law, presented a paper that describes in detail some of the complexities of immigration law enforcement and reveals the challenges to local police participation in immigration enforcement activities (see appendix B). Professor Morawetz begins by challenging the assumption that the immigration status of an individual is easy to identify. Firstly, she points out that approximately 70 percent of the foreign born in the United States are legal permanent residents or citizens. Of the remaining 30 percent, substantial numbers

A397

have some form of lawful status or are in the process of obtaining lawful status. About 300,000 of these immigrants have temporary protected status (TPS), which allows them to live and work in the United States; and 617,000 are in the process of applying for legal permanent residency and have official permission to work. Every year, approximately one million people receive legal permanent resident status. In addition, there are millions of people each year who are present in the United States with a lawful business, visitor, or student visa. The challenge this creates for police engaging in immigration enforcement is that there are no distinguishable factors that allow police to distinguish between the authorized and unauthorized immigrant population.



**Professor Nancy Morawetz describes the legal complexity of local law enforcement's role in immigration enforcement and legal constraints on methods of enforcement in a legal and institutional system that operates quite differently from local criminal justice systems.**

Furthermore, Professor Morawetz notes that police will have difficulty verifying immigration status because many people do not have the necessary documentation to prove their lawful status, in part because immigration documents were not designed to function as identity documents. Thirteen million U.S. citizens lack papers proving they are citizens, permanent residency card ("green card") renewals are frequently delayed, and there is no national database of citizens and the status of other people.

Both Professors Morawetz and Aldana also observed that federal immigration databases are notoriously inaccurate; thus, police reliance on these databases will most likely lead to error. The DHS Inspector General estimates that the immigration records relied upon by ICE's fugitive teams are inaccurate in up to 50 percent of cases (Morawetz and Das 2008, 27). DHS also commissioned a study of Social Security Administration (SSA) databases and found that they were able to verify employment eligibility in less than 50 percent of work-authorized noncitizens (Aldana 2008, 17). The SSA itself has estimated that 17.8 million of its records contain errors with respect to name, date of birth, and citizenship status; and that 4.8 million of 46.5 million noncitizen records in its database contain errors (Aldana 2008, 17). A mismatch between employee records when checked against the SSA databases can turn into an immigration administrative warrant (Aldana 2008, 17). Immigration warrants and information contained in the NCIC database have also proven to be inaccurate. A study by the Migration Policy Institute of calls to the LESC showed that 42 percent of all police inquiries to the LESC were false positives that DHS was unable to confirm (Gladstein et al. 2005, 3).

### 6. Racial Profiling and Other Civil Litigation Costs

Because local law enforcement agencies lack sufficient and ongoing training in federal immigration law, are prohibited from racial profiling, lack clear authority to enforce civil immigration laws, and are limited by state law on making warrantless arrests, those police agencies that get involved in civil immigration law enforcement risk being subject to civil litigation (MCC 2006, 8). Prohibitions on racial profiling and state laws limiting the scope of police authority exist to protect community members from being victim to police error or abuse. Were these laws to be violated in the context of immigration enforcement, and given the complexity of federal immigration law, it is likely that citizens and immigrants with lawful status would be arrested and detained. These errors are then likely to result in litigation.

# Prohibitions on racial profiling and state laws limiting the scope of police authority exist to protect community members from being victim to police error or abuse.

Indeed, there have been several lawsuits where citizens or legal permanent residents have been arrested, detained, and in some cases deported. For instance, Pedro Guzman, a cognitively-impaired U.S. citizen who had been arrested and detained in a Los Angeles County jail for misdemeanor charges, has sued the sheriff of Los Angeles County who erroneously identified Mr. Guzman as an unauthorized immigrant and turned him over to federal immigration officials who later deported him to Mexico. It took months for Mr. Guzman's family to locate him after he was deported to Mexico (Morawetz and Das 2008, 18).

The likelihood of error in the context of immigration enforcement is higher for poor and minority communities. A recent study showed that citizens with incomes under twenty-five thousand dollars are twice as likely to lack citizenship documents as those earning more than twenty-five thousand dollars. Twenty-five percent of African Americans lack any form of government-issued photo identification. As many as thirty-two million American women do not have citizenship documents reflecting their current name. And, as stated above, there is no national database of citizens to verify status (Morawetz and Das 2008, 16-17).

Even well-intentioned police officers risk racial profiling and resultant lawsuits in the course of enforcing immigration laws. As stated above, there are no discernible indicators of immigration status; thus, it is difficult for police officers to observe behavior that indicates immigration status as they would be able to observe criminal activity. As a result, police officers may use ethnic or racial characteristics as a basis for stopping and questioning, and possibly detaining, people from certain racial and ethnic groups (Chishti 2002, 374). The practice of using race or ethnic characteristics to determine whether to investigate immigration status also wastes valuable law enforcement resources. The number of erroneous stops or detentions resulting from false positives will be particularly high in regions with high Hispanic and Asian populations (Harris 2006, 51). Furthermore, many communities of color already have strained relations with police, which will be further exacerbated as they feel targeted by immigration enforcement efforts (Appleseed 2008, 10). A recent survey of Hispanic residents in the United States found that nearly one out of ten Hispanic adults (native-born 8 percent and immigrants 10 percent) have been stopped and questioned about their immigration status in the past year (Lopez and Minushkin 2008, i). Thus, it seems the trend towards greater participation by local law enforcement in federal immigration enforcement has already begun to impact the Hispanic community.

Professor Morawetz emphasized during her conference presentation that 287(g) agreements contain language clarifying that officers are bound by federal civil rights statutes and regulations and specifically prohibit the practice of racial profiling. The 287(g) agreements are also narrowed to authorize behavior only to the extent that it is consistent with state and local law (Morawetz and Das 2008, 14). Some state and local law enforcement officials participating in the project were under the impression that the federal government would assume liability under the Federal Tort Claims Act (FTCA) . However, because 287(g) limits police behavior as described

above, local agencies will not be protected or covered by the agreement where they have violated federal civil rights statutes, state or local law, or engaged in racial profiling in the course of immigration enforcement (Morawetz and Das 2008, 14-15).

Several major lawsuits have already been filed alleging racial profiling by police departments engaging in immigration enforcement. For instance, residents, alleging racial profiling among other violations, sued the Chandler, Arizona, Police Department as a result of a joint operation with CBP. Complainants alleged that police officers were stopping and questioning dark-skinned, Spanish-speaking residents (who appeared "Mexican") and requesting proof of citizenship (Venbrux 2006, 327-328). In addition to costing the city money as a result of the lawsuits, the police department created deep distrust in the Latino community, harming its ability to effectively police the city.

Sheriff Joe Arpaio of the Maricopa County, Arizona, Sheriff's Office (an ICE 287(g) partner) has faced several lawsuits, the allegations of which include racial profiling (Aldana 2008, 21). Mayor Gordon commented during his conference remarks that the sheriff, himself, says he can identify an unauthorized immigrant "by the way they dress and where they are coming from." As Mayor Gordon stated, that is "the very definition of racial profiling." Mayor Gordon further explained that sheriff's deputies are stopping citizens in Maricopa County because they are brown and detaining them, even when they have documentation proving their legal status. Even a member of Mayor Gordon's staff and her husband, who are third-generation Latino citizens, were stopped and asked for their social security cards by Maricopa sheriff deputies.

### 7. Immigrants Will Fear Accessing Other Municipal Services

The increased fear of deportation resulting from local law enforcement participation in immigration enforcement will not only impact police-community relations with immigrant communities but might also lead to fear among immigrant communities of accessing other state and local government services. Several focus group participants who worked for city agencies discussed the difficulty they already have encouraging immigrants to access municipal services. In a paper presented at the conference, Professor Roberto Gonzales of the University of Washington discusses the impact of immigration enforcement efforts on schools, including increased absences and students distracted by their anxiety over deportation (Gonzales 2008, 6) (see appendix E).

## Striking a Balance Between Immigration Enforcement and Civil Liberties: Recommendations

The goal of the Police Foundation project was to begin a dialogue among police executives and professionals, scholars, public policy and community groups over the role of local law enforcement in federal immigration law enforcement, in order to improve law enforcement's understanding of the issue and to begin to develop some consensus on how to strike the balance between the competing federal need of immigration enforcement with local public safety priorities and civil liberties. As stated earlier in the About the Project section, the foundation conducted a series of focus groups throughout the country with police executives, local government officials, and community members; convened a national conference of leaders in the policing, public policy, academic, and immigrant communities; commissioned academic papers on pertinent topics; and conducted a written survey of police executives. Throughout this process, there was a healthy level of dialogue and disagreement about specific questions and issues. However, it also became clear that certain recommendations and policy positions were widely held among the group. In this section of the report, we describe some of these positions and recommendations.

**Almost all project participants agreed that agencies should not be patrolling for immigration violators and that immigration enforcement activity should be limited to contacts incidental to a lawful arrest for a state criminal law violation.**

### The Costs of the 287(g) Program Outweigh the Benefits

As outlined earlier, the majority of police executives participating in the project did not see the benefits to local agencies of participating in the 287(g) program. They felt that the 287(g) program created substantial additional work for local agencies to fulfill a federal mandate for which they would not receive any compensation or funding and, therefore, would divert resources from traditional law enforcement functions. Because of the complexity of immigration law, they would have to invest significant labor hours and resources to provide and update training on developments in immigration law. They also were concerned that public safety would suffer because of destroyed trust and cooperation with immigrant communities. Participation in the 287(g) program, or at least the media coverage and fear generated by it, would undermine years of community-policing efforts, which in turn would compromise public safety. Finally, police leaders were concerned about racial profiling and litigation costs: if state and local law enforcement officers engage in racial profiling, violate federal civil rights laws, or violate state and local law defining the scope of police authority, 287(g) agreements will not protect them from liability.

### Police Officers Should be Prohibited from Arresting and Detaining Persons to Solely Investigate Immigration Status in the Absence of Probable Cause of an Independent Crime

Almost all project participants agreed that, at the very least, local law enforcement agencies should not be patrolling for immigration violators and that immigration enforcement activity should be limited to contacts incidental to a lawful arrest for a state criminal law violation.  Even under the best of circumstances, many participants expressed the concern that the use of racial profiling is almost inevitable where local police patrol for immigration violations. One police chief from Arizona stated that in many parts of the country, particularly Arizona, race is being used as a predictor of criminal behavior, which violates the equal protection clause of the Constitution. He explained that citizens and legal residents are being targeted by local immigration enforcement efforts because of the color of their skin. Many participants contended that there are no objective, visibly discernible factors indicating immigration status. "You cannot see immigration status," one participant stated. Therefore, Chief Harold Hurtt of Houston contended that were local law enforcement to begin engaging in civil immigration enforcement activities, they would have to ask everyone they stop for proof of citizenship. For example, he stated, the Caucasian wife of a member of the chamber of commerce is pulled over for a traffic violation and is without proof of citizenship. The police officer would have to ask her about her citizenship status and, in the absence of such proof, arrest and detain her. "Imagine," Chief Hurtt said, "the community outrage you would get then."



**Chief Harold Hurtt describes the Houston Police Department's policy of focusing on the criminal nexus in immigration enforcement.**

### *If a Local Agency Enters the 287(g) Program, it Should Limit Participation to Serious Criminal Offenders and Jail-Based Programs*

Many participants believed that if state and local law enforcement agencies were to enter a 287(g) agreement with the federal government, it should be limited to jail-based programs and that the delegated immigration enforcement powers should be selectively used to target serious felony offenders. One former INS official mentioned that, in response to political pressure to deport more unauthorized immigrants and the lack of available federal resources to do so, federal immigration officials designed the 287(g) program initially with the intent to focus on jails and prisons.

### *Implement Policies and Procedures for Monitoring and Enforcing Racial Profiling Violations*

Because of grave concerns about racial profiling, in particular in jurisdictions operating 287(g) programs in the patrol context (versus solely in the jail), it is important that both local agencies themselves and the federal government implement policies and procedures for monitoring and enforcing civil rights violations. While 287(g) agreements contain provisions prohibiting racial profiling, comments at the conference seem to suggest that the federal government has not been effectively policing compliance with these provisions of the 287(g) agreements. Indeed, Mayor Gordon of Phoenix stated that he had written a complaint letter to the U.S. Department of Justice's Civil Rights Division arguing that the Maricopa County Sheriff's Office has been using racially-biased enforcement practices, but the mayor stated that the federal government had not yet taken any steps towards investigating the allegations. Participants recommended that agencies engaging in immigration enforcement activities need to put into place their own racial profiling and civil rights violation self-monitoring policies and practices to prevent potential abuses of immigrant rights.

### *Involve Community Members in Developing Immigration Policies*

Local law enforcement agencies depend on the trust and cooperation of immigrant communities to effectively police these communities. In order to preserve this trust that they built over the years by aggressively engaging in community-oriented policing trust-building activities, state and local law enforcement agencies should open lines of communication with immigrant communities to establish collaborative partnerships for public safety and crime control purposes and to obtain input from the immigrant community on the impact of police department policies. Police departments should regularly meet with representatives of immigrant communities to educate them about their immigration policies, obtain their perspectives on immigration enforcement and other issues involving immigrant communities, and to monitor impact of their efforts. As a result of efforts by the Houston Police Department to educate the immigrant community on the content and purpose of department policies and the rationale necessitating changes, a more aggressive posture in the enforcement of immigration laws adopted by the department had no discernible negative effects on police-community relations.

> **Whether or not a local agency is involved in immigration enforcement, it is important that it make efforts to build trust with immigrant communities and ease tensions between different communities.**

### Evaluation Research Should be Conducted of the 287(g) Program and Other Local Immigration Enforcement Initiatives

Several participants suggested that there was very little research and empirical evidence of the costs and benefits of the different forms of local law enforcement collaboration in federal immigration enforcement efforts. As a result, we are asked to rely on subjective perspectives of law enforcement executives and politicians who may be influenced by a need to support their own policies. There is a great need for evaluation research of these programs, their outcomes, and their impact. Some research questions suggested by program participants included (1) who conducts the immigration status inquiry, (2) who is being arrested and detained, (3) who is being questioned but released, (4) is there any racially disparate impact, (5) how often is error occurring, (6) how often do civil rights violations occur, (7) what happens to those agencies that violate 287(g) agreements, and (8) how many people are going to jail and deported because of these efforts.

### Employ Community-Policing and Problem-Solving Tactics to Improve Police-Community Relations with Immigrant Communities and Resolve Tension Caused by Expanding Immigration

Whether or not a local agency is involved in immigration enforcement, it is important that it make efforts to build trust with immigrant communities and ease tensions between different communities. Rapidly changing demographics, tougher enforcement of immigration laws, and stricter limitations on the privileges and benefits authorized by the government for undocumented immigrants have created an environment in which increased tension between communities and police exist. In this environment, police-community relations will be impacted regardless of what local policy is. Several participants provided some good examples of strategies that not only improved police-community relations but also diffused local tensions over immigration.

For instance, one northeastern city police executive reported that they were experiencing tensions between communities over concerns attributed to increased immigration. The police department, in response, organized dialogues in various neighborhoods, including representatives of new immigrant communities and established communities. In these dialogues, using problem solving policing techniques, the police department facilitated discussions that led communities and police to jointly work out resolutions to neighborhood problems. In other words, they focused the energy of the group on specific behavioral issues and jointly problem-solved. Over-time, the police executive stated, "We're not yelling. They're not yelling anymore. They know each other's names now. They know the children. They know the teenagers. And we're working at it. And it's not solved. And it probably never will get solved because they're opposing cultures.

We're like a mediator. But it's not a crime problem. It's a community problem and that's how we're dealing with it."

Another police chief from an east coast beach city gave a similar example. They were having trouble with complaints about migrant workers coming to town during weekends, when they get a very large Hispanic population at the beach. These migrants sometimes would hang up hammocks underneath the pier and they would drink and bring their own food, at times creating a trash problem. For years, the police department had received complaints from the business community but since there was no real crime problem, there was little they could do. A few years ago, the department put up signs in Spanish explaining that drinking in public was illegal and could lead to arrest, placed garbage bins along the beach, and added showers to the beach. As a result, the chief explained, "Now we don't have the same complaints we had before. We used problem solving to help overcome some of the complaints that citizens were having."

Most of the conference participating agencies engaged in some form of outreach to immigrant communities. Respondents to the conference survey were asked to describe the strategies they have developed or would develop to engage the immigrant community. The most frequently cited strategies in the forty-five received responses were: organizing and/or attending community meetings, events, and forums (n=19), establishing community outreach programs or using community liaisons (n=17), attempting to educate the community through the media and bilingual pamphlets (n=13), or creating specialized department positions or programs to focus on the immigrant community (n=13) (Amendola et al. 2008).

### *The Federal Government Must Enact Comprehensive Border Security and Immigration Reforms*

One of the most universal recommendations made during the project was for police organizations to urge Congress and the federal government to make a real commitment to comprehensive border security and immigration reform. Participants expressed their frustration with Congress's inability to comprehensively reform the immigration system. They explained that Congress's failure has had severe consequences on cities and towns throughout the country that struggle to deal with the fiscal and administrative challenges of integrating immigrant communities and must figure out how to manage the racial and ethnic tension generated by the presence of an increasingly large population of immigrants.

Mayor Gordon, for instance, stated:

**I am calling upon this Congress and the next one, this president and the next one, to make the dual issues of border security and immigration reform their first order of national business. I don't believe that certain members of Congress understand...the impact of their neglect...on cities. They don't see the hate. They don't see the division. They don't hear the rhetoric. They don't see the civil rights violations. And they don't understand the costs.**

At the conference, Julie Erfle, the widow of a Phoenix police officer killed by an unauthorized immigrant who had previously been deported, discussed the psychological and social costs of Congress's failure to pass comprehensive immigration reform, not only on law enforcement and their families but also on the undocumented and their families. She, like Mayor Gordon, suggested, "My solution is comprehensive immigration reform....It is time to stop pandering and time to stop talking about the issue and time to start enacting a real policy" (see appendix M).

## Conclusion

Immigration issues are some of the most contentiously debated in the United States today. Increasing levels of immigration, the dispersal of immigrants to communities throughout the country that have no experience with immigration, and the federal government's failure to secure the borders and comprehensively reform the immigration system have created tensions between communities in regions throughout the country and the resultant pressure on state and local law enforcement to control unauthorized immigration. As one police chief stated, "Once again we [police] are found to be in between. In fact, much of the civil unrest in this country goes back to some conflict that erupted in one of our communities across this country, where police were at the fulcrum." During conversations throughout the project, we repeatedly heard law enforcement officials discuss the pressure they are feeling to take sides in the immigration debate.



Julie Erfle, an advocate for comprehensive immigration reform, told conferees, "We need to put compassion and humanity on an equal footing with immigration enforcement."

One of the ultimate goals of the foundation project was to give police a voice on this critical issue. And, indeed, during much of the national conference, participants openly and passionately discussed a range of issues relating to the role of local police in federal immigration enforcement: from the legal rights of the unauthorized immigrant population; to empirical evidence and research conducted on the demographic characteristics of the population, immigrant criminality, the experience of the undocumented, and the impact of immigration enforcement programs; to the diverse perspectives of law enforcement executives and community leaders on the issue. The conversations were always lively but respectful and they included specificity, empirical evidence, and detail often absent in national conversations about immigration enforcement.

Ultimately, however, the conversations at the conference always came back to the core role of local police and core principles of community policing. One police chief quoted the police officer's oath of office: "To support and defend the Constitution of the United States and to be faithful and bear true allegiance to state laws, and to the best of our skill and judgment diligently and faithfully without prejudice or partiality execute the office of the police officer." As this chief and many other law enforcement executives stated, police have a duty to uphold state and local laws but must do so while respecting and protecting the Constitution. This includes the equal protection clause, which prohibits racially discriminatory enforcement practices. In fact, great concern was expressed throughout the conference about the impact on the Latino community, in particular, and the risks of racial profiling where local law enforcement becomes involved in immigration



Coatesville, PA, Chief of Police William Matthews moderates the open forum on the final day of the conference.

# As one police chief asked, "How do you police a community that will not talk to you?"

enforcement. Moreover, the participants generally agreed that their duty as a police executive is to provide public safety to *all* residents in their community, whether documented or undocumented. One police chief stated, "We need to draw the line and stand for justice and civil liberties. This has to be done by the police because others will not do it. It goes back to our oath of office to uphold the Constitution and justice."

Many police executives, particularly those working in communities with significant immigrant populations, also expressed concern that police participation in immigration enforcement efforts has threatened to undo years of community oriented policing efforts to build trust with immigrant communities. Police participants discussed the difficulties they have gaining the trust and cooperation of immigrant communities because of fears of deportation and imported distrust and perceptions of police from their home country. Participants felt that they needed the support of these communities in order to effectively provide public safety. As one police chief asked, "How do you police a community that will not talk to you?" For this reason, one of the core recommendations discussed in this report is that law enforcement agencies engage communities in the process of developing immigration policies and educate them about agency policy and practices. By inviting communities to participate in the process of generating policies, agencies can make great headway towards striking a balance between immigration concerns, civil liberties, and maintaining public safety.



A406

## Endnotes

[1] The terms "immigrant" and "foreign-born" are used interchangeably throughout the report to describe individuals who were not born in the United States, including unauthorized immigrants, legal permanent residents, and naturalized citizens.

[2] The Bureau of Justice Assistance of the U.S. Department of Justice administers the State Criminal Alien Assistance Program (SCAAP), in conjunction with the Bureaus of Immigration and Customs Enforcement and Citizenship and Immigration Services, Department of Homeland Security (DHS). SCAAP provides federal payments to states and localities that incurred correctional officer salary costs for incarcerating undocumented criminal aliens with at least one felony or two misdemeanor convictions for violations of state or local law and incarcerated for at least four consecutive days during the reporting period. In 1995, Congress appropriated $130,000,000 to the program, Public Law 104-208 accessed at http://www.lib.umich.edu/govdocs/text/104208.txt. SCAAP awards totaled $377,323,723 in 2007, $287,143,095 in 2005, $281,605,292 in 2004, $239,999,996 in 2003, and $545,090,055 in 2002. Accessed at http://www.ojp.usdoj.gov/BJA/grant/scaap_site.html. Totals not posted for 2000, 2001, and 2006.

[3] In 2005 alone, LESC responded to 676,502 inquiries by state and local law enforcement officials (Aldana 2008).

[4] Citing *Gonzalez v. City of Peoria*, 722 F.2d 468 (9th Cir. 1983) (Court held that local police have authority to arrest for criminal provisions of INA but no inherent authority to arrest for civil violations.); *United States v. Vasquez-Alvarez*, 176 F.3d 1294 (10th Cir. 1999) (Court held state and local law enforcement officers have the general authority to investigate and make arrests for federal immigration law. Case premised on Oklahoma law allowing local officers to make arrests for violations of federal law.); and *United States v. Santana-Garcia*, 264 F.3d 1188 (10th Cir. 2001) (Court held local law enforcement had authority to investigate and make arrests for violations of immigration law, relying partially on Utah statute defining scope of authority of peace officers.).

## References

Alba, Richard, Rubén Rumbaut, and Karen Marotz. 2005. "A Distorted Nation: Perceptions of Racial/Ethnic Group Size and Attitudes toward Immigrants and Other Minorities." *Social Forces* 84: 901-919.

Aldana, Raquel. 2008. "Making Civil Rights Matter in Local Immigration Enforcement." Paper presented at the Police Foundation conference, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties, Washington, DC, August 21-22, 2008.

Amendola, Karen L., Kristin N. Williams, Edwin E. Hamilton, and Veronica Puryear. 2008. "Law Enforcement Executive Views: Results from the Conference Survey." Survey from the Police Foundation conference, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties, Washington, DC, August 21-22, 2008.

Appleseed. 2008. "Forcing Our Blues into Gray Areas: Local Police and Federal Immigration Enforcement." Appleseed: Washington, DC. http://neappleseed.org/docs/local_police_and_immigration_enforcement.pdf.

Bucher, Jacob, Beth Tarasawa, and Michelle Manasse. 2007. "Hidden Victims: An Examination of Crimes Against Illegal Immigrants." Paper presented at the annual meeting of the American Society of Criminology, Atlanta, Georgia, November 14.

Butcher, Kristin F. and Anne Morrison Piehl. 2007. "Why are Immigrants' Incarceration Rates So Low? Evidence on Selective Immigration, Deterrence, and Deportation." NBER Working Paper No. 13229. National Bureau of Economic Research: Cambridge, MA, July. http://www.nber.org/papers/w13229.

Capps, Randolph. 2008. "Local Enforcement of Immigration Laws: Evolution of the 287(g) Program and Its Potential Impacts on Local Communities." 2008. Paper presented at the Police Foundation conference, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties, Washington, DC, August 21-22, 2008.

Capps, Randolph and Michael E. Fix. 2005. "Undocumented Immigrants: Myths and Reality." Urban Institute: Washington, DC, November 1. http://urban.org/publications/900898.html.

Carroll, Susan. 2008. "Harris County Jailers Can Access Huge Immigration Database." *Houston Chronicle*, October 27.

Chishti, Muzaffar. 2002. "The Role of States in U.S. Immigration Policy." *NYU Annual Survey of American Law* 58: 371-376.

Chishti, Muzaffar. 2006. "Enforcing Immigration Rules: Making the Right Choices." *NYU Journal of Legislation and Public Policy* 10: 451-471.

Decker, Scott H., Paul G. Lewis, Doris Marie Provine, and Monica W. Varsanyi. 2008. "Immigration and Local Policing: Results from a National Survey of Law Enforcement Executives." Paper presented at the Police Foundation conference, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties, Washington, DC, August 21-22, 2008.

Gladstein, Hannah, Annie Lai, Jennifer Wagner, and Michael Wishnie. 2005. "Blurring the Lines: A Profile of State and Local Police Enforcement of Immigration Law Using the National Crime Information Center Database, 2002-2004." Migration Policy Institute: Washington, DC, December. http://www.migrationpolicy.org/pubs/MPI_report_Blurring_the_Lines_120805.pdf.

Gonzales, Roberto G. 2008. "Why Integration Matters: The Case of Undocumented Immigrant Youth and Moving Beyond Enforcement." Paper presented at the Police Foundation conference, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties, Washington, DC, August 21-22, 2008.

Gordon, Phil. 2008. Keynote address at the Police Foundation conference, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties, Washington, DC, August 21-22, 2008.

Harris, David A. 2006. "The War on Terror, Local Police, and Immigration Enforcement: A Curious Tale of Police Power in Post-9/11 America." *Rutgers Law Journal* 38: 1-60.

Immigration Policy Center (IPC). 2007. "Undocumented Immigrants as Taxpayers." Immigration Policy Center: Washington, DC, November 29. http://immigration. server263.com/images/File/factcheck/ Undocumented%20as%20 Taxpayer%2011-29-07.pdf.

International Association of Chiefs of Police (IACP). 2004. "Enforcing Immigration Law: The Role of State, Tribal, and Local Law Enforcement." International Association of Chiefs of Police: Alexandria, VA. http://www.theiacp.org/Portals/0/pdfs/Publications/ImmigrationEnforcementconf.pdf.

Kalhan, Anil. 2008. "Immigration Enforcement and Federalism After September 11, 2001." In *Immigration, Integration, and Security: America and Europe in Comparative Perspective*, edited by Arianne Chebel d'Appollonia and Simon Reich. Pittsburgh: University of Pittsburgh Press. http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1145666#.

King, Martha, ed. 2006. *Justice and Safety in America's Immigrant Communities*. Policy Research Institute for the Region, Woodrow Wilson School of Public and International Affairs. Princeton University: Princeton, NJ.

Lopez, Mark Hugo and Susan Minushkin. 2008. "2008 National Survey of Latinos: Hispanics See Their Situation in U.S. Deteriorating; Oppose Key Immigration Enforcement Measures." Pew Hispanic Center: Washington, DC, September 18. http://pewhispanic.org/reports/report.php?ReportID=93.

Macropoulos, Angela. 2008. "In Mourning an Immigrant, a Call for Unity on Long Island." *The New York Times*, November 15. NY/Region section.

Major Cities Chiefs Association. 2006. *MCC Immigration Committee Recommendations for the Enforcement of Immigration Laws by Local Police Agencies*, June. http://www.majorcitieschiefs. org/pdfpublic/mcc_position_statement_revised_cef.pdf

Media Matters Action Network Report. 2008. "Fear & Loathing in Prime Time: Immigration Myths and Cable News," May 21. http://mediamattersaction.org/reports/fearandloathing/online_version.

Moore, Mark H. 1992. "Problem-Solving and Community Policing." In *Modern Policing*, edited by Michael Tonry and Norval Morris, 99-158. Chicago: University of Chicago Press.

Morawetz, Nancy and Alina Das. 2008. "Legal Issues in Local Police Enforcement of Federal Immigration Law." Paper presented at the Police Foundation conference, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties, Washington, DC, August 21-22, 2008.

Nadler, Richard. 2008. "Immigration and the Wealth of States." Americas Majority Foundation: Overland Park, KS, January. http://www.amermaj.com/ImmigrationandWealth.pdf.

Olivas, Michael. 2007. "Immigration-Related State and Local Ordinances: Preemption, Prejudice, and the Proper Role for Enforcement." *University of Chicago Legal Forum* 27-56.

Passel, Jeffrey. 2008. "Unauthorized immigrants: Trends, characteristics, and surprises." Presentation at the Police Foundation conference, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties, Washington, DC, August 21-22, 2008.

Passel, Jeffrey and D'Vera Cohn. 2008. "Trends in Unauthorized Immigration: Undocumented Inflow Now Trails Legal Inflow." Pew Hispanic Center: Washington, DC, October 2. https://pewhispanic.org/files/reports/94.pdf.

Pham, Huyen. 2005. "The Constitutional Right Not to Cooperate? Local Sovereignty and the Federal Immigration Power." *bepress Legal Series*, Working Paper 771, September 11. http://law.bepress.com/expresso/eps/771.

Porter, Eduardo. 2005. "Illegal Immigrants Are Bolstering Social Security With Billions." *The New York Times*, April 5, Business/Financial Desk.

Raymond, Barbara, Laura J. Hickman, Laura Miller, and Jennifer S. Wong. 2005. "Police Personnel Challenges After September 11: Anticipating Expanded Duties and a Changing Labor Pool." RAND Occasional Paper. RAND Corporation: Santa Monica, CA. http://www.rand.org/pubs/occasional_papers/2005/RAND_OP154.pdf.

A408

Rodriguez, Cristina, Muzaffar Chishti, and Kimberly Nortman. 2007. "Testing the Limits: A Framework for Assessing the Legality of State and Local Immigration Measures." Migration Policy Institute: Washington, DC. http://www.migrationpolicy.org/pubs/NCIIP_Assessing%20the%20Legality%20of%20State%20and%20Local%20Immigration%20Measures121307.pdf.

Rumbaut, Rubén. 2008. "Undocumented Immigration and Rates of Crime and Imprisonment: Popular Myths and Empirical Realities." Paper presented at the Police Foundation conference, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties, Washington, DC, August 21-22, 2008.

Seghetti, Lisa M., Stephen R. Viña, and Karma Ester. 2005. "Enforcing Immigration Law: The Role of State and Local Law Enforcement." Congressional Research Service, updated October 13.

Singer, Audrey. 2004. "The Rise of New Immigrant Gateways." Center on Urban and Metropolitan Policy, The Brookings Institution: Washington, DC, February. http://www.brookings.edu/reports/2004/02demographics_singer.aspx.

Singer, Audrey. 2007. "The Impact of Immigration on States and Localities." Testimony presented before the House Committee on the Judiciary, Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law, May 17. http://www.brookings.edu/testimony/2007/0517demographics_singer.aspx.

U.S. Immigration and Customs Enforcement (ICE). 2008. "Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act," last modified November 17. http://www.ice.gov/partners/287g/Section287_g.htm.

U.S. Immigration and Customs Enforcement (ICE). 2008. "Operation Community Shield: Targeting Violent Transnational Street Gangs," last modified November 12. http://www.ice.gov/pi/news/factsheets/opshieldfactsheet.htm.

Venbrux, Greg K. 2006. "Devolution or Evolution? The Increasing Role of the State in Immigration Law Enforcement." *UCLA Journal of International Law and Foreign Affairs* 11.

## APPENDICES

**A.** **Focus Group Summary** ................................................................ **41**
Anita Khashu

**B.** **Legal Issues in Local Police Enforcement of Federal Immigration Law** ................... **69**
Nancy Morawetz and Alina Das

**C.** **Making Civil Liberties Matter in Local Immigration Enforcement** ..................... **91**
Raquel Aldana

**D.** **Undocumented Immigration and Rates of Crime and Imprisonment:** ............... **119**
**Popular Myths and Empirical Realities**
Rubén G. Rumbaut

**E.** **Why Integration Matters: The Case of Undocumented Immigrant Youth** ............. **140**
**and Moving Beyond Enforcement**
Roberto G. Gonzales

**F.** **Local Enforcement of Immigration Laws: Evolution of the 287(g) Program** .......... **155**
**and Its Potential Impacts on Local Communities**
Randolph Capps

**G.** **Immigration and Local Policing: Results from a National Survey** ..................... **169**
**of Law Enforcement Executives**
Scott H. Decker, Paul G. Lewis, Doris Marie Provine,
and Monica W. Varsanyi

**H.** **Law Enforcement Executive Views: Results from the Conference Survey** ............. **180**
Karen L. Amendola, Kristin N. Williams,
Edwin E. Hamilton, and Veronica Puryear

**I.** **Unauthorized Immigrants: Trends, Characteristics, and Surprises** ..................... **184**
Jeffrey S. Passel

**J.** **Conference Keynote Address** ........................................................ **188**
Phil Gordon

**K.** **Collier County Sheriff's Office Criminal Alien Task Force** ......................... **194**
**An Overview of the 287(g) Program: Strategy, Outcomes,**
**and Benefits of the Partnership**
Don Hunter

**L.** **Fear, Crime, and Community Trust: Community Perspectives** ....................... **199**
**on Immigration Enforcement by Local Police**
Kareem Shora

**M.** **Remarks** ...................................................................... **204**
Julie Erfle

**N.** **Conference Agenda and Presenters' Bios** .......................................... **205**

**O.** **Sample Police Department Policies on Immigration Enforcement** .................... **215**

## APPENDIX A
## Focus Group Summary

### Table of Contents

**Introduction** ................................................................................................................ **42**

**Methodology** ................................................................................................................ **42**

**General Themes Discussed in Focus Groups** ....................................................... **43**

    Challenges faced by communities adapting to a changing population .................... **43**

    The role of politics and media in influencing local immigration enforcement policy ....... **45**

    The costs and benefits of local police enforcement of federal immigration law: ............... **47**
        Is it a federal or local responsibility?

    Counterterrorism and immigration enforcement ...................................................... **50**

    Should undocumented immigrants and their children be entitled to public benefits? ...... **51**

    Proposed solutions and recommendations ............................................................... **52**

**Focus Group Sites** ...................................................................................................... **53**

    Topeka, Kansas ............................................................................................................ **53**

    El Paso, Texas .............................................................................................................. **56**

    Arlington, Texas............................................................................................................ **59**

    Collier County, Florida ................................................................................................ **63**

**Tables**

    Table 1. Crime Statistics for Topeka Participating Agencies .................................... **55**

    Table 2. Crime Statistics for Some El Paso Participating Agencies .......................... **58**

    Table 3. Demographic Statistics for Arlington Represented Counties – 2006 .................. **61**

    Table 4. Racial Makeup of Arlington Participating Agency Sworn ......................... **61**
     Personnel - 2006

    Table 5. Crime Statistics for Arlington Participating Agencies ............................... **62**

    Table 6. Crime Statistics for Collier County Participating Agencies ....................... **65**

**Figures**

    Figure 1. Topeka Focus Group Site Map ................................................................... **53**

    Figure 2. El Paso Focus Group Site Map ................................................................... **56**

    Figure 3. Arlington Focus Group Site Map ............................................................... **59**

    Figure 4. Collier County Focus Group Site Map ...................................................... **63**

**Endnotes** ....................................................................................................................... **66**

## APPENDIX A
## **Focus Group Summary**

### Introduction

The primary goal of the Police Foundation project, *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties,* was to bring together law enforcement agencies, public officials, and community stakeholders to collaboratively examine one of the most timely and controversial topics in policing today—how local and state police strike the balance between civil liberties and federal immigration enforcement. One of the principal activities the Police Foundation undertook was to host a series of focus groups across the country including representatives of law enforcement, elected officials, and immigrant[1] communities. Focus groups were held in Topeka (KS), El Paso (TX), Arlington (TX), and Collier County (FL). The objective of the focus groups was to elicit the perspectives and insights of those directly impacted by the issues surrounding immigration. As stated by the president of the Police Foundation, Hubert Williams, "It's absolutely critical from our perspective that the people who are most directly affected at the ground level have their voices heard at the policy-making level and have some impact and discussion related to this issue."

The information derived from focus groups is cited at various points in the final project report, was influential in the development of the agenda for the national conference, and is one of the main sources of data upon which the ultimate recommendations proposed were based. Because of the key role played by focus groups, this summary of the conversations is included here as an appendix.

This summary begins with an overview of focus group methodology, followed by a review of general themes raised across all or the majority of sites. Presented next is a description of each of the four focus group sites, including any issues unique to a specific site.

### Methodology

In choosing focus group sites, the Police Foundation wanted to include a varied set of law enforcement agencies and geographic locations so that recommendations would reflect the diversity of this nation and the different environments in which law enforcement agencies throughout the country operate. Criteria established for selecting a host agency for each focus group included the police executive's willingness to work with the Police Foundation, the makeup and size of the jurisdiction's immigrant population, and the agency's experience in confronting issues related to serving an immigrant population. Agencies directly involved in litigation were not selected. The local host law enforcement agency was responsible for assisting the Police Foundation in selecting a location that could accommodate focus group discussions.

Two ninety-minute sessions were conducted at each site. Law enforcement executives and officers of varying ranks attended the first session, scheduled from 11:00 a.m. to 1:00 p.m. Policy makers, legislators, community groups, service providers, and community members at large generally attended the second session, held from 6:30 p.m. to 8:30 p.m. The chief executive of the host law enforcement agency or his designee also attended the evening civilian session as an observer. A member of the Police Foundation staff with knowledge of policing and immigration facilitated the sessions. The foundation contracted with a local professional transcriber to record the conversation. As needed, the moderator or a participant interpreted for limited-English proficient participants.

The Police Foundation president and each host law enforcement executive jointly signed a letter of invitation mailed to service providers, policy makers, special interest groups, ad hoc committees, coalitions, and associations. The foundation also requested that host agencies draw

| APPENDIX A |
| **Focus Group Summary** |

from diverse neighborhoods, government departments, and organizations in order to obtain a varied set of viewpoints and experiences at the civilian sessions. Finally, the foundation specifically requested that invitations be sent to representatives of minority groups and others impacted by immigration issues. The designated point of contact invited selected, potential participants telephonically and by a letter drafted by the Police Foundation, which included information about the nature of the meeting but not focus group questions. Names of those confirming their intention to attend were forwarded to the Police Foundation. Once the maximum number of twenty attendees was reached, the process was closed and additional persons were not permitted to attend. The host agency also invited representatives of neighboring law enforcement agencies to attend the morning law enforcement sessions. As a result, thirty-three local and state agencies were represented in the four law enforcement focus groups.

Each civilian and law enforcement session began with an introduction from the host chief and from the president of the Police Foundation, who explained to participants the purpose of the focus group. The facilitator then provided a short briefing on the process and set the ground rules for discussion. The questions asked were open-ended and designed to elicit opinions, experiences, and perspectives from participants regarding the following topics: challenges and opportunities presented serving immigrant communities, agency practices and policies on immigration enforcement and police-immigrant community relations, benefits and costs of local involvement in immigration enforcement, political and economic factors involved with immigration enforcement, constitutional and civil liberty implications, and recommended approaches to striking the balance between immigration enforcement and civil liberties.

### General Themes Discussed in Focus Groups

**Challenges faced by communities adapting to a changing population**

In all sites except El Paso, participants discussed challenges associated with growth in the population, or a shift in the composition, of immigrant communities and the tensions produced by this change. In Arlington, for instance, law enforcement executives mentioned that the Dallas-Fort Worth Metroplex area has seen enormous population increases, which some participants attributed to growth in immigrant communities and "ethnic minorities." In Topeka, where immigration is relatively new and immigrants are still a very small part of the population, participants expressed concern about the resultant budgetary burdens of a large growth in the immigrant population. In Collier County, as well, participants discussed the growth in immigrant population and the resulting fiscal burdens placed on public services.

This growth in immigrant communities produces challenges for immigrants, long-standing residents, and police departments serving them because immigrants bring with them new cultures, languages, and lifestyles. Some participants, both civilian and law enforcement, felt that the introduction of these cultural differences can produce tensions with other communities. As one police executive in the Arlington session stated:

> **I don't think, generally speaking, people are complaining about the fact that someone is here in this country without official legal authorization to be here... All of a sudden their community is becoming more heavily populated with people who**

| APPENDIX A |
| :-: |
| **Focus Group Summary** |

> are different from them who enjoy doing things that are unlike what other people in the community have historically done.  And so rather than addressing the uneasy feeling about differences among the newcomers, they just cast this label "illegal immigration" over that, and then they want us to enforce immigration laws to get rid of the people who are different from what they are accustomed.

Arlington and Topeka law enforcement participants also talked about challenges presented by language barriers, in particular that some officers become frustrated when they cannot communicate with witnesses or victims and that Hispanic officers often are overburdened by responding to the language barrier. In El Paso, a participant mentioned that because of language barriers it is difficult for different ethnic communities to communicate, thereby creating challenges to resolving differences or creating mutual understanding.

In all sites except Collier County, many participants believed that attacks against "illegal immigration" are often motivated by racial discrimination. One Arlington participant stated:

> When the public talks about the open problem with illegal immigration, the focus is really on the Latino community. That same level of concern does not extend to the Asian population. And then I think the perception of the Muslim population is not that they're really illegal immigrants as much as they are terrorists or potential terrorists.

An El Paso participant stated, "It's been easy for them to hide this whole racism that is happening against the immigrant Mexicans, especially Latin America people, with the issue of the legality or illegality." Topeka participants characterized the current anti-immigrant environment as a continuation of a historical pattern of racism against African Americans in Topeka. This perspective could be due to the composition of the civilian group or the historical significance that the antiracism movement has played in Topeka, the home of *Brown v. Board of Education*.

One police executive from the Dallas-Fort Worth Metroplex provided an anecdote demonstrating that racial discrimination is underlying the immigration debate. The morning of the focus group, he had received a report that a predominantly White neighborhood was incensed that a Puerto Rican family had moved into a home there, out of which they ran a landscaping business. The homeowner employs predominantly Puerto Rican workers who come and go from the home throughout the day. Unaware that the family and their workers are Puerto Rican or that they are U.S. citizens, the community demanded that the police take action towards deporting the family and their workers. A Topeka participant, who works with youth, gave another example indicative of the racial undercurrent to the debate. He was transporting a group of Latino youth to a Hispanic orientation at a college and, while he was standing away from the group, some locals mistook the group of Latino youth for gang members. El Paso was different from other sites in that it has traditionally been a Latino-dominated city and therefore there was less discussion of local racial tension; however, participants felt the national discourse on immigration often stemmed from racist attitudes towards Latinos.

In Collier County, there was no discussion of racism against Latinos or the challenges of integrating new cultures and differences. The participants, however, discussed the financial challenges public agencies face integrating the needs of these new communities and commented

| APPENDIX A |
| **Focus Group Summary** |

on the belief that immigrants often do not contribute proportionately into the system by paying taxes. A law enforcement official mentioned that the majority of arrested immigrants do not have social security numbers, which he assumed meant they were not paying taxes. Other participants explained that when the costs of immigration outweigh tax revenue, it provokes a very emotional response in the community, particularly as the economy takes a downturn. In Topeka, one participant suggested that as state and local budgetary burdens resultant from increased migration rise, the local debate on immigration enforcement might grow more contentious. He believed once Midwesterners "see their emergency rooms close, as they see their school district costs go up 30 percent or 40 percent or deal with bilingual education, and as they see or perceive that they see an increase in crime based on immigrant population, then [their] attitudes [are] going to change too." In El Paso, representatives of several law enforcement agencies talked about the additional law enforcement resources needed to address the challenges produced by the changing dynamics of migration across the southern border. For example, one officer explained that they are encountering more corpses in the desert and that additional police resources are required to deal with these bodies appropriately.

The relation of immigration to crime was discussed in some of the sessions. Many participants spoke of the public's perception that crime problems were caused in part by immigration. A Dallas-Fort Worth Metroplex chief gave the example of a drug-trafficking cartel setting up a base in his city and the resultant public outrage and perception that immigration had brought this problem to their community. The police executive, on the other hand, did not believe there was a connection between immigration and the drug traffickers' decision to set up in his community. There were, however, different viewpoints on the relation of gang activity to immigration. In Collier County, one participant said "immigration exacerbates the gang problem," versus an Arlington participant who said the two issues are not connected. In El Paso, the sentiment was expressed more generally that homegrown American problems are being blamed on Mexico. In Arlington, one police chief stated that he regularly receives complaints about a day labor hiring site in his city where typically twenty to forty "Latino-looking" workers congregate, which community members fear is a threat to public safety.

A couple of participants also attributed some of the tensions mentioned above not only to the growth in immigrant communities but also to the growth in their visibility politically. For instance, some Arlington law enforcement participants felt that large immigrant marches, where thousands of Latinos and other immigrants publicly demonstrated in favor of immigrant rights, exacerbated racial tensions. In addition, a Topeka participant expressed the belief that the relative youth of the Latino community also causes fear and, consequently, racial tension.

**The role of politics and media in influencing local immigration enforcement policy**

In every site, law enforcement complained that media coverage of the immigration debate and the role of law enforcement is often sensationalized and has exacerbated an already sensitive environment. On both sides of this highly emotional and contentious debate, law enforcement participants felt that media coverage was often inaccurate and that advocates manipulate media coverage to advance their agenda. To demonstrate this position, one Topeka participant recounted the story of an accident that occurred involving a van of undocumented immigrants. The driver

| APPENDIX A |
| **Focus Group Summary** |

of the vehicle had a Mexican driver's license and since the officers had no database to verify the validity of the document, they called Immigration and Customs Enforcement (ICE). ICE advised that it did not have resources available at that moment to respond to the scene and, since no criminal law had been violated, the deputies released the driver and the passengers. Subsequently, the police executive received a lot of criticism in the media about the decision of his officers to release the passengers. On the other side of the immigration debate, a Collier County law enforcement participant related his experience with the media publishing inaccurate stories, namely that the Collier County Sheriff's Office was preparing to initiate immigration sweeps of undocumented immigrant communities, which he felt was an inaccurate portrayal of their 287(g) program. The participant stated that advocates for immigrants used the media to advance their agenda and, in the process, created fear in immigrant communities. In El Paso, one participant also commented that the media coverage of the border after the attacks of September 11 was highly sensationalized and unnecessarily intensified the immigration debate.

This hyped media coverage, combined with the racial tensions resulting from the demographic changes, can generate a lot of political pressure on local police to expand their activities into the immigration enforcement arena. In all but the Collier County focus group, law enforcement participants candidly talked about the pressures they face from politicians to be more aggressively involved in immigration enforcement. It is possible that this topic did not arise in Collier County because many of the participants were themselves elected officials, including three sheriffs. Some police executives also said that often they feel pulled in opposite directions; they need to preserve good police-community relations with a Caucasian majority community that often wants them to enforce immigration law, while simultaneously building trust in a minority immigrant community whose cooperation is essential to maintaining public safety. Some felt that many local politicians are under similar pressures. In fact, one sheriff, who is currently campaigning for reelection, stated that immigration is a big issue raised by constituents. Voters frustrated by the demographic changes in their communities put pressure on local politicians, such as mayors, city council representatives, and county commissioners, and these politicians in turn place pressure on police executives, some of whom were hired by those very same politicians. As one Arlington law enforcement participant stated:

> **In my city and in other cities around here, [people] are getting elected and unelected on this issue alone.  It's that big. . . So people at the municipal level are running scared on this issue and are just trying to find their way, regardless of what their personal beliefs are. . . .You got to figure out how far you are willing to go and what you are willing to get fired for on this issue.**

Some law enforcement participants noted that, while some politicians are merely responding to political pressure they feel from the media and the public, other politicians use the immigration debate and emotions surrounding it to win elections. One Arlington participant recounted, in outrage, an incident where a local politician in his community "was quoted in the media as saying that we should sit at the border and shoot the illegal immigrants as they come across the border." Some participants noted that the politics surrounding immigration enforcement do not always reflect overall public sentiment on the issue, because a large proportion of Latinos are either ineligible to vote or do not choose to vote.

APPENDIX A

**Focus Group Summary**

**The costs and benefits of local police enforcement of federal immigration law: Is it a federal or local responsibility?**

Focus group participants disagreed over whether immigration enforcement is and should be solely a federal responsibility or a dual responsibility of federal and local law enforcement. Generally speaking, the law enforcement perspective in three of the sites (all but Collier County) was that immigration enforcement is a federal responsibility. One law enforcement official in the Arlington session explained that local law enforcement's authority to enforce laws comes from the state. While he agreed that local law enforcement sometimes collaborates with federal authorities on specific investigations, he stated that they must be cautious when doing so and those police officials who sit on federal task forces often become federal officers to do so. When asked whether immigration enforcement is a federal or local responsibility, one law enforcement official in the El Paso group stated, "[I]f everybody does their own job and quits trying to be something that they're not, we could get a lot more done. Border Patrol doesn't answer calls in my community. They don't go and patrol neighborhoods and stuff like that. But I've got to go and patrol their border?"

Throughout the discussions, many arguments against and in favor of local enforcement of federal immigration laws were discussed. Prior to discussing these costs and benefits, it would be helpful to deconstruct the differing perspectives on what constitutes "immigration enforcement" because the variations in definitions often result in miscommunication. Frequently, law enforcement agencies assert they are not involved in immigration enforcement, while the immigrant communities served disagree, insisting that their community members have been deported as a result of law enforcement's actions.

For instance, in the El Paso and Doña Ana County sessions, where law enforcement participants across the board seemed to have a policy of nonenforcement of immigration laws, many community members complained that police were indeed enforcing immigration law and had examples to support their claim. Part of the reason for these diverging perspectives might be attributed to differing conceptions of what is "immigration enforcement." For instance, a representative of the Socorro Police Department explained that they do not ask immigrants or visitors for their immigration documentation: "These are people; they deserve to be served." But at the same time, another representative of the Socorro Police Department stated that they do not have the kind of databases that a larger agency, such as the El Paso Police Department, has to verify the identity of people who have perpetrated a crime. Therefore, they sometimes contact Customs and Border Protection (CBP), which has access to more sophisticated criminal databases, e.g., EPIC, after which CBP typically takes steps towards deporting the undocumented immigrant. This, the speaker explained, perpetuates the perception that they work with CBP. Another police representative explained that once they arrest someone, CBP might interview the arrestee and later initiate removal proceedings. This participant also complained that the community blames the law enforcement agency for deportation of these detainees. From the community's perspective, however, these actions described by police participants might constitute "immigration enforcement."

Even a participant from the Collier County Sheriff's Office, a law enforcement agency that has signed a memorandum of agreement with ICE as part of its 287(g) program (arguably the high-

## APPENDIX A
### Focus Group Summary

est level of involvement of local law enforcement in immigration control), stated that the 287(g) program is not really an immigration enforcement program. "It is simply just so we can access the database so we [can] document the people we're encountering who have already committed criminal law violations and informing ICE, filling out the paperwork, and subjecting those people to removal. So it's not really performing all the duties of the ICE agency."

In the three sites where participants considered immigration enforcement solely a federal responsibility (Topeka, El Paso, and Arlington), participants provided numerous examples of the costs of local involvement in immigration enforcement. Many believed the little trust immigrant communities have in police would disappear were local police to assist federal authorities deport unauthorized immigrants. Because so many families are mixed-status (they include both documented and undocumented members), not only would undocumented immigrants become difficult for police to work with, but also legally present relatives would be hesitant to cooperate. This reduced trust would lead to an underreporting in crime and less cooperation from witnesses, which in turn would make it more difficult to prosecute cases successfully. As one Topeka law enforcement participant expressed, "How do we police a community that won't talk to us?" Moreover, civilian participants explained that when one victim or witness is deported, this information spreads rapidly within the social networks of immigrant communities and fear proliferates. As a result of the lack of cooperation, the decrease in crime reporting, and the challenges this lack of cooperation presents to successful prosecutions, some participants believed that ultimately it would lead to an increase in crime.

Many participants also believed that increased fear of police and deportation would lead to increased victimization and exploitation of undocumented immigrants. While there was a general consensus across sites that criminals already target undocumented immigrants, believing that they will not report the offense to police, many felt this dynamic would worsen. In particular, participants expressed concern that victims of domestic violence would not come forward and that batterers would not only use the threat of deportation of the victim but also use the threat that the principal earner in the family—the batterer—would be deported after arrest. One participant in El Paso also believed that more enforcement would lead to more human trafficking, as smugglers or traffickers are better able to use the threat of deportation to coerce undocumented immigrants into situations of forced labor. In Collier County, one participant, while agreeing that undocumented immigrants are often targets of crime, had a slightly different perspective on immigrant victimization and stated that the increased patrol resources needed to deal with this increased victimization is another cost of undocumented immigration borne by local law enforcement agencies. Several participants also believed that there would be increased employer abuse and exploitation of undocumented immigrants. In addition, these fears, some participants believed, will deter immigrants from accessing other municipal services, such as health care and education.

During the El Paso sessions, the issue of police misconduct arose. Participants supposed that immigrants' fear of police and the threat of possible deportation would lead to an increase in police misconduct. As one police executive stated, "I might have issues out in the field with officers who are doing things that they're not supposed to be doing, but people are afraid to tell us, simply because they're afraid."

## APPENDIX A
### Focus Group Summary

Many law enforcement participants stated that the economic and labor costs of police involvement in immigration enforcement were high and would divert scarce resources from traditional law enforcement activities. Those costs include the funds needed to temporarily detain immigrants, medical costs for those in need of care while being detained by local authorities, and transportation costs to the jail. Moreover, an agency would need to invest patrol resources to arrest, to await federal response, and to process paperwork required by ICE. The federal 287(g) program merely pays for training local officers; the federal government does not cover all of these other costs. One participant explained, "You can't deficit spend in Kansas but the federal government can."

In the two Texas locations, participants also talked about the possibility of the federal government distributing funds to local agencies to enforce immigration laws. In the Arlington law enforcement session, some participants felt the price to pay for accepting these funds was not worth the gains. One participant noted federal funds are already being diverted to the Department of Homeland Security from funds that used to be allocated to assist law enforcement with traditional crime control efforts. He stated, "How many of you are getting money from Homeland Security for that stuff that absolutely makes no sense in a rational world? . . . COPS grants have gone . . . We don't have our local law enforcement block grants.  The [Byrne] grant situation is just appalling. You have to get an earmark from a senator to get a grant."

Participants also discussed the impact of increased deportation on children and families. When the principal earner is deported, how will those families manage? Will those families who are eligible require assistance from the state? Citizen children of deported parents might need to enter the foster care system if they do not have a legal relative that could care for them. One participant believed that because of poor outcomes in the foster care system, these children might eventually end up in the juvenile delinquency system.

Another cost of immigration enforcement many law enforcement officials raised was potential litigation costs, especially those resulting from racial-profiling and civil rights lawsuits. Across sites, law enforcement participants agreed that they could not legally arrest someone solely on the basis that they look Latino. Participants in every site also agreed that police could not just stop people on the street and ask about immigration status during a casual encounter. As one Collier County participant stated, "If you start picking them up sitting on the sidewalk because they look illegal, then I got a problem." One Collier County law enforcement official acknowledged that the department would be exposed to litigation were it to use the 287(g) program to patrol for immigration violators. For this reason, the sheriff has limited the use of the 287(g) program to target criminals who the department has already arrested and are detained in their jails and those who are the subject of an ongoing criminal investigation. An El Paso participant also noted that local agencies would expose themselves to litigation when officers mistakenly arrest a citizen or legal permanent resident. Finally, one of the Topeka participants explained that consequences of racial profiling extend beyond civil litigation in Kansas, which has a state statute prohibiting the use of race or ethnicity as the sole criteria for arrest.

Participants in Collier County, where the sheriff's office participates in ICE's 287(g) program, raised most of the benefits of local enforcement of immigration laws. The Collier County Sheriff's Office did an analysis of jail costs and found that approximately 24 percent of its jail popu-

| APPENDIX A |
| **Focus Group Summary** |

lation was immigration violators and that the pure jail costs associated with their cases cost the county approximately nine million dollars. This was the principal argument they gave county officials for entering into the 287(g) program. Currently, ICE removes one out of five detainees, which they contend saves the county jail costs.

The sheriff also views immigration enforcement as a criminal enforcement tool to remove criminals from his community. As he explained, the Collier County sheriff limits 287(g) activity to immigrants arrested for an independent state law violation and those who are targets of criminal investigations. Another Collier County participant contended that sophisticated criminals are not going to get caught committing crimes but, if the agency discovers that they are unauthorized residents, they could be removed from the community through deportation.

In Topeka, one participant articulated his unease with releasing undocumented immigrants on bond because they may provide false identities and because of the difficulties police agencies have verifying their addresses due to a shortage of interpreters. Another participant in Topeka also feared the establishment of vigilante movements if local and federal government do not control immigration and, in fact, provided an example of a town in Kansas where a group of citizens made such threats.

While law enforcement participants in Topeka clearly were opposed to sharing responsibility for immigration enforcement with the federal government, they seem to make an exception for immigrants who commit criminal law violations, in particular gang members. Some felt it was important for criminals to serve their criminal sentence in a state or local correctional facility prior to deportation. On the other hand, another participant explained that at times during criminal prosecutions, the defendant is offered the option to voluntarily agree to deportation in exchange for a dismissal of charges. As this participant explained, if the defendant then returns to the country, he or she can be prosecuted on the federal charge of illegal reentry. Another Topeka participant pointed out the complexity of the issue of deportation of criminal law violators, stating that while all agree that murderers should be deported, the issue becomes complicated with an undocumented immigrant who uses false documents to work in the country and has thus technically committed a felony offense.

Interestingly, in all conversations about criminal aliens, they were referred to as "illegal immigrants" who commit crimes. At no point did they mention legal permanent residents who are deported upon conviction of a crime; therefore, it is not clear if the participants' opinions on the issue would vary based on the legal status of the immigrant.

**Counterterrorism and immigration enforcement**

While the topic of the attacks of September 11 and counterterrorism was surprisingly infrequently mentioned during the sessions, a few participants commented on changes that have occurred post 9/11 and the relation between immigration enforcement and counterterrorism efforts. Due to changes that have occurred as a result of the increase in the budget and resources dedicated to homeland security and immigration enforcement, participants felt that ICE is much more responsive than the legacy Immigration and Naturalization Service (INS). Prior to 2001, it was very difficult to get INS to deport a criminal alien. Since then, at least regarding gang members, participants believed that ICE is more responsive. Moreover, comments were made that the

| APPENDIX A |
| :---: |
| **Focus Group Summary** |

federal government also has offered funds to local agencies to get them involved in border security and immigration enforcement. As stated above, in Arlington, the participants warned that taking these funds diverts resources from traditional criminal law enforcement funding streams, such as the COPS and Byrne grants.

There was some disagreement between the various sites about the link between terrorism and immigration. In Arlington, a participant stated that there was no relationship between terrorism and the Hispanic community. In El Paso, one participant questioned the emphasis of newer security measures on the U.S.-Mexico border versus the Canadian border. The participant maintained that if counterterrorism were the primary objective, the government would not make such a distinction. Participants in the El Paso civilian session related an incident where the Uvalde County sheriff publicly stated that there were al Qaeda training camps on the other side of the border, to justify seeking federal border security funds and actively participating in immigration enforcement. When asked to substantiate his claim, the sheriff stated, "Well, that's the whole point.  They're terrorists." The El Paso participants also recounted an incident where an ICE official, attempting to justify raids in a town located in the region, alleged that a group of al Qaeda operatives crossed the border with a group of undocumented Mexican migrants. When a local congressional representative confronted the ICE official about the veracity of this claim, the ICE official backed down. In sum, participants in these two Texas locations generally felt that there was no connection between terrorism and immigration and that the government used fear of terrorism to justify immigration enforcement initiatives.

In the Collier County sessions, on the other hand, some expressed the position that failure to enforce our nation's immigration laws is a threat to national security. One of the law enforcement participants suggested that potential terrorists might be coming in through Mexico, adopting Spanish surnames, learning Spanish and a Cuban accent, and being granted permission to stay in the United States under sanctuary policies directed at Cubans. This participant also stated that both President Chavez of Venezuela (who he claimed gave Venezuelan national identity cards to all that apply) and Fidel Castro are known to have close relations with foreign terrorist organizations. Also, one participant stated that they do not have access to government databases of many countries either because of the lack of technology or privacy rights (as is the case with Europe) and, therefore, are unable to verify identity of immigrants from these countries. This, the participant felt, was a national security threat.

**Should undocumented immigrants and their children be entitled to public benefits?**

During the civilian sessions of the focus groups, a question posed was, "What type of benefits, if any, do you think the government should provide to the undocumented immigrant who pays taxes? What about those who do not pay taxes?" In all but Collier County, the participants believed that undocumented immigrants were entitled to certain health and education benefits (to the extent that U.S. citizens are entitled to these benefits) and that such a public policy would generally benefit the country. Firstly, some participants explained that children have a constitutional right to education, regardless of their immigration status. Moreover, in the event that the federal government deports parents of U.S. citizen children, some commented that the government has an obligation to provide support to that child. Even in Collier County, where participants generally

| APPENDIX A |
|---|
| **Focus Group Summary** |

felt that immigrants should not receive government benefits, one participant stated that it would be morally difficult to deny benefits to a child but simultaneously argued that providing children with benefits could provide an incentive to the undocumented to migrate to the United States.

There was much debate during several sessions over whether the undocumented pay taxes and whether these taxes outweigh public expenditures on the undocumented. One tax attorney in Topeka stated that he often prepares taxes for undocumented immigrants. An El Paso participant contended that anyone who pays rent is indirectly paying property taxes and undocumented immigrants at the very least pay sales taxes when they purchase items. Another participant argued that it would be very difficult to identify which undocumented immigrants pay taxes. In Collier County, on the other hand, several participants claimed that the expenses incurred in serving the undocumented outweigh the revenue gained through taxes.

**Proposed solutions and recommendations**

While there may have been disagreement on the central question of whether local law enforcement shares responsibility for enforcing federal immigration laws, common to both sides of the debate was a call for a national policy to provide policy consistency from locality to locality. As one Collier County participant stated, "How would we resolve what is fundamentally a national problem when each jurisdiction deals with it differently?" In Arlington, law enforcement participants felt a national policy, or at least a regional one, would protect police chiefs against political pressure to enforce immigration laws. With a national policy (or at least regional), the public or politicians would not be able to pressure police chiefs using a comparison to a neighboring police chief's policy of collaboration with ICE. Moreover, participants in Arlington felt that the impact of an agency's decision to actively participate in immigration enforcement is felt in neighboring cities and counties and, therefore, it is important to have a uniform regional policy. In Topeka, where neighboring states such as Colorado, Oklahoma, and Nebraska have passed measures against unauthorized immigrants, concern was raised whether these states' undocumented population would move to Kansas in the absence of similar Kansas state laws. One Arlington participant stated that Congress and the attorney general did an extreme disservice to local law enforcement agencies when giving them authority to enforce federal immigration laws. "The federal government needs to come in and say that enforcement of federal laws is our purview."

Across sites, there was also a general frustration with Congress's inability to pass immigration reform and a belief that many of the problems associated with undocumented immigration could be resolved through both administrative and legislative reform of the federal immigration benefits and enforcement system. In Topeka and Collier County, some participants stated that Congress should increase funding to the various immigration departments within the Department of Homeland Security, including CBP, ICE, and U.S. Citizenship and Immigration Services, so that they can more effectively fulfill their respective missions. Others felt that Congress should create a pathway to legalization for the millions of undocumented immigrants currently in the country. Many also believed that the government must make the process easier for migrants to come legally to the United States and for the undocumented to adjust their status. In Collier County, one participant, who had had experience hiring temporary seasonal workers, argued that the federal government should make the process easier for businesses to hire temporary lawful workers.

APPENDIX A
## Focus Group Summary

Several recommendations were mentioned to improve the working relationship between police and immigrant communities. In Topeka, the law enforcement group agreed that bilingual-pay incentives would help attract more bilingual officers. They also believed that police departments should offer Spanish-language training to officers. A couple of participants in different sites suggested cultural sensitivity training for police officers. And in Arlington, participants also said that police should teach immigrants about police and public safety issues.

Several participants raised additional recommendations. In Collier County, for instance, a law enforcement participant suggested broadening the T visa and U visa programs to include a broader range of crimes (these are visas for victims of trafficking and victims of certain serious crimes that assist in prosecutions). Also, they suggested that since it would be impractical to deport all undocumented immigrants in the country, local and federal government should focus on the criminal alien population. One civilian participant in Collier County suggested taking away all incentives for undocumented migration, including jobs and benefits. In El Paso, where participants expressed concern about civil rights abuses and misconduct of federal immigration officials, a participant recommended creating civilian oversight commissions to oversee federal and local law enforcement agencies involved in immigration enforcement. In Arlington, one participant suggested legislation that would shield police executives from political influence.

## Focus Group Sites

### Topeka, Kansas

FIGURE 1. TOPEKA FOCUS GROUP SITE MAP



## APPENDIX A
### Focus Group Summary

Topeka is the capital of Kansas and the most populous city in Shawnee County. The Census Bureau estimated Shawnee County's population at 172,529 on average from 2005 to 2007,[2] with Topeka's at 121,184.[3] The location is unique in that it was the only Midwest site of the focus group project and has a relatively small population compared with the other sites. Besides providing desired geographical diversity, Topeka was chosen because of the importance of the immigration issue there and the Police Foundation's prior history working with its police chief, Ron Miller. Chief Miller invited other law enforcement officials, including the Shawnee County Sheriff and members of his agency and a representative of the Shawnee County District Attorney and Kansas Highway Patrol.

For the civilian session, the Topeka Police Department contacted community partners, such as the Law Enforcement Partnership Panel, the NAACP, and a number of Hispanic organizations, which were asked to extend invitations to their members. Once people started learning about the event, a number of additional people called the police department to request permission to attend. Ultimately, representatives attended the civilian session from the Topeka City Council, Kansas Human Rights Commission, Kansas Hispanic and Latino Commission, the NAACP, League of United Latin American Citizens, community-based organizations, private business, and the clergy. Given that Topeka is the most populous part of Shawnee County and the Topeka Police Department organized the event, it was no surprise that all of the community focus group participants were from the city of Topeka.

During focus group discussions, reference was made to Topeka's racial history. One of Topeka's school districts was the defendant in *Brown v. Board of Education*, the landmark Supreme Court case requiring racial integration of American public schools. In addition, in the late 1980s, a group of citizens calling themselves the Task Force to Overcome Racism in Topeka formed to address the problems associated with racism in the city, including housing segregation, disproportionate minority incarceration, and continuing school segregation.

Of all the project sites, Topeka had the smallest immigrant population. According to the U.S. Census Bureau American Community Survey three-year estimates of 2005 to 2007, approximately 5 percent of the population of Topeka[4] and 4 percent of the population of Shawnee County[5] was foreign born.  Of Topeka's foreign-born residents, approximately 33 percent were naturalized citizens and 35 percent entered in the year 2000 or later.[6] In both locations, only a slightly larger percentage of the population five years or older spoke a language other than English at home: 12 percent in Topeka[7] and 8 percent in Shawnee County.[8] In addition, approximately 11 percent of Topeka's population identified as Hispanic or Latino of any race, 12 percent Black or African American, 1 percent Native American, and a little less than 2 percent Asian.[9] Similarly, in Shawnee County, approximately 9 percent of the population identified as Hispanic or Latino of any race, 9 percent Black or African American, and a little over 1 percent identified as Asian and Native American.[10] Shawnee County saw a 58.4 percent increase in its Hispanic or Latino population between 1990 and 2000, which is slightly above the national average growth rate of 57.6 percent.[11] From 2005-2007, median household income in Topeka was $36,071 and median family income was $46,500; median household income was $45,274 and median family income was $57,636 in Shawnee County.[12]

The Topeka Police Department is a medium-size police force with 338 full-time employees, 283 of whom are sworn personnel. Of the sworn officers, 89 percent are White, 4 percent Black, 6 percent Hispanic or Latino, and 1 percent Native American.[13]  The Topeka Police Department saw

## APPENDIX A
### Focus Group Summary

slightly lower rates of reported violent and property crime in 2006 than in 1985 (see table 1), although the number of those crimes increased during the period.  For the Shawnee County Sheriff's Office, the rate of reported violent crimes decreased slightly while the rate of reported property crimes increased considerably. See table 1 for more detailed statistics.[14]

**TABLE 1. CRIME STATISTICS FOR TOPEKA PARTICIPATING AGENCIES**

| Agency | 1985 Violent Crime Rate | 1985 Property Crime Rate | 2006 Violent Crime Rate | 2006 Property Crime Rate |
|---|---|---|---|---|
| Topeka Police Department | 580.6 | 7,180 | 544.8 | 7,123.4 |
| Shawnee County Sheriff's Office | 226.7 | 1,476.1 | 205.2 | 3,310.6 |

Data Source: U.S. Department of Justice, Bureau of Justice Statistics, *Crime & Justice Data Online*, and *Crime Trends* from *FBI Uniform Crime Reports*. Violent and property crime rates are number of crimes reported per 100,000 population. Data are unavailable for some of the smaller agencies that participated. Violent crimes include murder and non-negligent homicide, forcible rape, robbery, and aggravated assault. The definition of property crimes includes burglary, larceny/theft, motor vehicle theft, and arson.

Overall, during the Topeka law enforcement session, participants made more comments about lack of ICE responsiveness than during the other sessions. To support this claim, a representative of the Kansas Highway Patrol related an incident involving seizure of two hundred and fifty thousand dollars worth of marijuana from undocumented immigrants. The officer called ICE to respond but ICE did not have officers available to do so. Some participants felt that if ICE did not respond to such a serious incident, it certainly would not have the resources to respond to all calls for service were local law enforcement to start actively enforcing immigration law. Moreover, because of ICE's inability to respond in a timely manner, the local law enforcement agency would incur significant detention (seventy-two dollars per day) and labor costs. The local agency would also be forced to allocate valuable beds in the detention center to immigration detainees. If the agency no longer had the space to detain all criminal law violators, it would be forced to pay another jurisdiction to hold the prisoners. The reason this issue mainly arose in this site is unclear, but perhaps it is due to the relatively fewer immigration resources allocated to this region.

APPENDIX A
## Focus Group Summary

### El Paso, Texas

**FIGURE 2. EL PASO FOCUS GROUP SITE MAP**



El Paso County, the westernmost county in Texas, borders New Mexico and the Mexican state of Chihuahua. El Paso City shares a border with Ciudad Juarez (the largest city in Chihuahua), which together make up the El Paso/Juarez Borderplex, the largest population center on any international border in the world. About 2.2 million live in the area.[15] In the Borderplex region, there are four major border points of entry and pedestrian traffic of approximately 8.3 million annually.[16] With a population of 609,415, El Paso is the twenty-first largest city in the nation and was the seventh fastest growing large city (cities with a population over 500,000) in the nation from 2000-2006.[17] From 2005 to 2007, El Paso County had an estimated population of 724,217.[18] El Paso County includes El Paso City, Horizon City, Socorro, Anthony, Clint, and Vinton.

Chief Richard Wiles of the El Paso Police Department, the host agency, invited law enforcement representatives from both El Paso County and bordering Doña Ana County, New Mexico. Doña Ana County includes the cities of Las Cruces and Sunland Park and borders the U.S.-Mexico border state of Chihuahua. A large number of the law enforcement session attendees were chiefs of police from these agencies. For the civilian session, Chief Wiles worked with community-based organizations to support efforts to get community participation. The final list of civilian session participants included

APPENDIX A

**Focus Group Summary**

representatives from the Border Network for Human Rights, Centro Mujeres de la Esperanza, Paseo del Norte Civil Rights Project, Diocesan Migrant and Refugee Services, and a local private attorney; most of the civilian participants were based in El Paso County.

In addition to being border counties, El Paso County, and to a slightly lesser extent Doña Ana County, compared with other selected sites, are unique in that Latinos are the majority population and a significant percentage of them are eligible to vote (citizens). While the population of Latinos is very high in the region—approximately 81 percent of El Paso County[19] and 65 percent of Doña Ana County identified as Hispanic or Latino according to three-year estimates from 2005 to 2007 of the American Community Survey[20]—the growth rate in the Hispanic or Latino population in both counties was lower than the national average of 58 percent.[21] El Paso County saw a 29 percent increase in Hispanic or Latino population between 1990 and 2000,[22] while Doña Ana County saw a 45 percent increase.[23]

Both El Paso County and Doña Ana County also have a foreign-born population well above the national rate of 12.5 percent. From 2005 to 2007, the U.S. Census Bureau estimated that approximately 27 percent of residents of El Paso County were born outside the United States or its territories. Of the foreign born, approximately 41 percent were naturalized U.S. citizens and 18 percent entered the United States after 2000.[24] In the same time period, the Census Bureau estimated that approximately 19 percent of Doña Ana County's 193,888 residents were foreign born. Of the foreign born, 31 percent were naturalized U.S. citizens and 22 percent entered the United States in 2000 or later.[25]

In both counties, the majority of the population speaks a language other than English at home—approximately 76 percent in El Paso and 54 percent in Doña Ana County from 2005 to 2007. During this period, median household income in El Paso was $33,684 and median family income was $36,817. In Doña Ana County, median household income was $34,118 and median family income was $39,453.[26, 27]

The El Paso Police Department is the largest law enforcement agency in the region and has by far the largest percentage of Hispanic or Latino officers of all agencies participating in the focus groups. As of 2000, the El Paso Police Department had 1,351 full-time employees, 1,057 of whom were sworn. Of the full-time sworn personnel, 24 percent were White (non-Hispanic), 2 percent Black (non-Hispanic), 72 percent Hispanic, 1 percent Asian, and 1 percent Native American. The second largest agency present at the El Paso law enforcement session was the Las Cruces Police Department, which had 199 full-time employees, 141 of whom were sworn personnel. Of sworn full-time personnel, 46 percent were White (non-Hispanic), 7 percent Black (non-Hispanic), 45 percent Hispanic, and 1 percent Native American.[28]

In the past twenty years, the rate of both violent and property crimes reported in El Paso City declined considerably despite an appreciable increase in population size and despite focus group comments that in recent years crimes relating to drug trafficking increased significantly and became more violent. The El Paso County sheriff reported a slight increase in the violent crime rate, most of this increase caused by a rise in aggravated assault charges. Murder/non-negligent manslaughter, forcible rape, and robbery rates all declined. The other agencies with available data for the past twenty years saw slight increases in the rate of violent crimes reported but large decreases in property crime rates. Despite proximity to the border, El Paso City was named the second safest city in America (of cities with a population of 500,000 or more).[29]  See table 2 for more detailed statistics.[30]

# APPENDIX A
## Focus Group Summary

**TABLE 2. CRIME STATISTICS FOR SOME EL PASO PARTICIPATING AGENCIES**

| Agency | 1985 Violent Crime Rate | 1985 Property Crime Rate | 2006 Violent Crime Rate | 2006 Property Crime Rate |
|---|---|---|---|---|
| El Paso Police Department | 771.2 | 6,324.9 | 393.5 | 3,370.6 |
| El Paso Sheriff's Office | 243.7 | 2,549.8 | 266.4 | 1,486.1 |
| Las Cruces Police Department | 504.8 | 8,749.9 | 614.6 | 4,661.4 |
| Doña Ana County Sheriff's Office | 289.5 | 2,231.1 | 331 | 1,367.3 |

Data Source: U.S. Department of Justice, Bureau of Justice Statistics, *Crime & Justice Data Online* and *Crime Trends* from *FBI Uniform Crime Reports*. Violent and property crime rates are number of crimes reported per 100,000 population. Data are unavailable for some of the smaller agencies that participated. Violent crimes include murder and non-negligent homicide, forcible rape, robbery, and aggravated assault. The definition of property crimes includes burglary, larceny/theft, motor vehicle theft, and arson.

Because El Paso is situated on the U.S.-Mexico border, participants had particular perspectives, issues, and concerns relating to the border that were not raised in other sessions. In El Paso, law enforcement interacts with immigrant residents, undocumented migrants who have recently crossed the border and are heading to the interior of the country, and Mexican visitors legally present in the United States with a border-crossing card. Furthermore, many residents of El Paso have family on both sides of the border, which influences their viewpoints on migration issues.

El Paso and Doña Ana County law enforcement agencies, particularly those located in rural border cities, often must respond to criminal activity specific to border communities, such as drug and human trafficking and the resulting violence. Some law enforcement participants expressed concern that these criminal problems have worsened in recent years. One participant contended that the Juarez and Sinaloa drug cartels have begun to enter the human trafficking business. These local law enforcement agencies feel overwhelmed by criminal enforcement demands placed on them, and for this reason the Border County Sheriff's Coalition sought federal funds to address border criminal activity and to deter criminal activity by having more of a presence in the rural areas of the county. One participant reported a decline in trespass and burglary complaints from farmers since more deputies were placed in these areas.

The discussions in El Paso often included comments about the role and presence of CBP in the region. In the past, as one civilian participant mentioned, the agency did not patrol beyond three miles of the border. Now, however, it is conducting enforcement activities further inland, patrolling public areas such as shopping malls. On occasion, some police agencies in the area have collaborated with CBP on criminal investigations, particularly in jurisdictions where patrol resources are limited. For example, an officer in a more rural area may call CBP for backup.

## APPENDIX A
### Focus Group Summary

### Arlington, Texas

FIGURE 3. ARLINGTON FOCUS GROUP SITE MAP



Arlington, Texas, is part of the Dallas-Fort Worth-Arlington Metropolitan area, as named by the U.S. Census Bureau, or as it is commonly named in the region, the Dallas-Fort Worth Metroplex. In 2006, the population of the Metroplex reached almost six million, making it the fourth-largest metropolitan area in the United States.[31] It is an enormous geographic area covering 9,286 square miles, which includes the third and fifth largest cities in Texas (Dallas and Fort Worth). Fort Worth was the fastest growing city in the nation from July 2000 to July 2006, having increased its population by more than 20 percent.[32] The Dallas-Fort Worth Metroplex includes the following counties that were represented in the law enforcement focus group: Dallas, Tarrant, Collin, Johnson, and Denton. Parker, Rockwall, Kaufman, Hunt, Ellis, and Wise counties, also located in the metropolitan area, did not have their law enforcement agencies represented at the law enforcement focus group session.

According to estimates of the 2006 American Community Survey, the foreign-born population of the Metroplex area was estimated at approximately 18 percent.[33] In 2006, 56 percent of foreign-born residents were born in Mexico and 67 percent came from Latin America.[34] In addition, approximately 29 percent of the metropolitan area spoke a language other than English at home.[35]

## APPENDIX A
## Focus Group Summary

Chief Theron Bowman of the Arlington Police Department invited local area police executives on the basis of their proximity to Arlington, agency size, and community similarities. Because this group regularly meets twice a month, they have had a lot of experience discussing complex issues, including challenges associated with immigration. Moreover, unlike other sites, almost all participants were chiefs of police. Sheriff's offices in the metropolitan area were not represented nor were the larger police departments in the region, specifically the Dallas Police Department and the Fort Worth Police Department.

The Arlington Police Department collaborated with a variety of local-area partners, including faith-based organizations, police partners, and residential communities, to whom they drafted an invitation letter describing the purpose of the event and requesting that the community partners invite residents to attend. They used this approach to establish a layer of trust with members of the community who might normally feel uncomfortable attending an event hosted by a police agency. Many participants were too frightened to give their name and contact information, preferring to remain anonymous; thus, we do not have specific information about the composition of this group, unlike the other sites.

Since the Arlington Police Department invited focus group participants by using organizations it worked with in the past, most civilian participants were from that city. Therefore, a more detailed description of its population is available. Arlington is a suburb of Fort Worth in Tarrant County. The demographic profile for Arlington is quite similar to the entire metropolitan area. From 2005 to 2007, the U.S. Census Bureau estimated Arlington's foreign-born population at 19 percent, and 30 percent of the population five years old or over was estimated to speak a language other than English at home.[36] Of the 30 percent, 71 percent spoke Spanish and approximately 51 percent reported that they did not speak English "very well."[37] From 2005 to 2007, 32 percent of the foreign-born population were naturalized citizens and 32 percent entered in 2000 or later.[38] Of the estimated 356,764 residents in Arlington from 2005 to 2007, 62 percent were White, 17 percent Black, 6 percent Asian, and less than 1 percent was Native American. Approximately 26 percent reported they were Hispanic or Latino (of any race). The city is relatively prosperous, with a median household income of $50,582 and median family income of $60,364.[39] According to Chief Bowman, Arlington's population has almost doubled in the past twenty to twenty-five years, and most of that growth is due to increases in ethnic minority communities. Specifically, Arlington's Hispanic population growth is significant, as is the unauthorized portion of this community, according to the chief.

Table 3 presents brief demographic statistics of the five counties that had at least one police department represented in the law enforcement session and gives the reader a brief overview of the population served by this large number of police agencies. Important to note in this table is that a significant portion of the immigrant population possibly resides in the cities of Dallas and Fort Worth; those cities were not represented in the law enforcement session. All five counties experienced tremendous growth in the Latino community between 1990 and 2000. Tarrant County's Latino population grew 104 percent; Dallas County's, 110 percent; Collin County's, 178 percent; Denton County's, 177 percent; and Johnson County's, 106 percent.[40] Some law enforcement group participants discussed growth not only in the Latino community but in various Asian and Middle Eastern communities as well.

APPENDIX A
## Focus Group Summary

**TABLE 3. DEMOGRAPHIC STATISTICS FOR ARLINGTON REPRESENTED COUNTIES – 2006**

| County | Population | Foreign Born (percent) | Speak a Language Other than English (percent) | Hispanic (percent) | Asian (percent) |
|--------|-----------|------------------------|-----------------------------------------------|--------------------|-----------------|
| Dallas | 2,336,012 | 24 | 40 | 37 | 4 |
| Tarrant | 1,668,042 | 16 | 26 | 25 | 4 |
| Collin | 695,317 | 17 | 23 | 14 | 10 |
| Johnson | 146,663 | 6 | 14 | 15 | .4 |
| Denton | 585,139 | 13 | 20 | 16 | 5 |

Data Source: U.S. Census Bureau, *American FactFinder, 2005-2007 American Community Survey 3-Year Estimates: Data Profile Highlights.*

The Arlington Police Department was the largest agency represented in the law enforcement session, with 643 full-time employees (485 sworn) in 2000 and the largest proportion of Hispanic sworn officers, 13 percent. Sixty-nine percent of sworn full-time employees were White (non-Hispanic), 12 percent Black (non-Hispanic), 3 percent Asian, and 3 percent Native American. Hispanic composition of sworn personnel in the other police departments for which data on racial makeup were available was less than 10 percent. See table 4 for more detailed statistics.[41]

**TABLE 4. RACIAL MAKEUP OF ARLINGTON PARTICIPATING AGENCY SWORN PERSONNEL – 2006**

| Agency | White (non-Hispanic) (percent) | Black (non-Hispanic) (percent) | Hispanic (percent) | Asian (percent) | Native American (percent) |
|--------|-------------------------------|-------------------------------|--------------------|-----------------|----------------------------|
| Arlington PD | 69 | 12 | 13 | 3 | 3 |
| Irving PD | 87 | 4 | 6 | 1 | 1 |
| Plano PD | 88 | 5 | 5 | 0 | 1 |
| Grand Prairie PD | 86 | 7 | 8 | 0 | 0 |
| Mesquite PD | 94 | 3 | 4 | 0 | 1 |
| Carrollton PD | 91 | 2 | 7 | 0 | 0 |
| Denton PD | 91 | 2 | 5 | 0 | 2 |

Data Source: U.S. Department of Justice, Bureau of Justice Statistics, *Crime & Justice Data Online, Law Enforcement Management and Administrative Statistics 2000* (LEMAS).

## APPENDIX A
## Focus Group Summary

All police departments participating in the Arlington focus group, except for the Frisco Police Department, saw a decrease in property crime rates between 1985 and 2006. A little more than half of participating police departments also saw a decrease in violent crime rates. See table 5 for more detailed statistics.[42]

**TABLE 5. CRIME STATISTICS FOR ARLINGTON PARTICIPATING AGENCIES**

| Agency | 1985 Violent Crime Rate | 1985 Property Crime Rate | 2006 Violent Crime Rate | 2006 Property Crime Rate |
|---|---|---|---|---|
| Arlington PD | 507 | 8,461.1 | 731.2 | 5,271.2 |
| Bedford PD | 198.6 | 6,414.4 | 510.4 | 3,239.5 |
| Burleson PD | 157.2 | 6,137 | 187.2 | 3,881.5 |
| Carrollton PD | 195.5 | 5,930.5 | 187.3 | 3,093.9 |
| Colleyville PD | 50.5 | 3,398.6 | 39.1 | 1,311.4 |
| Denton PD | 666.8 | 8,398.3 | 310.9 | 3,001.7 |
| Duncanville PD | 222.2 | 6,059.4 | 304.3 | 4,014.3 |
| Farmers Branch PD | 210.7 | 6,534.9 | 238.6 | 4,376.2 |
| Frisco PD | 598.1  (1988) | 3,646.5 | 134.6 | 4,375.1 |
| Grand Prairie PD | 629.2 | 8,162.2 | 330.1 | 5,038.8 |
| Haltom City PD | 342.8 | 8,722 | 463.4 | 5,689.6 |
| Irving PD | 687.4 | 9,095.3 | 426.8 | 4,842.9 |
| Keller PD | 264.8 | 4,583.4 | 68.1 | 1,497.9 |
| Mesquite PD | 588.8 | 8,315.7 | 371.3 | 4,023 |
| North Richland Hills PD | 316.8 | 6,724.6 | 299.1 | 3,758.3 |
| Plano PD | 167.4 | 5,973.2 | 287.7 | 3,338.1 |

Data Source: U.S. Department of Justice, Bureau of Justice Statistics, *Crime & Justice Data Online*, and *Crime Trends* from *FBI Uniform Crime Reports*. Violent and property crime rates are number of crimes reported per 100,000 population. Data are unavailable for some of the smaller agencies that participated. Violent crimes include murder and non-negligent homicide, forcible rape, robbery, and aggravated assault. The definition of property crimes includes burglary, larceny/theft, motor vehicle theft, and arson.

# APPENDIX A
## Focus Group Summary

### Collier County, Florida

**FIGURE 4. COLLIER COUNTY FOCUS GROUP SITE MAP**



With the exception of a few representatives, law enforcement and civilian participants of the Collier County focus group sessions were largely from two counties, Collier County and Lee County, both located in Southwest Florida. In 1923, Collier split from Lee County and includes the incorporated cities of Everglades City, Marco Island, and the City of Naples. The unincorporated areas of the county include Immokalee and East Naples (both had representatives at the focus group). The population of Collier County from 2005 to 2007 was 311,926;[43] Lee County's was 567,711.[44]

Both counties saw a more than doubling of their Hispanic or Latino populations from 1990 to 2000, well above the national average. The growth rate in the Hispanic or Latino population was 137.8 percent in Collier County and 178.5 percent in Lee County.[45] The U.S. Census Bureau American Community Survey 2005-2007 3-Year Estimates also indicate that 25 percent of Collier County and 16 percent of Lee County were Hispanic or Latino (of any race).  In addition, 24 percent of the population of Collier County was foreign born. Of the 76 percent of the population born in the United States, merely 21 percent was born in Florida.[46] During this same period of time, 14 percent of the population of Lee County was foreign born. Of the 86 percent born in the United States, 24 percent was born in Florida (similar to Collier County).[47] Thirty percent of the population five years or

| APPENDIX A |
| **Focus Group Summary** |

over spoke a language other than English at home in Collier County; 19 percent in Lee County did also. Median household income in Collier County from 2005 to 2007 was $57,166, and median family income was $66,846.[48] In Lee County, median household income in 2006 was $49,742, and median family income was $57,475.[49]

When county statistics for Collier and Lee Counties are disaggregated into smaller geographical areas, there is much variation in racial and ethnic makeup, median income, place of birth, and languages spoken. Included within Collier County, for instance, is Immokalee, where, in 2000, 46 percent of the population was foreign born, 71 percent was Hispanic or Latino, and 78 percent spoke a language other than English at home. Immokalee is also a very poor community, with median household income of $24,315 and a median family income of $22,628 in 2000.[50] In contrast, in this same year, Naples City, also in Collier County, had a foreign-born population of only 9 percent, a Hispanic or Latino population of 2 percent, and only 10 percent of the population spoke a language other than English at home. Naples is also a wealthier municipality than Immokalee, with a median household income of $65,641 and median family income of $83,831.[51]

Immokalee is the home base of the Coalition of Immokalee Workers (CIW), a community-based worker organization whose members are largely Latino and Haitian immigrants. It is well known nationally for boycotts against Taco Bell and McDonald's, resulting in both companies agreeing to pay a higher price for tomatoes in order to increase workers' wages. The CIW is also well known for its antitrafficking and antislavery programs with farm workers.

Sheriff Don Hunter and his staff coordinated participation in the Collier County focus group. Twelve of the twenty-one law enforcement session participants were from the Collier County Sheriff's Office. Seven members of the sheriff's office attended the afternoon civilian session, six merely as observers. The civilian session included representatives from the Collier County School Board, East Naples Civic Association, Collier County Board of County Commissioners, City of Bonita Springs, Florida Fish and Wildlife Commission, Collier County government, Greater Naples Chamber of Commerce, Golden Gate Fire Commission, Collier County School District, and Marco Island City Council.

No immigrant community representatives or organizations participated in the Collier County focus group. This site was added later in the project and there was a relatively short amount of time to organize the civilian session compared with the other focus group sites. Also, the Police Foundation had requested that elected and appointed government officials were included in the civilian session.

In 2000, the Collier County Sheriff's Office had 915 employees, 504 being full-time sworn personnel. Of full-time sworn personnel, 87 percent were White (non-Hispanic), 2 percent Black (non-Hispanic), 11 percent Hispanic, and 1 percent Asian. The Lee County Sheriff's Office had 910 full-time employees, 410 of whom were full-time sworn personnel. Of full-time sworn personnel, 94 percent were White (non-Hispanic), 3 percent Black (non-Hispanic), and 2 percent Hispanic. The Fort Myers Police Department had 238 full-time employees, 152 of whom were full-time sworn personnel. Of full-time sworn personnel, 84 percent were White (non-Hispanic), 11 percent Black (non-Hispanic), 5 percent Hispanic, and 1 percent Asian.[52]

The Collier County Sheriff's Office had a higher violent crime rate in 2006 than in 1985, although the rates have been decreasing slowly since 1999 (around the period when violent crime rates were relatively high in the jurisdiction). The county has seen consistent decreases in property crime

## APPENDIX A
### Focus Group Summary

rates since 1996. The Naples Police Department's violent and property crime rates both dropped during this period. As noted in table 6, the Lee and Charlotte County Sheriff's Offices saw increases in violent crime rates and barely any change in property crime rate between 1985 and 2006. The Fort Myers Police Department's property crime rate decreased; and while the violent crime rate was slightly higher in 2006 than in 1985, the violent crime rate has been steadily decreasing since 1992, when violent crime was at a high.

**TABLE 6. CRIME STATISTICS FOR COLLIER COUNTY PARTICIPATING AGENCIES**

| Agency | 1985 Violent Crime Rate | 1985 Property Crime Rate | 2006 Violent Crime Rate | 2006 Property Crime Rate |
|---|---|---|---|---|
| Collier County Sheriff's | 383.2 | 4,823.9 | 477.4 | 1,873.2 |
| Lee County Sheriff's | 188.4 | 3,230 | 522.6 | 3,420.6 |
| Naples PD | 500.2 | 7,218.8 | 240.1 | 3,891.3 |
| Fort Myers PD | 1,229.3 | 9,241.2 | 1,577.1 | 4,897.9 |
| Charlotte County Sheriff's | 182.9 | 3,360.6 | 483.9 | 3,505.8 |

Data Source: U.S. Department of Justice, Bureau of Justice Statistics, *Crime & Justice Data Online*, and *Crime Trends* from *FBI Uniform Crime Reports*. Violent and property crime rates are number of crimes reported per 100,000 population. Data are unavailable for some of the smaller agencies that participated. Violent crimes include murder and non-negligent homicide, forcible rape, robbery, and aggravated assault. The definition of property crimes includes burglary, larceny/theft, motor vehicle theft, and arson.

Because of the large Cuban population in Florida, participants in Collier County discussed special immigration benefits and privileges granted to Cubans. Unlike immigrants from other countries, ICE will not initiate removal proceedings against a Cuban who has committed a criminal law violation. One participant expressed his belief that Cubans should not receive such special treatment because they are no worse off than immigrants from many other countries. Some participants also claimed that the Castro administration provides support to Cuban smugglers, who are smuggling not only Cubans but also other foreign nationals. One member of the U.S. Coast Guard supported this claim, stating that the Coast Guard had recently intercepted a boat coming from Cuba where nine out of eleven of the passengers were Chinese nationals. Others claimed that Cubans are now entering the United States through the U.S.-Mexico border, and that their smuggling networks are training migrants from other countries on Cuban accents and mannerisms so that they can benefit from the immigration privileges extended to Cubans.

APPENDIX A
## Focus Group Summary

### Endnotes

[1] Throughout this report, the term "immigrant" is used to describe any foreign-born resident, including legal permanent residents and other legally present foreign nationals, naturalized citizens, undocumented immigrants, and out-of-status immigrants.

[2] U.S. Census Bureau. *American FactFinder, 2005-2007. American Community Survey 3-Year Estimates Data Profile Highlights, Shawnee County, Kansas*. http://factfinder.census.gov/servlet/ACSSAFFFacts?_event=Search&geo_id=&_geoContext=&_street=&_county =Shawnee+County&_cityTown=Shawnee+County&_state=04000US20&_zip=&_lang=en&_sse=on&pctxt=fph&pgsl=010.

[3] U.S. Census Bureau. *American FactFinder, 2005-2007. American Community Survey 3-Year Estimates Data Profile Highlights, Topeka, Kansas*. http://factfinder.census.gov/servlet/ACSSAFFFacts?_event=Search&geo_id=05000US20177&_geoContext=01000US%7C0 4000US20%7C05000US20177&_street=&_county=Topeka&_cityTown=Topeka&_state=04000US20&_zip=&_lang=en&_sse=on&Acti veGeoDiv=geoSelect&_useEV=&pctxt=fph&pgsl=050&_submenuId=factsheet_1&ds_name=ACS_2007_3YR_SAFF&_ci_nbr=null&qr_ name=null&reg=null%3Anull&_keyword=&_industry=.

[4] *Id.*

[5] U.S. Census Bureau. *American FactFinder, 2005-2007. American Community Survey 3-Year Estimates Data Profile Highlights, Shawnee County, Kansas*. http://factfinder.census.gov/servlet/ACSSAFFFacts?_event=Search&geo_id=&_geoContext=&_street=&_county= Shawnee+County&_cityTown=Shawnee+County&_state=04000US20&_zip=&_lang=en&_sse=on&pctxt=fph&pgsl=010.

[6] U.S. Census Bureau. *American FactFinder, Selected Social Characteristics in the United States: 2005-2007, 2005-2007 American Community Survey 3-Year Estimates, Topeka, Kansas*. http://factfinder.census.gov/servlet/ADPTable?_bm=y&-geo_id=16000US2071000&- qr_name=ACS_2007_3YR_G00_DP3YR2&-ds_name=ACS_2007_3YR_G00_&-_lang=en&-_sse=on.

[7] *Id.*

[8] U.S. Census Bureau. *American FactFinder, 2005-2007. American Community Survey 3-Year Estimates Data Profile Highlights, Shawnee County, Kansas*. http://factfinder.census.gov/servlet/ACSSAFFFacts?_event=Search&geo_id=&_geoContext=&_street=&_county= Shawnee+County&_cityTown=Shawnee+County&_state=04000US20&_zip=&_lang=en&_sse=on&pctxt=fph&pgsl=010.

[9] U.S. Census Bureau. *American FactFinder, Selected Social Characteristics in the United States: 2005-2007, 2005-2007 American Community Survey 3-Year Estimates, Topeka, Kansas*. http://factfinder.census.gov/servlet/ADPTable?_bm=y&-geo_id=16000US2071000&- qr_name=ACS_2007_3YR_G00_DP3YR2&-ds_name=ACS_2007_3YR_G00_&-_lang=en&-_sse=on.

[10] *Id.*

[11] http://www.hablamosjuntos.org/latinos/statetable.asp?st=kansas.

[12] U.S. Census Bureau. *American FactFinder, 2005-2007. American Community Survey 3-Year Estimates Data Profile Highlights, Shawnee County, Kansas*. http://factfinder.census.gov/servlet/ACSSAFFFacts?_event=Search&geo_id=&_geoContext=&_street=&_ county=Shawnee+County&_cityTown=Shawnee+County&_state=04000US20&_zip=&_lang=en&_sse=on&pctxt=fph&pgsl=010.

[13] U.S. Department of Justice, Bureau of Justice Statistics, *Crime & Justice Data Online, Law Enforcement Management and Administrative Statistics, 2000* (LEMAS), *Law Enforcement Agency Profile for Topeka Police Department, KS*. There were no LEMAS data available for Shawnee County Sheriff's Office. http://bjsdata.ojp.usdoj.gov/dataonline/Search/Law/Local/RunLawLocalAgencyProfile.cfm.

[14] U.S. Department of Justice, Bureau of Justice Statistics, *Crime & Justice Data Online*, and *Crime Trends* from *FBI Uniform Crime Reports*. The *FBI Uniform Crime Reports* began reporting on crime rates for individual agencies in 1985 and the most current data available are for 2006. http://www.fbi.gov/ucr/cius2006/data/table_08_tx.html, http://www.fbi.gov/ucr/cius2006/data/table_08_nm. html.

[15] http://www.elpasoinfo.com.

[16] Data provided by Mayor John Cook of El Paso City in his presentation at the Police Foundation national conference on August 21, 2008.

[17] Les Christie, "The Fastest Growing U.S. Cities," CNNMoney.com, June 28, 2007. http://money.cnn.com/2007/ 06/27/real_estate/ fastest_ growing _cities/.

[18] U.S. Census Bureau. *American FactFinder, 2005-2007. American Community Survey 3-Year Estimates Data Profile Highlights, El Paso County, Texas*. http://factfinder.census.gov/servlet/ACSSAFFFacts?_event=Search&geo_id=16000US4824000 &_geoContext =01000US%7C04000US48%7C16000US4824000&_street=&_county=El+Paso+County&_cityTown=El+Paso+County&_state=04000 US48&_zip=&_lang=en&_sse=on&ActiveGeoDiv=geoSelect&_useEV=&pctxt=fph&pgsl=160&_submenuId=factsheet_1&ds_name=ACS _2007_3YR_SAFF&_ci_nbr=null&qr_name=null&reg=null%3Anull&_keyword=&_industry=.

[19] *Id.*

[20] U.S. Census Bureau. *American FactFinder, 2005-2007. American Community Survey 3-Year Estimates Data Profile Highlights, Doña Ana County, New Mexico*. http://factfinder.census.gov/servlet/ACSSAFFFacts?_event=Search&geo_id=&_geoContext=&_street= &_county=Dona+Ana+County&_cityTown=Dona+Ana+County&_state=04000US35&_zip=&_lang=en&_sse=on&pctxt=fph&pgsl=010.

[21] U.S. Census Bureau, *Hispanics in the United States*. http://www.census.gov/population/www/socdemo/hispanic/files/ Internet_Hispanic_in_US_2006.pdf.

# APPENDIX A
## Focus Group Summary

[22] "Growth in Latino Population," table accessed at http://www.hablamosjuntos.org/latinos/statetable.asp?st=texas.

[23] "Growth in Latino Population," table accessed at http://www.hablamosjuntos.org/latinos/statetable.asp?st=newmexico.

[24] U.S. Census Bureau, *American FactFinder, Selected Social Characteristics in the United States: 2005-2007, 2005-2007 American Community Survey 3-Year Estimates, El Paso County, Texas.* http://factfinder.census.gov/servlet/ADPTable?_bm=y&-geo_id=05000US48141&-qr_name=ACS_2007_3YR_G00_DP3YR2&-ds_name=ACS_2007_3YR_G00_&-_lang=en&-redoLog=false&-_sse=on.

[25] U.S. Census Bureau, *American FactFinder, Selected Social Characteristics in the United States: 2005-2007, 2005-2007 American Community Survey 3-Year Estimates, Doña Ana County, New Mexico.* http://factfinder.census.gov/servlet/ADPTable?_bm=y&-geo_id=05000US35013&-qr_name=ACS_2007_3YR_G00_DP3YR2&-ds_name=ACS_2007_3YR_G00_&-_lang=en&-redoLog=false&-_sse=on.

[26] U.S. Census Bureau. *American FactFinder, 2005-2007. American Community Survey 3-Year Estimates Data Profile Highlights, El Paso County, Texas.* http://factfinder.census.gov/servlet/ACSSAFFFacts?_event=Search&geo_id=16000US4824000&_geoContext=01000US%7C04000US48%7C16000US4824000&_street=&_county=El+Paso+County&_cityTown=El+Paso+County&_state=04000US48&_zip=&_lang=en&_sse=on&ActiveGeoDiv=geoSelect&_useEV=&pctxt=fph&pgsl=160&_submenuId=factsheet_1&ds_name=ACS_2007_3YR_SAFF&_ci_nbr=null&qr_name=null&reg=null%3Anull&_keyword=&_industry=.

[27] U.S. Census Bureau. *American FactFinder, 2005-2007. American Community Survey 3-Year Estimates Data Profile Highlights, Doña Ana County, New Mexico.* http://factfinder.census.gov/servlet/ACSSAFFFacts?_event=Search&geo_id=&_geoContext=&_street=&_county=Dona+Ana+County&_cityTown=Dona+Ana+County&_state=04000US35&_zip=&_lang=en&_sse=on&pctxt=fph&pgsl=010.

[28] U.S. Department of Justice, Bureau of Justice Statistics, *Law Enforcement Management and Administrative Statistics, 2000* (LEMAS). Statistics are available only for local police and sheriffs' agencies with one hundred or more sworn officers and fifty or more uniformed officers assigned to respond to calls for service, which is why data were unavailable for other police participating agencies. http://www.ojp.usdoj.gov/bjs/pub/pdf/lemas00.pdf.

[29] Mayor John Cook's presentation at the Police Foundation's national conference on August 21, 2008, citing 12th Annual America's Safest (and Most Dangerous) Cities, Morgan Quinto Awards.

[30] U.S. Department of Justice, Bureau of Justice Statistics, *Crime & Justice Data Online*, and *Crime Trends* from *FBI Uniform Crime Reports.* http://www.ojp.usdoj.gov/bjs/data/lgcithom.csv, http://www.fbi.gov/ucr/cius2006/data/table_08_tx.html, http://www.fbi.gov/ucr/cius2006/data/table_08_nm.html.

[31] U.S. Census Bureau, *Estimates of Population Change for Metropolitan Statistical Areas and Rankings: July 1, 2006, to July 1, 2007.* http://www.census.gov/popest/metro/CBSA-est2007-pop-chg.html.

[32] Les Christie, "The Fastest Growing U.S. Cities," CNN.com, June 28, 2007. http://money.cnn.com/2007/06/27/real_estate/fastest_growing_cities/.

[33] U.S. Census Bureau, *United States—Metropolitan and Micropolitan Statistical Area; and for Puerto Rico, Percent of People Who are Foreign Born: 2006.* http://factfinder.census.gov/servlet/GCTTable?_bm=y&-geo_id=01000US&-_box_head_nbr=GCT0501&-ds_name=ACS_2006_EST_G00_&-_lang=en&-redoLog=false&-format=US-35&-mt_name=ACS_2006_EST_G00_GCT0703_US35&-CONTEXT=gct..

[34] U.S. Census Bureau, *United States—Metropolitan and Micropolitan Statistical Area; and for Puerto Rico, Percent of People Born in Mexico: 2006: Percent of People Born in Latin America: 2006.* http://factfinder.census.gov/servlet/GCTSubjectShowTablesServlet?_lang=en&_ts=255556846835.

[35] U.S. Census Bureau, *United States—Metropolitan and Micropolitan Statistical Area; and for Puerto Rico, Percent of People 5 and Over Who Speak a Language Other than English at Home: 2006.* http://factfinder.census.gov/servlet/GCTSubjectShowTablesServlet?_lang=en&_ts=255556846835.

[36] U.S. Census Bureau, *American FactFinder, 2005-2007. American Community Survey 3-Year Estimates Data Profile Highlights, Arlington, Texas.* http://factfinder.census.gov/servlet/ACSSAFFFacts?_event=Search&geo_id=&_geoContext=&_street=&_county=Arlington&_cityTown=Arlington&_state=04000US48&_zip=&_lang=en&_sse=on&pctxt=fph&pgsl=010.

[37] U.S. Census Bureau, *American FactFinder, Population and Housing Narrative Profile: 2005-2007, 2005-2007 American Community Survey 3-Year Estimates.* http://factfinder.census.gov/servlet/NPTable?_bm=y&-geo_id=16000US4804000&-qr_name=ACS_2007_3YR_G00_NP01&-ds_name=&-redoLog=false.

## APPENDIX A
# Focus Group Summary

[38] U.S. Census Bureau, *American FactFinder, Selected Social Characteristics in the United States: 2005-2007, Arlington, Texas.* http://factfinder.census.gov/servlet/ADPTable?_bm=y&-geo_id=16000US4804000&-qr_name=ACS_2007_3YR_G00_DP3YR2&-ds_name=ACS_2007_3YR_G00_&-_lang=en&-redoLog=false&-_sse=on.

[39] U.S. Census Bureau, *American FactFinder, 2005-2007. American Community Survey 3-Year Estimates Data Profile Highlights, Arlington, Texas.* http://factfinder.census.gov/servlet/ACSSAFFFacts?_event=Search&geo_id=&_geoContext=&_street=&_county=Arlington&_cityTown=Arlington&_state=04000US48&_zip=&_lang=en&_sse=on&pctxt=fph&pgsl=010.

[40] "Growth in Latino Population," tables accessed at http://www.hablamosjuntos.org/latinos/statetable.asp?st=texas.

[41] U.S. Department of Justice, Bureau of Justice Statistics, *Law Enforcement Management and Administrative Statistics, 2000* (LEMAS). Statistics are only available for local police and sheriffs' agencies with one hundred or more sworn officers and fifty or more uniformed officers assigned to respond to calls for service, which is why data were unavailable for other police participating agencies. http://www.ojp.usdoj.gov/bjs/pub/pdf/lemas00.pdf.

[42] Where statistics were unavailable for 1985, the comparison year is provided.

[43] U.S. Census Bureau, *American FactFinder, 2005-2007 American Community Survey 3-Year Estimates, Data Profile Highlights, Collier County.* http://factfinder.census.gov/servlet/ACSSAFFFacts?_event=Search&geo_id=&_geoContext=&_street=&_county=Collier+County&_cityTown=Collier+County&_state=04000US12&_zip=&_lang=en&_sse=on&pctxt=fph&pgsl=010.

[44] U.S. Census Bureau, *American FactFinder, 2005-2007 American Community Survey 3-Year Estimates, Data Profile Highlights, Lee County, Florida.* http://factfinder.census.gov/servlet/ACSSAFFFacts?_event=Search&geo_id=&_geoContext=&_street=&_county=Lee+County&_cityTown=Lee+County&_state=04000US12&_zip=&_lang=en&_sse=on&pctxt=fph&pgsl=010.

[45] http://www.hablamosjuntos.org/latinos/statetable.asp?st=florida.

[46] U.S. Census Bureau, *American FactFinder, Selected Social Characteristics in the United States: 2005-2007, Collier County, Florida.* http://factfinder.census.gov/servlet/ADPTable?_bm=y&-geo_id=05000US12021&-qr_name=ACS_2007_3YR_G00_DP3YR2&-ds_name=ACS_2007_3YR_G00_&-_lang=en&-redoLog=false&-_sse=on.

[47] U.S. Census Bureau, *American FactFinder, Selected Social Characteristics in the United States: 2005-2007, Lee County, Florida.* http://factfinder.census.gov/servlet/ADPTable?geo_id=05000US12071&ds_name=ACS_2007_3YR_G00_&qr_name=ACS_2007_3YR_G00_DP3YR2&_lang=en&_sse=on.

[48] U.S. Census Bureau, *American FactFinder, 2005-2007 American Community Survey 3-Year Estimates, Data Profile Highlights, Collier County, Florida.* http://factfinder.census.gov/servlet/ACSSAFFFacts?_event=Search&geo_id=&_geoContext=&_street=&_county=Collier+County&_cityTown=Collier+County&_state=04000US12&_zip=&_lang=en&_sse=on&pctxt=fph&pgsl=010.

[49] U.S. Census Bureau, *American FactFinder, 2005-2007 American Community Survey 3-Year Estimates, Data Profile Highlights, Lee County, Florida.* http://factfinder.census.gov/servlet/ACSSAFFFacts?_event=Search&geo_id=&_geoContext=&_street=&_county=Lee+County&_cityTown=Lee+County&_state=04000US12&_zip=&_lang=en&_sse=on&pctxt=fph&pgsl=010.

[50] U.S. Census Bureau, *Fact Sheet, Immokalee CDP, Florida, 2000.* Data is unavailable for the year 2005-2007. http://factfinder.census.gov/servlet/SAFFFacts?_event=Search&geo_id=&_geoContext=&_street=&_county=Immokalee&_cityTown=Immokalee&_state=04000US12&_zip=&_lang=en&_sse=on&pctxt=fph&pgsl=010&show_2003_tab=&redirect=Y.

[51] U.S. Census Bureau, *Fact Sheet, Naples City, Florida, 2000.* Data is unavailable for the year 2005-2007. http://factfinder.census.gov/servlet/SAFFFacts?_event=&geo_id=16000US1247625&_geoContext=01000US|04000US12|16000US1247625&_street=&_county=Naples+City&_cityTown=Naples+City&_state=04000US12&_zip=&_lang=en&_sse=on&ActiveGeoDiv=&useEV=&pctxt=fph&pgsl=160&_submenuId=factsheet_1&ds_name=ACS_2007_3YR_SAFF&_ci_nbr=null&qr_name=null&reg=&_keyword=&_industry=.

[52] U.S. Department of Justice, Bureau of Justice Statistics, *Crime & Justice Data Online, Law Enforcement Management and Administrative Statistics, 2000* (LEMAS). http://www.ojp.usdoj.gov/bjs/pub/pdf/lemas00.pdf.

## APPENDIX B
# Legal Issues in Local Police Enforcement of Federal Immigration Law

by Nancy Morawetz and Alina Das

### Introduction

The question of whether and to what extent local police should be involved in the enforcement of federal immigration law has sparked considerable debate in the current political climate. Local police departments are no doubt fielding concerns from political leaders and residents about this issue and are struggling to determine how to respond. Some police departments may view civil violations of immigration law as being similar to violations of criminal laws, and thus consider immigration enforcement as inherent in their law enforcement role. They may also welcome a closer collaboration with federal authorities on these issues. At the same time, however, some police departments may view direct involvement in federal immigration law enforcement as being in tension with their traditional models of policing. Local enforcement of immigration law also does not mesh well with public safety models of policing, since immigrants commit criminal offenses at lower rates than their citizen neighbors[1] and local police are already charged with the task of arresting individuals who do violate criminal laws. In addition, local enforcement of immigration law does not appear to fit neatly into community-based models of policing. As many police departments and community advocates have observed, fear of deportation undermines the ability of police to garner trust in immigrant communities and dissuades residents from contacting the police to report crime or otherwise engage in problem-solving partnerships.[2]

Despite these disconnects, some localities have chosen to get involved in the direct enforcement of immigration law, either by asserting that they have the inherent authority to enforce federal immigration law or by entering into agreements with federal agencies. They have revised their policing model to focus on the enforcement of an entirely different set of laws. In doing so, however, some localities have not fully considered the legal challenges inherent in federal immigration law enforcement and the very real possibility that their actions may violate the rights of the residents in their communities.

This paper seeks to address these issues by delving into the legal complexities of local enforcement of immigration law and their implications for local liability. Who is directly affected by the local enforcement of immigration laws and what rights do they have? What legal issues do local police face if they become involved in enforcing immigration law on the street, in people's homes and workplaces, and in local jails? How is immigration enforcement different from criminal law enforcement? What kind of liability do localities expose themselves to by taking on immigration enforcement duties? To what degree can police count on other institutions to provide checks and balances that will mitigate these potential liabilities?

As this paper will show, immigration enforcement is a complex business. The nuances of immigration law and the changing demographics of American communities create an environment ripe for violation of the myriad rights of both immigrants of any status as well as citizens. The

Nancy Morawetz is a Professor of Clinical Law at New York University School of Law.
Alina Das is an Immigrant Defense Fellow at New York University School of Law.

arrest, detention, and/or transfer of custody of citizens and residents with lawful immigration status, the use of racial profiling to target immigrants without status, and the unlawful arrests, stops, and searches of immigrants in their homes and communities all raise real risks of liability for localities. The role of enforcing federal immigration law essentially requires localities to become familiar with a completely different set of rules of engagement by officers, thereby blurring lines about permissible police action and leading to the violation of the rights of the residents of the communities they seek to protect and serve.

The ultimate choice of any locality on its role in immigration enforcement will involve a wide range of factors. As part of the calculus, localities should weigh the complexity of the immigration law enforcement task, the real risk that their actions will violate the rights of people in the community, and the resulting potential exposure to liability.

## I. Rights, Status, and the Changing Demographics of Immigrants in the United States

Popular discussions of immigration enforcement tend to make three false assumptions about the people who will be affected by local enforcement of immigration law. First, they assume that noncitizens have little or no rights under local, state, and federal law. Second, they assume that the precise immigration status of individuals in the community will be easy to identify. Third, they assume that if enforcement does target an individual who has violated immigration law, only that individual will be affected by the enforcement action. Because of these false assumptions, the debate over local enforcement of immigration law fails to consider significant potential of liability for violations of the rights of community residents. This section of the paper clarifies the underlying misconceptions that frame the debate.

### A. The Rights of Immigrants in the United States

Regardless of status in the United States, immigrants have numerous rights protected under the U.S. Constitution and local, state, and federal laws. Some people mistakenly believe that noncitizens have no rights under the U.S. Constitution because they lack citizenship. This is incorrect. Provisions under the U.S. Constitution that refer to "persons" rather than "citizens" apply to individuals regardless of immigration status. As the Supreme Court has explained, "[t]hese provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality."[3] Immigrants in the U.S. are considered "persons" within the territorial jurisdiction for purposes of constitutional protections regardless of how they entered the U.S. or whether they have lawful immigration status.[4] Under this reasoning, the Supreme Court has had occasion to uphold noncitizens' rights under a variety of provisions for over a century, including but not limited to the Fourth Amendment,[5] the Fifth and Sixth Amendments,[6] and the Due Process and Equal Protection clauses of the Fourteenth Amendment.[7]

Some of the misconceptions over the constitutional rights of noncitizens may be due to a much more narrow debate over how the Fourth Amendment applies in immigration courts. For example, a split Supreme Court addressed the degree to which suppression rules would be re-

## APPENDIX B
### Legal Issues in Local Police Enforcement
### of Federal Immigration Law

laxed in the immigration court context.[8] The majority denied suppression in the specific case, but went on to say that it did "not condone any violations of the Fourth Amendment that may have occurred" and explained that its "conclusions concerning the exclusionary rule's value [in immigration court] might change, if there developed good reason to believe that Fourth Amendment violations by INS officers were widespread."[9] It further noted that there had been no assertion that officers had violated the agency's internal regulations or that there were any egregious violations of the Fourth Amendment or other rights involved in that particular case. Thus, as immigration enforcement has changed since this 1984 opinion, immigration practitioners still bring motions to suppress in immigration court, addressing the issues outlined by the Supreme Court. In any event, the decision was limited to the issue of suppression in immigration court. Nothing in the opinion addressed application of the Fourth Amendment to damage actions, and recent lawsuits have raised claims under the Fourth Amendment and other rights in the U.S. Constitution.

In addition to the rights under the U.S. Constitution, numerous rights and obligations also flow from federal statutes, from civil rights legislation such as the Civil Rights Act of 1964[10] to immigrant-specific legislation such as discrete provisions within the Immigration and Nationality Act that specify rights and/or provide limits on government authority.[11] Federal regulations under these laws also provide immigrants with specific protections. At the state level, many states have constitutional provisions that may be more expansive than U.S. constitutional rights.[12] In addition, many states and localities have enacted laws to protect their residents that do not distinguish on the basis of immigration status. Local ordinances and regulations may also provide strict guidelines delineating permissible actions towards residents and their rights to redress violations.

Thus, local police departments will have to account for a plethora of constitutional provisions and laws that govern both the rights of immigrants and the obligations of law enforcement officials if they seek to expand their enforcement goals into the realm of immigration. To say that immigration enforcement is somehow made easier by differences in the rights of immigrants and citizens is extremely misleading. In many ways, law enforcement officers will have to contend with a more complex set of laws and regulations governing immigration enforcement and permissible state action than they usually contend with in their traditional criminal law enforcement activities.

### B. Status and the Changing Demographics of Immigrants in the United States

Another common misconception that has framed the debate over local enforcement of federal immigration law is the idea that the changing demographic Americans are witnessing in their communities involves only immigrants without status and thus such individuals will be easy to target through police efforts. This idea is flawed for two interrelated reasons. First, most new immigrants in the U.S. have some form of legal status. Second, the status of each specific individual is not easily discernable.

Contrary to popular belief, much of the changing demographic that Americans have witnessed in recent years deals primarily with legal immigration to the United States. While the percent-

## APPENDIX B
### Legal Issues in Local Police Enforcement of Federal Immigration Law

age of foreign-born individuals in the United States has risen dramatically in the last thirty years, the vast majority of these individuals have lawful immigration status or citizenship. The percentage of foreign born in the United States population reached an historic low of 4.7 percent in 1970; today that share has climbed to approximately 12.5 percent of the population, or 38 million persons residing in the U.S.[13] The U.S. Department of Homeland Security (DHS), which administers the programs that provide immigration status and citizenship to the foreign born, does not maintain statistics about the size of the different components of this population.[14] However, reliable estimates place the percentage of citizens or lawful permanent residents at approximately 70 percent of the foreign born.[15] The remaining 30 percent are unauthorized immigrants who overstayed their visas or those who entered the United States without permission. But even within this group, there are substantial numbers who have a form of lawful status or are on the verge of obtaining lawful status. About 300,000 have or will soon have Temporary Protected Status, a form of status that allows the person to work legally in the United States and that precludes detention.[16] An additional 617,000 have completed every step of the legal immigration process, have official permission to work, and are on the verge of being provided with lawful permanent resident status.[17] Thus, even among those who are labeled as "undocumented" or "illegal," many have important intermediate forms of status.

These numbers call into question whether a community is correctly characterizing the new immigrants that are residing in or passing through their neighborhoods. Legal immigration continues at historically high levels. Each year, there are approximately one million new lawful permanent residents in the U.S.[18] Added to these are 320,000 temporary workers and dependents on a path to legal residence.[19] Over 72 percent of new immigrants each year have lawful status.[20] On top of these numbers of permanent residents, there are millions of foreign born who come to the United States on temporary visas, such as student visas, business visas, and tourist visas. Approximately 1.1 million students study each year on student visas.[21] Tourism varies by the time of the year, but the latest statistics are a reminder of how many foreign born visit each year. In February 2008, hardly the top tourist month of the year, there were 3.3 million international visitors to the United States, a 15 percent increase over the previous year.[22]

There is no doubt that in some parts of the country the demographic shifts from immigration are striking, and residents are grappling with these demographic changes[23]. However, the changes may not reflect unauthorized immigration. In Virginia, for example, the fiscal years 2005 through 2007 brought in almost one hundred thousand new lawful permanent residents.[24] That number constitutes 1.2 percent of the entire population of the state of Virginia.[25] But these numbers are of lawful immigrants. While local residents might attribute changes in their environment to popular press discussions of illegal immigration, much of what they observe is legal immigration.

Moreover, there are no readily discernable factors that accurately indicate a person's immigration status. Some people may believe that foreign language use, or a lack of English skills, is necessarily a sign of unauthorized immigration. However, foreign language use is high across the foreign-born population. The vast majority of the foreign born use a language other than Eng-

lish in the home.[26] In addition, foreign language use is high among citizens. Nine percent of the native-born population over the age of five—twenty-three million Americans—speaks a language other than English at home.[27] Of these native-born citizens, most speak English. But 4.7 million report that they do not speak English "very well."[28] Thus, use of a foreign language or lack of English skills does not necessarily mean that a person is likely to lack immigration status. Similarly, a person's surname is also not an accurate indicator of unauthorized immigration. For example, while some localities particularly along the southern border might assume that a Spanish surname is an indicator of unauthorized immigration, such an assumption is baseless—nearly 15 percent of the U.S. population is of Hispanic origin and the majority of Hispanic residents are native-born U.S. citizens.[29]

In summary, the categories of lawful immigration status are complex and commonly used indicators to determine which individuals fall into which categories will often prove false. Treading into the local enforcement of federal immigration law will therefore entail a significant risk of targeting residents with lawful status, including U.S. citizens, and may be motivated by false assumptions about the demographic changes in the community.

### C. Mixed-Status Families and the Ripple Effect of Immigration Enforcement

Another common misconception related to the debate over local immigration enforcement is that the purported targets of these efforts are somehow isolated from the rest of the community by their lack of immigration status. There is no clear dividing line between citizens and noncitizens within most communities, however. Nearly one in ten U.S. families with children is a "mixed-status" family, i.e., a family with at least one noncitizen parent and at least one citizen child.[30] One in ten children living in the U.S. is a part of a mixed-status family.[31] Approximately 85 percent of immigrant families (families with one noncitizen parent) are mixed-status families.[32]

Thus, the arrest and detention of an immigrant may very well affect a citizen spouse or child. Recent studies and reports have noted the harms that U.S. citizen children have experienced when a parent is arrested and detained during a home raid or workplace raid.[33] The immediate harms may include unlawfully detaining U.S. citizen children[34] or leaving children unsupervised while their primary caregivers are detained.[35] Longer term effects for children and families may include socioeconomic hardship, school disruptions, and emotional trauma.[36]

As a matter of liability, mixed-status families present local officials engaged in immigration enforcement with two kinds of problems. First, they may improperly detain citizens or lawful residents in the course of seeking a person without proper status. If they do so, they will be held accountable for treading on these residents' right to liberty. Second, they may leave minors unsupervised as they detain their parents and thereby violate their general responsibility for the care and well-being of the children residing in the community. Simply put, immigration enforcement cannot proceed on the assumption that these U.S. citizen children will not be affected by their attempts to enforce immigration law.

Thus, immigration enforcement is made infinitely more complex by misconceptions about the well-ingrained legal rights of immigrants, the changing demographics of the immigrant pop-

APPENDIX B
## Legal Issues in Local Police Enforcement of Federal Immigration Law

ulation, and the intertwined nature of immigrants and citizens in local communities. The complexities of immigration law make it very difficult for even the most experienced and well-trained federal immigration officers to follow the letter of the law. These underlying complexities are important for localities to consider when evaluating the legal risks of undertaking immigration enforcement.

## II. Liability Issues in Local Police Enforcement of Immigration Laws

In the past year, as both the federal government and local authorities have stepped up immigration arrests, the methods for identifying, arresting, and detaining those charged with violations of the immigration laws have sparked significant litigation. These lawsuits range from class actions that challenge methods for arresting people in their homes or workplaces, to actions focused on the wrongful detention or deportation of a specific individual. Some of these actions involve police action outside of a correctional institution. Some involve sheriffs or wardens who are identifying or detaining suspected immigration law violators in the local jail.

This section of the paper serves to unpack the potential liability of state and local officials. First, it addresses the interplay between local and federal liability and how agreements between localities and the federal government affect local liability. Second, it takes a closer look at the specific liability risks inherent in the local enforcement of federal immigration law and describes some of the lawsuits that community members and their advocates have initiated to challenge unlawful actions in the recent raids, arrests, detentions, and deportations.

### A. The Interplay Between Local and Federal Liability

Police departments that engage in the enforcement of federal immigration law face potential damages, actions, and other lawsuits similar to those faced by federal authorities. A person who feels that a local law enforcement officer or police department violated his or her rights may sue to address those violations. The plethora of laws that may be at issue in a lawsuit may include but are not limited to numerous local and state laws, state constitutional provisions, Title VI of the Civil Rights Act of 1964, and various provisions of the U.S. Constitution, including the Fourth, Fifth, and Fourteenth Amendments. The exact contours of liability may depend both on the nature of the violations and the scope of the relationship between local and federal authorities.

States and localities that act on their "inherent authority" to enforce immigration law, i.e., independent immigrant enforcement efforts without a formal agreement with federal immigration authorities, also risk challenges to the underlying validity of their actions. Although this issue continues to be debated, there is substantial support for the view that localities are simply not permitted to engage in most forms of immigration law enforcement in the absence of a specific agreement with federal immigration authorities.[37] There are two interrelated bases for this view.

The first is the argument that states and localities have inherent authority to enforce federal law only as it pertains to criminal violations. Under this reasoning, states do not have inherent authority to enforce most immigration law because most immigration violations are civil, not criminal.[38] The second argument is focused on the issue of federal preemption. Given that the federal government has a comprehensive scheme for enforcing immigration law, there is a strong

---

APPENDIX B

## Legal Issues in Local Police Enforcement
## of Federal Immigration Law

---

argument that direct local enforcement of the immigration law is preempted by federal law.[39] The only forms of federal criminal enforcement that states and localities are arguably authorized to engage in under this scheme are for specific federal crimes related to smuggling, transporting or harboring,[40] and illegal presence following reentry after a deportation order.[41] But notably, even in these areas, Congress has imposed limitations. With respect to reentry, Congress included specific limitations on the reentry arrests, requiring that state and local officials first "obtain appropriate confirmation from the Immigration and Naturalization Service of the status of such individual and only for such period of time as may be required for the Service to take the individual into federal custody for purposes of deporting or removing the alien from the United States."[42] Indeed, the legislative history shows that Congress was careful not to provide broader state and local authority to enforce immigration laws.[43] As to smuggling, harboring, and transporting, there are arguments that these provisions are meant to be interpreted narrowly to reach classic smuggling operations and the harboring and transportation related to these operations. Localities that seek to enforce federal immigration law through their "inherent authority" risk making arrests that fall outside the scope of their actual legal authority.

For these reasons and others, some states and localities seek to establish an agreement with federal immigration authorities in an effort to prevent challenges to their authority. Section 287(g) of the Immigration and Nationality Act, a provision that Congress enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act, authorizes the federal government to enter into written memoranda of agreement (MOAs) with states and localities to provide for the local enforcement of federal immigration law.[44] These "287(g) agreements" permit "an officer or employee of the State or subdivision" to carry out the "function[s] of an immigration officer in relation to the investigation, apprehension, or detention of aliens . . . ."[45] An officer or employee "acting under color of authority" of a 287(g) agreement may be treated as federal employees for purposes of litigation under the Federal Tort Claims Act (FTCA), which provides for the United States to assume tort liability for actions taken by federal employees under the scope of their employment.[46]

At first blush, these 287(g) agreements seem to provide some measure of protection for state and local resources if facing suit over unlawful acts stemming from federal immigration law enforcement. However, the devil is in the details. The FTCA does not cover claims that are brought directly under constitutional guarantees distinct from torts under state law.[47] In addition, FTCA protections do not extend to "discretionary functions" or actions taken outside the scope of the officer's employment.[48]

Thus, lawsuits challenging a locality's actions will inevitably focus on activities that lie outside the 287(g) agreement. The DHS Bureau of Immigration and Customs Enforcement (ICE) has specified that the "287(g) program is not designed to allow state and local agencies to perform random street operations" and "is not designed to impact issues such as excessive occupancy and day labor activities."[49] ICE guidelines have clarified that "[p]olice cannot randomly ask for a person's immigration status or conduct raids" and may not use traffic offenses as a pretext for questioning individuals about their immigrations status.[50] Furthermore, 287(g) agree-

A445

APPENDIX B

## Legal Issues in Local Police Enforcement of Federal Immigration Law

ments do not cover conduct that constitutes racial profiling.[51] State officers operating under a 287(g) agreement will not be treated as federal officers for purposes of the FTCA if they fail to follow these guidelines.

Thus, as a whole, 287(g) provides very limited protection to localities and their officers, and may even introduce new dangers in liability. Section 287(g) provides that states and localities may carry out its functions only "at the expense of the State or political subdivision" and only "to the extent consistent with State and local law."[52] At the same time, however, the officer or employee taking on this role will be "subject to the direction" of the Attorney General.[53] If federal officers, untrained in state and local law, direct a state or locality to participate in an operation or series of arrests in a way that is inconsistent with state and local law, there are no protections under 287(g). Thus, regardless of federal officials' involvement, states and localities must assure that their practices comport with local and state laws, including state court rulings on state constitutional analogs to the Fourth and Fifth amendments, as well as other requirements under federal guidelines, federal statutes, and the U.S. Constitution.

### B. Liability Risks: An Overview of Recent Lawsuits Challenging Immigration Enforcement Actions

As the overview above describes, the local enforcement of federal immigration law involves a minefield of potential litigation and liability for police departments and localities. The Lawyers Committee in San Francisco alone reports that it has settled eight cases over the last ten years for a total of $642,500.[54] This section of the paper describes some of the most recent public lawsuits in varying locales that have exposed unlawful actions by states and localities, often in cooperation with or under direction of the federal government, when engaging in immigration law enforcement whether on the street, in people's homes or workplaces, or in the local jail.

#### 1. Liability Stemming from the Arrest and Detention of U.S. Citizens and Other U.S. Residents

Several localities have been sued in recent years due to the arrest and detention of U.S. citizens, lawful permanent residents, and other immigrants with lawful status. As explained above, immigration law is incredibly complex. Officers who make immigration arrests or detain individuals on the street, workplace, home, or jail will rarely have firsthand evidence of the status of a person. Instead, assuming there is a lawful basis for a stop or other questioning, they will be making judgments about whether the person is a citizen, an immigrant with some other form of lawful status, or an individual who lacks status altogether. These are not easy judgments and erroneous determinations create a risk of liability.

The first danger is of targeting U.S. citizens. This occurs when law enforcement officers improperly arrest and detain U.S. citizens for immigration violations or misidentify U.S. citizens in the local jail as noncitizens, holding and transferring them into immigration custody. While shocking, such occurrences are not uncommon. Citizenship law is complicated. Many persons born abroad are citizens as a result of the status of their parents or grandparents.[55] They may not know the details of their citizenship, or even that they are citizens. Other citizens do not carry or possess any proof of their status. As many as 13 million Americans do not have ready access

A446

to proof of citizenship (such as a birth certificate, U.S. passport, or naturalization certificate).[56] The problem is more pronounced for various segments of the population. Citizens with incomes under $25,000 are twice as likely to lack citizenship documents as citizens with incomes above $25,000.[57] Twenty-five percent of African Americans lack any form of government-issued photo identification.[58] As many as 32 million American women who have married do not have citizenship documents reflecting their current name.[59] Thus, lack of documentation does not necessarily mean that an individual is not a U.S. citizen. When a question about citizenship arises, however, there is no national database of citizens to resolve those questions. DHS can only answer questions about people who have been processed by that agency. Most citizens, however, have never had a file with DHS. DHS itself has reportedly detained and even deported U.S. citizens despite its own purported expertise in this area of law.[60] Similarly, local jails that attempt to engage in screening make the predictable error of issuing detainers on some citizens, improperly holding them for transfer into immigration custody instead of releasing them.[61]

A second danger is of arresting, detaining, holding, and transferring into immigration custody some immigrants with lawful immigration status who are not subject to removal. Immigrants who have been granted lawful permanent residence, for example, maintain that status regardless of whether their permanent resident card (or "green card") itself is expired; only a final removal order can terminate lawful permanent residence status.[62] Thus, many individuals with expired lawful permanent resident cards have diligently applied for and are still awaiting their replacement cards due to the government's delay, as described in a recent lawsuit challenging DHS's failure to provide cards in a timely manner for certain individuals.[63] In any event, such individuals still have lawful status and any false arrest and unlawful detention would be grounds for a lawsuit.

Similarly, individuals without lawful permanent residence status may nonetheless have other forms of immigration status that would make their arrest and detention on immigration grounds unlawful. For example, many individuals have been granted Temporary Protected Status (TPS), which is granted to persons who are from countries that are suffering from natural disasters or ongoing armed conflict or other extraordinary conditions.[64] It is available to persons who crossed the border without inspection and even to those with outstanding removal orders if they otherwise meet eligibility requirements.[65] The documentation for TPS, however, is chronically out of date. Each year, applicants must apply to renew their status.[66] The government does not process their applications in time, however, for them to have a new document before their current documents expire. Nonetheless, their status is considered valid and the government posts a notice in the federal register stating that employment authorization is automatically extended beyond the date on their existing cards.[67] Individuals with TPS are statutorily prohibited from being detained based on status.[68]

Given the serious violations inherent in the arrest and detention of U.S. citizens and residents with lawful immigration status in the name of immigration enforcement, such actions carry serious liability risks. Recent lawsuits that have been made public chronicle outrageous cases of botched federal and local enforcement of immigration law against U.S. citizens and other resi-

### APPENDIX B
### Legal Issues in Local Police Enforcement
### of Federal Immigration Law

dents. In one recent case, federal and local Los Angeles officials, including the sheriff, were sued for improperly causing the detention and deportation of Pedro Guzman, a cognitively impaired United States citizen.[69] Mr. Guzman was serving time for a misdemeanor charge in a local jail when local criminal justice officials, through a special pilot project established through an MOA with DHS, misidentified Mr. Guzman as a noncitizen, placing an immigration detainer on him in the local jail and then transferring him to ICE, which eventually deported him—despite the fact that Mr. Guzman was born in the U.S.[70] Pedro Guzman's case was a major news story since it took months for Mr. Guzman to be located and returned to his family.[71] The particular facts of his case have yet to be fully developed, but it is possible that his cognitive impairment played some role in his deportation. If so, it would follow a reported pattern in which the cognitively impaired or mentally ill are misidentified as noncitizens.[72]

In addition to actions resulting in unlawful deportation, unlawful stops, searches, questioning, arrests, and detention of U.S. citizens and residents also carry serious liability risks. In one recent case, filed as a class action against Maricopa County, Arizona, Maricopa County Sheriff's Office, and Maricopa County Sheriff Joe Arpaio, four U.S. citizens and one individual with lawful status at the time of his arrest describe having been unlawfully stopped, detained, and questioned by Maricopa County Sheriff's Office officials based on their efforts to enforce immigration laws through a 287(g) agreement.[73] In New Jersey, several U.S. citizens, lawful permanent residents, and an individual with TPS joined other immigrants challenging home raids conducted by ICE and the Penns Grove Police Department, describing the raids, questioning, seizure of documents, and/or arrests in their homes despite their lawful status.[74]

These are only a few public examples of the myriad cases involving lawsuits against localities attempting to enforce complex immigration law. They add to the already long list of lawsuits against ICE practices that ensnare people with lawful status, including highly publicized lawsuits such as a damages action following the wrongful arrest and detention of a nine-year-old U.S. citizen[75] and a damages action with 114 administrative complaints challenging a workplace raid that involved the detention and search of scores of U.S. citizens and lawful permanent residents.[76] Police departments that engage in federal immigration law enforcement can hardly expect to be better at identifying individuals without lawful immigration status than federal immigration agents, and open themselves up to liability for violating the rights of community residents.

#### 2. Liability Stemming from the Use of Racial Profiling as a Method of Enforcing Federal Immigration Law

Racial and ethnic profiling is a real risk in state and local immigration enforcement of federal immigration law. Enforcement without profiling requires some individualized suspicion related to the individual who is stopped and questioned or otherwise investigated. But what will constitute individualized suspicion? As explained above, immigration status is a complex legal issue. Local officers will not be able to "observe" an immigration violation the way they might observe a violation of criminal law. Under such circumstances, there is a serious risk that the grounds for suspicion will in fact be nothing more than a series of assumptions that begin with a profile

about people who speak another language or have a particular racial or ethnic profile. Indeed, the federal government has long been criticized for using racial profiling in its efforts to enforce immigration law.[77] A statistical study of data gathered through the Freedom of Information Act found substantial evidence of profiling in the New York office of the Immigration and Naturalization Service, the precursor agency to DHS.[78] Such tactics may well be ingrained in certain federal immigration enforcement efforts.

Despite its ubiquitous nature, racial profiling is unlawful and has subjected law enforcement officers to liability.[79] Even localities engaged in racial profiling under the direction of federal immigration agents will not escape liability for these actions. Under 287(g) agreements, localities have no protection from claims that they have engaged in racial profiling. The 287(g) agreements have specifically provided that officers exercising authority under the MOA are bound by all federal civil rights statutes and regulations, explicitly including the U.S. Department of Justice 2003 guidance, "Guidance Regarding the Use of Race by Federal Law Enforcement Agencies."[80] As the federal guidance states: "Reliance upon generalized stereotypes is absolutely forbidden. Rather, use of race or ethnicity is permitted only when the officer is pursuing a specific lead concerning the identifying characteristics of persons involved in an identified criminal activity."[81]

In the lawsuit against Maricopa County, its Sheriff's Office, and Sheriff Arpaio, allegations of racial profiling are front and center. The plaintiffs allege that the defendants have engaged in a pattern and practice of racial profiling that includes the use of sweeps involving "pretextual and unfounded stops, racially motivated questioning, searches and other mistreatment, and often baseless arrests" as well as "widespread, day-to-day targeting and mistreatment of persons who appear to be Latino."[82] The named plaintiffs in the complaint detail several disturbing incidents where police officers targeted individuals with Latino appearance during sweeps and arrests.[83] The plaintiffs allege that these actions violate the civil and constitutional rights of the class, citing violations of constitutional rights including the right to equal protection and the prohibition against unreasonable search and seizure; violations of the prohibition against racial discrimination by federally funded programs in Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d and its implementing regulations; and violations of the Arizona State Constitution Art. II, § 8, which provides that "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."[84]

Similarly, several immigrant plaintiffs brought a lawsuit against ICE agents and the mayor, police chief, and individual police officers in Danbury, Connecticut, raising claims under state and federal law.[85] The lawsuit challenges the "discriminatory and unauthorized enforcement of federal immigration laws against Latino residents" and alleges that the police "have repeatedly and knowingly made illegal civil immigration arrests, engaged in impermissibly discriminatory law enforcement, and retaliated against residents for expressive activities secured by the First Amendment."[86] The lawsuit challenges the city's discriminatory targeting of a group of day laborers as well as its use of racial profiling and pretextual stops to enforce civil immigration law, particularly in terms of the use of civil immigration violations found in the National Crime In-

## APPENDIX B
## Legal Issues in Local Police Enforcement of Federal Immigration Law

formation Center database to make unauthorized civil immigration arrests.[87] Because Danbury has taken on these actions without engaging in any 287(g) agreement with federal immigration officials, the lawsuit raises federal preemption arguments in addition to the other legal claims.[88]

Racial profiling is also the focus of a lawsuit against Sonoma County and the Sonoma County Sheriff's Department in Sonoma County, California. The lawsuit, brought by several individuals and the Committee for Immigrant Rights of Sonoma County, alleges that sheriff's deputies, both with and without assistance from DHS immigration agents, "use race as a motivating factor in traffic stops and other detentions," unlawfully targeting, interrogating, and detaining Latino residents of Sonoma County for purposes of immigration enforcement.[89] The lawsuit challenges the authority of the county to engage in this immigration enforcement as well as the county's denial of the constitutional, statutory, and regulatory rights of immigrants once held in the county jail for immigration purposes.[90]

Allegations of racial profiling and bias have also been raised in the context of identifying—and misidentifying—individuals as deportable immigrants while in criminal custody in local jails. The lawsuit against the Los Angeles County Sheriff's Department for the deportation of a U.S. citizen alleges that the plaintiff, Mr. Guzman, "was selected for interview [by the local law enforcement officer who works with DHS] based solely on his perceived race, ethnicity and national origin" and that that the Los Angeles County Sheriff's Department thus "unconstitutionally discriminated against plaintiff Guzman on the basis of his race and ethnicity...by causing or participating in the illegal deportation of Mr. Guzman."[91] The lawsuit also alleges inadequate training of the local law enforcement officials.[92]

Given the complexities of immigration law, it may not be uncommon for federal immigration agents and local police officers alike to fall back on racial profiling tactics to identify people who may be in violation of civil immigration law. Once such tactics are used, the violations may be widespread, as the plaintiffs in these lawsuits attest. Thus, states and localities that are considering whether to engage in federal immigration law enforcement must question how their officers will be able to conduct these activities and identify individuals who have violated immigration law without engaging in racial profiling.

### 3. Liability Stemming from Unlawful Arrests, Searches, and Seizures and Other Common Immigration Enforcement Tactics

In addition to the problems described above, local police also face a substantial risk of liability in performing immigration tasks due to the differing rules of engagement between traditional police work and immigration law enforcement. As police departments are well aware, the laws of criminal enforcement are complex and regular training is essential to ensure that rights are respected and evidence is admissible in any subsequent prosecution. Adding immigration enforcement into this mix, which differs in substantial ways from what is considered permissible police conduct in the criminal investigation context, changes the rules of engagement. Violating these complex rules could lead to significant liability for localities.

A key area of confusion for local police who have been involved in home raids and arrests involves the scope of the arrest warrant. In the criminal sphere, an arrest warrant is issued by a

| | |
|---|---|
| **APPENDIX B** | |
| **Legal Issues in Local Police Enforcement of Federal Immigration Law** | |

judge upon a showing of probable cause.[93] The underlying information for the warrant is likely to be supplied by an affidavit of an officer who has investigated the case and can provide sworn testimony about the probable cause for believing that the target has committed a crime.[94] The arresting officer may go to the home to execute the warrant and is expected to follow a knock and announce procedure.[95] If the suspect does not open the door, the officer may force open the premises and arrest the individual named in the warrant.[96] Once arrested, the individual is provided with a right to counsel and will be arraigned within a short time.[97] If there is a major mistake in the original ground for the arrest, it may well be discovered by the prosecutor and defense lawyer, and lead to a dismissal of the charges.

Consider the contrasting rules and institutional structure for an immigration arrest. An administrative warrant is issued by one of a wide array of immigration officers, often on the basis of limited paper information. There is no process for a sworn statement reviewed by a neutral judge or other officer. The warrant may be based on data that is old and out of date.[98] Once the warrant is prepared, the officers may go to the place believed to be the home of the person named in the warrant. They do not have the right, however, to enter the home without consent.[99] Once they arrest the individual on civil immigration grounds, they may detain the person and there is no right to an attorney at government expense.[100] As a result, it is very possible that a mistake will go undetected and that an individual who was not in fact subject to arrest will remain detained.

Because officers do not have the right on an administrative warrant to enter a home without consent, the key to the execution of an immigration home arrest focuses on the issue of consent. When an individual sees a police officer at her door, however, she may assume that she has no choice in the matter. A person who consents believing that the police would otherwise be authorized to gain entry forcibly cannot be said to have consented. Police officers may face similar confusions, not understanding the limitations of an administrative warrant. When the target of a warrant does not answer the door, for example, local police might presume that they are free to force their way into a home. Similarly, they may presume that the warrant bears the safeguards and relative reliability of the criminal law system and may be surprised to find that the person specified in the administrative warrant is not the person they find in the targeted home. Simply put, the "warrant" for an immigration arrest—a defining instrument of police authority under other regimes—is a highly misleading document for police who are accustomed to enforcing criminal laws.

Thus, it comes as no surprise that home raids have sparked litigation over the tactics in executing administrative immigration warrants or otherwise attempting to enter homes and arrest individuals without a valid warrant. In Minnesota, a group of U.S citizens, lawful permanent residents, and other immigrants filed a lawsuit challenging the legality of methods used by ICE and several local law enforcement officials as part of "Operation Crosscheck."[101] Through this operation, an officer with Kandiyohi County Probation Service "collected information regarding persons under her supervision who, in her determination, had been 'born in foreign countries' and concluded were 'here illegally.'"[102] She contacted ICE officials in Minnesota with a "'dossier of foreigners' for their inspection."[103] ICE and local law enforcement officers from several area

APPENDIX B

## Legal Issues in Local Police Enforcement of Federal Immigration Law

police departments used this information to engage in warrantless home raids that resulted in the unlawful arrest and detention of numerous individuals, including children.[104] The lawsuit asserts that ICE and the local law enforcement officers violated the plaintiffs' constitutional and statutory rights through these warrantless arrests, searches, and seizures and other unlawful practices during the raids.[105]

Similar lawsuits have also arisen in response to home raids as part of "Operation Return to Sender," a "fugitive" enforcement action that targets immigrants who have been ordered deported but have not left the country. In New Jersey, for example, a group of U.S. citizens, immigrants with lawful status, and other immigrants filed a lawsuit challenging the legality of methods used by ICE and local police in carrying out "Operation Return to Sender."[106] According to the lawsuit, the operation was carried out unlawfully and in fact did not target these alleged absconders. The complaint alleges that the agents used deceptive tactics or force to gain entry into the home and proceeded to interrogate everyone in the home without any individualized suspicion.[107] The complaint further alleges that these operations are conducted without adequate prior investigation, thereby leading to the harassment of people without reasonable cause to expect a "fugitive" to be in the relevant location.[108] Many of the individuals were wrongly arrested despite having valid status and/or otherwise treated harshly while detained.[109] For these violations of their rights, the plaintiffs are seeking compensatory and punitive damages as well as injunctive relief under federal and state constitutional law.

A similar lawsuit was filed in New York as a class action, also challenging ICE's tactics against residents under "Operation Return to Sender."[110] The complaint alleges that the agents used deceptive tactics—including announcing themselves as "police"—during predawn raids in people's homes.[111] The complaint further notes the lack of consent in ICE's entry as well as the agents' questioning and rough treatment of residents who were not listed as "fugitives."[112] Notably, the complaint cites the statements of public officials within Nassau County government expressing their frustration with ICE. In a public letter to the local Agent-In-Charge of ICE, Nassau County Commissioner of Police Lawrence W. Mulvey stated that ICE had misled the Nassau County Police about the nature of the raids and that the people arrested were not the purported targets of the raids.[113] Noting that the ICE agents acted with a "cowboy mentality," Police Commissioner Mulvey criticized the inaccurate information they used for the investigation, including their use of incorrect addresses for the targeted homes and, in one instance, their attempt to look for a 28-year-old suspect using a photograph of the suspect when he was seven years old.[114]

The inaccuracies that plagued these home raids described in these lawsuits are not isolated. A study by the DHS Inspector General has observed that the data relied upon by ICE's fugitive teams is inaccurate in up to 50 percent of cases.[115] Community groups have struggled to educate residents about their rights under the varying laws, but as the lawsuits demonstrate, many individuals are afraid and feel coerced when confronted with predawn operations at their homes. Local police departments may seek to consider whether to get involved in any such operations given the inaccurate and incomplete information and unlawful practices that are often involved.

APPENDIX B

## Legal Issues in Local Police Enforcement
## of Federal Immigration Law

### 4. Other Areas of Local Involvement in Potential Litigation

While many of the most recent lawsuits have focused on the problems described above, the local enforcement of federal immigration law may lead to numerous other types of unforeseen areas of liability and increased involvement in litigation. These include but are not limited to litigation over the conditions of confinement, the treatment of minors, the release of information about the policies and practices of the police department, and increasing involvement in immigration court litigation.

First, localities face considerable litigation concerning the conditions of confinement in local area jails that hold immigrant detainees. While localities may enter into formal agreements with the federal government to hold immigrant detainees, the federal government has pointedly argued that the states and localities that agree to hold detainees are solely responsible for the quality of their care under applicable intergovernmental service agreements and contracts.[116] They argue that these state and local facilities are "independent contractors" and are therefore not within the scope of the FTCA.[117]

Second, localities must face the real and pressing question of how children will be treated if and when police conduct arrests and raids. ICE has been highly criticized for detaining sole caregivers and children present during raids. For example, during a workplace raid in New Bedford, Massachusetts, community residents complained that ICE had given little notice to social welfare agencies and a significant number of children were left unsupervised while their parents were detained and even transferred out of state.[118] In another example involving a highly publicized home raid that resulted in a lawsuit, ICE agents arrested and detained a nine-year-old U.S. citizen for twelve hours, after his father showed the agents the child's U.S. passport and asked to arrange for someone to watch him.[119] In the Minnesota lawsuit challenging "Operation Crosscheck," sixteen children are included as plaintiffs challenging warrantless home raids in which the children themselves were arrested and detained.[120] These types of acts have instigated lawsuits and will no doubt result in liability risks for states and localities that engage in similar practices.

Third, many localities have been drawn into "freedom of information" litigation. In the Danbury lawsuit, for example, the immigrants' lawyers filed a state freedom of information law request to obtain documents related to the arrest of a group of day workers.[121] The hearing on the request involved testimony by the city police chief, the chief of detectives, the mayor's chief of staff, and the deputy corporation counsel.[122] In some of these freedom of information cases, the state may not be free to defend the action as it sees fit. In one case, the federal government appeared in the state freedom of information action to present the position of the United States in opposition to release of the records that the sheriff used to place an immigration detainer on an individual who had a "hit" on the NCIC database.[123] Ultimately the state was ordered to make the disclosure.[124] But in the meantime, the litigation was prolonged by the federal position against release of information.

Fourth, localities may find themselves being drawn increasingly into immigration court. Immigration proceedings differ significantly from criminal proceedings. In most cases, the court

APPENDIX B

## Legal Issues in Local Police Enforcement of Federal Immigration Law

decides a binary question—whether to deport or not deport. There is no opportunity to plead to reduced charges or otherwise achieve compromise. That means that in cases where the immigration law offers no relief if the case goes forward, there is a premium on proving that the arresting officers violated applicable regulations or otherwise made a wrongful arrest. Police errors are therefore more likely to be at the center of attention. This issue may arise in two different ways. First, an individual may move to terminate the proceedings based on an argument that the officer violated applicable regulations.[125] This kind of claim necessarily involves questions about what happened in connection with the arrest. It is therefore standard procedure in these kinds of cases to subpoena the officer to testify about the arrest. Secondly, immigration cases, like criminal cases, may involve motions to suppress evidence, such as statements made by the person arrested or documents obtained through the arrest.[126] These motions also involve subpoenas of the arresting officers to inquire into the circumstances surrounding the particular arrest but may also involve an inquiry into the general practices of the arresting agency. Thus localities may find the actions of their officers and their general practices and policies increasingly at issue in immigration court.

### Conclusion

Many of the issues surrounding state and local liability for immigration enforcement have yet to be resolved. Indeed, some of these issues may not be resolved for many years as immigration enforcement practices change and as cases work their way through the courts. But the risks for states and localities are very real. These risks must be considered as states and localities decide whether to take on enforcement of immigration law.

APPENDIX B

**Legal Issues in Local Police Enforcement
of Federal Immigration Law**

## Endnotes

[1] *See* Kristin F. Butcher & Anne Morrison Piehl, *Crime, Corrections, and California: What Does Immigration Have to Do With It?* CALIFORNIA COUNTS: POPULATION TRENDS AND PROFILES (Feb. 2008), *available at* http://www.ppic.org/content/pubs/cacounts/CC_208KBCC.pdf (last visited July 25, 2008); Kristin F. Butcher & Anne Morrison Piehl, *Why Are Immigrants' Incarceration Rates So Low? Evidence on Selective Immigration, Deterrence, and Deportation* (Nat'l Bureau of Econ. Research, Working Paper No. 13229, 2007); Daniel Mears, *Immigration and Crime: What's the Connection?* 14 Fed. Sent. Rep. 284 (2002).

[2] APPLESEED, FORCING OUR BLUES INTO GREY AREAS: LOCAL POLICE AND FEDERAL IMMIGRATION ENFORCEMENT 10 (2008), *available at* http://www.appleseednetwork.org/Portals/0/Reports/Forcing_Our_Blues_Into_Gray_Areas_2008.pdf (last visited July 25, 2008).

[3] *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886).

[4] *See Plyer v. Doe*, 457 U.S. 202, 210-212 (1982).

[5] *See, e.g., Almeida-Sanchez v. United States*, 413 U.S. 266 (1973).

[6] *See, e.g., Wong Wing v. United States*, 163 U.S. 228, 237 (1896).

[7] *See, e.g., Plyer*, 457 U.S. at 202-230; *Graham v. Richardson*, 403 U.S. 365, 370 (1971); *Yick Wo*, 118 U.S. at 369.

[8] *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1050 (1984).

[9] *Id.*

[10] *See Lau v. Nichols*, 414 U.S. 563 (1974).

[11] *See Zadvydas v. Davis*, 533 U.S. 678 (2001).

[12] *See* Michael J. Gorman, *Survey: State Search and Seizure Analogs*, 77 MISS. L. J. 417 (2007) (identifying differences between federal and state search and seizure law).

[13] AARON TERRAZAS, JEANNE BATALOVA, & VELMA FAN, MIGRATION POLICY INSTITUTE, FREQUENTLY REQUESTED STATISTICS ON IMMIGRANTS IN THE UNITED STATES (Oct. 2007), *available at* http://www.migrationinformation.org/USfocus/display.cfm?id=649#1.

[14] NANCY F. RYTINA, U.S. DEPT. OF HOMELAND SECURITY, OFFICE OF IMMIGRATION STATISTICS, ESTIMATES OF LEGAL PERMANENT RESIDENT POPULATION AND POPULATION ELIGIBLE TO NATURALIZE IN 2004, 1 (Feb. 2006), *available at* http://www.dhs.gov/xlibrary/assets/statistics/publications/LPRest2004.pdf (last visited July 25, 2008).

[15] *See* TERRAZAS ET AL., *supra* note 13.

[16] *See* DAVID A. MARTIN, MIGRATION POLICY INSTITUTE, TWILIGHT STATUSES: A CLOSER EXAMINATION OF THE UNAUTHORIZED POPULATION (June 2005) at 7-8, *available at* http://www.migrationpolicy.org/pubs/MPI_PB_6.05.pdf (last visited July 25, 2008).

[17] *See id.* at 6.

[18] MIGRATION POLICE INSTITUTE, ANNUAL IMMIGRATION TO THE UNITED STATES: THE REAL NUMBERS (May 2007) at 1, *available at* http://www.migrationpolicy.org/pubs/FS16_USImmigration_051807.pdf (last visited July 25, 2008).

[19] *Id.*

[20] *Id.*

[21] U.S. DEPT. OF HOMELAND SECURITY, YEARBOOK OF IMMIGRATION STATISTICS: 2006, TEMPORARY ADMISSIONS TABLE 32, available at http://www.dhs.gov/ximgtn/statistics/publications/YrBk06NI.shtm (last visited July 25, 2008).

[22] U.S. DEPT. OF COMMERCE, OFFICE OF TRAVEL & TOURISM INDUSTRIES, INTERNATIONAL VISITATION UP 15 PERCENT IN FEBRUARY 2008 (May 20, 2008), *available at* http://tinet.ita.doc.gov/tinews/archive/tinews2008/20080520.html (last visited July 25, 2008).

[23] *See* Cristina M. Rodríguez, *The Significance of the Local in Immigration Regulation*, 106 MICH. L. REV. 567, 593-595 (2008).

APPENDIX B

## Legal Issues in Local Police Enforcement
## of Federal Immigration Law

[24] Kelly Jefferys & Randall Monger, U.S. Dept. of Homeland Security, Office of Immigration Statistics, US Legal Permanent Residents: 2007 (Mar. 2008), *available at* http://www.dhs.gov/xlibrary/assets/statistics/publications/LPR_FR_2007.pdf

[25] U.S. Census Bureau, State & County Quick Facts, Virginia (2006), *available at* http://quickfacts.census.gov/qfd/states/51000.html (last visited July 25, 2008).

[26] U.S. Census Bureau, 2006 American Community Survey, Table B16005, Nativity by Language Spoken at Home by Ability to Speak English for the Population 5 Years and Older (2006), *available at* http://factfinder.census.gov/http://factfinder.census.gov/home/saff/main.html?lang=en (last visited July 25, 2008) (reporting that 84.4 percent of the foreign born speak a language pother than English at home).

[27] *Id.* (reporting that 23.4 million Americans over the age of five speak a language other than English at home).

[28] *Id.*

[29] Pew Hispanic Center, Statistical Portrait of Hispanics in the United States, 2006 (January 23, 2008), *available at* http://pewhispanic.org/factsheets/factsheet.php?FactsheetID=35 (last visited July 25, 2008).

[30] Michael E. Fix & Wendy Zimmerman, All Under One Roof: Mixed-Status Families in an Era of Reform 1 (Oct. 6, 1999), *available at* http://www.urban.org/UploadedPDF/409100.pdf (last visited July 25, 2008).

[31] *Id.* at 2.

[32] *Id.*

[33] *See, e.g.,* David B. Thronson, *Creating Crisis: Immigration Raids and the Destablization of Immigrant Families,* 43 Wake Forest L. Rev. 391, 403-406 (2008); Randy Capps, Rosa Maria Castañeda, Ajay Chaudry, & Robert Santos, Nat'l Council of La Raza & The Urban Inst., Paying The Price: The Impact of Immigration Raids on America's Children (2007), *available at* http://www.urban.org/UploadedPDF/411566_immigration_raids.pdf (last visited July 25, 2008).

[34] *See, e.g., Reyes v. Alcantar,* No. 4:07-cv-022771 (N.D. Cal., filed Nov. 19, 2007) (damage action involving the unlawful detention of a U.S. citizen child when his father was arrested during a home raid).

[35] *See* Capps et al., *supra* note 33, at 37-38 (describing cases in which children were left unsupervised when their parents were detained during raids).

[36] *See id.* at 43-54 (describing the long-term effects of immigration enforcement on children and families); Thronson, *supra* note 33, at 403-418 (same).

[37] For further discussion of the legality of state and local enforcement in the absence of a specific agreement under INA 287(g), see Lisa M. Seghetti, Stephen R. Vina, & Karma Ester, Congressional Research Service, Enforcing Immigration Law: The Role of State and Local Enforcement (August 14, 2006), available at http://www.ilw.com/immigdaily/news/2006,0912-crs.pdf (last visited July 25, 2008); Michael J. Wishnie, *State and Local Police Enforcement of Immigration Laws,* 6 U. Penn. J. Const. L. 1084 (2004).

[38] *See* Appleseed, *supra* note 2, 13-16.

[39] *See, e.g.,* Cristina Rodríguez, Muzaffar Chishti, & Kimberly Nortman, Migration Policy Institute, Testing the Limits: A Framework for Assessing the Legality of State and Local Immigration Measures 32-37 (2007); Wishnie, *supra* note 37.

[40] 8 U.S.C. § 1324(c). But note that it is debatable whether this provision extends to state and local officers since the provision does not mention state and local officers and could be read as reaching federal officers other than immigration agents.

[41] 8 U.S.C. § 1252c(a).

[42] *Id.*

[43] *See* Wishnie, *supra* note 37, at 1092-93.

[44] 8 U.S.C. § 1357(g)(1).

APPENDIX B

**Legal Issues in Local Police Enforcement
of Federal Immigration Law**

[45] *Id.*

[46] *Id.* § 1357(g)(7).

[47] *See* Jeremy Travis, *Rethinking Sovereign Immunity After Bivens,* 57 N.Y.U.L. Rev. 597, 650-51 (1982).

[48] 28 U.S.C. § 2680(a); *see also* Travis, *supra* note 47, at 650-51.

[49] *Ortega et al. v. Arpaio et al.,* No. CV 07-02513-PHX-MHM (D. Ariz., filed July 16, 2008) (quoting U.S. Dept. of Homeland Security, Bureau of Immigration and Customs Enforcement, Fact Sheet: Section 287g of the Immigration and Nationality Act (September 24, 2007)).

[50] *Id.*

[51] *Id.; see also* section B.2 *infra*.

[52] 8 U.S.C. § 1357(g)(2).

[53] *Id.* § 1357(g)(3).

[54] Stephanie Ward, *Illegal Aliens on I.C.E: Tougher Immigration Enforcement Tactics Spur Challenges*, ABA Journal (June 2008), *available at* http://www.abajournal.com/magazine/illegal_aliens_on_ice/ (last visited July 25, 2008).

[55] SungJee Lee, *The Parent/Child Relationship: Derivative Citizenship Through Parents,* 16 J. Contemp. Legal Issues 43 (2007).

[56] The Brennan Center for Justice, Citizens Without Proof: A Survey of Americans' Possession of Documentary Proof of Citizenship and Photo Identification 2 (Nov. 2006), *available at* http://www.brennancenter.org/page/-/d/download_file_39242.pdf (last visited July 25, 2008).

[57] *Id.*

[58] *Id.* at 3.

[59] *Id.* at 2.

[60] *See* Anna Gorman, *Immigration officials held U.S. citizen for two weeks*, LA Times (Oct. 28 2008), *available at* http://www.latimes.com/news/printedition/california/la-me-deport28-2008oct28,0,4273833.story (last visited November 19, 2008);, Sandra Hernandez, *Detainee Tries To Prove He Is a U.S. Citizen; Birth Certificate Isn't Enough to Win Man's Release* (Nov. 4, 2008), *at* http://www.ijjblog.org/2008/11/_detainee_tries_to_prove_he_is.html; Darryl Fears, *Immigration Is Snaring U.S. Citizens In Its Raid*s, Washington Post (Aug. 16 2008), *available at* http://www.washingtonpost.com/wp-dyn/content/article/2008/08/15/AR2008081503208.html; Jacqueline Stevens, *Thin ICE*, The Nation (June 5, 2008), *available at* http://www.thenation.com/doc/20080623/stevens (last visited July 25, 2008) (chronicling specific instances of U.S. citizens being detained and/or deported and estimating that "since 2004 ICE has held between 3,500 and 10,000 US citizens in detention facilities and deported about half"); *see also* Northwest Immigrant Rights Project, U.S. Citizen and Army Veteran Spends Nine Months in Detention While U.S. Immigration and Customs Enforcement Denies Detaining Citizens (July 21, 2008) (describing the experience of Rennison Castillo, a U.S. citizen and veteran who was detained in a local detention facility, and noting that the Northwest Immigrant Rights Project has seen fourteen cases of U.S. citizens being detained by federal immigration officials in that local detention center alone since 2005); Marisa Taylor, *Feds admit mistakenly jailing citizens as illegal immigrants*, Houston Chronicle (Feb. 14, 2008).

[61] *See, e.g.*, Rucks Russell, *American citizen held in county jail as illegal immigrant*, Khou-TV (Oct. 17, 2008), *at* http://www.khou.com/topstories/stories/khou081017_mp-american-held-as-immigrant.121b56a52.html (last visited November 18, 2008); Paloma Esquivel, *Suit filed over disabled U.S. citizen's deportation ordeal*, LA Times (Feb. 28, 2008), *available at* http://articles.latimes.com/2008/feb/28/local/me-guzman28.

[62] *See Matter of Lok*, 18 I&N Dec. 101 (BIA 1981), *aff'd, Lok v. INS*, 681 F.2d 107 (2d Cir. 1982).

[63] *See Pantoja-Castillo et al. v. Sanchez et al.*, No. 07-204 (S.D. Tex., filed Aug. 2, 2007).

[64] 8 U.S.C. § 1254a.

[65] *Id.*; 8 C.F.R. §§ 244.2, 244.3.

APPENDIX B

## Legal Issues in Local Police Enforcement of Federal Immigration Law

[66] 8 U.S.C. § 1254a.

[67] For example, in the recent extension of TPS for Somalis, the U.S. Citizenship and Immigration Service posted a notice in the Federal Register stating: "Given the timeframes involved with processing TPS re-registration applications, the Department of Homeland Security (DHS) recognizes the possibility that re-registrants may not receive a new EAD until after their current EAD expires on March 17, 2008. Accordingly, this Notice automatically extends the validity of EADs issued under the TPS designation of Somalia for 6 months, through September 17, 2008 and explains how TPS beneficiaries and their employers may determine which EADs are automatically extended." 73 Fed. Reg 13245-01 (Mar. 12, 2008).

[68] 8 U.S.C. § 1254a(d)(4) (providing that a person with TPS "shall not be detained on the basis of the alien's immigration status").

[69] *Guzman v. Chertoff et al.*, No. 2:08-cv-01327-GHK-SS (C.D. Cal., filed Feb. 27, 2008).

[70] *Id.*

[71] *See* Randal C. Archibold, *Deported in Error, Missing and Months Later Home*, N.Y. Times (Aug, 8, 2007); Stevens, *supra* note 60.

[72] *See* Stevens, *supra* note 60 (reporting that the author identified thirty-one cases of citizens charged with removal, fourteen of whom were deported, and describing a case of a mentally ill woman who claimed to have been born in Paris); *see also* Testimony of Kara Hartzler, Florence Immigrant and Refugee Project, U.S. House of Representatives, Subcommittee on Immigration 14 (Feb. 13, 2008) (reporting that her office sees 40 to 50 detainees a month with possible citizenship claims).

[73] *Ortega et al. v. Arpaio et al.*, No. CV 07-02513-PHX-MHM (D. Ariz., filed July 16, 2008).

[74] *Argueta v. ICE*, No. 2:08-cv-01652-PGS-ES (D. N.J., filed May 22, 2008).

[75] *Reyes v. Alcantar*, No. 4:07-cv-022771 (N.D. Cal., filed Nov. 19, 2007).

[76] *United Food and Commercial Workers International Union v. DHS*, No. 2:07-cv-00188 (N.C.D. Tex., filed Sept. 12, 2007).

[77] *See, e.g.,* Wishnie, *supra* note 37, at 1102-1113; Susan M. Akram & Kevin R. Johnson, *Race, Civil Rights, and Immigration Law After September 11, 2001: The Targeting of Muslims and Arabs*, 58 N.Y.U. Ann. Surv. Am. L. 295, 316-355 (2002) (describing the targeting of Arabs and Muslims in immigration enforcement); Kevin R. Johnson, "The Case Against Race Profiling in Immigration Enforcement," 78 Wash. U. L.Q. 675, 697-705 (2000) (describing the racial profiling of Mexicans and Central Americans in immigration enforcement)

[78] Wishnie, *supra* note 37, at 1109-1113.

[79] Michele Waslin, *Immigration Enforcement by Local Police: The Impact on the Civil Rights of Latinos*, Nat'l Council of La Raza Issue Br. No. 9 (Feb. 2003), *available at* http://www.nclr.org/content/publications/detail/1390/ (last visited July 25, 2008) (outlining incidents of racial profiling by federal and local officials and listing successful lawsuits filed on behalf of the targets of racial profiling).

[80] *See Ortega et al. v. Arpaio et al.*, No. CV 07-02513-PHX-MHM (D. Ariz., filed July 16, 2008); *see also* U.S. Dep't of Justice. Civil Rights Div., Guidance Regarding the Use of Race by Federal Law Enforcement Agencies (June 2003), *available at* www.usdoj.gov/crt/split/documents/guidance_on_race.pdf (last visited July 25, 2008) [hereinafter "Guidance"].

[81] *See* Guidance, *supra* note 80, at 5.

[82] *See Ortega et al. v. Arpaio et al.*, No. CV 07-02513-PHX-MHM (D. Ariz., filed July 16, 2008).

[83] *See id.*

[84] *Id.*

[85] *Barrera v. Boughton*, No. 3:07-cv-01436-RNC (D. Conn., filed Sept. 26, 2007).

[86] *Id.*

APPENDIX B

## Legal Issues in Local Police Enforcement of Federal Immigration Law

[87] *Id.* Data indicate that police are on particularly shaky ground when relying on National Crime Information Center data in order to make an arrest. *See* HANNAH GLADSTEIN, ANNIE LAI, JENNIFER WAGNER, & MICHAEL J. WISHNIE, BLURRING THE LINES: A PROFILE OF STATE AND LOCAL POLICE ENFORCEMENT OF IMMIGRATION LAW USING THE NATIONAL CRIME INFORMATION CENTER DATABASE, 2002-2004, 3 (Dec. 2005) (concluding that "[f]orty-two percent of all [National Crime Information Center] immigration hits in response to a police query were 'false positives,' where DHS was unable to confirm that the individual was an actual immigration violator").

[88] *Id.*

[89] *Committee for Immigrant Rights of Sonoma County et al. v. County of Sonoma et al.*, No. 08-CV-4220-PJH (N.D. Cal., filed Sept. 5, 2008).

[90] *Id.*

[91] *Guzman v. Chertoff et al.*, No. 2:08-cv-01327-GHK-SS (C.D. Cal., filed Feb. 27, 2008).

[92] *Id.*

[93] *See* 1-2 CRIM. CONST. L. § 2.05.

[94] *See id.*

[95] *See id.* § 2.08

[96] *See id.*

[97] *See* 3-13 CRIM. CONST. L. § 13.03.

[98] *See* Raquel Aldana, *Of Katz and "Aliens": Privacy Expectations and the Immigration Raids*, 41 U.C. DAVIS L. REV. 1081, 1111-1113 (2008) (describing the inaccuracies in immigration records that often form the basis for administrative warrants, including those based on records of individuals with old deportation orders entered into the National Crime Information Center database); GLADSTEIN ET AL., *supra* note 87, at 3 (noting inaccuracies in information found on immigration violators in the National Crime Information Center database).

[99] *See* Letter of Michael Chertoff to Senator Christopher J. Dodd (June 14, 2007) (on file with author) ("[A] warrant of removal is administrative in nature and does not grant the same authority to enter dwellings as a judicially approved search or arrest warrant.")

[100] *See* 8 U.S.C. §§ 1226 (providing Attorney General with authority to arrest and detain immigrants pending a decision on removal), 1362 (providing a statutory right to counsel "at no expense to the government").

[101] *Arias v. ICE*, No. 07-cv-01959-ADM-JSM (D. Minn., filed July 27, 2007).

[102] *Id.*

[103] *Id.*

[104] *Id.*

[105] *Id.*

[106] *Argueta v. ICE*, No. 2:08-cv-01652-PGS-ES (D. N.J., filed May 22, 2008)

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] *Aguilar v. ICE*, No. 07-cv-8224 (S.D.N.Y., filed Sept. 20, 2007).

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] *Id.*

## APPENDIX B
## Legal Issues in Local Police Enforcement
## of Federal Immigration Law

[115] *See* U.S. Dept. of Homeland Security, Office of the Inspector General, Assessment of United States Immigration and Customs Enforcement's Fugitive Operations Teams 15 (Mar. 2007), *available at* http://www.dhs.gov/xoig/assets/mgmtrpts/OIG_07-34_Mar07.pdf (last visited on July 25, 2008).

[116] *See Barrera v. Boughton*, No. 3:07-cv-01436-RNC, Federal Defendants' Memorandum in Support of Motion to Dismiss (Feb. 1, 2008).

[117] *Id.*

[118] *See* Thronson, *supra* note 33, at 405-406.

[119] *Reyes v. Alcantar*, No. 4:07-cv-022771 (N.D. Cal., filed Nov. 19, 2007).

[120] *Arias v. ICE*, No. 07-cv-01959-ADM-JSM (D. Minn., filed July 27, 2007).

[121] *See Junta for Progressive Action et al. v. Danaher*, No. FIC 2007-416 (Conn. Freedom of Information Comm., filed Aug. 2, 2007) (on file with author).

[122] Conversation with Michael J. Wishnie, June 16, 2008.

[123] Letter of Victoria Shin, Assistant United States Attorney to Mary E. Schwind, Freedom of Information Commission, re Dkt. No. FIC2007-136 (July 18, 2007).

[124] El Badrawi v. Commission, State of Connecticut, Department of Correction, (Freedom of Information Comm'n of the State of Connecticut, Dkt FIC 2007-136, Jan. 9, 2008) (on file with author).

[125] *See, e.g., Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *Waldron v. INS*, 17 F.3d 511, 518 (2d Cir. 1994)

[126] *See, e.g., Almeida-Amaral v. Gonzales*, 461 F.3d 231 (2d Cir. 2006).

APPENDIX C

# Making Civil Liberties Matter in Local Immigration Enforcement

BY Raquel Aldana

Every month, the United States Immigration and Customs Enforcement (ICE) Law Enforcement Support Center (LESC) responds to over 60,000 queries from local law enforcement about foreign nationals they encounter in the course of their daily duties.[1] In fiscal year 2005 alone, LESC responded to 676,502 such immigration queries,[2] representing an exponential increase from only 4,000 queries nearly a decade earlier.[3] This trend coincides with the "force multiplier" that has resulted from the involvement of local law enforcement in enforcing federal immigration laws, particularly post 9/11.[4] Thousands of local police, state troopers, correctional facilities staff, and other law enforcement personnel assist ICE to detect, arrest, detain, and turn over foreign nationals who are present in the United States in violation of civil or criminal immigration laws. To do so, local law enforcement agencies either rely on express statutory authority or claim inherent powers to enforce federal immigration laws. The claimed source of power to enforce immigration laws is relevant to assess local law enforcement's legality and scope of authority to enforce federal immigration laws. In this paper, therefore, I first address the issue of source and scope of local powers to enforce federal immigration laws, as this is also pertinent to the discussion of civil liberties that belong to immigrants and citizens alike who encounter these practices. Next, I explain the civil liberties concerns that arise from local law enforcement's involvement in immigration enforcement and offer recommendations for ensuring greater civil rights compliance by law enforcement agencies if they choose to enforce immigration laws. Finally, I explain immigrants' rights during these police encounters.

## I. The Source and Scope of Local Law Enforcement Agencies' Power to Enforce Federal Immigration Law

Congress cannot compel local law enforcement to enforce immigration laws, but it can and has conferred express authority to permit federal local law enforcement officers to voluntarily enforce certain provisions of the Immigration and Nationality Act (INA). To date, Congress has chosen to confer this power only with respect to a limited number of criminal provisions in the INA (*see* subpart A below). In addition, in 1996, Congress authorized cooperation agreements between federal immigration and state law enforcement agencies, which have in some cases significantly expanded the scope of local immigration enforcement authority (*see* subpart C below). The newness of these cooperation agreements and the limited resources for their implementation are the reasons why most local law enforcement agencies still rely on claims of inherent authority to make arrests for violations of most federal immigration laws. This claimed inherent local law enforcement power to enforce federal immigration laws minimally is plagued with lack of clarity and, worse, its legality *per se* is still in question (*see* subpart B below).

In understanding this debate, therefore, it is important to understand the legality—and consequently the implicated civil rights of immigrants in relation to local law enforcement—of immigration laws. Finally, not all localities have heeded the call to enforce immigration laws for various policy reasons, including limited resources and concerns over hurting local police community relations with immi-

---

Raquel Aldana is a Professor of Law at the William S. Boyd School of Law, University of Nevada, Las Vegas.

## APPENDIX C
## Making Civil Liberties Matter in Local Immigration Enforcement

grant communities. Some of these cities, thus, have opted instead to enact so-called "sanctuary laws" to forbid all or certain types of local police collaboration with ICE. Since 1996, however, federal law bans state laws that seek to forbid state employees from reporting immigration violations to ICE (*see* subpart D below). The issue therefore becomes the need for local law enforcement to resolve these seeming conflicts between state and federal law.

### A. Congressional Delegation of Authority to Local Law Enforcement to Enforce Specific Immigration Violations

Most provisions of the INA codifying immigration violations do not delineate which law enforcement officers have the authority to enforce them. A few sections, however, expressly assert that state and local officers have the authority to enforce them. These sections are:

- INA § 274: Arrest authority to enforce prohibitions against transporting and harboring certain aliens.[5]

- INA § 276: Authority to arrest and detain re-entry offenders; that is, previously deported immigrants with a felony conviction who are found present in the United States.[6]

- INA § 103(a)(8): Confers emergency powers on the Secretary of Homeland Security (DHS) to authorize "any State or local law enforcement officer" to enforce federal immigration laws in the event the Secretary certifies that "an actual or imminent mass influx of aliens arriving off the coast of the United States or near a land border" exists.[7]

- INA § 287(g): Authorizes immigration enforcement agreements between the Immigration and Customs Enforcement (ICE) and local law enforcement agencies (*see* subpart C below).

In addition to these provisions delegating specific immigration enforcement powers to local law enforcement, Congress has provided some resources to defer costs and for information sharing to facilitate cooperation between local and federal agencies. In 1994, Congress appropriated funds for the creation of the LESC to serve as the point of contact between police who apprehended possible noncitizen felons and ICE.[8] In 1996, Congress authorized the Attorney General (now the Secretary of DHS) to make payments to the states for the detention of undocumented immigrants in nonfederal facilities.[9] Then in 1998, Congress established Quick Response Teams (QRTs), used by INS and then ICE to respond to immigration arrests made by state and local police.[10] Eventually, ICE discontinued QRTs, as such, and now offers states and localities enforcement assistance through various programs.

The selective nature of congressional delegation of immigration enforcement powers strongly suggests that Congress did not intend for local law enforcement to possess broader authority than that expressly provided. If such broader authority exists, then the express delegation would be superfluous.[11] The issue of whether states possess inherent authority to enforce immigration laws other than the authority expressly delegated by Congress is not settled, however. As the next section explains, the lack of clarity in this area of the law has led states and localities to reach contradictory conclusions on the issue.

### B. Local Law Enforcement's Inherent Authority to Enforce Immigration Law?

The question on inherent authority asks whether states have the power to make arrests for violations to either criminal or civil federal immigration law or both without express congressional

## APPENDIX C
## Making Civil Liberties Matter in Local Immigration Enforcement

authorization. To date, there is fierce disagreement on the legal response. While some defend states' inherent right to make both civil and criminal immigration arrests,[12] others conclude that no such state inherent power exists because the enforcement of immigration law is an exclusive federal power that must be enforced uniformly by one sovereign in light of immigration laws' implications on foreign policy.[13] At a minimum, these scholars maintain that states can enforce federal immigration laws only to the degree that express congressional delegation authorizes.[14]

In practice, the legal resolution regarding the scope and nature of inherent local immigration enforcement authority does not apply to every encounter between noncitizens and local law enforcement. Much of local immigration enforcement occurs in the course of ordinary local policing work; e.g., during traffic stops or in the course of community policing functions or other criminal investigations. Thus, local law enforcement officers possess an independent state ground, even if pretextual, for detaining or even arresting the immigrant. As such, local law enforcement need not rely on any inherent immigration law enforcement authority to effectuate the detention or arrest. Moreover, almost always courts will treat inquiries, including by local law enforcement agents, into the detainees' immigration status as consensual encounters. Therefore, such inquiries do not constitute a separate immigration-related seizure, at least not under the Fourth Amendment. (*see* Part II.) Thus, in cases in which the immigrant is detained or arrested pursuant to independent state grounds, local law enforcement officers need not rely on the inherent authority doctrine at all to collaborate with ICE. Pretextual challenges to these types of encounters, moreover, are unlikely to succeed, at least under the Fourth Amendment (*see* Part II.) There may be other challenges to these types of encounters, such as the legality of including civil immigration violations in the NCIC databases, or racial profiling challenges under federal civil rights statutes (*see* Part II).

Still, generally, the relevance of inherent authority to enforce immigration law violations arises only when local law enforcement officers detain or arrest a person solely on the basis of an immigration violation. Such would be the case, for example, when police encounter passengers in a car during a routine traffic stop and detain or arrest the passengers, in addition to the driver, for immigration violations unrelated to the traffic stop. In such cases, neither Congress nor the courts, nor immigration federal agencies for that matter, have provided clear guidance to states on the issue of inherent authority.[15]

Congress's delegation of some immigration enforcement powers to states, without more, does not put to rest whether states are able to act beyond those delegated powers. The Supreme Court[16] and several federal appellate courts, including the Second,[17] Fifth,[18] and Seventh Circuits,[19] have long recognized that state law controls the validity of state law warrantless arrests for federal crimes, even when Congress has not directly authorized it. In the immigration context, however, only three federal circuit courts, the Ninth, the Tenth, and the Fifth, have weighed on the specific question of whether local law enforcement possesses inherent authority to make arrests for immigration offenses which have not been preempted by federal law.[20] A circuit split exists between the Ninth Circuit recognizing an inherent, nonpreempted local law enforcement power to make such arrests, but restricting it to violations of federal criminal immigration laws[21] and the Fifth[22] and Tenth Circuits[23] subsequently concluding similarly on the preemption issue, but without drawing the same distinction between civil and criminal offenses. In addition, the Third

Circuit has recently upheld the legality of a warrantless arrest executed by local law enforcement for an immigration criminal violation without expressly addressing local law enforcement's authority to engage in that type of law enforcement in the first place.[24]

The uncertainty of states' authority to make arrests for immigration violations has been made worse by conflicting opinions issued by the Office of Legal Counsel (OLC) on the issue. In 1996, after the Ninth and Fifth, but before the Tenth Circuit, opinions, the OLC accepted the Ninth Circuit limits and concluded that state and local police may constitutionally detain or arrest persons who have violated criminal provisions of the Immigration and Nationality Act (INA), subject to state law, but may not do so solely for civil violations.[25] After the September 11 attacks on the World Trade Center and the Pentagon, however, the OLC issued a new 2002 opinion retracting its earlier position and concluding that state and local police possess inherent authority to make arrests for both criminal and civil violations that would render that person removable.[26] The 2002 OLC opinion remained unpublished until July 2005 when it was released after the Second Circuit granted a FOIA request,[27] although allowing some redactions to the opinion.[28]

Given this lack of clarity in the law, it should not be surprising that state attorneys general continue to receive requests for advisory opinions on the nature and scope of states' inherent powers to enforce immigration laws. Nor should the varied responses be a surprise. In 2007, for example, the Virginia attorney general responded to an inquiry by two state legislators as follows:

> **It is my opinion that Virginia law-enforcement officers have authority to detain and arrest individuals who have committed violations of the laws of the United States and other states, subject to federal and state limitations. It further is my opinion that such authority extends to violations of federal criminal immigration law. Finally, because the federal appellate courts are ambiguous regarding state's authority to arrest individuals for civil violations of federal immigration law, until the law is clarified, it would not be advisable to enforce such violations outside of the scope of an agreement with federal authorities.[29]**

In addition, some attorneys general are turning to state statutes to decide the issue, given that state law controls on the question of when it is legal for states to arrest for federal offenses.[30] In 2007, for example, the attorney general of Ohio concluded that a county sheriff may arrest and detain persons suspected of violating a criminal provision of federal immigration law but may not do so if the violation is purely civil, given that state statutes define the general powers and duties of a county sheriff as "preserving the peace," a phrase that pertains only to criminal enforcement.[31] South Carolina's attorney general went even further and concluded that since South Carolina statutes only authorize state and local officers to enforce state criminal laws, no inherent authority to enforce federal immigration law exists in the state.[32] In an earlier opinion, in fact, the South Carolina attorney general had concluded that "any authority to empower state and local law enforcement officers to arrest and detain individuals for violation of the criminal provisions of federal immigration law would have to be provided by enactment of the General Assembly."[33]

Another layer of complexity is the relationship between a state's arrest warrant requirement and the inherent authority of local law enforcement to enforce immigration laws. The issue is that

APPENDIX C

**Making Civil Liberties Matter in Local Immigration Enforcement**

since some state statutes authorize warrantless arrests for misdemeanors solely when the crime is committed in the presence of the arresting officer, then warrantless arrests of noncitizens for federal immigration violations, whether for civil or minor crimes, violate this law.[34] When presented with the question, the New York attorney general, for example, concluded that the power to make warrantless arrests for federal immigration crimes more likely would be upheld, but subject to the requirements of state arrest requirements such that "offenses" would need to be committed in the presence of the officer and no arrest authority would exists for purely civil violations.[35]

Warrantless arrests that do not comply with state law requirements have been challenged in motions to suppress in federal criminal cases when defendants have been arrested by local law enforcement based solely on immigration violations. At least the Third Circuit, however, has denied remedy, even after it recognized that a violation to the state law has occurred. That case involved a member of the Marine Unit of the Virgin Islands Police Department (VIPD), who arrested the defendants and turned them over to ICE to be tried for alien smuggling offenses.[36] The Third Circuit affirmed the district court's finding that the arrest was illegal under state law because it was for a misdemeanor, which required the crime to be committed in the presence of the officer to justify a warrantless arrest.[37] Nevertheless, the Third Circuit reversed the initial grant of a motion to suppress on the basis that "an arrest that is unlawful under state or local law is [not] unreasonable *per se* under the Fourth Amendment."[38] As part of its rationale, the Third Circuit noted that a different holding would lead to the anomaly that the same arrest would be legal so long as local police conduct it jointly with ICE, given that ICE must not comply with the same presence requirement under federal law.[39] This type of potential watering down of state criminal procedural requirements as a result of local law enforcement of immigration laws is a civil rights concern I highlight in Part II.

*C. INA § 287(g) Agreements*

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) added Section 287(g) to the INA. This provision authorizes the Secretary of DHS to enter into an agreement, known as a Memorandum of Agreement (MOA), with a state or local law enforcement agency and to permit trained officers to perform immigration enforcement functions under the supervision of ICE officers, at the expense of the state or political subdivision and to the extent consistent with state and local law.[40] As of June 2008, 55 local law enforcement agencies, 765 officers in all, in 18 states have entered into such agreements, with approximately 80 more with pending requests.[41] ICE credits the program with identifying more than 60,000 persons since January of 2006, mostly in jails, who are suspected of being in the country without authorization.[42]

I have reviewed thirty-four of the fifty-five MOA agreements to date, which are available online after the Yale Law School Clinic filed a FOIA request with ICE.[43] ICE has entered into these MOAs directly with police departments, departments for public safety or state patrol, sheriff's offices, jails or correctional facilities, or with the city, the county, or the state. These MOAs reveal that Section 287(g) allows ICE to confer on local law enforcement nearly all of its enforcement powers under the INA. There are essentially eight types of immigration law enforcement

APPENDIX C

**Making Civil Liberties Matter in Local Immigration Enforcement**

functions that have been delegated to local law enforcement through these MOAs:

1. The power and authority to interrogate any person believed to be an alien as to his right to be or remain in the United States (INA § 287(a)(1) and 8 C.F.R. § 287.5(a)(1)) and to process for immigration violations those individuals who are convicted of state and federal felony offenses;

2. The power to arrest without warrant any alien entering or attempting to unlawfully enter the United States, or any alien in the United States, if the officer has reason to believe that the alien to be arrested is in the United States in violation of the law and is likely to escape before warrant can be obtained. INA § 287(a)(2) and 8 C.F.R. 287.5(c)(1);

3. The power and authority to arrest without warrant for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if there are reasons to believe that the person so arrested has committed such felony and if there is likelihood of the person escaping before a warrant can be obtained. INA § 287(a)(4) and 8 C.F.R. § 287.5(c)(2). Notification of such arrest must be made to ICE within twenty-four (24) hours;

4. The power and authority to serve warrants of arrest for immigration violations pursuant to 8 C.F.R. § 287.5(e)(3);

5. The power and authority to administer oath and to take and consider evidence (INA § 287(b) and 8 C.F.R. § 287(a)(2)), to complete required criminal alien processing, including fingerprinting, photographing, and interviewing of aliens, as well as the preparation of affidavits and the taking of sworn statements for ICE supervisory review;

6. The power and authority to prepare charging documents (INA Section 239, 8 C.F.R. § 239.1; INA Section 238; 8 C.F.R. § 238.1; INA Section 241(a)(5), 8 C.F.R. § 241. INA Section 235 (b)(1), 8 C.F.R. § 235.3), including the preparation of a Notice to Appear (NTA), application or other charging document, as appropriate, for the signature of an ICE officer for aliens in categories established by ICE supervisors;

7. The power and authority to issue immigration detainers (8 C.F.R. § 287.7) and I-213 Record of Deportable/Inadmissible Alien, for processing aliens in categories established by ICE supervisors; and

8. The power and authority to detain and transport (8 C.F.R. § 287.5(c)(6)) arrested aliens to ICE-approved detention facilities.[44]

The MOAs greatly differ in terms of their nature and scope. The broadest of them take on all of the eight powers/functions to allow trained local law enforcement officers to enforce both civil and criminal immigration laws.[45] Others also pertain to all types of immigration violations but may exclude certain of the delegated powers, usually the power to serve immigration warrants or the power to conduct warrantless arrests.[46] One MOA, that of Mecklenburg County, North Carolina, stands out because while it deals with all immigration violations, it includes only five of the eight powers (to interrogate; to administer oaths; to issue detainers; to prepare charging documents; and to transport aliens).[47] Most MOAs, however, restrict the cooperation agreement to assist ICE with

| APPENDIX C |
| :---: |
| **Making Civil Liberties Matter in Local Immigration Enforcement** |

criminal investigations in general; to certain types of criminal investigations, such as human trafficking, gangs, drugs, to identity theft; to capture "criminal aliens;" or to address counterterrorism and domestic security needs.[48] Florida, which opted not to include the power to serve warrants, is an exception to all other MOAs that include all power/functions.[49] There were also quite a few agreements with detention facilities, most of which did not include arrest powers in the MOAs as their purpose was to identity and process immigration violators already in detention.[50]

Thus, the MOA itself defines the scope and limitations of the authority to be designated to the local law enforcement agency, as well as the number of local officers trained and authorized to enforce federal immigration laws. Some MOAs are quite broad and grant all available powers to the local officers, while others are restricted to specific types of enforcement and adopt only some or a few of the enforcement powers. No one is monitoring how these agreements are actually being implemented, however, which raises concern over potential enforcement of immigration laws beyond those expressly spelled out in the agreement.[51]

Another issue is whether state law permits localities and/or local law enforcement agencies to enter into MOAs with ICE. Responses by the states attorneys general on the issue have varied among the states. In Ohio, for example, the attorney general concluded that a county sheriff lacked state statutory authority to enter into agreements with ICE for the enforcement of civil provisions of federal immigration law.[52] In contrast, Virginia's attorney general concluded that current Virginia law already authorized localities to enter into an agreement with ICE under the terms prescribed by INA § 287(g).[53]

The distinction between civil and criminal immigration enforcement continues to be relevant not only to the question of inherent local authority to enforce federal immigration laws but also to the permissible and/or actual scope of MOAs under INA § 287(g). However, in many instances this dichotomy under federal immigration law is unworkable as increasingly what were once treated as purely civil immigration violations now also result in criminal penalties, subject to the discretion of ICE. In fact, there are at least forty-seven criminal provisions in the sections of federal immigration law.[54] In addition, increasingly, ICE is relying on federal identity theft or fraud statutes to charge noncitizens for the possession or use of false or a third party's immigration documents or social security numbers.[55] Thus, while ICE is likely to simply institute removal proceedings against most persons apprehended through collaboration with local law enforcement, the potential applicability of a federal crime to any or most actions by the noncitizen is likely to conflate civil and criminal immigration enforcement to such degree as to make the distinction untenable. The conflation of civil and criminal immigration violations also has implications for civil liberties concerns, which I explore in Part II.

### D. Conflict with State Law: "Sanctuary Cities"

At the same time that localities and/or local law enforcement agencies are engaging in the enforcement of immigration laws, other local entities, including state and city governments, have adopted "sanctuary policies" restricting local law enforcement collaboration with ICE on the detection and detention of unauthorized immigrants. Most of the largest cities in the United States today have some variation of such sanctuary policies.[56] In all, about forty-nine cities and towns and about three states have some type of sanctuary law.[57] Such sanctuary policies are gen-

## APPENDIX C
### Making Civil Liberties Matter in Local Immigration Enforcement

erally of three types: (1) they limit inquiries into a person's immigration status (don't ask); (2) they limit arrests or detention for violation of immigration law (don't enforce); and (3) they limit provision to federal authorities of immigration status information (don't tell).[58] Localities promulgate these policies through various means, including by adopting city council resolutions, municipal ordinances, mayoral executive orders, and police chief memoranda.[59] The issues that arise with sanctuary policies are whether they are preempted by federal immigration law, as well as whether they are invalidated or made moot by conflicting local policies that seek greater local enforcement of immigration laws, including through adoption of INA § 287(g) agreements.

Several potential conflicts exist between sanctuary policies and federal law. Some suggest, for example, that sanctuary policies violate the federal anti-harboring provision.[60] The resolution is likely to depend on the federal court that decides the issue given that circuit courts interpret the harboring provision quite differently.[61] The issue might turn on whether courts view "sanctuary policies" as active concealment, as has been required by the Sixth Circuit, as opposed to most other circuits (the Second, the Fifth, the Eighth, and the Ninth) that include in the definition of harboring the provision of services and the mere omission to report that person to immigration authorities.[62] From a political perspective, however, such challenge is unlikely.[63]

Congress, however, passed two laws in 1996 explicitly to counter local sanctuary policies.[64] The first, Section 1373, mandates that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [ICE] information regarding the citizenship or immigration status, lawful or unlawful, of any individual."[65] Section 1644 includes much of the same language as Section 1373, and states that "no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States."[66] Essentially, the broader provision, Section 1373, prohibits a government entity or official from restricting disclosure of immigration status to ICE. Section 1644 only prohibits the proscription as applied to government entities. In 1999, the Second Circuit decided the only case to date that assesses the application of these provisions to sanctuary policies (*City of New York v. United States*).[67] In that case, the Giuliani administration sought to enjoin the 1996 laws, arguing that these laws violated the Tenth Amendment because they forced New York City to collaborate with federal immigration enforcement and the Guarantee Clause of the Constitution by interfering with the city's chosen form of government.[68] The Second Circuit disagreed and found that the federal provisions preempted the city's sanctuary policy, which proscribed voluntary cooperation with ICE by local police in immigration enforcement.

Essentially, "don't tell" sanctuary policies are vulnerable to preemption challenges in light of the Second Circuit opinion.[69] In contrast, "don't ask" and "don't enforce" sanctuary policies are not vulnerable to preemption.[70] Federal prohibition of such sanctuary policies, moreover, would run afoul of the anti-commandeering doctrine, under which the federal government could not require that state and local officials engage in immigration law enforcement.[71]

Local protection against immigration enforcement by local police responds to the strong policy objective of building trust and cooperation between immigrant communities and police.[72] Unfortunately, the effectiveness of the so-called sanctuary policies is weak for several reasons,

| APPENDIX C |
| --- |
| **Making Civil Liberties Matter in Local Immigration Enforcement** |

including that violations of these policies by local police are not enforced, and that the policies do not prevent removal of individual immigrants once they have been turned over to ICE.[73]

## II. The Civil Liberties Pitfalls of Localized Immigration Enforcement

Localizing immigration enforcement also means that local law enforcement agencies assume immigration enforcement powers generally available only to ICE under the INA. Indeed, in some localities this is already happening. Local law enforcement officers are not only asking all persons detained and/or arrested during their routine police work for their immigration status,[74] but they are, alone or in collaboration with ICE, executing immigration raids,[75] or conducting raids,[76] road blocks,[77] street sweeps, or other investigations that target noncitizens for violations of the federal immigration laws.[78] Moreover, this localized policing work is being conducted with increasingly greater access to immigration databases and immigration information, either directly or though requests to the LESC. As a result, the very same civil liberties concerns over trends in federal immigration enforcement by federal agents are simply transferred to local agents who essentially take on the role of ICE. In other words, the more local police act like ICE agents, the more the same civil liberties concerns will plague local immigration enforcement. These civil liberties concerns include: the transference of immigration enforcement's Fourth Amendment exceptionalism and flexible administrative enforcement tools to local law enforcement; the increased criminalization of immigration law in the context of few privacy protections; and racial profiling.

### A. Fourth Amendment Exceptionalism in Immigration Enforcement

The extremely limited application of the exclusionary remedy and the flexible application of the consent doctrine to immigration enforcement practices risk creating a culture of aggressive local law enforcement where abuses of power occur without judicial oversight. Essentially, the deterrence rationale behind the exclusionary remedy is almost absent from immigration law enforcement, given its nonapplication to nearly all immigration encounters, even when Fourth Amendment violations have occurred. For this reason, ICE is criticized for committing many civil rights violations in the course of immigration enforcement. Recently, ICE has been the subject of much litigation, particularly in the way it has executed raids.[79] Complaints against ICE, for example, have included the dragnet-like and intimidating execution of warrants in people's homes and in the workplace, which have devastating effects on families and communities.[80] In other cases, ICE has been accused of conducting forcible warrantless raids in people's homes, claiming they were police and aggressively interrogating all residents about their immigration status.[81] Still, more abuses include the racially charged nature in which these raids are being executed, mostly against Latinos.

Since 1984, the United States Supreme Court precluded the Fourth Amendment's exclusionary remedy in immigration proceedings, except within the narrow "egregious violations" exception.[82] Also, the exclusionary remedy does not apply to suppress the identity of the person arrested even in criminal trials, which has allowed ICE to successfully convict immigrants for certain immigration crimes, such as re-entry. In these cases, exclusion of any unlawfully seized evidence does not remedy the Fourth Amendment violation because the defendant's identity is

| APPENDIX C |
| **Making Civil Liberties Matter in Local Immigration Enforcement** |

never suppressible as the fruit of an unlawful arrest and because the government can prove its case simply by providing proof of a prior removal order and the defendant's renewed presence in the United States.[83]

Moreover, the application of the consent doctrine in immigration enforcement under the most coercive circumstances increasingly defies the premise that reasonable people feel free to walk away from law enforcement encounters. In immigration enforcement, the Fourth Amendment doctrine assumes that a reasonable person is free to refuse questions of immigration agents at immigration checkpoints.[84] The same assumption applies during unannounced workplace raids conducted by dozens of armed immigration agents, some of whom question workers while other agents guard the exits.[85]

At the local level, the assumption has often applied when local police question drivers and passengers about their immigration status during traffic stops[86] or roadblocks[87] even when, for instance, the encounter is prolonged when police seek information or direct assistance from ICE on the scene. The assumption has even applied during the execution of warrants in person's home when the person who has been handcuffed and detained for more than two hours was asked, by local law enforcement this time, about her immigration status.[88]

As a result, immigrants targeted for immigration enforcement have had almost no protection under the Fourth Amendment, either because the exclusionary rule has no application in removal proceedings or because it is limited in certain criminal trials. Moreover, even when the exclusionary rule does apply in removal proceedings, no Fourth Amendment protection is offered because most encounters are deemed nonseizures and nonsearches.

A related concern involves the transfer of ICE's broad regulatory and enforcement powers to local law enforcement, particularly through INA § 287(g) agreements. These transferred powers could have substantial adverse effects on privacy, especially through the increased use by local police of immigration databases and civil warrants to conduct law enforcement. ICE's regulatory arm reaches into employer hiring practices, university requirements (for foreign students), the government's distribution of public benefits, and driver's licenses, among other areas.

The regulatory function, in turn, has caused the proliferation of databases that, in most cases, grant ICE easy access to information about a person's immigration status as a worker, student, or driver. With easy access to these databases, ICE can arm itself with civil warrants even where no particularized probable cause exists to conduct raids in private or quasi-private spaces. Similarly, the proliferation of local ordinances that, for example, make it illegal for undocumented immigrants to loiter in public spaces, occupy housing, procure employment, or conduct business transactions,[89] is possibly expanding the administrative policing arm of local law enforcement against noncitizens and could lead to the creation of immigrant databases and to the issuance of civil warrants similar to those already available to ICE and some local law enforcement though INA §287(g) agreements.

The immigration warrants currently available to ICE are not that different from the general warrants that originally inspired the Fourth Amendment. The infamous general search warrants in early United States history were issued by executives and legislators, without judicial intervention, with neither a probable cause requirement or oath, nor a description of the particular places to be searched and persons or things to be seized.[90] Courts have upheld the constitu-

APPENDIX C

**Making Civil Liberties Matter in Local Immigration Enforcement**

tionality of immigration administratively issued warrants that lack particularized suspicion, such as workplace warrants based on general reasonable belief that unauthorized workers may be present, without having to name any particular worker.[91] This is a very low threshold given that ICE can establish a generalized reasonable suspicion of the presence of unauthorized persons in many contexts given the spread of immigration databases. Today, immigration laws authorize the compelled collection of information in ever-expanding databases over which persons retain no expectation of privacy and which become the basis for the issuance of warrants. Moreover, these databases, which were not intended to have a law enforcement purpose, often contain flawed information such that warrants are issued with significant errors, which are also shielded from any exclusionary remedy based on the "good faith" exception.[92]

One prominent example of immigration databases that provide easy access to immigration warrants are the databases established pursuant to the Immigration Reform and Control Act of 1986 ("IRCA")[93] to permit employer verification of immigration documents provided to employers by their employees at the time of hiring. In 1996, Congress created the Basic Pilot Employment Eligibility Verification Program (Basic Pilot), an electronic employment eligibility verification program which permits employers to match employee provided immigration information against the United States Citizenship and Immigration Services (CIS) and the Social Security Administration (SSA) databases for verification.[94] Basic Pilot is today known as E-Verify and contains over 444 million records in the SSA database and more than sixty million records in the DHS immigration databases.[95] Today, more than 69,000 employers are enrolled in E-Verify, with over four million queries executed so far in fiscal year 2008.[96]

IRCA data collection, along with E-verify, provide ICE with readily accessible information to procure warrants to execute immigration raids. In some cases, to avoid IRCA liability, employers voluntarily report to ICE discrepancies in their employee records when checked against the CIS and SSA databases.[97] As well, IRCA authorized DHS access to examine evidence of any person or entity under investigation for immigration violations and to compel such participation by subpoena.[98] Essentially, ICE can compel an employer to turn over all of its IRCA-mandated employee records, which ICE then runs through the databases. Any mismatch becomes a ground for an administrative warrant. Both the immigration and SSA databases are notoriously inaccurate, however. A 2004 report commissioned by DHS, for example, noted that the SSA databases are able to verify employment eligibility in less than 50 percent of the work-authorized noncitizens.[99] The SSA itself estimates that 17.8 million of its records contain discrepancies related to name, date of birth, or citizenship status.[100] SSA further notes that 4.8 million of the approximately 46.5 million noncitizen records contained in the SSA's database contain discrepancies.[101] Also, a government report reviewing immigration agencies' records (the then INS and the Executive Office of Immigration Review) found name, nationality, and case file number discrepancies, as well as cases missing from electronic files.[102]

Yet another database created to facilitate the execution of immigration warrants is based on ICE's implementation of its absconder initiatives in 2002 to arrest persons with a removal order who are still in the country.[103] The implementation of the absconder initiatives involved several preliminary steps. First, the government prepared the cases of immigration absconders, also called fugitives, for entry into the National Crime Information Center (NCIC) database,[104] an

## APPENDIX C
## Making Civil Liberties Matter in Local Immigration Enforcement

FBI-operated federal criminal database containing individuals' criminal histories. In 1996, Congress authorized the inclusion of deported "felons" records in the NCIC database to help authorities identify and prosecute persons for illegal re-entry.[105] Until then, the long-standing policy had been to keep immigration law enforcement information separate from that of criminal law enforcement. Since 2001, the then INS also began including absconders' names and information, of whom there are more than 465,000, into the NCIC system.[106]

Now the NCIC database contains records of persons with civil immigration removal orders, regardless whether they also have a criminal history. The database contains around 247,500 immigration warrants, more than half of which are for people with old removal orders, while the rest are records of persons removed for the commission of crimes.[107] The presence of these names in the NCIC database gives local police the necessary information to make immigration arrests during the course of routine traffic stops since most police vehicles are equipped with laptop computers connected to the NCIC system.[108]

Unfortunately, much of the information that forms the basis for these fugitive warrants is unreliable. Immigration agencies have been notorious for atrocious record-keeping and faulty databases, including errors in removal order files.[109] A 2003 study of immigration removal records revealed that discrepancies in the identity and address information occurred in 7 percent of the 308 cases of immigrant files with final orders reviewed, and 11 percent of the 470 cases of aliens from countries believed to sponsor terrorism.[110]

Absconder warrants are also served in people's homes, relying on the final address recorded in immigration files. Several other factors, however, contribute to incorrect records. First, many of the removal orders date back for years,[111] which increases the probability that persons other than the person subject to the removal order live at the address when the warrant is finally executed. Second, DHS relies on the addresses provided by noncomplying immigrants, who often move to avoid immigration authorities. Third, address changes reported to immigration agencies often are not recorded in the databases.[112] As a result of these factors, the administrative warrants are often issued on the basis of incorrect information about a person's place of residence.

Reliance on faulty databases to issue immigration warrants could become a ground for a Fourth Amendment challenge, when a motion to suppress is available. Courts, however, have not required foolproof evidentiary reliability to substantiate probable cause and may tolerate some degree of database inaccuracy. In fact, challenges to the NCIC database have been upheld, despite their noted inaccuracies.[113] In addition, the good-faith exception could very well provide an exception to the exclusionary rule.[114] Finally, recent challenges by civil rights groups to the inclusion of immigration information in the NCIC databases have been dismissed for lack of standing.[115]

An additional concern over immigration warrants pertains to their indiscriminate and dragnet-like execution. The problem with general workplace immigration warrants, for example, is precisely their undefined scope. Thus, what constitutes a reasonable execution of these warrants remains vague but is likely to lie somewhere between consensual encounters and indiscriminate seizures.

Consider workplace raids, during which it is not uncommon for ICE to interrogate all workers about their immigration status. The *INS v. Delgado* precedent involving consensual encounters during workplace raids already offers ICE significant flexibility to question the workers

| APPENDIX C |
| :---: |
| **Making Civil Liberties Matter in Local Immigration Enforcement** |

and, through the questioning, to acquire reasonable suspicion of unlawful presence.[116] In *Delgado*, the INS moved systematically through a garment factory, asked employees to identify themselves, and asked the employees one to three questions about their citizenship.[117] During the interrogations, armed INS agents were stationed near the exits while other agents moved throughout the factory and questioned workers at their work areas.[118] The agents showed badges, had walkie-talkies, and carried arms, though they never drew their weapons.[119] Despite all these facts, the court still considered the encounter consensual.

Usually, courts have drawn the line into nonconsensual encounters when immigration agents specifically have targeted Latinos or persons who simply looked "foreign" for more than brief questioning.[120] With absconder warrants executed in people's homes, ICE strategic practice has been to send several armed ICE agents to people's homes at the crack of dawn and aggressively interrogate everyone present about their immigration status and arrest those unable to provide it.[121]

### B. The Criminalization of Immigration Law

A significant explanation for the Fourth Amendment exceptionalism in immigration enforcement is early treatment by courts of immigration law as civil as opposed to criminal enforcement.[122] The characterization of immigration enforcement as administrative, which has allowed more flexible law enforcement practices, however, is becoming increasingly difficult to justify. In the last twenty years, immigration control has increasingly adopted the practices and priorities of the criminal justice system.[123] Yet, the criminal justice parallels in immigration enforcement have not resulted in correspondingly greater constitutional protections for immigrants, at least not in those protections that traditionally apply to criminal investigations and trials.

Professor Stephen H. Legomsky has called this trend "the asymmetric importation of the criminal justice norms into immigration law."[124] In other words, the enforcement aspects of criminal justice have been imported but without the bundle of procedural and substantive rights recognized in criminal cases.[125] The danger therefore is that law enforcement agencies are left without a legal obligation to balance immigrants' interests against the government's interest to control immigration, despite the large liberty stakes involved for immigrants.

Increasingly, what were once solely civil immigration violations have been criminalized, resulting in an unprecedented cooperation between criminal and immigration law enforcement agencies. Congress has created a host of new immigration crimes, ranging from illegal re-entry to the most recent attempt to criminalize mere immigration presence.[126] Further, criminal prosecution for immigration violations has increased rapidly. A recent study by Syracuse University's Transactional Records Access Clearinghouse documented that in March 2008, of 16,298 federal criminal prosecutions recorded, more than half (9,350) were for immigration violations.[127] The increase is part of DHS Operation Streamline, which seeks to deter undocumented migration through harsher criminal sanctions.[128]

Moreover, ICE is increasingly targeting for criminal prosecution persons who use false documents or documents belonging to third parties to procure work. An increasing number of persons arrested during workplace raids are being criminally prosecuted and face felony charges with a real threat of jail time for violating immigration or other United States laws related to identity theft. In 2006, for example, the number of those criminally charged was 716 (or 16 percent of the

total number), up from only twenty-five (or 5 percent) in 2002.[129] Then, in July 2008, in an unprecedented move, ICE criminally charged over 90 percent of the nearly 400 workers during the largest single-site workplace raid in the history of the United States at Postville, Iowa.[130] Also, at the local level, states are increasingly legislating to criminalize the aliens and those who associate with them. States are adopting laws, for example, that duplicate federal crimes, including in areas of human trafficking and document fraud.[131] States have also passed ordinances that impose criminal penalties on landlords who rent to undocumented immigrants or on employers who hire undocumented workers.[132]

Civil immigration enforcement, moreover, has become more punitive and difficult to distinguish from criminal enforcement. Mandatory immigration detention, previously reserved for the most dangerous persons, is now broadly applied in almost all removal cases.[133] Indeed, immigration detainees are currently the fastest growing segment of the jail population in the United States.[134] Most persons picked up in the latest wave of immigration raids have been detained, for example. Only a few are released for humanitarian reasons or because they were eligible for some other type of immigration relief. Those charged with any immigration crime or those with a criminal history are not eligible, however, for bond or any other avenue of relief from detention.[135]

Further, even when immigrants are criminally charged rather than placed in removal proceedings, the Fourth Amendment exceptionalism that characterizes immigration enforcement still applies. Pretextual doctrines permit prosecutors to rely on the significantly more relaxed immigration-related Fourth Amendment doctrines to justify reasonableness of searches and arrests. Consider, for example, the workplace raids. ICE has made the detection of identity theft during these raids a priority, such that most who are arrested are being criminally charged, rather than put in removal proceedings.[136] Still, ICE is conducting these raids, relying on its broad administrative law enforcement powers. The pretextual Fourth Amendment doctrine will likely preclude a motion to suppress remedy even in the limited cases where it is available, however. In parallel cases, where the argument has been that the administrative function is only a pretext for criminal law enforcement, motions to suppress have not succeeded.[137]

In *Whren v. United States*, the United States Supreme Court refused to consider whether the true motives of police officers who detained a group of young men for a traffic infraction were to investigate them for drug possession.[138] The Court's position instead was to avoid guessing the intent or motivation of the law enforcement officers when acting and to approve the action as long as the officers had "objective" Fourth Amendment grounds.[139] Thus, even when many of the workers are being criminally charged, despite the evidence that DHS is shifting policy to criminalize the undocumented worker, the motion to suppress, when available, will likely fail, so long as removal proceedings are plausible when instituted.

Pretextual claims have been successful only when the government's stated primary purpose cannot be justified as administrative. For example, in *City of Indianapolis v. Edmond*, which involved random stops at a checkpoint to investigate drug crimes, police conceded that the checkpoint was primarily for the detection of drugs, which the Court considered primarily a criminal law enforcement purpose.[140] Immigration enforcement, however, in the majority of cases carries both civil and criminal penalties, and it is unclear whether that fact alone would trigger a different holding from the courts on the continued use of the administrative function to con-

| APPENDIX C |
| :---: |
| **Making Civil Liberties Matter in Local Immigration Enforcement** |

duct criminal immigration enforcement.

Some of the factors that a court may consider to distinguish *Whren* are that, unlike traffic enforcement, which is predominantly civil, the transformation of immigration enforcement to a dual civil/criminal system argues for a different result. Consider the absconder initiative, for example, which has a clear criminal law enforcement purpose. Absconders are not solely immigration violators but also criminals *per se*, as they could face up to four years of incarceration for failure to depart after a removal order.[141] The entry of absconders' names into the NCIC database, moreover, indicates immigration agencies' shift to treat absconders as criminal, rather than solely civil immigration violators. This interrelatedness of civil/criminal sanctions in the absconder initiative could distinguish *Whren*. Until that happens, however, *Whren* is controlling in immigration enforcement and is likely to shield against motions to suppress with regard to the enforcement of immigration law during traffic stops, in the context of home raids, or in other types of investigative practices, whether conducted by ICE or by local law enforcement.

### C. Racial Profiling

Another looming civil liberties concern of immigration law enforcement has been its racially charged execution. Racial profiling in immigration enforcement in the form of the disproportionate targeting of Latinos occurs in several contexts. ICE is commonly accused of racial profiling in the execution of raids, for example. Consider the absconder initiative. When initially implemented, the then INS specifically targeted "priority absconders," a category that included persons with removal orders from countries with an al Qaeda presence, namely Muslims and Arabs. As such, the national origin discrimination was explicit.[142] The program then included persons with a criminal history and ultimately, in May 2006, DHS launched Operation Return to Sender, which casts a wider net and targets all persons with preexisting removal orders.[143] As such, the program now is at least facially neutral. Its disparate targeting of Latino immigrants, however, is documented in nearly all media stories detailing the raids.[144] The disparate targeting of Latino workers is also evident in workplace raids, which primarily occur in segregated workspaces occupied primarily by brown or Latino workers.[145] Allegations of racial profiling, moreover, are also present in the "driving while brown" phenomena, insofar as immigration enforcement occurs in the context of routine traffic stops disproportionately against Latinos.[146]

Sheriff Joe Arpaio's street raids in Arizona cities have also been heavily criticized for their racially charged execution. Similar street raids conducted in Arizona by local police jointly with immigration agents in the 1990's, known as the "Chandler Roundup," cost the city $400,000 as part of a settlement of lawsuits in which plaintiffs alleged they were stopped and questioned based exclusively on their apparent Mexican descent.[147] Not surprisingly, Sheriff Arpaio faces today similar lawsuits.[148] Indeed, in that litigation, allegations include Arpaio's reliance on citizen "tips" to single out alleged undocumented immigrants, which are often placed with biased and racialized stereotypes of who is or is not legally in the U.S.[149] The complaint also documents indiscriminate street sweeps that target "Latinos," and the use of private volunteers to execute the raids.[150] Finally, even consensual encounters that fall beyond the scope of Fourth Amendment seizures do not escape racial targeting to the extent that Latinos are disproportionately targeted for questioning about their immigration status.

| APPENDIX C |
| **Making Civil Liberties Matter in Local Immigration Enforcement** |

In racial profiling, too, few remedies are available, however. Courts are unlikely to consider these challenges, at least in the context of Fourth Amendment motions to suppress. First, the Court has directed parallel cases that have raised disproportionate law enforcement practices—such as in the "driving while black" phenomena away from Fourth Amendment challenges and into civil rights lawsuits.[151] Yet, a civil rights remedy for selective immigration enforcement is unlikely to be available under equal protection grounds, absent a clear showing of intentionality, which evidentiarily is nearly impossible to establish.[152]

Second, the United States Supreme Court has tolerated racial targeting in immigration enforcement, at least at immigration checkpoints and as a factor in the determination of reasonable suspicion in traffic enforcement.[153] The Court has justified a degree of ethnic profiling flexibility in immigration enforcement based partly on the questionable premise that civil immigration enforcement is less intrusive of liberty interests than in the criminal context.[154]

In addition, *in dictum* the Court noted that reliance on "Mexican appearance" as a factor for immigration law enforcement makes sense given that numerically it is largely Latinos, and primarily Mexican, who comprise the undocumented population.[155] The problem with this approach is twofold. First, ICE's enforcement statistics reveal that there is a notable disproportionate over-enforcement of immigration laws against Mexicans and other Latinos, even taking into account the large number of undocumented persons from these countries.[156] Second, the number of Latinos in the United States who are either citizens (by birth or naturalization) or possess immigration authorization to be in the United States is much larger than the number of unauthorized Latinos. A May 2008 press release by the United States Census Bureau puts the population of Hispanic origin at 45 million, a group still constituting the largest minority in the nation and totaling more than four times the number of unauthorized (and uncounted) persons of Hispanic origin.[157]

At least the Ninth Circuit in 2000 rejected the Court's dictum that Mexican appearance can be a factor to establish reasonable suspicion and reasoned that the much higher Latino percentage of the local population now makes demographic links between Latino ethnicity and unlawful status unreliable and that racial profiling unfairly stigmatizes.[158] In addition, the Ninth and the Third Circuits have found that stopping someone solely or partly because the driver is of Latino appearance constitutes "egregious" conduct, such that a motion to suppress is permitted in removal proceedings.[159]

### D. Civil Liberties Recommendations for Local Immigration Law Enforcement

In light of the foregoing, I offer the following recommendations to states to improve civil liberties in immigration law enforcement:

- States should exercise immigration enforcement powers only with express legislative approval, preferably by Congress. The lack of clarity regarding inherent authority to enforce immigration laws contributes to confusion and chaos about the nature and scope of this authority, such that it is best if the political branches of the government make the determinations. The legislative process also has the potential of providing adequate airing into the public and public participation about the policy reasons for and against authorizing local immigration enforcement.

| APPENDIX C |
| :---: |
| **Making Civil Liberties Matter in Local Immigration Enforcement** |

- Legislative authority should be clearly defined and monitored. As is the case of INA § 287(g) agreements, their nature and scope vary widely, with some containing a greater degree of specificity and outlining clear priorities. Localities and law enforcement agencies that choose to enter into such agreements for collaboration with ICE should aim to be as specific as possible regarding priorities and should detail as much as possible the scope and types of enforcement authorized. Ideally, localities should weigh the civil liberties implications of authorizing flexible immigration enforcement functions too broadly. For example, localities may wish to avoid local law enforcement collaborations in raids given the heightened civil liberties concerns that have been raised regarding their execution by ICE. Moreover, states should monitor and assure that the execution of the 287(g) agreements does not exceed the scope of their terms and establish complaint mechanisms through which civil rights groups may direct their concerns.

- Localities and/or agencies who enter into law enforcement collaboration agreements with ICE should also adopt policies to improve civil liberties in their execution, particularly taking into account the Fourth Amendment exceptionalism that characterizes immigration law enforcement and the particular civil liberties concerns that are implicated with such enforcement. In other words, localities cannot rely on federal courts to offer the civil liberties protections they may find desirable but can prevent violations to civil liberties by adopting good practice policies to preempt concerns. Some of these policies could include:

  - Restrict the enforcement of immigration warrants in the NCIC database, particularly given the database inaccuracies. Localities might, for example, prioritize enforcing cases involving only persons with a felony criminal record.

  - Disallow questioning of persons regarding their immigration status without reasonable suspicion. So-called consensual encounters involving immigration inquiries into a person's immigration status raise a host of civil liberties concerns that include judicial acquiescence into their voluntary nature under coercive circumstances and racial profiling.

  - Do not authorize the enforcement of immigration civil warrants. These immigration warrants are plagued with too many privacy violations, beginning from faulty databases, to their generalized character, and relatedly to their undefined scope of enforcement.

  - Disallow local enforcement participation in certain types of immigration enforcement, including raids, when such practices have been implicated in civil rights litigation.

### III. Immigrants' Rights During Immigration Encounters

Pro-immigrant groups, when devising strategies for immigrants on what to do to protect their civil liberties during immigration encounters, whether with ICE or local law enforcement, are aware of the following two circumstances: (1) too many immigrants "waive" their constitutional rights by "voluntarily" even if unwittingly cooperating with law enforcement during consensual encounters; and (2) even if a violation occurs, there is almost never an effective remedy that could offer relief for the damage caused. As a result, civil rights groups follow two principal strategies, both of which are focused on prevention. The first is to seek to enjoin law enforcement

| APPENDIX C |
| **Making Civil Liberties Matter in Local Immigration Enforcement** |

from certain practices that raise civil liberties concerns through civil rights litigation. The second is to train individual immigrants to assert their rights better during personal encounters with law enforcement. Below, I detail the list of rights that immigrants do possess when confronting law enforcement on immigration matters.

### A. *The Right to Refuse Cooperation*

#### 1. During Consensual Encounters or Nonconsensual Encounters Unrelated to Immigration Enforcement

Immigrants should assume that most encounters, irrespective of how coercive, are consensual and should always seek clarification about (1) whether they are being detained and (2) if so, why they are being detained. If they are not being detained or if the detention is unrelated to an immigration matter, then it is very likely that police are asking about their immigration status without reasonable suspicion. For this reason, as a general rule, civil rights groups advise immigrants to remain silent during all law enforcement encounters, under the assumption that these are consensual or that the inquiry into a person's immigration status exceeds the reasonable scope of the seizure.

Importantly, then, immigrants have a right not to cooperate with law enforcement by divulging their immigration status or providing identification in the absence of reasonable suspicion. Some have suggested that foreign nationals must produce immigration documents when requested in the course of consensual encounters and in the absence of individualized suspicion.[160] This argument is based on the fact that all foreign nationals over the age of 14, except temporary immigrants, must register with immigration agencies and be fingerprinted if they have been in the country more than 30 days.[161] Failure to register constitutes a misdemeanor offense, punishable by a $100 fine, 30 days maximum jail time, or both.[162] Yet, in the absence of individualized suspicion, compelling identification would violate Fourth Amendment principles. In *Hiibel v. Sixth Judicial District Court of Nevada*,[163] the United States Supreme Court upheld a Nevada statute that compelled having to identify oneself to the police but only when the police had reasonable suspicion for the stop. In contrast, consensual encounters have always presumed voluntariness, and, in fact, refusal to cooperate cannot then become the basis for reasonable suspicion.[164]

#### 2. During Nonconsensual Encounters Related to Immigration Enforcement

##### a. Workplace Raids

If ICE is executing a generalized immigration warrant and the person encountered or seized is not named in the warrant, then that person too has a right to remain silent and to refuse to cooperate. Here, too, refusal to cooperate cannot become the basis for reasonable suspicion, and persons over whom no legal justification to detain them exists should be allowed to leave. Moreover, it is not entirely clear that law enforcement can compel disclosure of identity under the warrant of persons not named in the warrant for purposes of locating the persons actually named in the warrant. Law enforcement could argue that finding the workers named in the warrant requires engagement of all workers in brief questioning and that such questioning could potentially be permitted if done in an indiscriminate fashion. The legality of such approach, provided the validity of the warrant is upheld, is still being decided in current litigation against ICE.

APPENDIX C

**Making Civil Liberties Matter in Local Immigration Enforcement**

**b. Home Raids**

Often, immigration raids in people's homes are under the absconder program. As such, the immigration warrant being executed is against a person or persons with prior removal orders. Immigrants have a right to see a copy of the warrant before opening the door to their homes and to refuse to answer the door if the person/s listed in the warrant does not live in the house or is not present at the time. Several questions arise here. The first question involves the constitutional "know and announce" requirement before the execution of warrants.[165] With criminal warrants, the knock-and-announce requirement only requires law enforcement to wait a reasonable time for occupants to respond to their knock, after which law enforcement may enter by force.[166] In contrast, ICE's administrative warrants do not require immigrants to answer the door or allow entry.[167]

If the person named in the warrant is present in the home, then during the execution of the warrant immigrants who are not named in the warrant, like the workers during a workplace raid, have a right to refuse cooperation. Again, it is unclear, however, if ICE can compel that those present disclose their identity unless it is necessary to identify the person named in the warrant. Once that person has been identified, law enforcement's justification for compelling the identity and/or immigration status of the rest of the persons present is questionable.

**B. The Right against Self-Incrimination and to an Attorney While in Custody**

The *Miranda* warnings required in criminal proceedings are not required in removal proceedings, and the absence of a warning does not preclude use of the statement in removal proceedings.[168] However, immigration regulations provide that a foreign national shall be advised of the reason for his arrest, informed of his right to be represented by counsel of his own choice at no expense to the government, provided with a list of available free legal services, and advised that any statement he makes may be used against him.[169] Thus, unlike defendants in a criminal trial, immigrants in removal proceedings or facing civil immigration charges do not have a right to an attorney provided by the state, but they do possess a statutory right to counsel at their own expense.[170] By requesting an attorney, foreign nationals in custody foreclose further questioning by law enforcement and law enforcement should offer the foreign national the opportunity to call his or her attorney.[171]

Motions to suppress are also available to immigrants when law enforcement has procured the statements illegally through coercion.[172] In such a case, quite apart from the benefit of deterring official lawlessness, the statement will be suppressed simply because of the dubiousness of its probative value.

## IV. Conclusion

The civil rights costs of local immigration enforcement can be high and localities should duly weigh these costs when deciding how and whether to enforce federal immigration laws.

| APPENDIX C |
| --- |
| **Making Civil Liberties Matter in Local Immigration Enforcement** |

### Endnotes

[1] *287(g) Program: Ensuring the Integrity of America's Border Security System Through Federal-State Partnerships: Before the House Committee on Homeland Security Committee on Management, Integration, and Oversight*, July 27, 2005, at 5 (statement of Paul M. Kilcoyne, Deputy Assistant Director of Investigative Serv. Div., USCIS), http://www.ice.gov/doclib/pi/news/testimonies/050727kilcoyne.pdf.

[2] ICE, Partners, Law Enforcement Support Center, www.ice.gov/partners/lesc/.

[3] ICE Law Enforcement Support Center, Fact Sheet, http://www.ice.gov/pi/news/factsheets/081204lesc.htm.

[4] *See* Kris W. Kobach, *The Quintessential Force Multiplier: The Inherent Authority of Local Police to Make Immigration Arrests*, 69 Alb. L. Rev. 179 (2005).

[5] The statute reads in pertinent part:

> No officer of person shall have the authority to make any arrests for a violation of any provision of this section except officers and employees of the Service designated by the Attorney General, either individually or as a member of a class, *and all other officers whose duty it is to enforce criminal laws.*

8 U.S.C § 1324 (2000) (emphasis added).

[6] Congress enacted amendment to grant local law enforcement authority to make arrests under INA § 276 as part of the 1996 broad immigration reform laws. The relevant provision reads:

In general

> Notwithstanding any other provisions of law, to the extend permitted by relevant State and local law, State and local law enforcement officials are authorized to arrest and detain an individual who:

is an alien illegal present in the United States; and (2) has previously been convicted of a felony in the United States and deported or left in the United States after such conviction, but only after the States or local law enforcement officials obtain appropriate confirmation from [ICE] of the status of such individual and only for such period of time as may be required for the Service to take the individual into Federal custody for purposes of deporting or removing the alien from the United States.

> The Attorney General shall cooperate with the States to assure that information in the control of the Attorney General, including information in the National Crime Information Center, that would assist the State and local law enforcement officials in carrying duties under subsection (a) of this section is made available to such officials.

8 U.S.C. 1256(c) (2000), *amended by* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, § 372(3), 110 Stat. 3009.

[7] Said provision reads:

> In the event that the Attorney General determines that an actual or imminent mass influx of aliens arriving off the United States or near a land border present urgent circumstances requiring an immediate Federal response, the Attorney General may authorize any State or local law enforcement officer, with the consent of the head of the department, agency or establishment under whose jurisdiction the individual is serving, to perform or exercise any of the power, privileges or duties conferred or imposed by the Act or regulations issued thereunder upon officers or employees of the service.

8 U.S.C. § 1103(a)(8) (2000), *amended by* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, § 372(3), 110 Stat. 3009.

[8] *See Department of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations for 1997: Hearings Before a Subcomm. of the H. Comm. on Appropriations*, 104th Cong. 1140 (1996) (testimony of Doris Meissner, INS Comm'r).

[9] 8 U.S.C. § 1103(a)(9) (2000).

[10] *INS and the Executive Office for Immigration Review: Hearing Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary*, 107th Cong. 10 (2001) (prepared statement of Kevin D. Rooney, Acting INS Comm'r).

APPENDIX C

## Making Civil Liberties Matter in Local Immigration Enforcement

[11] Michael J. Wishnie, *State and Local Police Enforcement of Immigration Law*, 6 U. Pa. J. Const. L. 1084, 1095 (2004). *But see* Kobach, *supra, note* at 4, 202-08 (listing other congressional actions as evincing an intent to preserve inherent state arrest authority, including the establishment in 1994 of the Law Enforcement Support Center (LESC) to respond to local police who make immigration arrests or the establishment in 1998 of QRTs for the express purpose of responding to immigration arrests made by state and local police).

[12] *See, e.g.*, Kobach, *supra* note 4.

[13] *See, e.g.*, Huyen Pham, *The Inherent Flaws in the Inherent Authority Position: Why Inviting Local Enforcement of Immigration Laws Violates the Constitution*, 31 Fla. St. U. L. Rev. 965, 978-1000 (2004). *See also* Wishnie, *supra* note 11, at 1092-95.

[14] Wishnie, *supra* note 11, at 1092-95.

[15] *See, e.g.*, U.S. Senator Jeff Sessions & Cynthia Hayden, *The Growing Role for State & Local Law Enforcement in the Realm of Immigration Law*, 16 Stan. L. & Pol'y Rev. 323 (2005).

[16] *U.S. v. Di Re*, 332 U.S. 581, 591 (1948) ("No act of Congress lays down a general federal rule for arrest without a warrant for federal offenses. None purports to supersede state law. And none applies to this arrest which, while for a federal offense, was made by a state officer accompanied by federal officers who had the power to arrest. Therefore the New York statute provides the standard by which this arrest must stand or fall."). *See also Miller v. U.S.*, 357 U.S. 301, 305 (1958) (in the circumstance of an arrest for violation of federal law by state peace officers, "...the lawfulness of the arrest without warrant is to be determined by reference to state law")

[17] *U.S. v. Haskins*, 228 F.3d 151, 152 (2d Cir. 2000), *cert denied*, 531 U.S. 1175 (2001).

[18] *U.S. v. Bowdach*, 561 F.2d 1160, 1168 (5th Cir. 1977).

[19] *U.S. v. Janik*, 723 F.2d 537, 548 (7th Cir. 1983).

[20] Sessions and Hayden, *supra* note 15, at 332-336.

[21] *Gonzalez v. City of Peoria*, 722 F.2d 468, 475-77 (9th Cir. 1983). The Ninth Circuit held, for example, that the enforcement authority must distinguish illegal entry, which is a criminal immigration violation, from illegal presence, such as overstaying a visa, which is only a civil violation. *Id.* at 477.

[22] *Lynch v. Cannatella*, 810 F.2d 1363, 1366, 1371 (5th Cir. 1987).

[23] *See* U.S. *v. Vasquez-Alvarez*, 176 F.2d 1294, 1295-1300 (10th Cir. 1999); *U.S. v. Santana-Garcia*, 264 F.3d 1188, 1190-1194 (10th Cir. 2001).

[24] *U.S. v. Laville*, 480 F.3d 187 (2007). *See infra* notes 35-36 and accompanying case for a discussing of the case.

[25] Theresa Wynn Roseborough, Deputy Assistant Att'y Gen., Office of Legal Counsel, U.S. Dep't of Justice, *Assistance by State and Local Police in Apprehending Illegal Aliens* (memorandum opinion for U.S. Attorney, S.D. Cal.) (Feb. 5, 1996), http://www.usdoj.gov/olc/immstopo1a.htm.

[26] Sessions and Hayden, *supra* note 15, at 337.

[27] *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350 (2nd Cir. 2005).

[28] Dep't of Justice, Office of Legal Counsel, *Non-preemption of the Authority of State and Local Law Enforcement Officials to Arrest for Immigration Violations* (Apr. 3, 2002), *available at* www.aclu.org/FilesPDFs/ACF27DA.pdf.

[29] Op. Va. Att'y Gen. No. 07-086 (2007), 2007 *1 WL 3120673 (Va. A.G.).

[30] See *supra* note 8 and accompanying text.

[31] Op. Ohio Att'y Gen. No. 2007-018 (2007), 2007 WL 1953424 * 2 (Ohio A.G.).

[32] Op. S.C. Att'y Gen. (2003), 2003 WL 21471506 (S.C. A.G.)

[33] Op. S.C. Att'y Gen. (2002), 2002 WL 399643 *1 (S.C. A.G.).

[34] *See, e.g.*, Cecilia Renn, *State and Local Enforcement of the Criminal Immigration Statutes and The Preemption Doctrine*, 41 U. Miami L. Rev. 999, 1005 (1987).

[35] Informal Op. N.Y. Att'y Gen. No. 2000-1 2(000), 2000 WL 420372 (N.Y. A.G.).

[36] *U.S. v. Laville*, 480 F.3d 187 (3rd Cir. 2007).

[37] *Id.* at 191.

| APPENDIX C |
| :---: |
| **Making Civil Liberties Matter in Local Immigration Enforcement** |

[38] *Id*. Other courts grappling with the same issue have simply given the "presence" requirement an extremely broad interpretation, such that an officer who acts quickly in response to an alert to arrest a noncitizen for a misdemeanor immigration violation still meets the "presence" requirement. *See, e.g., U.S. v. Daigle*, No. CRIM. 05-29-B-W, 2005 WL 1692648 (D. Me. Jul. 19, 2005).

[39] *Laville*, 480 F.3d at 193.

[40] 8 U.S.C § 1357(g) (2000).

[41] ICE, Partners, *Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act*, April 18, 2008, www.ice.gov/partners/287g/Section287_g.htm.

[42] *Id*.

[43] Worker & Immigrant Rights Clinic, Yale Law School, http://islandia.law.yale.edu/wirc/287g_foia.html.

[44] *See, e.g.*, Memorandum of Agreement between the ICE and the Arizona Department of Public Safety, at 2-3, *available at* http://islandia.law.yale.edu/wirc/287g_foia.html.

[45] These include MOAs with the Arizona Department of Public Safety; with the Washington County, Arkansas, Sheriff's Office; with the Tulsa County, Oklahoma, Sheriff's Office; with the Springdale, Arkansas, Police Department.

[46] These include, for example, those MOAs signed by the State of Alabama (no serving warrants, but power arrest without a warrant); or the Sheriff's Office of Alamance County, North Carolina (no warrantless arrests).

[47] Memorandum of Agreement between the ICE and the Mecklenburg County, North Carolina, at 2-3, *available at* http://islandia.law.yale.edu/wirc/287g_foia.html.

[48] These include MOAs with the State of Florida (counterterrorism and domestic security); the Town of Herndon, Virginia, and the Herndon Police Department (be assigned and/or collocated as task force officers to assist ICE with criminal investigations); the Colorado Department of Public Safety/Colorado State Patrol (assigned or collocated as task force officers to assist ICE with criminal investigations, specifically human smuggling, human trafficking, and the exploitation of all persons); the State of Georgia Department of Public Safety (assigned or collocated as task force officers to assist ICE agents with criminal investigations, specifically transport of contraband, such as narcotics or proceeds from illegal activities, and identity theft and document fraud, especially involving state driver's licenses); the Hudson Police Department in New Hampshire (assigned and/or collocated as task force officers to assist ICE agents with criminal investigations, specifically assisting local authorities in urban areas who have requested assistance due to pervasive criminal activity occurring in hot spots within their communities); Benton County, Arkansas, Sheriff's Office (to identify and remove criminal aliens from Benton County); Shenandoah County, Virginia, Sheriff's Office (assigned and/or collocated as task force officers to assist ICE agents with criminal investigations, in particular illegal trafficking in narcotics investigations and gang investigations, or general criminal investigations of persons who are not authorized to be in the U.S.); the Collier County, Florida, Sheriffs' Office (assigned and/or collocated as task force officers to assist ICE agents with criminal investigations, in particular identifying high-risk felons wanted for crimes or offenses that represent a significant threat to public safety, illegal trafficking of narcotics, gang activity, identifying enterprises and other forms of criminal activity, arresting and prosecuting all subjects involved in criminal activity, and investigating identity theft and fraudulent use of Florida driver's licenses or identification cards); Maricopa County, in Arizona (assigned and/or collocated as task force officers to assist ICE agents with criminal investigations, in particular with identifying high-risk felons wanted for crimes that represent a significant threat to public safety, criminal enterprises and other types of organized crimes, gangs, illegal trafficking in narcotics, and assisting local authorities in urban areas who have requested assistance due to pervasive criminal activity; the Framingham, Massachusetts, Police Department (assigned and/or collocated as task force officers to assist ICE agents with criminal investigations); and the Rockingham County, Virginia, Sheriff's Office (assigned or collocated as task force officers to assist ICE with criminal investigations, in particular gangs and illegal trafficking in narcotics).

[49] Memorandum of Agreement between ICE and the State of Florida, at 2-3, *available at* http://islandia.law.yale.edu/wirc/287g_foia.html.

[50] These include MOAs with the Jail Board of the Prince William-Manassas Regional Adult Detention Center (Virginia); the Cabarrus County (North Carolina) Sheriff's Office jail/correctional facilities; the Barnstable County (Massachusetts) Sheriff's Office correctional facilities; the Arizona Department of Corrections; the Cobb County (Georgia) Board of Commissioners and the Cobb County Sheriff jail/correctional facilities; the York County (South Carolina) Sheriff's Office detention facilities; the Massachusetts Department of Corrections; El Paso County (Colorado) Sheriff's Office

| APPENDIX C |
| **Making Civil Liberties Matter in Local Immigration Enforcement** |

detention facilities; the Gaston County (North Carolina) Sheriff's Office jail facilities; State of New Mexico Corrections Department; the Davidson County (Tennessee) Sheriff's Office jail and correctional facilities; the Los Angeles County (California) jail facilities; San Bernardino County (California) Board of Supervisors county jail facilities; County of Orange (California) jail facilities; and Riverside County (California) jail facilities.

[51] American Immigration Lawyers Association, Fact Sheet – "287(g)" Agreements, *available at* http://www.aila.org/search/default.aspx?searchterm=fact%20sheet%20287(g).

[52] Op. Ohio Att'y Gen. No. 2007-029 (2007), 2007 WL 2700588 (Ohio A.G.).

[53] Op. Va. Att'y Gen. No. 07-016 (2007), 2007 WL 1456159 (Va. A.G.).

[54] Kobach, *supra* note 4, at 220, Table 1.

[55] Press Release, U.S. Immigration and Customs Enforcement, Fact Sheet: Frequently Asked Questions About Worksite Enforcement (Oct. 15, 2007), http://www.ice.gov/pi/news/factsheets/worksite.htm.

[56] These include: Baltimore, Chicago, Denver, Detroit, Houston, Los Angeles, Minneapolis, New York City, Philadelphia, San Francisco, Seattle, and Washington, D.C. Orde F. Kittrie, *Federalism, Deportation, and Crime: Victims Afraid to Call the Police*, 91 Iowa L. Rev. 1449, 1466-74 (2006).

[57] Nat'l Immigration Law Ctr., Annotated Chart of Laws, Resolutions, and Policies, Instituted Across the U.S. Protecting Residents from Local Enforcement of Immigration Laws (2004).

[58] Kittrie, supra note 56, at 1455. *See* also Huyen Pham, *The Constitutional Right Not to Cooperate? Local Sovereignty and the Federal Immigration Power*, 74 U. Cin. L. Rev. 1373, 1388-91 (2006) (describing the characteristics of sanctuary policies as follows: no discrimination; no enforcement of civil immigration laws; no inquiry into citizenship status; and no notifying federal immigration authorities).

[59] *Id.* at 1474.

[60] This provision imposes criminal penalties on "[a]ny person who...knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in nay place, including any building or any means of transportation." 8 U.S.C. § 1324(a)(1)(A)(iii) (2000).

[61] Kittrie, supra note 56, at 1493-95.

[62] *See id.*

[63] *Id.* at 1495.

[64] Pham, *supra* note 58, at 1384-85.

[65] 8 U.S.C. § 1373 (2000).

[66] 8 U.S.C. § 1644 (2000).

[67] 179 F.3d 29 (2nd Cir. 1999).

[68] *Id.* at 33.

[69] Kittrie, *supra* note 56, at 1498. *See also* Pham, *supra* note 58, at 1391-95.

[70] Kittrie, *supra* note 56, at 1499.

[71] *Id.* at 1487-93, 1499-1500.

[72] *Id.* at 1475-80.

[73] *Id.* at 1480-84.

[74] *See, e.g., Muehler v. Mena*, 544 U.S. 93 (2005) (involving the questioning of detainee about her immigration status during the execution of a gang-related warrant in a home); *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 991 F. Supp. 85 (N.D. Ohio 1997) (involving asking occupants in a car during a traffic stop about their immigration status); *U.S. v. Esparza-Mendoza*, 386 F.3d 953 (10th Cir. 2004) (involving the discovery of an outstanding immigration warrant during a community care-function encounter).

[75] *See, e.g., Flores v. Walla Walla Police*, No. CV-06-166-MWL., 2006 WL 2850010 (E.D. Wash. Oct. 2, 2006) (involving local police arrest based on a federal immigration warrant).

[76] *See, e.g., U.S. v. Vite-Espinoza*, 342 F.3d 462, 464 (6th Cir. 2003) (involving the execution of a home raid with a fed-

APPENDIX C

**Making Civil Liberties Matter in Local Immigration Enforcement**

eral immigration search warrant during a joint federal, state, and local police task force investigating the counterfeiting of immigration and identification documents).

[77] *See, e.g., State v. Bolton*, 301 P.2d 98 (N.M. App. 1990) (involving participation of ICE agents in state road block).

[78] *U.S. v. Perez-Sosa*, 164 F.3d 1082 (8th Cir. 1998) (involving state trooper's consensual encounter that lead to probable cause based on report that person was transporting undocumented persons).

[79] *See, e.g., Arias, et. al., v. ICE*, Civ. No. 07-1959 ADM/JSM, 2008 WL 1827604 (D. Minn. Apr. 23, 2008). *See also* Original Complaint—Class Action Request for Injunctive Relief and Declaratory Relief and Damages, at 8-10, 12-14, *United Food & Commercial Workers Int'l Union v. Chertoff*, No. 07-000188 (N.D. Tex. Sept. 12, 2007), *available at* http://www.ailf.org/lac/chdocs/UFood-Complaint.pdf.

[80] *See, e.g.,* Randolph Capps, et. al., *Paying the Price: The Impact of Immigration Raids on America's Children*, Urban Institute, 2007, *available at* http://www.urban.org/url.cfm?ID=411566&renderforprint=1.

[81] *See, e.g., Arias*, 2008 WL 1827604 at 3.*See also* Complaint for Violations of the Fourth and Fifth Amendments to the United States Constitution, *Reyes v. Alcantar*, No. 07-02271 (N.D. Cal. Apr. 26, 2007), *available at* http://www.ailf.org/lac/chdocs/Reyes-Complaint.pdf.

[82] *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1050 (1984). *See also* Joseph J. Migas, *Exclusionary Remedy Available in Civil Deportation Proceedings for Egregious Fourth Amendment Violations*, 9 Geo. Immigr. L. J. 207, 209 (1995).

[83] Daniel P. Blank, Note, *Suppressing Defendant's Identity and Other Strategies for Defending Against a Charge of Illegal Reentry After Deportation*, 50 Stan. L. Rev. 139,140-41 (1997).

[84] *U.S. v. Martinez-Fuerte*, 428 U.S. 543, 558 (1976).

[85] *INS v. Delgado*, 466 U.S. 210, 218 (1984).

[86] *See, e.g., U.S. v. Urrieta*, 520 F.3d 569 (6th Cir. 2008); *U.S. v. Pasillas-Castanon*, No. 06-CR-175-HDC, 2007 WL 43391 (N.D. Okla. Feb. 2, 2007); *U.S. v. Villanueva-Madriz*, No. 05-CR-60073-HO, 2006 WL 278160 (D. Or. Feb. 3, 2006); *U.S. v. Santana-García*, 264 F.3d 1188 (10th Cir. 2001); *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, et al., 991 F. Supp. 895 (N.D. Ohio 1997).

[87] *See, e.g., New Mexico v. Bolton*, 801 P.2d 98 (N.M. App. 1990).

[88] *Muehler v. Mena*, 544 U.S. 93, 100-01 (2005).

[89] *See* Raquel Aldana, *On Rights, Federal Citizenship, and the "Alien,"* 46 Washburn L. J. 263, 284 (2007).

[90] Geoffrey G. Hemphill, *The Administrative Search Doctrine: Isn't This Exactly What the Framers Were Trying to Avoid?*, 5 Regent U. L. Rev. 215, 128-220 (1995).

[91] *See, e.g.,* Blackie's House of Beef, Inc. v. Castillo, 659 F.2d 1211, 1213 (D.C. Cir. 1981). *See also Int'l Molder's & Allied Worker's Local Union No. 164 v. Nelson*, 799 F.2d 547, 553 (9th Cir. 1986).

[92] *U.S. v. De Leon-Reyna*, 930 F.2d 396 (5th Cir. 1991).

[93] Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359, 3359 (1986) (codified as amended 8 U.S.C. § 1324a (2000 & Supp. V 2005)).

[94] Nat'l Immigration Law Ctr., Basic Information Brief: DHS Basic Pilot Program 3 (rev. Mar. 2008), *available at* http://www.nilc.org/immsemplymnt/ircaempverif/e-verify_infobrief_2008-03-13.pdf.

[95] DHS, E-Verify, *available at* www.dhs.gov/xprevprot/programs/gc_1185221678150.shtm.

[96] *Id.*

[97] Raquel Aldana, *Of Katz and "Aliens": Privacy Expectations and the Immigration Raids*, 41 UC Davis L. Rev. 1081, 1098-99 (2008) (describing the IMAGE program under which employers voluntarily agree to annual audits and to report any violations or deficiencies of employee records to ICE and employer response to SSA so-called No-Match letters, which notifies employers of SSN discrepancies).

[98] 8 U.S.C. § 1324a(e)(2)(C) (2000).

[99] U.S. Citizenship & Immigration Servs., Report to Congress on the Basic Pilot Programs 4-5 (2004), *available at* http://www.nilc.org/immsemplymnt/ircaempverif/basicpilot_uscis_rprt_to_congress_2004-06.pdf.

A484

APPENDIX C
## Making Civil Liberties Matter in Local Immigration Enforcement

[100] Office of the Inspector Gen. Soc. Sec. Admin., Congressional Response Report: Accuracy of the Social Security Administration's Numident File, at ii (2006) *available at* http://www.ssa.gov/oig/ADOBEPDF/audittxt/A-08-06-26100.htm .

[101] *Id.* at 11.

[102] *Id.*

[103] *See* Aldana, *supra* note 97, at 1109 for a description of ICE's absconder initiative.

[104] Memorandum from Larry Thompson, Deputy Att'y Gen., to the INS Comm'r, FBI Dir. U.S. Marshall Serv. Dir., and U.S. Att'ys, § A, at 1 (Jan. 25, 2002), *available at* http://fl1.findlaw.com/news.findlaw.com/hdocs/docs/doj/abscndr012502mem.pdf.

[105] 8 U.S.C. §§ 1326(a), (b) (2000).

[106] Seventh Public Hearing of the National Comm'n on Terrorist Attacks Upon the United States, Jan. 26, 2004, http://govinfo.library.unt.edu/911/hearings/hearing7/witness_ziglar.htm (statement of James W. Ziglar, INS Commissioner).

[107] Ernesto Londoño, *Database is Tool in Deporting Fugitives: Police Officers Find Illegal Immigrants in Warrant Searches*, WASH. POST., June 12, 2003, at A1.

[108] Kobach, *supra* note 4, at 188-192.

[109] Memorandum from Glenn A. Fine, Inspector Gen., U.S. Dep't of Justice, Review of the Immigration and Nationalization Service's Removal of Aliens Issued Final Orders I-2003-004 (Feb. 25, 2003), *available at* http://www.usdoj.gov/oig/reports/INS/e0304/memo.pdf.

[110] Office of the Inspector Gen., U.S. Dep't of Justice, Report No. 1-2003-004, The Immigration and Naturalization Services' Removal of Aliens Issued Final Orders 14 (2003) *available at* http://www.npr.org/documents/2005/mar/doj_alien_removal.pdf.

[111] *See* Ruth Morris, *U.S. Adding Fugitive Squads that Target Immigrants Who Ignore Expulsion Orders*, S. FLA SUN SENTINEL, Feb. 26, 2007, *available at* http://oneoldvet.com/?page_id=281#12.

[112] Michelle Wucker, *The Top Ten Ways America Gets Immigration Wrong*, AM. IMMIGRATION L. FOUND., June 19, 2006, *available at* http://www.visalaw.com/06oct2/12oct206.html.

[113] *U.S. v. Hines*, 564 F.2d 925, 928 (10th Cir. 1977) (finding that reliance upon NCIC to substantiate probable cause for arrest was acceptable. *See also U.S. v. Davis*, 568 F.2d 514, 515 (6th Cir. 1978).

[114] *Arizona v. Evans*, 514 U.S. 1, 16-17 (upholding use of evidence obtained from false arrest records that was the product of clerical errors).

[115] *Nat'l Council of La Raza v. Mukasey*, No. 07-0816-cv, 2008 WL 2630729 (2nd Cir. Jul. 3, 2008) and *Nat'l Council of La Raza v. Gonzales*, 468 F. Supp. 2d 429 (E.D. N.Y. 2007).

[116] 466 U.S. 210, 218 (1984).

[117] *Id.* at 212.

[118] *Id.*

[119] *Id.*

[120] *Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson*, 643 F. Supp. 884, 893-95 (N.D. Cal. 1986); *Ill. Migrant Council v. Pilliod*, 51 F. Supp. 1011, 1020-21 (N.D. Ill. 1982).

[121] *See* Aldana, *supra* note 97, at 1114-1115 (documenting several complaints on ICE execution of home warrants).

[122] *See* Daniel Kanstroom, *Deportation, Social Control, and Punishment: Some Thoughts about Why Hard Laws Make Bad Cases*, 113 HARV. L. REV. 1889, 1894 (2000).

[123] *See, e.g.*, Stephen H. Legomsky, *The New Path of Immigration Law: Asymmetric Incorporation of Criminal Justice Norms*, 64 WASH. & LEE L. REV. 469 (2007); Juliet Stumpf, *The Crimmigration Crisis: Immigrants, Crimes, and Sovereign Power*, 56 AM. U. L. REV. 367 (2006); Teresa A. Miller, *Citizenship and Severity: Recent Immigration Reforms and the New Penology*, 17 GEO. IMMIG. L. J. 611 (2003).

[124] Legomsky, supra note 123, at 521.

APPENDIX C

**Making Civil Liberties Matter in Local Immigration Enforcement**

[125] *Id.* at 472.

[126] In 2005, the House of Representatives passed a bill that would have created several additional crimes, including criminalizing the presence of the undocumented. Border Protection, Antiterrorism, and Illegal Immigration Control Act of 2005, H.R. 4437, 109th Cong. (2005).

[127] Nicole Gaouette, *Federal Prosecution of Illegal Immigrants Soars*, L.A. Times, June 18, 2008, at A-8, *available at* http://articles.latimes.com/2008/jun/18/nation/na-immig18.

[128] *Id.*

[129] U.S. Immigration and Customs Enforcement, Fact Sheets: Frequently Asked Questions about Worksite Enforcement (last updated Aug, 12, 2008), http://www.ice.gov/pi/news/factsheets/worksite.htm.

[130] Stephen Lendman, *Civil Wrongs: Targeting Immigrants - The Largest Ever US ICE Raid*, Baltimore Chronicle & Sentinel, *available at* http://baltimorechronicle.com/2008/081108Lendman.shtml.

[131] *See, e.g.,* Overview of State Legislation Related to Immigrants and Immigration, January-March 2008, National Conference of State Legislatures, Immigrant Policy Project, April 24, 2008, *available at* http://www.ncsl.org/print/immig/immigreportapril2008.pdf (reporting that in the first three months of 2008 alone, 24 bills on human trafficking and 198 bills on law enforcement were introduced).

[132] *Id.*

[133] Miller, supra note 123, at 614-15; Stumpf, supra note 123, at 391.

[134] Miller, supra note 123, at 648-49.

[135] *Id.* at 635-36.

[136] Consider, for example, DHS Secretary Michael Chertoff's remarks in defense of worksite raids:

> [Document fraud] is a serious problem not only with respect to illegal immigration, but with respect to national security. And that's precisely the point made by the 9/11 Commission a couple of years ago, because illegal documents are not only used by illegal migrants, but they are used by terrorists who want to get on airplanes, or criminals who want to prey on our citizens. And so, as part of this overall strategy of worksite enforcement, we've gotten very focused on the question of those who exploit illegal documents and identity theft in order to pursue illegal acts. So yesterday's enforcement action [the Swift and Co. raids] demonstrate another step in this worksite enforcement strategy. A tough stance against worksites that employ illegal aliens and against individuals and organizations that commit or facilitate identity theft or fraud.

Press Release, Dep't of Homeland Security, Remarks by Secretary of Homeland Security Michael Chertoff, Immigration and Customs Enforcement Assistant Secretary Julie Myers, and Federal Trade Commission Chairman Deborah Platt Majoras at a Press Conference on Operation Wagon Train (Dec. 13, 2006), *available at* http://www.dhs.gov/xnews/releases/pr_1166047951514.shtm.

[137] *See* Craig M. Bradley, *The Reasonable Policeman: Police Intent in Criminal Procedure*, 76 Miss. L. J. 339, 340 (2006).

[138] *Whren v. United States*, 517 U.S. 806, 811 (1996) (holding that ulterior motives need not invalidate police conduct that is otherwise justified by reasonable belief that a violation of law has occurred).

[139] *Id.*

[140] 531 U.S. 32, 50-51 (2000).

[141] Immigration and Nationality Act (INA) of 1990, 8 U.S.C. § 1253 (2000).

[142] *See* Kevin Lapp, *Pressing Public Necessity: The Unconstitutionality of the Absconder Apprehension Initiative*, 29 N.Y.U. Rev. L. & Soc. Change 573, 574 (2005).

[143] ICE Press Release, ICE Apprehends More Than 2,100 Criminal Aliens, Gang Members, Fugitives and Other Immigration Violators in Nationwide Interior Enforcement Operation, Jun. 14, 2006, *available at* http://www.dhs.gov/xnews/releases/press_release_0926.shtm.

[144] *See* Andrew Ryan, *Agency Nabs Illegal Immigrants Across U.S.*, Wash. Post, Jun. 14, 2006, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2006/06/14/AR2006061401245.html.

APPENDIX C
## Making Civil Liberties Matter in Local Immigration Enforcement

[145] *See* Leticia M. Saucedo, *The Employer Preference for the Subservient Workers and the Making of the Brown Collar Workplace*, 67 Ohio St. L. J. 961, 965-66 (2006).

[146] *See* Anthony E. Mucchetti, *Driving While Brown: A Proposal for Ending Racial Profiling in Emerging Latino Communities*, 8 Harv. Latino L. Rev. 1, 3 (2005)

[147] Carrie L. Arnold, *Racial Profiling in Immigration Enforcement: State and Local Agreements to Enforce Federal Immigration Law*, 49 Ariz. L. Rev. 113, 119-120 (2007) (discussing the "Chandler Roundup" operation which lasted five days and resulted in the arrest and deportation of 432 undocumented immigrants).

[148] ACLU Press Release, Sheriff Arpaio Sued over Racial Profiling of Latinos in Maricopa County, July, 7, 2008, *available at* www.aclu.org/immigrants/gen/36011prs20080716.html. A copy of the complaint is *available at* http://www.aclu.org/pdfs/immigrants/filedfirstamdcm071608(2).pdf.

[149] *Manuel de Jesus Ortega Melendres, et al., v. Arpaio*, First Amended Complaint, Class Actions, No. CV -07-02513-PHX-MHM, ¶ 16 *available at* http://www.aclu.org/immigrants/gen/35998lgl20080716.html.

[150] *Id.* at ¶¶ 3, 30-48.

[151] *See* David Harris, *"Driving While Black" and Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops*, 87 J. Crim. L. & Criminology 544, 550-51 (1997).

[152] *See* David Cole, Enemy Alien: Double Standards and Constitutional Freedoms in the War on Terrorism 204 (2003) (discussing the Court's tolerance of ethnically selective targeting).

[153] *See* Alfredo Mirande, *Is There a "Mexican Exception" to the Fourth Amendment?*, 55 Fla. L. Rev. 365, 372-74 (2003).

[154] *See, e.g., U.S. v. Brignoni-Pince*, 422 U.S. 873, 885-87 (1975).

[155] *Id.* A Pew Hispanic Center estimate of the size and characteristics of the undocumented population concluded that as of March 2004, of the 10.3 million estimated undocumented persons, 57 percent or 5.9 million were from Mexico, while 24 percent were from other Latin American nations. Jeffrey S. Passel, *Estimates of the Size and Characteristics of the Undocumented Population,* Report, Mar. 21, 2005, at 8 *available at* http://pewhispanic.org/files/reports/44.pdf.

[156] Consider, for example, ICE's enforcement statistics for 2006. ICE apprehended more than 1,206,000 foreign nationals that year, nearly 88 percent of whom were natives of Mexico. Moreover, of the 272,389 foreign nationals removed from the U.S., the leading countries of origin represented were: Mexico (67 percent); Honduras (10 percent); and Guatemala (7 percent). This record of removal does not consider the ethnic origin of the more than 1 million persons who accepted voluntary departure without a removal order. Office of Immigration Statistics, Immigration Enforcement Actions: 2006, Annual Report, May 2008, *available at* http://www.dhs.gov/xlibrary/assets/statistics/publications/enforcement_ar_06.pdf.

[157] U.S. Census Bureau News, U.S. Department of Commerce, U.S. Hispanic Population Surpasses 45 Million Now 15 Percent of Total, *available at* http://www.census.gov/Press-Release/www/releases/archives/population/011910.html.

[158] *U.S. v. Montero-Camargo*, 208 F.3d 1122 (9th Cir. 2000).

[159] *Arguelles-Vasquez v. INS*, 786 F.2d 1433 (9th Cir. 1986); *Gonzalez-Rivera v. INS*, 22 F.3d 1441 (9th Cir. 1994). *See also Orhordaghe v. INS*, 38 F.3d 488 (9th Cir. 1994) (holding that the INS's investigation of an individual based solely on his or her "foreign-sounding" name is also egregious).

[160] Rebecca Chiao, *Fourth Amendment Limits on Immigration Law Enforcement*, 93-02 Immigr. Brief. 1 (1993).

[161] 8 U.S.C. § 1302 (2000).

[162] *Id.*

[163] 542 U.S. 177 (2004).

[164] *Florida v. Royer*, 460 U.S. 491 (1983) (refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure). *But see Illinois v. Wardlow*, 525 U.S. 119 (2000) (rejecting that unprovoked flight upon sight of police per se offers ground for reasonable suspicion but allowing it as a factor to find reasonable suspicion).

[165] *See Wilson v. Arkansas*, 514 U.S. 927 (1995).

[166] William E. Ringel, Execution of Warrants, Searches and Seizures, Arrests, and Confessions § 6:10 (2007).

APPENDIX C

**Making Civil Liberties Matter in Local Immigration Enforcement**

[167] Nina Bernstein, *Hunts for "Fugitive Aliens" Leads to Collateral Arrests*, N.Y. TIMES, July 23, 2007, at B1 (reporting on DHS Secretary Chertoff's explanation that civil immigration warrants do not permit ICE to force entry); Jerry Seper, *Outnumbered in a Hunt for Aliens: Force of 200 Charged with Tracking 400,000 Criminals, "Absconders,"* WASH. TIMES, July 20, 2004, at A1 (describing same practice).

[168] Matter of Baltazar, 16 I & N Dec. 108, 1977 WL 39227 (B.I.A. 1977); *U.S. v. Valdez*, 917 F.2d 466 (10th Cir. 1990) (in conviction for re-entry after deportation, no right to or prejudice in absence of Miranda warnings).

[169] 8 C.F.R. §§ 1240.10, 1240.48.

[170] 8 C.F.R. §§ 1240.10(a)(1); 1240.48(a).

[171] Chiao, *supra* note 160, at 1 (describing requirements of lawsuit settlement (expired in 1995) against INS to allow foreign nationals access to counsel during post-arrest questioning).

[172] *Bustos-Torres v. INS*, 898 F.2d 1053, 1057 (5th Cir. 1990); Matter of Garcia, 17 I & N Dec. 319, 321 (B.I.A 1980).

APPENDIX D

## Undocumented Immigration and Rates of Crime and Imprisonment: Popular Myths and Empirical Realities

BY RUBÉN G. RUMBAUT

### Introduction

The perception that the foreign-born, especially "illegal aliens," are responsible for higher crime rates is deeply rooted in American public opinion and is sustained by media anecdote and popular myth. In the absence of rigorous empirical research, stereotypes about immigrants and crime often provide the underpinnings for public policies and practices, and shape public opinion and political behavior (Chávez 2001; Hagan and Palloni 1999; Lee 2003; Martínez and Valenzuela 2006). Such stereotypes, reinforced through popular movies and television programs and fueled by media coverage of singular events, project an enduring image of immigrant communities permeated by criminal elements.

The extent to which such views shape American public opinion was shown by the results of the National Opinion Research Center's 2000 General Social Survey, which interviewed a nationally representative sample of adults to measure attitudes toward and perceptions of immigration in a "multi-ethnic United States." Asked whether "more immigrants cause higher crime rates," 25 percent said "very likely" and another 48 percent "somewhat likely." Thus about three-fourths (73 percent) of Americans believed that immigration is causally related to more crime. That was a much higher proportion than the 60 percent who believed that "more immigrants were [somewhat or very] likely to cause Americans to lose jobs," or the 56 percent who thought that "more immigrants were [somewhat or very] likely to make it harder to keep the country united" (Alba, Rumbaut and Marotz 2005; Rumbaut and Alba 2003). A year later, the attacks of September 11, 2001, and the political and media reaction in the wake of a "war on terror," further exacerbated public fears of the foreign-born and conflated "illegal immigration" not only with crime but with potential terrorism.

But these perceptions are not supported empirically; instead, as demonstrated below, they are refuted by the preponderance of scientific evidence. Both contemporary and historical studies, including official crime statistics and victimization surveys since the early 1990s, data from the last three decennial censuses, national and regional surveys in areas of immigrant concentration, and investigations carried out by major government commissions over the past century, have shown instead that immigration is associated with *lower* crime rates and *lower* incarceration rates.

In what follows we examine the relationship of contemporary immigration, including undocumented migration, to crime and imprisonment. First, at the national level, we analyze changes in the rates of violent crimes and property crimes during the years of the surge in immigration. Next we look at the incarceration rates of young men eighteen to thirty-nine, comparing the foreign-born versus the U.S.-born by national origin and by education, and, among the foreign-born, by length of residence in the United States. The analysis compares the rates of incarceration of foreign-born young men from nationalities the majority of whom are undocumented

---

Rubén G. Rumbaut is Professor of Sociology at the University of California-Irvine.

APPENDIX D

## Undocumented Immigration and Rates of Crime and Imprisonment: Popular Myths and Empirical Realities

immigrants with less than a high school education (Mexicans, Salvadorans and Guatemalans) versus the rates for other immigrant nationalities as well as for native ethnic majority and minority groups. Finally, we summarize the available empirical evidence from a wide range of other studies, compare it to prevailing public perceptions, and note their implications for criminological theory, research, and public policy.

### The Conflation of "Undocumented Immigrant" and "Crime"

Periods of increased immigration have historically been accompanied by nativist alarms, perceptions of threat, and pervasive stereotypes of newcomers, particularly during economic downturns or national crises (such as the 2000-2002 recession and the "war on terror" of the post-September 11 era, which spiked public anxiety), and when immigrants have arrived *en masse* and differed substantially from the native-born in religion, language, physical appearance, and world region of origin (Fry 2006; Johnson 2005; Kanstroom 2007).  The present period is no exception—with the twist that "illegal immigrants" are now singled out with added animus and framed as harbingers of crime.

Thus, California's Proposition 187, which was passed with 59 percent of the statewide vote in 1994 (but challenged as unconstitutional and subsequently overturned by a federal court), asserted in its opening lines that "the people of California...have suffered and are suffering economic hardship [and] personal injury and damage caused by the criminal conduct of illegal aliens in this state." Similarly, the "Illegal Immigration Relief Act Ordinance" passed in 2006 by the city council of Hazleton, Pennsylvania—the first of hundreds of such ordinances passed by local councils throughout the U.S. since 2006—declared in part that "illegal immigration leads to higher crime rates" and sought accordingly to secure for the city's legal residents and citizens "the right to live in peace free of the threat of crime" and to protect them from "crime committed by illegal aliens."  (The Hazleton ordinance too was overturned in 2007 as unconstitutional.)

Such attitudes find support at the highest levels of political leadership. For example, in his May 15, 2006, address to the nation on immigration reform, President George W. Bush asserted that "illegal immigration puts pressure on public schools and hospitals, it strains state and local budgets, and brings crime to our communities." Two days later, CNN anchor Lou Dobbs, taking President Bush to task for what he termed "woefully inadequate" proposals, framed the issue as follows in his televised commentary: "Not only are millions of illegal aliens entering the United States each year across that border, but so are illegal drugs. More cocaine, heroin, methamphetamine, and marijuana flood across the Mexican border than from any other place, more than three decades into the war on drugs...If it is necessary to send 20,000 to 30,000 National Guard troops to the border with Mexico to preserve our national sovereignty and protect the American people from rampant drug trafficking, illegal immigration and the threat of terrorists, then I cannot imagine why this president and this Congress would hesitate to do so." About the only point of agreement between the president and Dobbs seemed to be the equation of "illegal immigration" and "crime."

The belief that immigration leads to increased crime is not solely an American phenomenon; we see similar trends at the international level.  Kitty Calavita's (2005) recent study in southern

APPENDIX D

## Undocumented Immigration and Rates of Crime and Imprisonment: Popular Myths and Empirical Realities

Europe, for example, reports that in Spain in 2002 a national poll found that 60 percent believed that immigrants were causing increases in the crime rate, while a survey conducted in Italy found that 57 percent of Italians agreed that "the presence of immigrants increases crime and delinquency." These notions in turn were fanned by media accounts. A content analysis of newspapers in southern Italy found that 78 percent of the articles regarding immigration were crime related, while another study found that 57 percent of television reports on immigrants dealt with crime.

### The Coincidence of Mass Immigration and Mass Imprisonment

A new era of mass migration, accelerating since the 1970s, has transformed the ethnic and racial composition of the U.S. population and the communities where they settle.  This time the flows have come largely from Latin America, the Caribbean, and Asia, not from Europe. Over the past fifteen years, the number of immigrants—in varying legal statuses[1]—coming to the United States has been the largest in history in absolute terms. In 2006 the foreign-born population surpassed 38 million, nearly 13 percent of the U.S. population.

In 1970, the U.S. census had found that the foreign-born population accounted for only 4.7 percent of the total population—the lowest proportion since 1850, when it first recorded the country of birth of U.S. residents.  But by 1980, the foreign-born population had grown to 14.1 million, or 6.2 percent of the national total; by 1990 it had grown to 19.8 million (7.9 percent); by 2000, to 31.1 million (11.1 percent); and it has been growing by more than one million per year since. More immigrants came in the 1980s than in any previous decade but one (1901-10, the peak years of mass migration from Europe when the foreign-born population reached 14.7 percent of the U.S. total); and more immigrants came in the 1990s than in any other decade—a total that may be surpassed in the present decade, adding to the largest immigrant population in history (both legal and illegal).  By 2008, over 70 million persons in the United States were of foreign birth or parentage (first or second generations)—about 23 percent of all Americans, including 76 percent of all "Hispanics" and 90 percent of all "Asians" (Rumbaut, 2008). Immigrants are heavily concentrated in metropolitan areas, are predominantly nonwhite, speak languages other than English, reflect a wide range of religious and cultural backgrounds, and arrive with a mix of legal statuses (Alba and Nee 2003; Portes and Rumbaut 2006).

More significant still is the diversity of their social class origins. By far the most educated *and* the least educated groups in the U.S. today are immigrants, a reflection of polar-opposite types of migrations embedded in different historical contexts—and inserted in a labor market increasingly polarized into high-tech/high-wage and manual/low-wage sectors, which attracts both immigrant professionals and undocumented laborers. They come through regular immigration channels, or without legal authorization, or as state-sponsored refugees—legal statuses which interact with their human capital to shape distinct modes of incorporation.  One mode is exemplified by groups composed of a majority of legal permanent residents with college degrees or more advanced credentials (such as the Indians, Chinese, Koreans, and Filipinos); another is typified by groups composed of a majority of unauthorized laborers with less than a high school education (principally Mexicans, Salvadorans, and Guatemalans, who have the lowest levels of education in the U.S.); yet a third

A491

## APPENDIX D

### Undocumented Immigration and Rates of Crime and Imprisonment: Popular Myths and Empirical Realities

involves groups admitted as refugees (such as the Vietnamese, Laotians, and Cambodians, and the Cubans, who benefit from a 1966 law that applies uniquely to them) (Rumbaut 2008).

Unlike the Europeans who entered a rapidly industrializing society in the last era of mass migration a century ago, the incorporation of contemporary immigrants has coincided with a period of economic restructuring and rising inequality in income, wealth, and social well-being, during which the returns to education have sharply increased (Massey 2007). As the post-World War II era of sustained economic growth, low unemployment, and rising real wages ended for most workers by the early 1970s, men with only a high school degree or less were hardest hit. In this changing context, social timetables that were widely observed a half century ago by young people for accomplishing adult transitions have become less predictable and more prolonged, diverse, and disordered (Settersten, Furstenberg, and Rumbaut 2005).

This new era of mass immigration has also coincided with an era of mass imprisonment in the U.S., which has further transformed paths to adulthood among young men with low levels of education (Pettit and Western 2004). The number of adults incarcerated in federal or state prisons or local jails in the U.S. skyrocketed during this period, quadrupling from just over 500,000 in 1980 to over 2.2 million in 2006. Those figures do not include the much larger number of those on probation (convicted offenders not incarcerated) or parole (under community supervision after a period of incarceration); when they are added to the incarceration totals, over seven million adults were under correctional supervision in the U.S. in 2006 (U.S. Bureau of Justice Statistics 2007).

Among some racial minorities in the U.S., becoming a prisoner has become a modal life event in early adulthood: astoundingly, as Pettit and Western (2004) have noted, a black male high school dropout born in the late 1960s had a nearly 60 percent chance of serving time in prison by the end of the 1990s, and recent birth cohorts of black men are more likely to have prison records than military records or bachelor's degrees. In a cycle of cumulative disadvantage, young men with low levels of education are significantly more likely to become a prisoner than same-age peers with higher levels of education. Having a prison record, in turn, is linked not only to unemployment, lower wages, marital and family instability, and severe restrictions on social and voting rights (including lifetime disenfranchisement in many states) but also to stigmatized identities and pathways to criminal recidivism (Manza and Uggen 2006; Pager 2003; Sampson and Laub 1993; Western 2002; Western, Kling, and Weiman 2001; Visher and Travis 2003).

In the wake of both phenomena—the rise of immigration and the rise of incarceration, which have occurred rapidly and in tandem, extending deeply into the fabric of American life—the research literatures on both immigration and incarceration have burgeoned, but independently of each other. Surprisingly, with some exceptions (e.g., Butcher and Piehl 1997; Hagan, Levi, and Dinovitzer 2008; Hagan and Palloni 1999; Lee 2003; Lee, Martínez, and Rosenfeld 2001; Martínez 2002; Martínez, Lee, and Nielsen 2004; Rumbaut, 1997, 2005), there has been scant scholarly effort made to connect the respective literatures. Immigration scholars, focused on the incorporation of the latest waves of newcomers, have all but ignored the areas of crime and imprisonment—although those would be indispensable to tests of theories of segmented assimilation and modes of incorporation. And criminologists in turn have paid no attention to the

APPENDIX D

## Undocumented Immigration and Rates of Crime and Imprisonment: Popular Myths and Empirical Realities

surge in immigration (for instance, Zimring 2007). Contemporary criminology has focused largely on the stratifications of race (still largely framed in black and white terms) and place, class, age and gender, leaving out ethnicity, nativity, and generation (in part because official criminal justice statistics are not collected by national origin, immigration or generational status).

### Undocumented Immigration 1993-2006

Today an estimated twelve million immigrants are unauthorized, or 30 percent of the foreign-born population of the U.S.; those figures are unprecedented. The number of undocumented immigrants has quadrupled since 1994. The U.S. Department of Homeland Security estimated their numbers at 11.6 million as of January 2006 (Hoefer *et al.*, 2007). According to the Pew Hispanic Center, two-thirds (66 percent) of the unauthorized population had been in the country for ten years or less, and the largest share, 40 percent or 4.4 million people, had been in the country five years or less. There were 1.8 million children who were unauthorized, or 16 percent of the total. In addition, 3.1 million children who are U.S. citizens by birth were living in households in which the head of the family or a spouse was unauthorized. About 56 percent of the unauthorized population was from Mexico, and another 8 percent from El Salvador and Guatemala, so that two-thirds of the total came from those three countries alone. Another 14 percent came from other Latin American countries, and 22 percent from Asia, Europe, Canada, Africa, and elsewhere (Passel 2006).

Since 1993, the militarization of the U.S.-Mexico border in four key sectors from San Diego to El Paso and the lower Rio Grande Valley, including a tripling of the number of Border Patrol agents and a quadrupling of the Border Patrol budget, has not deterred the flow of unauthorized migrants. Instead it has led to a booming industry of professional smugglers (*coyotes*) and redirected the flow of undocumented immigrants through more isolated and dangerous desert terrain, resulting in hundreds of deaths each year. Undocumented immigrants are now heading to new destinations across all fifty states, rather than just traditional destinations in California and Texas. Another unintended consequence of heightened border enforcement is that the largely temporary population of "sojourner" workers that predominated in the past has been transformed into a population of permanent "settlers" who bring their families and stay, since the risks and costs of dangerous border crossings have sharply increased. For instance, in recent years *coyotes* have charged Mexican migrants about $3,000 per person to cross the border (Cornelius 2006; Massey, Durand and Malone 2002).

Still, the undocumented immigrant population is disproportionately made up of poor young males who have recently arrived from Mexico, El Salvador, and Guatemala, and a few other Latin American countries to work in low-wage jobs requiring little formal education. These migrants are responding to the growing demand for their labor generated by the U.S. economy, which faces a demographic challenge to future labor-force growth as the fertility rate of natives declines and a growing number of native-born workers retire (IPC 2005). As the Congressional Budget Office put it in a recent report (2005: 25): "The baby-boom generation's exit from the labor force could well foreshadow a major shift in the role of foreign-born workers in the labor force. Unless native fertility rates increase, it is likely that most of the growth in the U.S. labor force will

APPENDIX D

## Undocumented Immigration and Rates of Crime and Imprisonment:
## Popular Myths and Empirical Realities

come from immigration by the middle of the century."

Conventional wisdom presumes a connection between the characteristics of workers who fill less-skilled jobs (i.e., young, male, poor, high-school dropout, ethnic minority)—which describe a much greater proportion of the foreign-born than of the native-born—and the likelihood of involvement with crime, all the more when those young male workers are unauthorized migrants. Federal Bureau of Investigation (FBI) statistics also show that late teens and young adult males exhibit the highest rates of violent and property crimes. But if immigration (legal or illegal) were associated with increasing crime rates, the official crime statistics would clearly reveal it. The opposite, however, is the case.

### Crime Rates 1993-2006

Since the early 1990s, over the same time period as legal and especially illegal immigration was reaching and surpassing historic highs, crime rates have *declined*, both nationally and most notably in cities and regions of high immigrant concentration (including cities with large numbers of undocumented immigrants, such as Los Angeles and border cities like San Diego and El Paso, as well as New York, Chicago, and Miami). This is especially evident from national-level data on crimes and arrests reported by city, county and state law enforcement authorities to the FBI, as well as from the National Crime Victimization Survey (NCVS), an annual household survey ongoing since 1972 that interviews about 134,000 persons age twelve or older in 77,200 households about their victimizations from crime (whether or not they were reported to the police). Data from the latter provide a more precise estimate of crimes that often go unreported to the police (in 2005, for example, only 47 percent of all violent victimizations and 40 percent of all property crimes were reported to the police).

The Uniform Crime Reports released each year by the FBI demonstrate the decline of both reported violent crime and property crime at the same time that the foreign-born population has surged. *From 1994 to 2005, property crimes and violent crimes reached lows in the United States not seen in decades.* Over that period, the total number of reported *property* crimes declined significantly. Specifically, burglary rates stabilized after many years of decline, motor-vehicle theft rates were cut by more than half during the 1990s and leveled off after 2000, and theft rates reached the lowest level ever recorded in 2005. Even more significantly, in this same time period, the total number of reported *violent* crimes declined by 34 percent. In particular, homicide rates fell 38 percent to levels last seen in the late 1960s, robbery rates dropped 41 percent, and assault rates declined 32 percent; serious violent crimes committed by juveniles also decreased during this period. In fact, both overall property and violent crime rates reached their lowest levels in about thirty years, with rates for some reported crimes at all-time lows (U.S. Bureau of Justice Statistics 2007).

Data from the NCVS document even more impressive reductions in serious violent crime and property crime during the same period. Between 1993 (when the NCVS was redesigned) and 2005, the rate of every major violent and property crime measured—rape or sexual assault, robbery, aggravated assault, simple assault, burglary, theft, and motor vehicle theft—fell significantly. Overall, the violent crime rate decreased 58 percent, from fifty to twenty-one victimizations per 1,000 persons age twelve or older. Property crime declined 52 percent, from 319 to 154 per 1,000 house-

APPENDIX D

## Undocumented Immigration and Rates of Crime and Imprisonment: Popular Myths and Empirical Realities

holds.  Specifically, significant declines were measured in the rates of rape or sexual assault (down 69 percent), robbery (down 57 percent), aggravated assault (down 64 percent), and simple assault (down 54 percent).  The household burglary rate fell 49 percent; the motor vehicle theft rate fell 56 percent; and the theft rate fell 52 percent (Catalano 2006).

Yet during these same years there was an unprecedented rise in the foreign-born and Hispanic populations.  From 1994 to 2006, the foreign-born population grew from 22.6 to 38.6 million people in the United States (a 71 percent increase), and the Hispanic population increased from 26.6 to 43.2 million people (a 62 percent increase). "Hispanics" are often lumped together in both the media and official statistics without regard to generational differences, national or class origins, or immigration status, and are often categorically scapegoated for perceived increases in crime rates. While correlation is not causation, *it is telling that during a thirteen-year period when the immigrant population (and especially the undocumented population) was increasing sharply to historic highs, the overall rates of property and violent crimes in the United States decreased significantly, in some instances to historic lows.*

### Incarceration Rates 1980-2006

On the other hand, paralleling the rise in immigration, the U.S. incarceration rate has become the highest of any country in the world. There are more people behind bars in the United States than in either China or India, each of which has a population roughly four times larger than that of the United States (Walmsley 2005). The U.S., with less than 5 percent of the world's population, now has almost a fourth of the world's prisoners. The U.S. incarceration rate, which had been relatively stable at some 110 prisoners per 100,000 people from 1925 to 1975, began increasing sharply thereafter. Between 1980 and 2006, the rate grew from 139 prisoners for every 100,000 people to 751 per 100,000. Of the more than two million people behind bars, two-thirds are in federal or state prisons and one-third in local jails. The vast majority are young men between eighteen and thirty-nine.

Although official statistics are not kept by nativity or immigration status, they show that imprisonment rates vary widely by gender (93 percent of inmates in federal and state prisons are men, most between eighteen and thirty-nine); by racial/pan-ethnic groups (there were 4,834 black male prisoners per 100,000 black males in the U.S., compared to 1,778 Hispanic males per 100,000, and 681 white males per 100,000, although since 1985 Hispanics have been the fastest group being imprisoned); and by level of education (those incarcerated are overwhelmingly high school dropouts) (U.S. Bureau of Justice Statistics 2007). According to the National Center on Addiction and Substance Abuse at Columbia University (1998), about 80 percent of those in prison either violated drug or alcohol laws, were high at the time they committed their crimes, stole property to buy drugs, had a history of drug and alcohol abuse and addiction, or some combination of those characteristics—reflecting the impact of mandatory-sentencing and "three strikes" laws during this period.

### Incarceration Rates of Foreign-born vs. Native-born Men

Inasmuch as the incarcerated population is overwhelmingly composed of less educated young adult males from ethnic minority groups—a profile which, as noted, fits a much greater proportion of the

APPENDIX D

## Undocumented Immigration and Rates of Crime and Imprisonment: Popular Myths and Empirical Realities

undocumented immigrant population—it follows that immigrants would be expected to have higher incarceration rates than natives. And immigrant Mexican men—who comprise fully a third of all immigrant men in the U.S. between eighteen and thirty-nine—would be expected to have the highest rates. The hypothesis is examined empirically in Tables 1 and 2. The results shown there turn those expectations on their head. Data from the 2000 census are used to measure the institutionalization rates of immigrants and natives, focusing on males age eighteen to thirty-nine, among whom the vast majority of the institutionalized are in correctional facilities (Butcher and Piehl 1997).

As Table 1 shows, 3 percent of the 45.2 million males age eighteen to thirty-nine were in federal or state prisons or local jails at the time of the 2000 census (a total of over 1.3 million, coinciding with official prison statistics). However, *the incarceration rate of the U.S.-born (3.51 percent) was five times the rate of the foreign-born (0.68 percent)*. The latter was less than half the 1.71 percent rate for non-Hispanic white natives, and seventeen times less than the 11.6 percent incarceration rate for native black men. The advantage for immigrants *vis-à-vis* natives applies to every ethnic group without exception. Almost all of the Asian immigrant groups have lower incarceration rates than the Latin American groups (the exception involves foreign-born Laotians and Cambodians—two refugee groups with the highest levels of poverty in the country—whose incarceration rate of 0.92 percent is still well below that for non-Hispanic white natives). Tellingly, among the foreign-born the highest incarceration rate by far (4.5 percent) was observed among island-born Puerto Ricans—who are not immigrants as such since they have statutory U.S. citizenship and can travel freely to the mainland as natives.

**Incarceration Rates by Education and Nativity**

Of particular interest is the finding that *the lowest incarceration rates among Latin American immigrants are seen for the least educated groups, who are also the groups who account for the majority of the undocumented*: the Salvadorans and Guatemalans (0.52 percent), and the Mexicans (0.70 percent). However, those rates increase significantly for their U.S.-born co-ethnics. That is most notable for the Mexicans, whose incarceration rate increases to 5.9 percent among the U.S.-born; for the Vietnamese, whose incarceration rate increases from 0.5 among the foreign-born to 5.6 percent among the U.S.-born; and for the Laotians and Cambodians, whose rate moves up to 7.3 percent, the highest of any group except for native blacks. (Almost all of the U.S.-born among those of Latin American and Asian origin can be assumed to consist of second-generation persons—with the exceptions of Mexicans and Puerto Ricans, who may include among the U.S.-born a sizable but unknown number of third-generation persons.) Thus, *while incarceration rates are found to be extraordinarily low among the immigrants, they are also seen to rise rapidly by the second generation*: except for the Chinese, Indians, Koreans, and Filipinos (who as noted earlier are the children of mainly professional immigrants), the rates of all other U.S.-born Latin American and Asian groups exceed that of the referent group of non-Hispanic white natives.

For all ethnic groups, as expected, the risk of imprisonment is highest for men who are high school dropouts (6.9 percent) compared to those who are high school graduates (2.0 percent). However, as Table 2 elaborates, *the differentials in the risk of incarceration by education are observed principally among native-born men, and not immigrants*. Among the U.S.-born, 9.8 percent of all male dropouts age eighteen to thirty-nine were in jail or prison in 2000, compared to

APPENDIX D

## Undocumented Immigration and Rates of Crime and Imprisonment: Popular Myths and Empirical Realities

TABLE 1. PERCENTAGE OF MALES 18 TO 39 INCARCERATED IN THE UNITED STATES, 2000, BY NATIVITY AND LEVEL OF EDUCATION, IN RANK ORDER BY ETHNICITY

| Ethnicity | Males, ages 18-39: | | Percent incarcerated, by nativity and by education: | | | |
|---|---|---|---|---|---|---|
| | Total in U.S. | Percent incarcerated | Nativity: | | High school graduate? | |
| | | | Foreign-born | U.S.-born | No | Yes |
| | N | % | % | % | % | % |
| Total: | 45,200,417 | 3.04 | 0.68[b] | 3.51 | 6.91 | 2.00 |
| **Latin American Ethnicities:** | **7,514,857** | **3.26** | **0.99** | **6.72** | **3.95** | **2.62** |
| Salvadoran, Guatemalan | 433,828 | 0.68 | 0.52 | 3.01 | 0.71 | 0.62 |
| Colombian, Ecuadorian, Peruvian | 283,599 | 1.07 | 0.80 | 2.37 | 2.12 | 0.74 |
| Mexican | 5,017,431 | 2.71 | 0.70 | 5.90 | 2.84 | 2.55 |
| Dominican | 182,303 | 2.76 | 2.51 | 3.71 | 4.62 | 1.39 |
| Cuban | 213,302 | 3.01 | 2.22 | 4.20 | 5.22 | 2.29 |
| Puerto Rican[a] | 642,106 | 5.06 | 4.55 | 5.37 | 10.48 | 2.41 |
| **Asian Ethnicities:** | **1,902,809** | **0.62** | **0.29** | **1.86** | **2.43** | **0.35** |
| Indian | 393,621 | 0.22 | 0.11 | 0.99 | 1.20 | 0.14 |
| Chinese, Taiwanese | 439,086 | 0.28 | 0.18 | 0.65 | 1.35 | 0.14 |
| Korean | 184,238 | 0.38 | 0.26 | 0.93 | 0.93 | 0.34 |
| Filipino | 297,011 | 0.64 | 0.38 | 1.22 | 2.71 | 0.41 |
| Vietnamese | 229,735 | 0.89 | 0.46 | 5.60 | 1.88 | 0.55 |
| Laotian, Cambodian | 89,864 | 1.65 | 0.92 | 7.26 | 2.80 | 1.04 |
| **Other:** | | | | | | |
| White, non-Hispanic | 29,014,261 | 1.66 | 0.57 | 1.71 | 4.64 | 1.20 |
| Black, non-Hispanic | 5,453,546 | 10.87 | 2.47 | 11.61 | 21.33 | 7.09 |

SOURCE: 2000 U.S. Census, 5% PUMS. Data are estimates for adult males, ages 18 to 39, institutionalized at the time of the census.

[a] Island-born Puerto Ricans, who are U.S. citizens by birth and not immigrants, are classified as "foreign born" for purposes of this table; mainland-born Puerto Ricans are here classified under "U.S.-born."

[b] The foreign-born incarceration rate is 0.68 percent when island-born Puerto Ricans (U.S. citizens) are excluded, 0.86 percent when included.

## APPENDIX D
## Undocumented Immigration and Rates of Crime and Imprisonment: Popular Myths and Empirical Realities

**TABLE 2. PERCENTAGE OF U.S.-BORN AND FOREIGN-BORN MALES 18-39 INCARCERATED IN THE UNITED STATES, 2000, BY COMPLETION OF A HIGH SCHOOL EDUCATION, IN RANK ORDER BY ETHNICITY**

| Ethnicity | Males, ages 18-39: | | Percent incarcerated, by education by nativity: | | | |
| | Total in U.S. | Percent incarcerated | If foreign-born: High School Graduate? | | If U.S.-born: High School Graduate? | |
| | N | % | No | Yes | No | Yes |
|---|---|---|---|---|---|---|
| Total: | 45,200,417 | 3.04 | 1.31 | 0.57 | 9.76 | 2.23 |
| **Latin American Ethnicities:** | **7,514,857** | **3.26** | **1.11** | **0.81** | **12.42** | **4.22** |
| Salvadoran, Guatemalan | 433,828 | 0.68 | 0.58 | 0.43 | 4.70 | 2.16 |
| Colombian, Ecuadorian, Peruvian | 283,599 | 1.07 | 1.54 | 0.54 | 7.01 | 1.58 |
| Mexican | 5,017,431 | 2.71 | 0.70 | 0.70 | 10.12 | 3.95 |
| Dominican | 182,303 | 2.76 | 3.99 | 1.24 | 8.67 | 1.82 |
| Cuban | 213,302 | 3.01 | 3.18 | 1.78 | 11.32 | 2.90 |
| Puerto Rican[a] | 642,106 | 5.06 | 9.01 | 1.96 | 11.54 | 2.66 |
| **Asian Ethnicities:** | **1,902,809** | **0.62** | **1.03** | **0.18** | **9.66** | **1.00** |
| Indian | 393,621 | 0.22 | 0.29 | 0.09 | 6.69 | 0.48 |
| Chinese, Taiwanese | 439,086 | 0.28 | 0.91 | 0.07 | 4.71 | 0.36 |
| Korean | 184,238 | 0.38 | 0.58 | 0.24 | 2.05 | 0.82 |
| Filipino | 297,011 | 0.64 | 1.73 | 0.23 | 4.73 | 0.81 |
| Vietnamese | 229,735 | 0.89 | 0.85 | 0.32 | 16.18 | 2.85 |
| Laotian, Cambodian | 89,864 | 1.65 | 1.72 | 0.52 | 9.11 | 5.80 |
| **Other:** | | | | | | |
| White, non-Hispanic | 29,014,261 | 1.66 | 1.63 | 0.43 | 4.76 | 1.23 |
| Black, non-Hispanic | 5,453,546 | 10.87 | 7.08 | 1.32 | 22.25 | 7.64 |

SOURCE: 2000 U.S. Census, 5% PUMS.  Data are estimates for adult males, ages 18 to 39, institutionalized at the time of the census.
[a] Island-born Puerto Ricans are U.S. citizens by birth and not immigrants, but are classified as "foreign born" for purposes of this table;  mainland-born Puerto Ricans are classified under "U.S.-born."

APPENDIX D

## Undocumented Immigration and Rates of Crime and Imprisonment: Popular Myths and Empirical Realities

2.2 percent among those who had graduated from high school. But among the foreign-born, the incarceration gap by education was much narrower: only 1.3 percent of immigrant men who were high school dropouts were incarcerated, compared to 0.6 percent of those with at least a high school diploma. The advantage for immigrants held when broken down by education for every ethnic group. Indeed, *nativity emerges in these data as a stronger predictor of incarceration than education*: as noted, native-born high school graduates have a higher rate of incarceration than foreign-born non-high school graduates (2.2 to 1.3 percent).

Among U.S.-born men who had not finished high school, the highest incarceration rate by far was seen among non-Hispanic blacks, an astonishing 22.2 percent of whom were imprisoned at the time of the census; that rate was triple the 7.6 percent among foreign-born black dropouts. Other high rates among U.S.-born high school dropouts were observed among Vietnamese (over 16 percent), followed by Colombians (over 12 percent), Cubans and Puerto Ricans (over 11 percent), Mexicans (10 percent), and Laotians and Cambodians (over 9 percent). Almost all of these can be assumed to consist of second-generation persons—with the exceptions of Mexicans and Puerto Ricans, who may include among the U.S.-born a sizable but unknown number of third-generation persons.

### Incarceration Rates over Time in the United States

The finding that incarceration rates are much lower among immigrant men than the national norm, despite their lower levels of education and minority status, but increase significantly among their co-ethnics by the second generation, especially among those with lower levels of education, suggests that the process of "Americanization" can lead to downward assimilation and greater risks of involvement with the criminal justice system among a significant segment of this population. To explore this question further, we examined what happens to immigrant men over time in the United States. The results are presented in Table 3.

For every group without exception, *the longer immigrants had resided in the U.S., the higher were their incarceration rates*. Here again, the rates of incarceration for island-born Puerto Ricans are significantly higher—regardless of how long they have lived in the U.S. mainland—than the rates for all the immigrant groups listed in Table 3, underscoring the unique status of the former. In contrast, foreign-born Mexican men age eighteen to thirty-nine, by far the largest group (at over three million), have a *lower* incarceration rate than many other ethnic and racial groups—even after they have lived in the U.S. for over fifteen years. The Mexican incarceration story in particular can be very misleading when the data conflate the foreign-born and the native-born (as official statistics on "Latinos" or "Hispanics" routinely do). Rather than a story of upward mobility often mentioned in the "straight-line" assimilation literature, the data in Tables 1-3 suggest instead a story of segmented assimilation to the criminal norms of the native-born.

### Incarceration Rates in California

We also examined the same census data for California, the state with by far the greatest number of immigrants, legal and illegal (over a quarter of the national total), and the state with the greatest number of persons in prisons and jails (in fact, California has one of the highest inmate populations in the world, behind China and a handful of other countries). California also has

APPENDIX D

## Undocumented Immigration and Rates of Crime and Imprisonment: Popular Myths and Empirical Realities

**TABLE 3. PERCENTAGE OF FOREIGN-BORN MALES 18–39 INCARCERATED IN THE UNITED STATES, 2000, BY LENGTH OF U.S. RESIDENCE, IN RANK ORDER BY ETHNICITY**

| Ethnicity | Total foreign-born males 18-39: | | Years in the United States: | | |
|---|---|---|---|---|---|
| | N | % incarcerated | 0-5 yrs | 6-15 yrs | 16 yrs+ |
| Total (foreign-born men 18-39): | 8,079,819 | 0.68[b] | 0.50 | 0.77 | 1.39 |
| **Latin American Ethnicities:** | **4,535,269** | **0.99** | **0.57** | **0.89** | **1.70** |
| Salvadoran, Guatemalan | 407,147 | 0.52 | 0.37 | 0.46 | 0.88 |
| Mexican | 3,082,660 | 0.70 | 0.46 | 0.66 | 1.12 |
| Colombian, Peruvian, Ecuadorian | 234,834 | 0.80 | 0.55 | 1.30 | 1.98 |
| Cuban | 127,399 | 2.22 | 1.28 | 1.99 | 3.07 |
| Dominican | 144,387 | 2.51 | 1.48 | 2.49 | 3.40 |
| Puerto Rican[a] | 240,713 | 4.55 | 2.57 | 4.01 | 6.06 |
| **Asian Ethnicities:** | **1,510,298** | **0.29** | **0.14** | **0.25** | **0.50** |
| Indian | 343,834 | 0.11 | 0.05 | 0.11 | 0.27 |
| Chinese | 347,029 | 0.18 | 0.07 | 0.22 | 0.27 |
| Korean | 152,785 | 0.26 | 0.10 | 0.15 | 0.50 |
| Filipino | 205,167 | 0.38 | 0.31 | 0.35 | 0.45 |
| Vietnamese | 210,331 | 0.46 | 0.46 | 0.41 | 0.51 |
| Laotian, Cambodian | 79,489 | 0.92 | † | 0.33 | 1.19 |
| **Other:** | | | | | |
| White, non-Hispanic | 1,266,100 | 0.57 | 0.36 | 0.41 | 0.88 |
| Black, non-Hispanic | 441,263 | 2.47 | 1.64 | 2.10 | 3.80 |

SOURCE: 2000 U.S. Census, 5% PUMS. Data are estimates for all foreign-born males, ages 18 to 39, institutionalized at the time of the census, regardless of age at arrival in the United States.
[a] Island-born Puerto Ricans (who are U.S. citizens by birth) are classified as "foreign born" for purposes of this table.
[b] The foreign-born incarceration rate is 0.68 percent when island-born Puerto Ricans (U.S. citizens) are excluded.
† There are too few cases for an accurate estimate.

APPENDIX D

## Undocumented Immigration and Rates of Crime and Imprisonment: Popular Myths and Empirical Realities

one of the toughest mandatory-sentencing "three strikes" laws in the country (Domanick 2004). The results of the state-level analysis further reinforce those reviewed above.

Overall, native-born men age eighteen to thirty-nine in California have *higher* incarceration rates than the rest of the U.S., while the foreign-born have *lower* rates in California compared to the rest of the U.S. The total incarceration rate for the U.S.-born is more than 1 percentage point higher in California than in the rest of the U.S. (4.5 to 3.4). In contrast, the rate for the foreign-born in California was less than half the foreign-born rate in the rest of the country (0.4 to 1.0).

### Survey Findings from Southern California

Those incarceration estimates were drawn from U.S. census data.  We can get more direct evidence of actual lifetime experiences with the criminal justice system from comprehensive regional surveys of immigrant-origin populations. Consider, for instance, two major surveys of adult children of immigrants recently carried out in Southern California, the region with the greatest number of immigrants (and of undocumented immigrants): the Immigration and Inter-generational Mobility in Metropolitan Los Angeles (IIMMLA) survey, carried out in 2004 (Rum-baut *et al*., 2003); and the third wave of the Children of Immigrants Longitudinal Study (CILS) in San Diego, a decade-long panel study whose last phase of data collection ended in 2003 (Portes and Rumbaut 2005).

By the year 2000 one of every five immigrants in the United States resided in the region's six contiguous counties (San Diego, Orange, Los Angeles, Ventura, Riverside, and San Bernardino), including the largest communities of Mexicans, Salvadorans, Guatemalans, Filipinos, Taiwanese, Koreans, Vietnamese, Cambodians, and Iranians outside of their countries of origin, and to siz-able contingents of many others (Rumbaut 2004). For this analysis the two data sets were merged (n=6,135), since they are based on representative samples evenly divided by gender, of the same approximate age (the mean age was 27.5) and national origins (Mexicans, Salvadorans, Guatemalans, Filipinos, Chinese, Koreans, Vietnamese, Cambodians and Laotians make up 76 percent of the merged sample, and other Latin American and Asian nationalities 10 percent), and surveyed at about the same time in the same metropolitan region (the six contiguous Southern California coun-ties). Our surveys collected data on criminal justice involvement of *foreign-parentage* (1.5- and sec-ond-generation) young adults, compared to *native-parentage* (third-generation and beyond) white, black and Mexican-American peers.  (For details of the sampling and research design of each study, see Rumbaut 2008.)

We focus here on the arrest and incarceration histories of the males in the sample (n=2,971). Table 4 looks at whether they had ever been arrested or incarcerated (which in most cases involved being convicted and sentenced for the commission of a crime), broken down by ethnicity and generation.  There are striking differences between ethnic groups and generations. Inter-generational differences are strongly significant overall, with the U.S.-born (second and third-plus generations) much more likely to become ensnared with the criminal justice system than the foreign-born (the 1.5 generation, who came to the U.S. as children), reflecting the national pat-terns noted earlier among young adult men age eighteen to thirty-nine.  The patterns are linear,

## APPENDIX D
## Undocumented Immigration and Rates of Crime and Imprisonment:
## Popular Myths and Empirical Realities

**TABLE 4. ARREST AND INCARCERATION AMONG YOUNG MEN IN SOUTHERN CALIFORNIA, BY ETHNICITY AND GENERATION**
(MERGED IIMMLA AND CILS-III SURVEYS: N=2,971 MALES, AGES 20-39; MEAN AGE=27.5)

| Ethnicity | Generation[a] | Ever arrested | | | Ever incarcerated | | |
|---|---|---|---|---|---|---|---|
| | | 1.5 | 2nd | 3rd+ | 1.5 | 2nd | 3rd+ |
| | N | % | % | % | % | % | % |
| Total sample (males 20-39): | 2,971 | 13.2 | 20.7 | 36.3 | 7.8 | 12.1 | 23.8 |
| **Latin American Ethnicities:** | | | | | | | |
| Mexican | 787 | 22.3 | 29.8 | 39.6 | 11.9 | 20.4 | 26.6 |
| Salvadoran, Guatemalan | 187 | 21.3 | 36.7 | | 11.2 | 17.3 | |
| Other Latin American | 107 | 17.4 | 21.3 | | 15.2 | 11.5 | |
| **Asian Ethnicities:** | | | | | | | |
| Chinese | 245 | 5.8 | 7.4 | | 2.9 | 1.9 | |
| Korean | 201 | 11.6 | 18.1 | | 3.9 | 2.8 | |
| Filipino | 475 | 13.3 | 9.6 | | 8.2 | 5.7 | |
| Vietnamese | 294 | 8.1 | 12.7 | | 5.8 | 9.9 | |
| Laotian, Cambodian | 88 | 8.4 | 20.0 | | 8.4 | 20.0 | |
| All other nationalities | 200 | 12.3 | 21.7 | | 7.0 | 11.9 | |
| **Other:** | | | | | | | |
| White, non-Hispanic | 201 | | | 29.4 | | | 18.1 |
| Black, non-Hispanic | 186 | | | 40.4 | | | 27.3 |

SOURCE: Adapted from Rumbaut, 2008.
[a] 1.5 generation = foreign-born, arrived in the U.S. before teen years;  2nd generation = U.S.-born, one or both parents foreign-born; 3rd or higher generations = U.S.-born, both parents U.S.-born.

but with the outcomes worsening over time and generation—and acculturation—in the United States: among the 1.5ers, 13 percent had ever been arrested and 8 percent incarcerated, compared to 21 percent and 12 percent respectively in the second generation, and 36 percent and 24 percent in the third-plus generations.  Indeed, the rates for all of the immigrants and U.S.-born children of immigrants in this sample are *lower* than the rates for native-stock majority-group *whites*.  The rates of arrest and incarceration were highest by far for blacks (almost all of whom were fourth-plus generation African Americans), and lowest for Asians, with whites and Hispanics

# Undocumented Immigration and Rates of Crime and Imprisonment: Popular Myths and Empirical Realities

in between.  Among native-parentage blacks, fully 40 percent had been arrested at some point by the police and 27 percent had been incarcerated; among both native-parentage whites and Hispanics, 29 percent had ever been arrested and 18 percent incarcerated; and among Asians, the respective figures were 10 percent and 6 percent.

For the large Mexican-origin subsample, the intergenerational patterns are clear: among the Mexican-born 1.5ers, 22 percent had ever been arrested and 12 percent incarcerated (significantly *lower* than the rates for native whites), compared to 30 percent and 20 percent respectively in the second generation (about the *same* as the rates for native whites), and almost 40 percent and 27 percent in the third-plus.  The latter figures are virtually identical to those for African American men—the highest observed in this sample, as well as nationally. Given the huge size of the Mexican-origin second generation compared to other groups in the U.S., this is a finding fraught with implications for the future—not only for the downward mobility prospects of men caught in a cycle of arrest and imprisonment (who tend to have high rates of recidivism after release), but also for both the short-term and long-term effects on their ethnic communities.

In a multivariate analysis of the odds of having been convicted and jailed for a crime (among the men in this merged sample), incarceration was found to be most strongly predicted by poor educational attainment in adolescence *and* by the generational status variables: i.e., compared to native-parentage non-Hispanic whites, the *least* likely to be incarcerated were the foreign-born 1.5-generation children of immigrants, followed by the U.S.-born second generation with two immigrant parents, and more weakly by those with only one immigrant parent. Having been raised in a two-parent family *reduced* the odds of incarceration, while having grown up in dangerous neighborhoods (with major problems of drugs, crime and gangs) *increased* the odds. Ethnicity washed out of the logistic regression once the other predictor variables were controlled—that is, none of the ethnic group variables was significantly linked to incarceration, despite the fact that non-Hispanic blacks and Mexicans had the highest rates of arrest and incarceration, suggesting that those other variables rather than ethnicity as such accounted for the association.

## Confirmatory Results from Other Empirical Studies

The evidence from the 2000 census demonstrating the lower rate of incarceration among immigrants is strongly supported by other studies conducted over the past century. For instance, a study by economists Kristin Butcher and Anne Morrison Piehl based on data from the 1980 and 1990 U.S. censuses yielded similar findings (1998). A more recent analysis by Butcher and Piehl (2005) demonstrates that lower rates are *not* the result of increased deportations of non-citizen criminals or the impact of harsher immigration laws in deterring immigrants from committing crimes. Rather, the authors conclude that during the 1990s, "those immigrants who chose to come to the United States were less likely to be involved in criminal activity than earlier immigrants and the native born." Taken together with the findings presented above, those studies provide consistent and compelling evidence over a period of three decades that incarceration rates are much lower among immigrant men than the national norm despite their lower levels of education and higher rates of poverty. In 2000, these patterns applied to every ethnic group without exception.

## APPENDIX D
## Undocumented Immigration and Rates of Crime and Imprisonment: Popular Myths and Empirical Realities

Other scholars have addressed similar questions concerning immigration and crime and concluded that increased immigration is a major factor associated with lower crime rates. In a study of 180 Chicago neighborhoods from 1995 to 2002, Robert J. Sampson and his colleagues found that Latin American immigrants were less likely than the U.S.-born to commit violent crimes even when they lived in dense communities with high rates of poverty. First-generation immigrants (foreign-born) were 45 percent less likely to commit violent crimes than were third-generation Americans (children of native-born parents), adjusting for family and neighborhood background. The second generation (those born in the United States to immigrant parents) was 22 percent less likely to commit violence than the third or higher generation (Sampson, Morenoff, and Raudenbush 2005; see also Press 2006).  These findings clearly echo those reported above.

Recent empirical studies by sociologists Ramiro Martínez and Matthew Lee of homicides in three high-immigration border cities (San Diego, El Paso, and Miami) and of drug violence in Miami and San Diego came to similar conclusions, further refuting commonly presumed linkages between immigration and criminality (Martínez, Lee, and Nielsen 2004; Lee, Martínez, and Rosenfeld 2001).  In addition, several other studies have examined homicide rates among the Cuban refugees who arrived in the United States as a result of the Mariel Boatlift of 1980. Although these *marielitos* frequently were depicted in the media as prolific criminal offenders, even murderers, they in fact were not overrepresented among either homicide victims or offenders. Moreover, after only a short time in the United States, they were much less likely to commit crimes than Cubans who arrived in Miami before the Mariel Boatlift. As with South Florida in general, Miami experienced a sharp spike in homicides *before* the Mariel Cubans arrived in the city. Homicide rates continued to decline throughout the 1980s despite a steady inflow of Latin American immigrants (see Martínez and Lee 2000).

Data from the National Longitudinal Study of Adolescent Health (Add Health) demonstrate the intra- and inter-generational differences in delinquency and other risk behaviors among adolescents. Add Health is a nationally representative longitudinal survey of adolescents conducted in several "waves" since 1994. Drawing upon this survey, sociologists Kathleen Mullan Harris (1999), and Hoan Bui and Ornuma Thingniramol (2005), have found that second-generation youth were significantly more prone than foreign-born youth to engage in risk behaviors such as delinquency, violence, and substance abuse—precisely the sorts of behaviors likely to lead to involvement with the criminal justice system and to cycles of arrests and incarceration. In their analyses, every foreign-born (first-generation) immigrant nationality engaged in significantly *fewer* risk behaviors than the comparison group of native-born non-Hispanic whites.

Similarly, John Hagan and his colleagues (2008) used scores from a delinquency and drug use scale of two cohorts near Toronto to examine delinquency and violent behavior among Canadian youth. They separated the first, 1.5, and second generations from third-generation Canadians. Controlling for gender, age, socioeconomic background, ethnic origin, and cohort, they found generational status to be the most significant predictor of youth delinquency.  That is, the foreign-born first and 1.5 generations were significantly *less* likely than the native-born to engage in high-risk activities. As generational status increased, the odds of engaging in delinquent behavior also increased.

## APPENDIX D

## Undocumented Immigration and Rates of Crime and Imprisonment: Popular Myths and Empirical Realities

Survey research has consistently shown a striking relationship between acculturation and risk behaviors, for both Hispanic and non-Hispanic ethnic groups.  For example, data from the Hispanic Health and Nutrition Examination Survey (HHANES), with a large regional sample, indicated that marijuana use is five to eight times higher among highly acculturated Mexican Americans compared to those (Mexican immigrants) who are not, controlling for demographic factors. Studies based on the HHANES and more recent survey data have also documented adverse effects of acculturation among Hispanic groups with respect to cocaine use and alcohol consumption (for a summary see Portes and Rumbaut 2006).

A recent study in Washington State (Akins *et al.*, 2008), with a rural and more dispersed Hispanic population, found that acculturated Hispanics were nearly thirteen times more likely to report current illegal drug use and more than four times as likely to report current hard drug use than non-acculturated Hispanics.  Acculturated Hispanics were about twice as likely to report alcohol binge drinking (consuming five or more drinks in one day) and more than three times as likely to report bender drinking (drinking for two or more days in a row without sobering up). Such findings on substance abuse support the growing body of research indicating the negative consequences of acculturation—and help in part to explain the significantly higher rates of arrest and incarceration among acculturated U.S.-born groups as compared to the foreign-born. Increased exposure to the U.S. brings, among other things, increased opportunities and risks for substance use and abuse—particularly among the U.S.-born.

In a sense, these findings should not come as news, for they are not new—merely forgotten and overruled by popular myth. In the first three decades of the twentieth century, during the previous era of mass immigration, three major government commissions came to similar conclusions. The Industrial Commission of 1901, the [Dillingham] Immigration Commission of 1911, and the [Wickersham] National Commission on Law Observance and Enforcement of 1931 each sought to measure how immigration resulted in increases in crime. Instead, each found lower levels of criminal involvement among the foreign-born and higher levels among their native-born counterparts (see Tonry 1996). As the report of the Immigration Commission concluded a century ago (1911: 168): "No satisfactory evidence has yet been produced to show that immigration has resulted in an increase in crime disproportionate to the increase in adult population. Such comparable statistics of crime and population as it has been possible to obtain indicate that immigrants are *less* prone to commit crime than are native Americans." More than eight decades later, not surprisingly, the U.S. Commission on Immigration Reform concluded in a 1994 report that immigration is not associated with higher crime. The Commission compared crime rates in U.S.-Mexico border cities such as El Paso with cities elsewhere in the United States and found that crime rates generally were lower in border cities.

### Conclusion and Implications

Because many immigrants to the United States, especially Mexicans and Central Americans, are young men who arrive with very low levels of formal education, popular stereotypes tend to associate them with higher rates of crime and incarceration. The fact that many of these immi-

APPENDIX D

## Undocumented Immigration and Rates of Crime and Imprisonment: Popular Myths and Empirical Realities

grants enter the country through unauthorized channels or overstay their visas often is framed as an assault against the "rule of law," thereby reinforcing the impression that immigration and criminality are linked. This association has flourished in a post-September 11 climate of fear and ignorance where terrorism and undocumented immigration often are mentioned in the same breath. Thus in May 2007, as reported by the Associated Press, former U.S. Senator Fred Thompson, a star of the television series "Law & Order" and later Republican presidential candidate, blamed the Immigration Reform and Control Act of 1986 for illegal immigration, adding: "Twelve million illegal immigrants later, we are now living in a nation that is beset by people who are suicidal maniacs and want to kill countless innocent men, women and children around the world....We're sitting here now with essentially open borders."

But political scapegoating and hyperbole are no substitute for scientific evidence. Since the early 1990s, as the immigrant population (especially the undocumented population) increased sharply to historic highs, the rates of violent crimes and property crimes in the United States decreased significantly, in some instances to historic lows—as measured both by crimes reported to the police and by national victimization surveys. Moreover, data from the census and a wide range of other empirical studies show that for every ethnic group without exception, incarceration rates among young men are lowest for immigrants, even those who are the least educated. This holds true especially for the Mexicans, Salvadorans, and Guatemalans, who make up the bulk of the undocumented population. These patterns have been observed consistently over the last three decennial censuses, a period that spans the current era of mass immigration, and recall similar national-level findings reported by three major government commissions during the first three decades of the twentieth century, as did another U.S. commission in the 1990s.

Given the cumulative weight of this evidence, the rise in immigration is arguably one of the reasons that crime rates have *decreased* in the United States over the past decade and a half—and even more so in cities of immigrant concentration. A further implication of this evidence is that if immigrants suddenly disappeared and the U.S. became immigrant-free (and illegal-immigrant free), crime rates would likely *increase*. The problem of crime and incarceration in the United States is not "caused" or even aggravated by immigrants, regardless of their legal status. But the uncritical and evidence-optional assumption that the opposite is true persists among policymakers, the media, and the general public, thereby impoverishing a genuine understanding of complex phenomena—a situation that undermines the development of evidence-based, reasoned public responses to both crime *and* immigration.

APPENDIX D

## Undocumented Immigration and Rates of Crime and Imprisonment: Popular Myths and Empirical Realities

## Endnotes

[1] As used here, "legal" immigrants consist of Legal Permanent Residents (LPRs)—about 40 percent of whom had been in the United States in other statuses (refugee, temporary, or unauthorized) before becoming LPRs—as well as former LPRs who subsequently became naturalized U.S. citizens. "Illegal" or undocumented immigrants are those who entered the country without proper authorization, or who entered the country lawfully with non-immigrant visas but subsequently over-stayed or violated the terms of their visas. Visa overstayers and violators may make up as much as 40 percent of the "illegal immigrant" population (see Passel, 2006: 16).

## References

Akins, Scott, Clayton Mosher, Chad L. Smith, and Jane Florence Gauthier. 2008. "The Effect of Acculturation on Patterns of Hispanic Substance Use in Washington State." *Journal of Drug Issues* 38, 1: 103-118.

Alba, Richard D., and Victor Nee. 2003. *Remaking the American Mainstream: Assimilation and Contemporary Immigration.* Cambridge, MA: Harvard University Press.

Alba, Richard D., Rubén G. Rumbaut, and Karen Marotz. 2005. "A Distorted Nation: Perceptions of Racial/Ethnic Group Sizes and Attitudes Toward Immigrants and Other Minorities." *Social Forces* 84: 901-919.

Bui, Hoan N., and Ornuma Thingniramol. 2005. "Immigration and Self-Reported Delinquency: The Interplay of Immigrant Generations, Gender, Race, and Ethnicity." *Journal of Crime and Justice* 28(2), 79-100.

Butcher, Kristin F., and Anne Morrison Piehl. 2005. *Why Are Immigrants' Incarceration Rates So Low? Evidence on Selective Immigration, Deterrence, and Deportation* (WP 2005-19). Chicago: Federal Reserve Bank of Chicago, November 2005.

_____. 1998. "Recent Immigrants: Unexpected Implications for Crime and Incarceration." *Industrial and Labor Relations Review* 51(4), July: 654-679.

_____. 1997. "Recent Immigrants: Unexpected Implications for Crime and Incarceration." *NBER Working Paper 6067.* Cambridge, MA: National Bureau of Economic Research.

Calavita, Kitty. 2005. *Immigrants at the Margins: Law, Race, and Exclusion in Southern Europe.* Cambridge: Cambridge University Press.

Catalano, Shannan M. 2006. "National Crime Victimization Survey: Criminal Victimization, 2005." *Bulletin*, September 2006. U.S. Bureau of Justice Statistics, NCJ 214644. At: http://www.ojp.usdoj.gov/bjs/pub/pdf/cv05.pdf

Chávez, Leo R. 2001. *Covering Immigration: Popular Images and the Politics of the Nation.* Berkeley: University of California Press.

Congressional Budget Office. 2005. *The Role of Immigrants in the U.S. Labor Market.* Washington, DC: U.S. Congress.

Cornelius, Wayne A. 2006. "Impacts of Border Enforcement on Unauthorized Mexican Migration to the United States." New York: Social Science Research Council. At: http://borderbattles.ssrc.org/Cornelius/

Domanick, Joe. 2004. *Cruel Justice: Three Strikes and the Politics of Crime in America's Golden State.* Berkeley: University of California Press.

Fry, Brian N. 2006. *Nativism and Immigration: Regulating the American Dream.* New York: LFB Scholarly Publishing.

Hagan, John, Ron Levi, and Ronit Dinovitzer. 2008. "The Symbolic Violence of the Crime-Immigration Nexus: Migrant Mythologies in the Americas." *Criminology & Public Policy* 7: 95-112.

Hagan, John, and Alberto Palloni. 1999. "Sociological Criminology and the Mythology of Hispanic Immigration and Crime." *Social Problems* 46: 617-32.

Harris, Kathleen Mullan. 1999. "The Health Status and Risk Behavior of Adolescents in Immigrant Families," in Donald J. Hernández, ed., *Children of Immigrants: Health, Adjustment, and Public Assistance.* Washington, DC: National Academy of Sciences Press, pp. 286-347.

A507

## APPENDIX D
## Undocumented Immigration and Rates of Crime and Imprisonment:
## Popular Myths and Empirical Realities

Hoefer, Michael, Nancy Rytina, and Christopher Campbell. 2007. "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2006." Office of Immigration Statistics, Policy Directorate, U.S. Department of Homeland Security. Accessed at: http://www.dhs.gov/xlibrary/assets/statistics/publications/ill_pe_2006.pdf

Immigration [Dillingham] Commission. 1911. *Reports of the Immigration Commission*, 61st Congress, 3rd Session. Washington, DC: Government Printing Office.

Immigration Policy Center. 2005. *Economic Growth and Immigration: Bridging the Demographic Divide*. Washington, DC: American Immigration Law Foundation.

Johnson, Kevin. 2005. "The Forgotten 'Repatriation' of Persons of Mexican Ancestry and Lessons for the 'War on Terror.'" *Pace Law Review* 26, 1: 1-26.

Kanstroom, Daniel. 2007. *Deportation Nation: Outsiders in American History*. Cambridge: Harvard University Press.

Lee, Matthew T. 2003. *Crime on the Border: Immigration and Homicide in Urban Communities*. New York: LFB Scholarly Publishing.

Lee, Matthew T., Ramiro Martínez, Jr., and Richard B. Rosenfeld. 2001. "Does Immigration Increase Homicide? Negative Evidence from Three Border Cities." *Sociological Quarterly* 42:559–580.

Manza, Jeff, and Christopher Uggen. 2006. *Locked Out: Felon Disenfranchisement and American Democracy*. New York: Oxford University Press.

Martínez, Jr., Ramiro. 2002. *Latino Homicide: Immigration, Violence and Community*. New York: Routledge.

Martínez, Jr., Ramiro, and Matthew T. Lee. 2000. "On Immigration and Crime," in National Institute of Justice, *Criminal Justice 2000: The Nature of Crime, vol. 1* (NCJ 182408). Washington, DC: U.S. Department of Justice, Office of Justice Programs, July 2000.

Martínez, Jr., Ramiro, Matthew T. Lee, and Amie L. Nielsen. 2004. "Segmented Assimilation, Local Context and Determinants of Drug Violence in Miami and San Diego: Does Ethnicity and Immigration Matter?" *International Migration Review* 38: 131-157.

Martínez, Jr., Ramiro, and Abel Valenzuela, Jr., eds. 2006. *Immigration and Crime: Race, Ethnicity, and Violence*. New York: New York University Press.

Massey, Douglas S. 2007. *Categorically Unequal: The American Stratification System*. New York: Russell Sage Foundation.

Massey, Douglas S., Jorge Durand, and Nolan J. Malone. 2002. *Beyond Smoke and Mirrors: Mexican Immigration in an Era of Economic Integration*. New York, NY: Russell Sage Foundation.

National Center on Addiction and Substance Abuse. 1998. *Behind Bars: Substance Abuse and America's Prison Population*. New York: Columbia University.

Pager, Devah. 2003. "The Mark of a Criminal Record." *American Journal of Sociology* 108: 937-975.

Passel, Jeffrey S. 2006. *The Size and Characteristics of the Unauthorized Migrant Population in the U.S.* Washington, DC: Pew Hispanic Center.

Pettit, Becky, and Bruce Western. 2004. "Mass Imprisonment and the Life Course." *American Sociological Review* 69:151-169.

Portes, Alejandro, and Rubén G. Rumbaut. 2006. *Immigrant America: A Portrait*. 3rd edition. Berkeley: University of California Press.

_____. 2005. "The Second Generation and the Children of Immigrants Longitudinal Study." *Ethnic and Racial Studies* 28, 6: 983-999.

Press, Eyal. 2006. "Do Immigrants Make Us Safer?" *The New York Times Magazine*, December 3.

Rumbaut, Rubén G. 2008. "The Coming of the Second Generation: Immigration and Ethnic Mobility in Southern California." *The Annals of the American Academy of Political and Social Science* 620, 1: 196-236.

APPENDIX D

## Undocumented Immigration and Rates of Crime and Imprisonment: Popular Myths and Empirical Realities

_____. 2005. "Turning points in the transition to adulthood: Determinants of educational attainment, incarceration, and early childbearing among children of immigrants." *Ethnic and Racial Studies* 28, 6: 1041-1086.

_____. 2004. "Ages, Life Stages, and Generational Cohorts: Decomposing the Immigrant First and Second Generations in the United States." *International Migration Review* 38: 1160-1205.

_____. 1997. "Assimilation and Its Discontents: Between Rhetoric and Reality." *International Migration Review* 31(4): 923-960.

Rumbaut, Rubén G., and Richard D. Alba. 2003. "Perceptions of Group Size and Group Position in 'Multi-Ethnic United States.'" Paper presented at the annual meeting of the American Sociological Association, Atlanta.

Rumbaut, Rubén G., Frank Bean, Leo Chávez, Jennifer Lee, Susan Brown, Louis DeSipio, and Min Zhou. 2003. *Immigration and Intergenerational Mobility in Metropolitan Los Angeles*. At: http://www.russellsage.org/programs/main/immigration/immigration_and_intergenerational_mobility_in_metropolitan_los_angeles

Sampson, Robert J., and John H. Laub. 1993. *Crime in the Making: Pathways and Turning Points Through Life*. Cambridge, MA: Harvard University Press.

Sampson, Robert J., Jeffrey D. Morenoff, and Stephen Raudenbush. 2005. "Social Anatomy of Racial and Ethnic Disparities in Violence." *American Journal of Public Health* 95, 2: 224-232.

Settersten, Jr., Richard A., Frank F. Furstenberg, Jr., and Rubén G. Rumbaut, eds. 2005. *On the Frontier of Adulthood: Theory, Research, and Public Policy*. Chicago: University of Chicago Press.

Tonry, Michael, ed. 1996. *Ethnicity, Crime, and Immigration: Comparative and Cross-National Perspectives*. Chicago: University of Chicago Press.

U.S. Bureau of Justice Statistics, Department of Justice. 2007. "Adult Correctional Populations in the United States, 1980-2006." At: http://www.ojp.usdoj.gov/bjs/glance/tables/corr2tab.htm, and "Crime and Victims Statistics." At: http://www.ojp.usdoj.gov/bjs/cvict.htm

U.S. Commission on Immigration Reform. 1994. *U.S. Immigration Policy: Restoring Credibility*. Washington, DC.

Visher, Christy A., and Jeremy Travis. 2003. "Transitions from Prison to Community: Understanding Individual Pathways." *Annual Review of Sociology* 29:89-113.

Walmsley, Roy. 2005. *World Prison Population List, 6th edition*. London: University of London, King's College, School of Law, International Centre for Prison Studies.

Western, Bruce. 2002. "The Impact of Incarceration on Wage Mobility and Inequality." *American Sociological Review* 67:1-21.

Western, Bruce, Jeffrey R. Kling, and David F. Weiman. 2001. "The Labor Market Consequences of Incarceration." *Crime and Delinquency* 47:410-427.

Zimring, Franklin E. 2007. *The Great American Crime Decline*. Oxford: Oxford University Press.

APPENDIX E

# Why Integration Matters: The Case of Undocumented Immigrant Youth and Moving Beyond Enforcement

BY ROBERTO G. GONZALES

Today's immigration debates have brought to the fore conflicting visions within the United States over how to address a population of eleven to twelve million undocumented immigrants. In the absence of a comprehensive set of immigration policies at the federal level, individual states and localities are left to reconcile these problems on their own. Unfortunately, most of the proposed solutions, to date, fail to address the complexity and diversity of the undocumented population and have focused chiefly on enforcement and less so on integration. As such, they have largely ignored the particular needs of families and children. While immigration enforcement is certainly a necessary ingredient for any comprehensive strategy, enforcement alone creates a deeper set of problems, particularly when not combined with integration policies.

Of the more vocal complaints, have been those lodged against efforts to enlist community officials—educators, social service and health providers, teachers, and police—to carry out immigration enforcement. Opponents of these measures argue that immigration enforcement by the police or other community providers erodes community trust and compromises their ability to effectively carry out their jobs.

A relatively understudied segment of the undocumented population, the youth, provides policy makers and community officials, alike, a different lens through which to examine questions of immigrant reform and community responsibility. Undocumented youth represent a sizeable and vulnerable population.[1] These children grow up and are schooled side-by-side with American born youth. They experience childhood and early adolescence without many of the restrictions that impact their parents, as the Fourteenth Amendment guarantees their access to a free public education.[2] However, after high school they are excluded from participating in most forms of adult life. They cannot vote, participate in the labor force, and, in most states, drive. These young men and women are directly affected by a confusing and contradictory immigration system that leaves more questions than answers.

Because the transition to adulthood marks their entry into undocumented life, these young people find many of the defining roles of adulthood to be beyond their legal limits. As a result, they spend much of their late adolescence and early adulthood contending with blocked opportunities, stigma, and fear. However, many of these young people have to contribute to their families and take care of themselves. On a daily basis, they spend much of their time looking over their shoulders and worrying about what might happen to them and their family if they come in contact with their legal limitations.

While the particular circumstances of these young people may warrant a broader discussion on legalization, immediate integration efforts are of equal importance. Undocumented youth, particularly those transitioning to adulthood, are in need of a range of community services to ensure

Roberto G. Gonzales is an Assistant Professor at the University of Washington School of Social Work. Special thanks to Hubert Williams and the fine staff of the Police Foundation. All errors in fact or interpretation are my own. Address correspondence to Roberto G. Gonzales, University of Washington School of Social Work, 4101 15th Avenue, WA 98105-6299, or rggonzal@u.washington.edu. To protect confidentiality, all names of individuals have been replaced with pseudonyms.

## APPENDIX E

## Why Integration Matters: The Case of Undocumented Immigrant Youth and Moving Beyond Enforcement

they grow up healthy, receive the benefits of an education, and develop trusting relationships with community members. However, when they are in constant fear, they retreat into the shadows, do not seek the help they need, and become susceptible to engaging in illicit activities. The findings in this paper suggest that while enforcement efforts are counterproductive, police and other community officials have an important role to play in the integration process of undocumented youth.

### Contemporary Immigration Enforcement

It has become the contention of most Americans that the current immigration system is no longer adequate and requires a major overhaul. However, there are diverging opinions on what immigration reform may entail. On one hand, many Americans favor guest worker programs, a pathway to legalization, and increased access to education. On the other hand, many others favor tighter enforcement, an expansion and fortification of a fence along the border, and stricter punishment for those in this country without proper authorization. However, Congress has failed to provide any solutions to the nation's complex immigration problems. And with efforts towards comprehensive immigration reform stalled in Congress, states and local jurisdictions have attempted to make their own reforms by drafting and passing piecemeal immigration legislation.

As a result, the last two or three years have witnessed huge increases in state- and local-level activity. In the first quarter alone of 2008, state legislators across the country considered more than 1,100 proposals related to immigration in 44 states. Twenty-six states have enacted 44 laws and adopted 38 resolutions or memorials. These numbers are comparable to those of 2007 at the beginning of the first quarter, and double those of 2006 (National Conference of State Legislatures 2008). While some states adopted measures to help immigrants by protecting them from exploitation and by extending education and health care to immigrant children, the political tide ran generally against immigrants (Olivas 2008). Many other states drafted a wide range of legislation to limit undocumented immigrants, including: education, employment, driver's licenses, law enforcement, legal services, public benefits, housing and rental, alcohol and tobacco purchases, gun and firearm permits, flag displays, and juvenile reporting requirements (Rumbaut and Menjívar 2008). Further, municipalities and counties considered hundreds of harsh provisions aimed at undocumented immigrant renters, use of English-only documents, the use of a public library card, and prohibition of the sale of Mexican food from trucks (ibid). Many of these local ordinances have been struck down in the courts, but many more are still pending.

Meanwhile, immigration enforcement efforts have increased. The Department of Homeland Security's Immigration and Customs Enforcement (ICE) initiated Operation Return to Sender in 2006. Since then, ICE agents have carried out removal efforts in homes, shopping mall parking lots, bus terminals, farms, meatpacking plants, and other public and work places across the country. As a result, thousands of unauthorized migrants have been deported, many more children have lost their parents due to deportation, and increasing numbers of students have been targeted.

In fact, since September 11, 2001, immigration enforcement has received a significant amount of attention. The contention by some that the federal government is not equipped with resources

APPENDIX E

# Why Integration Matters: The Case of Undocumented Immigrant Youth and Moving Beyond Enforcement

sufficient to enforce immigration law has prompted a discussion on state and local law enforcement's role in the enforcement of immigration law (Seghetti, Viña, and Ester 2004). To date, a handful of states and localities have entered into agreements to deputize officers and assist the federal government with enforcing certain aspects of immigration law. Georgia's law, for example, contains a provision that allows state and local law enforcement to detain arrestees for federal immigration law violations, and several other counties and local municipalities have followed suit.

Many other state and local enforcement agencies, however, contend that it is the federal government's role to enforce immigration law, in light of limited state and local resources and immigration expertise. Moreover, many police officials have expressed concern over proper training, finite resources at the local level, potential civil rights violations, and the overall impact on communities.

The stance that many police officials have taken is that immigration enforcement by local police, among other things, erodes community trust. Already, ICE raids and local measures against unauthorized immigrants have elevated a climate of fear within the immigrant community. A recent Pew Hispanic Center survey (2007) found that more than 50 percent of Latinos living in the U.S. fear that either they or someone they know will be deported. For many, the constant fear of deportation exacerbates physical and mental health problems. In San Pedro, California, "a school principal told reporters that the raids and presence of ICE agents near the school has created a climate of 'ongoing, relentless terror' with more students absent from school or distracted by the possibility of their parents being gone when they arrive home" (Rumbaut and Menjívar 2008).

## Defining the Problem

Over the last three decades, however, dislocations in sending countries, increased labor recruitment, and dramatic changes in immigration policy have dramatically altered the complexity of international migration and the immigrant family. Until the 1980s, unauthorized immigrants were mostly seasonal labor migrants who left children and families home in their countries of origin. The unauthorized now consist of larger proportions of families and children who will grow up and be schooled in the U.S.[3] These unauthorized children, who come to the U.S. before the age of twelve, represent a relatively new and vulnerable population. Given the size and relative recency of this population, what happens to these children is of great scholarly and policy significance. To date, however, there has been a dearth of scholarly research on undocumented youth (Abrego 2008, 2006; Gonzales 2008; Perez-Huber and Malagon 2007; Seif 2004), and a scattered few notable policy reports and articles (Gonzales 2007; Batalova and Fix 2006; McGray 2006; Passel 2003).

### The 1.5 Generation

Unauthorized children find themselves betwixt and between two worlds. Most of them only know their country of birth through their parents' stories. They may feel a nostalgic connection to their homeland, but with every year lived in the United States they feel a growing distance between them and their parents, as they speak more English and less of their parents' language. Ironically, though, each of these years also brings them closer to the realities of their parents' undocumented lives.

APPENDIX E

**Why Integration Matters: The Case of Undocumented Immigrant Youth and Moving Beyond Enforcement**

These children, born abroad and brought to the U.S. before the age of twelve, represent a relatively new but significant population. Their generation, referred to as the 1.5 generation, fit somewhere between the first and second generations (Rumbaut 2004). They are not of the first generation because they did not choose to migrate, but not of the second generation either, as they were born and spent part of their childhood abroad. While they have some association with their countries of origin, their primary identification is affected by experiences growing up American. They straddle two worlds and are often called upon to assist their parents in the acculturation and adaptation process. Their dual frames of reference provide both advantage and difficulty. Those of the 1.5 generation tend to be bicultural and attain linguistic characteristics similar to those persons born in the U.S. This unique positioning could provide them an advantage in the global economy, as they are equipped with bilingual and bicultural skills. However, many of these youngsters fail to experience these advantages.

Rumbaut and Ima (1988) explain that the 1.5 generation faces two challenges: adolescence and the transition from childhood to adulthood, and acculturation and the task of managing the transition from one culture to another. Similar to their parents, they must successfully acculturate to the values and norms of the host society. Many will find more ease in this process than will their immigrant parents. However, they must do so while simultaneously making transitions from childhood to adulthood. Because of their legal status, these dual transitions are often in great conflict.

From childhood to early adolescence, legal status has little meaning in the lives of undocumented youths. During this buffer period, undocumented children move through their own development and participate in community institutions, notably the school system, and are sheltered from the constraints their parents experience. Once undocumented youth reach late adolescence, however, the limits imposed by their immigrant status make themselves known. American culture creates various needs and thus defines what it means to successfully pass from one phase of development to the next: obtaining a library card, renting a movie, applying for a driver's license, obtaining a work permit, moving on to college, marrying, and buying a home. From about the ages of fifteen to sixteen on, these various turning points mark and define successful transitions from childhood to adolescence and adulthood. However, many of these important stages require important forms of state-issued identification and legal status. Without the ability to produce such forms of legitimizing identification, undocumented young adults are shut out of these important activities and distanced from their peers.

Exclusion from these important rites of passage circumscribes their limited roles within adult society and sets them apart from their peers. While certain avenues are closed, others are restricted. In order to help their families, support themselves, and pay for school, they must face the dilemma of whether or not to work. And, in order to get to and from work and school, they must make tough decisions about how to get around. In most states, the unauthorized cannot obtain a driver's license. Hence, they cannot purchase a car, buy insurance, or legally drive. In cities with good public transportation systems like New York and Chicago, this is a viable, yet limited, option as many of the manufacturing jobs have moved out to suburban areas. In

APPENDIX E

## Why Integration Matters: The Case of Undocumented Immigrant Youth and Moving Beyond Enforcement

metropolitan areas like Los Angeles, however, the prospects are dim. Given the limited public transportation options and the sprawling nature of the municipality, reliance on public transportation limits employment and school options severely. Taken together, these numerous barriers severely limit the mobility of these young adults. At every turn, daily decisions are tantamount to putting their lives on the line as any of these pursuits can place them face-to-face with immigration authorities.

Suddenly the world changes substantially for these youngsters, as does what it means to participate in society. Not only do undocumented youth experience exclusion, they are also unable to meet the demands of adult life and are forced to make important decisions that have consequences not only for the present but also for the future. This new status within society and their communities proves extremely difficult to overcome, both in terms of the numerous new barriers and the psychological effects.

What happens in the early years has a strong bearing on later life chances. Blocked opportunities early on can cause these youth to retreat underground and to seek illicit alternatives. However, the longer the buffer period, the stronger the opportunities to successfully compete in school, develop positive self-image, and prepare themselves for full and active participation in the legal world. By the time they reach adulthood, the impediments and opportunities faced as adolescents play strong determining roles in how their adult lives will unfold.

Without adequate education and requisite job skills, many undocumented youth will find difficulties securing steady work, as options with or without legal status are both limited and limiting. However, early opportunities in education and community-based mentorship can help them hold on to aspirations and ready themselves for the possibility of a change in status.

### Data Section

The following discussion draws from more than three years of fieldwork in Southern California, seventy-eight in-depth life histories, and observations of more than 250 young adults, ages twenty to thirty-six, who migrated clandestinely with parents before the age of twelve.[4] While a portion of these young men and women have regularized their status, all of them began and spent most of their school years in unauthorized status. I have also stratified the interview sample so as to be able to compare diverse experiences. Half of the interviewees went on to graduate from high school and went to college, while the other half exited before college, either by dropping out of high school or ending their education upon completion of high school. This sampling choice helped me to draw out the various contexts and structural mechanisms that promoted upward trajectories and downward spirals.

### Transitioning to Illegal Lives

Among my respondents, many described this period as one of great stress and anxiety. Because most of them were not required as children to produce forms of identification, when they attempted to insert themselves into the American mainstream, they found themselves without the proper credentials. And because their own status did not pose too many restrictions as they grew up, many of them simply did not think of legal status as an issue in their lives. In fact, many

believed themselves to be just like their U.S.-born peers. However, their status came as a surprise to many who were unaware they were not legal citizens.

Rodolfo described to me this pivotal period and the moment he realized he was different.

> **Rodolfo: Well you know what, I never actually felt like I wasn't born here. 'Cause when I came here, I was like ten and a half. I went to school, I learned the language. But it was like, I first felt like I was really out of place when I graduated from high school, when I tried to get a job.**

Roberto: Why was that?

> **Rodolfo: Because I didn't have a social security number...Well I didn't even know. I mean, I didn't even know what it meant. You know social security, legal, illegal. I didn't even know what that was. I asked my mom and [she] said, "it's in the process." In the process? I didn't even know what that meant. I don't know why she would tell us that.**

Prior to this experience, Rodolfo was never required to produce his social security number for entry and acceptance and, as a result, his early life was not defined by his legal status. However, the process of looking for a job forced him to discover what he was missing and to confront the implications of not having legal status. This sudden discovery and hard lesson had immediate and severe consequences, as Rodolfo's plans were quickly diverted and his hopes for some level of intergenerational mobility were quickly derailed.

It took Rodolfo some time to come to terms with the meaning of his status, whether it was temporary or permanent, and what it meant for his day-to-day life. While his stepfather had gone through a local immigration attorney to try to sponsor his family, at the time of Rodolfo's job search there were no legal options.

I have talked to many adults who experienced similar discoveries of their limitations during this critical period, many blaming their parents for keeping them in the dark during their childhood. While it was true that in most of those cases parents withheld information about their legal status, a social security number was not the defining factor of childhood and early adolescence that it became for late adolescence and early adulthood. It was not the decisions made by parents on whether or not to disclose to their children, but the intersection of late adolescence, the cultural requirements of that particular period, and legal restrictions that make the experience of this transition so jarring and potentially traumatic. As one respondent described to me, "It's like living a nightmare, but not being able to wake up."

Indeed, the sudden and dramatic changes that accompany these transitions alter the lives of undocumented young adults in profound ways. As these young people come to grips with their new status, the recognition of their limitations sets in. Many of my respondents described a sense of hopelessness as they looked ahead to an uncertain future. Miguel explained to me that during most of high school he believed he had his whole future laid out, but when his mother alerted him to the reality of his status, everything was "turned upside down." As a result, his school work and attendance trailed off. When Cory found out, she ran away from home. Many other

APPENDIX E

**Why Integration Matters: The Case of Undocumented Immigrant Youth and Moving Beyond Enforcement**

of my respondents concurred that their levels of productivity and optimism about the future fell considerably during their last year or two of high school.

This transition can also be quite stigmatizing, as it occurs during a corresponding period in which American-born peers and siblings are making similar, albeit unrestricted, transitions into adulthood. Until then, they sit in the same classrooms, participate in the same social functions and compete uniformly for the attention of school personnel. However, legal limitations during late adolescence separate many undocumented youths from their peers and siblings.

As the world of adulthood was opening up to their peers, a succession of doors was simultaneously being shut on them. My respondents recounted numerous instances whereby they also felt as though they were forced to explain why they did not drive, could not meet their friends at bars, or could not travel to local destinations that led them across immigration checkpoints.

The confusion and fear of unauthorized adult life leads many to a state of perpetual limbo. Many of the young people I met had gone through various processes of legalization, while others were waiting. Over my three-plus years in the field, I met many young people who were in the process of being sponsored by a family member or spouse for residency. However, many found the waits to be long and became discouraged and doubtful after long periods of waiting. However, the fear of something happening to jeopardize their immigration case renders many of these undocumented young adults immobile and afraid to invest time, money, or hopes in their future. Living their lives in a narrowly circumscribed present, several of these young men and women let go of their aspirations to have anything more.

While the consequences of being caught while working and driving are severe, the effects of inactivity can be numbing. Many of these young adults stay frozen in a state of limbo for long periods of time. They do not gain work experience and become increasingly dependent on others to meet their needs. Over time, many of them become so fearful, they stop holding on to things, such as material possessions, relationships, and aspirations. Living only for today, many of these young men and women lose a sense of the future, while only the past and present are their realities.

Nevertheless, many feel as though they do not have the choice whether to work or drive, as family and individual circumstances necessitate the entry of these young adults into the workforce. The act of working also sets into motion a myriad of other decisions that have equally grave consequences. Faced with such dilemmas of needing to take care of themselves and their families, but not being able to legally meet these needs, their circumstances require many to take the risk. However, in doing so, they place themselves in direct contact with their legal limits and in a perpetual state of fear.

Working without the proper authorization is always a precarious venture. The risks of getting caught include jail and deportation. However, many undocumented immigrants feel as though they have little choice. While some adult migrants have learned the ropes and are skillful at finding safer jobs and dealing with the consequences, for many of the undocumented 1.5 generation navigating the world of unauthorized work and the subsequent consequences is a daunting challenge.

Similarly, many take the risk of driving without licenses. Driving, like work, is a necessity for most. Public transportation is neither highly accessible nor convenient for many. Those with

## APPENDIX E
## Why Integration Matters: The Case of Undocumented Immigrant Youth and Moving Beyond Enforcement

children explain that getting to daycare and then to work require commutes of up to three to four hours a day on the bus and waking up two hours early in order to get to work on time. Regardless of their situation, however, by driving they face potential legal trouble. Most of my respondents were well aware of the consequences, yet felt as though they had little choice. Nevertheless, even a minor traffic violation or accident can throw their lives into peril.

Over time, the jarring transition, the day-to-day efforts to conceal their status, and the constant stress and fear take their toll on these unauthorized young adults. Many of these young undocumented men and women in my sample experienced stress, fear, and worry, as a result. A common experience among most is the continual looking over their shoulders. Many of these young people, do not, however, have the luxury of time and space needed to pull their lives together. Faced with impending deadlines for colleges and economic pressures to work, few experience comfortable transitions. As a result, the corresponding entrances into adulthood and the constraints of undocumented life create numerous points of stress. Many find that the pressures of adulthood and the numerous decisions they needed to make in order to survive—with respect to working, driving, going to school, raising families—have tremendous consequences for their present and future lives.

### Community Support and Divergent Paths

While the transition to adulthood and the accompanying constraints of unauthorized status are stressful and difficult, unauthorized youth do not experience them uniformly. A range of factors creates divergent outcomes, including family resources, individual choices, social ties, and mentorship. Of crucial importance, assistance from adults within the family and community can enable some unauthorized youth to seek out and access resources to alternative and legal avenues. However, without such resources and support, limited and limiting options place unauthorized young adults in more direct contact with their legal constraints and further expose them to stress, fear, and anxiety. Taken together, this confluence of unfavorable circumstances pushes many of these youth underground and more vulnerable to fringe elements within the community.

Above all sources of support, mentorship from adults provides these young people with distinct advantages with respect to information and resources. High school teachers and counselors, social workers, church officials, human service providers, and local police are important sources of information, advice, and support. Many of these community-level officials have the capacity to help youngsters access the needed financial support and continue their schooling.

For unauthorized youth, the ability to seamlessly move from high school to college is tremendously important. Because school is one of the few legal avenues accessible to the unauthorized, staying in school allows young people a productive and viable pursuit. Moreover, the college campus preserves a certain level of protection, sheltering unauthorized students from potential run-ins with hate groups or immigration officials.

César's story provides further insight into the benefits of mentors and a post-secondary education. Ever since he was young, science has been César's passion. At the end of his senior year of high school, he was accepted to the University of California, Berkeley. His excitement was short-

lived, however, after receiving a phone call from the office of admissions asking for his social security number. At that time, there was not an allowance for undocumented students to pay in-state tuition, and César's family could not afford to send him to Berkeley. However, he had support from teachers and counselors who encouraged him to continue his schooling. The following fall, he enrolled in a community college and finished with a 3.8 grade point average and honors. Meanwhile, his parents took extra jobs and saved enough money to pay for his tuition at UCLA at nearly $25,000 a year.

César graduated two years later with a bachelor of arts in molecular, cell, and developmental biology. He was offered a job in a cytogenetics lab, analyzing chromosomes under a microscope, but lost out because of his undocumented status. Thanks to a tip from a leader within the community, however, he was able to take an internship in a similar lab (albeit without pay). César continued his schooling, finishing a master's program in public health at a California State University campus and a one-year post-baccalaureate program in medicine at a nearby University of California campus. Upon acceptance to the program, community leaders pooled money together to come up with his tuition costs.

César continues to pursue education, while waiting for a door to open to medical school. As he waits he tutors neighborhood children, runs a summer youth leadership program for low-income males, and speaks regularly at community events. To his advantage, he has a strong network of support and resources among his family, school personnel, and community members. Because of this extensive support system, César has successfully navigated obstacles at every step along his post-secondary educational journey. This important support has enabled him to find alternatives to work, access important sources of financial support, and actively pursue education while he waits for a change in his circumstances.

Among the young people in my study who went on to college, each of them had similar systems of support that enabled them to push over barriers, access needed resources and opportunities, and participate in community service. On the other hand, not having such sources of support proved to be the chief difference between young adults experiencing productive educational and career pursuits and those facing day-to-day constraints and troubled involvement with neighborhood countercultures.

Gabriel's late adolescent-early adulthood trajectory helps to provide a contrast to that of César, and an example of the potentially debilitating effects of unauthorized status on 1.5 generation youth. After Gabriel's family was evicted from an apartment in Anaheim, he decided to find a place of his own in order to alleviate the burden on his mother. He felt like a "dead weight," not being able to contribute financially to the family because of his legal status. On his own, Gabriel needed to work in order to support himself. He found factory jobs and used someone else's social security number in order to secure employment. However, he has twice received No-Match letters from the Social Security Administration stating that his social security number did not match the name he was using. He lost one job because of this and is fearful that future employers will also find out. Beyond being scared, Gabriel is frustrated and angry about his status. Moreover, Gabriel is increasingly turning to illicit means in order to support himself: he stopped taking the bus in

APPENDIX E

**Why Integration Matters: The Case of Undocumented Immigrant Youth and Moving Beyond Enforcement**

lieu of driving after receiving a warning from an employer that his tardiness would cost him his job; when he could not buy a cell phone through regular channels, he bought one from a guy in his neighborhood only to find that the number had more than four hundred dollars of charges on it. To further weigh him down, Gabriel served a three-year probation sentence for an attempted robbery as an accomplice, after being pulled over with a group of guys with which he was hanging out. As Gabriel's situation indicates, restrictions due to immigrant status limit the scope of choices and structure decisions.

Based on my interviews and observations, Gabriel's situation is not uncommon. In fact, many others described to me similar limiting circumstances that they felt pushed them into illicit activity. For many years Josue made his money selling drugs. Contemplating the alternative of working clandestinely in a factory or restaurant, he chose the street, where he felt he had some power. As he looks ahead at his future, with little formal job training, he cannot help but to compare these different experiences and outcomes.

> **In a way it's hard to get a job, you know? Get paid the way we want to be paid. And back then I used to skip that you know? You know what I'm not gonna work for a job. I'm not gonna bust my ass for someone who can be yelling at me for like $5.75, $5 bucks an hour. Nah nah hell no. If I get a job, I wanna get paid $20 bucks an hour. Because I thought that man, I speak English, I do good, I do that, but actually I didn't have any experience and I decided to start selling drugs, you know, because I thought, this is easy. I got my own schedule, I can do whatever the hell I want to the whole day, I can scream at them, nobody is gonna scream at me. Nobody is gonna do nothing to me because I am the one in control.**

However, Josue's activities caught up to him and put him in a life-threatening situation. At twenty-six, he finds himself struggling to put his life together. He refuses to go back to selling drugs but is having a hard time competing with adult migrant workers for low-wage jobs.

### Discussion and Conclusion

While undocumented young adults face limited choices and debilitating circumstances, some, in fact, find sources of support to bring them into mainstream institutions, provide them with safe and productive alternatives, and allow them to experience the transition to adulthood without undue stress and anxiety. Comparing César and Gabriel, whose stories provide important analytical contrasts, suggests some clues about community-level contextual factors. At 27, these two young men are the same age, both came to the U.S. before they were eight years old, grew up in Southern California, and neither has regularized his immigrant status. While they share many common characteristics, the differences between the two are several.

César has three degrees, including a master's in public health, and runs a successful private tutoring business. Gabriel, on the other hand, works in a factory with low-skilled immigrant coworkers. He has been laid off from several jobs and has received No-Match letters from two of them. Although he has community college credits, Gabriel is no longer in school after several interruptions. He lives on his own and from check to check.

# Why Integration Matters: The Case of Undocumented Immigrant Youth and Moving Beyond Enforcement

None of the differences between César and Gabriel are coincidental. César's parents both work and, before he began high school, managed to move to a quiet neighborhood with an academically strong high school. With the constant encouragement of his parents to excel in school, he brought home good grades and attracted the attention of several teachers and counselors. His strong high school record earned him admission to several universities. The transition from high school was relatively smooth and without many of the constraints of his status. When he realized he could not attend his dream school because of family finances and had to attend community college, his network mobilized resources and raised enough money for him to attend the University of California. With his degree, he was able to continue to pursue education while he waited for a change in his status.

Gabriel, however, experienced the cumulative disadvantages of unauthorized status as he transitioned out of school. He was kicked out of high school for excessive absences and did not finish on time. Although he eventually earned his diploma at a continuing education school, his progress was slowed considerably. While his mom wishes for him to be successful and to go to college, she has very little means to support those endeavors. Her monthly income is often insufficient to meet monthly expenses. A few years ago, Gabriel felt as though he was a burden on his mom and moved out. Over the years, he has gained work experience in low-wage sectors and has become conditioned to the limitations and hazards of low-wage work. Because two of his employers were sent No-Match letters from the Social Security Administration, he is fearful of getting caught at work and being deported. He takes the risk of driving, relies on underground means for providing basic needs, and is surrounded by a peer group that has, more than once, brought trouble.

While parental experiences shape children's trajectories, educational attainment determines whether or not the transition to adulthood will be successful. Gabriel was one of the almost 50 percent of his entering freshmen class who left high school before completion. As a result, he did not have any mentors to guide him through the barriers that awaited. César went to a high school that was ethnically and economically diverse and enjoyed a range of honor's and AP classes. He accumulated a strong network of supporters in high school, was active in extracurricular activities, and carried his network and skills to college and community service. While he remained undocumented, he was, however, able to seamlessly move on to college and concentrate on his studies. As a result, he graduated within four years and moved on to attain two graduate degrees.

The divergent trajectories of César and Gabriel provide important illustrations of the key determinants of mobility and incorporation of the undocumented 1.5 generation into the community. There is good reason to be cautious attributing success to human characteristics alone, as family circumstances, quality of educational opportunities, the presence of adult mentors, and access to community resources structure opportunities for these young adults. Because of modest levels of family success, César was able to attend a stronger high school. His friends were of different ethnicities, and he experienced greater opportunity. He also benefited from a wide range of classes, teachers who advocated for him, and important school resources. Gabriel, on the other hand, went to a large, crowded high school that was over 80 percent low-income. His classes were large, and he had little contact with his teachers or school counselors. And when he

APPENDIX E

**Why Integration Matters: The Case of Undocumented Immigrant Youth and Moving Beyond Enforcement**

left school, there was no one from his school reaching out to him. As a result, Gabriel was not able to enlist the support needed to develop resiliency and coping strategies.

The presence of adult mentors in the lives of unauthorized youth is of paramount importance. And because, in most states, college offers a legal and legitimate means to participate and compete in American life, moving on to post-secondary institutions is critical. Adults in the community can play an important role in not only helping these young people navigate these stressful transitions but also providing guidance and resources that will enable these young men and women to continue to play active and productive roles in communities.

While the immigration debate stalls in Congress, on the ground local-level decisions regarding health care, education, and law enforcement are shaping communities across the U.S. This paper is an attempt to contribute to localized conversations about today's immigrants and how we respond to them.

Contemporary immigration is taking shape differently than it did a century ago. The increased presence of unauthorized immigrants—young as well as old—compels us to make important decisions about their role in communities. However, in order to do so, it is important that we move beyond one-size-fits-all approaches to this complex set of issues.

Based on extensive observation in immigrant communities and in-depth interviews with unauthorized young adults, this paper has focused on a particular subset of the unauthorized population and their experiences of unauthorized adult life. As I have found in my research, these experiences prove to be quite difficult. Saturated with fear, stigma, paralysis, and physical and mental health problems, day-to-day life can be challenging and unpleasant. For a group of young people who grow into these limitations as they are acculturating, the net effect can be quite debilitating. These experiences, however, provide evidence for the potential benefits of integration efforts. To be sure, policies that criminalize the unauthorized fail to account for these unique circumstances. Moreover, increased enforcement efforts that keep these young people in fear and away from critical services they require are limited and limiting.

The transitions young people make from childhood to adolescence and to young adulthood are of critical importance. Because of the circumstances of unauthorized youth, these transitions are often traumatic. As a result, unauthorized youth require a range of services that cover education, occupation, and physical and mental health issues. Moreover, their unique circumstances require trusting relationships with institutions and mentors within their communities. However, when health care officials, social service providers, and community police perform immigration-related duties, the level of fear and anxiety in communities is ratcheted up and exacerbates mental and physical health problems. Moreover, unauthorized youth lose trust in community officials, do not seek out the help they need, and shy away from cooperating and participating in important community-level institutional efforts. This scenario is neither good for unauthorized youth nor the community.

The youth are the future of our communities. What we must decide is whether we want a healthy and productive generation of young people marching forward, or whether we are ready to deal with the consequences of an undereducated, underground, frustrated population of

APPENDIX E

## Why Integration Matters: The Case of Undocumented Immigrant Youth and Moving Beyond Enforcement

young men and women with limited access to mainstream opportunities.

By virtue of their status, unauthorized youth cannot work, vote, or drive in most states. However, they can go to school and make positive contributions to our communities. When they are presented with a narrow range of options, necessity forces them to move beyond the legal realm. Here is where they come in contact with increased exposure to fringe elements within the community. While channels of legalization are beyond the scope of this particular discussion and the purview of community-level decision makers, we can strategize ways to eliminate dangerous and illicit choices by broadening the range of possibilities for unauthorized youth to participate in productive activities.

This research suggests a need for increased community awareness and for adult stakeholders better educated on the issues these youth confront. By mobilizing community resources, schools, community-based organizations, chambers of commerce, and police districts can work together to provide alternative solutions, a broader range of activities, and increased educational access for the youth of the community.

APPENDIX E

## Why Integration Matters: The Case of Undocumented Immigrant Youth and Moving Beyond Enforcement

### Endnotes

[1] According to recent estimates, undocumented youth who are under the age of 24 and who have lived in the U.S. for 5 years or longer number 2.5 million. At 20 percent of the total undocumented population, these numbers are significant enough to warrant attention.

[2] The Supreme Court ruled in *Plyler v. Doe* (1982) that, because these children are "persons" under the Constitution and thus entitled to equal protection under the law according to the Fourteenth Amendment, they cannot be denied access to public elementary and secondary education on the basis of their legal status. This decision has enabled thousands of undocumented students to graduate from high school each year. See Michael A. Olivas, "*The Story of Plyler v. Doe, The Education of Undocumented Children, and the Polity*," in David A. Martin and Peter H. Schuck, eds., *Immigration Stories*. New York, NY: Foundation Press, 2005, pp. 197-220.

[3] As of 2005, there were an estimated 4.9 million children of unauthorized parents living in the U.S. Of these, about 1.8 million are unauthorized, while an additional 3.1 million are U.S. citizens (Passel 2006; Passel and Suro 2005).

[4] This paper is based on ongoing research with adult children of unauthorized Mexican migrants. The entire sample consists of 102 in-depth interviews with 1.5 and 2nd generation young adults in the five-county Los Angeles metropolitan area. For this paper, I am focusing only on the 1.5 generation respondents within that sample.

### References

Abrego, Leisy J. 2008. "Legitimacy, Social Identity, and the Mobilization of Law: The Effects of Assembly Bill 540 on Undocumented Students in California." *Law & Social Inquiry*, 33(3).

____. 2006. "I Can't Go to College Because I Don't Have Papers: Incorporation Patterns of Undocumented Latino Youth." *Latino Studies*, 4: 212-231.

Batalova, Jeanne, and Michael Fix. 2006. "Estimates of Unauthorized Youth Eligible for Legal Status under the DREAM Act." *Immigration Backgrounder*, October 2006. Washington, D.C.: Migration Policy Institute.

Gonzales, Roberto G. 2008. "Left Out but Not Shut Down: Political Activism and the Undocumented Student Movement." *Northwestern Journal of Law and Social Policy*, 3(2).

____. 2007. "Wasted Talent and Broken Dreams: The Lost Potential of Undocumented Students." *In-Focus*, 5(13). Washington, D.C.: Immigration Policy Center.

McGray, Douglas. 2006. "The Invisibles." *Los Angeles Times Magazine*. April 23, 2006.

National Council of State Legislators. 2008. "State Laws Related to Immigrants and Integration, January 1-June 30, 2008." *Immigration Policy Project*, July 24, 2008, prepared by Dirk Hegan.

Olivas, Michael A. 2008. "Lawmakers Gone Wild? College Residency and the Response to Professor Kobach." *SMU Law Review* 99: 101-166.

Passel, Jeffrey S. 2006. "The Size and Characteristics of the Unauthorized Migrant Population in the U.S.: Estimates based on the March 2005 Current Population Survey." Washington, D.C.: Pew Hispanic Center.

____. 2003. *Further Demographic Information Relating to the DREAM Act*. Washington, DC: The Urban Institute.

Passel, Jeffrey S., and Roberto Suro. 2005. *Rise, Peak, and Decline: Trend in U.S. Immigration 1992-2004*. Washington, DC: Pew Hispanic Center.

Perez-Huber, Lindsay, and Maria Malagon. 2007. "Silenced Struggles: The Experiences of Latina and Latino Undocumented College Students in California". *Nevada Law Journal*, Vol. 7: 841.

Pew Hispanic Center. *2007 National Survey of Latinos: As Illegal Immigration Issue Heats Up, Hispanics Feel A Chill*. Washington, DC, December 2007.

Rumbaut, Rubén G. 2004. "Ages, Life Stages, and Generational Cohorts: Decomposing the Immigrant First and Second Generations in the United States." *International Migration Review*, 38: 1160–1205.

APPENDIX E

# Why Integration Matters: The Case of Undocumented Immigrant Youth and Moving Beyond Enforcement

Rumbaut, Rubén G., and Kenji Ima. 1988. *The Adaptation of Southwest Asian Refugee Youth: A Comparative Study.* Washington, DC: U.S. Office of Refugee Resettlement.

Rumbaut, Rubén G., and Cecilia Menjívar. 2008. "Rights of Racial and Ethnic Minorities and Migrants: Between Rhetoric and Reality." *The Leading Rogue State: The United States and Human Rights,* Judith Blau, David Brunsma, Alberto Moncada, and Catherine Zimmer, eds. Boulder, CO: Paradigm Publishers.

Seghetti, Lisa M., Stephen R. Viña, and Karma Ester. 2004. "Enforcing Immigration Law: The Role of State and Local Law Enforcement." *Congressional Research Service*, The Library of Congress, March 11, 2004.

Seif, Hinda. 2004. "'Wise Up!' Undocumented Latino Youth, Mexican-American Legislators and the Struggle for Higher Education Access." *Latino Studies*, 2(2).

APPENDIX F

# Local Enforcement of Immigration Laws: Evolution of the 287(g) Program and Its Potential Impacts on Local Communities

BY RANDOLPH CAPPS

## Introduction

The Urban Institute has for years studied the unauthorized immigrant population, but for the most part our research has focused on demographic trends, the incorporation of unauthorized immigrants in the U.S. workforce, and the well-being of children with unauthorized parents. Until the last few years, there has been little enforcement of laws that make it illegal for unauthorized immigrants to live and work in the United States. But following the events of September 11, 2001, and the creation of the Department of Homeland Security in 2002, U.S. policy has moved rapidly toward increasing enforcement and criminalization of this population. While most of the legal foundation for the current uptick in enforcement was grounded in legislation enacted in 1996, if not before, there clearly was a sea change in the nation's immigration enforcement policies during the 2005-2008 period. With about twelve million unauthorized immigrants (including two million children) and an additional three million U.S.-born children of unauthorized immigrants, these enforcement policies put an ever greater number of families at risk of separation and other adverse consequences (Passel 2006).

The Urban Institute modified its research agenda somewhat to reflect the change in our nation's approach to enforcing immigration laws. Starting in 2005, the new Department of Homeland Security began investing substantial new resources in arrests of unauthorized immigrants at their workplaces, as well as using Fugitive Operation Teams (FOTs) to arrest immigrants with outstanding deportation orders. In 2007, we investigated three of the largest worksite raids Immigration and Customs Enforcement (ICE) had conducted to that point, and published a report that focused on the impact of parental arrest, detention, and deportation on children in unauthorized families in these locations (Capps, Castañeda, Chaudry, and Santos 2007). ICE arrested approximately 5,000 immigrants per year in worksite raids in fiscal years 2006-2008, about ten times the pace of arrests by the old Immigration and Naturalization Service in its last year of operation—2002.[1] These worksite raids have received a lot of attention in the media and in Congress recently, especially because of the large raids in May 2008 in Postville, Iowa, and in August in Laurel, Mississippi.

The 5,000 arrests in worksite raids, however, represent a small fraction of the now more than 275,000 arrests and deportations made annually by the Department of Homeland Security (including by Customs and Border Protection (CBP) as well as by ICE).[2] When compared to the number of immigrants arrested in worksite raids by ICE, far more have been arrested, detained, and deported by FOTs and by state and local law enforcement agencies (LEAs) that have signed formal agreements with ICE granting them immigration authority, as authorized by Section 287(g) of the Immigration and Nationality Act. It is these memoranda of agreement (MOA) between ICE and LEAs, known now as "287(g)s," that are primary addressed here.

Randolph Capps is Demographer and Senior Policy Analyst at the Migration Policy Institute in Washington, DC. Dr. Capps prepared this paper while at The Urban Institute in Washington, DC.

APPENDIX F

## Local Enforcement of Immigration Laws: Evolution of the 287(g) Program and Its Potential Impacts on Local Communities

The balance of this paper begins with a brief timeline and overview of the 287(g) program and discusses some of the broad outlines of how it has been implemented to date. Then, for further background, population and political trends that underlie the adoption of 287(g) programs across the country are discussed. As part of our ongoing research, we are investigating the impact of immigration raids at worksites on children in some new locations (including Postville) but also taking a look at the impact of FOT raids in Miami as well as the 287(g) program now active in Northwest Arkansas. Next presented are preliminary findings about the implementation of 287(g) in Arkansas, based on a site visit there in June 2008. The paper concludes with policy recommendations and general observations about potential impacts of 287(g) operations on cities, immigrant communities, and children.

### Overview of 287(g) Program

Section 287(g) of the Immigration and Nationality Act was enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996. The mid-1990s were a period of anti-immigrant sentiment that led to 1994 Proposition 187 in California (which denied unauthorized immigrants a range of public services) and of increasing enforcement along the U.S. border, beginning with Operation Hold the Line in El Paso in 1993. IIRIRA established the 287(g) program in order to help INS expand its resources for interior enforcement—resources which were at that time much more limited than they are today. It is important to remember also that the 1996 law greatly expanded the categories of crime for which immigrants—both legal and unauthorized— could be deported; reduced their appeal rights after arrest; and added lengthy bars on legal reentry into the United State for those who are deported (Espenshade, Baraka, and Huber 1997). The 1996 law was the primary legal foundation not only for the 287(g) program but also for many of the tools and strategies that ICE uses today in enforcement. However, other than expansions in CBP operations and some modest increases in interior enforcement, the 1996 law did not result in major immediate changes in immigration enforcement strategies.

If we turn specifically to the 287(g) program, the first agreement between the federal government and a LEA was not implemented until 2002, with the State of Florida (Figure 1).[3]  The State of Alabama followed with an agreement in 2003, and there were a half dozen more agreements implemented in 2005 and 2006 in Arizona, California, and North Carolina. But the program really took off in 2007, with twenty-six LEAs signing on, and with twenty-eight more joining the program during the first seven months of 2008. According to ICE, in August 2008 there were sixty-two active 287(g) programs, and about seventy-five more LEAs were on a waiting list to execute agreements. By August 2008, more than 840 LEA officers had been trained under the 287(g) program, and over 65,000 individuals were identified as being in the country "illegally" between January 2006 and August 2008.

APPENDIX F

## Local Enforcement of Immigration Laws: Evolution of the 287(g) Program and Its Potential Impacts on Local Communities

**FIGURE 1 (1 OF 2). 287(g) PROGRAMS IMPLEMENTED AS OF AUGUST 2008**

| State | Memorandum of Agreement (MOA) Name | Type* | Signed |
|---|---|---|---|
| AL | AL State Police | TFO | 9/10/2003 |
| AL | Etowah County Sheriff's Office | JEO | 7/8/2008 |
| AR | Benton County Sheriff's Office | JEO/TFO | 9/26/2007 |
| AR | City of Springdale Police Department | TFO | 9/26/2007 |
| AR | Rogers Police Department | TFO | 9/25/2007 |
| AR | Washington County Sheriff's Office | JEO/TFO | 9/26/2007 |
| AZ | AZ Department of Corrections | JEO | 9/16/2005 |
| AZ | AZ Department of Public Safety | TFO | 4/15/2007 |
| AZ | City of Phoenix Police Department | TFO | 3/10/2008 |
| AZ | Maricopa County Sheriff's Office | JEO/TFO | 2/7/2007 |
| AZ | Pima County Sheriff's Office | JEO/TFO | 3/10/2008 |
| AZ | Pinal County Sheriff's Office | JEO/TFO | 3/10/2008 |
| AZ | Yavapai County Sheriff's Office | JEO/TFO | 3/10/2008 |
| CA | Los Angeles County Sheriff's Office | JEO | 2/1/2005 |
| CA | Orange County Sheriff's Office | JEO | 11/2/2006 |
| CA | Riverside County Sheriff's Office | JEO | 4/28/2006 |
| CA | San Bernardino County Sheriff's Office | JEO | 10/19/2005 |
| CO | CO Department of Public Safety | TFO | 3/29/2007 |
| CO | El Paso County Sheriff's Office | JEO | 5/17/2007 |
| FL | Bay County Sheriff's Office | TFO | 6/15/2008 |
| FL | Brevard County Sheriff's Office | JEO | 8/13/2008 |
| FL | Collier County Sheriff's Office | JEO/TFO | 8/6/2007 |
| FL | FL Department of Law Enforcement | TFO | 7/2/2002 |
| FL | Jacksonville Sheriff's Office | JEO | 7/8/2008 |
| FL | Manatee County Sheriff's Office | JEO | 7/8/2008 |
| GA | Cobb County Sheriff's Office | JEO | 2/13/2007 |
| GA | GA Department of Public Safety | TFO | 7/27/2007 |
| GA | Hall County Sheriff's Office | JEO/TFO | 2/29/2008 |
| GA | Whitfield County Sheriff's Office | JEO | 2/4/2008 |
| MA | Barnstable County Sheriff's Office | JEO | 8/25/2007 |
| MA | Framingham Police Department | TFO | 8/14/2007 |

*TFO means that LEA officers were trained as Task Force Officers. JEO means that officers were trained as Jail Enforcement Officers.

APPENDIX F

## Local Enforcement of Immigration Laws: Evolution of the 287(g) Program and Its Potential Impacts on Local Communities

**FIGURE 1 (2 OF 2): 287(g) PROGRAMS IMPLEMENTED AS OF AUGUST 2008**

| State | Memorandum of Agreement (MOA) Name | Type* | Signed |
|---|---|---|---|
| MA | MA Department of Corrections | JEO | 3/26/2007 |
| MD | Frederick County Sheriff's Office | JEO/TFO | 2/6/2008 |
| MO | MO State Highway Patrol | TFO | 6/25/2008 |
| NC | Alamance County Sheriff's Office | JEO | 1/10/2007 |
| NC | Cabarrus County Sheriff's Office | JEO | 8/2/2007 |
| NC | Cumberland County Sheriff's Office | JEO | 6/25/2008 |
| NC | Durham Police Department | TFO | 2/1/2008 |
| NC | Gaston County Sheriff's Office | JEO | 2/22/2007 |
| NC | Henderson County Sheriff's Office | JEO | 6/25/2008 |
| NC | Mecklenburg County Sheriff's Office | JEO | 2/27/2006 |
| NC | Wake County Sheriff's Office | JEO | 6/25/2008 |
| NH | Hudson City Police Department | TFO | 5/5/2007 |
| NM | NM Department of Corrections | JEO | 9/17/2007 |
| OH | Butler County Sheriff's Office | JEO/TFO | 2/5/2008 |
| OK | Tulsa County Sheriff's Office | JEO/TFO | 8/6/2007 |
| SC | Beaufort County Sheriff's Office | TFO | 6/25/2008 |
| SC | York County Sheriff's Office | JEO | 10/16/2007 |
| TN | Davidson County Sheriff's Office | JEO | 2/21/2007 |
| TN | TN Department of Safety | TFO | 6/25/2008 |
| TX | Carrollton Police Department | JEO | 8/12/2008 |
| TX | Farmers Branch Police Deptartment | TFO | 7/8/2008 |
| TX | Harris County Sheriff's Office | JEO | 7/20/2008 |
| VA | City of Manassas Police Department | TFO | 3/5/2008 |
| VA | Herndon Police Department | TFO | 3/21/2007 |
| VA | Loudoun County Sheriff's Office | TFO | 6/25/2008 |
| VA | Manassas Park Police Department | TFO | 3/10/2008 |
| VA | Prince William County Police Department | TFO | 2/26/2008 |
| VA | Prince William County Sheriff's Office | TFO | 2/26/2008 |
| VA | Prince William-Manassas Adult Detention Center | JEO | 7/9/2007 |
| VA | Rockingham County Sheriff's Office | JEO/TFO | 4/25/2007 |
| VA | Shenandoah County Sheriff's Office | TFO | 5/10/2007 |

SOURCE: U.S. Immigration and Customs Enforcement, *Partners: Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act*, August 18, 2008, available at http://www.ice.gov/partners/287g/Section287_g.htm.

APPENDIX F

## Local Enforcement of Immigration Laws: Evolution of the 287(g) Program and Its Potential Impacts on Local Communities

What are these 287(g) programs? Essentially they are memoranda of agreement between LEAs and ICE that allow LEA officers to enforce immigration laws. LEAs designate officers for training by ICE in, among other things, immigration laws, identification of potential unauthorized immigrants, procedures for verifying documents, and use of databases to validate identities. Once trained, the designated officers then return to their home jurisdictions where they continue their roles as state or local law enforcement officials but are supervised by ICE agents whenever conducting immigration enforcement activities. There are essentially two different types of 287(g) agreements—"Jail Enforcement" and "Task Force" models. They differ depending on the type of LEAs that enter into agreements. Through Task Force agreements, designated officers (and only designated officers) may check the legal status of arrestees at the scene of arrest or participate with ICE agents in joint enforcement operations. The Task Force agreements generally designate officers to check immigration status as part of their regular policing duties and spell out which officers will become part of the Task Force. Jail Enforcement officers check the legal status of inmates as they are booked into jail, and Jail Enforcement agreements are mostly between ICE and county sheriffs' offices.

As of August 2008, there were twenty-three LEAs with Task Force agreements, twenty-seven with Jail Enforcement agreements, and another twelve with joint Task Force/Jail Enforcement agreements (Figure 2). Forty-one county LEAs had adopted 287(g) programs, compared with just eleven city and ten state agencies. All of the joint models and almost all of the Jail Enforcement models were adopted by counties (as most of the jails in question are county jails), but the Task Force models were fairly evenly distributed among cities, counties, and states.

**FIGURE 2: TYPES OF 287(G) PROGRAMS AND PARTICIPATING AGENCIES**

| Jurisdiction | Task Force Programs | Jail Programs | Joint Programs | Total |
|---|---|---|---|---|
| State | 7 | 3 | 0 | 10 |
| City | 10 | 1 | 0 | 11 |
| County | 6 | 23 | 12 | 41 |
| Total | 23 | 27 | 12 | 62 |

SOURCE: U.S. Immigration and Customs Enforcement, *Partners: Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act*, August 18, 2008, available at http://www.ice.gov/partners/287g/Section287_g.htm.

APPENDIX F

# Local Enforcement of Immigration Laws: Evolution of the 287(g) Program and Its Potential Impacts on Local Communities

## Demographics of 287(g) Program Location

Where are 287(g) programs located? As Figure 1 shows, a majority of jurisdictions with these programs (thirty-seven of them) are in southeastern states, with the greatest frequency in North Carolina and Virginia. The Southwest is the other region of the country with a substantial number (18), including programs in Arizona, California, Colorado, and Texas. There are only five programs in the Northeast (in Maryland, Massachusetts, and New Hampshire), and two in the Midwest (in Ohio and Missouri). It should not be surprising overall that the Southwest has such a high proportion of these programs, as that region of the country is closest to the U.S.-Mexico border, and so the proportion of unauthorized immigrants in the foreign-born and total populations is relatively high there. But why are there so many in the Southeast and so few in the rest of the country?

If we look at recent patterns of immigration, the 287(g) programs are mostly located in states with either substantial immigrant populations or with fast-growing immigration populations (Figure 3). In 2000, two-thirds of all immigrants were located in just six "major destination" states shown in blue: California, New York, Florida, Texas, Illinois, and New Jersey. These are the states with the nation's largest and most diverse cities; they also have a decades-long tradition of immigrant settlement.  Half of these six major destination states—California, Florida, and Texas—had a combined total of thirteen 287(g) programs as of August 2008. In fact, these three states accounted for almost half (46 percent) of the estimated unauthorized population in 2005.[4]

On the other hand, there were twenty-two "new growth" states (shown in red in Figure 3) with foreign-born populations that grew faster than the major destinations between 1990 and 2000, led by North Carolina with a 275 percent increase. These states generally had very low or minimal immigrant populations in 1990, but by now all of them have substantial populations of newcomers.

There are several demographic factors about new growth states that may cause anti-immigrant backlash and lead to 287(g) implementation: relatively high shares of immigrants who are unauthorized and from Latin America, as well as a relatively low share who are citizens who can vote. North Carolina is among the nine new growth states that have 287(g) programs, and the state has eight such programs, more than any state except neighboring Virginia. There are forty-one programs overall in new growth states, far more than in the traditional states (all of which have much larger total populations). So clearly there is some correlation between rapid immigrant population growth and the implementation of 287(g). But there are also thirteen new growth states without 287(g) programs, and seven states with 287(g) programs that are neither main destination nor new growth states. It is worth noting that most of the southeastern new growth states have at least one 287(g) program, while none of the new growth states in the Midwest and Northwest have any programs.

There are also some interesting geographic and demographic features worth noting in the pattern of 287(g) location at the metropolitan level.  There are just three major immigrant destination cities with 287(g) programs: Houston, Los Angeles, and Phoenix. The other large cities in the U.S. with longstanding immigrant populations (e.g., Dallas, Chicago, Miami, and New

APPENDIX F

# Local Enforcement of Immigration Laws: Evolution of the 287(g) Program and Its Potential Impacts on Local Communities

**FIGURE 3: 1990-2000 IMMIGRATION GROWTH PATTERNS AND LOCATION OF 287(G) PROGRAMS ACROSS THE STATES**



York) do not have 287(g) programs. Atlanta (Cobb County, GA) is the next largest city with a 287(g) program, but it has a relatively recent immigrant population (Singer 2004). Nashville (Davidson County, TN), along with Durham and Raleigh (Wake County) in North Carolina, represent other large southeastern cities with 287(g) programs. The four 287(g) programs in Arkansas are all located in the two northwestern-most counties in the state—Benton and Washington—which together include almost half of the state's immigrants (Capps, Henderson et al. 2007). Thus many of the southeastern 287(g) programs are in cities with substantial and rapidly growing immigrant populations; however, some are in very rural areas as well (e.g., Shenandoah and Rockingham Counties in Virginia). Closer to the nation's capital, the jurisdictions with 287(g) programs are all in suburbs of Washington, DC with small but rapidly growing immigrant populations (Frederick County, Maryland; Herndon, Manassas, Loudon County, and Prince William County, Virginia). The Dallas suburban areas of Farmers Branch and Carrollton County also have 287(g) programs.

Two political scientists, Paul Lewis and Karthick Ramakrishnan (2007), analyzed the factors that have led to the development of state and local legislation aimed at reducing the unauthorized population. While they did not specifically model the development of 287(g)s, their findings with regard to state and local legislation are informative. They found that immigrant popula-

APPENDIX F

## Local Enforcement of Immigration Laws: Evolution of the 287(g) Program and Its Potential Impacts on Local Communities

tion sizes and recent growth rates were correlated with the legislation, but that the political context was far more important. Republican Party affiliation was the single most important factor in predicting the passage of such laws. Thus it may be a combination of demographic and political factors that are at play in promoting the proliferation of 287(g) programs. It appears that the highest concentrations are in cities and suburban locations with new but rapidly growing immigrant populations in conservative states in the Southeast and Southwest. With the exception of a handful of programs in Maryland and New Hampshire, there are no programs in the more liberal areas of the Northwest, Midwest, or Northeast. In fact, almost half (fifteen out of the thirty-one) states that went for George W. Bush in the 2004 presidential election have 287(g) programs, compared with about a fifth (four out of nineteen) states that went for John Kerry.[5]

### The 287(g) Program in Northwest Arkansas

Our field research in northwest Arkansas offers a little more detail with regard to the factors underlying implementation, implementation itself, and some preliminary possible impacts. Rogers and Springdale are located in the northwest corner of Arkansas, in Benton and Washington Counties respectively. They are the home bases of two large U.S. corporations—Wal-Mart and Tyson's—that have been on the receiving end of immigration raids in recent years. Their immigrant populations were small in the 1980s but grew rapidly starting in the 1990s, and currently Latino immigrants are about a quarter of total population and a third of the school-age population in both locations (Capps, Henderson et al. 2007).

The original motivation for the program came from the mayor of Rogers (located in Benton County), who campaigned on curtailing illegal immigration[6] and championed a restrictive ordinance targeting unauthorized immigrants. It was modeled after one in Hazleton, Pennsylvania, before that ordinance was struck down in the courts.[7] Once it became clear that a Hazleton-style ordinance (mostly restricting housing and government services for unauthorized immigrants) either would not pass or would fail on implementation, the mayor started to pursue a 287(g) agreement.[8] Due to lack of space to house unauthorized immigrants in Rogers' facilities, Benton County came on board. Around the same time, neighboring Washington County was building a large jail, which has since become the main holding facility for immigrants arrested through the program. Springdale also joined the agreement. In a somewhat unique arrangement, ICE negotiated the 287(g) program with all four jurisdictions (Rogers, Springdale, Benton County, and Washington County) simultaneously.[9] All four jurisdictions sent nineteen officers for training at the same time, and established a joint Task Force/Jail Enforcement model across all four jurisdictions.[10]

The mayor of Rogers was the driving force behind the creation of the program, but there was reluctant support from other quarters in the area as well.[11] Springdale proceeded somewhat more cautiously and established a Hispanic advisory committee for its program.[12] The primary rationale behind asking for the program was based on a perceived uptick in crime, which included several gang-related incidents and the non-fatal shooting of a Rogers police officer by an unauthorized immigrant.[13] Like the mayor of Hazleton and other local leaders who have promoted meas-

# Local Enforcement of Immigration Laws: Evolution of the 287(g) Program and Its Potential Impacts on Local Communities

ures directed against unauthorized immigrants, the mayor of Rogers advocated the 287(g) program as means to combat crime. Local leaders in Springdale also used the anti-crime argument and, in public discussions with the Hispanic advisory committee, promised to focus solely on deporting immigrants who committed serious crimes. Thus the rapid increase in the Latino immigrant population, perceptions of a new crime wave among these recent immigrants, an increase in county jail capacity, and the personal leadership of the mayor were the major driving forces behind the pursuit of the 287(g) program in northwest Arkansas. Between October 2007, when the program there was implemented, and May 2008, over four hundred people had been arrested and identified as unauthorized immigrants to be deported.[14]

Because the 287(g) program is a joint Task Force/Jail Enforcement model, some of those immigrants were identified after they had already been arrested and booked at one of the county jails. But on the Task Force side, there were a variety of different operations. The Rogers Police Department has arrested a significant number of unauthorized immigrants through traffic violations, the most common of which is driving without a valid license. In some cases people were picked up during routine traffic stops, but the department has also operated some roadblocks to randomly check licenses.[15] This practice has been controversial because Rogers was sued by the Mexican American Legal Defense and Education Fund in 2001 for racial profiling against Latinos during traffic stops.[16] This suit was settled out of court, and the Rogers Police Department agreed to adopt language in its regulations to avoid racial profiling and set up an advisory committee to monitor compliance.[17] However, local advocates have accused the department of reverting to racial profiling during traffic stops since the 287(g) agreement was implemented. The Springdale Police Department has reportedly made far fewer arrests of unauthorized immigrants during traffic stops than has Rogers.

Police from both Rogers and Springdale have also participated in investigations and raids on worksites alongside ICE agents. The 287(g) Task Force there has concentrated heavily on identity theft and document fraud, much as ICE has across the country in recent large-scale worksite raids, including the one in Postville in May 2008. The Task Force has focused on small-scale investigations and, in the largest raid to date, arrested owners and about two dozen employees of a Mexican restaurant chain in the area.[18] ICE and other federal agencies had begun this investigation before 287(g) was implemented, but the designation of Rogers and Springdale police officers as immigration agents added manpower to the investigation and the raid, which took place in December 2007.[19]

Many local advocates and some within the local governments of Rogers and Springdale have questioned the implementation of the 287(g) program, as it has evolved from a focus on violent and other serious criminals toward more routine violations and worksite enforcement. Many local Latino leaders in Springdale were on board with the program originally, albeit reluctantly, because they approved of a focus on deporting serious criminals. But as the net widened to include traffic violations and it became clear that the designated Task Force officers were working on ICE worksite operations (such as the restaurant chain raid), many of the Latino leaders withdrew their support and began criticizing the program.[20] Relations between the police and the Latino

# Local Enforcement of Immigration Laws: Evolution of the 287(g) Program and Its Potential Impacts on Local Communities

community deteriorated further during spring 2008 following a few well-publicized abuses by a Task Force officer acting alone to question people about their legal status without probable cause for an arrest. Then Task Force officers arrested an unauthorized immigrant while he was at an elementary school picking up his son, which upset both the school district and the local Latino community.

One of the most troubling aspects of ICE's immigrant enforcement strategies generally, which we have observed both in worksite operations and in the 287(g) arrests in Arkansas, is the secrecy surrounding arrest and detention. Those immigrants arrested for a state or local violation were given the same rights as any other arrestee—to a phone call and a lawyer. Information about all of those arrested on state and local charges is available for immigrants, just as for any other inmates at the county facility. But those immigrants arrested on federal charges such as identity theft, or merely referred to ICE as an "administrative arrest" for deportation (because they committed no state or local crime), were generally not given access to a telephone, and often there was no information at all available about them.

ICE generally only releases the numbers they assign unauthorized immigrants in detention, not their names or locations.  Many of those who were not charged with a state or local violation were moved out of Arkansas quickly, along with those who had served their sentence in the county jail and were remanded to ICE custody. Although the federal government had jurisdiction over this group of detainees, they were originally arrested by local police officers in most cases. When they disappeared into the federal system, their family members, lawyers, and others had difficulty locating and communicating with them. This increased the panic and sense of hopelessness among arrestees' families, as they did not know the whereabouts and could not verify the safety and health of their loved ones.

During June 2008 when we visited Rogers and Springdale, there was anecdotal evidence that the 287(g) program had led to strained relations between the police departments and local immigrant communities. There were anecdotes of crimes going unreported, though no hard evidence that crime rates had increased. The school districts in Rogers and Springdale saw their enrollments stabilize in 2007-08 for the first time following twenty years of rapid growth led by Hispanic immigrants, and there was anecdotal evidence that large numbers of Latinos were leaving the area for other parts of the U.S. Tax receipts began to decline and housing vacancy and foreclosures increased.  But like so much of the rest of the country, the area was experiencing a housing bust (which in turn created a downturn in construction employment—a major source of immigrants' jobs), and so it is difficult to disentangle economic from enforcement effects. It is probably too early to tell, but many local leaders (within and outside the local governments) believe that the enforcement has taken an economic and social toll on the communities there.

## Conclusions and Recommendations

Our research to date in Arkansas, though preliminary, suggests that LEAs should proceed cautiously in entering into 287(g) agreements with ICE. Perhaps the first caution is that there should be a broad base of local support for the program; too often it seems that one or a handful

## APPENDIX F

## Local Enforcement of Immigration Laws: Evolution of the 287(g) Program and Its Potential Impacts on Local Communities

of local government leaders are promoting the program without broad-based support, as appeared to be the case in Rogers.

Second, local community leaders including immigrants may support a 287(g) program if it is directed at violent and other serious offenders, as they did initially in Springdale; however, their support is likely to erode and distrust to grow between the community and the police if immigrants are arrested for minor violations.

Third—and this is a very important factor for LEAs to consider—we were told that once trained, the Task Force officers were directly supervised by an ICE agent, and that all Task Force operations however minor had to be either initiated by or cleared by ICE. This means that in effect the Rogers and Springdale police departments were paying their staff to work for ICE, representing a cost transfer from the federal to the local government. On the other hand, we also heard that the Washington County Jail was reimbursed for housing those arrested on immigration charges, and thus 287(g) may have brought a fiscal benefit to the county.

Fourth, both because ICE initiated worksite operations and because one officer tested the boundaries of his authority, it appeared that the local police departments had lost some measure of control over the actions of their officers.

Fifth, because of the large numbers of arrests (several hundred) over just a short period of time (six months), a small wave of panic fell over the immigrant communities in Rogers and Springdale. While their fear was not as great as what we found in communities with large-scale single-day worksite raids (such as Postville, Iowa), nonetheless, this fear resulted in driving some families out of the area and others into hiding, thereby somewhat reducing overall economic activity.

Finally—and this was the major topic of our investigation—we have been documenting the impacts on families and children when parents are arrested in immigration raids, including those by the local police in Rogers and Springdale. In our previous work on ICE raids on work-sites, we found that children suffer from separation from their parents (which may be prolonged if parents are detained for several months); economic hardship after parents are arrested (bearing in mind that unauthorized families, unlike most other families with incarcerated members, are by and large ineligible for or afraid to seek public assistance); social isolation as fear and panic grip immigrant communities and families go into hiding; and the social stigma associated with racial profiling and the labeling of parents as "illegal."

We have not yet investigated the longer-term impacts on children but are planning to do so both in Arkansas and in our other study sites. We anticipate we may also find that over time, these types of enforcement strategies not only sow distrust between law enforcement agencies and immigrants but also may lead immigrants' children to distrust authority and despise the laws that govern our country, which they may rightfully perceive as unjust. This is the greatest long-run danger of our current immigration enforcement regime—that it might create anti-social behaviors and increase crime among immigrants and their children—and it is no less a danger when the enforcement is conducted by local law enforcement than when conducted by federal authorities.

Given these tentative conclusions and the likelihood that the number, scope, and breadth of

## APPENDIX F

## Local Enforcement of Immigration Laws: Evolution of the 287(g) Program and Its Potential Impacts on Local Communities

287(g) activities will increase substantially in the near future, the following recommendations to state and local LEAs derive from our research:

- Establish a broad base of support for agreements before they are signed, and bring on board leaders from local immigrant communities. Seek the input of local immigrant leadership when drafting the agreement and setting the parameters on enforcement, and meet with local leaders regularly to monitor the program.

- Concentrate on deportation of immigrants already incarcerated (i.e., through the Jail Enforcement model) and those who are arrested for very serious crimes. Do not extend operations to include traffic and other routine violations.

- Avoid LEA involvement in potentially controversial worksite or other major ICE enforcement operations; leave the federal law enforcement side to federal officers.

- Work out a supervision arrangement with ICE that allows greater control over operations by the LEA, even if this requires tough negotiations with ICE or some overhaul of the program at the federal level.

- Maintain control over individual officers that receive Task Force designation and discipline those who step over the line.

- Establish and enforce prohibitions against racial profiling by designated Task Force officers and be sure that the public is aware that racial profiling will not be tolerated.

- Be transparent with local leaders and the public about the types of arrests and operations that Task Force officers are engaged in; provide data on numbers of arrests and allow family members to visit loved ones who have been incarcerated (which is sometimes difficult after people are moved into ICE custody). Providing accurate and timely information can avoid the spread of rumors and panic, which may be detrimental both to law enforcement and the local community.

- Provide resources for families whose members are arrested. Work with local schools, childcare providers, health and social service agencies, and faith-based organizations to ensure that they are aware of ongoing operations, get accurate and timely information about who is arrested, and are able to locate and assist families and children as necessary.

**Acknowledgments**

The author would like to acknowledge Urban Institute colleagues Ajay Chaudry, Rosa Maria Castañeda, Juan Pedroza, Robert Santos, and Katherine Matthews, who helped design and conduct the research that made this paper possible. A number of local elected officials, police officers, community leaders, and immigrant families were interviewed and gave their valuable input for this research project. The Urban Institute will release a full report on the impact on immigrant families and children of the 287(g) program in Arkansas—along with the impact of federal enforcement efforts—in early 2009.

APPENDIX F

## Local Enforcement of Immigration Laws: Evolution of the 287(g) Program and Its Potential Impacts on Local Communities

### Endnotes

[1] See U.S. Immigration and Customs Enforcement, "Frequently Asked Questions About Worksite Enforcement," *Fact Sheet,* August 12, 2008, available at http://www.ice.gov/pi/news/factsheets/worksite.htm.

[2] See U.S. Immigration and Customs Enforcement, "FY 2007 Accomplishments," *Fact Sheet,* January 2008, available at http://www.ice.gov/doclib/pi/news/factsheets/fy07accmplshmntsweb.pdf.

[3] See U.S. Immigration and Customs Enforcement, "Partners: Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act," *Fact Sheet,* August 18, 2008, available at http://www.ice.gov/partners/287g/Section287_g.htm

[4] See Pew Hispanic Center, "Estimates of the Unauthorized Migrant Population for States based on the March 2005 CPS," *Fact Sheet,* April 26, 2006, available at http://pewhispanic.org/files/factsheets/17.pdf.

[5] For a map of states that went for Bush versus Kerry in 2004, see Gastner, Michael, Cosma Shalizi, and Mark Newman, "Maps and cartograms of the 2004 US presidential election results," University of Michigan, Department of Physics and Center for the Study of Complex Systems, November 17, 2004, available at http://www-personal.umich.edu/~mejn/election/.

[6] "Stephen Allen Womack Mayor with a mission," *Arkansas Democrat-Gazette,* November 25, 2001.

[7] "Ordinance on aliens hits snag," *Arkansas Democrat-Gazette,* November 2, 2006.

[8] "City's Immigration Plan Stretches to Nation's Border," *The Morning News* (Northwest Arkansas), November 29, 2006.

[9] "Regional Immigration Task Force Suggested, "*The Morning News* (Northwest Arkansas), July 4, 2007.

[10] "19 area lawmen begin immigration training," *Arkansas Democrat-Gazette,* August 22, 2007.

[11] "Alderman says crack down on illegals, cites Rogers' idea," *Arkansas Democrat-Gazette,,* November 15, 2006.

[12] "Council favors chief's bid for immigrant clout," *Arkansas Democrat-Gazette,* April 7, 2007.

[13] "Sides debate police training need," *Arkansas Democrat-Gazette,* March 4, 2007.

[14] "Information Scarce on 287(g) Program: Task Force Officers Arrest 419 in First Seven Months, "*The Morning News* (Northwest Arkansas), May 14, 2008.

[15] The Rogers MOA with ICE specifically allows Task Force officers to check immigration status during routine traffic enforcement operations, or after someone has been arrested for a traffic violation.

[16] "Rogers Police dealings with INS focus of profiling suit," *Arkansas Democrat-Gazette,* December 22, 2001.

[17] "Womack: Suit no issue in immigration enforcement training," *Arkansas Democrat-Gazette,* March 2007.

[18] "Restaurateurs before court deny harboring illegals," *Arkansas Democrat-Gazette,* January 15, 2008.

[19] "Prosecutor: Bad Employers Prompt Raids, Activists Question Move Against Smaller, Hispanic-Owned Businesses, *The Morning News* (Northwest Arkansas), January 28, 2008.

[20] "Hispanic leaders troubled by raids," *Arkansas Democrat-Gazette,* January 13, 2008.

APPENDIX F

## Local Enforcement of Immigration Laws: Evolution of the 287(g) Program and Its Potential Impacts on Local Communities

### References

Capps, Randy, Rosa Maria Castañeda, Ajay Chaudry, and Robert Santos. (2007). "Paying the Price: The Impact of Immigration Raids on America's Children." *Research Report*. Washington, DC: National Council of La Raza.

Capps, Randy, Everett Henderson, John D. Kasarda, James H. Johnson, Jr., Stephen J. Appold, Derrek L. Croney, Donald J. Hernandez, and Michael E. Fix. (2007). "A Profile of Immigrants in Arkansas." *Research Report*. Little Rock, AR: Winthrop Rockefeller Foundation.

Espenshade, Thomas, Jessica Baraka, and Gregory Huber. (1997). "Implications of the 1996 Immigration and Welfare Reform Acts for U.S. Immigration." *Population and Development Review* 23(4): 769-801.

Lewis, Paul, and Karthick Ramakrishnan. (2007). "Police Practices in Immigrant-Destination Cities: Political Control or Bureaucratic Professionalism?" *Urban Affairs Review* 42(6): 874-900.

Passel, Jeffrey S. (2006). "Size and Characteristics of the Unauthorized Migrant Population in the U.S." *Research Report*. Washington, DC: The Pew Hispanic Center.

Singer, Audrey. (2004). "The Rise of New Immigrant Gateways." *The Living Census Series*. Washington, DC: The Brookings Institution.

APPENDIX G

# Immigration and Local Policing:
# Results from a National Survey of Law Enforcement Executives

by Scott H. Decker, Paul G. Lewis, Doris Marie Provine, Monica W. Varsanyi

In the past several decades, the number of immigrants in the United States who lack legal documentation has grown to unprecedented levels—approximately twelve million, according to recent estimates (Passel 2006)—and so has controversy surrounding their settlement in American communities. Many immigrants are choosing new destinations. Cities, suburbs, and rural communities in parts of the country that have not traditionally hosted large numbers of immigrants are now more on par with traditional gateway cities like Los Angeles, New York, and Chicago (Zúñiga and Hernández-León 2005). As evidence of this dramatic shift, the Mexican immigrant population (both legal and undocumented) in "new gateway" states grew dramatically between 1990 and 2000: 200-400 percent in New York, Pennsylvania, Washington, and Wisconsin; 645 percent in Utah; 800 percent in Georgia; 1000 percent in Arkansas and Minnesota; and over 1800 percent in North Carolina, Tennessee, and Alabama (Zúñiga and Hernández-León 2005, p. xiv).

With immigrant settlement patterns shifting, undocumented immigration has become even more of a hot-button political issue. An increasing number of state and local governments are asking police to take a more active role in identifying and arresting immigrants for civil immigration violations. Two federal statutes adopted in 1996 created opportunities for this partnership between federal immigration agents and local police. The Antiterrorism and Effective Death Penalty Act (AEDPA) gives local police the authority to arrest previously deported non-citizen felons, and the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) authorizes training of local and state police to enforce federal immigration laws.

## Federal Powers, Local Police, and Immigration

The devolution of immigration policing authority from the federal to local governments represents a sharp break with a long-established tradition of federal control over all aspects of immigration enforcement and is giving rise to what some observers are calling "immigration federalism" (Spiro 1997; Huntington 2007). Although federal authority over immigration has always involved a degree of cooperation and occasional conflict between local and federal officials, the federal government has historically been recognized to have plenary power in this area. Being present in the U.S. without authorization is a civil violation under federal law, not a prosecutable crime under the jurisdiction of localities. In the past, state and local police forces played only a supportive role, sometimes sharing information about those they had detained as criminal suspects or assisting in enforcement actions.

The federal government cannot require local governments to do immigration policing. Police powers are constitutionally reserved for the states and their jurisdictional subunits, an arrange-

Scott H. Decker, Professor, School of Criminology and Criminal Justice, Arizona State University; Paul G. Lewis, Assistant Professor, Department of Political Science, Arizona State University; Doris Marie Provine, Professor, School of Justice and Social Inquiry, Arizona State University; Monica W. Varsanyi, Associate Professor, Department of Government, John Jay College of Criminal Justice (at Arizona State University during preparation of this paper).

## APPENDIX G
## Immigration and Local Policing:
## Results from a National Survey of Law Enforcement Executives

ment that provides localities with significant flexibility and autonomy. But with the AEDPA and IIRIRA, the federal government has created an opening for localities to ask their police officers to be trained by and to join the federal government in enforcing immigration laws within the interior of the United States.

Beginning in 2002, informal working relationships between local police and federal immigration agents have developed in some departments. Others are seeking formal training from federal immigration authorities under the 287(g) program (referring to the section of the IIRIRA which authorizes such collaboration). Federal agents also are embedded in some police departments to assist in enforcement of drug and human smuggling laws. A number of state prisons and local jails send the names of criminal suspects to federal authorities to be checked for immigration violations. And an increasing number of police departments are electing to do their own immigration status checks. Within the past several years, the number of law enforcement agencies that have asked for training to make these checks has increased from eight to more than sixty (Immigration and Customs Enforcement 2008). Other local governments and police departments, stating concerns for public safety and the importance of police-community relationships, have rejected local civil immigration enforcement entirely—a small number have declared themselves to be sanctuary cities, while others follow a kind of informal "don't ask, don't tell" policy regarding contacts with possible unauthorized immigrants.

This devolution of immigration policing to the local level presents police departments with several important challenges. One is the potential for conflict between commitments to community policing and active involvement in immigration control. Community policing practices emphasize close communication and collaboration between police and community. Engagement in identifying and removing unauthorized immigrants challenges these relationships in areas with large numbers of Hispanic residents. As the Immigration Committee of the Major Cities Chiefs (2006, p. 3) observed, "Local enforcement of federal immigration laws raises many daunting and complex legal, logistical and resource issues for local agencies and the diverse communities they serve." While stopping short of endorsing one approach for local law enforcement in the debate over how best to respond to unauthorized immigration, the recommendations highlight the many challenges to local law enforcement in carrying out its primary function, including loss of trust among immigrant groups, inadequate resources, complexity of federal laws, lack of local legal authority for intervention, and risks of civil liability.

A second concern is that immigration enforcement activities may discourage members of immigrant communities who are victims or witnesses of crime to come forward. Many new immigrant groups that may be vulnerable to high rates of victimization come from countries where distrust of authorities—particularly law enforcement—is a valid concern. In such cases, building community trust in the police is already a difficult task. A 2007 report by the International Association of Chiefs of Police notes that local immigration enforcement makes that task even more difficult. This report identifies eight specific areas of conflict between communities, elected officials, and federal and local law enforcement.

A third concern is that the core commitment to local concerns in policing will be lost in the

## APPENDIX G
## Immigration and Local Policing:
### Results from a National Survey of Law Enforcement Executives

process of developing stronger links with federal immigration authorities.   American policing spent the last half of the twentieth century elaborating on and strengthening local control. During this period, the focus of police evolved from an emphasis on administrative and professional issues, to community relations and interaction.  Problem solving and fear reduction and an emphasis on "zero-tolerance" have also been added to the policy mix (Greene 2001).  Each of these re-conceptualizations of American policing, despite their differences, has a decidedly local character.  Local communities have provided an important check on the expansion of police authority and jurisdiction, reflecting the historical antipathy of the American populace toward federalizing law enforcement (Mastrofski 1988).

Finally, police commitments to avoid racial profiling are put at risk by active involvement in immigration enforcement because the drive to eliminate unauthorized immigrants has focused on people who have crossed the nation's southern border from Mexico. Although many departments have developed antiprofiling policies, immigration enforcement subtly encourages officers to focus on people who "look Mexican" or who are heard to speak a foreign language. Also, enforcement efforts that target unauthorized immigrants will inevitably draw some naturalized citizens, legal permanent residents, and citizens into newly intrusive contacts with the police.  The climate is reportedly becoming inhospitable for many people: as detailed in a recent Pew Hispanic Center report, over half of all Latinos in the United States fear that they or someone close to them may be deported in the current enforcement climate (Pew Hispanic Center 2007).

How, then, should police respond?   Will enforcing civil immigration laws erode community policing ideals, particularly in towns and cities with significant immigrant populations?  Are other essential elements of local police services at risk?

The growing involvement of local police in immigration enforcement has gained enormous momentum with almost no systematic research or information base (though see Waslin 2007 and www.trac.syr.edu).  Law enforcement executives, public officials, and scholars seeking information on this topic have largely had to rely on media accounts, anecdotal information, and reports by advocacy groups of one stripe or another.  To respond to the need for systematic information on this topic, the authors have launched a four-stage project, which includes two rounds of survey research and two rounds of local, in-depth, comparative case studies.  Our research is geared toward describing the range of actions local police have taken in regard to unauthorized immigration and ultimately describing the context for these actions.

This report presents the initial results of our first nationwide survey of police executives in large U.S. cities.  We report on several issues.  These issues include the role of local politics in setting police policy, the relationship of local police departments with federal Immigration and Customs Enforcement authorities, the range of variation in local practices and policies, and community relations.  The results indicate that local police play a critical role in the ways in which local communities relate to immigrants, particularly in their exercise of discretion with regard to immigration enforcement.

APPENDIX G
# Immigration and Local Policing:
# Results from a National Survey of Law Enforcement Executives

## Nature of the Sample

A national web/mail survey of 452 law enforcement executives was initiated in November 2007. We received 237 survey responses (a response rate of 52.4 percent). The sample chosen for this survey was large and medium-sized local (subcounty) jurisdictions. We began with a list of all U.S. cities and towns that were included in the Census Bureau's American Community Survey (ACS) in 2005; the Census Bureau aimed to include in the ACS all localities of 60,000 or higher population, although a few communities had slightly lower populations. We dropped from this list several communities that do not have their own police departments (such as certain townships, and some municipalities that contract with other local governments for police services). This list yielded our 452-community sample and ultimately the 237 responses reported here.

Most of these communities have a substantial number of foreign-born residents. Sixteen percent of the residents in the average locality represented in our survey were immigrants as of 2005 (according to the ACS data). The share of immigrants in the cities we surveyed ranged widely from 1 percent to 60 percent of the population.

## Local Politics, Law Enforcement, and Immigration

One of the critical issues for law enforcement in responding to immigration is the extent to which the attitudes of personnel in their department may differ from those of residents or political leaders of the jurisdiction they serve. The nature of law enforcement and the situations officers encounter often cause the police to see their community from a somewhat different perspective than other community members. In this section, we contrast the views of law enforcement leaders with their perceptions of the attitudes prevailing in the jurisdictions their departments are responsible for protecting.

The responses suggest that on the issue of immigration, the difference between police departments and their community is significant. Figure 1 depicts the degree to which unauthorized immi-

**Figure 1: Unauthorized immigration is a controversial topic...**



gration is viewed as a controversial topic in a comparative format. Police executives are more inclined to see unauthorized immigration as a controversial topic within their community than within their department. Indeed, the differences on this question are quite striking. This suggests a cleavage between the way that police and communities frame the immigration issue.

A related issue is whether people believe that it is easy to determine who is in the country without authorization. Figure 2 shows a contrast in views between departments and communities. Law enforcement officials see community members as more likely than police personnel to think that determining someone's immigration status is relatively easy. Chiefs also report that gaining the trust of unauthorized immigrants is a much greater priority for their department than for their locality. Fifty-two percent note that gaining the trust of unauthorized immigrants is a priority in their departments, as compared with 25 percent in their community. The difference may be attributable to the view, widespread among police departments, that effective police work depends on law enforcement's ability to gain the trust and communication of all segments of the local population.

**Figure 2: People believe that it is relatively easy to determine who is in this country without authorization…**



Figure 3 provides an additional perspective on the issue of trust in immigrant communities. The majority of chiefs believe that immigrants are less likely than the general population to report to the police situations in which they have been victims or witnesses of crime.

A related issue is the potential for victimization of unauthorized immigrants by criminals. Chiefs are split on whether unauthorized immigrants are more or equally vulnerable to street crime and domestic violence. But on this topic, chiefs tend to see their communities as somewhat less likely to appreciate the victimization of immigrants as a significant problem. Three in ten chiefs reported that their own departments consider victimization of immigrants to be a significant problem, compared to 23 percent who believe that the broader community feels the same way (see Figure 4).

## APPENDIX G
## Immigration and Local Policing:
## Results from a National Survey of Law Enforcement Executives

**Figure 3: How likely are immigrants in your community to contact law enforcement when they are victims or witnesses to crime, as compared with the general population?**



A majority of the chiefs responding (59 percent) report a relatively high level of satisfaction from elected officials with their current level of immigration enforcement.  Chiefs report wide variation, however, in what local officials expect.  Nearly half (46 percent) report that their local government has no official policy regarding unauthorized immigrants living or traveling through the jurisdiction.  At the other end of the spectrum, 12 percent of chiefs report that their local governments expect their departments to take a proactive role in deterring unauthorized immigration.  Only 4 percent of chiefs report that their local governments have openly declared themselves as "sanctuary cities" for unauthorized migrants who are not engaged in criminal activities, while another 15 percent report that their cities unofficially operate under a "don't ask-don't tell" policy.

**Figure 4: Victimization of immigrants is considered a significant problem...**



APPENDIX G

# Immigration and Local Policing:
## Results from a National Survey of Law Enforcement Executives

### Relationships with U.S. Immigration and Customs Enforcement (ICE)

The relationship between local law enforcement and Immigration and Customs Enforcement, an agency of the U.S. Department of Homeland Security, is an important part of the local response to immigration issues. Our survey revealed interesting differences among local police chiefs in their views regarding the relationship between their department and ICE (see Figure 5).

**Figure 5: Which of these statements best describes the direction of your department's current communication with ICE?**



Although a plurality of chiefs (44 percent) believe that useful information flows equally between their department and ICE, 20 percent report that the flow of useful information is mostly in one direction—from their department to ICE. Another 32 percent report little or no communication with ICE at all.

Whether a department has a formal agreement with ICE or not, a large majority (74 percent) report that they contact ICE when a suspected unauthorized immigrant is held for a criminal violation. Formal written agreements with ICE are rare, however. Only 4 percent of departments report having a 287(g) Memorandum of Agreement (MOA) that provides for federal training of local law enforcement and cooperation in arrests and investigations of unauthorized immigrants, while 3 percent have an MOA to help manage unauthorized immigrants who have been incarcerated. A slightly larger share of departments (8 percent) have ICE officers embedded in one or more of their units. It should also be noted that 14 percent of chiefs responded that their departments do *not* participate or assist in ICE immigration-enforcement activities. (Note that respondents were allowed to choose more than one of the above responses, if appropriate.) A majority of those who work with ICE report satisfaction with this relationship.

The survey also asked chiefs how their department and their communities assess the responsibilities of the federal government in immigration control. The great majority of chiefs (72 percent) regard

APPENDIX G

## Immigration and Local Policing:
## Results from a National Survey of Law Enforcement Executives

immigration enforcement as the responsibility of the federal government (see Figure 6). A significantly smaller majority (58 percent) perceive support for this view within their local communities.

**Figure 6: Immigration enforcement is considered the responsibility of the federal government...**



**Practices and Policy of Immigration Enforcement**

The survey probed police practices in situations involving immigrants whose residence in the U.S. was unauthorized. Chiefs were asked how their officers would respond when faced with a number of situations. In general, the more serious the violation, the more likely they believe that their officers are to check immigration status. Thus chiefs believe that in situations involving traffic violations and witnesses or victims of crime (except human trafficking), their officers are least likely to contact ICE or inquire of immigrant status. Chiefs believe that their officers are most likely to contact ICE in situations involving violent crime or a parole violation. Arrests for domestic violence and nonviolent crime fall somewhere between (see Figure 7).

In many cases, these decisions are made without clear policy guidance. Just under one-half of departments have a policy regarding interactions with immigrants, with 39 percent reporting that these are written policies and 9 percent reporting that these are unwritten policies. Fifty-one percent of departments do *not* have a written or unwritten policy regarding how officers are to deal with immigrants, and 1 percent reported that they do not know whether they have a policy regarding interactions with immigrants.

Furthermore, only 45 percent of departments offer training for sworn officers specifically related to incidents or calls involving unauthorized immigrants. This suggests that in many jurisdictions, local law enforcement is not well prepared to deal with the often complex and difficult decisions posed by unauthorized immigration and that decisions regarding immigrant-police interactions are more frequently made on an ad hoc basis.

APPENDIX G

# Immigration and Local Policing:
## Results from a National Survey of Law Enforcement Executives

**Figure 7: Percentage of police departments that typically check immigration status, contact ICE, or both, when encountering possible unauthorized immigrants in these situations.**



Most chiefs report that their response to the problem of illegal immigration is largely a product of their own departmental leadership, but some note the participation of local elected officials, the district attorney's office, federal officials, and the courts.

## Community Relations and Local Law Enforcement

Good community relations was a priority in the departments surveyed.  Chiefs report a variety of tools used to maintain relationships.  A majority of chiefs rated the following activities as very effective:  neighborhood meetings, visits to schools, churches and neighborhoods, bike patrols, cooperation with nongovernmental organizations, and officer proficiency in foreign languages.

Three-quarters of chiefs reported that their departments accept the Mexican consular ID card (*matrícula consular*) or other foreign IDs as forms of identification under some circumstances.  However, only 17 percent of respondents said that their departments maintained a phone line for confidential reports of criminal activity by members of the immigrant community.  Only 40 percent of chiefs report that their departments have enough officers proficient in foreign languages to work effectively in their immigrant communities.

## Conclusion

The results of this survey suggest several important conclusions about immigration and local police departments.

First, chiefs perceive significant differences between their departments and the communities they serve on important dimensions of the immigration issue.  In the view of law enforcement leaders, the community is more likely to view unauthorized immigration as controversial than is the department, somewhat more likely to see immigration as a local rather than federal enforcement

APPENDIX G

**Immigration and Local Policing:**
**Results from a National Survey of Law Enforcement Executives**

problem, and more likely to see determining immigration status as relatively straightforward.

Second, in many cases the police lack guidelines for their officers in the area of immigration. While nearly every department (91 percent) has a policy prohibiting racial profiling, the potential for conflict between these policies and immigration enforcement remains unresolved in many departments. A majority of police departments in our sample lack an official policy on how to deal with unauthorized residents and do not provide training to their officers on this issue. Norms may be developing on an ad hoc basis. The survey responses suggested that officers make distinctions between types of crime in deciding whether to inform federal authorities, with less serious crimes being reported less often.

Third, while most departments have some relationship with ICE, the vast majority have no formal agreement, such as a 287(g) MOA. Nevertheless, ICE is viewed as an important resource by local law enforcement, and levels of satisfaction with ICE are reasonably high. It is noteworthy, however, that a significant minority of departments report no relationship with ICE.

Fourth, chiefs report varied levels of interest in their communities in the issue of immigration enforcement. Nearly half of the communities in this survey have so far remained silent on this issue, and opinion in the remainder is split on whether police should be more involved. Most chiefs report that local authorities are satisfied with the department's efforts in this area.

Taken together, these results suggest that the leaders of local law enforcement are at an early stage of the development of policies and training to respond to unauthorized individuals. Communities and departments are both in need of information. It is imperative that more information be gathered about the nature of challenges facing local police in immigration issues so that the police and community can work together more effectively. As in most areas of public safety, immigration enforcement requires effective engagement of the community in order to be successful. Policies, programs, and training that enhance such relationships are likely to pay dividends in this area.

APPENDIX G

# Immigration and Local Policing:
# Results from a National Survey of Law Enforcement Executives

## References

Greene, Jack R. 2001. "Community Policing in America: Changing the Nature, Structure, and Function of the Police." In J. Horney (ed.) *Policies, Processes, and Decisions of the Criminal Justice System: Criminal Justice 2000*. Washington, D.C.: National Institute of Justice.

Huntington, Clare. 2007. "The Constitutional Dimension of Immigration Federalism," *University of Colorado Law Legal Studies Research Paper No. 07-06*. Available at SSRN: http://ssrn.com/abstract=968716.

U.S. Immigration and Customs Enforcement. 2008. *Partners: ICE ACCESS*. Retrieved http://www.ice.gov/partners/dro/iceaccess.htm.

International Association of Chiefs of Police. 2007. *Police Chiefs Guide to Immigration Issues*. Retrieved Jan. 3, 2008 from http://www.theiacp.org/documents/pdfs/Publications/PoliceChiefsGuidetoImmigration.pdf.

Major Cities Chiefs. 2006. *M.C.C. Immigration Committee Recommendations for Enforcement of Immigration Laws by Local Police Agencies*. Retrieved 3 Jan 2008 from http://www.houstontx.gov/police/pdfs/mcc_position.pdf.

Mastrofski, Stephen D. 1988. "Varieties of Police Governance in Metropolitan America," *Politics and Policy* 8, pp. 12-31.

Passel, Jeffrey S. 2006. *The Size and Characteristics of the Unauthorized Migrant Population in the U.S.: Estimates Based on the March 2005 Current Population Survey*. Last retrieved 15 July 2007 at http://pewhispanic.org/files/reports/61.pdf.

Pew Hispanic Center. December 2007. *2007 National Survey of Latinos: As Illegal Immigration Issue Heats Up, Hispanics Feel a Chill*. Last retrieved 3 January 2008 at http://pewhispanic.org/files/reports/84.pdf.

Spiro, Peter. 1997. "Learning to Live with Immigration Federalism," *Connecticut Law Review* 29, pp. 1627-36.

Waslin, Michele. 2007. "Immigration Enforcement by Local and State Police: The Impact on Latinos," *Law Enforcement Executive Forum* 7, pp. 15-32.

www.trac.syr.edu, "Transactional Records Access Clearinghouse: Comprehensive, Independent, and Nonpartisan Information on Federal Enforcement, Staffing, and Spending."

Zúñiga, Víctor, and Rubén Hernández-León, eds. 2005. *New Destinations: Mexican Immigration in the United States*. New York: Russell Sage Foundation.

APPENDIX H

**Law Enforcement Executive Views: Results from the Conference Survey**

by Karen L. Amendola, Kristin N. Williams, Edwin E. Hamilton, and Veronica Puryear

## Survey Respondents

The Police Foundation conducted a survey of law enforcement executives who attended the August 2008 national conference, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties.  Only those who were the top executive or his/her designee were asked to complete the survey.  This report shows the findings for the surveys returned at the conclusion of the conference.

### Respondents' Roles

A total of 54 attendees of the conference completed the survey as senior leaders in their respective agencies.  As demonstrated in Figure 1 below, the majority of survey respondents (40) were police chiefs.  The other respondents were deputy chiefs or assistant chiefs (9), sheriffs (2), a police superintendent (1), and two others (a major and one who indicated he/she was both a sheriff and a chief).

**Figure 1: Survey respondents by agency role**



### Respondents' Jurisdictions and Agency Types

Most of the participants were from urban agencies (n=29), while many were from urban/suburban areas (n=19).  The remaining six claimed to be from rural type areas.  The size of the jurisdictions ranged from just under 15,000 to more than 4 million.  Also, the majority of respondents (n=47) were from municipal or local law enforcement agencies while one was from a county police department, four were from sheriffs' offices, one was from an urban county met-

---

This survey was the work of the following Police Foundation staff: Karen L. Amendola, Chief Operating Officer, Research, Evaluation, and Professional Services; Edwin E. Hamilton, Professional Services Director; Veronica Puryear, Senior Research Associate; Kristin N. Williams, Research & Administrative Coordinator.

ropolitan area, and one was from both a sheriff's office and a municipal department.  The sizes of the respondents' agencies ranged from very small (<10 officers) to very large (>20,000 officers).

## Agency Concerns

Respondents were asked to list the five most critical issues facing them and their agencies.  As Table 1 (below) shows, resource concerns topped the list, with violent crime and gangs following.  Also among the top seven were community relations, drugs, and property crime, followed by immigration issues.

## Impact of Immigration Issues

Almost three-fourths (74%) of respondents agreed that they were facing new demands and changing expectations as leaders as a result of the growing emphasis on immigration law enforcement, and almost half (44%) said they are responding to increasing political pressure in their communities as a result of this issue.

While just 26% of these leaders felt that their resources were being diverted from activities that would better serve the community as a result of immigration enforcement, over three-fourths (78%) said that they were engaging the immigrant community more as a result of the growing emphasis on immigration law enforcement. They also expressed a high level of confidence in their understanding of immigration issues pertinent to their communities (76%).

> **TABLE 1. HIGHEST RANKED AGENCY CONCERNS**
>
> In general, what do you consider to be the most critical issues facing you and your agency? Please list them in priority order, from highest to lowest.
>
> 1. Resources
> 2. Staffing
> 3. Violent Crime
> 4. Gangs
> 5. Community Relations; Drugs (tie)
> 6. Property Crime
> 7. Immigration Issues
>
> Rankings were based on a weighted scoring system. Those ranked first were given a score of 5, second scored 4, third scored 3, and so forth.

Very few agencies were in favor of adopting a sanctuary policy (9%), whereas half (50%) were not supportive of sanctuary policies in their communities. At the same time, the remaining 41% had no opinion on that issue, perhaps indicating that they have not yet decided.

It is important to note that participants generally did not believe that *local* law enforcement should be even partially responsible for enforcement of immigration law (54%), whereas just 24% said they should.  The remaining 22% neither agreed nor disagreed that local law enforcement had at least partial responsibility.  However, the majority (62%) of law enforcement leaders believed that officers should ask for documentation of citizenship status when in contact with those who break the law (including those violating traffic laws), whereas only 17% agreed they should do so when in contact with crime witnesses, and even fewer (15%) when in contact with crime victims. While 13% of respondents felt such decisions should be at the discretion of officers, just 7% said that officers should *never* ask for proof of citizenship.

## Strategies for Engaging the Immigrant Community

Respondents were asked to describe the strategies they have developed or would develop to engage the immigrant community.  The most frequently cited strategies in the forty-five received

APPENDIX H

# Law Enforcement Executive Views: Results from the Conference Survey

responses were: organizing and/or attending community meetings, events, and forums (n=19), establishing community outreach programs or using community liaisons (n=17), attempting to educate the community through the media and bilingual pamphlets (n=13), or creating specialized department positions or programs to focus on the immigrant community (n=13).

## Advantages and Disadvantages of Local Immigration Enforcement

Respondents were asked to summarize the advantages and disadvantages of enforcing immigration law at the local level. Some indicated that local enforcement would help to fight crime in general (n=9) and would appease supporters in the community (n=9). A few suggested that there would be little or no advantage (n=3).

Over one-third (n=22) of the respondents suggested that a potential disadvantage to local enforcement would be the corrosion of trust in the community, while almost one-third (n=16) said that it would put a strain on their resources, result in civil liability, or constitutional issues (n=7), as well as racial profiling (n=6), and reduce witness cooperation (n=5). These responses indicate concerns by local law enforcement about the complexity associated with enforcing federal law.

## Impact of Immigrant Population on Crime and Victimization

Respondents were asked to indicate the likelihood of undocumented immigrants being crime perpetrators and crime victims. As Figure 2 shows, respondents believed that undocumented immigrants were more likely to be crime victims (81%) than crime perpetrators (39%). It should be noted that two respondents said they were not sure about the likelihood of immigrants to be perpetrators or victims.

While the aforementioned indicates that law enforcement leaders do not believe by and large that undocumented immigrants perpetrate crime, they have mixed views on the impact that undocumented immigrants have on various offenses. While less than half (44%) indicated that

**Figure 2: Likelihood of crime perpetration and victimization**



APPENDIX H

**Law Enforcement Executive Views: Results from the Conference Survey**

the presence of undocumented immigrants increases violent crime, youth crime (42%), or loitering (46%), half or more of the participants felt their presence increases traffic offenses (75%), drug-related crime (67%), gang-related crime (63%), and property crime (60%), followed by domestic assault and/or battery (52%) and public intoxication (50%).

## Local Enforcement of Immigration Law

Nearly half (46%) of the survey respondents indicated that their department has decided not to enter into a partnership with the federal government to enforce immigration law, while almost a quarter (24%) of them considered such action. Conversely, 13% have implemented or are in the process of implementing this relationship, with another 2% planning on doing so. The remaining respondents indicated that their jurisdiction has done none of the above.

Fully 87% of respondents said that aggressive enforcement of immigration law would somewhat or significantly impact budgetary resources in their agencies.

The majority of respondents indicated that aggressive enforcement of immigration law would have a negative impact on community relationships by decreasing: the community trust of the police (74%), trust between community residents (70%), and reporting of both crime victimization (85%) and criminal activity (83%). These important findings underscore the problem local law enforcement would expect to face if they were to aggressively enforce immigration laws.

Adding to those concerns are beliefs that aggressive enforcement of immigration laws would weaken public trust initiatives (77%), community-policing efforts (77%), youth outreach (74%), intelligence/information gathering (63%), criminal investigations (67%), and even recruitment (31%), thereby impacting operations significantly.

At the same time, respondents felt that aggressive enforcement of immigration law would result in a *decrease* in various crimes (see Table 2). Crimes most likely to see a decrease according to the respondents were gang-related crimes (56.5%), while domestic assault and battery (21%) would be impacted the least.

The survey concluded with a request for policies that the respondents have developed or would develop for their agency in order to strike a balance between the enforcement of immigration laws and the protection of civil liberties. There were several respondents who said that they kept or would keep the local role to a minimum by only enforcing immigration law in the event of an arrest (n=11), by leaving the enforcement up to jail officials (n=2), or by not enforcing immigration law at all (n=3). Others offered a more general policy of 'treating everyone fairly' (n=6).

| TABLE 2. IMPACT OF AGGRESSIVE ENFORCEMENT ON CRIME | Expected to Decrease |
|---|---|
| a. Violent Crimes | 37% |
| b. Property Crimes | 37% |
| c. Gang-Related Crimes | 56% |
| d. Drug-Related Crimes | 45% |
| e. Loitering | 46% |
| f. Domestic Assault/Battery | 21% |
| g. Public Intoxication | 38% |
| h. Traffic Offenses | 46% |
| i. Youth Crime | 25% |

## APPENDIX I

## Unauthorized Immigrants: Trends, Characteristics, and Surprises











Jeffrey S. Passel is Senior Demographer of the Pew Hispanic Center in Washington, DC.

# APPENDIX I

## Unauthorized Immigrants: Trends, Characteristics, and Surprises













## APPENDIX I
### Unauthorized Immigrants: Trends, Characteristics, and Surprises













A556

## APPENDIX I
### Unauthorized Immigrants: Trends, Characteristics, and Surprises









### Unauthorized Migration to U.S.

- **Very Large In-Flows**
  - Steadily Increasing Population
  - Slowing Growth (or Decline?)
- **Largely Mexican & Latino**
  - No Routes to Green Cards
- **New Destinations Emerge**
  - Job Availability in U.S.
  - Conditions in Mexico & Elsewhere
- **Majority in Families**
  - Spouses & Families Follow
  - 2/3 of Kids Born in U.S.

### For more information, contact:

**Jeffrey S. Passel, Ph.D.
Pew Hispanic Center
Pew Research Center
1615 L St., N.W.
Washington, D.C. 20036**

(202) 419-3625
jpassel@pewhispanic.org
www.pewhispanic.org

A557

| APPENDIX J |
| :---: |
| **Conference Keynote Address** |

BY MAYOR PHIL GORDON, PHOENIX, ARIZONA

**August 21, 2008**
**JW Marriott Hotel**
**Washington, D.C.**

Before I begin, I just want to recognize all of you—the men and women who risk everything, every single day—and to thank you for your service.

When this nation was founded, no one ever conceived or imagined that immigration enforcement was an issue that would ever fall to mayors and local police departments. But because of federal neglect, here we are. As the federal government continues to do *less* with more, cities are forced to do more with less. Not only are we being forced to step up our immigration efforts but we also have an increased burden when it comes to gun crimes and white-collar crimes connected to illegal immigration and formerly handled at the federal level.

In just the past two years, the Phoenix PD has arrested or turned over to ICE more than 13,000 illegal immigrants. Clearly, the lack of federal enforcement has a direct impact on cities like mine. And cities like yours.

Before I begin detailing that impact, let me give you just a little background on my city. Phoenix, Arizona, is the fifth largest city in the nation, the largest state capital in the United States, and continues to be the fastest growing major city in the nation. Slightly more than 42 percent of our population is Hispanic and, of the 3.4 million people in the greater Phoenix metropolitan area, about 275,000 persons are thought to be here illegally. That is a situation we did not create but it's a situation that we must contend with.

The question I have been asked to address this morning is an important one: What are the costs of enforcing immigration laws at the local level? Obviously, there are economic costs. But some costs go beyond dollars and cents. There are also public safety costs, social costs, and constitutional costs. There are human costs.

Not all can be easily quantified. But let's start with public safety personnel, which *can* be quantified. Quite simply, in order to deal with all the issues caused by our nation's failed immigration policy, local police resources in cities like mine are strained. At a time when our city budget is being otherwise reduced, at a time when we're eliminating positions and imposing hiring freezes in other departments, at a time when programs are being cut, we are hiring 600 new public safety personnel, mostly police officers. A large number of those new officers are the direct result of our growing population, but 100 of those new officers are directly related to the crimes associated with immigration, such as smuggling, kidnapping, and other felonies. And that equates to over $10 million a year.

Those are the basic costs of hiring new officers. But there are other hard costs. The City of Phoenix is paying about $2 million a year in booking costs to Maricopa County to house the illegal immigrants we arrest for committing crimes in our city. That number is growing—and doesn't include our sales and property taxes that help fund the increased jail costs—due to illegal immigration. I personally hand-delivered an invoice to the Department of Homeland Secu-

| APPENDIX J |
| **Conference Keynote Address** |

rity last year seeking reimbursement for the hard costs directly tied to immigration. Do I expect to recover a single cent? I do not. But for cities like mine, immigration has turned into a de facto unfunded mandate and that's a point that needed to be made and still needs to be made.

Then there are operational costs. In my community, public protests and demonstrations are a regular occurrence, on both sides of the immigration issue. Some protestors on both sides are armed, sometimes with knives and guns, and sometimes with signs like these. For those of you who can't see it, here's what it says: *"Hooray for the slaughtering of the illegals. Boo to the Beaners !!"* And then it's got a swastika at the bottom. You may not yet see this in Des Moines, or in Fargo, or in Dover but you'll see them soon if the federal government doesn't act and act soon. It's hateful stuff and it's dangerous. That means the Phoenix Police Department is called upon to maintain law and order under extremely dangerous conditions and that also means hundreds of thousands of dollars of overtime.

Unique to the immigration issue is the proliferation of "Drop Houses." These are homes, in residential neighborhoods, where dozens of illegal immigrants are warehoused after being brought into the United States by various smuggling syndicates. Phoenix police rescue and turn over to ICE about 1,200 people a year from drop houses. We investigate, track, and break up the human smugglers known as coyotes. By the way, we are one of the very few police departments in the nation to have ten ICE agents embedded within our department on a full-time basis to go after violent criminals who are illegal. That, in terms of both cost and effectiveness, is a much better model for local police departments than taking police officers and turning them into full time immigration agents.

Hand-in-hand with the drop house operations are the kidnapping operations. Almost every night, Phoenix police will get one or more emergency calls with variations of the same story: "My wife is being held in a Phoenix drop house and she will be tortured and killed if we don't pay them thousands of dollars." That means Phoenix PD has to divert resources on the spot to find and protect these kidnap victims. And again, this happens routinely. The overtime hours are staggering and the personnel resources diverted from preventing or solving other crimes are massive.

Lastly, we have the cost of long-term, ongoing undercover and investigative operations designed to cut the head off big smuggling operations—humans, drugs, guns and money—and interrupt that activity, beginning at the top. We've taken down sophisticated syndicates, travel agents, and transportation providers who smuggle and transport humans and who launder millions of dollars in cash each month.

Smuggling operations are becoming more sophisticated and more dangerous, which means local police need more sophisticated intelligence and more strategic undercover work, which means more costs. And as the smugglers use more sophisticated and costly armaments and armor, so must we. Phoenix PD has just begun offering our officers 45-caliber Glocks and adding more rifles to our arsenal.

Then, we have another situation developing in Phoenix that is both difficult to describe and difficult to deal with. It has always been the rule of law enforcement that the victims of crimes and witnesses to crimes will be protected. If the witness to a homicide is in this country illegally, it is more important for us to catch the killer than to turn the witness over to ICE. If the vic-

| APPENDIX J |
| **Conference Keynote Address** |

tim of a sexual assault is in this country illegally, it is more important for us to catch the rapist than to turn the victim over to ICE. That makes sense and it's always been the rule. My police department absolutely protects innocent witnesses and victims, in order to catch the "really bad guys." But our job has been made tougher because of a sheriff who doesn't. Instead, he allows sexual assaults, homicides and other serious crimes to go unsolved, by arresting victims and witnesses and sending them to jail for violating immigration statutes. That's a direction that makes our community less safe. And that's a sad reality that creates public safety costs that are impossible to determine.

Targeting illegal immigrants who have not broken a single law since they crossed the border comes at too high a cost for our communities. In order, for example, to concentrate on these immigrants, the county sheriff's operations in El Mirage, Arizona, a city of just 32,000 people, failed to investigate at least thirty violent crimes, including a dozen sexual assaults last year. While crime rates are down in every category in Phoenix, in the parts of the county under the sole jurisdiction of the sheriff, crime rates soared in every category but one last year.

Lastly, the dearest costs we are incurring in our city are social, constitutional and human costs. And again, it centers around our sheriff and a broken federal system.

Maricopa County Sheriff Joe Arpaio has filled a political void created by the utter neglect and inaction on immigration issues by Congress and the president and he has exploited that void to suit his own political needs. Washington's inaction has caused frustration in cities like Phoenix. The sheriff's method is to profile people with brown skin and to ignore the civil rights we should all be enjoying. It is unconstitutional and wrong.

On April 4th, I called for an investigation by the United States Department of Justice for civil rights violations, a call that has yet to be answered. The sheriff, himself, says he doesn't need to engage in racial profiling because he can tell if someone is here illegally "by the way they dress and where they are coming from." That is, as you know, the very definition of racial profiling. One of his chief deputies admits that when it comes to enforcing immigration laws, their department does not follow federal civil rights requirements. *Citizens* are being stopped because they are brown. Immigrants here quite legally, carrying their paperwork, are detained. Street vendors with current visas and properly licensed mobile businesses are also being detained.

I'd like to tell you three quick but important stories that help to humanize these issues. The first is from an editorial in the *Washington Post* that was published earlier this month: *"Manuel Ortega, a Mexican citizen, entered the United States legally last fall, using a visa valid until 2016 as well as a permit from the Department of Homeland Security. Ortega had every reason to believe he was on the right side of the law, except for one small misstep: being brown in Maricopa County.*

*"He had been in the United States for barely three weeks last September when Arpaio's deputies stopped the vehicle he was riding in. Despite showing the officers his documents, he was handcuffed, jailed (for 9 hours) and finally turned over to federal immigration officials, who promptly released him..."*

That's shameful. And it's a cost no one should have to pay.

Very close to home—a member of my own staff and her husband went "off-roading" with five other couples a few months ago. Deputies pulled all six vehicles over. One by one each couple was approached, and let go—until they got to the last vehicle, the one driven by my assistant and her

APPENDIX J

**Conference Keynote Address**

husband, third generation Americans. The sheriff's deputy didn't ask for a driver's license like he did the others. He asked for a social security card. And he didn't let them go like he did the others. He wrote a citation. Their first names are David and Jessika. And their last name is Rodriquez. And the only thing that made them different from the other five couples was the color of their skin.

Finally, as reported by a Phoenix radio station reporter, a United States Marine, in full uniform, was harassed, insulted, and called a traitor by a group of protestors posing as "Pretend Patriots." *"It's too bad you didn't die in the war; you're a disgrace to your uniform,"* they shouted at him. *"Go back to your own co*untry." Well, this American hero of Hispanic heritage *is* in his own country. He fought for this country.

These stories have nothing to do with green cards. They have everything to do with brown skin. They were about racism and nothing else. Yet despite these and other blatant violations—well documented in the Phoenix media—the Civil Rights Division of the United States Department of Justice, through its silence, continues to thumb its nose at both civil rights *and* justice.

And how do you assign a cost to that? How can you put a price tag on the very promise of America? Cemeteries here and around the world are filled with men and women who traded their lives for our rights and freedoms—the same rights we see perched at the top of that famously dangerous slippery slope.

Those are big prices to pay. And here's another one. Last September, one of Phoenix's finest—Police Officer Nick Erfle—was shot and killed by a man he was trying to arrest, a man who had been arrested before, found to be in this country illegally, and deported to Mexico by our federal government. Of course, because this Congress and this president have yet to find the time to secure our borders, this man had no problem re-entering the country, and crossing paths with Officer Erfle on that tragically fateful day.

My community paid too much on that day. But not as much as Officer Erfle's wife and children, who will continue to pay for our failed immigration policies and our do-nothing Congress for the rest of their days. Julie Erfle is here today, and will help lead the fight for a secure border and immigration reform so that, hopefully, no other officers and the people who love them will pay the consequences for the inactions of Washington. Julie, will you please join me at the podium as I ask everyone to join with me in thanking you for your service and the sacrifices you continue to make.

Julie, you said it best eight months after Nick's tragic death: *"We need comprehensive immigration reform that puts safety and humanity on equal footing."* And that's why I accepted the invitation to come to Washington today. It is time for the federal government to take responsibility for the situation they have created. They need to take responsibility today. They need to begin addressing each of these complex issues today.

But the good news is they *can* fix the problem. When, as a nation, we roll up our sleeves, focus on a goal, debate our options, outline a course, and act with conviction and principle there is nothing we cannot accomplish. America is a great nation and Americans always live up to that greatness. We have won freedom for much of the world. We have industrialized the world. We have fed the world. In so many ways, we have *changed* the world. And we have shown the ability to change our own nation when change was needed. During my lifetime, African Americans could not use public drinking fountains, sit at lunch counters, or ride in the front of a city bus. But

| APPENDIX J |
| --- |
| **Conference Keynote Address** |

thanks to the greatness of individual Americans like Rosa Parks, Martin Luther King, Jr., and Robert Kennedy, and thanks to a responsible and compassionate Congress and White House, we changed all that. We lived up to the very promise of America. And on the issue of immigration, this nation of immigrants will do it again.

I am calling upon this Congress and the next one—this president and the next one—to make the dual issues of border security and immigration reform their first order of national business. I don't believe that certain members of Congress understand what impact their neglect is having on cities. They don't see the hate. They don't see the division. They don't hear the rhetoric. They don't see the civil rights violations. And they don't understand the costs.

Phoenix is a good community, filled with good people. The many voices of compassion in our community have always prevailed over the voices of hate, racism, and violence. That's why I am calling upon this nation's investigative journalists and other members of the media to come to Phoenix and shine a light on the intolerant few. Let Congress and the White House finally see what their unconscionable neglect is costing us. Report on the racism and the hate. Turn your cameras into the eyes of American citizens whose civil rights don't seem to matter anymore. Help us tell this story to our national leaders and help them—no, *make them*—see the light.

It's been *seven* years since our nation was attacked by terrorists. It's been *four* years since the 9-11 commission made its recommendations. It's been *three* years since the United States House of Representatives debated the Border Protection, Anti-Terrorism and Illegal Immigration Control Act. It's been *two* years since the McCain/Kennedy Comprehensive Immigration Reform Act was defeated. And it's been *eleven months* since we said goodbye to Officer Nick Erfle.

And *still* there is no debate—meaningful or otherwise in House races, in Senate races, or between the two candidates for president of the United States. And that needs to change.

In just the past few days, I was asked by the U.S. Conference of Mayors to head up a Task Force on Immigration Reform, to study the problem and to make recommendations to the 111th Congress and the 44th president.

And I accepted that honor, with one important caveat: No more studying. No more hearings. No more task forces. No more white papers and executive summaries lining the shelves of Congress. This is an issue that has already been studied and studied and studied some more. Now it's time for action. Now it's time to implement.

My message is as simple as it is urgent: Do not wait another day to figure out a way to secure our borders. We need more personnel. We need to make better use of technology. I recently went to the State of Israel. They have, through sheer necessity, figured out how to best secure their own borders. For them, it's a literal matter of life and death. And I say to Washington, "If you can't figure out how to secure our borders, then ask the Israelis for their advice and counsel." I say to Washington, "If the greatest technological nation in the world can't do it, bring in someone who can."

Second, I call upon Congress to change our failed immigration policies. For our economy and for the foreign workers who need to support their families, let's use the technology that is available to match up the skills of these workers with jobs in this country that are going unfilled. Make the work visa program make sense. And because half the immigrants who are in our country illegally entered the United States quite legally but overstayed their visas, Congress needs to

| APPENDIX J |
|---|
| **Conference Keynote Address** |

make this new visa system completely trackable.

Third, not everyone who comes here to work will want to become a citizen. But for those who do, we need a pathway to citizenship that doesn't stretch out for ten years or more, the way it does now. You wonder why so many ignore the system and come here illegally? It's because a ten year-plus process is no process at all. It is broken and it is ours to fix.

Fourth, we need to recognize the human side of immigration. Consider a grandmother who has lived here peacefully for decades, who has worked and raised a family, and paid taxes and contributed to our social fabric and our economy—treating *her* the very same way we treat a drug dealer who is in the United States illegally makes no sense at all. We should never paint with a brush that broad. We need to recognize different circumstances and treat them differently.

Two years ago, the Western Governors' Association, under the leadership of Arizona Governor Janet Napolitano, issued a policy resolution very much like the proposal I just outlined. It, too, is a reasonable proposal that a reasonable Congress should use as a road map. But here we are, two years later, and that map still sits folded in some Congressional cloakroom.

So one of the main reasons I'm here today is to force the Congress of the United States to face the two-headed monster of hate and racism it has created and turned loose 2,000 miles from this very room.

If you're a member of Congress, or the next president of the United States, you'll be hearing from me. And when you do, I'll be standing right next to Julie Erfle because I want you to look into her eyes and to see for yourself what the cost of your inaction has been.

So, again, the research has been done and the papers have been written. Our mission is to obtain the full backing of the US Conference of Mayors, law enforcement groups like this one, the United States Chamber of Commerce, the faith community and with the support of the Western Governors' Association march over to Capitol Hill, proposal in hand, and knock Congress upside its partisan head with it and tell them to fix... the damn...problem.

Thank you and God bless you.

Now, with the chair's permission, I'd be happy to take a couple of questions.

APPENDIX K

## Collier County Sheriff's Office Criminal Alien Task Force
## An Overview of the 287(g) Program:
## Strategy, Outcomes and Benefits of the Partnership

BY DON HUNTER

### Introduction and Background

There are an estimated 11.5-12 million illegal immigrants living in the U.S.[1] In January 2007, the Collier County Sheriff's Office determined approximately one-quarter of the jail population was comprised of illegally-present foreign nationals. At this time, the cost to house illegal immigrants committing crimes in Collier County totaled more than $9 million per year.[2] In addition, it was determined that approximately 40 percent of total felony warrants and 60 percent of murder warrants were for illegally-present foreign nationals.

The Sheriff's Office began formal efforts to address the problem of jail overcrowding and escalating costs associated with detaining criminal aliens. In June 2007, the Collier County Sheriff's Office entered into a Memorandum of Agreement (MOA) with the United States Immigration and Customs Enforcement (ICE), a component of the Department of Homeland Security (DHS). Among other things, the MOA outlines the purpose, authority, policy, training, ICE supervision and length of agreement.

Initially, in September 2007, 27 members of the agency graduated from extensive ICE training. In August 2008, another seven members of the agency graduated from ICE training. These members are authorized to perform certain immigration enforcement functions as specified in the MOA and Section 287(g) of the Immigration and Nationality Act. From this authority, the Collier County Sheriff's Office developed the Criminal Alien Task Force (CATF).

### CATF Strategy

The agency designated members from various disciplines throughout the agency to receive the ICE training and certification. These members function under the authority and direction provided by the MOA. The various agencywide components are critical to the CATF strategy. In addition, the strategy outlines key concepts such as operational flexibility, and clear understanding and communication agencywide and with ICE.

**CATF Agency Components**



Don Hunter was elected sheriff of Collier County, Florida, in 1988 and served in that office for twenty years.

APPENDIX K

## Collier County Sheriff's Office Criminal Alien Task Force
## An Overview of the 287(g) Program:
## Strategy, Outcomes and Benefits of the Partnership

### Corrections Component and Process

- CATF members initiate contact with newly arrested and/or already detained inmates to determine legal status in the U.S.

- Fingerprints and identification documents are used to search several databases, including the ICE Identification System.

- Subjects qualifying for detainers enter the detention and removal process.

- A deportation file (including arrest report, criminal history, detain order, etc.) is sent to ICE.

- Upon final order from a Federal Immigration Judge, deportation orders are processed.

- Subject is removed from the country once all sentences have been served.

### Law Enforcement Component

**Phase 1:** CATF members identify violent criminal aliens, including gang members, violent felony offenders, career criminals and sexual predators. The primary goal is to apprehend violent criminal aliens representing the greatest threat to residents in Collier County.

**Phase 2:** CATF members identify other felony criminal aliens, including those charged with identify theft, narcotics and fraud.

**Phase 3:** CATF members concentrate on lower level crime, such as DUI and driving without a license. In addition, the CATF educates the community, particularly assisting local employers to assure they are hiring authorized workers.

In all phases, no arrest is made until the subject is approved by ICE. Removing the most serious and violent offenders, as outlined in Phase I, will always remain a priority.

### CATF — Descriptive Statistics and Program Activity

### Corrections (October 1, 2007 – August 1, 2008)

*Interviews Conducted* – In the jail, a total of 4,147 inmate interviews have been conducted to determine legal status. Of those, 2,867 inmates (69%) were illegally present in the country and 1,271 (31%) were legally present.

| Detainers Placed for Removal | No. |
|---|---|
| Entry without Inspection (EWI) | 340 |
| Final Orders | 137 |
| Re-Entries | 102 |
| Legal Permanent Resident (LPR) | 32 |
| Overstays (expired Visas) | 11 |
| Total Detainers Placed | 622* |

*25 lifted for various reasons for a total of 597 cases

| Status of Detained Criminal Aliens | No. |
|---|---|
| Removed from the U.S. | 344 |
| In Collier County Custody | 130 |
| In ICE or U.S. Marshal Custody | 74 |
| Transferred to Other Facilities | 38 |
| Case Terminated or Posted Bond | 11 |
| Total Cases | 597 |

## APPENDIX K
### Collier County Sheriff's Office Criminal Alien Task Force
### An Overview of the 287(g) Program:
### Strategy, Outcomes and Benefits of the Partnership



**Detainers Placed for Removal**

- 2% Overstay
- 5% LPR
- 16% Re-entry
- 22% Final Order
- 55% EWI

**Status of Detained Criminal Aliens**

- 2% Terminate/Bond
- 6% Other Transfer
- 12% Federal Custody
- 22% CCSO Custody
- 58% Removed

*Prior Arrest History* — The total number of arrest charges for criminal aliens identified in the jail and detained for removal is 3,993 (2,899 misdemeanor and 1,094 felony arrest charges). On average, each criminal alien has 1.8 prior felony and 4.8 prior misdemeanor arrest charges, for a total of nearly seven (7) prior arrest charges each.

*Jail Population* — Overall, in 2008, the jail population has been at lower levels when compared to the same month in 2007. The time period of January through July 2007 was prior to CATF implementation (the CATF was implemented in the jail in October 2007). So far, the largest drop by month has been in July 2008, with a 14 percent decrease in the jail population from the previous year.



**Average daily jail population 2007–2008, monthly comparison.**

|      | Jan.  | Feb.  | Mar.  | Apr.  | May   | June  | July  |
|------|-------|-------|-------|-------|-------|-------|-------|
| 2007 | 1,198 | 1,209 | 1,215 | 1,209 | 1,209 | 1,245 | 1,282 |
| 2008 | 1,159 | 1,180 | 1,202 | 1,192 | 1,214 | 1,170 | 1,107 |

APPENDIX K

## Collier County Sheriff's Office Criminal Alien Task Force
### An Overview of the 287(g) Program:
### Strategy, Outcomes and Benefits of the Partnership

**Law Enforcement (October 30, 2007 – August 10, 2008)**

| Investigations – Status | No. |
|---|---|
| Approved by ICE - detained by CATF | 68 |
| Approved by ICE - not yet located by CATF | 35 |
| Current Investigation | 32 |
| Pending ICE Approval | 15 |
| Detained by Other Agency | 10 |
| Total Investigations | 160* |

*CATF conducted 210 preliminary investigations; 50 did not meet standards to continue into formal investigations



*Prior Arrest Charges*—Criminal aliens detained by CATF investigations have extensive prior arrest histories—a combined total of more than 1,300 prior criminal charges. On average, each criminal alien removed by CATF investigations has more than nine (9) previous arrest charges—with an average of 3.7 felony and 5.6 misdemeanor prior arrest charges each.

In this chart, person crimes include robbery, sexual assault, assault and battery, stalking and kidnapping. Property crimes include burglary and theft charges. Disorder crimes include disorderly conduct, disturbing the peace and resisting arrest. Traffic crimes include DUIs and all other traffic-related violations.

*Examples of Phase I Cases*—CATF investigations have apprehended and detained many violent, felony career criminals who otherwise would not have been identified.

- Subject with multiple prior arrests for robbery, burglary, drug/cocaine, and firearm charges was apprehended by CATF and charged federally. He used a false birth certificate to obtain US ID, including a passport and driver's license.

- Subject was previously arrested on multiple occasions for molesting children. He was apprehended by CATF investigations before he could reoffend.

- Subject had been previously deported and had a warrant in another state for rape of a child with a firearm. He is suspected of murdering his eight-month-old daughter and has been arrested by CATF on immigration charges.

- Subject is a documented MS-13 gang member previously deported from another state after a gang-related shooting. He traveled to Collier County and has been arrested and detained by CATF on immigration charges.

## APPENDIX K

### Collier County Sheriff's Office Criminal Alien Task Force
### An Overview of the 287(g) Program:
### Strategy, Outcomes and Benefits of the Partnership

*Country of Origin* — Due to geographic location, most illegally-present criminal aliens detained and removed by CATF are from Mexico (on average, 60 percent). However, the CATF has identified and interviewed aliens from more than 50 countries. These countries include:

| | | | |
|---|---|---|---|
| Albania | Costa Rica | Iran | Russia |
| Argentina | Cuba | Israel | Scotland |
| Australia | Czech Republic | Jamaica | Slovakia |
| Bahamas | Dominican Republic | Jordan | South Africa |
| Bangladesh | Ecuador | Kazakhstan | South Korea |
| Belize | El Salvador | Mexico | St. Lucia |
| Bolivia | England | Nicaragua | Thailand |
| Brazil | Germany | Nigeria | Trinidad & Tobago |
| Bulgaria | Guatemala | Panama | Turkey |
| Canada | Haiti | Peru | Turks & Caicos |
| Chile | Honduras | Philippines | Uruguay |
| China | Hungary | Poland | Venezuela |
| Colombia | India | Romania | Vietnam |

### CATF Benefits

This program promotes community safety, reduces jail overcrowding, reduces victimization and provides cost savings for Collier County. Early outcomes and indicators are promising. Our jail population has been reduced and our crime rate continues to decline, a remarkable accomplishment particularly in this difficult economy.

Further, this program has greatly improved intelligence gathering and identification—a critical element in local enforcement in our country's post-9/11 environment. Through this program, the Collier County Sheriff's Office has been able to identify very violent criminal predators, including sexual offenders and gang members, using fraudulent identities to further their criminal careers. Without the necessary resources and support to pursue criminal investigations, these offenders would not be identified, arrested and removed from our country.

### Endnotes

[1]Pew Hispanic Center, *Size and Characterisics of the Unauthorized Migrant Population in the U.S.*, March 2006.

[2]Cost was determined based on the number of self-admitting illegal immigrants, calculated at several times throughout the year. This does not include other justice costs such as court costs and victim services.

APPENDIX L

## Fear, Crime, and Community Trust: Community Perspectives on Immigration Enforcement by Local Police

STATEMENT BY KAREEM SHORA, JD, LLM
NATIONAL EXECUTIVE DIRECTOR
AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE (ADC)

August 21-22 2008
JW Marriott Hotel
Washington, DC

On behalf of the American-Arab Anti-Discrimination Committee (ADC), I wish to thank the Police Foundation for this valuable opportunity. As key stakeholders and community partners, we welcome the positive efforts already undertaken by the Police Foundation in coordination with key local law enforcement agencies in addressing the vital issues of trust, fear and crime prevention. My statement will highlight some of the challenges encountered by the Arab- and Muslim-American communities in the area of civil rights and liberties as a result of certain U.S. government policies that have involved local law enforcement agency enforcement of federal immigration law and the impact this has had on the ability of our communities to actively participate, as members of civil society, in reaching our full potential in assisting legitimate efforts aimed at combating crime in all its forms.

ADC is the largest grassroots organization in the United States dedicated to protecting the civil rights and liberties of Arab Americans. ADC was established in 1980 by a former U.S. senator and has grown into a national organization with headquarters in Washington D.C., fully staffed regional offices in Massachusetts, New York, New Jersey, Michigan, and California, as well as 38 volunteer-based chapters throughout the United States.

The unfortunate, ineffective, and cosmetic actions undertaken by the U.S. government in the days, weeks, and months following the horrific September 11, 2001, terrorist attacks on our nation left a bitter taste within the Arab, Muslim, and South Asian American communities and a mark of shame on the fabric of our American society.  To be just, in the past several years some government agencies have undertaken constructive proactive steps at regular dialogue with the ADC and the Arab, Muslim, and South Asian American communities. Many local police agencies have taken the lead, utilizing the time proven method of "community policing" to build trust and work with the communities to protect and serve everyone regardless of race, religion, gender, age, or ethnicity.

Security cannot be assessed in a vacuum and must be addressed in light of the challenges encountered by members of most communities in the areas of civil and human rights and liberties as a result of some government domestic policies with mandates to combat terrorism.  We also cannot ignore popular culture's and the media's portrayal of Muslims and Arabs, as well as some of the recent hateful rhetoric made by some of our elected officials. One cannot ignore practices which have involved some U.S. government agencies—practices that violate international human rights standards and U.S. constitutional standards—such as extraordinary rendition and secret detentions, the continuing controversy of the Guantanamo enemy combatant detentions, or the Abu Ghoraib torture scandal, all of which are factors in drumming up hate targeted against Arabs and Muslims.

The need for such an assessment is vital in understanding the negative perceptions and stigmas

## Fear, Crime, and Community Trust: Community Perspectives on Immigration Enforcement by Local Police

associated with anti-Muslim discrimination and the impact this has had on the relationship between these communities and local law enforcement.  We must acknowledge and understand that some U.S. government policies designed to combat terrorism have both proven ineffective in fulfilling their mandates and have had a devastating impact on the ability of the Arab and Muslim communities to actively participate, as members of their communities, in reaching our full potential as full partners with the police.

Some of the policies the U.S. government undertook following the horrific September 11, 2001, terrorist attacks on our nation and some more recent decisions made in the name of combating terrorism have made it easier for those who promote hate, perpetuate violent extremism and radicalization, and others who engage in hate and anti-Muslim discrimination to operate regardless of the legal protections often afforded later to their respective victims.

I would like to highlight a few challenges that have involved local police and the enforcement of federal immigration law, challenges that have caused additional strain on already overburdened police agencies and, at the same time, served to negatively impact the trust and communication that is required to maintain a safe and law abiding community that is free of crime.  These policies include targeted immigration enforcement measures such as the National Security Entry-Exit Registration System (NSEERS), also know as "special registration;" perceived racial profiling in the approach to conduct voluntary interviews by the FBI in partnership with local police agencies; the increased reliance on the "watch" and "no fly" lists  (also known as the "terrorism watch list"); the Immigration Absconder Apprehension Initiative which, in 2002, targeted immigration absconders based specifically on national origin; and, most damaging to local police, the deeply flawed and now discredited reports by local law enforcement  agencies, including the New York City Police Department (NYPD), advocating increased scrutiny of Muslims in the U.S. based on cultural affiliation and religious practices.

As you might have read or heard in recent high-profile media reports, some accounts have claimed that the U.S. government "terrorism watch list" now contains over one million names or records. Anecdotal examples suggest that Arab, Muslim, and South Asian Americans are more likely to be flagged by this watch list. Local police agencies are required to enforce this list when they conduct routine traffic enforcement, given that the list is maintained as part of the National Crime Information Center (NCIC) database operated by the FBI and accessed by all local law enforcement agencies. Although the U.S. government's position states that it does not profile individuals based on race, ethnicity, or religion, the "watch" and "no fly" list challenges, and the involvement of local police with this controversy, have created a tremendous level of mistrust and the perception of ethnic and racial profiling in Arab, Muslim, and South Asian American populations.  It is clear that local police agencies have inherited, sometimes involuntarily, the mistakes born out of the federal government.

Another example is NSEERS or "special registration."  NSEERS is a poorly constructed program that has outlived any constructive purpose it may have once served and is in need of replacement by the more extensive and reliable US-VISIT program.  US-VISIT relies on biometric technology to obtain information about anyone entering the United States. While the port-of-entry phase of this program has been implemented, we are hopeful that the U.S. government, namely the United States

## APPENDIX L
## Fear, Crime, and Community Trust: Community Perspectives on Immigration Enforcement by Local Police

Congress, will provide the necessary funding for US-VISIT so that it can be fully implemented at ports of departure.

The U.S. Department of Justice (DOJ) created NSEERS, also known as "special registration," in 2002 allegedly as an anti-terrorism program that required male visitors from certain countries—and others whom an immigration inspector decides meet certain confidential criteria—to be fingerprinted, photographed, and questioned by immigration officers.  The most controversial part of this program, known as the "domestic call-in" phase, required men from twenty-five predominantly Muslim and Arab countries to report to immigration offices around the country for fingerprints, photographs, and lengthy questioning by officers. There are criminal and civil penalties associated with NSEERS, including arrest, detention, monetary fines, and/or removal from the United States.

Although initially portrayed by the Department of Justice (and, in turn, understood by those who voluntarily complied with the program) as a tool to combat terrorism following the devastating terrorist attacks against our country on September 11, 2001, NSEERS has apparently become just another tool used in immigration law enforcement, and law enforcement more generally. NSEERS raises serious constitutional issues since the program discriminates on the basis of national origin and it further burdens local police with enforcing yet another federal program without receiving additional funding or resources.

Indeed, like the "watch list," NSEERS is also part of the National Crime Information Center (NCIC) database maintained by the FBI and routinely enforced by local police.  A system designed to arrest those who are alleged to have committed serious crimes, such as bank robberies, murder, child molestation, and rape, is now using limited police resources to arrest or detain civil immigration violators.  Ironically, it was those who complied with NSEERS that were subject to penalty. Nearly 14,000 men who complied with call-in registration were placed in removal proceedings.  If a goal of special registration was to track possible terrorists, deporting those who complied with the program undermines this aim, by reducing future compliance and serving to destroy trust between the police and the community.

Because of the poor implementation of NSEERS, thousands of men who were required to register failed to do so—many no doubt due to lack of notice—and are therefore now vulnerable to NSEERS penalties.  Although the NSEERS program was modified in December 2004, many elements remain and are subject to abuse, including departure registration, registration at ports of entry, as well as the potential for the re-initiation of domestic "call-ins" and enforcement action based on information collected through the program.

While some Bush administration officials have expressed apprehension about the continued use of NSEERS, the program is still being utilized.  In fact, Asa Hutchinson, former Undersecretary of Border and Transportation Security at DHS, recognized the problems with NSEERS and has gone on record as saying "It is our hope to completely end this special registration program because our long-term goal is to treat everybody the same way and not based upon where you come from" (June 11, 2004, speech to ADC National Convention, Washington, D.C.).

It should be noted that the perceived injustice of singling out people based on national origin (and ultimately religion) and, in turn, penalizing them for their cooperation with a government pro-

## APPENDIX L
## Fear, Crime, and Community Trust: Community Perspectives on Immigration Enforcement by Local Police

gram may have significantly harmed the relationship of trust between law enforcement and the Arab and Muslim American and immigrant communities—a relationship that is vital to the national security of the United States.

ADC has diligently sought to cast a public light on the NSEERS program and has maintained a dialogue with DOJ and DHS in hopes of curbing abuses of the program and ultimately seeing it retired. However, ADC's repeated efforts to obtain information on implementation and use of the NSEERS program and resulting databases have been rebuffed and multiple FOIA requests have gone unanswered, either under the guise of the "law enforcement exception" or have simply been ignored.

More recently, the U.N. Committee on the Elimination of Racial Discrimination (CERD) stated, in its February 2008 recommendations to the United States, that "Measures taken in the fight against terrorism must not discriminate, in purpose or effect, on the grounds of race, color, descent, or national or ethnic origin." The CERD urged the U.S. "to put an end to the National Security Entry-Exit Registration System (NSEERS) and to eliminate other forms of racial profiling against Arabs, Muslims, and South Asians."

I would like to describe a case example of the negative impact and fear the enforcement of federal immigration law by local police has had on the Arab, Muslim, and South Asian communities. In February of 2004, ADC was contacted by Mr. X. Mr. X is a United States citizen who lives in Tennessee and owns a small business. In February of 2004, Mr. X drove to a neighboring town in Mississippi to park one of his driver's cars and pick up his personal vehicle. When he arrived, Mr. X noticed a police car shining the lights on his vehicle. When Mr. X got out of the car while speaking on his cell phone, the officer pulled a gun and asked him not to move. The officer allegedly started screaming and asking Mr. X to put his cell phone down. Mr. X allegedly complied and within minutes three more sheriff cars arrived and with guns drawn the officers shouted, "Don't move or we will kill you. Any sudden moves, we will kill you!"

Complying with police orders, Mr. X got on the ground and placed his hands behind his back. The police handcuffed him and threw his money and wallet on the ground. Mr. X allegedly heard one of the officers using a cell phone, calling what appeared to be the FBI and saying, "We got him, we got him!" Mr. X alleged that while he was handcuffed and on the ground the other three officers continued to point their guns at him shouting, "If you move, we will kill you!"

Mr. X alleged that one of the sheriff deputies said, "I want to see your nose touching the ground. I know your kind of people; I worked for the CIA for ten years," all the while pointing his weapon at him and saying, "If you breathe wrong, I will kill you!" Mr. X alleged that the same officer said, "You need to go back to whatever Sand Ni**er country you came from," and he then allegedly called Mr. X a terrorist and a baby killer. Mr. X further alleged that the officer asked him if he was scared and then added, "Your kind of people don't care if they die. I want to see your nose touching the ground, you terrorist!" The officer allegedly kept walking back and forth, repeating his threats and racial epithets.

Mr. X reported that while this was taking place, the other officers were on their phones saying that his name came up on a terrorist watch list. The older officer who initially stopped Mr. X found a handgun permit in his wallet. He walked to Mr. X with his gun drawn and said, "I found a gun permit; don't

## APPENDIX L
## Fear, Crime, and Community Trust: Community Perspectives on Immigration Enforcement by Local Police

let me find a gun or I will shoot you with it." Mr. X then alleged that a third officer walked to him and asked whether the car is "going to blow up in my face" if he turns on the ignition.  Mr. X was then allegedly asked by the same officer whether Mr. X knew how to fly airplanes.

After over an hour on the ground, Mr. X saw his driver, the owner of the car approach.  He later told Mr. X that he saw him on the ground and heard one of the police officers call him a baby killer.  The driver also reported that he was asked by the police, "Why did you let him use your car? He is a well known terrorist. His information came up on our computer."

Finally, the officers took Mr. X's handcuffs off and permitted him to collect his belongings.  One of the officers asked, "Do you know why we stopped you?"  Mr. X said, "No, it doesn't make any sense to me, what you did does not make any sense to me."  Mr. X then walked to the officer that called him a baby killer to ask why he was treated in this fashion, and the officer allegedly responded by yelling, "If you don't get out of (Mississippi) we will take you in!" and a second officer allegedly yelled, "If I see you back in Mississippi, I will personally kill you!"

Mr. X was permitted to leave with no federal agents being involved and without being read his Miranda rights or being arrested or charged with anything.  When Mr. X got in his car he called the FBI in Memphis and gave them a description of the incident and the officers involved. He then called the FBI office in Jackson, Tennessee, and provided the same information. After a week, an FBI special agent interviewed both Mr. X and his witness and recommended that Mr. X file an internal affairs complaint with the same sheriff's department whose officers allegedly were involved in the incident.  The sheriff's department failed to investigate the incident or address Mr. X's concerns.  Unfortunately, when ADC filed a complaint with the DOJ Civil Rights Division, asking for an investigation, and when Mr. X followed up with the FBI on this matter, he received a letter from the DOJ Civil Rights Division, Criminal Section, stating that no further action would be taken by the DOJ and telling him he may wish to pursue the matter in civil court.

In conclusion, government agencies, including law enforcement agencies, have taken many proactive steps at constructive dialogue and communication in the past few years.  These steps have gone a long way in improving trust and in turn effectively combating crime.  However, the unfortunate policies I have mentioned here continue to reverberate with their negative and destructive effects on the Arab, Muslim, and South Asian communities and on the relationship between those communities and local police.

The lesson we have learned as a people is not to strip the most valuable treasure we have as a nation by ignoring the basic rights and liberties and inherently weakening the great American values of freedom, fairness, and equality we have championed for decades.  With the exception of our friends in the Native American nations, we are indeed a nation of immigrants.  Our African-American communities are primarily here as a result of another historical injustice, namely slavery, a form of cruel involuntary immigration.  Most of the rest of us are here because of the great immigration tradition that has crafted this mosaic we hold so dear.

Thank you.

APPENDIX M
## Remarks

By Julie Erfle

**August 21-22 2008**
**JW Marriott Hotel**
**Washington, DC**

It would have been easy to cling to hate when my husband was killed last September. I was certainly angry. Angry that my husband—a good man, a wonderful father, a two-time cancer survivor, a highly decorated officer—was killed by a street thug with a record almost as long as his life. It would have been easy to say, "Deport his family, deport them all!" They killed my husband, and they deserve no mercy. They showed no mercy for Nick, no mercy for me or my children, or the hundreds of other family members and friends and fellow officers left to pick up the pieces of their lives.

Except, "they" didn't kill Nick. A felon named Eric Martinez killed my husband, and Eric Martinez isn't a "they." But he certainly is a powerful example of a failed immigration policy, isn't he?

When Nick was killed, I knew deep in my heart that there had to be some greater purpose, some deeper meaning for his senseless death. I found that reason when just hours later, the media focus turned to the immigration status of his killer. It was then that the cries for deportation began, the lines were drawn, the political pundits on their game. They all had an opinion and they also had a great deal of anger and hate to go with it.

In some ways, I wished I could have joined in the yelling matches, screamed my way out of my pain, and found reasons as to why simple deportation was the answer. Except it wasn't that easy for me, and I knew better. I wanted the answer, the solution. So I did my research, read about the issue, talked to the real experts in the field like immigration attorneys and law enforcement officers— those dealing with this issue every day—and I listened to others like me who lived with the consequences of a failed system. And that's when I realized that it's a little more complex than some of our politicians and media would have us believe.

But I also realized that there were and are solutions out there. This issue has been researched very thoughtfully by people who are not seeking political office or hyped-up listeners to bolster their ratings. It isn't just a pro- or anti-immigration or Republican or Democratic solution. There *is* middle ground. We've just failed in our efforts to make that the focus of our discussions.

And so that's why I'm here today, to work with individuals, like Mayor Gordon, who have decided the time to move this discussion forward is now. I have asked the mayor and others to join me in supporting a comprehensive immigration policy outline put forth by the Western Conference of Governors. The mayor will address this policy in more detail shortly but know that this policy outline addresses all major areas of concern within the immigration debate. I hope you will join us in pushing this policy forward.

I will not stand idly by and wait for the day when our legislators finally decide, "Now is the time for action." That time has passed and, sadly, some of us have paid dearly because of it. Let's not wait any longer for a solution. The lives of our officers and their families are far, far too precious to just stand by and wait.

---

Julie Erfle is an advocate for immigration reform. The widow of Phoenix police officer Nick Erfle, she lives in Phoenix with her two children.

## APPENDIX N
## Conference Agenda and Presenters' Bios

| | | |
|---|---|---|
| **WEDNESDAY, AUGUST 20** | | |
| 4:00-7:00 pm | **Registration** | |
| **THURSDAY, AUGUST 21** | | |
| 7:00-8:00 am | **Registration/Continental breakfast** | |
| **PLENARY** **8:00-8:15 am** | **Opening remarks** | Hubert Williams, President Police Foundation |
| 8:15-8:45 am | **Keynote address** | The Honorable Phil Gordon Mayor of Phoenix, Arizona |
| 8:45-9:00 am | **Report of Police Foundation focus group findings** | Anita Khashu, Special Advisor, Center on Immigration & Justice, Vera Institute of Justice; consultant, Police Foundation |
| 9:00-10:00 am | **Panel 1: Enforcing federal immigration law at the local level: why and why not?** States and local municipalities have been encouraged to participate in the enforcement of federal immigration laws. Some local law enforcement agencies have entered into a Memorandum of Agreement (MOA) with Immigration and Customs Enforcement (ICE) under Section 287(g) added to the Immigration and Nationality Act by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). MOAs authorize designated officers to perform civil immigration law enforcement functions, provide them with access to the ICE database, and enable them to fill out the necessary forms to initiate the deportation process. The purpose of this panel is to examine the challenges, problems, and opportunities encountered by local police and sheriffs engaged in the enforcement of federal immigration laws. | **MODERATOR:** Anita Khashu, Special Advisor, Center on Immigration & Justice, Vera Institute of Justice; consultant, Police Foundation **PANELISTS:** Sheriff Donald Hunter, Collier County, FL Chief Harold Hurtt, Houston, TX James Pendergraph, Executive Director, Office of State & Local Coordination, U.S. Immigration & Customs Enforcement |
| 10:00-10:15 am | **Break** | |
| 10:15-10:35 am | **Legal issues in local police enforcement of federal immigration law** As local police consider taking on enforcement of federal immigration law, they should carefully consider the legal complexity of their role and legal constraints on methods of enforcement in a legal and institutional system that operates quite differently from local criminal justice systems.  Local police enforcement of federal immigration law must account for local, state, and federal laws that govern the rights of community residents and the obligations of localities. It must also account for the civil nature of most immigration violations.  Most importantly, it must be conducted in a way that avoids several common misconceptions about the supposed targets of immigration law enforcement, including confusion over their rights, | Professor Nancy Morawetz, New York University School of Law |

| APPENDIX N | |
|---|---|
| **Conference Agenda and Presenters' Bios** | |

| | | |
|---|---|---|
| | migration law enforcement, including confusion over their rights, status, and place in the community. The risk of error is high, and already several localities have been subject to lawsuits over unlawful arrests and detentions, the use of racial profiling in enforcement, poor conditions of confinement, and other violations of law. This panel discusses the legal complexities of federal immigration law enforcement in the local setting and the changing demographics of communities. Risks of liability provide yet another factor for police departments to consider before making a decision about whether to tread into this new field of enforcement. | |
| 10:35-11:15 am | **Panel 2: A balanced perspective on the undocumented immigrant**<br><br>The presentation will begin with a short summary of the issues raised, and some of the data, concerning the characteristics of the undocumented population in the United States. It will continue with a summary of the overall impact of this population. The presentation concludes by highlighting some of the most frequently debated policy responses, including enforcement, legalization, legal issues, and the bundle of more recent strategies that aim to encourage "self-deportation." It will seek to lay out, as objectively as possible, the pros and cons of the various strategies. | Professor Stephen Legomsky, Washington University School of Law<br><br>Professor Raquel Aldana, William S. Boyd School of Law, University of Nevada, Las Vegas |
| 11:15 am-<br>12:15 pm | **Panel 3: Crime, violence, disorder, victimization: patterns and trends associated with the undocumented immigrant population**<br><br>It has been estimated that there are 12 million undocumented immigrants in America and hundreds of thousands crossing our borders illegally each year or overstaying their visas. Americans are troubled by, and fearful of, the existence of such a large undocumented immigrant population.  Shocking violent criminal acts committed by gangs such as MS-13 are frequently reported in newspapers, television, and the radio.  This has heightened the anxieties and concerns about the undocumented community as a whole, and resulted in the passage of tough new statutes and more rigorous enforcement of immigration laws by some states and localities. The purpose of this panel is to examine research on crime within the undocumented community, discuss how the undocumented crime rate comports with that of other groups within the nation, and explore pattern and trends related to crime and victimization within the undocumented community. | **MODERATOR:** Professor William McDonald, Georgetown University<br><br>**PANELISTS:** Professor Roberto Gonzales, University of Washington<br><br>Jeffrey Passel, PhD, Senior Demographer, Pew Hispanic Center<br><br>Professor Rubén Rumbaut, University of California-Irvine |
| 12:15-1:15 pm | **Luncheon (Salon 1)** | |
| 1:15-1:30 pm | **Break** | |
| 1:30-2:30 pm | **WORKSHOPS (repeated at 5:00 pm)** | **FACILITATOR:** |
| | **Workshop #1: How does law enforcement enhance cooperation with the undocumented and documented communities?** | Chief (Ret.) Richard Wiles, El Paso, TX |
| | **Workshop #2: What are the positive and negative impacts of 287(g)?** | Chief Ron Miller, Topeka, KS |

| APPENDIX N |
| **Conference Agenda and Presenters' Bios** |

| | Workshop #3: How can law enforcement work within the undocumented community? | Chief (Ret.) Arturo Venegas, Sacramento, CA |
| --- | --- | --- |
| | **Workshop #4: What strategies should law enforcement executives employ to effectively manage the political pressures associated with the enforcement of federal immigration laws?** *(chiefs and sheriffs only)* | Chief Theron Bowman, PhD, Arlington, TX |
| 2:30-2:45 pm | **Break** | |
| 2:45-3:45 pm | **Panel 4: What is the cost of enforcing immigration law at the local level? When state and local laws addressing undocumented immigrants are enacted, what are the social and economic impacts on: (1) police operations; (2) municipal budgets; (3) the quality of life of community residents?**<br><br>Although the federal government has the primary role in directing overall policy regarding immigration and refugees, the effects of such policy on local communities present challenges that cannot be ignored by state and local governments. There is concern about the impact of local law enforcement of immigration law on already strained state and local resources, and particularly on the ability of local law enforcement to maintain its core mission of protecting communities and promoting safety. There is also concern about undermining law enforcement efforts to build trust and support in immigrant communities so that witnesses and victims are not fearful of reporting crime. | MODERATOR: Muzaffar Chishti, Director, Migration Policy Institute at New York University School of Law<br><br>PANELISTS: Randolph Capps, PhD, Senior Research Associate, The Urban Institute<br><br>Mayor John Cook, El Paso, TX<br><br>Mayor Phil Gordon, Phoenix, AZ |
| 3:45-4:45 pm | **Panel 5: Fear, crime, and community trust: community perspectives on immigration enforcement by local police**<br><br>Although there are common threads that link fear, crime, and community trust, these issues are influenced significantly by public perceptions of the police, and differentiated by class, race, ethnicity, religion, culture, and national origin. Many of these differences are rooted in historical experiences or encounters with the police, directly or indirectly, that affect the way people view the police and the manner in which they respond to police authority.<br>    In an era of community policing, in which the police acknowledge public trust to be among their highest priorities, understanding these differences and developing constructive solutions to problems that separate the police from the public are essential for building and sustaining community partnerships that enhance public trust and public support for the police.<br>    The purpose of this panel is to consider the influence of immigration enforcement from the perspectives of different communities whose experiences may provide the police with insights into the impact of policy and practice at the ground level, and establish a new feedback loop that will facilitate improvement in both areas.<br>    It is our hope that the panelists' presentations, audience questions, and subsequent discussion will generate greater clarity and a more nuanced and in-depth understanding of the concerns and problems faced by diverse communities, as well as the types of policies and strategies necessary to effectively address them. | MODERATOR: Professor Rubén Rumbaut, University of California-Irvine<br><br>PANELISTS: Tuyet Duong, Senior Staff Attorney, Immigration and Immigrant Rights Program, Asian American Justice Center<br><br>Clarissa Martinez De Castro, Director, Immigration & National Campaigns, National Council of La Raza<br><br>Kareem Shora, Executive Director, American-Arab Anti-Discrimination Committee |

## APPENDIX N
## Conference Agenda and Presenters' Bios

| | | |
|---|---|---|
| 4:45-5:00 pm | **Break** | |
| 5:00-6:00 pm | **WORKSHOPS (repeat)** | **FACILITATOR:** |
| | **Workshop #1: How does law enforcement enhance cooperation with the undocumented and documented communities?** | Chief (Ret.) Richard Wiles, El Paso, TX |
| | **Workshop #2: What are the positive and negative impacts of 287(g)?** | Chief Ron Miller, Topeka, KS |
| | **Workshop #3: How can law enforcement work within the undocumented community?** | Chief (Ret.) Arturo Venegas, Sacramento, CA |
| | **Workshop #4: What strategies should law enforcement executives employ to effectively manage the political pressures associated with the enforcement of federal immigration laws?** *(chiefs and sheriffs only)* | Chief Theron Bowman, PhD, Arlington, TX |
| 6:00-7:30 pm | **Reception (Salon 1)** | |
| **FRIDAY, AUGUST 22, 2008** | | |
| 7:30-8:15 am | **Continental breakfast** | |
| **PLENARY**<br>8:15-8:30 am | **Day 2: Opening remarks** | Hubert Williams, President, Police Foundation |
| 8:30-9:45 am | **Panel 6: Immigration and local policing: results from a survey of local law enforcement executives** | **MODERATOR:** Doris Marie Provine, Professor, Arizona State University |
| | One of the most important challenges for law enforcement agencies in many communities is how to respond to immigration and the presence of undocumented residents. Departments often face conflicting pressures from local politicians, federal authorities, community groups, and the private sector.  Yet they have little available information to help them make sound policy decisions. This panel reports on the results of a recent nationwide survey of police executives on several issues, including differences between departments and communities and their attitudes about immigration and local law enforcement; relationships with federal immigration and customs enforcement authorities; and the range of policies on immigration policing being developed by cities and departments. The survey also explores levels of commitment to community policing practices and the potential for conflict with enforcement of immigration laws by local police. | **PANELISTS:** Scott Decker, Professor, Arizona State University<br><br>Paul Lewis, Asst. Professor, Arizona State University<br><br>Monica Varsanyi, Assoc. Professor, John Jay College, CUNY |
| 9:45-10:00 am | **Break** | |
| 10:00-11:00 am | **Open forum** | **FACILITATOR:** Chief William Matthews, Coatesville, PA, Police Department |
| 11:00-11:30 am | **Conference summation** | Professor Stephen Legomsky, Washington University School of Law |
| 11:30-11:45 am | **Closing remarks**<br><br>**Conference evaluations** | Hubert Williams, President Police Foundation |

# APPENDIX N
## Conference Agenda and Presenters' Bios

**Raquel Aldana** is professor of law at William S. Boyd School of Law, University of Nevada Las Vegas, where she teaches immigration law, criminal law and criminal procedure, international human rights, and international public law. She also co-teaches experiential learning courses, including a course in Nicaragua on domestic violence in a post-conflict society and a course on the criminalization of immigrants. Prior to coming to the Boyd School of Law, Professor Aldana worked for the Center for Justice and International Law, representing victims of gross human rights violations in the Inter-American System on Human Rights. She is the author of numerous books, articles, and other publications, including *Everyday Law for Latinos* (with S. Bender & J. Avila) (forthcoming 2008); Of Katz and "Aliens": Privacy Expectations and the Immigration Raids, ___ 41 U.C. Davis Law Rev. 101___ (forthcoming 2008); The Subordination and Anti-Subordination Story of the U.S. Immigrant Experience in the 21st Century, ___ 7 Nev. L. J. 713___ (2007) (Lat Crit Symposium Cluster Introduction); On Rights, Federal Citizenship, and the "Alien", 46 Washburn L. Rev. 101 (2007). Professor Aldana earned her JD from Harvard Law School, where she served as articles editor of the Harvard Civil Rights-Civil Liberties Law Review.

**Theron Bowman** began his law enforcement career in 1983 as an officer with the Arlington, Texas, Police Department, and served in numerous positions before being appointed chief of police in 1999. A Fort Worth native, he received his bachelor's, master's, and doctorate degrees from the University of Texas at Arlington. Chief Bowman is a graduate of the Senior Management Institute for Police, the FBI National Academy, and the FBI National Executive Institute. He has served on the faculty of three local universities, teaching sociology, criminology, and criminal justice classes. He is a member of the International Association of Chiefs of Police, National Organization of Black Law Enforcement Executives, Police Executive Research Forum, and a host of other organizations. Dr. Bowman serves as chair for the Texas Intelligence Council and as a commissioner for the Commission on Accreditation for Law Enforcement Agencies.

**Randolph Capps,** a demographer with substantial expertise in immigrant populations, is a Senior Research Associate at the Urban Institute. He has a PhD in sociology from the University of Texas, and has analyzed data on immigrants from a wide variety of sources, at the national, state, and local levels. Dr. Capps recently published national-level reports on trends in the immigrant labor force, the health and well being of young children of immigrants, and the characteristics of immigrants' children in elementary and secondary schools. He is currently conducting a study of the impact of immigration enforcement operations on children of unauthorized immigrants and recently participated in an evaluation of employment services in the federal refugee resettlement program. His recent work at the state and local level includes a demographic profile of immigrants in Arkansas; a study of immigrant integration in Louisville, Kentucky; a description of the unauthorized population in California and Los Angeles; a study of tax payments by immigrants in the Washington, DC, metropolitan area; an assessment of immigrants' health care access in Connecticut; and an analysis of the involvement of children of immigrants in the Texas child welfare system.

**Muzaffar Chishti**, a lawyer, is director of the Migration Policy Institute's office at New York University School of Law. His work focuses on US immigration policy, the intersection of labor and immigration law, civil liberties, and immigrant integration. Prior to joining MPI, Mr. Chishti was director of the Immigration Project of the Union of Needletrades, Industrial & Textile Employees (UNITE). Mr. Chishti currently serves on the boards of directors of the National Immigration Law Center, the New York Immigration Coalition, and the Asian American Federation of New York. He has served as chair of the board of directors of the National Immigration Forum, and as a member of the Coordinating Committee on Immigration of the American Bar Association. His publications include: *America's Challenge: Domestic Security, Civil Liberties, and National Unity After September 11* (co-authored); "Guest Workers in the House of Labor" in the *New Labor Forum*; "The Role of States in US Immigration Policy" in the *NYU Annual Survey of American Law* (2002); "Employer Sanctions Against Immigrant Workers" in *WorkingUSA*; and "Rights or Privileges," in the special issue on the Promise of Immigration in *The Boston Review*. Mr. Chishti was educated at St. Stephen's College, Delhi; the University of Delhi; Cornell Law School; and the Columbia School of International Affairs.

**John Cook** was elected Mayor of El Paso, Texas, in 2005. From 1999 to 2005, he served on the City Council, representing El Paso's 4th district. Mayor Cook has lived in Northeast El Paso for most of his life where his family has owned and operated several Northeast businesses. He has been deeply involved in El Paso's community affairs, as a businessman, a teacher, coach, founder and member of the board of many civic and veterans' organizations. He served in the United States Army from 1966 to 1971, seeing service as a Special Agent Military Intelligence. He holds a business degree from the University of Texas at El Paso.

**Alina Das** is a supervising attorney and teaching fellow with the Immigrant Rights Clinic at New York University (NYU) School of Law. She works with clinic students to defend the rights of immigrants facing deportation and detention and to provide support for community organizations' immigrant rights campaigns. Prior to joining the Immigrant Rights Clinic, Alina was an attorney and Soros Justice Fellow with the New York

---

Biographical information current at the time of the Police Foundation conference, August 21-22, 2008.

APPENDIX N

# Conference Agenda and Presenters' Bios

State Defenders Association Immigrant Defense Project, where she engaged in a wide range of litigation and advocacy on immigration and criminal justice issues. Prior to joining the Immigrant Defense Project, Alina clerked for the Hon. Kermit V. Lipez of the U.S. Court of Appeals for the First Circuit. Alina's recent publications include *Immigrants and Problem-Solving Courts* in the *Criminal Justice Review* (forthcoming 2008) and *Addressing Unintended Consequences in Civil Advocacy for Criminally Charged Immigrants* in the *Clearinghouse Review Journal of Poverty Law and Policy* (July-August 2007). Alina is a graduate of Harvard University, NYU Wagner School of Public Service, and NYU School of Law.

**Scott H. Decker** is professor in the School of Criminology and Criminal Justice at Arizona State University. He received the BA in Social Justice from DePauw University and the MA and PhD in Criminology from Florida State University. His main research interests are in the areas of gangs, criminal justice policy, and the offender's perspective. His most recent books include *European Street Gangs and Troublesome Youth Groups* (winner of the American Society of Criminology Division of International Criminology Outstanding Distinguished book award 2006) and *Drug Smugglers on Drug Smuggling: Lessons from the Inside* (Temple University Press, 2008).

**Tuyet G. Duong** is a senior staff attorney for the Immigration and Immigrant Rights Program with the Asian American Justice Center (AAJC) in Washington, D.C. Previously, Ms. Duong led AAJC's language access and emergency preparedness program, advocating for Asian Americans impacted by Hurricanes Katrina and Rita, and as an immigration staff attorney for Boat People SOS, Inc. (BPSOS) in Houston, where she provided legal assistance on citizenship, human trafficking, family-based sponsorship, and domestic violence matters. During law school, she clerked at the Department of Justice Executive Office of Immigration Review

in Los Angeles, California, and at the Texas Civil Rights Project. Ms. Duong is a frequent speaker and trainer on immigration and language issues. She currently chairs the Board of Directors of BPSOS, Inc. and is a founding board member of the Vietnamese American Bar Association in Washington, DC. Ms. Duong received her JD degree from the University of Texas Law School at Austin, and a bachelor's degree in English from the University of Texas at Austin.

**Roberto G. Gonzales** earned his PhD in the department of sociology from the University of California, Irvine, and in September 2008 will join the faculty of the School of Social Work at the University of Washington in Seattle. He received his undergraduate degree from Colorado College and an AM from the School of Social Service Administration at the University of Chicago. He combines fifteen years of direct service and formal training in social work and sociology to shape his research and teaching interests. His most recent research took place in Southern California and explores the effects of legal status on the adult children of unauthorized Mexican migrants. In particular, his doctoral dissertation, "Born in the Shadows: The Uncertain Futures of the Children of Unauthorized Mexican Migrants," examines the role of policy and mediating institutions in shaping the on-the-ground realities and options available for unauthorized Mexican youth as they move into adulthood. Gonzales' research and teaching interests include international and unauthorized migration, urban studies, the one-and-a-half and second generations, and Latino communities and families. He is the author of *Wasted Talent and Broken Dreams: The Lost Potential of Undocumented Students* published by the Immigration Policy Center and coauthor of *Debunking the Myth of Immigrant Criminality: Imprisonment Among First- and Second-Generation Young Men*. He has served on several local level and national boards, including the Crossroads Fund and the American Friends Service Committee.

**Phil Gordon** was elected Mayor of Phoenix, Arizona, on September 9, 2003, and was re-elected in September 2007. Gordon was recently appointed by the U.S. Conference of Mayors to chair its Comprehensive Immigration Reform Task Force. As Mayor, Gordon lists his three priorities for the city as public safety, education, and jobs. Phoenix invests more than 60 percent of its budget in public safety. A new crime lab is open, new precincts are under construction, and 600 new police officers and firefighters will be hired over the next two years. In education, a downtown Phoenix campus is a second home to both Arizona State University and the University of Arizona. Additionally, Phoenix has invested in small high schools to prepare students for immediate careers in specific areas like public safety and nursing. Phoenix has led the nation for three years straight, creating 45,000 new jobs each year. Before serving in elected office, Gordon was a leader in the movement to revitalize, preserve, and redevelop central Phoenix. Gordon has a bachelor's degree in education from the University of Arizona and graduated cum laude from Arizona State University School of Law.

**Don Hunter** has served as Sheriff in Collier County, Florida, since 1988, when he was first elected. Prior to joining the Collier County Sheriff's Department in 1979, he served as administrator for the Southwest Florida Regional Planning Council. Hunter serves on the Commission on Accreditation for law Enforcement Agencies and is a member of the National Sheriffs Association and the International Association of Chiefs of Police. He has a BS and MS in criminology from Florida State University and is a graduate of the FBI National Academy. Sheriff Hunter is active in a number of community and civic organizations in Collier County.

**Harold L. Hurtt**, was appointed Chief of Police of Houston, Texas, in 2004. A veteran of the United States Air Force, he began his law enforcement career in 1968 as a patrolman in the Phoenix Police De-

A580

## APPENDIX N
## Conference Agenda and Presenters' Bios

partment. During his tenure with the Phoenix PD, he attained many promotional achievements, including the ranks of patrolman, sergeant, lieutenant, captain/commander, major, assistant chief, and eventually executive assistant chief of police. In 1992, Hurtt retired from the Phoenix Police Department to become chief of police for the Oxnard, California, Police Department. In 1998, he returned to Phoenix as that city's chief of police. In 2002, and again in 2004, Chief Hurtt was selected by his peers as president of the Major Cities Chiefs Association, an organization of the 63 largest police departments in the United States and Canada. Chief Hurtt is a noted proponent of the "community policing" concept and has led efforts to increase the number of officers who speak Spanish, Chinese, and Vietnamese in the diverse Phoenix community. Chief Hurtt graduated from Arizona State University with a bachelor's degree in sociology, and earned a master's degree in organizational management from the University of Phoenix.

**Anita Khashu** was the first director of The Vera Institute of Justice's Center on Immigration and Justice, initiating and managing the Institute's various projects involving immigrants in the justice system. She currently serves as Senior Advisor to the Center. Anita is also currently working as a consultant for the Police Foundation on the project, The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties. Anita was a 2007-08 Fulbright Scholar in residence at Instituto Tecnologico Autonomo de Mexico in Mexico City, where she conducted research on Mexican policy and practice of detention and deportation of Central American unaccompanied migrant minors. She joined Vera at the Bureau of Justice Assistance in South Africa in 2002, where she managed Vera's technical assistance to the Legal Aid Board of South Africa. In 2003, Anita returned to New York and moved to the Institute's planning department, where she worked on projects involving immigrant relations

with the police. Her publications include *Building Strong Police-Immigrant Community Relations: Lessons from New York City*, *Justice and Safety in America's Immigrant Communities*, and *Overcoming Language Barriers: Solutions for Law Enforcement*. Anita received her BA in economics, cum laude, from Tufts University and a JD, cum laude, from Boston University School of Law.

**Stephen Legomsky** is the John Lehmann University Professor at the Washington University School of Law in St. Louis. He is the author of *Immigration and Refugee Law and Policy* (now in its fourth edition), which has been the required text for immigration courses at 163 U.S. law schools. His other books, published by the Oxford University Press, include *Immigration and the Judiciary: Law and Politics in Britain and America*; and *Specialized Justice*. Legomsky founded the immigration section of the Association of American Law Schools and has chaired the Law Professors Committee of the American Immigration Lawyers Association and the Refugee Committee of the American Branch of the International Law Association. He has testified before Congress and has been a consultant to President Clinton's transition team, the first President Bush's Commissioner of Immigration, the UN High Commissioner for Refugees, and several foreign governments, on migration and refugee issues. Legomsky is an elected member of the American Law Institute. He has been a senior visiting fellow at Oxford University and a visiting fellow at Cambridge University. He has had other teaching or research appointments in the United States, Mexico, New Zealand, Switzerland, Germany, Italy, Austria, Australia, Suriname, and Singapore.

**Paul G. Lewis** is an assistant professor of political science at Arizona State University in Tempe, AZ. His area of research and teaching expertise is American local government, urban affairs, and public policy. With three ASU col-

leagues, Lewis has begun work on a national study of the responses of local police departments to unauthorized immigration. He also coauthored a prior study focused on such issues as California municipalities, "Policing Practices in Immigrant-Destination Cities," which appeared in Urban Affairs Review in July 2007. In addition to examining the relationship between immigrants and local governments, his research has focused mainly on issues of land-use policy and suburbanization. He is coauthor of a forthcoming book, Custodians of Place: Governing the Growth and Development of Cities, which will be published by Georgetown University Press in 2009, and his prior published work includes one book and numerous journal articles and policy reports. From 1996-2005 Lewis was a research fellow at the Public Policy Institute of California, a think tank focused on state and local policy issues, and from 2002-2005 he also served as program director for the Institute's governance and public finance program. He holds a PhD from Princeton University.

**William F. McDonald** is Professor of Sociology and Co-Director of the Institute of Criminal Law and Procedure at Georgetown University. Since 1995, his research has focused on the nexus between immigration and crime. He is currently editing a volume entitled Immigration, Crime and Justice and is beginning a survey of unauthorized immigrants to determine their experiences as victims of crime and their willingness to cooperate with the police. His work includes: "Immigrants As Victims of Crime: An Introduction," International Review of Victimology (1) (2007); "Police and Immigrants: Community & Security in Post-9/11 America," in Justice and Safety in America's Immigrant Communities: A Conference Report, Martha King, Ed. (Policy Research Institute for the Region at Princeton University: Princeton, NJ) "Crime and Illegal Immigration: Emerging Local, State, and Federal Partnerships," National Institute of Justice Jour-

# APPENDIX N
## Conference Agenda and Presenters' Bios

nal, June 2-10, 1997. He has a doctorate of criminology from the University of California, Berkeley.

**Clarissa Martínez De Castro** is Director of Immigration and National Campaigns for the National Council of La Raza (NCLR), and oversees the organization's work on immigration and efforts to expand opportunities for Latino engagement in civic life and public policy debates. She previously managed NCLR's state policy advocacy efforts and civic engagement work, and in 2007 served as manager of the Coalition for Comprehensive Immigration Reform, a broad network of national, state, and local organizations committed to advancing policy solutions on immigration. Prior to NCLR, she served as public policy coordinator for the Southwest Voter Research Institute, as assistant director of the California-Mexico Project at the University of Southern California, as organizer with the Ladies' Garment Workers Union, and as union representative with the Hotel Employees and Restaurant Employees Union (HERE) Local 11. A Salzburg Seminar Fellow, she received her undergraduate degree from Occidental College, and her master's degree from Harvard University. A naturalized U.S. citizen, she was born and raised in the Mexican State of Sinaloa.

**William H. Matthews** is Chief of Police for the City of Coatesville, PA. Prior to his appointment in Coatesville, Matthews served as deputy director of the Police Foundation in Washington DC, and as executive director of the Community Policing Consortium, a national project of the Office of Community Oriented Policing Services of the US Department of Justice. Matthews' extensive criminal justice and policing background includes serving as director of community policing programs for the International City-County Management Association (ICMA); as executive director of the National Organization of Black Law Enforcement Executives (NOBLE); as chief of the Baltimore, MD, Housing Authority Police; and as CEO of a private firm that managed major law enforcement projects for national associations. He also assisted in the development of graduate courses at Howard University, and in the development of national standards for law enforcement agencies and the creation of the Commission on Accreditation for Law Enforcement Agencies. A native of New York and a military veteran, Chief Matthews is an experienced instructor, speaker, and group facilitator. He has a BS degree from Howard University and a MS degree from the American University of Washington, DC.

**Ronald Miller** was appointed chief of police in Topeka in 2006. He has served in law enforcement in the State of Kansas for thirty-six years, joining the Kansas City, Kansas, Police Department in 1972, rising through the ranks to serve as the chief of police for six years. Chief Miller holds a bachelor's degree from the University of Central Missouri and a master's degree from Wichita State University. He is a graduate of the FBI National Academy, the Southern Police Institute, and the Senior Management Institute for Policing at Harvard/Boston University. Chief Miller is active on several committees and boards in Topeka and also serves with national police organizations. He received the Clarence M. Kelley Award for Excellence in Law Enforcement Administration in the Kansas City Metropolitan area, and is a graduate of Leadership Greater Topeka.

**Nancy Morawetz** is a Professor of Clinical Law at New York University School of Law, where she has taught since 1987. She currently teaches in the Immigrant Rights Clinic (IRC). Professor Morawetz's recent writings include *Citizenship and the Courts*, 2007 U. Chi. Legal F. 447 (2007); *The Invisible Border: Restrictions on Short-Term Travel By Noncitizens*, 21 Geo. Imm. L. J. 201 (2007); *INS v. St. Cyr: The Campaign to Preserve Court Review and Stop Retroactive Application of Deportation Laws*, in David Martin and Peter Schuck, Immigration Stories (2005); *Determining the Retroactive Effect of Laws Altering the Consequences of Criminal Convictions*, 30 Ford. Urb. L. J. 1743 (2003); *Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms*, 113 Harv. L. Rev. 1936 (2000); and *Rethinking Retroactive Deportation Laws and the Due Process Clause*, 73 N.Y.U.L. Rev. 97 (1998). Professor Morawetz is a graduate of Princeton University and NYU School of Law, where she served as Editor-in-Chief of the New York University Law Review. She is a former clerk to the Hon. Patricia M. Wald of the United States Court of Appeals for the District of Columbia Circuit.

**Jeffrey S. Passel** is the Senior Demographer at the Pew Hispanic Center in Washington, DC, which he joined in January 2005. His research interests include the demography of Hispanics and immigrants, measurement of immigration (particularly undocumented), integration of immigrants into American society, and the impacts (fiscal, demographic, and social) of immigrants. He also works on generational dynamics, population projections, defining racial/ethnic groups, and measuring census undercount. Previous positions include principal research associate at The Urban Institute and various positions at the Census Bureau, where he directed programs of population estimates, projections, and demographic methods for measuring census undercount. Dr. Passel has served on committees of the Population Association of America, panels of The National Academy of Sciences, and on the Social Security Advisory Board's Technical Panel on Assumptions and Methods. He is a fellow of the American Association for the Advancement of Science and the American Statistical Association. In 2004, *American Demographics* magazine selected him as a "demographic diamond," one of the five demographers/social scientists most representative of influential work in the last 25 years. Passel has a bachelor's degree in mathematics from MIT, a master's degree in sociology from the University of

# APPENDIX N
## Conference Agenda and Presenters' Bios

Texas at Austin, and a PhD in social relations from The Johns Hopkins University.

**James Pendergraph** is executive director of Office of State and Local Coordination, US Customs and Immigration (ICE). The first person to hold this position, Mr. Pendergraph heads an office responsible for coordinating U.S. Immigration and Customs Enforcement (ICE) participation in programs and activities that relate to state and local governments and their respective law enforcement entities. Mr. Pendergraph joined ICE in December 2007 after serving for 13 years as the sheriff of Mecklenburg County, N.C. During that time he was recognized for his innovative thinking and partnership with federal authorities on immigration enforcement. As Mecklenburg's sheriff, he spearheaded the use of the 287(g) program, through which ICE provides training and supervision that allow state and local authorities to provide targeted immigration enforcement. Mr. Pendergraph's law enforcement career began when he served as military policeman with the U.S. Army. Following his military service, he became a police officer with the Charlotte/Mecklenburg Police Department, where he served for 23 years, reaching the rank of deputy chief. He was first elected Mecklenburg County Sheriff in 1994 and was re-elected to three additional terms before joining ICE. Mr. Pendergraph is a graduate of Harvard University's John F. Kennedy School of Government. He also has an associate's degree in criminal justice and is a graduate of the FBI National Academy and FBI National Executive Institute. He has served in leadership positions with numerous law enforcement associations, including the National Sheriffs' Association and the International Association of Chiefs of Police.

**Doris Marie Provine** is a professor in the School of Justice & Social Inquiry at Arizona State University and a past director of the School (2001-2007). She is a lawyer and political scientist. Many of her publications explore the politics and practices of courts at various levels, from town and village justice courts (*Judging Credentials: Non-lawyer Judges and the Politics of Professionalism*), to the United States Supreme Court (Case Selection in the US Supreme Court) and courts at the international level. Her more recent work focuses on policy issues, including, most recently, racism in the war on drugs (*Unequal Under Law: Race and the War on Drugs*). Currently Provine is studying policy responses to settled but unauthorized immigrants. With the support of a Fulbright North American Studies research grant, she spent the past academic year studying policies related to unauthorized immigration in Canada and Mexico. She is currently writing a book about these policies, from the vantage point of three cities, one in Canada, one in the United States, and one in Mexico. At the same time, with three Arizona State University colleagues, and with support from the National Science Foundation, she is examining how police departments are responding to calls from city officials to become more engaged in enforcing federal immigration laws.

**Rubén G. Rumbaut** is Professor of Sociology at the University of California, Irvine. He is the founding chair of the Section on International Migration of the American Sociological Association, a member of the Committee on Population of the National Academy of Sciences, and a former fellow at the Center for Advanced Study in the Behavioral Sciences at Stanford, and visiting scholar at the Russell Sage Foundation in New York. A leading authority on immigration in the United States, Dr. Rumbaut co-directs the landmark *Children of Immigrants Longitudinal Study*; and a large-scale study of *Immigration and Intergenerational Mobility in Metropolitan Los Angeles*. He is the author of more than one hundred scientific papers on immigrants and refugees in the U.S., and coauthor or coeditor of a dozen books, including *Legacies*, which received the Distinguished Book Award of the American Sociological Association and the Thomas and Znaniecki Award for best book in the immigration field. He recently completed work with a panel of the National Academy of Sciences on two volumes on the Hispanic population of the United States: *Multiple Origins, Uncertain Destinies*, and *Hispanics and the Future of America*. His doctoral dissertation, on "The Politics of Police Reform," was based on three years of research in the San Diego Police Department in the mid-1970s, supported by Police Foundation grants.

**Kareem W. Shora** is Executive Director of the American-Arab Anti-Discrimination Committee (ADC). Shora, who joined ADC in 2000, is a recipient of the 2003 American Immigration Lawyers Association (AILA) Arthur C. Helton Human Rights Award. He has testified before major international human rights bodies, including regular testimonies before the Organization for Security and Cooperation in Europe (OSCE) and the United Nations Human Rights Commission. He was selected by the Ford Foundation as a member of the Foreign Policy Task Force designing their 2008 Laboratory for New Thinking on Foreign Policy. He was selected by the Police Foundation in 2008 to serve on their advisory board on the study of the role of local police in immigration enforcement. Shora is also the civil society representative on the G8 Experts Roundtable on Diversity and Integration. He has been published by the National Law Journal, TRIAL Magazine, the Georgetown University Law Center's Journal on Poverty Law and Public Policy, the Harvard University JFK School of Government Asian American Policy Review, the American Bar Association (ABA) Air and Space Lawyer, and the Yeshiva University Cardozo Public Law Policy and Ethics Journal. Born in Damascus, Syria, Shora is a native of Huntington, West Virginia, is fluent in Arabic, and holds a JD degree from the West Virginia University (WVU) College of Law and the LLM specialty in International

| APPENDIX N |
| :---: |
| **Conference Agenda and Presenters' Bios** |

Legal Studies from the American University Washington College of Law.

**Monica Varsanyi** will be an associate professor in the Government Department at John Jay College of Criminal Justice, City University of New York, beginning in the Fall of 2008, after a two-year tenure in the School of Justice and Social Inquiry at Arizona State University. She is an urban and political geographer whose research addresses the politics of unauthorized immigration in the United States. She is currently working on two related projects: one which explores growing tensions between local and state grassroots immigration policy activism and the federal government's plenary power over immigration and citizenship policy; and the second with Scott Decker, Paul Lewis, and Marie Provine, a national study which explores the growing involvement of city police in immigration enforcement and the impact this is having on the relationship of local police and (unauthorized) immigrant communities. Prior to joining the faculty at John Jay, she was a postdoctoral scholar at the Centers for Comparative Immigration Studies and US-Mexican Studies at the University of California, San Diego, an assistant professor at Arizona State University, and received her PhD in Geography from UCLA. Varsanyi's articles have appeared in academic journals such as *Urban Geography*, *Geopolitics*, *Annals of the Association of American Geographers*, *Citizenship Studies*, *Antipode*, and *Space and Polity*, and popular outlets such as the *Los Angeles Times*. She is currently editing a book on state and local immigration policy activism in the United States.

**Arturo Venegas, Jr.** was the chief of police in Sacramento, California, from January 1993 through February 2003. He instituted community-oriented policing during the difficult economic times of the 1990s and led the agency through a number of major financial reductions while maintaining a focus on community service and problem solving. He was credited with preventing the city from making detri-

mental cuts to the police and other city departments. He assisted in the delivery of training in various topic areas to communities and agencies across the nation for the national Community Policing Consortium. From August 1, 2006, through February 15, 2008, under a contract with the New Jersey Attorney General, he served as Supersession Executive over the Camden, NJ, Police Department, providing day-to-day oversight of the department. Chief Venegas has a BA degree from the University of San Francisco and a MS degree from California State University Polytechnic, Pomona. He is a graduate of the FBI National Academy, the FBI National Executive Institute, the California Law Enforcement Command College, and other California POST accredited studies. He is a member of IACP, PERF, HAPCOA, NOBLE, Cal Chiefs, and the Fresno Peace Officers Association.

**Richard D. Wiles** served as chief of police in El Paso, Texas, from 2003 through 2007. As chief, Wiles was committed to the implementation of a culture of integrity and honesty within the El Paso Police Department. During his 27-year public service career, he served with both the police and fire departments of El Paso. Wiles is currently the democratic nominee for Sheriff of El Paso County. He earned a bachelor of science in criminal justice from the University of Texas at El Paso and a master of science in criminal justice from Sul Ross State University. Wiles is a graduate of the Bill Blackwood Law Enforcement Management Institute of Texas, the FBI National Academy, and the FBI National Executive Institute.

## APPENDIX O
### Sample Police Department Policies on Immigration Enforcement

**Arlington, Texas** .................................................................................**216**

**Dallas, Texas** .......................................................................................**219**

**Detroit, Michigan** ...............................................................................**220**

**Houston, Texas** ...................................................................................**223**

**Los Angeles, California** .......................................................................**225**

**Mesa, Arizona** .....................................................................................**226**

**Milwaukee, Wisconsin** ........................................................................**232**

**State of New Jersey** ..............................................................................**234**

APPENDIX O

## Sample Police Department Policies on Immigration Enforcement

## 403.02    GENERAL RULES ON ARRESTS AND SEARCHES
*(Title Effective 11-01-97)*

A.  **Probable Cause Required**.  Arrest or search made without probable cause violates the Fourth Amendment to the U.S. Constitution and Art. 1. Sec. 9 of the Texas Constitution.  (Re-numbered and **Revised 11-01-97**)

1.  Probable cause **for arrest** exists when an officer has reason to believe that a person has committed an offense, although precisely what offense is not known, or that a person has committed a particular offense, the method of which is uncertain.  (Re-numbered and **Revised 11-01-97**)

    •  There is no difference in the amount of probable cause required to make an arrest without warrant, an arrest pursuant to warrant, or an arrest that ordinarily would require a warrant but because of exigent circumstances can be made without warrant.
    •  The only difference in the three situations, from a probable cause standpoint, is the timing of the judicial scrutiny that will be given to the situation.
    •  In the case of an arrest without warrant, a magistrate will review the arrest after-the-fact, and if the magistrate does not find that sufficient probable cause existed to make the arrest, the arrested person will be released and the officer may be subject to penalty for false arrest.
    •  In the case of an arrest under warrant, a magistrate will review the affidavit to support issuance of the warrant, and if the magistrate finds that there is sufficient probable cause to justify the arrest, the magistrate will issue an arrest warrant.

2.  Probable cause exists **for a search** when an officer has reason to believe that a person possesses seizable items or a place contains seizable items.  (Re-numbered and **Revised 11-01-97**)

3.  All facts and circumstances used to determine probable cause must be fully documented in writing.  (Re-numbered 11-01-97)

    a.  An officer shall employ the officer's training, skills, and experience as a peace officer in determining whether probable cause exists.  (Re-numbered 11-01-97)
    b.  All lawfully acquired information available at the moment of the arrest or search may be considered, regardless of its admissibility at trial.  (Re-numbered 11-01-97)
    c.  Mere suspicion, speculation, or reasonable suspicion, or generally suspicious conduct that does not suggest any specific kind of criminal conduct, is not probable cause but may be grounds for further investigation.  (Re-numbered and **Revised 11-01-97**)
    d.  Good faith, in the absence of probable cause, will not justify an invalid arrest or search.  (Re-numbered 11-01-97)
    e.  Probable cause for arrest requires only enough evidence to reasonably show that a particular person probably or most likely committed an offense.  Probable cause for search requires only enough evidence to reasonably show that a particular person or place probably or most likely possesses or contains seizable items.  It is not necessary to have sufficient evidence to prove these facts beyond a reasonable doubt.  (Re-numbered 11-01-97)
    f.  When probable cause is based on information from an informant, reliability of the informant, the underlying circumstances that form the basis for the informant's belief, and verification of the informant's information must be established.  In most cases, all three are necessary.  In some cases, informant reliability and verifying details together may be strong enough to overcome weak underlying circumstances that form the basis for the informant's belief.  Similarly, strong underlying circumstances and observed details together may overcome weak or unestablished informant reliability.  (Re-numbered and **Revised 11-01-97**)

APPENDIX O

**Sample Police Department Policies on Immigration Enforcement**

    g.   Victim or witness information must be confirmed.  Their ability to observe and remember what happened must be determined.  Directly observable results of an offense can serve as partial confirmation of an offense.  In cases of doubt, officers must investigate further.  The more doubt an officer has about the victim or witness's veracity, sincerity, or ability to perceive, the more confirmation is needed.  Particularly in cases of a citizen who is claiming to have made a citizen's arrest or security personnel or officers of other agencies who have taken a suspected violator into custody, officers will conduct an independent investigation to assure that sufficient probable cause exists for arrest and taking of the person into police custody.  (Re-numbered and **Revised 11-01-97**)

    h.   An officer making an arrest at the request of another officer does not have to have probable cause as long as the requesting officer had probable cause.  Where officers from another agency have made off-duty arrests, Arlington officers will not take the arrested person into Arlington police custody unless they are satisfied that sufficient probable cause for arrest exists and that the arrest is in the public interest and not just in furtherance of the off-duty employer's business.  If officers do not believe the arrest was justified and in the public interest, they will tell the other agency officer, out of the hearing of the arrestee, that the other agency officer, must arrange transport to the Tarrant County Jail if they desire the person to be jailed.  Where sufficient probable cause exists for the arrest, Arlington officers will take custody of persons arrested by off-duty officers from other agencies, transport the person to jail, and file appropriate charges, listing the other agency officer as a witness.  (**Revised 11-01-97**)

B.   **Arrest Awareness and Warnings**.  Arrested persons must be made aware that they are being arrested.  Unless in uniform, an officer must display badge and identification and state the officer's name and status as an officer with the Arlington Police Department, unless circumstances prohibit it.  Persons will be told of the officer's intention to take them into custody and the reason for arrest unless they are in the act of committing the offense, are fleeing from the scene of the crime, the officer is endangered, or the arrest would be imperiled.  An unconscious, insane, or injured person may be arrested even though the person is incapable of understanding that they are under arrest.  If an arrest is pursuant to warrant, officers will so advise the arrestee and will exhibit the arrest warrant.  If officers do not possess the warrant and the arrestee asks for a copy, officers will provide a copy of the arrest warrant confirmation as soon as possible.  All arrested persons will be given standard Miranda warnings before questioning.  (Re-numbered and **Revised 11-01-97**)

C.   **Mistaken Identity/Alibi Claims**.  At the time of arrest or thereafter, if an arrestee asserts mistaken identity or plausible alibi, mistake, or defense, a reasonable investigation will be made to clarify, confirm, or refute it.  (Re-numbered 11-01-97)

D.   **Prohibitions**.  An officer shall not make an arrest:  (Re-numbered 11-01-97)

- for conduct which the officer has provoked;
- when the department has administratively ruled that certain criminal laws will not be enforced.  These will be specified in writing;
- based on the race, gender, religion, ethnicity, national original, or sexual preference or any other arbitrary classification of the offender or victim; or
- for investigation.

E.   **Jurisdiction Limitations**  (Re-numbered 11-01-97) (**A** 74.03.01)

1.   **Arrest without Warrant**.  An Arlington officer's authority to arrest without warrant is limited by department policy to Tarrant County unless the officer is in fresh pursuit or a felony or breach of peace has been committed in the officer's presence or view.  See also directive on Off-duty Enforcement for off-duty enforcement limits.  (**Revised 11-01-97**)

E-Version 2008

## APPENDIX O
## Sample Police Department Policies on Immigration Enforcement

2. **Warrant Execution** is limited as follows:

- Traffic or Class C misdemeanor arrest warrants may be executed anywhere in Tarrant County or adjoining counties.  Execution elsewhere requires prior supervisor approval.  (Re-numbered and **Revised 11-01-97**)
- Search warrant executions are limited to Arlington except when a direct link of criminal activity can be demonstrated between the suspect and the Arlington community.
- Arlington officers will not execute an arrest or search warrant outside Arlington without notifying authorities in the other jurisdiction.  If resistance is anticipated or other high risk factors exist on any arrest warrant execution, and on all search warrant executions outside the City of Arlington, an officer of the jurisdiction where the arrest or search occurs is to accompany Arlington officers.  (Re-numbered and **Revised 11-01-97**)

F. **Arraignments**:  Code of Criminal Procedure Art. 15.18 requires that persons arrested under a warrant issued in a county other than the one in which the person is arrested are to be taken to a magistrate of the county where the arrest takes place.  However, Art. 15.18 also provides that, if necessary to provide more expeditious magistrate's warnings, the arrested person may be taken before a magistrate in any county in the state in accordance with CCP Art. 15.17.  (Re-numbered and **Revised 11-01-97**) (Revised 12-18-06)

G.    **Immigration and Military Offenses**

1. **Aliens**.  Texas Peace Officers have no authority to arrest individuals without a warrant for the federal misdemeanor of first offense illegal entry into the United States unless the officer observes the illegal entry.  (Re-numbered 11-01-97)
2. **Federal Military**.  Peace officers have no authority to arrest individuals without a warrant for federal military AWOL even if listed on NCIC.  Peace officers may arrest those listed on NCIC as federal military deserters.  (Re-numbered 11-01-97)
3. **State Military**.  Peace officers may arrest state military deserters for whom an apprehension order or arrest warrant has been issued by proper state military authority.  A sheriff or constable is the only authority permitted to arrest persons for state military AWOL or other non-desertion type offenses pursuant to an arrest warrant issued by proper state military authorities.  (Re-numbered 11-01-97)

## APPENDIX O

## Sample Police Department Policies on Immigration Enforcement

---

### Dallas Police Department General Order
### 315.00 Arrests Requiring Special Handling

Revised 09/24/08

---

**315.00   ARRESTS REQUIRING SPECIAL HANDLING**

**315.02   Arrests Made on NCIC, TCIC, and NCTCIC Checks**

    A.   Arrests made on NCIC, TCIC, and NCTCIC (Regional) Hits will be in accordance with Communications Section, Detention Services Section, General Investigations Section, and Records Section Standard Operating Procedures.

    B.   No arrest or confiscation of property without a warrant will be made solely on an NCIC, TCIC, or NCTCIC hit on a computer or radio check.  In all cases, the name of the confirming individual from the originating agency must be included in the report.

    C.   An NCIC or TCIC hit alone is not probable cause to arrest.  A hit indicates a warrant has been issued and the date of the warrant.  A hit is only one fact that an officer must add to other facts in arriving at sufficient legal grounds for probable cause to arrest.  It is imperative that officers compare sufficient identifiers to verify that the person in custody is the same person named in the warrant.

        1.   To verify a person's identity, consider the following possible identifiers:
            a.   Name.
            b.   Race.
            c.   Sex.
            d.   Date of birth (DOB).
            e.   Place of birth.
            f.   Driver's License number (DL).
            g.   Social Security number (SSN).
            h.   Address.
            i.   Complete physical description to include height, weight, hair, eye color, scars, marks, and tattoos.

        2.   Every effort must be made to verify an arrested person's identity prior to incarceration.  When there is a doubt that an individual is the wanted subject, he/she will be fingerprinted prior to incarceration.

        3.   In instances where there is less than substantial evidence to identify the person in custody, a field supervisor must be contacted to make the final determination.  An arrest will not be made if the field supervisor determines there are not enough significant identifiers to connect the individual to the warrant.

        4.   If a field release is made, comply with General Order 313.08 (Release of Erroneously Arrested Persons in the Field).

**315.04   Illegal Immigrants**

    A.   The U.S. Immigration Code denies us the authority to enforce its provisions; therefore, we do not enforce immigration laws.  All other laws apply to illegal immigrants.

    B.   Officers will not stop or contact citizens for the sole purpose of determining immigration status.

    C.   Arrest reports will contain arrest elements only and not refer to immigration status.

    D.   INS agents have the sole responsibility for determining the immigration status of incarcerated persons.

    E.   The INS must confirm outstanding NCIC detainer hits for INS violations.  Confirmed hits will be booked as Hold for INS.

    F.   Detention Services Supervisors will release city charges when requested by INS.

*NOTE: Only relevant sections of General Order 315 are included by the Police Foundation for this publication.*

## APPENDIX O

### Sample Police Department Policies on Immigration Enforcement

 **Detroit Police Department**

# Training Directive

| |
|---|
| Numbered Directives shall be retained by all members |
| **Number:** 07-04 |
| **Date:** July 10, 2007 |

**SUBJECT**: SOLICITATION OF IMMIGRATION INFORMATION BY POLICE DEPARTMENT PERSONNEL

The Detroit City Council has enacted an ordinance concerning the solicitation of immigration status by public servants and several provisions pertain directly to police officers. This Training Directive provides an explanation of the ordinance. The full text of the ordinance has been placed on the DPD Intranet.

**BACKGROUND**: The responsibility for enforcement of immigration laws rests with the federal government. Federal immigration laws are extremely complicated as there are several immigration status classifications and depending on the particular circumstances, the matter can be a criminal offense or a non-criminal matter handled through a civil deportation process. Under Michigan law, an officer's arrest powers do not extend to non-criminal offenses. Proper enforcement in this complex area requires specialized training beyond the training of members of this agency and improper enforcement could result in officers exceeding their authority and exposure to civil liability.

Additionally, persons whose immigration status prohibits their lawful presence in the country are nevertheless a significant part of the population that need police protection and service. Cooperation and assistance to the police in reporting crimes or coming forward with information to solve crimes require confidence and trust which can be undermined by unnecessary solicitation of immigration status, particularly if the only basis for inquiry is a person's surname or language fluency. It is with this background that Sections 27-9-1 through 27-9-7 of the Detroit City Code has been enacted.

**1. What does the ordinance prohibit?**

It prohibits an officer from soliciting information concerning immigration status in certain circumstances. The circumstances where solicitation of immigration information is prohibited are:

- If the solicitation of information concerning immigration status is **for the purpose** of ascertaining a person's compliance with federal immigration law.

- If the person from whom the immigration information is solicited is:
  1. A victim
  2. A witness
  3. A person who is seeking police services

Detroit Police Department

Page 1 of 2

This Training Directive is for internal departmental use only, and violations of the procedures outlined in this Training Directive may form the basis for Departmental administrative sanctions. This document is not intended for third-party use or benefit. No criminal or civil duty or standard of care is intended to be, or is, created by the issuance of this Training Directive.

## APPENDIX O

## Sample Police Department Policies on Immigration Enforcement

**Training Directive:** SOLICITATION OF IMMIGRATION INFORMATION
**Number:** 07-04
**Date:** July 10, 2007

**2.  Under what circumstances does the ordinance permit police officers to solicit information concerning immigration status?**

There are three circumstances in which the ordinance expressly authorizes the solicitation of information concerning immigration status.  These are:

- A police officer is authorized to solicit information concerning immigration status if the officer is performing public safety functions while assisting federal law enforcement in the investigation of a criminal offense.

- A police officer is authorized to solicit information concerning immigration status from the subject of an investigation only when relevant to the investigation or prosecution of a criminal offense.

- A police officer is authorized to solicit information concerning immigration status when processing an arrested person.

**3.  What is the purpose of this ordinance?**

As previously mentioned, the job responsibilities of a Detroit police officer do not include enforcement of federal immigration laws because, among other reasons, not all immigration violations are criminal offenses and police officers do not have the statutory authority to arrest or detain an individual in a non-criminal immigration matter.  Further, the ordinance reflects the recognition that victims and witnesses may avoid contact with the police if they believe the consequence of cooperation is deportation.  On the other hand, the ordinance recognizes that police officers at times have valid reasons for inquiring into immigration status and permits such inquiries.

**4.  What is an example where immigration status can be solicited from the subject of a criminal investigation?**

During a proper investigative detention supported by reasonable suspicion (*Terry v. Ohio*), officers may properly make inquiries into a person's identity and run a name check in the LEIN system to determine if the person is wanted.  In response to a possible hit, officers ask follow-up questions about his identity and the person claims that he is not the person named in the arrest warrant because he only recently came to the country.  Because immigration status is relevant to the officer's investigation into whether the person is wanted, the officer is not prohibited from asking questions in that regard.

Page 2 of 3

Detroit Police Department

This Training Directive is for internal departmental use only, and violations of the procedures outlined in this Training Directive may form the basis for Departmental administrative sanctions. This document is not intended for third-party use or benefit. No criminal or civil duty or standard of care is intended to be, or is, created by the issuance of this Training Directive.

## APPENDIX O

## Sample Police Department Policies on Immigration Enforcement

**Training Directive:** SOLICITATION OF IMMIGRATION INFORMATION
**Number:** 07-04
**Date:** July 10, 2007

**5.   Can a person be asked about immigration status during arrest processing?**

Yes.   The ordinance specifically permits questioning concerning immigration status during the processing of an arrestee.   Members are reminded that federal law and department policy impose a duty to inform foreign nationals who are arrested, without delay, of their right to have a consular officer from their country notified of their detention.   Furthermore, with regard to certain countries that are known as "Mandatory Notification Countries," the consular office must be notified by the law enforcement agency regardless of the wishes of the foreign national. This policy is delineated in Section 202.6 - 7 of the Detroit Police Manual.   For purposes of consular notification, a "foreign national" is any person who is not a United States citizen, and includes lawful permanent resident aliens ("green card" holders) as well as persons in the country in violation of immigration laws.

**6.   Does the ordinance prohibit contacting or requesting assistance from federal agencies, such as Immigration & Customs Enforcement (I.C.E.) (formerly known as Border Patrol); concerning suspected violations of federal immigration laws or other law enforcement matters?**

No.   The ordinance only addresses the solicitation of immigration status and does not prohibit reporting suspected violations of immigration laws to appropriate federal agencies.

**7.   Should officers routinely ask that I.C.E. officers respond to the scene to translate when an individual does not speak English?**

No.   Members are advised that department policy is not to routinely request response by I.C.E. personnel solely to provide translation assistance.   This policy does not prohibit the use of any law enforcement personnel already at the scene to assist in translating nor does it apply in emergency or serious situations requiring immediate action.   Members requiring translation services should notify Communications for assistance.

**8.   Does the ordinance apply to city employees who are not police officers?**

Yes.   However, solicitation of immigration status by public servants is permitted if required by law as a condition of eligibility for a government program, for completing legally mandated employment forms, and with regard to the issuance of subpoenas.

Questions concerning the content of this Training Directive may be directed to Legal Affairs at 596-2161.

Detroit Police Department

Page 3 of 3

This Training Directive is for internal departmental use only, and violations of the procedures outlined in this Training Directive may form the basis for Departmental administrative sanctions. This document is not intended for third-party use or benefit. No criminal or civil duty or standard of care is intended to be, or is, created by the issuance of this Training Directive.

## APPENDIX O

## Sample Police Department Policies on Immigration Enforcement



**HPD Immigration Policy**
**Questions & Answers**

1.      Is it true that immigrants should now be afraid of reporting any crimes to HPD because if they do, they may be turned over to Immigration and Customs Enforcement (ICE)?

*No.  We hope and encourage immigrant communities to continue to call us when they need assistance from the police. Immigrants who are victims of crime or have information regarding criminal activity should contact the police.  They should not fear that HPD will call federal immigration agents on them.  HPD will contact ICE when the person is confirmed to have a deportation warrant or a notice that they are a previously deported felon.*

2.      Will HPD officers detain me simply because they think I am here illegally?

*No.  HPD officers are not authorized to arrest or detain a person <u>solely</u> on a belief that the person is in the country illegally. Officers are authorized to arrest and detain persons they have reasonable basis to believe have committed a criminal violation.*

3.      Is it true that HPD officers are going to ask all people they encounter for proof of legal residence/status?

*No.  Once a person has been arrested and taken to a jail facility, HPD jail personnel will then ask the person for his/her legal status.  Jail personnel will ask the arrested person if they are a citizen of the United States or if they were born in the U.S.*

4.      Is it true that HPD will arrest any foreign person?

*No.  Officers are not authorized to detain or arrest a person <u>solely</u> on the basis of their nationality or ethnicity.  Officers are authorized to arrest and detain persons they have a reasonable basis to believe have committed a criminal violation.*

5.      Is it true that HPD will run a background check on all people they encounter?

*No.  Officers will check the wanted status of all persons who are ticketed, arrested, or who have been jailed.  Officers also have the discretion to check the wanted status of all persons they have legally detained.*

6.      Is it true that HPD will call ICE on all people they encounter?

*No. ICE will be contacted if during a check of their wanted status, the person is confirmed to have a deportation warrant or a notice that they are a previously deported felon or have other criminal warrants issued by ICE.*

7.      If I am arrested or taken to jail by HPD will ICE be called?

*HPD will contact ICE when a person is arrested and taken to jail and the person is confirmed to have a deportation warrant, a notice that they are a previously deported felon or any other criminal warrant with ICE.  ICE officials will be allowed full access to HPD jail facilities.*

8.      If I am driving without a license and get stopped by HPD, will I get arrested?  Will ICE be called?

*If a person drives without a license and is stopped by HPD, that person will be asked to provide valid identification.  If the person cannot provide valid identification and the HPD officer cannot verify their identity, the person will be taken to jail for driving without a license so the person can be can be positively identified and fingerprinted.  ICE will be contacted only if the person is confirmed to have a deportation warrant, a notice that they are a previously deported felon or any other criminal warrant with ICE.*

1

| APPENDIX O |
| :---: |
| **Sample Police Department Policies on Immigration Enforcement** |

9.      What forms of identification will HPD officers accept?

*Officers will accept driver's licenses and identification cards issued by any state of the United States of America.  Also, the officers will accept most other forms of government ID like a military ID, passport, etc.  Additionally, officers are advised that a matricula consular card issued by the Mexican government is presumed valid unless the totality of the circumstances calls the validity of the card into question.*

*10.*      If I am a suspect in a crime or the HPD officer believes that I may be involved in a criminal episode, can he/she ask me for identification?

*Yes.  The officer is authorized to ask a person who the officer has a reasonable basis to believe has committed or was involved in a criminal episode for identification.*

11.      If I do not have identification, can I be arrested?

*No.  Not unless you have been suspected of committing a crime.  If you have committed a crime or a traffic violation and cannot provide identification to the officer and the officer cannot verify your identity, the officer has the authority to take you into custody for the criminal violation and so that you can be identified and fingerprinted by AFIS (Automated Fingerprinting Identification System).  For safety reasons, the HPD officer needs to know whom he/she is dealing with at the time.*

12.      If the officer stops me for a minor traffic violation, will I be arrested?

*An officer has the discretion to arrest you if the officers cannot verify your identity.  You will be arrested if it is confirmed that you have an NCIC and/or SETCIC warrant hit.  Officers will check the wanted status of all persons arrested, ticketed or jailed.  Officers have the discretion to check the wanted status of anyone legally detained, including persons detained on minor traffic violations.*

13.      If the officer stops me for a minor traffic violation, will I be deported?

*If the officer's computer check verifies you have a deportation warrant or a notice that you are a previously deported felon, the officer will take you to a city jail facility and ICE will be contacted accordingly.  The federal immigration authorities will determine whether or not you will be deported.  HPD does not make decisions on deportation.*

14.      If I am found to have city warrants (like unpaid traffic tickets), will I eventually be deported?

*If you have city warrants you are subject to arrest for those warrants.  If during such arrest, you are also confirmed to have a deportation warrant, a notice that you are a previously deported felon or any other criminal warrant with ICE, the officer will take you to a city jail and ICE will be contacted.  Only ICE will make decisions on deportation matters.*

15.      If I am an illegal immigrant in possession of a firearm, can I be arrested and deported?

<u>*Yes!*</u>  *Illegal immigrants are prohibited from possessing a firearm and are s subject to arrest by HPD officers.  If during such arrest, you are also confirmed to have a deportation warrant or are a previously deported felon, the officer will take you to a city jail and ICE will be contacted.  ICE will decide on deportation matters.  More importantly, you can be charged federally with a felony that carries a sentence of up to 10 years in prison and subject to deportation after serving that sentence.  Should you return to the U.S. after being convicted of the felony of being in possession of a firearm, the federal authorities can prosecute you for illegal re-entry with a penalty of up to 20 years in prison.  The Harris County District Attorney's Office has agreed to refer all cases of an illegal immigrant in possession of a firearm to the U.S. Attorney's Office for federal prosecution.*

2

## APPENDIX O
## Sample Police Department Policies on Immigration Enforcement

### LOS ANGELES POLICE DEPARTMENT

**264.50 ENFORCEMENT OF UNITED STATES IMMIGRATION LAWS.** Officers shall not initiate police action where the objective is to discover the alien status of a person.  Officers shall neither arrest nor book persons for violation of Title 8, Section 1325 of the United States Immigration Code (Illegal Entry).

**675.35 PLACEMENT AND DISPOSITION OF ILLEGAL ENTRY HOLDS.** Supplemental holds charging illegal entry against persons in the custody of this Department for an unrelated criminal offense shall only be authorized by officers of the United States Immigration and Naturalization Service (INS). Arrestees against whom the INS has placed a hold shall be released to the custody of INS within 24 hours after:

- All local charges are dismissed; or,
- Bail is deposited on the local charges; or,
- The arrestee is determined to be eligible for release on his/her own recognizance on the local charges.

**Note:** Under no circumstances shall any person be held longer than 24 hours when an illegal entry hold is the only remaining charge. There is no extension of the 24 hour detention limit because of an intervening holiday or weekend period. Procedures governing the booking and detention of prisoners held enroute are unaffected by this section.

**390. UNDOCUMENTED ALIENS.**  Undocumented alien status in itself is not a matter for police action. It is, therefore, incumbent upon all employees of this Department to make a personal commitment to equal enforcement of the law and service to the public regardless of alien status. In addition, the Department will provide special assistance to persons, groups, communities and businesses who, by the nature of the crimes being committed upon them, require individualized services. Since undocumented aliens, because of their status, are often more vulnerable to victimization, crime prevention assistance will be offered to assist them in safeguarding their property and to lessen their potential to be crime victims.

Police service will be readily available to all persons, including the undocumented alien, to ensure a safe and tranquil environment. Participation and involvement of the undocumented alien community in police activities will increase the Department's ability to protect and to serve the entire community.

## APPENDIX O

## Sample Police Department Policies on Immigration Enforcement



**MESA POLICE DEPARTMENT**

**SPECIAL ORDER**



**George Gascón**
**Chief of Police**

| SO#: | Effective date: | Termination date: | Superseded Order(s): |
|------|-----------------|-------------------|----------------------|
| 2009-01 | 01/01/09 | 01/01/10 | FLD 441 |

### IMMIGRATION AND CUSTOMS ENFORCEMENT PROTOCOL

### 1.    STATEMENT OF PURPOSE

The purpose of this protocol is to provide guidelines for the management of undocumented foreign nationals (UFN) that come in contact with law enforcement officers.

**Where the contents of this special order conflict with earlier department statements, policies, procedures or rules, this order will control.**

### 2.    POLICY

The Mesa Police Department (MPD) is committed to improving the quality of life in our community by implementing strategies to reduce crime whether committed by citizens, visitors, and/or undocumented foreign nationals.

In 1996, the United States Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act, 8 U.S.C. 1101, *et. seq* (IIRIRA). IIRIRA made many changes to immigration laws including adding immigration consequences to certain crimes and requiring mandatory detention of UFNs convicted of certain crimes. IIRIRA also addressed the relationship between the federal government and local governments by permitting certain designated officers to perform immigration law enforcement functions provided they receive the appropriate training and agree to function under the supervision of officers from Immigration and Customs Enforcement (ICE) to identify, process, and when appropriate, detain UFNs they encounter during their regular, daily law-enforcement activity.

Federal immigration laws are complicated in that they involve both civil and criminal aspects. Federal agencies such as ICE have the authority to determine if a person will be criminally prosecuted for their violations of immigration laws or be dealt with through a civil deportation process. Immigration violations are different from the typical criminal offenses that patrol officers face every day, whose law enforcement activities revolve around crimes such as murder, assaults, narcotics, robberies, burglaries, domestic violence, traffic violations and the myriad of other criminal matters. The immigration status of any particular person can vary greatly and whether they are in violation of the federal immigration regulations, civilly or criminally, can be very difficult to determine without a special expertise.

**Page 1 of 6**

APPENDIX O

## Sample Police Department Policies on Immigration Enforcement

| SO#: | Effective date: | Termination date: |
|------|-----------------|-------------------|
| **2009-01** | **01/01/09** | **01/01/10** |

The MPD is committed to partnering with federal agencies and others to the extent allowable under federal, state and local laws to address criminal activity within our community. This practice is consistent with our duty to ensure the safety and well-being of all persons, regardless of their immigration status.

**3. PROCEDURES**

The MPD provides law enforcement services and enforces the laws of the City of Mesa, the State of Arizona, and the United States Constitution impartially. While the investigation and enforcement of federal laws relating to illegal entry and residence in the United States is specifically assigned to ICE, the MPD commits to cooperating with ICE and others, to the extent permitted by law, on any criminal activity that threatens the safety and well-being of our community.

In enforcing the laws, officers may legally stop, detain or arrest anyone when reasonable suspicion or probable cause exists that a crime has occurred. Officers, however, shall not engage in bias-based profiling, also referred to as "racial profiling", when conducting stops, detentions, or arrests of any subject.

In order to combat state and local crime effectively the following policies apply:

**Arrested - Booked**

• Adults, not including juveniles (unless chargeable for a crime covered in ARS 13-501A 1-5, Persons under eighteen years of age; felony charging) who are arrested for committing a state or local crime **shall** be asked about their immigration status and, if the officer(s) develop information that the suspect is in the United States unlawfully, the information **shall** be detailed in the DR (Department Report). The detention supervisor **shall** contact ICE (Law Enforcement Agency Response Team (LEAR)), complete an ICE Inquiry (NLLQ) as needed, and **shall** notify the Support Services Lieutenant as soon practical. A copy of the NLLQ and any ICE response shall be forwarded to the Support Services Lieutenant.

**Cite and Release Or Long Form**

• If the person arrested is being cited and released or a long form complaint is being sought for a state or local crime he or she **may** be asked about their immigration status, and if the officer(s) develop information that the suspect is in the United State unlawfully, the officer(s) **shall** document it in a DR and **shall** refer the individual to ICE by completing an **ICE Request for Inquiry Form**, noting in the remarks sections that the person was cited and released, and forwarding the form to the affected District Coordinator/Metro Resources Lieutenant. The District Coordinator/Metro Resources Lieutenant is responsible for ensuring the notice to ICE (NLLQ)

**Page 2 of 6**

## APPENDIX O

## Sample Police Department Policies on Immigration Enforcement

| SO#: 2009-01 | Effective date: 01/01/09 | Termination date: 01/01/10 |
|---|---|---|

is completed. The **ICE Request for Inquiry Form**, NLLQ and any response from ICE shall be kept at the affected district.

**NOTE**: If an officer develops information that the individual is in the United States illegally without asking about his/her immigration status, the officer **may** complete the ICE Request for Inquiry Form and the District Coordination **shall** refer the information to ICE.

The officer should take into consideration the following factors in determining whether to cite and release or arrest:

> **ties to the community, including family ties and relationships, and length of residence, prior criminal activity, and any other facts bearing on the risk of nonappearance or danger to the public.**

### Unsolicited Information

- If the officer comes upon unsolicited information during the course of his or her enforcement efforts about a UFNs immigration status, of the person(s) being investigated, it **shall** be documented in a Field Interview Card (FI) and it **may** be detailed in the **ICE Request for Inquiry Form** and forwarded to the affected District Coordinator/Metro Resources Lieutenant.
- The **ICE Request for Inquiry Form shall** be routed to ICE through the District Coordinator/Metro Resources Lieutenant for investigation.

### NOTE

Consistent with our efforts to protect the safety and well-being of the community and to encourage the public to report criminal activity, department personnel **shall not** ask a person about his or her immigration status who is:

- a victim of a crime,

- a witness to a crime,

- a juvenile, unless chargeable for a crime covered in ARS 13-501A 1-5, Persons under eighteen years of age; felony charging;

- stopped and/or cited for a civil traffic violation with a valid driver's license or evidence of identity pursuant to ARS 28-1595(B),

- seeking medical assistance,

- a victim of domestic violence incident, or

- a community volunteer in police service (including but not limited to police service based programs such as neighborhood watch, community forums, or community advisory board; youth programs, Making Every Student Accountable (MESA) Program or the citizens police academy or similar volunteer organization).

**Page 3 of 6**

## APPENDIX O

## Sample Police Department Policies on Immigration Enforcement

| SO#: | Effective date: | Termination date: |
|---|---|---|
| **2009-01** | **01/01/09** | **01/01/10** |

### Detention and Removal Order (DRO) Hold

The Detention and Removal Office is a unit of ICE that has the responsibility of detaining and transporting UFNs apprehended by ICE, Customs and Border Protection and local law enforcement.

- Once a person has been identified as being in the United States illegally, ICE issues a DRO hold, which can be for criminal or civil violations.

- This hold is similar to a hit from a warrant when a person's information is run through NCIC.

- If an Officer receives a DRO hit, the following **shall** be done:

  - Call the telephone number on the DRO hit to determine whether the DRO hold is criminal or civil.

- If an Officer receives a DRO hit, the subject may be detained for the length of time it takes to determine whether the DRO hold is criminal or civil.

### DRO - Civil Hold

Arizona law authorizes police officers to enforce provisions of the criminal law. The authorization is limited to criminal and does not include civil. Therefore, officers shall not transport for civil violations or continue to detain if the only violation is a civil DRO hold.

- If the officers develop Information that the suspect is in the United States unlawfully, the information shall be detailed in the FI and forwarded to the affected District Coordinator/Metro Resources Lieutenant.

- The **ICE Request for Inquiry Form** shall be completed and routed to ICE through the District Coordinator/Metro Resources Lieutenant.

- Once the **ICE Request for Inquiry Form** has been completed, the subject may be released.

- An FI shall be completed containing all of the relevant information.

### DRO - Criminal Hold

- Detain and transport for criminal DRO holds, if requested to do so by ICE.

**Page 4 of 6**

## APPENDIX O

## Sample Police Department Policies on Immigration Enforcement

| SO#: | Effective date: | Termination date: |
|------|-----------------|-------------------|
| 2009-01 | 01/01/09 | 01/01/10 |

- A DR entitled "Possible Federal Immigration Violation" shall be completed for all arrests and transports for ICE on a criminal DRO hold or criminal violations of a federal immigration law.

- The questions and answers to the following shall be asked of all parties involved and documented thoroughly in the DR:

  - What is your country of birth?

  - Are you in the United States legally?

### ICE Contact for Drop Houses, Human Smuggling and Load Vehicles

When dealing with drop houses, human smuggling, and/or load vehicles, the following steps **shall** be taken:

- A patrol supervisor **shall** contact the on duty shift lieutenant and provide a detailed account of the incident.

- The on duty shift lieutenant **shall** contact ICE to advise of the circumstances.

- The on duty shift lieutenant shall document each reported incident along with the response by ICE in a supplement to the DR.

- The on duty shift lieutenant **shall** advise the patrol supervisor of a response by ICE and/or other investigative details.

- Officers **shall** cooperate with ICE agents in ICE law enforcement activities consistent with the mandates of MPD policy.

- Officers may transport ICE prisoners at the request of an on-call ICE agent and with the approval of an on-duty supervisor when they come in contact with undocumented persons in regards to a smuggling operation/drop house, or a load vehicle.

- The command duty officer (CDO) or the affected division commander and the on-duty or on-call media relations officer (MRO) **shall** be notified as soon as possible for on scene assistance by ICE or other high profile incidents involving undocumented persons.

### Community and Victim Services

Officers may refer community members to the Chicanos Por La Causa and/or Friendly House assistance; contact Communications or Victim Services for telephone numbers and locations.

For additional referral services contact Community Information & Referrals at (602) 263-8856.

**Page 5 of 6**

## APPENDIX O

## Sample Police Department Policies on Immigration Enforcement

| SO#: | Effective date: | Termination date: |
|---|---|---|
| 2009-01 | 01/01/09 | 01/01/10 |

### U-Visa Certification Forms

U-Visas are available through United States Citizenship and Immigration Services for immigrants who are current or former victims, witnesses, or affected family who are assisting or have assisted officials in the criminal justice system investigate or prosecute criminal activity.

If the applicant is requesting a U-Visa based upon past cooperation, the assigned detective may document specific details they believe merit consideration.

- All requests for U-Visas **shall** be forwarded to the affected Division Commander.

- The affected division commander **shall** determine if the applicant meets the conditions required on the U-Visa Certification Form in regards to type of crime committed and involvement (for example, the applicant is a victim, witness, or possesses relevant information for a successful resolution to the case).

- The affected division commander shall forward his or her written recommendation to the Chief of Police through the chain of command.

### 4.   CONCLUSION

MPD recognizes its role in the community to fight crime and the fear of crime by implementing strategies and utilizing all available tools to do so. Our commitment to this mission extends to all persons that engage in criminal activity within our community irrespective of their immigration status.

This policy evidences our intent to cooperate with ICE and others, to the extent permitted by law, on any criminal activity that threatens the safety and well-being of our community.

**Page 6 of 6**

## APPENDIX O

## Sample Police Department Policies on Immigration Enforcement

| General Order 2008-39 | FOREIGN NATIONALS – DIPLOMATIC IMMUNITY – RACIAL PROFILING – IMMIGRATION ENFORCEMENT | |

### MILWAUKEE, WISCONSIN, POLICE DEPARTMENT

**130.25  RACIAL PROFILING POLICY**
    A.    DEFINITION

        Racial profiling is any police-initiated action that relies upon the race, ethnicity, or national origin of an individual rather than the behavior of that individual, or information that leads the police to a particular individual who has been identified as being engaged in or having been engaged in criminal activity.

    B.    POLICY

        It shall be the policy of the Milwaukee Police Department that police members, during the performance of their duties, shall not engage in the practice of racial profiling. Police members shall not use racial or ethnic stereotypes as factors in selecting whom to stop and whom to search. Police members may use race or ethnicity to determine whether a person matches a specific description of a particular suspect.

**130.30  IMMIGRATION ENFORCEMENT**
    A.    POLICY

        It shall be the policy of the Milwaukee Police Department to implement an immigration enforcement strategy that is consistent with the mission of reducing the levels of crime, fear, and disorder in the City of Milwaukee. However, this strategy must also be in balance with the jurisdictional responsibilities of the federal government and the corresponding jurisdictional limitations of local law enforcement. The following procedures not only achieve that balance but also comply with the Wisconsin Attorney General's law enforcement guide to immigration enforcement.

        With a policing philosophy that is community-based, problem-oriented, and data-driven, we are committed to ridding the city's streets of violent offenders regardless of whether such offenders are in the United States legally or illegally. We are also committed to facilitating safe, sustainable communities where citizens are encouraged to report crime and provide the police with useful information and intelligence. However, proactive immigration enforcement by local police is inherently detrimental to our mission and policing philosophy when doing so ultimately deters some citizens from participating in their civic obligation to assist the police. It is therefore expected that each police member follow the procedures set forth below regardless of one's personal opinion or political ideology on the issue of immigration.

    B.    Enforcement of the nation's immigration laws is the responsibility of the federal government, particularly the United States Bureau of Immigrations and Customs Enforcement (ICE). Accordingly, the Milwaukee Police Department shall not unilaterally undertake immigration-related investigations and shall not routinely inquire into the immigration status of persons encountered during police operations. This prohibition does not preclude the Department from cooperating with federal immigration officials when requested, or from notifying those officials in serious situations where a potential threat to the public is perceived.

        **Note: Most immigration violations are civil and fall under the jurisdiction of the federal government. As such, local law enforcement officers have no right of arrest in these matters.**

## APPENDIX O

## Sample Police Department Policies on Immigration Enforcement

| General Order 2008-39 | FOREIGN NATIONALS – DIPLOMATIC IMMUNITY – RACIAL PROFILING – IMMIGRATION ENFORCEMENT | |
|---|---|---|

### MILWAUKEE, WISCONSIN, POLICE DEPARTMENT

C.   A person's right to file a police report, participate in police-community activities, or otherwise benefit from police services is not contingent upon their immigration status. Consequently, Department members shall not question any person about his or her immigration status unless that person is reasonably believed to be involved in one or more of the activities identified in (F) below.

D.   Department members shall not request passports, visas, "green cards," or other documents relating to one's immigration status in lieu of, or in addition to, standard forms of identification such as a driver's license, state identification card, etc. Immigration related documents shall only be requested when standard forms of identification are unavailable, or when the member is proceeding under (F) below.

E.   Police members shall not contact, detain, or arrest a person solely for a suspected immigration violation unless such contact, detention, or arrest is in cooperation with and at the direction of federal immigration officials.

F.   Police members shall not inform federal immigration officials of the whereabouts or behavior of any suspected illegal immigrant or foreign visitor, except when the immigrant or foreign visitor:

   1.   Is arrested for a felony

   2.   Is arrested for a misdemeanor involving the possession or use of a dangerous weapon

   3.   Is arrested for a terrorism-related offense, or is otherwise reasonably suspected of involvement in terrorism and/or subversive activities

      4.   Is arrested for any offense involving the entry or fraudulent assimilation of undocumented foreigners into the country, or is reasonably suspected of participating in an organized venture to bring or fraudulently assimilate undocumented foreigners into the country

      5.   Is a previously deported felon

      6.   Is reasonably suspected of participating in criminal street gang activity

G.   In the event a police member needs to contact ICE, they shall first attempt to contact the local office at (414) 297-1571. If the local office is closed or if an agent is unavailable, the police member shall contact the ICE Law Enforcement Support Center (LESC) at 1-802-872-6050.

H.   Only federal immigration officials can determine a person's immigration status; therefore, citizens wishing to report immigration violations shall be referred to the local office of ICE at (414) 287-6326, fax (414) 287-6344.

EDWARD A. FLYNN
CHIEF OF POLICE

A603

## APPENDIX O

## Sample Police Department Policies on Immigration Enforcement



### State of New Jersey
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
PO Box 080
TRENTON NJ 08625-0080

JON S. CORZINE
*Governor*

ANNE MILGRAM
*Attorney General*

### ATTORNEY GENERAL
### LAW ENFORCEMENT DIRECTIVE NO. 2007-3

These guidelines shall establish the manner in which local, county, and State law enforcement agencies and officers shall interact with federal immigration authorities.

While enforcement of immigration laws is primarily a federal responsibility, State, county, and local law enforcement agencies necessarily and appropriately should inquire about a person's immigration status under certain circumstances. Specifically, after an individual has been arrested for a serious violation of State criminal law, the individual's immigration status is relevant to his or her ties to the community, the likelihood that he or she will appear at future court proceedings to answer State law charges, and the interest of the federal government in considering immigration enforcement proceedings against an individual whom the State has arrested for commission of a serious criminal offense. When there is reason to believe that the arrestee may be an undocumented immigrant, the arresting agency is responsible for alerting federal immigration officials, the prosecuting agency, and the judiciary.

The overriding mission of law enforcement officers in this State is to enforce the State's criminal laws and to protect the community that they serve. This requires the cooperation of, and positive relationships with, all members of the community. Public safety suffers if individuals believe that they cannot come forward to report a crime or cooperate with law enforcement. Moreover, Article 1, Paragraph 22 of the New Jersey Constitution mandates that "a victim of a crime shall be treated with fairness, compassion and respect by the Criminal Justice System." Consistent with that constitutional mandate, as well as basic

HUGHES JUSTICE COMPLEX ● TELEPHONE: (609) 292-4925 ● FAX: (609) 292-3508
*New Jersey Is An Equal Opportunity Employer ● Printed on Recycled Paper and Recyclable*

## APPENDIX O

## Sample Police Department Policies on Immigration Enforcement

principles of effective policing, victims, as well as witnesses and other persons requesting police assistance, should not be discouraged from approaching police officers out of fear of inquiry into their immigration status.

In 1996, Congress authorized federal authorities to delegate civil and criminal immigration enforcement authority to local, county and State agencies that enter into a written agreement with Immigration and Customs Enforcement (ICE).[1]  Regardless of any additional enforcement powers granted pursuant to an agreement with ICE, however, the primary function of local, county and State agencies must be to enforce State law and to ensure public safety in the community.  The exercise of federal immigration enforcement authority by State, county or local law enforcement officers must therefore be consistent with, and in support of, their State law enforcement mission.  In addition, unlike federal task forces, to which participating officers are assigned on a full-time basis and are under direct and constant federal supervision, Section 287(g) officers need not obtain federal approval before taking enforcement actions in the name of the federal government.

To further the priorities of strong relationships between law enforcement and all members of the community, as well as other fundamental principles of equal protection and civil rights, New Jersey has taken a leadership position in eliminating racially-influenced policing, or racial profiling.  In 2005, the Attorney General issued Attorney General Law Enforcement Directive 2005-1, which prohibits law enforcement officers from engaging in racially-influenced policing.  In that directive, the Attorney General formalized and mandated the great advances that have been made in the State in eliminating racially-influenced policing practices.  Additionally, the Legislature has affirmed that it is against the policy of this State for law enforcement officers to use race or ethnicity as a basis for initiating an investigation.  See N.J.S.A. 2C:30-5.  Consistent with public policy, statute, and Attorney General Directive, law enforcement agencies must refrain from any law enforcement strategies that risk undermining – or which create the impression of undermining – the prohibitions on racially-influenced policing.

Accordingly, by virtue of the authority vested in me by the Constitution and the Laws of this State, and in furtherance of securing

---

1 See Section 287(g) of the Immigration and Nationality Act, codified at 8 U.S.C. § 1357(g).

2

## APPENDIX O

## Sample Police Department Policies on Immigration Enforcement

the benefits of a uniform and efficient enforcement of the criminal law and the administration of criminal justice throughout the State, N.J.S.A. 52:17B-97 et. seq., I do hereby promulgate the following directives:

I.   Arrest of Undocumented Immigrants for Indictable Offenses and Driving While Intoxicated (Applicable to all Agencies and Officers)

    **1.  When a local, county, or State law enforcement officer makes an arrest for any indictable crime, or for driving while intoxicated, the arresting officer or a designated officer, as part of the booking process, shall inquire about the arrestee's citizenship, nationality and immigration status. If the officer has reason to believe that the person may not be lawfully present in the United States, the officer shall notify Immigration and Customs Enforcement (ICE) during the arrest booking process. The only exception to this requirement shall be if the County Prosecutor or the Director of the Division of Criminal Justice determines, in writing, that good cause exists to refrain from notifying ICE during the arrest booking process.**

    **2.  Notification to ICE may be made telephonically, by facsimile transmission, or by such other means as ICE may provide. The officer shall document when and by what means notification to ICE was made and the factual basis for believing that the person may be an undocumented immigrant.**

    **3.  Whenever a law enforcement officer notifies ICE about a suspected undocumented immigrant, notification shall also be made to the prosecuting authority that will handle the matter (*e.g.*, the County Prosecutor in the case of an indictable charge), and to any court officer setting bail or conditions of pretrial release.**

    **4.  County Prosecutors shall on an annual basis report to the Director of the Division of Criminal Justice on the total number of notifications made pursuant to this Directive and the Director shall make the aggregate data public on an annual basis.**

3

## APPENDIX O
## Sample Police Department Policies on Immigration Enforcement

II.   <u>Prohibition on Immigration Status Inquiries of Victims and Witnesses</u> (Applicable to all Agencies and Officers)

    **5.** **No State, county, or local law enforcement officer shall inquire about or investigate the immigration status of any victim, witness, potential witness, or person requesting or receiving police assistance. An exception to this requirement shall exist if: (a) the County Prosecutor or the Director of the Division of Criminal Justice determines, in writing, that good cause exists to inquire about or investigate the person's immigration status; (b) the person has been arrested for an indictable offense or for driving while intoxicated as set forth in Section 1 above; or, (c) as may be constitutionally or otherwise legally required during the criminal litigation discovery process.**

III.   <u>Standards for Agencies and Officers Who Enter Agreements to Exercise Federal Immigration Authority Pursuant to Section 287(g)</u> (Applicable only to Section 287(g) Agencies and Officers)

    Directives 6 through 12 apply only to those local, county, and State law enforcement agencies and officers performing functions of a federal immigration officer pursuant to an agreement with federal authorities under 8 U.S.C. § 1357(g). As used in this Directive, the term "Section 287(g) agency" means a State, county or municipal law enforcement agency that is a signatory to a written agreement with Immigration and Customs Enforcement (ICE) authorized by Section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1357(g). The term "Section 287(g) officer" means a law enforcement officer employed by a Section 287(g) agency who has received the training required by Section 287(g) and is authorized by ICE to act as a federal immigration officer.

    A.   <u>Provisions Applicable to Section 287(g) Officers in Detention Facilities</u>

    **6.** **A Section 287(g) officer may invoke or exercise federal authority under Section 287(g) with respect to any undocumented immigrant who is being detained in a county jail or State detention facility.**

4

APPENDIX O

**Sample Police Department Policies on Immigration Enforcement**

B.      Provisions Applicable to All Other Section 287(g) Officers

7.      **A Section 287(g) officer may not exercise federal law enforcement authority under Section 287(g) unless and until the officer has arrested an individual(s) for violation of an indictable offense, or for driving while intoxicated, under State law.**

8.      **Any law enforcement officer making inquiry or investigation into the immigration status of an individual arrested for an indictable offense, or for driving while intoxicated, shall document and report the inquiry to the officer's supervisor during the arrest booking process.   The report shall include the individual's name, address, gender, date of birth, country/place of birth, race, ethnicity, location encountered, and shall specify the criminal offense that formed the basis for the arrest, the outcome of inquiry and investigation into immigration status, and indicate whether the individual was taken into custody or otherwise ordered detained based on immigration status. The officer shall attach the arrest report to the reporting document.**

9.      **A Section 287(g) agency shall submit on a monthly basis to the Director of the Division of Criminal Justice all reports (with arrest report attached) produced pursuant to No. 8 of this Directive to ensure that immigration enforcement efforts are being performed in compliance with all applicable State laws, directives, and guidelines.   The Director shall compile the information and shall make the aggregate data public on an annual basis.**

10.     **A Section 287(g) agency shall enter into a written agreement with an appropriate ICE-approved detention facility or facilities to ensure that there is adequate space to hold potential federal detainees in addition to local, county, or State detainees.   The agreement shall set forth the procedures established to ensure that the**

5

## APPENDIX O

### Sample Police Department Policies on Immigration Enforcement

detention of any individual solely on the basis of immigration charges comports with the requirements of 8 C.F.R. § 287.7.  No agency shall exercise the authority granted by Section 287(g) prior to reaching agreement with a detention facility that meets the requirements set forth in this paragraph.

11.  Nothing in this Directive shall limit the ability of local, county, or State law enforcement agencies to enter into written agreements authorized by Section 287(g) that impose greater restrictions on the agency's performance of functions under that agreement.

12.  Directives 6 through 12 inclusive shall not apply to any officer who has been detailed on a full-time basis to a federal law enforcement agency or to a task force operated under the direct supervision of a federal law enforcement agency, provided that the officer is acting exclusively under the authority of federal law.

IV.  <u>General Matters</u>

13.  No law enforcement officer shall at any time engage in conduct constituting racially-influenced policing, as defined in Attorney General Law Enforcement Directive No. 2005-1.  An officer or employee of a police agency in this State acting either under the authority of the laws of the State of New Jersey or pursuant to an agreement authorized by Section 287(g) shall not consider a person's race or ethnicity as a factor in drawing an inference or conclusion that the person may be an undocumented immigrant.

14.  All questions concerning the interpretation, implementation or enforcement of this Directive shall be addressed to the Director of the Division of Criminal Justice, or his designee.

6

## APPENDIX O
## Sample Police Department Policies on Immigration Enforcement

15. **This Directive shall take effect immediately and shall remain in full force and effect unless and until repealed, amended or superseded by Order of the Attorney General.**

Anne Milgram
Attorney General

ATTEST:

John Michael Vazquez
First Assistant Attorney General

Dated: August 22, 2007

7



More Than 50,000 Sign Up to Enroll in City's New Municipal Identification Program in First Week | NBC New York

NEWS > LOCAL

# More Than 50,000 Sign Up to Enroll in City's New Municipal Identification Program in First Week

By Melissa Russo

View Comments (6)  |  Email  |  Print     Tweet  11     Recommend  630     Send     +1  5



New Yorkers are coming forward by the tens of thousands to get their hands on new identification cards being offered by the city. The demand is so high the wait is already several months long. Government Affairs Reporter Melissa Russo reports. (Published Friday, Jan 16, 2015)

Updated at 8:23 PM EST on Friday, Jan 16, 2015

Thousands of New Yorkers have enrolled in the city's new municipal identification card program since it launched Monday, and more than 50,000 others have booked appointments to learn how it can give them access to key city services they were previously unable to obtain, officials said Friday.

The card, dubbed IDNYC, was approved last year and is aimed at those who do not currently have a government-issued ID, including the elderly, homeless and an estimated 500,000 immigrants in the city who live in the U.S. without legal documentation.

- **Man Buys Lottery Tickets to Break $100 Bill, Wins $10M**



ENDS SOON

NEW YEAR'S RESOLUTION: TRAVEL

SAVE 15% ON NEW EXPERIENCES* (EXCEPT JAPAN)

Book now »

contiki

### TRENDING STORIES

PHOTOS  **Massive Blaze at Luxury Apartment Complex Accidental: Officials**

Man Buys Lottery Tickets to Break $100 Bill, Wins $10M

Teacher Accused of Sex Crimes Against 16-Year-Old Boy

VIDEO  NY Man Bulldozes Home Without Telling Wife: Police

WATCH: News 4 New York

### WEATHER FORECAST

⚡ WEATHER ALERTS          View All »

Mayor de Blasio hailed the program, the largest of its kind in the nation, as a "gateway to city services," enabling those otherwise lacking documentation to have acces to crucial benefits and participate in all aspects of civic life.

New Yorkers without IDs lined up all week to apply for them. On Friday, the line included one person whose job is to deliver food but can't get into most buildings without a government-issued ID and an Upper West Side resident who wants one in order to get access to museum discounts. A grandmother waiting in line said she needed an ID to pick up her grandchildren from school.



▶ NYC Launches Municipal ID Card Program

New York City has launched its municipal identification card program, the largest in the country, which officials say will allow immigrants living in the country illegally to access key city services they were previously unable to obtain. Andrew Siff reports. (Published Monday, Jan 12, 2015)

"Most buildings like Rockefeller Center, World Trade Center, they ask for a state ID," said the delivery worker, Luiz, adding that customers have gotten annoyed when they had to come down and pick up their deliveries when he can't produce ID.

Ken Thomas said he's in it for the discounts and memberships.

- **Sad Miami Monkey Gets Comforted by Pal**

"Just about every museum in the city -- the Met, MoMA, the Whitney and Frick," she said.

Appointments are required for enrollment; the city says it is no longer accepting walk-ins. In total, nearly 55,000 appointments have been made since the program launched, including 14,000 secured on Friday alone. Nearly 5,700 have already enrolled. The city has been so flooded with interest in the program that its next available appointment is not until the middle of April.

- **Target Launches New Plus-Size Clothing Line**

"Before we launched, people were saying things like nobody's going to come out because they're concerned [about privacy], immigrants aren't going to step forward," said Nisha Agarwal, commissioner of the mayor's office of immigrant affairs.

But it's clear that tens of thousands of people in just the first few days of the rollout

New York, NY ⦿

☀ 39° Clear
Feels Like 34°

  
Radar        Forecast        Maps


CONTACT BETTER GET BAQUERO

NEWSLETTERS ✉
Receive the latest local updates in your inbox
[                    ]  SIGN UP

Privacy Policy | More Newsletters


If Banks Knew You Did This, They'd Freak
Before you pay your mortgage, you need to see this.
An often-overlooked way to pay off your mortgage has banks scrambling!
Read more

A612

have set aside any confidentiality concerns to get the card.

- **Will Ferrell Hurls Basketball at "Cheerleader's" Head**

A city official said there have been some glitches with the rollout, but they've been worked out. Extra work stations have been opened at existing locations so there's more staff on hand to process appointments, and two more enrollment centers will be up and running in the next two weeks -- one at LaGuardia Community College in Queens and another at the Center for Family Life in Brooklyn.

To help mitigate long lines at the enrollment centers, the city has been reminding New Yorkers they can call 311 or use the IDNYC website to schedule appointments. A spokesperson for the mayor's office said 311 wait times were an issue earlier in the week, but they were down to 4 minutes and 23 seconds by Friday afternoon. It wasn't clear how long the average wait time was at launch.

- **Abraham Lincoln's Hair Up for Auction**

As one city official put it, New Yorkers want the cards now. Membership is free, though a fee may be applied in the future, city officials have said, and is not limited to a calendar year, so if someone doesn't get a card until April, his or her membership will be valid until next April.

All New Yorkers age 14 and older are eligible, as long as they can prove their identity and city residency. Applicants without a home address may prove residency by providing a letter from a city agency, nonprofit organization, religious institution, hospital or health clinic where their mail is received.

- **UPDATED Man Left Twin 9-Year-Old Boys Home Alone for Months: Police**

To prevent any possible stigma that the ID is only carried by immigrants who are in the country illegally, the city has created an incentive program to entice all New Yorkers, regardless of their immigration status, to get a card. Cardholders are eligible for free memberships at many of the city's signature cultural institutions as well as other discounts.

*Follow Melissa Russo on Twitter* **@MelissaRusso4NY**, **Facebook** *or email her:* **melissa.russo@nbcuni.com**

Get the latest from NBC 4 New York anywhere, anytime: **iPhone/iPad App** | **Twitter** | **Facebook** | **Email Newsletters** | **Send Us News Tips** | **Google+** | **Instagram** | **RSS**

Copyright Associated Press / NBC New York

From Around the Web                     More from NBC New York


Parents Mourn The Loss Of Son Who Died In A Car Crash. When…
Resharable.org


Forget the iPhone 6. Next Hit Apple Product Leaked The Motley Fool

New York man's driver license photo is making his life very awkward New York Natives

What Does Your Last Name Say About You? Ancestry

90 Minutes From NYC and a Whole Day of Fun Zipcar

Copper Thieves Beware: Planted Plant DNA Will Bring the Coppers DGI Wire

---

View Comments (6) | Email | Print

---

## Leave Comments

Add a comment...

[ Comment ]

 **Carl Wolf** · ⭐ Top Commenter · Jacksonville, Florida
Conservatives hate this, as noted by the idiot below.
Reply · Like · 👍 2 · January 16 at 5:34pm

 **Jo Burm** · ⭐ Top Commenter
Who are you calling an idiot
Reply · Like · January 16 at 6:18pm

 **Letticia Rosado** · ⭐ Top Commenter · Survey Taker / Writer at Work at home
On Monday, I waited nearly 11 hours to get mine! Took a toll on the body, but it was worth the wait. I got served by 8:00 PM! It's the perks that got me to sign up.
Reply · Like · January 17 at 9:48am

 **Jo Burm** · ⭐ Top Commenter
They are not new yorkers they are illegals who should be sent back to where they came from
Reply · Like · January 16 at 4:50pm

 **Mary O'Shaughnessy** · ⭐ Top Commenter · New York, New York
I am a second-generation native Manhattanite and I was there in the morning on Monday to sign up for mine. Where are you planning to send me?
Reply · Like · 👍 2 · January 17 at 6:11am

 **Jo Burm** · ⭐ Top Commenter
If you are an illegal immigrant you don't deserve any of the benefits that come with this id
Reply · Like · January 17 at 4:07pm

 Facebook social plugin

---

| NEWS | WEATHER | ENTERTAINMENT | CONTACT US | TRAFFIC |
| --- | --- | --- | --- | --- |
| Local | Forecast | Entertainment News | Social Directory | Traffic |
| U.S. & World | Maps & Radar | The Scene | About Us | Cameras |
| Sports | Weather Alerts | Events | Community | |

http://www.nbcnewyork.com/news/local/IDNYC-Municipal-Identification-Card-Immigrant-New-York-Wait-Time-311-Appointment-New-York-City-288871711....    4/5

A614

| | | | |
|---|---|---|---|
| Health | School Closing | In The Wings | TV Listings |
| Tech | Alerts | NY Live | Next Step for Vets |
| Weird | Weather News | Your Guide 4 NY | Careers |
| Weather | | Open House | |
| | | 1st Look | |
| | | Talk Stoop | |

FCC Independent Programming Report
FCC News and Information Programming Report
NBC Non-Profit News Partnership Reports
WNBC Public Inspection File
21st Century Solutions

Send Feedback　|　Terms Of Service New　|　Privacy Policy

AdChoices

© 2015 NBCUniversal Media, LLC. All rights reserved. Portions by Broadcast Interactive Media.

A615

## The Psychosocial Impact of Detention and Deportation on U.S. Migrant Children and Families

### A Report for the Inter-American Human Rights Court

### August, 2013

*Julia[1], a Guatemalan indigenous Mayan woman, was detained in a raid at a Massachusetts factory where she was manufacturing backpacks for U.S. soldiers in Iraq (Brabeck, Lykes, & Hershberg, 2011). Julia's two-year-old son was with a babysitter when his mother was detained; he was waiting by the windowsill, as was his habit, for his mother on the day she did not return from work. Julia was transported to a Texas detention center. She was prohibited from placing a phone call to her family for the first few days there. She pleaded with immigration officials: her son had asthma, a condition for which he had previously been hospitalized, and the babysitter didn't know how to operate his oxygen machine. Julia recalled that she was threatened by immigration officials that her children would be taken from her if she continued to ask for "special treatment," and was informed that her processing could take anywhere from one month to one year to complete. Julia was separated from her son for nine days during her detention. According to Julia, the raid and resulting separation precipitated her son's tantrums and nightmares; difficulty sleeping, eating, and speaking; and extreme separation anxiety.*

**Unauthorized[2] Migrants and Their Children: A Population at Risk and under Stress**

Current estimates indicate that 82% of the children born to the United States' 11.1 unauthorized migrants are U.S.-born citizen children; this amounts to 4.5 million U.S. citizen children living in "mixed status families", that is, families wherein at least one member is authorized and one member is not (Passel & Cohn, 2011)[3]. Additionally, there are approximately 1.15 million unauthorized children in the U.S., comprising 10% of the total unauthorized population (Capps, Bachmeier, Fix & VanHook, 2013). Between July, 2010 and September, 2012, 205,000 deportees reported having at least one U.S.-citizen child, resulting in an estimated annual average of approximately 90,000 parental deportations (Wessler, 2012). A study conducted by the New York University School of Law Immigrant Rights Clinic found that between 2005-2010, 87% of processed cases of noncitizens with citizen children resulted in

---

[1] Pseudonyms have been used to protect participant confidentiality.

[2] The language that is used in much public and media discourse to describe non-citizens in the U.S., i.e., "illegal alien," "illegal immigrant," "illegal," creates a blurring of boundaries between the "immigrant" and the "criminal," and is not neutral, reflecting rather the U.S.'s history with immigration, race, and ethnicity. In this report, we use "unauthorized," although we acknowledge that others who share the concerns articulated here use the term "undocumented." No single term fully reflects the complexities articulated and discussed in this report.

[3] While these numbers represent best estimates, it is difficult to accurately count the number of unauthorized migrants in the U.S. due in part to individuals "living in the shadows" out of fear of discovery and deportation. Researchers have used different methods to estimate the size of the unauthorized population; the numbers reported by Passel and Cohn (2011) were calculated using the "residual" method, i.e., an estimate of the authorized foreign-born is subtracted from the total foreign-born, and the residual is assumed to be unauthorized.

1

PSYCHOSOCIAL IMPACT OF DETENTION & DEPORTATION

deportation (NYU School of Law Immigrant Rights Clinic, 2012). An increasing body of social scientific literature, which includes both qualitative and quantitative methodologies, documents the adverse impact of U.S. immigration policies and their enforcement on U.S. migrant families and children.

From the cumulative risk perspective (Rutter, 1979), adverse effects from a single event, such as a parent's deportation, are more likely to result in negative outcomes when they occur against the backdrop of multiple risk factors. Deportation most typically occurs within the context of exploitation, stigma, discrimination, economic disadvantage, and social marginalization, factors which contextualize the lives of most unauthorized migrants and mixed status families in the U.S. (Henderson & Baily, 2013).

Specifically, although the majority of unauthorized adults (especially men) are employed, unauthorized families are typically low-income or poor, with 32% of adult parents and 51% of children in 2011 living below the federal poverty level (FPL), and 44% of unauthorized adult parents and 63% of children living below 138% FPL, the cutoff for Medicaid eligibility  (Capps, et al., 2013)[4]. Only 30% of unauthorized adults are English proficient (as defined by the U.S. Census Bureau), and the vast majority (71%) lack health insurance. Unauthorized immigrant adults (compared to authorized) are more likely to experience economic hardship (Kalil & Chen, 2008), occupational stress (Yoshikawa, 2011), social isolation (Yoshikawa, 2011), decreased ability to access social service programs (Capps & Fortuny, 2006; Cleveland & Ihara, 2013), psychological distress (Furman, Ackerman, Iwamoto, Negi, & Mondragon, 2013; Human Impact Partners, 2013; Sullivan & Rehm, 2005), and acculturative stress (Arbona, Olvera, Rodriguez, Hagan, Linares, & Wisener, 2011). Migrant adults who fear deportation (regardless of legal status) are more likely to experience employment challenges, physical health problems, psychological distress, acculturative stress, and decreased access to services (Arbona et al., 2011; Cavazos-Regh, Zayas & Sptiznagel, 2007; Hacker, et al., 2011). They are also less willing to report a crime (Hacker et al., 2011), more likely to avoid public spaces (e.g., churches, organizations, schools) (Menjivar, 2011), and more likely to experience discrimination and racial profiling (Human Impact Partners, 2013).

In summary, unauthorized parents and their children experience a multitude of risk factors. Research has documented that children who experience multiple risks (e.g., family disruption, low socioeconomic status, high parental stress) are more prone to behavioral and emotional problems later in life (Appleyard, Egeland, Dulmen, & Sroufe, 2005). From the cumulative risk perspective (Rutter, 1979), a parent's detention and/or deportation may be expected to have an even more profound effect because it occurs against the backdrop of the challenges and risk factors described above (Henderson & Bailey, 2013).

The effects of growing up in a family wherein family members are at risk for deportation can also be understood from the perspective of toxic stress, that is, the notion that adverse experiences (such as those noted above) that upset a child, parent, and household, can result in

---

[4] The federal poverty level is an inclusive term that connotes two measures used by the federal government: 1) the federal poverty threshold, which is used for statistical purposes, e.g., to count the number of Americans living in poverty, and 2), the federal poverty guidelines, which are used to determine eligibility for certain federal programs. (See: http://aspe.hhs.gov/poverty/13poverty.cfm.)

2

PSYCHOSOCIAL IMPACT OF DETENTION & DEPORTATION

biological, neurological, and psychological changes (Shonkoff, Boyce & McEwen, 2009). As noted in a recent report issued by Human Impact Partners (2013), a child's health and wellbeing is predicated upon the parent's ability to provide family and economic stability, to access needed services (e.g., childcare and medical care), and to maintain her/his own physical and emotional wellbeing. Research consistently finds that parental psychological and economic stress impacts parenting and child outcomes (Conger et al., 1994; Webster-Stratton, 1990). Thus, it is not surprising, given the multiple stressors unauthorized parents experience, that parent legal status is a predictor of multiple adverse outcomes for children, including emotional wellbeing, academic performance, and health status (American Psychological Association Task Force, 2012; Brabeck & Xu, 2012; Dreby, 2012; Human Impact Partners, 2013; Suarez-Orozco, Yoshikawa, Teranishi & Suarez-Orozco, 2011). Some research with children of unauthorized immigrants has found that they are more likely to report anxiety, fear, sadness, posttraumatic stress symptoms, anger, and withdrawal (Human Impact Partners, 2013; Potochnick & Perreria, 2010). In a nationally representative birth cohort study, Yoshikawa (2011) followed children of low-income mothers from birth to age six. While all low-income mothers experienced significant challenges, Yoshikawa (2011) found that stressors that were more associated with unauthorized status (e.g., occupational stress, psychological distress, lower social support, and lower access to center-based childcare) affected children's cognitive development at 24- and 36-months. Other researchers have found that children of unauthorized parents are at greater risk for developmental delay (Fuller et al., 2009; Ortega, et al., 2009) and school readiness (Crosnoe, 2006). U.S. citizen children with two undocumented parents or an undocumented mother are estimated to have 1.18 fewer years of education (Bean, Leach, Brown, Bachmeier, & Hipp, 2011). Children of unauthorized parents are also less likely to be medically insured (Capps et al., 2013; Ku & Jewers, 2013), less likely to have seen a physician in the past year (Human Impact Partners, 2013), less likely to be reported as being in good health (Human Impact Partners, 2013; Kalil & Ziol-Guest, 2009), and less likely to have good eating, sleep, and exercise habits (Human Impact Partners, 2013). Even when children are eligible for services, unauthorized parents may be reluctant to apply for public assistance or seek medical care for them (Ku & Jewers, 2013) due the fear of disclosing their status and being deported.

**Untenable Decisions**

When an unauthorized parent of a U.S.-citizen child is arrested, that parent must make what Zayas (2010) calls a "Solomonic decision" (p. 809): He/she may move the child to a linguistically and culturally foreign environment, where the child likely loses access to the educational, health, and other benefits afforded to her/him as a U.S.-citizen, or he/she may leave the child in the U.S. in the care of others (Brabeck et al., 2011; Dreby, 2012; Lykes, Brabeck & Hunter, 2013). These "others" may include extended family or friends, but may also include the child welfare system. Family reunifications are complicated by legal status, increasing the likelihood that the child will remain in the child welfare system (Wessler, 2011). Placement with relatives also can be complicated by requirements of legal background checks for adults and careful consideration of housing conditions in a potential placement (Reed & Karpilow, 2002). Parents, then, must decide whether it is better for children to remain with the parent, but with potentially limited access to healthcare and educational opportunities, or to remain in the U.S. with its array of opportunities and supports, but without one or both parents' present nurturing and support (Zayas, 2010).

3

PSYCHOSOCIAL IMPACT OF DETENTION & DEPORTATION

**Research Findings on Welfare of Children and Adults during the Detention Process**

When detained, parents are typically not released pending deportation hearings, but rather, are held in detention as they await the hearing, leaving no time to see family or to make preparations, including for childcare (Androff, et al., 2011). Sometimes detained migrants are transferred to a facility far away from their family members (McLeigh, 2011). A study following workplace raids in three communities found that fear, lack of access to telephones, and being detained left approximately 500 children in the care of others without information on the whereabouts or conditions of their parents (Capps, Castaneda, Chaudry & Santos, 2007). This kind of sudden "disappearance" of a family member can be particularly traumatic for migrants who experienced state-sponsored kidnapping and murders in their countries of origin (Brabeck, et al., 2011). Following arrest, many parents are reluctant to disclose that they have children, for fear that the children will be permanently removed from their custody (Capps, et al., 2007). Amnesty International (2009) and the investigative branch of Department of Homeland Security (DHS) (2006) found instances of mistreatment and neglect of detainees, e.g., inadequate healthcare and lack of due process for reporting human rights violations. Philips, Hagan, and Rodriguez (2006), drawing on a random sample of Salvadoran deportees (upon arriving in El Salvador following deportation from the U.S.), reported that 25% of the deportees reported racial slurs during arrest, 26% reported racial slurs during detention, 31% reported being denied access to adequate food and water in detention, 45% reported being denied access to a phone during detention, and 20% reported some form of force (e.g., shoving, throwing to the ground) during arrest; among these instances of force, 84% involved excessive force. According to the authors, deportees were 1.5 times more likely than citizens to report force during arrest (Phillips et al., 2006).

The nature of detention, compounded by the uncertainty of its length, is regarded as a major contributing factor to mental deterioration, despondency, suicidality, anger, and frustration (Physicians for Human Rights & Bellevue/New York University, 2003).  In 2003, the Bellevue/NYU Program for Survivors of Torture and Physicians for Human Rights interviewed 70 asylum seekers in U.S. detention centers. They documented high levels of psychological distress, which worsened during the course of detention, and inadequate or non-existent mental health services within detention centers (Physicians for Human Rights & Bellevue/NYU, 2003). Researchers have also documented that female detainees in Arizona experienced inadequate prenatal and mental health care (Southwest Institute for Research on Women, 2009).

Unfortunately, children's basic rights may also go unprotected during arrest and detention. A report issued by the Center for Public Policy Priorities on workplace raids found that noncitizen children in deportation proceedings have experienced maltreatment by Immigration and Customs Enforcement (ICE) officials, failure of ICE to notify Child Protective Services, denied access to a lawyer, denied access to country of origin consulates, holding for unreasonable periods of time, and removal to unsafe conditions (Benjet, et al., 2009). Thus, the process of arrest and detention results in negative consequences for physical and mental health for detained adults and children.

4

PSYCHOSOCIAL IMPACT OF DETENTION & DEPORTATION

**Research Findings on the Short- and Long-term Impact of Detention and Deportation on Children and Families**

Not only is there detrimental impact on the wellbeing of immigrant individuals as they either anticipate or experience detention or deportation, there is also deterioration of the family members and of the community of those left behind. Studies are beginning to document the short- and long-term effects of detention and deportation on children and families of the deported individual. This mounting empirical research confirms what social scientists, mental health professionals, and advocates have predicted, based partly on the much more established literature on the impact of parental incarceration on child and family wellbeing. Specifically, this latter research reveals that children with an incarcerated parent are 3-4 times more likely than those without an incarcerated parent to engage in delinquent behavior, and 2.5 times more likely to experience mental health problems (e.g., anxiety and depression) (Makariev & Shaver, 2010). Later in life, the children of incarcerated parents are more likely to have substance abuse problems and to be unemployed (Murray & Murray, 2010), and to experience poor romantic relationships, divorce, and separation from their own children (Murray, 2007). In the wake of parental incarceration, family members must deal with the sequalae of traumatic separation, loneliness, stigma, how to explain the separation to children, strained parenting, reduced family income, unstable childcare arrangements, and home and school instability and transitions (Murray et al., 2012).

*The trauma of sudden and imposed family separation*. The detrimental effects of forced and unexpected parent-child separation, even when children are well cared for in a safe environment, have long been documented in the psychological and psychiatric literature (e.g., Freud & Burlingham, 1943). Unlike separations involved in voluntary migration decisions, which may include economic benefits but social/emotional costs, forced separations due to deportation incur the social/emotional cost without the economic benefit (in fact, economic situations typically deteriorate further following deportation) (Dreby, 2012). Deportations involve a double or triple trauma for children, who may witness the forcible removal of the parent, suddenly lose their caregiver, and/or abruptly lose their familiar home environment (McLeigh, 2011). From the attachment theory perspective (Bowlby, 1969), a child's sense of security is rooted in relationships with familiar caregivers; this secure base is a necessary foundation for developing social, cognitive, and emotional regulation skills that are fundamental throughout life. The physical separation between a parent and child, particularly when unexpected as in the case of deportation, disrupts this essential secure base, risking internalizing symptoms (depression, anxiety), externalizing behaviors (withdrawal, aggression), and social and cognitive difficulties (Makariev & Shaver, 2010).

The Urban Institute and National Council of La Raza (NCLR) explored the short- (two month), intermediate- (six month), and long-term (one year) impact of worksite raids on three communities where a total of 500 children, mostly U.S. born citizens, temporarily or permanently lost parents (Capps, et al., 2007; Chaudry et al., 2010). Chaudry et al. (2010) reported that the most common short-term effects to children's psychological wellbeing following a parent's arrest included eating (e.g., loss of appetite) and sleeping changes (e.g., nightmares); this was followed by crying and feeling afraid. Anxiety, withdrawal, anger/aggression, and clinginess were less common but still reported by many respondents.

5

PSYCHOSOCIAL IMPACT OF DETENTION & DEPORTATION

These hardships were especially prevalent among children whose household structure and primary caregiving relationships changed after a parent's arrest (Chaudry et al., 2010). At follow-up, Chaudry et al. (2010) reported that the more frequently cited behavioral and emotional changes (eating, sleeping, crying, fear, and anxiety) reduced over time, but less frequently cited changes (withdrawal and angry/aggressive behaviors) persisted at similar or higher levels in the longer terms. Additional short- and long-term consequences for children following a parent's arrest included developmental difficulties (e.g., speech delay) and behavioral and academic decline at school. Similar results were found by Brabeck, Lykes, and Hershberg (2011) who conducted interviews with Guatemalan and Salvadoran immigrant families impacted by detention and deportation.

From the theoretical perspective of ambiguous loss (i.e., the parent is physically absent but psychologically present) (Boss, 2006), when ambiguity and loss are experienced simultaneously, individuals may internalize stress and experience negative psychological symptoms (e.g., depression and anxiety). Children whose parents are deported may experience confusion over whether their parent is a "criminal", messages that the loss should be kept a secret, and confusing explanations about what happened, all of which compound the loss and increase the likelihood for adverse psychological effects. Unfortunately, while such adverse effects can be profound, they may not be considered "exceptional and extremely unusual hardship" under the current immigration policies (e.g., the Antiterrorism and Effective Death Penalty Act (AEDPA) (Hagan, Castro & Rodriguez, 2010).

*Financial, health, and psychological consequences for the deported individual*. Deportees often face high levels of stigma upon their return to their countries of origin. Although not always the case (McMillan, 2011), they are sometimes seen by communities of origin or their own families as failures and as criminals, despite any evidence to this effect (Barrios & Brotherton, 2011). They typically face employment difficulties and feel demoralized (Barrios & Brotherton, 2011). Research has also found that deportation is associated with more frequent drug use and less interaction with medical or treatment services (including HIV testing, medical care, and substance abuse treatment) (Brouwer, et al., 2009). As a result of the employment challenges and inability to fulfill the provider role, as well as the stigma, shame, and depressive symptoms, many deported fathers lose contact with their children in the U.S. In this way, deportation severs paternal bonds, and forces many single mothers into very difficult positions as both family caretakers and providers (Dreby, 2012). For female deportees, deportation increases the risk for physical and sexual assaults, and increased prostitution in the context of financial insecurity and ineffective law enforcement (Robertson, et al., 2012).

*Changes in family structure and stability*. A parent's deportation can lead to a permanent change in family structure and in the extreme cases, family dissolution (Dreby, 2012). From the perspective of Social Control theory and Strain theory (Cullen & Agnew, 2006), a parent's detention and deportation disrupts family processes and family resources; specifically, income, parental involvement, and parental supervision all decline, while school and housing instability increase. Dreby (2012) found that ¼ of families in her sample that experienced deportation were unable to keep the family together post-deportation. Although changing trends in migration have led to increased numbers of female deportees, overwhelming deportees continue to be male (Brotherton & Barrios, 2011; Kohli, Markowitz & Chavez, 2011). Thus, as Dreby points out

6

PSYCHOSOCIAL IMPACT OF DETENTION & DEPORTATION

(2012), when parental deportation results in a single parent household, it's typically a single *mother* household, and often that single mother has a tenuous legal status herself. Unlike a single breadwinner whose husband was laid off or injured, these newly single mothers are not going to receive worker's compensation or unemployment benefits to help make ends meet (Dreby, 2012). Children in a single parent household are 4.2 times more likely to live in poverty, and the poverty rate is double for single mother households compared to single father (Women's Legal Defense and Education Fund, 2010). For the remaining family members, loss of the deported person's income can lead to housing insecurity, food insecurity, psychological distress, and slipping from low-income into poverty. Additionally, the loss of the deported parent can create a crisis in childcare, and older siblings may be increasingly relied on for care of younger siblings (Dreby, 2012).

*Economic costs for families*. As alluded to above, caregiver detention and/or deportation have important implications for the family's economic wellbeing. Parents often lose employment and income, and even detained parents who are granted work release experience subsequent difficulty finding employment. Related economic hardships include difficulty paying bills, increasing debts, housing instability, food insecurity, inability to send remittance money, and apprehension about applying for public assistance (Chaudry et al., 2010). Economic crises are especially prevalent among families who have not yet paid off the debt incurred in migration (Brabeck, et al., 2011; Menjivar & Abrego, 2012).

*Consequences for the "de facto" deportees*. While children left in the U.S. face abundant challenges, children who return with parents to the host country—children Luis Argueta calls "de facto deportees"— also face a myriad of difficulties. According to the Pew Hispanic Center (2012), 300,000 U.S. citizen children have returned to Mexico alone since 2005 (Passel, Cohn & Barrera, 2012). These children often feel like exiles, and experience difficulties with language and discrimination (Boehm, 2011). As noted previously, they are deprived of the benefits of U.S. citizenship, including access to healthcare, educational opportunities, and social service programs (Hagan et al., 2011). The transition between schooling systems can be a challenge, particularly if returning to a rural area (Zuinga & Hammam, 2006). As a result of these cumulative experiences, children may begin to lose their aspirations and dreams, and may have lower educational and vocational readiness, as well as untreated mental health disorders (Zayas, 2010). They may be returned to living situations of extreme poverty, as documented in a 2012 article in the Guatemalan newspaper, *La Prensa*, which described the experiences of an 11-year-old U.S.-born girl who returned with deported parents to a remote Guatemalan village; as a result of the extreme change in standard of living, she began to experience health problems, dietary issues, academic regression, and loss of English fluency (Ventura, 2012).

*Impact on the broader community*. The aftermath of deportation impacts entire communities as it instills fear of family separation and distrust of anyone assumed to be associated with the government, including local police, school personnel, health professionals and social service professionals (Dreby, 2012; Menjivar & Abrego, 2012). Unauthorized adults drive less (Human Impact Partners, 2013), unauthorized crime witnesses and victims are reluctant to disclose information to the police (Hacker et al., 2011; Human Impact Partners, 2013; Sladkova, Garcia Mangado, & Reyes Quinteros, 2011), and children of unauthorized parents may be kept out of school (Androff et al., 2011; Capps et al., 2007). Thus, while smaller

7

PSYCHOSOCIAL IMPACT OF DETENTION & DEPORTATION

numbers of individuals are directly impacted and suffer the worst consequences of deportation, the entire community suffers adverse effects (DeGenova, 2010; Dreby, 2012). Importantly, this fear extends beyond the unauthorized population, to include authorized Latino immigrants who still fear deportation, experience discrimination, and, as a result, feel less optimistic about the future for their children and more mistrusting of their government (Becerra, et al., 2013). Additionally, the psychological and financial sequelae of detention and deportation extend to family members living in the country of origin, who also experience the sudden panic of losing contact with their family member, and often go for weeks or months with no information regarding loved ones' whereabouts (Brabeck et al., 2011).

Finally, growing up in a climate of fear, distrust, and "in the shadows" impacts a child's (including U.S. citizen children's) self-concept and relationship with the US, its government, and authorities more generally. Research has found that children in immigrant families begin to associate all immigrants with illegal status, and to associate being "illegal" with being a criminal; as a result they may reject their own immigrant heritage. Moreover, children may conflate police with ICE officials, thereby growing up seeing the police as a threat and not a resource (Dreby, 2012; Hacker, et al., 2011). These mixed messages may be confounded by the ways in which adults may try to protect children, either by avoiding direct communication with children about status, detention, and deportation, or by interpreting the events in ways that may not be entirely accurate, e.g., "deported people are criminals but we are not at risk because we haven't committed a criminal act" (Lykes, et al., 2013).

**Conclusions**

In this document, we have reviewed the considerable evidence that confirms that current U.S. immigration policies and their enforcements have detrimental effects for migrant adults, children, families, and communities, both in the U.S. and abroad. At the same time, it is critical to note that in the midst of these abundant and extreme challenges, unauthorized migrants and their families fight for family unity, improved lives for their children, and the betterment of their communities. Despite the harsh treatment they may receive, many maintain strong ties and patriotic attitudes toward the U.S. and its citizens (McMillan, 2011). Many migrants, including those who are unauthorized, learn to successfully navigate two cultures, two languages, and family obligations on both sides of the U.S. border. They have demonstrated resilience, figuring out ways to make their income flow in three directions: paying off debt incurred in migration, covering bills and expenses in the U.S., and sending remittance money home (Brabeck, et al., 2011). Despite parents' contributions to their children's wellbeing, the research presented herein confirms that U.S. immigration policies and practices harm these children, adults, families, and communities. The specific requests presented in accompanying briefs are critical to redressing at least some of these injuries to these children and their families, as they seek the dignified life promised them by the U.N. Declaration on Human Rights and its conventions.

8

PSYCHOSOCIAL IMPACT OF DETENTION & DEPORTATION

*This report was drafted by:*

Kalina Brabeck, PhD, Associate Professor & Chair, Department of Counseling, Educational Leadership, & School Psychology, Rhode Island College

M. Brinton Lykes, PhD, Professor of Community-Cultural Psychology & Chair, Department of Counseling, Educational & Developmental Psychology; Associate Director, Center for Human Rights & International Justice, Boston College

Stuart L. Lustig, MD, MPH, Lead Medical Director, Cigna Behavioral Health; Associate Clinical Director, Department of Psychiatry, University of California San Francisco School of Medicine

*The experts listed alphabetically below have read and indicated their endorsement of the report:*

Cecilia Ayón, PhD, Assistant Professor of Social Work, Arizona State University

Joanna Dreby, PhD, Assistant Professor of Sociology, University at Albany: State University of New York

Lili Farhang, MPH, Co-Director, Human Impact Partners

Tracy Harachi, PhD, Associate Professor of Social Work, University of Washington

Allen S. Keller, MD, Associate Professor of Medicine; Director, Bellevue/NYU Program for Survivors of Torture; Director, NYU School of Medicine Center for Health and Human Rights

Cecilia Menjivar, PhD, Cowden Distinguished Professor; Associate Director, T. Denny Sanford School of Social and Family Dynamics, Arizona State University

Katherine Porterfield, PhD, Senior Staff Psychologist, Bellevue/NYU Program for Survivors of Torture

Rinku Sen, MS, President, Applied Research Center; Publisher, ColorLines: News for Action

Carola Suárez-Orozco, PhD, Professor of Human Development and Psychology; Co-Director, Institute for Immigrant Children and Youth, University of California, Los Angeles

Marcelo Suárez-Orozco, PhD, Dean and Distinguished Professor of Education; Co-Director, Institute for Immigrant Children and Youth, University of California, Los Angeles

Pratyusha Tummala-Narra, PhD, Assistant Professor, Department of Counseling, Educational & Developmental Psychology, Boston College

Hirokazu Yoshikawa, PhD, Courtney Sale Ross University Professor of Education, New York University

9

PSYCHOSOCIAL IMPACT OF DETENTION & DEPORTATION

# References

American Psychological Association, Presidential Task Force on Immigration. (2012). *Crossroads: The psychology of immigration in the new century*. Retrieved from http://www.apa.org/topics/immigration/report.aspx

Amnesty International, USA. (2009). *Jailed without justice: Immigration detention in the USA*. Washington, DC: Amnesty International USA. Retrieved from http://www.amnestyusa.org/pdfs/JailedWithoutJustice.pdf

Androff, D.K., Ayon, C., Becerra, D., Gurrola, M., Salas, L., Krusik, J…. & Segal, K. (2011). U.S. immigration policy and immigrant children's well-being: The impact of policy shifts. *Journal of Sociology & Social Welfare, XXXVIII (1),* 77-98. Retrieved from http://law.asu.edu/LinkClick.aspx?fileticket=6a67g_51e4E%3D&tabid=2927

Appleyard K., Egeland B., Dulmen M.H., & Sroufe L. (2005). When more is not better: The role of cumulative risk in child behavior outcomes. *Journal of Child Psychology and Psychiatry, 46(3)*, 235–245. doi: 10.1111/j.1469-7610.2004.00351.x

Arbona, C., Olvera, N., Rodriguez, N., Hagan, J., Linares, A. & Wisener, M. (2011). Acculturative stress among documented and undocumented Latino immigrants in the United States. *Hispanic Journal of Behavioral Sciences, 32,* 362-384. doi: 10.1177/0739986310373210

Brotherton, D. & Barrios, L. (2011). *Banished to the homeland: Dominican deportees and their stories of exile*. New York, NY: Columbia University Press.

Bean F.D., Leach M.A., Brown S.K., Bachmeier J.D., & Hipp J.R. (2011). The educational legacy of unauthorized migration: comparisons across US-immigrant groups in how parents' status affects their offspring. *International Migration Review. 45(2)*, 348–385.

Becerra, D., Androff, D., Cimino, A., Wagaman, M.A., & Blanchard, K.N. (2013). The impact of perceived discrimination and immigration policies upon perceptions of quality of life among Latinos in the United States. *Race & Social Problems, 5,* 65-78. doi 10.1007/s12552-012-9084-4

Benjet C., Borges G., Medina-Mora M.E., Zambrano, J. &Aguilar-Gaxiola, S. (2009). Youth mental health in a populous city of the developing world: Results from the Mexican Adolescent Mental Health Survey. *Journal of Child Psychology and Psychiatry, 50(4),* 386–95. doi: 10.1111/j.1469-7610.2008.01962.x.

Boehm, D. (2011). *Out of place: Youth and deportation in the U.S.-Mexico transnationally.* Paper presented at the Annual Meeting of Anthropology of Children and Youth Interest Group, Society for Cross-Cultural Research, and Society for Anthropological Sciences, Charleston, South Carolina.

Boss, P. (2006). *Loss, trauma, and resilience: Therapeutic work with ambiguous loss*. New York, NY: W.W. Norton.

10

PSYCHOSOCIAL IMPACT OF DETENTION & DEPORTATION

Bowlby J. (1969). *Attachment and loss:  Vol. 1. Loss*. New York, NY: Basic Books.

Brabeck, K.M., Lykes, M.L.B. & Hershberg, R. (2011). Framing immigration to and deportation from the United States: Central American immigrants make meaning of their experiences. *Community, Work, & Family*, 13 (3), 275-296. doi: 10.1080/13668803.2010.520840

Brabeck, K.M. & Xu, Q. (2010). The impact of detention and deportation on Latino immigrant children and families: A quantitative exploration. *Hispanic Journal of Behavioural Sciences, 32,* 341-361. doi: 10.1177/0739986310374053

Brouwer, K.C., Lozada, R., Cornelius, W.A., Cruz, M.F., Magis-Rodriguez, C., Zuniga de Nuncio, M.L., & Strathdee, S.A. (2009). Deportation along the U.S.-Mexico border: Its relation to drug use patterns and accessing care. *Journal of Immigrant Minority Health, 11,* 1-6. doi: 0.1007/s10903-008-9119-5

Capps, R., Bachmeier, J., Fix, M. & VanHook, J. (2013). *A demographic, socioeconomic, and health coverage profile of unauthorized immigrants in the United States.* Washington, DC: Migration Policy Institute. Retrieved from http://www.migrationpolicy.org/pubs/CIRbrief-Profile-Unauthorized.pdf

Capps, R., Castaneda, R.M., Chaudry, A. & Santos, R. (2007). *Paying the price: The impact of immigration raids on America's children.* Washington, DC: Urban Institute. Retrieved from http://www.urban.org/UploadedPDF/411566_immigration_raids.pdf

Capps, R., & Fortuny, K. (2006). *Immigration and child and family policy.* Washington, DC: Urban Institute. Retrieved from http://www.taxpolicycenter.org/UploadedPDF/311362_lowincome_children3.pdf

Cavazos-Rehg, P.A., Zayas, L.H., & Sptiznagel, E.L. (2007). Legal status, emotional wellbeing, and subjective health status of Latino immigrants. *Journal of the National Medical Association, 99*, 1126-1131. Retrieved from http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2574408/pdf/jnma00209-0050.pdf

Chaudry, A., Capps, R., Pedroza, J., Castaneda, R.M., Santos, R. & Scott, M.M. (2010). *Facing our future: Children in the aftermath of immigration enforcement.* Washington, DC: Urban Institute. Retrieved from http://www.urban.org/UploadedPDF/412020_FacingOurFuture_final.pdf

Cleveland, C. & Ihara, E.S. (2013). "They treat us like pests": Undocumented immigrant experiences obtaining health care in the wake of a "crackdown" ordinance. *Journal of Human Behavior in the Social Environment, 22(7),* 771-788. doi:  10.1080/10911359.2012.704781

Conger, R. D., Ge, X., Elder, G. H., Jr., Lorenz, F. O., & Simons, R. L. (1994). Economic stress, coercive family process, and developmental problems of adolescents. *Child*

PSYCHOSOCIAL IMPACT OF DETENTION & DEPORTATION

*Development, 65,* 541–561. Retrieved from http://www.jstor.org/stable/1131401

Crosnoe, R. (2006). *Mexican roots, American schools: Helping Mexican immigrant children succeed.* Palo Alto, CA: Stanford University Press.

Cullen, F. & Agnew, R. (2006). *Criminological theory: Past to present: Essential readings.* New York, NY: Oxford University Press.

DeGenova, N.  & Peutz., N.C. (eds). (2010). *The deportation regime: Sovereignty, space, and the freedom of movement*. Durham, NC: Duke University Press.

Dreby, J. (2012). *How today's immigration enforcement policies impact children, families, and communities: A view from the ground*. Center for American Progress. Retrieved from http://www.americanprogress.org/wp-content/uploads/2012/08/DrebyImmigrationFamiliesFINAL.pdf

Dreby, J. (2012). The burden of deportation on children in Mexican immigrant families. *Journal of Marriage and Family, 74,* 829–845. doi: 10.1111/j.1741-3737.2012.00989.x

Freud, A. & Burlingham, D. (1943). *War and children*. New York, NY: MEdica; War Books.

Fuller, B., Bridges, M., Bein, E., Jang, H., Jung, S., Rabe-Hesketh, S…. & Kuo, A. (2009). The health and cognitive growth of Latino toddlers: At risk or immigrant paradox? *Maternal and Child Health Journal, 13*, 755–768. Retrieved from http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2759448/

Furman, R., Ackerman, A.R., Iwamoto, D., Negi, N & Mondragon, G. (2013). Undocumented Latino immigrant men at risk. *Social Developmental Issues, 35(1),* 1-12. doi: 10.1177/0020872812450729

Hacker, K., Chu, J., Leung, C., Marra, R., Brahimi, M., English, M…& Marlin, M.P. (2011). The impact of immigration and customs enforcement on immigrant health: Perceptions of immigrants in Everett, Massachusetts, USA. *Social Science Medicine, 73(4),* 586-594. doi: 10.1016/j.socscimed.2011.06.007

Hagan, J., Castro, B. & Rodriguez, N. (2010). The effects of U.S. deportation policies on immigrant families and communities: Cross-border perspectives. North Carolina Law Review, 88, 1799-1824. Retrieved from: http://www.nclawreview.org/documents/88/5/hagan.pdf

Hagan, J., Rodriguez, N. & Castro, B. (2011). The social effects of mass deportations by the United States government 2000-10. *Ethnic and Racial Studies, 34 (8),* 1374-1391. Retrieved from http://www.actionresearch.illinois.edu/courses/FAA391_Spring12/Hagan_2011.pdf

Henderson, S.W. & Baily, C.D.R. (2013). Parental deportation, families, and mental health. *Journal of the American Academy of Child and Adolescent Psychiatry, 52 (5),* 451-453. doi: 10.1016/j.jaac.2013.01.007

12

PSYCHOSOCIAL IMPACT OF DETENTION & DEPORTATION

Human Impact Partners. (2013). *Family unity, family health: How family-focused immigration reform will mean better health for children and families*. Oakland, CA: Author. Retrieved from: http://www.familyunityfamilyhealth.org/uploads/images/FamilyUnityFamilyHealth.pdf

Kalil, A. & Chen, J-H. (2008). Mothers' citizenship status and household food insecurity among low-income children of immigrants. *New Directions in Child and Adolescent Research, 121,* 43-62. doi: 10.1002/cd.222

Kalil, A., & Ziol-Guest, K. (2009). Welfare reform and health among the children of immigrants. In J. Ziliak (Ed.) *Welfare reform and its long-term consequences for America's poor* (pp. 308–336). Cambridge, UK: Cambridge University Press.

Kohli, A., Markowitz, P.L., & Chavez, L. (2011). *Secure Communities by the numbers: An analysis of demographics and due process*. Berkeley: Chief Justice Earl Warren Institute on Law and Social Policy. Retrieved from http://www.law.berkeley.edu/files/ Secure_Communities_by_the_numbers.pdf

Ku, L. & Jewers, M. (2013). *Health care for immigrant families.* Washington, DC: Migration Policy Institute. Retrieved from http://www.migrationpolicy.org/pubs/COI-HealthCare.pdf

Lykes, M.B., Brabeck, K.M. & Hunter, C. (2013). Exploring parent-child communication in the context of threat: Mixed-status families facing detention and deportation in post 9/11 USA. *Community, Work & Family*. http://www.tandfonline.com/doi/abs/10.1080/13668803.2012.752997

Makariev, D.W. & Shaver, P.R. (2010). Attachment, parental incarceration, and possibilities for intervention. *Attachment & Human Development, 12(4),* 311-331. doi:10.1080/ 14751790903416939

McLeigh, J. (2010). How do immigration and customs enforcement (ICE) practices affect the mental health of children? American Journal of Orthopsychiatry, 80(1), 96-100. doi: 10.1111/j.1939-0025.2010.01011.x

McMillan, A.S. (2011). *"They are waiting in the middle of the desert": Experiences of Guatemalan migrants deported from the US: Pilot study.*

Menjivar, C. & Abrego, L. (2012). Legal violence: Immigration law and the lives of Central American immigrants. American Journal of Sociology, 117(5), 1380-1421. Retrieved from: http://www.jstor.org/stable/10.1086/663575

Murray, J. (2007). The cycle of punishment: Social exclusion of prisoners and their children. *Criminology & Criminal Justice, 7,* 55–81. doi: 10.1177/1748895807072476

Murray, J., & Murray, L. (2010). Parental incarceration, attachment and child psychopathology. *Attachment & Human Development, 12,* 289–309. doi:10.1080/14751790903416889

Murray, J., Farrington, D.P., & Sekol, I. (2012). Children's antisocial behavioral, mental health, drug use, and educational performance after parental incarceration: A systematic review and

PSYCHOSOCIAL IMPACT OF DETENTION & DEPORTATION

meta-analysis. *Psychological bulletin, 138(2*), 175-210. Retrieved from: http://www.apa.org/pubs/journals/features/bul-138-2-175.pdf

New York University School of Law Immigrant Rights Clinic. (2012). *Insecure communities, devastated families: New data on immigrant detention and deportation practices in New York City*. Retrieved from: http://immigrantdefenseproject.org/wp-content/uploads/2012/07/NYC-FOIA-Report- 2012-FINAL.pdf

Ortega A.N., Horwitz S.M., Fang H, Kuo A.A., Wallace S.P., & Inkelas M. (2009). Documentation status and parental concerns about development in young U.S. children of Mexican origin. *Academic Pediatrics, 9,* 278-282. doi: 10.1016/j.acap.2009.02.007

Passel, J. & Cohn, D. (2011). *Unauthorized immigrant population: National and state trends.* Washington, DC: Pew Research Center. Retrieved from: http://www.pewhispanic.org/files/reports/133.pdf

Passel, J., Cohn, D. & Gonzalez-Barrera, A. (2012). Net migration from Mexico falls to zero— And perhaps less. Washington, DC: Pew Hispanic Center. Retrieved from: http://www.pewhispanic.org/2012/11/14/references-5/

Phillips, S., Hagan, J. and Rodriguez, N. (2006). Brutal borders: Examining the treatment of deportees during arrest and detention. *Social Forces, 85 (1),* 93-110. doi: 0.1353/sof.2006.0137

Physicians for Human Rights and Bellevue/NYU Program for Survivors of Torture (2003). *From persecution to prison: The health consequences of detention for asylum seekers*. Retrieved from http://physiciansforhumanrights.org/library/report-persprison.html

Reed, D.F. & Karpilow, K.K. (2002). *Understanding the child welfare system in California: A primer for service providers and policymakers*. Berkeley, CA: California Center for Research on Women and Families. Retrieved from: http://www.ccrwf.org/wp-content/uploads/2009/03/final_web_pdf.pdf

Robertson, A.M., Remedios, L., Vera, A., Palinkas, L.A., Burgos, J.L, Magis-Rodriguez, C.… Ojeda, V.D. (2012). Deportation experiences of women who inject drugs in Tijuana, Mexico. *Qualitative Health Research, 22 (4),* 499-510. doi: 10.1177/1049732311422238

Rutter, M. (1979). Protective factors in children's responses to stress and disadvantage. In M. W. Kent & J. E. Rolf (Eds.), *Primary prevention of psychopathology: Vol. 3. Social competence in children* (pp. 49-74). Hanover, NH: University Press of New England.

Shonkoff, J.P., Boyce, W.T., & McEwen, B.S. (2009). Neuroscience, molecular biology, and the childhood roots of health disparities: Building a new framework for health promotion and disease prevention. The Journal of the American Medical Association, 301(21), 22252-2259. doi: 10.001/jama.2009.754.

Sladkova, J., Garcia Mangado, S., & Reyes Quinteros J. (2011). Lowell immigrant communities in the climate of deportations.  *Analyses of Social Issues and Public Policy.* doi: 10.1111/j.1530-2415.2011.01253.x

14

PSYCHOSOCIAL IMPACT OF DETENTION & DEPORTATION

Southwest Institute for Research on Women. (2009). *Unseen prisoners: A report on women in immigration detention facilities in Arizona.* University of Arizona: Southwest Institute for Research on Women. Retrieved from:
http://www.law.arizona.edu/depts/bacon_program/pdf/Unseen_Prisoners.pdf

Suarez-Orozco, C., Yoshikawa, H., Teranishi, R.  & Suarez-Orozco, M. (2011). Growing up in the shadows: The developmental implications of unauthorized status. *Harvard Educational Review, 81(3)*, 438-472. Retrieved from: http://hepg.org/document/163/

Sullivan, M.M. & Rehm, R. (2005). Mental health of undocumented Mexican immigrants: A review of the literature. *Association of Advances in Nursing Science, 28,* 240-251. Retrieved from: http://focus.psychiatryonline.org/cgi/content/full/4/1/23

United States Department of Homeland Security (DHS). (2006). *Treatment of immigration detention at enforcement facilities.* Washington, DC: U.S. Department of Homeland Security, Office of the Inspector General. Retrieved from: www.oig.dhs.gov/assets/Mgmt/OIG_07-01_Dec06.pdf

Ventura, C. (March 4, 2012). Nacidos en EE.UU. viven en pobreza. *Presa Libre.* Retrieved from: http://www.prensalibre.com/departamental/Nacidos-EE-UU-viven-pobreza_0_691730843.html

Webster-Stratton, C. (1990). Stress: A potential disruptor of parent perceptions and family interactions. *Journal of Clinical Child Psychology, 19* (4)*, 302-312. Retrieved from http://www.incredibleyears.com/Library/items/stress-a-potential-disruptor_1090.pdf

Wessler, S. (2011). *Shattered families: The perilous intersection of immigration enforcement and the child welfare system*. New York, NY: Applied Research Center. Retrieved from:
http://www.atlanticphilanthropies.org/sites/default/files/uploads/ARC_Report_Shattered_Families_FULL_REPORT_Nov2011Release.pdf

Wessler S. *Primary data: Deportations of parents of U.S. citizen kids.* ColorLines.com. Retrieved from: http://colorlines.com/
archives/2012/12/deportations_of_parents_of_us-born_citizens_122012.html.

Yoshikawa, H. (2011). *Immigrants raising citizens: Undocumented parents and their young children.* New York: Russell Sage Foundation.

Zayas, L. (2010). Protecting citizen-children safeguards our children. *Journal of Health Care for the Poor and Underserved, 21(3)*, 809-814. doi: 10.1353/hpu.0.0325

Zuñiga, V. & Hamman, E.T. (2006). Going home? Schooling in Mexico of transnational children. Confines de Relaciones Internacionales y Ciencia Política, 2 (4), 41-57. Retrieved from: http://web2.mty.itesm.mx/temporal/confines/articulos4/VZuniga.pdf



ASSOCIATED PRESS PHOTO/WILFREDO LEE/AP

Center for American Progress

# How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

## A View from the Ground

Joanna Dreby        August 2012

WWW.AMERICANPROGRESS.ORG



# How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

## A View from the Ground

Joanna Dreby        August 2012

Documenting the Undocumented Series

*This report is the third in a Center for American Progress series that looks at the daily lives, struggles, and strategies of undocumented immigrants who must live through the assault of harsh laws designed to make their lives unbearable. Throughout 2012 we will release reports that lift the veil on our nation's undocumented, providing a window into the lives of the 11 million who live in the United States without papers and how our nation's immigration policies impact us all–documented or not.*

# Contents

**1  Introduction and summary**

**5  Ramped-up immigration enforcement and deportation
   in the United States**

**9  Direct effects: Deportation's disastrous consequences
   for families**

**21  Wider ramifications: Deportation's destabilizing effects
   on children and communities**

**30  Conclusion and policy recommendations**

**32  About the author and acknowledgments**

**33  Endnotes**

# Introduction and summary

What happens to children when their parents are deported? How do these deportations, now more numerous than ever,[1] affect families and the communities in which they live? This report looks at how immigration enforcement shapes family life in the United States, both among immigrant and mixed-status families, and in their wider communities.

Even as the United States has failed to pass comprehensive immigration reform in the past decade, it has increasingly taken a hardline stance on immigration enforcement, particularly in targeting unauthorized immigrants living in the country.[2]

The number of immigrants removed has steadily risen, from close to 190,000 deportations in 2001 to close to 400,000 per year in the past four years.[3] Even more troubling, in the first six months of 2011 alone, more than 46,000 parents of U.S. citizen children were deported.[4]

With more than 11 million unauthorized immigrants living in the country, these deportations affect a wide swath of the population,[5] including the undocumented and the citizen alike. Undocumented immigrants do not live separate and walled-off lives from the documented, but instead live side by side in the same communities and in the same families. A total of 16.6 million people currently live in mixed-status families—with at least one unauthorized immigrant—and a third of U.S. citizen children of immigrants live in mixed-status families.[6]

Additionally, having citizen children or even being the primary provider for U.S. citizen children is little help in removal proceedings: A recent report by the NYU School of Law's Immigrant Rights Clinic found that between 2005 and 2010, 87 percent of processed cases in New York City of individuals with citizen children resulted in deportation.[7]

As individuals face the threat of deportation,[8] ripple effects split families and entire communities apart.

1   Center for American Progress  |  How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A634

We argue in this report that deportations break families up and have a wider effect on the community as a whole—not just the individual and the family involved.

........................................................................................................

## Deportations rip apart families

Deportations have a large effect on families, forcing children into foster care as their parents are shipped out of the country and leaving single mothers struggling to make ends meet.

- **They leave children in foster care.** As the Applied Research Council has found, many U.S. citizen children of undocumented deportees may end up in the foster care system, often for no other reason than the undocumented status of a parent. Legal status complicates reunifications, placing the burden for the care of these children on state and federal governments. The total costs to foster each child (between administrative and maintenance costs) are significant—close to $26,000 per year.[9]

- **They create a large number of single mothers struggling to make ends meet.** While many single parents in the United States face similar circumstances, in this case it is the government's own policies that create the conditions for single parenthood. In addition, the tenuous legal status of many parents left behind adds a double burden on these families to provide for their families while also raising their children.

........................................................................................................

## Deportations affect communities, as well as families

Deportations' consequences ripple out from those individuals with a family member that has been deported, affecting the larger community as well. This research finds that the knowledge alone that deportations are occurring in one's community puts children and families—and thus entire communities—on edge and heightens fears about family separation.

- **Children and their parents live in constant fear of separation.** Often children who do not know anyone deported still fear for their own families based on the knowledge that they could be separated at a moment's notice.

This research finds that the knowledge alone that deportations are occurring in one's community puts children and families—and thus entire communities—on edge and heightens fears about family separation.

2   Center for American Progress  |  How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A635

- **Because of fears of deportation, children routinely conflate the police with immigration officials.** This is true even in areas where local law enforcement have no official agreements to work with the Department of Homeland Security. These children—who are U.S. citizens—grow up afraid of the police.

- **Children begin to associate all immigrants with illegal status, regardless of their own identity or legal status.** As a result, children are dissociating themselves with their immigrant heritage.

To better support children and families, we make the following policy recommendations:

- **Enact a commonsense and comprehensive policy change.** In the long term only comprehensive immigration reform with a pathway to earned legalization for unauthorized immigrants can grant security to parents and children in mixed-status families. Children need not be afraid that their family will be broken up due to irregular statuses. They must not learn to be ashamed of their immigrant heritage.

- **Modest legislative fixes can help as well.** On July 16, 2012, Rep. Lucille Roybal-Allard (D-CA) introduced the Help Separated Families Act, H.R. 6128, to ensure that children are not taken away from their relatives simply because of their parents' immigration status. In July 2011 Sen. Al Franken (D-MN) and Rep. Lynn Woolsey (D-CA) introduced the Humane Enforcement and Legal Protections for Separated Children Act, which would mandate standards for immigration enforcement when children are involved. The bill would ensure that parents are kept informed of and are able to continue to make decisions about the care of their children, and that the interests of the children are taken into account in detention, release, or transfers. Passing these bills would go a long way toward preventing children from ending up in foster care while their family members are detained or deported.[10]

- **Expand executive action.** In the short term administrative action can greatly alleviate threats to immigrant families. President Barack Obama can and should allow parents, especially those supporting U.S. citizen children, to stay in the country if they have committed no crimes and are only guilty of the civil offense of being in the country without status.[11]

In this report we focus specifically on children in Mexican immigrant households, as enforcement policies disproportionately affect them. Mexicans are approxi-

3    Center for American Progress  |  How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A636

mately 30 percent of the foreign-born population and 58 percent of the unauthorized population in the United States.[12] In 2010, however, Mexicans comprised 83 percent of the detained, 73 percent of those forcibly removed, and 77 percent of voluntary departures.[13] More than 7 million children in the United States live with parents from Mexico, and half of these children are estimated to be U.S. citizens living with noncitizen parents.[14]

This report draws on findings from the author's ethnographic study with Mexican immigrant families in two sites—one in central New Jersey and the other in northeast Ohio. The data include in-depth interviews with 110 children and 91 parents, and home and school visits with 12 families. Similarities in family members' experiences, even across two vastly different local contexts, illustrates that the results reported here are likely true for children living in other settings around the country.[15]

Certainly the deportation of people who have committed certain serious crimes and are threats to our national security will inevitably break up families. But there are ways to recognize the importance of family unification and to mitigate the devastating effects of deportation—especially for those who have committed no crimes, save for the civil penalty of being in the country without status.

4   Center for American Progress  |  How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A637

# Ramped-up immigration enforcement and deportation in the United States

Over the past few years, the United States has ratcheted up the number of people it removes from the country each year.[16] The nearly 400,000 people deported each year since 2009 represents more than twice the 189,000 deported in 2001.[17]

Mexicans are the most adversely affected by such policies. While they are not the only group to be unauthorized—nor are all Mexican immigrants unauthorized[18]—they are overrepresented in apprehensions, detentions, removals, and returns.[19]

And while the president's June 15 announcement granting deferred action to DREAM Act-eligible youth will go a long way to protecting unauthorized children from deportation, the program is of no help to their parents.[20]

Other programs of prosecutorial discretion such as the one announced in the summer of 2011, meant to prioritize resources toward deporting criminals first and foremost—have not lived up to their promises. A recent study by Syracuse University found that only 1.9 percent of pending deportation cases have been closed because of the this program.[21]

## Shifts in immigrant settlement patterns

A national emphasis on enforcement coincides with a major shift in patterns of Mexican migration to and from the United States. In the past Mexican migration was primarily seasonal and temporary, but since the 1990s settlement has sharply increased.[22] Mexican immigrants today live in various types of settled families:

- 3.5 million U.S. citizen children have noncitizen Mexican parents.
- 755,000 noncitizen Mexican children have parents who are also noncitizens.
- 79,000 noncitizen Mexican children have parents who are U.S. citizens,[23] but those children are likely to be on backlogged waiting lists to naturalize. Some

5   Center for American Progress | How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A638

may be permanently stuck without a pathway to legalization based on immigration re-entry bars of either three years or 10 years, depending on how long they have been in the country without status.[24]

With the economic recession, jobs in the United States have dried up; new inflows of people from Mexico have ceased.[25] Nonetheless, the Mexican American unauthorized population continues to grow, and with it the number of mixed-status families—those with at least one unauthorized resident and one U.S. citizen.

In the 1980s and 1990s, most growth in the Mexican population in the United States was due to immigration; between 2000 and 2010 the Mexican American population in the United States primarily grew as a result of new births.[26] This shift attests to an unprecedented number of young people who will likely be affected by U.S. enforcement policies.

## Local effects of enforcement

Immigration policy is under federal jurisdiction, but the consequences are felt locally.

Between 2009 and 2011 the author completed an ethnographic study in Ohio and New Jersey. Both are newer destinations for Mexican migrants—places where Mexican communities did not exist prior to the 1990s. Neither site has been plagued by the overt tensions fueled by a specific controversy over unauthorized migration. At the time of the study, for example, neither had signed an agreement under section 287(g) of the Immigration and Nationality Act—which deputizes local law enforcement to act as immigration officials, something usually reserved for federal officers—or participated in the Secure Communities program. Yet the characteristics of each site—and the Mexican communities within them—vary considerably.

In the midsize urban area of the site in northeast Ohio, the Mexican community is small and relatively invisible. It is an economically depressed region that has suffered severe job loss with deindustrialization. Most Mexicans work in the food service industry or in area factories. Some men work in construction and some women in domestic service. Families live dispersed throughout the city and surrounding suburbs. Small businesses catering to Latinos are scattered, often located in strip malls. Mexicans enjoy relatively low housing costs. Most rent their own homes or apartments on minimum-wage incomes. Many mothers choose not

6   Center for American Progress | How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A639

to work, a decision they described as more affordable than child care. Children attend schools with very few other Latino children. Most are the only Mexican children in their grades, if not in their schools.

In the more bustling site in a midsize city in central New Jersey, the declining industries of the 1970s and 1980s were replaced by growths in manufacturing, as well as a vibrant service sector—especially in landscaping and construction. This attracted many Mexican migrants in the 1990s and 2000s. Of the approximately 50,000 city residents, 33 percent are foreign born and 39 percent are Hispanic.[27] Many residents call one area of the midsize city "Little Mexico," as nearly every storefront boasts Spanish names.

Most Mexicans in this area are relatively low-wage workers surviving in a community where the cost of living is high. They typically double up, with two or three families in each housing unit. Both mothers and fathers work, often at alternate times so they do not have to pay for child care. At one district elementary school, 80 percent of students have Mexican immigrant parents.

Mexican families across America face challenges as they navigate differing local environments. In some places, such as the site in New Jersey, they have access to transportation and translation or interpretation services, which greatly improve their access to social services in the area. In other places, such as the study site in Ohio, Mexican families are more isolated.

Yet in both types of settings, Mexican immigrant families describe confrontations with local law enforcement as being an area of great concern. Community members in each site are highly aware of and carefully monitor their relationships with police and other law enforcement agencies, as the rest of this report will show.

## Methodology

This report draws from the author's interviews with 91 parents and 110 children in northeast Ohio (between 2009 and 2011) and central New Jersey (from 2011 to 2012). The local context is crucial, but in this report we focus on the experiences that were similar for families in New Jersey and Ohio. The cross-site comparison identifies themes that may apply to Mexican children living elsewhere.[28]

7   Center for American Progress | How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A640

The study purposefully sampled different types of families, including those in which children were U.S. born, legal migrants, and undocumented, as well as parents in the same three categories. The author interviewed parents and children in a total of 80 families. Of the parents, 63 were undocumented, 18 were legal migrants, and 10 were U.S. born. Of the children, 31 were undocumented, 8 were legal migrants, and 71 were U.S. born. Sixteen families described experiences with detention or deportation.[29]

In addition, the author did home and school visits with a smaller group of 12 families. This allowed for observation of the children in these families, as well as other children interviewed in their neighborhoods and schools. Contact with families outside the interview setting contextualized the information gathered in interviews.[30]

# Direct effects: Deportation's disastrous consequences for families

We first turn to the direct effects that deportations have on families. It is important to note that even in the vastly different local contexts of Ohio and New Jersey (particularly in light of the differing approaches by local law enforcement toward immigration), this report finds that children in both places experience similar consequences of enforcement policies.

Children are most directly affected when a parent is arrested, detained, or deported. These forced separations mean an abrupt shift from living with two parents to living with just one. For some children, the experience of living with one parent may be short lived; parents typically try to reunite as soon as possible. Some do so by returning to Mexico, but many U.S. citizen children remain in the United States, where their families attempt to reunite by returning to America.[31] For others, there may be more longstanding effects even after the family has been reunited, as financial and emotional hardships rarely vanish even after the immediate trauma of such an event. Finally, for some children, a parent's deportation leads to a permanent change in their family structure and, in extreme cases, family dissolution.[32]

It is important to note that deportation is a gendered process. While the Department of Homeland Security does not release the gender composition of deportees, research suggests that, in most cases, men are the ones who are arrested, detained, and deported.[33] A recent report on Secure Communities by the Warren Institute of the University of California, Berkeley, found that 93 percent of detainees under the program were male, even though only 57 percent of the unauthorized population is such.[34] Researchers Brotherton and Barrios interviewed Dominican deportees and found that 84 percent were male,[35] while Hondagneu-Sotelo and Golash-Boza report that studies in Mexico estimate that 89 percent of those who are repatriated are male.[36]

Thus these incidents do not just result in single parenthood but single motherhood. Nationwide, children in single-parent households are 4.2 times more likely to live in poverty than are children with married parents. The poverty rate for

9   Center for American Progress | How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A642

single-mother families is 40.7 percent, compared to just 24.2 percent for single-father families.[37] Enforcement policies leave women—more so than men—in extremely vulnerable situations.

Here we examine both the immediate effects of deportations on families, as well as their long-term consequences.

## Families torn apart

Most of the mothers the author met successfully kept their families together after a deportation or detention, but one-quarter were unable to. For these families, a deportation marks a permanent change in the composition of the household.[38] Children may be placed in foster care, the mother may become a single mother, or the family may try to return to Mexico.

### Children placed in foster care

One of the biggest fears that families expressed in interviews is that parents may lose custody of their U.S.-born citizen children as a result of a detention or deportation. The author asked a 12-year-old girl, "What scares you?" She replied:

> I don't know … maybe they're gonna report you. You know on the news they say they report them. And then the kids stay here, but they get adopted.[39]

Later in the interview she went on to explain:

> Yea, 'cause I'm scared, 'cause maybe one day, they take her [Mom], and maybe we're at the mall, or we're walking around. Just leave us all by yourself, like what happened when this girl … just because she went to the store to buy diapers … and her daughter that was 10 or 11, they said that they took her.[40]

This concern is not simply hypothetical. A recent report by the Applied Research Council estimates that at least 5,100 children are currently in the U.S. foster care system and cannot be reunited with their parents due to a parents' detention or deportation—and 15,000 more could face similar circumstances in the next five years. On average it costs state and federal governments just under $26,000 per

*One of the biggest fears that families expressed in interviews is that parents may lose custody of their U.S.-born citizen children as a result of a detention or deportation.*

10   Center for American Progress | How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A643

year to foster a child (between maintenance and administrative costs), so this glut of entries into the foster system does not come cheaply.[41]

The Applied Research Council report details three pathways by which children of deportees end up in foster care.

1. Some parents are deported after they have been involved with Child Protective Services and are then reported to Immigration and Customs Enforcement, the agency involved in investigating immigration cases. It is important to note that being involved with Child Protective Services does not expressly mean that children suffered abuse in the households: Seventy-two percent of child welfare issues involving Child Protective Services come from neglect rather than actual abuse, and, as the Applied Research Council report illustrates, oftentimes the neglect can be synonymous with poverty, as it becomes difficult to adequately feed or clothe the child.[42]

2. Other times, the initial report of abuse or neglect leads to the discovery of the undocumented status. Such was the case of a California father who was deported after leaving his children with a babysitter, who then left them unattended. Police responded to call and arrested him. He was subsequently deported.[43]

3. But, most troubling, many parents have never had a reason to be involved with Child Protective Services but still lose their children because of an immigration violation. In these cases many Child Protective Services view the tenuous nature of unauthorized status as a reason to place the children with a foster family. This happened to a mother in Tucson, Arizona, who was arrested for driving without a license. If she had been a U.S. citizen, she would have been released the same day and returned to her children. But when she was detained and held for Immigration and Customs Enforcement officials, her children were left unattended overnight, which was viewed by the state as being neglected, and they ended up in the foster care system. The source of the "neglect" was the mother's arrest and prolonged detention by police, who kept her in custody for Immigration and Customs Enforcement.[44]

It is the final scenario that parents and children fear the most: Parents will lose custody of their children—not for being bad parents but due solely to their undocumented status.

11   Center for American Progress  |  How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A644

## Moises: Children fear being separated from their parents

One fifth grader, Moises—born in Mexico but came to New Jersey when he was 1 year old and does not remember living anywhere else—eloquently explained the fears that both parents and children harbor about foster care. The 10-year-old lives with his parents, an 8-year-old citizen brother, two aunts and uncles, and four cousins. His father has worked in New Jersey for more than 20 years, only bringing his family to the United States with him after Moises was born because he no longer wanted to be separated from his son. Moises has only attended schools in the United States, and, although he speaks Spanish so that he can communicate with his mother, he prefers English.

"Have the police ever been here?" the author asked.

"My dad got a ticket. He needed to show his license," he replied. "He still had it. They didn't say 'Let me see the papers.' They just said, 'Let me see the license.' He was lucky!"

"Do you ever talk to your parents about it? What do they tell you when you tell them you're scared?" the author continued.

"That that's how life is. That's how life is when someone doesn't have the papers. You have to go to the country you were born in. And you never go back to America."

"Do you think it will be really hard if you had to go back? What would happen to your brother if you went back?"

He paused for a moment, sober, and then answered, "He'll just have to take care of himself. Maybe they'll adopt him."[45]

### Single-parent households

Single parenthood is financially and emotionally costly for children.[46] But it is especially costly and devastating when it is the result of a deportation, as these cases illustrate.

Perla's oldest daughter was an infant the first time her ex-husband was arrested. Accused of a gang-related assault, he awaited trial in prison. As a new mother suffering from post-partum depression, Perla struggled, so she moved in with her in-laws, who supported her even though she was angry with her husband and considered this period a trial separation.

When the evidence against him was found insufficient, he was released. They reconciled. Yet the relationship was tumultuous, as he became physically and emotionally abusive. "Sometimes I ended up sleeping all alone on the floor of the room," she explained.

Pregnant with their second child, Perla stayed with him. Then he was arrested again. This time he was found guilty, served a five-year sentence, and was deported.

12   Center for American Progress  |  How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A645

Perla resolved, at first, to wait for him, but with time she gained perspective on his abuse and moved on. She does not talk to her ex-husband, and he has no relationship with his two daughters.

The deportation of Perla's ex-husband may be viewed as a blessing in disguise because she was ultimately able to get out of an abusive relationship. Yet Perla struggled as a single mother. She worked two jobs, one at a gas station in the mornings and another cleaning at night. She would not be able to afford her one-room apartment if her younger brother had not moved in with her. She also depended on him for child care. Although her ex-husband's family supported her during both of his incarcerations, they have all but disappeared since he was deported. "Only once did his brother come and take the girls out to eat." Perla's ex-husband only called from Mexico once, but he did not seem to know what to say and has not called back since.[47]

Gladys's story is similar. Her husband was deported after he was arrested for involvement in illicit business activities. Gladys described him, too, as being abusive, and her life turned upside down after his arrest. Before he was deported, she was a stay-at-home mother. They had separated once temporarily, but Gladys's husband supported her financially. With his arrest, however, she was on her own. She began to work an afternoon shift.

When interviewed three years later, Gladys saw her children, ages 14 and 7, only a few hours per day during the week.[48] Her ex-husband occasionally called from Mexico, but 14-year-old Marjorie had little to say about her father. "I don't really have much contact with him," she said. Her 7-year-old brother said, "I just say hi and pass it [the phone] on to my sister."[49]

When temporarily separated from their children, due to incarceration in Perla's case and a trial separation in Gladys's case, both fathers remained in contact with their children. As deportees, neither did. In the absence of economic ties to their children, the fathers' emotional connections faltered.

The separation of fathers from their children is not all that uncommon. But research shows that when fathers voluntarily migrate, they maintain contact with their children via regular phone calls, gift giving, and remittances.[50] Children still feel resentful toward their fathers for leaving, but their fathers remain a part of their lives, much the same as a divorced father who shares custody and visits with his children regularly.

13   Center for American Progress  |  How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A646

Deportation, in contrast, severs paternal bonds with children. Scholarship shows that deportees face high levels of stigma upon their returns; they are viewed as failed migrants and oftentimes as criminals, even if the deportation had nothing to do with a criminal offense. Deportees have trouble finding stable work, and they cannot support their children from their home countries. They are also demoralized.[51]

While many American families face single parenthood, in this case it is the actions of the federal government that make the families so. Likewise, the precarious legal status of many of the parents left behind leaves a double burden on these families.

## Repatriation to Mexico

Children and parents fear adoption due to a deportation, but an equally likely scenario—at least according to the families interviewed for this report—is that the entire family returns to Mexico. This is what self-deportation advocates want. By making life extremely difficult for unauthorized migrants here, some hope they will return home, taking their U.S.-born children with them.

For these folks a return to Mexico is a success story. But Sofia's experiences show why a return to Mexico is not a story of triumph but rather one of defeat—one in which U.S.-born children's lives are negatively affected, and their educational opportunities are curtailed.

The author first met Sofia after Immigration and Customs Enforcement released her from a detention center. At the time, Sofia was struggling to support her four U.S.-born citizen children after her husband had been deported.

Sofia's problems started when local police detained her and her husband one night when they went to Wal-Mart for diapers. They had left the couple's four children with Sofia's brother, who lived with them. The arresting officer said Sofia's husband had not stopped at a stop sign in the parking lot. The couple was taken to the local jail for two days before being sent to an immigration facility. They got word home about what happened, but Sofia was not able to talk to her children for the four days she was detained. A friend went for the children and sent a lawyer to get Sofia released. Sofia's husband was deported directly to Mexico.[52] Sofia was released with an ankle monitor strapped to her leg to keep track of her whereabouts until her next court date, when her deportation would be ordered.

While many American families face single parenthood, in this case it is the actions of the federal government that make the families so. Likewise, the precarious legal status of many of the parents left behind leaves a double burden on these families.

14   Center for American Progress  |  How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A647

Sofia's children knew little about life in Mexico other than the accounts from their mother. When the author asked her 8-year-old daughter if she had an idea of what life was like in Mexico, she answered simply, in a hushed voice, "Nope." The 6-year-old was even harder to interview; she had a speech impediment and had been born with a birth defect. Still, due to early intervention and extra help at school, by age 6 she was able to talk—just not at length with a stranger. She smiled and nodded "yes" or "no" instead in response to the questions.

The oldest, age 12, verbalized more of what she knew of Mexico, which was secondhand accounts from the stories her mother told.

> It's poor there … my mom tells me about how she lived and that when her shoes ripped, they had to buy it, but maybe like a year.[53]

Sofia wanted to stay in the United States, saying that, "I don't want to go, that is what I am going to say [to immigration judge], that I don't want to go. Here I have the means to give things to my children, and there [in Mexico], no, there I don't have anything, not a house, nothing."[54]

She could have tried to fight the deportation, and with a good lawyer she might have been eligible for a waiver of deportation based on her daughter's disability. But she was still afraid that she would be deported, and that her children would be stuck without her in the United States. She said:

> I am not leaving without my children because I don't want to leave them here. Because I have seen on the news how they take them away, and I don't want that. I don't know, I mean, you see I don't have enough money right now. But I feed them from the food I have, they have enough to eat. I am not going to leave them.[55]

Ultimately Sofia decided to return with her children to her parents' rural home in Chiapas, Mexico, a home she left because there was no work. Her husband remained in a neighboring town in the home of his own parents. It took her months, however, to orchestrate a return. "What I want to do is to get their passports and then send them first … that is my decision," she explained.[56] But she did not have enough money for the passports and flights, and she had to scramble and borrow funds over the next four months before she finally left with her children. All four did not speak Spanish well, having been educated in U.S. schools for all of their lives.

A return to Mexico can be very disruptive for U.S.-born children, who have been raised in the United States. The Pew Hispanic Center estimates that 300,000

A648

U.S.-born children have moved from the United States to Mexico since 2005.[57] Research shows U.S.-citizen children who return to Mexico with their deported parents feel like exiles. One teenage girl reported to researcher Deborah Boehm, for example, that, "At home, I was on the phone all the time or texting. Now we don't even have phone reception. I hate school. I even got in a fight with another student. I'm glad I can be with my mother, but I wish I were back in the U.S."[58]

U.S.-born children who move to Mexico with their parents are also deprived of the benefits of U.S. citizenship such as access to health care and insurance.[59] Sofia's 6-year-old daughter, for example, will no longer receive speech therapy in her school, and she will have to learn to read and write in Spanish, something that will be difficult for her in a rural school with few educational resources.

U.S.-citizen children who have previously attended schools in the United States suffer when they return to school in Mexico; the transitions between school systems are not easy, and they are especially difficult in rural areas.[60] Children who return to Mexico find adjusting to the educational system to be a challenge, both in terms of language and access issues and in discrimination against the children of returnees.[61] Not only is the return disruptive, but it robs the United States of these children's future potential and productivity, losing out on the talent of native-born citizens.

Perhaps most disturbing is the permanent loss of U.S.-citizen children's aspirations when they return to Mexico. Sofia's 12-year-old daughter, a U.S. citizen, dreamed of being a lawyer. "When she grows up, she says she is going to study, and that she wants to be a lawyer, that she can help Hispanics," explained Sofia. "Since I talk with her about how we used to live over there [Mexico], she doesn't want to go. I tell her that I don't want her to go through the same things that I went through when I was a little girl because I grew up in the countryside."[62]

Sofia, similar to most parents, wanted to provide a better future for her children than the one she had—that's why she came to the United States in the first place. The return to Mexico represents the defeat of that dream. Yet the return also represents the end of her daughter's dreams for the future.

Not only is the return disruptive, but it robs the United States of these children's future potential and productivity, losing out on the talent of native-born citizens.

16   Center for American Progress | How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A649

## Long-term consequences

### The economic fallout

The economic fallout of a deportation is perhaps the most significant of the long-term consequences of immigration enforcement. Being thrust from a family in which a father is the primary breadwinner to one in which a mother is the sole provider has a large impact on children's daily lives. Unlike when a husband is laid off or hurt at work, sudden single mothers cannot rely on unemployment or worker's compensation. And because many are undocumented, they cannot apply for welfare or food stamps for themselves and their families.

But while their U.S.-citizen children are eligible for social service benefits, research shows that undocumented parents underuse the social services available to their children due to their fears of disclosing their legal status in the application process—for example taking up preschool education or community health services. Other parents wrongly believe using social services at a young age would hinder their children's ability to get future benefits such as student loans.[63]

As Harvard Professor Hirokazu Yoshikawa has illustrated, this avoidance of social services results in far lower enrollment rates in programs such as child care or food stamps that can help their children's early cognitive development, a process that greatly influences children's abilities and achievements throughout the rest of their lives.[64]

Prior to a detention or deportation, families constitute a class of low-wage workers. With a detention or deportation, families slip easily into poverty. For families experiencing a detention or deportation, household income drops drastically from one day to the next, which is a shock for families already getting by on low wages. Of the 16 cases of deportation in this study, every single one described financial hardship as a direct consequence of their partner's detention or deportation. Mothers scrambled to find enough work and arrange for child care. "However it turns out, one suffers so, so much," explained one mother whose husband had been deported twice.[65]

Even mothers who continue to live with their spouses described the financial impacts from these enforcement acts. Clara lives with her husband in northeast Ohio. Two years ago he was detained, but he refused to sign the voluntary removal

form and was never actually deported. After a nine-day stint in detention, Clara managed to find a lawyer to have him released. Clara had to come up with $5,000 for bail and then another $5,000 in legal fees over the next few years. Clara borrowed money to pay off the debts they had accrued. During an interview with the author two years later, she said, "Right now, we are in the red. … sometimes we don't have enough even for food."[66]

A related impact is housing insecurity. One mother, for example, relocated eight times with her two children in the three years after her husband's deportation.[67] Another had to move in with her sister: After her husband was deported, she could no longer afford their two-bedroom condo on her salary as a restaurant hostess alone.[68] A third woman could not pay the rent after her husband was incarcerated for a speeding ticket; she was only able to stay in the house where she lived with her two U.S. citizen children because the landlord, also her husband's former boss, allowed her to skip paying the rent.[69]

Sofia was detained with her husband, who was deported; she was eventually released, with the help of a lawyer, to her U.S. citizen children. When she returned home with the ankle monitor locked around her leg, her cousins—who shared her home with her—moved out because they did not want to risk Immigration and Customs Enforcement finding them there. She fell behind on the rent, unable to afford the four-bedroom home on her own.[70]

It is also costly for mothers to orchestrate the reunification of their families. One struggled for months to save enough money for each of her four children's passports in order to be able to take them back with her to her husband, who was previously deported, in Mexico.[71] Another wanted to stay in the United States with her three U.S.-born children, but the hours at her factory job had been cut back, and she was not able to make ends meet. She decided that the best recourse was to return to Mexico. Still, she did not have enough money saved. She explained:

> It's just that right now I cannot leave because they don't have their passports and then … the baby … he doesn't have his social security number yet. You see, I have to get the social security card in order to apply for his passport. You see the problem?[72]

Although the financial consequences are the most striking, as these cases illustrate, mothers also face a tremendous amount of stress figuring out how to reunify and support their families financially during a husband's absence.

18   Center for American Progress | How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A651

### Emotional stress

The stress of a separation is felt by all members of a family. Mothers take on the burdens of family subsistence. They also may withdraw, traumatized by the intrusion of the government into their families. Vanessa, for example, said, "I don't feel safe talking to the police … sometimes I want to dye my hair blond and have blue eyes."[73]

But the emotional stress for children, who are often less verbal, is especially disturbing. A report by the Urban Institute found numerous changes in behavior among children whose parents were detained or deported, as reported by their families, including increased frequency of crying, loss of appetite, sleeplessness, clingy behavior, and an increase in fear and anxiety.

A large literature on child development shows the detrimental effects that such anxieties and the overall social environment can have on early childhood development, and with it these children's future successes, including things such as school achievements and earnings as adults. Ensuring the successful development of all citizen children, regardless of their parents' immigration status, should be paramount.[74]

Parents repeatedly reported how distressed their children were during the periods of their husbands' detentions or deportations. Although many described their children as too young to really understand what had happened, young children interviewed expressed awareness of the circumstances surrounding a deportation.

Women also described the trauma their partners experienced after a deportation or detainment. Vanessa explained how hard it was for her husband back in Mexico:

> You see, in your country, when you go back, everyone adores you. But he arrived [back to his hometown] and everything was bad, and he was ashamed. He almost never went out of the house. He felt awful. He didn't have money.[75]

Maria's Honduran husband also felt defeated after he was deported to Mexico. The day of his arrival, he was robbed and had his Mexican ID stolen. She said:

> They were going to deport him all the way to Honduras, and I said to him, "Here; I have some copies of the IDs," and I said, "I will send you the papers." And he said, "What for?" I told him, "I sent a copy to my father so that he can go and get you wherever you are, or give me a fax number, something where I can send some proof, the children's birth certificates that prove you are their father or our wedding certificate. That way they can let you go." He said, "No, don't do anything."[76]

The stress of a separation is felt by all members of a family. Mothers take on the burdens of family subsistence. But the emotional stress for children, who are often less verbal, is especially disturbing.

19   Center for American Progress  |  How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A652

### Daily routines

Aside from the long-term financial and emotional consequences, a detention or deportation directly affects families' lives on a more minute level by drastically altering their daily routines. Again, many of the issues that newly single immigrant parents face are similar to those faced by other single parents, but the trauma of having a loved one deported, coupled with their own precarious legal statuses, makes their situation doubly disadvantaged.

For one, suddenly single mothers described crises with child care. To illustrate: One mother entered the workforce for the first time in 12 years after her husband was imprisoned and then deported. Her daughter Marjorie, 11 years old at the time, became the primary child care provider for her 4-year-old brother in the after-school hours. Now 14 years old, the teenager explained, "My mom started working when I was in fifth grade. So I've been pretty much taking care of my brother since like fifth grade … it was a lot harder for me because I never really experienced my mom going to work."

At the end of the interview, when asked how she thought that immigration affected young people, Marjorie added:

> I guess it's hard for us because my mom can't really get an official professional job. So I guess, not trying to sound negative, but we're probably gonna have money problems most of the time. Maybe until I can work or something … I don't know. I've noticed that many Hispanic kids, they grow up faster than white kids … because most Hispanic kids and their parents, well, both their parents are working. So we usually have to grow up faster than usual kids do.[77]

20   Center for American Progress  |  How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A653

# Wider ramifications: Deportation's destabilizing effects on children and communities

Enforcement actions have a devastating impact on families, tearing parents and children apart and leaving a slew of economic and psychological trauma in their wake. They also potentially deny U.S.-citizen children the rights other children born in America enjoy—to live in stable families with their parents.

Yet this is not the full story. Focusing solely on these acts of deportation obscures the insidious effects deportation policies have had on a much larger segment of the population. Interviews with children and families show that it is crucial to look past the experiences of families in which parents have been either detained or deported. Even children in families who never have had a family member in Immigration and Customs Enforcement custody talk about the possibility of being separated from their parents, equate immigration with illegality, and associate a stigma with immigrant status.

The threat of deportation has significant consequences on children, their families, and entire communities, introducing instability and insecurity into the lives of thousands of children growing up in the United States.[78]

## Fears of separation

Research shows that the threat of deportation affects entire communities, with members avoiding public spaces and feeling afraid to interact with the police.[79] Communitywide fears seep into the consciousness of children, many of whom are U.S. citizens, despite parents' best efforts to shield their children from these types of distresses that are ultimately out of their control.

These fears were perhaps best illustrated in May 2010, in the wake of the passage of Arizona's anti-immigrant law, S.B. 1070. Speaking at an elementary school in Silver Spring, Maryland, a second grader expressed her own concern for her

parents, telling First Lady Michelle Obama that, "My mom … she says that Barack Obama is taking everybody away that doesn't have papers. … my mom doesn't have any papers."[80]

Even places such as public schools, which are supposed to be safe spaces and for which there is a constitutional right to education without regard for immigration status, are under attack. Anti-immigrant laws such as Alabama's H.B. 56, which mandates that school officials report on the immigration status of their students and their students' parents, are a concerted effort by restrictionists to go after unauthorized immigrant children. Not surprisingly, then, the day after H.B. 56 went into effect, 2,285 Latino students were absent from Alabama schools. Although the school-reporting provision of H.B. 56 is on hold pending legal challenges, it marks a new frontier for restrictionist action.[81]

### Parents try to shield children from the threats of deportation

Parents view as one of their primary roles to protect their children. The majority of the 91 parents interviewed felt compelled to shield their children from the threat of deportation. As a result, many avoided talking to their children about legal status. Some felt their children were too young to understand the nuances of immigration policy. One mother insisted that her two U.S.-born children do not know that she is undocumented:

> *No, no, they don't know … but they do ask about it. My son asks me why I don't have a license. And I tell him that I don't have a social security number but, no … I think about them, and I don't want to tell them because it's a lot, it's long to explain, it's too complicated.*[82]

Parents believed it was important to protect their children from adult worries. A mother of an 8-year-old explained, "No ... I have never talked to her about it. ... I have not put any of these ideas in my daughter's head. I have never told her because her mind is, right now, with her childhood, with playing … with her life as a girl."[83]

But despite parents' efforts to protect children from any fears related to legal status, interviews with children show that they are highly cognizant of the implications legal status has for their everyday lives. Children, regardless of their own legal status, fear the authorities and being separated from their parents.

22   Center for American Progress | How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A655

## Undocumented children fear law enforcement

Undocumented children especially fear the police. The understanding that they need to be careful around the police appears to kick in early, even though parents prefer to shield their children from anxieties about immigration.

One 9-year-old recounted the story of crossing the border with his 7-year-old brother two years earlier, when they were 5 years old and 7 years old. "When we came here, the first time the police found us, the second time they sent us back to Mexico, the third they let us go, and the fourth time they let us go too."[84] Neither brother distinguished between the police and immigration officials in the retelling.

In Ohio, they continued to view police as synonymous with trouble, as their mother explained:

> They know [about their legal status], and sometimes when I see a patrol car, I say "Police in sight," and they know that they have to sit up straight … then they see that it has gone by, and the danger is gone, then they relax.[85]

Another mother explained that her 11-year-old daughter, who was 9 years old when she came to the United States from Mexico, "has a great fear of the police. She was afraid that they would send her back to Mexico." She went on to say that at school:

> Her biggest worry is this [her legal status]. She used to evade people so they would not ask her questions because she was afraid that they would ask her for a social security number … she started biting her nails out of worry.[86]

How do young undocumented children learn to be afraid of the police? In a hostile environment, parents may try to protect their children by not talking about legal status. But they also need to communicate something about the threat of deportation to keep their children safe.

A656

## Maria and Brandon: Young children fear law enforcement

Maria had met and married her Honduran husband in her hometown of Tamaulipas, Mexico. Unable to make a living there, the couple decided to come north in 2005, as members of Maria's family had already done. In Ohio both found work in factories; once their son, Brandon, was born, they alternated shifts—Maria at night and her husband in the morning—so that they would not have to leave their son alone. They could not afford child care. The day before the interview, Brandon had just turned 5 years old.

The author asked Brandon, who said his mother was Mexican and his father Honduran, if anyone in his family had been back to Honduras.

"My dad and my uncle … they got them," he answered.

"Who got them?"

"The police." Brandon went on to explain, "Well, they were going to work, and they went down a street they didn't know. And there was a police there. My uncle was driving, but they took them."

The incident occurred six months earlier, when Brandon was only 4 years old. But he was not too young to understand the consequences. The incident clearly stuck out in his mind. Maria then explained how Brandon continued to be fearful of the police.[87]

One undocumented 10-year-old, for example, said he does not talk to his parents about his legal status, but then admitted that he is often worried about being sent back to Mexico. When the author asked him what his parents say to this, he answered, "They just say if we see a cop, don't tell them we were born in Mexico, or they will take us away."[88]

The relative silence between parents and children about illegality increases children's stress about the potential impact that legal status has on their lives.

In addition, studies show that the threat of deportation makes families and community members less trusting of police and other government officials, while researchers at the University of California, San Diego, found that immigrants in hyperactive enforcement jurisdictions such as North County, San Diego, were reluctant to contact the police to report crimes. When immigrants do not trust the police, they are less likely to reports crimes or to cooperate, and it limits the ability of law enforcement to do their jobs keeping our communities safe.[89]

24   Center for American Progress  |  How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A657

## U.S.-citizen children also fear being separated

It is not only undocumented children who fear for their families. U.S.-citizen children worry that their families will be ripped apart starting at very young ages.

The author asked a 6-year-old if she ever feels scared that her parents are immigrants. She said yes, "because if I am here, and my mom goes to Mexico, I am going to be sad because I would miss her."[90] A 10-year-old U.S. citizen whose mother has severe kidney disease and receives dialysis biweekly thinks her family is going to have to go back to Mexico someday, "[be]cause the policiales [sic.] are looking for people that don't have papers to be here."[91] A 12-year-old boy is scared his parents are immigrants because "we might be apart."[92]

Some of these children had a friend or extended family member detained by immigration officials. One mother, for example, said that after a close friend of the family was deported, she and her husband, both undocumented, got their three children—two U.S.-born citizens and one undocumented—passports. She was explicit in explaining to them that if something similar happened to them, they would all go back to Mexico together.[93]

Most of the children the author interviewed, however, did not have such explicit plans of action with their parents. None of the children interviewed, for example, carried around information with their vitals or contact phone numbers in the event their parents were detained, as has been occasionally reported in the news.

It is, in fact, the aura of ambiguity and insecurity that is especially scary for children. U.S.-born citizens and undocumented children alike experience the threat of deportation but feel powerless to do anything about it.

## The media's influence

One contributing factor to children's feelings of powerless is the news media. Children may not know anyone in their families or communities who has been detained or deported, but they hear about this potential outcome. Often this is because they have seen news coverage about the increase in enforcement tactics nationwide.

While research has shown that Spanish-language media tends to adopt a more positive perspective on immigration stories than English-language media, it has

> It is not only undocumented children who fear for their families. U.S.-citizen children worry that their families will be ripped apart starting at very young ages.

25   Center for American Progress | How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A658

also shown that the Spanish-language news focuses far more on immigration than English-language outlets, leading to far more exposure about the prevalence of deportations across the nation.[94]

A 10-year-old, when asked if she had ever seen someone have their parents taken away, told the author, "Yes, I've seen it on TV."[95] A 12-year-old girl said she is scared that the members of her family are immigrants "because when that happened on the news that a lot of people were getting catched, like, um, came on the door random and just took them. Yeah, I got really scared that time."[96] When a 9-year-old was asked about what she thinks it is like to be an immigrant, she answered "sad." When the author asked why, she responded:

> I saw a video of people, and they are immigrants, and one time they were going back to Mexico, and the policeman caught them, and they took them. And they had a daughter, and they left the daughter in the car.[97]

U.S.-born children who have never had any interaction with Immigration and Customs Enforcement or with the police hear rumors about deportations on the news and feel afraid that this might affect their own families.

## Misunderstandings about immigration

Children are not only afraid of family separation, but they also are confused about it. As is evident above, their accounts conflate immigration officials with police and vice versa. With more and more police districts collaborating with the Department of Homeland Security today, children are probably right. But the children interviewed did not live in districts with formal agreements between local law enforcement and the Department of Homeland Security, attesting to the trickle-down effects of policies on local communities nationwide.

Moreover, their misunderstandings go a step further: They not only conflate the police with the immigration, but they also begin to view immigration as equivalent to illegal.

### Equating immigration with illegality

Children in both Ohio and New Jersey equated immigration with illegality. The author asked children what they thought it was like to be an immigrant. A 12-year-old U.S.-citizen boy said, "They must be scared when they, if they catch them, then they have to go back to their country."[99] Another, age 12, said "Scary, because you never know if they'll want your passport. They catch you out of nowhere. They come and put you in a truck and send you back to Mexico."[100] A 10-year-old said that while most in his family are immigrants, he thinks it would be "weird" to be an immigrant. "What's weird about it?" the author asked him. "I think that, like, the people that are not from here, they are not supposed to be here" he answered.[101]

Interestingly, children responded this way even after given a definition for an immigrant as simply being someone who is born in one country and then moves to another country to live.

## Andrea: Children equate immigrant with undocumented

Ten-year-old Andrea was born in the United States in 2001. Her mother, Leticia, left the university in Mexico, where she was studying law, to join her boyfriend in New Jersey. Leticia got pregnant as soon as she arrived in New Jersey and had Andrea at the age of 21.

The relationship with Andrea's father did not last; he became abusive and, with the help of her in-laws, Leticia decided to raise Andrea on her own. She worked two jobs, one in the morning and one after she picked up Andrea from school in the afternoon. Andrea spent most evenings with her cousins at her paternal aunt and uncle's house.

Andrea's father had returned to Mexico; she never saw him. She spoke both Spanish and English but had never herself been to Mexico. She knew a lot about Mexico, however, as her paternal grandmother visited her grandchildren every year on a tourist visa.

The author asked Andrea if she knew what an immigrant is.

"Yeah, it is when someone is illegal in this country, and police-ICE come to look for them to send them back to their country."

Her eyes started to water when she then said her parents are immigrants. The author asked if she is proud that her parents are immigrants. She said "no."

"Do you ever feel scared that they are immigrants?"

"Yeah," she said, her chin quivering. "What scares you?" the author continued.

"When the police-ICE come, they will take them."

Andrea confused being an immigrant with being undocumented. "What do you think it is like to be an immigrant?"

"I think it is hard because you have to try not to be caught by police-ICE, and you would like to stay in this country to have jobs and children to be legal in this country."[98]

27   Center for American Progress  |  How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A660

Even if young children do not fully understand immigration, they are aware at very young ages that there are social differences based on legal status even if this is difficult for them to articulate. Children, of all ages, have begun to associate immigration with illegality, regardless of their own family members' legal status and experiences with immigration. The conflation is potentially devastating for children's sense of self, as they grow up as children of immigrants in the United States.

## The stigma of immigration

For young children, "immigrant" has almost become a dirty word, something they are ashamed of. Children, especially at young ages, frequently associated negative perceptions with immigration in interviews. In fact, only 25 of the 110 children interviewed across the sites said they were proud of their immigrant heritage. This compares to 77 children who said they were proud of their Mexican heritage.

Under the current enforcement regime, children are learning to associate a stigma with their immigrant heritage, hindering their social integration as they grow up in the United States.

### Ashamed

Young children believe that immigration has a negative connotation. In fact, many children preferred that others not know that either they or their parents are immigrants.

One 8-year-old girl said she needed to be careful about who she told. "Would you want your friends to know your mom is an immigrant?" the author asked. "Not every, every single friend, but some of them," she replied. "How come?" "They are mean because I was born in a different place from my mom."[103]

Older children agree. Twelve-year-old Osvelia—a U.S. citizen—wavered when asked if she wanted people to know about her parents' undocumented status. "I really don't—I want some people to know." "So which people would you feel okay knowing?" the author asked. "My friends that I feel like keep secrets well."[104] A 10-year-old boy said that only one person in his class knows that he is an immigrant. "What was his reaction?" I asked.

> Under the current enforcement regime, children are learning to associate a stigma with their immigrant heritage, hindering their social integration as they grow up in the United States.

28   Center for American Progress | How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A661

*"I told him, 'Don't tell anybody. It's a secret. Not the teacher, not the principal. Or else I won't be your friend anymore.'"*

*"What did he say?"*

*"'I promise, I won't tell anybody about it.'"*[105]

Remarkably, even a 10-year-old boy whose mother is a U.S.-born citizen expressed reservations about others learning that some members of his family are immigrants. "If somebody finds out about that," he explained, "they might make fun of me."[106]

Children learn, in school, that this is a nation of immigrants. But under the threat of deportation, "immigration" and "undocumented" become synonymous, and children associate a stigma with immigration—turning it into a mark of shame rather than one of pride.

## Elizabeth and Kevin: Children internalize a stigma of immigrant status

Elizabeth's husband came to the United States first, to live with Elizabeth's sister, when his job as a taxi driver was not enough to support Elizabeth and the couple's two young sons. Within months he felt defeated, ready to return to Mexico, depressed without his family and without any more money to support them.

At this point Elizabeth decided to join him in Ohio, where she could work alongside him and help him save money. She left her boys, toddlers at the time, with her mother in Mexico. But the child care strategy did not last: Elizabeth's mother called, and said she could not look after the two boys, so Elizabeth and her husband sent for the boys.

Kevin, age 7, had lived in the United States for four years when the author first met him. He had only attended school in the United States. In an interview with the author, Kevin said he was born in Mexico but did not know anyone in his family who is an immigrant. This was after the author gave him a definition of an immigrant as someone who is born in one country and then moves to another country to live. But when later asked point blank, "Are you an immigrant?" he admitted, "Yes."

"Would you want your friends to know that you are an immigrant?" the author asked.

"No," he answered.

"Why?"

"Because I would be ashamed."[102]

29   Center for American Progress  |  How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A662

# Conclusion and policy recommendations

Deportation policies are bad for children and their families. They may permanently restructure families, and they have severe repercussions for families' daily routines. Deportations also have financial and emotional consequences for all family members. They especially shape the experiences of women who become sudden single mothers when a father is deported. Specifically, they alter children's relationships with their fathers.[107]

Deportation policies are also especially harmful for children in the communities in which they live. Most children interviewed had never had a direct interaction with the Department of Homeland Security. But they described the fears of potential separation from their parents. They also expressed many misunderstandings about the roles of the police, Immigration and Customs Enforcement, and immigration in general. Finally, children express a stigma attached to immigration, as they conflate "immigration" with "illegality." They dissociate from their immigration heritage.[108]

Certainly the deportation of people who have committed certain serious crimes and are threats to our national security will inevitably break up families. But there are ways to recognize the importance of family unification and to mitigate the devastating effects of deportation, especially for those who have committed no crimes, save for the civil penalty of being in the country without status.

To better support children and families, we make the following policy recommendations:

- **Enact commonsense and comprehensive policy change.** In the long term, only comprehensive immigration reform with a pathway to earned legalization for unauthorized immigrants can grant long-term security to parents in mixed-status families. Children need not be afraid that their family will be broken up due to irregular statuses. They must not learn to be ashamed of their immigrant heritage.

30   Center for American Progress  |  How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A663

- **Modest legislative fixes can help, as well.** On July 16, Rep. Lucille Roybal-Allard (D-CA) introduced the Help Separated Families Act, H.R. 6128, to ensure that children are not taken away from their relatives simply because of their parents' immigration status. In July 2011 Sen. Al Franken (D-MN) and Rep. Lynn Woolsey (D-CA) introduced the Humane Enforcement and Legal Protections for Separated Children Act, which would mandate standards for immigration enforcement when children are involved. The bill would ensure that parents are kept informed and are able to continue to make decisions about the care of their children, and that the interests of the children are taken into account in detention, release, or transfers. Passing these bills would go a long way toward preventing children from ending up in foster care while their family members are detained or deported.[109]

- **Expand executive action.** In the short term, administrative action can greatly alleviate threats to immigrant families. President Obama can and should allow parents, especially those supporting U.S.-citizen children, to stay in the country if they have committed no crimes and are only guilty of being in the country without status.

## About the author

**Joanna Dreby** is assistant professor of sociology at the University of Albany, State University of New York and received her doctorate from the City University of New York Graduate Center in 2007. She is the author of the book *Divided by Borders: Mexican Migrants and their Children*, as well as numerous other articles on families and immigration. Dreby is an ethnographer of family life, whose research focuses on the ways migratory patterns and families' decisions about work and child care affect children. Her current work explores how legal status affects families.

## Acknowledgments

The Foundation for Child Development provided funding for this research project. Kent State University and the University of Albany, State University of New York also provided research support. Dreby is grateful to the many people in Ohio and New Jersey, whether other academics, social service practitioners, educators, or concerned community members, whose cooperation made this study possible. Dreby especially wants to acknowledge all the children who answered all her questions and so honestly shared their very deep fears and insecurities around immigration. This is not easy: Thank you for trusting enough to do so. The author would also like to thank Philip Wolgin at the Center for American Progress for all of his help with this report.

32   Center for American Progress | How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A665

## Endnotes

1   Dan Kanstroom, *Deportation Nation: Outsiders in American History* (Cambridge: Harvard University Press, 2007); Douglas S. Massey, Jorge Durand, and Nolan J. Malone, *Beyond Smoke and Mirrors: Mexican Immigration in an Era of Economic Integration* (New York: Russell Sage Foundation, 2002).

2   Marshall Fitz, "Safer than Ever" (Washington: Center for American Progress, 2011), available at http://www.americanprogress.org/issues/2011/08/border_security_brief.html

3   Molly O'Toole, "Analysis: Obama deportations raise immigration policy questions," Reuters, September 20, 2011, available at http://www.reuters.com/article/2011/09/20/us-obama-immigration-idUS-TRE78J0572011092O; Office of Immigration Statistics, *Immigration Enforcement Actions: 2010* (Department of Homeland Security, 2011), available at http://www.dhs.gov/xlibrary/assets/statistics/publications/enforcement-ar-2010.pdf.

4   Seth Freed Wessler, "U.S. Deports 46K Parents with Citizen Kids in Just Six Months," Colorlines, November 3, 2011, available at http://colorlines.com/archives/2011/11/shocking_data_on_parents_deported_with_citizen_children.html.

5   Increased enforcement over the past few decades has paradoxically led to greater settlement of unauthorized immigrants in the United States, and is one of the reasons that the unauthorized population itself has grown from 8.4 million in 2000 to 11.5 million today. See Massey, Durand, and Malone, *Beyond Smoke and Mirrors*; Leah Muse-Orlinoff, "Staying Put but Still in the Shadows: Undocumented Immigrants Remain in the Country Despite Strict Laws" (Washington: Center for American Progress, 2012), available at http://www.americanprogress.org/issues/2012/02/pdf/mexico_immigration.pdf; Fitz, "Safer than Ever"; Jeffrey S. Passel and D'Vera Cohn, "Unauthorized Immigrant Population: National and State Trends, 2010" (Washington: Pew Hispanic Center, 2011), available at http://pewhispanic.org/files/reports/133.pdf. On the issue of how families cope with deportation, see Women's Refugee Commission, "Torn Apart by Immigration Enforcement: Parental Rights and Immigration Detention" (Washington, 2010).

6   Paul Taylor and others, "Unauthorized Immigrants: Length of Residency, Patterns of Parenthood" (Washington: Pew Hispanic Center, 2011); Randy Capps and Karina Fortuny, "Immigration and Child and Family Policy" (Washington: The Urban Institute, 2006); Karen Fortuny and others, "Children of Immigrants: National and State Characteristics" (Washington: The Urban Institute, 2009).

7   Wessler, "U.S. Deports 46K Parents with Citizen Kids in Just Six Months"; New York University School of Law Immigrant Rights Clinic, "Insecure Communities, Devastated Families: New Data on Immigrant Detention and Deportation Practices in New York City" (2012), available at http://immigrantdefenseproject.org/wp-content/uploads/2012/07/NYC-FOIA-Report-2012-FINAL.pdf.

8   Nicholas de Genova, "The Deportation Regime: Sovereignty, Space, and the Freedom of Movement." In Nicholas de Genova and Nathalie Peutz, eds., *The Deportation Regime* (Durham: Duke University Press, 2010).

9   Seth Freed Wessler, "Shattered Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare System" (Washington: Applied Research Council, 2011). National averages on children in foster care come from 2009 data analyzed by Nicholas Zill, "Better Prospects, Lower Cost: The Case for Increasing Foster Care Adoption" *Adoption Advocate* 35 (2011): 3, available at https://www.adoptioncouncil.org/images/stories/NCFA_ADOPTION_ADVOCATE_NO35.pdf.

10  Office of Congresswoman Lucille Royal-Allard, "Rep. Roybal-Allard Introduces Help Separated Families Act to Keep Immigrant Families Together," Press Release, July 16, 2012, available at http://roybal-allard.house.gov/News/DocumentSingle.aspx?DocumentID=303274; First Focus Campaign for Children, "Humane Enforcement & Legal Protections (HELP) for Separated Children Act," available at http://www.ffcampaignforchildren.org/sites/default/files/HELPAct%20%282%29.pdf.

11  Memorandum from Director of Immigration and Customs Enforcement John Morton, "Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens," June 17, 2011, available at http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf.

12  Passel and Cohn, "Unauthorized Immigrant Population: National and State Trends, 2010."

13  Office of Immigration Statistics, *Immigration Enforcement Actions: 2010*.

14  The Urban Institute, "Data from the Integrated Public Use Microdata Series, Datasets Drawn from the 2005-2009 American Community Survey" (2011). This data is from 2009.

15  Joanna Dreby, "The Burden of Deportation on Children in Mexican Immigrant Families" *Journal of Marriage and Family* 74 (2012): 829–845.

16  De Genova, "The Deportation Regime: Sovereignty, Space, and the Freedom of Movement."

17  Immigration and Customs Enforcement, "Fact Sheet: Delegation of Immigration Authority 287(g) Immigration and Naturalization Act" (U.S. Department of Homeland Security, 2010), available at http://www.ice.gov/news/library/factsheets/287g.html.

18  In 2010 Mexican immigrants comprised 6.5 million of the estimated 11.2 million unauthorized immigrants, or 58 percent. Out of 11.75 million total foreign-born Mexicans living in the United States in 2010, an additional 5.25 million were U.S. citizens, legal permanent residents, or legal immigrants. See Passel and Cohn, "Unauthorized Immigrant Population: National and State Trends, 2010"; Pew Hispanic Center, "Statistical Portrait of the Foreign-Born Population in the United States, 2010" (2012), available at http://www.pewhispanic.org/files/2012/02/PHC-2010-FB-Profile-Final_APR-3.pdf.

19  Office of Immigration Statistics, *Immigration Enforcement Actions: 2010*.

A666

20  Center for American Progress Immigration Team, "6 Things You Need to Know About Deferred Action and DREAM Act Students" (2012), available at http://www.americanprogress.org/issues/2012/06/6_things_dream_act.html.

21  TRACImmigration, "ICE Prosecutorial Discretion Program: Latest Details as of June 28, 2012" (Syracuse: Syracuse University, 2012), available at http://trac.syr.edu/immigration/reports/287/.

22  Douglas S. Massey and others, *Return to Aztlan* (Berkeley: University of California Press, 1987); Massey, Durand, and Malone, *Beyond Smoke and Mirrors.*

23  The Urban Institute, "Data from the Integrated Public Use Microdata Series Datasets Drawn from the 2005-2009 American Community Survey." Note: These estimates refer to nativity not legal status.

24  On the three years and 10 years bars, see Immigration Policy Center, "So Close and Yet So Far: How the Three- and Ten-Year Bars Keep Families Apart" (2011), available at http://www.immigrationpolicy.org/just-facts/so-close-and-yet-so-far-how-three-and-ten-year-bars-keep-families-apart. Note that under immigration enforcement prosecutorial discretion guidelines, noncitizen children of citizen parents have little fear of deportation themselves, but, that being said, obtaining permanent legal status can be difficult. One such case emerged from the author's interviews: Anita's husband, for example, came to work in the United States in 1992 as an undocumented immigrant. In 1996 he received legal permanent residency (a green card) through his employer and subsequently submitted applications for Anita and their only daughter at the time. For the next 10 years, he returned periodically to the couple's rural home in Guadalajara, Mexico, every year to spend time with his family. Anita maintained the family home and land with the remittances her husband sent from the United States. During the 10 years that elapsed between application and approval, Anita and her husband had four more children but did not know that they needed to add these new children to their immigration application. So when Anita's visa was finally approved, she and her oldest daughter were eligible to migrate, but the four younger ones were not. Anita went to the United States without them, leaving them with her mother, but she could not bear the separation. Within a few months, the younger children crossed the border to live with their parents, who are now naturalized citizens. The four younger children are ineligible to apply for residency, despite their parents' citizenship, due to their undocumented status. Personal interview with author, northeast Ohio, May 22, 2009.

25  Jeffrey Passel and D'Vera Cohn, "U.S. Unauthorized Immigration Flows Are Down Sharply Since Mid-Decade" (Washington: Pew Hispanic Center, 2010), available at http://www.pewhispanic.org/2010/09/01/us-unauthorized-immigration-flows-are-down-sharply-since-mid-decade/.

26  Pew Hispanic Center, "The Mexican-American Boom: Births Overtake Immigration" (2011), available at http://pewhispanic.org/files/reports/144.pdf.

27  U.S. Census Bureau, *State & County Quickfacts, New Brunswick, New Jersey* (Department of Commerce, 2012), available at http://quickfacts.census.gov/qfd/states/34/3451210.html.

28  The sites strategically differ so as to explore the ways local contexts shape children's experiences. Indeed, differences in enforcement practices exist. In Ohio stories of deportations often started with arrests for minor traffic infractions, whereas in New Jersey stories of deportations most often started with more severe encounters with the law such as a DUI in one case or a speeding ticket in another.

29  The author conducted all the interviews in Spanish or English, as requested—generally in Spanish with parents and in English with children. Most interviews took place in families' homes. Interviews with parents were semistructured, while interviews with children followed a structured format. The author adapted questions to the child's age, posing more simple questions to younger children and using more in-depth questions with older children.

30  The author obtained approval from the institutional review boards at Kent State University and the State University of New York at Albany for all phases of this study. She also received a certificate of confidentiality from the National Institutes of Health to further protect the identities of the study participants. All names that appear in this report are pseudonyms.

31  For information on the number of U.S.-citizen children who have returned to Mexico, see Silvia Giorgula and Edith Gutierrez "Migracion international y asistencia escolar" paper presented in XI Reunion Nacional de Investigation Demografic," Aguascalientes, Ags., May 30, 2012 to July 1, 2012; Victor Zuniga "Migracion international y trayectorias escolares en Jalisco 2010," paper presented in XI Reunion Nacional de Investigation Demografica," Aguascalientes, Ags., May 30, 2012 to July 1, 2012.

32  For a visual depiction of the burden of deportation on children, see the deportation pyramid in Dreby, "The Burden of Deportation on Children in Mexican Immigrant Families."

33  David Brotherton and Luis Barrios, *Banished to the Homeland: Dominican Deportees and their Stories of Exile* (New York: Columbia University Press, 2011); Tanya Maria Golash-Boza, *Immigration Nation: Raids, Detentions, and Deportations in Post-9/11 America* (Boulder: Paradigm, 2011); Pierette Hondagneu-Sotelo and Tanya Maria Golash-Boza, "Latino Immigrant Men and the Deportation Crisis: A Gendered Racial Removal Program?" Unpublished manuscript, held by author.

34  Aarti Kohli, Peter L. Markowitz, and Lisa Chavez, "Secure Communities By the Numbers: An Analysis of Demographics and Due Process" (Berkeley: Chief Justice Earl Warren Institute on Law and Social Policy, 2011), available at http://www.law.berkeley.edu/files/Secure_Communities_by_the_Numbers.pdf.

35  Brotherton and Barrios. *Banished to the Homeland.*

36  Hondagneu-Sotelo and Maria Golash-Boza, "Latino Immigrant Men and the Deportation Crisis: A Gendered Racial Removal Program."

37  Women's Legal Defense and Education Fund, "Reading Between the Lines: Women's Poverty in the United States, 2010."

38  Note that this sample, out of 16 total families, is too small to be fully representative.

39  Personal interview with author, central New Jersey, January 24, 2011.

40  Ibid.

41  Wessler, "Shattered Families"; Zill, "Better Prospects, Lower Cost."

42  Wessler, "Shattered Families."

43  Ibid.

44  Ibid.

45  Personal interview with author, central New Jersey, November 11, 2011.

A667

46  Frank Furstenberg and Andrew J. Cherlin, *Divided Families: What Happens to Children When Parents Part* (Cambridge: Harvard University Press, 1994).

47  Personal interview with author, central New Jersey, January 20, 2011.

48  Personal interview with author, central New Jersey, January 9, 2011.

49  Personal interview with author, central New Jersey, January 13, 2011.

50  Dreby, *Divided By Borders*.

51  Brotherton and Barrios, *Banished to the Homeland*.

52  Personal interview with author, northeast Ohio, August 2, 2009.

53  Personal interview with author, northeast Ohio, August 4, 2009.

54  Personal interview with author, northeast Ohio, August 2, 2009.

55  Ibid.

56  Ibid.

57  Pew notes that many of these immigrants moved voluntarily, "but a significant minority were deported and remained in Mexico." Jeffrey Passel, D'Vera Cohen, and Ana Gonzalez-Barrera, "Net Migration from Mexico Falls to Zero—and Perhaps Less" (Washington: Pew Hispanic Center, 2012).

58  Deborah Boehm, "Out of Place: Youth and Deportation in the U.S.-Mexico Transnation," Annual Meeting of Anthropology of Children and Youth Interest Group, Society for Cross-Cultural Research, and Society for Anthropological Sciences, Charleston, South Carolina, 2011.

59  "US Born, Living in Mexico and Ineligible for Basic Services," Associated Press, July 18, 2012, available at http://latino.foxnews.com/latino/news/2012/07/18/us-born-living-in-mexico-and-ineligible-for-basic-services/#ixzz22CpMPPSn.

60  Victor Zuñiga and Edmund T. Hamman, "Going Home? Schooling in Mexico of Transnational Children," *Confines de Relaciones Internacionales y Ciencia Política* 2 (4) 2006.

61  Damien Cave, "American Children, Now Struggling to Adjust to Life in Mexico," *New York Times*, June 18, 2012, available at http://www.nytimes.com/2012/06/19/world/americas/american-born-children-struggle-to-adjust-in-mexico.html?pagewanted=all.

62  Personal interview with author, northeast Ohio, August 2, 2009

63  On immigrant reluctance to use social services for their eligible children and the cognitive effects of such choices, see Hirokazu Yoshikawa, *Immigrants Raising Citizens: Undocumented Parents and Their Young Children* (New York: Russell Sage Foundation, 2011), chapter 3.

64  Ibid.

65  Personal interview with author, northeast Ohio, September 22, 2009

66  Personal interview with author, northeast Ohio, October 9, 2009

67  Personal interview with author, central New Jersey, January 9, 2011.

68  Personal interview with author, northeast Ohio, September 26, 2009.

69  Personal interview with author, central New Jersey, February 3, 2011.

70  Personal interview with author, northeast Ohio, August 2, 2009

71  Ibid.

72  Personal interview with author, northeast Ohio, September 22, 2009.

73  Personal interview with author, northeast Ohio, September 26, 2009; Angela S. Garcia and David G. Keyes, "Life as an Undocumented Immigrant: How Restrictive Local Immigration Policies Affect Daily Life" (Washington: Center for American Progress, 2012), available at http://www.americanprogress.org/issues/2012/03/pdf/life_as_undocumented.pdf.

74  Ajay Chaudry and others, "Facing Our Future: Children in the Aftermath of Immigration Enforcement" (Washington: The Urban Institute, 2010), available at http://carnegie.org/fileadmin/Media/Publications/facing_our_future.pdf. To understand the links between undocumented status, early developmental stress, and later outcomes in school and everyday life, see Yoshikawa, *Immigrants Raising Citizens*, pgs. 14-15.

75  Personal interview with author, northeast Ohio, September 26, 2009.

76  Personal interview with author, northeast Ohio, September 18, 2009.

77  Personal Interview with Author, central New Jersey, January 13, 2011.

78  De Genova, "The Deportation Regime."

79  Cecilia Menjívar, "The Power of the Law: Central America's Legality and Everyday Life in Phoenix, Arizona," *Latino Studies* 9 (2011).

80  Stephanie Condon, "Second Grader to Michelle Obama: 'My Mom Doesn't Have Any Papers,'" CBS News, May 19, 2010, available at http://www.cbsnews.com/8301-503544_162-20005436-503544.html?tag=contentMain;contentBody.

81  Marshall Fitz, Philip E. Wolgin, and Ann Garcia, "Triumphs and Challenges on the 30th Anniversary of Plyler v. Doe" (Washington: Center for American Progress, 2012), available at http://www.americanprogress.org/issues/2012/06/plyler.html; Tom Baxter, "Alabama's Immigration Disaster: The Harshest Law in the Land Harms the State's Economy and Society" (Washington: Center for American Progress, 2012), available at http://www.americanprogress.org/issues/2012/02/pdf/alabama_immigration_disaster.pdf.

82  Personal interview with author, central New Jersey, May 23, 2009.

83  Personal interview with author, northeast Ohio, May 20, 2009.

84  Personal interview with author, northeast Ohio, May 23, 2009.

85  Personal interview with author, northeast Ohio, May 20, 2009.

35   Center for American Progress  |  How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A668

86  Personal interview with author, northeast Ohio, May 22, 2009.

87  Personal interview with author, northeast Ohio, September 18, 2009; Personal interview with author, northeast Ohio, September 19, 2009.

88  Personal interview with author, central New Jersey, November 11, 2011.

89  Jacqueline Hagan, Brianna Castro, and Nestor Rodriguez, "The Effects of U.S. Deportation Policies on Immigrant Families and Communities: Cross-Border Perspectives," *North Carolina Law Review* 88 (2010): 1799–1824; Victor Talavera, Guillermina Gina Núñez-Mchiri, and Josiah Heyman, "Deportation in the U.S.-Mexico Borderlands: Anticipation, Experience, and Memory." In de Genova and Peutz, eds., *The Deportation Regime.*

90  Personal interview with author, central New Jersey, February 8, 2011.

91  Personal interview with author, northeast Ohio, June 4, 2009.

92  Personal interview with author, central New Jersey, January 31, 2011.

93  Personal interview with author, central New Jersey, January 17, 2011.

94  Regina Branton and Johanna Dunaway, "English- and Spanish-Language Media Coverage of Immigration: A Comparative Analysis," *Social Science Quarterly* 89 (4) (2009); Marisa Abrajano and Simran Singh, "Examining the Link Between Issue Attitudes and News Source: The Case of Latinos and Immigration Reform," *Political Behavior* 31 (2009); Kristin Moran, "Is Changing the Language Enough?: The Spanish-Language 'Alternative' in the USA," *Journalism* 7 (3) (2006); Yann P. Kerevel, "The Influence of Spanish-Language Media on Latino Public Opinion and Group Consciousness," *Social Science Quarterly* 92 (2) (2011).

95  Personal interview with author, central New Jersey, January 27, 2011.

96  Personal interview with author, central New Jersey, January 24, 2011.

97  Personal interview with author, central New Jersey, January 26, 2011.

98  Personal interview with author, central New Jersey January 27, 2011.

99  Personal interview with author, central New Jersey, January 31, 2011.

100  Personal interview with author, central New Jersey, November 11, 2011.

101  Personal interview with author, central New Jersey, January 17, 2011.

102  Personal interview with author, northeast Ohio, May 30, 2009.

103  Personal interview with author, central New Jersey, March 5, 2011.

104  Personal interview with author, central New Jersey, January 24, 2011.

105  Ibid.

106  Personal interview with author, central New Jersey, May 24, 2011.

107  Dreby, "The Burden of Deportation."

108  Ibid.

109  Office of Congresswoman Lucille Royal-Allard, "Rep. Roybal-Allard Introduces Help Separated Families Act to Keep Immigrant Families Together"; First Focus Campaign for Children, "Humane Enforcement & Legal Protections (HELP) for Separated Children Act," available at http://www.ffcampaignforchildren.org/sites/default/files/HELPAct%20%282%29.pdf.

36   Center for American Progress  |  How Today's Immigration Enforcement Policies Impact Children, Families, and Communities

A669

The Center for American Progress is a nonpartisan research and educational institute dedicated to promoting a strong, just, and free America that ensures opportunity for all. We believe that Americans are bound together by a common commitment to these values and we aspire to ensure that our national policies reflect these values. We work to find progressive and pragmatic solutions to significant domestic and international problems and develop policy proposals that foster a government that is "of the people, by the people, and for the people."

Center for American Progress

# SHATTERED FAMILIES

## The Perilous Intersection of Immigration Enforcement and the Child Welfare System



APPLIED RESEARCH CENTER
*Racial Justice Through Media, Research and Activism*
arc.org

publisher of
COLORLINES.com

NOVEMBER 2011

# ACKNOWLEDGEMENTS

**About ARC**

The Applied Research Center (ARC) is a thirty year old racial justice think tank using media, research, and activism to promote solutions. ARC's mission is to popularize racial justice and prepare people to achieve it. For more information on ARC's work, please visit www.arc.org.

**AUTHOR AND PRINCIPAL INVESTIGATOR**
Seth Freed Wessler

**RESEARCH FELLOW**
Esther Portillo-Gonzales

**RESEARCH DIRECTOR**
Dominique Apollon, Ph.D.

**ARC EXECUTIVE DIRECTOR**
Rinku Sen

**RESEARCH INTERNS**
Jillian Maclearie
Asraa Mustufa
John Sullivan
Karina Hurtado
Yasmin Madadi

**DESIGN**
Hatty Lee

**ILLUSTRATION**
Wendy MacNaughton (pg 5, 21, 22, 29, 43,44)

**COPY EDITOR**
Kathryn Duggan

**ADDITIONAL EDITING**
Mónica Novoa
Rebekah Spicuglia

**TRANSLATION**
The Matea Group

**VIDEO PRODUCTION**
Channing Kennedy

**VIDEO INTERN**
David Zlutnick


**Thanks are due to the detained and deported mothers and father who agreed to speak to ARC about their families.**

**ARC is grateful to the Atlantic Philanthropies for funding this project.**

**Thanks to the following people for reviewing all or portions of the report:** Gaylynn Burroughs; Emily Butera (Women's Refugee Commission); Raha Jojani (UC Davis); Yali Lincroft (Policy Consultant for First Focus); Nina Rabin (University of Arizona), and Dorothy Roberts (Northwestern University)

**Thanks to the following people for their support in research design or execution:** Emily Butera (Women's Refugee Commission); Randy Capps (Migration Policy Institute); Alan Dettlaff (University of Illinois, Chicago); Kara Finck (Bronx Defenders); Jennifer Friedman (Bronx Defenders); Tanya Krupat (Osborne Association); Romy Lerner (Florida Immigrant Advocacy Center); Patricia Manning (University of Arizona); Lindsay Marshall (Florence Immigrant and Refugee Rights Project); Nina Rabin (University of Arizona); Cindy Schlosser, (Florence Immigrant and Refugee Rights Project); Wendy Sotolongo (North Carolina Office of Indigent Defense Services); David Thronson (Michigan State University); Karen Winston (Jacksonville Area Legal Aid, Inc.), and Nathan Freed Wessler

# TABLE OF CONTENTS

**I: INTRO  5**

    KEY RESEARCH FINDINGS  6

    KEY BARRIERS TO FAMILY UNITY  8

    STRUCTURE OF THE REPORT  9

**II: BACKGROUND ON IMMIGRATION ENFORCEMENT, CHILD WELFARE AND ANTI-IMMIGRANT BIAS  10**

    IMMIGRATION ENFORCEMENT  10

        **Deporting Parents  11**

        **Modes of Immigration Enforcement  11**

            BORDER ENFORCEMENT  11

            INTERIOR ENFORCEMENT  11

        **Detention  12**

    CHILD WELFARE AND JUVENILE DEPENDENCY  13

        **How the Child Welfare System Works  13**

        **Termination of Parental Rights (TPR)  15**

        **Race, Poverty and the Child Welfare System  16**

    CHILD WELFARE SYSTEM BIAS AGAINST UNDOCUMENTED PARENTS  17

        **Disproportionate Immigrant Poverty  18**

        **Parents Are Denied Access to Services  18**

        **Discrimination Against Parents with "Unverifiable" Employment  20**

        **Driving Without a License  20**

    CONCLUSION  21

**III: IMMIGRATION ENFORCEMENT, DETENTION AND THE SHATTERING OF FAMILIES  22**

    HOW MANY CHILDREN ARE AFFECTED?  22

    GEOGRAPHY OF THE PROBLEM  24

    PATHS TO SEPARATION  26

        **Straight Path  26**

        **Parallel Path  26**

        **Interrupted Path  27**

    IMPACT OF LOCAL IMMIGRATION ENFORCEMENT ON CHILD WELFARE  27

    CHILD WELFARE CASEWORKERS AND ATTORNEYS LACK KNOWLEDGE ABOUT IMMIGRATION ENFORCEMENT  28

    FEW PROTECTIONS FOR PARENTS AT THE TIME OF APPREHENSION  29

    ICE DISCRETION IS ALLOWED, BUT NOT USED  29

    LIMITS OF DISCRETION  30

    "ILLEGAL REENTRY"  31

    UNREPRESENTED IN MANDATORY DETENTION  32

VICTIMS OF GENDER-BASED VIOLENCE AT RISK  33

    Domestic Violence  33

    Victims of Human Trafficking  34

    Failure to Protect  35

    Children of Detained Mothers Remain With Abusers  35

ICE OBSTRUCTS DUE PROCESS  36

    Inconsistent Phone Access  37

DETENTION EXCLUDES PARENTS FROM PARTICIPATION IN FAMILY REUNIFICATION PLAN  38

LONG DETENTION AND SHORT PERMANENCY DEADLINES  40

CHILD WELFARE CASEWORKERS AND ATTORNEYS LACK KNOWLEDGE
    ABOUT IMMIGRATION ENFORCEMENT 41

THE TRAUMA OF SEPARATION  42

CONCLUSION  43

IV: DEPORTATION, CHILD WELFARE PRACTICE AND
THREATS TO FAMILY REUNIFICATION  44

REUNIFICATION WITH DEPORTED PARENT  44

    Lack of Policy  44

    Systemic Bias and Borders on Parental Rights  45

    Consulate Involvement  47

        CONSULATES IN BORDER COUNTIES  48

        CONSULATES IN NON-BORDER JURISDICTIONS  49

        DILIGENT SEARCHES  50

    Home Studies and Case Plans after Deportation  50

    Geographic Disparities  51

BARS AND BARRIERS TO PLACEMENT WITH UNDOCUMENTED CAREGIVERS  51

    "Could be Deported at Any Time": CPS Refusal to Place Children
    With Their Families 52

        FOR PARENTS  52

        FOR RELATIVES  54

            Barriers to Services and Subsidies For Undocumented Relatives  54

            Background Checks on Undocumented Caregivers 55

            Community Fears of Deportation  55

            Policy Confusion  56

CONCLUSION  56

V: CONCLUSION AND RECOMMENDATIONS  57

POLICY RECOMMENDATIONS  57

    Congress  57

    Executive Branch, Department of Homeland Security (DHS)  57

    State Legislatures  58

    State Child Welfare Departments and Juvenile Dependency Courts  58

VI: METHODOLOGY  59

NOTES  62

# I: INTRODUCTION

## SHATTERED FAMILIES: The Perilous Intersection of Immigration Enforcement and the Child Welfare System



Josefina's baby was just 9-months old and Clara's[1] children were 1 and 6 when they were placed in foster homes with strangers. Clara and Josefina, sisters in their early 30s who lived together in a small New Mexico town, had done nothing to harm their children or to elicit the attention of the child welfare department.

In the late summer of 2010, a team of federal immigration agents arrived at the front door of Clara and Josefina's trailer home in New Mexico. Immigration and Customs Enforcement (ICE) had received a false tip that the sisters, who were undocumented immigrants, had drugs in their home. Though they found nothing incriminating in the trailer and the sisters had no criminal record, ICE called Child Protective Services (CPS) to take custody of the children and ICE detained the sisters because of their immigration status.

For the four months that ICE detained them, Josefina and Clara had no idea where their children were. In December, the sisters were deported, and their children remained in foster care. Josefina was very quiet as she talked by phone from Mexico a year after she was deported: "I don't know where my child is; I have no contact with my baby. I didn't do anything wrong to have my children taken away from me."

**"SHATTERED FAMILIES," A REPORT BY THE APPLIED RESEARCH CENTER (ARC),** is the first national investigation on threats to families when immigration enforcement and the child welfare system intersect. It explores the extent to which children in foster care are prevented from uniting with their detained or deported parents and the failures of the child welfare system to adequately work to reunify these families. ARC's yearlong research project found that Clara and Josefina's children are among thousands of children currently in foster care who are separated from their family because of immigration enforcement.

**Immigration policies and laws are based on the assumption that families will, and should, be united, whether or not parents are deported.[2] Similarly, child welfare policy aims to reunify families whenever possible.** In practice, however, when mothers and fathers are detained and deported and their children are relegated to foster care, family separation can last for extended periods. Too often, these children lose the opportunity to ever see their parents again when a juvenile dependency court terminates parental rights.

In fiscal year 2011, the United States deported a record-breaking 397,000 people and detained nearly that many. According to federal data released to ARC through a Freedom of Information Act request, a growing number and proportion of deportees are parents. **In the first six months of 2011, the federal government removed more than 46,000 mothers and fathers of U.S.-citizen children.** These deportations shatter families and endanger the children left behind.

Anecdotal evidence drawn from news and advocacy reports and ARC's initial research over the last half decade have shown that a disturbing number of children with detained or deported parents are now in foster care.[3]

Systematic research on this topic is challenging, because child welfare departments and the federal government fail to document cases of families separated in this way. This "Shattered Families" report is the first to provide evidence on the national scope and scale of the problem. As more noncitizens are detained, the number of children in foster care with parents removed by ICE is expected to grow. Without explicit policies and guidelines to protect families, children will continue to lose their families at alarming rates.

## KEY RESEARCH FINDINGS

- **ARC conservatively estimates that there are at least 5,100 children currently living in foster care whose parents have been either detained or deported** (this projection is based on data collected from six key states and an analysis of trends in 14 additional states with similarly high numbers of foster care and foreign-born populations). This is approximately 1.25 percent of the total children in foster care. If the same rate holds true for new cases, **in the next five years, at least 15,000 *more* children will face these threats to reunification with their detained and deported mothers and fathers.** These children face formidable barriers to reunification with their families.

- In areas where local police aggressively participate in immigration enforcement, children of noncitizens are more likely to be separated from their parents and face barriers to reunification. For example, **in counties where local police have signed 287(g) agreements with ICE, children in foster care were, on average, about 29 per-cent more likely to have a detained or deported parent than in other counties.** The impact of aggressive immigration enforcement re-mains statistically significant when our research controls for the size of a county's foreign-born population and a county's proximity to the border.

- **Immigrant victims of domestic violence and other forms of gender-based violence are at particular risk of losing their children. Approximately one in nine of the stories recounted to ARC in interviews and focus groups involved domestic violence.** As a result of ICE's increased use of local police and jails to enforce immigration laws, when victims of violence are arrested, ICE too often detains them and their children enter foster care. Many immigrant victims face an impossible choice: remain with an abuser or risk detention and the loss of their children.

- **ARC has identified at least 22 states where these cases have emerged in the last two years.** This is a growing national problem, not one confined to border jurisdictions or states. Across the 400 counties included in our projections, more than one in four (28.8 percent) of the foster care children with detained or deported parents are from non-border states.

Whether children enter foster care as a direct result of their parents' detention or deportation, or they were already in the child welfare system, immigration enforcement systems erect often-insurmountable barriers to family unity.

# The ANATOMY of a CASE

### How Families are Separated at the Intersections of the Child Welfare System and Parental Detention/Deportation

## IMMIGRATION ENFORCEMENT

**Immigration and Customs Enforcement:** ICE is the federal agency tasked with detaining and removing noncitizens from the interior of the U.S. ICE also conducts raids and investigates immigration violations.

**Local Immigration Enforcement:** The increasing use of local police to enforce federal immigration law turns any interaction with the police into a possible route to detention and deportation. "**Secure Communities**" checks immigration status of anyone booked into local jail and will soon be operational in every county in the country. The federal government forces states to participate in the program despite resistance from numerous governors and local law enforcement officials.

**ICE "Hold":** When ICE identifies a noncitizen in a local jail, through Secure Communities or another program, the agency will issue an ICE "hold" to require local authorities to keep the person in custody until ICE can move them to a detention center.

**Detention:** Detainees are held for an indeterminate length of time while their case is being processed and are transferred an average of 370 miles from their homes. In 2010, ICE detained 363,000 people in a network of 350 detention centers

**Deportation:** The federal government deported close to 400,000 people in 2010.

## THE FAMILY

### BARRIER: Aggressive Immigration Enforcement

Police arrive at the home of an undocumented immigrant mom of two U.S. citizens after neighbor calls 911 to report what sounds like domestic violence. Police arrest both the mother and her boyfriend. **Police call Child Protective Services (CPS).**

**CPS investigator places children in temporary foster care with strangers** instead of with loving undocumented aunt. CPS says undocumented relatives cannot take custody because they "could be deported at any time". Mother is charged with assault.

At the time of booking, mother's fingerprints are automatically sent to **Immigration and Customs Enforcement (ICE)** and checked against the **Secure Communities** database. **ICE flags her for deportation and issues "hold."**

### BARRIER: Detention Obstructs Communication Between Parent and CPS

**Within three days, mother is sent to immigration detention center 300 miles away.** Her court-appointed attorney cannot find her, and she misses dependency court hearing. Court keeps children in foster care.

Three months later, mother's attorney locates her and informs her of next hearing, but **ICE refuses to transport her.** After much effort, mother arranges to call the court. CPS presents "reunification plan" that includes visiting her children, parenting classes and securing housing. **ICE detention prevents mother from complying with any part of child welfare case plan.**

Nine months pass. Children remain in foster care; the youngest begins to forget Spanish. **CPS writes "permanency plan"** with two possible outcomes: 1) If mother is released, CPS will attempt to reunify the family; 2) Children will be put up for adoption with foster care providers after their parental rights are terminated.

### BARRIER: Lack of CPS Policy on Reunification with Deported Parents

After 11 months in detention, **mother is deported to Mexico. CPS does not know where to find her and does not contact Mexican consulate for help.**

The mother arrives at relative's house in Mexico. She contacts the child welfare caseworker to say she wants her children in Mexico. **CPS replies that it will not consider reunification in Mexico unless mother arranges a home study, completes parenting classes and finds a job.**

Within 8 months, mother completes the plan. Still, **CPS petitions to terminate parental rights** as federal deadline approaches.

## CHILD WELFARE AND JUVENILE DEPENDENCY

When an allegation of maltreatment is reported to **Child Protective Services (CPS)**, a caseworker investigates. If deemed to be unsafe, child may be placed in foster care.

After children are removed from home, CPS petitions **juvenile dependency court** to stop child from being returned home.

Parent is issued a **case plan**, an outline of tasks to complete to regain custody of children. Case plans can include finding new housing or enrolling in parenting classes, drug treatment, or domestic violence prevention courses.

Once child has been in foster care for one year, and in some cases less than a year, child welfare department drafts a "**permanency plan.**" Permanency plans include a goal for the placement of the child, which might be reunification with parents, adoption or guardianship with kinship caregivers or others. If parent fails to complete case plan, or child is out of parent's custody for 15 months of any 22-month period, **federal law requires CPS to petition the court to terminate parental rights.**

Permanency Outcome: If parent completes case plan and is deemed fit to care for child, CPS will reunify the family. If not possible, CPS must first seek placement with a relative. However, if CPS decides not to place child with relatives, CPS petitions the court to **terminate parental rights.**



APPLIED RESEARCH CENTER • 7 •

# KEY BARRIERS TO FAMILY UNITY

- **Federal immigration enforcement uses local police and jails to detain noncitizens.** As a result of aggressive local immigration enforcement, especially the expansion of Secure Communities, any interaction with police can spur ICE involvement and lead to detention and deportation. An incident with police that would not separate children from a citizen parent can result in a long-term or permanent separation if the parent is not a U.S. citizen.

- **ICE does not protect families at the time of apprehension.** ICE and arresting police officers too often refuse to allow parents to make arrangements for their children. Existing ICE guidelines are largely out-dated and insufficient for the current immigration enforcement context in which ICE has shifted from high-profile raids to more-hidden and devolved forms of enforcement that operate through local police and jails and smaller-scale ICE enforcement actions.

- **ICE detention obstructs participation in CPS plans for family unity.** ICE consistently detains parents when they could be released on their own recognizance or expand the use of community-based supervisory programs. Once detained, ICE denies parents access to programs required to complete CPS case plans. Due to the isolation of detention centers and ICE's refusal to transport detainees to hearings, parents can neither communicate with/visit their children nor partici-pate in juvenile court proceedings. Child welfare caseworkers and attor-neys struggle to locate and maintain contact with detained parents.

- **Child welfare departments lack proactive policies to reunify children with deported parents.** ARC's research found that chil-dren are reunited with their deported parents only if foreign consulates are involved with the case. However, few child welfare departments systematically contact a foreign consulate when they take custody of the U.S. citizen children of a detained or deported noncitizen.

- **Systemic bias against reunifying children with parents in other countries is pervasive in child welfare practice.** CPS administra-tors, caseworkers, judges, and attorneys (including the children's own lawyers) often believe that children are better off in the United States, even if those children are in foster care. This belief often supersedes the child welfare system's mandate to move toward family reunification and places borders on family and parental rights.

- **Structural barriers and systemic bias against undocumented parents and relatives threaten the reunification of families.** Despite clear child welfare policy that prioritizes placing children with their own families, many child welfare departments will not place children with their undocumented non-custodial parents, aunts, uncles, grandparents or other relatives. As a result, children of detained and deported parents are likely to remain in foster care with strangers when they could be with their own family.

As the federal government continues to expand its immigration enforcement infrastructure, detention and deportation will continue to pose barriers to family unity for families involved in the child welfare system. **Federal, state and local governments must create explicit policies to protect families from separation.**

These polices should stop the clock on the child welfare process and the immigration enforcement process to ensure that families can stay together and allow parents to make the best decisions for the care and custody of their children.

# STRUCTURE OF THE REPORT

This "Shattered Families" report will explore the treacherous intersection of immigration enforcement and the child welfare system. The report is divided into six sections. Section II, "Background on Immigration Enforcement, Child Welfare and Anti-Immigrant Bias," will provide important background of the immigration enforcement and child welfare/juvenile dependency systems. It will then present ARC's findings on systemic anti-immigrant bias in the child welfare system. Section III, "Immigration Enforcement, Detention and Shattering of Families," explores ARC's research findings on the treacherous intersection of immigration enforcement and child welfare and maps the paths that lead to children entering or remaining in foster care while their parents are detained or deported. Section IV, "Deportation, Systemic Bias and Barriers to Reunification", discusses ARC's findings on threats to family unity after a parent is deported and the failure of the child welfare system to adequately move toward reunifying these children with their parents or place them with family members in the United States. This report concludes with a set of recommendations for change. An appendix that includes a full explanation of ARC's research methods follows the report.

**About ARC**
The Applied Research Center (ARC) is a 30-year-old racial justice think tank that uses media, research and activism to promote solutions. ARC's mission is to popularize racial justice and prepare people to achieve it. For more information on ARC's work, please visit www.arc.org.

## A NOTE ON METHODOLOGY

To arrive at our national estimates, ARC gathered county-level survey data from child welfare caseworkers, attorneys and judges in 19 jurisdictions in six key states: Arizona, California, Florida, North Carolina, New York and Texas. These states account for more than half of the noncitizen population in the U.S. and more than one-third of the children in foster care. Jurisdictions were selected to provide a mix of border and non-border regions, varied levels of aggression in local immigration detention practices, and high and low foreign-born populations.

The foster care cases with deported or detained parents ranged from under 1 percent to 8 percent of the total foster care cases for each of the counties surveyed. Using these percentages, we then utilized regression analysis to calculate the typical independent impact of three variables: the border county status, the presence of 287(g) immigration enforcement agreements, and the percentage of foreign-born individuals in each state. We then projected the prevalence of detained/deported parent cases in the remaining major jurisdictions in these six states and in 14 other similarly situated states (Colorado, Georgia, Illinois, Indiana, Maryland, Michigan, Missouri, New Jersey, New Mexico, Ohio, Oregon, Pennsylvania, Virginia and Washington) using the resulting coefficients from the regression analysis. These 20 states account for almost 85 percent of the country's undocumented population and more than 70 percent of foster care rolls.

The estimates provided in this report are conservative as far as the actual number of children affected nationally. Therefore, many more children in foster care may be adversely affected by the detention and deportation of noncitizen parents.[4]

# II: BACKGROUND ON IMMIGRATION ENFORCEMENT, CHILD WELFARE AND ANTI-IMMIGRANT BIAS

**BEFORE EXPLORING HOW IMMIGRATION ENFORCEMENT AND CHILD WELFARE INTERSECT**, it's important to have a clear understanding of how each system works (or in some cases, doesn't work). To this end, this section of the report introduces the following topics: Immigration Enforcement, Child Welfare and Juvenile Dependency and ARC's findings on the systemic racial and anti-immigrant bias in the child welfare system.

## IMMIGRATION ENFORCEMENT

For the last decade and a half, rates of deportation have steadily risen. In 1992, the U.S. government removed 44,000 people, a historical number at the time. In less than two decades, that number has grown ninefold. In fiscal year 2011, a record-breaking 397,000 people were removed from the U.S. because of their immigration status.[5] There are an estimated 22 million non-citizens living in the U.S., and of those noncitizens, 11 million have some sort of documentation that allows them to stay in the U.S. on a provisional basis. About 11 million immigrants are undocumented, which means that either they came to the U.S. without paperwork or their documentation is expired and they now live in a state of immigration limbo. Though undocumented immigrants are at risk of deportation based on their immigration alone, all noncitizens, including green card holders, can be deported if they are convicted of a crime. As hundreds of thousands of noncitizens are removed from the U.S. each year—over one million in the last three years—their children are often left behind.

There are approximately 5.5 million children in the U.S. who have an undocumented parent, and about 4.5 million of these children are U.S. citizens.[6]

Federal immigration enforcement policy is based on the assumption that families will remain together. The Bureau of Immigration Appeals has held that "When an alien-parent's child is a United States citizen and the child is below the age of discretion, and if the alien-parent is deported, it is the parent's decision whether to take the minor child along or to leave the child in this country."[7] The U.S. Supreme Court affirmed that the Immigration and Naturalization Act "establishes that congressional concern was directed at 'the problem of keeping families of United States citizens and immigrants united.'"[8] In practice, however, many families are separated by parental deportation. As this "Shattered Families" report shows, when children of deported parents are in foster care, families are at risk of extended and even permanent separation.



**THERE ARE APPROXIMATELY 5.5 MILLION CHILDREN WITH AN UNDOCUMENTED PARENT**

**ABOUT 4.5 MILLION OF THESE CHILDREN ARE U.S. CITIZENS**

## Deporting Parents

By submitting a Freedom of Information Act request to Immigration and Customs Enforcement, ARC was able to obtain previously unreleased data on the deportation of immigrant parents in the U.S. According to this new data, **in the six months between January and June 2011, Immigration and Customs Enforcement removed 46,486 parents of U.S.-citizen children from the United States.** This signifies a marked increase in the deportation rate of parents of U.S. citizens. The last time the federal government released equivalent data, the Department of Homeland Security, Office of the Inspector General reported that it carried out more than 180,000 removals of noncitizen parents of U.S.-citizen children between 1998 and 2007.[9] The new figures obtained by ARC suggest that if parent deportation continues at the current rate, ICE will deport more parents in just two years as it did in the previously reported ten year period. (The current figure represents a 400 percent increase in annual removals of parents of U.S. citizens.)



**1998-2007** (fiscal years)
2,200,000 total deportations
**8%** were **parents** of U.S.-citizen children.



**2011** (fiscal year)
397,000 total deportations
**22%** were **parents** of U.S.-citizen children.

## Modes of Immigration Enforcement

There are two primary modes of immigration enforcement that lead to detention and deportation: border enforcement and interior enforcement.

**BORDER ENFORCEMENT:** The mandate of the Border Patrol, which is a division of the DHS U.S. Customs and Border Protection, it to regulate migration at ports of entry as well as prevent undocumented immigrants from crossing borders into the U.S. without authorization. The vast majority of border enforcement funding is allocated to the southwest, near the U.S. border with Mexico. The Border Patrol maintains checkpoints at border crossings, on public transportation, on various roads, and in local jails to verify citizenship. In federal courts, the Border Patrol also prosecutes undocumented immigrants who cross the border without permission.

**INTERIOR ENFORCEMENT:** The apprehension and detention of noncitizens who are already within U.S. boundaries, including areas that overlap with Border Patrol territory within 100 miles from the border. This was originally one of the functions of the DHS Immigration and Naturalization Service, but in 2003, **Immigration and Customs Enforcement (ICE)** was created to coordinate these interior enforcement efforts.

- **Local enforcement:** ICE relies increasingly on local jails and police to detain noncitizens. Its local enforcement policy is primarily based on three programs: 287(g), the Criminal Alien Program (CAP), and Secure Communities. ICE claims that all three programs focus on identifying and deporting noncitizens convicted of serious crimes. However, these programs have thus far operated somewhat indiscriminately, targeting all noncitizens.

- **287(g) program:** The 287(g) program establishes agreements between ICE and a local police department that gives that department the authority to essentially act as ICE agents—questioning people about their immigration status and detaining them until ICE can take custody. Effectively, the program empowers local police officers to turn an alleged traffic violation or an arrest of any kind into an immigration enforcement operation.

**SECURE COMMUNITIES**
When ICE launched Secure Communities in 2008, the federal government described it as a good faith partnership between the federal government and localities—states and jurisdictions that wished to participate in the program could do so and others could opt out. However, the federal government recently announced that Secure Communities is mandatory and that all local jails will participate in identifying and holding noncitizens.[11] Despite widespread resistance from states, counties and cities around the country as well as from advocates, the Obama Administration plans to implement Secure Communities in every jurisdiction across the U.S. by 2013.[12] The program is already expanding rapidly and, according to ICE statistics, is now operational in 1508 jurisdictions in 44 states covering 74.7 percent of the total population of noncitizens in the U.S.[13] As of August 31, 2011, Secure Communities has led to the deportation of over 134,000 people since it started in 2008.[14]

**287(g):** Currently, 287(g) programs operate in 69 jurisdictions, including the state police or highway patrol in 24 states.[15] Last year, almost 50,000 people were detained through 287(g) programs.[16] The program has been widely criticized for facilitating racial profiling by local police departments[17] and for obstructing effective community policing.[18] 287(g) agreements have been established between county law enforcement agencies and the federal government in seven of the 19 counties where ARC conducted surveys (Pima and Maricopa counties in Arizona; Cabarrus and Mecklenburg counties in North Carolina; Los Angeles County, California; and Duval and Collier counties in Florida).

**ICE "HOLDS":** Through local immigration enforcement programs, ICE flags noncitizens for deportation and issues a hold, asking the jail or prison to maintain custody of an individual after the person's jail or prison term ends. ICE may then detain the suspect and move toward deportation.[19] Immigration holds are the primary tool that ICE employs to detain noncitizens who come to the attention of local, state or federal criminal justice systems. The purpose of an ICE hold is to move noncitizens into ICE custody and to initiate their removal from the U.S. Holds block the release of noncitizens even if their charges are dropped, preclude release on bail, and prevent access to alternatives to incarceration programs. Once ICE issues a hold, the agency has 48 hours to take that person into custody after the time when the person would otherwise have been released.

- **Criminal Alien Program (CAP):** This program operates within federal prisons and under agreement with state and local jails to identify, detain and deport noncitizens. ICE does not release information on the reach of the program, but it is operational in many federal and state prisons and some local jails.

- **Secure Communities:** Starting in 2008, ICE began broadly implementing Secure Communities across the country. Unlike CAP and 287(g), Secure Communities does not rely on local agreements with ICE. Instead, **when local police departments run a standard background check through the FBI database, that data is automatically sent to ICE.**

   **The overwhelming majority of those detained and deported through the Secure Communities program were convicted of no crime at all or some low-level violation like driving without a license or petty theft.[10]**

## Detention

When ICE identifies noncitizens for deportation, many are transported to one of over hundreds of **immigration detention centers** scattered around the country. The number of people detained during fiscal year 2010 was 363,000. On averages, 33,400 people were detained each day, at a cost of $122 per day per detainee.[20] In the year to come, the government is expected to spend over $2 billion on immigration detention.[21] ICE operates some detention centers, but the majority are owned and operated by private correctional companies or by county governments with contracts to detain noncitizens. Immigrants may be held in detention centers (many of which are like jails and prisons) for an indeterminate length of time while their case is being resolved. Detainees are often moved to detention centers in other parts of the country, an average distance of 370 miles from their homes.[22] These transfers make it very difficult for detained parents to maintain contact with their families.

In late 2009, the Obama Administration announced plans to reform the detention system. These reforms include stated efforts to decrease the number of immigrants and asylum seekers held in penal jails or jail-like facilities, and to detain people closer to their homes by building new facilities near urban centers. Yet, detainees continue to be held in prisons far away from their families. According to an October 2010 report by Human Rights First, "In July 2009, approximately 50 percent of ICE's [detained] population was held in actual correctional facilities that also housed criminal detainees.[23] Since DHS announced its intention to reform the detention system, there has been no decrease in that proportion. The remaining 50 percent of ICE immigration detainees—those who are not held in actual jails or prisons— are still held in jail-like facilities."[24]

All indications from ARC's visits to detention centers confirm that these detention reforms have been scarcely implemented and significant change remains to be seen. Even if current planned changes are implemented and new facilities are built, only approximately 14 percent of detainees will be housed in these facilities while the remaining 86 percent will remain in penal facilities.[25]

Perhaps more significantly, the construction of these new facilities is likely to correspond with a net growth in the number of noncitizens detained and incarcerated even if some are held in more "humane" facilities. For example, ICE recently announced plans to close one facility, Willacy Detention Center in South Texas, which held close to 1000 detainees when ARC visited it in

early 2011. The facility, which has been cited for a number of serious abuses and in which detainees were housed in cavernous Kevlar tents with dozens of others and no privacy, will not actually be closed. Instead, it will shift to the control of Federal Bureau of Prisons and will hold thousands of non-citizens convicted in federal court of charges like "illegal reentry". [26] They will be deported immediately following their incarceration. Meanwhile, the federal government has announced any clear plans to construct facilities for several thousand new detention beds around the country without any plans to close other facilities.[27]

## CHILD WELFARE AND JUVENILE DEPENDENCY

Parents have a constitutional right to the custody of their children, and unless parents are deemed unfit, families are supposed to be protected from state-sanctioned separation and parents safeguarded from losing custody of their children without cause.[28] However, when children are unsafe or have been the victims of maltreatment, the federal government requires that states protect them.[29]

Once a child is removed from the home, the integrity of that family becomes a matter of intense intervention by the state. While placement of children in substitute care is meant to be a temporary remedy for child maltreatment, if a court determines that a father or mother is ultimately unfit to care for his or her children, that parent's right to legal custody of the child in question can be terminated.

**Foster care** is the institutional mechanism to provide children deemed unsafe with an alternative place to live. Foster homes, which can be provided by institutions, strangers or relatives ("kinship care") receive government subsidies to serve as caregivers. At the end of fiscal year 2010, there were 408,000 children in foster care.[30] 254,000 of all foster children in 2010 were removed from their homes that year.[31] The remaining 154,000 children were still in foster care after entering it in a previous year.[32] Though foster care is designed as a temporary living arrangement for children, in 2010 the average amount of time that a foster child spent in foster care was 25 months, and many children remained in foster care much longer.[33] Most children who exit foster care return to their parents or live with other relatives. Just over half of the children who exited foster care last year were reunified with their parent or caregiver.[34] A fifth of children were adopted by strangers or by relatives, and others remain in foster care or in long-term guardianship arrangements with other caregivers.[35]

**Child Protective Services** (CPS), which exists in every state, investigates reports of child maltreatment, removes children from homes when children are deemed unsafe (even if simply because children's parents are detained), supervises the placement of children with alternative caregivers and manages the process of a child welfare or "dependency" case. In some states, the control and administration of CPS is tightly run from a state office, while in others, counties retain vast power to make rules about the child welfare process. A number of states have contracted out parts of their child welfare work to private entities.[36]



**408,OOO children**
in foster care at end of
fiscal year 2010

## How the Child Welfare System Works

Once a report of child maltreatment is called into CPS, the department will start an investigation and make an initial determination about the veracity of the report. If the investigation does not substantiate the report, the maltreatment case will generally be closed. But if the investigator believes that

the child's safety may be at risk, then the child is either allowed to stay with their families and services are provided to minimize the risk of harm, or the child is removed from their family and placed in foster or kinship care.



## SAMPLE TIMELINE FOR CHILD WELFARE AGENCY AND DEPENDENCY COURT ACTIONS AFTER A CHILD ENTERS FOSTER CARE

Child removed from home.

30 days after   60 days after   within 6 months   within 12 months   child has been in care for 15 of the most recent 22 months.

Identifies and notifies all adult relatives

Continues to work with family on case plan

Develops case plan that outlines steps needed to reunify child with parent or place in an alternative home.

Petitions court to terminate parental rights unless an exception applies

Court determines that child should be removed.

• May approve foster care placement and case plan.

• Determines if reasonable efforts to prevent removal were made or excused.

Reviews status of case, such as whether child's placement is still appropriate and the progress with case plan goals.

• Holds a permanency hearing to determine whether reunification or other option should be pursued

• Determines whether reasonable efforts were made to finalize the permanency plan

Sometime later, holds a hearing to terminate parental rights if determines appropriate

*Source: GAO analysis of federal laws and other information sources.*

*Note: This timeline is illustrative. For example, it does not include instances in which a court determines that reasonable efforts to reunify the family are not required or when a child is removed through a voluntary placement agreement with the child's parent or legal guardian. As a result, this timeline may vary based on a child's individual circumstances.*

Once a child is removed from their parent's care, or if the child welfare department seeks to remove a child, CPS is required to file a petition to a **juvenile dependency court** (sometimes called family court or child protective court). These courts make essential decisions about family reunification and parental rights.

Once CPS files a petition to the court, the department creates a **permanency plan** that moves a case toward closure. Federal law mandates that courts hold "permanency hearings" no later than 12 months after a

child enters foster care. In over half of all CPS cases, the permanency plan goal is to reunify children with their parent or caregiver. In another quarter of all cases, the end goal is termination of parental rights and adoption by someone else. The goal of the remaining cases is permanent placement with relatives or other caregivers or long-term foster care.[37]

Parents with children in the child welfare system are issued a set of tasks, or a **reunification plan**, that they are required to complete if they are to be reunified with their children. If a child is removed from their mother or father because he or she left them unattended, for example, then the parent might be required to attend parenting classes and find childcare. Additional tasks can be added to a reunification plan that have nothing to do with the reason for the initial removal but that the child welfare department and/or dependency court deem would make the home safer.

Federal laws require child welfare agencies to make **"reasonable efforts"** to help families access the services they need in order to reunify. According to the U.S. Department of Health and Human Services:

> Laws in all States, the District of Columbia, Guam, and Puerto Rico require the provision of services that will help families remedy the conditions that brought the child and family into the child welfare system. Generally, these efforts consist of accessible, available, and culturally appropriate services that are designed to improve the capacity of families to provide safe and stable homes for their children. These services may include family therapy, parenting classes, drug and alcohol abuse treatment, respite care, parent support groups, and home visiting programs.[38]

However, if a child welfare department has made reasonable efforts and a court determines that a parent is incompliant with her or his case plan, or if the child was removed for a reason that's especially egregious and extreme, then the permanency plan changes to either long-term foster care, permanent custody with a relative, or adoption. A child cannot be adopted unless the dependency court terminates the parental rights of their mother and father.

Research shows that as a general matter, except for cases of extreme abuse or neglect, children are better off in the long run if they stay with their families than if they are placed in foster care. Studies find that foster youth are more likely than other children to become homeless, abuse drugs, be arrested or drop out of school. An MIT economist performed a study of 15,000 child welfare cases in Illinois, which provided empirical evidence that children who faced similar home circumstances consistently had better life outcomes if they stayed with their own families than if they were placed in foster care.[39] Other research has shown that children in foster care are actually more likely to be abused than children out of foster care.[40]

## Termination of Parental Rights (TPR)

**The Adoption and Safe Families Act (AFSA),** enacted in 1997, is a federal law designed to make it easier for children in the child welfare system to be adopted or placed in permanent homes through the speedy termination of parent's rights. At the time of its passage, many advocates were concerned that children were languishing in foster care without any hope of a permanent home. By requiring the rapid termination of parental rights, ASFA sought to "free" children for adoption.

ASFA requires that if a child has been out of their parent's custody for 15 of the last 22 months, the state child welfare department must petition the dependency court for the termination of parental rights. Broadly, ASFA

**Children** in families with an annual **income below $15,000** were **22 times more likely to be considered maltreated** than those in families with incomes above $30,000.

curtailed the reach of parental rights so that the extended separation of children and parents can itself be a basis for the severance of family bonds.

Importantly, parental rights can be terminated before 22 months. Once the child welfare department can show that it has made "reasonable efforts" to reunify a family and that the parent has nonetheless failed to comply with the reunification plan, the department can stop offering parents services toward that end and change the plan to termination of parental rights and adoption. **Terminating parental rights does not necessarily lead to adoption. Many children remain in foster care after they are severed from their parents and become, in effect, legal orphans.**

Importantly, ASFA created a number of exceptions to the TPR time clock. If children are placed in a permanent guardianship arrangement or another legal custody arrangement with a relative, the child welfare department does not need to petition to terminate parental rights. As a result, placement with family leaves open the possibility that families may be reunified even if a child is out of a parent's custody for longer than 22 months.

## Race, Poverty and the Child Welfare System

### POVERTY AS NEGLECT

As noted above, children enter CPS custody because the child welfare department suspects that those children are unsafe, often because of parental maltreatment, abuse or neglect. In some instances, children are indeed seriously harmed and the child welfare system responds appropriately. In other cases, however, child welfare practice results in the unnecessary removal of children from their mothers and fathers.[41]

The terms abuse and neglect can be misleading because they are broad categories, subject to the interpretation and discretionary judgment of a long list of actors, from the person who initially makes a report to the investigating caseworker, long-term caseworker, attorneys, children's advocates and judges. Importantly, the majority of child welfare cases involve neglect, not abuse. Seventy-two percent of children come to the attention of child welfare because of

neglect, as opposed to physical or sexual abuse.[42]

The predominance of neglect as the reason for child welfare system involvement should raise concerns because neglect, which is already ill-defined by federal and state law, can be practically indiscernible from the effects of poverty.[43] Indeed, poverty is the single best predictor of allegations of abuse and neglect. A 1996 study which remains among the clearest research on the links between poverty and child welfare found that children in families with an annual income below $15,000 were 22 times more likely to be considered maltreated than those in families with incomes above $30,000.[44] If a parent is too poor to feed, clothe or house her child, or to pay for childcare, she may be deemed neglectful.

Though the effects of poverty are often the basis of abuse and neglect allegations, the attorneys, caseworkers and judges

who perform the day-to-day functions of the child welfare system rarely name economic inequality outright. Martin Guggenheim, a professor of law at New York University (NYU) analyzed the case of a mother found to be neglectful because she was discovered living with her seven children inside "an unsafe and unsanitary motel room." In his analysis, Guggenheim noted the following:

> It is important to observe that poverty is unmentioned anywhere in the case. This is almost always true. The point about the connection between poverty and child neglect prosecutions is not that any [parent] is charged explicitly with being poor. It is, rather, that but for being poor, there would never be a prosecution.[45]

## RACIAL DISPROPORTIONALITY

Poverty does not operate in isolation. Children in foster care are disproportionately children of color. Black children make up 14 percent of children in the U.S. but 29 percent of foster children. American Indian children are 1 percent of the total population but 2 percent of foster care population. White children are significantly underrepresented in foster care. While Latino children enter foster care at rates just slightly lower than their representation in the general population—21 and 23 percent respectively—they are more likely to be in foster care than white children and are overrepresented in many states with large foster care populations. Black and Latino children are both more likely to be placed in out-of-home care more quickly and for longer periods of time than white children.[46]

One reason for these disparities is that children of color are far more likely to live in poor families and so are more vulnerable to face the conditions of poverty that child welfare departments consider neglect. Another reason that children of color are more likely to enter and remain in foster care is child welfare practice is laden with extensive discretion at every point a decision is made. As a result, the unconscious biases held by child welfare investigators, caseworkers, attorneys and judges can significantly shape the outcomes of a case. Even when controlling for poverty, research shows that child welfare departments are more likely to remove children of color (Black children in particular) from their parents rather than offering services to help them stay together.[47] This is not because these children are more likely to be abused—when the child welfare system deems that white children have been abused or neglected, it is twice as likely to offer that family services so that the child can stay at home as compared to Black families.[48]

Importantly, bias in the child welfare system is rarely intentional. It is usually the result of the complex interplay of disparities in poverty, income and wealth with unconscious and systemic racial biases that play out in the everyday and often mundane decision making of child welfare practice.[49]

## CHILD WELFARE SYSTEM BIAS AGAINST UNDOCUMENTED PARENTS

In the context of immigrant families, it is important to note that immigrants are more likely to be poor and face significant racial and anti-immigrant bias. Consequently, immigrant families, who face both economic and political exclusion as well as the constant threat of deportation, are situated inequitably in relation to the child welfare system.

Many child welfare caseworkers interviewed for this project described a pervasive relationship of fear on the part of immigrant communities because of anxieties that involvement with the child welfare system could result in deportation. As a result, immigrant families are likely to make particular efforts to stay clear of the child welfare system. However, once children of undocumented immigrants enter foster care, our research indicates that their families face significant barriers to family reunification.

There are no firm figures on the number of children of noncitizens in foster care though research shows that children of foreign-born parents are less likely to come to the attention of CPS investigations.[50] However, **ARC's research clearly indicates that once children of noncitizens are removed from the custody of their parents, their families are subjected to particular and deep systemic barriers to reunification.** As this report makes clear, this is especially true for families when parents have been detained or deported, but it is also the case for families with undocumented parents in general.

A judge in Southwest Florida described the effect of a parent's undocumented status when combined with related factors:

> Our child protection system has had very little, almost non-existent success at reunifying children, whether born in the USA or in a foreign country, with parents who come the USA (1) undocumented, (2) poor, (3) uneducated/illiterate, (4) unable to communicate in English, (5) culturally segregated. …If children of these parents come into care, they are virtually doomed by these five factors and the probability of permanent loss of these children is overwhelmingly high.

The judge added, "It's been my impression over the years that even if a parent has some of these other factors—like lack of English language ability and cultural segregation—they still have a fighting chance of getting their kids back but if you had the factor of being an undocumented immigrant, it makes it impossible."

## Disproportionate Immigrant Poverty

Like other communities of color, noncitizens, especially undocumented immigrants who are predominantly from Latin America and Asia, are concentrated in low-wage job sectors and are more likely to be poor. Children of immigrants are significantly more likely than children of non-immigrant parents to live in low-income families (below 200% poverty line)—35% to 49%.[51] In the context of the current rise in deportation rates, families who previously relied on two incomes but were still low income, or those that relied on one parent's income while the other parent cared for children, become especially vulnerable to deep poverty when a breadwinner is deported. Meanwhile, the threat of deportation is often wielded as a mechanism of control by employers, making it difficult for noncitizen parents to secure more equitable labor practices.

## Parents Are Denied Access to Services

Economic inequity is compounded by legal bans on immigrants' access to many public programs, such as Medicaid and Temporary Aid for Needy Families (TANF), that might help them avoid the worst conditions of deep poverty. The Personal Responsibility and Work Opportunity Act of 1996, which limited access to TANF for all U.S. residents, explicitly barred all undocumented immigrants from access to TANF and non-emergency Medicaid services. The Act also barred permanent residents who have lived in the U.S. less than five years from access to these programs. The federal government has given each state significant power to determine whether undocumented immigrants are eligible for state benefits, but many of these states have continued to block undocumented immigrants from most programs.[52]

Though most of the children of noncitizen parents are U.S. citizens themselves and are therefore eligible for many government programs, the exclusion of their mothers and fathers from these vital services means that immigrant families are marginalized from systems of support.[53]

Respondents in ARC's focus groups and interviews described undocumented parents struggling to maintain custody of their children because of immigration status–related barriers to services,[54] including lack of access to Medicaid, public housing or TANF.[55] A child welfare caseworker in Orlando (Orange County), Florida, recalled a recent case of a mother of two U.S. citizens who could not regain custody because federal laws block undocumented immigrants from accessing many services:

We removed the kids because of a dirty house issue, poverty basically, and we reunified [initially] with her because there was no reason not to.

But then once we placed we were caught in a situation where she could not get a baby sitter because all her network is undocumented and they would not be approved by our background check, she could not drive without a license and she could not get services… Not having papers was the number one barrier for her. This has nothing to do with this woman maliciously abusing or neglecting her children but it was a situation where we did not feel safe reunifying with her because she does not have the means to get the services or help she needed. We ended up having to remove them from her.

With the clock ticking, undocumented parents who are unable to access services due to their status can lose parental rights because they have not completed their plan in time. The longer the period that a child stays out of their parent's custody, the greater the chances that their family will never be reunified.[56] Ultimately, if these barriers are so great that a child cannot be reunified with their family before the ASFA deadline approaches its end, barriers that immigrants face can themselves lead to the legal end of a family.

A parents' attorney in Durham, North Carolina, described a mother who was ordered to get a psychiatric evaluation but could not because of her immigration status. "The judge brings [the psychiatric exam] up every time we go to court," said the attorney. "[The mother] keeps getting the finding against her that she's not doing it, and it's been slightly over a year now. There's a possible adoptive parent waiting, and this woman wants her kids back but she's not getting the services because she can't pay for them."

For undocumented parents who are more likely to work in low-wage jobs, paying for services out-of-pocket may be simply impossible. An attorney who has represented many undocumented parents in New York City said that the lack of access to Medicaid can be an insurmountable barrier for undocumented parents struggling with mental health issues:

> There are very few places that will offer free services. There are some places where you can get someone in on a sliding scale but even then it's very hard and without Medicaid that can be too expensive. This is especially hard for mental health issues where they are told they simply cannot get their kids back without treatment. When your client is bi-polar, say, and needs meds and you can't get anyone to see them or prescribe them drugs or pay for them, that's a problem. If you need services and you can't get them then you can't get your kids back.

Caseworkers said they often have to get creative to find alternatives to traditional services. In Duplin County, North Carolina, a rural county with a significant immigrant farm labor population and a thin infrastructure of social services, several caseworkers said they have approached clergy to provide undocumented parents with counseling and other services. These clergy do not have any formal training but, according to one of the caseworkers, "sometimes it works."

A clergy member from Duplin County said that he had been asked to provide an undocumented mother with counseling services even though, as he said, "I'm trained in spiritual counseling."

**Children of immigrants** are significantly more likely than children of non-immigrant parents to **live in low-income families (below 200% poverty line)—35% to 49%.**

## Discrimination Against Parents with "Unverifiable" Employment

In some jurisdictions, undocumented parents face barriers to completing their case plans because their income is not considered "verifiable or legal." Child welfare laws do not require parents to have a job in order to reunify with their children. They must only prove that they can support their children. However, in some jurisdictions, undocumented parents are not given the opportunity to do so.

In Osceola County, Florida, a caseworker said, "If we can't show that [parents] have a legal source of income, we have to note in that part of the file that they are not complying. It slows up the case when a parent can't show that they are working. If a parent can't show that they are working, it makes it difficult to move forward with these cases."

In Maricopa and Pima counties in Arizona, dependency attorneys said they had recently faced barriers to reunifying families because undocumented parents cannot be legally hired.

"Undocumented parents face the issue where the parent's rights are severed and the fact that they are undocumented and working under the table plays a factor," said one Maricopa County attorney. "Their status is never asked outright; well sometimes it is, but usually it's 'do you have a job, do you have pay stubs?' It's usually about work and not being able to prove it."

## Driving Without a License

In some rural areas that lack significant public transportation infrastructure, ARC found that child welfare departments and dependency courts are barring family reunification because undocumented parents cannot acquire driver's licenses. A case manager in Duplin County, a small farming area in North Carolina said:

> I had a case yesterday; the mother is transporting the children without a license. She has no means of getting a license. She has to work. She has to get her kids to school. She is going to keep driving. That definitely reflects badly in the eyes of the judge but she really does not have a choice. A lot of times the judge will say they have to abide by the law. The judge is saying that she is not complying with the plan.

According to two Texas caseworkers who spoke on the condition of anonymity, it may be official policy there that children are not to be placed with people without licenses. One of these caseworkers had this to say:

> What I'm hearing now from Austin is that if they are illegal and don't have a driver's license, you can't place the child. The problem is that if you place with an illegal immigrant or someone without a license, if they get stopped or arrested, then we have to go pick up the kids. The problem comes more from Austin, from the policy makers in [the child welfare department]. From a caseworker perspective, there's no problem placing with illegal families. We try to ignore it if possible. But meanwhile, Austin is saying that we can't place the children if the people don't have a valid driver's license because if they get picked up it's a danger.

A690



In border regions, undocumented immigrants face additional barriers to mobility because of Border Patrol checkpoints. Near Nogales, an Arizona border town south of Tucson, an undocumented man could not make it to his children's juvenile dependency court hearings because he would have to cross a border checkpoint. As a result, he's been excluded from the dependency process.

## CONCLUSION

As more noncitizens are deported, families are being shattered. Immigration enforcement practices, most significantly the rapid spread of local immigration enforcement programs, threaten to make any interaction with local police into a path to deportation. Meanwhile, undocumented immigrant parents and their children in the child welfare system face significant barriers to reunifying as a result of bans on access to services and social support systems as well as a systemic bias against immigrants. Children of immigrants often experience the worst outcomes, including extended periods in the child welfare system and the prospect of losing their parents forever.

Child welfare departments should make every attempt to locate services for undocumented parents and nonprofits should step in to help provide needed services. States should also provide funding to child welfare agencies for services that can help families reunify. In addition, child welfare departments should ensure that parents are not penalized because they are poor or because their income from an informal job is not considered verifiable.

# III: IMMIGRATION ENFORCEMENT, DETENTION AND THE SHATTERING OF FAMILIES



Inside the Baker County Jail, a few minutes outside of the 4500 person town of Macclenny in northeastern Florida, several hundred immigrants are held in prison cells because of their immigration status. A few times a day, guards enter the pods and yell for the men and women to line up so they can be counted. Then the detainees move back into groups of four or five around metal tables where they wait again until night, when they can sleep, and yet again until morning, when the whole waiting cycle begins again. What they wait for varies, but for some in detention, the wait could mean they lose their children.

In March, ARC spoke with several dozen men and women inside the cell-lined pods in the Baker County jail where detainees eat, sleep and wait. One of the women, who'd immigrated to the United States from Jamaica two decades ago and lived for years in central Florida, could not say where her four U.S.-citizen children were; she knew only that they were in foster care and that she'd had no contact with her caseworker since she arrived in detention.

Through tears, the woman said, "They stole my babies from me. They took them from me." With the prospect of deportation looming, she added, "I don't know if I'll ever see them again."

Two pods away, a British woman also struggled from inside the detention center to maintain contact with her daughter in foster care. She had received a letter in the mail from a child welfare case management agency with a list of tasks she was required to complete to reunify with her daughter—parenting classes and visits with her daughter. But the sheriff who runs the jail and the federal immigration authorities do not allow detainees to participate in classes and her child is too far away to visit her, so she waited inside as the clock ticked further and further toward the termination of her parental rights.

On the other side of the detention center, a Jamaican man who lived in Brooklyn for most of his adult life said he had not been able to call his wife even once since he arrived in the detention center, because collect calls home were too expensive for his family. He worried that his wife would not able to support their daughters without his help, and feared that his children might slip into foster care.

## HOW MANY CHILDREN ARE AFFECTED?

**Based on data collected from six key states and an analysis of trends in 14 other states with similarly high numbers of foster care and foreign-born populations, ARC estimates that there are at least 5,100 children who are presently in foster care whose parents have been detained or deported.** These children and their parents face formidable barriers to reunification. ARC's projection is consciously conservative, and many more children may currently be affected.

ARC's research found that an increasing number of families are separated by the intersection of immigration enforcement and the child welfare system. Immigration and child welfare policies must change to address the needs of

families; otherwise, thousands more children will be subjected to the same treatment. ARC's conservative estimate of at least 5100 detained/deported parent foster care cases comprise approximately 1.25% of the total children in foster care. **If these rates continue through the next five years, at least 15,000 additional children will face threats to reunification with their detained and deported mothers and fathers.**

Until now, no research has systematically explored the extent to which children of detained and deported parents are pushed into or remain in foster care, and only a few studies have explored the impact of parental deportation on children in general. One such study, called "Paying the Price: The Impact of Immigration Raids on America's Children," was released by the Urban Institute in 2007 in the wake of workplace-based immigration raids in Colorado, Nebraska and Massachusetts.[57] The report found that the raids left children alone without caregivers, that one child was affected for every two immigrants arrested, and that after the heat of the raids cooled, the children who were left behind experienced growing isolation, fear, economic hardships, depression and other psychological effects.[58]

For years, the media has published accounts of detained and deported parents struggling to maintain custody of their children. Policy advocates have warned of a growing trend. A policy report released in December 2010 by the Women's Refugee Commission concluded that ICE is not doing enough to protect parents from losing their children.[59] And a study released in May 2011 by the Southwest Institute for Research on Women at the University of Arizona found that in Pima County, Arizona, parents who are detained are at significant risk losing their parental rights.[60] "Shattered Families" is the first study to systematically investigate the extent to which children of detained or deported parents enter or remain in foster care.

**Over the course of our research, ARC visited six detention centers and interviewed almost 70 parents. Nineteen had children in foster care. Many more feared that their children might enter foster care because the child welfare system might decide that their children are not safe with their current caregiver or that the caregiver is too poor to support them.**

Each parent was clear: their children's well-being was their greatest concern. For parents with children in the custody of the child welfare departments, that concern became a matter of consuming distress. These parents faced the already devastating prospect of separation from their children as well as the very real possibility that their legal right to parent their sons and daughters could be terminated. Their children—at least 5100 of them today and thousands more in the future—face a corresponding nightmare: that they will never see their mothers and fathers again.

The federal government has expanded immigration detention and deportation dramatically in the last decade, and in the last three years, deportation rates have taken a particularly steep upward turn. Before immigrants are deported, they are usually detained in a network of hundreds of immigration detention centers scattered across the country. While the average length of detention is 32 days, many detainees spend far longer behind bars, especially those who are legally challenging their deportation. **Detained parents interviewed for this report almost uniformly challenged their deportation, because it threatens to separate them from their children.**



At least **5100 children** who are presently **in foster care** whose **parents have been detained or deported**

# GEOGRAPHY AND DEMOGRAPHICS OF THE PROBLEM

Children of detained and deported parents are entering foster care in every corner of the U.S. While rates of detained/deported parent cases vary from place to place, foster care populations in states from the East Coast to the West Coast, on the border and in the interior, from large urban counties to small agricultural counties include a growing number of children separated from their parents by immigration enforcement and stuck in the child welfare system. While the cases did not approach a majority of the foster care population in any one jurisdiction, they accumulate at the national scale and in some places account for one in every 12 children in foster care. The following table shows the local percentages and numbers of children in foster care with detained or deported parents from a selection of the jurisdictions where ARC conducted field research. Local differences in rates of detained/deported parent foster cases vary. Rates depend on a number of factors, including the number of noncitizens in the county, the aggressiveness with which local authorities participate in immigration enforcement and the county's proximity to the border.

## Selected Jurisdictions from ARC's Research: Estimated Current Children in Foster Care with Detained/Deported Parents


**Arizona**

| County | Percentage | Current Number of Children in Foster Care |
|---|---|---|
| Maricopa | 4.5% | 274 |
| Pima | 5.2% | 130 |


**California**

| County | Percentage | Current Number of Children in Foster Care |
|---|---|---|
| Los Angeles | 6.2% | 1178 |
| San Diego | 5.9% | 219 |


**Florida**

| County | Percentage | Current Number of Children in Foster Care |
|---|---|---|
| Collier | 6.6% | 17 |
| Duval | 1.8% | 19 |
| Lee | 2.6% | 10 |
| Orange | 3.0% | 26 |
| Polk | 2.9% | 28 |


**North Carolina**

| County | Percentage | Current Number of Children in Foster Care |
|---|---|---|
| Cabarrus | 5.5% | 3 |
| Mecklenburg | 4.5% | 28 |


**New York**

| County | Percentage | Current Number of Children in Foster Care |
|---|---|---|
| Bronx | 0.7% | 30 |


**Texas**

| County | Percentage | Current Number of Children in Foster Care |
|---|---|---|
| El Paso | 7.5% | 46 |
| Rio Grande Valley East, Child Protection Court jurisdiction | 7.8% | 55 |

In addition to the six states where ARC collected quantitative data on the percent of current foster care cases with detained/deported parents, we spoke to attorneys, child welfare caseworkers and foreign consulates in 10 other states where these cases have recently emerged in the past several years and tracked media reports of cases from at least six additional states. Collectively, that means ARC has identified at least 22 states where cases in which the detention or deportation of mothers and fathers put families at risk of permanent separation.

## States Where ARC Identified Detained/Deported Parent Foster Care Cases



The parents we interviewed and those we heard about from interview and focus group respondents were immigrants from all over the world. The distribution of their countries of origin was roughly equivalent to the countries of origin of all deportees. The significant majority of the noncitizen parents we interviewed or heard about were from Mexico, and the majority of the others were from South and Central America (El Salvador, Ecuador, Honduras, Guatemala or Peru) and the Caribbean (Jamaica, Bahamas or Haiti). ARC also heard accounts of parents from England, Germany, Pakistan, Portugal and the Democratic Republic of the Congo.

# PATHS TO SEPARATION

Detained parents' children enter foster care for a variety of reasons, and the child welfare system and immigration enforcement can intersect in a number of ways. However, **there are three common routes that lead to the separation of families in this way**. In each of these scenarios, detention and deportation resulted in extended family separation and left children in foster care for long periods.

## Straight Path

The first common route is that children entered foster care as a direct result of their parent's arrest or detention. In these cases, when parents are detained by ICE directly or arrested by police and then issued an ICE hold, parents are not able to care for their children because they are detained so CPS takes custody. A dependency attorney in Tucson, Arizona (60 miles from the U.S.-Mexico Border) described a case where a mother's detention kept her family from being together:

> A mother was picked up on charges that were entirely unrelated to the children. Considering the nature of the relatively minor allegations, had she been a citizen, there is no doubt that she would have bonded out in a day or two. We have here a good mom who had some issues. In this particular case, it was her inability to be with her kids because of detention and deportation that got them into care. The kids are a little older and if she had been a citizen, the children would have made do for a day and then she would have been out and back with them. But the fact that she was incarcerated with an ICE hold and then detained and deported means it's considered to be neglect now by our state's statutory regime. This case has been open two months and the kids are still in foster care.

In these cases, even if parents are released from detention after a long period, the fact that their children are in CPS custody can mean that the family is not immediately reunified. In Phoenix, Arizona, a 2-year-old girl was placed in foster care when her mother was pulled over by police and arrested because she was undocumented and was driving without a license. ARC spoke with the girl's foster care provider who said without equivocation, "The only reason they're not back together yet is the bureaucracy of the system. Before they can return her to her mother, they have to verify that the mom has a stable home, everyone else in the home passes background checks and that takes time." He added if the mother had not been detained, the child welfare system would never have been involved in this family's life. "None of these were made into problems until she was detained."

## Parallel Path

The second route that results in children of detained/deported parents entering foster care is similar to the first. These cases entail an allegation of child maltreatment that brings a family to the attention of both CPS and ICE at the same time. When police are involved in CPS investigations, what might have been a normal CPS case that would likely have resulted in prompt reunification, leads to an ICE hold, detention and extended separation when parents are undocumented. Parents in detention are denied the due process right to advocate for themselves in juvenile court, and the child welfare system poses obstacles to reunifying families.

**UNDOCUMENTED CHILDREN:**
Although in the overwhelming majority of cases reported to ARC, the children in foster care with detained and deported parents were themselves U.S. citizens, some of these children were undocumented. Their status raises some important issues. Undocumented children who are deemed to have no fit caregiver are eligible to apply for Special Immigrant Juvenile Status (SIJS). In order to qualify for SIJS, a juvenile court must first declare the child dependent on the court or a child welfare department. The child must not be able to reunify with at least one of their parents and the court must determine that it is not in the child's best interest to be returned to the home country. In most cases, SIJS is a vital path for undocumented children without caregivers to gain status. However, SIJS also poses concerns about parental rights, because in certain instances reported to ARC, child welfare departments are confronted by a difficult choice: help an undocumented child to gain authorized immigration status and terminate parental rights, or reunify children with their parents in another country. As discussed in Section IV, bias against placing children in other countries can sway CPS decision-making against placement in other countries even when the parents of these children are deemed fit.

A California man was arrested and his babies placed in foster care because a babysitter left the children alone for less than an hour and the police were called. When he arrived home, he was arrested for child endangerment, and when his information was run through the Secure Communities database, he was picked up and moved to detention.

## Interrupted Path

The third route to this sort of separation involves families that were already involved with the child welfare system when parents are detained. In these cases, parental detention interrupts, sometimes irreparably, the process of family reunification. ARC heard many of these stories including one from a woman in a Florida detention center who was just weeks away from fully reunifying with her son when she was detained:

Magda, a green card holder from Portugal, and her U.S.-citizen son were weeks away from reunification, when she was detained in January after stealing clothes for her son. At the time, the son was already in foster care because Magda had previously struggled with addiction, but mother and son were soon to be reunited. They were spending the afternoon together on one of their biweekly supervised visits when Magda's son soiled his pants. With little money to spare, she decided to go to the dollar store across the street and steal the clothes he needed. She wanted to avoid taking her son back to the foster home without changing his clothes first. The security guard called the police, who arrested Magda for petty theft. The officers drove her son back to his foster home and Magda was placed in deportation proceedings. From detention, she could do little to maintain contact with her son, and their path to reunification was interrupted.

As a result of expanding local immigration enforcement, an interaction with police that for a U.S. citizen might not have entailed temporary family separation, threatens to sever family bonds permanently for noncitizen mothers and fathers and their children. Parents' due process right to meaningfully participate in their case is denied. As long as aggressive immigration enforcement continues, parents are at risk of being detained and deported.

## IMPACT OF LOCAL IMMIGRATION ENFORCEMENT ON CHILD WELFARE

As most of the stories included in this report suggest, in jurisdictions where local police aggressively participate in immigration enforcement (e.g. 287(g) and Secure Communities), children are more likely to be separated from their parents and face barriers to reunification.

**ARC's research found that in counties included in our surveys where local police have signed 287(g) agreements with Immigration and Customs Enforcement, children in foster care were, on average, about 29 percent more likely to have a detained or deported parent than in other counties (an average of 4.9% of foster care kids in 287(g) counties compared to 3.8% in others).** This type of aggressive immigration enforcement exerts a statistically significant impact when ARC controls for the size of the noncitizen population and proximity to the border.

The significance of aggressive local enforcement is put in clear relief when comparing counties that except for 287(g) programs are otherwise similar. Based on our survey data, Collier and Lee counties (two adjacent counties in



**Secure Communities** resulted in **277,826 detentions** between 2008 and June 2011.

Southwest Florida) have vastly divergent rates of foster children with deported or detained parents. The average percent of such cases reported by respondents in Collier County was 6.6% as opposed to 2.6% in Lee County. While Collier County has a higher foreign-born population—23 percent compared to Lee County's 14 percent—the difference is not great enough to account for the significantly higher rate of deported/detained parent cases. The fact that Collier County has implemented a 287(g) agreement while Lee County has not may account for much of that difference. Additionally, significantly larger numbers of people have been deported per month from Collier County through Secure Communities as compared to Lee County. Local immigration enforcement drives up the likelihood that children in foster care have detained and/or deported parents.

This finding is of particular importance because as the federal government implements Secure Communities in more and more counties around the country, the rate of detained/deported parents foster care cases is likely to increase. Secure Communities is an ICE program that checks the immigration status of anyone booked into a local jail that resulted in 277,826 detentions between 2008 and June 2011.

## CHILD WELFARE CASEWORKERS AND ATTORNEYS LACK KNOWLEDGE ABOUT IMMIGRATION ENFORCEMENT

Often, attorneys, caseworkers and judges who work in the juvenile dependency and child welfare system know little about immigration law and policy. Despite the expansion of Secure Communities, few caseworkers and attorneys interviewed for this study were aware of the program, although it operates in most of the counties we examined. In counties where ICE operates 287(g) agreements, child welfare workers were only slightly more aware of that program.

The lack of knowledge about immigration policy is manifest in an inaccurate assumption among many child welfare workers that to be deported, immigrants must have committed a serious crime.

An attorney who works in the child welfare system in Florida said, "It comes up when there is an ICE hold and that typically happens when the parent has a criminal background and becomes incarcerated for whatever reason. *They don't come in solely because of immigration status* [emphasis added by ARC]. Once law enforcement finds out they are illegal, that's when the deportation ball gets rolling. Law enforcement only gets involved in these if there is a criminal issue." But as the data on the rates of Secure Communities deportations of people without convictions makes clear, **"criminal issue" does not mean a person has been convicted of a crime but rather that an individual without immigration status interacts with local police and is booked into a local jail.**

ARC's research found that **expanding local, police-based immigration enforcement has increasingly meant that the trigger that pushes children into foster care or that bars parents from carrying out a reunification plan only *appears* to be criminal justice system involvement. In fact, it is often immigration detention absent of a conviction.**

Yet most child welfare workers remain unclear about how immigration enforcement works and who gets detained and deported. This misunderstanding about the routes to deportation affects the way in which child welfare workers think about detained and deported parents.

# FEW PROTECTIONS FOR PARENTS AT THE TIME OF APPREHENSION

ICE has offered few protections for families. Following a series of workplace raids in the mid-2000s that left a number of children uncared for, ICE released "Guidelines for Identifying Humanitarian Concerns among Administrative Arrestees When Conducting Worksite Enforcement Operations." These guidelines demand that ICE screen those who are detained in raids to ensure that sole caretakers of minors are not detained for extended periods.

These time-of-apprehension guidelines, however, apply only to ICE-administered raids of 25 or more people.[61] They do not pertain to smaller-scale ICE-enforcement actions or Border Patrol activities. Most significantly, **the protections are largely outdated and insufficient for the current context** in which ICE has shifted from high-profile raids to more hidden and devolved forms of enforcement that operate through local police and jails or smaller-scale ICE enforcement actions. Now, whether or not parental rights and children's needs are respected is increasingly contingent upon the policies and practices of local law enforcement agencies and on the discretion of single ICE agents.

In stories told to ARC by parents and attorneys, local police officers and federal ICE agents did not allow mothers and fathers to arrange for their children's care when they were arrested or detained. If local police or ICE had allowed parents to contact relatives or friends of their own choosing, children may never have entered foster care in the first place.

Late one December night, in Tucson, Arizona, police arrived at Elena's home to break up a party that her 16-year-old son was hosting. Elena came home shortly after the police arrived. The police arrested her for buying alcohol for minors, though she said her son threw the party without her permission and she had not bought any alcohol. Before the police took her away, Elena asked one of the officers if she could call a friend who could come and pick up her children. The police officer threw her phone on the ground and told her that she could not make any calls. The officer then called CPS, put Elena in cuffs, led her into the back of a cruiser and booked her in the county jail.

Her three children were placed in foster care and Elena was detained an hour and a half north of her home.

Elena's case is not uncommon and could have been avoided. Numerous detained parents whose children were not in foster care said that they'd avoided this because they were allowed to make arrangements for their children at the time of apprehension.

# ICE DISCRETION IS ALLOWED, BUT NOT USED

After failing to allow parents to make appropriate arrangements for their children at the time of arrest and apprehension, ICE has continued to needlessly separate families once a mother or father is detained. While ICE officials hold broad discretion in determining who to continue detaining and who to release, many parents remain behind bars for extended periods while their families move closer and closer to permanent severance.

In many cases, this extended detention without release is in direct contradiction with ICE's own instructions for its staff. In June 2011, ICE Director John Morton released a memo reiterating past ICE memos stating that ICE




officers and attorneys have broad power to determine who they will target, seek to deport, detain, or release from detention.[62] The long list of factors to be considered by ICE officials when deciding whether to detain nonciti-zens or pursue a removal case against them is divided into 19 categories, including the following:

- The person's ties and contributions to the community, including **family relationships**

- Whether the person has a U.S.-citizen or permanent-resident spouse, **child**, or parent

- Whether the person is the primary caretaker of a person with a mental or physical disability, **minor**, or seriously ill relative

Though the memo could have significant impact, all indications from our research suggest that this discretion has been used inconsistently at best for mothers and fathers who risk losing their parental rights. One reason that ICE may not be using discretion to release the parents is that ICE officers and agents are simply not consistently asking detainees whether they have children.

**Only four of the almost 70 detained parents we met in six detention centers said that ICE officers had actually asked them if they had children.** The four who said they'd been asked were detained in the Hutto Detention center in Texas, a women's detention center that ICE says is a model facility, despite a record of sexual abuse by guards.[63] The other seven mothers interviewed in Hutto said that they had not been asked about children. Since only 16 of all detainees have legal representation and few have information about their ability to petition for themselves, many who might be eligible for release are not granted relief.[64]

When ICE discretion appeared to be used to release parents, which ac-cording to ARC's research happens with some greater regularity for single mothers than for other parents, mothers and fathers almost always had to petition for their own release and often spent significant periods of time in detention— in some cases close to a year—before they were released. This contradicts the language of the memo, which states that it is "preferable for ICE officers, agents, and attorneys to consider prosecutorial discretion in cases without waiting for an alien or alien's advocate or counsel to request a favorable exercise of discretion."

## LIMITS OF DISCRETION

The ICE discretion memo is also very clear about its limits, and lists the fol-lowing broad categories as "negative factors" that should weigh against release:

- Individuals who pose a clear risk to national security

- Serious felons, repeat offenders, or individuals with a lengthy criminal record of any kind

- Known gang members or other individuals who pose a clear danger to public safety

- Individuals with an egregious record of immigration violations, including those with a record of illegal re-entry and those who have engaged in immigration fraud

While discretionary relief does result in some parents being released or avoiding detention altogether, the narrow field of eligibility raises questions about the extent to which the memo can protect children from remaining

in foster care and parents from losing their parental rights. The list contains "lengthy criminal record of any *kind* [italics added by ARC]," a broad category that can include minor violations. For example, "Criminal Traffic Offenses" comprise the third largest group. This can include violations as small as driving without a license. There are indications that ICE may slow deportations for this particular violation; however, ARC's research found that, as of June 2011, parents continued to be deported for such minor infractions.

As immigration enforcement is increasingly devolved to local police departments, the day-to-day risks of becoming detained grow, especially when undocumented immigrants are driving because that augments their exposure to police. When parents in jurisdictions without public transportation infrastructure are undocumented, their only option is to drive. Only three states—Washington, New Mexico and Utah—continue to allow undocumented immigrants to get driver's licenses, and these policies are embattled.

Fernando, a father of three U.S.-citizen children, had lived in North Carolina for a decade when he was deported after repeatedly being pulled over by North Carolina police for driving without a license. Because the state of North Carolina does not permit undocumented immigrants to get licenses, Fernando was forced to drive to work without one. He was arrested and quickly issued an ICE hold. According to Fernando's attorney, Fernando's girlfriend could not afford to pay rent or to pay for other basics for their children without her boyfriend's support. As a result, the children are now in foster care.

Fernando has been deported, and both he and the children's mother are facing the termination of their parental rights. Fernando's attorney said, "Here in this area, it seems like before, to get deported you had to do something with blood involved. Now, a simple traffic violation gets you deported and a slew of other consequences happen."

## "ILLEGAL REENTRY"

Also included in the discretion memo's list of "negative factors" are individuals with a "record of illegal re-entry and those who have engaged in immigration fraud." Immigration-related criminal charges were the second-largest category of deportable offenses among those deported as a result of a conviction. Both "illegal re-entry" and "immigration fraud" charges criminalize the very act of being an undocumented immigrant, because most undocumented immigrants, with no route to gain documentation use some sort of fake paperwork just to obtain work to support themselves.[65]

The charge of "illegal reentry" has put parents behind bars who, after they've been deported, cross back over the border into the U.S. just to be with their children. In October 2011, *The New York Times* reported that about half of all noncitizens detained by Border Patrol at the U.S.-Mexico border had been deported previously.[66] The report stated that a growing number of immigrants who are caught reentering the U.S. had previously been living in this country for many years and are merely attempting to rejoin their families.[67]

In certain border areas, respondents said that parents who had been deported regularly risk a return journey so that they can make it to court. Because juvenile courts usually maintain a "don't ask, don't tell" policy on reporting immigration status, these parents are sometimes able to return to participate in their hearings and regain custody of their children. But in some instances, they are picked up by Border Patrol and prosecuted criminally, sometimes for extended periods, before being deported again.

Many immigrants who enter without inspection or proper documentation are subject to misdemeanor and felony charges and can be sentenced to significant periods in jail or prison. First-time entrants can be sentenced to as much as 180 days in jail. Those convicted of "illegal reentry" for entering without papers after a previous deportation can be charged with a felony that carries prison terms from 2 to 20 years.[68] Immigration-related criminal prosecutions have overwhelmed the federal courts. In 2009, there were 91,899 federal criminal prosecutions related to immigration issues in the country. Fifty-four percent of these were for immigration charges, mostly "illegal entry" and "illegal reentry".[69]

In Brownsville, Texas, a mother's parental rights were terminated and her children were put up for adoption because she is undocumented and was charged with "illegal reentry." A dependency attorney who represented the children described the case:

> I had a case where the single mom of six U.S.-citizen children lived close to a major thoroughfare and the kids were out near the highway playing. Someone saw them and was afraid that the 3-year-old was going to wander into the road. The police and CPS arrived and the mother was arrested on neglectful supervision and child endangerment charges. Because she is undocumented, Border Patrol checked her criminal record, found she had been deported before so she got an illegal reentry charge and was not released. If she hadn't gotten the 'hold'... she probably would have been released and the child endangerment charges would have been dropped. But here, the feds prosecute her for illegal reentry. It was a minimum of two years' incarceration and she was going to be deported after that. We terminated her parental rights. Now, we are having difficulty getting the sibling group adopted together. If she were a citizen, she would have been bonded out in 24 hours. She would not have lost her kids.

## UNREPRESENTED IN MANDATORY DETENTION

While our research did uncover instances in which ICE agents used their discretion to release parents with children in foster care, most were among the shockingly low 16% of detainees with legal representation[70] or were among a very small number of parents whose caseworker actively contacted ICE to ask for their release.

Without a broader basis for relief, many families will continue to be separated by detention and deportation. For some parents, ICE discretion offers little hope because their detention and deportation is mandatory based on federal law. **Mandatory detention and deportation** means that even immigration judges are denied the prerogative to release detainees or cancel an order of removal. Immigrants convicted of a broad category of charges are subject to mandatory detention and deportation. Others are detained for extended periods because ICE officers believe that if they were released while waiting for the decision of an immigration judge, they would flee. However, immigration attorneys as well as parents interviewed for this report made it very clear that **parents with children in foster care are categorically a low flight risk because their primary concern is almost always to regain custody of their children.** Few parents would leave town without their sons and daughters.

**THE CHILD CITIZEN PROTECTION ACT:** *"Amends the Immigration and Nationality Act, in the case of an alien subject to removal, deportation, or exclusion who is the parent of a U.S. citizen child, to authorize an immigration judge to decline to order such removal if the judge determines that such action is against the child's best interests."*

# VICTIMS OF GENDER-BASED VIOLENCE AT RISK

In a disturbing number of cases uncovered by ARC, ICE detained victims of family and gender-based violence, and their children entered foster care. Immigrant victims of gender-based violence are at particular risk of losing their children to foster care for several reasons. First, victims of domestic violence and human trafficking are often isolated from their networks because traffickers and abusers cut them off from families and friends. As a result, if they are detained by ICE, their children may have no other family or close family friends who are available to care for them. Second, police often call CPS automatically when children are present in homes where family violence occurs. As a result, children are sometimes automatically removed from their homes. In some instances, victims are also arrested and ICE detains them because of their immigration status.

Many of these women should have been protected from detention in the first place, because victims of crimes can apply for visas in the U.S. Federal law maintains specific categories of visas for victims of domestic violence and human trafficking in particular. Additionally, in his June 2011 memo on ICE discretion, ICE director John Morton explicitly included "victim[s] of domestic violence, human trafficking, or other crime," in the long list of factors that "ICE officers, agents, and attorneys should consider" when deciding who to detain and deport. Nonetheless, victims appear to be detained in immigration detention centers with disturbing regularity and for extended periods.

## Domestic Violence

The Applied Research Center found that victims of domestic violence are too often detained in immigration detention centers and their children enter foster care. **Immigrant victims of domestic violence are faced with an impossible choice: remain with an abuser or risk detention and loss of their children. Approximately one in nine of the stories recounted to ARC in interviews and focus groups involved domestic violence.**

In most jurisdictions, if a report of domestic violence is made to the police and children are present, the police department will call CPS immediately and an investigation will ensue. A parents' attorney in Maricopa County, Arizona, described a case in which a report of domestic violence caused the initiation of the CPS case and a mother's arrest and detention:

> I have a Mexican immigrant client detained by ICE for a year. She was a [domestic violence] victim and the police got involved and that's when they found out that she was undocumented and so they had to go ahead and detain her. Eventually, they released her and permitted her to stay here in the U.S. based on a Violence Against Women Act visa. But the fact that she was detained by ICE was enough to push the kids into foster care.
>
> Her kids were in care for a whole year and there was no other family to take them. Now CPS is trying to help her get her sons back but the process is slow.

In numerous cases, police arrested victims of domestic violence while investigating a report of abuse. At least two women that ARC met in detention centers said that their abusers reported them to ICE. In other cases, victims were arrested on assault charges after they defended themselves.

> Immigrant victims of domestic violence are faced with an impossible choice: remain with an abuser or risk detention and loss of their children.

**VIOLENCE AGAINST WOMEN ACT (VAWA):** (*From: "Protecting Children: The Intersection of Migration and Child Welfare: Emerging Issues and Implications"*)[71] "A collection of federal laws, known generally as VAWA, was first enacted in 1994 to address a widespread problem: non-citizen spouses who stay in abusive relationships because their partners and abusers have U.S. citizen or legal permanent resident status and are sponsoring the family's visa petition. Until a non-citizen has legal immigration status, she or he can be deported at any time and cannot get permission to work legally. Often, the abusive spouse will use the immigration sponsorship as a way to control the undocumented spouse. The VAWA legislation attempted to acknowledge and address these complexities by helping lawful permanent residents leave dangerous situations without prejudicing pre-existing immigration petitions.

…Domestic violence clients only qualify for VAWA when their abusers are either legal permanent residents or U.S. citizens. While a VAWA petition is not automatic, it can lead to residency for the spouse and children in question. Credible evidence of abuse must be provided, but this does not necessarily include a police record."

Hilaria was arrested in Phoenix, Arizona, because she tried to defend herself against her abusive husband. In October 2010, her husband attacked her and she says she fought back, drawing blood. A neighbor heard screams and called the police. When officers arrived, they arrested Hilaria for assault. ICE quickly detained her.

Because their children were home at the time of the report, the police called CPS. When the CPS caseworker arrived, the officers and Hilaria's husband said that Hilaria was the assailant, so the caseworker left the children with the husband. Two weeks later, the child welfare department returned to check on the children. The caseworker suspected that Hilaria's husband was using drugs and removed the children from him, placing them in foster care.

Two months later, sitting in a visitation room over an hour from her children, Hilaria said tearfully, "I've had domestic violence before but I took it for my kids. Now they've robbed me. I did what I did to defend myself and my kids."

## Victims of Human Trafficking

ARC also met victims of human trafficking, who were detained and are at risk of permanently losing their children.

In May, 30-year-old Paula was one of almost 1000 detainees held at the time inside the Willacy Detention Center, in the Rio Grande Valley of Texas. For more than a dozen years, Paula lived with a man 20 years her senior who she says brought her to the U.S. after he met her in Mexico. The man presented himself to the outside world as her partner, but behaved more like her owner, keeping her on a short leash and forcing her to work without pay cleaning the homes of his family and contacts. He forbade her from having contact with her family in Mexico and she has not spoken with them for more than a decade. An attorney who represents her says she is a victim of human trafficking.

She had seven children with him since she came to the U.S. One of her daughters was very ill and at intervals required a machine to breath.

Paula tearfully recalled the night that, while the man slept, she piled her children into his vehicle and drove away. Because of the hasty escape, Paula could not take her daughter's breathing machine. The next day, knowing that her girl could not survive without this machine, she drove to the closest CPS office and made the decision to voluntarily place her daughter in foster care until she could arrange to get the breathing machine or a buy a new one. She took her other children to a domestic violence shelter. But several months later, a sheriff's deputy arrived and arrested Paula, charging her with neglect because she'd failed to provide her ill child with necessary care. She was brought to the local jail and the rest of her children were placed in foster care. Rather than being released on bond or spending a short time in jail, Paula was soon moved to Willacy. When ARC interviewed her, she had already been at Willacy for seven months, with no word of when she might be released or deported.

Victims of trafficking may be at particular risk of having their children placed in foster care if they are detained. As an attorney familiar with the case explained, "Trafficking victims are by definition isolated. They have no support network at all. A lot of immigrants have extended networks, but trafficking victims don't. Because of that, there's nobody to take the kids to."

## Failure to Protect

In a number of cases reported to ARC, children were removed from their homes after incidents of domestic violence or sexual assault perpetrated by the mother's partner. These mothers were then themselves charged with neglect because the child welfare department claimed that the mothers knew about the violence or abuse and did nothing to stop it. Immigrant women who fear that calling police will result in deportation are at particular risk of being charged with "failure to protect." These charges can result in jail time and then lead immediately to ICE detention.

In New York State, an advocate reported the story of an undocumented woman who was convicted on a "failure to protect" charge when her adolescent daughter was sexually abused by the mother's boyfriend. The man battered the mother for years and regularly threatened to have her deported if she reported the violence. When she found out that he was sexually molesting her daughter, however, she reported him to police. She was charged with "failure to protect" based on the assumption that she knew about the abuse but failed to stop it. Her two children were removed from her custody and placed in foster care. After several months in jail, her attorneys succeeded in convincing the criminal court judge that the woman was not a perpetrator but rather a victim whose charges should be dropped. But before she was released from jail, ICE moved her to a detention center. Collectively, she was incarcerated and detained for a year until she was finally released on her own recognizance while waiting for the conclusion of her deportation proceedings. The family is still not reunified.

When a parent is charged with "failure to protect," or any other kind of child maltreatment, it may be held against her/him if she/he applies for immigration status, including VAWA-based immigration relief. The fact that a victim is charged criminally as a perpetrator may stand in the way of that parent's ability to regain custody *and* block access to immigration relief.

## Children of Detained Mothers Remain With Abusers

Numerous detained women said that since being detained, their children were now in the custody of their abusers. Unlike Hilaria, whose children were removed from her abuser, these women were tormented by a dual fear: on the one hand, they worried that their children were unsafe living with men who abused them; on the other hand, they feared that if they called CPS to protect the children, they themselves might lose their parental rights if they remained in detention or were deported.

Numerous **detained women** said that since being detained, their **children were now in the custody of their abusers.**

A 34-year-old Ecuadoran woman named Maria who has lived in Minneapolis, Minnesota, for almost a decade was pulled over by a state police officer as she drove her daughter to school one morning. The Minnesota Department of Public Safety has signed a 287(g) agreement with ICE, and when Maria rolled down her window, the officer asked her for her papers. Because she is undocumented, she had no driver's license, so the officer arrested her.

Before taking her to the station, the police officer said that she could call someone to pick up the girl, but Maria told the officer that she had no family in the area. When the officer told her that the only other option was to call CPS, Maria called her elderly landlady who agreed

to take the girl. Maria was soon detained by ICE and moved over 1000 miles away to the Hutto women's detention center in Texas.

A few days later, Maria's former boyfriend, who was the girl's father and who had abused Maria for years, arrived at the caregiver's house and took his daughter away. The girl had no previous relationship with the man, who now has several other children and according to Maria, makes her daughter sleep in the living room. Maria does not know whether to call CPS and risk losing her daughter, or leave the girl in what might be an unsafe home with a man who she knows is violent.

## ICE OBSTRUCTS DUE PROCESS

Once parents are detained and their children are in CPS custody, parents are largely separated from their children and are prevented from participating in case plans and advocating for their families. Detention makes it nearly impossible for mothers and fathers to comply with court-mandated case plans, denies them access to services in which they are required to participate to get their children back, erects barriers to visits between children and parents, and makes it very difficult for parents to communicate with their attorneys or caseworkers or to appear in court.

**In none of the accounts shared by detained parents with children in foster care or by attorneys, caseworkers and judges was a detained parent allowed to physically appear at their dependency hearings.**

Ricardo has spent nine months in immigration detention 800 miles away from his two babies, who are now almost 1-year-old and 2-years-old and living in foster care with strangers in Napa, California. Ricardo looked through the double-paned window of the visitation booth at the Pinal County Jail in Arizona where he is detained and said, "I love them like nothing else." He has not seen the younger one since she was 2-weeks-old. His children were removed from his custody because a babysitter left them alone for less than an hour and he was arrested for child endangerment. When his information was run through the Secure Communities database, ICE moved him to detention.

None of his family, let alone the caseworker responsible for his children's case, can make the drive to visit him. Even if they did, the detention center forces visitors to communicate with detainees through a video feed from another room in the facility.

Weeks after the fact, Ricardo learned that the dependency court held a hearing about his case without informing him. His children have now been in foster care for 10 months and he has been almost fully excluded from proceedings because he is detained. He does not know if he has been issued a case plan and the CPS worker, whom Ricardo was finally able to call Collect from the detention center, says the attorney for the child welfare department in Napa is pushing to have the children adopted by the foster home where they now live. From inside detention, there is little he can do to stop the dissolution of his family.

A judge in Pima County, Arizona, explained:

> Detention becomes a factor because [detainees] can't participate in court hearings. If they are in a detention center, hardly anyone knows how to find them. … Parents [should] have an absolute right to be present in a court hearing. … We order that if they are in custody they appear, but these orders are not honored by the detention facilities. We don't have the authority over the federal center.

Parents are often cut off entirely from the juvenile court and child welfare process when they are detained. "If [parents] are in detention," said a children's attorney in Charlotte, North Carolina (Mecklenburg County), "they have to do the work to get in touch because we can't reach them. It ends up being like a black hole." Caseworkers and attorneys say that contacting and adequately involving detained parents in the dependency legal process is often impossible.

From the perspective of detained parents with children in foster care, detention is experienced as a legal no-man's-land as they struggle to contact their attorneys and CPS caseworkers and are often left in the dark as to the progress of their dependency court case or the whereabouts of their children. "I don't know anything about a reunification plan," said one detainee. "They haven't told me anything. The CPS lawyer has not called or contacted me; the caseworker hasn't either. I'm in the dark here."

Some child welfare workers stop trying to contact detained parents altogether. A child welfare investigator in another county in North Carolina lamented, "We are supposed to make contact with them and supposed to involve them in the process. When they're in detention, we don't. We contact them before they are moved there, but when they are detained, we can't talk to them."

Attorneys and judges made clear that ICE obstructionism is a matter of policy. **Even detainees in the same jurisdiction as where their dependency hearings are held were not allowed to appear in court.** In San Diego, an attorney who represents parents said, "You can basically see where the detainees are held, you could walk right over there, but ICE won't bring them over for court, ever."

## Inconsistent Phone Access

Typically, juvenile dependency courts allow parents who are unable to be physically present in the court to appear by phone. While ICE detainees are sometimes able to arrange telephone calls for their juvenile court dates, ICE appears to have no uniform practice to ensure that this can happen. Detainees said that their ability to arrange calls depended entirely on the discretion of the particular ICE officer in charge of their case. **All of the parents we interviewed with children in foster care missed at least one and usually more than one of their hearings because they were detained and could not appear in person or by phone.**

A Maricopa County, Arizona parents' attorney said:

> In general, one of the problems we've had as attorneys is that when clients are in ICE detention, [juvenile] courts will routinely allow them to appear telephonically for the hearings, but the problem is that a lot of times ICE detention for whatever reason doesn't let them get on the phone. I have had that problem on a couple of cases, even though there's an order from the [juvenile] court [for ICE to produce the parent].

In all of the six states that ARC focused on, some of the attorneys interviewed said that they have not once had a detained client who was allowed to participate in a hearing, even by phone. As a result, parents lose the opportunity to advocate for their families as courts are deliberating their future relationship with their children.

The legal processes of determining where a child should be placed either temporarily or long-term and then whether a parent is fit to maintain or

> "Basically, ICE is obstructionist to the process. It makes it basically impossible for the court to do its job."

regain legal custody almost always occur without the detained parent's regular involvement. A county attorney who represents CPS in El Paso County, Texas, juvenile court put it most clearly: "Basically, ICE is obstructionist to the process. It makes it basically impossible for the court to do its job."

## DETENTION EXCLUDES PARENTS FROM PARTICIPATION IN FAMILY REUNIFICATION PLAN

Parents in detention are almost universally denied access to the services they need to comply with their reunification plans because ICE, or the counties and private companies contracted to run many detention centers, simply do not provide detainees access to any services. As a result, the termination of parental rights and permanency timelines move forward while detained parents are largely powerless to complete their case plans.

A caseworker in the Compton neighborhood of Los Angeles described an open case involving a detained mother: "It's kind of like a catch-22. You know, in a sense, we're asking her to do something, but we're not allowing her to do it. You know, so it's kind of like [detainees] are not in a good position."

In the Baker County Jail in Florida, Sarah, a British woman who'd been a U.S. resident for almost two decades, was one of two women among over 20 in the detention pod whose children were in CPS custody. Sarah was able to contact her caseworker through a friend. The caseworker, who was employed by a private case management agency, sent Sarah a letter that read as follows:

This letter is to advise you that as part of your outstanding dependency case plan tasks, you are court ordered to complete:

1. Parent Educational Training for Teens
2. Psychological Evaluation and follow all Court approved recommendations
3. Substance Abuse Evaluation and follow all Court approved recommendations
4. Family Counseling upon release
5. Stable Housing and Income….

Sarah could do none of these things from within detention.
The document that the caseworker sent to Sarah went on to read, "One of the tasks in your case plan is to visit with your child."

Most reunification plans require parents to visit with their children. In a normal case plan for a family in which the children have been taken from the parents, parents are first allowed to visit with their children under caseworker supervision and then move to unsupervised visits and eventually to reunification.

However, visitation can be impossible for detained parents. Detainees are often transferred to detention centers far from their homes, and child welfare departments and dependency courts have little knowledge of where immigrant detainees are taken or how to find them. In New York City, an advocate for parents said a client was incarcerated locally and then before she was to be released, "ICE grabbed her and brought her to detention. We could not find her. Turns out, she was transferred to Pennsylvania and then to Arizona. We ended up connecting with an immigration attorney and finally found her after several months."

Detainees are transported an average of 370 miles from the place of their initial detention.[72] Many are moved even farther. Non-citizens identified by

ICE in New York City's Rikers Island, for example, are often moved first to Pennsylvania or New Jersey and then flown to South Texas—a total of almost 1800 miles.

**While the Obama administration has said that it plans to overhaul immigration detention practices, including making efforts to keep detainees closer to home, as of August 2011, this promise does not appear to have taken effect in any significant way. Most of the detainees we interviewed and those we heard about had been transferred far away from their children.**

In the summer of 2010, ICE implemented an online detainee locator system, which anyone with accurate basic information about a detained person can use to find out where that detainee is being held. When discussions of detainee transfers arose among focus groups in the six key states we explored, **few child welfare caseworkers or dependency attorneys had ever heard of the locator system**. Furthermore, while the locator is a needed step in the process of making immigration detention more transparent, when detainees are located, it does not mean they are able to communicate any more easily with those on the outside.

Even when parents are detained close enough to their homes to make visits possible, those visits rarely happen. First, ICE detention centers are not hospitable places and it can sometimes be difficult to organize visits. The Eloy Detention Center in Arizona, for example, is a sprawling barbed wired complex. To get in, visitors must be buzzed through two locked gates, all surrounded by barbed wire, and then wait in line at a metal detector for a guard to check if they've been approved for the visit. In at least two of the six detention centers where we travelled, visitors can only speak with their family members through video feeds.



**Detainees are transferred an average of 370 miles from their homes.**

Sarah is detained at the Baker County Jail where, if her daughter's caseworker were to drive her to see her mother, they would not be allowed to have a contact visit.

Sitting at a metal table in the common area outside, a large open concrete triangle lined with two stories of prison cells where the women sleep, Sarah spoke over the voices of other detainees. "Look at this line," she said," pointing to a part of the letter from the child welfare agency that read, "Should the services that you need to complete your case plan tasks not be available at your present facility, you should inquire… about transferring to another facility where you can complete your case plan tasks."

ICE detainees cannot request their own transfers, and even if they could no detention center offers services.

For many parents, incarceration in jail or prison can actually be more conducive to completing a case plan than detention. Many local jails provide inmates with drug treatment programs, parenting classes and counseling, among other programs that can help a parent to carry on with the tasks in their case plans. None of this is available to ICE detainees.

A caseworker in Mecklenburg County, North Carolina, explained:

In local jails they can get parenting and domestic violence classes and counseling, but not in detention. I have had cases where parents were

engaged in services in the local jail and then when they got moved to Georgia, we lose touch. …If you are [detained], you are not given the same opportunities even as those given in the jail system.

The caseworker added that even those detainees held in local jails are not allowed to participate in services available to other inmates. "They offer services to people inside the jails, but these services are not available to the ICE detainees in the local jail because they don't want to waste their resources in the jail on people who will be sent away quickly."

Courts sometimes fault parents who are detained for their inability to participate in their case plan. An attorney in Maricopa County, Arizona, explained: "The court will find them to not be compliant with case plan tasks and parental rights are terminated. Once ICE gets a hold of an individual and they're in the system, they're likely going to be deported [and] parents usually end up losing their kids."

# LONG DETENTION AND SHORT PERMANENCY DEADLINES

Even when courts recognize the significant barriers facing detained parents and do not find them to be incompliant, courts will rarely slow the ASFA time clock or wait to move forward with a permanency plan to account for the needs of families when parents are detained. According to focus group participants and interviewees, judges usually deny requests to issue a "continuance" based on a parent's detention. A San Diego parents' attorney explained, "We can always request a continuance but really, the courts have never granted one in my experience for a detained parent."

The attorney said judges deny requests to extend a case while parents are detained because, "ICE holds are indefinite. They have no clear time period attached to them and we have no concrete idea of when they can get them to court. [The court] won't extend for that because they don't know how long they're extending for."

*Detention itself can result in children moving into permanent placements and ultimately into adoption*

Because courts generally will not stop the clock for detained parents, detention itself can result in children moving into permanent placements and ultimately into adoption. An attorney who represents the child welfare department in Hardee County, a small rural area in southeast Florida, told a story about a mother whose detention contributed directly to the termination of her parental rights and the adoption of her children. In the case, the central problem with detention was the extended time she spent in it.

As a general matter, the attorney said:

A delay could well mean that if returning the child to that parent was a viable option, we are delayed just trying to find out what is going on, if that parent is looking at being deported or is looking at being detained a long time, then all of a sudden the gears shift on where we are going with that case.

In one of these cases, the attorney explained:

The children have now been adopted. We spent five months locating this father, figuring out whether he will be deported, whether they will be released. We were moving toward reunification locally with the father and then he was deported. The detention slowed down the reunification process. It delayed the process. It would have just taken a week to get a home study and it would have been finished and done. Had he not been detained, we would have reunified and we would have closed the case. If he had been released after arrest [rather than

> being detained] he could have reunified. Then, if he'd been deported,
> he could have been on his way to Mexico [with his son].

In at least three state states—Nebraska, New York and Colorado—there now exist statutory exceptions to termination of parental rights deadlines when parents are incarcerated. Colorado law does not require courts terminate parental rights in the normal deadline of 15 of the most recent 22 months if the child's extended stay in foster care is due to circumstances beyond the parent's control, including a parent's incarceration.[73] New York allows child welfare agencies stop the termination of parental rights clock and extend it beyond standard timelines in cases where a parent is incarcerated.[74]

However, although immigration detention is certainly "beyond a parent's control" and very similar to incarceration (albeit more isolating), the aforementioned exceptions do not apply. Because states have not passed exceptions for detainees, detention can lead directly to the termination of parental rights.

## CHILD WELFARE CASEWORKERS AND ATTORNEYS LACK KNOWLEDGE ABOUT IMMIGRATION ENFORCEMENT

Because detainees have such a difficult time advocating for themselves in juvenile dependency courts, and few are represented by attorneys in immigration court, child welfare caseworkers and departments are among the only possible voices that detainees have in advocating discretionary release of a parent. To be clear, the instances in which this advocacy occurs are exceedingly rare. Of all the hundreds of cases reported to ARC, there were only five where CPS involved itself in advocating for a parent's release.

In at least one jurisdiction we explored—Maricopa County, Arizona—administrators of the child welfare department reportedly prohibited caseworkers from assisting an immigration attorney who was advocating for the discretionary release of a detainee. The caseworker, who spoke with one of our researchers on the condition of anonymity, explained that an immigration attorney representing a detained mother of several children called the caseworker to ask for some information about the children that could help win her release:

> I had to go through my attorney general to get these documents and
> I asked her and she said the department is absolutely not open to
> sharing anything. She said, 'You are not to pass on these children's
> birth certificates or anything else.' Of course these things would
> help her to argue for release.

In a handful of cases, caseworker involvement did help secure a parent's release. In Cabarrus County, North Carolina, a case manager described a 2009 case in which a mother was arrested for driving without a license and then detained by ICE. Her children were in CPS custody at the time she was detained but were about to be reunified with her. According to a supervisor in Cabarrus County, the department "provided ICE a letter saying that it was our intention to place the child with her but that we needed to ensure that she would not be deported. ICE actually released her and we returned the child to her and closed the case."

In a county in Maryland, a supervising attorney in a dependency representation office called a friend who worked for ICE in Washington, D.C., to advocate for the release of a parent. "It was a very, 'who do you know' kind of scenario," said an attorney involved with the case. The parent was eventually released.

Because child welfare departments are tasked with reunifying children with their parents whenever possible, this sort of advocacy would seem well within the bounds of their mandate. In fact, not doing so could be liberally construed as a failure to make "reasonable efforts" to reunify families.

## THE TRAUMA OF SEPARATION

The prolonged separation of children from their parents has traumatic effects on both parent and child, according to parents, caseworkers, and others involved in the child welfare system to whom we spoke. This includes foster care providers, who are intimately involved in the lives of children separated from their parents.

A man in Arizona who has served as a foster parent for dozens of children over the past decade described the impact of extended separation of a mother from her baby daughter after the mother was detained for driving without a license and her 2-year-old baby was placed in foster care. The baby was with a babysitter when the mother was detained. At day's end, when the woman did not arrive as she always did to pick up her daughter, the babysitter called CPS.

The girl, now 3-years-old, has lived in foster care with this man and his wife for a year. The man helped the girl's mother secure pro bono immigration legal representation, and after six months in detention, she was released. The department is now moving toward reunification, but that process is slow and, according to the foster father, is only happening because "this particular caseworker is totally committed to getting them reunified. She said from the onset, 'we are going to reunify this family here or in Mexico.' If it were a different caseworker who didn't speak Spanish and had a different outlook, this girl would have been on her way to adoption."

If eventually this girl is able to return to her mother, they have been through more than any family should have to endure. Speaking of the emotional impact that the separation has had on the 3-year-old, the foster care provider said:

> The girl is so deeply tormented now. First was the initial trauma of the separation. Now she spends time with her mother three times a week as they move toward reunification. They have weekend sleepovers when we can get them approved. But she's been with us for a long time. She calls my wife mommy and me daddy. You can tell she's tormented. It's like, 'who am I supposed to love, these strangers who I call mommy and daddy or this woman who speaks Spanish?' She has to speak English in our house because my wife does not speak Spanish. She's lost some of her Spanish. That was a significant source of contention. The mom was furious that her daughter does not speak Spanish.

Caseworkers and attorneys repeatedly described cases in which children were placed with foster families where a language other than the parent's language was spoken. In some cases, children's attorneys and caseworkers actually argued that because of this loss of language, reunification no longer made sense for the child since communication between parent and child would become difficult.

A parents' attorney in Maricopa County, Arizona, recounted, "I have a case that has been open for three years. [The department] will not give her kids back, in large part because the case has been open for so long and the older girls don't speak Spanish anymore and the younger one has virtually no relationship with mom."



Other interviewees talked about a number of other troubling results of time spent in foster care. A Mexican woman, detained for nine months before she was deported, says her 14-year-old daughter, the oldest of her five children, became pregnant while living in a foster care group home. She also believes two of her younger children were abused in the foster home where they now live. Indeed, numerous studies have found that rates of physical and sexual abuse of children in foster care are significantly higher than the rates in the general population.[75]

## CONCLUSION

After long periods of isolation while in detention, parents are often deported with little notice and are not allowed to reunify with their children between detention and deportation. While some deported parents choose to leave their children in the U.S. with family or friends, all of the 19 detained or previously detained parents with children in foster care that we interviewed said they wanted to take their children with them if they were deported.

As the federal government sets deportation records, children and families are shattered. Parents in detention are not only separated from their children but also denied the ability to meaningfully participate in their court-ordered reunification plans. Immigration enforcement is obstructing the juvenile justice system and violating families' rights to remain together.

Immigration and Customs Enforcement should halt deportations of parents of U.S.-citizen children. If deportation proceedings occur, ICE should release parents on their own recognizance and expand the use of community-based supervisory programs. Meanwhile, child welfare departments should develop clear policies for ensuring that detained parents can maintain contact with their children and are not penalized because they are detained. Child welfare departments should also work to support undocumented victims of family violence who may be eligible for relief from deportation through the Violence Against Women Act.

# IV: DEPORTATION, CHILD WELFARE PRACTICE AND THREATS TO FAMILY REUNIFICATION



In January, Roberta was deported to Mexico after spending seven months in an Arizona detention center. Roberta's five young children were placed in foster care.

A children's attorney familiar with Roberta's case explained, "The mom is detained right now and she's likely going to be deported." The attorney said that as long as Roberta remained in detention and there was still a chance that she might be released, the child welfare department would maintain a plan to reunify the family. "But it's only going to remain that way until she's deported. In that case, then it's likely going to be severance and adoption."

Separated now by the U.S.-Mexico border, Roberta cannot make the journey back to fight for her kids. An arrest for a heedless mistake in Phoenix that would likely have triggered only a short interruption in the custody of her children were she a citizen, threatens to result in the termination of the 35-year-old's parental rights because she was deported.

Roberta's children are now in two different foster homes, while Roberta is in Mexico with no money and only a shallow network of connections to support her. She has lost all contact with her children and caseworker.

## REUNIFICATION WITH DEPORTED PARENT

Parental deportation too often marks the end of any prospects for family unity when children are in the child welfare system. Child welfare departments and courts often move to terminate the parental rights of mothers and fathers who have been deported. Even when undocumented parents are not detained, some child welfare departments and attorneys object to placing children with them because of the possibility that they might be deported. The assumption is clear: children should not be allowed to live with their parents if their parents have been deported to another country or if they are at risk of being deported. Although research shows that outcomes for children are ultimately better when they are reunified with their own parents or placed with relatives, children of deported parents and with adult family members who are undocumented face barriers to this end. Parental deportation should not be tantamount to the termination of family bonds.

### Lack of Policy

With some exceptions, most child welfare departments lack clear protocols on reunifying children with deported parents.

An attorney for Florida's child welfare department in Tallahassee explained: "[The child welfare department] does not have policies on much of anything because we make it all case by case. We want to make the best decision for the child. But of course, sometimes people's ideology gets in the way when we don't have policy."

In some jurisdictions, policy has not been created because relevant cases do not emerge with enough regularity to generate the will to do so. In other states, however, it is clear that child welfare department administrators have made the intentional decision to forego explicit policy to remain under the radar of anti-immigrant politicians and groups.

In Arizona, a child welfare administrator spoke to ARC on the condition of anonymity and said, "There's no policy here because there is pushback from the powers that be in the state… There are legal objections from the attorney general and policy objections from administrators. Ever since SB 1070 was passed, there's no discussion at all."

## STATE ANTI-IMMIGRATION BILLS

In 2010, the state of Arizona passed what at the time was the most extreme immigration restriction bill ever passed by a state legislature. The bill, SB 1070, required local police to check the immigration status of anyone suspected of being an undocumented immigrant and made it a criminal violation for undocumented immigrants to be present within the state.  A federal court blocked most components of the bill, yet numerous other states soon moved to pass similar laws. While the legislation was defeated in most states, Georgia, Alabama, Indiana and Utah all passed laws that mimic Arizona's.  Alabama's bill went significantly further than Arizona's by requiring schools to verify students' immigration status. A court recently blocked that portion of Alabama's bill.

ARC's interviews with caseworkers and attorneys in Arizona, and in Florida where an SB 1070-like bill was proposed but defeated, found that the presence of such laws, or the prospect of their passage, significantly impacts child welfare work.  In Arizona, numerous caseworkers and attorneys said that the law generated significant confusion among child welfare staff as to what services and supports they are allowed to provide to families with undocumented parents. Meanwhile, child welfare staff in Arizona said that since the passage of SB 1070, it has become more difficult to locate relatives willing to act as kinship caregivers for their young family members. Caseworkers said that these families now fear that if they come forward, they will be deported.

ARC conducted research in Florida at the same time that the state's legislature was debating an SB 1070-like bill.  Even though the Florida bill did not become law, caseworkers and attorneys said that its introduction alone had a chilling impact on child welfare work and made it more difficult to work with immigrant communities to maintain family unity.

Importantly, while ARC's research found that state immigration restriction legislation had a negative effect on day to day child welfare work, the most significant driver of detained/deported foster care cases is the federal government's immigration policy, especially regarding its use of local jails and law enforcement to deport noncitizens.

In other cases, the failure to make policy is articulated as a means of protecting the department from conservative attack. A CPS administrator in Texas said, "We keep the policies vague. Every so often we get an inquiry from a conservative legislator who wants to know what we are doing with our funding so we don't try to make any policy about it to stay away from that controversy."

A parent's attorney in North Carolina, who had represented several deported parents, asked a CPS administrator whether there was a policy on working with parents in another country. The response: "We specifically do not put it in writing. We don't want to be bound by anything like that. … Once we come out with a [policy], we'll get a backlash."

## Systemic Bias and Borders on Parental Rights

Whatever the reason, this policy silence leaves a wide-open space for systemic bias to prevent reunification of children and parents. Without explicit or enforced policies to facilitate reunification with detained or deported parents, systemic bias against placing children with their parents in other countries can take hold. One of the central barriers to the reunification of children with parents who have been deported is a deep bias often articulated as a belief that children are better off in the U.S., regardless of who they live with. The objection often supersedes the child welfare system's mandate to move toward family reunification whenever possible, and places **borders on family and parental rights.**

Because most child welfare departments lack explicit policy or practice guidelines for addressing the needs of children and deported parents, including little protocol for involving foreign consulates to pursue an international reunification process, these biases can flourish.

An attorney in a rural county in North Carolina said, "There is no education or policy really about how to deal with these cases."

The attorney's client, an undocumented father, was recently deported to Mexico for driving without a license and his children are in foster care.

Before the father's deportation, he was supporting his family and by all accounts, a loving father. But when he was deported, his children entered foster care because their mother could not afford to support without his income. Now the man wants his children to be placed with him in Mexico, but the department has thus far refused to do so because of concerns that it is not in the children's best interest to live in the relative poverty that their father has found himself in since deportation.

According to the father's attorney, "He is a good father and the fact that he may be living in different standards now because he's in Mexico should not prevent children from reunifying with their father."

Many of the attorneys, social workers, children's advocates and judges who we spoke to raised questions about whether any consideration should be given to reunifying U.S.-citizen children with their deported noncitizen parents. These biases were especially pronounced from children's attorneys and advocates and some caseworkers.

An attorney in El Paso, Texas, who represents parents and children said, "When you break down the cases, placement with parents in Mexico happens very rarely. In my cases it might have happened every five years. The kneejerk reaction of almost everyone is that the children are better off in U.S."

A parents' and children's attorney in Brownsville, Texas, said, "With the climate in Mexico, nobody wants to send any of the kids to that—it's unsafe there now. Most of the attorneys don't want to send the kids back to Mexico and their arguments are, one, poor conditions in that county and, two, they only get public education up to a certain age before the parents have to pay for it. Most of our parents don't have education themselves; they are poor and they don't have the ability to pay for further education."

After clearly stating that the barrier to reunification in these cases is an objection to the conditions in Mexico, not to the parents' ability to parent, the attorney argued that life in the U.S. provides a better alternative:

"The kids can stay here, get a good education, and get it publicly paid for. It would be contradictory if we want to protect the kids but then we send them to Mexico..."

As this attorney's comments suggest, these concerns appear to arise not in relation to the parent's "fitness" or ability to raise children but, rather, stereotypes about conditions in the country to which a parent has been deported. Because child welfare systems are tasked primarily with reunifying children with fit parents, the impact of this bias raises serious due process questions.

A CPS caseworker in Los Angeles objected to what he sees as a systemic bias against placing children with their parents internationally. "Ultimately, as social workers our role is to reunify families. I'm not saying that ICE is right or wrong; what I'm saying is, let us do our job, let us reunify families. We are not here to deal with immigration; we are here to reunify children [with parents]. That's our goal and that's our job. That's what social workers do."

A central barrier to placing children in other countries is an anxiety among child welfare attorneys and courts about giving up jurisdiction over a dependency case, even if that case was near closure.

A judge in Pima County took this position explicitly. "As a general matter, everyone is hesitant about placing a kid in another country because from a practical standpoint we are going to lose control of the case. Once I place the child [in another country], the judge basically ends up being asked to dismiss the dependency."

Child welfare departments and courts object with some regularity to placing children internationally because they cannot continue to supervise a family. Stories of these objections emerged from almost every county we explored. While these concerns may sometimes be justified, there appears to be a clear predisposition against sending U.S.-citizen children to another country, regardless of the considerations of a parent's fitness.

A case described by a parents' attorney in Orange County, California, makes it clear that the final obstacle to reunification in another country is often less about the parent and more about a belief that children are better off in the U.S. The attorney described a case that did not involve a deported parent, but rather, an undocumented father who wished to take his children with him back to Mexico because he felt that life in Mexico would be safer for his children based on the rising number deportations and the lack of access to medical care for undocumented immigrants in the U.S. The attorney explained:

> The father had taken sole custody of the children after charges were filed against the mother. He had never been accused of any neglectful behavior. Through the judge was otherwise ready to close the case entirely and let the family live without CPS supervision, the judge refused to do so because the father said he wanted to go to Mexico. The lawyer for the department made the allusion that the kids couldn't be better off in Mexico, so why would we want them to go there? I argued that it was in best interest of children to let them be with their father, but the court did not see it that way.

The most serious effect of this reluctance to turn over jurisdiction combined with objections to placing children in other countries is that **deportations can lead almost seamlessly to termination of parental rights.**

## Consulate Involvement

The deportation of parents with children in foster care does not always spell the irreparable shattering of that at family. However, child welfare departments must make particular efforts to facilitate reunification after parents are deported.

ARC's research found that children are reunified with their families following parental deportation only if foreign consulates are involved in a case. Consulates can serve as a bridge between deported parents and the child welfare departments. They can help parents access case plan services in other countries, facilitate home studies, conduct searches for parents who may have been deported and now have a child in foster care, process passports so that children are allowed to leave the U.S., and help facilitate visits between parents and their children in border regions. Consulates can also transport children to be reunified with parents who have been deported.

Few child welfare departments systematically contact consulates when child welfare departments take custody of the U.S.-citizen children of a detained noncitizen. Based on interviews, the practice of involving consulates when a foreign national is involved in a case is increasing in some jurisdictions.

However, even in these jurisdictions, rarely are those relationships formalized. As a result, consulates interviewed for this report believed that they heard of only a fraction of cases involving detained or deported parents from their countries. Our research confirms this.

ARC surveyed 14 Mexican consulates in 10 states and the Dominican Consulate in New York. All of these consulates were currently involved in reunification efforts for families with deported parents. **However, consular offices are aware of only a fraction of the cases that emerge in their regions.**

For example, in Maricopa County, Arizona, ARC's analysis found that there are approximately 250 children currently in foster care with detained or deported parents. However, the Mexican consulate in Maricopa County reported that it is currently assisting with only 31 cases involving detained or deported parents. The average child welfare investigation involves two children, which would mean the consulate is likely involved with 62 children. This suggests that the consulate in Maricopa County may be aware of only about one in four cases. In certain areas, the consulates were aware of an even smaller proportion of cases.

## CONSULATES IN BORDER COUNTIES

Counties we explored that are adjacent to the border with Mexico were more likely than non-border counties to have high rates of CPS cases involving detained and deported parents. This comes as no surprise because child welfare departments in border counties have higher rates of cases with detained and deported parents. **ARC's research found that in counties included in our within Border Patrol's jurisdiction 100 miles from the border, children in foster care were, on average, about 32 percent more likely to have a detained or deported parent than in other counties (an average of 4.9% of foster care kids in border communities compared to 3.7% in others).** Aggressive border enforcement exerts a statistically significant impact when ARC research controls for the size of the noncitizen population and existence of a 287(g) agreement.

Perhaps because of the relatively high percentages of detained/deported parent cases in border areas, **border counties are generally more likely than others to have established policies or protocols for dealing with cross-border cases. The result is that border counties may ultimately be more likely to successfully reunify families with deported parents.**

Of the counties we explored on the U.S.-Mexico border, several have established formal or semi-formal relationships with the Mexican consulates and in some instances with Mexico's federal child welfare agency called DIF (*Desarollo Integral de la Familia*). Among the counties where we conducted focus groups, El Paso, Texas, San Diego, California, and Los Angeles, California, have established international liaison positions to coordinate with foreign consulates and with DIF.

A judge in El Paso said: "The liaison will be in touch regularly with the Mexican authorities and will also work with the TV stations in Mexico to get the word out that CPS is looking for parents. The liaison arranges for home studies and services in Mexico. He is an employee of State of Texas, Region 10."

San Diego's international liaison works similarly to El Paso's, and interview respondents there explained that the liaison has even helped work directly with parents in detention. Interview respondents in Los Angeles said that the liaison position there works predominantly on cases involving undocumented youth and is less involved with detained/deported parent cases.

## BORDER COUNTY



children in foster care are **32% more likely** to have a detained or deported parent

In El Paso, San Diego, and parts of the Rio Grande Valley in Texas, and to a lesser extent in Los Angeles, child welfare staff, attorneys, judges and consulates described facilitating visitation between parents in Mexico and their children in the U.S. CPS would take children to the border and parents would meet them there for a designated period of time. In El Paso and the Rio Grande Valley, Texas, judges and attorneys said that on occasion, parents who had been deported were even escorted over the border by an officer of the court to attend hearings.

As a general matter, respondents in border counties with these agreements between child welfare departments and consulates were more likely to say that reunification with deported parents happens with greater regularity, although respondents were unanimously clear that even in these jurisdictions, immigration enforcement significantly diminishes the chances of reunification.

And not all border counties have developed these policies and practices. For example, in Pima County, Arizona (which comprises both the city of Tucson and a swath on the U.S.-Mexico border), the judges, attorneys and caseworkers we spoke to said that the Arizona child welfare administration has refused to sign agreements with the Mexican Consulate to create clear protocols for facilitating international reunifications. Staff at the Mexican Consulates in Pima and Maricopa counties said that while particular caseworkers and supervisors may sometimes be in touch with the consulates, there is no uniform practice.

## CONSULATES IN NON-BORDER JURISDICTIONS

Counties and states without the benefit of geographic proximity to Mexico face additional challenges and more pronounced hesitation about international reunification. A staff person in a Mexican consulate that covers Michigan and Northern Ohio said that she will randomly be called by Child Welfare caseworkers from both states, but she says they usually get her phone number through colleagues and there is nothing formal in place to ensure that consulates are contacted:

> There is no signed agreement with CPS in either state. It's more on the case-by-case basis. It's on the level of individual caseworkers. I have been here for five years. What I do see is an increase of case managers or social workers hearing about us. So more and more I get calls from social workers saying, 'I have a case, can you help me?' But it really is not formal. The connection is even less strong in Ohio because we are far away from there and it can be hard to get there through the snow.

And even in places where some policy has been established, it is often vague and there can be a lack of uniformity in implementation. A Mexican consular staff person in Santa Ana, California, described the relationship between the consulate and the Orange County Child welfare department: "We have a Memorandum of Understanding but it really does not say much. All it says is that CPS and [the consulate] will work together to exchange information, and that's it. It doesn't say to what extent the social worker has to have contact with us. This has been a black hole for us."

The staff person also described the effect of caseworker discretion when polices are not clearly established: "We have issues such as social workers saying to us, 'Why do I have to talk to you about this case? This child is a U.S. citizen.' And I respond, 'Because this child is also protected by the Mexican constitution, because at least one parent is Mexican.'"

### DILIGENT SEARCHES

Some consulates say that CPS only contacts them when they need help finding a parent. Child welfare departments are required to conduct what's called a "diligent search" for parents involved in dependency cases whose location is unknown. In practice, child welfare departments in many jurisdictions do little to contact parents who have been deported.

Further, most Mexican consulates said that they encountered serious problems locating parents in other countries because the information that the child welfare department gives them is often very sparse. A Mexican consular staff person explained: "CPS gives me a name, maybe something like Jose Perez. They don't tell us anything more than this. They don't even give us the full name with both last names. When we look for that name, it's impossible. There are millions of men with the name Jose Perez in Mexico. I try to ask more questions to figure out what state they are in. We would at least need the complete name and date of birth."

A Mexican consular staff person in South Texas said that when child welfare departments give the consulate names of parents to locate, it's usually only in order to inform parents that their parental rights are being terminated. The staff person explained: "Last year, CPS asked us to find parents in Mexico about 40 times. In almost every single one, we do not have enough information to actually find the person. **Sometimes [CPS] contacts us to see if they can place the kids in Mexico, but normally it's just to be able to terminate on the parent's rights.**"[Emphasis added by ARC.]

> CPS gives me a name, maybe something like Jose Perez. They don't tell us anything more than this. They don't even give us the full name with both last names.

## Home Studies and Case Plans after Deportation

For parents in other countries, completing case plans can be difficult. However, some foreign governments have child welfare agencies that can help facilitate the process of reunification, provide services to deported parents and even take jurisdiction over a case. By contacting the Mexican consulate, for example, child welfare departments in the U.S. can coordinate with DIF (*Desarollo Integral de la Familia*) to conduct home studies, offer services to children and parents and conduct background checks. The structure of child welfare in other countries varies, but consulates can usually help facilitate the provision of needed case plan services.

However, caseworkers and attorneys said that child welfare departments in the U.S. do not always respect these home studies, even when the home studies report on the parents in a positive light.

In 2010, a father who was deported from a county in Washington state lost his parental rights and his children were adopted despite what the attorney described as "a glowing home study" that had been provided by DIF.

After his deportation, the man had established himself in Mexico, was living in his own house, had a car and was working at a decent-paying job. DIF conducted a home study and found the house and father to be a fully fit placement for the children. When it was time to reunify, the [child's attorney] objected because at least one of the children was asthmatic. "It's dusty there and we don't know what kind of care they'd get," the GAL apparently said. The department filed for termination, and the children were adopted.

## Geographic Disparities

Barriers to international reunification efforts increase dramatically based on geography. ARC did not identify agreements between child welfare departments and the consulates of any country other than Mexico. This does not mean that children of parents from countries other than Mexico are never reunified with their deported parents. However, it does indicate that these reunifications to countries other than Mexico are always facilitated on an ad hoc basis.

Meanwhile, high barriers exist to reunification with parents in countries without established infrastructures of social services or rural and remote areas without significant services in any country. When parents are not easily able to access case plan services, child welfare departments appeared less willing to consider reunification. Geography appeared to exacerbate existing blanket biases against placements with parents in other countries.

A child welfare department attorney in Miami, Florida, said that the department sometimes encountered issues with maintaining a case and supervising a placement in areas with thin service infrastructure. "The issue is how you do placement and post placement supervision when they are living up in the mountains. A lot of these places are up in the mountains and you can only get there by taking a car, a bicycle, and then a donkey.

A dependency attorney from San Diego county said, "The problems you see come up are when people are not in the major metro areas and some delivery by way of a donkey did not happen. The border area with Mexico works well, but go farther into the country or to a country like Guatemala, and there is a struggle to get evidence about whether the services will work. Trying to work with the agencies there is very difficult."

# BARS AND BARRIERS TO PLACEMENT WITH UNDOCUMENTED CAREGIVERS

In Washtenaw County, Michigan, an 11-year-old boy has languished in foster care with strangers for 16 months because the child welfare department refuses to allow his aunt and uncle to care for him for no other reason than that they are undocumented.

The boy entered foster care in 2010 after both of his parents were deported. The boy's aunt and uncle tried to take custody of their nephew, but the child welfare department would now allow it even though they had a strong relationship with their nephew, have lived in the U.S. for a decade and half, and have their own children. The child welfare department argued that the chance that they could be deported makes it too risky for their nephew to live there.

Michigan's child welfare department maintains no written policy that requires foster parents or family guardians to be documented, and in lieu of guidelines is blocking kinship placement. The foster home where the boy now lives has allowed his aunts and uncle to maintain contact with their nephew; however, that foster family says that they are uninterested in adopting, which means the boy may well remain in foster care indefinitely or be moved to another family of strangers for adoption. That family may not be willing to allow him to maintain contact with his family.

<div style="color:orange">

**Children in foster care whose parents and extended families are undocumented are less likely to reunify with their parents and then less likely to be placed with relatives**

</div>

Child welfare experts agree that as a general rule, children are better off living with their mothers, fathers or other relatives than in foster care. Federal policy supports this by requiring child welfare departments to make diligent efforts to reunify families. In a more recent policy shift, in 2008 Congress passed "Fostering Connections," a bill that increased federal funding for subsidized family guardianship and encouraged child welfare departments to more fully include extended family members in the dependency process.

Research studies indicate that children who enter the child welfare system and are placed with family or friends are less likely to be moved around from foster home to foster home,[76] are more likely to continue living with their siblings[77] and, perhaps most importantly, are more likely to say that they "always felt loved."[78] Because of this, Fostering Connections eased requirements on relatives who wished to care for their own young family members.

Ultimately, child welfare departments are not required to petition for the termination of parental rights when children live with their own family. As a result, **children in kinship care are more likely to reunify with their parents later. For detained or deported parents who may be separated from their children for long periods through no fault of their own, kinship care can stop the total dissolution of their families.**

Yet, despite the focus and clear benefits of relative placement, child welfare departments regularly conjure objections to placement with undocumented relatives. **ARC's research indicates that children in foster care whose parents and extended families are undocumented are less likely to reunify with their parents and then less likely to be placed with relatives.** Previous research supports this. A study of the child welfare system in Texas found that "Latin American immigrants were placed with relatives much less frequently than other children in care."[79] The study also found that Latin American children "were much less likely than other children to have reunification and relative adoption as case goals."[80] Among the reasons for this disparity listed in the study was the undocumented immigration status of potential relative caregivers.[81]

## "Could be Deported at Any Time": CPS Refusal to Place Children With Their Families

Child welfare departments, caseworkers, childrens' advocates and attorneys too often argue that they cannot place children with undocumented family members because they believe that the caregiver "could be deported at any time." These objections arise when children have entered foster care and child welfare departments are moving to place the children in permanent homes. CPS and attorneys regularly say that this possibility of caregiver deportation puts children at risk of an interruption in their permanent placement.

### FOR PARENTS

These objections emerge not only in the context of placement with extended family, but also with non-custodial parents (usually fathers) who wish to take custody of their own children in the foster care system.

In Jacksonville, Florida, a children's attorney expressed the opinion that undocumented parents are sometimes considered unfit because they might be deported. The attorney explained:

> Typically, as a policy, we are reluctant to recommend a placement with a parent that we know is not legally here, because our position

> representing the best interests of the child is to ensure [they] have
> permanency and not set them up for further disappointment. To be
> placed back with a parent that may at any time be deported is not
> truly in the best interest of children… [A]s a policy for the program,
> we typically don't like to make those recommendations knowing full
> well that the parent is not documented.

The attorney stressed that the Guardian ad Litem program he/she works for always tries to help locate relatives with whom a child can live rather than place them in non-relative foster care. However, ultimately, the bias against undocumented parents can result in children remaining in foster care.

In a handful of instances, child welfare departments have gone so far as to include the possibility of deportation in the list of allegations against a parent. In Michigan, a non-custodial father was actually named in a dependency petition by the child welfare department. According to an attorney involved in the case, the department argued not only that his undocumented status made him an unfit caregiver, but also that "he is abusive or neglectful of his child because he is an illegal alien who is in danger of being arrested every time he walks out the door. The attorney added, "Basically, the theory is that because of his immigration status and lack of contingency plans for his child, should he be arrested on an immigration hold, he places his child at a substantial risk of harm."

Similarly, in Maricopa County, Arizona, a parents' attorney said that the child welfare department had "recently started including in the allegation section of dependency petitions, 'since the parent is undocumented, they are at risk of deportation and not a secure placement.'"

Once a parent is detained, that assumption is exacerbated. In some instances, judges refuse to slow the permanency clock and CPS moves toward terminating parental rights because they assume that detention will necessarily lead to deportation. Many child welfare departments and dependency courts treat deportation as the end of all prospects for family reunification.

In Cabarrus County, North Carolina, a case supervisor told ARC about a Central American woman facing deportation who was not issued a reunification plan because she was detained and the child welfare department expected that she'd be deported:

> When [the children entered foster care], the mom was detained
> and facing deportation so trying to reunify with this mother is
> futile, Reunification has been taken off the table on this one in part
> because of the deportation that's coming. We would have been
> working toward reunification had it not been for the fact that she'll
> be deported. So we made no case plan at all.

> It would be totally different if she were a citizen… If she were not
> going to be deported, we could work toward reunification while she
> was in jail and then see what happened when she was released.

Even when a parent manages to maintain contact with the dependency court while detained and the department and the judge keep open the possibility of reunification after release, deportation can signal the end of the road for that family.

Collier County in Southwest Florida, has a 287(g) agreement and a population of undocumented immigrants that's grown significantly in the last decade. A caseworker from that county said that as soon as a parent is deported, the default is often to terminate their parental rights. "As long as

"Typically, as a policy, we are reluctant to recommend a placement with a parent that we know is not legally here."

they are not deported, we give them a case plan, even in detention, but as soon as [they're] deported, a lot of times it goes straight to termination of parental rights… Once they're gone, it's usually over for them."

## FOR RELATIVES

Child welfare departments and agencies are turning away family members and family friends who wish to care for their young kin because of their immigration status. This practice, which is not actually supported by any written policy, means that children are remaining in foster care when they could be placed with their own families.

Undocumented relatives and family friends face these "could be deported" objections with even more regularity than parents. A children's attorney in Bartow, Florida, told of one such case:

> In one recent instance, placement was denied because the individual, who was not a family member but a friend, had limited documentation, expired visa and was subject to deportation and so the worry was that we were trying to create stability and permanency for that child and we place them there and then two months later, we'd be back to the same place. They *could* have been deported.

Even in jurisdictions where caseworkers assume that children can be placed with undocumented family, the dearth of policy means that the biases of caseworkers or the internal policies of case management agencies can derail the maintenance of extended families. In South Texas, the CPS caseworkers and supervisors, attorneys and judges we interviewed were in almost unanimous agreement that immigration status should not impede placing children with their families. Yet, this belief is not always put into practice, as evidenced by a home study that a CPS worker in San Antonio, Texas, read to one of our researchers. The home study, which had been conducted by a private case management agency, recommended against placing two foster children with their grandparents because of the couple's immigration status. The grandparents had a strong relationship with the children and their home was deemed to be an otherwise perfectly safe place for their grandchildren, who they loved and had helped raise. The home study reads:

> [The grandparents have] many years of child care experience. [Their home] seems stable with regard to physical and emotional health, … [for] happy, healthy thriving kids [who] went to the caregivers for love and attention. [Although the] caregivers appear willing and able and…agreed to install cabinet locks, have the yard cleaned… and get a fire extinguisher and carbon monoxide alarm… it's a major concern that both of the caregivers are undocumented aliens… both unable to remain here permanently. Should they be deported [the children] would be put at risk of displacement; Their ability to maintain a crime free lifestyle is a concern considering their immigration status and their current use of a vehicle without a Texas driver's license.

The San Antonio caseworker was livid that the home study read as it did, but said that a bad home study from the agency can affect the case in negative ways even if she were to present a different view in court.

### Barriers to Services and Subsidies For Undocumented Relatives

Even in instances where departments consider placement with undocumented relatives, federal and state bans on access to public benefits and on foster care reimbursement funds for undocumented immigrants exclude relatives

from taking custody of their young kin. While caseworkers are instructed by federal policy to pursue family placements, undocumented relatives cannot receive many of the federal subsidies available to citizen families who care for their young family members.[82]

In Brownsville, Texas, an attorney said that sometimes the lack of subsidies mean that children have to be removed from their caretakers:

> [They] have a grandma who can probably care of them, but the problem is then [the] grandma needs financial assistance. And because she's not a citizen, she's undocumented, there are no programs within the department or federal programs that will help her financially to take care of these kids long term. It's kind of an 'immigration makes poverty' issue.

### Background Checks on Undocumented Caregivers

Many caseworkers and attorneys said that undocumented family members could not take custody of children because in order to license a relative as a caregiver, the relative must produce a Social Security number and be fingerprinted to pass a background check. Many caseworkers and attorneys mistakenly believed that it is impossible to check the criminal histories of undocumented immigrants because they lack Social Security numbers. In other jurisdictions, caseworkers said that immigrants' fear of deportation and a worry that they may be denied future citizenship because they will become a "public charge" stops potential relative caregivers from coming forward.

In fact, child welfare departments could run background checks on undocumented immigrants with a name and date of birth. However, because there is a lack of clear policy establishing this practice, it rarely happens. A foster care supervisor in Arizona said, "The problem is that it's not written in policy. If it comes to my section, then we'll do a check. But a lot of the workers in the field, because we don't have a policy, they don't know if they can place with illegal [immigrant] relatives so the workers in the field don't place with them, they rule it out. The case managers are scared because there is no clear policy. They are scared to run a background check and that if they work with illegal immigrant family members, [they] will get in trouble or get indicted if something happens."

Even relatives who are citizens but live with an undocumented person can have trouble gaining custody of the child, because CPS requires fingerprinting from everyone who lives in the household. Child welfare departments' failure to proactively address the needs of mixed immigration status families threatens to leave children in foster care.

### Community Fears of Deportation

Some undocumented relatives decline to come forward to take custody of children who they have relationships with because they fear that interacting with the foster care system could result in their detention and deportation. As local law enforcement is increasingly implicated in immigration enforcement, fear of local government workers may grow. Respondents in every one of our focus groups indicated that this fear is a significant problem.

A caseworker in Mecklenburg County, North Carolina, said, "I think when [family] are undocumented, they are afraid to come to the system. In one of my cases, the father in Honduras has provided me with three family members in North Carolina and in Virginia. But they are afraid of us getting involved in their lives and getting deported."

A caseworker in Miami, Florida, echoes this: "There are cases where they have a lot of family, but the family members are scared to get involved with the state because then they [fear they] could have their kids removed or it could get them deported. They are worried about all of this."

The caseworker was clear that these fears have increased in Miami in recent years. "In the past, there was not a fear of deportation. A lot of the families I dealt with were much more cooperative. Now... they are scared because of the laws and the culture around. Because of what's been happening in the last couple years, people are more fearful."

**Policy Confusion**

The blanket policy silence when it comes to placing children with undocumented relatives leads to understandable confusion, and sometimes disagreement among child welfare staff. In Polk County, Florida, a caseworker and her supervisor argued about placing children with family members who are undocumented.

The supervisor said to the caseworker, "We can't do a background check on an undocumented person. We can't do a placement without a background check....they can't get any services so that's a big problem too."

The caseworker responded, "But if we want to place a child with someone that does not have paperwork, we would rather do that than place a child in foster care."

The supervisor continued to object. "Yes but you would have to take into account that if they are illegal, where were they working, how are they working, where is their income coming from..."

The caseworker became upset at the idea that the department would have to keep a child in foster care when there was loving family willing to take custody. She said, "But I'm saying if this guy is picking oranges, he gives us documentation that he makes X amount a week? I don't want to place a kid in the foster home!

The supervisor replied: "If it's under the table though...," and then stopped and changed the subject.

## CONCLUSION

The children of deported parents in the child welfare system are subjected to extended periods of separation and the risk of termination of parental rights while their parents are detained. However, because of barriers and biases to reunifying U.S.-citizen children with their parents in other countries, many of these families remain in the custody of child welfare departments. Despite laws that explicitly privilege kinship placement over foster care with non-relatives, many child welfare departments refuse to place children with their families. The result is that children, who were once separated from their parents and denied the opportunity to be reunified, may also be severed from the other adults in their communities. Policy changes are necessary to ensure that families may stay together regardless of their immigration status.

# V: CONCLUSION AND RECOMMENDATIONS

**IN LATE SEPTEMBER 2011, JOSEFINA AND CLARA, THE SISTERS WHOSE STORY OPENED THIS REPORT**, received a call in Michoacán, Mexico from the Mexican consulate in New Mexico.

"They told us to go to the airport the next day," said Clara.

In the morning, they drove three hours to the airport. Two employees of the Mexican government escorted the three children off the plane. In the middle of a waiting room at the airport, after 14 months apart, Josefina and Clara took the children into their arms. The next day, now back at their mother's home, Clara said over the phone, "It hurts me so much to talk about this. I don't want to remember anymore."

Their family was separated for well over a year and the sisters say that the younger two children, who are now both walking and talking, did not remember their mothers when they arrived. Indeed, Josefina's baby, who was 9 months old when they were separated, is now almost two; he's spent more of his life in foster care than with his own mother. They will have to work to rebuild a family that few could argue should ever have been separated.

Ultimately, Clara and Josefina and their children are only now back together because of the concerted efforts of the Mexican Consulate. Yet, their reunification should not have taken so long. Even worse, many others are never reunified—their families are irreparably shattered because there are no policies in place to facilitate their reunification. As the federal government continues to expand its immigration enforcement infrastructure, and continues to detain and deport parents at historical levels, more families will face threats to family unity.

## POLICY RECOMMENDATIONS

**Federal, state and local governments must create explicit policies to protect families from separation and facilitate family unity.** These polices should stop the clock on the child welfare process and the immigration enforcement process to ensure that families can stay together and allow parents to make the best decisions for the care and custody of their children.

### Congress

- Institute protections for detained parents including: alternatives to detention for parents; provisions to enable detained parents to comply with child welfare case plans and participate meaningfully in dependency proceedings; and policies to facilitate family unity at the time of deportation if a parent wishes to leave the country with their child. (i.e., the Humane Enforcement and Legal Protections for Separated Children Act).

- Reinstate judicial discretion to consider the best interests of children and families in decisions about deportation (i.e., the Child Citizen Protection Act).

## Executive Branch, Department of Homeland Security (DHS)

- Suspend the Secure Communities program and other programs including 287(g) and the Criminal Alien Program that use local criminal justice systems as arms of the immigration enforcement apparatus.

- Amend the June 2011 ICE discretion memo to clarify that all parents of minor children in the U.S. should be granted discretionary relief with an emphasis on parents with children in foster care.

- Release parents on their own recognizance and expand the use of community-based supervisory programs.

- The DHS Office of Inspector General should initiate a study on the prevalence of practices that result in children entering or remaining in foster care as a result of detention and deportation.

## State Legislatures

- Create exceptions to the termination of parental rights timelines for incarcerated, detained and deported parents.

- Institute "time-of-arrest" protocols for local law enforcement agencies to enable parents to decide who should take custody of their children.

## State Child Welfare Departments and Juvenile Dependency Courts

- State child welfare departments should initiate research to explore the extent to which children in foster care have detained or deported parents.

- All caseworkers, supervisors, attorneys and judges who practice in dependency court should be mandated to participate in training on immigration law and immigration enforcement policies.

- All state and/or county child welfare departments should sign agreements with foreign consulates to ensure that as soon as noncitizen parents of foster children are detained, consular involvement is commenced.

- Adopt clear policies ensuring equal treatment of undocumented parents and families in the child welfare system, including clear guidelines on the rights of undocumented parents and extended families to be treated equitably as viable caregivers for children.

- Create state- or county-level staff positions dedicated to facilitating reunification for families impacted by immigration enforcement.

# VI: METHODOLOGY

This study explores the extent to which immigration enforcement threatens parental rights and creates barriers to family reunification for families in the child welfare system.

The research consisted of three parts: interviews, focus groups, and quantitative data collection.

**Interviews:** Between August 2010 and August 2011, ARC conducted approximately 200 interviews with individual caseworkers and supervisors, dependency attorneys, immigration attorneys and advocates, dependency judges, foreign consulates and detained parents.

Interviews were also conducted with 60 parents in six detention centers (in Arizona, Florida and Texas) and with seven other parents who had already been deported or were released from detention. Nineteen of these parents had children in foster care. Many more feared that their children were unsafe and might enter foster care. ARC interviewed approximately nine juvenile court judges, 120 dependency attorneys, 10 immigration attorneys, and did eight not-for-attribution interviews with child welfare caseworkers in jurisdictions where we were not able to conduct focus groups because the child welfare departments declined to work with ARC on this study.

Child welfare departments in the states of Texas and Arizona and in San Diego County, California all declined to participate in focus groups. In Texas and San Diego, the departments cited excessive workloads and budget cuts as the reason. In Arizona, several mid-level supervisors informed ARC that the department would not allow staff to speak with ARC researchers but no reason was given. After receiving these responses, ARC did not seek permission from the state child protection agency to conduct focus groups or interviews.

In many jurisdictions, attorneys were contacted randomly from full lists of private-contract attorneys made available by the county court administration. Other attorneys, as well as caseworkers, other advocates and judges, who we reached out to as a means of gathering stories and/or to better understand the dynamics at the intersections of immigration and child welfare, were contacted in a snowball approach where existing respondents suggested future respondents from among their professional circles.

Interview questions with judges, caseworkers, attorneys and advocates generally remained consistent but were tailored slightly to the particulars of each category. Like focus groups, questions were divided into three categories: immigration status, detention/deportation, and reunification.

Detained parents were contacted in three ways: 1) through nonprofit legal organizations that represent detained noncitizens; 2) through sign-up sheets that ICE agreed to hang on the walls of "pods" in several detention centers; and 3) randomly during detention center visits. All detainees were informed at the beginning of the interviews that ARC was a research organization, not a legal advocacy organization. Many of their stories are included in this report.

ARC spoke with an additional seven parents who had already been deported or released from detention and had children in foster care. ARC contacted these parents through their immigration attorneys and while visiting centers for deportees in Mexico.

**Focus groups:** ARC conducted 35 focus groups in 23 counties in six states over an eight-month period beginning in January 2011. Focus groups were approximately one hour long and included between 4 and 10 child welfare caseworkers or attorneys who represent parents or children in juvenile dependency court. Because of county-by-county variations in the particular structure of the child welfare/dependency system and varying degrees of openness on the part of child welfare departments to participate in our study, we were not always able to complete focus groups with precisely comparable respondents in each jurisdiction. Focus groups also varied in terms of recruitment. In some jurisdictions, attorneys and caseworkers were compelled to come by their supervisors, though in most jurisdictions, they came voluntarily. Focus groups were audio-recorded, but participants were informed that their names would not be used in the report or in any other resulting publications.

Focus group questions were broken down into three subsections: 1) Impact of immigration status on child welfare cases; 2) Impact of parental detention or deportation on child welfare cases; 3) Policies and practices for facilitating reunification of children with detained or deported parents.

**Quantitative data:** To arrive at our national estimates, ARC began by gathering select survey and focus group data from child welfare caseworkers, attorneys and judges to determine the average percentage of foster care cases involving detained or deported parents in their respective counties. These individuals were located in 19 jurisdictions in six key states—Arizona, California, Florida, North Carolina, New York and Texas—which account for more than half of the noncitizen population in the U.S. and more than one-third of the children in foster care. Jurisdictions were selected to provide a mix of border and non-border regions, more and less aggressive local immigration detention practices, and high and low foreign-born populations.

Based on these local percentages, which ranged from under one percent to eight percent of all child welfare cases in a given jurisdiction, we utilized regression analysis to calculate the typical independent impact of three variables on this percentage of foster care cases with deported or detained parents: 1) the percentage of foreign born individuals, 2) the presence of 287(g) immigration enforcement agreements, and 3) border county status. The regression analysis provided an estimated "average" impact of each of these variables on a hypothetical county's rate, which allowed us to then project the extent of the problem in the remaining major jurisdictions in these six states and in 14 other similarly situated states (Colorado, Georgia, Illinois, Indiana, Maryland, Michigan, Missouri, New Jersey, New Mexico, Ohio, Oregon, Pennsylvania, Virginia and Washington). These 20 states account for almost 85 percent of the country's undocumented population and more than 70 percent of foster care rolls.

ARC's estimates are a conservative count for a variety of reasons. First, because our regression did not include every state, there are hundreds of jurisdictions in the remaining 30 states that contain approximately 15 percent of the undocumented population, as well as almost 30 percent of the foster care rolls that are not included in our projection. Second, when survey respondents reported a range of relevant cases, we only included the low end of that range. (For example, when a respondent said, "About three to five of my 36 current cases involve a detained or deported parent," we used 3 of 36 cases, or 8.3% of cases.) Third, given our analysis of interviews and survey data, we utilized a dampening weight on non-border counties where the federal government had not yet implemented the Secure Communities program for at least three months, and where the county had not entered into a 287(g) agreement. This dampening weight prevented an over-count from our regression-based projections in areas with similarly passive enforcement of immigration laws (at least in comparison to many other areas of the nation). Because our projected number is a conservative count, many more children may be affected than we were able to estimate.

The federal government does not make sufficient data available on immigration enforcement. For example, Immigration and Customs Enforcement releases little data about its local jail–based Criminal Alien Program. As a result, we were not always able to account for variables that might drive up the local rate of deported/detained parent cases.

# NOTES

1. The names of all parents in this report have been changed to protect the identity of families with ongoing child welfare cases

2. The Bureau of Immigration Appeals has held that "When an alien-parent's child is a United States citizen and the child is below the age of discretion, and if the alien-parent is deported, it is the parent's decision whether to take the minor child along or to leave the child in this country." B & J Minors, 279 Mich. App. 12, 20 n.5 (2008) (citing Liu v. United States Department of Justice, 13 F.3d 1175, 1177 (CA 8 1994). The U.S. Supreme Court affirmed that the Immigration and Naturalization Act "establishes that congressional concern was directed at 'the problem of keeping families of United States citizens and immigrants united.'" Fiallo v. Bell, 430 U.S. 787, 795 (1977).

3. Sources included the following: Nacha Cattan, "Courtroom Skype Helps Reunite Mexican Family." *The Christian Science Monitor*, July 22, 2011, www.csmonitor.com/World/Americas/Latin-America-Monitor/2011/0722/Courtroom-Skype-helps-re-unite-Mexican-family (accessed September 1, 2011); Julianne Hing and Seth Wessler, "When An Immigrant Mom Gets Arrested," Colorlines.com, July 1, 2008, 216.92.102.223/archives/2008/07/when_an_immigrant_mom_gets_arrested.html (accessed September 1, 2011); Nina Rabin, "Disappearing Parents: A Report on Immigration Enforcement and the Child Welfare System," University of Arizona, May 2011; Emily Butera, "Torn Apart By Immigration Enforcement: Parental Rights and Immigration Detention," Women's Refugee Commission, December 2010.

4. We consider our estimates conservative for a host of reasons, including: a) The fact that while states with medium to small numbers of foreign-born residents and foster care rolls were left out of this analysis, there is no reason to assume that no children within those jurisdictions are impacted by this problem; b) We consistently utilized our respondents' more conservative estimates when they reported a range of affected cases within their current caseloads to calculate a county average (e.g., when a caseworker reported that "three to five percent of my current cases involve a detained/deported parent," we invariably utilized the lower bound for our calculations); c) to buffer against projecting an over-count, we placed a dampening weight on counties where the federal government had not yet implemented the Secure Communities program and a buoying weight on counties with 287(g) agreements; d)The federal government does not make sufficient data available on immigration enforcement. For example, Immigration and Customs Enforcement releases little data about its local jail-based Criminal Alien Program. As a result, we were not always able to account for variables that might drive up the local rate of deported/detained parent cases.

5. Of those deported in 2010, 282,000 were removed to Mexico, and another 93,000 to other Latin American countries and the Caribbean. The remaining 11,000 were deported to other countries all over the world.

6. Passel, Jeffrey S. and Cohn, D'Vera Cohn. "A Portrait of Unauthorized Immigrants in the United States." Pew Hispanic Center, April 14, 2009.

7. B & J Minors, 279 Mich. App. 12, 20 n.5 (2008) (citing Liu v. United States Dep't of Justice, 13 F.3d 1175, 1177 (CA 8 1994).

8. Fiallo v. Bell, 430 U.S. 787, 795 (1977).

9. Department of Homeland Security (DHS), Office of Inspector General. "Removals Involving Illegal Alien Parents of United States Citizen Children," p. 4. January 2009.

10. Kohli; Aarti, Markowitz, Peter; Chavez, Lisa, "Secure Communities by the Numbers: An Analysis of Demographics And Due Process," Chief Justice Earl Warren Institute on Law and Social Policy, Berkeley Law, October 2011.

11. Hing, Julianne. "DHS Tells States: We Don't Need Your Approval for Secure Communities." *Colorlines*, August 9, 2011. http://colorlines.com/archives/2011/08/dhs_tells_states_we_dont_need_your_approval_for_secure_communities.html (accessed August 10, 2011).

12. U.S. Immigration and Customs Enforcement. "Secure Communities." http://www.ice.gov/secure_communities/ (accessed October 6, 2011).

13. U.S. Immigration and Customs Enforcement. "Secure Communities: IDENT/IAFIS Interoperability Monthly Statistics through August 31, 2011." http://www.ice.gov/doclib/foia/sc-stats/nationwide_interoperability_stats-fy2011-to-date.pdf (accessed October 1, 2011).

14. U.S. Immigration and Customs Enforcement. "IDENT/IAFIS Interoperability Monthly Statistics Through August 31, 2011." http://www.ice.gov/doclib/foia/sc-stats/nationwide_interoperability_stats-fy2011-to-date.pdf (accessed October 10, 2011).

15. U.S. Immigration and Customs Enforcement. "Fact Sheet: Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act." http://www.ice.gov/news/library/factsheets/287g.htm#signed-moa (accessed October 6, 2011).

16. Capps, Randy, Rosenblum, Marc R., Rodriguez, Cristina and Chishti, Muzaffar. "Delegation and Divergence: A Study of 287(g) State and Local Immigration Enforcement." Migration Policy Institute, January 2011. www.migrationpolicy.org/pubs/287g-divergence.pdf.

17. Weissman, Deborah M., Headen, Rebecca C. and Parker, Katherine Lewis. "The Policies and Politics of Local Immigration Enforcement Laws: 287(g) Program in North Carolina." American Civil Liberties Union of North Carolina Legal Foundation and Immigration and Human Rights Policy Clinic University of North Carolina at Chapel Hill, February 2009. http://acluofnc.org/files/287gpolicyreview_0.pdf.

Garnder II, Trevor and Kohli, Aarti. "The C.A.P. Effect: Racial Profiling in the ICE Criminal Alien Program." The Warren Institute, University of California, Berkeley Law School, September 2009. www.law.berkeley.edu/files/policybrief_irving_FINAL.pdf.

18. Police Foundation. "The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties." April 2009. http://www.policefoundation.org/pdf/striking-balance/Executive%20Summary.pdf.

19. Wessler, Seth Freed. "Collaborating with ICE Has Consequences." Colorlines. February 19, 2008. http://colorlines.com/archives/2008/02/collaborating_with_ice_has_consequences.html.

ICE and participating localities contend that CAP targets only serious criminal offenders. For example, the Deputy Sheriff in Travis County, Texas, told Colorlines magazine in 2008, "We know for a fact that we are only getting the bottom of the barrel, so to speak. These guys are really the undesirables. Most people wouldn't want them getting out of jail and being their neighbor. They'd like to see them deported out of the country." Yet, analysis that has been conducted on CAP indicates that the program has been used as an immigration dragnet, rather than as a means of targeting the most serious offenders.

20. Department of Homeland Security (DHS), Office of Immigration Statistics. "Immigration Enforcement Actions: 2010." June 2011. http://www.dhs.gov/xlibrary/assets/statistics/publications/enforcement-ar-2010.pdf.
Detention Watch Network. "About the U.S. Detention and Deportation System." http://www.detentionwatchnetwork.org/aboutdetention.

21. Human Rights First. "Jails and Jumpsuits: Transforming the U.S. Immigration Detention System—A Two-Year Review." 2011. http://www.humanrightsfirst.org/wp-content/uploads/pdf/HRF-Jails-and-Jumpsuits-report.pdf.

22. Human Rights Watch. "A Costly Move: Far and Frequent Transfers Impede Hearings for Immigrant Detainees in the United States." June 14, 2011. http://www.hrw.org/reports/2011/06/14/costly-move.

23. Human Rights First. "Jails and Jumpsuits: Transforming the U.S. Immigration Detention System—A Two-Year Review." 2011. http://www.humanrightsfirst.org/wp-content/uploads/pdf/HRF-Jails-and-Jumpsuits-report.pdf.

24. Ibid.

25. Ibid.

26. Brezowski, Lynn. "ICE Will Relocate Crowded Detention Center." Houston Chronicle. June 9, 2011. http://www.chron.com/news/article/ICE-will-relocate-crowded-detention-center-1689843.php (accessed Oct. 6, 2011).

27. Human Rights First. "Jails and Jumpsuits: Transforming the U.S. Immigration Detention System—A Two-Year Review. 2011.

http://www.humanrightsfirst.org/wp-content/uploads/pdf/HRF-Jails-and-Jumpsuits-report.pdf.

28. Guggenheim, Martin. What's Wrong with Children's Rights. Cambridge, MA: Harvard University Press, 2005.

29. Ibid.

30. U.S. Department of Health and Human Services, Administration for Children and Families. "The AFCARS Report – Preliminary FY 2010 Estimates as of June 2011 (18)." http://www.acf.hhs.gov/programs/cb/stats_research/afcars/tar/report18.htm (accessed Oct. 6, 1011).

31. Ibid.

32. Ibid.

33. Ibid.

34. Ibid.

35. Ibid.

36. Center for Public Policy Priorities, "Drawing the Line between Public and Private Responsibility in Child Welfare: The Texas Debate." August 2008.

37. Many states encourage "concurrent planning" that allows departments to prepare simultaneously for reunification and for another outcome like adoption in case that reunification fails. Ultimately, the majority of children who spend time in foster care will return home; however, "concurrent planning" means that a permanency plan may be quickly changed if a parent is found to be incompliant on the path to reunification. See: Barth, Richard, "Adoption from Foster Care: A Chronicle of the Years after ASFA," in "Intentions and Results: A Look Back at the Adoption and Safe Families Act," Center for the Study of Social Policy & The Urban Institute, 2010.

38. U.S. Department of Health and Human Services, Administration for Children and Families, Child Welfare Information Gateway. "Reasonable Efforts to Preserve or Reunify Families and Achieve Permanency for Children: Summary of State Laws." 2009. http://www.childwelfare.gov/systemwide/laws_policies/statutes/reunify.cfm (accessed Oct. 6, 2011).

39. Doyle, Joseph J. Jr. "Child Protection and Child Outcomes: Measuring the Effects of Foster Care." American Economic Review 97(5). December 2007: 1583-1610.

40. National Coalition for Child Protection Reform. "Foster Care vs. Family Preservation: The Track Record on Safety and Well-being." January 3, 2011. www.nccpr.org/reports/01SAFETY.pdf.

41. The District of Columbia Citizen Review Panel. "An Examination of the Child and Family Services Agency's Performance When It Removes Children from and Quickly Returns them to their Families: Findings and Recommendations from the Citizens Review Panel." September 2011. www.documentcloud.org/documents/253124-citizen-review-panel-d-c-child-welfare-study.html.

42. U.S. Department of Health and Human Services. "Child Maltreatment 2007." Administration on Children, Youth and Families, 2009. http://www.acf.hhs.gov/programs/cb/pubs/cm07/cm07.pdf (accessed January 26, 2010).

43. While 12 states have created "poverty exemptions" stating that poverty itself should be the primary basis for a court's neglect finding and other states have made narrower exemptions focused, for example, on homelessness, in most states the direct effects of poverty itself can be considered neglect. By contrast, some states list particular effects of poverty as neglect. The state of Colorado, for example, explicitly includes homelessness as a reason for finding neglect. See: "Poverty Exemptions in State Child Neglect Statutes," in "Child Law Practice: Helping Lawyers Help Kids," 30 (1), p. 6, March 2011, http://apps.americanbar.org/child/clp/archives/vol30/mar11.pdf (accessed October 6, 2011).

44. Sedlak, A.J. and Broadhurst, D.D. "Third National Incidence Study of Child Abuse and Neglect." U.S. Department of Health and Human Services, Administration on Children, Youth and Families, National Center on Child Abuse and Neglect. 1996.

45. Duva, Joy and Metzger, Sania. "Addressing Poverty as a Major Risk Factor in Child Neglect: Promising Policy and Practice." *Protecting Children*, 25 (1), pp. 63-74, 2010. http://www.judiciary.state.nj.us/conferences/2A-4/Protecting_Children_Article_on_Poverty_and_Neglect.pdf.

46. Church, W., Gross, E., and Baldwin, J. "Maybe ignorance is not always bliss: The disparate treatment of Hispanics within the child welfare system." *Children & Youth Services Review*, 27, 1279-1292. 2005.

47. Roberts, Dorothy. *Shattered Bonds: The Color of Child Welfare.* Basic Civitas Books. New York, NY: 2001.

48. Ibid.

49. In *Shattered Bonds*, legal scholar Dorothy Roberts notes that while part of the vast overrepresentation of Black children in foster care is a result of racialized poverty, race also influences child welfare because in "child protection decision making … caseworkers tend to use a model family as a frame of reference. They evaluate problem behavior by the extent it deviates from the parenting ideal. The model for many caseworkers is a white, middle-class family composed of married parents and their children. … From the outset, most black families diverse from the ideal because they are headed by unmarried mothers."

50. The children of immigrants in the child welfare system are mostly people of color. Over two-thirds of children of immigrants who come to the attention of the child welfare system are Latino, almost 15 percent are white, 10 percent are Black and 7.5 percent are Asian. Nationally, children of immigrants are underrepresented among those who come to the attention of the child welfare system. Children with at least one foreign-born parent make up about 24 percent of the population, but only 9.6 percent of children that come to the attention of the child welfare system were living with a foreign-born primary caregiver.

See: Dettlaff, Alan and Earner, Ilze. "Children of Immigrants in the Child Welfare System: Findings From the National Survey of Child and Adolescent Well-Being." Migration and Child Welfare Network. 2010.

51. Chaudry, Ajay and Fortuny, Karina. "Children of Immigrants: Economic Well-Being." Urban Institute. November 24, 2010. http://www.urban.org/publications/412270.html.

52. Lincroft, Yali and Borelli, Ken. *Public Benefits and Child Welfare Financing.* First Focus. May 21, 2010. http://www.firstfocus.net/library/reports/public-benefits-and-child-welfare-financing.

53. Lincroft, Yali and Borelli, Ken. "Public Benefits and Child Welfare Financing." First Focus. May 21, 2010. http://www.firstfocus.net/library/reports/public-benefits-and-child-welfare-financing.

54. Lincroft, Yali and Resner, Jen. "Undercounted, Underserved: Immigrant and refugee Families in the Child Welfare System." Annie E. Casey Foundation. 2006. http://www.aecf.org/KnowledgeCenter/Publications.aspx?pubguid={A6A32287-6D6B-4580-9365-D7E635E35569}.

55. Other researchers have also found status-related barriers to be an issue; Earner, Dr. Ilze and Dettlaff, Dr. Alan. Webcast conversation. "Immigrants and Refugees: The Intersection of Migration and Child Welfare." Permanency Planning Today. Spring 2009, pp. 5-6. http://www.americanhumane.org/assets/pdfs/children/permanency-planning-todaypdf.pdf.

56. Guggenheim, Martin. *What's Wrong with Children's Rights.* Cambridge, MA: Harvard University Press. 2005.

57. Capps, Randy, The Urban Institute, "Paying the Price: The Impact of Immigration Raids on America's Children," 2007.

58. Ibid.

59. Butera, Emily. "Torn Apart By Immigration Enforcement: Parental Rights and Immigration Detention." Women's Refugee Commission, December 2010.

60. Rabin, Nina. "Disappearing Parents: A Report on Immigration Enforcement and the Child Welfare System." University of Arizona, May 2011.

61. Butera, Emily. "Torn Apart By Immigration Enforcement: Parental Rights and Immigration Detention." Women's Refugee Commission, December 2010.

62. Director John Morton to All Field Office Directors, All Special Agents in Charge, All Chief Council, June 17, 2011. "Exercising Prosecutorial Discretion Consistent with the Civil Immigration Priorities of the Agency for the Apprehension, Detention and Removal of Aliens." U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement. http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf (accessed October 6, 2011).

63. Vail, Isadora. "Former worker charged in sexual assaults of detainees." *Austin American-Statesmen.* August 20, 2010. http://www.statesman.com/news/local/former-worker-charged-in-sexual-assaults-of-detainees-869333.html.

64. Inter-American Commission on Human Rights. "Report on Immigration in the United States Detention and Due Process." December 30, 2010.

65. The Department of Homeland Security reports the following number of people deported as a result of a criminal conviction:

| Crime category | Number removed | Percent of total |
|---|---|---|
| Total | 168,532 | 100.0 |
| Dangerous Drugs | 42,692 | 25.3 |
| Immigration | 31,585 | 18.7 |
| Criminal Traffic Offenses | 30,808 | 18.3 |
| Assault | 12,105 | 7.2 |
| Larceny | 5,406 | 3.2 |
| Burglary | 4,188 | 2.5 |
| Fraudulent Activities | 3,849 | 2.3 |
| Robbery | 3,628 | 2.2 |
| Family Offenses | 3,318 | 2.0 |
| Sexual Assault | 3,252 | 1.9 |
| Other | 27,701 | 16.4 |

See: Department of Homeland Security, Office of Immigration Statistics. "Immigration Enforcement Actions: 2010." June 2011. http://www.dhs.gov/xlibrary/assets/statistics/publications/enforcement-ar-2010.pdf.

66. Cave, Damien. "Crossing Over, and Over." New York Times, October 2, 2011. http://www.nytimes.com/2011/10/03/world/americas/mexican-immigrants-repeatedly-brave-risks-to-resume-lives-in-united-states.html?ref=illegalimmigrants (accessed October 6, 2011).

67. Ibid.

68. Buentello, Tara, Carswell, Sarah V., Hudson, Nicholas and Libal, Bob. "Operation Streamline: Drowning Justice and Draining Dollars along the Rio Grande." Grassroots Leadership. July 2010. http://grassrootsleadership.org/OperationStreamline/wp-content/uploads/2010/08/Operation-Streamline-Green-Paper.pdf.

69. Transactional Records Access Clearinghouse, "FY 2009 Federal Prosecutions Sharply Higher." Syracuse University. Dec. 21, 2009.

70. U.S. Department of Justice, Executive Office for Immigration Review. "FY2008 Statistical Yearbook," p. G1. March 2009. http://www.justice.gov/eoir/statspub/fy08syb.pdf.

71. Borelli, Ken; Earner, Ilze; Yali Lincroft "Administrators in Public Child Welfare: Responding to Immigrant Families in Crisis." *Protecting Children A Professional Publication of American Humane.* Vol. 22, Number 2. 2007

72. Human Rights Watch. "A Costly Move: Far and Frequent Transfers Impede Hearings for Immigrant Detainees in the United States." June 14, 2011. http://www.midwesthumanrights.org/costly-move-far-and-frequent-transfers-impede-hearings-immigrant-detainees-united-states.

73. U.S. Government Accountability Office. "More Information and Collaboration Could Promote Ties Between Foster Care Children and Their Incarcerated Parents." September 2011. http://www.gao.gov/products/GAO-11-863.

74. Ibid.

75. National Coalition for Child Protection Reform. "Foster Care vs. Family Preservation: The Track Record on Safety and Well-being." January 3, 2011. www.nccpr.org/reports/01SAFETY.pdf.

76. Testa, M. "Kinship care and permanency." *Journal of Social Service Research*, Vol. 28 (1) (2001): pp. 25 – 43.

Chamberlain, P., et al. "Who disrupts from placement in foster and kinship care?" Child Abuse & Neglect, Vol. 30, (2006): pp. 409 – 424.

77. Herrick, M. & Piccus, W. "Sibling Connections: The importance of nurturing sibling bonds in the foster care system." *Children and Youth Services Review*, Vol. 27 (7) (2005): pp. 845-861.

78. Wilson, L. "Satisfaction of 1,100 Children in Out-of-Home Care, Primarily Family Foster Care, in Illinois' Child Welfare System." Tallahassee, Florida: Wilson Resources. 1996.

79. Vericker, T., Kuehn, D. "Foster Care Placement Settings and Permanency Planning – Findings from Texas." Washington, D.C.: Urban Institute. May 2007.

80. Ibid.

81. Ibid.

82. Lincroft, Yali and Borelli, Ken. "Public Benefits and Child Welfare Financing." First Focus. May 21, 2010. http://www.firstfocus.net/library/reports/public-benefits-and-child-welfare-financing.

# Facing Our Future

## Children in the Aftermath of Immigration Enforcement

Ajay Chaudry
Randy Capps
Juan Manuel Pedroza
Rosa Maria Castañeda
Robert Santos
Molly M. Scott



The Urban Institute

# Facing Our Future

## Children in the Aftermath of Immigration Enforcement

Ajay Chaudry
Randy Capps
Juan Manuel Pedroza
Rosa Maria Castañeda
Robert Santos
Molly M. Scott

February 2010

The Urban Institute

Copyright © 2010. The Urban Institute. All rights reserved. Except for short quotes, no part of this report may be reproduced or used in any form or by any means, electronic or mechanical, including photo-copying, recording, or by information storage or retrieval system, without written permission from the Urban Institute.

The Urban Institute is a nonprofit, nonpartisan policy research and educational organization that examines the social, economic, and governance problems facing the nation. The views expressed are those of the authors and should not be attributed to the Urban Institute, its trustees, or its funders.

# CONTENTS

Acknowledgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2. The Separation of Parents and Children Following Immigration Enforcement  . . . 13

3. The Effects of Immigration Enforcement on Family Well-Being . . . . . . . . . . . . . . . 27

4. Consequences for Children: Child Behaviors, Changes, and Adjustments . . . . . . . 41

5. Community Responses to Raids and Other Arrests  . . . . . . . . . . . . . . . . . . . . . . . . . 55

6. Facing Our Future: Conclusions and Recommendations . . . . . . . . . . . . . . . . . . . . . 69

# ACKNOWLEDGMENTS

**T**he authors of this study are Urban Institute researchers Ajay Chaudry, Juan Manuel Pedroza, Rosa Maria Castañeda, Robert Santos, and Molly M. Scott and Randy Capps of the Migration Policy Institute. The views and conclusions included herein are those of the authors alone, and do not necessarily reflect the opinions of the project's funders, the Urban Institute, or its funders.

The authors are especially grateful to the parents and family members in Grand Island, Nebraska, Miami, Florida, New Bedford, Massachusetts, Postville, Iowa, Van Nuys, California, and Rogers-Springdale, Arkansas, who shared their experiences with us. In addition, the authors would like to thank staff at the many organizations in these sites who helped the research team meet key community contacts as well as parents and other caregivers in the study sites. Without their assistance, the study would not have been possible. In particular, the authors would like to acknowledge staff at the National Council of La Raza and their affiliates; St. Bridget's Catholic Church in Postville and Luther College in Decorah, Iowa; the Economic Opportunity Agency of Washington County and Legal Aid of Arkansas in Northwest Arkansas; the Coalition for Humane Immigrant Rights of Los Angeles; the Florida Immigrant Advocacy Center and the Sant-La Haitian Neighborhood Center, Fanm Ayisyen Nan Miyami, Catholic Legal Services and Notre Dame d'Haiti Catholic Church in Miami, Florida; Catholic Social Services and Our Lady of Guadalupe parish of St. James Church in New Bedford, Massachusetts; and Greater Boston Legal Services and the Massachusetts Immigrant and Refugee Advocacy Coalition in Boston, Massachusetts.

The authors thank the Advisory Group for the project for their support in designing the study. Olivia Golden, Robin Harwood, and Heather See of the Urban Institute reviewed earlier drafts of the report. In addition, the authors thank the many individuals who reviewed the report, including Donald Hernandez, Hunter College and the CUNY Graduate Center, Department of Sociology; Bill Ong Hing, Professor of Law and Asian American Studies, University of California, Davis, School of Law; Donald Kerwin, Vice President at the Migration Policy Institute; Kathleen Moccio, Consulting Attorney for Dorsey & Whitney LLP; and Carola Suárez-Orozco, Professor of Applied Psychology, New York University, Steinhardt School of Culture, Education, and Human Development.

The authors would also like to acknowledge the assistance of a number of Urban Institute researchers during the project. Molly Hawkins, Adam Kent, Katie Mathews, and Jennifer Pelletier provided valuable assistance during data collection and editing. Elysa Baron and Celeste Chaves worked diligently on completing transcriptions of project interviews, and Muriel Germeil provided valuable Creole-English translation and interpretation services.

Finally, the authors acknowledge the generous support of the project's funders. This report was made possible by the support of the Foundation for Child Development, Carnegie Corporation of New York, the W. K. Kellogg Foundation, the Peppercorn Foundation, the A. L. Mailman Family Foundation, and the Annie E. Casey Foundation.

v

A742

# EXECUTIVE SUMMARY

The United States is engaged in an intense debate about immigration policy, particularly with regard to unauthorized immigrants. Debates rage about the economic contributions of immigrants to the U.S. economy, job competition, tax payments and fiscal costs, and the integration of immigrants in communities and the larger society. Largely absent from the discussion are the children of immigrants. Today there are an estimated 5.5 million children with unauthorized immigrant parents, about three-quarters of whom are U.S.-born citizens. The nation builds its own future by investing in the futures of children, spending billions of dollars annually on education and health care, preventing abuse and neglect, and supporting when necessary their basic needs for housing and food. Yet, unlike other children in this country, the children of unauthorized immigrants live with the fear that their parents might be arrested, detained, or deported. The federal government spends billions each year to arrest, detain, and deport immigrants, many of whom are parents. By one estimate, in the last 10 years, over 100,000 immigrant parents of U.S. citizen children have been deported from the United States.

This report examines the consequences of parental arrest, detention, and deportation on 190 children in 85 families in six locations across the country. Building on our 2007 report *Paying the Price: The Impact of Immigration Raids on America's Children,* the current study documents the effects on these children after their parents were arrested in worksite raids, raids on their homes, or operations by local police officers. We researched impacts on children in the days and weeks after parental arrests, in the intermediate and long term while parents were detained or contested their deportation, and in some cases, after parents were deported.

We interviewed arrested parents or their spouses shortly (2 to 5 months) after arrest, in the long term (9 to 13 months after arrest), and sometimes twice, both shortly after arrest and in the long term. We used semi-structured protocols that included standardized assessments of child behavior, parental mental health, family food sufficiency, housing characteristics, and other conditions. We also interviewed community respondents in each site, including public officials, teachers, social workers, attorneys, consular officials, and staff at community organizations. Our study populations included immigrant families mostly from Mexico, Guatemala, El Salvador, and Haiti. We recruited families to reflect a range of circumstances and experiences.

## Worksite Arrests and Other Forms of Enforcement in Our Study Sites

Our site selection captured a range of community characteristics and enforcement circumstances. Four of our six study sites experienced large-scale worksite raids by U.S. Immigration and Customs Enforcement (ICE) agents. One site involved arrests in homes and other locations by ICE Fugitive Operation Teams (FOTs), which seek immigrants with outstanding deportation orders or who have committed immigration-related crimes. The sixth site included arrests of immigrants in their homes and workplaces as well as on the street by local police officers trained to enforce federal immigration laws under the 287(g) program—so named for the section of U.S. immigration law that authorizes it.

Two of the worksite raid sites—Grand Island, Nebraska, and New Bedford, Massachusetts—were included in our earlier study, *Paying the Price.* For the current study we conducted interviews with affected families and community interviews more than a year after the raids. The other two worksite raid sites that we studied—Van Nuys, California, and Postville, Iowa—experienced raids in the first half of 2008. In these sites we interviewed families and conducted community interviews twice—in 2008, a couple of months

A744

after the raids, and again in 2009 about a year later. The four sites included between 100 and 400 arrests each, which received considerable media attention and resulted in community-wide responses.

Our other two study sites involved smaller numbers of arrests over long time spans, and these arrests received less media attention and weaker community responses. We visited Miami in December 2008, where we interviewed Haitian families that had a parent arrested at home or in another setting by ICE FOTs during the previous two years. About 30,000 of the more than 500,000 immigrants on ICE's fugitive list are Haitian; many of this group applied for asylum and were rejected, or overstayed a valid visa. Our sixth site was Rogers-Springdale in Northwest Arkansas, which we visited in May 2008, six months after the local police signed 287(g) agreements with ICE to enforce immigration laws. Police screened immigrants in the county jails for their legal status and conducted a number of operations in the community—including raids on homes, roadblocks to check drivers' licenses, traffic stops for minor offenses, and a raid on a local Mexican restaurant chain. More than 400 immigrants were arrested in this six-month period.

## Findings

The children in the study experienced severe challenges, including separations from parents and economic hardships that likely contributed to adverse behavioral changes that parents reported.

### Family Separation

Parent-child separations pose serious risks to children's immediate safety, economic security, well-being, and longer-term development. Such separations were common in our study, though for a majority of children at least one parent was able to remain, either because they were not arrested or because they were released under supervision. About half of the families had parents released on the day of their arrest, often with electronic monitoring devices (EMDs) affixed to their ankles. In many cases parents were detained for an extended period following their arrests, including nearly a quarter where a parent was detained for more than a month and a handful where separations lasted more than six months, though our sample likely *underrepresents* these cases because we could not interview parents in detention. The

most common change in family structure that resulted from parent separation following arrest was that two-parent families became single-parent families, although in a few cases children stayed with other relatives or friends for an extended period when either a single parent or both parents were detained.

Between the time of the earlier worksite raids in Grand Island and New Bedford and the 2008 Van Nuys and Postville worksite raids, ICE issued humanitarian guidelines for large-scale worksite raids, which mandated release of single parents and those with needy children. These guidelines reduced the frequency of family separation, especially in the Van Nuys raid. The application of ankle bracelets with tracking devices allowed ICE to continue to monitor arrestees without requiring detention. This clearly was a better outcome from the families' point of view, though many parents faced some stigma and some other difficulties while wearing the ankle bracelets. Yet, in Postville—where many parents were also charged criminally for identity theft—and in the non-worksite arrests in Miami and Rogers-Springdale, children faced prolonged separations from at least one parent in a majority of cases.

In the long term, at least 20 families in our study experienced the deportation of a parent and were forced to confront painful decisions about whether children would leave the country with the deported parent or remain in the United States with either the other parent or another relative. In eight of these families, some or all of the children went with one or both parents to the parents' countries of origin, and in 12 cases, children remained in the United States, separated from one of their parents. The whole family left to join the deported parent in some of these cases, while in others the parents and siblings were split between countries. Our time frame was not long enough to assess the impacts on children who faced separations following deportation or, in most cases, to know the ultimate outcome regarding deportations and longer-term separations. Finally, in a few cases, parents returned illegally to the United States to be reunited with their children and families. The return journeys were rough, and one parent died the day after he was reunited with his family.

### Family Economic Hardship

Most families in our sample lost a working parent, because they were detained, deported, or released but not allowed to work. Following job loss, households experienced steep

A745

declines in income and hardships such as housing instability and food insufficiency. Many families experienced prolonged hardship in part due to extended efforts to contest deportation that took months and often more than a year to adjudicate.

*Job and income loss.* After the worksite raids, families lost workers who almost always had full-time jobs, consistent employment histories, and earnings that made their families generally self-sufficient. Families with workers at the meatpacking plants in Grand Island and Postville averaged $650 per week in income before the raids. Each of the families in Grand Island, New Bedford, and Postville lost all, or nearly all, of its income in the first few months following the raids, and the Postville families still had almost no income more than nine months after the raid. It was difficult to find new jobs in small communities like Postville, and families relied on informal supports, private charity, and public benefits to survive. EMD bracelets represented an additional barrier to work for families in Postville, Van Nuys, and Miami due to the stigma. Across all six sites, average incomes after the raids or other arrests were half or less than what they had been before.

*Housing instability.* Lost incomes in our sample were associated with housing instability. Many families started out in crowded conditions, but conditions worsened when families needed to move in with other relatives to control costs. One in four families moved in with others to save on housing costs. Of the eight families that had owned their homes before the parental arrest, four lost their homes afterward. Across our study sites, many children wound up moving often. Such instability can have adverse consequences for children, especially when coupled with other hardships and added family stress.

*Food hardship.* Families in our study reported food hardship at levels many times greater than those found in nationally representative samples. Nearly three out of five households reported difficulty paying for food "sometimes" or "frequently" in the months following parental arrest. Parents offered less variety of food to their children and cut back on their own consumption so that their children could eat. Nearly two out of three parents reduced the size of their meals, over half ate less than before, and more than a fifth reported having experienced hunger because they did not have enough to eat. These food-related hardships persisted in our long-term sample, in some cases for more than a year.

## Child Behavior Changes

*Widespread changes in child behavior.* In the short term, six months or less after a raid or other arrest, about two-thirds of children experienced changes in eating and sleeping habits. More than half of children in our study cried more often and were more afraid, and more than a third were more anxious, withdrawn, clingy, angry, or aggressive. A majority of children experienced four or more of these behavior changes. These behavioral changes subsided somewhat over time but were still widespread more than six months after the raids or other arrests, with shares on most of these indicators still above 40 percent. Younger children experienced greater difficulties eating and sleeping, excessive crying, and clinging to parents, while aggressive and withdrawn behavior was more common among the older children.

*Behavioral changes were more common following parent-child separation and following parental arrests in the home.* Children who were separated from detained parents were more likely to experience behavioral changes in both the short term and the long term. In the short term, about three out of four of the children separated from parents experienced changes in eating habits, while these changes were experienced by only half of the children who were not separated from their parents. About two-thirds of the children separated from their parents began crying, and about half of them exhibited fear. Of the children who were not separated from parents, about half cried more than before and about a third felt afraid. In the long term, children who did not see their parents for a month or more exhibited more frequent changes in sleeping habits, anger, and withdrawal compared with children who saw their parents in the first month after arrest.

The children in our sample who saw their parents arrested in home raids had even greater changes in sleeping and eating patterns, and much higher degrees of fear and anxiety. Children whose parents were arrested at home exhibited multiple behavioral changes more often than children whose parents were arrested elsewhere.

*Children's experience in schools.* Schools provided stability and a safe haven for many of the children in our sample, helping them adjust to life after their parents' arrests. As we found in our previous study, *Paying the Price,* schools across all sites worked with parents and community leaders to prevent children from going to empty homes. Despite efforts by school officials to keep children in school, many children initially

A746

experienced disruptions in the short run, including missed days of school. Some of the children's grades slipped in the short term. However, more often, parents and teachers told positive stories about children's long-run adjustments and the school's role in offering stability and structure for children. Students appear to have benefited from school routines and the support they received from teachers and school personnel—including counseling for a significant number of students in New Bedford and Postville. In several cases students who had struggled at first recovered their academic performance or saw improvements in the long term.

## Community Responses

Aside from schools, significant responses to the raids and other arrests were made by churches and faith-based organizations, community-based organizations (CBOs) and non-profit service providers, lawyers, and, to a lesser extent, public human services and child welfare agencies.

*Humanitarian assistance.* In the immediate aftermath of the large worksite raids in three sites—Grand Island, New Bedford, and Postville—communities mobilized assistance for affected families quickly, developing what might be considered disaster-relief operations. Sources of support varied, but in general these relief efforts were expensive, possibly surpassing $1 million in Postville. A confluence of participants were usually involved, including churches, community organizations, nonprofit service providers (e.g., United Way agencies), state and local government agencies, employers, and labor unions. These relief efforts were complicated because of the families' many needs (e.g., housing, utilities, food, and other basic needs) and the need to coordinate services across multiple providers, and because in many cases these needs lasted a long time.

Unlike *Paying the Price,* our current study also focuses on impacts and community responses in sites where immigrants were arrested in smaller-scale operations. Without a well-publicized raid as a catalyst, there was no such mobilization in Rogers-Springdale and Miami, leaving families there without an emergency response safety net. Family hardship was just as high, if not higher, in these two sites, but the levels of assistance to affected families were much lower.

*Legal assistance.* Among our study's workplace raid sites, legal assistance and efforts to contest deportation appear to have been most effective in New Bedford and Van Nuys. In these two sites many of those arrested have contested their deportations, a significant number have been successful, and

many of their cases continue to be adjudicated. The Rapid Response Network of Los Angeles assembled 45 attorneys to help defend the Van Nuys arrestees from deportation. These attorneys challenged the legality of the raid itself, leading to the temporary dismissal of deportation cases against almost half of all the arrestees. Following the New Bedford raid, Greater Boston Legal Services and legal staff at Catholic Social Services assembled a group of attorneys to represent the arrested workers, and a local philanthropist contributed to paying the bonds for many of the immigrants placed in detention. More than 100 of the New Bedford arrestees were still in the United States contesting their deportation two years after the raid.

Fewer people were able to contest their deportation in Postville, because most had also been charged criminally; however, more than a dozen had received relief from deportation a year and a half after the raid. Legal assistance was least successful in Grand Island, the earliest of our raid sites, where more parents took voluntary departure and fewer contested their deportation. It may be that over time, owing to national and state-level organizing efforts, lawyers became somewhat better equipped to assist immigrants caught up in raids. It is also likely that assembling legal responses to worksite raids proved more difficult in the smaller, more isolated communities of Postville and Grand Island than it did in Los Angeles and New Bedford (which is near Boston and Providence). It may also be that some legal remedies—such as U-visas, which can be issued for victims of crime—became more widely used. This was certainly the case in Postville, where most of those who succeeded in contesting their deportation received U-visas.

In our two nonworkplace raid sites, however, there was no organized legal response. Also, legal remedies were much less of an available option. Almost all of the Haitians arrested in Miami were on a final deportation order list, meaning that relief from deportation was very difficult. Immigrants in Rogers-Springdale were in some cases arrested for working illegally, but most were brought in on traffic violations and other criminal charges. Once they were charged criminally, obtaining immigration relief became much more difficult.

## Conclusion

The U.S. Department of Homeland Security (DHS) has continued to promote a policy of strict enforcement in the

A747

absence of progress on immigration reform legislation. The President, the Secretary of Homeland Security, ICE's leadership, and congressional leaders have all emphasized that strict enforcement would be a pillar of any credibly reformed system. Although comprehensive reform remains as elusive as it has been over the past several years, the new DHS leadership initiated some important smaller-scale changes in immigration enforcement.

- Humanitarian guidelines delineating terms for parental release during large-scale worksite raids were expanded to include smaller-scale raids (down to 25 arrests).
- Large worksite raids have ended for now, with the last small raid in Bellingham, Washington, in February 2009.
- Worksite enforcement is focusing instead on electronic verification of worker eligibility, audits of employers' personnel records, and fines against employers.
- The 287(g) program was revised, with stricter federal oversight and a focus on arresting and detaining serious criminals.
- Some greater discretion has been exercised in the detention of FOT arrestees, with a large group released under supervision recently in New Jersey.

In addition, the DHS is considering reforms to the detention system, including releasing more arrestees with supervision, detaining people in more humane conditions, and allowing better communication with attorneys and family members.

Overall, the number of arrests, detentions, and deportations of unauthorized immigrants has remained consistent at the historically high levels seen since 2006. ICE's FOTs continue their operations, and the number of 287(g) programs has expanded slightly. ICE has reemphasized its commitment to deporting immigrants with criminal records and has concentrated resources toward this aim, though what amounts to a "serious criminal offense" has yet to be defined.

Given that any overall abatement in the need for enforcement is not likely and that in many cases arrested unauthorized immigrants will have children, most of whom are U.S. citizens from birth, the nation must act to protect these children. Balancing enforcement imperatives against the best interests of children is a challenge the country must face squarely, whether or not the immigration system is more comprehensively reformed.

## Policy Recommendations

We make several recommendations to address the hardships of children within the context of ongoing enforcement of immigration laws. These include changes in U.S. immigration law, in immigration enforcement strategies, and in how community and public agencies respond to the needs of children affected by immigration enforcement.

*Changes to current immigration laws.*
1. Congress should modify immigration laws to take into account the circumstances and interests of children, especially U.S. citizen children, during deportation proceedings. Arrested parents should be allowed to argue hardship to U.S. citizen children before immigration judges, even when they do not meet other conditions for relief. Minor children who are U.S. citizens should be allowed to petition for their parents to become legal permanent residents (through a court-appointed legal guardian who can advocate for their interests).

*Changes in immigration enforcement strategies.*
2. ICE should maintain the de facto moratorium on worksite raids and instead concentrate on electronic verification, audits of employers, and other mechanisms to enforce laws against hiring immigrants illegally.
3. ICE should develop alternatives to detention for parents who represent neither a danger to the community nor a flight risk. ICE should consider expanding use of supervised release, including ankle bracelets, to nonworksite enforcement operations—as it appears ICE has done in some FOT operations. As DHS and ICE review detention policies, they should prioritize keeping families together and outside of detention settings whenever possible.
4. ICE should allow family members greater access to arrested immigrants during their processing and detention. ICE should minimize the transfer of detainees to remote locations and support children's communication and visitation with detained parents, as recommended by recent reports from the DHS Office of Inspector General and the U.S. Government Accountability Office.
5. ICE should allow parents who have a potentially valid claim the opportunity to work while contesting their deportation, by issuing work permits early on and by expediting U-visas for parents who are legitimate victims of crimes. Allowing parents to work would substantially reduce family economic hardship, the burden on

faith-based and other community-based providers, and use of public benefits for U.S. citizen children.

*Changes in community responses and services to affected children and families.*

6. DHS and the U.S. Department of Health and Human Services (DHHS) should work together to develop strategies to support state and local governments and nonprofit organizations to ensure the well-being of children when their parents are deported. Such plans should provide for education, health, and family stability.

7. The special role of schools and early childhood programs should be strengthened through policies that ensure early alerts from ICE and local law enforcement. Schools and early childhood providers should develop plans to protect children immediately following raids or other arrests to provide safe havens and responsive learning environments. The U.S. Department of Education and DHHS should work with ICE to offer technical assistance or federal guidance on best ways to ensure a positive learning environment for children in the aftermath of enforcement activities and provide resources for counseling children in schools.

8. Lawyers, community leaders, immigrant-serving organizations, faith-based organizations, and other trusted community members and institutions should educate parents about the best ways to respond when they are detained and asked whether they have children. This can be based on guidelines already developed by national groups and those used in states with large immigrant populations.

9. State and local child welfare agencies, along with foundations, experts, and advocates, should consider appropriate avenues to protect and advance the interests of children whose parents are caught up in immigration enforcement. The U.S. Children's Bureau in the Administration of Children and Families in DHHS should support work to identify positive practices and provide funding for technical assistance if best practices are identified.

10. National, state, and local networks of deportation defense lawyers should be established, perhaps through the American Bar Association and the American Immigration Lawyers Association. Such networks will be hardest to develop, yet most essential, in smaller cities and rural areas. Their services should be extended to immigrants caught up in both worksite and non-worksite raids.

11. Both legal and humanitarian assistance should be coordinated by and offered through trusted community institutions such as faith-based and immigrant-serving organizations. Such organizations should be prepared to continue assistance over the long term. We also recommend that government agencies work closely with these organizations to plan service delivery to affected families, including benefits for eligible U.S. citizen children.

12. Nongovernmental institutions such as churches, CBOs, foundations, and advocacy organizations, alongside state and national governments, should consider strategies for developing and coordinating health, education, and other essential services for citizen children who cross back and forth between nations as a result of parental deportation.

# 1. INTRODUCTION

Immigration persists as a national concern, engendering contentious debate, with most of the attention revolving around the estimated 12 million unauthorized immigrants living in the United States. Between 1990 and 2008 the number of unauthorized immigrants has risen from fewer than 5 million to nearly 12 million.[1] Recent legislative attempts in Congress—in 2006 and in 2007—failed to attract consensus on how to reform the immigration system or what to do about unauthorized immigrants. Immigration reform has been controversial with strongly held and competing viewpoints on issues such as the rule of law, the labor market demand for immigrants, their economic contributions, their fiscal costs and contributions, and how their integration affects local communities and schools.

Largely absent from the discussion and nearly invisible in the portraits of the illegal immigrant population have been the millions of children living with unauthorized parents.[2] In 2008, an estimated 5.5 million children (more than 7 percent of all children living in the United States) had unauthorized parents. Almost three-quarters of these children were U.S.-born citizens.[3] Like other U.S. children, these children grow up needing economic security, a stable home environment, strong and supportive families, and access to quality schools, health care, and social services. Their parents, even when they are unauthorized, work hard to provide these necessities for their children. Like all U.S. children, the nation invests in their future and relies in turn on their families to provide the primary support for raising them and developing their potential, and thereby the nation's. Yet unlike other U.S. children, the children of the unauthorized live under constant threat that their parents might be arrested and deported, leaving them vulnerable to family separation, instability, economic hardship, dramatic changes in their life courses, and potentially severe psychological and behavioral impacts. This report focuses on children who have experienced the arrest of at least one of their parents in a worksite raid or other immigration enforcement action.

## Immigration Enforcement

Absent consensus on immigration reform, the unauthorized immigrant population in the United States and their families have been subject to increasingly strict enforcement. Hundreds of thousands of children have experienced the arrests of their parents in recent years; a report by the U.S. Department of Homeland Security (DHS) estimated that over 100,000 parents with U.S. citizen children were deported over the past 10 years—most likely a significant underestimate since parents often do not divulge the presence of children when they are arrested.[4]

---

[1] Jeffrey S. Passel and D'Vera Cohn, 2009, *A Portrait of Unauthorized Immigrants in the United States,* Washington, DC: Pew Hispanic Center.

[2] The parents and many other family members discussed in this report were or are for the most part in the country illegally. There has been controversy over whether they should be called "illegal" or "undocumented." They are most often both. We use the term "unauthorized" in this report because it makes the fewest assumptions about their status. As discussed in later chapters, many have entered and live and work here illegally. Some are immigrants who have invalid documents, and some are found after adjudication to have legitimate claims for legal residence or may be pursuing such claims.

[3] An estimated 4 million children with unauthorized parents were U.S.-born citizens. Passel and Cohn, 2009, p. 7.

[4] U.S. Department of Homeland Security, 2009, *Removals Involving Illegal Alien Parents of United States Citizen Children,* OIG-09-15, Washington, DC: DHS, Office of Inspector General.

1

Our report describes the experiences of nearly 200 of these children in six sites where recent immigration enforcement activities have taken place. These enforcement activities include four large-scale worksite raids—each involving more than 100 arrests—as well as scattered, smaller-scale arrests of immigrants in their homes, on the street, and in other locations in two other sites.

The enforcement activities in our six study sites took place between December 2006 and May 2008, a period of heightened immigration enforcement. From federal fiscal years (FY) 2005 to 2009 the budget for U.S. Immigration and Customs Enforcement (ICE), the agency within DHS responsible for interior enforcement, grew from $3.6 to $5.9 billion and its personnel rose from 15,000 to 19,000. Of the total budget of about $6 billion in FY 2010, $2.5 billion is dedicated to "detention and removal operations"—including most of the activities we describe in this report.[5]

The number of immigrants in ICE detention on an average day rose by 45 percent from about 21,000 in FY 2005 to about 31,000 in FY 2008.[6] The total number of unauthorized immigrants deported annually increased from 206,000 in FY 2005 to 357,000 in FY 2008.[7] Although most of the immigrants detained and deported are apprehended through border enforcement efforts in areas near the Southwestern border, those arrested by ICE in the interior of the country through raids of worksites, homes, and other locations number in the tens of thousands each year.[8]

During our study period (2006–08), ICE increased its immigration enforcement activities, and in this report we focus on three forms of enforcement:[9] worksite raids, arrests by fugitive operations teams (FOTs) in homes and other locations, and arrests by state and local police officers through the 287(g) program.

*Worksite enforcement.* In FY 2005, a total of about 1,300 unauthorized immigrants were arrested at worksites; by FY 2008 this total had increased to 6,300.[10] Because of the large scale of these operations—which have at times involved a few hundred arrests—they have attracted widespread media attention. Despite the large numbers of people arrested in a single location, worksite raids have led to fewer arrests of unauthorized immigrants than other forms of enforcement activities we studied.

*Fugitive operations teams.* In one site, we studied arrests that had been made by FOTs, which have been active in arresting immigrants in homes and other locations. "Fugitives" are defined as immigrants who have "failed to leave the United States based upon a final order of removal, deportation, or exclusion; or who have failed to report to ICE after receiving notice to do so."[11] Between FY 2003 and FY 2008,

---

[5] ICE, 2009, "ICE Fiscal Year 2010 Enacted Budget," *Fact Sheet,* November 5, http://www.ice.gov/doclib/pi/news/factsheets/2010budgetfactsheet.doc.

[6] ICE, 2008, "Detention Management," *Fact Sheet,* November 18, http://www.ice.gov/pi/news/factsheets/index.htm. A recent report estimates that 379,000 immigrants in 2008 (and a similar number in 2009) passed through ICE detention or were supervised under threat of deportation. Dora Schriro, 2009, *Immigration Detention Overview and Recommendations,* Washington, DC: U.S. Department of Homeland Security, Immigration and Customs Enforcement, October 6.

[7] ICE, 2009, *ICE Fiscal Year 2008 Annual Report,* http://www.ice.gov/pi/reports/annual_report/index.htm.

[8] Kristen McCabe and Jeanne Batalova, 2009, "Immigration Enforcement in the United States," Washington, DC: Migration Policy Institute; Schriro, 2009, p. 12.

[9] These are not all of the enforcement activities under ICE's responsibility, and our report is not a review of all of ICE's enforcement activities. We did not study two other major programs that identify unauthorized immigrants when they come into contact with state and local law enforcement authorities. The first of these—the Criminal Alien Program—places ICE officers in state and local jails, where they identify unauthorized immigrants and put them in deportation proceedings (see ICE, 2008, "Criminal Alien Program," *Fact Sheet,* November 19, http://www.ice.gov/pi/news/factsheets/criminal_alien_program.htm). This program has resulted in a large number of referrals and deportations (over 200,000 in FY 2008), but it nets only criminals who are already serving time in state and local jails—and so does not result in any arrests. The second—Secure Communities—is a program just created in 2008 that allows state and local officers to screen immigrants for legal status via FBI and DHS databases, using their fingerprints; ICE plans to extend this program to all state and local jails in the coming years (see ICE, 2009, "Secure Communities," *Fact Sheet,* September 1, http://www.ice.gov/doclib/pi/news/factsheets/secure_communities.pdf).

[10] DHS, 2009, "Worksite Enforcement Overview," *Fact Sheet,* April 30, http://www.ice.gov/pi/news/factsheets/index.htm.

[11] ICE, 2009, "ICE Fugitive Operations Program," *Fact Sheet,* August 19, http://www.ice.gov/pi/news/factsheets/NFOP_FS.htm. Some fugitives are criminals who have orders of removal; however, the majority of those who have been arrested in recent years are people who have a deportation order because they missed a deportation hearing or failed to leave after being ordered deported.

the number of FOT arrests nationally increased dramatically from just 1,900 to over 34,000—and there were a total of nearly 100,000 arrests during this six-year period.[12]

*Arrests by state and local police with 287(g) agreements.* One of the study sites was a setting for arrests made by local law enforcement officers through the 287(g) agreements—so named for the section of immigration law that allows state and local law enforcement officers to become trained and then work under ICE supervision to enforce immigration laws.[13] In 1996, as part of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA),[14] Congress empowered ICE to delegate authority to make immigration arrests to state and local law enforcement agencies (as long as the agencies entered into formal agreements). This 287(g) program experienced rapid growth during our study period from just eight agreements in 2006 to 66 by 2009. As of November 2009, 1,075 officers had been trained and about 130,000 potentially deportable immigrants had been identified, mostly through screening of inmates in state and local jails.[15]

Immigration enforcement policies also changed during the period of our research and have continued to change since. For changes that occurred during our research—such as a new humanitarian policy to release parents of young children more expeditiously pending adjudication when they are picked up during worksite raids, or to make greater use of electronic monitoring devices (EMDs) to track released arrestees—we have sought to provide evidence about their implementation and effects.

In addition, the report provides information to inform ongoing and future policy reviews. Since we were in the field in 2008 and early 2009, the new Obama administration has reviewed a number of enforcement policies and made some significant changes in the enforcement of immigration laws. Large-scale worksite raids have all but ended, with the last major raid in February 2009 in Bellingham, Washington. Instead, the administration has focused on electronic verification of workers' legal status, increased audits of employer records and pressure on employers to fire unauthorized workers, and fines against employers who hire them. However, the administration has continued FOTs and other operations to pursue immigrants who have committed crimes or who have outstanding deportation orders.

## Goals of the Study

In 2007, we published *Paying the Price: The Impact of Immigration Raids on America's Children,* a report focusing on the short-term impacts of three large-scale worksite raids on immigrant families, communities, and schools, along with public and community response efforts that took place within six months after the raids.[16] Like that initial exploratory work, our current study relies primarily on structured interviews with community respondents and families with children that had at least one parent arrested, detained, or deported.

We have extended our previous work by capturing long-term raid impacts and community responses, monitoring changes in worksite raid implementation over time, studying multiple types of enforcement activities beyond worksite raids, representing the diversity of populations and communities affected by the raids, documenting more thoroughly family and child well-being after enforcement actions, and understanding how enforcement and community contexts affect community responses.

### Capturing Long-Term Consequences and Community Responses

We returned to two of the original worksite raid sites (Grand Island and New Bedford) for follow-up interviews more than one year after the raids. We visited two new (2008) worksite raid sites (Van Nuys and Postville), twice—within a couple of months after the raids and 10 months to

---

[12] Margot Mendelson, Shayna Strom, and Michael Wishnie, 2009, "Collateral Damage: An Examination of ICE's Fugitive Operations Program," Washington, DC: Migration Policy Institute.

[13] Anita Khashu, 2009, *The Role of Local Police: Striking a Balance between Immigration Enforcement and Civil Liberties,* Washington, DC: Police Foundation.

[14] Public Law 104-208.

[15] ICE, 2009, "Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act," *Fact Sheet,* November 13, http://www.ice.gov/pi/news/factsheets/section287_g.htm.

[16] Randy Capps, Rosa Maria Castañeda, Ajay Chaudry, and Robert Santos, 2007, *Paying the Price: The Impact of Immigration Raids on America's Children,* Washington, DC: National Council of La Raza.

3

one year later. In all four sites we interviewed a subset of affected families as well as leaders in the community twice.

### Monitoring Changes in Worksite Raid Implementation over Time

There has been considerable evolution in the way that worksite raids are carried out. During the earlier raids (Grand Island and New Bedford), ICE deported many people quickly or detained them for a period of time, though a few parents were released on their own recognizance or with bonds. In the more recent raids (Van Nuys and Postville), a significant number of parents were released almost immediately with EMDs on their ankles. Our study samples included many parents with EMDs on their ankles at these two sites. In Postville, a majority of the arrested immigrants were convicted of misuse of Social Security Numbers (SSNs) and held for five months.

### Studying Multiple Types of Enforcement Activities beyond Worksite Raids

Two study sites—Miami and Northwest Arkansas—were included to capture other types of enforcement activities. In Miami, the study respondents or their spouses or partners were arrested in their homes through FOT operations or at immigration hearings or appointments. The Miami study population was comprised of Haitian immigrants, most of whom were on ICE's list for deportation because their asylum claims had been rejected or they had overstayed their visa status. In Northwest Arkansas, local law enforcement agencies had entered into 287(g) agreements with ICE to enforce immigration laws and had arrested immigrants at worksites, during traffic stops, on the street, and in one case, just outside an elementary school. Because both of these types of enforcement activities result in arrests spread over a long period of time, rather than a massive number of arrests all at once, they often attract less attention and receive less of a community response than more dramatic worksite raids.

### Representing the Diversity of Populations and Communities Affected by the Raids

The vast majority (almost 90 percent) of unauthorized immigrants arrested and detained by ICE and local law enforcement agencies are from Mexico and Central America.[17] We also sought to include at least one non-Latino population and chose Haitians in Miami—a large unauthorized population that has been affected by thousands of arrests and deportations in recent years. To obtain diversity of community size, we included two of the nation's largest metropolitan areas (Miami and Van Nuys—which is part of Los Angeles); two medium-sized metropolitan areas (New Bedford and Rogers-Springdale); one small city (Grand Island); and Postville—a small town with an official population of just over 2,000 people. Our sites are also regionally diverse: one is in the Northeast, two in the Midwest, two in the Southeast, and one on the West Coast.

### Documenting More Thoroughly Family and Child Well-Being after Enforcement Actions

In our previous study, *Paying the Price,* we documented short-term family separations, economic hardship, and the need for social assistance following three large-scale worksite raids. The current study built on this previous work by documenting specific impacts on families and children. We still primarily relied on one-on-one conversations with arrested parents or their spouses, partners, or other relatives. The current study included the domains in the first study as well as others. The primary domains included family separation, economic hardship, changes in children's behavior, schooling interruptions, and parents' mental health. Where possible we added more structured questions to enhance data analysis across sites and other dimensions of our sample.

### Understanding How Enforcement and Community Contexts Affect Community Responses

In our initial exploratory study we found significant variation in the ways that organizations—including state and local government agencies, nonprofit human services providers, legal assistance groups, schools, and community-based organizations (CBOs)—responded to enforcement actions. In the current study, we also analyzed how the responses varied by community context: for instance, large cities versus rural areas and areas with more positive or negative attitudes toward immigration. We also looked at how

---

[17] Schriro, 2009, p. 6.

community responses differed following worksite raids versus FOT home raids and local policing operations.

## Research Questions

To achieve our research goals, the study and report focus on the following central questions:

1. What are the effects of enforcement actions on parent-child separation? How do these differ in the short, intermediate, and longer terms?
   - In the short term—the days and weeks following arrest,
     - How many parents are released, detained, or deported?
     - How long do parent-child separations last, and what are the consequences for children?
   - In the intermediate and longer terms,
     - How many families remain in the community where they were arrested? In another U.S. community?
     - How many parents leave the country, either voluntarily or by deportation?
     - When parents leave the community or the country, do they take their children with them?

2. What are some of the specific effects of enforcement actions on children's well-being?
   - How does family income change?
   - What types of material hardship do families face? How are their housing stability, food sufficiency, and other material conditions affected?
   - How do children respond to the stresses? Are there noticeable changes in children's behavior at home or in school?

3. What types of services and social support did immigrant families receive in the immediate and longer-term aftermath of parental arrests?
   - How were community (public and private) services delivered, and what kinds of response models were developed?
   - What lessons can be learned from the successes and challenges of providing community and public services intended to benefit children?

## Organization of the Report

The remainder of this introduction outlines the characteristics of the six study sites, provides an overview of the study meth-

ods, describes the sample of families with children that we interviewed, and discusses the study's limitations. The second chapter of the report discusses the different enforcement operations in the study sites. This chapter also addresses the effects of enforcement activities on parent-child separations when a parent is arrested, detained, or deported. Chapter 3 discusses other enforcement impacts on families, including changes in family income, housing instability, and food hardship. This chapter also describes the assistance that families received to cope with some of these difficulties. Chapter 4 describes in detail the consequences for children in terms of behavioral changes at home and at school. Chapter 5 focuses on community response efforts, including both legal efforts to contest deportation of parents and humanitarian assistance to families and children over the short, intermediate, and longer term. The final chapter discusses the study's main findings and conclusions, describes recent policy changes, and makes recommendations for developing effective and humane immigration enforcement policies.

## Study Sites

ICE conducted large-scale single-day raids on manufacturing plants in four of our study sites: Grand Island, New Bedford, Van Nuys, and Postville. The other two sites—Miami and Rogers-Springdale—were sites where other enforcement actions took place over extended periods (table 1.1). In Miami, FOTs, along with local police and Border Patrol agents, arrested immigrants at their homes; other immigrants were arrested during their immigration appointments and hearings with immigration officers. In Rogers-Springdale, the local police entered into a 287(g) agreement with ICE to enforce immigration laws, conducted joint worksite raids with ICE, and arrested immigrants during routine policing operations.

### Grand Island, Nebraska

Grand Island is a small city of about 45,000 people located 100 miles west of Omaha, Nebraska, and just off of Interstate 80, one of the nation's main East-West highways. More than 10 percent of the city's population is foreign born, and Latino immigrants are dispersed across the city. Mexico is the largest country of origin among Latino immigrants, but there are many recent arrivals from Guatemala, including indigenous Maya K'iche who speak neither

TABLE 1.1.  Characteristics of the Six Study Sites

| | Grand Island, Nebraska | New Bedford, Massachusetts | Van Nuys, California | Postville, Iowa | Miami, Florida | Rogers-Springdale, Arkansas |
|---|---|---|---|---|---|---|
| Region | Midwest | Northeast | West | Midwest | South | South |
| Metro area | Rural | Providence, RI | Los Angeles, CA | Rural | Miami, FL | Fayetteville, AR |
| Total population[a] | 45,000 | 94,000 | 3.8 million[b] | 2,300 | 352,000 | 47,000/64,000[c] |
| Foreign-born population | 6,000 | 20,000 | 1.5 million[b] | 750 | 206,000 | 9,000/13,000[c] |
| Primary origins of sample | Guatemala, Mexico | Guatemala, Honduras, El Salvador | Mexico, El Salvador | Guatemala, Mexico | Haiti | Mexico |
| Location of raid/arrests | Worksite | Worksite | Worksite | Worksite | Home, at appointments | Local policing operations, at appointments |
| Date of raid or arrests | December 2006 | March 2007 | February 2008 | May 2008 | Ongoing | Ongoing, starting in fall 2007 |
| Date(s) of our visit(s) | June 2007, June 2008 | May 2007, May 2008 | April 2008, May 2009 | July 2008, March 2009 | December 2008 | May 2008 |

a. Population from American Community Survey, 2005–2007 3-year average, for all sites except Postville. 2000 Census population for Postville.
b. Total and foreign-born populations for Los Angeles City.
c. Total and foreign-born populations for Rogers and Springdale, respectively.

English nor Spanish well. The surrounding area is agricultural and in town there are several manufacturing plants including the meatpacking plant, employing about 3,000. This plant was raided in December 2006 as part of a single-day raid on six Swift and Company plants simultaneously, netting over 1,297 arrests—the largest worksite raid conducted by ICE. Two hundred seventy-three unauthorized workers were arrested at the Grand Island plant. Before the raid, workers at the plant were unionized and earned $10–$15 hourly for full-time work, and many enjoyed significant overtime pay. Swift and Company was bought out by a Brazilian company in summer 2007 and the plant has remained in operation.

## New Bedford, Massachusetts

New Bedford is near the Providence and Boston metropolitan areas and has a population of almost 100,000, of whom just over 20 percent are immigrants. Located on the New England coast between Rhode Island and Cape Cod, the city is a seaport with an old and declining manufacturing base. Portuguese, Brazilian, and Cape Verdean immigrants form the nucleus of the long-term immigrant community, yet there are many recent arrivals from Central America—including the Hondurans, Salvadorans, and Guatemalans (mostly Maya K'iche as in Grand Island) who worked at the Michael Bianco sewing plant that made backpacks for the U.S. military. That plant was raided in March

2007 following investigations of alleged worker abuses, and 361 immigrants were arrested. Most of those arrested held sewing jobs that generally paid $7–$9 per hour, which was low relative to the cost of living in the area. The plant initially closed soon after the raid and was later sold to Eagle Industries of Missouri, which started new sewing operations at the factory.

## Van Nuys, California

Van Nuys is a suburban area within the City of Los Angeles, located in the San Fernando Valley, just northwest over the hills from downtown and Hollywood. Los Angeles is the second-largest city in the United States, with a 2005–2007 population of 3.8 million, 40 percent of whom are foreign born. Los Angeles has immigrants from all over the world, but more than half come from Mexico or Central America—600,000 from Mexico alone.[18] Van Nuys is a working-class community that includes several major manufacturing plants, including the Micro Solutions Enterprises plant that was raided by ICE in February 2008. The raid was based on a warrant for eight employees suspected of holding falsified documents. The vast majority of the 138 arrestees were immigrants from Mexico or El Salvador. Micro Solutions makes supplies for computer printers and is still in business.

_____

[18] American Community Survey, 2005–2007 three-year average, American Factfinder, http://factfinder.census.gov.

6

## Postville, Iowa

Postville is a small town in rural northeast Iowa, located almost 200 miles northeast of the state capital of Des Moines and nearly 200 miles south of Minneapolis. According to the 2000 Census, Postville had a population of just 2,300 (about a third of whom were immigrants), making it by far our smallest study site. However, unofficially there were more than 1,000 Latino immigrants in Postville, mostly workers at the town's largest employer: the Agriprocessors kosher meatpacking plant. Agriprocessors reportedly employed over 1,000 people—half the town's official population—just before it was raided in April 2008. The majority of the 389 arrested immigrants were Guatemalans, while others were from Mexico and Russia. Postville also had a large orthodox Jewish population that included plant managers and other employees.

Agriprocessors was investigated before and after the raid for a range of violations including fraudulent business transactions, underage hiring, worker physical and sexual abuse, withholding of pay, and environmental infractions. Agriprocessor's vice president and senior manager was convicted on 72 counts of fraud in November 2009 and faces significant potential jail time. The company, which also operated a kosher plant in Nebraska, filed for bankruptcy in November 2008 and closed for a period of weeks. In fall 2009 a Canadian company bought the plant and kosher meatpacking operations continue, but at about a third of the capacity before the raid. Postville has been devastated by the plant's bankruptcy and near closure, and the surrounding, mostly agricultural, area has few other employment or economic development options.

## Miami

Miami is the other major city in our study, with a 2005–2007 population of 350,000—over half of whom are immigrants. The greater Miami area is much larger, with a population of over 5 million—an estimated 200,000 of whom are of Haitian origin.[19]

Our study focused on Little Haiti, a poor community in Miami which has been a major settlement area for Haitian immigrants since 1980. Haitians in Miami-Dade County had a poverty rate of 30 percent, and the overall population of Little Haiti had a poverty rate of 44 percent in 2000. Many Haitians are employed in tourism and related industries, which are often seasonal, part-time, and low paying. Retail and food industry jobs, which are also low paying, are also common among Haitians in Miami. Although both English and Spanish are commonly spoken across Miami, most Haitians speak a Creole dialect of French, for which interpretation and translation are often difficult to obtain.

Haiti is the poorest country in the Western Hemisphere, has had a significant amount of political unrest and violence, and was struck by four hurricanes in 2008. However, unlike some Latin American and Caribbean nations, its nationals are not generally eligible for asylum or temporary protected status (TPS) due to political upheaval or natural disasters. As a consequence, there are a large number of Haitians living in Miami who are unauthorized and subject to arrest and deportation. Most of our study participants lived in the Little Haiti section of Miami, although a few lived farther north in the Miami metropolitan area. Little Haiti and other communities in Miami have been subject to a wave of sweeps by FOTs and other enforcement activities since 2005, which appear to have begun to decline very recently.

## Rogers-Springdale, Arkansas

Rogers and Springdale are neighboring cities in the Fayetteville metropolitan area, located in the northwest corner of Arkansas, adjoining the states of Oklahoma and Missouri. The metropolitan area has a 2005–2007 population of just over 400,000, with about 10 percent immigrants—half of whom are from Mexico. Rogers has a population of about 50,000 and Springdale, about 60,000. Rogers is located near the corporate headquarters of Wal-Mart, and Springdale is home to Tyson chicken processing. Employment growth in manufacturing (mostly food processing) and construction spurred rapid immigration to the area during the 1990s and since 2000.

In the fall of 2007, Rogers and Springdale, along with the surrounding counties of Benton and Washington, signed agreements with ICE that allowed local police officers to be

---

[19] The statistics about the Haitian population and Little Haiti presented here are taken from Ana Cruz-Taura and Jessica LeVeen Farr, 2008, "Miami, Florida: The Little Haiti Neighborhood," pp. 47–56 in *The Enduring Challenge of Concentrated Poverty in America: Case Studies from Communities across the U.S.,* edited by David Erickson, Carolina Reid, Lisa Nelson, Anne O'Shaughnessy, and Alan Berube, Washington, DC: The Federal Reserve System and The Brookings Institution.

7

trained to enforce immigration laws. After about one month of training, 19 officers from the four jurisdictions (Rogers, Springdale, and the two surrounding counties) returned and began checking the legal status of arrestees in the county jails, during traffic stops and other routine policing operations, and in small worksite raids. Most of the several hundred arrested immigrants were from Mexico or other Latin American countries.

## Study Methods

The central goal of the current study is to assess changes in children's well-being over time in the aftermath of immigration enforcement activities, within the context of each community. This goal guided the development of our research protocols.

### Research Protocols

We worked with an advisory committee (table 1.2) of ten experts from the fields of immigration law, child development, child psychiatry, education, sociology, and demography to design the study approach and protocols for data collection. Board members and staff from the foundations

---

*TABLE 1.2.  Study Advisory Committee*

| | |
|---|---|
| Vincent Eng<br>Deputy Director<br>Asian American Justice Center<br>Washington, D.C. | Krista Perreira, PhD<br>Professor of Public Policy<br>The University of North Carolina at Chapel Hill<br>Chapel Hill, North Carolina |
| Donald J. Hernandez, PhD<br>Professor of Sociology<br>Hunter College and the Graduate<br>   Center (CUNY)<br>New York, New York | Andres J. Pumariega, MD<br>Chair, Department of Psychiatry<br>The Reading Hospital and Medical Center<br>Reading, Pennsylvania |
| Bill Ong Hing, JD<br>Professor of Law and Asian American Studies<br>University of California, Davis, School of Law<br>Davis, California | Nestor Rodriguez, PhD<br>Professor of Sociology<br>University of Texas at Austin<br>Austin, Texas |
| Alan Jenkins, JD, MA<br>Co-Founder and Executive Director<br>Opportunity Agenda<br>New York, New York | Selcuk R. Sirin, PhD<br>Assistant Professor of Applied Psychology<br>New York University<br>New York, New York |
| Kathleen A. Moccio, JD<br>Consulting Attorney to Dorsey & Whitney LLP<br>Minneapolis, Minnesota | Carola Suárez-Orozco, PhD<br>Professor of Applied Psychology<br>New York University<br>New York, New York |

---

supporting our work also provided input on approach and protocol development for our research.

We developed two protocols—one for community respondents and the other for interviews with arrestees or their spouses/partners:

- *Community interview protocol.* The community interviews were guided by semi-structured protocols, which allowed for comparison across interviews within sites as well as across sites, but also encouraged open-ended responses. Community interviews centered on questions about the local economy and social characteristics of immigrant communities, as well as the conditions of immigrant families before the raids, experiences of families during the raids, and their legal disposition. We explored faith-based, nonprofit, community-based, and public response efforts in detail, as we did in the 2007 *Paying the Price* study.

- *Parent interview protocol.* The parent protocol included the characteristics of the family before parental arrest; the arrest itself, detention, supervised release, and deportation afterward; family economic hardship before and after the arrest; parental mental health; children's behavior and school performance; informal support offered by family and community members; and use of public social services. The protocol was structured around key indicators of child and family well-being but was also flexible enough to allow for conversation to flow from different starting points. It was important for parents feel comfortable telling their stories, and a flexible interviewing approach yielded valuable information.

In all sites we attempted to obtain data from the local schools on children's attendance, behavior, and academic performance before and after the raids. However, we were only successful in obtaining such academic records from one school district—Postville, Iowa—and thus, we make only limited use of these data in this report.

*Confidentiality of responses.* We ensured the confidentiality of all the information shared with us by both family and community respondents. Parent interviews were audiotaped and fully transcribed in Spanish, except for interviews in Miami, which were conducted in Creole and summarized in English. The resulting recordings, transcriptions, and summaries in the study's database included only unique identifiers, not names or other

identifying information on the families. All material from the family interviews was stored on encrypted computers. Targeted transcripts of our interviews with community respondents did not include identifying information, and all "off the record" comments were omitted from this report. We screened all material in this report to make sure that details cannot identify any respondents. Our data collection, storage, analysis, and reporting procedures were approved by the Urban Institute's institutional review board.

*Contacting and interviewing respondents.* Following the successful methodology used in our 2007 study, we communicated with national, state, and local organizations and contacted local leaders from community organizing groups, CBOs, churches and other faith-based organizations (FBOs), and service providers. We then identified and interviewed the following groups of community respondents:

- employers and union locals;
- state and local elected officials, board members, and service providers;
- law enforcement officials;
- nonprofit service providers;
- churches and other FBOs;
- teachers, administrators, other staff at schools, and child care providers;
- grassroots organizations and local community leaders;
- health care and mental health providers;
- immigration lawyers; and
- consular officials for countries with nationals arrested in immigration enforcement activities.

Through CBOs, FBOs, and other local contacts we were able to obtain contact information for a number of families in each site. In the worksite raid sites, we generally worked through one or two local CBOs or FBOs—usually the groups that organized and provided legal or humanitarian services to arrested immigrants and their families. However, because arrests were scattered over long time periods and across larger geographic areas, recruiting families in Miami and Rogers-Springdale required collaboration with more local contacts to help identify and locate respondents.

Two Urban Institute bilingual/bicultural (Spanish/English) researchers worked with local contacts to recruit and interview the sample and interviewed the family respondents in all sites except Miami. We hired a professionally trained Haitian Creole interpreter in Miami, the only site

where Spanish was not spoken by the respondents. All interviews were conducted where the family felt most comfortable. These locations included respondents' homes, churches, and community centers.

## Study Sample

Our sampling methodology involved subjective sampling of sites and respondents within sites. As outlined in the earlier explanation of the goals of the study, we chose our sites to capture the diversity of enforcement activity and its impacts on children by selecting those that

- spanned a range of enforcement activities (e.g., worksite raids, home raids, 287(g) sites),
- included immigrants from a range of home countries and regions (e.g., Mexico, Central America, Haiti),
- included a diversity of community environments and responses, and
- allowed for a longitudinal impact investigation.

To the extent possible we aimed to interview a diverse group of families to capture the range of experiences that they and their children encountered. Specifically, we aimed for a sample of families that included

- children ranging from infants to teenagers,
- both U.S. native and foreign-born children,
- families with different countries of origin, and
- parents who were detained for various lengths of time.

We asked the groups that helped us recruit families to identify as diverse a sample as possible using these criteria. In each site we were able to obtain a variety of children by age and citizenship. However, since the conditions of arrests in each site strongly influenced the family structure and length of separation for families we interviewed, we have more diversity across than within sites on these criteria.

Our study includes a final sample of 87 respondents across six sites (table 1.3). The 87 respondents were in 85 families and 83 households. About half our respondents in Grand Island and New Bedford were also interviewed in 2007 for our previous study. We interviewed the largest numbers of families in Van Nuys and Postville because our central contacts there were in communication with many families right after the raids and because we wanted to develop a broad base for follow-up interviews a year later.

9

A758

TABLE 1.3.  *Study Respondents and Household Characteristics by Site*

| Site | Children | Respondents | Households[a] | Families or couples[b] | Average children under 18 in U.S. per family[c] | Interviews (2008)[d] | Interviews (2009) |
|------|----------|-------------|---------------|------------------------|--------------------------------------------------|----------------------|--------------------|
| Postville, IA | 55 | 18 | 18 | 18 | 3.1 | 17 | 11 |
| Van Nuys, CA | 48 | 28 | 26 | 27 | 1.8 | 26 | 12 |
| Grand Island, NE | 27 | 12 | 12 | 12 | 2.3 | 9 | 0 |
| Rogers-Springdale, AR | 27 | 10 | 8 | 9 | 3.0 | 8 | 0 |
| Miami, FL | 19 | 9 | 9 | 9 | 2.1 | 10 | 0 |
| New Bedford, MA | 14 | 10 | 10 | 10 | 1.4 | 10 | 0 |
| Total | 190 | 87 | 83 | 85 | 2.2 | 80 | 23 |

*Source:* Urban Institute surveys of families in study sites.
a. Reflects two cases where respondents moved in together after parental arrest and two other cases where both the mother and the father were interviewed. There were 83 separate households before arrest.
b. Data were collected on four families in the two households where families moved in together, yielding two more families than households in the sample.
c. Children in the primary care of respondent, respondent's partner (or children's parent), or respondent's family member at time of interview. The total does not include (1) offspring age 18 years or older living in the household or (2) children who were living in their parents' country of origin at the time of the interview.
d. In most 2008 interviews, respondents were interviewed individually. In two cases, partners were interviewed together. In Grand Island, four unrelated respondents were interviewed together.

In 2009, we interviewed 23 respondents (12 in Van Nuys and 11 in Postville) and collected data on 55 children during a second round of interviews. We did not reinterview respondents in either Miami or Rogers-Springdale because their arrests were more dispersed over time and across locations than the worksite raids in the other sites.

We collected data on nativity and age for 187 children, two-thirds of whom (124 children) were U.S.-born citizens. In the overall sample, all children under 2 years old, and nearly all (34 out of 38) children age 3 to 5 were U.S. born. Almost half of children age 6 to 11 and a third of those ages 12 to 17 were born in the U.S. (table 1.4).

TABLE 1.4.  *Characteristics of Children in Study Sample*

| Child age | Gender | | All children | | U.S.-born children | |
|-----------|--------|--------|--------------|-----------------|--------------------|----------------------|
| | Male | Female | Number | Percent of total | Number | Percent of age group |
| 0 to 2 | 23 | 23 | 46 | 25% | 46 | 100% |
| 3 to 5 | 21 | 17 | 38 | 20% | 34 | 89% |
| 6 to 11 | 28 | 36 | 64 | 34% | 31 | 48% |
| 12 to 17 | 18 | 21 | 39 | 21% | 13 | 33% |
| Total, all age groups | 90 | 97 | 187[a] | 100% | 124 | 66% |

*Source:* Urban Institute surveys of families in study sites.
a. Does not include 3 children (out of 190) whose parent did not provide age or nativity.

Our study sample was drawn from Mexican and Central American immigrants in five of the six sites and from Haitian immigrants in Miami. Mexican immigrants were majorities of our Van Nuys and Rogers-Springdale samples. Approximately half of the respondents in Postville and Grand Island were from Guatemala and half were from Mexico. Nearly all New Bedford respondents were born in Central America, mainly in El Salvador and Guatemala.

Most of the families in our sample included long-term U.S. immigrants. More than a third (37 percent) had been in the country 10 years or longer, another third (36 percent) between 5 and 10 years, and less than a third (27 percent) for fewer than five years. There was substantial variation by site, with respondents in Arkansas and Grand Island averaging the longest U.S. tenure of 10 and 13 years, respectively, while respondents in Miami, Postville, Van Nuys, and New Bedford averaged only six to eight years. A few respondents in Arkansas, Grand Island, and Van Nuys had lived in the U.S. for nearly 20 years.

## Study Limitations

The primary limitation of the study lies in the recruitment of parent respondents. For this qualitative research study we worked through local intermediaries to screen and recruit respondents. As with most qualitative research studies, there are limitations that accompany our recruitment and sampling processes:

- Respondents were mostly recruited through FBOs and CBOs, so they may have been more connected to these institutions and more likely than other families to have received services.
- Arrestees who had already left the country with their families were not included, although in some cases we did interview families where one parent had been deported and another remained behind. This potential source of bias is more pronounced in our follow-up interviews, when some of the families we interviewed in the first round may have since left the country, and so are not included in second-round data.
- Arrestees who were in detention at the time of our site visits were also not included, unless a spouse or other family member was available to talk to us. As a result, we also somewhat underrepresent families with parents in long-term detention.
- Respondents who were more difficult to locate because they avoided seeking assistance, went into hiding, moved multiple times, or did not have telephones were more likely to be excluded from or underrepresented in the sample—and more so in the follow-up sample.

Because this is a qualitative research study that uses nonrandom sampling, it would be inappropriate to draw conclusions about the *statistical significance* of events and conditions we studied. We provide relevant data for documentation purposes, to illustrate the diversity of the sample we drew and the range of their experiences. The tabulations and statistics based on our sample cannot be generalized to the population arrested in raids or other enforcement activities.

We included open-ended questions as well as some closed-ended questions or short scales used in surveys to address issues such as housing, food sufficiency, and child behavior. In the report we at times refer to prevalence of certain behaviors or conditions in order to provide a foundation for our more in-depth qualitative analysis. In other words, we use some numbers to support our stories and give the reader a sense of how many other respondents in the sample reported similar experiences.

A number of other limitations also apply to this study. To document family experiences, interviewers were tasked with eliciting information across a broad range of domains. Doing so required building and maintaining strong rapport with respondents. We avoided lengthy closed-ended collection instruments so as not to disrupt the flow of conversation or trust between interviewers and respondents. We did not always ask short scales and closed-ended questions in the specific order and wording required for sophisticated scale construction. We used such questions more to elicit open-ended responses than to develop quantitative indicators of health and well-being.

Using parental reports as the primary source of data about the effects on children has both strengths and weaknesses. Parents may be limited in their ability to answer some questions, such as those about their children's school performance, since they may not readily observe it. Parents' own experiences may also affect their reporting. For example, parents experiencing stress for an extended period of time may interpret their children's behavior in a gloomy light. Conversely, parents may underreport less visible internalizing symptoms of anxiety or depression. Parents may also be reluctant to admit that their own arrest or detention has negatively affected their children. Further, parents may not equally understand what was meant by each of the questions we asked. For all of these reasons, the protocols were designed to ask to the extent possible about changes in specific observable behaviors, and to probe further using nontechnical terms that parents could understand.

Finally, we asked respondents about events and conditions in their families and for their children before and after the worksite raids and other enforcement activities. Based on their responses, we drew some conclusions about the impacts of immigration raids on children. We did not, however, collect sufficient data in a structured fashion that would permit broader generalizations. Nonetheless, the information in this report should provide useful insights for understanding how these raids and other arrests affect families and communities. From these data we draw what we believe to be appropriate policy conclusions and recommendations.

11

# 2. THE SEPARATION OF PARENTS AND CHILDREN FOLLOWING IMMIGRATION ENFORCEMENT

This chapter answers the first set of research questions about parent-child separations that followed worksite raids and other immigration enforcement activities. We begin with family separation because it poses serious risks to children's immediate safety, economic security, well-being, and longer-term development. Separation from a parent can be immediately traumatic and mean less—or less safe—supervision of a child. It can also mean less attention and reduced parent-child bonding. Children experiencing prolonged separation may experience emotional difficulties and have less assistance with their development and schooling.

There is a growing body of research that has explored the effects of family separation, either as a result of families migrating to the United States without their children or due to removal and deportation. These studies examine how children and parents respond and adjust to family separation. The circumstances surrounding separation (especially who is separated from whom), family and household dynamics, reunification or the prospect of reunification, the immigration status of individual family members, and length of separation can complicate or relieve the damaging consequences of parent-child separation.[20]

This chapter describes the effects of enforcement actions on parent-child separation not only in the short term—the days and weeks following arrest—but also in the intermediate and longer terms. In this chapter, we cover three phases that we have found best describe the complex experiences of families: the *immediate aftermath* of a raid or parental arrest, the *limbo* period when parents are detained or are released but contest their deportation, and the *final disposition* of cases leading to deportation or granting of U.S. residency. The way our sample of families was selected means that we do not have representative quantitative information about the proportion of families or children experiencing various kinds and durations of separation, but our qualitative data describe how separations played out for the families and children involved. Beyond this overall description, the chapter also identifies differences in parent-child separation as a result of changes in enforcement policy, and it looks at differences based on the type of enforcement action—worksite raids compared with fugitive operations and arrests by state and local police.

---

[20] A number of studies examine how families cope after being separated during the migration process. For a review of the impacts resulting from family separation during migration, see Carola Suárez-Orozco, Irina L. G. Todorova, and Josephine Louie, 2002, "Making Up for Lost Time: The Experience of Separation and Reunification among Immigrant Families," *Family Process* 41: 625–43; Carola Suárez-Orozco, Hee Jin Bang, and Ha Yeon Kim, "Psychological and Academic Implications of Transnational Immigrant Family Separations," *under review;* and Cecilia Manjívar and Leisy Abrego, 2009, "Parents and Children across Borders: Legal Instability and Intergenerational Relations in Guatemalan and Salvadoran Families," pp. 160–89 in *Across Generations: Immigrant Families in America,* edited by Nancy Foner, New York and London: New York University Press. For a study of family separation stemming from removal and deportation, see Nestor Rodriguez and Jacqueline Maria Hagan, 2004, "Fractured Families and Communities: Effects of Immigration Reform in Texas, Mexico, and El Salvador," *Latino Studies* 2: 328–51; and Jacqueline Hagan, Karl Eschbach, and Nestor Rodriguez, 2008, "U.S. Deportation Policy, Family Separation, and Circular Migration," *International Migration Review* 42: 64–88.

13

The descriptions in this chapter set the stage for the next two chapters, which trace important consequences for children that may flow from parent-child separation. The next chapter describes children's and families' experiences of economic hardship, including crowded housing and food insecurity, after the arrest of a working parent. After that, chapter 4 describes the behavioral, psychological, and developmental effects on children.

## Overview of Parent-Child Separations

A few different scenarios might follow from the arrest of a parent for an immigration violation, all of which have implications for the well-being of children and other family members. First, parents may be released promptly after their arrest to care for their children or for other humanitarian reasons. These parents—who may be released on their own recognizance, after posting a bond, or with an ankle monitoring device or another form of supervision—often remain in the communities in which they were arrested for months or even years awaiting resolution of their deportation cases. Second, parents may be detained for prolonged periods, during which they are separated from their children. Third, parents may be deported or choose voluntary departure, either immediately after their arrest or after prolonged detention. Deportation represents a potentially permanent geographic separation of children from their parents. Some of the parents who take voluntary departure are allowed to spend time with their families before leaving, but others leave the country without having this opportunity.

We summarize below the experiences of parents in our sample as they moved through this process. These experiences should be seen as examples but are not necessarily representative of all the arrested parents in our sites. Our sample includes examples of many different family experiences, but the sample may somewhat overrepresent parents—usually mothers—who were released, and it may underrepresent those who experienced longer detention or deportation.

### Early Release of Some Parents in the Sample

The parents in our study experienced detention periods ranging from just a few hours up to 10 months. Forty-two parents were released on the day of their arrest, primarily for humanitarian reasons—for example, to take care of their children (table 2.1). The vast majority of the parents released the same day were women (37), and most of these (34) also had children under age 6. Ten of those released on the same day were single mothers.

A nearly equal number of parents (45) spent at least one night in jail. In 17 cases, the parent was held for between 24 hours and one week before being allowed to rejoin his or her family; 10 more were held for up to one month. Eighteen parents were detained longer than one month, and of these, eight were eventually released, four remained in detention at the time of our interviews, and six were detained for an extended period and then deported.

### Arrests of Both Parents

Arrests of both parents (or a parent and unmarried partner) occurred in 12 families in the sample. In eight cases, the mother alone was released on the same day to take care of the children while her husband, partner or—in one case—

*TABLE 2.1.  Length of Separation of Parents from Children for Sample Respondents*

| | Length of Separation | | | | | |
|---|---|---|---|---|---|---|
| Site | Released same day | 1 day–1 week | 1 week–1 month | 1 month–6 months | > 6 months[a] | Total |
| Grand Island, NE | 7 | 1 | 2 | 0 | 2 | 12 |
| New Bedford, MA | 2 | 5 | 2 | 0 | 1 | 10 |
| Van Nuys, CA | 18 | 10 | 0 | 0 | 0 | 28 |
| Postville, IA | 11 | 0 | 0 | 6 | 1 | 18 |
| Miami MSA, FL | 4 | 0 | 2 | 2 | 1 | 9 |
| Rogers-Springdale, AR | 0 | 1 | 4 | 3 | 2 | 10 |
| Total | 42 | 17 | 10 | 11 | 7 | 87 |

*Source:* Urban Institute surveys of families in study sites.
a. Includes four cases in which parents were still detained at the time of interview.

14

ex-husband remained in detention. In one case, both the mother and father were released on the day of the raid to care for their infant child.

In three cases, both parents were held beyond the day of arrest. A New Bedford mother was held until the next day because immigration agents thought she looked too old to have an infant at home. She had given birth to a girl three months before the raid. Agents ignored her pleas for release. The father, who was held for two months, had also informed the agents that his wife needed to pick up the infant from the babysitter. In Grand Island, a father who had a work permit was held because he did not want to reveal where his wife was hiding. He was released three days later, but his wife was arrested and remained in detention over a year and a half after the raid. Two parents from Arkansas were both held on immigration violation charges for an extended period. The mother was detained for three weeks before her release and the father was held for three months. The grandparents took care of the children while the parents remained in detention. This was the only case in our sample in which both parents were detained for an extended period, and it involved arrest by the local police rather than ICE agents.

## Parental Deportation

Twenty of the 85 families—and 49 out of 190 children in our sample—experienced the deportation of a parent by the time of our last interview with the family. Many of our interviews took place within six months after the raid or other form of arrest. Sometimes the parent was still in detention. Even in our second-round interviews, more than nine months after arrest, many families were still contesting their deportation and the outcome was uncertain. Of the 12 men and eight women deported, nine were from Postville, five from Grand Island, four from Miami, one from New Bedford, and one from the Rogers-Springdale area. Seven parents returned to Mexico, nine to Guatemala, and four to Haiti.

Some of the parents who were eventually deported were detained for varying periods of time before their removal. Five parents chose to leave voluntarily immediately after their same-day release from detention. Another six deportees were detained for between several days and one month prior to their removal. The remaining nine parents were in detention for extended periods averaging about six months before their

final deportation. Many of these longer-term deportations were in Postville, where the majority of arrestees overall (but not in our sample) spent five or six months in detention.

These overall findings reflect considerable differences among our sites due to different enforcement strategies, including changes in ICE policies over time. We now turn to variation in children's experiences of separation by type of immigration enforcement and study site.

## Parent-Child Separations in Workplace Raids

Our 2007 report *Paying the Price* focused exclusively on three large-scale worksite raids which all took place in late 2006 or early 2007. The current study includes worksite raids that occurred over a longer time frame—between late 2006 and early 2008, allowing us to examine changes in ICE enforcement tactics over this period. During the earlier Grand Island and New Bedford raids, there was greater inconsistency in releasing parents soon after the raid versus keeping them in detention. More parents were held for long hours or extended periods lasting a week in the earlier raid sites, especially in New Bedford.[21] In November 2007, after the Grand Island and New Bedford raids, ICE released new guidelines for worksite raid operations— guidelines developed at least in part to respond to criticisms of how the New Bedford raid was conducted. These guidelines specified that in worksite raids of 150 arrests or more, all single parents and primary caregivers, as well as arrestees with serious medical conditions, should be immediately released.[22]

The Postville and Van Nuys raids occurred in 2008, after the guidelines were developed, and were large enough for them to apply. During these raids, ICE followed the guidelines by releasing primary or sole caregivers of minor children and those with acute medical conditions quickly— usually the same day—and often directly from the raid site. Consequently, there were no accounts of children left unattended or neglected for a significant amount of time in either Van Nuys or Postville. In fact, the large majority of

---

[21] Capps et al., 2007.

[22] On April 30, 2009, the new Obama administration extended these guidelines to include worksite raids with 25 or more arrests. For more detail, see ICE, 2009, "Worksite Enforcement Strategy," *Fact Sheet,* Washington, DC, April 30, http://www.ice.gov/doclib/pi/news/factsheets/worksite_strategy.pdf.

15

the cases in which parents had been released on the same day as the raid—as described above in table 2.1—occurred in these two sites.

In Van Nuys and Postville, all of the single mothers in our sample returned to their families on the day of the raid, though a single grandmother in charge of a young child was held for two days. In these raids, mothers also generally reported somewhat shorter arrest and processing periods on the day of arrest than did those arrested in the New Bedford or Grand Island raids. All were reunited with their families by evening and most were released earlier in the day.

In the longer term, many parents in all four of our worksite raid sites were deported. However, due to the efforts of immigration defense attorneys, several dozen immigrants in New Bedford, Van Nuys, and Postville received work permits while contesting their deportations or cooperating with prosecution of their employers. In Postville, about two dozen received "U-visas" for crime victims—mostly due to sexual and other harassment at work—and another group of 30 received temporary work permits for cooperating with the federal immigration case against their employers.[23] In New Bedford, at least 15 of the workers were able to acquire permanent resident status through the granting of asylum claims, U-visas, or special immigrant juvenile status (SIJS).[24] In Van Nuys, a group of 30–35 received temporary work permits for cooperating in the investigation against their employer, and 60–70 others had their deportation withheld while the legality of the raid was contested. Across the study sites, small numbers of other arrested immigrants were

granted asylum, had domestic violence or marriage claims that were accepted, or were young people who had been placed in foster care and would become eligible for SIJS.

The remainder of this section details the separation experiences of parents and children in the different worksite study sites. In addition, we take this opportunity to provide more detail on immigration operations in each site and briefly explain the degree to which our sample reflects the experiences of other arrestees in each site.

## Grand Island, Nebraska

The first of our study sites was part of the largest single-day operation that ICE has ever conducted. On December 12, 2006, ICE conducted "Operation Wagon Train" in which agents simultaneously raided six Swift and Company meatpacking plants in Greeley, Colorado; Grand Island, Nebraska; Marshalltown, Iowa; Worthington, Minnesota; and Cactus, Texas, arresting over 1,200 immigrants.[25] Swift and Company had used the DHS electronic verification system for its employees, and false SSNs had been discovered. ICE obtained warrants to raid the plants to find and arrest those with false SSNs. There were also small numbers of arrests in people's homes for at least a week in Grand Island and some of the other Swift sites.

A total of 273 workers were arrested at the Swift plant in Grand Island. They were taken by bus to Camp Dodge, a National Guard facility in Iowa, for initial processing—checking identities against ICE and criminal databases; taking fingerprints; and making initial determinations about who should be released, detained, or allowed to leave the country voluntarily. More than a quarter of arrestees (72 out of 273), many of whom were fathers in two-parent families, opted to take voluntary departure shortly after their arrest.[26] Only a

---

[23] U-visas were authorized by Congress in the Victims of Trafficking and Violence Protection Act of 2000 (Public Law 106-386) and are granted to victims of crime or people who possess information about a range of crimes committed in the United States. To qualify for a U-visa, immigrants must cooperate with U.S. law enforcement officials in prosecuting the crime. For more information, see National Immigration Law Center, 2000, "Congress Creates New 'T' and 'U' Visas for Victims of Exploitation," *Immigrant Rights Update,* 14(6), October 19, http://www.nilc.org/immlawpolicy/obtainlpr/oblpr039.htm.

[24] To qualify for SIJS, an immigrant youth must be under the jurisdiction of a juvenile court and eligible for long-term foster care due to drug abuse, abandonment, or neglect. Generally, this means that the youth is in long-term foster care and not eligible for family reunification. SIJS petitions lead to permanent residency but must be filed before youth turn age 18 and while they are still in custody of the state. For more information, see Center for Human Rights and Constitutional Law, 2004, "Special Immigrant Juvenile Status," October 20, http://immigrantchildren.org/SIJS/.

---

[25] Two of these raid sites—Greeley and Grand Island—were included in our 2007 report, *Paying the Price.*

[26] Voluntary departure has several advantages over formal deportation. First, voluntary departure is faster: immigrants can leave the country (and get out of detention) as soon as they are able to make travel arrangements. Contesting deportation can take months or even years—as was the case for many parents in our sample. Voluntary departure is often a way to end this process before it becomes prolonged. Second, formal deportation makes immigrants ineligible for a visa to reenter the country legally for 3 to 10 years, which is not the case for immigrants taking voluntary departure. Third, immigrants who have been formally deported are charged with a felony if they are caught reentering the United States illegally.

limited number of parents that we know of (six single mothers and three parents whose spouses had also been arrested) were released promptly after the raid to care for their children.[27] These early releases were achieved through the pressure of lawyers and community groups, some of whom showed up at the factory with children to demand their parents' release. Most of the rest of the arrestees were placed in continuing detention, and many workers were sent to facilities in Georgia and Alabama, far removed from their families. For the great majority of Grand Island arrestees, detention and separation from their children lasted for extended periods of time.

The length of detention and the nature of the legal process for families varied. By the six-month mark, 26 arrestees (10 percent of the total) had been criminally charged and were serving one-year sentences. The remaining workers had been either released on bond or deported. Those released paid bonds ranging from $1,500 to $10,000.

Lawyers initially estimated that fewer than 10 percent of those who stayed in the U.S. could contest their deportation based on asylum, marriage to a U.S. citizen, domestic violence, or another claim. At least a dozen arrestees were still contesting their deportation as of August 2009, and we only heard of two cases in which arrestees had been granted permanent residency. These examples from Grand Island as well as in the other sites show that legal battles to fight deportation can keep families in limbo for years.

The families in our sample differed from other families who experienced the Grand Island raid in important ways. First, while same-day release from ICE custody was rare in Grand Island, more than half of our respondents (7 of 12) had this experience. Second, only two of the workers we interviewed experienced long-term detention even though this was the norm for this site. Third, none of the parents with whom we spoke mentioned that a spouse had taken voluntary departure, while among all the arrestees voluntary departures predominated and many formal deportations had already occurred by the time of our second visit in June 2008. Five of the families we interviewed were ultimately affected by deportation.

### New Bedford, Massachusetts

Our second study site experienced one of the most controversial worksite raids because so many immigrant parents were held for prolonged periods of time, resulting in hardship for their families. A federal agent had been working undercover at Michael Bianco, Inc.—a contractor making backpacks for the U.S. military—and through this investigation, ICE obtained a warrant for violations of working conditions and workers' rights. On March 6, 2007, ICE agents raided Michael Bianco with a large show of force, which local leaders compared to an invasion by land, air, and sea. A total of 361 immigrants were arrested and most were transferred to Fort Devens, a U.S. Army training facility just outside of Boston, where lawyers and consular officials were unable to see them.[28]

The length of parents' separation from their children in this site varied substantially. About 60 New Bedford arrestees were released within the first three days on humanitarian grounds. However, most of the remaining arrestees (211) were flown to three different detention facilities in Texas two days after their initial arrest. This complicated the efforts of lawyers, consular officials, and workers from the Massachusetts Department of Social Services (MDSS) to contact them and inquire about the presence of children in their homes.[29] Eventually, the lawyers and a contingent of MDSS workers travelled to the detention centers in Texas. It took two very long days of interviews by MDSS workers, along with the intervention of Massachusetts's governor and its two U.S. senators, to get about two dozen women with children released in the week following their visit.[30] Two months after the raid, the majority of workers (191) were still in detention, though about 42 percent of the workers (149) had been released to await the result of their immigration cases, most with bonds ranging from $1,500 to $32,000.[31]

---

[28] Following both the Grand Island and New Bedford raids, ICE initially denied attorneys access to the facilities where most of the detainees were held because these were military facilities.

[29] The arrestees from El Salvador were generally kept within Massachusetts, but most of those from Guatemala and other countries were flown out of state.

[30] See for example Senator Edward M. Kennedy, 2007, "Making an Example of New Bedford Workers Doesn't Solve the Problem," *New Bedford Standard Times,* March 13; and Shane Harris, 2007, "Raid, 'Rashomon' Style," *National Journal,* April 14. Outrage over this situation prompted the Congressional hearings which led to the issuance of the new humanitarian guidelines for workplace raids referred to in the overview of this section.

[31] Many of the bonds were paid by a local philanthropist, Robert Hildreth, who initially remained anonymous and later identified himself. This philanthropist also later started a bond fund for detainees in other raids.

---

[27] Capps et al., *Paying the Price,* 2007.

17

By the one-year anniversary of the raid, all of the detainees had been released and many cases had been closed. About 44 percent of those who were originally arrested (160) had been deported; of these, slightly less than half (75) had signed voluntary departure agreements. However, another 190 cases were still being contested by families' immigration lawyers. Two years after the raid, 15 of the workers had been able to acquire permanent status in the U.S.; another hundred or more were still awaiting decisions or were still in the process of contesting their cases. New Bedford and Van Nuys were the two study sites with the largest numbers of deportation cases that were still being contested more than a year after the raids.

As in Grand Island, the parents we interviewed in New Bedford experienced shorter separations from their children than other workers at the same workplace raid. While more than half of those detained at Michael Bianco were held for more than two months after their arrest, only one of the parents with whom we spoke had been in detention for more than a month. Similarly, despite the prevalence of deportation and voluntary departure among detained workers in New Bedford, only one of our sample families experienced this kind of separation.

### Van Nuys, California

In our third study site, ICE put its new humanitarian release policy into practice. On February 7, 2008, ICE executed a search warrant and raided the headquarters and a manufacturing plant for Micro Solutions Enterprises, which makes printer cartridges for computers.[32] However, in contrast to the earlier raids, ICE called civil rights groups and social service agencies beforehand to alert them of an imminent raid in the area.[33] ICE systematically screened and identified for early release those workers with health problems or minor children. Of the 138 immigrants arrested, 48 were released the same day under the new guidelines—some with EMDs on their ankles.

Within a few days, the majority (99) of the arrestees had been released, though the conditions of their release

varied. Some parents were released without any conditions, while others' were released after posting a $1,000 bond or wearing an EMD.[34]

In our study sample, 18 out of 28 respondents were released on the day of the raid, and the other 10 were released within the first week—exemplifying the implementation of ICE's new humanitarian release policies. Twelve workers in our sample were released with an ankle bracelet initially. ICE agents expedited the processing of several respondents so that they could make it home to their children on the same day as the raid, even though this resulted in their being released without bracelets. Those released without EMDs were all required to return for a follow-up appointment to complete their paperwork. Thus there were no cases in our Van Nuys sample of prolonged detention or immediate deportation following arrest. Our sample fit the profile of the arrested population in Van Nuys, where virtually everyone was released quickly and almost no one was deported.

By June 2009, 15 months after the raid, 30–35 arrestees had decided to cooperate with ICE in testifying against Micro Solutions managers, and their deportation cases were put on hold at the discretion of the government. Within this group, some were given work permits, while others were not. Aside from these cases that were put on hold, most of the immigrants arrested in Van Nuys were still contesting their deportation as of December 2009—more than a year and a half after the raid. About half of the arrestees (60–70) had their deportation withheld after their attorneys challenged the legality of the raid itself. ICE did not have evidence that any of this group were in the country unlawfully; only 8 of the 138 arrestees were listed by name on criminal arrest warrants. A handful of other arrestees were pursuing relief from deportation individually.

Finally, a small but unknown number of Van Nuys arrestees had left the country voluntarily or had been

---

[32] Two or three of these arrests were in people's homes.

[33] Editorial, 2008, "Immigration Evolution: As Legislative Reforms Stall, Those on the Front Lines Are Hammering Out Workable Compromises," *Los Angeles Times*, April 3.

[34] ICE has an extensive monitoring infrastructure for unauthorized immigrants with deportation orders in Los Angeles, including a new program called the Intensive Supervision Appearance Program (ISAP). ISAP is one of ICE's initiatives to create alternatives to detention and includes use of ankle bracelet EMDs, telephone calls, required office visits, and unannounced home visits. See ICE, 2009, "Alternatives to Detention," Fact Sheet, Washington, DC, March 16, http://www.ice.gov/pi/news/factsheets/2009_immigration_detention_reforms.htm.

deported because they had previous deportation orders when they were arrested. Most of the ankle bracelets were removed within a few months after the raid.[35]

In our sample, at the time of the follow-up interview in May 2009, four parents were qualified to receive work permits. Two had received a work permit and two still waiting to receive a work permit. The others still found themselves without permits while awaiting the final outcomes of their legal cases.

## Postville, Iowa

The experiences of arrested parents were very different in our fourth site, Postville, which was the largest single-site raid we studied (389 arrests) and took place in a small-town setting (just 2,300 official population). Agriprocessors, a kosher meatpacking plant, had been under investigation by various federal and state agencies for underage hiring, worker abuses, and environmental infractions for some time when it was raided on May 12, 2008. Almost 1,000 agents descended on the town along with helicopters and multiple vehicles; this was the largest show of force in any site we visited. Most of the 389 arrested immigrants were arrested at the work site and then moved to the Cattle Congress in nearby Waterloo, Iowa, where ICE and the U.S. District Attorney's Office set up trials over a period of about 10 days. Among the 389 arrested, most were men and most did not have children in the United States.

On the day of the raid, 47 adults (44 women and 3 men) were released under humanitarian guidelines because they were parents; all of them were outfitted with EMDs on their ankles. About 20 other adults were held by ICE without criminal charges. In addition, 22 underage workers were arrested; 17 of these minors were released, and 5 were sent into the custody of the U.S. Office of Refugee Resettlement as unaccompanied minors.[36] The 47 adults released on

humanitarian grounds in Postville were required to wear the ankle EMDs for a prolonged period of time—more than a year in a few cases. In the summer of 2008, 15 of this group agreed to depart voluntarily and left the country. The remaining 32 worked with lawyers to contest their deportation with claims for asylum, domestic violence, or victimization at the plant.[37]

In our Postville sample, 11 of the 18 parents we interviewed were processed at the worksite and released on the same day. One of these 11 respondents said that ICE did not ask whether she had young children, and she did not volunteer the information until late in the day. She and her husband, parents of two daughters (ages 1 and 5), were arrested at the plant and put in buses to be transferred to Waterloo, Iowa. At 6:30 p.m. before the bus left, an agent asked her why she was crying so much. She told the agent that she was worried about her daughters. At that point, she was removed from the bus and reprocessed for release by 8:30 that evening. Another mother in Postville did not disclose she had children at home, but rather told ICE officials that her children were on vacation, fearing they might be taken away if ICE visited her home. As a result, she was detained for five months. Reflecting on her experience during the interview, she said she would have let ICE know she had children if she had been informed that this would have made her eligible for early release.

Parents in Postville who were detained beyond the first day of the raid had longer detention periods than in any of our other workplace raid sites. One of the unique features of the Postville raid was the leveling of criminal charges against a large majority of arrested immigrants. Over 300 immigrants were threatened with aggravated identity theft—a felony carrying a two-year prison term—because they had used someone else's SSN. Charges were dropped against about 35 of these immigrants because the SSNs they used did not actually belong to someone else (i.e., they used completely invalid SSNs), but the remaining 270 pled guilty to the misdemeanor charge of misusing SSNs and served five-month terms in state and federal facilities scattered across

---

[35] Alex Garcia, 2009, "Uncertainty Remains for Immigrants Detained during Van Nuys Raid," *San Fernando Valley Sun,* January 1.

[36] In Iowa it is against the law for meatpacking plants to employ people under age 18, but Agriprocessors had employed at least two dozen minors, not all of whom were arrested during the raid. The illegal employment of these minors was one of the most controversial elements of plant operations and has led to charges against the owners, as well as U-visas for some of the minors—as they were victims of underage hiring.

[37] In particular, there were numerous accusations of sexual and physical harassment of female employees at Agriprocessors, and these alleged incidents formed the basis for U-visa applications for many of the women in the ankle EMD group.

19

the Midwest.[38] Seven parents in our Postville sample were detained for three to five months and then released with work permits.

In May 2009, about a year after the raid, the U.S. Supreme Court struck down the convictions of SSN misuse, finding that the distinction between having an invalid SSN and using someone else's SSN was meaningless, and that the immigrants could not possibly have understood that they had stolen someone else's identity.[39] The decision came too late for most of the 270, who had already served their five-month terms and been deported. However, 41 were released in October 2008—after their terms were over—to testify against Agriprocessors, and most of this group received work permits.[40] Thirty-five of them were adults released to testify in the federal immigration case against Agriprocessors vice president Shalom Rubashkin. These 35 adults (including seven in our sample) were released with ankle EMDs in November 2008, and in February 2009 a court ordered their EMDs removed. In November 2009, the federal government dropped its immigration charges against Rubashkin, as he had already been convicted on 86 counts of financial fraud and faced likely significant jail time. In December 2009, these 35 immigrants awaited their likely imminent deportation.[41] The other six who were released after serving their sentences were minors expected to testify in the State of Iowa's case against Agriprocessors for hiring underage workers, a case still expected to go forward.

In December 2009, more than a year and a half after the raid, 29 women and minors—beyond those released as material witnesses—had received U-visas or work permits, and there were 30 deportation relief cases still pending. Some of those who received visas and permits were not caught up in the raid.

## Parent-Child Separations in the Nonworkplace Raid Sites

Besides the arrests at workplaces, immigration enforcement activities can take the form of FOT sweeps conducted by ICE agents and 287(g) arrests made by local police and sheriffs. Our current study expands the scope of the research described in our 2007 report *Paying the Price* to include these activities in addition to worksite raids. Because these arrests are most often the result of investigations of individuals rather than large employers, ICE's humanitarian guidelines around detention do not apply. Moreover, the scale of the arrests in any given operation is generally too small—less than 150 arrests at the time (less than 25 now)—for the guidelines to apply. The fact that humanitarian guidelines do not apply, along with the relative invisibility of these operations in comparison to workplace raids, makes parents and children particularly vulnerable to long separations. Nonetheless, there were instances in Miami when ICE released parents quickly for humanitarian reasons.[42] There were no such releases—and detention periods tended to be long—following arrests by the local police in Rogers-Springdale, Arkansas.

### Miami, Florida

Our research took place in the Miami metropolitan area, which in 2005–2007 was home to about one-third of the

---

[38] The speedy processing of these immigrants in group trials at the "Cattle Congress," their coercion into signing the pleas, and the lack of adequate interpretation and translation (as many immigrants were Guatemalans who spoke neither English nor Spanish well) were roundly criticized by the media, immigration attorneys, and some of those present during the proceedings. Eventually there were Congressional hearings on the topic. For a full accounting see the Congressional testimony of one of the Spanish language interpreters, Erik Camayd-Freixas, 2008, "Statement of Dr. Erik Camayd-Freixas, Federally Certified Interpreter at the U.S. District Court for the Northern District of Iowa Regarding a Hearing on 'The Arrest, Prosecution, and Conviction of 297 Undocumented Workers in Postville, Iowa,' from May 12 to 22, 2008, before the Subcommittee on Immigration, Citizenship, Refugees, Border Security and International Law," July 24.

[39] Adam Liptak and Julia Preston, 2009, "Justices Limit Use of Identity Theft Law in Immigration Cases," *New York Times,* May 4.

[40] Some of this group of 41 actually served an additional month in jail before they were released as material witnesses.

[41] Grant Schulte, 2009, "Postville Immigrants Face Likely Deportation," *Des Moines Register,* December 6.

[42] ICE has issued guidelines stating that FOTs should not take into custody children under age 18 who are citizens or permanent residents but instead should refer them, in order, to child welfare authorities, local law enforcement agencies, or a third party designated by the parent. These guidelines prioritize referral to child welfare or law enforcement over placement with relatives or friends of arrested immigrants. In practice it is not known the extent to which the FOTs follow the guidelines, and we did not encounter referrals of children to child welfare or local law enforcement during our visit to Miami. See ICE, 2007, "Juveniles Encountered during Fugitive Operations," Washington, DC: Office of Detention and Removal Operations, http://www.ice.gov/doclib/foia/dro_policy_memos/juvenilesencounteredduring fugitiveoperations.pdf.

20

nation's Haitian immigrants (about 175,000 out of 500,000).[43] Miami is home to a large Haitian unauthorized population, many of whom are on ICE's list for final deportations—a list estimated at 30,000 people nationally.[44] Many of the Haitian immigrants in the area applied for but were denied asylum, and others overstayed visas. There have not been many Haitian arrivals in the past few years, and most of the Haitians apprehended by ICE have resided in the United States for a long time.[45]

The arrests of Haitians in Miami occurred in small batches over a period of a few years. In 2008 there were many sweeps by FOTs—sometimes alongside Border Patrol agents or the local police—as well as arrests of Haitians during court dates and at ICE interviews. For example, in November 2008—a month before our visit—71 immigrants of various nationalities, including Haitians, were arrested by Miami FOTs.[46] A number of arrested Haitians were married to U.S. citizens who had petitioned for their legal residency. Nevertheless, some of this group had outstanding deportation orders and were arrested

and detained at meetings with immigration officers after their petitions were approved.[47] Some Haitians were also arrested by local police in traffic stops.

Our sample is comprised of immigrant parents—and spouses or partners of parents—who were arrested in one of the FOT sweeps or during court appearances or interviews between 2006 and 2008. Because many of the parents had outstanding deportation orders requiring mandatory detention, deportation and long-term detention were common both among our respondents and among other Haitians who were arrested during the same period. Three parents in our sample were deported and three were held for more than five months. However, there were four cases in which parents were immediately released with ankle bracelets so they would be able to take care of their children. For example, one single mother was arrested at her home one morning but was released and ordered to visit the immigration processing center later that morning. Immigration agents then told her that her deportation would be put on hold because she had no one else who could care for her daughter. This is a rare case in which ICE actually held up deportation because of a parent's caregiving responsibilities—and indicates that ICE has some capacity for discretion in such cases.

## Rogers-Springdale, Arkansas

In September 2007 the police departments of Rogers and Springdale joined with the sheriff's offices of the surrounding counties—Benton and Washington—to enter into four linked 287(g) agreements for a local Immigration Criminal Apprehension Task Force. Once this new task force was formed, local officers began pursuing unauthorized immigrants aggressively, arresting them not for serious crimes but for less serious infractions or for no crimes at all.[48] By May 2008, task force officers had arrested 419 immigrants during the first seven months of the program, but after May 2008

[43] American Community Survey, 2005–2007 three-year average, estimates from *American Factfinder*, http://factfinder.census.gov.
[44] Kirk Semple, 2009, "Haitians in U.S. Illegally Look for Signs of a Deporting Reprieve," *New York Times*, May 27.
[45] There has been a long-running political battle in Congress and the media over whether the U.S. government should grant Haitians either permanent asylum or TPS—as has been given to immigrants from several other countries in the Western Hemisphere. TPS, which allows immigrants to work and reside temporarily in the U.S., has been designated through September 2009 for some immigrants from Somalia, through May 2010 for Sudan, through July 2010 for Honduras and Nicaragua, and through September 2010 for El Salvador. See U.S. Citizenship and Immigration Services, 2009, "Temporary Protected Status," Washington, DC, April 30, http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=609d3591ec04d010VgnVCM10000048f3d6a1RCRD&vgnextchannel=609d3591ec04d010VgnVCM10000048f3d6a1RCRD.

Haiti is the poorest country in the Western Hemisphere, and suffers perennial political instability and violence. It was hit by four hurricanes in 2008 causing nearly a billion dollars in damages. The United States has had a consistent policy—in both Republican and Democratic administrations—of denying TPS, asylum, and other protective statuses regardless of the severity of circumstances in Haiti. The Bush administration suspended deportations to Haiti in September 2008—following the hurricanes—but then resumed them in December. There were a small number of deportations in early 2009, but as of June 2009 it was unclear whether the Obama administration would resume deportations on a significant scale.
[46] ICE, 2009, "ICE Arrests 71 Florida Residents in Targeted Immigration Fugitive Operation," Press Release, November 26.

[47] In these cases, the outstanding deportation orders appear to have trumped the petition for residency based on marriage to a U.S. citizen.
[48] ICE recently released data on the characteristics of immigrants brought into ICE detention through the 287(g) program. In FY 2008, 72 percent (27,000 out of 38,000) of all 287(g) detainees were not criminal aliens—in other words, they had not committed any nonimmigration-related crimes at the time of their arrests and had no prior criminal history. See Schriro, 2009, p. 13.

21

no further data on the program were released.[49] For example, the Rogers police department arrested some immigrants during routine traffic stops, reviving charges of racial profiling.[50] Further, the Benton County Sheriff's Office set up a New Year's Eve roadblock and arrested 14 immigrants— 4 for driving under the influence and the other 10 for driving without a license.[51]

In a controversial enforcement activity, officers from both Rogers and Springdale joined ICE agents in conducting mini–workplace raids on a chain of Mexican restaurants in December 2007. During these raids four owners and relatives were arrested and charged criminally, and another 19 employees were charged administratively.[52] The owners' home was raided as well, and their assets were confiscated. This amounted to a worksite raid conducted by the local police.

The types of arrests among our sampled families reflected the wide array of enforcement activities being carried out in the area. About half of the arrests occurred at the families' homes, while the rest took place where respondents worked or during routine traffic stops or immigration appointments. The reasons for the parents' arrests were also varied. Three of the nine arrests captured by our sample were related to the investigation of the Mexican restaurant chain. Two others involved outstanding deportation orders similar to those issued for the arrest of Haitians in Miami. One parent was initially arrested for shoplifting and had her immigration status checked in the process. One woman's abusive boyfriend reported her as unauthorized to local police. In the final case, a man was arrested and deported

the same day after police routinely stopped the truck full of laborers that his employer was driving.

None of the parents with whom we spoke had been granted early release for humanitarian reasons. Respondents from Arkansas on average had much longer detention periods than the parents we interviewed in other sites. Notably, three single mothers in Arkansas were held in detention between 12 days and six months. Finally, we heard of very few cases in Rogers-Springdale where arrested immigrants were able to contest their deportation.[53] Because of the additional criminal charges they faced, the likelihood of humanitarian release or relief from deportation was very low among immigrants arrested by 287(g) officers in Rogers and Springdale.

## Reliance on Spouses, Partners, and Extended Family for Children's Care during Arrest and Detention

One of the key concerns surrounding parent-child separation is the well-being of children in the care of someone other than their parent. In our sample, detained parents primarily relied on their spouse or extended family members to take care of the children during parental detention, over both the short and longer term. As a result, children were almost never left unattended following a parent's arrest.

In 33 out of our 85 sampled families, parents were released and reunited with their families on the day of their arrest. This included 11 single-parent families and 22 two-parent families; in the 22 two-parent cases, children saw both their parents again by the end of the day. As discussed earlier, in one case, both parents had been detained and released the same day to care for their infant. Sixty-one out of 190 children in our study sample saw their parents before the end of the day and did not experience separation resulting from a parent's arrest. Also, as discussed earlier, there were eight instances in which two parents were both arrested and one parent was released to care for the children. In each instance the mother was reunited with the

---

[49] The local police departments and ICE refused to release data on who was arrested and why (i.e., what their criminal charges were)—citing "privacy concerns" and other factors. See Melissa Sherman, 2008, "Information Scarce on 287(g) Program: Task Force Officers Arrest 419 in First Seven Months," *Morning News* (Northwest Arkansas), May 14.

[50] The Rogers police department settled a racial profiling lawsuit brought by Hispanic motorists in 2003. See Mark Minton, 2008, "Rogers Task Force Revives Fears of Bias: City Says Profiling Worries Are Baseless," *Arkansas Democrat-Gazette,* January 15; and Liz Boch, 2006, "Immigration Plan by Rogers Mayor Worries Hispanics: They See Racial-Profiling Dangers," *Arkansas Democrat-Gazette,* November 17.

[51] Jon Gambrell, 2008, "Hispanic Community Fears New Powers Given To Local Police in Arkansas," *Associated Press Financial Wire,* March 10.

[52] Dave Hughes, 2008, "Two Plead Innocent in Alien-Hiring Case," *Arkansas Democrat-Gazette,* January 15.

[53] In August 2009, nearly two years after the program's implementation, we only heard of one documented case where an arrested immigrant might get a visa under through the Violence against Women Act (VAWA). The VAWA case had started long before the arrest.

children, but the children were separated from their fathers, who remained detained.

In the remaining 52 families, 129 children experienced separation beyond the day of arrest: 44 lived in two-parent families and 8 lived with single parents. Among the two-parent families, 36 detained parents primarily relied on their spouses to take care of the children. In 28 of these families, an arrestee's wife or female partner took care of the children while her husband or partner remained in detention, and eight fathers (or male partners) became the primary care-givers when mothers were arrested. Eight two-parent house-holds relied on extended family members or friends to care for their children during parental detention, including two cases where both parents were detained and extended family cared for the couples' children. In the other six of these cases, a mother was detained while female family and friends assumed primary caretaking responsibilities, with support from the children's father. In the eight cases where a child had lived with a single parent before that parent's arrest, extended family and friends cared for the child while the parent remained in detention.

A mother in New Bedford and a custodial grandmother in Van Nuys were held for days before being released. Close friends and relatives took care of their children during their absence. In Arkansas, a divorced mother was released after 12 days, while another single mother remained in detention for weeks, and a third single mother was held for months. In these three cases, the mother's extended family, an ex-partner, and a close friend, respectively, took care of the children. Two divorced parents were detained and then deported. In both of these cases, extended family looked after the deportees' chil-dren, and in one case, the deportee later returned illegally to the United States to reunite with her children.

Among the families we spoke with, there were only a few cases in which children were left unsupervised or unattended for long periods, including one instance when a parent was released late on the day of the raid. A single mother of three in Van Nuys said her children were left unsupervised for several hours before she was released on the evening of the raid. Her 16- and 17-year-old children arrived home from school that day and then took care of their 4-year-old brother by themselves for several hours after he was dropped off from child care. A couple to whom she rented a separate bedroom in her home arrived late in the evening and helped take care of the young boy until the mother was released from detention very late that same night. One mother in

Arkansas was arrested by the local police for a traffic violation and narrowly avoided having her toddler left at a Head Start facility. She was not allowed a phone call by her arresting officer but managed to secretly make a quick call on her cell phone before it was taken from her. The mother called a friend and asked her to pick up her daughter from Head Start.

## Local Community Members Helped Coordinate Care for the Children of Detainees

In addition to spouses, partners, extended family, and friends, clergy members and community leaders played important roles in caring for children separated from their parents. In Postville, the entire community quickly mobi-lized because the raid was so large relative to the size of the community (as over a quarter of the town's official population was arrested). St. Bridget's Catholic Church became a safe haven for families. The principal and a counselor at the local public school coordinated all of the pick-ups and drop-offs of children from school, and child care center staff did the same for younger children. More than 100 children of all ages stayed at the church with their parents who had not been arrested or other relatives for almost a week after the raid. Schools and churches played similar supporting roles following the New Bedford and Grand Island raids, but the families there did not stay in churches for extended periods. In all three of these sites, churches, schools, and community organizations worked together to help families arrange care for their children and weather the storm in the immediate aftermath of the raids.

There was no large-scale coordinated effort in Van Nuys, although there were individual instances in which nonrelated caregivers stepped up to look out for children. An immediate, coordinated effort to locate children of arrested parents and find arrangements for them was less necessary in Van Nuys than the other raid sites, because the arrestees in Van Nuys were released quickly—including all of the single parents on the same day of the raid. One of our Van Nuys respondents told us that one of her children's teachers heard about the raid and held two of her students late at school. The teacher arranged for another parent to drive them to their adult sister's house that evening. Teachers also stayed late to supervise children in Grand Island, but there, too, all the children went to their own home or to a relative's home by the end of the day.

23

A772

## Parental Communication with Children during Detention

Most of the parents who were held for more than one day reported difficulties communicating with their children during detention. One man who was detained for six months said he was not permitted to make phone calls from the first detention center where he was held for a week.[54] A mother from Arkansas had a similar experience. During the first two months, she was only allowed to write letters. After that, she could call once or twice a week but had to call collect, and it was expensive. Other respondents, including a mother from Grand Island, registered the same complaint: "*The calls were very expensive. Ten dollars for five minutes to talk about everything you could in five minutes. So, I was always depressed* [when I hung up]." Those held in some of the detention centers were eventually able to use calling cards, which facilitated greater contact with loved ones at home. One mother said, of her detained spouse, "*In the beginning . . . they weren't letting him use the card to call. But later, when they changed him to the detention center where he is now, they let him use a calling card.*"

## Family Separations after Deportation and Voluntary Departure

The 20 families in our sample where a parent either chose voluntary departure or was formally deported were forced to confront difficult and often painful decisions about whether to send children out of the country with the deported parent. In eight of these families, some or all of the children went abroad with one or both parents, while in 12 other cases, children remained in the United States, separated from one of their parents. In some of these cases, the whole family left to join the deported parent, and in others, parents and siblings were split between countries. Finally, in a few cases, parents returned illegally to the United States to be reunited with their children. This section describes the experiences of these families with deported parents and the decisions that parents made about the future of their children.

## Families Where Children Traveled to Parents' Countries of Origin

Five families decided that some or all of the children should accompany the deported parent while their other parent stayed behind in the United States. In three of these cases, the mothers made this decision quickly, opting for voluntary departure after their same-day release, and they took their children with them. One mother, whose husband and brothers had fled Postville after the raid, explained that leaving was preferable given the extreme economic hardship that she and her three children were facing.

> The truth is here [St. Bridget's] *they're helping us, but this month I've said that I'm going to move out because now the situation is that you can't be with your kids . . . With a family, it's a little more difficult, and so I'm going to turn over the house and I'm going to take my children. I'm going to take either two or three children to Guatemala. I'm taking them in August because you can't survive like this.*

For the other two families that sent at least one child to be with a parent outside the United States, the trigger was deportation rather than voluntary departure, and the reunification of the deported parent and children outside of the United States came after a period of separation. One 11-year-old U.S.-born girl in Postville was separated from her mother for five months during the mother's detention and for sixth months following the mother's deportation; after six months the two were reunited in Mexico. This meant leaving behind the father and two older siblings, who were all undocumented and could not travel freely between the United States and Mexico. In another case, a Miami mother sent her 2-year-old son to live with his deported father in Haiti, because she could not afford to keep him with her in the United States anymore. "*The thing is, I cannot find any work and I have to support him. And if I'm not working I cannot rely on my parents all the time.*"

A total of three other whole families also opted to reunite with their deported family member in the parent's country of origin. In one of the Iowa families facing deportation, the decision for everyone to return to Mexico hastened plans that were already in place to return to their country of origin. The mother told us that before the raid occurred, she and her husband had planned on moving back to Mexico after earning enough money to finish construction on a home they were building there. She said that she

---

[54] The U.S. Government Accountability Office has documented difficulties with telephone communication between immigrants in ICE detention and their families. See GAO, 2007, *Telephone Access Problems Were Pervasive at Detention Facilities; Other Deficiencies Did Not Show a Pattern of Noncompliance,* GAO 07-785, July, http://www.gao.gov/new.items/d07875.pdf.

had even started encouraging their 9-year-old son to improve his Spanish grades at school so he would be ready to transition to school in Mexico. When both parents were arrested, they chose voluntary departure and moved back to Mexico as a family. In another instance, a mother, who followed her husband back to Guatemala after his deportation, shared how no one in the family had any will left to remain in Iowa, especially given the economic toll that the arrest had taken on their household. *"They don't want to be here anymore, practically, they don't want to anymore and neither does their dad."* Moving back reunited this mother and her four children not only with their deported father but also with two of their older siblings who had been separated from the family when their parents had migrated to the United States to look for work.

## Families Where Children Remained in the United States, Separated from a Deported Parent

At the time of the interview, the children in five of our sampled families remained in the United States, separated from their deported parent. One Miami mother, whose husband was deported after six months in detention, leaving her alone with her three children, lamented, *"I just can't take care of them anymore. It's only me and I cannot take care of them. I have no help."* She found herself working all the time just to keep the family afloat economically, but she could not bear the idea of sending their children back to Haiti.

Six of the deported parents reported that they did everything possible to make it back the United States to be with their children. For most of these parents, this meant facing a dangerous border crossing. One mother, who had been separated from her two children for more than four months, described the harrowing experiences she endured to be reunited with her children, who were being taken care of by an elderly aunt and uncle who had a hard time caring for them. After borrowing money from friends in Guatemala to fly to Mexico City, the mother was driven to the river in a trailer with other migrants. They then walked for 21 hours until a truck picked them up and brought them to Houston.

> *When they dropped us off up here in Houston, we couldn't even stand up. We couldn't stand the pain, our feet covered with blisters. But in spite of that, I gave thanks to God that I had made it and that I was here, and I went to see my kids.*

The border crossing took a tragic toll on one family in particular. After spending six months in jail, the father was deported to Guatemala and then traveled back through Mexico to New Bedford to rejoin his wife and 4-year-old child. He succumbed to a fatal heart attack just hours after their reunification.

One of these deportees was able to reunite with his family members through legal means. A Miami man, who took voluntary departure after he was arrested and released with an ankle bracelet on the same day, was able to petition for his legal residence because of his marriage to a U.S. citizen. He returned legally after about 14 months of separation from his family.

*****

Taken together, our six study sites provide a detailed picture of family separations following immigration enforcement operations by ICE and local police officers. There was considerable variation in the length of time after initial arrests that parents were detained and separated from their children, ranging from several months for many parents in Arkansas, New Bedford, and Postville, to less than a week for everyone in Van Nuys. The shares of parents overall and in our sample who were deported also varied significantly, with more deportations and voluntary departures in Arkansas, Grand Island and Postville than in the other sites. Our sample, however, was biased toward the parents who were released on the same day as their arrest or early on, because we could not interview those in detention or those who had already been deported by the time of our interviews. Nonetheless, about half of the sample consisted of two-parent families where at least one parent was arrested and detained for a significant period of time.

ICE humanitarian guidelines, which arose out of the controversies surrounding parent-child separations after the New Bedford raid, appear to have been fully implemented by early 2008, when the raids occurred in Van Nuys and Postville. In both of these sites—as well as in Miami, where the guidelines did not formally apply because the raids did not occur in workplaces—a significant share of our interviewed parents were released on the same day as their arrest. Requirements to wear EMDs on their ankles complicated matters for many of these parents, but release with an EMD was better than prolonged detention from the standpoint of maintaining the relationships between these children and their parents.

25

A774

On the other hand, the findings highlight the potentially far greater level of parent-child separation in enforcement actions carried out by local police through 287(g) agreements. The ICE humanitarian guidelines did not apply to the arrests by local police in Rogers and Springdale, where all of the sampled families experienced prolonged parent-child separations. In both Postville and Rogers-Springdale, the application of criminal charges mandated detention for many arrestees—in Rogers-Springdale most were arrested at their workplace or for minor traffic violations.

Another interesting and somewhat surprising finding was the variation in the final disposition of cases across our sites, particularly the differences in the likelihood of deportation across the workplace raid sites. In Van Nuys, only a small minority of arrestees were deported; about half were contesting their deportation as of December 2009, and another 30–35 had their deportation withheld for cooperating in the immigration case against Micro Solutions. More than half of the New Bedford arrestees were still contesting their deportation two and a half years after their arrests, and 15 that we know of have been granted asylee status, visas, or work permits. In Postville, by contrast, the majority of arrestees (but only a minority of those in our sample) were held for five months and then deported. Among those detained for a prolonged period, a significant minority were eventually released and some were granted work permits for cooperating with the investigation against Agriprocessors. Others in Postville continue to contest their deportation as victims of crime or on other grounds. In Grand Island only a few arrestees ever contested their

deportation, and we know of only a handful of cases in which they were successful.

As we shall see later in the report, much of this variation in outcomes has to do with the thorough legal defense efforts mounted in New Bedford and Van Nuys—and to a lesser extent in Postville. These legal defense efforts have been mounted on a variety of avenues to contest deportation. Thus far the most successful of these across the sites appears to be pursuit of U-visas for immigrants who are crime victims (as many were in the terrible working conditions in New Bedford and Postville). In Van Nuys, defense attorneys used a more unusual strategy, challenging the legality of the raid itself and the validity of the warrants served on immigrants there.

Immigrants arrested in the nonworkplace raid sites—through FOT home raids, at court dates, or in local policing operations under the 287(g) program—fare worse, with far less prospect of staying together as a family in the United States. The Haitians arrested in Miami generally had no chance to contest their deportation because they already had final deportation orders. According to respondents, only one person had his deportation order of removal canceled—out of hundreds of arrests—in Rogers-Springdale.

Regardless of the eventual outcomes, the vast majority of our sample from the workplace raids experienced long limbo periods while their deportation cases were contested. The next chapter turns to the experience of families during these limbo periods, with a particular focus on economic hardship as a consequence of separation—a parent detained or deported—or as a consequence of a parent's inability to work.

26

A775

# 3. THE EFFECTS OF IMMIGRATION ENFORCEMENT ON FAMILY WELL-BEING

This chapter addresses the second set of research questions—the effects of immigration enforcement on child and family well-being—and focuses specifically on economic hardship, including food insecurity and housing instability. We provide a detailed description of families' economic circumstances from several perspectives, but we focus in detail on lost income, food insecurity, and housing instability because these hardships can pose particular risk to children.[55] We then discuss where families turned for assistance and how much assistance they were able to receive.

## Changes in Families' Economic Hardship

The arrest of an immigrant parent has severe consequences for the economic well-being of children and families because the family generally loses a breadwinner. This is always the case in a worksite raid, where by definition the arrest is of a working parent, but it is also often the case when immigrants are arrested at home or other locations. The loss of a breadwinner occurs not only when parents are detained or deported, but also when they are released with a pending immigration case without authorization to work. Thus, in the vast majority of our cases, family incomes dropped severely following the raid or other parental arrest. Lost income triggered further economic hardships for families, including difficulty paying bills, housing instability, and food hardship.

## Lost Employment and Income

Before their arrest, most parents we interviewed—or their spouses—were working steadily and earning incomes suffi-

cient for them to support their families. Several of them had worked many years for the same company and had managed to obtain supervisory positions with higher wages. One woman in Van Nuys said she had worked nearly eight years for a company that merged with Micro Solutions, working her way up from a line worker to a supervisor, teaching lower-level employees how to do their jobs. *"I taught people how to work, looked over their work, kept track of production . . . and at the end of the day, I had to give a report to my supervisor . . . about what had been produced that day."* Another worker in Postville recounted how he had started at Agriprocessors when he was 14, working the night shift, taking dead chickens and turkeys to the garbage for $6.25 per hour. Over the next five years, he slowly worked his way up, aided by his burgeoning English skills, and transferred to the quality control team where he was making $9.25 per hour at the time he was arrested. Other workers had managed to build solid lives for themselves and were slowing breaking into the middle class. One woman explained, *"Everything was going well. I was in school, I had a good job, I had a magazine called* Contigo, *money coming in and going out, I owned a three-bedroom house, I paid my bills, I had a car. Everything was good."*

*Changes in employment.* Across our study sites, one in four households had no workers at all at the time of our

---

[55] Greg J. Duncan and Jeanne Brooks-Gunn, eds., 1997, *Consequences of Growing Up Poor,* New York: Russell Sage Foundation; Jane Waldfogel, 2006, *What Children Need,* Cambridge, MA: Harvard University Press.

27

interviews. Even those parents who were released often felt it would jeopardize their release to work or had difficulty finding employment. After being arrested in her home by police investigating unauthorized workers, a mother in Arkansas said that even though immigration had not expressly forbidden her to work after she was released, she was afraid that they would arrest her again if she did. *"They didn't for-bid me to work, or release me with any provisions, but, in truth, I don't have a way to work anymore. I'm afraid that immigration will grab me."* Another mother in Arkansas said that local police often used their knowledge of illegal employment to pressure immigrants to cooperate with investigations of their employers.

Respondents released on supervision with ankle moni-toring devices (most of whom were in Postville or Van Nuys) were the least likely to be working. These monitoring devices have GPS locators, allowing ICE to track immigrants. Respondents wearing bracelets were afraid ICE would find out they were working and this would lead to another arrest. One mother with an ankle bracelet said she could not stay in any particular location for an extended period of time because ICE might suspect she was working. Others felt they could not physically do the work because of the discomfort of the bracelet. *"In fact, you can't work. It's uncomfortable even just to walk."*

Some workers found that even if they overcame their fear of going back into the labor force, no one would hire them. One mother noted that everyone in her community knew she had been detained and that none of the employers would hire her because they were afraid of having problems with ICE. *"You want to look for work, everybody knows already that you got picked up, and so they are all afraid and no one wants to give you work, because you, even though you're afraid, go out to look and everyone closes their doors to you."* This was particularly the case in Postville, a small community in which the plant that was raided was the only significant employer.

*Declines in household income.* Household incomes before the raids or other arrests were modest and varied by site, reflecting differences in parental occupations and household structures. Household incomes before arrest were highest in the worksite raid sites, in part because these parents were working longer hours. In Postville, where the great majority of households (15 of 18) had two or more workers who routinely worked more than eight hours a day, median weekly house-hold income was relatively high compared with all of the other sites except Grand Island, where the Swift meatpacking plant workers were unionized (table 3.1). In contrast, families in Arkansas and Miami had lower household incomes and depended on fewer workers to support them. Six of nine Arkansas families and five of nine Miami families relied on only one paycheck before parental arrest. In both of these sites, parents worked in a variety of occupations that often offered part-time hours and paid lower wages than manufac-turing. These occupations included service sector jobs in restaurants and hotels, as well as seasonal work in construc-tion and plant nurseries.

Household incomes dropped precipitously in each of the four sites we visited within two months after a raid or within

TABLE 3.1. *Average Weekly Household Income and Workers Before and After Arrest*

| Site | N | Before arrest | Less than 6 months since arrest | % Change since arrest | More than 6 months since arrest[a] | % Change since arrest |
|------|---|---------------|--------------------------------|-----------------------|-----------------------------------|-----------------------|
| | | | **Time elapsed** | | | |
| All | 85 | $509 (1.8) | $154 (1.1) | –70% | $238 (1.3) | –53% |
| Grand Island | 12 | $652 (1.6) | – | – | $154 (1.3) | –76% |
| New Bedford | 10 | $553 (2.1) | – | – | $300 (1.1) | –46% |
| Van Nuys | 27 | $428 (2.1) | $221 (1.4) | –48% | $255 (2.0) | –40% |
| Postville | 18 | $654 (2.1) | $74 (0.6) | –89% | $51 (0.5) | –92% |
| Miami | 9 | $290 (1.1) | $158 (1.0) | –46% | $121 (1.0) | –58% |
| Arkansas | 9 | $376 (1.2) | $159 (1.0) | –58% | $160 (0.6) | –57% |

*Source:* Urban Institute surveys of families in study sites.
*Note:* Values in parentheses represent the average number of workers per household.
a. For Postville and Van Nuys, these consist of follow-up interviews. For Grand Island and New Bedford, "–" refers to "not applicable" because these data were not collected for our earlier study, *Paying the Price*, and are therefore not available for the current report.

28

six months after a parent's arrest in a nonworksite enforcement action. Postville had the steepest drop in incomes—to zero in most households—because the parents we interviewed who had been released with ankle bracelets were prohibited from working and could not find employment in the community. In Van Nuys where more families had some members still working after the raid, the loss in earned income was still nearly half of the pre-raid level, and many households that had two working members now had one.

In the instances where we interviewed families at a later point in time, including the raid sites where we returned, some families had stabilized their incomes somewhat, bringing up the average, but overall household earnings were still lower than the pre-raid levels. Households in New Bedford and Van Nuys were the only ones where weekly incomes were over half their pre-raid average more than a year after the raids there. On the other hand, families in Postville mostly experienced continuing unemployment. Among the 10 Postville families we reinterviewed nine months after the raid, six had little or no change in the number of workers or earnings in their households, and two families had lost the one income that they had had at the time of the first interview. Only one family increased its income between the first and second interviews. This family, which had no workers immediately after detention, had one member who was working informally making and selling jewelry, but the income earned from this activity was nominal and sporadic. Our four follow-up visits suggest that substantial declines in family incomes can persist up to a year or more following raids and other immigration arrests.

### Difficulty Paying Bills

As families lost workers and their incomes declined following the raids or arrests, they began to have more and more difficulty paying bills. Nearly two-thirds of families (54 of 85) reported having difficulty paying their household bills at the time of their first interview. These difficulties were most acute in Miami where all nine families were affected and in New Bedford where all but one of the 10 families testified to having economic problems of this type. The economic well-being of families seemed to become more precarious over time. Across our entire sample, a little more than half of those interviewed between two and six months following parental arrest had trouble paying bills, and this share rose

to three-quarters for those interviewed at later points in time. Difficulty paying bills remained relatively stable in Van Nuys between the first and second round of interviews, but the rate actually declined in Postville where families received sustained support for rent and utilities from St. Bridget's Church.

Because families often ended up delaying utility payments in order to pay their rent, these kinds of debts were the first to start piling up. Two out of every five families said that they had missed at least one payment for basic utilities such as water, electricity, and gas; and about a fifth had not paid a bill for telephone, cable, or internet service. Missed payments led to late fees that compounded difficulties paying bills and, in some cases, service cut-offs. Four families reported having at least one of their basic utilities cut off and another 12 families said their phone, cable, or Internet service had been discontinued.

Parents tried a number of things to keep up. Some cut off nonessential services like cable and cell phones to pay the rent or reduced their use of essential services further beyond already low levels. In Van Nuys, several families managed to stay in their homes by negotiating with their landlords over the amount and timing of rental payments, as well as waiving the cost of utilities. In one case, a father said that the only way he was able to stay in his apartment was that the landlord let him apply his security deposit to the incomplete rental payments he had made. Another worker shared that he had worked out a deal with the landlord for reduced rent in exchange for repair and maintenance work on his properties.

In Van Nuys, keeping up with bills was even more difficult for those who were released with EMDs on their ankles, because these EMDs were linked to a telephone landline for ICE to verify their location. At a time when many other families were discontinuing their phone service, those with ankle bracelets were being forced by ICE to take on another expense. Some of these families only had cell phones before the raid and had difficulty getting the phone company to install a landline without having a formal credit history. Many times, their only alternative was to pay an out-of-pocket security deposit.

### Housing Instability

Housing was the area in which the steep loss of income became the most apparent, particularly over time, largely because this was the families' biggest expense.

29

A778

*Crowded housing.* Many of the families started in very tight housing conditions and were doubled up with relatives and other families, but the arrests worsened these conditions significantly. For many families we interviewed, the burden of rent and other household bills was unsustainable during the first few months after an arrest, and this burden spurred them to look at other housing alternatives to cut costs. For one in four families, this meant moving in with friends or family or having others move in with them to pool resources.

This doubling up, however, was often less than ideal, as crowded households only became more overcrowded. One family of three in Van Nuys initially moved from their one-bedroom apartment to a garage after the raid, only to find that they could not afford the rent there either. From there, they moved into a two-bedroom house with seven other family members. Another mother, who had been left alone with her four children after her husband was detained, faced a similar reality. She had no choice but to move the five of them into the three-bedroom house where her mother, father, sister, and niece were already living. Doubling up with others changed family situations and affected children. One family in Van Nuys rented out their bedroom to another couple and their two children for $250 when money was especially tight. The experience was particularly hard for the children, who had conflicts with each other. The children lacked the space to run around inside the apartment and had to go play outside in the building's patio. They told their mother, *"I don't like to live like this."* But, there was nothing she could do.

In most cases, housing assistance did not lead to greater housing stability in the long run, because the amount of assistance received was insufficient to sustain families in their prior accommodations. Most of the housing assistance was also short term, for just three or four months after the raids. One exception was Postville, where charitable assistance through the church persisted for over year after the raid. However, even in Postville, about a third of the parents interviewed one year after the raid had moved to apartments with lower rents or moved in with family members or nonrelatives.

*Frequent moves.* The stigma the arrests carried sometimes led to housing instability. In one case in Van Nuys, a landlord heard about the raid and asked one of the women who was arrested to move out because he wanted to avoid having problems in his building. Another mother in Van Nuys had recurring housing problems because she wore an ankle bracelet. The couple that was living with her and her kids was sharing the rent at the time of her arrest but moved out when they saw she had an ankle bracelet. They were afraid immigration would come to the house. *"So, they said to me that if they put an ankle bracelet on me, they were going to move to another place because it made them afraid. I told them, 'Don't be afraid' and they said, 'No, we're going to leave.' And they left."* She then left that apartment and attempted to rent a room in another apartment, but once the man there found out about the bracelet, he told her that he was going to leave the apartment if she did not move out. Given the ultimatum, the mother and her three children moved into the living room of an apartment that four men were also renting.

Others reported voluntarily separating from loved ones to protect them, because living together could have exposed them to immigration enforcement. One father made the decision to move in with other workers who had to wear bracelets and sent his partner and her children to live with a relative. A woman encouraged her nephew, who lived with her family at the time of her arrest, to move out after she started wearing an ankle bracelet. She did not want to put him at risk.

> So he left because, since I have [an ankle] *bracelet and supposedly they've been calling a lot and are going to come and check on me, I imagine he had to have thought, "It's better if I go." And I told him, "It's OK. I don't want to put you in a bad position."*

Other families felt that they had to keep moving in order to avoid problems with immigration. One mother was deported and returned to the United States to be reunited with her husband and two children. Shortly after she returned, immigration officers came to the house. After that, she went to live with her adult son for two months for fear of them coming back again, even after her husband reassured her that the immigration officers thought she was still in Mexico. When she moved back in with her family briefly, immigration officers came back again, but she did not open the door. On that day, she moved back in with her son and had a friend pick up her children from school.

*Loss of homeownership.* Not surprisingly, the large majority of families in our sample rented their homes, but eight families across four of our sites—all but Miami and

*TABLE 3.2.  Short-Term Food Hardship in Households Following Arrest*

| Response | Could not afford enough food (n = 51) | Were not able to eat (could not afford) balanced meals (n = 50) | Reduced size of meals (n = 50) | Ate less than before (n = 49) | Experienced hunger (n = 50) |
|---|---|---|---|---|---|
| Never | 14 | 20 | 18 | 21 | 39 |
| Sometimes | 21 | 14 | 14 | 12 | 7 |
| Frequently | 16 | 16 | 18 | 16 | 4 |

*Source:* Urban Institute surveys of families in study sites.
*Notes:* These results are combined from 54 households across four sites—Van Nuys (27), Postville (17), Arkansas (6), and Miami (4)—interviewed two to six months after parental arrest. The total numbers of responses across the columns are different due to incomplete data and refusals to answer. All households included in the table answered at least four of the five items. One household is not included at all due to insufficient data.

Grand Island—owned homes and paid a mortgage prior to the parental arrest. All of these families struggled to make mortgage payments in the aftermath of the arrest, because of the loss of the main breadwinners' income. Half of the families had actually lost their homes by the time they were interviewed. This devastated families who had managed to establish themselves in the community and provide what they expected would be more substantial stability for their children. One mother explained how crushed her 5-year-old daughter was when she realized that the family had to sell the home they had lived in for seven years. *"When my daughter saw the 'For Sale' sign, she started to cry and she said to me, 'I don't want my house to be sold, it's our house.' "*

One mother in Arkansas lost her home when the father of her two sons, from whom she was estranged, took advantage of her six-month detention to refinance her three-bedroom home in his name, gain custody of their children, and move into her house with his new wife. When the mother was finally released and sent home on a Greyhound bus, she did not have anywhere to stay. Some friends offered a place for a while, but then they got tired of this arrangement. So, she stayed in a motel until she was able to find a room-mate. The worst part of losing her home was that she could not apply to regain custody of her children because she did not have anywhere for them to live. *"I can't, I don't have a place to . . . for them to be with me right now."* She was only able to see her sons a couple of times a week. *"Sunday is my day off so I see them from two to eight, eight thirty. And then between the week I go and see them for a couple of hours because they live* [here] *and I live* [there] *and you know with all the gas prices I barely have money for gas to take me to work."*

## Food Hardship

Most of our study families had difficulties affording food after immigration enforcement.[56] In the four sites where we interviewed families two to six months after a raid or arrest (table 3.2), nearly three out of five of these households reported difficulty paying for food "sometimes" or "frequently" immediately following detention; nearly two out of three reduced the size of their meals; over half ate less than before; and more than a fifth reported having experienced hunger because they did not have enough to eat, including four respondents who said they experienced hunger frequently.

These findings are far above national norms (table 3.3) and show considerable distress in our study sample. Well over half of the parents we interviewed said that, at least once in the past month, the food that they bought did not last, they could not afford to buy more food, or they could not afford to eat balanced meals. This contrasts with fewer

---

[56] Our study employed four questions from a broadly used food security scale developed by the U.S. Department of Agriculture. We did not employ the full scale, so we do not report "food security" results here but instead discuss the individual items. Moreover, we cannot directly ascribe difficulties affording food to the raids or arrests, although we know that most of these families experienced severe drops in income following these events. We did not ask food security questions about the period before the arrest, so we cannot gauge how much of the food hardship pre-dated immigration enforcement. We rely mostly on our qualitative data from the interviews to interpret the results from these food security items. For the full scale, refer to Mark Nord and Gary Bickel, 2002, *Measuring Children's Food Security in U.S. Households, 1995–99*, Food Assistance and Nutrition Research Report No. (FANRR25) 38, Washington, DC: USDA, Economic Research Service.

31

TABLE 3.3.  *Short- and Long-Term Food Hardship in Households Following Arrest*

| Food hardship item[a] | Time Elapsed (UI Sample) | | |
|---|---|---|---|
| | Less than 6 months (n = 54)[b] | More than 6 months (n = 46)[c] | National[d] |
| Food bought didn't last and respondent didn't have money to get more | 72.5% | 82.6% | 12.4% |
| Respondent couldn't afford to eat balanced meals | 60.0% | 78.3% | 11.3% |
| Adults cut the size of meals or skipped meals | 64.0% | 60.9% | 6.5% |
| Respondent ate less than felt he/she could | 57.1% | 57.8% | 6.5% |
| Respondent was hungry but couldn't afford to eat | 22.0% | 28.3% | 3.3% |

*Source:* Urban Institute surveys of families in study sites.
*Note:* Actual numbers for individual items may sometimes be lower because of refusals or missing data.
a. Share reporting condition "sometimes" or "frequently" within the past month.
b. Includes first interviews from families in Van Nuys (27) and Postville (17), as well as interviews with families from Arkansas (6) and Miami (4).
c. Includes follow-up interview in Van Nuys (12) and Postville (11) as well as interviews from four other sites: New Bedford (9), Grand Island (8), Miami (4), and Arkansas (2)—interviewed more than nine months after parental arrest. 22 of the families were also interviewed in the first round in Van Nuys and Postville.
d. These statistics come from Mark Nord, Margaret Andrews, and Steven Carlson, 2008, *Household Food Security in the United States, 2007*, ERR-66, Washington, DC: USDA, Economic Research Service.

than one in eight American families being affected by these conditions. More frequently than other U.S. families, our parents also reported that they cut the size of meals or skipped meals, ate less than they felt they could, or felt hungry but did not eat because they could not afford to buy food. The parents we spoke with were seven times more likely to report experiencing hunger than the U.S. average.

The families interviewed across all of the sites in our sample more than six months after arrests reported difficulties securing enough food over the long term (table 3.4). Among the families in the study sample—which includes 22 follow-up interviews—these difficulties generally persisted and sometimes increased. In the long term, a higher percentage of parents reported that the food they bought did not last, they could not afford to eat balanced meals, or

they endured hunger because they could not afford to buy food.

There was some variation in responses to these questions across the study sites, with the highest reports of food insufficiency and hunger in the nonworksite raid sites: Miami and Rogers-Springdale. Haitian families in Miami reported the highest levels on each of the five food hardship measures, particularly hunger. All nine families interviewed indicated they went hungry and were more likely to report that they "frequently" experienced food hardship. For example, a Haitian single mother who was arrested at home one morning three months before the interview said, *"Not only did we have to cut the size of our meals we had to skip meals, because it's not whenever you want a meal that you can have a meal."* Another single mother, caring for her own two children as well as her niece, reported great difficulty finding

TABLE 3.4.  *Long-Term Food Hardship in Households Following Arrest*

| Response | Could not afford enough food (n = 46) | Were not able to eat (could not afford) balanced meals (n = 46) | Reduced size of meals (n = 46) | Ate less than before (n = 45) | Experienced hunger (n = 46) |
|---|---|---|---|---|---|
| Never | 8 | 10 | 18 | 19 | 33 |
| Sometimes | 18 | 18 | 8 | 16 | 10 |
| Frequently | 20 | 18 | 20 | 10 | 3 |

*Source:* Urban Institute surveys of families in study sites.
*Notes:* These results are combined from 46 households across six sites—Van Nuys (12), Postville (11), New Bedford (9), Grand Island (8), Miami (4), and Arkansas (2)—interviewed more than nine months after parental arrest. 22 of the families were also interviewed in the first round in Van Nuys and Postville. The total numbers of responses for questions may be lower due to a missing response. 45 households answered each of the five items.

work since her work permit expired three years earlier. With her brother deported, things have only gotten harder, since she could no longer count on his income to help put food on the table. She said,

> The kids have a lot of problems because sometimes I have five dollars for whole week and the kids only have noodles and the kids will only eat noodles. And I'll buy a gallon of water and they'll drink water and just go to bed like that.

Even so, food hardship was by no means limited to Miami. A family from Postville with two children said that they cut their food purchases from about $180 per week to between $30 and $50 per week in the first few months after the raid. The mother described their situation: *"It was really hard because since then, we've been here but it isn't easy at all because we can't work and I would like to work and, well, so that my daughters can have what they ask for because . . . Now we don't buy . . . fruit, yogurt, and all those things. We don't buy* [them] *because . . . we can* [only] *buy the necessities."* A mother of four in Postville explained to her children when they asked for some variety in their meals after the raid, *"We don't have it right now. Eat this now, even if it's beans. You know the situation we're in. I can't buy you everything."* In Arkansas, one interviewee related how her sick mother's health has been compromised by food hardship.

> My mother, she has an illness, she has arthritis, and she has to take pills. But the pills make her sick to her stomach. So, she has to drink a lot of milk and sometimes she's had to go without so that the baby can have it.

For families in Postville that were interviewed twice, food hardship abated for some by the time of the second interview nine months after the raids. In Postville, the number of families reporting milder forms of food hardship declined, and by the second interview no families reported hunger. Although some families in Postville continued to struggle to get enough food to eat on a regular basis, they fared better than families in our other sites because of sustained assistance from St. Bridget's Church and local organizations.

Several families talked about juggling between food and other basic needs. In Arkansas, a mother of four children, ages 2, 8, 13, and 16, who was picked up for a traffic violation six months prior to the interview said that it had

become untenable to make ends meet. She said, *"It doesn't last. If I'm going to pay the bills, I have nothing for food."* Another mother of two toddlers ages 1 and 2 who was given an ankle bracelet during a home raid four months earlier said that she constantly negotiated which bills to pay. *"Sometimes we don't pay the water so we can buy food. Sometimes we don't pay the insurance so we can buy food. Sometimes we don't pay the light so that we can buy food."*

Some parents reported eating less or going without food so that their children could eat more. A single mother of three in Van Nuys said that during the first few months, her children refused to eat dinner because they thought that there wasn't enough food for the household. Every night before starting to eat dinner they asked her if there was enough food for everyone. She told them constantly that there was enough, and she would eat less herself so they would have more to eat. She would say, *"Sons, eat,"* and they would respond, *"Mommy, you eat first."* Once she saw how concerned they were over her reduced portions, she began to hide her food intake as much as she could from them. After she obtained a work permit and began working work again, she took salads for lunch because she wanted to save the rest of the food for the family dinner. Another father of two in Van Nuys said that he and his partner regularly ate less so that his two boys, ages 12 and 8, would not notice the scarcity as much. He said with some hesitation,

> Up until now, the boys—we, as adults, well, I—the truth, yes, I've endured, well, sometimes I haven't eaten, um, one day, two days, for the same reason that I've had to reduce my expenses, but we try to manage so the boys . . . don't go through that.

One of the most common strategies for stretching food was to buy less expensive items, cheaper ingredients, or more processed foods to save on food costs. A mother in Grand Island said,

> So, I can change their meals to something more economical but not start measuring things out, understand? I think that would be very cruel, that you say "ay—only this or only that." I prefer to change the menu and make it cheaper.

Several parents mentioned that buying cheaper food was a lot harder at a time when the prices of basics like milk, eggs, and rice were increasingly expensive.

33

## Families' Coping Strategies and Forms of Assistance after Arrests

### Employment after Parental Arrests

During this difficult adjustment period when many of the arrested parents were unable to work, spouses often took on extra hours to help make ends meet. One interviewee reported that her husband was working 12-hour shifts, from 3:00 in the afternoon to 3:00 in the morning. *"More hours, overtime. He works from three in the afternoon to three in the morning . . . and he tries to make sacrifices, I'll tell you, because there are expenses, lots of expenses."* Another interviewee said her husband sometimes worked double shifts twice a week. *"He stays to work a double shift and nowadays that's how it's been, only him working. Sometimes two times he has to stay to work a double shift, two times a week and it's hard because eight hours and you're really worn out and you still have to work more, but like he says, it's a necessity."*

In a few families, the parents decided to separate geographically so that one of them could find employment. One family separated after the children's mother was arrested and the father could no longer find work in Postville. He moved to a nearby town where he found work to help support the wife and children, but because of his work schedule he rarely visited and could no longer take as much of a role in helping with the children. Their older son regularly asked about him and worried he would be arrested, too. By the time we returned to Postville for the second round of interviews with families, the father had returned after eight months and was living with his family. In Grand Island, a father raising two children on his own because his wife was deported lost his job a few months later and could not find a job nearby with a good enough income. He took a job working at an energy plant that was six hours away, and was only able to come home three days per week. During the months his wife was in detention, the teenage children mostly stayed home alone and on occasion were looked after by relatives.

In the long term, many workers who had been arrested found ways to go back to work because of economic necessity. Most of the parents who worked after their arrest found themselves in the informal labor market to avoid being detected by ICE again. One father in Grand Island said he mostly worked mowing lawns and doing odd jobs, though he could easily have found steady factory work, because he didn't want to do anything that might complicate his legal case. *"I want to work. I do house repairs here and there. But I don't want to get a job at a company because I don't want to ruin my case."* The most commonly held informal jobs included house and office cleaning, babysitting for relatives and friends, doing odd jobs and construction as day laborers, recycling, selling raffle tickets, and making and selling handicrafts. One couple in Van Nuys reported working more than eight hours a day collecting bottles and cans for recycling and buying and reselling used items. *"We sell dishes, clothing, appliances, like . . . and we walk around gathering up aluminum and plastic containers to sell."* Though these activities helped families piece together some much-needed income for their families, they could not adequately replace the full-time steady wages that many had earned prior to their detention.

A small number of respondents had received work permits, due to their cooperation with ICE in testifying against their employers or successful appeals of deportation on other grounds. However, even this group sometimes had difficulty finding work. At the time of their second follow-up interview, five detainees in Postville and Van Nuys had been released and obtained work permits. However, only one of them had actually been able to find work because of the economic conditions in their communities. One woman in Van Nuys told us that she had taken two different temporary jobs and looked for months before finally finding a night-shift job, working from 11:00 p.m. to 5:00 a.m. *"The schedule is uncomfortable but because it was stable, I preferred to stay there for now while things get better, to see what happens. If I can get a better job, I'll take it but there aren't any . . . Everyone is looking for work and can't find any."*

### Back Pay and Assistance from Former Employers

The initial economic impact of some families' loss of earned income during the first weeks after an arrest was mitigated by the back wages and unused vacation or sick days that families were able to claim from the arrested workers' employers. In three of the four worksite raids (Grand Island, Postville, and Van Nuys), families reported being paid for back wages and unused vacation or sick days. In Grand Island, Swift and Company set up a fund disbursed through local United Way agencies to provide rent and other assistance for a number of months after the raid.[57] Several of our

---

[57] Swift and Company did this for employees arrested in all six plants that were raided by ICE in December 2006.

34

A783

respondents in Grand Island told us that their employer made payments of $200 a month for three months following the raid.

In addition to back wages, one worker in Van Nuys was able to get her employer, Micro Solutions, to pay out disability benefits for a repetitive motion injury that she incurred while operating a drill at the work site. At the time of our follow-up interview more than a year after the raid, she was still receiving biweekly checks and regular medical treatment for the injury, although these payments were about to expire at that time.

In Grand Island, local community organizations were largely successful in getting the final paychecks and vacation pay for immigrants arrested in the raid there, but getting final paychecks for arrested workers in Postville was not an easy undertaking. Staff at St. Bridget's Church spent a considerable amount of time pursuing Agriprocessors to obtain final paychecks, and then had difficulty getting local banks to cash them. The check-cashing problem became so severe that parish staff had to cash them in their own names. *"They didn't want to cash their checks at the bank either. Sister Mary or the priest, I believe they were cashing checks for several people because they [the banks] didn't want to cash them."*

In instances where people were not arrested in a worksite raid, families generally had more difficulty getting final paychecks. One Arkansas woman explained that four weeks after her brother-in-law's detention and deportation, his employer still had not paid back wages to the workers' families. She retained a lawyer because the employer, who was a subcontractor for a larger company, wanted to keep the money for himself and thought that the families would not or could not do anything about it. *"The man . . . played dumb when it all happened because he thought that the families wouldn't do anything about it . . . He was always a little harsh because he didn't want to . . . he wanted to keep their money."*

## Assistance from Family and Friends

More than three of every four families in our sample reported receiving some sort of support from their networks of family and friends. As discussed earlier, this often meant moving in with friends or family or having others move in with them to pool resources. One interviewee described her extended family helping each other by talking, going to immigration appointments together, sharing money for gasoline, and offering each other food. Some families even

reported that members of their new households entered the labor force to help support the household as a whole.

Forty-three families in our sample received direct material support from their network of family and friends. Two out of five of these families received support in the form of cash. One of our respondents related how a friend of hers went to look for her, gave her money to buy food, and offered to help her with whatever else she needed.

> *After about two weeks, I didn't have any food . . . and this American friend came looking for me here, and was cheering me up and he says to me, "Do you have anything to eat in your house today?" and I told him yes so I didn't have to tell him no, I'm embarrassed, and he pulls sixty dollars out of his bag and gives it to me and says, "If you need anything, call me."*

Another one out of six families in our sample received food assistance from friends or relatives, who often offered to share everything they had with affected families. One woman recounted: *"My dad brought fish, the basic stuff, milk and cereal for my kids because we didn't have any milk . . . and my sister was working and she said, 'Don't worry, it's OK, take whatever we have here.'"* A mother of a 3-year-old in Van Nuys said that when her daughter aged out of WIC nutrition assistance, a friend whose daughter still received WIC regularly brought her extra milk.

In some cases, help came from unexpected people. One woman noted that circumstances had prompted a noncustodial parent to step up to the plate: *"For the first time in thirteen years, he took responsibility as a father . . . that is, he's taken charge of them and I know that they're not lacking food, shelter, a doctor, and all that."* Others reported getting assistance from complete strangers. A father in Arkansas whose wife was detained said that a neighborhood store owner had lent them $300 to help them post bail. *"He knows us from when we first got here because we used to go to that store and buy things there and that's how he met us. We told him about the situation and he didn't think twice* [and gave us the money, saying,] *'It's all that I have.'"* Another woman related how a school counselor had volunteered to pay the phone bill for the family so that she could comply with ICE's requirement that all detainees released with a bracelet have a landline.

Informal assistance from friends and family members was critical in the days and weeks following the raids and arrests, but was not sustainable for those families needing

assistance for longer periods while they waited for parents to be released from detention or for deportation cases to be decided. In most cases, the friends or family members providing assistance were themselves low income and could not afford to help more than once or twice. Additionally, in three of our sites—Grand Island, New Bedford, and Postville—the whole immigrant community was affected economically by the raids and so it was difficult for local community members to find the necessary resources. One respondent described how her coworkers made tamales for her to sell to raise money when she was first detained but quickly forgot about her as time went on. *"All of my coworkers supported me but afterward . . . When this happens they help you the first few times, 'We'll make tamales and you can sell them.' But further on they start to forget you need* [help] *and you have to find other ways to survive."* Another interviewee said that after all that her friends had done for her family, she was ashamed to ask them for anything else. *"I don't know. It's really . . . our friends have, they're the ones that lent us little by little* [the money] *for my bail, so . . . we're ashamed to approach them and ask them for even more."*

### Assistance from Local Churches and Community Organizations

More than half of the families we interviewed reported receiving some type of assistance from a local nonprofit organization or a church. These types of organizations provided food to almost half of our study families, as well as rental and utility assistance to one in five families and cash assistance to one in ten. All of the cash assistance came from churches, as did the majority of the food, rental, and utility assistance.

Churches and community organizations played more prominent roles in assisting families in some sites than in others. St. Bridget's Church in Postville provided some assistance to all of our respondents, with most receiving ongoing monthly packages of food, cash, rental, and utility assistance. In fact, St. Bridget's fully covered rent and utilities for a few dozen families—including most of our sample—for more than nine months after the raid there. One Postville interviewee said that he was more comfortable accepting help from the church than from friends and family. *"A relative told me he'd help with anything I needed and another friend as well, anything I needed, but . . . you shouldn't be asking and asking, those one hundred dollars I would ask*

*for here, at the church."* Most of the families interviewed in New Bedford received substantial assistance with rent and utilities for a period of months from a network of community organizations spearheaded by the Massachusetts Immigrant and Refugee Advocacy coalition (MIRA), while local United Way agencies provided similar assistance for most of the families in Grand Island.[58] However, by the time of our second interview for this study, more than a year after these two raids, these forms of assistance had ended in both sites.

In Van Nuys, the only other worksite raid, there was little coordinated response by community organizations to meet the immediate needs of families. As a result, the assistance that families received was limited to food from local churches and food banks. Six of the 27 families reported getting this kind of aid. The only institutional monetary assistance that families received was from local consulates. More than a third of families in Van Nuys received cash assistance from the Mexican or Honduran consulates.

Families in Arkansas and Miami were far less likely to receive any assistance from churches or community organizations. No families interviewed in Arkansas or Miami reported receiving such assistance. Without a high-profile raid to draw attention to the plight of the families of arrested immigrants, there was no organized response effort to the arrests in either location.

### Public Assistance

As described earlier, food hardship was common in our study families, and government assistance programs provided crucial aid for many of them. Many parents said they counted on cash welfare; the Supplemental Nutrition Assistance Program (SNAP), formerly known as the Food Stamp Program;[59] the Supplemental Nutrition Program for Women, Infants and Children (WIC); free and reduced-price school meals; and in one case, free meals at a child care center. All but 10 of our study families were mixed-status families with unauthorized parents and at least one citizen child. If these families received welfare or food stamp benefits, they were generally prorated to include only the citizen children. WIC and school meal programs are available to all age- and income-eligible chil-

---

[58] Capps et al., 2007.
[59] Throughout the rest of the report, we refer to SNAP benefits using their older, more commonly understood name: "food stamps."

TABLE 3.5.  *Receipt of Temporary Assistance for Needy Families and Food Stamps by All Study Families*

| | Less Than 6 Months after Arrest | | | | More Than 6 Months after Arrest | | | |
| | TANF | | Food stamps | | TANF | | Food stamps | |
| Site | Yes | % | Yes | % | Yes | % | Yes | % |
|---|---|---|---|---|---|---|---|---|
| All | 8 | 15% | 14 | 26% | 14 | 27% | 25 | 48% |
| Grand Island | – | – | – | – | 5 | 42% | 6 | 50% |
| New Bedford | – | – | – | – | 4 | 40% | 5 | 50% |
| Van Nuys | 0 | 0% | 1 | 4% | 0 | 0% | 3 | 25% |
| Postville | 8 | 47% | 12 | 71% | 5 | 45% | 9 | 82% |
| Miami | 0 | 0% | 1 | 25% | 0 | 0% | 2 | 50% |
| Arkansas | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |

*Source:* Urban Institute surveys of families in study sites.
*Notes:* Short-term percentages are based on data from 54 households and exclude one interview due to insufficient data. Long-term percentages are based on data from 52 households. For Grand Island and New Bedford, "–" refers to "not applicable" because these data were not collected for our earlier study, *Paying the Price,* and are therefore not available for the current report.

dren, regardless of their citizenship or legal status.

*Receipt of nutrition assistance.*  Nutrition support programs were the most widely used before the arrests. WIC was the most common. In fact, more than 60 percent of study families with children under age 5 received WIC prior to parental arrest. About one-quarter of families with school-age children received free or reduced-price lunches for those children before parental arrest. One mother in Postville said that her two children were better fed during the week because they got breakfast and lunch at school. On the weekends, they only ate twice a day. After parental arrest, WIC and free or reduced-price lunch participation remained largely the same as before.

*Receipt of public benefits.*  Receipt of Temporary Assistance for Needy Families (TANF) benefits and food stamps was uncommon before arrest but increased somewhat afterward. Before parental arrest, about one in ten families reported having ever received TANF benefits. Among families interviewed within six months of arrest, this proportion had increased to a little more than one in seven (table 3.5).[60]

Families which had no previous experience with welfare benefits took up TANF benefits, but only in half of our sites: Postville, Grand Island, and New Bedford (table 3.6).

---

[60] While unauthorized immigrants are ineligible for TANF, U.S.-born citizen children are eligible for what is commonly referred to as "child-only" TANF benefits. Child-only benefits are lower than they would be if the whole family qualified, and unauthorized parents with children receiving child-only benefits do not qualify for support services such as child care and employment referral that other TANF parents may receive.

In these sites, churches and community organizations developed coordinated response efforts, and state social services agencies were heavily involved. In Postville, a Spanish-English bilingual worker from a nearby Iowa Department of Human Services (DHS) office had developed a good working relationship with the immigrant community and already had a substantial caseload of Agriprocessors workers and families before the raid. She and other Iowa DHS employees came to St. Bridget's Church to screen for eligibility and take applications several times after the raid. The regional director of Nebraska Department of Health and Human Services (DHHS), herself a bilingual immigrant, worked hard to connect affected families with public benefits after the Grand Island raid. MDSS was involved in obtaining the release of two dozen parents from detention following the New Bedford raid and coordinated relief efforts with MIRA and local organizations that distributed humanitarian assistance.

No families in Arkansas, Miami, or Van Nuys took up cash assistance after the raid, including three families who had used TANF at some point in the past. The state and county social services agencies in these locations were, according to our interviews, uninvolved in any relief efforts following raids or arrests and generally disconnected from local immigrant communities.

Food stamp receipt was higher than TANF everywhere and mostly showed the same pattern as TANF use, with the highest use rate in Postville (87 percent). This pattern suggests a stronger connection between state social service agencies and immigrant communities, as well as

TABLE 3.6.  *Receipt of Temporary Assistance for Needy Families and Food Stamps by Previously Unenrolled Eligible Families*

| | Short-Term Interviews (26 Months after Arrest) | | | | Long-Term Interviews (9–15 Months after Arrest) | | | |
| | TANF | | Food stamps | | TANF | | Food stamps | |
| Site | Yes | % | Yes | % | Yes | % | Yes | % |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| All | 8 | 16% | 11 | 24% | 12 | 26% | 23 | 50% |
| Grand Island | | – | | – | 3 | 38% | 4 | 50% |
| New Bedford | | – | | – | 4 | 40% | 5 | 50% |
| Van Nuys | 0 | 0% | 0 | 0% | 0 | 0% | 3 | 25% |
| Postville | 8 | 50% | 10 | 71% | 5 | 45% | 9 | 75% |
| Miami | 0 | 0% | 1 | 33% | 0 | 0% | 2 | 67% |
| Arkansas | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |

*Source:* Urban Institute surveys of families in study sites.
*Note:* Nine households in the sample used welfare at some point before arrest and 14 used food stamps. For Grand Island and New Bedford, "–" refers to "not applicable" because these data were not collected for our earlier study, *Paying the Price,* and are therefore not available for the current report.

greater involvement by these agencies in the response efforts in these sites.

*Attitudes, fears, and other barriers to public assistance receipt.* Even though many families sought public assistance following parental arrest, some of our study respondents expressed a general aversion to public benefits, most notably food stamps and TANF. Some respondents said they felt they were already indebted to the government and did not want to be a burden:

> Because my husband was one of those people who pre-ferred to work, he used to say that he didn't want to be a burden for this government. We already owe because we owe taxes, we owe hospitals, but we wanted to give back. That's why he struggled so hard. We wanted to get our papers and be able to work, and pay all of those debts because we didn't want to take advantage of this government, and we have bills but we're going to pay.

Some indicated that their primary motivation in immi-grating was the opportunity to work hard to support their families and that they preferred labor to handouts. One woman stated that she wanted to prove to immigration that she was not looking for any handouts, no matter how difficult things might be:

> I want them to see that I'm not a burden for anybody, I don't want to ask for anything, I know people can give you [things] but I won't ask even if I'm drowning, even now that I have the water coming up to here, I haven't done it.

Other families did not apply for food stamps, TANF in particular, because they feared that it would cause problems for them in the future if and when they were able to fix their immigration status. One mother confided:

> I've always been told that whoever . . . when someone receives a check from the government . . . when you want to fix your papers . . . that causes problems. So my husband says we'll only get it when we really need it.

Another respondent agreed: *"We haven't wanted to get mixed up in that so we don't jeopardize [things] in the future if we have the chance to fix our papers."*

Still other families feared that the information they needed to provide in order to receive public assistance could be accessed by ICE. A Grand Island respondent related the story of a woman who was found by immigration through information she had given to a WIC office. *"I'd been hearing . . . women talk . . . that they [immigration] had gone to pick up a young girl . . . because of WIC. . . . Immigration got her information from WIC."* Another respondent was particularly wary of applying for food stamps because both she and her husband had to be fingerprinted as part of the application process.

Some families reported believing that they risked losing custody of their children by signing up for public benefits. One mother in Grand Island admitted that she thought her children would be taken away if she chose to leave the United States. *"I used to think that . . . at the time that you went back to your country, they would take your children away because you're receiving help from the government."* Another

mother thought that she would be surrendering the custody rights for her son if she applied for aid. *"I told them no because I was scared that in the long term that . . . maybe it was something, like I said, my ignorance . . . that they could take away my son and my custody . . ."* Yet another mother didn't want to enroll in any kind of public assistance because she believed this would give the government the right to take her children away if she spanked them:

> *I was afraid. I said no because supposedly if I scold my children or spank them . . . This was my thinking, if one day I hit them, the government won't have any reason to take them away from me if I've never taken money from them.*

Finally, some respondents related confusing or frustrating prior experiences applying for public benefit programs, especially food stamps and TANF. One mother had applied once for food stamps but was very confused, because she was first told she would qualify but was told later that she did not. The process was so frustrating that she never appealed the decision.

> *I went to the place and filled out the papers and everything, and they told me that they would let me know by mail. It was really strange because at the beginning . . . they sent me something and made it seem like I qualified, but days afterward, they sent me another notice saying I didn't qualify . . . and that I had to send them I don't know what . . . well, I went in again, and they said that they were going to mail me an answer and finally they told me that I didn't qualify . . . I didn't understand . . . I wasn't going to go in anymore. I didn't like that.*

Even with these concerns, many families ended up applying for public assistance after the raids or arrests because of their low income, food hardship, and other acute economic needs. In some cases respondents felt better able to access benefits because people they trusted (e.g., clergy, social workers, educators, and community advocates) were able to reassure them that receiving the assistance they needed and their children were entitled to would not harm them. Many families in Postville, who depended primarily on donations from St. Bridget's Church, felt a responsibility to sign up for public benefits to relieve the burden on the church and the local community. In other cases, families had to put away their misgivings about seeking aid and apply out of pure economic necessity. One mother whose husband had been working a lot of overtime to compensate for the income they lost when she was detained said, *"Seeing myself in a situation where I needed to help my husband a little, I wanted to do it."*

***** 

The stories described in this chapter detail the economic hardships that families with children faced after family members were arrested in a worksite raid or other immigration enforcement action. Almost all of the families lost workers in the raid, either because they were detained and deported or because a parent who was released was prohibited from working. Their incomes declined substantially, leading to increased economic hardship and dependency on charity and government assistance. A large majority of families experienced significant difficulty paying for food and a few parents experienced hunger. Many families had difficulty paying their bills, and their housing situations, already crowded, became more crowded and unstable. Hardship was prolonged for many families either because it took several months for parents to be released from detention or—in many cases—because attempts to contest deportation took months or even more than a year to adjudicate.

In the face of extreme economic hardship, in many cases, families pieced together the resources they could to provide food and shelter for their children. Well-coordinated relief efforts that included links to government agencies helped provide needed housing, cash, and food assistance in three of the sites—Grand Island, New Bedford, and Postville—but in other sites families largely relied on informal networks of friends and family members or fended for themselves.

The next chapter of the report describes how children fared emotionally and behaviorally during these difficult periods following raids and other arrests. Child development research suggests that, in addition to children's experience of their parents' arrest and detention, the consequences described in this chapter—food hardship, housing instability, and prolonged economic deprivation—pose risks to children's development, behavior, and success in school. These findings provide the backdrop for the next chapter which examines the well-being and behavior of the children in these families.

39

# 4.  CONSEQUENCES FOR CHILDREN: CHILD BEHAVIORS, CHANGES, AND ADJUSTMENTS

This chapter continues to address the second set of research questions, regarding the specific effects of immigration enforcement on children, by focusing on changes in children's behavior and emotional well-being. To describe behavior changes, we draw on interviews with parents and other family respondents. In our previous study, *Paying the Price,* we described changes in children's behavior in general terms, but in the current study we consistently documented changes in specific types of behavior. Based on advice from the child development and methods scholars on our advisory board, we used open-ended probes that borrow key items from a number of instruments designed to gauge child well-being by documenting instances of externalizing and internalizing behavior: changes in eating and sleeping patterns, crying or whining, fear, clinginess, withdrawal, anxiety, aggression, and anger. We focused particularly on children's adjustment to their parents' arrest and related consequences, including separations of uncertain lengths, economic hardship, housing instability, and continuing uncertainty about their fate in the limbo period that followed arrests.

## Changes in Children's Behavior

Parents in this study reported observing significant behavioral changes, most but not all of which were adverse, in their children. Each family had a unique set of circumstances before parental arrest, and there were differences across families in their arrest and detention experiences, as described in the prior chapters. Nevertheless, children in each of the sites exhibited significant behavior changes following their parent's arrest.

We organize the analysis below in terms of short-term and long-term effects. The short-term analysis includes interviews conducted within six months of parental arrest. These interviews include first wave interviews in two sites (Van Nuys and Postville) conducted about two months after worksite raids and making up a majority of the short-term cases we studied. Also included in the short-term analysis are some observations from interviews conducted with families that experienced home raids or arrests by local police (in Miami and Rogers-Springdale) within the six months before

our interview. This short-term group includes 133 children from 55 families in these four sites.

The long-term analysis is based on second wave interviews in Grand Island, New Bedford, Van Nuys, and Postville, more than nine months after the worksite raids in those locations. Interviews with families that had experienced arrests in Miami and Rogers-Springdale more than nine months before our visits are also included in our long-term sample for a total of 115 children in 52 families.

## Short-Term Changes

Table 4.1 summarizes the most frequent child behavioral changes described by respondents interviewed in the short term (within six months of a parent's arrest). Eating and sleeping changes were the most common effects in the short term, followed by crying and feeling afraid. Anxiety, withdrawal, and clinginess, while a bit less common, were still problems reported among many of the children.

41

TABLE 4.1.  *Children Experiencing Behavior Changes in Four Sites (Short-Term Interviews)*

| Age group | Eating | Sleeping | Crying | Afraid | Anxious | Withdrawn | Clingy | Angry or aggressive |
|-----------|--------|----------|--------|--------|---------|-----------|--------|---------------------|
| 0 to 5    | 62%    | 55%      | 61%    | 43%    | 38%     | 16%       | 42%    | 36%                 |
| 6 to 11   | 81%    | 69%      | 60%    | 61%    | 46%     | 51%       | 42%    | 37%                 |
| 12 to 17  | 61%    | 79%      | 57%    | 60%    | 43%     | 62%       | 35%    | 34%                 |
| All ages  | 68%    | 66%      | 60%    | 54%    | 42%     | 42%       | 40%    | 36%                 |

*Source:* Urban Institute surveys of families in study sites.
*Notes:* The short-term interviews were conducted within six months of a worksite raid or other form of parental arrest. Data were collected on 133 children from 55 families in 4 sites—Arkansas, Miami, Van Nuys, and Postville. All changes were reported by responding parents or other adult caregivers, and the frame of reference for the changes is prior to parental arrest. The percentages exclude missing data and employ different denominators, ranging from 92 to 120 (out of 133 children)

Children age 6 to 11 exhibited the most frequent changes in eating habits. Parents reported that these children, along with adolescents (ages 12 to 17), became noticeably withdrawn more often than younger children. The fact that younger children are less able to express their emotions in words may explain these apparent differences to some extent.

In general, boys and girls responded similarly after their parent's arrest with two exceptions. First, girls cried more often than boys, though nearly half of all boys and male adolescents also cried in response to their parent's arrest. Second, in the few households where children assumed additional responsibilities, girls and young women more often stepped in to help their parents.

Parents reported many instances in which children exhibited multiple behavioral changes (table 4.2). Children over age five exhibited a higher rate of multiple behavioral changes, which may attest to their ability to communicate and express their feelings more outwardly than younger children.

TABLE 4.2.  *Children Experiencing Multiple Behavior Changes in Four Sites (Short-Term Interviews)*

| Age group | 3 or more changes | 4 or more changes | 5 or more changes |
|-----------|-------------------|-------------------|-------------------|
| 0 to 5    | 57%               | 45%               | 30%               |
| 6 to 11   | 76%               | 65%               | 48%               |
| 12 to 17  | 74%               | 59%               | 44%               |
| All ages  | 68%               | 56%               | 40%               |

*Source:* Urban Institute surveys of families in study sites.
*Notes:* The short-term interviews were conducted within six months of a worksite raid or other form of parental arrest. Data were collected on 133 children from 55 families in 4 sites—Arkansas, Miami, Van Nuys, and Postville. All changes were reported by responding parents or other adult caregivers, and the frame of reference for the changes is prior to parental arrest. The percentages exclude missing data and employ different denominators, ranging from 92 to 120 (out of 133 children).

Children in our short-term sample whose household structure and primary caregiving relationships changed after an arrest were more likely to experience changes in eating, crying, and fear, compared with children whose caregiving did not change. Among children in families that did not remain intact, about three out of four experienced changes in eating habits, about two-thirds began crying, and about half exhibited fear. Only about a third of children in our sample remained in intact families (i.e., remained with both their parents or their single parent). Children of intact families also exhibited similar changes, though much less frequently: about half experienced changes in eating habits, about half cried more than before, and about a third felt afraid. In addition, children of intact families also exhibited multiple behavioral changes less frequently than other children. Although parents in all sites reported sleeping and eating problems and fear in their children, children exhibited these changes less frequently among intact families, especially in Van Nuys where a large number of families were reunited on the same day.

In addition to household changes, children whose parents were arrested at home exhibited multiple behavioral changes more often than children whose parents were arrested elsewhere. Since Arkansas and Miami conducted home arrests, children in these two sites comprised most of our sample of children whose parents were arrested at home. Eleven families experienced home raids, including four in Miami, four in Arkansas, two in Van Nuys, and one in Grand Island. In almost all cases, at least one child witnessed his or her parent's arrest. Although home raids comprised a relatively small number of cases in the sample, respondents reported some of the more noticeable and outward signs of children's behavioral changes among those who witnessed the arrest.

42

A791

## Long-Term Changes

We returned to Grand Island, New Bedford, Van Nuys, and Postville more than nine months after raids in those locations; several of the families we interviewed in Miami and Rogers-Springdale had experienced parental arrest more than nine months before our visits there. Over time, the number and frequency of parents' reports of behavioral changes remained relatively high, but they did not become more severe for most children, and some children seemed to adjust somewhat in the longer term. Some of the more frequent behavior changes (eating, sleeping, crying, feeling afraid, and anxiety) seem to have moderated somewhat by the time of our long-term interviews. But other behaviors that were less frequent during the short-term (withdrawn and angry/aggressive behaviors) persisted at the same or higher levels in the longer term (table 4.3).

Children over age five continued to be withdrawn more often than younger children in the long term, and children age 6 to 11 continued to have frequent disruptions to their eating habits. Girls and young women (rather than their brothers) usually continued assuming responsibilities at home. However, compared with the short term, parents reported fewer instances of multiple behavior changes in the long term (table 4.4).

Similar to short-term changes in children's behavior, the changes reported at least nine months after arrest were more frequent among households where parents had been detained longer than a month and where parenting and caregiving responsibilities changed. Among children whose families did not remain intact or were separated longer than one month, some behavioral changes continued to be more frequent in the long run. For instance, children who did not see their parents within a month of arrest exhibited more frequent changes in sleeping habits, anger, and withdrawing from fam-

ily when compared with children who saw their parents a month or less after arrest. Children separated from at least one parent for at least one month were also more likely to continue crying in the long term.

The sections below discuss some of the major changes in children's behavior and recount families' experiences. The examples are organized according to the central behavior patterns that parents observed.

## Eating and Sleeping Changed Frequently in Tandem

In the short term, families identified disruptions to children's eating and sleeping as the two most common behavioral changes. Nearly half of the children in our short-term sample experienced changes in eating and sleeping patterns in tandem. These patterns were consistent across age groups (see table 4.1).

*TABLE 4.4. Children Experiencing Multiple Behavior Changes in Six Sites (Long-Term Interviews)*

| Age group | 3 or more changes | 4 or more changes | 5 or more changes |
|---|---|---|---|
| 0 to 5 | 21% | 13% | 8% |
| 6 to 11 | 49% | 33% | 28% |
| 12 to 17 | 48% | 39% | 22% |
| All ages | 36% | 25% | 18% |

*Source:* Urban Institute surveys of families in study sites.
*Notes:* The long-term interviews were conducted at least nine months after a worksite raid or other form of parental arrest. Data were collected on 115 children from 52 families in 6 sites—New Bedford, Grand Island, Arkansas, Miami, Van Nuys, and Postville. All changes were reported by responding parents or other adult caregivers, and the frame of reference for the changes is prior to parental arrest. The percentages exclude missing data and employ different denominators, ranging from 55 to 77 (out of 112 children).

*TABLE 4.3. Children Experiencing Behavior Changes in Six Sites (Long-Term Interviews)*

| Age group | Eating | Sleeping | Crying | Afraid | Anxious | Withdrawn | Clingy | Angry or aggressive |
|---|---|---|---|---|---|---|---|---|
| 0 to 5 | 39% | 30% | 48% | 21% | 7% | 17% | 56% | 18% |
| 6 to 11 | 56% | 46% | 52% | 35% | 35% | 54% | 63% | 56% |
| 12 to 17 | 29% | 53% | 35% | 55% | 31% | 67% | 38% | 56% |
| All ages | 43% | 41% | 47% | 33% | 23% | 43% | 54% | 41% |

*Source:* Urban Institute surveys of families in study sites.
*Notes:* The long-term interviews were conducted at least nine months after a worksite raid or other form of parental arrest. Data were collected on 115 children from 52 families in 6 sites—New Bedford, Grand Island, Arkansas, Miami, Van Nuys, and Postville. All changes were reported by responding parents or other adult caregivers, and the frame of reference for the changes is prior to parental arrest. The percentages exclude missing data and employ different denominators, ranging from 55 to 77 (out of 112 children).

43

Disruptions to families' daily routines unsettled children's regular eating and sleeping patterns. For example, the lives of two sisters (ages 7 and 9) in Van Nuys changed dramatically. Before the raid, their mother and her partner had both worked at Micro Solutions. The mother had quit her job upon hearing rumors of an impending raid and the father was arrested at the factory. Prior to the raid they maintained a daily family routine: they would rise early to prepare the kids for school and then go to work; in the afternoon the girls returned home and spent time on their homework; in the evenings the family ate dinner and prepared for the next day. After the raid, the family's eating patterns revolved around much more unpredictable work schedules because both parents began working odd jobs to make up for the loss of both jobs. The girls' mother said, *"We used to have a stable schedule, a stable job. Now the girls have to get up earlier because we all get up earlier and eat quickly."* The family altered their routine to make sure both the mother and father could work whenever possible, including in the early morning hours. As a result, the girls began to get less sleep after the raid. She described how these adjustments affected her daughters:

> We don't have a schedule anymore. Before, we would have breakfast at eight in the morning . . . Sometimes they don't eat [at home] *until five, after they get out of school, and it's not because we don't want to eat but because that's our schedule . . .*

As a result of disruptions to families' daily routines, children spent less time with their parents and caregivers. Children experienced lower levels of the daily interaction and support they enjoyed and needed from a parent. For instance, the younger daughter in the family described above had been struggling academically at school before the raid. Her parents' sustained attention and help with homework helped her academically. Amid disruptions in family routines and absent the support her parents used to provide, the daughter's progress in school eroded.

Changes in eating and sleeping patterns were also associated with disruptions to families' living arrangements and the increased housing instability described in chapter 3. For example, when a father of four children (ages 11, 9, 5, and 4) was detained in Postville, his partner and their children moved in with their extended family. As described in the last chapter, the children's mother had to sell the family home because they could no longer afford the payments, to the distress of the children. After the move, the children lived in their grandparents'

basement, and their sleeping patterns changed considerably. Their mother struggled to get them to go to sleep at a regular time and sometimes had to resort to punishment. At the time of our visit, her oldest was staying up late and would sometimes leave the house and stay out until 10:30 p.m. The oldest daughter's eating habits also changed:

> She stopped for a few days after the raid but it was as a result of what was happening . . . You would tell her, "Do you want strawberries?" And you take them to her but she wouldn't eat them. And she would always say, "I'm not hungry" . . . and she was the same at school. At school, they also told me, "She's not eating," "We're worried that she won't eat" . . . I beg her to eat. I tell her, "Go eat." She loves peanut butter and jelly sandwiches . . . and I give her one . . . [but] she lost her appetite. She's not very hungry.

Despite her mother's best efforts, the oldest girl's eating habits remained irregular and she lost weight.

Children who experienced a change in parenting after arrest often underwent greater loss of appetite and more severe sleep disruptions. Children separated from a parent or caregiver struggled during these periods of great uncertainty for the family, especially since they did not know if or when their parent would return. For instance, a 2-year-old boy in New Bedford was apart from his mother for two weeks. He did not want to engage with family members who were caring for him. *"He had a fever,"* said the boy's aunt who took care of him. *"*[He was] *sad, very sad. He couldn't eat. And when the night came . . . even though we're family, he would just watch us . . . He didn't want to play."* In Arkansas, a mother was in detention for three days, long enough to unnerve and disorient her four daughters (ages 16, 13, 8, and 2). The girls stayed with a family friend who watched after them while the mother was in jail. *"While they were in the house,"* the friend said, *"they did not want to eat. During the days they spent there, I had to beg them to eat. They were very depressed. They couldn't sleep because I would wake up at dawn and the girls were crying."* Even after their mother was released, the family feared going back to their apartment because they were afraid the entire family would be arrested. The youngest became so depressed that she only wanted to sleep. Her mother thought about taking her daughter to a specialist to see if anything could be done to help the girl.

Sometimes fears that drive families to go into hiding affected children's sleep and eating patterns. For example, after he was arrested in the Micro Solutions raid, a father sent

his family to live in a nearby county because he feared ICE would come to his home. His wife and their three children (ages 6, 5, and 3) moved on the day of the raid. The children left quickly with a few of their belongings. Two months after the raid, the children were crying at night on a regular basis and had trouble sleeping at night. Their father explained, *"They're afraid. They say that they're afraid, but when we ask them, 'What are you afraid of?' they say, 'We're just afraid.' We tell them, 'Nothing's going to happen'. . .* [they respond,] *'But we're scared.'"* The oldest, a 6-year-old, was also bedwetting immediately after the raid. She had not wet the bed for years. Since the raid, the family has remained separated and the children have had less food available to eat. Their father was unable to secure steady employment to provide financial support for his family.

## Nightmares and Sleepwalking

While discussing sleeping problems, a few parents described how their child began having nightmares after their parents' arrest. In each case, the nightmares persisted more than nine months after the arrest. A mother who spent six months in detention said her children had not been the same since her detention. They had trouble focusing at school, and the children fought all the time. Her 13-year-old son complained that his 8 year-old sister kept him up at night because she was having nightmares. A father of two (12- and 3-year-old girls) in Miami was arrested in the spring of 2007 and was deported within a month. Since then, the youngest girl had become physically aggressive. A family doctor told her mother that her behavior stemmed from the instability at home after her father's deportation. The youngest girl did not want to sleep in her own bed, began screaming at night, and also had nightmares.

In another case, a Postville mother who was arrested and released described how her 12-year-old son had been affected. Right after the raid, her children were afraid to answer the door and became clingy. Her son appeared to be no more traumatized by the raid than his siblings. However, nine months after the raid, she was considering taking him to a counselor because his behavior had become exceedingly worrisome. *"He's, like, traumatized because sometimes he's sleeping . . . he gets up screaming at his uncle* [who was arrested], *someone he loved a lot and he gets up screaming, crying . . . And if you grab him, he walks and leaves* [the house]. *Then, when you talk to him, he wakes up from his sleep."* He repeated similar sleep-

walking episodes almost every night and sometimes woke up in other people's rooms.

## Crying Regularly

Children often expressed anxiety about their family's situation by crying. Parents and caregivers we interviewed reported that just over half of the children cried frequently after a family member's arrest. Among children who experienced changes in eating or sleeping, nearly half also began crying more often. In the short term, a third of all children had problems sleeping and eating and were crying a lot—all at once.

Many of these children cried from the anxiety of being physically separated from their parents and the uncertainty associated with the circumstances of that separation. To illustrate, three very young children (2 years old and younger), whose mother was arrested in Arkansas, showed signs of missing their mother, who had not been home for a week. According to the children's father, the 1-year-old boy regularly *"woke up with eyes swollen from crying so much . . . Last night, between twelve at night and three thirty in the morning I couldn't cheer him up. That's why I missed work, because I spent all morning with him and, seeing him cry, I didn't know what to do."* Their father continued, *"I was really sad, and I was crying in my room, and my little girl* [the youngest child] *came in and saw me and then she started to cry . . . She's very young and she's noticing more or less what's happening."* His 2-year-old daughter had grown more and more anxious, biting her nails and acting out as never before.

Some children were emotionally sensitive after their parents returned home and started crying in situations that would not ordinarily have upset them. For example, a 7-year-old boy whose father was arrested in Van Nuys started crying at school when classmates took his toys, which he had never done before.

Similar to disruptions to sleeping and eating, crying happened less often over time although it did not disappear completely more than nine months after arrest. Children who experienced a long-term separation from a parent cried more often than children whose parent or family member was detained and released on the same day.

## Increased Fear and Anxiety

Parents reported that about half of the children expressed fear and anxiety within the first six months after a parent's arrest.

45

A794

Parents said their children were most afraid of "immigration" and were anxious that law enforcement would come back to arrest their family. In the short term, feeling afraid was more frequent among children who experienced a change in parenting and primary caregiving. In the long term, fear generally dissipated for most children although it persisted for several children whose parents were required to wear an EMD.

Parents mentioned that some of the older children understood the circumstances surrounding their parents' arrest, and this fed their fears. In Grand Island ICE arrested a few people in their homes in the days after the initial worksite raid, and many immigrant families went into hiding for weeks after that. An 8-year-old boy whose mother was arrested in Grand Island often worried that immigration would visit their home:

> Since my son is older, he understands things well and, since [the raid], he's remained afraid. He always [thinks] that immigration is taking people . . . He gets nervous, he starts to cry, closes the curtains and when someone knocks he tells me, "Mommy: immigration" . . . He sees someone walk by and says, "Mommy, someone went by, hopefully it's not immigration." Yesterday, we were getting ready to go to church—and I don't know what he saw through the window—he said, "Mommy, look, there goes someone from immigration. Who are they looking for?" he asked me. He has those moments all the time.

A 14-year-old boy whose mother was arrested during the Postville raid exhibited similar fears. His father was not arrested because Agriprocessors fired him shortly before the raid, demanding that he return with new identification if he wanted to work at the plant again. The boy was afraid that ICE would come back to Postville to arrest his father. In the words of the mother, who was arrested at Agriprocessors and then released, the boy *"sometimes says that he's afraid. My husband was working and* [some people] *said that immigration was in Waterloo* [a nearby town] *and that they had taken people. He started to cry and said, 'I hope God doesn't want* [my father] *taken away because I don't want him to leave.' "* Rumors swirled in the community that ICE would come back for workers who were at home at the time of the raid. After the raid, fears of a second wave of arrests gripped many families.

A 14-year-old girl whose mother was detained during a home raid in Rogers, Arkansas, was afraid that officers would return to the home. Her mother spent a few weeks in jail. Her mother said, *"She made me a note that said that we should go to another house; that she didn't want to stay here, that she was afraid that ICE would come here again."* She and her siblings worried that ICE would take their parents away again, as her mother recounted:

> If we get [to school] *late, after the time we always pick them up, they worry that we have not gone for them, that something has happened, so they have this, for example, the day that* [the raid] *happened, they all got picked up at school late. Very late. In addition,* [my daughters] *leave school at two forty-five. They got picked up at school after three thirty.* [Ever since, if we're late picking them up, they think,] *"Why don't they get here?" . . . Where were we* [they say]—*that they're worried that we haven't come.*

## Generic Fears of Law Enforcement Authorities

In other cases involving raids by federal agents, children did not differentiate between local police and immigration authorities. An 8-year-old boy in Van Nuys who witnessed his father's arrest by ICE agents—in the family home, at gunpoint—no longer trusted the police. According to his father, *"They see the police and they run home . . . Sometimes I go to visit them and, well, I'm there and they come in running and shutting the door because they say that the police is coming."* A 5-year-old boy whose mother was arrested at the Swift plant in Grand Island also feared both immigration and the police. *"Like it or not, they take notice of all of this—*[everything we say about] *immigration, immigration, immigration. It's like they also think that they are bad in the eyes of the police.* [My oldest son] *is even afraid of the police . . . When he sees a police officer, he goes away and hides."*

## Increased Clinging and Attachment

In the short term, roughly one third of the children responded to a family member's arrest by a steady desire for attention or a compulsion to be constantly in the presence of their parent or family. In some cases, children became very clingy toward their parents and often hesitated to be apart from their family or to open the door to their home. In New Bedford, a 2-year-old boy seemed initially not to recognize his mother when she was released after spending four days in detention. After their reunion, he was perpetually at her side.

*He's more attached to me . . . The day I was released . . . when I opened the* [car] *door and he saw me, it was like he was scared to see me. I don't know what he thought. I know that he was scared . . . he started to cry, to cry and to reach for my husband's arms. Then, when I told him . . . that it was me, that is, his mom, then it was like he kept looking at me . . . Then he hugged me right there and he started to cry and, well, he hugged me hard and he just said, "Mommy" . . . But it was just that moment, since then he has always been attached to me.*

Clinging to parents was also evident in cases where a parent was released on the same day as their arrest. After the single mother of two girls (6 and 2 years old) was arrested and released the same day, the girls became excessively clingy. The girls grew up in Postville and were used to going to the park and walking around town with their mother. After the raid, both clung closely to their mother when a police car drove by their home and hesitated to leave the house. Almost immediately after the raid, as she became clingier toward her mother, the older girl also began asking questions. The girl was too young to understand the full consequences of the raid, but she wanted to know what had happened. *"She understands,"* her mother said about her inquisitive daughter.

*She says, "Tell me the truth. I don't want you to lie to me. Don't cry anymore because we're with you. Nothing happened to us but nothing happened to you either, right?" I told her, "No" . . . I told her I was fine and not to worry, and I told myself that she would forget about questioning me.*

## Withdrawing

While some children became increasingly clingy after the raids, nearly half of all children—and more than half age 6 and older—showed signs of withdrawal within months of their parents' arrests. As their parents recounted, some were anxious and worried about being arrested, having to move to another country, and not knowing what might happen to their family.

Signs of withdrawal were more common among older children. In a typical example, an only son who was 7 years old withdrew from others and lost his appetite after his father was arrested and held in detention for six days before being released. Before the raid, the boy was active and energetic. His father said, *"When he got home from school, the first thing he would do is put his bookbag down. He would leave it and go outside with* [a neighbor]. *After the raid, he just sleeps."*

A mother whose husband was arrested and detained for three months in Arkansas mentioned that their oldest son (13 years old) began withdrawing from the family. *"He isolates himself a lot; he almost doesn't come around with us."* She attributed this to her son having a difficult time coping after being apart from his father for so long. The boy withdrew from everyone except his 15-year-old cousin—whose father was also detained—as they were lending each other support.

In another example, three brothers became withdrawn after ICE arrested their mother and her partner, whom the boys treated as their father. The children's biological father had not been involved with the family for years, and the boys had become very close to their mother's partner. The mother was released on the day of the raid, but her partner remained in detention for five months and then was deported. The children were told that he had left to find work and that he would return soon. They did not find out that he had been detained until much later. His absence affected the boys deeply. The youngest (4 years old) would not talk to anyone, and the middle child (5 years old) kept to himself most of the time after the raid and spent a lot of time in his room. The oldest (13 years old) became very quiet and withdrawn until he was able to reconnect with his mother's partner:

*He was sick from depression because he was very sad . . . and he would tell me, "Don't talk to me" and he was like that for almost an entire month. Now* [that happens] *less because they talk to my partner by telephone and . . . we talk with him sometimes once a week.*

Nearly nine months after the arrest, and after the mother's partner was deported, the middle child grew more distant, and his mother described him as being "distracted" and less affectionate than he used to be before the raid.

In some cases, older children continued to withdraw after their parents were released and returned home. For instance, an Arkansas mother was arrested in her home by the Rogers police. Before the arrest, the mother was able to talk to her daughter, especially when something was wrong or when the girl would misbehave and talk back rudely. Her mother said, *"Before I used to say, 'Watch how you talk to me' and that was it.* [My daughter would reply,] *'Okay, mom, sorry.' "* After the arrest, the girl's mother found it very difficult to talk to her daughter, who spent long periods of time in silence and told her mother that nothing was wrong. The

47

A796

mother lamented not knowing how the arrest had affected her daughter. In addition to being more reserved, the girl began to shout back when her mother would try to ask her what she was thinking: "Shut up! Don't talk to me!" Her mother worried she had lost touch with her daughter, whose behavior was growing increasingly aggressive.

## Aggression and Rebellion

Anger, aggression, or rebelliousness were reported for one-third of all children in the short-term sample, though the way parents described the behavior differed according to the child's age. Parents of younger children described how their children began lashing out angrily, while parents of older children said their children had become disobedient or less respectful. Angry behavior toward others, for some children, also became a way to voice their frustrations or redirect their outrage after their parent's arrest.

Children's anger was often directed toward other children. A mother in Arkansas said that her 11-year-old daughter would get angry before the raid but had become very temperamental since then. *"She doesn't want us to say anything to her . . . she's almost come to say that we don't love her because we don't let her go wherever she wants."* She quarreled with her siblings and cousins more often, and with less provocation than before.

In Iowa, a 4-year-old boy, who had both parents arrested and one kept in prolonged detention, began quarreling with his older brother:

> *Before, they played fine, but not anymore; sometimes they fight. I don't see them being closer; instead, well, we used to support each other and when something would happen my husband would tell them, "Don't fight" and now they don't listen and when the little boy fights with the older boy he says, "I want my daddy," and I don't like it.*

In Miami, a 3-year-old girl whose father was arrested and deported began acting out. She kicked other children, talked back to her mother, and frequently got angry. Her mother was surprised because the girl had never behaved that way before. A 2-year-old boy in Miami whose mother was arrested at home and fitted with an EMD on his ankle also started behaving more aggressively, and his anger appeared directed toward the ankle bracelet. When she charged her bracelet for two hours each day, her son tried to be patient but soon wanted his mother's attention. He sometimes pulled the cord

his mother used to charge her monitor out of the wall. *"To begin with,"* his mother said, *"he didn't listen much but ever since that day he's gotten worse. He's more violent and throws stuff on the floor and hits himself. Sometimes he pulls the thing from my foot. But I can't explain it to him because he won't understand."*

## Speech and Other Developmental Difficulties

In addition to the behavioral changes described above, some parents of young children (under 6 years old) voiced concern about related changes in their children's development and speech patterns. For example, a 3-year-old who witnessed his mother's arrest in the family's home underwent a dramatic reversal in developmental milestones. Before the arrest, he was a well-adjusted young boy who had begun learning to feed and dress himself. His mother said the boy took great pride in getting ready in the morning and making sure that his shoes, shirt, vest, and hair all came together just right. Immediately after the raid, his mother described a boy whose behavior and demeanor changed almost completely. The boy became very clingy toward his mother and no longer wanted to do things for himself.

> *Before this happened, I had bought him a trainer* [toilet] *and he sometimes used the trainer to pee but not anymore. He doesn't want to go. He goes around saying that he has to pee and I take him, and he cries and cries and cries and doesn't* [use the trainer]. *Before, he would go to the kitchen table on the bench and would say, "Give me milk with a straw, milk with a straw"* . . . *He used a bottle but he wasn't as attached to the bottle—before, he only used it in the morning and at night, and now he uses it all day. He sometimes doesn't want to eat his food . . . Sometimes I give him a bowl of soup, and* [he says,] *"I don't want soup, I want my teta* [bottle]."

The boy refused to dress himself and, for the first time, would often run around the apartment wearing nothing but a diaper. His older sister, by contrast, withdrew while the son begged for attention all the time and acted out (e.g., throwing the television remote control in the garbage, breaking things in the apartment, putting keys in the microwave) when he did not get attention. Such a regression in terms of toilet training and dressing worried his mother.

A few parents also noted increased difficulty in speaking in their children. For example, a 5-year-old girl and a

4-year-old boy whose fathers were arrested at Agriprocessors and detained for months both developed speech problems. The girl stuttered slightly before the raid, but this worsened after her father's arrest. Her mother said, *"She talks with a little bit of a stutter . . . I've noticed that she started doing it more . . . She gets stuck trying to say a word."* After her father's release, her mother said her stuttering was not as noticeable. The boy, on the other hand, developed a stuttering problem after the raid. He stuttered especially when he was afraid, at which point he ran to his mother's side and clenched her hands.

In another case, a 4-year-old girl had a speech delay that her mother believes stemmed from witnessing years of domestic abuse. Her mother left the abusive boyfriend, and he became enraged and turned her in to immigration authorities. Authorities left the abusive boyfriend in charge of the children while their mother was in detention for more than two weeks. When she was released, the girl began to have intensified speech problems. Her mother said, *"Since she was a little girl, she never spoke perfectly well but as a result of all of this* [i.e., her arrest, the order of removal, and a two-week stay with the abusive boyfriend], *it's like she went through a reversal in how she talks."*

## School Behavior and Performance

In addition to asking parents about changes in their children's behavior at home, we asked them to discuss their children's performance or behavior at school. Two-thirds of the children in our sample were enrolled in school when we interviewed their parents. Approximately one-tenth were enrolled in an early education program (Head Start, pre-kindergarten), three-quarters in elementary or middle school (kindergarten through 8th grade), and the rest in high school. The analysis below relies primarily on parents' observations about their children's experiences in school, observations which are more limited than those at home. The descriptions below also rely on interviews with teachers and school administrators in three sites (Postville, Rogers-Springdale, and New Bedford). We obtained attendance and academic performance data for 26 elementary school children in Postville, but we have no school data for children in any other sites.

In general, parents viewed schools as safe havens, though some students missed days of school, struggled to maintain their academic performance, or started misbehaving at school.

However, many parents noted that their children were bringing home stable or improving report cards.

## Schools as Safe Havens

Schools provided stability and a safe haven for many students, which helped children adjust to life after their parents' arrest. Parents and school officials both agreed that most children benefited from support and guidance at school. In New Bedford, teachers emphasized that students affected by the raid were well behaved and voiced concern about the instability they experienced at home. One educator said, *"They might be thriving in school but it's difficult to survive in general."* Teachers and administrators in Postville voiced similar concerns and worked to make sure students returned to school and received support services such as counseling. In Springdale, Arkansas, teachers and administrators worked closely with students who feared that their parents would be arrested, and the staff described how siblings comforted and looked after each other following a wave of arrests. An immigration-related arrest in front of an elementary school stoked the children's fears, but administrators and teachers responded quickly to calm children and allay parents' fears. This rare event only reinforced the school district's resolve to assure parents that schools are safe havens.

## Missed Days

Despite efforts by school officials to keep children in school, parents in each of the sites were initially wary of going outside and hesitated to send their children back to school. Many students missed at least a few days of school after their parents' arrests. Two kindergarten students, a boy and a girl, in two different Postville families missed school after their mothers were arrested. Like their siblings and other students in town, neither attended summer school as they had planned to do before the raid. The boy was afraid to be apart from his mother and preferred to be home. The boy's mother told us how her children had grown fearful.

> *They're afraid. They're also afraid of going outside and even going to school. They missed a week. "We don't want to go, mom.* [What if] *they take us from the bus?" . . . "No," I tell them, "they won't do anything to you." It's very difficult . . . I've sent them to study. Their teacher* [sent for them] *on Tuesday and they're studying* [at school].

A798

The girl's day-to-day routine changed so much that she said she did not feel like getting up in time for summer school. Their mother said,

> *They don't want to go to summer* [school]. *They sleep late—eleven, twelve, one in the morning and they're still* [awake], *which is a change for them; it wasn't like that because they would leave for school* [in the morning]. *They would go out to have fun. Not anymore. They stay in the house.*

The two unrelated children initially lost interest in school. Both mothers eventually left the country with their children while their husbands—neither of whom was arrested—remained in the United States.

Some parents kept their students out of school when scrambling to deal with the consequences of arrest. Reeling from the shock of her husband's apprehension in a worksite raid, a mother in Arkansas kept her two school-age boys out of school for 20 days. The children moved from house to house during those three weeks. Their mother was afraid to send them to school because the arrest made local headlines, and she did not want her children to be taunted. Her mother recalled interactions with the school:

> *My sons missed a lot of school. And I sent my niece to tell the school that my son had not gone to school for some days, and the secretary said that . . . they were going to fail him because he had missed a lot, but my niece said that the principal came out . . . and that he heard the name and that he said, "No," he said, "I know what problems he's going through," and they supported him.*

In this case, the school continued communicating with the family to ensure the children returned to school once their living arrangements and home life became more stable.

Some students struggled to achieve consistently good grades and contemplated skipping school to start working. A 7th-grade boy decided to skip summer school and told his mother he wanted to look for a job instead. His mother recalled,

> *My oldest did not want to go* [to summer school] *anymore, he went last year but he didn't want to this year, because he tried to go see at McDonald's if they couldn't give him some hours to work . . . but since he is only 15 years old they told him no and he got really sad, almost wanting to cry and he told me, "It's too bad that they didn't want to help me."*

Almost a year after the Postville raid, the boy's grades fluctuated with his mood. When he could set aside what happened to his family, his grades improved. His mother said, *"There are times when he doesn't think about what's happening to us and he gets* [his grades] *up and there are weeks or semesters when they go down . . . And, well, I can't help him either because I don't understand what it's all about."* Some other students who missed days of school also had problems keeping their grades up within the first few months after their parent's arrest.

A few older students sometimes dropped out of school altogether following a parent's arrest. Two high school students started missing school after their mother was arrested at Micro Solutions. The mother tried to convince the girls to keep attending, but they eventually stopped going altogether. One of her daughters was close to finishing school. According to the girl's mother, *"She had already passed her exam . . .* [colleges] *were already calling her by telephone . . .* [because] *they saw that she was a good student . . .* [saying] *that they were going to help her and that, but, well, everything came down after that day and they did not want to go* [to school] *. . . they told me, 'We don't want to go' and 'Not anymore.' "* Two months after the raid, the girls stayed home to be with their mom and their 4-year-old brother.

As time passed, most parents sent their children back to school. At school, many students received support from teachers, counselors, and after-school program coordinators that provided them with stability.

## Behavior Problems

Some children exhibited behavioral and emotional changes in the classroom, according to both parents and educators we interviewed. In these instances, students had difficulties focusing at school across all ages. For example, after attending an immigration court appointment at which authorities placed a monitoring bracelet on her mother's ankle, a girl started paying less attention and lost focus in her pre-kindergarten class. The 5-year-old would drift and, according to her teacher, go to "La La Land."

Another 5-year-old girl also experienced problems paying attention after her mother was arrested at a worksite raid. Her teacher noticed major changes. According to her mother, the girl's feelings of sadness had extended into the classroom:

> *She is really sad at school . . . her teacher says that she sometimes sees her, well, sad and that she doesn't want*

to pay attention to what she's doing . . . and she gets home and tells me that she has a lot—a lot of sadness in her eyes, she tells me. And I tell her, "And why?" and she tells me, "Because I know that they are going to take you, mommy, I know that the police is going to take you and I don't want it," she says, "I don't want it," she says, "and if we go, don't leave me here, don't leave me here. I want to go with you."

More than a year after the raid, the girl had started biting her nails at school, although not at home. When her teacher asked her what was wrong, she said that her mother was going to be taken away and she would start crying.

A 9-year-old girl whose mother was detained for five months became rebellious at school in her mother's absence. A family member said, *"She didn't want us to tell her how to do things . . . She began to have a very aggressive attitude toward her teachers."* Her report cards reflected a steady decline, and she stopped participating in class as she had done before.

School officials in Springdale and Postville mentioned that students who began rebelling were often responding to the absence of a parent. For instance, a 3rd grader's misbehavior began to worsen after he was separated from his mother, who had been detained at Agriprocessors and spent five months in four different jails across the country. He banded together with a group of children at school, and they proudly and defiantly referred to themselves as the "bad kids." His teachers expressed concern about the boy. When his mother was released, she noticed that he was disobedient. *"He was always mischievous,"* she said nine months after the raid, *"but now he became more—he got a piercing to wear an earring . . . I took out the earring, I scolded him, and I said, 'Just watch out if you start leaving* [the house].' "

An 8th-grade student also exhibited outward behavioral problems. She had generally excelled in school before her mother's arrest, and while she continued to perform well academically, she began crying a lot at school. Her mother recounted her daughter's disobedient behavior at school:

*In her mind, anything was better than whatever her teacher was talking about. She started talking back . . . she became kind of aggressive . . . Everything affected her at once. Then we talked and she was the one who cried the most, not even the little one cried as much as she did. And I would tell her, you have to be very strong, that's how life is and you'll learn from this because you never know what will happen to you, learn to cherish and to mature from your experiences because it's going to hurt a lot.*

Her mother's encouraging words were meant to transform difficult times into an opportunity to teach her daughter about life's challenges.

## Declining School Performance

Within the first six months after their parents' arrest, students' study and work habits began to change and children's academic performance started to suffer. In the short term, about one in five students in the sample could not keep up their grades, according to their parents. A 2nd grader in Miami, whose father was arrested in their apartment and deported, was no longer doing his homework five months later. The boy's teacher called to tell his mother that he was failing and might have to repeat 2nd grade. A case detailed earlier in this chapter described a student who struggled with changes in the family routine in the first few months after a raid. The ongoing disruptions in her family's life continued to unhinge and dampen her day-to-day routine:

*She was a little behind but we had to punish her . . . because she is very—it's not that she doesn't know but that she doesn't want to do . . . Everything that's happened has a lot to do with it because, like I said, instead of sitting down to study with them, instead of sitting down to talk with them, to go to the park, well, no, we have to leave them with someone to go work. We have to leave them overnight.*

Students had difficulties keeping up their grades in the long term about as often as they did within the first six months after their parent's arrest. For example, nine months after the Postville raid, a 10th grader asked her mother why she should continue studying if they are going to be sent away. Her mother recounted, *"She does pay attention to her studies but a lot less."* As of the spring of 2009, the family remained in Iowa waiting for her mother's court date scheduled toward the end of 2009, almost a year and a half after the raid.

## Academic Resilience

Some parents in our sample noted stable or improved academic performance among their children. For example, educators in New Bedford mentioned that students' academic performance remained generally stable. Similarly, school officials in Postville and Springdale noted that most

students were performing at the same level as they were before the arrests.

Even students who struggled at first were able to recover their academic performance in the long term. For instance, two months after the raid in Van Nuys, a mother worried that her daughter might drop out because the girl would say she did not see the point of graduating from high school if her mother was going to be deported. A year later, the daughter's grades improved after an initial slump and she began doing better than before the raid. The mother proudly said that her daughter wants to succeed.

In another example, after an initial drop in her children's grades, a mother in Arkansas saw an opportunity to encourage them to do better at school. She recalled that their grades *"came down, they came down a lot but I talked with them and I told them to do their best, because when I would go before the immigration judge, the judge would say . . . 'These children don't even do their part, why should I let you stay here?' So we have all tried to lift ourselves up."* Her children (in 3rd, 6th, and 10th grades) all made improvements.

In Postville, several elementary and middle school students in our sample made efforts to maintain or improve their grades. Two children (3rd and 5th grades) missed a week of school after their mother's arrest. She encouraged them to try harder and not give up on school and told them, *"You have to go . . . it's a moment when they will go and distract themselves a little, they will take their mind off of this."* Nine months after the raid, the younger child maintained a B average, and her older brother's report card improved dramatically from a C average to better than a B+ average. Similarly, a girl in 5th grade at the time of the raid improved her grades. Nine months after the raid, an 8th-grade boy in Postville was taking some high school classes and earning an A in nearly every subject. His steady improvement came after an initial period of disillusionment when he withdrew from school activities and friends. Near the end of the 2008–09 school year, he had joined the band and the basketball team and was poised to skip a grade. A family member said, *"It was really complicated but now . . . I think that* [school] *is like a refuge for him. I don't know if it's to forget everything that has happened or to make sure that his mother's sacrifice is worth it. I don't know but, well, it makes him feel good."* Three siblings (in 5th, 6th, and 8th grades) were averaging near or above a B+ through most of the 2008–09 academic year, despite ongoing behavioral problems at home and being apart from their father and uncle. Their father was not arrested but had

left Postville to look for work, and their uncle had been deported.

## School as a Beneficial Routine

Some younger children in our sample appear to have benefitted from the routines provided by preschool and kindergarten classrooms. For example, a 4-year-old girl started pre-kindergarten soon after her mother was arrested in Van Nuys. School became an outlet for the girl, who was a bit quiet and shy in the classroom but learned a lot and made friends easily. One year after the raid, the girl was well adjusted and had become less clingy. Two siblings enrolled in Postville's Early Head Start and Head Start programs stayed in summer school after the raid. Attending school allowed these children to have a daily routine at a time when many things were changing, including the prolonged detention of their father and a change of residence. A mother of a kindergarten student in Van Nuys had feared that her son would have trouble at school, but her son did well. She said:

> School is what surprised me. I thought the boy would be doing badly but no. The teacher told me, "Look, since that time [since the raid], the boy—" I said, "Well, he's fallen," the teacher said, "No, he's progressing a lot." And I thought the teacher was going to tell me that [his grades] fell. "Look," the teacher said, "he has dedicated to learning a lot of words . . . he dedicated himself and he knows them." [I said,] "Well, teacher, it seems strange to me, I thought he was bound to fall." But the teacher told me, "No, it's been the opposite since [that time] until now."

A kindergarten student was able to adjust at school despite many changes since the Postville raid. He was enrolled in Head Start before the raid, which allowed him to get acquainted with school and meet other students. After his mother was arrested, the family prepared to move back to Mexico because they expected her imminent deportation. The 5-year-old boy spent four months in Mexico before returning to the United States after his mother was released. Remarkably, nine months after the raid, he was doing well and his report card reflected some improvement despite the hectic events following his mother's arrest.

Some older children also demonstrated an ability to focus on their school life and perform well in the face of tremendous stress. A high school student in Arkansas was doing well in school and excelling in sports. Despite years of

domestic abuse and his mother's pending deportation, the boy focused on school. His mother was proud that he was doing well, even as she struggled emotionally:

> *Before having these problems . . . I was different . . . happier, and now, well, lately, people tell me, "What's the matter? You're, like, really sad" . . . it's like they ask to be foolish, knowing that it's impossible for me to be well in the situation that I'm in . . . right now, I only go to take my two children and the oldest one to school . . . right now, he's doing very well in school. In sports, things are going very well, in high school, and . . . I don't want to move him. And my sister tells me, "Well, in the meantime, leave him with me."*

*****

Parents in our sample observed substantial and wide-ranging behavioral changes in children following parental arrest, detention, and deportation. A majority of the children in the study displayed changes in such basic areas as sleeping, eating, and controlling their emotions. Parents of more than half the children reported that their children cried and complained about being afraid after the raid. Many children displayed increased anxiety and were more withdrawn, clingy, and aggressive. These behavior changes apply to children with parents arrested in worksite raids, in home raids, and during routine police operations. Behavioral change symptoms coexist for many children in the sample, with more than three of five of the children exhibiting three or more behavioral changes, and two of five exhibiting five or more behavioral changes. In the short term, children who were separated from their parents due to detention or deportation seemed to have experienced particularly severe effects. Children whose parents were arrested at home in front of their children also exhibited drastic changes.

In the long term, more than nine months after parental arrest, the frequency of children's reported behavioral changes fell somewhat but remained common. While the frequency of changes related to eating, sleeping, crying, and feeling afraid had declined modestly, at least 40 percent of children in the long-term sample still exhibited each of these behavioral changes. Withdrawal and aggression were especially persistent and troubling for children who were separated from their parents for long periods.

Children in the sample displayed both positive and negative changes at school. Many children experienced disruptions in school in the short run, including missing days of school as well as behavioral and academic problems. However, many parents and teachers also relayed positive stories about children's long-run adjustments and the schools' role in offering stability and structure. Schools were generally safe havens for children (and often parents) in four of our sites (Grand Island, New Bedford, Postville, and Rogers-Springdale), but we were unable to collect sufficient data on the other two sites. Students appear to have benefitted from school routines and the support they received from teachers and school personnel at a time when their lives at home were unstable. As we detail in the next chapter on community impacts, schools in these four sites went out of their way to continue welcoming students, educating them, and keeping them safe.

# 5. COMMUNITY RESPONSES TO RAIDS AND OTHER ARRESTS

Previously in this report we described the enforcement activities that took place in our six study locations and their impacts on families and children. Our study communities were selected to reflect a diversity of settings: a small town in rural Northeast Iowa (Postville), a medium-sized city in rural central Nebraska (Grand Island), two medium-sized cities together in a rural-urban area of Northwest Arkansas (Rogers and Springdale), a medium-sized city near Boston (New Bedford), neighborhoods in a one of the nation's largest cities (Miami), and a suburb of the nation's second largest city, Los Angeles (Van Nuys).

In this chapter we present our findings regarding the community responses to worksite raids and other enforcement activities, and how these responses helped ameliorate impacts on families and children. We seek to answer the central research questions we developed about community responses:

- How were community responses (both public and private) implemented in the sites, and what kind of response models were developed?
- What lessons can be learned from the sites about how to deliver assistance to affected families and children?
- What were the successes and challenges of the institutions providing assistance?

Our findings primarily come from our interviews with community respondents—local government officials, law enforcement officers, service providers, and faith-based and other community leaders. As with our interviews of parents, our community-respondent interviews in the four sites—Grand Island, New Bedford, Van Nuys, and Postville—occurred at two points in time: within six months after the raids and nine months or more after the raids. The interviews in the other sites—Miami and Rogers-Springdale—occurred at single points in time.

As in our chapters describing impacts on families and children, we focus here on both short- and long-term response efforts in our study communities. One of the important themes we discuss is the extent to which response efforts are sustainable over time.

## Community Response Efforts in the Study Sites

### Grand Island

Grand Island is one of the three sites we included in our 2007 study *Paying the Price,* and short-term response efforts are also described in that report. On the morning of the raid, December 12, 2006, ICE notified the Grand Island chief of police who in turn notified government institutions including the Nebraska DHHS and the Grand Island public schools. Subsequent rapid communication to community leaders resulted in the mobilization of the Grand Island Multicultural Coalition (MC), which consisted of over 20 CBOs, churches, DHHS, and the public schools. The MC organized and conducted a meeting the day after the raid to develop a coordinated response.

Many of the response efforts focused on meeting the immediate material needs of affected families. Swift gave $62,000 to the local United Way (an MC member) for relief to families whose members were detained in the raid.[61] Churches conducted fundraising and food drives, and provided sanctuary and food to affected families. There was also significant assistance from the United Food and Commercial

---

[61] Swift donated several hundred thousand dollars to the United Way to assist arrested workers across all six company plants that were raided on December 12, 2006.

Workers (UFCW), as the plant was unionized. Just after the raid, public service announcements on Spanish language radio and in the newspaper provided information about services available to affected families.

The Grand Island public schools acted immediately through a coordinated effort led by the district superintendent. Principals and teachers were briefed and a plan was implemented to protect the safety of the immigrant students. The superintendent announced that the schools would be safe havens, and within a few days parents trusted the schools enough to send their children back. The local public health department and the DHHS provided access to services for families, including welfare, food stamps, and health benefits to eligible applicants.

While not a member of the MC, the Grand Island police chief declared publicly that his department was not connected to the raid and did not support it. The mayor of Grand Island and state elected officials made no public statements about the raid.

Grand Island had no experienced immigration attorneys before the raid, and this opened the door to *notarios*—notary publics who posed as immigration consultants—who reportedly provided misinformation to unwitting immigrants. After the raid, UFCW and the Mexican consulate contacted lawyers in the state capital of Lincoln and the state's largest city of Omaha.[62]

Roughly three-quarters of the money from the Swift fund was disbursed in the first six months. The United Way imposed strict accounting and proof of eligibility on the funds, limiting the assistance to families that included an arrested immigrant. Central Nebraska Community Services (CNCS)—a local United Way agency—was the main provider of assistance for housing, food, medical bills, and other daily living expenses. CNCS served more than 100 families with almost 200 children. Families were allocated about $200 for the first month, then up to $700 in total assistance in subsequent months. Most families tapped into this assistance for three or four months.

The worksite raid and subsequent home raids led to widespread fears in the immigrant community that were seen in immigrants' hiding behaviors, businesses shutting down for periods, workers fearful of returning to work, and children absent from schools. Some immigrants hid in their homes, drew curtains, and refused to open the door for neighbors and trusted community members. Residents also reported that a number of Latino local businesses suspended operations temporarily as their customer base dwindled. According to school officials, about 275 Latino public school students—most, but not all, from immigrant families—failed to report to school in the days following the raid.

Church and school officials reported conducting outreach, going door to door to draw families out and reassure them that schools were a secure place for their children. Representatives from churches, schools, and CBOs reported that even with this outreach, they had difficulty getting some to open their doors to receive basic assistance such as food baskets.

During our first visit six months after the raid, in spring 2007, the Swift plant continued to have difficulty replacing lost workers. Somali immigrants moved into the community to fill jobs vacated by the Latino community, but many left after a short time for better employment opportunities elsewhere. Schools secured funding to add social workers through a federal grant, allowing them to provide counseling and other services to help children acclimate to the post-raid environment.

By the time of our second visit in spring 2008, more than a year after the raid, a number of families had moved elsewhere in the United States to seek work or had returned to their home countries following deported or voluntarily departed family members. Since a large majority of arrested immigrants were deported or left voluntarily right after the raid, some families found themselves separated for prolonged periods. The Mexican consulate provided assistance to some of the families who chose to return to Mexico. There was little cash assistance, with just $9,000 in funds still available through the United Way. However, there were only a few affected families still living in Grand Island, and a handful of them continued to receive this assistance.

For the families who remained in Grand Island, transportation remained a persistent problem. Often, the male householder was the only driver in a family, so if he was detained or deported, the remaining spouse was unable to transport herself or her family to school, to legal proceedings, or to receive services.

In hindsight, legal assistance was generally acknowledged to be the biggest unmet need after the raid. A small number of families were able to get legal representation through UFCW or private attorneys, but most of the arrested immi-

---

[62] Lincoln is about an hour's drive from Grand Island, and Omaha is about two hours away.

grants chose voluntary departure fairly quickly or wound up getting deported within months following the raid. Another unmet need stemmed from the large bonds—up to $10,000—that immigration judges imposed on some arrested immigrants as a condition of their release. None of the groups involved in response efforts—the consulates, UFCW, state and local agencies, or local churches—were able to provide assistance in paying these bonds.

## New Bedford

New Bedford was the second of our study sites, and community responses there are also outlined in *Paying the Price.* The community response to the New Bedford raid on March 6, 2007, was noteworthy because of the broad-based federal, state, and local government support in the aftermath of the raid, and the effective coordination among different institutions immediately after the raid. MDSS played a key role in gaining access to detainees in order to assess whether they were parents. Their actions included securing a commitment from ICE (via court order) to allow MDSS social workers to meet with detainees, half of whom had been transferred to Texas detention centers. The local MDSS office also worked with the New Bedford schools to identify needs and coordinate services to students.

State and local elected government officials soon became involved in the community response. Soon after the raid, the governor visited New Bedford and met with community leaders. The mayor and other city officials expressed concern about the manner in which the raids were conducted. The state's U.S. senators and the local congressional representative were active in voicing their support for MDSS to gain access to detainees in Texas, and their efforts were successful in gaining the release of about two dozen mothers.

New Bedford is located near Boston, a hub for many different immigrant-serving organizations. Unlike in Grand Island, the New Bedford response included substantial financial, legal, and other resources raised from within the state. MIRA, a statewide coalition comprised of over 100 community organizations, helped coordinate service delivery immediately after the raid. MIRA established a special fund called the New Bedford Immigrant Families/Niños Fund with donations from foundations, CBOs (from as far away as Seattle), Boston-area businesses, and the general public. The fund covered basic needs for more than 100 families affected by the raid with assistance for housing, utilities, and food.

Their efforts quickly raised more than $200,000 and were distributed mostly in the first three months after the raid.

Institutions in New Bedford and Boston were active during this critical 90-day period. In New Bedford, Our Lady of Guadalupe parish offered sanctuary to families in need of emergency shelter. CBOs such as Maya K'iche, MIRA, Catholic Social Services (CSS), and the Community Foundation of Southeastern Massachusetts coordinated distribution of the Niños Fund and triaged services. CSS and Greater Boston Legal Services (GBLS) assisted detainees with legal proceedings. A Boston-based philanthropist, Robert Hildreth, personally contributed more than $132,000 for bonds to get 37 detainees released. In the single most expensive case across our study sites, the judge required a $37,000 bond, and the philanthropist paid $32,000 of it.[63] The public schools mobilized to make sure that students were not stranded at school on the day of the raid, and that parents felt comfortable sending their children back to class.

At the time of our second visit about a year after the raid (in spring 2008), when about 200 deportation cases were still being contested, the resources of the Niños Fund had diminished to about $50,000. After the first few months, the fund's use shifted to preserving intact families (e.g., obtaining passports for U.S.-born children who might return to their parents' countries of origin) and helping with emergency situations (e.g., providing rent money to families facing imminent eviction). MIRA substantially reduced its coordination role, while a pool of local CBOs and churches continued to support the remaining immigrant families. More generally, fewer families sought assistance from organizations, preferring instead to work if they could or rely on family or social networks for support. Some immigrant families found work locally, mostly in fisheries. However, these replacement jobs were mostly temporary and paid less than their jobs at Michael Bianco before the raid. Some community organizations shifted their emphasis to English language learning programs and immigrant rights workshops.

Transportation remained a major ongoing need, with MIRA and Our Lady of Guadalupe parish teaming to provide such services. In particular, there was a need to regularly transport families an hour away to Boston for scheduled

---

[63] Miriam Jordan, 2008, "Boston Financier Steps In to Bail Out Illegal Immigrants," *Wall Street Journal,* March 19.

hearings and to provide transportation to the ICE field office, which was more than an hour away, for monitoring meetings.

### Van Nuys

On February 7, 2008, the day of the raid of Micro Solutions, ICE contacted the Coalition of Humane Immigrant Rights of Los Angeles (CHIRLA) and the Central American Resource Center (CARECEN). Both are part of the Los Angeles Rapid Response Network (RRN), a coalition of community-based organizations, legal service organizations, and labor organizers whose objective is to respond to ICE work raids. Prior to the raid, members of the RRN had received training from Yale University Law School professor Michael Wishnie, which centered on the rights of immigrants when arrested or detained by ICE.[64]

RRN was prepared by this training and mobilized quickly upon notification of the raid. RRN members were dispatched to Micro Solutions and to the downtown Los Angeles detention center to provide detainees with advice and legal counsel. Roughly 45 RRN attorneys were involved. The National Lawyers Guild filed a suit against ICE on behalf of the detainees and negotiated the presence of legal counsel when ICE interviewed the detainees. About a third of the detainees were released with supervision on the day of the raid, and most of them had electronic monitoring devices affixed to their ankles.

The day after the raid, CHIRLA, Unite Here Local 11 (a union), and local businesses conducted a joint press conference to highlight community outrage over the raid. But neither the City of Los Angeles nor the State of California issued an official reaction. Attempts by a city council member to pass a resolution were unsuccessful. The Los Angeles

Independent School District had no official reaction to the raid. Mexican and Salvadoran consular staff were present at the Los Angeles detention center, where they met with their nationals, provided advice, and made legal referrals.

After the raid, CHIRLA convened weekly Sunday meetings with victims to triage needs and create solidarity toward a common cause. A fundamental objective of these meetings was community organizing and advocacy (which are central to CHIRLA's mission). To meet basic needs on an emergency basis, families were referred to churches (e.g., Holy Rosary, Immaculate Conception, and Sacred Heart), which conducted fundraising and food drives. Families were also directed to other service providers, such as the Los Angeles Department of Public Social Services and local food banks. Independently, other organizations such as Mujeres Unidas conducted their own separate fundraising and relief efforts. The Mexican consulate provided $19,000 in cash assistance to 50 families within the first year after the raid. As in Grand Island, the consulate also paid some families' expenses associated with returning to Mexico. The Honduran consulate distributed food baskets to 80 families (irrespective of nationality) for two weeks after the raid. Finally, Unite Here Local 11 worked with Campaign Car Wash to raise funds to offset legal expenses of the immigrants who chose to fight deportation in court. This was a point of contention because the victims wanted to use some of the funding to offset basic economic needs.

Our study respondents told us that fundraising to help the families affected by the raid was difficult, despite the substantial resources available in the Los Angeles area. In the case of Van Nuys it was much easier to recruit legal assistance than to find funding for humanitarian assistance—the opposite of the pattern we observed in Grand Island and Postville.

More than a year and a half after the raid, a large majority of the Van Nuys arrestees was still in the United States. The immigrant community was buoyed by legal victories, including two deportation hearing dismissals, which led other arrestees to more actively challenge their cases. In addition, over 30 arrested immigrants had their deportation put on hold in exchange for cooperating with the immigration investigation against Micro Solutions. Staff at CHIRLA and other CBOs said that these legal victories had led more of the arrested immigrants to engage in community organizing activities. At the same time, there were also signs that the protracted legal battles to contest deportation were associated with continuing economic hardship among some families in

---

[64] The training, based in part on lessons learned in Wishnie's study of the New Bedford experience, had two goals: first, to educate key people in the community who could then inform immigrants how to respond in the case of a worksite raid or home arrest, and second, to prepare local lawyers on the related constitutional law issues to put them in position to mount an adequate defense for those detained. For more detail on the key constitutional law issues surrounding immigration arrests, see J. Cox and M. J. Wishnie, 2009, "Appendix: The Constitutional Law of Immigration Enforcement," pp. 63–68 in *Raids on Workers: Destroying Our Rights,* Washington, DC: United Food and Commercial Workers, http://www.ufcw.org/docUploads/UFCW%20ICE%20rpt%20FINAL%20150B_061809_130632.pdf?CFID=7532992&CFTOKEN=84036596.

58

Van Nuys because the arrested immigrants were unable to work. Even those with work permits had difficulty finding employment due to California's severe recession.

## Postville

In the immediate aftermath of the May 12, 2008, raid, leaders from the local Catholic, Presbyterian, and Lutheran churches and their statewide networks began organizing a humanitarian response. Local religious leaders, working with a statewide network, successfully tapped resources from Luther College in Decorah (just a half hour away) as well as from more distant locales such as Des Moines, Minneapolis, and Chicago. Collectively they raised relief funds, developed service delivery infrastructure, and secured legal assistance. More than $900,000 was raised—a large sum relative to amounts that were raised in the other sites we studied. Most of the resources were devoted to humanitarian assistance.

The relief operation was centrally organized out of St. Bridget's Catholic Church in Postville, where the local clergy, the Sisters of Mercy (based out of nearby Waterloo), and faculty and students from Luther College ran the operation. The clergy and volunteers developed a service delivery infrastructure from scratch, since none existed before the raid. Notably, St. Bridget's developed their own financial and accountability systems, and found outside resources for basic infrastructure such as upgraded phone lines, computers, and fax machines. An existing Hispanic ministry at St. Bridget's had an established relationship with members of the Postville Latino community. Before the raid, the ministry periodically assisted families and had become a well-known source of support for families seeking translation and other services. St. Bridget's had previously coordinated a short-term relief effort five years earlier when Postville's then second-largest employer, a turkey processing plant, was destroyed in a fire.

St. Bridget's Catholic Church was not the only immigrant congregation before the raid, since many immigrants were Protestants from Guatemala. However, St. Bridget's quickly established itself as a relief hub by providing sanctuary to over 400 family members of arrested immigrants in the week that followed. The raid so terrified Postville's immigrant families (not just those with arrested members) that many were afraid to stay in their own homes. This is remarkable because in our other sites, we mostly heard that immigrants hid in their homes. In Postville, however, most families

either ran to St. Bridget's or fled the town altogether. Some families even fled into nearby fields, where they stayed for several days.[65] It was not until more than a week after the raid that families began leaving St. Bridget's and returning to their homes. During this week, St. Bridget's provided food, bedding, clothing, medical care, and all of the basic needs for hundreds of parents and children. This intensive experience cemented the church's role as a sanctuary and the foundation of support for the immigrant community.

The depth of humanitarian support and the length of time for which it was delivered were greater in Postville than the other sites, although there was substantial long-term support in New Bedford as well. By March 2009, at the time of our second visit and nine months after the raid, St. Bridget's had already spent more than $500,000 to assist about 200 families.[66] The church was still supporting more than 50 families, including minors who had been arrested and released, and mothers who were still wearing ankle bracelets and unable to work. At its peak, the St. Bridget's relief operation expended more than $80,000 per month. Relief was limited to families with members arrested in the raid, and support mostly went for housing, utilities, food, basic necessities, and—in some cases—medical bills. St. Bridget's paid up to $600 monthly for rent directly to landlords, and paid electric and gas bills directly to utilities. Food was provided through the local food bank and food drives; hot meals were available once or twice per week. St. Bridget's estimated that in some months up to $1,200 was needed to support an individual family.

The mayor and other city leaders spoke out against the raid but were not actively involved in St. Bridget's relief efforts. The lieutenant governor came to Postville in the fall of 2008, more than six months after the raid and after Agriprocessors went bankrupt. At that time, the City had declared a local economic and humanitarian disaster and asked the State of Iowa for disaster assistance. The State did

---

[65] We were told that many of the Guatemalan immigrants in Postville had experienced raids by the military or other forces during the country's civil war and had fled into the fields to escape capture and violence. This pattern appears to have repeated itself during the Postville raid.

[66] St. Bridget's support was also essential to the survival of landlords and other local businesses, many of which would likely have failed if so many immigrant families had lost the means to pay rent and other basic expenses.

A808

not declare Postville a disaster area, in part because so many other Iowa communities had been affected by recent major floods and plant closings.

However, the State and City worked together to obtain a $700,000 grant from the U.S. Department of Housing and Urban Development for disaster relief in the form of housing and utility assistance to families affected by the plant closing. This funding served the larger population in Postville affected by the plant closing, including some of the families of arrested immigrants. The Postville Relief Coalition was set up as a nonprofit organization specifically to disburse these funds. Families were limited to $3,000 or three months of assistance, and this grant had mostly been spent by March 2009, because the majority of the population of Postville was affected by the plant closing. It was unclear how much of this grant went to immigrant families caught up in the raid, but some of our respondents received some assistance through this program.

St. Bridget's was also effective in linking affected families with health care and public assistance. The free clinic in nearby Decorah, which had seen several workers from Agriprocessors before the raid, sent a doctor and a nurse to St. Bridget's during the week after the raid. A bilingual social worker from the Iowa DHS office in nearby Decorah already had some Agriprocessors workers on her food stamps caseload before the raid, and she came to St. Bridget's several times during that first week to reassess the needs of her existing clients and to sign up new ones. St. Bridget's worked closely with the free clinic and Iowa DHS in the months following the raid to ensure that families received needed health care and benefits for their eligible citizen children.

The Postville public school system was also active in responding to the raid, just as the schools had been in Grand Island and New Bedford. Postville has a single high school and one elementary/middle school, and most teachers and administrators live in the community. On the day of the raid, one of the principals and the lead counselor visited both the plant and St. Bridget's Church to speak with arrestees and their families. Over the course of the next week, the principal and counselor communicated directly with the families staying at St. Bridget's and convinced worried parents to allow their children to be transported by bus to and from the school. They also went door to door in search of students. As a result, most students with immigrant parents were back in school by the second week after the raid (although that was

the last week of the school year). While enrollment declined for summer school, it rebounded in the fall. As of March 2009, 10 months after the raid, about 100 students out of 350 had left the elementary/middle school, but there were as many new students. Enrollment had stabilized.

As in Grand Island, the efforts of the Postville administrators to make schools safe havens paid off with better attendance over the long run. Teachers and administrators said that academics had not suffered and children's behavior remained good. However, they did report that there were still some lingering impacts of the raid months later, and that between September 2008 and January 2009 there were over 100 counseling sessions for schoolchildren with arrested parents, as well as dozens of sessions for other children—with both immigrant and U.S.-born parents—who were strongly affected by the events surrounding and following the raid.

One of the most important participants in the Postville response effort was an immigration lawyer based out of Des Moines, who represented over 50 of the arrested immigrants. She was successful, with limited paralegal assistance, in obtaining visas for more than half of her clients, as described in chapter 2. There were a handful of other immigration lawyers involved, but their caseloads were much smaller. As was the case in Grand Island, the remoteness of Postville limited the availability of legal assistance, and this single lawyer handled most of the caseload by herself. In December 2009, more than a year and a half after the raid, 29 women and minors had received U-visas or other forms of relief from deportation, and 30 cases were still pending. Most of these 60 women and minors were caught up in the raid, but a few were other workers at the plant. Additionally, 35 adults and six minors were released as material witnesses and were still in the country, although the 35 adults were no longer needed for trial and likely to be deported within a short period.

## Miami

The raids by ICE's fugitive teams and other officers on Haitians in their homes and across the community had a fundamentally different effect on the community compared with the large-scale worksite raids we studied in other locations. The Miami raids lacked a single, defining traumatic event and did not generate the same community reaction that characterized workplace raid sites such as New Bedford

and Postville.[67] Worksite raids can instill a sharp, intense fear in the immigrant community. The Miami enforcement activity, on the other hand, instilled a more *chronic* fear in the Haitian community, a fear that subsided less over time because of a perception of ICE's continuing and conspicuous presence.

In contrast to the sites with large-scale worksite raids, in Miami there was far less community and media attention to the situation of affected families and less of a community effort to raise funds and coordinate relief efforts. Though as described earlier, families in Miami experienced material hardship as great as or greater than families in our other sites, no special relief operation was available to help them. They sought services through informal channels or through CBOs on a case-by-case basis.

While there appeared to be no coordinated effort to provide relief to the families of detainees, a number of CBOs, churches, and legal service organizations provided assistance independently to the Haitian community as a whole, including the families of arrested immigrants. Church Notre Dame D'Haiti, through its affiliated Haitian Center, counseled families affected by ICE activity on both psychological and spiritual matters. The church also sent letters to immigration judges documenting the residency period of detainees and immigrants seeking permanent residency. The Florida Immigrant Advocacy Coalition (FIAC) had been working with the Haitian consulate and the Florida Department of Families and Children to protect the interests of detainee children and developed materials for families before and after arrest, as well as during detention.[68] Other organizations (e.g., Haitian's Women's Association, Sant La) offered parenting classes, after-school care, and limited legal services. They also assisted families with applications for aid such as Medicaid, food stamps, and WIC.

Organizations such as Catholic Legal Services and FIAC provide legal services to the Haitian community, as well as others affected by home raids. Due to thousands of arrests in the Miami area each year, the demand for legal services exceeds capacity—even in Miami, which has a relatively high number of immigration lawyers. In Miami, as in Grand Island, our community respondents reported increased business for *notarios* who are suspected of providing poor legal advice while charging immigrants excessive fees. Because Haitian immigration cases often involve asylum requests, which are complex and difficult to substantiate, competent legal assistance is particularly important.

The Haitian families in Miami we studied also had little recourse to contest deportation, because they mostly had outstanding prior deportation orders. These orders were the reason for their arrest by FOTs and could rarely be contested.

## Rogers-Springdale

In Rogers and Springdale, Arkansas, we studied the aftermath of arrests and raids by the local police, who were acting under 287(g) agreements with ICE to enforce immigration laws. These raids occurred over about six months, starting in October 2007 and leading up to our visit in May 2008. As in Miami, there was no single large-scale raid to generate significant media attention and coordination of relief efforts. There was one set of small-scale raids on a chain of Mexican restaurants in December 2007 that attracted some media attention (especially on Spanish language radio stations) and, for a short time, a community response. Leaders in the business community and the Latino community generally complained that these raids were not targeted at serious criminals—but instead at Latino business owners more generally. These raids served to drive a wedge between local police departments and most of the Latino community leaders who had originally supported the 287(g) program.

Overall, however, there was not much media attention to the 287(g) program and the impacts that arrests had on families. Additionally, many of our respondents said the constant threat of arrest by local authorities, for instance, for driving violations, deterred immigrants from seeking services from government offices or CBOs such as food pantries.

There was no apparent coordination among service providers, CBOs, FBOs, or schools after the 287(g) program was implemented and the restaurant raids took place. Individuals and organizations provided assistance as best as they were able. St. Vincent de Paul church provided ad hoc cash assistance to cover bills. Legal assistance was available through a Catholic Charities affiliate and several local lawyers, but their capacity was limited. A few organizations provided families with referrals to appropriate services. A

---

[67] Our interviews in December 2008 included families with parents arrested over a two-year period beginning in early 2007.

[68] Florida Immigrant Advocacy Center, no date, "Detainees with Minor Children: Frequently Asked Questions" Miami; Florida Immigrant Advocacy Center, 2008, "Immigration Raids: How to Protect Yourself in Case of a Raid," Miami, July 16.

61

number of service providers and advocacy organizations that are centrally located in the Jones Center in downtown Springdale did not generally coordinate their efforts. The Mexican consulate in Little Rock—about four hours away—provided some help with emergency funding. There were limited housing services available; in fact, the only general overnight shelter in the area was provided by the Salvation Army and they did not serve unauthorized immigrants. Local domestic violence shelters, however, took unauthorized victims and their children.

Neither the state nor the city governments of Rogers and Springdale—which were participating alongside ICE in enforcement activities—offered support for the affected families or the immigrant community in general. However, both a congressional representative and a former representative communicated their concerns to the federal government about ICE enforcement activity in Arkansas.

Beyond the lack of coordination there were other barriers to accessing services. One problematic area was translation and interpretation, for which government service agencies in the area had limited capacity. A handful of CBOs (e.g., Catholic Charities and St. Francis Community Clinic) had ample bilingual staff but some others (e.g., Economic Opportunity Agency and the local Head Start programs) did not.

As in other sites, transportation emerged as another important barrier. The two cities are spread out geographically with minimal public transportation, and many immigrants said they were afraid to drive because of the arrests during traffic stops.

Finally, as in Miami, arrested immigrants had little hope of relief from deportation. Because they had been charged with other crimes most avenues of relief were unavailable to the immigrants arrested through the 287(g) program, even in cases where the charges may have been for relatively minor offenses.

## Lessons Learned about the Delivery of Assistance

This section describes briefly what we learned about the types of organizations providing assistance, the frameworks or models they used for service delivery, and the types of assistance they offered.

**1.  Across most sites, many organizations participated in providing community assistance, including community-**

**and faith-based groups, schools, and legal services organizations.**

Churches and faith-based groups generally played the most important roles in providing short-term humanitarian relief and long-term spiritual support to families affected by ICE enforcement activity. Churches were often the first places that families would turn for emergency assistance. Churches were conduits for food and clothing drives and cash-based fundraising efforts. Some churches like St. Bridget's in Postville and Our Lady of Guadalupe in New Bedford played key roles as safe havens and in the distribution of humanitarian relief. Faith-based organizations such as Catholic Charities were involved in humanitarian relief efforts in Grand Island, New Bedford, and Postville. They also provided legal services in New Bedford, Miami, and Rogers-Springdale.

Other community groups were also important contributors. Organizations like the United Way, the Salvation Army, and local community health centers provided humanitarian assistance and referred families to other service providers. United Way–based organizations were especially involved in Grand Island, because Swift had funneled their relief funding through these organizations. In Grand Island, Postville, and Rogers-Springdale, local nonprofit community clinics played important roles in health screening and delivery. CBOs also worked with local government and businesses to coordinate service delivery. However, as described below, while these organizations were able to step up in the immediate aftermath of the raids, their resources were tested during the longer limbo periods of months or even a year or more when parents were contesting their deportation. Moreover, in some sites these organizations were not well prepared to address the needs of a culturally diverse, non-English-speaking population.

Public schools offered strong support for children with arrested parents in four of our sites. In Grand Island and New Bedford, the districtwide coordinated strategy ensured that children were not stranded at school on the day of the raid. In Postville, school staff provided secure transportation to and from school for a week after the raid, to get the children back in school. Moreover, these school systems established themselves as "safe places" for immigrant children. This helped reduce absenteeism stemming from parents' fear that their children would be detained. All three also provided counseling to a significant number of students following the

raids. In Springdale, the district worked hard to maintain a sense of safety after police arrested parents outside of an elementary school as they waited to pick up their children. We did not find comparable evidence of school involvement in Miami or Van Nuys.

Organizations that provide legal services, community organizing, and advocacy were important partners in several sites, although they were constrained by limited capacity. Even in a large urban environment like Van Nuys, a coalition of legal service organizations, including the American Civil Liberties Union and the National Lawyers Guild, was collectively unable to meet the needs of all of the arrested immigrants. Advocacy organizations such as CHIRLA in Van Nuys were central in the effort to create a unified group of immigrants willing to fight deportation. In New Bedford, MIRA played a similarly important role, although one that was more focused on helping to bring attention to the needs of arrested immigrants and their families and to coordinate the activities of local groups to engage in ongoing response efforts.

**2.  While public agencies in many sites stood ready to serve eligible immigrant family members, some overcame families' suspicion and fear more successfully than others.**

State departments of human services, social service agencies, child welfare agencies, and health departments offered a variety of services to at least some family members of arrested immigrants. Benefits included food stamps, Medicaid, and the Children's Health Insurance Program (CHIP) for eligible U.S.-born children of immigrants, and more generally, WIC for families with young children. In New Bedford, MDSS helped secure the release of two dozen parents to be with their children, and a few minors who were arrested while working at Michael Bianco were taken into foster care. In Postville, one minor who was not arrested but left his job at Agriprocessors came to St. Bridget's several months after the raid and was taken into foster care.

In some sites, families continued to be very cautious about presenting themselves to apply for benefits, while community responders in other sites helped encourage and facilitate a much broader use of public benefits in this time of economic necessity. We found much higher use of public benefits soon after the raid and over the longer term in the sites with well-coordinated disaster-relief efforts—Postville, Grand Island, and New Bedford—than in the other three sites. In Arkansas, Miami, and Van Nuys, where relatively

few sought assistance despite their needs, a significant concern for families was the perception that presenting themselves for benefits and services at government agencies could subject other family members to arrest and detention. This was especially apparent in Rogers-Springdale, where the local police were involved in arresting and detaining immigrants.

When churches, advocacy groups, and CBOs served as intermediaries or when public agencies directly conducted outreach, they were better able to connect eligible family members with needed benefits. In Grand Island, New Bedford, and Postville, social service workers went into the community to discuss eligibility and help with the application process. Prior experiences also affected the degree to which public agencies were able to deliver services to a community. In Postville, a bilingual social service worker from nearby Decorah, Iowa, who already had immigrant families on her caseload before the raid, came to St. Bridget's Church during the week following to help others apply for benefits. In Grand Island, immigrants distrusted the Nebraska DHHS because an immigrant mother had nearly lost custody of her children before the raid following a child protective services removal and her deportation. Yet outreach efforts there still proved successful in getting public benefits to a significant number of families caught up in the raid—at least in our study sample.

**3.  Many community responders, especially in worksite raid sites, used a "disaster-relief model."**

When a worksite raid captures a sizeable number of immigrant workers, it sends a shockwave throughout the resident community of immigrants, as well as the broader community. The community reaction is typically swift. Three of the study communities that experienced worksite raids—Grand Island, New Bedford, and Postville—developed, to one degree or another, what could be considered a *disaster-relief approach* for addressing the short-term needs of affected families.

On the day of the raids, community organizations, churches, and local government engaged in rapid information dissemination to initiate an immediate response. While in Van Nuys the Los Angeles Independent School District had virtually no reaction, the schools in Grand Island, New Bedford, and Postville conducted teacher briefings and launched efforts to ensure children were not stranded and had access to services to address the emotional trauma associated with these raids.

As in natural disasters, the media played an important role in disseminating information to community leaders and officials. Community organizations and churches

63

commenced fundraising and preparing their facilities for use as sanctuaries. Community organizations mobilized their staffs to be present at the worksite and (when response staff included lawyers) at the detention centers. If they did not already exist, coalitions consisting of community organizations, churches, schools, and sometimes local government were quickly formed to more effectively coordinate efforts, pool resources, and provide centralized triage to match and refer services to eligible families.

Response efforts typically featured one or more centralized locations (e.g., churches, CBOs) where affected immigrants could present themselves to receive relief services. In both Postville and New Bedford families were able to use central points of distribution: St. Bridget's Church in Postville and Our Lady of Guadalupe parish as well as the offices of Catholic Social Services in New Bedford. This approach, by all accounts, worked well for distributing short-term resources and services to victims seeking assistance. In the other sites, distribution centers had more difficulty reaching out to immigrants gripped by fear that they might be arrested while seeking assistance. Outreach to immigrant families in their homes was somewhat effective in Grand Island.

Short-term humanitarian relief packages typically included food, housing and utility assistance, clothing, health services, and occasionally cash or gift cards and coupons for gas or food. In some cases the hubs referred families to state and federal aid programs such as Medicaid, CHIP, food stamps, and unemployment insurance if the adults or children were eligible, which the U.S.-born children usually were.

**4.  In Van Nuys, responders used a "community organizing model."**

The Van Nuys response, driven by a community organizing model of the problem, was unique in that it was largely developed with a longer-term plan in mind. CHIRLA focused its energies primarily on organizing affected families to join in a common effort to contest deportations. CHIRLA's legal service partners and other CBOs (e.g., Unite Here Local 11) implemented a strategy to identify arrestees, train them in leadership and organizing techniques, and work with them to galvanize the other arrestees in support of their common cause.

In a mirror image of the strengths and weaknesses of the disaster-relief model, this alternative model generated some concerns in the Latino community that the humanitarian needs of victims' families might not be adequately addressed.

Van Nuys was the one site we studied in which legal resources exceeded humanitarian assistance following the raid. However, the legal strategy began to show success a year after the raid when an immigration judge dismissed one of the deportation cases because of inhumane treatment at the detention center. As described earlier in chapter 2, lawyers in Van Nuys were also successful in contesting the legality of the raid itself, which suspended the deportation of between 60 and 70 immigrants. Further, they were able to get work permits for 30–35 immigrants for cooperating with the prosecution against Micro Solutions. These legal victories have generated momentum for immigrant-organizing efforts there (with help from CHIRLA), and community support for these efforts has grown with their success.

**5.  All sites, particularly those using a disaster-relief model, had to confront the challenge of long-run as well as short-run assistance.**

As each of these sites illustrated, children and families often had long-term needs, particularly given the time required for the legal process to play out. For the most part, CBOs, local governments, and churches in our study sites adjusted their responses over time due to funding constraints and changes in the volume and needs of immigrant families. The short-term disaster model was often effective in soliciting one-time or limited-duration donations from organizations, businesses, and, in one case, a philanthropist. Moreover, there was a noticeable synergy produced by cooperating organizations in response to a common emergency. Over time, however, maintaining that momentum and dedication can be taxing to individual donors and staff alike, especially for those organizations for which direct relief is not specifically a part of their mission.

Two sites merit special attention for their ability to provide longer-term support to immigrant families: Postville and New Bedford. In Postville, over the course of a year, St. Bridget's Church raised over $900,000 from a web site, faith-based networks, and national fundraising appeals. This sum was necessary to support families for over a year after the raid, with humanitarian relief costing $80,000 per month at its peak. St. Bridget's also provided some funding to offset legal costs (e.g., costs of filing applications for visas), although most legal assistance was provided pro bono.

In New Bedford, because some affected immigrants were able to find temporary work, the demand for emergency assistance for basic needs diminished about three months after the

64

raid. This allowed much more of an ongoing focus on the legal cases of detainees and their families. Catholic Charities, GBLS, and other legal aid organizations continued to provide representation services as immigrants applied for U-visas and other forms of relief from deportation. Transportation emerged as another long-term need that was continually met by CBOs, especially for getting individuals to court hearings. Our Lady of Guadalupe and Maya K'iche partnered to address this need. A sewing cooperative was started with donated sewing machines, and this proved to have therapeutic benefits to participants, as well as leading some of them to start their own businesses selling bags. A year after the raid, New Bedford school teachers were regularly meeting with the Community Foundation of Southeastern Massachusetts to continue discussing the needs of affected children, and community organizations began shifting their services to immigrant integration (e.g., English language instruction).

**6. Humanitarian assistance and legal representation were both important.**

One significant finding from the sites is the importance of legal representation to help immigrants contest their deportation. In fact, the most important benefit an immigrant can receive after being arrested in a raid is a work permit, visa, or other mechanism to stay in the country legally and work. Only legal presence in the United States and the opportunity to work can ameliorate parent-child separation and economic hardship among affected families in the long run. As illustrated in the site descriptions above, there was great unevenness in the availability of high-quality legal advice. Smaller, more isolated places like Grand Island and Postville were able to generate significant disaster-relief efforts aimed at providing humanitarian assistance, but they had much more difficulty finding needed legal resources. This was because these resources are much more specialized and less dispersed across the country. A handful of lawyers took on all the cases in both of these sites, and in both sites most arrested immigrants went unrepresented. In Postville, one pro bono lawyer launched a deportation defense effort on behalf of more than 50 clients. By contrast, the Rapid Response Network in Van Nuys included 45 attorneys. The majority of New Bedford arrestees who chose to fight deportation and the entire Van Nuys group found representation. Even though most cases in New Bedford and Van Nuys were still pending more than a year after the raids, in the long-term a number of some significant legal victories were obtained. Greater resources possibly could

have been available for deportation defense in Miami, but most of our sample of arrested Haitians there had little to no recourse available to them against deportation.

The availability of humanitarian assistance followed a different pattern across our sites. Surprisingly, the greatest funding for humanitarian resources was raised following the raid in the smallest site: Postville. Grand Island, which is also a relatively small and isolated community, also benefitted from a significant fundraising effort including the raided employer and FBOs. The arrestees in New Bedford benefitted from their proximity to Boston in terms of humanitarian assistance, just as they had in terms of legal representation: MIRA and the local church dioceses raised significant sums in the Boston area, and the Community Foundation of Southeastern Massachusetts also provided support.

The other two major urban areas in our study—Los Angeles and Miami—had much less thorough fundraising and humanitarian response efforts. In both sites, the small number of arrestees relative to the overall immigrant population (and relative to large, ongoing ICE operations across the area) meant much less media and community attention to the plight of arrestees. This made fundraising and mounting a relief operation more difficult in these areas.

Finally, in Rogers-Springdale, both humanitarian and legal resources were limited. This partly reflected the climate toward immigrants in the area, including the active participation of city and county governments in immigration enforcement as well as anti-immigrant sentiment in those communities more generally. It also reflected the fact that, as in Miami, the arrests were scattered across a widespread area over a long period of time and generated far less media and community attention than the large workplace raid sites we studied.

## Successes and Challenges of Institutions Providing Assistance

We next summarize the characteristics of community responses that appeared to be effective in addressing the needs of families, as well as some of the challenges faced by response efforts.

### Successes

*Coalitions.*  In general, a single CBO, church, or agency cannot address the myriad of family needs that result from

ICE enforcement in a community. The more effective coalitions covered many basic needs as well as legal and health services, and some included psychological counseling. These coalitions included churches, faith-based and community organizations, legal services, public schools, local government, and businesses.

St. Bridget's Church was somewhat of an exception, because it was able to raise funding and sustain an extraordinary humanitarian relief effort (costing almost $1 million) for more than a year. However, even though St. Bridget's coordinated and disbursed virtually all of this assistance, the fundraising and media efforts were coordinated with community leaders and other religious organizations both within and outside Postville. St. Bridget's also benefitted from significant logistical support from a statewide network that included Catholic Charities of Iowa and staffing during the relief effort from Luther College in Decorah.

*Balanced combination of humanitarian and legal services.*  As we have seen, both humanitarian and legal services were very important to families. On the one hand, good legal services, while hard to find, turned out to be crucial. Legal services allowed some arrested immigrants to obtain legal status that allowed them to stay in the United States with their families and obtain employment. On the other hand, the longer their deportation cases were open, the more humanitarian assistance these families needed. The comprehensive relief efforts in New Bedford and Postville were able to adequately support legal assistance and humanitarian needs until immigrants either succeeded in obtaining relief from deportation or were deported. But these operations were very well coordinated and expensive (or required intensive in-kind and pro bono labor), and lasted for more than a year.

*Schools as safe havens.*  In three of our sites—Grand Island, New Bedford, and Postville—schools provided safe havens for children in the immediate aftermath of the raids and were able to retain students in the longer term. These schools were successful in retaining the trust of the immigrant community, including affected families. They were also by and large successful in keeping students engaged in learning. All three districts provided counseling for affected students. In Springdale, the schools also attempted to address the impacts of parental arrests on students, but the effectiveness of their efforts was more difficult to gauge, because the scattered nature of the raids there made it difficult to pull a sample of affected children in any one school. The public schools in Miami and Van Nuys did not mount

significant responses to raids and arrests in those locations, and we do not know how well children fared academically afterward.

*Engagement by state and local government.*  Government support was evident and helpful in several of the sites. In Grand Island and Postville, government support provided public benefits to help families through difficult economic periods, even though in these sites the elected officials were not outspoken. In New Bedford, having staff from public agencies such as MDSS argue on behalf of children for their families' reunification, as well as having elected officials raise concerns about the impacts of the raid on immigrant families and the broader community, helped restore some trust in needed civic institutions, such as local schools.

*Culturally tailored outreach.*  A solid understanding of the languages and cultures in immigrant communities is a key to providing effective services to these communities. Across our sites, churches and CBOs showed the most cultural competency in addressing the needs of affected families. In general, churches were active in Latino communities and had Spanish-speaking capacity, although this capacity was somewhat limited in the smaller study communities of Grand Island and Postville. In Grand Island, New Bedford, and Postville, language access and cultural competency were further complicated by the fact that many arrestees were from groups such as the Maya K'iche from Guatemala that speak rare indigenous languages. Community leaders who were originally from Guatemala played instrumental roles in the delivery of services in all three of these sites.

Public agencies also showed a degree of cultural and linguistic competence in some of our sites. In Postville, a bilingual English-Spanish caseworker from the Iowa DHS office in nearby Decorah worked closely with St. Bridget's Church to link affected families with public assistance. In Grand Island, the regional Nebraska DHHS director was from Guatemala, as were some of the social workers; they were also able to connect some affected families with benefits. The public resources available to the New Bedford arrestees were much greater: the leadership of MDSS and three dozen bilingual social workers were all involved in obtaining the release of parents.

## Challenges

*Sustaining service delivery.*  Sustaining relief after a period of three to six months was a principal challenge in all of our

A815

sites except for Postville. Persistent needs included legal services, transportation (especially in larger communities and those lacking public transportation), counseling, and humanitarian assistance in cases where arrested immigrants remained in limbo and could not work. In the early months, fundraising and donations were generally secured within the community and from nearby communities. With the progression of time, contributions faded while the needs of families in periods of prolonged detention or with drawn-out deportation cases increased (as resources from friends and families declined). Thus, fundraising from a broader base of support—as was done with national campaigns for Postville—became important to sustain service delivery.

*Translation and interpretation.* The need for bilingual staff for triage and service delivery was another common challenge across the sites. In communities like Postville and Rogers-Springdale, where immigrant communities were newer and relatively small, it was difficult to find Spanish language capacity. Even in the larger, more diverse areas, it was difficult to find interpretation for rarer languages such as those spoken by indigenous Guatemalans. In Miami, Haitian Creole interpreters were difficult to find.

*Transportation.* In Postville, Grand Island, and New Bedford, it was difficult to obtain transportation to and from immigration hearings, appointments with lawyers, and bond postings—as ICE and attorneys' offices were mostly located several hours away. In some cases, appointments with attorneys had to be done over the phone or on site, requiring the lawyers to travel frequently over long distances. Arrestees in Postville also had to travel to nearby Decorah for medical appointments at the free clinic and for renewal of public assistance. In both New Bedford and Postville, the church and community organizations arranged private transportation for these immigrants.

In Rogers and Springdale it became dangerous for unauthorized immigrants to drive at all, given that many of the 287(g) arrests were from roadblocks or traffic stops. Advocates and community leaders arranged transportation for immigrants in Rogers and Springdale on an ad hoc basis.

*Mobilizing community efforts when there is no single, large-scale raid.* It was relatively difficult to mobilize responses in Miami and Rogers-Springdale because there was no single crisis in need of a response and no major coverage of events in the media. Very few people in the community knew who the arrested immigrants were, as they were not identified by a single employer. It was generally left to their families or friends

to approach community leaders for support. There was also very little basis for targeted outreach under such circumstances, because there was no single employer, neighborhood, or period of time on which to focus outreach efforts.

*Finding legal representation can be difficult in more remote communities.* Finally, securing legal services was much more difficult in remote locations like Grand Island, Postville, and Rogers-Springdale, where there were few or no practicing immigration attorneys. Efforts following the Postville raid to link Iowa attorneys with a national base of legal support were largely ineffective. Attorneys specializing in deportation defense simply could not be recruited to work in remote, rural Iowa on a pro bono basis, and even with nearly $1 million in funding, the St. Bridget's relief effort could not afford to pay salary and travel costs for attorneys to come to Postville from outside Iowa.

*****

The community responses we studied across our six sites illustrate some of the complexities and difficulties of supporting families with children in the aftermath of immigration enforcement activity. As we described earlier, whether a parent is arrested, deported, or released under supervision, families typically lose a breadwinner, resulting in economic hardship and reliance on charity or public benefits. In the immediate aftermath of the large worksite raids in three of our sites—Grand Island, New Bedford, and Postville—communities mobilized assistance for affected families. Sources of support varied, but in general these relief efforts were expensive, approaching $1 million in Postville. Without a well-publicized raid as a catalyst, there was no such mobilization in Arkansas and Miami, leaving families there without an emergency response safety net.

A confluence of participants were involved, including churches, community organizations, nonprofit service providers (e.g., United Way agencies), state and local government agencies, employers and labor unions. These relief efforts were complicated because of the families' many needs (housing, utilities, food, and other basic needs) and because they had to be maintained for so long (for several months in Grand Island and New Bedford, and for more than a year in some cases in Postville).

Legal assistance was a crucial component of these relief efforts, and it was often expensive and difficult to obtain. Immigration law is a complex field, and there is a limited supply of qualified attorneys to defend deportation cases across the country. In general, it was easier to find legal resources in

locations near some of the major cities—New Bedford and Van Nuys—than in the smaller, more remote communities we studied. In Grand Island and Postville there were no qualified lawyers in the community, and so a handful of outside lawyers had to take on these cases. The deportation cases still being contested more than two years after the Grand Island and New Bedford raids show how long the need for this assistance can last, and how long the families contesting their deportation remain in limbo.

Our review of impacts on children and families, along with the community responses described in this chapter, show the many difficulties experienced by families following a parent's arrest. These difficulties are especially apparent following many of the individual arrests that were not the result of large-scale raids. The families affected by individual enforcement activities do not get the publicity, the mobilized response, or the community support that many of those arrested in worksite raids receive. While the new leadership at the Department of Homeland Security has significantly curtailed the use of large-scale worksite raids, the 287(g) program has recently expanded to deputize immigration enforcement powers to more local police departments, and FOT arrests have continued at much the same rate. As long as immigration enforcement activities continue, we need to consider how to meet the goals of enforcement while mitigating the very serious impacts on the thousands of children directly affected and the millions more potentially at risk. This is the focus of attention in the concluding chapter of this report.

68

A817

# 6. FACING OUR FUTURE: CONCLUSIONS AND RECOMMENDATIONS

The U. S. government is embarking on what promises to be a renewed round of spirited debate about reforming the country's immigration system. In November 2009, Secretary of Homeland Security Janet Napolitano called on the Congress to reconsider a comprehensive approach to immigration reform that would include some form of legal status for most of the country's 11 to 12 million unauthorized immigrants.[69] Many of the issues underlying the immigration debate are perennial: the aging U.S. workforce and need for immigrant workers, competition with U.S.-born workers, the fiscal costs of immigration, security and sovereignty concerns, respect for the law, civil rights, and the potential benefits of diversity in an increasingly globalized economy.

This report, like our predecessor report *Paying the Price,* focuses on one of the issues that has *not* been central in the debate: the impact of our current immigration policies on the 5.5 million U.S. children with unauthorized parents. These children account for 7 percent, or 1 in 14, of all children living in the United States. They and their families are by and large well integrated into the communities where they live, with the vast majority of the parents working[70] and the children attending school.[71] However, these children have an uncertain future in this country. Because their parents can be arrested and removed at any time, they live in tenuous circumstances, not knowing whether they can count on their families remaining whole or on this country remaining their home. Children who find themselves with a parent arrested for an immigration violation suffer further potential barriers to their well-being and integration, including the loss of parental support, economic hardship, and emotional difficulties.

About two-thirds of the children in our study sample are U.S.-born citizens,[72] entitled to remain in the country and to receive the full benefits and responsibilities of citizenship. As American children they are a critically important component of the future U.S. workforce, needed to support a growing economy and an aging population. Their futures are for the nation to support or circumscribe, and the nation's future is theirs to make. The question, then, is what future we choose.

## Summary of Findings

Many of the findings discussed in the preceding chapters provide ample cause for concern. Our findings highlight the difficulty of balancing different policy objectives: the need for enforcement of immigration laws and our desire to preserve the integrity of families and promote the best interests of children. Despite the actions of their parents, the children bear no fault and as this report has shown, they experience deeply damaging consequences from immigration enforcement. In

---

[69] Melanie Trottman, 2009, "Immigrant Bill Is Back on the Table," *Wall Street Journal,* November 14.

[70] Passel and Cohn, 2009.

[71] For a full discussion of the integration of immigrants and their children—along with difficulties they face in poor urban communities—see Alejandro Portes and Rubén G. Rumbaut, 2001, *Legacies: The Story of the Immigrant Second Generation,* Los Angeles: University of California Press, and Rubén G. Rumbaut and Alejandro Portes, 2001, *Ethnicities: Children of Immigrants in America,* Los Angeles: University of California Press.

---

[72] This is comparable to the estimated 73 percent of all 5.5 million children of unauthorized immigrants that are U.S.-born citizens, Passel and Cohn, 2009.

69

several other areas of U.S. policy—child welfare, education, and the distribution of public benefits—the primary objectives are to protect children from harm and to advance their prospects regardless of their starting points in life. Yet such protections and opportunities to prosper are jeopardized when parents are caught up in immigration enforcement actions.

The discussion in the previous chapters highlights several significant findings that the American public and its leaders should take into account as part of the immigration debate.

## Family Separation

The separation of children from their parents is one of the most direct results of immigration arrests. Such separations were common in our sample, though in a large majority of cases at least one parent was able to remain with the children because he or she was either not arrested or released under supervision. Our sample included many cases in which parents were held for weeks or months in detention following their arrest, and it likely underrepresents these cases because we could not interview parents in detention. In most of our sample, two-parent families became single-parent families, although in a few cases children stayed with other relatives or friends for an extended period.

ICE's humanitarian guidelines for large-scale worksite raids, which mandate release of single parents and those with needy children, reduced the frequency of family separation, especially in the Van Nuys raid. The application of ankle bracelets with tracking devices allowed ICE to continue to monitor arrestees without requiring detention—clearly a better outcome from the families' point of view. Yet in Postville—where so many parents were charged criminally—and in the nonworksite arrests in Miami and Rogers-Springdale, detentions were more widespread and caused prolonged separations from at least one parent in a majority of cases. When criminal charges mandating detention are involved, it may be more difficult for ICE to consider alternatives to detention.

We also documented short-term family separations in our previous study, *Paying the Price,* but in the current study we interviewed some families more than a year after the parent was arrested. In our long-term sample, a significant number of parents had been or were soon to be deported. Deportation created difficult choices for parents, who had to decide whether to leave the country with

their families intact or leave their children behind in the United States with the other parent or another relative. There currently is no legal remedy for deportation of a parent based on harm to a child, unless a child is very sick or in other extremely unusual circumstances.[73] Thus, in our sample, arrested immigrants had to seek other forms of relief—asylum, domestic violence, and crime victimization, primarily, rather than separation or harm to their children, to try to avoid deportation.

There is no clear or easy choice in this heart-wrenching decision that no parent ever wants to face, as illustrated by the mixture of responses in our sample, with some parents leaving children and others taking them with them. In a significant number of cases, couples were split and siblings were split—some leaving and some staying. Our time frame was not long enough to assess the impacts on children who faced separations following deportation. Some deported parents were clearly worried enough about their children and families to risk illegal reentry to be reunited with them. In one case, a parent died making the return journey.

## Family Economic Hardship, Housing Instability, and Food Insufficiency

Steep declines in household income, economic hardship, and reliance on informal support, community charity, or public assistance were typical of sampled families with arrested parents. In all of the worksite raids, families lost breadwinners—

---

[73] Before 1996, when determining deportation cases, immigration judges could weigh length of U.S. residency, standing in the community, and hardship to children against immigration and criminal charges. But in 1996 IIRIRA narrowed judicial discretion by mandating deportation for immigrants convicted of a wide range of crimes and those without 10 years of continuous physical presence in the United States—regardless of potential harm to children in the family (8 U.S.C. § 1229b). As a practical matter, this means it is almost impossible for immigrants who entered the country illegally or those with even minor criminal offenses to have their deportation canceled by immigration judges, even when severe hardship to their children could result. For more on the difficulties of appealing deportation based on hardship to children, see James D. Kremer, Kathleen A. Moccio, and Joseph W. Hammell, 2009, "Severing a Lifeline: The Neglect of Citizen Children in America's Immigration Enforcement Policy," Minneapolis: Dorsey and Whitney, LLP. For a fuller description of the IIRIRA provisions affecting deportation decisions, see Donald Kerwin, 1999, "How Our Immigration Laws Divide, Impoverish, and Undermine American Families," *Interpreter Releases* 31(76): 1213–26.

who almost always had full-time jobs and consistent employment histories, albeit at mostly low-wage jobs. Family breadwinners were also arrested in the cases we studied in Miami and Rogers-Springdale. In all of the sites in our sample—with the exception of Van Nuys—very few families had access to work following arrests. It was more difficult for people to find work in the smaller communities, especially Postville, where the raided plant was the area's primary employer. When parents were released with ankle bracelets and monitored, it was nearly impossible for them to find another job.

We found that lost incomes were associated with housing instability. Some families lost their homes or their ability to pay rent, while others moved in with relatives to control costs, and still others—in Postville—were asked by charities to move in together to save on rental assistance. Across our study sites, many children wound up moving often and living in crowded conditions. Such instability can have adverse consequences for children, especially when coupled with other related material hardships and increased family stress.

Families in our study sample reported high levels of food hardship—many times the levels in nationally representative samples—as indicated by difficulty affording food and by parents cutting meals, skipping meals, or going hungry to feed their children. As in other studies of food hardship, parents reported that the children themselves rarely went hungry, but in many cases they worried that their children's diets were not adequate to ensure good health.

These findings reinforce some of the short-term hardships we reported in *Paying the Price,* while also showing that some of these conditions can persist over a much longer time frame. Housing instability and food hardship lasted for many months, and even more than a year for some of the families in our long-term sample.

Economic hardship was prolonged by parental detention and by the inability of parents to work while they were contesting their deportation. We did not interview many families where parents were deported right away after their arrest—a common outcome in the first raid we studied in Grand Island—because we did not interview parents after they left the country. Most parents in our workplace raid sites were either detained for a period and then released, or released under bond or with electronic monitoring. Most of the parents chose to stay and contest their deportation. Their attempts to obtain relief from deportation lasted more than

six months in almost every case, more than a year in many cases, and more than two years (and counting) in some cases. In the cases of home raids and arrests by local police in our sample, parents were less likely to be released and were generally detained for a period of months and then deported.

## Child Behavior

Changes in child behavior represented a new focus of the current study, and parents in our sample reported many significant changes following raids and other arrests. Parents reported a large majority of children had difficulties sleeping and eating in the months immediately following the raids and other arrests, and a majority of children also cried often and clung to their parents. These behavioral changes subsided somewhat over time, but were still widespread more than six months after the raids or other arrests. Difficulties eating and sleeping, excessive crying, and clinging to parents were most common among younger children, while aggressive and withdrawn behavior was more common among the older children. There were mixed effects on children's behavior in school, and in many cases schools were supportive environments that helped children cope. School absenteeism often increased in the short run, and in some cases, children lost their motivation for school. Overall, however, the evidence about academic difficulties among children in the sample was mixed, and in the longer term, some children were reported to be doing a bit *better* than before the arrest, while others showed a bit of a slide. We may not have had a time frame long enough to observe deterioration in academic performance. Moreover, the schools were very supportive of the children in the smaller communities we studied—especially Grand Island, New Bedford, and Postville—which may have ameliorated some of the psychological impacts on children following parental arrest.

## Community Response

St. Bridget's Church in Postville launched the most comprehensive humanitarian response of any group that we studied, but there were also large-scale community responses to the workplace raids in New Bedford, Grand Island, and Van Nuys. Coordination of services by a coalition or church, strong fundraising and publicity efforts, and provision of services through trusted locations such as churches and community-based organizations were common features in

71

Postville, Grand Island, and New Bedford. Provision of charity for housing, utilities, food, and other necessities for a period of months was common in all three of these sites. Humanitarian assistance was less comprehensive and less well coordinated in Van Nuys, where the response focused more on linking families to legal assistance. Nearly all the arrestees in Van Nuys were released, and it was comparatively less difficult—though by no means easy—for them to find new work following the raid.

Unlike *Paying the Price,* our current study also focuses on impacts and community responses in sites where immigrants were arrested in smaller-scale operations. This focus is especially important given the trend away from large-scale worksite raids toward more widespread arrests through FOTs and the 287(g) program. In two of our sites—Miami and Rogers-Springdale—there were no large-scale raids, and as a result, no significant publicity, fundraising, or private assistance for affected families in these locations. We found family hardship to be just as high, if not higher in Miami and Rogers-Springdale than in the other sites, but we found levels of assistance to affected families to be much lower.

Among our study's workplace raid sites, legal assistance and efforts to contest deportation appear to have been most effective in New Bedford and Van Nuys, where most of those arrested contested their deportations. A significant share have been successful, and many of the remaining cases continue to be adjudicated. Fewer people were able to contest their deportation in Postville, because most had also been charged criminally; however, about two dozen had received relief from deportation a year and a half after the raid. Legal assistance was least successful in Grand Island, the earliest of our raid sites, where more parents took voluntary departure and fewer contested their deportation. It may be that over time, owing to national- and state-level organizing efforts, lawyers became better equipped to assist immigrants caught up in raids. It may also be that new legal remedies—such as the U-visa for victims of crime—became more widely used. This was certainly the case in Postville, where most of those succeeding in contesting their deportation received U-visas.

In our two nonworkplace raid sites, however, legal remedies like U-visas were unavailable. Almost all of the Haitians arrested in Miami were on a final deportation order list, meaning that relief from deportation was very difficult. Immigrants in Rogers-Springdale were in some cases arrested for working illegally, but most were brought in on traffic violations and other criminal charges. Once they were charged

criminally, obtaining relief from immigration enforcement became much more difficult.

## The Policy Context

Our research was conducted during 2008 and early 2009, and the parents in our sample were arrested between 2006 and 2008. The period of study was one of intense enforcement activity, with a significant increase in the total number of arrests, detentions, and deportations over previous years overall—and specifically in worksite and home raids. This was a period of rapid expansion in enforcement and detention for ICE and its partner agencies. Some of the widespread confusion and difficulties faced by the families, communities, lawyers, and other responders in our study may have been the result of inevitable growing pains due to rapid expansion of ICE's operations during this period. One beneficial policy change during the period of study was the release of humanitarian guidelines for parents arrested in workplace raids of 150 or more arrests.

### Replacing Worksite Raids with Other Employer Enforcement Strategies

Enforcement has continued at a rapid pace since the Obama administration took office in 2009, but there have also been several significant shifts in enforcement policy. First, there has been a major change of direction in worksite enforcement. ICE applied the humanitarian guidelines to all worksite raids of 25 or more arrests, and following a small raid in Washington State in February 2009, there have been no further workplace raids. Instead, DHS has focused on expanding and improving E-Verify, an electronic system for verifying work authorization that was piloted several years ago and is now mandatory for all federal contractors and voluntary for most other employers. In November 2009, approximately 170,000 U.S. businesses were using the system.[74] During 2009 ICE also concentrated on auditing employers, leading to fines against several dozen employers and the firing of

---

[74] Immigration and Customs Enforcement, 2009, "Secretary Napolitano, ICE Assistant Secretary Morton and USCIS Director Mayorkas Announce New Campaign to Recognize Employers Committed to Maintaining a Legal Workforce," Press Release, November 19, http://www.ice.gov/pi/nr/0911/091119washingtondc.htm.

several thousand unauthorized workers.[75] These audits and firings may inflict economic hardship on immigrant families as parents lose their jobs—a topic worthy of further study. However, they avert some of the most adverse consequences for families, including the stigma of arrest, family separation, and anxiety about parental deportation.

## Expanding Operations to Arrest and Deport Criminal Aliens

ICE has continued to expand its operations to arrest, detain, and deport unauthorized immigrants with criminal histories. Despite the controversies surrounding the program, ICE signed 287(g) agreements with several new state and local law enforcement agencies in late 2009.[76] ICE also renegotiated most of the older agreements, and a few jurisdictions dropped out of the program. During the negotiations and in new contracts, ICE emphasized that 287(g) programs should focus primarily on serious criminals, and that participating agencies should not conduct random sweeps or arrest immigrants without criminal histories. But ICE has allowed participating jurisdictions to continue some street-level operations. Moreover, ICE has expanded the Secure Communities program, which allows for electronic screening of the immigration status of all inmates when they are booked, with the goal of screening all inmates in state and local prisons by 2013.[77] Together with an expanded set of 287(g) agreements, Secure Communities will cast a much wider net to find and deport unauthorized immigrants with criminal histories. The expansion of Secure Communities

and 287(g) agreements could theoretically lead to a much larger number of arrests and deportations, but targeting the focus of these efforts on immigrants who have committed serious crimes could potentially reduce the scope of these programs.[78]

## Continuing Arrests by Fugitive Operations Teams

ICE has also stated that it will continue operations to identify, detain, and deport unauthorized immigrants with outstanding deportation orders. ICE is continuing large sweeps by FOTs but focusing more on immigrants who have committed serious crimes. For instance, during three days in early December 2009, FOTs conducted their largest single sweep to date. The FOTs arrested almost 300 immigrants in California, about 80 percent of whom had committed violent or other serious crimes.[79] At the same time, ICE is releasing some of those caught up in the FOT sweeps.[80] About 30,000 Haitians remain on a final deportation list, and ICE may continue to target this population for deportation.[81] Advocates have requested that the federal government extend TPS to Haitians to prevent their deportation, but as of late 2009 there had not been any progress on this issue.

## Redesigning the Detention System

There have been criticisms—some of which are reflected in this report—of ICE detention policies for separating families, detaining children, moving detainees to inaccessible locations, preventing communication with lawyers and family members, and contracting out detention to private companies with poor

---

[75] In May 2009, American Apparel, a garment manufacturer in Los Angeles, fired 1,800 immigrants after an ICE audit (Neil A. Lewis, 2009, "Immigration Officials to Audit 1,000 More Companies," *New York Times,* November 20). For an overview of ICE's new worksite enforcement policy, see Immigration and Customs Enforcement, 2009, "Worksite Enforcement Strategy," Fact Sheet, April 30, http://www.ice.gov/doclib/pi/news/factsheets/worksite_strategy.pdf. For a description of results of the new policy as of November 2009, see Immigration and Customs Enforcement, 2009, "ICE Assistant Secretary John Morton Announces 1,000 New Workplace Audits to Hold Employers Accountable for Their Hiring Practices," Press Release, November 19, http://www.ice.gov/pi/nr/0911/091119washingtondc2.htm.

[76] Randal C. Archibald, 2009, "U.S. Alters Disputed Immigration Rules for Police," *New York Times,* October 16.

[77] Chris Strohm, 2009, "Search for Illegal Immigrants Widens," *Congress Daily,* November 12.

[78] A significant concern remains that 287(g) and other state and local coordination programs have resulted in increasing numbers of immigrants being referred to ICE due to immigration violations or minor crimes. For statistics on the charges against immigrants referred into ICE detention from these various programs, see Schriro, 2009, pp. 12–13.

[79] Randal C. Archibald, 2009, "Immigration Officials Arrest 300 in California," *New York Times,* December 11.

[80] For example, a group of immigrants arrested by FOTs in New Jersey were recently released, under supervision and with work permits, while they contest their deportation. A local church has developed a compact with ICE to help supervise these immigrants. Nina Bernstein, 2009, "New Jersey Church Works with U.S. to Spare Immigrants Detention," *New York Times,* December 12.

[81] Kirk Semple, 2009, "Haitians in U.S. Illegally Look for Signs of a Deporting Reprieve," *New York Times,* May 27.

73

track records in how they treat detainees. In October 2009, DHS released a report with recommendations for a major overhaul of the immigration detention system,[82] which would include keeping only persons with serious criminal records in secure settings, developing less secure facilities for detainees without criminal records or who otherwise present little risk to others, using alternatives to detention more often, keeping detainees in major metropolitan areas closer to their families and attorneys, and providing easier access to and communication with detainees. Given the size of the current system—over 30,000 detainees in more than 200 facilities on any given night—such an overhaul would be a large and complex undertaking. But further increasing alternatives to detention and developing a system that allows family members better access to detainees would clearly benefit children with arrested parents.

## Setting the Context for Immigration Reform

The Obama administration has announced its intention to seek another round of debate over comprehensive immigration reform starting in 2010, although the amount of support in Congress is uncertain. Comprehensive reform bills failed twice in 2006 and 2007, in part due to the impression that enforcement efforts had not been successful. The Obama administration and one of the key proponents of reform, Senator Charles Schumer, have stated that any new reform effort would focus on enforcement first, followed by legalization.[83] The administration and DHS are making the case that enforcement is succeeding, based on an historic reduction in Southwest border apprehensions (which are down about two-thirds since 2000), a high level of deportations (which rose 65 percent to 387,000 in the fiscal year ending in September 2009), and employer enforcement efforts via E-Verify alongside a growing number of workplace investigations and fines.[84] As was the case in 2006 and 2007, there is a continuing pressure to prove that enforcement is working, and this could lead to increasing arrests and deportations.

## Recommendations

In this climate of change, it is particularly important that the evidence about impacts of immigration enforcement on children informs policy decisions and implementation. The following recommendations draw on the findings of our research:

### Changes to Current Immigration Laws

**1.  Congress should modify current immigration law to take into account the circumstances and interests of all children, especially U.S. citizen children, during deportation proceedings.**

In 1996, IIRIRA set the stage for many of the sweeping enforcement operations undertaken by ICE and state and local law enforcement agencies in recent years. It authorized the federal government to enter into agreements with state and local agencies to enforce immigration laws, and expanded the range of crimes for which immigrants must be detained and can be deported. Most importantly for our research, the 1996 law limited relief from deportation. Among other changes, it removed the discretion of immigration judges to weigh the significant harm that would result to a U.S. citizen child of a deported parent in considering this relief.[85]

We recommend modification of these provisions, either as part of a comprehensive reform bill or as stand-alone legislation, as follows.

First, the law should be amended so that a U.S. citizen child under age 18, with representation from a legal guardian (i.e., a *guardian ad litem*), should be allowed by law to petition for the lawful admission and residency of his or her parent through the family immigration process for immediate relatives. This would require an amendment to the definition of "immediate relative" in current law (which includes spouses and children of adult legal residents) to include the parents of minor children.[86]

[82] Schriro, 2009.

[83] Julia Preston, 2009, "White House Plan on Immigration Includes Legal Status," *New York Times,* November 13; Senator Charles E. Schumer, 2009, "Schumer Announces Principles for Comprehensive Immigration Reform Bill in Works in Senate," June 24, http://schumer.senate.gov/new_website/record.cfm?id=314990.

[84] Melanie Trottman, 2009, "Immigrant Bill Is Back on Table," *Wall Street Journal,* November 14; Manuel Valdes, 2009, "Criminal Deportations Spike in Pacific Northwest," *Associated Press,* November 19.

[85] Kremer, Moccio, and Hammell, 2009; Kerwin, 1999.

[86] It would also be necessary to revise the requirements in IIRIRA around the affidavits of support, which require sponsors to document family incomes at or above 125 percent of the federal poverty level to petition for their relatives. This requirement would preclude most children from sponsoring their parents. For more on affidavits of support see Kerwin, 1999.

Prioritizing the admission of parents with minor citizen children would be the broadest change to current law and could be an important provision of a comprehensive reform bill. Comprehensive reform efforts could also make the parents of citizen children a priority group for establishing legal residency, while requiring them to meet the same requirements as others in the population to be legalized (i.e., to pay fines for illegal entry).

Second, the rights and interests of children during deportation proceedings should be recognized by law. Before IIRIRA, the law allowed immigration judges to grant relief from deportation when it would cause hardship to children, but IIRIRA raised the bar for such a determination to "exceptional and extremely unusual hardship"—a standard that is seldom met in practice.[87] In addition, IIRIRA made immigrants with criminal charges and those with insufficient consecutive time in the United States ineligible for such relief. We would recommend that Congress establish an alternative standard such that if a parent's deportation were likely to cause substantial economic, psychological, or development hardship to children, the parent could remain in the United States.[88] We also recommend that Congress allow immigration judges to evaluate deportation cases individually, as they did before 1996, and weigh the potential harm to children against the seriousness of immigration offenses, danger to the community, flight risk, and other factors.[89] Legislation revising the criteria for relief from deportation based on hardship to a citizen child has been introduced in recent years, and such legislation would directly address this issue.[90]

Policy changes regarding the arrest, detention, and release of parents can only go so far in ameliorating the hardship of children in these circumstances. Deportation inevitably results in either prolonged separation of the family or the de facto deportation of children to the parents' country of origin. Additionally, the removal of parents results in economic hardship for children whether the children remain in or leave the United States. Ultimately, children would best be protected if immigration judges could weigh the harm to children against other factors in considering their parents' deportation.

Finally, while it may seem largely symbolic, the United States should indicate its strong commitment to protecting the interests of children by signing on to and ratifying the International Convention on the Rights of the Child and bring detention and deportation standards for parents to international norms.[91] Signing on to the convention would signal that the U.S. government is serious about extending protections to children into all aspects of federal policy, including immigration enforcement. It could also facilitate harmonizing protections for children during immigration proceedings along the lines of those in other countries. Only the United States and Somalia have not signed the convention.[92]

Signing on to the convention, and most importantly, making the appropriate adjustments to immigration laws consistent with these international norms and with American values are the main and most far-reaching changes that the United States should make to protect children from any harm that may result from the arrest of their immigrant parents.

---

[87] 8 U.S.C. § 1229b. A related issue is whether or not parents can legally return to the United States after their deportation. Bars on legal reentry currently run from 3 to 10 years for most deportees, and hardship to a child is *not* a consideration in establishing these bars (Kremer, Moccio, and Hammell, 2009).

[88] For a fuller explanation, see Kremer, Moccio, and Hammell, 2009.

[89] For more on this recommendation, see Kerwin, 1999.

[90] In the 111th Congress, Rep. José Serrano and 33 cosponsors introduced House Resolution 1176, the "Child Citizen Protection Act," which would "provide discretionary authority to an immigration judge to determine that an alien parent of a United States citizen child should not be ordered removed, deported, or excluded from the United States." OpenCongress bill summary, http://www.opencongress.org/bill/110-h1176/show. Rep. Serrano and others sponsored similar legislation in previous Congresses, but it failed to

pass. Such protections for children against parental deportation are also included in a Democratic comprehensive reform bill introduced in the House in December 2009: the Immigration Reform for America's Security and Prosperity Act of 2009. For more information see, Immigration Policy Center, "Summary of the Immigration Reform for America's Security and Prosperity Act of 2009," December 15, 2009, http://immigrationpolicy.org/just-facts/summary-comprehensive-immigration-reform-americas-security-and-prosperity-act-2009.

[91] UNICEF, "Convention on the Rights of the Child," August 28, 2008, http://www.unicef.org/crc/, accessed November 20, 2009.

[92] Amnesty International USA, "Convention on the Rights of the Child," http://www.amnestyusa.org/children/convention-on-the-rights-of-the-child/page.do?id=1101777.

## Changes in Immigration Enforcement Strategies

ICE should also continue to review and revise its enforcement policies in a number of critical areas.[93] This is important because, given the difficulties experienced in 2006 and 2007 in passing comprehensive immigration reform, the prognosis for a successful bill in 2010 is uncertain. In addition, stand-alone legislation protecting the rights of children in deportation proceedings has also been considered but not passed recently. Without such legislative changes, the law instructs ICE to arrest, detain, and deport unauthorized immigrants for a broad variety of charges, and the agency will continue to experience pressure to show results in terms of deporting large numbers of immigrants, finding and removing criminal aliens, and targeting employers who hire their unauthorized workers. Our specific recommendations for enforcement changes are as follows:

**2.  ICE should continue the de facto moratorium on worksite raids.**

We applaud ICE's apparent decision to stop large-scale worksite raids and focus instead on investigating and fining employers and increasing use of E-Verify. Our current and previous work, along with the research of many others, has highlighted the harmful child-specific and community-wide effects of such raids due to their large numbers of arrests and shows of force, which have overwhelmed many communities. It is much more humane, practical, and effective to focus on changing employer behavior, rather than punishing parents for working and children for having working parents.

**3.  Law enforcement should allow alternatives to detention for arrested parents who represent neither a danger to the community nor a flight risk in all types of enforcement operations, as long as mandatory detention rules do not apply to these parents.**

The humanitarian release rules that applied to the worksite raids we studied in Postville and Van Nuys should apply to arrests by FOTs and referrals from state and local law enforcement agencies. The humanitarian guidelines ICE issued in November 2007 regarding the quick release of parents in large-scale worksite raids made a significant difference for many families and children in Van Nuys and Postville.

We observed worse impacts on family hardship and children's behavior in those cases where parents were detained for long periods of time. The extension of these humanitarian guidelines to cover raids in which 25 or more workers are arrested and the absence of large-scale worksite raids in the past year are positive developments. However, until these guidelines cover the full range of enforcement activities by ICE and its partner agencies, which result in a larger number of arrests, most children will remain unprotected and family separations will continue to be a significant problem. On a broader scale, DHS and ICE are currently reviewing detention policies, and as they do so, the agencies should consider further developing alternatives to detention for parents.

**4.  As ICE reforms the system, the agency should develop supervised release policies and other alternative forms of detention with the needs of parents and children in mind.**

Our research also suggests that parent-child separation has harmful effects on children over the long term. ICE has in many cases established alternative forms of detention for parents during the period of weeks, months, and sometimes years between arrest and eventual deportation. In particular, ICE should consider alternatives to using ankle bracelets for longer periods of time when other types of supervised release—having less impact on mobility for the parent and less stigma for the whole family—could be implemented, particularly if this can be done without significantly compromising the goal of monitoring.

**5.  ICE should improve screening and data collection on arrests, detentions, and deportations that involve parents and release such data publicly.**

Here, too, ICE made significant progress in the later worksite raids: we heard that ICE was thorough in screening parents in Postville and Van Nuys, and only heard of one case in Postville where a parent served a full five-month sentence because she was afraid to reveal that she had young children. But there are no published, comprehensive data

---

[93] Congress might choose to weigh in on ICE procedures during enforcement operations, including several of the issues discussed below. For instance, in the 111th Congress, Representative Lynn Woolsey and seven cosponsors have introduced H.R. 3531, the Humane Enforcement and Legal Protections for Separated Children Act (HELP Act). The HELP Act would require ICE to identify parents and other vulnerable populations apprehended during immigration enforcement activities, establish procedures for treating parents and children respectfully during arrest and detention, and set guidelines for their release or placement into alternatives to detention programs.

on the number of parents who are arrested—the DHS Inspector General's report provides only a limited estimate over a 10-year period.[94] In order to determine whether arrestees have children, ICE should provide full access to immigration lawyers, home country consulates, social service providers, and child welfare representatives. This may be more difficult for isolated arrests and smaller operations than for larger-scale worksite raids, but if ICE were to better centralize investigative and detention operations, then such procedures could be institutionalized. Improved screening and data collection should be required as part of the training and activities of state and local officers in the 287(g) program as well, with ICE officers screening for children a second time when detained immigrants are picked up from state and local facilities.

**6.  Law enforcement should allow greater access to arrested immigrants during their processing and detention, including minimizing transfer of detainees to remote locations and supporting children's communication and visitation with detained parents.**

For those parents who are detained, it is important to grant access not only to third parties to screen for children, but also to lawyers to provide for their defense and to consular officials to address other needs. In this area we noted fewer improvements over time: access was as problematic in Postville, the last raid we studied, as it was in the earlier raids in Grand Island and New Bedford. Detainees need access to these resources not only in the initial period following the raid, when consulting a lawyer is critical, but also when detention lasts for days, weeks, or months. Communication with children throughout a parent's detention is important for children's psychological well-being, as we noted in some examples in this report. The DHS report on reforming immigration detention suggested developing less punitive facilities for detainees who do not have criminal records or otherwise are not a danger to others.[95] ICE should develop such facilities to allow children and other family members frequent and easy access to detained parents, in those cases where supervised release is not possible. We also recommend, as did the DHS report, that immigrants be detained near their fami-

lies and communities, and that families be informed of impending transfers.[96]

**7.  Allow parents who have a potentially valid claim the opportunity to work while contesting their deportation, by issuing work permits early on and expediting processing of U-visas for parents who are victims of crimes.**

In our long-term sample, we found substantial food hardship and housing instability in families where parents were released but could not work while contesting their deportation. In a large number of cases—a majority of our sample in Postville—the legal procedures and resulting hardship lasted for several months. In some cases in Postville, parents contesting deportation remained monitored by ankle bracelets, could not work, and were entirely dependent on charity for their survival for over a year. We recommend that ICE provide work permits early on for parents who have put forth what may be a valid claim for temporary or permanent residency (for example, as a victim of crime or abuse, a cooperative witness, or an asylum claimant). The parents in this category amounted to a fraction of all the cases in our study sites—thus far, less than 10 percent in Grand Island and New Bedford, and about 15 percent in Postville. DHS should expedite processing of U-visas, as many immigrants who are illegally employed may be the victims of crimes, as was the case at Agriprocessors in Postville and Michael Bianco in New Bedford.

**8.  ICE should work with other agencies, state and local governments, and the nonprofit sector to develop plans for the well-being of children when their parents are deported.**

Absent changes in immigration law, only a small fraction of parents will be able to contest their deportation. In the

---

[94] Department of Homeland Security, 2009.

[95] Schriro, 2009.

---

[96] A more recent report by the DHS Office of Inspector General found that detainees are frequently transferred without regard to eligibility for release and with incomplete information about their status, legal counsel, and other factors. The report concludes that poor information exchange among ICE offices and between ICE and the immigration courts results in detainees getting lost in the system and being transferred far from legal counsel and family members. This is consistent with what we heard from the community and family respondents we interviewed. See Department of Homeland Security, Office of Inspector General, 2009, "Immigration and Customs Enforcement Policies and Procedures Related to Detainee Transfers," OIG 10-13, Washington, DC: Department of Homeland Security.

77

majority of cases where deportation is a likely result, deportation should be timed such that a plan for the well-being of children can be developed, either in the United States or in the parents' return country. Such a plan should provide for education, health, and family stability. For example, in a situation where a parent is being deported and the rest of the family is likely to return to the parent's country of origin as well, it may be important for children to be able to complete the academic year in the United States. If children are receiving special medical treatment, arrangements to continue treatment should be made in their new place of residence.

## Changes in Community Response Efforts and Services to Affected Children and Families

Absent comprehensive reform or other legislation to prevent deportation, there will continue to be large numbers of arrests, detentions, and deportations of parents. Changes in ICE procedures can only go so far to ameliorate family separation, economic hardship, and other consequences for children. ICE is limited in its ability to be responsive to children's needs by its primary law enforcement mission. The welfare of children with arrested and deported parents is also the responsibility of community institutions—here defined broadly as institutions in affected communities, nationally in the United States and transnationally in communities of origin. Our research demonstrated both the successes of and the challenges experienced by these institutions in supporting families during and after enforcement actions, and we draw a number of recommendations from this evidence.

**9. The special role of schools and early childhood programs, amply demonstrated in the study, should be strengthened through policies that ensure early alerts from ICE and local law enforcement and through plans developed in advance by schools themselves to protect children in the immediate aftermath of raids or other arrests and to provide safe havens and comfortable learning environments.**

Public schools are a universal institution, operating in every U.S. community and which all children are entitled to attend. Schools in our study sites provided both short- and long-term support to children and families. School districts in three of our sites—Grand Island, New Bedford, and Postville—were able to obtain information about the raids relatively quickly and developed plans to ensure that no children were left without parents after school. We recommend that local law enforcement agencies also inform local school districts, early childhood programs, and social service agencies of impending raids and ongoing small-scale enforcement activities. Schools and other community institutions for their part should develop plans to ensure the safety of children in the event of a raid or other form of parental arrest.

Children and families experiencing parental arrest may need counseling and other mental health services over the long term. Due to their universal presence, schools may be the best place to provide children with counseling, but many school districts may be unable to afford counseling for large numbers of children over a long period of time. Significant numbers of children in both New Bedford and Postville received counseling following the raids in these communities. Finding resources for counseling adults may be more difficult, and we only heard about significant or sustained counseling efforts for adults in Postville. Finding counselors who understand the language and culture of affected immigrants may be another hurdle. Additionally, immigrants are often reluctant to attend counseling; they may respond better to interventions by clergy or from more informal healing activities, like the sewing circles many of the women formed in New Bedford.

**10. Lawyers, community leaders, immigrant-serving organizations, faith-based organizations, and other trusted community actors should educate parents about the current protocols used by immigration enforcement agents and how best to respond in the circumstances where parents are detained and asked whether they have children.**

In Massachusetts, local community-based organizations and legal service agencies have conducted trainings and produced concise, easy-to-read guides about how families, individuals, and institutions can respond to home or workplace raids. These guides discuss individuals' rights if they are detained, as well as how to notify attorneys, family members, and others about their arrest.[97] Before the Postville raid, lawyers and community leaders across Iowa had developed a network to

---

[97] For a comprehensive guide for families and communities on how to prepare for immigration raids and other arrests, as well as a list of resources at the state and local levels, see National Council of La Raza, 2009, "Community Responses to Immigration Raids: A Collection of Resources," http://www.nclr.org/files/54953_file_Comprehensive_Raids_Resources.pdf.

disseminate such information and develop plans to respond to raids, but the network did not reach Postville in time for the raid.

**11. State and local child welfare agencies, along with foundations, experts, and advocates specializing in child welfare issues, should consider appropriate avenues to protect and advance the interests of children whose parents are caught up in immigration enforcement.**

Public child welfare agencies may in some circumstances be able to assist families, as in the example of MDSS during the New Bedford raid, where the agency maintained a focus on the best interests of children, pressed ICE to release parents, and avoided removal of children from their homes after parental arrest. However, the role of child welfare agencies is not always clear-cut, and there is some danger that their involvement could lead to separation of children from parents. These risks are particularly great if agency staff do not have expertise in reaching out to extended families, knowledge of immigration laws (or access to such knowledge), and considerable cultural competence. Further work to identify positive practices and roles for the child welfare system would be helpful.

**12. National, state, and local networks of deportation defense lawyers should be established, for instance, through chapters of the American Bar Association and the American Immigration Lawyers Association.**

Legal resources were uneven across our study sites, with the strongest networks in New Bedford and Van Nuys, where lawyers helped the largest numbers of immigrants contest their deportation. Lawyers across Iowa had begun setting up a network before the Postville raid, but it was too small and too far from Postville to be of much assistance. As a result, a single lawyer out of Des Moines wound up handling most of the cases. Deportation defense is a difficult task under current U.S. immigration law, and it is seldom profitable, especially when deportees do not have the resources to pay lawyers—as was the case for families in our sample. Thus, we would recommend that foundations, large law firms, and other institutions develop and support networks of deportation defense lawyers at the national, state, and local levels.

**13. Both legal and humanitarian assistance should be coordinated by and offered through trusted community institutions such as those in faith-based and immigrant-serving organizations.**

Trusted community institutions should conduct outreach to affected families and facilitate their enrollment in public assistance programs. The best example of this was in Postville, where St. Bridget's Church centralized services and hosted staff from a nearby health clinic and from the Iowa DHS, which took food stamp applications on site and significantly lessened the level of food hardship in this community relative to the other sites. Churches also played important roles in relief provision, to one degree or another, in all of our other study sites. Many nonprofit and faith-based organizations lack the financial resources or infrastructure to sustain large-scale or long-term relief so it is also important for these organizations to help link eligible families with public benefits to help them overcome the material hardships that children in particular might otherwise experience.

We recommend that state and local government agencies work as closely as possible with faith-based organizations and community organizations in immigrant communities to develop plans for service delivery to families affected by immigration arrests.

**14. Institutions such as churches and community organizations that provide humanitarian assistance should be prepared to continue assistance over the long term.**

Detentions often last for months, and deportation proceedings, including subsequent appeals, can last for years, but the relief efforts we studied were mostly concentrated in the first days and weeks following worksite raids. The exceptions were in Postville, where religious groups managed to raise enough money to continue supporting families for more than a year, and in New Bedford, where local organizations such as Catholic Charities kept up intensive efforts to support families for many months. Housing is generally a family's most expensive basic need, and families often wind up crowding together to reduce costs. Over the long term, responding institutions should concentrate on housing as well as other forms of support.

**15. Nongovernmental institutions such as churches, CBOs, foundations, and advocacy organizations, alongside state and federal governments, should consider strategies for coordinating health and education services for citizen children who cross back and forth between nations as a result of parental deportation.**

Even though many of the parents in our study contested their deportation, the majority of them have been or may

79

A828

eventually be deported. Parents faced heart-wrenching decisions about whether to take their children with them or leave them in the United States with another parent or relative. There has been little documentation of conditions that await children after deportation, but in general the receiving communities in Mexico, Central America, and elsewhere are poor, with limited infrastructure in health, education, and other basic necessities for children. Even when schools and other services are relatively strong, they are not well coordinated with U.S. school and health systems, and children who move back and forth may lose ground and fall into gaps. The numbers of U.S. deportees—hundreds of thousands every year—are now sufficient to warrant partnerships between U.S. and receiving community service providers (such as schools) and potentially, investments in receiving communities as well. Without such linkages and investments, the children of deportees will continue to experience hardship and limited opportunities for their future.

## Conclusion

In conclusion, our report finds substantial economic hardship and emotional difficulties for children with parents arrested in immigration raids. Worksite raids have received the most attention—both from the press and in terms of community responses—but other forms of arrest such as those by FOTs and the state and local police have similar impacts on children—long-term family separation, economic hardship, and changes in children's behavior. As the U.S. government shifts its attention from controversial large-scale workplace raids to other forms of enforcement, protections for children during parental arrest, detention, and deportation are critical. Comprehensive immigration reform could consider the presence of U.S. citizen children as a central criterion for legalization. Absent comprehensive reform, the most important protection for children would be allowing immigration judges to consider the harm that children would face if deported or separated from deported parents, but this would require legislation reforming the process for contesting deportation. It is likely that comprehensive reform or other immigration legislation would take some time to pass and possibly might not pass at all. In the meantime, ICE should continue to reform its enforcement and detention operations—keeping the best interests of children in mind. And national, state, and local institutions involved in protecting children and integrating immigrants should continue to plan strategies to respond to immigration operations—both large and small. The substantial resources that community institutions have expended on supporting affected families in the aftermath of ICE operations—alongside the large sums ICE has spent on the operations themselves—show how costly our current broken immigration system has become in financial terms. However, the underlying price that is paid by children poses a much longer-term burden that will continue to extend into the future unless it is faced squarely and practically by the United States.

80

A829



The Urban Institute

2100 M Street, NW
Washington, DC 20037
ph 202.833.7200
fax 202.467.5775
http://www.urban.org

# In the Child's Best Interest?

## the consequences of losing a
## lawful immigrant parent to deportation

*March 2010*



**International Human Rights Law Clinic**
University of California, Berkeley
School of Law

**Chief Justice Earl Warren Institute
on Race, Ethnicity and Diversity**
University of California, Berkeley
School of Law

**Immigration Law Clinic**
University of California, Davis
School of Law

# In the Child's Best Interest?

## THE CONSEQUENCES OF LOSING
## A LAWFUL IMMIGRANT PARENT TO DEPORTATION

*March 2010*

**International Human Rights Law Clinic**
University of California, Berkeley, School of Law

**Chief Justice Earl Warren Institute on Race, Ethnicity and Diversity**
University of California, Berkeley, School of Law

**Immigration Law Clinic**
University of California, Davis, School of Law

**INTERNATIONAL HUMAN RIGHTS LAW CLINIC, UNIVERSITY OF CALIFORNIA, BERKELEY, SCHOOL OF LAW**

The International Human Rights Law Clinic (IHRLC) designs and implements innovative human rights projects to advance the struggle for justice on behalf of individuals and marginalized communities through advocacy, research, and policy development. The IHRLC employs an interdisciplinary model that leverages the intellectual capital of the university to provide innovative solutions to emerging human rights issues. The IHRLC develops collaborative partnerships with researchers, scholars, and human rights activists worldwide. Students are integral to all phases of the IHRLC's work and acquire unparalleled experience generating knowledge and employing strategies to address the most urgent human rights issues of our day. For more information, please visit: www.humanrightsclinic.org.

**CHIEF JUSTICE EARL WARREN INSTITUTE ON RACE, ETHNICITY AND DIVERSITY**
**UNIVERSITY OF CALIFORNIA, BERKELEY, SCHOOL OF LAW**

The Chief Justice Earl Warren Institute on Race, Ethnicity and Diversity (Warren Institute) is a multi-disciplinary, collaborative venture to produce research, research-based policy prescriptions, and curricular innovation on issues of racial and ethnic justice in California and the nation. The Warren Institute's mission is to engage the most difficult topics related to civil rights, race and ethnicity in a wide range of legal and public policy subject areas, providing valuable intellectual capital to public and private sector leaders, the media and the general public, while advancing scholarly understanding. Central to its methods are concerted efforts to build bridges connecting the world of research with the world of civic action and policy debate so that each informs the other, while preserving the independence, quality and credibility of the academic enterprise. For more information, please visit: www.warreninstitute.org.

**IMMIGRATION LAW CLINIC, UNIVERSITY OF CALIFORNIA, DAVIS, SCHOOL OF LAW**

The Immigration Law Clinic (ILC) provides legal representation to indigent non-citizens in removal proceedings before U.S. Immigration Courts, the Board of Immigration Appeals, and federal courts, including the Ninth Circuit Court of Appeals. The ILC provides this necessary service to Northern California's immigrant communities, offering education and legal services to low-income immigrants facing deportation while enabling students to gain practical, real-world experience. ILC students take on all major aspects of litigation, including interviewing clients and witnesses, preparing legal briefs, drafting pleadings and motions, and arguing complex legal issues. ILC students regularly conduct naturalization workshops and organize various other community legal workshops. Recognizing the increased collaboration between criminal and immigration enforcement agencies, the ILC has been at the forefront of indigent detention and deportation defense. For more information, please visit: www.law.ucdavis.edu.

# Contents

Executive Summary ................................................................................................................ 1

Introduction ........................................................................................................................... 3

Number of U.S. Citizen Children Affected By Deportation of an LPR Parent ................ 4

Costs of Detention and Deportation of LPR Parents ........................................................ 5

Legal Protection for the Most Vulnerable Members of Society ....................................... 6

Application of the Principle of Family Unity to Deportation of LPR Parents ................. 6

U.S. Deportation Law and Policy Should Be Informed by European Court
of Human Rights Jurisprudence ................................................................................ 9

Conclusions and Recommendations ................................................................................. 11

Appendix ............................................................................................................................. 13

Notes .................................................................................................................................... 14

Authors & Acknowledgements .......................................................................................... 19

# EXECUTIVE SUMMARY

Congress is considering a comprehensive overhaul of the nation's immigration laws more than a decade after the enactment of strict immigration measures. Lawmakers should take this opportunity to reaffirm the nation's historic commitment to family unity by addressing the discrete provisions that currently undermine it. Current U.S. immigration laws mandate deportation of lawful permanent resident (LPR) parents of thousands of U.S. citizen children, without providing these parents an opportunity to challenge their forced separations. Through a multi-disciplinary analysis, this policy brief examines the experiences of U.S. citizen children impacted by the forced deportation of their LPR parents and proposes ways to reform U.S. law consistent with domestic and international standards aimed to improve the lives of children.

This report includes new, independent analysis of U.S. Department of Homeland Security (DHS) data. We estimate that more than 100,000 children have been affected by LPR parental deportation between 1997 and 2007, and that at least 88,000 of impacted children were U.S. citizens. Moreover, our analysis estimates that approximately 44,000 children were under the age of 5 when their parent was deported. In addition to these children, this analysis estimates that more than 217,000 others experienced the deportation of an immediate family member who was an LPR.

**WE PROPOSE THAT THE UNITED STATES:**

» *Restore judicial discretion in all cases involving the deportation of LPRs who have U.S. citizen children in order to give parents a meaningful opportunity to present evidence of the adverse impact that their deportation will have on their U.S. citizen children.* There is a bill pending before Congress, the Child Citizen Protection Act (CCPA), that would restore discretionary authority to immigration judges to determine whether a non-citizen parent of a U.S. citizen child should be ordered removed from the United States. This bill would restore judicial decision-making power when the best interests of a U.S. citizen child hang in the balance. We recommend that Congress move to

enact the CCPA, either alone or as part of comprehensive immigration reform legislation.

» *Revert to the pre-1996 definition of "aggravated felony."* Before the legislative changes in 1996, the aggravated felony category was reserved for the most serious offenses. The designation of a conviction as an aggravated felony results in ineligibility for discretionary relief regardless of the equities involved. With such grave consequences for LPR parents and their U.S. citizen children, Congress should amend the current aggravated felony definition and revise it to include only serious felony offenses.

» *Collect data on U.S. citizen children impacted by deportation of an LPR parent.* DHS should collect information on the number, age, gender, and other demographics regarding U.S. citizen children who are separated from one or both LPR parents as a result of parental deportation. DHS should also record whether the U.S. citizen child of the LPR remains in the United States or accompanies his or her deported parent. Independent research should be commissioned to study the psychological, educational, social, and economic impact of separation on U.S. citizen children.

» *Establish guidelines for the exercise of discretion in cases involving the deportation of LPRs with U.S. citizen children.* U.S. immigration laws recognize that children constitute a vulnerable group that requires special protection. The Executive Office for Immigration Review should issue guidelines applicable in all cases in which discretion is available to assist immigration judges in considering the impact on citizen children of deporting an LPR parent. Immigration judges should also receive appropriate training from experts to adequately balance the needs of U.S. citizen children against the interests of the government in removing certain LPRs from the United States. The establishment of guidelines and access to training for judges is necessary to ensure reasoned outcomes that do not inadvertently cause disproportionate harm to U.S. citizen children.

i

# A Family Portrait

Sann Chey* sat at a picnic table at his father's house in California's Central Valley, three of his sons at his side, and talked about the future.

"I knew what I did was wrong, and I did not want to fight the charge," Sann said. "I honestly never thought I could be deported. I had been here for so long, more than 20 years, so I thought I would go to jail and that would be it."

Sann, a father of five, came to the United States in 1981. He and his family fled Cambodia when the Khmer Rouge seized power in the mid-1970s and launched a brutal genocide that left approximately 1.5 million people dead in the country's infamous "killing fields." His family escaped to a refugee camp across the border in Thailand, and then, in 1981, the U.S. government resettled them in the United States.  Sann has built a successful life in his adopted country. Sann graduated from high school, served in the U.S. Army, married, found steady work as a mechanic, and had five children, all of whom are U.S. citizens.

Today, however, his future is again in jeopardy.  Sann awaits deportation to Cambodia, and his children, ranging in age from 11 to 18, risk losing their father.  The government classified Sann's misdemeanor domestic violence conviction resulting from a fight with his wife as an "aggravated felony" because Sann received a 365-day sentence.  A sentence of just one day less would have avoided the aggravated felony classification and given Sann the opportunity to persuade an immigration judge not to deport him because of the impact it would have on his children. However, based on that one-day difference, the law denied the immigration judge the power to fully hear Sann's case and to consider all the facts before ordering him removed.

According to Sann, his wife had a gambling addiction. Their marriage suffered, and in 2002, the police came to Sann's home to settle a dispute. Police charged Sann with domestic battery. He accepted responsibility, pleaded guilty, and served his time.  After his release, a California family court awarded Sann custody of his five children because it determined he was most qualified to care for them.

For four years after his release, Sann and his children went on with their lives. But in 2006, Sann lost his green card and applied for a replacement. When a package arrived from the federal government more than a year later, Sann thought it was his replacement green card. Instead, it was a court document informing Sann that he was facing deportation to Cambodia because of his five-year-old misdemeanor conviction.

In spring 2009, U.S. Immigration and Customs Enforcement officers came to his home and arrested him. They held Sann for six months in immigration detention. The immigration judge eventually determined that under the strict definition Congress imposed in 1996, Sann's conviction constituted an aggravated felony.  Under the law, the judge had no choice but to order Sann's removal.

Today, Sann is back home with his family only because the government has not yet been able to obtain travel documents from Cambodia for his return. Sann is living in immigration limbo. He could be deported at any time. When this happens, Sann fears his children will suffer most.

"What would happen to his children if both parents were gone?" said Paul, Sann's brother. "If all you have is a broken family, is that a family, or just the remnants of one?"

---

*The names of individuals interviewed in this policy brief have been changed to protect their privacy.

## Introduction

Congress is considering a comprehensive overhaul of the nation's immigration laws more than a decade after the enactment of strict immigration measures. Lawmakers should take this opportunity to reaffirm the nation's historic commitment to family unity by addressing the discrete provisions that currently undermine it. For example, the United States currently deports lawful permanent resident (LPR)[1] parents of thousands of U.S. citizen children, without providing these parents an opportunity to challenge their forced separations. Through a multi-disciplinary analysis, this policy brief examines the experiences of U.S. citizen children impacted by the forced deportation of their LPR parents and proposes ways to reform U.S. law consistent with domestic and international standards aimed to improve the lives of children.

LPRs, also known as green card holders, have legal status to live and work in the United States. Some green card holders enter as infants or young children. More than 20,000 LPRs currently serve in the U.S. military.[2] While many green card holders are eligible to become U.S. citizens through naturalization, immigration experts speculate that many do not take advantage of this option because of the hefty fees required to apply or a mistaken belief that their "permanent resident" status protects them from deportation.[3] In fact, LPRs make up nearly 10 percent of those who are deported from the United States.[4] Most LPRs facing deportation on the basis of criminal convictions have already served their criminal sentences.[5]

In 1996, Congress passed the Antiterrorism and Effective Death Penalty Act (AEDPA)[6] and the Illegal Immigrant Reform and Immigrant Responsibility Act (IIRIRA),[7] which together introduced additional immigration restrictions on LPRs convicted of crimes. The law expanded the category of crimes designated as aggravated felonies to encompass a broad range of minor and non-violent offenses.[8] Lawful permanent residents convicted of an aggravated felony are subject to mandatory deportation and other severe immigration consequences.[9] Currently, a conviction may fall into this category without being a felony and without involving any aggravated circumstances.[10] Even expunging such a crime from an individual's record does not remove the immigration consequences it triggers.[11]

### Non-Violent Aggravated Felonies

Under the 1996 legislation, the following non-violent crimes may constitute aggravated felonies:

- » Non-violent theft offenses
- » Non-violent drug offenses
- » Forgery
- » Receipt of stolen property
- » Perjury
- » Fraud or deceit, where the loss to the victim exceeds $10,000
- » Tax evasion, where the loss to the government exceeds $10,000

Source: INA § 101(a)(43), 8 U.S.C. § 1101(a)(43).

Until 1996, most lawful permanent residents with criminal convictions facing deportation were entitled to a hearing before an immigration judge who would balance an individual's criminal convictions against his or her positive contributions to the United States.[12] At this hearing, an immigration judge could consider the impact that deportation of an LPR parent would have on U.S. citizen children and, if warranted, could decide to allow an LPR to remain in the country. However, the 1996 immigration laws eliminated such hearings for LPRs facing deportation based on convictions classified as aggravated felonies.[13]

Despite claims by U.S. Immigration and Customs Enforcement (ICE) that it focuses on deporting the "worst of the worst" criminal offenders,[14] analysis of data from the U.S. Department of Homeland Security (DHS) by the nongovernmental organization Human Rights Watch found that more than 68 percent of LPRs are deported for relatively minor, non-violent



FIGURE 1:  LEGAL PERMANENT RESIDENTS (LPRs) DEPORTED BY YEAR

Source: U.S. Department of Homeland Security.

Note: Data for 1997 includes only the months of April–December and data for 2007 includes only the months of January–August.

offenses.[15] Our independent analysis of data from DHS estimates that more than 100,000 children have been affected by parental deportation between 1997 and 2007, and that at least 88,000 of these children were U.S. citizens.

Against this backdrop, this policy brief draws attention to the impact of the 1996 immigration laws on U.S. citizen children of LPR parents. U.S. Customs and Border Patrol recently confirmed that on October 1, 2009, it increased efforts to identify LPRs with criminal convictions.[16] It is likely that a greater number of LPRs will be detained and placed into removal proceedings.

This analysis is based on data provided by DHS as well as the 2008 American Communities Survey, a representative survey of the U.S. population administered by the U.S. Census Bureau. We have also reviewed relevant social science literature as well as international and domestic laws and standards regarding family separation. We interviewed several LPRs and their family members living in California who have been affected by deportation or potential deportation.[17] We note that all children, regardless of immigration status, may be impacted by forced separations from their parents. Although U.S. citizen children are the focus of this research, this policy brief does not assert that other children are any less deserving of protection under domestic law.

## Number of U.S. Citizen Children Affected By Deportation of an LPR Parent

In the ten-year period between April 1997 and August 2007, the United States deported 87,884 LPRs for criminal convictions at an average rate of approximately 8,700 per year (see *Figure 1*).[18]

Lawful permanent residents deported during this time period lived in the United States an average of approximately ten years, long enough to form families (see *Table 1*). The majority (53 percent) of these LPRs had at least one child living with them. In the ten-year period described above, the United States deported the lawful permanent resident mother or father of approximately 103,000 children. At least 88,000 (86 percent) of these children were U.S. citizens. Moreover, approximately 44,000 of these children were under the age of 5 when their parent was deported. In addition to these children, more than 217,000 other immediate family members—including U.S. citizen husbands, wives, brothers, and sisters—were affected by the deportation of LPRs. See the Appendix for a detailed explanation of the methodology used to estimate the length of residency and family composition of deported LPRs.

| Table 1: Number of LPRs Deported and Estimated Children/Family Members Impacted from 1997–2007 | |
| --- | --- |
| Total Number of LPRs Deported | 87,884 |
| Estimated percent of LPRs that had at least one child living with them | 53% |
| Estimated Total Number of Children Under 18 Impacted by Deportation of an LPR Father or Mother | 103,055 |
| Estimated Total Number of Children Under 5 Impacted by Deportation of an LPR Father or Mother | 44,422 |
| Estimated Total Number of U.S. Born Children Under 18 Impacted by Deportation of an LPR Father or Mother | 88,627 |
| Estimated Total Number of Immediate Family Members Impacted by Deportation of an LPR in Household | 217,068 |

Source: U.S. Department of Homeland Security. Estimates of the number of children and family members are based on a 95 percent confidence interval and were derived from the 2008 American Communities Survey. See Appendix for details.

## Costs of Detention and Deportation of LPR Parents

Individuals who are detained by DHS are in custody pending resolution of their removal cases. ICE spends approximately $2.55 billion each year on Detention and Removal Operations, the largest single portion of its annual budget.[19] Of this total, approximately $1.77 billion is spent incarcerating immigrants in local jails, while another $221 million is spent on legal proceedings related to individual removal hearings.[20] Because LPRs make up an estimated 10 percent of those deported from the United States,[21] it can be reasonably assumed that at least 10 percent of ICE's detention and removal budget, or approximately $255 million each year, is spent detaining and deporting lawful permanent residents, half of whom have children living with them.

By removing a lawful permanent resident parent of a U.S. citizen child, the government also creates immense secondary social and economic effects. While little data exists on the impact on U.S. citizen children of deporting LPR parents, a great deal of data exists regarding the impact of removing a parent from the home due to incarceration. These data show that children of incarcerated parents are much more likely to experience psychological disorders and to exhibit behavioral problems.[22] Children of incarcerated parents are more likely to experience trouble in school, including poor grades and behavioral problems, than children of non-incarcerated parents. One study found that 70 percent of children under age 6 with incarcerated mothers exhibited poor academic performance.[23] Removal of an LPR parent increases the likelihood of poor education outcomes for children, leading to a greater number of U.S. citizens who may be relegated to low-income employment as adults.

It is also likely that many U.S. citizen children separated from an LPR parent will suffer economic strain, requiring additional public assistance for the families left behind. A recent study by the Urban Institute on the consequences of arrest, detention, and deportation of immigrant parents on children in the United States found that parental arrest results in severe economic hardship for families because they lose a breadwinner.[24] The study found that most households experienced lower incomes, housing instability, and food insufficiency.[25] Households surveyed in all six cities in the study reported

a significant average drop in income after a parent's arrest.[26]

The Urban Institute found that the vast majority of affected families received some sort of assistance from family and friends, yet informal support was not sustainable for families facing long deportation proceedings.[27] More than half the families studied relied on private or public financial support to sustain the household including food, rent, and utility assistance.[28] Public benefits for U.S. citizen children affected included cash welfare, Supplemental Nutrition Assistance Program (formerly known as the Food Stamp Program), the Supplemental Nutrition Program for Women, Infants and Children, and free and reduced-price school meals.[29]

## Legal Protection for the Most Vulnerable Members of Society

International human rights law and domestic family law recognize children as among the most vulnerable members of society. Nearly every major human rights treaty recognizes the need for special protection of children.[30] In the United States, immigration is governed primarily by federal law. Nevertheless, a human rights framework provides a useful lens for analyzing the impact of deporting lawful permanent resident parents and supplies an important source of norms that may guide domestic lawmakers in their efforts to reform the U.S. immigration system.

International human rights treaties recognize the family as the natural and fundamental unit of society.[31] The International Covenant on Civil and Political Rights (ICCPR) provides that the family is "entitled to protection by society and the State."[32] The right to a family also requires that states take appropriate measures "to ensure the unity or reunification of families."[33] As such, states cannot arbitrarily or unlawfully interfere with this essential social unit. The United Nations Human Rights Committee, which oversees state compliance with the ICCPR, has found that states must respect the right to family unity in cases where the deportation of a parent would arbitrarily interfere with this right.[34] The Convention on the Rights of the Child also enshrines the principle that in all legal actions, "the best interests of the child shall be a primary consideration."[35]

U.S. federal law and the laws of many states also protect family integrity. Laws in all fifty states require the use of the best interests of the child standard in decisions "regarding a child's custody, placement or critical life issues."[36] Federal laws such as the Family Medical Leave Act also protect the rights of individuals to take leave from their jobs to care for a family member.[37] Certain states, such as California, have also passed similar family leave laws that allow parents to take unpaid leave to attend their child's school activities.[38]

## Application of the Principle of Family Unity to Deportation of LPR Parents

In drafting the Immigration and Nationality Act of 1952 (INA), Congress's primary purpose was to ensure the unification of mixed families of U.S. citizens and immigrants.[39] This priority was reiterated in 1981, by the Select Commission on Immigration and Refugee Policy, a body appointed by Congress to study immigration policies and recommend legislative reform, which stated:

> [R]eunification . . . serves the national interest not only through the humaneness of the policy itself, but also through the promotion of the public order and well being of the nation. Psychologically and socially, the reunion of family members with their close relatives promotes the health and welfare of the United States.[40]

Courts also have recognized the importance of the INA's emphasis on family unity. In the 1977 case *Fiallo v. Bell*, the U.S. Supreme Court recognized that the legislative history of the INA "establishes that congressional concern was directed at 'the problem of keeping families of United States citizens and immigrants united.'"[41]

6

Application of the Principle of Family Unity to Deportation of LPR Parents

Numerous appellate courts have affirmed this interpretation of the INA as consistent with its goal of preventing the "continued separation of families."[42]

However, current immigration laws undermine these foundational principles. In more than half the cases documented in the Urban Institute study, children remained in the United States after the deportation of a parent.[43] Sann's story exemplifies how immigration laws interfere with family unity. When Sann was detained, his sister, a high school teacher, took care of Sann's daughter, and his younger brothers took care of Sann's four sons. The children continue to live in separate homes.

"Nothing was the same when he was gone—Sann was the glue that held this family together," said his brother, Paul. Sann's sister said she fears what will happen to her brother if he returns to Cambodia. She believes that his absence will tear all of them apart.

Sann was ordered removed without the opportunity for a hearing to consider the effects his deportation would have on his five U.S. citizen children, ranging in age from 11 to 18. Had such a hearing been available, the immigration judge could have considered the impact of Sann's deportation on his dependent U.S. citizen children, consistent with the INA's commitment to family unity.

### IMPACT ON HEALTH

Removing a lawful permanent resident parent from the home also negatively impacts the physical and mental health of U.S. citizen children. The right to health is widely recognized by numerous human rights treaties.[44] The scope of this right has been held to include the "enjoyment of the highest attainable standard of physical and mental health."[45] The first post-World War II treaty to establish the right to health, the 1946 Constitution of the World Health Organization, describes "health" as "a state of complete physical, mental, and social well-being and not merely the absence of infirmity."[46]

## Impacts of Forced Separation

Emilio Martinez has been a green card holder since he came to the United States from Mexico as a toddler. His problems started when he was 18 years old. Police picked him up with some friends and charged him with illegal possession of a firearm. Emilio pleaded guilty, and a judge sentenced him to six months in jail. As a condition of his probation, the judge ordered Emilio to stay away from gang members.

For three years, life continued as normal. Emilio bought a house, married Cathy, a U.S. citizen, and started his career as a welder. But in 2008, Emilio got a call at work from his sister saying that her husband had been arrested. She asked Emilio to stop by her house to check on her children. When Emilio went to his sister's house, the police accused him of "associating with a gang member"—simply by visiting his brother-in-law's house—and they arrested him for violating his parole. Emilio was jailed for thirty days. Just before he was scheduled for release, officials told him he had an "Immigration and Customs Enforcement hold." As a result, he was transferred to another jail where he has been held in the custody of the U.S. Department of Homeland Security for nearly a year and a half.

During this time Cathy and their children have been separated from Emilio. "I have had to be a dad and a mom—I just barely get by," Cathy said. She was unsure how to explain their father's absence to their children. "I didn't want to tell the kids at first, because I thought he would be home soon," she said. "But after a while, it had been so long that I had to tell them something." When she did tell her 5-year-old son, she explained: "[He] told me I should go to the jail for a couple of days to trade positions, so he could see his dad."

In recent years, Congress has passed a number of laws aimed at promoting the welfare of children on issues relating to health, education, and protection from crime.[47] For example, the No Child Left Behind Act requires schools to track the academic performance of limited-English speaking children and other groups that include children of immigrants.[48] Policies requiring the deportation of LPR parents of U.S. citizen children directly contradict the purposes of these laws and place the welfare of these children at risk.

Available data on children whose parents are absent as a result of incarceration suggest that these children may suffer a number of health problems. Studies of this population show that children who witness a parent's arrest often suffer psychological harm, including persistent nightmares and flashbacks.[49] Additionally, studies have shown that incarceration of parents results in the introduction of new caregivers in a child's life, which significantly increases the likelihood a child will be victimized.[50]

Limited research has been conducted that documents adverse health impacts on children living in the United States when a parent is deported. Anthropologists Marcelo and Carola Suárez-Orozco recently completed a study that examined 385 early adolescents in the United States from China, Central America, the Dominican Republic, Haiti, and Mexico, 85 percent of whom experienced separation from one or both parents for extended periods because of immigration, divorce, or death.[51] Marcelo and Carola Suárez-Orozco found that children from separated families were more likely to show signs of depression than children who had not been separated.[52] Their data also indicated that separations from loved ones, particularly parents, led to feelings of loss and sadness in both adults and children.[53]

The Urban Institute study also found significant behavioral changes among most children who had experienced immigrant parental separation.[54] A majority of the children displayed changes in such basic areas as sleeping,

eating, and controlling their emotions.[55] More than half cried more frequently and were more afraid, and more than a third were more anxious, clingy, withdrawn, angry, or aggressive following their parent's arrest.[56] Although the severity of these psychological impacts tended to decrease in the long term, at least 40 percent of children exhibited signs of these behavioral changes after nine months.[57]

Christine Sun, a Chinese immigrant who lives in the San Francisco Bay Area, arrived in the United States in 1996, to begin her new life with her husband, a U.S. citizen. However, the marriage was unsuccessful and the couple divorced in 1998. In 2007, as Christine returned from a trip to China to visit relatives, immigration officials asked about her criminal history. She admitted that she had two prior shoplifting offenses. As a result, the officials seized her green card and told her that she would be placed in deportation proceedings.

Christine's deportation proceedings affected her daughter, Jamie, an 11-year-old U.S. citizen. "I got depressed," said Jamie. Jamie explained that every time her mother left the apartment, even to take out the trash, Jamie "felt cold, nervous, and would start crying" because it gave her a sense of what it would be like to live without her mother.

Similarly, Juan, the 12-year-old U.S. citizen child of an LPR from Mexico, had a hard time sleeping and playing when his father was detained by immigration officers. His older sister said she feared she would never see her father again.

Although the Suárez-Orozco study noted the resilience of children, it also stressed the importance of considering how the child understands the separation.[58] If a child is well prepared for the separation and the time apart is framed as temporary and necessary, the separation will be more psychologically manageable than if the child feels that he or she has been abandoned by the parent.[59] Because the context and circumstances of separations due to detention and deportation are likely neither prepared

for in advance nor framed as temporary, these separations likely will be psychologically difficult.

In fact, uncertainty is a hallmark of detention and deportation of LPR parents. There is no pre-determined, fixed period of detention, and it is not clear until a final decision has been rendered in each case whether the parent will be released or deported.[60]

### IMPACT ON EDUCATION AND SOCIAL DEVELOPMENT

Parents contribute to their children's academic success by reading to them, helping with homework, taking their children to and from school, and providing a stable home environment where children learn and grow. However, each year, the education of thousands of U.S. citizen children is affected by the detention and deportation of a parent who is a lawful permanent resident.

The right to education is firmly established in international human rights law,[61] which defines education as encompassing the broad range of activities that contribute to the development of children.[62] For example, the Committee on the Rights of the Child, the body that enforces the international Convention on the Rights of the Child, notes that education includes activities "beyond formal schooling" which "enable children, individually and collectively, to develop their personalities, talents and abilities and to live a full and satisfying life within society."[63]

The U.S. Supreme Court has recognized the importance of education, noting the "lasting impact of its deprivation on the life of the child."[64] Access to education is also protected under U.S. federal and state law. The stated goal of the No Child Left Behind Act is to improve access to a quality education for all children.[65] In addition, certain states such as California have declared education to be a fundamental right.[66]

The Urban Institute study also documented the effects that parental detention and deportation can have on a child's education.[67] A significant number of children in the study experienced disruptions in their schooling: many missed school following their parent's arrest, some

struggled to maintain good grades, and others considered dropping out of school.[68] Following the arrest of a parent, academic performance suffered and grades dropped for about one in five students.[69]

The families interviewed for this policy brief demonstrate how detention can hinder the education of U.S. citizen children. When Sann was detained, his childrens' performance in school plummeted. Sann's youngest son, Vithu, 13, went from being an A student to flunking 7th grade English.

Christine Sun's daughter Jamie, is an honor student in the Gifted and Talented Education program (GATE). While her mother's case was pending, Jamie said it took her longer to finish her homework because she was distracted by thoughts of her mother's possible deportation. Her mother's deportation proceedings also affected Jamie's social life. She found herself getting angry more often. She said she became upset that her normal homework took longer than usual and was quicker to become angry at her fellow classmates.

Another U.S. citizen, Daniel, is a 14-year-old who had to change schools when his LPR mother, a Mexican national, was detained for a year. Daniel—also a student in the GATE program—saw his grades drop. "I didn't concentrate as much because I was in a place that I didn't recognize," he explained. Daniel said that he used to be more playful and socially engaged before he had to transfer schools. He said he has become withdrawn in his new learning environment and does not like talking to his peers.

## U.S. Deportation Law and Policy Should Be Informed by European Court of Human Rights Jurisprudence

The European human rights regime provides one model for addressing potential family separation in deportation hearings involving a lawful permanent resident parent of a U.S. citizen child. Many European nations have immigration systems that, like the United States, confront the problem

of deporting long-term legal residents who commit crimes, but who have citizen children and extensive ties to the country. European countries have incorporated a judicial balancing test that considers the nation's interest in public safety in light of the right to the family and the best interests of the child.

The European Court of Human Rights (European Court), the judicial body that enforces the European Convention on Human Rights (European Convention),[70] has repeatedly upheld the right of a state to expel immigrants convicted of crimes to maintain public order.[71] Further, the court has emphasized that the European Convention does not guarantee the right of an immigrant to live in a particular country, especially after committing a crime.[72] However, the European Court has held that a state's decision to deport an individual is justified only if the interference with family life is not excessive compared to the public interest that is protected.[73] In cases in which an individual convicted of a crime poses little threat to public security and has extensive family ties to the country, the European Court has held that deportation may violate the right to family unity protected by Article 8 of the European Convention.[74]

The European Court has often found that the right to family unity outweighs the state's interest in deporting an immigrant convicted of a crime. In the case of *Mehemi v. France*, the European Court considered the case of an Algerian national sentenced to six years imprisonment for illegal importation of a controlled substance.[75] The European Court weighed Mehemi's family connections, including his wife and three minor children of French nationality, and found that his right to family life outweighed the state's interest in deporting him. Because his crime was a non-violent drug offense, the court found his deportation was disproportionate to the public interest aims pursued, and thus violated Article 8.[76]

The Inter-American Commission has followed a similar balancing test to determine whether the deportation of a parent violates the right to family under the American Convention on Human Rights[77] and the American Declaration of the Rights and Duties of Man.[78] The Commission's report on Canada's immigration system concedes

---

## European Court Model

The European Court for Human Rights criteria for evaluating whether a particular deportation violates the right to family unity include:

(1) the nature and seriousness of the offense;

(2) the duration of the individual's stay in the country;

(3) the time which has elapsed since the commission of the offense and the applicant's conduct during that period;

(4) the nationalities of the various persons concerned;

(5) the applicant's family situation, including the length of the marriage and other factors that reveal a genuine family life;

(6) whether there are children, and, if so, their age;

(7) the best interests and well-being of the children, in particular the seriousness of the difficulties which any children of the applicant are likely to encounter in the country to which the applicant is to be expelled; and

(8) the strength of social, cultural and family ties with the host country and with the country of destination.

Sources: Mehemi v. France, 1997-VI Eur. Ct. H.R. 1959; Boultif v. Switzerland, 2001-IX Eur. Ct. H.R. 120.

Conclusions and Recommendations

that while states have the right and duty to maintain public order through expulsion of immigrants, they must balance this right with the potential harm to the rights of the individuals in a specific case.[79] The Commission also accepted the European Court's determination that a balancing test should be applied on a case-by-case basis and that states must have a compelling justification for interference with the right to family.[80]

Similar to U.S. immigration law prior to 1996, the current European model provides a feasible alternative to mandatory detention and deportation. This model could be adapted to restore the authority of U.S. immigration judges to conduct a practical balancing test that considers the rights of the LPR parent, the U.S. citizen child, and the state. Because of the particular vulnerabilities of children, U.S. immigration judges need flexibility in applying a multi-factored analysis to ensure that the needs of all parties are given proper consideration. Such an approach would bring current immigration laws in line with the basic American values of public safety and family unity, as well as with international human rights standards.

## Conclusions and Recommendations

Reform of the nation's immigration system is urgently needed. Thousands of U.S. citizen children have been adversely impacted by the expansion of the "aggravated felony" definition. Reforming the nation's immigration laws to take into consideration the best interests of U.S. citizen children will reduce unnecessary costs to our social welfare system. Such modifications also will bring the United States in line with international law and the practice of many European countries. By strengthening legal protections for these children, Congress can reaffirm its  historic commitment to the principle of family unity.

WE RECOMMEND THE FOLLOWING MEASURES:

» *Congress should restore judicial discretion in all cases involving the deportation of LPRs who have U.S. citizen children in order to give parents a meaningful opportunity to present evidence of the adverse impact that their deportation will have on their U.S. citizen children.* Restoring discretion will give immigration judges an opportunity to make informed decisions based on all relevant facts, including the health, well being, and educational needs of U.S. citizen children. Currently there is a bill pending in Congress that would provide this needed reform. The Child Citizen Protection Act (CCPA)[81] was introduced by Congressman Jose Serrano (D-NY) on January 6, 2009, in the 111th Congress as H.R. 182.[82] This bill would provide discretionary authority to immigration judges to determine whether a non-citizen parent of a U.S. citizen child should be ordered removed, deported, or excluded from the United States. This bill would return the decision-making power to judges when the best interests of a U.S. citizen child hang in the balance. This bill would not interfere with the power of immigration judges to order LPRs removed. If enacted, this bill will restore discretion in cases in which relief is foreclosed by a statutory bar.[83] We recommend that Congress move to enact the CCPA, either alone or as part of comprehensive immigration reform legislation.

» *Congress should revert to the pre-1996 definition of aggravated felony.* Before the legislative changes in 1996, the aggravated felony designation was reserved for the most serious offenses. At that time many convictions that fell into this category required sentences of five years or more.[84] Today, a sentence of just one year qualifies many offenses under the aggravated felony designation.[85] The designation of a conviction as an aggravated felony results in ineligibility for discretionary relief, regardless of the equities involved. With such grave consequences for LPR parents and their U.S. citizen children, the aggravated

felony definition should be revised to limit this category to only serious felony convictions. On February 8, 2010, the American Bar Association voted to urge Congress to change current immigration laws, in part by changing the current definition of aggravated felony. The ABA recommends limiting this category to felony convictions in which a sentence of more than one year has been imposed, and excluding suspended sentences.[86]

» ***The U.S. government should collect data on U.S citizen children impacted by deportation of an LPR parent.*** Currently, we know very little about the numbers of U.S. citizen children affected by deportation of an LPR parent. Such information is critical to gain a fuller understanding of the real impact of deportation laws on the nation's youngest citizens. U.S. Department of Homeland Security should collect information on the number, age, gender and other demographics regarding U.S. citizen children who are separated from one or both LPR parents as a result of parental deportation. The agency should also record whether the U.S. citizen child remains in the United States or accompanies his or her deported parent. The social impacts of deportation of an LPR parent should also be investigated. Independent research should be commissioned to study the psychological, educational, social, and economic impacts on U.S. citizen children of LPR parental deportation.

» ***The Executive Office for Immigration Review should establish guidelines for the exercise of discretion in cases involving the deportation of LPRs with U.S. citizen children.*** U.S. immigration laws recognize that children constitute a vulnerable group that requires special protection.[87] In 2007, the Chief Immigration Judge issued guidelines for adjudicating cases in which the respondent is an unaccompanied minor who is not a U.S. citizen.[88] These guidelines applied the principle of the best interests of the child to modify the court procedures and environment to account for the special needs of unaccompanied minors

in these circumstances.[89] The Executive Office for Immigration Review should issue similar guidelines to assist immigration judges in considering the impact on citizen children of deporting an LPR parent.

In some situations, deportation of an LPR parent will result in dependent U.S. citizen children being left without any family caretakers in the United States. In other situations, U.S. citizen children will accompany their parents to foreign countries. Immigration judges should receive appropriate training. A greater understanding of the needs of children, how children process information and events, and the effect of removing an LPR parent from the home of a U.S. citizen child will better prepare immigration judges to adequately balance the needs of citizen children against the interest of the government in removing certain LPRs from the United States. The establishment of guidelines and access to training for judges is necessary to ensure well reasoned outcomes that do not inadvertently cause disproportionate harm to U.S. citizen children.

# APPENDIX

## DATA SOURCES AND METHODOLOGY

The U.S. Department of Homeland Security (DHS) provided data to the nongovernmental organization Human Rights Watch, which published an analysis in their April 2009 report *Forced Apart (By the Numbers): Non-citizens Deported Mostly for Nonviolent Crimes*.[90] Human Rights Watch made available a subset of the data covering lawful permanent residents (LPRs) to the authors of this report for our independent analysis.

The estimates of the number of family members affected by the deportations of LPRs were generated in a two-step process. First, using the DHS data, we identified the 18 countries of deportation that accounted for 90 percent of the 87,844 LPRs who were deported between 1997 and 2007. These countries are Mexico, the Dominican Republic, Jamaica, El Salvador, Colombia, Philippines, Haiti, Guatemala, Trinidad and Tobago, Guyana, Honduras, Canada, United Kingdom, Portugal, Ecuador, Peru, and South Korea. Second, we made use of the 2008 American Communities Survey, a representative survey of the U.S. population administered by the U.S. Census Bureau, to generate estimates of noncitizen family sizes.[91] We analyzed noncitizen survey respondents who met two requirements: they were age 30 and their country of birth was one of 18 countries listed above. A 1996 Bureau of Justice Statistics publication "Noncitizens in the Federal Criminal Justice System, 1984-94" found that the median age of noncitizens prosecuted in federal courts was 30, thus we used that age for our analysis. The estimates are based on the following assumptions (after accounting for age and country-of-birth as described here): (1) The population statistics generated from the 2008 American Communities Survey adequately describes the non-citizen population for years 1997-2007; (2) the characteristics of the LPR population are similar to those of non-citizens in general (the American Communities Survey does not distinguish between different types of non-citizens); and (3) deported LPRs have similar characteristics to the general population of non-citizens.

This analytical population of noncitizens reported an average of 10.6 years living in the United States. We calculated average family size, average number of own children, and average number of children under age 5 living in the household as well as 95th confidence intervals for each mean using the ACS household weight. The rounded means were 3.7, 1.3 and .53, respectively. Finally, we calculated estimates of the number of family members (total, children, and children under age 5) affected by total LPR deportations between 1997 and 2007 by multiplying the upper and lower limits of each unrounded mean's estimate by 87,844 (see table below). For the purpose of estimating the number of family members affected by a deportation, 1 was subtracted from the mean of 3.72885 to account for the respondent. Finally, an Urban Institute study found that 86 percent of all children of immigrants are U.S. citizens.[92] To estimate the number of children under 18 impacted by a parent deportation who were U.S. citizens, we multiplied 103,055 by .86.

|  | Estimate | Estimated Range |
|---|---|---|
| **TABLE A.1: ESTIMATES OF CHILDREN AND FAMILY MEMBERS OF LPRs DEPORTED BETWEEN 1997–2007** | | |
| Total Number of Children Under 18 Impacted by Deportation of an LPR Father or Mother | 103,055 | 98,143 to 107,968 |
| Total Number of Children Under 5 Impacted by Deportation of an LPR Father or Mother | 44,422 | 41,801 to 47,044 |
| Total Number of Immediate Family Members Impacted by Deportation of LPR in Household | 217,068 | 209,590 to 224,547 |

Note: Estimates are based on 95 percent confidence interval.

13

IN THE CHILD'S BEST INTEREST?

# Notes

**1**   Also commonly referred to as "green card holders," the term "lawful permanent resident," or LPR, refers to individuals who enjoy the legal status to reside permanently in the United States as an immigrant in accordance with the immigration laws. Immigration and Nationality Act [hereinafter INA] § 101(a)(20), 8 U.S.C. § 1101 (2000) (all INA citations in this report are to the official print version of the U.S. Code (2000) unless otherwise noted). Individuals may obtain this status a number of ways including through family members or employment. *See generally* INA § 203, 8 U.S.C. § 1153.

**2**   JEANNE BATALOVA, MIGRATION POLICY INSTITUTE, IMMIGRANTS IN THE US ARMED FORCES (May 2008), available at http://www.migrationinformation.org/USFocus/display.cfm?ID=683#1 (accessed Feb. 24, 2010).

**3**   *See* Ly Diem, *Deported! Surprising Details On Who Can Get the Boot,* IN'L EXAMINER, vol. 34, No. 24, Jan. 10, 2008, *available at* http://www.detentionwatchnetwork.org/node/518 (accessed Feb. 21, 2010).

**4**   *See* HUMAN RIGHTS WATCH, FORCED APART (BY THE NUMBERS): NON-CITIZENS DEPORTED MOSTLY FOR NONVIOLENT OFFENSES, April 15, 2009 [hereinafter "FORCED APART (BY THE NUMBERS)"], *available at* http://www.hrw.org/en/reports/2009/04/15/forced-apart-numbers-0 (accessed Feb. 21, 2010).

**5**   The U.S. Supreme Court has found that deportation does not legally constitute punishment. Fong Yue Ting v. United States, 149 US 698, 728 (1893). However, the practical effect of deportation based on criminal convictions is that immigrants are punished once by the criminal justice system, and then again by the immigration system. Lea McDermid, *Deportation is Different: Noncitizens and Ineffective Assistance of Counsel,* 89 CAL. L. REV. 741, 763 (2001)("The technical distinction between collateral and direct consequences does nothing to ameliorate the suffering of those who are subject to the double punishment of a prison sentence plus removal."); FORCED APART (BY THE NUMBERS), *supra* note 4, at 5 (stating that non-citizens convicted of crimes are "subject to deportation after they have finished serving their criminal sentences.").

**6**   Anti-Terrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996).

**7**   Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009 (1996).

**8**   When the category was first established in 1988, the term "aggravated felony" applied to serious crimes such as murder, drug trafficking crimes, and certain illicit trafficking offenses. Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7342, 102 Stat. 4181 (1988). INA § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii), states that any alien who is convicted of an aggravated felony at any time after

admission is deportable; INA § 240A(a)(3), 8 U.S.C. § 1229b(a)(3) states that individuals convicted of any aggravated felony are not eligible for cancellation of removal. Additionally, Congress has taken further action to restrict the ability of federal judges to review immigration court decisions. *See* REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231 (2005) (barring federal courts from reviewing discretionary denials of relief).

**9**   In this policy brief, we use the term "mandatory deportation" to refer to deportation without a discretionary hearing to consider circumstances specific to the individual case. Individuals convicted of aggravated felonies are subject to mandatory detention, ineligible for asylum, permanently barred from entering the United States, and are subject to a sentence of up to twenty years if they re-enter the country without permission from the Secretary of Homeland Security. INA § 236(c), 8 U.S.C. § 1226(c); INA § 208(b)(2)(B)(i), 8 U.S.C. 1158 (b)(2)(B)(i); § 212(a)(9)(A)(ii), 8 U.S.C. § 1182(a)(9)(A)(ii); § 276(b)(2), 8 U.S.C. § 1326(b)(2).

**10**   Many state law misdemeanor crimes which are punishable by sentences of one year are included in the aggravated felony category in federal immigration law. These crimes include non-violent offenses because the word "aggravated" has no legal bearing on the circumstances of the offense.

**11**   The INA definition of a conviction for immigration purposes does not exclude a conviction that was expunged or eliminated on the basis of rehabilitative relief. *See* 8 U.S.C. § 1101(a)(48).

**12**   Before 1996, lawful permanent residents were eligible for relief from deportation under INA § 212(c) as long as they had not been convicted of aggravated felonies for which they had served sentences of five years or more. 8 U.S.C. § 1182(c) (1952), repealed by Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-208, Div. C., Title III, § 304(b), 110 Stat. 3009-597 (1996).

**13**   INA 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii), states that any alien who is convicted of an aggravated felony at any time after admission is deportable; INA 240A(a)(3), 8 U.S.C. § 1229b(a)(3), states that individuals convicted of any aggravated felony are not eligible for cancellation of removal. Additionally, Congress has taken further action to restrict the ability of federal judges to review immigration court decisions. The 2005 REAL ID Act, Pub. L. No. 109-13, 119 Stat. 231 (2005), bars federal courts from reviewing discretionary denials of relief, including discretionary relief still available to lawful permanent residents, such as cancellation of removal, voluntary departure, and adjustment of status. INA § 242(a)(2)(B), 8 U.S.C. § 1252(a)(2)(B) (removing jurisdiction to review "any judgment regarding the granting of relief under section 212(h), 212(i), 240A, 240B, or 245," or "any other decision or action... .").

**14**   U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE), FISCAL YEAR 2008 ANNUAL REPORT, PROTECTING

National Security and Upholding Public Safety 3, *available at* http://www.ice.gov/pi/reports/annual_report/2008/ar_2008_page1.htm (accessed Jan. 6, 2010).

**15**   The most common criminal offenses are driving under the influence of liquor, simple assault, and drug possession. *See* Forced Apart (By the Numbers), *supra* note 4, at 39.

**16**   American Immigration Lawyers Association, AILA InfoNet, Doc. No. 09100122, available at http://www.aila.org/content/default.aspx?docid=9826 (accessed Feb. 25, 2010).

**17**   The names of those interviewed for this policy brief have been changed to protect their privacy.

**18**   This was based on the average across years 1998-2006; data for years 1997 and 2007 are not for those full years.

**19**   U.S. Dept. of Homeland Security, Office of Public Affairs, Fact Sheet: ICE Fiscal Year 2010 Enacted Budget 2, Nov. 5, 2009, *available at* http://www.ice.gov/pi/news/factsheets/index.htm (accessed Feb. 21, 2010).

**20**   *Id.* at 1-2.

**21**   Forced Apart (By the Numbers), *supra* note 4, at 24.

**22**   Based on a qualitative study of 30 children who had witnessed the arrest of their mothers, Jose-Kampfner posited that the high levels of anxiety and depression found among participants were associated with the experience of maternal incarceration and with trauma related to the arrest event itself. C.J. Jose-Kampfner, *Post-Traumatic Stress Reactions in Children of Imprisoned Mothers*, in Children of Incarcerated Parents (K. Gabel & D. Johnston eds., 1995). In her sample of 56 mothers incarcerated at women's prisons in Kentucky and Washington State and their children, Baunach found that 70 percent of the children exhibited symptoms of social and psychological disorders, such as aggression, hostility, and withdrawal. Phyllis Jo Baunach, Mothers in Prison (Transaction Books 1985).

**23**   Ann M. Stanton, When Mothers Go to Jail (Lexington Books 1980).

**24**   Ajay Chaudry et al., Urban Inst., Facing Our Future: Children in the Aftermath of Immigration Enforcement 27 (2010) [hereinafter Urban Inst.]. The study included 190 children in 85 families living in six U.S. cities. For more information on the effect of deportation on families in the United States, see the work of Families for Freedom, a New York-based multi-ethnic defense network run by and for families confronting deportation, http://www.familiesforfreedom.org.

**25**   Urban Inst., *supra* note 24, at ix. Because of these financial difficulties, one in four families moved in with friends and family to reduce their housing costs, and of the eight families that owned their homes prior to the detention of their parent, four lost their homes as a result.

**26**   Urban Inst., *supra* note 24, at xiii (stating that one in four of the households did not have any wage earners after the arrest, and about two-thirds of the families interviewed stated that they had trouble paying their monthly bills as a result of the parental detention).

**27**   Urban Inst., *supra* note 24, at 35.

**28**   Urban Inst., *supra* note 24, at 36 (stating that while only one in ten of the families interviewed reported receiving Temporary Assistance for Needy Families benefits before the arrest, about one in seven received benefits following the arrest).

**29**   Urban Inst., *supra* note 24.

**30**   *See, e.g.*, International Covenant on Economic, Social and Cultural Rights, Dec. 16, 1966, 993 U.N.T.S. 3, 10, art. 24, S. Exec. Doc. D, 95-2 (1978); S. Treaty Doc. No. 95-19, 6 I.L.M. 360 (1967) [hereinafter ICESCR]: (every child has "the right to such measures of protection as are required by his status as a minor"). *See also*, UN Human Rights Committee, General Comment 17, ¶ 2 (stating that the ICCPR requires that states adopt "special measures to protect children" to ensure that they enjoy all of the rights provided in the Covenant). *See also*, Convention on the Rights of the Child, Nov. 20, 1989, 1577 U.N.T.S. 3, 28 I.L.M. 1456 (1989) [hereinafter CRC].

**31**   *See, e.g.*, ICESCR, *supra* note 30, art. 10(1) (stating "[T]he widest possible protection and assistance should be accorded to the family.").

**32**   International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171, 177, 179, arts. 17, 23 [hereinafter ICCPR].

**33**   Human Rights Committee, General Comment No. 19: Article 23 (The Family) Protection of the Family, the Right to Marriage and Equality of the Spouses, ¶ 5 (27/07/90).

**34**   *See, e.g.*, Winata v Australia (No. 930/2000), 16 August 2001, U.N. Doc. No. CCPR/C/72/D/930/2000 (referring to case of a stateless married couple from Indonesia, where the Human Rights Committee found that deporting the parents would violate articles 17, 23, and 24 of the ICCPR). The Committee noted that the fact that non-citizen parents may have a child who is a citizen does not necessarily classify the deportation as an arbitrary interference with the right to a family. On the one hand, this statement highlights that under the ICCPR, non-citizens do not have an absolute right to remain in the host country. On the other hand, it illuminates the need for states to evaluate possible unlawful interferences with the right to family. In this instance, because the child had been born and raised in Australia, "attending Australian schools as an ordinary child would and developing the social relationships inherent in that," the Committee ruled that Australia had to present additional factors to justify the deportation of his parents "in order to avoid a characterization of arbitrariness."

**35**   CRC, *supra* note 30, at 46, art. 3.

**36**   U.S. Dept. of Health and Human Services, Administration for Children and Families, Determining the Best Interests of the Child: Summary of State Laws, April 2008, *available at* http://www.childwelfare.gov/systemwide/laws_policies/statutes/best_interestall.pdf (accessed Feb. 21, 2010).

**37**   Family and Medical Leave Act, Pub. L. 103-3, 107 Stat. 6, 29 U.S.C. § 2601 (1993).

**38**   *See, e.g.*, Cal. Lab. Code § 230.8 (prohibiting employers who employ 25 or more employees from discriminating against employees for taking off up to 40 hours each year to participate in school or child care activities for his or her child).

**39**   This key purpose is mentioned in the legislative history of the Act and in subsequent litigation. *See also* Solis-Espinoza v. Gonzales, 401 F.3d 1090, 1094 (9th Cir. 2005) (quoting H.R. Rep. No. 85-1199, pt. 2 (1957), reprinted in 1957 U.S.C.C.A.N. 2016, 2020); *see also* Colon-Navarro, Fernando, *What Happened to Family Unity?*, 19 Fla. J. Int'l L. 491, 492 (2007).

**40**   Colon-Navarro, *supra* note 39, at 497 (quoting U.S. Select Commission on Immigration and Refugee Policy, U.S. Immigration Policy and the National Interest 112-13 (1981)). Until the 1996 changes, family reunification had been at the foundation of U.S. immigration policy. In 1965, Congress passed the Immigration Reform Act of 1965, which changed "the primary focus of the criteria for admission from nationality to family reunification." *Id.* at 496 (quoting National Research Council, Statistics on U.S. Immigration: An Assessment of Data Needs for Future Research (1996)).

**41**   Fiallo v. Bell, 430 U.S. 787, 795 (1977) (quoting H.R. Rep. No. 85-1199, at 7 (1957)). Specifically, in *Lau v. Kiley*, the Second Circuit upheld the importance of family reunification in visa preference laws when it stated that the "foremost policy underlying the granting of preference visas under our immigration laws [is] that of the reunification of families." Lau v. Kiley, 563 F.2d 543, 547 (2d Cir. 1977).

**42**   Kaliski v. Dist. Dir. of INS, 620 F.2d 214, 217 (9th Cir. 1980). In a later case, Solis-Espinoza v. Gonzales, 401 F.3d 1090, 1094 (9th Cir. 2005), the Ninth Circuit reaffirmed that the primary purpose of the INA is to "keep families together" and that public policy "supports recognition and maintenance of a family unit."

**43**   Urban Inst., *supra* note 24, at 24, 70.

**44**   The right to health has been formally recognized by six international human rights treaties. *See*, International Convention on the Elimination of All Forms of Racial Discrimination, Dec. 21, 1965, S. Exec. Doc. C, 95-2 (1978); S. Treaty Doc. 95-18; 660 U.N.T.S. 195, 212, 220, art. 5(e)(iv); Convention on the Elimination of all Forms of Discrimination Against Women, Dec. 18, 1979,

1249 U.N.T.S. 13, 18-9, arts. 11(1)(f), 12 and 14(2)(b) (1980) [hereinafter CEDAW]; International Convention on the Protection of the Rights of All Migrant Workers and Members of Their Families, New York, Dec. 18, 1990, *entered into force* July 1, 2003, 2220 U.N.T.S. 93, 105, 108, 109, arts. 28, 43(e), and 45(c) (1991) [hereinafter Migrant Workers Convention]; International Convention on the Protection and Promotion of the Rights and Dignity of Persons with Disabilities, G.A. res. 61/106, Annex I, U.N. GAOR, 61st Sess., Supp. No. 49, at 65, U.N. Doc. A/61/49 (Dec. 13, 2006), 46 I.L.M. 443, art. 25; CRC, *supra* note 30, at 52, art. 24; ICESCR, *supra* note 30, at 10, art. 12.

**45**   ICESCR, *supra* note 30, at 10, art. 12(1).

**46**   Constitution of the World Health Organization, preamble, July 22, 1946.

**47**   *See, e.g.*, The No Child Left Behind Act of 2001, 20 U.S.C. 6301 (2002) [hereinafter No Child Left Behind Act]; State Child Health Insurance Program Reauthorization Act of 2009, 42 U.S.C. § 1320, 1396-97 2009.

**48**   Randy Capps et al, Urban Inst., The New Demography of America's Schools: Immigration & The No Child Left Behind Act 1 (2005), *available at* http://www.urban.org/publications/311230.html (accessed Feb. 21, 2010).

**49**   D. Johnston, Jailed Mothers (Pacific Oaks Center for Children of Incarcerated Parents 1991).

**50**   *See* R. Whelan, Broken Homes and Battered Children: A Study of the Relationships Between Child Abuse and Family Type (London, Family Education Trust 1993) (finding that the presence of other adults other than blood relatives in a child's home increases the chances of victimization).

**51**   Marcelo and Carola Suárez-Orozco, *Making Up for Lost Time: The Experience of Separation and Reunification among Immigrant Families*, in The New Immigration: An Interdisciplinary Reader 179, 185 (Marcelo and Carola Suárez-Orozco ed., 2005) [hereinafter Suárez-Orozco].

**52**   Suárez-Orozco, *supra* note 51, at 179.

**53**   Suárez-Orozco, *supra* note 51, at 191.

**54**   Urban Inst., *supra* note 24, at 53.

**55**   Urban Inst., *supra* note 24, at ix.

**56**   Urban Inst., *supra* note 24, at ix (stating that a majority of children experienced four or more of these behavior changes) and at 53 (stating that children who experienced long-term separation from their parents were most prone to withdrawal and aggression).

**57**   Urban Inst., *supra* note 24, at 53.

**58**   Suárez-Orozco, *supra* note 51, at 193.

**59**   Suárez-Orozco, *supra* note 51, at 193.

**60**   Additionally, in a policy report that focused on family separation due to migration of parents to the United States,

16

University of Maryland professors found that parents and psychologists in family separation has negative psychological effects for both parents and children during their separation and after reunification. T.H. Gidling & Sara Poggio, Family Separation and the Educational Success of Immigrant Children 2 (2009) *available at* http://globalchild.rutgers.edu/pdf/Family_Separation-Policy_Brief.pdf (accessed Feb. 21, 2010). The mothers in their focus group were intensely aware of the emotional burden of separation their children experienced. *Id.* Many mothers were very concerned that their children would become involved in gangs as a "refuge from emotional problems." *Id.*

**61**  See, e.g., ICESCR, *supra* note 30, at 8, art. 13(1) (mandating that the "States Parties to the present Covenant recognize the right of everyone to education"). *See also* CRC, *supra* note 30, at 53, art. 28.

**62**  The right to education extends beyond basic skills instruction. *See, e.g.*, CRC, *supra* note 30, at 54, art. 29(1)(a) (stating that education should be directed to "development of the child's personality, talents and mental and physical abilities to their fullest potential"). The Committee on the Rights of the Child has also recognized that developing social relationships is a key part of education. The Committee has interpreted the right to education to encompass the purpose of "ensuring that essential life skills are learnt by every child and that no child leaves school without being equipped to face the challenges that he or she can expect to be confronted with in life." Committee on the Rights of the Child, General Comment 1: Aims of Education, Article 29 (1), ¶ 9 (4/17/01) [hereinafter CRC General Comment 1]. The committee went on to define "basic skills" as "not only literacy and numeracy but also life skills such as the ability to make well-balanced decisions; to resolve conflicts in a non-violent manner; and to develop a healthy lifestyle, good social relationships and responsibility, critical thinking, creative talents, and other abilities which give children the tools needed to pursue their options in life." *Id.*

**63**  CRC General Comment 1, *supra* note 62, at ¶ 2.

**64**  Plyer v. Doe, 457 U.S. 202, 221 (1982).

**65**  *See*, No Child Left Behind Act, *supra* note 47.

**66**  Serrano v. Priest, 487 P.2d 1241 (1971).

**67**  Urban Inst., *supra* note 24, at 53.

**68**  Urban Inst., *supra* note 24, at 49-50.

**69**  Urban Inst., *supra* note 24, at 51 (stating that among the number of children who showed signs of behavioral changes at school, most had trouble focusing).

**70**  Convention for the Protection of Human Rights and Fundamental Freedoms, Sept. 3, 1953, 213 U.N.T.S. 222 [hereinafter European Convention].

**71**  *See* Uner v. Netherlands, 2006-XII, Eur. Ct. H.R. ___, *available at* http://cmiskp.echr.coe.int/tkp197/view.asp?item=1&portal=hbkm&action=html&highlight=Uner%20|%20v.%20|%20Netherlands&sessionid=47796967&skin=hudoc-en.

**72**  European Convention, *supra* note 70, art. 8. Article 8 of the European Convention on Human Rights provides: "Everyone has the right to respect for his private and family life, his home and his correspondence. There shall be no interference by a public authority with the exercise of this right except such as is in accordance with the law and is necessary in a democratic society in the interests of national security, public safety or the economic well-being of the country, for the prevention of disorder or crime, for the protection of health or morals, or for the protection of the rights and freedoms of others."

**73**  Berrehab v. the Netherlands, 138 Eur. Ct. H.R. (ser. A) (1988); see also Beldjoudi v. France, 234 Eur. Ct. H.R. (1992), Mehemi v. France, 1997-VI Eur. Ct. H.R. 1959; and El Boujaïdi v. France, 1997-VI Eur. Ct. H.R. 1980.

**74**  Boultif v. Switzerland, 2001-IX Eur. Ct. H.R. 120.

**75**  Mehemi v. France, 1997-VI Eur. Ct. H.R. 1959.

**76**  Despite the fact that the amount of drugs in question was substantial, 142 kilograms of hashish, the European Court of Human Rights gave considerable weight to the fact that Mehemi had no prior convictions and that his deportation had completely separated him from his wife and children because it was impossible for them to resettle together in Algeria or any other country. *Id.* The court also noted that Mehemi "was completely integrated into French society and had no link whatsoever with Algeria other than his nationality." *Id. See also* Amrollahi v. Denmark, (No. 56811/00) Eur. Ct. H.R. ( July 11, 2002) *available at* http://cmiskp.echr.coe.int/tkp197/view.asp?item=1&portal=hbkm&action=html&highlight=Amrollahi%20|%20v.%20|%20Denmark&sessionid=47796967&skin=hudoc-en (holding that the deportation of an Iranian national from Denmark for a serious drug offense violated Article 8 under the *Boultif* test because Amrollahi was married to a Danish national, had two Danish citizen children, and it was impossible for them to relocate to Iran). It is important to note that the European Court often does not find an Article 8 violation. In *Grant v. United Kingdom*, the court held that because Grant, a national of Jamaica living in England, had committed over fifty offenses, had continued to re-offend, and never cohabited with his citizen children, his deportation to Jamaica was not a violation of Article 8. Grant v. United Kingdom, (No. 10606/07), Eur. Court. H.R. ( Jan. 8, 2009) *available at* http://cmiskp.echr.coe.int/tkp197/view.asp?item=2&portal=hbkm&action=html&highlight=Grant%20|%20v.%20|%20United%20|%20Kingdom&sessionid=47796967&skin=hudoc-en. Although the European Court acknowledged that the majority of his offenses were non-violent, it could not ignore the "sheer number of offences" he committed and the fact that with the exception of one four-year period, there was no prolonged period during which he was out of prison and did not re-offend. *Id.* The court recognized that his deportation would affect his youngest

17

daughter, but maintained that it would not affect her in the same manner it would have if they had been living together as a family. *Id.* Thus, the court held that a fair balance was struck and that Grant's deportation was proportionate to the legitimate aim pursued. *Id.*

**77**   American Convention on Human Rights, Nov. 21, 1969, O.A.S. T.S. No. 36; 1144 U.N.T.S. 143, 150, art. 17(1) (stating "The family is the natural and fundamental group unit of society and is entitled to protection by society and the state"), Art. 19 stating "Every minor child has the right to the measures of protection required by his condition as a minor on the part of his family, society, and the state") (1969).

**78**   American Declaration of the Rights and Duties of Man, Res. XXX, Final Act of the Ninth International Conference of American States (Pan American Union), Bogota, Colombia, Mar. 30-May 2, 1948, at 38; *reprinted in* Handbook of Existing Rules Pertaining to Human Rights, OEA/Ser.L/V/II.23 Doc. 21 Rev. 6, at 5 (1979); 1 Annals of the O.A.S. 130 (1949); Basic Documents Pertaining to Human Rights in the Inter-American System, OAS/Ser.L/V/I.4 Rev. 9 (2003); and 43 Am. J. Int'l L. Supp. 133 (1949). Art. V (stating "Every person has the right to the protection of the law against abusive attacks upon his honor, his reputation, and his private and family life.") Art. VI (stating "Every person has the right to establish a family, the basic element of society, and to receive protection therefor.").

**79**   Report on the Situation of Human Rights of Asylum Seekers Within the Canadian Refugee Determination System, Inter-Am. C.H.R., OEA/Ser.L/V/II.106, doc. 40 (2000) [hereinafter Report on Canadian Refugee System]. The Commission found that in instances in which immigration proceedings may potentially separate families, the resulting interference with family life may only be justified where necessary to meet a pressing need to protect public order, and where the means are proportional to that end.

**80**   Report on Canadian Refugee System, *supra* note 79.

**81**   The changes proposed by the Child Citizen Protection Act also appear in the Comprehensive Immigration Reform for America's Security and Prosperity Act, H.R. 4321, introduced by Congressman Luis V. Gutierrez (D-IL) in December 2009. Under Section 315, the bill restores discretionary authority to decline to order "removed, deported, or excluded from the United States" the parent of a child who is a U.S. citizen. H.R. 4321, 111th Cong. § 315 (1st Sess. 2009).

**82**   H.R. 182, 111th Cong. (1st Sess. 2009).

**83**   In addition to the aggravated felony bar to discretionary relief, the "stop-time" or "clock stop" rule found in immigration law bars discretionary relief to individuals who have been convicted of certain crimes based on how soon after their admission the convictions took place. 8 U.S.C. § 1229b(a)(2), 8 U.S.C. § 1229b(d)(1). Even minor, non-violent, and non-aggravated felony offenses can bar

eligibility for a discretionary waiver. *Id.* The American Bar Association adopted Resolution 114A on February 8, 2010, urging Congress to amend the Immigration and Nationality Act to restore an immigration judge's authority to consider a discretionary application "to deserving lawful permanent residents barred from cancellation by the offense 'clock-stop' provision." ABA Comm'n on Immigration, Recommendation 114A Adopted by the House of Delegates (Feb. 8, 2010), available at http://www.abanet.org/leadership/2010/midyear/docs/daily_journal.pdf. [hereinafter Resolution 114A].

**84**   *See* Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, § 321(a), 110 Stat. 3009-546 (1996), reducing the sentence required for defining less serious crimes as aggravated felonies. *See also* Banished For Minor Crimes: The Aggravated Felony Provision Of The Immigration And Nationality Act As A Human Rights Violation, 23 B.C. Third World L.J. 293 (2003).

**85**   *See, e.g.,* 8 U.S.C. § 1101(a)(43)(F), (G), (R), (S).

**86**   Resolution 114A, *supra* note 83.

**87**   *See, e.g.,* INA § 240A(b)(1)(D), 8 U.S.C. § 1229b(b)(1)(D), which requires that undocumented immigrations seeking cancelation of removal establish "that removal would result in exceptional and extremely unusual hardship to the alien's spouse parent, or child," or INA § 240A(b)(2)(A), 8 U.S.C. § 1229b(b)(2), which provides special rules for battered spouses and children.

**88**   Dep't of Justice, Executive Office for Immigration Review, Office of the Chief Immigration Judge Operating Policies and Procedures Memorandum 07-01: Guidelines for Immigration Court Cases Involving Unaccompanied Alien Children (2007) [hereinafter Guidelines].

**89**   The Chief Immigration Judge suggested that while "the concept of 'best interests of the child'" does not provide relief that is not sanctioned by law, it is nevertheless a factor that relates to the immigration judge's discretion in taking steps to ensure that a 'child-appropriate' hearing environment is established …." Guidelines, *supra* note 88, at 4.

**90**   Forced Apart (By the Numbers), *supra* note 4.

**91**   Steven Ruggles, Matthew Sobek, Trent Alexander, Catherine A. Fitch, Ronald Goeken, Patricia Kelly Hall, Miriam King, and Chad Ronnander. Integrated Public Use Microdata Series: Version 4.0 [Machine-readable database]. Minneapolis, MN: Minnesota Population Center [producer and distributor], 2008.

**92**   Urban Inst., Children of Immigrants: A Statistical Snapshot (2009), *available at* http://www.urban.org/publications/901294.html (accessed Feb. 24, 2010).

# Authors & Acknowledgments

**AUTHORS**

Jonathan Baum
Rosha Jones
Catherine Barry

Jonathan Baum and Rosha Jones are J.D. Candidates at the University of California, Berkeley, School of Law (2011) and are the primary authors of this report. They conducted this work as interns in the school's International Human Rights Law Clinic. Catherine Barry is a Ph.D. Candidate in Sociology & Demography at the University of California, Berkeley. She analyzed demographic data to estimate the numbers of family members affected by deportations of legal permanent residents.

**CONTRIBUTORS**

Parisa Ijadi-Maghsoodi
Lisa Chávez
M. Quin Hodges

Parisa Ijadi-Maghsoodi is a J.D. Candidate at the University of California, Davis, School of Law (2010) and provided legal analysis of immigration detention and removal defense, and conducted interviews of detainees as an intern in the Immigration Law Clinic. Lisa Chávez is a Research Analyst at the Chief Justice Earl Warren Institute on Race, Ethnicity and Diversity at the University of California, Berkeley, School of Law, and conducted deportation and demographic data analysis. Quin Hodges is a J.D. Candidate at University of California, Davis, School of Law (2011) and contributed legal research and analysis of immigration laws and conducted interviews of detainees as an intern in the Immigration Law Clinic.

**EDITORS**

Laurel E. Fletcher
Director, International Human Rights Law Clinic & Clinical Professor of Law
University of California, Berkeley, School of Law

Raha Jorjani
Clinical Professor of Law, Immigration Law Clinic
University of California, Davis, School of Law

Aarti Kohli
Director of Immigration Policy
Chief Justice Earl Warren Institute on Race, Ethnicity and Diversity
University of California, Berkeley, School of Law

**DESIGN**

Jonas Lerman Studio, San Francisco, CA

**COVER PHOTO**

Tommy Fjordbøge, "All alone...." (2008)

**ACKNOWLEDGEMENTS**

We would also like to thank Deepa Varma at the Warren Institute for her review and comments on drafts of the report; Judy London of Public Counsel for her invaluable outreach assistance on this project; and Alison Parker at Human Rights Watch for providing data from their Freedom of Information Act request for analysis in this report. The Berkeley Law library staff provided invaluable research support. The authors also thank Dean Christopher Edley, Jr., for his commitment to clinical education and support of the project.

The authors are grateful to the individual donors to the International Human Rights Law Clinic, without whom this work would not be possible.



**Berkeley**Law
UNIVERSITY OF CALIFORNIA

International Human
Rights Law Clinic

**International Human Rights Law Clinic**
University of California, Berkeley, School of Law
396 Simon Hall
Berkeley, CA 94720-7200
PHONE: (510) 643-4800
humanrightsclinic.org



**Berkeley**Law
UNIVERSITY OF CALIFORNIA

Chief Justice Earl Warren
Institute on Race,
Ethnicity and Diversity

**Chief Justice Earl Warren Institute on Race, Ethnicity and Diversity**
University of California, Berkeley, School of Law
2850 Telegraph Avenue, Suite 500
Berkeley, CA 94705-7220
PHONE: (510) 642-8568
law.berkeley.edu/ewi.htm



**UC DAVIS**
SCHOOL OF LAW
*Immigration Law Clinic*

**Immigration Law Clinic**
UC Davis School of Law
One Shields Avenue, T.B. 30
Davis, CA 95616
PHONE: (530) 754-5892
law.ucdavis.edu

*Deporting Parents Hurts Kids - NYTimes.com*

**The New York Times**



April 20, 2012

# Deporting Parents Hurts Kids

By HIROKAZU YOSHIKAWA and CAROLA SUÁREZ-OROZCO

LAST May, President Obama told an audience in El Paso that deportation of immigrants would focus on "violent offenders and people convicted of crimes; not families, not folks who are just looking to scrape together an income."

Two weeks ago, however, the Department of Homeland Security released a report that flatly belies the new policy.  From January to June 2011, Immigration and Customs Enforcement removed 46,486 undocumented parents who claimed to have at least one child who is an American citizen.

In contrast, in the entire decade between 1998 and 2007, about 100,000 such parents were removed. The extraordinary acceleration in the dismantling of these families, part of the government's efforts to meet an annual quota of about 400,000 deportations, has had devastating results.

Research by the Urban Institute and others reveals the deep and irreversible harm that parental deportation causes in the lives of their children. Having a parent ripped away permanently, without warning, is one of the most devastating and traumatic experiences in human development.

These children experience immediate household crises, starting with the loss of parental income. The harsh new economic reality causes housing and food insecurity. In response to psychological and economic disruptions, children show increased anxiety, frequent crying, changes in eating and sleeping patterns, withdrawal and anger.

In the long run, the children of deportation face increased odds of lasting economic turmoil, psychic scarring, reduced school attainment, greater difficulty in maintaining relationships, social exclusion and lower earnings. The research also exposes major misconceptions about these parents.

First, statistics about those who were deported in 2011 show that 45 percent w[ere] apprehended for any criminal offense. Those who were, were usually arrested [for] minor offenses, not violent crimes.



MORE IN OP[...]
**Op-Ed C[...]
Isn't Tu[...]**
Read More

Second, most American-born children of undocumented parents are not "anchor babies"; most of the parents have lived and worked in the United States for years before having their first child. "Birth tourism" is a xenophobic myth.

Finally, our studies in New York City and elsewhere show that these parents are extremely dedicated to their children's well-being and development. Undocumented parents typically work 12 hours a day, 6 days a week, at the lowest of wages. Deporting them worsens the already precarious lot of their children.

A more humane deportation policy would not, as Mr. Obama pledged last May, target those with strong family ties who posed no public safety threat. Immigration and Customs Enforcement, in fact, began implementing such a "prosecutorial discretion" policy last fall, aimed at considering family ties and other factors in deportation decisions and closing low-priority cases.

But preliminary data from Immigration and Customs Enforcement raise the question of how committed the agency is to identifying and closing those cases. As John Morton, the agency's director, testified in March, of 150,000 deportation cases the agency has reviewed nationwide, about 1,500 — a mere 1 percent — have been closed.

What does that mean for affected families? Consider Sara Martinez, 47, whose daughter is an American citizen. Since arriving from Ecuador, Ms. Martinez has paid her taxes, learned English and never broken a law, according to the New York Immigration Coalition, which has taken up her case. In January 2011, she was on a bus in Rochester with her daughter when three border patrol agents asked her for identification. She could produce only her Ecuadorean passport, and was arrested.

She has applied to Immigration and Customs Enforcement for prosecutorial discretion three times and been denied, without explanation, even though she meets new criteria for such discretion: she has close ties to the community and is not a threat to public safety.

Ms. Martinez's six-year-old daughter has suffered from nightmares, had trouble sleeping and eating and expressed fear that the "police" will come again and take away her mother (who is not in detention while the case is pending) for good.

The United States should not be in the business of causing untold hardship by separating children from the love and care of their hard-working parents.

Hirokazu Yoshikawa, the academic dean at the Harvard Graduate School of Education, is the author of "Immigrants Raising Citizens: Undocumented Parents and Their Young Children."

Carola Suárez-Orozco, co-director of immigration studies at New York University, is an author of "Crossroads: The Psychology of Immigration in the New Century."



- 
- 
- 

# U.S. Deports 46K Parents With Citizen Kids in Just Six Months

Guillermo Campos-Ojeda says goodbye to his wife Adela and daughter Paloma before boarding a deportation flight chartered by U.S. Immigration and Customs Enforcement (ICE) in 2010. (Photo by Scott Olson/Getty Images)

by Seth Freed Wessler

Thursday, November 3 2011, 9:30 AM EST

Between January and June of 2011, the United States carried out more than 46,000 deportations of the parents of U.S.-citizen children, according to previously unreleased federal data obtained [http://act.colorlines.com/acton/attachment/1069/f-007d/0/-/-/-/-/file.pdf] by Colorlines.com's publisher, the Applied Research Center. The figures reflect a striking increase in the rate of removals of parents and raise serious concerns about the impact of these deportations on children, many of whom are left behind.

Congress demanded two years ago that the Department of Homeland Security begin to compile this data by July 2010, but it had not been made available to the public. The Applied Research Center obtained it through a Freedom of Information Act request.

Shattered Families

Thousands of Kids Taken From Parents In U.S. Deportation System [http://colorlines.com/archives/2011/11/thousands_of_kids_lost_in_foster_homes_after_parents_deportation.html]

Obama: Kids Stuck in Foster Care "Real Problem" [http://colorlines.com/archives/2011/11/obama_says_the_fate_of_kids_in_foster_care_after_parents_are_deported_is_a_real_problem.html]

DOWNLOAD FULL REPORT
arc.org/shatteredfamilies [http://www.arc.org/shatteredfamilies]


[http://arc.org/shatteredfamilies]

A mother tells her story. [http://www.arc.org/shatteredfamilies]

The data on parental deportations does not reveal how many children each of these parents had, or whether their children remained in the U.S. or left with their mothers and fathers. However, the Applied Research Center has also found a disturbing number of children languishing in foster care and separated from their parents for long periods. After a year-long national investigation, we estimate there are at least 5,100 children in foster care who face barriers to family reunification because their mother or father is detained or deported. That number could reach as high as 15,000 in the next five years, at the current rate of growth.

The rising number of parental deportations has corresponded with an overall increase in immigration enforcement under the Obama administration; in fiscal year 2011, a record 397,000 people were deported. Yet parental deportation has also increased as a proportion of all removals. Between 1998 and 2007, the last period for which similar data is available [http://www.nytimes.com/2009/02/14/us/14immig.html], approximately 8 percent of almost 2.2 million removals were parents of U.S.-citizen children. The new data released to the Applied Research Center in September reveals that more than 22 percent of all people deported in the first half of this year were parents of citizen kids.

If rates of parental deportation remain steady in the year to come, the country will remove about as many parents in just two years as it did in the ten-year period ICE tracked previously. The number of children of non-citizens placed in the U.S. child welfare system will no doubt shoot up as well. Already, according to our research, one in 16 kids in Los Angeles' child welfare system are the children of detained or deported parents. Certain jurisdictions on the U.S.-Mexico border and at least one Florida county included in our field research had even higher rates.

The Obama administration has accepted the deportation of parents as an acceptable consequence of its immigration enforcement policy. In an interview aired on PBS' "Frontline" last month, Cecilia Munoz, the administration's top advisor on immigration, said that unless Congress passes a comprehensive immigration reform bill to provide a path to lawful status for undocumented immigrants, the deportation of parents will continue.

"At the end of the day, when you have immigration law that's broken and you have a community of 10

Support
Colorlines.com

Investigative
reporting is costly.
DONATE today!
[http://www.colorlines.com/donate]

million, 11 million people living and working in the United States illegally, some of these things are going to happen," said Munoz.

"Even if the law is executed with perfection, there will be parents separated from their children," Munoz added. "It is a result of having a broken system of laws."



The Obama administration has been clear that ICE holds vast power to determine who it will and will not detain and deport. In July, ICE director John Morton released a memo affirming that agents have discretion in enforcement decisions. The memo instructed agents to consider "whether the person has a U.S. citizen or permanent resident spouse, child, or parent" when determining who to detain or deport.

Yet, Munoz's comments and the data we've obtained suggest that indiscriminate deportation of parents may be an inevitable result of a rapidly growing immigration-enforcement juggernaut. It is less a matter of a broken system than of the Obama administration's very intentional policy of deporting 400,000 people a year.

Parents Return to Find Their Kids

In October, the New York Times reported [http://www.nytimes.com/2011/10/03/world/americas/mexican-immigrants-repeatedly-brave-risks-to-resume-lives-in-united-states.html?pagewanted=all] that almost half—48 percent—of undocumented immigrants in the U.S. arrived before 2000. Long-term residents, who are more likely to have children with U.S. citizenship, are increasingly the targets of federal immigration enforcement.

Indeed, the flow of immigrants crossing over the U.S.-Mexico border has declined in the last several years. And of the majority of the diminishing numbers of people still picked up crossing the border have already lived in the U.S. In 2010, 56 percent of people caught at the border had been deported before, up from 44 percent in 2005. Advocates say many of those who are returning are coming back to be with their children, who were left behind when they were deported.

These long-term residents of the U.S. are targeted by a federal deportation policy that relies increasingly on local police. A controversial program called Secure Communities, which has elicited protest from governors in three states, now turns a traffic stop or other run-in with police into a path to deportation.

Immigration and Customs Enforcement maintains that parents who are deported have control over what happens to their children. "The parent can decide whether to have the child leave with them or stay in the U.S.," an ICE spokesperson wrote in an email to the Applied Research Center, explaining the new data.

Yet, as our research on the intersections of immigration enforcement and the child welfare system shows, that is not always the case. Detained and deported parents regularly face the prospect of permanently losing their parental rights because their children are in the foster care system. These parents are often left out of decisions about where their children should live.

According to policy advocates, ICE has for years said that it does not believe significant numbers of families are separated in this way.

Emily Butera, senior program officer at the Women's Refugee Commission, a policy advocacy organization in Washington, said, "ICE tends to say, 'We think these are isolated incidents.' Everyone we've talked to from DHS and ICE say that they can't do anything unless they know how big the problem is."

Our research suggests the problem is substantial. In just six months, 46,486 parents of an unknown number of U.S.-citizen children were removed. According to our national study, thousands of their children face extended and sometimes permanent separation from their parents.

The data on parents of U.S.-citizens deported is overdue.

In 2009, after Homeland Security's inspector general released earlier data [http://www.gpo.gov/fdsys/pkg/CRPT-111hrpt298/html/CRPT-111hrpt298.html] on the number of deported parents, Congress directed ICE to "begin collecting data on the deportation of parents of U.S.-born children no later than July 1, 2010" and to report that data at least semi-annually. Despite these

Case 1:14-cv-00254    Document 127    Filed on 01/30/15 in TXSD    Page 868 of 879

demands, no data has been released to the public until now.

The new data suggest that parents living in certain parts of the country are particularly likely to be deported. The breadth of removals includes not only known deportation hubs like Arizona, Texas and California, but also parts of the South and Midwest. The ICE office covering Georgia, South Carolina and North Carolina ordered large numbers of deportations, as did the one based in Chicago and covering seven states in the Midwest. These geographic trends provide further evidence of the changing orientation of immigration enforcement; it is moving increasingly to communities in the interior of the country.

As immigration enforcement spreads across the country and more parents of United States citizen children are deported, the collateral effects are likely only to grow.

Read this online at
http://colorlines.com/archives/2011/11/shocking_data_on_parents_deported_with_citizen_child

Thank you for printing out this Colorlines.com article. If you liked this article, please make a donation today at colorlines.com/donate to support our ongoing news coverage, investigations and actions to promote solutions.

- 
- Published by ARC.
- ©2011 Colorlines.com

A863



LEGAL
momentum

The Women's Legal Defense
and Education Fund

# READING BETWEEN THE LINES
## Women's Poverty in the United States, 2010

The Census Bureau poverty data for 2010 show the largest number of poor people in the 52 years that poverty has been measured, 46.2 million, and the highest overall poverty rate, 15.1%, since 1993.[1]  The growth in poverty in 2010 reflects the continuing impact of the great recession that began in 2007 and that officially ended in June 2009.  Since unemployment has remained high in 2011, the poverty rate may increase again this year.

There has been a large gender poverty gap in every year since the official poverty standard was created.  In 2010, adult woman were 29 percent more likely to be poor than adult men, with a poverty rate of 14.5% compared to a 11.2% rate for adult men.  There were 17.2 million poor adult women compared to 12.6 million poor adult men.

The Census Bureau has done little to publicize the gender poverty gap.  While its annual poverty reports highlight poverty rate differences based on categories such as age and race, the Bureau has resisted giving similar attention to poverty rate differences based on gender.   As the lack of attention to gender distorts the public perception of poverty in this country, this Legal Momentum report focuses on women's poverty, using the detailed poverty information that the Census Bureau makes available on its website.[2]  The Census statistics reveal a deep gender gap in poverty rates, even when factors such as work experience, education, or family structure are taken into account.

### POVERTY RATES FOR ADULT WOMEN AND MEN IN 2010

| | Women | Men | Increased incidence of poverty among women compared to men |
|---|---|---|---|
| All adults (18 or above) | 14.5 | 11.2 | 29% |
| Age 65 or above | 10.7 | 6.7 | 60% |
| Single parents | 40.7 | 24.2 | 68% |
| Worked | 7.7 | 6.3 | 22% |
| Not High School grad | 29.4 | 23.4 | 26% |
| High School grad only | 17.3 | 12.4 | 40% |
| College less than 4 yrs | 12.3 | 9.3 | 32% |
| College 4 yr degree | 5.0 | 4.3 | 16% |

395 Hudson Street  New York, NY 10014  T 212.925.6635  F 212.226.1066  www.legalmomentum.org
*Legal Momentum is the nation's oldest legal defense and education fund dedicated to advancing the rights of all women and girls.*

## Overall Poverty

Poverty is measured by comparing annual income with the federal poverty standard which the federal government updates annually for inflation.  In 2010, the official poverty guidelines were $10,830 for an individual, $14,570 for a family of 2, $18,310 for a family of 3, and $22,050 for a family of 4.

Adult women were 29 percent  more likely to be poor than adult men in 2010, with a poverty rate of 14.5% compared to 11.2% for men.  About one of every seven women was poor, compared to about one of every nine men.  Aged women were 60 per cent more likely to be poor than aged men.

While the gender poverty gap has been persistently large, it has become smaller.  The 1.29 ratio of women's poverty rate to men's poverty rate in 2010 was the lowest since at least 1987, and perhaps the lowest ever.

## Work Experience

Work outside the home reduces the likelihood of being poor for both men and women.  However, women who worked outside the home in 2010 were 22 percent more likely to be poor than men who worked outside the home, with a poverty rate of 7.7% compared to 6.3% for men.

## Education

While education reduces the likelihood of being poor for both men and women, women are more likely to be poor than men with the same level of education.  In 2010, at every education level women were again more likely to be poor than men.

## Single Parents

The 37.1% poverty rate for single parents in 2010 was 4.2 times the 8.8% poverty rate for married parents.  However, comparing married parents with all solo parents gives a misleading impression of the significance of family structure by concealing the sharp difference in poverty rates between solo fathers and solo mothers.  The 40.7%  poverty rate for solo mother families was 68 percent greater than the 24.2% rate for solo father families.

## BEYOND THE SIMPLE NUMBERS

## Child Care Costs

Poverty is measured based on gross income, rather than on income net of child care expenditures, perhaps because mothers were much less likely to be in the paid labor force when the poverty standard was formulated in the 1960's.  If poverty were measured based on income net of child care expenditures so as to exclude income that is unavailable for other basic needs, many more women (and men) would be counted as poor.  In 2006, the most recent year for which this data is available, child care expenditures for employed mothers with child care costs averaged $115 a week.[3]

## Hardship

Poverty is strongly associated with hardship.  A 2001 study by the Economic Policy Institute found that about 30% of those below the poverty line experienced critical hardship, defined as being evicted, having utilities disconnected, doubling up in others' housing due to lack of funds, or not having enough food to eat; and that an additional 30% to 45% experienced other serious hardships.[4] In 2009, 43% of poor households were found by the federal government to be "food insecure."[5]

## International Comparisons

Many studies have found that poverty rates in the United States are much higher than in other rich countries.  One study concluded that the United States had the highest poverty rate for female-headed households among the 22 countries studied, 30.9% compared to the 10.5% average for the group.[6]  This study defined poverty as an income less than 50% of the median income and was based on national income surveys conducted in the early 1990's.  In another study reporting on poverty rates for single persons in twenty three high income countries, the United States had the largest gender poverty gap.[7]  Our own recent study found that in the mid-2000s the poverty rate for single mothers in the United States was almost twice the average rate in the other 15 high income countries in the study.[8]

The exceptionally high poverty rate for single mothers in the United States is not the result of below average work effort.  In a study of single mothers' employment rates (full or part time) in eight rich countries in the mid-1990's, the 69% employment rate for single mothers in the United States was the highest rate and was twenty percentage points higher than the 49% average employment rate for single mothers in the other seven countries (United Kingdom, Australia, Netherlands, Germany, Norway, Finland, Denmark).[9]  In a study reporting on average annual hours worked by poor single parents around 2000, the 1,087 average hours of work for poor single parents in the United States was the highest total, and almost twice the 582 average in the other six countries (Canada, Netherlands, Austria, Germany, Belgium, Ireland).[10]

One reason for the exceptionally high poverty rates in the United States seems to be that the U.S. invests less in social welfare programs:  in 2000 the United States spent less than 3% of Gross Domestic Product on social assistance to the non-elderly, and this was less than half the spending on the non-elderly by Canada and Great Britain; less than a third of the spending by Germany, the Netherlands, and Belgium; and less than a fourth of the spending by Finland and Sweden.[11]  The United States also has much less generous parental leave than other rich countries and far less public support for child care.[12]

## Rising Living Standards

There is a broad consensus that poverty should be defined relative to contemporary living standards and consequently that any poverty line must be revised periodically.  However, the official U.S. poverty line has not been adjusted in response to the rise in real income and the changes in general living standards since it was formulated over 40 years ago.  If the poverty standard were adjusted to

reflect the 30% increase in real household median income since 1967, many more women (and men) would be counted as poor.

For further information, contact Timothy Casey, Senior Staff Attorney: (212) 413-7556 or tcasey@legalmomentum.org

Founded in 1970 as NOW Legal Defense and Education Fund, Legal Momentum is the nation's oldest legal advocacy organization dedicated to advancing the rights of women and girls. Legal Momentum occupies a unique position as a multi-issue organization dedicated solely to women's rights. It is a national leader in developing and implementing litigation, advocacy, and public education strategies to open and expand opportunities for women, and to ensure that all women can build safe and economically secure lives for themselves and their families. Among its many and historic contributions to the advancement of women's rights, Legal Momentum was instrumental in the passage of the Violence Against Women Act (VAWA) and the Freedom of Access to Clinic Entrances Act (FACE).

---

[1] The Census Bureau's report of key poverty statistics for 2010 is included in *Income, Poverty, and Health Insurance Coverage in the United States: 2010*, U.S. Census Bureau, P60-239 (2011). This report is available at http://www.census.gov/prod/2011pubs/p60-239.pdf.

[2] Detailed Census poverty data for 2010 is available at http://www.census.gov/hhes/www/cpstables/032011/pov/toc.htm.

[3] For child care expense data, see U.S. Census Bureau, *Table 6 Average Weekly Child Care Expenditures of Families with Employed Mothers that Make Payments, by Age Groups and Selected Characteristics: Summer 2006*, available at http://www.census.gov/population/www/socdemo/child/tables-2006.html.

[4] Boushey & Gunderson, *When Work Just Isn't Enough*, EPI Briefing Paper (June 2001), available at http://www.epinet.org/briefingpapers/hardshipsbp.pdf.

[5] United States Department of Agriculture, *Household Food Security in the United States 2009* (2010), at Table 2, available at http://www.ers.usda.gov/Publications/ERR108/ERR108.pdf.

[6] Pressman, *Explaining the Gender Poverty Gap in Developed and Transitional Economies*, Luxembourg Income Study Working Paper No. 243 (Sept. 2000), available at http://www.lisproject.org/publications/liswps/243.pdf.

[7] Pamala Wiepking & Ineke Maas, *Gender Differences In Poverty: A Cross-National Research*, Luxembourg Income Study Working Paper No. 389 (Oct.. 2004). In six of these countries, single men actually had somewhat higher poverty rates than single women.

[8] Legal Momentum, *Poverty Rates for Single Mothers Are Higher in the U.S. than in Other High-Income Countries* (2011), available at http://www.legalmomentum.org/our-work/women-and-poverty/resources--publications/single-mothers-poverty-higher-us.pdf.

[9] Mia Hakovirta, *The Income Sources Of Single Parents: A Comparative Analysis*, Luxembourg Income Study Working Paper No. 282 (Nov. 2001), available at http://www.lisproject.org/publications/liswps/282.pdf.

[10] Timothy Smeeding, *Poor People in Rich Nations: The United States in Comparative Perspective*, Luxembourg Income Study Working Paper No. 419 (Oct. 2005), available at http://www.lisproject.org/publications/liswps/419.pdf.

[11] Timothy Smeeding, *Public Policy and Economic Inequality: The United States in Comparative Perspective*, Luxembourg Income Study Working Paper No. 367 (Feb. 2005), available at http://www.lisproject.org/publications/liswps/367.pdf.

[12] Jane Waldfogel, "What Other Nations Do: International Policies Toward Parental Leave and Child Care," *The Future of Children* 11(4): 99–111 (2001), available at http://www.futureofchildren.org/information2826/information_show.htm?doc_id=79378.

1/23/2015    MPI: As Many as 3.7 Million Unauthorized Immigrants Could Get Relief from Deportation under Anticipated New Deferred Action Program | migrationpo…

Case 1:14-cv-00254 Document 127 Filed on 01/30/15 in TXSD Page 873 of 879



MENU

Like ·    Tweet    Share

Home » Newsroom

PRESS RELEASE | THURSDAY, NOVEMBER 20, 2014

# MPI: As Many as 3.7 Million Unauthorized Immigrants Could Get Relief from Deportation under Anticipated New Deferred Action Program

## With Existing DACA Program Included, Anticipated Actions Could Benefit More than 5.2 Million in Total — Nearly Half of U.S. Unauthorized Population

WASHINGTON — As many as 3.7 million unauthorized immigrants who are parents of U.S. citizens or legal permanent residents could apply for temporary relief from deportation under the new deferred action program that President Obama is expected to unveil this week, the Migration Policy Institute (MPI) estimates. In addition, widespread reports of apparently imminent changes to the Deferred Action for Childhood Arrivals (DACA) program — which has been in place since 2012 and has provided relief from deportation to more than 580,000 young unauthorized immigrants — could expand the immediately eligible DACA population by 290,000, bringing it to close to 1.5 million.

In total, MPI estimates the anticipated new deferred action program and expanded DACA initiative could benefit as many as 5.2 million people — nearly half of the 11.4 million unauthorized immigrants living in the United States (see table below for national and top state breakdowns).

"The president's anticipated actions could have a significant effect on the lives of millions of unauthorized immigrants, improving job and educational prospects, the ability to apply for driver's licenses and expanding engagement in their communities," said MPI President Michael Fix.

Under the anticipated announcement, 3.7 million parents of U.S. citizens or legal permanent residents (aka green card holders) could apply for a grant of relief from deportation and work authorization under a new deferred action program, provided they have lived in the United States for five years or more. The potential

### U.S. & State Estimates
To get estimates for the United States, 41 states, and the District of Columbia, click here   .

### County Estimates
To get estimates for the 94 counties with the largest unauthorized populations, click here   .

Case 1:14-cv-00254 Document 127 Filed on 01/30/15 in TXSD Page 874 of 879

DACA changes would reportedly eliminate the age cutoff (currently applicants must be under age 31) and move forward DACA's U.S. residency requirement from 2007 to 2010.

## MPI NATIONAL ESTIMATES OF EXECUTIVE ACTION IMPACTS

MPI has produced the following estimates of those potentially eligible for the new and expanded deferred action programs under the anticipated actions, using an innovative methodology to estimate the size and characteristics of the unauthorized immigrant population based on analysis of U.S. Census Bureau data from the 2008-2012 American Community Survey (ACS) and the 2008 Survey of Income Program Participation (SIPP).

| Populations Potentially Eligible to Apply for Anticipated New Deferred Action Program | Estimate |
|---|---|
| Parents of U.S. citizens with 5+ years of U.S. residence | 3.53 million |
| Parents of legal permanent residents with 5+ years of U.S. residence | 180,000 |
| Subtotal for anticipated new deferred action program | 3.71 million |
| New Populations Potentially Eligible under Anticipated DACA Program Expansions | Estimate |
| Eliminating the age cutoff (currently applicants must be under age 31) | 205,000 |
| Advancing the U.S. residency requirement (to 2010 from current 2007) | 85,000 |
| Subtotal for populations newly eligible under anticipated expanded DACA program | 290,000 |
| Immediately eligible for the current DACA program | 1.2 million |
| Subtotal for revised DACA program with anticipated changes | 1.5 million |
| Total | 5.2 million |

*Notes:* Because a certain number of individuals could appear in more than one category, these estimates model these overlaps. The estimates for the new deferred action program for parents exclude individuals eligible for DACA.

*Sources:* For DACA estimates: Migration Policy Institute (MPI) analysis of U.S. Census Bureau data from the 2012 American Community Survey (ACS) and the 2008 Survey of Income and Program Participation (SIPP) by James Bachmeier of Temple University and Jennifer Van Hook of The Pennsylvania State University, Population Research Institute. For estimates of the new deferred action program for parents, sources are MPI analysis of 2008-2012 ACS data, pooled, and 2008 SIPP data by Bachmeier and Van Hook. For more detail on the methodology, see *DACA at the Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action* (Washington, DC: MPI, 2014).

## SELECTED STATE ESTIMATES OF EXECUTIVE ACTION IMPACTS

MPI has also developed estimates of the populations potentially eligible for the anticipated deferred action program for key states. The top 20 states are presented here; **for data on the 41 states that MPI was able to estimate, see: www.migrationpolicy.org/sites/default/files/datahub/US-State-Estimates-u…**

| State | Parents Eligible for Anticipated New Deferred Action Program | Immediately Eligible for Anticipated Expanded DACA Program | Total Eligible for Anticipated Deferred Action and DACA Programs |
|---|---|---|---|
| **United States** | 3,712,000 | 1,489,000 | 5,201,000 |
| California | 1,116,000 | 456,000 | 1,572,000 |
| Texas | 560,000 | 183,000 | 743,000 |
| New York | 234,000 | 104,000 | 338,000 |
| Illinois | 199,000 | 81,000 | 280,000 |
| Florida | 163,000 | 90,000 | 253,000 |
| New Jersey | 137,000 | 67,000 | 204,000 |
| Georgia | 122,000 | 48,000 | 170,000 |
| North Carolina | 117,000 | 38,000 | 155,000 |
| Arizona | 97,000 | 39,000 | 136,000 |
| Washington | 77,000 | 28,000 | 105,000 |
| Virginia | 62,000 | 30,000 | 92,000 |
| Colorado | 67,000 | 23,000 | 90,000 |
| Maryland | 55,000 | 25,000 | 80,000 |
| Nevada | 49,000 | 18,000 | 67,000 |
| Massachusetts | 40,000 | 25,000 | 65,000 |
| Oregon | 49,000 | 15,000 | 64,000 |
| Pennsylvania | 35,000 | 20,000 | 55,000 |
| Tennessee | 38,000 | 12,000 | 50,000 |
| Utah | 36,000 | 12,000 | 48,000 |
| Michigan | 32,000 | 13,000 | 45,000 |

*Sources*: For DACA estimates: MPI analysis of U.S. Census Bureau data from the 2012 ACS and the 2008 SIPP by Bachmeier and Van Hook. For estimates of the new deferred action program for parents: MPI analysis of 2008-2012 ACS data, pooled, and 2008 SIPP data by Bachmeier and Van Hook.

The DACA experience makes clear that not all potentially eligible applicants will apply. MPI has estimated that as of July 2014, 55 percent of those who met the DACA criteria had applied for relief. Application costs, fear of self-identifying as unauthorized or potentially exposing other unauthorized relatives to government scrutiny and lack of information about the program and its temporary nature were among the barriers.

For more on unauthorized immigrant populations nationally and by state, including size of the overall population, countries of origin, top languages and more, check out a unique new MPI data tool with detailed profiles for the U.S., 41 states and the District of Columbia: http://migrationpolicy.org/programs/us-

immigration-policy-program-data-hub/unauthorized-immigrant-population-profiles.

# # #

*The Migration Policy Institute (MPI) is an independent, non-partisan, non-profit think tank in Washington, DC dedicated to analysis of the movement of people worldwide. MPI provides analysis, development and evaluation of migration and refugee policies at the local, national and international levels. For more on MPI, please visit* www.migrationpolicy.org.

SUBSCRIBE FOR UPDATES

## Media Contact

Michelle Mittelstadt
202-266-1910
mmittelstadt@migrationpolicy.org



A872



A873



1400 16th St NW, Suite 300, Washington, DC 20036
ph. 202-266-1940 | fax. 202-266-1900

     

Copyright © 2001-2015 Migration Policy Institute. All rights reserved.

CONTACT  |  SITE MAP  |  EXPERTS  |  SIGN UP  |  SUPPORT

A874