# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

_____

STATE OF TEXAS, *et al.*

           Plaintiffs,

      v.

UNITED STATES OF AMERICA, *et al.*

          Defendants.
_____

No. 1:14-CV-254


## DEFENDANTS' SUR-REPLY IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..................................................... 1

ARGUMENT ........................................................................................................................... 3

I.     Plaintiffs Fail to Demonstrate Standing ........................................................................ 3

     A.     Plaintiffs Cannot Demonstrate Article III Injury on the Basis of Benefits They Choose to Provide .................................................................................... 4

     B.     Plaintiffs' Theory of Harm from Increased Immigration Fails as Inherently Speculative and Attenuated ....................................................................... 8

          1.     Plaintiffs Have Not Demonstrated a "Certainly Impending" Injury .......... 8

          2.     Plaintiffs Have Not Demonstrated Any Injury Traceable to Defendants or Capable of Redress by an Order of This Court ................ 10

          3.     *Massachusetts v. EPA* Does Not Support Plaintiffs' Theory of Standing ................................................................................................ 11

     C.     Plaintiffs Lack *Parens Patriae* Standing ........................................................ 12

     D.     Further Considerations Compel Dismissal of Plaintiffs' Claims ......................... 15

          1.     Plaintiffs' Claims Amount to a Generalized Policy Grievance ............... 15

          2.     Plaintiffs Are Not Within the Zone of Interests of the Relevant Provisions of the Immigration Laws ....................................................... 16

II.     Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits ..................... 17

     A.     *Youngstown* Does Not Establish an Independent Cause of Action Against the Executive Under the Take Care Clause and, In Any Event, Does Not Support Plaintiffs' Claims ................................................................................... 18

     B.     The Secretary's Guidance Regarding the Exercise of Deferred Action for Certain Low Priority Aliens Is an Unreviewable Form of Prosecutorial Discretion Under *Heckler v. Chaney* .................................................................. 20

          1.     *Chaney* Applies Because Plaintiffs Do Not Identify Any Statutory Provision Limiting the Exercise of Prosecutorial Discretion Through Deferred Action ......................................................................... 21

          2.     The Secretary Has Exercised His Statutory Responsibilities by Providing a Framework for the Exercise of Prosecutorial Discretion ............................................................................................. 25

3.      The Secretary's 2014 Deferred Action Guidance Appropriately Reflects the Exercise of the Agency's Prosecutorial Discretion at Several Different Levels ............................................................ 30

4.      Work Authorization for Deferred Action Is Based on Longstanding Legal Authority ...................................................................... 35

C.      Even If It Were Reviewable, the Deferred Action Guidance Must Be Upheld as a Valid Exercise of Discretion Under the APA ................................. 38

D.      Plaintiffs Fail to State a Procedural Challenge Under the APA to the Deferred Action Guidance ...................................................................... 39

III.    Plaintiffs Have Failed To Establish Irreparable Harm or That the Balance of the Harms Favor an Injunction ...................................................................... 43

CONCLUSION ............................................................................................ 45

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Adams v. Richardson,*
   480 F.2d 1159 (D.C. Cir. 1973) .................................................................... 25, 26

*Air Courier Conference v. Am. Postal Workers Union,*
   498 U.S. 517 (1991) ................................................................................... 16

*Ala. Nursing Home Ass'n v. Harris,*
   617 F.2d 388 (5th Cir.1980) ........................................................................ 39

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
   458 U.S. 592 (1982) ................................................................................... 13

*Allen v. Wright,*
   468 U.S. 737 (1984) ................................................................................ 9, 18

*Appalachian Power Co. v. E.P.A.,*
   208 F.3d 1015 (D.C. Cir. 2000) ................................................................ 40, 42

*Arizona Dream Act Coalition v. Brewer,*
   757 F.3d 1053 (9th Cir. 2014) ............................................................... 7, 24, 36

*Arizona DREAM Act Coalition v. Brewer,*
   No. 12-2546, 2015 WL 300376 (D. Ariz. Jan. 22, 2015) .......................................... 7

*Arizona v. United States,*
   132 S. Ct. 2492 (2012) ....................................................................... <u>passim</u>

*Arpaio v. Obama,*
   27 F. Supp. 3d 185 (D.D.C. 2014) .................................................................. 4

*Ass'n of Civilian Technicians, Inc. v. Fed. Labor Relations Auth.,*
   283 F.3d 339 (D.C. Cir. 2002) ..................................................................... 26

*Bartholomew v. United States,*
   740 F.2d 526 (7th Cir. 1984) ...................................................................... 23

*Block v. SEC,*
   50 F.3d 1078 (D.C. Cir. 1995) ..................................................................... 26

*Camp v. Pitts,*
   411 U.S. 138 (1973) ................................................................................. 32

*Chamber of Commerce v. U.S. Dep't of Labor*,
   174 F.3d 206 (D.C. Cir. 1999) .............................................................. 43

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979) ........................................................................... 40

*City of Seabrook v. Costle*,
   659 F.2d 1371 (5th Cir. 1981) ............................................................ 23

*Clapper v. Amnesty Int'l USA*,
   133 S. Ct. 1138 (2013) ......................................................................... 9

*Clarke v. Sec. Indus. Ass'n*,
   479 U.S. 388 (1987) ........................................................................... 16

*Commodity Futures Trading Comm'n v. Schor*,
   478 U.S. 833 (1986) ........................................................................... 37

*Crane v. Napolitano*,
   920 F. Supp. 2d 724 (N.D. Tex. 2013) ........................................ <u>passim</u>

*Cutler v. Hayes*,
   818 F.2d 879 (D.C. Cir. 1987) ............................................................ 26

*Dalton v. Specter*,
   511 U.S. 462 (1994) ........................................................................... 19

*Dhuka v. Holder*,
   716 F.3d 149 (5th Cir. 2013) ............................................................ 25

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ........................................................................... 38

*Federation for American Immigration Reform, Inc. v. Reno*,
   93 F.3d 897 (D.C. Cir. 1996) ............................................................ 17

*Florida v. Mellon*,
   273 U.S. 12 (1927) ............................................................................. 12

*Florida ex rel. Cobb v. U.S. Dep't of Justice*,
   No. 5:10-cv-118, 2010 WL 3211992 (N.D. Fla. Aug. 12, 2010) ............ 13

*Florida v. U.S. Dep't of Justice*,
   440 F. App'x 860 (11th Cir. 2011) .................................................... 13

*Frank Krasner Enters., Ltd. v. Montgomery County*,
   401 F.3d 230 (4th Cir. 2005) ........................................................ 10

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) .................................................................. 18

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010) .................................................................. 18

*Gillis v. U.S. Dep't of Health & Human Servs.*,
   759 F.2d 565 (6th Cir. 1985) ........................................................ 26

*Guardian Fed. Sav. and Loan Ass'n v. Fed. Sav. and Loan Ins. Corp.*,
   589 F.2d 658 (D.C. Cir. 1978) ...................................................... 42

*Hartigan v. Cheney*,
   726 F. Supp. 219 (C.D. Ill. 1989) .................................................. 17

*Harvard Pilgrim Health Care v. Thompson*,
   318 F. Supp. 2d 1 (D.R.I. 2004) .................................................... 32

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ......................................................... 2, 20, 27

*Hernandez v. Reno*,
   91 F.3d 776 (5th Cir. 1996) .......................................................... 4

*Holder v. Martinez Gutierrez*,
   132 S. Ct. 2011 (2012) .............................................................. 21

*Iowa ex rel. Miller v. Block*,
   771 F.2d 347 (8th Cir. 1985) ........................................................ 13

*Lane v. Holder*,
   703 F.3d 668 (4th Cir. 2012) ......................................................... 4

*League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*,
   659 F.3d 421 (5th Cir. 2011) ......................................................... 8

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ............................................................. 40, 42

*Linda R.S. v. Richard D.*,
   410 U.S. 614 (1973) .......................................................... 3, 9, 12

*Lopez v. Davis,*
  531 U.S. 230 (2001) ............................................................................................ 30

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ................................................................................ 10, 11, 12

*Martinez v. Mukasey,*
  519 F.3d 532 (5th Cir. 2008) ............................................................................. 23

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ...................................................................... 11, 12, 13, 17

*Massachusetts v. Mellon,*
  262 U.S. 447 (1923) .................................................................................... 12, 13

*Metropolitan Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.,*
  501 U.S. 252 (1991) ............................................................................................ 29

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .............................................................................................. 39

*Nat'l Ass'n of Broadcasters v. FCC.,*
  569 F.3d 416 (D.C. Cir. 2009) ......................................................................... 43

*Nat'l Broadcasting Co. v. United States,*
  319 U.S. 190 (1943) ............................................................................................ 39

*Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.,*
  522 U.S. 479 (1998) .................................................................................... 16, 17

*Oklahoma ex rel. Pruitt v. Sebelius,*
  No. 11-30, 2013 WL 4052610 (E.D. Okla. Aug. 12, 2013) .................................. 13

*Pennsylvania ex rel. Shapp v. Kleppe,*
  533 F.2d 668 (D.C. Cir. 1976) ................................................................. 3, 8, 13, 16

*Pennsylvania v. New Jersey,*
  426 U.S. 660 (1976) ....................................................................................... 5, 6

*Perales v. Casillas,*
  903 F.2d 1043 (5th Cir. 1990) ............................................................... 20, 37, 38

*Prof'ls & Patients for Customized Care v. Shalala,*
  56 F.3d 592 (5th Cir. 1995) ...................................................................... 40, 41, 42

vi

*Pub. Citizen, Inc. v. EPA*,
    343 F.3d 449 (5th Cir. 2003) ................................................... 20

*Puerto Rico by Hernandez Colon v. Walters*,
    660 F. Supp. 1230 (D.P.R. 1987)............................................... 14

*Red Lion Broad. Co. v. FCC*,
    395 U.S. 367 (1969)................................................................... 29

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    ("AAADC"), 525 U.S. 471 (1999)........................................ 1, 19

*Russell v. Law Enforcement Assistance Admin.*,
    637 F.2d 354 (5th Cir. 1981) ..................................................... 22

*Safari Club Int'l v. Salazar*,
    852 F. Supp. 2d 102 (D.D.C. 2012) .......................................... 44

*Seafarers Int'l Union of N. Am. v. U.S.*,
    891 F. Supp. 641 (D.D.C. 1995) ............................................... 32

*Sierra Club v. Larson*,
    882 F.2d 128 (4th Cir. 1989) ..................................................... 26

*Sierra Club v. Morton*,
    405 U.S. 727 (1972)................................................................... 16

*Sierra Club v. Yeutter*,
    911 F.2d 1405 (10th Cir. 1990) ................................................. 26

*Star Satellite, Inc. v. City of Biloxi*,
    779 F. 2d 1074 (5th Cir. 1986) .................................................. 44

*Sure-Tan, Inc. v. NLRB*,
    467 U.S. 883 (1984)..................................................................... 3

*Tel. and Data Sys., Inc. v. FCC*,
    19 F.3d 42 (D.C. Cir. 1994) ...................................................... 14

*Texas v. ICC*,
    258 U.S. 158 (1922)..................................................................... 7

*Texas v. United States*,
    106 F.3d 661 (5th Cir. 1997) ............................................ passim

*Texas v. United States*,
  497 F.3d 491 (5th Cir. 2007) ........................................................................ 5

*Town of Castle Rock v. Gonzales*,
  545 U.S. 748 (2005) .................................................................................... 22

*Traux v. Raich*,
  239 U.S. 33 (1915) ....................................................................................... 8

*U.S. Postal Serv. v. Gregory*,
  534 U.S. 1 (2001) ........................................................................................ 31

*United Transp. Union v. ICC*,
  891 F.2d 908 (D.C. Cir. 1989) ................................................................... 10

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State Inc.*,
  454 U.S. 464 (1982) .................................................................................... 15

*Virginia ex rel. Cuccinelli v. Sebelius*,
  656 F.3d 253 (4th Cir. 2011) ................................................................ 12, 16

*Wash. Legal Found. v. Alexander*,
  984 F.2d 483 (D.C. Cir. 1993) ................................................................... 26

*Whitman v. Am. Trucking Ass'ns, Inc.*,
  531 U.S. 457 (2001) .................................................................................... 39

*Wyoming ex rel. Sullivan v. Lujan*,
  969 F.2d 877 (10th Cir. 1992) .................................................................... 15

*Wyoming v. U.S. Dep't of the Interior*,
  674 F.3d 1220 (10th Cir. 2012) .................................................................. 13

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ............................................................................ 2, 18, 19

## STATUTES

5 U.S.C. § 553 ........................................................................................... 39, 40

5 U.S.C. § 553(b)(3)(A) .................................................................................. 39

5 U.S.C. § 701(a)(2) ................................................................................. 20, 40

5 U.S.C. § 702 ................................................................................................ 16

6 U.S.C. § 202(5) ................................................................................ 21, 26, 30

8 U.S.C. § 1101(a)(13)(A) ............................................................................. 23

8 U.S.C. § 1103(a) .................................................................................................. 21

8 U.S.C. § 1151(a)(1) ............................................................................................. 24

8 U.S.C. § 1151(a)(2)(A)(i) .................................................................................... 24

8 U.S.C. § 1154(a)(1)(D)(i)(II) .............................................................................. 37

8 U.S.C. § 1154(a)(1)(D)(i)(IV) ............................................................................ 37

8 U.S.C. § 1158(d)(2) ............................................................................................. 36

8 U.S.C. § 1182(a)(9)(B) ........................................................................................ 24

8 U.S.C. § 1182(a)(9)(B)(v) ................................................................................... 21

8 U.S.C. § 1225 ...................................................................................................... 23

