EXHIBIT 35

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 1:14-CV-254 |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA, *et al.* ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF MICHAEL HOEFER

I, Michael Hoefer[1], hereby make the following declaration with respect to the above captioned matter.

### I. QUALIFICATIONS

1. I am a Senior Advisor for the Office of Policy & Strategy at U.S. Citizenship and Immigration Services (USCIS), a component within the U.S. Department of Homeland Security ("DHS" or "Department"). I have held this position since March 2013. I was previously the Director of the DHS Office of Immigration Statistics (OIS) from 1997 to 2013. The OIS is the lead office within DHS for the reporting and analysis of immigration data. I began working in the Statistics Office at the Immigration and Naturalization Service (INS) in March 1982.

2. I am a graduate of Cornell University with a B.S. (1976) in Industrial and Labor Relations with a concentration in applied statistics.

3. As a technical expert at OIS I authored many reports on Department immigration data and population estimates, including annual estimates of the number of unauthorized aliens

---

[1] Curriculum Vitae provided at Exhibit 1.

residing in the United States. I was staff statistician (on detail) at the Commission on Immigration Reform from 1994-95 and was a member of the DHS Immigration Reform Team in 2007. I co-chaired the Federal Interagency Workgroup on Immigration Statistics and Research for several years. As a leading expert on U.S. immigration data, I gave an invited address to the Annual Meeting of the Committee on National Statistics, National Academy of Sciences, titled "Measuring Immigration Flows and Immigrant Populations: What Do We Know? How Can we Learn More?" in October 2008. I also testified before the Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law, of the House Judiciary Committee in June of 2007 on the subject, "Comprehensive Immigration Reform: Government Perspectives on Immigration Statistics." This past year I was the United States representative to the Organization for Economic Co-operation and Development Expert Meeting on Migration. I also was a member, and provided statistical guidance, to the DHS task force addressing the increase in apprehensions of unaccompanied minor children beginning in the spring of 2012.

4. Resulting from my role as Senior Advisor for the Office of Policy & Strategy at USCIS, I am familiar with the 2012 Deferred Action for Childhood Arrivals policy (DACA), as well as the Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy and modification of DACA announced in 2014 and presently in the process of being implemented by DHS.

5. I have worked on various projects to estimate the size and characteristics of unauthorized populations, such as those who meet the guidelines for DACA. I was the lead author of DHS annual reports on the size and characteristics of unauthorized populations from 2005 to 2011. I also assisted in the development of the "Report on the Legalized Alien Population," which was sponsored by the former INS. Last year I served as an advisor on the

development of a USCIS report on the "Characteristics of Individuals Requesting and Approved for DACA."

6.      The purpose of this declaration is to respond to certain opinions and conclusions in the Declaration of Karl Eschbach, Ph.D., submitted as Exhibit 14 to the Plaintiffs' Reply Brief, filed in the case *State of Texas, et al., v. United States of America, et al.*, 14-cv-254, pending before the United States District Court for the Southern District of Texas.

7.      In addition to the documents and information available to me as Senior Advisor for the Office of Policy & Strategy at USCIS, I have reviewed the above-referenced Declaration of Karl Eschbach, Ph.D., including attachments.

8.      My views expressed in this declaration are based on my education, experience, knowledge of relevant scientific literature, knowledge of the generally accepted methodologies associated with review and analysis of statistical data regarding migrant populations, and my review of relevant documents and information.  I have personal knowledge of the matters stated herein.

## II.      SUMMARY OF DECLARATION

9.      Dr. Eschbach was retained by the Office of the Attorney General of Texas to analyze three issues: (1) whether the 2012 Deferred Action for Childhood Arrivals (DACA) policy caused an increase in the unauthorized immigrant population, and whether the 2014 Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy likely would cause concomitant increase in the unauthorized immigrant populations; (2) the method for counting the unauthorized immigrant population and the number of authorized immigrants that reside in Texas; and (3) whether unauthorized immigrants receive a disproportionate amount of uncompensated healthcare.  (Eschbach Dec. at ¶ 4, pg. 2)

10.     This declaration addresses Dr. Eschbach's analysis of the first of these issues, i.e. whether 2012 DACA caused an increase in the unauthorized immigrant population, and whether the 2014 deferred action policies likely would cause concomitant increase in the unauthorized immigrant populations.

11.     Dr. Eschbach opines, regarding issue (1), that "DAPA will discernibly and significantly increase unauthorized immigration to the United States in two ways":  (1) by encouraging both eligible and ineligible unauthorized immigrants to stay in the United States, in the hopes of attaining adjustment of status in the future and relatedly, by reducing the emigration rate of immigrants who may be considered for DAPA; and (2) by "making it more attractive for unauthorized immigrants to migrate to the United States." (Eschbach Dec. at ¶ 5(a), pg. 3).  He therefore concludes that DAPA implementation will result in an increase in unauthorized immigrants. (Eschbach Dec at ¶ 5(a), pg. 4.)

12.     Having reviewed Dr. Eschbach's declaration, including the data and bases for his hypotheses and conclusions, it is my opinion that Dr. Eschbach's opinions are not supported by the available evidence.  DACA and DAPA are very recent policies, and they have not been fully studied.  Dr. Eschbach himself notes that with respect to DACA that "there is no peer-reviewed analytic study evaluating the influences on recent trends in child migration." (Eschbach Dec. at ¶ 26.)   Dr. Eschbach's opinions rest on speculation and unsupported inferences drawn largely from historical data reflecting generalized immigration statistics (e.g., Eschbach Dec. at ¶ 12, Table 2), and a program implemented in 1986 (the Immigration Reform and Control Act or "IRCA") (Eschbach Dec. at ¶¶ 20-23).  There are not sufficient data to support his conclusions.

