


February 2, 2015

***Via CM/ECF***

The Honorable Andrew S. Hanen
600 East Harrison Street, #101
Brownsville, Texas 78520

Re: *Texas v. United States*, No. 1:14-cv-254 (S.D. Tex.)

Dear Judge Hanen:

At the January 15 hearing on our motion for a preliminary injunction, the Court contemplated that the Plaintiff States would respond by letter to Defendants' anticipated sur-reply. More than two weeks after that hearing — to which Defendants did not object — Defendants offered new declarations from previously undisclosed witnesses. This letter explains why nothing in Defendants' sur-reply or their untimely new exhibits undermines Plaintiffs' entitlement to relief.

## I. THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION WITHOUT A NEW HEARING

Defendants' sur-reply raises five new issues. Plaintiffs briefly respond to each issue below. None warrants denial of the preliminary injunction, or necessitates a new hearing before granting it.

**A.** First, Defendants have yet again changed their position on driver's licenses. Having previously told the Ninth Circuit one thing and this Court another, Defendants now offer a third position: States are free to deny "driver's licenses to DACA and DAPA recipients, so long as the States base [the denials] on existing federal alien classifications." Sur-reply 7. But that is *exactly* what Arizona did before being enjoined at Defendants' urging. Arizona refused to give licenses to anyone with deferred action. And it did so based on all three of the preexisting "federal alien classifications" for deferred action: "deferred enforced departure" (DED), "deferred action" (DA), and "Deferred Action for Childhood Arrivals" (DACA). *See* ADOT Policy 16.1.4, Establishing Authorized Presence 4 (attached as Ex. A). Those are not Arizona's classifications. *Defendants* created them and even assigned codes to them: the federal classification codes for DED, DA, and DACA are "(a)(11)," "(c)(14)," and "(c)(33)," respectively. *See* USCIS Instructions for I-765, Application for Employment Authorization 1, 5 (attached as Ex. B). *Defendants* use those alien-classification codes for issuing work permits. *See* USCIS Form I-765, Application for Employment Authorization at Box 16 (attached as Ex. C). But when Arizona tried to deny driver's licenses to all deferred-action recipients, using Defendants' own alien-classification codes to identify those recipients, Defendants convinced the federal courts to enjoin the effort. *See* Order and Permanent Injunction 5, *Ariz. Dream Act Coalition v. Brewer*, No. 12-cv-2546 (D. Ariz. Jan. 22, 2015) (attached as Ex. D) (enjoining Arizona from denying driver's licenses based on Defendants' own (a)(11), (c)(14), and (c)(33) codes). Four of the Plaintiff States are effectively bound by a federal injunction that Defendants helped secure. Defendants cannot turn around and contend that the States' free "choices" — rather than the preemptive force of federal law — are to blame for the burdens of issuing new driver's licenses.

Moreover, even if the States could change their licensing laws, Defendants still cannot characterize Plaintiffs' injuries as "self-inflicted." To the contrary, Article III allows States to challenge federal efforts to interfere with preexisting state programs. *See, e.g.*, *Alaska v. DOT*, 868 F.2d 441, 443 (D.C. Cir. 1989) ("emphatically" rejecting DOT's argument that 27 state Attorneys General, including Texas's, lacked standing to challenge federal agency action that affected a state program); *cf. Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 270 (4th Cir. 2011) (a State cannot create its own standing by passing a new statute that intentionally conflicts with federal law, but States do have standing when federal law affects *preexisting* state programs). As we have explained from the outset, state licensing programs that existed long before DACA and DAPA require Plaintiff States to issue licenses to deferred-action beneficiaries. *See* PI Mot. 27 (ECF No. 5); Second Decl. of Joe Peters (attached as Ex. E). And the States have an Article III interest — vindicable through a suit in federal court — in defending those preexisting "legal code[s]" against changes foisted upon them by federal law. *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982).

