D

1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9   Arizona Dream Act Coalition; Jesus Castro-          No. CV12-02546 PHX DGC
    Martinez; Christian Jacobo; Alejandro Lopez;
10  Ariel Martinez; Natalia Perez-Gallagos; Carla
    Chavarria; and Jose Ricardo Hinojos,
11
                                                        **ORDER AND PERMANENT**
12                  Plaintiffs,                         **INJUNCTION**

13  v.

14
    Janice K. Brewer, Governor of the State of
15  Arizona, in her official capacity; John S.
    Halikowski, Director of the Arizona Department
16  of Transportation, in his official capacity; and
    Stacey K. Stanton, Assistant Director of the Motor
17  Vehicle Division of the Arizona Department of
    Transportation, in her official capacity,
18
19
                    Defendants.
20

21          This case concerns the constitutionality of the State of Arizona's denial of driver's

22  licenses to persons commonly known as "DREAMers."[1]  On June 15, 2012, the Secretary

23  of the Department of Homeland Security ("DHS") announced the Deferred Action for

24  Childhood Arrivals ("DACA") program, which provides deferred action for a period of

25  _____

26          [1] Plaintiffs generally refer to themselves as "DREAMers" based on proposed
    federal legislation known as the Development, Relief, and Education for Alien Minors
27  Act (the "DREAM Act").  Doc. 1, ¶ 2.  The DREAM Act would grant legal status to
    certain undocumented young adults.  Congress has considered the DREAM Act several
    times, but no version has been enacted.  *See, e.g.*, DREAM Act of 2011, S. 952, H.R.
28  1842, 112th Cong. (2011); DREAM Act of 2010, H.R. 6497, S. 3962, S. 3963, 111th
    Cong. (2010); DREAM Act of 2007, S. 774, 110th Cong. (2007).



1    two years to certain eligible DREAMers (referred to here as "DACA recipients").

2    Deferred action constitutes a discretionary decision by law enforcement authorities to

3    defer legal action that would remove an individual from the country.   The DACA

4    program provides that DACA recipients may work during the period of deferred action

5    and may obtain employment authorization documents, generally known as "EADs," from

6    the United States Citizenship and Immigration Services ("USCIS").

7         Under Arizona law, the Arizona Department of Transportation ("ADOT") "shall

8    not issue to or renew a driver license . . . for a person who does not submit proof

9    satisfactory to the department that the applicant's presence in the United States is

10   authorized under federal law."  A.R.S. § 28-3153(D).  Before the announcement of the

11   DACA program, the Motor Vehicle Division ("MVD") of ADOT accepted all federally-

12   issued EADs as sufficient evidence that a person's presence in the United States was

13   authorized under federal law, and therefore granted driver's licenses to these individuals.

14   After announcement of the DACA program, MVD revised its policy to provide that

15   EADs issued to DACA recipients did not constitute sufficient evidence of authorized

16   presence, even though the MVD continued to accept all other EADs, including those

17   issued to persons who had received other forms of deferred action.  MVD later revised its

18   policy so that two other categories of deferred action recipients – those with (a)(11) and

19   (c)(14) deferrals – could not use EADs to obtain driver's licenses.

20        Plaintiffs are the Arizona Dream Act Coalition (the "Coalition"), which is an

21   immigrant youth-led community organization, and six individual DACA recipients.  They

22   allege that Defendants' driver's license policy violates the Equal Protection Clause of the

23   United States Constitution.[2]   Plaintiffs sought a preliminary injunction barring

24   Defendants from enforcing their policy.  Doc. 29.  The Court found that Defendants were

25   likely to succeed on the merits of their equal protection claim, but that they had not

26   shown a likelihood of irreparable harm sufficient to justify preliminary injunctive relief.

27   _____

28        [2] Plaintiffs also claim that Defendant's policy is preempted by federal law.  *See*
     Doc. 1.  The Court granted Defendants' motion to dismiss this claim.  Doc. 114.

- 2 -

1   Doc. 114.  The Ninth Circuit reversed, *Arizona Dream Act Coalition v. Brewer*, 757 F.3d

2   1053 (9th Cir. 2014) ("*ADAC*"), and the Court entered a preliminary injunction on

3   remand.  Doc. 295.

4        The parties have filed and briefed motions for summary judgment.  Docs. 247,

5   251, 259-2, 261, 267-1, 273, 278-1.  At the Court's request, the parties also filed

6   memoranda addressing the effect of *ADAC* on the merits of this case.  Docs. 287, 289.

7   The Court heard oral argument on January 7, 2015.  For the reasons that follow, the Court

8   will grant summary judgment to Plaintiffs and enter a permanent injunction.

9   **BACKGROUND**

10   **I.**    **Deferred Action and DACA.**

11        The federal government has broad and plenary powers over the subject of

12   immigration and the status of aliens.  *Arizona v. United States*, 132 S. Ct. 2492, 2498

13   (2012); *see also* U.S. Const. art. I, § 8, cl. 4.  Through the Immigration and Nationality

14   Act ("INA"), 8 U.S.C. § 1101, *et seq*., Congress has created a complex and detailed

15   federal immigration scheme governing the conditions under which foreign nationals may

16   be admitted to and remain in the United States, *see, e.g.*, *id.* §§ 1181, 1182, 1184, and

17   providing for the removal and deportation of aliens not lawfully admitted to this country,

18   *see, e.g.*, *id.* §§ 1225, 1227-29, 1231.  *See generally United States v. Arizona*, 703 F.

