**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, ET AL., | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL NO. B-14-254 |
| | § | |
| UNITED STATES OF AMERICA, ET AL., | § | |
| *Defendants*. | § | |

# MEMORANDUM OPINION AND ORDER

This is a case in which twenty-six states or their representatives are seeking injunctive relief against the United States and several officials of the Department of Homeland Security to prevent them from implementing a program entitled "Deferred Action for Parents of Americans and Lawful Permanent Residents." [1]  This program is designed to provide legal presence to over four million individuals who are currently in the country illegally, and would enable these individuals to obtain a variety of both state and federal benefits.

The genesis of the problems presented by illegal immigration in this matter was described by the United States Supreme Court decades ago:

> Sheer incapability or lax enforcement of the laws barring entry into this country, coupled with the failure to establish an effective bar to the employment of undocumented aliens, has resulted in the creation of a substantial "shadow population" of illegal migrants—numbering in the millions—within our borders.

---

[1] The Plaintiffs include: the State of Texas; State of Alabama; State of Arizona; State of Arkansas; State of Florida; State of Georgia; State of Idaho; State of Indiana; State of Kansas; State of Louisiana; State of Montana; State of Nebraska; State of North Dakota; State of Ohio; State of Oklahoma; State of South Carolina; State of South Dakota; State of Utah; State of West Virginia; State of Wisconsin; Attorney General Bill Schuette, People of Michigan; Governor Phil Bryant, State of Mississippi; Governor Paul R. LePage, State of Maine; Governor Patrick L. McCrory, State of North Carolina; and Governor C. L. "Butch" Otter, State of Idaho.  The States of Tennessee and Nevada were added in the latest Amended Complaint.  All of these plaintiffs, both individuals and states, will be referred to collectively as "States" or "Plaintiffs" unless there is a particular need for specificity.

The Attorney General recently estimated the number of illegal aliens within the United States at between 3 and 6 million.  In presenting to both the Senate and House of Representatives several Presidential proposals for reform of the immigration laws—including one to "legalize" many of the illegal entrants currently residing in the United States by creating for them a special statute under the immigration laws—the Attorney General noted that this subclass is largely composed of persons with a permanent attachment to the Nation, and that they are unlikely to be displaced from our territory.

> "We have neither the resources, the capability, nor the motivation to uproot and deport millions of illegal aliens, many of whom have become, in effect, members of the community.  By granting limited legal status to the productive and law-abiding members of this shadow population, we will recognize reality and devote our enforcement resources to deterring future illegal arrivals."  Joint Hearing before the Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary and the Subcommittee on Immigration and Refugee Policy of the Senate Committee on the Judiciary, 97th Cong., 1st Sess., 9 (1981) (testimony of William French Smith, Attorney General).

This situation raises the specter of a permanent caste of undocumented resident aliens, encouraged by some to remain here as a source of cheap labor, but nevertheless denied the benefits that our society makes available to citizens and lawful residents.  The existence of such an underclass presents most difficult problems for a Nation that prides itself on adherence to principles of equality under law.

*Plyler v. Doe*, 457 U.S. 202, 218-19 & n.17 (1982).  Thus, even in 1982, the Supreme Court noted in *Plyler* that the United States' problems with illegal immigration had existed for decades.  Obviously, these issues are still far from a final resolution.

Since 1982, the population of illegal aliens in this country has more than tripled, but today's situation is clearly exacerbated by the specter of terrorism and the increased need for

security.[2]   Nevertheless, the Executive Branch's position is the same as it was then.  It is still voicing concerns regarding its inability to enforce all immigration laws due to a lack of resources.   While Congress has not been idle, having passed a number of ever-increasing appropriation bills and various acts that affect immigration over the last four decades (especially in the wake of the terrorist attacks in 2001), it has not passed nor funded a long term, comprehensive system that resolves this country's issues regarding border security and immigration.   To be sure, Congress' and the Executive Branch's focus on matters directly affecting national security is understandable.   This overriding focus, however, does not necessarily comport with the interests of the states.   While the States are obviously concerned about national security, they are also concerned about their own resources being drained by the constant influx of illegal immigrants into their respective territories, and that this continual flow of illegal immigration has led and will lead to serious domestic security issues directly affecting their citizenry.   This influx, for example, is causing the States to experience severe law enforcement problems.[3]   Regardless of the reasons behind the actions or inaction of the Executive and Legislative Branches of the federal government, the result is that many states ultimately bear the brunt of illegal immigration.

---

[2] The Court uses the phrases "illegal immigrant" and "illegal alien" interchangeably.  The word "immigrant" is not used in the manner in which it is defined in Title 8 of the United States Code unless it is so designated.  The Court also understands that there is a certain segment of the population that finds the phrase "illegal alien" offensive.  The Court uses this term because it is the term used by the Supreme Court in its latest pronouncement pertaining to this area of the law.  *See Arizona v. United States*, 132 S. Ct. 2492, 2497 (2012).

[3] *See Arizona v. United* States, as quoted on p. 58 of this opinion.  For example, as the Court writes this opinion, Brownsville police have been investigating the kidnapping of a local university student.  The student was reportedly kidnapped at gunpoint by a human trafficker a few miles from this Courthouse and forced to transport the trafficker and an alien who had just crossed the border (the Rio Grande River) from the university campus to their destination. *See* Tiffany Huertas, *UT-Brownsville Students on Alert Following Reported Gunpoint Kidnapping*, Action 4 News, Feb. 4, 2015, http://www.valleycentral.com/news/story.aspx?id=1159456#.VNfHn-bF-wE.

This case examines complex issues relating to immigration which necessarily involve questions of federalism, separation of powers, and the ability and advisability, if any, of the Judiciary to hear and resolve such a dispute.

Chief Justice Roberts wrote in *National Federation of Independent Business v. Sebelius*:

We [the judiciary] do not consider whether the [Patient Protection and Affordable Care] Act embodies sound policies.  That judgment is entrusted to the Nation's elected leaders.  We ask only whether Congress has the power under the Constitution to enact the challenged provisions.

\*   \*   \*

Nearly two centuries ago, Chief Justice Marshall observed that "the question respecting the extent of the powers actually granted" to the Federal Government "is perpetually arising, and will probably continue to arise, as long as our system shall exist."  In this case, we must again determine whether the Constitution grants Congress powers it now asserts, but which many States and individuals believe it does not possess.

132 S. Ct. 2566, 2577 (2012) (quoting *McCulloch v. Maryland*, 17 U.S. 316, 404 (1819)).

## I.   THE ISSUES BEFORE AND NOT BEFORE THE COURT

Although this Court is not faced with either a Congressional Act or an Executive Order, the sentiment expressed by these Chief Justices is nonetheless applicable.  The ultimate question before the Court is: Do the laws of the United States, including the Constitution, give the Secretary of Homeland Security the power to take the action at issue in this case?  Nevertheless, before the Court begins to address the issues raised in this injunctive action, it finds that the issues can best be framed by emphasizing what is not involved in this case.

First, this case does not involve the wisdom, or the lack thereof, underlying the decision by Department of Homeland Security ("DHS") Secretary Jeh Johnson to award legal presence status to over four million illegal aliens through the Deferred Action for Parents of Americans

and Lawful Permanent Residents ("DAPA," also referred to interchangeably as the "DHS Directive" and the "DAPA Memorandum") program. Although the Court will necessarily be forced to address many factors surrounding this decision and review the relationship between the Legislative and Executive Branches as it pertains to the DHS Secretary's discretion to act in this area, the actual merits of this program are not at issue.

Second, with three minor exceptions, this case does not involve the Deferred Action for Childhood Arrivals ("DACA") program. In 2012, DACA was implemented by then DHS Secretary Janet Napolitano. The program permits teenagers and young adults, who were born outside the United States, but raised in this country, to apply for deferred action status and employment authorizations. The Complaint in this matter does not include the actions taken by Secretary Napolitano, which have to date formalized the status of approximately 700,000 teenagers and young adults. Therefore, those actions are not before the Court and will not be addressed by this opinion. Having said that, DACA will necessarily be discussed in this opinion as it is relevant to many legal issues in the present case. For example, the States maintain that the DAPA applications will undergo a process identical to that used for DACA applications and, therefore, DACA's policies and procedures will be instructive for the Court as to DAPA's implementation.

Third, several of the briefs have expressed a general public perception that the President has issued an executive order implementing a blanket amnesty program, and that it is this amnesty program that is before the Court in this suit. Although what constitutes an amnesty program is obviously a matter of opinion, these opinions do not impact the Court's decision. Amnesty or not, the issues before the Court do not require the Court to consider the public

popularity, public acceptance, public acquiescence, or public disdain for the DAPA program.  As Chief Justice Roberts alluded to above, public opinions and perceptions about the country's policies have no place in the resolution of a judicial matter.

Finally, both sides agree that the President in his official capacity has not directly instituted any program at issue in this case.  Regardless of the fact that the Executive Branch has made public statements to the contrary, there are no executive orders or other presidential proclamations or communique that exist regarding DAPA.  The DAPA Memorandum issued by Secretary Johnson is the focus in this suit.

That being said, the Court is presented with the following principle issues:  (1) whether the States have standing to bring this case; (2) whether the DHS has the necessary discretion to institute the DAPA program; and (3) whether the DAPA program is constitutional, comports with existing laws, and was legally adopted.  A negative answer to the first question will negate the need for the Court to address the latter two.  The factual statements made hereinafter (except where the Court is discussing a factual dispute) should be considered as findings of fact regardless of any heading or lack thereof.  Similarly, the legal conclusions, except where the Court discusses the various competing legal theories and positions, should be taken as conclusions of law regardless of any label or lack thereof.  Furthermore, due to the overlap between the standing issues and the merits, there is by necessity the need for a certain amount of repetition.

## II.   <u>HISTORY OF THIS LITIGATION</u>

On November 20, 2014, Jeh Johnson, in his position as Secretary of the DHS, issued multiple memoranda to Leon Rodriguez, Director of the United States Citizenship and

Immigration Services ("USCIS"), Thomas S. Winkowski, Acting Director of the United States Immigration and Customs Enforcement ("ICE"), and R. Gil Kerlikowske, Commissioner of the United States Customs and Border Protection ("CBP").  One of these memoranda contained an order establishing a new program utilizing deferred action to stay deportation proceedings and award certain benefits to approximately four to five million individuals residing illegally in the United States.  The present case, filed in an attempt to enjoin the rollout and implementation of this program, was initiated by the State of Texas and twenty-five other states or their representatives.  Specifically, the States allege that the Secretary's actions violate the Take Care Clause of the Constitution and the Administrative Procedure Act ("APA").  *See* U.S. Const. art. II, § 3; 5 U.S.C. §§ 500 *et seq.*[4]  The States filed this suit against DHS Secretary Johnson and the individuals mentioned above, as well as Ronald D. Vitiello, the Deputy Chief of the United States Border Patrol, and the United States of America.[5]  In response to Plaintiffs' suit, the Defendants have asserted two main arguments:  (1) the States lack standing to bring this suit; and (2) the States' claims are not meritorious.

Multiple *amici curiae* have made appearances arguing for one side of this controversy or the other.   Several separate attempts have been made by individuals—at least one attempt seemingly in support of Plaintiffs, and one in support of Defendants—to intervene in this lawsuit.  Both the States and the Government opposed these interventions.  Because the Court had already implemented a schedule in this time-sensitive matter that was agreed to by all

---

[4] Most authorities seem to indicate that the original Constitution the "Take Care Clause" actually was the "take Care Clause" with the "T" in "take" being lowercase.  The Court will use upper case for the sake of consistency.

[5] All of these Defendants will be referred to collectively as the "Government" or the "Defendants" unless there is a particular need for specificity.

existing parties, it denied these attempts to intervene without prejudice. Permitting the intervention of new parties would have been imprudent, as it would have unduly complicated and delayed the orderly progression of this case. *See* Fed. R. Civ. P. 24(a)(2), (b)(3). Further, this Court notes that the interests of all putative intervenors are more than adequately represented by the Parties in this lawsuit.[6] As suggested by Fifth Circuit authority, the Court has reviewed their pleadings as if they were *amici curiae*. *See Bush v. Viterna*, 720 F.2d 350, 359 (5th Cir. 1984) (*per curiam*).

## III.   BACKGROUND

### A.   Factual Background

For some years now, the powers that be in Washington—namely, the Executive Branch and Congress—have debated if and how to change the laws governing both legal and illegal immigration into this country. This debate has necessarily included a wide-ranging number of issues including, but not limited to, border security, law enforcement, budgetary concerns, employment, social welfare, education, positive and negative societal aspects of immigration, and humanitarian concerns. The national debate has also considered potential solutions to the myriad of concerns stemming from the millions of individuals currently living in the country illegally. To date, however, neither the President nor any member of Congress has proposed

---

[6] While one set of the putative intervenors is allegedly covered by Secretary Johnson's memorandum and may be affected by this ruling, there was no intervention as a matter of right because there is no federal statute that gives them an unconditional right to intervene nor does this lawsuit involve property or a transaction over which they claim a property interest. *See* Fed. R. Civ. P. 24(a).

legislation capable of resolving these issues in a manner that could garner the necessary support to be passed into law.[7]

On June 15, 2012, DHS Secretary Janet Napolitano issued a memorandum creating the DACA program, which stands for "Deferred Action for Childhood Arrivals."   Specifically, Secretary Napolitano's memorandum instructed her Department heads to give deferred action status to all illegal immigrants who:

1.   Came to the United States before age sixteen;

2.   Continuously resided in the United States for at least five years prior to June 15, 2012 and were in the United States on June 15, 2012;

3.   Were then attending school, or had graduated from high school, obtained a GED, or were honorably discharged from the military;

4.   Had not been convicted of a felony, significant misdemeanor, multiple misdemeanors, or otherwise pose a threat to national security; and

5.   Were not above the age of thirty.

Doc. No. 38, Def. Ex. 19 (June 15, 2012 DACA Memorandum issued by Secretary Napolitano). This Directive applies to all individuals over the age of fifteen that met the criteria, including those currently in removal proceedings as well as those who are newly-encountered by the DHS. In addition, DHS employees were instructed to accept work authorization applications from those individuals awarded deferred action status under DACA.  While exact numbers regarding the presence of illegal aliens in this country are not available, both sides seem to accept that at least 1.2 million illegal immigrants could qualify for DACA by the end of 2014.  Doc. No. 38, Def. Ex. 21; Doc. No. 64, Pl. Ex. 6.  Of these individuals, approximately 636,000 have applied

---

[7] Indeed this Court has received *amici curiae* briefs from many members of Congress supporting the States' position and at least one supporting the Government's position.  Additionally, many officials of local political units and entities have also filed *amici curiae* briefs supporting one side of this controversy or the other.

for and received legal presence status through DACA.  Doc. No. 38, Def. Ex. 28.  Both of these figures are expected to rise as children "age in" and meet the program's education requirements. Doc. No. 38, Def. Ex. 6; Doc. No. 64, Pl. Ex. 6.  Estimates suggest that by the time all individuals eligible for DACA "age in" to the program, approximately 1.7 million individuals will be eligible to receive deferred action.  Doc. No. 38, Def. Ex. 21; Doc. No. 64, Pl. Ex. 6.

A review of the DACA program, however, would not be complete without examining the number of individuals who have applied for relief through the program but were denied legal status: of the approximately 723,000 DACA applications accepted through the end of 2014, only 38,000—or about 5%—have been denied. Doc. No. 38, Def. Ex. 28.  In response to a Senate inquiry, the USCIS told the Senate that the top four reasons for denials were:  (1) the applicant used the wrong form; (2) the applicant failed to provide a valid signature; (3) the applicant failed to file or complete Form I-765 or failed to enclose the fee; and (4) the applicant was below the age of fifteen and thus ineligible to participate in the program.  Doc. No. 64, Pl. Ex. 29 at App. P. 0978.  Despite a request by the Court, the Government's counsel did not provide the number, if any, of requests that were denied even though the applicant met the DACA criteria as set out in Secretary Napolitano's DACA memorandum.  The Government's exhibit, Doc. No. 130, Def. Ex. 44, provides more information but not the level of detail that the Court requested.

The States contend and have supplied evidence that the DHS employees who process DACA applications are required to issue deferred action status to any applicant who meets the criteria outlined in Secretary Napolitano's memorandum, and are not allowed to use any real

"discretion" when it comes to awarding deferred action status.[8]   Similarly, the President of the National Citizenship and Immigration Services Council—the union that represents the individuals processing the DACA applications—declared that the DHS management has taken multiple steps to ensure that DACA applications are simply rubberstamped if the applicants meet the necessary criteria.  *See* Doc. No. 64, Pl. Ex. 23 at 3 (Dec. of Kenneth Palinkas, President of Nat'l Citizenship and Immigration Services Council) (hereinafter "Palinkas Dec.").  The States also allege that the DHS has taken steps to ensure that applications for DAPA will likewise receive only a *pro forma* review.[9]

On November 20, 2014, following in his predecessor's footsteps, Secretary Johnson issued a memorandum to DHS officials instructing them to implement the DAPA program and expand the DACA program in three areas.  That memorandum, in pertinent part, states the following:

---

[8] In their latest filing with the Court, the Government repeated these four reasons given to Congress and added a fifth:  dishonesty or fraud in the application process, which of course is implied in any application process.  Because the Government could not produce evidence concerning applicants who met the program's criteria but were denied DACA status, this Court accepts the States' evidence as correct.

[9] The DHS' own website states that, pursuant to the discretion granted to the DHS Secretary, its officers can use their discretion to "prevent [DACA] qualifying individuals from being apprehended, placed into removal proceedings, or removed."  *Consideration of Deferred Action for Childhood Arrivals Process, Frequently Asked Questions*, Official Website of the Dept. of Homeland Security, http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions (last updated Feb. 11, 2015).  Clearly the discretion that exists belongs to the Secretary, who exercised it by delineating the DACA criteria; but if an applicant meets the DACA criteria, he or she will not be removed.  President Obama has stated that if the DAPA applicant satisfies the delineated criteria, he or she will be permitted to remain in the United States.  *See* Press Release, Remarks by President Barack Obama in the President's Address to the Nation on Immigration (Nov. 11, 2014).  The DHS even provides a hotline number that individuals can call to make sure they can terminate removal proceedings if they otherwise meet the criteria for relief under DACA. *Consideration of Deferred Action for Childhood Arrivals Process, Frequently Asked Questions*, Official Website of the Dept. of Homeland Security, http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions (last updated Feb. 11, 2015).

## A.      Expanding DACA

DACA provides that those who were under the age of 31 on June 15, 2012, who entered the United States before June 15, 2007 (5 years prior) as children under the age of 16, and who meet specific educational and public safety criteria, are eligible for deferred action on a case-by-case basis.    The initial DACA announcement of June 15, 2012 provided deferred action for a period of two years.    On June 5, 2014, U.S. Citizenship and Immigration Services (USCIS) announced that DACA recipients could request to renew their deferred action for an additional two years.

In order to further effectuate this program, I hereby direct USCIS to expand DACA as follows:

**Remove the age cap.**  DACA will apply to all otherwise eligible immigrants who enter the United States by the requisite adjusted entry date before the age of sixteen (16), regardless of how old they were in June 2012 or are today.  The current age restriction excludes those who were older than 31 on the date of the announcement (*i.e.*, those who were born before June 15, 1981).  That restriction will no longer apply.

**Extend DACA renewal and work authorization to three-years.**  The period for which DACA and the accompanying employment authorization is granted will be extended to three-year increments, rather than the current two-year increments. This change shall apply to all first-time applications as well as all applications for renewal effective November 24, 2014.  Beginning on that date, USCIS should issue all work authorization documents valid for three years, including to those individuals who have applied and are awaiting two-year work authorization documents based on the renewal of their DACA grants.  USCIS should also consider means to extend those two-year renewals already issued to three years.

**Adjust the date-of-entry requirement.**  In order to align the DACA program more closely with the other deferred action authorization outlined below, the eligibility cut-off date by which a DACA applicant must have been in the United Sates should be adjusted from June 15, 2007 to January 1, 2010.

USCIS should begin accepting applications under the new criteria from applicants no later than ninety (90) days from the date of this announcement.[10]

---

[10] The removal of the age cap, the program's three-year extension, and the adjustment to the date of entry requirement are the three exceptions mentioned above to the general proposition that the DACA program is not at issue in this case.

12

### B.      Expanding Deferred Action

I hereby direct USCIS to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis, to those individuals who:

- have, on the date of this memorandum, a son or daughter who is a U.S. citizen or lawful permanent resident;

- have continuously resided in the United States since before January 1, 2010;

- are physically present in the United States on the date of this memorandum, *and* at the time of making a request for consideration of deferred action with USCIS;

- have no lawful status on the date of this memorandum;

- are not an enforcement priority as reflected in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum; and

- present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.

Applicants must file the requisite applications for deferred action pursuant to the new criteria described above.  Applicants must also submit biometrics for USCIS to conduct background checks similar to the background check that is required for DACA applicants.  Each person who applies for deferred action pursuant to the criteria above shall also be eligible to apply for work authorization for the period of deferred action, pursuant to my authority to grant such authorization reflected in section 274A(h)(3) of the Immigration and Nationality Act.  Deferred action granted pursuant to the program shall be for a period of three years.  Applicants will pay the work authorization and biometrics fees, which currently amount to $465.  There will be no fee waivers and, like DACA, very limited fee exemptions.

USCIS should begin accepting applications from eligible applicants no later than one hundred and eighty (180) days after the date of this announcement.  As with DACA, the above criteria are to be considered for all individuals encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or USCIS, whether or not the individual is already in removal proceedings or subject to a final order of removal.  Specifically:

13

- ICE and CBP are instructed to immediately begin identifying persons in their custody, as well as newly encountered individuals, who meet the above criteria and may thus be eligible for deferred action to prevent the further expenditure of enforcement resources with regard to these individuals.

- ICE is further instructed to review pending removal cases, and seek administrative closure or termination of the cases of individuals identified who meet the above criteria, and to refer such individuals to USCIS for case-by-case determinations. ICE should also establish a process to allow individuals in removal proceedings to identify themselves as candidates for deferred action.

- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear. The USCIS process shall also be available to individuals subject to final orders of removal who otherwise meet the above criteria.

Under any of the proposals outlined above, immigration officers will be provided with specific eligibility criteria for deferred action, but the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only an Act of Congress can confer these rights. It remains within the authority of the Executive Branch, however, to set forth policy for the exercise of prosecutorial discretion and deferred action within the framework of existing law. This memorandum is an exercise of that authority.

Doc. No. 1, Pl. Ex. A (November 20, 2014 DAPA Memorandum issued by Secretary Johnson).

(emphasis in original). The Government relies on estimates suggesting that there are currently 11.3 million illegal aliens residing in the United States and that this new program will apply to over four million individuals.[11]

---

[11] This 11.3 million figure is based upon a 2009 study from the Pew Research Center. The number appears to have increased since then, with a 2013 study finding that 11.7 million illegal immigrants resided in the United States in 2012. *Population Decline of Unauthorized Immigrants Stalls, May Have Reversed*, Pew Research Center (Sept. 23, 2013). An estimated sixty percent of these illegal immigrants reside in California, Florida, Illinois, New Jersey,

Deferred action is not a status created or authorized by law or by Congress, nor has its properties been described in any relevant legislative act.  Secretary Johnson's DAPA Memorandum states that deferred action has existed since at least the 1960s, a statement with which no one has taken issue.  Throughout the years, deferred action has been both utilized and rescinded by the Executive Branch.[12]  The practice has also been referenced by Congress in other immigration contexts.  *See, e.g.,* 8 U.S.C. §§ 1154(a)(1)(D)(i)(II), 227(d)(2).  It was described by the United States Supreme Court in *Reno v. Arab-American Anti-Discrimination Committee* as follows:

> To ameliorate a harsh and unjust outcome, the INS may decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation.  This commendable exercise in administrative discretion, developed without express statutory authorization, originally was known as nonpriority and is now designated as deferred action.  A case may be selected for deferred action treatment at any stage of the administrative process.  Approval of deferred action status means that, for the humanitarian reasons described below, no action will thereafter be taken to proceed against an apparently deportable alien, even on grounds normally regarded as aggravated.

525 U.S. 471, 484 (1999) (quoting 6 C. Gordon, S. Mailman & S. Yale-Loehr, Immigration Law and Procedure § 72.03[2][h] (1998)).  It is similarly defined in 8 C.F.R. § 274a.12(c)(14).

## B.     Factual Contentions

Secretary Johnson supported the implementation of DAPA with two main justifications.  First, he wrote that the DHS has limited resources and it cannot perform all of the duties assigned to it, including locating and removing all illegal aliens in the country.  Secretary Johnson claimed

---

New York, and Texas—with Texas being the only state whose illegal immigrant population increased between 2007 and 2011.  *Id.*  The Court will rely on the 11.3 million figure, however, since it is the one cited by the Parties.

[12]  The deferred action practice was apparently rescinded in 1979, and reinstituted in the 1981 INS Operating Manual.  The 1981 program was then rescinded in 1997.  Nevertheless, after that date, the concept seems to have been used by all subsequent administrations.

15

that the adoption of DAPA will enable the DHS to prioritize its enforcement of the immigration laws and focus its limited resources in areas where they are needed most.  Second, the Secretary reasoned that humanitarian concerns also justify the program's implementation.

Plaintiffs maintain that the Secretary's justifications are conditions caused by the DHS, are pretexts, or are simply inaccurate.  Regarding resources, Plaintiffs argue that the DHS has continued to be funded at record levels and is currently spending millions to create the enormous bureaucracy necessary to implement this program.[13]  The States additionally maintain that the DAPA program was:  politically motivated and implemented illegally.  The first proposition is not the concern of the Court; the second is.  To support the latter proposition, the States quote President Obama at length.  First, they quote the President's statements made prior to the implementation of DAPA stating that he, as President, did not have the power under the Constitution or the laws of this country to change the immigration laws.  On these occasions, he asserted that only Congress could implement these changes in this area of the law.  From these statements, the States reason that if the President does not have the necessary power to make these changes, then the DHS Secretary certainly does not.

