EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

|  |  |
|---|---|
| STATE OF TEXAS, *et al.* )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>UNITED STATES OF AMERICA, *et al.* )<br>)<br>Defendants. )<br>) | No. 1:14-cv-254 |

## DECLARATION OF SARAH R. SALDAÑA

I, Sarah R. Saldaña, hereby make the following declaration with respect to the above-captioned matter.

1. I am the Director of U.S. Immigration and Customs Enforcement (ICE), a component of the Department of Homeland Security (DHS or Department). I have held this position since December 23, 2014. My current work address is: 500 12th Street Southwest, Washington, D.C. I am a graduate of Texas A&I University, currently Texas A&M University, and hold a Bachelor of Science degree. I also hold a Juris Doctorate from Southern Methodist University.

2. Before becoming ICE Director, I served as United States Attorney for the Northern District of Texas for more than three years. I was previously an Assistant United States Attorney in the Northern District of Texas and a partner in the trial department of a law firm in Dallas, Texas.

3. In my current position as ICE Director, I lead the largest investigative agency within DHS, overseeing nearly 20,000 employees in 400 offices across the country.

1

4. I make this declaration on the basis of my personal knowledge and information made available to me in the course of my official duties.

**The DHS and ICE Immigration Enforcement Mission**

5. ICE is one of the three DHS components with responsibilities over the administration and enforcement of the nation's immigration laws. The other two agencies are: U.S. Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services (USCIS). ICE's primary mission is to promote homeland security and public safety through the criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration. In working to achieve its mission, ICE coordinates closely with CBP, which includes the Offices of Border Patrol, Field Operations, and Air and Marine Operations, and employs the uniformed corps of officers and agents charged with patrolling our nation's ports and borders. ICE also partners with USCIS immigration adjudicators who decide eligibility for immigration benefits and certain other forms of immigration relief.

6. Within ICE, the Office of Enforcement and Removal Operations (ERO) is responsible for identifying, apprehending, detaining, and removing inadmissible or deportable aliens from the United States, as appropriate. ERO also removes aliens transferred to ICE by CBP officers and agents, and aliens against whom removal proceedings are initiated by USCIS. Based on limited resources, DHS does not have the capacity to investigate, detain, and remove all individuals who violate our immigration laws. For the last several years, ERO has consistently removed between 300,000 and 400,000 aliens annually from the United States. In light of DHS's limited resources and statutory mandates, ICE prioritizes the apprehension and removal of persons who pose a threat to national security, persons apprehended while attempting to illegally cross the border or who recently did so ("recent border crossers"), and persons convicted of serious crimes or who

2

otherwise threaten public safety. The vast majority of individuals removed by ICE fall into one of these categories.

### ICE Enforcement Challenges

7. Besides limited resources, ICE faces several challenges in accomplishing its enforcement mission. One challenge requiring ICE to spend more resources conducting removals is the changing demographics of the immigrant population entering the country. Since FY 2010, the number of Mexican nationals apprehended by the Border Patrol has fallen by 43 percent, while the number of apprehensions of nationals from El Salvador, Guatemala, and Honduras has increased by 423 percent, in FY 2014. In general, removing Central Americans is more resource-intensive than removing Mexican nationals. While a Mexican national apprehended by CBP may, in many cases, be removed in a matter of hours, often without entering ICE custody, a national of a non-contiguous country apprehended at the border must generally be transferred to ICE and may need to remain in ICE custody for weeks or months until travel documents can be obtained from that country and removal arrangements via aircraft can be arranged.[1]

8. Another important demographic change impacting Department operations was the unprecedented surge of children and families from El Salvador, Guatemala, and Honduras intercepted at the border during FY 2014. Such cases present unique challenges for ICE given the special care needed and the legal obligations imposed by applicable laws and court orders

---

[1] Although inadmissible aliens apprehended at the border are often subject to the "expedited removal" process, those who demonstrate a "credible fear" of persecution or torture if returned to their countries are legally entitled to formal removal proceedings before an immigration judge, which can take many months, if not years, to complete. Because nationals of some Central American countries are more likely than Mexican nationals to claim a fear of return, the increased percentage of Central American apprehensions increases DHS's costs in managing and deterring border violations.

