EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STATE OF TEXAS, *et al.* )
)
)
                Plaintiffs, )
) No. 1:14-cv-254
v. )
)
UNITED STATES OF AMERICA, *et al.* )
)
                Defendants. )
)

## DECLARATION OF R. GIL KERLIKOWSKE

I, R. Gil Kerlikowske, hereby make the following declaration with respect to the above-captioned matter.

1. I am the Commissioner of U.S. Customs and Border Protection (CBP). I have held this position since March 7, 2014. My current work address is 1300 Pennsylvania Ave., N.W., Washington, D.C. I hold a B.A. and an M.A. in criminal justice from the University of South Florida.

2. Prior to my tenure as CBP Commissioner, I had approximately four decades of experience with law enforcement and drug policy. From 2000 to 2009, I served as the Chief of Police for Seattle, Washington. From 2009 to 2014, I served as the Director of the Office of National Drug Control Policy, and from 1998 to 2000, I served as Deputy Director for the U.S. Department of Justice, Office of Community Oriented Policing Services. In addition, I served as the Police Commissioner for Buffalo, New York, from 1994 to 1998. I began my law enforcement career as a police officer in St. Petersburg, Florida, in 1972.

3. In my position as CBP Commissioner, I oversee approximately 60,000 employees. CBP officers protect our nation's borders and safeguard national security by keeping criminal organizations, terrorists, and their weapons out of the United States while facilitating lawful international travel and trade.

4. I make this declaration on the basis of my personal knowledge as well as information made available to me in the course of my official duties.

### The DHS and CBP Immigration Enforcement Mission

5. DHS has three components with responsibilities over the administration and enforcement of the nation's immigration laws: CBP, U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS). CBP secures the borders at and between ports of entry, preventing the admission of inadmissible aliens and the entry of illicit goods. CBP works closely with ICE, which is responsible for identifying, apprehending, detaining and removing inadmissible and deportable aliens from the United States, including many such aliens apprehended by officers and agents of CBP. CBP also works closely with USCIS, which, among other duties, determines on a case-by-case basis whether deferred action is appropriate under certain circumstances.

6. CBP Officers and Agents regularly encounter individuals who lack lawful status to enter or remain in the United States. For instance, in fiscal year (FY) 2014, Border Patrol apprehended 486,651 individuals who lacked lawful presence in the United States. While the vast majority of these individuals were apprehended while attempting to illegally cross the border, or after recently crossing the border into the United States, the Border Patrol also encounters individuals who are unlawfully in the country, often at checkpoints located at places of strategic importance, furthering the broader work of border security throughout the area.

**Benefits of Deferred Action for CBP Immigration Enforcement Efforts**

7. When a Border Patrol Agent at a checkpoint or other location encounters an individual whose lawful status is not apparent after initial questioning, that alien is taken to the nearest location where the Agent can more fully question and process the alien. During processing, an alien's biographic information and biometrics (i.e., fingerprints) are collected. Records checks are run through CBP and other law enforcement systems. Agents review all of the pertinent facts and circumstances to determine whether or not the alien is a priority for removal, consistent with Secretary Johnson's memorandum of November 20, 2014, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants*, including whether the alien poses a threat to national security, border security (including those who recently unlawfully entered the United States), or public safety. Processing individuals (which involves questioning the individuals, collecting biographic and biometric information, and conducting background checks) takes Border Patrol Agent time that could otherwise be spent at the checkpoint or on other enforcement duties.

8. Individuals who were granted deferred action under the 2012 Deferred Action for Childhood Arrivals (DACA) guidelines are, at times, encountered by Border Patrol Agents at checkpoints or other locations. When a DACA recipient is encountered at a checkpoint or other location and is able to provide DACA documentation or a work authorization document, a Border Patrol Agent can more efficiently verify the identity of the individual, as well as the authenticity of the documentation provided. Absent other facts and circumstances meriting further inquiry, upon verifying the information provided, Border Patrol Agents normally take no further action with respect to that individual. Instead, Border Patrol Agents rely on the determination made by another component of DHS, USCIS, that the encountered individual is not a priority for an

immigration enforcement action. Thus, DACA facilitates CBP more efficiently identifying those individuals who are not a priority for removal and better concentrate its limited enforcement efforts on those who pose a threat to national security, border security, and public safety.

9. I expect that the Deferred Action for Parents of Americans or Lawful Permanent Residents (DAPA) guidelines, as well as the guidelines that expanded DACA, announced by Secretary Johnson in November 2014, would create the same resource efficiencies that DACA, as announced in 2012, created, as they involve conducting background checks and providing similar documentation to certain aliens who have strong ties to the United States and are not enforcement priorities. Because policies like DACA and DAPA encourage certain aliens to come forward and identify themselves to USCIS, these policies create an efficient mechanism for CBP to quickly identify aliens who are not priorities for removal and thus focus limited resources on high priority aliens. DACA and DAPA thus support CBP's overall mission to secure the border.

10. I am aware that this Court has temporarily enjoined implementation of DAPA and the 2014 modifications to DACA. By preventing certain aliens who are not a priority for deportation from obtaining DAPA documents (or DACA documents under the expanded guidelines), the temporary injunction interferes with the agency's ability to obtain the enforcement efficiencies that DAPA and the expansion of DACA are anticipated to create, for the time that the injunction remains in place. The injunction is thus expected to impair CBP's ability to ensure that its limited enforcement resources are spent in the most effective and efficient way to safeguard national security, border security and public safety.

## Effects of Injunction

11. Based on my years of experience in law enforcement, I believe that DACA and DAPA substantially benefit the overall safety of our communities, and that the temporary injunction the Court has entered detracts from those benefits.

12. As a former police chief and now the Commissioner of one of the world's largest law enforcement organizations, I understand the critical need to prioritize law enforcement resources. If law enforcement organizations do not ensure that their limited resources are directed to their highest priorities, overall public safety might be compromised. Focusing limited immigration enforcement resources on aliens who are eligible for DACA and DAPA is anticipated to divert resources from recent border crossers and real national security and public safety threats, such as those who may be terrorists, smugglers, drug traffickers, or engaged in transnational organized crime.

13. Another anticipated law enforcement benefit of DACA and DAPA is that, by temporarily eliminating the immediate fear of detention and deportation, recipients might be more inclined to cooperate with federal, state, and local law enforcement in reporting crimes or serving as witnesses in criminal cases. As the numerous law enforcement officials have made clear in an amicus brief filed in this case, DAPA and DACA are expected to support community policing efforts and help law enforcement agencies safeguard their communities.

14. DAPA and the expansion of DACA would allow a significant number of otherwise law-abiding aliens with strong ties to the country to step forward and request deferred action. By halting implementation of DAPA and the expansion of DACA, the temporary injunction undermines these potential law enforcement benefits for the duration of time that the injunction remains in place.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of February of 2015.

R. Gil Kerlikowske
Commissioner