IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
Brownsville Division

| | |
|---|---|
| STATE OF TEXAS, *et al.* <br><br> Plaintiffs, <br> v. <br><br> UNITED STATES OF AMERICA, et al. <br><br> Defendants | Case No. 1:14-cv-254 |

## BRIEF AND MEMORANDUM OF LAW IN OPPOSITION TO A STAY OF PRELIMINARY INJUNCTION BY AMICUS CURIAE SHERIFF JOE ARPAIO

### I.   INTRODUCTION

The administration of President Barack Obama ("President Obama") has requested a stay of this Court's temporary injunction pending appeal and has appealed this Court's ruling of February 16, 2015, which ordered a temporary injunction.

Defendants once again lean significantly upon Sheriff Joe Arpaio's case in the U.S. District Court of Appeals, *Arpaio v. Obama* now on appeal in the U.S. Circuit Court for the District of Columbia Circuit, Case No. 14-5325. The U.S. Government Defendants' opposition brief is due on March 3, 2015, in Sheriff Arpaio's appeal.

*Amicus Curiae* Sheriff Joe Arpaio, having previously filed a Friend of the Court Brief on the merits of the motion for preliminary injunction and standing, also now wishes to offer this additional brief and information in opposition to the Defendants' request for a stay of the injunction and in support of the preliminary injunction requested by the Plaintiffs.

The Court already found that there is a significant likelihood of the Plaintiffs' success on the merits, that irreparable harm would result if an injunction were not issued, and that the

Defendants would not suffer substantial injury from the injunction.

The Court having fund grounds for a preliminary injunction, a stay of that injunction such that the programs could nevertheless begin operation during an unknown period.

## II. STATEMENT OF FACTS

Waiting until the sixth (6th) year of his eight (8) year term in office, on an *arbitrary* date of November 20, 2014, apparently chosen [1] to evade public scrutiny by the voters during the November 4, 2014, Congressional elections, President Obama through his Secretary of Homeland Security Jeh Johnson issued several Memoranda orders granting amnesty and immunity from prosecution and deportation to citizens of foreign countries estimated to total between 4 and 5 million people.  President Obama scheduled a televised address to the nation for the evening of November 20, 2014.  Had the Obama Administration engaged in Administrative Procedures Act rule-making, it could have been completed that by now over the last six years.

This case involves a series of new programs which the Defendants describe as "deferred action" for removable illegal aliens, including two major programs extending the Obama Administration's June 15, 2012, Deferred Action for Childhood Arrivals ("DACA") to more candidates and expanding the DACA template to grant amnesty and immunity to parents of U.S. citizens and legal immigrants (lawful permanent residents) who could not otherwise qualify for lawful presence and work permits in the United States.

Secretary Johnson's Memoranda orders ordered the U.S. Department of Homeland Security ("DHS") to begin accepting applications for the two major, new "deferred action" programs on the *entirely arbitrary dates* of February 18, 2015 (90 days after November 20, 2014) and May 20, 2015 (180 days after November 20, 2014).  Generally speaking, the programs

---

[1]  Inferred from Obama's statements over the six months preceding the November 4, 2014, election that he intended to take this action, and from the action being taken immediately after that election.

have not yet gone into effect, although DHS has ordered its personnel to halt deportation (removal) proceedings for all illegal aliens in custody or encountered who might qualify for the programs, even if they have not yet actually applied for deferred action status.

Defendants have not suggested any reason why the new programs – if legally valid – must begin on any particular date, either within this present case or in Sheriff Arpaio's lawsuit against the same Defendants now on appeal in the U.S. Court of Appeals for the District of Columbia Circuit, Case No. No. 14-5325. Indeed, the Defendants have not offered any reason why the Obama Administration waited until the sixth (6th) year of President Obama's year in office to begin this program, other than the rejection of the policy by the U.S. Congress.

