**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| vs. | ) | Case No. 1:14-cv-254 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO STAY PENDING APPEAL
THE COURT'S FEBRUARY 16, 2015 ORDER
OF PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Table of Authorities ...................................................................................... ii

Introduction and Summary of the Argument .................................................. 1

Statement of the Nature and Stage of the Proceeding.................................... 3

Statement of the Issues to be Ruled Upon by the Court................................. 3

Argument ...................................................................................................... 4

    I.    The Court Correctly Found That Maintaining the Status Quo Does Not Irreparably Harm Defendants.................................. 4

        A.    The Preliminary Injunction Preserves the Status Quo. .............. 4

        B.    Defendants' Claim of an Exigent Need to Protect the Nation Is Certainly Less Compelling than President Truman's Unavailing Claim in *Youngstown*. .............................. 5

        C.    Defendants' Claimed Financial Injury Is Contrived. ................... 7

        D.    Defendants' Mere Assertion of Irreparable Injury Undermines Their Position on the Merits................................... 8

    II.    Allowing the DHS Directive to Take Effect Would Irreversibly Harm Plaintiffs By Effectively Denying Their Requested Remedies.................................................................... 9

    III.    Plaintiffs Have Already Established That They Are Likely to Prevail on the Merits....................................................... 10

        A.    Plaintiffs Have Standing............................................................ 10

        B.    Plaintiffs' Claims Are Meritorious. ............................................. 15

    IV.    The Public Interest Does Not Favor a Stay. ......................................... 16

    V.    The Preliminary Injunction Must Apply to the Federal Officials in Any Place They May Be Deemed to Act........................................... 17

Conclusion.................................................................................................... 20

Certificate of Service

i

# TABLE OF AUTHORITIES

## Cases

*Alden v. Maine,*
  527 U.S. 706 (1999) ............................................................................................. 14

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
  458 U.S. 592 (1982) ............................................................................................. 14

*Am. Lands Alliance v. Norton,*
  CIV.A. 00-2339 (RBW), 2004 WL 3246687 (D.D.C. June 2, 2004) ........................ 18

*Az. Dream Act Coalition v. Brewer,*
  757 F.3d 1053 (9th Cir. 2014) ............................................................................. 12

*Az. Dream Act Coalition v. Brewer,*
  No. CV-12-02546, 2015 WL 300376 (D. Ariz. Jan. 22, 2015) ............................... 12

*Arizona v. United States,*
  132 S. Ct. 2492 (2012) ................................................................................... 14, 20

*Brown v. DFS Servs., LLC,*
  719 F. Supp. 2d 785 (S.D. Tex. 2010) .................................................................... 6

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ............................................................................................. 18

*Canal Auth. of Fl. v. Callaway,*
  489 F.2d 567 (5th Cir. 1974) ................................................................................. 4

*Chamber of Commerce v. DOL,*
  174 F.3d 206 (D.C. Cir. 1999) ............................................................................... 8

*Doe v. Rumsfeld,*
  341 F. Supp. 2d 1 (D.D.C. 2004) .......................................................................... 18

*Fiber Sys. Int'l, Inc. v. Roehrs,*
  470 F.3d 1150 (5th Cir. 2006) ............................................................................. 18

*In re First S. Sav. Ass'n,*
  820 F.2d 700 (5th Cir. 1987) ............................................................................... 10

*John Doe No. 1 v. Rumsfeld,*
  CIV.A. 03-707 (EGS), 2005 WL 774857 (D.D.C. Feb. 6, 2005) ............................. 18

*John Doe No. 1 v. Rumsfeld,*
  CIV.A. 03-707(EGS), 2005 WL 1124589 (D.D.C. Apr. 6, 2005) ............................ 18

*Kos Pharm., Inc. v. Andrx Corp.,*
  369 F.3d 700 (3d Cir. 2004) ............................................................................... 7

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ........................................................................................ 14

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
  145 F.3d 1399 (D.C. Cir. 1998) ........................................................................ 18

*Ohio Oil Co. v. Conway,*
  279 U.S. 813 (1929) (per curiam) .................................................................... 10

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott,*
  734 F.3d 406 (5th Cir. 2013) ......................................................................... 3, 10

*Prof'ls & Patients for Customized Care v. Shalala,*
  56 F.3d 592 (5th Cir. 1995) ............................................................................... 8

*Steele v. Bulova Watch Co.,*
  344 U.S. 280 (1952) ........................................................................................ 18

*Stieberger v. Bowen,*
  801 F.2d 29 (2d Cir. 1986) ................................................................................. 6

*Ty, Inc. v. Jones Group, Inc.,*
  237 F.3d 891 (7th Cir. 2001) .............................................................................. 7

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ................................................................................... 2, 5, 6

## Constitutional Provisions and Statutes

U.S. CONST. art. I, § 8, cl. 4 ............................................................................... 20

5 U.S.C. § 706(2)(D) .......................................................................................... 17

Immigration Reform and Control Act of 1986, Pub. L. No. 99-603,
  § 115, 100 Stat. 3384 ...................................................................................... 20

**Other Authorities**

Stephen Dinan,
   *Obama Immigration Chief Says Amnesty Designed to Cement Illegals Place in
   Society*, WASH. TIMES, Dec. 9, 2014 ........................................................................ 10

Michael Muskal,
   *Texas, Oklahoma Threaten Suits to Block Obama's Immigration Plan*,
   L.A. TIMES, Nov. 21, 2014 ........................................................................ 7

Office of the Press Sec'y,
   Remarks by the President in Immigration Town Hall (Feb. 25, 2015) .................. 2

Office of the Press Sec'y,
   Remarks by the President on Immigration (Nov. 25, 2014).................................... 1

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Defendants have moved for a stay of the preliminary injunction so that they can drastically disrupt the status quo—which has existed for decades—by conferring lawful presence, work authorizations, and a host of other benefits on over 4 million unauthorized aliens.  Defendants cannot show anything close to looming irreparable harm.  The stay motion can be denied for that reason alone—and for multiple others.

