IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS, ET AL | ) |
| | ) CIVIL ACTION NO. |
| VS. | ) B-14-254 |
| | ) |
| UNITED STATES OF AMERICA, ET AL | ) |

MOTION HEARING
BEFORE THE HONORABLE ANDREW S. HANEN
MARCH 19, 2015

APPEARANCES:

For the Plaintiffs: MS. ANGELA V. COLMENERO
MR. ADAM NICHOLAS BITTER
MR. JOHN CAMPBELL BARKER
MR. ERIC ALAN HUDSON
Texas Attorney General's Office
P.O. Box 12548
Austin, Texas 78711

For the State of Indiana: MR. JOSEPH C. CHAPELLE

For the Defendants: MS. KATHLEEN R. HARTNETT
MS. KYLE R. FREENY
MS. DIANE KELLEHER
US Department of Justice
Civil Division
950 Pennsylvania Avenue
Washington, D.C. 20530

Transcribed by: BARBARA BARNARD
Official Court Reporter
600 E. Harrison, Box 301
Brownsville, Texas 78520
(956)982-9668

THE COURT: All right. Be seated.

All right. We're here in B-14-254, Texas versus United States. Who do we have for Texas?

MS. COLMENERO: Your Honor, my name is Angela Colmenero. I'm here on behalf of the plaintiff states, and I'm also joined at counsel table by Cam Barker, Eric Hudson, Adam Bitter and counsel for the State of Indiana, Joe Chapelle.

THE COURT: All right. Thank you, Ms. Colmenero.

And for the government?

MS. HARTNETT: Good afternoon, Your Honor. Kathleen Hartnett from the Civil Division, Department of Justice for the federal defendants. And at counsel table with me are Kyle Freeny and Diane Kelleher, also from the Civil Division.

THE COURT: All right. Great.

All right. Ms. Colmenero, we're here on your motion, so if you will lead off.

MS. COLMENERO: Yes, Your Honor.

Your Honor, the plaintiff states filed this lawsuit on December 3rd challenging the DHS directive issued on November 20th that sought to legalize the creation of a deferred action program which would have granted lawful presence to 4 million unauthorized aliens. The plaintiff states moved with great speed after filing their lawsuit by filing a motion for preliminary injunction the day after their lawsuit was filed and requesting relief as quickly as possible due to the emergency

created by defendants' actions.

The plaintiffs moved with such speed for one important reason, a desire to preserve the status quo. This is because we knew that once the federal government implemented this new program, it would be virtually impossible to put the toothpaste back in the tube, and the plaintiffs would suffer irreparable injury. Despite the haste with which litigation proceeded and despite assurances from the Department of Justice attorneys that they gave to the plaintiffs and this Court that the status quo would be preserved during the pendency of this litigation, the exact opposite occurred.

Defendants instead granted 100,000 individuals three year periods of deferred action status under expanded DACA, a program plaintiffs explicitly challenged in this lawsuit. Defendants did not inform this Court and plaintiffs did not learn of these developments until March 3rd, nearly 15 days after the preliminary injunction had issued.

These actions have prejudiced plaintiffs as 100,000 individuals received three-year periods of deferred action and three year employment authorization cards.

Defendants have moved for early discovery for two reasons. First, defendants' assurances and representations to this Court do not square with their conduct. The need for discovery that the plaintiffs seek relates not -- to us not being sure we can rely on the Department of Justice about what is and what is not

currently being done with respect to implementation of programs in the 2014 DHS directive.

Second, defendants have moved for additional discovery -- I'm sorry, we've moved for additional discovery because plaintiffs need more information focused on the implementation of expanded DACA in order to determine the scope of the remedies that plaintiffs may pursue in this litigation.

As I indicated earlier, defendants informed this Court through an advisory that between November 24th and the issuance of this Court's preliminary injunction order on February 16th, that USCIS had granted three year periods of deferred action to 100,000 individuals. This was the first time this action had been disclosed to either this Court or the plaintiffs, and plaintiffs were more than surprised by this information.

What is even more troubling than just the disclosure at this stage of the proceeding is that defendants insist that their actions were not inconsistent with the terms of the preliminary injunction or the relief requested by plaintiffs in this lawsuit. Indeed, defendants state that they did not understand plaintiffs to be challenging the issuance of three year deferred action benefits to 2012 DACA renewals.

Defendants' position is just untenable. While defendants are correct that individuals could be eligible to receive renewals of their deferred action periods under the original DACA program, the length of that deferred action would be

limited to two years under the original 2012 DHS directive. But that is not the action that defendants took here. Instead, they relied on the November 2014 DHS directive to issue three year periods of deferred action to over 100,000 individuals, a benefit that would not otherwise exist but for the 2014 memo, and a benefit that was directly challenged by the plaintiff states and later enjoined by this Court as unlawful.

The reason plaintiffs are concerned about this information in the advisory is because on three separate occasions, defendants made statements to this Court that directly contradicted the actions they were taking in terms of implementing the expanded DACA program.

First, this Court held an initial status conference over the telephone shortly after the lawsuit was filed. Counsel for plaintiffs expressed concern at that time whether the status quo would be preserved between the date of the conference and the date of the preliminary injunction setting.

In response to questioning from the Court, counsel for defendants stated that the agencies would not begin accepting applications for deferred action until mid February.

