1

```
1                   UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLUMBIA

3

4

5    JOSEPH M. ARPAIO,                    :
                                          :
6                   Plaintiff,            :CA No. 14-1966
                                          :
7    v.                                   :
                                          :
8    BARACK OBAMA, et al,                 :
                                          :
9                   Defendants.           :
     -------------------------------------------------------

10

11              TRANSCRIPT OF MOTIONS HEARING

12          BEFORE THE HONORABLE BERYL A. HOWELL

13              UNITED STATES DISTRICT JUDGE

14              Monday, December 22, 2014

15   APPEARANCES:

16     For the Plaintiff:      FREEDOM WATCH

17                             BY:  LARRY KLAYMAN, ESQ.
                               2020 Pennsylvania Avenue, NW.
18                             Washington, D.C. 20006
                               (310)595-0800
19
       For the Defendant:      U.S. DEPARTMENT OF JUSTICE.
20                             BY:  KATHLEEN HARTNETT, ESQ.
                               Washington, D.C.
21

22

23   Proceedings reported by machine shorthand, transcript

24   produced by computer-aided transcription.

25
```

2

                    P R O C E E D I N G S

1

2          DEPUTY CLERK:  Matter before the Court, Civil

3   Action 14-1966, Joseph M. Arpaio v. Barack Obama, et al.

4   Counsel please come forward and identify yourselves for

5   the record.

6          MR. KLAYMAN:  Good morning, Your Honor.  Larry

7   Klayman, nice to see you.

8          THE COURT:  Yes, nice to see you, Mr. Klayman.

9   How are you?

10          MR. KLAYMAN:  Good.  I wanted to ask permission,

11   I have my paralegal and counsel sitting at the table with

12   me.  Counsel is from Virginia.  He's a Virginia lawyer.

13   His name is Jon Moseley.

14          THE COURT:  Good morning, Mr. Moseley.

15          MR. KLAYMAN:  My paralegal's name is Dina James.

16          THE COURT:  What's your paralegal's name?

17          MR. KLAYMAN:  Dina James.

18          THE COURT:  That's absolutely fine.

19          MR. KLAYMAN:  Thank you.

20          THE COURT:  And for the government.

21          MS. HARTNETT:  Good morning, Your Honor.

22   Kathleen Hartnett from the Civil Division at the

23   Department of Justice for the defendants.

24          THE COURT:  Yes, I saw your notice last night,

25   Ms. Hartnett.

3

1           MS. HARTNETT:  Yes.

2           THE COURT:  Am I pronouncing that correctly?

3           MS. HARTNETT:  Yes, Your Honor.

4           THE COURT:  Good morning, Ms. Hartnett.

5           MS. HARTNETT:  With me at counsel table is Adam

6    Kirschner from the Federal Programs Branch at the

7    Department of Justice.

8           THE COURT:  Good morning, Mr. Kirschner.  All

9    right.

10          So this morning I have in front of me two

11   motions:  the plaintiff's motion for preliminary

12   injunction and the government's motion for dismissal for

13   lack of subject matter jurisdiction under Federal Rule of

14   Civil Procedure 12(b)(1).  So why don't we start with you,

15   Mr. Klayman.

16          MR. KLAYMAN:  Thank you, Your Honor.

17          THE COURT:  Since yours was the first motion

18   filed.

19          MR. KLAYMAN:  Does Your Honor have any timing

20   limitations?

21          THE COURT:  None.

22          MR. KLAYMAN:  None, okay.  Thank you.

23          THE COURT:  We can go on as long as I have

24   questions.

25          MR. KLAYMAN:  Okay.

4

1                  THE COURT:  Or you have things to say.

2                  MR. KLAYMAN:  I look forward to it, questions.

3                  Your Honor, this is a case at the pinnacle of

4      national importance.  It's not really just a question

5      about immigration enforcement.  It's a question about our

6      Constitution.  It's a question about whether the president

7      can override Congress, go around Congress.  And that's why

8      this is so important.  It reminds me of another case that

9      I had the privilege of arguing about a year ago before

10     Judge Leon, which was involving the NSA where he granted a

11     preliminary injunction, and that's what we're seeking

12     here.

13                 THE COURT:  Mr. Klayman, I did see reference in

14     some parts of your brief to unlawful surveillance,

15     warrantless unlawful surveillance and why it was in the

16     public interest to grant the preliminary injunction.

17                 MR. KLAYMAN:  Perhaps it's on my mind.  That was

18     a brief that we filed, and then we filed a correction

19     immediately after that.  We were taking a little bit from

20     a prior brief.

21                 THE COURT:  All right.  So you filed a

22     correction, I can see that.  So you had success with one

23     brief in front of another judge across the hall so you

24     thought why not --

25                 MR. KLAYMAN:  Give it a try.

**JA708**

5

1          THE COURT:  Give it a try, got it.  Does that

2    explain why I've got two motions for preliminary

3    injunctions from you?

4          MR. KLAYMAN:  That's correct.

5          THE COURT:  One docketed at ECF 6 and one at ECF

6    7?

7          MR. KLAYMAN:  That's correct.

8          THE COURT:  All right.  I just wanted to make

9    sure --

10          MR. KLAYMAN:  The latter one is the one that

11    governs.  We picked that up a few minutes after it was

12    filed.

13          THE COURT:  I got it, okay, thank you.

14          MR. KLAYMAN:  I appreciate you bringing that to

15    the record's attention.

16          Your Honor, on March 28, 2011, President Obama

17    stated to the American people, "America is a nation of

18    laws, which means that I as president am obligated to

19    enforce the law.  I don't have a choice about that.

20    Congress passes a law.  The Executive Branch's job is to

21    enforce and implement these laws and then the judiciary to

22    interpret the laws.  There are enough laws on the books by

23    Congress that are very clear in terms of how we have to

24    enforce our immigration system."

25          THE COURT:  Mr. Klayman, I've heard that speech

6

1    and I've also seen it referenced in papers, so there's no

2    need for you to be repeating things.  I have read the

3    papers quite thoroughly, and so let's hear from you about

4    things that you want to supplement your papers with since,

5    even though I've said there's no time limit, I also don't

6    want to repeat everything that's in the papers.

7                MR. KLAYMAN:  I understand that.  I wanted to --

8                THE COURT:  Let me just ask you because there

9    are a couple things that I wanted to be clear about in my

10    own mind.  The plaintiff's supplemental declaration that

11    was filed on December 19th states in Paragraph 9 that he

12    seeks an injunction, and I quote, "on behalf of not just

13    myself and my office but all of the American people,"

14    which really addressed one of the questions I had in this

15    case about whether Joseph Arpaio was suing, you know, in

16    his personal capacity as a citizen of the United States or

17    only in his official capacity as sheriff of Maricopa

18    County or both.

19                MR. KLAYMAN:  He's suing as both, Your Honor.

20                THE COURT:  All right.

21                MR. KLAYMAN:  As we set forth in this affidavit,

22    and I might add we're not seeking an injunction for all of

23    the American people.  It will have that impact, of course,

24    in terms of precedent, but he's representing the people of

25    Maricopa County.

7

1          THE COURT:  Okay.  So his entire affidavit is

2   all about -- and the reason I was confused is because his

3   affidavits that you filed on his behalf are all about the

4   harms to his office.  And so, you know, I was a little bit

5   confused in terms of the framing of the caption of the

6   complaint and some of his statements in the declaration,

7   including the one I just read about whether he was also

8   complaining in his personal capacity.  If he is suing in

9   his personal capacity, on what basis would he have

10  standing?

11         MR. KLAYMAN:  Yes.  I would look at Paragraph 40

12  of that affidavit, Your Honor.  He's suing in part

13  because --

14         THE COURT:  You're talking about the

15  supplemental affidavit?

16         MR. KLAYMAN:  Supplemental affidavit.  Because

17  he himself has been threatened.  He himself has been

18  threatened by individuals on the basis of his stance on

19  immigration.

20         THE COURT:  Okay.  Well, that leads me to my

21  next question.  If he's suing because of -- you're

22  talking, for example, about the notice that you filed just

23  last night about the bomb threats, which was the press

24  release from Maricopa County about bomb threats to the

25  plaintiff in this case, that's the nature of the personal

8

1   injury to him?

2         MR. KLAYMAN:  In part, and there's another

3   report which incorporates by reference into his affidavit

4   which is attached as Exhibit 5 to that affidavit where an

5   individual threatened him with death on the basis that his

6   family was deported as a result of actions that were

7   taken.

8         THE COURT:  But if I read your notice last

9   night, for example, it says specifically in the press

10   release issued by the plaintiff and his office that the

11   reason he received the death threats is because of his

12   widely known stance regarding illegal immigration, and if

13   that's the case, is there anything I could do here that

14   would change the plaintiff's widely known stance on

15   illegal immigration that would stop him from being

16   threatened?

