IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
Brownsville Division

STATE OF TEXAS, *et al.*

           Plaintiffs,

   v.

**UNITED STATES OF AMERICA, et al.**

           Defendants

Case No. 1:14-cv-254

Hon. Andrew S. Hanen, Presiding

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO INTERVENE BY JOSEPH ARPAIO,
ELECTED SHERIFF OF MARICOPA COUNTY, ARIZONA**

**I.   INTRODUCTION**

For the reasons set forth in this Memorandum of Law, proposed Intervenor, the Office of Joseph Arpaio, in his capacity as the elected Sheriff of Maricopa County, Arizona ("Sheriff Arpaio" below) and the chief law enforcement officer responsible for the safety of approximately sixty percent (60%) of the population of the State of Arizona,[1] seeks to intervene as a party in the litigation.

The outcome of the case will have a direct effect upon Sheriff Arpaio's office. It appears that the State of Arizona did not as actively as Sheriff Arpaio's Office can and will come forward with information about the Defendants' programs financial and practical impact upon the State. By contrast, Sheriff Arpaio's office has first-hand access to information about some of the most direct effects upon Arizona of the Defendants' programs through law enforcement activities. Sheriff Arpaio provided only some of the available data and

---

[1]     The U.S. Government owns approximately 48% of the land of the State of Arizona.

information in a related case, but can more extensively participate under the normal time table and progress of this litigation.

## II.     STANDARD OF REVIEW / GOVERNING LAW

Federal Rules of Civil Procedure (FRCP) Rule 24 governs intervention by additional parties in existing litigation in the federal courts: [2]

> Rule 24. Intervention
>
> (a) INTERVENTION OF RIGHT. On timely motion, the court must permit anyone to intervene who:
>     (1) is given an unconditional right to intervene by a federal statute; or
>     (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.
>
> (b) PERMISSIVE INTERVENTION.
>     (1) *In General.* On timely motion, the court may permit anyone to intervene who:
>         (A) is given a conditional right to intervene by a federal statute; or
>         (B) has a claim or defense that shares with the main action a common question of law or fact.
>
>     (2) *By a Government Officer or Agency.* On timely motion, the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on:
>         (A) a statute or executive order administered by the officer or agency; or
>         (B) any regulation, order, requirement, or agreement issued or made under the statute or executive order.
>     (3) *Delay or Prejudice.* In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

---

[2] It does not appear that the Local Rules of the U.S. District Court for the Southern District of Texas present any additional rules or requirements for intervention.

> (c) NOTICE AND PLEADING REQUIRED. A motion to intervene must be served on the parties as provided in Rule 5. The motion must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought.

**III.     PROCEDURAL AND FACTUAL HISTORY**

It should be noted that although the proceedings are in an advanced stage with regard only to the Temporary Injunction heard and entered by the Court, the underlying case is actually at a very early stage in its overall progress.  Indeed, the Court postponed the deadlines for the progress of the underlying case while awaiting the outcome of the Defendants' appeal of the Court's Temporary Injunction.

On November 20, 2014, Secretary of Homeland Security Jeh Johnson issued several orders to the U.S. Department of Homeland Security ("DHS") immediately stopping enforcement of the Immigration and Naturalization Act ("INA") with regard to an estimated 4 to 5 million citizens of foreign countries illegally present in the United States of America who meet specific criteria (even if those persons did not apply for relief), [3] and ordering a grant of amnesty, work permits, and other benefits to those persons who meet the specified criteria, in coordination with an address to the nation on the same topic by President Barack Obama.  The Defendants style these efforts as "deferred action" programs suspending the enforcement of the immigration laws (INA) by "executive action" apart from Congressional legislation.

This case was filed on December 3, 2014, by the Complaint of the Plaintiff States.

The Plaintiffs filed a Motion for Preliminary Injunction on December 4, 2014.

---

[3]     The Plaintiffs here did not challenge the Executive Branch's June 15, 2012, Deferred Action for Childhood Arrivals ("DACA"), affecting an estimated 1 to 1.5 million additional potential beneficiaries, whereas Sheriff Arpaio did in his lawsuit *Arpaio v. Obama*.  Please also note that the estimated beneficiaries do not (cannot) anticipate how many of those estimated to be eligible will actually choose to apply.

An Amended Complaint was filed on December 9, 2014.

Ultimately, additional Plaintiff States and State Attorneys General joined the lawsuit so as to bring the total to 26 Plaintiff States and/or Attorneys General.

The Court heard oral argument on the Motion for a Preliminary Injunction on January 16, 2015, and received additional briefing.

The Court issued a Temporary Injunction on February 16, 2015.

The Defendants filed an interlocutory appeal of the Court's Temporary Injunction on February 23, 2015, however the main case remains pending.

