## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

—————————————————————————
                                        )
STATE OF TEXAS, *et al.*,                )
                                        )
                      Plaintiffs,        )
                                        )
          v.                             )          No. 1:14-CV-254
                                        )
UNITED STATES OF AMERICA, *et al.,*      )          (Redacted for Public Filing)
                                        )
                      Defendants.        )
—————————————————————————                )


## DEFENDANTS' RESPONSE TO THE COURT'S ORDER OF APRIL 7, 2015

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

I.      BACKGROUND ....................................................................................................4

II.     THE GOVERNMENT DID NOT ATTEMPT TO MISLEAD THE COURT...................6

III.    NO FURTHER INQUIRY IS NECESSARY TO DETERMINE THAT
        NO MISCONDUCT OCCURRED HERE AND THAT SANCTIONS
        ARE UNWARRANTED ......................................................................................18

IV.     THE COURT NEED NOT REVIEW THE MATERIALS SUBMITTED
        *IN CAMERA* AND SHOULD NOT ORDER THEIR PRODUCTION
        TO PLAINTIFFS ..............................................................................................22

CONCLUSION................................................................................................................27

# TABLE OF AUTHORITIES

**CASES**                                                              **PAGE(S)**

*Armstrong, v. Bush*,
   924 F.2d 282 (D.C. Cir. 1991) ............................................................ 26

*Brinton v. Dep't of State*,
   636 F.2d 600 (D.C. Cir. 1980) ............................................................ 24

*Browning v. Kramer*,
   931 F.2d 340 (5th Cir. 1991) ............................................................ 20

*Chambers v. NASCO, Inc.*,
   501 U.S. 32 (1991) ....................................................... 18,19- 20, 21, 24

*Cheney v. U.S. Dist. Court for Dist. of Columbia*,
   542 U.S. 367 (2004) ......................................................................... 26

*City of Alexandria v. Cleco Corp.*,
   547 Fed. Appx. 568 (5th Cir. 2013) .................................................. 19

*Crowe* v. Smith,
   151 F.3d 217 (D.C. Cir. 1998) ......................................................... 19

*Daily v. Vought Aircraft Co.*,
   141 F.3d 224 (5th Cir. 1998) ................................................ 19-20, 21

*Degen v. United States*,
   517 U.S. 820 (1996) ......................................................................... 24

*In re Grand Jury Subpoena*,
   190 F.3d 375 (5th Cir. 1999), *cert. denied*, 529 U.S. 1062 (2000) ......... 27

*Hickman v. Taylor*,
   329 U.S. 495 (1947) ......................................................................... 23

*Hornbeck Offshore Servs., LLC v. Salazar*,
   713 F.3d 787 (5th Cir. 2013) ........................................................................ 18

*Hunting Energy Servs. LP v. Inter-Mountain Pipe & Threading Co.*,
   242 Fed. Appx. 257 (5th Cir. 2007) ............................................................... 19

*In re Int'l Sys. & Controls Corp. Sec. Litig.*,
   693 F.2d 1235 (5th Cir. 1982) ...................................................................... 23

*J.H. Rutter Rex Mfg. Co., Inc. v. N.L.R.B.*,
   473 F.2d 223 (5th Cir. 1973) ........................................................................ 23

*Kent Corp. v. NLRB*,
   530 F.2d 612 (5th Cir.) ............................................................................... 23

*Maguire Oil Co. v. City of Houston*,
   143 F.3d 205 (5th Cir. 1998) ........................................................................ 19

*In re Moore*,
   739 F.3d 724 (5th Cir. 2014) ........................................................................ 19

*Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*,
   2 F.3d 1397 (5th Cir. 1993) .......................................................................... 20

*Newby v. Enron Corp.*,
   302 F.3d 295 (2002) ..................................................................................... 21

*Positive Software Solutions, Inc. v. New Centry Morg. Corp.*,
   619 F.3d 458 (5th Cir. 2010) ........................................................................ 21

*Roadway Exp., Inc. v. Piper*,
   447 U.S. 752 (1980) ............................................................................... 18, 19

*In re Sealed Case*,
   121 F.3d 729 (D.C. Cir. 1997) ..................................................................... 26

*In re Sealed Case*,
   146 F.3d 881 (D.C. Cir. 1998) .................................................................. 24

*Shields v. Sturm, Ruger & Co.*,
   864 F.2d 379 (5th Cir. 1989) .................................................................... 1

*Union Pump Co. v. Centrifugal Tech., Inc.*,
   404 Fed. Appx. 899 (5th Cir. 2010) ................................................... 18,19

*In re United States*,
   397 F.3d 274 (5th Cir. 2005) ................................................................ 4,27

*United States v. El Paso Co.*,
   682 F.2d 530 (5th Cir. 1982) .................................................................. 23

*United States v. Kelly*,
   569 F.2d 928 (5th Cir. 1978) .................................................................. 23

*United States v. McGraw-Hill Cos., Inc., No. 13-CV-0779-DOC (JCGx)*,
   2014 U.S. Dist. LEXIS *19 (C.D. Cal. Sept. 25, 2014) ......................... 26

*United States v. Nelson*,
   732 F.3d 504 (5th Cir. 2013) .................................................................. 23

*Universal Oil Prods. Co. v. Root Refining Co.*,
   326 U.S. 575 (1946) ............................................................................... 24

**STATUTES**

28 U.S.C. § 1927 ............................................................................................ 20

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 11(c)(2) ........................................................................... 20, 21

**MISCELLANEOUS**

2 Paul R. Rice, Attorney-Client Privilege in the United States § 9:25 (2d ed.1999) .................... 1

iv

24 Wright and Graham, Fed. Prac. & Proc. § 5507, at 578-79 (1986 ed.) ..................................... 1

Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse*, § 17(A)(4) ..................... 25

## <u>INTRODUCTION</u>

Defendants respectfully submit this filing, along with an *in camera* production of privileged documents and a privilege log, in response to the Court's Order of April 7, 2015.[1] Defendants and the Department of Justice (DOJ) take extremely seriously their obligation of candor to the courts in representing the interests of the United States and recognize the Court's legitimate interest in ensuring the candor of those appearing before it. DOJ and Defendants have fulfilled that duty in this case, and they regret and apologize for the misunderstanding that inadvertently resulted from their statements about the effective dates for actions under the November 20, 2014 Deferred Action Guidance at issue in this case. But, as the broad array of privileged material being submitted pursuant to the Court's Order helps demonstrate, neither that misunderstanding nor the timing of the Government's notice to the Court concerning this matter was the product of a lack of candor or bad faith or calculated delay. Rather, the misunderstanding was the inadvertent result of Government counsel's effort to be forthcoming with the Court about matters related to the preliminary injunction motion. The Government did not attempt to mislead the Court or engage in any other intentional misconduct; no basis exists for imposing sanctions; and the imposition of sanctions would, in any event, be improper in the absence of additional procedures.

