UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.* ) | |
| ) | |
| Plaintiffs, ) | No. 1:14-CV-254 |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA, *et al.* ) | |
| ) | |
| Defendants. ) | |
| ) | |

DECLARATION OF DONALD W. NEUFELD

I, Donald W. Neufeld, hereby make the following declaration with respect to the above captioned matter.

1.  I am the Associate Director for Service Center Operations (SCOPS) for U.S. Citizenship and Immigration Services (USCIS), a component within the U.S. Department of Homeland Security (DHS).  I have held this position since January 2010.  In this position, I oversee all policy, planning, management and execution functions of SCOPS.  My current job duties include overseeing a workforce of more than 4,500 government and contract employees at the four USCIS Service Centers located in California, Nebraska, Texas and Vermont.  These four centers handle about four million immigration-related applications and requests annually, including all requests for deferred action under the Deferred Action for Childhood Arrivals (DACA) process. I previously submitted a declaration in this case on January 30, 2015.

2.  I make this declaration on the basis of my personal knowledge and information made available to me in the course of my official duties.  The statements made in this declaration are based on USCIS's current understanding of information available at this time.

**Introduction**

3.  As I will further describe below, USCIS has recently discovered errors in its identification and tracking of cases decided under the 2012 DACA eligibility guidelines[1] in which three-year terms of deferred action and employment authorization had already been approved prior to entry of the preliminary injunction in this case, but for which employment authorization documents (EADs) had not yet been printed and prepared for mailing by that time (hereinafter "EAD-pending cases").

4.  Immediately following the injunction, USCIS put a hold on these EAD-pending cases to prevent three-year EADs from issuing, and it believed that these cases would remain on hold until further notice.

5.  Recently, in the course of attempting to issue two-year EADs, consistent with the 2012 DACA policy not at issue in this case, to individuals in the cases USCIS believed were being held, USCIS discovered that it had erroneously failed to remove these cases from the processing queue, and as a consequence, these EADs had been processed and these individuals had received three-year EADs after the preliminary injunction.  USCIS has already issued notices to the recipients of these three-year EADs whom it has identified, informing them that their approvals of deferred action and employment authorization have been converted from three to two years, that they will be issued two-year EADs, and that they must return the three-year EADs sent to them.

6.  This declaration will explain on the basis of currently available information how the foregoing errors in identification and tracking came about and the corrective actions that USCIS has taken in response.  USCIS continues to refine its understanding of the matters discussed

---

[1]  In addition to modifying the eligibility criteria for DACA, the November 20, 2014, Deferred Action Guidance changed the term of deferred action (and the corresponding term for work authorization) from two years to three years.

herein, and to ensure that it has identified and taken corrective action in all cases in which three-year EADS (or any other three-year DACA-related documents) were issued after the injunction.

**Background on the Processing of Requests for DACA and Work Authorization**

7.   In order to understand where the process of identification and tracking broke down, it is necessary to understand the steps involved in the approving of deferred action and employment authorization and in the production and issuance of EADs to DACA recipients.  The review and consideration of a request for deferred action and application for employment authorization under DACA is a multi-step, case-specific process.  As described more fully below, that process involves three principal, consecutive steps for approved cases:  (1) consideration of the request for deferred action; (2) consideration of the application for employment authorization; and (3) production of the EAD.  Each of these steps results in USCIS issuing a separate document to the requestor.  Approval of the request for deferred action triggers the issuance of an approval notice to the requestor.  Approval of the application for employment authorization similarly triggers a separate approval notice.  Finally, after approval, USCIS prints and then mails the EAD to the requestor.  This typically takes approximately two to five business days after approval of the application for employment authorization.

