IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

|  |  |
|---|---|
| STATE OF TEXAS, *et al.*, ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | Case No. 1:14-cv-254 |
| ) | |
| UNITED STATES OF AMERICA, *et al.*, ) | |
| ) | |
| *Defendants*. ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MAY 7 ADVISORY
AND RELATED SUBMISSION OF MATERIALS**

Defendants' May 7 Advisory (ECF No. 247) and supplemental declarations (ECF Nos. 256-1, 256-2) further confirm the unwieldiness of the DAPA/DACA bureaucracy—so large and complex that not even Defendants have a full grasp of what their machinery is doing. That, in turn, creates serious questions about the reliability of Defendants' representations concerning the enjoined Directive's implementation. Indeed, Defendants have now admitted to violating the preliminary injunction by issuing what they currently quantify as approximately 2,000 three-year terms of deferred action. ECF No. 247.

The facts regarding Defendants' compliance seem to be constantly evolving, from injunction compliance (March 3 advisory), to 55 recipients of three-year terms after the injunction (disclosed at the March 19 hearing), and now 72 recipients of such terms after the injunction plus "approximately" 2,000 more—with Defendants still

"refin[ing]" their understanding through "ongoing" efforts (May 7 advisory and supplemental declarations). And this is in addition to more than 108,000 pre-injunction beneficiaries of the Directive.

Defendants' recent discovery production involves such broad assertions of privileges that Plaintiffs know little more about the circumstances behind the inaccurate information furnished by Defendants and their newly revealed violation of the preliminary injunction. Because this Court or its appointed designee may review the allegedly privileged materials, however, Plaintiffs in this Response suggest a path forward and a range of options available to the Court based on what those materials show. Plaintiffs suggest that, at a minimum, a compliance-assurance mechanism would be prudent—with exploration of the need for sanctions being a separate matter depending on what the withheld materials reflect about who knew the truth and for how long. Plaintiffs also suggest certain areas of further discovery that may help shed light on appropriate next steps.

**1. Defendants' assertions of absolute privileges are dubious and prevent Plaintiffs from ascertaining how to proceed.**

Defendants withheld 1,163 pages of documents from production. This was nearly the entirety of the production. The broadly asserted privileges are far from absolute, yet Defendants' assertions prevent Plaintiffs from offering more than a menu of options at this point.

According to Defendants, the 1,163 pages of documents include drafts of the March 3 advisory, communications about it, and lists of who knew about and approved the advisory and when. Resp. 25, ECF No. 243. But Defendants withhold those

2

documents, broadly asserting a host of privileges—attorney-client, work-product, and deliberative-process—and for some documents a "presidential-communications" privilege. As an initial matter, Plaintiffs bear the burden of demonstrating a claimed privilege, *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710 (5th Cir. 2001), and they have not offered any clear proof substantiating the claims. Moreover, none of Defendants' claimed privileges offer the "virtually absolute" (Resp. 23) protection Defendants seek. Each of these is a reason for further review of the assertions.

    *a.    Deliberative-process privilege.* For example, the deliberative-process privilege is not absolute, but rather requires a balancing of factors, including the "interest of the litigant, and ultimately society, in accurate judicial fact finding." *Doe v. City of San Antonio*, No. SA-14-CV-102-XR, 2014 WL 6390890, at *2 (W.D. Tex. Nov. 17, 2014) (internal quotation marks omitted). And a party cannot rely on this privilege when the decisionmaking process itself is at issue. *See, e.g.*, *In re Subpoena Duces Tecum Served on Office of Comptroller of Currency*, 145 F.3d 1422, 1424 (D.C. Cir. 1998) (deliberative process privilege "was fashioned in cases where the governmental decisionmaking process is collateral").

    *b.    Attorney-client and work-product privileges.* The attorney-client privilege is not absolute and "applies only where necessary to achieve its purpose" of "encourag[ing] full and frank communication between lawyers and their clients." *United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997) (internal quotation marks omitted). The work-product privilege also must yield when information is sought to evaluate the veracity of representations made in the course of litigation. *See, e.g.*, *Nat'l*

*Immigration Project of Nat'l Lawyers Guild v. U.S. Dep't of Homeland Sec.*, 842 F. Supp. 2d 720, 727-28 (S.D.N.Y. 2012) (when government counsel made a factual representation to the Supreme Court, intending that it be relied upon, the government could not later claim work-product privilege over a document on which the representation was based in response to a FOIA request).

  *c.* *Presidential-communications privilege.* So too, the presidential-communications privilege, the question of its propriety aside, is at most a qualified privilege for which courts must "balance the public interests at stake in determining whether the privilege should yield in a particular case." *In re Sealed Case*, 121 F.3d 729, 746 (D.C. Cir. 1997).

