# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States District Court
Southern District of Texas
FILED

MAY 26 2015

David J. Bradley, Clerk of Court

1:14-CV-254

No. 15-40238

United States Court of Appeals
Fifth Circuit

**FILED**

May 26, 2015

Lyle W. Cayce
Clerk

STATE OF TEXAS; STATE OF ALABAMA; STATE OF GEORGIA;
STATE OF IDAHO; STATE OF INDIANA; STATE OF KANSAS;
STATE OF LOUISIANA; STATE OF MONTANA; STATE OF NEBRASKA;
STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA;
STATE OF UTAH; STATE OF WEST VIRGINIA; STATE OF WISCONSIN;
PAUL R. LEPAGE, Governor, State of Maine;
PATRICK L. MCCRORY, Governor, State of North Carolina;
C. L. "BUTCH" OTTER, Governor, State of Idaho;
PHIL BRYANT, Governor, State of Mississippi;
STATE OF NORTH DAKOTA; STATE OF OHIO; STATE OF OKLAHOMA;
STATE OF FLORIDA; STATE OF ARIZONA; STATE OF ARKANSAS;
ATTORNEY GENERAL BILL SCHUETTE; STATE OF NEVADA;
STATE OF TENNESSEE,

       Plaintiffs–Appellees,

versus

UNITED STATES OF AMERICA;
JEH CHARLES JOHNSON, Secretary, Department of Homeland Security;
R. GIL KERLIKOWSKE,
  Commissioner of U.S. Customs and Border Protection;
RONALD D. VITIELLO,
  Deputy Chief of U.S. Border Patrol, U.S. Customs and Border Protection;
SARAH R. SALDANA,
  Director of U.S. Immigration and Customs Enforcement;
LEON RODRIGUEZ, Director of U.S. Citizenship and Immigration Services,

       Defendants–Appellants.

---

Appeal from the United States District Court
for the Southern District of Texas

---

No. 15-40238

Before SMITH, ELROD, and HIGGINSON, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Twenty-six states (the "states") are challenging the government's[1] Deferred Action for Parents of Americans and Lawful Permanent Residents program ("DAPA") as violative of the Administrative Procedure Act ("APA") and the Take Care Clause of the Constitution. The district court determined that the states are likely to succeed on their procedural APA claim, so it temporarily enjoined implementation of the program. *Texas v. United States*, Civ. No. B-14-254, 2015 WL 648579 (S.D. Tex. Feb. 16, 2015). The United States appealed the preliminary injunction and moved for a stay of the injunction pending resolution of the merits of that appeal. Because the government is unlikely to succeed on the merits of its appeal of the injunction, we deny the motion for stay and the request to narrow the scope of the injunction.

I.

In 2012, then-Department of Homeland Security ("DHS") Secretary Janet Napolitano announced the Deferred Action for Childhood Arrivals program ("DACA"), setting forth how officers should exercise "prosecutorial discretion" before enforcing "immigration laws against certain young people."[2] She instructed agency heads that five criteria "should be satisfied before an individual is considered for an exercise of prosecutorial discretion"[3] but that

---

[1] This opinion refers to the defendants collectively as "the United States" or "the government" unless otherwise indicated.

[2] Memorandum from Janet Napolitano, Sec'y, Dep't of Homeland Sec., to David Aguilar, Acting Comm'r, U.S. Customs and Border Prot., et al., at 1 (June 15, 2012) (the "DACA Memo"), *available at* http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

[3] *Id.* (stating that the individual may be considered if he "[1] came to the United States under the age of sixteen; [2] has continuously resided in the United States for a [sic] least five years preceding [June 15, 2012] and is present in the United States on [June 15]; [3] is

2

"requests for relief . . . are to be decided on a case by case basis."[4] "For individuals who are granted deferred action . . . [U.S. Citizenship and Immigration Services ("USCIS")] shall accept applications to determine whether these individuals qualify for work authorization," but the DACA Memo purported to "confer[] no substantive right, immigration status or pathway to citizenship."[5] Of the at least 1.2 million persons who qualify for DACA, approximately 636,000 have been accepted through 2014.[6]

In November 2014, DHS Secretary Jeh Johnson instructed the same agencies to expand DACA in three areas.[7] He also "direct[ed] USCIS to establish a process, similar to DACA," known as DAPA. He set forth six criteria "for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis."[8] Although "[d]eferred action does not confer any form

---

currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the [military]; [4] has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and [5] is not above the age of thirty").

[4] *Id.* at 2.

[5] *Id.* at 3.

[6] *See Texas*, 2015 WL 648579, at *4.

[7] Memorandum from Jeh Johnson, Sec'y, Dep't of Homeland Sec., to Leon Rodriguez, Dir., U.S. Citizenship and Immigration Servs., et al., at 3–4 (Nov. 20, 2014) (the "DAPA Memo"), *available at* http://www.dhs.gov/sites/default/files/publications/14_1120_memo_deferred_action.pdf. First, the "age restriction exclud[ing] those who were older than 31 on the date of the [DACA] announcement . . . will no longer apply." *Id.* at 3. Second, "[t]he period for which DACA and the accompanying employment authorization is granted will be extended to three-year increments, rather than the current two-year increments." *Id.* Third, "the eligibility cut-off date by which a DACA applicant must have been in the United States should be adjusted from June 15, 2007 to January 1, 2010." *Id.* at 4. The district court enjoined implementation of those expansions, and they are included in the term "DAPA" in this opinion.

[8] *Id.* at 4 (stating that individuals may be considered if they "[1] have, on [November 20, 2014], a son or daughter who is a U.S. citizen or lawful permanent resident; [2] have continuously resided in the United States since before January 1, 2010; [3] are physically present in the United States on [November 20, 2014], *and* at the time of making a request

3

of legal status in this country, much less citizenship[,] it [does] mean[] that, for a specified period of time, an individual is permitted to be *lawfully present* in the United States."[9]

That designation makes aliens who were not otherwise qualified for most federal public benefits eligible for "social security retirement benefits, social security disability benefits, [and] health insurance under Part A of the Medicare program."[10] Further, "[e]ach person who applies for deferred action pursuant to the [DAPA] criteria . . . shall also be eligible to apply for work authorization for the [renewable three-year] period of deferred action."[11] "An alien with work authorization may obtain a Social Security Number"; "accrue quarters of covered employment"; and "correct wage records to add prior covered employment within approximately three years of the year in which the wages were earned or in limited circumstances thereafter."[12] The district court

_____

for consideration of deferred action with USCIS; [4] have no lawful status on [November 20, 2014]; [5] are not an enforcement priority as reflected in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum; and [6] present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.").

[9] *Id.* at 2 (emphasis added). As the United States admits in its opening brief at 45–46, "lawful presence," unlike "legal status," is not an enforceable right to remain in the United States and can be revoked at any time. But "lawful presence" does have significant legal consequences, as we will explain.

[10] Brief for the United States at 48–49 (citing 8 U.S.C. § 1611(b)(2)–(3)). With limited exceptions, "an alien who is not a qualified alien . . . is not eligible for any Federal public benefit," § 1611(a), but that prohibition does "not apply to any benefit payable under title II of the Social Security Act [42 U.S.C. § 401 *et seq.*] to an alien who is lawfully present in the United States as determined by the Attorney General," § 1611(b)(2), or "to any benefit payable under title XVIII of the Social Security Act (relating to the medicare program) [42 U.S.C. § 1395 *et seq.*] to an alien who is lawfully present in the United States as determined by the Attorney General and, with respect to benefits payable under part A of such title [42 U.S.C. § 1395c *et seq.*], who was authorized to be employed with respect to any wages attributable to employment which are counted for purposes of eligibility for such benefits," § 1611(b)(3) (alterations in original).

[11] DAPA Memo, *supra* note 7, at 4.

[12] Brief of the United States at 49 (citations omitted) (citing 42 U.S.C. § 405(c)(1)(B),

4

determined that "DAPA recipients would be eligible for earned income tax credits once they received a Social Security number."[13] Texas maintains that DAPA recipients become eligible for driver's licenses and unemployment benefits.[14] Of the approximately 11.3 million illegal aliens[15] in the United States, 4.3 million are eligible for DAPA. *Texas*, 2015 WL 648579, at *7 & n.11, *15.

The states sued to prevent implementation of the program. First, they claimed that DAPA is procedurally unlawful under the APA because it is a substantive rule that is required to undergo notice and comment, but DHS had

---

(4), (5)(A)–(J); 8 C.F.R. § 1.3(a)(4)(vi); 20 C.F.R. §§ 422.104(a)(2), 422.105(a)).

[13] *Texas*, 2015 WL 648579, at *44 n.64; *see also* 26 U.S.C. § 32(c)(1)(E), (m) (stating that eligibility for earned income tax credit is limited to individuals with Social Security numbers); 20 C.F.R. §§ 422.104(a)(2), 422.107(a), (e)(1).

[14] *See* TEX. TRANSP. CODE § 521.142(a) ("An applicant who is not a citizen of the United States must present . . . documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States before the applicant may be issued a driver's license."); TEX. LAB. CODE § 207.043(a)(2) ("Benefits are not payable based on services performed by an alien unless the alien . . . was lawfully present for purposes of performing the services . . . ."); *see also* 26 U.S.C. § 3304(a)(14)(A) (approval of state laws making compensation payable to aliens who are "lawfully present for purposes of performing such services").

[15] There is some confusion—not necessarily in this case but generally—regarding the proper term for non-citizens who are in the United States unlawfully. The leading legal lexicographer offers the following compelling explanation:

The usual and preferable term in [American English] is *illegal alien*. The other forms have arisen as needless euphemisms, and should be avoided as near-gobbledygook. The problem with *undocumented* is that it is intended to mean, by those who use it in this phrase, "not having the requisite documents to enter or stay in a country legally." But the word strongly suggests "unaccounted for" to those unfamiliar with this quasi-legal jargon, and it may therefore obscure the meaning.

More than one writer has argued in favor of *undocumented alien* . . . [to] avoid[ ] the implication that one's unauthorized presence in the United States is a crime . . . . But that statement is only equivocally correct: although illegal aliens' presence in the country is no crime, their *entry* into the country is. . . . Moreover, it is wrong to equate illegality with criminality, since many illegal acts are not criminal. *Illegal alien* is not an opprobrious epithet: it describes one present in a country in violation of the immigration laws (hence "illegal").

BRYAN A. GARNER, GARNER'S DICTIONARY OF LEGAL USAGE 912 (Oxford 3d ed. 2011) (citations omitted).

not followed those procedures. *See* 5 U.S.C. § 553. Second, the states asserted that DAPA was substantively unlawful under the APA because DHS lacked the authority to implement the program even if it did follow the correct process. *See* 5 U.S.C. § 706(2)(A)–(C). Third, the states contended that DAPA violated the President's constitutional duty to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3.

The district court held that Texas had standing because it would be required to issue driver's licenses to DAPA beneficiaries, and the costs of doing so would constitute a cognizable injury. *Texas*, 2015 WL 648579, at \*11–17. Alternatively, the court held that Texas had standing based on a theory it called "abdication standing," under which a state has standing if the government has exclusive authority over a particular policy area but declines to act. *Id.* at \*28–34.[16] The court entered the preliminary injunction after concluding that Texas had shown a substantial likelihood of success on its claim that DAPA's implementation would violate the APA's notice-and-comment requirements. *Id.* at \*62. The court did not "address[] Plaintiffs' likelihood of success on their *substantive* APA claim or their constitutional claims under the Take Care Clause/separation of powers doctrine." *Id.* at \*61. The government's motion for a stay pending appeal is based on its insistence that the states do not have standing or a right to judicial review under the APA and, alternatively, that DAPA is exempt from the notice-and-comment requirements. The government also urges that the injunction's nationwide scope is an abuse of discretion.[17]

---

[16] The court considered but ultimately did not rely on two other theories. The first was that the states could sue as *parens patriae* on behalf of citizens injured by economic competition from DAPA beneficiaries. *Texas*, 2015 WL 648579, at \*18–20. The second was that, in light of *Massachusetts v. EPA*, 549 U.S. 497 (2007), the states could sue based on the losses they suffer from illegal immigration generally. *Texas*, 2015 WL 648579, at \*21–28.

[17] The issues in this case were not resolved by *Crane v. Johnson*, 783 F.3d 244, 247

6

## II.

"We consider four factors in deciding whether to grant a stay pending appeal: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'"[18] To succeed on the merits, the government must show that the district court abused its discretion by entering a preliminary injunction.[19] A decision "grounded in erroneous legal principles is reviewed *de novo*," and findings of fact are reviewed for clear error.[20] "A stay 'is not a matter of right, even if irreparable injury might otherwise result to the appellant.'"[21]

## III.

We begin by deciding whether the government has made a strong showing that it is likely to succeed on the merits of its claim that the states

---

(5th Cir. 2015), which held "that neither the [Immigration and Customs Enforcement] Agents nor the State of Mississippi has demonstrated the concrete and particularized injury required to give them standing" to challenge DACA. Mississippi lacked standing because it failed to allege facts indicating that its costs had increased or would increase as a result of DACA. *Id.* at 252. The agents lacked standing because, *inter alia*, they had not alleged a sufficient factual basis for their claim that an employment action against them was "certainly impending" if they "exercise[d] [their] discretion to detain an illegal alien." *Id.* at 254. That conclusion was informed by the express delegation of discretion on the face of the DACA Memo and the fact that no sanctions or warnings had yet been issued. *Id.* at 254–55. We expressly declined to address the driver's license theory, *id.* at 252 n.34, and did not hold that deferred action under DACA was an exercise of prosecutorial discretion or that the criteria were not binding, *id.* at 254–55.

[18] *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)) (internal quotation marks omitted).

[19] *Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1789 (2014).

[20] *Id.* at 418 (quoting *Janvey v. Alguire*, 647 F.3d 585, 592 (5th Cir. 2011)).

[21] *Planned Parenthood*, 734 F.3d at 410 (quoting *Nken*, 556 U.S. at 427).

lack standing. It has not done so. We reach only the district court's first basis for standing—the driver's license rationale—because it is dispositive.[22]

The states have the burden of establishing that at least one of them has Article III standing.[23] First, they must assert an injury that is "concrete, particularized, and actual or imminent."[24] "'[T]hreatened injury must be *certainly impending* to constitute injury in fact,' and . . . '[a]llegations of *possible* future injury' are not sufficient."[25] Second, the injury must be "fairly traceable to the challenged action." *Clapper*, 133 S. Ct. at 1147 (quoting *Monsanto*, 561 U.S. at

[22] The United States cites several cases for the proposition that DAPA is not justiciable. None of them resolved the question at issue here, so we consider them only to the extent that they are relevant to our analysis of the standing requirements. *See Arizona v. United States*, 132 S. Ct. 2492, 2497 (2012) (where standing was not at issue); *Heckler v. Chaney*, 470 U.S. 821, 823 (1985) (addressing availability of judicial review under APA but not standing); *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 886 (1984) (where standing was not at issue); *Plyler v. Doe*, 457 U.S. 202, 205 (1982) (same); *Fiallo v. Bell*, 430 U.S. 787, 788 (1977) (same); *Mathews v. Diaz*, 426 U.S. 67, 69 (1976) (same); *Linda R.S. v. Richard D.*, 410 U.S. 614, *passim* (1973) (addressing standing in a different context); *Henderson v. Stalder*, 287 F.3d 374, *passim* (5th Cir. 2002) (same); *Texas v. United States*, 106 F.3d 661, 664 n.2 (5th Cir. 1997) (assuming but not deciding that Texas had standing to seek payment from government for expenses associated with illegal immigration); *United States v. Cox*, 342 F.2d 167, 170 (5th Cir. 1965) (en banc) (where standing was not at issue).

[23] *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1148 (2013) ("'The party invoking federal jurisdiction bears the burden of establishing' standing . . . ." (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992))); *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."). The decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), casts doubt on whether the limitations often described as prudential standing requirements should be considered as part of the standing inquiry. *See id.* at 1386–88; *see also Superior MRI Servs., Inc. v. Alliance Healthcare Servs., Inc.*, 778 F.3d 502, 505–06 (5th Cir. 2015) (discussing *Lexmark*'s impact). We need not address that, because there is no suggestion that the states are attempting to assert a third party's rights or to seek adjudication of a generalized grievance, and we must apply the zone-of-interests test to determine whether judicial review is available under the APA. *See generally Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474–75 (1982) (listing prudential-standing requirements).

