UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:14-CV-254 |
| UNITED STATES OF AMERICA, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**<u>DEFENDANTS' RESPONSE TO PLAINTIFFS' FILING OF MAY 20, 2015</u>**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

I. FORMAL OVERSIGHT REGARDING DHS'S COMPLIANCE WITH THE
   PRELIMINARY INJUNCTION IS UNNECESSARY.......................................................2

II. THERE IS NO NEED FOR DISCOVERY REGARDING THE
    APPROXIMATELY 2000 INDIVIDUALS, BUT THE GOVERNMENT
    INTENDS TO CONFER WITH PLAINTIFFS ON INFORMATION RELATED
    TO CORRECTIVE ACTIONS ..........................................................................................7

III. NO FURTHER PROCEEDINGS ARE NECESSARY REGARDING THE
     COURT'S APRIL 7 ORDER OR THE GOVERNMENT'S PRIVILEGE
     ASSERTIONS ..................................................................................................................10

CONCLUSION.............................................................................................................................15

## TABLE OF AUTHORITIES

**CASES**

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991) .................................................................................................. 12

*Dunlop v. Marvin A. Smith Co.*,
    1976 WL 1719 (E.D. Tex. Aug. 17, 1976) ................................................................ 4

*Enron Corp. Sav. Plan v. Hewitt Assocs., LLC*,
    258 F.R.D. 149 (S.D. Tex. 2009) ............................................................................ 13

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*,
    2014 WL 7177794 (S.D. Tex. Dec. 17, 2014) .......................................................... 7

*Flextronics Int'l, Ltd. v. Parametric Tech., Corp.*,
    2013 WL 5200175 (N.D. Cal. Sept. 16, 2013) .......................................................... 6

*FSLIC v. Schoenberger*,
    1990 WL 130641 (E.D. La. Aug. 30, 1990) ............................................................ 14

*Gary W. v. Louisiana*,
    601 F.2d 240 (5th Cir. 1979) ..................................................................................... 7

*Kansas v. Nebraska*,
    135 S. Ct. 1042 (2015) .............................................................................................. 4

*R.C. ex rel. the Ala. Disabilities Advocacy Program v. Walley*,
    475 F. Supp. 2d 1118 (M.D. Ala. 2007) .................................................................... 3

*Schlagenhauf v. Holder*,
    379 U.S. 104 (1964) .................................................................................................. 8

*SEC v. Brady*,
    238 F.R.D. 429 (N.D. Tex. 2006) ............................................................................ 13

*SEC v. Radio Hill Mines Co.*,
    479 F.2d 4 (2d Cir. 1973) .................................................................................... 5, 12

*Sierra Club v. Clifford*,
    257 F.3d 444 (5th Cir. 2001) ..................................................................................... 6

*United States v. Garrett*,
    571 F.2d 1323 (5th Cir. 1978) ................................................................................... 8

*United States v. W.T. Grant Co.*,
  345 U.S. 629 (1953) ............................................................................................................. 4

*Vasudevan Software, Inc. v. IBM Corp.*,
  2011 WL 940263 (N.D. Cal. Feb. 18, 2011) ................................................................. 12, 14

*Youakim v. McDonald*,
  1996 WL 392150 (N.D. Ill. July 11, 1996) .......................................................................... 5

**RULES**

Fed. R. Civ. P. 11 ....................................................................................................................... 12

Fed. R. Civ. P. 26(b)(3) ............................................................................................................... 13

Fed. R. Civ. P. 53 ............................................................................................................... 6, 7, 15

## INTRODUCTION

As part of the Court's Order of April 7, 2015, the Court permitted Plaintiffs to file "a list of any further discovery that they may deem necessary, with a brief summary of why that discovery is relevant." ECF No. 226 at 12.  But Plaintiffs' Response, filed on May 20, 2015, requests a few pieces of specific information, and instead largely urges some form of formal oversight to monitor Defendants' ongoing compliance with the preliminary injunction.

