1              IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF TEXAS
2                    BROWNSVILLE DIVISION

3    _____
                                      )
     STATE OF TEXAS, ET AL            )
4                                     )
                                      ) CIVIL ACTION NO.
5    VS.                              ) B-14-254
                                      )
6    UNITED STATES OF AMERICA, ET AL  )
     _____)
7

8
                          MOTION HEARING
9            BEFORE THE HONORABLE ANDREW S. HANEN
                       JUNE 23, 2015
10

11
     APPEARANCES:
12
     For the Plaintiffs:        MS. ANGELA V. COLMENERO
13                              MR. ADAM NICHOLAS BITTER
                                Texas Attorney General's Office
14                              P.O. Box 12548
                                Austin, Texas  78711
15
     For the Defendants:        MS. JENNIFER D. RICKETTS
16                              MR. DANIEL SCHWEI
                                US Department of Justice
17                              Civil Division
                                20 Massachusetts Ave., NW
18                              Washington, D.C.  20001

19   ALSO PRESENT:  Ur Jaddou, Agency Counsel

20   Transcribed by:            BARBARA BARNARD
                                Official Court Reporter
21                              600 E. Harrison, Box 301
                                Brownsville, Texas  78520
22                              (956)982-9668

23

24

25

1          THE COURT:  All right.  Be seated.

2      Okay.  We're here in B-14-254, State of Texas, et al versus

3  the United States, et al.

4      Ms. Colmenero, who is accompanying you today?

5          MS. COLMENERO:  I'm joined here today by Adam Bitter,

6  who is also an attorney with the Texas Attorney General's

7  office.

8          THE COURT:  Okay.  I was going to call on Mr. Hu because

9  he's the face I recognize.

10          MR. HU:  I'll be happy to introduce everyone at the

11  table.  They're going to be doing all the talking.

12          THE COURT:  All right.

13          MR. HU:  I have Jennifer Ricketts from the Department of

14  Justice in Washington and Daniel Schwei from DOJ.  And Ur Jaddou

15  from agency counsel.

16          THE COURT:  Okay.

17          MS. RICKETTS:  And, Your Honor, with your permission,

18  Mr. Schwei and I would like to share the podium.  We would

19  divide it up so that I would handle any questions related to the

20  April 7th order.  He would handle --

21          THE COURT:  Well, the only thing you need to do in

22  sharing the podium is to make sure you're always in front of a

23  microphone or you'll get the wrath of my court reporter.

24          MS. RICKETTS:  Will do, Your Honor.

25          THE COURT:  All right.  Let me start off by saying or by

1   asking, I guess really, have y'all gotten together, I hope, and

2   talked about how we can resolve any -- and I guess what I'll

3   call it -- remedial action?  What can we do to get this behind

4   us?

5            MS. COLMENERO:  Yes, Your Honor, we have.  And the

6   meet-and-confer process was initiated the beginning of June.

7   We've had two meet and confers thus far.  And really the focus

8   of the meet and confers has been related to the 2,000 work

9   authorization documents that were issued after the Court's

10  February 16th injunction, and so the parties have been

11  discussing an exchange of information that would better aid the

12  plaintiff states in determining whether they need to proceed

13  forward with any corrective action orders.

14       And we've requested kind of a list of information that we

15  think is pertinent to our inquiries in terms of whether or not

16  we need to undertake any corrective action orders within our own

17  respective states, and the Department of Justice and the other

18  defendants have provided us with some limited information.

19       And most recently as of Friday, the information that they've

20  provided out of the 2,000 post-injunction grants that were

21  issued, it appears that 814 of those were -- came from or were

22  individuals who resided in the plaintiff states, and so they've

23  provided us with a tally of where those individuals reside.  And

24  specifically just for the State of Texas, they have provided us

25  with the number of queries that have been run on the SAVE

1    database.

2              THE COURT:  Tell me what that means.

3              MS. COLMENERO:  So whenever an individual comes to a

4    Texas driver's license facility, in order to confirm that they

5    are, in fact, an individual who is lawfully present here in the

6    United States, we've run the work authorization ID number

7    through the SAVE database which verifies that that individual

8    does, in fact, have lawful presence here.  And so the Department

9    of Justice has provided us only for the State of Texas the

10   number of inquiries that were run on the SAVE database for

11   individuals who are part of this group of 2,000 from the

12   February 6th date I believe through mid June, if that's correct.

13        And so we've only gotten that information just for the State

14   of Texas.  We've expressed that we believe -- on our last meet

15   and confer that while we appreciate that information, it is kind

16   of an initial first step, and we think it's useful, it obviously

17   doesn't translate over to the other plaintiff states, and we

18   would want that same information for them.

19        And in addition to the information that they provided us, we

20   have also requested information related to the return of the

21   three-year work authorization documents.  They've identified in

22   their latest filings that they've taken some corrective action

23   orders on their own end which include asking for the return of

24   those documents as well as transferring the three-year grants to

25   two-year grants.

1    And so we've asked for information related to when the

2    request to return the documents was made, and if, in fact, those

3    documents have, in fact, been returned to the federal agency.

4    And we haven't received that information, but we're in the

5    meet-and-confer process, and there has been an initial exchange

6    of some information.  It's just been very limited.

7         THE COURT:  All right.  Mr. Schwei, did you want to

8    weigh in?

9         MR. SCHWEI:  Yes.  Thank you, Your Honor.  With respect

10   to the letter that was sent to the plaintiffs on Friday, I have

11   copies of that four-page letter here.  It's rather detailed in

12   the amount of information that it provides.  We'd be happy to

13   provide Your Honor with a copy of that letter if Your Honor

14   would like one.

15        I think from our perspective, the meet-and-confer process

16   has been a productive one.  We have met two times and provided

17   the plaintiffs with some of their requested information and are

18   continuing to look on our end whether additional information may

19   be possible.  I think our -- our position would be that the

20   meet-and-confer process should continue going forward and that

21   the next step, what the plaintiffs have said to us in some of

22   our conversations, is that they would like to do a, quote,

23   phased approach where they review the information that we've

24   been -- that we provide to them, and they would determine

25   whether any additional information is necessary.

1        So we believe the next step would be to hear back from the

2   plaintiffs precisely what information they are requesting, and

3   the parties could continue that meet-and-confer process.  But

4   overall we think it has been a productive one and would request

5   that the parties be allowed to continue that process.

6        THE COURT:  Who are the recipients, if you can

7   categorize them.  There may not be a way to categorize them, but

8   who are the recipients of the 2,000 work authorizations after

9   the injunction?

10        MR. SCHWEI:  All of those individuals were individuals

11   eligible under the 2012 Deferred Action for Childhood Arrivals,

12   the 2012 DACA.

