**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

_____

| | |
|---|---|
| STATE OF TEXAS, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 1:14-CV-254 |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA, *et al.* ) | |
| ) | |
| Defendants. ) | |

_____)

### JOINT STATUS REPORT OF JULY 31, 2015

Plaintiffs and Defendants, through counsel, hereby jointly submit the following status report, pursuant to the Court's Order of July 7, 2015.  *See* ECF No. 281; *see also* June 23 Tr. at 3-8, 42.  Consistent with the Court's instructions, the parties have continued their meet-and-confer process, which has been ongoing for approximately two months.  This process has resulted in significant communications between the parties, both in writing and via telephone conference.  The major written communications are attached hereto.  *See* Exhibit 1 (E-mails between Schwei and Colmenero, dated June 3, 2015); Exhibit 2 (Schwei Letter, dated June 19, 2015); Exhibit 3 (Colmenero Letter, dated July 6, 2015); Exhibit 4 (Schwei Letter, dated July 17, 2015); Exhibit 5 (Colmenero Letter, dated July 22, 2015).

As part of the meet-and-confer process, the parties have discussed the following topics, each of which is discussed in more detail below:  (a) information related to the approximately 2100 post-injunction issuances of three-year instead of two-year EADs and the approximately 500 post-injunction re-mailings of three-year instead of two-year EADs; (b) information related to the approximately 108,000 pre-injunction three-year approvals; (c) any agreement regarding

the approximately 108,000 pre-injunction three-year approvals; and (d) any additional discovery requests by Plaintiffs.

**A.      Information Related to the Post-Injunction Issuances and Re-Mailings of Three-Year Instead of Two-Year EADs.**

1.      In response to Plaintiffs' requests, Defendants have provided information regarding the post-injunction issuances and re-mailings.  For both universes of individuals—the 2128 previously identified post-injunction issuances, and the 484 previously identified post-injunction re-mailings—Defendants have now provided:

- A state-by-state breakdown of both universes of individuals, based on state of residence—covering the Plaintiff States with respect to the 2128 previously identified post-injunction issuances, and covering all states with respect to the 484 previously identified post-injunction re-mailings;

- A state-by-state breakdown of the number of previously identified individuals within each Plaintiff State who are part of the post-injunction issuance or re-mailing universes, and who were queried through SAVE for a driver's license, and in which the USCIS SAVE Program Office provided a response on or after February 16, 2015 based on a validity period of greater than two years;

- Confirmation that all 2612 previously identified individuals have had their three-year EADs invalidated, and were re-issued new two-year EADs;

- Confirmation that USCIS has updated its records and systems, including the systems that determine the responses to SAVE and E-Verify queries, to reflect two years (rather than three years) of deferred action and employment authorization for all 2612 previously identified individuals;

- Confirmation that all 2612 previously identified individuals were instructed that they must return their invalidated three-year EADs;

- Confirmation that, with respect to the now-invalidated three-year EADs, as of July 30, 2015, 2117 of the 2128 previously identified post-injunction issuances, and 473 of the 484 previously identified post-injunction re-mailings, have now been accounted for—meaning that an individual's invalid three-year EAD has been returned to DHS, the individual has certified that they are unable to return the three-year EAD for good cause (*e.g.*, it was lost, destroyed, etc.), or DHS has determined that the individual did not receive the three-year EAD (*e.g.*, it was returned as undeliverable, etc.);

- Confirmation that the remaining previously identified individuals—11 of the 2128 post-injunction issuances, and 11 of the 484 post-injunction re-mailings—have had their deferred action and work authorization terminated, effective as of July 31, 2015; and

- Confirmation that Defendants will provide certain Personally Identifiable Information (PII) regarding those individuals within the group of 2612 previously identified individuals who reside in the Plaintiff States—specifically, each individual's name, address, date of birth, alien registration number ("A Number"), EAD Receipt Number, Social Security Number, and certain SAVE query-related information for driver's license queries—pursuant to an appropriate Protective Order, *see* paragraph 3, *infra*.

2.     Defendants have also provided other information to Plaintiffs regarding the post-injunction issuances and re-mailings—specifically, the Secretary's two directives that were previously filed with the Court.  *See* ECF Nos. 283-1, 283-2.

