**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

_____

|  |  |  |
|---|---|---|
| ) | | |
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 1:14-CV-254 |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

_____)

**DEFENDANTS' EXPEDITED, UNOPPOSED MOTION TO CANCEL
AUGUST 19 HEARING OR, IN THE ALTERNATIVE, TO EXCUSE
SECRETARY JOHNSON AND OTHER DEFENDANTS AND TO
SUBSTITUTE WITNESSES, AND MEMORANDUM IN SUPPORT**

i

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION AND SUMMARY OF THE ARGUMENT ....................................................1

NATURE AND STAGE OF THE PROCEEDING...................................................5

Immediate Steps Taken to Comply With the Court's Preliminary Injunction................................5

Discovery of the Post-Injunction Issuances of Three-Year EADs, and the
    Initiation of Corrective Action.................................................................9

Secretary Johnson's July 10 Directive ......................................................13

The Approximately 500 Re-Mailed Three-Year EADs...........................................16

Corrective Action Regarding the 484 Re-Mailed EADs .......................................18

STATEMENT OF THE ISSUES TO BE RULED ON BY THE COURT ...................................21

ARGUMENT ...............................................................................22

I.      THE COURT SHOULD CANCEL THE AUGUST 19 HEARING
        BECAUSE CONTEMPT PROCEEDINGS ARE UNNECESSARY
        AND UNWARRANTED................................................................22

        A.      Legal Standards Governing Contempt Proceedings ...............................23

        B.      Contempt Proceedings Are Unnecessary and Unwarranted
                Because the Government Is In Full Compliance, Or at a Minimum
                Substantial Compliance, with the Court's Injunction ...........................25

        C.      The Government's Diligence in Complying with the Court's
                Injunction and Comprehensive Efforts To Cure Any Violations
                That May Have Occurred Also Preclude Contempt Sanctions............................28

        D.      There is No Basis to Pursue Contempt Against Secretary
                Johnson or the Other Named Defendants .............................................30

        E.      Imposition of Contempt is Legally Precluded ....................................34

III.    IN THE ALTERNATIVE, THE COURT SHOULD EXCUSE THE
        ATTENDANCE OF SECRETARY JOHNSON AND MOST OF THE
        REMAINING NAMED DEFENDANTS.......................................................36

A.      High-Level Executive Branch Officials Can Be Compelled to
        Testify Only in Extraordinary Circumstances ........................................................37

B.      No Extraordinary Circumstances Exist to Compel the Attendance
        of the Secretary and Three of the Remaining, High-Ranking Officials
        Who Lack Any Relevant Evidence, Much Less Essential Evidence ....................40

C.      The Relevant Evidence is Available from Alternative Witnesses ........................44

IV.     THE COURT SHOULD CONCLUDE ITS INQUIRY INTO THE
        ISSUES RELATED TO ITS APRIL 7 ORDER ................................................................46

CONCLUSION ...................................................................................................................................50

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Alexander v. FBI*,
   186 F.R.D. 1 (D.D.C. 1998)........................................................................... 39

*Am. Airlines, Inc. v. Allied Pilots Ass'n*,
   228 F.3d 574 (5th Cir. 2000) ............................................................... 21, 28

*Ashcraft v. Conoco, Inc.*,
   218 F.3d 288 (4th Cir. 2000) ..................................................................... 35

*Bogan v. City of Boston*,
   489 F.3d 417 (1st Cir. 2007).................................................................. 38, 42

*Boylan v. Detrio*,
   187 F.2d 375 (5th Cir. 1951) ................................................................ 30, 35

*Burgin v. Broglin*,
   900 F.2d 990 (7th Cir. 1990) ..................................................................... 49

*In re Cheney*,
   544 F.3d 311 (D.C. Cir. 2008).............................................................. 39, 40

*Church of Scientology v. IRS*,
   138 F.R.D. 9 (D. Mass. 1990).................................................................... 42

*Cmty. Fed. Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*,
   96 F.R.D. 619 (D.D.C. 1983).................................................................... 43

*Consol, Coal Co. v. United Mineworkers of Am.*,
   683 F.2d 827 (4th Cir. 1982) ..................................................................... 24

*Cobell v. Norton*,
   334 F.3d 1128 (D.C. Cir. 2003)................................................................. 23

*Cole v. U.S. Dist. Court for Dist. of Idaho*,
   366 F.3d 813 (9th Cir. 2004) ..................................................................... 36

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
   10 F.3d 693 (9th Cir. 1993) ....................................................................... 24

*In re FDIC*,
   58 F.3d 1055 (5th Cir. 1995) ............................................................... <u>passim</u>

*Gen. Signal Corp. v. Donallco, Inc.*,
   787 F.2d 1376 (9th Cir. 1986) ................................................................................. 26

*Gibson v. Carmody*,
   1991 WL 161087 (S.D.N.Y. Aug. 14, 1991) ........................................................ 43

*Hornbeck Offshore Servs., LLC v. Salazar*,
   713 F.3d 787 (5th Cir. 2013) .................................................................................. 24

*Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*,
   389 U.S. 64 (1967) .................................................................................................... 26

*Johnson v. Gen. Tel. Co.*,
   1982 WL 200 (N.D. Tex. Feb. 4, 1982) ................................................................ 49

*Kelley v. FBI*,
   Civ. No. 13-0825 (ABJ) (D.D.C. July 16, 2015) ................................................ 41

*La. Ed. Ass'n v. Richland Parish Sch. Bd.*,
   421 F. Supp. 973 (W.D. La. 1976) *aff'd*, 585 F.2d 518 (5th Cir. 1978) ................... 35

*Lamar Fin. Corp. v. Adams*,
   918 F.2d 564 (5th Cir. 1990) ........................................................................... 23, 24

*Lelsz v. Kavanagh*,
   673 F. Supp. 828 (N.D. Tex. 1987) ...................................................................... 25

*MacNeil v. United States*,
   236 F.2d 149 (1st Cir. 1956) .................................................................................. 35

*Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc.*,
   779 F.3d 102 (2d Cir. 2015) ................................................................................... 24

*Matter of Baum*,
   606 F.2d 592 (5th Cir. 1979) .................................................................................. 36

*McGuire v. Sigma Coatings, Inc.*,
   48 F.3d 902 (5th Cir. 1995) .................................................................................... 31

*New York v. Nat'l R.R. Passenger Corp.*,
   2007 WL 4377721 (N.D.N.Y. Dec. 12, 2007) ................................................... 43

*In re Office of Inspector General*,
   933 F.2d 276 (5th Cir. 1991) .................................................................................. 37

*Peoples v. Dep't of Agric.*,
    427 F.2d 561 (D.C. Cir. 1970) ............................................................ 41

*Remington Rand Corp.-Delaware v. Bus. Sys., Inc.*,
    830 F.2d 1256 (3d Cir. 1987) ............................................................. 45

*Robinson v. City of Philadelphia*,
    2006 WL 1147250 (E.D. Pa. Apr. 26, 2006) ...................................... 43

*Ruiz v. McCotter*,
    661 F. Supp. 112 (S.D. Tex. 1986) ..................................................... 24

*In re Sec. Exch. Comm'n*,
    374 F.3d 184 (2d Cir. 2004) ............................................................... 40

*Simplex Time Recorder Co. v. Sec'y of Labor*,
    766 F.2d 575 (D.C. Cir. 1985) ............................................................ 42

*Spallone v. United States*,
    493 U.S. 265 (1990)..................................................................... 22, 31

*Spangler v. Pasadena City Bd. of Educ.*,
    537 F.2d 1031 (9th Cir. 1976) ............................................................ 35

*Tillman v. Bd. of Pub. Instruction*,
    430 F.2d 309 (5th Cir. 1970) .............................................................. 49

*Travelhost, Inc. v. Blandford*,
    68 F.3d 958 (5th Cir. 1995) ................................................................ 24

*U.S. Steel Corp. v. United Mine Workers of Am.*,
    598 F.2d 363 (5th Cir. 1979) ........................................... 21, 24, 25, 28

*Ungar v. Sarafite*,
    376 U.S. 575 (1964)............................................................................ 45

*In re United States (Reno and Holder)*,
    197 F.3d 310 (8th Cir. 1999) ................................................... 39, 40, 41

*In re United States* (Bernanke),
    542 F. App'x 944 (Fed Cir. 2013) ...................................................... 40

*In re United States* (Jackson),
    624 F.3d 1368 (11th Cir. 2010) ................................................... passim

*In re United States (Kessler),*
   985 F.2d 510 (11th Cir. 1993) *cert. denied* 510 U.S. 989 (1993)...................................... 37, 40

*United Mine Workers of Am. v. Bagwell,*
   512 U.S. 821 (1994)............................................................................................... 23, 36

*United States v. Berg,*
   20 F.3d 304 (7th Cir. 1994) ............................................................................................... 24

*United States v. Morgan,*
   313 U.S. 409 (1941)........................................................................................................... 41

*United States v. Saccoccia,*
   433 F.3d 19 (1st Cir. 2005) ............................................................................................... 36

*United States v. U.S. Dist. Court for Nothern Mariana Islands*
   694 F.3d 1051 (9th Cir. 2012) ......................................................................................... 44

*Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.,*
   689 F.2d 885 (9th Cir. 1982) ........................................................................................... 24

*Warzon v. Drew,*
   155 F.R.D. 183 (E.D. Wis. 1994) .................................................................................... 43

*Washington Metro. Area Transit Auth. v. Amalgamated Transit Union,*
   531 F.2d 617 (D.C. Cir. 1976)................................................................................... 22, 35

*Waste Mgmt. of Washington, Inc. v. Kattler,*
   776 F.3d 336 (5th Cir. 2015) ........................................................................................... 45

*Williams v. Iberville Parish Sch. Bd.,*
   273 F. Supp. 542 (E.D. La. 1967).................................................................................... 35

## STATUTES

5 U.S.C. § 5314................................................................................................................ 41, 42
5 U.S.C. § 5315................................................................................................................ 41, 42

## RULES

Fed. R. Civ. P. 11(b) .............................................................................................................. 49
Fed. R. Crim. P. 42 .......................................................................................................... 24, 44
Fed. R. Crim. P. 42(a)(1)(C) ................................................................................................. 44

**MISCELLANEOUS**

*Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents* (November 2014) ................................................... 5

Wright & Miller, Fed. Prac. & Proc. § 2960 (3d ed.) ................................................................ 35

## <u>INTRODUCTION AND SUMMARY OF THE ARGUMENT</u>

The Court's Order of July 7, 2015 (ECF No. 281) directs the Secretary of Homeland Security and four other senior Department of Homeland Security (DHS) officials to appear on August 19, 2015, to show cause why they should not be held in contempt of Court.  It further provides, however, that the Court will cancel the August 19 hearing if, by July 31, the Government reports that it has "remedie[d] [the] situation" concerning the Employment Authorization Documents (EADs) with three-year terms that the Government issued to approximately 2100 Deferred Action for Childhood Arrivals (DACA) recipients after the Court handed down its February 16 preliminary injunction.  The Government fully appreciates the seriousness of the Court's concern and has taken extraordinary measures to address that concern. The Government, including the five named Defendants, attaches utmost importance to the responsibility to comply with court orders and the need to take corrective action, when necessary, to ensure such compliance.

The Government reports here, and in the parties' Joint Status Report also filed today, that it stands in compliance with the Court's preliminary injunction, including compliance as to the approximately 2100 individuals who received the EADs at issue in the Court's July 7 Order. The terms of deferred action and employment authorization of all 2128 individuals have been converted by U.S. Citizenship and Immigration Services (USCIS) from three years to two, or terminated altogether in the cases of those individuals who failed to comply with USCIS's requirement to return their three-year EADs.  Likewise, the SAVE and E-Verify systems have been updated to reflect these changes, so that state agencies and employers can verify that these individuals have been granted two, rather than three, years of deferred action and employment authorization.  Each of these 2128 individuals has been issued a replacement two-year EAD, and, through a series of extensive efforts—including visits by teams of USCIS officers to recipients'

homes—USCIS has retrieved or otherwise accounted for 2117 of the previously identified 2128 three-year EADs issued after the injunction (thus representing 99.5 percent accounted for). And as of today, the deferred action and employment authorization of the remaining 11 individuals in these cases have been terminated. Similar corrective steps have been completed with regard to the approximately 500 individuals noted in the Government's July 9 Advisory, to whom three-year EADs were issued and mailed before the injunction, but returned as undeliverable, and then re-mailed after the injunction. As of July 30, USCIS has retrieved or accounted for 473 of the 484 previously identified three-year EADs (thus representing 97.7 percent accounted for), and as of today the recipients' deferred action and employment authorization in the remaining 11 cases have been terminated as well. These efforts are described in more detail in the attached declaration of USCIS Director León Rodríguez, filed herewith as Exhibit 1, and the circumstances surrounding the re-mailed three-year EADs are described in more detail in the attached declaration of USCIS Associate Director Donald W. Neufeld, filed herewith as Exhibit 2.

