# EXHIBIT 1

OFFICE OF INSPECTOR GENERAL

# USCIS' Issuance of 3-year Employment Authorization Documents Following a Federal District Court Injunction


Homeland
Security

**August 11, 2015**
**OIG-15-122**



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

August 11, 2015

MEMORANDUM FOR:    The Honorable Jeh Charles Johnson
                   Secretary

FROM:              John Roth  *John Roth*
                   Inspector General

SUBJECT:           *USCIS' Issuance of 3-year Employment Authorization
                   Documents Following a Federal District Court Injunction*

In response to your May 8, 2015 request, we have reviewed the circumstances of the U.S. Citizenship and Immigration Service's (USCIS) issuance of 3-year Employment Authorization Documents (EAD) after the Federal District Court's preliminary injunction of February 16, 2015. We are providing the results of our review in this report.

We determined that a combination of factors led to the erroneous production and issuance of approximately 2,000 3-year EADs after the February 16, 2015, Federal District Court injunction. USCIS Service Center Operations Directorate (SCOPS) management was not specific in its direction to USCIS Office of Information Technology (IT) staff. In addition, SCOPS management was mistaken in its assumptions about what IT staff was able to do or had done in halting production of the 3-year EADs. Finally, within IT, we concluded there was a lack of understanding about the consequences of actions taken related to release of the EADs that had been held from production.

USCIS originally identified 2,128 3-year EADs produced after the injunction. According to USCIS, 64 of the 2,128 were printed the morning of February 17, 2015, but were destroyed and not sent to recipients. USCIS initially reported that the remaining 2,064 3-year EADs were later printed and mailed, but we were unable to confirm this number. In addition, USCIS continues to discover 3-year EADs produced and issued after the injunction that are not included in the originally identified 2,128. For these reasons, we conclude that USCIS' data is unreliable and we cannot validate the number of 3-year EADs either produced or issued after the injunction. Our review was limited to determining the circumstances surrounding the production and issuance of approximately 2,000 3-year EADs USCIS reported to the Federal District Court on May 7, 2015. We make no recommendations in this report.

Consistent with our responsibility under the *Inspector General Act*, we will provide copies of our report to congressional committees with oversight and appropriation



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

responsibility over the Department of Homeland Security (DHS).  We will post the report on our website for public dissemination.

Please call me with any questions, or your staff may contact Anne L. Richards, Assistant Inspector General for Inspections and Evaluations, at (202) 254-4100.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Background

On November 20, 2014, President Barack Obama announced he would implement a series of executive actions, which included:

- Expanding the population eligible for the Deferred Action for Childhood Arrivals (DACA) program to people of any current age who entered the United States before the age of 16 and lived in the United States continuously since January 1, 2010, and extending the period of DACA and the authorization to work, reflected in an identification card called an Employment Authorization Document (EAD), from 2 years to 3 years.
- Allowing parents of U.S. citizens and lawful permanent residents to request deferred action and EADs for 3 years, in a new Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) program, provided they have lived in the United States continuously since January 1, 2010, and pass required background checks.
- Expanding the use of provisional waivers of unlawful presence to include the spouses and children of lawful permanent residents and the children of U.S. citizens.

On November 20, 2014, DHS Secretary Jeh Johnson issued a memorandum, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents,* to U.S. Immigration and Customs Enforcement, U.S. Customs and Border Protection, and USCIS reflecting the President's executive actions.  These executive actions served as supplements and amendments to Secretary Napolitano's June 15, 2012, memorandum, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children.*  Subsequently, on November 24, 2014, DHS began granting 3-year DACA approvals and EADs to qualified eligible individuals under the 2012 DACA guidelines.

On December 3, 2014, 14 states and 4 governors (Plaintiffs) filed suit against the United States and several DHS officials (Defendants),[1] claiming President Obama's executive actions violate the Take Care Clause of the Constitution and the *Administrative Procedure Act.*  The Plaintiffs also requested injunctive relief to prevent the implementation of DAPA and the Lawful Permanent Residents program.  Since the original complaint filing, eight additional states, or their representatives, have joined the lawsuit against the Defendants.

---

[1] *Texas, et al. versus United States, et al* (S.D. Tex) No. 1:14-cv-00254



## OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

On February 16, 2015, the United States District Court for the Southern District of Texas, Brownsville Division, granted the Plaintiffs' request for a preliminary injunction. The injunction enjoined the implementation of the DAPA program and the modification of the DACA program contained in the DHS Secretary's November 20, 2014, memorandum.[2] In response to the injunction, USCIS and the Department took a number of steps, detailed in the body of this report.

On March 3, 2015, the Defendants filed their first advisory to the Court, stating that between November 24, 2014, and February 16, 2015, USCIS granted 3-year periods of deferred action to approximately 100,000 individuals who had requested deferred action under the original 2012 DACA guidelines. USCIS issued 3-year EADs to members of this group whom it found eligible for work permits.

At a hearing on March 19, 2015, the Defendants advised the Court that after the preliminary injunction, 55 individuals had received 3-year EADs erroneously. Defendants also advised the Court that there were about 750 applicants who had requested deferred action under the 2012 DACA guidelines and had been approved prior to the February 16, 2015, preliminary injunction, but who had not yet been issued EADs at the time of the injunction. The Defendants stated that those pending cases were put on hold at the time of the injunction to prevent documentation associated with 3-year terms from being sent.

On May 7, 2015, the Defendants filed a second advisory to the Court stating that while preparing notifications to the 55 individuals who had erroneously been given 3-year EADs after the issuance of the injunction, they discovered another group of approximately 2,000 individuals who had been erroneously sent 3-year EADs after the Court issued its injunction.[3] The Defendants stated DHS had already begun the process of retracting the 3-year EADs and reissuing them as 2-year EADs.

---

[2] In response to the injunction, on February 23, 2015, the Defendants filed a notice of appeal and motion to stay the injunction.

