1        **UNITED STATES DISTRICT COURT**
         **SOUTHERN DISTRICT OF TEXAS**
2              **HOUSTON DIVISION**

3
     STATE OF TEXAS, ET AL          *   1:14-CV-00254
4                                   *
     VS.                            *   10:12 a.m.
5                                   *
     UNITED STATES OF AMERICA, ET   *   AUGUST 19, 2015
6    AL

7                 **HEARING ON MOTIONS**
           **BEFORE THE HONORABLE ANDREW S. HANEN**
8              **Volume 1 of 1, Pages 1 - 50**

9    **APPEARANCES:**

10   **FOR THE PLAINTIFFS:**
     Ms. Angela V. Colmenero
11   Texas Office of the Attorney General
     P.O. Box 12548
12   Austin, Texas 78711-2548
     (512) 474-2697
13
     Mr. Nicholas Bitter
14   Texas Office of the Attorney General
     P.O. Box 12548
15   Austin, Texas  78711-2548
     (512) 474-2697
16
     **FOR THE DEFENDANTS:**
17   Ms. Jennifer D. Ricketts
     United States Department of Justice
18   20 Massachusetts Avenue
     Washington, D.C. 20001
19   (202) 514-3671

20   Mr. James J. Gilligan
     United States Department of Justice
21   20 Massachusetts Avenue
     Washington, D.C. 20001
22   (202) 514-3358

23   Mr. Daniel David Hu
     Office of the United States Attorney
24   1000 Louisiana, Suite 2300
     Houston, Texas  77002
25   (713) 567-9518

1                       **APPEARANCES  (continued)**

2    Mr. Evan Franke
     Litigation Coordination Counsel
3    Office of the Chief Counsel
     United States Citizenship and Immigration Services
4    Department of Homeland Security
     20 Massachusetts Avenue, NW; Suite 4025
5    Washington, D.C.  20529

6    Ms. Jessica Schau-Nelson
     United States Department of Homeland Security
7    3801 Nebraska Avenue, NW
     Nac01-01-001
8    Washington, D.C.  20538

9    Court Reporter:
     Laura Wells, RPR, RMR, CRR
10   515 Rusk, Suite 8004
     Houston, Texas 77002

11
     Proceedings recorded by mechanical stenography.
12   Transcript produced by computer-assisted transcription.

13

14

15

16

17

18

19

20

21

22

23

24

25

1
**VOLUME 1**
**(Hearing on Motions)**

2                                                                          Page

August 19, 2015

3

Announcements...................................        4
4   Ruling of Court on Agreed Amended Motion for        4
Entry of Protective Order.......................

5
Statements by Mr. Gilligan......................        5
6   Statements by Ms. Ricketts......................       14
Statements by Ms. Colmenero.....................       17
7   Statements by Ms. Ricketts......................       27
Statements by Ms. Colmenero.....................       28
8   Statements by Ms. Ricketts......................       29
Statements by Ms. Colmenero.....................       32
9   Statements by Ms. Ricketts......................       34
Statements by Mr. Gilligan......................       37
10  Statements by Ms. Colmenero.....................       40
Statements by Mr. Gilligan......................       41
11  Statements by Ms. Colmenero.....................       43
Statements by Mr. Gilligan......................       45

12
Ruling of Court.................................       47

13
Court Reporter's Certificate....................       50

14

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS**

THE COURT:  All right.  Be seated.  We're here in
B-14-CV-254.  Ms. Colmenero, who is with you representing
the states?

10:12:54

MS. COLMENERO:  Your Honor, I'm joined by Adam
Bitter from the Texas Attorney General's office.  We're
here on behalf of the plaintiff states.

THE COURT:  Ms. Ricketts, who is here with you?

MS. RICKETTS:  Good morning, Your Honor.  I have
10:13:05   Jim Gilligan from my office, Department of Justice.

I also have Jonathan Meyer, Deputy General Counsel at
DHS and Jessica Schau-Nelson and Evan Franke from CIS and
then Mr. Hu, whom you know.

THE COURT:  Okay.  Let me start with the easy
10:13:21   part, maybe.  I have what appears to be an agreed amended
motion for entry of protective order.  I hate to ask this.
Is it agreed?

MS. RICKETTS:  It is, Your Honor.

MS. COLMENERO:  It is, Your Honor.

10:13:38   THE COURT:  All right.  Then I'm signing it.

Now we have got two different topics I want to cover.
As you know from the last time we met, my goal was and
still is to try to resolve all the ancillary issues that
might otherwise detract from a decision on the merits or
10:14:19   from starting to even consider the merits before we get

1    the case back because if I'm affirmed, we have got a long

2    road ahead of us; and if I'm reversed, depending on how

3    I'm reversed, I've still got to deal with this matter.  So

4    my goal is to get rid of this one way or the other.

10:14:46    5    Okay.  The first issue that I want to talk about are

6    the actual violations of the injunctions and the remedy;

7    and I have looked at the Government's filings, including

8    the one from last night or yesterday evening.  And while

9    I'm not clear on everything, it looks like we're making

10:15:15    10    substantial progress in resolving all this.

11    Ms. Ricketts, who is going to address that?

12    MS. RICKETTS:  Your Honor, with your permission,

13    Mr. Gilligan will address the compliance issues; and then,

14    I will address the joint advisory issues.

10:15:29    15    THE COURT:  Great.  That's basically how I have

16    that divided in my mind as well.  All right.

17    All right.  Mr. Gilligan, let me ask you:  I have used

18    the figures that you guys have provided; and it looked

19    like -- at least by my math, and it's always bad when

10:15:55    20    lawyers start to do math -- that we had of the original

21    2,128 we got -- and the real "we", you guys, got most

22    everything resolved with the exception of 11 individuals.

23    Am I in the ballpark on that?

24    MR. GILLIGAN:  You are in the ballpark, Your

10:16:26    25    Honor.  Actually, the story is that of the -- both the

1   2,128 post-injunction issuances plus the 484 re-mailed

2   EADs a total of about 2,612 or so.  We have over 2,600 of

3   those back or accounted for, and the 11 reflects the

4   outstanding number for both groups in total.

10:16:53  5   THE COURT:  Okay.  For some reason I had 11 from

6   one group and 11 from the other.  So I had in my mind 22

7   that were outstanding.

8   MR. GILLIGAN:  That was indeed, Your Honor, you

9   are correct, the status on July 31st, when we made our

10:17:07  10  July 31st filing.  As of yesterday, when we made our

11  supplemental filing, we were down to 11 total between the

12  two groups.

13  THE COURT:  All right.  And as I understand from

14  yesterday's filings with regard to these -- and we'll talk

10:17:23  15  about the other 50 in a minute, but that the Government is

16  still trying to take measures to fix that with regard to

17  these outstanding 11 people?

18  MR. GILLIGAN:  Yes, Your Honor.  That is correct.

19  In fact, we have already begun.  We have already sent

10:17:41  20  letters out where we have contact information, and we are

21  attempting to continue to reach people by telephone and

22  e-mail where we have the necessary contact information.

23  I can give Your Honor a little bit of detail about the

24  breakdown of the 11.

10:17:56  25  THE COURT:  Okay.  If you will, go ahead.

