**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | No. 1:14-CV-254 |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA, *et al.* ) | |
| ) | |
| Defendants. ) | |

**<u>DEFENDANT'S MEMORANDUM FOLLOWING</u>**
**<u>THE HEARING OF AUGUST 19, 2015</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ......................................................................................................... 1

DISCUSSION ................................................................................................................ 1

I.      There Is No Legal Basis to Impose Any Punitive Sanction. ............................... 1

        A.      The Record Does Not Support a Conclusion of Bad Faith. .................................... 2

        B.      Punitive Sanctions Are Procedurally Unavailable and Also Unnecessary. ............. 4

II.     There Is No Basis for Plaintiffs' Requested Equitable Order. ........................... 5

        A.      Any Action to the Detriment of the Approximately 108,000 Individuals
                Would Be Contrary to the Public Interest. ............................................................. 7

        B.      Plaintiffs Have Not Demonstrated Any Harm Caused by the Government's
                Unintentional Miscommunication with the Court or the Three-Year Terms
                Themselves. ............................................................................................................. 8

        C.      The Balance of the Equities Weighs Squarely Against an Equitable Order. ......... 12

III.    No Other Steps Are Necessary or Warranted. .................................................... 13

CONCLUSION ............................................................................................................ 14

## TABLE OF AUTHORITIES

**Federal Cases**

*Avmed, Inc. v. BrownGreer, PLC,*
    300 F. App'x 261 (5th Cir. 2008) ............................................................ 7

*Canal Auth. of State of Fla. v. Callaway,*
    489 F.2d 567 (5th Cir. 1974) ......................................................... 6, 8, 10

*Capitol Radiology, LLC v. Sandy Spring Bank,*
    2010 WL 2595781 (D. Md. June 24, 2010) ........................................ 4, 5

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991) ..................................................................................... 4

*Chaves v. M/V Medina Star,*
    47 F.3d 153 (5th Cir. 1995) ...................................................................... 2

*City of Alexandria v. Cleco Corp.,*
    547 F. App'x 568 (5th Cir. 2013) ............................................................ 2

*Crowe v. Smith,*
    151 F.3d 217 (5th Cir. 1998) .................................................................... 2

*In re Moore,*
    739 F.3d 724 (5th Cir. 2014) .................................................................... 2

*Maguire Oil Co. v. City of Houston,*
    143 F.3d 205 (5th Cir. 1998) .................................................................... 2

*Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.,*
    2 F.3d 1397 (5th Cir. 1993) ...................................................................... 4

*Richland Park Homeowners Ass'n, Inc. v. Pierce,*

    671 F.2d 935 (5th Cir. 1982) ................................................................ 8

*Roadway Exp., Inc. v. Piper,*

    447 U.S. 752 (1980) ........................................................................... 2

*Star Satellite, Inc. v. Biloxi,*

    779 F.2d 1074 (5th Cir. 1986) ............................................................. 7

*Winter v. Natural Res. Def. Council, Inc.,*

    555 U.S. 7 (2008) ..........................................................................6, 11

*Yakus v. United States,*

    321 U.S. 414 (1944) ......................................................................... 12

**Federal Rules**

Fed. R. Civ. P. 11(b)(3) ...................................................................... 3

Fed. R. Civ. P. 11(c)(2) ...................................................................... 5

Fed. R. Civ. P. 11(c)(3) ...................................................................... 5

**Other Authorities**

Wright & Miller, Federal Practice and Procedure § 2948.1 (3d ed.). .......................................... 10

Wright & Miller, Federal Practice and Procedure § 2948.4 (3d ed.) ............................................ 8

## INTRODUCTION

At the hearing on August 19, 2015, the Court permitted the parties to file memoranda discussing two issues: (1) assuming the Court finds that facts were misrepresented, what sanctions could be ordered; and (2) assuming the Court concludes that sanctions are appropriate, what should those sanctions be. *See* Aug. 19 Tr. at 47.

