**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

STATE OF TEXAS, *et al.*,          §
                                   §
          Plaintiffs,              §
                                   §
     v.                            §          Case No. 1:14-cv-254
                                   §
UNITED STATES OF AMERICA, *et al.*,          §
                                   §
          Defendants               §
                                   §
                                   §

**[PROPOSED] *AMICUS* BRIEF OF JANE DOE #1, JANE DOE #2, AND JANE DOE #3
OPPOSING CERTAIN SANCTIONS REQUESTED BY PLAINTIFFS**

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ............................... 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT .................................................. 1

STATEMENT OF THE ISSUES TO BE RULED ON BY THIS COURT ................................. 3

ARGUMENT ........................................................................................................................ 4

    I.      THE COURT CANNOT GRANT THE STATES' REQUESTED RELIEF
          UNDER THE SANCTIONS POWER .................................................................... 4

          A.      Plaintiffs Are Requesting Broad Mandatory Injunctive Relief
                  Targeted At DACA Grantees, Not Sanctions Targeted At
                  Defendants Or Their Counsel ...................................................................... 4

          B.      Moreover, Unless And Until The 108,000 Pre-Injunction Three-
                  Year Grants Are Enjoined, Plaintiffs Cannot Take "Corrective
                  Action" Against DACA Grantees ................................................................ 8

    II.     SHOULD THE COURT REACH THE ISSUE, IT SHOULD HOLD
          THAT THE STATES ARE NOT ENTITLED TO A MANDATORY
          PRELIMINARY INJUNCTION GRANTING THEIR REQUESTED
          RELIEF ................................................................................................................ 9

          A.      The States Will Not Suffer Any Irreparable Injury If Their
                  Requested Relief Is Denied ...................................................................... 10

          B.      Conversely, An Injunction Would Cause Significant Harm To The
                  108,000 DACA Grantees Who Received Three-Year Terms Of
                  Deferred Action, As Well As To The Public Interest ............................... 12

    III.    THE STATES' NEW REQUEST FOR DEFENDANTS TO MODIFY
          THEIR INTERNAL RECORDS "AT MINIMUM" IS A DISGUISED
          REQUEST FOR A FULL CLAWBACK OF THE 108,000 THREE-
          YEAR EADS, AND SHOULD BE TREATED AS SUCH ............................... 14

CONCLUSION .................................................................................................................. 15

## TABLE OF AUTHORITIES

**Page**

<u>**CASES**</u>

*Arizona v. United States*,
132 S. Ct. 2492 (2012) .......................................................................................... 9

*Bullard v. Chrysler Corp.*,
925 F. Supp. 1180 (E.D. Tex. 1996) ..................................................................... 6

*Chacon v. Granata*,
515 F.2d 922 (5th Cir. 1975) ......................................................................... 10, 11

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991)............................................................................................ 5, 6

*Consol. Aluminum Corp. v. Alcoa, Inc.*,
244 F.R.D. 335 (M.D. La. 2006) .......................................................................... 7

*FDIC v. Maxxam, Inc.*,
523 F.3d 566 (5th Cir. 2008) ....................................................................... passim

*In re Envirodyne Indus., Inc.*,
29 F.3d 301 (7th Cir. 1994) .................................................................................. 6

*Int'l Bhd. of Teamsters v. United States*,
431 U.S. 324 (1977)............................................................................................... 6

*Janvey v. Alguire*,
647 F.3d 585 (5th Cir. 2011) ................................................................................ 9

*Justin Indus., Inc. v. Choctaw Sec., L.P.*,
747 F. Supp. 1218 (N.D. Tex.), *aff'd & remanded*, 920 F.2d 262 (5th Cir.
1990) .................................................................................................................. 4, 9

*Martinez v. Mathews*,
544 F.2d 1233 (5th Cir. 1976) ............................................................................ 10

*McKethan v. Texas Farm Bureau*,
35 F.3d 559 (5th Cir. 1994) .................................................................................. 6

*Murphy v. Collins*,
26 F.3d 541 (5th Cir. 1994) .................................................................................. 6

