```
 1            IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
 2                  BROWNSVILLE DIVISION

 3
    STATE OF TEXAS, ET AL.        )
 4                                )
                                  )
 5                                )
    VS.                           ) CIVIL ACTION NO.
 6                                ) B-14-254
                                  )
 7                                )
    UNITED STATES OF AMERICA,     )
 8  ET AL.                        )

 9

10

11           JOINT MOTION TO STAY HEARING
         BEFORE THE HONORABLE ANDREW S. HANEN
12                DECEMBER 15, 2015

13

14

15              A P P E A R A N C E S

16
    FOR THE STATE OF TEXAS, ET AL.:
17
         MS. ANGELA V. COLMENERO
18       DIVISION CHIEF GENERAL
         LITIGATION DIVISION
19       PO Box 12548
         AUSTIN, TEXAS 78711-2548
20

21  FOR THE STATE OF TEXAS, ET AL.:

22       MR. ADAM N. BITTER
         ASSISTANT ATTORNEY GENERAL
23       FINANCIAL LITIGATION, TAX, AND
         CHARITABLE TRUSTS DIVISION
24       PO Box 12548
         AUSTIN, TEXAS 78711-2548

25
```

```
 1   FOR THE UNITED STATES OF AMERICA, ET AL.:

 2        MR. JOHN R. TYLER
          ATTORNEY AT LAW
 3        Clinton Square
          Rochester, New York 14604
 4

 5   FOR THE UNITED STATES OF AMERICA, ET AL.:

 6        MR. ADAM D. KIRSCHNER
          U.S. DEPARTMENT OF JUSTICE
 7        20 Massachusetts Avenue, NW
          Washington, DC 20530
 8

 9   FOR THE UNITED STATES OF AMERICA, ET AL.:

10        MR. DANIEL HU
          U.S. ATTORNEY'S OFFICE
11        1000 Louisiana, Suite 2300
          Houston, Texas 77002
12

13   FOR THE UNITED STATES OF AMERICA, ET AL.:

14        MS. JENNIFER D. RICKETTS
          U.S. DEPARTMENT OF JUSTICE,
15        CIVIL DIVISION, FEDERAL PROGRAMS
          BRANCH
16        20 Massachusetts Avenue, NW
          Washington, DC 20530
17

18   FOR MS. ORLY TAITZ - PRO SE:

19        MS. ORLY TAITZ
          ATTORNEY AT LAW
20        29839 Santa Margarita Parkway,
          Suite 100
21        Rancho Santa Margarita,
          California 92688
22

23   FOR JANE DOE'S 1, 2 & 3:

24        MS. NINA PERALES
          ATTORNEY AT LAW
25        100 Broadway Street, Suite 300
          San Antonio, Texas 78205-1910
```

| | | |
|---|---|---|
| 14:36:53 | 1 | THE COURT:  All right.  Be seated. |
| 14:37:04 | 2 | Must be doing something right, the crowd |
| 14:37:04 | 3 | keeps getting smaller and smaller. |
| 14:37:12 | 4 | Okay.  We're here in B-14-254, the State of |
| 14:37:16 | 5 | Texas versus USA. |
| 14:37:19 | 6 | And for Texas, Ms. Colmenero, who's with |
| 14:37:26 | 7 | you? |
| 14:37:27 | 8 | MS. COLMENERO:  Adam Bitter from the Texas |
| 14:37:29 | 9 | Attorney General's office. |
| 14:37:30 | 10 | THE COURT:  Okay. |
| 14:37:31 | 11 | And Mr. Hu, would you introduce your table |
| 14:37:35 | 12 | to me? |
| 14:37:36 | 13 | MR. HU:  This is Ms. Ricketts, Mr. Tyler and |
| 14:37:40 | 14 | Mr. Kirschner. |
| 14:37:41 | 15 | THE COURT:  All right. |
| 14:37:42 | 16 | MR. HU:  And I think Mr. Tyler's going to be |
| 14:37:45 | 17 | taking the lead today. |
| 14:37:46 | 18 | THE COURT:  Okay. |
| 14:37:46 | 19 | Mr. Tyler and Mr. Kirschner, I have signed |
| 14:37:49 | 20 | your pro hac's, so you are here. |
| 14:37:54 | 21 | Ms. Taitz, why don't you come up and, if you |
| 14:37:56 | 22 | would, sit at one of the tables. |
| 14:37:57 | 23 | And that leaves me with one person I don't |
| 14:37:59 | 24 | know.  Tell me who you are. |
| 14:38:01 | 25 | MS. PERALES:  Good afternoon, Your Honor. |

14:38:03   1   Nina Perales for Jane Doe's one through three.

14:38:07   2                   THE COURT:  Okay.  Why don't you come up,

14:38:09   3   too.  Grab a -- grab a chair.

14:38:11   4                   MS. PERALES:  Thank you.

14:38:12   5                   THE COURT:  Because you're one of the people

14:38:13   6   I want to talk about today.

14:38:22   7                   All right.  I appreciate y'all being here.

14:38:27   8   The -- the main purpose, number one, is to talk about

14:38:32   9   the Motion to Stay and what we want to do there.  And by

14:38:38  10   the word, "we", I mean, y'all.

14:38:40  11                   But the second part of this is we now have

14:38:47  12   a -- a -- an opinion by Judge Elrod basically saying I

14:38:53  13   should have let the Jane Doe's in.

14:38:57  14                   Although, Ms. Perales, you argued some

14:38:59  15   things at the Fifth Circuit that you didn't argue here,

14:39:01  16   but that's all right.  You're forgiven for that.  You

14:39:04  17   might have had a different result here if you'd argued

14:39:07  18   the same things, but the question is, and -- and

14:39:13  19   normally it wouldn't matter so much, except we're

14:39:15  20   dealing with an interlocutory judgment, and the -- and

14:39:20  21   the Supreme Court reverses, depending on what they

14:39:22  22   reverse on, I get it back.  And if they affirm, I

14:39:25  23   clearly get it back.

14:39:27  24                   And the question is clearly Ms. Perales'

14:39:32  25   clients are in, but how in are they?  That's one issue I

14:39:37  1  want to talk about.

14:39:38  2          And the second issue is who else is in?

14:39:44  3          Because I entered, with regard to

14:39:47  4  Ms. Perales, the same order I entered with regard to

14:39:49  5  five or six other people who attempted to intervene.

14:39:53  6  And the question is who else falls under the auspices or

14:40:03  7  the -- who fulfills the requirements of -- set out by

14:40:06  8  Judge Elrod in her order.

14:40:09  9          So, let's talk, first of all, about the

14:40:16  10 Motion to Stay, which I think is 90 percent agreed on at

14:40:24  11 least.

14:40:25  12         Ms. Colmenero, tell me what the State's view

14:40:28  13 is.

14:40:29  14         MS. COLMENERO:  I -- I believe from the

14:40:30  15 State's view, the agreed motion is one hundred percent

14:40:34  16 agreed on.  Which, I believe the parties had agreed to a

14:40:38  17 stay of proceedings until the USA's petition for writ of

14:40:45  18 certiori was decided by the U.S. Supreme Court and then

14:40:48  19 final disposition by the U.S. Supreme Court.  And so I

14:40:50  20 believe we were asking for a stay of all proceedings and

14:40:53  21 that the court's scheduling requirements would then kick

14:40:56  22 in 21 days after there had been a final disposition from

14:40:59  23 the U.S. Supreme Court.

