IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States District Court
Southern District of Texas
FILED

JAN - 4 2016

David J. Bradley, Clerk of Court

United States Court of Appeals
Fifth Circuit
**FILED**
November 9, 2015
Lyle W. Cayce
Clerk

No. 15-40333

STATE OF TEXAS; STATE OF ALABAMA; STATE OF GEORGIA; STATE OF IDAHO; STATE OF INDIANA; ET AL.,

    Plaintiffs – Appellees,

v.

UNITED STATES OF AMERICA; JEH CHARLES JOHNSON, Secretary, Department of Homeland Security; R. GIL KERLIKOWSKE, Commissioner of U.S. Customs and Border Protection; RONALD D. VITIELLO, Deputy Chief of U.S. Border Patrol, U.S. Customs and Border of Protection; SARAH R. SALDANA, Director of U.S. Immigration and Customs Enforcement; LEON RODRIGUEZ,

    Defendants – Appellees,

v.

JANE DOE #1; JANE DOE #2; JANE DOE #3,

    Movants – Appellants.

Appeal from the United States District Court
for the Southern District of Texas

Before KING, SMITH, and ELROD, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

    Three Jane Does appeal from the denial of their motion to intervene in *State of Texas v. United States*, No. 15-40238. Because the Jane Does satisfy

No. 15-40333

the requirements for intervention by right under Federal Rule of Civil Procedure 24(a)(2), we REVERSE the district court's order denying intervention to the Jane Does and REMAND the case to the district court.

## I.

In *Texas v. United States*, No. 15-40238, twenty-six states seek injunctive relief against the United States and several officials of the Department of Homeland Security to prevent them from implementing a program entitled "Deferred Action for Parents of Americans and Lawful Permanent Residents" (DAPA).[1] The program is outlined in a memorandum issued in November 2014 by Department of Homeland Security Secretary Jeh Johnson (DAPA Memorandum).[2] If DAPA is implemented, certain aliens would become eligible for grants of "deferred action," which would "mean that, for a specified period of time, [those aliens would be] permitted to be lawfully present in the United States." *Texas v. United States*, 787 F.3d 733, 744 (5th Cir. 2015) (alterations,

---

[1] We refer to the plaintiffs in the *Texas* case as "the States" and refer to the defendants as "the Government."

[2] *See* Memorandum from Jeh Johnson, Sec'y, Dep't of Homeland Sec., to Leon Rodriguez, Dir., U.S. Citizenship and Immigration Servs., et al. (Nov. 20, 2014), *available at* http://www.dhs.gov/sites/default/files/publications/14_1120_memo_deferred_action.pdf. The DAPA Memorandum directs USCIS to "exercis[e] prosecutorial discretion through the use of deferred action, on a case-by-case basis, to those individuals who:
- have, on the date of this memorandum, a son or daughter who is a U.S. citizen or lawful permanent resident;
- have continuously resided in the United States since before January 1, 2010;
- are physically present in the United States on the date of this memorandum, and at the time of making a request for consideration of deferred action with USCIS;
- have no lawful status on the date of this memorandum;
- are not an enforcement priority as reflected in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum; and
- present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate."

No. 15-40333

emphasis, and internal quotation marks omitted).

Three Jane Does sought to intervene as defendants in the *Texas* case. The Jane Does are aliens who have lived in the United States for more than ten years, currently live in the Rio Grande Valley, and have minor children who are United States citizens. Thus, all three Jane Does satisfy the first four criteria set forth in the DAPA Memorandum. In addition, all three Jane Does believe that they satisfy the final two DAPA criteria because they are not "enforcement priorities" and because they "present no other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate." Accordingly, the Jane Does believe they are likely to receive grants of deferred action if DAPA goes into effect.

