Dr. Orly Taitz, ESQ
29839 Santa Margarita, ste 100
Rancho Santa Margarita, CA 92688



US DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

| | | |
|---|---|---|
| TAITZ, | ) | Case# 14-cv-00254 |
| v | ) | HONORABLE ANDREW S. HANEN PRESIDING |
| JOHNSON, ET AL | ) | |

SUMMARY OF THE SUPPLEMENTAL BRIEF

On December 15, 2015 this court held a hearing to determine whether the court should reconsider its' prior order and grant intervener petitions to other prospective interveners in light of 11.09.15 decision by the Fifth Circuit to grant an appeal filed on behalf of three illegal alien proposed interveners.

Since Taitz found out about this hearing from a newspaper and was not given a proper notice from the court, she was given by the court until 01.08.16 to submit additional arguments, facts and points of law in support of her petition to intervene. Taitz argues that she should be granted an intervener status based on her original

petition, submitted herein as an exhibit A, argument during 12.15.15 hearing and additional argument submitted herein.

Taitz, proposed intervener, filed on 02.05.15 her intervener motion.(attached herein as exhibit A) She sought intervener status under three categories:

a. as an American worker in danger of losing work and contracts due to DAPA under N.W. Forest Workers Association, 688 F Supp. precedent

2. as a tax payer under Flast v Cohen 392 U.S. 83(1968) precedent

3. as a doctor who will be exposed to contagious diseases

One of the main prongs in the test of whether to grant intervener petition, is whether the existing parties will redress the grievances of the intervener. Of the bet the Fifth Circuit noticed that the plaintiffs proposed to the court that there are individuals that will be harmed by the executive action in question and sought to sue as parens patriae on behalf of citizens facing economic competition from DAPA beneficiaries.

'The court also considered but ultimately did not accept the notions that Texas could sue as *parens patriae* on behalf of citizens facing economic competition from DAPA beneficiaries and that the state had standing based on the losses it suffers generally from illegal immigration. *Id.* at 625–36." 11.25.15 Fifth Circuit ruling confirming Preliminary Injunction by this court in this case.

So, the parties and the court are aware that intervener will suffer losses due to economic competition, as a taxpayer and specific losses as a doctor working with immigrants, who will flood as a result of the executive amnesty. Previously, in order to narrow the scope of this case, this court denied all intervener petitions without prejudice, however in light of the decision of the Fifth Circuit allowing Defendant -Interveners, this court should grant the petition of this Plaintiff - Intervener as well, as she will be harmed and existing plaintiffs cannot redress her grievances and were expressly denied by this court the right to represent her and redress her grievances in parens patriae.

## SUPREME COURT DECISION MAY COME UP WITH A RELIEF FOR THE STATES WITHOUT PROVIDING A RELIEF FOR THE INTERVENER

The case is currently in the Supreme Court on appeal of the preliminary injunction. Higher courts routinely uphold or reject decisions of the lower courts using different grounds and arguments then were used in the lower courts. There is a possibility that the Supreme Court would want to come up with a Solomon decision and cut the baby in half by allowing the government alleged "prosecutorial discretion," but requiring the Federal government to reimburse the states for damages. For example, the state of Texas claims a potential loss of $65 million per

year ($130 per drivers license for 500,000 illegal aliens) In this hypothetical the states will be reimbursed and effectively their case will be over, however millions of illegal aliens will continue competing with the Intervener for jobs. Additionally, she will continue to suffer damages as a tax payer and medical professional. So, in this hypothetical the resolution of the case as far as the States are concerned will not resolve the grievances and complaint of the Intervener.

Second hypothetical is one, where the Supreme Court decides to give standing only to Texas. As Taitz is not from Texas, she will not get any relief.

Third hypothetical is, where the Supreme Court renders relief only to 27 states, which are a part of the law suit. Since Taitz is not from one of the 27 Plaintiff states, she will not get any relief.

