# Exhibit A

**DR. ORLY TAITZ, ESQ**

**29839 SANTA MARGARITA, STE 100**

**RANCHO SANTA MARGARITA, CA 92688**

**PH 949-683-5411 FAX 949-766-7687**



United States District Court
Southern District of Texas
FILED

FEB - 5 2015

David J. Bradley, Clerk of Court

## US DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

## BROWNSVILLE DIVISION

TAITZ,                    )          Case # 14-cv-00254

V                         )     **HONORABLE ANDREW S. HANEN PRESIDING**

JOHNSON, ET AL   )

## MOTION TO INTERVENE AS AN ADDITIONAL PLAINTIFF

# TABLE OF
# CONTENTS

I.    STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT .....................1

II.   STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING.....................2

III.  SUMMARY OF THE ARGUMENT ................................................................................5

      IV.   THE PROPOSED DEFENDANT-INTERVENORS ARE ENTITLED TO INTERVENTION AS OF RIGHT...........................................................................................5

      A.    The Proposed Defendant-Intervenors' Motion to Intervene Is Timely ....................6

      B.    The Proposed Defendant-Intervenors Possess a Protectable Interest ......................8

      C.    The Proposed Defendant-Intervenors' Interests Would Be Subject to Impairment If Intervention Were Denied ................................................................10

      D.    The Proposed Defendant-Intervenors' Interests Cannot Be Adequately Represented by the Existing Parties.......................................................................11

V.    PERMISSIVE INTERVENTION IS ALSO APPROPRIATE..........................................13

VI.   CONCLUSION................................................................................................................14

# TABLE OF
# AUTHORITIES

Arpaio v. Obama, No. 14-cv-1966, slip op. at 5 (D.D.C. Dec. 23, 2014) .......................................... 2

Black Fire Fighters Ass'n of Dallas v. City of Dallas,
    19 F.3d 992 (5th Cir. 1994)
    ................................................................................... 11

Ceres Gulf v. Cooper,
    957 F.2d 1199 (5th Cir. 1992)
    ................................................................................ 7, 11

Chiles v. Thornburgh,
    865 F.2d 1197 (11th Cir. 1989)
    ................................................................................. 9, 11

Day v. Sebelius,
    227 F.R.D. 668 (D. Kan.
    2005)....................................................................... 9, 13

Decker v. United States Dep't of Labor,
    473 F. Supp. 770 (E.D. Wis.
    1979).......................................................................... 10

Diaz v. S. Drilling Corp.,
    427 F.2d 1118 (5th Cir. 1970)
    ................................................................................ 8, 9

Dimond v. District of Columbia,
    792 F.2d 179 (D.C. Cir. 1986)
    ..................................................................................... 12

Edwards v. City of Houston,
    78 F.3d 983 (5th Cir. 1996)
    ..................................................................................... 6, 8

    Flast v Cohen

Florida et al v Department of Health and Human Services 10-cv-91 US District
Court for the Northern District of Florida

Ford v. City of Hunstville,
    242 F.3d 235 (5th Cir. 2001)
    ........................................................................................ 7

Forest Conservation Council v. U.S. Forest Serv.,
    66 F.3d 1489 (9th Cir. 1995), rev'd on other grounds by Wilderness Soc'y v.

U.S. Forest Serv., 630 F.3d 1173 (9th Cir. 2011)
............................................................ 12

Gen. Tel. Co. of the Nw., Inc. v. EEOC,
    446 U.S. 318
    (1980)............................................................................................
    12

Grutter v. Bollinger,
    188 F.3d 394 (6th Cir. 1999)
    ............................................................................... 11

In re Lease Oil Antitrust Litig.,
    570 F.3d 244 (5th Cir. 2009)
    ........................................................................... 6, 8

John Doe No. 1 v. Glickman,
    256 F.3d 371 (5th Cir. 2001)
    ...............................................................................

Lewis v. Stark, 312 F. Supp. 197 (N.D. Cal. 1968), rev'd on other grounds by
    Lewis v. Martin, 397 U.S. 552
    (1980)........................................................................ 9

Martin v. Travelers Indem. Co.,
    450 F.2d 542 (5th Cir. 1971)
    ............................................................................... 11

Mich. State AFL-CIO v. Miller,
    103 F.3d 1240 (6th Cir. 1997)
    ............................................................................... 11

Natural Res. Def. Council v. Costle,
    561 F.2d 904 (D.C. Cir. 1977)
    ............................................................................... 12

Ross v. Marshall,
    426 F.3d 745 (5th Cir. 2005)
    ............................................................................... 8

Saldano v. Roach,

363 F.3d 545 (5th Cir. 2004)
.................................................................................................... 5

Sierra Club v. Espy,
    18 F.3d 1202 (5th Cir. 1994)
.................................................................................. 6, 11

Sierra Club v. Fed. Emergency Mgmt. Agency,
    No. 07-0608, 2008 U.S. Dist. LEXIS 47405 (S.D. Tex. June 11, 2008)
.............................. 12

Stallworth v. Monsanto Co.,
    558 F.2d 257 (5th Cir. 1977)
.................................................................................. 6, 7

Trbovich v. United Mine Workers of Am.,
    404 U.S. 528
    (1972)........................................................................................... 12,
    13

United States v. LULAC,
    793 F.2d 636 (5th Cir. 1986)
.............................................................................. 14

US v Escobar
Article I, 8. US Constitution


Usery v. Brandel, 87 F.R.D. 670 (W.D. Mich. 1980)
.................................................................................. 10


DHS Appropriations Act, Pub. L. No. 111-83, 123 Stat 2142, 2149
(2009)................................ 3

Fed. R. Civ. P. 24 advisory comm. note to 1966 Amendment
.................................................. 10

Fed. R. Civ. P.
24(a)(2)..........................................................................................

Fed. R. Civ. P. 24(b)
.............................................................................................. 14

Fed. R. Civ. P. 24(b)(1)(B)

........................................................................................................... 1, 13

Fed. R. Civ. P. 24(c)

............................................................................................................... 1

## SUMMARY OF THE MOTION

The Proposed Plaintiff-Intervenor respectfully requests that the Court grant her leave to intervene as an additional plaintiff in this action as of right pursuant to Federal Rule of Civil Procedure 24(a)(2) or, in the alternative, grant her permissive intervention pursuant to Federal Rule of Civil Procedure 24(b)(1)(B).

