UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 1:14-CV-254 |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA, *et al.* ) | |
| ) | |
| Defendants. ) | |

### DECLARATION OF LEÓN RODRÍGUEZ

I, León Rodríguez, hereby make the following declaration with respect to the above-captioned matter.

1) I am the Director of U.S. Citizenship and Immigration Services (USCIS), a component of the Department of Homeland Security (DHS). I was confirmed by the U.S. Senate on June 24, 2014, and began serving as USCIS Director on July 9, 2014. USCIS has a workforce of approximately 18,500 people, including both federal employees and contractors, and handles approximately eight million matters each year.

2) I have spent a large portion of my professional career as a state and Federal prosecutor. Throughout my career I have also served in a number of leadership positions in Federal and local government.

3) I make this declaration on the basis of my personal knowledge and information made available to me in the course of my official duties. The statements made in this declaration are based on USCIS's current understanding of information available at this time.

1

4) In this Court's May 19 Order, the Court states that the Government must "file a list of each of the individuals in each of the Plaintiff States" who were granted Deferred Action for Childhood Arrivals (DACA) prior to this Court's injunction and pursuant to the 2012 DACA Directive, but who were granted three-year instead of two-year DACA terms and associated Employment Authorization Documents (EADs). Memorandum Opinion and Order (ECF 347) at 22-23. The Court's Order specifies:

> This list should include all personal identifiers and locators including names, addresses, "A" file numbers and all available contact information, together with the date the three-year renewal or approval was granted. This list shall be separated by individual Plaintiff State.

*Id.* at 23. The Order further states that although the list "will remain sealed until a further order of this Court," the personally identifiable information (PII) may be released to the "proper authorities" of one or more of the Plaintiff States on a "showing of good cause." *Id.* Finally, the Court's Order states that it "will not entertain any requests concerning the release of this sealed information to any state until the Supreme Court has issued its decision on the issues currently before it." *Id.*

5) In a letter to Plaintiffs dated July 17, 2015, USCIS indicated that of the approximately 108,000 DACA recipients who were granted three-year terms under the 2012 DACA Directive prior to this Court's injunction, approximately 50,000 were associated with addresses indicating residence in Plaintiff States according to an electronic query of USCIS's CLAIMS 3 system.[1] Joint Status Report of July 31, 2015 (ECF 285-4) at 7-9. USCIS understands the Court's May 19 Order to refer to these approximately 50,000 individuals.

---

[1] As discussed further below, the CLAIMS 3 system is an electronic records system used by USCIS to track and update the actions taken in individuals' cases. USCIS considers the CLAIMS 3 system to be the authoritative system of records documenting individuals' deferred action and/or work authorization.

**HARM TO USCIS AND THIRD PERSONS**

6)      The Court's Order to produce the names and detailed PII of approximately 50,000 individuals would require an unprecedented breach of USCIS's longstanding commitment to zealously guard the private and sensitive information of the millions of persons who provide such information for an array of immigration adjudications.  Based on my experience as Director of USCIS, I believe the production of such information would have a chilling effect on the willingness of individuals to seek a wide range of immigration benefits from USCIS and to provide all information necessary for USCIS to adjudicate their petitions, applications, and requests ("applications").  The chilling effect is of particular concern given that the Order compels disclosure of sensitive personal information concerning individuals who are not parties to the proceeding and are not alleged to have engaged in any wrongdoing.

7)      Protecting personal information is essential to USCIS's fulfillment of its mission because the agency necessarily requires petitioners, applicants, and requestors ("applicants")—including millions of U.S. citizens, U.S. businesses, and foreign nationals—to submit extensive background and identifying information.  That information is necessary for careful and thorough adjudication of eligibility and background checks.  It is essential to the agency's function and to fulfilling its statutory role that applicants have confidence in the privacy of the information they submit.  Providing this information under circumstances where the affected individual is not a party to the case, no wrongdoing by the individual is alleged or demonstrated, and where no security, public safety or other danger is alleged, would undermine the public trust and confidence established by USCIS.