8 U.S.C. § 1225(a)(1) ............................................................................................. 22

8 U.S.C. § 1225(b)(2)(A) .................................................................................. 22, 23

8 U.S.C. § 1226(a)(3) ............................................................................................. 36

8 U.S.C. § 1229b(b) ............................................................................................... 25

8 U.S.C. § 1231(a)(7) ............................................................................................. 36

8 U.S.C. § 1324a(b)(1)(C)(ii) ................................................................................ 36

8 U.S.C. § 1324a(h)(l) ............................................................................................ 36

8 U.S.C. § 1324a(h)(3) ............................................................................... 35, 36, 37, 38

8 U.S.C. § 1356(m) ................................................................................................ 27

29 U.S.C. § 218c .................................................................................................... 14

42 U.S.C. § 7521(a)(1) ........................................................................................... 17

Immigration Act of 1990,
   Pub. L. No. 101-649, 104 Stat. 4978 ................................................................ 29

Immigration and Nationality Act,
   H.R. Rep. No. 82-1365 (1952), reprinted in 1952 U.S.C.C.A.N. 1653 ............... 21

Immigration Reform and Control Act of 1986 ("IRCA"),
   Pub. L. No. 99-603, 100 Stat. 3359 .................................................................. 37

Patient Protection and Affordable Care Act,
   Pub. L. No. 111-148, 124 Stat. 119 (2010) ....................................................... 14

National Defense Authorization Act for Fiscal Year 2004,
   Pub. L. No. 108-136, 117 Stat. 1392 (2003) ................................................ 24, 36

USA PATRIOT Act of 2001,
   Pub. L. No. 107-56, 115 Stat. 272 ....................................................................... 24, 36

## REGULATIONS

8 C.F.R. § 103.7(b)(1)(i)(C) ........................................................................................ 27

8 C.F.R. § 103.7(b)(1)(i)(HH) ..................................................................................... 27

8 C.F.R. § 274a.12(c) ................................................................................................... 38

8 C.F.R. § 274a.12(c)(14) ............................................................................................ 36


*Employment Authorization to Aliens in the United States*,
   46 Fed. Reg. 25079 (May 5, 1981) ............................................................................ 36

*Employment Authorization; Classes of Aliens Eligible*,
   52 Fed. Reg. 46092 (Dec. 4, 1987) ............................................................................ 37

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The Executive Branch is constitutionally and statutorily vested with broad discretion to enforce the Nation's immigration laws. *See Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012). The 2014 Deferred Action Guidance at issue in this case, which sets forth general parameters for the exercise of discretion and provides for such exercise on a case-by-case basis, responds to compelling enforcement needs and falls within the recognized scope of that discretion. *See Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AAADC*"), 525 U.S. 471, 483-84 (1999). Plaintiffs' claims to the contrary are based on rhetoric, not law. Plaintiffs' Reply and presentation at oral argument confirm that their motion for the extraordinary relief of preliminary injunction fails as a matter of law – both on Article III standing and on the merits.

As an initial matter, Plaintiffs lack standing – and thus necessarily lack the irreparable harm that must be shown for a preliminary injunction. Plaintiffs' submission of voluminous factual materials with their Reply does nothing to cure the inherent legal defects in their theories of standing. Key among these defects is that their alleged and speculative harm based on driver's licensing is the result of state policy choices, not the challenged federal policies, and therefore is not an actionable Article III injury traceable to Defendants. Lacking a non-speculative injury, Plaintiffs – both in their Reply and at argument – rested significantly on the claim that they may sue the federal government to protect their citizens on a *parens patriae* theory. That is simply incorrect as a matter of law. At base, the States' grievance is a generalized one about the vague and indirect effects of a federal policy they oppose. As a matter of law, that is not a proper basis for standing, particularly in the immigration context, where the Federal Government has plenary and exclusive authority. It thus necessarily fails as a predicate for the irreparable harm that Plaintiffs must prove to obtain the relief they seek.

Although the lack of standing and irreparable harm are dispositive, Plaintiffs' claims are

not reviewable on the merits and in any event are unfounded.  Despite mentioning *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), only in passing in their opening brief, Plaintiffs have made clear through their Reply and at oral argument that their purported constitutional claim hinges fully on that case.  But *Youngstown* is inapposite and fails to support Plaintiffs' claim.  In *Youngstown*, the Executive concededly acted outside statutorily-delegated authority and therefore sought to justify its actions by reference to the Take Care Clause.  By contrast, the Secretary of Homeland Security's actions here were based on authority delegated to him by Congress pursuant to statutes that require him to prioritize the enforcement of immigration laws, consistent with the scarce resources provided by Congress.  Plaintiffs' claim is therefore a challenge to agency action governed by the Administrative Procedure Act ("APA").  And that claim fails.  As an initial matter, Plaintiffs are not within the zone of interests of the Immigration and Nationality Act ("INA") and thus cannot bring an APA claim.  Moreover, because the Secretary is exercising prosecutorial discretion to enforce federal immigration laws using limited available resources, and no statute precludes the exercise of that discretion, *Heckler v. Chaney*, 470 U.S. 821 (1985), clearly forecloses judicial review.  Plaintiffs' procedural challenge under the APA also fails because the Guidance is a general statement of policy that is not subject to the APA's notice-and-comment requirements.

The policy challenged by Plaintiffs is part of an integrated and comprehensive effort to most effectively deploy existing resources to enforce the Nation's immigration laws.  As reflected in the concurrently-issued memoranda setting forth the Department's enforcement priorities, the Deferred Action Guidance is part and parcel of the Secretary's judgment on how best to focus on the removal of priority threats to the Nation and to secure the Nation's borders in light of indisputably limited resources.  Plaintiffs' novel and expansive arguments concerning

standing, reviewability, and the merits are legally insufficient and would have no logical end. Federal control over immigration policy would be subject to challenge by any State whenever it might disagree with such policy, despite the plenary power of the Federal Government over immigration.  Having failed to satisfy any of the requirements for a preliminary injunction, Plaintiffs' motion should be denied.

## ARGUMENT

### I.      Plaintiffs Fail to Demonstrate Standing

The Plaintiff States have no legally cognizable interest in the enforcement or non-enforcement of the immigration laws against particular aliens (here, individuals who may be considered for deferred action under the challenged guidance), and thus they lack Article III standing to pursue this case.  It is a fundamental principle of American jurisprudence that a plaintiff "lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *see also* Defs.' Opp. to Pls.' Mot. for Prelim. Inj. ("Defs.' Opp.") at 15 [ECF No. 38].  And the Supreme Court has specifically held that "private persons . . . have no judicially cognizable interest in procuring enforcement of the immigration laws by the INS [now DHS]." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984).  Nor do the Plaintiff States.  Under the constitutional structure, the Federal Government has exclusive authority over immigration. *Arizona*, 132 S. Ct. at 2499.  In addition, under settled case law that recognizes the need to avoid unnecessary "state interference with the exercise of federal powers," States may not invoke the jurisdiction of the federal courts on the basis of the kind of indirect "economic repercussions of . . . federal policies" that Plaintiffs seek to rely on here.  *Pennsylvania ex rel. Shapp v. Kleppe*, 533 F.2d 668, 672, 678 (D.C. Cir. 1976); *see also* Defs.' Opp. at 23, 29.

In their Reply, Plaintiffs make no effort to address these first principles, or deal with the three most closely analogous standing cases, *see Arpaio v. Obama*, 27 F. Supp. 3d 185 (D.D.C. 2014), *appeal pending*, No. 14-05325 (D.C. Cir.); *Crane v. Napolitano*, 920 F. Supp. 2d 724, 745-46 (N.D. Tex. 2013), *appeal pending*, No. 14-10049 (5th Cir.) (oral arg. to be heard Feb. 3, 2015); *Texas v. United States*, No. B-94-228, at *7 (S.D. Tex. Aug. 7, 1995), *aff'd on other grounds*, 106 F.3d 661 (5th Cir. 1997).  Relying on extensive precedent, all three of these cases rejected similar attempts by state and local governments to challenge federal immigration policies based on predictions about the indirect effects of those policies on the flow of undocumented immigrants and the public fisc.  Plaintiffs' voluminous factual materials, submitted for the first time with Plaintiffs' Reply, are an attempt to obscure the same legal impediments that preclude standing for Plaintiffs in the present case.

## A.    Plaintiffs Cannot Demonstrate Article III Injury on the Basis of Benefits They Choose to Provide

Only three of the Plaintiff States – Texas, Wisconsin, and Indiana – have filed declarations purporting to show that the 2014 Deferred Action Guidance will impose costs on the State as a result of "state licensing programs."[1]  *See* Pls.' Reply in Supp. of Mot. for Prelim. Inj. ("Pls.' Reply") at 42 [ECF No. 64].  And even then, their purported showing confirms the fatal flaw in Plaintiffs' theory:  the States' obligation to provide licenses and other benefits to future DACA and DAPA recipients, and any costs attendant thereto, flow directly from these States' policy choices.  *See, e.g.*, Snemis Decl. ¶ 13 (Pls.' Ex. 30).  It is well-established that "injuries to

---

[1] Contrary to Plaintiffs' suggestion, no State can be excused from demonstrating standing in this case. Each party seeking separate relief must itself demonstrate an independent basis for standing.  *See LULAC v. City of Boerne*, 659 F.3d 421, 428 (5th Cir. 2011).  And each State necessarily seeks separate relief here, because an injunction may only be granted (if at all) to the extent necessary to remedy the harm *to the party seeking it*.  *See Hernandez v. Reno*, 91 F.3d 776, 781 (5th Cir. 1996) (modifying nationwide injunction to apply only to plaintiff).

[a State's] fisc[] . . .[that] result[] from decisions by [the] state legislatures" cannot form the basis of Article III standing.[2]  *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (concluding that Pennsylvania did not have standing to challenge laws of New Jersey based on allegations of harm tied to interplay between the two states' laws).  Indeed, it would be anathema to the principles of federalism to deem Defendants responsible for consequences that flow directly from state legislative choices.

Then-Governor Rick Perry conceded this point in a letter to then-Attorney General Greg Abbott shortly after the announcement of the 2012 DACA initiative.  Governor Perry clearly stated:  "In Texas, the legislature has passed laws that reflect the policy choices that they believe are right for Texas," and the Federal Government's deferred action policy "does not undermine or change our state laws" or "change our obligations . . . to determine a person's eligibility for state and local public benefits."  *See* Ltr. from Perry to Abbott (Aug. 16, 2012) (Ex. 34).  Not only do Texas, Wisconsin, and Indiana choose to provide driver's licenses to deferred action recipients, but they also choose to subsidize those licenses with state funds – a decision that presumably reflects the States' view that the public safety benefits gained by providing licenses outweigh the cost.  *Cf.* Amicus Br. of Major Cities Chiefs Ass'n *et al.* at 7-9 (explaining that driver's licenses promote road safety and assist law enforcement efforts) [ECF No. 83-1].  Thus, to the extent Plaintiff States "will lose money" from their issuance of licenses to future DACA and DAPA recipients, Pls.' Reply at 43, it is money that those states have chosen to spend.

---

[2] Plaintiffs err when they suggest that *Texas v. United States*, 497 F.3d 491, 496-97 (5th Cir. 2007), supports their view that their alleged injuries are not self-inflicted.  *See* Pls.' Reply at 47.  In that case, unlike this one, Texas challenged a policy that purported to *directly* regulate its conduct by compelling it to participate in mediation.  *See Texas*, 497 F.3d at 497-98 (noting that Texas was the "object" of the regulation at issue).

Plaintiffs also contend that the "obligation to change state law" in order to "avoid giving licenses to DHS Directive beneficiaries" itself states an Article III injury.  Pls.' Reply at 47. That misstates the choice facing these States.  The Guidance does not require the Plaintiffs to do anything with respect to these laws.  And a State's decision to change its law in response to the policy choices of another sovereign does not give rise to Article III standing.  *See Pennsylvania*, 426 U.S. at 664 (finding that standing did not lie where "nothing prevent[ed] Pennsylvania from withdrawing" the state law that reduced its revenues).  Were it otherwise, States would have virtually limitless ability to hale the Federal Government (or another State) into court and demand preliminary injunctive relief whenever they disagreed with a change in federal policy that they claimed would make it desirable to change state law.

Plaintiffs try to create the appearance of coercion by Defendants – notwithstanding the fact that Texas, Wisconsin, and Indiana have freely opted to provide driver's licenses to deferred action recipients – by noting that the United States submitted an amicus brief in *Arizona Dream Act Coalition v. Brewer*, in which it expressed the view that federal law preempted Arizona's policy of refusing to accept federal Employment Authorization Documents ("EADs") from deferred action recipients while accepting them from all other aliens.  *See* Amicus Br. of United States in Opp'n to Reh'g En Banc, No. 13-16248 (9th Cir.) (filed Sept. 30, 2014) (Pls.' Ex. 3). This effort is a red herring.  The United States explained in that amicus brief that Arizona's driver's licensing scheme was preempted not because it denied licenses to deferred action recipients, but because it relied on "new alien classifications not supported by federal law" – in that case, a redefinition of which EADs were to be regarded by the State as evidence of *federal* authorization.  *Id.* at 11.  The government's position thus turned on the particulars of that state scheme.  As a matter of preemption, neither the 2014 Deferred Action Guidance nor any federal

statute compels States to provide driver's licenses to DACA and DAPA recipients, so long as the States base eligibility on existing federal alien classifications – such as deferred action recipients, or other categories of aliens – rather than creating new state-law classifications of aliens.