## III.    DISCUSSION

13.    In his analysis, Dr. Eschbach discusses unauthorized migration, including incentives that affect individuals considering whether or not to attempt an unauthorized entry into the United States, and the potential effects/incentives that policies such as DACA and DAPA may have on those individuals.  He views the unauthorized immigrant population at issue as being comprised of three groups: (1) unauthorized immigrants in the United States who may apply for deferred action under DACA or DAPA; (2) "potential migrants", i.e., individuals outside the United States who do not meet the DACA/DAPA guidelines and who may be considering an illegal entry into the United States; and (3) unauthorized immigrants presently in the United States who do not meet the DACA/DAPA guidelines.  (Eschbach Dec. at ¶ 16.)

14.    Dr. Eschbach bases much of his speculation regarding the effect of DACA and DAPA on a rough extrapolation from pre-DACA/DAPA data, from which no relationship to DACA or DAPA can be inferred, without considering other significant factors that may affect his conclusions.  Dr. Eschbach concedes that the "flow of unauthorized entrants across the border was responsive to many influences, including primarily perceptions of relative employment opportunities and wage rates."  (Eshbach Dec. at ¶ 23.)  But Dr. Eschbach goes on to draw inferences regarding the causes of unauthorized migration without addressing environmental factors, such as crime, civil unrest and natural disasters.  For example, he concludes that an increase in unauthorized migration can be attributed to IRCA, but the increase in the flow of unauthorized migrants since its passage was most notable between 1998 and 2002 (accounting

for 42% of the total increase), which is significantly attenuated with respect to IRCA, and correlates with other events.[2]

### a. Dr. Eschbach's Opinions Regarding DACA/DAPA Causing an Increase in the Unauthorized Immigrant Population are Speculative and Unreliable

15.     Regarding the first of Dr. Eschbach's groups – unauthorized immigrants in the United States who meet the guidelines for consideration under DACA or DAPA – Dr. Eschbach postulates that DACA and DAPA will increase the size of the unauthorized population, by: (1) deferring the removal of individuals whom he surmises would otherwise be "identified by" DHS and "subject to deportation within the time period specified in the programs"; and (2)  "reducing the incentive to emigrate (i.e., return to [unauthorized immigrants'] home countr[ies])." (Eschbach Dec. at ¶ 17).  The evidence he relies on to support this conclusion – data reflecting estimated removal and emigration rates for the resident unauthorized immigrant population within the United States during the period 1990-2010 – predates the implementation of DACA, so this conclusion is based purely on conjecture.   (Eschbach Dec. at ¶ 17, pg. 10, fn. 10.)  Dr. Eschbach postulates a "crude estimate of an increase in the stock of resident unauthorized immigrants of 3 percent of the enrollees in the program for each year of their participation," before conceding that "[t]he actual number of reduced deportations/deferrals may vary" if certain factors are true.  (Id.).[3]   This "crude estimate" is just that – an unsupported guess based on

---

[2] In 1998 Hurricane Mitch devastated Central America, killing thousands and affecting more than 100,000 people. In 2001, El Salvador was struck by a series of earthquakes, killing more than a thousand people and damaging more than 100,000 homes and businesses.

[3] No recent data are available on the rate that foreign-born residents (e.g., lawful permanent residents LPRs, unauthorized residents) emigrate.  The U.S. government stopped collecting information on the emigration of LPRs in 1957.  The "residual" methodology used by the DHS Office of Immigration Statistics and others to estimate the size of the unauthorized population does not require an estimate of the emigration rate of the unauthorized population, but does utilize an estimate of the foreign-born emigration based by Ahmed and Robinson, "Estimates of Emigration of the Foreign-Born Population: 1980-90," Census Bureau Technical Working Paper No. 9, December 1994.  Ahmed and Robinson estimate that  emigration rate of the foreign born population during the 1980-89 period was 18.7 percent for those who entered during 1970-79, 9.1 percent for those who entered during 1960-69, and 7.1

several layers of inference – and it is particularly speculative because it does not rest on data or analysis drawn from DACA or DAPA.   The incentives created by DACA and DAPA with regard to emigration now or in the future, and their relationship to existing disincentives to emigrate among the DACA and DAPA community, are affected by a complex set of factors which are not considered or discussed in any meaningful way by Dr. Eschbach.[4]  He later postulates that those who meet the DACA/DAPA guidelines will serve as anchors for new unauthorized migration among non-DACA/DAPA populations, and by this connection he attributes that possible future growth to DACA/DAPA.  (Eschbach Dec. at ¶ 28.)  Dr. Eschbach provides no reliable data or analysis supporting his conclusions, which are more in the nature of conclusory assertions.

16.   For example, Dr. Eschbach's declaration lacks any analysis or consideration of pre-DACA/DAPA incentives to emigrate, and present and future consequences of DACA/DAPA on that same community regarding incentives to emigrate.

17.   In addition, Dr. Eschbach relies in part on data regarding the effects of the Immigration Reform and Control Act of 1986 (IRCA), a program implemented twenty-eight years ago.  As I explain below, IRCA does not provide a basis on which to make predictions

---

percent for those who entered before 1960.   Warren and Warren, in their estimate of 3 percent emigration, have extrapolated the emigration rates for the total foreign-born population who entered in 1970-79 and applied it to unauthorized residents who have entered the United States from 1980 to 2009.