**B.** Second, Defendants have doubled down on their claim that they have unreviewable discretion to give work permits to every single one of the 11 million undocumented immigrants in the United States. *See* Sur-reply 37 (arguing INA does nothing to "preclude[] the Secretary . . . from granting work authorization"). But if Defendants were correct that the INA's definition of "unauthorized alien," 8 U.S.C. § 1324a(h)(3), authorizes DHS to give permits to anyone and everyone, then numerous other statutory provisions would be surplusage. For example, Congress would have no reason to give DHS discretion to "grant work authorization to any alien who has a pending, bona fide [U-visa] application," 8 U.S.C. § 1184(p)(6), if that discretion was hidden in the statute's definitional provision all along. *See also id.* § 1105a(a) (DHS "may authorize" employment of battered spouses of certain nonimmigrants); *id.* § 1154(a)(1)(D)(i)(II), (IV), 1154(a)(1)(K) (VAWA self-petitioners and children are "eligible for work authorization"); *id.* § 1158(d)(2) (applicant for asylum "may be provided [work authorization] under regulation"); *id.* § 1226(a)(3) (DHS may authorize certain LPRs to work); *id.* § 1231(a)(7) (DHS may authorize certain unremovable individuals to work). Defendants' only response is that Congress's decision to authorize work permits in *some limited* circumstances purportedly means that Congress authorized work permits in *any and every* circumstance. Sur-reply 36-37. Precedent forecloses this irregular approach to statutory interpretation and administrative delegation. *See, e.g., FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000).

Nor can Defendants avoid the problem by noting that the States do not "separately" challenge a regulation purporting to authorize a work permit for "[a]n alien who has been granted deferred action." 8 C.F.R. § 274a.12(c)(14); *see* Sur-reply 35-36. That regulation is lawful insofar as Congress authorized the work permits, as it did for VAWA self-petitioners. *See* 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV). Thus, the regulation is not unlawful in all of its applications — *i.e.*, "separately" from Defendants' use of it here. What *is* facially unlawful is Defendants' reading of a regulation supported only by limited grants of authority as nevertheless authorizing work permits for every single undocumented immigrant in the country. Defendants still refuse to offer any limiting principle for their alleged unreviewable discretion to issue work permits to anyone they please.

**C.** Third, Defendants gain nothing by belatedly attempting — for the first time since the creation of DACA and DAPA — to identify examples of "case-by-case discretion" under the programs. Out of 727,164 DACA applications, Defendants issued a "Notice of Intent to Deny" in only 6,496 cases (less than 1%). *See* Sur-reply App. 511-12. Even more remarkably, Defendants can

point to only two NOIDs that were allegedly based on "discretionary" considerations (less than 0.00028%). *See id.* at 554-55. Moreover, in both of those allegedly "discretionary" cases, the DACA applicant *did* violate DHS's eligibility criteria by "committ[ing] Robbery and Grand Theft," *id.* at 554, or by "committ[ing] multiple felonies" including "the sale of illegal drugs," *id.* at 555. *See* Memorandum for Thomas S. Winkowski *et al.* from Jeh Johnson, Policies for Apprehension, Detention and Removal of Undocumented Immigrants 3 (Nov. 20, 2014) ("Johnson-Winkowski Memo") ("felony" makes applicant ineligible for DACA). Even if a 0.00028% denial rate qualifies as genuine "discretion," it is unreasonable to call these two NOIDs "discretionary" simply because the applicants committed their felonies when they were juveniles. Sur-reply 32; Sur-reply App. 512.[†]

More fundamentally, Defendants cannot leverage their supposed "case-by-case discretion" to preclude judicial review of their actions. Agency *inaction* generally is immune from judicial review because courts are ill-equipped to evaluate the "complicated balancing of a number of factors" that inform an agency's discretionary decision not to act in a particular case. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (explaining unreviewable inaction must be truly discretionary). But as *Chaney* itself acknowledged, the exact opposite is true when agencies take action: "[W]hen an agency *does* act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner." *Id.* at 832 (emphasis in original). That is why judicial review routinely attaches to agency action, even when the agency has broad discretion in deciding how to act. *E.g.*, *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 142-43 (2002) ("This case exemplifies the principle that the Board's discretion . . . , though generally broad is not unlimited." (citation omitted)). And that is one reason why judicial review attaches here: No matter how broad DHS's discretion not to enforce the INA, it must have constitutional and statutory authority when it *does* act — for example, by setting up a program to grant millions of deferred-action applications and work permits. Thus, "discretion" and *Chaney* do not shield the DHS Directive from judicial review.