19   Supp. 2d 980, 987-88 (D. Ariz. 2010) (describing the federal immigration scheme).  The

20   INA charges the Secretary of Homeland Security with the administration and

21   enforcement of all laws relating to immigration and naturalization.   8 U.S.C.

22   § 1103(a)(1).  Under this delegation of authority, the Secretary may exercise a form of

23   prosecutorial discretion and decide not to pursue the removal of a person unlawfully in

24   the United States.  This exercise of prosecutorial discretion is commonly referred to as

25   deferred action.  *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-

26   84 & n.8 (1999) (recognizing the practice of "deferred action" where the Executive

27   exercises discretion and declines to institute proceedings for deportation).

28        On June 15, 2012, the DHS Secretary issued a memorandum announcing that

certain young persons not lawfully present in the United States will be eligible to obtain deferred action if they meet specified criteria under the newly instituted DACA program. Doc. 259-5 at 131-33.  Eligible persons must show that they (1) came to the United States under the age of 16; (2) continuously resided in the United States for at least five years preceding the date of the memorandum and were present in the United States on the date of the memorandum; (3) currently attend school, have graduated from high school or obtained a general education development certificate, or have been honorably discharged from the Coast Guard or Armed Forces of the United States; (4) have not been convicted of a felony offense, a significant misdemeanor, multiple misdemeanor offenses, or otherwise pose a threat to national security or public safety; and (5) are not older than 30. *See id.* at 131-33, 208-13.  Eligible persons could receive deferred action for two years, subject to renewal, and could obtain an EAD for the period of the deferred action.  *Id.* at 132-33.   The DHS memorandum makes clear that it "confers no substantive right, immigration status or pathway to citizenship[,]" and that "[o]nly the Congress, acting through its legislative authority, can confer these rights." *Id.* at 133.

## II.     Defendants' Driver's License Policy.

As noted above, A.R.S. § 28-3153(D) states that non-citizens may obtain Arizona driver's licenses by presenting proof that their presence in the United States is authorized under federal law.  MVD policies identify the documentation deemed sufficient to show federal authorization.  *See* Doc. 259-6 at 13.  Before DACA, MVD accepted EADs as satisfactory evidence.  Doc. 259-3, ¶ 31; Doc. 267-2, ¶ 31.  Between 2005 and 2012, MVD issued tens of thousands of driver's licenses to persons who submitted EADs to prove their lawful presence in the United States.  Doc. 259-6 at 8-11.

The announcement of the DACA program prompted ADOT Director John S. Halikowski to review the program's potential impact on ADOT's administration of the State's driver's license laws.  Doc. 248-1 at 48.  After Director Halikowski initiated the ADOT policy review, but before the review had been concluded, Governor Brewer issued Executive Order 2012-06 on August 15, 2012 (the "Executive Order").  Doc. 259-5 at

1    231-32.  The Executive Order concluded that "issuance of Deferred Action or Deferred

2    Action USCIS employment authorization documents to unlawfully present aliens does

3    not confer upon them any lawful or authorized status and does not entitle them to any

4    additional public benefit."  *Id*.  The Executive Order directed state agencies to "conduct a

5    full statutory, rule-making and policy analysis and . . . initiate operational, policy, rule

6    and statutory changes necessary to prevent Deferred Action recipients from obtaining

7    eligibility, beyond those available to any person regardless of lawful status, for any

8    taxpayer-funded public benefits and state identification, including a driver's license[.]"

9    *Id*.  On September 17, 2012, ADOT formally revised its policy to conform to the

10   Governor's order.  *Id*. at 254-57.

11   **III.    2013 Revision.**

12        After the 2012 revision and during the pendency of this lawsuit, Director

13   Halikowski continued to review ADOT's driver's license policy.  *See* Doc. 248, ¶¶ 28-33.

14   He was concerned about possible inconsistencies in ADOT's treatment of EAD holders.

15   *See* Doc. 248-1 at 65-67.  To resolve these inconsistencies, ADOT developed three

16   criteria for determining which EADs would be deemed sufficient proof that the EAD

17   holder had authorized presence under federal law.  *Id*.  Under these criteria, an EAD is

18   sufficient proof of authorized presence if the EAD demonstrates: "(1) that the applicant

19   has formal immigration status, (2) that the applicant is on a path to obtaining a formal

20   immigration status, or (3) that the relief sought or obtained is expressly provided for in

21   the INA."  Doc. 248, ¶ 31 (citing Doc. 248-1 at 67).  Applying these criteria, ADOT

22   revised its policy on September 16, 2013.  Doc. 172-1 at 3-6.  The newly revised policy

23   continued to deny driver's licenses to DACA recipients, who have EADs with a category

24   code of (c)(33).  *Id*. at 6.  The revised policy also refused to accept EADs with a category

25   code of (c)(14), which are issued to recipients of other forms of deferred action, and

26   (a)(11), which are issued to recipients of deferred enforced departure.  *Id*.; *see also* 8 CFR

27   § 274a.12 (listing category codes of EAD holders).  The revised policy continued to

28   accept EADs with other category codes as sufficient proof of authorized presence under

1    federal law. *See* Doc. 172-1 at 6.  Defendants argue that, as revised, the 2013 policy does

2    not violate the Equal Protection Clause.  Doc. 247.  The Ninth Circuit considered the

3    revised policy and found, at the preliminary injunction stage, a likelihood that the policy

4    violates the Equal Protection Clause. *ADAC*, 757 F.3d at 1063-67.