The States claim that following the announcement of the DAPA program, the President's rhetoric dramatically shifted.  They cite statements made after the announcement of DAPA in which the President is quoted as saying that because Congress did not change the law, he

---

[13] At oral argument, Defendants maintained that the fees charged to process DAPA applications will cover the cost of the program, but had to concede that the DHS was already expending large sums of money to implement DAPA and as of yet had not received any fees.  According to the declaration of one INS employee, the DHS plans to begin construction of a service center that will employ 700 DHS employees and 300 federal contract employees.  *See* Doc. No. 64, Pl. Ex. 23 at 3 ("Palinkas Dec.").  His statement that the DHS is shifting resources away from other duties in order to implement this program is certainly reasonable, especially since the USCIS admitted that it is shifting staff to meet the DAPA demand.  *Executive Actions on Immigration: Key Questions and Answers*, U.S. Customs & Immigration Enforcement, http://www.uscis.gov/immigrationaction (last updated Jan. 30, 2015).  *See id*.

changed it unilaterally.  The States argue that the DAPA program constitutes a significant change in immigration law that was not implemented by Congress.  Agreeing with the President's earlier declarations, the States argue that only Congress can create or change laws, and that the creation of the DAPA program violates the Take Care Clause of the Constitution and infringes upon any notion of separation of powers.  Further, they assert that the President has effectuated a change in the law solely because he wanted the law changed and because Congress would not acquiesce in his demands.

Obviously, the Government denies these assertions.

### C.      Legal Contentions

This case presents three discrete legal issues for the Court's consideration.  First, the Government maintains that none of the Plaintiffs have standing to bring this injunctive action. The States disagree, claiming that the Government cannot implement a substantive program and then insulate itself from legal challenges by those who suffer from its negative effects.  Further, the States maintain that Secretary Johnson's DAPA Directive violates the Take Care Clause of the Constitution; as well as the Administrative Procedure Act ("APA") and the Immigration and Naturalization Act ("INA").  In opposition to the States' claims, the Government asserts that it has complete prosecutorial discretion over illegal aliens and can give deferred action status to anyone it chooses.  Second, the Government argues that discretionary decisions, like the DAPA program, are not subject to the APA.  Finally, the Government claims that the DAPA program is merely general guidance issued to DHS employees, and that the delineated elements of eligibility are not requirements that DHS officials are bound to honor.  The Government argues that this flexibility, among other factors, exempts DAPA from the requirements of the APA.

## IV.   <u>STANDING</u>

### A.   Legal Standard

#### 1.   Article III Standing

Article III of the United States Constitution requires that parties seeking to resolve disputes before a federal court present actual "Cases" or "Controversies."  U.S. Const. art. III, § 2, cl. 1.  This requirement limits "the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process."  *Flast v. Cohen*, 392 U.S. 83, 95 (1968).  Plaintiffs, as the parties invoking the Court's jurisdiction, bear the burden of satisfying the Article III requirement by demonstrating that they have standing to adjudicate their claims in federal court.  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  The "irreducible constitutional minimum of standing contains three elements."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  First, a plaintiff must demonstrate that they have "suffered a concrete and particularized injury that is either actual or imminent."  *Massachusetts v. E.P.A.*, 549 U.S. 497, 517 (2007).  Second, a plaintiff must show that there is a causal connection between the alleged injury and the complained-of conduct— essentially, that "the injury is fairly traceable to the defendant."  *Id.*  Finally, standing requires that it "be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Lujan*, 504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)).

#### 2.   Prudential Standing

In addition to these three constitutional requirements, "the federal judiciary has also adhered to a set of 'prudential' principles that bear on the question of standing."  *Valley Forge*

*Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982).   Many opinions refer to these principles as being under the banner of "prudential" standing.   *See, e.g., Bennett v. Spear*, 520 U.S. 154, 164 (1997).   First, the Supreme Court has held that when the "asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone does not warrant exercise of jurisdiction."   *Id.*   Rather, these "abstract questions of wide public significance" are more appropriately left to the representative branches of the federal government.   *Warth v. Seldin*, 422 U.S. 490, 500 (1975).   Second, the plaintiffs must come within the "zone of interests to be protected or regulated by the statute or constitutional guarantee in question."   *Valley Forge*, 454 U.S. at 475 (quoting *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970)).   Finally, a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."   *Id.* at 474 (quoting *Warth*, 422 U.S. at 499).

### 3.    Standing Under the Administrative Procedure Act

The APA provides that a "person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."   5 U.S.C. § 702.   This right of judicial review extends to agency actions "for which there is no other adequate remedy in a court."   5 U.S.C. § 704.   To demonstrate standing under the APA, the plaintiff must show that it has suffered or will suffer a sufficient injury in fact.   *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488 (1998).   The plaintiff must also demonstrate prudential standing under the APA, which requires showing that "the interest sought to be protected by the complainant [is] arguably within

the zone of interests to be protected or regulated by the statute . . . in question." *Id.* (quoting *Data Processing*, 397 U.S. at 152).  For this prudential standing inquiry, it is not necessary for a court to ask "whether there has been a congressional intent to benefit the would-be plaintiff." *Nat'l Credit Union Admin.*, 522 U.S. at 488-89.  Rather, if the plaintiff's interests are "arguably within the 'zone of interests' to be protected by a statute," the prudential showing requirement is satisfied.  *Id.* at 492.  This requisite showing is not made, however, if the plaintiff's interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).

When seeking review of agency action under the APA's procedural provisions, Plaintiffs are also operating under a favorable presumption.  They are presumed to satisfy the necessary requirements for standing.  *See Mendoza v. Perez*, 754 F.3d 1002, 1012 (D.C. Cir. 2014). Specifically, as stated by the D.C. Circuit, "[p]laintiffs asserting a procedural rights challenge need not show the agency action would have been different had it been consummated in a procedurally valid manner—the courts will assume this portion of the causal link." *Id.*

## B.      Resolution of Standing Questions

Questions regarding constitutional and prudential standing implicate the court's subject-matter jurisdiction; thus challenges to standing are evaluated as a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  When evaluating subject-matter jurisdiction, the court may consider:  "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming*, 281 F.3d at 161.  The

court's analysis also depends on whether the challenging party has made a "facial" or "factual" attack on jurisdiction.  *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).  A facial challenge consists of only a Rule (12)(b)(1) motion without any accompanying evidence; for this challenge, the court "is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true."  *Id.*

Conversely, when making a factual attack on the court's jurisdiction, the challenging party submits affidavits, testimony, or other evidentiary materials to support its claims.  *Id.*  A factual attack requires the responding plaintiff "to submit facts through some evidentiary method" and prove "by a preponderance of the evidence that the trial court does have subject matter jurisdiction."  *Id.*  Here, Defendants submitted a number of exhibits in support of their attack on Plaintiffs' standing to bring this suit in federal court.  Therefore, for the purposes of ruling on Defendants' challenge, the Plaintiffs bear the burden to prove by a preponderance of the evidence that they possess the requisite standing required by Article III.  It is not necessary, however, for *all* Plaintiffs to demonstrate standing; rather, "one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."  *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).  Thus Plaintiffs' suit may proceed as long as one Plaintiff can show by a preponderance of the evidence that it fulfills the necessary requirements to show standing.

### C.   Analysis

#### 1.   Article III Standing

##### a.   Injury

The States allege that the DHS Directive will directly cause significant economic injury to their fiscal interests.  Specifically, Texas argues that the DHS Directive will create a new class of individuals eligible to apply for driver's licenses,[14] the processing of which will impose substantial costs on its budget.  Plaintiffs rely on Texas' driver's license program to demonstrate how the costs associated with processing a wave of additional driver's licenses will impact a state's budget.  Texas' undocumented population is approximately 1.6 million, and Plaintiffs' evidence suggests that at least 500,000 of these individuals will be eligible for deferred action through DAPA.  Doc. No. 64, Pl. Ex. 14 ¶ 33; Pl. Ex. 24 ¶ 6.  Under current Texas law, applicants pay $24.00 to obtain a driver's license, leaving any remaining costs to be absorbed by the state.  *See* Tex. Transp. Code Ann. § 521.421.  If the majority of DAPA beneficiaries currently residing in Texas apply for a driver's license, it will cost the state $198.73 to process and issue each license, for a net loss of $174.73 per license.  Doc. No. 64, Pl. Ex. 24 ¶ 8.  Even if only 25,000 of these individuals apply for a driver's license—approximately 5% of the population estimated to benefit from the DHS Directive in Texas—Texas will still bear a net loss of $130.89 per license, with total losses in excess of several million dollars.  *Id.*  These costs,

---

[14] Some driver's license programs, like that in Arkansas, provide that individuals with deferred action status will be eligible to apply for a driver's license.  *See, e.g.,* Ark. Code Ann. § 27-16-1105.  Other programs, like the one in Texas, provide that a license will be issued to individuals who can show they are authorized to be in the country. *See, e.g.,* Tex. Transp. Code Ann. § 521.142.  Employment authorization—a benefit that will be available to recipients of DAPA—is sufficient to fulfill this requirement.  Thus under either statutory scheme, DAPA will make its recipients eligible to apply for state driver's licenses.

Plaintiffs argue, are not unique to Texas; rather, they will be similarly incurred in all Plaintiff States where DAPA beneficiaries will be eligible to apply for driver's licenses.

In addition to these increased costs associated with processing a wave of additional driver's licenses, a portion of the States' alleged injury is directly traceable to fees mandated by federal law.  *See* REAL ID Act of 2005, PL 109-13, 119 Stat. 231 (2005).  Following the passage of the REAL ID Act in 2005, states are now required to determine the immigration status of applicants prior to issuing a driver's license or an identification card.  *Id*.  To verify immigration status, states must submit queries to the federal Systematic Alien Verification for Entitlements (SAVE) program and pay $0.50-$1.50 for each applicant processed.  SAVE Access Methods & Transaction Charges, USCIS.   In Texas, estimates suggest that the state pays the federal government on average $0.75 per driver's license applicant for SAVE verification purposes.  Doc. No. 64, Pl. Ex. 24 ¶ 5.  Thus by creating a new group of individuals that are eligible to apply for driver's licenses, the DHS Directive will increase the costs incurred by states to verify applicants' immigration statuses as required by federal law.[15]

As Defendants concede, "a direct and genuine injury to a State's own proprietary interests may give rise to standing."  Doc. No. 38 at 23; *see also, e.g., Clinton v. City of N.Y.*, 524 U.S. 417, 430-31 (1998) (negative effects on the "borrowing power, financial strength, and fiscal planning" of a government entity are sufficient injuries to establish standing); *Sch. Dist. of City of Pontiac v. Sec'y of the U.S. Dep't of Educ.*, 584 F.3d 253, 261 (6th Cir. 2009) (school districts had standing "based on their allegation that they must spend state and local funds" to comply with federal law).  Defendants in this case argue, however, that the projected costs to Plaintiffs'

---

[15] In a procedural rights case, the size of the injury is not important for defining standing; rather it is the fact of the injury.  "The litigant has standing if there is some possibility that the requested relief will prompt the injury causing party to reconsider the decision."  *Massachusetts v. E.P.A.*, 549 U.S. at 518, 525-26.

driver's license programs are "self-inflicted" because the DHS Directive does not directly require states to provide any state benefits to deferred action recipients, and because states can adjust their benefit programs to avoid incurring these costs. Doc. No. 38 at 21-22. This assertion, however, evaluates the DHS Directive in a vacuum. Further, this claim is, at best, disingenuous. Although the terms of DAPA do not compel states to provide any benefits to deferred action recipients, it is clear that the DHS Directive will nonetheless affect state programs. Specifically, in the wake of the Ninth Circuit's decision in *Arizona Dream Act Coalition v. Brewer*, it is apparent that the federal government will compel compliance by all states regarding the issuance of driver's licenses to recipients of deferred action. 757 F.3d 1053 (9th Cir. 2014).

In *Arizona Dream Act Coalition v. Brewer*, the plaintiffs, DACA beneficiaries, sought an injunction to prevent the defendants from enforcing an Arizona policy that denied driver's licenses to recipients of deferred action. *Id.* at 1060. Necessary for the imposition of an injunction, the Ninth Circuit examined whether the plaintiffs were likely to succeed on the merits of their case, and focused on the fact that Arizona's driver's license program permitted other non-citizens to use employment authorization documents to obtain driver's licenses—the same documentation that would be conferred upon DAPA recipients. *Id*. at 1064. Finding that this policy likely discriminated against similarly-situated parties in violation of the Equal Protection Clause, the court enjoined the defendants from denying driver's licenses to deferred action beneficiaries. *Id.* at 1069.

More importantly, the Ninth Circuit in *Arizona* also considered whether the denial of driver's licenses to deferred action recipients was preempted by the Executive Branch's determination that deferred action recipients were also authorized to work in the United States.

*Id.* at 1063.  Stating that "the ability to drive may be a virtual necessity for people who want to work in Arizona," the court noted that more than 87% of Arizona's workforce depended on personal vehicles to commute to work.  *Id.* at 1062.  Although not the basis for its finding, the court addressed preemption at length.  It reasoned that the defendants' policy of denying driver's licenses to deferred action recipients "interferes with Congress's intention that the Executive determine when noncitizens may work in the United States" and would be preempted by federal law.  *Id.* at 1063.  Reinforcing this position, the concurring opinion argued that the majority should have not merely discussed it, but should have included this reasoning as part of its holding since there was no question that federal law required the issuance of driver's licenses to deferred action recipients.  *Id.* at 1069-75.  The Government filed briefs in that case arguing that all of Arizona's attempts to avoid these expenses were preempted.  Doc. No. 54, Pl. Ex. 3.

Although the Ninth Circuit's opinion in *Arizona* is not necessarily binding on the majority of Plaintiffs in this case, it nonetheless suggests that Plaintiffs' options to avoid the injuries associated with the DHS Directive are virtually non-existent and, if attempted, will be met with significant challenges from the federal government.[16]  The federal government made it clear in *Arizona* (and would not retreat from that stance in this case) that any move by a plaintiff state to limit the issuance of driver's licenses would be viewed as illegal.  As held by the Ninth Circuit in *Arizona*, denying driver's licenses to certain recipients of deferred action violated the Equal Protection clause, and would likely be preempted by DAPA, as well.  *See id.* at 1067. This conclusion would be particularly persuasive in Texas since its driver's license program—like Arizona's—permits applicants to rely on federal employment authorization documentation

---

[16] The Ninth Circuit opinion is binding on Arizona, Idaho, and Montana, the Plaintiff States located in the Ninth Circuit.  Therefore, the Government's argument with respect to these states is totally meritless.

to show legal status in the United States.  If Texas denied driver's licenses to beneficiaries of the DHS Directive, as suggested by the Government here, it would immediately be sued for impermissibly discriminating against similarly-situated parties that rely on employment authorization documentation to apply for driver's licenses.  *See id.* at 1064.  Even if Texas could structure its driver's license program to avoid these impermissible classifications, the court in *Arizona* strongly suggested that the denial of driver's licenses to deferred action recipients would be preempted by the Executive Branch's intent that deferred action recipients work while they remain in the United States.  Therefore, if Texas or any of the other non-Ninth Circuit States sought to avoid an Equal Protection challenge and instead denied driver's licenses to all individuals that rely on employment authorization documentation, they would be subjecting themselves to a different but significant challenge on federal preemption grounds.  As stated above, Arizona, Idaho, and Montana—the Plaintiff States that fall within the Ninth Circuit's jurisdiction—do not even have the option of trying to protect themselves.[17]

Setting aside these legal questions, this all-or-nothing choice—that Texas either allow the DAPA beneficiaries to apply for driver's licenses and suffer financial losses or deny licenses to

---

[17] Also, it is not a defense to the Plaintiffs' assertion of standing to argue that it is not the DAPA program causing the harm, but rather the Justice Department's enforcement of the program.  Both departments are a part of the United States and work for the same branch of the federal government.

The Court additionally notes that while the Government claimed preemption on the one hand, it correctly notes that the actual Circuit decision was based upon equal protection.  Thus, it argues that the Government is not ultimately causing the States' injuries; rather, it is the Constitution.  This is not accurate.  This distinction is not convincing for several reasons.  First, if the Government enforced the INA as written, these applicants would not be in the states to apply.  Second, the Government is still maintaining and asserting its right of preemption to prevent the states from enforcing the INA provisions requiring removal of these individuals and instead is using that power to force a state's compliance with these applications.  Third, whether or not the Constitution is involved, it is ultimately the combination of the REAL ID Act and DAPA combined with the failure to enforce the INA that will compel the complained-about result.  It is the implementation of the DACA program that has been causing and the implementation of the DAPA program that will cause these damages when they intersect with the REAL ID Act.  Stated another way, without DAPA there are no damages, and without the REAL ID Act, there are less damages.  Finally, the Government has also not indicated that it will refrain from litigation or aiding litigants to compel the States to issues licenses and incur these expenses once DAPA is instituted.

26

all individuals that rely on employment authorization documentation—is an injury in and of itself.  An injury cannot be deemed "self-inflicted" when a party faces only two options:  full compliance with a challenged action or a drastic restructure of a state program.  *See Texas. v. United States*, 497 F.3d 491, 496-98 (5th Cir. 2007) (finding that Texas had standing on the basis of a "forced choice":  after federal regulations, Texas either had to comply with an administrative procedure it thought was unlawful or forfeit the opportunity to comment on proposed gaming regulations).  Further, the necessary restructuring to ensure constitutional compliance would require Texas to deny driver's licenses to individuals it had previously decided should be eligible for them—a significant intrusion into an area traditionally reserved for a state's judgment.  This illusion of choice—instead of protecting the state from anticipated injuries—merely places the states between a rock and hard place.

Defendants also argue that the projected injuries to Plaintiffs' driver's license programs are merely generalized grievances that are shared by all the states' citizens, and as such are insufficient to support standing in this case.  The cases that Defendants cite for this contention, though, are easily distinguishable.  In these cases, the plaintiffs broadly alleged general harm to state revenue or state spending.  *See Commonwealth of Pa. v. Kleppe*, 533 F.2d 668, 672 (D.C.C. 1976) (Pennsylvania's "diminution of tax receipts [was] largely an incidental result of the challenged action" and was not sufficient to support standing); *People ex rel. Hartigan v. Cheney*, 726 F. Supp. 219, 226 (C.D. Ill. 1989) (Illinois' alleged injury of "decreased state tax revenues and increased spending on social welfare programs" not sufficient to support standing).  When, however, an action directly injures a state's identifiable proprietary interests, it is more likely that the state possesses the requisite standing to challenge the action in federal court.  *See*

*Wyo. v. Okla.*, 502 U.S. 437, 448 (1992) (Wyoming had standing to challenge a state statute for direct and undisputed injuries to specific tax revenues); *Sch. Dist. of City of Pontiac*, 584 F.3d at 261-62 (school district had sufficient injury to demonstrate standing when compliance with No Child Left Behind forced plaintiffs to spend state and local funds). Here, Plaintiffs have shown that their projected injuries are more than "generalized grievances"; rather, Plaintiffs have demonstrated that DAPA will directly injure the proprietary interests of their driver's license programs and cost the States badly needed funds. In Texas alone, the state is projected to absorb significant costs. If the majority of the DHS Directive beneficiaries residing in the state apply for driver's licenses, Texas will bear directly a $174.73 per applicant expense, costing the state millions of dollars.

On a final note, it is important to reiterate the federal government's position in front of the Ninth Circuit in *Arizona*—a position that it has not retreated from in the present case: a state may not impose its own rules considering the issuance of driver's licenses due to claims of equal protection and preemption. Although the federal government conceded that states enjoy substantial leeway in setting policies for licensing drivers within their jurisdiction, it simultaneously argued that the states could not tailor these laws to create "new alien classifications not supported by federal law." Doc. No. 64, Pl. Ex. 3 at 11. In other words, the states cannot protect themselves from the costs inflicted by the Government when 4.3 million individuals are granted legal presence with the resulting ability to compel state action. The irony of this position cannot fully be appreciated unless it is contrasted with the DAPA Directive. The DAPA Directive unilaterally allows individuals removable by law to legally remain in the United States based upon a classification that is not established by any federal law. It is this very lack of

law about which the States complain.   The Government claims that it can act without a supporting law, but the States cannot.

The contradictions in the Government's position extend even further.   First, driver's license programs are functions traditionally reserved to state governments.   Even the DHS recognizes this reservation.   The DHS teaches naturalization applicants preparing for their civics examination that driver's license programs are clearly a state interest.   *See* Study Materials for the Civics Test, USCIS.[18]   Of the sample civics questions, the DHS provides the following question and lists five acceptable answers:

> 42.   Under our Constitution, some powers belong to the states.   What is <u>one</u> power of the states?
>
> ▪   *provide schooling and education*
>
> ▪   *provide protection (police)*
>
> ▪   *provide safety (fire departments)*
>
> ▪   <u>*give a driver's license*</u>
>
> ▪   *approve zoning and land use.*

*Id.* (emphasis added).[19]

Nonetheless, the DHS through its DACA Directive directly caused a significant increase in driver's license applications and the costs incurred by states to process them; DAPA, a much larger program, will only exacerbate these damages.   These injuries stand in stark contrast to the

---

[18] This website can be accessed at http://www.uscis.gov/citizenship/learners/study-test/study-materials-civics-test.

[19] *Id.*

Government's public assertion that driver's license programs fall in the realm of "powers [that] belong to the states." *Id.*

The Government's position is further undermined by the fact that a portion of Plaintiffs' alleged damages associated with the issuance of driver's licenses are fees mandated by federal law and are paid to the Government. As discussed above, the REAL ID Act requires states to pay a fee to verify the immigration status of each driver's license applicant through the federal SAVE program. *See* REAL ID Act of 2005, PL 109-13, 119 Stat. 231 (2005); SAVE Access Methods & Transaction Charges, USCIS.[20] The fees associated with this program, combined with the federal government's creation of the possibility of four to five million new driver's

---

[20] The SAVE price structure chart may be accessed at http://www.uscis.gov/save/getting-started/save-access-methods-transaction-charges.

It was suggested that the original Real ID Act might have been subject to attack because of the burden it placed upon the states. *See* Patrick R. Thiessen, *The Real ID Act and Biometric Technology: A Nightmare for Citizens and the States That Have to Implement It*, 6 J. Telecomm. & High Tech. L. 483 (2008) (hereinafter "*REAL ID and Biometric Technology*"). These fees have always been a source of objections and opposed by both conservative and liberal groups alike:

> The Act is also opposed by groups as diverse as the CATO Institute, a libertarian think tank, and the American Civil Liberties Union ("ACLU"), an organization designed to defend and preserve the individual liberties guaranteed under the Constitution, both of which testified in opposition to the Real ID Act in New Hampshire. The CATO Institute's opposition is based on what it characterizes as the *federal government blackmailing the states*. The CATO Institute has highlighted the fact that the states are being *forced to comply with the Real ID Act because a noncompliant state's citizens will be barred from air travel, entry to federal courthouses, and other federal checkpoints*.
>
> ACLU opposition is based on *the high cost of implementation being imposed on the states*, its belief that it will not actually prevent terrorism, and the diminished privacy Americans will experience because of the compilation of personal information. Barry Steinhardt, Director of ACLU's Technology and Liberty Project, stated:
>
>> It's likely the costs for Real ID will be billions more than today's estimate [$11 billion]--but no matter what the real figure is, Real ID needs to be repealed. *At a time when many state budgets and services are already stretched thin, it is clear that this unfunded mandate amounts to no more than a tax increase in disguise*.

*Id.* at 490-91 (emphasis added) (citations omitted). Under DAPA and DACA, the States are facing a new unfunded matter—one which is levied by the DHS and enforced by the Justice Department.

license applicants, give rise to a situation where states must process an increased amount of driver's license applications and remit a significant portion of their funds to the federal government as required by the REAL ID Act.  Further, the states have no choice but to pay these fees.  If they do not, their citizens will lose their rights to access federal facilities and to fly on commercial airlines.[21]

Another ironic aspect of the Government's argument exists again at the intersection of the DAPA Directive and the REAL ID Act.  Those supporting the passage of the REAL ID Act asserted that the Act would prevent illegal immigration by making it more difficult for individuals with no legal status to get state driver's licenses.  *See REAL ID and Biometric Technology*, at 492.[22]  While the REAL ID Act recognized that individuals with deferred action status would be eligible to obtain driver's licenses, it seems almost without argument that the drafters of the Act did not foresee four to five million individuals obtaining deferred action by virtue of one DHS Directive, especially when the yearly average of deferred action grants prior to DACA was less than 1,000.  Therefore, DAPA arguably undercuts one of the very purposes of

---

[21] *REAL ID and Biometric Technology*, at 486 n.14.

[22]       Defenders of the Real ID Act have been able to deflect some of the criticism from various groups by arguing that the Act is necessary to prevent illegal immigration and to prevent terrorism.  For instance, Representative Sensenbrenner referenced the fact that Muhammad Atta, one of the 9/11 hijackers, came over to the United States on a six-month visa, but still was able to obtain a six-year driver's license in Florida.  *Supporters also argue that the Act will prevent illegal immigration by making it more difficult for illegal immigrants to get state driver's licenses.*  Moreover, supporters contend that asylum seekers should bear the burden of proving a valid cause for asylum, which is required under the Real ID Act because a terrorist will not be able to easily gain residency status by claiming asylum.  Supporters also argue that a true national database, which would be susceptible to hackers, is not required because the states will send electronic queries to each other that will be answered with the individual state's database.

*REAL ID and Biometric Technology*, at 497 (emphasis added) (citations omitted).  Due to DAPA, the Real ID Act will not be used to prevent illegal immigration, but rather, together, they form a basis to compel a reward for illegal immigration.

the REAL ID Act, and will certainly undermine any deterrent effect or security benefit that may have motivated passage of the Act.

     b.  Causation

   Establishing causation can be difficult where the plaintiff's alleged injury is caused by "the government's allegedly unlawful regulation (or lack of regulation) of *someone else* . . . ." *Lujan*, 504 U.S. at 562 (emphasis in original).  In the cases cited by the Government, causation depends on the decisions made by independent actors and "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation . . . ."  *Id.*  Essentially, establishing causation requires the plaintiff to show that the alleged injury is not merely "remote and indirect" but is instead fairly traceable to the actions of the defendant.  *Florida v. Mellon*, 273 U.S. 12, 18 (1927).

   The Supreme Court has declined to find that a plaintiff had standing sufficient to bring suit in federal court when it merely speculates as to whether the defendant's action would cause the alleged harm.  *See id.* at 17-18.  In *Florida v. Mellon*, the plaintiff sought to enjoin the federal government from collecting an inheritance tax in Florida, arguing that it would cause Florida residents to remove property from the state, thereby "diminishing the subjects upon which the state power of taxation may operate."  *Id.*  The Supreme Court held that whether the defendants' actions would cause individuals to act in such a way that would produce injury to the state was "purely speculative, and, at most, only remote and indirect."  *Id.* at 18.