3

with regard to providing housing for alien children in immigration proceedings,[2] as well as the stringent standards applicable to ICE family residential centers.[3] In order to respond to these developments, ICE has significantly expanded its family-appropriate housing, which must be designed and operated in a manner appropriate for the unique needs of this population and compliant with applicable legal requirements and residential standards, which are far more expensive to satisfy than those applicable to adult detention facilities.

9. As mentioned above, ICE's mission includes both the removal of aliens from the interior of the country and the removal of aliens apprehended by CBP while attempting to illegally enter the United States. To address the demographic changes in illegal immigration (i.e., increases in Central Americans and families requiring ICE involvement), and to do our part to ensure border integrity, ICE has detailed resources from the interior of the country to the border. This, in turn, results in fewer resources available to identify, detain, and remove individuals in the interior of the country. For instance, over the course of FY 2014, ERO detailed over 800 of its officers and support personnel (over 10 percent of the ERO workforce) to support southwest border operations. ICE also reallocated increased detention capacity, transportation resources, and other assets to support those operations.

10. Additionally, the fact that many state and local jurisdictions have restricted or prohibited their law enforcement officers from cooperating with immigration detainers, which are used by ICE to facilitate the transfer of a removable alien from criminal custody, has also required ICE to expend additional resources in attempting to gain custody of these individuals before they are released or shortly thereafter.

---

[2] *See* William Wilberforce Trafficking Victim Protection Reauthorization Act of 2008, Pub. L. No. 110–457 (Dec. 23, 2008); *Flores* settlement agreement, *Flores v. Reno*, Case No. CV 85-4544 (C.D. Cal. Jan. 17, 1997).

4

11. Another factor significantly impacting the ability of ICE to remove individuals from the United States is the backlog of the nation's immigration courts, which are under the jurisdiction of the Department of Justice. At the end of FY 2014, there were 418,861 cases pending before the immigration courts, up from 262,622 at the end of FY 2010. In particular, cases on the non-detained immigration court dockets now routinely take years or more to complete.

### Establishment of Department-Wide, Coordinated Enforcement Efforts

12. Given DHS finite resources, Secretary Johnson issued Department-wide immigration enforcement priorities on November 20, 2014. Under the Secretary's November 20, 2014 guidance, all DHS immigration components operate under the same three enforcement priorities: Priority 1, for aliens who pose a threat to national security, are apprehended at the border, are members of organized criminal gangs, or have been convicted of felony offenses; Priority 2, for aliens who have been convicted of certain misdemeanors, have recently entered the country, or have significantly abused the visa or visa waiver programs; and Priority 3, for certain aliens with final orders of removal. To further ensure that DHS's limited resources are available to pursue such aliens, the memorandum directs that resources "be dedicated, to the greatest degree possible, to the removal of aliens described in the priorities set forth above, commensurate with the level of prioritization identified." This memorandum ensures that the three DHS immigration components have the same removal priorities, which enhances coordination and efficiency.

13. In conjunction with this prioritization memo, the Secretary also issued on November 20, 2014, the memorandum that has now been enjoined that provides guidelines for the use of a form of prosecutorial discretion known as "deferred action," on a case-by-case basis, for certain aliens. The memorandum generally provides guidelines for two types of undocumented aliens who have

---

[3] *See* ICE Family Residential Standards, at http://www.ice.gov/detention-standards/family-residential.

been living in the United States since before January 1, 2010, who have significant ties to the country, who submit fingerprints and pass background checks, and who otherwise pose no danger to the country. First, the memorandum expands the 2012 "Deferred Action for Childhood Arrivals" (DACA) policy, which established guidelines concerning the availability of deferred action for such individuals who were brought to the country as children (*i.e.*, before the age of 16). Second, the memorandum establishes "Deferred Action for Parents of Americans or Lawful Permanent Residents" (DAPA), which provides guidelines on the availability of deferred action for those who are parents of U.S. citizens or lawful permanent residents.