*Amicus Curiae* also remains concerned at the U.S. Government Defendants repeating the argument that they may abdicate enforcement of the immigration laws wholesale based upon the pretext of a lack of recourses. *Amicus Curiae* Sheriff Arpaio previously demonstrated in his main Brief that the Defendants have never asked Congress for the funding they now complain they lack, that Congress has consistently appropriated more funding for immigration enforcement than DHS has requested since 2006, and that DHS is legally compelled under the laws governing the budgetary process to inform Congress of all of its funding needs. Under Federal Rule of Civil Procedures Rule 11, Eric Holder's Justice Department should document any requests for additional funding for immigration enforcement that Congress denied.

## II. <u>ARGUMENT</u>

### A. <u>GOVERNING LAW / STANDARD OF REVIEW</u>

The standard of review for a stay of an injunction is similar to the standard of review for issuing an injunction initially:

> "We consider four factors in deciding whether to grant a stay pending appeal: '"(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'"9 A stay "is not a matter of right, even if irreparable injury might otherwise result to the appellant."

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, Case No. 13-51008, 2013 WL 5857853 (5th Cir., Oct. 31, 2013) (staying (modifying) an injunction in part on the grounds that it was worded too broadly in excess of what was proven); *See Nken* v. *Holder*, 556 U. S. 418, 434 (2009). The first two factors are "the most critical." *Id.*

To support injunctive relief, Plaintiffs must demonstrate (1) a substantial likelihood of success on the merits; (2) that they are likely to suffer "irreparable injury" if preliminary relief is not granted; (3) that an order would not substantially injure other interested parties; and (4) that the public interest would be furthered by granting the order. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977); *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). These four factors must be viewed as a continuum where greater strength in one factor compensates for less in the other: "If the arguments for one factor are particularly strong, in injunction may issue even if the arguments in other areas are rather weak." *CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 739, 747 (D.C. Cir. 1995).

### B. <u>NO SUBSTANTIAL INJURY TO DEFENDANTS FROM ISSUANCE OF A PRELIMINARY INJUNCTION AND STATUS QUO OF CURRENT LAW</u>

There is no exigency requiring or recommending a stay of the preliminary injunction. Having waited six (6) years in President Obama's term as President, the procedural posture now should be viewed under *laches*. Having waited six years, until after the 2014 elections, the

4

Defendants cannot now claim harm from waiting for a proper trial on the merits.

The dates on which the Defendants announced their new programs and the dates set for implementation are entirely *arbitrary*. The fact that the Defendants have pulled dates out of thin air does not create any injury or necessity to support a stay.

Also, as a matter of law, Defendants cannot be said to be "burdened" by a requirement to continue to comply with existing law as enacted by Congress. The Defendants have announced that their program is explicitly intended to depart from governing law. However, the status quo is both a set of circumstances that have existed for many years and also the law of the land pursuant to existing statutory law enacted by Congress. There can be no burden recognized by the law from continuing to obey and apply the law as it currently exists. There can be no burden recognized by the law that political leaders desire to adopt new and different policies.

### C. **PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF PRELIMINARY RELIEF IS STAYED**

As this Court already found and ruled in the February 16, 2015, Memorandum Opinion,

> "Once these services are provided, there will be no effective way of putting the toothpaste back in the tube should Plaintiffs ultimately prevail on the merits."

If the programs are allowed to start in advance of a trial on the merits, it would be impossible as a pragmatic matter to reverse and unravel the effects of the implemented programs should the Court later rule that the Defendants "deferred action" programs are not lawful.

Defendants' "deferred action" programs are intended to and designed to frustrate any attempt to reverse the implementation of the programs. As an admission by a party Defendant, as reported in The Washington Times, attached as Exhibit A, Leon Rodriquez, Director of the United States Citizenship and Immigration Services ("USCIS"), of the U.S. Department of

Homeland Security ("DHS") announced to his DHS employees in a townhall meeting that: [2]

> "If this program does what we want it to do, you will now have literally millions of people who will be working on the books, paying taxes, being productive. You cannot so easily by fiat now remove those people from the economy."

Defendant Rodgriquez admits that one purpose of the program's design is to prevent the amnesty program from being unraveled, by getting these citizens of other countries illegally present in this country integrated into the U.S. economy to such an extent that future attempts to remove them will be frustrated and hindered. Thus, the Defendants explicitly state that their intent is to make it difficult or impossible to unravel the programs later once they go into effect. Moreover, Defendants admit that difficulty will exist.