Defendants insist that the preliminary injunction interferes with their exercises of prosecutorial discretion and allocation of removal resources.  In reality, the Court enjoined only DAPA and Expanded DACA—binding executive directives affecting the legal status of unauthorized aliens en masse.  The preliminary injunction does not touch the DHS Secretary's separate November 20, 2014 memorandum establishing three categories for removal prioritization.  In other words, the preliminary injunction does not "enjoin or impair the Secretary's ability to marshal his assets or deploy the resources of the DHS," and "[i]t does not enjoin the Secretary's ability to set priorities for the DHS."  Op. 123.

The actual effect of the preliminary injunction is that the President may not unilaterally confer new legal status, work authorizations, and other benefits on millions of otherwise removable aliens.  The President himself recognized that the laws on the books do not authorize his program, admitting: "I just took action to change the law."[1]  And days ago, the President explained that, despite his litigation posture that not even notice and comment were required, "What we've done is we've expanded

---

[1] Office of the Press Sec'y, Remarks by the President on Immigration (Nov. 25, 2014) www.whitehouse.gov/the-press-office/2014/11/25/remarks-president-immigration-chicago-il.

my authorities."[2]  That is precisely the point, and the Court correctly ruled for the Plaintiff States on that basis.

The President's statements six days ago further clarify the nature of DAPA and Expanded DACA:

- "There are going to be some jurisdictions, and there may be individual ICE officials or Border Patrol who aren't paying attention to our new *directives*. But they're *going to be answerable to the head of the Department of Homeland Security*, because he's been very clear about what our priorities should be."

- "[T]he bottom line is, is that if somebody is working for ICE and there is a policy and they don't follow the policy, *there are going to be consequences to it*."

- "In the U.S. military, when you get an order, you're expected to follow it.  It doesn't mean that everybody follows the order.  If they don't, *they've got a problem*.  And *the same is going to be true with respect to the policies that we're putting forward*."[3]

These statements (1) make clear the President's position that DAPA and Expanded DACA are binding directives, (2) demonstrate that agents lack enforcement discretion, and (3) direct government employees to choose between disregarding the laws enacted by Congress and suffering severe employment consequences.

Against this backdrop, Defendants assert—with no credible explanation—that this large bureaucracy must be put into operation *immediately*.  But their claimed need for immediate action "to best protect the Nation" (Mot. 11) is indisputably less compelling than President Truman's claimed need to immediately seize steel mills during the Korean War to "avert a national catastrophe." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952).  Even there, a preliminary injunction issued.

---

[2] Office of the Press Sec'y, Remarks by the President in Immigration Town Hall (Feb. 25, 2015) www.whitehouse.gov/the-press-office/2015/02/25/remarks-president-immigration-town-hall-miami-fl.
[3] *Id.* (emphases added).

In short, there is no emergency need to institute this sweeping new program, and the stay can be denied for that reason alone.  In any event, this Court has already held that each of the stay factors favors Plaintiffs.  Similarly, Defendants' request to somehow limit the geographical scope of the injunction is meritless.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

On February 16, 2015, this Court issued a memorandum opinion and order entering a preliminary injunction of the implementation of the DHS Directive.  Defendants now seek a full or partial stay of that injunction.

## STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

The only issue before the Court is whether the preliminary injunction should be stayed pending appeal, in whole or in part.  That issue overlaps in nearly all respects with the issue already decided: whether to grant the preliminary injunction in the first place.  Nonetheless, Plaintiffs assume with one exception[4] that this stay request is litigated de novo under the following factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013) (internal quotation marks omitted).

---

[4] *See infra* note 5.

# ARGUMENT

## I.   THE COURT CORRECTLY FOUND THAT MAINTAINING THE STATUS QUO DOES NOT IRREPARABLY HARM DEFENDANTS.

### A.   The Preliminary Injunction Preserves the Status Quo.

The preliminary injunction merely leaves the longstanding status quo undisturbed, and Defendants offer no basis to believe that this irreparably harms them.

For decades, no one has believed that the Executive has unilateral, unfettered discretion to grant lawful presence and work authorizations to more than a third of the unauthorized aliens in the country.  The President himself said repeatedly that he lacked this authority, and he has accepted the status quo for the bulk of his two terms.  *See* First Am. Compl. 15-18 (¶ 44), ECF No. 14.  If there were any imminent and irreparable harm curable only by conferring lawful presence, work authorizations, and other benefits to over 4 million removable aliens, that cure would not have surfaced only after the November elections in the President's sixth year in office.