Furthermore, counsel for defendants stated that there would not be any decisions on those applications until later and assured the Court that she would not expect anything to happen between now, the time of the December 19 telephone conference, and the date of the hearing. The plaintiffs relied on this

initial assurance of nonaction from the defendants to establish the schedule moving forward on the preliminary injunction.

Second, defendants also filed a motion for extension of time to file a surreply to plaintiffs' reply in support of the preliminary injunction brief. This was filed on January 14th, 2015.

In that brief, defendants represented to this Court that USCIS did not intend to entertain requests for deferred action under the challenged policy until February 18th, 2015; and that once again, no decisions would be made on those applications until at least March 4th, 2015.

Nowhere in this pleading do defendants openly state that they are implementing a portion of the 2014 DHS directive. And again, defendants' assurances of nonaction were relied upon by this Court and plaintiffs as the case progressed.

Finally during the preliminary injunction hearing before this Court on January 15th, the Court questioned defendants regarding -- regarding when the status quo would change, and this was in response to the pending motion for extension of time to file a surreply.

Consistent with the prior representations, defendants confirmed that no application for expanded DACA would be accepted until February 18th, and no action would be taken on any of those applications until, once again, March the 4th.

Now, defendants have tried to diffuse the significance of

their March 3rd advisory and the information contained therein by claiming that their prior assurances to this Court may have led to confusion. But what defendants do not explain is why they made certain representations to the Court that proved not to be true or, at a minimum, less than forthcoming. They also failed to explain why they chose not to inform the Court that the entire time the lawsuit was proceeding, the entire time they were representing and assuring the plaintiffs that nothing was happening, that the Department of Homeland Security and USCIS was granting tens of thousands of three year periods of deferred action benefits over a two-and-a-half month period.

Defendants have also suggested that expanded DACA applicants for first time beneficiaries are somehow different than renewals for individuals who were already receiving deferred action under original DACA. This is perhaps why they do not understand the plaintiffs to be challenging this program. But that is a distinction without a difference. This is because applicants for renewals submit the same application as first time applicants. They simply check a different box.

As a result, from November 20th until when the preliminary injunction issued, USCIS was receiving renewal applications and they were taking actions on those applications, and plaintiffs believe all of that is contrary to what was conveyed to this Court. Defendants had a duty to the Court and to the plaintiffs to inform them that the entire time this case was moving forward

and the preliminary injunction proceeding that they were actively implementing the expanded DACA program and awarding three year periods of deferred action benefits.

Defendants also attempt to justify their actions by claiming that the plaintiff states and this Court were somehow on notice that three year deferred action benefits were being handed out. We believe this is also incorrect. Defendants point to a declaration from Donald Neufeld which was included in an appendix filed with their surreply on January 30th. But buried in the Neufeld declaration in a footnote in a 566 page appendix is the following statement.

And this statement simply says that pursuant to the November 20th memo issued by Secretary Johnson as of November 24th, 2014, all first time DACA requests and requests for renewals now receive a three year period of deferred action.

While this statement is entirely consistent with the language that was contained within the November 20th DHS directive, nowhere in this declaration is there any statement that defendants were actively issuing three year deferred action benefits to expanded DACA beneficiaries. Instead, just days before this motion was filed with the Court and at the PI hearing, defendants said just the exact opposite. This hardly constitute notice to the plaintiff states that 100,000 deferred action benefits would be doled out and the status quo would be changed during the pendency of the proceeding.

The plaintiffs states have filed a motion for early discovery in this matter, and we believe it is necessary. The plaintiff states have been irreparably harmed by defendants' actions in at least the following ways.

First, the plaintiff states have argued that a preliminary injunction was necessary, and this Court, in its February 16th order, agreed because it is virtually impossible to unscramble the egg or put the toothpaste back into the tube once defendants issue lawful presence documents.

Temporary driver's licenses and other state benefits may have been issued to DACA beneficiaries who receive renewals and three year deferred action statuses. At least in Texas, this means that an individual may have received a temporary driver's license for a three year period of time as a result of this renewal of three year deferred action status, and that's because driver's licenses are issued for the length of time in which an individual can lawfully remain in the United States.

To the extent that there's -- there's a suggestion that perhaps we could claw back that three year benefit and change that to a two year benefit, that doesn't solve the irreparable harm that the states have suffered. The cost of clawing back driver's licenses only add to the burden of the states and makes it virtually impossible for the states to try to pull that benefit back once it is issued.

Second, plaintiffs also argued in the preliminary injunction

proceeding that an injunction was necessary because original DACA program set off a humanitarian crisis, and we sought to prevent another one from occurring. The three year deferred action period that was part of expanded DACA was an added incentive to individuals applying for such a benefit. It goes without saying that a three year term of deferred action and work authorization is more valuable than a two year term. The longer term encourages more applicants for DACA and more DACA renewals. This triggers immediate costs to the states that we have asserted in response or in our preliminary injunction motion such as issuing driver's licenses and other benefits to the people who newly apply for or renew those benefits.

Third, every instance of the executive issuing more favorable benefits such as expanded DACA or even original DACA increases the perception that immigrating illegally now will yield lawful presence down the road, which as we have established in our briefing to this Court on the preliminary injunction, increases costs to the states.