17         MR. KLAYMAN:  Well, there's a nexus here, and it

18   doesn't have to be an absolute nexus.  In terms of

19   standing, I think you asked me the standing question --

20         THE COURT:  Let's hear your explanation of that

21   nexus.

22         MR. KLAYMAN:  Yes.  The fact that he has himself

23   filed this complaint which is seeking to enforce the

24   immigration laws as they currently exist exacerbates a

25   pre-existing condition where he's viewed as -- and he's

9

1    not because I know him quite well; he's a client as well

2    as a friend.   The image that's been created by some in the

3    media, in particular, that he's anti-immigrant, he's not

4    anti-immigrant, but he's been viewed as anti-illegal

5    immigrant, people have threatened him repeatedly.   There

6    are protests going on as we speak in front of his

7    sheriff's office in Phoenix today as a result of this

8    complaint.   And there is -- and you'll probably see press

9    reports about that -- but there is a substantial

10   likelihood that he will be threatened with severe bodily

11   injury or death as a result of simply filing this case and

12   trying to enforce the immigration laws.

13        THE COURT:   Mr. Klayman, I come back again to

14   the evidence that you have submitted, you have submitted

15   in this case with statements issued by the sheriff's

16   office, and I'm reading page 2 of the document docketed at

17   ECF 21-1, page 2, "All three aforementioned threats

18   against Arpaio came as a result of the sheriff's widely

19   known stance on illegal immigration," and I take it that

20   there's nothing that I can say or do that is going to

21   change his widely known stance on illegal immigration

22   which he says was the cause of the threats.   Am I correct

23   on that?

24        MR. KLAYMAN:   That's one cause of the threats.

25   And if you look at the actual attachments, Your Honor, the

**JA713**

1    exhibits, Exhibit 5 for instance, is that he was

2    threatened with severe bodily injury or death by someone

3    who as a result of his actions had his family deported

4    from this country.  What we are arguing in this case and

5    the position that he's taken throughout is that we should

6    enforce the immigration laws.  He hands illegal aliens

7    over to ICE --

8                 THE COURT:  Well --

9                 MR. KLAYMAN:  -- for deportation, yet they come

10   back into his jail.

11                THE COURT:  Okay.  So I want to ask, just like I

12   was a little puzzled by your papers about whether the

13   plaintiff was suing in his personal or official capacity

14   or both, I want to be clear about precisely what policies

15   you're challenging here, Mr. Klayman.  You have a broad

16   phrase that you used, "the president's immigration

17   policies."  That just doesn't cut it for me when you're

18   asking me to enjoin from the bench with the strike of my

19   pen some national programs.  I have to be absolutely clear

20   what is it precisely you're asking me to challenge, you're

21   asking me to enjoin and stop.

22                So let me be clear --

23                MR. KLAYMAN:  Certainly.

24                THE COURT:  -- and ask you to be clear about it.

25                So this is what I understand based on your

**JA714**

11

1   papers that you're challenging the policies that are

2   announced in two memoranda:  the memorandum from Janet

3   Napolitano issued on June 15, 2012, entitled Exercising

4   Prosecutorial Discretion With Respect to Individuals Who

5   Came to the United States as Children, which I am going to

6   refer to, as the parties do in their papers, as the DACA

7   program, D-A-C-A.

8          You're also challenging the programs outlined in

9   a memorandum from Secretary of Homeland Security Jeh

10  Johnson, dated November 20, 2014, titled Exercising

11  Prosecutorial Discretion With Respect to Individuals Who

12  Came to the United States as Children and With Respect to

13  Certain Individuals Who Are the Parents of U.S. Citizens

14  or Permanent Residents.  I'll call that program, as the

15  parties do, the DAPA program, D-A-P-A.  And the revisions

16  to the DACA program, as the parties do in their papers.

17         So as I understand it, you're challenging the

18  DACA program, the 2014 revisions to the DACA program and

19  the DAPA program.

20         MR. KLAYMAN:  That's correct.

21         THE COURT:  Do I have that right?

22         MR. KLAYMAN:  You do.

23         THE COURT:  All right.  So you are not

24  challenging the policies that are announced, for example,

25  because I take it that there were about ten memoranda that

**JA715**

12

1    were issued by Secretary Johnson on November.  You're not

2    challenging, for example, the memorandum from DHS

3    Secretary Jeh Johnson titled Expansion of the Provisional

4    Waiver Program which allows, I guess, some eligible

5    immigrants to travel overseas.  You're not challenging

6    that; is that correct?

7                 MR. KLAYMAN:  Correct.

8                 THE COURT:  And you're not challenging the

9    memorandum on the same date, November 20, 2014, from the

10   Secretary of DHS titled Policies for the Apprehension,

11   Detention and Removal of Undocumented Immigrants, which as

12   I've read it defines the priorities 1, 2 and 3 for the

13   undocumented immigrants who are the priorities for federal

14   enforcement authority.  Am I correct on that?

15                MR. KLAYMAN:  You're correct.

16                THE COURT:  And you're also not challenging the

17   memorandum of the same date, November 20, 2014, by the

18   Secretary of Homeland Security entitled Policies

19   Supporting U.S. High-Skilled Business and Workers.  Is

20   that correct?

21                MR. KLAYMAN:  Correct, Your Honor.

22                THE COURT:  So we're really down to these DACA

23   program, DACA revisions program and the DAPA program.  Is

24   that right?

25                MR. KLAYMAN:  That is right.

13

1          THE COURT:  So with respect to the DACA program,

2     which has been in effect since 2012, two years, how is it

3     that you can show any kind of irreparable harm since it's

4     taken you two years to challenge that program?

5          MR. KLAYMAN:  What's set forth in the

6     supplemental affidavit of Sheriff Arpaio is that since

7     this new executive order has a memorandum, whatever you

8     want to call it, it's kind of murky as to what the

9     president did through DHS, but it is in effect an

10     executive action in any event, and the president admits

11     that.

12          THE COURT:  What's murky about it?

13          MR. KLAYMAN:  Well, they call them memoranda

14     rather than executive orders.  Executive orders would

15     ordinarily come out as an executive order.  But we believe

16     that for political purposes, because the president doesn't

17     want to exceed the numbers of executive orders issued by

18     other presidents, he's calling them memoranda right now

19     and it's being implemented through the Department of

20     Homeland Security.

21          THE COURT:  Well, doesn't the president affect

22     policy over the sprawling federal bureaucracy in a number

23     of different ways?  One way is executive orders; one way,

24     signing statements.  When they sign legislation into law,

25     they have signing statements that tell agencies how the

14

1    president wants them interpreted.  There are many

2    different ways where presidents affect the execution of

3    the laws.

4          MR. KLAYMAN:  Absolutely.

5          THE COURT:  I know you made this argument, but

6    I'm not sure I really understand essentially what

7    difference that makes.  I want to make sure I'm not

8    missing your point, Mr. Klayman.  So what difference does

9    it make?

10         MR. KLAYMAN:  Well, the primary point is that

11   what the president has done through these memoranda, which

12   are executive actions, is not policy.  He's enacting law.

13   He's creating law.  And he cannot override Congress in

14   doing that under Article I, Section 1 of the U.S.

15   Constitution; all legislative powers --

16         THE COURT:  Why is it that you say it's not a

17   policy?  I mean, you know, I have information that's been

18   submitted in the -- by you, actually, as part of the

19   Department of Justice's OOC memorandum that the

20   government's brief was talked about; that the resources in

21   DHS to handle undocumented immigrants in this country, you

22   know, only allows deportation of 400,000 out of the

23   11-point some, 11-plus million such immigrants.  So they

24   have to figure out their enforcement priorities.

25         So why -- do you dispute those numbers, first of

**JA718**

15

```
 1   all; and second of all, why isn't that an appropriate
 2   focus of administrative, administration policy of how they
 3   are going to take limited resources and target it even if
 4   you disagree with their targets, but why isn't that an
 5   appropriate function, first of all, of the president to
 6   give that kind of guidance through his cabinet secretaries
 7   and why isn't that appropriate?
 8        MR. KLAYMAN:  First of all, I might say, Your
 9   Honor, that this is not in any way an attack on this
10   particular president.  Presidents in the past have
11   violated executive orders and courts have overturned them.
12   This president, in fact, just about a year ago had one
13   overturned with regard to the National Labor Relations
14   Board where he did an interim appointment.  It's not
15   unusual for courts to overturn executive actions.
16   Presidents do try to extend their powers as much as they
17   can, and that's the reason why we have the courts and
18   that's the reason why I'm proud to be in front of you,
19   because you are the protector of the American people.
20        But let me get to the point.  I don't dispute
21   the numbers.  But this president in particular has not
22   been shy about asking for money for appropriations.  We're
23   now at a budget deficit of $18 trillion.  It's increased
24   several trillion since he's been president.  No request
25   was ever made to Congress to increase the appropriation so
```

**JA719**

16

1    that border security could be enhanced and so people could

2    be deported who are here illegally.