Also, the Movant Sheriff Arpaio filed a lawsuit in the U.S. District Court for the District of Columbia on November 20, 2014.  This case was dismissed on grounds of standing which the Movant contends to have been misunderstood.

**IV.   ARGUMENT**

   A.   <u>Intervenor has an Interest in the Transaction or Subject of the Action Pursuant to FRCP Rule 24(a)(2)</u>

> (a) INTERVENTION OF RIGHT. On timely motion, the court must permit anyone to intervene who:
> \* \* \*
> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Here, Sheriff Arpaio is directly and dramatically impacted by the Defendants' deferred action / executive action amnesty programs, in many ways:

First, the Defendants' programs are an elaborate scheme for not enforcing existing immigration laws.  Defendants' proffer those schemes as fig leafs for not enforcing the current,

4

governing law at the federal level. Therefore, in the absence of those deferred action programs, current law would continue to govern and would command the deportation of those whom Congress has determined removable. [4] The effect of enforcing current law – that is, not allowing Defendants' schemes to evade current law – would be to remove illegal aliens from the country, removing significant burdens upon the proposed Intervenor Sheriff Arpaio.

Second, historical and empirical experience has proven beyond all doubt, including Ronald Reagan's mistake of caving to Democrat Party demands for a comprehensive immigration reform bill in 1986 and further back almost to the Eisenhower Administration, that each grant of amnesty inevitably, always, empirically, and quite logically stimulates massive further waves of new illegal aliens flooding the country.

Apologists for amnesty including the Defendants insist that – by reading the fine print of U.S. Government programs in English – foreigners will understand that they would not qualify for the current amnesty programs if they enter the United States. This presupposes a high degree of legal education in the English language by those who have – we are told by amnesty advocates – come to do "jobs that Americans won't do."

But in fact, on a real-world level more sophisticated than the intellectuals in America's political world, foreigners understand our U.S. politics better than most political experts. They understand that each new mass grant of amnesty, followed by yet another wave of illegal immigration, will make the next round of amnesty unavoidable

---

[4] Certainly, the nation's immigration laws are complex and include many provisions. Sheriff Arpaio understands the term and concept of "illegal alien" to refer to and be defined as a citizen of a foreign country illegally in the United States for whom *NONE* of the INA's many categories of relief established by Congress are available. Therefore, an "illegal alien" who could qualify under any of the many provisions of the INA for lawful admission, presence, or status legislated by Congress is not, by definition or concept, an "illegal alien." (He may be an applicant.) Therefore, the concept of "illegal alien" presupposes that Congress has decided that such person must be deported.

and irresistible to U.S. politicians.  Particularly as the voting strength of amnesty beneficiaries grows – the theory goes – each round of amnesty makes the next one harder to resist.  Thus, foreigners considering a rush across the border demonstrate a sharper and keener sense of political insight into U.S. politics than the average highly-paid pundit inside the beltway.

      As a result, the Defendants' programs will increase the degree, scope, breadth, and extent of harm to the Intervenor Sheriff Arpaio, just as the nation watched in the Summer of 2014 as floods of unaccompanied "minors" [5] accompanied by death and dismemberment on the Mexican train called "La Bestia."  There are already signs that the Summer of 2015 will equal or surpass the flood across the border.

      Third, it is true that the Executive Branch of the U.S. Government has not enforced the immigration laws even before the announcement of the Defendant's deferred action programs.  However, over the last six (6) years, it was largely in anticipation of the Defendants granting amnesty that the Executive Branch has been unwilling to undertake vigorous enforcement of the law and deportation proceedings.  The two phenomenon are directly, closely and integrally linked.  A final decision that the Defendants' programs are unlawful would help end the foot-dragging of the Executive Branch at enforcing the immigration laws.  Upholding the law as written by Congress, and rejecting schemes to evade the law, would directly impact the overall approach of the U.S. Government to the laws that Congress passed.

---

[5]    Some "minors" entering with no documentation but reportedly sporting gray hair or the bodies of 30 year old men, some placed in high school next to minor girls.

    B. <u>The Court Disposing of the Action May as a Practical Matter Impair or Impede the Intervenor's Ability to Protect the Sheriff's Office's Interests</u>

Pursuant to FRCP Rule 24(a)(2)

> (a) INTERVENTION OF RIGHT. On timely motion, the court must permit anyone to intervene who:
>     \* \* \*
> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Sheriff Arpaio's interest in the Court halting the Defendants' illegal deferred action will be impaired or impeded as a practical matter without being able to vindicate those interests. As an example, the legal underpinning that the Defendants claim as the lynchpin of their entire justification and implementation of amnesty is their claim that Congress has not appropriated sufficient funds for the Executive Branch to carry out the law (INA) and deport those whom Congress has determined must be deported.