    **1.** The Government did not deliberately attempt to mislead the Court or Plaintiffs about the fact that the Department of Homeland Security (DHS) had begun according three-year

---

[1] A redacted version of this filing, which omits privileged material, is being served on Plaintiffs and filed on the public docket. The Government notes that it understands the Court's order to compel the production of the privileged material, and therefore that the production pursuant to the April 7 Order does not waive or otherwise compromise any privileges attaching to that material. *See Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989) (holding that attorney work product does not lose its protection "when a party is compelled to disclose [it] and does so only after objecting and taking other reasonable steps to protect the privilege"); *see also* 2 Paul R. Rice, Attorney-Client Privilege in the United States § 9:25, at 64 (2d ed.1999) ("[C]ourts generally hold that when production of privileged communications is judicially compelled, compliance with the order does not waive the attorney-client privilege that should have shielded the communications from disclosure."); 24 Wright and Graham, Fed. Prac. & Proc. § 5507, at 578–79 (1986 ed.) (emphasizing that disclosure must be "voluntary" for waiver to occur).

periods—rather than two-year periods—of deferred action and employment authorization on the date specified in the Secretary's memorandum, November 24, 2014, to aliens who already fell within the existing 2012 Deferred Action for Childhood Arrivals (DACA) guidelines and otherwise were determined to merit deferred action as a matter of prosecutorial discretion.

But as the Government has previously explained, the preliminary injunction proceedings in this case focused on (1) the Secretary's expansion of the DACA guidelines to make eligible additional categories of aliens, with DHS accepting applications from these newly eligible individuals at an unspecified date no later than 90 days after the announcement date, and (2) guidelines for a new policy, Deferred Action for Parental Accountability (DAPA), pursuant to which DHS would begin accepting deferred action requests at an unspecified date no later than 180 days after the policy was issued.  The expansion of eligibility to additional categories of individuals under both DACA and DAPA was at the heart of Plaintiffs' complaint and preliminary injunction briefing.  And counsel believed that the unspecified effectiveness dates (applications would be accepted "no later than 90 days from" and "no later than 180 days from" the announcement date for expanded DACA and DAPA, respectively) were the subject of the Court's inquiries about timing and at the core of the timing issues relating to the preliminary injunction motion.

As a result, the Government's statements to the Court about timing related to the preliminary injunction motion

focused on the forthcoming expansion of eligibility to additional categories of individuals, and not on the three years of deferred action that were being accorded to aliens under the 2012 DACA eligibility guidelines on an ongoing basis.  The Government did not deliberately mislead the Court or deliberately attempt to hide the fact of the three-year deferrals, nor did it appreciate the potential for miscommunication caused by its statements to this Court during the pendency of Plaintiffs' preliminary injunction motion.

Indeed, as the privileged information we are submitting shows,

that counsel at DOJ learned that approximately 100,000 people who qualified under the 2012 DACA eligibility guidelines had been accorded three-year deferrals between November 24, 2014, and the date the Court entered the preliminary injunction.  In light of that new information, realizing the broad scope of the Court's preliminary injunction and bearing in mind their own earlier representations to this Court, counsel realized that they should inform the Court and Plaintiffs of the fact and number of three-year deferrals.  Attorneys for the Government immediately drafted and filed the Advisory

of first hearing this information.  The Government deeply regrets not only the confusion that these statements created, but that it did not recognize the prospect of confusion earlier.  But the miscommunications were not the product of bad faith, and they do not warrant sanctions or further discovery.  Plaintiffs have already been informed of the three-year deferrals under the 2012 DACA eligibility guidelines, and thus can assess whether they have suffered any harm from those deferrals.  If the Court concludes otherwise, the Government is prepared to discuss with Plaintiffs an appropriate resolution, including as indicated in the March 19 hearing before the Court.

**2.**  As described more fully in Part IV below, we are submitting *in camera* privileged lists of individuals who "knew about th[e] Advisory, or about the DHS activity discussed therein,"

Order at 11, as well as 1163 pages of privileged documents, comprising the results of our search

for "any and all drafts of the March 3, 2015 Advisory, including all corresponding metadata and

other tangible items that indicate when each draft of the document was written and/or edited or

revised." April 7 Order at 11. However, we do not believe it necessary for the Court to review

those materials, because this filing and the privilege log are sufficient to show that the Advisory

was filed                                       after counsel for Defendants realized that there had been a

potential for misunderstanding. Furthermore, the underlying materials, which concern the

drafting and filing of a document in ongoing litigation, reside at the core of the work product

doctrine, the attorney-client privilege, and the deliberative process privilege. Exposure of such

sensitive materials, even *in camera*, while the underlying suit remains pending on the merits

before the Court could create significant difficulties, and thus should be avoided. In all events,

this privileged information should not be disclosed to Plaintiffs. *See, e.g., In re United States*,

397 F.3d 274, 285-86 (5th Cir. 2005).

## I.      BACKGROUND.

Defendants advised the Court on March 3 that—before the February 16 injunction—

three-year deferrals had been accorded to aliens who merited deferred action under the

unchallenged 2012 DACA policy. Plaintiffs then filed a motion seeking early discovery to

obtain factual information about the three-year deferrals to help them determine (1) how

Plaintiffs were harmed, if at all, and what remedy they should seek, if any; and (2) whether

Defendants were actually complying with the preliminary injunction. Plaintiffs did not make

specific discovery requests or move for substantive relief or sanctions. Rather, Plaintiffs stated

that they would "likely seek information related to when Expanded DACA deferred action began

issuing; which supervisory officials were involved in granting that deferred action and the extent

to which they described that practice to Defendants and their counsel; details about how many of

4

the approximately 100,000 aliens who received Expanded DACA relief applied during the time period in dispute; and the extent to which those applicants requested Expanded DACA relief." March 5 Motion at 8.

In response, attorneys for the Government sought to provide Plaintiffs and the Court with relevant information about the three-year deferrals so that Plaintiffs and the Court could assess any claim of harm and need for relief.   Among other things, the Government informed Plaintiffs that DHS had accorded three-year deferrals to 108,081 individuals before the Court's injunction and that 94,681 of those individuals had submitted their requests for deferred action before issuance of the November 20, 2014 Deferred Action Guidance.  Mar 19 Tr. at 25.  All of those 108,081 individuals received deferrals in accordance with the original 2012 DACA eligibility guidelines, not the expansion of eligibility to additional categories of individuals set forth in the November 20, 2014 Guidance.  Opp Br. 3; *see* Mar. 19 Tr. 39-40; *id*. at 14-15.  The Government also reiterated that it was complying with the preliminary injunction.