8.   The process begins when an individual requestor submits a request for deferred action under DACA (Form I-821D), an application for employment authorization (Form I-765), an accompanying worksheet showing economic necessity for employment (Form I-765WS), and related filing fees and supporting documentation to one of three USCIS "lockbox" facilities based on the location of the requestor's residence in the United States.  The lockbox facility logs each filing and reviews each DACA package for compliance with applicable intake requirements.  If the lockbox facility determines that a package fails to comply with the intake requirements, it rejects the package and mails it back to the requestor with an explanation of the

3

reason for the rejection.  If the package is complete, the lockbox facility considers the package appropriately filed and sends a receipt to the requestor.  Appropriately filed packages are then forwarded to one of four USCIS Service Centers for further substantive processing and consideration.

9.   DACA packages forwarded to the Service Centers are assigned to USCIS adjudicators.  After reviewing the paper file and conducting the decision-making process, the adjudicator may approve the request, deny the request, or seek additional information from the requestor if additional evidence is necessary to make a decision.  If the DACA request is approved, the adjudicator then considers the application for employment authorization and makes a determination whether the individual has demonstrated an economic need for employment.  If so, the application for employment authorization is approved.  If not, the adjudicator may deny the application, or may request additional evidence, thereby delaying the decision on the application for employment authorization until a response is received.  If the DACA request is denied due to a finding that the requestor has not satisfied the DACA guidelines or does not otherwise merit an exercise of prosecutorial discretion in the form of deferred action, the associated application for employment authorization is also denied.

10. All decisions regarding both the DACA request and the application for employment authorization are recorded by Service Center staff into an electronic system known as CLAIMS 3.  Approval of a DACA request and approval of an application for employment authorization are two distinct determinations, and for each a period of authorization must be entered into CLAIMS 3.  The electronic recording of a decision may be made by the adjudicator or other Service Center personnel, either contemporaneously with the decision or afterward.

11. Upon the recording of an approval or denial of a DACA request or an application for employment authorization, a notice of action (Form I-797) is generated by the CLAIMS 3

4

system to inform the requestor of the relevant decision.  These notices are generated at, and mailed from, USCIS Service Centers.  Specifically, upon the approval of a DACA request, a notice of action indicating such approval and the validity period of deferred action is mailed to the requestor.  Upon the approval of an associated application for employment authorization, a separate notice of action is generated to inform the individual of the approval and validity period of the employment authorization—which should be valid until the end of the validity period for the underlying approval of deferred action.  Such a notice specifically states that it may not be used as evidence of work authorization and that such evidence, in the form of an EAD (Form I-766), will be mailed separately.

12. Unlike the notices of action showing approval or denial of DACA or work authorization, production of EADs is not performed at USCIS Service Centers or by the personnel who work at these locations.  Rather, the printing, packaging, and mailing of EADs is a separate multi-step process handled at card-production facilities located elsewhere.  The process begins with the electronic transfer of approval data and relevant biometric and biographic information from the CLAIMS 3 system to one of USCIS's card-production facilities, for actual production and mailing via the Integrated Card Production System ("ICPS").  This process is initiated when an adjudicator updates CLAIMS 3 with an approval of an application for employment authorization, along with the relevant validity period and a code ("C-33") indicating that the requestor is a DACA recipient.

13. Upon the update of the CLAIMS 3 system, the ICPS system sends an order to print an EAD, along with data relevant to EAD card production, through the ICPS interface to the National Production System ("NPS").  The NPS establishes a queue for permanent resident cards and EADs, including DACA-related EADs, awaiting production.  Pursuant to agency policy, the NPS holds the card for a 48-hour period (excluding holidays and weekends) prior to moving to

physical production, to provide the originating office with an opportunity to make any

corrections it might identify as a result of quality assurance or other action.  After the 48-hour

hold, the card production request is transmitted to the Card Personalization System Tech Refresh

("CPSTR") system, which is the print queue that manages card printing at the USCIS card-

production facility.  The card is then printed, checked for quality, packaged, and mailed to the

requestor.