  *d.* *Defendants' lack of detail.* Yet it is difficult to assess Defendants' assertions because their privilege log repeats boilerplate descriptions nearly verbatim across 223 pages of entries. Almost every entry contains the same generalized information—for example, "[d]raft reflecting deliberations, proposals, comments and/or proposed edits to document, reflecting attorney's impressions, conclusions, opinions, and/or legal advice re proposed contents of Advisory." *E.g.*, Privilege Log 1. Nor have Defendants offered anything in the way of "detailed affidavits or other evidence to enable the court to determine whether the privilege exists." *Navigant Consulting, Inc. v. Wilkinson*, 220 F.R.D. 467, 473 (N.D. Tex. 2004).

  Defendants' submission does not allow Plaintiffs to assess the merits of each assertion. *See SEC v. Microtune, Inc.*, 258 F.R.D. 310, 315 (N.D. Tex. 2009) (party asserting privilege must provide "detailed description" of the documents and state

"specific and precise reasons for their claim of protection from disclosure" (internal quotation marks omitted)); *see also Chevron Corp. v. Weinberg Grp.*, 286 F.R.D. 95, 99 (D.D.C. 2012) ("For entry after entry [in the privilege log], one part of the description for a particular category is exactly the same. This raises the term 'boilerplate' to an art form . . . ."). And this lack of detail can defeat the asserted privilege. *See, e.g.*, *Smithkline Beecham Corp. v. Apotex Corp.*, 193 F.R.D. 530, 534 (N.D. Ill. 2000) ("[T]he description of each document and its contents must be sufficiently detailed to allow the court to determine whether the elements of attorney-client privilege—or in other cases, work product doctrine—have been established. Failing this, the documents must be produced.").

2. **Defendants' response leaves open a number of options to address concerns about misrepresentations, compliance, and corrective action.**

The unfolding events as we now know them create concerns about (1) misrepresentations and (2) ongoing compliance with the preliminary injunction. They also raise (3) the possibility that the consequences of the improper DAPA implementation could be remediated to some limited extent. The following actions appear prudent on each of those fronts.

  a.  *Misrepresentations*. A question that should be addressed given this state of affairs is whether any of the inaccurate and misleading information reaching the Court was the product of conscious breaches of ethical duties that the Court may wish to address by sanctions. *Cf., e.g.*, *Chilcutt v. United States*, 4 F.3d 1313 (5th Cir. 1993) (upholding district court order imposing monetary sanctions against AUSA personally, and forbidding government from reimbursing the AUSA). Defendants' recent

5

response advances a claim of inadvertent miscommunication and misunderstanding. Resp. 1-3, 6-7, 9-10. Plaintiffs' inability to review withheld documents means they are in no position to adequately verify this claim.

This Court, however, is in such a position. Plaintiffs disagree with Defendants' contention that this Court may not review the documents *in camera* because it would "intrude upon the core protections traditionally safeguarded by the various privileges" asserted here (Resp. 24), or should not review the documents *in camera* because it is beyond question that "there was no bad faith" (Resp. 22).

*In camera* review is "well established in the federal courts" and is often utilized when a party seeks to avoid disclosing documents to the opposing party. *United States v. Zolin*, 491 U.S. 554, 569 (1989); *In re Grand Jury Subpoenas (Mr. S.)*, 662 F.3d 65, 70 (1st Cir. 2011) ("[F]ederal courts commonly—and appropriately—conduct such reviews to determine whether particular documents are or are not privileged."). An *in camera* proceeding, by itself, does not call into question a court's impartiality to rule on subsequent matters in a case. *See ISC Holding AG v. Nobel Biocare Invs., N.V.*, 759 F. Supp. 2d 289, 290-91 (S.D.N.Y. 2010). Defendants must offer more than mere speculation about "significant difficulties" from *in camera* review (Resp. 4).

But to avoid a time-wasting collateral proceeding on Defendants' apparent intention to argue some "taint" (Resp. 25) on this Court from *in camera* review, Plaintiffs gladly consent to the Court referring such *in camera* review to a magistrate judge or special master appointed for that purpose (to be paid by Defendants). That magistrate or master can review the documents *in camera* and, in his or her discretion or

6

with the Court's guidance, either rule on the asserted privileges (so that documents not proved to be privileged may be released) or advise the Court on whether the documents reviewed *in camera* show the need for further proceedings to explore deliberate misrepresentations or silence in the face of an ethical duty to speak. Additionally, if this Court or an appointed magistrate or special master believes that further discovery would add clarity on the issue, Plaintiffs would respectfully request such further discovery—for example, all communications referenced or relied on in the recent declarations of Leon Rodriguez, ECF No. 256-1, and Donald W. Neufeld, ECF No. 256-2.

     b.    *Ongoing compliance with the preliminary injunction.* It is crucial to ensure ongoing compliance with the preliminary injunction.

Reliability of compliance is a very real concern given that Defendants themselves have had difficulty reporting accurate information about what the DAPA/DACA bureaucracy is doing. Defendants explain the violations of the injunction as the result of "manual errors," largely attributed to "IT personnel." Neufeld Decl. ¶¶ 18-24, 26. Defendants also recognize that their massive machinery (which was supposedly erected to implement "prosecutorial discretion") suffered from inadequate "management oversight" by failing to effectively block the issuance of three-year grants after the preliminary injunction. Rodriguez Decl. ¶ 12. The fact that the DHS Secretary has requested an investigation by the DHS Inspector General suggests that Defendants themselves lack confidence in their own processes. *Id.* ¶ 14 & Attach. Put simply, post-injunction events suggest that Defendants' representations

7

alone cannot reliably protect Plaintiffs from what Defendants call "errors" in compliance.