[24] *Amnesty Int'l*, 133 S. Ct. at 1147 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).

[25] *Id.* (second alteration in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

149). The states may establish standing based on costs they incur as a rea-
sonable reaction to a risk of harm only if that harm is certainly impending. *See
id.* at 1151. Third, the injury must be "redressable by a favorable ruling." *Id.*
at 1147 (quoting *Monsanto*, 561 U.S. at 149). "When a litigant is vested with
a procedural right, that litigant has standing if there is some possibility that
the requested relief will prompt the injury-causing party to reconsider the
decision that allegedly harmed the litigant." *Massachusetts*, 549 U.S. at 518.

A.

The first requirement is likely satisfied by Texas's proof of the costs of
issuing driver's licenses to DAPA beneficiaries. "An applicant who is not a
citizen of the United States must present . . . documentation issued by the
appropriate United States agency that authorizes the applicant to be in the
United States before the applicant may be issued a driver's license." TEX.
TRANSP. CODE § 521.142(a). Documentation confirming lawful presence pur-
suant to DAPA would qualify.[26] The district court found that Texas would lose
at least $130.89 on each license it issues to a DAPA beneficiary,[27] and the
United States does not dispute that calculation on appeal. It is well established

---

[26] *See* TEX. DEP'T OF PUB. SAFETY, VERIFYING LAWFUL PRESENCE 4 (2013), *available
at* https://www.txdps.state.tx.us/DriverLicense/documents/verifyingLawfulPresence.pdf
(listing acceptable document for "[p]erson granted deferred action" as "[i]mmigration docu-
mentation with an alien number or I-94 number"); *supra* text accompanying note 9.

[27] *Texas*, 2015 WL 648579, at *11. The court noted that some of those costs are attrib-
utable to Texas's participation in the REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119
Stat. 302 (codified as amended in scattered sections of 8 and 49 U.S.C.). *Id.* To comply with
that law, a state must, *inter alia*, use the federal Systematic Alien Verification for Entitle-
ments system to verify an applicant's immigration status. 6 C.F.R. § 37.13(b)(1). The court
found that the average fee Texas pays to use that system is $0.75 per applicant. Although
states are not required to participate in the REAL ID Act, nonparticipating states' licenses
are not valid for access to certain federal facilities and eventually will not be valid for com-
mercial air travel without a secondary form of identification. *REAL ID Enforcement in Brief*,
U.S. DEPARTMENT OF HOMELAND SECURITY (Mar. 30, 2015), http://www.dhs.gov/real-id-
enforcement-brief.

that a financial loss generally constitutes an injury,[28] so Texas is likely to meet its burden.

The government attacks that conclusion on two grounds. First, it claims that Texas will be required neither to issue licenses nor to subsidize them. Texas responds that it will have to do so in light of *Arizona DREAM Act Coalition v. Brewer*, 757 F.3d 1053 (9th Cir. 2014), which held that DACA beneficiaries were likely to succeed on their equal-protection challenge to Arizona's policy of issuing licenses to some noncitizens but not to them, *id.* at 1067, and suggested but did not decide that the policy was preempted, *id.* at 1063. Although *Arizona DREAM Act* supports Texas's position that it cannot legally deny licenses to DAPA beneficiaries, it is not dispositive. Even if we were bound by the decision of another circuit, that court said nothing about subsidizing licenses, and Texas could avoid financial injury by raising its application fees to cover the full cost of issuing and administering a license.

But that does not resolve the matter. The flaw in the government's reasoning is that Texas's forced choice between incurring costs and changing its fee structure is itself an injury: A plaintiff suffers an injury even if it can avoid that injury by incurring other costs.[29] And being pressured to change state law constitutes an injury.

"[S]tates have a sovereign interest in 'the power to create and enforce a legal code.'"[30] Based on that interest, we held that Texas had standing to

---

[28] *See, e.g., Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473–74 (5th Cir. 2013); *Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693, 699 (5th Cir. 2011).

[29] *See Texas v. United States*, 497 F.3d 491, 497 (5th Cir. 2007) ("Texas's only alternative to participating in this allegedly invalid process is to forfeit its sole opportunity to comment upon Kickapoo gaming regulations, a forced choice that is itself sufficient to support standing.").

[30] *Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)).

challenge the FCC's assertion of authority over an aspect of telecommunications regulation that the state believed it controlled[31]; three other circuits held that the preemption of an existing state law constitutes an injury[32]; and the Sixth Circuit held that making the enforcement of an existing state law more difficult qualifies.[33] Reviewing that caselaw, the Fourth Circuit explained that a state has standing based on a conflict between federal and state law if "the state statute at issue regulate[s] behavior or provide[s] for the administration of a state program," *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011), but not if "it simply purports to immunize [state] citizens from federal law," *id.* at 270.

That well-established caselaw is dispositive because if pressure to change state law in some substantial way were not injury, states would have no standing to challenge *bona fide* harms because they could offset most financial losses by raising taxes or fees. Texas's forced choice between incurring costs and changing its laws is an injury because those laws exist for the administration of a state program, not to challenge federal law, and Texas did not enact them merely to create standing.[34]

---

[31] *Id.*

[32] *See, e.g., Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008); *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443–44 (D.C. Cir. 1989); *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 232–33 (6th Cir. 1985); *cf. Diamond v. Charles*, 476 U.S. 54, 62 (1986) (noting in *dictum* that "a State has standing to defend the constitutionality of its statute").

[33] *Celebrezze*, 766 F.2d at 232–33; *cf. Maine v. Taylor*, 477 U.S. 131, 137 (1986) ("[A] State clearly has a legitimate interest in the continued enforceability of its own statutes.").

[34] The government relies on *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) (per curiam), for the proposition that Texas's injury is self-inflicted. There, several states alleged that other states had unconstitutionally taxed nonresidents' incomes. *Id.* at 661–63. The plaintiffs said the challenged practices had caused them to lose tax revenue. *Id.* at 663. The Court held that the plaintiffs' injuries were self-inflicted because they were caused by the plaintiffs' decisions to give their residents credits for taxes paid to other states, so there was no cognizable injury. *See id.* at 664. The Court later held, however, that Wyoming had

## No. 15-40238

Second, the government urges that Texas will suffer no injury, because the costs of issuing licenses will be outweighed by countervailing economic benefits, including increased tax revenue, decreased reliance on state-subsidized health care, better financial support for DAPA beneficiaries' children, increased revenue from vehicle-registration fees, and decreased auto insurance costs. All that may be true, but those benefits are not properly weighed in evaluating standing here. We have addressed the question of offsetting benefits only to a limited extent, holding that individuals lacked taxpayer standing to challenge Louisiana's issuance of pro-life license plates in part because the extra fees paid by drivers who purchased the plates could have covered the expenses associated with offering them and distributing the funds they raised. *Henderson*, 287 F.3d at 379–81.

That approach is appropriate, if at all, where the costs and benefits are of the same type and arise from the same transaction because the plaintiff has suffered no real injury. By contrast, other circuits have declined to consider offsetting benefits of different types or from different transactions.[35] Our sister

standing to challenge an Oklahoma statute that decreased Wyoming's severance-tax revenue by requiring some Oklahoma power plants to burn at least 10% Oklahoma-mined coal. *See Wyoming v. Oklahoma*, 502 U.S. 437, 447–50 (1992).

*Wyoming* controls here. The plaintiffs in *Pennsylvania* chose to base their tax credits on other states' tax policies; they could have used other methods to accomplish a similar result, such as basing the credits on residents' out-of-state incomes, rather than taxes actually paid to other states. By contrast, Wyoming did nothing to tie its severance tax to Oklahoma law. Like Wyoming, Texas has few options to avoid being affected by what it believes are unlawful changes to federal immigration policies: It must rely on federal immigration classifications if it seeks to issue licenses only to those lawfully present in the United States. The government acknowledges this in its motion for stay, noting that "[s]tates may choose to issue driver's licenses to deferred action recipients or not, as long as they base eligibility on federal immigration classifications rather than creating new state-law classifications of aliens." Because Texas does not have the level of choice the plaintiffs in *Pennsylvania* enjoyed, its injury is not self-inflicted.

[35] *See, e.g., NCAA v. Governor of N.J.*, 730 F.3d 208, 223 (3d Cir. 2013); *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 656–59 (9th Cir. 2011); *Ross v. Bank of Am., N.A.*

12

No. 15-40238

circuits' approach makes sense in that context because attempting to balance all costs and benefits associated with a challenged policy would leave plaintiffs without standing to challenge legitimate injuries, given that defendants could point to unrelated benefits, improperly shifting to the plaintiffs the burden of showing that the costs outweigh them.

Most of the benefits the government cites—increased tax revenue, decreased reliance on state-subsidized health care, and better financial support for DAPA beneficiaries' children—are wholly separate from the costs of issuing licenses. The other benefits it identifies—increased revenue from vehicle fees and decreased auto insurance costs—are more closely associated with the costs of issuing licenses, but the caselaw illustrates that they are still too far removed to be applied as offsets.

For example, in *NCAA*, 730 F.3d at 222–23, the Third Circuit held that sports leagues had standing to challenge New Jersey's plan to license sports betting even though the damage to the leagues' reputations could have been outweighed by increased interest in watching sports. Likewise, in *Markva*, 317 F.3d at 557–58, the Sixth Circuit held that grandparents who cared for dependent children had standing to challenge a requirement that they spend more of their own money before obtaining Medicaid benefits, as compared to similarly situated parents, even though the grandparents arguably received more of other types of welfare benefits. Here, as in those cases and others,[36]

---

*(USA)*, 524 F.3d 217, 222 (2d Cir. 2008); *Markva v. Haveman*, 317 F.3d 547, 557–58 (6th Cir. 2003); *see also* 13A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3531.4 (3d ed. 2015) ("Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury.").

[36] *See, e.g.*, *L.A. Haven Hospice*, 638 F.3d at 656–57 (holding that hospice had standing to challenge regulation that allegedly increased its liability even though regulation may have also saved it money); *Sutton v. St. Jude Med. S.C., Inc.*, 419 F.3d 568, 570–75 (6th Cir. 2005)

the benefits the government cites concern the same subject matter as the costs but do not arise from the same transaction, so we cannot consider them. Accordingly, Texas has likely asserted an injury that is "concrete, particularized, and actual or imminent." *Clapper*, 133 S. Ct. at 1147 (quoting *Monsanto*, 561 U.S. at 149).

## B.

Texas is likely to satisfy the second requirement by showing that its injury is "fairly traceable to the challenged action." *Id.* (quoting *Monsanto*, 561 U.S. at 149). As we have explained,[37] it is undeniable that DAPA would enable beneficiaries to apply for licenses, but the United States asserts that DAPA's incidental consequences are not cognizable injuries because the causal link is too attenuated. *Massachusetts v. EPA* establishes, much to the contrary, that Texas's injury suffices.

In *Massachusetts*, 549 U.S. at 526, the Court held that the erosion of the state's shoreline gave it standing to challenge the EPA's decision not to regulate greenhouse-gas emissions from new motor vehicles. The Court noted that the Clean Air Act authorizes judicial review of the EPA's denial of a rulemaking petition, a fact that "is of critical importance to the standing inquiry [because] 'Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before.'" *Id.* at 516 (quoting *Defenders of Wildlife*, 504 U.S. at 580). Moreover, "States are not normal litigants for the purposes of invoking federal jurisdiction," *id.* at 518, because they surrendered some of the sovereign powers necessary to protect themselves from harms such as climate change when they

---

(holding that patient had standing based on increased risk from defective medical device even though his device had not malfunctioned and had benefited him).

[37] *See supra* note 26 and accompanying text.

14

joined the union, *id.* at 519. That point was especially relevant because the EPA's inaction had caused the erosion of Massachusetts's sovereign territory. *See id.* "Given that procedural right and Massachusetts's stake in protecting its quasi-sovereign interests, the Commonwealth [was] entitled to special solicitude in [the] standing analysis." *Id.* at 520.

This case implicates the same concerns. Texas is exercising a procedural right: Just as the Clean Air Act ("CAA") authorizes judicial review of "final action taken[] by the Administrator," 42 U.S.C. § 7607(b)(1), the APA authorizes judicial review of "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704.[38] And Texas is protecting its quasi-sovereign interest in not being forced to choose between incurring costs and changing its driver's license regime.[39] Therefore, it is entitled to the same

---

[38] The fact that the CAA's review provision is more specific than the APA's is relevant to, but not dispositive of, our "special solicitude" analysis. The former's specificity may suggest that Congress meant for plaintiffs to have standing to challenge procedural violations of the CAA even if they would not have standing to challenge some analogous violations of the APA. That said, we routinely hold that plaintiffs have standing to challenge failures to comply with the APA's notice-and-comment requirements, *see, e.g.*, *United States v. Johnson*, 632 F.3d 912, 920–27 (5th Cir. 2011), and the Tenth Circuit treats the APA's review provision as sufficient to entitle a state to "special solicitude," at least in some circumstances, *see New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 694, 696 n.13 (10th Cir. 2009) (holding that the state was entitled to special solicitude where one of its claims was based on APA); *Crank*, 539 F.3d at 1241–42 (same where only claim was based on APA). Moreover, Texas's interest in not being pressured to change its law is more directly related to its sovereignty than was Massachusetts's interest in preventing the erosion of its shoreline. *See supra* notes 30–33 and accompanying text. Because of Texas's substantial interest, it is entitled to "special solicitude" here even though a state may not always be entitled to that presumption when seeking review under the APA—an issue we need not decide.

[39] *See Crank*, 539 F.3d at 1241–42 (reasoning that the state was entitled to special solicitude where its asserted injury was interference with enforcement of state law); *Tex. Office of Pub. Util. Counsel*, 183 F.3d at 449 ("[S]tates have a sovereign interest in 'the power to create and enforce a legal code.'" (quoting *Snapp*, 458 U.S. at 601)); *cf. Richardson*, 565 F.3d at 696 n.13 (state was entitled to special solicitude where its asserted injury was both harm to its land and financial loss).

"special solicitude" as was Massachusetts.[40]

The analysis of the "fairly traceable" requirement in *Massachusetts* is also highly relevant. The main causation issue was whether the connection between the EPA's inaction and the state's injury was too remote. *See Massachusetts*, 549 U.S. at 523. The EPA maintained that the injury was not cognizable, because regulating greenhouse-gas emissions from new motor vehicles would have done little to prevent the erosion of the state's land. *Id.* at 523–24. The Court rejected that theory, explaining that the fact "[t]hat a first step might be tentative does not by itself support the notion that federal courts lack jurisdiction to determine whether that step conforms to law" and that "reducing domestic automobile emissions [was] hardly a tentative step," in any event. *Id.* at 524.

The answer here is the same. Although Texas would not be directly regulated by DAPA, the program would have a direct and predictable effect on the state's driver's license regime, and the impact would be significant because at least 500,000 potential beneficiaries live in the state. Alternatively, Texas could change its law, but being pressured to do so is itself a substantial injury, as already discussed.

By contrast, where the Supreme Court has found that an injury is not fairly traceable, the intervening, independent act of a third party has been a necessary condition of the harm's occurrence, or the challenged action has played a minor role. For instance, the plaintiffs in *Clapper* lacked standing to challenge a section of the Foreign Intelligence Surveillance Act that they

---

[40] This panel heard over two hours of oral argument on this motion for stay. Government counsel was specifically asked to explain how the United States avoids the "special solicitude" language in its effort to defeat standing. Counsel acknowledged that he had no explanation.

alleged would lead to the monitoring of their communications. *Clapper*, 133 S. Ct. at 1155. For the asserted injury to occur, the Attorney General and the Director of National Intelligence would have had to authorize the collection of communications to which the plaintiffs were a party, the Foreign Intelligence Surveillance Court would have had to approve the surveillance, and the government would have had to succeed in intercepting the communications. *Id.* at 1148. Emphasizing its "usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors," the Court held that the plaintiffs had not satisfied the "fairly traceable" requirement.[41] Separately, the Court rejected the theory "that a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful—whether a trademark, the awarding of a contract, a landlord-tenant arrangement, or so on." *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 731 (2013). Myriad factors determine market shares, so it is difficult to trace a competitive injury to a particular decision benefiting a competitor.[42]

Texas's claim regarding driver's licenses suffers from neither of those deficiencies. The only intervening act of a third party is the beneficiaries'

---

[41] *Clapper*, 133 S. Ct. at 1150; *see also, e.g.*, *Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1447–48 (2011) (stating that taxpayers lacked standing to challenge tax credits that indirectly benefited religious schools in part because private individuals decided whether to use credits for religious schools); *Whitmore*, 495 U.S. at 156–57 (concluding that death-row inmate lacked standing to challenge another inmate's death sentence in part because it was unclear whether courts would rule favorably).