Such oversight would be unnecessary.  Upon the Court's issuance of its preliminary injunction on February 16, 2015, the Department of Homeland Security (DHS) immediately undertook significant measures to cease all activity under the enjoined November 2014 Deferred Action Guidance.  There is no dispute that DHS successfully halted the overwhelming majority of the November 2014 Guidance, including implementation of the new eligibility guidelines for DACA, scheduled to go into place on February 18, as well as the ongoing preparation for the implementation of DAPA.

Plaintiffs' sole basis for seeking oversight is thus the approximately 2000 individuals who were issued three-year (rather than two-year) documentation under the 2012 eligibility guidelines post-injunction, contrary to DHS's intent, as explained in Defendants' May 7 Advisory.  But Defendants promptly self-reported and are voluntarily correcting all approximately 2000 individuals who received three-year as opposed to two-year documentation. Furthermore, the vast majority of the approximately 2000 individuals were issued three-year documentation due to an isolated miscommunication not likely to recur, particularly in the wake of corrective actions undertaken by DHS.  Thus, there is no basis or need for court-ordered oversight.  Nor is there any basis or need for discovery into these circumstances.  Nonetheless, in an effort to avoid further dispute, Defendants intend to meet-and-confer with Plaintiffs to explore

1

providing information that would address Plaintiffs' questions about the corrective actions undertaken regarding these approximately 2000 individuals.

Regarding the issues identified in the Court's April 7 Order, Plaintiffs do not contest the Government's explanation provided in its April 30 filing, and suggest only that further proceedings should be conducted to verify its accuracy. For the reasons previously explained, further inquiry is unnecessary for the Court to reach the conclusion that no sanctionable conduct occurred here. But to the extent the Court concludes that further review is warranted, the Government agrees with Plaintiffs that it would be appropriate to refer the matter to a magistrate judge, subject to the procedural protections required in such an inquiry.

Accordingly, the appropriate course here is for the Court (i) to decline to order any compliance oversight; (ii) to order the parties to provide a joint status report on the meet-and-confer process regarding certain information requested by Plaintiffs in their latest filing; and (iii) to conclude that no misconduct occurred and that no further proceedings are warranted regarding the Court's April 7 Order.

## I.  FORMAL OVERSIGHT REGARDING DHS'S COMPLIANCE WITH THE PRELIMINARY INJUNCTION IS UNNECESSARY.

Plaintiffs suggest that, in light of the approximately 2000 individuals who were eligible under the 2012 DACA guidelines and were issued three-year (rather than two-year) documentation post-injunction, "it would be prudent to institute some mechanism to oversee Defendants' ongoing compliance with the preliminary injunction." Pls.' Resp. (ECF No. 261) at 8. Plaintiffs specifically suggest that the Court require "weekly or monthly sworn certification of compliance with the injunction," or "the appointment of an external compliance monitor to oversee Defendants' compliance and provide periodic reports to the Court, at Defendants' expense." *Id.* Neither suggestion has merit.

A. Plaintiffs' basis for seeking compliance oversight is Defendants' report on May 7 that DHS had erroneously issued three-year, rather than two-year, documentation to approximately 2000 individuals who met the eligibility guidelines for deferred action under the 2012 DACA Guidance. *See* Pls.' Resp. at 7-8.[1] While the Government sincerely regrets the circumstances that led to that occurrence, these circumstances do not warrant formal compliance oversight.

First and foremost, DHS promptly notified the Court about these approximately 2000 individuals after they came to the agency's attention, and DHS immediately began taking corrective action to change their terms of deferred action and/or employment authorization. *See* Rodriguez Decl. (ECF No. 256-1) ¶ 12; Neufeld Decl. (ECF No. 256-2) ¶¶ 31-37. DHS's actions thus demonstrate prompt self-reporting and voluntary self-correction—not the type of circumstances necessitating oversight. *See R.C. ex rel. the Ala. Disabilities Advocacy Program v. Walley*, 475 F. Supp. 2d 1118, 1178 (M.D. Ala. 2007) (terminating a consent decree based in part on the defendant's "success in the area of self-monitoring and self-correction"), *aff'd*, 270 F. App'x 989 (11th Cir. 2008).