13        THE COURT:  So they either were or could have been, for

14   lack of a better term, DACA eligible recipients?

15        MR. SCHWEI:  With re -- they were eligible under the

16   2012 DACA recipient or under the 2012 guidelines.  So all of the

17   individuals were correctly eligible for two-year terms but

18   mistakenly were granted three-year terms.  And so the corrective

19   actions that the agency has been taking are con -- are designed

20   to convert the three-year terms to two-year terms.

21        THE COURT:  Okay.

22        MR. SCHWEI:  All of the individuals were eligible under

23   the original 2012 DACA guidelines.

24        THE COURT:  All right.  Ms. Colmenero, do you see any

25   problem as long as both sides are making progress?  I don't

 1   necessarily think that the Court needs to weigh in on a process

 2   that's actually perhaps resolving itself.

 3          MS. COLMENERO:  And --

 4          THE COURT:  Not that it's resolving itself.  You guys

 5   are working on it, but --

 6          MS. COLMENERO:  And that's what I just wanted to

 7   reiterate, is that we are, in fact, working with the defendants

 8   on this issue, and we did -- and we did, in fact, suggest that

 9   it would be done -- it made the most sense for it to be done in

10   a phased approach for us to see what information could be

11   provided to us and whether or not it, in fact, is useful.

12      And I expect in the next meet and confer for us to, you

13   know, request some more information because the limited

14   information that we do have and has been provided to us, it

15   is -- while it is useful in a very limited respect, I think some

16   additional information is warranted.  And so if the parties can

17   continue to have these productive conversations, we are hopeful

18   that perhaps we might be able to reach a resolution and finally

19   find some information that the plaintiff states can use in terms

20   of determining the extent of the injuries that they may have

21   suffered with these post-injunction grants and work

22   authorizations.

23          THE COURT:  Okay.  All right.  Is there any feel for a

24   time frame when y'all can finally -- and I don't mean you have

25   it resolved, but you have agreed on a procedure to resolve it?

1    MS. COLMENERO:  I think originally the defendants had

2    suggested that at the -- that there be -- it's kind of a 60-day

3    meet-and-confer process, and then the parties file a joint

4    status report with the Court letting the Court know where the

5    parties stood.  I think that that's still reasonable, and

6    hopefully we can strive to meet that deadline or perhaps reach

7    an agreement on a new deadline as these conversations progress.

8            THE COURT:  Mr. Schwei?

9            MR. SCHWEI:  Yes, Your Honor.  I think it makes sense to

10   provide Your Honor with a joint status report on that date

11   originally suggested, which was July 27th, 2015.  I'm not sure

12   whether all, you know, provision of information will be

13   completed by that point, but I think certainly more will be

14   completed, and we'll have a clearer focus at that time with

15   respect to what additional information may be at issue.

16           THE COURT:  Okay.  Why don't I -- I'm going to go ahead

17   and amend that a little bit.  Let's give to the end of July.

18   The 31st is a Friday anyway, and I always work better on Friday

19   deadlines.  So why don't we say if y'all can get me a status

20   report by July 31st.

21           MR. SCHWEI:  Certainly, Your Honor.

22           THE COURT:  Okay.  All right.  Let's turn to what I

23   guess I consider the other issue then.  What do I do, if

24   anything, about the representations that were made during the

25   hearings that nothing was going to happen between the time that

1   the representations were made and February 18th?

2       The government has filed in response to my order a variety

3   of documents along with both a redacted brief and an unredacted

4   brief.  The state has obviously complained that they can't

5   figure out enough information from what's been filed.

6       In the brief, the Court's been assured that, hey, look, we

7   basically notified the Court within two or three business days

8   when we found this out, but then you cite me to some documents

9   that are contained in the packages that you tell me I can't look

10  at.  And so -- and here they are.  I have not unsealed them.

11  They're both right here.

12      So how do I rule on something that I can't look at?

13          MS. RICKETTS:  My turn, I'm guessing.  Good morning,

14  Your Honor.

15      I appreciate the awkwardness of that situation.  Obviously

16  we have struggled as well to make sure that we provided full

17  information to Your Honor everything that was responsive to the

18  April 7th order as well as as much explanation as we could

19  possibly provide.  We were very mindful of trying not to waive

20  some pretty core privileges.  It is unusual, to say the least,

21  to be providing mental impressions of attorneys, drafts,

22  pleadings in litigation in the midst of a litigation.  And so

23  what you got, Your Honor, reflected that struggle.

24      We do think, however, based on the narrative that we

25  provided -- and we would note that the plaintiffs did receive

1    most of that narrative.  What was redacted were things like

2    dates and attorney-client communications which we thought were

3    important to protect.

4         Taking a look at the privilege log, the dates in the

5    metadata list chart that we provided, that those in combination

6    with the narrative hopefully lay to rest any concerns that

7    anyone from the government's side was trying to intentionally

8    mislead anyone, certainly not the Court or the plaintiffs; that

9    it was a genuine disconnect in not understanding what the

10   questions were.

11        THE COURT:  Where do I get that?  I'm not arguing with

12   you that that evidence may show that, but where is that

13   evidence?  Help me here.

14        MS. RICKETTS:  The evidence is in the narrative as well

15   as in the --

16        THE COURT:  I mean, do I have any affidavits?  Do I have

17   any proof?  I mean, that's really what I -- I need to see.

18        MS. RICKETTS:  Your Honor, no, we haven't provided any

19   affidavits.  I would say that a lot of the pieces of information

20   that we've provided put together help explain the stories.  So,

21   for example, the declaration of Director Rodriguez helps explain

22   much of what was happening during that two-week period that the

23   Court was particularly concerned about after the issuance of the

24   injunction and the advisory.  His declaration helps explain much

25   of what the agency was doing and obviously their counsel were

1   doing.

2       The Court pleadings during that time period would also help

3   explain what Department of Justice counsel were particularly

4   busy with.  This was a very intense period on both sides.  So

5   the Court's order came in, for at least those on the east coast,

6   fairly late that Monday night.  I'll just note that Tuesday was

7   a snow day, so everyone was snowed in.  And your Honor's opinion

8   was fairly thorough.

9           THE COURT:  We have very few snow days here.

10          MS. RICKETTS:  I understand that.  I understand that,

11  Your Honor.  We wish we did too.

12      And so we -- during that time period, the Department of

13  Justice was getting permission to appeal.  We were drafting a

14  stay motion.  We were conferring, actually conferring among

15  ourselves first and then conferring with the plaintiffs, as I

16  understand that the Court had given us 14 days in which to make

17  a recommendation for next steps in the litigation.  That

18  culminated with a joint motion for extension of time.