3.     As mentioned above, Defendants have agreed to provide certain types of PII regarding all individuals in both the post-injunction issuance and post-injunction re-mailing groups who reside in the Plaintiff States, pursuant to an appropriate Protective Order.  The parties have agreed upon the terms of the Protective Order, and Defendants will provide Plaintiffs with the PII reasonably promptly after the Protective Order is entered.  The parties anticipate filing the proposed Protective Order with the Court next week, once the Plaintiff States obtain all necessary signatures/authorizations.

4.     The various Plaintiff States have not yet decided whether to undertake any potential corrective action(s) regarding state-issued licenses and/or benefits in light of the above information.  The parties dispute whether, if any Plaintiff State decides to undertake corrective action, the Plaintiffs should notify Defendants about that corrective action:

    a.     <u>Plaintiffs' Position</u>:  During the meet-and-confer process, the Plaintiff States and Defendants have engaged in negotiations in an effort to reach an agreement on an acceptable form of protective order.  As part of that process, the Defendants requested that the

protective order include a provision stating that if the Plaintiff States decide to undertake any corrective action with respect to individuals who were erroneously issued three-year grants of deferred action and employment authorization after the Court's February 16 injunction, the Plaintiff States would "notify Defendants, within a reasonably prompt time, of the state agency and the particular type of corrective action that is being undertaken."  As the Plaintiff States have explained to Defendants, this type of provision constitutes a reporting requirement and an unnecessary oversight by the Defendants into actions taken by the States in response to Defendants' failure to comply with the Court's injunction.  Moreover, the Plaintiff States do not believe that the benefit that the Defendants suggest they would receive from this notice— furthering their interest in being aware of corrective actions taken by the States—justifies the burden that this requirement would impose on twenty-six states and their numerous agencies.  To the extent that the Defendants are concerned that an individual's status may change between the time the disclosure of PII and the time that any corrective action is taken, that concern is addressed by the Plaintiff States' agreement in the protective order to "ensure that they are using the most up-to-date information to determine the immigration status of [an] individual prior to taking any corrective action."  This concern is further addressed if the Defendants have correctly identified the three-year grantees and the immigration status for these individuals is appropriately reflected in Defendants' records and databases.

To be clear, if the Court requests that the Plaintiff States provide information regarding any corrective actions undertaken with respect to the post-injunction three-year grantees, the States are willing to provide such information.  However, the States do not believe they are under any legal obligation to provide information regarding their corrective actions simply because the underlying personally identifiable data originated from the Defendants' records.

b.      Defendants' Position:    In connection with the Protective Order negotiations, Defendants proposed the following term to Plaintiffs:  "In the event that any Plaintiff State decides to undertake any corrective action(s), Plaintiffs will notify Defendants, within a reasonably prompt time, of the state agency and the particular type of corrective action that is being undertaken."  Plaintiffs resisted that term, and Defendants, in an effort to provide Plaintiffs with their requested information as soon as possible, agreed to enter into a Protective Order without such a term.  Nonetheless, Defendants believe that Plaintiffs should be required to notify Defendants about the types of corrective action actually undertaken by Plaintiff States, which is information relevant to Defendants' interests, as well as information that Defendants assume the Court is interested in knowing.

Given that the sole basis for any Plaintiff State's corrective action would be information provided by Defendants, Defendants have an important interest in being aware of what corrective actions are being undertaken on the basis of their information.  This interest is particularly acute given that Plaintiffs, during the protective order negotiations, insisted on the ability to undertake corrective action for state agencies that do not use the SAVE system and therefore would not re-query SAVE prior to undertaking corrective action.  (Re-querying SAVE prior to undertaking corrective action would help ensure that the Plaintiff States are using the most accurate, up-to-date information regarding an individual's status.)  Accordingly, Defendants have an important stake in being notified regarding corrective actions that are being undertaken on the basis of their information provided to Plaintiffs.

Defendants have requested notification in a manner that would impose the least burden on Plaintiffs.  Defendants have not requested advance notification of any corrective action, nor have Defendants requested that Plaintiffs submit a list of every individual against whom

-5-

corrective action is taken.  Rather, Defendants are merely requesting a simple notification from the Plaintiff States in the event they decide to undertake corrective action, which could be satisfied through a one-sentence e-mail: *e.g.*, "the Texas Department of Public Safety is now converting individuals' driver's licenses from three-year terms to two-year terms."  Thus, Plaintiffs' objections to this proposed term are overwrought.