Because the Government has "remedie[d] [the] situation" that led to the Court's July 7 Order, the Government respectfully submits that, in accordance with the terms of the Order itself, the August 19 hearing should be canceled. The Government has achieved full compliance, or at a minimum substantial compliance, with the Court's February 16 injunction. This removes any need or justification for contempt proceedings, the purpose of which (as the July 7 Order acknowledges) is to compel a party's compliance with a prior court order. As the record before the Court now confirms, no such compulsion is necessary here; the Government is in compliance and has demonstrated its commitment to remaining so. Indeed, even if the Government were not yet in compliance with the February 16 injunction, the reasonable, diligent, and extensive efforts

that it has made to retrieve the outstanding post-injunction three-year EADs also render contempt proceedings inappropriate.

In any event, even if there were a basis on the current record to conduct contempt proceedings (which there is not), such proceedings should be directed against the United States; no justification lies for issuing contempt citations against the named Government officials. Secretary Johnson and USCIS Director Rodríguez have consistently directed, supported, and overseen not only compliance with the injunction on a massive scale, but also the successful implementation of corrective measures to address the relatively small number of cases involving post-injunction issuances and re-mailings of three-year EADs.[1] The remaining three defendants—the Commissioner of U.S. Customs and Border Protection (CBP), the Director of U.S. Immigration and Customs Enforcement (ICE), and the Deputy Chief of the U.S. Border Patrol—have no responsibility for, authority over, or personal knowledge about the actions taken by USCIS that gave rise to these circumstances, or the actions taken by USCIS to correct them. Therefore these three Defendants could not be the proper subjects of contempt.

Contempt is also legally precluded under the circumstances here, because Plaintiffs have not moved for contempt or shown the requisite harm. As numerous courts have held, in the absence of a motion by a complaining party, courts lack authority to initiate civil contempt proceedings *sua sponte*. For these reasons, the August 19 hearing should be canceled.

Even if the Court concluded, however, that the August 19 hearing remains necessary, it should excuse the Secretary and all of the other named Defendants, with the exception of

---

[1] In addition, on May 8, 2015, Secretary Johnson asked the DHS Inspector General to investigate the issuance of the post-injunction EADs discussed in Defendants' May 7 Advisory. *See* May 15 Rodríguez Decl. ¶ 14.  The Inspector General's report of his investigation is expected in the coming days, and Defendants will share the report with Plaintiffs, and file the report with the Court, when a public version is available.

Director Rodríguez.  It is settled law that high-ranking Government officials, such as the

Secretary, and the other named Defendants in this case, cannot be compelled to appear or give

testimony in judicial proceedings absent extraordinary circumstances, which are present only

when a high-ranking official has personal knowledge of information that is essential to a case

and cannot be obtained from another source.  As the record reflects, Secretary Johnson had no

personal involvement with or advance knowledge of the events leading to the post-injunction

issuance and re-mailing of the three-year EADs, and he placed responsibility for the

implementation and oversight of corrective measures with Director Rodríguez.  Notwithstanding

his role in directing that remedial efforts take place, the Secretary possesses no unique personal

knowledge of these matters that would justify compelling the attendance or testimony of a

Cabinet-level official.  The remaining Defendants had no involvement with or knowledge of the

matters raised by the Court's July 7 Order at all, as confirmed by their declarations filed

herewith.  *See* Kerlikowske Decl. (Exh. 3); Saldaña Decl. (Exh. 4); Vitiello Decl. (Exh. 5).

Moreover, the information pertinent to those matters can be obtained from the four other

witnesses that the Government intends to bring to the August 19 hearing, should it take place.

These include Director Rodríguez and the heads of involved USCIS Directorates, who can testify

in particular to the part each Directorate played (if any) in the issuance and re-mailing of the

three-year EADs, and the role each has undertaken in correcting the situation.

  Given the importance of the interests implicated by the Court's Order to Secretary

Johnson and these other senior officials—interests including the separation of powers and the

proper relationship between co-equal branches of the Federal Government—the Government

respectfully requests a ruling on its motion to excuse the Secretary and the other high-ranking

officials by no later than Monday, August 10, so that it may have a reasonable opportunity to

seek appellate review, if necessary.  In the event the Court denies the Government's motion to

excuse these officials, the Government also respectfully requests a stay of the August 19 hearing

pending any appellate review, to ensure that the Secretary and other Defendants are not

compelled to appear before the Court of Appeals can provide meaningful relief, if such relief is

sought.  Plaintiffs have authorized Defendants to represent that Plaintiffs take no position on the

relief requested in Defendants' motion.  Plaintiffs reserve the right to file any response or

advisory in connection to Defendants' motion and agree to submit such filing no later than

Thursday, August 6, 2015.

Finally, the Government addresses below issues raised in the Court's Order of April 7,

2015 (ECF No. 226), discussed at the hearing held on June 23, 2015, and mentioned as well in

the Court's July 7 Order.  The Government has sincerely apologized for the miscommunications

regarding the implementation dates of the changes made to DACA by the Secretary's 2014

Deferred Action Guidance.  The Government reiterates that apology.  In addition, as discussed

below, the record contains more than sufficient evidence, on which this Court may rely, showing

that these miscommunications were inadvertent, without intent to mislead or deceive.  There is

also plentiful evidence showing that the Government did not delay filing its March 3 Advisory

after the Court issued its preliminary injunction on February 16.  Therefore, in addition to

canceling the August 19 hearing, the Government respectfully submits that the Court should also

conclude its inquiry into the matters raised by the April 7 Order.

## NATURE AND STAGE OF THE PROCEEDING

### Immediate Steps Taken to Comply With the Court's Preliminary Injunction

On February 16, 2015, the Court issued its preliminary injunction prohibiting the

Government "from implementing any and all aspects or phases" of Deferred Action for Parents

of Americans and Lawful Permanent Residents (DAPA), and of "the expansions (including any

and all changes)" to DACA, as set out in Secretary Johnson's November 20, 2014 memorandum,

*Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents* (the 2014 Deferred Action Guidance). Order of Temporary Injunction (ECF No. 144) at 1, 2.

Within two hours after the Court's preliminary injunction was issued, Defendant León Rodríguez, Director of USCIS, had already set in motion a series of steps intended to ensure that USCIS complied with the Court's Order. May 15 Rodríguez Decl. (ECF No. 256-1) ¶ 7; May 15 Neufeld Decl. (ECF No. 256-2) ¶ 15. Per instructions from Director Rodríguez, USCIS implemented a "broad freeze," suspending the anticipated processing of applications under the expanded DACA eligibility guidelines (then scheduled to begin on February 18, 2015) and ceasing further action as well to prepare for DAPA. May 15 Neufeld Decl. ¶¶ 15-16.[2]

USCIS also took immediate steps to ensure that it ceased approving and issuing three-year terms of deferred action and employment authorization under the existing 2012 DACA eligibility guidelines, and three-year EADs, so that following the injunction, individuals found to meet the criteria under the 2012 DACA guidelines would receive only two years of deferred action and employment authorization instead of three. May 15 Rodríguez Decl. ¶ 7; May 15 Neufeld Decl. ¶ 15. These included steps to prevent the issuance of three-year approval notices

---

[2]  Notification of the Director's instructions to halt the anticipated implementation of the changes to DACA and preparations for implementing DAPA was broadcast to the USCIS workforce. The steps taken to halt implementation of the new DACA guidelines and of DAPA included, but were not limited to: (i) halting the planned February 17, 2015 posting of the new DACA application on USCIS's public website; (ii) removing instructions for and other guidance pertaining to applications under the expanded DACA eligibility guidelines that had been posted on February 14, 2015; (iii) ceasing policy and operational discussions to develop guidelines, procedures, and forms to implement DAPA; and (iv) suspending hiring actions to bring new staff on to support DAPA implementation. May 15 Rodríguez Decl. ¶ 7; May 15 Neufeld Decl. ¶ 16.

and EADs even in those cases where applicants had already been approved under the 2012 DACA guidelines prior to the Court's injunction.  May 15 Rodríguez Decl. ¶ 8.

Thus, on February 17, USCIS leadership directed that:

- USCIS Service Centers immediately suspend further approval of all requests for deferred action and employment authorization;

- USCIS Service Centers immediately suspend issuance of DACA approval notices;

- USCIS card-production facilities (the separate locations where EADs are printed and mailed) immediately suspend issuance of all DACA-based EADs, all regardless of the associated terms of validity.  (Approval of DACA requests and issuance of notices and EADs for two-year terms was allowed to resume on February 18.); and

- The card-production facilities immediately intercept and hold any three-year EADs that had been printed but not yet mailed to DACA recipients.

May 15 Neufeld Decl. ¶¶ 15-20.  Personnel at USCIS Service Centers and card-production facilities took immediate action to execute these instructions, and manually destroyed some of the three-year EADs that had been printed but not yet mailed.[3]  *Id.* ¶¶ 18, 20 n. 2.  These actions were taken notwithstanding the numerous other duties that USCIS employees have, many of which are wholly unrelated to deferred action requests.  *Cf.* May 15 Rodríguez Decl. ¶ 4 (explaining that in fiscal year 2014, USCIS processed approximately 7 million cases under a broad variety of immigration programs, including petitions for refugee status, for family-sponsored and employment-based visas issued in the United States, and naturalization).

USCIS was also aware on February 17 that there were a number of cases in which three-year terms of deferred action and employment authorization had already been approved prior to

---

[3] USCIS personnel at one facility did not, however, intercept a box of EADs, most of which did not concern DACA recipients, that was awaiting pickup by the U.S. Postal Service on the morning of February 17 (and, due to a snowstorm, was not picked up until February 18).  These EADs had already been printed and packaged for mailing before the injunction.  May 15 Neufeld Decl. ¶ 20 n.2.

the injunction, but in which the recipients' EADs had not yet been printed and still remained in

the production queues at the card-production facilities.  On February 17, USCIS decided to place

a "hold" on these cards, as well.  *See generally* May 15 Rodríguez Decl. ¶ 7; May 15 Neufeld

Decl. ¶¶ 17-21.  The intent of all these actions was "to stop the approval or issuance of three-year

approval notices or EADs under DACA once the injunction had issued."  May 15 Rodríguez

Decl. ¶ 9.

On February 17, 2015, after setting these steps in motion, Director Rodríguez informed

Secretary Johnson of the measures USCIS had undertaken to comply with the Court's injunction.

July 31 Rodríguez Decl. ¶ 10.  The Secretary approved of these measures and instructed Director

Rodríguez that he should closely oversee USCIS's compliance efforts.  *Id.*  The Secretary

followed this instruction with a February 20, 2015 memorandum to senior DHS officials

directing that the Department and its components continue to suspend implementation of both

the modifications to DACA, and preparations for DAPA, and that they ensure compliance with

the Court's order.  *Id.* & Attachment A thereto.

Although the bulk of the Secretary's 2014 Deferred Action Guidance provided direction

to USCIS regarding implementation of the new DACA guidelines and DAPA, the Secretary also

placed limited responsibilities on ICE and CBP (and by extension, the Border Patrol, a CBP

component) in connection with both policies.  ICE and CBP were directed to begin identifying

persons in their custody as well as newly encountered individuals who may be eligible for

deferred action under DACA or DAPA (whom USCIS could then consider for deferred action).

2014 Deferred Action Guidance at 5.  ICE was also instructed (i) to seek administrative closure

or termination in the pending removal cases of individuals who may be eligible for deferred

action under DACA or DAPA, and refer them to USCIS; and (ii) to establish a process allowing

individuals in removal proceedings to identify themselves as candidates for deferred action.  *Id.*

When the Court issued its injunction on February 16, Director Saldaña, Commissioner Kerlikowske, and Deputy Chief Vitiello directed that ICE, CBP, and the Border Patrol, respectively, implement steps to comply with the injunction, including that they not refer individuals newly eligible under the 2014 Guidance to USCIS.   Kerlikowske Decl. ¶ 11; Saldaña Decl. ¶ 13; Vitiello Decl. ¶ 9.

### Discovery of the Post-Injunction Issuances of Three-Year EADs, and the Initiation of Corrective Action

Prior to the March 19 hearing on Plaintiffs' motion for discovery into the Government's pre-injunction issuance of three-year EADs to approximately 108,000 individuals, USCIS conducted a review of its records to determine the precise number of cases involved.  May 15 Neufeld Decl. ¶¶ 25-26.  In the course of this review it discovered a small number of cases in which requests for deferred action and employment authorization had been approved after the injunction, but, due to manual errors, they had been granted for three years instead of two.  *Id.* During the March 19 hearing, defendants informed the Court that post-injunction three-year EADs had been issued in these manual-error cases.  March 19 Tr. at 35.  USCIS converted the terms of deferred action and employment authorization in these cases from three years to two, and prepared to issue letters to the recipients advising them of the change, and, in cases where they had been issued three-year EADs, informing them that the cards must be returned to USCIS. May 15 Neufeld Decl. ¶ 27.

As also discussed at the March 19 hearing, after placing a hold on all pending EADs in which three years of deferred action and employment authorization had been approved prior to the injunction, USCIS decided to convert the authorized terms in these cases from three years to two.  *Id.* ¶ 19.  The agency also prepared letters to send to these individuals afterward advising them that their approved terms of deferred action and employment authorization had been

converted to two years from three, that USCIS was issuing them two-year EADs, and that they should return any three-year notices of approval in their possession. *Id.* ¶ 27.