[3] At this time (May 7, 2015), USCIS reported it identified 2,128 3-year DACA-related EADs produced after the injunction, 64 of which were printed the morning of February 17, 2015, before USCIS instructed personnel at its card production facility to pull DACA-related EADs from production. USCIS reported it intercepted and destroyed these 64 EADs before they could be mailed to recipients. As a result of the factors we identified, we know that 2,064 3-year EADs were released to the USCIS card production facility in Corbin, Kentucky, to be produced and subsequently mailed. Although the vast majority of these EADs appear to have been both produced and mailed, we could not confirm the exact number. Further, until July 29, 2015, USCIS continued to identify EADs that may have been produced or issued after the injunction. We conclude that



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

On May 8, 2015, DHS Secretary Johnson requested that the DHS Office of Inspector General (OIG) investigate the circumstances of the issuance of approximately 2,000 3-year EADs after the Court issued its preliminary injunction.

On May 15, 2015, the Defendants filed declarations from Donald W. Neufeld, USCIS Associate Director for Service Center Operations and Leon Rodriguez, Director of USCIS. The declarations advised the Court that the 3-year EADs erroneously issued were believed to have been segregated and withheld from the card production queue, but had in fact been released. Additionally, the Defendants advised that there was a group of requestors who had been both approved for and received EADs valid for more than 2 years after the injunction, based on manual error by the adjudicators.

As of July 29, 2015, USCIS continued to advise OIG of additional discoveries of 3-year EADs that were produced or issued after the February 16, 2015, injunction.

<u>USCIS Process for DACA-related Requests for Deferred Action and Employment Authorization</u>

Individuals submit a request for deferred action under DACA (Form I-821D), an application for employment authorization (Form I-765), an accompanying worksheet showing economic necessity for employment (Form I-765WS), and related filing fees and supporting documentation to one of three USCIS "lockbox" facilities, based on where they reside in the United States. At the lockbox, the package is reviewed for compliance. Packages that do not comply are rejected and sent back to the requestor with the reason for rejection. For packages that are complete and appropriately filed, USCIS sends a receipt to requestors. These packages are forwarded to one of four national USCIS service centers for further consideration and processing by USCIS adjudicators.

USCIS adjudicators may approve or deny a request for deferred action under DACA or seek additional information from the requestor. If the DACA request for deferred action is approved, the adjudicator then considers the application for employment authorization and determines whether the individual has demonstrated an economic need for employment. Adjudicators may approve the application for employment authorization, deny the application, or delay the decision until receipt of additional requested evidence of economic need. If the DACA request for deferred action is denied because the requestor has not satisfied the DACA guidelines or does not otherwise merit an exercise

---

USCIS' data is unreliable and we cannot validate the number of 3-year EADs produced or issued.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

of prosecutorial discretion in the form of deferred action, the associated application for employment authorization is also denied.

USCIS service center staff record all decisions (approval or denial) about DACA requests for deferred action and the application for employment authorization in the Computer-Linked Application Information Management System-3 (CLAIMS-3). For all approved DACA requests for deferred action and employment authorization, staff members enter a period of authorization (the length of time each is valid) into CLAIMS-3. Once approval or disapproval is recorded in CLAIMS-3, the system generates a notice of action (Form I-797), which is mailed from a service center to the applicant. Individuals whose DACA requests for deferred action are approved receive a notice of action, which includes the length of time action is deferred. USCIS sends a second notice of action for approved associated employment authorization, which includes the length of time that employment is authorized. This notice specifically states that it may not be used as evidence of employment authorization and that such evidence, an EAD (Form I-766), will be mailed separately.

Individuals who are granted employment authorization receive EADs, which reflect the length of time the individual is authorized to work. EADs are not produced at USCIS service centers or by personnel at service centers. They are printed, packaged, and mailed through a separate process at a USCIS card production facility. Prior to the injunction, there was one USCIS card production facility in Corbin, Kentucky; after the injunction, USCIS opened another facility in Lee Summit, Missouri.

Generating an EAD takes several steps. First, an adjudicator at a service center updates CLAIMS-3 with an approval of an application for employment authorization, along with the relevant length of time employment is authorized, and the record is coded C33, indicating a DACA recipient. Then, USCIS follows this process:

- Approval data and relevant biometric and biographic information from CLAIMS-3 are transferred through the Integrated Card Production System (ICPS) to a card production facility. ICPS comprises the National Production System (NPS) and the Card Personalization System Tech Refresh (CPSTR). NPS, which is managed by a contract database administrator in Washington, DC, supports printing of all benefits cards for printers distributed around the United States. It consolidates print requests from the various card production sources, tracks them, and routes them to printers. CPSTR is the print queue for managing card printing at the Kentucky and Missouri card production facilities; it is managed by a contract database administrator in Corbin, Kentucky.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

- ICPS sends an order to print an EAD, along with relevant EAD production data, to NPS.

- NPS establishes a queue for permanent resident cards and EADs, including DACA-related EADs, awaiting production. According to USCIS policy, NPS holds all cards for 48 hours (excluding holidays and weekends) before moving them to production. This allows the originating office to make any corrections it might identify as a result of quality assurance or other action.

- After the 48-hour hold, the card production request is transmitted to CPSTR. The card is then printed, checked for quality (for example, to ensure it does not have any physical defects and the image is not too dark or too light), packaged, and mailed to the requestor.

Figure 1 depicts USCIS' process at the time of the injunction.



**Figure 1: USCIS' Process**

*Source*: OIG analysis of USCIS' process at the time of the injunction



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

### Results of Inspection

We did not find any evidence that the production and subsequent mailing of 3-year DACA-related EADs held in NPS from February 17 through February 19, 2015, was done in defiance of the Federal District Court's injunction. We determined that a combination of factors led to the production, and mailing of about 2,000 of these 3-year EADs.[4] USCIS Service Center Operations Directorate (SCOPS) management was not specific in its direction to USCIS Office of Information Technology (IT) staff. In addition, SCOPS management was mistaken in its assumptions about what IT staff was able to do or had done in halting production of the 3-year EADs. Finally, within IT, we concluded there was a lack of understanding about the consequences of actions taken related to release of the EADs that had been held. USCIS could not provide reliable data on the actual number of EADs held in NPS that were subsequently produced and mailed. USCIS also continues to discover EADs that were produced or issued after the injunction but not included in the 2,128 originally identified. Therefore, we cannot validate the number of 3-year EADs produced or issued after February 16, 2015.