1           MR. GILLIGAN:  Five of them are cases where as
2    far as we can tell it appears that they had moved and are
3    now at new addresses without having informed the agency as
4    they should have.  So it may be that these five
10:18:14  5    individuals never received any of the notices and did not
6    reside at the addresses where we made home visits.  And so
7    we're trying to reach out to them at the new addresses to
8    see if we can get the cards retrieved.
9           And if that does not prevail, we will send USCIS
10:18:33  10   personnel out to knock on the doors and see if we can
11   obtain the cards that way.
12          Of course, we are using whatever contact information
13   we have in those cases as well.
14          There are four other cases where we had succeeded in
10:18:45  15   making contact of one form or another either with the
16   individual cardholder or a relative or an associate and
17   were told that they would comply.  They would send the
18   card back or provide us with a certification of good cause
19   for not doing so.
10:19:01  20          But that did not happen by the July 30th deadline that
21   we had established.  But given that these individuals had
22   at least or their associates had at least expressed a
23   willingness to do what was required, we have determined
24   that we will continue to reach out to them with the
10:19:17  25   contact information we have as necessary, pay further home

 1  visits, if other means don't prove successful, and do what
 2  we can to retrieve those four.
 3      That leaves two final cases out of the 11 where we
 4  have not been successful in making contact with anyone.
 5  It appears, at least in one of those cases, that the
 6  individual may have moved.  So we were told by his
 7  landlord.  And we have no additional contact information,
 8  no new address of that nature.
 9      We do have some telephone information.  We have a new
10  number for one of them.  We have a new number for the
11  other's representative.  And so we're going to try to
12  continue to reach out to these two individuals by those
13  means.  But it may be that we have reached a dead end at
14  least in these two cases.
15          THE COURT:  All right.  But with respect to any
16  records that the DHS is keeping or the immigration service
17  or however you want to describe it, has the Government
18  changed their records to reflect what should accurately be
19  the situation?
20          MR. GILLIGAN:  Well, in all 11 cases, Your Honor,
21  all of these individuals have been terminated and notices
22  have been issued to them telling them that their deferred
23  action and employment authorization has been revoked and
24  they are told that use of their cards is not authorized
25  and updates have been made in the appropriate databases.

10:19:35 (line 5)
10:19:52 (line 10)
10:20:08 (line 15)
10:20:26 (line 20)
10:20:40 (line 25)

1          THE COURT:  Then we have the 53 that apparently

2   got released by accident in Nebraska.

3          MR. GILLIGAN:  Yes, Your Honor.  That's correct.

4   Nebraska Services.

10:20:56   5          THE COURT:  Where are we there?

6          MR. GILLIGAN:  We have all 53 of them either

7   retrieved or accounted for, Your Honor.  I believe that is

8   reported in the declaration we filed yesterday as well.

9   We have made the appropriate updates in the agency's

10:21:10  10   databases and in the databases that support the E-Verify

11   and SAVE systems.

12          THE COURT:  All right.  And then, just for my

13   edification, this failure to stop the printing queue or

14   however it were, Mr. Gilligan, that actually happened

10:21:34  15   quite a while ago?

16          MR. GILLIGAN:  Yes.

17          THE COURT:  You didn't discover it happened until

18   just recently.  Am I right about that?

19          MR. GILLIGAN:  That's right.  The reason we

10:21:42  20   didn't discover it, Your Honor, is that what happened was

21   that the Nebraska Service Center in an aggressive effort

22   to try to come into compliance with the Court's injunction

23   back in February, they electronically converted the

24   authorized terms in a number of cases from three years to

10:21:59  25   two years shortly after the injunction.

1    And this was successful in a number of those cases in

2    preventing the cards from being issued because the data

3    had not been forwarded from the official records system

4    CLAIMS 3 to the card production system.  And so those

10:22:17  5    cards were held.

6    But then in these other approximately 50 cases,

7    unfortunately, by the time the electronic conversion was

8    made in CLAIMS 3, the data authorizing the production of

9    those approximately 50 cards had already gone forward; and

10:22:30  10    so, they were not stopped.

11    THE COURT:  But the folks in charge of that

12    facility they understand what their obligation is now, and

13    that whole problem is not going to reoccur?

14    MR. GILLIGAN:  That problem should not reoccur,

10:22:43  15    Your Honor.  We --

16    THE COURT:  Please don't say it like that because

17    it implies that some other problem will.

18    MR. GILLIGAN:  Your Honor, as much as I would

19    love to, I hesitate when we're dealing with electronic

10:22:57  20    systems as complicated as these to provide the Court a

21    110 percent guarantee.  But we have -- we have taken a

22    number of preventive measures such as in the system now it

23    is the system will not allow anybody to put in an

24    authorization for deferred action or employment

10:23:15  25    authorization greater than two years.  It simply cannot be

 1  done.

 2      And at the direction of Director Rodriguez, the agency

 3  has scoured its databases over and over again to see if

 4  there are any other pockets of cards like the 53 that we

 5  don't know about.  At this point in time, we have no

 6  reason to believe that there are any further.

 7          THE COURT:  What I understood from the last

 8  advisory is it's the agency's goal to try to have this

 9  wrapped up by September 18th?

10          MR. GILLIGAN:  Yes, Your Honor.  That's our

11  objective.

12          THE COURT:  Okay.  All right.  Then let's shift

13  gears.  Let's talk about the problem that we started with

14  that we're back on track on now which is the ones that

15  happened that got approved before the injunction.

16          MR. GILLIGAN:  Okay.  May I make a quick

17  clarification before we make that shift in gears, Your

18  Honor?

19          THE COURT:  Go ahead.

20          MR. GILLIGAN:  Concerning the E-Verify system, we

21  stated in our July 31st papers that a result of the

22  updates that are made to our systems, state agencies and

23  employers can accurately verify individuals' two-year

24  terms of deferred action and work authorization in the

25  state and E-Verify systems.  In particular, that appears

1    in Paragraph 5 of the Director's July 31st declaration.

2        In preparing our filing yesterday we determined that

3    the statement is somewhat imprecise so far as E-Verify is

4    concerned.  It's on the money with SAVE; but we provided a

10:24:54   5    clarification in Footnote 2 of the supplemental

6    declaration we submitted yesterday, which explains that

7    when employers submit a query to the E-Verify system it

8    informs the employer whether or not the individual is

9    authorized to work.

10:25:14   10   And then, 90 days prior to the expiration of the

11   individual's authorized term the system then sends a

12   reminder to the employer that the individual's work

13   authorization must be reverified.

14   So in the case of individuals whose terms have been

10:25:30   15   converted from three years to two, the employers, if they

16   obtain work, will receive a reverification notice 90 days

17   before the two-year term expires.

18       THE COURT:  Okay.

19       MR. GILLIGAN:  So Your Honor wished to switch

10:25:47   20   gears and talk about the 108,000 approvals prior to the

21   injunction?

22       THE COURT:  Right.  And I want to talk about the

23   efforts that have been made to reach some resolution on

24   what to do about those, if anything.

10:26:03   25       MR. GILLIGAN:  Well, Your Honor, in terms of the

1    details of the parties' meet-and-confer on that, I would

2    defer to Ms. Ricketts.

3         Our bottom line on that issue is, in light of the

4    statements that plaintiffs have made in the parties' joint

10:26:19    5    status report, that if we are to seriously entertain the

6    notion of converting 100,000 cases from three years to two

7    and further then attempting to retrieve 108,000 employment

8    authorization cards, that that's a matter that needs to be

9    briefed given the magnitude of the undertaking that's

10:26:39    10    being contemplated.