As the Court recognized at the hearing, Defendants' position is that the Court lacks both authority and cause to impose any punitive sanction here. *Id.*; *see* Section I, *infra*. To the extent the Plaintiffs suggest that the Court should exercise any equitable authority it possesses to enter some sort of relief as to the three-year (instead of two-year) terms of deferred action and work authorization that issued before the preliminary injunction—which the Government regrettably, though inadvertently, did not mention during communications with the Court—Plaintiffs have not established the necessary elements to justify any type of additional equitable relief. *See* Section II, *infra*. The Government respectfully submits that no further steps are needed to resolve this matter given the Government's good faith, its sincere expressions of regret, and the care and promptness with which the Government has kept the Court updated and informed, through the filing of Advisories, any time an issue comes to the Government's attention that may be of concern to the Court. *See* Section III, *infra*; ECF Nos. 176, 247, 256, 282, 283, 287-4.

## DISCUSSION

### I.    There Is No Legal Basis to Impose Any Punitive Sanction.

On August 19, the Court instructed the parties to assume a finding of misrepresentation. *See* Aug. 19 Tr. at 47-48. But a misrepresentation alone is insufficient for the Court to exercise its inherent sanctions authority; under Fifth Circuit law, sanctions cannot issue absent clear and convincing evidence of bad faith. Here, the record does not remotely support, let alone contain clear and convincing evidence supporting, a conclusion that the Government acted in bad faith.

Punitive sanctions, moreover, would be unavailable in any event.  As a prerequisite to imposing any punitive sanctions, a court must first provide necessary procedural safeguards, such as proper notice and an opportunity to respond to the specific sanctions being contemplated, which have not been provided here.  In addition, even if a factual and procedural foundation existed that could support punitive sanctions, there must also exist a record of "necessity" justifying the imposition of such sanctions.  That record is also lacking in this case, as the Government has made clear through its actions and statements over the past five months of proceedings that it takes extremely seriously the obligation to provide the Court with accurate, prompt, and complete information.  For all of these reasons, the Court lacks legal authority to impose any punitive sanction.

### A.    The Record Does Not Support a Conclusion of Bad Faith.

Even assuming, as the Court has instructed, that the Government misrepresented facts to the Court, there would be no basis for issuing a punitive sanction.  The Fifth Circuit has made clear that imposition of a punitive sanction requires a specific finding, supported by clear and convincing evidence, that the offending party acted in bad faith.  *See, e.g.*, *In re Moore*, 739 F.3d 724, 729 (5th Cir. 2014); *Crowe v. Smith*, 151 F.3d 217, 236 (5th Cir. 1998); *Maguire Oil Co. v. City of Houston*, 143 F.3d 205, 209 (5th Cir. 1998); *Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir. 1995); *City of Alexandria v. Cleco Corp.*, 547 F. App'x 568, 569 (5th Cir. 2013); *see also Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767 (1980).  Even a negligent misrepresentation is insufficient to warrant a punitive sanction.  *See Maguire Oil Co.*, 143 F.3d at 211-12 ("[M]ere negligence does not trigger a court's inherent sanctioning power."); *In re Moore*, 739 F.3d at 730 ("[N]ondisclosure and inconsistency, while justifying scrutiny, are not alone clear and convincing evidence of . . . bad faith or willful misconduct.").

-2-

Here, the factual record does not support a finding of bad faith, much less do so clearly and convincingly.  The Government regrets and apologizes for the circumstances that led to the Court's April 7 Order.  But the factual record demonstrates that those circumstances resulted from an unintentional miscommunication.  *See, e.g.*, ECF No. 242 at 1-22; June 23 Tr. at 9-12, 31-35; ECF No. 287 at 46-50.  To briefly summarize, the evidence here shows that, although the Government did not specifically mention the ongoing approvals of three-year terms when communicating with the Court about scheduling, that omission was not deliberate or intended to deceive, but instead resulted from not recognizing that the discussions implicated that issue.  The speed with which the Government drafted and filed its March 3 Advisory shows that it did not intentionally withhold this information from the Court.  The absence of such intention is further confirmed by the Government's own public references (preceding the filing of the March 3 Advisory) to the initiation of three-year terms, which are wholly inconsistent with any deliberate attempt to conceal such information from the Court.

Plaintiffs have never contested the Government's explanation of an unintentional miscommunication, nor have they contested the ability of the Court to rely on the factual materials that the Government has submitted—including the April 30 *in camera* filing submitted by a different team of attorneys, as officers of the Court, pursuant to Rule 11(b)(3).[1]  There are no facts here to establish a finding of deliberate misrepresentation.

---

[1] Both parties have also agreed that, to the extent additional verification of Defendants' account is necessary, the appropriate course would be to refer the matter to a magistrate judge for review of the other *in camera* materials submitted by Defendants.  *See* ECF No. 261 at 6-7; ECF No. 265 at 14-15.