*Natural Gas Pipeline Co. v. Energy Gathering, Inc.*,
86 F.3d 464 (5th Cir. 1996) ............................................................................... 3, 5

*Porter v. Lee*,
328 U.S. 246 (1946)....................................................................................... 2, 7, 9

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Thomas v. Capital Sec. Servs.*,
836 F.2d 866 (5th Cir. 1988) ................................................................... 5

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......................................................................... 10, 11

## RULES AND REGULATIONS

Fed. R. Civ. P. 11(c)(1) ............................................................................ 6

8 C.F.R. § 264.1(c) ................................................................................ 15

## OTHER AUTHORITIES

5A Charles A. Wright et al., *Fed. Prac. & Proc.* (3d ed. 2015) ..................... 5

*U.S. Citizenship and Immigration Services Employment Authorization Document*,
http://www.uscis.gov/green-card/green-card-processes-and-
procedures/employment-authorization-document (last visited Sept. 4, 2015) ...... 15

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

During the August 19 hearing, this Court invited the parties to submit briefing by September 4 on what sanctions the Court has the power to order, and what sanctions the Court should order, should it find that Defendants or their counsel misrepresented facts regarding implementation of the 108,000 pre-injunction three-year grants of deferred action.  *See* Hr'g Tr. 47:7-18, Aug. 19, 2015, ECF No. 299 (hereinafter "Aug. 19 Tr.").  *Amici* submit this proposed brief to assist the Court in concluding that the States' requested relief would be inappropriate. *Amici* take no position in this brief on whether misrepresentations occurred or whether any other sanctions would be appropriate.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

*Amici curiae* Jane Does hereby state their position that the Court cannot use the sanctions power to grant the relief requested by Plaintiff States, and that it should not do so under its separate power to issue a mandatory preliminary injunction.  At the August 19 hearing and in their advisory of September 4, the States have requested that this Court order Defendants to (1) revoke and claw back all 108,000 three-year employment authorization documents ("EADs") granted to DACA recipients prior to the February preliminary injunction; or "at minimum" (2) update their records and databases to reflect a two-year period of authorization for all 108,000 grantees; and (3) to provide the States with the personal identifying information ("PII") of the 108,000 grantees.  *See* Aug. 19 Tr. 22:1-24:8, 27:16-21; ECF No. 304 at 1-2.  For the reasons listed below, all of these requested forms of relief would be inappropriate and should not be granted.

First, the States are actually requesting a new or expanded preliminary injunction, one that falls outside the bounds of the Court's sanctions power.  While the sanctions power allows district courts wide authority to enforce compliance with court orders, sanctions should be by the

least restrictive methods possible, punishment should be as against the culpable actors themselves, and sanctions cannot extend to the underlying issues in the suit.  Here, the States do not seek targeted sanctions against a party or counsel that made misrepresentations; instead, they openly admit that they are requesting a "return of the status quo" through a sweeping order that would negatively impact the 108,000 grantees and grant the States the injunctive relief they seek in the underlying case.  Aug. 19 Tr. 43:25, 45:5-13; ECF No. 304 at 5, 7.  But the proper way to restore the pre-suit status quo is a mandatory injunction, not sanctions, and the Court may only do so after finding that the facts meet the heightened standard for issuing such an injunction.  *See Porter v. Lee*, 328 U.S. 246, 251 (1946) ("It has long been established that where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may *by mandatory injunction* restore the status quo." (emphasis added)).  Indeed, to the extent the States seek PII so that they can unilaterally invalidate driver's licenses and any other social services granted in reliance on the three-year EADs, that *requires* an injunction—federal law requires the States to honor the 108,000 three-year EADs unless and until this Court enjoins them.  Accordingly, the States' requested relief cannot be granted under this Court's sanction power.