14:41:00  24         THE COURT:  Either a denial of cert or an

14:41:05  25 opinion?

| | | |
|---|---|---|
| 14:41:06 | 1 | MS. COLMENERO:  Exactly. |
| 14:41:07 | 2 | THE COURT:  All right. |
| 14:41:11 | 3 | And, Mr. Tyler, does that square with your |
| 14:41:13 | 4 | thinking? |
| 14:41:13 | 5 | MR. TYLER:  That squares with our thinking, |
| 14:41:15 | 6 | Your Honor.  I believe -- think that makes imminent |
| 14:41:16 | 7 | sense to wait to hear from the Supreme Court on our cert |
| 14:41:19 | 8 | petition. |
| 14:41:19 | 9 | THE COURT:  All right. |
| 14:41:19 | 10 | MR. TYLER:  And then proceed from there. |
| 14:41:20 | 11 | THE COURT:  I may have taken the cart before |
| 14:41:22 | 12 | the horse here, but let me -- Ms. Perales, assuming you |
| 14:41:25 | 13 | still want in, does that -- do you have any opposition? |
| 14:41:33 | 14 | MS. PERALES:  We do not, Your Honor.  We |
| 14:41:35 | 15 | join the motion. |
| 14:41:36 | 16 | THE COURT:  Okay.  All right.  Okay.  So |
| 14:41:39 | 17 | that one seems pretty straight forward. |
| 14:41:43 | 18 | Let me talk generally about intervention |
| 14:41:48 | 19 | and -- and, Ms. Perales, part of this is directed |
| 14:41:52 | 20 | clearly at you and so I want your input. |
| 14:41:54 | 21 | Obviously, the -- the Fifth Circuit thinks I |
| 14:42:01 | 22 | should have granted your intervention motion.  And I |
| 14:42:06 | 23 | intend to do that.  I still have a question of why you |
| 14:42:11 | 24 | want in as opposed to being a friend of the court, but |
| 14:42:17 | 25 | you don't -- you don't have to -- come on up to the |

14:42:19  1   podium -- but you don't have to tell me why.  Your

14:42:22  2   motivations, I don't care about.

14:42:23  3            Here's what I care about.  Judge Elrod, in

14:42:34  4   her opinion, said, for purposes of the intervention

14:42:36  5   motion, we treat it basically like a motion to dismiss

14:42:40  6   in that we take the allegations as being true.

14:42:46  7            And, so, she and the rest of the Fifth

14:42:51  8   Circuit took the allegations as being true and said,

14:42:53  9   that being the case, you guys had an interest that was

14:42:56 10   not adequately represented by the Government in that you

14:42:59 11   should have been let in.

14:43:01 12            And I'm okay with that.  Here's what I -- I

14:43:05 13   mean, I'm foreseeing difficulties down the road.  Now,

14:43:08 14   obviously, if the Fifth Circuit says for -- I mean, if

14:43:12 15   the Supreme Court says, for instance, Texas doesn't have

14:43:15 16   standing, all this is going to be moot.  If -- but if

14:43:19 17   they reverse on anything else or affirm, here's what's

14:43:25 18   going to happen:  Your client's depositions are going to

14:43:27 19   be taken.  And it's -- it's not going to be a mystery.

14:43:33 20   Let's see, what do you think the first three questions

14:43:36 21   will be?  What's your name?  Where do you live?

14:43:40 22            And assuming then they're going to go right

14:43:44 23   down the -- the DAPA criteria to see if you really --

14:43:51 24   your clients really do have an interest in this case.

14:43:55 25   And they're entitled to do that.  In fact, it would been

| | | |
|---|---|---|
| 14:43:58 | 1 | malpractice for them not to do it. |
| 14:44:01 | 2 | So how do I handle that? |
| 14:44:03 | 3 | MS. PERALES:  Well -- |
| 14:44:04 | 4 | THE COURT:  I'm going to order you to |
| 14:44:05 | 5 | answer. |
| 14:44:05 | 6 | MS. PERALES:  Well, of course, Your Honor. |
| 14:44:07 | 7 | And -- and that would be very typical.  And in cases |
| 14:44:09 | 8 | like this where parties have been granted permission to |
| 14:44:13 | 9 | proceed under a pseudonym, we would typically -- |
| 14:44:17 | 10 | THE COURT:  You haven't been granted that |
| 14:44:18 | 11 | permission -- |
| 14:44:19 | 12 | MS. PERALES:  Okay. |
| 14:44:19 | 13 | THE COURT:  -- is what -- that -- that's |
| 14:44:20 | 14 | what -- that's the whole point. |
| 14:44:22 | 15 | MS. PERALES:  So then let me backup. |
| 14:44:23 | 16 | THE COURT:  Okay. |
| 14:44:24 | 17 | MS. PERALES:  What we would do, Your Honor, |
| 14:44:25 | 18 | first, is seek permission to proceed under pseudonyms. |
| 14:44:29 | 19 | THE COURT:  Okay.  I've denied that. |
| 14:44:32 | 20 | You've -- you've made that motion and I've denied it. |
| 14:44:34 | 21 | MS. PERALES:  I believe Your Honor granted |
| 14:44:35 | 22 | it. |
| 14:44:36 | 23 | THE COURT:  I believe I denied it.  It's |
| 14:44:38 | 24 | moot. |
| 14:44:38 | 25 | MS. PERALES:  Okay.  We would seek to |

14:44:41  1   proceed --

14:44:42  2                   THE COURT:  I could be wrong about that.  I

14:44:43  3   mean --

14:44:43  4                   MS. PERALES:  Okay.  No, I'm sure Your Honor

14:44:46  5   is right.

14:44:47  6                   THE COURT:  -- I only have about five

14:44:48  7   thousand motions in this case.

14:44:49  8                   MS. PERALES:  No, I'm sure Your Honor is

14:44:50  9   right.

14:44:51  10                  We would seek to proceed under pseudonyms

14:44:53  11  and then we would seek to negotiate with the other

14:44:55  12  parties, as we do in cases similar where we have clients

14:44:59  13  proceeding as Doe, we would seek to negotiate a

14:45:02  14  protective order where the information was known and

14:45:07  15  shared among the parties but probably for attorneys eyes

14:45:10  16  only.  And I can provide the court with examples of this

14:45:13  17  as it's done in other district courts.

14:45:16  18                  And we would, of course, have the clients

14:45:19  19  give their depositions and -- and go forward from there.

14:45:23  20                  THE COURT:  Okay.  If -- let me -- while I

14:45:29  21  fully intend to grant the Motion to Stay, I think you

14:45:33  22  and Ms. Colmenero, or whomever from the State side, need

14:45:37  23  to get together on that.  Because the minute the Motion

14:45:41  24  to Stay is up, I -- I mean, if I was the defense lawyer

14:45:46  25  or the -- or the -- I guess they're Plaintiffs, the

14:45:47   1   first thing I would do would be try to get rid of you.

14:45:47   2              MS. PERALES:  Uh-huh.

14:45:50   3              THE COURT:  Just because you'd mess up their

14:45:52   4   case.  Not you personally, but why -- why fight two

14:45:58   5   against one when I can fight one against one?  Y'all

14:46:03   6   work out a procedure and if it's -- I find it

14:46:08   7   reasonable, I mean, I'm sure I'll -- I'll follow it.

14:46:10   8              But they have a right to know who your

14:46:13   9   clients are and to make sure that the allegations that

14:46:18  10   you made in your petition are right, or at least

14:46:21  11   factually accurate.

14:46:22  12              MS. PERALES:  Oh, we completely agree,

14:46:24  13   Your Honor.

14:46:24  14              THE COURT:  Okay.  All right.  Okay.  That

14:46:25  15   takes -- that -- that actually solves one of the

14:46:29  16   problems.  I thought that was going to be a bigger

14:46:31  17   problem than -- than we thought.  Okay.  So, during the

14:46:34  18   pendency of this stay, I'm going to ask you and the

14:46:39  19   states to work that out.

14:46:40  20              MS. PERALES:  Yes, Your Honor.

14:46:41  21              THE COURT:  Okay.  All right.  You can sit

14:46:44  22   down now --

14:46:45  23              MS. PERALES:  Thank you, Your Honor.

14:46:46  24              THE COURT:  -- because you're no longer a

14:46:47  25   problem.

14:46:47  1          MS. PERALES:  Thank you.

14:46:48  2          THE COURT:  Or, at least temporarily, no

14:46:49  3   longer a problem.

14:46:51  4          All right.  Ms. Taitz, Dr. Taitz, you're

14:46:53  5   here.  I -- why don't you come up to the podium.

14:46:58  6          MS. TAITZ:  Yes, Your Honor.