The States and the Government both opposed intervention in the district court. The district court denied the Jane Does' motion to intervene, stating that the Jane Does' "interests are adequately represented by the United States" and that "this matter [is] time sensitive and the addition of new parties will cause undue delay and prejudice." Shortly thereafter, the district court preliminarily enjoined implementation of DAPA. The Jane Does timely appealed the denial of their motion to intervene. Although the Jane Does argued in the district court that they were entitled both to intervention by right and to permissive intervention, on appeal they argue only that they are entitled to intervention by right.

## II.

"A ruling denying intervention of right is reviewed *de novo*." *Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir. 1996) (en banc). "Although the movant bears the burden of establishing its right to intervene, Rule 24 is to be liberally construed." *Brumfield v. Dodd*, 749 F.3d 339, 341 (5th Cir. 2014) (citing 6 James W. Moore, et al., *Moore's Federal Practice* § 24.03[1][a] (3d ed. 2008) [*Moore's*]). "Federal courts should allow intervention where no one would

3

No. 15-40333

be hurt and the greater justice could be attained." *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994) (internal quotation marks omitted). For the purposes of deciding the motion to intervene, we accept the Jane Does' factual allegations as true. *Mendenhall v. M/V Toyota Maru No. 11*, 551 F.2d 55, 57 (5th Cir. 1977).

### III.

Intervention by right is governed by Federal Rule of Civil Procedure 24(a). To intervene by right, the prospective intervenor either must be "given an unconditional right to intervene by a federal statute," Fed. R. Civ. P. 24(a)(1), or must meet each of the four requirements of Rule 24(a)(2):

> (1) the application for intervention must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; (4) the applicant's interest must be inadequately represented by the existing parties to the suit.

*New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 463 (5th Cir. 1984) [*NOPSI*] (en banc) (internal quotation marks omitted). The Jane Does claim that they satisfy each of the four requirements of Rule 24(a)(2). The States and the Government concede the first and third requirements, but argue that the Jane Does do not satisfy the "interest" requirement or the "inadequate representation" requirement. We will address each of these two disputed requirements in turn.

### A.

The Jane Does satisfy the "interest" requirement of Rule 24(a)(2), which requires that intervenors "claim[] an interest relating to the property or transaction that is the subject of the action." Fed. R. Civ. P. 24(a)(2). The "property or transaction that is the subject of the action" in this case is DAPA,

4

so the legal question is whether the Jane Does have an "interest" relating to DAPA. Although "[t]here is not any clear definition of the nature of the interest . . . that is required for intervention of right," 7C Charles Alan Wright, et al., *Federal Practice and Procedure* § 1908.1 (3d ed. 2007) [*Wright & Miller*] (internal quotation marks omitted), we previously have interpreted Rule 24(a)(2) to require a "'direct, substantial, legally protectable interest in the proceedings,'" *Edwards*, 78 F.3d at 1004 (quoting *NOPSI*, 732 F.2d at 463).

Although "this gloss on the rule" may not "provide any more guidance than does the bare term 'interest' used in Rule 24 itself," *Wright & Miller* § 1908.1, our cases reveal that the inquiry turns on whether the intervenor has a stake in the matter that goes beyond a generalized preference that the case come out a certain way. So, an intervenor fails to show a sufficient interest when he seeks to intervene solely for ideological, economic, or precedential reasons; that would-be intervenor merely *prefers* one outcome to the other.[3] For example, in *NOPSI*, a private utility company filed suit against a seller of natural gas in a contractual dispute concerning fuel prices. 732 F.2d at 454–55. Officials from the city of New Orleans attempted to intervene on the ground that the electricity rates paid by the city would increase if the fuel-pricing dispute was decided against the utility company. *Id.* at 460–61. Sitting *en banc*, we held that the officials' generalized, "purely economic interest" was