Recent history of ACA litigation shows that when US citizens and taxpayers are not allowed to participate in litigation of national importance, they end up losing and paying the price and holding the bag. Soon after passing of ACA (Affordable Care Act), also known as Obamacare, just as it is a case herein, 27 states filed a challenge to the act, *Florida et al v Department of Health and Human Services* 10- cv-91 US District Court for the Northern District of Florida. At a time, Taitz, as well as several other individual plaintiffs and taxpayers, sought to join as interveners. At a time, presiding judge, Roger Vinson, felt that the case was too big and ruled that individual plaintiffs could not join as interveners. Additionally, he possibly believed that his ruling of unconstitutionality of ACA based on

states' action only would be sufficient to throw the whole act out. This was not meant to be, as the real fight was looming in the Supreme Court and the pressure of the US ruling oligarchy was enormous. On January 31, 2011 Judge Vinson found ACA unconstitutional. 11th Circuit confirmed the ruling and the case reached the Supreme Court, US Department of Health v FL SCOTUS #11-400. Supreme Court gave the states a minor concession, allowing the states to refuse expansion of the Medicare, however the Supreme Court left the quintessence of the law, the "individual mandate", intact. As such, the law suit by 27 states had only very limited results. Plaintiff Taitz believes that if the citizens and individual tax payers were to be allowed to be a part of the case brought by the states early on, the Supreme Court would have been forced to consider not only the standing and damages of the states, but also the standing and damages of the individual citizens and taxpayers and the result might have been different. There is a high probability that the law suit brought by the states herein will follow the same scenario as *Florida v HHS*.

The Supreme Court might decide that the states are not required to provide subsidized drivers licenses to DAPA and DACA recipients. This might end the case for the states, however it will leave the intervener grievances of loss of contracts to illegals, loss of tax payer dollars and exposure to infectious diseases unresolved, which highlights the fact that the intervener is not represented by the states and her petition should be granted.

# INTERVENER STATUS AS A DOCTOR WORKING WITH IMMIGRANTS AND IMMINENT EXPOSURE TO INFECTIOUS DISEASES WARRANTS INTERVENER STATUS

There is a known legal maxim, don't cry fire in a crowded theatre. Obama's executive amnesty is more like crying fire in a crowded stadium during the super bowl. This executive order is saying: come on in, sooner or later you will get work permits and all the benefits. This is an invitation for a stampede and it is well documented that among illegal aliens crossing the border, many suffer from Tuberculosis, Lice, Measles and other infectious diseases. Taitz is a doctor-provider for federal programs providing care for immigrants. Taitz is a doctor in a border state working with immigrants and will be particularly affected.

We are seeing now how such orders by the executive or judiciary branch are playing out. We have seen a stampede of illegal immigrants flooding Europe after Chancellor Angela Merkel announced that she will not set limits and will take all in.

Here is an account from a medical doctor in Munich, Germany:

"    Relations between the staff and migrants are going from bad to worse. Since last weekend, migrants going to the hospitals must be accompanied by police with K-9 units.

Many migrants have AIDS, syphilis, open TB and many exotic diseases that we, in Europe, do not know how to treat them." "For now, the local hospital staff has not come down with the diseases they brought here, but, with so many hundreds of patients every day – this is just a question of time". "In a hospital near the Rhine, migrants attacked the staff with knives after they had handed over an 8-month-old on the brink of death, which they had dragged across half of Europe for three months. The child died in two days, despite having received top care at one of the best pediatric clinics in Germany. The physician had to undergo surgery and two nurses are laid up in the ICU. Nobody has been punished. The local press is forbidden to write about it, so we know about it

Similarly, recent Obama appointee, Judge Dolly Ge in the Central District of California, made a ruling in a 30 year old case, which was supposed to be closed decades ago. This case, started as Flores v Meese on July 11, 1985, during Reagan administration, and later continued as Flores v Ashcroft and Flores v Reno 2:85-cv-04544-DMG-AGR, sought to allow illegal alien minors in DHS detention centers to be released on bail to non-parents. Judge Ge's recently re-opened this dormant 30 year old case and ordered release of all illegal alien minors from all DHS and HHS detention centers. On top of that she ordered release of all adults, who illegally crossed the US border and travelling with those illegal alien minors.

Fully expected negative results of this decision came swiftly. It created a stampede of illegal alien minors, over 10,000 crossed the border recently, particularly crossing in this jurisdiction, in Brownsville-Laredo area.