In the case at hand 26 states are suing the federal government, Department of Homeland Security, seeking declaratory and injunctive relief in invalidating and enjoining agency actions, specially, agency granting deferral from deportation, as well as work permits and Social Security and other Social benefits to millions of illegal aliens in clear violation of existing US immigration laws and without any consent of the Congress. Earlier, a number or proposed interveners Jane Does 1-3, illegal aliens, filed a motion for a leave to intervene, as they seek deferral from deportation, work permits at the expense of stealing jobs from law abiding US citizen-workers and they want Social Security benefits to be given to them at the expense of stealing tax payer dollars from the law abiding US tax payers.

In motion at hand, proposed intervenor is seeking a leave to join as an intervenor as well and is claiming intervenor status under FRCP 24(a) as of right and FRCP 24(b) permissible intervenor as a number of her judicially cognizable rights will be affected should DAPA be enacted.   She will suffer damages for following reasons:

a. She is a tax payer and under *Flast v Cohen* 392 U.S. 83 (1968), she has a well established judicially cognizable right to intervene and seek to enjoin a lawless action by the agency, which leads to outright theft of taxpayer dollars for the benefit of illegal aliens and for the benefit of a few oligarchs drawing astronomical profits while employing cheap foreign labor.

b. Under *N. W Forest Workers Ass 'n,* **688** F. Supp. and *Washington alliance of Technology workers v US Department of Homeland security* 1:14-cv-00529-ESH USDC District of Columbia,  she is claiming competitive standing as a US citizen- worker, as grant of millions of work permits to millions of illegal aliens will deprive her of work and livelihood.

c. Grant of this de facto amnesty is a magnet, which will lead to massive influx of millions more illegals, which leads to epidemics and outbreaks of multiple infectious diseases. As a doctor-provider for a number of federal programs she is at

risk of infection and as such her legally cognizable right under the 5th and 14 th amendment of the US Constitution is affected.

Allowing the Proposed Plaintiff-Intervenor to participate as intervener will ensure that her direct, immediate interests are adequately protected and will provide her with the opportunity to offer evidence and argument that will assist the Court in rendering a decision in this important case. Because the Proposed Plaintiff-Intervener meets all the requirements for intervention under Rule 24(a)(2), she respectfully requests that her motion to intervene be granted.

## THE PROPOSED PLAINTIFF-INTERVENOR IS ENTITLED TO INTERVENTION AS OF RIGHT

Federal Rule of Civil Procedure 24(a)(2) provides:

On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

To intervene as of right under Rule 24(a)(2), an applicant must meet four requirements: (1) the motion to intervene is timely; (2) the potential intervenor asserts an interest that is related to the basis of the controversy in the underlying

case; (3) the disposition of the case may impair or impede the potential

intervenor's ability to protect his interest; and (4) the existing parties do not

adequately represent the potential intervenor's interests. *See Saldano v. Roach*, 363

F.3d 545, 551 (5th Cir. 2004). The Fifth Circuit has construed Rule 24(a) broadly

in favor of intervenors. *See John Doe*

*No. 1 v. Glickman*, 256 F.3d 371, 375 (5th Cir. 2001). "[T]he inquiry under

subsection (a)(2) is a flexible one, which focuses on the particular facts and

circumstances surrounding each application." *Edwards v. City of Houston*, 78 F.3d

983, 999 (5th Cir. 1996) (internal quotation and citation omitted). "[I]ntervention

of right must be measured by a practical rather than technical yardstick." *See id.* at

999 (internal quotation and citation omitted). Accordingly, courts, as a general

matter, allow intervention where "no one would be hurt and greater justice could

be attained." *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994) (citing

*Glickman*, 256 F.3d at 375) (internal quotation omitted).


## A. The Proposed Motion to Intervene Is Timely

In determining whether a motion for intervention is timely under Fed. R. Civ. P.

24(a)(2), the Court should consider:

(1) the length of time between the potential intervenor's learning that its interest is

no longer protected by the existing parties and its filing of a motion to intervene,

(2) the extent of prejudice to the existing parties from allowing late intervention,

(3) the extent of prejudice to the potential intervenor if the motion is denied, and

(4) any unusual circumstances.

See *Stallworth v. Monsanto Co.*, 558 F.2d 257, 264-66 (5th Cir. 1977); *In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 247-48 (5th Cir. 2009).

The Proposed Motion to Intervene comes promptly after proposed Plaintiff learned of her interest in the case via the filing of Plaintiffs' December 2014 complaint. Taitz originally sought to consolidate her case Taitz v Johnson 14-cv 0119, which is before Judge Hanen as well. Her motion for consolidation was followed with interest by the US media, as in her motion to intervene Taitz argued that US taxpayer deserves to take part in this case, as recent DAPA and DACA actions deprive US taxpayers of taxpayer dollars. According to recent Gallop poll only 7% of US citizens-taxpayers want more immigration, 93% don't. Her motion to consolidate was not granted and even Washington Times wrote an article, noting Taitz argument that US taxpayer should have her date in court in this case and Washington Times seemed puzzled by the fact that Taitz motion to consolidate was denied without any comment.    After consolidation of two cases was not allowed,  possibly due to the fact that Taitz v Johnson is more advanced and there were already two days of testimony in *Taitz v Johnson*, Taitz is seeking an Intervenor status and not consolidation.

2. The litigation is currently in its early stages, and the timing of this motion poses no prospect of prejudicing the parties: at this early juncture, Defendants have yet to file their answer, no discovery has been conducted, no scheduling order has been issued, and no trial date set.

3. Plaintiffs filed their Complaint on December 3, 2014.

Although Plaintiffs have filed a motion for a preliminary injunction (*see* Dkt. No. 5), the Court has not ruled on this motion. Taitz does not intend to request any modification to the current hearing schedule, and intervention therefore poses no potential to prejudice the rights of any current party. *See Ford v. City of Hunstville*, 242 F.3d 235, 240 (5th Cir. 2001) (finding that prejudice is only created by "the intervenor's delay in seeking to intervene after it learns of its interest") (citing *Ceres Gulf v. Cooper*, 957 F.2d 1199, 1203 (5th Cir. 1992)); *see also Stallworth*, 558 F.2d at 265 ("[T]he prejudice to the original parties to the litigation that is relevant to the question of timeliness is only that prejudice which would result from the would-be intervenor's failure to request intervention as soon as he knew or reasonably should have known about his interest in the action").