8)      The danger to that trust and confidence is particularly important with regard to DACA, which depends on eligible individuals who arrived in the United States as children,

through no fault of their own, disclosing their identity and voluntarily submitting their requests. Because of the complexity of this litigation, past orders in this case, and the lack of precision in public reporting, there is already a high level of reported fear, concern and confusion among DACA recipients with regard to the disclosure of their information. Based on inquiries USCIS has received and the fear publicly expressed by DACA recipients and their advocates, after the Court's May 19 Order, I believe that production of this information, no matter how cabined, could fundamentally compromise USCIS's ability to obtain full disclosure in the future.[2]

9) The fear and confusion would be further exacerbated by the fact that the Court has ordered production of the information for the purpose of potentially providing it to the Plaintiff States. As an officer of the court and former prosecutor, I fully appreciate and understand the integrity of the judicial process and the significance of information filed under seal. However, in this case, even if the Court were never to release the information to Plaintiff States, the restriction of filing under seal does not sufficiently diminish the harmful effect of producing this information to the Court.

   a. First, the stated purpose of the sealed production is for potential disclosure to the Plaintiff States that have expressed their opposition to the three-year DACA grants that these individuals have received. Hence, it is understandable that recipients would perceive the sealed filing by USCIS as the first and critical step in disclosure of information to state actors adverse to their DACA grants.

   b. Second, the subset of DACA recipients whose information would be disclosed have complied in all respects with the requirements of DACA and have no reason to be singled out simply because they received their periods of deferred action

---

[2] Regardless of how the validity of the affected three-year DACA extensions is resolved, DACA remains in place and individuals continue to be eligible to request two-year periods of deferred action.

4

   between November 20, 2014 and the issuance of this Court's preliminary injunction on February 16, 2015.[3]

 c. Third, the production of information in this circumstance would be different than the earlier production of information relating to a limited number of individuals,[4] under a carefully-developed protective order, where the Plaintiff States asserted a need for the information in order to update or verify their own data *after* the periods of deferred action were converted from three years to two. In this case, there has been no change in the deferred-action term of any individual and there is no evident purpose in the Plaintiff States receiving the information that the Court has ordered or, therefore, in the Court's ordering it be filed with the Court in anticipation of furnishing it to the Plaintiff States.

 d. The production of information in this circumstance is also different than automated USCIS responses to queries by state agencies about particular individuals through USCIS's Systematic Alien Verification for Entitlements (SAVE) program. The SAVE program is a service provided by USCIS to government agencies that enter into a detailed memorandum of agreement (MOA) to help them determine the eligibility of applicants for benefits.[5] When

---

[3] The Court's Order seeks information for individuals granted three-year terms of deferred action between November 20, 2014, and March 3, 2015, but only if such terms have not been withdrawn. Because USCIS has withdrawn all three-year terms that were granted after the injunction, USCIS understands the Court's Order to apply only to individuals granted three-year terms prior to that date.

[4] These were individuals who had been issued three-year periods of deferred action, or whose three-year documents were re-mailed to them, *after* the Court's injunction was issued.

[5] *See* "Sample Memorandum of Agreement Between the Department of Homeland Security, U.S. Citizenship and Immigration Services, and State or Local Government Agency," USCIS, Nov. 2015, available at https://www.uscis.gov/sites/default/files/USCIS/Verification/SAVE/SAVE%20Publications/save-non-fed_moa-sample.pdf (requiring states to "[s]afeguard such information . . . to ensure that it is not used for any other purpose than described in this MOA and protect its confidentiality; including ensuring that it is not disclosed to any unauthorized persons(s) without prior written consent of DHS-USCIS," and to "[c]omply with the Privacy Act . . . and other applicable laws, regulations, and policies . . . in safeguarding, maintaining, and disclosing any data

        submitting a query through the SAVE program, the state agency submits personal information it collects directly and voluntarily from the benefit applicants. The SAVE program validates that information and confirms the immigration status and/or employment authorization of the benefit applicant. If it is relevant and provided for in the MOA with the state agency, the response would also include the expiration date of that status or authorization. The exchange of information is governed by the privacy provisions of the MOA, and the program does not otherwise share personal information with state agencies.

   e. Finally, the urgency of production by June 10 is not apparent. There is no urgent need for the Plaintiff States to receive the information or evident reason the production could not be deferred until the propriety of the Court's Order is fully resolved. The information in USCIS's files is permanently preserved, can be produced at any time in the future, and will be equally available if ordered at a future time.