Plaintiffs also contend that Arizona, Idaho, and Montana are injured because they are bound by the Ninth Circuit's decision in *Arizona Dream Act Coalition*, which ordered entry of a preliminarily injunction of Arizona's policy of selectively accepting EADs.[3]  757 F.3d 1053 (9th Cir. 2014).  Although none of those three States submitted declarations alleging harm in this case, such alleged harms are in any event insufficient to establish standing for the reasons stated above.  Like the 2014 Deferred Action Guidance, the decisions in *Arizona Dream Act Coalition* do not require States to provide driver's licenses to deferred action recipients.  *See Arizona Dream Act Coalition v. Brewer*, No. 12-2546, 2015 WL 300376, at *9 (D. Ariz. Jan. 22, 2015) ("The Court is not saying that the Constitution requires the State of Arizona to grant driver's licenses to all noncitizens.").  And those three States still retain the choice to decline to subsidize any state licenses provided.  *Cf. Texas*, 106 F.3d at 666 (state expenditures on services for undocumented aliens, including those required by the Equal Protection Clause, "are not the result of federal coercion" nor legally attributable to the actions of federal immigration authorities).[4]

---

[3] The Ninth Circuit's finding of a likely Equal Protection violation was premised on the specific way that Arizona chose to structure its policy.  In particular, the court found that Arizona's selective acceptance of federal Employment Authorization Documents was an "attempt to distinguish between these noncitizens on the basis of an immigration classification that has no basis in federal law" and thus was not likely to survive even rational basis review.  757 F.3d at 1066.  On January 22, 2015, the district court entered a permanent injunction in the case on similar grounds.  *See Ariz. Dream Act Coal.*, No. 12-2546, 2015 WL 300376, at *8 (D. Ariz. Jan. 22, 2015).  In doing so, the district court also rejected Arizona's argument that DHS "lacked the authority to grant [DACA recipients] deferred status."  *See id*. at 6.

[4] Plaintiffs also attempt to repackage their claim of economic harm as one that amounts to an "affront to their sovereignty," Pls.' Reply at 48, but this effort gets them no closer to establishing an injury cognizable under Article III.  *See Texas v. ICC*, 258 U.S. 158, 162 (1922) (state's claim of infringement upon state sovereignty was merely "an abstract question of legislative power," not a justiciable case or controversy).  Plaintiffs "cannot have a quasi-sovereign interest" in creating their own alien classifications

B.    **Plaintiffs' Theory of Harm from Increased Immigration Fails as Inherently Speculative and Attenuated**

Plaintiffs' second theory of standing hypothesizes that the 2014 Deferred Action Guidance will increase the population of undocumented aliens in the Plaintiff States, leading them to expend additional funds on law enforcement and social services.  Defendants have explained that this theory is both inherently speculative and not traceable to the challenged conduct of Defendants, and nothing in Plaintiffs' Reply or oral argument presentation cures these defects.

1.    **Plaintiffs Have Not Demonstrated a "Certainly Impending" Injury**

Like the State of Mississippi, which was found to lack standing to challenge the 2012 DACA Memoranda by another district court in this State, Plaintiffs have failed to show that the costs associated with the presence of undocumented aliens will increase *at all* as a result of the 2014 Deferred Action Guidance.  *See Crane*, 920 F. Supp. 2d at 745-46.

The vast majority of the declarations submitted by state officials contend only that expenditures on law enforcement and social services "will increase *if* additional undocumented immigrants come to Texas."  Pls.' Reply at 53 (citing declarations) (emphasis added).  In an effort to cure this acknowledged uncertainty, Plaintiffs submit a declaration from a demographer employed by the State of Texas, who speculates that the 2014 Deferred Action Guidance will cause or incentivize greater numbers of undocumented aliens to enter and remain in the United States.  But Plaintiffs cannot satisfy the rigorous requirements of Article III with predictions about how third parties will respond to the supposed incentives created by prosecutorial enforcement policies.  *See Linda R.S.*, 410 U.S. at 619; *Allen v. Wright*, 468 U.S. 737, 758-59

---

for purposes of licensure statutes, "because the matter falls within the sovereignty of the Federal Government."  *Kleppe*, 533 F.2d at 677; *see also Traux v. Raich*, 239 U.S. 33, 42 (1915).

(1984).  And in any event, Plaintiffs' predictions are themselves uncertain and speculative, resting on hypothesized outcomes.  *See* Eschbach Decl. ¶ 5a (Pls.' Ex. 33) (DAPA "*may*" encourage undocumented immigrants to enter the country in the hope of getting benefits to which they are not actually entitled); *id.* ¶ 26 (it is "reasonable to *hypothesize*" that the 2012 DACA policy increased the size of the undocumented population); *id.* ¶ 28 (there is a "*theoretical*" basis to believe that the challenged policy will increase the unauthorized immigrant population) (emphasis added).  The speculative nature of Plaintiffs' theory of harm, though evident from the face of the Eschbach declaration, is further highlighted by the Declaration of Michael Hoefer, a technical expert on immigration statistics at USCIS's Office of Policy and Strategy, who explains that the predictions offered by Mr. Eschbach "rest on speculation and unsupported inferences . . . without sufficient data to support his conclusions."[5] *See* Hoefer Decl. ¶ 35.  Such speculation, regardless of whether plausible as a theoretical matter, falls well short of demonstrating that Plaintiffs' posited future injury is "certainly impending."  *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013).

Contrary to Plaintiffs' speculation, it is equally if not more plausible to expect that the challenged policy may *decrease* the number of undocumented aliens in the United States by rededicating scarce agency resources to border security.[6] *See* Defs.' Opp. at 21; *see also Crane*, 920 F. Supp. 2d at 745 (faulting Mississippi for failing to account for potential "increased

---

[5] Because the Eschbach Declaration fails, as a matter of law, to satisfy the requirements of Article III, the Court should reject Plaintiffs' flawed theory of standing, without the need to consider the Hoefer Declaration.  The Hoefer Declaration simply provides additional detail on the unfounded premises that underlie the speculative assertions in the Eschbach Declaration.

[6] Defendants have not, as Plaintiffs suggest, "conceded" that unspecified "immigration policies are causing increases in illegal immigration."  Pls.' Reply at 54.  Plaintiffs base this contention solely on material cited in the Amended Complaint, which is not in the record before this Court on Plaintiffs' Motion for Preliminary Injunction (and the very existence of which has never been established).  *Id.*  And even accepting Plaintiffs' unsupported characterization of that material as true, it is not connected to the particular immigration policies at issue in this case.

removal of high-priority illegal aliens").  It would be inappropriate for this Court to assume, before the Guidance has even gone into effect, that that effort will fail.  Moreover, even assuming that the challenged policy would increase the total number of undocumented aliens present in the Plaintiff States, it would still require another speculative leap to conclude that any given State would be economically harmed, on balance, by the policy – a leap that Plaintiffs fail to substantiate in their Reply.  Allowing certain individuals already present in the Plaintiff States to work legally is expected to expand state tax bases, *see* Amicus Br. of the State of Washington, *et al.* at 6 (noting that grant of work authorization to individuals who may receive DACA or DAPA in Texas will lead to estimated $338 million increase in the state tax base over five years) [ECF No. 81], and will also make it more likely that those individuals obtain work-sponsored health insurance, thereby decreasing their need to rely on state health care, *see id.* at 9 & App. 55 (citing Roberto Gonzales & Angie Bautista-Chavez, *Two Years and Counting: Assessing the Growing Power of DACA*).  Plaintiffs make no effort to account for these anticipated effects and thus have failed to show that the policy would "harm rather than help" them.  *United Transp. Union v. ICC*, 891 F.2d 908, 914 (D.C. Cir. 1989) ("indeterminacy" about effect of challenged policy "is enough to defeat. . . standing"); *see also Crane*, 920 F. Supp. 2d at 731 (finding no standing, where Mississippi failed to show a "*net* fiscal cost [to] the state") (emphasis added).

### 2. Plaintiffs Have Not Demonstrated Any Injury Traceable to Defendants or Capable of Redress by an Order of This Court

Even if Plaintiffs' speculation were sufficient to show a "certainly impending" injury, the chain of causation on which it is based is too attenuated, as a matter of law, to permit the Court to conclude that the predicted injury is "fairly traceable" to the 2014 Deferred Action Guidance rather than "the result of the independent action[s] of some third party not before the court." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal punctuation and citations

omitted).  Such actions "break[] the causal chain" as a matter of law, regardless of the factual showing about incentives and influences.  *See Frank Krasner Enters., Ltd. v. Montgomery County*, 401 F.3d 230, 234-36 (4th Cir. 2005) (concluding that harm was not traceable to government action even though the "record [left] no doubt" that third party was influenced by the challenged law); *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012) ("Because any harm to the plaintiffs results from the actions of third parties not before this court, the plaintiffs are unable to demonstrate traceability.").  Here, the 2014 Deferred Action Guidance expressly forecloses deferred action for newly arriving aliens.  The possibility that third party aliens might nevertheless misunderstand the policy and migrate based on that misunderstanding is not "*fairly trace[able]*" to Defendants.  *Lujan*, 504 U.S. at 560 (emphasis added).

Moreover, there is no reason to believe that individuals who would allegedly migrate to the United States on the basis of misunderstandings about the scope of the 2014 Deferred Action Guidance would cease to do so if that guidance were enjoined.  Other federal immigration policies, including 2012 DACA (which is not subject to challenge here), will remain in place, and Plaintiffs cannot demonstrate that the migratory effect they allege is independent of these policies.  There is therefore no reason to believe (let alone proof) that a temporary injunction against one of these policies would have the effect of reducing immigration.

### 3.   *Massachusetts v. EPA* Does Not Support Plaintiffs' Theory of Standing

Plaintiffs are also incorrect when they contend that their standing "follows *a fortiori*" from the Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. 497 (2007).  *See* Pls.' Reply at 49-50 (capitalization altered).  In that case, the Court did not recognize standing based on speculative future effects, such as Massachusetts' "generalized concern over 'global warming,'" *id.* at 42, nor on the basis of state expenditures on public programs, as Plaintiffs

-11-

suggested at oral argument.  Rather, the Court found standing to challenge the EPA's failure to regulate greenhouse gas emissions based on injuries to state-owned coastal property that had "already begun" and that would "only increase" in the future.  549 U.S. at 522.  Importantly, and unlike here, the EPA "[did] not dispute the existence of a causal connection between manmade greenhouse gas emissions and global warming," such that there was no question that "EPA's refusal to regulate such emissions 'contribute[d]' to Massachusetts' injuries."  *Id.* at 523.[7]  In contrast, Plaintiffs here have failed to identify an injury to the States' interests *qua* States that is currently ongoing, let alone one that is traceable to the challenged policy, as discussed above.

*Massachusetts* also presented a categorically different situation for standing purposes, because (1) Massachusetts' challenge to emissions standards did not (unlike here) involve an area of the law that is constitutionally-committed exclusively to the Federal Government, and (2) Massachusetts identified specific authorization by Congress for its challenge to agency inaction (none of which exists here).[8]  *See id.* at 516 (noting that such authorization was "critical . . . to the standing inquiry").

### C.   Plaintiffs Lack *Parens Patriae* Standing

Plaintiffs cannot cure their failure to show an Article III injury by claiming to represent the purported interests of their citizens under a *parens patriae* theory of standing.  *See* Defs.' Opp. at 24.  A State may not sue the Federal Government unless it demonstrates an injury-in-fact

---

[7] Plaintiffs' speculation about how third parties may respond to federal enforcement policies is also quite different, as a matter of law, from Massachusetts' scientific modeling of the behavior of molecules in the atmosphere.  *See Linda R.S.*, 410 U.S. at 619; *Lujan*, 504 U.S. at 575.

[8] To the extent that Plaintiffs suggest that *Massachusetts* recognizes standing anytime a State sues to challenge a federal law that has supremacy over state law, *see* Pls.' Reply at 50, this argument cannot be reconciled with the reasoning of that case or with other precedent.  *See, e.g., Florida v. Mellon*, 273 U.S. 12, 17 (1927) (fact that federal law "interferes with the exercise by the state of its full powers of taxation . . . affords no ground for judicial relief"); *cf. Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011).

to *its own* legally cognizable interests.  *See Massachusetts v. Mellon*, 262 U.S. 447, 485-86

(1923).  Instead of citing precedent to the contrary, Plaintiffs attempt to draw support from suits

against *private* defendants, which present entirely distinct issues.  Indeed, the leading case cited

by Plaintiffs, *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982), confirms that a

"State does not have standing as *parens patriae* to bring an action on behalf of its citizens against

the Federal Government."  *Id.* at 610 n.16.

Plaintiffs' suggestion at oral argument that *Massachusetts* overruled, *sub silentio*, this

well-established principle is incompatible with the holding of that case; the Court found that

Massachusetts had standing not on the basis of an injury to its citizens' health and welfare, but to

property that the State itself owned.  *Massachusetts*, 549 U.S. at 519-22 & n.17.  Plaintiffs'

reading of *Massachusetts* is also directly contrary to the manner in which the case has been

interpreted and applied by numerous courts.  *See, e.g.*, *Wyoming v. U.S. Dep't of the Interior*,

674 F.3d 1220, 1232 (10th Cir. 2012) ("[S]tanding pursuant to *parens patriae* . . . is not available

when a state sues the federal government because the federal government is presumed to

represent the citizens' interests."); *Oklahoma ex rel. Pruitt v. Sebelius*, No. 11-30, 2013 WL

4052610, at *3-4 (E.D. Okla. Aug. 12, 2013); *Florida ex rel. Cobb v. U.S. Dep't of Justice*, No.

5:10-cv-118, 2010 WL 3211992, at *1 (N.D. Fla. Aug. 12, 2010) (citing *Massachusetts*, 549 U.S.

at 519), affirmed by 440 Fed. App'x. 860 (11th Cir. 2011).

Plaintiffs alternatively contend that the bar to *parens patriae* suits against the Federal

Government applies only where a State challenges a federal statute, rather than an agency action.