[4] For example, lacking actual data and analysis concerning DACA and DAPA, any reasonable hypothesis regarding the effect of DACA and DAPA on incentives to emigrate, and the predicted consequence to the overall unauthorized immigrant population in the United States, would need to consider the pre-DACA and pre-DAPA incentives on the eligible population.  Pursuant to the eligibility requirements of the program, the population of individuals in the United States who meet the DACA guidelines necessarily entered the United States at a young age.  Their parents and immediate family are likely to be in the United States, and their primary community ties are likely to be in the United States.  Conversely, this population may have diminished or non-existent family and community ties in their country of birth.  The DAPA policy necessarily correlates with strong ties to the United States, including having at least one United States citizen or legal resident child and having at least 5 years of residence in the United States.  Further, inasmuch as the DACA and DAPA policies are contingent upon individuals having not been convicted of serious crimes, this population is less likely to be placed in removal proceedings.

about DACA and DAPA.[5]   Dr. Eschbach attempts to support his conclusion that DACA and DAPA will lead to an increased in the unauthorized population in the United States based on a tenuous comparison to the fact that unauthorized migration has increased in the decades since IRCA was passed; but the fundamental assumption—that this increase is attributable to IRCA— is itself speculative, and fails to take into account other significant factors that may affect his conclusions, like environmental and economic factors.  (supra at ¶ 14.)[6]   Available data, and reasonable inferences that can be drawn from them, do not support Dr. Eschbach's prediction that DAPA or DACA will increase unauthorized immigration.

18.     Dr. Eschbach's opinion regarding the effect of DACA and DAPA on incentives to voluntarily emigrate is not supported by the data or reasonable inferences drawn from it.  His conclusory statement that an "unambiguous effect" of DACA and DAPA is that they will "reduce the incentive to emigrate" suffers from a lack of analysis or consideration of pre-DACA/DAPA incentives to emigrate, and present and future consequences of DACA/DAPA on that same community regarding incentives to emigrate.  As such, Dr. Eschbach's hypothesized growth in the unauthorized population based upon the theory that individuals who meet the DACA/DAPA guidelines who are discouraged from emigrating by DACA/DAPA will attract new unauthorized migrants, is also unsupported by the data or reasonable inferences that can be drawn from them.  This is because a necessary premise of that hypothesis is that DACA or DAPA had a meaningful effect on the incentive to emigrate.  Dr. Eschbach has not demonstrated

---

[5] DACA and DAPA, for example, result in a temporary and revocable grant of deferred action (which is not a lawful immigration status), while IRCA allowed persons to be granted the legal status of lawful permanent resident.
[6] If the net rate of removal remains constant, but immigration removal authorities are successful in focusing removal resources on higher priorities for removal, there would be a net qualitative benefit from DACA or DAPA, even if there is not a net quantitative increase in removals.

DACA and DAPA have a meaningful effect on incentives to emigrate, and as such, he cannot tie any hypothesized future "anchor" growth to DACA/DAPA.

**b. Dr. Eschbach's Conclusions Regarding the Effect of DACA/DAPA on Individuals who do Not Meet those Policy Guidelines Are Not Supported by the Data or His Analysis.**

19.     Dr. Eschbach hypothesizes that DACA and DAPA may incentivize unauthorized migrants who do not meet the policy guidelines to seek illegal entry to the United States (group "2") (See supra, ¶ 13), or to stay in the United States if they are already here (group "3") (See supra, ¶ 13).   Dr. Eschbach does not purport to base this hypothesis on any data regarding DACA.  (Eschbach Dec. at ¶ 26).  Instead, he begins by looking at IRCA and attempting to extrapolate the consequences of DACA/DAPA based his analysis of IRCA. (Eschbach Dec. at ¶ 20)  His conclusions are not supported by available data or reasonable inferences that can be drawn from that data.

20.     IRCA was implemented in 1986.  Dr. Eschbach asserts that IRCA was intended to "reduce the impacts of unauthorized migration . . . [through] adjustment in status of a substantial portion of the resident unauthorized populations . . . [combined with] enhanced enforcement [which would] reduce future growth of the population."  Dr. Eschbach assets that IRCA "failed to accomplish its goals" (Eschbach Dec. at ¶ 12, with citation at FN 13), and further asserts that "[i]n the 25 years after IRCA was implemented, there has not been a significant decrease in the number of unauthorized immigrants entering the United States.   Instead, the unauthorized population has surged to 11.7 million individuals since its implementation."  (Eschbach Dec. at ¶¶ 21-22.)[7]

---

[7] I take no position on the success or failure of IRCA vis-à-vis its intended goals.

21.    This conclusion does not support Dr. Eschbach's hypothesis that DACA and DAPA will have "the expected effect of increasing subsequent growth of the unauthorized population." (Eschbach Dec. at ¶28).

22.    First it is based on a flawed premise: Dr. Eschbach implies a relationship between IRCA and the growth of unauthorized populations within the United States by citing data reflecting growth in unauthorized population in the United States between 1990 and 2010 (Eschbach Dec. at ¶ 22), but this does not demonstrate a causal connection.  (Eschbach Dec. ¶ 22.)  In fact, Dr. Eschbach goes on to point to other primary causes for that increase, noting that "[t]he most important factors influencing" decisions to engage in unauthorized migration to the United States "are likely to be based on relative wages and job opportunities in the United States and the country of origin.  (Eschbach Dec. at ¶ 23, pg. 13.; ¶ 11, pg. 7.)  Given the primacy Dr. Eschbach and his authorities assign to perceptions of employment opportunities and wages in the United States as incentivizing unauthorized migration, his hypothesized connection between IRCA and unauthorized migration is not supported by his own findings.

23.    The mere fact of an increase in the flow of unauthorized migrants reflected in the 21 years of accumulated data between 1990 and 2010 supports no clear connection to the 1986 passage of IRCA.  Further, Dr. Eschbach fails to consider other factors affecting the flow of unauthorized migrants to the United States.

24.    Dr. Eschbach references trend data, including data reflecting increased apprehensions of unauthorized immigrants, "changes in the effectiveness of border enforcement," and other "confounding influences on trend data" (Eschbach Dec. at ¶ 24, pg. 13), but this discussion fails to shed any light on IRCA, subsequent growth of unauthorized migration, and how, if at all, they are connected.