To be sure, "case-by-case discretion" determines whether the Directive is a "substantive rule" under the APA. If the contractors and employees in DHS service centers had genuine discretion, and were in no way bound by the Directive, then the Directive would be a non-binding "policy statement," exempt from the APA's notice-and-comment requirements. But Defendants do not dispute that it is *their* burden to prove that the DHS Directive is merely a "policy statement." *See* PI Reply 34-35 (ECF No. 64) (explaining that APA creates presumption of reviewability, which agency bears burden to rebut). And in order to prove that the DHS Directive is a policy statement, DHS must justify every deferred-action decision without regard to the Directive's eligibility criteria: "When the agency applies the policy in a particular situation, it must be prepared to support the [decision] just as if the policy statement had never been issued." *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 596 (5th Cir. 1995) (internal quotation marks omitted). This they cannot do. Even using Defendants' most-aggressive numbers in this case, far more than 90% of DHS's decisions were based *exclusively* on the Directive's eligibility criteria. And Defendants can point to no

[†] It is even more unreasonable to claim that "gang membership" and "fraud" in the DACA-application process qualify as "discretionary" reasons. Sur-reply App. 510, 512. "Gang activity" is expressly prohibited by DHS's eligibility criteria. *See* Johnson-Winkowski Memo 3. Moreover, the DACA application itself states that fraud is a "felony" and hence a violation of DHS's no-felony eligibility criterion. *See* USCIS Form I-821D, Consideration of Deferred Action for Childhood Arrivals 5 (attached as Ex. F) (requiring applicant to certify: "I also understand that knowingly and willfully providing materially false information on this form is a federal felony").

case, from any court, suggesting that a similar pattern of decisionmaking can avoid compliance with the APA as a mere "policy statement."

**D.** Fourth, Defendants cannot avoid judicial review by claiming that the Plaintiff States fall outside the APA's "zone of interests." Sur-reply 16-17. Plaintiffs' procedural claim falls squarely within the zone of interests under the APA's notice-and-comment provision, which "is designed to ensure that affected parties [like the Plaintiff States] have an opportunity to participate in and influence agency decision making at an early stage." *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979). And the Plaintiff States' substantive challenge also falls within the zone of interests of federal immigration laws, the "clear intent" of which is "to protect American workers from the deleterious effects the employment of foreign labor might have on domestic wages and working conditions." *Mendoza v. Perez*, 754 F.3d 1002, 1017 (D.C. Cir. 2014); *accord Perales v. Casillas*, 903 F.2d 1043, 1051 (5th Cir. 1990). It is well settled that States have *parens patriae* standing to vindicate that interest. *E.g.*, *Alfred L. Snapp*, 458 U.S. at 608-10.

If there were any doubt, the Plaintiff States benefit from a heavy thumb on the scale. The Supreme Court has said that the zone-of-interests test is "not especially demanding" and has instructed federal courts to "apply the zone-of-interests test in a manner consistent with Congress's evident intent . . . to make agency action presumptively reviewable." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1389 (2014) ("[T]he benefit of any doubt goes to the plaintiff."); *ibid.* (insisting upon a "lenient approach" when applying the "generous review provisions of the APA"). Indeed, the zone-of-interests test "forecloses suit only when plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be reasonably assumed that Congress authorized the plaintiff to sue." *Lexmark*, 134 S. Ct. at 1389 (internal quotation marks omitted). Defendants cannot use the zone-of-interests doctrine to tell more than half of the States in the Union *both* that the INA preempts States' police powers with regard to immigration *and* that States are barred from complaining in any forum that the federal government is not following the INA. *Cf. Massachusetts v. EPA*, 549 U.S. 497, 519 (2007) (noting "in the federal system, the States are not relegated to the role of mere provinces or political corporations, but retain the dignity, though not the full authority, of sovereignty" (internal quotation marks omitted)).

**E.** Finally, Defendants have reiterated their abiding disagreement with *Massachusetts v. EPA*. *Compare* Sur-reply 13 (arguing that States cannot bring "*parens patriae* suits against the Federal Government"), *with Massachusetts,* 549 U.S. at 519-20 & n.17 (holding Massachusetts has "standing to sue *parens patriae*," even "against the Federal Government" (internal quotation marks omitted)). Defendants cannot avoid the legal import of that decision by pretending that it only applies "to property that the State itself owned." Sur-reply 13. That is like saying that *Youngstown* only applies where the President seizes steel mills. And in all events, the Plaintiff States' injuries in this case *do* affect property that the States themselves own — including schools, healthcare systems, law-enforcement assets, and land along their borders.