5    **IV.**     **Present Position of Case.**

6         Plaintiffs and Defendants have filed motions for summary judgment.  Docs. 247,

7    251.  Defendants' motion rests entirely on their argument that DACA recipients are not

8    similarly situated to other EAD holders who may obtain driver's licenses under Arizona's

9    revised policy.  Plaintiffs' motion argues that DACA recipients are similarly situated to

10    other EAD holders who may obtain driver's licenses.  Plaintiffs also argue that although a

11    heightened scrutiny should apply to Arizona's denial of driver's licenses to DACA

12    recipients, Defendants' driver's license policy fails under any standard of review.

13    Plaintiffs seek summary judgment in their favor and a permanent injunction.

14         The parties filed and briefed these motions before the Ninth Circuit had ruled on

15    Plaintiffs' motion for a preliminary injunction.  Although the Ninth Circuit's *DACA*

16    decision does not control the outcome of the motions for summary judgment where new

17    facts or evidence are presented, it does control questions of law:

18
19
20
21
> [T]he district court should abide by 'the general rule' that our decisions at
> the preliminary injunction phase do not constitute the law of the case.  Any
> of our conclusions on pure issues of law, however, are binding.  The district
> court must apply this law to the facts anew with consideration of the
> evidence presented in the merits phase.

22    *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of*

23    *Agr.*, 499 F.3d 1108, 1114 (9th Cir. 2007) (citations omitted); *see also S. Oregon Barter*

24    *Fair v. Jackson Cnty., Oregon*, 372 F.3d 1128, 1136 (9th Cir. 2004).

25                     **MOTIONS FOR SUMMARY JUDGMENT**

26    **I.**     **Plaintiffs Are Similarly Situated.**

27         To prevail on their equal protection claim, Plaintiffs "must make a showing that a

28    class that is similarly situated has been treated disparately." *Christian Gospel Church,*

1  *Inc. v. City and Cnty. of S.F.*, 896 F.2d 1221, 1225-26 (9th Cir. 1990).  "The first step in

2  equal protection analysis is to identify the state's classification of groups."  *Country*

3  *Classic Dairies, Inc. v. State of Mont., Dep't of Commerce Milk Control Bureau*,

4  847 F.2d 593, 596 (9th Cir. 1988).  "The groups must be comprised of similarly situated

5  persons so that the factor motivating the alleged discrimination can be identified."

6  *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2012).  The question is not

7  whether DACA recipients are identical in every respect to other noncitizens who are

8  eligible for a driver's license, but whether they are the same in respects relevant to the

9  driver's license policy.  *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("The Equal

10  Protection Clause does not forbid classifications.  It simply keeps governmental

11  decisionmakers from treating differently persons who are in all relevant respects alike.").[3]

12  Defendants' policy initially prevented only DACA recipients from receiving

13  driver's licenses.  All other holders of EADs, including other deferred action recipients,

14  could use their EADs to obtain licenses.  Defendants subsequently amended their policy

15  to bar two additional classes of EAD holders from receiving driver's licenses – persons in

16  the (c)(14) category who had also received deferred action, albeit for reasons other than

17  the DACA program, and persons in the (a)(11) category who had received deferred

18  enforced departures.  *See* Doc. 172-1 at 6; *see also* 8 CFR § 274a.12.

19  Defendants argue that DACA recipients are not similarly situated to the remaining

20  EAD holders who are entitled to obtain driver's licenses because those persons either

21  have lawful status in the United States, are on a path to lawful status, or have EADs that

---

23  [3] Plaintiffs argue that the Equal Protection Clause does not require the Court to find that DACA recipients are similarly situated to other EAD holders who are eligible to

24  receive driver's licenses.  Doc. 261 at 20.  It is true that identification of a "similarly situated class" is not always a requirement in Equal Protection cases.  For example, in

25  cases challenging statutes on the basis of their discriminatory purpose the Supreme Court has not discussed the "similarly situated" requirement.  *See, e.g.*, *Pers. Adm'r of Mass. v.*

26  *Feeney*, 442 U.S. 256 (1979); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977); *see also* Giovanna Shay, *Similarly Situated*, 18 Geo. Mason L. Rev.

27  581, 598 (2011) (noting that the 'similarly situated' requirement "has never been viewed by the U.S. Supreme Court as a threshold hurdle to obtaining equal protection review on

28  the merits").  The Court need not decide whether these cases control Plaintiffs' challenge, however, because the Court finds that DACA recipients are similarly situated to other EAD holders who are eligible to receive driver's licenses.

are tied to relief provided under the INA.  Doc. 247 at 10-14.  Defendants also argue that DACA recipients are not similarly situated because their authorization to stay – unlike the authorization of other EAD holders who may obtain a driver's license – is the result of prosecutorial discretion.  *Id.*

The Court does not agree.  DACA recipients have been authorized by the federal government to remain in the United States for two years and have been granted the right to work through the issuance of EADs.  Other noncitizens are in similar positions.  For example, applicants for adjustment of status receive a (c)(9) code and applicants for suspension of deportation and cancellation of removal receive a (c)(10) code.  8 C.F.R. §§ 274a.12(c)(9)-(10).  These persons have not been granted citizenship or lawful residence, but they have been permitted to remain and work in the United States while their applications are considered.  These individuals may present their EADs to ADOT and obtain driver's licenses, while DACA recipients cannot.  It is not a material difference that DACA recipients receive their authorization from an act of prosecutorial discretion and other EAD holders receive their authorization through a statutory provision.  The fact remains that they all receive a form of authorization, and documents entitling them to work, from the federal government.