   Here, unlike Florida's injury in *Mellon*, the alleged harm to Plaintiffs' driver's license programs would be directly caused by the DHS Directive.  Further, there is no speculation as to the probability of its occurrence; rather, it is like watching the same play performed on a new

stage.  The DACA Directive, implemented in 2012, permitted its recipients to receive the status

or documentation necessary to subsequently apply for driver's licenses.  *See Access to Driver's*

*Licenses for Immigrant Youth Granted DACA*, NILC (Dec. 2014) ("DACA recipients who obtain

an employment authorization document and a Social Security number have been able to obtain a

license in almost every state").[23]  Similarly, the DAPA Directive also provides its recipients with

the status and the documentation necessary to apply for a driver's license in most states.  *See*

Ark. Code Ann. § 27-16-1105 (proof of deferred status sufficient to apply for driver's license);

Tex. Transp. Code. Ann. § 521.142 (employment authorization documentation sufficient for

driver's license application).  Aside from furnishing the status or documents necessary to apply

for a driver's license, the DAPA Directive will also provide an incentive for its applicants.  The

Directive permits and encourages its beneficiaries to apply for work authorization for the period

that they will be granted deferred status in the United States.  For individuals in the United States

who commute to work, driving is the most common mode of transportation.  In 2013, it was

estimated that 86.3% of the United States' workforce commuted to work in private vehicles.[24]

*See Commuting in America 2013:  The National Report on Commuting Patterns and Trends*,

American Association of State Highway and Transportation Officials (Oct. 2013).[25]  This is

especially true in the states that are Plaintiffs in this case, as none of them have extensive mass

transit systems.  In sum, the federal government's actions in *Arizona*, and its refusal to disclaim

future such actions in this case, establish that it will seek to force Texas (and other similarly-

---

[23] A PDF of this article may be accessed at http://www.nilc.org/document.html?id=1120.

[24] The Ninth Circuit in *Arizona Dream Act Coalition v. Brewer* similarly noted that the majority of the workforce relies on private vehicles to commute to work.  757 F.3d at 1062.  Specifically, the court highlighted that approximately 87% of Arizona's workforce commuted to work by car.  *Id.*

[25] A PDF of this study may be accessed at http://traveltrends.transportation.org/Documents/CA10-4.pdf.

situated states) into these changes.  Further, some portion of Plaintiffs' alleged injuries are fees mandated by federal law that are required to be paid by states directly to the federal government—damages that are a virtual certainty.  Plaintiffs—or at least Texas—have clearly met their burden of showing that their alleged injuries have been and will be directly "traceable" to the actions of the Defendants.  Far from a generalized injury or "pie in the sky" guesswork, Plaintiffs have demonstrated a direct, finite injury to the States that is caused by the Government's actions.  Given that Plaintiffs have shown that they stand to suffer concrete and particularized consequences from Defendants' actions, they have pled an injury sufficient to demonstrate standing in this Court.

c.      Redressability

The redressability prong of the standing analysis examines whether the remedy a plaintiff seeks will redress or prevent the alleged injury.  *Lujan*, 504 U.S. at 560.  Of this three-prong standing analysis, the question of redressability is easiest for this Court to resolve.  The remedy Plaintiffs seek will undoubtedly prevent the harm they allege will stem from Defendants' DHS Directive. DAPA provides its beneficiaries with the necessary legal presence and documentation to allow them to apply for driver's licenses in most states; without this status or documentation, these beneficiaries would be foreclosed from seeking a driver's license.  Therefore enjoining the implementation of the DHS Directive would unquestionably redress Plaintiffs' alleged harm.

Plaintiffs (or at least one Plaintiff) has clearly satisfied the requirements for Article III standing.

2.      Prudential Standing

In addition to fulfilling the Article III standing requirements, Plaintiffs have also satisfied the requirements of prudential standing.  As discussed above, the States have not merely pled a "generalized grievance" that is inappropriate for the Court's resolution.  Rather, the States have shown that the DAPA program will directly injure their proprietary interests by creating a new class of individuals that is eligible to apply for state driver's licenses.  When this class applies for driver's licenses, the States will incur significant costs to process the applications and issue the licenses—costs that the States cannot recoup or avoid.  Instead of a "generalized grievance," the States have pled a direct injury to their fiscal interests.

Second, Plaintiffs' claims come within the "zone of interests" to be protected by the immigration statutes at issue in this litigation. The Supreme Court has stated time and again that it is the duty of the federal government to protect the border and enforce the immigration laws.[26] The Government has sought and obtained rulings that preempt all but token participation by the states in this area of the law. The basis for this preemption was that the states' participation was

---

[26] For example, in *Plyler v. Doe*, all nine justices on the Supreme Court agreed that the United States was not doing its job to protect the states. In his concurring opinion, Justice Powell stated that:

> Illegal aliens are attracted by our employment opportunities, and perhaps by other benefits as well. This is a problem of serious national proportions, as the Attorney General has recently recognized. Perhaps because of the intractability of the problem, Congress—vested by the Constitution with the responsibility of protecting our borders and legislating with respect to aliens—has not provided effective leadership in dealing with this problem.

457 U.S. at 237-38 (Powell, J., concurring) (citations omitted). The dissenters in *Plyler*, while disagreeing with the result, did not disagree about who is duty bound to protect the states:

> A state has no power to prevent unlawful immigration, and no power to deport illegal aliens; those powers are reserved exclusively to Congress and the Executive. If the Federal Government, properly chargeable with deporting illegal aliens, fails to do so, it should bear the burdens of their presence here.

*Id.* at 242 n.1 (Burger, J., dissenting).

not wanted or required because the federal government was to provide a uniform system of protection to the states. The fact that DAPA undermines the INA statutes enacted to protect the states puts the Plaintiffs squarely within the zone of interest of the immigration statutes at issue.

Further, Congress has entrusted the DHS with the duty to enforce these immigration laws. 8 U.S.C. § 1103(a)(i). The DHS' duties include guarding the border and removing illegal aliens present in the country. 8 U.S.C. §§ 1103(a)(5), 1227. DAPA, however, is certainly at odds with these commands. These duties were enacted to protect the states because, under our federal system, they are forbidden from protecting themselves.

Finally, Plaintiffs are not resting their claim for relief solely on the rights and interests of third-parties. Rather, the States are seeking to protect their own proprietary interests, which they allege will be directly harmed by the implementation of DAPA. Thus Plaintiffs have similarly satisfied their burden to show prudential standing.

### 3. Standing under the APA

Relying on the APA, Plaintiffs assert not only a basis for standing but also an argument on the merits. Because these concepts are closely intertwined, the Court will address both in its discussion of the merits. Nevertheless, for the reasons stated above and the reasons articulated below, the States have APA standing as well.

### D. Other Grounds for Standing

The States have asserted three additional bases for standing: (1) *parens patriae* standing; (2) *Massachusetts v. E.P.A.* standing; and (3) abdication standing. Following the Supreme Court's decision in *Massachusetts v. E.P.A*, these theories seem at least indirectly related to the *parens patriae* claim discussed below. There is, however, ample evidence to support standing

based upon the States' demonstration of direct injury flowing from the Government's implementation of the DAPA program.  Since the States have, or at least Texas has, shown a direct injury, as well as for the reasons discussed below, this Court either rejects or refuses to rely solely on either of the *parens patriae* or *Massachusetts v. E.P.A.* theories as the basis for Plaintiffs' standing.  Both the Parties and *amici curiae*, however, have briefed these theories in depth; thus the Court is compelled to address them.

### 1.    *Parens Patriae*

Plaintiffs also rely on the doctrine of *parens patriae* to establish an independent basis for standing in their suit against Defendants.  *Parens patriae* permits a state to bring suit to protect the interests of its citizens, even if it cannot demonstrate a direct injury to its separate interests as a sovereign entity.  *Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez*, 458 U.S. 592, 601 (1982).  Meaning literally "parent of the country," *parens patriae* recognizes the interests "that the State has in the well-being of its populace" and allows it to bring suit when those interests are threatened.  *Id*. at 602; *Black's Law Dictionary* 1287 (10th ed. 2014).  Here, the States allege that the DHS Directive will injure the economic interests of their residents, necessitating a *parens patriae* suit to ensure that those interests are protected from the consequences of the Government's actions.

Defendants, relying primarily on the Supreme Court's opinion in *Massachusetts v. Mellon*, contend that the States' invocation of *parens patriae* is misplaced.  They claim states cannot maintain a *parens patriae* suit against the federal government since the federal government is the ultimate protector of the citizens' interests.  *See* 262 U.S. 447, 485-86 (1923).  In *Massachusetts v. Mellon*, Massachusetts brought a *parens patriae* suit to challenge the

37

constitutionality of the Maternity Act, arguing that the burden of funding the Act fell disproportionately on industrial states like Massachusetts.  *Id.* at 479.  Holding that the federal government is the supreme *parens patriae*, the Court stated that "it is no part of [a state's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government."  *Id.*  Thus, Defendants argue that the States' suit should be similarly barred since the federal government's right to protect citizens' interests trumps that of the states.

Defendants' succinct argument, however, ignores an established line of cases that have held that states may rely on the doctrine of *parens patriae* to maintain suits against the federal government.  *See, e.g., Wash. Utilities and Transp. Comm'n v. F.C.C.*, 513 F.2d 1142 (9th Cir. 1975) (state regulatory agency relied on *parens patriae* to bring suit against F.C.C. and U.S.); *Kansas ex rel. Hayden v. United States*, 748 F. Supp. 797 (D. Kan. 1990) (state brought suit against U.S. under *parens patriae* theory); *Abrams v. Heckler*, 582 F. Supp. 1155 (S.D.N.Y. 1984) (state used *parens patriae* to maintain suit against the Secretary of Health and Human Services).  These cases rely on an important distinction.  The plaintiff states in these cases are not bringing suit to *protect* their citizens *from* the operation of a federal statute—actions that are barred by the holding of *Massachusetts v. Mellon*. *See, e.g.*, *Wash. Utilities and Transp. Comm'n*, 513 F.2d at 1153; *Kansas ex rel. Hayden*, 748 F. Supp. at 802; *Abrams*, 582 F. Supp. at 1159.  Rather, these states are bringing suit to *enforce* the rights guaranteed by a federal statute. *Id.*  For example, in *Kansas ex rel. Hayden v. United States*, the governor of Kansas brought a *parens patriae* suit to enforce the provisions of the Disaster Relief Act, which provided for the disbursement of federal funds to aid areas deemed a "major disaster."  *Kansas ex rel. Hayden*, 548 F. Supp. at 798.  Specifically, the governor brought suit to enforce the statute after he

alleged that the area in question was wrongfully denied status as a "major disaster area" when the procedural mechanisms for making that decision were ignored.  *Id.* at 799.  Similarly, in *Abrams v. Heckler*, New York's attorney general brought a *parens patriae* suit to enforce the provisions of a Medicare statute after a final rule issued to implement the statute deprived New York Medicare recipients of a significant amount of funds.  *Abrams*, 582 F. Supp. at 1157.  Arguing that the final rule misinterpreted the provisions of the statute and thus exceeded statutory authority, the attorney general sought to have the Medicare funds distributed in compliance with the statute.  *Id.*

Consequently, Defendants' rebuttal to the States' *parens patriae* argument is not as simple as they would suggest.  States are not barred outright from suing the federal government based on a *parens patriae* theory; rather, provided that the states are seeking to *enforce*—rather than prevent the enforcement of—a federal statute, a *parens patriae* suit between these parties may be maintained.  In the instant case, the States are suing to compel the Government to enforce the federal immigration statutes passed by Congress and to prevent the implementation of a policy that undermines those laws.  Though seeking adherence to a federal statute is a necessary component for a state's *parens patriae* suit against the federal government, it alone is not enough; in addition, states must identify a quasi-sovereign interest that is harmed by the alleged under-enforcement.  *See Alfred L. Snapp*, 458 U.S. at 601 ("to have such [*parens patriae*] standing the State must assert an injury to what has been characterized as a 'quasi-sovereign interest'").  The defining characteristics of a quasi-sovereign interest are not explicitly laid out in case law; rather, the meaning of the term has undergone a significant expansion over time.  *See Com. of Pa. v. Kleppe*, 533 F.2d 669, 673 (D.C. Cir. 1976).  Although the earliest recognized

quasi-sovereign interests primarily concerned public nuisances, the doctrine expanded rapidly to encompass two broad categories: (1) a state's quasi-sovereign interest "in the health and well-being—both physical and economic—of its residents"; and (2) a state's quasi-sovereign interest in "not being discriminatorily denied its rightful status within the federal system." *Alfred L. Snapp*, 458 U.S. at 607. In particular, courts have consistently recognized a state's quasi-sovereign interest in protecting the economic well-being of its citizens from a broad range of injuries. *See, e.g., Alfred L. Snapp*, 458 U.S. at 609 (discrimination against Puerto Rican laborers injured economic well-being of Puerto Rico); *Wash. Utilities and Transp. Comm'n*, 513 F.2d at 1152 (increased rates for intrastate phone service would injure the economic well-being of the state); *Abrams*, 582 F. Supp. at 1160 (changes to Medicare that would decrease payments to New York recipients is sufficient injury to economic well-being); *Alabama ex rel. Baxley v. Tenn. Valley Auth.*, 467 F. Supp. 791, 794 (N.D. Ala. 1979) (relocation of executive and administrative offices would damage the economic well-being of Alabama by decreasing available jobs and injuring state economy).

Here, the States similarly seek to protect their residents' economic well-being. Specifically, Plaintiffs allege that the DHS Directive will create a discriminatory employment environment that will encourage employers to hire DAPA beneficiaries instead of those with lawful permanent status in the United States.[27] To support this assertion, Plaintiffs focus on the interplay between the DHS Directive and the Affordable Care Act passed in 2010. Beginning in

---

[27] In addition to the injuries stemming from the alleged creation of a discriminatory employment environment, certain portions of the States' briefs—as well as various *amici* briefs—detail a number of encumbrances suffered by their residents due to the lack of immigration enforcement, such as increased costs to healthcare and public school programs. Few—if any—of these allegations have actually been specifically pled by the Parties as a basis for *parens patriae* standing.

2015, the Affordable Care Act ("ACA") requires employers with fifty or more employees to offer adequate, affordable healthcare coverage to their full-time employees.  Patient Protection and Affordable Care Act, 26 U.S.C. § 4980H.  If an employer with fifty or more employees chooses not to offer health insurance to its full-time employees, it instead incurs a monetary penalty.  *Id.*  Currently, ACA requires that employers provide health insurance only to those individuals that are "legally present" in the United States. *Id.* at § 5000A(d)(3).  The definition of "legally present," however, specifically excludes beneficiaries of the 2012 DACA Directive.  If an employer hires a DACA beneficiary, it does not have to offer that individual healthcare nor does it incur a monetary penalty for the failure to do so.  *See* 45 C.F.R. § 152.2(8).  The States argue that the Obama Administration is expected to promulgate similar regulations that will also bar beneficiaries of the DAPA Directive from participating in the ACA's employer insurance mandate.  This exclusion, the States argue, will exacerbate unemployment for its citizens because it will create an employment environment that will encourage employers to discriminate against lawfully present citizens.  Since the ACA's exclusion of DAPA beneficiaries makes them more affordable to employ, employers will be inclined to prefer them over those employees that are covered by the terms of the ACA.  *Id.*

The States' alleged injury to their citizens' economic well-being is within the quasi-sovereign interests traditionally protected by *parens patriae* actions.  *See, e.g., Alfred L. Snapp*, 458 U.S. at 609; *Wash. Utilities & Transp. Comm'n*, 513 F.2d at 1152; *Kansas ex rel. Hayden*, 548 F. Supp. at 802; *Abrams*, 582 F. Supp. at 1160; *Alabama ex rel. Baxley*, 467 F. Supp. at 794.  The States' challenge, however, is premature.  Although some expect that the Obama Administration will promulgate regulations barring DAPA beneficiaries from participating in the

ACA's employer insurance mandate, it has yet to do so.  *See A Guide to the Immigration Accountability Executive Action*, Immigration Policy Center (Dec. 22, 2014)[28] ("[T]he Obama Administration *will* promulgate regulations to exclude DAPA recipients from any benefits under the Affordable Care Act, much as it did in the aftermath of the DACA announcement.") (emphasis added); *DACA and DAPA Access to Federal Health and Economic Support Programs*, NILC (Dec. 10, 2014)[29] (the Obama Administration "issued regulations that deny access to health coverage under the ACA for DACA recipients and *is expected* to do the same for DAPA recipients") (emphasis added); Michael D. Shear & Robert Pear, *Obama's Immigration Plan Could Shield Five Million*, N.Y. Times (Nov. 19, 2014)[30] (quoting Stephen W. Yale-Loehr, professor of immigration law at Cornell, for assertion that it "*appears*" that these individuals will be barred from health benefits under ACA) (emphasis added).  Discouraging the resolution of controversies that are not ripe, the Supreme Court has held that courts should avoid "entangling themselves in abstract disagreements . . . until an administrative decision has been formalized and its effects felt in a concrete way . . . ."  *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003).  Here, the administrative decision from which the States' alleged economic injury will flow has not been formalized.  Thus, the States' *parens patriae* suit is not ripe for adjudication.

---

[28] This article may be accessed at http://www.immigrationpolicy.org/special-reports/guide-immigration-accountability-executive-action.

[29] A PDF of this article may be accessed at http://allianceforcitizenship.org/wp-content/uploads/2014/12/DAPA-DACA-and-fed-health-economic-supports.pdf.

[30] This article may be accessed at http://www.nytimes.com/2014/11/20/us/politics/obamacare-unlikely-for-undocumented-immigrants.html?_r=0.

2.      *Massachusetts v. E.P.A.* Claims

Clearly, in addition to the traditional Article III standing, Plaintiffs can also pursue their direct damage claims under the ambiguous standards set forth in *Massachusetts v. E.P.A.*   In *Massachusetts*, the Supreme Court held that Massachusetts had standing to seek redress for the damages directly caused to its interests as a landowner.   Similarly, the States have standing because the Defendants' actions will allegedly cause direct damage to their proprietary interests. Consequently, no matter how one reads *Massachusetts v. E.P.A.*, it strengthens the conclusion that the States do have standing to sue for direct damages.

Nevertheless, separate and apart from their direct damage claim (for which at least Texas has standing) and somewhat related to the *parens patriae* basis for standing, the States also assert standing based upon the continual non-enforcement of the nation's immigration laws, which allegedly costs each Plaintiff State millions of dollars annually.   The evidence in this case supplies various examples of large, uncompensated losses stemming from the fact that federal law mandates that states bear the burdens and costs of providing products and services to those illegally in the country.   These expenses are most clearly demonstrated in the areas of education and medical care, but the record also contains examples of significant law enforcement costs.

a.      Argument of the States and *Amici*

The States and some *amici* briefs argue that the Supreme Court's holding in *Massachusetts v. E.P.A.* supports the States' assertion of standing based on their injuries caused by the Government's prolonged failure to secure the country's borders.   Whether negligently or even with its best efforts, or sometimes, even purposefully, the Government has allowed a situation to exist where illegal aliens move freely across the border, thus allowing—at a

minimum—500,000 illegal aliens to enter and stay in the United States each year.[31]   The federal government is unable or unwilling to police the border more thoroughly or apprehend those illegal aliens residing within the United States; thus it is unsurprising that, according to prevailing estimates, there are somewhere between 11,000,000 and 12,000,000 illegal aliens currently living in the country, many of whom burden the limited resources in each state to one extent or another.   Indeed, in many instances, the Government intentionally allows known illegal aliens to enter and remain in the country.   When apprehending illegal aliens, the Government often processes and releases them with only the promise that they will return for a hearing if and when the Government decides to hold one.[32]   In the meantime, the states—with little or no help from the Government—are required by law to provide various services to this population.[33]   Not surprisingly, this problem is particularly acute in many border communities.   According to the States' argument, this situation is exacerbated every time the Government or one of its leading officials makes a pro-amnesty statement or, as in the instant case, every time the DHS institutes a program that grants status to individuals who have illegally entered the country.

---

[31]  Michael Hoefer, et al., *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2010*, U.S. DHS, Feb. 2011.

[32]  The Court was not provided with the "no-show" rates for adult illegal aliens who are released and later summoned for an immigration hearing.  It has been reported, however, that the immigration hearings for last year's flood of illegal immigrant children have been set for 2019.  Further, reports also show that there is a 46% "no-show" rate at these immigration hearings for children that were released into the population. *Challenges at the Border: Examining the Causes, Consequences, and Responses to the Rise in Apprehensions at the Southern Border:  Hearing Before the S. Homeland Sec. Comm.*, 113th Cong. (July 9, 2014) (statement of Juan Osuna, Director of the Executive Office for Immigration Review).  Thus, for these children that the Government released into the general population, despite a lack of legal status, the States will have to bear the resulting costs for at least five more years— if not forever, given the rate of non-compliance with appearance notices.

[33]  *See, e.g., Plyler* , 457 U.S. at 224-25; *Toll v. Moreno*, 458 U.S. 1, 16 (1982).

b.      Analysis

The States' argument is certainly a simplification of a more complex problem. Regardless of how simple or layered the analysis is, there can be no doubt that the failure of the federal government to secure the borders is costing the states—even those not immediately on the border—millions of dollars in damages each year.  While the Supreme Court has recognized that states "have an interest in mitigating the potentially harsh economic effects of sudden shifts in population,"[34] the federal government has effectively denied the states any means to protect themselves from these effects.  Further, states suffer these negative effects regardless of whether the illegal aliens have any ties or family within the state, or whether they choose to assimilate into the population of the United States.[35]  The record in this case provides many examples of these costs.  Evidence shows that Texas pays $9,473 annually to educate each illegal alien child enrolled in public school.[36]   In Texas, 7,409 unaccompanied illegal immigrant children were released to sponsors between October of 2013 and September of 2014.  Thus, in that period alone, Texas absorbed additional education costs of at least $58,531,100 stemming from illegal immigration.  Further, this figure addresses only the newly-admitted, unaccompanied children; it by no means includes all costs expended during this period to educate all illegal immigrant

---

[34] *Plyler,* 457 U.S. at 228.

[35] *Id*.  While most Americans find the prospect of residing anywhere but the United States unthinkable, this is not a universally-held principle.  Many aliens are justly proud of their own native land and come to the United States (both legally and illegally) because our economy provides opportunities that their home countries do not.  Many of these individuals would be satisfied with working in the United States for part of the year and returning to their homeland for the remainder.  This arrangement is often unfeasible for illegal aliens, though, because of the risk of apprehension by authorities when traveling back and forth across the border.  Regardless, many illegal aliens have no intention of permanently immigrating, but rather seek to be able to provide for their families.  The Supreme Court in *Arizona* noted that 476,405 aliens are returned to their home countries every year without a removal order. 132 S. Ct. at 2500.  Many others return outside of any formal process.  *See also*, footnotes 41 and 42 and the text accompanying footnote 42.

[36] This figure presumes the provision of bilingual services.  If bilingual services are not required, the cost is $7,903 annually per student.

children residing in the state.  Evidence in the record also shows that in 2008, Texas incurred $716,800,000 in uncompensated medical care provided to illegal aliens.

These costs are not unique to Texas, and other states are also affected.  Wisconsin, for example, paid $570,748 in unemployment benefits just to recipients of deferred action. Arizona's Maricopa County has similarly estimated the costs to its law enforcement stemming from those individuals that received deferred action status through DACA.  That estimate, which covered a ten-month period and included only the law enforcement costs from the prior year, exceeded $9,000,000.

To decrease these negative effects, the States assert that the federal government should do two things:  (1) secure the border; and (2) cease making statements or taking actions that either explicitly or impliedly solicit immigrants to enter the United States illegally.  In other words, the Plaintiffs allege that the Government has created this problem, but is not taking any steps to remedy it. Meanwhile, the States are burdened with ever-increasing costs caused by the Government's ineffectiveness.  The frustration expressed by many States and/or *amici curiae* in their briefing is palpable.  It is the States' position that each new wave of illegal immigration increases the financial burdens placed upon already-stretched State budgets.

It is indisputable that the States are harmed to some extent by the Government's action and inaction in the area of immigration.  Nevertheless, the presence of an injury alone is insufficient to demonstrate standing as required to bring suit in federal court.  A plaintiff must still be able to satisfy all of the elements of standing—including causation and redressability—to pursue a remedy against the one who allegedly caused the harm.

Not surprisingly, the States rely, with much justification, on the Supreme Court's holding in *Massachusetts v. E.P.A.* to support standing based on these damages. 549 U.S. 497 (2007). In *Massachusetts*, the Supreme Court held that states have special standing to bring suit for the protection of their sovereign or quasi-sovereign interests. *Id.* at 520. Justice Stevens quoted a prior decision from Justice Kennedy, stating to the effect that states "are not relegated to the role of mere provinces or political corporations but retain the dignity, though not the full authority, of sovereignty." *Id.* at 519 (quoting *Alden v. Maine*, 527 U.S. 706, 715 (1999)) The majority concluded that Massachusetts, in its role as a landowner, suffered (or would suffer) direct damages from the EPA's refusal to act under the Clean Air Act. *Id.* at 519, 526.  Massachusetts' status as a landowner, however, was only the icing on the cake. *See id.* at 519. This status reinforced the Supreme Court's conclusion that "[Massachusetts'] stake in the outcome of this case is sufficiently concrete to warrant the exercise of federal jurisdiction." *Id.*  Without explicitly delineating formal elements, the majority seemed to recognize a special form of "sovereignty standing" if the litigant state could show:  (1) a procedural right to challenge the act or omission in question and (2) an area of special state interest. *See id.* at 518-26.  With regard to the latter, Justice Stevens concluded that states have standing to file suit to protect the health and welfare of their citizens since our structure of government mandates that they surrender to the federal government:  (1) the power to raise a military force; (2) the power to negotiate treatises; and (3) the supremacy of their state laws in areas of federal legislation.  *Id.* at 519.

The States conclude that Justice Stevens' holding is equally applicable to their situation. First, the States have no right to negotiate with Mexico or any other country from which large numbers of illegal aliens immigrate; thus the States cannot rely on this avenue to resolve or

lessen the problem.  Second, the States cannot unilaterally raise an army to combat invaders or protect their own borders.  Third, the federal government ardently defends against any attempt by a state to intrude into immigration enforcement—even when the state seeks to enforce the very laws passed by Congress.  Therefore, the States reach the same conclusion as the Supreme Court did in *Massachusetts v. E.P.A.*  They have the power to sue the federal government in federal court to protect their quasi-sovereign interests in the health, welfare, and natural resources of their citizens.