### Effects of the Injunction

14. The expansion of DACA and the implementation of DAPA represent an effort by DHS to better prioritize its limited resources against individuals who pose threats to national security, public safety, or the integrity of the border. Among other things, the policies are intended to: incentivize certain non-priority aliens to present themselves to DHS, submit biographic and biometric information, and undergo background checks; and provide temporary relief from removal, which is expected to assist state and local law enforcement agencies with community-policing efforts, as explained in the amicus brief submitted in this case by numerous sheriffs and police chiefs. These policies are intended to complement and support DHS's effective, priority-based use of its resources.

15. Enjoining the policies would prevent ICE from benefitting from the efficiencies that such policies are intended to create. For instance, when state and local law enforcement agencies encounter an alien who has received deferred action under these policies, ICE personnel would be able to quickly confirm the alien's identity through a biometric match. This is because USCIS collects fingerprints and conducts background checks for DACA and DAPA requestors.

The availability of such information allows ICE to more efficiently work with our law enforcement partners to promote public safety.

16. Similarly, when ICE officers are engaged in at-large enforcement operations, such as to locate criminal and fugitive alien targets, they often encounter non-target aliens who may also be removable from the United States. If such aliens have received deferred action under these guidelines and have documentary proof of this on their persons, ICE officers would be able to ascertain more quickly whether enforcement resources should be expended to detain and initiate removal proceedings against the individuals. This would also allow ICE to further focus its resources on priority aliens.

17. The DACA and DAPA policies are also intended to assist with the efficient processing of high-priority cases in the immigration courts. While ICE attorneys who represent DHS in removal proceedings before the immigration courts can and do exercise prosecutorial discretion to promote efficient handling of dockets by immigration judges, DAPA and expanded DACA, once implemented, can potentially further assist ICE attorneys and immigration judges in identifying non-priority cases. And, when an alien in removal proceedings receives deferred action from USCIS under DAPA or expanded DACA, the immigration judge may administratively close the case, thereby making additional docket time available for high-priority cases. Once the cases of aliens with deferred action under DAPA and expanded DACA are taken off the immigration dockets, immigration judges should be able to focus more time and effort on the adjudication of cases involving recent border entrants and national security and public safety threats.

18. Enjoining the DAPA and expanded DACA policies is also likely to limit, in certain circumstances, the ability of law enforcement officials to protect public safety. As I recently

7

wrote in an opinion editorial for the Dallas Morning News, "cooperation between police and community members is a cornerstone of modern law enforcement."[4] While ICE has long taken steps to ensure that prosecutorial discretion is appropriately used when the agency encounters individuals who are crime victims and witnesses,[5] I believe that DAPA and expanded DACA will further enhance the willingness of undocumented crime victims and witnesses to come forward and cooperate with their local law enforcement agencies, thereby bolstering efforts by police to address crimes that affect our communities, including domestic violence, human trafficking, and gang activity.

19. In sum, preventing the deferred action policies from going into effect interferes with the Federal Government's comprehensive strategy for enforcing our immigration laws. The halting of DAPA and expanded DACA jeopardizes the efficiencies that such policies can provide to ICE, making it more difficult to efficiently and effectively carry out its mission. The injunction also undermines the effectiveness of community policing in various jurisdictions, impedes the identification of non-priority aliens, and leaves in place a barrier to more efficient proceedings to remove threats from our country.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of February, 2015.

_____
Sarah R. Saldaña
Director
U.S. Immigration and Customs Enforcement

---

[4] Sarah Saldaña and Gil Kerlikowske, *Obama's immigration initiative will make nation safer*, The Dallas Morning News, Jan. 20, 2015, http://www.dallasnews.com/opinion/latest-columns/20150120-sarah-saldana-and-gil-kerlikowske-obamas-immigration-initiative-will-make-nation-safer.ece.

[5] *See, e.g.*, ICE Policy No. 10076.1, Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs (June 17, 2011), available at http://www.ice.gov/doclib/secure-communities/pdf/domestic-violence.pdf.