Courts have consistently held that a colorable constitutional violation gives rise to a showing of irreparable harm. *See Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (a constitutional violation and loss of constitutional protections "'for even minimal periods of time, unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)); *see also Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37, 53 (D.D.C. 2002) (deprivation of constitutional protection "is an undeniably substantial and irreparable harm").

Here, if the programs are allowed to begin operation, an estimated 6 million citizens of other countries who legally belong, as a matter of U.S. and international law, in a different country will obtain entrenched legal rights in the United States under the deferred action expansions and extensions. Because the deferred action programs are clearly regulatory, the beneficiaries may even receive a vested legal property right in the grant of status under these programs. *See, e.g., Goldberg v. Kelly*, U.S. 254, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970) (due

---

[2] "**Obama immigration chief says amnesty designed to cement illegals place in society**," Stephen Dinan, The Washington Times, December 9, 2014, http://www.washingtontimes.com/news/2014/dec/9/obama-amnesty-designed-cement-illegals-place-socie/

process required to withdraw rights once granted under regulatory program).

Furthermore, on February 11, 2015, Internal Revenue Service ("IRS") Commissioner John Koskinen admitted in sworn testimony before the U.S. House of Representatives Committee on Oversight and Government Reform that the beneficiaries of the deferred action programs which the Plaintiffs challenge here will be eligible to receive tax refunds for the preceding three (3) tax years including under the Earned Income Tax Credit ("EITC") program. Each illegal alien could receive up to $6,000 each for the current year and up to $18,000 each for the past three years, for a total of a $24,000 instant payment upon receiving deferred action status under the Defendants new deferred action programs. See Exhibit B, attached, and also video broadcast of the Congressional hearing accessible via C-SPAN at http://www.c-span.org/video/?324304-1/hearing-government-fraud-abuse, at time period 1:43:05 to 1:48:26 under questioning by Rep. Mick Mulvaney (R-SC). Commissioner Koskinen testified under oath that once deferred action beneficiaries receive a social security number they could claim the EITC for the current year and also amend their tax returns or file a tax return for the preceeding three tax years, for a total of four (4) tax years.

This February 11, 2015, testimony indicates that the IRS could issue a one-time bonus of $24,000 each or as high as $144 billion in total to the estimated 5 million beneficiaries made eligible for deferred action benefits under the Obama Administration's new programs announced on November 20, 2014, in addition to an estimated 1 million beneficiaries of the Deferred Action for Childhood Arrivals ("DACA") program announced on June 15, 2012.

If the injunction is stayed, and the Administration begins to issue "deferred action" amnesty and immunity status to applicants, those beneficiaries can immediately apply for up to $24,000 as a windfall in tax refunds from the U.S. Treasury by filing amended tax returns

7

covering the preceding four (4) years and claiming the EITC as the basis for refunds. Up to 5 million illegal aliens could immediately apply for and receive a payment from the U.S. Treasury of up to $24,000 before this case could proceed to a decision on the merits.

Thus, the U.S. Treasury could have to disburse as much as a maximum $144 billion as a result of implementing the deferred action programs on a one-time basis for the estimated 5 million illegal aliens who will be eligible for deferred action status, assuming that every illegal alien might be eligible independently for the maximum possible amount.

### D. THE BALANCE OF HARM AS WELL AS THE PUBLIC INTEREST SUPPORTS THE IMPLEMENTATION OF A PRELIMINARY INJUNCTION

The Court should contrast the situation here before the Court now – in which a program is just being started up and has not yet gone into effect (in most respects) – with other situations where a preliminary injunction would overturn the status quo and bring a pre-existing program to a halt. Here, where the Defendants' deferred action programs have not yet started, the more drastic action would be to change the status quo, to allow the programs to begin in advance of a determination of their legality.