Defendants gain nothing by relying (Mot. 12) on *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).  The Fifth Circuit there noted that "[t]he purpose of a preliminary injunction is always to prevent irreparable injury," and that it "*often happens* that this purpose is *furthered by preservation of the status quo*."  *Id.* at 576 (emphases added).  Preliminary injunctions, it explained, turn fundamentally on the need "to preserve the court's ability to render a meaningful decision on the merits."  *Id.*  That is precisely what the Court did here, observing that once Defendants' programs go into effect, "it will be difficult or even impossible for anyone to 'unscramble the egg'" by unwinding the programs and their collateral consequences

4

once they are held unlawful at trial.  Op. 115.  Defendants have no response.  In short, the Court rightly concluded that "[i]f the circumstances underlying this case do not qualify for preliminary relief to preserve the status quo, [it is] hard to imagine what case would."  Op. 121.

### B. Defendants' Claim of an Exigent Need to Protect the Nation Is Certainly Less Compelling than President Truman's Unavailing Claim in *Youngstown.*

Defendants do not assert that they will be unable to implement DAPA and Expanded DACA if these programs are ultimately upheld.  Rather, Defendants argue that immediate implementation is needed so they can "best protect the Nation."  Mot. 11.  This, of course, is strikingly similar to President Truman's argument against preliminarily enjoining his seizure of steel mills during the Korean War.  *See Youngstown*, 343 U.S. at 583 ("The indispensability of steel . . . led the President to believe that the proposed work stoppage would immediately jeopardize our national defense").  The national-security argument failed even then, and it is vastly less compelling now.  *Id.* at 584.

Moreover, the President has insisted that he acted only because Congress refused to "pass a bill," First Am. Compl. 19 (¶ 49), ECF No. 14, and that critically undermines the claim of irreparable harm.  The President cannot claim a crisis due simply to frustration that Congress does not share his views on a legislative policy issue.  Congress's choice not to enact this sweeping, new immigration reform implicitly rejects the notion that an emergency need exists.

Defendants argue that they need to offer protections and benefits to "encourag[e] certain aliens to come forward" and identify themselves as low priorities for

5

removal.[5]  Mot. 11.  But Defendants have not explained why this has suddenly become an emergency, and in any event the injunction does not prevent their agents from ascertaining whether unauthorized aliens they encounter are priorities for removal. More fundamentally, even an emergency does not justify unlawful, unilateral executive action.  *Youngstown*, 343 U.S. at 589; *see id.* at 637 (Jackson, J., concurring in the judgment).  Defendants cannot hold out inducements that they are unauthorized to confer, such as lawful presence, work authorizations, and other benefits—whatever their rationale for doing so.

Defendants' belief that enforcing this basic limit on executive action somehow violates the separation of powers (Mot. 10-11) offends fundamental principles of judicial review.  An executive official's inability to offer "clearly" unauthorized benefits (Op. 112) is not itself cognizable as injury.  And the preliminary injunction here does not prevent the officials from offering those benefits if ultimately held lawful.  Nor does it involve anything approaching "protracted involvement" with a complex scheme.  *Cf.* Mot. 11 (citing *Stieberger v. Bowen*, 801 F.2d 29, 33-34 (2d Cir. 1986)). The Court is not fine-tuning DAPA and Expanded DACA; it has enjoined them.

---

[5] In several parts of their argument, Defendants seek to relitigate this Court's rulings by citing two *more* new declarations, in addition to those they submitted after the preliminary-injunction hearing. *E.g.*, Mot. 12, 13, 15.  The belated factual allegations in these declarations are forfeited.  In opposing the motion for a preliminary injunction, Defendants had a full opportunity to argue the equities of delaying the DHS Directive.  No sound principle of case management justifies allowing Defendants to again add new factual assertions.  In the analogous context of motions for reconsideration, this Court recognizes that evidence previously available to a litigant is no basis for the Court to reconsider its rulings.  *E.g.*, *Brown v. DFS Servs., LLC*, 719 F. Supp. 2d 785, 788 (S.D. Tex. 2010) (reconsideration motion "cannot be used to raise arguments which could, and should, have been made before").  And the assertions of Defendants' own senior officials were well within their knowledge.

In the meantime, "DHS may continue to prosecute or not prosecute these illegally-present individuals, as current laws dictate." Op. 119. But Defendants cannot unlawfully confer lawful presence, work authorizations, and other benefits as the foundation of a sweeping new program. That has been the status quo for many years, and "there is little-to-no basis to conclude that harm will fall upon the Defendants" if that status quo continues pending trial. Op. 119.

## C.   Defendants' Claimed Financial Injury Is Contrived.

Defendants argue that the preliminary injunction will cause irreparable harm because of their decision to "expend[] large sums of money to implement DAPA" (Op. 16 n.13) while its legality is being litigated. Courts consistently disregard such alleged harms, manufactured while a defendant had knowledge of the potential consequences of its actions. *See, e.g.*, *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 729 (3d Cir. 2004); *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 902-03 (7th Cir. 2001). It would be perverse to allow the Executive Branch to exercise unlawful power, whenever it wished, by engaging in preemptive spending that may itself be unlawful.