Finally, there is harm that actually happens in the third year under expanded DACA. Although defendants claim that no harm exists because these individuals would have received a two year deferred action renewal under original DACA, this does not mean that everyone would have received this benefit. Individuals still must meet the eligibility requirements, so there is at least some percentage of people who got a third year

under expanded DACA who would not have received two year term under original DACA. That third year would lead to a certain percentage to remain in the country during that third year, and the presence of those individuals would impose costs on the states. There would be direct economic costs in the form of licensing, and this would also include the *parens patriae* injuries of our citizen workers and costs from additional social services.

So what do plaintiffs seek to accomplish through this motion? Plaintiffs merely seek permission to conduct early discovery in this matter. As this Court is aware, before defendants filed their March 3rd advisory, the parties agreed to stay the meet and confer requirements to develop a schedule for trial on the merits pending resolution of the motion to stay the injunction. As a result, a motion for early discovery and a granting of our motion would allow plaintiffs the opportunity to conduct limited discovery on the issue of the implementation of expanded DACA and the extent of the plaintiffs' representations and prior assurances to this Court that that program would not be implemented during the pendency of this litigation.

We want discovery focused on the representations that the attorneys for defendants made to the Court. This type of discovery would help us learn how the states have been injured and help us ensure that the information that we are receiving from the attorneys for defendants is, in fact, reliable.

Additionally, we would like discovery on how many three year terms of DACA, the three year expanded deferred action benefits were handed out to the individuals, when those have been issued, and when USCIS received those applications with respect to the November 20th DHS directive. All of this information would enable the plaintiffs to learn more information regarding implementation of expanded DACA and would assist them in determining the scope of any future remedial relief that they may seek from this Court.

And with that, Your Honor, the plaintiffs would request that the Court grant their motion for early discovery and allow them to seek this information from defendants.

THE COURT: Let me -- let me ask you a question, Ms. Colmenero. Say I grant your request. And let's say what you find out is exactly what you just argued, you know, that okay, they misrepresented the facts to the Court. In that time period that they misrepresented facts to the Court, 100,000 people or maybe more -- I mean, I understand why you want to find out how many, but let's say that's all -- let's say it's all true. What then?

MS. COLMENERO: Well, Your Honor, defendants need this information in order to better assess what further relief that they may seek from the Court. I believe our concern is really geared more towards the preliminary injunction that this Court issued and ensuring that there has, in fact, been compliance

with it and ensuring that everyone is on the same page in terms of what plaintiffs challenged in this lawsuit and what this Court enjoined and ensuring that everyone is complying with the terms of the preliminary injunction order as this case moves forward.

THE COURT: The theory being that if they made these representations on three different occasions to the Court and these representations were not true, how do you know they're complying with the injunction?

MS. COLMENERO: Exactly. And ensuring reliability from these representations to the Court will impact the relief that we may seek, which may include a motion to modify the preliminary injunction if it is unclear that it applies to certain aspects of the DHS directive. It may include modifying the preliminary injunction to impose reporting duties from the defendants to ensure compliance. Or depending on whether the facts show a concern more than just unreliable information or a breach of the duty of full disclosure, perhaps sanctions.

But there are a multitude of issues that we need to learn more about in order to inform the scope of the remedial relief that the plaintiffs may seek in the future from this Court.

THE COURT: Okay. All right. Thank you.

Ms. Hartnett?

MS. HARTNETT: Thank you, Your Honor. On behalf of the government, I would like to first of all apologize for any

confusion that our representations created in the case, and we are -- of course stand ready to answer any questions that the Court has or to provide additional information that would be helpful to the Court in understanding what happened here. I'm -- also just wanted to inform the Court that we do intend to submit a written opposition to the plaintiffs' motion for discovery which is due mid next week.

I -- you know, happy to answer any specific questions. What I would say is that these were grants of deferred action under the 2012 criteria that existed before the 2014 memorandum came out.

THE COURT: Tell me how that is.

MS. HARTNETT: Yes, Your Honor.

THE COURT: First of all, let me read the first sentence to your advisory. This is what you filed with the Court. "Defendants file this advisory to inform the Court of certain actions that U.S. Citizenship and Immigration Services took pursuant to the November 20th, 2014." That's DAPA.

MS. HARTNETT: Your Honor, we -- I completely agree with you and would not dispute that the three year period versus the two year period deferred action, the genesis of that was the 2014 memorandum. I think -- I do think that the basis for this confusion, and I do apologize for it on behalf of my client and our team, is that we were -- when we were talking about applications being accepted for expanded DACA, that would be the

actual harm that's being alleged in this case of expanding the universe of people who will be eligible to receive deferred action. As the state here said, the case is about 4 million, up to 4 million new people who may be able to receive benefits. That was the harm that we were focused on. Therefore, the dates that we were providing to the Court were when applications would be accepted for that expanded group to join -- to seek deferred action.

THE COURT: We talked about that at the hearing. I mean, I -- Ms. Colmenero's predecessor actually misspoke because I asked, "Does this concern DACA at all?" And he initially told me no, and then caught himself and went back and said, "No, this includes the -- the amendments that are contained in the November 20th, 2014 letter."

And then I asked, "You mean like the expansion of the years?" And everybody agreed that was it.

And then you said, "It's not happening."

MS. HARTNETT: Your Honor, I certainly don't want to take issue with your -- I have looked closely at the transcript, and I don't think that the issue of the three year to two year grant came up during that hearing or I would have immediately brought to the Court's attention this issue. Again, I think we were focused on, because the entire crux of the claim of irreparable harm here, was that people were going to start getting DACA and eventually DAPA that didn't get it before.