3            What's happened here -- and I don't mean any

4    disrespect to the president -- is that he's trying to

5    force the hand of the next Congress is that by putting in

6    effect the law in effect -- in fact, he's made reference

7    to that, some of the quotes I was going to read you, he's

8    daring them to do what he wants and to enact.  He said

9    several times, 22 times in the past, that he's not an

10   emperor.  That he does not have the power to legislate as

11   a president.

12           And that's the bottom line here.  He did not ask

13   for the money, but all of a sudden after the fact he and

14   his colleagues at the Department of Homeland Security

15   decide, well, we don't have the money so we have to leave

16   all these people here.  Here is an irony too --

17           THE COURT:  Mr. Klayman, let me just say that,

18   you know, I'm well aware of my power to undo executive

19   actions of agencies.  And I do exercise that power humbly

20   when necessary.  And I fully appreciate that you're

21   inviting me in this case to protect Congress's prerogative

22   to act in the immigration arena.  But I have some pause,

23   given the power of Congress to control purse, the purse

24   strings, to tell the president exactly how Congress feels

25   about whether the president's interpretation of the

1  immigration laws and enforcement priorities for the

2  immigration laws are ones that Congress accepts or does

3  not.

4        When it comes to deferred removal programs, the

5  government's brief has outlined -- you know, the deferred

6  removal programs have been longstanding in this country

7  dating back to the 1970s.  It was very interesting for me

8  to read that and that Congress has, in fact, sanctioned

9  the use of deferred removal programs in -- with reference

10 to them embodied in the law.

11       So deferred removal programs per se are the

12 kinds of enforcement prioritization that the executive

13 branch has exercised over a number of administrations,

14 over a number of years, at least 30, that Congress has

15 sanctioned; and if Congress doesn't like it, doesn't

16 Congress have the power to step in and address whatever

17 misprioritization it thinks is going on here without the

18 Court accepting your invitation and reaching out to

19 intervene in this Legislative-Executive Branch squabble?

20       MR. KLAYMAN:  You asked a really good question

21 that has a number of different responses to it.  First of

22 all, we're talking here about, first talked about

23 appropriation.  We cited a Supreme Court case called

24 *Chadha* where President Nixon decided he wasn't going to

25 spend money that Congress had appropriated.  Supreme Court

18

1    said, No, you can't make that decision.  You can't

2    override Congress; the money has been appropriated.  This

3    money has been appropriated maybe ipso, after the fact the

4    president said it's not enough, but it's been appropriated

5    for enforcement for deportation.

6         THE COURT:  Well --

7         MR. KLAYMAN:  He's shutting -- he's shutting

8    down the potential of deportation.

9         THE COURT:  But Mr. Klayman, this is not a case,

10   I really -- I looked at *Chadha*, I appreciate how you're

11   using *Chadha* in this case, but I really fail to see how

12   *Chadha* is applicable here where *Chadha* was a blatant, you

13   know, response by the president to the Congress, You've

14   given me money and told me how you want me to spend it.

15   I'm just not going to spend it the way you want.  That is

16   an appropriate role for the Court to step in and say No,

17   no, no, you can't -- you are not the emperor, you have to

18   follow the directions.

19        This program is a deferred removal program, you

20   know, as I said, longstanding practice for prioritization

21   of resources that have been provided by Congress.  I just

22   don't see how *Chadha* is at all applicable here.

23        MR. KLAYMAN:  *Chadha* is applicable on two

24   different grounds.  One, with regard to purse strings or

25   something for the Congress to decide, and Congress has

19

1    appropriated this money for use in large part in

2    deportation proceedings against illegal aliens.

3    Secondly --

4         THE COURT:  I do think *Chadha* would be

5    applicable if Congress passed a law saying to the

6    president, You may not expend any funds for the DACA

7    program, the revised, you know, DACA program, the revised

8    DACA program or the DAPA program.  Then if the president

9    proceeded, I think then you might have a *Chadha* issue.

10   But that's not what happened.

11        MR. KLAYMAN:  Let me tell you respectfully, Your

12   Honor, why you have it, Your Honor, just teeing the

13   question up.  That's why I started with that aspect of

14   your question is because the money is being used not for

15   purposes which it was appropriated, which was immigration

16   enforcement of the current law, but if you look at these

17   memoranda, they are deferring benefits which go part far

18   beyond the current law.

19        For instance, it's in effect granting amnesty

20   and immunity from prosecution authority.  It's their

21   employment authorization cards for the right to work,

22   regardless of whether you're legal or illegal; the

23   opportunity to use the law to get a work authorization

24   card to get a state driver's license.  From that you can

25   get the right to vote -- not the right to vote but you can

**JA723**

20

present it and no questions are asked and sign up on the

register to vote.  Plus there are background checks here

for nearly 5 million illegal immigrants.  This costs

money.

THE COURT:  Mr. Klayman, really this is not a

case about purported voter fraud.  Is that what you're

saying one of the harms is, voter fraud?

MR. KLAYMAN:  It can be one of the harms.  It's

not something we put into the affidavit, but it can be.

What I'm saying to Your Honor is is that the monies are

being used for purposes that were not appropriated by

Congress to use the monies for, and I just listed various

aspects of that, including background checks for

potentially 5 million illegal aliens.  There has never

been -- and this is the third part in answer to your

question -- there's never been any deferred action here on

this grand scale.  5 million people, nearly half of the

illegal immigrant population.  It's never been done to

that extent.

I'm not condoning what President Bush did

earlier for 1.2.  But he didn't have all these different

aspects to it when money was being spent for purposes that

Congress had not authorized it for.  And that's a

important aspect here.  This is a very expensive --

THE COURT:  Are you saying, Mr. Klayman, that

**JA724**

21

1   the old, the longstanding prior deferred removal programs

2   implemented from the '70s up to today did not carry with

3   them a work permit certificate?  Is that -- is that the

4   factual matter of what you're saying, that this deferred

5   removal program differs because it has a work certificate

6   authorization?

7           MR. KLAYMAN:  Some of them -- I'm sorry, I

8   didn't mean to interrupt you.  Some of them did not, yes.

9           THE COURT:  But some of them did.

10          MR. KLAYMAN:  I'm not sure.  I'm trying to be --

11  I haven't studied the prior ones, okay.

12          In any event, what we said in our brief was it

13  doesn't matter what other presidents did.  We're

14  challenging this now.  And I can tell you if you know my

15  reputation -- I think you do -- I gave President George W.

16  Bush a pretty hard time.  I just don't bring cases with

17  regard to Democrat [sic] presidents.  I sued them over

18  warrantless wiretaps.  The Cheney Energy Task Force.  I'm

19  thought of as a Libertarian conservative.  My supporters

20  weren't that kind to me over doing that.

21          I'm doing this on the basis of principle, and so

22  is Sheriff Arpaio.  It doesn't matter what Bush did in the

23  past or Clinton or anybody else, this is not right and

24  it's not legal.

25          And there are many aspects that go beyond the

22

1   work permits.  They are dealing with background checks for

2   nearly 5 million illegal aliens; and one of the problems

3   here -- and we can to this later if you want, is that it's

4   a blanket, in effect, amnesty to these people, because --

5         THE COURT:  So can we go back to my original

6   question?

7         MR. KLAYMAN:  Yes.

8         THE COURT:  Which is, I'm not sure I really

9   fully understand your answer.  Putting aside the revisions

10  to the DACA program and the DAPA program, which are fairly

11  of recent vintage, how can you establish irreparable harm

12  from a program that you're only suing on two years after

13  it came into effect, the DACA program?

14        MR. KLAYMAN:  Number one, as set forth in the

15  affidavit, since this has gone into effect on November 20,

16  2014 --

17        THE COURT:  Oh, you're back to the bomb threats.

18        MR. KLAYMAN:  No, not the bomb threats.  What

19  happens here is that illegal aliens who are turned over by

20  the sheriff's office -- and this is primarily a case about

21  his office.  I just mentioned one aspect, personal aspect

22  of it, but that's a very small part of this case.  It's

23  about the function of his office, which strains his

24  resources and takes away law enforcement priorities to do

25  things which unfortunately are not productive because of

**JA726**

23

1    the executive action of this president is that he turns

2    over after sentences are fulfilled in his jail --

3            THE COURT:  I do understand --

4            MR. KLAYMAN:  -- and then they come back.

5            THE COURT:  Part of your argument is that these

6    three programs, DACA, revised DACA and the DAPA program

7    are going to be a magnet for other immigrants to come

8    illegally into the country.  And that because of that

9    magnet it's going to burden the resources of the

10   plaintiff's sheriff's office.  Do I have that right?