Fatal to this argument, however, are the facts that (1) the Executive Branch has never in recent time periods asked for the funding it now claims it lacks and (2) Congress has always appropriated significantly more money for immigration enforcement than the Executive Branch asked for through the "President's Budget" submitted by the Executive Office of the President, Office of Management and Budget.

The Plaintiffs have, as far as Intervenor can see, never attacked the central underpinning of the Defendants' entire legal case. Defendants' claim inherent authority to rewrite the immigration laws of the nation (e.g., the INA) on the grounds that they would be unable to fully implement those laws without more funding. Yet, they never asked for more funding. Defendants cannot build a legal case on a lack of funding they never asked for.

Defendants' proper remedy is to submit an appropriate, formal budget request to Congress documenting the funding that they need – which the law requires each department and agency to do in any event.  This is also important because Congressional staff advise the staff of undersigned counsel Freedom Watch that the problem includes the Executive Branch reprogramming funds provided by Congress for immigration enforcement and diverting it to other purposes.  Therefore, presenting a request for funding before Congress along with the scrutiny of Congressional hearings would get to the heart of the matter.

<u>Neither this Court, the U.S. Court of Appeals for the Fifth Circuit, nor any other court should sit in place of a Congressional appropriations committee hearing.</u>  It cannot be the role of any federal court to pass judgment on whether or not Congress has appropriated adequate funding – including when funds have allegedly been diverted to other purposes.

Similarly, the size and scope of the program is a consequence of other actions, omissions, or failures by the U.S. Government.  How much funding is necessary in light of the Executive Branch failing to build the border fence mandated by the Border Security Fence Act of 2006?  Adequate funding cannot be evaluated without also evaluating whether the Executive Branch is making the problem bigger than it needs to be by other policy failures.  A court is ill-equipped to do the work of a Congressional appropriations committee.

Yet the Plaintiffs including the State of Arizona – despite magnificent and comprehensive work on other topics – have not brought forward this and other important legal arguments that are necessary to protect and vindicate Sheriff Arpaio's interests.  Without Sheriff Arpaio's participation as a party, he will not be able to ensure – as a practical matter – that his interests are protected.

In this regard, FRCP Rule 24(a)(2) concerns whether <u>as a practical matter</u> – not as a

theoretical or hypothetical matter – the movant's interests would not be protected: The movant "is so situated that disposing of the action may *as a practical matter* impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  *(Emphasis added.)*

Therefore, the analysis is not whether Sheriff Arpaio's interests are hypothetically or theoretically vindicated, but whether those interests would be "impaired" or "impeded" by a decision on the merits "*as a practical matter.*"

Similarly, Sheriff Arpaio's Office has extensive real-world, empirical data that is not readily available to any of the State Plaintiffs.  Sheriff Arpaio presented only quick, tiny examples immediately after the President announced these new programs.  Sheriff Arpaio, as a practical matter, needs to present the practical impact upon law enforcement protecting approximately 4 million Americans who are citizens of Maricopa County and under his care as Sheriff.

C. <u>Intervenor Shares Common Questions of Law or Fact with Main Action</u>

Pursuant to FRCP Rule 24(b)(1)(B),

> (b) PERMISSIVE INTERVENTION.
>   (1) *In General.* On timely motion, the court may permit anyone to intervene who:
>         * * *
>   (B) has a claim or defense that shares with the main action a common question of law or fact.

Quite obviously, Sheriff Arpaio's challenges to the Defendants' deferred action programs by executive action share common questions of law and fact with the Plaintiffs' case here, concerning the illegality of the Defendants' programs.

9

## V.   CONCLUSION

Intervenor asks for leave to intervene as a party in support of the Plaintiffs for the reasons set forth above, seeking the relief that the Defendants' deferred action programs established by executive action should be declared unlawful under the procedural requirements of the Administrative Procedures Act, the substantive requirements of the APA requiring faithfulness of agency action and regulations to the laws passed by Congress and to the U.S. Constitution, and the Constitution itself directly including the "Take Care" clause.

Dated:  March 26, 2015                    Respectfully submitted,

                                                            Larry Klayman, Esq.
Washington, D.C. Bar No. 334581
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com
        Of Counsel

/s/ Jonathon Moseley

Jonathon Moseley, Esq.

Virginia State Bar No. 41058
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com
Attorney for Plaintiff
*Pro Hac Vice Approved*

**CERTIFICATE OF CONSULTATION**

I hereby certify that

????

10

_____
Jonathon Moseley, Esq.

**CERTIFICATE OF SERVICE**

      I hereby certify that service of the foregoing Supplemental *Amicus Curiae* Brief by Sheriff Joe Arpaio for Leave of Court Filing Transcript of Defendants' Argument December 22, 2014, by Deputy Assistant General Kathleen Hartnett will be delivered electronically on March 26, 2015, to counsel for Plaintiffs and Defendants through the District's Electronic Case Filing system.

_____
Jonathon Moseley, Esq.