On April 7, this Court issued an order on the States' motion for early discovery.  Order at 11.  The Court stated that it was "extremely troubled by the multiple representations made by the Government's counsel—both in writing and orally—that no action would be taken pursuant to the 2014 DHS Directive until February 18."  *Id*. at 3.  This Court found "even more troublesome" the approximately two-week period between the issuance of the preliminary injunction, on February 16, and the filing of the Advisory, on March 3, stating that during that period "the Government did nothing to inform the Court of the 108,081 revised DACA approvals."  *Id*. at 8.  Ultimately, the Court ordered the Government to "file, complete with courtesy copies to the Court and Plaintiffs":

> (i) any and all drafts of the March 3, 2015 Advisory [Doc. No. 176], including all corresponding metadata and all other tangible items that indicate when each draft of the document was written and/or edited or revised; and

5

(ii) a list of each person who knew about this Advisory, or about the DHS activity discussed therein, and each person who reviewed or approved its wording or filing, as well as the date and time when each person was apprised of this document and/or its contents, or of the DHS activity that is the subject matter thereof.

*Id.* at 11.  This Court stated that it "[did] not foresee any privilege problems impacting the merits of this case," but instructed that "any privileged material shall be filed *in camera* with a privilege log supplied to the Court and [Plaintiffs'] counsel."  *Id.* at 11-12.  It also ordered that, following review of the produced documents, Plaintiffs shall, by May 1, 2015, file a list of any further discovery they deemed necessary and why it is relevant, and that the Government would have until May 8, 2015, to respond to that request.  The Government sought an extension based on the extensive efforts required to compile information in response to the Court's Order.  *See* ECF No. 234.  On April 20, 2015, the Court granted the Government's motion to extend the response date to April 30, 2015, and moved the other due dates accordingly.

## II.    THE GOVERNMENT DID NOT ATTEMPT TO MISLEAD THE COURT.

The Government did not, in any exchange with or submission to the Court, seek to mislead the Court about the fact that, beginning on November 24, 2014, DHS had been according three-year deferrals and employment authorizations to those eligible under the existing 2012 DACA guidelines.  Defendants filed the March 3 Advisory                    after counsel in the Department of Justice first realized that the Government's prior statements may have inadvertently created confusion about the provision of three-year deferrals to 2012 DACA requestors and that they should provide to Plaintiffs and the Court information they had just learned—that three-year deferrals had been provided to approximately 100,000 aliens.  The March 3 filing was a good-faith effort to apprise Plaintiffs and the Court of relevant information that had just come to counsel's attention and to correct any misunderstandings promptly.  Neither

6

that Advisory nor the circumstances leading up to it were motivated by or reflect any intentional

misconduct, bad faith, or gamesmanship on the part of the Government or its counsel.

**A. 1.**   The Secretary of Homeland Security publicly issued the Deferred Action

Guidance on November 20, 2014.  It both (1) set forth guidelines that expanded eligibility for

deferred action to additional categories of individuals; and (2) expanded from two to three years

the period of deferred action available to aliens, including for those who could receive deferred

action under the existing 2012 DACA guidelines.  The memorandum specified that the eligibility

guidelines for additional categories of individuals would not go into effect immediately; instead,

the Secretary directed DHS to implement the expanded DACA eligibility guidelines at an

unspecified time "no later than [90] days" and "no later than [180] days" for DAPA.   But the

Guidance also stated expressly that the change to three years would go into effect immediately,

explaining that it "shall apply to all first-time applications as well as all applications for renewal

effective November 24, 2014."  *Id*.  It went on to specify that "[b]eginning on that date, USCIS

should issue all work authorization documents valid for three years, including to those

individuals who have applied and are awaiting two-year work authorization documents based on

renewal of their DACA grants."  *Id*.

The timing of this litigation is probative given this context.  Plaintiffs filed their lawsuit

on December 3, 2014.  Plaintiffs also sought a preliminary injunction, not a temporary

restraining order, indicating that they were focused not on activity that was ongoing but rather on

an alleged impact that would first be felt in the future, when requests under the expanded

eligibility guidelines would be accepted in the coming months.  As Plaintiffs put it, the

expansion of the eligibility guidelines in expanded DACA and DAPA would create "the single

largest deferred action program in our Nation's history, permitting 4 million undocumented

immigrants to remain in the country."  Pls.' Mot. for Prelim. Inj. and Mem. in Supp. ("Pls.'
Mem.") at 3, ECF No. 5.

Plaintiffs did not challenge the 2012 DACA guidelines.  And the crux of their briefing
and argument supporting their motion for a preliminary injunction was on the effects of the
expansion of the deferred action guidelines to include additional categories of aliens that would,
once implemented, have an immediate impact on Plaintiffs by permitting a large number of
aliens who were not previously able to apply for DACA under the 2012 eligibility guidelines to
do so beginning within 90 days (for expanded DACA) or 180 days (for DAPA).  *See, e.g.*, Pls.'
Mem. at 27 ("Once 4 million individuals take advantage of those benefits, it is difficult to
imagine how the process could be reversed."); *see also id.* at 3, 14 (focusing on allegation that
potentially 4 million new aliens could fall within expanded guidelines).  For example, Plaintiffs'
argument that they would be harmed by giving drivers' licenses to additional aliens would not
apply to individuals who already had deferred action under the 2012 DACA guidelines and were
merely seeking renewal.

The portion of the November 2014 Deferred Action Guidance that provided that aliens
accorded deferred action under the 2012 DACA guidelines would now receive deferred action
for three years, rather than two, did not have the effect of permitting any *additional* aliens—that
is, any of the 4 million aliens who could fall within the expanded DACA or DAPA guidelines—
to receive deferred action or to become eligible for work authorization.  While the November
2014 Guidance expressly stated that DHS would begin granting an additional year of deferred
action starting on November 24, 2014, the difference between a three-year versus a two-year
deferral would not be felt until at least 2016, when a two-year deferral would otherwise end
(subject to potential renewal at that time).  Thus, the parties would have a period of nearly two
years to litigate and resolve the merits of the case (even on a non-expedited schedule) before the

third year of any three-year DACA deferral could have even an arguable irreparable impact on the Plaintiffs.  Consistent with this fact, at no time during the preliminary injunction proceedings did Plaintiffs identify an irreparable harm that they claimed to be based on the change from two-year to three-year deferrals for aliens eligible under the 2012 DACA guidelines.  Thus, because the dispute over the preliminary injunction had been framed in terms of the additional aliens who would be eligible for deferred action, not the additional year of deferred action provided for by the Guidance, counsel for the Government did not appreciate that the immediate implementation of three-year deferrals was an issue of consequence in the timing of the preliminary injunction litigation.[2]

Finally, while the November 2014 Guidance provided a date certain as to when three-year deferrals would begin (November 24, 2014), it did not do so with respect to the start date of the expansion of eligibility to additional categories of individuals.  Instead, it stated that DHS would begin accepting requests "no later than [90] days" under the expanded DACA guidelines (or 180 days under the new DAPA guidelines) after November 20, 2014.  This left open the possibility that DHS could begin accepting requests under the expanded guidelines sooner.  Given that clarity on timing was required with respect to the aspect of the Guidance that expanded eligibility to new groups, the Government understood Plaintiffs and the Court to be seeking confirmation that DHS would not begin actually issuing deferrals under the expanded guidelines before a date specified by the Government.  The Government therefore provided that date, February 18, 2015, to address the question of timing that the Guidance left uncertain.  *See*

---

[2] The Government does not dispute, and indeed has never disputed, that the three-year deferrals were pursuant to the 2014 Deferred Action Guidance.  *See* April 7 Order at 5 n.5; March 3 Advisory at 1; Mar. 19 Tr. at 14.  Likewise, there is no dispute that the Government also understood the change from two- to three-year grants of deferred action to be a contested issue in the case.  *See* April 7 Order at 5.  But the pivotal fact is that the Government did not understand that the three-year deferrals were material to the timing of the preliminary injunction proceedings.