### USCIS's Immediate Response to the Preliminary Injunction

14. In the late evening of February 16, 2015, the Court issued its preliminary injunction in

this case.  That preliminary injunction enjoined the Federal Government "from implementing

any and all aspects or phases" of: (1) the "Deferred Action for Parents of Americans and Lawful

Permanent Residents" (DAPA) policy, and (2) modifications to the 2012 "Deferred Action for

Childhood Arrivals" policy, in which the Court included both the expansion of the DACA

eligibility guidelines and the change in the term of deferred action and employment authorization

from two to three years, as set forth in the Secretary's November 20, 2014 memorandum entitled

*Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States*

*as Children and with Respect to Certain Individuals Who Are Parents of U.S. Citizens or*

*Permanent Residents*.

15. Upon becoming aware of the preliminary injunction, USCIS took immediate steps to

cease all work toward implementing the changes set forth in that memorandum.  Hours after the

injunction issued, in the early morning hours of February 17, USCIS Director León Rodríguez

instructed appropriate USCIS leadership personnel to immediately suspend all further action to

prepare for implementation of DAPA, all further action to implement the modified DACA

eligibility guidelines, and all approvals of pending requests for DACA under the 2012

guidelines, while the scope of the injunction was determined.  The Director also specifically

ordered his staff to cease the issuance of three-year EADs to individuals who had been approved

for deferred action under the original 2012 DACA eligibility guidelines.

16. Pursuant to these instructions, USCIS personnel immediately implemented a broad freeze

of work related to DAPA and DACA.  With respect to the implementation of DAPA and the

expanded DACA eligibility guidelines, USCIS immediately took steps to halt the posting on its

websites of forms and instructions related to the expanded DACA eligibility guidelines, which

had been expected to begin the following day (February 18); to remove Frequently Asked

Questions and other public guidance related to the expanded DACA eligibility guidelines from

USCIS websites or to include a banner on such websites noting the effect of the injunction; to

cancel upcoming public engagements related to the implementation of the new expanded DACA

eligibility guidelines; to halt all work on the development of the new DAPA policy; to halt hiring

activities initiated for the purposes of administering the Secretary's new policies; to cease

contract solicitation related to mail and file support for the new DAPA policy; and to update

internal and external communications to remove information about the expansion of DACA

eligibility and the DAPA launch (while maintaining historical press releases and notices

regarding the scope of the executive actions).

### Detailed Efforts to Prevent the Issuance of Three-Year EADs

17. On the morning of February 17, USCIS also took immediate steps to stop the issuance of

three-year periods of deferred action and employment authorization to individuals who had

already requested deferred action under the 2012 DACA eligibility guidelines.  Specifically,

headquarters personnel sent instructions to personnel at the USCIS Service Centers—which are

responsible for considering DACA requests and related applications for employment

authorization—to immediately suspend the further approval of any DACA requests.  Instructions

were also sent to USCIS personnel at USCIS card-production facilities, and the information

technology ("IT") staff that maintain the technology supporting the card production process, to immediately suspend the further printing and issuance of EADs for all DACA recipients. Finally, USCIS personnel at the Service Centers and card-production facilities were also instructed to intercept and hold any printed approval notices or EADs related to three-year periods of deferred action or employment authorization until further notice.

18. Upon the issuance of the above instructions, USCIS personnel took immediate action to execute them.  USCIS Service Center adjudicators took steps to stop approving requests for deferred action (whether for two or three years), as well as related applications for employment authorization.  Document production and IT personnel at the card-production facilities issued electronic orders to suspend the printing of EADs for DACA recipients.  And USCIS personnel at both the Service Centers and the card production facilities initiated efforts to intercept any DACA-related approval notices or EADs that had already been printed, or were subject to imminent printing, but had not yet been submitted for mailing.

19. The agency understood at the time of the injunction that there was some number of approved DACA cases in which approvals for three-year rather than two-year terms of DACA and employment authorization had already been issued, but for which EADs had not yet been printed and sent to the requestors.  In each of these EAD-pending cases, a Service Center adjudicator would have entered an approval for a three-year term of deferred action and for a three-year term of employment authorization in the CLAIMS 3 system before the injunction, which would then have routed an EAD production request to the National Production System. All that remained for these cases then was the ministerial step of printing and sending the associated EADs to the requestor.  Nevertheless, USCIS decided to hold these EAD-pending cases until the agency could effectively determine an appropriate course of action for their

resolution.  Ultimately, USCIS determined that these cases should be converted to two-year

terms of both deferred action and work authorization.