Given Defendants' admission that at least 2,000 more individuals were granted Expanded DACA relief after the preliminary injunction, it would be prudent to institute some mechanism to oversee Defendants' ongoing compliance with the preliminary injunction. In the Court's discretion, that could range from a requirement of weekly or monthly sworn certification of compliance with the injunction to the appointment of an external compliance monitor to oversee Defendants' compliance and provide periodic reports to the Court, at Defendants' expense. *See, e.g.*, *United States v. Apple Inc.*, 992 F. Supp. 2d 263, 280 (S.D.N.Y. 2014) (affirming appointment of compliance monitor to ensure defendant's implementation of court's remedial order: "'[A]s with any other [equitable] remedial tool' a district court has 'broad discretion' to appoint a compliance monitor." (alterations in original)).

      c.      *Potential corrective action.* Although it will be impossible to fully understand all of the derivative uses to which three-year DACA recipients have put their three-year authorizations, much less to attempt to array and unwind each of them, Defendants volunteer that they have *asked* recipients of three-year deferred-action terms to send back their authorization paperwork. (Defendants would say they are asking for beneficiaries' help in returning the Executive's exercise of prosecutorial discretion—not in unwinding a component of a benefits program.) Plaintiffs wish to explore the extent to which this takes place and to obtain a list of returned three-year authorizations. This would allow Plaintiffs to begin to assess for themselves whether

8

the unrecoverable cost of unwinding at least limited effects of Defendants' injunction violation outweighs the unrecoverable costs of not expending that time and effort. In other words, Plaintiffs wish to gain insight into this choice of two irreparable harms. Although the effects of the Directive's implementation can never be fully undone, Plaintiffs would respectfully request discovery into this limited additional matter to understand if even a small portion of it might be cost-feasible to address in some part.

## Conclusion

For the foregoing reasons, Plaintiffs respectfully provide this menu of responsive options and suggested courses of action.

Respectfully submitted.

LUTHER STRANGE
*Attorney General of Alabama*

MARK BRNOVICH
*Attorney General of Arizona*

DUSTIN MCDANIEL
*Attorney General of Arkansas*

PAMELA JO BONDI
*Attorney General of Florida*

SAMUEL S. OLENS
*Attorney General of Georgia*

LAWRENCE G. WASDEN
*Attorney General of Idaho*

JOSEPH C. CHAPELLE
PETER J. RUSTHOVEN
*Counsel for the State of Indiana*

DEREK SCHMIDT
*Attorney General of Kansas*

JAMES D. "BUDDY" CALDWELL
*Attorney General of Louisiana*

TIMOTHY C. FOX
*Attorney General of Montana*

DOUGLAS J. PETERSON
*Attorney General of Nebraska*

ADAM PAUL LAXALT
*Attorney General of Nevada*

WAYNE STENEHJEM
*Attorney General of North Dakota*

KEN PAXTON
*Attorney General of Texas*

CHARLES E. ROY
*First Assistant Attorney General*

SCOTT A. KELLER
*Solicitor General*

/s/ Angela V. Colmenero
ANGELA V. COLMENERO
*Assistant Attorney General*
   Attorney-in-Charge
   State Bar No. 24048399

J. CAMPBELL BARKER
*Deputy Solicitor General*

ERIC A. HUDSON
ADAM N. BITTER
*Assistant Attorneys General*

Office of the Attorney General of Texas
P.O. Box 12548
Austin, Texas 78711-2548
512-936-1700

MICHAEL DEWINE
*Attorney General of Ohio*
ERIC E. MURPHY
*Co-counsel for the State of Ohio*

E. SCOTT PRUITT
*Attorney General of Oklahoma*

ALAN WILSON
*Attorney General of South Carolina*

MARTY J. JACKLEY
*Attorney General of South Dakota*

HERBERT SLATERY III
*Attorney General and Reporter of
    Tennessee*

SEAN D. REYES
*Attorney General of Utah*

PATRICK MORRISEY
*Attorney General of West Virginia*

BRAD D. SCHIMEL
*Attorney General of Wisconsin*

BILL SCHUETTE
*Attorney General for the People of
    Michigan*

DREW SNYDER
*Counsel for the Governor of Mississippi*

PAUL R. LEPAGE
*Governor of Maine*

ROBERT C. STEPHENS
*Counsel for the Governor of North
    Carolina*

TOM C. PERRY
CALLY YOUNGER
*Counsel for the Governor of Idaho*

## CERTIFICATE OF SERVICE

  I certify that I served a copy of this pleading on all counsel of record via this Court's CM/ECF system.

                /s/ Angela V. Colmenero
                ANGELA V. COLMENERO