[42] *See also, e.g.*, *McConnell v. FEC*, 540 U.S. 93, 228 (2003) (deciding that candidates lacked standing to challenge increased hard-money limits because their inability to compete was also caused by their decisions not to accept large contributions), *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010); *Allen v. Wright*, 468 U.S. 737, 756–59 (1984) (holding that parents lacked standing to challenge tax exemptions for racially discriminatory private schools in part because effect on their children's ability to receive education in racially integrated public school depended on whether withdrawal of exemption would cause private schools to change policies and on the number of students who would transfer to public schools if they did so), *abrogated on other grounds by Lexmark*, 134 S. Ct. at 1388.

decisions to apply for licenses, but it is hardly speculative that they will do so—driving is a practical necessity in most of Texas, especially to get and hold a job, so many beneficiaries will be eager to obtain licenses. Further, DAPA is the only substantial cause of Texas's injury. In short, given the "special solicitude" that the Supreme Court directs us to afford to Texas, the parallels between this case and *Massachusetts*, and the differences between this case and those in which the Supreme Court has not found standing, the states are likely to satisfy the "fairly traceable" requirement.

C.

The third requirement, that the injury be "redressable by a favorable ruling," *Clapper*, 133 S. Ct. at 1147 (quoting *Monsanto*, 561 U.S. at 149), is easily met here. Enjoining the implementation of DAPA until it undergoes notice and comment could prompt DHS to reconsider its decision, which is all a litigant must show when asserting a procedural right. *See Massachusetts*, 549 U.S. at 518.

Thus, the government has not made a strong showing that it is likely to succeed on the merits of its notion that the states lack standing. At least one state—Texas—is likely to satisfy all three requirements, so the government's challenge to standing is without merit.

IV.

In addition to having standing, the states must seek to protect interests that are "arguably within the zone of interests to be protected or regulated by the statute . . . in question."[43] Under "the 'generous review provisions' of the

---

[43] *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 396 (1987) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).

APA,"[44] that "test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff."[45] "We apply the test in keeping with Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable,'" and "the benefit of any doubt goes to the plaintiff."[46] The states would fail the test only if their "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."[47]

The government has not made a strong showing that the interests the states seek to protect fall outside the zone of interests of the Immigration and Nationality Act ("INA"). "The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States," which "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 132 S. Ct. 2492, 2500 (2012). In recognition of that fact, Congress permits states to deny many benefits to illegal aliens.[48] Knowing that they may not enforce laws that conflict with federal law, *see, e.g., Arizona*, 132 S. Ct. at 2510, the states seek only to be heard in the formulation of immigration policy before it imposes substantial costs on them. "Consultation between federal and state officials is an important feature of the immigration system," *id.* at 2508, and

---

[44] *Id.* at 400 n.16 (quoting *Data Processing*, 397 U.S. at 156).

[45] *Id.* at 399–400 (footnote omitted).

[46] *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quoting *Sec. Indus. Ass'n*, 479 U.S. at 399–400).

[47] *Id.* (quoting *Sec. Indus. Ass'n*, 479 U.S. at 399).

[48] *See* 8 U.S.C. § 1621 (identifying aliens ineligible "for any State or local public benefit," § 1621(a) and noting that "[a] State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible," § 1621(d)); *United States v. Alabama*, 691 F.3d 1269, 1298 (11th Cir. 2012) (noting that driver's licenses fall within definition of "public benefit" in § 1621(c)).

19

the notice-and-comment process, which "is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making,"[49] facilitates such communication. The states easily satisfy the zone-of-interests test.

## V.

In deciding whether the United States has made a strong showing that judicial review is precluded, we are mindful that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."[50] But judicial review is unavailable "to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a).

### A.

"[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 350 (1984) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)). That "standard is not a rigid evidentiary test but a useful reminder . . . that, where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *Id.* at 351. "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action

---

[49] *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979).

[50] 5 U.S.C. § 702. The government does not dispute that DAPA is a "final agency action." *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990).

involved." *Id.* at 345.

The United States maintains that 8 U.S.C. § 1252(g)[51] expressly prohibits judicial review, but that provision is not "a sort of 'zipper' clause that says 'no judicial review in deportation cases unless this section provides judicial review'"; instead, it "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'"[52] It is inapplicable here because (1) the states are not bringing a "cause or claim by or on behalf of any alien," and (2) the action does not "aris[e] from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien." § 1252(g).

Nor does the government's broad and exclusive authority over immigration policy mean that review is implicitly barred.[53] The INA has numerous specific jurisdiction-stripping provisions[54] that would be rendered superfluous

---

[51] With limited exceptions, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g).

[52] *Reno v. Am.-Arab Anti-Discrimination Comm. (AAADC)*, 525 U.S. 471, 482 (1999) (quoting § 1252(g)).

[53] Although "private persons . . . have no judicially cognizable interest in procuring enforcement of the immigration laws," *Sure-Tan*, 467 U.S. at 897; *accord Fiallo*, 430 U.S. at 792 (emphasizing government's authority over immigration), neither the preliminary injunction nor the notice-and-comment process requires the government to enforce the immigration laws.

[54] *See AAADC*, 525 U.S. at 486–87 (listing "8 U.S.C. § 1252(a)(2)(A) (limiting review of any claim arising from the inspection of aliens arriving in the United States), [(B)] (barring review of denials of discretionary relief authorized by various statutory provisions), [(C)] (barring review of final removal orders against criminal aliens), [(b)(4)(D)] (limiting review of asylum determinations)"); *see also, e.g.*, 8 U.S.C. §§ 1182(a)(9)(B)(v) (barring review of waiver of reentry restrictions); 1226a(b)(1) (limiting review of detention of terrorist aliens); 1229c(e) (barring review of regulations limiting eligibility for voluntary departure), (f) (limiting review of denial of voluntary departure).

21

by application of an implied, overarching principle prohibiting review.[55] Such a conclusion would be contrary to *AAADC*, 525 U.S. at 482, in which the Court noted that § 1252(g) does not "impose a general jurisdictional limitation; and that those who enacted IIRIRA were familiar with the normal manner of imposing such a limitation."[56]

Moreover, judicial review of an action brought by states to enforce procedural rights under the APA is consistent with the protections Congress affords to states that decline to provide benefits to illegal aliens. As we have explained,[57] Texas, as permitted by § 1621, subsidizes driver's licenses to, *inter alia*, lawfully present aliens but declines to issue them to those unlawfully present. And the state seeks to participate in notice and comment before the Secretary changes the designation of 500,000 aliens residing there in such a way that would cause the state to incur substantial costs.

The Supreme Court's discussion of deferred action in *AAADC* suggests that judicial review may be available if there is an indication that deferred-action decisions are not made on a case-by-case basis. There, a group of aliens sought to stop deportation proceedings against them, but § 1252(g) deprived the courts of jurisdiction. *AAADC*, 525 U.S. at 487. Noting that § 1252(g) codified the Secretary's discretion to decline "the initiation or prosecution of various stages in the deportation process," *id.* at 483, the Court observed that "[p]rior to 1997, deferred-action decisions were governed by internal

---

[55] *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . ." (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).

[56] "The Illegal Immigration Reform and Immigrant Responsibility Act of 1996, ('IIRIRA'), Pub. L. 104–208, 110 Stat. 3009, amended the INA's provisions pertaining to removal of aliens and enacted new judicial review provisions, codified at 8 U.S.C. § 1252." *Mejia Rodriguez v. DHS*, 562 F.3d 1137, 1142 n.12 (11th Cir. 2009) (per curiam).

[57] *See supra* note 48 and accompanying text.

No. 15-40238

[Immigration and Naturalization Service ("INS")] guidelines which considered [a variety of factors]," *id.* at 484 n.8. Although those guidelines had since been rescinded, the Court noted that "there [was] no indication that the INS has ceased making this sort of determination on a case-by-case basis." *Id.* The United States has not rebutted the strong presumption of reviewability with clear and convincing evidence that the INA precludes review.[58]

## B.

The Secretary does, nonetheless, have broad enforcement discretion and maintains that deferred action under DAPA—a grant of "lawful presence" and subsequent eligibility for otherwise unavailable benefits—is a presumptively unreviewable exercise of that discretion.[59] "The general exception to reviewability provided by § 701(a)(2) for action 'committed to agency discretion' remains a narrow one, but within that exception are included agency refusals to institute investigative or enforcement proceedings, unless Congress has indicated otherwise."[60] When, however, "an agency *does* act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner. The action at least can be reviewed to determine whether the agency exceeded its statutory powers." *Chaney*, 470 U.S. at 832.

Some features of DAPA are similar to prosecutorial discretion: DAPA

---

[58] *See, e.g., Gulf Restoration Network v. McCarthy*, No. 13-31214, 2015 WL 1566608, at \*4 (5th Cir. Apr. 7, 2015) ("[T]here is a 'strong presumption,' subject to Congressional language, that 'action taken by a federal agency is reviewable in federal court.'" (quoting *RSR Corp. v. Donovan*, 747 F.2d 294, 299 n.23 (5th Cir. 1984))).

[59] *See Arizona*, 132 S. Ct. at 2499 ("A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." (citation omitted)).

[60] *Chaney*, 470 U.S. at 838 (citation omitted); *see Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993).

23

## No. 15-40238

amounts to the Secretary's decision—at least temporarily— not to enforce the immigration laws as to a class of what he deems to be low-priority aliens.[61] If that were all DAPA involved, we would have a different case. DAPA's version of deferred action, however, is more than nonenforcement: It is the affirmative act of conferring "lawful presence" on a class of unlawfully present aliens.[62] Though revocable, that new designation triggers eligibility for federal[63] and state[64] benefits that would not otherwise be available.[65]

"[A]lthough prosecutorial discretion is broad, it is not 'unfettered.'"[66] Declining to prosecute does not convert an act deemed unlawful by Congress into a lawful one and confer eligibility for benefits based on that new

---

[61] The preliminary injunction does not require the Secretary to deport any alien or to alter his enforcement priorities, and the states have not challenged the priority levels he has established. *See* Memorandum from Jeh Johnson, Sec'y, Dep't of Homeland Sec., to Thomas Winkowski, Acting Dir., U.S. Immigration and Customs Enforcement, et al. (Nov. 20, 2014) (the "Prioritization Memo"), *available at* http://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf.

[62] *See* DAPA Memo, *supra* note 7, at 2; *supra* note 9 and accompanying text. Although "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States," it is a civil offense. *Arizona*, 132 S. Ct. at 2505; *see* 8 U.S.C. §§ 1182(a)(9)(B)(i), 1227(a)(1)(A)–(B).

[63] *See supra* notes 10–143 and accompanying text. DAPA also tolls the recipients' unlawful presence under the INA's reentry bars, which will benefit aliens who receive lawful presence as minors because the unlawful-presence clock begins to run only at age 18. *See* 8 U.S.C. § 1182(a)(9)(B)(iii). Tolling will not help most adult beneficiaries because one must have continuously resided in the United States since before January 1, 2010, to be eligible for DAPA, and therefore will likely already be subject to the reentry bar for aliens who have "been unlawfully present in the United States for one year or more." § 1182(a)(9)(B)(i)(II), (C)(i)(I).

[64] *See supra* notes 14 and 26 and accompanying text.

[65] *Cf.* Memorandum from James Cole, Deputy Att'y Gen., to All United States Attorneys (Aug. 29, 2013) (the "Cole Memo"), *available at* http://www.justice.gov/iso/opa/resources/3052013829132756857467.pdf. The Cole Memo does not direct an agency to grant any type of affirmative benefit to anyone engaged in unlawful conduct, whereas the DAPA Memo directs an agency to grant lawful presence and provides eligibility for employment authorization and other federal and state benefits to certain illegally present aliens.

[66] *Wayte v. United States*, 470 U.S. 598, 608 (1985) (quoting *United States v. Batchelder*, 442 U.S. 114, 125 (1979)) (internal quotation mark omitted).

classification. Regardless of whether the Secretary has the authority to offer those incentives for participation in DAPA, his doing so is not shielded from judicial review as an act of prosecutorial discretion.[67] And as shown above,[68] neither the preliminary injunction nor compliance with the APA requires the Secretary to prosecute deportable aliens or change his enforcement priorities.

Our conclusion is bolstered by the Supreme Court's description of deferred action in *AAADC*:

> To ameliorate a harsh and unjust outcome, the INS may *decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation.* This commendable exercise in administrative discretion, developed without express statutory authorization, originally was known as nonpriority and is now designated as deferred action.... *Approval of deferred action status means that . . . no action will thereafter be taken to proceed against an apparently deportable alien,* even on grounds normally regarded as aggravated.[69]

Unlike the claim in *AAADC*, the states' procedural claim does not involve a

---

[67] Offering lawful presence and other benefits may ultimately help the Secretary enforce immigration laws more efficiently because those benefits make deportable aliens likely to self-identify, but not all inducements fall within the narrow exception for actions "committed to agency discretion." *See Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2446 (2014) ("An agency confronting resource constraints may change its own conduct, but it cannot change the law."). As discussed in part V.C, *infra*, we do not interpret the INA, at least at this early stage of the case, as conferring unreviewable discretion on the Secretary to grant the class-based lawful presence and eligibility for benefits at issue in DAPA.

[68] *See supra* note 61.

[69] *AAADC*, 525 U.S. at 484 (emphasis added) (quoting 6 C. GORDON, S. MAILMAN & S. YALE-LOEHR, IMMIGRATION LAW AND PROCEDURE § 72.03[2][h] (1998)); *accord Johns v. Dep't of Justice*, 653 F.2d 884, 890 (5th Cir. 1981) ("The Attorney General also determines whether (1) to refrain from (or, in administrative parlance, to defer in) executing an outstanding order of deportation, or (2) to stay the order of deportation." (footnote omitted)); *see also Yoon v. INS*, 538 F.2d 1211, 1213 (5th Cir. 1976) (per curiam). Those decisions do not address the unique features of DAPA—class-wide eligibility, derived from a child's legal status, for lawful presence and accompanying eligibility for work authorization and other benefits. *See Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 596 n.27 (5th Cir. 1995) ("[T]he fact that we previously found another FDA compliance policy guide to be a policy statement is not dispositive whether [this guide] is a policy statement."); *infra* note 92 (discussing factual disputes in comparison between DAPA and previous deferred-action programs).

25

No. 15-40238

challenge to the Secretary's decision to "decline to institute proceedings, ter-
minate proceedings, or decline to execute a final order of deportation," nor does
deferred action pursuant to DAPA mean merely that "no action will thereafter
be taken to proceed against an apparently deportable alien." Under DAPA,
"[d]eferred action . . . means that, for a specified period of time, an individual
is permitted to be *lawfully present* in the United States,"[70] a change in desig-
nation that confers eligibility for federal and state benefits on a class of aliens
who would not otherwise qualify.[71] Therefore, DAPA "provides a focus for judi-
cial review, inasmuch as the agency must have exercised its power in some
manner. The action at least can be reviewed to determine whether the agency
exceeded its statutory powers."[72]

## C.

"There is no judicial review of agency action 'where statutes [granting
agency discretion] are drawn in such broad terms that in a given case there is
no law to apply.'"[73] For example, "[t]he allocation of funds from a lump-sum
appropriation," *Vigil*, 508 U.S. at 192, is one of "those rare circumstances
where the relevant statute 'is drawn so that a court would have no meaningful
standard against which to judge the agency's exercise of discretion.'"[74] The
district court did not rule on the substantive APA claims, and we do not decide

---

[70] DAPA Memo, *supra* note 7, at 2 (emphasis added).