Furthermore, the circumstances here highlight why formal oversight is unnecessary. The vast majority of the three-year (rather than two-year) documentation was issued due to a single, isolated error—a miscommunication between DHS operational personnel and IT personnel— occurring in the wake of "a period of intense activity at USCIS" to implement immediately the Court's preliminary injunction order. Rodriguez Decl. ¶ 6. It is exceedingly unlikely that this

---

[1] The vast majority of these approximately 2000 individuals were approved for three-year deferrals and employment authorizations prior to the injunction. *See* Neufeld Decl. (ECF No. 256-2) ¶¶ 3, 19. For these individuals, most were issued only their Employment Authorization Documents (EADs) after the injunction, *see id.* ¶ 19, although a subset were also issued approval notices for deferred action and/or employment authorization after the injunction, *see id.* ¶ 37. The 2000 individuals also include some post-injunction three-year approvals. *See id.* ¶¶ 36-37.

3

situation would recur given the unique circumstances here (in which the deferred action and employment authorization requests had been approved for three years prior to the injunction but documentation was still pending at the time of the injunction; the documentation was initially held back from issuance; but then a subsequent instruction that was intended to permit issuance of only two-year documentation erroneously resulted in three-year documentation also being issued). *See* Rodriguez Decl. ¶¶ 8-9; Neufeld Decl. ¶¶ 5, 22-24. Additionally, DHS has taken steps to ensure that similar situations do not occur again in the future, *see* Rodriguez Decl. ¶¶ 12-14 & Att., and Plaintiffs have not challenged the sufficiency of those remedial steps.[2] Because recurrence is thus unlikely, formal court-ordered oversight is unnecessary. *See Kansas v. Nebraska*, 135 S. Ct. 1042, 1059 (2015) (holding that "Kansas has failed to show, as it must to obtain an injunction, a 'cognizable danger of recurrent violation,'" because "Nebraska's new compliance measures, so long as followed, are up to the task of" preventing future violations (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)); *Dunlop v. Marvin A. Smith Co.*, 1976 WL 1719, at *2 (E.D. Tex. Aug. 17, 1976) (where defendants' prior non-compliance was "due to mistake on their part," "no injunction is necessary to insure future compliance with the Act").

    Finally, the broader context of DHS's compliance with the Court's preliminary injunction further weighs against monitoring. There is no dispute that DHS successfully halted implementation of the overwhelming majority of the 2014 Deferred Action Guidance, which required significant efforts by DHS. *See* Rodriguez Decl. ¶ 7; Neufeld Decl. ¶¶ 15-16. The issuance of three-year (rather than two-year) documentation to approximately 2000 individuals,

---

[2] DHS has also taken other corrective steps, such as directing creation of a technological solution that will prevent manual mistakes. *See* Neufeld Decl. ¶ 36; Rodriguez Decl. ¶ 12.

4

all eligible under the 2012 DACA eligibility guidelines, is only one small aspect of compliance; DHS was also required to immediately halt implementation of the new eligibility guidelines for DACA, scheduled to go into place on February 18, as well as the ongoing preparation for the implementation of DAPA. Rodriguez Decl. ¶¶ 6-8; Neufeld Decl. ¶¶ 14-16. And now that DHS has halted its activities, there is no need for the sort of ongoing monitoring that might be appropriate for an injunction governing the implementation of an ongoing program.

  **B.**  The two specific forms of oversight requested by Plaintiffs—regular reporting requirements and appointment of an external compliance monitor—would be particularly inappropriate here.