19      But during that two-week period, everyone was incredibly

20  busy.  What we think the in-camera pleading demonstrates is when

21  we learned from our client the number.  And I apologize for

22  stumbling.  I'm trying very hard not to divulge privileged

23  information.  But when we learned the number, for us that was a

24  lightbulb going off, and we've described that in the pleading

25  that this is something we should let the Court know, and we

1  should let the Court know immediately.  And the metadata chart

2  and the privilege log demonstrate just how quickly we produced

3  that advisory to the Court.

4      So all of those things combined -- we certainly understand

5  why the Court was concerned.  We now understand in hindsight

6  what the disconnect was.  We are truly sorry for that.  There

7  was no one at the Department of Justice or the Department of

8  Homeland Security who were trying to hide that from the Court or

9  from the plaintiffs.  We simply did not believe that it was

10 material to what was being argued on irreparable injury in the

11 preliminary injunction proceeding.  We now understand that for

12 the Court and the plaintiffs it was, and so we are very sorry

13 for that.  But there is nothing in anything that we've submitted

14 that would even suggest that we did any of that intentionally.

15 In fact, the contrary.  That as soon as we made the connection

16 finally, we moved with lightning speed to make sure we notified

17 the Court.

18      THE COURT:  Well, here's my -- let me just be blunt with

19 both sides here.  I don't like sanctioning lawyers.  In 13

20 years, I can remember twice when I've done it.  And once was a

21 situation where one side clearly misled the other side on

22 something that was down a frivolous rabbit trail that both the

23 other side and the Court in a hearing had said this doesn't

24 sound like it's even remotely possible, and they assured us it

25 was and then figured out that it wasn't after they cost the

other side a bunch of money.  And I made them pay that bunch of money back.

And the other was an incident where counsel basically called -- accused some of Mr. Hu's colleagues of being racist and acting in a discriminatory fashion.  And I basically told the lawyer, "If you've got proof of that, I want to hear it. And if you don't have proof of that, you ought to apologize to them."

And the lawyer realized he had stepped over the bounds and basically apologized to the U.S. Attorneys and basically said: Look, it was the heat of battle and I said something I shouldn't have said.  And after he apologized, I mean, I didn't sanction him further.  He apologized.

And sometimes things get said in the heat of battle or -- you can call it the heat of battle or, you know, any time there's a contentious hearing going on, you may not have all the facts at your fingertips.  And, you know, even with computers nowadays, you might not know what's going on.  So I have a -- always have probably, maybe to a fault, an inclination not to sanction lawyers as long as I think they're in good faith and trying to do the best they can.

What I need -- and I guess the first step is the remedial action.  If I'm convinced, hey, you've made a mistake and we're going to fix it, that's what's important to me.  More important than anything else, because we all make mistakes.  You know, the

1    Fifth Circuit may tell -- in the next month or two may say I

2    made a mistake.  And that's understandable.  You can't -- we're

3    not -- we're all human.  We all make mistakes.

4        But what I want to see is us try to fix those mistakes as

5    quickly as we can and then move on.  And that's one of the

6    reasons I'm holding this hearing today.  I'm not unmindful that

7    the merits are going to be argued next month; but regardless of

8    how the Fifth Circuit rules, I'm stuck with this problem.  You

9    know, if they reverse me, I'm stuck with this problem.  If they

10   affirm me, I'm stuck with this problem.

11       So what I want to do is get rid of this problem so we can

12   all go on with our lives.  And if the case proceeds, it proceeds

13   on the merits and not on some rabbit trail that we're all caught

14   up in.

15           MS. RICKETTS:  I appreciate that, Your Honor, and we're

16   absolutely on the same page.  What I would suggest is that the

17   process that we're engaged in on the post-injunction issuance of

18   the three EADs is a productive beginning to that.  And I believe

19   Texas has agreed with that, that we would begin providing the

20   information that Mr. Schwei described to Your Honor, and that

21   would give the states an opportunity to see what sort of

22   information is available so that they can assess what sort of

23   remedies might be practical from their perspective.

24       We think that's a productive process and that it would help

25   potentially resolve both issues and that the parties should have

1   the opportunity at least to explore what the information is and

2   how difficult the remedial measure might be to undo the 108,000.

3   We'd certainly want the opportunity to brief that, but we think

4   this meet-and-confer process might be the most productive way

5   and most expeditious way in the first instance to sort that out.

6       THE COURT:  Ms. Colmenero, let me ask you a hypothetical

7   question.  Assuming that we can fix the problem, I mean, did the

8   states, once that problem fixed, do they have any -- or feel any

9   need for further action by the Court?

10      MS. COLMENERO:  Well, I think it depends on what fixing

11  the problem really entails, and I think that's where I'm a

12  little unclear.

13      There was the problem concerning the post-injunction 2,000

14  grants, which the defendants have taken corrective action

15  measures to change those from three years to two years

16  consistent with the 2012 directive.  If fixing the problem for

17  the 108 consists of taking a similar corrective action measure

18  and changing that from three years to two years for those

19  individuals and then engaging in the same type of

20  meet-and-confer process to determine how that may have impacted

21  the plaintiff states, I think that's a really good beginning in

22  terms of fixing the problem.  Because from the plaintiff states'

23  perspective, I think there's two problems that exist with these

24  pre-injunction 108 grants, which are that they were done under

25  the 2014 directive during a period of time when we thought the

1   status quo would remain the same while the PI was proceeding.

2   And then second of all, pretty much the reliability of these

3   statements that were being made during that period of time.

4        But in terms of the harm, I think engaging in the same

5   meet-and-confer process as the 2,000 would allow the plaintiff

6   states to then assess whether or not we can attempt to do any

7   clawback or unwinding of benefits that may have been extended to

8   this class of individuals during the time periods in dispute

9   here and to see whether or not that -- that it's really kind of

10  worth our efforts at the end of the day because it may prove to

11  be too difficult, but we don't know that at this point.  We

12  don't have enough information to really make that determination.

13       THE COURT:  Mr. Schwei, let me ask you.  I mean, what is

14  it -- I mean, I'm asking you a practical question.  I mean, what

15  is it that each of these individuals have?  They have some card

16  that gives them permission to work?

17       MR. SCHWEI:  Yes, Your Honor.  The specific focus of

18  that meet and confer is the EADs, the Employment Authorization

19  Documents, which is a physical document which, as I understand

20  it, individuals can present to the Texas Department of Public

21  Safety.  It says three years on it.  And then the Texas

22  Department of Public Safety, according to one of the

23  declarations they filed, the Peters declaration, the Texas

24  Department of Public Safety would issue a driver's license for

25  three years, so there is a piece of paper.  With respect to the

1   corrective actions that the agency is taking, that's spelled out

2   in the letter, which again, I'm happy to provide to Your Honor.