Even apart from the importance of providing this notification in connection with the Protective Order and potential corrective action, moreover, Plaintiffs' refusal to provide this information as part of the parties' ongoing meet-and-confer process is inexplicable.  Defendants have now provided a significant amount of information to Plaintiffs, and will be providing additional sensitive PII.  The ostensible purpose of Plaintiffs' requests for this information was to allow the Plaintiff States to "determine whether [they] need to take any corrective action as to the three-year grantees[.]"  Exh. 5 at 2.  In light of the significant amount of information provided to Plaintiffs, Defendants are posing a simple question to Plaintiffs, to be answered once they receive and review the PII:  whether they do, in fact, intend to undertake any corrective action; and if so, what types of corrective action.  Plaintiffs' wholesale refusal to answer this question— a question that Defendants assume the Court is also interested in knowing—is inconsistent with the notion of a joint meet-and-confer process.

5.      During the process of Defendants' corrective actions on the post-injunction issuances and re-mailings, Defendants learned that some additional instances of post-injunction issuances and re-mailings may have occurred but may not have been captured in the prior queries (that provided the numbers of 2128 and 484, respectively).  Based on the best information currently available, Defendants have currently identified these possible additional three-year EAD post-injunction issuances and re-mailings as approximately 50 and 1, respectively.

Defendants will provide the same above-described information to Plaintiffs regarding these additional individuals.  Defendants continue to investigate the circumstances leading to these individuals not being captured in prior queries, are in the process of undertaking corrective action for those cases where USCIS has confirmed that a three-year EAD was issued or re-mailed post-injunction, and will continue to undertake corrective action as other cases are identified and confirmed.

6.    The parties dispute whether, on the basis of the above information and commitments, Defendants have now resolved all of Plaintiffs' requests for information related to the post-injunction issuances and re-mailings.

a.    <u>Plaintiffs' Position</u>: Plaintiffs are unable to agree that the Defendants "have now resolved all of Plaintiffs' requests for information related to the post-injunction issuances and re-mailings."  As the Plaintiff States have made clear throughout the early discovery proceedings, they are seeking information regarding the provision of three-year grants of deferred action and employment authorization during the pendency of this litigation. Although the Plaintiff States appreciate the level of information that the Defendants have provided, or have committed to provide, the Defendants' representations regarding the extent to which such three-year grants were issued is constantly evolving.  For example, as part of this status report, the Defendants have further refined their estimates of the number of individuals who were issued three-year EADs after the Court's February 16 injunction—now acknowledging an additional group of "approximately" 51 individuals who should have been captured in their previous calculations of post-injunction grantees.  As a result, the Plaintiff States have suggested—and they reiterate the suggestion here—that the Court impose a compliance-assurance mechanism such as a periodic certification of compliance with the injunction or an

external compliance monitor.  Moreover, the Defendants' privilege claims in response to the Court's April 7, 2015 Order—which may implicate information related to three-year grants issued before or after the Court's injunction—remain pending before the Court.

b. <u>Defendants' Position</u>: Based on the above provision of information, all of Plaintiffs' requests for information regarding the post-injunction issuances and re-mailings have now been satisfied in full, with the exception of the information regarding the additional individuals identified in paragraph 4, above, and the actual provision of the PII—both of which Defendants have committed to providing to Plaintiffs.  Once that information is provided, therefore, Plaintiffs should not be permitted to belatedly request any additional information; they have had more than ample opportunity to do so during the past two months of meeting and conferring.  Plaintiffs' assertions regarding compliance oversight and privilege issues (which are addressed in paragraph 13, *infra*) have no bearing whatsoever on whether Defendants have fully satisfied Plaintiffs' requests for information regarding the post-injunction three-year EAD issuances and re-mailings.  On that question, Plaintiffs notably do not dispute that Defendants have satisfied (or committed to satisfy) all of the specific requests put forth by Plaintiffs during the past two months.