On Friday May 1 and Monday May 4, 2015, as USCIS personnel began the process of converting recipients' terms and issuing the approved letters, they discovered that the pending three-year EADs that had been placed on hold following the injunction—and which were still believed to be on hold—had in fact been printed and mailed. *Id.* ¶¶ 29-31. Service Center personnel immediately alerted USCIS headquarters, which after a series of inquiries determined that approximately 2100 three-year EADs had been issued after the injunction.[4] *Id.* ¶¶ 28-33.

The agency's inquiries also revealed how the unintended post-injunction issuance of these approximately 2100 pending three-year EADs had occurred. Ordinarily, when a hold is placed on an individual case, a pending EAD is withdrawn from the production queue, requiring that Service Center adjudicators take action in the case to return the card to the queue before it can be printed and mailed by the card-production facility. This is the procedure that Service Center personnel believed had been followed when, immediately following the injunction, a hold was placed on all pending EADs. *Id.* ¶ 23. However, unknown to these Service Center personnel, personnel in the Office of Information Technology had implemented the hold by placing a system-wide "pause" on all the DACA-related EADs in the production queue, but did not remove them from the queue altogether. *Id.* ¶ 24. As a result, when approvals of two-year terms of deferred action and employment authorization resumed on February 18, and the initial post-injunction hold on all pending two-year EADs was lifted on February 20, the three-year EADs still pending in the queue moved forward, together with the newly authorized two-year

---

[4] For ease of reference, although a small number of the EADs discussed herein were issued for terms greater than two years but not exactly three years, the term "three-year EADs" will be used rather than "EADs with validity periods of greater than two years."

EADs in the production queue.  *Id.* ¶¶ 18, 22, 24.  The Government informed the Court of these approximately 2100 post-injunction issuances of pending three-year EADs in its May 7 Advisory, and provided further information to the Court about them in the supplement filed on May 15.  ECF Nos. 247, 256.

Upon discovering that these approximately 2100 pending three-year EADs had been released after the injunction, USCIS, at the instruction of Director Rodríguez, began immediate corrective action.  USCIS determined that it would:  (i) convert the authorized period of deferred action and employment authorization in each case from three to two years; (ii) issue replacement two-year EADs; (iii) update the SAVE[5] and E-Verify[6] systems to reflect each individual's two-year terms of deferred action and employment authorization; and (iv) retrieve the three-year EADs.  July 31 Rodríguez Decl. ¶ 12.  (Discussed herein are the essential facts surrounding USCIS's corrective action and the success achieved.  The declarations filed herewith provide a fuller picture of the time, effort, and resources required to carry out these corrective measures, and the difficulties the agency encountered.  *See generally* July 31 Rodríguez Decl.; July 31 Neufeld Decl.)

Within days after the discovery of the approximately 2100 post-injunction three-year EADs, USCIS service center adjudicators began converting the cases in the agency's records systems to two-year (rather than three-year) terms of deferred action and employment authorization.  Concurrent with this conversion process, USCIS began to send letters to the recipients advising them that (i) USCIS had converted their terms of deferred action and

---

[5] The SAVE Program is a service that helps federal, state, and local benefit-issuing agencies, institutions, and licensing agencies obtain immigration information about benefit applicants so only those entitled to benefits receive them.  July 31 Rodríguez Decl. ¶ 6 n.4.

[6] E-Verify is an Internet-based system that allows businesses to determine the eligibility of their employees to work in the United States.  July 31 Rodríguez Decl. ¶ 6 n.5.

employment authorization from three to two years; (ii) that USCIS would be sending them replacement two-year EADs; (iii) that they must return the three-year EADs upon receipt of the replacement EADs; and, (iv) that failure to do so may result in adverse action.[7]  *Id.* ¶ 20.

As the term of deferred action and employment authorization in each of the 2128 cases was converted to two years, USCIS began in mid-May to mail the replacement two-year EADs. *Id.* ¶ 17.  By June 22, 2114 of the 2128 replacement cards were issued.  *Id.* ¶ 17.   Following the resolution of a small number of cases in which the two-year EADs were repeatedly rejected for quality-control reasons, the last of the replacement two-year EADs in these cases were issued on July 8.  *Id.*  Once the replacement two-year EAD was issued in each case, the recipient's employment authorization data (including the updated two-year term) could be transmitted to the underlying system that supports SAVE and E-Verify.  *Id.* ¶ 18.  By July 9, after resolution of a number of anomalies requiring case-by-case review, all 2128 cases were updated in SAVE and E-Verify.  *Id.*

By July 2, as a result of its corrective action efforts that began in May, USCIS had obtained three-year EADs issued after the injunction in 1135 of the 2128 cases.  *Id.* ¶ 21.  On July 6, 2015, USCIS began sending follow-up warning letters to the remaining individuals who had not yet returned their three-year cards, instructing them that they must return their three-year EADs by July 17, 2015, or certify good cause for no longer possessing them (e.g., because they had been lost, stolen, destroyed, or never received), and advising them that failure to return the

_____

[7] To facilitate and encourage recipients' compliance, USCIS did not require the return of the three-year EADs until the individuals received the two-year EADs.  It also enclosed self-addressed, postage-paid envelopes in which to return the three-year EADs.  July 31 Rodríguez Decl. ¶ 20.

three-year EADs (or failure to certify good cause for not doing so) may affect their deferred action and employment authorization.  *Id.* ¶ 21.[8]

On July 6 USCIS also began gathering additional contact information, including telephone numbers and email addresses, to conduct further outreach to those who had not yet returned their three-year EADs.  *Id.* ¶ 23.   On July 9 and 10, USCIS customer-service representatives placed calls to those individuals for whom contact information could be found, and informed those whom they reached that they must return their three-year EADS (or certify good cause for not doing so) and that failure to comply may affect their deferred action and employment authorization.  *Id.* ¶ 24.

### Secretary Johnson's July 10 Directive

On July 10, 2015, Secretary Johnson issued a memorandum directing USCIS, by July 31, to take still further actions to retrieve the remaining three-year EADs.  July 31 Rodríguez Decl. ¶ 25.  Specifically, Secretary Johnson directed that USCIS:

- By July 17, mail Notices of Intent to Terminate individuals' deferred action and employment authorization if they did not return their three-year EADs by July 30;

- Dispatch USCIS personnel to visit recipients' homes to retrieve their three-year EADs; and

- On July 31 terminate the deferred action and employment authorization of recipients who had not returned their three-year EADs, certified good cause for not doing so, or whose cards were not otherwise accounted for.

*Id.* ¶ 26.

---

[8]  To facilitate return of the three-year EADs, USCIS again enclosed postage-paid envelopes with the letters in which to return individuals' three-year EADs (or submit their good-cause certifications), and included in the letters the toll-free number of USCIS's National Customer Service Center, which recipients could call any with questions they might have about the letters.  July 31 Rodríguez Decl. ¶¶ 20, 22.

In accordance with the Secretary's instructions, on July 13, USCIS sent Notices of Intent to Terminate to the 887 remaining DACA recipients who had not yet returned their three-year cards, again informing them, *inter alia*, that they must return their three-year EADs to USCIS (or certify good cause for not doing so), that failure to comply would result in termination of their deferred action and employment authorization effective July 31, 2015 and (as still further incentive to return the cards) that failure to return their 3-year EADs, and subsequent termination of their deferred action and employment authorization, may be considered negative factors in weighing whether to grant any future requests they might make for deferred action or any other discretionary action. *Id.* ¶ 27.

On July 16, as directed by Secretary Johnson, USCIS initiated an unprecedented residential site visit program to facilitate the return of outstanding post-injunction three-year EADs nationwide. *Id.* ¶ 29. Residential site visits initially began in Chicago, Los Angeles, Dallas, and Houston, the metropolitan areas with the highest concentration of unreturned three-year EADs, and focused further on contacting DACA recipients for whom USCIS did not have a current telephone number. *Id.* Each site visit was conducted by a team of two USCIS officers who regularly conduct site visits as part of their daily duties, and are specifically trained in outreach to USCIS customers (and officer safety). In some cases, these site visits required officers to travel to remote locations requiring hours of travel to reach. *Id.* & Attachment F thereto (map of United States showing locations of outstanding post-injunction three-year EADs).[9]

---

[9] Although not instructed to do so by the Secretary's July 10 directive, USCIS on July 16 also began sending text messages and on July 21 began sending emails to DACA recipients who had not yet returned their three-year EADs, as still further means of alerting recipients that they needed to return their three-year EADs. *Id.* ¶¶ 30, 32. In total, USCIS sent over 2990 text messages, and 1627 e-mails. *Id.* ¶ 6.

As a result of all of the efforts described above, USCIS succeeded by July 30 in retrieving 1906 of the 2128 three-year cards, and obtaining certifications in another 98 cases that the cards had been lost, stolen, destroyed, or never received. *Id.* ¶ 33. Another 11 three-year cards had been returned as undeliverable, and USCIS determined that another 102 of the 2128 post-injunction three-year EADs were in fact never sent. *Id.* In total 2117 cards were retrieved or otherwise accounted for by July 30. *Id.* On July 31, as directed by the Secretary, USCIS terminated the deferred action and employment authorization of the remaining 11 DACA recipients who did not return their three-year EADs, or otherwise certify good cause for not doing so, and is currently in the process of preparing and mailing Termination Notices to the 11 individuals. *Id.* ¶ 34.

Notwithstanding that USCIS has terminated the deferred action and employment authorization for these 11 individuals, USCIS will continue efforts to retrieve their outstanding three-year cards, as well as the replacement two-year EADs sent to them prior to their termination on July 31. *Id.* ¶ 35.[10]

---

[10] USCIS has recently identified another small number of three-year EADs that were issued after the injunction. An individual recently visiting a USCIS field office turned in a three-year EAD that had been issued post-injunction; however, this EAD was on neither the list of 2128 post-injunction three-year EADs, nor the list of re-mailed EADs. In addition, this individual's term of deferred action and employment authorization recorded in CLAIMS 3 was only two years. USCIS immediately conducted research into this case and has preliminarily determined that, in the midst of the aggressive compliance efforts undertaken shortly after the injunction was issued, one information-technology specialist located at a service center converted the terms of deferred action and employment authorization for a group of cases, approved prior to the injunction, to two-year instead of three-year terms. Although this action successfully prevented three-year EADs from being produced in some cases, because CLAIMS 3 had not yet ordered their EAD card production, the EADs in the remaining cases, approximately 50, were already in the print queue, and were printed and mailed. Because CLAIMS 3 was already updated to show two-year terms in these cases, the query that USCIS ran in May to identify the number of post-injunction three-year EAD issuances failed to identify this group of cases. USCIS continues to research the situation to understand why it occurred. USCIS has also begun to take corrective action, including issuing two-year EADs, ensuring that SAVE and E-

### The Approximately 500 Re-Mailed Three-Year EADs

In early July 2015, USCIS discovered a different group of approximately 500 cases—all approved under the 2012 DACA guidelines—in which three-year EADs had originally been mailed prior to the Court's injunction, but were returned to USCIS by the U.S. Postal Service (USPS) as undeliverable, and then re-mailed by USCIS to their intended recipients after the injunction had issued.  July 31 Neufeld Decl. ¶ 4 & n.2.  The Government informed the Court of the discovery of these re-mailed EADs in its July 9 Advisory.  ECF No. 282.

The post-injunction re-mailing of these approximately 500 three-year EADs, like the post-injunction issuance of approximately 2100 three-year EADs, was inadvertent.  July 31 Neufeld Decl. ¶ 15. While all EADs are printed and mailed at USCIS card-production facilities, the return address on each envelope is the address of the USCIS Service Center that approved the underlying application for employment authorization.  *Id.* ¶ 8.  Therefore, if the USPS is unable to deliver an EAD, it is returned to the originating service center.  *Id.* ¶ 9.  All mail returned to USCIS Service Centers is opened and sorted by contract personnel, and cards, such as EADs and Permanent Resident Cards, are conveyed to USCIS Records Management personnel.  *Id.* ¶ 10.  Records Management personnel are not Service Center adjudicators and have no role in the process of adjudicating requests for deferred action or employment authorization, whether under DACA or otherwise.  *Id.* ¶ 13.

Upon receipt of an undeliverable EAD, USCIS Records Management personnel attempt to locate a current address for the recipient.  *Id.* ¶ 11.  In some cases, the USPS will have a forwarding address for the recipient, or a current address can be found in USCIS databases.  *Id.*

---

Verify are appropriately updated, and retrieving any three-year EADs that were in fact issued after the injunction.  July 31 Rodríguez Decl. ¶ 36.