After the injunction was issued, USCIS took steps to ensure that further issuance of 3-year EADs was halted. For example, at 1:07 a.m. (Eastern Standard Time) on February 17, 2015, the Director of USCIS sent an email regarding the injunction, which read in part, "Please stop any further steps to provide further information about DACA expansion ...." At 1:10 a.m., he followed up with a second email, again directing that no further action be taken, "including issuance of 3-year EAD's until we receive further direction from counsel." At 10:00 a.m. that same morning, the Associate Director for SCOPS confirmed in an email, "Yes, we can stop DACA approvals pending further guidance.", but added that the Office of Intake and Document Production would need to "weigh in" on whether production could be stopped for approvals "already in the pipeline if that is also being requested." In response, the USCIS Senior Counselor advised, "if possible, stop production of cards in the pipeline."

Also that morning, the Associate Director for SCOPS forwarded the Senior Counselor's email about stopping production of EADs in the pipeline to the Associate Director of the USCIS Management Directorate. (The Management Directorate is responsible for USCIS' IT systems). The Associate Director of the Management Directorate forwarded

---

[4] USCIS originally identified 2,128 DACA-related, 3-year EADs produced after the injunction. According to USCIS, 64 of these were printed on February 17, 2015, but were intercepted and destroyed at the Corbin card production facility on February 26, 2015, before they could be sent to DACA recipients. Our review focused on the remaining 2,064 EADs that were held in NPS from February 17 through February 19, 2015, and were subsequently released to the card production facility to be printed and mailed.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

the email to the Deputy Chief of IT, who forwarded the same email to the CLAIMS-3/ICPS IT program manager, who, in a separate email, directed the NPS database administrator to "place [a] stop on all C33 [EADs]" in NPS. At this point in time, all DACA-related EADs already in NPS' production queue had been approved before the injunction and thus were authorized for 3 years.

The same day (February 17, 2015), in response to the direction from the CLAIMS-3/ICPS IT program manager, the NPS database administrator moved all DACA-related EADs to a different queue in NPS to prevent them from being printed. All the EADs moved to this queue (and thus stopped from being produced) were authorized for 3 years. The NPS database administrator confirmed with the CLAIMS-3/ICPS IT program manager via email that she had stopped all C33 cases in NPS.

The CLAIMS-3/ICPS IT program manager notified her direct supervisor, the Deputy Chief of IT, that they had stopped production of DACA-related EADs. This notification was forwarded to the Associate Director of the Management Directorate, who notified the Associate Director for SCOPS. The Associate Director for SCOPS then notified the SCOPS Supervisory Adjudications Officer, the Chief of Adjudications, and the Deputy Associate Director for SCOPS.

Thus, by 11:15 a.m. (Eastern Standard Time) on February 17, 2015, USCIS believed it had effectively stopped all DACA 3-year EADS from being sent to and subsequently produced at the Corbin card production facility.

Although USCIS adjudicators had ceased approving DACA-related employment authorizations for 3 years and began approving EADs for 2 years, as directed, the NPS database administrator continued to hold *all* DACA-related EADs from moving to production. Thus, the newly approved, post-injunction 2-year EADs were being moved to the same queue where the 3-year EADs were being "held."

From February 17 through February 19, 2015, the NPS database administrator prevented *all* DACA-related EADs — both the newly approved 2-year EADs as well as the 3-year EADs that were the subject of the injunction — from proceeding to production.

According to the Associate Director for SCOPS, he assumed that the 3-year DACA-related EADs being held in NPS would be removed from the queue in the system and be returned to CLAIMS-3 to be converted to 2-year EADs. He said this assumption was based on his experience regarding holds placed on individual cards for quality assurance issues. In these cases, card orders can be electronically returned from a card production facility to CLAIMS-3.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

However, we found no evidence that SCOPS explicitly directed IT to send any EADS back to CLAIMS-3.[5] Rather, the following communications occurred, the net effect of which was to release the 3-year EADs.

First, on February 20, 2015, in an email concerning another DACA-related matter, the SCOPS Supervisory Adjudications Officer informed the CLAIMS-3/ICPS IT program manager, "We resumed adjudication under the original DACA guidelines earlier in the week, so please allow the card requests to proceed. (They will all be 2 years)."

The same day, based on the Supervisory Adjudications Officer's email request, the CLAIMS-3/ICPS IT program manager informed the NPS database administrator, "We don't need to stop C33 EADs any longer."

The NPS database administrator replied in an email that she would not stop any more cases (DACA-related EADs) loaded into NPS since her report of the previous day (February 19); after 48 hours, these EADs would be sent to the card production facility. She also replied that she would not stop any more DACA-related EADs for this "event/request." Finally, and most importantly, the NPS database administrator informed the CLAIMS-3/ICPS IT program manager that she would "release all the cases" she had "stopped" on February 17, 18, and 19 to the card production facility that day (February 20). The program manager affirmatively acknowledged these actions in an email.

As a result of these actions, once the hold was removed, all the EADs, both 2- and 3-year, that had been held in NPS from February 17 through February 19 became available in CPSTR, from which they were presumably printed the following business day and subsequently mailed.

Based on these communications, we conclude that if the CLAIMS-3/ICPS IT program manager had fully understood the consequences of the NPS database administrator's release of all EADs that had been held for those 3 days, she would have realized that the 3-year EADs were going to continue to production and be printed and mailed. We found no evidence in her email that she was aware of this or knew that this action would release 3-year EADs.