11         But in terms of discussions in the meet-and-confer

12    process, as I said, I would defer to Ms. Ricketts.

13         THE COURT:  Let me ask one other thing; and,

14    Mr. Gilligan, I don't know if you or Ms. Ricketts is the

10:26:53    15    person.

16         I understood from what was filed, the joint filing,

17    that there seems to be -- and again, I'm talking about the

18    post-injunction folks, the 2,500 --

19         MR. GILLIGAN:  Uh-huh.

10:27:07    20         THE COURT:  -- or so individuals, that there is

21    some argument between the parties about whether if the

22    states take any kind of corrective action there has to be

23    some kind of notification or the Federal Government would

24    like notification of any corrective action.

10:27:27    25         Is that your bailiwick or is that Ms. Ricketts'?

1          MR. GILLIGAN:  Again, I defer to Ms. Ricketts on

2    that question.

3          THE COURT:  All right.

4          MR. GILLIGAN:  If you wish to address that issue

10:27:35   5    now, Your Honor, I will allow her to do that.

6          THE COURT:  Thank you, Mr. Gilligan.

7          MS. RICKETTS:  Thank you, Your Honor.

8        From our perspective the issue is -- was part of the

9    negotiation over the protective order; and we had asked,

10:27:48  10    given the sensitive nature of the information that we were

11    providing to the plaintiff states and the fact that the

12    plaintiff states did not want to use the SAVE system to

13    undertake any corrections that they determined they wanted

14    to undertake, SAVE system being the most up-to-date

10:28:04  15    information, that all we wanted was an e-mail that

16    indicated if a state agency was going to undertake a

17    corrective action so that we could try to make sure that

18    the information was as up-to-date as possible and, also,

19    because if it is not or if the individual against whom

10:28:20  20    they took that action believed the DHS information which

21    we had provided to the plaintiff states was inaccurate,

22    they have the right to approach DHS and go through a

23    process to request a corrected record.

24        So we wanted a heads-up, if you will, that that might

10:28:38  25    happen in a particular state.  It was not because we

1   suggested it was a legal requirement as Texas suggests.

2   It was simply a courtesy that we were asking.  We did not

3   insist on it in the protective order because we were

4   trying to complete those negotiations and get the

5   protective order signed as quickly as possible so that we

6   could get the PII information to the plaintiff states.

7   That's why we didn't include it.

8           THE COURT:  What have the states been provided?

9           MS. RICKETTS:  We have provided them for the

10  2,600 post-injunction EADs a state-by-state breakdown for

11  the plaintiff states in all instances and for the

12  re-mailings for all states.

13          THE COURT:  I mean, do they know, like, name and

14  address of the 2,600?

15          MS. RICKETTS:  That's actually the PII

16  information that we will provide to them.  We have agreed

17  to provide the date of birth, the name, address, Social

18  Security number, the EAD number and some specific SAVE

19  information, the static SAVE information, for all of those

20  individuals.

21          THE COURT:  What about for the 108,000?

22          MS. RICKETTS:  We have provided for the 108,000 a

23  state-by-state breakdown for all of them and approximate

24  SAVE queries for driver's licenses from November 2014

25  through July 2017.

1        And, of course, throughout the meet-and-confer process

2    we have provided them with confirmation of where we were

3    in the corrective actions.  So they have everything except

4    for the PII.

10:29:54    5        I believe we have also agreed to provide the same

6    information as for the 2,600 for the most recent 50 or so.

7    We have not yet provided that, but we have agreed to

8    provide that.

9        THE COURT:  Okay.  And is there a problem with

10:30:07   10    providing that same information for the 108,000?  I know

11    it's a lot of work but I mean --

12        MS. RICKETTS:  It would be a significant amount

13    of work, Your Honor, to do that for the 108,000.

14        So to where we left it, as I understand it -- and

10:30:23   15    Ms. Colmenero can speak to this more directly -- is that

16    they had asked for this information which we agreed to

17    provide so they could determine whether they wanted the

18    additional information for the 108.  I don't want to speak

19    for her.

10:30:35   20        THE COURT:  Ms. Colmenero, let's start with the

21    2,500 group.  It looks to me, I mean, like the Government

22    has done its best to try to fix the problem here, which is

23    my term, from the last hearing.

24        Do the states have any problem with that, what they

10:30:56   25    have done with the 2,500?

10:31:11

10:31:26

10:31:40

10:31:55

10:32:13

1    MS. COLMENERO:  With the approximately 2,600

2  corrections or remediation efforts that have taken place

3  and the exchange of the PII, you know, the states

4  appreciate the efforts that the Federal Government has

5  gone through.

6       I think where the states end up with respect to these

7  post-injunction violations -- and we alerted the Court to

8  this in our last response to the defendants' motion to

9  cancel the hearing -- is that we expect full compliance

10  with the injunction.  We don't necessarily expect

11  substantial compliance, which is what we understand that

12  they are endeavoring to take.

13       And so, our concern is with ongoing and future

14  compliance with the Court's injunction.  Because even in

15  the last declarations that have been filed, the way we

16  read them is that there are still ongoing efforts to

17  determine whether or not there are additional

18  post-injunction violations.  And we are now here six

19  months after the Court's February 16th injunction, and

20  we're still talking about complying with the Court's

21  injunction.  And we see that as problematic.

22       So from our -- from our standpoint, we have the

23  concern of compliance with the Court's injunction, which

24  has been a concern for us ever since the initial

25  disclosure of the 108,000 pre-injunction EAD grants that

1    happened in March.

2         THE COURT:  Let me stop you with -- I mean, if I

3    understood what Mr. Gilligan just said, they basically

4    have accounted for or brought into compliance all but 11

10:32:37    5    individuals; and they are working on those 11.

6         And so, while I'm not satisfied with substantial

7    compliance either, they have done a substantial amount of

8    work to bring everybody back into compliance and have

9    given us assurances that the outstanding 11 individuals

10:32:59    10   will be brought back into compliance.

11        I mean, I guess in a way I'm asking you what else can

12   they do?

13        MS. COLMENERO:  With respect to the 2,600 and the

14   remediation efforts as well as the disclosure of the PII

10:33:14    15   to the plaintiff states we believe the issues have been

16   resolved pretty much with the 2,600 post-injunction

17   violations.

18        And I think that our concern is just ongoing

19   compliance going forward and this potential that there may

10:33:32    20   be additional problems that are discovered in the future,

21   which we just feel at this point that there should be --

22   we should be assured of compliance with the injunction and

23   we shouldn't have to -- there shouldn't be these issues

24   coming up where we find 53 additional individuals out of

10:33:46    25   the Nebraska Service Center.

1     And we have reiterated our concerns with compliance

2   many times before, Your Honor; and so we have requested,

3   you know, many options, some of which include a reporting

4   requirement or an external compliance monitor to at least

10:34:03   5   ensure that they are, in fact, complying with the Court's

6   injunction.

7     THE COURT:  Okay.  Here is -- well, shift over

8   and talk to me about the notification issue that you have

9   with Ms. Ricketts as far as corrective action by the

10:34:25   10   states.