**B.      Punitive Sanctions Are Procedurally Unavailable and Also Unnecessary.**

Even if a factual basis for a punitive sanction might exist (which it does not), the Court would still lack authority to impose such a sanction.  First, the requisite procedural protections—including notice to the entities and/or individuals against whom sanctions are contemplated, the basis for such potential sanctions, the type of sanctions being contemplated (including whether the potential sanctions are personal in nature), and an opportunity for the entity and/or individual to respond to the specific sanctions being contemplated—have not been provided.  *See* ECF No. 242 at 19-21; ECF No. 265 at 14-15; ECF No. 287 at 50 n.22.

Moreover, even if the Court had a sufficient factual and procedural foundation to support a punitive sanction, the Court must still conclude that a sanction is necessary to achieve the desired purpose.  *See Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1412 (5th Cir. 1993) ("The ultimate touchstone of inherent powers is necessity."); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("Because of their very potency, inherent powers must be exercised with restraint and discretion.").

Here, there is no need for any punitive sanction to achieve the desired effect—namely, ensuring that the Government provides this Court (and other courts) with prompt, accurate, and complete information at all stages of a case.  These very proceedings have underscored to everyone the paramount importance of the Government's duties in this regard.  And the Government's practice of filing Advisories to inform the Court of actions potentially implicating the preliminary injunction, and the seriousness with which the Government undertook efforts to remedy those issues, demonstrate the Government's understanding of its duties to the Court.  No further action is necessary to ensure that the Government understands, and will strive to continue to fulfill, its duty in this case and future cases.  And because there is no need for a punitive sanction here, it would be improper for the Court to impose one.  *Cf. Capitol Radiology, LLC v.*

*Sandy Spring Bank*, 2010 WL 2595781, at *2 (D. Md. June 24, 2010) (declining to impose sanctions because "[t]he fact that Plaintiff had to respond to Defendant's motion for sanctions will serve as enough of a warning").

For all of the above reasons, there is no basis for the Court to impose any type of punitive sanction.[2]

## II. There Is No Basis for Plaintiffs' Requested Equitable Order.

At the August 19 hearing, Plaintiffs suggested that the Court should issue an equitable order, akin to a new preliminary injunction, restoring the status quo to what the Plaintiffs believe it should have been absent the Government's miscommunication with the Court—*i.e.*, ordering the conversion of the approximately 108,000 three-year terms to two-year terms.[3]  *See* Aug. 19 Tr. at 27 ("[I]f we reverted back to the status quo, which is the 108 are remediated, plaintiff states

---

[2] At the August 19 hearing, the Court expressed the possibility that Plaintiffs could be deemed to have filed a motion for sanctions.  *See* Aug. 19 Tr. at 36.  Plaintiffs have not filed any sanctions motion, however, and any such motion filed now could not possibly lead to sanctions—the Government's unintentional miscommunication was cured by its March 3 Advisory, thus precluding the imposition of sanctions pursuant to a motion by Plaintiffs.  *See* Fed. R. Civ. P. 11(c)(2) (providing a 21-day cure period before a motion for sanctions may be filed); *see also* Fed. R. Civ. P. 11(c)(3) (imposition of sanctions on the Court's initiative must be preceded by an order "to show cause why conduct specifically described in the order has not violated Rule 11(b)").

[3] For purposes of clarity, some of the approximately 108,000 pre-injunction three-year approvals have already been converted to two-year terms.  The vast majority of the approximately 2,600 post-injunction cases were included in the 108,000 figure, *see* ECF No. 285-4 at 7 n.*, and all of those cases have now been converted to two years.  Additionally, approximately 1000 individuals returned their valid three-year cards to USCIS though they had not been asked to, and USCIS is now in the process of issuing two-year cards to those individuals.  There have also been some individuals who, for legitimate reasons, including losing their card, requested replacement EADs, which USCIS issued for only a two-year term.  Accordingly, the current number of individuals with valid three-year terms is lower than the previously identified universe of 108,081.  And of course, only a portion of those individuals reside within the Plaintiff States, *cf.* ECF No. 285-4 at 7-9, and in turn only a portion of those individuals received three-year terms of deferred action and work authorization after the Government's unintentional miscommunications with the Court.

provided with the PII related to those 108, then I do believe that that resolves the plaintiff states disputes[.]").  But Plaintiffs have not made the necessary showing to obtain any additional equitable relief, whether the primary burden of that relief falls upon the approximately 108,000 individuals or the Federal Government.