Second, even if this Court were to *sua sponte* construe the States' request to be for a mandatory preliminary injunction, they cannot show that the injunction factors favor such an injunction or the requested release of PII.  The States cannot show imminent harm that they would suffer without such a preliminary injunction, because—even if they ultimately prevail at trial—all 108,000 grantees are eligible for two-year terms of deferred action under the original DACA program that is not at issue.  These two-year terms, which are outside this litigation, will not expire until November 2016 at the earliest.  In contrast, the requested injunction and release

of PII would cause significant disruption to the lives of the 108,000 grantees who have relied on their grants and EADs to apply for and obtain lawful employment and driver's licenses. Finally, the public interest does not support compelling Defendants to undertake a massive, costly bureaucratic effort to update Defendants' records and—in practice—to recover all 108,000 EADs when the only result of doing so would be to replace them with two-year EADs.

Third, the Court should deny the States' newly formulated request to "at minimum" order modification of records and databases to reflect two-year grants. That request is simply a way for the States to seek a *de facto* full clawback of all 108,000 EADS without making an express request for that relief. If they were ordered to "only" update their records and databases, Defendants would nonetheless be forced to undertake a full clawback to ensure that those records actually reflected the EADs possessed by the 108,000 grantees. Any grantees whose three-year EADs were not clawed back would be at risk of detention and accusations of using fraudulent documents were they to try to use their old EADs to prove authorized presence or apply for a job. Moreover, Defendants' standard policies generally require grantees to return erroneous EADs before obtaining a new one, and there is no reason to believe they would not voluntarily require grantees to return their cards, even if the Court did not so order.

Accordingly, this Court should deny the States' requested relief.

## STATEMENT OF THE ISSUES TO BE RULED ON BY THIS COURT

The first issue is whether this Court has the authority to grant the States' requested relief under its sanctions power as a way of remedying any misrepresentations by Defendants or their counsel. Whether under Rule 11 or its own inherent power, the Court's power to sanction is limited; the sanctions issued must be the least restrictive measures that have a reasonable probability of addressing the offense. *See FDIC v. Maxxam, Inc.*, 523 F.3d 566, 591 (5th Cir. 2008); *Natural Gas Pipeline Co. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996).

Moreover, the Court may not use the sanctions power to address the substance of the underlying case.  *See Maxxam*, 523 F.3d at 593.

The second issue, whether the States' requested relief should instead be granted as a mandatory preliminary injunction, is not properly before the Court and should not be addressed. However, if the Court chooses to do so, it must apply the well-known preliminary injunction factors in the context of the particularly high burden for a mandatory preliminary injunction.  *See Justin Indus., Inc. v. Choctaw Sec., L.P.*, 747 F. Supp. 1218, 1220 (N.D. Tex.), *aff'd & remanded*, 920 F.2d 262 (5th Cir. 1990).

<u>**ARGUMENT**</u>

**I.      THE COURT CANNOT GRANT THE STATES' REQUESTED RELIEF UNDER THE SANCTIONS POWER**

       **A.      Plaintiffs Are Requesting Broad Mandatory Injunctive Relief Targeted At DACA Grantees, Not Sanctions Targeted At Defendants Or Their Counsel**

There are several reasons that this Court may not, as a sanction for Defendants' possible misrepresentations, order them either to revoke and claw back the 108,000 three-year EADs, modify their records to reflect two-year grants, or to turn over the grantees' PII.  First, there are many other, lesser sanctions sufficient to respond properly to Defendants' possible misrepresentations.  Second, the States' requested relief would not affect the proper targets of any sanctions—Defendants or their counsel—but would instead harm only innocent third parties who followed the process laid out for them under 2012 DACA.  And, third, the requested relief is actually the substantive relief that the States seek in the underlying suit, and thus can only properly be granted as a mandatory preliminary injunction, not as a sanction.