14:47:00  7          THE COURT:  I denied your motion to

14:47:01  8   intervene as well.  The Fifth Circuit opinion was silent

14:47:07  9   as to you.  I assume you didn't appeal.  I, quite

14:47:11 10   frankly, didn't know the Jane Doe's had appealed.  That

14:47:15 11   was news to me when I was trying to figure out why I get

14:47:17 12   an e-mail with like all these different opinions

14:47:20 13   attached to it.  And I'm going -- you know, there aren't

14:47:23 14   that many judges on the Fifth Circuit panel and I've got

14:47:26 15   more opinions than -- than judges.

14:47:28 16          But I'm assuming, especially since you're

14:47:33 17   here, that you still want to intervene?

14:47:35 18          MS. TAITZ:  Yes, Your Honor.

14:47:35 19          THE COURT:  Okay.

14:47:36 20          MS. TAITZ:  If --

14:47:36 21          THE COURT:  Tell me how, under Judge Elrod's

14:47:40 22   opinion --

14:47:41 23          MS. TAITZ:  Yes, Your Honor.

14:47:42 24          THE COURT:  -- you fit under the

14:47:43 25   criteria she set out?

14:47:44  1          MS. TAITZ:  Well, Judge Jennifer Elrod

14:47:46  2     stated that the Fifth Circuit made its decision based on

14:47:53  3     Sierra Club v. Espy where federal courts should allow

14:47:55  4     intervention when no -- no one would be hurt and the

14:47:57  5     greater justice could be attained.

14:47:59  6          And she also quoted Mendenhall versus M/V

14:48:03  7     Toyota Maru stating that all of the allegations that are

14:48:09  8     provided would be accepted as true.

14:48:11  9          So what Judge Elrod is stating, she's

14:48:15  10    bringing several precedents which I believe are relevant

14:48:18  11    in my case.  One of those precedents is, of course, The

14:48:23  12    Black Fire Fighters Association of Dallas versus City of

14:48:25  13    Dallas where black fire fighters were allowed special

14:48:31  14    status.  And white fire fighters, which were not

14:48:35  15    entitled to any specific status, were allowed to

14:48:39  16    intervene because they were stating that they will be

14:48:43  17    affected by the -- by the fact that the black fire

14:48:47  18    fighters will be getting promotions, higher salaries and

14:48:50  19    they will be left behind.

14:48:52  20          Well, there's something similar happening

14:48:54  21    here.  Here, there is this mammoth decision which gives

14:48:58  22    millions of people legal status.  Millions of people are

14:49:02  23    getting work permits and they will be competing --

14:49:08  24    they -- they will be competing with myself and -- and --

14:49:12  25    and individuals similar situated.

14:49:13  1      So this is one of the -- the points.

14:49:16  2           And I have argued competitor status.   And I

14:49:24  3  have argued in -- in -- in -- in my pleadings *Northwest*

14:49:34  4  *Forest Workers Association* where the court has found

14:49:37  5  that there -- there was -- where -- in *Northwest Forest*

14:49:48  6  *Workers Association*, the holding was that nonprofit

14:49:51  7  organizations concerned with the economic, environmental

14:49:53  8  and demographic effects of immigration had standing to

14:49:56  9  challenge immigration regulations on the ground that the

14:49:59 10  regulations improperly expanded the scope of guest work

14:50:04 11  program.

14:50:05 12           And I have argued in my motion that this --

14:50:10 13  this decision does improperly affect myself and similar

14:50:18 14  situated individuals on a number of levels.   One is that

14:50:22 15  competitor where suddenly there are millions of

14:50:26 16  competitors that will be -- will be affecting contracts

14:50:30 17  and wages.

14:50:32 18           Second of all, I have argued Flast v. Cohen.

14:50:39 19  And I have argued the status as being a tax payer.

14:50:43 20           And thirdly, I have argued as a doctor

14:50:47 21  who -- who is located in the border state and working

14:50:51 22  with immigrants, I -- I -- I argued that this decision

14:50:57 23  represents a magnet, represents an invitation to a large

14:51:01 24  number of future illegal immigrants entering the

14:51:05 25  country.

```
14:51:06   1              And I have provided in --
14:51:08   2              THE COURT:  But doesn't Judge Elrod's
14:51:10   3    opinion basically say you have to have more than just
14:51:14   4    your status quo as an American or as a tax payer?
14:51:14   5              MS. TAITZ:  And --
14:51:18   6              THE COURT:  You have to have some kind of
14:51:21   7    individualized interest?
14:51:23   8              MS. TAITZ:  Yes, Your Honor.  And that --
14:51:24   9    that is why I -- I argued in -- in my pleadings that
14:51:27  10    being a doctor who is located in the border state, who
14:51:30  11    is contracted in working with immigrants, I will be
14:51:34  12    affected -- affected by this decision because this
14:51:37  13    decision invites a large number of illegal immigrants
14:51:42  14    entering the country and impacting myself.
14:51:48  15              And let me give you a couple of examples.
14:51:50  16              We've seen what's happening currently in
14:51:53  17    Germany where Chancellor Angela Merkel has opened the
14:51:57  18    borders.  It created a magnet where millions of
14:52:01  19    individuals flighted Germany.  And I have articles
14:52:05  20    stating that they brought with them large number of
14:52:08  21    epidemics of infectious diseases.  And I will be one
14:52:13  22    exposed to them.  They -- they -- they --
14:52:14  23              THE COURT:  How do you know you're going to
14:52:16  24    be exposed to them?
14:52:17  25              MS. TAITZ:  Oh, Your Honor, for example, I
```

14:52:20   1    brought with me a file, for example, a file of one of
14:52:23   2    those individuals.  As you know, there were individuals
14:52:27   3    from Syria who are crossing the border right here in
14:52:30   4    Laredo.  They're all put under Government programs.  And
14:52:33   5    I already got one of them, a refugee from Syria.  And I
14:52:39   6    have, if Your Honor would like to see it, I have his
14:52:40   7    medical file here with me.
14:52:42   8         So --
14:52:43   9         THE COURT:  What disease does he have that
14:52:46  10    you have been exposed to?
14:52:48  11         MS. TAITZ:  Well, I do have articles stating
14:52:50  12    that, among those refugees, there is a large number
14:52:55  13    of -- of infectious diseases.  I have information coming
14:52:59  14    from Germany and here.  Among them, Tuberculosis.  Among
14:53:04  15    them, drug -- drug resistant Tuberculosis.  Specifically
14:53:08  16    among individuals coming from Syria, there is an
14:53:12  17    epidemic of cholera.
14:53:13  18         THE COURT:  But does the person you're
14:53:14  19    talking about, did he have any diseases, communicable
14:53:19  20    diseases, that you were exposed to?
14:53:20  21         And my second question, my next question's
14:53:25  22    going to be in -- so -- and what does he have to do with
14:53:26  23    the program that's being argued about here?
14:53:28  24         MS. TAITZ:  Well, what -- what I am arguing,
14:53:32  25    that every time there is a decision, either by the

14:53:36    1    Government or by the federal court, which largely

14:53:38    2    expands -- expands federal programs allowing legal

14:53:44    3    status to large numbers of immigrants, that impacts the

14:53:49    4    community as -- as it becomes a magnet.  And it brings

14:53:52    5    large number of new illegal immigrants.  And there is

14:53:56    6    clear evidence that there are infectious diseases among

14:53:59    7    them.

14:54:00    8           As a matter of fact, Your Honor --

14:54:01    9    Your Honor stated in -- in my case, Taitz v. Johnson,

14:54:05   10    that you had individuals with Tuberculosis right here in

14:54:07   11    this courtroom.

14:54:09   12           I would like to bring another example.  Not

14:54:12   13    so long ago, Judge Dolly Gee in Los Angeles has issued

14:54:16   14    the decision in Flores v. Reno.  In that decision, she

14:54:21   15    argued that all of the individuals, all of the minors

14:54:24   16    and all of the families with minors who are currently in

14:54:27   17    detention centers, need to be released because detention

14:54:30   18    is bad for minors.  They can be depressed because of

14:54:30   19    that.