---

[3] *See Pub. Serv. Co. of N.H. v. Patch*, 136 F.3d 197, 205 (1st Cir. 1998) ("It is settled beyond peradventure, however, that an undifferentiated, generalized interest in the outcome of an ongoing action is too porous a foundation on which to premise intervention as of right."); *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972 (3d Cir. 1998) ("[I]ntervenors should have an interest that is specific to them, is capable of definition, and will be directly affected in a substantially concrete fashion by the relief sought."); *Security Ins. Co. v. Schipporeit, Inc.*, 69 F.3d 1377, 1380–81 (7th Cir. 1995) ("It is something more than a mere 'betting' interest, but less than a property right." (citations omitted)); David L. Shapiro, *Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators*, 81 Harv. L. Rev. 721, 729 (1968) ("This language indicates that one must have more of a stake in the proceeding than simply a concern with the general precedent value of the decision in wholly unrelated litigation . . . .").

5

insufficient to justify intervention. *Id.* at 466. "After all, every electricity consumer . . . and every person who does business with any electricity consumer yearns for lower electric rates." *Pub. Serv. Co. of N.H. v. Patch*, 136 F.3d 197, 205 (1st Cir. 1998). Similarly, a Sixth Circuit panel determined that an advocacy organization opposing abortion was not entitled to intervene in an action challenging the constitutionality of Michigan's Legal Birth Definition Act because the organization had "only an ideological interest in the litigation, and the lawsuit does not involve the regulation of [the organization's] conduct in any respect." *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 343 (6th Cir. 2007).

On the other hand, an interest that is concrete, personalized, and legally protectable is sufficient to support intervention. A property interest, for example, is "the most elementary type of right that Rule 24(a) is designed to protect," *Diaz v. S. Drilling Corp.*, 427 F.2d 1118, 1124 (5th Cir. 1970), because it is concrete, specific to the person possessing the right, and legally protectable. *See Moore's* § 24.03[2][a] ("Motions to intervene in which the proposed intervenor advances a clear property interest present the easiest cases for intervention."). Accordingly, in *Diaz*, we permitted intervention by the government when it sought to assert a lien on a fund before the court. 427 F.2d at 1124. Likewise, in *Espy*, we held that two trade associations representing timber purchasers met the "interest" requirement of Rule 24(a)(2) because the timber purchasers had "property interests in existing timber contracts that are threatened by the [litigation]." 18 F.3d at 1207.

Although property interests are almost always adequate, they are not the only types of interests that can support intervention under Rule 24(a)(2). Indeed, we have disclaimed the notion "that a person must possess a pecuniary or property interest to satisfy the requirement of Rule 24(a)(2)." *Mothersill D.I.S.C. Corp. v. Petroleos Mexicanos, S.A.*, 831 F.2d 59, 62 (5th Cir. 1987); *see*

6

*also Moore's* § 24.03[2][b] ("Rule 24 does not require that the intervenor prove a property right . . . ."). Non-property interests are sufficient to support intervention when, like property interests, they are concrete, personalized, and legally protectable. For example, in *League of United Latin American Citizens, District 19 v. City of Boerne*, 659 F.3d 421 (5th Cir. 2011), we held that an intervenor had a "legally protectable interest" where he sought to protect "his right to vote in elections to choose all five city council members." *Id.* at 434. The intervenor was not seeking to protect a property interest, but his interest in vindicating his own personal right to vote was sufficiently concrete and specific to support intervention. Similarly, in *City of Houston v. American Traffic Solutions, Inc.*, 668 F.3d 291 (5th Cir. 2012), we reversed the district court's denial of intervention by petition organizers who "engineered the drive that led to a city charter amendment over the nearly unanimous, well funded, and longstanding opposition of the Mayor and City Council." *Id.* at 294. Although the intervenors had no property interest in the continued vitality of the amendment, we held that the intervenors' specific and "unique" interest "in cementing their electoral victory and defending the charter amendment itself" satisfied Rule 24(a)(2). *Id.*

Moreover, although an asserted interest must be "legally protectable," it need not be legally *enforceable*. In other words, an interest is sufficient if it is of the type that the law deems worthy of protection, even if the intervenor does not have an enforceable legal entitlement or would not have standing to pursue her own claim.[4] For example, in *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 537 (1972), the Supreme Court held that a union member was

---

[4] *See* Shapiro, *supra*, at 726 ("A may not have a dispute with C that could qualify as a case or controversy, but he may have a sufficient interest in B's dispute with C to warrant his participation in the case once it has begun, and the case or controversy limitation should impose no barrier to his admission." (footnote omitted)).