So, current DACA and DAPA executive orders are likely to create a similar or even bigger stampede than a million aliens stampede in Europe or a current stampede at the Southern border. Taitz, who is a doctor working with immigrants in a border state will be particularly affected, as she will be immediately exposed to a large number of contagious diseases that are seen in large groups of illegal aliens.

## TAITZ WILL HAVE STANDING TO INTERVENE ON A COMPETITIVE STANDING DOCTRINE AS AN AMERICAN WORKER

As an American worker, she will have to compete with millions more people, illegal aliens, who are suddenly getting work permits by an executive fiat. Competitor standing doctrine recognizes that a party suffers a cognizable injury under Article III when "'agencies lift regulatory restrictions on their competitors or otherwise allow increased competition.'" *Mendoza*, 754 F.3d at 1011 (quoting *La. Energy and Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998)). The competitor standing doctrine typically arises in the context of establishing a constitutionally adequate injury-in-fact, and it has established that agency action benefiting a plaintiff's competitor can have a direct effect on a plaintiff association or one of its members. *See Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 212 (D.C. Cir. 2013) (U.S. truck drivers had standing because agency program increased the competition they faced when the Department of Transportation lifted restrictions on Mexico- domiciled drivers operating in United States); *Sherley v. Sebelius*, 610 F.3d 69, 74 (D.C. Cir.), 2010) (researchers had standing to challenge regulatory guideline that increased competition for stem-cell research grants); *La. Energy and Power Auth.*, 141 F.3d at 367 (plaintiffs merely needed to show they were direct competitor of energy company that received an advantage as a result of the agency action and injury assumed for standing purposes). "A party seeking to establish standing on the basis of competitor standing doctrine 'must demonstrate that it is a direct and current competitor whose bottom line may be adversely affected by the challenged government action.'" *lvfendoza*, 754 F.3d at 1013 (quoting *KERM, Inc. v. FCC*, 353 F.3d 57, 60 (D.C. Cir. 2004)). Multiple courts found that citizens have standing challenging immigration laws and regulations. *N. W Forest Workers Ass'n,* **688** F. Supp. at 3 n.2 (holding that nonprofit organization "concerned with the economic, environmental and demographic effects of immigration" had standing to

challenge immigration regulations on the ground that the regulations improperly expanded the scope of a guest worker program); *cf Fed'n for Am. Immigration Reform, Inc.,* **93 F.3d at 900.**

## TAITZ HAS JUDICIARY COGNIZABLE INJURY AND STANDING UNDER FLAST V COHEN PRECEDENT

Plaintiff herein is a U.S. taxpayer and the president of DOFF. Members of DOFF are US taxpayers. Taitz should be granted an Intervener status under *Flast v Cohen* 392 U.S. 83 (1968)precedent. hFlast, Earl Warren, Chief Justice of the Supreme Court of the US wrote in the majority opinion

" ...our point of reference in this case is the standing of individuals who assert only the status of federal taxpayers and who challenge the constitutionality of a federal spending program. Whether such individuals have standing to maintain that form of action turns on whether they can demonstrate the necessary stake as taxpayers in the outcome of the litigation to satisfy Article III requirements."

Funding for DACA and DAPA originate from Omnibus spending and satisfy a requirement of a program, originating from an action by Congress. Taitz's taxpayer dollars will be taken to provide funding for this program. .

Intervener must meet each of the four requirements of Rule 24(a)(2):

(1) the application for intervention must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; (4) the applicant's interest must be inadequately represented by the existing parties to the suit.

*New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 463 (5th Cir. 1984) [*NOPSI*] (en banc) (internal quotation marks omitted). So, as previously stated in the petition, Taitz satisfied all the requirements and her representation by the plaintiffs was specifically disallowed by this court.

Additionally, in 11.09.15 order in this cases 5th Circuit quoted: *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972 (3d Cir. 1998) ("[I]ntervenors should have an interest that is specific to them, is capable of definition, and will be directly affected in a substantially concrete fashion by the relief sought."). Taitz states that as a doctor working with immigrants, she will be affected in a particularized way.

Further, the Fifth Circuit found that an interest does not have to be a property interest.