On the other hand, Taitz would be severely prejudiced if this Court denies this motion to intervene. In *Stallworth*, the Fifth Circuit framed the question of

prejudice against proposed intervenors who are denied intervention in terms of

whether "a [Rule 24] section (a) intervenor 'may be seriously harmed if he is not

permitted to intervene.'" 558 F.2d at 266 (internal quotation and citation omitted).

As nonparty, Taitz will be directly affected by any court ordered

remedy, but will not be able to participate in presenting evidence and argument in

support of he position or to appeal the ruling. *See Edwards*, 78 F.3d at 1002–03;

*see alsoLease Oil Antitrust Litig.*, 570 F.3d at 249–50 ("Intervening in the existing

federal lawsuit is the most efficient, and most certain, way for [the potential

intervenor] to pursue its claim."). Intervention is timely because (1) the Proposed

Plaintiff–Intervenor promptly filed this motion; (2) the existing parties will not be

prejudiced if the Court permits intervention at this

juncture; and (3) the Proposed Plaintiff -Intervenor will be greatly harmed if this

motion is denied because she will not be able to protect her interests before the

Court.

**B. The Proposed Plaintiff Intervenor Possesses a Protectable Interest and
Would Be Subject to Impairment if Intervention Were Denied**

The Proposed Plaintiff-Intervenor also satisfied the requirements of Rule 24(a)(2)

because she has a protectable interest in the subject matter of this litigation that

would be otherwise impaired by an adverse decision. Their protectable interest

does not have "to be of a legal nature identical to that of the claims asserted in the main action." *Diaz v. S. Drilling Corp.*,

427 F.2d 1118, 1124 (5th Cir. 1970). Indeed, "[a]ll that is required by the terms of the rule is an interest in . . . [the] rights that are at issue, provided the other elements of intervention are present." *Id.* Ultimately, "the interest 'test' is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Ross v. Marshall*, 426 F.3d 745, 757 (5th Cir. 2005).

Here, the Proposed Plaintiff-Intervenor's interest is in finding DAPA unlawful and unconstitutional and enjoining it. If it is not done, she will be damaged threefold:

   As an American worker, she will have to compete with millions more people, illegal aliens, who are suddenly getting work permits by an executive fiat. Competitor standing doctrine recognizes that a party suffers a cognizable injury under Article III when "'agencies lift regulatory restrictions on their competitors or otherwise allow[] increased competition.'" *Mendoza*, 754 F.3d at 1011 (quoting *La. Energy and Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998)). The competitor standing doctrine typically arises in the context of establishing a constitutionally adequate injury-in-fact, and it has established that agency action benefiting a plaintiff's competitor can have a direct effect on a plaintiff association or one of its members. *See Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 212 (D.C. Cir. 2013) (U.S. truck drivers had standing because agency program increased the competition they faced when the Department of Transportation lifted restrictions

on Mexico- domiciled drivers operating in United States); *Sherley v. Sebelius*, 610 F.3d 69, 74 (D.C. Cir.) , 2010) (researchers had standing to challenge regulatory guideline that increased competition for stem-cell research grants); *La. Energy and Power Auth.*, 141 F.3d at 367 (plaintiffs merely needed to show they were direct competitor of energy company that received an advantage as a result of the agency action and injury assumed for standing purposes). "A party seeking to establish standing on the basis of competitor standing doctrine 'must demonstrate that it is a direct and current competitor whose bottom line may be adversely affected by the challenged government action.'" *Mendoza*, 754 F.3d at 1013 (quoting *KERM, Inc. v. FCC*, 353 F.3d 57, 60 (D.C. Cir. 2004)). Multiple courts found that citizens have standing challenging immigration laws and regulations. *N. W Forest Workers Ass 'n*, **688** F. Supp. at **3** n.2 (holding that nonprofit organization "concerned with the economic, environmental and demographic effects of immigration" had standing to challenge immigration regulations on the ground that the regulations improperly expanded the scope of a guest worker program); *cf Fed'n for Am. Immigration Reform, Inc.*, **93 F.3d** at **900.**

2. As an American taxpayer, she will be damaged as her taxpayer dollars will be used to pay for Social Security, Medicaid, unemployement of millions of illegal aliens or for Social Security, Medicaid and unemployment of millions of Americans who will be displaced from their jobs by millions of illegal aliens getting deferral from deportation and work permits. Today, according to Gallop and Pew polls 93 million adult Americans are not in workforce. According to

Gallop, only 44% of American adults are working 30 hours per week or more.

Labor participation is the lowest in some 30 years. As an American taxpayer,

Taitz has a cognizable legal interest in seeking enjoinment of DACA and DAPA.

## PROPOSED PLAINTIFF INTERVENER CAN INTERVENE, AS SHE HAS JUDICIARY COGNIZABLE INJURY AND STANDING UNDER FLAST V COHEN PRECEDENT

Plaintiff herein is a U.S. taxpayer and the president of DOFF. Members of DOFF

are US taxpayers . injunction should be granted under *Flast v Cohen* 392 U.S. 83

(1968)precedent.  In Flast, Earl Warren,  Chief Justice of the Supreme Court of the

US wrote in the majority opinion

" ...our point of reference in this case is the standing of individuals   who assert

only the status of federal taxpayers and who challenge the constitutionality  of a

federal spending program. Whether such individuals have standing to maintain that

form of action turns on whether they can demonstrate the necessary stake as

taxpayers in the outcome of the litigation to satisfy Article III requirements.

The nexus demanded of federal taxpayers has two aspects to it. First, the taxpayer

must establish a logical link between that status and the type of legislative

enactment attacked. Thus, a taxpayer will be a proper party to allege the

unconstitutionality only of exercises of congressional power under the taxing and

spending clause of Art. I, 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute. Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, 8. When both nexuses are established, the litigant will have shown a taxpayer's stake in the outcome of the controversy and will be a proper and appropriate party to invoke a federal court's jurisdiction.

Any and all expenditures for aforementioned executive actions are coming from the 2015 Omnibus funding bill and under the taxing and spending powers of the US Congress under Article I, 8. So, the first prong of Flast test is satisfied.