10) USCIS is responsible for the proper adjudication of more than eight million applications annually. A necessary and fundamental aspect of this duty is the collection of PII to make determinations and ensure that the individuals who are the subject of those applications are properly vetted for law enforcement and national security purposes.

11) USCIS rigorously guards against the unauthorized disclosure of all PII submitted and entrusted to it by applicants. Although the Privacy Act does not apply to non-U.S. persons, USCIS applies privacy protections to all records held by the agency regardless of the status of the alien for important public policy and foreign relations reasons, including to promote

---

provided or received pursuant to the MOA," and requiring that states "[p]rovide all benefits-applicants who are denied benefits based . . . on the SAVE response with adequate written notice of the denial" and opportunity to appeal.).

commensurate protections for records of U.S. citizens held by foreign countries.[6] As noted in the Department of Justice's *Overview of the Privacy Act of 1974*,[7] one of the important purposes behind the Privacy Act is "to balance the government's need to maintain information about individuals with the rights of the individuals to be protected against unwarranted invasion of their privacy stemming from federal agencies' collection, maintenance, use, and disclosure of personal information about them." This important purpose applies equally to all individuals who come before USCIS, regardless of nationality or immigration status.

12) If the safeguards in place for PII are compromised, it may affect the actions of other countries with regard to U.S. citizen PII held by those nations. Preventing the disclosure of PII of foreign nationals in the possession of USCIS is necessary to insist upon similar protections for U.S. citizens abroad.

13) Though USCIS may disclose PII pursuant to a federal court order, the agency has an obligation to safeguard such information and to honor the public's expectation that PII will be protected from release to third parties absent a compelling purpose and particularized showing of need. Thus, while we recognize the authority of a court to compel disclosure, no showing of a compelling purpose or need has been demonstrated for this information under the circumstances presented here.

14) If the public were to lose confidence in the security of PII in USCIS's possession, it could negatively affect the number of individuals who come forward to seek benefits and other services administered by USCIS. The distinctions between filing information under seal, further disclosure at some later point to the Plaintiff States, and disclosure to the public at large are not

---

[6] *See* Department of Homeland Security Privacy Policy Guidance Memorandum (Jan. 7, 2009), available at https://www.dhs.gov/sites/default/files/publications/privacy-policy-guidance-memorandum-2007-01.pdf.

[7] United States Department of Justice Overview of the Privacy Act of 1974, 2015 ed., available at https://www.justice.gov/opcl/file/793026/download.

readily understandable distinctions among the public we serve, including the DACA-eligible community.

15) In this case, disclosure to the Court (even under seal) for the further potential dissemination to the Plaintiff States is not to remedy any misconduct or wrongdoing by the DACA recipients whose terms of deferred action have not changed. Nor is it evident for what proper purpose the Plaintiff States might use the information sought by the Court for dissemination to them. The anticipated dissemination, therefore, sows greater confusion and fear because it bears no nexus to any actions by the individuals whose PII will be shared. The resulting fear in the DACA-eligible community that personal information may be subject to future disclosure for reasons unrelated to their own actions could lead to fewer requests, thereby frustrating the purposes of the Secretary's initiative to efficiently allocate DHS resources by "encourag[ing] these people to come out of the shadows, submit to background checks, pay fees, and apply for work authorization…and be counted." Mem. from Jeh Charles Johnson, Sec'y of Homeland Security, to León Rodríguez, Director, USCIS, *et. al.*, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents* (Nov. 20, 2014). Even those who continue to request DACA may be more fearful of sharing PII comprehensively, thereby diminishing the ability of USCIS to adjudicate claims and fully scrutinize all applications based on all PII that would otherwise be provided.

16) The likelihood of fear and confusion is demonstrated by misunderstandings resulting from earlier orders related to three-year DACA grants. When USCIS revoked and collected incorrectly-issued three-year EADs, USCIS received innumerable questions from the public regarding the scope of the revocation and reissuance order, and the validity of pre-

injunction three-year EADs. Among the three-year EADs converted to two-year periods were a number of EADs unilaterally and proactively submitted by individuals whose EADs were not at issue because they were issued *before* the injunction issued. These individuals mistakenly believed they were obliged to return their EADs notwithstanding extensive USCIS efforts to specify which EADs were covered by the return order and which were not.