Pls.' Reply at 61-62.  There is no support for such a distinction.  Numerous courts have

recognized that, whether acting through regulation or statute, "it is the United States, and not the

state, which represents [its citizens] as *parens patriae*."  *Mellon*, 262 U.S. at 486; *see also, e.g.*,

*Kleppe*, 533 F.2d at 676-78 & n.56 (state challenge to federal agency's decision not to provide

disaster assistance); *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 354 (8th Cir. 1985) (state suit to

compel U.S. Department of Agriculture to implement federal agricultural disaster relief

programs); *Oklahoma*, 2013 WL 4052610, at *3-4 (state challenge to, *inter alia*, an IRS rule);

*Puerto Rico by Hernandez Colon v. Walters*, 660 F. Supp. 1230, 1233 (D.P.R. 1987) (rejecting

contention that *Mellon* does not apply "[w]hen a state sues [a federal agency] over rights and

benefits flowing from Federal legislation").

    Even if Plaintiffs were not barred from bringing suit against the Federal Government on

behalf of their citizens (which they clearly are), they could not maintain a *parens patriae* suit

here, having failed to show that their citizens will suffer any concrete injury as a result of the

challenged guidance.  Plaintiffs' conjecture that the guidance will injure U.S. citizen workers in

the Plaintiff States, *see* Pls.' Reply at 60, does not state a cognizable injury.  Plaintiffs

hypothesize that unknown employers will someday discriminate against U.S. citizens, in favor of

DACA and DAPA recipients, to avoid an employment tax under the Affordable Care Act.  *Id.*

Not only does this theory improperly rest on numerous layers of speculation about third-party

conduct, but it also ignores the fact that it is against the law for an employer to discriminate

against U.S. citizens who are receiving tax credits under the ACA in favor of alien employees

who are not eligible for them.  *See* Pub. L. No. 111-148, § 1558, 124 Stat. 119, 261 (codified as

amended at 29 U.S.C. § 218c (2010)); *see also Tel. and Data Sys., Inc. v. FCC*, 19 F.3d 42, 48

(D.C. Cir. 1994) (refusing to "presume illegal activities on the part of actors not before the court"

in order to find standing).

    Plaintiffs' second theory of *parens patriae* standing rests on their claim that the

challenged policy will interfere with their ability to enforce state laws that allegedly "prohibit

employers . . . from hiring undocumented immigrants."  Reply at 60.  But the provisions of state law cited by Plaintiffs prohibit employers from hiring immigrants *who are not authorized to work*, and each state statute *tracks* the federal definition of work authorization.  Accordingly, the 2014 Deferred Action Guidance stands as no obstacle to their enforcement.

### D.      Further Considerations Compel Dismissal of Plaintiffs' Claims

#### 1.      Plaintiffs' Claims Amount to a Generalized Policy Grievance

Plaintiffs do not dispute that this suit is animated by their ideological disagreement with the challenged federal policy rather than an effort to protect the States from the economic consequences they allege as the basis for standing.  *See* Defs.' Opp. at 28 n. 4 ("[W]e're not suing for that economic harm . . . [W]hat we're suing for is actually. . . harm to the [C]onstitution . . . .") (quoting interview of Greg Abbott).  Nor do Plaintiffs dispute that they invoke this Court's jurisdiction for the purpose of "the ventilation of public grievances."  *Wyoming ex rel. Sullivan v. Lujan*, 969 F.2d 877, 881 (10th Cir. 1992) (internal quotation marks omitted).  Instead, Plaintiffs note that Article III does not "bar[] the federal courts from adjudicating issues of 'broad public significance.'"  Pls.' Reply at 57.  But it is not the "public significance" of the legal issues in this case that deprives this Court of jurisdiction.  Rather, it is the abstract and generalized nature of the harms alleged, which – to the extent they exist at all – would be "pervasively shared" by all citizens and thus would be "more appropriately addressed in the representative branches."  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State Inc.*, 454 U.S. 464, 475 (1982).  Given that all federal policies may be said to have some indirect and generalized consequence on the populace, and thus on States in which that populace resides, if this Court were to accept Plaintiffs' theory of standing here, "no issue, no matter how generalized or quintessentially political, would fall beyond a state's power to litigate in federal

court."[9]  *Cuccinelli*, 656 F.3d at 272 (finding the lack of a limiting principle a basis for rejecting

state standing); *see also Kleppe*, 533 F.2d at 672-73.

### 2.    Plaintiffs Are Not Within the Zone of Interests of the Relevant Provisions of the Immigration Laws

Even if Plaintiffs had satisfied the requirements of Article III standing, they still would

not be entitled to adjudication of their APA claims, because they have not established that

Congress intended to confer on them a right to challenge the Secretary's immigration

enforcement policies.  *See* Defs.' Opp. at 27 & n. 22.  It is not enough, as Plaintiffs suggest, *see*

Pls.' Reply at 56, that the APA contains a general cause of action.  In order to obtain judicial

review under the APA, a party must show that it is "adversely affected or aggrieved by agency

action within the meaning of a relevant statute," 5 U.S.C. § 702, and that requires it to show that

its interests fall "arguably within the zone of interests to be protected or regulated by the

[substantive] statute in question."  *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*,

522 U.S. 479, 488 (1998) (citation and internal ellipses omitted); *Sierra Club v. Morton*, 405

U.S. 727, 732-33 (1972).  The "essential inquiry" under the "zone of interests" test is "whether

Congress intended for a particular class of plaintiffs to be relied upon to challenge" alleged

violations of the specific statutory provisions they seek to enforce.  *Clarke v. Sec. Indus. Ass'n*,

479 U.S. 388, 389 (1987) (internal quotations and brackets omitted); *Air Courier Conference v.*

*Am. Postal Workers Union*, 498 U.S. 517, 530 (1991).  Thus, the question before the Court is

whether Congress intended to allow States to challenge the Secretary's immigration enforcement

policies with respect to individuals already residing in the United States.

---

[9] This concern is heightened in the immigration context, where any grant of citizenship, lawful permanent residency, or other lawful immigration status (including asylum, parole, or other relief) may make an individual eligible for benefits under state law.  By Plaintiffs' logic, States would have standing to challenge even these individual adjudications.

The Supreme Court's decision in *Arizona* compels the conclusion that Congress had no such intent. While crediting the "importance of immigration policy to the States" as a general matter, the Court went on to conclude that Congress did not intend to permit States to countermand decisions by the Executive Branch about whether it is "appropriate to allow a foreign national to continue living in the United States." *Arizona*, 132 S. Ct. at 2505-06. This absence of congressional intent is dispositive here. *See Nat'l Credit Union Admin.*, 522 U.S. at 516 ("The pertinent question . . . is whether Congress *intended* to protect certain interests through a particular provision, not whether, irrespective of congressional intent, a provision may have the *effect* of protecting those interests."); *cf. Hartigan v. Cheney*, 726 F. Supp. 219, 227 (C.D. Ill. 1989) (Illinois not within zone of interest of the Base Closure and Realignment Act, because "states have no constitutional or statutory role in federal military policy"). As the D.C. Circuit held in *Federation for American Immigration Reform, Inc. v. Reno*, 93 F.3d 897 (D.C. Cir. 1996), the public's interest in preventing "stresses on the provision of government services" – the interest sought to be advanced here – does not lie within the zone of interests of any provisions limiting the Executive Branch's authority to grant immigration relief. [10] *Id.* at 901.

## II.   Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits

Even if Plaintiffs were able to establish standing, which they cannot, they would still not be entitled to the extraordinary relief requested, because, among other things, they have failed to demonstrate a likelihood of success on the merits, in the light of the significant discretion enjoyed by the Secretary in the enforcement of the Nation's immigration laws.

---

[10] By contrast, the statute at issue in *Massachusetts* specifically directed the Administrator of the EPA to act in the interests of the "public health or welfare" when considering whether to issue emissions standards. 549 U.S. at 519-20 (citing 42 U.S.C. § 7521(a)(1)).

A.    ***Youngstown* Does Not Establish an Independent Cause of Action Against the Executive Under the Take Care Clause and, In Any Event, Does Not Support Plaintiffs' Claims**

Plaintiffs now focus singularly on Justice Jackson's concurrence in *Youngstown*, 343 U.S. 579 (1952), to support their constitutional claim, but that case does not demonstrate an independent cause of action against the Executive under the Take Care Clause.[11]  The Take Care Clause vests discretionary authority directly in the President, not the Legislative or Judicial Branch, to take care that the laws are properly executed.  This is consistent with Supreme Court precedent that – far from countenancing judicial review of how the President exercises the authority vested in him under the Take Care Clause – has emphasized the need to protect the President's Article II power from intrusion by Congress or the courts.  *See*, *e.g.*, *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 484 (2010) ("The President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them."); *Allen*, 468 U.S. at 761 (declining to recognize Article III standing where adjudication of claim would interfere with President's Take Care Clause authority); *Franklin v. Massachusetts*, 505 U.S. 788, 827-28 (1992) (Scalia, J., concurring) (Court cannot order relief that would interfere with President's constitutional responsibility under the Take Care Clause).

To be clear, *Youngstown* did not involve a claim brought under the Take Care Clause against the President.  Rather, the steel companies brought an action against the Secretary of Commerce claiming that the President's Executive Order, which directed the Secretary of Commerce to seize privately owned steel mills, was not authorized by an act of Congress or by the Constitution.  343 U.S. at 583.  The Government acknowledged that it failed to meet

---

[11] Although Plaintiffs previously relied upon a host of other cases as purported authority for a Take Care Clause claim, all of those cases are distinguishable, *see* Defs.' Opp. at 30 n.25, and Plaintiffs have not contested in their Reply Defendants' arguments with respect to those cases.

conditions necessary to invoke two statutes that would have authorized the Executive to take personal and real property under certain circumstances.  *Id.* at 585-86.   Instead, the Government invoked, *as a defense*, the President's inherent authority under Article II, including the Take Care Clause, to act without statutory authority.  *Id.* at 587.  Thus, *Youngstown*'s use of the Take Care Clause obtains only in the rare circumstance where the President takes action concededly outside the authority conferred by statute and then relies solely on powers inherent in Article II as a defense to a claim that his order was *ultra vires*.  *See Dalton v. Specter*, 511 U.S. 462, 473 (1994) (explaining that *Youngstown* "involved the conceded *absence* of *any* statutory authority, not a claim that the President acted in excess of such authority," and holding that "claims simply alleging that the President has exceeded his statutory authority" are not constitutional claims subject to judicial review). That is categorically different from the situation here, where the Secretary of Homeland Security has acted pursuant to a congressional mandate to prioritize enforcement resources and within the Executive Branch's longstanding enforcement discretion under the immigration laws, Homeland Security Act, and other congressional enactments.  *See* Defs.' Opp. at 33-34, 43.[12]

Additionally, Plaintiffs here are not suing the President, nor are they challenging any action taken by him.  Unlike *Youngstown*, there has been no Executive Order issued by the President; the only issue before the Court is whether the Secretary's 2014 Deferred Action Guidance is lawful within the framework of the INA and other immigration laws.

---

[12] Plaintiffs mischaracterize the President's prior statements concerning the Executive's inability to grant a non-statutory path to lawful immigration status (which the Secretary has not done here) as implying that the immigration laws and other congressional enactments do not confer discretion upon the Secretary to prioritize removals, including through the use of deferred action.  But no such concession has been made, and Supreme Court precedent makes clear that such discretion continues to exist.  *See Arizona*, 132 S. Ct. at 2499; *AAADC*, 525 U.S. at 483-84.

In all events, Plaintiffs' Take Care Clause claim – even were it cognizable – necessarily fails because Plaintiffs cannot demonstrate that the Executive acted contrary to the express command of the statutes Congress has enacted.  As explained below, the Secretary's actions are not foreclosed by statute, and, indeed, are consistent with recognized enforcement discretion under the immigration laws.[13]

### B. The Secretary's Guidance Regarding the Exercise of Deferred Action for Certain Low Priority Aliens Is an Unreviewable Form of Prosecutorial Discretion Under *Heckler v. Chaney*

Quite apart from the other threshold bars to this suit discussed above, a challenge to an agency's decision not to exercise its enforcement authority, or to exercise it in a particular way, is "presumed" to be "immune from judicial review under § 701(a)(2)" of the APA.  *See* Defs.' Opp. at 31-32 (citing *Chaney*, 470 U.S. at 832).  Thus, the Court must determine whether the statute bars the exercise of prosecutorial discretion here.  *See Perales v. Casillas*, 903 F.2d 1043, 1048 (5th Cir. 1990) (holding, in challenge to immigration enforcement decisions, that "[r]eview of agency nonenforcement decisions is permissible *only* where statutory language sets constraints on the agency's discretion."); *see also Pub. Citizen, Inc. v. EPA*, 343 F.3d 449, 464 (5th Cir. 2003).  Such standards are not present here, and thus the Federal Government's discretionary immigration enforcement efforts are not subject to judicial review.  *See Texas*, 106 F.3d at 667 ("Real or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty").

---

[13] The OLC Memorandum's discussion of *Youngstown* is consistent with the above points, as it cited the Jackson concurrence for the obvious point that, as a statutory matter, enforcement decisions have to be consonant with, rather than contrary to, congressional policies underlying the statute that the agency is charged with administering.  OLC Op. at 6 (Defs.' Ex. 2).  The Secretary has not exceeded those limits here.  *Id.* at 31.

1.    *Chaney* Applies Because Plaintiffs Do Not Identify Any Statutory Provision Limiting the Exercise of Prosecutorial Discretion Through Deferred Action

The Secretary's use of deferred action is part of a comprehensive Departmental effort to most effectively enforce the Nation's immigration laws, consistent with the language and purpose of the INA.  *See* Defs.' Opp. at 11.  Specifically, Congress has afforded the Secretary broad discretion to take necessary actions to carry out his authority, *see* 8 U.S.C. § 1103(a), and directed him to "[e]stablish[] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5).  That is precisely what the Secretary has done with the 2014 Deferred Action Guidance, which is part of a series of interrelated memoranda that set Department-wide enforcement priorities and allow resources to be deployed most effectively in support of those priorities.[14]  This integrated approach allows DHS to implement its comprehensive scheme to prioritize the removal of high priority aliens in a way that promotes national security and public safety, as well as family unity,[15] and is consistent with the plain language and purpose of the immigration laws.  Because Congress has not foreclosed this discretion, *Chaney* applies.