25.     In support of his hypothesis that DACA and DAPA will increase the growth of unauthorized immigrant populations among individuals who do not meet the guidelines under those policies, Dr. Eschbach theorizes a connection between the unaccompanied minors ("UAC") surge and DACA.  He does this by juxtaposing the 2012 implementation of DACA with statistical data regarding UAC border apprehensions before and after the implementation of DACA, and which reflect the UAC surge.  (Eschbach Dec. at ¶¶ 25-26).  Dr. Eschbach's hypothesis is premised upon the assumption that DACA created a "climate of expectations…that status adjustments might be available to resident unauthorized children" rather than on data or reasonable inferences derived therefrom, and that DAPA and DACA expansion will create a similar misimpression.

26.     Notably, after conceding an absence of peer-reviewed studies supporting his hypothesis, Dr. Eschbach concedes that another statute, the Trafficking Victims Protection Reauthorization Act of 2008 (not DACA), was "the recent policy most directly related to the differential treatment of the Central American child population that has contributed the largest numbers to the recent increase in unauthorized migration by children."  (Eschbach Dec. at ¶ 26.) Nevertheless, Dr. Eschbach asserts a meaningful connection between DACA and the UAC surge, and bases that connection largely on a hypothesized misinformation effect, i.e., that individuals may have sent their children to the U.S. border based on the mistaken belief that they meet the DACA guidelines.  (Eschbach Dec. at ¶ 26 ("…contributed to a climate of expectation…")).  But Dr. Eschbach's analysis of the extent of the hypothesized misinformation effect is flawed.  And moreover, any misinformation effect has abated, as shown below, and there is no support for Dr. Eschbach's inference that DAPA or DACA would have a similar impact in the future.

27.     The reasonable inference to be drawn from available data is that DACA did not create a "discernabl[e] and significan[t]" incentive for "increased unauthorized migration." (Eschbach Dec. at ¶ 5).  The initial increase in apprehensions of Central American children began before the DHS Secretary announced DACA on June 15, 2012 (approximately 9 months into Fiscal Year 2012).  In particular, apprehensions of Central American[8] children had been fairly steady in Fiscal Years 2009-11; however, child[9] apprehensions increased 147 percent between Fiscal Years 2011 and 2012 (Exhibit 2, Chart 1).  The increase in Central American child apprehensions during the first 9 months of Fiscal Year 2012 (October 1, 2011 to June 30, 2012) was 112 percent above comparable months during Fiscal Year 2011.   This increase is *prior* to the date of the DACA announcement.   These differences contravene a reasonable inference that DACA was the primary factor affecting migration decisions during the relevant time period.  Finally, and as further described below, while a misinformation effect may have briefly existed and, as a result, motivated some individuals to attempt illegal migration, or send their children to the U.S. border, based on a misunderstanding of the DACA policy (infra at ¶¶30, 31), available data suggest that the effect was temporary and will not be a permanent feature of DACA, or a predictable consequence of DAPA (infra at ¶¶ 30-31).  There is no data supporting the conclusion that a misinformation effect had a significant effect on migration rates.

28.     An increase in apprehension of adults at the border also preceded the implementation of the 2012 DACA policy.   Mirroring the patterns for children, Central American adult apprehensions had been fairly steady in Fiscal Years 2009-11 and then increased by 103 percent between Fiscal Years 2011 and 2012 (Exhibit 2, Chart 1).

---

[8] This reference is to citizens of El Salvador, Guatemala, and Honduras, who account for nearly all of the apprehensions from Central America.
[9] Here, children are defined as persons under 18 years old, including Unaccompanied Minors (UAC) and those entering with others.

13

29.     Historically, Mexicans have represented the largest single nationality among persons apprehended by the U.S. Border Patrol.  Recent apprehension trends for Mexicans are strikingly different from trends for Central Americans, suggesting that factors other than DACA have had the most influence on recent migration decisions.   Mexican adult apprehensions have decreased annually from 442,000 in 2009 to 206,000 in 2014 (Exhibit 2, Chart 4).  Mexican child apprehensions have also declined.   Apprehensions of Mexican children have decreased from 61,000 in 2009 to 24,000 in 2014 (Exhibit 2, Chart 4).   Conversely, there has been continued growth in the number of Central American children apprehended by the U.S. Border Patrol following the DACA announcement in June 2012, peaking in June 2014 (Exhibit 2, Table 1). The increasing trend in apprehensions of Central American adults, who clearly do not meet DACA guidelines, has also continued through 2014.   The proportion of children among all Central American apprehensions, however, has increased from about 16 percent in Fiscal Years 2009-11, to 19 percent in 2012, 23 percent in 2013, and then to 38 percent in 2014.   The concomitant increase in adult and child apprehensions before and after the DACA announcement suggests that macro factors such as economic or safety concerns were pushing Central Americans to migrate in 2012 rather than the DACA policy.[10]

30.     If DACA had in fact created incentives among potential migrants who are ineligible for that program, child or otherwise, it is reasonable to conclude that those incentives would be constant as between Mexican migrants and Central American migrants, yet the data reflects significantly different migration patterns.   Dr. Eschbach does not address this

---

[10] For example, Central American children interviewed in U.S. detention facilities in 2012 reported that "dramatic increases in violence and poverty in their home countries" were the main reasons they migrated to the United States. See "Forced From Home:  The Lost Boys and Girls of Central America," Women's Refugee Commission, October 2012, Page 1.  A UNHCR report also found that "forty-eight percent of the displaced children interviewed for this study shared experiences of how they had been personally affected by the augmented violence in the region by organized armed criminal actors, including drug cartels and gangs or by State actors."  See "Children on the Run," UNHCR, July 2014, page 6.