Nor can Defendants distinguish *Massachusetts* by claiming that the States' injuries here are somehow more speculative. Their effort is based on the declaration of Michael Hoefer, a USCIS employee with a bachelor's degree in industrial and labor relations and no graduate or post-graduate education or training in any field. *See* Sur-reply App. 445. Even assuming Mr. Hoefer could in

theory challenge Dr. Karl Eschbach's expertise in demography — which is based on a doctoral degree and more than two decades of relevant graduate and post-graduate training and experience — he has not done so here. Mr. Hoefer does not dispute that approximately 400,000 undocumented immigrants leave the United States each year voluntarily or through removal by DHS. *See* Eschbach Decl. ¶ 12 (Plaintiffs' PI App. 757 tbl. 2). But *everyone* who receives deferred action and a work permit will have zero prospect of removal by DHS and will have drastically reduced (if not eliminated) incentives to leave voluntarily. Thus, even if the Directive had no effect on new illegal immigration, its effects on those already here would be enough to give the Plaintiff States standing to challenge costs to their public programs, like schools and healthcare systems. Moreover, even assuming that Mr. Hoefer is competent to testify about the cause-and-effect relationship between federal legalization programs and new illegal immigration, he does not (and could not) suggest that this relationship is somehow more tenuous than the one between EPA's regulation of new-car carbon emissions and the erosion of Massachusetts's shoreline.

## II. ALTERNATIVELY, THE COURT SHOULD HOLD A SECOND HEARING

The new declarations accompanying Defendants' sur-reply do not create any *material* factual dispute, for all of the reasons explained here and previously. Indeed, given that Defendants had over a week to review each and every one of Plaintiffs' factual assertions before the hearing, and given that Defendants participated in the hearing without objection, they cannot later manufacture a fact dispute by offering new, post-hearing declarations. That is sandbagging. *See Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*, 446 F.2d 353 (5th Cir. 1971) (reversing where litigant produced 175 of pages of evidence on the day of the preliminary-injunction hearing, thus denying its opponent a chance to review the evidence and seek resolution of any factual disputes at the hearing).

But if the Court decides that the Defendants' new declarations create a fact dispute of material consequence to the motion (which they do not), the correct step would be to hold a second hearing. As Wright and Miller observe, "most courts[, including the Fifth Circuit,] hold that when the written evidence reveals a factual dispute, an evidentiary hearing must be provided to any party who requests one." 11A Fed. Prac. & Proc. Civ. § 2949 & n.43 (3d ed. 2014 Supp.) (citing, *inter alia*, *Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958)). Although Defendants unsurprisingly disclaim that right, Sur-reply 9 n.5, we made clear at the January 15 hearing that Plaintiffs want to preserve it; Defendants cannot override Plaintiffs' objection by filing un-crossed declarations 15 days later. *See Bernal v. Gonzalez*, 923 F. Supp. 2d 907, 927 n.17 (W.D. Tex. 2012) (defendant's denial of that opportunity requires discounting weight of defendant's post-hearing submissions). Moreover, to the extent it matters that defendant Vitiello authored a memorandum asserting a cause-and-effect relationship between illegal immigration and Defendants' violations of the INA, *but see* Sur-reply 9 n.6 (denying that relationship), Plaintiffs should be allowed to call him to testify and establish it.

* * *

On the day Defendants filed their sur-reply, USCIS publicly announced that the 2014 DHS Directive will go into effect on February 18, 2015. *See* http://1.usa.gov/1wPXWrb. For the sake of those who will rely on Defendants' invitation to "come out of the shadows," FAC ¶ 50, and to preserve the legal rights of more than one-half of the States in the country, Plaintiffs respectfully request injunctive relief by that date.

Sincerely,

ANDREW S. OLDHAM
Deputy Solicitor General of Texas
*Counsel for Plaintiffs*

cc: All counsel of record via CM/ECF

## EXHIBITS

ADOT Policy 16.1.4, Establishing Authorized Presence .......... A

USCIS Instructions for I-765, Application for Employment Authorization .......... B

USCIS Form I-765, Application for Employment Authorization .......... C

Order and Permanent Injunction, *Ariz. Dream Act Coalition v. Brewer*, No. 12-cv-2546 (D. Ariz. Jan. 22, 2015) .......... D

Second Declaration of Joe Peters .......... E

USCIS Form I-821D, Consideration of Deferred Action for Childhood Arrivals .......... F