The Ninth Circuit provided this explanation about (c)(9) and (c)(10) recipients, with which the Court agrees:

> DACA recipients are similarly situated to other categories of noncitizens who may use [EADs] to obtain driver's licenses in Arizona.  Even under Defendants' revised policy, Arizona issues driver's licenses to noncitizens holding [EADs] with category codes (c)(9) and (c)(10).  These (c)(9) and (c)(10) [EADs] are issued to noncitizens who have applied for adjustment of status and cancellation of removal, respectively.  See 8 C.F.R. § 274a.12(c)(9)-(10). . . .
>
> Defendants look to the statutory and regulatory availability of immigration relief for the (c)(9) and (c)(10) groups as a point of distinction.  But individuals with (c)(10) employment authorization, for example, are not in the United States pursuant to any statutory provision while their applications are pending.  With regard to adjustment of status, we have

noted that "the submission of an application does not connote that the alien's immigration status has changed, as the very real possibility exists that the INS will deny the alien's application altogether." *Vasquez de Alcantar v. Holder*, 645 F.3d 1097, 1103 (9th Cir. 2011) (quoting *United States v. Elrawy*, 448 F.3d 309, 313 (5th Cir. 2006)).

In sum, like DACA recipients, many noncitizens who have applied for adjustment of status and cancellation of removal possess no formal lawful immigration status, and may never obtain any. *See Guevara v. Holder*, 649 F.3d 1086, 1095 (9th Cir. 2011). Like DACA recipients, noncitizens who have applied for adjustment of status and cancellation of removal often have little hope of obtaining formal immigration status in the foreseeable future. Indeed, those with (c)(10) documents are already in removal proceedings, while many DACA recipients are not – suggesting that individuals in the (c)(10) category are more, not less, likely to be removed in the near future than are DACA recipients. In the relevant respects, then, noncitizens with (c)(9) and (c)(10) employment authorization documents are similarly situated to DACA recipients.

Unlike DACA recipients, however, noncitizens holding (c)(9) and (c)(10) [EADs] may use those documents when applying for Arizona driver's licenses to prove — to the satisfaction of the Arizona Department of Transportation — that their presence in the United States is authorized under federal law. As the district court found, these two groups of noncitizens account for more than sixty-six percent of applicants who obtained Arizona driver's licenses using [EADs] during the past seven years. Although DACA recipients are similarly situated to noncitizens holding (c)(9) and (c)(10) [EADs], they have been treated disparately.

*ADAC*, 757 F.3d at 1064.[4]

Other categories of noncitizens who receive driver's licenses under Defendants' current policy are also similarly situated to DACA recipients. For example, individuals who receive a discretionary grant of parole are authorized to be present in the United States and are eligible for EADs (coded (c)(11)) although they lack formal immigration status, are not necessarily eligible for obtaining such a status, and are not even considered

---

[4] Defendants argue that the Ninth Circuit's decision is not binding at this summary judgment stage. Defendants also argue, however, that Plaintiffs' "similarly situated" claim "fails as a matter of law." Doc. 273 at 11; *see also* Doc. 269 at 2. Defendants thus concede that the "similarly situated" issue in this case is a question of law, on which the Ninth Circuit's decision does control. *Ranchers Cattlemen*, 499 F.3d at 1114.

1   admitted.  *See* 8 U.S.C. § 1182(d)(5)(A).  Parolees lack any avenue for obtaining lawful

2   immigration status, and yet they may obtain an Arizona driver's license on the basis of

3   their EADs.[5]

4        Defendants argue that DACA recipients are still in the country illegally because

5   the Secretary of DHS lacked the authority to grant them deferred status.  Doc. 247 at 12-

6   14.  Defendants rely on a district court decision in *Crane v. Napolitano*, No. 3:12-cv-

7   03247-O, 2013 WL 1744422 (N.D. Tex. Apr. 23, 2013).  In *Crane*, immigration

8   enforcement agents argued that the DACA program forced them to violate 8 U.S.C.

9   § 1225, which requires immigration officers to initiate removal proceedings when they

10  determine that "an alien seeking admission is not clearly and beyond a doubt entitled to

11  be admitted." *Id.* at *5.  In response to the plaintiffs' motion for a preliminary injunction,

12  the district court addressed whether the plaintiffs were likely to succeed on the merits of

13  their claim that the DACA program conflicts with § 1225 by forbidding immigration

14  officers from initiating removal proceedings against certain unauthorized aliens.  *Id.* at

15  *13.  Although the district court found that the plaintiffs were likely to succeed on this

16  claim, it did not grant a preliminary injunction because of concerns over whether it had

17  subject matter jurisdiction.  *Id.* at *19.  After additional briefing, the court dismissed the

18  case for lack of subject-matter jurisdiction.  *See Crane v. Napolitano*, No. 3:12-CV-

19  03247-O, 2013 WL 8211660 (N.D. Tex. July 31, 2013).