The States lose badly needed tax dollars each year due to the presence of illegal aliens—a clear drain upon their already-taxed resources.  These damages, the States argue, are far greater and more direct than the damages stemming from air pollution in *Massachusetts*.  Thus, they conclude that they should similarly have standing.  This Court agrees to the actual existence of the costs being asserted by Plaintiffs.  Even the Government makes no serious attempt to counter this argument, considering that the Government's lack of border security combined with its vigilant attempts to prevent any state from protecting itself have directly led to these damages.  Causation here is more direct than the attenuated causation chain patched together and accepted by the Supreme Court in *Massachusetts*.

Nevertheless, standing in *Massachusetts* was not dependent solely on damages flowing from the lax enforcement of a federal law; the Supreme Court also emphasized the procedural avenue available to the state to pursue its claims.  *See id*. at 520.  Specifically covering the section under which Massachusetts' claim was brought, the Clean Air Act provided that "[a] petition for review of action of the Administrator in promulgating any . . . standard under section 7521 of this title . . . may be filed only in the United States Court of Appeals for the District of

Columbia." Clean Air Act, 42 U.S.C. § 7607(b)(1).  The States claim that the APA gives them a similar procedural avenue.  The APA states:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.  The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States:  *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance.  Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702 (emphasis in original).  Section 703 of the APA specifically authorizes a suit like this case where the States seek a mandatory injunction.  5 U.S.C. § 703.  Finally, Section 704 provides a cause of action for a "final agency action for which there is no other adequate remedy in a court . . . ."  5 U.S.C. § 704.  It is appropriate to note that the Government has asserted that there is absolutely no remedy, under any theory, for the Plaintiffs' suit—seemingly placing the States' suit squarely within the purview of Section 704.

The Government counters this contention, however, by arguing that the DAPA program is an exercise of discretion and merely informational guidance being provided to DHS employees.  Since it argues that discretion is inherent in the DAPA program, the Government concludes that it not only prevails on the merits of any APA claim, but that this discretion also

closes the standing doorway that the States are attempting to enter.[37]   The Court will address

these assertions in a separate part of the opinion because they are not the key to the resolution of

the indirect damages contemplated in this section regarding standing under *Massachusetts v.

E.P.A.*

It has been recognized that the resources of states are drained by the presence of illegal

aliens—these damages unquestionably continue to grow.   In 1982, the Attorney General

estimated that the country's entire illegal immigrant population was as low as three million

individuals.  *See Plyler v. Doe*, 457 U.S. at 218-19.  Today, California alone is reported to have

at least that many illegal immigrants residing with its borders.   Among the Plaintiff States, the

only difference with regard to the population of illegal immigrants residing within each is that

---

[37] *See* 5 U.S.C. § 701.  There is some authority in the immigration context that a private immigration organization
cannot attack immigration decisions via the APA.  *See Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897
(D.C. Cir. 1996).  These decisions are based primarily on a lack of "prudential standing" rather than on the
requirements of the APA.  However, for those directly affected by a federal agency action, these decisions are
inapplicable.  In this context, the Government in places conflates the issue of standing with that of reviewability.

> Standing to seek review is a concept which must be distinguished from reviewability.   In
> *Association of Data Processing Serv. Organizations, Inc. v. Camp*, the Court defined "standing" in
> terms of a two-part test.  First, the complainant must allege "that the challenged action has caused
> him injury in fact, economic or otherwise."   Second, "the interest sought to be protected by the
> complainant [must be] arguably within the zone of interests to be protected or regulated by the
> statute or constitutional guarantee in question."

> Reviewability presumes that the standing prerequisite has been satisfied and then adds the element
> of the courts' power to judge a certain administrative decision.   Correspondingly, "unreviewable"
> administrative actions are those which will not be judicially scrutinized, despite the fulfillment of
> all prerequisites such as standing and finality, either because Congress has cut off the court's
> power to review or because the courts deem the issue "inappropriate for judicial determination."

> Even "unreviewable" administrative action may be judicially reviewed under exceptional
> circumstances, such as whether there has been a clear departure from the agency's statutory
> authority.

*Statutory Preclusion of Judicial Review*, 1976 Duke L. J. 431, 432 n.4 (1976) (citations omitted).  The States have
seemingly satisfied these two standing requirements, but that alone does not allow the Court to review the DHS'
actions.

the population is not evenly distributed.[38]  The Government does not dispute the existence of these damages, but instead argues that widespread and generalized damages—such as those suffered by all taxpayers collectively—do not provide a basis for one to sue the Government. The States concede that the cases cited by the Government certainly stand for that proposition; but they argue that the new rules announced in *Massachusetts v. E.P.A.* give them, in their role as states, "special solicitude" to bring an action to protect the resources of their citizens.  Turning to the dissent, the States similarly find support for this new form of standing from Chief Justice Roberts' statement that the majority opinion "adopts a new theory of Article III standing for States . . . ." *Id.* at 539-40 (Roberts, J., dissenting).

The Court recognizes that the Supreme Court's opinion in *Massachusetts* appears to establish new grounds for standing—a conclusion the dissenting opinions goes to lengths to point out.  Nevertheless, the Court finds that *Massachusetts* did not abandon the traditional standing requirements of causation and redressability—elements critical to the damages discussed in this section.  The Court finds that the Government's failure to secure the border has exacerbated illegal immigration into this country.  Further, the record supports the finding that this lack of enforcement, combined with this country's high rate of illegal immigration, significantly drains the States' resources.[39]

---

[38] The Court notes that, while twenty-six states or their representatives are Plaintiffs herein, thirteen states and many municipalities have filed *amici* briefs on the Government's behalf.  One of the arguments raised in their brief is that DAPA may eventually change the presence of illegal aliens in this country into an economic positive, an opinion based upon a number of studies. Doc. No. 81; *see also* Doc. No. 121 (*amici* brief filed by the Mayors of New York and Los Angeles, *et al.*).

[39] The Government, though not necessarily agreeing that it has failed to secure the border, concedes that many costs associated with illegal immigration must be borne by the states, particularly in the areas of education, law enforcement, and medical care.

Regardless, the Court finds that these more indirect damages described in this section are not caused by DAPA; thus the injunctive relief requested by Plaintiffs would not redress these damages. DAPA applies only to individuals who have resided in the United States since 2010. If the DHS enforces DAPA as promulgated, this group has already been in the country for approximately five years. Therefore, the costs and damages associated with these individuals' presence have already been accruing for at least a five-year period. The relief Plaintiffs seek from their suit is an injunction maintaining the status quo—however, the status quo already includes costs associated with the presence of these putative DAPA recipients. If the Court were to grant the requested relief, it would not change the presence of these individuals in this country, nor would it relieve the States of their obligations to pay for any associated costs. Thus, an injunction against DAPA would not redress the damages described above.

The States also suggest that the special sovereign standing delineated in *Massachusetts* encompasses three other types of damages that will be caused by DAPA. First, the continued presence of putative DAPA recipients will increase the costs to which the States are subjected.[40] Specifically, the States allege that, because DAPA recipients will be granted legal status for a three-year period, those who have not already pursued state-provided benefits will now be more likely to seek them. Stated another way, DAPA recipients will be more likely to "come out of the shadows" and to seek state services and benefits because they will no longer fear deportation. Thus, the States' resources will be taxed even more than they were before the promulgation of DAPA.

---

[40] This discussion does not include direct costs to the state, such as the costs associated with providing additional driver's licenses, which were discussed in a prior section. This Court does not address the issue as to whether some or all of these damages might be recoverable under the theory of "abdication standing" because that ruling is not necessary to grant this temporary injunction.

Regardless of whether the States' prediction is true, the Constitution and federal law mandate that these individuals are entitled to state benefits merely because of their presence in the United States, whether they reside in the sunshine or the shadows.  Further, aside from the speculative nature of these damages, it seems somewhat inappropriate to enjoin the implementation of a directive solely because it may encourage or enable individuals to apply for benefits for which they were already eligible.

The States' reply, though supported by facts, is not legally persuasive.  The States rightfully point out that DAPA will increase their damages with respect to the category of services discussed above because it will increase the number of individuals that demand them. Specifically, the Plaintiffs focus on two groups.  First, there are many individuals each year that self-deport from the United States and return to their homeland.[41]  The States suggest, with some merit, that DAPA will incentivize these individuals to remain in the United States.

Second, the States focus on the individuals that would have been deported without the legal status granted by DAPA, alleging that their continued presence in this county will increase state costs.  The States argue that the DHS has decided it will not enforce the removal statutes with regards to at least 4,300,000 people plus hypothetically millions of others that apply but are not given legal presence.  They conclude in the absence of the DAPA program, the DHS in its normal course of removal proceedings would have removed at least some of these individuals. Thus DAPA will allow some individuals who would have otherwise been deported to remain in the United States.  The Government has made no cogent response to this argument.  Were it to

---

[41] As stated earlier in a footnote, many individuals voluntarily return to their homeland. *See* DHS, Office of Immigration Statistics, Immigration Enforcement Actions: 2013, at 1 (Sept. 2014). In fact, in the years 2007 through 2009, more illegal immigrants self-deported back to Mexico than immigrated into the United States.

argue against this assertion, the Government would likely have to admit that these individuals would not have been deported even without DAPA—an assertion that would damage the DHS far more than it would strengthen its position.

The States are correct that there are a number of individuals that fall into each category. Immigration experts estimate that 178,000 illegal aliens self-deport each year.[42]  Though the DHS could likely calculate the number of individuals deported and estimate the number that self-deported over the past five years (and used those figures to estimate those who would in the near future) that would have otherwise qualified for DAPA relief, that evidence is not in the record.  It is reasonable to conclude, however, that some of these individuals would have self-deported or been removed from the country.  The absence of these individuals would likely reduce the states' costs associated with illegal immigration.

The Government has not directly addressed the suppositions inherent in this argument, but it and at least two sets of *amici curiae* have suggested a response.  Specifically, they suggest that any potential reduction in state costs that could have been anticipated in the absence of DAPA will be offset by the productivity of the DAPA recipients and the economic benefits that the States will reap by virtue of these individuals working, paying taxes, and contributing to the community.

This Court, with the record before it, has no empirical way to evaluate the accuracy of these economic projections, and the record does not give the Court comfort with either position. Yet, these projections do demonstrate one of the reasons why the Court does not accept the States' argument for standing on this point.  A theory without supporting evidence does not

---

[42] DHS, Office of Immigration Statistics, Immigration Enforcement Actions: 2013, at 1 (Sept. 2014).

support a finding of redressability.  Based upon the record, the presence of damages or off-setting benefits is too speculative to be relied upon by this or any other court as a basis for redressability.

The last category of damages pled by Plaintiffs that falls within *Massachusetts*' "special solicitude" standing is predicated upon the argument that reports made by the Government and third-parties concerning the Government's actions have had the effect of encouraging illegal immigration.  The Government does not deny that some of its actions have had this effect, but maintains that its actions were legal and appropriate.  In other words, these actions may have had the unintended effect of encouraging illegal immigration, but that does not create a damage model that would satisfy either the causation or redressability requirements of standing.

Nevertheless, a myriad of reasons support a court's abstention from intervention when damages are premised upon the actions of third-parties motivated by reports (and misreports) of governmental action.[43]  The Court will address only two.

The First Amendment protects political debate in this country.  Enjoining that debate, or finding damages predicated upon that debate, would be counter-productive at best and, at worst, a violation of the Constitution.  The crux of the States' claim is that the Defendants violated the Constitution by enacting their own law without going through the proper legislative or administrative channels.  One cannot, however, consistently argue that the Constitution should control one aspect of the case, yet trample on the First Amendment in response to another.  Speech usually elicits widely-differing responses, and its ramifications are often unpredictable.  Clearly, reports of governmental activity, even if they are biased, misleading, or incorrect, are

---

[43] In a different case held before this Court, a DHS official confirmed under oath the existence of this unintended consequence.  *See* footnote 110.

protected speech—despite the fact that they may have the unintended effect of inspiring illegal immigration.

Second, a lawful injunction that would cure this problem cannot be drafted. Unquestionably, some immigrants are encouraged to come to the United States illegally based upon the information they receive about DACA and DAPA.  Reports of lax border security, minimal detention periods following apprehension, and the ease of missing immigration hearings may also encourage many to immigrate to this country illegally.  Individuals may also be encouraged to immigrate illegally because they have been told that the stock market is doing well, or that the United States' economy is doing better than that of their homeland, or because the United States has better schools or more advanced medical care.  The decision to immigrate illegally is motivated by innumerable factors, and a court would be jousting at windmills to craft an injunction to enjoin all of these activities.

Statements and reports about the implementation of DACA and DAPA may very well encourage individuals to try to reach the United States by any means, legal or otherwise.  Further, it is undisputed that illegal immigration strains the resources of most states.  This side-effect, however, is too attenuated to enjoin DAPA's implementation.  The States have not shown that an injunction against DAPA would redress these particular damages.

### E.      Standing Created by Abdication

1.      The Factual Basis

The most provocative and intellectually intriguing standing claim presented by this case is that based upon federal abdication.[44]   This theory describes a situation when the federal government asserts sole authority over a certain area of American life and excludes any authority or regulation by a state; yet subsequently refuses to act in that area.  Due to this refusal to act in a realm where other governmental entities are barred from interfering, a state has standing to bring suit to protect itself and the interests of its citizens.

The States concede, here, that the regulation of border security and immigration are solely within the jurisdiction of the United States—an assertion the United States agrees with and has repeatedly insisted upon in other cases.  However, rather than enforcing laws pertaining to border security and immigration, the Government, through DAPA, has instead announced that it will not seek to deport certain removable aliens because it has decided that its resources may be better used elsewhere.  In sum, the States argue that the Government has successfully established its role as the sole authority in the area of immigration, effectively precluding the States from taking any action in this domain and that the DHS Secretary in his memorandum establishing DAPA has announced that except for extraordinary circumstances, the DHS has no intention of enforcing the laws promulgated to address millions of illegal aliens residing in the United States.

The facts underlying the abdication claim cannot be disputed.   In *Arizona v. United States*, the federal government sued Arizona when the state tried to enforce locally enacted immigration restrictions.  *Arizona v. United States*, 132 S. Ct. 2492 (2012).  The Supreme Court

---

[44] "Abdication" is defined as "[t]he act of renouncing or abandoning . . . duties, usually those connected with high office . . . ." *Black's Law Dictionary* 4 (10th ed. 2014).

upheld the Government's position, holding that federal law preempted the state's actions. *Id.* at

2495.   Nonetheless, the Supreme Court, in doing so, still recognized the states' plight due to

federal preemption in the area of immigration:

> The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States.   Arizona bears many of the consequences of unlawful immigration.    Hundreds of thousands of deportable aliens are apprehended in Arizona each year.   Unauthorized aliens who remain in the State comprise, by one estimate, almost six percent of the population.   And in the State's most populous county, these aliens are reported to be responsible for a disproportionate share of serious crime.

> Statistics alone do not capture the full extent of Arizona's concerns.   Accounts in the record suggest there is an "epidemic of crime, safety risks, serious property damage, and environmental problems" associated with the influx of illegal migration across private land near the Mexican border.   Phoenix is a major city of the United States, yet signs along an interstate highway 30 miles to the south warn the public to stay away.    One reads, "DANGER—PUBLIC WARNING—TRAVEL NOT RECOMMENDED/Active Drug and Human Smuggling Area/Visitors May Encounter Armed Criminals and Smuggling Vehicles Traveling at High Rates of Speed."   The problems posed to the State by illegal immigration must not be underestimated.

> These concerns are the background for the formal legal analysis that follows.   The issue is whether, under preemption principles, federal law permits Arizona to implement the state-law provisions in dispute.

*Id.* at 2500.   Despite this expression of empathy, the Supreme Court held, with minor exceptions,

that states are virtually powerless to protect themselves from the effects of illegal immigration.[45]

---

[45] Though clearly pre-dating DACA and DAPA, courts from a variety of jurisdictions have similarly expressed sympathy for the plight of the states that bear the brunt of illegal immigration.   *See, e.g., Arizona v. United States*, 104 F.3d 1095 (9th Cir. 1997); *California v. United States*, 104 F.3d 1086 (9th Cir. 1997); *New Jersey v. United States*, 91 F.3d 463 (3d Cir. 1996); *Padavan v. United States*, 82 F.3d 23 (2d Cir. 1996); *Chiles v. United States*, 69 F.3d 1094 (11th Cir. 1995), *cert. denied*, 517 U.S. 1188 (1996).   These courts invariably denied the states the relief they sought since inadequate immigration enforcement did not supply a basis for standing.   *Id.*   Indeed, as recently as 2013, another court dismissed similar claims by the State of Mississippi.   *See Crane v. Napolitano*, 920 F. Supp. 2d 724 (N.D. Tex. 2013).

Three things were constant in all of these cases.   In each, the courts expressed sympathy with the plight of the states.   Second, the courts held that the states could not recover indirect costs they suffered as a result of *ineffective* enforcement.   This is identical to the ruling this Court made in the prior section regarding damages stemming from

*Id.* Holding that States cannot even exercise their civil power to remove an illegal alien, the majority opinion stated that "Immigration and Customs Enforcement (ICE), an agency within the Department of Homeland Security, is responsible for identifying, apprehending, and removing illegal aliens." *Id.* at 2495. The Government continues to take the position that "even State laws relating to matters otherwise within the core of the police power will generally be preempted . . . Arizona (or any other State) may not substitute its judgment for the federal government's when it comes to classification of aliens."   Brief for the United States as Amicus Curiae at 14-16, *Arizona v. Brewer*, 757 F.3d 1053 (9th Cir. 2014). As made clear in this DACA-related brief, the Government claims total preemption in this area of the law.   Thus, the first element of an abdication claim is established.

---

the provision of services like education and medical care.  Third, none of these cases, however, held that a state was absolutely precluded from ever bringing suit concerning immigration enforcement issues.

Three important factors separate those cases from the present one—any one of which would be considered a major distinction.  The presence of all three, however, clearly sets this case apart from those cited-above.  First, with the exception of *Crane*, none of the cases involved the Government announcing a policy of non-enforcement.  Here, the DHS has clearly announced that it has decided not to enforce the immigration laws as they apply to approximately 4.3 million individuals—as well as to untold millions that may apply but be rejected by the DAPA program.  The DHS has announced that the DAPA program confers legal status upon its recipients and, even if an applicant is rejected, that applicant will still be permitted to remain in the country absent extraordinary circumstances.  There can be no doubt about this interpretation as the White House has made this clear by stating that the "change in priorities applies to everybody." S*ee* footnote 88.  Because of this announced policy of non-enforcement, the Plaintiffs' claims are completely different from those based on mere ineffective enforcement.  This is abdication by any meaningful measure.

Second, the plaintiffs in the above-cited cases did not provide proof of any direct damages—rather, the plaintiffs in these cases only pled *indirect* damages caused by the presence of illegal aliens.  Conversely, in the present case, Texas has shown that it will suffer millions of dollars in *direct* damages caused by the implementation of DAPA.

Finally, with the exception of *Crane* (in which this issue was not raised), the above-cited cases pre-date the REAL ID Act of 2005.  The REAL ID Act mandates a state's participation in the SAVE program, which requires that a state pay a fee to verify an applicant's identity prior to issuing a driver's license or an identification card.  By creating a new class of individuals eligible for driver's licenses and identification cards, individuals that the INA commands should be removed, DAPA compounds the already federally-mandated costs that states are compelled to pay.

To establish the second element necessary for abdication standing, the States assert that the Government has abandoned its duty to enforce the law.  This assertion cannot be disputed. When establishing DAPA, Secretary Johnson announced that the DHS will not enforce the immigration laws as to over four million illegal aliens eligible for DAPA, despite the fact that they are otherwise deportable.  DHS agents were also instructed to terminate removal proceedings if the individual being deported qualifies for relief under the DAPA criteria. Further, the DHS has also announced that, absent extraordinary circumstances, it will not even deport illegal aliens who apply for DAPA and are rejected.  The record does not contain an estimate for the size of this group, but hypothetically the number of aliens who would otherwise be deported if the INA were enforced is in the millions.  Secretary Johnson has written that these exemptions are necessary because the DHS' limited funding necessitates enforcement priorities. Regardless of the stated motives, it is evident that the Government has determined that it will not enforce the law as it applies to over 40% of the illegal alien  population that qualify for DAPA, plus all those who apply but are not awarded legal presence.  It is not necessary to search for or imply the abandonment of a duty; rather, the Government has announced its abdication.

The Government claims, however, that its deferred action program is merely an exercise of its prosecutorial discretion.   Any justifications regarding abdication, though, are not a necessary consideration for standing.  This inquiry may be necessary to a discussion on the merits, but standing under a theory of abdication requires only that the Government declines to enforce the law.  Here, it has.[46]

---

[46] In the absence of these declarations of abdication, an examination of relevant DHS statistics might be instructive, but apparently the DHS is not very forthcoming with this information.  The author of a recent law review article detailed the trouble she experienced in trying to get deferred action numbers from the Government.  Finally, after numerous attempts, her conclusions were:

The Government claims sole authority to govern in the area of immigration, and has exercised that authority by promulgating a complex statutory scheme and prohibiting any meaningful involvement by the states.  As demonstrated by DACA and DAPA, however, the Government has decided that it will not enforce these immigration laws as they apply to well over five million people, plus those who had their applications denied.  If one had to formulate from scratch a fact pattern that exemplified the existence of standing due to federal abdication, one could not have crafted a better scenario.

> 2.    The Legal Basis

The Government has not seriously contested the Plaintiffs' factual basis for this claim— nor could it.  Turning from the facts of this claim to the applicable law, the concept of state standing by virtue of federal abdication is not well-established.  It has, however, been implied by a number of opinions, including several from the Supreme Court.  The abdication theory of standing is discussed most often in connection with a *parens patriae* claim.  It has also been discussed as providing APA standing, and in some contexts is relied upon as the exclusive basis

---

While the grant rate for deferred action cases might cause alarm for those who challenge the deferred action program as an abuse of executive branch authority, it should be clear that regardless of outcome, the number of deferred action cases considered by ICE and USCIS are quite low . . . Even doubling the number of legible deferred action grants produced by USCIS and ICE between 2003 and 2010 (118 plus 946) yields less than 1,100 cases, or less than 130 cases annually.

Shoba S. Wadhia, *Sharing Secrets:  Examining Deferred Action and Transparency in Immigration Law*, 10 U.N.H. L. Rev. 1, 47 (2011) (hereinafter "Sharing Secrets").  *See also*, Leon Wildes, *The Deferred Action Program of the Bureau of Citizenship and Immigration Services:  A Possible Remedy for Impossible Immigration Cases*, 41 San Diego L. Rev. 819 (2004).  Other statistics suggest the deferred action rate between 2005 and 2010 ranged between a low 542 to an annual high of 1,029 individuals.  Regardless, DACA has raised that number to an annual average over the years 2012-2014 to over 210,000 and if DAPA is implemented in a similar fashion, the average for the next three years will be in excess of 1.4 million individuals per year.  The Court is not comfortable with the accuracy of any of these statistics, but it need not and does not rely on them given the admissions made by the President and the DHS Secretary as to how DAPA will work.  Nevertheless, from less than a thousand individuals per year to over 1.4 million individuals per year, if accurate, dramatically evidences a factual basis to conclude that the Government has abdicated this area—even in the absence of its own announcements.

for standing.  Traditionally, *parens patriae* actions were instituted by states seeking to protect the interests of their citizens, as well as for protection of their own quasi-sovereign interests.  One of this principle's few limitations stems from the notion that the federal government, rather than a state, has the superior status in the role as a parent.  In other words, the federal government was the supreme *parens patriae*.  Thus a state can rely on *parens patriae* to protect its interests against any entity or actor—except the federal government.  As explicitly noted by the dissent in *Massachusetts v. E.P.A.*:

> A claim of *parens patriae* standing is distinct from an allegation of direct injury. *See Wyoming v. Oklahoma,* 502 U.S. 437, 448–449, 451, 112 S. Ct. 789, 117 L. Ed. 2d 1 (1992).  Far from being a substitute for Article III injury, *parens patriae* actions raise an additional hurdle for a state litigant: the articulation of a "quasi-sovereign interest" "*apart* from the interests of particular private parties." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 607, 102 S. Ct. 3260, 73 L. Ed. 2d 995 (1982) (emphasis added) (cited *ante,* at 1454).  Just as an association suing on behalf of its members must show not only that it represents the members but that at least one satisfies Article III requirements, so too a State asserting quasi-sovereign interests as *parens patriae* must still show that its citizens satisfy Article III.  Focusing on Massachusetts's interests as quasi-sovereign makes the required showing here harder, not easier.  The Court, in effect, takes what has always been regarded as a *necessary* condition for *parens patriae* standing—a quasi-sovereign interest—and converts it into a *sufficient* showing for purposes of Article III.
>
> What is more, the Court's reasoning falters on its own terms.  The Court asserts that Massachusetts is entitled to "special solicitude" due to its "quasi-sovereign interests," *ante,* at 1455, but then applies our Article III standing test to the asserted injury of the Commonwealth's loss of coastal property. *See ante,* at 1456 (concluding that Massachusetts "has alleged a particularized injury *in its capacity as a landowner* " (emphasis added)).  In the context of *parens patriae* standing, however, we have characterized state ownership of land as a "nonsovereign interes[t]" because a State "is likely to have the same interests as other similarly situated proprietors." *Alfred L. Snapp & Son, supra,* at 601, 102 S. Ct. 3260.
>
> On top of everything else, the Court overlooks the fact that our cases cast significant doubt on a State's standing to assert a quasi-sovereign interest—as opposed to a direct injury—against the Federal Government.  As a general rule, we have held that while a State might assert a quasi-sovereign right as *parens*

> *patriae* "for the protection of its citizens, it is no part of its duty or power to
> enforce their rights in respect of their relations with the Federal Government.  In
> that field it is the United States, and not the State, which represents them."
> *Massachusetts v. Mellon*, 262 U.S. 447, 485–486, 43 S. Ct. 597, 67 L. Ed. 1078
> (1923) (citation omitted); see also *Alfred L. Snapp & Son, supra*, at 610, n.16, 102
> S. Ct. 3260.