For example, when The Honorable Richard J. Leon, U.S. District Court for the District of Columbia, Case No. 1:13-cv-0851-RJL ruled that mass surveillance of telephone communications of U.S. citizens by the National Security Agency without a warrant is unconstitutional, the injunction that Judge Leon issued would have changed the status quo and brought a long-running NSA intelligence-gathering program to a halt. Thus, Judge Leon issued an injunction but voluntarily stayed his injunction pending appeal to preserve the status quo.

Here, by contrast, the Defendants' November 20, 2014, programs have not yet begun in implementation. Staying this Court's injunction so that the new November 20, 2014, programs

begin to go into operation for the first time ever would be the greater disruption now. Leaving the status quo and injunction in place is the appropriate action.

Also, if the temporary injunction is stayed and the programs go into effect, all employees and officials of DHS are in danger of violating the Antideficiency Act, which makes it a violation of law, with potential civil and criminal penalties, for government officials to spend funds that have not been appropriated by Congress.

There have been no funds specifically appropriated for granting deferred action status to illegal aliens. In fact, Congress has appropriated funding to deport those illegal aliens instead.

If the Defendants' new deferred action programs are unlawful, but are implemented anyway, than DHS officials and staff would be violating the Antideficiency Act by spending funds not authorized by appropriation or otherwise. DHS proposes to use fees collected to finance the programs. However, if the programs are unlawful, then there are no funds that DHS can spend legally within the Antideficiency Act.

The Antideficiency Act 31 U.S.C. §1341(a)(1)(A) & (B).generally prohibits an officer or employee of the U.S. government from:

- making or authorizing an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; or
- involving the U.S. government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law.

To the extent an officer or employee may be in violation of the Antideficiency Act, Congress mandates that the Comptroller General, the head of GAO, conduct an investigation of the matter. 31 U.S.C. § 712(1) & 31 U.S.C. 717(b). An investigation may be commenced upon request by Congress, its committees, or its members. 31 U.S.C. § 717.

E.  **DEFENDANTS DO NOT HAVE A SUBSTANTIAL LIKELIHOOD OF PREVAILING ON APPEAL**

It cannot be seriously argued that the Defendants have a substantial likelihood of prevailing on appeal in challenging the preliminary injunction. However, the main parties address this in detail and Amicus Curiae has addressed those issues in his main Brief.

The legal opinion by the Office of Legal Counsel (OLC) under Attorney General Eric Holder's U.S. Department of Justice extensively warned the Defendants not to do what they are doing, that what the U.S. District Court found they are doing is illegal.

Where the Court's analysis tracks with and agrees with the analysis of Eric Holder's OLC which Defendants offered publicly in support of their programs, the Defendants cannot show a substantial likelihood of success on appeal. Where the Court's findings differ from the OLC's opinion and the Defendants' arguments are mainly on questions of fact.

The Court made findings of fact upon the evidence – including reciting that the Court had invited the Defendants to submit further evidence to clarify at least one crucial point (case-by-case discretion) and the Defendants did not do so – that the programs do not actually operate as claimed by the Defendants and as the OLC warned they must operate. Short of a full presentation of evidence at trial, the Court's analysis must stand in force.

IV.  **CONCLUSION**

The U.S. District Court and Court of Appeals should leave Judge Andrew Hanen's preliminary injunction in force pending a trial on the merits in this case.

Dated:  February 23, 2015              Respectfully submitted,

                                                               Larry Klayman, Esq.
                                                               Washington, D.C. Bar No. 334581
                                                               Freedom Watch, Inc.

2020 Pennsylvania Avenue N.W., Suite 345  
Washington, D.C. 20006  
(310) 595-0800  
leklayman@gmail.com  
Of Counsel

_____  
Jonathon Moseley, Esq.

Virginia State Bar No. 41058  
Freedom Watch, Inc.  
2020 Pennsylvania Avenue N.W., Suite 345  
Washington, D.C. 20006  
(310) 595-0800  
leklayman@gmail.com  
Attorney for Plaintiff  
*Pro Hac Vice Approved*

CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing motion and proposed brief will be delivered electronically on February 23, 2015, to counsel for Plaintiffs and Defendants through the District's Electronic Case Filing system.

_____  
Jonathon Moseley, Esq.