Here, within a day of the DHS Directive's issuance, Texas announced that it would challenge the Directive as circumventing Congress and threatening the rule of law.[6] Within two weeks, Texas filed this lawsuit along with a motion for a preliminary injunction. Yet while the lawsuit and motion were pending, "DHS [was] shifting resources away from other duties" and "shifting staff to meet the DAPA demand."

---

[6] Michael Muskal, *Texas, Oklahoma Threaten Suits to Block Obama's Immigration Plan*, L.A. TIMES, Nov. 21, 2014, www.latimes.com/nation/nationnow/la-na-texas-arizona-threaten-suits-obama-immigration-20141121-story.html.

Op. 16 n.13. Any burdens assumed by Defendants in the face of this lawsuit are not cognizable grounds to stay or deny a preliminary injunction. To hold otherwise would encourage gamesmanship by defendants.

### D. Defendants' Mere Assertion of Irreparable Injury Undermines Their Position on the Merits.

Defendants' assertion of irreparable harm also undercuts their argument on the merits. First, it confirms that the DHS Directive is indeed a substantive rule—not a general statement of policy. Second, it shows that the Directive is affirmative agency action rather than unreviewable inaction.

Defendants' theory on the APA claim is that the DHS Directive is merely a general policy statement that does not create legal rights or restrict the discretion of agency employees. *See* Mot. 10. But, if that were so, an injunction of that mere "policy statement" could not possibly impose an irreparable injury. At most, it would affect the DHS Secretary's ability to issue a statement that does not bind the agency, limit the discretion of its employees, or endorse any sort of conduct. *Cf. Chamber of Commerce v. DOL*, 174 F.3d 206, 211 (D.C. Cir. 1999) (rule is legislative if it "puts a stamp of agency approval or disapproval on a given type of behavior") (internal quotation marks and alteration omitted). A "policy statement," fundamentally, is nothing more than "the agency's tentative intentions for the future." *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 596 (5th Cir. 1995) (internal quotation marks omitted). It makes no sense to seek *emergency* relief in order to implement a mere tentative statement of future intentions. This very request for an emergency stay confirms that the Directive is a binding substantive rule that directs new action.

8

Defendants' irreparable-injury argument also confirms that the Directive entails affirmative government action, not merely discretionary non-enforcement. The Directive has been enjoined, but Defendants remain free to use case-by-case discretion in deciding not to remove individual aliens. The injunction does not require Defendants to remove any particular person or to allocate their enforcement resources in any particular way. Op. 123. Defendants seek relief only because the Court's order prevents affirmative government action: setting up a new bureaucracy, charging fees, and accepting applications to programmatically confer lawful presence, work authorizations, and financial benefits to over 4 million unauthorized aliens.

## II. ALLOWING THE DHS DIRECTIVE TO TAKE EFFECT WOULD IRREVERSIBLY HARM PLAINTIFFS BY EFFECTIVELY DENYING THEIR REQUESTED REMEDIES.

Absent a preliminary injunction, Plaintiffs would suffer substantial injuries that defeat effective judicial review. As this Court noted, "legalizing the presence of millions of people is a 'virtually irreversible' action once taken." Op. 115. For example, the issuance of work authorizations would cause a number of state benefits to flow, including driver's licenses, unemployment benefits, alcoholic-beverage licenses, and licensure as private security officers. Op. 116 & n.107. Texas alone would have to spend "several million dollars" issuing driver's licenses.[7] Op. 22. Other Plaintiffs would suffer similar costs. Op. 22 & n.14, 33, 45-46. If Plaintiffs ultimately prevail,

---

[7] Defendants assert that the Plaintiff States could simply raise fees for driver's licenses. Mot. 16. In effect, the argument is that the States should offset the injury imposed on them by levying a tax or fee on their citizens. That can always be said of any financial injury to a State and thus shows nothing. In any event, the States have made a policy decision to subsidize the receipt of driver's licenses; it would be an injury to the States to be coerced into abandoning that sovereign decision.

there would be no feasible way to identify and claw back benefits issued to millions of people, much less recover the millions of dollars spent issuing them.  Op. 115.

Indeed, the Director of the U.S. Citizenship and Immigration Service, León Rodríguez, has admitted that once this program is implemented, it will be nearly impossible to reverse: "If this program does what we want it to do . . . [y]ou cannot so easily by fiat now remove those people from the economy."[8]  In short, it is imperative to preserve the status quo pending a final adjudication of the legality of Defendants' programs.  *See Ohio Oil Co. v. Conway*, 279 U.S. 813, 814 (1929) (per curiam).  As the Court put it: "This genie would be impossible to put back into the bottle."  Op. 116.

## III. PLAINTIFFS HAVE ALREADY ESTABLISHED THAT THEY ARE LIKELY TO PREVAIL ON THE MERITS.

The merits prong of the stay analysis requires Defendants to make "a strong showing that [they are] likely to succeed on the merits." *Planned Parenthood*, 734 F.3d at 410 (internal quotation marks omitted).[9]  The Court rejected these arguments before, Mot. 5, and Defendants offer no compelling basis for the Court to reach a different result now.

### A. Plaintiffs Have Standing.

**1.**   Defendants suggest that standing cannot be based on the economic harm that States would suffer when the DHS Directive drastically increases the number of driver's licenses that States would have to issue under pre-existing state laws.