I actually don't take issue with what Ms. Colmenero -- I mean, we don't dispute that the state is challenging the memo in full. And we certainly appreciate the Court's injunction order applies to the memo in full. And if I may, I would explain the reason why this came to our attention and that we promptly brought this to the Court's attention once we realized that we have inadvertently caused confusion. Was -- the Court's injunction order is very clear that it -- it mostly -- obviously the Court's opinion focuses on DAPA. At the end it says DACA as well, to the extent that there are revisions. And your order says clearly "any and all aspects or phases of the expansions, including any and all changes to DACA."

In the course of -- that would mean that to the extent that the agency was issuing three year grants rather than two year grants pursuant to the terms of the November memo, that had to cease.

THE COURT: And that's what brought it to your attention?

MS. HARTNETT: Yes, Your Honor.

THE COURT: So you waited three weeks to tell me you were doing it?

MS. HARTNETT: Your Honor, I would say this. We also -- I think that the state does direct your attention in their filing to a footnote in our -- in our motion for a stay that we filed with this Court, and I'm not -- I'm not sure -- I think

that that indicates even by February 23rd, I believe, which was the date of that motion, we were still not focused on this issue. That footnote talked about that there were some cases in the pipeline, people who were trying to apply for 20 -- I'm going to call it 2014 DACA. I'm trying to use clear phrases but also ones that are not too long. But for the people under the new 2014 criteria had been applying before the February 18th deadline. Those were not being processed, accepted or touched by the agency until -- or processed in any way by the agency pending the outcome of this hearing with this Court.

On the other hand, they were there. And if the Court had allowed the program to go forward, could have been processed as 2014 DACA applications.

And so this -- what my point here is, that footnote again on February 23rd indicated to the Court that there were some 2014 applications waiting to potentially be acted on, but again did not draw the Court's attention to the fact that there had been these three year grants because I would just represent to the Court -- and this is certainly our -- these were part of the 2012 application process which had a different form, was being processed pursuant to the existing infrastructure, and the big change that was going to occur from the perspective of the agency and, frankly, from the perspective of the harms being alleged here, was the roll-out on February 18th of the new application form. There would have been a whole new apparatus

in place to accept the expanded class of people.

So all I can tell you, Your Honor, is that is -- that is what we were trying to convey to the Court accurately because the Court's opinion, as it noted, said that it would be -- it was unclear from the face of the November 20th memo what exact date expanded DACA, meaning people who met the broader criteria, could apply on. It gave a number of days rather than a date.

And so when we were telling the Court the February 18th was the date, not February 20th as it could have been under the timing in the memo, that is the date that we were trying to explain to the Court.

THE COURT: Well, and I took that date to heart. I mean, that's why I -- I mean, my injunction came out on the 16th. In fact, it came out late the night of the 16th because I was trying to meet the deadline you set.

MS. HARTNETT: Yes, Your Honor. And we -- we -- again, without trying to -- we apologize for the confusion because we were focused, as were the plaintiffs, frankly, and as the Court was on the irreparable harm that was being alleged. And the irreparable harm had to do with new people being eligible for those benefits, new people possibly getting driver's licenses. There was no -- and I just think it does -- it is telling, again, without trying to under -- you know, without trying to de-minimize any confusion that we may have caused, that the state did not point out any harm from three year versus two year

grants in its preliminary injunction papers. So even assuming, as the state says --

THE COURT: That's because like the judge, the state thought it wasn't happening because you and Ms. Freeny told us nothing is happening. I mean, that was the term, "nothing." I said, "So you're telling me nothing is happening?" And you basically said, "Yes, that's what I'm telling you." So like an idiot, I believed that.

MS. HARTNETT: Your Honor, certainly we don't think that. And I do -- I would say that what my point was actually about the -- about the -- about the -- the point is that we were focused on when the expanded group of people would be getting eligible to get the benefits.

And my point about the irreparable harm in the papers, I think I'm trying to make a point separate from what you're indicating there, which is if there were independent irreparable harm from going from two years to three years, even if the state thought that wasn't currently happening, which again, without trying to dispute whether that was or was not the state's understanding, one would have expected somewhere in the papers to see an explanation of harm from that. And the fact that that wasn't a focus of the harm, it wasn't a focus of the argument, it wasn't a focus of any of our preliminary discussions is why the government was focused on the date new people could apply. And we were trying to provide the best and most accurate

information to the Court on that question, and that was accurate. February 18th was the roll-out date. There was a big apparatus in motion, and that was brought to a halt on the morning of February 17th because we take your order extremely seriously.

As part of that compliance, it also became clear that the three year to two year -- the grants from two years to three years which were -- flowed from the November 24th memorandum -- I don't dispute that -- also had to immediately cease, and that was what was directed throughout the organization.

THE COURT: All right. And the state is basically saying -- and you can just tell me now. You don't have to file something. Why do you think she's not entitled to find out: Look, Judge, we've -- we relied on representations before, and those representations turned out not to be true. We want to make sure we can rely on the representations we're getting now.

MS. HARTNETT: Your Honor, I would submit at least two things in response. One is we obviously strive to be as candid as possible and provide the Court with all relevant information. It truly became clear to us that there was potential confusion on this point. This was not an area of focus. This is not something that we did not want to answer the Court's questions if it had it. It was simply not the harm we were focused on, which was new people getting it. So I would say this is -- there was not any record of unreliable representations here

except with respect to this one potential confusion that we brought, promptly brought to the Court's attention when it came -- became evident to us that we may have created confusion.