11           MR. KLAYMAN:  No, that's just one part.  That's

12   a small part.  That's what the government would like you

13   to believe, okay.  We're taught in law school, always

14   shape the argument in the most favorable light.  That

15   argument is extremely disingenuous.

16           THE COURT:  Well, that's why you're here,

17   Mr. Klayman.

18           MR. KLAYMAN:  Right.

19           THE COURT:  So that you can respond.  You asked

20   for oral argument, so here you are.

21           MR. KLAYMAN:  Okay.  And I used to be a Justice

22   Department lawyer too, so I know how we're taught, keep it

23   simple.  KISS over at the department.  They want to keep

24   it simple, it's not that simple.  The reality is -- and

25   this is where most of the harm comes in and it's set forth

**JA727**

24

1    in the supplemental affidavit in particular -- is that

2    illegal immigrants who are serving time for crimes, when

3    those sentence are concluded, are turned over to ICE, to

4    DHS, the immigration authorities.  Because the deportation

5    laws were not being enforced or for that matter any other

6    immigration law that's related thereto, these criminals

7    wind up back in the jail, they wind up getting rearrested

8    and that costs -- we detailed over $9 million of greater

9    costs, which included part of this period.

10           THE COURT:  Mr. Klayman, this is the fallacy,

11    the logical fallacy that I perceive in that argument:

12    Those are harms that the plaintiff is claiming even before

13    the DACA program or the revised DACA program have gone

14    into effect.  So how can these programs that you're

15    seeking to stop have any causative effect or

16    redressability possibility for those particular harms that

17    you have laid out in the plaintiff's original affidavit

18    and the supplemental affidavit?  And redressability and

19    causation?  Prerequisites for standing here.

20           MR. KLAYMAN:  Let me turn your attention first

21    to Paragraph 38 of the supplemental affidavit.  Based on

22    the average length of stay, I estimate that Maricopa

23    County incurred an additional expense of $9,293,619.96

24    from February 1, 2014, through December 17, 2014.  That's

25    over a month -- that's about a month since this was

25

implemented.  So there is an overlap.  They are continuing

to get these illegal immigrants who have been released

come back into the jails, which are incurring expense.  So

yes, it does fall within the time period after this

presidential memorandum was implemented on November 20.

So that's in the record, Your Honor.

      THE COURT:  But it hasn't been implemented yet.

It's been announced, but I think it has a 180-day lag

period even before, you know, applications for eligibility

determinations are made.  Am I right on that date?

      MR. KLAYMAN:  Your Honor, having relied upon the

argument in the Justice Department's brief, which was

frankly misleading, notice that they didn't submit one

affidavit.  They did not go under oath on anything.  They

didn't want to put their money where their mouth is.

There is nothing in that record which contravenes our

affidavit.  They just threw in a bunch of documents.  Why

didn't they go under oath and swear what was going on,

because what we know --

      THE COURT:  But Mr. Klayman, let's not -- let's

not play to the gallery here.  We all understand as

lawyers, that it is your burden, not the government's to

establish standing.  It's your burden to introduce the

affidavits --

      MR. KLAYMAN:  And we have.

**JA729**

26

1          THE COURT:  -- to establish your standing.  The

2     government doesn't have that burden.

3          MR. KLAYMAN:  It's a very low threshold at this

4     point.  Let me tell you why on standing.  But let me back

5     up on this.  I just read to you one paragraph, more than

6     one paragraph in the supplemental affidavit which deals

7     with what's happening and how it's increasing costs to

8     Maricopa County since these memoranda opinion were issued.

9     In addition, we have set forth --

10          THE COURT:  Because of the magnet effect?

11          MR. KLAYMAN:  I'm not talking about magnet.

12     Yes, there is a magnet, that's another aspect, but it's

13     because illegal immigrants that have been arrested for

14     crimes, for state crimes -- we don't enforce the federal

15     immigration law, the United States has already, the U.S.

16     Supreme Court said no, that's a federal province.  I was

17     actually part of that case as an amicus, because people

18     who have been arrested, illegal immigrants for state

19     crimes, once they serve their sentence are let out and

20     turned over to ICE.  They then are not in any way deported

21     or having any action taken against them.  They are let out

22     into the Maricopa County community; they commit other

23     crimes and they wind up back in the jail at a rate of

24     36 percent approximately.

25          THE COURT:  And for --

**JA730**

1          MR. KLAYMAN:  This has happened since the

2     memorandum has come out.

3          THE COURT:  Let me ask you, these are people who

4     have committed, as you said, by your definition a state

5     crime, been arrested for a state crime; whatever happens

6     to them in the state criminal justice system happens and

7     then they are turned over to ICE for processing.  And what

8     you're saying is that instead of -- ICE instead of

9     deporting them releases them.  Do I have that right?

10          MR. KLAYMAN:  Well, they are not ordered to

11     release them.  If it's not a major crime, they are ordered

12     to release them under this deferred action program.  They

13     are back out into the public domain, they are being

14     rearrested for committing other crimes and they wind up

15     back in the jail.  These people are repeat offenders.

16          THE COURT:  Your complaint is because one of the

17     eligibility requirements for the DAPA program is that the

18     particular undocumented immigrant does not fall within one

19     of the categories of enforcement that's set out in the

20     memorandum on enforcing, you know, that sets out the

21     priorities 1, 2 and 3 for enforcement.  Is that right?

22          MR. KLAYMAN:  It could be a case, but it's also

23     the case that this administration just simply is not even

24     enforcing that aspect of things.  Because what they're

25     doing is they are just letting people out who have

1    committed crimes rather than -- if you commit a crime, you

2    generally get deported, no matter what that crime may be,

3    notwithstanding this criteria.

4           THE COURT:  Well, as I've read the plaintiff's

5    affidavit, he has a complaint that undocumented immigrants

6    that are picked up by the Maricopa County Sheriff's

7    Department, processes them and then they are turned over

8    to ICE are being released.  And that is the complaint that

9    I take it predates the DACA program, the revised DACA

10   program and the DAPA program; right?

11          MR. KLAYMAN:  It's been a running complaint, but

12   what happened here, Your Honor, is an exacerbation.  I'm

13   going to get to standing cases in a second.  This is an

14   exacerbation of the current situation, because it's not

15   just that some of them, 36 percent, are coming back; but

16   now under this program, this executive action, they are

17   all going to be out there unless they commit some heinous

18   crime.  They are all going to be out in the community,

19   vandalizing, assaulting, whatever the case may be.  They

20   are out there and they are coming back to the jails.  And

21   that increases the costs, and we documented from that time

22   period I just read to you, increased it over $9 million.

23   And that goes into the period after the president's

24   executive action took effect.

25          Now, we also gave you the other day a case by

1    Judge Schwab in the Western --

2         THE COURT:  Well, you keep saying "in effect,"

3    but what you mean is after the president's policies were

4    announced, they are not in effect.  And they are not even

5    accepting applications, I think, until 180 days after the

6    November 20 announcement; right?

7         MR. KLAYMAN:  They are in effect -- you have 180

8    days to apply, okay.

9         THE COURT:  Right.

10         MR. KLAYMAN:  Okay.  They are in effect right

11    now.  You can apply right now.

12         In addition, as is in the record, the Department

13    of Homeland Security is hiring thousands of other

14    employees to process.  Now, granted these applications --

15    and here is another irony.  They put in effect a fee of

16    $465 to apply.  How many illegal immigrants are going to

17    come to the surface here and show their face when they

18    have to ante up $465? Most of them in all likelihood want

19    to remain illegal rather than having to pay it.  The

20    president's policies, and I'll get to that later --

21         THE COURT:  Let me just say, it was curious to

22    me to read in your briefs your expressions of concern over

23    undocumented immigrants paying $465 to make their

24    application for their eligibility review for the revised

25    DACA program and the DAPA program and your concern that

30

1    they may not get a refund of their money.  I take it

2    you're not here on behalf of the undocumented immigrants

3    who may be eligible for these programs.

4         MR. KLAYMAN:  I'm not here on behalf of them,

5    Your Honor; but as an aside, if you know anything about

6    me, I'm not anti-immigration.  In 1996 I did a

7    presidential debate at the National Press Club that was

8    trying to say that immigration is good for this country.

9    I'm not anti.  And that's the problem, people tar you with

10   that, they think you're conservative, you're

11   anti-immigrant, you're a homophobe and everything else.