Mar. 19 Tr. at 17-18.  The representations regarding what Government counsel understood to be the question at issue were true, complete, and accurate.

     **2.**  The April 7 Order expresses concern that Government counsel misrepresented "that *no action* would be taken pursuant to the 2014 DHS Directive until February 18."  April 7 Order at 3; *cf., e.g.*, Feb. 16 Mem. Op. at 76 (explaining, including based Plaintiffs' submission, that "the DHS Directive has been in effect and *action has been taken pursuant to it* since November of 2014") (emphasis added).  The Order also expresses concern that Government counsel misrepresented the facts by stating that DHS would not accept applications for revised DACA until February 18, while simultaneously concealing the fact that DHS had been granting three-year deferrals to aliens under the 2012 DACA policy since November 2014.  *See* April 7 Order at 5 n.5; *id.* at 5 n.6.  The Government respectfully submits that it did not attempt to mislead the Court about the three-year deferrals, that it did not engage in deliberate misconduct of any sort, and that the record does not support any finding of bad faith.

     The Government did not make a misrepresentation or deliberately evade the issue by stating that "no action" would be taken pursuant to the 2014 Directive.  April 7 Order at 3. What attorneys for the Government represented on multiple occasions was that USCIS "does not intend to entertain requests for deferred action under the challenged policy until February 18, 2015."  Mot. for Extension of Time to File Surreply at 3, ECF No. 90; *see* Jan. 15, 2015 Tr. at 133-134 ("no applications for the revised DACA . . . would be accepted until the 18th of February"); Dec. 19, 2014 Tr. at 10-11 (stating that the Government did "not expect anything between now and the date of the hearing" that would, in Plaintiffs' words, "chang[e] the calculus on the preliminary injunction," because "[t]he agency was directed to begin accepting requests for deferred action . . . beginning sometime in – by mid-February").

    The lists we are submitting pursuant to this Court's order

provides additional information about when personnel at DOJ and DHS were apprised that three-

year grants were occurring.  The November 2014 Guidance itself stated this explicitly,

November 2014 Guidance at 3-4,

.[3]

  Most important, the list of DOJ attorneys helps to show what happened here:

was understandable in the press of highly demanding, expedited litigation involving matters of national importance, and amidst complex legal issues that focused almost exclusively on other policy changes made by the November 2014 Guidance. *See* Mar. 19 Tr. at 14-15, 18-19, 36. What is critical is that in no event did counsel for the Government deliberately mislead the Court, Mar. 19 Tr. at 15-16, 20-21,

The Government understands now that the Court took references to "expanded" or "revised" DACA to include according three years of deferred action to individuals encompassed by the 2012 DACA policy. Regrettably, the Government did not fully understand the scope of the Court's inquiries, and did not appreciate, either, the Court's understanding of our written and oral statements regarding the February 18, 2015, date for accepting requests under the expanded DACA guidelines. But that disconnect was not the product of bad faith, and no evidence suggests that it was. Instead, counsel for the Government and the Court were speaking about the issue of "expanded" or "revised" DACA in two different ways. *See* Mar. 19 Tr. at 14-15. In the absence of any specific claim by Plaintiffs that the grant of three-year deferrals was the source of any imminent harm, the Government's counsel genuinely did not recognize its significance in the preliminary injunction proceedings, and counsel did not appreciate that those three-year deferrals were an issue of consequence in the timing of the preliminary injunction litigation. *See* Mar. 19 Tr. at 15-16, 20-21. For the additional reason that the start date for the new expanded eligibility guidelines was not clearly set in the 2014 Guidance, counsel for the Government

12

believed that was the relevant date it was addressing in its extension motion and its answers to the Court's inquiries, *i.e.*, the question of timing that was left ambiguous by the Guidance. *Id.* at 17-18. And critically, nothing in counsel's exchanges with or written submissions to the Court about scheduling brought to their minds that DHS had begun granting three three-year deferrals. No intentional effort was made to conceal this fact from the Court or Plaintiffs.[4]

The record confirms that counsel for the Government was not deliberately attempting to hide the fact of three-year deferrals. The 2014 Deferred Action Guidance itself was widely publicized, and it directs that DHS "shall award" three years of deferred action under the 2012 DACA criteria, "effective November 24, 2014." November 2014 Guidance at 3. Also, as the Government has noted in its past filings, Defendants filed a declaration with the Court that identified the shift to three-year DACA deferrals as one aspect of the November 2014 Deferred Action Guidance that was already being implemented. *See* Neufeld Declaration at 6 n.3, ECF No. 130, Exh. 44 (filed Jan. 30, 2015) (noting that "as of November 24, 2014, all first- time DACA requests and requests for renewals now receive a three-year period of deferred action"); Neufeld Decl., Ex. 44, Ex. B; *see also* Mem. Op. at 76 (ECF No. 145). To be sure, that declaration identified this aspect of the policy only in a footnote and in a supporting exhibit (*see* March 19 Tr. at 8), but this placement only underscores the reality that the parties were not focused on this element of the changes to DACA in addressing Plaintiffs' allegations of harm that would arise once DHS began accepting applications for deferred action under the expanded eligibility guidelines in February 2015.

---

[4] As discussed in the Government's opposition to Plaintiffs' motion for early discovery, the Court's reference during the preliminary injunction hearing to the "increase in years" amidst an explanation by counsel that the federal government understood Plaintiffs to be focused in their preliminary injunction motion on the "revision or expansion of the group that would be eligible" for deferred action did not trigger a recognition that the additional year of deferral was at issue. *See* ECF No. 207 at 4 n.2; Jan. 15 Tr. at 91. Instead, counsel for the Government understood the Court's statement as referring to the expansion of the DACA eligibility guidelines—namely the change in the relevant starting point for the five-year residency requirement from June 15, 2007 to January 1, 2010.