20. On the morning of February 17, 2015, to prevent cards from being printed for these

EAD-pending cases, USCIS IT managers were instructed to hold EADs with the C-33 code (i.e.,

EADs for DACA recipients).  By the afternoon of February 17, USCIS headquarters was

provided confirmation that all DACA-related EADs in the National Production System

production queue had been successfully held.  To prevent any three-year cards that had already

been printed from being packaged and mailed, personnel at the card-production facilities were

instructed to manually review printed cards and to pull those with the C-33 code.[2]

21. Later in the afternoon of February 17, 2015, USCIS headquarters personnel informed

Service Center adjudicators that they could resume approvals of DACA requests under the

original 2012 eligibility guidelines but to revert to issuing two-year approvals of deferred action

and employment authorization for all such requests going forward, consistent with the terms of

the 2012 DACA policy not subject to the preliminary injunction.  Going forward, adjudicators

were instructed to enter two-year validity periods into the CLAIMS 3 system with respect to any

newly approved DACA cases. Such approvals fully resumed on February 18, 2015, although the

hold on actual production and issuance of DACA-related EADs remained in place.

22. On February 20, USCIS operational personnel informed the IT personnel administering

the hold in the National Production System that the Service Centers had resumed approvals of

---

[2] USCIS personnel intercepted some EADs with three-year validity periods that had been printed and were being prepared for mailing.  USCIS eventually destroyed these cards and began issuing two-year EADs to the relevant requestors.  USCIS did not, however, intercept a box of EADs, most of which did not concern DACA recipients, that was awaiting pick-up by the US Postal Service on the morning of February 17.  (The pick-up was delayed until February 18, due to a snowstorm.)  These EADs had already been printed, enveloped, and prepared for mailing before the injunction.

DACA requests, and that production of EADs could now also begin again.  In giving that instruction, USCIS operational personnel believed that the earlier cases for which three-year EADs had been approved (*i.e.*, the EAD-pending cases) had been removed from the production queue and would continue to be held, and that the only production requests that would be allowed to proceed would be those that involved two-year validity periods going forward.

23.   Although the intention had been only for two-year EADs to proceed to production, the three-year EADs that had previously been placed on hold also proceeded to production.  USCIS operational personnel had believed that the hold on all DACA-related EAD production would be effected by electronically removing each individual case from the National Production System production queue, returning it to the CLAIMS 3 system, and requiring a manual, case-specific action to return it to the queue and allow the case to again proceed.  This is the mechanism that operational personnel were familiar with, based on past experience when holds were placed on individual cases, such as when card orders have been electronically returned from a card production facility to a Service Center due to issues identified during the quality assurance process.  Therefore, when USCIS operational personnel instructed IT personnel to again allow production requests for DACA-related EADs to proceed, the operational personnel believed that such an instruction would not affect those three-year cases that they understood to have been removed from the production queue and returned to the CLAIMS 3 system.

24.   However, the February 20 instruction to resume production of EADs led to the issuance of three-year EADs for the previously held EAD-pending cases, although the intention had been for only the two-year EADs to proceed to production.  IT personnel had implemented a system-wide pause on the production of all DACA-related EAD requests in the queue.  They had not removed production requests for three-year EADs from the queue.  As a result, those three-year EAD requests were not prevented from moving forward once production resumed on the cases

approved for two-year EADs.  Nevertheless, USCIS believed that the three-year EADs

associated with EAD-pending cases were no longer in the production queue with the newly

approved two-year EADs.  USCIS personnel continued to believe that these cases would remain

on hold until USCIS took steps to convert the approvals in these cases from three years to two.