[71] *See supra* notes 10–14 and accompanying text.

[72] *Chaney*, 470 U.S. at 832. Having concluded that DAPA's version of deferred
action—at least to the extent that it confers lawful presence—is not an exercise of enforce-
ment discretion committed to agency action, we do not reach the issue of whether the pre-
sumption against review of such discretion is rebutted. *See id.* at 832–34; *Adams v. Richard-
son*, 480 F.2d 1159, 1161–62 (D.C. Cir. 1973) (en banc) (per curiam).

[73] *Perales v. Casillas*, 903 F.2d 1043, 1047 (5th Cir. 1990) (alteration in original) (quot-
ing *Overton Park*, 401 U.S. at 410) (internal quotation marks omitted).

[74] *Vigil*, 508 U.S. at 191 (quoting *Chaney*, 470 U.S. at 830).

26

No. 15-40238

whether the Secretary has the authority to implement DAPA. We do note, however, that even granting "special deference,"[75] the INA provisions cited by the government for that proposition cannot reasonably be construed, at least at this early stage of the case, to confer *unreviewable* discretion.

The INA expressly identifies legal designations allowing defined classes of aliens to reside lawfully in the United States[76] and eligibility for "discretionary relief allowing [aliens in deportation proceedings] to remain in the country,"[77] including narrow classes of aliens eligible for deferred action.[78] The Act also specifies classes of aliens eligible[79] and ineligible[80] for work

---

[75] *Texas,* 106 F.3d at 666 ("Courts must give special deference to congressional and executive branch policy choices pertaining to immigration.").

[76] *E.g.,* lawful-permanent-resident ("LPR") status, *see* 8 U.S.C. §§ 1101(a)(20), 1255; nonimmigrant status, *see* §§ 1101(a)(15), 1201(a)(1); refugee and asylum status, *see* §§ 1101(a)(42), 1157–59, 1231(b)(3); humanitarian parole, *see* § 1182(d)(5); temporary protected status, *see* § 1254a. *Cf.* §§ 1182(a) (inadmissible aliens), 1227(a)–(b) (deportable aliens).

[77] *Arizona,* 132 S. Ct. at 2499 (citing 8 U.S.C. §§ 1158 (asylum), 1229b (cancellation of removal), 1229c (voluntary departure)); *see also* § 1227(d) (administrative stay of removal for T- and U-visa applicants (victims of human trafficking, or of various serious crimes, who assist law enforcement)).

[78] *See* 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (certain petitioners for immigration status under the Violence Against Women Act of 1994 ("VAWA"), Pub. L. No. 103-322, tit. IV, § 40701(a), 108 Stat. 1796, 1953–54); USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361 (immediate family members of LPRs killed by terrorism); National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)–(d), 117 Stat. 1392, 1694–95 (immediate family members of LPRs killed in combat and granted posthumous citizenship); *see also* 8 U.S.C. § 1227(d)(2) ("The denial of a request for an administrative stay of removal [for T- and U-visa applicants] shall not preclude the alien from applying for . . . deferred action, or a continuance or abeyance of removal proceedings under any other provision of the immigration laws . . . .").

[79] *E.g.,* 8 U.S.C. §§ 1101(i)(2) (human-trafficking victims in lawful-temporary-resident status pursuant to a T visa), 1105a(a) (nonimmigrant battered spouses), 1154(a)(1)(K) (grantees of VAWA self-petitions), 1158(c)(1)(B), (d)(2) (asylum applicants and grantees), 1160(a)(4) (certain agricultural workers in lawful-temporary-resident status), 1184(c)(2)(E), (e)(6) (spouses of L- and E-visa holders), (p)(3)(B) (certain victims of criminal activity in lawful-temporary-resident status pursuant to a U visa), 1254a(a)(1)(B) (temporary-protected-status holders), 1255a(b)(3)(B) (temporary-resident-status holders).

[80] *E.g.,* 8 U.S.C. §§ 1226(a)(3) (limits on work authorizations for aliens with pending

27

authorization, including those "eligible for work authorization and deferred action," *supra* note 78. Although the Secretary is given discretion to make immigration decisions based on humanitarian concerns, that discretion is authorized for particular family relationships and specific forms of relief.[81] Congress has developed an intricate process for unlawfully present aliens to reside lawfully (albeit with legal status as opposed to lawful presence) in the United States on account of their child's citizenship.[82] Moreover, judicial review of many decisions is expressly limited or precluded, *supra* note 54, including some that are made in the Secretary's "sole and unreviewable discretion."[83]

Against that background, we would expect to find an explicit delegation of authority to implement DAPA—a program that makes 4.3 million otherwise removable aliens eligible for lawful presence, work authorization, and associated benefits—but no such provision exists.[84]     Perhaps the closest is

---

removal proceedings), 1231(a)(7) (limits on work authorizations for aliens ordered removed).

[81] *See e.g.*, 8 U.S.C. §§ 1182(a)(9)(B)(v), (C)(iii) (authorizing waiver of reentry bars for particular classes of inadmissible aliens), 1227(a)(1)(E)(iii) (authorizing waiver of inadmissibility for smuggling by particular classes of aliens), 1229b(b)(1)(A), (D) (authorizing cancellation of removal and adjustment of status if, *inter alia*, "the alien has been physically present in the United States for a continuous period of *not less than 10 years* immediately preceding the date of such application" and "removal would result in *exceptional and extremely unusual hardship* to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence" (emphasis added)).

[82] In general, an applicant must (i) have a child who is at least 21 years old, (ii) leave the United States, (iii) wait 10 years, and then (iv) obtain a family-preference visa from a United States consulate. *See* 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255. DAPA allows a parent to derive lawful presence from his or her child's LPR status, although the INA does not contain a family-sponsorship process for parents of an LPR child. *See* 8 U.S.C. §§ 1151(b)(2)(A)(i), 1152(a)(4), 1153(a).

[83] *E.g.*, 8 U.S.C. §§ 1613(c)(2)(G), 1621(b)(4), 1641.

[84] *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("[W]e must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency.").

28

§ 1324a(h)(3),[85] a definitional provision[86] that does not mention lawful presence or deferred action.

Likewise, we do not construe the broad grants of authority in 6 U.S.C. § 202(5),[87] 8 U.S.C. § 1103(a)(3),[88] or § 1103(g)(2)[89] as assigning unreviewable "decisions of vast 'economic and political significance'"[90] to an agency. Presumably because there is no specific statutory basis for DAPA, the United States suggests that its authority is grounded in historical practice, but that "does not, by itself, create power."[91] Even assuming that an amalgamation of

---

[85] "As used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General."

[86] *See Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

[87] "The Secretary . . . shall be responsible for . . . [e]stablishing national immigration enforcement policies and priorities."

[88] "The Secretary . . . shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter."

[89] "The Attorney General shall establish such regulations, prescribe such forms of bond, reports, entries, and other papers, issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out this section."

[90] *Util. Air*, 134 S. Ct. at 2444 (quoting *Brown & Williamson*); *accord id.* ("When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' we typically greet its announcement with a measure of skepticism. We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" (citation omitted) (quoting *Brown & Williamson*, 529 U.S. at 159)); *Perales*, 903 F.2d at 1051 ("The mere fact that a statute grants broad discretion to an agency does not render the agency's decisions completely unreviewable under the 'committed to agency discretion by law' exception unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised." (quoting *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) (per curiam)).

[91] *Medellin v. Texas*, 552 U.S. 491, 532 (2008) (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981)); *but see NLRB v. Noel Canning*, 134 S. Ct. 2550, 2560 (2014) ("[T]he longstanding 'practice of the government,' can inform our determination of 'what the law is.'"

historical practice,[92] congressional acquiescence, the immigration context, and the INA provide authority for DAPA, it would be bold and premature for us to conclude that an as-yet-undefined delegation is beyond the scope of judicial review.

Our decision in *Perales* is not to the contrary. There, we recognized that the INS's decision *not* to grant pre-hearing voluntary departures and work authorizations to a group of aliens was committed to agency discretion because "there is nothing in the [INA] expressly providing for the grant of employment authorization or pre-hearing voluntary departure . . . to [that class of aliens]." *Perales*, 903 F.2d at 1047. "An agency's inaction in such a situation is necessarily exempt from judicial review because there are no meaningful standards against which to judge the agency's exercise of discretion." *Id.* In this case, however, issuing work authorizations to DAPA beneficiaries is an affirmative action, and whether the Secretary has the authority to do so remains an open question.

And even assuming the Secretary has that power, it is the designation of lawful presence *itself*—the prerequisite for work authorization under DAPA— that causes Texas's injury because a document showing legal presence makes one eligible for a driver's license.[93] The Secretary's authority to grant lawful

---

(quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 401, and *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176)).

[92] Many aspects of previous deferred-action programs have not been precisely explained at this early stage of the litigation, particularly whether they granted "lawful presence" or were purely non-enforcement decisions, whether the beneficiaries were merely given a temporary reprieve while transitioning from one lawful status to another, whether the programs were interstitial to a statutory legalization scheme, whether they are comparable in scale and scope to DAPA, and whether Congress's failure to enact the DREAM Act bears on its acquiescence to DAPA. Because the district court has not yet resolved those factual issues, historical practice does not clarify our understanding of the reviewability of DAPA.

[93] *See supra* notes 14 and 26 and accompanying text.

30

No. 15-40238

presence was not at issue in *Perales*. Moreover, in *Perales, id.* at 1048, the Attorney General had explicit statutory discretion to authorize pre-hearing voluntary departures—discretion the INA does not specifically confer here.

The government asserts that 8 C.F.R. § 274a.12(c)(14),[94] rather than DAPA, makes aliens granted deferred action eligible for work authorizations. But if DAPA's class-based deferred action program, on which work authorizations are contingent, must be subjected to the notice-and-comment process, then work authorizations may not be validly issued pursuant to it until that process has been completed. And again, it is DAPA's version of deferred action *itself*—the designation of "lawful presence"—that causes Texas's injury.[95]

## VI.

Because the United States has not made a strong showing that judicial review is precluded, we must decide whether it has made a strong showing that DAPA does not require notice and comment. The government does not dispute that DAPA is a rule[96]; it urges instead that DAPA is exempt as an "interpretative rule[], general statement[] of policy, or rule[] of agency organization, procedure, or practice," § 553(b)(A), or "a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts," § 553(a)(2). "The 'APA's notice-and-comment exemptions must be

---

[94] "An alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority, [may be able to obtain work authorization upon application] if the alien establishes an economic necessity for employment."

[95] *See supra* notes 14 and 26 and accompanying text. Moreover, it would be reasonable to construe § 274a.12(c)(14) as pertaining only to those classes of aliens identified by Congress as eligible for deferred action and work authorization. *See supra* note 78.

[96] The APA defines a "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes [various substantive agency functions] or practices bearing on any of the foregoing." 5 U.S.C. § 551(4).

31

No. 15-40238

narrowly construed'" and if a rule is "substantive," all "notice-and-comment requirements must be adhered to scrupulously."[97]

## A.

The government's main argument is that DAPA is a policy statement. We consider two criteria to determine whether a purported policy statement is actually a substantive rule: whether it (1) "impose[s] any rights and obligations" and (2) "genuinely leaves the agency and its decisionmakers free to exercise discretion."[98] There is some overlap between those criteria "because '[i]f a statement denies the decisionmaker discretion in the area of its coverage . . . then the statement is binding, and creates rights or obligations.'"[99] "While mindful but suspicious of the agency's own characterization, we . . . focus[] primarily on whether the rule has binding effect on agency discretion or severely restricts it."[100]

---

[97] *Prof'ls & Patients*, 56 F.3d at 595 (quoting *United States v. Picciotto*, 875 F.2d 345, 347 (D.C. Cir. 1989)); *see Pickus v. U.S. Bd. of Parole*, 507 F.2d 1107, 1112 (D.C. Cir. 1974) ("[T]he interested public should have an opportunity to participate, and the agency should be fully informed, before rules having . . . substantial impact are promulgated.").

[98] *Prof'ls & Patients*, 56 F.3d at 595 (quoting *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987) (per curiam)); *see also Vigil*, 508 U.S. at 197 (describing general statements of policy "as 'statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'" (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979))); *id.* ("Whatever else may be considered a 'general statemen[t] of policy,' the term surely includes an announcement . . . that an agency will discontinue a discretionary allocation of unrestricted funds from a lump-sum appropriation." (alteration in original)); *Brown Express, Inc. v. United States*, 607 F.2d 695, 701 (5th Cir. 1979) ("A general statement of policy is a statement by an administrative agency announcing motivating factors the agency will consider, or tentative goals toward which it will aim, in determining the resolution of a [s]ubstantive question of regulation.").

[99] *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002) (quoting *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988)).

[100] *Prof'ls & Patients*, 56 F.3d at 595 (footnote omitted); *accord id.* ("[W]e are to give some deference, 'albeit not overwhelming,' to the agency's characterization of its own rule." (quoting *Cmty. Nutrition Inst. v. Young*, 818 F.2d at 946) (internal quotation marks omitted)); *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616, 619 (5th Cir. 1994) ("This court, however, must determine the category into which the rule falls: '[T]he label that the particular agency

32

Extrapolating from the implementation of DACA,[101] the district court determined that "[n]othing about DAPA '*genuinely* leaves the agency and its [employees] free to exercise discretion,'"[102] a finding that is reviewed for clear error. Although the DACA Memo instructed agencies to review applications on a case-by-case basis and exercise discretion, the court found that those statements were "merely pretext" because only around 5% of the 723,000 applications have been denied.[103] "Despite a request by the [district] [c]ourt, the [g]overnment's counsel did not provide the number, if any, of requests that were denied [for discretionary reasons] even though the applicant met the DACA criteria . . . ."[104] The court's finding was also based on a declaration by

---

puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather it is what the agency does in fact.'" (alteration in original) (quoting *Brown Express*, 607 F.2d at 700)).

[101] *See Gen. Elec.*, 290 F.3d at 383 ("[A]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding."); 3 JACOB A. STEIN ET AL., ADMINISTRATIVE LAW § 15.05[3] (2014) ("In general, the agency's past treatment of a rule will often indicate its nature.").

[102] *Texas*, 2015 WL 648579, at *55 (second alteration in original) (quoting *Prof'ls & Patients*, 56 F.3d at 595). To the extent that the government maintains that the proper focus of the inquiry into the binding nature of the DAPA Memo is on whether the agency has bound itself—rather than on whether agency officials have bound their subordinates—the government confuses the test for determining whether a purported policy statement is actually a substantive rule with the notice-and-comment exception for internal directives, discussed *infra* part VI.B. An agency action is not exempt as a policy statement just because the agency purports to retain discretion; whether the agency in fact retains discretion is determined, at least in part, by whether its decisionmakers are actually free to exercise discretion. *See supra* notes 98–100 and accompanying text. Of course, as discussed *infra* part VI.B, a lack of discretion by subordinates does not necessarily mean that a directive is subject to notice and comment; subordinates are expected to adhere to internal directives.

[103] *See id.* at *4–5, *55 n.101. Of the at least 1.2 million persons who qualify for DACA, approximately 723,000 had applied through 2014. About 636,000 had been accepted, some decisions were still pending, and only about 5% had been denied, with the top reasons being the following: "(1) the applicant used the wrong form; (2) the applicant failed to provide a valid signature; (3) the applicant failed to file or complete Form I-765 or failed to enclose the fee; and (4) the applicant was below the age of fifteen and thus ineligible to participate in the program." *Id.* at *4–5.

[104] *Id.* at *5. The parties submitted over 200 pages of briefing over a two-month period,

33

Kenneth Palinkas, the president of the union representing the USCIS employees processing the DACA applications, that "DACA applications are simply rubberstamped if the applicants meet the necessary criteria," *id.*; DACA's Operating Procedures, which "contains nearly 150 pages of specific instructions for granting or denying deferred action," *id.* at *55 (footnote omitted); and mandatory language in the DAPA Memo, *id.* at *39, *56 n.103.