  First, there is no basis for concluding that "the circumstances of this case" warrant "additional reporting requirements . . . to insure compliance with [the] injunction." *SEC v. Radio Hill Mines Co.*, 479 F.2d 4, 6 (2d Cir. 1973) (upholding such relief based on the defendant's history of "orchestrat[ing] an elaborate scheme" to defraud, and his "practice of concealing his participation in securities transactions"). Here, as discussed above, DHS has already implemented the Court's injunction by halting all activities under the enjoined 2014 Deferred Action Guidance. Periodic updates on compliance are therefore unnecessary. Further, DHS has already sought to ensure utmost compliance with the Court's injunction, *see* Rodriguez Decl. ¶¶ 10-14, and requiring compliance certifications would add nothing to those efforts. Nor would regular reports assist the Court or Plaintiffs in learning of any future issues, given DHS's previous self-reporting and self-correcting. Thus, there is no need or basis to impose a court-ordered reporting requirement in this matter. *Cf. Youakim v. McDonald*, 1996 WL 392150, at *5 (N.D. Ill. July 11, 1996) (holding in analogous circumstances that "compliance reporting constitutes precisely the type of relief repeatedly condemned by the Seventh Circuit as violative

of federalism principles"); *Flextronics Int'l, Ltd. v. Parametric Tech., Corp.*, 2013 WL 5200175, at *9 (N.D. Cal. Sept. 16, 2013) (declining to impose a compliance-reporting requirement as "disproportionate and burdensome").

Second, Plaintiffs' request for an external compliance monitor does not satisfy the standards set forth in Rule 53 governing the appointment of such external masters. At a minimum, such an appointment would be permissible only if oversight is a matter "that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P. 53(a)(1)(C). And depending on the scope of the referral—*i.e.*, if the special master were to "hold trial proceedings and make or recommend findings of fact"—the Court may be required to find "some exceptional condition" warranting the appointment. Fed. R. Civ. P. 53(a)(1)(B); *see also* Fed. R. Civ. P. 53 adv. cmte. note (2003) (discussing how "[t]he core" of the Rule is that "appointment of a master must be the exception and not the rule").

For all of the reasons discussed above, Rule 53's standards cannot be met here. DHS's post-injunction issuance of three-year, rather than two-year, documentation to approximately 2000 individuals who met the 2012 DACA guidelines was based on isolated errors, and DHS immediately and voluntarily began taking corrective action. These circumstances do not amount to an "exceptional condition," nor do they suggest that compliance is so complicated that it "cannot be effectively and timely addressed" either by this Court, another district judge, or a magistrate judge of this district. Fed. R. Civ. P. 53(a)(1); *see Sierra Club v. Clifford*, 257 F.3d 444, 447 (5th Cir. 2001).

This case is thus distinguishable from ones where compliance monitors are genuinely needed. "Reliance on a master is appropriate when a complex decree requires complex policing, particularly when a party has proved *resistant or intransigent*." Fed. R. Civ. P. 53 adv. cmte.

6

note (2003) (emphasis added); *see also Gary W. v. Louisiana*, 601 F.2d 240, 244 (5th Cir. 1979) (approving appointment of a special master because "during the past two years the appellants have failed to comply substantially with the original injunction"). DHS's self-reporting and self-correction here are the very opposite of intransigence or resistance, and there is no basis for concluding that an external monitor would lead to increased compliance with the Court's injunction. *See Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, --- F. Supp. 3d ----, 2014 WL 7177794, at *25 (S.D. Tex. Dec. 17, 2014). Accordingly, appointment of an external compliance monitor is unwarranted.[3]

## II. THERE IS NO NEED FOR DISCOVERY REGARDING THE APPROXIMATELY 2000 INDIVIDUALS, BUT THE GOVERNMENT INTENDS TO CONFER WITH PLAINTIFFS ON INFORMATION RELATED TO CORRECTIVE ACTIONS.

**A.** Plaintiffs do not expressly request discovery with respect to the substance of the May 7 Advisory, and instead only suggest that, if further clarity on the issue were needed, discovery might be ordered with respect to "all communications referenced or relied on" in the supplemental Rodriguez and Neufeld declarations filed on May 15, 2015. Pls.' Resp. at 7. The lack of an express request for such discovery or an explanation of why it is necessary or relevant are sufficient reasons not to consider any such discovery. Moreover, even were the Court to consider Plaintiffs' suggestion of potential discovery, any discovery into the issues addressed in Defendants' May 7 Advisory, ECF No. 247, or the May 15 supplemental declarations, ECF No. 256, is unnecessary.