3       But just to summarize, the corrective action that the agency

4   is taking is to, No. 1, correct the agency's own internal

5   records.  No. 2, to issue a two-year employment authorization

6   document to that individual.  No. 3, to send the individual a

7   letter saying as soon as you receive the two-year EAD, you must

8   return the three-year EAD.

9       And then finally ensuring that the system, the SAVE system

10  that the plaintiffs mentioned earlier, which is precisely what

11  the Texas Department of Public Safety would use to verify the

12  piece of paper, the agency is ensuring that that system is

13  updated to reflect only two years.

14      So hypothetically if an individual presented a three-year

15  EAD to the Department of Public Safety, when they query the

16  agency SAVE system, after all the corrective actions have

17  occurred, the SAVE system would inform the Texas Department of

18  Public Safety, in fact, the EAD is only valid for two years, not

19  three years.  So there's a range of corrective actions that are

20  being taken, and the letter --

21          THE COURT:  Can't -- and I'm saying this with the

22  knowledge that there's a wildly vast difference between the

23  pools, the 108,000 and the 2,000.  But with regard to the 2,000

24  that actually violated the injunction, I mean, why can't

25  somebody physically go knock on their door and say, "Here's your

```
1    new card.  Give me your old card"?

2         MR. SCHWEI:  Well, Your Honor, the judgment of the

3    agency at this time is to first start by sending a letter

4    informing that individual that they must return the old card

5    upon receipt of their new card, and that failing to return the

6    card could result in adverse action.  And those letters -- what

7    we have confirmed and provided to Texas in the letter is that

8    all of those letters have gone out to the individuals in the

9    plaintiff states.

10        THE COURT:  And how much time have you given them?

11        MR. SCHWEI:  The letters to those individuals do not

12   include a specific deadline.  They say you must return it upon

13   receipt of your new two-year card.  This process is ongoing, and

14   we've provided to the -- to the plaintiffs specific information

15   about the numbers that have gone out currently, and that process

16   continues going forward.

17        THE COURT:  And have you given the plaintiffs the names

18   of those 2,000 individuals?

19        MR. SCHWEI:  No, Your Honor.  In our meet and confer,

20   we -- Texas did not ask for the names at least at this stage.

21   We -- I would of course defer to them on their position.  But

22   they expressed openness that at least for the beginning

23   provision of information, it was not necessary to have the names

24   of the individuals.

25        MS. COLMENERO:  And just to clarify that one --
```

 1          THE COURT:  Stay right there, Mr. Schwei.

 2          MS. COLMENERO:  Just to clarify that one point about the

 3     names of the individuals.  I think if there was another form of

 4     identifiable information that would allow us to determine the

 5     identity of that individual, such as the work authorization ID

 6     number where we could actually determine whether or not a

 7     professional license was extended to that individual or a

 8     driver's license was extended to that individual or any other

 9     form of benefit, that would be useful information.  All we've

10     been provided thus far is simply a tally of the individual -- of

11     the number of individuals who reside in the plaintiff states.

12          THE COURT:  Okay.  I think you need to provide them some

13     kind of way for them to identify these people.  And I also think

14     with regard to the 2,000 that actually violate the injunction is

15     that you ought to step up your efforts.  And if it means going

16     and knocking on their door and saying, "Here's your two year.

17     Give me your three-year card," you ought to do that.  I mean,

18     how hard can that be?

19          MR. SCHWEI:  Your Honor, those -- Your Honor's

20     sentiments I will certainly take back and report to the agency

21     in charge of administering the program.  I think that with

22     respect to the provision of information to Texas specifically

23     about identifying information, that is certainly a subject that

24     we are open to, and in our --

25          THE COURT:  Well, I'm talking about all the plaintiff

1    states, not just Texas.  I mean, you got to have a list

2    somewhere or you wouldn't know there was 2,000.

3         MR. SCHWEI:  Again, Your Honor, in our May 27th filing,

4    one of the reasons we requested 60 days is precisely so that if

5    Texas and the rest of the plaintiff states wanted identifying

6    information, we could work with the agency to find out whether

7    there is such identifying information that's not as sensitive as

8    their names and whether a protective order would be necessary.

9    I'm simply -- I'm not trying to suggest that we would not

10   provide such information, just that further discussions with the

11   agency and with Texas and the other plaintiff states would be

12   necessary before --

13        THE COURT:  Well, I don't see why -- I mean, I see those

14   in a whole different category.  I mean, it's one thing -- I

15   mean, you can say, gee, we didn't know we were talking about the

16   other 108,000 in the period before the injunction.  But, I mean,

17   this period after the injunction, I mean, you clearly violated

18   the injunction.

19        MR. SCHWEI:  Your Honor, DHS intended to stop all

20   three-year terms immediately after the injunction, and the --

21   and I think as soon as DHS realized that these three-year terms

22   had erroneously gone out, immediately began taking corrective

23   action precisely because they recognized that these were errors

24   that should not have been issued.

25        THE COURT:  Well, but the DHS has got to know who these

 1    2,000 people are.  They could go knock on their door and say,

 2    "Hey, we made a mistake.  You know, trade us back the card."

 3    And then the states wouldn't be -- have to go through all

 4    this -- these hoops.

 5         MR. SCHWEI:  Right, Your Honor.  And I think it's

 6    important to keep in mind that it's more than just the paper

 7    card.  And this gets back to --

 8         THE COURT:  That's why I asked what it was.

 9         MR. SCHWEI:  Sorry.  The -- yes, Your Honor, there is a

10    paper card that is the employment authorization document.  But

11    whether an individual retains their three-year EAD is not

12    dispositive of whether that EAD could be used for any particular

13    purpose.  And that gets to the SAVE system, which is if the

14    individual tried to use a three-year EAD that should have been

15    returned to obtain a three-year driver's license from the Texas

16    Department of Public Safety, our understanding is they would not

17    be able to do so because the SAVE system would inform the Texas

18    Department of Public Safety that only two years of that EAD are

19    valid.

20         THE COURT:  Don't you operate the SAVE system?

21         MR. SCHWEI:  Yes, Your Honor.

22         THE COURT:  You, the federal government?  So how hard

23    would it be to change that?  You have a computer programmer go

24    in and change it.

25         MR. SCHWEI:  Precisely, Your Honor.  And that --

1          THE COURT:  I mean, that should have already been done.

2   Hasn't it been done?

3          MR. SCHWEI:  Your Honor, and that's exactly what we've

4   been discussing with the plaintiffs in terms of the corrective

5   actions.

6          THE COURT:  Well, I expect you to do that.  I'm shocked

7   that you haven't done that.