**B.** **Information Related to the Pre-Injunction Approvals.**

7. In response to Plaintiffs' requests, Defendants have also provided information regarding the identified 108,081 pre-injunction three-year approvals.  Specifically, Defendants have now provided:

- A state-by-state breakdown of this universe of individuals for all states; and

- A state-by-state breakdown of the number of queries submitted through SAVE, or responded to by the SAVE Program Office, for state driver's licenses, between November 20, 2014 and July 17, 2015, for the 108,081 identified individuals.

8.      <u>Plaintiffs' Position</u>: For the reasons stated above in paragraph 6(a), the Plaintiff States are unable to agree that "Plaintiffs' requests for information regarding the pre-injunction three-year approvals have now been satisfied in full."

9.      <u>Defendants' Position</u>: Based on the above provision of information, and the reasons stated above in paragraph 6(b), all of Plaintiffs' requests for information regarding the pre-injunction three-year approvals have now been satisfied in full.  Again, Plaintiffs do not dispute that Defendants have satisfied all of the specific requests put forth by Plaintiffs regarding the universe of approximately 108,000 pre-injunction three-year approvals.

**C.      Any Agreement Regarding the Pre-Injunction Approvals.**

10.      <u>Plaintiffs' Position</u>:  In its February 16, 2015 Order of Temporary Injunction, this Court enjoined Defendants from "implementing any and all aspects or phases of the expansions (including any and all changes)" to the DACA program contained in the challenged DHS Directive. ECF No. 144 at 2.  These expansions include, among other things, the increase in DACA's term of deferred action (and accompanying employment authorization) from two years to three years.  DHS Directive at 3 (ECF No. 38-7). In the five-and-a-half months that have passed since the injunction was issued, Defendants have not committed to revise their databases and records so that any three-year terms of deferred action issued under DACA or corresponding three-year EADs are reflected to extend only for two years.  Yet, any such three-year terms are authorized only by the now-enjoined DHS Directive.

Although the 108,081 three-year grants at issue here were conferred prior to the Court's February 16 injunction, Defendants' continuing maintenance of those three-year authorizations in their databases and records—which are used by state agencies and others when querying the federal government for information relating to an individual's immigration status—is contrary to

the February 16 injunction's provision barring implementation of "any and all aspects" of the DHS Directive's DACA expansions.  ECF No. 144 at 2.  Because the Defendants' awarding of three-year DACA and EAD terms can only be based on the now-enjoined DHS Directive, Defendants lack any authority to represent on an ongoing basis that three-year terms are, in fact, authorized.  These representations also must be considered in light of Defendants' earlier failure to disclose that such three-year grants were being provided during the pendency of this litigation.

        The proper course of action as to the 108,081 pre-injunction grants of three-year deferred action and EADs is for Defendants to cease implementing the three-year expansion aspect of the Directive by modifying their databases and records to reflect a two-year term of authorization for these individuals.  By presenting documentation that they have received a three-year period of deferred action and employment authorization, these post-injunction grantees are representing that Defendants will continue to afford those benefits for the three-year term.  However, Defendants' authority to act in that manner has been enjoined by this Court.  As such, Defendants should take steps to retrieve and replace all three-year EADs issued before the injunction just as they are doing for the post-injunction grants.

        11.    <u>Defendants' Position</u>:    Defendants disagree with Plaintiffs' theory of an injunction violation.  Nothing about the Court's preliminary injunction indicates that it is meant to, in effect, operate retroactively—by requiring the agency to go back and undo three-year approvals that were fully completed prior to entry of the injunction.  As the Court itself has noted on several occasions, there is a big difference between what occurred prior to the injunction and what occurred after the injunction.  *See* June 23 Tr. at 17 (acknowledging "that there's a wildly vast difference between . . . the 108,000 and the 2,000"); *id.* at 20 (describing the 108,000 as "in

a whole different category"); *id.* at 30 ("I understand 108,000 is a completely different universe").

Furthermore, Plaintiffs articulated their theory for the first time on July 22, 2015, *see* Exh. 5 at 2-3. Plaintiffs criticize Defendants for not taking action "[i]n the five-and-a-half months that have passed since the injunction was issued," but Plaintiffs failed to request any such action—and indeed never mentioned the possibility of an ongoing injunction violation—until July 22, 2015, over four-and-a-half months after Defendants' March 3 Advisory. Even when directly questioned about the approximately 108,000 pre-injunction three-year approvals by the Court on June 23, Plaintiffs failed to mention the prospect of an injunction violation. *See* June 23 Tr. at 15-16 (identifying "two problems that exist with these pre-injunction 108 grants," neither of which was that their continued maintenance violates the Court's injunction). This broader context significantly undermines Plaintiffs' new theory.