If Records Management personnel can locate a current address for the recipient, the EAD is re-mailed, usually within one or two business days, and the recipient's case record in USCIS databases is updated to reflect that the EAD was re-mailed.  *Id.*  If a return address for the recipient cannot be located, however, Records Management personnel will place the EAD in secure storage at the Service Center, where it will remain for up to a year.  *Id.* ¶ 12.  If, during that time, Records Management personnel obtain or are provided with the recipient's current address, they will re-mail the EAD; otherwise, if the card remains in secure storage after one year, it will be destroyed.  *Id.*

As discussed above, in the early hours of February 17, immediately after the Court issued its injunction, Director Rodríguez instructed that USCIS take a series of actions intended to halt further approvals of deferred action and employment authorization, three-year approval notices and EADs, for three-year terms.  *Id.* ¶ 14.  These instructions were conveyed to Service Center adjudicators (and their supervisors) responsible for processing deferred action requests and applications for employment authorization, and to personnel at USCIS card-production facilities responsible for printing and mailing EADs.  *Id.*  In the flurry of communications and activity to ensure that new three-year EADs were not issued after the injunction, the scenario in which three-year EADs that had already been issued and mailed before the injunction could be returned as undeliverable, and then re-mailed afterward, did not occur to (nor was it raised with) USCIS leadership.  Because of this oversight, instructions were never provided to Records Management personnel to suspend re-mailing of DACA-related three-year EADs.  *Id.* ¶ 15.  As a result, following the injunction, three-year EADs were re-mailed to DACA recipients in 484 identified cases.  *Id.*

This group of 484 re-mailed EADs was discovered as a result of continuing efforts by USCIS to identify all cases in which individuals may have been issued documentation reflecting

17

three-year terms of deferred action or employment authorization after the injunction, for any

reason.  *Id.* ¶¶ 16-18; *see also* May 15 Neufeld Decl. ¶ 37.   After USCIS discovered in May

2015 (and reported to the Court) that approximately 2100 three-year EADs had been issued after

the injunction, it began efforts to verify that all such cases had been identified.   July 31 Neufeld

Decl. ¶¶ 16-18.  Among these efforts, in June 2015 USCIS requested its Office of Performance

and Quality (OPQ)—which, among other functions, collects and validates agency data for

purposes of internal and external reporting—to audit the data and queries employed by USCIS in

determining that three-year EADs had been issued after the injunction in approximately 2100

cases, and to verify that these cases represented the entire universe of such cases.  *Id.*

In the course of its audit, OPQ designed its own queries of USCIS databases that included

a history action code indicating whether an EAD had been re-mailed after being returned to

USCIS as undeliverable, not just the date when it was originally issued and/or mailed.  *Id.* ¶ 18.

On June 29, these queries revealed that three-year EADs that had been approved, issued, and

mailed prior to the injunction, but which were then returned as undeliverable, were subsequently

re-mailed after February 16.  *Id.*  As of July 9, analysis of the available data revealed 484 such

cases.  *Id.* ¶¶ 4 n.2, 18.[11]

### Corrective Action Regarding the 484 Re-Mailed EADs

Once the re-mailing of these 484 three-year EADs was discovered, USCIS began prompt

corrective action.  On July 6, per instructions from Director Rodríguez, USCIS Service Centers

temporarily suspended re-mailings of all undeliverable mail that might contain three-year

---

[11] USCIS recently became aware of one additional case in which an individual's three-
year EAD had been re-mailed after the February 16 injunction, but which was not identified by
prior queries.  *See* July 31 Neufeld Decl. ¶ 4 n.2.  USCIS has retrieved that individual's three-
year EAD and is also taking additional corrective steps to convert the newly-identified
individual's term of deferred action and employment authorization to two years in USCIS's
databases, including the SAVE and E-verify systems.

DACA-related EADs while it reviewed measures to prevent the re-mailing of such three-year EADs in the future.  July 31 Neufeld Decl. ¶ 19.  All returned-undeliverable EADs with three-year terms that still remained at USCIS Service Centers were sequestered to ensure they are not re-mailed.  *Id.* ¶ 21.  (If current addresses are found for the intended recipients of any of these EADs, they will be issued replacement two-year EADs in lieu of the three-year cards.)  And, in order to prevent the re-mailing of pre-injunction three-year EADs that may be returned as undeliverable in the future, USCIS has placed supervisory holds in its systems in all cases in which three-year EADs were issued before the injunction.  *Id.* ¶ 20.  Supervisory holds prevent any action from being taken in these cases without the permission of supervisory adjudicators, who have been instructed that the returned three-year EADs cannot be re-mailed.  *Id.*

In addition, USCIS determined that it should implement the same type of corrective action to recover the re-mailed three-year EADs in these 484 cases as it had taken in the cases of the 2128 three-year EADs issued after the injunction:  converting each individual's term of deferred action and employment authorization from three to two years; issuing each individual an updated two-year EAD; updating SAVE and E-Verify to reflect two-year authorizations; and retrieving each individual's three-year EAD.  July 31 Rodríguez Decl. ¶ 39.  On July 14, Secretary Johnson issued another directive that likewise instructed USCIS to take corrective measures similar to those he had ordered in the cases of the 2128 post-injunction EADs.  *Id.* ¶ 41.  These measures included:

- Immediately issuing new two-year approval notices and EADs to the recipients in all 484 cases;

- Immediately updating the SAVE and E-Verify systems to reflect their two-year terms of work authorization;

- By July 17, mailing notices of intent to terminate to all 484 recipients informing them that their deferred action and employment authorization would be

terminated on July 31 if they had not returned their three-year EADs (or certified good cause for failing to do so);

- Contacting them by telephone by no later than July 17;

- Dispatching USCIS personnel to visit their homes in order to retrieve their three-year cards; and

- On July 31 terminating the deferred action and work authorization of those individuals whose three-year EADs had not been returned or otherwise accounted for.

July 31 Rodríguez Decl. ¶ 41.

By July 13 USCIS had converted the terms of deferred action and employment authorization of all identified 484 individuals from three to two years.  *Id.* ¶ 40.  In accordance with the Secretary's July 14 directive, on July 15 USCIS sent them Notices of Intent to Terminate, informing them that their terms of deferred action and employment authorization had been converted from three to two years; that USCIS had issued them updated two-year EADs; that they must either return their three-year EADs or certify good cause for not doing so; that failure to comply would result in termination of their deferred action and employment authorization effective July 31, 2015; and that failure to return their three-year EADs, and subsequent termination of their deferred action and employment authorization, may be considered negative factors in weighing whether to grant any future requests they might make for deferred action or any other discretionary action.  *Id.* ¶ 42.

As also directed by the Secretary, USCIS issued replacement two-year EADs to all 484 identified individuals by July 17, and by July 27 had updated the SAVE and E-Verify systems to reflect their two-year terms of deferred action and work authorization.  *Id.* ¶¶ 43, 44.  On July 16 and 17, in accordance with the Secretary's instructions, USCIS made in-person telephone calls to 334 individuals in the re-mailing cases, advising them, *inter alia*, that they must return their three-year EADs to USCIS (or certify good cause for not doing so); and that failure to comply

20

would result in termination of their deferred action and employment authorization effective July 31, 2015. *Id.* ¶ 45. And on July 20, as also instructed by the Secretary, USCIS extended the nationwide residential site visit program to include individuals in the 484 identified re-mailing cases who had not yet returned their three-year EADs, for the purpose of either retrieving their EADs or obtaining written good-cause certifications for their failure to do so. *Id.* ¶ 48. In total, for both the post-injunction issuances and re-mailings, USCIS conducted 721 home visits by 306 USCIS officers from over 50 field office locations. *Id.* ¶ 6.

As a result of these corrective efforts, and despite the very compressed time frame in which the agency conducted them, by July 30 USCIS retrieved or had otherwise accounted for 473 of the 484 identified re-mailed EADs. *Id.* ¶ 50. On July 31, as directed by the Secretary, USCIS terminated the deferred action and employment authorization of the remaining 11 individuals who had not returned their three-year EADs or certified good cause for not doing so. *Id.* ¶ 51.

As in the cases of the three-year EADs issued after the injunction, USCIS will continue efforts to retrieve the outstanding three-year cards in the re-mailing cases, as well as the replacement two-year EADs sent to these individuals prior to their termination on July 31. *Id.* ¶ 52.

## STATEMENT OF THE ISSUES TO BE RULED ON BY THE COURT

The Government requests that the scheduled August 19 hearing be canceled because contempt is neither necessary nor warranted here. Civil contempt is not available where a party is in substantial compliance with a court order, *U.S. Steel Corp. v. United Mine Workers of Am.*, 598 F.2d 363, 368 (5th Cir. 1979), or where a party is taking reasonable and diligent steps toward compliance. *Am. Airlines, Inc., v. Allied Pilots Ass'n*, 228 F.3d 574, 582 n.12 (5th Cir. 2000). Even if grounds were present here at all for consideration of contempt sanctions, they

should be considered solely against the United States and not the Defendant Government

officials. *Spallone v. United States*, 493 U.S. 265 (1990). Civil contempt is also precluded in the

absence of a motion by an injured party. *E.g., Wash. Metro. Area Transit Auth. v. Amalgamated

Transit Union,* 531 F.2d 617, 622 (D.C. Cir. 1976).

      If the August 19 hearing is not canceled, Defendants respectfully request that Secretary

Johnson, Director Saldaña, Commissioner Kerlikowske, and Deputy Chief Vitiello, be excused

from appearing, and that the Government be permitted to substitute other witnesses who are

better positioned to address the matters raised in the Court's July 7 Order. High-ranking officials

such as the Secretary and these other three Defendants cannot be compelled to appear and testify

in judicial proceedings absent a showing of "extraordinary circumstances," meaning that they

possess unique personal knowledge, unavailable from other sources, that is essential to the

resolution of the case. *In re FDIC,* 58 F.3d 1055, 1060 (5th Cir. 1995).

## <u>ARGUMENT</u>

## I.    <u>THE COURT SHOULD CANCEL THE AUGUST 19 HEARING BECAUSE CONTEMPT PROCEEDINGS ARE UNNECESSARY AND UNWARRANTED.</u>

      The Government stands in compliance with the Court's preliminary injunction, and has

made reasonable and diligent efforts to secure the return of the three-year EADs that were issued

or re-mailed post-injunction. Indeed, the Government has taken robust and comprehensive steps

to comply with the Court's injunction and to rectify the unintended post-injunction issuance and

re-mailing of three-year EADs. At a minimum, the Government is in substantial compliance

with the injunction. The Court, therefore, should cancel the hearing currently scheduled for

August 19, 2015.

      The circumstances of this case present no basis for pursuing contempt against the

Government, and no grounds for contemplating contempt citations against the named DHS

officials.  Secretary Johnson and Director Rodríguez have consistently directed and supported efforts by USCIS (and other DHS components) to comply with the Court's injunction, and efforts by USCIS to retrieve the post-injunction three-year EADs.  The remaining Defendants have no responsibility for, authority over, or even personal knowledge about the USCIS activities that led to the post-injunction issuance and re-mailing of three-year EADs, or the corrective actions USCIS has undertaken.  Moreover, imposition of contempt sanctions is legally precluded because Plaintiffs have not moved for contempt, let alone established any harm from the post-injunction issuance and re-mailing of three-year (as opposed to two-year) EADs, especially now that all three-year grants of deferred action and work authorization have been converted to two years and DHS's systems have been updated to reflect those conversions.  For all of these reasons, the proper course is to cancel the August 19 hearing; initiation of contempt proceedings is unnecessary and unwarranted here.

**A. Legal Standards Governing Contempt Proceedings.**

"A contempt proceeding is either civil or criminal by virtue of its 'character and purpose.'"  *Cobell v. Norton*, 334 F.3d 1128, 1145 (D.C. Cir. 2003) (quoting *United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994)).  The Court's July 7 Order states that "[i]f the Government remedies this situation and comes into compliance with this Court's injunction by July 31, 2015 . . . it will cancel the August 19, 2015 hearing," but "[o]therwise . . . intends to utilize all available powers to compel compliance."  July 7 Order at 2.  Thus, the Order contemplates contempt to coerce compliance with a prior court order, the hallmark of civil contempt.  *See Bagwell*, 512 U.S. at 827; *Lamar Fin. Corp. v. Adams*, 918 F.2d 564, 566 (5th Cir. 1990) ("If the purpose of the sanction is to coerce the contemnor into compliance with a

court order, or to compensate another party for the contemnor's violation, the order is considered purely civil.").[12]

Civil contempt occurs when a party "violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Hornbeck Offshore Servs., LLC v. Salazar*, 713 F.3d 787, 792 (5th Cir. 2013) (citation and internal quotation marks omitted).[13]   Civil contempt cannot be imposed when a party has substantially complied with a court's injunction.  *See U.S. Steel Corp. v. United Mine Workers of Am.*, 598 F.2d 363, 368 (5th Cir. 1979) ("Traditional defenses of substantial compliance or inability to comply are, of course, available."); *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 891-92 (9th Cir. 1982).  That is so because "[c]ontempt represents more than a delay in performance or lack of perfection; it is, instead, the failure to accomplish what was ordered in meaningful respects." *Ruiz v. McCotter*, 661 F. Supp. 112, 117 (S.D. Tex. 1986); *see Consol. Coal Co. v. United Mineworkers of Am.*, 683 F.2d 827, 832 (4th Cir. 1982).  Similarly, contempt is inappropriate if a party has "diligently attempted to comply in a reasonable manner." *Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc.*, 779 F.3d 102, 111 (2d Cir. 2015) (citation and internal quotation marks omitted); *United States v. Berg*, 20

---

[12] The purpose of criminal contempt "is to punish the contemnor and vindicate the authority of the court." *Lamar Fin. Corp.*, 918 F.2d at 566.  Institution of criminal contempt proceedings would require various procedural protections that have not been provided here, including proper notice of potential criminal contempt.  *See, e.g.*, Fed. R. Crim. P. 42; *Bagwell*, 512 U.S. at 826-27.