---

[5] According to the NPS database administrator, it was not possible for her to return any of the held EADs to CLAIMS-3 because NPS does not have this capability. To send a card back to CLAIMS-3, the card would have to be "errored out" through CPSTR at the card production facility. Had she been directed to do so, however, the NPS database administrator could have released the 2-year EADs from the hold and continued to hold the 3-year EADs.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

The Associate Director for SCOPS was also mistaken in his assumption that the 3-year EADs had been removed from NPS and sent back to CLAIMS-3. Further, when interviewed later, the SCOPS Supervisory Adjudications Officer said he realized IT was holding EADs that had been approved on February 18 and 19, at which point adjudicators were approving EADs for 2 years instead of 3; he reasoned there was no need to hold these 2-year EADs. In the same interview, he said he expected the CLAIMS-3/ICPS IT program manager to allow the EADs from February 18 and 19 to proceed because they would all have been 2-year EADs; he also expected her to wait for instructions on the other (3-year) EADs in the system.

At no point in any instructions did SCOPS management differentiate between 2- and 3-year EADs. Although the SCOPS Supervisory Adjudications Officer later explained his reasoning and understanding of the situation, in his email he did not differentiate between 2- and 3-year EADs, nor did he mention the 3-year EADs. In our view, the statement in his email, "They will all be 2 years." could be understood to mean either the EADs already in NPS or the EADs that would be approved and entering the system from that point forward.

The combination of these factors ultimately led to the production and mailing of DACA-related 3-year EADs after the Federal District Court's injunction.

As part of our inspection, we also reviewed USCIS Associate Director for SCOPS Donald W. Neufeld's May 15, 2015, declaration to the United States District Court for the Southern District of Texas, Brownsville Division. We found no evidence to invalidate the statements in this declaration.

## Scope and Methodology

DHS OIG was established by the *Homeland Security Act of 2002* (Public Law 107–296) by amendment to the *Inspector General Act of 1978*. We conducted this review under the authority of the *Inspector General Act of 1978*, as amended, and according to the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency.

During our review, we interviewed USCIS staff from USCIS headquarters, the Nebraska and California Service Centers, the Corbin, Kentucky Card Production Facility, as well as a contract database administrator. In addition, we obtained and reviewed electronic correspondence (email) between SCOPS staff and IT personnel. We also analyzed USCIS CLAIMS-3 data and a listing of 3-year EADs to determine the current status of 3-year EADs; whether USCIS provided a complete listing of EADs issued for a 3-year



## OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

period; the number of cards issued from November 20, 2014, through February 16, 2015, before the injunction became effective. We analyzed the statement of Donald W. Neufeld in the May 15, 2015, declaration to the United States District Court for the Southern District of Texas, Brownsville Division, to determine its accuracy.

According to the USCIS website, which showed it was updated on July 20, 2015, about 500 3-year EADs that were approved and issued *before* the February 16, 2015, injunction were returned to USCIS as undeliverable by the U.S. Postal Service. USCIS subsequently re-mailed these EADs to updated addresses *after* the injunction. We did not include these EADs in the scope of our review. As of July 29, 2015 USCIS continued to identify additional 3-year EADs that had been approved, produced, and issued to recipients after the date of the injunction. Some of these were identified only when returned to USCIS by the recipient. These 3-year EADs were not included in the scope of our review. The scope of our review was limited to the approximately 2,000 3-year DACA-related EADs identified by the Defendants and to the Court on May 7, 2015.

The Office of Inspections major contributors to this report are John D. Shiffer, Chief Inspector; Natalie Fussell, Senior Inspector; Kimberley Lake de Pulla, Senior Inspector; Glenn Stewart, Inspector; Renita Hunter, Inspector; Tuyet-Quan Thai, Forensics Division Director; Beverly Burke, Audit Manager; and Kelly Herberger, Communications Analyst.



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## Appendix A
## Declaration of Donald W. Neufeld, May 15, 2015

Case 1:14-cv-00254   Document 256-2   Filed in TXSD on 05/15/15   Page 1 of 17

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 1:14-CV-254 |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### DECLARATION OF DONALD W. NEUFELD

I, Donald W. Neufeld, hereby make the following declaration with respect to the above captioned matter.

1. I am the Associate Director for Service Center Operations (SCOPS) for U.S. Citizenship and Immigration Services (USCIS), a component within the U.S. Department of Homeland Security (DHS). I have held this position since January 2010. In this position, I oversee all policy, planning, management and execution functions of SCOPS. My current job duties include overseeing a workforce of more than 4,500 government and contract employees at the four USCIS Service Centers located in California, Nebraska, Texas and Vermont. These four centers handle about four million immigration-related applications and requests annually, including all requests for deferred action under the Deferred Action for Childhood Arrivals (DACA) process. I previously submitted a declaration in this case on January 30, 2015.

2. I make this declaration on the basis of my personal knowledge and information made available to me in the course of my official duties. The statements made in this declaration are based on USCIS's current understanding of information available at this time.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

### Introduction

3.   As I will further describe below, USCIS has recently discovered errors in its identification and tracking of cases decided under the 2012 DACA eligibility guidelines[1] in which three-year terms of deferred action and employment authorization had already been approved prior to entry of the preliminary injunction in this case, but for which employment authorization documents (EADs) had not yet been printed and prepared for mailing by that time (hereinafter "EAD-pending cases").

4.   Immediately following the injunction, USCIS put a hold on these EAD-pending cases to prevent three-year EADs from issuing, and it believed that these cases would remain on hold until further notice.

5.   Recently, in the course of attempting to issue two-year EADs, consistent with the 2012 DACA policy not at issue in this case, to individuals in the cases USCIS believed were being held, USCIS discovered that it had erroneously failed to remove these cases from the processing queue, and as a consequence, these EADs had been processed and these individuals had received three-year EADs after the preliminary injunction.  USCIS has already issued notices to the recipients of these three-year EADs whom it has identified, informing them that their approvals of deferred action and employment authorization have been converted from three to two years, that they will be issued two-year EADs, and that they must return the three-year EADs sent to them.

6.   This declaration will explain on the basis of currently available information how the foregoing errors in identification and tracking came about and the corrective actions that USCIS has taken in response.  USCIS continues to refine its understanding of the matters discussed

---

[1]  In addition to modifying the eligibility criteria for DACA, the November 20, 2014, Deferred Action Guidance changed the term of deferred action (and the corresponding term for work authorization) from two years to three years.