11     MS. COLMENERO:  Yes, Your Honor.  Ms. Ricketts is

12   correct.  This issue came up in the negotiations with the

13   agreed protective order regarding the disclosure of the

14   personally identifiable information related to the 2,600

10:34:35   15   individuals.

16     There was the request that a reporting requirement be

17   included in the order.  The plaintiff states objected to

18   that, and we felt that that was an unnecessary oversight

19   due to the fact that the plaintiff states really did

10:34:50   20   nothing wrong here and we're merely trying to determine

21   whether or not we need to undertake any corrective action

22   and whether or not it's worth the cost and effort that,

23   obviously, we will never recover for those efforts.

24     THE COURT:  Does this current proposed order have

10:35:07   25   notification requirements?

1          MS. COLMENERO:  It does not.  And so then the
2   request shifted to could you just send us an e-mail.
3          We feel that any type of notification requirement to
4   the Federal Government is unnecessary here because the
5   protective order itself requires the plaintiff states to
6   use the most up-to-date information to conduct
7   remediations.
8          So if the concern is accuracy, that is accounted for
9   in the order.  And there should also be no issues
10   regarding accuracy given that the personally identifiable
11   information originated from the defendants' own records.
12   And the plaintiff states intend to conduct these accuracy
13   checks using the SAVE databases for those agencies that
14   do, in fact, use them.
15          But in a state as large as Texas, I'm sure Your Honor
16   can imagine, we have numerous state agencies that are
17   here; and the burden placed on the plaintiff states to
18   notify the Federal Government any time it decides to take
19   any action related to the PII is onerous given the state
20   of circumstances as they exist right now because this is
21   really a process the plaintiff states did not anticipate
22   taking in this case.
23          THE COURT:  All right.  Let me resolve this, both
24   of these issues.
25          One, I am not going to -- I don't think the states

1  need to give any kind of notice to the Federal Government

2  of corrective action.

3      And secondly, Mr. Gilligan, I would like a status

4  report on September 25th as to the status of that.  That's

10:36:59  5  a week after your hopeful deadline of the 18th.

6      And then, I would like another status report, which

7  I'm hoping will be very short, on May 25th, 2016.  And by

8  status I'm talking about are we in compliance with the

9  injunction.

10:37:27  10     So I would think by the next six months that would be

11  "We're in compliance.  Nothing has happened that would put

12  us out of compliance."  I mean, it could be a paragraph, I

13  hope.

14     All right.  Now let's shift gears.  As far as I'm

10:37:54  15  concerned, that puts to bed anything post injunction.  I

16  mean --

17          MS. COLMENERO:  We agree, Your Honor.

18          THE COURT:  Ms. Ricketts, is there anything you

19  would --

10:38:01  20         MS. RICKETTS:  (Shaking head side to side.)

21          THE COURT:  Okay.  Let's talk about

22  pre-injunction.  All right.  I understand there were

23  various issues where -- let me ask you, Ms. Colmenero,

24  since you have the podium right now.

10:38:27  25     What do you think the issues are outstanding, setting

1  aside the fact -- well, maybe I should ask this:  Is it

2  the states' position that they should recall all 108,000

3  and replace them, the three-year with a two-year?

4        MS. COLMENERO:  It is, Your Honor.  And I think

10:38:49    5  the way the states see it is that we grouped the 108

6  pre-injunction grants together with the discovery disputes

7  stemming from this Court's April 7th order because those

8  in many ways relate to the misrepresentations that

9  occurred during the preliminary injunction proceeding.

10:39:08    10    And so, the way we look at these 108,000

11  pre-injunction grants is we do view them as a violation of

12  the Court's February 16th injunction.  And we believe that

13  the defendants should go back and unwind these benefits

14  and provide that personally identifiable information to

10:39:27    15  the plaintiff states for the plaintiff states to determine

16  whether or not any corrective action measures are

17  necessary on their end.

18        THE COURT:  Short of redoing all 108,000, what

19  other issues do the states have with the Federal

10:39:42    20  Government that need to be resolved?

21        MS. COLMENERO:  There are the discovery disputes

22  from -- stemming from the Court's April 7th order which

23  related to the assertions of privilege on the information

24  that Your Honor had requested in its order.

10:39:58    25    And so, if I can kind of propose a solution to the

1    Court from the plaintiffs' perspective that could kind of

2    wrap this issue up.  The plaintiff states would -- if the

3    defendants would agree to take similar remediation efforts

4    as they did for the 2,600 individuals and these

10:40:17   5    remediation efforts would apply to the 108,000 individuals

6    who got the pre-injunction EADs, the plaintiff states

7    would be content for this Court to not rule on the

8    privilege ascertain disputes and the additional discovery

9    that the plaintiff states have sought in response to the

10:40:36   10   Court's April 7th order.

11       And the reason being is that in our mind a remediation

12   of these 108,000 individuals would serve as a remedy for

13   the misrepresentations that were the subject of the

14   Court's order.

10:40:49   15       THE COURT:  And by remediation, I mean, what

16   steps do you -- are you -- do you think they ought to

17   take?

18       MS. COLMENERO:  We understand that they took some

19   swift action with respect to the 2,600 post-injunction

10:41:04   20   individuals but we now know that there is a process in

21   place that can happen and there is a remediation effort

22   that can occur and we think that there should be a similar

23   remediation effort that occurs with the 108 but we

24   wouldn't -- I mean, obviously, we can work on the timeline

10:41:21   25   issue with them.

1      We understand they were responding quickly to Your

2  Honor's July 7th order.  So they took extraordinary steps

3  in order to fix those issues.  But every day that those

4  three-year EADs remain on their databases there are

10:41:38  5  individuals who are seeking benefits from the plaintiff

6  states.  There is an outward representation that

7  three-year terms are, in fact, authorized on what is now

8  an enjoined directive.

9      THE COURT:  Okay.  Let me play devil's advocate

10:41:54  10  with you and I say, okay, Ms. Colmenero, setting aside the

11  fact that we may have mislead the states as to what was

12  going on between November 20th and February 16th -- and,

13  you know, I'm not making an argument you haven't heard

14  before, I'm sure -- we didn't violate the injunction

10:42:21  15  because there was no injunction.  How can we violate an

16  injunction that doesn't exist?

17      MS. COLMENERO:  And our response is -- and we

18  have identified this in the joint status report filed by

19  both parties.  But the way we read the Court's February

10:42:36  20  16th injunction is it has enjoined the defendants from

21  implementing any and all aspects of the expanded DACA

22  program.

23      And so, in the six months since the injunction was

24  issued the defendants have continued to maintain databases

10:42:49  25  and records reflecting the granting of three-year terms of

1   deferred action under a now enjoined directive.

2       And while these three-year terms were issued prior to

3   the Court's February 16th injunction, the continued

4   maintenance of these three-year authorizations and the

10:43:05   5   databases and records which are used by state agencies to

6   query the Federal Government for information related to an

7   individual's immigration status is, in fact, contrary to

8   the February 16th injunction provision barring

9   implementation in any and all aspects.

10:43:21   10       And so, we do believe the defendants lack the

11   authority to continue to represent on an ongoing basis

12   that three-year terms are authorized.

13       THE COURT:  You don't think that perhaps runs

14   afoul of some kind of retroactivity, retroactive

10:43:36   15   application of an injunction?