Any order of the type Plaintiffs suggest would emanate from the Court's traditional equitable authority, pursuant to which the Court entered a preliminary injunction in the first place.  Thus, Plaintiffs here are effectively seeking a new preliminary injunction.  *See, e.g.*, *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).  The framework for analyzing such a request is well-settled:  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

One of the factors in analyzing whether a preliminary injunction is warranted is whether a plaintiff can demonstrate a likelihood of success on the merits.  Plaintiffs have not made that showing here, although an extended discussion of that element is unnecessary because the other elements weigh squarely against equitable relief.[4]  In particular, Plaintiffs have not demonstrated

---

[4] The other factors are sufficient to establish that Plaintiffs cannot obtain an equitable order here.  But Plaintiffs also cannot prevail on likelihood of success.  Even assuming, for purposes of this filing, that Plaintiffs have Article III standing, that their claims are justiciable, and that they are likely to succeed on every argument they have made thus far, Plaintiffs are still not likely to succeed in challenging the increased duration of grants under the original DACA criteria.  Plaintiffs have not challenged the original DACA, and thus its lawfulness is not in dispute.  And Plaintiffs have advanced no argument why the increased *duration* from two years to three years (under the same DACA eligibility criteria) is substantively unlawful or requires notice-and-comment rulemaking.  Plaintiffs therefore have not demonstrated a likelihood of success in challenging the lawfulness of the increase in the duration.

any harm, let alone irreparable harm, stemming from the change in duration from two years to three years for individuals eligible under 2012 DACA.  Moreover, any remedy affecting those individuals would be contrary to the balance of equities because it would impose greater burdens on DHS than it would benefit Plaintiffs.  Finally, any such order would also be contrary to the public interest.  This last factor is particularly significant—indeed, decisive—as both Plaintiffs and the Court acknowledged on August 19 that the approximately 108,000 individuals with three-year terms are effectively innocent bystanders in this situation.  Thus, we address that factor first below.

> A.   **Any Action to the Detriment of the Approximately 108,000 Individuals Would Be Contrary to the Public Interest.**

Any action that negatively affects the approximately 108,000 individuals with three-year terms is unwarranted because it would harm the interests of innocent third parties, and thus would be contrary to the public interest.  "Plaintiffs have the burden to show that if granted, a preliminary injunction would not be adverse to public interest."  PI Op. (ECF No. 145) at 118 (citing *Star Satellite, Inc. v. Biloxi,* 779 F.2d 1074, 1079 (5th Cir. 1986)).  The public interest "should be given considerable weight," *id.*, including consideration of how the requested injunction would affect persons who are not parties to the suit.  *See Avmed, Inc. v. BrownGreer, PLC*, 300 F. App'x 261, 265 (5th Cir. 2008).

Here, the approximately 108,000 individuals who received three-year terms are effectively innocent bystanders in this situation—as Plaintiffs and the Court agreed at the hearing on August 19.  *See* Aug. 19 Tr. at 44-46.  The Court should not take any action, therefore, to the detriment of these individuals' interests.  Additionally, the current status quo for these 108,000 individuals has been in place for more than six months.  The public interest weighs strongly

against disrupting that status quo for a potentially temporary and uncertain period of time (until the preliminary injunction and/or merits proceedings conclude).

These weighty public interests apply to any potential injunctive order that would affect the approximately 108,000 individuals. The bottom-line is that these approximately 108,000 individuals did nothing wrong in this situation, and their interests should not be harmed, or even potentially harmed, because of any miscommunication by the Federal Government. *Cf. Richland Park Homeowners Ass'n, Inc. v. Pierce*, 671 F.2d 935, 943 (5th Cir. 1982) ("The injury to the public interest that would be caused by the uprooting of these 44 innocent families . . . are factors that weigh heavily against the plaintiffs in the judicial consideration of their demand for relief of this nature."). Certainly Plaintiffs have not shown how an equitable order that harms these approximately 108,000 individuals would *advance* the public interest. *See* PI Op. at 118 ("If no public interest supports granting preliminary relief, such relief should ordinarily be denied, 'even if the public interest would not be harmed by one.'" (quoting Wright & Miller § 2948.4)).