Because traditional sanctions like monetary penalties or reprimands would be a more than sufficient response to any misrepresentations that occurred in this case, it would be inappropriate for the Court to order Defendants to claw back all 108,000 three-year EADs (and re-issue them

as two-year EADs), update their records—which in practice cannot be done without also clawing back the 3-year EADs—or to release the grantees' PII.  The sanctions power, whether based in Rule 11 or the Court's inherent authority to issue sanctions, has a very specific purpose—to maintain order over parties and counsel who act in bad faith in defiance or disruption of, or disobedience to, the Court.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991); *Maxxam*, 523 F.3d at 590-91; 5A Charles A. Wright et al., *Fed. Prac. & Proc.* § 1336.3 (3d ed. 2015) ("[T]he main purpose . . . is to deter improper behavior, not to compensate the victims of it or punish the offenders.").  Sanctions must be narrowly tailored to deter the type of misconduct in question, and must be no more sweeping than required; indeed, less restrictive sanctions must be exhausted before more expansive ones are employed.  *Thomas v. Capital Sec. Servs.*, 836 F.2d 866, 878 (5th Cir. 1988) (en banc) (regarding Rule 11 sanctions); *accord Natural Gas Pipeline*, 86 F.3d at 467 (same rule, with respect to sanctions issued under the Court's inherent power).  As a result, sanctions typically come in the form of monetary penalties, reprimands, and the like, rather than orders for the sanctioned party to take some affirmative action.  *See Natural Gas Pipeline*, 86 F.3d at 467-68 (noting that a "monetary penalty increasing each day" is a "traditional sanction"); *see also* Wright et al., *supra*, § 1336.3 (noting that normal penalties under Rule 11 are "fines and reprimands").  In this high-profile case, these kinds of traditional sanctions would provide a great deterrent effect, one that is more than sufficient to redress any past misrepresentations and to deter future ones.  The States' requested relief, by contrast, would be overly broad and inappropriate.

Similarly, the States' requested relief cannot be granted as a sanction because it would only affect blameless non-parties—the 108,000 grantees—but would not deter any misconduct by parties or their counsel.  A basic principle of sanctions doctrine is that the penalties issued

should be designed to deter the actual persons who acted in bad faith.  *See* Fed. R. Civ. P.

11(c)(1) (sanctions allowable against counsel and parties); *Chambers*, 501 U.S. at 43; *Maxxam*,

523 F.3d at 590-91.  Monetary penalties and reprimands are appropriate under this principle

because, by their nature, they confine their negative effects to the sanctioned individuals.

Sanctions compelling affirmative action may also comply with this principle, but only if the

compelled act constitutes a penalty against the sanctioned party himself.  *See, e.g.*, *Murphy v.

Collins*, 26 F.3d 541 (5th Cir. 1994) (requiring frequent litigant to seek leave before filing future

lawsuits); *McKethan v. Texas Farm Bureau*, 35 F.3d 559 (5th Cir. 1994) (unpublished table

decision) (litigant required to write letters of apology to the state Bar and judges); *Bullard v.

Chrysler Corp.*, 925 F. Supp. 1180 (E.D. Tex. 1996) (attorney required to complete 10 hours of

CLE, in addition to other sanctions).

      By contrast, it would be inappropriate to require the sanctioned party to take some

affirmative act that negatively affects innocent non-parties, as this would violate "the age-old

principle that in formulating equitable relief a court must consider the effect of the relief on

innocent third parties."  *In re Envirodyne Indus., Inc.*, 29 F.3d 301, 304 (7th Cir. 1994) (citing

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 375 (1977).  Accordingly, the States'

requested relief, which would substantially impact the 108,000 grantees, falls far outside the

scope of the sanctions power.  *See* Aug. 19 Tr. 43:25, 45:5-13 (statement of States' counsel as

follows: "I agree, Your Honor, that they are kind of the victim . . . of what's happened with

respect to this change in the status quo . . . .").  The 108,000 grantees are recipients of deferred

action under 2012 DACA, which is not challenged in this litigation.  *See* Hr'g Tr. 90:25-91:24,

Jan. 15, 2015, ECF No. 106.  The 2012 DACA initiative provided that grantees could apply for a

two-year renewal of their deferred action, and the form provided by Defendants for that renewal,

USCIS Form I-821D, is identical to the form for an initial request; the 108,000 grantees checked a box indicating whether they sought an initial grant of deferred action or a renewal.  ECF No. 38-19 at 2-3.  Additionally, the form did not show any information indicating the time period for the grant.  Thus the 108,000 DACA grantees did nothing more than submit the required form, and they later received deferred action and EADs that were marked effective for a three-year instead of two-year period.