14:54:34   20           Well, what we've seen, as a result of this

14:54:35   21    decision by Judge Dolly Gee, that there were over 10,000

14:54:41   22    crossings right here in this area because it became a

14:54:45   23    magnet.  And individuals who were interviewed and asked,

14:54:48   24    why?  What is happening?  Why so many are crossing the

14:54:51   25    border?  And they were stating that they understand that

14:54:56   1   they will be granted legal status.  So there -- there

14:54:59   2   is -- there are consequences to those decisions,

14:55:02   3   Your Honor.

14:55:03   4           And --

14:55:04   5           THE COURT:  But -- but what consequences are

14:55:07   6   there to you?

14:55:09   7           MS. TAITZ:  As --

14:55:09   8           THE COURT:  That's what Judge Elrod says.  I

14:55:11   9   mean, she's -- she, for, let's say hypothetically,

14:55:14   10  said -- and -- and I'm paraphrasing or maybe even

14:55:18   11  reading between the lines -- but, I mean, she basically

14:55:21   12  said there are certain things in -- in federal policy,

14:55:25   13  whether it be immigration or other things, that affect

14:55:29   14  all of us as people that live in the United States.

14:55:34   15          But what gives you standing, for instance,

14:55:37   16  Ms. Perales' clients, they would qualify for this

14:55:41   17  program.  And -- and so they are affected.  Because

14:55:46   18  if -- if -- if the program goes forward, they

14:55:48   19  immediately get the benefit of it.

14:55:50   20          So they're directly affected.

14:55:54   21          MS. TAITZ:  Well, what's interesting, what I

14:55:56   22  found in the decision by Judge Elrod is that she stated

14:56:02   23  that, in order to be an Intervenor, you don't even have

14:56:06   24  to have standing.  You don't have to have standing that

14:56:10   25  you would have to open a case.  All you have to -- to

14:56:14  1   show that you -- that you are affected and that --

14:56:19  2              THE COURT:  But you have to be affected in

14:56:21  3   some way that's uniquely individualized as opposed to

14:56:27  4   being affected as a tax payer, for instance, or being

14:56:30  5   affected as a citizen of California or Texas.

14:56:34  6              MS. TAITZ:  Well, Your Honor --

14:56:35  7              THE COURT:  I mean, doesn't she say that

14:56:38  8   directly?

14:56:38  9              MS. TAITZ:  Well, she didn't say that.  She

14:56:40 10   did not state -- she -- she stated that you have to be

14:56:42 11   affected.  However, there is nothing in her decision

14:56:45 12   stating, for example, that a tax payer, somebody, for

14:56:49 13   example, who potentially would be losing work, will be

14:56:53 14   losing -- would -- would be losing contracts, is not

14:56:56 15   affected.

14:56:57 16              We, as a matter of fact, the way -- a number

14:57:00 17   of decisions, Your Honor, as I quoted *Northwest Forest*

14:57:05 18   *Association* where a nonprofit organization concerned

14:57:10 19   with economic, environmental and demographic effects of

14:57:14 20   immigration had standing to challenge immigration

14:57:17 21   regulations on the ground that the regulations

14:57:18 22   improperly expended the scope of a guest worker program.

14:57:23 23              So, in this particular case, and that case

14:57:27 24   went to Supreme Court, they -- a finding that you do not

14:57:31 25   have to have a -- a direct effect.  You -- you can be

14:57:40   1    affected, for example, here, just by the fact that there
14:57:44   2    is an increase scope of guest worker program.
14:57:47   3                    THE COURT:  Let me -- let me -- let me
14:57:49   4    change gears on you then.  If I say, all right,
14:57:53   5    Dr. Taitz, come on in.  What's your position in this
14:57:58   6    lawsuit?
14:57:59   7                    MS. TAITZ:  I -- I would -- would like --
14:58:03   8    to -- to join -- join with the State of Texas and the
14:58:07   9    states.
14:58:07   10                   THE COURT:  Why -- why aren't the states
14:58:08   11   already representing your interest?
14:58:10   12                   MS. TAITZ:  Yes.  Yeah.  That's a good --
14:58:12   13   that -- that's a very good question.  Because, when I
14:58:14   14   read the case, the only thing that they're arguing is
14:58:20   15   that -- that they will suffer some damages.  And, for
14:58:27   16   example, cost of drivers' licenses.  And I believe in
14:58:31   17   one of the -- --
14:58:33   18                   THE COURT:  Well, that's not the only thing
14:58:35   19   they were arguing, but they argued that primarily
14:58:37   20   because it gave them standing.
14:58:39   21                   MS. TAITZ:  Exactly.  But there are a number
14:58:42   22   of issues where --
14:58:43   23                   THE COURT:  It's ironic that drivers'
14:58:46   24   licenses not only gave the State standing, it gave
14:58:48   25   Ms. Perales an entryway into the lawsuit as well.

14:58:51  1          Go ahead.

14:58:52  2          MS. TAITZ:  But what is interesting, though,

14:58:54  3  that, in -- in -- in this whole -- whole situation,

14:58:57  4  individuals like myself are -- are lost in the shuffle.

14:59:03  5  Your Honor, the -- if, for example, the citizens who are

14:59:08  6  affected get -- get no resolution.

14:59:14  7          For example, when you talk about competitive

14:59:17  8  standing, in *Mendoza*, it states, agencies list --

14:59:24  9  competitor standing doctrine recognizes that a party

14:59:27  10  suffers a cognizable injury under Article 3 when

14:59:31  11  agencies list --

14:59:32  12          THE COURT:  No.  Let me interrupt you.

14:59:35  13  Because I'm not saying that -- that you may have things

14:59:39  14  that you're interested in that they're not interested

14:59:42  15  in.  That -- I mean, that's probably easily true.  But

14:59:48  16  the relief they're requesting, if they win, don't you

14:59:52  17  win?

14:59:53  18          MS. TAITZ:  Well, the -- the problem here is

14:59:56  19  that, if they lose, then I -- I have no venue.  However,

15:00:03  20  if I am part of this case, I'm able to bring issues that

15:00:08  21  they do not bring in their case.  So I'm able to augment

15:00:13  22  the case.  And, if, for example, it happens so that they

15:00:16  23  lose, that they lose in the Supreme Court, it does not

15:00:20  24  necessarily mean that the case is dead.  That I lose.

15:00:25  25  If -- if I --

15:00:25   1          THE COURT:  Hold on.  Wait.  Wait.  Help me

15:00:27   2   there.  If they lose in the Supreme Court, I -- well, I

15:00:29   3   guess it depends on how they lose, but that usually --

15:00:33   4   that usually puts an end to most cases.

15:00:36   5          MS. TAITZ:  Well, Your Honor, I believe if

15:00:37   6   Your Honor grants me an Intervenor status, I would be

15:00:40   7   able to file a brief in the Supreme Court as well based

15:00:45   8   on the status.  And -- and -- and that way Supreme Court

15:00:48   9   will look not only at the rights of the states, it will

15:00:52  10   also look at the rights of the individuals who are

15:00:56  11   affected by -- by those large executive orders that are

15:01:01  12   brought by the federal government.

15:01:03  13          Suddenly the Supreme Court would have to

15:01:05  14   look not only at clients of Ms. Perales --

15:01:10  15          THE COURT:  Perales.

15:01:11  16          MS. TAITZ:  -- Perales, I'm sorry, but also

15:01:12  17   they would have to look at the individuals like myself

15:01:15  18   who are affected.

15:01:18  19          For example, let me give you one example.

15:01:21  20   DHS is stating that they have very limited funding.  And

15:01:26  21   suddenly they decide to -- to -- to use, I guess, most

15:01:30  22   of their funding to -- to provide legal status to

15:01:34  23   millions of individuals under this program.  Their

15:01:38  24   funding will be taken away.  It affects me.

15:01:40  25          I just came from the State of California

15:01:42  1   where we just buried 14 of my fellow California citizens

15:01:47  2   who -- who died to a great extent because DHS is under

15:01:51  3   funded, is not doing its job and not checking people who

15:01:54  4   are coming in.