7

entitled to intervene by right in a suit brought by the Secretary of Labor to invalidate an election of union officers, even though federal law prohibited the union member from initiating his own suit. Another example is *Black Fire Fighters Ass'n of Dallas v. City of Dallas*, 19 F.3d 992, 994 (5th Cir. 1994), in which the city of Dallas entered into a consent decree with an employee group, agreeing to give a specified number of promotions to black officers who would not otherwise be chosen for promotions. A group of non-black firefighters sought to intervene, claiming that the decree interfered with their own promotion opportunities. Even though the non-black fire fighters did not have legally enforceable rights to promotions, we held that they satisfied Rule 24(a)(2) because "[a] decree's prospective interference with promotion *opportunities* can justify intervention." *Id.* (emphasis added).

*Edwards* is similar. In that case, a police department entered into a consent decree with black and Hispanic officers, and a group of other officers sought to intervene. 78 F.3d at 989. The putative intervenors claimed that the decree "adversely affects the[ir] interests . . . in having equal access to a promotion system and promotion opportunities within the HPD for the ranks of Sergeant and Lieutenant without reference to race, color, or national origin." *Id.* at 1004. Sitting *en banc*, we reversed the district court's denial of intervention, explaining that a "'vested interest in one of the . . . target promotions is not required. Intervenor-appellants claim they are ineligible for these promotions solely on account of race . . . . We hold this is sufficient to confer standing to intervene.'" *Id.* (first alteration in original) (quoting *Howard v. McLucas*, 782 F.2d 956, 959 (11th Cir. 1986)). Although the non-black, non-Hispanic officers were not legally entitled to any promotions, their interest in being *considered* for a promotion was sufficient to support intervention.

More recently, in *Brumfield*, parents whose children received school vouchers via Louisiana's Scholarship Program sought to intervene in litigation

8

between Louisiana and the federal government over the state's voucher program. 749 F.3d at 340. The United States initially sought to enjoin the voucher program on the ground that it violated a prior desegregation order. By the time the case reached us on appeal, however, the United States only sought "a process under which the State would provide the information needed to assess and monitor the voucher program's implementation . . . on a regular and timely basis." *Id.* at 341 (internal quotation marks omitted). The United States opposed the parents' intervention, arguing that the parents did not have a legally protectable interest in this monitoring process. We ruled in favor of the parents, holding that the parents had an interest justifying intervention: "Here, a *potential* decree . . . threatens a prospective interference with educational opportunities." 749 F.3d at 343 (internal quotation marks omitted). Even though it was uncertain whether the parents' interests would be affected at all, and even though the parents' interest in the continuance of the voucher program likely was not an enforceable legal right, the parents' interest was sufficient to support intervention.

Like the intervenors in *Trbovich*, *Black Fire Fighters*, *Edwards*, and *Brumfield*, the Jane Does have interests sufficient to support intervention. First, they have an interest in receiving deferred action under DAPA so that they may legally remain in the United States. This is not a mere generalized interest in the implementation of DAPA; rather, the Jane Does are the intended beneficiaries of the challenged federal policy. *Cf. Cal. ex rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006) ("[The proposed intervenors] are the intended beneficiaries of this law . . . . The proposed intervenors' interest thus is neither 'undifferentiated' nor 'generalized.'" (internal quotation marks omitted)). The Jane Does themselves will or will not be eligible for deferred action, depending on the outcome of this case (assuming, as we must, that their factual allegations are true). Thus, although the Jane Does do not

have a legal entitlement to deferred action, their interest in avoiding deportation is a concrete, personalized interest that is legally protected by the Due Process Clause of the Fifth Amendment. *See Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.").