"Non-property interests are sufficient to support intervention when, like property interests, they are concrete, personalized, and legally protectable.
For example, in *League of United Latin American Citizens, District 19 v. City of Boerne*, 659 F.3d 421 (5th Cir. 2011), we held that an intervenor had a "legally protectable interest" where he sought to protect "his right to vote in elections to choose all five city council members." *Id.* at 434. The intervenor was not seeking to protect a property interest, but his interest in vindicating his own personal right to vote was sufficiently concrete and specific to support intervention. Similarly, in *City of Houston v. American Traffic Solutions, Inc.*, 668 F.3d 291 (5th Cir. 2012), we reversed the district court's denial of intervention by petition organizers who "engineered the drive that led to a city charter amendment over the nearly unanimous, well funded, and longstanding opposition of

the Mayor and City Council." *Id.* at 294. Although the intervenors had no property interest in the continued vitality of the amendment, we held that the intervenors' specific and "unique" interest "in cementing their electoral victory and defending the charter amendment itself" satisfied Rule 24(a)(2). *Id. "id*

## Fifth Circuit ruled that the interest must not be legally inforceable:

"Moreover, although an asserted interest must be "legally protectable," it need not be legally *enforceable*. In other words, an interest is sufficient if it is of the type that the law deems worthy of protection, even if the intervenor does not have an enforceable legal entitlement or would not have standing to pursue her own claim. For example, in *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 537 (1972), the Supreme Court held that a union member was entitled to intervene by right in a suit brought by the Secretary of Labor to invalidate an election of union officers, even though federal law prohibited the union member from initiating his own suit. Another example is *BlackFireFighters Ass'n of Dallas v. City of Dallas*, 19 F.3d 992, 994(5th Cir. 1994), in which the city of Dallas entered into a consent decree with an employee group, agreeing to give a specified number of promotions to black officers who would not otherwise be chosen for promotions. A group of non-black firefighters sought to intervene, claiming that the decree interfered with their own promotion opportunities. Even though the non-black fire fighters did not have legally enforceable rights to promotions, we held that they satisfied Rule24(a)(2) because"[a] decree's prospective interference with promotion *opportunity s*can justify intervention." *Id.*(emphasis added).*Edwards* is similar. In that case, a police department entered into a consent decree with black and Hispanic officers, and a group of other officers sought to intervene.78 F.3d at989. The putative intervenors claimed that the decree "adversely affects the[ir]interests . . .in having equal access to a promotion system and promotion opportunities within the HPD for the ranks of Sergeant and Lieutenant without reference to race, color, or national origin." *Id.*at 1004. Sitting *en banc*, we reversed the district court's denial of intervention, explaining that a "'vested interest in one of the . . . target promotions is not required. Intervenor-appellants claim they are ineligible for these promotions solely on account of race . . . . We hold this is sufficient to confer standing to intervene.'" *Id.*(first alteration in original) (quoting *Howardv. McLucas*, 782 F.2d 956, 959(11th Cir.1986)). Although the non-black, non-Hispanic officers were not legally entitled to any promotions, their interest in being *considered* for a promotion was sufficient to support intervention. More recently, in *Brumfield*, parents whose children received school vouchers via Louisiana's Scholarship Program sought to intervene in litigation between Louisiana and the federal government over the state's voucher program. 749 F.3d at 340. The United States initially sought to enjoin the voucher program on the ground that it violated a prior desegregation order. By the time the case reached us on appeal, however, the United States only sought "a process under which the State would provide the information needed to assess and monitor the voucher program's implementation . . . on a regular and timely basis." *Id.* at 341 (internal quotation marks omitted). The United States opposed the parents' intervention, arguing that the parents did not have a legally protectable interest in this monitoring process. We ruled in favor of the parents, holding that the parents had an interest justifying intervention: "Here, a *potential* decree . . . threatens a prospective interference with educational opportunities." 749 F.3d at 343 (internal quotation marks omitted). Even though it was uncertain whether the parents' interests would be affected at all, and even though the parents' interest in the continuance of the voucher program likely was not an enforceable legal right, the parents interest was sufficient to support intervention."id

So, the Fifth Circuit viewed intervener standing liberally and as such Taitz should be granted an intervener status.