Secondly, USDC of the Western District of PA already found in *US v Escobar* aforementioned executive immigration actions to be unconstitutional, as such both prongs are satisfied and this court has to grant the injunction

## PROPOSED INTERVENER HAS STANDING TO INTERVENE UNDER THE DOCTRINE OF COMPETITIVE STANDING

Proposed intervener asserts that she is a professional, both a licensed doctor of Dental Surgery and a licensed attorney. Grant of work permits to millions of illegal aliens will cause her legally cognizable injury under the doctrine of competitive standing.

The precedent of **NORTHWEST FOREST WORKERS ASS'N V. LYNG UNITED STATES DISTRICT COURT, DISTRICT OF COLUMBIA.APRIL 25, 1988, 688 F.SUPP. 1 clearly shows that the Supreme Court of the United States finds standing for individuals challenging immigration decisions based on a threat of injury, not injury, which already occurred.**

*N. W Forest Workers Ass 'n,* **688** F. Supp. at **3** n.2 (holding that nonprofit organization

"<u>concerned with the economic, environmental and demographic effects of immigration" had standing to challenge immigration regulations on the ground that the regulations improperly expanded the scope of a guest worker program.</u>

3.Taitz is both a licensed attorney and a licensed Doctor of Dental Surgery, She is a doctor- provider for multiple federal programs, which provide care for immigrants. DAPA and DACA are a magnet for more illegal aliens crossing the

border. Vast majority of them have no records of vaccinations and were not vaccinated. Many carry infectious diseases. We have seen a wave of multiple infectious diseases brought to this country by this wave of illegal aliens. This included Enterovirus, Measles, H1N1. In summer of 2014 Taitz and her dental assistant, both, contracted a respiratory disease from one of these patients. At the hearing in her parallel case of *Taitz v Johnson et al* 14-cv-0119 USDC So District of TX Taitz provided  evidence of drug resistant Tuberculosis being transferred by illegal aliens crossing the border and doctors and nurses being infected. Taitz filed a FOIA seeking information from the department of Health and CDC on transmission of infectious diseases and quarantine. When no information was provided by the agency, she filed a second  legal actions with this court seeking information under FOIA. After the law suit was filed, some information was provided and it is provided herein as an exhibit 1. It confirmed spread of deadly drug resistant Tuberculosis by illegal aliens crossing the US border. As a doctor working with immigrants in the border state and exposed to infectious diseases, she has a legal cognizable interest in enjoining DAPA and DACA, which are actions by the defendants directly encouraging illegal immigration and spread of infectious diseases. If DAPA is not enjoined Taitz will be directly and adversely impacted.

Courts have routinely granted intervention to parties seeking to protect their interest in government programs that affect them. For example, in Kansas, a federal district court allowed students and Latino organizations to intervene in a case concerning a challenge to state legislation that made undocumented immigrant students eligible for in-state tuition rates. *See Day v. Sebelius*, 227 F.R.D. 668, 670, 676 (D. Kan. 2005) (granting motion to intervene as defendants filed by the Kansas League of United Latin American Citizens, the Hispanic American Leadership Organization, and three college students); *see also Chiles v. Thornburgh*, 865 F.2d 1197, 1214 (11th Cir. 1989) (detainees seeking to intervene as a matter of right in an action brought by a U.S. Senator to challenge housing of immigrant felons at a particular facility had an interest relating to the main suit). Similarly, in *Lewis v. Stark*, 312 F. Supp. 197 (N.D. Cal. 1968), *rev'd on other grounds by Lewis v. Martin*, 397 U.S. 552 (1980), the plaintiffs sought a declaration that the state welfare law, which provided that a man assuming the role of spouse in a home is bound to support children in the home, was unconstitutional and contrary to federal regulations interpreting the Social Security Act. *Id.* at 199. The court held that families with men assuming the role of spouse in the household were entitled to intervene as of right under Rule 24(a).

The Proposed Intervenor is "so situated that the disposition of the action

may as a practical matter impair or impede [its] ability to protect [its] interest."

Fed. R. Civ. P. 24(a)(2). Here, the advisory committee notes to Rule 24(a) are

instructive: "[i]f an absentee would be substantially affected in a practical sense by

the determination made in an action, he should, as a general rule, be entitled to

intervene." Fed. R. Civ. P. 24 advisory committee note to 1966 Amendment. To

demonstrate "impairment," a prospective intervenor "must show only that

impairment of its substantial legal interest *is possible* if intervention is denied."

*Grutter v. Bollinger,* 188 F.3d 394, 399 (6th Cir. 1999) (citing *Mich. State AFL-

CIO v. Miller,* 103 F.3d 1240, 1247 (6th Cir. 1997)) (emphasis added). "This

burden is minimal." *See Grutter,* 188 F.3d at 399 (rejecting the notion that Rule

24(a)(2) requires a specific legal or equitable interest).

As argued before, Taitz will be affected directly should DAPA and DACA are not

found unconstitutional  and enjoined. She will be affected as a taxpayer, as an

American worker and as a doctor working with immigrants.

She cannot wait until the conclusion of the litigation to vindicate her interests.

Courts have recognized that parties seeking intervention would face a

"practical disadvantage" in asserting their rights once a court has rendered a

decision. *Chiles,* 865 F.2d at 1214. The Fifth Circuit has recognized that a

prospective intervenor's interest may be practically "impaired by the *stare decisis*

effect" of a court's rulings in subsequent proceedings. *Sierra Club,* 18 F.3d at 1207

(quoting *Ceres Gulf*, 957 F.2d at 1204) (italics in original); *see also Martin v. Travelers Indem. Co.*, 450 F.2d 542, 554 (5th Cir. 1971) ("[S]tare decisis . . . would loom large" in any attempt by prospective intervenors "to achieve a favorable resolution of the coverage issue" on their own.); *Black Fire Fighters Ass'n of Dallas v. City of Dallas*, 19 F.3d 992, 994 (5th Cir. 1994) (to the extent that a lawsuit involves common legal issues, potential adverse effects on the prospective intervenors favor intervention).

## C. The Proposed Intervenor Interests Cannot Be Adequately Represented by the Existing Parties

The burden under this prong is "satisfied if [the Proposed Defendant-Intervenors] show[] that representation of [their] interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972). Courts have recognized that "[i]nadequate representation is most likely to be found when the applicant asserts a personal interest that does not belong to the general public."

*Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1490 (9th Cir. 1995) (internal citation omitted), *rev'd on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011). Intervention is warranted when the proposed intervenors "occup[y] a different position and [have] different

interests" than the existing defendants. *Sierra Club v.Fed. Emergency Mgmt. Agency*, No. 07-0608, 2008 U.S. Dist. LEXIS 47405, at *18-19 (S.D. Tex. June 11, 2008).

Courts have recognized that governmental representation of private, non-governmental intervenors may be inadequate. For example, in *Dimond v. District of Columbia*, the court held that because the government was responsible for representing a broad range of public interests rather than the more narrow interests of intervenors, the "application for intervention . . . falls squarely within the relatively large class of cases in this circuit recognizing the inadequacy of governmental representation of the interests of private parties in certain circumstances." 792 F.2d 179, 192 (D.C. Cir. 1986); *see Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 331(1980) (granting individual aggrieved party's motion to intervene in order to protect its personal interests, which may at times be in conflict with those of the EEOC); *see also Natural Res. Def.Council v. Costle*, 561 F.2d 904, 911-12 (D.C. Cir. 1977) (holding that the government does not adequately represent private organizations because intervenors' interests are different).

As noted above, this prong is easily satisfied here. Plaintiffs and Proposed Intervenor interests are profoundly different.

Plaintiffs have no direct personal interest at stake. *See, e.g., Day,* 227 F.R.D. at 674

("To the court's knowledge, none of these existing defendants are or ever will be

personally impacted by [the in-state tuition law].").

Plaintiffs' potential failure to advance certain arguments is sufficient to satisfy the

Proposed Intervenor minimal burden that Plaintiffs' representation "may be"

inadequate. *Trbovich,* 404 U.S. at 538 n.10. The Proposed Intervenor's interests are

too divergent from the interests of Plaintiffs, and too vital for the Proposed

Intervenor to be denied an active role as intervenor. *See Day,* 227 F.R.D. at 674–75

(granting intervention and recognizing direct and personal interests of

undocumented immigrant student in defending an in-state tuition law). For these

reasons, the Proposed Intervenor seeks to participate in this case as intervenor and

respectfully requests that the Court grant her intervention as a matter of right.

Interests of the plaintiffs and intervener are divergent and plaintiffs cannot

adequately represent the intervener. Plaintiffs main concern is affect of DAPA and

DACA on the states. Taitz is seeking to uphold her judicially cognizable interests,

which revolve around her standing as a taxpayer, American worker and a Doctor

exposed to infectious diseases.

Recent history of ACA litigation shows that when US citizens and taxpayers are

not allowed to participate in litigation of national importance, they end up losing

and paying the price and holding the bag. Soon after passing of ACA (Affordable

Care Act), also known as Obamacare, just as it is a case herein, 27 states filed a challenge to the act, *Florida et al v Department of Health and Human Services* 10-cv-91 US District Court for the Northern District of Florida. At a time, Taitz, as well as several other individual plaintiffs and taxpayers, sought to join as interveners. At a time, presiding judge, Roger Vinson, felt that the case was too big and ruled that individual plaintiffs could not join as interveners. Additionally, he possibly believed that his ruling of unconstitutionality of ACA based on states' action only would be sufficient to throw the whole act out. This was not meant to be, as the real fight was looming in the Supreme Court and the pressure of the US ruling oligarchy was enormous. On January 31, 2011 Judge Vinson found ACA unconstitutional. 11th Circuit confirmed the ruling and the case reached the Supreme Court, US Department of Health v FL SCOTUS #11-400. Supreme Court gave the states a minor concession, allowing the states to refuse expansion of the Medicare, however the Supreme Court left the quintessence of the law, the "individual mandate", intact. As such, the law suit by 27 states had only very limited results. Plaintiff Taitz believes that if the citizens and individual tax payers were to be allowed to be a part of the case brought by the states early on, the Supreme Court would have been forced to consider not only the standing and damages of the states, but also the standing and damages of the individual citizens and taxpayers and the result might have been different.

There is a high probability that the law suit brought by the states herein will follow the same scenario as *Florida v HHS*.


## PERMISSIVE INTERVENTION IS ALSO APPROPRIATE

Even if this Court were to determine that the Proposed Intervenor does not satisfy the requirements for intervention as of right, it should grant permissive intervention. Rule 24(b)(1)(B) grants permissive intervention upon timely motion by anyone who "has a claim or defense that shares with the main action a common question of law or fact." The Fifth Circuit has recognized that permissive intervention may be granted in the Court's discretion if (1) the motion is timely; (2) an applicant's claim or defense has a question of law or fact in common with the existing action; and (3) intervention will not delay or prejudice the adjudication of the rights of the original parties. Fed. R. Civ. P. 24(b); *see United States v. LULAC*, 793 F.2d 636, 644 (5th Cir. 1986) ("Although the court erred in granting intervention as of right, it might have granted permissive intervention under Rule 24(b) because the intervenors raise common questions of law and fact.").

As a threshold matter, the Proposed Intervenor motion to intervene is timely. *See supra* Section IV.A. Second, the Proposed Intervenor claims will share

substantial questions of law and fact with the main action as the Proposed

Intervenor seeks invalidate and enjoin DAPA. Third, as discussed above,

intervention will not create delay or prejudice the existing parties. *See id.*

Adding the Proposed Intervenor at this juncture of the lawsuit will not needlessly

increase cost, delay disposition of the litigation, or prejudice the existing parties.

Importantly, the Proposed Intervenor's participation in this lawsuit will offer

evidence and argument from the US worker and taxpayer who has a direct and

personal stake in the outcome of this case. At a minimum, therefore, the Proposed

Intervenor asks the Court to exercise its broad discretion and

grant her permissive intervention.

## PARTIES WERE NOTIFIED IN REGARDS TO PROSPECTIVE
## INTERVENTION

Taitz contacted both plaintiffs and defendants notifying them about her perspective

intervention. Plaintiffs did not respond yet. What is of interest, is the fact that after

Taitz called Assistant US Attorney Daniel Hu, she got a call from Assistant US

Attorney Kyle Renee Freeny, who understandably opposed a proposed additional

plaintiff. What is particularly noteworthy, is that she asked when Taitz is planning

to file her motion for a proposed intervention. Taitz responded that she is planning

to file today or tomorrow. By the end of the day, on 02.03.2015, Taitz saw on the

docket a hastily filed opposition against the motion to intervene (ECF #136), which

was filed in response to motion to intervene by Jane Does 1-3(ECF #91) filed January 14. Defendants did not oppose Defendants -Intervenors until they found out that Taitz intends to file as an additional Plaintiff-Intervenor, which appears to be the real reason for an opposition by the Defendants to Defendants-Intervenors. It appears, the thinking behind it, is that if both parties oppose Jane Does intervenors and the court will deny Proposed -Defendant Intervenors, the court will, also, deny Proposed-Plaintiff Intervenor, Taitz.