17) The effect on applicants would not be limited to this DACA population. USCIS maintains extensive files with PII on all individuals seeking U.S. citizenship, lawful permanent residence, temporary immigration classification, or asylum or other humanitarian protection, as well as employers in the United States seeking immigrant or nonimmigrant status for current and prospective employees. Absent stringent privacy protections, all such information would be at risk and many would either seek to limit the information they provide or forego immigration benefits to which they are entitled, thereby undermining the fulfillment of our mission, thwarting the purposes of the immigration laws, and diminishing the benefits of our immigration system to the Nation.

18) Moreover, the Court's Order anticipates further sharing of the information with Plaintiff States without specifying what, if any, safeguards may apply to the PII and what prohibitions on further dissemination may be imposed. The essential protection that the PII be filed under seal (which, as noted, does not sufficiently ameliorate the harm to USCIS) does not provide assurance of further protections and, to the contrary, invites fear and speculation that wide dissemination without safeguards may be forthcoming. The immediacy of the production order without articulation of specific and explicit limitations on downstream disclosures leaves individuals and the community with the understandable impression that such protections are not essential and that ensuring confidence in privacy is not important to USCIS.

19) The current Order stands in contrast to the PII provided by USCIS in August of 2015, with regard to a limited group of approximately 2,600 individuals. In that instance, the Plaintiff States asserted to the satisfaction of the Court that the information was necessary for the States to determine if further corrective action with regard to their own records was needed to update the eligibility duration for DACA recipients whose term had been reduced from three years to two. The change in duration of DACA triggered the States' concerns that their own records may not fully reflect the change. By contrast, in this order the PII is unrelated to any change in the DACA duration. For all individuals whose PII is at issue, their three-year DACA terms and EADs remain valid.

20) Furthermore, when USCIS provided PII information in August 2015, it did so under a carefully crafted protective order that USCIS prepared in agreement with Plaintiff States, which limited the use of such information to specific individuals to address only the correction of state records related to the invalid three-year EADs. *See* Stipulated Protective Order (ECF 298). Here, the Court has not articulated any limitations for the release of such information to Plaintiff States, except for a vague reference to "good cause."

21) Finally, certain statutory confidentiality provisions further govern USCIS's ability to share the information of certain DACA recipients. Particularly, USCIS may not "disclos[e] to *anyone… any* information which relates to an alien who is the beneficiary of an application" for a T visa (for victims of human trafficking), a U visa (for victims of serious crimes), or certain protections under the Violence Against Women Act (VAWA). 8 U.S.C. § 1367(a)(2) (emphasis added). This provision would thus restrict the sharing of information related to DACA recipients who are also T, U, or VAWA applicants. *Id.*

**BURDEN TO USCIS**

22) As explained in detail below, if compliance with the Court's Order is understood to require more than an electronic query and compilation from USCIS's CLAIMS 3 system, which reflects DACA adjudication decisions, because of the Order's requirement to produce "*all* personal identifiers and locators" and "*all* available contact information" in the agency's possession (which could include information unavailable through the automated query of electronic systems), such compliance would present an extraordinary burden on the agency that would divert significant resources and personnel from other ongoing tasks. While USCIS has produced aggregate statistical information for courts based on queries of the agency's electronic systems, the large quantities of personal information requested by the Court's Order is unprecedented. Depending on the scope of data collection the Court intended, in addition to running electronic queries against CLAIMS 3 and perhaps other USCIS systems, USCIS personnel would be required to (1) review and validate the information retrieved from each system; (2) retrieve and manually review the physical case file for each affected individual, if the Court intended that as well; and (3) merge and crosscheck the information retrieved from various sources to compile the information in an accurate and usable manner. Due to the format of the information produced from various USCIS systems and the extensive nature of individual case files, USCIS estimates that gathering all such information would require 17,350 employee work hours along with other contractor and overhead costs, with a total estimated cost of $1,071,353, including lost hours of productivity.[8] As also explained below, allowing USCIS to comply with

---

[8] These and other estimates below represent USCIS's best understanding at this time. Because USCIS does not normally use its systems for the purpose of gathering personal information on large numbers of people, it is not certain what complications may arise. As results are received, these estimates may require adjustment.

the Court's Order by querying only the agency's electronic systems would mitigate, but not eliminate, the significant burden to the agency posed by the Court's Order.[9]