In response, Plaintiffs contend that certain inapplicable provisions of the INA, which they

---

[14] On November 20, 2014, the Secretary issued ten interrelated memoranda aimed at, among other things, strengthening border security, revising removal priorities, improving personnel policies for ICE officers, expanding availability of provisional waivers of inadmissibility under 8 U.S.C. § 1182(a)(9)(B)(v) to spouses and children of U.S. citizens or lawful permanent residents, revising parole rules, promoting the naturalization process, and supporting high-skilled business and workers.  Although Plaintiffs only challenge the 2014 Deferred Action Memorandum, *see* Am. Compl. ¶¶ 71, 83, 87 [ECF No. 14]; *see also* Proposed Order on Mot. for Prelim. Inj. [ECF No. 5-1], copies of the other memoranda that have not already been submitted in this case are attached hereto, at the Court's request.  *See* Exs. 36-43.

[15]  Plaintiffs base much of their argument on the conclusory assertion that "family unity" is not a proper objective of the immigration laws.  The immigration laws further a variety of Congressional objectives, but it is well-established that maintenance of family unity and the liberal treatment of children represent well-known goals of the INA.  H.R. Rep. No. 82-1365, at 29 (1952), reprinted in 1952 U.S.C.C.A.N. 1653, 1680 (statute implements "the underlying intention of our immigration laws regarding the preservation of the family unit"); *see, e.g., Holder v. Martinez Gutierrez*, --- U.S. ---, 132 S. Ct. 2011, 2019 (2012) (observing that the "objectives of providing relief to aliens with strong ties to the United States and promoting family unity . . . underlie or inform many provisions of immigration law" (internal quotation marks and citations omitted)).

mischaracterize in their Reply, invalidate the Secretary's actions. *See* Pls.' Reply at 9-14. The logical extension of Plaintiffs' statutory arguments would be that *all* grants of deferred action, and not just the challenged policy, violate the INA – an outcome that the Supreme Court has already foreclosed. Plaintiffs' arguments cannot be squared with the language or purpose of the immigration laws, nor with the Supreme Court's and Congress's historical recognition of the valid exercise of prosecutorial discretion through deferred action. *See* Defs.' Opp. at 33-37.

First, Plaintiffs' argument that 8 U.S.C. § 1225(b)(2)(A) creates a mandatory duty of removal[16] is inconsistent with the text of the statute and the Supreme Court's recognition in *Arizona* that "a principal feature of the removal system is the broad discretion exercised by immigration officials," which includes the decision "whether it makes sense to pursue removal at all."[17] 132 S. Ct. at 2499. Moreover, Plaintiffs ignore the settled case law that a statute does not foreclose prosecutorial discretion simply because it speaks in mandatory terms (*e.g.*, "shall"). *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005) (recognizing "[t]he deep-rooted nature of law-enforcement discretion, even in the presence of seemingly mandatory legislative

---

[16] This legal question is currently before the 5th Circuit in *Crane v. Johnson*, No. 14-10049 (5th Cir.) (oral argument to be heard Feb. 3, 2015).

[17] Plaintiffs also misstate the scope of 8 U.S.C. § 1225(b)(2)(A), which states that "an alien seeking admission . . . shall be detained for [removal proceedings]." *Id.* This provision, on its face, does not apply to aliens who are already present within the United States and who are taking no action to "seek" admission. *Id.* Although Plaintiffs contend otherwise, their argument rests on a conflation of those aliens who are "seeking admission" with aliens who are "applicants for admission." Some aliens who may be considered for DACA and DAPA, who already must be physically present within the United States, may be "deemed" to be "applicant[s] for admission" by operation of law. *See* 8 U.S.C. § 1225(a)(1). But unlike aliens arriving at the border, or a port of entry, they are not engaged in any affirmative behavior that qualifies as "seeking admission," and instead are requesting temporary relief from removal. If Congress intended section 1225(b)(2)(A) to apply to all aliens deemed "applicants for admission," it could easily have used that existing term of art instead of the distinct formulation of "seeking admission." *See Russell v. Law Enforcement Assistance Admin.*, 637 F.2d 354, 356 (5th Cir. 1981) ("There is . . . a well settled rule of statutory construction that where different language is used in the same connection in different parts of a statute it is presumed that the Legislature intended a different meaning and effect."). Indeed, some aliens who may request DACA and DAPA are not even "applicants for admission," including aliens who were lawfully admitted but overstayed their period of authorized admission.

-22-

commands"); *see also City of Seabrook v. Castle*, 659 F.2d 1371, 1373-75 (5th Cir. 1981)

(concluding that the phrase "shall notify" did not create a nondiscretionary duty, given the

"broad discretion" afforded administrative agencies charged with enforcing the laws, as well as

their limited resources).  Given that Congress granted the Secretary discretion to prioritize

enforcement efforts, and that Congress has not appropriated sufficient resources for DHS to

detain and commence proceedings against all removable aliens (including undocumented

immigrants, persons apprehended at the border, and lawfully authorized aliens who commit

crimes or otherwise violate the terms of their immigration status), Plaintiffs' reading of section

1225 to create a mandatory duty to remove all undocumented immigrants would lead to an

"absurd result[]."[18]  *Bartholomew v. United States*, 740 F.2d 526, 531 (7th Cir. 1984) (courts

should consider whether "a mandatory construction would yield harsh or absurd results").

       Second, ignoring the structure and complexity of the immigration laws, Plaintiffs attempt

to mischaracterize unrelated provisions of the INA to suggest that deferred action somehow

circumvents the INA's scheme for lawful admission.  *See* Pls.' Reply at 10-14.  But the

longstanding practice of deferred action does not confer lawful status on recipients or constitute

lawful admission.  For purposes of the INA, "the terms 'admission' and 'admitted' mean . . .

lawful entry of the alien into the United States after inspection and authorization by an

immigration officer."  8 U.S.C. § 1101(a)(13)(A); *see also Martinez v. Mukasey*, 519 F.3d 532,

543-44 (5th Cir. 2008).  An alien who is present in the United States unlawfully – either because

he was not inspected and admitted by an immigration officer or because he overstayed his

---

[18] Moreover, even under Plaintiffs' interpretation, section 1225(b)(2)(A) applies only to the decision to
file a "notice to appear" commencing removal proceedings.  Thus, the Government would remain free to
exercise prosecutorial discretion to terminate removal proceedings at any subsequent stage.  Plaintiffs'
construction would thus have the illogical consequence of requiring the Government to spend its time and
resources to commence removal proceedings that it has no intention of prosecuting further.  The language
of the statute does not compel such absurd results.

authorized period of admission as a nonimmigrant – cannot turn his or her unlawful status into a lawful one simply by being granted deferred action. *See Ariz. Dream Act Coalition*, 757 F.3d at 1058 ("Like recipients of other forms of deferred action, DACA recipients enjoy no formal immigration status."). The statutory provisions concerning admission discussed by Plaintiffs are thus irrelevant to the issues before the Court.

Plaintiffs suggest that deferred action contravenes provisions of the INA that place conditions on the lawful admission of certain relatives of U.S. citizens or lawful permanent residents (LPRs) pursuant to immigrant or nonimmigrant visas.[19] *See* Pls.' Reply at 10-11, 13-14 (citing, *inter alia*, 8 U.S.C. § 1151(a)(1), (a)(2)(A)(i)). But a grant of deferred action is categorically different from admission pursuant to a visa: deferred action does not constitute lawful admission, does not confer any lawful immigration status, does not provide a basis from which to seek lawful permanent residence or U.S. citizenship, and can be revoked at any time for any reason whatsoever.[20] In fact, Congress itself indicated that granting deferred action to immediate relatives of LPRs did not contravene its statutory scheme, by expressly providing that certain of those aliens were "eligible for deferred action" and "work authorization" in some circumstances. USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b)(1), 115 Stat. 272, 361; National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)(1)(A), (d)(1), 117 Stat. 1392, 1694. Similarly, Plaintiffs' reliance on the eligibility

---

[19] Immigrant visas lead to lawful permanent residence (commonly known as having a "green card") upon admission. Nonimmigrant visas lead to lawful temporary status (such as H-1B specialty occupation worker status) upon admission.

[20] Under long-standing policy, deferred action tolls the accrual of "unlawful presence" for purposes of the so-called "3- and 10-year bars" under 8 U.S.C. § 1182(a)(9)(B). Such tolling is irrelevant for virtually all individuals who may be considered for deferred action under DACA or DAPA. An individual need only have been here unlawfully for one year to trigger the 10-year bar. Additional unlawful presence triggers no additional consequences or penalties, and neither tolling nor deferred action cures any unlawful presence an individual has already accumulated.

criteria for cancellation of removal (a term of art for certain relief in the INA) is inapt, because, unlike deferred action, a grant of cancellation of removal to an otherwise inadmissible and removable alien confers LPR status and all the rights that come with such status, including prospective eligibility for U.S. citizenship. *See* 8 U.S.C. § 1229b(b).

Indeed, none of the provisions cited by Plaintiffs demonstrates that deferred action is prohibited by statute or that it confers lawful immigration status, which the Fifth Circuit has held "implies a right protected by law." *Dhuka v. Holder*, 716 F.3d 149, 156 (5th Cir. 2013). The statutory provisions on which Plaintiffs rely reflect the intent to limit DHS's ability to provide lawful immigration status, which deferred action does not provide. No provision cited by Plaintiffs – or in the immigration laws – reflects an intent to limit DHS's enforcement discretion, much less the clear intent that would be required to permit judicial review under *Chaney*.

### 2.    The Secretary Has Exercised His Statutory Responsibilities by Providing a Framework for the Exercise of Prosecutorial Discretion

Plaintiffs also fail to support their claim that *Chaney* does not apply because Defendants allegedly have abdicated a statutory duty by announcing a framework for the exercise of prosecutorial discretion. *See* Pls.' Reply at 9, 32 (citing *Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973)). Specifically, they argue that the challenged policy does not conserve resources and that its use of deferred action is different in "kind or scale" than past exercises of agency discretion. *See* Pls.' Reply at 18-23, 27. These arguments, while lacking in merit, fail to demonstrate that the Secretary is violating an express statutory mandate akin to *Adams*. As the Fifth Circuit has held, real or perceived inadequacies in federal immigration enforcement policy do not constitute an abdication of a statutory duty, especially given the broad discretionary authority conferred upon the Secretary by the immigration laws. *See Texas*, 106 F.3d at 667; *see also Arizona*, 132 S. Ct. at 2499. For similar reasons, DHS's decisions regarding how to deploy

enforcement resources or how to design guidelines for exercising prosecutorial discretion for a group do not constitute an abdication of statutory responsibilities under the INA. *See* Defs.' Opp. at 37-44. To the contrary, these decisions fulfil the Secretary's charge under the Homeland Security Act to "establish[] national immigration enforcement policies and priorities." 6 U.S.C. § 202(5).

Plaintiffs first argue that the granting of deferred action to a high percentage of DACA requestors is indicative of an abdication of a statutory duty similar to *Adams v. Richardson*. Pls.' Reply at 32. But contrary to Plaintiffs' characterization, the D.C. Circuit's holding in *Adams* did not hinge on the number of noncompliant school districts that were receiving Title VI funds from the Department of Health, Education, and Welfare, but rather focused on the Department's failure to carry out a "clear and direct statutory mandate." *See Cutler v. Hayes*, 818 F.2d 879, 893 (D.C. Cir. 1987). Here, on the other hand, Congress has enacted no provision forbidding the exercise of deferred action, comparable to the provisions of the Civil Rights Act that were dispositive in *Adams*.[21] In addition, the existence of unreviewable discretion here is further supported by the fact that "the [agency] lacks the resources necessary to locate and prosecute every [statutory] violator." *Adams*, 480 F.2d at 1162.