457

discrepancy, which significantly undercuts his primary hypothesis regarding DACA's effect on UAC migration.

31.     Dr. Eschbach hypothesizes that DACA may have initially had a misinformation effect among individuals considering illegal migration to the United States, such that individuals who do not meet the DACA guidelines may have attempted unauthorized migration, or sent their children to the U.S. border, based upon a mistaken understanding of DACA. This hypothesis does not provide a reasonable basis for extrapolating to future effects of DACA and DAPA. Dr. Eschbach does not identify data from which it can be determined the extent, if any, that a false expectation of non-removal based on a misinterpretation of DACA, or a misunderstanding about eligibility for other immigration programs, or other factors affected the UAC surge, and to what extent it has affected migration patterns generally.     Moreover, the available data reflect a decrease of UAC migration in the latter half of 2014, a trend which corresponds to the redoubled efforts of DHS to inform the parents of children who were considering sending their children to the U.S. border that those apprehended would be a priority for deportation and that their children were not eligible for DACA.[11]  DHS also initiated a series of responses focused on stepped up deterrence, enhanced enforcement, stronger regional cooperation, and greater capacity of affected Federal agencies to ensure that the U.S. border remained secure. The monthly number of apprehensions of Central Americans dropped from 38,790 in June 2014, to 23,170 in July, and leveled off at approximately 9,500 during the months of September to December 2014 (Exhibit 2, Table 1). This rapid and significant decrease in apprehensions following the DHS's increased

---

[11]  See "An Open Letter to the Parents of Children Crossing Our Southwest Border," June 23, 2014; http://www.dhs.gov/news/2014/06/23/open-letter-parents-children-crossing-our-southwest-border; "Statement by Secretary Johnson About the Situation Along the Southwest Border," September 8, 2014, http://www.dhs.gov/news/2014/09/08/statement-secretary-johnson-about-situation-along-southwest-border for a description responses taken to address the increase in South West border apprehensions.

15

education efforts supports a reasonable inference that even assuming there was a misinformation-effect on migration related to DACA, any such effect was mitigated through the information campaign and stepped up enforcement.  In sum, available data indicate that any hypothesized misinformation effect was likely temporary and has abated, and it would not be reasonable to infer from these data that DACA or DAPA will cause a significant misinformation effect in the future.

32.     Dr. Eschbach's hypothesized connection between the UAC surge, or indeed any migration effect, and DACA and DAPA do not rest on peer reviewed analysis, or on a complete analysis of the empirical data.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 30th day of January, 2015

_____
Michael Hoefer

459

EXHIBIT 1

**Michael D. Hoefer**

20 Massachusetts Avenue, NW

Washington, DC

20529

*Telephone:  202 272-1258*

---

**<u>EMPLOYMENT</u>**

Mar 2013 to Present          Senior Advisor

Office of Policy and Strategy

**U.S. Citizenship and Immigration Services**

Develop estimates of the number of persons that may be eligible for various congressional bills, programs, or executive actions.  Also, provide technical support to the Research and Evaluation Office on statistical projects and immigration data analysis and reporting.

Oct 2003 to Mar 2013          Director

Office of Immigration Statistics

Office of Policy

**U.S. Department of Homeland Security**

Mar 1997 to Mar 2012          Chief

Statistics Branch

Policy Division

**U.S. Immigration and Naturalization Service**

Managed the Office of Immigration Statistics (OIS), which is the lead office within DHS for the reporting and analysis of immigration data.  The Statistics Branch of the U.S. Immigration and Naturalization Service was transferred to DHS in 2003 when DHS was created.  OIS serves a decision-support function within the DHS Policy Office by producing annual core reports on immigrants by legal status and by conducting quantitative studies and research on immigration.  The Office develops annual publications such as the *Yearbook of Immigration Statistics* and reports on trends in DHS administrative data of U.S. Lawful Permanent Residents, U.S. Naturalizations, Refugees and Asylees, Nonimmigrant admissions, and Immigration Enforcement Actions.  OIS also produces annual estimates of the Unauthorized, Lawful Permanent Resident, and Nonimmigrant populations.

Mar 1982 to Mar 1997          Supervisory Statistician (beginning in 1988)

Demographic Analysis

Statistics Branch

Policy Division

**U.S. Immigration and Naturalization Service**

1993 to 1994          Statistician (on Detail)

**Commission on Immigration Reform**

| Sep 1979 to Mar 1982 | Statistician |
| | Measurement and Analysis Division |
| | Office of Productivity Programs |
| | **U.S. Office of Personnel Management** |

Served as the statistician for the Office of Productivity Programs and provided guidance on sampling procedures and the analyses of productivity measures under review. Worked on the development and implementation of productivity systems designed for use by all governmental personnel, engineering, and security offices.

| Aug 1976 to Sep 1979 | Economist |
| | Office of Occupational Safety and Health Statistics |
| | Bureau of Labor Statistics |
| | **U.S. Department of Labor** |

Worked on the design of the Supplementary Data System, a collection of State Workers Compensation Records with information on workplace injuries and illnesses. Wrote programs to compile the information and produce reports on the characteristics and patterns of injuries and illnesses

## EDUCATION

| 1972 to 1976 | CORNELL UNIVERSITY, Ithaca, New York, |
| | **B.S. Industrial and Labor Relations, 1976** |
| | (Concentration in Applied Statistics) |

## PUBLICATIONS AND REPORTS

*Estimates of Unauthorized Immigrant Population Residing in the U.S.*
(Various years, 2005-11),
Office of Immigration Statistics
U.S. Department of Homeland Security

*Background of U.S. Immigration Policy Reform*
U.S. Immigration Policy Reform in the 1980s: A Preliminary
Assessment, Edited by Francisco L. Rivera-Batiz, Selig L. Sechzer, and
Ira N. Gang, 1991