20       *Crane* did not hold the DACA program invalid.  It concluded that the plaintiffs

21  were likely to succeed on the merits of their DACA-related arguments, but then found

22  that it lacked subject matter jurisdiction to address the issue at all.  *Crane* is less than

23  dictum from a fellow district court – it is a preliminary conclusion from a court that

24  _____

25       [5] The relevant statute on the status of parolees provides:  "The Attorney General
    may, . . . in his discretion parole into the United States temporarily under such conditions
26  as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or
    significant public benefit any alien applying for admission to the United States, but such
27  parole of such alien shall not be regarded as an admission of the alien and when the
    purposes of such parole shall . . . have been served the alien shall forthwith return or be
28  returned to the custody from which he was paroled and thereafter his case shall continue
    to be dealt with in the same manner as that of any other applicant for admission to the
    United States."  8 U.S.C. § 1182(d)(5)(A).

- 10 -

1    lacked subject matter jurisdiction to reach even a preliminary conclusion.  Furthermore,

2    *Crane*'s holding was limited to a finding that the DHS lacked the "discretion to refuse to

3    initiate removal proceedings when the requirements of Section 1225(b)(2)(A) are

4    satisfied." *Crane*, 2013 WL 1744422, at *13.  Defendants do not address whether the

5    requirements of that section are satisfied by any Plaintiffs in this case.  Finally, although

6    *Crane* preliminarily concluded that DHS was required to initiate removal proceedings

7    against DACA recipients, it also expressly noted that DHS could then exercise its

8    discretion to terminate the proceedings and permit the unauthorized aliens to remain in

9    the United States. *See id.* at *24.

10          Other authorities have recognized that noncitizens on deferred action status are

11   lawfully permitted to remain in the United States.  *See*, *e.g.*, *Ga. Latino Alliance for*

12   *Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1258-59 (11th Cir. 2012) (a noncitizen

13   "currently classified under 'deferred action' status . . . remains permissibly in the United

14   States"); *In re Pena-Diaz*, 20 I.&N. Dec. 841, 846 (B.I.A. 1994) (deferred action status

15   "affirmatively permit[s] the alien to remain"); 8 C.F.R. § 1.3(a)(4)(vi) (persons "currently

16   in deferred action status" are "permitted to remain in" and are "lawfully present in the

17   United States").

18          The Court concludes that DACA recipients are similarly situated in all relevant

19   respects to noncitizens who are permitted by the State to obtain driver's licenses on the

20   basis of EADs.  DACA recipients are treated differently for purposes of equal protection.

21   **II.    Level of Scrutiny.**

22          Although it implied that strict scrutiny should apply (757 F.3d at 1065 n.4), the

23   Ninth Circuit in *ADAC* elected not to address the level of scrutiny applicable to

24   Defendants' driver's license policy: "we need not decide what standard of scrutiny

25   applies to Defendants' policy: as the district court concluded, Defendants' policy is likely

26   to fail even rational basis review." *ADAC*, 757 F.3d at 1065 (citation omitted).  The

27   Ninth Circuit went on to assess whether "Defendants' disparate treatment of DACA

28   recipients [was] 'rationally related to a legitimate state interest.'" *Id.* (citation omitted).

- 11 -

1    The Ninth Circuit did not state that it was applying a more rigorous form of rational basis

2    of review, as had this Court in its preliminary injunction decision.  *See* Doc. 114 at 24-27.

3           The Ninth Circuit examined each of the justifications proffered by Defendants in

4    support of their policy, considered whether the justifications were supported by evidence

5    or consistent with Defendants' other actions, and found "no legitimate state interest that

6    is rationally related to Defendants' decision to treat DACA recipients disparately from

7    noncitizens holding (c)(9) and (c)(10) [EADs]."  757 F.3d at 1065-67.  This form of

8    rational basis review appears to be more rigorous than the traditional approach, under

9    which "a classification . . . is accorded a strong presumption of validity. . . .  [A]

10   classification 'must be upheld against equal protection challenge if there is *any*

11   *reasonably conceivable state of facts that could provide a rational basis for the*

12   *classification*.'"  *Heller v. Doe*, 509 U.S. 312, 319-20 (1993) (emphasis added; citations

13   omitted).  Because the rigorousness of equal protection review is a question of law, the

14   Court feels bound to apply the form of rational basis scrutiny applied in *ADAC*.  *See*

15   *Ranchers Cattlemen*, 499 F.3d at 1114.[6]

16   **III.    Application.**

17          Defendants rely on four rational bases for their policy: (1) DACA recipients may

18   not have authorized presence under federal law, and ADOT therefore could face liability

19   for issuing up to 80,000 driver's licenses to unauthorized aliens or for not cancelling

20   those licenses quickly enough if the DACA program is subsequently determined to be

21   unlawful; (2) issuing driver's licenses to DACA recipients could allow those individuals