*Massachusetts*, 549 U.S. at 539 (Roberts, J., dissenting).  Following this assertion, Chief Justice

Roberts described the majority opinion as bestowing upon the states "a new theory of Article III

standing . . . ."  *Id.* at 1466.  Expounding further on this point, Chief Justice Roberts quoted a

footnote from *Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez* stating that:

> [T]he fact that a State may assert rights under a federal statue as *parens patriae* in
> no way refutes our clear ruling that "[a] State does not have standing as *parens
> patriae* to bring an action against the Federal Government."

*Massachusetts*, 549 U.S. at 540 n.1 (quoting *Alfred L. Snapp*, 458 U.S. at 610 n.16) (citations

omitted).

    As demonstrated by *Massachusetts*' conflicting opinions regarding the limitations of

*parens patriae* standing, it is difficult to determine how long the law has permitted a state to rely

upon this doctrine to show standing in a suit against the federal government.  This interpretation

may be well established, as asserted by Justice Stevens in the majority opinion, or it may be

unprecedented, as described by the four dissenters.  Regardless of its longevity, it is a rule

delineated by the Supreme Court of the United States and which this Court is bound to follow.

*See, e.g.*, Bradford Mank, *Should States Have Greater Standing Rights than Ordinary Citizens?:

Massachusetts v. EPA's New Standing Test for States*, 49 Wm. & Mary L. Rev. 1701 (2008).

    The concept of abdication standing, however, has not been confined to *parens patriae*

cases.  Specifically, the States rely on the Supreme Court's opinion in *Heckler v. Chaney*, which

involved a decision by the FDA not to take certain enforcement actions regarding the drugs used

in lethal injections administered by the states.  470 U.S. 821 (1985).  Upholding the agency's decision not to act, the Supreme Court noted that they were not presented with "a situation where it could justifiably be found that the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities."  *Id.* at 833 n.4 (quoting *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973)).

The States claim that, unlike the FDA's action at issue in *Heckler*, the DAPA program is a total abdication and surrender of the Government's statutory responsibilities.  They contend that the DAPA Directive basically concedes this point, and this Court agrees.  The DAPA Memorandum states that the DHS cannot perform all the duties assigned to it by Congress because of its limited resources, and therefore it must prioritize its enforcement of the laws.  This prioritization necessitated identifying a class of individuals who are guilty of a violation of the country's immigration laws, and then announcing that the law would not be enforced against them.  The DAPA Memorandum concludes that, for the DHS to better perform its tasks in one area, it is necessary to abandon enforcement in another.

In response, the Government maintains its overall position: it is immaterial how large the putative class of DAPA beneficiaries is because DAPA is a legitimate exercise of its prosecutorial discretion.  Earlier in this opinion, this Court held that Plaintiffs have standing based upon the direct damages they will suffer following the implementation of DAPA.  Nevertheless, based upon the Supreme Court's opinion in *Heckler*, and the cases discussed below, this Court also finds that Plaintiffs have standing because of the DHS' abdication of its statutory duties to enforce the immigration laws.

The *Heckler* Court is not alone in addressing abdication standing.  Again not involving the *parens patriae* doctrine, the Fifth Circuit has addressed the concept of abdication in a similar suit involving the same parties.  *See Texas v. United States*, 106 F.3d 661 (5th Cir. 1997).  In *Texas v. United States*, the Fifth Circuit held that abdication did not exist for several reasons.  *Id.* at 667.  First, it noted that Texas did not argue that the Government was "mandating" that it take any action with respect to undocumented aliens.  *Id.*  This fact situation is dissimilar to the one presently before the Court.  Here, the States put forth evidence that demonstrates that the Government has required and will require states to take certain actions regarding DAPA recipients.  Further, the Government has not conceded that it will refrain from taking similar action against the remaining Plaintiffs in this case.  Second, the Fifth Circuit in *Texas* held that the Government's failure to effectively perform its duty to secure the border did not equate to an abdication of its duty.  *Id.*

Plaintiffs contend that these distinctions made by the Fifth Circuit in *Texas* are noticeably absent in the present case. The DHS unilaterally established the parameters for DAPA and determined that it would not enforce the immigration laws as they apply to millions of individuals—those that qualify for DAPA and surprisingly even those that do not.  Thus, the controlling but missing element in *Texas* that prevented a finding of abdication is not only present in this case, but is factually undisputed.[47]  Further, if one accepts the Government's position, then a lack of resources would be an acceptable reason to cease enforcing environmental laws, or the Voting Rights Act, or even the various laws that protect civil rights

---

[47] Obviously, the Government disputes whether these facts equate to abdication, but it does not dispute the underlying facts themselves—nor could it, as these facts are set out in writing by the DHS Secretary in the DAPA Memorandum.

and equal opportunity.  Its argument is that it has the discretion to cease enforcing an act as long as it does so under the umbrella of prosecutorial discretion.  While the Court does not rule on the merits of these arguments, they certainly support the States' standing on the basis of abdication.

In regards to abdication standing, this case bears strong similarities to *Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973).  In *Adams*, the Secretary of Health, Education and Welfare adopted a policy that, in effect, was a refusal to enforce Title VI of the Civil Rights Act of 1964.  *Id.* at 1161.  Specifically, the Secretary refused to effectuate an end to segregation in federally-funded public education institutions.  *Id.*  In *Adams*, as in the case before this Court, the Government argued that the "means" of enforcement is a matter of absolute agency discretion, and in the exercise of that discretion it chose to seek voluntary compliance.  *See id.* at 1162. Rejecting this argument and holding that the Secretary had abdicated his statutory duty, the D.C. Circuit noted that:

> [t]his suit is not brought to challenge HEW's decisions with regard to a few school districts in the course of a generally effective enforcement program.  To the contrary, *appellants allege that HEW has consciously and expressly adopted a general policy which is in effect an abdication of its statutory duty.  We are asked to interpret the statute and determine whether HEW has correctly construed its enforcement obligations.*
>
> A final important factor distinguishing this case from the prosecutorial discretion cases cited by HEW is the nature of the relationship between the agency and the institutions in question.  HEW is actively supplying segregated institutions with federal funds, contrary to the expressed purposes of Congress.  *It is one thing to say the Justice Department lacks the resources necessary to locate and prosecute every civil rights violator; it is quite another to say HEW may affirmatively continue to channel federal funds to defaulting schools.  The anomaly of this latter assertion fully supports the conclusion that Congress's clear statement of an affirmative enforcement duty should not be discounted.*

*Id.* (emphasis added).

In the present case, Congress has clearly stated that illegal aliens should be removed. Like that at issue in *Adams*, the DHS program clearly circumvents immigration laws and allows individuals that would otherwise be subject to removal to remain in the United States. The policy in *Adams* purported to seek voluntary compliance with Title VI. In contrast, the DHS does not seek compliance with federal law in any form, but instead establishes a pathway for non-compliance and completely abandons entire sections of this country's immigration law. Assuming that the concept of abdication standing will be recognized in this Circuit, this Court finds that this is a textbook example.

### F.    Conclusion

Having found that at least one Plaintiff, Texas, stands to suffer direct damage from the implementation of DAPA, this Court finds that there is the requisite standing necessary for the pursuit of this case in federal court. Fulfilling the constitutional requirements of standing, Texas has shown that it will suffer an injury, that this injury is proximately caused by the actions of the Government, and that a favorable remedy issued by the Court would prevent the occurrence of this injury.[48]  This Court also finds that Texas' claim has satisfied the requirements of prudential standing:  Plaintiffs' suit is not merely a generalized grievance, the Plaintiffs' fall within the "zone of interest" pertaining to the immigration statutes at issue, and Plaintiffs' suit is not based merely on the interests of third-parties.

Finally, for the various reasons discussed above and below, it is clear that Plaintiffs satisfy the standing requirements as prescribed by the APA. Thus even "unreviewable"

---

[48] The Court has also found that the Government has abdicated its duty to enforce the immigration laws that are designed, at least in part, to protect the States and their citizens. While many courts, including the United States Supreme Court, have suggested that the abdication of duty gives rise to standing, this Court has not found a case where the plaintiff's standing was supported solely on this basis. Though not the only reason, the Court finds Plaintiffs (at least Texas) have standing pursuant to this theory, as well.

administrative actions may be subject to judicial review under exceptional circumstances, such as when there has been a clear departure from the agency's statutory authority.  *See Manges v. Camp*, 474 F.2d 97, 99 (5th Cir. 1973).  With regard to APA standing, this Court emphasizes that there is a difference between the standing required to bring a lawsuit and that necessary for APA reviewability.  Although traditional standing refers to the ability of a plaintiff to bring an action, APA "reviewability" concerns the ability of the Court to actually review and grant relief regarding the act or omission in question on either procedural or substantive grounds.  This Court will address these redressability issues as part of its discussions on the merits.

Having reached the conclusion that standing exists for at least one Plaintiff, the Court turns to the merits.

## V.      THE MERITS OF THE STATES' CLAIMS

As previously noted, this opinion seeks to address three issues:  standing, legality, and constitutionality.  Having concluded that at least one Plaintiff, the State of Texas, has standing, the Court now addresses the merits of the States' claims regarding the DAPA program.

### A.      Prosecutorial Discretion and Agency Prioritization

A basic issue intrinsically interwoven in most of the arguments presented in this case warrants attention before proceeding.  It does not resolve any of the ultimate remaining questions, but the Court nevertheless finds it important.  Just as the Government has been reluctant to make certain concessions, prosecutorial discretion is an area where the States, possibly in fear of making a bigger concession than intended, are reluctant to concede.  As discussed above, one of the DHS Secretary's stated reasons for implementing DAPA is that it

allegedly allows the Secretary to expend the resources at his disposal in areas he views as deserving the most attention.  He has set forth these priorities as follows:

1.      Priority 1:  threats to national security, border security, and public safety;

2.      Priority 2:  misdemeanants and new immigration violators;

3.      Priority 3:  other immigration violations.

*See* Doc. No. 38, Def. Ex. 5 (Nov. 20, 2014 Memorandum, "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants").[49]

The law is relatively clear on enforcement discretion and, thus, the Court will not address it at length.  Nevertheless, because the DHS has so intertwined its stated priorities with the DAPA program as justification for its alleged exercise of discretion, the Court finds it helpful to point out some basic legal principles.

The law is clear that the Secretary's ordering of DHS priorities is not subject to judicial second-guessing:

> [T]he Government's enforcement priorities and . . . the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to make.

*Reno*, 525 U.S. at 490 (quoting *Wayte v. United States*, 470 U.S. 598, 607-08 (1985)).

Further, as a general principle, the decision to prosecute or not prosecute an individual is, with narrow exceptions, a decision that is left to the Executive Branch's discretion.  *Heckler,* 470 U.S. at 831 (citing a host of Supreme Court opinions).  As the Fifth Circuit has stated:

---

[49] Interestingly, this memorandum, which is different from the DAPA Memorandum (although dated the same day), states:  "Nothing in this memorandum should be construed to prohibit or discourage the apprehension, detention, or removal of aliens in the United States who are not identified as priorities herein."  The DAPA recipients arguably fall under Priority 3, but the Secretary's DAPA Memorandum seems to indicate he thinks otherwise.  Despite this admonition, the DAPA Memorandum instructs DHS officials not to remove otherwise removable aliens.  In fact, it also instructs ICE officials to immediately stop enforcement procedures already in process, including removal proceedings.

> The prosecution of criminal cases has historically lain close to the core of the Article II executive function. The Executive Branch has extraordinarily wide discretion in deciding whether to prosecute. Indeed, that discretion is checked only by other constitutional provisions such as the prohibition against racial discrimination and a narrow doctrine of selective prosecution.

*Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 756 (5th Cir. 2001).

The Judiciary has generally refrained from injecting itself into decisions involving the exercise of prosecutorial discretion or agency non-enforcement for three main reasons. First, these decisions ordinarily involve matters particularly within an agency's expertise. Second, an agency's refusal to act does not involve that agency's "coercive" powers requiring protection by courts. Finally, an agency's refusal to act largely mirrors a prosecutor's decision to not indict. *Heckler*, 470 U.S. at 821-32. This is true whether the suit is brought under common law or the APA. Absent abdication, decisions to not take enforcement action are rarely reviewable under the APA. *See, e.g.*, *Texas*, 106 F.3d at 667.

Consequently, this Court finds that Secretary Johnson's decisions as to how to marshal DHS resources, how to best utilize DHS manpower, and where to concentrate its activities are discretionary decisions solely within the purview of the Executive Branch, to the extent that they do not violate any statute or the Constitution.

The fact that the DHS has virtually unlimited discretion when prioritizing enforcement objectives and allocating its limited resources resolves an underlying current in this case. This fact does not, however, resolve the specific legal issues presented because the general concept of prosecutorial discretion—or Defendants' right to exercise it—is not the true focus of the States'

legal attack.[50]  Instead, Plaintiffs argue that DAPA is not within the Executive's realm (his power to exercise prosecutorial discretion or otherwise) at all; according to Plaintiffs, DAPA is simply the Executive Branch legislating.

Indeed, it is well-established both in the text of the Constitution itself and in Supreme Court jurisprudence that the Constitution "allows the President to execute the laws, not make them." *Medellin*, 552 U.S. at 532.  It is Congress, and Congress alone, who has the power under the Constitution to legislate in the field of immigration. *See* U.S. Const. art. 1, § 8, cl. 4; *Plyler*, 457 U.S. at 237–38.  As the Supreme Court has explained, "[t]he conditions for entry [or removal] of every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determinations should be based, have been recognized as matters *solely for the responsibility of the Congress . . . .*" *Harisiades v. Shaughnessy*, 342 U.S. 580, 596-97 (1952) (emphasis added).

Just as the states are preempted from interfering with the "careful balance struck by Congress with respect to unauthorized employment," for example,[51] Plaintiffs argue that the doctrine of separation of powers likewise precludes the Executive Branch from undoing this careful balance by granting legal presence together with related benefits to over four million individuals who are illegally in the country.  It is the contention of the States that in enacting DAPA, the DHS has not only abandoned its duty to enforce the laws as Congress has written them, but it has also enacted "legislation" contrary to the Constitution and the separation of

---

[50] The States obviously question the soundness of Defendants' alleged exercise of discretion.  Their complaint also questions whether this program can be characterized or justified as an exercise of discretion at all.

[51] *Arizona*, 132 S. Ct. at 2505.

powers therein. Finally, the States complain that the DHS failed to comply with certain procedural statutory requirements for taking the action it did.

The Court now turns to those issues.

### B.    Preliminary Injunction

To support the "equitable remedy" of a preliminary injunction, the Plaintiff States must establish four elements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat that the [States] will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause [Defendants]; and (4) that the injunction will not disserve the public interest." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014) (quoting *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998)). While a preliminary injunction should not be granted unless the plaintiff, "*by a clear showing*," carries his burden of persuasion on each of these four factors, *see Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted) (emphasis in the original), the plaintiff "need not prove his case." *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 n.11 (5th Cir. 1991); *see also Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (emphasizing that a party "is not required to prove his case in full at a preliminary injunction hearing").

The "generally accepted notion" is that the "purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Meis v. Sanitas Serv. Corp.*, 511 F.2d 655, 656 (5th Cir. 1975) (citations omitted); *see also Camenisch*, 451 U.S. at 395 ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."). "Given this limited purpose, and given the haste that is often necessary if [the parties'] positions

are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* The Court's analysis requires "a balancing of the probabilities of ultimate success on the merits with the consequences of court intervention at a preliminary stage." *Meis*, 511 F.2d at 656; *see also Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974) ("[T]he most compelling reason in favor of (granting a preliminary injunction) is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act.") (quotation marks and citations omitted).

1.  Preliminary Injunction Factor One:  Likelihood of Success on the Merits

The first consideration in the preliminary injunction analysis is the likelihood that the plaintiff will prevail on the merits.  The Fifth Circuit has previously stated that the likelihood required in a given case depends on the weight and strength of the other three factors. *See Canal Auth.*, 489 F.2d at 576-77.  Although some doubt has been cast on this "sliding scale" approach, it is clear that, at a minimum, the plaintiff must demonstrate a "substantial case on the merits." *See, e.g.*, *Southerland v. Thigpen*, 784 F.2d 713, 718 n.1 (5th Cir. 1986).  Thus, to meet the first requirement for a preliminary injunction, the States "must present a prima facie case," but "need not show a certainty of winning."   11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.3 (3d ed. 2014) (hereinafter "Wright & Miller").

a.  The Administrative Procedure Act

The States complain that the implementation of DAPA violates the APA. 5 U.S.C. §§ 501 *et seq.*  Specifically, the States assert that DAPA constitutes a "substantive" or "legislative" rule that was promulgated without the requisite notice and comment process required under Section

553 of the APA.[52]  Defendants concede that DAPA was not subjected to the APA's formal notice-and-comment procedure.  Instead, they argue that DAPA is not subject to judicial review and, even if reviewable, is exempt from the APA's procedural requirements.

i.     Judicial Review Under the Administrative Procedure Act

When a party challenges the legality of agency action, a finding that the party has standing will not, alone, entitle that party to a decision on the merits.  *See Data Processing*, 397 U.S. at 173 (Brennan, J., concurring).  Thus, before proceeding to the merits of Plaintiffs' claim, the Court must ensure that the agency action at issue here is reviewable under the APA.

Subject to two exceptions described below, the APA provides an avenue for judicial review of challenges to "agency action."  *See* 5 U.S.C. §§ 701-706.  Under Section 702, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  Section 702 contains two requirements.  First, the plaintiffs must identify some "'agency action' that affects [them] in the specified fashion; it is judicial review 'thereof' to which [they are] entitled."  *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 882 (1990) (quoting 5 U.S.C. § 702).  "Agency action," in turn, is defined in the APA as "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  When, as here, judicial review is sought "not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'"  *Lujan*, 497 U.S. at 882 (citing 5

---

[52] The States also claim that DAPA substantively violates the APA in that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" under 5 U.S.C. § 706.  If accurate (and all other requirements under the APA are satisfied), Section 706 would require that the Court "hold unlawful and set aside" the DAPA program.  5 U.S.C. § 706.

U.S.C. § 704, which provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review").

To obtain review under Section 702, Plaintiffs must additionally show that they are either "suffering legal wrong" because of the challenged agency action, or are "adversely affected or aggrieved by [that] action within the meaning of a relevant statute." 5 U.S.C. § 702. A plaintiff claiming the latter, as the States do here, must establish that the "injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan*, 497 U.S. at 871 (citing *Clarke*, 479 U.S. at 396-97).

(1)    Final Agency Action

The Supreme Court has identified two conditions that must be satisfied for agency action to be "final." First, "the action must mark the consummation of the agency's decisionmaking process . . . —it must not be of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 178 (internal quotations marks and citations omitted). One need not venture further than the DHS Directive itself to conclude that it is not "of a merely tentative or interlocutory nature." Secretary Johnson ordered immediate implementation of certain measures to be taken under DAPA. For instance, he ordered ICE and CBP to "immediately begin identifying persons in their custody, as well as newly encountered individuals, who meet the . . . criteria . . . to prevent the further expenditure of enforcement resources." Doc. No. 1, Pl. Ex. A at 5. Secretary Johnson further instructed ICE to "review *pending* removal cases, and seek administrative closure or termination" of cases with potentially eligible deferred action beneficiaries. *Id.* (emphasis added). The DHS has additionally set up a "hotline" for immigrants in the removal

process to call and alert the DHS as to their eligibility, so as to avoid their removal being effectuated.[53]   USCIS was given a specific deadline by which it "should begin accepting applications under the new [DACA] criteria":  "no later than ninety (90) days from the date of [the Directive's] announcement."  *Id.* at 4.  As of the date of this Order, that deadline is less than a week away.[54]   Moreover, the DHS is currently obtaining facilities, assigning officers, and contracting employees to process DAPA applications.[55]   Thus, the DHS Directive has been in effect and action has been taken pursuant to it since November of 2014.

Under the second condition identified by the Supreme Court, to be "final," the agency's action "must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett*, 520 U.S. at 178 (internal quotation marks and citations omitted).   As evidenced by the mandatory language throughout the DAPA Memorandum requiring USCIS and ICE to take certain actions, the Secretary's Directive clearly establishes the obligations of the DHS and assigns specific duties to offices within the agency.   Additionally, DAPA confers upon its beneficiaries the right to stay in the country lawfully.   Clearly, "legal consequences will flow" from Defendants' action: DAPA makes the illegal presence of millions of individuals legal.

---

[53] *See, e.g., Frequently Asked Questions, The Obama Administration's DAPA and Expanded DACA Programs*, NILC, at http://www.nilc.org/dapa&daca.html (last updated Jan. 23, 2015).

[54] Defendants have not indicated any intention to depart from the deadline established in the DHS Directive.  To the contrary, the DHS' website states in bold, red font that it will begin accepting applications under the new DACA criteria on February 18, 2015.  *See Executive Actions on Immigration*, Official Website of the Dept. of Homeland Security, at http://www.uscis.gov/immigrationaction (last updated Jan. 30, 2015).  A deadline by which USCIS should begin accepting applications for DAPA was also provided in the DHS Directive: no later than 180 days from the date DAPA was announced.  Thus, USCIS must begin accepting applications by mid-May of this year.

[55] Doc. No. 64, Pl. Ex. 23 (Palinkas Dec.) ("USCIS has announced that it will create a new service center to process DAPA applications. The new service center will be in Arlington, Virginia, and it will be staffed by approximately 1,000 federal employees. Approximately 700 of them will be USCIS employees, and approximately 300 of them will be federal contractors.").

Two other factors confirm that the DAPA Directive constitutes final agency action.  First, the Government has not specifically suggested that it is not final.  To the contrary, the DHS' own website declares that those eligible under the new DACA criteria may begin applying on February 18, 2015.  Finally, the 2012 DACA Directive—which was clearly final and has been in effect for two and a half years now—was instituted in the same fashion, pursuant to a nearly identical memorandum as the one here.  Indeed, Secretary Johnson in the DAPA Memorandum "direct[s] USCIS to establish a process, *similar to DACA*" for implementing the program.  Doc. No. 1, Pl. Ex. A (emphasis added).  This experience—and the lack of any suggestion that DAPA will be implemented in a fashion different from DACA—serves as further evidence that DAPA is a final agency action.  Based upon the combination of all of these factors, there can be no doubt that the agency action at issue here is "final" in order for the Court to review it under the APA.

(2)     The Zone of Interests

To challenge Defendants' action under the APA, Plaintiffs must additionally show: (1) that they are "adversely affected or aggrieved, i.e. injured in fact," and (2) that the "interest sought to be protected by the [Plaintiffs] [is] arguably within the zone of interests to be protected or regulated by the statute in question."  *Clarke*, 479 U.S. at 395-96 (internal quotation marks and citations omitted).  The key inquiry is whether Congress "intended for [Plaintiffs] to be relied upon to challenge agency disregard of the law."  *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347 (1984); *see also Clarke*, 479 U.S. at 399 ("The 'zone of interest' test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively

reviewable, a particular plaintiff should be heard to complain of a particular agency decision.").

The test is not "especially demanding."[56]  *Id.*  As the Supreme Court in *Clarke* held:

> In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are *so marginally related to or inconsistent with the purposes implicit in the statute* that it cannot reasonably be assumed that Congress intended to permit the suit . . . . [T]here *need be no indication of congressional purpose to benefit the would-be plaintiff.*

*Id.* at 399-400 (citations removed) (emphasis added).

As described above in great detail, it is clear that at least one Plaintiff, the State of Texas, (and perhaps some of the other States if there had been time and opportunity for a full development of the record), will be "adversely affected or aggrieved" by the agency action at issue here.  DAPA authorizes a new status of "legal presence" along with numerous other benefits to a substantial number of individuals who are currently, by law, "removable" or "deportable."  The Court finds that the acts of Congress deeming these individuals removable were passed in part to protect the States and their residents.  Indeed, over the decades there has been a constant flood of litigation between various states and the federal government over federal enforcement of immigration laws.  The states have been unsuccessful in many of those cases and have prevailed in only a few.  Regardless of which side prevailed and what contention was at issue, there has been one constant:  the federal government, under our federalist system, has the

---

[56] The *Clarke* Court noted that, although a similar zone of interest test is often applied when considering "prudential standing" to sue in federal court (as already discussed in this opinion), the zone of interest test in the APA context is much less demanding than it is in the prudential standing context.  479 U.S. at 400 n.16 (stating that the invocation of the zone of interest test in the *standing* context "should not be taken to mean that the standing inquiry under whatever constitutional or statutory provision a plaintiff asserts is the same as it would be if the 'generous review provisions' of the APA apply").  This Court, in its consideration of prudential standing concerns, already found Plaintiffs to be within the zone of interest of the relevant immigration laws, which DAPA contravenes.  Thus, based on the less-demanding nature of the APA's zone of interest test, the Court need not go into great detail in this part of its analysis.

duty to protect the states, which are powerless to protect themselves, by enforcing the

immigration statutes.  Congress has recognized this:

> States and localities can have significant interest in the manner and extent to which federal officials enforce provisions of the Immigration and Nationality Act (INA) regarding the exclusion and removal of unauthorized aliens.[57]

Similarly, the Supreme Court has recognized that the states have an interest in the enforcement

or non-enforcement of the INA:

> Since the late 19th century, the United States has restricted immigration into this country.  Unsanctioned entry into the United States is a crime, and those who have entered unlawfully are subject to deportation. But despite the existence of these legal restrictions, a substantial number of persons have succeeded in unlawfully entering the United States, and now live within various States, including the State of Texas.

*Plyler*, 457 U.S. at 205 (citations omitted). Finally, the Department of Justice has likewise

acknowledged that the states' interests are related to and consistent with the purposes implicit

within the INA:

> Unlawful entry into the United States and reentry after removal are federal criminal offenses.[58]
> . . . .
> To discourage illegal immigration into the United States, the INA prohibits employers from knowingly hiring or continuing to employ aliens who are not authorized to work in the United States.
> . . . .
> The federal immigration laws encourage States to cooperate with the federal government in its enforcement of immigration laws in several ways.  The INA provides state officials with express authority to take certain actions to assist federal immigration officials.  For example, state officers may make arrests for violations of the INA's prohibition against smuggling, transporting or harboring aliens. . . . And, if the Secretary determines that an actual or imminent mass influx of aliens presents urgent circumstances requiring an immediate federal response,

---

[57] *See, e.g.*, Kate M. Manuel, Cong. Research Serv., R43839, *State Challenges to Federal Enforcement of Immigration Law: Historical Precedents and Pending Litigation* 2 (2014).