---

[8] Stephen Dinan, *Obama Immigration Chief Says Amnesty Designed to Cement Illegals Place in Society*, WASH. TIMES, Dec. 9, 2014, http://goo.gl/wdmjj9.

[9]  Even if the equities were "heavily tilted" in Defendants' favor, they would still have to show that their position has "patent substantial merit." *In re First S. Sav. Ass'n*, 820 F.2d 700, 709 n.10 (5th Cir. 1987) (internal quotation marks omitted).

Mot. 7-8. But Defendants do not, and cannot, question the Court's fundamental conclusion that "DAPA will directly injure the proprietary interests of [the States'] driver's license programs and cost [them] badly needed funds." Op. 28. That result follows inexorably from the Court's factual findings: driver's licenses are costly to issue, Op. 22-23; the DHS Directive makes millions of individuals eligible for driver's licenses, Op. 22 & n.14; and invalidating the Directive would therefore "undoubtedly prevent th[is] harm," Op. 34.[10]

Defendants argue instead that the Court's analysis would "permit States to challenge a federal law or policy simply because they have borrowed some concept of federal law or policy and incorporated it into state law." Mot. 7. This argument is ironic in light of the fact that, here, the federal government has *compelled* the States to adopt federal immigration concepts into their laws. Indeed, Defendants themselves have argued that denying driver's licenses to deferred-action recipients would violate federal law. Op. 24-26.[11]

In an attempt to rebut this point, Defendants once again accuse this Court of misreading their *Arizona Dream Act* brief. Mot. 7-8. That position remains "at best, disingenuous." Op. 24. As we have explained—without contradiction—Arizona did

---

[10] Defendants complain that this theory might "allow standing by States to challenge countless individual decisions to grant immigration relief or status." Mot. 7. Unsurprisingly, they do not suggest that any State has shown any interest in launching that type of lawsuit. In any event, the holding in this case—where Texas alone would lose millions of dollars if even a tiny percentage of the DAPA-eligible population applied for driver's licenses, Op. 22—has little bearing on cases involving individual immigration decisions, where standing may prove speculative. And those cases might also trigger additional doctrines precluding judicial review (for instance, if the Executive Branch is able to show that the relevant decision is actually committed to its discretion by law).

[11] Even the position stated in Defendants' stay motion would prohibit states from "employ[ing] any new, *non-federal* immigration classification." Mot. 7-8 (emphasis added).

11

precisely what Defendants now claim it was entitled to do: namely, deny driver's licenses to *all* deferred-action recipients, without relying on any non-federal classification. Pls.' Ltr. 1, Feb. 2, 2015, ECF No. 132. Yet Defendants *still* argued that the Arizona law was preempted. *Id.*[12]

Defendants also ignore the Ninth Circuit's holding that "denying driver's licenses to certain recipients of deferred action violated the Equal Protection clause, and would likely be preempted by DAPA, as well." Op. 25 (discussing *Az. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1067 (9th Cir. 2014)). Four of the Plaintiff States are bound by that holding because they are located in the Ninth Circuit; accordingly, "the Government's argument with respect to [them] is totally meritless." Op. 25 n.16. In fact, Plaintiff Arizona is bound by a permanent injunction, as the district court on remand in *Arizona Dream Act* enjoined it "from enforcing any policy or practice by which [Arizona] refuses to accept Employment Authorization Documents, issued under DACA, . . . for purposes of obtaining a driver's license." No. CV-12-02546, 2015 WL 300376, at *12 (D. Ariz. Jan. 22, 2015). The other Plaintiffs are appropriately concerned that, if they changed their laws to exclude deferred-action recipients from driver's licenses, the same rule would be imposed on them. Op. 26.

Finally, even if the States did have the option of passing such a law, that option would be a mere "illusion of choice," requiring Plaintiffs to choose between "full compliance with a challenged action [and] a drastic restructure of a state program." Op.

---

[12] Additionally, the federal REAL ID Act—thoroughly analyzed by this Court but ignored by Defendants—"requires states to pay [the federal government] a fee to verify the immigration status of each driver's license applicant," on pain of causing "their citizens [to] lose their rights to access federal facilities and to fly on commercial airlines." Op. 30-31.

27.   The only way States like Texas—whose policy of granting driver's licenses to deferred-action recipients predates the DHS Directive—could avoid the monetary harm imposed by the Directive would be to deny driver's licenses to a class of people covered by its laws.  Defendants cannot put Plaintiffs to a choice between two injuries and declare the chosen injury to be self-inflicted.[13]

**2.**   Defendants say nothing about the other direct costs demonstrated by Plaintiffs, namely, the costs of the education, healthcare, and law-enforcement services they are obligated to provide to unauthorized aliens.  Op. 43-46.  In particular, as this Court found, there are two large categories of unauthorized aliens that would demand those services only if the DHS Directive goes into effect: (1) those who otherwise would have voluntarily left the country, and (2) those who otherwise would have been removed.  Op. 53-54.

Defendants argued that these costs "will be offset by the productivity of the DAPA recipients and the economic benefits that the States will reap."  Op. 54.  Although this Court entertained this argument, it also noted that there was "no empirical way to evaluate the accuracy of these economic projections."  *Id.*  Plaintiffs are likely to prevail on this theory because such speculation cannot defeat standing and, in any event, the States' expenditures are a concrete harm for standing purposes (even if there is eventually some offsetting benefit).  *See* Reply Br. 57-58, ECF No. 64.