And so I would just say the fact that we filed an advisory to make clear the facts to the Court should not be used as the toehold to have further discovery. And I can tell you myself that I'm happy and the team and our client is happy to provide the Court with information that it would find useful to -- to satisfy itself of that.

I think discovery is a separate question and is not the proper course for addressing any concerns that the Court may have.

I also would note that when they called and let us know that they were going to be filing their motion, we did attempt to confer with them to figure out if there was certain specific information that they requested that would be useful and stave off a separate discovery issue here in this case, and we did not -- that engagement did not occur. And also the harms that were being set forth here for the first time in this case -- first time was on the PowerPoint today about the alleged harm from the three year to two year grant.

So again, I think there's a separate -- there's two issues as they've identified. One is can you trust what the government is telling you? And I'm saying to you, Your Honor, with full respect and apologies for the confusion that we have caused that

yes, you can. And that we brought this issue to the Court's attention promptly. I think there's --

THE COURT: I can trust what you're saying, is what you're saying, yes?

MS. HARTNETT: Well, yes. And, Your Honor, I do think --

THE COURT: I can trust what Secretary Johnson says?

MS. HARTNETT: Your Honor, you can. And I may --

THE COURT: I can trust what the president says?

MS. HARTNETT: Your Honor, we -- the --

THE COURT: That's a yes or no question.

MS. HARTNETT: Of course, yes. Yes, Your Honor, of course.

THE COURT: Okay.

MS. HARTNETT: And we are striving to provide the Court with accurate information. We did not -- the government did not implement the revised DACA as we understood that term meaning, the expansion of this deferred action to potentially 4 million new people before the Court ruled. That was the crux of this case, that was the crux of their focus of harm, and we were doing our best to let the Court know when that would happen so that the Court could, as you've noted, timely rule and prevent that from taking effect if the Court so saw fit.

THE COURT: All right. Let me ask you a question because I asked Ms. Colmeneri. And if I mispronounce your name,

I apologize. Colmenero. Basically the same question.

So let's say everything they say is true. What do you think I ought to do?

MS. HARTNETT: Right. To the extent, Your Honor -- I mean, they say a lot of things. I mean, to the extent there was a -- I guess to the point of -- if they were able to establish --

THE COURT: Let me -- I'm taking it to the full extreme of what that -- let me -- if I find that the government misrepresented the facts that the states relied on, that the Court relied on it, what should I do? Nothing?

MS. HARTNETT: Your Honor, I think I do have an answer for you on that. Thank you for framing the question that way. I think that to the extent the Court believes that it issued its preliminary injunction ruling and that the briefing was -- occurred without full information that was relevant to the Court, the proper remedy here would be to do supplemental briefing on the specific issue of should there be additional relief ordered by the Court for the three year grants that occurred during the relevant period.

THE COURT: Should I order sanctions?

MS. HARTNETT: No, Your Honor, you should not. And I would note that that's not been something that was teed up for this hearing, either in your order, in their motion.

THE COURT: She brought it up in her argument.

MS. HARTNETT: That's correct, but we would deserve full notice of whatever -- whatever type of relief was being sought there, given the severity of that type of relief. And moreover, I would say there was absolutely no basis for sanctions here. The government was trying to do the right thing by bringing to this Court's attention an important fact that the Court may find important and that we realize may have inadvertently been left out of the presentation of this case.

But I think what is -- the key here, though, is that for there to be some additional relief here, and I'm talking about whether something should be done to transform the three year grants into two year grants and consistent with what the government has told this Court, there are options for taking relief to accomplish that because we -- as we told the Court, these grants are revocable. They can be taken back. These are all people that would have had two year grants if they had --

THE COURT: My span of options -- my span.

MS. HARTNETT: Yes.

THE COURT: Not what y'all can do, but what I can do. I mean, I can do nothing on one hand. I can strike your pleadings on the other. I mean --

MS. HARTNETT: I think there's a third --

THE COURT: I mean, Judge Ellison in Houston in the Tesco Corporation case, I mean, he granted a dismissal with prejudice against a person that had -- or a company that had won

a lawsuit.

MS. HARTNETT: Your Honor, I think that would be wholly unwarranted here. For example, I -- I think this would be a different situation, for example, if the government had been implementing the expanded class and giving new people access to deferred action during the relevant time period. That did not happen. These are all people that would have received two year grants anyway under the old criteria. I do think --

THE COURT: Go ahead, finish.

MS. HARTNETT: To be constructive, though, I do think that if there is a true allegation here of harm that the state is facing due to the hundred thousand -- I can -- it's 108,081 grants during the relevant time period. If there was a harm that the state is facing from those, the proper course would be for Your Honor to receive briefing on the harm and to issue an order. And if the order were to require some sort of a remedial action on behalf of the government to unwind those three year grants, the government of course would -- would receive that court's order.

THE COURT: What about attorney's fees? Should I order attorney's fees?

MS. HARTNETT: Your Honor, I would -- we would --

THE COURT: I mean, but that's --

MS. HARTNETT: No.

THE COURT: -- certainly an option. Let me ask you

this. If I order attorney's fees, who pays it?

MS. HARTNETT: Well, the United States.