12   I'm not.

13        And the reality is that we are a system of laws

14   and not men, as our second president, John Adams said.

15   And those laws need to be respected.  The precedent here

16   is terrible.  It's trashing our Constitution.  It's more

17   important than the immigration issue even.  And that's

18   what's at issue, and that's why the president 22 times

19   said I can't do this, I'm not an emperor, why are you

20   pressing on me?  When it's politically convenient, then he

21   does it.  Other presidents have done the same thing, but

22   that doesn't make it right and that's not precedent.

23   What's precedent is the Constitution, that's what counts.

24        Now; let me get into the standing issues.  Judge

25   Helen Segal Huvelle, one of your colleagues, in a case,

**JA734**

1   *Honeywell Intern, Inc. v. EPA*, found that chemical

2   manufacturers had standing because the challenged

3   regulation could lead customers to seek out manufacturers'

4   competitors in the future.  She didn't require an absolute

5   direct nexus for standing.

6         In fact, and this is ironic, the case involving

7   SB 1070 -- and we also cited this case -- a Supreme Court

8   case where the case was the U.S. Government and I was, I

9   participated as an intervenor in that case, I represented

10   the -- it tells you where I come from -- the Arizona

11   Latino Republicans, Latinos, who were supporting that law,

12   legal immigration.  And in that case the Supreme Court did

13   not throw the case out on standing, nor did the lower

14   courts, but the administration was challenging whether

15   these stop-and-ask situations by the police where they

16   would stop someone on probable cause and ask for their

17   immigration papers to see whether they were here legally.

18   The administration was challenging that, and yet that law

19   had not gone into effect yet.  And standing was found by

20   the lower courts and upheld by the Supreme Court.

21         THE COURT:  Well, Mr. Klayman, you have put your

22   finger on one of the critical issues for standing in this

23   case, which is how much is the plaintiff's alleged injury,

24   in fact, which has to be concrete and particularized for

25   him to have standing in this case dependent on the actions

32

1    of multiple third parties in the form of undocumented

2    immigrants.  And when I look at, with all due respect, my

3    colleague's opinions on this issue but, in fact, look at

4    what binds me, which is the D.C. Circuit opinions, in

5    cases such as *Crete Carrier Corp*. from 2004, the *National*

6    *Wrestling Coaches Association* from also 2004, where the

7    D.C. Circuit has made clear that when the injury, in fact,

8    depends on what the conduct is of third parties, you've

9    got a big standing problem.  So how do you address those

10   cases?

11            MR. KLAYMAN:  These are not third parties here

12   we're talking about.  The president and his

13   administration, the Department of Homeland Security is not

14   third parties.  This is a direct hit.

15            THE COURT:  Well, the injury that the plaintiff

16   is alleging here is because the -- as a result of the

17   policies, third parties, undocumented immigrants are going

18   to react in a particular way.  One, they are going to use

19   those policies as a magnet to come to the United States,

20   increasing undocumented illegal immigration to the

21   country; and two, that certain parts of those, that

22   population are going to commit crimes.

23            MR. KLAYMAN:  No --

24            THE COURT:  That attacks the sheriff's

25   resources.

**JA736**

33

```
 1              MR. KLAYMAN:  Okay.  There you have it, Your
 2   Honor.
 3              THE COURT:  So it's those third parties --
 4              MR. KLAYMAN:  Yes, it's a direct impact on the
 5   sheriff's office.  This sheriff stands in no different
 6   position than the 24 states that brought an action in
 7   Texas.
 8              THE COURT:  That case was not in front of me,
 9   and I don't think that that Court has yet opined on the --
10              MR. KLAYMAN:  No, you're right, but there's a
11   Court in the Western District of Pennsylvania that has
12   opined and has found the president's actions
13   unconstitutional, Western District of Pennsylvania, Judge
14   Schwab.
15              THE COURT:  Let's talk about that case.  I found
16   it a little bit --
17              MR. KLAYMAN:  And he didn't opine.  That's a
18   ruling.
19              THE COURT:  Some commentators have called that
20   case complex.  I just find it a puzzle.  As I understand
21   the context of that case, there was a defendant in front
22   of the judge awaiting sentencing for illegal reentry, and
23   the judge, as he was required to do, evaluated the
24   sentencing factor, 18 U.S.C. 3553(a)(6), which calls upon
25   sentencing courts to impose a sentence that avoids
```

34

1   unwarranted sentencing disparities among similarly

2   situated defendants convicted of the same crime.  And in

3   the context of considering that factor, sentencing factor,

4   unwarranted sentencing disparities among similarly

5   situated defendants convicted of the same crime, reached

6   out and decided that he had to decide the

7   constitutionality of the DACA program in order to

8   ascertain whether the time-served sentence called for in

9   that case under the federal sentencing guidelines was,

10  would result in an unwarranted sentencing disparity.

11       And then the Court -- the aspect of the case

12  that puzzles me, among others, is that the Court concluded

13  that this defendant wasn't eligible for the DAPA program

14  and therefore was not similarly situated to defendants who

15  might be eligible but then proceeded to evaluate the

16  constitutionality of the program.

17       So it wasn't even having found that the

18  defendant wasn't eligible for the DAPA program, that

19  defendant was no longer -- was not similarly situated

20  defendants who might be.  I actually find it a real puzzle

21  how he was able to then reach out and evaluate the

22  constitutionality of this program, which didn't apply to

23  the defendant in front of him.

24       MR. KLAYMAN:  I didn't read it that way.  Here

25  is the way I read it.

**JA738**

35

1          THE COURT:  All right.

2          MR. KLAYMAN:  I read it that the defendant who

3     was trying to change his plea, he was going to plea, was

4     pleading to a crime where he could be deported under that

5     provision.  And the defendant was claiming, in effect the

6     defense, that under this new DACA program, DAPA program, I

7     should remain here, I don't want to be deported.

8          THE COURT:  No, no, no.  The defendant wasn't

9     claiming that.  In fact, the defendant didn't even raise

10    this issue.  The defendant was going to be sentenced to

11    time served and didn't raise the issue at all.  The Court

12    sua sponte raised the issue, which is fine.  Courts have a

13    statutory obligation to consider that factor and look at

14    the consideration for that factor.  But I don't think the

15    defendant even contended in the case, based on my reading

16    of the opinion, that he was even eligible for the DAPA

17    program.

18         MR. KLAYMAN:  That's what I glean from it or

19    whether it was expressed or whether it was implied, the

20    defendant didn't want to be deported from the United

21    States.  So the judge reached that issue and he said, No,

22    you're still subject to deportation because this was

23    unconstitutional, you're not going to be able to have this

24    umbrella.

25         THE COURT:  Well, let me just say that case is

**JA739**

36

1   from another circuit.  It's a District Court opinion, and

2   because of the puzzling nature of how the judge reached

3   the decision on the constitutionality, I really don't find

4   it at all persuasive either.  So let's, we can move on

5   from the Pennsylvania District Court opinion.

6        MR. KLAYMAN:  No, that's fine, but I was citing

7   that, that there was a federal judge who found this

8   unconstitutional.  We got there from Texas as to whether

9   Texas had anything to do with here.

10        THE COURT:  Well, you raised it, Mr. Klayman.  I

11   just wanted to share with you my views so you wouldn't

12   waste any more time.

13        MR. KLAYMAN:  I understand.  There are myriad of

14   other cases that we cited in our briefs on standing.  And

15   one of them is *International Union of Bricklayers and*

16   *Allied Craftsmen,* 761 F.2d 802, that is the D.C. Circuit

17   in 1985, standing is found despite lack of details

18   regarding specific future jobs.  It was jobs impact into

19   the future, not present.  And standing can result -- we've

20   ask for declaratory judgment here too, Your Honor, which

21   is when harm is imminent.  It doesn't actually have to

22   occur right now, but it has to be imminent.  So we have a

23   declaratory judgment provision, too, as one of our counts.

24        THE COURT:  With respect to your imminent harm,

25   I did want to hear, Mr. Klayman, your response to the

**JA740**

37

1  government's argument that these, the deferred removal

2  program because of its special targeting of priority

3  enforcement, you know, immigrants, illegal immigrants,

4  will actually help local law enforcement.  So how do you

5  respond to that argument?

6       MR. KLAYMAN:  I don't think that's a sensical

7  argument.  It's not rationally based.  It doesn't help

8  local law enforcement to let people out on the streets who

9  have committed crimes and are winding up back in the jail.

10  It puts a strain on resources.

11       In the courtroom today is my brother.  He's a

12  policeman in Philadelphia.  I wish he could come up here

13  and testify.  He knows all about that, criminals back on

14  the streets in Philadelphia or anywhere else.  And that's

15  what's happening in Maricopa County.  Maricopa County is

16  the largest sheriff's office, at least in terms of land

17  mass, in this country.  It puts a great strain on the

18  resources to have these people out there and not subject

19  to deportation.