The policy and practice of granting three-year deferrals beginning November 24, 2014, to persons accorded deferred action under the 2012 DACA guidelines were publicly discussed in other ways.  DHS stated the fact on the "frequently asked questions" section of its website, which the Government submitted as an exhibit to this Court on January 30, 2015.[5]  The fact was also publicly discussed by various persons and entities outside the Executive Branch that were interested in this issue, including by Members of Congress, who highlighted it on their websites;[6] in news reports;[7] and on other websites.[8]

Defendants do not recount these public reports to suggest that the Court should have been independently aware of the fact that three-year deferrals were underway.  Rather, we note that these public discussions are inconsistent with any conclusion that the Government or its counsel intentionally sought in bad faith to hide the facts.  Under these circumstances, there is no basis to suggest that the Government deliberately concealed the fact that DHS was issuing three-year deferrals.

---

[5] Surreply Ex. 44, Exhibit B (submitted Jan. 30, 2015).

[6] *See, e.g.*, Deferred Action for Parental Accountability & Expansion of DACA, Sen. Harry Reid, http://www.reid.senate.gov/wp-content/uploads/2015/01/ReidDAPA_ENG.pdf (last visited Apr. 30, 2015); DACA Expansion & Frequently Asked Questions, Rep. Lloyd Doggett, http://doggett.house.gov/index.php/daca-expansion-and-frequently-asked-questions# (last visited Apr. 30, 2015); DACA Expansion & Frequently Asked Questions, Rep. Luis Gutiérrez, http://gutierrez house.gov/daca (last visited Apr. 30, 2015).

[7] *See, e.g.*, Grant Sovern, Immigration Changes Will Affect Employers & Employees, BizTimes Milwaukee (Nov. 24, 2014, 10:55 AM), http://www.biztimes.com/article/20141124/BLOGS/141129922/Immigration-changes-will-affect-employers-and-employees; FAIR, Immigration Reform News & Impact on US Homeland Sec., Right Side News (Nov. 24, 2014, 12:52 PM), http://www rightsidenews.com/2014112435172/us/homeland-security/immigration-reform-news-and-impact-on-us-homeland-security-november-24-2014 html; Michael Oleaga, Obama Executive Action on Immigration Expands DACA, Defers Deportation for Undocumented Parents, Latin Post (Nov. 26, 2014, 2:14 PM), http://www.latinpost.com/articles/26598/20141126/obama-executive-action-immigration-expands-daca-defers-deportation-undocumented-parents.htm.

[8] *See, e.g.*, Executive Action Expanding DACA, Frequently Asked Questions, Admin. Relief (Dec. 8, 2014), http://www.nclr.org/images/uploads/pages/CIRIEXPDACAFAQ.pdf; Q&A from Webinar on Executive Action, "Getting Ready for Administrative Relief: What We Know Now", Admin. Relief, www.adminrelief.org/resources/attachment.260475 (last updated Dec. 4, 2014); A Guide to the Immigration Accountability Executive Action, Am. Immigr. Council (Nov. 2014), http://www.immigrationpolicy.org/sites/default/files/docs/a_guide_to_the_immigration_accountability_executive_action_final.pdf; Frequently Asked Questions: DACA Renewal Process, Nat'l Immigr. Law Ctr., https://nilc.org/dacarenewalprocess.html (last updated Dec. 18, 2014).

In communicating with the Court on this matter, the Government only intended to convey, and only believed it was conveying, that aliens who would be newly eligible for deferred action under the November 2014 Guidance would not be able to request such action until February 18, 2015.  The Government neither intended to suggest, nor believed that it was suggesting, that three-year deferrals for 2012 DACA would not begin until February 18, 2015.  Again, the federal government was trying at all times to provide the Court with accurate information on the issue it believed to be the crux of Plaintiffs' allegations of harm and the subject of the Court's inquiry—namely, when possibly as many as four million additional aliens could submit requests—and there was no conscious or deliberate attempt to hide information pertaining to the three-year deferrals.  The Government again apologizes for causing confusion. But at no time did the Government intend to mislead or steer either Plaintiffs or the Court astray.

**B.1.**  The Government also did not deliberately delay filing its March 3 Advisory.  As the privileged material we are now submitting to the Court helps show,

The Advisory was filed approximately 24 hours after counsel first began drafting it.

The preliminary injunction issued by the Court on February 16, 2015, barred implementation of the 2014 Deferred Action Guidance in its entirety, and it therefore prohibited DHS not only from according deferred action to aliens falling within the new DAPA and expanded DACA eligibility guidelines, but also from providing three-year rather than two-year deferrals to aliens accorded deferred action under the unchallenged 2012 DACA guidelines.  In response, DHS immediately took steps to cease all activity under the November 2014 Guidance,

15

including issuance of three-year deferrals.  *See* Mar. 19 Tr. at 20.  The Government's immediate

priority at that time was confirming that no activity pursuant to the November 2014 Deferred

Action Guidance was occurring following the injunction, to ensure it was in full compliance

.[9]

It was this Court's injunction,

that caused counsel for the

Government to realize that there may have been an unintentional disconnect between

representations made to the Court and how Plaintiffs and the Court understood those

representations.  To be clear, Government counsel

, that, between November 24, 2014, and

the date on which the injunction was issued, approximately 100,000 aliens eligible under the

2012 DACA criteria had already received three-year deferrals.                                   This

information regarding pre-injunction activity of a significant scope, combined with the Court's

---

[9] DHS took immediate steps to make sure that any implementation efforts that were underway before the Court entered its preliminary injunction were halted.  As Government counsel indicated at the March 19, 2015 hearing, the Secretary issued a directive on February 17, 2015, directing DHS to fully comply with the injunction.  *See* Mar. 19 Tr. at 34.  That same day, the Directors of USCIS, ICE, and CBP, issued instructions to all employees to stop work on implementing the 2014 Guidance.  *Id*. On February 17, 2015, USCIS was specifically instructed not to process any more three-year deferrals to individuals eligible for deferred under 2012 DACA.  *Id*. at 35.

broad injunction against "any and all changes" to DACA, caused attorneys for the Government to recognize for the first time that prior statements might have caused confusion and that the information regarding three-year deferrals needed to be conveyed to Plaintiffs and the Court.[10]

The Government filed the March 3 Advisory

The first draft of a filing was prepared and circulated for review at DOJ on the evening of Monday, March 2, 2015.                           Drafts of the Advisory were further circulated on March 3, 2015.  *Id.*[11]  Accordingly, and although                                          , the Advisory—as the privilege log reflects—was filed approximately twenty-four hours after drafting began.