**Information Provided to the Court About the Issuance
of Three-Year EADs After the Injunction**

25. On March 3, 2015, the defendants notified the court that, prior to issuance of the

preliminary injunction, USCIS had approved approximately 100,000 three-year periods of

deferred action and work authorization for individuals eligible under the 2012 DACA eligibility

guidelines.  At that time, USCIS also reported to the court, through counsel, that it had ceased

providing three-year EADs immediately following issuance of the injunction.  At the time this

information was provided to the Court, USCIS understood (albeit mistakenly) that the issuance

of EADs for the EAD-pending cases described above had been halted, thereby preventing

issuance of three-year EADs for those cases, and that those cases remained on hold until further

action was taken.  Defendants repeated this understanding in a filing on March 12, 2015.

26. Prior to the March 19 hearing on Plaintiffs' motion for discovery, USCIS conducted

reviews of its records to ascertain information such as the precise number of DACA recipients

who had been approved for three years of deferred action and employment authorization prior to

the injunction, and when they had requested deferred action and applied for work authorization.

Based on these reviews USCIS also estimated  the number of EAD-pending cases.  (At this time

USCIS still believed that the individuals in these cases had not been issued three-year EADs.)

The reviews also revealed that a number of individuals had been erroneously approved for a

three-year period of deferred action and employment authorization after the injunction, some of

whom were also issued three-year EADs after the injunction .  Based on this information, USCIS

11

reported at the March 19 hearing, through counsel, that on February 17 a number of cases that remained in the "pipeline" (that is, EAD-pending cases), had been placed on hold and that three-year EADs had not been issued to these individuals.  USCIS also reported, through counsel, that a number of three-year EADs were erroneously issued after the injunction due to manual errors. These representations were made on the basis of USCIS's understanding of the information obtained and conveyed at that time.

<strong>Actions to Address Pending Cases and Other Cases</strong>

27. Subsequent to the March 19 hearing, USCIS proceeded to undertake action to address the EAD-pending cases believed to still be on hold, and continued to take action to address cases in which three-year terms of deferred action and/or work authorization had been erroneously approved after the court's injunction.  USCIS categorized cases into three groups and developed a distinct letter to be sent to the members of each group.  These letters were intended to begin resolving all outstanding issues:

- **Group 1:**  One letter was drafted for the individuals whose requests for employment authorization had been erroneously approved for a three-year term after February 16 and who were also erroneously issued three-year EADs post-injunction.  This letter was drafted to inform the individuals: (1) of the error that was made in their case; (2) that USCIS had converted the three-year approval in their case to a two-year approval; (3) that USCIS would provide a two-year EAD to them; (4) that they were required to return the three-year EAD that had been issued to them and that failure to do so could result in adverse action in their case; and (5) that they should also return any three-year approval notices that were still in their possession.

- **Group 2:**  A second letter was drafted for the individuals who had been found to have been erroneously approved for three-year terms of deferred action after the court's

12

injunction, but who had *not* been issued three-year EADs.  This letter informed them: (1)

of the error made in their case; (2) that USCIS had converted the three-year approval of

deferred action to a two-year approval; and (3) that they would be receiving notice of

such two-year approval and should return any three-year approval notice in their

possession.

- **Group 3:**  A third letter was drafted for the previously described EAD-pending cases in

  which three years of employment authorization had been approved before the injunction

  but for which EADs had not yet been issued at the time of the injunction.  As USCIS

  believed that all of these EAD-pending cases were on hold, the letter drafted for this

  group informed the recipients: (1) that USCIS had converted the three-year approval in

  their case to a two-year approval; (2) that USCIS would be issuing a two-year EAD; and

  (3) that they should return any three-year approval notice in their possession to USCIS.

Although the letters addressed different categories of cases, they all endeavored to effectuate the

same intention—that any cases in which any part of the processing took place (or remained to

take place) post-injunction had been or would be converted to two-year approvals of both

deferred action and work authorization, with associated documentation.

### Discovery of the Failure to Hold the EAD-Pending Cases

28. On April 30, language was approved for the above-described letters.  That same day,

USCIS headquarters personnel sent templates of these letters to the USCIS Service Centers and

instructed them to begin issuing letters and correcting the electronic records of the individuals in

the three relevant groups.  USCIS headquarters also asked the Service Centers to track all

responses for further evaluation.