The agency's characterization of both the DACA and DAPA criteria exudes discretion—using terms such as "guidance," "case-by-case," and "prosecutorial discretion."[105] But a rule can be binding if it is "applied by the agency in a way that indicates it is binding,"[106] and the states offered evidence from DACA's implementation that DAPA's discretionary language was pretextual. The programs are not completely analogous, however: Many more persons are eligible for DAPA,[107] and eligibility for DACA was restricted to a younger population—suggesting that DACA applicants are less likely to have backgrounds that would warrant a discretionary denial. The DAPA Memo also contains more discretionary criteria: Applicants must not be "an enforcement priority as reflected in the [Prioritization Memo]; and [must] present no other factors that, in the exercise of discretion, makes the grant of deferred action

---

supported by more than 80 exhibits. The district court held a hearing on the motion for a preliminary injunction and heard extensive argument from both sides and "specifically asked for evidence of individuals who had been denied for reasons other than not meeting the criteria or technical errors with the form and/or filing." *Id.* at *55 n.101.

[105] *See* DACA Memo, *supra* note 2; DAPA Memo, *supra* note 7.

[106] *Gen. Elec.*, 290 F.3d at 383; *accord McLouth Steel*, 838 F.2d at 1321–22 (reviewing historical conformity as part of determination of whether rule was substantive or non-binding policy, despite language in rule indicating that it was policy statement); *id.* at 1321 ("More critically than EPA's language . . . its later conduct applying it confirms its binding character.").

[107] Approximately 1.2 million persons are eligible for DACA and 4.3 million for DAPA. *See Texas*, 2015 WL 648579, at *4, *55.

## No. 15-40238

inappropriate."[108] Despite those differences, there are important similarities: The Secretary "direct[ed] USCIS to establish a process, *similar to DACA*, for exercising prosecutorial discretion,"[109] and there was evidence that the DACA application process *itself* did not allow for discretion, regardless of the approval rate.

We are attentive to the difficulty of evaluating an agency's discretion where the action involves issuing benefits to self-selecting applicants, as distinguished from imposing obligations on a regulated industry. Although a person who expected to be denied DACA relief for discretionary reasons would be unlikely to apply, the self-selection issue is mitigated by the district court's finding that "the [g]overnment has publicly declared that it will make no attempt to enforce the law against even those who are denied deferred action (absent extraordinary circumstances)." *Texas*, 2015 WL 648579 at *50.

Moreover, the court did not rely exclusively on DACA's approval rate. It also considered the detailed nature of the DACA Operating Procedures and the declaration from Palinkas that, as with DACA, the DAPA application process itself would preclude discretion: "[R]outing DAPA applications through service centers instead of field offices . . . created an application process that bypasses traditional in-person investigatory interviews with trained USCIS adjudications officers" and "prevents officers from conducting case-by-case investigations, undermines officers' abilities to detect fraud and national-security risks, and ensures that applications will be rubber-stamped."

There was conflicting evidence on the degree to which DACA allowed for discretion. Donald Neufeld, the Associate Director for Service Center

---

[108] DAPA Memo, *supra* note 7, at 4.

[109] *Id.* (emphasis added).

Operations for USCIS, declared that "deferred action under DACA is a . . . case-specific process" that "necessarily involves the exercise of the agency's discretion" and purported to identify several instances of discretionary denials.[110] Although he stated that officials made approximately 200,000 requests for more evidence after receiving DACA applications, the government does not know the number, if any, that pertained to discretionary factors rather than the objective criteria. Likewise, the government did not offer the number of cases service center officials referred to field offices for interviews.[111] The United States has not made a strong showing that it was clearly erroneous to find that DAPA would not genuinely leave the agency and its employees free to exercise discretion.[112]

## B.

A lack of discretion does not trigger notice-and-comment rulemaking if the rule is one "of agency organization, procedure, or practice," § 553(b)(A); agencies and their employees are of course expected to adhere to such rules.

---

[110] The states dispute whether those denials were actually discretionary or instead were required because of failures to meet DACA's objective criteria.

[111] Neufeld stated that "[u]ntil very recently, USCIS lacked any ability to automatically track and sort the reasons for DACA denials." Although the district court did not hold an evidentiary hearing or make a formal credibility determination as to the conflicting statements by Neufeld and Palinkas, the record indicates that it did not view the Neufeld declaration as creating a material factual dispute. Following a hearing on the preliminary injunction, the government filed a surreply containing the Neufeld declaration. Although the government did not seek an evidentiary hearing, the states requested one if the "new declarations create a fact dispute of material consequence to the motion." No such hearing was held, and the court cited the Palinkas declaration favorably, *Texas*, 2015 WL 648579 at *5, *8 n.13, *38 n.55, but described the Neufeld declaration as providing insufficient detail, *id.* at *5, 55 n.101.

[112] Because DAPA is much more than a nonenforcement policy, which is presumptively committed to agency discretion, *see supra* part V.B, requiring it to go through notice and comment does not mean that a traditional nonenforcement policy would also be subject to those requirements, assuming that a party even had standing to challenge it. Moreover, a nonenforcement policy may be exempted as a rule "of agency organization, procedure, or practice." *See infra* part VI.B.

36

We use "the substantial impact test [as] the primary means . . . [to] look beyond the label 'procedural' to determine whether a rule is of the type Congress thought appropriate for public participation."[113] "An agency rule that modifies substantive rights and interests can only be nominally procedural, and the exemption for such rules of agency procedure cannot apply."[114] DAPA modifies substantive rights and interests—conferring lawful presence on 500,000 illegal aliens in Texas forces the state to choose between spending millions of dollars to subsidize driver's licenses and changing its law.

The District of Columbia Circuit has enunciated a more intricate process for distinguishing between procedural and substantive rules.[115] The court first looks at the "effect on those interests ultimately at stake in the agency proceeding."[116] "Hence, agency rules that impose 'derivative,' 'incidental,' or 'mechanical' burdens upon regulated individuals are considered procedural, rather than substantive."[117] Further, "a procedural rule generally may not 'encode [] a substantive value judgment or put[] a stamp of approval or disapproval on a given type of behavior,'"[118] but "the fact that the agency's decision

---

[113] *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984); *accord* STEIN, *supra* note 101, §15.05[5] ("Procedural and practice rules have been distinguished from substantive rules by applying the substantial impact test.").

[114] *Kast Metals*, 744 F.2d at 1153; *accord Brown Express*, 607 F.2d at 701–03.

[115] *Compare Kaspar Wire Works, Inc. v. Sec'y of Labor*, 268 F.3d 1123, 1132 (D.C. Cir. 2001) (recognizing that the D.C. Circuit has expressly rejected "the Fifth Circuit's 'substantial impact' standard for notice and comment requirements"), *with City of Arlington, Tex. v. FCC*, 668 F.3d 229, 245 (5th Cir. 2012), *aff'd*, 133 S. Ct. 1863 (2013) ("The purpose of notice-and-comment rulemaking is to assure fairness and mature consideration of rules having a substantial impact on those regulated." (quoting *United States v. Johnson*, 632 F.3d 912, 931 (5th Cir. 2011))), *and Phillips Petroleum*, 22 F.3d at 620 (reaffirming substantial impact test announced in *Brown Express*).

[116] *Nat'l Sec. Counselors v. CIA*, 931 F. Supp. 2d 77, 107 (D.D.C. 2013) (quoting *Neighborhood TV Co. v. FCC*, 742 F.2d 629, 637 (D.C. Cir. 1984)).

[117] *Id.* (quoting *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1051 (D.C. Cir. 1987)).

[118] *Id.* (alterations in original) (quoting *Am. Hosp.*, 834 F.2d at 1047).

37

was based on a value judgment about procedural efficiency does not convert the resulting rule into a substantive one."[119] "A corollary to this principle is that rules are generally considered procedural so long as they do not 'change the *substantive standards* by which the [agency] evaluates' applications which seek a benefit that the agency has the power to provide."[120]

Applying those standards here yields the same result as does the substantial-impact test. Although the burden DAPA imposes on Texas is derivative of issuing lawful presence to beneficiaries, it is still substantial—Texas has a quasi-sovereign interest in not being forced to choose between incurring millions of dollars in costs and changing its laws. Moreover, DAPA establishes the "*substantive standards* by which the [agency] evaluates applications which seek a benefit that the agency has the power to provide"—a critical fact requiring notice and comment.[121] Further, receipt of those benefits implies a "stamp of approval" from the government.

## C.

Section 553(a)(2) exempts rules "to the extent that there is involved . . . a matter relating to . . . public property, loans, grants, benefits, or contracts." § 553(a)(2). We construe the public-benefits exception very narrowly as applying only to agency action that "clearly and directly relate[s] to 'benefits' as that

---

[119] *Id.* (quoting *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 282 (D.C. Cir. 2000)).

[120] *Id.* (alteration in original) (quoting *JEM Broad. Co. v. FCC*, 22 F.3d 320, 327 (D.C. Cir. 1994)).

[121] *Id.* (alteration in original) (quoting *JEM Broad.*, 22 F.3d at 327) (internal quotation marks omitted). *Compare JEM Broad.*, 22 F.3d at 327 ("The critical fact here, however, is that the 'hard look' rules did not change the substantive standards by which the FCC evaluates license applications . . . ."), *with Reeder v. FCC*, 865 F.2d 1298, 1305 (D.C. Cir. 1989) (per curiam) (stating that notice and comment is required for "rules [that] changed substantive criteria for" evaluating station allotment counter-proposals).

word is used in section 553(a)(2)."[122]

To the extent that DAPA relates to public benefits, it does not do so "clearly and directly." Although § 553(a)(2) suggests that "rulemaking requirements for agencies managing benefit programs are . . . voluntarily imposed,"[123] USCIS, which is the agency tasked with evaluating DAPA applications, is not such an agency. Neither USCIS nor any other agency within DHS confers public benefits on DAPA beneficiaries. Further, lawful presence is an immigration classification, not a grant of money, goods, services, or any other kind of public benefit that has been recognized, or was likely to have been recognized,[124] under this exception.[125] To the extent that lawful presence triggers eligibility for public benefits, receipt of those benefits depends on compliance with programs managed by other agencies. *See supra* notes 10–14 and accompanying text.

In summary, the United States has not made a strong showing that it is

---

[122] *Baylor Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052, 1061 (5th Cir. 1985); *accord Hous. Auth. of Omaha, Neb. v. U.S. Hous. Auth.*, 468 F.2d 1, 9 (8th Cir. 1972) ("The exemptions of matters under Section 553(a)(2) relating to 'public benefits,' could conceivably include virtually every activity of government. However, since an expansive reading of the exemption clause could easily carve the heart out of the notice provisions of Section 553, it is fairly obvious that Congress did not intend for the exemptions to be interpreted that broadly.").

[123] *Alcaraz v. Block*, 746 F.2d 593, 611 (9th Cir. 1984).

[124] The Departments of Agriculture, Health and Human Services, and Labor have waived the exemption for matters relating to public property, loans, grants, benefits, or contracts. *See* 29 C.F.R. § 2.7 (Department of Labor); Public Participation in Rule Making, 36 Fed. Reg. 13,804, 13,804 (July 24, 1971) (Department of Agriculture); Public Participation in Rule Making, 36 Fed. Reg. 2532, 2532 (Jan. 28, 1971) (Department of Health and Human Services, then known as Health, Education, and Welfare).

[125] *See e.g.*, *Vigil*, 508 U.S. at 184, 196 (clinical services provided by Indian Health Service for handicapped children); *Hoerner v. Veterans Admin.*, No. 88-3052, 1988 WL 97342 at *1–2 & n.10 (4th Cir. July 8, 1988) (per curiam) (unpublished) (benefits for veterans); *Baylor Univ. Med. Ctr.*, 758 F.2d at 1058–59 (Medicare reimbursement regulations issued by Secretary of Health and Human Services); *Rodway v. U.S. Dep't of Agric.*, 514 F.2d 809, 813 (D.C. Cir. 1975) (food stamp allotment regulations).

39

likely to succeed on the merits. We proceed to examine the remaining factors of the test for obtaining a stay pending appeal.

## VII.

The remaining factors also favor the states. The United States has not demonstrated that it "will be irreparably injured absent a stay." *Planned Parenthood*, 734 F.3d at 410 (quoting *Nken*, 556 U.S. at 426). It claims that the injunction offends separation of powers and federalism, but it is the resolution of the case on the merits, not whether the injunction is stayed pending appeal, that will affect those principles.

The government urges that DHS will not be able to determine quickly whether illegal aliens it encounters are enforcement priorities, but even under the injunction, DHS can choose whom to remove first; the only thing it cannot do is grant class-wide lawful presence and eligibility for accompanying benefits as incentives for low-priority aliens to self-identify in advance. And the government's allegation that the injunction is delaying preparatory work is unpersuasive. Injunctions often cause delays, and the government can resume work if it prevails on the merits.

The states have shown that "issuance of the stay will substantially injure" them. *Id.* (quoting *Nken*, 556 U.S. at 426). A stay would enable DAPA beneficiaries to apply for driver's licenses and other benefits, and it would be difficult for the states to retract those benefits or recoup their costs even if they won on the merits. That is particularly true in light of the district court's findings regarding the large number of potential beneficiaries, including at least 500,000 in Texas alone.

The last factor, "where the public interest lies," *id.* (quoting *Nken*, 556 U.S. at 426), leans in favor of the states. The government identifies several

No. 15-40238

important interests: It claims a stay would improve public safety and national security, provide humanitarian relief to the family members of citizens and lawful permanent residents, and increase tax revenue for state and local governments. To the contrary, however, and only by way of example, on March 16, 2015, the Attorney General, in opposing a motion to stay removal in an unrelated action, argued to this very panel that "granting a stay of removal . . . would impede the government's interest in expeditiously . . . controlling immigration into the United States."[126]  Presumably, by referring to "the government's interest," the United States is referring to "the public interest."

The states say the injunction maintains the separation of powers and ensures that a major new policy undergoes notice and comment. And as a prudential matter, if the injunction is stayed but DAPA is ultimately invalidated, deportable aliens would have identified themselves without receiving the expected benefits. The public interest favors maintenance of the injunction, and even if that were not so, in light of the fact that the first three factors favor the states and that the injunction merely maintains the status quo while the court considers the issue,[127] a stay pending appeal is far from justified.[128]

---

[126] Respondent's Opposition to Petitioner's Motion To Stay Removal at 8, *El Asmar v. Holder*, No. 15-60155 (5th Cir. filed Mar. 16, 2015) (citing *Nken*, 556 U.S. at 436).

[127] *Cf., e.g., Veasey v. Perry*, 769 F.3d 890, 892–95 (5th Cir. 2014) (discussing the importance of maintaining the status quo in the election context because a change could cause substantial disruption that would be difficult to undo).

[128] An invalid rule does not necessarily result in vacatur; depending on the circumstance, the appropriate remedy may be remand to the agency. That determination is made by evaluating whether "(1) the agency's decision is so deficient as to raise serious doubts whether the agency can adequately justify its decision at all; and (2) vacatur would be seriously disruptive or costly." *N. Air Cargo v. USPS*, 674 F.3d 852, 860–61 (D.C. Cir. 2012). The government has not asked for remand, and it would be premature for us to weigh those considerations at this early stage.

41

No. 15-40238

## VIII.

The government maintains that the nationwide scope of the injunction is an abuse of discretion, so it asks that the injunction be confined to Texas or the plaintiff states. But partial implementation of DAPA would undermine the constitutional imperative of "a *uniform* Rule of Naturalization"[129] and Congress's instruction that "the immigration laws of the United States should be enforced vigorously and *uniformly*."[130] A patchwork system would "detract[] from the 'integrated scheme of regulation' created by Congress."[131] Further, there is a substantial likelihood that a partial injunction would be ineffective because DAPA beneficiaries would be free to move between states.

The motion to stay the preliminary injunction or narrow its scope pending appeal is DENIED.

---

[129] U.S. CONST. art. I, § 8, cl. 4 (emphasis added).

[130] Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 115(1), 100 Stat. 3359, 3384 (emphasis added).

[131] *Arizona*, 132 S. Ct. at 2502 (quoting *Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 288–289 (1986)).