Specifically, there is no "good cause" for early discovery into the issues addressed in the May 7 Advisory and supplemental declarations. *See Schlagenhauf v. Holder*, 379 U.S. 104, 118

---

[3] Were the Court inclined to appoint such a monitor, further proceedings would be necessary prior to any such appointment. *See* Fed. R. Civ. P. 53(b)(1) & adv. cmte. note (2003).

7

(1964) (noting that good cause must "exist[] for ordering each particular examination" because "[o]bviously, what may be good cause for one type of examination may not be so for another"). The good cause standard is demanding and fact-specific, requiring narrowly tailored discovery, and Plaintiffs bear the burden of demonstrating good cause. *Id.*; *see also United States v. Garrett*, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978) ("The burden is upon the movant to show" the existence of good cause, which requires "a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements."). Here, DHS has provided detailed declarations about what happened, *see* ECF Nos. 256-1, 256-2, and Plaintiffs have offered no reason to doubt those straightforward explanations. Thus, there is no basis for expedited discovery into the discrete issues reported in the May 7 Advisory.

Indeed, Plaintiffs mention the issue of discovery into these declarations only in the context of addressing the Government's response to the Court's Order of April 7, 2015. *See* Pls.' Resp. at 7. But these declarations have nothing to do with the response to the April 7 Order, which is addressed below. Plaintiffs appear to conflate two distinct issues: (i) the approximately 2000 individuals who were issued three-year (instead of two-year) documentation *post-*injunction, as discussed in the May 7 Advisory and supplemental declarations; and (ii) the confusion surrounding DHS's *pre-*injunction approval of three-year grants of deferred action and employment authorization, as discussed in the Court's April 7 Order. Discovery concerning the supplemental Neufeld and Rodriguez declarations would provide no insights into the issues discussed in the Government's April 30 filing, and in any event is not warranted.

**B.** Plaintiffs' filing also hints at discovery regarding the extent to which "corrective action" has taken place for the approximately 2000 individuals, Pls.' Resp. at 8, but does not establish "good cause" as to any such discovery.

Plaintiffs suggest that it is necessary for them to "obtain a list of returned three-year authorizations" in order for them to determine whether to undo any allegedly irreparable harm they suffered from the issuance of three-year, rather than two-year, documentation to approximately 2000 individuals eligible under the 2012 DACA guidelines. Pls.' Resp. at 8-9. But it is unclear why Plaintiffs would in fact need such a list. To the extent Plaintiffs are concerned about individuals using unreturned three-year documentation, Plaintiffs overlook that an individual's documentation is subject to verification. For example, before issuing a driver's license, Texas relies on USCIS's Systematic Alien Verification of Entitlement ("SAVE") system to confirm the duration of an individual's employment authorization. *See* Decl. of Joe Peters (ECF No. 64-43) ¶¶ 3-5. And because USCIS has confirmed that it is "correcting its records of these cases to reflect two-year validity periods for both deferred action and employment authorization," Neufeld Decl. ¶ 35, discovery into the return of three-year documentation is not necessary.

Further, to the extent Plaintiffs are trying to determine whether to unwind any actions they may have already taken with respect to some of the 2000 individuals, Plaintiffs have not established the predicate to their proposed discovery—*i.e.*, that the issuance of three-year (as opposed to two-year) documentation to approximately 2000 individuals eligible under the 2012 DACA guidelines actually caused Plaintiffs any injury. Absent such a demonstration, Plaintiffs' requested discovery into an asserted "choice of two irreparable harms," Pls.' Resp. at 9, lacks sufficient basis.