8          MR. SCHWEI:  Your Honor, we are in the process of doing

9   that, and we are nearly complete with doing so.  We gave the

10  plaintiffs a specific number of how many have been corrected,

11  which is specifically --

12         THE COURT:  Wait a minute.  How hard can it be to

13  correct your own computer?  I mean, a computer programmer can do

14  that.

15         MR. SCHWEI:  Your Honor, as of June 17 --

16         THE COURT:  Give them a list of 2,000, and whether

17  they're by IDs or by names, I mean, these are the questions -- I

18  mean, there's no question with regard to these 2,000.  You guys

19  violated the injunction.

20         MR. SCHWEI:  Your Honor, just to get to Your Honor's

21  concern about the SAVE system, as of June 17th, at least 793 of

22  the 814 individuals in the plaintiff states have now been

23  updated, and DHS expects that the remainder will be done very

24  soon.  And we are certainly happy to --

25         THE COURT:  Why can't -- what about the last 20?  I

1    mean, I just don't understand how it -- why it takes this long.

2    I mean, you realized you violated the injunction.  Let's fix it.

3    I mean, this is what is frustrating for me, is there seems to

4    be, okay.  We violated the injunction.  No big deal.  Let's just

5    go on.  I mean, you know, this is the kind of thing that it

6    looks like you're deliberately doing this at as slow as possible

7    pace as you could possibly do it.

8            MR. SCHWEI:  Respectfully, Your Honor, I do not think

9    that is accurate.  And I think the declaration submitted from

10   Director Rodriguez and from Mr. Neufeld demonstrate that as soon

11   as DHS realized that it had mistakenly issued three-year terms

12   rather than two-year terms after the injunction, it immediately

13   began corrective action.  And that corrective action is

14   underway, and we are working expeditiously to complete that

15   corrective action for the complete universe of 814 individuals

16   in the plaintiff states.

17           THE COURT:  All right.  It's baffling to me how you

18   can't have corrected your own computer system.

19           MR. SCHWEI:  Your Honor, and that's --

20           THE COURT:  I mean, the Chinese seem to be able to get

21   into our computer system without any problem.

22           MR. SCHWEI:  Your Honor, that is precisely what the

23   agency is doing is correcting the system, and they are very well

24   along that process and are working expeditiously to complete

25   that process.  And that's precisely what we have been meeting

1    and conferring with Texas about, and we think it would be most

2    productive to continue those discussions, including informing

3    them when all of the 814 individuals in the plaintiff states

4    have been corrected.

5        But again, Your Honor, that -- the issue of the SAVE system

6    is just to emphasize that the -- that the paper card itself is

7    not dispositive as to whether an individual could actually use

8    it for a particular purpose.

9        THE COURT:  Well, I'm just -- I can't believe the day

10   you found out that you had 2,000 people, that you didn't correct

11   the computer system.

12       MR. SCHWEI:  Your Honor, the corrective actions began

13   immediately, but the computer system and all of the range of

14   corrective actions takes some time to play out.  But I assure

15   you they are working expeditiously to complete that process.

16       THE COURT:  All right.  Well, I expect with regard --

17   especially with regard to the 2,000, that that be a high

18   priority, front burner item.  So regardless of your meet and

19   confer with regard to the 108,000, if I don't see some action

20   with regard to those 2,000, then we are going to have a problem.

21       MR. SCHWEI:  Understood, Your Honor.

22       THE COURT:  Because there's no doubt with regard to

23   those that the United States violated the injunction.

24       MR. SCHWEI:  And, Your Honor, DHS appreciates that all

25   three-year terms were to stop after the Court's injunction.

1    That was their intent to do so, and that they mistakenly issued

2    these three year terms, and they are -- they immediately began

3    correcting them and are in the process of correcting them.

4        THE COURT:  Okay.  Well, the process better pick up some

5    speed.  I mean, you only have a couple hundred thousand

6    employees.  Someone up there surely can get in the computer SAVE

7    system and change the three to a two.

8        MR. SCHWEI:  Respectfully, Your Honor, I think it has

9    been going very quickly with respect to the SAVE system in

10   particular.  793 out of the 814 individuals in the plaintiff

11   states are now complete.  I think that shows how quickly this

12   is, in fact, occurring.

13       And again, with respect to the remainder not yet corrected,

14   the agency is working expeditiously to correct that set.

15       THE COURT:  Okay.  All right.  Well, I expect by the end

16   of July that that report ought to have that you fixed the

17   problem with regard -- not just you met and conferred.  With

18   regard to the 2,000, I expect that to be fixed.

19       MR. SCHWEI:  And, Your Honor, I would be happy to walk

20   through the entire step-by-step process that is required before

21   that SAVE system is, in fact, updated.  I think what the process

22   shows is that it's designed to be one that -- it's designed to

23   allow for quality assurance, precisely to ensure that things are

24   done properly.  And there are steps along the way where it may

25   take some time, but those time periods are built in to ensure

1    that the overall process works effectively.  But I'd be happy to

2    walk Your Honor through it.

3          THE COURT:  Go ahead.  Walk me through it.

4          MR. SCHWEI:  Certainly.  So with respect to an

5    individual who is erroneously granted three-year terms, the

6    first step is to -- is for a -- an individual to manually reopen

7    that case file and adjudicate the -- the person from three years

8    down to two years.  Essentially to convert it.  That would get

9    entered into the claims database, all of which I believe -- most

10   of this, if not all of it, is spelled out in more detail in

11   Mr. Neufeld's declaration, but there are various databases and

12   systems within USCIS.  But once the two-year approval date is

13   entered into the claims database, that generates certain

14   approval notices both for deferred action and then separately

15   for employment authorization.

16       Once the deferred -- once the approval notices are produced,

17   that causes the employment authorization document card to be

18   produced, which occurs in a separate facility apart from the

19   service centers where these individuals are -- individual cases

20   are actually adjudicated.

21       In that card processing center, there is a 48-hour hold, and

22   that's 48 business hours, that allows for the service centers to

23   determine -- it gives them an opportunity where, if there has

24   been an error, they can pull the case back at that stage before

25   the card actually gets produced.

1        So for every EAD that gets produced, there's a 48-hour hold

2    in terms of business hours.  And then once the actual EAD is

3    produced, from there it takes one to two days before the SAVE

4    system is updated.

5        And so with respect to the 814 individuals in the plaintiff

6    states, all of those individuals have been sent letters

7    informing them that they must return their card as soon as they

8    receive their two-year EAD.  As of June 17th, 8 -- at least 806

9    individuals were sent their two-year EADs.  With respect to the

10   SAVE system, at least 793 of the 814 individuals have been

11   updated in SAVE.  And so --

12           THE COURT:  How many have returned their three year?

13           MR. SCHWEI:  Your Honor, with respect to the plaintiff

14   states, I believe as of sometime last week, almost half returned

15   their three-year EADs.  But again, they were -- that number will

16   only go up as they continue to receive their three-year EADs

17   and -- or their two-year EADs, excuse me, and as the agency

18   follows up with them.