Thus, the approximately 108,000 pre-injunction three-year approvals plainly do not constitute a violation of the preliminary injunction. To the extent the Court entertains Plaintiffs' new legal theory, however, Defendants respectfully request the opportunity for further briefing on that issue, as well as briefing on the proper scope of any available remedies. Additionally, Defendants note that whatever occurs next regarding Plaintiffs' new legal theory and the approximately 108,000 pre-injunction approvals, the legal issues are distinct from the Court's July 7 Order and the potential contempt hearing on August 19, which are focused on the post-injunction three-year EADs.

**D.    Any Additional Discovery and Further Relief.**

12.    <u>Plaintiffs' Position</u>:  In response to the Court's April 7, 2015 Order granting in part the Plaintiff States' motion for early discovery, Defendants withheld over 1,163 pages of

documents along with lists of who knew that three-year terms of deferred action and EADs were being granted during the course of this litigation and when they knew it. As the Plaintiff States have maintained in their briefing, Defendants have not offered clear proof to substantiate their privilege claims, and the lack of detail in Defendants' privilege log prevents the Plaintiff States from assessing the merits of the privilege assertions. ECF No. 261. At the same time, the Plaintiff States have indicated that additional discovery—including communications referenced or relied on in declarations submitted by Defendants regarding their efforts to comply with this Court's February 16 injunction—may be appropriate depending on how the Court (or an appointed magistrate judge) rules on Defendants' privilege assertions. E.g., ECF No. 261 at 7. Defendants' privilege claims remain pending before the Court. Finally, in light of the additional information Defendants are providing to the Court regarding the extent of their compliance with the preliminary injunction, Plaintiffs suggest that, at a minimum, a compliance-assurance mechanism would be prudent.

13.   <u>Defendants' Position</u>:  There is no basis for any additional discovery, particularly given that Plaintiffs did not identify any such requested discovery as part of their May 20 response to the Court's April 7 Order—which directed Plaintiffs to file "a list of any further discovery that they may deem necessary," ECF No. 226 at 12—nor did Plaintiffs identify any such discovery at any point during the past two months, as part of the parties' ongoing meet-and-confer process. One of the central purposes of the meet-and-confer process was to address, and potentially resolve, any outstanding discovery requests by Plaintiffs.

Plaintiffs rely on "Defendants' privilege claims in response to the April 7, 2015 Order" as a potential hook for future discovery, because those privilege assertions purportedly "remain pending for the Court's determination."  Exh. 5 at 3.  For the reasons explained on May 27,

however, there is no need for adjudication of any of those privilege assertions vis-à-vis Plaintiffs: Plaintiffs themselves suggested that "verification" of Defendants' April 30 explanation could be done by this Court or a magistrate judge, without any role for Plaintiffs in that process.  *See* ECF No. 261 at 6 (stating that Plaintiffs "are in no position to adequately verify this claim" but "[t]his Court . . . is in such a position").  (Defendants' position is that such verification is unnecessary, but any verification should be done by a magistrate judge.  *See* ECF No. 265 at 11-12, 14-15.)

Moreover, even if resolution of Defendants' privilege assertions vis-à-vis Plaintiffs were necessary, that would be the end of the matter.  Regardless of how the Court ruled, that would not open the door for Plaintiffs to request any additional discovery—particularly given Plaintiffs' failure over the past two months to articulate any specific discovery requests they wish to pursue. *See also* ECF No. 265 at 7-8 (discussing how Plaintiffs must demonstrate "good cause" for each specific item of requested discovery).  Thus, any future discovery would be inappropriate.

Finally, Plaintiffs vaguely suggest that "a compliance-assurance mechanism would be prudent."  For all of the reasons explained on May 27, however, any reporting requirement or external monitor would be inappropriate.  *See* ECF No. 265 at 2-7.  Indeed, with respect to the additional individuals recently identified, DHS's recent identification of those individuals—and commitment to undertake full corrective action for them—stands as testament to why such compliance oversight is unnecessary here.  DHS has once again proven itself capable of self-monitoring and self-correcting any potential issues regarding compliance.