[13] Civil contempt "must be established by clear and convincing evidence." *Id.*  This standard "is higher than the 'preponderance of the evidence' standard, common in civil cases, but not as high as 'beyond a reasonable doubt.'" *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (citation omitted); *see also Hornbeck Offshore Servs.*, 713 F.3d at 792.  The burden of proof rests with the petitioner seeking to impose the contempt sanction. *Travelhost*, 68 F.3d at 961.

F.3d 304, 311 (7th Cir. 1994); *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993).

> **B.    Contempt Proceedings Are Unnecessary and Unwarranted Because the Government Is In Full Compliance, Or at a Minimum Substantial Compliance, with the Court's Injunction.**

In light of the Government's reasonable and diligent efforts to comply with the Court's injunction when it was first issued, and the extraordinary lengths to which the Government has gone to correct the terms of deferred action and work authorization of the individuals who received the unintended issuances and re-mailing of post-injunction three-year EADs, no contempt proceedings are necessary or justifiable here.  The Government's efforts have achieved compliance, or at the very least substantial compliance, with the Court's injunction, thus meeting the standard the Court itself set out for canceling the August 19 hearing, *see* July 7 Order at 2, and, more fundamentally, eliminating any justification for exercising the Court's coercive powers, *see U.S. Steel Corp.*, 598 F.2d at 368.

As noted above, civil contempt proceedings are subject to the "[t]raditional defense[ ] of substantial compliance[.]"  *U.S. Steel Corp.*, 598 F.2d at 368; *see also Lelsz v. Kavanagh*, 673 F. Supp. 828, 839 (N.D. Tex. 1987).  Here, there is no dispute that when the Court issued its order enjoining implementation of any and all aspects of the Secretary's 2014 Deferred Action Guidance, the Government immediately took steps to comply.  Within hours after receiving the preliminary injunction order, USCIS initiated a series of steps to ensure that it suspended the imminent processing of applications under the new DACA eligibility guidelines, and ceased any further preparations for DAPA.  May 15 Rodríguez Decl. ¶ 7.  USCIS also took immediate steps to prevent further issuances of three-year (rather than two-year) notices of deferred action and employment authorization, and three-year EADs, even in cases that had already been adjudicated (under the 2012 DACA eligibility guidelines) prior to the injunction.  *Id.*¶ 8; *see also* May 15

Neufeld Decl. ¶¶ 14-20.  Other agencies within DHS also took immediate steps to ensure that they complied with the Court's injunction, to the extent that they had been tasked by the Secretary's 2014 Deferred Action Guidance with responsibility for any aspect of the modifications to DACA, or for DAPA.  Kerlikowske Decl. ¶ 11;  Saldaña Decl. ¶ 13;  Vitiello Decl. ¶ 9.  Secretary Johnson not only approved of these efforts but reinforced the imperative of complying with the Court's order in his statement issued on February 17, 2015, and in a February 20, 2015 memorandum to senior DHS officials, in which he directed that all DHS components continue to suspend implementation of the changes made to DACA in the 2014 Deferred Action Guidance, and of DAPA, and to comply with the terms of the Court's injunction.  July 31 Rodríguez Decl. ¶ 10.

As the Government has further explained, the actions resulting in the post-injunction issuance of the approximately 2100 three-year EADs were inadvertent.  Most of these EADs were issued beginning on February 20, 2015, because (unknown to USCIS operational personnel) they had not been removed from the automated production queue, but only "paused," and thus they moved forward to production and mailing once post-injunction production of two-year EADs began, and the automated production queue resumed.  *Id.* ¶ 11; May 15 Neufeld Decl. ¶¶ 21-24.  An additional small number were issued due to manual errors.  Rodríguez Decl. ¶ 9; May 15 Neufeld Decl. ¶ 36.  Finally, the re-mailing of approximately 500 three-year EADs following the injunction was, at most, an oversight, not a deliberate decision by the agency.  July 31 Neufeld Decl. ¶¶ 15-16.  The backdrop of overall compliance against which these unintended issuances and re-mailings of three-year EADs occurred makes the "potent weapon" of contempt inappropriate.  *Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967); *see Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986) ("If a

26

violating party has taken 'all reasonable steps' to comply with the court order, technical or inadvertent violations of the order will not support a finding of civil contempt.").

Moreover, the Government has not only substantially complied with the Court's injunction on the whole—halting implementation of the changes to the DACA eligibility guidelines, implementation of DAPA, and further three-year approvals under the 2012 DACA guidelines—it has also ensured compliance, or at least ensured substantial compliance, in the cases involving post-injunction three-year EADs.  Regarding the 2128 three-year EADs issued after the injunction, USCIS has converted the recipients' terms of deferred action and employment authorization in the agency's official records from three years to two; issued them new two-year approval notices and replacement two-year EADs; and updated the SAVE and E-Verify systems to reflect the changes to the recipients' records, so that state agencies and employers can accurately verify their two-year terms of deferred action and employment authorization.  In addition, as a result of the extensive efforts discussed above, by July 2 USCIS had already recovered 1135 three-year EADs, and by July 30 succeeded in either retrieving or otherwise accounting for 2117 of the 2128 three-year EADs issued post-injunction.  July 31 Rodríguez Decl. ¶¶ 21, 33.  On July 31, USCIS terminated altogether deferred action and employment authorization of the remaining 11 individuals who failed to return, or otherwise account for, their three-year EADs.  *Id.* ¶ 34.

Similarly, in the 484 previously identified re-mailing cases, USCIS has converted the recipients' terms of deferred action and employment authorization from three to two years, issued them two-year notices and replacement two-year EADs, and updated the SAVE and E-Verify systems.  *Id.* ¶ 5.  USCIS also made similar efforts, on a compressed timeframe, to retrieve the 484 previously identified re-mailed EADs, and by July 30 had received or otherwise accounted for 473 of them.  *Id.* ¶ 7.  On July 31, USCIS terminated altogether deferred action

and employment authorization of the remaining 11 individuals who failed to return, or otherwise account for, their three-year EADs. *Id.* USCIS has also instituted prophylactic measures to prevent the inadvertent issuance or re-mailing of three-year approval notices or EADs in the future. *Id.* ¶ 9; May 15 Neufeld Decl. ¶ 36; July 31 Neufeld Decl. ¶¶ 5, 20-21.

The Government submits that these significant actions have brought it into full compliance with the Court's injunction. Although approximately 22 post-injunction three-year EADs have not been returned or otherwise accounted for—notwithstanding the exceptional lengths to which the Government has gone to retrieve them—the deferred action and employment authorization for all such individuals have been terminated. As a result, those individuals' three-year EADs no longer have any force or effect. Particularly given the absence of any demonstrated harm to Plaintiffs flowing from these unaccounted for but now terminated EADs, DHS has thus fully cured any injunction violations that may have occurred here, and there is no basis for pursuing contempt proceedings on August 19.

Under any standard, however, the completion of the steps described above constitutes substantial compliance, sufficient to remove any need or justification for potential contempt sanctions, or for the August 19 hearing.

### C. The Government's Diligence in Complying with the Court's Injunction and Comprehensive Efforts To Cure Any Violations That May Have Occurred Also Preclude Contempt Sanctions.

Even where a party is not yet in substantial compliance with a court's order (contrary to the situation here), contempt sanctions, and, by extension, contempt proceedings are unwarranted if a party is taking reasonable and diligent steps towards compliance. *See Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581, 585 (5th Cir. 2000) (upholding contempt sanctions against union officers because they "did little if anything to halt" an illegal "sick-out" that grew in scope after the court ordered them to halt it); *U.S. Steel Corp.*, 598 F.2d at 368 (upholding

28

contempt because "[n]o significant effort was made" to comply with the court's order).  The record now before the Court demonstrates that the Government has made extensive efforts to comply with this Court's preliminary injunction and, through its extraordinary efforts, has rectified the post-injunction issuance and re-mailing of three-year EADs.

To rectify that situation, USCIS devoted significant personnel, time, and resources to converting each individual's term of deferred action and employment authorization from three to two years, issuing replacement two-year EADs, and updating the SAVE and E-Verify systems. July 31 Rodríguez Decl. ¶¶ 12-19.  USCIS completed these tasks in the approximately 2600 identified cases despite various quality-control and fraud-prevention protocols embedded in USCIS's data-processing and records-management systems that in some cases prolonged the process.  *Id.* ¶ 17.

USCIS has also gone to extraordinary lengths to retrieve or otherwise account for both groups of three-year EADs.  In the cases of the approximately 2100 EADs issued after the injunction, the agency issued two rounds of letters warning recipients that they must return their three-year EADs, and that failure to do so (or to certify good cause for not doing so) could adversely affect their deferred action and employment authorization.  As a result, USCIS had recovered at least 1135 of these three-year EADs even prior to the Court's July 7 Order, and the Secretary's July 10 directive.  *Id.* ¶ 21.  In the remaining cases, USCIS issued notices of intent to terminate informing recipients (i) that their deferred action and employment authorization would be terminated if they did not return their three-year EADs, or certify good cause for not doing so, and (ii) that failure to return their three-year EADs (or certify good cause for not doing so) may be considered a negative factor in considering future requests they may make for deferred action or other discretionary action.  Where additional contact information was available, USCIS made personal (not automated) telephone calls to those who had not yet returned their cards, contacted

them by e-mail, and/or sent them text messages, to urge them to comply, assist them in doing so, and impress upon them the consequences if they did not.  And, in accordance with Secretary Johnson's express instruction, USCIS initiated an unprecedented nationwide residential site-visit program, specifically for purposes of collecting these documents:  teams of trained USCIS officers fanned out nationwide, including to remote locations, to visit the homes and attempt to retrieve the three-year EADs of those individuals who had not yet returned their cards to USCIS (or certified their inability to do so).  *Id.* ¶ 29.  Equally extraordinary efforts were made to retrieve the 484 identified three-year EADs issued in the re-mailing cases, on an even more urgent timeline.  *Id.* ¶¶ 37-49.  As a result of these efforts, USCIS has to date succeeded in retrieving or otherwise accounting for 2117 of the 2128 post-injunction three-year EADs, 473 of the 484 re-mailed three-year EADs, and has terminated the deferred action and employment authorization of the remaining 22 individuals.

These robust measures represent complete compliance or, at minimum, reasonable and diligent attempts to correct USCIS's post-injunction issuances and re-mailings of three-year EADs.[14]  Thus, the Court should cancel the scheduled August 19 hearing.

---

[14] The Court's July 7 Order expressed concern about the pace of the Government's corrective actions.  *See* July 7 Order at 3 ("[A]t some point, when a non-compliant party refuses to bring its conduct into compliance, one must conclude that the conduct is not accidental, but deliberate.").  The factual record demonstrates that the Government was at the time proceeding expeditiously to correct matters since first discovering that in some cases where deferred action and work authorization were granted before the injunction, three-year EADs were not issued until after the injunction.  By that time USCIS had already updated its records systems, including SAVE and E-Verify, for more than 2000 of the cases, and retrieved or accounted for at least 1135 of the 2128 cards at issue.  July 31 Rodríguez Decl. ¶¶ 18, 21.  In any event, such past conduct is not at issue here.  The question in a civil contempt proceeding is whether a party is *currently* taking reasonable and diligent steps to comply the court's order.  *See Boylan v. Detrio*, 187 F.2d 375, 378 (5th Cir. 1951) ("Civil contempt proceedings . . . look only to the future. They are not instituted as punishment for past offenses[.]").  And on that score the record is not debatable.

### D.      There is No Basis to Pursue Contempt Against Secretary
Johnson or the Other Named Defendants.

Even if any basis appeared on this record for consideration of contempt sanctions,

contempt citations directed at Secretary Johnson or the other individual Defendants (whether in

their individual or official capacities) would be unjustified.[15]  Any potential contempt sanctions

must first be directed at the United States, not at any of the named Defendants.