2



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Case 1:14-cv-00254   Document 256-2   Filed in TXSD on 05/15/15   Page 3 of 17

herein, and to ensure that it has identified and taken corrective action in all cases in which three-year EADS (or any other three-year DACA-related documents) were issued after the injunction.

### Background on the Processing of Requests for DACA and Work Authorization

7.   In order to understand where the process of identification and tracking broke down, it is necessary to understand the steps involved in the approving of deferred action and employment authorization and in the production and issuance of EADs to DACA recipients. The review and consideration of a request for deferred action and application for employment authorization under DACA is a multi-step, case-specific process. As described more fully below, that process involves three principal, consecutive steps for approved cases: (1) consideration of the request for deferred action; (2) consideration of the application for employment authorization; and (3) production of the EAD. Each of these steps results in USCIS issuing a separate document to the requestor. Approval of the request for deferred action triggers the issuance of an approval notice to the requestor. Approval of the application for employment authorization similarly triggers a separate approval notice. Finally, after approval, USCIS prints and then mails the EAD to the requestor. This typically takes approximately two to five business days after approval of the application for employment authorization.

8.   The process begins when an individual requestor submits a request for deferred action under DACA (Form I-821D), an application for employment authorization (Form I-765), an accompanying worksheet showing economic necessity for employment (Form I-765WS), and related filing fees and supporting documentation to one of three USCIS "lockbox" facilities based on the location of the requestor's residence in the United States. The lockbox facility logs each filing and reviews each DACA package for compliance with applicable intake requirements. If the lockbox facility determines that a package fails to comply with the intake requirements, it rejects the package and mails it back to the requestor with an explanation of the

3



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

reason for the rejection. If the package is complete, the lockbox facility considers the package appropriately filed and sends a receipt to the requestor. Appropriately filed packages are then forwarded to one of four USCIS Service Centers for further substantive processing and consideration.

9.   DACA packages forwarded to the Service Centers are assigned to USCIS adjudicators. After reviewing the paper file and conducting the decision-making process, the adjudicator may approve the request, deny the request, or seek additional information from the requestor if additional evidence is necessary to make a decision. If the DACA request is approved, the adjudicator then considers the application for employment authorization and makes a determination whether the individual has demonstrated an economic need for employment. If so, the application for employment authorization is approved. If not, the adjudicator may deny the application, or may request additional evidence, thereby delaying the decision on the application for employment authorization until a response is received. If the DACA request is denied due to a finding that the requestor has not satisfied the DACA guidelines or does not otherwise merit an exercise of prosecutorial discretion in the form of deferred action, the associated application for employment authorization is also denied.

10. All decisions regarding both the DACA request and the application for employment authorization are recorded by Service Center staff into an electronic system known as CLAIMS 3. Approval of a DACA request and approval of an application for employment authorization are two distinct determinations, and for each a period of authorization must be entered into CLAIMS 3. The electronic recording of a decision may be made by the adjudicator or other Service Center personnel, either contemporaneously with the decision or afterward.

11. Upon the recording of an approval or denial of a DACA request or an application for employment authorization, a notice of action (Form I-797) is generated by the CLAIMS 3

4



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

system to inform the requestor of the relevant decision. These notices are generated at, and mailed from, USCIS Service Centers. Specifically, upon the approval of a DACA request, a notice of action indicating such approval and the validity period of deferred action is mailed to the requestor. Upon the approval of an associated application for employment authorization, a separate notice of action is generated to inform the individual of the approval and validity period of the employment authorization—which should be valid until the end of the validity period for the underlying approval of deferred action. Such a notice specifically states that it may not be used as evidence of work authorization and that such evidence, in the form of an EAD (Form I-766), will be mailed separately.

12. Unlike the notices of action showing approval or denial of DACA or work authorization, production of EADs is not performed at USCIS Service Centers or by the personnel who work at these locations. Rather, the printing, packaging, and mailing of EADs is a separate multi-step process handled at card-production facilities located elsewhere. The process begins with the electronic transfer of approval data and relevant biometric and biographic information from the CLAIMS 3 system to one of USCIS's card-production facilities, for actual production and mailing via the Integrated Card Production System ("ICPS"). This process is initiated when an adjudicator updates CLAIMS 3 with an approval of an application for employment authorization, along with the relevant validity period and a code ("C-33") indicating that the requestor is a DACA recipient.

13. Upon the update of the CLAIMS 3 system, the ICPS system sends an order to print an EAD, along with data relevant to EAD card production, through the ICPS interface to the National Production System ("NPS"). The NPS establishes a queue for permanent resident cards and EADs, including DACA-related EADs, awaiting production. Pursuant to agency policy, the NPS holds the card for a 48-hour period (excluding holidays and weekends) prior to moving to

5



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

physical production, to provide the originating office with an opportunity to make any corrections it might identify as a result of quality assurance or other action. After the 48-hour hold, the card production request is transmitted to the Card Personalization System Tech Refresh ("CPSTR") system, which is the print queue that manages card printing at the USCIS card-production facility. The card is then printed, checked for quality, packaged, and mailed to the requestor.

**USCIS's Immediate Response to the Preliminary Injunction**

14. In the late evening of February 16, 2015, the Court issued its preliminary injunction in this case. That preliminary injunction enjoined the Federal Government "from implementing any and all aspects or phases" of: (1) the "Deferred Action for Parents of Americans and Lawful Permanent Residents" (DAPA) policy, and (2) modifications to the 2012 "Deferred Action for Childhood Arrivals" policy, in which the Court included both the expansion of the DACA eligibility guidelines and the change in the term of deferred action and employment authorization from two to three years, as set forth in the Secretary's November 20, 2014 memorandum entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are Parents of U.S. Citizens or Permanent Residents.*

15. Upon becoming aware of the preliminary injunction, USCIS took immediate steps to cease all work toward implementing the changes set forth in that memorandum. Hours after the injunction issued, in the early morning hours of February 17, USCIS Director León Rodríguez instructed appropriate USCIS leadership personnel to immediately suspend all further action to prepare for implementation of DAPA, all further action to implement the modified DACA eligibility guidelines, and all approvals of pending requests for DACA under the 2012 guidelines, while the scope of the injunction was determined. The Director also specifically

6

 **OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

ordered his staff to cease the issuance of three-year EADs to individuals who had been approved for deferred action under the original 2012 DACA eligibility guidelines.