16       MS. COLMENERO:  We don't believe so, Your Honor,

17   because just as they are taking these extraordinary

18   efforts to call back these 11 EAD cards that exist with

19   these individuals there is still an outward representation

10:43:50   20   that exists by the 108,000 also having these EAD cards and

21   using them for future benefits for -- which would allow

22   them to get benefits on a three-year term if we were

23   talking about driver's licenses in the plaintiff states.

24       THE COURT:  Well, I understand that.  But, I

10:44:05   25   mean, I guess it's no secret what I'm asking you.  I'm

1   troubled by the fact that you don't -- help me with the

2   legal distinction.  I think there is a legal distinction

3   of violating an order that is in effect with perhaps

4   violating the spirit of what was represented to somebody

10:44:30   5   but the order wasn't in effect.

6      I mean, doesn't the fact that the order was signed

7   change a lot of things?

8        MS. COLMENERO:  I see your point, Your Honor; and

9   I think those are kind of two distinct arguments in our

10:44:44   10   mind.  You know, I think you can look at the 108 and

11   really tie those to the -- what the parties understood

12   what is happening during the pendency of the preliminary

13   injunction and tie those to the misrepresentations that

14   occurred.

10:44:58   15     I do think that the proposal that we propose to the

16   Court would, in fact, address that harm because I think

17   the whole reason we got to these discovery disputes, we

18   got to the Court's April 7th order, was because of the

19   misrepresentation.

10:45:10   20     And if they had corrected to what we believe was a

21   status quo at the time that the preliminary injunction was

22   ongoing and those proceedings were happening, I don't

23   think we ever would have reached to the point of the

24   misrepresentations as well as these discovery disputes

10:45:26   25   that arose from the Court's April 7th order.

1          THE COURT:  So what you are suggesting is I could

2     do that not as a violation -- I mean, the power of the

3     Court is not to protect its own injunction order.  It's

4     almost as a sanction for misrepresenting the facts to the

10:45:45    5     Court.

6          MS. COLMENERO:  I don't want to call it a

7     sanction.  I think what we proposed in our initial filings

8     with the Court back in March was we wanted to seek early

9     discovery to determine what potential remedies that we may

10:45:58   10     want to propose to the Court.  We have kind of reached

11     this point where there are these discovery disputes, but I

12     think the reason we have these disputes between us related

13     to the 108 is all based on this idea that there is a

14     status quo that was being maintained that wasn't being

10:46:14   15     maintained.

16          But if we could -- if we reverted back to the status

17     quo, which is the 108 are remediated, plaintiff states

18     provided with the PII related to those 108, then I do

19     believe that that resolves the plaintiff states disputes

10:46:30   20     that were part of our initial motion for early discovery

21     that we filed with the Court back in March.

22          THE COURT:  Ms. Ricketts, do you want to weigh in

23     to this?

24          MS. RICKETTS:  Your Honor, this is an area that

10:46:43   25     actually is both Mr. Gilligan's and mine.  So I'll take a

 1    first crack at it.

 2        My understanding of the point of the meet and confer

 3    was that the Government -- we could provide to the states

 4    information so that they could determine what harm they

 5    suffered and whether they wanted to request remediation.

 6    I do appreciate they have now requested remediation.

 7        But if that is the case, if they are asking as either

 8    a violation of the injunction or in any other way to undo

 9    the 108, we certainly would ask for the opportunity to

10    brief that so that they could demonstrate the harm that

11    they have suffered and we could have an opportunity to

12    brief what, if any, remedy might be appropriate in this

13    instance.

14        That was our understanding of the point of the meet

15    and confer.  So I do not understand that we have any

16    dispute regarding requested information.  The only dispute

17    remaining seems to be what action, further action then we

18    should be taking.  We have provided them all the

19    information that they have requested to date.

20        THE COURT:  Ms. Colmenero, will you -- both of

21    you all just stay there.

22        MS. COLMENERO:  Thank you.  We had understood --

23    and maybe this was just a misunderstanding during our very

24    hurried meet and confers -- that with respect to the 108,

25    yes, they did provide us with some information in terms of

1  potential impact on the states, which was the

2  state-by-state breakdown, as well as a driver's license

3  SAVE query number.  But in our mind that was not --

4          THE COURT:  Tell me what you mean by a driver's

10:48:24  5  license SAVE query number.

6          MS. COLMENERO:  These would have been the number

7  of queries done through the Federal Government SAVE

8  databases from Texas driver's licenses facilities.

9          THE COURT:  Okay.  But how does that -- how is

10:48:36  10  that helpful?

11          MS. COLMENERO:  It doesn't really tell us a whole

12  lot other than there were individuals who came to Texas

13  driver's license facilities who fell within the 108,000

14  category of individuals who potentially got driver's

10:48:51  15  licenses from the state for three-year terms.

16      So it does give us some indication in terms of the

17  impact on the plaintiff states but doesn't necessarily

18  provide a road map in terms of the processes the states

19  would put in place to undergo any kind of corrective

10:49:09  20  action because we don't have personally identifiable

21  information for any particular individual within the class

22  of the 108,000.

23          MS. RICKETTS:  And if I might, Your Honor, our

24  understanding was that we provided all of that specific

10:49:21  25  information for the 2,600 so the states could, in fact,

1    make that determination on a smaller scale.  They have the

2    numbers on a larger scale for the 108.

3         And the value, from our perspective of the SAVE

4    queries for the driver's licenses, is presumably states

10:49:38    5    would only be taking corrective action for licenses or

6    benefits that had a validity period for more than two

7    years.  And it is tough to find a license or a benefit

8    that has a validity period for longer than two years other

9    than driver's licenses and, perhaps, bar licenses.

10:49:56   10         And so the driver's license SAVE query information

11   seemed the most relevant for the states to make that

12   determination.

13         THE COURT:  Well, how does that help them?  I

14   mean, what do they do with that?

10:50:02   15         MS. RICKETTS:  What they would do is determine

16   whether they think they have suffered harm.  They would

17   have the number -- not necessarily the number of driver's

18   licenses that have been provided, it's true; but it would

19   be a ballpark number of the queries that were made by the

10:50:17   20   state agency for the purposes of determining whether to

21   provide a driver's license number.

22         THE COURT:  And so they would use the cost of the

23   inquiry as a damage figure?

24         MS. RICKETTS:  I don't know, Your Honor,

10:50:32   25   honestly.

1          THE COURT:  That's why I'm trying to figure out

2    why that helps them.

3          MS. COLMENERO:  We don't find it particularly

4    helpful.  Having the personal identifiable information

10:50:41    5    which they are going to provide to us as part of the 2,600

6    is, in fact, the most accurate kind of information for us

7    to develop processes and protocols.

8          Because I'll tell Your Honor this has never happened

9    before in Texas where we have to go back and unfix these

10:50:56    10   types of licenses and undergo this type of remediation

11   effort.  So we actually need to ensure that we have the

12   most accurate information possible in order to ensure that

13   we have the appropriate individual who is being queried

14   within our own system.

10:51:12    15         MS. RICKETTS:  And again, we're at the beginning

16   stage of that because we have not yet provided to Texas

17   the personally identifiable information for the 2,600.

18   Some of this might be then speculative.

19         I have no sense of what is most valuable from Texas'

10:51:26    20   perspective, I will readily admit.  We have been trying to

21   provide the information they have requested, and I believe

22   we have provided the information they have requested.