### B.   Plaintiffs Have Not Demonstrated Any Harm Caused by the Government's Unintentional Miscommunication with the Court or the Three-Year Terms Themselves.

For the Court to exercise its equitable authority, Plaintiffs must establish that they are suffering irreparable injury as a result of the current status quo—*i.e.*, the approximately 108,000 pre-injunction three-year approvals, assertedly caused by the Government's miscommunication with the Court regarding timing. *See Canal Auth.*, 489 F.2d at 576; *see also* Court's PI Op. at 113. But again, Plaintiffs have not shown any harm flowing from those events.

Importantly, all of the approximately 108,000 individuals were eligible for and accorded deferred action and work authorization under the pre-existing 2012 DACA eligibility guidelines, which are not challenged in this lawsuit. Therefore, as discussed at the August 19 hearing, the only difference between a person who obtained DACA in 2013 and a person who is part of the

-8-

108,000 is that the former has a two-year term of deferred action and work authorization, whereas the latter has a three-year term.  *See* Aug. 19 Tr. at 32-34.  With respect to that third year specifically, Plaintiffs have never articulated any cognizable injuries—let alone irreparable injuries—that could justify any type of equitable order here.

Plaintiffs have previously argued that the third year of deferred action and work authorization injure them because state licenses and benefits were or will be issued to these individuals for a longer period.  But the Court premised its conclusions about Plaintiffs' standing not on the issuance of a driver's license of the same duration as an alien's term of deferred action or work authorization, but on Texas's alleged subsidization of licenses for aliens with deferred action.  And with respect to such a subsidy, Texas appears to be financially better off granting the individuals three-year licenses rather than two-year licenses because Texas will incur the alleged subsidy less often.  *See* ECF No. 64-43 (Peters Decl.) ¶ 8 (declaration from Texas DPS explaining how longer-term driver's licenses impose less costs on the State, because "[e]very renewal for a limited term license requires an additional in-person visit to a DPS facility, and thus requires additional costs").[5]  In terms of state licenses and benefits, therefore, Plaintiffs have not established that the approximately 108,000 three-year terms cause any irreparable injury that is distinct from these individuals possessing only two-year terms.

Nor have Plaintiffs explained how any purported harm from the additional third year would accrue before the conclusion of this litigation, a prerequisite for equitable injunctive relief at this stage.  *See* PI Op. at 117 ("Therefore, if a trial on the merits can be conducted before the

---

[5] With respect to other kinds of state licenses and benefits, Plaintiffs have not identified any particular benefit that could be implicated by a three-year term rather than a two-year term—despite requests by Defendants throughout the meet-and-confer process for that very information.  *See* ECF No. 285-1; ECF No. 285-2 at 4; ECF No. 285-4 at 10; ECF No. 285 ¶ 4(b); Aug. 19 Tr. at 29-30; *see also* ECF No. 207 at 3; ECF No. 265 at 8.

injury would occur, there is no need for interlocutory relief." (quoting Wright & Miller § 2948.1, emphasis omitted)).  Indeed, the third year will not begin until November 2016 at the earliest. And at that time, deferred action for aliens who continue to meet the criteria of the unchallenged 2012 DACA policy could be renewed for a further two years, thereby continuing their eligibility for driver's licenses under current Texas law.

Plaintiffs have previously relied upon the cost of converting driver's licenses from three years to two years as irreparable harm.  *See, e.g.*, Aug. 19 Tr. at 43 (discussing how the State's "own remediation efforts . . . are going to require time and expense that are unrecoverable"); *see also* Mar. 19 Tr. at 9.  But the cost of converting a driver's license if a three-year term of deferred action were converted to a two-year term does not establish that the three-year term itself is *currently* causing any irreparable injury—which is the showing that would be necessary to obtain relief here.  *See Canal Auth.*, 489 F.2d at 576 (allowing relief "[i]f the *currently existing* status quo itself is causing one of the parties irreparable injury" (emphasis added)).  As it stands, Plaintiffs have no need (even under their own theories) to alter the terms of their driver's licenses.  Indeed, Plaintiffs' focus on the cost of converting three-year driver's licenses to two years further illustrates how the relief they seek would in fact create, rather than alleviate, harm.