Finally, the States' requested relief cannot be granted under the sanctions power because that relief goes to the underlying merits of the litigation and is part of the ultimate remedy that the States seek in this suit.  *See Maxxam*, 523 F.3d at 593 ("[T]he . . . power to sanction does not extend to the underlying conduct that gives rise to a claim." (internal quotation and citation omitted)); *cf. Consol. Aluminum Corp. v. Alcoa, Inc*., 244 F.R.D. 335, 340 & n.5 (M.D. La. 2006).  By their own admission, the States are requesting that this Court order the restoration of the pre-litigation status quo, rather than some deterrent or punishment for misrepresentations committed by Defendants or their counsel.  Aug. 19 Tr. 43:24-25.  However, restoring the pre-litigation status quo is not a matter of sanctions: it requires a mandatory injunction (specifically, at this stage of the case, a mandatory preliminary injunction).  *See Porter*, 328 U.S. at 251 ("It has long been established that where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may *by mandatory injunction* restore the status quo." (emphasis added)).  This is especially true where, as here, the States are asking that this Court grant them the ultimate relief they seek in this suit, a complete reversal of the expansion of DACA as laid out in DHS's November 2014 deferred action guidance.  Granting this type of ultimate substantive relief in the form of a sanction is impermissible because it would go beyond

sanctions' purposes of deterrence and punishment to subsume the merits issue of whether the 108,000 pre-injunction three-year grants should be enjoined and revoked.

B.     **Moreover, Unless And Until The 108,000 Pre-Injunction Three-Year Grants Are Enjoined, Plaintiffs Cannot Take "Corrective Action" Against DACA Grantees**

Furthermore, the States' requested relief cannot be granted as a sanction because it incorrectly assumes that the 108,000 three-year *pre-injunction* grants are void.  But as issued, this Court's February injunction is purely prohibitory.  It does not contain any mandatory component ordering Defendants to reverse whatever implementation of expanded DACA may have already occurred.  ECF No. 144.  Accordingly, the 108,000 pre-injunction grants and EADs, though admittedly made in reliance on an initiative that has since been preliminarily enjoined pending resolution of the merits of this suit, are still valid.

Thus, unless and until this Court acts to enjoin them, or Defendants voluntarily revoke them, the States must honor those three-year grants and EADs.  To the extent the States seek PII for the purpose of rescinding driver's licenses or taking other corrective action, that further demonstrates that their request is properly framed as a request for a new injunction enjoining the 108,000 pre-injunction grants, rather than a sanction.  Even if this Court orders Defendants to release PII, unless it also enjoins the three-year grants and EADs, the States have no proper use for that data.  They may not, as they suggested at the August 19 hearing, act to revoke three-year driver's licenses issued to grantees and replace them with two-year licenses.[1]  *See Arizona v.*

---

[1] It is unclear what other "corrective measures" the States could be referring to.  However, the States have already hinted that these efforts include going so far as to sending State law enforcement officers to grantees' homes.  *See* Aug. 19 Tr. 32:19-33:1 (stating, in reference to the extensive efforts Defendants used to claw back EADs, that Texas would probably have "to go through similar efforts" to claw back driver's licenses).  Such an act would be in express violation of federal supremacy over immigration enforcement.  *See Arizona*, 132 S. Ct. at 2503.

*United States*, 132 S. Ct. 2492, 2503 (2012) (holding that States are preempted from enforcing additional regulations in the field of immigration).

As noted, if a Defendant with notice of a pending suit for injunctive relief modifies the status quo before he can be enjoined from doing so, the appropriate tool for undoing that modification is not the sanctions power—it is to determine whether the injunction factors support issuing a new mandatory injunction forcing return to the status quo.  *Porter*, 328 U.S. at 251. There is no support for the States' argument that the Court can grant their requested relief without a full consideration of whether a mandatory preliminary injunction is appropriate, and the States cannot get around that fact by requesting PII so that they may act against the DACA grantees in violation of federal law.  Accordingly, because the States' requested relief cannot be granted as a sanction against Defendants or their counsel, this Court should deny the States' requested relief.