15:01:55  5          The woman who came to -- to California lied

15:01:58  6   on her application for Visa.  She gave a bogus

15:02:02  7   nonexistent address.  They -- they missed it.  They're

15:02:05  8   under funded.  They -- she also was making statements in

15:02:08  9   support of ISIS on Internet.  They missed it.  They

15:02:12  10  under funded.

15:02:12  11         So, now, every person at DHS is not doing

15:02:17  12  their job, they're not defending me, they're not

15:02:20  13  defending individuals who are similar situated.  And

15:02:22  14  suddenly, most of their funding will be gone because

15:02:25  15  they will be busy processing those millions of DACA and

15:02:32  16  DAPA applications instead of using this funding in their

15:02:32  17  job in defending me.

15:02:36  18         THE COURT:  Let me -- let me stop you there.

15:02:37  19  I understand that argument, but, if I said that

15:02:41  20  everybody who thinks that DHS is not protecting us could

15:02:45  21  intervene in this lawsuit, I'd have to have the biggest

15:02:49  22  class action in the history of class actions; wouldn't

15:02:51  23  I?

15:02:52  24         MS. TAITZ:  Well, maybe you should allow

15:02:53  25  class action lawsuits, Your Honor.  And --

15:02:55  1          THE COURT:  I wasn't soliciting.

15:02:57  2          MS. TAITZ:  But I would definitely agree to

15:02:59  3  that and I think they should -- the -- the -- the

15:03:01  4  individuals like myself who are affected and the

15:03:04  5  citizens should be given a word, a say in this case.

15:03:08  6          It's not only about the states and the

15:03:11  7  federal government, it's also -- and it's -- it's not

15:03:14  8  only about illegal immigrants, it's also about citizens

15:03:18  9  like myself who are affected, whose -- whose taxes are

15:03:22  10 being taken away.

15:03:23  11         Ms. Perales' clients, many of them, are --

15:03:28  12 are indigent, are very poor.  The moment they get

15:03:31  13 their -- their legal status, many of them will be on

15:03:33  14 welfare programs.  That affects me as a tax payer.  It

15:03:38  15 affects me on -- on -- on -- under the basis of

15:03:41  16 competitive standing on the *Mendoza* that I just argued.

15:03:44  17 Because, when there are millions of people that suddenly

15:03:47  18 are getting work permits, there is more competition and

15:03:51  19 the wages are going down.  The contracts would be going

15:03:56  20 down.

15:03:56  21         For example, if I have a contract with

15:04:00  22 federal government, and I do, in providing here for --

15:04:06  23 for individuals, like Ms. Perales' clients, suddenly

15:04:10  24 there are 10 other doctors who -- who suddenly get work

15:04:14  25 permits, they get legal status, they're opening their

| | | |
|---|---|---|
| 15:04:17 | 1 | offices across the street from me, what's going to |
| 15:04:20 | 2 | happen to those contracts?  Those contracts are going to |
| 15:04:22 | 3 | go down.  The -- the compensation is going to go down. |
| 15:04:26 | 4 | And, at this point in this important case, the citizens |
| 15:04:29 | 5 | like myself have no -- no say, have no representation. |
| 15:04:35 | 6 | And -- and -- and Your Honor is right, I hope you -- |
| 15:04:37 | 7 | THE COURT:  Setting aside you're from |
| 15:04:39 | 8 | California, I mean, with regard to the actual states |
| 15:04:42 | 9 | that are Plaintiffs in this case, aren't there -- aren't |
| 15:04:47 | 10 | there respective states Attorney General's here arguing |
| 15:04:51 | 11 | on behalf of their citizens?  I mean, that's part of |
| 15:04:54 | 12 | their argument is they're representing their -- their |
| 15:04:56 | 13 | citizens. |
| 15:04:57 | 14 | MS. TAITZ:  But -- but -- but, Your Honor, |
| 15:04:58 | 15 | if you -- if you look at their argument, and that's |
| 15:05:03 | 16 | what -- and that's what Judge Elrod is -- is stating, |
| 15:05:06 | 17 | the question is:  Are they arguing the same?  Are they |
| 15:05:11 | 18 | arguing the same points?  And they're not.  They're |
| 15:05:14 | 19 | arguing only the -- the point of the states losing some |
| 15:05:20 | 20 | of the funding that they will have -- that -- to -- to |
| 15:05:24 | 21 | expand, that will be expanded towards providing those |
| 15:05:28 | 22 | illegal immigrants with drivers' licenses, with welfare |
| 15:05:31 | 23 | benefits, with low income housing and so forth. |
| 15:05:35 | 24 | But they -- they -- the states do not |
| 15:05:38 | 25 | represent the citizens themselves who will be affected |

15:05:43  1   and competitor standing due to increased competition

15:05:47  2   where they will be losing their jobs, they -- they will

15:05:50  3   be -- the -- the contracts that they have today and the

15:05:52  4   wages that they have today will be going down.

15:05:57  5           And also they're affected in terms of --

15:06:02  6   they will be affected in terms of -- as tax payers

15:06:08  7   because their tax payer funding will be used for those

15:06:15  8   individuals, not -- they will not be used for myself,

15:06:18  9   for my children, for my community, they will be used

15:06:21  10  for -- for those individuals.

15:06:22  11          And there will be other effects that are

15:06:27  12  specific --

15:06:27  13          THE COURT:  Aren't those political

15:06:30  14  questions?

15:06:30  15          MS. TAITZ:  No, they're not political

15:06:33  16  questions.  And, Your Honor, I have argued -- I have

15:06:35  17  provided Your Honor with cases where the court's decided

15:06:38  18  this as justiciable issues.

15:06:41  19          As I stated, in *Mendoza*, the court has found

15:06:46  20  that there is competitor standing.  *Northwest Forest*

15:06:52  21  *Workers Association*, it was found to be justiciable and

15:06:56  22  standing was given to an association that's

15:07:00  23  represented -- that was representing the -- the citizens

15:07:03  24  who were concerned with -- with expanded scope of guest

15:07:06  25  worker -- guest workers.

| | |
|---|---|
| 15:07:08 | 1 |
| 15:07:15 | 2 |
| 15:07:18 | 3 |
| 15:07:20 | 4 |
| 15:07:23 | 5 |
| 15:07:27 | 6 |
| 15:07:32 | 7 |
| 15:07:34 | 8 |
| 15:07:38 | 9 |
| 15:07:41 | 10 |
| 15:07:44 | 11 |
| 15:07:47 | 12 |
| 15:07:53 | 13 |
| 15:07:57 | 14 |
| 15:08:01 | 15 |
| 15:08:06 | 16 |
| 15:08:08 | 17 |
| 15:08:12 | 18 |
| 15:08:16 | 19 |
| 15:08:20 | 20 |
| 15:08:24 | 21 |
| 15:08:28 | 22 |
| 15:08:32 | 23 |
| 15:08:36 | 24 |
| 15:08:42 | 25 |

Flast v. Cohen, it was found to be a justiciable issue.  And Earl Warren, Chief Justice of the Supreme Court, notes:  Our point of reference in this case is the standing of individuals who assert only the status of federal tax payer and who challenge the Constitutionality of a federal spending program. Whether such individuals have standing to maintain that form of action turns on whether they can demonstrate the necessary stake as tax payer in the outcome of the litigation to satisfy Article 3 requirement.

And here it's a program that exists under spending -- taxing and spending.  The -- the allocation of funds was given to the federal government through omnibus and it's -- it's squarely within Flast v. Cohen. As a tax payer, I can get in -- in this case.

And I hope Your Honor would allow a -- a class action lawsuit so that I would not be the only one, so it would be -- so other citizens like myself, who are affected in so many different levels, who suddenly are exposed to -- to -- to -- to infectious diseases.  I have provided Your Honor in -- in Taitz v. Johnson with a sworn declaration of a fellow doctor who also works with immigrants, Dr. James Hedrick, who stated that he and his whole team of nurses were infected with drug resistant Tuberculosis.  And he had

15:08:46   1    to go through extensive treatment.