Second, the Jane Does have an interest in the employment opportunities that would be available to them if they are granted deferred action and employment authorization, the former of which would make them eligible for the latter. These are the same types of interests that we deemed sufficient for intervention in *Black Fire Fighters* and *Edwards*—as in those cases, the intervenors do not have a legal entitlement to particular jobs, but their interest in having access to job opportunities is sufficiently concrete and personalized to support intervention.

Third, similar to the intervenors in *Brumfield*, the Jane Does have an interest in directing the upbringing of their United States-citizen children. This interest, which would be adversely affected if the Jane Does are deported, is a legally protected liberty interest under the Due Process Clause. *See Troxel v. Granville*, 530 U.S. 57, 66 (2000) ("[W]e have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children."). Just as the parents in *Brumfield* had "an interest relating to" the Louisiana voucher program because of its impact on their children, the Jane Does have "an interest relating to" DAPA because of its impact on their own children.

The Government argues that the Jane Does do not have a legally protectable interest in deferred action because deferred action may be terminated at any time at the Government's discretion. But the Government fails to explain why uncertainty at the back end is any different from uncertainty at the front end. The intervenors in *Black Fire Fighters* and

No. 15-40333

*Edwards* had no guarantee that they would receive promotions in the first place; the Jane Does have no guarantee that they will retain deferred action after they receive it. We perceive no legal difference. Besides, the same sort of revocability is present in nearly every case in which a government program gives rise to the intervenors' interest. In *Brumfield*, for example, the parents' interest in the lawsuit would have evaporated if Louisiana had modified its voucher program in a way that made the parents ineligible, or if the federal government abandoned its efforts to enjoin the program. The possibility that the parents' interests would be eliminated by government action did not prevent them from intervening.

In short, the Jane Does have a real, concrete stake in the outcome of this litigation—if DAPA is invalidated, the Jane Does will lose their opportunity to obtain deferred action and their opportunity to obtain employment authorization. The Jane Does are not individuals seeking to defend a governmental policy they support on ideological grounds; rather, they are the intended beneficiaries of the program being challenged. Just as the parents in *Brumfield* had a specific, concrete interest in their children's education, and just as the individuals in *Edwards* and *Black Fire Fighters* had a specific, concrete interest in pursuing job opportunities, the Jane Does have interests that are sufficiently concrete and specific to support their intervention by right.

### B.

The Jane Does also satisfy the "inadequate representation" requirement of Rule 24(a)(2), which requires the Jane Does to demonstrate that their interests are inadequately represented by the existing parties. "The burden of establishing inadequate representation is on the applicant for intervention." *Edwards*, 78 F.3d at 1005. However, the applicant "need not show that the representation by existing parties will be, for certain, inadequate." *Moore's* § 24.03[4][a][i]. Instead, "the Rule is satisfied if the applicant shows that the

11

No. 15-40333

representation of his interest 'may be' inadequate." *Trbovich*, 404 U.S. at 538 n.10; *see also Wright & Miller* § 1909 ("[T]he rule is satisfied if there is a serious possibility that the representation may be inadequate . . . .").