## FIFTH AMENDMENT DUE PROCESS CONSIDERATION

The Fifth Circuit ruled: "although the Jane Does do not have a legal entitlement to deferred action, their interest in avoiding deportation is a concrete, personalized interest that is legally protected by the Due Process Clause of the Fifth Amendment.

*See Reno v. Flores*, 507 U.S. 292, 306 (1993)

Here, Fifth amendment right of Taitz will be infringed upon as she will be subjected to contagious diseases and loss of health without due process.

Additionally, as an American -citizen worker she will be subjected to loss of work and contracts due to the fact that suddenly millions of people will be getting work permits.

Obama administration claims that there are only 11.3 million illegal aliens in the country and roughly half of them, about five million, will be getting work permits under DAPA and DACA (4 million DAPA and 1.2 million DACA recipients), which in itself is a high number. However, in reality this number is expected to be much higher. Obama administration never explained how did it come up with 11 million illegals number. It appears to be a number pulled out of the thin air. According to the Ambassador of Mexico in the US there are 30 million illegal aliens in the US.

http://www.breitbart.com/big-government/2015/08/18/30-million-illegal-immigrants-in-us-says-mexicos-former-ambassador/. One can rely on the number coming from the ambassador of Mexico, as he knows how many of his citizens are getting drivers licenses, copies of birth certificates and other documents from the Mexican embassy or consulates in the US. Thirty million is the number quoted by the Center of Immigration Studies as well. So, if you go by Obama's calculation that roughly half of illegal aliens will qualify for DACA and DAPA, it amounts to 15 million (half of 30 million), not five million as claimed by the Obama administration. Additionally, it is not clear, why Obama administration believes that DACA and DAPA recipients will amount to only half of illegal aliens in the country. DACA relates to young illegal aliens, DAPA relates to adults, who had their children in the US. Since most illegal aliens come as young adults and most of them have children here, it means that DACA and DAPA will comprise close to a 100% of all illegal aliens, close to 30 million. So, if the Fifth Circuit found that illegal aliens who hope to gain jobs under DAPA have standing, then a US citizen, who will see a loss of business, redaction in fees, profits and earnings due to increased competition under DAPA will fall under the same reasoning of the Fifth Circuit and should be granted an intervener status as well, as her Fifth Amendment rights will be infringed upon without due process.

Lastly, as a taxpayer, under Flast v Cohen, she will have standing and have her 5th Amendment rights infringed as her tax payer dollars will be used to provide benefits

to illegal aliens. Fifth Circuit found that three illegal aliens, Jane Does1-3 had standing as they had interest in receiving benefits and subsidized drivers licensees under DAPA. Similarly, Taitz has standing as her tax payer dollars will be used to subsidize those drivers licensees.

Further, in case the Supreme Court dismisses the case by the states, Intervener Taitz will be allowed to continue with her case.

In Magdoff v Saphin 228 F.2d 214 Dec 21, 1955 Fifth Circuit ruled that Intervenor suit can proceed even when the case of the original plaintiff is dismissed.
Upon defendant's motion, the United States District Court for the Northern District of Texas, Wm. H. Atwell, J., rendered judgment dismissing plaintiff's suit and dismissing intervenor from suit, and plaintiff and intervenor appealed. The Court of Appeals held that where intervention, though permissive and not of right, was not ancillary to, but was independent of, plaintiff's suit, it survived dismissal of that suit, and where intervention stated claim against plaintiff but not against defendant, judgment dismissing suit and intervention would be reversed as to plaintiff but affirmed as to defendant. Plaintiff's appeal dismissed; judgment dismissing intervention affirmed as to defendant and reversed as to plaintiff.