## CONCLUSION

Based on all of the above, the court should rule in favor of the proposed Plaintiff-Intervenor, Taitz.

Respectfully,

/s/ Dr. Orly Taitz ESQ

02.03.2015

# EXHIBIT 1

Case 1:14-cv-00254   Document 332-1   Filed on 01/08/16 in TXSD   Page 30 of 45
Case 1:14-cv-00254   Document 137   Filed in TXSD on 02/05/15   Page 29 of 44
Page 4 of 72

## U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
### CENTERS FOR DISEASE CONTROL AND PREVENTION

### DECLARATION OF MEDICAL OFFICER
### IN SUPPORT OF ORDER PURSUANT TO
### SECTION 361 OF THE PUBLIC HEALTH SERVICE ACT

I, Francisco Alvarado-Ramy, M.D., do hereby declare that

1) I am a Supervisory Medical Officer, Captain of the U.S. Public Health Service, in the Quarantine Border Health Services (QBHS) Branch, Division of Global Migration and Quarantine (DGMQ), at the Centers for Disease Control and Prevention (CDC). CDC is a component of the U.S. Department of Health and Human Services. I serve as Acting Team Lead for Epidemiology and Surveillance within the QBHS Branch. My duties include working with CDC subject matter experts, officials from other federal agencies, and state and local health departments, to identify persons with specified communicable diseases that may require federal isolation and quarantine. I have been a Quarantine Medical Officer since August 2005.

2) I received my medical degree from the University of Puerto Rico School of Medicine and completed an internal medicine residency at the Cleveland Clinic in Cleveland, Ohio. I am board certified in internal medicine, and I am licensed to practice medicine in Puerto Rico and Georgia.

3) The primary mission of DGMQ is to work with other federal agencies, state and local health departments, the travel industry, and other organizations to prevent the introduction, transmission, and spread of communicable diseases into the United States and from one state or possession into another.

Case 1:14-cv-00254   Document 332-1   Filed on 01/08/16 in TXSD   Page 31 of 45
Case 1:14-cv-00254   Document 137   Filed in TXSD on 02/05/15   Page 30 of 44

Page 5 of 72

4)   This declaration is based in part upon my conversations with other DGMQ staff,
staff from CDC's Division of Tuberculosis Elimination (DTBE), officials at the Texas
Department of State Health Services, and from the U.S. Immigration and Customs
Enforcement (ICE), Department of Homeland Security (DHS).

5)   Tuberculosis (TB) is caused by *Mycobacterium tuberculosis* complex. Pulmonary
or respiratory tract TB can be transmitted from person to person by airborne droplet
nuclei, which are infectious particles expelled by the patient when coughing, sneezing, or
talking. These particles can remain suspended in the air for extensive periods of time
after the person with TB coughs, sneezes, or talks. Persons with pulmonary TB may
experience signs and symptoms such as cough (with or without bloody sputum), fever,
lack of appetite, fatigue, unintended weight loss, and night sweats.

6)   Persons with pulmonary TB can transmit disease to others through prolonged or
frequent close contact. It usually takes several hours of exposure for TB transmission to
occur. However, there have been reports of transmission involving only brief contacts
with the contagious person. The ability of a person with infectious TB to transmit the
infection to someone else depends on the extent of disease, the adequacy and duration of
the patient's TB treatment, and the intensity, duration, and frequency of exposure to
others. Inadequately treated patients with pulmonary TB may continue to be infectious
for years. Recommended precautions for persons with inadequately treated infectious TB
include respiratory isolation in an airborne infection isolation room with negative
pressure and proper treatment.

7)   Multidrug-resistant TB (MDR TB) is TB that is resistant to the two best first-line
anti-TB drugs, isoniazid, and rifampin. Resistance to anti-TB drugs can occur when

2

Case 1:14-cv-00254   Document 332-1   Filed on 01/08/16 in TXSD   Page 32 of 45
Case 1:14-cv-00254   Document 137   Filed in TXSD on 02/05/15   Page 31 of 44

Page 6 of 72

these drugs are misused or mismanaged. Examples include when patients take their medications erratically or do not complete their full course of treatment; when patients do not absorb doses of medication well; when health-care providers prescribe the wrong treatment, the wrong dose, or length of time for taking the drugs; when the supply of drugs is not always available; or when the drugs are of poor quality. Persons with incompletely treated TB are at risk of reactivation of disease and at increased risk of developing drug-resistant TB. Persons may also become infected with MDR TB if exposed to someone with MDR TB who is infectious. Persons with MDR TB can prevent the spread of the disease and prevent development of additional drug resistance by taking all of their medications as prescribed, ideally by directly observed therapy, and adhering to recommendations for infection control, particularly while still infectious. No doses should be missed, and treatment must not be stopped early unless a compelling reason exists to do so (e.g., intolerance to medications or life-threatening adverse events).

8) Extensively drug-resistant (XDR) TB is TB that is resistant to the two best first line anti-TB drugs, isoniazid and rifampin, (i.e., MDR TB), with additional resistance to any of the fluoroquinolones (such as ofloxacin or moxifloxacin) and to at least one of three injectable second-line drugs (amikacin, capreomycin, or kanamycin). Because XDR TB is resistant to the most potent first- and second-line TB drugs, the remaining treatment options are less effective, have more side effects, and are more expensive.

9) I have reviewed the following medical records: drug susceptibility testing (DST) results from isolates collected on (b)(6) and a TB Case and Suspect Report and International Referral Form prepared by the ICE's Division of Immigration Health Services describing the clinical findings related to TB.