23) As noted above, if the Court's Order were understood to require the production of "all personal identifiers and locators" and "all available contact information" located anywhere in the agency's possession, regardless of the medium on which it is stored (electronic, paper, or otherwise), compliance would be exceedingly burdensome. Although some information for each affected individual is available in an electronic and searchable format in USCIS's CLAIMS 3 system, the agency also has information about affected individuals stored in individual paper case files as well as in other electronic systems, including the Verification Identification System (VIS) used by USCIS for its SAVE and E-Verify programs. As noted previously, the CLAIMS 3 system is the internal USCIS records system designed to assist in the processing of applications related to a wide range of immigration benefits and visas. The system is used to track individual cases, including for DACA recipients, through all aspects of the immigration process. It is also used, among other things, to reflect USCIS's official adjudication decisions documented in individuals' A-Files, track case histories, produce statistics, and ingest data captured through electronic and physical case filing. The VIS system is a composite information system that incorporates data from various DHS and other Government databases, and is the underlying information technology platform that supports the SAVE and E-Verify programs. As noted above, the SAVE program is a service provided by USCIS to help government benefit-issuing agencies determine the eligibility of applicants for benefits. The E-Verify program is a service

---

[9] Although USCIS believes it should be possible to provide by June 10 the particular information that is contained in CLAIMS 3 that is specifically listed by the Court in its Order (i.e., name, address, A number, and date that the three-year approval or renewal was granted), the agency has never undertaken such a task of this magnitude and cannot predict with certainty what complications could arise in retrieving and compiling this information.

12

provided by USCIS that allows employers to electronically check the eligibility of their employees to work in the United States.

    24) Depending on the scope of the Court's Order, collecting and compiling all such potentially responsive information in the agency's possession could require USCIS to engage in the following steps:

    a. At a minimum, USCIS is being required to design and run an electronic query in its CLAIMS 3 system to obtain potentially responsive information contained in that system. This task is not simple or quick; while the CLAIMS 3 system is designed to run data pulls for statistical purposes, it is not designed for the purpose of collecting and producing personal information regarding large numbers of individuals. Information maintained by the CLAIMS 3 system generally includes the individual's current name and address, as well as (if available) telephone number, date of birth, social security number, DHS-assigned "Alien number" (or "A number"), current immigration status, date on which such status was granted, date on which such status expires, and various other types of information.[10] Finally, to ensure the production of requested information in an accurate manner, USCIS would need to review and validate the information obtained from the CLAIMS 3 system by manually reviewing the results to identify anomalies. When such anomalies are identified, USCIS would need to crosscheck the relevant information against other information systems to attempt to resolve any issues. In cases where electronic systems could not resolve the issue, USCIS would manually review individual paper case files, known as "A-

---

[10] Some of this information is not required for particular types of applications and thus only available if provided by the individual. It is also possible that some of this information is missing or incomplete in any individual record.

files." Absent unforeseen and significant review of paper files in the validation process,[11] USCIS estimates that this process would require approximately 100 employee work hours and cost approximately $11,458, including lost employee productivity and overhead.

b. If the search were to be extended beyond CLAIMS 3, there may also be potentially responsive locator and personal identifying information that could be retrieved from the VIS system, although much of this information would duplicate the information in the CLAIMS 3 system. As noted above, the VIS system is used for the SAVE and E-Verify services, which are available to government agencies and employers, respectively, for the purposes of validating information obtained by them from third-party individuals. Specifically, the VIS system is not a database in itself, but retains the case history of (1) queries run by government agencies through the SAVE system with respect to applicants for benefits; and (2) queries run by employers through the E-Verify system with respect to employees. These queries would provide possible information about the source and location of the querying entity and some personal identifying information (such as Social Security numbers and dates of birth) related to the subjects of those queries. To search the VIS system, USCIS would be required to design and run an electronic query to obtain such information. As with the CLAIMS 3 system, the VIS system is not designed for the purpose of providing locator and other personal information, and initial queries will likely have errors, missing information, and

---

[11] Previous queries run for this litigation often have required significant modification following quality review and verification. Each query is different, and unpredictable issues frequently arise. As this would be the first time USCIS runs this type of query on 50,000 cases, it is likely that unforeseen complications would be encountered, requiring some individual electronic and paper file review. This could greatly increase the number of work hours involved.