Plaintiffs also have failed to demonstrate the kind of extreme conduct required to establish even a remotely colorable claim of abdication under *Chaney*. Plaintiffs do not dispute that DHS lacks funds to pursue removal of anything more than a small fraction of the removable

---

[21] Numerous courts have distinguished *Adams* on the ground that plaintiffs have failed to demonstrate extreme dereliction or complete abandonment of enforcement efforts. *See, e.g.*, *Ass'n of Civilian Technicians, Inc. v. FLRA*, 283 F.3d 339, 344 (D.C. Cir. 2002); *Block v. SEC*, 50 F.3d 1078, 1082-84 (D.C. Cir. 1995); *Wash. Legal Found. v. Alexander*, 984 F.2d 483, 487-88 (D.C. Cir. 1993); *Sierra Club v. Yeutter*, 911 F.2d 1405, 1412 (10th Cir. 1990); *Sierra Club v. Larson*, 882 F.2d 128, 132-33 (4th Cir. 1989); *Cutler v. Hayes*, 818 F.2d 879, 892-93 (D.C. Cir. 1987); *Gillis v. U.S. Dep't of Health & Human Servs.*, 759 F.2d 565, 578-79 (6th Cir. 1985).

aliens present in the United States and encountered at the border, nor do they contest that DHS is using all funds appropriated to it for removal.  Instead, they contend that implementation of the 2014 Deferred Action Guidance does not conserve resources, Pls.' Reply at 27, questioning resource allocation decisions uniquely within the agency's expertise and discretion.  Notably, though, Plaintiffs ignore the fact that the costs of administering the Deferred Action Guidance will be covered through fees submitted by requestors and not with congressionally appropriated funds.  *See* Decl. of Donald W. Neufeld ("Neufeld Decl.") ¶¶ 5, 26 (Ex. 44); *see also* OLC Op. at 10 (citing, *inter alia*, 8 U.S.C. § 1356(m); 8 C.F.R. § 103.7(b)(1)(i)(C), (b)(1)(i)(HH)).  Plaintiffs also disregard that by using USCIS's fee-funded resources to investigate potential candidates for non-removal and to provide a means for identifying them on a prospective basis, DHS has enabled U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP") to more easily identify low-priority aliens and instead focus on the aliens that Congress has prioritized for removal.  *See* OLC Op. at 28.  This includes being able to more efficiently devote manpower to border security, expend resources attempting to locate, apprehend, and remove criminal aliens who were released by state and local authorities, and reduce costs associated with detaining low priority aliens and obtaining travel documents and transporting them back to their home countries, particularly those countries not contiguous to the United States.[22]  *See generally* Defs.' Ex. 3 at 4 (DHS Immigration Enforcement Actions: 2013),

---

[22]  For example, between fiscal years 2011 and 2013, the total number of aliens apprehended at the border rose, including the number and percentage from non-contiguous countries (*i.e.*, other than Mexico), *see* Defs.' Ex. 3 at 4.  Generally, the removal of nationals to non-contiguous countries is far more costly, takes significantly more time, and requires added officer resources, as compared to removals of Mexican nationals.  *See* Defs.' Ex. 4 at 4, 9.  In addition, the influx of unaccompanied children (UACs) at the border in FY2014 required ICE to reassign 800 officers from the interior to support southwest border operations, as well as to construct and staff additional detention facilities.  *See id.* at 3.  During FY2014, Congress did not act upon a DHS request for emergency supplemental funding, requiring DHS to reprogram funds from other key homeland security priorities.  *Id.*  Finally, ICE has been challenged by an

Ex.4 at 2-6, 9 (ICE Enforcement and Removal Operations Report, FY2014).  As recognized by *Chaney*, the need to efficiently allocate scarce enforcement resources is a quintessential basis for an agency's exercise of enforcement discretion.  470 U.S. at 831.

Plaintiffs also argue that prior programs identifying certain groups of aliens who may be eligible for an exercise of discretion were of a different "kind or scale."  *See* Pls.' Reply at 18-19.  Of course, this alone is not dispositive of the lawfulness of the present initiative.  In any event, Plaintiffs fail to distinguish the 2014 Deferred Action Guidance from the Family Fairness Program of 1990, which addressed a similar type of family-based classification[23] and reflected a statutory concern for promoting unity among U.S. citizens and their undocumented families.  As to the scope, although a limited number of potential recipients ultimately applied for temporary relief under the 1990 Family Fairness Program, *see* Pls.' Reply at 19, the relevant data point for comparison purposes is the number of potential applicants estimated at the time of the program's announcement, which was 1.5 million.[24]  As a percentage of the total estimated undocumented population at present (11.3 million), the estimated potential applicant pool under the 2014 Deferred Action Guidance (35%, or 4 million) is below the estimated potential requestor pool for the Family Fairness Program (43%, or 1.5 million) as a percentage of the total undocumented

---

increasing number of state and local jurisdictions that are declining to honor ICE immigration detainers.  *Id.* at 4.  This has meant that ICE has to use additional resources to try to locate, apprehend, and remove criminal aliens who are released by state and local authorities.  *Id.* at 5.

[23] In that program, the Executive granted "extended voluntary departure" and provided work authorization for certain aliens who were ineligible for legal status under the Immigration Reform and Control Act of 1986 but who were the spouses and children of aliens who qualified for legal status under the Act.  *See* Defs.' Opp. at 42 (citing OLC Op. at 14-15).

[24] *See* Defs.' Ex. 8 ("At the time, [INS Commissioner] McNary stated that an estimated 1.5 million unauthorized aliens would benefit from the policy."); *see also* Decision Mem. to Gene McNary, *The Implementation of the Family Fairness Policy* at 1 (Feb. 8, 1990) (Ex. 45) (stating that the program would provide voluntary departure and employment authorization "to potentially millions of individuals"); *Draft Processing Plan, Processing of Family Fairness Applications, Utilizing Direct Mail Procedures* at 1 (Feb. 8, 1990) (estimating that "greater than one million IRCA-ineligible family members" would file for relief under the announced policy) (Ex. 46).

population at the time when that program was first announced (3.5 million).[25]  *See* OLC Op. at 1,

14-15, 30-31.  Given these relative percentages, combined with Congress's implicit approval of

the Family Fairness policy, *see* OLC Op. at 30 n. 15, the 2014 Deferred Action Guidance is not,

by virtue of its kind and scale, inconsistent with what Congress has previously deemed to be a

reasonable exercise of enforcement discretion.[26]  *Id.* at 31.

Although Plaintiffs contend that prior deferred action programs were limited to providing

a "temporary bridge" to lawful status for which recipients were already eligible by statute, that

was true of neither the 1990 Family Fairness Program nor 2012 DACA (which Plaintiffs are not

challenging here).[27]  Plaintiffs have cited no statute or regulation that confines the Executive's

exercise of deferred action to only providing a temporary bridge to lawful status.  Nor could

they, as Congress has long been aware of the practice of granting deferred action, including

through the use of categorical framework, and has never acted to disapprove or limit the practice.

OLC Op. at 18.  To the extent that Congress has considered legislation that would limit the

practice of granting deferred action, it has never enacted such a measure.  *See* OLC Op. at 18 n.

---

[25] There remains uncertainty regarding how many people will apply for or receive deferred action under
the 2014 Guidance.  Approximately 1.2 million people, for example, were estimated to be eligible for
deferred action under 2012 DACA when the program was announced.  But as of December 31, 2014, only
638,897 of DACA eligible individuals had been granted deferred action.  *See* Neufeld Decl. ¶ 23.
Moreover, any comparison between the number of aliens who may receive deferred action under the 2014
guidance and those who received temporary relief under the Family Fairness Program would also have to
take into account that Congress enacted a statute in 1990 providing certain relief less than a year after the
program's announcement, thereby rendering the program unnecessary.  *See infra* note 25.

[26] Indeed, other high-level officials have in the past exercised their discretion to set policies that exempted
large numbers of people from prosecution, including based on bright-line categories.  *See, e.g.*, *Wayte v.
United States*, 470 U.S. 598, 604, 609-10 (1985) (upholding application of policy that categorically
exempted from prosecution 99.96% of a class of 674,000 violators of the selective-service registration
requirement).

[27] After INS implemented the Family Fairness policy, Congress enacted a separate statute granting
recipients under the Family Fairness program an indefinite stay of deportation.  *See* Immigration Act of
1990, Pub. L. No. 101-649, § 301, 104 Stat. 4978, 5030.  Although that grant of relief did not take effect
for nearly a year, Congress clarified that "the delay in effectiveness of this section shall not be construed
as reflecting a Congressional belief that the existing family fairness program should be modified in any
way before such date."  *Id.* § 301(g).

9.  Plaintiffs' contention that the House of Representatives has issued a "rebuke[]" of the Secretary's November 20 guidance, Pls.' Reply at 24, is irrelevant.  As the Supreme Court has made clear, an unenacted bill is an unreliable indicator of legislative intent.  *See Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381 n. 11(1969); *see also Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 276 (1991).

For all of these reasons, the Secretary's proposed exercise of deferred action at issue here does not constitute an abdication of a statutory duty and hence is not reviewable by this Court.

### 3.  The Secretary's 2014 Deferred Action Guidance Appropriately Reflects the Exercise of the Agency's Prosecutorial Discretion at Several Different Levels

Contrary to Plaintiffs' claim, the fact that the Secretary has established a framework for the exercise of DHS's prosecutorial discretion, which nevertheless preserves ultimate decisionmaking on a case-by-case basis, does not remove that exercise of discretion from the rule of *Chaney* and the non-reviewability of exercised of enforcement discretion.  As explained previously, the creation of a framework *itself* is an exercise of discretion.  *See Lopez v. Davis*, 531 U.S. 230, 243-44 (2001).  And DAPA's framework for the exercise of this discretion in individual cases helps ensure that it is not employed arbitrarily, *see* Defs.' Opp. at 40 (citing cases), and that this discretion is being exercised both at a Department-level and on a case-by-case basis.  *Id.* at 41-42.  Consistent with his statutory charge to set Department-wide enforcement priorities, *see* 6 U.S.C. § 202(5), the Secretary in the exercise of his discretion has first established general guidelines for who may be considered—for example, having a U.S. citizen or LPR son or daughter, continuous residence for five years, and no current lawful status.  These parameters, reflecting the exercise of discretion by the agency's top law-enforcement official, are designed to ensure that the policy is limited in scope, reflects enforcement priorities,

-30-

and at the same time serves a particularized humanitarian interest in promoting family unity and is consonant with congressional policies embodied in the immigration laws.

The Guidance further preserves significant judgment and discretion to be exercised on a case-by-case basis, by including broad and flexible criteria, such as whether the person constitutes a threat to public safety or whether the person presents any other "factors that, in the exercise of discretion, [would] make[] the grant of deferred action inappropriate." Deferred Action Guidance at 4. Plaintiffs incorrectly claim that each guideline is akin to a check-box that allows no discretion, when in fact many of the guidelines, such as the public safety factor, necessarily require USCIS adjudicators to exercise significant discretion. Although Plaintiffs speculate, without foundation, that this discretion may not be implemented on a case-by-case basis, *see*, *e.g.*, Pls.' Reply at 28-32, what matters for purposes of this Court's inquiry under *Chaney* is that the Deferred Action Guidance reflects multiple layers of prosecutorial discretion on a matter committed by law to agency discretion.

Plaintiffs' argument that the Deferred Action Guidance will amount to "rubber-stamping," *see* Pls.' Reply at 28-29, is also contrary to the Secretary's policy. Because Plaintiffs challenge a memorandum that has not yet gone into effect, it would be inappropriate and contrary to law for this Court to assume that the Government will not administer the policy in keeping with its terms, which clearly contemplate case-by-case consideration. *See USPS v. Gregory*, 534 U.S. 1, 10 (2001) ("[A] presumption of regularity attaches to the actions of Government agencies"). Plaintiffs have cited no case in which a court has rejected an exercise of prosecutorial discretion by second-guessing the manner in which an agency implemented a policy that is lawful on its face, let alone based on an assumption about the agency's presumed failure to comply with the policy as written before it has gone into effect.

In any event, Plaintiffs' claim of "rubber-stamping" with respect to the existing DACA policy that they carefully avoid challenging is incorrect and rests on erroneous assumptions.[28] As an initial matter, approximately six percent of adjudicated DACA requests have been denied, in addition to the six percent that were initially rejected when filed.  Defs.' Opp. at 41.[29]  The denials have been based on an adjudicator's case-by-case determination that the requestor has not met the substantive criteria of the policy or for other discretionary reasons.  Neufeld Decl. ¶ 15.  While these numbers alone (in addition to the express terms of the 2012 DACA policy itself) show that discretion is being exercised under that policy, there are also concrete examples in which requests have been denied based on decidedly discretionary grounds (although the absence of such cases in the record would not be dispositive of the relevant legal issues).  *See id.* ¶¶ 17, 18, 24;  *see also* Amicus Br. of Am. Immigration Council *et al.* at 2 [ECF No. 39-1) (noting *amici*'s experience seeing "individuals who meet all of the DACA eligibility requirements [but are] still denied deferred action").  For example, requests have been denied for public safety reasons where the requestor was suspected of gang membership or gang-related

---

[28] For example, Plaintiffs' complaint about the relatively high rate of approval under 2012 DACA fails to take into account that an individual who may not merit deferred action, *e.g.*, one who has multiple arrests, is unlikely to apply in the first place.  Defs.' Opp. at 41-42.