## INVITED PRESENTATIONS AND TESTIMONY

*DHS Population Estimates: Legal and Illegal Residents*
Briefing for the U.S. Census Bureau Demographic Analysis Team
September 2009

*Immigration Flows: What Do We Know? How Can We Learn More?*
107th Meeting of the Committee on National Statistics
National Academy of Sciences
October 2008

*Comprehensive Immigration Reform: Government Perspectives on Immigration Statistics*
Testimony before the House Committee on the Judiciary Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law
June 2007

*The INS Statistics Program*
Testimony before the Commission on Immigration Reform
January 1993

*The Impact of the Immigration Act of 1990 on new flows of legal immigrants to the United States*
Population Reference Bureau
February 1991

*The Legalization Program in California*
Fourth Annual Demographic Workshop
University of Southern California
April 1991

*The Newest Americans*
Knight Center of Specialized Journalism
University of Maryland
April 1990

*Recent Trends in Immigration*
Population Resource Center
Immigration:  An Update for the Congressional Sunbelt Caucus
February 1990

*U.S. Immigration Policy Reform:  A Preliminary Assessment*
Rutgers University Colloquium
October 1988

**NON-DEGREE SEMESTER COURSEWORK**

| | |
|---|---|
| 1979 to 1986 | George Washington University |
| | Econometrics |
| | Times Series Analysis |
| | Demography |
| | Mathematical Statistics I and II |

**AWARDS**

Secretary's Award for Team DHS Excellence
Immigration Task Force
December 2007

Joyce Chiang Memorial Award for Excellence in Customer Service
U.S. Immigration and Naturalization Service
October 2000

EXHIBIT 2





Chart 2.  Number of Adults and Children Apprehended from El Salvador, Guatemala, and Honduras, and Children as a Percent of the Total:  Fiscal Years 2009-14



Chart 3. Percent Change in Apprehensions of Mexican Adults and Children: Fiscal Years 2009-14



Chart 4.  Number of Mexican Adults and Children Apprehended, and Children as a Percent of the Total:  Fiscal Years 2009-14

**Table 1.  Border Patrol Apprehensions of Adults and Children for Selected Nationalities October 2008 to December 2014**