---

22

23          [6] In ruling on the preliminary injunction, this Court applied a more rigorous form
     of rational basis review after concluding that the reason for Defendants' policy was
24   Governor Brewer's political disagreement with the Obama Administration's DACA
     program.  *See* Doc. 114 at 24-28.  Defendants have now presented evidence that the State
25   may have adopted the new policy for a different reason – ADOT's conclusion that DACA
     recipients do not have authorized presence under federal law.  *See* Docs. 270-3 at 50;
26   270-4 at 59, 93.  Although this evidence might create a question of fact as to why
     Defendants adopted their policy, that reason appears to be irrelevant under the Ninth
27   Circuit's rational basis scrutiny.  *ADAC* did not base the rigorousness of its review on
     Defendants' reason for adopting the policy.  757 F.3d at 1065.  Defendants' evidence on
28   this issue, therefore, does not preclude summary judgment.  *See* Fed. R. Civ. P. 56(a)
     (summary judgment is warranted if "there is no genuine dispute as to any *material* fact
     and the movant is entitled to judgment as a matter of law") (emphasis added).

1   to access federal and state benefits to which they are not entitled; (3) ADOT could be

2   burdened by having to process a large number of driver's licenses for DACA recipients

3   and then cancel those licenses if DACA were revoked; and (4) if DACA were revoked or

4   if DHS commenced removal proceedings against any DACA recipient, as it could at any

5   time, then the DACA recipient would be subject to immediate deportation or removal and

6   that individual could escape financial responsibility for property damage or personal

7   injury caused in automobile accidents.  Doc. 269 at 17-20.  The Ninth Circuit considered

8   each of these justifications and found that none of them satisfies rational basis review.

9   757 F.3d at 1066-67.[7]

10      As their first justification, Defendants argue that they had uncertainty about

11  whether DACA recipients have an authorized presence in the United States under federal

12  law and were concerned that they might face liability if they issued licenses to

13  unauthorized persons.  Doc. 269 at 18.  In their depositions, however, ADOT Director

14  Halikowski and Assistant Director Stanton could identify no instances where ADOT

15  faced liability for issuing licenses to individuals who lacked authorized presence.

16  Docs. 259-3, ¶¶ 152-53; 270, ¶¶ 152-53.  Halikowski provided only one example of

17  potential state liability – when ADOT had improperly issued a driver's license to a person

18  convicted of driving under the influence of alcohol (Doc. 270, ¶ 152; Doc. 270-4 at 62) –

19  an instance quite unrelated to the prospect of issuing a license to a person presenting a

20  federally-issued EAD as proof of lawful presence under federal law.  Stanton could

21  provide no examples.  Doc. 259-6 at 298.  Thus, the evidence does not support

22  Defendants' first justification.  *See ADAC*, 757 F.3d at 1066.

23      Second, Defendants express concern that issuing driver's licenses to DACA

24  recipients could lead to improper access to federal and state benefits.  But as the Ninth

26  [7] Defendants present no new evidence in support of these justifications, arguing
27  instead that a "government actor need not have specific evidence to validate a reasonable
    concern for the purposes of rational basis analysis."  Doc. 270, ¶ 176; *see also id.*, ¶¶ 152,
    160-161, 171, 177-78.  As noted above, however, the *ADAC* did not apply this deferential
28  level of review.  Because Defendants have presented no new evidence on these
    justifications, the decision in *ADAC* controls.  *See Ranchers Cattlemen*, 499 F.3d at 1114.

- 13 -

1    Circuit recognized, "Defendant Halikowski . . . and Defendant Stanton . . . testified that

2    they had *no* basis whatsoever for believing that a driver's license alone could be used to

3    establish eligibility for such benefits.  It follows that Defendants have no *rational* basis

4    for any such belief."  *Id.* at 1066 (emphasis in original); *see also* Doc. 259-6 at 262, 302.

5    Furthermore, although Defendants no longer issue driver's licenses to (a)(11) and (c)(14)

6    EAD holders, they have made no attempt to revoke licenses previously issued to these

7    types of EAD holders.  Doc. 259-6 at 283, 316.

8         Third, Defendants assert that because the DACA program might be canceled,

9    ADOT might be burdened by having to process a large number of driver's licenses for

10   DACA recipients and then cancel those licenses.  But the depositions of Halikowski and

11   Stanton show a general lack of knowledge regarding any revocation process.  *See*

12   Doc. 254-2 at 266, 300-01.  Also, as the Ninth Circuit recognized, "it is *less* likely that

13   Arizona will need to revoke DACA recipients' driver's licenses, compared to driver's

14   licenses issued to noncitizens holding (c)(9) and (c)(10) [EADs]. While Defendants'

15   concern for DACA's longevity is purely speculative, applications for adjustment of status

16   or cancellation of removal are routinely denied."  *ADAC*, 757 F.3d at 1066-67 (emphasis

17   in original).

18        Fourth, Defendants argue that DACA recipients may have their status revoked at

19   any time and may be removed quickly from the country, leaving those they have injured

20   in accidents with no financial recourse.  The Ninth Circuit responded:

21        Here too, however, Defendants' professed concern applies with equal force
         to noncitizens holding (c)(9) and (c)(10) [EADs].  Noncitizens who have
22        applied for adjustment of status or cancellation of removal may find their
         applications denied at any time, and thereafter may be quickly removed
23        from the United States, leaving those they may have injured in automobile
         accidents with no financial recourse.  Nevertheless, Defendants' policy
24        allows noncitizens holding (c)(9) and (c)(10) [EADs] to obtain driver's
         licenses, while prohibiting DACA recipients from doing the same.
25

26   *ADAC*, 757 F.3d at 1067.  If Defendants were genuinely concerned about persons being

27   removed from the country and leaving those injured in accidents without financial

28   recourse, they would not allow (c)(9) and (c)(10) EAD holders to obtain driver's licenses.