[58] As the Supreme Court held in *Arizona v. United States*, it is the job of ICE officers to remove those who violate Sections 1325 and 1326.  *See* 132 S. Ct. at 2500.

she may authorize any state or local officer . . . to exercise the powers, privileges or duties of federal immigration officers under the INA.

Congress has also authorized DHS to enter into agreements with States to allow appropriately trained and supervised state and local officers to perform enumerated functions of federal immigration enforcement. Activities performed under these agreements . . . "shall be subject to the direction and supervision of the [Secretary]."

The INA further provides, however, that a formal agreement is not required for state and local officers to "cooperate with the [Secretary]" in certain respects . . . . Even without an agreement, state and local officials may "communicate with the [Secretary] regarding the immigration status of an individual," or "otherwise cooperate with the [Secretary] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States". . . . To further such "cooperat[ive]" efforts to "communicate," Congress has enacted measures to ensure a useful flow of information between DHS and state . . . agencies.

Brief for the United States in Opposition on Petition for Writ of Certiorari at 2-6, *Arizona v. United States*, 132 S. Ct. 2492 (2012) (No. 11-182), 2011 WL 5548708 (citations omitted).

According to estimates available to the Court, at least 50-67% of potentially-eligible DAPA recipients have probably violated 8 U.S.C. § 1325.[59]  The remaining 33-50% have likely overstayed their permission to stay.  Under the doctrine of preemption, the states are deprived of the ability to protect themselves or institute their own laws to control illegal immigration and, thus, they must rely on the INA and federal enforcement of the same for their protection.  *See Arizona*, 132 S. Ct. at 2510 (reaffirming the severe limit on state action in the field of

---

[59] *See, e.g.*, David Martin, *A Defense of Immigration-Enforcement Discretion: The Legal and Policy Flaws in Kris Kobach's Latest Crusade*, 122 Yale L. J. Online 167, 171 (2012) (citing *Modes of Entry for the Unauthorized Migrant Population*, PEW Hisp. Center 3 (May 22, 2006), at http://pewhispanic.org/files/factsheets/19.pdf).  (Mr. Martin served as General Counsel of the INS from 1995-1997, and as Principal Deputy General Counsel of the DHS from 2009-2010.).  *See also* Andorra Bruno, Cong. Research Serv., R41207, *Unauthorized Aliens in the United States: Policy Discussion* 2 (2014) (hereinafter "Bruno, *Unauthorized Aliens in the United States*").

immigration).  Despite recognizing the inability of states to tackle their immigration problems in

a manner inconsistent with federal law, the Supreme Court in *Arizona* noted:

> *The National Government has significant power to regulate immigration.  With power comes responsibility, and the sound exercise of national power over immigration depends on the Nation's meeting its responsibility to base its laws on a political will informed by searching, thoughtful, rational civic discourse.* Arizona may have understandable frustrations with the problems caused by illegal immigration while that process continues, but the State may not pursue policies that undermine federal law.

*Id.* (emphasis added).

The responsibility of the federal government, who exercises plenary power over

immigration, includes not only the passage of rational legislation, but also the *enforcement* of

those laws.[60]  The States and their residents are entitled to nothing less.  DAPA, no matter how it

is characterized or viewed, clearly contravenes the express terms of the INA.   Under our

federalist system, the States are easily in the zone of interest contemplated by this nation's

immigration laws.

(3)     Exceptions to Review

Although the Court easily finds the agency action at issue here final and that the States

fall within the relevant zone of interests in order to seek review, Defendants claim that review is

nevertheless unavailable in this case because the APA exempts the DHS action from its purview.

There are two exceptions to the general rule of reviewability under the APA.  First,

agency action is unreviewable "where the statute explicitly precludes judicial review."  5 U.S.C.

---

[60] Congress exercises plenary power over immigration and the Executive Branch is charged with enforcing Congress' laws.  *See Faillo v. Bell*, 430 U.S. 787, 792 (1997) ("[O]ver no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens.") (internal quotation marks and citations omitted).  Just like the states, albeit for a different reason, the Executive Branch "may not pursue policies that undermine federal law."

81

§ 701(a)(1).  This exception applies when "Congress has expressed an intent to preclude judicial review."  *Heckler*, 470 U.S. at 830.[61]  Second, and arguably more relevant to the present case, even if Congress has not affirmatively precluded judicial review, courts are precluded from reviewing agency action that is "committed to agency discretion by law."  5 U.S.C. § 701(a)(2). This second exception was first discussed in detail by the Supreme Court in *Citizens to Preserve Overton Park, Inc. v. Volpe*. 401 U.S. 402 (1971).  There, the Court interpreted the exception narrowly, finding it "applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'"  *Id.* at 410 (quoting S. Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)).  Subsequently, in *Heckler v. Chaney*, the Supreme Court further refined its interpretation of Section 701(a)(2).  Distinguishing the exception in Section 701(a)(1) from that in Section 701(a)(2), the Court stated:

> The former [§ 701(a)(1)] applies when Congress has expressed an intent to preclude judicial review. The latter [§701(a)(2)] applies in different circumstances; even where Congress has not affirmatively precluded review, *review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.* In such a case, the statute ("law") can be taken to have "committed" the decisionmaking to the agency's judgment absolutely. This construction avoids conflict with the "abuse of discretion" standard of review in § 706--if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for "abuse of discretion."

470 U.S. at 830 (emphasis added).

Relevant to the present issue, the Supreme Court then exempted from the APA's "presumption of reviewability" non-enforcement decisions made by an agency.  *Id.* at 831

---

[61] The Government has not pointed the Court to any statute that precludes reviewability of DAPA.  As there is no statute that authorizes the DHS to implement the DAPA program, there is certainly no statute that precludes judicial review under Section 701(a).

(disagreeing with the lower court's "insistence that the 'narrow construction' of § (a)(2) required application of a presumption of reviewability even to an agency's decision not to undertake certain enforcement actions").  The Court distinguished the availability of review for the type of agency action in *Overton Park* from the challenged agency decisions in *Heckler*:

> *Overton Park* did not involve an agency's refusal to take requested enforcement action. It involved *an affirmative act of approval under a statute that set clear guidelines* for determining when such approval should be given. Refusals to take enforcement steps generally involve precisely the opposite situation, and in that situation we think the presumption is that judicial review is not available.

*Id.* (emphasis added).

Thus, according to the *Heckler* Court, there is a "rebuttable presumption" that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion" and, consequently, unsuitable for judicial review.  *Id.*  An "agency's refusal to institute proceedings" has been "traditionally committed to agency discretion," and the enactment of the APA did nothing to disturb this tradition.  *Id.* at 832.

Underlying this presumption of unreviewability are three overarching concerns that arise when a court proposes to review an agency's discretionary decision to refuse enforcement.  First, "an agency decision not to enforce often involves a complicated balancing of a number of factors which are particularly within its expertise[,]" and the agency is "far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities."  *Id.* at 831-32.  These factors or variables that an agency must assess in exercising its enforcement powers include "whether a violation has occurred, . . . whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the

particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." *Id.* at 831.  Due to circumstances beyond its control, an agency "cannot act against each technical violation of the statute it is charged with enforcing." *Id.*  For obvious reasons, this has application in the criminal and immigration contexts.  Consequently, the deference generally accorded to "an agency's construction of the statute it is charged with implementing" and the "procedures it adopts" for doing so (under general administrative law principles)[62] is arguably even more warranted when, in light of the above factors, the agency chooses not to enforce the statute against "each technical violation." *Id.* at 831-32.

Second, an agency's refusal to act generally does not "infringe upon areas that courts often are called upon to protect[,]" including individual liberty or property rights.  In other words, a non-enforcement decision ordinarily does not involve an exercise of governmental "*coercive* power" over an individual's rights.  *Id.* at 832 (emphasis in original).  By contrast, when an agency does take action exercising its enforcement power, the action in and of itself "provides a focus for judicial review." *Id.*  Because the agency "must have exercised its power in some manner," its action is more conducive to review "to determine whether the agency exceeded its statutory powers." *Id.* (citing *FTC v. Klesner*, 280 U.S. 19 (1929)).

---

[62] The *Heckler* Court cited *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978), and *Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 87 (1975). For instance, in discussing deference to agency interpretation, the Supreme Court stated in *Vermont Yankee*:

> But this much is absolutely clear. Absent constitutional constraints or extremely compelling circumstances, the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties. Indeed, our cases could hardly be more explicit in this regard.

435 U.S. at 543 (internal quotations and citations omitted).

Lastly, the *Heckler* Court compared agency non-enforcement decisions to the exercise of prosecutorial discretion in the criminal context—decisions that plainly fall within the express and exclusive province of the Executive Branch, which is constitutionally charged to "take Care that the Laws be faithfully executed." *See id.* ("Finally, we recognize that an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'to take Care that the Laws be faithfully executed.'") (quoting U.S. Const. art. II, § 3).

While the Court recognizes (as discussed above) that the DHS possesses considerable discretion in carrying out its duties under the INA, the facts of this case do not implicate the concerns considered by *Heckler* such that this Court finds itself without the ability to review Defendants' actions.   First, the Court finds an important distinction in two terms that are commonly used interchangeably when discussing *Heckler*'s presumption of unreviewability: "non-enforcement" and "inaction."  While agency "non-enforcement" might imply "inaction" in most circumstances, the Court finds that, in this case, to the extent that the DAPA Directive can be characterized as "non-enforcement," it is actually affirmative *action* rather than inaction.

The Supreme Court's concern that courts lack meaningful focus for judicial review when presented with agency *inaction* (*see Heckler*, 470 U.S. at 832) is thus not present in this situation. Instead of merely refusing to enforce the INA's removal laws against an individual, the DHS has enacted a wide-reaching program that awards legal presence, to individuals Congress has deemed deportable or removable, as well as the ability to obtain Social Security numbers, work

authorization permits, and the ability to travel.[63]   Absent DAPA, these individuals would not

receive these benefits.[64]   The DHS has not instructed its officers to merely refrain from arresting,

ordering the removal of, or prosecuting unlawfully-present aliens.   Indeed, by the very terms of

DAPA, that is what the DHS *has* been doing for these recipients for the last five years[65]—

whether that was because the DHS could not track down the millions of individuals they now

deem eligible for deferred action, or because they were prioritizing removals according to limited

resources, applying humanitarian considerations, or just not removing these individuals for

"administrative convenience."[66]   Had the States complained only of the DHS' mere failure to (or

---

[63] *See, e.g.*, *Frequently Asked Questions, The Obama Administration's DAPA and Expanded DACA Programs*, NILC, at http://www.nilc.org/dapa&daca.html (last updated Jan. 23, 2015) (instructing potential DAPA/DACA beneficiaries that "[o]nce [their] work permit arrives," to look up their local Social Security office at www.ssa.gov to apply for Social Security numbers).   The official website for the Social Security Administration offers information for noncitizens, explaining that noncitizens "authorized to work in the United States by the Department of Homeland Security (DHS) can get a Social Security number . . . . You need a Social Security number to work, collect Social Security benefits and receive some other government services."   *Social Security Numbers for Noncitizens*, Official Website of the Social Security Administration (Aug. 2013), http://www.ssa.gov/pubs/EN-05-10096.pdf.

[64] The States raised, but did not address at length, the tax benefit issue perhaps because this is an expense that the federal taxpayers must bear.   Nevertheless, it is clear from the testimony of IRS Commissioner John A. Koskinen presented to the Senate Finance Committee that the DAPA recipients would be eligible for earned income tax credits once they received a Social Security number.   *See* Testimony of IRS Commissioner John A. Koskinen on February 3, 2015 before Senate Finance Committee that DAPA confers another sizable benefit in addition to those that directly affect the States due to certain tax credits.   *See also* "Taxpayer Identification Number Requirements of Eligible Individuals and Qualifying Children Under the EIC," FTC A-4219, 19 XX WL 216976, and Chief Counsel Advice, IRS CCA 200028034, 2000 WL 33116180 (IRS CCA 2000).   One way to estimate the effect of this eligibility is to assign as an earned income tax credit the sum of $4,000 per year for three years (the number of years for which an individual can file) and multiply that by the number of DAPA recipients.   If, for instance, that number is 4.3 million, if calculated accurately, the tax benefits bestowed by DAPA will exceed $50,000,000,000.   Obviously, such a calculation carries with it a number of assumptions.   For example, it is somewhat unlikely that every DAPA recipient would actually claim or qualify for these credits.   Nevertheless, the importance lies not in the amount, but in the fact that DAPA makes individuals eligible at all.   Bestowing a tax benefit on individuals that are otherwise not entitled to that benefit is one more reason that DAPA must be considered a substantive rule.

[65] In order to qualify for DAPA, an unlawfully-present alien must have "continuously resided in the United States since before January 1, 2010."   Doc. No. 1, Pl. Ex. A at 4.   Thus, expected beneficiaries of DAPA have been present in the country illegally for *at least* five years, yet the DHS (whether knowingly or unknowingly/intentionally or unintentionally) has not acted to enforce the INA's removal provisions against them during those years.

[66] *See* 8 C.F.R. 274a.12(c)(14) (defining deferred action as "an act of administrative convenience to the government which gives some cases lower priority").

decision not to) prosecute and/or remove such individuals in these preceding years, any conclusion drawn in that situation would have been based on the *inaction* of the agency in its refusal to enforce.  In such a case, the Court may have been without any "focus for judicial review."  *See Heckler*, 470 U.S. at 832.

Exercising prosecutorial discretion and/or refusing to enforce a statute does not also entail bestowing benefits.  Non-enforcement is just that—not enforcing the law.[67]  Non-enforcement does not entail refusing to remove these individuals as required by the law *and then* providing three years of immunity from that law, legal presence status, plus any benefits that may accompany legal presence under current regulations.  This Court seriously doubts that the Supreme Court, in holding non-enforcement decisions to be presumptively unreviewable, anticipated that such "non-enforcement" decisions would include the affirmative act of bestowing multiple, otherwise unobtainable benefits upon an individual.  Not only does this proposition run afoul of traditional exercises of prosecutorial discretion that generally receive judicial deference, but it also flies in the face of the very concerns that informed the *Heckler* Court's holding.  This Court finds the DHS Directive distinguishable from the non-enforcement decisions to which *Heckler* referred, and thus concludes that *Heckler's* presumption of unreviewability is inapplicable in this case.

---

[67] *See, e.g.*, *In re Aiken Cnty.*, 725 F.3d 255, 266 (D.C. Cir. 2013) (explaining that prosecutorial discretion includes the decision to not *enforce* a law, but does not include the discretion not to *follow* a law).  The law requires these individuals to be removed.  The DHS could accomplish—and has accomplished—non-enforcement of the law without implementing DAPA.  The award of legal status and all that it entails is an impermissible refusal to *follow* the law.

(4)     If Applicable, the Presumption
is Rebutted

Assuming *arguendo* that a presumption of unreviewability applied in this case, the Court nonetheless finds that presumption rebutted.  Notably, in *Heckler*, after listing the above-addressed concerns underlying its conclusion that an agency's non-enforcement decisions are presumed immune from review under Section 701(a)(2), the Supreme Court emphasized that any non-enforcement decision "is only presumptively unreviewable."  The presumption "may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers."  *Id.* at 832-33.  Drawing on its prior analysis of Section 701(a)(2)'s exception in O*verton Park*, the Supreme Court elaborated on instances when the presumption may be rebutted:

> Thus, in establishing this presumption in the APA, Congress did not set agencies free to disregard legislative direction in the statutory scheme that the agency administers. Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue. How to determine when Congress has done so is the question left open by *Overton Park*.

*Id.* at 833.

a.   The Applicable Statutory Scheme

Here, the very statutes under which Defendants claim discretionary authority[68] actually compel the opposite result.  In particular, detailed and mandatory commands within the INA provisions applicable to Defendants' action in this case circumscribe discretion.   Section 1225(a)(1) of the INA provides that "[a]n alien present in the United States who has not been admitted . . . shall be deemed for purposes of this chapter an applicant for admission."  8 U.S.C.

---

[68] As detailed below, the Defendants claim that Congress granted them discretion under two statutory provisions: 8 U.S.C. § 1103 and 6 U.S.C. § 202.

§ 1225(a)(1).  All applicants for admission "shall be inspected by immigration officers."  *Id.* §
1225(a)(3).  "[I]f the examining immigration officer determines that an alien seeking admission
is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a
proceeding under section 1229a [of the INA]."  *Id.* § 1225(b)(2)(A).[69]

Section 1229a provides for removal proceedings.  In these proceedings, if the alien is an
applicant for admission, the burden of proof rests with the alien to establish that he or she is
"clearly and beyond doubt entitled to be admitted and is not admissible under section 1182" of
the INA.  8 U.S.C. § 1229a(c)(2)(A).  Alternatively, the alien has the burden of establishing "by
clear and convincing evidence" that he or she is "lawfully present in the United States pursuant
to a prior admission."  *Id.* § 1229a(c)(2)(B).  An alien is "removable" if the alien has not been
admitted and is inadmissible under Section 1182, or in the case of an admitted alien, the alien is
deportable under Section 1227.  *Id.* § 1229a(e)(2).  Section 1182 classifies and defines
"Inadmissible Aliens."  Inadmissible aliens are ineligible to receive visas and ineligible to be
admitted to the United States.  Among the long list of grounds for inadmissibility are those
related to health, crime, and security.  Section 1227 classifies and defines individuals who are
deportable.  Potential DAPA beneficiaries who entered unlawfully are inadmissible under
Section 1182 and the law dictates that they should be removed pursuant to the authority under
Sections 1225 and 1227.  Those potential recipients who entered legally, but overstayed their

---

[69]  It is understood that unauthorized aliens enter the United States in three main ways:

> (1) [S]ome are admitted to the United States on valid nonimmigrant (temporary) visas (e.g., as
> visitors or students) or on border-crossing cards and either remain in the country beyond their
> authorized period of stay or otherwise violate the terms of their admission; (2) some are admitted
> based on fraudulent documents (e.g., fake passports) that go undetected by U.S. officials; and (3)
> some enter the country illegally without inspection (e.g., by crossing over the Southwest or
> northern U.S. border).

Bruno, *Unauthorized Aliens in the United States* at 2.

legal permission to be in the United States fall under Section 1227(a)(1).  Thus, regardless of their mode of entry, DAPA putative recipients all fall into a category for removal and no Congressionally-enacted statute gives the DHS the affirmative power to turn DAPA recipients' illegal presence into a legal one through deferred action, much less provide and/or make them eligible for multiple benefits.[70]

The Government must concede that there is no specific law or statute that authorizes DAPA.  In fact, the President announced it was the failure of Congress to pass such a law that prompted him (through his delegate, Secretary Johnson) to "change the law."[71]  Consequently, the Government concentrates its defense upon the *general* discretion it is granted by law.

While there is no specific grant of discretion given to the DHS supporting the challenged action, Congress has conferred (and the DHS relies upon) two general grants of discretion under 8 U.S.C. § 1103(a)(3) (the "INA Provision") and 6 U.S.C. § 202 (the Homeland Security Act of 2005 ("HSA")) (the "HSA Provision").[72]  Under the first of these provisions, the INA provides:

> [The Secretary] shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter.

---

[70] In rejecting an agency's claimed use of prosecutorial discretion as justifying its inaction, the D.C. Circuit has emphasized:

> [P]rosecutorial discretion encompasses the discretion not to *enforce* a law against private parties; it does not encompass the discretion not to *follow* a law imposing a mandate or prohibition on the Executive Branch.

*In re Aiken County*, 725 F.3d at 266 (emphasis in original).

[71] *See* Press Release, Remarks by the President on Immigration – Chicago, IL, The White House Office of the Press Secretary (Nov. 25, 2014).

[72] Despite using the name of the Acts throughout, the Court will refer to the codified provisions of the INA and the HSA, as provided for in Title 8 and Title 6, respectively.

8 U.S.C. § 1103(a)(3).  Under the latter of these provisions, the HSA provides in relevant part:

> The Secretary, acting through the Under Secretary for Border and Transportation Security, shall be responsible for the following:
>
> (1)   Preventing the entry of terrorists and the instruments of terrorism into the United States.
>
> (2)   Securing the borders, territorial waters, ports, terminals, waterways, and air, land, and sea transportation systems of the United States, including managing and coordinating those functions transferred to the Department at ports of entry.
>
> (3)   Carrying out the immigration enforcement functions vested by statute in, or performed by, the Commissioner of Immigration and Naturalization (or any officer, employee, or component of the Immigration and Naturalization Service) immediately before the date on which the transfer of functions specified under section 251 of this title takes effect.
>
> (4)   Establishing and administering rules, in accordance with section 236 of this title, governing the granting of visas or other forms of permission, including parole, to enter the United States to individuals who are not a citizen or an alien lawfully admitted for permanent residence in the United States.
>
> (5)   Establishing national immigration enforcement policies and priorities.

6 U.S.C. § 202.

The INA Provision is found in the "General Provisions," Subchapter I, of Title 8, which provides definitions of terms used throughout the INA and identifies the general powers and duties of the DHS Administration.[73]  The HSA Provision establishes the "responsibilities" of the DHS Secretary.  The INA thus gives the DHS Secretary the authority (and indeed directs the Secretary) to establish regulations that he deems necessary to execute the laws passed by Congress.  The HSA delegates to the Secretary in Section 202(4) the authority to establish and administer rules that govern the various forms of acquiring *legal* entry into the United States

---

[73] (It is in Title I of the Immigration and Nationality Act (Section 103)).

under 6 U.S.C. § 236 (dealing with visas).  *See* 6 U.S.C. § 202(4).  Expected DAPA recipients, who by definition are already illegally present, are not encompassed by subsection 4 of HSA Provision.  They are not aliens seeking visas or other forms of permission to come to the United States.  Instead, the individuals covered by DAPA have already entered and either achieved that entry illegally, or unlawfully overstayed their legal admission.

The HSA, through subsection 5 of the HSA Provision, makes the Secretary responsible for establishing enforcement policies and priorities.  The Government defends DAPA as a measure taken to prioritize removals and, as previously described, the DAPA Memorandum mentions or reiterates some of the Secretary's priorities.  The States do not dispute that Secretary Johnson has the legal authority to set these priorities, and this Court finds nothing unlawful about the Secretary's priorities.  The HSA's delegation of authority may not be read, however, to delegate to the DHS the right to establish a national rule or program of awarding *legal presence*—one which not only awards a three-year, renewable reprieve, but also awards over four million individuals, who fall into the category that Congress deems removable, the right to work, obtain Social Security numbers, and travel in and out of the country.[74]  A tour of the INA's provisions reveals that Congress clearly knows how to delegate discretionary authority because in certain instances it has explicitly done so.  For example, Section 1227 (involving "Deportable Aliens") specifically provides:

---

[74] If implemented like DACA, the DAPA program will actually be more widespread.  The DHS has published notice that even those who were not granted DACA "will not be referred to ICE for purposes of removal . . . except where DHS determines there are exceptional circumstances" (assuming their cases did not involve a criminal offense, fraud, or a threat to national security or public safety).  *See Frequently Asked Questions*, *Consideration of Deferred Action for Childhood Arrivals Process*, Official Website of the Dept. of Homeland Security, http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions#DACA%20process (last updated Dec. 4, 2014).  According to the President, DAPA will be implemented in the same fashion.  Thus, as long as you are not a criminal, a threat to security, or fraudulent, and if you qualify under these programs, you receive legal presence and are allowed to stay in the country; if you do not qualify, you still get to stay.

(d)(1)   If the Secretary of Homeland Security determines that an application for nonimmigrant status under subparagraph (T) or (U) of section 1101(a)(15) of this title filed for an alien in the United States sets forth a prima facie case for approval, *the Secretary may grant the alien an administrative stay* of a final order of removal under section 1231(c)(2) of this title until

(A)    the application for nonimmigrant status under such subparagraph (T) or (U) is approved; or

(B)    there is a final administrative denial of the application for such nonimmigrant status after the exhaustion of administrative appeals.

(2)    the denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for a stay of removal, deferred action, or a continuance or abeyance of removal proceedings under any other provision of the immigration laws of the United States.

(3)    During any period in which the administrative stay of removal is in effect, the alien shall not be removed.

(4)    Nothing in this subsection may be construed to limit the authority of the Secretary of Homeland Security or the Attorney General to grant a stay of removal or deportation in any case not described in this subsection.

8 U.S.C. § 1227(d).

In the above situations, Congress has expressly given the DHS Secretary the discretion to grant or not grant an administrative stay of an order of removal.  Thus, when Congress intended to delegate to the Secretary the right to ignore what would otherwise be his statutory duty to enforce the removal laws, it has done so clearly.  *See, e.g.*, *F.C.C. v. NextWave Personal Communications, Inc.*, 537 U.S. 293, 302 (2003) (holding that when Congress has intended to create exceptions to bankruptcy law requirements, "it has done so clearly and expressly"); *Franklin Nat'l Bank v. New York*, 347 U.S. 373, 378 (1954) (finding no indication that Congress intended to make the phase of national banking at issue there subject to local restrictions, as it had done by express language in other instances); *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485 (1996) ("Congress . . . demonstrated in CERCLA that it knew how to provide for the

recovery of cleanup costs, and . . . the language used to define the remedies under RCRA does not provide that remedy.").

The DHS cannot reasonably claim that, under a general delegation to establish enforcement policies, it can establish a blanket policy of non-enforcement that also awards legal presence and benefits to otherwise removable aliens.  As a general matter of statutory interpretation, if Congress intended to confer that kind of discretion through the HSA Provision (and INA Provision) to apply to all of its mandates under these statutes, there would have been no need to expressly and specifically confer discretion in only a few provisions.  The canon of statutory construction warning against rendering superfluous any statutory language strongly supports this conclusion.  *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991).

Despite this, the Government argues that the INA Provision and the HSA Provision, combined with inherent executive discretion, permits the enactment of DAPA.  While the Government would not totally concede this point in oral argument, the logical end point of its argument is that the DHS, solely pursuant to its implied authority and general statutory enforcement authority, could have made DAPA applicable to all 11.3 million immigrants estimated to be in the country illegally.  This Court finds that the discretion given to the DHS Secretary is not unlimited.

Two points are obvious, and each pertain to one of the three statutes (5 U.S.C. § 701, 6 U.S.C. § 202, and 8 U.S.C. § 1103) at issue here.  The first pertains to prosecutorial discretion and the INA Provision and the HSA Provision.  The implementation of DAPA is clearly not "necessary" for Secretary Johnson to carry out his authority under either title of the federal code.