---

[13] Defendants attempt to rely on previous district court cases which have dismissed challenges to federal immigration policies for lack of standing.  Mot. 8.  But as this Court explained, prior opinions on this subject are distinguishable on a number of dimensions.  Op. 59 n.45.  For example, unlike the States in this case, the plaintiffs in previous cases "did not provide proof of any direct damages."  *Id.*

Moreover, the special solicitude accorded to States under *Massachusetts v. EPA*, 549 U.S. 497 (2007), "strengthens" this theory of standing.  Op. 43; *see* Op. 47, 48.  And it is bolstered yet further, as this Court recognized, by the executive's abdication of its duties in this area.  The federal government has preempted the immigration field, leaving the States unable to protect themselves from these costs.  Accordingly, the States are harmed by the Directive's "total abdication and surrender of [its] statutory responsibilities."[14]  Op. 64; *see* Op. 57.

**3.**      Finally, Defendants suggest that the Plaintiff States have no prudential standing because they are not within the "zone of interests" of the INA.  Mot. 8-9.  Their logic appears to be that States have no relevant interests because the federal government has exclusive authority in the field of immigration.  That view directly contradicts *Arizona v. United States*, which held that "[t]he pervasiveness of federal regulation *does not diminish the importance of immigration policy to the States*."  132 S. Ct. 2492, 2500 (2012) (emphasis added) (quoted at Op. 58).  This is because States are not "mere provinces or political corporations"—they "retain the dignity . . . of sovereignty."  *Alden v. Maine*, 527 U.S. 706, 715 (1999) (quoted at Op. 47).  In short, this

---

[14] Defendants also say nothing about Plaintiffs' *parens patriae* theory of standing.  As this Court explained, States have standing to protect the economic well-being of their citizens.  Op. 41.  If DAPA recipients are excluded from Affordable Care Act benefits, they will be less expensive for employers to hire, creating precisely the sort of economic discrimination that gave rise to state standing in *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982).  Op. 40-41.  While the Administration has yet to promulgate regulations explicitly establishing that employers of DAPA beneficiaries are excluded from Affordable Care Act burdens, recipients of DACA have been excluded from the Act through regulation.  Op. 41-42.  Accordingly, if the DHS Directive goes into effect, employers will begin hiring DAPA and Expanded DACA recipients, expecting reduced financial burdens under the Affordable Care Act.  This will cause concrete harm to Texas citizens and to Texas as *parens patriae*.

14

Court was entirely correct to conclude that Plaintiffs "fall within the 'zone of interest' pertaining to the immigration statutes at issue." Op. 67.

### B.    Plaintiffs' Claims Are Meritorious.

Defendants make only a cursory effort to question this Court's holding that "the implementation of DAPA violates the APA's procedural requirements." Op. 112. The two paragraphs Defendants devote to the issue do not even purport to offer any new argument or authority. Instead, they rehash two assertions this Court has thoroughly considered and rejected: first, that the DHS Directive is merely an exercise of unreviewable enforcement discretion; and second, that it is a guidance document rather than a substantive rule. Mot. 9-10. Neither argument is plausible.

As this Court explained, an agency cannot hide behind prosecutorial discretion when it "enact[s] a program whereby it not only ignores the dictates of Congress, but actively acts to thwart them." Op. 99. The DHS Directive not only constitutes a "complete abdication" of DHS's statutory responsibilities, *id.*, it also involves "affirmative *action*" that creates benefits for the program's recipients, Op. 85, 99. In particular, it gives unauthorized aliens "the ability to obtain Social Security numbers, work authorization permits, and the ability to travel," among other benefits. Op. 85-86. It is absurd to suggest that conferring benefits on over 4 million people is an unreviewable exercise of prosecutorial discretion.

Similarly, it is "disingenuous" and "contrary to the substance of DAPA" to refer to the DHS Directive as "agency guidance." Op. 105-06. The Directive "imposes specific, detailed and immediate obligations upon DHS personnel," Op. 110; "substantially changes both the status and employability of millions," Op. 112; and "represents

a massive change in immigration practice," Op. 111.  These are not the hallmarks of a guidance document.  The President was right when he said that he had taken "an action to change the law."  Op. 107; *see* Op. 111 (observing that the Guidance was "in effect, a new law").  Even in their stay motion, Defendants acknowledge the substantive nature of the DHS Directive by arguing that "irreparable harm" will ensue if the federal government cannot immediately implement the Directive.  Mot. 11, 13.  They never explain how such dire consequences could stem from delaying a mere advisory "statement[] of policy."  Mot. 10; *see supra* Part I(D).[15]

## IV.    THE PUBLIC INTEREST DOES NOT FAVOR A STAY.

Defendants' public-interest argument largely mimics their irreparable-harm argument, Mot. 14, and fails for the same reasons.  It also overlooks "the public interest factor that weighs the heaviest" in this case: "ensuring that actions of the Executive Branch . . . comply with this country's laws and its Constitution."  Op. 120-21.  As the Court explained, "[i]t is far preferable to have the legality of these actions determined before the fates of over four million individuals are decided."[16]  Op. 121.