THE COURT: Well, United States taxpayers pay it, right?

MS. HARTNETT: Your Honor, I -- again, I -- we have this --

THE COURT: Well, answer my question. The United States taxpayers?

MS. HARTNETT: Ultimately, yes.

THE COURT: All right. So that means that the states, the people that have already suffered the damage, if there is damage, actually end up paying their own sanctions, right?

MS. HARTNETT: In that respect, Your Honor, yes, but --

THE COURT: Okay.

MS. HARTNETT: Again, I -- we're happy -- these are all issues that are far beyond what is sought in the motion that is at issue today. And, frankly, the government has not had a chance to brief that or even hear what the allegations would be against it.

But what I'm telling you is that we do -- we take seriously the notion that if the Court finds there to be a reason for further briefing or further potential relief for the state based on harm that the state could establish from those three year grants, we of course would be welcome to -- willing to do that.

But I think -- I don't -- without again minimizing the confusion, there has been no allegation throughout any of the

proceedings in this case that the three year grants are some way harmful.

THE COURT: Okay. I'm just saying I'm doing this on the assumption she's right.

MS. HARTNETT: I'm saying that even if she is right, the question then would be, okay. There was a -- there -- assuming that there was a mistaken information before the Court and that was the fault of the government, what do you do with that? And I'm -- what my point here is I believe that they would have a chance perhaps to show that it was material and that they should get an additional injunction. The other injunction of course is already up before the Court of Appeals, and we would of course be willing to brief that issue for the Court.

THE COURT: All right. And what I asked you about if I awarded attorney's fees, the same would be true if I fined somebody or fined the government or if I awarded some kind of damages. I mean, what would happen is the taxpayers would end up having to pay that, correct?

MS. HARTNETT: Essentially, Your Honor, yes.

THE COURT: All right. So the states would end up having to pay their own damages, the taxpayers of the states, correct?

MS. HARTNETT: Yes, Your Honor.

THE COURT: All right. Let me switch over on a different topic while I have you.

MS. HARTNETT: Yes, Your Honor.

THE COURT: Because you have a pending motion in front of the Court, a motion to stay.

MS. HARTNETT: Yes, Your Honor.

THE COURT: One of the things that was new, and I -- the state has objected to this, but I want to ask you while I have you here about it. There was an affidavit from -- and I will butcher this name too as well -- Kerlikowske?

MS. HARTNETT: That's accurate, yes. That's correct.

THE COURT: All right. And he's basically laid out, and maybe it's laid out other places, but it's probably in his affidavit the most succinctly, the way that DAPA or DACA, for that matter, helps them.

And the -- and what I'm asking you is if -- the way I understood his affidavit is because these individuals will be issued some kind of license or card or ID or something like that, that if a Border Patrol or an ICE agent stops a person, they can show them their card, and they'll know that they don't have to pursue that person. Am I reading his affidavit right?

MS. HARTNETT: Yes, Your Honor.

THE COURT: Okay. All right. My question is, why aren't you doing that now? I didn't enjoin you from doing that. You could issue them some kind of form that says, "We're not prosecuting this person."

MS. HARTNETT: Your Honor, I think the people that

receive deferred action receive more than a slip of paper that is their deferred action approval, and they also receive an employment authorization document. I think the employment authorization document is a recognized secure type of ID.

THE COURT: My question to you is, you could say we have a bunch of folks here that other than being in the country illegally are fairly law abiding. They -- as Secretary Johnson says in the memo, they may be working, they may be supporting their families. They may be doing all the things that we would hope they would do other than being in the country illegally.

There's nothing that's stopping the Department of Homeland Security from saying: All right. We want those people. Come forward. We're going to do a background check on you, and we'll give this card that says for three years we're not prosecuting you. We're not going to -- we've got higher priorities. I mean, y'all could do that right now.

MS. HARTNETT: Your Honor, yes. That was not the judgment of how to do the program, but that's an alternative.

THE COURT: I know. But, I mean, you could -- if you wanted, even with my injunction in place, you could satisfy all those security needs without issuing legal presence and without giving them tax benefits and employment authorizations and Social Security. I mean, that came up in the news. Can you -- are they going to be eligible for Social Security benefits?

MS. HARTNETT: Your Honor, under existing law, the

people that get deferred action end up having a number that could allow them to later on -- basically account for their income in the meantime to put it on the books.

But may I just add to that? Not to get into a -- do more argument than Your Honor would want. I think an incentive for this pro -- the reason why deferred action in the department's judgment works in a way that's different than the prosecutorial discretion is it does provide an incentive for people to come out and identify themselves. The ability to work -- and again, I know -- I understand Your Honor may disagree under existing regulatory and statutory structures, but work authorization is a large incentive for getting people to be able to come out of the shadows, as it said, and to identify themselves.

I think that the idea would be to make sure that we're having people identify themselves and have a ability to work legally while they're in that period of deferred action. So that would be a difference from the way Your Honor was proposing it.

THE COURT: Well, it would be a difference. But what you're saying is basically we have to -- I mean, just an offer to stay in the country without being prosecuted, we have to give them some extra incentive? I mean, we're basically bribing the people to stay in the -- stay in the country legally?