20       And that's the essence of our argument no matter

21  how the government wants to couch it.  You can't put

22  lipstick on a pig.  This is not a case about primarily

23  drawing people to this country.  This is a case about the

24  burden on resources of this sheriff's office.  It's

25  already stretched incredibly thin, and that's what it's

**JA741**

1    about.

2              I know known Sheriff Arpaio for a long time.  I

3    never heard one negative biased remark against Latinos or

4    I wouldn't represent him if he did.  And SB 1070, I came

5    in there and I told the Supreme Court, I said if Latinos'

6    rights are violated in terms of stop and questioning and

7    searched, Freedom Watch, my group, will be the first group

8    that came to their defense.  I lived in Miami for a long

9    time.  I represented the Cuban-American community, a lot

10   of other communities.  This is not about Latinos.  This is

11   about our laws and enforcing our laws.

12             THE COURT:  I think I understand your arguments,

13   Mr. Klayman.  But if you have anything further, you can

14   save it for your reply.

15             MR. KLAYMAN:  Well, I did have a little -- I

16   want to talk about the APA for a little, if I may.

17             THE COURT:  All right.

18             MR. KLAYMAN:  *National Resources Defense Council*

19   *v. Environmental Protection Agency*, 643 F.3d 311 D.C.

20   Circuit July 1, 2011, recent case.  Wherein, you know,

21   this is dealing with environmental protection, also

22   questions of causation, because these questions are

23   brought and standing is found with regard to APA edicts,

24   some by executive order or memoranda which are to take

25   effect in the future.  Here is what's going to happen if

1        this goes into effect.

2               And standing has been found and preliminary

3        injunctions have been granted.  So there are a number of

4        cases, Your Honor, and I know from the other case that we

5        had that you're a very scholarly person and that you'll

6        read those and have an open mind on this because this is

7        not in any way geared against the Latino community or any

8        other community.  It's called protecting our Constitution.

9               With regard to the APA, there's a requirement

10       when you have these kinds of substantive rights that are

11       being doled out by presidential action or by an agency, an

12       agency like the DHS whose memorandum that I enumerated

13       before, there is a duty to have at least rule-making,

14       notice and comment.  And that's under Section 702 through

15       706, notice and comment.  And under 7062, 5 U.S.C. 7062,

16       the Court must hold unlawful and set aside any agency

17       which is "arbitrary, capricious and abuse of discretion or

18       otherwise not in accordance with law; B, contrary to

19       constitutional right" -- constitutional right is what is

20       at issue here in part -- "power, privilege or immunity; or

21       C, in excess of statutory jurisdiction, authority or

22       limitations or short of statutory authority."

23               THE COURT:  I know, Mr. Klayman, that under the

24       APA should you prevail on your standing and the

25       government's substantial challenge to standing here and

1    therefore this Court's subject matter jurisdiction, but

2    let's say you prevail on that, as I appreciate that you

3    said that one of the key major questions here is whether

4    the programs that are challenged are a valid exercise of

5    prosecutorial discretion, and, you know, I appreciate that

6    you call them phony and disingenuous or the description of

7    them is a valid exercise of prosecutorial discretion, you

8    call that phony and disingenuous because the guidelines

9    used a standardized approach and I was a little bit

10   curious about that because it sort of seems like the

11   Executive Branch is therefore sort of between a rock and a

12   hard place.

13          If they have fairly clear guidelines for their

14   enforcement priorities in the immigration arena, it's too

15   standardized and, you know, you call it phony and

16   disingenuous.  But if they don't have very clear guidance

17   somewhat, their priorities would be, they would certainly

18   be subject to a challenge for being arbitrary, capricious

19   and unreasonable under the APA.  So where are you drawing

20   that line --

21          MR. KLAYMAN:  That's a good question.

22          THE COURT:  -- with regard to what the APA

23   program is in your view with these policies?

24          MR. KLAYMAN:  First of all, why it is phony and

25   disingenuous, no disrespect, I could have used stronger

41

1    language.

2           THE COURT:  You could have used stronger

3    language than phony and disingenuous?  Those words sort of

4    hopped off the brief to my eyes, fairly, you know,

5    noteworthy.

6           MR. KLAYMAN:  Okay.

7           THE COURT:  In terms of your views.

8           MR. KLAYMAN:  I could have used Woody Allen's

9    expression, a sham was a sham was a sham.  The reality

10   here is that because the breadth is so broad and because

11   it's clear to have prosecutorial -- prosecutorial

12   discretion --

13          THE COURT:  When you say "breadth," you mean the

14   numbers?

15          MR. KLAYMAN:  The numbers.

16          THE COURT:  Okay.

17          MR. KLAYMAN:  And there are no criteria to

18   really determine, except a few criteria -- and I'll get

19   into that -- what is at issue.  So broad that an

20   immigration enforcement person cannot possibly process the

21   applications of 5 million illegal immigrants, and the law

22   is clear, and even the Justice Department admitted in its

23   earlier memorandum when the president said I can't be an

24   emperor, is that you have to do it on a case-by-case

25   basis.

1          So are we going to process 5 million illegal

2     immigrants on a case-by-case basis?  That's irrational.

3     You talk about trying to save funds, and that's why it's

4     phony and disingenuous.  Just to process 5 million

5     potential illegal immigrants for -- and using

6     prosecutorial discretion is going to bust our budget to

7     the point where we won't be able to do anything else at

8     INS or anywhere else.  You can't process that.  And it

9     requires a background check for either of them.

10          THE COURT:  Why do you think it can't be

11     processed?  In the DACA program the government presented

12     statistics that -- and you also challenged the DACA

13     program -- that it resulted in a denial of 36,860

14     applications as of December 5, 2014.  So those are tens of

15     thousands of denials that were done on a case-by-case

16     basis.

17          MR. KLAYMAN:  Out of 766,000 illegals.  That's a

18     very low percentage.

19          THE COURT:  But it's not 100 percent.  It's not

20     a hundred percent that we're just rubber stamping.

21          MR. KLAYMAN:  No, we never said 100 percent,

22     Your Honor, but most of these people are getting through

23     the system.  They are not being processed.  That's why

24     this is irrational is that you can't.  There's no rational

25     basis for us to process 5 million people doing background

43

1    checks with personnel.  That's why there's an immediate

2    impact.  That's why they are hiring more people right now.

3    The people they are hiring isn't even enough.  This is all

4    a manipulation to have the president step in to try to

5    force the hand of Congress to meet his political promises

6    that he made years ago.  And right now the president --

7    and I don't mean this in a political sense, but he appears

8    not to even care about his own party anymore.  He's doing

9    what he wants to do.

10           THE COURT:  All right, Mr. Klayman.  I think --

11           MR. KLAYMAN:  Can I say one last thing?

12           THE COURT:  One last thing.

13           MR. KLAYMAN:  Yes, one last thing and that is

14   that Your Honor's duty, in all due respect, and I know you

15   take it seriously, is to enforce the law.  And with regard

16   to the rule-making in these presidential memorandum, and

17   there's a couple of examples there, one is dealing with

18   changing --

19           THE COURT:  How about presidential memoranda,

20   let's be clear.  They are DHS --

21           MR. KLAYMAN:  The president signs off of them,

22   but they do come out of DHS.  Even in those memoranda we

23   cited in our brief where DHS and the president are

24   admitting they have to do rule-making such as changing

25   visa requirements based on employment.  They in effect

**JA747**

44

1    have shot themselves in the foot with that admission in

2    terms of the APA, because at a minimum they should have

3    done rule-making here.  Thirty days notice and comment,

4    the American people have a right to comment on this, and

5    what we're asking is not a lot.  We're just saying, Your

6    Honor, enjoin this and allow for rule-making, let them,

7    let them publish a rule as they should do under the APA.

8    Because we meet the requirements here for a rule.  And

9    courts have done that before.  I realize this is a real

10   big --

11            THE COURT:  Mr. Klayman, you surprise me with

12   your last comment.  Because I had read your complaint as

13   asking me to enjoin these programs as an unconstitutional

14   violation of separation of powers and not just to stop

15   them for a rule-making, notice of comment rule-making to

16   take place.  Am I wrong on that?

17            MR. KLAYMAN:  Yes.  And as I just read to you

18   under 706, arbitrary and capricious and abuse of

19   discretion are otherwise not in accordance with law.  This

20   is arbitrary, capricious and abuse of discretion.

21            THE COURT:  Right.  I'm just reading Count I of

22   your complaint.

23            MR. KLAYMAN:  And are contrary to constitutional

24   rights.