**2.**  The Court's April 7 Order suggests that Defendants may have intentionally delayed filing the March 3 Advisory, by up to two weeks, in order to conceal the fact of the three-year deferrals from the Court and Plaintiffs during the pendency of the Government's motion for a stay of the preliminary injunction.  *See* April 7 Order at 8-9.  As set forth above, that is not at all what happened.  The Government moved for a stay on February 23,

.  Indeed, one reason the Government filed the March 3 Advisory quickly was to ensure that the Court had this information before it acted on the government's stay motion.  *See* Mar. 19 Tr. at 21 (noting "this one potential

---

[10] Counsel for the Government explained at the March 19 hearing that while the Court's injunction order set in motion the process leading to the realization that it must promptly file a notice, that realization did not crystalize immediately upon the issuance of the injunction.   *See* Mar. 19 Tr. at 16 (telling the Court that "the reason why this came to our attention . . . . [w]as - - the Court's injunction order is very clear"); Mar. 19 Tr. at 16-17 (in response to Court's question whether the government therefore "waited three weeks to tell me," explaining that information in the government's February 23 stay motion showed that by that time it still had not "focused on th[e] issue" of prior three year grants).  In fact, as the newly submitted, privileged materials reflect
                         in conjunction with the Court's injunction, that triggered the realization that a filing was necessary.

[11] The Government made diligent efforts to file the motion before Plaintiffs filed their opposition to the stay, but it was unable to do so; as explained further below, it likewise strived to file before the Court's stay ruling.

confusion that we brought, promptly brought to the Court's attention when it came – became

evident to us that we may have created confusion"); Defs.' Opp. to Pls.' Mot. for Early Disc.

(ECF No. 207) ("[O]nce it became apparent to Defendants that their prior statements might have

led to confusion about their implementation of the 2014 Deferred Action Guidance, they

promptly filed the March 3 Advisory to dispel any potential confusion.").

## III.   NO FURTHER INQUIRY IS NECESSARY TO DETERMINE THAT NO MISCONDUCT OCCURRED HERE AND THAT SANCTIONS ARE UNWARRANTED.

The facts before the Court, including the privileged information just set forth, are

sufficient for the Court to conclude, without further inquiry, that no misconduct occurred here.

No sanctions are therefore warranted, and, moreover, no notice or opportunity to be heard on any

issue of sanctions has been provided to any affected party, as would be required, in a step-by-

step process, before any such action could be taken.[12]

**A.**  The inherent power to sanction is "not a broad reservoir of power . . . but a limited

source." *Union Pump Co. v. Centrifugal Tech., Inc.*, 404 F. App'x 899, 906 (5th Cir. 2010)

(citations omitted).  "Because of their very potency," and because they "are shielded from direct

democratic controls," a court's inherent powers "must be exercised with restraint and discretion,"

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991); *Roadway Express, Inc. v. Piper*, 447 U.S.

752, 764 (1980); *Hornbeck Offshore Servs., LLC v. Salazar*, 713 F.3d 787, 792 (5th Cir. 2013).

The "threshold  . . . is high":  inherent powers "are reserved for conduct which abuses the

---

[12] The facts and information presented above more than answer the questions that underlie Plaintiffs' motion for early discovery.  Plaintiffs sought phased early discovery into information about the three-year deferrals to determine (1)  how they harmed the Plaintiffs, if at all, and thus to help Plaintiffs determine what relief to seek, if any; and (2) whether the federal government was actually complying with the preliminary injunction.  Here, Plaintiffs already know the scope of the three-year deferrals that were accorded to aliens falling within the 2012 DACA guidelines, and accordingly can assess whether to seek relief or what relief to seek.  To date, however, Plaintiffs have not requested such relief.  And Defendants are complying fully with this Court's preliminary injunction. This submission accordingly should address Plaintiffs' concerns.

judicial process," and "may be exercised only if essential to preserve the authority of the court." *Union Pump*, 404 F. App'x at 905 (citations and internal quotation marks omitted).

Substantively, a sanctions order would require a finding by clear and convincing evidence that the Government acted in bad faith. A "specific finding" of bad faith, or "willful[ ] abuse [of the] judicial process," is a "necessary predicate to issuing an inherent power sanction," *City of Alexandria v. Cleco Corp.*, 547 F. App'x 568, 569 (5th Cir. 2013); *Crowe v. Smith*, 151 F.3d 217, 236 (5th Cir. 1998). *See also Roadway Express*, 442 U.S. at 767; *In re Moore*, 739 F.3d 724, 729 (5th Cir. 2014). "[M]ere negligence does not trigger a court's inherent sanctioning power." *Maguire Oil Co. v. City of Houston*, 143 F.3d 205, 211-12 (5th Cir. 1998); *see Cleco Corp.*, 547 F. App'x at 570 ("Inadvertence is inconsistent with a finding of bad faith."). And any finding of bad faith "must be supported by clear and convincing proof." *In re Moore*, 739 F.3d at 730. "[N]ondisclosure and inconsistency, while justifying scrutiny, are not alone clear and convincing evidence of [a party's] bad faith," "nor [does] suspicion alone justif[y] the invocation of the inherent power." *Id.* at 730, 733; *see also Hunting Energy Servs. LP v. Inter-Mountain Pipe & Threading Co.*, 242 F. App'x 257, 260 (5th Cir. 2007) (reversing sanction where question of party's bad faith was "not obvious").

Procedurally, before invoking its inherent authority to sanction based on abuse of its processes, a court "must comply with the mandates of due process, both in determining that the requisite bad faith exists, and in assessing [the sanction]." *Chambers*, 501 U.S. at 50, citing *Railway Express*, 442 U.S. at 767. The "fundamental requirement[s] of due process" include both "fair notice" and "the opportunity to be heard at a meaningful time and in a meaningful manner." *Roadway Express*, 442 U.S. at 767; *Crowe*, 151 F.3d at 230-31. Fair notice, without which sanctions may not be imposed, includes notice to the affected parties that sanctions are under consideration, the reasons why, and the type of sanctions under consideration. *See Dailey*

19

*v. Vought Aircraft Co.*, 141 F.3d 224, 230 (5th Cir. 1998) (Rule 11 sanctions); *Browning v. Kramer*, 931 F.2d 340, 346 (5th Cir. 1991) (sanctions under 28 U.S.C. § 1927). *Cf.* Fed. R. Civ. P. 11(c)(2) (providing counsel an opportunity to cure a challenged paper, claim, defense, contention, or denial before a court will consider sanctions).

B.   Far from establishing a conscious or deliberate decision to mislead Plaintiffs or the Court, the record before this Court, including the Government's submission in conjunction with this filing, indicates at most inadvertent miscommunication by the Government.  As explained above, the Government's statements were made in the course of a good-faith effort to provide all the information that Government counsel genuinely believed the Court had sought and was relevant to scheduling proceedings on Plaintiffs' motion for a preliminary injunction—namely, the earliest date by which the harm complained of by Plaintiffs (the extension of deferred action to aliens under new eligibility guidelines) would begin:  February 18, 2015.  The Government's understanding was reasonable and in good faith, particularly considering that Plaintiffs' claims of imminent irreparable harm rested on the expansion of the eligibility guidelines for deferred action, and not on the grant of three-year deferrals to previously eligible persons.  And as noted above, nothing in counsel's exchanges with or submissions to the Court regarding scheduling brought to their minds the three-year grants.  Furthermore, as explained above, the very filing of the March 3 Advisory demonstrates the Government's good faith in this case.  The Government filed the Advisory                         after counsel at DOJ first learned information that, viewed in light of the injunction of "any and all changes" to DACA that were outlined in the November 2014 Guidance, triggered a recognition that the Government's past statements may inadvertently have created confusion.