29. On the following day, Friday, May 1, USCIS Service Center personnel began issuing the

above-mentioned letters to the three identified groups, as well as making the appropriate

corrections to USCIS's electronic records with respect to those cases that had not been corrected earlier.

30. As USCIS employees at these locations went through the relevant electronic records and began to electronically update USCIS databases, they began to discover that some EAD-pending cases in Group 3—which were believed to remain on hold—had already been mailed three-year EADs after the injunction.  (Again, the actual approval of such EAD-pending cases had occurred prior to the injunction).

31. By Monday, May 4, USCIS Service Center employees concluded that many EAD-pending cases had been issued three-year EADs after the injunction.  These employees decided to treat such persons as in Group 1 (i.e., people who had received three-year EADS that had been erroneously *approved* after the injunction) and took action accordingly—including correcting records and sending them the Group 1 letter.  That afternoon, USCIS Service Center personnel informed USCIS headquarters staff of their findings.

32. Headquarters staff immediately began a series of inquiries, including querying all relevant Service Centers with impacted EAD-pending cases, and also learned that in addition to the cases not actually remaining on hold, the number of such cases was higher than had been previously understood.  As a result of this new information, USCIS began to run additional systems queries to ensure that it had identified the entire universe of EAD-pending cases and to determine whether these cases had also been sent three-year EADs.  Based on these queries USCIS estimated that approximately 2000 three-year EADs had been issued to DACA recipients on or after the date of the injunction (and as of this time has no reason to believe that estimate is incorrect).

33. Through this process, USCIS discovered that the EAD-pending cases that were believed to be segregated and withheld from the card production queue had in fact been released, thus

allowing the three-year EADs to be erroneously printed and sent to the relevant requestors. Upon further investigation, we now understand that this error was the result of USCIS's failure to place the right kind of hold on the EAD-pending cases.

34. On Wednesday, May 6, DHS alerted counsel at the Department of Justice of this information, and the following day, defendants advised the Court.

35. With respect to the cases now known to involve the issuance of three-year EADs after the injunction, USCIS has initiated corrective action.  USCIS has sent letters to all individuals known to have received these EADs notifying them that they received three-year EADs post-injunction, that they will receive two-year EADs to replace them, and that they are required to return the three-year EADs.  USCIS is also correcting its records of these cases to reflect two-year validity periods for both deferred action and employment authorization.

36. Additionally, there is a group of requestors who were both approved for and received EADs valid for more than two years after the injunction based on manual error by the adjudicator, as opposed to the failure to maintain a hold on the EAD-pending cases.  This subset of requestors, described at the March 19 hearing and further in the May 7 Advisory, is currently being re-examined by USCIS, and the requestors identified have been sent letters as described above in paragraph 27.  To the extent that any further manual errors are detected during the re-examination process, corrective letters will be sent to those requestors as well.  These manual errors occurred because the CLAIMS 3 system permitted adjudicators to enter custom dates, leaving open the possibility of human error in entering those dates.  To prevent further similar errors, a directive has been issued to develop a technical fix to the CLAIMS 3 system that would prevent adjudicators from issuing DACA and related EADs for longer than two years, thereby eliminating the possibility of human error.

37.   Since the discovery of these errors, USCIS has continued its efforts to identify all cases in which individuals were issued documentation reflecting three-year terms of deferred action and/or work authorization after the injunction – whether due to the failure to segregate out EAD-pending cases, due to manual error on the part of the adjudicator post-injunction, or for any other reason.  These efforts remain ongoing, and USCIS understands that ongoing verification is required to ensure that it has identified all cases that may require corrective action.  As such, the total number of cases in which three-year EADs and/or notices were issued after the injunction, and the number falling into each category, may change  from the estimates previously provided to the Court in the Government's May 7 filing, which represented USCIS's best understanding at that time.  To the extent USCIS identifies additional cases in which three-year documentation was erroneously issued after the injunction, it will take prompt corrective action similar to that described above.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this __15th__day of May of 2015.

Donald W. Neufeld