42

STEPHEN A. HIGGINSON, Circuit Judge, dissenting:

Agreeing with the district court, the plaintiff-states recognize that removal and deportation of non-citizens is a power exclusively of the federal government. *See Arizona v. United States*, 132 S. Ct. 2492, 2498 (2012). Their complaint, however, is that the federal government isn't doing its job; that whereas Congress, through unambiguous law, requires the identification, apprehension, and removal of non-citizens who lack documentation to be in the United States, *see* 8 U.S.C. § 1225(a)(3) (inspection); *id.* § 1225(b)(2)(A) (detention); *id.* § 1227(a) (removal), the President is thwarting that law. According to the plaintiffs, the President refuses to remove immigrants Congress has said must be removed and has memorialized that obstruction in a Department of Homeland Security ("DHS") memorandum. This, plaintiffs contend, is a Take Care Clause violation, a *Youngstown* scenario courts must correct; furthermore, because deferring removal of immigrants causes states injury and has substantive impact, the plaintiffs contend that the DHS memorandum is invalid without the full apparatus of rulemaking, notice and comment and public participation, under the Administrative Procedure Act ("APA"). 5 U.S.C. § 553. The district court offered extensive viewpoints on the first point, but ruled in plaintiffs' favor only on the second. The government seeks to stay that ruling, which is the matter before us.

My colleagues conclude that the government has not made a "strong showing" of likelihood of success on the merits. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (internal quotation marks and citation omitted). I am grateful to them for their analysis and collegiality, and our exchange has informed my views, although I dissent as follows.

## Introduction: The Challenged Executive "Action"

On November 20, 2014, the Secretary of the Department of Homeland Security sent to the Director of U.S. Citizenship and Immigration Services, and

43

the Acting Director of the U.S. Immigration and Customs Enforcement, and the Commissioner of the U.S. Customs and Border Protection a memorandum with the subject heading, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents," which aims to focus resources on illegal immigration at the border and prioritize deporting felons while lesser priority, but removable, immigrants are encouraged to self-report, pass background checks, and pay taxes on any employment they might obtain under preexisting law. *See* Memorandum from Jeh Johnson, Sec'y, Dep't of Homeland Sec., to Leon Rodriguez, Dir., U.S. Citizenship and Immigration Servs., et al. (Nov. 20, 2014) ("Nov. 20 Memo"), *available at* http://www.dhs.gov/sites/default/files/publications/14_1120_memo_deferred_action.pdf. The Office of Legal Counsel at the Department of Justice terms the memorandum "prioritization policy," and the government in briefing to us terms it "deferred action guidance." By contrast, plaintiffs label it a "directive," a term adopted by the district court, which further describes the memorandum as a "program" "to award legal presence status to over four million illegal aliens."

The November 20 memorandum, on its face, gives notice of expanded eligibility criteria used by DHS to assess whether undocumented immigrants who seek "deferred action" should "for a specified period of time . . . [be] permitted to be lawfully present in the United States." This memorandum, expanding on pre-existing guidance, permits undocumented immigrants who are "hard-working," "integrated members of American society," and "otherwise not enforcement priorities" to self-report and become a lower removal priority. The immigrant explicitly stays removable, but is not a removal priority. *See Reno v. Am.–Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483–84 (1999) (recognizing that deferred action, which was originally known as "nonpriority,"

44

is an appropriate exercise of the Executive's removal discretion); *see also* 8 C.F.R. § 274a.12(c)(14) (defining "deferred action" as "an act of administrative convenience to the government which gives some cases lower priority"). The parties have offered argument and submissions, but to date without adversarial and evidentiary testing, disagreeing about consequences that could follow from executive adherence to the November 20 memorandum.

## I.   Non-Justiciability

I would hold that Supreme Court and Fifth Circuit caselaw forecloses plaintiffs' arguments challenging in court this internal executive enforcement guideline. In an earlier *Texas v. United States*, 106 F.3d 661 (5th Cir. 1997), we summarized and resolved the following statutory argument:

> [T]he State alleges that the Attorney General has breached a nondiscretionary duty to control immigration under the Immigration and Nationality Act. The State candidly concedes, however, that section 1103 places no substantive limits on the Attorney General and commits enforcement of the INA to her discretion.
>
> The State's allegation that defendants have failed to enforce the immigration laws and refuse to pay the costs resulting therefrom is not subject to judicial review. An agency's decision not to take enforcement actions is unreviewable under the Administrative Procedure Act because a court has no workable standard against which to judge the agency's exercise of discretion. We reject out-of-hand the State's contention that the federal defendants' alleged systemic failure to control immigration is so extreme as to constitute a reviewable abdication of duty. The State does not contend that federal defendants are doing nothing to enforce the immigration laws or that they have consciously decided to abdicate their enforcement responsibilities. Real or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty.

*Id.* at 667 (citations omitted). The authority our court relied on was Chief Justice Rehnquist's opinion for a unanimous Supreme Court in *Heckler v. Chaney*, which held "that an agency's decision not to prosecute or enforce,

whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." 470 U.S. 821, 831 (1985); *see also Perales v. Casillas*, 903 F.2d 1043, 1047–48 (5th Cir. 1990); *see generally* 5 U.S.C. § 701(a)(2); *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, — F.3d —, No. 13-1316, 2015 WL 2145776, at *1–4 (D.C. Cir. May 8, 2015) (holding that the court was without jurisdiction to review an internal guidance document that "inform[s] the exercise of discretion by agents and officers in the field").[1]

The district court repeatedly acknowledged the controlling authority of *Heckler* and *Texas* that "'[r]eal or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty,'" but

---

[1] Because I believe that *Heckler* compels the conclusion that the November 20 memorandum is non-justiciable, I would not reach the issue of standing. At this emergency-stay point, I would note only that there has been little developed guidance from lower courts on how far *Massachusetts v. EPA*'s logic extends for plaintiff-states beyond the facts of that case, which involved a state that asserted an injury based on its own property interests and the relevant statute provided an explicit right to challenge the denial of a rulemaking petition. *See* 549 U.S. 497, 518–20 (2007). Furthermore, Texas's inability to articulate a limiting principle to its drivers' license theory of standing—triggered, it appears, by any federal executive policy that leads to the grant of even one deferred action request—as well as countervailing developments in this court and others, suggest to me that *Massachusetts v. EPA* may not apply here. *See Crane v. Johnson*, 783 F.3d 244, 247 (5th Cir. 2015) (holding that the State of Mississippi had not "demonstrated the concrete and particularized injury required to give [it] standing to maintain [its] suit" against the precursor DHS memorandum); *Arpaio v. Obama*, 27 F. Supp. 3d 185, 207 (D.D.C. 2014) (holding that Sheriff Arpaio did not have standing to challenge the precursor DHS memorandum); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006) (holding that plaintiffs do not have standing by virtue of their status as taxpayers to challenge the conferral of tax credits on third parties); *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) (holding that Pennsylvania lacked standing to challenge a New Jersey tax that triggered a Pennsylvania tax credit because "nothing prevent[ed] Pennsylvania from withdrawing that credit for taxes paid to New Jersey" and explaining that "[n]o State can be heard to complain about damage inflicted by its own hand"); *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) (emphasizing that a third party "lacks a judicially cognizable interest in the prosecution or nonprosecution of another"); *Henderson v. Stalder*, 287 F.3d 374, 384 (5th Cir. 2002) (Jones, J., concurring) ("[A] plaintiff who complains merely that a benefit has been unconstitutionally granted to others is asserting only a 'generalized grievance' that does not allow the plaintiff standing to obtain judicial relief for the alleged wrong in federal court."). Given the debatability of the plaintiff-states' attenuated theory of standing, I would therefore resolve this matter on the threshold issue of non-justiciability.

held "[t]hat is not the situation here" because the November 20 memorandum is "an *announced* program of non-enforcement of the law that contradicts Congress' statutory *goals*." *Texas v. United States*, — F. Supp. 3d —, No. B-14-254, 2015 WL 648579, at *50 (S.D. Tex. Feb. 16, 2015) (emphases added). This twofold extrapolation—focusing not on the memorandum itself set against current law, but instead on an embellishment of it set against a perceived imperative to remove all illegal immigrants—rests on sublimer intelligences than existing law allows. The district court distinguished *Heckler* and *Texas* by drawing an inference of executive overreaching from two sources: first, public statements by the President, and second, the district court's negative assessment of the earlier DACA 2012 memorandum, an assessment that our court has since rejected in *Crane v. Johnson*. The district court's inferences from these two sources led it to characterize the November 20 memorandum as a presidentially "announced program" that thwarts Congress's "goals" to remove all undocumented immigrants.[2]

This characterization is the essential point of disagreement I have with the district court's ruling. Congress could, but has not, removed discretion from DHS as to which undocumented immigrants to apprehend and remove first. *See* 6 U.S.C. § 202(5) (directing Secretary to "[e]stablish[] national immigration enforcement policies and priorities"); 8 U.S.C. § 1103(a)(3)

---

[2] The district court's April 7, 2015 order, revisiting its stay, reinforces, in my opinion, this error. The April 7 order rests even more determinatively on press statements of the President to re-emphasize both that "[t]his is not merely ineffective enforcement[,] [t]his is total non-enforcement," and also, contrary to our intervening *Crane* decision, that "[i]f there were any doubts that the 2014 DHS Directive is correctly characterized as 'substantive,' the President's warning to DHS employees of adverse consequences for failing to follow the Directive should clearly extinguish those." *Compare* April 7 Memorandum Opinion & Order (observing that immigration officers not only lack discretion but will suffer consequences), *with Crane*, 783 F.3d at 254–55 (holding that DACA 2012's guidelines and the November 20 memorandum's guidelines afford immigration officers discretion to grant or withhold deferred action on a case-by-case basis).

No. 15-40238

(vesting the Secretary with broad authority to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority" under the statute); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (describing immigration law as "'a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program'" (quoting *Lichter v. United States*, 334 U.S. 742, 785 (1948))). Indeed, the Supreme Court recently revisited the interplay between Congressional law and coordinate Executive enforcement responsibility, clarifying that "[a] principal feature of the removal system is the broad discretion exercised by immigration officials," who "must decide whether it makes sense to pursue removal at all," taking into consideration, for example, "immediate human concerns," such as "[u]nauthorized workers trying to support their families . . . [who] likely pose less danger than alien smugglers or aliens who commit a serious crime." *Arizona*, 132 S. Ct. at 2499; *see also Crane*, 783 F.3d at 249 (8 U.S.C. § 1225 "does not limit the authority of DHS to determine whether to pursue removal of the immigrant").[3] Even specifically as to deferred action, the Supreme Court

---

[3] As with criminal law enforcement generally, there is no one immigration imperative and blueprint the Executive must follow. *See* Adam B. Cox & Cristina M. Rodriguez, *The President and Immigration Law*, 119 Yale L.J. 458, 463, 510–11 (2009) (contending that the "detailed, rule-bound immigration code" developed by Congress "has had counterintuitive consequences of delegating tremendous authority to the President to set immigration screening policy by making a huge fraction of noncitizens deportable at the option of the Executive"). Prosecution, as a core executive duty, has elasticity, ranging from nonprosecution altogether, variable and selected charges, guilty plea flexibility, and recommendations for sentencing leniency or severity. *See, e.g.*, *City of Seabrook v. Costle*, 659 F.2d 1371, 1374 n.3 (5th Cir. 1981) (Although "the word 'shall' is normally interpreted to impose a mandatory duty, . . . when duties within the traditional realm of prosecutorial discretion are involved, the courts have not found this maxim controlling." (internal citation omitted)); *Inmates of Attica Corr. Facility v. Rockefeller*, 477 F.2d 375, 381 (2d Cir. 1973) (holding that mandatory statutory language directing that each United States attorney "shall . . . prosecute for all offenses against the United States" "has never been thought to preclude the exercise of prosecutorial discretion"). This elasticity was described over a half century ago by the Supreme Court in *Berger v. United States*, 295 U.S. 78, 88 (1935) (a

48

has recognized that the Executive may choose to take no action "to proceed against an apparently deportable alien" because of "humanitarian reasons." *Reno*, 525 U.S. at 484; *see also id.* at 483 (noting that "[a]t each stage" of removal, the "Executive has discretion to abandon the endeavor"). And in *Crane*, this court held that the DHS memorandum does not preclude the agency's exercise of enforcement discretion, a ruling that the district court of course did not have the benefit of. *Compare Texas*, 2015 WL 648579, at \*55 ("Nothing about DAPA genuinely leaves the agency and its employees free to exercise discretion." (internal quotation marks, alterations, and emphasis omitted)), *with Crane*, 783 F.3d at 254–55 & n.42 (emphasizing that DACA 2012 "makes it clear that the Agents shall exercise their discretion in deciding to grant deferred action" and that the November 20 memorandum's case-by-case review of applicants makes it "highly unlikely that the agency would impose an employment sanction against an employee who exercises his discretion to detain an illegal alien").

---

prosecutor's interest "in a criminal prosecution is not that it shall win a case, but that justice shall be done."). Even more so in the immigration context, the Supreme Court has been sensitive to unique concerns beyond humanitarian circumstances and limited resources, especially foreign policy. *See Arizona*, 132 S. Ct. at 2499 ("The dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy . . . ."); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."); *cf.* 8 U.S.C. § 1252(g) (recognizing the executive branch's authority to exercise prosecutorial discretion by generally stripping courts' jurisdiction to hear any claim "by or on behalf of any alien" arising from the Executive's decision to "commence proceedings, adjudicate cases, or execute removal orders against any alien"); Hiroshi Motomura, *Immigration Law After a Century of Plenary Power: Phantom Constitutional Norms and Statutory Interpretation*, 100 Yale L.J. 545, 547 (1990) ("[C]ourts should only rarely, if ever, and in limited fashion, entertain constitutional challenges to decisions about which aliens should be admitted or expelled.").

## No. 15-40238

The plaintiffs point to no statutory removal of the executive discretion that the Supreme Court and our court emphasize vitally exists in the law. Regardless, it is undisputed that the Executive presently is deporting a total number of immigrants at a faster rate than any administration before, ever; that the Executive is and should allocate limited resources to deport violent and dangerous immigrants, ahead of citizen–children's parents who self-report to DHS acknowledging their illegal presence; and finally, that even categories of persons, like immigrants cooperating with the government in criminal cases or who contribute to our Armed Forces, historically receive deferrals.[4]

---

[4] The Executive's granting of temporary reprieve from prosecution to categories of individuals is neither new nor uncommon. This occurred, to begin with an example in the immigration context, with the Family Fairness program. In 1987, the INS announced a policy of deferring the deportations of certain children whose parents received legal status under recent legislation. *See Legalization and Family Fairness—An Analysis*, 64 Interpreter Releases 1190, 1200–1204 (Oct. 26, 1987) (containing policy by Alan C. Nelson, INS Commissioner, providing that "indefinite voluntary departure shall be granted" to these children). In 1990, the INS expanded its deferral program to include certain spouses of legalized persons. Memorandum from Gene McNary, Comm'r, Immigration and Naturalization Serv., to Regional Commissioners, *Family Fairness: Guidelines for Voluntary Departure* (Feb. 2, 1990) (providing that "[v]oluntary departure will be granted for a one-year period"). The Family Fairness program was effectively codified by Congress later that year. Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (Nov. 29, 1990). The practice of immigration parole, which "permits a person's physical presence in the United States even when she could not legally be granted formal admission," also "originated as a purely administrative innovation." David A. Martin, *A Defense of Immigration-Enforcement Discretion*, 122 Yale L.J. Online 167, 178 (2012) (noting that "[t]he practice was well established by the time parole gained explicit statutory sanction in the original 1952 Immigration and Nationality Act"). In the larger criminal context—such as the recent nonprosecution of banks that self-report regarding overseas tax infractions, or nonprosecution of possession of personal use amounts of marijuana—deferred prosecution is common (and more consequential because statutes of limitations make it binding legally). Indeed, the practice of pretrial diversion, set forth in the United States Attorney's Manual, began as an executive initiative, without express statutory authorization, announced by Assistant Attorney General Burke Marshall in 1964, and then expanded in 1974 by then–Deputy Attorney General Laurence Silberman, before the Pretrial Services Act of 1982 was enacted. *See Pre-Trial Diversion: Hearing on H.R. 9007 and S. 798 Before the Subcomm. on Courts, Civil Liberties, and the Admin. of Justice of the H. Comm. on the Judiciary*, 93d Cong. 127–28 (1974); Stephen J. Rackmill, *Printzlien's Legacy, the "Brooklyn Plan," A.K.A. Deferred Prosecution*, 60 Fed. Probation 1, 8, 10, 14 (June 1996). Such clear and announced enforcement guidelines do several things. They channel limited resources by prioritizing

50

No. 15-40238

The district court did not view the November 20 memorandum as a non-prosecution policy. Instead, the district court reads the memorandum as agency action that affirmatively confers legal status and other benefits on undocumented immigrants. The district court, however, failed to recognize the important distinction between lawful "status" and lawful "presence." Whereas legal *status* implies "a right protected by law," legal *presence* simply reflects an "exercise of discretion by a public official." *See Dhuka v. Holder*, 716 F.3d 149, 156 (5th Cir. 2013); *see also Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013) ("[U]nlawful presence and unlawful status are distinct concepts."). The November 20 memorandum like its precursors, dating back to 1975, contemplates categorizing deferred action recipients as being present for a temporary period of time, but does not change the applicant's lawful "status." Congress, separately through 8 U.S.C. § 1255, has codified exact ways non-citizens may gain lawful "status," but has left lawful "presence" broadly defined to include a discretionary "period of stay authorized by the Attorney General." 8 U.S.C. § 1182(a)(9)(B)(ii); *see also Black's Law Dictionary* 565 (10th ed. 2014) (defining "prosecutorial discretion" in the immigration context as "[a] federal authority's discretion not to immediately arrest or endeavor to remove an illegal immigrant because the immigrant does not meet the federal government's immigration-enforcement priorities"). When DHS exercises its discretion to grant a qualified and temporary reprieve from removal, the immigrants' now-identified "presence" is thus consistent with, and furthers,

---

targeted felons. They animate the political process so that executive policy-setting either proves its worth and becomes embodied in law, as with pretrial diversion or the Family Fairness program, or oppositely, for myriad reasons—unworkability, unpopularity, or budgetary realities—policies are rescinded or countermanded by law. Third, nonprosecution necessarily means that persons not being prosecuted, arrested, and detained will seek work according to pre-existing law, pay taxes, and parent children. *See* Nov. 20 Memo at 3 (case-by-case exercises of deferred action will "encourage [people] to come out of the shadows . . . and be counted").