Nevertheless, in an effort to avoid any further briefing or dispute on this discovery issue, the Government intends to meet-and-confer with Plaintiffs to determine whether there is any information Defendants could voluntarily provide to address Plaintiffs' concerns, as identified in

9

their Response. *See* Pls.' Resp. at 8-9 (seeking specific information related to DHS's corrective actions regarding the approximately 2000 individuals). The Government proposes that the parties file a joint status report with the Court regarding this meet-and-confer process 60 days after the date of this filing (the first business day after 60 days being July 27, 2015). This time is necessary for the Government to get a better idea from Plaintiffs as to what exactly their concerns are; to determine what information, if any, might actually be relevant to those concerns; and to the extent Plaintiffs' concerns would require the production of sensitive personal information, then for the parties, if necessary, to negotiate a protective order that would protect such personal information. To the extent the Court would prefer an earlier joint status report on this meet-and-confer process, the Government is of course amenable to providing one.

### III.  NO FURTHER PROCEEDINGS ARE NECESSARY REGARDING THE COURT'S APRIL 7 ORDER OR THE GOVERNMENT'S PRIVILEGE ASSERTIONS.

Regarding the subject of the Court's April 7 Order, Plaintiffs have not submitted "any further discovery that they may deem necessary," or a brief summary "of why that discovery is relevant," as the Court's April 7 Order gave them an opportunity to do. ECF No. 226 at 12. Nor have Plaintiffs provided any basis for doubting the Government's narrative of events set forth in its April 30 filing. Instead, Plaintiffs assert that the Government's claims of privilege are overbroad, *see* Pls.' Resp. at 2-5, and that this Court should "verify" the Government's April 30 narrative, with the possibility of further "exploration of the need for sanctions" depending on what the privileged materials reveal. *Id.* at 2, 5-6. For all of the reasons set forth in the Government's April 30 filing, however, such proceedings are unwarranted: the appropriate result is for the Court to conclude that no misconduct occurred and that no further proceedings are necessary in connection with its April 7 Order.

As explained at length in Defendants' response to the Court's April 7 Order, *see* ECF Nos. 242-43, the Government's statements to the Court and Plaintiffs regarding the effective date for implementing the expanded eligibility guidelines for DACA under the 2014 Deferred Action Guidance were not intended to conceal, by omission or otherwise, the fact that, pursuant to the 2014 Deferred Action Guidance, DHS was issuing three-year terms of deferred action and work authorization to individuals who were already eligible under the unchallenged 2012 DACA guidelines.  Nor did the Government improperly delay filing the March 3 Advisory.  Rather, the Government filed the Advisory promptly in an effort to apprise the Court, before it ruled on Defendants' pending stay motion, of potentially relevant information that had just come to counsel's attention.  *See id.* at 1-3, 6-18.

Plaintiffs do not contest the Government's explanation of these events.  Nor have Plaintiffs submitted "any further discovery that they may deem necessary" with respect to those events.  Apr. 7 Order at 12.[4]  Rather, Plaintiffs suggest only that further "exploration" by the Court may be needed, depending on what the Government's *in camera* submission reveals to the Court, because the Government's claims of privilege over its submission prevent them from "verify[ing]" the Government's account.  Pls.' Resp. at 2, 5-6.

But as we have explained, the Government's April 30 filing shows that there was no misconduct here; and that filing alone should satisfy the Court's concerns and obviate the need for any review of the withheld materials submitted *in camera*.  Specifically, the Government's representations regarding the effective dates for action under the 2014 Deferred Action Guidance were made in good faith, as explained in the April 30 filing and further confirmed by other

---

[4] The only potential discovery Plaintiffs specifically mention—for communications referred to or relied on in the May 15, 2015 Rodriguez and Neufeld declarations—would have no bearing on Defendants' representations regarding implementation of the 2014 Deferred Action Guidance, or the March 3 Advisory.  *See* Section II.A, *supra*.

11

matters of record. *See* ECF No. 243 at 1-3, 6-10, 12-15. And with respect to potential delay in filing the March 3 Advisory, the Government's privilege log and metadata chart confirm that the March 3 Advisory was promptly filed within approximately 24 hours after the first draft was prepared. Thus, as explained in the Government's April 30 filing, it is unnecessary even for the Court to review the Government's privileged documents in order to conclude that no misconduct occurred here, and thus that no further proceedings on this issue are required. ECF No. 242 at 22-24.