19           THE COURT:  All right.  Well, this process you're

20   describing is a process that looks like it could be completed in

21   a matter of weeks, and it's been weeks.

22           MR. SCHWEI:  Certainly, Your Honor.  The -- the agency

23   has been working expeditiously to complete this process.  I

24   believe those numbers reflect the speed with which the agency is

25   working, and they are certainly working expeditiously to finish

1    the process of updating these individuals from three-year terms

2    to only two-year terms.

3          THE COURT:  All right.  Well, here's -- I'm going to

4    wait until July 31st, but I expect that report on July 31st to

5    say that the 2,000 have been resolved.  And if they're not

6    resolved, then I'm going to figure out what action to take.  I

7    mean, if you clearly can't do this in two months after you've

8    discovered you violated an injunction, you're not trying.

9          MR. SCHWEI:  Well, Your Honor, respectfully, we are

10   trying, and we are working expeditiously.

11         THE COURT:  You could give that document to an agent.

12   He could go out there and knock on the door and say:

13   Mrs. Smith, we accidentally gave you a three year.  You should

14   have only got a two year.  Trade me cards.  And you have

15   thousands of agents or employees located in every state.

16         MR. SCHWEI:  And, Your Honor, the agency understands

17   that this is a top priority, and they are working expeditiously

18   to complete the process.  The -- with respect to any corrective

19   actions, the plaintiffs have not asked for those, and I think it

20   would be premature to address those.

21         THE COURT:  Whoa, whoa, whoa.

22         MR. SCHWEI:  With respect to any further actions from

23   Your Honor.

24         THE COURT:  Well, no, no.  With regard to the 2,000 that

25   violated my injunction, I'm ordering you to do that.  I don't

1    care what the plaintiffs say.  You need to fix those 2,000.

2         MR. SCHWEI:  Respectfully, Your Honor, the agency is

3    taking corrective action and has been taking corrective action.

4         THE COURT:  Well, I expect at the end of July for you to

5    tell me those 2,000 are fixed.

6         MR. SCHWEI:  Understood, Your Honor.

7         THE COURT:  I mean, the others we can argue about

8    whether there was confusion caused or something was misleading

9    or whatever, but you yourself have admitted you violated the

10   injunction with regard to those 2,000.

11        MR. SCHWEI:  Your Honor, I don't think it's necessary to

12   parse out whether they technically violated the injunction or

13   not.  The important thing is the agency intended to -- intended

14   that as soon as Your Honor's injunction issued, all three-year

15   terms would stop.

16        THE COURT:  I know, but they didn't do it.  I mean, and

17   I -- and one of the reasons I haven't sanctioned anybody yet is

18   because I -- it's my feeling that they did intend to do it.

19   But, you know, good intentions only get you so far.

20        MR. SCHWEI:  Respectfully, Your Honor, I think there's

21   no basis in the record for that.  I think the declarations from

22   Director Rodriguez and Mr. Neufeld demonstrate that these were

23   errors, and the agency recognizes them as errors that should not

24   have occurred.  And that is precisely why the agency is

25   taking -- began corrective actions immediately and is continuing

1    those.

2          THE COURT:  And, Mr. Schwei, I'm giving you the benefit

3    of the doubt that you didn't do it on purpose, that it was an

4    accident, that it happened.  But when somebody does something

5    that's an accident and it's violative of a court order, whether

6    you agree with the order or not, you fix it.

7       And what I'm saying is you guys aren't fixing it, or at

8    least you aren't fixing it fast enough.  So with regard to -- I

9    understand 108,000 is a completely different universe.  But with

10   regard to 2,000, especially 2,000 that you admit violate the

11   injunction, that would -- that's eminently fixable.

12         MR. SCHWEI:  Respectfully, Your Honor, just to correct

13   the record, I don't think I've admitted that they violate the

14   injunction.

15         THE COURT:  Your briefs have.

16         MR. SCHWEI:  I think the important point is that they --

17   the agency recognizes that they were erroneously issued because

18   they intended to stop all three-year terms after the injunction.

19         THE COURT:  Okay.  I'm not getting in a semantic

20   argument with you, Mr. Schwei.  Whether they were erroneously

21   issued or whether they were wrongfully issued or whether they

22   were issued in violation of a court order, I don't care.  I'm

23   telling you to fix it.

24         MR. SCHWEI:  Understood, Your Honor.  And the agency

25   began fixing it immediately and will continue to do so.  But we

1    understand Your Honor's urging that this needs to be a top

2    burner priority, and I will certainly reflect that sentiment to

3    the agency.

4        THE COURT:  Okay.  And also provide the states, all the

5    plaintiff states with proof that you've taken care of this,

6    okay?

7        MR. SCHWEI:  Your Honor, and that's exactly what we've

8    been discussing with the plaintiffs and provided them the first

9    set of information on Friday, and we're happy to continue

10    discussing with them additional information.

11        THE COURT:  Okay.  All right.  Let me circle back,

12    Ms. Ricketts, and visit with you for a minute.  Setting aside

13    whether we're fixing a problem fast enough or not, I would like

14    to -- and I'll wait for the status report in July as far as that

15    goes.  But I would like to lay to rest anything else that has to

16    do with these problems.

17      One of my main problems with doing that is my inability to

18    look at everything you filed.  And I honored your request; but,

19    I mean, you're asking me to buy a pig in a poke.  I mean, you

20    can imagine:  Judge, everything you need to look at that proves

21    what we did was right is in these envelopes; but by the way,

22    Judge, don't look at the envelopes.  So help me here.

23        MS. RICKETTS:  I appreciate the dilemma, Your Honor.  I

24    think from our perspective what is in the envelopes is not

25    necessarily what you need to resolve any doubt about whether

1   there was any intentional misrepresentation to the Court by the

2   department.  We provided all of that information because that's

3   what Your Honor requested.  We do think it's consistent with the

4   fact that there was no intentional misrepresentation, absolutely

5   no intent by anyone to try to deceive the plaintiffs or the

6   Court.  So they are connected.  I appreciate that.  They're

7   related.  But reviewing those documents is not necessary from

8   our perspective to come to that conclusion.

9          THE COURT:  Okay.  All right.  Here's one of my

10  problems, and it's -- it was just like the earlier example I

11  gave you where, you know, we got by it quickly is, you know,

12  somebody just come in and say:  Look, you know, we messed up.