Dated: July 31, 2015                    Respectfully submitted,

KENNETH MAGIDSON                        BENJAMIN C. MIZER
United States Attorney                  Principal Deputy Assistant Attorney General

DANIEL DAVID HU                         JOYCE R. BRANDA
Assistant United States Attorney        Deputy Assistant Attorney General
Deputy Chief, Civil Division

                                        AUGUST E. FLENTJE
                                        Special Counsel

                                        JENNIFER D. RICKETTS
                                        Director, Federal Programs Branch
                                        Attorney-in-Charge (VA Bar No. 29281)

                                        JAMES J. GILLIGAN
                                        Special Litigation Counsel

                                         _/s/  Daniel Schwei_____
                                        DANIEL SCHWEI
                                        Trial Attorney
                                        Civil Division, Federal Programs Branch
                                        U.S. Department of Justice
                                        P.O. Box 883
                                        Washington, D.C. 20044
                                        Tel.: (202) 305-8693
                                        Fax: (202) 616-8470
                                        Daniel.S.Schwei@usdoj.gov

                                        *Counsel for Defendants*

\*      \*      \*

LUTHER STRANGE
*Attorney General of Alabama*

MARK BRNOVICH
*Attorney General of Arizona*

DUSTIN MCDANIEL
*Attorney General of Arkansas*

PAMELA JO BONDI
*Attorney General of Florida*

SAMUEL S. OLENS
*Attorney General of Georgia*

LAWRENCE G. WASDEN
*Attorney General of Idaho*

JOSEPH C. CHAPELLE
PETER J. RUSTHOVEN
*Counsel for the State of Indiana*

DEREK SCHMIDT
*Attorney General of Kansas*

JAMES D. "BUDDY" CALDWELL
*Attorney General of Louisiana*

TIMOTHY C. FOX
*Attorney General of Montana*

DOUGLAS J. PETERSON
*Attorney General of Nebraska*

ADAM PAUL LAXALT
*Attorney General of Nevada*

WAYNE STENEHJEM
*Attorney General of North Dakota*

KEN PAXTON
*Attorney General of Texas*

CHARLES E. ROY
*First Assistant Attorney General*

SCOTT A. KELLER
*Solicitor General*

/s/ Angela V. Colmenero
ANGELA V. COLMENERO
*Assistant Attorney General*
    Attorney-in-Charge
    State Bar No. 24048399

J. CAMPBELL BARKER
*Deputy Solicitor General*

ERIC A. HUDSON
ADAM N. BITTER
*Assistant Attorneys General*

Office of the Attorney General of Texas
P.O. Box 12548
Austin, Texas 78711-2548
512-936-1700

-15-

MICHAEL DEWINE
*Attorney General of Ohio*
ERIC E. MURPHY
*Co-counsel for the State of Ohio*

E. SCOTT PRUITT
*Attorney General of Oklahoma*

ALAN WILSON
*Attorney General of South Carolina*

MARTY J. JACKLEY
*Attorney General of South Dakota*

HERBERT SLATERY III
*Attorney General and Reporter of Tennessee*

SEAN D. REYES
*Attorney General of Utah*

PATRICK MORRISEY
*Attorney General of West Virginia*

BRAD D. SCHIMEL
*Attorney General of Wisconsin*

BILL SCHUETTE
*Attorney General for the People of Michigan*

DREW SNYDER
*Counsel for the Governor of Mississippi*

PAUL R. LEPAGE
*Governor of Maine*

ROBERT C. STEPHENS
*Counsel for the Governor of North Carolina*

TOM C. PERRY
CALLY YOUNGER
*Counsel for the Governor of Idaho*

**CERTIFICATE OF CONFERRAL**

Undersigned counsel hereby certifies that counsel for Plaintiffs, Adam Bitter, concurred in the filing of this Joint Status Report.

/s/ Daniel Schwei
Counsel for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Joint Status Report has been delivered electronically on July 31, 2015, to counsel of record via the District's ECF system.

/s/ Daniel Schwei
Counsel for Defendants

-17-