The Supreme Court endorsed this principle in *Spallone v. United States*, 493 U.S. 265

(1990), in which the district court imposed civil contempt sanctions on individual

councilmembers (in their official capacities) if they failed to vote a certain way.  *Id.* at 274.  The

Court reversed the sanctions, holding that "the District Court, in view of the 'extraordinary'

nature of the imposition of sanctions against the individual councilmembers, should have

proceeded with such contempt sanctions first against the city alone in order to secure compliance

with the remedial order."  *Id.* at 280.  This holding was based in part on the fundamental

principle that "in selecting contempt sanctions, a court is obliged to use the least possible power

adequate to the end proposed," *id*. at 276 (internal quotation marks omitted), and in part in

recognition that personalized sanctions create a conflict of interest for public officials—they are

encouraged to act "not with a view to the interest of their constituents or of the city, but with a

view solely to their own personal interests."  *Id.* at 279.  That same conflict would exist here if

any sanction were directed at the named Defendants, and there is no reason to question that

contempt sanctions against the United States would be sufficient to secure compliance with the

---

[15] The Government understands the Court's July 7 Order to be directed at the named
Defendants exclusively in their official capacities, since that is the sole capacity in which they
have been sued, *see* Am. Compl. (ECF No. 14) ¶¶ 9-13, and the Court's Order does not indicate
otherwise.  Thus, notice has not properly been given with respect to any potential personal-
capacity sanctions.  *See McGuire v. Sigma Coatings, Inc.*, 48 F.3d 902, 907 (5th Cir. 1995).

Court's injunction.  Thus, the proper focus for any contempt citation here, if any, would be the United States—not any of the individual officials, even in their official capacities.

That is all the more true because none of the individual Defendants has taken (or failed to take) any action him or herself (in an official or personal capacity) that would merit a finding of contempt, nor is responsible for any conduct by others that would merit a finding of contempt. Secretary Johnson has consistently directed and endorsed efforts by USCIS (and other DHS components) to comply with the Court's preliminary injunction, and on February 20 issued an express written directive to the heads of all affected DHS components to ensure that they remained in compliance.  July 31 Rodríguez Decl. ¶ 10; *see also* Kerlikowske Decl. ¶ 11; Saldaña Decl. ¶ 13.  Secretary Johnson also fully endorsed the corrective actions begun by USCIS once the post-injunction issuances of three-year EADs were discovered.  July 31 Rodríguez Decl. ¶ 11.  And when the Court expressed concern with the degree to which USCIS had succeeded in correcting the situation involving the individuals who were issued three-year EADs after the injunction, Secretary Johnson personally directed that USCIS institute extraordinary measures, including home visits, and termination of recipients' deferred action and work authorization, in order to retrieve the outstanding three-year EADs by July 31.  *Id.* ¶¶ 25, 26.  Far from directing that USCIS take any action contrary to the terms of the Court's injunction, or frustrating efforts by USCIS to take corrective action regarding the post-injunction three-year EADs, the Secretary has exerted his authority to promote compliance with the injunction and ensure that USCIS made utmost efforts to complete the remedial steps it had begun.  A contempt citation would be irreconcilable with the Secretary's actions in this matter.

The same is true for Director Rodríguez.  Within two hours after the Court issued its injunction on the evening of February 16—which is to say, during the midnight hours of February 17—Director Rodríguez contacted senior USCIS leadership and instructed them to

bring all implementation of the expanded DACA guidelines, and preparation for implementation of DAPA, to a halt.  May 15 Rodríguez Decl. ¶ 7.  He also expressly directed that USCIS cease approving requests for three-year terms of deferred action and/or employment authorization under the 2012 DACA guidelines, and that the agency cease issuing three-year notices of approval and EADs, even in cases where individuals' applications had already been approved before the injunction was issued.  May 15 Neufeld Decl. ¶ 15.  When it was later discovered that, notwithstanding these measures, approximately 2100 three-year EADs had been inadvertently printed and mailed after the injunction, and later still that approximately 500 had been re-mailed post-injunction, Director Rodríguez implemented prophylactic measures to prevent the recurrence of similar incidents, and he instituted corrective measures not only to convert the terms of deferred action and employment authorization in these cases from three to two years, but also to retrieve the erroneously issued and re-mailed three-year EADs.  July 31 Neufeld Decl. ¶¶ 5, 20-21; July 31 Rodríguez Decl. ¶ 4-51.  Director Rodríguez was also responsible for the successful implementation of the even more extraordinary measures directed by Secretary Johnson to recover the post-injunction three-year EADs, which, together with the measures the Director had already instituted, have resulted to date in the retrieval of (or accounting for) 2117 of the 2128 EADs issued after the injunction, and 473 of the 484 that were re-mailed.  July 31 Rodríguez Decl. ¶ 7.  The Director's consistent and effective efforts to ensure compliance with the Court's injunction, and to correct the erroneous post-injunction issuance and re-mailing of three-year EADs, should dispel any question of contempt in his case, as well.

Likewise, there is no justification for issuing contempt sanctions against Defendants Kerlikowske, Saldaña, and Vitiello.  Defendant Kerlikowske is the Commissioner of U.S. Customs and Border Protection (CBP).  Kerlikowske Decl. ¶ 1.  Defendant Saldaña is the Assistance Secretary and Director of U.S. Immigration and Customs Enforcement (ICE), Saldaña

Decl. ¶ 1, and Defendant Vitiello is the Deputy Chief of the U.S. Border Patrol, Vitiello Decl.

¶ 1.  None of these agencies was responsible under the Secretary's 2014 Deferred Action

Guidance for the receipt or consideration of requests for deferred action and employment

authorization under DACA or DAPA.  None was responsible for issuing notices of approval or

EADs under DACA or DAPA.  Those functions are performed by USCIS.  Therefore, neither

Commissioner Kerlikowske, nor Director Saldaña, nor Chief Vitiello has any responsibility for,

authority over, or even personal knowledge about the activities that resulted in the post-

injunction issuance and re-mailing, by USCIS, of three-year EADs.  Kerlikowske Decl. ¶ 14;

Saldaña  Decl. ¶ 17; Vitiello Decl. ¶ 12.  Similarly, neither CBP, nor ICE, nor the Border Patrol

has had any responsibility for the actions taken by USCIS to correct the post-injunction issuances

and re-mailings of three-year EADs.  Therefore, Defendants Kerlikowske, Saldaña, and Vitiello

likewise have no responsibility for, authority over, or even personal knowledge regarding the

corrective actions taken by USCIS.  Kerlikowske Decl. ¶ 15; Saldaña  Decl. ¶ 17; Vitiello Decl.

¶ 13.  Thus, as these officials bear no responsibility for the actions that led to the post-injunction

issuances and re-mailings of three-year EADs, and they have no authority to direct or oversee

corrective actions taken by USCIS, issuing contempt citations against them could do nothing to

advance the objective of compelling compliance with the Court's injunction.  That being the

case, holding these officials in contempt would also be legally unsupportable.[16]

--------

[16] To be sure, ICE and CBP both have important equities in DACA and DAPA unrelated
to the matters raised in the Court's July 7 Order.  As explained in the Declarations of Director
Saldaña and Commissioner Kerlikowske submitted in support of Defendants' motion to stay the
injunction, when ICE and CBP (including Border Patrol) agents encounter individuals who have
received deferred action, they rely on the determinations made by USCIS that the encountered
individuals are not a priority for immigration enforcement action, thereby allowing agents to
concentrate their attention and limited resources on others who may pose a threat to national
security, border security, and public safety.  ECF Nos. 150-1, 150-2.  But ICE's and CBP's

### E.      Imposition of Contempt is Legally Precluded.

The August 19 hearing should also be cancelled because Plaintiffs have not requested

contempt, nor have they demonstrated any harm from the post-injunction issuance and re-

mailing of three-year EADs.

Given the remedial purpose of civil contempt, such proceedings are initiated by the

opposing party.  *See La. Educ. Ass'n v. Richland Parish Sch. Bd.*, 421 F. Supp. 973, 975 (W.D.

La. 1976) *aff'd*, 585 F.2d 518 (5th Cir. 1978); Wright & Miller, Fed. Prac. & Proc. § 2960 (3d

ed. 1998).  Indeed, courts lack the authority to initiate such proceedings *sua sponte*.  *See Wash.*

*Metro. Area Transit Auth. v. Amalgamated Transit Union*, 531 F.2d 617, 622 (D.C. Cir. 1976)

("[T]he district court had no jurisdiction to enter a final contempt judgment . . . in the absence of

a motion to that effect by the plaintiff.  . . .  In the civil contempt setting, the court has no

independent interest in vindicating its authority should its orders be violated."); *Spangler v.*

*Pasadena City Bd. of Educ.*, 537 F.2d 1031, 1032 (9th Cir. 1976); *MacNeil v. United States*, 236

F.2d 149, 153-54 (1st Cir. 1956); *Williams v. Iberville Parish Sch. Bd.*, 273 F. Supp. 542, 545

(E.D. La. 1967).  Similarly, in light of civil contempt's remedial purpose, sanctions are available

only if the complaining party establishes some harm from the alleged contempt.  *See Boylan v.*

*Detrio*, 187 F.2d 375, 379 (5th Cir. 1951); *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir.

2000); *Iberville Parish Sch. Bd.*, 273 F. Supp. at 545.

Here, Plaintiffs have not filed a motion seeking imposition of civil contempt sanctions.

Indeed, Plaintiffs do not take a position on the Government's present motion to cancel the

August 19 contempt hearing.  Plaintiffs also have not demonstrated any harm resulting from the

---

equities in DACA and DAPA are distinct from, and do not bear on, issues raised in the July 7
Order.

Government's alleged injunction violations.  If anything, the record evidence suggests that Texas will be *better off* due to individuals obtaining three-year driver's licenses rather than two-year licenses.  *See* Decl. of Joe Peters (ECF No. 64-43) ¶ 8 (explaining that driver's licenses with longer terms cost Texas less money than licenses with shorter terms).  Given this absence of demonstrated harm, as well as the fact that Plaintiffs themselves have not sought civil contempt remedies, initiating possible contempt proceedings on August 19 would be inappropriate.[17]

\*       \*       \*

For the foregoing reasons, the August 19 hearing should be cancelled.  As the record confirms, there is no factual or legal basis for contempt proceedings here.[18]

## III.   IN THE ALTERNATIVE, THE COURT SHOULD EXCUSE THE ATTENDANCE OF SECRETARY JOHNSON AND MOST OF THE REMAINING NAMED DEFENDANTS.

High-ranking government officials cannot be compelled to appear and testify in judicial proceedings absent extraordinary circumstances, which exist only when those officials can provide essential testimony that cannot be obtained from other witnesses.  This heightened

---

[17] The Court's July 7 Order appears to conclude that the post-injunction issuances violated the Court's injunction, *see* July 7 Order at 1-2, and also construes the Government's May 7 Advisory as "conced[ing] that [the Government] has directly violated this Court's Order[.]"  *Id.* at 2.  The Court made similar statements at the June 23 hearing.  As explained at that hearing, however, the Government has not conceded that it has violated the Court's injunction.  *See* June 23 Tr. at 30.   But even with the Court's apparent conclusion, more is required to support imposition of contempt sanctions: "the court's order must set forth in specific detail an unequivocal command" that the action in question expressly violated.  *Matter of Baum*, 606 F.2d 592, 593 (5th Cir. 1979) (citation and internal quotation marks omitted); *see also United States v. Saccoccia*, 433 F.3d 19, 28 (1st Cir. 2005).  Here, the ministerial processes of issuing and re-mailing EADs that were approved prior to the injunction do not rise to that standard.

[18] To the extent the Court intends to pursue contempt proceedings, DHS is entitled to additional procedural protections—at a minimum, notice of the type of sanctions being considered by the Court.  *See Cole v. U.S. Dist. Court for Dist. of Idaho*, 366 F.3d 813, 821 (9th Cir. 2004); *see also Bagwell*, 512 U.S. at 833-34.

standard applies even when the testimony of a high-ranking official is sought for purposes of a contempt hearing. *In re United States (Jackson)*, 624 F.3d 1368, 1372 (11th Cir. 2010).

Here, all of the named defendants are high-ranking officials—including a member of the President's Cabinet—and most of them lack relevant, much less essential, knowledge regarding USCIS's compliance with the Court's injunction. Even to the extent they possess relevant information, that information is obtainable from other witnesses, identified below, that the Government intends to bring to the August 19 hearing, should it take place. Thus, even if the Court determines that it is necessary to proceed with the August 19 hearing, it should excuse the personal attendance of the Secretary and all other named Defendants except USCIS Director Rodríguez, and allow the Government to present the below-named witnesses (including Director Rodríguez) who are better suited by virtue of their duties and responsibilities and personal knowledge to address the matters raised by the Court's July 7 Order.

### A.    High-Level Executive Branch Officials Can Be Compelled to Testify Only in Extraordinary Circumstances.

"It is a settled rule in this circuit that 'exceptional circumstances must exist before the involuntary depositions of high agency officials are permitted.'" *In re FDIC*, 58 F.3d 1055, 1060 (5th Cir. 1995) (quoting *In re Office of Inspector General*, 933 F.2d 276, 278 (5th Cir. 1991) (per curiam)). This rule applies as well where the testimony of a high-ranking official is sought at trial or other evidentiary proceedings. *See In re United States (Jackson),* 624 F.3d at 1372.