16. Pursuant to these instructions, USCIS personnel immediately implemented a broad freeze of work related to DAPA and DACA. With respect to the implementation of DAPA and the expanded DACA eligibility guidelines, USCIS immediately took steps to halt the posting on its websites of forms and instructions related to the expanded DACA eligibility guidelines, which had been expected to begin the following day (February 18); to remove Frequently Asked Questions and other public guidance related to the expanded DACA eligibility guidelines from USCIS websites or to include a banner on such websites noting the effect of the injunction; to cancel upcoming public engagements related to the implementation of the new expanded DACA eligibility guidelines; to halt all work on the development of the new DAPA policy; to halt hiring activities initiated for the purposes of administering the Secretary's new policies; to cease contract solicitation related to mail and file support for the new DAPA policy; and to update internal and external communications to remove information about the expansion of DACA eligibility and the DAPA launch (while maintaining historical press releases and notices regarding the scope of the executive actions).

### Detailed Efforts to Prevent the Issuance of Three-Year EADs

17. On the morning of February 17, USCIS also took immediate steps to stop the issuance of three-year periods of deferred action and employment authorization to individuals who had already requested deferred action under the 2012 DACA eligibility guidelines. Specifically, headquarters personnel sent instructions to personnel at the USCIS Service Centers—which are responsible for considering DACA requests and related applications for employment authorization—to immediately suspend the further approval of any DACA requests. Instructions were also sent to USCIS personnel at USCIS card-production facilities, and the information

7



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

technology ("IT") staff that maintain the technology supporting the card production process, to immediately suspend the further printing and issuance of EADs for all DACA recipients. Finally, USCIS personnel at the Service Centers and card-production facilities were also instructed to intercept and hold any printed approval notices or EADs related to three-year periods of deferred action or employment authorization until further notice.

18. Upon the issuance of the above instructions, USCIS personnel took immediate action to execute them. USCIS Service Center adjudicators took steps to stop approving requests for deferred action (whether for two or three years), as well as related applications for employment authorization. Document production and IT personnel at the card-production facilities issued electronic orders to suspend the printing of EADs for DACA recipients. And USCIS personnel at both the Service Centers and the card production facilities initiated efforts to intercept any DACA-related approval notices or EADs that had already been printed, or were subject to imminent printing, but had not yet been submitted for mailing.

19. The agency understood at the time of the injunction that there was some number of approved DACA cases in which approvals for three-year rather than two-year terms of DACA and employment authorization had already been issued, but for which EADs had not yet been printed and sent to the requestors. In each of these EAD-pending cases, a Service Center adjudicator would have entered an approval for a three-year term of deferred action and for a three-year term of employment authorization in the CLAIMS 3 system before the injunction, which would then have routed an EAD production request to the National Production System. All that remained for these cases then was the ministerial step of printing and sending the associated EADs to the requestor. Nevertheless, USCIS decided to hold these EAD-pending cases until the agency could effectively determine an appropriate course of action for their

8



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

resolution. Ultimately, USCIS determined that these cases should be converted to two-year terms of both deferred action and work authorization.

20. On the morning of February 17, 2015, to prevent cards from being printed for these EAD-pending cases, USCIS IT managers were instructed to hold EADs with the C-33 code (i.e., EADs for DACA recipients). By the afternoon of February 17, USCIS headquarters was provided confirmation that all DACA-related EADs in the National Production System production queue had been successfully held. To prevent any three-year cards that had already been printed from being packaged and mailed, personnel at the card-production facilities were instructed to manually review printed cards and to pull those with the C-33 code.[2]

21. Later in the afternoon of February 17, 2015, USCIS headquarters personnel informed Service Center adjudicators that they could resume approvals of DACA requests under the original 2012 eligibility guidelines but to revert to issuing two-year approvals of deferred action and employment authorization for all such requests going forward, consistent with the terms of the 2012 DACA policy not subject to the preliminary injunction. Going forward, adjudicators were instructed to enter two-year validity periods into the CLAIMS 3 system with respect to any newly approved DACA cases. Such approvals fully resumed on February 18, 2015, although the hold on actual production and issuance of DACA-related EADs remained in place.

22. On February 20, USCIS operational personnel informed the IT personnel administering the hold in the National Production System that the Service Centers had resumed approvals of

---

[2] USCIS personnel intercepted some EADs with three-year validity periods that had been printed and were being prepared for mailing. USCIS eventually destroyed these cards and began issuing two-year EADs to the relevant requestors. USCIS did not, however, intercept a box of EADs, most of which did not concern DACA recipients, that was awaiting pick-up by the US Postal Service on the morning of February 17. (The pick-up was delayed until February 18, due to a snowstorm.) These EADs had already been printed, enveloped, and prepared for mailing before the injunction.

9



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

DACA requests, and that production of EADs could now also begin again.  In giving that instruction, USCIS operational personnel believed that the earlier cases for which three-year EADs had been approved (*i.e.*, the EAD-pending cases) had been removed from the production queue and would continue to be held, and that the only production requests that would be allowed to proceed would be those that involved two-year validity periods going forward.

23.  Although the intention had been only for two-year EADs to proceed to production, the three-year EADs that had previously been placed on hold also proceeded to production.  USCIS operational personnel had believed that the hold on all DACA-related EAD production would be effected by electronically removing each individual case from the National Production System production queue, returning it to the CLAIMS 3 system, and requiring a manual, case-specific action to return it to the queue and allow the case to again proceed.  This is the mechanism that operational personnel were familiar with, based on past experience when holds were placed on individual cases, such as when card orders have been electronically returned from a card production facility to a Service Center due to issues identified during the quality assurance process.  Therefore, when USCIS operational personnel instructed IT personnel to again allow production requests for DACA-related EADs to proceed, the operational personnel believed that such an instruction would not affect those three-year cases that they understood to have been removed from the production queue and returned to the CLAIMS 3 system.