23         But we had understood this would be a staged process

24   that they would receive the significant and very sensitive

10:51:41    25   information for the 2,600 to make a determination as to

1    what next steps they would propose.  We had anticipated

2    that would be through briefing, but they would have all of

3    the information then to make an argument to Your Honor as

4    to what next steps should be taken and why, what harm they

10:51:56   5    have suffered and how it would be remedied -- how it would

6    be appropriately remedied from their perspective and we

7    would have that opportunity to respond.

8              MS. COLMENERO:  And, Your Honor, if I may, I

9    think from our perspective we're proposing a solution such

10:52:12   10   that we can end this dispute not only related to the

11   discovery issues that are still outstanding but also the

12   -- any type of remedy that might be available for the

13   108,000.

14             THE COURT:  Ms. Colmenero, let me ask you this:

10:52:27   15   Let's assume I order the Federal Government to do that.

16   They are going to provide you with the names, addresses or

17   whatever; and they send them to you.  I mean, what is the

18   next step?  What happens then?

19             MS. COLMENERO:  We need to look at the personally

10:52:40   20   identifiable information, talk to the appropriate state

21   agencies, develop protocols, processes to determine what

22   type of remediation we need to undertake; and I think

23   similar to the remediation efforts that the Federal

24   Government has undergone in terms of exchanging cards for

10:52:58   25   driver's licenses, for example, we would probably have to

1    go through similar efforts ourselves.

2           THE COURT:  So, hypothetically, the State of

3    Texas would -- when it issued -- well, maybe I need to

4    understand the process better when, let's say, one of the

10:53:20   5    DACA folks with a two-year work authorization comes in and

6    wants a driver's license and Texas gives them a driver's

7    license with a two-year expiration date.

8           MS. COLMENERO:  Uh-huh.

9           THE COURT:  Is that a yes?

10:53:36   10           MS. COLMENERO:  Well, it would depend upon

11   whether or not that individual fell within the 2,600 post

12   injunction.

13           THE COURT:  No.  No.  No.  I'm talking about not

14   any.  Not the 108,000.  Not the --

10:53:47   15           MS. COLMENERO:  Okay.

16           THE COURT:  I'm talking about, let's say, in

17   2013, before this ever came up.

18           MS. COLMENERO:  Okay.  That individual comes to a

19   Texas driver's license facility.  They present a form of

10:53:58   20   identification that shows that they are lawfully present

21   in the U.S.  We take that form of identification.  We

22   query the Federal Government's SAVE database to ensure

23   that they are, in fact, here lawfully present for the

24   amount of time that sets forth on that document.

10:54:15   25           THE COURT:  And then you give them a license for

1  how long?

2          MS. COLMENERO:  For two years.

3          THE COURT:  Okay.

4          MS. COLMENERO:  The amount of time they are here

10:54:21  5  lawfully present.

6          THE COURT:  All right.  Now, if they have a

7  three-year authorization do they get a license for three

8  years?

9          MS. COLMENERO:  If they are queried through the

10:54:30  10  SAVE database and confirmed that they are, in fact, here

11  for three years, we would issue a temporary license for

12  three years.

13          THE COURT:  All right.  And so what you are

14  saying is if, say, out of this 108,000, 15,000 are in

10:54:42  15  Texas, Texas would then go through all 15,000 people and

16  say, okay, instead of a two-year license -- I mean, a

17  three-year license, here is a two-year license, send us

18  back your three-year license?

19          MS. COLMENERO:  We would correct our records

10:55:00  20  internally and determine how best to go about exchanging

21  the actual cards that have been issued to those

22  individuals.

23          MS. RICKETTS:  One thing I would note, Your

24  Honor, if I might.  For the SAVE queries I would just note

10:55:18  25  that the query information we provided for the 108 is

1    likely an overestimate of those who might have received a

2    driver's license; and certainly not all of those who

3    received the three-year EADs had SAVE queries in Texas or,

4    frankly, in any state.  So it is a smaller number than

10:55:35    5    those who received the three-year EADs, and it is a

6    smaller number still from the SAVE query numbers because

7    some of those queries were multiple queries.

8          If I could channel Mr. Schwei who couldn't be here

9    today because of a family emergency, I could perhaps

10:55:51   10    explain to you why that is.  I can't right at this moment.

11    But it is an overestimate.

12          THE COURT:  Don't channel Mr. Schwei.  Please

13    don't do that.

14          All right.  Here is where I am.  I am soliciting help

10:56:05   15    from both sides.  I know, Ms. Colmenero, you have

16    basically said here is one solution.

17          The way I look at it is I can open this up to

18    discovery, which is how this first came up, which was a

19    request to do discovery.

10:56:26   20          And what I'm trying to figure out is why I would do

21    that.  And I don't mean justification why.  I mean what

22    does it eventually accomplish?  I mean, it's either -- I

23    have tried to play out the scenario in my head.

24          We're either going to go through the discovery

10:57:00   25    process, the states are going to -- and, really, the

1   discovery process that I anticipated may be different,

2   Ms. Colmenero, than what you are talking about because I

3   was concerned, quite frankly, about the misrepresentations

4   made to the Court.  And it sounds like the states are more

10:57:24   5   concerned, and maybe rightfully so, with the 108,000 and

6   who they are and where they are.  And I can see that, but

7   I am not sure where that gets us.  I mean, that's one

8   scenario though.

9       The second scenario is I just do nothing.

10:57:54   10       And the third scenario is, you know, I say all right

11   I'm just going to decide this as a sanctions motion and

12   decide whether or not sanctions are appropriate given the

13   representations that were made before the Court that were

14   not accurate.

10:58:25   15       And if so, then I have got to come up with an

16   appropriate remedy.  And, I mean, I hear you say your

17   remedy is for me to order the Government to redo all

18   108,000 of them.  I'm not sure I necessarily buy into that

19   but I mean -- Ms. Ricketts, I mean, assuming

10:58:52   20   hypothetically the Court was inclined to issue some kind

21   of sanctions, what would be an appropriate sanction?

22       MS. RICKETTS:  I was actually voting for Door

23   No. 2, Your Honor.

24       THE COURT:  The do nothing door?

10:59:05   25       MS. RICKETTS:  The do nothing door.

1          THE COURT:  The door where Carol Merrill is

2     standing.

3          MS. RICKETTS:  I would be happy to be there.

4     That would be my generation, as well.

10:59:14   5          Your Honor, obviously, we don't believe that a

6     sanction like that is appropriate; but we would want the

7     opportunity to brief that.  Again, our understanding is

8     that the states would need to demonstrate the harm that

9     they have suffered.  It was why we provided voluntarily so

10:59:28  10    much sensitive information to them.  We believe that is

11    the information they asked for, and we assumed it was --

12    at least I had understood it was for that very purpose to

13    determine what harm they had suffered and what remedy they

14    thought was appropriate.  We would like the opportunity to

10:59:43  15    brief that before the Court would order any particular

16    sanction or remedy.

17         Also, if you don't mind, Your Honor -- I am stepping

18    on Mr. Gilligan's toes in this topic.  If you don't mind

19    if I check with him if there is anything else he has to

10:59:59  20    add?

21         THE COURT:  Well, if he has got a fifth solution

22    or a fourth solution, I am willing to listen.