At the March 19 hearing, Plaintiffs attempted to articulate various other theories of irreparable injury resulting from the third year of the affected individuals' terms of deferred action.  *See* Mar. 19 Tr. at 9-11.  As the Court correctly pointed out, however, those theories of injury were held not to be cognizable for Article III purposes.  *See id.* at 37-38.  Those injuries are therefore likewise insufficient to support preliminary injunctive relief.  *See* PI Op. at 113 ("It is clear that, to satisfy this [irreparable injury] factor, speculative injuries are not enough[.]").

-10-

Finally, Plaintiffs also have not established any harm resulting from the Government's miscommunication with the Court regarding timing (even assuming such a factor is relevant to the irreparable injury calculus). Specifically, Plaintiffs have not established two facts critical to any notion of "harm" stemming from the Government's miscommunication with the Court: (1) that the ongoing three-year terms were otherwise unknown to Plaintiffs (and thus the Government's alleged misrepresentations actually concealed the information from Plaintiffs);[6] and (2) that if Plaintiffs had known the information earlier, they would have acted differently in the litigation.[7]

At bottom, then, even when considering the issues in the context of the Government's miscommunication with the Court, Plaintiffs have not established any harm that could justify any form of equitable relief here.

_____

[6] Some of the Plaintiff States (and/or their legal counsel) could have become aware of the three-year terms from the 2014 Deferred Action Guidance itself; from other state officials (*e.g.*, those who were actively granting three-year driver's licenses to DACA recipients), *see* ECF No. 64-43 (Peters Decl.) ¶ 8; from one of Plaintiffs' other declarants who asserts detailed knowledge of DACA, *see, e.g.*, ECF No. 64-42 (Decl. of Kenneth Palinkas, a USCIS employee); from filings in this case, *see* ECF No. 243 at 13; or from other publicly available sources, *see id.* at 14 & nn.5-8 (citing, *inter alia*, a Frequently Asked Questions page located on DHS's website).

[7] Plaintiffs did not file this lawsuit until December 3, 2014—nine days after the November 24, 2014 effective date for three-year terms provided on the face of the 2014 Deferred Action Guidance. And the first scheduling conference with the Court did not occur until December 19, 2014. *Cf.* ECF No. 183 at 3. At no point during the scheduling discussions did Plaintiffs specifically inquire of the Government whether the three-year terms had gone into effect. These facts certainly cast doubt on whether Plaintiffs would have realistically sought a temporary restraining order solely on the three-year terms. *Compare, e.g.*, ECF No. 183 at 7 (stating that Plaintiffs "would have *explored* seeking a temporary restraining order" (emphasis added)), *with Winter*, 555 U.S. at 22 (holding that a "'possibility' standard is too lenient" for purposes of irreparable harm). Notably, the allegations of irreparable harm in Plaintiffs' Complaint and preliminary injunction briefing all related to the expansion of the eligibility criteria, not the change in the duration of the term.

### C.        The Balance of the Equities Weighs Squarely Against an Equitable Order.

Plaintiffs also have not demonstrated—as they must—that "they would suffer more harm without the injunction than would the Defendants if it were granted."  PI Op. at 118.  A decision to grant injunctive relief requires "careful balancing of the interests of—and possible injuries to—the respective parties."  *Id*. (citing *Yakus v. United States*, 321 U.S. 414, 440 (1944)).  As the Court stated in its February 16, 2015 Opinion, "[i]f there is reason to believe that an injunction issued prior to a trial on the merits would be burdensome, the balance tips in favor of denying preliminary relief."  *Id*.

At the August 19 hearing, Plaintiffs suggested two remedial options: (1) requiring DHS to convert all 108,000 individuals' three-year terms to two-year terms, and then employ, in addition, the same efforts to retrieve the 108,000 invalidated EADs as were employed with respect to the 2600 post-injunction and re-mailed EADs; and (2) requiring DHS to provide PII on all 108,000 individuals.  *See* Aug. 19. Tr. at 27.  Neither of these suggestions, alone or in combination, is warranted, nor is any other form of equitable relief that Plaintiffs might suggest.