## II.    SHOULD THE COURT REACH THE ISSUE, IT SHOULD HOLD THAT THE STATES ARE NOT ENTITLED TO A MANDATORY PRELIMINARY INJUNCTION GRANTING THEIR REQUESTED RELIEF

The issue of whether to grant a mandatory preliminary injunction ordering the relief the States request has not been briefed and is not currently before the Court.  However, even if it were, the Court should decline to order Defendants to claw back the 108,000 pre-injunction grants and EADs, modify their internal records, or produce the grantees' PII.  Under the four-part preliminary injunction standard, *see Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011), the States cannot show entitlement to an injunction because they would not suffer irreparable injury without it, an injunction would cause significant injury in its own right, and it would harm the public interest.  Moreover, because mandatory preliminary injunctions upset the status quo rather than preserve it, they can only be granted upon a much higher showing than that required for a prohibitive injunction.  *See Justin Indus.*, 747 F. Supp. at 1220.  The States cannot meet this

burden, particularly with regard to their request for the grantees' PII, the transfer of which would go beyond restoring the pre-litigation status quo to give the States information they did not have prior to filing this suit.  *See Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party.").

A.     **The States Will Not Suffer Any Irreparable Injury If Their Requested Relief Is Denied**

Even assuming *arguendo* that the Court's February determination regarding likelihood of success on the merits is applicable here, the States cannot show that they will suffer any imminent, irreparable injury without an injunction ordering clawback of the 108,000 grants and EADs, modification of Defendants' internal records, or release of the grantees' PII.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975).  As this Court is well-aware, the 108,000 pre-injunction grants of three-year deferred action terms under expanded DACA only went to individuals who were already eligible for two-year terms of deferred action under 2012 DACA.  As a result, the injury analysis is completely different from that discussed in this Court's February order, and it must therefore be examined anew.

In its February order, this Court found that the licenses and benefits that would issue if individuals became newly eligible for deferred action under DAPA or expanded DACA justified a preliminary injunction, because without the initiative those licenses and benefits would not issue, and if they did issue it would be difficult or impossible to claw them back.  ECF No. 145 at 115-16.  No such injury (far less an imminent or irreparable one) exists here.  All 108,000 grantees remain eligible for licenses and other social services under original DACA regardless of

10

what occurs in this case, so no injury is prevented by issuing an injunction.  This is because those individuals are *already* eligible for two-year grants of deferred action under the original 2012 DACA's eligibility guidelines, and they may use their deferred action documents to apply for driver's licenses regardless of whether the grant period is two or three years.  An injunction ordering Defendants to claw back these individuals' three-year EADs and replace them with two-year EADs, to modify their records to reflect only two-year EADs, or to release grantees' PII would not prevent or ameliorate any costs to the States.  The States will incur any costs of issuing the driver's licenses for these DACA grantees either way and thus cannot show any harm resulting from the issuance of three-year, as opposed to two-year, EADs.

Moreover, even if the States would be injured without a clawback and divulgence of grantees' PII, that injury is neither imminent nor irreparable.  Because the end result of the injunction would be to replace the grantees' three-year EADs with two-year EADs, and the first of the grants in question issued no earlier than November 2014, the States will not even begin to suffer *any* harm until November 2016, when the first two-year EADs would have begun expiring.  In other words, the pre-November 2014 status quo (under which the 108,000 grantees would have received two-year grants) will be in place until at least November 2016.  Since their supposed injury cannot manifest for more than a year, the States cannot meet the imminence requirement.  *Winter*, 555 U.S. at 22; *Chacon*, 515 F.2d at 925 ("An injunction is appropriate only if the anticipated injury is imminent and irreparable.").  Likewise, they fail to meet the irreparability requirement because it is highly likely that the ongoing appeals will conclude, and this Court will be able to proceed to a final resolution of the merits, before the States suffer any injury.  If the November 2014 directive is ultimately ruled unlawful on the merits, then that

would be the appropriate time to consider entering a permanent injunction clawing back the 108,000 grants, updating Defendants' records, and turning over the grantees' PII.