15:08:48   2          This is -- this is not some -- something

15:08:51   3    hypothetical.  This is what I face every day when I work

15:08:55   4    with patients, when the patients are bleeding, they're

15:08:58   5    next to me.  So, when -- when you have a situation where

15:09:01   6    the federal government encourages illegal immigration,

15:09:05   7    where -- where federal government suddenly gives legal

15:09:09   8    standing to millions of individuals who come here

15:09:12   9    illegally, that creates a flood.

15:09:15   10         Your Honor, I'm sure you -- you see this

15:09:17   11   flood of people crossing the border right here.  As I

15:09:20   12   said, it -- it was in the papers, there were over 10,000

15:09:24   13   people.  That affects people like myself, doctors

15:09:27   14   working with immigrants, it affects communities.  There

15:09:31   15   is, unfortunately, increase in crime and -- and increase

15:09:37   16   in -- in -- in those epidemics of infectious diseases.

15:09:42   17         So, in this case, this is such an important

15:09:46   18   case.  And, at this point, individuals are not

15:09:49   19   represented.  The only individuals that are represented

15:09:52   20   are illegal aliens.  But not the citizens who are

15:09:55   21   affected by -- by this order.

15:09:57   22         THE COURT:  All right.

15:09:58   23         Mr. Tyler, you want to weigh in on whether

15:10:01   24   Dr. Taitz can --

15:10:04   25         MR. TYLER:  Giving all due respect to the

15:10:07   1   concerns that Dr. Taitz expressed in court today on

15:10:10   2   behalf of herself as a citizen and on behalf of her

15:10:13   3   fellow citizens, Your Honor, I don't think this is a

15:10:15   4   closed issue.

15:10:17   5            I'll -- I'll begin with the adequate

15:10:18   6   representation.  I mean, the Fifth Circuit made it very

15:10:22   7   clear in the Doe's decision that a punitive Intervenor

15:10:26   8   has to demonstrate that one or the other party in this

15:10:29   9   litigation cannot adequately represent that interest.

15:10:32  10   And there's a presumption of adequate representation if

15:10:35  11   they share the same outcome as is true with Dr. Taitz

15:10:41  12   and the state Plaintiffs.

15:10:42  13            She cannot show that there is in fact an

15:10:48  14   adverse interest between herself and the states.  And as

15:10:51  15   a result, without that adversity, she cannot demonstrate

15:10:55  16   inadequate representation.  Nor can she demonstrate that

15:10:58  17   she has a real substantial and legally protected

15:11:04  18   interest in this case.  It has to be reel, it has to be

15:11:08  19   direct and it has to be substantial.  Your Honor's

15:11:11  20   questions of Dr. Taitz, I think, are right on the money.

15:11:14  21   They're very well directed.

15:11:16  22            The concern she expresses are too

15:11:19  23   attenuated.  To diffuse as a tax payer, there's no

15:11:22  24   limiting limitation to that and any and all tax payers

15:11:25  25   of this country could join this suit.

15:11:27  1          So to competitive standing.  I -- I don't

15:11:30  2   know that the limitation is of that as such.

15:11:32  3          And as I understand it in rereading

15:11:36  4   Your Honor's decision addressing the Government's motion

15:11:39  5   to dismiss, you have rejected within the context of

15:11:43  6   the standing analysis this so called "magnet theory"

15:11:46  7   that, if DAPA is allowed to go forward, it will attract

15:11:50  8   further illegal immigrations, which will bring all these

15:11:51  9   alleged ill's to the country.

15:11:55  10         You've already rejected that.  And while it

15:11:55  11   was within the context of a standing analysis, I think

15:11:58  12   it fully applies in this case in regard to the

15:12:00  13   intervention issue that Your Honor is now entertaining.

15:12:03  14         She does not, in effect, have a concrete

15:12:06  15   stake in the outcome of this case.  If Your Honor were

15:12:10  16   to enjoin permanently DAPA, it would not remedy the

15:12:18  17   ill's that she complains of.

15:12:19  18         And, so, for all of these reasons, again,

15:12:21  19   Your Honor, with respect, I -- I don't think this is a

15:12:22  20   closed question.  I don't think she comes anywhere close

15:12:25  21   to satisfying the elements that one must satisfy

15:12:28  22   pursuant to the discussion by the Fifth Circuit and the

15:12:32  23   Doe decision.

15:12:33  24         THE COURT:  Ms. Perales, do you want to

15:12:35  25   weigh in at all?

15:12:36  1           MS. PERALES:  Just briefly, Your Honor.

15:12:44  2           I believe that Ms. Taitz' concerns, her --

15:12:47  3  her injuries that she believes that she will experience,

15:12:51  4  fall most closely under the Fifth Circuit case known as

15:12:59  5  NOPSI, New Orleans Public Service, Incorporated,

15:13:01  6  732 F2nd 452, which differentiated the type of broad and

15:13:07  7  non-specific injury that was alleged in that case by the

15:13:11  8  city of New Orleans on behalf of its rate pairs.  And

15:13:16  9  they were ultimately denied intervention from the type

15:13:19  10  of concrete and specific injury that the Fifth Circuit

15:13:23  11  found the Doe's had and that was sufficient for

15:13:26  12  intervention.

15:13:28  13          I don't want to repeat much of what

15:13:31  14  Mr. Tyler said regarding this court's previous rejection

15:13:36  15  in the context of standing of the mass influx idea, but

15:13:42  16  I would say that *Black Fire Fighters*, which was cited by

15:13:47  17  Ms. Taitz, doesn't really apply here in terms of

15:13:51  18  employment opportunities.

15:13:54  19          The white fire fighters in that case had a

15:13:57  20  very direct and concrete interest in promotional

15:14:01  21  employment opportunities.  The Fifth Circuit, in the

15:14:04  22  opinion regarding the Doe's, made a connection between

15:14:08  23  that and the Doe's direct interest in receiving work

15:14:12  24  authorization.

15:14:13  25          I would only point out that the idea of

15:14:18  1    Ms. Taitz is -- is greatly more attenuated in the sense

15:14:22  2    that somebody might receive a grant of deferred action

15:14:26  3    under DAPA who is already present, secure work

15:14:31  4    authorization and medical licensing and then open up a

15:14:35  5    competitive medical practice nearby, just seems a bit

15:14:40  6    too far.

15:14:41  7             And then, finally, of course, the very

15:14:44  8    professional and skilled team that is representing the

15:14:49  9    Plaintiffs in this case, whom I've had the pleasure of

15:14:52  10   working with in other cases, is providing more than

15:14:55  11   adequate representation to Ms. Taitz regarding the

15:15:00  12   issues that she wants to bring.

15:15:02  13            What I didn't hear were different legal

15:15:04  14   claims or any assertion that these claims were being

15:15:08  15   litigated by Plaintiffs in a way that was adverse to her

15:15:12  16   interests, but merely a desire on her part to add the

15:15:15  17   perspective that she has, in which case that would be

15:15:20  18   insufficient for intervention.

15:15:22  19            Thank you.

15:15:22  20            THE COURT:  Ms. Colmenero, do you want to

15:15:26  21   weigh in?

15:15:26  22            MS. COLMENERO:  Sure, Your Honor.

15:15:29  23            Just very briefly because I think these

15:15:31  24   issues have been covered before by both the Defendants

15:15:34  25   as well as the Jane Doe's.  But the Plaintiff states

15:15:38   1   believe that the Fifth Circuit's ruling has no impact on

15:15:41   2   Ms. Taitz' proposed intervention because she asserts no

15:15:45   3   legally recognizable injury that is sustained from any

15:15:47   4   other citizen.

15:15:48   5          And we believe, as we read the Fifth Circuit

15:15:51   6   opinion, the Doe's were allowed to intervene because

15:15:53   7   they had a legally protectable interest as intended

15:15:58   8   beneficiaries of the program.

15:15:59   9          And, two, because the Doe's had identified a

15:16:02  10   specific way in which their divergent interests with the

15:16:06  11   federal government led them to adopt a -- a different

15:16:06  12   litigation position.