Although we have characterized the intervenor's burden as "minimal," *Edwards*, 78 F.3d at 1005, "it cannot be treated as so minimal as to write the requirement completely out of the rule," *Cajun Elec. Power Co-op., Inc. v. Gulf States Utilities, Inc.*, 940 F.2d 117, 120 (5th Cir. 1991) (internal quotation marks omitted); *see Veasey v. Perry*, 577 Fed. App'x 261, 263 (5th Cir. 2014) ("[T]his requirement must have some teeth."). Accordingly, "our jurisprudence has created two presumptions of adequate representation" that intervenors must overcome in appropriate cases. *Edwards*, 78 F.3d at 1005. One presumption arises when "the would-be intervenor has the same ultimate objective as a party to the lawsuit." *Id.* Another presumption arises "when the putative representative is a governmental body or officer charged by law with representing the interests of the [intervenor]." *Id.* If the "same ultimate objective" presumption applies, "the applicant for intervention must show adversity of interest, collusion, or nonfeasance on the part of the existing party to overcome the presumption." *Id.*[5] Similarly, if the government-representative presumption applies, the intervenor must show "that its interest is in fact different from that of the [governmental entity] and that the

---

[5] Although we often have implied that "adversity of interest, collusion, or nonfeasance" are the *only* three ways to demonstrate inadequacy of representation, commentators have noted that "[t]he wide variety of cases that come to the courts make it unlikely that there are three and only three circumstances that would make representation inadequate and suggest that adequacy of representation is a very complex variable." 7C Charles Alan Wright, et al., *Federal Practice and Procedure* § 1909 (3d ed. 2007); *see also Daggett v. Comm'n on Governmental Ethics & Election Practices*, 172 F.3d 104, 111 (1st Cir. 1999) (explaining that the court's prior reference to "adversity of interest, collusion, or nonfeasance" was not intended to create an exclusive list).

12

interest will not be represented by [it]." *Id.* (alterations in original) (internal quotation marks omitted).

Assuming *arguendo* that one or both presumptions apply, the Jane Does have rebutted the presumption(s) by showing adversity of interest between themselves and the Government. In order to show adversity of interest, an intervenor must demonstrate that its interests diverge from the putative representative's interests in a manner germane to the case. In *Brumfield*, for example, Louisiana and the parents had the same objective in upholding the state voucher program. However, the parents demonstrated that their interests diverged from the state's in certain key respects: "The state has many interests in this case—maintaining not only the [voucher program] but also its relationship with the federal government and with the courts that have continuing desegregation jurisdiction. The parents do not have the latter two interests; their only concern is keeping their vouchers." 749 F.3d at 346. In addition, the parents took a legal position "significantly different from that of the state"; whereas the state conceded that the district court had jurisdiction over the voucher program because of a continuing desegregation order, "the parents challenge[d] that notion," arguing that the program did not constitute state aid to private schools and thus was not subject to the continuing desegregation order. *Id.* Accordingly, we held that "[t]he lack of unity in all objectives, combined with real and legitimate additional or contrary arguments, is sufficient to demonstrate that the representation *may* be inadequate, so this requirement of Rule 24(a) is met." *Id.*

In contrast, in *Hopwood v. Texas*, we affirmed the denial of a motion to intervene filed by the Thurgood Marshall Legal Society and Black Pre–Law Association in a case challenging Texas's affirmative action policy. 21 F.3d 603 (5th Cir. 1994). The intervenors argued, at a high level of generality, that "the State's interests are broader" than the intervenors' interests because "the State

13

must balance competing goals while [the intervenors] are sharply focused on preserving the admissions policy." *Id.* at 605. However, the intervenors did not demonstrate how these allegedly divergent interests would have any impact on the state's defense of its affirmative action policy. Because the intervenors did not connect the allegedly divergent interests with any concrete effects on the litigation, we held that the the intervenors had not carried their burden: "The proposed intervenors have not demonstrated that the State will not strongly defend its affirmative action program. Nor have the proposed intervenors shown that they have a separate defense of the affirmative action plan that the State has failed to assert." *Id.* at 606; *see also Brumfield*, 749 F.3d at 346 ("[A] private group does not always satisfy this prong just because a governmental entity is on the same side of an issue . . . ."); *Daggett v. Comm'n on Governmental Ethics & Election Practices*, 172 F.3d 104, 112 (1st Cir. 1999) ("The general notion that the [government] represents 'broader' interests at some abstract level is not enough.").