The case at hand is important as DACA and DAPA executive orders give our ruling oligarchy and Obama donors an unending supply of cheap foreign labor. Illegal aliens themselves appear to be pawns in the quest to replace American workers with cheap foreign labor, which might explain rather unusual moves by the Supreme Court. Typically, Supreme Court refrains from reviewing the case until there is a final adjudication on the merits by the lower courts. This does not appear to be the case here. The States requested a routine thirty day extension to be granted by SCOTUS and were denied. SCOTUS gave the states only eight days as it appears it wants the case included in January-February conferences and is inclined to provide a

late May supplementary oral argument date for this case. This means that around June 29-30s there will be a decision. This is even more likely in light of recent interviews by Chief Justice Roberts urging federal courts to expedite cases. It is likely that SCOTUS will come up with a decision in this case similar to what was done in ACA, where the court might allow the "executive amnesty" but allow the states to deny DAPA recipients subsidized drivers licenses or will rule that the Federal government will have to reimburse the States for the subsidies.

In this case, the complaint by the States will be over, however if this court grants Taitz an Intervenor-plaintiff status, her case will continue based on the above mentioned Fifth Circuit precedent of Magdoff v Saphin 228 F.2d 214. Additionally, the case by the states rests on one theory: Obama administration abused its' authority in creating a whole class of beneficiaries and giving millions of illegal aliens lawful residence and work permits in violation of existing immigration laws and without any consent of the US Congress.

Not only Taitz has separate grievances, she brings forward herein an additional theory, which makes DAPA and DACA orders unlawful. Taitz attaches herein Exhibit B, a 150 page file of official government records and sworn affidavits of law enforcement officers and experts. This file shows that Barack Obama committed egregious identity fraud by getting in the White House, in the position of the US president, while using a last name, which is not legally his and asserting his eligibility for presidency based on a flagrantly stolen Connecticut Social Security

number xxx-xx-4425 and fabricated IDs. Since Obama was not legitimately occupying his position, his executive orders, including DACA and DAPA were not lawful as well.

The file at hand (Exhibit-B) shows that in his mother's passport Obama was listed under the last name Soebarkah and in his official school records in Indonesia he was listed under his step-father's last name, Soetoro, and as a citizen of Indonesia, not US citizen. Barack Obama, himself, on April 15, 2010, 11am, posted on whitehouse.gov his 2009 tax returns, where he did not "flatten" the PDF file, so full unredacted Social Security number he is using became available for the public. The number started with 042, which indicated that it is a Connecticut Social Security number. Obama was never a resident of Connecticut and attached affidavits of experts show that this number was originally assigned to Harry J Bounel, resident of CT, presumed to be deceased without heirs, and aforementioned number was fraudulently assumed by Obama in and around 1980s. Similarly, expert testimony of Stephen Coffman, Former Chief investigator of Special Investigations Unit of the US Coast Guard attached herein shows Obama's Selective Service registration to be a flagrant forgery with a fabricated 1980 postal cancellation stamp affixed to it. Moreover, expert testimony provided herein shows that Obama's alleged long form birth certificate is a flagrant computer-generated forgery with letters and numbers from all different fonts and sizes and the document opens in multiple layers with the stamp of the

registrar and a date stamp residing in different layers of this computer generated forgery.

As this is only a supplemental brief on the matter of the intervener status, Taitz will not go into further details of the forged documents, however she proposes to the court that even if the case by the States is dismissed by the Supreme Court in the current appeal, she can still proceed with her Intervenor case, not only because she has separate claims and grievances, but, also, she brings additional theories and arguments for relief. Furthermore, the issue of Obama's use of a stolen Social Security number and fabricated IDs is factual. The issue of alleged prosecutorial discretion is the matter of legal interpretation and there is a possibility that the Supreme Court rules that Obama had a right to use prosecutorial discretion in DAPA and DACA. The issue of Obama's use of fabricated IDs is undeniable factual evidence. A person got into the position of the US president by fraud, using fabricated IDs, was not eligible to issue any executive orders, including DAPA and DAPA. When this is adjudicated in this court on the merits and DACA and DAPA are invalidated on this basis, this decision cannot be overturned by the Supreme Court, as this is a factual, evidentiary matter, which cannot be interpreted in more than one way.

## CONCLUSION

Based on all of the above, Taitz should be allowed as an intervener.

Respectfully submitted /s/ Dr. Orly Taitz, ESQ   Taitz 01.07.16

Certificate of Service

I, Lila Dubert, certify that parties in this case were served with attached pleadings by first class mail on 01.07.16

_____