Case 1:14-cv-00254   Document 332-1   Filed on 01/08/16 in TXSD   Page 33 of 45
Case 1:14-cv-00254   Document 137   Filed in TXSD on 02/05/15   Page 32 of 44

Page 7 of 72

10) **(b)(6)** who, upon information and belief, is a citizen of **(b)(6)** Upon information and belief, the patient entered the United States without proper documentation. It is believed that **(b)(6)** contracted TB while in **(b)(6)** but **(b)(6)** reported **(b)(6)** was not diagnosed or treated there. **(b)(6)** was presumptively diagnosed with pulmonary TB in the United States on **(b)(6)** in Texas while in ICE custody at the **(b)(6)** TB skin test result was positive with 13 mm of induration **(b)(6)** and a chest x-ray showed a small cavity and scattered patchy consolidation in mid lung zones **(b)(6)** Microscopic examination of three sputum specimens (collected on **(b)(6)** showed many acid-fast bacilli (AFB); *Mycobacterium tuberculosis* was later isolated from cultures of these sputum specimens, confirming the diagnosis of TB.

11) Upon information and belief, personnel at the **(b)(6)** began treating **(b)(6)** for TB on **(b)(6)** with a standard first-line four drug treatment regimen. However, once the patient was found to have drug-resistant TB **(b)(6)** treatment was discontinued until complete DST results were available and an appropriate regimen could be determined and procured.

12) Preliminary DST results from public health laboratories in Texas were consistent with XDR TB, showing resistance to all four first-line drugs (isoniazid, rifampin, pyrazinamide, ethambutol), three second-line injectable drugs (amikacin, kanamycin, capreomycin), and a fluoroquininolone (ofloxacin). These results were confirmed at the CDC TB Reference Laboratory in Atlanta, GA. Additional second-line drugs, ethionamide and streptomycin, were also found to be resistant at both laboratories. All drug susceptibility testing for additional second line anti-TB drugs, performed at CDC

4

Case 1:14-cv-00254   Document 332-1   Filed on 01/08/16 in TXSD   Page 34 of 45
Case 1:14-cv-00254   Document 137   Filed in TXSD on 02/05/15   Page 33 of 44

Page 8 of 72

and non-CDC reference laboratories, were finalized February 22, 2012; the results showed susceptibility to linezolid, cycloserine, and clofazimine. The minimal inhibitory concentration (MIC) of moxifloxacin was 1–4 µg/mL and Levofloxacin was 2 µg/mL, suggesting that the patient TB was resistant to levofloxacin and not fully susceptible to moxifloxacin *in vitro.*

13) Upon information and belief, (b)(6) has been under airborne isolation precautions at the (b)(6) between (b)(6) (b)(6) was transferred to the (b)(6) (b)(6) to facilitate medical monitoring, especially once on treatment. While at (b)(6) remained under airborne infection isolation precautions (b)(6) started a treatment regimen of moxifloxacin, linezolid, cycloserine, clofazimine, and vitamin B6 on (b)(6) A fifth medication, bedaquiline, newly FDA-approved, will be added to this regimen once it is procured for compassionate use from the pharmaceutical company.

14) On (b)(6) was transferred to the (b)(6) (b)(6) to continue treatment and clinical management of medication side effects. Microscopic examination of sputum specimens a (b)(6) are collected every two weeks. Three sputum specimens collected (b)(6) (b)(6) showed no acid-fast bacilli (AFB); *Mycobacterium tuberculosis* was later isolated from cultures of these sputum specimens, confirming persistent TB presence. Results of sputum culture specimens collected (b)(6) and (b)(6) are still pending (b)(6) remains under airborne infection isolation precautions.

5

15) Considering (b)(6) history of international travel and irregular entry into the United States (b)(6) may suddenly decide to travel without notice if (b)(6) were to be released on (b)(6) own recognizance, under a bond posting, or if (b)(6) were granted asylum, even while infectious and/or under treatment,.

16) TB patients who are partially treated are at risk of treatment failure, disease relapse, may become re-infectious and pose a risk to persons with whom they come into contact. Moreover, persons with XDR TB, such as (b)(6) are at risk for developing further drug resistance making (b)(6) TB disease, and anyone who becomes infected with (b)(6) strain, untreatable. Extensively-drug resistant TB is considered infectious until patients are on appropriate treatment regimen, have consistently negative culture results, and show evidence of clinical improvement. Consistently negative culture results is generally defined as having two consecutive cultures taken at least one week apart with no subsequent positive cultures.

17) It is my professional judgment that, based upon the information and evidence cited herein, that (b)(6) is infected with extensively drug-resistant (XDR) TB , a communicable disease subject to public health restrictions, including isolation, under section 361 of the Public Health Service Act (42 U.S.C. § 264) and 42 CFR §70.6.

18) Under 42 U.S.C. 264(d)(2), a "qualifying stage" of the disease is defined as the communicable stage of the disease or a pre-communicable stage if the disease would be likely to cause a public health emergency if transmitted to other individuals. (b)(6) illness meets the definition of qualifying stage because (b)(6) is presently communicable.

19) Furthermore, it is my professional judgment that if this TB strain were transmitted to others it would represent a public health emergency because XDR TB represents a

6

relatively severe and uncommon type of TB and exemplifies an infectious disease that has been controlled in the United States. Additional infections with this strain would pose a high probability of serious long-term morbidity and substantial future harms to others, including death. Besides the high risk of traveling interstate, in light of (b) (b)( undocumented entry into the United States (b)(6) would also be a probable source of infection to other individuals who, while infected with XDR TB in a qualifying stage, will be moving from one state to another state.

20) I recommend that if (b)(6) is released from ICE custody prior to cure in the United States, that (b)(6) be isolated to allow for airborne infection isolation precautions until public health authorities determine (b)(6) is no longer infectious. (b)(6) should continue on directly observed treatment until cured.

21) Accordingly, pursuant to section 361 of the Public Health Service Act (42 U.S.C. § 264) and 42 CFR §70.6, I recommend that an isolation order be issued, requiring that (b)(6) be admitted at the (b)(6) or another appropriate facility approved by CDC.


In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Signed this 18th day of April, 2013.

Francisco Alvarado-Ramy, MD, FACP
Supervisory Medical Officer
Captain, U.S. Public Health Service
Quarantine & Border Health Services Branch
Division of Global Migration & Quarantine

7

Case 1:14-cv-00254 Document 332-1 Filed on 01/08/16 in TXSD Page 37 of 45
Case 1:14-cv-00254 Document 137 Filed in TXSD on 02/05/15 Page 36 of 44
Page 11 of 72

Centers for Disease Control and Prevention

# EXHIBIT 2

## IRS offers extra tax refunds to illegal immigrants granted amnesty by Obama

IRS Commissioner John Koskinen confirmed Tuesday that illegal immigrants granted amnesty from deportation under President Obama's new policies would be able to get extra refunds from the IRS for money they earned while working illegally, as long as they filed returns during those years.