anomalous results that would require further review. For quality assurance, USCIS would thus review and validate the information obtained from the VIS system by manually reviewing responses for discrepancies and abnormalities, and potentially accessing other systems and perhaps the physical A-files to resolve. Absent unforeseen and significant review of paper A-files in the validation process, USCIS estimates that this process would require approximately 500 employee work hours and cost approximately $28,511.

c. If the search were to be extended further, there may also be potentially responsive information in other electronic systems maintained by USCIS, including the Service Request Management Tool (SRMT) system used by USCIS customer service representatives to record and respond to requests for service. For example, when an individual submits a service request to USCIS, the agency normally records contact information in the SRMT system, including limited information that may not be reflected in the CLAIMS 3 or other USCIS systems. As with the CLAIMS 3 and VIS systems, USCIS would be required to design and run electronic queries to obtain relevant information from its other electronic systems. And because these systems are also not designed for the purpose of providing locator and other personal information, initial queries will likely have errors, missing information, and anomalous results that would require further review and validation. USCIS does not currently know how many of the approximately 50,000 individuals covered by this Court's Order would have information in the SRMT or other electronic systems maintained by USCIS.

USCIS is thus currently unable to accurately estimate employee work hours and costs for retrieving data from such systems.

d.  If the search were to be extended even further, there may also be potentially responsive information in the approximately 50,000 relevant A-files maintained by USCIS, potentially including information not contained in any of the electronic systems described above.  Although certain current biographic and case-specific information is maintained in the CLAIMS 3 system, and other locator and identifying information may be obtainable through other electronic systems, those systems do not necessarily contain all potentially responsive information maintained by USCIS.  While much of the information in A-files would be reflected in the CLAIMS 3 system, those files may contain additional addresses, alternate phone numbers, email addresses, and other contact information, as well as personal identifiers, not maintained in electronic databases.  To review such files, USCIS would generally be required to locate and retrieve them from the National Records Center or Federal Records Center (which are co-located).  In cases where the A-file is not stored in one of those two locations, USCIS would also have to retrieve the file and transport it to the National Records Center.  USCIS personnel would be required to manually review the A-files for potentially responsive information and manually enter such information into a database for further use.  For context, A-files can run from several pages to several thousand pages in length.  USCIS's Service Center Operations states that the average A-file is 50 pages.  Assuming that average, reviewing the A-files for 50,000 individuals would mean a manual review of approximately 2.5 million pages.  USCIS

        estimates that this process would require approximately 16,500 employee work hours and cost approximately $1,011,132.

    e. Finally, merging and crosschecking the information from these different systems and paper files, for accuracy and usability, would entail some automated processes, but would rely heavily on manual compilation and review for accuracy. Again, these additional steps would be necessary to ensure that the information was appropriately combined and produced in an accurate and usable manner. USCIS estimates that this process would require approximately 250 employee work hours and cost approximately $20,252.

25) If USCIS were required to engage in all of the steps described above in order to produce all responsive information in its possession, the agency estimates that compliance with the Court's Order would require a total of 17,350 employee work hours and cost approximately $1,071,353. This would present a significant burden on the agency, impacting its core mission to provide immigration services on a timely basis. Among other things, the USCIS personnel needed to retrieve and compile responsive information would be diverted from their normal functions, thus resulting in the loss of productivity for the agency. The agency's resources are already stretched to meet the current service needs of its paying customers. Should the agency be required to divert a significant amount of resources to comply with this Court's Order, backlogs in services would result.

26) For context, in August of 2015, USCIS agreed to provide Plaintiff States with information related to approximately 2,600 DACA recipients—including name, address, date of birth, A number, immigration receipt number (which is a unique number assigned to any application that USCIS receives), Social Security number, SAVE query identifying number, and

17

the type of document that the relevant State agency used to query the VIS system through the SAVE service. Even though this information could be just a subset of the information maintained by USCIS that may be deemed responsive based on an expansive reading of the Court's Order, the production of this information for about 2,600 individuals required approximately 650 employee work hours to prepare and validate the information for accuracy. The process required multiple queries of the CLAIMS 3 and VIS systems, as well as manual review of data for verification and accuracy.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 31, 2016

León Rodríguez