[29] In the Neufeld Declaration, Defendants provide further details about DHS's implementation of 2012 DACA at the request of the Court and to respond to some of the points made in Plaintiffs' papers.  Because the 2014 Deferred Action Guidance is, on its face, a valid exercise of DHS's prosecutorial discretion for the reasons discussed above, the details about the agency's implementation of 2012 DACA are not necessary to reject Plaintiffs' pre-enforcement challenge to that Guidance.  Moreover, challenges brought pursuant to the APA are ordinarily confined to the administrative record or appropriately explanatory materials.  This is in contrast to the Kenneth Palinkas Declaration (Pls.' Ex. 23) [ECF No. 64-42] submitted by Plaintiffs, which, aside from reflecting conclusory, generalized assertions lacking support, is unrelated to the agency's administrative action, and thus does not bear on whether Plaintiffs can demonstrate a likelihood of success on the merits.  *See Camp v. Pitts*, 411 U.S. 138, 142 (1973); *see also Harvard Pilgrim Health Care v. Thompson*, 318 F. Supp. 2d 1, 10 (D.R.I. 2004) (when constitutional and APA claims overlap, review must be on the administrative record); *cf. Seafarers Int'l Union of N. Am. v. U.S.*, 891 F. Supp. 641, 647 (D.D.C. 1995) ("Although judicial review is normally confined to the administrative record, *agency* affidavits may be used to supplement the administrative record to further explain the administrative record and describe the background information that was available to the agency") (emphasis added).

activity or had a series of arrests without convictions, arrests resulting in a pre-trial diversionary program, or an ongoing criminal investigation. Neufeld Decl. ¶ 24. In addition, requests have been denied on the basis of factors not expressly set forth in the 2012 DACA guidance, such as where the requestor had made false prior claims of U.S. citizenship. *Id.* ¶¶ 18, 24. Thus, contrary to Plaintiffs' unsupported contentions, implementation of 2012 DACA demonstrates the entirely appropriate use of case-by-case discretion.[30]

Plaintiffs question USCIS's ability to exercise discretion under the upcoming 2014 Deferred Action Guidance on two additional grounds, *see* Pls.' Reply at 31-32, both of which are flawed. First, Plaintiffs contend that the use of service centers to process requests under DACA has "prevent[ed] investigators from interviewing applicants." Pls.' Reply at 31 (citing Palinkas Decl. ¶ 8). This contention is unfounded. USCIS uses its service centers for substantive processing of DACA requests because they are capable of handling high-volume caseloads. *See* Neufeld Decl. ¶ 8. And such handling is not dissimilar from several other programs through which individuals may receive deferred action. *Id.* ¶ 8 n.1. As explained in the Neufeld Declaration, after a DACA request is received and determined to be complete, it is subject to a substantive determination by a USCIS adjudicator, in which the adjudicator considers the guidelines and weighs the evidence submitted by the requestor. *Id.* ¶¶ 14-18. The USCIS service center has the authority to refer a case for interview at a USCIS field office in order to

---

[30] Other documents submitted by Plaintiffs describing the 2012 DACA program also fail to show that USCIS is not exercising discretion in adjudicating DACA requests. Plaintiffs cite a letter from USCIS Director Rodriguez to Senator Grassley in support of this point, but that letter lists only the four most common reasons why DACA requests were *rejected* during the time period from August 15, 2012 to August 31, 2014 (all of which relate to failing to meet the guidelines), Pls.' Ex. 29; the letter does not address why DACA requests were *denied* for other discretionary reasons. DACA rejections are based on a deficiency in the request (*e.g.*, missing fee) or failure to meet one of the age-related guidelines, while denials require adjudication of particular factors and weighing of evidence. Neufeld Decl. ¶¶ 14-15. The Migration Policy Institute Study (also cited by Plaintiffs) similarly does not address the reasons for DACA denials, including any discretionary reasons for those denials. *See* Pls.' Ex. 6.

resolve outstanding concerns on DACA requestors, examples of which are attached to the Neufeld Declaration.  *Id.* ¶ 20.  Thus, contrary to Mr. Palinkas's unsupported and conclusory assertions, *see*, *e.g.*, Palinkas Decl. ¶ 10, the process for consideration of DACA requests by the service centers preserves the case-by-case consideration contemplated by the policy.

Plaintiffs also err when they contend that the existence of agency-wide procedures for accepting evidentiary submissions and sending notices to requestors somehow indicates that adjudicators are prevented from exercising discretion under DACA.  Pls.' Reply at 31-32.  Such instructions do not indicate a lack of discretion; rather, they highlight that DACA requests must be supported by evidence presented in each case and that officers are encouraged to consider all relevant factors and evidence before determining whether deferred action is appropriate.  *See* Neufeld Decl. ¶¶ 18-19.  Likewise, Plaintiffs' assertion that DACA involves solely the mechanical use of "templates," *see* Pls.' Reply at 32, is baseless: the portion of the DACA Standard Operation Procedures they cite in support of this claim clearly reflects that, even though standardized forms are used to record decisions, those decisions are to be made "on a case-by-case basis, according to the facts and circumstances of a particular case."  Pls.' Ex. 10.  In the end, the existence of standardized forms and procedures for administering DACA shows only that the agency has processes in place for managing work flows and for ensuring that discretion is exercised consistent with articulated enforcement priorities and in a non-arbitrary fashion.[31]

---

[31] Contrary to Plaintiffs' contention, *see* Pls.' Reply at 32-34, deferred action has been terminated under DACA for discretionary reasons, *see* Ltr. from USCIS Dir. Leon Rodriguez to Sen. Charles Grassley, Oct. 9, 2014, Enclosure 1, Pls.' Ex. 29 (listing twelve different reasons that deferred action has been terminated under DACA).  The fact that there have not been more terminations should not be held against the agency, as it most likely indicates that discretion is being exercised carefully in the initial consideration of DACA requests.

**4.    Work Authorization for Deferred Action Is Based on Longstanding Legal Authority**

Plaintiffs also erroneously characterize the 2014 Deferred Action Guidance as a "massive new permitting scheme" not subject to *Chaney*'s limits on judicial review of prosecutorial discretion, Pls.' Reply at 27, on the ground that it may ultimately lead to the grant of federal work authorization to individuals granted deferred action.  Federal work authorization is made available not through the challenged guidance, but through a separate statutory and regulatory scheme that confers discretion to the Secretary to consider which aliens are authorized to be employed in the United States – a legal scheme Plaintiffs do not separately challenge.  *See* Am. Compl. ¶¶ 71, 83, 87.  Accordingly, any subsequent grant of work authorization is irrelevant to the agency's exercise of prosecutorial discretion under the Guidance.  It is not legally significant, for purposes of *Chaney*, that Plaintiffs complain of what they anticipate to be the independent statutory and regulatory consequences of a discretionary decision to defer removal.  *See Texas*, 106 F.3d at 667 (regardless of costs to State from defendants' alleged failure to control illegal immigration, Attorney General's immigration enforcement decisions are not subject to a "workable standard against which to judge the agency's exercise of discretion").

In any event, the statutory and regulatory scheme for granting federal work authorization to deferred action recipients is well-grounded in established law and precedent.  Federal immigration officials are specifically authorized by statute to determine which aliens are authorized to work in the United States.  *See* 8 U.S.C. § 1324a(h)(3) (defining "unauthorized alien" not entitled to work as an alien who is neither a legal permanent resident nor "authorized to be . . . employed by [the INA] or *by the Attorney General* [now the Secretary of Homeland Security].") (emphasis added).  Other provisions also indicate that federal immigration officials

possess broad discretion in determining when aliens may work in the United States.[32]  Congress

has therefore provided the Secretary with authority to address which aliens may work under

these circumstances.  *See Arizona Dream Act Coalition*, 757 F.3d at 1062 ("Congress has given

the Executive Branch broad discretion to determine when noncitizens may work") (citing 8

U.S.C. § 1324a(h)(3)).  Exercising the discretion within these statutory provisions, the Secretary

has determined that those granted deferred action may ordinarily apply for work authorization.  8

C.F.R. § 274a.12(c)(14).  This regulation, which was subject to notice-and-comment, dates back

to 1981, and in both its original and current form, defines "deferred action" as an "act of

administrative convenience to the government which gives some cases lower priority."  *See*

Employment Authorization to Aliens in the United States, 46 Fed. Reg. 25079-03, 25081 (May

5, 1981); 8 C.F.R. § 274a.12(c)(14).  In numerous enactments since, Congress has indicated its

approval of this longstanding practice of granting work authorization to recipients of deferred

action.  *See* Pub. L. No. 107-56, § 423(b)(1) (certain relatives of LPRs "may be eligible for

deferred action *and work authorization*" (emphasis added)); Pub. L. No. 108-136,

§ 1703(c)(1)(A), (d)(1) (certain immediate relatives "shall be eligible for deferred action . . . *and*

*work authorization*" (emphasis added)); 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (certain children

---

[32] *See*, *e.g.*, 8 U.S.C. § 1324a(h)(l) (providing that Attorney General is responsible for documenting aliens' right to work in the United States); § 1324a(b)(1)(C)(ii) (providing that a document is valid as evidence of employment authorization if "the Attorney General finds [it], by regulation, to be acceptable" for that purpose).  Moreover, in the few instances in which Congress has determined to limit employment authorization for certain classes of aliens, it has done so expressly.  *See*, *e.g.*, 8 U.S.C. § 1158(d)(2) ("An [asylum] applicant who is not otherwise eligible for employment authorization shall not be granted such authorization prior to 180 days after the date of filing of the application for asylum."); § 1226(a)(3) (restricting employment authorization for aliens who have been arrested and are in removal proceedings unless the alien is a lawful permanent resident "or otherwise would (without regard to removal proceedings) be provided [work] authorization"); § 1231(a)(7) (providing that alien who has been ordered removed is ineligible for work authorization unless the Secretary finds that the alien cannot be removed for lack of a country willing to receive the alien or "the removal of the alien is otherwise impracticable or contrary to the public interest").

are "eligible for deferred action *and work authorization*" (emphasis added)).

Plaintiffs argue that 8 U.S.C. § 1324a(h)(3) is a "definitional provision" and that the Secretary's interpretation is inconsistent with other provisions of the INA.  Pls.' Reply at 15-16.  Shortly after Congress enacted 8 U.S.C. § 1324a(h)(3) as part of the Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L. No. 99-603, 100 Stat. 3359, the Immigration and Naturalization Service ("INS") was presented with the identical argument as part of a petition for rescission of the employment authorization regulation.  *See* Employment Authorization; Classes of Aliens Eligible, 52 Fed. Reg. 46,092, 46,093 (Dec. 4, 1987).  INS rejected the argument that 8 U.S.C. § 1324a(h)(3) precludes the Secretary (then the Attorney General) from granting work authorization.  Rather, INS concluded "that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined 'unauthorized alien' in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the regulatory process, in addition to those . . . authorized by statute."  52 Fed. Reg. at 46,093.  Given that an agency's "contemporaneous interpretation of the statute it is entrusted to administer" is given "considerable weight," *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 844 (1986), Plaintiffs' argument fails.

Further, the Fifth Circuit has explicitly recognized that 8 U.S.C. § 1324a(h)(3) provides federal immigration officials with extensive flexibility in granting work authorization.  *See Perales*, 903 F.2d at 1048-50.  In *Perales*, immigration visa applicants brought a class action requesting that INS "change its method of considering petitions for voluntary departure and employment authorization for certain types of aliens." *Id.* at 1045.  The Fifth Circuit found that, under *Chaney*, neither 8 U.S.C. § 1324a(h)(3) nor 8 C.F.R. § 274a.12(c) provides a court with

judicially manageable standards for reviewing the manner in which federal immigration officials exercise their discretionary power to grant work authorizations.  *See Perales*, 903 F.2d at 1048-50.[33]

In short, the provision of federal work authorization for deferred action recipients, whether related to DACA or DAPA or some other grant of deferred action, has a strong statutory and regulatory basis and does not contravene the express or implied will of Congress.

### C.  Even If It Were Reviewable, the Deferred Action Guidance Must Be Upheld as a Valid Exercise of Discretion Under the APA

Even if the Guidance Memorandum were subject to judicial review on the merits—which it is not—Plaintiffs' vague and unsupported argument that it violates the substantive requirements of the APA, *see* Pls.' Reply at 40-42, is without merit.  Plaintiffs' first claim is that the Deferred Action Guidance violates "Congress's clear statutory commands."  *Id.* at 41.  But as Defendants demonstrated above, Plaintiffs fail to show that the Guidance violates any provision of the INA.  *See supra* Part II.B.1.

To the extent that Plaintiffs separately contend that the Deferred Action Guidance is arbitrary and capricious, even though it is not contrary to the terms of the immigration laws, Plaintiffs fall far short of meeting the extremely high bar for such a showing.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) ("We have made clear . . . that 'a court is not to substitute its judgment for that of the agency.'"); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (courts should "uphold a decision of less than ideal

---

[33] Moreover, there is a long history of the Executive providing work authorization for categories of individuals who have had their removals deferred.  Under the Family Fairness Program in 1990, the Executive granted "extended voluntary departure" and provided work authorization for certain aliens who were ineligible for legal status under IRCA but who were the spouses and children of aliens who qualified for legal status under the Act.  *See* OLC Op. at 14-15.  Likewise, students who wished to apply for deferred action under a program for foreign student affected by Hurricane Katrina were required to submit an application for work authorization.  *Id.* at 16.

clarity if the agency's path may reasonably be discerned."). Under this standard, a court must presume the validity of agency action. *See Ala. Nursing Home Ass'n v. Harris*, 617 F.2d 388, 393 (5th Cir.1980). Plaintiffs have made no effort whatsoever to explain how they can overcome this presumption.

Plaintiffs' only other ground for invalidating the Guidance under the APA—a meritless non-delegation argument that they raise for the first time in their Reply—fares no better. The Supreme Court has repeatedly endorsed broad grants of discretion to agencies to carry out legislative commands. *See, Whitman v. Am. Trucking Ass'ns, Inc*., 531 U.S. 457, 474-75 (2001) (citing *Nat'l Broadcasting Co. v. United States*, 319 U.S. 190, 194, 225-26 (1943) (upholding delegation to the FCC to regulate airwaves in the "public interest")). Also, *Arizona* makes clear that discretion pervades the INA. Because Plaintiffs have failed to raise any colorable challenge to the Secretary's use of deferred action, the Court should deny their motion.

### D.     Plaintiffs Fail to State a Procedural Challenge Under the APA

Plaintiffs' procedural claim that the Guidance violates the APA because it was not issued using notice-and-comment procedures rests on a fundamental misunderstanding of the principles of administrative law and the relevant precedent. It is not the law, as Plaintiffs claim, that if "the APA applies" to a particular agency action, that agency action – regardless of its content and form – can be issued only after notice to the public and opportunity to comment. *See* Pls.' Reply at 34. As Defendants have already explained, the APA does not subject general statements of policy to the notice-and-comment requirements set forth in 5 U.S.C. § 553. *See id.* § 553(b)(3)(A). Plaintiffs are thus flatly incorrect when they suggest that Defendants "concede that they will lose if the Court reaches the merits [of their notice-and-comment] claim, because they [have] undisputedly failed to engage in notice-and-comment rulemaking." Pls.' Reply at

34-35.  To be sure, Plaintiffs' notice-and-comment claim is *not* subject to review, because Plaintiffs are not within the relevant zone of interests under the APA.  *See supra* Part I.D.2; *cf. Mendoza v. Perez*, 754 F.3d 1002, 1016 (D.C. Cir. 2014) ("Although the plaintiffs here assert a [notice and comment] cause of action under the APA, in considering whether plaintiffs are authorized to sue . . . we look to whether they fall within the zone of interests sought to be protected by the substantive statute pursuant to which [agency] acted").  But even if their claim were properly presented, it fails as a matter of law because the 2014 Deferred Action Guidance is expressly exempt from the requirement of notice-and-comment rulemaking, as a "statement of general policy."  Defs.' Opp. at 44-47.