| Month-Year | All Nationalities | | | Central American | | | Mexican | | |
|---|---|---|---|---|---|---|---|---|---|
| | Adults | Children | Total | Adults | Children | Total | Adults | Children | Total |
| **Fiscal Year Total** | | | | | | | | | |
| 2009 | 487,152 | 68,880 | 556,032 | 35,357 | 6,541 | 41,898 | 441,895 | 61,484 | 503,379 |
| 2010 | 410,292 | 53,090 | 463,382 | 38,317 | 7,392 | 45,709 | 359,892 | 44,473 | 404,365 |
| 2011 | 302,414 | 37,838 | 340,252 | 35,472 | 6,660 | 42,132 | 256,087 | 30,067 | 286,154 |
| 2012 | 316,852 | 47,916 | 364,768 | 71,854 | 16,461 | 88,315 | 235,531 | 30,224 | 265,755 |
| 2013 | 354,416 | 66,373 | 420,789 | 106,372 | 32,334 | 138,706 | 235,568 | 32,166 | 267,734 |
| 2014 | 369,819 | 116,888 | 486,707 | 148,552 | 90,686 | 239,238 | 205,579 | 23,650 | 229,229 |
| | | | | | | | | | |
| **Change** | | | | | | | | | |
| 2009-10 | -76,860 | -15,790 | -92,650 | 2,960 | 851 | 3,811 | -82,003 | -17,011 | -99,014 |
| 2010-11 | -107,878 | -15,252 | -123,130 | -2,845 | -732 | -3,577 | -103,805 | -14,406 | -118,211 |
| 2011-12 | 14,438 | 10,078 | 24,516 | 36,382 | 9,801 | 46,183 | -20,556 | 157 | -20,399 |
| 2012-13 | 37,564 | 18,457 | 56,021 | 34,518 | 15,873 | 50,391 | 37 | 1,942 | 1,979 |
| 2013-14 | 15,403 | 50,515 | 65,918 | 42,180 | 58,352 | 100,532 | -29,989 | -8,516 | -38,505 |
| | | | | | | | | | |
| **% Change** | | | | | | | | | |
| 2009-10 | -16% | -23% | -17% | 8% | 13% | 9% | -19% | -28% | -20% |
| 2010-11 | -26% | -29% | -27% | -7% | -10% | -8% | -29% | -32% | -29% |
| 2011-12 | 5% | 27% | 7% | 103% | 147% | 110% | -8% | 1% | -7% |
| 2012-13 | 12% | 39% | 15% | 48% | 96% | 57% | 0% | 6% | 1% |
| 2013-14 | 4% | 76% | 16% | 40% | 180% | 72% | -13% | -26% | -14% |
| | | | | | | | | | |
| Oct-08 | 38,401 | 6,036 | 44,437 | 3,231 | 574 | 3,805 | 34,251 | 5,383 | 39,634 |
| Nov-08 | 29,509 | 4,447 | 33,956 | 2,578 | 507 | 3,085 | 26,201 | 3,862 | 30,063 |
| Dec-08 | 23,621 | 3,499 | 27,120 | 2,392 | 459 | 2,851 | 20,319 | 2,933 | 23,252 |
| Jan-09 | 39,727 | 5,930 | 45,657 | 2,170 | 382 | 2,552 | 36,661 | 5,460 | 42,121 |
| Feb-09 | 43,925 | 6,503 | 50,428 | 2,703 | 507 | 3,210 | 40,520 | 5,939 | 46,459 |
| Mar-09 | 60,139 | 8,601 | 68,740 | 3,282 | 639 | 3,921 | 56,057 | 7,894 | 63,951 |
| Apr-09 | 52,613 | 7,158 | 59,771 | 3,008 | 617 | 3,625 | 48,812 | 6,479 | 55,291 |
| May-09 | 46,536 | 5,541 | 52,077 | 3,191 | 550 | 3,741 | 42,597 | 4,941 | 47,538 |
| Jun-09 | 41,924 | 5,330 | 47,254 | 3,117 | 543 | 3,660 | 38,011 | 4,715 | 42,726 |
| Jul-09 | 39,539 | 5,561 | 45,100 | 3,289 | 600 | 3,889 | 35,466 | 4,901 | 40,367 |
| Aug-09 | 38,906 | 5,943 | 44,849 | 3,372 | 613 | 3,985 | 34,678 | 5,266 | 39,944 |
| Sep-09 | 32,312 | 4,331 | 36,643 | 3,024 | 550 | 3,574 | 28,322 | 3,711 | 32,033 |
| Oct-09 | 37,110 | 5,185 | 42,295 | 2,804 | 479 | 3,283 | 33,386 | 4,615 | 38,001 |
| Nov-09 | 30,318 | 3,805 | 34,123 | 2,402 | 390 | 2,792 | 27,022 | 3,335 | 30,357 |
| Dec-09 | 23,312 | 2,872 | 26,184 | 2,148 | 398 | 2,546 | 20,336 | 2,417 | 22,753 |
| Jan-10 | 32,051 | 3,779 | 35,830 | 1,914 | 356 | 2,270 | 29,346 | 3,339 | 32,685 |
| Feb-10 | 38,946 | 5,102 | 44,048 | 2,504 | 465 | 2,969 | 35,472 | 4,531 | 40,003 |
| Mar-10 | 55,176 | 7,639 | 62,815 | 3,542 | 664 | 4,206 | 50,648 | 6,860 | 57,508 |
| Apr-10 | 49,852 | 6,766 | 56,618 | 3,798 | 767 | 4,565 | 45,011 | 5,892 | 50,903 |
| May-10 | 42,814 | 5,585 | 48,399 | 4,586 | 986 | 5,572 | 37,092 | 4,498 | 41,590 |
| Jun-10 | 30,445 | 3,776 | 34,221 | 4,311 | 895 | 5,206 | 25,043 | 2,757 | 27,800 |
| Jul-10 | 24,011 | 2,819 | 26,830 | 3,608 | 745 | 4,353 | 19,394 | 1,984 | 21,378 |
| Aug-10 | 24,751 | 3,192 | 27,943 | 3,770 | 710 | 4,480 | 19,699 | 2,312 | 22,011 |
| Sep-10 | 21,506 | 2,570 | 24,076 | 2,930 | 537 | 3,467 | 17,443 | 1,933 | 19,376 |
| Oct-10 | 24,699 | 2,836 | 27,535 | 2,126 | 308 | 2,434 | 21,534 | 2,445 | 23,979 |
| Nov-10 | 21,034 | 2,519 | 23,553 | 2,180 | 369 | 2,549 | 17,910 | 2,071 | 19,981 |
| Dec-10 | 17,944 | 2,405 | 20,349 | 1,940 | 399 | 2,339 | 15,306 | 1,933 | 17,239 |
| Jan-11 | 22,264 | 2,781 | 25,045 | 1,686 | 303 | 1,989 | 19,794 | 2,412 | 22,206 |
| Feb-11 | 26,426 | 3,352 | 29,778 | 2,271 | 413 | 2,684 | 23,391 | 2,852 | 26,243 |

**Table 1.  Border Patrol Apprehensions of Adults and Children for Selected Nationalities October 2008 to December 2014**