1   Although not directly argued, Defendants have suggested two additional rational

2   bases for their policy.  Defendants argue that their concern about "consistent application

3   of ADOT policy" provides a rational basis.  *See* Docs. 269 at 19-20; 270, ¶ 151.  They

4   point to ADOT's three criteria for determining whether an EAD is sufficient proof of

5   authorized presence – criteria that supposedly treat equally those who have formal

6   immigration status, are on a path to obtaining formal immigration status, or who receive

7   relief expressly provided for in the INA.  Doc. 248, ¶ 31.  But the same policy grants

8   driver's licenses to (c)(9) and (c)(10) applicants even though they do not appear to satisfy

9   these requirements.  As the Ninth Circuit noted in *ADAC*, "we are unconvinced that

10  Defendants have defined a 'path to lawful status' in any meaningful way.  After all,

11  noncitizens' applications for adjustment of status or cancellation of removal [(c)(9) and

12  (c)(10) holders] are often denied, so the supposed 'path' may lead to a dead end."  757

13  F.3d at 1065.

14  Defendants also argue that their driver's license policy is "rationally related to

15  ADOT's statutory obligation in administering A.R.S. § 28-3153(D)."  Doc. 269 at 17.

16  But as noted above, Defendants' granting of driver's licenses to (c)(9) and (c)(10)

17  applicants who present EADs does not appear to be more consistent with § 28-3153(D) –

18  which requires that the applicant's presence be authorized by federal law – than granting

19  of licenses to similarly situated DACA recipients who presents EADs.

20  In summary, the Court concludes that Defendants' distinction between DACA

21  recipients and other EAD holders does not satisfy rational basis review.  While

22  Defendants have articulated concerns that may be legitimate state interests, they have not

23  shown that the exclusion of DACA recipients is rationally related to those interests.  The

24  Court is not saying that the Constitution requires the State of Arizona to grant driver's

25  licenses to all noncitizens.  But if the State chooses to confer licenses on some individuals

26  who have been temporarily authorized to stay by the federal government, it may not deny

27  them to similarly situated individuals without a rational basis for the distinction.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### REQUEST FOR A PERMANENT INJUNCTION

**I.    Legal Standard.**

An injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008).  A plaintiff seeking a permanent injunction must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC.*, 547 U.S. 388, 391 (2006).  "While '[t]he decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court,' the 'traditional principles of equity' demand a fair weighing of the factors listed above, taking into account the unique circumstances of each case." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 880 (9th Cir. 2014) (quoting *eBay*, 547 U.S. at 391, 394).

**II.    Irreparable Harm and Adequacy of Legal Remedies.**

**A.    Harm to Individual Plaintiffs.**

The Ninth Circuit found that the individual Plaintiffs are suffering irreparable harm as a result of Defendants' policy:

> Plaintiffs in this case have produced ample evidence that Defendants' policy causes them to suffer irreparable harm.  In particular, Plaintiffs' inability to obtain driver's licenses likely causes them irreparable harm by limiting their professional opportunities.  Plaintiffs' ability to drive is integral to their ability to work – after all, eighty-seven percent of Arizona workers commute to work by car.  It is unsurprising, then, that Plaintiffs' inability to obtain driver's licenses has hurt their ability to advance their careers.  Plaintiffs' lack of driver's licenses has prevented them from applying for desirable entry-level jobs, and from remaining in good jobs where they faced possible promotion.  Likewise, one Plaintiff – who owns his own business – has been unable to expand his business to new customers who do not live near his home.  Plaintiffs' lack of driver's licenses has, in short, diminished their opportunity to pursue their chosen professions.  This "loss of opportunity to pursue [Plaintiffs'] chosen profession[s]" constitutes irreparable harm.

*ADAC*, 757 F.3d at 1068.

In their summary judgment briefing, Plaintiffs have presented uncontradicted

evidence that their inability to obtain a driver's license has caused a "loss of opportunity to pursue [their] chosen profession."  *Id*.  One Plaintiff is a self-employed graphic designer.  Doc. 259-6 at 333.  Because she is unable to obtain a driver's license, she relies on public transportation.  Doc. 259-7 at 421.  Using public transportation instead of a car causes her to spend roughly the same amount of time working on her clients' projects as she does travelling to meet those clients.  Doc. 259-6 at 334.  Plaintiff's inability to drive has forced her to decline work from clients.  *Id*. at 342-45; Doc. 259-7 at 423.  Another Plaintiff is interested in becoming an Emergency Medical Technician.  Doc. 259-7 at 34. He has been unable to pursue this career because the local fire department requires a driver's license for employment.  *Id*. at 35.  A third Plaintiff turned down a job opportunity partly because she was unable to drive with a driver's license.  *Id*. at 155-56. Other Plaintiffs have been unable to pursue new jobs or develop business opportunities because of their inability to drive.  *See, e.g.*, Doc. 259-3, ¶¶ 264-77.