The Secretary of the DHS has the authority, as discussed above, to dictate DHS objectives and marshal its resources accordingly.  Just as this Court noted earlier when it refused the States standing to pursue certain damages, the same is true here.  The DAPA recipients have been present in the United States for at least five years; yet, the DHS has not sought them out and deported them. [75]

The Court notes that it might be a point of discussion as to what "legal presence" constitutes, but it cannot be questioned that DAPA awards some form of affirmative status, as evidenced by the DHS' own website.  It tells DACA recipients that:

> [Y]ou are considered to be lawfully present in the United States . . . and are not precluded from establishing domicile in the United States.  Apart from immigration laws, "lawful presence," "lawful status," and similar terms are used in various other federal and state laws.[76]

It is this affirmative action that takes Defendants' actions outside the realm of prosecutorial discretion, and it is this action that will cause the States the injury for which they have been conferred standing to seek redress.

---

[75] The implementation of DAPA is not a necessary adjunct for the operation of the DHS or for effecting its stated priorities.  In fact, one could argue given the resources it is using and manpower it is either hiring or shifting from other duties, that DAPA will actually hinder the operation of the DHS.  *See Executive Actions on Immigration*, Official Website of the Dept. of Homeland Security, http://www.uscis.gov/immigrationaction (last updated Jan. 30, 2015) ("USCIS will need to adjust its staffing to sufficiently address this new workload. Any new hiring will be funded through application fees rather than appropriated funds . . . . USCIS is working hard to build capacity and increase staffing to begin accepting requests and applications . . . ."). *See also* Doc. No. 64, Pl. Ex. 23 (Palinkas Dec.) ("USCIS has announced that it will create a new service center to process DAPA applications . . . . and it will be staffed by approximately 1,000 federal employees. Approximately 700 of them will be USCIS employees, and approximately 300 of them will be federal contractors.").  However, such considerations are beside the point for resolving the issue currently before the Court.

[76] *See Frequently Asked Questions, Consideration of Deferred Action for Childhood Arrivals Process*, Official Website of the DHS, http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions (last updated Feb. 11, 2015) (emphasis added).  *See also* Doc. No 38, Def. Ex. 6 at 11 (U.S. Citizenship and Immigration Services (USCIS), Deferred Action For Childhood Arrivals (DACA) Toolkit: Resources for Community Partners (2014)).  This response clearly demonstrates that the DHS knew by DACA (and now by DAPA) that by giving the recipients legal status, it was triggering obligations on the states as well as the federal government.

The second obvious point is that no statute gives the DHS the power it attempts to exercise.  As previously explained, Section 701(a)(2) of the APA forbids reviewability of acts "committed to agency discretion by law."  The Government has pointed this Court to no law that gives the DHS such wide-reaching discretion to turn 4.3 million individuals from one day being illegally in the country to the next day having lawful presence.

The DHS' job is to enforce the laws Congress passes and the President signs (or at least does not veto).  It has broad discretion to utilize when it is enforcing a law.  Nevertheless, no statute gives the DHS the discretion it is trying to exercise here.[77]  Thus, Defendants are without express authority to do so by law, especially since by Congressional Act, the DAPA recipients are illegally present in this country.  As stated before, most, if not all, fall into one of two categories.  They either illegally entered the country, or they entered legally and then overstayed their permission to stay.  Under current law, regardless of the genesis of their illegality, the Government is charged with the duty of removing them.  Subsection 1225(b)(1)(A) states unequivocally that the DHS "shall order the alien removed from the United States without further hearing or review . . . ."  Section 1227, the corresponding section, orders the same for aliens who entered legally, but who have violated their status.  While several generations of statutes have amended both the categorization and in some aspects the terminology, one thing has remained constant: the duty of the Federal Government is to effectuate the removal of illegal aliens.  The Supreme Court most recently affirmed this duty in *Arizona v. United States*: "ICE

---

[77] Indeed, no law enacted by Congress expressly provides for deferred action as a form of temporary relief.  Only regulations implemented by the Executive Branch provide for deferred action.  That is not to say that deferred action itself is necessarily unlawful—an issue on which this Court need not touch.

officers are responsible for the identification, apprehension, and removal of illegal aliens." 132 S. Ct. at 2500.

Notably, the applicable statutes use the imperative term "shall," not the permissive term "may."[78]   There are those who insist that such language imposes an absolute duty to initiate removal and no discretion is permitted.[79]   Others take the opposition position, interpreting "shall" to mean "may."[80]   This Court finds both positions to be wanting.   "Shall" indicates a congressional mandate that does not confer discretion—i.e., one which should be complied with to the extent possible and to the extent one's resources allow.[81]   It does not divest the Executive Branch of its inherent discretion to formulate the best means of achieving the objective, but it does deprive the Executive Branch of its ability to directly and substantially contravene statutory commands.   Congress' use of the term "may," on the other hand, indicates a Congressional grant of discretion to the Executive to either accept or not accept the goal.

In the instant case, the DHS is tasked with the duty of removing illegal aliens.   Congress has provided that it "shall" do this.   Nowhere has Congress given it the option to either deport these individuals or give them legal presence and work permits.   The DHS does have the

---

[78] The Court additionally notes that in 8 U.S.C. § 1227 ("Deportable Aliens") Congress uses both "may" and "shall" within the same section, which distinguishes the occasions in which the Secretary has discretion to award a stay from removal from when he is required to remove an alien.   For instance, in § 1227(a), an alien "shall" be removed upon order of the Secretary if he or she is in one of the classes of deportable aliens.   In § 1227(d), however, Congress provides circumstances when the Secretary "may" award an administrative stay of removal.   *See Lopez v. Davis*, 531 U.S. 230, 241 (2001) ("Congress' use of the permissive 'may' . . . contrasts with the legislators' use of the mandatory 'shall' in the very same section."); *United States ex rel. Siegel v. Thoman*, 156 U.S. 353, 359-60 (1895) ("[I]n the law to be construed here, it is evident that the word 'may' is used in special contradistinction to the word 'shall.'").

[79] See the plaintiffs' contentions as recounted in the court's Memorandum Opinion and Order dated April 23, 2013, in *Crane v. Napolitano*, No. 3:12-cv-03247-O, 2013 WL 1744422, at *5 (N.D. Tex. Apr. 23, 2013).

[80] *See, e.g., Matter of E-R-M & L-R-M*, 25 I&N Dec. 520 (BIA 2011).

[81] *See Lopez*, 531 U.S. at 241 (distinguishing between Congress' use of the "permissive may" and the "mandatory shall" and noting that "shall" "imposes discretionless obligations").

discretion and ability to determine *how* it will effectuate its statutory duty and use its resources where they will do the most to achieve the goals expressed by Congress. Thus, this Court rejects both extremes. The word "shall" is imperative and, regardless of whether or not it eliminates discretion, it certainly deprives the DHS of the right to do something that is clearly contrary to Congress' intent.

That being the case, this Court finds that the presumption of unreviewability, even if available here, is also rebuttable under the express theory recognized by the *Heckler* Court. In *Heckler*, the Supreme Court indicated that an agency's decision to "'consciously and expressly adopt[] a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities," would not warrant the presumption of unreviewability. 470 U.S. at 833 n.4 (citing *Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973)).[82]

Since *Heckler* and *Adams*, it has clearly been the law that "[r]eal or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty." *See Texas*, 106 F.3d at 667. That is not the situation here. This Court finds that DAPA does not simply constitute *inadequate* enforcement; it is an announced program of non-enforcement of the law that contradicts Congress' statutory goals. Unlike the Government's position in *Texas v.*

---

[82] In *Adams*, as noted above in the abdication discussion, the agency-defendants (including executive officials of Health, Education, and Welfare (HEW)) were sued for not exercising their duty to enforce Title VI of the Civil Rights Act because they had not been taking appropriate action to end segregation in schools receiving federal funds, as required by the Act. Defendants insisted that enforcement of Title VI was committed to agency discretion and thus that their actions were unreviewable. The Court first noted that the agency-discretion-exception in the APA is a narrow one, citing *Citizens to Preserve Overton Park*. It found that the statute provided "with precision the measures available to enforce" Title VI and thus the terms of the statute were "not so broad as to preclude judicial review." Like Defendants here, the defendants in *Adams* relied on cases in which courts declined to interfere with exercises of prosecutorial discretion. Rejecting defendants' reliance on those cases, the court emphasized: "[t]hose cases do not support a claim to absolute discretion and are, in any event, distinguishable from the case at bar." Unlike the cases cited, Title VI required the agency to enforce the Act and also set forth specific enforcement procedures. The INA removal provisions at issue here are no different and, like those at issue in *Adams*, are not so broad as to preclude review.

*U.S.*, the Government here is "doing nothing to enforce" the removal laws against a class of millions of individuals (and is additionally providing those individuals legal presence and benefits). *See id.* Furthermore, if implemented exactly like DACA (a conclusion this Court makes based upon the record), the Government has publicly declared that it will make no attempt to enforce the law against even those who are denied deferred action (absent extraordinary circumstances).[83] Theoretically, the remaining 6-7 million illegal immigrants (at least those who do not have criminal records or pose a threat to national security or public safety) could apply and, thus, fall into this category.[84] DAPA does not represent mere inadequacy; it is complete abdication.

The DHS does have discretion in the manner in which it chooses to fulfill the expressed will of Congress. It cannot, however, enact a program whereby it not only ignores the dictates of Congress, but actively acts to thwart them. As the Government's own legal memorandum—which purports to justify DAPA—sets out, "the Executive cannot, under the guise of exercising enforcement discretion, attempt to effectively rewrite the laws to match its policy preferences." *See* Doc. No. 38, Def. Ex. 2 at 6 (OLC Op.) (citing *Heckler*, 470 U.S. at 833 (an agency may not "disregard legislative direction in the statutory scheme that [it] administers")). The DHS Secretary is not just rewriting the laws; he is creating them from scratch.

---

[83] *See Frequently Asked Questions, Consideration of Deferred Action for Childhood Arrivals Process*, Official Website of the Dept. of Homeland Security, http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions#DACA%20process (last updated Dec. 4, 2014).

[84] *See also* Press Release, Remarks by the President on Immigration–Chicago, IL, The White House Office of the Press Secretary (Nov. 25, 2014) ("*[T]he way the change in the law works* is that we're reprioritizing how we enforce our immigration laws generally. So not everybody qualifies for being able to sign up and register, *but the change in priorities applies to everybody*."). (Court's emphasis). Thus, as under the DACA Directives, absent exceptional circumstances, the DHS is not going to remove those who do not qualify for DAPA either.

b.   Past Uses of Deferred Action

Defendants argue that historical precedent of Executive-granted deferred action justifies DAPA as a lawful exercise of discretion.  In response, the Plaintiffs go to great lengths to distinguish past deferred action programs from the current one, claiming each program in the past was substantially smaller in scope.  The Court need not decide the similarities or differences between this action and past ones, however, because past Executive practice does not bear directly on the legality of what is now before the Court.  Past action previously taken by the DHS does not make its current action lawful.  President Truman in *Youngstown Sheet & Tube Co. v. Sawyer*, similarly sought "color of legality from claimed executive precedents," arguing that, although Congress had not expressly authorized his action, "practice of prior Presidents has authorized it."  343 U.S. at 648.  The Supreme Court firmly rejected the President's argument finding that the claimed past executive actions could not "be regarded as even a precedent, much less an authority for the present [action]."  *Id.* at 649; *see also Professionals & Patients for Customized Care v. Shalala*, 56 F.3d 592, 596 n.27 (5th Cir. 1995) ("[T]he fact that we previously found another FDA compliance policy guide to be a policy statement [and thus not subject to the APA's formal procedures] is not dispositive whether CPG 7132.16 is a policy statement.").

The Supreme Court was again faced with the argument that action taken by the President was presumptively lawful based on the "longstanding practice" of the Executive in *Medellin*, 552 U.S. at 530-32.  There, the Federal Government cited cases that held, "if pervasive enough, history of congressional acquiescence can be treated as a gloss on Executive power vested in the President by § 1 of Art. II."  *Id.* at 531 (internal citations and quotations marks omitted).  The

Supreme Court, however, distinguished those cases as involving a narrow set of circumstances; they were "based on the view that 'a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned,' can 'raise a presumption that the [action] had been [taken] in pursuance of [Congress'] consent.'"  *Id.* (quoting *Dames & Moore v. Regan*, 453 U.S. 654 (1981)).  In these "narrowly" construed cases cited by the government there, the Court had upheld the (same) Executive action involved in each as "a particularly longstanding practice . . . . [g]iven the fact that the practice [went] back over 200 years, and [had] received congressional acquiescence throughout its history . . . ."  *Id.*  In *Medellin*, the Supreme Court clarified that, even in those cases, however, "the limitations on this source of executive power are clearly set forth and the Court has been careful to note that 'past practice does not, by itself, create power.'"  *Id.* at 531-32.  Thus, the *Medellin* Court found that President Bush's "Memorandum [was] not supported by a 'particularly longstanding practice' of congressional acquiescence . . ., but rather [was] what the United States itself [had] described as 'unprecedented action.'"  *Id.* at 532.  Here, DAPA, like President Bush's Memorandum/directive issued to state courts in *Medellin*, is not a "longstanding practice" and certainly cannot be characterized as "systematic" or "unbroken."  Most importantly, the Court is not bound by past practices (especially ones that are different in kind and scope)[85] when determining the legality of the current one.  Past practice by immigration officials does not create a source of power for the DHS to implement DAPA.  *See id.* at 531-32.  In sum, Defendants' attempt to find a source of discretion committed to it by law (for purposes of Section 701(a)(2)) through Congress's alleged

---

[85] A member of the President's own Office of Legal Counsel, in advising the President and the DHS on the legality of DAPA, admitted that the program was unprecedented in that it exceeded past programs "in size."  *See* Doc. No. 38, Def. Ex. 2 at 30 (OLC Memo).

acquiescence of its past, smaller-scaled grants of deferred action is unpersuasive, both factually and legally.

i.       Rulemaking Under the APA

Neither party appears to contest that, under the APA, the DAPA Directive is an agency "rule,"[86] and its issuance therefore represents "rulemaking."  *See* 5 U.S.C. § 551(4) ("'[R]ule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ."); *id.* § 551(5) ("'[R]ule making' means agency process for formulating, amending, or repealing a rule.").  Thus, it is clear that the rulemaking provisions of the APA apply here.  The question is whether Defendants are exempt from complying with specific procedural mandates within those rulemaking provisions.[87]

Section 553 of Title 5, United States Code, dictates the formal rulemaking procedures by which an agency must abide when promulgating a rule.  Under Section 553(b), "[g]eneral notice of proposed rule making shall be published in the Federal Register."  5 U.S.C. § 553(b).  The required notice must include "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved."

---

[86] While Defendants in one place assert in passing that the DAPA Directive is not a rule, it is in the context of distinguishing a substantive rule from a statement of policy.  [*See* Doc. No. 38 at 45 ("[T]he Deferred Action Guidance is not a rule, but a policy that 'supplements and amends . . . guidance' . . . . *Further*, unlike *substantive rules*, a general statement of policy is one 'that does not impose any rights or obligations' . . . .").].  There can be no doubt that the DAPA Directive is a rule within the meaning of § 551 of the APA.  Instead, the issue focuses on whether the rule is substantive, subjecting it to the formal procedural requirements for rule making, or whether it is exempt from those requirements.

[87] Interestingly, the legal memorandum from the President's Office of Legal Counsel, whose opinion the Defendants have cited to justify DAPA, in no way opines that the DHS may ignore the requirements of the APA.

*Id.* Upon providing the requisite notice, the agency must give interested parties the opportunity to participate and comment and the right to petition for or against the rule. *See id.* § 553(c)-(e).

There are two express exceptions to this notice-and-comment requirement, one of which Defendants argue applies in this case. Pursuant to Section 553(b)(3)(A), the APA's formal rulemaking procedures do not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." *Id.* § 553(b)(3)(A). On the other hand, if a rule is "substantive," this exception does not apply, and all notice-and-comment requirements "must be adhered to scrupulously." *Shalala*, 56 F.3d at 595. The Fifth Circuit has stressed that the "'APA's notice and comment exemptions must be narrowly construed.'" *Id.* (quoting *United States v. Picciotto*, 875 F.2d 345, 347 (D.C. Cir. 1989)).

The APA does not define "general statements of policy" or "substantive rules"; however, the case law in this area is fairly well-developed and provides helpful guidelines in characterizing a rule. With that said, the analysis substantially relies on the specific facts of a given case and, thus, the results are not always consistent. Here, Plaintiffs' procedural APA claim turns on whether the DAPA Directive is a substantive rule or a general statement of policy.[88] If it is substantive, it is "unlawful, for it was promulgated without the requisite notice-and-comment." *Id.*

This Circuit, following guidelines laid out in various cases by the D.C. Circuit, utilizes two criteria to distinguish substantive rules from nonsubstantive rules:

---

[88] Defendants specifically assert that the DAPA Directive is a general statement of policy. They do not argue that it is an "interpretative rule[]" or a "rule[] of agency organization, procedure, or practice" under § 553(b)(3)(A). Nor do they cite the other exception provided for in § 553(b)(3)(B) ("[W]hen the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."). Thus, this Court will confine its analysis to whether the Directive is a general statement of policy or substantive rule.

103

> First, courts have said that, unless a pronouncement acts prospectively, it is a binding norm. Thus ... a *statement of policy may not have a present effect*: "a 'general statement of policy' is one that does not impose any rights and obligations".... The second criterion is whether a purported policy statement genuinely leaves the agency and its decisionmakers free to exercise discretion.
>
> The court [in *Community Nutrition Institute v. Young*, 818 F.2d 943 (D.C. Cir. 1987)] further explained that "*binding effect,* not the timing, ... *is the essence of criterion one.*" In analyzing these criteria, we are to give some deference, "albeit 'not overwhelming,' " to the agency's characterization of its own rule.

*Id.* (emphasis added) (citations omitted).

The rule's effect on agency discretion is the primary determinant in characterizing a rule as substantive or nonsubstantive. *Id.* ("While mindful but suspicious of the agency's own characterization, we follow the D.C. Circuit's analysis . . ., focusing primarily on whether the rule has binding effect on agency discretion or severely restricts it.").  For instance, rules that award rights, impose obligations, or have other significant effects on private interests have been found to have a binding effect on agency discretion and are thus considered substantive. *Id.* n.19 (citing *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 908 (5th Cir. 1983)).  A rule, while not binding per se, is still considered substantive if it "severely restricts" agency discretion. Put another way, any rule that "narrowly constrict[s] the discretion of agency officials by largely determining the issue addressed" is substantive. *Id.* n.20.  Lastly, a substantive rule is generally characterized as one that "establishes a standard of conduct which has the force of law." *Id.* (quoting *Panhandle Producers & Royalty Owners Ass'n v. Econ. Regulatory Admin.*, 847 F.2d 1168, 1174 (5th Cir. 1988)).

In sharp contrast to a substantive rule, a general statement of policy does not establish a binding norm, nor is it "finally determinative of the issues or rights to which it is addressed." *Shalala*, 56 F.3d at 596.  A general statement of policy is best characterized as announcing the

agency's "tentative intentions for the future."  *Id.*  Thus, it cannot be applied or relied upon as law because a statement of policy merely proclaims what an agency seeks to establish as policy.[89]  *See id.*

### (1)   The Government's  Characterization of DAPA

Both parties[90] acknowledge that, in line with the Fifth Circuit's analysis above, the starting point in determining whether a rule is substantive or merely a statement of policy is the DHS' own characterization of the DAPA Directive.  Defendants insist that the Directive is "a policy that 'supplements and amends . . . guidance' for the use of deferred action."  [Doc. No. 38 at 45].   In their briefings before the Court, Defendants label DAPA "Deferred Action Guidance."[91]   The Court finds Defendants' labeling disingenuous and, as discussed below,

---

[89] The Fifth Circuit in *Panhandle Producers* further defined a general statement of policy:

> When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued. An agency cannot escape its responsibility to present evidence and reasoning supporting its substantive rules by announcing binding precedent in the form of a general statement of policy.

847 F.2d at 1175.

[90] Although Plaintiffs strenuously insist that Defendants "mislabel" the DAPA Directive and that an agency's characterization of its own rule is "self-aggrandizement," they apparently agree that the agency's characterization is at least relevant to the analysis.  *See* Doc. No. 64 at 38 (citing *Shalala*, 56 F.3d at 596, where the Fifth Circuit states that an agency's characterization of its own rule, while not conclusive, is the starting point to the analysis).

[91] The DHS may have a number of reasons for using the language and specific terms it uses in the DAPA Memorandum--whether to assure itself, the public and/or a future reviewing court that it need not comply with formal agency rulemaking procedures, or simply because it is standard language used in its other memoranda.  The Court, however, finds substance to be more important than form in this case.  The DHS' actions prove more instructive than its labels.

Moreover, the Court notes that it is not bound by any decision a different court may have reached regarding the characterization of a *prior* DHS/INS memorandum (e.g., the Ninth Circuit's opposing holdings in *Nicholas v. INS*, 590 F.2d 802 (9th Cir. 1979) and *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006 (9th Cir. 1987)).  For one, past DHS/INS memoranda, including the operating instructions reviewed in the 1970s and 80s by the Ninth Circuit, have been expressly superseded by subsequent DHS memoranda or instructions.  Further, both Ninth Circuit opinions (each dealing with a different INS memorandum) support this Court's findings on the characterization of DAPA.  Finally, as the Fifth Circuit has held, a prior court ruling that characterizes an agency's rule as a general statement of policy

contrary to the substance of DAPA.  Although Defendants refer to DAPA as a "guidance" in their briefings and in the DAPA Memorandum, elsewhere, it is given contradictory labels.  For instance, on the official website of the DHS, DAPA is referred to as "a new Deferred Action for Parents of Americans and Lawful Permanent Residents *program*."[92]

The DHS website does use the term "guidelines" in describing DAPA's criteria; however, this is only in the context of a "list" of guidelines that candidates must satisfy in order to qualify for DAPA (or the newly expanded DACA).[93]  Thus, not only does this usage of the term "guidelines" not refer to the DAPA program itself, but it is also a misnomer because these "guidelines" are in fact requirements to be accepted under these programs.  Throughout its description of DAPA, the DHS website also refers to the various "executive actions" taken in conjunction with the implementation of the DAPA Directive as "initiatives."  *Id.* ("On November 20, 2014, the President announced a series of executive actions . . . . These initiatives include . . . .").  For example, the site states that "USCIS and other agencies and offices are responsible for implementing these initiatives as soon as possible."  *Id.*  The term "initiative" is defined in Black's Law Dictionary as:

---

[92] *Executive Actions on Immigration*, Official Website of the Dept. of Homeland Security, http://www.uscis.gov/immigrationaction (last updated Jan. 30, 2015) (emphasis added); *see also*, Doc. No. 1, Pl. Ex. A ("In order to further effectuate this program, I hereby direct USCIS to expand DACA as follows . . . .").

[93] *See, e.g.*, *id.* (listing out the new DACA criteria and including as the last criterion, "meet all the other DACA guidelines").

is not dispositive in determining the characterization of that agency's current rule.  *See Shalala*, 56 F.3d at 596 n.27 ("[T]he fact that we previously found another FDA compliance policy guide to be a policy statement is not dispositive whether [the current FDA compliance policy guide] is a policy statement.").  This rule would be especially applicable to a directive that changes the current law.

> An electoral process by which a percentage of voters can *propose legislation* and compel a vote on it by the legislature or by the full electorate. Recognized in some state constitutions, the initiative is one of the few methods of direct democracy in an otherwise representative system.

*Black's Law Dictionary* (9th ed. 2009) (emphasis added) (the sole definition offered for "initiative").   An "initiative," by definition, is a legislative process—the very thing in which Defendants insist they have not partaken.

What is perhaps most perplexing about the Defendants' claim that DAPA is merely "guidance" is the President's own labeling of the program.   In formally announcing DAPA to the nation for the first time, President Obama stated, "I just took an action to change the law."[94]  He then made a "deal" with potential candidates of DAPA: "if you have children who are American citizens . . . if you've taken responsibility, you've registered, undergone a background check, you're paying taxes, you've been here for five years, you've got roots in the community – *you're not going to be deported . . . . If you meet the criteria, you can come out of the shadows . . . .*"[95]

While the DHS' characterization of DAPA is taken into consideration by this Court in its analysis, the "label that the . . . agency puts upon its given exercise of administrative power is not . . . conclusive; rather, it is what the agency does in fact."  *Shalala*, 56 F.3d at 596 (internal quotation marks omitted) (citing *Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th

---

[94] Press Release, Remarks by the President on Immigration – Chicago, IL, The White House Office of the Press Secretary (Nov. 25, 2014) ("But what you're not paying attention to is the fact that I just took action to change the law . . . . [t]he way the change in the law works is that we're reprioritizing how we enforce our immigration laws generally.  So not everybody qualifies for being able to sign up and register, but the change in priorities applies to everybody.").

[95] President Obama, Remarks in Nevada on Immigration (Nov. 20, 2014) (emphasis added).  (Court's emphasis). *See also* Doc. No. 64, Pl. Ex. 26 (Press Release, Remarks by the President in Immigration Town Hall – Nashville, Tennessee, The White House Office of the Press Secretary (Dec. 9, 2014) ("What we're also saying, though, is that for those who have American children or children who are legal permanent residents, that you can actually register and submit yourself to a criminal background check, pay any back taxes and commit to paying future taxes*, and if you do that, you'll actually get a piece of paper that gives you an assurance that you can work and live here without fear of deportation.*") (emphasis added)).

Cir. 1979)).  Thus, the Court turns its attention to the primary focus of its analysis: the substance

of DAPA.  Nevertheless, the President's description of the DHS Directive is that it changes the

law.

(2)      Binding Effect

The Fifth Circuit in *Shalala* propounded as a "touchstone of a substantive rule" the rule's

binding effect.  The question is whether the rule establishes a "binding norm."  *Id.* at 596.  The

President's pronouncement quoted above clearly sets out that the criteria are binding norms.

Quoting the Eleventh Circuit, the *Shalala* Court emphasized:

> The key inquiry ... is the extent to which the challenged policy leaves the agency
> free to exercise its discretion to follow or not to follow that general policy in an
> individual case, or on the other hand, whether the policy *so fills out the statutory
> scheme that upon application one need only determine whether a given case is
> within the rule's criteria.* As long as the agency remains free to consider the
> individual facts in the various cases that arise, then the agency action in question
> has not established a binding norm.