Moreover, Defendants' dangerous views cannot be confined to the immigration context.  As this Court recognized, the government's view of enforcement discretion implies that "a lack of resources would be an acceptable reason to cease enforcing

---

[15] Defendants say nothing about the claims this Court did not reach: the substantive APA claim and the separation-of-powers claim.  Op. 121.  For purposes of responding to this motion, Plaintiffs rest on their prior briefing on these claims except to note that they have been substantially bolstered by this Court's rulings.  *See, e.g.*, Op. 99 ("The DHS Secretary is not just rewriting the laws; he is creating them from scratch."); *id.* ("DAPA does not represent mere inadequacy; it is complete abdication.").

[16] Nor can Defendants credibly claim a public interest in their plans because they "respond to humanitarian concerns and promote family unification."  Mot. 14.  As Plaintiffs have detailed, Congress prescribed the steps aliens must take for family reunification, Reply Br. 10-14, and Defendants have discarded that scheme.  The public interest is not furthered by executive lawmaking.  Op. 99.

environmental laws, or the Voting Rights Act, or even the various laws that protect civil rights and equal opportunity." Op. 65-66. Plaintiffs have noted from the outset of this litigation that, if the DHS Directive is allowed to proceed, "future presidents will be able to remake the United States Code by declining to enforce it." PI Mot. 32, ECF No. 5. Defendants have yet to offer a single word in response. It is not in the public interest to allow Defendants to effect a breathtaking expansion of executive power, all before the courts have had a full opportunity to consider its legality.

## V.   THE PRELIMINARY INJUNCTION MUST APPLY TO THE FEDERAL OFFICIALS IN ANY PLACE THEY MAY BE DEEMED TO ACT.

Defendants urge the Court to stay its preliminary injunction "to the extent that it purports to reach implementation of the Guidance outside of Texas," whatever that means. Mot. 18. This request ignores the fact that over half of the States in the Union are represented as Plaintiffs here, and it misunderstands the Court's authority, the appropriate scope of relief, and the harm that would follow from partial implementation of the DHS Directive.

Plaintiffs brought a *facial* challenge to the DHS Directive on several grounds, including that it was promulgated without notice-and-comment rulemaking as required by the APA. This Court found that Plaintiffs were likely to prevail on that procedural claim. Op. 112. The claim necessarily implies that the Directive was invalid when issued because notice and comment did not occur. Unsurprisingly, the APA compels that result. It provides that courts "shall . . . hold unlawful and set aside" procedurally improper agency actions. 5 U.S.C. § 706(2)(D). Courts have con-

17

sistently recognized that the invalidation of a regulation under the APA has "nation-wide" effect, for "plaintiffs and non-parties alike." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1408-10 (D.C. Cir. 1998).[17]

There is also no geographical limit on the Court's equitable authority. Defendants are properly before the Court, so the Court "in exercising its equity powers may command [them] to cease or perform acts outside its territorial jurisdiction." *Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952).

Defendants argue that injunctive relief must be tailored to the "specific harm the Court found here," which they assert is only the cost of issuing driver's licenses to DAPA and Expanded DACA recipients. Mot. 18. This confuses the basis for standing with the object of a judicial remedy. The Court's remedial power is defined by Defendants' unlawful action, not the concrete injury showing the existence of an Article III case or controversy. *See, e.g.*, *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (explaining that "the scope of injunctive relief is dictated by the extent of the violation established"); *Fiber Sys. Int'l, Inc. v. Roehrs*, 470 F.3d 1150, 1159 (5th Cir. 2006) ("[A]n injunction must be narrowly tailored to remedy the specific action necessitating the injunction.").

---

[17] *See, e.g.*, *Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 19 (D.D.C. 2004) (holding that, where a rule establishing a government program was invalid for failure to afford an opportunity for meaningful comment, that the rule should be enjoined as to "all persons subject to" the program and not simply as to the plaintiffs), *modified sub nom. John Doe No. 1 v. Rumsfeld*, CIV.A. 03-707 (EGS), 2005 WL 774857 (D.D.C. Feb. 6, 2005) and *modified sub nom. John Doe No. 1 v. Rumsfeld*, CIV.A. 03-707(EGS), 2005 WL 1124589 (D.D.C. Apr. 6, 2005); *cf. Am. Lands Alliance v. Norton*, CIV.A. 00-2339 (RBW), 2004 WL 3246687, at *3 (D.D.C. June 2, 2004) (imposing a nationwide injunction prohibiting the Fish and Wildlife Service from applying a policy that violated the Endangered Species Act's notice-and-comment requirement).