MS. HARTNETT: I'm not saying that, Your Honor. I think -- again, this is just a matter of -- I believe that the

law enforcement officials that run the Department of Homeland Security had made the judgment that the right way to get people to come out, account for themselves, be accountable for their work, be on the rolls, have the tax taken out of their income, this is the judgment that this program is the one that would most successfully on a proper scale to actually achieve the efficiencies that come from having a program like this, I think the judgment has been made that that's the way that the program would best work.

THE COURT: Okay. And the population you're talking about is greater than the population of 26 states?

MS. HARTNETT: So I'm not sure --

THE COURT: Four-and-a-half million people, fair estimate?

MS. HARTNETT: That's the estimate under both DACA and DAPA of who would be eligible to apply. Of course, not everyone applies or receives it.

THE COURT: Okay. All right. Let me switch gears because there's one other thing that I think was -- and again, it may not have been new, but it was set forth different.

At one point in your motion, you suggest that I ought to apply the injunction only to Texas?

MS. HARTNETT: Yes, Your Honor.

THE COURT: I mean, isn't that contrary to every immigration argument that the government has ever made? I mean,

can you think of a case where the government has ever argued that there ought to be special rules for states? I mean, haven't they always argued that immigration ought to be uniform across the board?

MS. HARTNETT: As a general matter, yes, Your Honor. And I believe that would be the best way for this program to be applied. On the other hand, there are examples that I -- I can bring them to the Court's attention if it would be useful. I'm not fully prepared to discuss them here. Where there are pilot programs with certain states or localities in which the immigration laws are applied differently. I think the point of the case law in this area is that it's the federal government's -- it's up to the federal government to determine when and how that will be appropriate.

And so in this case like in other cases involving pilot programs or places where the federal government has chosen to have differential application of the law, I think the judgment is the benefit of that would outweigh the -- any downside; and, frankly, that it would at least accomplish some of the important goals that the government is seeking to achieve.

THE COURT: Why not do it for the ten states that are in favor of it, at least by amicus, and not do it for the 27 states that are plaintiffs? We have a lawyer here from Indiana. He's one of the plaintiffs. Why not do it for all 27 states?

MS. HARTNETT: Well, again, Your Honor, I appreciate the

question. I think our point of view is that the best way to do the program and the way that the law enforcement officials at the Department of Homeland Security believe was the best was to do it on a nationwide basis. I think the reason why we argued for limiting it to Texas in our motion for a stay was that the evidence that came in at the preliminary injunction phase as supported at most an injunction with respect to Texas. As to an alternative program that would only be directed at states that chose to be part of it, that certainly is another policy option, but is not the one we're defending here because the law enforcement officials chose a program that would apply nationwide and deliver the highest benefit and national security benefit from their perspective.

THE COURT: I'm shaking a little bit. I know you're not from Texas, but the current slogan for the governor's tourism office is, "It's like a whole other country." This would play right into it. You might get his support for that.

Let me go back and seriously ask. I mean, doesn't the constitution contemplate a uniform law, Article I of the constitution?

MS. HARTNETT: Your Honor, as a general matter, yes. But as I'm pointing out, there have been pilot programs and other -- and other -- and other initiatives that are directed at certain communities, and we would be happy to provide the Court additional authority on that if you would find it useful.

THE COURT: All right.

MS. HARTNETT: But again, I'm just now back to the discovery for one further point, is that we would not only seek the ability to file a written opposition, which would provide some of the legal analysis that we haven't covered here also, but, you know, we also would want to maintain the ability to object to any discovery requests that -- the specifics of any discovery requests. Because as the Court may be aware, there are some sensitivities of privilege and other things that were implicated by what they -- what they said.

I guess one other -- not to dig my hole any further, but I actually wanted to add one other. This didn't come out in the questioning that you have here, but I also wanted to bring to your attention one other thing. I had meant to kind of go through the activities that the DHS officials took right after your injunction to make you feel comfortable that we had been immediately implementing them.

The secretary issued a directive on Tuesday, a statement saying we would comply fully. The USCIS, head of USCIS also issued an email to the field that day on the 17th saying that we would have full compliance. The other two components also issued emails to the field the next day because they have some, as you know, interaction with the deferred action, even though they don't principally run the program.

And there's been some talk in the news about facilities and

employment of people for gearing up for DAPA. All of that ceased, and resources have been directed to other places. In addition, there have been obviously all the forms and things that were going to go up on the website on the 18th did not go up. Things that had -- publicity that had been out there, including existing websites had banners added to them to make clear that the program was not taking effect.

And also I just would note with respect to the three year to two year grants, immediately as of the 17th, that did cease. The USCIS centers were told not to process any more three year to two year grants, and that included -- there were about 750 that were in the pipeline that day that were about to go out the door with the three year cards, and those were pulled back, and so those were only issued as two year cards, even though some of those people had gotten notice that they would get three years.

We have been consulting with our clients, determined there were about 55 cards that have gone out as three year terms since the Court's injunction. That those were a result of what appears to be just manual error, having the three inserted in the system rather than two. And the department has actually in its system corrected those, and those are now two year grants of deferred action, but those were not in any way -- those were -- is an error and contrary to the directive from the top of no more three year cards as of February 17th.

THE COURT: I hope you notified the recipients of that.

MS. HARTNETT: We're in the process of taking full corrective action, but I just wanted to bring that to the Court's attention because again, we really had no -- no intent and certainly no -- no intent to withhold any of this material from the Court. It simply was not the focus of the harms that were at the crux of the PI motion.

THE COURT: All right. Ms. Colmenero, you want to add anything?