25            THE COURT:  Excuse me, Mr. Klayman, I'm reading

45

1      Count I of your complaint that says that it violates the

2      Constitution and Paragraph 52 is ultravirus and you want a

3      declaratory judgment to that effect to stop it in its

4      tracks.

5              MR. KLAYMAN:  Right.  And the second count talks

6      about violation of rule-making requirements.

7              THE COURT:  Right.

8              MR. KLAYMAN:  Third cause of action, violation

9      of existing regulatory authority and we cite the APA, 5

10     U.S.C. 702 through 5 U.S.C. 706.  This is not rocket

11     science when it comes to the APA.  When I was a Justice

12     lawyer I represented the FDA, Consumer Product Safety

13     Commission and the Federal Trade Commission.  I had to

14     defend regulations that were promulgated, some without

15     notice and comment.  And when the agency messed up, they

16     had to go back and redo it or the Courts enjoined it.

17             THE COURT:  All right.  Thank you, Mr. Klayman.

18             MR. KLAYMAN:  Thank you.  I appreciate your

19     questions and time.

20             THE COURT:  And Ms. Hartnett.

21             MS. HARTNETT:  Thank you, Your Honor.  I'd be

22     happy to address any specific questions that the Court

23     has.

24             THE COURT:  Yes.  I mean, Mr. Klayman has raised

25     this issue about, you know, undocumented immigrants

46

1    eligible for those programs who are accepted into the, I

2    guess, both the DACA program and the revised DACA program

3    and the DAPA program as receiving a certificate.  Could

4    you explain, what is this certificate?

5              MS. HARTNETT:  I think that's a reference to an

6    employment identification card, so when the person applies

7    for either the DACA program or DAPA program, they both

8    make an application for deferred action which is reviewed

9    on a case-by-case basis and they also make an employment

10   authorization card.  And I believe that card, if it were

11   to be issued, would be a piece of documentation that would

12   identify the person as having received deferred action.

13             THE COURT:  And does that -- and so the

14   undocumented immigrant who receives this certificate, does

15   the person get a Social Security number so if they do, if

16   the person does get employment the person can pay taxes

17   and enter the Social Security program?  Is that also part

18   of it?

19             MS. HARTNETT:  Your Honor, I want to make sure I

20   don't go beyond what we put before the Court in the brief,

21   but I believe they do receive an identifying number which

22   will allow them to have taxes taken from their wages going

23   forward.  This is part of, again, not the DACA and DAPA

24   program itself but part of a pre-existing regulatory

25   scheme that's been in place since 1981 which includes

47

1    people receiving deferred action among many other groups

2    of people under the immigration laws as eligible for

3    employment authorization while they are in that status

4    which, again, is a temporary status that could be revoked

5    at any time but allows them employment during that time

6    period.

7             THE COURT:  And one of the things that I talked

8    to Mr. Klayman about is whether any of the other fairly

9    long-standing deferred removal programs that have been

10   implemented over the past 20, 30 years, did those also

11   have this work certificate accompanying the grant of the

12   deferred removal, you know, status?

13            MS. HARTNETT:  Yes, Your Honor.  I mean, among,

14   one of the most significant examples would be the 1990

15   Family Fairness Program, which you'll see an opinion in

16   our brief that applied to 1.5 million people and also

17   included ability to apply for employment authorization.

18   And, again, that would be something that would be standard

19   regardless; if someone is in the deferred action category

20   and has received deferred action according to preexisting

21   regulation, they would be able to apply for employment

22   authorization.

23            THE COURT:  Okay.  Now, one thing that I also

24   wanted clarification on is in footnote 23 of your brief

25   you cite statistics regarding the applicants under the

48

1    DAPA program, and you state that 42,632 applications have

2    been rejected and 36,860 applications were denied.  What's

3    the difference between a rejection and a denial?

4            MS. HARTNETT:  Thank you for asking and sorry we

5    didn't provide that information in our brief.  The

6    rejection is something that -- and we can provide

7    additional information to the Court if necessary.  But a

8    rejection would be something that would be facially not

9    complying with the requirements, for example, maybe

10   lacking a signature.  I believe it was only one of the

11   substantive requirements of the DACA program that would be

12   kind of a facial basis for just rejecting the application

13   and sending it back, and I think that was if the person

14   was above the age of 30.  I can confirm that.

15           But I think the most relevant statistic -- that

16   is a relevant statistic because it shows some initial

17   vetting going on and then the 36,000 number would be

18   people whose application was actually processed and

19   considered but rejected, and that could be for not meeting

20   the other criteria or, as the DACA program sets forth,

21   because discretion was determined to be inappropriate

22   under a case-by-case basis.

23           THE COURT:  Because Mr. Klayman, you know, did

24   suggest that the 36,860 number of denied DACA applications

25   was, you know, fairly low as a percentage of the total

49

1    numbers deemed eligible and granted.  But, you know, I do

2    think it's important to point out that there was this

3    other 42,000, right.

4              MS. HARTNETT:  That's correct.

5              THE COURT:  That were rejected.

6              MS. HARTNETT:  And also if I can add that it

7    makes sense, the lower rate there is a significant rate,

8    if not an extremely high rate.  It does take some, for a

9    person to come forward and identify themselves, one would

10   imagine they want to met the criteria in light of what

11   that meant to actually identify yourselves to the

12   authorities.  So at some level it seems reasonable that

13   there be a relatively high rate of people to be accepted

14   because one would have to be careful to make sure they met

15   the criteria before they identified themselves.

16             THE COURT:  The plaintiff has raised this in

17   support of his irreparable harm requirement for

18   preliminary injunctive relief as well as in support of his

19   showing of an injury in fact to establish the necessary

20   standing in the case that there are undocumented

21   immigrants who commit crimes or picked up by the sheriff's

22   office and then released to ICE and released into the

23   community again and commit other crimes.  And as I

24   understand Mr. Klayman's argument -- and I'm sure he'll

25   have an opportunity to apply and correct me if I'm

50

1 wrong -- but as I understand Mr. Klayman's argument, when

2 the Maricopa County Sheriff's Office now takes these

3 undocumented immigrants, turns -- who are committing state

4 crimes, processed through the state system, turns them

5 over to ICE, if they are eligible for this program they

6 are just going to be released into the community again.

7 So what happens to individuals in terms of their

8 eligibility for either the DACA or the DAPA program if

9 they've committed a crime on their deferred removal

10 status?

11    MS. HARTNETT:  Your Honor, so in the first place

12 the person would likely, you know, not be eligible for

13 DACA or DAPA if they had a significant criminal offense,

14 and both of those programs incorporate into them a

15 requirement that the person not be convicted of a

16 significant crime and not be a national security or public

17 safety threat.

18    So that's an initial response as to why --

19 there's several reasons why there's no nexus between these

20 programs and the harms that are being alleged here, but

21 that would be one of them.

22    But even assuming that the person had at some

23 point committed a crime again, no basis in the record for

24 concluding that, the status is revocable at any time.

25 When I say "status," I mean the deferred action category.

51

1    When someone receives deferred action, it may be revoked

2    at any time.  They could be deported at any time.  That

3    could be another potential option for someone, if there

4    were a hypothetical person who received DACA and DAPA and

5    nonetheless committed a crime after that.

6           Again, there's no record evidence at all that

7    any of the people about whom he's complaining were people

8    that had received DACA or DAPA and then went on to commit

9    a crime in the community.  He seems to be, as the Court

10   was indicating, challenging some other aspect of

11   immigration enforcement at the federal issue that's not

12   really at issue in this case.

13          THE COURT:  All right.  Could you clarify for

14   me, because maybe it's just confused in my head, the

15   effective date of the DAPA program and the revised DACA

16   program, because I thought the revised DACA program had a

17   90-day date before it became effective and the DAPA

18   program had 180-day date to be effective.

19          So could you just explain how those two dates

20   operated.  Are they effective now, as Mr. Klayman says,

21   and the government's just receiving applications for a

22   90-day period and a 180-day period?  Could you just

23   explain whether I'm confused on the effective date.

24          MS. HARTNETT:  No, you're not confused, and the

25   programs are pursuant to memoranda.  The terms of the

52

1   memoranda are not yet in effect.  The revised DACA program

2   applications should be, begin to be received starting on

3   February 18 of 2015, approximately, but that would be the

4   date, the 90-day date from the date of announcement.  And

5   for the DAPA program, that would take you to May 19, 2015,

6   to even be able to submit an application.  Because at that

7   point there would still have to be a period of time for

8   the consideration of the application, so even those dates

9   would not be dates of necessarily beginning to grant

10  requests under those applications.

11          Now, there is the ongoing DACA process from

12  2012, and that continues.  But these, the revisions to the

13  process will take effect pursuant to the memoranda.