C.   "The ultimate touchstone of inherent powers is necessity."  *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1412 (5th Cir. 1993).  The imposition of sanctions

is not necessary here, either to "preserve the authority of the court," *Positive Software Solutions v. New Century Moving Corp.*, 619 F.3d 458, 460 (5th Cir. 2010), or to ensure the orderly and expeditious function of the judicial process. *Newby v. Enron Corp.*, 302 F.3d 295, 302 (5th Cir. 2002). No sanctions are needed in this case to ensure the Government's commitment to the duty of candor—a duty to which the Government has adhered throughout this matter. The Government holds in highest esteem its ethical responsibilities and duty of candor to this Court and every court. Knowing misrepresentations to a court would strike at the heart of the Judiciary's confidence in DOJ and its mission, not just in this litigation but in other matters—and no such misrepresentations were made here.

The Government regrets the confusion its prior statements in this case unintentionally caused, but it believes no harm has been done to Plaintiffs. As mentioned previously, if the Court concludes otherwise, the Government is prepared to discuss with Plaintiffs an appropriate resolution, including as indicated in the March 19 hearing before the Court. *Cf.* Fed. R. Civ. P. 11(c)(2) (party should be given an opportunity to cure prior to consideration of sanctions). Such discussions with Plaintiffs are the appropriate starting point for addressing any harm the Government's statements may have caused.

The above discussion amply demonstrates that this case presents no occasion for the exercise of the Court's inherent sanctions power. If the Court nonetheless determines that further inquiry is needed, however, then it should proceed in accordance "with the mandates of due process, both in determining that the requisite bad faith exists, and in assessing the [sanction]." *Chambers*, 501 U.S. at 50, citing *Railway Express*, 442 U.S. at 767. Specifically, due process requires an opportunity to be heard in response to adequate notice that identifies exactly what parties face the prospect of sanctions, and what form of sanctions are contemplated. *See Dailey*, 141 F.3d at 229-30. Sanctions would be wholly unwarranted in this case for the

21

reasons explained above, and the Government respectfully submits that the inquiry should end

with this submission.  But in all events, appropriate process must be observed before any

sanctions could issue in this matter.

**IV.    THE COURT NEED NOT REVIEW THE MATERIALS SUBMITTED *IN CAMERA* AND SHOULD NOT ORDER THEIR PRODUCTION TO PLAINTIFFS.**

As noted above, the April 7 Order directs the Government to file:

(i) any and all drafts of the March 3, 2015 Advisory [Doc. No. 176], including all corresponding metadata and all other tangible items that indicate when each draft of the document was written and/or edited or revised; and

(ii) a list of each person who knew about this Advisory, or about the DHS activity discussed therein, and each person who reviewed or approved its wording or filing, as well as the date and time when each person was apprised of this document and/or its contents, or of the DHS activity that is the subject matter thereof.

*Id.* at 11.  The April 7 Order further instructs that "any privileged material shall be filed *in camera* with a privilege log supplied to the Court and [Plaintiffs'] counsel."  *Id.* at 12.

In conjunction with this filing, the Government is complying with the requirements of the

Order by filing documents, which are mostly privileged and being filed *in camera*.  We do not

believe, however, that the Court needs to examine those documents, because this filing and the

privilege log show that there was no bad faith, and that counsel for the Government filed the

Advisory                                    after realizing that there may have been a miscommunication

requiring clarification.  The Government has explained—based in part on privileged material—

the details surrounding the circumstances that gave rise to the March 3 Advisory and the

misunderstanding that it sought to address.   The circumstances before the Court do not warrant

the significant intrusion into confidentiality that examination of the documents themselves—

which concern the drafting of a filing in a case still pending on the merits before this Court—

22

would entail.   This Court should accordingly limit any such intrusion and, so far as it believes

review of these materials is necessary, consider referring the matter to a magistrate.

A.     The production of drafts of attorneys' court filings on behalf of their clients—

along with lists of when particular client-related information came to the attention of particular

persons—implicates the work-product, deliberative-process, and attorney-client privileges.  *See,*

*e.g., United States v. Nelson*, 732 F.3d 504, 517-18 (5th Cir. 2013) (attorney-client privilege);

*United States v. El Paso Co.*, 682 F.2d 530, 542 (5th Cir. 1982) (work product); *J.H. Rutter Rex*

*Mfg. Co., Inc. v. N.L.R.B.*, 473 F.2d 223, 234 (5th Cir. 1973) (deliberative-process privilege).

Emails indicating the times and dates that the Advisory was written, edited, or revised also

contain additional information and commentary that implicate the same privileges.

By their very nature, draft pleadings contain "lawyer's research, analysis, legal theories,

and mental impressions."  *El Paso Co.*, 682 F.2d at 542.  Requiring their disclosure "would deter

lawyers from committing to paper their work in preparation for trial and would thus diminish the

quality of representation." *Id*.  Indeed, the "invasion of a lawyer's private thoughts would

demoralize the profession," *id*., and "[a]n attorney's thoughts, hithertofore inviolate, would not

be his own," *Hickman v. Taylor*, 329 U.S. 495, 511 (1947).  The protection of such materials is

therefore virtually absolute.  *See Kent Corp. v. NLRB*, 530 F.2d 612 624 (5th Cir. 1976) ("Such

materials, if prepared in anticipation of litigation or for trial, are always protected by a properly-

raised claim of work product privilege, regardless of the opposing litigant's need."); *see also In*

*re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1240 (5th Cir. 1982) (describing an

"almost absolute protection" for opinion work product).  Similarly, the lists we have provided are

a window into the subjects of and timing of attorney-client communications, and how the

government's attorney work product was developed in this case.  The lists are therefore properly

treated as privileged.  *See, e.g.*, *United States v. Kelly*, 569 F.2d 928, 938 (5th Cir. 1978)

(attorney-client privilege includes communications from the client "relat[ing] to a fact of which the attorney was informed"); *Brinton v. Dep't of State*, 636 F.2d 600, 604 (D.C. Cir. 1980) (applying deliberative process privilege to withhold the names of individuals who authored documents); *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998) (noting that "a strong work-product privilege" is designed to allow lawyers to "communicat[e] with other lawyers").