51

Congressional enactments. *See Chaudhry*, 705 F.3d at 292. Non-citizens who only have lawful presence, but not lawful status, are not entitled to remain in the United States; their presence is revocable at any time. The non-citizen thus remains in the country at the discretion of DHS, who may remove the individual whenever it pleases.

The plaintiff-states draw a further flavor of doubt from eligibility for work authorization, whereas amici-states see advantage and financial windfall. That choice is exclusively a task for Congress, however. *See Perales*, 903 F.2d at 1045, 1047 (holding that the INS's decision to grant work authorization has been "committed to agency discretion by law" and is therefore not subject to judicial review). Moreover, the November 20 memorandum does not itself "award" work authorization. *See U.S. Dep't. of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1156 (5th Cir. 1984) (finding a rule non-substantive because its substantive effect was "purely derivative" of another statute and rules). Work authorization for deferred-action recipients is expressly authorized under a 1981 regulation that was promulgated through notice-and-comment rulemaking. *See* 8 C.F.R. § 274a.12(c)(14). That authorization has since been reinforced in the United States Code. *See* 8 U.S.C. § 1324a(h)(3). If an influx of applications makes the statutory availability of work authorization inadvisable, it is for Congress, not the courts, to recalibrate. *See, e.g.*, 8 U.S.C. § 1158(c)(1)(B) (directing the Secretary to grant work authorization to certain categories of non-citizens); *id.* § 1226(a)(3) (directing the Secretary *not* to grant work authorization to a certain category of non-citizens).

On this record, as well as focusing below on the four corners of the November 20 memorandum, I would say DHS is adhering to law, not derogating from it. The Supreme Court in *Heckler* noted that derogation and

52

No. 15-40238

abdication occur rarely, where there is statutory language removing non-enforcement discretion yet still "a refusal by the agency to institute proceedings" or "'consciously and expressly adopt[ing] a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." 470 U.S. at 833 n.4 (quoting *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973)). Neither exists here. The DHS memorandum guides executive policy that has allowed enforcement and more removals per year than under any prior presidency. Although executive abdication, if renunciatory of Congress, extreme and diametric, must be checked, courts should not truncate the myriad political processes whereby most executive intention, good and bad, is ever balanced. *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("[W]e hardly need to note that an agency's decision to ignore congressional expectations may expose it to grave political consequences."); *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 543–44 (1978) ("[T]his much is absolutely clear. Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties. Indeed our cases could hardly be more explicit in this regard." (internal quotation marks and citations omitted)). *See generally* Jack M. Beermann, *Congressional Administration*, 43 San Diego L. Rev. 61 (2006).

In fact, if the Supreme Court has insisted on any one constant as it relates to immigration disputes, it is to redirect disputes from the multiplicity of state reactions back to dialogue between our coequal federal political branches so that nationwide concerns and practicalities are weighed, Congress's purse dispensed as it chooses, and the Executive refines its enforcement priorities or is compelled by Congress to do so. If internal executive policy-setting authority—adjusting to limited resources and making

53

critical offender severity determinations, all superintended by Congress—now instead becomes challengeable in courts and forced into "the often cumbersome and time-consuming mechanisms of public input," *Kast Metals*, 744 F.2d at 1152, this case, as precedent, may well rise, swell, and burst with clutter beyond judicial control over immigration removal (in)action. *Id.* at 1156 (noting that notice and comment "would foresee aeons of rulemaking proceedings when all the agency seeks to do is operate in a rational manner"). *See generally Ramah Navajo Sch. Bd. v. Babbitt*, 87 F.3d 1338, 1353, 1354 (Silberman, J., dissenting) (cautioning courts against "teas[ing] statutory law out of a vacuum" created by Congress and ignoring "the zero sum game" of limited Congressional appropriations which require executive agencies to communicate prioritizations via policies).

## II.  **Executive Policy-Setting**

For the foregoing reasons, I would grant a stay of the district court's preliminary injunction because I believe the policy articulated in the November 20 memorandum is non-justiciable.[5]   *See supra* Part I; *see also* 5 U.S.C.

---

[5] Absent non-justiciability, I would agree that there is a reason to maintain the status quo pending the government's approaching appeal on the merits. *Compare INS v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Labor*, 510 U.S. 1301, 1306 (1993) (O'Connor, Circuit Justice) (granting an application to stay the district court's order that required enforcement of INS regulations when the district court's order was "an improper intrusion by a federal court in the workings of a coordinate branch of the Government"), *with Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 134 S. Ct. 506, 509 (2013) (Breyer, J., dissenting) ("[I]t is a mistake to disrupt the status quo so seriously before the Fifth Circuit has arrived at a considered decision on the merits."), *and Campaign for S. Equality v. Bryant*, 773 F.3d 55, 58 (5th Cir. 2014) (granting a stay pending appeal in part because "a temporary maintenance of the status quo" prevents the "inevitable disruption that would arise from a lack of continuity and stability in [an] important area of law"). *See generally* Jill Wieber Lens, *Stays Pending Appeal: Why the Merits Should Not Matter*, Fla. St. U. L. Rev. (forthcoming) (manuscript at 35), *available at* http://ssrn.com/abstract=2571003 (arguing that panels reviewing motions for stay pending appeal should consider "whether the circumstances would (irreparably change) in a way that would interfere with the appellate court's ability to make a decision meaningful to the parties").

§ 701(a)(2); *Perales*, 903 F.2d at 1045–47. However, because the district court's injunction rested solely on the district court's classification of the November 20 memorandum as agency action issued without adhering to the notice and comment requirements of the APA, I articulate my disagreement on that point as well.

The district court highlighted that "well-developed" caselaw exists to distinguish executive action that is internal policy-setting from executive action that is a procedurally invalid legislative rule because it binds members of the public, the agency, and even courts. *See Hudson v. FAA*, 192 F.3d 1031, 1035–36 (D.C. Cir. 1999); *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). Judge Kavanaugh's well-reasoned opinion in *National Mining Association v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014), succinctly articulates the § 553 framework. Step 1, he explains, is whether the agency has said it is imposing a legally binding rule on regulatees. *Id.* at 251–52. Even if the agency says it is not, Step 2 asks whether the policy nonetheless draws a line in the sand, coercing conformity. *Id.* at 252. Finally, Step 3 asks whether post-guidance events show that agency action has become "binding on regulated parties." *Id.* at 253. The district court correctly noted that "the analysis substantially relies on the specific facts of a given case." *Texas*, 2015 WL 648579, at *52. Because the November 20 memorandum has yet to go into effect, and no evidentiary hearing was held, the record is undeveloped and contains considerable conjecture, and conjecture is guided by feeling.

## A. Step 1: Agency Characterization

The starting point for analysis under § 553(b), though not the deciding factor, is an agency's own characterization of its action, and specifically whether the agency itself seeks to impose binding obligations as a basis for enforcement action. *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 596 (5th Cir. 1995); *see also Kast Metals*, 744 F.2d at 1149; *Pac. Gas &*

*Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 39 (D.C. Cir. 1974). DHS titles its memorandum as internal policy statements expanding prosecutorial discretion for undocumented immigrants who seek "deferred action" instead of removal from the United States. That description is neither a boilerplate beginning nor a final caveat, weak bookends around an imposed regulatory regime. *See Huerta*, 2015 WL 2145776, at \*5 ("The language employed by the agency may play an important role [in determining whether a document is a policy statement or legislative rule]; a document that reads like an edict is likely to be binding, while one riddled with caveats is not."); *Nat'l Mining Ass'n*, 758 F.3d at 251–53. No fewer than ten times, the November 20 memorandum instructs immigration officers that: (1) "DHS must exercise prosecutorial discretion in the enforcement of the law"; (2) "[immigration laws] are not designed to be blindly enforced without consideration given to the individual circumstances of each case"; (3) "[d]eferred action is a form of prosecutorial discretion by which the Secretary deprioritizes an individual's case for humanitarian reasons, administrative convenience, or in the interest of the Department's overall enforcement mission"; (4) "deferred action is legally available so long as it is granted on a case-by-case, and it may be terminated at any time at the agency's discretion"; (5) "[c]ase-by-case exercises of deferred action for children and long-standing members of American society who are not enforcement priorities are in this Nation's security and economic interests and make common sense"; (6) "this Department's limited enforcement resources . . . must continue to be focused on those who represent threats to national security"; (7) "USCIS [should] establish a process, similar to DACA [2012], for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis"; (8) "ICE is further instructed to review pending removal cases . . . and to refer [certain] individuals to USCIS for case-by-case determinations"; (9) "immigration officers will be provided with specific

56

eligibility criteria for deferred action, but the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis"; and (10) "[i]t remains within the authority of the Executive Branch . . . to set forth policy for the exercise of prosecutorial discretion and deferred action . . . . This memorandum is an exercise of that authority."[6]

## B. Step 2: Intent to Bind

Looking behind an agency's stated purpose claiming or disclaiming the force and effect of law, courts also give a close, four-corners look for language that reads like an edict, commanding language, to discern if a priority statement nonetheless will operate bindingly on regulatees. *Nat'l Mining Ass'n*, 758 F.3d at 252 ("The most important factor concerns the actual legal effect (or lack thereof) of the agency action in question on regulated entities.").

---

[6] In this regard, also, the November 20 memorandum is consistent with prior deferred action guidance dating back to at least 1975, which structure executive discretion to delay removal of immigrants who are not priorities for removal. *See* Immigration and Naturalization Service Operating Instruction 103.1(a)(1)(ii) (1975); Memorandum from Sam Bernsen, *Legal Opinion Regarding Service Exercise of Prosecutorial Discretion* (July 15, 1976); Memorandum from Bo Cooper, *INS Exercise of Prosecutorial Discretion* (July 11, 2000); Memorandum from Doris Meissner, Commissioner, Immigration and Naturalization Service, to Regional Directors et al., *Exercising Prosecutorial Discretion* (Nov. 17, 2000); Memorandum from William J. Howard, Principal Legal Advisor, ICE, to All Office of the Principal Legal Advisor Chief Counsel, *Prosecutorial Discretion* (Oct. 24, 2005); Memorandum from Julie L. Myers, Assistant Secretary of Homeland Security, to All Field Office Directors and Special Agents in Charge of U.S. Immigration and Customs Enforcement, *Prosecutorial and Custody Discretion* (Nov. 7, 2007); Memorandum from John Morton, *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens* (June 17, 2011). In several instances, prior policies on deferred action were held to be exempt from requirements in § 553. *See Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1009 (9th Cir. 1987) (rejecting claim that the 1981 version of INS Operating Instruction 103.1(a)(1)(ii) "violated the notice-and-comment requirements of the APA, because the amended Operating Instruction qualifies under the APA's exception for 'general statements of policy'"); *Pasquini v. Morris*, 700 F.2d 658, 662 (11th Cir. 1983) (concluding that Operating Instruction 103.1(a)(1)(ii) was exempt from § 553(b) because it was "only general guidance for service employees" (internal quotation marks and citation omitted)).

As a preliminary matter, it is undisputed that any "directing" here is internal only, not binding with respect to regulated entities. And to the extent that DHS directs internally, it directs immigration officers to "establish a *process*, similar to DACA [2012], for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," (emphasis added), containing features common to nonbinding statements of policy (exempt from notice and comment procedure), and dissimilar from binding substantive regulations (requiring APA rulemaking and public participation).

First, the memorandum guides only as to when to exercise broad lenity, i.e. delayed enforcement. The memorandum channels when DHS will *not* act, much like longstanding Department of Justice internal prosecution guidelines, such as the "Petite Policy," which "precludes the initiation or continuation of a federal prosecution, following a prior state or federal prosecution based on substantially the same act(s) or transaction(s) . . . . This policy constitutes an exercise of the Department's prosecutorial discretion, and applies even where a prior state prosecution would not legally bar a subsequent federal prosecution . . . ." Dual and Successive Prosecution Policy ("Petite Policy"), United States Attorneys' Manual, Title 9-2.031;[7] *see also Heckler*, 470 U.S. at 832 ("[W]e note that when an agency refuses to act it generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect.").

---

[7] The Petite Policy, like many other law enforcement policies, is a policy governing prosecutorial discretion as to an undefined class of similarly situated persons that has no express statutory authorization and has never been challenged as ultra vires, either violative of APA rulemaking or as an abdication from the Take Care duty to enforce the federal criminal code. *See Heckler*, 470 U.S. at 832 ("[A]n agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'" (citation omitted)).

No. 15-40238

The pretext cases relied on by plaintiffs, *see, e.g., Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000); *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616 (5th Cir. 1994); *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317 (D.C. Cir. 1988); *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943 (D.C. Cir. 1987) (per curiam), involve, contrastingly, affirmative agency action or exact nonenforcement tolerances, such as food contamination set to parts per billion specificity, not, as here, a nonprosecution memorandum built around offenders who self-report, confirm their whereabouts, submit to background checks, and stay subject to prosecution and removal while seeking employment according to law.

Second, the memorandum neither continues nor imposes a regulatory regime. There is no threat to conform. No obligation or prohibition is placed on regulated entities. Instead, DHS has expanded on its preexisting guidance, allowing immigrants to self-report their illegal presence but show they fall outside DHS's "enforcement priorities" and also are not otherwise "inappropriate" for deferred action. The memorandum describes opt-in procedures, whose incontestable accomplishment is that persons illegally here will be identified and located and submit to a criminal background check, all the while allowing DHS to tighten border interdiction and target violent and dangerous felons. It goes without saying that to prosecute a fugitive, the government must first find him. Every applicant under the November 20 memorandum voluntarily will self-report as illegally present and provide information DHS then will use in a criminal background check coordinated with Immigration and Customs Enforcement ("ICE") to effectuate priority removals. Nov. 20 Memo at 3 ("Case-by-case exercises of deferred action for children and long-standing members of American society who are not enforcement priorities are in this Nation's security and economic interests and

59

make common sense, because they encourage these people to come out of the shadows, submit to background checks, pay fees, . . . and be counted.").