Similarly, there is also no need for the Court to adjudicate the validity of Defendants' privilege assertions. *See* Pls.' Resp. at 2-5. Plaintiffs effectively confirm that such adjudication is unnecessary: although Plaintiffs "are in no position to adequately verify" the Government's narrative, "[t]his Court . . . is in such a position." *Id.* at 6. In other words, as long as the Court can verify the Government's narrative, there is no need for adjudication of the privilege assertions vis-à-vis Plaintiffs. Even if *ex parte* review of the privileged materials were needed for such verification (which it is not), Plaintiffs have not sought a role for themselves in the Court's process of evaluating the Government's litigation conduct—nor would they properly have one—therefore making it unnecessary to resolve the privilege issues vis-à-vis Plaintiffs.[5]

In any event, Defendants' claims of privilege are well-founded and substantiated by Defendants' privilege log. Given the nature of the material at issue—*i.e.*, "any and all drafts of the March 3, 2015 Advisory," "corresponding metadata," and "all other tangible items that indicate when each draft of the document was written and/or edited or revised," April 7 Order

---

[5] Although the Court has inherent authority "to conduct an independent investigation" into potential misconduct occurring before it, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991), that does not mean that opposing parties are permitted to conduct such an investigation through civil discovery. Even if Plaintiffs had brought their own motion for sanctions (which they have not), that still would not entitle them to discovery. *See* Fed. R. Civ. P. 11 adv. cmte. note (1983); *Vasudevan Software, Inc. v. IBM Corp.*, 2011 WL 940263, at *5 (N.D. Cal. Feb. 18, 2011).

12

at 11—it is unsurprising that privilege is asserted "broadly" here, given that all responsive materials are related to attorneys' drafts of a court filing in an ongoing case. Furthermore, the privilege log includes a description of each document (e-mails are described by subject line), the identities of the author, recipients, and custodian, and a detailed explanation of the basis for withholding each document under the privileges claimed. And in accordance with the Court's Order of May 12, 2015, Defendants have supplemented the log with the positions of each author, recipient, and custodian identified in the log. This information provides more than sufficient detail for Plaintiffs to assess each assertion of privilege without disclosing so much information as to waive the very privileges invoked. Tellingly, Plaintiffs do not cite a single specific example of a purportedly deficient entry in Defendants' log.

Plaintiffs further argue that the protections afforded by the work-product doctrine and the attorney-client and deliberative-process privileges asserted by Defendants are "far from absolute," Pls.' Resp. at 3-4, but that sweeping assertion is unfounded. It is well established that the protection afforded to "opinion" work product, such as drafts of a party's filings, is "almost absolute" and can be overcome only on a showing of "high[est] necessity, which is a rare situation if it exists at all." *Enron Corp. Sav. Plan v. Hewitt Assocs., LLC*, 258 F.R.D. 149, 161 & n.8 (S.D. Tex. 2009); *SEC v. Brady*, 238 F.R.D. 429, 443 (N.D. Tex. 2006); *see also* Fed. R. Civ. P. 26(b)(3)(B) (even if a court permits discovery of ordinary work product, "it *must* protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation" (emphasis added)).

Plaintiffs are correct that the deliberative-process privilege is a qualified privilege that can be overcome by a demonstration of "need for accurate fact finding [that] override[s] the government's interest in nondisclosure." *FSLIC v. Schoenberger*, 1990 WL 130641, *5 (E.D.

13

La. Aug. 30, 1990). But Plaintiffs do not assert that the privileged materials would assist them, and essentially agree that *in camera* review is the most that is called for here. *See* Pls.' Resp. at 6. Accordingly, there is no need here that would surmount the deliberative-process privilege, much less a "compelling need" required to prevail over the near-absolute protection afforded to core work product, or a justification for disregarding the protection extended by the attorney-client privilege.[6]

Plaintiffs suggest that, to avoid the potential difficulties that could arise if the Court itself reviewed the privileged materials, the Court may refer this matter to a magistrate judge to rule on Defendants' assertions of privilege, and to conduct further inquiries into the question of sanctions, including possible discovery. Pls.' Resp. at 6-7.[7] But no further proceedings are required, including adjudication of Defendants' privilege claims, to arrive at the conclusion that no misconduct occurred here. The sole reason given by Plaintiffs to continue the inquiry is their own stated inability to determine that Defendants' statements and actions were unmotivated by bad faith. *See* Pls.' Resp. at 6. The Court can make that determination itself, however, on the basis of the already existing record, and without the Court's examination of privileged materials.