13  We're sorry.  We didn't mean to mess up.  You know, we apologize

14  to the plaintiffs.  We screwed up.  Stuff happens.  You know, we

15  can all live with that.  But, I mean, that hasn't happened here.

16         MS. RICKETTS:  Your Honor, respectfully, I think we have

17  apologized every way we can here in terms of we did not intend

18  to do this.  We did not intend to mislead the plaintiffs, and we

19  did not intend to mislead the Court.  I'm not sure if I'm

20  understanding Your Honor's question correctly, though.

21         THE COURT:  Well, I mean, I -- okay.  I think this could

22  have been resolved a long time ago with a more direct approach.

23  Let me put it that way.

24         MS. RICKETTS:  Understood, Your Honor.  But we are

25  trying to be as up-front with the Court as we possibly can be

1   that there absolutely was no -- anywhere, no intention to

2   mislead the Court and misrepresent.

3       But we have also offered, I think from the beginning, my

4   understanding, from the beginning and certainly today that if

5   Your Honor would like it, we could brief possible remedies for

6   the 108,000.  Again, it's not something the plaintiffs have yet

7   asked for, and we do think the meet-and-confer process might be

8   a more productive way to at least determine --

9           THE COURT:  No, I'm willing to live with the --

10          MS. RICKETTS:  -- what's possible.

11          THE COURT:  -- meet and confer on the 108,000.  I want

12  the 2,000 fixed.

13          MS. RICKETTS:  Understood.

14          THE COURT:  And with regard to any other issue, I'll

15  take a look at it.  My goal, one way or the other, however the

16  appellate court rules -- and, I mean, quite frankly, I think all

17  of us in this room probably realize that we've had one panel

18  that's ruled.  We have another panel that ruled.  There's no

19  telling which way they'll rule.  You know, if they rule the same

20  way or if they rule the opposite way, I mean, I think it's

21  headed to an en banc probably rehearing, I mean realistically,

22  and then probably up to the Supreme Court.  I mean, that's -- if

23  you were a betting person, that's probably what you would agree.

24  But regardless of how they rule, I would like to put this to

25  bed.

1          MS. RICKETTS:  We would as well, Your Honor.  Agreed.  I

2     mean, again, we don't think it's necessary because we think the

3     privilege log and all the other materials that we provided

4     should lay to rest any concerns.  But I will note that the

5     states have also suggested that the Court could refer all of the

6     privileged documents to a magistrate judge if that's something

7     that will give the Court comfort.  We have no objection to that.

8          THE COURT:  Well, the problem is the magistrate judge is

9     not going to know the context or anything.  I mean, we can see

10    that.  Just look at the last Fifth Circuit opinion where one of

11    the judges suggested that the Court, me, shifted the burden of

12    proof to the government when I questioned the -- the accuracy of

13    one of the statements that was made.  And that wasn't -- I

14    wasn't at all shifting the burden of proof.  What I was saying

15    is:  Okay.  You're saying this is an accurate statement.  Show

16    me it's accurate.  Show me.  And I gave them two weeks.

17         And, I mean, it was just a matter of questioning or

18    challenging the credibility of a statement that didn't have

19    anything to do with shifting the burden of proof.

20         And that's the problem when somebody doesn't have the

21    context with something.  And that's my reluctance about sending

22    it to a magistrate judge who hasn't sat through all these

23    hearings.  Plus if -- I mean, you're telling me there's nothing

24    in the envelopes that's going to help.  And if it's not going to

25    help me, how can it help a judge that doesn't even know what the

1   issues are.

2          MS. RICKETTS:  And I think what is in the envelopes

3   would certainly not show any intention whatsoever to mislead the

4   Court.  I suspect what's in the envelopes would be fairly boring

5   to read through.  I can certainly suggest that it was fairly

6   boring for me to read through them because it would be endless

7   drafts.

8          THE COURT:  That's the first statement I'm almost

9   100 percent sure I'll agree with.

10          MS. RICKETTS:  Yes.  Thank you, Your Honor.

11       But I do think to the extent the Court has concerns, and we

12   understand they were sincere concerns based on how this played

13   out, you know, those documents could potentially lay to rest

14   any -- a portion of those concerns.

15       But I do think again, the metadata chart which I don't fully

16   understand at this point in my career, but I do understand that

17   it reflects when the draft advisory that Your Honor had asked

18   about, when that was drafted, when it was edited and that sort

19   of thing, that will show the speed with which we moved.  The

20   privilege log will also show the speed with which we moved, and

21   the list of individuals on the privilege log will indicate the

22   number of individuals who participated in that process, which

23   again makes the speed with which we moved all the more

24   remarkable.

25          THE COURT:  Okay.  All right.  Ms. Colmenero, is there

1   anything else from the state's standpoint that we can accomplish

2   today?

3           MS. COLMENERO:  Sure.  Just a couple of points that we

4   want to make.  And I'll start first with the documents that were

5   produced in response to the Court's April 7th order.  The

6   plaintiff states were given very limited information.  We got 33

7   pages of publicly filed documents and then a 200-page privilege

8   log.  It's our position that the Court now -- now that you have

9   the fully unredacted brief, you have the envelopes of the

10   withheld material that are logged on the privilege log, is now

11   in the best position to determine whether or not any of the

12   statements are, in fact, misleading.

13       We still need some additional information.  We contend that

14   the assertions of privilege made by the defendants are broadly

15   asserted, and we contest that some of them just frankly do not

16   apply, given the circumstances of this case.  And that is what

17   we've briefed to you in our brief submitted to this Court.

18       The second issue I want to raise, and Your Honor hit on it,

19   is I do agree that this issue probably could have been resolved

20   with respect to the Court's April 7th order sooner.  And I think

21   from the plaintiff states' perspective, if there had been some

22   willingness to take corrective action with respect to these

23   108,000 grants early on, I think a lot of this -- these

24   proceedings could have been avoided.

25       And so my hope is with the meet and confer with respect to

1    the 108, perhaps the parties are able to reach some type of

2    agreement in terms of corrective action measures the defendants

3    can take with respect to these 108,000, knowing -- but from the

4    plaintiff states' perspective, I wish just to state on the

5    record that we may have already suffered injuries that are just

6    too costly for us to unwind or even know that we can unwind at

7    this point.

8         Finally I also wanted to reiterate on the record that our

9    main priority going forward as this case proceeds forward to a

10   trial on the merits is compliance with the Court's preliminary

11   injunction order.  And we do have some serious concerns in light

12   of the 2,000 grants that were made after the Court's preliminary

13   injunction order.

14        And I think that the declarations that the defendants have

15   put forward show what we've said all along, that this is a very

16   large, complex federal program with lots of moving parts, and

17   it's unclear to us that defendants may not even know the full

18   extent to which their client agencies are operating.