One of the rationales for this heightened standard is that "'[h]igh ranking government officials have greater duties and time constraints than other witnesses.'" *In re FDIC*, 58 F.3d at 1060 (quoting *In re United States*, 985 F.2d 510, 512 (11th Cir. 1993) (per curiam) *cert. denied* 510 U.S. 989 (1993)). The rule also rests in part on principles of separation of powers and the proper relationship between executive agencies and reviewing courts. *See In re United States*

*(Jackson)*, 624 F.3d at 1372 ("[T]he compelled appearance of a high-ranking officer of the executive branch in a judicial proceeding implicates the separation of powers[.]").  Indeed, the court in that case observed that "compelling [a high-ranking official's] testimony by telephone for 30 minutes disrespected the separation of powers.  By contrast, compelling the personal appearance of [a high-ranking official] in a distant judicial district for interrogation by the court for an indefinite period is a far more serious encroachment on the separation of powers." *Id.* at 1373–74 (internal citations omitted).

    The duties and responsibilities of high-ranking DHS officials, especially Secretary Johnson, are vast, and the demands on their time unremitting.  DHS is the third-largest cabinet-level agency in the Federal Government.  Secretary Johnson and his leadership oversee the activities of more than 240,000 federal employees.  They hold ultimate responsibility for the successful execution of DHS's mission, which includes preventing terrorism, enhancing national security, managing the international borders of the United States, administering the immigration laws, protecting the lives of the President and his family, and ensuring disaster resilience.  *See generally* U.S. Dep't of Homeland Sec., About DHS, http://www.dhs.gov/about-dhs.

    If high-ranking governmental officials, such as the leadership of DHS, were compelled to testify in even a fraction of the civil cases in which their decisions may be relevant, they would have time for little else.  *See Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007) ("Without appropriate limitations, [high-ranking] officials will spend an inordinate amount of time tending to pending litigation.").  The Government takes extremely seriously the concerns raised in the Court's July 7 Order—as shown by the extraordinary efforts that DHS has undertaken to rectify the situation involving the post-injunction issuances and re-mailings of three-year EADs.  However, DHS and its leadership are named defendants in hundreds of federal cases pending in the 94 district courts, 13 courts of appeals, and the Supreme Court.  Many of

38

them (as here) name the Secretary as a defendant in his official capacity; and many of them (as here) involve urgent issues of national significance and priority.  The Secretary and his leadership could not faithfully execute their roles as high-ranking executive officials, if they could be compelled to personally appear in court or in depositions.

Because of their numerous and important public duties and the resulting constraints on their time, and the multitude of cases in which the leadership of agencies could otherwise be ordered to testify, high-ranking government officials cannot be compelled to appear unless extraordinary circumstances exist.  *In re FDIC*, 58 F.3d at 1060.  These "extraordinary circumstances" are present only when high-ranking officials can give testimony that is essential to a case and the information cannot be obtained from another source.  *See id.* at 1062 ("We think it will be the rarest of cases—and the present action is not one [of them]—in which exceptional circumstances can be shown where the testimony is available from an alternate witness.") (citing *In re United States*, 985 F.2d at 512).  *See also In re United States (Reno and Holder)*, 197 F.3d 310, 314 (8th Cir. 1999) (explaining that a movant seeking to depose high-level government officials must establish that the officials "possess information essential to [the] case which is not obtainable from another source.  This means both that the discovery sought is relevant and necessary and that it cannot otherwise be obtained.") (internal citations omitted); *Alexander v. FBI*, 186 F.R.D. 1, 4 (D.D.C. 1998) ("There is substantial case law standing for the proposition that high ranking government officials are generally not subject to depositions unless they have *some* personal knowledge about the matter and the party seeking the deposition makes a showing that the information cannot be obtained elsewhere.").

Indeed, the Fifth Circuit and other appellate courts have repeatedly issued writs of mandamus to prevent the compulsion of testimony by high-level governmental officials.  *See In re United States (Jackson)*, 624 F.3d at 1372-73; *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir.

2008); *In re Sec. Exch. Comm'n*, 374 F.3d 184, 187-88 (2d Cir. 2004); *In re United States (Holder and Reno)*, 197 F.3d at 316; *In re FDIC*, 58 F.3d at 1060; *In re United States (Kessler)*, 985 F.2d 510, 513 (11th Cir. 1993); *see also In re United States (Bernanke)*, 542 F. App'x 944, 947 (Fed Cir. 2013).  Given the "extraordinary" nature of mandamus as a remedy, *see In re Cheney*, 544 F.3d at 312, these decisions underscore the disfavor in which the compelled testimony of senior officials is held.

In a comparable case, the Eleventh Circuit granted a petition for a writ of mandamus where the district court ordered the EPA Administrator to appear at a hearing to determine whether agency officials should be held in contempt for failing to comply with court orders in a dispute over protection of the Everglades.  *In re United States (Jackson)*, 624 F.3d at 1371.  The Eleventh Circuit concluded that the district court should have accepted the EPA's proffer of an Assistant Administrator as a substitute witness.  *Id.* at 1373.  Although the district court asserted that "the Administrator had adequate time to prepare for the hearing, the protection of the Everglades is an issue of national importance, and the Agency has not complied with the earlier orders of the court," the Eleventh Circuit held that "none of those assertions explains why the Assistant Administrator is an inadequate substitute."  *Id.*  The same reasoning applies here, especially where USCIS Director Rodríguez and other officials with direct knowledge of the relevant facts will be available to testify if necessary.

**B.      No Extraordinary Circumstances Exist to Compel the Attendance of the Secretary and Three of the Remaining, High-Ranking Officials, Who  Lack Any Relevant Evidence, Much Less Essential Evidence.**

The burden of establishing extraordinary circumstances typically rests with the party seeking to compel the officials' testimony.  *In re United States (Holder and Reno)*, 197 F.3d at 314.  Here, there is no record, or even an articulation, of extraordinary circumstances that could warrant compelling Secretary Johnson, Commissioner Kerlikowske, Director Saldaña, or

Deputy Chief Vitiello to testify, particularly when Director Rodríguez and others will be available if necessary.  To the contrary, the attached declarations demonstrate that these high-ranking officials lack unique personal knowledge (in some cases, any knowledge) that is essential to resolving the matters raised in the Court's July 7 Order.  Kerlikowske Decl. ¶¶ 14, 15; Saldaña Decl. ¶¶ 16,17; Vitiello Decl. ¶¶ 12, 13.

Secretary Johnson, a member of the President's cabinet and head of the third-largest federal agency, is a high-level official whose appearance cannot be required absent a showing of exceptional circumstances.  *See United States v. Morgan*, 313 U.S. 409, 422 (1941) (explaining in hindsight that the Secretary of Agriculture "should never have been subjected to [deposition]"); *In re United States (Jackson)*, 624 F.3d at 1372  (granting mandamus to prevent compelled testimony of the EPA Administrator—a member of the President's cabinet); *In re United States (Reno and Holder)*, 197 F.3d at 314 (granting mandamus to prevent compelled testimony by the Attorney General); *Peoples v. Dep't of Agric.*, 427 F.2d 561, 567 (D.C. Cir. 1970) ("[S]ubjecting a cabinet officer to oral deposition is not normally countenanced.").  *See also* Order, *Kelley v. FBI*, Civ. No. 13-0825 (ABJ) (D.D.C. July 16, 2015) (ECF No. 63) (granting a motion to quash the deposition of Secretary Johnson).

 Director Saldaña, as the Assistant Secretary and head of ICE, also qualifies as a high-level government official who cannot be compelled to appear and testify absent extraordinary circumstances.  As the Assistant Secretary and Director of ICE, she leads the largest investigative agency within DHS, overseeing nearly 20,000 employees in 400 offices across the country.  Saldaña Decl. ¶ 6.  ICE's primary mission is to promote homeland security and public safety through criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration.  *Id.*  Director Saldaña is also a Level IV Presidential Appointee.  *Id.* ¶ 5; 5 U.S.C. § 5315.  The Fifth Circuit has held that the heightened standard requiring a

41

demonstration of extraordinary circumstances before a high-level official may be compelled to testify applies to Level III and Level IV Presidential Appointees. *In re FDIC*, 58 F.3d at 1059; *see* 5 U.S.C. §§ 5314 & 5315.

Likewise, Commissioner Kerlikowske, as Commissioner of CBP, is a high-level government official entitled to the same protection. As CBP Commissioner he oversees approximately 60,000 employees. Kerlikowske Decl. ¶ 8. He is responsible, among other things, for the protection of our Nation's borders and safeguarding national security by keeping criminal organizations, terrorists, and their weapons out of the United States, while at the same time facilitating lawful international travel and trade. *Id.* ¶ 7. He is a Level III Presidential Appointee and as such qualifies under Fifth Circuit precedent as a high-ranking official. *See In re FDIC*, 58 F.3d at 1059; 5 U.S.C. § 5314.

Ronald D. Vitiello is the Deputy Chief of U.S. Border Patrol, CBP. Vitiello Decl. ¶ 1. In this capacity he is responsible for planning and directing the Border Patrol's nationwide enforcement and administrative operations, which include patrolling nearly 6,000 miles of U.S. international land borders and thousands of miles of coastal waters surrounding the Florida Peninsula and Puerto Rico; detecting and apprehending individuals seeking to enter the country unlawfully; and preventing illegal trafficking in contraband. *Id.* ¶¶ 5, 6. His responsibilities extend to oversight of nearly 21,000 Border Patrol agents. *Id.* ¶ 4. Although Deputy Chief Vitiello is not a Presidential Appointee, and in this respect stands on a different footing than the other named defendants, the heightened standard for requiring his appearance and testimony still applies. *Cf. Church of Scientology v. IRS*, 138 F.R.D. 9, 12 (D. Mass. 1990) (applying heightened standard to IRS's Director of Exempt Organizations Technical Division); *see also, e.g.*, *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985) (same, Department of Labor's Administration's Area Director); *Bogan*, 489 F.3d at 423-24 (mayor of

42

Boston); *New York v. Nat'l R.R. Passenger Corp.*, No. 04-962, 2007 WL 4377721, at *2 (N.D.N.Y. Dec. 12, 2007) (former State Comptroller); *Robinson v. City of Phila.*, No. 04-3948, 2006 WL 1147250, at *2 (E.D. Pa. Apr. 26, 2006) (mayor of Philadelphia); *Gibson v. Carmody*, No. 89-civ-5358, 1991 WL 161087, at *1 (S.D.N.Y. Aug. 14, 1991) (New York County District Attorney); *Warzon v. Drew*, 155 F.R.D. 183, 185 (E.D. Wis. 1994) (Wisconsin Secretary of Administration); *Cmty. Fed. Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 96 F.R.D. 619, 620 (D.D.C. 1983) (two members—out of eleven—of the Federal Home Loan Bank Board).  In any event, even if Deputy Chief Vitiello did not fully qualify as "high-ranking," he still should not be compelled to appear and testify in light of his numerous important duties and responsibilities and his lack of personal knowledge of any information pertinent to the current compliance issues.  Vitiello Decl. ¶¶ 4-6, 12-13.

Because Secretary Johnson, Director Saldaña, Commissioner Kerlikowske, and Deputy Chief Vitiello are all high-ranking officials, extraordinary circumstances—including that they have essential testimony that cannot be obtained from another source—must be shown before they can be compelled to attend.  That standard cannot be met here, particularly when Director Rodríguez and other knowledgeable officials are available.  For his part, Secretary Johnson had no direct involvement with the events that led to the post-injunction issuance and re-mailing of three-year EADs.  While the Secretary was apprised by Director Rodríguez of these events, and of USCIS's initial plans to rectify the situation, and while the Secretary later directed that additional, extraordinary steps be taken, he placed responsibility for implementing the necessary corrective measures with Director Rodríguez and the officials and employees working at USCIS under Director Rodríguez's direction.  July 31 Rodríguez Decl. ¶¶ 11, 25-26.  Commissioner Kerlikowske, Director Saldaña, and Deputy Chief Vitiello had even less involvement—indeed none.  As discussed above, the DHS components they oversee do not accept, process, review, or

grant requests for deferred action under DACA, employment authorization, or renewals thereof. Neither CBP, nor ICE, nor the Border Patrol authorizes, issues, or mails approval notices or EADs, or administers the SAVE or E-Verify systems.  Accordingly, their agencies had no responsibility for or involvement with any of the activities that resulted in the issuance of the post-injunction three-year EADs, or efforts by USCIS to address the situation.  By the same token, these senior officials lack any personal knowledge regarding the post-injunction issuances or re-mailings of three-year EADs, or the subsequent corrective actions taken by USCIS. Kerlikowske Decl. ¶¶ 14, 15; Saldaña  Decl. ¶¶ 16, 17; Vitiello Decl. ¶¶ 12, 13.   Secretary Johnson, Commissioner Kerlikowske, Director Saldaña, and Deputy Chief Vitiello should therefore be excused from testifying at the August 19 hearing, because none of them has unique personal knowledge, unavailable from other sources, of matters that are essential to the issues raised in the Court's July 7 Order.[19]

### C. The Relevant Evidence is Available from Alternative Witnesses.

In the event that the August 19 hearing is not cancelled, the Government intends to bring the below-named witnesses who will be prepared to testify regarding the topics listed below. The availability of these witnesses is yet another reason why Secretary Johnson, and the remaining high-ranking defendants (other than Director Rodríguez), should not be compelled to appear or testify on August 19.  *See In re FDIC*, 58 F.3d at 1062 ("We think it will be the rarest

---

[19] Even if the Court's July 7 Order could be construed as requiring only the attendance, but not testimony, of Secretary Johnson and the three other senior officials, the same considerations would apply:  preparation for, and attendance at, a judicial proceeding still involves a significant imposition on these officials' time and duties.  *See United States v. U.S. Dist. Court for Northern Mariana Islands*, 694 F.3d 1051, 1053 (9th Cir. 2012) (granting a writ of mandamus vacating the district court's orders requiring the Assistant Attorney General for the Tax Division to appear at a settlement conference).

of cases . . . in which exceptional circumstances can be shown where the testimony is available

from an alternate witness.").