24.  However, the February 20 instruction to resume production of EADs led to the issuance of three-year EADs for the previously held EAD-pending cases, although the intention had been for only the two-year EADs to proceed to production.  IT personnel had implemented a system-wide pause on the production of all DACA-related EAD requests in the queue.  They had not removed production requests for three-year EADs from the queue.  As a result, those three-year EAD requests were not prevented from moving forward once production resumed on the cases

10



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

approved for two-year EADs. Nevertheless, USCIS believed that the three-year EADs associated with EAD-pending cases were no longer in the production queue with the newly approved two-year EADs. USCIS personnel continued to believe that these cases would remain on hold until USCIS took steps to convert the approvals in these cases from three years to two.

### Information Provided to the Court About the Issuance of Three-Year EADs After the Injunction

25. On March 3, 2015, the defendants notified the court that, prior to issuance of the preliminary injunction, USCIS had approved approximately 100,000 three-year periods of deferred action and work authorization for individuals eligible under the 2012 DACA eligibility guidelines. At that time, USCIS also reported to the court, through counsel, that it had ceased providing three-year EADs immediately following issuance of the injunction. At the time this information was provided to the Court, USCIS understood (albeit mistakenly) that the issuance of EADs for the EAD-pending cases described above had been halted, thereby preventing issuance of three-year EADs for those cases, and that those cases remained on hold until further action was taken. Defendants repeated this understanding in a filing on March 12, 2015.

26. Prior to the March 19 hearing on Plaintiffs' motion for discovery, USCIS conducted reviews of its records to ascertain information such as the precise number of DACA recipients who had been approved for three years of deferred action and employment authorization prior to the injunction, and when they had requested deferred action and applied for work authorization. Based on these reviews USCIS also estimated the number of EAD-pending cases. (At this time USCIS still believed that the individuals in these cases had not been issued three-year EADs.) The reviews also revealed that a number of individuals had been erroneously approved for a three-year period of deferred action and employment authorization after the injunction, some of whom were also issued three-year EADs after the injunction . Based on this information, USCIS

11



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

reported at the March 19 hearing, through counsel, that on February 17 a number of cases that remained in the "pipeline" (that is, EAD-pending cases), had been placed on hold and that three-year EADs had not been issued to these individuals. USCIS also reported, through counsel, that a number of three-year EADs were erroneously issued after the injunction due to manual errors. These representations were made on the basis of USCIS's understanding of the information obtained and conveyed at that time.

### Actions to Address Pending Cases and Other Cases

27. Subsequent to the March 19 hearing, USCIS proceeded to undertake action to address the EAD-pending cases believed to still be on hold, and continued to take action to address cases in which three-year terms of deferred action and/or work authorization had been erroneously approved after the court's injunction. USCIS categorized cases into three groups and developed a distinct letter to be sent to the members of each group. These letters were intended to begin resolving all outstanding issues:

- **Group 1:** One letter was drafted for the individuals whose requests for employment authorization had been erroneously approved for a three-year term after February 16 and who were also erroneously issued three-year EADs post-injunction. This letter was drafted to inform the individuals: (1) of the error that was made in their case; (2) that USCIS had converted the three-year approval in their case to a two-year approval; (3) that USCIS would provide a two-year EAD to them; (4) that they were required to return the three-year EAD that had been issued to them and that failure to do so could result in adverse action in their case; and (5) that they should also return any three-year approval notices that were still in their possession.

- **Group 2:** A second letter was drafted for the individuals who had been found to have been erroneously approved for three-year terms of deferred action after the court's

12



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Case 1:14-cv-00254  Document 256-2  Filed in TXSD on 05/15/15  Page 13 of 17

injunction, but who had *not* been issued three-year EADs. This letter informed them: (1) of the error made in their case; (2) that USCIS had converted the three-year approval of deferred action to a two-year approval; and (3) that they would be receiving notice of such two-year approval and should return any three-year approval notice in their possession.

- **Group 3:** A third letter was drafted for the previously described EAD-pending cases in which three years of employment authorization had been approved before the injunction but for which EADs had not yet been issued at the time of the injunction. As USCIS believed that all of these EAD-pending cases were on hold, the letter drafted for this group informed the recipients: (1) that USCIS had converted the three-year approval in their case to a two-year approval; (2) that USCIS would be issuing a two-year EAD; and (3) that they should return any three-year approval notice in their possession to USCIS.

Although the letters addressed different categories of cases, they all endeavored to effectuate the same intention — that any cases in which any part of the processing took place (or remained to take place) post-injunction had been or would be converted to two-year approvals of both deferred action and work authorization, with associated documentation.

### Discovery of the Failure to Hold the EAD-Pending Cases

28. On April 30, language was approved for the above-described letters. That same day, USCIS headquarters personnel sent templates of these letters to the USCIS Service Centers and instructed them to begin issuing letters and correcting the electronic records of the individuals in the three relevant groups. USCIS headquarters also asked the Service Centers to track all responses for further evaluation.

29. On the following day, Friday, May 1, USCIS Service Center personnel began issuing the above-mentioned letters to the three identified groups, as well as making the appropriate

13



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

corrections to USCIS's electronic records with respect to those cases that had not been corrected earlier.

30. As USCIS employees at these locations went through the relevant electronic records and began to electronically update USCIS databases, they began to discover that some EAD-pending cases in Group 3—which were believed to remain on hold—had already been mailed three-year EADs after the injunction. (Again, the actual approval of such EAD-pending cases had occurred prior to the injunction).

31. By Monday, May 4, USCIS Service Center employees concluded that many EAD-pending cases had been issued three-year EADs after the injunction. These employees decided to treat such persons as in Group 1 (i.e., people who had received three-year EADS that had been erroneously *approved* after the injunction) and took action accordingly—including correcting records and sending them the Group 1 letter. That afternoon, USCIS Service Center personnel informed USCIS headquarters staff of their findings.