23         MS. RICKETTS:  I think he will vote for Door

24    No. 2, as well.

11:00:06  25         MR. GILLIGAN:  Your Honor, I think I have been

1   given a hint to select Door No. 2, as well; but I would

2   just say, Your Honor, regarding the question of a sanction

3   for miscommunications that we had earlier with the Court

4   regarding the implementation of the three-year grants of

11:00:23   5   deferred action under the 2012 guidelines, again, we

6   apologize for those miscommunications.  We regret them.

7   They were inadvertent and unintended for all the reasons

8   we have explained in our prior filings.

9          THE COURT:  I know, but they were repeated on at

11:00:42   10   least three different occasions.

11          MR. GILLIGAN:  Yes, Your Honor.  But consider

12   what happened when we first learned of the 108,000 cases

13   as is reflected in the public documents, the privilege log

14   and the metadata chart.  We responded immediately to

11:01:09   15   provide the Court that information.

16       The filing, the March 3rd advisory, was drafted,

17   reviewed and filed in just about 24 hours.  There was no

18   delay in bringing that to the Court's attention.  And I

19   think the urgency with which we got that document on file

11:01:23   20   also reflects the fact that we weren't trying to hide

21   anything from the Court in the first place.

22       There are, of course, other circumstances which we

23   have discussed in our prior filings which go to show that

24   the issue of the ongoing grants was simply something that

11:01:39   25   didn't cross our minds when people were focused on the

1  harm that the states had asserted during the preliminary

2  injunction proceedings, which was the harm from additional

3  categories of individuals becoming eligible for deferred

4  action and, therefore, state benefits, not people who were

5  already eligible under the 2012 guidelines.

6       But ultimately I think -- while I can respond to a

7  number of the points the state has made, our position is

8  that any question of remediation as some sort of a

9  sanction, particularly retrieving 108,000 cards, is

10  something that needs to be briefed; and it would need to

11  be predicated, Your Honor, with some sort of demonstration

12  of harm by the plaintiff states.

13       Equity is proportional, Your Honor.  It's not

14  punitive.  It does not require that a party make

15  tremendous efforts that -- be required to make tremendous

16  expenditures of time and effort and public resources

17  because of an innocent mistake, at least where there has

18  been no showing of appreciable harm to another party or

19  that there would be any benefit that would accrue from the

20  effort that's being made.

21       We also -- we, of course, agree with the view that

22  there is a difference between something that occurred

23  after the injunction and something that occurred and was

24  completed beforehand.  We are talking here about cases

25  where the adjudication was made and all the databases were

1  updated and the cards were issued prior to the Court's

2  injunction.

3        And there is a difference here, and we would want to

4  elaborate upon this in further briefing.  There is a

11:03:34  5  difference between a continuing violation of an injunction

6  and the continuing effects of past acts that occurred

7  beforehand.

8              THE COURT:  How do we know there is 108,000?

9              MR. GILLIGAN:  I believe that that -- that is an

11:03:50  10  issue I haven't looked at closely in a while, Your Honor,

11  because we have moved on to other things.  It is based on

12  queries of the agency's principle database of these kinds

13  of records, the CLAIMS 3 system.

14              MS. COLMENERO:  And if I may, Your Honor, just

11:04:07  15  interject here.  I think from the plaintiff states

16  perspective the Inspector General's report that was filed

17  with this Court earlier this week at least in our opinion

18  suggests that it's hard to know whether or not there is

19  actually 108,000 that occurred before the injunction

11:04:26  20  happened.

21        The Inspector General's report states that the data

22  was unreliable that USCIS used; and based on the

23  information it reviewed, even the Inspector General cannot

24  say with confidence the exact number of three-year EADs

11:04:40  25  issued after the injunction.

1    So, you know, we talk about the 108,000 pre-injunction

2    grants; but I think there is even a question as to if

3    that's truly an accurate number.

4        MR. GILLIGAN:  Your Honor, I have just been

11:04:52   5    advised that as part of the agency's own ongoing,

6    self-monitoring, self-evaluation that the Office of

7    Performance and Quality has verified that the 108,000

8    number is correct.

9        Regarding the Inspector General's report, which the

11:05:11  10    principle conclusion of which was that the initial 2,100

11    that we were talking about earlier, post-injunction

12    three-year EADs, were issued inadvertently and not

13    intentionally, what the Inspector General had to say about

14    the reliability of the data we don't want to -- you know,

11:05:36  15    we don't want to take issue with the Inspector General.

16    But they stated that the data was unreliable because they

17    couldn't confirm the numbers they had been provided by the

18    agency, but they didn't explain what the basis was of

19    that.

11:05:49  20        So we're uncertain why they considered the data

21    unreliable.  They refer to the fact that we were finding

22    additional groups of cards that had been re-mailed or

23    issued after the injunction.  But that's not, in our

24    minds, an indication of unreliability.  That's simply a

11:06:07  25    reflection of the fact that when you ask the system

1    different questions it gives you different answers.

2         The 2,100 were the result of a query about EADs that

3    had been produced after the injunction; and when the

4    Office of Performance and Quality was at the Director's

5    instruction conducting an audit of that number to make

6    sure we had found them all, they asked a different query

7    were there any re-mailed after the injunction.  And that

8    different question then revealed a different answer.

9         So to us it's not a data quality issue.  It's a

10   question of understanding the complexities of the systems

11   that the agency has.

12        But to bring it back to the question of remediation,

13   what the plaintiffs are asking here is that DHS be

14   required to take what we did in order to get the 2,500 or

15   2,600 cases taken care of and those cards returned and to

16   scale that effort up by a factor of 40 times, from 2,600

17   to 108,000.  That's a tremendous undertaking.

18        And yet to date there has been no demonstration of

19   harm by the states.  Perhaps, you know, the PII will have

20   something to do with that.  But as it stands it seems to

21   us that if we're going to do an equitable balancing here

22   of what burden is on one party or the other there is no

23   basis, no showing at this time that could justify the kind

24   of remedial efforts the states are suggesting.

25        And if it's going to be entertained, it's something

1    that we feel that the legal issues should be briefed and

2    the factual issues there should be a record made on those.

3          THE COURT:  Do you have a response,

4    Ms. Colmenero?

11:08:09    5          MS. COLMENERO:  Very briefly, Your Honor.  I

6    think we would not opt for Door No. 2 but opt for a

7    combination of perhaps Door No. 1 or Door No. 3, which is

8    -- you are correct, Your Honor.

9          We were -- we are concerned about the

11:08:21   10    misrepresentations that were made during the pendency of

11    the preliminary injunction proceeding.  We understood that

12    the status quo was going to remain the same; and it did,

13    in fact, change.

14          And we have previously argued to this Court that the

11:08:34   15    states have been irreparably harmed by the change in the

16    status quo; and I think that's evident by these

17    post-injunction violations given the fact that now the

18    state has, you know, its own remediation efforts that they

19    need to consider taking that are going to require time and

11:08:52   20    expense that are unrecoverable.

21          So there is direct harm to the plaintiff states by the

22    issuance of the three-year EADs, especially with a

23    directive that is now enjoined.

24          And so, we propose a solution which is, essentially, a

11:09:06   25    return of the status quo, which is what we anticipated had

1    always been occurring during the pendency of the

2    preliminary injunction.  And I think if there was a return

3    to such a status quo through a remediation by the

4    defendants I think that would resolve these outstanding

11:09:21  5    discovery disputes that were related to the

6    misrepresentations.