First, an injunction requiring the Government to convert all of the approximately 108,000 three-year grants of deferred action and work authorization—issued under the 2012 DACA eligibility guidelines—to two-year grants and, in addition, to retrieve all EADs evidencing those three-year grants, would be heavily burdensome.  *See generally* July 31 Rodríguez Decl. (ECF No. 287-1) ¶ 6; *see also* Aug. 19 Tr. at 24 (Plaintiffs characterizing the efforts with respect to the 2600 post-injunction cases as "extraordinary").  Any marginal harm Plaintiffs could demonstrate that stems from the three-year rather than two-year grants of deferred action under the 2012 DACA guidelines is outweighed by the time, effort, and resources required to convert the approximately 108,000 three-year grants to two years and also (if further required) to retrieve the cancelled three-year EADs.  Those efforts would necessarily divert resources and personnel from

-12-

the agency's other important responsibilities.  *Cf.* May 17 Rodríguez Decl. (ECF No. 256-1) ¶ 4.

So would an order requiring conversion of the three-year terms to two-year terms but not

requiring retrieval of the EADs themselves.  *Cf.* July 31 Rodríguez Decl. ¶¶ 12-14 (explaining

how conversion of a three-year term to a two-year term requires individualized, case-by-case

action).  These burdens squarely tip the balance against issuing injunctive relief here.

Second, Plaintiffs' request for PII on these approximately 108,000 individuals, either on

its own or in combination with some other remedy, is also unwarranted.  At no point during the

August 19 hearing, or in the preceding meet-and-confer process, did Plaintiffs explain or

articulate their purported need for PII regarding the approximately 108,000 individuals.  There is

no basis for requiring Defendants to provide such information absent the showing of a benefit

that would flow to Plaintiffs based on their possession of this information—which Plaintiffs have

not yet made.  And because there is no demonstrated benefit to Plaintiffs from requiring this

disclosure, even a slight burden to Defendants is sufficient to defeat the requested relief.  *See* PI

Op. at 118 ("[T]he Plaintiffs must show that they would suffer more harm without the injunction

than would the Defendants if it were granted.").

Accordingly, the balance of the equities weighs against the Plaintiffs' request.

## III.   No Other Steps Are Necessary or Warranted.

Defendants take with the utmost seriousness the concerns that this Court expressed in its

April 7 Order as well as in subsequent orders and hearings in this case.  The Federal Government

carries the heaviest duty of candor in all cases in all tribunals, and has sought to fully discharge

that duty at all times in this case.  The Government recognizes, however, that it is responsible for

its unintentional miscommunications to this Court, and the Government deeply regrets and

sincerely apologizes for those unintentional miscommunications.  The Government further

submits that its good faith—and resolve to rectify problems that come to its attention—has been

confirmed over the past several months, based on the record of extraordinary efforts undertaken to ensure compliance with the preliminary injunction, the prompt self-reporting of any potential issues regarding compliance, and the urgency with which it filed its March 3 Advisory.  The Government respectfully submits that these actions demonstrate its good faith throughout these proceedings, as well as its understanding of its duty of candor to the Court.

Independent of any of the above discussion, one important point bears emphasizing:  the Federal Government as a whole is responsible for the conduct of this litigation.  A large team of attorneys at DOJ and DHS, including the latter's components, have worked together throughout this litigation.  Whatever the result of these proceedings, therefore, the proper subject for any sanction or equitable order is the Federal Government.  Setting aside that no individual attorney has received any notice that he or she may be subject to sanctions, *see* Section I.B, *supra*, it would be fundamentally unfair to sanction any individual—in his or her official or personal capacity—for the Government's unintentional miscommunication in the conduct of this litigation.  Thus, whatever the result here, the Government as a whole should be held responsible, not any individual person or attorney.

## CONCLUSION

For the foregoing reasons, the Court should find that no misconduct occurred here, and conclude its inquiry into the issues identified in its April 7 Order.

Dated: September 4, 2015

KENNETH MAGIDSON
United States Attorney

DANIEL DAVID HU
Assistant United States Attorney
Deputy Chief, Civil Division

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

JOYCE R. BRANDA
Deputy Assistant Attorney General

AUGUST E. FLENTJE
Special Counsel

JENNIFER D. RICKETTS
Director, Federal Programs Branch
Attorney-in-Charge (VA Bar No. 29281)

JAMES J. GILLIGAN
Special Litigation Counsel

 _/s/  Daniel Schwei_____
DANIEL SCHWEI
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883
Washington, D.C. 20044
Tel.: (202) 305-8693
Fax: (202) 616-8470
Daniel.S.Schwei@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Defendant's Memorandum Following the Hearing of August 19, 2015 has been delivered electronically on September 4, 2015, to counsel of record via the District's ECF system.


*/s/ Daniel Schwei*
Counsel for Defendants