      **B.**      **Conversely, An Injunction Would Cause Significant Harm To The 108,000 DACA Grantees Who Received Three-Year Terms Of Deferred Action, As Well As To The Public Interest**

While the States would not suffer injury in the absence of an injunction, an injunction would have a substantial negative impact on the 108,000 DACA grantees, despite the fact that those grantees are blameless in this matter.  As the Court noted during the August 19 hearing, those grantees "didn't do anything wrong . . . .  [A]s far as they are concerned they applied just like they were told to apply."  Aug. 19 Tr. at 44:21-45:2.  Yet, ordering the clawback that the States request would result in those grantees having to return their three-year EADs to Defendants in exchange for the two-year EADs they would have received under the original DACA guidelines.  As Defendants' efforts to come into compliance with the injunction have made clear, clawing back EADs from deferred action grantees is a tenuous, extremely time-intensive process, one that will likely result in many grantees having their homes visited by federal agents and even in some grantees having their deferred action terminated.  *See* ECF No. 287 at 1-2, 13.  This entails a very real human cost; it is certainly possible that at least some of the grantees will be unable to return their EADs and will have deferred action terminated, thereby becoming vulnerable to removal and losing their ability to work lawfully in the United States.  Moreover, even if grantees are able to successfully receive two-year EADs, many of them would still be likely to suffer harm.  Employed grantees would have to approach their employers to update them about their change in work authorization.  That, as well as any delays that occurred in receiving two-year EADs, could lead to employer confusion, temporary loss of work authorization, and possible job loss and economic uncertainty.

Additionally, if this Court orders Defendants to turn over grantees' PII to the States, it appears likely that the States will begin their own efforts to recover driver's licenses issued in reliance on three-year EADs.  As the States themselves admit, those efforts would be similar to Defendants' own efforts to recover EADs, and thus would almost inevitably include contacts and personal visits to grantees' residences by State agents or law enforcement officers.  *See* Aug. 19 Tr. at 32:19-33:1.  Such visits would be extremely stressful to grantees and their families, particularly given that State agents and law enforcement officers are not likely to be trained in all the nuances of immigration enforcement, and may in some cases believe that the grantees are not legally present in the United States or are otherwise breaking the law.

Aside from the harm to the grantees themselves, the injunction would be harmful to the public interest.  The intense logistical operation that Defendants had to create and operate to take care of the less than 3,000 post-injunction grants would be dwarfed by the bureaucratic effort and expense to taxpayers needed to ensure return of the 108,000 pre-injunction three-year grants and EADs.  As discussed below, this type of operation would need to occur even if this Court did not order Defendants to recover the three-year EADs, as Defendants are not, as a practical matter, able to maintain records that do not reflect the EADs actually possessed by grantees.  Moreover, the public interest would not be served by sending federal agents (or State law enforcement officers) on personal visits to grantees' homes, as these types of visits can only serve to decrease trust between grantees and the Federal Government and encourage grantees, especially those living with undocumented family members, to change residences or otherwise avoid contact with federal personnel, thereby frustrating Defendants' goals of using deferred action to help prioritize removals of high-priority targets.  Since an injunction ordering clawback would harm grantees and disserve the public interest, the Court should deny the States their requested relief.

III.    **THE STATES' NEW REQUEST FOR DEFENDANTS TO MODIFY THEIR INTERNAL RECORDS "AT MINIMUM" IS A DISGUISED REQUEST FOR A FULL CLAWBACK OF THE 108,000 THREE-YEAR EADS, AND SHOULD BE TREATED AS SUCH**

Finally, regardless whether this Court exercises its sanctions powers or its injunctive powers, it should reject the States' new request that Defendants be ordered to modify their internal records to reflect that the 108,000 grantees received two-year grants of deferred action and EADs.  Although the States originally requested a full clawback of the 108,000 EADs at the August 19 hearing, they do not expressly request this relief in their September 4 advisory.  Aug. 19 Tr. 22:1-24:8, 27:16-21.  Instead, likely recognizing that the injunction standard disfavors their request for a clawback, and perhaps desiring to appear more reasonable, they now "at minimum" request that Defendants' records and databases be updated to reflect two-year grants of deferred action and EADs.  Aug. 19 Tr. 44:15-22; ECF No. 304 at 1-2.