15:16:09  13          And that was namely whether or not the

15:16:11  14   Plaintiffs required to give them drivers' licenses.  And

15:16:14  15   we believe that no other individuals, including

15:16:17  16   Ms. Taitz, meets these elements as set forth by the

15:16:19  17   Fifth Circuit.

15:16:20  18          And I will say the one, under questioning

15:16:22  19   from Your Honor, regarding the adequate representation

15:16:25  20   and whether or not what arguments she would make and

15:16:29  21   whether she would take a different litigation position

15:16:32  22   from the Plaintiff states, the one example she raised

15:16:35  23   was, in fact, an argument that the Plaintiff states did

15:16:38  24   raise before Your Honor as one of the different standing

15:16:42  25   issues that we believed satisfied our standing

15:16:45  1    requirement.  And that was the magnet theory.

15:16:47  2                    THE COURT:  I think it's one I rejected,

15:16:50  3    but --

15:16:50  4                    MS. COLMENERO:  Yes, it was.  It was -- it

15:16:52  5    was one that you did, in fact, reject.  But we did, in

15:16:55  6    fact, advance that argument here fully and have

15:16:57  7    continued to advance it as well.

15:16:58  8                    So I believe that we have -- there is

15:17:01  9    adequate representation by the Plaintiff states here and

15:17:03 10    that Ms. Taitz doesn't meet the requirements for

15:17:06 11    intervention.

15:17:08 12                    MS. TAITZ:  May I --

15:17:08 13                    THE COURT:  Dr. Taitz, I'll give you the

15:17:09 14    last word.

15:17:10 15                    MS. TAITZ:  Okay.  Well, I would like to

15:17:12 16    respond with several points.  In -- I saw in one of the

15:17:16 17    decisions, it -- it stated that it's possible that only

15:17:20 18    the State of Texas would be found to have standing and

15:17:24 19    not other states.  So it is not clear that, as a citizen

15:17:28 20    of California, I would have any relief.

15:17:31 21                    As Your Honor have correctly stated,

15:17:33 22    Attorney General of California is not part of this

15:17:37 23    action.  So, if -- if -- if I'm not given Intervenors

15:17:42 24    status and -- and allowed to be part of this case, then

15:17:45 25    I would have no relief if, for example, Supreme Court

15:17:48   1   decides that only the State of Texas would get some

15:17:53   2   relief for them.

15:17:56   3         The -- one of the arguments was that it's

15:18:00   4   something unlikely that individuals who is illegally

15:18:05   5   here will get a license and will be a professional.

15:18:08   6         Your Honor, in the State of California, the

15:18:10   7   legislature just recently decided that illegal aliens

15:18:15   8   are -- are allowed, for example, to -- to sit for the

15:18:19   9   bar and become attorneys and officers of the court.  It

15:18:22   10   was in the papers.  There was a very well known case

15:18:25   11   with somebody who was an illegal alien demanded this

15:18:28   12   right and he received it.

15:18:30   13         So, yes, I would get competition from

15:18:34   14   individuals who might be here illegally.  But they are

15:18:37   15   allowed to sit -- there is no requirement to be a

15:18:40   16   citizen or permanent resident in order to sit for the

15:18:43   17   bar in California or to sit for dental boards and become

15:18:47   18   a licensed dentist.

15:18:49   19         Next, in the decision of Judge Elrod, she

15:18:52   20   actually brought as an example two cases.  One was

15:18:56   21   League of United Latin American Cities versus City of

15:19:00   22   Boerne here in -- in Texas.  And what it stated that

15:19:06   23   the -- the -- those individuals were given an Intervenor

15:19:09   24   status because their voting right was affected.

15:19:13   25         Your Honor, I argued to you that my voting

15:19:16   1   rights were taken away from me because typically

15:19:20   2   immigration is something that comes from --

15:19:23   3              THE COURT:  Let's back up here, though.  How

15:19:25   4   does DAPA affect voting?

15:19:28   5              MS. TAITZ:  Yes.  Yes.  Yes, Your Honor.

15:19:29   6   And I would like to explain.  Typically immigration --

15:19:31   7   immigration decisions are going from bottom up.  We, the

15:19:33   8   citizens, vote for our representatives.  Our

15:19:35   9   representatives vote for specific laws.  They become

15:19:38  10   statutes.  They become -- they become immigration

15:19:42  11   statutes and they're supposed to be enforced by the

15:19:46  12   federal government.

15:19:46  13              What is happening here is, with the stroke

15:19:49  14   of a pen, the President decides to do away with existing

15:19:56  15   statutes.  And he decides to create -- to create a -- a

15:20:01  16   group of millions of people who suddenly are getting

15:20:05  17   legal status.

15:20:06  18              What does it do to my -- to my legal rights?

15:20:10  19   They become a sham.  And -- and I do hope that

15:20:12  20   Your Honor would allow a class action because I'm not

15:20:15  21   the only one.  My -- myself and other individual --

15:20:19  22              THE COURT:  Dr. Taitz, don't hold up --

15:20:19  23              MS. TAITZ:  Okay.

15:20:22  24              THE COURT:  -- hold out any hope --

15:20:22  25              MS. TAITZ:  Okay.

15:20:22    1              THE COURT:   -- that I'll allow a class

15:20:23    2    action.

15:20:24    3              MS. TAITZ:   Okay.   Okay.   But -- but,

15:20:25    4    Your Honor, what -- what I am saying that this is

15:20:29    5    similar to League of United Latin American Citizens

15:20:32    6    versus the City of Boerne and also City of Houston

15:20:35    7    versus American Traffic Solutions.

15:20:39    8              In both cases that were quoted by -- by

15:20:43    9    Judge Elrod, the -- the law says that individuals

15:20:49   10    suffered, which allowed them to be Intervenors who are

15:20:52   11    not pecuniary.   They didn't lose any money.   What she is

15:20:55   12    stating that, in those cases, they -- their voting

15:21:00   13    rights were affected.   Because what is happening in --

15:21:04   14    in those cases, basically, their voting rights have no

15:21:07   15    value.   And that is what is happening here.   My voting

15:21:11   16    rights are affected, just like in those two cases.

15:21:15   17              Further --

15:21:16   18              THE COURT:   Well, if DAPA gave someone the

15:21:20   19    right to vote, I could see that argument.   But it

15:21:22   20    doesn't give them the right to vote.

15:21:24   21              MS. TAITZ:   No, it doesn't give them the

15:21:26   22    right to vote, but what is happening, my right -- I

15:21:28   23    voted for my representative.   My representative voted

15:21:31   24    for specific bills which became immigration statutes.

15:21:36   25    What -- what Mr. Obama did, he just threw away all of

15:21:42  1   this process of -- of me voting, of my representative

15:21:45  2   voting, of creating statutes, making those into law.  He

15:21:49  3   just threw it all away.  He decided basically an

15:21:52  4   imperial order, I'm going to give a special legal status

15:21:55  5   to millions of people.

15:21:56  6              THE COURT:  If I gave standing to someone to

15:21:58  7   sue, then the entire United States could be Plaintiffs.

15:22:01  8              MS. TAITZ:  Well, maybe Your Honor should

15:22:02  9   allow this.

15:22:04  10             Next -- but -- but this is an important

15:22:07  11  right that was -- that was quoted by Judge Elrod.  So,

15:22:10  12  in the State of California, my -- my vote -- my vote

15:22:15  13  became null and void, became a sham.  Whatever I voted

15:22:19  14  for has no value.  I'm not represented in this case

15:22:23  15  because the -- the -- the secretary -- because the

15:22:26  16  Attorney General of California did not join this case.

15:22:30  17  So I have no representation.  Unless Your Honor gives me

15:22:33  18  an Intervenor status, I have no representation

15:22:35  19  whatsoever.

15:22:37  20             Specifically if the Supreme Court decides

15:22:40  21  that only the State of Texas would -- would have

15:22:42  22  standing, then -- then I have nothing.

15:22:45  23             And then also the attorney for the

15:22:49  24  Jane Doe's mentioned the -- the -- the City of

15:22:52  25  New Orleans.  What's interesting, I -- I do recall --

15:22:56  1   and -- and I -- I wanted to mention something else.