The Jane Does have carried their burden here. The Jane Does specify the particular ways in which their interests diverge from the Government's. Although both the Government and the Jane Does seek to uphold DAPA, the Government's "interests are in securing an expansive interpretation of executive authority, efficiently enforcing the immigration laws, and maintaining its working relationship with the States, who often assist it in detaining immigrants like the Jane Does." In contrast, the Jane Does' concerns are "to remain in their long-time home state of Texas, to retain custody of their U.S. citizen children, and to obtain work authorization, driver's licenses, and lawful employment so that they can provide for their families." *Cf. Trbovich*, 404 U.S. at 538–39 ("[T]he Secretary has an obligation to protect the vital public interest in assuring free and democratic union elections that transcends the narrower interest of the complaining union member."); *Brumfield*, 749 F.3d

14

No. 15-40333

at 346 (although Louisiana and the federal government were directly adverse in the case, Louisiana had a broader interest in maintaining "its relationship with the federal government."); *Espy*, 18 F.3d at 1207 ("The government must represent the broad public interest, not just the economic concerns of the timber industry.").

The Jane Does then identify the particular way in which these divergent interests have impacted the litigation. In order to undermine the States' standing argument, the Government has taken the position that the States may refuse to issue driver's licenses to deferred action recipients. This position is directly adverse to the Jane Does, who are eligible for deferred action. The disagreement between the Government and the Jane Does on the driver's license issue arises directly from their divergent interests; the Government has an institutional interest in shielding its actions from state intervention through the courts, whereas the Jane Does' interest is in working and providing for their families, for which a driver's license is beneficial.[6] As in *Brumfield*, "[t]he lack of unity in all objectives, combined with real and legitimate additional or contrary arguments, is sufficient to demonstrate that the representation *may* be inadequate, so this requirement of Rule 24(a) is met." 749 F.3d at 346.

---

[6] The States argue that the Jane Does have waived their position on the driver's license issue by incorporating the Government's initial preliminary injunction opposition into their own proposed opposition. However, the Government's preliminary injunction opposition did not argue (at least not explicitly) that the States were free to deny driver's licenses to deferred action recipients. The Government did not explicitly take that position until its sur-reply brief, which the Jane Does did not incorporate. Indeed, after the Government filed its sur-reply, the States filed a letter with the district court, contending that "Defendants have yet again changed their position on driver's licenses. Having previously told the Ninth Circuit one thing and this Court another, Defendants now offer a third position: States are free to deny driver's licenses to DACA and DAPA recipients." Accordingly, the Jane Does have not waived their position that the States may not deny driver's licenses to deferred action recipients *qua* deferred action recipients.

No. 15-40333

The Jane Does also argue that the Government's misconduct in the district court has impaired the Government's ability to adequately represent the Jane Does' interests. The Jane Does point out that the Government admitted to granting three-year periods of deferred action to approximately 100,000 individuals (after representing that it would not do so), issuing three-year terms of deferred action and three-year employment authorization documents to dozens of people after the district court enjoined DAPA, and granting three-year employment authorization documents to an additional 2,000 individuals after the injunction issued. The district court described the Government's actions as "misleading" and as "unacceptable misconduct," and has held multiple hearings regarding the Government's efforts to claw back the improperly issued documents. As a result, according to the Jane Does, the Government has lost its credibility with the district court and has been forced to divert resources away from the litigation itself. The government responds that it did not engage in any intentional misconduct and that, in any event, the proceedings in the district court "do not bear on the government's defense of the legality of [DAPA]." Because we hold that the Jane Does have rebutted the presumption of adequate representation by showing adversity of interest, we need not opine on whether these developments in the district court have impaired the Government's ability to adequately represent the Jane Does' interests.

## IV.

For the foregoing reasons, the Jane Does are entitled to intervene by right. REVERSED and REMANDED.