Illegal immigrants who are granted the amnesty will be given official Social Security numbers, which means they can go back and amend up to three years of previous tax forms to claim the EarnedIncome⊅ Tax Credit, potentially claiming billions of dollars in additional payments they were ineligible for before the amnesty.

Mr. Koskinen said they will have to have already filed returns for those back-years, and there's a statute of limitations that governs how far they can go back, but said the agency's current interpretation of laws would allow them to claim the EITC credit retroactively."This is the problem you get into," said Sen. Charles E. Grassley, an Iowa Republican who demanded a solution⊅ to the loophole. "The IRS's interpretation of the EITC eligibility requirements undermines congressional policy for not rewarding those working illegally in the United States."

The loophole stems from the way the IRS handles illegal immigrants. While the immigrants are not authorized to work in the U.S. legally, the IRS still wants to be paid taxes on the earnings of those who do work, and so it⊅ has issued millions of Individual Taxpayer Identification Numbers, or ITINs, to illegal immigrants, enabling them to pay up.

Some tax credits are only eligible to those with a valid Social Security number. Those who get valid numbers, however, can go back and claim them.

The IRS website says taxpayers have until April 15 this year to file⊅ back to 2011 claiming tax credits they didn't ask for in their previous returns, and have until April 15, 2016, to claim tax credits from 2012.

Mr. Grassley asked Mr. Koskinen to go back and revisit his agency's interpretation of the laws.

The Obama administration says up to 4 million illegal immigrants could earn "deferred action☒," or a stay of deportation and work permits that would accompany it. It's uncertain how many of those were paying taxes using ITINs, and thus could be eligible to claim the EITC.

The EITC isn't the only tax credit to be ensnared in the immigration debate. The IRS already pays out billions of dollars a year to illegal immigrants under a program known as the additional child tax credit.

The IRS says the law is vague on who is eligible for the child credit, so to be on the safe side they pay it out to illegal immigrants.

Backers argue that the children claimed for the child tax credit are likely U.S. citizens, even if their parents☒ are here illegally, and so it would be unfair to strip the money.

In 2010, the government☒ paid out $4.2 billion to illegal immigrants who claimed the child tax credit, the IRS's inspector general found. http://www.washingtontimes.com/news/2015/feb/3/irs-offers-extra-tax-refunds-to-illegal-immigrants/#ixzz3QmLwVa57

# EXHIBIT 3

**Federal Government Issued Nearly 5.5 Million Work Permits to Foreign Nationals Since 2009**

More than 5.46 million foreign nationals received work permits from the federal government since 2009, according to a new report from the Center for Immigration Studies. Data uncovered from the U.S. Citizenship and Immigration Services agency reveal that approximately 982,000 work permits were given to illegal immigrants and other foreign nationals unqualified for admission, most of whom crossed the border without inspection

http://www.nationalreview.com/corner/397713/report-federal-government-issued-nearly-55-million-work-permits-foreign-nationals-2009

The remarkable number of work permits granted by the federal government to law-breaking aliens better explains how all net jobs growth since 2007 has gone to immigrants.

http://www.nationalreview.com/corner/397713/report-federal-government-issued-nearly-55-million-work-permits-foreign-nationals-2009

"The executive branch is operating a huge parallel work-authorization system outside the bounds of the [immigration] laws and limits written by Congress [and which] inevitably reduces job opportunities for Americans," said Jessica Vaughan, the policy director at the Center for Immigration Studies, while filed the FOIA request.

"The true magnitude of how often he has evaded the limits set by Congress on foreign workers has never been known until now," she told The Daily Caller.

....

So 18 million foreign students and workers — including many university-trained workers — have jumped into the U.S. economy since Obama was inaugurated in 2009.

The 18 million is almost level with the roughly 24 million young Americans who have turned 18 and joined the work force in the six years since 2009. In effect, Obama has given employers the option to hire a government subsidized foreigner in place of roughly one-in-two Americans who have graduated since 2009.

http://dailycaller.com/2015/02/02/obama-quietly-adds-5-46-million-foreigners-to-economy/

Obama's aides claim he has added 10 million jobs to the economy since 2009.

But Obama's quiet award of five million work permits, plus his November amnesty, will have added roughly 10 million foreign workers to the economy by the end of 2015. The influx adds to the normal inflow of 1 million immigrants per year and the standing population of 2 million white-collar and blue-collar guest workers.

http://dailycaller.com/2015/02/02/obama-quietly-adds-5-46-million-foreigners-to-economy/

Not authorized by law...

The Obama administration has been issuing millions of work permits over the limits set by Congress, according to a new report from the Center for Immigration Studies.

In the report released Monday, the anti-amnesty group explains data it obtained from U.S. Citizen and Immigration Services (USCIS) via a Freedom of Information Request.

Federal records show, the CIS finds, that from 2009-2014 the agency issued 5,461,568 new work permits to immigrants, beyond the 1.1 million legal immigrants and 700,000 guest workers admitted to the U.S. each year.

CIS laid out three categories of immigrants who received work authorization under what the group is calling a "shadow" system:

Approximately 1.8 million new work permits were issued to aliens with temporary visas or who entered under the visa waiver program. Of these, about 1.2 million (67%) had a visa status for which employment is not authorized by law, such as foreign students and independents of guest workers.

About 982,000 new work permits issued to illegal aliens or aliens unqualified for admission. Of these, 957,000 were aliens who crossed the border illegally (Entered Without Inspection). Inexplicably, 1,200 new work permits were issued to aliens who were denied asylum, were suspected of using fraudulent documents, were stowaways, or were refused at a port of entry.

About 1.7 million, were issued to aliens whose status was unknown, not recorded
by the adjudicator, or not disclosed by U.S. Citizenship and Immigration Services
(USCIS), the agency that processes the applications.

http://www.breitbart.com/big-government/2015/02/02/report-5-5-million-
additional-work-permits-issued-since-2009-in-shadow-authorization-system/

I, Lila Dubert, served the parties in this case with the attached pleadings on 02.03.15 by placing those pleadings in the first class mail