In *Lincoln v. Vigil*—a case Plaintiffs fail to cite, let alone distinguish—the Supreme Court defined "general statements of policy" as "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."  508 U.S 182, 197 (1993) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979).  The 2014 Deferred Action Guidance, which seeks to inform the public prospectively about the manner in which DHS proposes to exercise prosecutorial discretion in certain instances, falls squarely within the statutory exemption.  *See id.*; *see also Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 601 (5th Cir. 1995) ("*PPCC*") (finding FDA policy announcing nine factors it will consider in bringing discretionary enforcement action fits the Fifth Circuit's definition of general statement of policy "to a tee").  The policy *itself* is an exercise of discretion and should be exempt from notice-and-comment requirements on that ground alone; and in any event, it further contemplates the exercise of discretion on a case-by-case basis without proscribing any result.

Plaintiffs erroneously claim that general statements of policy must be "legally

meaningless." *See* Pls.' Reply at 38.  However, that is contrary to the standard recognized by the

Fifth Circuit, which has provided that a general statement of policy is one that "does not impose

any rights and obligations" and that "genuinely leaves the agency and its decisionmakers free to

exercise discretion."  *PPCC*, 56 F. 3d at 595.  In *PPCC*, the Fifth Circuit found that FDA-issued

guidance setting forth enforcement standards qualified as a "statement of policy" after first

analyzing the plain language of the policy itself to determine whether it created binding norms.

*Id.* at 597.  The court noted that, although the policy directed that the FDA "will consider" nine

factors that were included in the guidance, the policy "afford[ed] an opportunity for

individualized determinations," and noted that even if the factors were met, the FDA retained

discretion on whether to bring an enforcement action.  *Id*. at 597-98.  The Court also noted that

the policy included "broad, general, [and] elastic" criteria that required discretion to apply.  *Id*. at

598.  The same is true of the Deferred Action Guidance.  *See supra* Part II.B.3.

Plaintiffs' argument that the Deferred Action Guidance cannot be a general policy

statement because it has "substantive effects," *see* Pls.' Reply at 37-38, is also unavailing.  First,

contrary to Plaintiffs' suggestion, deferred action is not "conferred through the [Guidance]," *id.*

at 38; rather, it is conferred through the determination by an immigration officer to defer removal

in a given case.  Moreover, it was irrelevant to the Supreme Court's definition of a "general

statement of policy" in *Vigil* whether such a policy has some substantive impact.  508 U.S. at

197.  The argument that a rule has some substantive impact "alone does not undercut the

conclusion that . . . [it is a] general statement[] of policy."  *Guardian Fed. Sav. and Loan Ass'n v.*

*Fed. Sav. and Loan Ins. Corp.*, 589 F.2d 658, 668 (D.C. Cir. 1978).

Plaintiffs assert that the Guidance "uses a series of *shalls* and *musts*," Pls.' Reply at 36,

but none of these verbs directs officials to deny or grant particular requests for deferred action.

-41-

Accordingly, this language is irrelevant to the inquiry, which turns on whether "the rule has binding effect *on agency discretion*." *PPCC*, 56 F.3d at 595 (emphasis added); *see also Guardian Fed. Sav. and Loan Ass'n*, 589 F.2d at 667 (concluding that rule was "statement of policy," notwithstanding its "mandatory tone"). Plaintiffs' reliance on *Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000), is also misplaced. In that case, the agency's guidance "from beginning to end . . . read[] like a ukase," [*i.e.*, an unfair edict] *id.* at 1024, which manifestly cannot be said about the guidance here. In addition, the policy at issue in *Appalachian Power*, unlike the present one, purported to impose new legal obligations on regulated parties that commanded compliance. *Id.* at 1023. In contrast, the Guidance here is akin to the FDA enforcement guidance that the Fifth Circuit found to be exempt from notice-and-comment requirements in *PPCC*.

Plaintiffs invite the Court to ignore that the guidance is a "policy statement," as well as the language of the Guidance generally, and to find that it leaves no discretion to agency officials to make individualized determinations. *See* Pls.' Reply at 38-39. Thus, even though the Guidance expressly provides that "the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis," Deferred Action Guidance at 5, Plaintiffs ask this Court to assume the contrary. This approach is not permitted under the law of this Circuit. *PPCC*, 56 F. 3d at 596 ("[T]he starting point is 'the agency's characterization of the rule.'"); *see also Nat'l Ass'n of Broadcasters v. F.C.C.*, 569 F.3d 416, 426 (D.C. Cir. 2009) (determination of "whether the agency has imposed any rights and obligations or has left itself free to exercise discretion" must "tak[e] into account the agency's phrasing").

Further, this argument fails for the reasons previously explained in Part II.B.3, *supra*. As noted, Plaintiffs' claim that "it is undisputed that the [Guidance] has yielded a 99.5-94.4%

approval rate," Pls.' Reply at 37, is wrong.  To begin with, the 2014 Deferred Action Guidance

has not gone into effect yet, so it cannot have "yielded" any approval rate.  To the extent

Plaintiffs refer to the approval rate of 2012 DACA requests, this statistic is both inaccurate and

irrelevant, as 2012 DACA is not at issue in this case.  Moreover, Plaintiffs have identified no

case in which a court has determined that a policy such as this one, which is addressed to the

exercise of agency discretion, was subject to notice-and-comment requirements based on the rate

at which that discretion was ultimately exercised under the policy.[34]  Further, Plaintiffs' claim

that immigration "officers have no discretion to grant a reprieve" to an individual who does not

meet the guidelines, Pls.' Reply at 36, ignores the fact that USCIS retains discretion to grant

deferred action or certain forms of discretionary relief to such an individual.  *See* Neufeld Decl.

¶ 27.  The Deferred Action Guidance does not purport to restrict the existing discretion that

immigration officers have to defer removal or provide certain forms of discretionary relief.

 For all of these reasons, the Court must reject Plaintiffs' procedural APA claim.

**III. Plaintiffs Have Failed To Establish Irreparable Harm or That the Balance of the Harms Favor an Injunction**

 Because Plaintiffs have failed to establish that they will suffer a concrete injury as a

result of the 2014 Deferred Action Guidance, and thus lack standing, they have necessarily failed

to show that they will suffer irreparable injury absent an injunction.  Defs.' Opp. at 49; *cf. Safari*

*Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012) (no irreparable harm when

plaintiffs could avoid harm).  Indeed, Plaintiffs' assertion that, absent an injunction, future

---

[34] Plaintiffs suggestion that *Chamber of Commerce v. U.S. Dep't of Labor*, 174 F.3d 206 (D.C. Cir. 1999), found a "70%-90% rate" to be "sufficient" to show that a rule is substantive and binding, Pls.' Reply at 37, is quite misleading.  That case did not involve consideration of the rate of grants or denials of discretionary relief under the policy subject to challenge; rather, it involved a policy that, on its face, left "no room for discretionary choices by inspectors in the field," and provided that every company that did not comply with its terms would be inspected, which meant that the effect of the rule was to "inform employers of a decision already made."  174 F.3d at 213.

Presidents will be emboldened to exceed their authority, Pls.' Reply at 66-67, underscores the highly speculative and abstract nature of Plaintiffs' claims of harm, which are insufficient to justify the extraordinary remedy of a preliminary injunction.  *See* Defs.' Opp. at 49.

And although Plaintiffs contend that Defendants "cannot claim any countervailing injury," Pls.' Reply at 65, it is Plaintiffs, not Defendants, who have the burden of showing that "the threatened harm to [Plaintiffs] will outweigh any potential injury the injunction may cause [to Defendants]" and that the injunction "will not be adverse to public interest."  *Star Satellite, Inc. v. City of Biloxi*, 779 F. 2d 1074, 1079 (5th Cir. 1986).  Plaintiffs have failed to meet this burden.  As demonstrated by the numerous amicus briefs submitted in opposition to Plaintiffs' Motion, a preliminary injunction would have a significant negative impact on other States, and on municipalities and communities nationwide.  *See* ECF Nos. 39-1, 49-2, 81, 121.  Among other things, DACA and DAPA will have important public safety benefits, as leading law enforcement officials from a wide range of cities (including in the Plaintiff States) have explained, and an injunction will prevent communities from reaping those benefits.  *See* ECF No. 83-1.  Plaintiffs weakly contend that an injunction cannot harm the public because "the status quo has existed 'for years.'" Pls.' Reply at 65.  But Plaintiffs ignore the need to address the challenges DHS confronts in enforcing our immigration laws.  As Defendants explained in their Opposition, the need for the 2014 Deferred Action Guidance, which allows DHS to efficiently identify and temporarily set aside aliens who are low priorities for removal, and thus to focus on its top enforcement priorities (threats to public safety, national security risks, and recent border crossers), is especially acute in light of recent demographic shifts in the immigrant population, restrictions on ICE's use of detainers, the backlog in the immigration courts, and DHS's limited resources.  Defs.' Opp. at 51-54.  DACA and DAPA are tools that help DHS address these

challenges while promoting other legitimate immigration objectives, such as humanitarian concerns and family unity. *Id.* at 52-53. Halting or delaying policies that promote national security, public safety, administrative efficiency, and humanitarian concerns is not in the public interest. *Id*. at 54.

## **CONCLUSION**

This Court should deny Plaintiffs' motion for preliminary injunction and dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction.

Dated: January 30, 2015                     Respectfully submitted,


KENNETH MAGIDSON                    JOYCE R. BRANDA
United States Attorney                       Acting Assistant Attorney General

DANIEL DAVID HU                         KATHLEEN R. HARTNETT
Assistant United States Attorney         Deputy Assistant Attorney General
Deputy Chief, Civil Division
                                                      DIANE KELLEHER
                                                      Assistant Branch Director

                                                        */s/ Kyle R. Freeny*
                                                      KYLE R. FREENY (Cal. Bar No. 247857)
                                                        Attorney-in-Charge
                                                      HECTOR G. BLADUELL
                                                      BRADLEY H. COHEN
                                                      ADAM D. KIRSCHNER
                                                      JULIE S. SALTMAN
                                                      Civil Division, Federal Programs Branch
                                                      U.S. Department of Justice
                                                      P.O. Box 883
                                                      Washington, D.C. 20044
                                                      Tel.: (202) 514-5108
                                                      Fax: (202) 616-8470
                                                      Kyle.Freeny@usdoj.gov
                                                      *Counsel for Defendants*

**State of Texas, et al. v. United States of America, et al.**
**No. 1:14-CV-254**

### INDEX OF EXHIBITS

| EXHIBIT NO. | DOCUMENT NAME | PAGE NO. |
|---|---|---|
| 34 | Letter from Rick Perry, Governor of Texas, to Greg Abbott, Attorney General of Texas (Aug. 16, 2012) | 442 - 443 |
| 35 | Declaration of Michael Hoefer | 444 - 470 |
| 36 | Memorandum from Jeh Charles Johnson, Secretary, DHS to R. Gil Kerlikowske, Commissioner, U.S. Customs and Border Protection, et. al., *Southern Border and Approaches Campaign* (November 20, 2014) | 471 - 475 |
| 37 | Memorandum from Jeh Charles Johnson, Secretary, DHS to Thomas S. Winkowski, Acting Director, U.S. Immigration and Customs Enforcement, et. al., *Secure Communities* (November 20, 2014) | 476 - 479 |
| 38 | Memorandum from Jeh Charles Johnson, Secretary, DHS to Thomas S. Winkowski, Acting Director, U.S. Immigration and Customs Enforcement, et. al., *Personnel Reform for Immigration and Customs Enforcement Officers* (November 20, 2014) | 480 - 483 |
| 39 | Memorandum from Jeh Charles Johnson, Secretary, DHS, to León Rodriguez, Director, USCIS, *Expansion of the Provisional Waiver Program* (November 20, 2014) | 484 - 486 |
| 40 | Memorandum from Jeh Charles Johnson, Secretary, DHS, to León Rodriguez, Director, USCIS, et. al., *Policies Supporting U.S. High Skilled Businesses and Workers* (November 20, 2014) | 487 - 492 |
| 41 | Memorandum from Jeh Charles Johnson, Secretary, DHS, to León Rodriguez, Director, USCIS, *Families of U.S. Armed Forces Members and Enlistees* (November 20, 2014) | 493 - 495 |
| 42 | Memorandum from Jeh Charles Johnson, Secretary, DHS, to Stevan E. Bunnell, General Counsel, Office of the General Counsel, et. al., *Directive to Provide Consistency Regarding Advance Parole* (November 20, 2014) | 496 - 498 |

| EXHIBIT NO. | DOCUMENT NAME | PAGE NO. |
|---|---|---|
| 43 | Memorandum from Jeh Charles Johnson, Secretary, DHS, to León Rodriguez, Director, USCIS, *Policies to Promote and Increase Access to U.S. Citizenship* (November 20, 2014) | 499 - 501 |
| 44 | Declaration of Donald W. Neufeld | 502 - 558 |
| 45 | Decision Memo to Gene McNary, *The implementation of the Family Fairness Policy – Providing For Voluntary Departure under 8 CFR 242.5 and Employment Authorization under 8 CFR 274a.12 for the spouses and children of legalized aliens (sections 245a and section 210)* (Feb. 8, 1990) | 559 - 561 |
| 46 | *Draft Processing Plan, Processing of Family Fairness Applications, Utilizing Direct Mail Procedures* (Feb. 8, 1990) | 562 - 566 |