| Month-Year | All Nationalities | | | Central American | | | Mexican | | |
|---|---|---|---|---|---|---|---|---|---|
| | Adults | Children | Total | Adults | Children | Total | Adults | Children | Total |
| Mar-11 | 38,159 | 5,087 | 43,246 | 3,517 | 679 | 4,196 | 33,531 | 4,254 | 37,785 |
| Apr-11 | 33,014 | 4,169 | 37,183 | 3,508 | 727 | 4,235 | 28,574 | 3,349 | 31,923 |
| May-11 | 28,782 | 3,425 | 32,207 | 3,290 | 638 | 3,928 | 24,464 | 2,650 | 27,114 |
| Jun-11 | 25,113 | 2,984 | 28,097 | 3,780 | 734 | 4,514 | 20,427 | 2,145 | 22,572 |
| Jul-11 | 21,519 | 2,643 | 24,162 | 3,781 | 704 | 4,485 | 16,710 | 1,856 | 18,566 |
| Aug-11 | 22,397 | 2,867 | 25,264 | 4,004 | 706 | 4,710 | 17,535 | 2,087 | 19,622 |
| Sep-11 | 21,063 | 2,770 | 23,833 | 3,389 | 680 | 4,069 | 16,911 | 2,013 | 18,924 |
| Oct-11 | 23,247 | 3,150 | 26,397 | 3,809 | 781 | 4,590 | 18,776 | 2,309 | 21,085 |
| Nov-11 | 21,162 | 3,020 | 24,182 | 3,961 | 887 | 4,848 | 16,452 | 2,067 | 18,519 |
| Dec-11 | 17,022 | 2,498 | 19,520 | 3,169 | 796 | 3,965 | 13,192 | 1,645 | 14,837 |
| Jan-12 | 22,928 | 3,391 | 26,319 | 3,400 | 759 | 4,159 | 18,812 | 2,569 | 21,381 |
| Feb-12 | 27,930 | 4,222 | 32,152 | 5,188 | 1,197 | 6,385 | 22,003 | 2,932 | 24,935 |
| Mar-12 | 37,119 | 5,704 | 42,823 | 6,604 | 1,555 | 8,159 | 29,666 | 4,032 | 33,698 |
| Apr-12 | 35,750 | 5,468 | 41,218 | 7,494 | 1,853 | 9,347 | 27,374 | 3,469 | 30,843 |
| May-12 | 32,637 | 4,959 | 37,596 | 8,990 | 2,137 | 11,127 | 22,760 | 2,672 | 25,432 |
| Jun-12 | 27,345 | 3,965 | 31,310 | 8,471 | 1,796 | 10,267 | 17,911 | 2,037 | 19,948 |
| Jul-12 | 23,907 | 3,817 | 27,724 | 7,105 | 1,634 | 8,739 | 15,919 | 2,030 | 17,949 |
| Aug-12 | 24,096 | 4,080 | 28,176 | 7,044 | 1,606 | 8,650 | 16,312 | 2,340 | 18,652 |
| Sep-12 | 23,709 | 3,642 | 27,351 | 6,619 | 1,460 | 8,079 | 16,354 | 2,122 | 18,476 |
| Oct-12 | 25,397 | 4,180 | 29,577 | 6,546 | 1,561 | 8,107 | 18,120 | 2,516 | 20,636 |
| Nov-12 | 23,947 | 4,186 | 28,133 | 6,455 | 1,704 | 8,159 | 16,772 | 2,380 | 19,152 |
| Dec-12 | 19,879 | 3,801 | 23,680 | 5,565 | 1,656 | 7,221 | 13,640 | 2,038 | 15,678 |
| Jan-13 | 23,201 | 4,116 | 27,317 | 4,929 | 1,408 | 6,337 | 17,524 | 2,609 | 20,133 |
| Feb-13 | 30,287 | 5,217 | 35,504 | 7,997 | 2,178 | 10,175 | 21,434 | 2,913 | 24,347 |
| Mar-13 | 40,694 | 7,144 | 47,838 | 11,077 | 3,219 | 14,296 | 28,404 | 3,737 | 32,141 |
| Apr-13 | 41,477 | 7,220 | 48,697 | 12,183 | 3,477 | 15,660 | 28,059 | 3,534 | 31,593 |
| May-13 | 37,554 | 6,694 | 44,248 | 12,173 | 3,568 | 15,741 | 24,081 | 2,922 | 27,003 |
| Jun-13 | 29,424 | 5,529 | 34,953 | 9,770 | 3,102 | 12,872 | 18,403 | 2,257 | 20,660 |
| Jul-13 | 27,979 | 5,905 | 33,884 | 10,112 | 3,360 | 13,472 | 16,600 | 2,350 | 18,950 |
| Aug-13 | 28,158 | 6,324 | 34,482 | 10,158 | 3,615 | 13,773 | 16,772 | 2,537 | 19,309 |
| Sep-13 | 26,419 | 6,057 | 32,476 | 9,407 | 3,486 | 12,893 | 15,759 | 2,373 | 18,132 |
| Oct-13 | 28,815 | 7,119 | 35,934 | 9,661 | 4,140 | 13,801 | 17,819 | 2,764 | 20,583 |
| Nov-13 | 25,104 | 7,342 | 32,446 | 8,495 | 4,736 | 13,231 | 15,264 | 2,407 | 17,671 |
| Dec-13 | 22,459 | 7,525 | 29,984 | 8,588 | 5,293 | 13,881 | 12,715 | 1,992 | 14,707 |
| Jan-14 | 22,933 | 6,305 | 29,238 | 7,318 | 3,978 | 11,296 | 14,570 | 2,168 | 16,738 |
| Feb-14 | 28,654 | 8,281 | 36,935 | 10,134 | 5,653 | 15,787 | 17,326 | 2,378 | 19,704 |
| Mar-14 | 37,681 | 12,498 | 50,179 | 14,126 | 9,132 | 23,258 | 22,204 | 3,116 | 25,320 |
| Apr-14 | 40,656 | 11,405 | 52,061 | 16,353 | 9,126 | 25,479 | 22,844 | 2,063 | 24,907 |
| May-14 | 43,456 | 17,901 | 61,357 | 20,731 | 15,810 | 36,541 | 21,009 | 1,779 | 22,788 |
| Jun-14 | 38,672 | 19,941 | 58,613 | 20,533 | 18,367 | 38,900 | 16,554 | 1,284 | 17,838 |
| Jul-14 | 31,559 | 9,791 | 41,350 | 14,947 | 8,336 | 23,283 | 15,354 | 1,261 | 16,615 |
| Aug-14 | 27,057 | 5,042 | 32,099 | 10,492 | 3,620 | 14,112 | 15,274 | 1,286 | 16,560 |
| Sep-14 | 22,773 | 3,738 | 26,511 | 7,174 | 2,495 | 9,669 | 14,646 | 1,152 | 15,798 |
| Oct-14 | 23,277 | 3,734 | 27,011 | 6,934 | 2,424 | 9,358 | 15,334 | 1,204 | 16,538 |
| Nov-14 | 21,162 | 3,982 | 25,144 | 6,542 | 2,729 | 9,271 | 13,608 | 1,157 | 14,765 |
| Dec-14 | 21,133 | 4,483 | 25,616 | 7,128 | 3,305 | 10,433 | 12,931 | 1,076 | 14,007 |
| Total | 2,306,517 | 403,184 | 2,709,701 | 456,528 | 168,532 | 625,060 | 1,776,425 | 225,501 | 2,001,926 |

Source: U.S. Border Patrol and the DHS Office of Immigration Statistics
Note:  Data are for all Border Patrol Sectors, including the Northern and Sea Borders
Adults are those persons 18 years or older.