The Court finds that the denial of driver's licenses has caused Plaintiffs irreparable harm.  Although Defendants dispute the extent and details of Plaintiffs' harm (Doc. 269 at 25-31), they have not shown that there is a genuine issue as to whether the individual Plaintiffs have lost employment opportunities.  The Court finds that monetary damages cannot fully compensate Plaintiffs for their harm and that legal remedies are inadequate. *See Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 709 (9th Cir. 1988) (finding that an alternate job that did not use plaintiff's "skills, training or experience [was a] non-monetary deprivation" and a "substantial injury").

**B.     Harm to Coalition Members.**

The Arizona Dream Act Coalition has brought suit both on its own behalf and on behalf of its members.  Doc. 173, ¶ 18.  The Coalition claims that Defendants' policy has irreparably harmed its members by depriving them of employment opportunities.  Doc. 259-2 at 37-38.  The Court agrees.  One Coalition member currently works in a temporary position.  Doc. 259-7 at 3.  She has been unable to acquire a permanent position at her place of work because such a position requires a driver's license.  *Id.*

- 17 -

1    Another member works as a nutritionist, although she has been trained as a diet

2    technician. *Id.* at 199-202, 225-26.  She was not able to pursue a job opportunity as a diet

3    technician because her employer required that she have a driver's license. *Id.* at 236-37.

4    As with the individual plaintiffs, the Coalition has shown that Defendants' policy has

5    caused its members to lose opportunities to pursue their chosen professions.  The Court

6    finds this to be an irreparable harm that is not compensable by legal remedies. *ADAC*,

7    757 F.3d at 1068.[8]

8    **III.    Balance of Hardships and the Public Interest.**

9           In deciding whether to grant a permanent injunction, "courts must balance the

10   competing claims of injury and must consider the effect on each party of the granting or

11   withholding of the requested relief. . . [and] should pay particular regard for the public

12   consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at

13   24 (quotation marks and citations omitted); *see Amoco Prod. Co. v. Vill. of Gambell,*

14   *Alaska*, 480 U.S. 531, 546 n.12 (1987) (finding that the standards for a permanent

15   injunction are "essentially the same" as for a preliminary injunction).  Addressing these

16   factors, the Ninth Circuit held:

17
        [B]y establishing a likelihood that Defendants' policy violates the U.S.
18      Constitution, Plaintiffs have also established that both the public interest
        and the balance of the equities favor a preliminary injunction.  It is clear
19      that it would not be equitable or in the public's interest to allow the state to
        violate the requirements of federal law, especially when there are no
20      adequate remedies available.  On the contrary, the public interest and the
        balance of the equities favor prevent[ing] the violation of a party's
21      constitutional rights.
22

23   *ADAC*, 757 F.3d at 1069 (quotation marks and citations omitted).

24          The Court agrees.  The government "cannot suffer harm from an injunction that

25   merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir.

26

27          [8] Because of this conclusion, the Court finds it unnecessary to address whether the
     Coalition as an organization has suffered irreparable harm to its organizational mission.
28   *See* Doc. 259-2 at 38 (citing *Valle del Sol v. Whiting*, 732 F.3d 1006, 1029 (9th Cir.
     2013)).

- 18 -

1    2013).  And the public has little interest in Defendants' continuing a policy that violates

2    the Equal Protection Clause.

3    **IV.    Scope of Injunction.**

4      The parties disagree on whether the Court should enter an injunction that applies

5    to all DACA recipients, as opposed to applying merely to the named plaintiffs in this

6    action.  Docs. 288, 290.  The Ninth Circuit has held that an injunction should be limited

7    to the named plaintiffs unless the court has certified a class.  *Zepeda v. I.N.S.*, 753 F.2d

8    719, 727-28 & n.1 (9th Cir. 1983).  The Ninth Circuit has also held, however, that an

9    injunction is not overbroad because it extends benefits to persons other than those before

10   the Court "if such breadth is necessary to give prevailing parties the relief to which they

11   are entitled."  *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-02 (9th

12   Cir. 1996) (quoting *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987)).  Because

13   the Coalition seeks relief on behalf of its members, the Court concludes that the

14   permanent injunction should apply to all DACA recipients.  Requiring state officials at

15   driver's license windows to distinguish between DACA recipients who are members of

16   the Coalition and those who are not is impractical, and granting an injunction only with

17   respect to the named plaintiffs would not grant the Coalition the relief it seeks on behalf

18   of its members.

19     **IT IS ORDERED:**

20     1. Plaintiffs' motion for summary judgment and a permanent injunction

21      (Doc. 251) is **granted.**

22     2. Defendants' motion for summary judgment (Doc. 247) is **denied.**

23     3. Defendants and their officials, agents, and employees, and all persons

24      acting in concert or participating with them, are permanently enjoined from

25      enforcing any policy or practice by which the Arizona Department of

26      Transportation refuses to accept Employment Authorization Documents,

27      issued under DACA, as proof that the document holders are authorized

28      under federal law to be present in the United States for purposes of

1    obtaining a driver's license or state identification card.

2    4.    The Clerk is directed to terminate this action.

3    Dated this 22nd day of January, 2015.

4

5

6

7    _____
                David G. Campbell
8              United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28