*Id.* at 596-97 (quoting *Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1377 (11th Cir.

1983)).  In this case, upon application, USCIS personnel working in service centers (established

for the purpose of receiving DACA and DAPA applications), need only determine whether a

case is within the set-criteria.  If not, applicants are immediately denied.

Despite the DAPA memorandum's use of phrases such as "case-by-case basis" and

"discretion," it is clear from the record that the only discretion that has been or will be exercised

is that already exercised by Secretary Johnson in enacting the DAPA program and establishing

the criteria therein.  That criteria is binding.  At a minimum, the memorandum "severely

restricts" any discretion that Defendants argue exists.  It ensures that "officers will be provided

with *specific* eligibility criteria for deferred action."  Doc. No. 1, Pl. Ex. A at 5 (emphasis added).

108

Indeed, the "Operating Procedures" for implementation of DACA[96] contains nearly 150 pages[97] of specific instructions for granting or denying deferred action to applicants.[98]   Denials are recorded in a "check the box" standardized form, for which USCIS personnel are provided templates.[99]   Certain denials of DAPA must be sent to a supervisor for approval before issuing the denial.[100]   Further, there is no option for granting DAPA to an individual who does not meet each criterion.[101]   With that criteria set, from the President down to the individual USCIS employees actually processing the applications, discretion is virtually extinguished.

---

[96] There is no reason to believe that DAPA will be implemented any differently than DACA.  In fact, there is every reason to believe it will be implemented exactly the same way.  The DAPA Memorandum in several places compares the procedure to be taken for DAPA to that of DACA. [*See, e.g.*, Doc. No. 1, Ex. 1 at 5 ("As with DACA, the above criteria are to be considered for all individuals encountered . . . .")].

[97] The Court was not provided with the complete Instructions and thus cannot provide an accurate page number.

[98] *See* Doc. No. 64, Ex. 10 (National Standard Operating Procedures (SOP), Deferred Action for Childhood Arrivals (DACA), (Form I-821D and Form I-765)).

[99] *See id.*  Defendants assert that "even though standardized forms are used to record decisions, those decisions are to be made on a case-by-case basis."  [Doc. No. 130 at 34].  For one, the Court is unaware of a "form" or other process for recording any discretionary denial based on factors other than the set-criteria (to the extent that such a denial is even genuinely available to an officer).  Further, the means for making such discretionary decisions are limited considering the fact that applications are handled in a service center and decisions regarding deferred action are no longer made in field offices where officers may interview the immigrant.

[100] *See id.* at 96.

[101] Defendants argue that officers retain the ability to exercise discretion on an individualized basis in reviewing DAPA applications as evidenced by the last factor listed in DAPA's criteria ("present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate").  Evidence of DACA's approval rate, however, persuades the Court that this "factor" is merely pretext.  As previously noted, there is every indication, including express statements made by the Government, that DAPA will be implemented in the same fashion as DACA. No DACA application that has met the criteria has been denied based on an exercise of individualized discretion.  Whether Plaintiffs' or Defendants' calculations are correct, it is clear that only 1-6% of applications have been denied at all, and all were denied for failure to meet the criteria (or "rejected" for technical filing errors, errors in filling out the form or lying on the form, and failures to pay fees), or for fraud.  *See, e.g.*, Doc. No. 64, Pl. Ex. 29 at App. p. 0978; *id.* Pl. Ex. 23 at 3 (Palinkas Dec.) (citing a 99.5% approval rate for all DACA applications from USCIS reports).  Other sources peg the acceptance rate at approximately 95%, but, again, there were apparently no denials for those who met the criteria.

     The Court in oral argument specifically asked for evidence of individuals who had been denied for reasons other than not meeting the criteria or technical errors with the form and/or filing.  Except for fraud, which always disqualifies someone from any program, the Government did not provide that evidence.  Defendants claim that some

In stark contrast to a policy statement that "does not impose any rights and obligations" and that "*genuinely* leaves the agency and its decisionmakers free to exercise discretion," the DAPA Memorandum confers the right to be legally present in the United States and enables its beneficiaries to receive other benefits as laid out above.  The Court finds that DAPA's disclaimer that the "memorandum confers no substantive right, immigration status, or pathway to citizenship" may make these rights revocable, but not less valuable.  While DAPA does not provide legal permanent residency, it certainly provides a legal benefit in the form of legal presence (plus all that it entails)—a benefit not otherwise available in immigration laws.  The DAPA Memorandum additionally imposes specific, detailed and immediate obligations upon DHS personnel—both in its substantive instructions and in the manner in which those instructions are carried out.  Nothing about DAPA "*genuinely* leaves the agency and its [employees] free to exercise discretion."  In this case, actions speak louder than words.

(3)    Substantive Change in Existing Law

Another consideration in determining a rule's substantive character is whether it is essentially a "legislative rule."  A rule is "legislative" if it "supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy."  *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) (citations omitted).

---

requests have been denied for public safety reasons (e.g. where the requestor was suspected of gang-related activity or had a series of arrests), or where the requestor had made false prior claims of U.S. citizenship. Public safety threats and fraud are specifically listed in the Operation Instructions as reasons to deny relief, however.  More importantly, one of the criterion for DAPA is that the individual not be an enforcement priority as reflected in another November 20, 2014 Memorandum ("Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants").  That DHS memorandum lists a threat to public safety as a reason to prioritize an individual for removal in the category, "Priority 1" (the highest priority group).  *See* Doc. No. 38, Def. Ex. 5 at 5 (Nov. 20, 2014, Memorandum, "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants").

The DAPA program clearly represents a substantive change in immigration policy.  It is a program instituted to give a certain, newly-adopted class of 4.3 million illegal immigrants not only "legal presence" in the United States, but also the right to work legally and the right to receive a myriad of governmental benefits to which they would not otherwise be entitled.[102]  It does more than "supplement" the statute; if anything, it contradicts the INA.  It is, in effect, a new law.  DAPA turns its beneficiaries' illegal status (whether resulting from an illegal entry or from illegally overstaying a lawful entry) into a legal presence.  It represents a massive change in immigration practice, and will have a significant effect on, not only illegally-present immigrants, but also the nation's entire immigration scheme and the states who must bear the lion's share of its consequences.  *See Shalala*, 56 F.3d at 597 (concluding the agency's policy guidance was not a binding norm largely because it did "*not represent a change in [agency] policy* and *[did] not have a significant effect* on [the subjects regulated]").   In the instant case, the President, himself, described it as a change.

Far from being mere advice or guidance, this Court finds that DAPA confers benefits and imposes discrete obligations (based on detailed criteria) upon those charged with enforcing it.  Most importantly, it "severely restricts" agency discretion.[103]  *See Community Nutrition Inst. v.*

---

[102] One could argue that it also benefits the DHS as it decides who to remove and where to concentrate their efforts, but the DHS did not need DAPA to do this.  It could have done this merely by concentrating on its other prosecutorial priorities.  Instead, it has created an entirely new bureaucracy just to handle DAPA applications.

[103] This is further evidenced by the "plain language" of the DAPA Directive.  *See Shalala*, 56 F.3d at 597 (considering the policy's plain language in determining its binding effect).  Without detailing every use of a mandatory term, instruction, or command throughout Secretary Johnson's memorandum, the Court points to a few examples:

> (1) When detailing DAPA and its criteria, the Secretary states: "I hereby direct USCIS to establish a process . . . . Applicants must file the requisite applications for deferred action pursuant to the new criteria described above.  Applicants must also submit biometrics . . . . Each person who applies . . . shall also be eligible to apply for work authorization . . . ."

*Young*, 818 F.2d 943, 948 (D.C. Cir. 1987) ("[C]abining of an agency's prosecutorial discretion can in fact rise to the level of a substantive . . . rule.").

In sum, this Court finds, both factually based upon the record and the applicable law, that DAPA is a "legislative" or "substantive" rule that should have undergone the notice-and-comment rule making procedure mandated by 5 U.S.C. § 553. The DHS was not given any "discretion by law" to give 4.3 million removable aliens what the DHS itself labels as "legal presence." *See* 5 U.S.C. § 701(a)(2). In fact the law *mandates* that these illegally-present individuals be removed.[104] The DHS has adopted a new rule that substantially changes both the status and employability of millions. These changes go beyond mere enforcement or even non-enforcement of this nation's immigration scheme. It inflicts major costs on both the states and federal government. Such changes, if legal, at least require compliance with the APA.[105] The Court therefore finds that, not only is DAPA reviewable, but that its adoption has violated the procedural requirements of the APA. Therefore, this Court hereby holds for purposes of the temporary injunction that the implementation of DAPA violates the APA's procedural requirements and the States have clearly proven a likelihood of success on the merits.

---

(2) When explaining the expansion of DACA, the Secretary states: "I hereby direct USCIS to expand DACA as follows . . . DACA will apply . . . The current age restriction . . . will no longer apply . . . . The period for which DACA and the accompanying employment authorization is granted will be extended to three-year increments, rather than two-year increments. This change shall apply to all first-time applicants . . . . USCIS should issue all work authorization documents valid for three years . . . ."

[104] The Court again emphasizes that it does not find the removal provisions of the INA as depriving the Executive Branch from exercising the inherent prosecutorial discretion it possesses in enforcing the laws under which it is charged. Whether or not Defendants may exercise prosecutorial discretion by merely not removing people in individual cases is not before this Court. It is clear, however, that no *statutory* law (i.e., no express Congressional authorization) related to the removal of aliens confers upon the Executive Branch the discretion to do the opposite.

[105] This Memorandum Opinion and Order does not rule on the substantive merits of DAPA's legality.

2.      Preliminary Injunction Factor Two:  Irreparable Harm

In addition to showing a likelihood of success on the merits of at least one of their claims, the Plaintiff States must also demonstrate a "likelihood of substantial and immediate irreparable injury" if the injunction is not granted, and the "inadequacy of remedies at law."  *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974).

It is clear that, to satisfy this factor, speculative injuries are not enough; "there must be more than an unfounded fear on the part of [Plaintiffs]."  Wright & Miller § 2948.1.  Thus, courts will not issue a preliminary injunction "simply to prevent the possibility of some remote future injury."  *Id.*  Instead, the Plaintiff States must show a "presently existing actual threat."  *Id.*; *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("We agree . . . that the Ninth Circuit's 'possibility' standard is too lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction.") (internal citations omitted).  The Plaintiffs' injury need not have already been inflicted or *certain* to occur; a strong threat of irreparable injury before a trial on the merits is adequate for a preliminary injunction to issue.  *See, e.g.*, Wright & Miller § 2948.1.

Plaintiffs allege that they will suffer two "categories" of irreparable injuries if this Court declines to grant a preliminary injunction.  First, according to Plaintiffs, the DAPA Directive will cause a humanitarian crisis along the southern border of Texas and elsewhere, similar to the surge of undocumented aliens in the summer of 2014.  *See* Doc. No. 5 at 25-26.  The State of Texas specifically points to the economic harm it experienced in the last "wave" of illegal immigration allegedly caused by DACA.  *See id.* at 26 ("Texas paid almost $40 million for Operation Strong Safety to clean up the consequences of Defendants' actions.").   Texas

additionally complains of the millions of dollars it must spend each year in providing uncompensated healthcare for these increasing numbers of undocumented immigrants.

The Court finds primarily, for the reasons stated above, this claimed injury to be exactly the type of "possible remote future injury" that will not support a preliminary injunction. For the same reasons the Court denied standing to Plaintiffs on their asserted injury that DAPA will cause a wave of immigration thereby exacerbating their economic injuries, the Court does not find this category of alleged irreparable harm to be immediate, direct, or a presently-existing, actual threat that warrants a preliminary injunction. *See, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (noting that standing considerations "obviously shade into those determining whether the complaint states a sound basis for [injunctive] relief," and that, even if a complaint presents an existing case or controversy under Article III, it may not also state an adequate basis for injunctive relief). The general harms associated with illegal immigration, that unfortunately fall on the States (some of whom must bear a disproportionate brunt of this harm), are harms that may be exacerbated by DAPA, but they are not immediately caused by it.[106] Whether or not Defendants' implementation of DACA in 2012 actually contributed to the flood of illegal immigration experienced by this country in 2014—an issue not directly before this Court— injuries associated with any future wave of illegal immigration that may allegedly stem from DAPA are neither immediate nor direct. *Lyons*, 461 U.S. at 102 (citing *O'Shea*, 414 U.S. at 496, in which the Court denied a preliminary injunction because the "prospect of future injury rested

---

[106] Indeed, Chief Kevin Oaks, Chief of the Rio Grande Valley Sector of U.S. Border Patrol, testified before this Court in Cause No. B-14-119 that in his experience, it has been traditionally true that when an administration talks about amnesty, or some other immigration relief publicly, it increases the flow across the border and has an adverse effect on enforcement operations. As of the time he testified, on October 29, 2014, he stated that the DHS was preparing for another surge of immigrants given the talk of a change in immigration policy. *See* Test. of Kevin Oaks, Cause No. B-14-119 (S.F. 172-176).

'on the likelihood that [plaintiffs] [would] again be arrested for and charged with violations'" and be subjected to proceedings; thus, the "threat to the plaintiff was not sufficiently real and immediate to show an existing controversy simply because they anticipate" the same injury occurring in the future).  The law is clear that "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief."  *Id.*  Consequently, this Court will exclude Plaintiffs' first category of injuries from the Court's determination of irreparable injury.

Plaintiffs additionally allege that legalizing the presence of millions of people is a "virtually irreversible" action once taken.  *See* Doc. No. 5 at 25-28.  The Court agrees.  First, there are millions of dollars at stake in the form of unrecoverable costs to the States if DAPA is implemented and later found unlawful in terms of infrastructure and personnel to handle the influx of applications.  Doc. No. 64, Pl. Ex. 24.  The direct costs to the States for providing licenses would be unrecoverable if DAPA was ultimately renounced.  Further, and perhaps most importantly, the Federal Government is the sole authority for determining immigrants' lawful status and presence (particularly in light of the Supreme Court's holding in *Arizona v. United States*, 132 S. Ct. 2492 (2012)) and, therefore, the States are forced to rely on the Defendants "to faithfully determine an immigrant's status."  Once Defendants make such determinations, the States accurately allege that it will be difficult or even impossible for anyone to "unscramble the egg."  *Id.*  Specifically, in Texas and Wisconsin, as this Court has already determined, through

benefits conferred by DAPA, recipients are qualified for driver's licenses, in addition to a host of other benefits.[107]

The Court agrees that, without a preliminary injunction, any subsequent ruling that finds DAPA unlawful after it is implemented would result in the States facing the substantially difficult—if not impossible—task of retracting any benefits or licenses already provided to DAPA beneficiaries. This genie would be impossible to put back into the bottle. The Supreme Court has found irreparable injury in the form of a payment of an allegedly unconstitutional tax that could not be recovered if the law at issue was ultimately found unlawful. *See Ohio Oil Co. v. Conway*, 279 U.S. 813 (1929). There, the Court held that "[w]here the questions presented by an application for an interlocutory injunction are grave, and the injury to the moving party will be certain and irreparable, if the application be denied and the final decree be in his favor, while if the injunction be granted and the injury to the opposing party, even if the final decree be in his favor, will be inconsiderable . . . the injunction usually will be granted." *Id.* at 814.

Similarly, here, any injury to Defendants, even if DAPA is ultimately found lawful, will be insubstantial in comparison to Plaintiffs' injuries. A delay of DAPA's implementation poses no threat of immediate harm to Defendants.[108]  The situation is not such that individuals are currently considered "legally present" and an injunction would remove that benefit; nor are potential beneficiaries of DAPA—who are under existing law illegally present—entitled to the benefit of legal presence such that this Court's ruling would interfere with individual rights.

---

[107] For example, in Texas, these individuals, according to Plaintiffs, would also qualify for unemployment benefits (citing Tex. Lab. Code § 207.043(a)(2)); alcoholic beverage licenses (citing 16 Tex. Admin. Code § 33.10); licensure as private security officers (citing 37 Tex. Admin. Code § 35.21); and licensure as attorneys (citing Tex. Rules Govern. Bar Adm'n, R. II(a)(5)(d)).

[108] To the contrary, if individuals begin receiving benefits under DAPA but DAPA is later declared unlawful, Defendants, just like the States, would suffer irreparable injuries.

Preliminarily enjoining DAPA's implementation would in this case merely preserve the status quo that has always existed.

> According to the authors of Wright & Miller's Federal Practice and Procedure:
>
> Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted, the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.  Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief. *Therefore, if a trial on the merits can be conducted before the injury would occur, there is no need for interlocutory relief.*  In a similar vein, a preliminary injunction usually will be denied if it appears that the applicant has an adequate alternate remedy in the form of money damages or other relief.

Wright & Miller § 2948.1 (emphasis added).

Here, the Government has required that USCIS begin accepting applications for deferred action under the new DACA criteria "no later than ninety days from the date of" the announcement of the Directive.  Doc. No. 1, Pl. Ex. A.  The Directive was announced on November 20, 2014.  Thus, by the terms of the Directive, USCIS will begin accepting applications no later than February 20, 2015.  Further, as already mentioned, the DHS' website provides February 18, 2015 as the date it will begin accepting applications under DACA's new criteria, and mid-to-late May for DAPA applications.  The implementation of DAPA is therefore underway.  Due to these time constraints, the Court finds that a trial on the merits cannot be conducted before the process of granting deferred action under the DAPA Directive begins.  Without a preliminary injunction preserving the status quo, the Court concludes that Plaintiffs will suffer irreparable harm in this case.

3.      Preliminary Injunction Factors Three and Four:  Balancing
        Hardship to Parties and the Public Interest

Before the issuance of an injunction, the law requires that courts "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief."  *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987).  Thus, in addition to demonstrating threatened irreparable harm, the Plaintiffs must show that they would suffer more harm without the injunction than would the Defendants if it were granted.   The award of preliminary relief is never "strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff," but is rather "a matter of sound judicial discretion" and careful balancing of the interests of—and possible injuries to—the respective parties.  *Yakus v. United States*, 321 U.S. 414, 440 (1944).  If there is reason to believe that an injunction issued prior to a trial on the merits would be burdensome, the balance tips in favor of denying preliminary relief.  *See Winter*, 555 U.S. at 27 ("The policy against the imposition of judicial restraints prior to an adjudication of the merits becomes more significant when there is reason to believe that the decree will be burdensome.") (quoting Wright & Miller § 2948.2).

The final factor in the preliminary injunction analysis focuses on policy considerations. Plaintiffs have the burden to show that if granted, a preliminary injunction would not be adverse to public interest.  *Star Satellite, Inc. v. Biloxi*, 779 F.2d 1074, 1079 (5th Cir. 1986).  If no public interest supports granting preliminary relief, such relief should ordinarily be denied, "even if the public interest would not be harmed by one."   Wright & Miller § 2948.4.  "Consequently, an evaluation of the public interest should be given considerable weight in determining whether a motion for a preliminary injunction should be granted."  *Id.*

Here, the Plaintiffs seek to preserve the status quo by enjoining Defendants from acting. The Court is not asked to order Defendants to take any affirmative action. *See* Wright & Miller § 2948.2 (noting that one significant factor considered by courts when balancing the hardships is whether a mandatory or prohibitory injunction is sought—the latter being substantially less burdensome to the defendant). Further, the Court's findings at the preliminary injunction stage in this case do not grant Plaintiffs all of the relief to which they would be entitled if successful at trial. *See id.* (explaining that if "a preliminary injunction would give plaintiff all or most of the relief to which the plaintiff would be entitled if successful at trial," courts are less likely to grant the injunction). Indeed, as detailed below, the Court is ruling on the likelihood of success for purposes of preliminary relief on only one of the three claims (and that one being a procedural, not a substantive claim) brought by Plaintiffs. Thus, neither of the usual concerns in considering potential burdens on a defendant in granting a preliminary injunction is applicable here. Preliminarily enjoining Defendants from carrying out the DAPA program would certainly not be "excessively burdensome" on Defendants. *See id.*

Additional considerations suggest that the Government would not be harmed at all by the issuance of a temporary injunction before a trial is held on the merits. The DHS may continue to prosecute or not prosecute these illegally-present individuals, as current laws dictate. This has been the status quo for *at least* the last five years[109] and there is little-to-no basis to conclude that harm will fall upon the Defendants if it is temporarily prohibited from carrying out the DAPA program. If a preliminary injunction is issued and the Government ultimately prevails at a trial on the merits, it will not be harmed by the delay; if the Government ultimately loses at trial, the

---

[109] Obviously, this has been the status quo for at least the last five years with respect to the specific individuals eligible for DAPA. Given that DAPA is a program that has never before been in effect, one could also conclude that enjoining its implementation would preserve the status quo that has *always* existed.

States avoid the harm that will be done by the issuance of SAVE-compliant IDs for millions of individuals who would not otherwise be eligible.

If the preliminary injunction is denied, Plaintiffs will bear the costs of issuing licenses and other benefits once DAPA beneficiaries—armed with Social Security cards and employment authorization documents—seek those benefits.  Further, as already noted, once these services are provided, there will be no effective way of putting the toothpaste back in the tube should Plaintiffs ultimately prevail on the merits.  Thus, between the actual parties, it is clear where the equities lie—in favor of granting the preliminary injunction.

This is not the end of the inquiry; in fact, in this case, it is really the tip of the iceberg.  Obviously, this injunction (as long as it is in place) will prevent the immediate provision of benefits and privileges to millions of individuals who might otherwise be eligible for them in the next several months under DAPA and the extended-DACA.  The Court notes that there is no indication that these individuals will otherwise be removed or prosecuted.  They have been here for the last five years and, given the humanitarian concerns expressed by Secretary Johnson, there is no reason to believe they will be removed now.  On the other hand, if the Court denies the injunction and these individuals accept Secretary Johnson's invitation to come out of the shadows, there may be dire consequences for them if DAPA is later found to be illegal or unconstitutional.  The DHS—whether under this administration or the next—will then have all pertinent identifying information for these immigrants and could deport them.

For the members of the public who are citizens or otherwise in the country legally, their range of interests may vary substantially: from an avid interest in the DAPA program's consequences to complete disinterest.  This Court finds that, directly interested or not, the public

interest factor that weighs the heaviest is ensuring that actions of the Executive Branch (and within it, the DHS—one of the nation's most important law enforcement agencies) comply with this country's laws and its Constitution.  At a minimum, compliance with the notice-and-comment procedures of the APA will allow those interested to express their views and have them considered.

Consequently, the Court finds, when taking into consideration the interests of all concerned, the equities strongly favor the issuance of an injunction to preserve the status quo.  It is far preferable to have the legality of these actions determined before the fates of over four million individuals are decided.  An injunction is the only way to accomplish that goal.

The Court finds that Plaintiffs' injuries cannot be redressed through a judicial remedy after a hearing on the merits and thus that a preliminary injunction is necessary to preserve the status quo in this case.  While recognizing that a preliminary injunction is sometimes characterized as a "drastic" remedy, the Court finds that the judicial process would be rendered futile in this case if the Court denied preliminary relief and proceeded to a trial on the merits.  If the circumstances underlying this case do not qualify for preliminary relief to preserve the status quo, this Court finds it hard to imagine what case would.

### C.    Remaining Claims

In this order, the Court is specifically not addressing Plaintiffs' likelihood of success on their *substantive* APA claim or their constitutional claims under the Take Care Clause/separation of powers doctrine.  Judging the constitutionality of action taken by a coequal branch of government is a "grave[]" and "delicate duty" that the federal judiciary is called on to perform. *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 204 (2009) (citations omitted).

The Court is mindful of its constitutional role to ensure that the powers of each branch are checked and balanced; nevertheless, if there is a non-constitutional ground upon which to adjudge the case, it is a "well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question."   *Id.* at 205 (quoting *Escambia Cnty. v. McMillan*, 466 U.S. 48, 51 (1984) (*per curiam*)).   In this case, the Plaintiffs brought substantive and procedural claims under the APA in addition to their constitutional claim to challenge the Defendants' actions.   All three claims are directed at the same Defendants and challenge the same executive action.   Thus, the Court need only find a likelihood of success on one of these claims in order to grant the requested relief.   This "constitutional avoidance" principle is particularly compelling in the preliminary injunction context because the Court is not abstaining from considering the merits of Plaintiffs' constitutional claim altogether.   It is only declining to address it now.[110]

Consequently, despite the fact that this ruling may imply that the Court finds differing degrees of merit as to the remaining claims, it is specifically withholding a ruling upon those issues until there is further development of the record.   As stated above, preliminary injunction requests are by necessity the product of a less formal and less complete presentation.   This Court, given the importance of these issues to millions of individuals—indeed, in the abstract, to virtually every person in the United States—and given the serious constitutional issues at stake,

---

[110] Given the dearth of cases in which the Take Care Clause has been pursued as a cause of action rather than asserted as an affirmative defense (and indeed the dearth of cases discussing the Take Care Clause at all), a complete record would no doubt be valuable for this Court to decide these unique claims.   It also believes that should the Government comply with the procedural aspects of the APA, that process may result in the availability of additional information for this Court to have in order for it to consider the substantive APA claim under 5 U.S.C. § 706.

finds it to be in the interest of justice to rule after each side has had an opportunity to make a complete presentation.

VI.     **CONCLUSION**

      This Court, for the reasons discussed above, hereby grants the Plaintiff States' request for a preliminary injunction.  It hereby finds that at least Texas has satisfied the necessary standing requirements that the Defendants have clearly legislated a substantive rule without complying with the procedural requirements under the Administration Procedure Act.  The Injunction is contained in a separate order.  Nonetheless, for the sake of clarity, this temporary injunction enjoins the implementation of the DAPA program that awards legal presence and additional benefits to the four million or more individuals potentially covered by the DAPA Memorandum and to the three expansions/additions to the DACA program also contained in the same DAPA Memorandum.[111]  It does not enjoin or impair the Secretary's ability to marshal his assets or deploy the resources of the DHS.  It does not enjoin the Secretary's ability to set priorities for the DHS.  It does not enjoin the previously instituted 2012 DACA program except for the expansions created in the November 20, 2014 DAPA Memorandum.


      Signed this 16th day of February, 2015.

                                            Andrew S. Hanen
                                            United States District Judge

---

[111] While this Court's opinion concentrates on the DAPA program, the same reasoning applies, and the facts and the law compel the same result, to the expansions of DACA contained in the DAPA Directive.