Moreover, Defendants ignore that the other 25 Plaintiff States would also suffer concrete injuries from the DHS Directive.[18]  This Court found that the harm threatened by implementation of the DHS Directive will extend beyond the borders of Texas to other States: "any subsequent ruling that finds DAPA unlawful after it is implemented would result in the States facing the substantially difficult—if not impossible—task of retracting any benefits or licenses already provided to DAPA beneficiaries."[19]  Op. 116.  Similarly, the failure to comply with the APA's notice-and-comment requirements is undifferentiated; it makes no sense to invalidate the Directive and require notice and comment only as to Texas.  In any event, even Texas would not be protected by the limited injunction Defendants propose.  The relevant federal agencies operate across the country, and they may well use employees in a number of States outside of Texas to receive, process, and grant applications for DAPA and Expanded DACA benefits to unauthorized aliens in Texas.  And even if those benefits

---

[18] Defendants mistakenly imply that only Texas has presented evidence regarding irreparable harm. Mot. 18.  In reality, other States, namely Indiana and Wisconsin, have provided declarations demonstrating their injuries.  *See* Exs. 15, 16, 25, 30 to Reply Br.  Moreover, this Court found that many or all States have been affected.  *See, e.g.*, Op. 29 (noting that DACA "directly caused a significant increase in … the costs incurred by states to process [driver's license applications]" and that "DAPA, a much larger program, will only exacerbate these damages").

[19] *See, e.g.*, Op. 23 ("[T]he DHS Directive will increase the costs incurred by states to verify applicants' immigration statuses as required by federal law."); Op. 24 ("[I]t is apparent that the federal government will compel compliance by all states regarding the issuance of driver's licenses to recipients of deferred action."); Op. 25 ("Plaintiffs' options to avoid the injuries associated with the DHS Directive are virtually non-existent and, if attempted, will be met with significant challenges from the federal government."); Op. 28 ("[T]he states cannot protect themselves from the costs inflicted by the Government when 4.3 million individuals are granted legal presence with the resulting ability to compel state action."); Op. 31 ("[S]tates must process an increased amount of driver's license applications and remit a significant portion of their funds to the federal government as required by the REAL ID Act.").

could somehow be issued only to recipients outside Texas through a perfectly implemented program, unauthorized aliens could simply move to Texas after taking advantage of DAPA or Expanded DACA in another State.

Moreover, partial implementation of the DHS Directive is wholly at odds with *Arizona v. United States*, which recognized that Congress imposed nationwide uniformity on immigration policy. *See, e.g.*, 132 S. Ct. at 2502 ("Federal law makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders"). Allowing DAPA and Expanded DACA to take effect in some, but not all, States would undermine the constitutional imperative to "establish an uniform Rule of Naturalization," U.S. CONST. art. I, § 8, cl. 4, as well as Congress's instruction that "'the immigration laws of the United States should be enforced vigorously and *uniformly*,'" Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 115, 100 Stat. 3384 (emphasis added).

Immigration law is a nationwide policy, and an unlawful immigration directive requires a nationwide remedy.

## CONCLUSION

Defendants' motion to stay the Court's February 16, 2015 order pending appeal should be denied.

Respectfully submitted.

LUTHER STRANGE
*Attorney General of Alabama*

MARK BRNOVICH
*Attorney General of Arizona*

DUSTIN MCDANIEL
*Attorney General of Arkansas*

PAMELA JO BONDI
*Attorney General of Florida*

SAMUEL S. OLENS
*Attorney General of Georgia*

LAWRENCE G. WASDEN
*Attorney General of Idaho*

JOSEPH C. CHAPELLE
PETER J. RUSTHOVEN
*Counsel for the State of Indiana*

DEREK SCHMIDT
*Attorney General of Kansas*

JAMES D. "BUDDY" CALDWELL
*Attorney General of Louisiana*

TIMOTHY C. FOX
*Attorney General of Montana*

JON C. BRUNING
*Attorney General of Nebraska*

ADAM PAUL LAXALT
*Attorney General of Nevada*

WAYNE STENEHJEM
*Attorney General of North Dakota*

KEN PAXTON
*Attorney General of Texas*

CHARLES E. ROY
*First Assistant Attorney General*

SCOTT A. KELLER
*Solicitor General*

/s/ Angela V. Colmenero
ANGELA V. COLMENERO
*Assistant Attorney General*
Attorney-in-Charge
State Bar No. 24048399

J. CAMPBELL BARKER
*Deputy Solicitor General*

ADAM N. BITTER
*Assistant Attorney General*

Office of the Attorney General of Texas
P.O. Box 78711
Austin, Texas 78711-2548
512-936-1700

21

MICHAEL DEWINE
*Attorney General of Ohio*
ERIC E. MURPHY
*Co-counsel for the State of Ohio*

E. SCOTT PRUITT
*Attorney General of Oklahoma*

ALAN WILSON
*Attorney General of South Carolina*

MARTY J. JACKLEY
*Attorney General of South Dakota*

HERBERT SLATERY III
*Attorney General and Reporter of Tennessee*

SEAN D. REYES
*Attorney General of Utah*

PATRICK MORRISEY
*Attorney General of West Virginia*

BRAD D. SCHIMEL
*Attorney General of Wisconsin*

BILL SCHUETTE
*Attorney General for the People of Michigan*

DREW SNYDER
*Counsel for the Governor of Mississippi*

PAUL R. LEPAGE
*Governor of Maine*

ROBERT C. STEPHENS
*Counsel for the Governor of North
    Carolina*

TOM C. PERRY
CALLY YOUNGER
*Counsel for the Governor of Idaho*

## CERTIFICATE OF SERVICE

I certify that I served a copy of this pleading on all counsel of record via this Court's CM/ECF system.

/s/ Angela V. Colmenero
A<small>NGELA</small> V. C<small>OLMENERO</small>