MS. COLMENERO: Sure. Just a couple of points, Your Honor.

Just to clarify, our motion for early discovery is simply asking the Court the ability to take -- to conduct some early discovery. We're not asking for any specific form of remedial relief. This is information that we have learned about that we find surprising, we find concerning, and we would like to learn some more information about it. And there is a mechanism to do that, and that's through discovery. And Rule 26(d) allows for parties to conduct early discovery when there is good cause. And this situation here presents good cause in which to take early discovery because clearly there was some confusion in terms of what plaintiffs were challenging and what -- in terms of the expanded DACA and the three year grants of deferred action compared to the two year renewal grants.

I want to be clear that we disagree that the only -- that the only harm that would have flowed would be to new DACA

applicants. There is irreparable harm that flows from the issuance of the three year deferred action grants under the expanded DACA program. And the reason is is that -- and we told the Court that. On page 26 of our motion for preliminary injunction, we specifically mentioned that an expansion of the DACA program which would include the change from the two year deferred action period to the three year deferred action period would cause new waves of immigration in the plaintiff states and in the country. And that was irreparable harm that we were seeking to prevent with the preservation of the status quo. So we have always been concerned about the harm by the expansion of DACA as set forth in the 2014 DHS directive.

In terms of that there's not -- I just want to reiterate that we don't -- we disagree with defendants that there is not -- that there's really no distinction between two year deferred action renewals and this expansion of DACA with the three year grants. As we set forth in our argument earlier today, there is irreparable harm that does flow from the states from this -- these three year grants.

And in particular, it is the issuance of driver's licenses. It is the new waves of immigration. It is an additional incentive that it creates with individuals who may want to immigrate here to the United States or want to apply for this additional benefit.

THE COURT: Well, just as a matter of course here, let

me stop you.

MS. COLMENERO: Okay.

THE COURT: I mean, I basically ruled against you on the new wave of immigration argument, didn't I?

MS. COLMENERO: Yes, Your Honor. But we do think that -- and even though you ruled against us and we -- you know, we support the preliminary injunction that Your Honor did, in fact, issue, this is irreparable harm.

THE COURT: So you liked the part where I ruled for you, and you didn't like the part where I ruled against you?

MS. COLMENERO: Well, this is a harm that the plaintiff states continue to feel, and we do want to make that -- that -- we wanted to preserve that point with the Court. And that even with this additional information, there is still irreparable harm that just cannot be cured by changing these three year grants to two year grants.

And I just want to conclude by saying, you know, we understand that this is a big, complex federal program. And I guess it's not surprising to us that there may have been less than stellar communication between the on-the-ground folks and the attorneys. But in light of the incomplete information that has reached this Court and the plaintiffs so far, and in light of the complex nature of this entire program, we need some additional information, we need some documents, and not just the words of a few attorneys from the Department of Justice in order

to detect and address at an early opportunity whether any further implementation is occurring or further irreparable harm is occurring.

And for that reason, Your Honor, we would request that this Court grant our motion for early discovery.

THE COURT: Ms. Hartnett, anything you want to add?

MS. HARTNETT: Just about two quick points. Just to the -- I wanted to briefly respond to the suggestion here for the first time that the -- having the grants be three year sort of incentivizes people to apply more. And just for the Court's awareness, and we're happy to provide this more officially if the Court would like it, of the 108,081 -- this is based on our best -- obviously information that we have today. Of the 108,081 three year grants that occurred during this time period, 94,681 were applications that were submitted prior to the November 20th memo. And so I don't think there's a basis, although we could obviously provide that further in writing if the Court would find it useful --

THE COURT: How did they -- how did they apply for a three year grant --

MS. HARTNETT: They just applied --

THE COURT: -- before -- before the November 20th memo? That's what created the three year grant.

MS. HARTNETT: Sorry to interrupt, Your Honor. Yes. No, they just were applying for DACA under the 2012 criteria.

And then effective November 24th from the memorandum, those became three year grants. So I just wanted to bring that fact to the Court's attention.

And on the point about communication that the -- that the other side alluded to regarding our relationship with our client, all I would tell the Court again, as I said earlier, was that we strove to provide the Court accurate information on all issues of focus, and that was not an issue of focus. But I just didn't want to let stand the notion that we wouldn't be able to get accurate information from our client and provide it to the Court if the Court needed that from us.

THE COURT: All right. All right. Thank you, counselors. I'm going to rule on this and the other pending motions promptly. I mean, obviously I've heard them. If there's any remedial things that I order, we'll take care of that here. And obviously during the pendency of that, the appeal will go up, and you can discuss that, the merits with the Fifth Circuit.

I don't see a need, Ms. Hartnett, unless you just want to file a response to her motion, because you basically just argued your response. Her motion for discovery. But if you want to file it, you need to do it like in the next 48 hours.

MS. HARTNETT: Your Honor, we will do so just on the good cause standard. There's some law we would like to provide you as well.

THE COURT: All right. Because I don't think it's fair to anybody to let this linger. It -- you know, I've given it my best shot. It's time to let somebody else give it their best shot.

All right. Thank you, counsel. We'll stand adjourned.

*(Court adjourned.)*

* * *

(End of requested transcript)

-oOo-

I certify that the foregoing is a correct transcript from the record of proceedings in the above matter.

Date: March 19, 2015

/s/______________________________
Signature of Court Reporter
Barbara Barnard