14          THE COURT:  So just so we're absolutely clear,

15  the earliest date that anybody could be granted a DAPA

16  deferred removal status is 180 days after November 20; is

17  that right?

18          MS. HARTNETT:  Correct, for DAPA, yes.

19          THE COURT:  All right.  Okay, good.  I wanted to

20  clarify that myself.

21          All right.  Is there anything else you want to

22  add to your papers?

23          MS. HARTNETT:  If I could just make a couple of

24  quick points.  I wanted to react to one, there was some

25  dispute here about what exactly was being complained of,

53

1    and I would direct the Court's attention to, among other

2    things, Paragraph 16 of the supplemental declaration where

3    the declarant does make the point that he seems to be

4    attacking President Obama's six years of promising what is

5    in effect amnesty, so I think again kind of to the point

6    of another indicia here that we have a generalized

7    grievance or a political dispute as opposed to an actual

8    concrete dispute.

9            THE COURT:  Well, I mean, Mr. Klayman's papers

10   do refer to these programs, the challenged programs, DACA,

11   revised DACA and DAPA as an amnesty.  Does the government

12   view them as an amnesty in any way, and why not?

13           MS. HARTNETT:  No, Your Honor, we don't, and I

14   think the repeated use of that term kind of obscures the

15   actual nature of the program, which is the temporary

16   deferral of deportation to allow the government to focus

17   on its most critical pressing threats which include border

18   security threats and national security and public safety

19   threats and serious criminals.  So this does not provide a

20   legal status or a pathway to citizenship but is in essence

21   a way to put a group of cases to the side after

22   individualized consideration to really allow the

23   enforcement authorities to really focus on the most

24   critical priorities in light of limited resources.

25           THE COURT:  But it is an amnesty to the extent

54

1   that if somebody who has been granted this deferred

2   removal status is picked up by immigration authorities,

3   they do get an amnesty from being deported; is that right?

4         MS. HARTNETT:  They have their card that will

5   provide the identification of them as a deferred action

6   person, but at the same time, as I pointed out, that would

7   be revocable at any time.  To the extent that there would

8   be some reason to revoke that at that time, they would be

9   able to have that opportunity.

10         So, again, it's not an amnesty in the sense of

11   creating any legal right or entitlement for the person.

12   The person is simply put to the side as a matter of

13   administrative convenience with some -- to help focus the

14   efforts of the enforcement authorities in the meantime in

15   light of the severe resource constraints that the agency

16   faces.

17         THE COURT:  All right.  Anything else you want

18   to respond to?

19         MS. HARTNETT:  No.  I guess one other just point

20   of clarification about the funding of the program.  There

21   was some discussion about whether this would be taking

22   resources away from the enforcement efforts to have to pay

23   for the administration of the DACA and DAPA programs.  And

24   I think among other places at page 26 of the OOC opinion,

25   but as the plaintiff acknowledges, there will be fees

55

1    collected and this will be funded through that.  So as the

2    OOC opinion pointed out, there would not be any indication

3    that there would be a strain of resources for removal

4    efforts by having the DAPA and DACA programs exist.

5              THE COURT:  Thank you.  Mr. Klayman.

6              MR. KLAYMAN:  A few points.  Some of the

7    commentary that we heard in answer to your first question,

8    it's not on the record, Your Honor.  And there's no backup

9    for that.  So we ask Your Honor not to regard that in

10   writing your opinion ultimately.  Also I want to thank you

11   for moving this case along quickly, because however you

12   rule, it's clear this is probably going to the Supreme

13   Court at some point.

14             THE COURT:  I wouldn't predict.

15             MR. KLAYMAN:  Make you more famous.

16             THE COURT:  In this room I think you are the

17   most famous person, Mr. Klayman.

18             MR. KLAYMAN:  I'm glad you didn't say -- third

19   point, with regard to injury, *United States v. Mills*,

20   violation of the Constitution in and of itself has been

21   found by the Supreme Court to give rise to irreparable

22   injury.

23             The other thing I might add, and this was what

24   was not stated accurately, is that in the memoranda today

25   that are at issue here that you clarified at the beginning

56

1    of this hearing, it states explicitly that enforcement is

2    to stop immediately.  Everything stops to allow these

3    people to come out from, you know, underground and come

4    forward.  And I ask you --

5                    THE COURT:  Where is that in, in which

6    memorandum are you talking about?  Are you talking about

7    the November 20th memoranda?

8                    MR. KLAYMAN:  Yes.  It's Exhibit D, Your Honor.

9                    THE COURT:  I mean, I'm looking another

10   document, ECF 6-4, and on page 3 of that document where it

11   states -- it has a justification for the case-by-case

12   exercises of deferred action to encourage people to come

13   out of the shadows, submit to background checks and so on,

14   but I didn't see any reference in here to stopping removal

15   proceedings for the priority, undocumented immigrants.

16                   MR. KLAYMAN:  If you look at page 5, it's the

17   corollary what's being set there.  It's implicit in that.

18   Wherein it says, "ICE and CBP are instructed to

19   immediately begin identifying persons in their custody as

20   well as newly encountered individuals who meet the above

21   criteria and may thus be eligible for deferred action to

22   prevent the further expenditure and enforcement resources

23   with regard to these individuals."

24                   So what they are saying is we want to identify

25   these people immediately because we don't want to have

57

1    them subject to deportation so as to prevent the further

2    expenditure of enforcement resources.  So it does have

3    immediate effect in that regard.  And the other two

4    paragraphs are similar.

5             So that's the immediate harm.  And -- but it

6    doesn't have to be immediate harm.  It has -- it can even

7    just be imminent harm or respective harm, and that's

8    what's important here.

9             And with regard -- we feel firmly Your Honor

10   should make a ruling on the constitutionality, whether you

11   agree with us or not.  We ask that you make a ruling on

12   that.  But even under their concept of, this is not going

13   to kick in --

14            THE COURT:  So just like the judge in

15   Pennsylvania, even if I don't have to and I don't have a

16   case in controversy in front of me that entitles me as a

17   Federal judge to make a ruling, you want me to just opine?

18            MR. KLAYMAN:  We don't want you to be like the

19   judge in Western District.  We want you to be yourself.

20   But the reality is you have to reach that issue because

21   there is a case of controversy here and there is a

22   constitutional issue, and it falls within the scope of

23   Section 706 of the APA.  That's one of the reasons why you

24   should invalidate what they did under the APA.  You have

25   to reach the constitutional issue.  I read that a couple

**JA761**

58

1    times.

2            But in addition, what I'm trying to say is that

3    under their scenario of when this thing kicks in, you can

4    make a ruling, an expedited ruling that they have to have

5    notice and comment, 30 days.  Since they are claiming that

6    this is not going to take effect until some time in

7    February, that if Your Honor makes a quick ruling they are

8    going to have to do notice and comment and the American

9    people are going to have a right to respond.

10           THE COURT:  All right.  Well, Mr. Klayman, let

11   me just, you know, satisfy the curiosity of people who are

12   listening.  I am not prepared to issue a ruling today,

13   although I appreciate all the points you've made about the

14   importance of this issue and I will -- I do plan to be

15   issuing an opinion very shortly on both your pending

16   motion for a preliminary injunction and the government's

17   pending motion to dismiss for lack of subject matter

18   jurisdiction.

19           So you've all given me a lot to think about on a

20   number of cases to review, and you've been presenting

21   documents up until last night.  And so I want an

22   opportunity to fully consider those before I issue my

23   ruling.

24           MR. KLAYMAN:  Actually we filed last night

25   because the ECF system was down.

**JA762**

59

1          THE COURT:  I know.  Sorry about that.

2          MR. KLAYMAN:  We wanted -- we e-mailed them

3   their document days ago so they would have it.  But what I

4   was basically saying the last point, if I may make a

5   possible suggestion.  You could issue an order quickly on

6   the notice and comment and defer on the rest of it,

7   because it's quite clear that this was not a policy, and

8   even if it was, it would have to be under notice and

9   comment.  And if you issue that quickly, then it will give

10  them the 30 days to publish the notice and comment.  That

11  should have been done, they admitted that in the memoranda

12  with regard to other types of actions that they took such

13  as visa status with regard to change of employment.

14          Thank you, Your Honor.  I appreciate your time.

15          THE COURT:  Thank you.

16          Thank you.  You are all excused.

17          (Proceedings adjourned at 10:49 a.m.)

18

19

20

21

22

23

24

25

**JA763**

60

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Barbara DeVico, certify that the foregoing is

4    a correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9

10

11    _____              12-29-14

12    SIGNATURE OF COURT REPORTER                DATE

13

14

15

16

17

18

19

20

21

22

23

24

25

JA764