The critical interests that these privileges protect retain their importance even in the context of sanctions. Although a court's inherent power to impose sanctions includes "the power to conduct an independent investigation in order to determine whether" sanctionable conduct has occurred, *Chambers*, 501 U.S. at 44 (citation omitted), the power to impose a sanction is "limited by the necessity giving rise to its exercise," *Degen v. United States*, 517 U.S. 820, 829 (1996). In particular, the inherent power "must be exercised with restraint and discretion," *Chambers*, 501 U.S. at 44, and "if the rights of parties are to be adjudicated in such an investigation, the usual safeguards of adversary proceedings must be observed." *Universal Oil Prods. Co. v. Root Refining Co.*, 328 U.S. 575, 580 (1946). *See also* Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse*, § 17(A)(4), at 356 ("Any inquiry into [the attorney's pre-filing] conduct threatens to encroach on the attorney-client relationship and into areas protected by the attorney-client privilege or opinion work product.").

The Government's explanation above for the timing of the March 3 Advisory, in combination with the privilege log, renders examination of the underlying materials themselves unnecessary to decide the issue before the Court. And such examination would not only intrude upon the core protections traditionally safeguarded by the various privileges previously discussed, but also present additional case-specific issues, because it would involve the Court directly reviewing the litigation-related discussions among lawyers (and between lawyers and their clients) in a case that is still pending before the Court. For that reason, the Court should

24

consider referring any review of the documents to another judge or to a magistrate judge to prevent any prospect of taint or prejudice in ongoing litigation.

**B.**     Should the Court review the materials, the Government has provided *in camera* two sealed envelopes of materials, labeled "Envelope 2" and "Envelope 3."

"Envelope 2" contains "any and all drafts of the March 3, 2015 Advisory, including all corresponding metadata and all other tangible items that indicate when each draft of the document was written and/or edited or revised" that were located at DOJ and DHS.  These documents, both emails and drafts, reflect communications within each Department and between the two Departments.  This envelope also contains communications between DOJ and the White House concerning the Advisory which were found within DOJ's files.[13]  Finally, this envelope includes the responses from DOJ and DHS to the Court's second inquiry, compiled by the respective agencies.  The lists include the DOJ and DHS personnel participating in the litigation who knew of, reviewed, or approved of the Advisory, or who knew of the DHS activity discussed therein, and the dates and times when these individuals were apprised of this information.  These lists do not include broad categories of individuals at each agency who, for operational reasons, might have known that the three-year deferrals in question were occurring, or knew of the Advisory, but who were not involved with the litigation or the Advisory in any way.[14]  The lists also contain a range of information reflecting a degree of ambiguity in the Order's reference to "the DHS activity discussed" in the Advisory.

---

[13] The Department of Justice and the White House Counsel's Office sometimes confer regarding civil litigation that impacts high-priority policy initiatives of the Administration.

[14]  More than 1,500 employees in the various components of DHS were aware that three-year deferrals were occurring starting on or about November 24, 2014, in large part because they were doing the work of granting those deferrals.  We have included in the list those DHS employees who reviewed or had awareness of the Advisory before its filing (which included a small number of individuals in the Office of the General Counsel and the Offices of the Secretary, Deputy Secretary, and Director of USCIS), and individuals (primarily attorneys) who have participated in the litigation in the form of interacting with the Department of Justice, reviewing and commenting on

"Envelope 3" contains (1) purely internal White House documents responsive to the Court's first inquiry (with unresponsive material redacted), and (2) a list of attorneys at the White House with whom DOJ corresponded about the Advisory, as well as other general categories of personnel who learned about the Advisory.  The Court need not review this even more sensitive material, because the information relevant to the Court's inquiry would most naturally come from those persons at DOJ and DHS who were responsible for or assisted in the litigation.  Moreover, separation of powers concerns militate strongly against any review of these materials, particularly in the first instance and without a showing of necessity.  *See Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 385 (2004) ("'[t]he high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery,'" and "the Executive's 'constitutional responsibilities and status [are] factors counseling judicial deference and restraint' in the conduct of litigation against it") (citations omitted); *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997) (privilege protects "communications authored or solicited and received by those members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate"); *United States v. McGraw-Hill Cos., Inc.*, No. 13-CV-0779-DOC (JCGx), 2014 WL 8662657, at *8 (C.D. Cal. Sept. 25, 2014) (explaining that courts should take a "methodical approach" to discovery of White House documents because "[t]he Supreme Court has been crystal clear:  courts must ensure that the invocation of executive privilege is the last resort"); *cf. Armstrong, v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991)

---

briefs and pleadings, or participating in meetings concerning litigation strategy.  We do not understand this Court's order to include other employees of DHS.

26

(avoiding separation of powers concerns).  This "methodical approach" ordinarily includes briefing, argument, and an opportunity to narrow the inquiry before further intrusion occurs.

**C.**  Regardless of whether the Court reviews the privileged materials provided *in camera*—and the Government respectfully submits that it need not—the Court should not order Defendants to provide those privileged materials to Plaintiffs.  *See In re Grand Jury Subpoena*, 190 F.3d 375, 387-88 (5th Cir. 1999), *cert. denied*, 529 U.S. 1062 (2000).  The problems created by review of highly privileged materials concerning the litigation of an ongoing case would be exacerbated if those materials were also disclosed to the opposing party.  *See In re United States*, 397 F.3d at 285-86 ("turning over any further information—even *in camera*—would require documents, affidavits, or perhaps even depositions from several levels of the Department of Justice, all of which could engender various privilege claims, and as a precedent, could be subject to abuse in this and in future cases").  If the Court has any questions or concerns about the privileged character of any specific documents or information we have submitted *in camera*, we respectfully request an opportunity to submit briefing to address those concerns before the Court orders disclosure of any such documents or information to Plaintiffs.

## CONCLUSION

The Government recognizes this Court's sincere interest in assuring the candor of the Government before the Court.  The Government has fully abided by that duty, and it has submitted a broad array of highly privileged materials in conformance with this Court's order that should allow this Court to fully resolve the concerns it articulated in its April 7 Order.  We sincerely regret the misunderstanding that the Government's statements inadvertently caused, and hope that this submission fully resolves the issue.

Dated: April 30, 2015

KENNETH MAGIDSON
United States Attorney

DANIEL DAVID HU
Assistant United States Attorney
Deputy Chief, Civil Division

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

JOYCE R. BRANDA
Deputy Assistant Attorney General

AUGUST E. FLENTJE
Special Counsel

JENNIFER D. RICKETTS
Director, Federal Programs Branch
Attorney-in-Charge (VA Bar No. 29281)

JAMES J. GILLIGAN
Special Litigation Counsel

  _/s/  Daniel Schwei_____
DANIEL SCHWEI
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883
Washington, D.C. 20044
Tel.: (202) 305-8693
Fax: (202) 616-8470
Daniel.S.Schwei@usdoj.gov

*Counsel for Defendants*

28