Third, plaintiffs cite no § 553 caselaw relating to a statutory regime whose flexibility the Supreme Court has highlighted, *Arizona*, 132 S. Ct. at 2499 ("A principal feature of the removal system is the broad discretion exercised by immigration officials."); 6 U.S.C. § 202(5) (affording the Secretary authority to "[e]stablish[] national immigration enforcement policies and priorities"), set against agency policy guidance that incorporates this same flexibility, such as the criteria that the applicant (1) not be an "enforcement priority"; and (2) "present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate." Any invalidating logic must postulate the opposite of these broad caveats, therefore, both that the Supreme Court's yes (broad discretion over removal) means no (no removal discretion), and also that DHS's no (no blanket approvals to be *present*) means yes (give lawful *status* to millions).[8] Also illogical, future policy-setting would seem possible only when executive fiat is absolute, which in turn would maximize executive arbitrariness—unwritten and individualized assessments for deferred action applicants—and minimize information Congress has to perform day-to-day oversight and funding. *See* Richard J. Pierce, Jr., *Administrative Law Treatise*, § 6.3, at 424–25 (5th ed. 2010) (warning of the "horrible incentives" if agencies are unable to direct their employees without "the expensive and time-consuming notice and comment procedure").

---

[8] In its April 7, 2015 supplemental order, the district court construes remarks by the President as a threat to immigration officers to conform to the November 20 memorandum. However, the memorandum instructs officials to use discretion and make case-by-case determinations, so any invalidating logic must actually be that officials understand the threat to mean they must do the opposite of what is in writing, and apply criteria blindly, ignore discretionary criteria, and decline to make case-by-case determinations.

60

## C. Step 3: Implementation Facts

Behind label and language, courts vigilantly will look to any post-guidelines implementation data to assure, again, that an agency policy announcement does not inadvertently or strategically cause binding effect equivalent to a legislative rule. The concern is to not allow an agency speak one way—claiming resource constraints and discretion—yet carry out de facto regulation, binding regulatees. Put delicately, is the announced discretion "pretext"? Put indelicately, as the district court held, is the Executive being "disingenuous"? *Texas*, 2015 WL 648579, at *53.

The district court held that "[d]espite the [November 20] memorandum's use of phrases such as 'case-by-case' and 'discretion'" the criteria set forth in the November 20 memorandum were actually "binding." But because it enjoined the November 20 memorandum before it went into effect, no post-guidance evidence exists to help determine "whether the agency has applied the guidance as if it were binding." *Nat'l Mining Ass'n*, 758 F.3d at 253. Instead, as noted earlier, the district court looked above DHS, the executive agency, to President Obama, the executive-in-chief to find contradiction to DHS stated purpose and emphasis on case-by-case discretion. For good reason, however, the Supreme Court has not relied on press statements to discern government motivation and test the legality of governmental action, much less inaction. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 624 n.52 (2006) ("We have not heretofore, in evaluating the legality of executive action, deferred to comments made by such officials to the media."). Presidents, like governors and legislators, often describe law enthusiastically yet defend the same law narrowly. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 647 (1952) (Jackson, J.) (noting "[t]he claim of inherent and unrestricted presidential powers has long been a persuasive dialectical weapon in political controversy" yet warning against the use of such "unadjudicated claims of

power" to answer constitutional questions). In addition, our court has noted that "informal communications often exhibit a lack of 'precision of draftsmanship'" and therefore "are generally entitled to limited weight" in the analysis of whether a rule is substantive. *Prof'ls & Patients*, 56 F.3d at 599 (quoting *Cmty. Nutrition*, 818 F.2d at 948).[9]

More significant, the district court discerned pretext—inferred intent to bind—from the fact that the majority of DACA 2012 deferred action applications have been granted. I disagree for factual and legal reasons.

First, without evidence-taking and testing, I question the relevance of DACA 2012 implementation data. The DACA 2012 memorandum purports to guide the exercise of prosecutorial discretion "with respect to individuals who came to the United States as children," a subset of undocumented immigrants who are particularly inculpable as they "were brought to this country as children" and, thus, "lacked the intent to violate the law." That memorandum, in its original form, applies only to individuals who came to the United States under the age of sixteen, have not yet reached the age of thirty, and who have achieved a certain level of education. The November 20 memorandum being challenged here, and specifically its DAPA provisions, on the other hand, casts a much wider net, applying to a larger and broader group of individuals, but then narrows its deferred-action-availability reach through the use of more discretionary criteria than in DACA 2012. Despite these dissimilarities, the district court concluded that "[t]here is no reason to believe that DAPA will be implemented any differently than DACA [2012]" and there was no "suggestion that DAPA will be implemented in a fashion different from DACA [2012]."

---

[9] Much less informally, Presidents often in presidential signing statements say they will not enforce aspects of law, yet no court has used such statements to classify subsequent agency inaction as an intent to bind triggering the APA rulemaking process.

*Texas*, 2015 WL 648579, at \*39, \*55 n.96. The court did not explore, however, the government's contention that a significant difference existed between the two programs, specifically, the catch-all discretionary exception that was added to the November 20 memorandum—"present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate." The district court rejected this distinction because, the court contended, using circular reasoning, that the approval rate under the DACA 2012 program persuaded the Court that "this 'factor' is merely pretext." *Id.* at \*55 n.101.

Second, the district court placed the burden on the government to put forth "evidence of individuals who had been denied [under DACA 2012] for reasons other than not meeting the criteria or technical errors with the form and/or filing." *Id.* But "[t]he plaintiff has the burden of introducing sufficient evidence to justify the grant of a preliminary injunction." *See PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 1985). The district court then reached its conclusions about the agency's binding intent without giving any weight to the government's contrary evidence or justification for discrediting that evidence. *See Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr*, S.A., 320 F.3d 1205, 1211 (11th Cir. 2003) (holding that the district court abused its discretion when it "effectively issued and upheld the injunction based on evidence presented by only one party" and without holding an evidentiary hearing); *cf. Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558–59 (5th Cir. 1987) (finding that the district court did not abuse its discretion by declining to hold an evidentiary hearing where there were no material factual disputes). Especially because this case touches on the sensitive issues of immigrant presence in the United States, as well as when one branch of government may invalidate internal guidelines of another branch, I do not think it should come resolved on inferences of disingenuousness made from press statements and untested inferences from a

63

precursor program whose challenge on similar grounds our court has rejected. *See Crane*, 783 F.3d 244. No evidentiary hearing was held. For example, Kenneth Palinkas's contention that DACA 2012 applicants are "rubber-stamped" was not tested against Donald Neufeld's specific examples of discretionary denials.[10] *See Sims v. Greene*, 161 F.2d 87, 88 (3rd Cir. 1947) ("Such conflict [between allegations in competing pleadings and affidavits] must be resolved by oral testimony since only by hearing the witnesses and observing their demeanor on the stand can the trier of fact determine the veracity of the allegations . . . made by the respective parties. If witnesses are not heard the trial court will be left in the position of preferring one piece of paper to another."); *Heil v. Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 334 n.17 (5th Cir. 2013) ("[I]t is fundamental that, '[i]f there is a factual controversy, . . . oral testimony is preferable to affidavits because of the opportunity it provides to observe the demeanor of the witnesses.'" (citation omitted)); *see also Four Seasons*, 320 F.3d at 1211 ("Where conflicting factual information place[s] in serious dispute issues central to [a party's] claims and much depends upon the accurate presentation of numerous facts, the trial court err[s] in not holding an evidentiary hearing to resolve these hotly contested issues." (citations and internal quotation marks omitted)); 11 Charles Alan Wright et al., *Federal Practice and Procedure* § 2949 (3d ed.) ("When the outcome of a Rule 65(a)

---

[10] The government presented a 13-page affidavit of Donald Neufeld, USCIS Associate Director for Service Center Operations, accompanied by over 40 pages of exhibits, which purported to show that USCIS maintains authority and discretion to grant deferred action to non-DAPA applicants and to deny deferred action to applicants who meet the November 20 memorandum's listed criteria. The affidavit describes specific examples of instances when USCIS denied DACA 2012 requests for discretionary reasons that were not contemplated by the DACA 2012 guidelines. This affidavit was based on Neufeld's personal knowledge gained during the course of his official duties. Significantly, the district court never mentions Neufeld, and its only reference to his proof was its early rejection of the entire declaration and exhibits, without any detailed discussion, as not providing "the level of detail that the Court requested." *Texas*, 2015 WL 648579, at *5.

application depends on resolving a factual conflict by assessing the credibility of opposing witnesses, it seems desirable to require that the determination be made on the basis of their demeanor during direct and cross-examination, rather than on the respective plausibility of their affidavits."). As a second example, Jeh Johnson, the author of what is held disingenuous, was not heard from. His ten instructions requiring individualized, case-by-case assessment were not tested as pretext. When a court assesses unlawful motive and declares executive action invalid nationwide, highest government officials whose veracity is entirely discredited should be heard. Indeed, the District of Columbia Circuit commendably has developed a "curative option" short of complete invalidation for such circumstances. *McLouth*, 838 F.2d at 1324 (remanding to permit agency to demonstrate that it is "truly exercis[ing] discretion in individual" cases). This intermediate remedy seems especially noteworthy because of our intervening *Crane* decision, which calls into doubt the district court's basis for inferring disingenuousness.[11]

Third, DACA 2012 itself contains classic markers of discretion, including the ability to interview applicants, request additional evidence, and contact the applicant's educational institution, other government agencies, employers, or other entities to verify documents and facts. This discretion was actually exercised by DHS; the executive made nearly 200,000 requests for additional evidence under the DACA 2012 program, a fact the district court does not mention. Applications have been denied after an official exercised discretion in applying the criteria set forth in the DACA 2012 memorandum (i.e., making

---

[11] If a concern is that the unanimous panel in *Crane* itself lacked evidentiary foundation, it would seem even more advisable to require actual and adversarial evidence-taking, avoiding either agency action that is feared to be disingenuous or, an opposite extreme, requiring DHS to prioritize its limited resources only through full public participation.

a subjective determination that the applicant posed a public safety risk), and for reasons not expressly set forth in the DACA 2012 memorandum.

Fourth, and especially significant, placing determinative weight on the approval rate of applicants under DACA 2012 fails to take into account the crucial voluntary aspect of this memorandum, that applicants will *not* apply if they are ineligible—essentially self-reporting for removal—or, if eligible, when they have any other flaw they do not want revealed. In light of this manifest self-selection bias, it is unclear why the appropriate piece of data would be the approval rate of only applicants, crucially relied on by the district court to infer pretext, rather than the approval rate of all those who qualify. Again, the district court did not address at all this self-selection bias inherent in DACA 2012 and the November 20 memorandum.

Finally, as a leading administrative law scholar has observed, it is to be expected and encouraged that subordinate executive officers will follow enforcement guidelines. *See* Pierce, *Administrative Law Treatise*, § 6.3, at 424–25; *see also Prof'ls & Patients*, 56 F.3d at 599 (agents' conformance with agency guidance is "not particularly probative whether the rule is substantive" because "what purpose would an agency's statement of policy serve if agency employees could not refer to it for guidance?"). This positive should not become a negative to invalidate the very delineation of executive authority the APA exists to assure.

### D. Commonsense

Judge Kavanaugh brackets his *National Mining Association* framework for the § 553 analysis applied above with commonsense. First, he offers that "agency action that merely explains how the agency will enforce a statute . . . in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule—is a general statement of policy." *Nat'l Mining Ass'n*, 758 F.3d at 252. The Supreme Court,

66

in *Arizona*, resolved that immigration officials have "broad discretion" to enforce the federal immigration laws, including the "deci[sion] whether it makes sense to pursue removal at all." *Arizona*, 132 S. Ct. at 2499. Second, Judge Kavanaugh notes that a token of a general statement of policy is that the agency would have legal authority to undertake the action absent the guidance document. *See Nat'l Mining Ass'n*, 758 F.3d at 253 ("[W]hen the agency applies [a general statement of] policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued." (internal quotation marks and citation omitted)). As described earlier, deferred action has existed for half a century, reflected in longstanding regulations as an "act of administrative convenience," *see* 8 C.F.R. § 274a.12(c)(14), and recognized by the Supreme Court as an appropriate exercise of the Executive's removal discretion, *see Reno*, 525 U.S. at 483–84. Indeed, the same deferred action decisions for which the November 20 memorandum provides guidance already are permissible under the unchallenged 2014 enforcement priorities memorandum, which is explicitly incorporated into the November 20 memorandum. *See* Memorandum from Jeh Charles Johnson, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants* (Nov. 20, 2014). The November 20 memorandum, by incorporating a framework the plaintiffs admit is discretionary, necessarily contains at least that identical level of discretion.

## Conclusion

I would hold that the underlying issue presented to us—the order in which non-citizens without documentation must be removed from the United States—must be decided, presently is being decided, and always has been decided, by the federal political branches. *See Mathews v. Diaz*, 426 U.S. 67, 81 (1976) ("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors

No. 15-40238

has been committed to the political branches of the Federal Government."). On the expedience of immigration measures, sensible things can be said on all sides, mindful that our country is an immigrant society itself.[12] The political nature of this dispute is clear from the names on the briefs: hundreds of mayors, police chiefs, sheriffs, attorneys general, governors, and state legislators—not to mention 185 members of Congress, 15 states and the District of Columbia on the one hand, and 113 members of Congress and 26 states on the other. I would not affirm intervention and judicial fiat ordering what Congress has never mandated.

---

[12] Over twenty years ago, Judith Shklar observed in her book *American Citizenship*, aptly subtitled *The Quest for Inclusion*, that the United States has an "extremely complicated" history of "exclusions and inclusions, in which xenophobia, racism, religious bigotry, and fear of alien conspiracies have played their part." Judith N. Shklar, *American Citizenship: The Quest for Inclusion* 4 (1991). And over two hundred years ago, our non-citizen forebears grieved against their king that, "[h]e has endeavoured to prevent the population of these States; for that purpose obstructing the Laws for Naturalization of Foreigners; refusing to pass others to encourage their migrations hither." *The Declaration of Independence* (U.S. 1776).

68

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

May 26, 2015

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW:

No. 15-40238    State of Texas, et al v. USA, et al
                USDC No. 1:14-CV-254

Enclosed is an opinion entered in this case.

Sincerely,

LYLE W. CAYCE, Clerk

Jamei R. Schaeffer

By: _____
Jamei R. Schaeffer, Deputy Clerk

Mr. Alexandre I. Afanassiev
Mr. Chirag Gopal Badlani
Mr. J. Campbell Barker
Mr. Michael Bekesha
Mr. James Davis Blacklock
Mr. David J. Bradley
Ms. Beth S. Brinkmann
Mr. Joseph Conrad Chapelle
Mr. Jeffrey A. Clair
Mrs. Angela Veronica Colmenero
Mrs. April L. Farris
Mr. Matthew Hamilton Frederick
Mr. Kyle R. Freeny
Mr. Matthew James Ginsburg
Ms. Kathleen Roberta Hartnett
Mr. William Ernest Havemann
Mr. Michael Hethmon
Mr. Lawrence John Joseph
Mr. Scott A. Keller
Mr. Stephen Blake Kinnaird
Mr. Adam Paul KohSweeney
Mr. Steven James Lechner
Mr. Gabriel Markoff
Mr. Scott R. McIntosh
Mr. Benjamin C. Mizer
Ms. Angelique Marie Montano

Mr. Leif A. Olson
Mr. William Jeffery Olson
Mr. Paul Orfanedes
Ms. Nina Perales
Mr. James Peterson
Mr. Bradley S. Phillips
Mr. Alex Potapov
Mr. Matthew E. Price
Mr. Noah Guzzo Purcell
Mr. Charles Eugene Roy
Mr. Jay A. Sekulow
Mr. Ilya Shapiro
Mr. Benjamin Gross Shatz
Mr. Jeremy W. Shweder
Mr. Clifford M. Sloan
Ms. Linda J. Smith
Ms. Karen Cassandra Tumlin
Mr. Seth Paul Waxman
Mr. Jonathan Weissglass
Mr. Dale Wilcox
Mr. Paul Reinherz Wolfson
Ms. Elizabeth Bonnie Wydra
Mr. Ernest Young