---

[6] To the extent the Court has questions or concerns about the privileged character of any of Defendants' *in camera* submissions, Defendants respectfully request the opportunity for further briefing and/or declarations to address those concerns before the Court orders disclosure of any such materials to Plaintiffs. *See* ECF No. 242 at 27.

[7] Plaintiffs also argue that this Court can review the privileged materials *in camera*, observing that federal courts commonly conduct *in camera* review of documents to resolve contested claims of privilege. Pls.' Resp. at 6. Plaintiffs here are not seeking *in camera* review merely to resolve a privilege assertion, however, but rather for purposes of a substantive adjudication—*i.e.*, to verify that Defendants' representations were made in good faith. *Id.* And consideration of the privileged materials is unnecessary to determine that Defendants engaged in no misconduct here; thus, adjudication of Defendants' claims of privilege is unnecessary to resolve the underlying question of whether any further proceedings are needed. Moreover, the documents in question here include drafts of a filing made in a still-pending case, and counsel's commentary on those drafts. Performing an *in camera* review of these documents would require the Court to scrutinize counsel's mental impressions, analysis, and strategy concerning a case that remains pending for decision before it. *See* ECF No. 242 at 22-25. Plaintiffs cite no authority condoning such a potentially prejudicial intrusion on the confidentiality of counsel's thought processes in pending litigation.

Nonetheless, to the extent the Court believes further proceedings are necessary, including review of the *in camera* materials, Defendants agree with Plaintiffs that referral to a magistrate judge presents an appropriate alternative that would avoid the potential for prejudice to Defendants inherent in review of such materials by the Court itself.[8] Before embarking on any further inquiry regarding the possible imposition of sanctions, however, the Court would need to ensure that the additional requirements of due process are observed. That would require, at a minimum, notice to the parties and/or counsel against whom sanctions are contemplated, the basis for such potential sanctions, the type of sanctions being contemplated (including whether the potential sanctions are personal in nature), and an opportunity for the party and/or counsel to respond to the specific sanctions being contemplated. *See* ECF No. 242 at 18-19, 21-22. Based on the record of this proceeding and the parties' submissions to date, however, there is no basis for further review or inquiry related to any concern of misconduct or the Government's privilege assertions.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' request for compliance monitoring, and order the parties to file a joint status report no later than July 27, 2015, regarding the provision of information related to Defendants' corrective actions for the approximately 2000 individuals who were issued three-year instead of two-year documentation post-injunction. The Court should also find that no misconduct occurred here, and conclude its inquiry into the issues identified in its April 7 Order.

---

[8] For the reasons explained above, referral to a special master for these purposes, *see* Pls.' Resp. at 6, would be contrary to Rule 53, and would require further proceedings prior to any such referral.

Dated: May 27, 2015

KENNETH MAGIDSON
United States Attorney

DANIEL DAVID HU
Assistant United States Attorney
Deputy Chief, Civil Division

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

JOYCE R. BRANDA
Deputy Assistant Attorney General

AUGUST E. FLENTJE
Special Counsel

JENNIFER D. RICKETTS
Director, Federal Programs Branch
Attorney-in-Charge (VA Bar No. 29281)

JAMES J. GILLIGAN
Special Litigation Counsel

 /s/ Daniel Schwei
DANIEL SCHWEI
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883
Washington, D.C. 20044
Tel.: (202) 305-8693
Fax: (202) 616-8470
Daniel.S.Schwei@usdoj.gov

*Counsel for Defendants*