19        With that being said, we have requested several options in

20   our latest filing with the Court that Your Honor may wish to

21   consider, which are essentially compliance assurance mechanisms

22   which include either a certification requirement by the

23   defendants that they are, in fact, complying with the

24   injunction.  I will note it took them nearly until May to

25   determine that these 2,000 grants were made in violation of the

1    Court's injunction, or at least that's when the plaintiff states

2    were aware.  So -- and they have never fully stated that they

3    are, in fact, 100 percent compliant with the injunction.  And

4    from our perspective, they continue only to tell us that they

5    are, quote, refining their understanding of the processes in

6    place to determine how these 2,000 grants were made after the

7    Court entered their injunction.

8         So with that, you know, we propose some type of compliance

9    assurance mechanism, either in the form of a monthly or weekly

10   reporting requirement, and we've also proposed this idea of an

11   external compliance monitor.  And frankly, it's just the -- the

12   plaintiff states have concerns going forward, and we just wish

13   to state those on the record.

14        THE COURT:  Okay.  Ms. Ricketts, do you want to either

15   reply to that and/or bring up anything from the government's

16   standpoint that we can resolve today?

17        MS. RICKETTS:  Yes, Your Honor, just briefly.  So I do

18   want to make very clear that we apologize on behalf of the

19   entire United States Government for how this has played out.

20   The effects of the 108,000 were in changing the status quo.  And

21   I would take a slight issue with what Ms. Colmenero had said.

22   We have offered from the very beginning to brief what remedy

23   might be appropriate.  We remain willing to do that.  Again, we

24   think this meet-and-confer process would be more productive.

25        And the only other thing, I'll let Mr. Schwei address the

1   compliance aspect here, but I would say that based on the

2   information that we have, we are currently 100 percent in

3   compliance.  The Department of Homeland Security, the Department

4   of Justice are taking this extraordinarily seriously.

5   Department of Justice is working closely with the Department of

6   Homeland Security to make sure that we remain in compliance.

7   And if we learned of anything to the contrary, as has been our

8   pattern in this case, we would immediately alert the plaintiff

9   states and Your Honor.

10      I would like for Mr. Schwei to briefly address the

11   compliance options that she raised if that's all right.

12           THE COURT:  All right.  Is it Schwei?

13           MR. SCHWEI:  It is Schwei, Your Honor.

14           THE COURT:  All right.  I'm sorry.  I was saying Schway.

15           MR. SCHWEI:  That's all right.

16      With respect to the specific requests for compliance

17   monitoring, there are a number of reasons why that would be

18   inappropriate as spelled out in our May 27th filing.  But just

19   briefly, the -- the only basis for the plaintiff's request is

20   this relatively isolated set of post-injunction cases.  There's

21   no dispute that DHS has taken significant measures in terms of

22   the big picture to broadly comply with the Court's preliminary

23   injunction.  The circumstances surrounding the post-injunction

24   three-year terms are unique based on the timing of when the --

25   for the vast majority at least, they're unique in terms of the

1   timing of when the Court's prelim -- of where those cases were

2   when the preliminary injunction was issued, and so there's no

3   basis for thinking that the -- that these circumstances would

4   recur.

5       And this is not an ongoing program where prospective

6   oversight might be necessary.  The -- Your Honor's injunction

7   with respect to the 2014 deferred action guidance has halted the

8   deferred action guidance, and so there's no ongoing issues over

9   which compliance oversight may be necessary.  And the plaintiffs

10  have the burden of meeting the specific legal standards for

11  that.  For example, appointment of an external master would be

12  governed by Rule 53 of the Federal Rules of Civil Procedure, and

13  they have not satisfied the legal standards necessary for that

14  appointment.

15          THE COURT:  Mr. Schwei, let me put -- you know, again,

16  I'm going to be blunt with you.  The more forthcoming and --

17  that the government is with regard to fixing the problem, the

18  less likely I am to want a monitor, okay?  I mean, that's just

19  plain old common sense.  I understand -- I mean, the

20  government's like an ocean liner.  You can't stop it like you

21  can a car.  I mean, I -- believe me, you know, after a fashion,

22  we are -- most everybody on this side of the room including me

23  work for the federal government, okay?  We understand it's like

24  an ocean liner.  It's not a car.  You can't just slam on the

25  brake and stop it.

1        But let's fix the problem, and let's work with the states to

2    get it fixed, and let's get this behind us.  That's all I'm

3    asking.

4        MR. SCHWEI:  Absolutely, Your Honor.  And I would just

5    add that with respect to this small -- this one problem, that is

6    a small problem in terms of the larger compliance with the

7    preliminary injunction which DHS successfully accomplished.

8        THE COURT:  Well, I understand you had -- there were a

9    lot of bells and whistles that had to go off.  And, I mean, you

10   know, we from this side worked as hard as we could to get what

11   we got out by the time we got it out given what we thought the

12   deadline was, and that's the way we operated.  And whether we

13   could have done it faster or slower or more thorough or

14   whatever, I don't know.  I mean, and whether it's affirmed or

15   reversed, again, I won't know.  But we'll find out the same time

16   probably when we get something on our computer.

17       But let's fix the problem so we don't have to worry about it

18   in the future because, I mean, let's -- assuming it gets sent

19   back either on the merits or for some other proceeding, I don't

20   want to have to deal with anything that even remotely hints of

21   sanctions.  What I want to deal with is the merits or whatever

22   they send it back for me to do.

23       MR. SCHWEI:  Absolutely, Your Honor.  And we share that

24   goal of putting everything to bed.  And with respect to these

25   post-injunction issues, to, you know, seize your Honor's concern

1    about being forthcoming, I think the meet-and-confer process is

2    the best vehicle for allowing that to happen, and we certainly

3    wish to be as forthcoming as possible in that meet-and-confer

4    process.

5            THE COURT:  Okay.  All right.  Ms. Ricketts, anything

6    else from the government's standpoint?

7            MS. RICKETTS:  I can't think of anything, Your Honor.

8            THE COURT:  Okay.  All right.  Y'all meet and confer.

9    I'll look forward to getting the report at the end of July.  I'm

10   going to cogitate, I guess, on what to do with regard to the

11   other issue.  But let's fix this and let's get it behind us so

12   we can just talk about law, which is what I think we all would

13   rather talk about, okay?

14       All right.  Thank y'all.

15       *(Court adjourned.)*

16                               * * *

17        (End of requested transcript)

18                              -oOo-

19       I certify that the foregoing is a correct transcript from

20   the record of proceedings in the above matter.

21

22   Date:  June 24, 2015

23

24                              /s/_____

25                              Signature of Court Reporter
                                Barbara Barnard