The witnesses who would attend the August 19 hearing on behalf of the Government,

were it held, and the subjects on which they would be prepared to testify, are as follows:

- León Rodríguez, Director of USCIS:  Corrective action taken, and the results of
  the corrective action, regarding the post-injunction issuances of three-year EADs
  and the re-mailed three-year EADs.

- Donald Neufeld, USCIS, Associate Director for Service Center Operations:
  Circumstances that led to the post-injunction issuances of three-year EADs and
  the re-mailing of three-year EADs; details relating to corrective action taken by
  Service Centers for those individuals.

- Daniel Renaud, USCIS, Associate Director for Field Operations:  Details relating
  to corrective action taken by USCIS related to field operations, especially
  residential site visits.

- Tracy Renaud, USCIS, Associate Director for Management:  Details relating to
  corrective action taken in USCIS systems including SAVE and E-Verify.

The Government believes that these are the relevant topics the Court may wish to address at the

August 19 hearing, and that these are the witnesses best situated, by virtue of their positions and

involvement in the events in question, to address those topics.  No extraordinary circumstances

exist, therefore, to justify compelling other, high-ranking and less knowledgeable officials,

including Secretary Johnson, to attend or give testimony on August 19.[20]

---

[20]  The Court's July 7 Order directs that "the Government shall bring all relevant
witnesses on [the topic of why Defendants should not be held in contempt] as the Court will not
continue this matter to a later date." July 7 Order at 2.  The Government intends to bring the
above-described witnesses to any contempt hearing on August 19, to address the above-
described topics.  To the extent the Court believes that additional witnesses are necessary, or that
the Government should be prepared to address additional topics, the Government respectfully
requests such notice as part of the Court's resolution of this motion no later than August 10,
2015.  Otherwise, the Court's instruction to "bring all relevant witnesses" would be inconsistent
with the due process requirement that a party be permitted to prepare and present a meaningful
defense.  *See* Fed. R. Crim. P. 42(a)(1)(C) (requiring statement of "the essential facts
constituting" the alleged contempt); *Remington Rand Corp.-Delaware v. Bus. Sys., Inc.*, 830 F.2d

Given the importance of this issue, the Government respectfully requests a decision on this motion—in particular, whether Secretary Johnson and the others will be excused from appearing, either because the August 19 hearing will be canceled, or the Court will not require their testimony—by no later than August 10, 2015.  It is necessary that the Government make this exceptional request of the Court for a decision no later than August 10 to preserve as a practical matter the option of seeking appellate relief before any hearing occurring on August 19. Plaintiffs do not object to this schedule.

In the event the Court denies the Government's request to excuse the Secretary and Defendants Kerlikowske, Saldaña, and Vitiello from appearing on August 19, then the Government alternatively requests a stay of the hearing to provide an opportunity to seek appellate review.  If the hearing is not stayed, and these high-ranking Government officials are compelled to appear and testify, then the important interests the Government seeks to protect could not be vindicated on appeal.

## IV.     THE COURT SHOULD CONCLUDE ITS INQUIRY INTO THE ISSUES RELATED TO ITS APRIL 7 ORDER.

The Court's July 7 Order states, with respect to the issues addressed in the Court's April 7 Order, that "[t]he Court will resolve any and all questions regarding future discovery and/or sanctions once it reviews the parties' [July 31] report."  July 7 Order at 1.  As discussed in prior filings, the Government fully appreciates the significance of the Court's concerns expressed

---

1256, 1258 (3d Cir. 1987) (applying Rule 42's notice requirements in a proceeding for civil contempt); *see also Waste Mgmt. of Washington, Inc. v. Kattler*, 776 F.3d 336, 339-40 (5th Cir. 2015).  It would also be inconsistent with due process for the Court to pre-emptively deny a continuance of the August 19 hearing if one is necessitated by an unanticipated question arising at the hearing.  C*f. Ungar v. Sarafite*, 376 U.S. 575, 589 (1964) ("There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.  The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.").

46

in its April 7 Order, and the Government genuinely regrets the miscommunication that led to that

Order.  But there has been no misconduct here, as documented in the Government's submission

on April 30.  *See* ECF No. 242.

At the June 23 hearing, the Court expressed concern that the Government had not

sufficiently apologized for the miscommunication leading to the Court's April 7 Order.  *See*

June 23 Tr. at 32-33.  The Government intended to convey its sincere apologies in prior filings

and proceedings, however, and reaffirms that message today:  undersigned counsel, on behalf of

the entire Government as well as the attorneys who have appeared in this matter, sincerely and

genuinely apologize for the unintentional miscommunication that occurred in this case.  The

Government fully understands that this case is one of national importance, and that the Court and

everyone involved worked diligently throughout December 2014, January 2015, and February

2015 to reach a preliminary resolution before the February 18 date that the Government had

understood and represented to the Court as the first significant date for purposes of Plaintiffs'

claims of irreparable harm.  The Government sincerely regrets that it did not recognize and

identify for the Court the potential relevance of the ongoing three-year deferrals, and apologizes

for not doing so.

The Government respectfully submits that it has consistently apologized for the

miscommunication, both on behalf of the Government as a whole, as well as the attorneys

involved in this matter:

- "On behalf of the government, I would like to first of all apologize for any confusion that our representations created in the case,"  Mar. 19th Tr. at 13-14;

- "we apologize for the confusion," *id.* at 18;

- offering "full respect and apologies for the confusion that we have caused," *id.* at 21-22;

- "Defendants also reiterate, as they explained at that hearing, that they apologize for any confusion that may have resulted," ECF No. 207 at 1;

- "DOJ and Defendants . . . regret and apologize for the misunderstanding that inadvertently resulted from their statements," ECF No. 242 at 1;

- "The Government deeply regrets not only the confusion that these statements created, but that it did not recognize the prospect of confusion earlier." *Id.* at 3;

- "The Government again apologizes for causing confusion." *Id.* at 15.

- "We now understand in hindsight what the disconnect was.  We are truly sorry for that." June 23 Tr. at 12; and

- "I do want to make very clear that we apologize on behalf of the entire United States Government for how this has played out." *Id.* at 38.

Throughout this proceeding, the Government has fully intended to convey its sincere apologies to the Court.

At the June 23 hearing, the Court also expressed concern about the lack of evidence to assist in resolving the issues related to its April 7 Order.  *See* June 23 Tr. at 9-10.  As explained at that hearing, however, no additional evidence is necessary.  First, for the post-injunction time period that the Court is particularly concerned about, there is in fact record evidence—of contemporaneous court filings, as well as Director Rodríguez's May 15 declaration, *see* ECF No. 256-1—that explains the numerous fast-moving events occurring at that time to which the attention of the Defendants and their counsel were necessarily drawn.  *See* June 23 Tr. at 10-12.

Second, the metadata chart and the privilege log—both of which were unprivileged, and produced to both Plaintiffs and the Court—confirm that there was no improper delay with respect to the filing of the March 3 Advisory.  The metadata chart shows that the first draft of the March 3 Advisory was created on Monday, March 2, 2015 at 7:36 p.m., approximately 24 hours before the March 3 Advisory was filed.  *See* Metadata Chart, entries for document Bates numbered TX_A00000017–0021.  The privilege log similarly reflects that all of the drafts of the March 3 Advisory were created or transmitted on Monday, March 2 or Tuesday, March 3—thus further confirming that the Advisory was created, drafted, reviewed, and then filed in a very short period of time (just over 24 hours).  *See generally* Privilege Log (containing hundreds of

48

entries, none of which involved a document sent or created earlier than 7:36 p.m. on March 2,

2015).  Indeed, the privilege log and metadata chart confirm that attorneys were working on the

draft Advisory literally overnight.  *See, e.g.*, Privilege Log and Metadata Chart entries for

documents TX_A00000036–0038 (e-mails between attorneys, sent at 10:48 p.m. on March 2);

TX_A00000044–0045 (same, sent at 1:35 a.m. on March 3); TX_A00000046–0047 (same, sent

at 1:51 a.m.); TX_A00000048–0050 (same, sent at 5:38 a.m.).  Thus, there is already concrete,

unchallenged evidence before the Court demonstrating the speed with which the Government

acted to file the March 3 Advisory.

Finally, the Court also has evidence before it in the form of the Government's unredacted

April 30 filing.  *See* ECF No. 242.  Plaintiffs have not challenged the Court's ability to rely on

the Government's filing for purposes of resolving the issues related to the April 7 Order.[21]  *Cf.*

*Tillman v. Bd. of Pub. Instruction*, 430 F.2d 309, 310-11 (5th Cir. 1970) (per curiam)

("adopt[ing]" the district court's factual findings, which were based in part on "[e]vidence . . .

taken without objection in the form of factual representations by counsel"); *Burgin v. Broglin*,

900 F.2d 990, 993 n.3 (7th Cir. 1990).  The Government's April 30 submission was prepared by

a team of attorneys, different from the team involved in the underlying merits litigation, and

signed by a number of those attorneys—thereby certifying that the factual statements were

supported "to the best of [those attorneys'] knowledge, information, and belief, formed after an

inquiry reasonable under the circumstances[.]"  Fed. R. Civ. P. 11(b).  This Court is entitled to

---

[21] Plaintiffs have argued that the Government's filing, and its explanation of an "inadvertent miscommunication and misunderstanding," should be subject to "verif[ication]." ECF No. 261 at 6.  But they have not challenged the filing as containing inadmissible factual representations that the Court should not consider.  And with respect to Plaintiffs' requested "verification," although the Government believes that such verification is unnecessary, *see* ECF No. 265 at 11-12, both parties have agreed that referral to a magistrate judge would be appropriate for such purposes.  *See* ECF No. 261 at 6; ECF No. 265 at 14.

rely on the statements of those attorneys, as officers of the court, set forth in the written April 30 submission.  *Cf. Johnson v. Gen. Tel. Co.*, No. CA-6-78-2, 1982 WL 200, at *2 (N.D. Tex. Feb. 4, 1982).

For all of these reasons, as well as those set forth in prior filings, *see* ECF Nos. 242, 265, the Court should conclude its inquiry into the issues related to its April 7 Order and determine that no misconduct occurred, and that no further proceedings are warranted.[22]

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should cancel the currently scheduled August 19 hearing.  In the alternative, the Court should excuse the attendance of Secretary Johnson and the other high-ranking officials except Director Rodríguez, and permit the above-described substitution of witnesses.  In any event, the Government respectfully requests a ruling on this motion no later than August 10, 2015, and a stay of the hearing pending appellate review should the request for substitution of witnesses be denied.

---

[22] As discussed in prior filings, imposing sanctions would be impermissible absent additional procedural protections—including notice to the entities and/or individuals against whom sanctions are contemplated, the basis for such potential sanctions, the type of sanctions being contemplated (including whether the potential sanctions are personal in nature), and an opportunity for the entity and/or individual to respond to the specific sanctions being contemplated.  *See* ECF No. 242 at 1-21; ECF No. 265 at 14-15.

Dated: July 31, 2015

KENNETH MAGIDSON
United States Attorney

DANIEL DAVID HU
Assistant United States Attorney
Deputy Chief, Civil Division

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

JOYCE R. BRANDA
Deputy Assistant Attorney General

AUGUST E. FLENTJE
Special Counsel

JENNIFER D. RICKETTS
Director, Federal Programs Branch
Attorney-in-Charge (VA Bar No. 29281)

JAMES J. GILLIGAN
Special Litigation Counsel

 /s/ Daniel Schwei                                    
DANIEL SCHWEI
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883
Washington, D.C. 20044
Tel.: (202) 305-8693
Fax: (202) 616-8470
Daniel.S.Schwei@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF CONFERRAL

Undersigned counsel hereby certifies that counsel for Plaintiffs, Angela Colmenero, authorized Defendants to represent Plaintiffs' position as follows:  "Plaintiffs have authorized Defendants to represent that Plaintiffs take no position on the relief requested in Defendants' motion.  Plaintiffs reserve the right to file any response or advisory in connection to Defendants' motion and agree to submit such filing no later than Thursday, August 6, 2015."

*/s/ Daniel Schwei*
Counsel for Defendants


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Joint Status Report has been delivered electronically on July 31, 2015, to counsel of record via the District's ECF system.

*/s/ Daniel Schwei*
Counsel for Defendants

52