32. Headquarters staff immediately began a series of inquiries, including querying all relevant Service Centers with impacted EAD-pending cases, and also learned that in addition to the cases not actually remaining on hold, the number of such cases was higher than had been previously understood. As a result of this new information, USCIS began to run additional systems queries to ensure that it had identified the entire universe of EAD-pending cases and to determine whether these cases had also been sent three-year EADs. Based on these queries USCIS estimated that approximately 2000 three-year EADs had been issued to DACA recipients on or after the date of the injunction (and as of this time has no reason to believe that estimate is incorrect).

33. Through this process, USCIS discovered that the EAD-pending cases that were believed to be segregated and withheld from the card production queue had in fact been released, thus

14



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

allowing the three-year EADs to be erroneously printed and sent to the relevant requestors. Upon further investigation, we now understand that this error was the result of USCIS's failure to place the right kind of hold on the EAD-pending cases.

34. On Wednesday, May 6, DHS alerted counsel at the Department of Justice of this information, and the following day, defendants advised the Court.

35. With respect to the cases now known to involve the issuance of three-year EADs after the injunction, USCIS has initiated corrective action. USCIS has sent letters to all individuals known to have received these EADs notifying them that they received three-year EADs post-injunction, that they will receive two-year EADs to replace them, and that they are required to return the three-year EADs. USCIS is also correcting its records of these cases to reflect two-year validity periods for both deferred action and employment authorization.

36. Additionally, there is a group of requestors who were both approved for and received EADs valid for more than two years after the injunction based on manual error by the adjudicator, as opposed to the failure to maintain a hold on the EAD-pending cases. This subset of requestors, described at the March 19 hearing and further in the May 7 Advisory, is currently being re-examined by USCIS, and the requestors identified have been sent letters as described above in paragraph 27. To the extent that any further manual errors are detected during the re-examination process, corrective letters will be sent to those requestors as well. These manual errors occurred because the CLAIMS 3 system permitted adjudicators to enter custom dates, leaving open the possibility of human error in entering those dates. To prevent further similar errors, a directive has been issued to develop a technical fix to the CLAIMS 3 system that would prevent adjudicators from issuing DACA and related EADs for longer than two years, thereby eliminating the possibility of human error.

15



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

37. Since the discovery of these errors, USCIS has continued its efforts to identify all cases in which individuals were issued documentation reflecting three-year terms of deferred action and/or work authorization after the injunction – whether due to the failure to segregate out EAD-pending cases, due to manual error on the part of the adjudicator post-injunction, or for any other reason. These efforts remain ongoing, and USCIS understands that ongoing verification is required to ensure that it has identified all cases that may require corrective action. As such, the total number of cases in which three-year EADs and/or notices were issued after the injunction, and the number falling into each category, may change from the estimates previously provided to the Court in the Government's May 7 filing, which represented USCIS's best understanding at that time. To the extent USCIS identifies additional cases in which three-year documentation was erroneously issued after the injunction, it will take prompt corrective action similar to that described above.

16



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Case 1:14-cv-00254   Document 256-2   Filed in TXSD on 05/15/15   Page 17 of 17

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 15th day of May of 2015.

Donald W. Neufeld

17



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Appendix B**
**Analysis of Donald W. Neufeld's May 15, 2015 Declaration to the Court**

| USCIS Declaration | OIG Analysis |
|---|---|
| In Mr. Neufeld's declaration, he stated that USCIS personnel at both the service centers and the card production facility initiated efforts to intercept any DACA-related approval notices or EADs that had been printed or were subject to imminent printing, but had not yet been submitted for mailing. | We determined the California Service Center intercepted printed approval notices. However, according to staff at the Nebraska Service Center (NSC), NSC did not attempt to retrieve approval notices printed before February 17, 2015, because the service center did not have the print staff to undertake such a task. NSC did advise that they stopped printing approval notices. |
| Mr. Neufeld stated USCIS did not intercept a box of EADs that was awaiting pick up by the U.S. Postal Service on the morning of February 17, 2015, most of which did not concern DACA recipients. (The pickup was delayed until February 18 because of a snowstorm.) These EADs had already been printed, enveloped, and prepared for mailing before the injunction. | We determined that about 8,700 EADs were printed, enveloped, and prepared for mailing, of which 472 were DACA-related. |



# OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

| | |
|---|---|
| Mr. Neufeld stated USCIS operational personnel (SCOPS staff) believed that the hold on all DACA-related EAD production would be effected by electronically removing each individual case from the NPS production queue, returning it to CLAIMS-3, and requiring a manual, case-specific action to return it to the queue and allow the case to again proceed.  Operational personnel were familiar with this mechanism, based on past experience, when holds were placed on individual cases, such as when EAD orders are electronically returned from a production facility to a service center because of issues identified during the quality assurance process.  Therefore, when USCIS operational personnel instructed IT personnel to again allow production requests for DACA-related EADs to proceed, the operational personnel believed that such an instruction would not affect those 3-year cases that they understood to have been removed from the production queue and returned to CLAIMS-3. | Our review of USCIS staff email showed that SCOPS personnel never gave specific instruction to IT staff to return individual cases to CLAIMS-3 for a manual, case-specific action to return it to the queue.  IT staff therefore held all EADs, based on the original SCOPS instruction to pause all DACA-related EADs. |

 **OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix C

### Department of Homeland Security

Secretary
Deputy Secretary
Chief of Staff
Deputy Chiefs of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Assistant Secretary for Office of Policy
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
USCIS Director
USCIS Liaison

### Office of Management and Budget

Chief, Homeland Security Branch
DHS OIG Budget Examiner

### Congress

Congressional Oversight and Appropriations Committees

**ADDITIONAL INFORMATION AND COPIES**

To view this and any of our other reports, please visit our website at: www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.  Follow us on Twitter at: @dhsoig.



**OIG HOTLINE**

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click on the red "Hotline" tab. If you cannot access our website, call our hotline at (800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

> Department of Homeland Security
> Office of Inspector General, Mail Stop 0305
> Attention: Hotline
> 245 Murray Drive, SW
> Washington, DC  20528-0305