7         THE COURT:  Say that last sentence again.

8         MS. COLMENERO:  I said I think if there was -- if

9    the defendants undertook similar remediation efforts as to

11:09:32  10    the 108 it would essentially be a return to the status

11    quo, which means no more three-year EADs exist out there,

12    which would resolve the discovery disputes at least from

13    the plaintiff states perspective that relate to the

14    misrepresentations that occurred.

11:09:47  15         THE COURT:  Let me ask you this -- and I know we

16    have states on one side and we have the Federal Government

17    on this side.  But in the middle of all this is 108,000

18    individuals.  I mean, should I take their well-being into

19    account?

11:10:11  20         MS. COLMENERO:  You could --

21         THE COURT:  I mean, they didn't do anything

22    wrong.

23         MS. COLMENERO:  I agree.

24         THE COURT:  Other than perhaps being in the

11:10:20  25    country illegally.  But, I mean, as far as they are

1  concerned they applied just like they were told to apply;

2  and they got a three-year extension.  And, oh, boy, I

3  don't have to reapply for three years instead of two

4  years.

5       MS. COLMENERO:  I agree, Your Honor, that they

6  are kind of the victim of kind of what's happened with

7  respect to this change in the status quo that happened

8  during the pendency of the preliminary injunction

9  proceedings.

10      However, from the plaintiff states perspective we want

11  to ensure that our records are, in fact, correct and that

12  we issue licenses for individuals who are, you know, here

13  to be -- who are lawfully here in the United States.

14      And we do believe that by maintaining these three-year

15  terms on a now enjoined directive that when those

16  individuals come to the plaintiff states and seek a term

17  driver's license, for example, that we're now issuing

18  licenses on a now enjoined directive for that period of

19  time.

20      And so, we believe that if those records were

21  corrected, which is what we would want, that that from our

22  perspective is the best-case scenario.

23       MR. GILLIGAN:  Your Honor, I do believe your

24  question hits on the question of the public interests in

25  all this.  And certainly we would agree that the 108,000

11:10:35
11:10:48
11:11:07
11:11:20
11:11:37

1    individuals who at least in respect to these matters have

2    done nothing wrong should be taken into account as well as

3    the public interests.  We are talking about public

4    resources on both sides of the equation here and I --

11:11:56    5    THE COURT:  Well, I think that would -- I mean,

6    we have taxpayers of 26 states over here; and we have

7    taxpayers of all 50 states over here.  And that's one of

8    the reasons I'm trying to resolve this and bring this

9    portion of this litigation to an end.

11:12:14    10    MR. GILLIGAN:  Indeed, Your Honor.  You know, the

11    states -- you know, we hear the states speak in abstract

12    terms about the efforts required to convert driver's

13    licenses from three years to two years and so forth and

14    there are remedial efforts but we -- there is no record as

11:12:33    15    yet on the extent to which any such efforts are necessary

16    among this group of 108,000 and whether any benefits to

17    the states that would accrue from the Federal Government

18    going to the time and effort and expense of retrieving

19    these cards would justify the tremendous effort that would

11:12:54    20    be required to do that, again, on a scale of 40 times what

21    we have already done with respect to the 2,600.

22    THE COURT:  Is there some record somewhere

23    located in some computer that has a list of all 108,000 or

24    can be programmed to provide a list of all 108,000?

11:13:25    25    (Sotto voce discussion between defense counsel.)

1          MR. GILLIGAN:  I'm advised by knowledgeable

2     co-counsel that we have information, yes, to that effect,

3     Your Honor.

4          THE COURT:  All right.  Anything either side

11:13:42    5     wants to add?

6          MS. COLMENERO:  Not right now, Your Honor.

7          THE COURT:  All right.  Here is what I want, and

8     I'm not ordering you to do this.  I'm -- if you want to do

9     this.

11:14:13    10         Assuming, hypothetically, the Court finds that facts

11     were misrepresented to it, I want to know what sanctions

12     you think I can order.

13         And secondarily, again, hypothetically, if the Court

14     were to conclude that sanctions were appropriate of some

11:14:47    15     kind for the misrepresentations made to the Court, what

16     should those sanctions be?

17         And if you will have those on file by the 4th of

18     September.

19         Let me say right off the bat so that there is no need

11:15:13    20     for flowery, assuming arguendo language that I understand

21     that the defendants opt for Door No. 2 and that it's their

22     position that there should be no sanctions.  And I

23     understand that.  So I am -- nothing you say is going to

24     be an admission in any way that sanctions are appropriate.

11:15:42    25         I'm assuming -- I'm trying to make things easy for

1   you.  If you choose to file something, you don't have to

2   put a bunch of flowery language saying we don't think

3   there ought to be sanctions because I know that's your

4   position.

11:15:57  5        And this doesn't have to be an encyclopedia.  I mean,

6   it can be short and sweet and to the point.

7        And after that, I will decide what to do.  But I have

8   made it clear, I think, it's my intention to resolve this

9   matter so that one way or the other, however the appellate

11:16:28  10  courts rule, that it's not lingering.

11       I will sign the protective order today.  Regardless of

12  the -- how I rule on this other issue, Mr. Gilligan, I

13  still am -- the issue of a certification of where we are

14  as of September 18th and as of next May 18th, that's

11:16:59  15  remaining in place.  All right?

16            MR. GILLIGAN:  Understood, Your Honor.  We're

17  happy to do that.

18            THE COURT:  Okay.  Let me just say one other

19  thing with regard to any kind of future motions.  I

11:17:17  20  understand the time pressures that everybody is under

21  sometimes.  I don't find it good advocacy to arbitrarily

22  put deadlines on a Court.  In fact, I have never heard of

23  it.  I have never seen it before this case.  It's now

24  happened twice in this case.

11:17:47  25       I don't think there is a Court -- there may be, but I

1    know there isn't in Texas -- that has as heavy a docket as

2    mine.  And so I rule on things as promptly as I can.  And

3    I don't think I have left any stones unturned in this

4    case.

5        I mean, even the opinion I wrote on the injunction,

6    you know, I was given a February 18th deadline; and I had

7    it out by February 16th.

8        Now, fortunately for me and for this community, Judge

9    Olvera is riding to my rescue.  His investiture will be

10   next week.  And so I'll get some help.  But I promise both

11   sides that I will try to rule on things as promptly as

12   possible.

13       I will readily admit this issue I find troubling both

14   in terms of -- well, I have already stated my concerns on

15   this; and I stated at the last hearing how I don't

16   necessarily take any joy in considering any kind of

17   sanctions against attorneys who are in the heat of battle

18   representing their clients.

19       But get whatever you want to on file by September 4th,

20   and I plan to dispose of this issue so that once the Fifth

21   Circuit rules we either can proceed on the merits or

22   everything will be over one way or the other and whichever

23   side wins or loses can go talk to the Supreme Court.

24       All right.  Thank you all.

25       (Proceedings concluded at 11:19.)

1  Date:  August 21, 2015

2                **COURT REPORTER'S CERTIFICATE**

3

4      I, Laura Wells, certify that the foregoing is a

5  correct transcript from the record of proceedings in the

6  above-entitled matter.

7

8                           /s/ Laura Wells
                    _____

9                    Laura Wells, CRR, RMR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25