This is nothing more than a stealth request for a full clawback.  In practice, it is impossible for Defendants to "only" update their records and databases without also undertaking the requisite massive effort to ensure that all three-year EADs are returned and replaced with two-year EADs.  This Court is fully aware of the difficulty that Defendants have in ensuring that their systems correctly reflect whether a grantee has a three-year or two-year period of deferred action and EAD.  This bureaucratic nightmare would only be worse if Defendants attempted to change their records without also ensuring that grantees possessed updated, corrected EADs.

Moreover, allowing grantees to retain three-year EADs while Defendants' systems reflected two-year grants could be extraordinary harmful to grantees and interfere with the operation of 2012 DACA, which is not challenged in this litigation.  EADs are the only photo documentation grantees possess to prove authorized presence.  A grantee who has two years of deferred action but attempts to use the old three-year EAD card to prove authorized presence (at,

say, a Border Patrol checkpoint or an airport) could easily be detained or arrested, as the system would show that the swiped card is inconsistent with the information in DHS's system. Likewise, grantees using EADs to apply at agencies for driver's licenses or other services could be accused of document fraud or even have their EADs confiscated, if the agency employee ran the EAD against the SAVE system and realized the information displayed was inconsistent.

Additionally, Defendants' policy is that, if an individual's EAD contains an error, that individual apply for a replacement EAD and return the original, erroneous EAD to USCIS. *See U.S. Citizenship and Immigration Services Employment Authorization Document*, http://www.uscis.gov/green-card/green-card-processes-and-procedures/employment-authorization-document (last visited Sept. 4, 2015) ("[Y]ou must submit the original card along with a detailed explanation of the card error . . . ."); *cf.* 8 C.F.R. § 264.1(c) ("Any alien whose registration document is not available for any reason must immediately apply for replacement document in the manner prescribed by USCIS."). While *amici* obviously cannot predict Defendants' actions, it seems highly unlikely that they would allow grantees to retain possession of three-year EADs if this Court orders them to modify their records and databases to reflect two-year EADs.

The Court should thus analyze the States' request that Defendants be ordered to update their records and databases the same way it would analyze a request for the full clawback of all EADs. As described in Parts I and II, *supra*, it should reject any such request as unavailable under the sanctions power and unjustified as a mandatory preliminary injunction.

## <u>CONCLUSION</u>

For the foregoing reasons, *amici* Jane Does respectfully request that the Court deny the States' requested relief.

Dated:  September 4, 2015

Respectfully submitted,

**O'MELVENY & MYERS LLP**
Adam P. KohSweeney (Cal. Bar No. 229983)*
Gabriel Markoff (Cal. Bar. No. 291656)*
2 Embarcadero Center 28th Floor
San Francisco, CA 94111-3823
Phone:  (415) 984-8700
Facsimile:  (415) 984-8701

**DLA PIPER LLP**
Linda J. Smith (Cal. Bar. No. 78238)*
2000 Avenue of the Stars, Ste. 400N
Los Angeles, CA 90067
Phone: (310) 595-3000
Facsimile: (310) 595-3300

*Admitted *pro hac vice*.

**MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND**
**By** */s/ Nina Perales*
Nina Perales (Tex. Bar No. 24005046;
Southern District of Tex. Bar No. 21127)
Attorney-in-Charge
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone:  (210) 224-5476
Facsimile:  (210) 224-5382

<u>**CERTIFICATE OF SERVICE**</u>

I, the undersigned, hereby certify that, on the 4th day of September 2015, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Nina Perales*
Nina Perales (Tex. Bar No. 24005046)
***Attorney for Amici Curiae***

16