15:23:00  2   Your Honor, I did not know about this hearing until

15:23:02  3   yesterday night.  You have issued an order on December

15:23:07  4   the 1st and what I received, it -- it stated there is a

15:23:14  5   motion hearing on Motion to Stay.  So because I -- I

15:23:16  6   wasn't allowed to be an Intervenor, I -- I did not think

15:23:20  7   it applied to me.  And I think the other Intervenors are

15:23:23  8   not here.  They saw the same way.

15:23:26  9         Your Honor, you would be surprised how I

15:23:28  10  found out about this case.  Yesterday I was working with

15:23:30  11  my patients, end of the day, I just wanted to look on

15:23:33  12  the net for news.  And on Google news, suddenly I

15:23:37  13  stumbled on an article that was -- that -- that -- that

15:23:39  14  was printed by POLITICO Magazine, an author,

15:23:45  15  Josh Gerstein, of POLITICO.  And I think that,

15:23:49  16  Your Honor, you are famous.  And so he -- he wrote an

15:23:52  17  article, he stated that Orly Taitz and Sheriff Arpaio

15:23:57  18  might become a part of this legal action in Texas and

15:24:00  19  the Judge might -- might allow them as Intervenors and

15:24:04  20  the hearing is tomorrow.

15:24:05  21        I called, Ms. Sustaeta will -- will confirm,

15:24:07  22  I called right away.  I said, can I do it on the phone?

15:24:09  23  And then I looked, I went on the docket, I saw you

15:24:12  24  cannot appear on the phone.  Your Honor, I have spent

15:24:14  25  $1,100 for the last minute ticket to appear here.  I

15:24:19   1   flew all night long.  I just came here straight from the

15:24:22   2   plane.  I'm not even dressed for court because I just

15:24:25   3   came from -- from -- from the airport.  So I just wanted

15:24:28   4   to tell you, I'm quoting you.  I had just a little bit

15:24:31   5   overnight to look at this decision --

15:24:34   6            THE COURT:  I -- I will give you more time

15:24:35   7   to do it.  I -- I mean, my specific order, and if it

15:24:39   8   didn't get carried out, I'll -- I'm going to speak to

15:24:42   9   the clerk, was to make sure everybody that had sought

15:24:44   10  intervention got notice of this.

15:24:46   11           MS. TAITZ:  It just wasn't --

15:24:48   12           THE COURT:  Not just you and not just

15:24:49   13  Mr. Arpaio, but there were also Mitchell Williams,

15:24:52   14  Harold William Van Allen and obviously the Jane Doe's.

15:24:56   15           MS. TAITZ:  What -- what was happening,

15:24:57   16  when -- when I received on December the 1st a

15:25:00   17  notification from court, it stated -- it -- it was

15:25:02   18  notice of a hearing to stay the -- the -- the

15:25:05   19  proceedings.  And I did not think that I had anything to

15:25:10   20  do with this.  And only late -- only yesterday night

15:25:12   21  when I read the article in Google news in POLITICO, I

15:25:17   22  realized that inside there, there was an order that

15:25:19   23  mentioned me.  And I -- I -- I got the airplane ticket

15:25:22   24  right away.  And, at night, I mean, I am quoting

15:25:25   25  basically something that I read at night in between the

15:25:29    1    flights or on the flight.  And that's how I -- I'm --

15:25:33    2    I'm arguing here because I had just very little time.

15:25:36    3             But basically, in -- so what I'm stating, in

15:25:40    4    the decision, I do recall decision of Judge Elrod, she

15:25:43    5    is mentioning that -- and -- and -- and we were talking

15:25:48    6    about the City of New Orleans -- there was a case where,

15:25:51    7    in Louisiana, and I believe it was the City of

15:25:54    8    New Orleans, the -- the parents sought to intervene

15:25:58    9    because they wanted some vouchers for -- for school.

15:26:01   10    And what Judge Elrod stated that, if there is an

15:26:06   11    Intervenor whose due process rights are affected, this

15:26:11   12    Intervenor can be part of the case.

15:26:13   13             And I submit to you, Your Honor, that my due

15:26:16   14    process rights are affected because I -- I am -- I -- I

15:26:20   15    will be exposed to -- to -- to -- to this clad of -- of

15:26:26   16    new illegal immigrants with infectious diseases.

15:26:29   17             My due process rights are affected in -- in

15:26:32   18    that I will be subjected to increased competition with

15:26:35   19    people who are suddenly getting licenses.

15:26:37   20             My due process rights, my -- my voting

15:26:40   21    rights, are affected because I have -- I basically have,

15:26:45   22    if -- if Your Honor does not allow me to be part of this

15:26:47   23    case, then I don't have the first amendment right for

15:26:50   24    address of grievances.  I do have all those grievances.

15:26:54   25    Where can I address them, if not here?

| 15:26:56 | 1 | And -- and so I do believe that my fifth and |
| 15:26:59 | 2 | 14th amendments due process rights were affected and the |
| 15:27:03 | 3 | only way I -- I'll be able to -- to -- to represent them |
| 15:27:05 | 4 | is by being part of this case as -- as -- as an |
| 15:27:09 | 5 | Intervenor Plaintiff. |
| 15:27:11 | 6 | THE COURT:  Okay.  All right, Dr. Taitz. |
| 15:27:13 | 7 | Thank you. |
| 15:27:14 | 8 | Here's what I'm going to do.  I'm ruling now |
| 15:27:20 | 9 | that all the putative Intervenors who are not here, |
| 15:27:28 | 10 | which include Mitchell Williams, Harold William Van |
| 15:27:32 | 11 | Allen and Joe Arpaio, I'm not changing my ruling on |
| 15:27:37 | 12 | that.  They're -- they didn't attend the hearing. |
| 15:27:41 | 13 | With regard to the Jane Doe's, they are |
| 15:27:44 | 14 | obviously in. |
| 15:27:47 | 15 | And Dr. Taitz, I'll take your renewed motion |
| 15:27:51 | 16 | to intervene under advisement.  If there's anything you |
| 15:27:55 | 17 | want to add because you didn't feel like you got |
| 15:28:01 | 18 | adequate notice of the hearing, as long as you file it |
| 15:28:03 | 19 | by July 8th -- July, January 8th, I'll consider it. |
| 15:28:08 | 20 | And if -- that goes for either side.  If you |
| 15:28:10 | 21 | want to intervene in this issue, just whatever it is, |
| 15:28:14 | 22 | July -- January 8th is the deadline. |
| 15:28:16 | 23 | And I'm going to grant the Motion to Stay |
| 15:28:24 | 24 | along the outlines that we talked about today.  And then |
| 15:28:27 | 25 | I'll decide Ms. -- Dr. Taitz' Motion to Intervene, or |

```
15:28:34   1   renewed motion to intervene, given the ruling of the
15:28:37   2   Fifth Circuit after I -- after some time after the 8th.
15:28:43   3           All right.  Counsel, is there anything else
15:28:46   4   that we need to take up today for the good of the order
15:28:49   5   while we're waiting to see what the Supremes do?
15:28:52   6           MS. COLMENERO:  I don't believe so,
15:28:53   7   Your Honor.
15:28:53   8           MS. RICKETTS:  No, Your Honor.
15:28:54   9           MS. PERALES:  No, Your Honor.
15:28:55  10           THE COURT:  Okay.  All right.  We'll stand
15:28:57  11   adjourned.  Thank y'all for coming.  Have a good holiday
15:28:59  12   season.
15:29:00  13           (COURT IN RECESS.)
          14
          15
          16
          17
          18
          19
          20
          21
          22
          23
          24
          25
```

1                    REPORTER'S CERTIFICATE

2

3      I certify that the foregoing is a correct transcript

4  from the record of proceedings in the above-entitled

5  matter.

6

7

8                    ___/s/_ SHEILA E. HEINZ_____
                     SHEILA E. HEINZ, CSR RPR
9                    Exp. Date:  Dec. 31, 2016

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25