United States District Court
Southern District of Texas
**ENTERED**
May 19, 2016
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, ET AL., | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | CIVIL NO. B-14-254 |
| | § | |
| UNITED STATES OF AMERICA, ET AL., | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

An exchange between two characters from a recent popular film exemplifies what this case is, and has been, about:

| | |
|---|---|
| FBI Agent Hoffman: | Don't go Boy Scout on me.  We don't have a rulebook here. |
| Attorney James Donovan: | You're Agent Hoffman, yeah? |
| FBI Agent Hoffman: | Yeah. |
| Attorney James Donovan: | German extraction? |
| FBI Agent Hoffman: | Yeah, so? |
| Attorney James Donovan: | My name's Donovan, Irish, both sides, mother and father. I'm Irish, you're German, <u>but what makes us both Americans?  Just one thing . . . the rulebook.</u> |
| | <u>We call it the Constitution and we agree to the rules and that's what makes us Americans</u>. It's all that makes us Americans, so don't tell me there's no rulebook . . . .[1] |

Whether it be the Constitution or statutory law, this entire case, at least in this Court, has been about allegiance to the rulebook.  In its prior orders concerning the actual subject matter of this case, the Court never reached the relative merits or lack thereof of the Defendants' 2014 Department of

---

[1] BRIDGE OF SPIES (DreamWorks 2015) (emphasis added).  Screenplay by Matt Charman, Ethan Coen and Joel Coen.

Homeland Security ("DHS") Directive.   The question addressed by this Court was whether the Government had to play by the rules.  This Court held that it did.  The Fifth Circuit has now also held that the Government must play by the rules, and, of course, that decision is now before the Supreme Court.  It was no surprise to this Court, or quite frankly to any experienced legal observer, that this question would ultimately reach the Supreme Court.  Consequently, the resolution of whether the Executive Branch can ignore and/or act contrary to existing law or whether it must play by the rulebook now rests entirely with that Court.

What remains before this Court is the question of whether the Government's lawyers must play by the rules.  In other words, the propriety of the Defendants' actions now lies with the Supreme Court, but the question of how to deal with the conduct, or misconduct, of their counsel rests with this Court.

To that end, this Court neither takes joy nor finds satisfaction in the issuance of this Order.  To the contrary, this Court is disappointed that it has to address the subject of lawyer behavior when it has many more pressing matters on its docket.  It is, at best, a distraction, and there is nothing "best" about the conduct in this case.  The United States Department of Justice ("DOJ" or "Justice Department") has now admitted making statements that clearly did not match the facts.  It has admitted that the lawyers who made these statements had knowledge of the truth when they made these misstatements.  The DOJ's only explanation has been that its lawyers either "lost focus" or that the "fact[s] receded in memory or awareness."  [Doc. No. 242 at 18].[2]  These misrepresentations were made on multiple occasions starting with the very first hearing this Court held.  This Court would be remiss if it left such unseemly and unprofessional conduct unaddressed.[3]

---

[2] To explain its conduct, the Government has filed an unredacted brief and a redacted brief with only the latter being produced to the Plaintiff States.  [Doc. Nos. 242 & 243].  This Court, by necessity, will cite the unredacted brief [Doc. No. 242] as that is the brief that contains the Government's explanations.  It will not unseal the unredacted brief and will only quote here those segments pertinent to this opinion.

[3] Judges on the Ninth Circuit have described a court's duty to address misconduct:

> When a public official behaves with such casual disregard for his constitutional obligations and the rights of the accused, it erodes the public's trust in our justice system, and chips away at the foundational

As the parties know, this Court has been deliberating for quite some time about the proper way to address the series of misrepresentations made by the attorneys from the Justice Department to the Plaintiff States and to this Court.  This Court in at least one prior order has detailed the multiple times attorneys for the Government misrepresented the actions being taken (or, according to their representations, not being taken) by their clients.  *See, e.g.*, Doc. No. 226.  These misrepresentations will be discussed in more detail below; but suffice it to say the Government's attorneys effectively misled the Plaintiff States into foregoing a request for a temporary restraining order or an earlier injunction hearing.  Further, these misrepresentations may have caused more damage in the intervening time period and may cause additional damage in the future.  Counsel's misrepresentations also misdirected the Court as to the timeline involved in the implementation of the 2014 DHS Directive, which included the amendments to the Deferred Action for Childhood Arrivals ("DACA") program.

## I.    The Timing of this Order

Initially, this Court had decided to postpone ruling on this matter until after a final ruling on the merits since the injunction it entered was interlocutory, and the Court could not reasonably foresee a fact scenario in which the case would not ultimately be remanded for further proceedings.  Subsequent events have changed the landscape in this regard.  Usually, the legal issues in a case narrow on appeal until a case reaches the highest rung on the appellate ladder, at which point that court (be it a Court of Appeals or the Supreme Court) has one or two overriding issues that it must resolve.  In addressing the request for a temporary injunction, this Court ruled, as is the custom and tradition in American jurisprudence, on the narrowest issue that would resolve the existing controversy: the procedural issue

---

premises of the rule of law.  When such transgressions are acknowledged yet forgiven by the courts, we endorse and invite their repetition.

*United States v. Olsen*, 737 F.3d 625, 632 (9th Cir. 2013) (Kozinski, J., dissenting from denial of petition for rehearing en banc).  Four judges joined this dissent.

concerning the Administrative Procedure Act ("APA").  This Court anticipated that the two issues on appeal would be this Court's ruling on standing and the procedural APA issue, with only the former possibly being case-determinative.

This case, however, has not followed the normal progression.  Instead of the issues narrowing on appeal, they have expanded.  The Fifth Circuit expanded the holding by not only affirming on the APA procedural violation, but also by ruling that the Plaintiff States have established a substantial likelihood of success on the merits of their claim that Defendants' actions violated substantive APA standards as well.  *Texas v. United States*, 809 F.3d 134, 146 (5th Cir. 2015).  The Supreme Court has apparently expanded the scope of review even further.  It has not only granted review of the Fifth Circuit's judgment, but has also asked the parties to brief the constitutional issues.[4]  *United States v. Texas*, 136 S. Ct. 906 (2016) (No. 15-674).  Consequently, one now has reason to speculate that the Supreme Court could rule in a way that would negate the need for a remand to this Court.  That being the case, the most efficacious path for this Court to follow is to proceed to rule upon what may be the only remaining issue.

## II.    The Misconduct Involving the Implementation of the 2014 DHS Directive

This Court has previously described the events that occurred in this case in its April 7, 2015, order.  [Doc. No. 226].  In summary, this Court and opposing counsel were misled both in writing and in open court on multiple occasions as to when the Defendants would begin to implement the Secretary's 2014 DHS Directive establishing the Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") program and amending the DACA program.  Opposing counsel and this Court were assured that no action would be taken implementing the 2014 DHS Directive until February 18,

---

[4] This Court has not been the only observer to note this expansion on appeal.  "A rather unusual aspect of the case was that, although the lower courts had not decided a constitutional question the states had raised, the Justices added that question on their own."  Lyle Denniston, *Immigration Policy: Review and Decision This Term*, SCOTUSBLOG (Jan. 19, 2016 9:50 AM), http://scotusblog.com/2016/01/immigration-policy-review-and-decision-this-term.

2015.  Counsel for the Government made these assurances on the record on December 19, 2014, and in open court on January 15, 2015.  Similar misrepresentations were made in pleadings filed on January 14, 2015, [Doc. No. 90 at 3] and even after the injunction issued, on February 23, 2015.  [Doc. No. 150].  For example, on February 23, 2015, the Government lawyers wrote that: "DHS was to begin accepting requests for modified DACA on February 18, 2015."[5]  [Doc. No. 150 at 7].  This representation was made despite the fact that in actuality the DHS had already granted or renewed over 100,000 modified DACA applications using the 2014 DHS Directive.

At the time of the Court's April 2015 order, the Government had not filed its brief explaining its conduct to the Court.  Prior to reviewing that brief, the Court entertained a variety of possible explanations concerning the conduct of the Government lawyers.  These included the more innocuous possibilities that the DOJ lawyers lacked knowledge or that they made an innocent mistake that led to the misrepresentations.

Now, however, having studied the Government's filings in this case, its admissions make one conclusion indisputably clear: the Justice Department lawyers knew the true facts and misrepresented those facts to the citizens of the 26 Plaintiff States, their lawyers and this Court on multiple occasions.[6]

A.    <u>The Government's Explanation</u>

The Government claims that the reason its lawyers were not candid with the Court was that they either "lost focus on the fact" or that somehow "the fact receded in memory or awareness."  [Doc. No. 242 at 18].  The Government's brief admits that its lawyers, including the lawyers who appeared in this Court, knew that the Defendants were granting three-year DACA renewals using the three-year period

---

[5] This date matches the Government's earlier representation that "U.S. Citizenship and Immigration Services (USCIS) does not intend to entertain requests for deferred action under the challenged policy until February 18, 2015 and even after it starts accepting requests, it will not be in a position to make any final decisions on those requests *at least* until March 4, 2015." [Doc. No. 90 at 3] (emphasis in the original).  In reality, by March 3, 2015, over 100,000 requests had been granted.

[6] "As of early December 2014, the attorneys who appeared before this Court (and many other attorneys at both the DOJ and DHS) had been informed that DHS was providing three-year deferrals to new and renewal applicants. . . ." [Doc. No. 242 at 8].  Three-year deferrals could only have been granted using the 2014 DHS Directive.  *See* the Government's brief quoted *infra* p. 7.

created by the 2014 DHS Directive at issue in this case.  Yet the Government's lawyers chose <u>not</u> to tell the Plaintiff States or the Court.  In fact, the Justice Department knew that DHS was implementing the three-year renewal portion of the 2014 DHS Directive weeks before its attorneys told this Court for the very first time that no such action was being taken.  Apparently, lawyers, somewhere in the halls of the Justice Department whose identities are unknown to this Court, decided unilaterally that the conduct of the DHS in granting three-year DACA renewals using the 2014 DHS Directive was immaterial and irrelevant to this lawsuit and that the DOJ could therefore just ignore it.  [Doc. No. 242 at 17].  Then, for whatever reason, the Justice Department trial lawyers appearing in this Court chose not to tell the truth about this DHS activity.  The first decision was certainly unsupportable, but the subsequent decision to hide it from the Court was unethical.

Such conduct is certainly not worthy of any department whose name includes the word "Justice."[7]  Suffice it to say, the citizens of all fifty states, their counsel, the affected aliens and the judiciary all deserve better.

### B.   <u>The Misrepresentations by the Government's Attorneys</u>

The Government has admitted to the Court in multiple places that both DHS and DOJ personnel knew since November of 2014 that three-year DACA renewals were being granted.  It was impossible to grant a three-year deferral using the 2012 DACA criteria.  The Government admits the only way these three-year deferrals could be granted was pursuant to the 2014 DHS Directive—the very subject of the States' injunction lawsuit:

---

[7] Just recently, the Sixth Circuit expressed a similar conclusion.  It wrote:
> <u>In closing, we echo the district court's observations about this case</u>.  The lawyers in the Department of Justice have a long and storied tradition of defending the nation's interests and enforcing its laws—all of them, not just selective ones—in a manner worthy of the Department's name.  <u>The conduct of the IRS's attorneys in the district court [like the attorneys representing the DHS in this Court] falls outside that tradition</u>.  We expect that the IRS will do better going forward.  And we order that the IRS comply with the district court's discovery orders of April 1 and June 16, 2015—without redactions, and without further delay.

*In re United States*, No. 15-3793, 2016 WL 1105077, at *11 (6th Cir. Mar. 22, 2016) (emphasis added).  The district court had earlier written that it questioned "whether or not the Department of Justice is doing justice."  *Id.* at *5.

> The Government does not dispute, and indeed has never disputed, that the three-year deferrals were pursuant to the 2014 Deferred Action Guidance. Likewise, there is no dispute that the Government also understood the change from two- to three-year grants of deferred action to be a contested issue in the case.

[Doc. No. 242 at 15 n.2] (citation omitted).

### *1. The December 2014 Misrepresentation*

From day one, the Plaintiffs sought to enjoin the entire 2014 DHS Directive. [Doc. Nos. 1 & 5]. The injunction proposed by the Plaintiff States sought to prevent the implementation of "the DHS Directive of November 20, 2014." [Doc. No. 5-1]. This by definition included the three-year DACA deferrals. It is important to remember that the Plaintiff States initially requested that a hearing on the merits of their motion be held before December 31, 2014. [Doc. No. 5 at 12]. The Plaintiff States agreed to a later hearing date as a result of the Government's representations made in a conference call with the Court on December 19, 2014. During that call, counsel for the Plaintiff States agreed to a January hearing date, but only did so after being assured by the Government that nothing would happen between the December 19th call and the hearing date. Out of an abundance of caution, counsel had the following exchange:

> **PLAINTIFF STATES' COUNSEL:** . . . [W]e have been operating under the assumption . . . that we absolutely protected our interests in this and that there won't be any curve balls or surprises about, you know, deferred action documents being issued, you know, tomorrow or on the first of the year . . . [W]e have filed in our pleadings and have pointed out, that, you know, the United States has hired a thousand employees in the initial large processing center and that there are, you know, there is a potential for I think for prejudice or at least changing the calculus on the preliminary injunction inquiry if the state of the playing field changes between now and the 9th of January.
>
> **THE COURT**: . . . [D]o you anticipate that happening?
>
> **COUNSEL FOR THE GOVERNMENT**: No, I do not, your Honor. The agency was directed to begin accepting requests for deferred action I believe beginning sometime in -- by mid-February but even after that we wouldn't anticipate any decisions on those for some time thereafter. So there -- I really would not expect anything between now and the date of the hearing.

[Doc. No. 184 at 10–11] (emphasis added).  Clearly, counsel for the Plaintiff States was concerned about any intervening implementation of the 2014 DHS Directive that might occur before the injunction hearing.  The Government has now conceded that, at the very time counsel told the Court and opposing counsel that no action was taking place, over 100,000 three-year deferred action renewals were being processed using the 2014 DHS Directive.

The response by a DOJ lawyer, who the Government concedes knew that the DHS was already issuing three-year extensions pursuant to the 2014 DHS directive, was:

"I really would not expect <u>anything</u> between now and the date of the hearing."

[Doc. No. 184 at 11] (emphasis added).  How the Government can categorize the granting of over 100,000 applications as not being "anything" is beyond comprehension.  Even if one did not think the increase in DACA time limits was at issue, a position completely unjustifiable under the circumstances, the duty of candor to the Court would certainly require that one mention the fact that the DHS was going forward with that part of the 2014 DHS Directive.

This was not a curve ball thrown by the Government; this was a spitball which neither the Plaintiff States nor the Court would learn of until March 3, 2015.

### 2.  The January 2015 Misrepresentations

One misrepresentation could be understandably a mistake, but the exchange between Counsel and the Court in the January hearing puts to rest any doubt regarding misconduct.  On this occasion, the Court was worried about what impact a delay in the briefing schedule requested by the Government might cause.

**THE COURT**:  I'm a little concerned about how much time you asked for.  If I give you until the 28th [of January, 2015], can you work with that?

**COUNSEL FOR THE GOVERNMENT:**  Let me confer with my co-counsel, but I believe so.

Your Honor, in part we're just discussing about the need to respond to some of the voluminous factual material. If we could have until the 30th, that Friday, that would be preferable.

**THE COURT:** Okay. And . . . I guess to preempt Mr. Oldham [Counsel for the Plaintiff States] when I ask him does he have any problem with that, he's going to want to know what's happening when?

**COUNSEL FOR THE GOVERNMENT:** And we set this -- we did file yesterday afternoon, Your Honor.

**THE COURT:** I can't find it.

**COUNSEL FOR THE GOVERNMENT:** My apologies.

**THE COURT:** No, no. It's here. I just buried it with all my paper.

**COUNSEL FOR THE GOVERNMENT:** In that document [Motion for Extension of Time, Doc. No. 90] we reiterated that no applications for the revised DACA -- this is not even DAPA -- revised DACA would be accepted until the 18th of February, and that no action would be taken on any of those applications until March the 4th.

**THE COURT:** And nothing is happening on DAPA?

**COUNSEL FOR THE GOVERNMENT:** So the memorandum said that DAPA should be implemented no sooner than mid[-]May, so DACA is really the first -- the revised DACA is the first deadline.

**THE COURT:** Okay. Then you can have until the 30th.

**COUNSEL FOR THE GOVERNMENT:** Okay. Thank you.

**THE COURT:** Wait, wait. You're being flagged.

**COUNSEL FOR THE GOVERNMENT:** Oh, sorry. Just to be clear, I meant no later than. So the memorandum provides that by mid[-]May, DAPA will be stood up.

**THE COURT:** Okay.

**COUNSEL FOR THE GOVERNMENT:** But the main -- the driver here would be --

**THE COURT:** But as far as you know, nothing is going to happen in the next three weeks?

**COUNSEL FOR THE GOVERNMENT:** No, Your Honor.

**THE COURT:**  Okay.  On either.

**COUNSEL FOR THE GOVERNMENT:**   <u>In terms of accepting applications or granting any up or down applications</u>.

**THE COURT:**  Okay.

**COUNSEL FOR THE GOVERNMENT:**  <u>For revised DACA, just to be totally clear</u>.

[Doc. No. 106 at 133–34] (emphasis added).

Twice counsel for the Government (who, according to the Government's brief, knew that the DHS was already granting renewals using revised DACA) told this Court that the Government would not begin to implement the revised DACA (which includes the three-year extensions) until mid-February.  She, in fact, confirmed to this Court that <u>nothing</u> was going to happen.

Certainly no one can claim this even approaches candor to the Court.  This was not a casual exchange between counsel.  This exchange was prompted by the Government's own request for additional time.  It was responsive to a direct inquiry by the Court, which was concerned that its order would, regardless of which side it ultimately favored, be issued in a timely and fair fashion.

The reason this Court is certain that there could have been no misinterpretation as to whether the increase to a three-year renewal period was at issue is that it raised that very topic just before the above-quoted exchange.

**COUNSEL FOR THE GOVERNMENT:**  And just to be clear on that last point, . . . there's one directive that the plaintiffs are challenging in the complaint, and that both is directed toward the DAPA program, <u>but also is a[n] expansion or revision of the DACA program</u>.  So to the extent that there's a revision or expansion of the group that would be eligible to apply for that, <u>we do understand the plaintiffs to be challenging that</u>.

**THE COURT:**  <u>The increase in years</u>?

**COUNSEL FOR THE STATES:** Your Honor --

**COUNSEL FOR THE GOVERNMENT:** <u>They ask to have you direct and enjoin, and that directive would allow the revisions to the DACA program that we described in our brief</u>.

[*Id.* at 91] (emphasis added).

The brief referred to by counsel described the 2014 DHS Directive as "revis[ing] three aspects of DACA . . . .   Second, it extended the period of DACA <u>from two to three years</u>."  [Doc. No. 38 at 29] (emphasis added).   Again, there is no doubt that counsel knew the increase in years for a DACA term was a matter of contention.   This Court directly raised the issue.   The Government admits that the lawyer making these statements knew at the time of this hearing that the DHS was already granting these three-year extensions (which it also admits are only authorized by the 2014 DHS Directive) instead of the two-year renewals authorized in 2012.   Not only did counsel fail to tell the Court that the DHS was already granting relief using the 2014 DHS Directive, she told the Court that nothing would happen with regard to revised DACA until mid-February of 2015.

### 3.  *The Lack of Candor After the Injunction*

If those two instances on the record were not enough, a later incident occurred when again there could be no doubt that the proposed revisions to DACA were at issue.   This Court issued its injunction on February 16, 2015.   That order enjoined the Government from implementing:

> . . . any and all aspects or phases of the expansions (including any and all changes) to the Deferred Action for Childhood Arrivals ("DACA") program as outlined in the DAPA Memorandum pending a trial on the merits or until a further order of this Court, the Fifth Circuit Court of Appeals or the United States Supreme Court.

[Doc. No. 144 at 2].   This clearly enjoined the three-year renewals created by the 2014 DHS Directive. Those are the same renewals that the Government's trial counsel, according to the Government's brief, knew had been occurring since early December of 2014.   Despite this knowledge, counsel did not alert

the Court to this ongoing activity until March 3, 2015—some two weeks later.  This should have been done immediately—especially given the bad faith representations counsel had already made.

To the contrary, what counsel did borders on the incredible.  Instead of informing the Court that its clients had already been implementing the three-year renewals pursuant to the 2014 DHS Directive since late-November 2014, the Government filed a motion on February 23, 2015, to stay the Court's ruling and in that motion stated:

"DHS was to begin accepting requests for modified DACA on February 18, 2015."

[Doc. No. 150 at 7].  Again no mention was made that the DHS had already been granting three-year extensions under modified DACA for three months.  Regardless of how one spins the facts prior to the injunction, no one after the injunction could conceivably think that the three-year extensions were not a matter of contention and were not now enjoined.  Yet counsel, who knew of the DHS activity, were not only silent, but their motion was certainly calculated to give the impression that nothing was happening or had happened pursuant to the 2014 DHS Directive—when, in fact, by that time over 100,000 applications had already been granted.  In the Motion to Stay, counsel also wrote:

> Moreover, the Court's assertion that its Order does not affect the status quo is at odds with the Court's recognition that DHS had already begun preparing to effectuate the Deferred Action Guidance.  *See* Op. at 76.  The Court issued its injunction one business day before USCIS [U.S. Citizenship and Immigration Services] was scheduled to begin accepting requests for deferred action under the modified DACA guidelines.  USCIS had spent the prior 90 days—the time period established by the Guidance for implementation—preparing to receive such requests.  The injunction sets back substantial preparatory work that has already been undertaken.

[Doc. No. 150 at 17] (emphasis added).[8]

---

[8] There is actually a fourth misrepresentation that the Government made.  On January 14, 2015, when requesting an extension of time, the Government claimed that "Plaintiffs will not be prejudiced by [a] two-week extension . . . because U.S. Citizenship and Immigration Services (USCIS) does not intend to entertain requests for deferred action under the challenged policy until February 18, 2015, and even after it starts accepting requests, it will not be in a position to make any final decisions on those requests *at least* until March 4, 2015."  [Doc. No. 90 at 3] (emphasis in the original).  This Court finds that both of these misrepresentations in pleadings [Doc. Nos. 90 & 150] clearly breach Federal Rule of Civil Procedure 11(b).  In sum, counsel twice in hearings and twice in pleadings knowingly made representations to the Court that they knew were not true.

"[P]reparing to" do something and actually doing it are obviously two different things. What counsel did not say was that, despite the fact that the Government was scheduled "to begin accepting requests for deferred action under the modified DACA guidelines," it had already granted relief using the modified DACA guidelines over 100,000 times. At this point, even the most calculating attorney would conclude that he or she would have to tell the Court the complete truth.

### C.   No *De Minimis* Rule Applies to the Truth

In its own defense, the Government has claimed it did not know before February 27, 2015, that the number of individuals that had been granted three-year deferrals between November 24, 2014, and the date of the injunction exceeded 100,000. It claims that it notified the Court very quickly after it realized that the number exceeded 100,000. [Doc. Nos. 242 & 243]. This may be true, but knowing the exact number is beside the point. The Government's attorneys knew since late-November of 2014 that the DHS was issuing three-year deferrals under the 2014 DHS Directive. Whether it was one person or one hundred thousand persons, the magnitude does not change a lawyer's ethical obligations. The duties of a Government lawyer, and in fact of any lawyer, are threefold: (1) tell the truth; (2) do not mislead the Court; and (3) do not allow the Court to be misled. *See* MODEL RULES OF PROF'L CONDUCT r. 3.3 cmts. 2 & 3 (AM. BAR ASS'N 2013). The Government's lawyers failed on all three fronts. The actions of the DHS should have been brought to the attention of the opposing counsel and the Court as early as December 19, 2014. The failure of counsel to do that constituted more than mere inadvertent omissions—it was intentionally deceptive. There is no *de minimis* rule that applies to a lawyer's ethical obligation to tell the truth.

### III.  The Rulebook

The rules that apply to this case are both succinct and clear.  There is no gray area or even grounds for debate.  Attorney conduct in the Southern District of Texas is controlled by Appendix A of its local rules.  Appendix A is entitled "Rules of Discipline."  Rule 1 is as follows:

> Rule 1.  *Standards of Conduct.*
>
> A.  Lawyers who practice before this court are required to act as mature and responsible professionals, and the minimum standard of practice shall be the Texas Disciplinary Rules of Professional Conduct.
>
> B.  Violation of the Texas Disciplinary Rules of Professional Conduct shall be grounds for disciplinary action, but the court is not limited by that code.

S.D. Tex. Local Court Rules App. A.

Thus, this District has adopted the Texas Disciplinary Rules of Professional Conduct ("Texas Disciplinary Rules") as its minimum ethical standards.  The Court also notes that courts in the Fifth Circuit are not limited to their respective state codes.  Indeed, the Fifth Circuit, in an appeal emanating from a Southern District of Texas case, broadened the ethical standards applicable to all lawyers practicing in the Fifth Circuit.  *In re Dresser Industries, Inc.*, 972 F.2d 540, 543–44 (5th Cir. 1992).  In that case, which concerned disqualification of counsel, the Court held that for courts in the Fifth Circuit compliance with the local (Texas) disciplinary rules was not in and of itself sufficient.  It stated that the conduct of lawyers practicing in this Circuit should certainly include compliance with the applicable state disciplinary rules, but courts should also look at ethical rules "announced by the national profession in the light of the public interest and the litigants' rights."  *Id.* at 543.  In short order, the Circuit reaffirmed that approach in *In re American Airlines, Inc.*, 972 F.2d 605 (5th Cir. 1992).  Regardless of whether state or national standards apply or how many authorities one consults, the result here would be the same.  An attorney owes a duty of candor and honesty to the court, and at the very least a duty not to misrepresent the facts to a judge or opposing counsel.  The pertinent Texas ethical rules are as follows:

14

**Rule 3.03.  Candor Toward the Tribunal**

(a)     A lawyer shall not knowingly:

       (1)     <u>make a false statement of material fact</u> or law to a tribunal;

       (2)     fail to disclose a fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act;

       (3)     in an ex parte proceeding, fail to disclose to the tribunal an unprivileged fact which the lawyer reasonably believes should be known by that entity for it to make an informed decision;

       (4)     fail to disclose to the tribunal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or

       (5)     offer or use evidence that the lawyer knows to be false.

(b)     If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall make a good faith effort to persuade the client to authorize the lawyer to correct or withdraw the false evidence.  If such efforts are unsuccessful, the lawyer shall take reasonable remedial measures, including disclosure of the true facts.

(c)     <u>The duties stated in paragraphs (a) and (b) continue until remedial legal measures are no longer reasonably possible.</u>[9]

Tex. Disciplinary Rules Prof'l Conduct R. 3.03 (emphasis added).

Candor is required by all rules of ethics that could possibly apply here.  One definition of "candor" describes it as being "[t]he quality of being open, honest and sincere."  *Candor*, BLACK'S LAW DICTIONARY (10th ed. 2014).  The "duty of candor" under which lawyers operate is a bit broader.  It is a "duty to disclose material facts; esp[ecially], a lawyer's duty not to allow a tribunal to be misled by false statements, either of law or of fact, that a lawyer knows to be false."  *Duty*, BLACK'S LAW DICTIONARY (10th ed. 2014).  Most authors would also include that it is a lawyer's duty not only to be honest but also not to mislead or allow a court to be misled by half-truths or statements which, while technically honest,

---

[9] Note the obligation placed on counsel to take remedial action.

are calculated to mislead.  MODEL RULES OF PROF'L CONDUCT r. 3.3 cmts. 2 & 3 (AM. BAR ASS'N

2013).

Of course, that was not the case here.  Counsel in this case violated virtually every interpretation

of candor.  The failure of counsel to inform the counsel for the Plaintiff States and the Court of the DHS

activity—activity the Justice Department admittedly knew about—was clearly unethical and clearly

misled both counsel for the Plaintiff States and the Court.

### Rule 4.01.  Truthfulness in Statements to Others

In the course of representing a client a lawyer shall not knowingly:

(a)    make a false statement of material fact or law to a third person; or

(b)    fail to disclose a material fact to a third person when disclosure is necessary to avoid making the lawyer a party to a criminal act or knowingly assisting a fraudulent act perpetrated by a client.

Tex. Disciplinary Rules Prof'l Conduct R. 4.01 (emphasis added).

### RULE 8.04.  Misconduct

(a)    A lawyer shall not:

    (1)    violate these rules, knowingly assist or induce another to do so, or do so through the acts of another, whether or not such violation occurred in the course of a client-lawyer relationship;

    (2)    commit a serious crime or commit any other criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

    (3)    engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

*    *    *

*Id.* R. 8.04 (emphasis added).  These are the applicable rules that are incorporated by reference as the

controlling rules of the Southern District of Texas.

Further, compliance with these rules has been mandated by federal law since 1998 when Congress enacted the so-called "McDade Amendment."  That law reads in pertinent part:

§ 530B.  Ethical standards for attorneys for the Government

(a)     An attorney for the Government <u>shall be subject to State laws and rules, and local Federal court rules</u>, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State.

(b)     The Attorney General shall make and amend rules of the Department of Justice to assure compliance with this section.[10]

\*   \*   \*

28 U.S.C. § 530B (emphasis added).  Counsel's conduct in this case was not only unethical, but a failure to comply with federal law.

National standards, to the extent those are represented by the Model Rules of Professional Conduct promulgated by the American Bar Association ("ABA"), do not suggest any contrary result in this case.  The applicable ABA rules track those found in the Texas Disciplinary Rules of Professional Conduct.

**Rule 3.3  Candor Toward The Tribunal**

(a)     <u>A lawyer shall not knowingly</u>:

(1)     <u>make a false statement of fact or law to a tribuna</u>l or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;

\*   \*   \*

MODEL RULES OF PROF'L CONDUCT r. 3.3 (AM. BAR ASS'N 2013) (emphasis added).

---

[10] While this amendment has received criticism from various commentators, virtually none of the criticism has been directed at a lawyer's duty to be honest with the Court and opposing counsel.  *See, e.g.*, Bradley T. Tennis, *Uniform Ethical Regulation of Federal Prosecutors*, 120 YALE L.J. 144 (2010); Paula J. Casey, *Regulating Federal Prosecutors: Why McDade Should Be Repealed*, 19 GA. ST. U. L. REV. 395 (2002).

**Rule 4.1  Truthfulness In Statements To Others**

In the course of representing a client a lawyer shall not knowingly:

(a)     <u>make a false statement of material fact or law to a third person</u>; . . .

*   *   *

*Id.* r. 4.1 (emphasis added).

**Rule 8.4  Misconduct**

It is professional misconduct for a lawyer to:

(a)     violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b)     commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c)     <u>engage in conduct involving dishonesty, fraud, deceit or misrepresentation</u>;

(d)     <u>engage in conduct that is prejudicial to the administration of justice</u>;

*   *   *

*Id.* r. 8.4 (emphasis added).


**IV.     The Government's Conduct Violates the Rulebook**

This Court has found no authority to support the concept that it is ever ethical and appropriate conduct to mislead a court and opposing counsel; nor has the Government provided any authority to that effect.  That being the case, the Court finds no need for a comprehensive dissertation on the duty of candor and honesty because counsel in this case failed miserably at both.  The Government's lawyers in this case clearly violated their ethical duties.

To say that the Government acted contrary to its multiple assurances to this Court is, at best, an understatement. The Government knowingly acted contrary to its representations to this Court on over 100,000 occasions.[11] This Court finds that the misrepresentations detailed above: (1) were false; (2) were made in bad faith; and (3) misled both the Court and the Plaintiff States.

Both the Court and the attorneys representing the Plaintiff States relied upon February 18, 2015, (the implementation day for the 2014 DHS Directive specified by the Government attorneys) as the controlling date. The Court issued the temporary injunction on February 16, 2015. The timing of this ruling was clearly made based upon the representations that no action would be taken by Defendants until February 18, 2015. If Plaintiffs' counsel had known that the Government was surreptitiously acting, the Plaintiff States could have, and would have according to their representations, sought a temporary restraining order pursuant to Federal Rule of Civil Procedure 65(b) much earlier in the process. Their clear intent until the Government misrepresented the facts during the December 19, 2014, conference call was to obtain a hearing before year's end. Due to the Government's wrongful misstatements, the Plaintiff States never got that opportunity. The misrepresentations of the Government's attorneys were material and directly caused the Plaintiff States to forgo a valuable legal right to seek more immediate relief.

## V.     The Appropriate Remedy for the Inappropriate Conduct

### A.     <u>What This Court Will Not Do</u>

Since there is no doubt that misconduct has occurred and since there is for the first time a possibility that this case will not be remanded, the Court will take this opportunity to dispose of the only impediment to the Supreme Court issuing a complete and final judgment in this matter. The misconduct

---

[11] The figure quoted at the March 19, 2015, hearing was 108,081. [Doc. No. 203 at 25]. This figure does not include the approximately 2,000 times the Government admitted it actually violated this Court's injunction. [Doc. No. 247 at 1].

in this case was intentional, serious and material.  In fact, it is hard to imagine a more serious, more calculated plan of unethical conduct.  There were over 100,000 instances of conduct contrary to counsel's representations; such a sizable omission cannot be classified as immaterial.

The most immediate remedy that must be considered for misconduct so blatant and with adverse consequences of such magnitude is the striking of the party's pleadings.  While perhaps an appropriate sanction, as this Court has expressed in prior proceedings and opinions (and despite the overwhelming grounds to do so), it will not strike the Government's pleadings.  In a different situation, this Court might very well have taken that action.  This egregious conduct merits it.  While this Court has that power (both pursuant to the Rules and under its inherent power), the fact that a federal court might have a power does not mean that court should necessarily exercise it.  The national importance of the outcome of this litigation outweighs the benefits to be gained by implementing the ultimate sanction.  The citizens of this country and those non-citizens who may be affected by the 2014 DHS Directive deserve an answer and should not be deprived of that answer due to the misconduct of counsel.  Further, the Supreme Court has decided to weigh in on these matters.  Striking the Government's pleadings would not only be unfair to the litigants, but also unfair, and perhaps even disrespectful, to the Supreme Court as it would deprive that Court of the ability to thrash out the legal issues in this case.  Regardless of how unprofessional the DOJ's conduct may have been, this Court will not strike the Government's pleadings.

The second remedy that is most frequently implemented in cases of attorney misconduct is to award the aggrieved parties the attorneys' fees and costs that may have resulted due to the misconduct.  The Supreme Court and Fifth Circuit have consistently recognized the applicability of this form of sanction.

> Courts have inherent power to sanction a party that has engaged in bad-faith conduct and can invoke that power to award attorney's fees. *Chambers v. Nasco, Inc.*, 501 U.S. 32, 45 (1991).  "In *Chambers*, the Supreme Court held that a district court may sanction

parties for conduct that occurs in portions of the court proceeding that are not part of the trial itself." *FDIC v. Maxxam, Inc.*, 523 F.3d 566, 590–91 (5th Cir. 2008).

*In re Skyport Global Communication, Inc.*, No. 15-20246, 2016 WL 1042526, at *1 (5th Cir. Mar. 14, 2016).

This Court finds, however, that this remedy is also inappropriate in this case. The taxpayers of the 26 Plaintiff States are already paying the attorneys' fees, expenses and costs for the Plaintiff States. The taxpayers of all 50 states (including the 26 Plaintiff States) are paying the attorneys' fees, expenses and costs of the Government. Thus, the taxpayers of a majority of the states are already paying for the fees and expenses of the plaintiffs and a large portion of those of the defendants, while those of the remaining 24 states are only paying their share of the costs of the defense.

The Government's counsel told this Court that if it sanctions the misconduct of the Government's attorneys in a monetary fashion, those sanctions would be paid by the taxpayers of the United States. Thus, the taxpayers of the 26 Plaintiff States, who have been wronged by the misconduct, would have to pay for: (1) the original fees, expenses and costs of their own attorneys; (2) a large percentage of the original fees, expenses and costs of opposing counsel; (3) the fees, expenses and costs of their own counsel caused by the misconduct; (4) a large percentage of the fees, expenses and costs of the opposing side caused by the misconduct; plus (5) a substantial portion of whatever sanction amount this Court would levy. Stated another way, the Court would be imposing more costs on the aggrieved parties, and the Justice Department, which is actually responsible for this mess, would go unscathed. There would be no corrective effect and no motivation for the Government's lawyers to act more appropriately in the future. Since the taxpayers would foot the bill for any fines, fining counsel would not make the Plaintiff States whole, serve as a deterrent to any future misconduct, or act as a punishment

for any past transgressions.  Therefore, this Court will not impose monetary sanctions on the defense counsel.[12]

### B.     The Appropriate Remedy

There is no doubt, however, that because the Government's counsel breached the most basic ethical tenets, the Plaintiff States have been damaged and have given up a valuable legal right. Moreover, counsel for the Government should not be rewarded for their past misconduct.  There is certainly no indication that counsel will not repeat this conduct.[13]  They knowingly continued to hide this conduct for months and only admitted it once they realized the number of violations exceeded 100,000.  Clearly, there seems to be a lack of knowledge about or adherence to the duties of professional responsibility in the halls of the Justice Department.  In addition to the loss of their opportunity to seek a temporary restraining order or an earlier injunction hearing date, there remains a distinct possibility that the Plaintiff States are being damaged and/or will suffer future damages due to these misrepresentations. All of these factors demand that this Court take some level of action.

This Court hereby orders the Government to file a list of each of the individuals in each of the Plaintiff States given benefits (and whose benefits have not been withdrawn) under the 2014 DHS

---

[12] One could argue that the Court should order the sanction only be paid by the taxpayers of the 24 non-plaintiff states.  This would not be warranted either as those taxpayers committed no wrong.  Furthermore, this solution would no doubt create an accounting nightmare for the Treasury Department.

[13] Indeed, the conduct of the Justice Department in other aspects of this case has been anything but laudable.  For example, counsel did not act appropriately when it later came to light that their clients were actually violating the injunction.  The regrettable conduct of the prior counsel involved in the misrepresentations at issue here was exacerbated by the dilatory manner in which their replacements from the Justice Department and their clients tried to evade their duty to correct the actions the Defendants took in violation of this Court's injunction.  The Government admitted it violated this Court's injunction in over 2,000 instances.  [Doc. No. 247 at 1].  Six weeks later, the Government admitted it had not fixed the violations.  [Doc. No. 275].  Rather than acting responsibly, professionally and promptly, counsel did not implement effective corrective measures until this Court ordered their clients to actually appear in Court to explain their inaction.  [Doc. No. 281]. While this latter conduct is related to the Government's violations of this Court's injunction (violations to which the Government has admitted), it was not directly related to the misrepresentations referred to in this Order.  Nevertheless, it is not without importance, as this misconduct and the failure of the Justice Department to insist that its clients immediately seek to remedy their violations of this Court's injunction are indicative of the unprofessional manner in which the attorneys for the Government have approached this case.  Ultimately, it took action by this Court to finally force counsel to act as responsible members of the Bar.  It goes without saying, or at least it should go without saying, that it is the duty of all attorneys to act professionally whether ordered to by a court or not.

Directive contrary to its lawyers' multiple representations.  These are the individuals granted benefits during the period (November 20, 2014–March 3, 2015) in which the attorneys for the Justice Department promised that no benefits were being conferred.  This list should include all personal identifiers and locators including names, addresses, "A" file numbers and all available contact information, together with the date the three-year renewal or approval was granted.  This list shall be separated by individual Plaintiff State.  It should be filed in a sealed fashion.  The Court, on a showing of good cause (such as a showing by a state of actual or imminent damage that could be minimized or prevented by release of the information to one of the Plaintiff States), may release the list or a portion thereof to the proper authorities in that particular state.  Obviously, this list, once filed, will remain sealed until a further order of this Court.

Notwithstanding the foregoing, the Court will not entertain any requests concerning the release of this sealed information to any state until the Supreme Court has issued its decision on the issues currently before it.  The Justice Department has until June 10, 2016, to make this filing.

The Court next turns to the topic of candor.  Candor in court is such a self-evident concept that it is almost too mundane to discuss in an opinion.  Indeed, when one addresses the need for honesty in court, it is hard not to speak in platitudes.  It is such a truism that all Americans, if not individuals worldwide, are familiar with the requirement.  This concept is so pervasive that it can be seen in almost any aspect of society.  One example that easily comes to mind is that drawn from the beloved movie *Miracle on 34th Street* when the young child of the assistant district attorney is called to the witness stand:

Mr. Gailey:  Will Thomas Mara please take the stand?
(Attorney for Mr. Kringle)

Thomas Mara Sr.:  Who, me?
(Assistant District Attorney)

23

| | |
|---|---|
| Mr. Gailey: | Thomas Mara Jr. |
| | (Spectators Murmuring) |
| Tommy Mara Jr.: | Hello, Daddy. |
| Mr. Gailey: | Here you are, Tommy. |
| The Judge: | Tommy, you know the difference between telling the truth and telling a lie, don't you? |
| Tommy Mara Jr.: | <u>Gosh, everybody knows you shouldn't tell a lie, especially in court</u>. |
| | (Spectators Chuckling) |
| The Judge: | Proceed, Mr. Gailey.[14] |

The need to tell the truth, especially in court, was obvious to a fictional young Tommy Mara Jr. in 1947, yet there are certain attorneys in the Justice Department who apparently have not received that message, or more likely have just decided they are above such trivial concepts.  Regardless of the motivation behind the conduct, multiple misrepresentations over a period of months both in pleadings and in open court cannot be ignored—especially when, as here, they were made knowingly and had the effect of depriving the millions of individuals represented by the Plaintiff States of a valuable remedy.

While this Court does not hold the Department of Justice attorneys to a higher standard than it would attorneys practicing elsewhere, it would hope that the Justice Department, itself, would seek to maintain the highest ethical standards.  The Justice Department purports to represent <u>all</u> Americans—not just those who are in favor of whatever actions the Department is seeking to prosecute or defend.  The end result never justifies misconduct.  That is the stance the Justice Department takes daily in thousands of its other cases, and it is no less applicable here.

Therefore, this Court, in an effort to ensure that all Justice Department attorneys who appear in the courts of the Plaintiff States that have been harmed by this misconduct are aware of and comply with

---

[14] MIRACLE ON 34TH STREET (20th Century Fox 1947) (emphasis added).  Screenplay by George Seaton.

their ethical duties, hereby orders that any attorney employed at the Justice Department in Washington, D.C. who appears, or seeks to appear, in a court (state or federal) in any of the 26 Plaintiff States annually attend a legal ethics course.[15]  It shall be taught by at least one recognized ethics expert who is unaffiliated with the Justice Department.  At a minimum, this course (or courses) shall total at least three hours of ethics training per year.  The subject matter shall include a discussion of the ethical codes of conduct (which will include candor to the court and truthfulness to third parties) applicable in that jurisdiction.  The format of this continuing education shall be left to the independent expert lecturer. Self-study or online study will not comply with this Order, but attendance at a recognized, independently sponsored program shall suffice.

Despite the fact that 26 different jurisdictions are involved, this ethics requirement should not be a task that places too great of a burden on the Department.  First of all, the vast majority, if not all, of the 26 states in question have adopted a version of the ABA Model Rules of Professional Conduct ("ABA Model Rules").  Consequently, compliance with the Order should not be too cumbersome.[16]  Further, this Court's Order is requiring no more than what the Justice Department should have been, but obviously is not effectively, doing already.  This Order will merely ensure compliance with the legal standards already placed upon Justice Department attorneys by 28 U.S.C. § 530B(a).  For example, the ethical standards of Texas and the Southern District of Texas were clearly violated in this proceeding. Education as to ethical standards should be a crucial part of the Justice Department's continuing legal education, even if it were not included as part of this Order.

---

[15] The Plaintiff States include: the State of Alabama, the State of Arizona, the State of Arkansas, the State of Florida, the State of Georgia, the State of Idaho, the State of Indiana, the State of Kansas, the State of Louisiana, the State of Maine, the State of Michigan, the State of Mississippi, the State of Montana, the State of Nebraska, the State of Nevada, the State of North Carolina, the State of North Dakota, the State of Ohio, the State of Oklahoma, the State of South Carolina, the State of South Dakota, the State of Tennessee, the State of Texas, the State of Utah, the State of West Virginia and the State of Wisconsin.

[16] For example, as quoted above, the Texas Disciplinary Rules and the ABA Model Rules are almost identical.  With regard to the duty of candor, this will no doubt be true for most states as this Court has not found any code of conduct that specifically allows counsel to misrepresent the facts to a court.

The Attorney General of the United States shall appoint a person within the Department to ensure compliance with this Order.  That person shall annually file one report with this Court including a list of the Justice Department attorneys stationed in Washington, D.C. who have appeared in any court in the Plaintiff States with a certification (including the name of the lawyer, the court in which the individual appeared, the date of the appearance and the time and location of the ethics program attended) that each has attended the above-ordered ethical training course.  That certification shall be filed in this cause during the last two weeks of each calendar year it covers.  The initial report shall be filed no later than December 31, 2016.  This Order shall remain in force for a period of five years (the last report being due December 31, 2021).

The decision of the lawyers who apparently determined that these three-year renewals under the 2014 DHS Directive were not covered by the Plaintiff States' pleadings was clearly unreasonable.  The conduct of the lawyers who then covered up this decision was even worse.  Therefore, the Attorney General is hereby ordered to report to this Court in sixty (60) days with a comprehensive plan to prevent this unethical conduct from ever occurring again.  Specifically, this report should include what steps the Attorney General is taking to ensure that the lawyers of the Justice Department will not, despite what court documents may portend or what a court may order, unilaterally decide what is "material" and "relevant" in a lawsuit and then misrepresent that decision to a Court.  Stated differently, the Attorney General is also hereby ordered to report what steps she is taking to ensure that, if Justice Department lawyers make such an internal decision without approval from the applicable court, the Justice Department trial lawyers tell the truth—the entire truth—about those decisions to the court and opposing counsel.[17]

---

[17] While denying misconduct, the Government concedes that "[k]nowing misrepresentations to a court would strike at the heart of the Judiciary's confidence in DOJ and its mission, not just in this litigation but in other matters. . . ."  [Doc. No. 242 at 27].  Obviously, this Court agrees that unethical conduct undermines the DOJ's mission.

Finally, whatever it is that the Department of Justice Office of Professional Responsibility has been doing, it has not been effective.  The Office of Professional Responsibility purports to have as its mission, according to the Department of Justice's website, the duty to ensure that Department of Justice attorneys "perform their duties in accordance with the high professional standards expected of the Nation's principal law enforcement agency."  *Office of Professional Responsibility*, DEP'T OF JUSTICE, https://www.justice.gov/opr (last visited May 17, 2016).  Its lawyers in this case did not meet the most basic expectations.[18]  The Attorney General is hereby ordered to inform this Court within sixty (60) days of what steps she is taking to ensure that the Office of Professional Responsibility effectively polices the conduct of the Justice Department lawyers and appropriately disciplines those whose actions fall below the standards that the American people rightfully expect from their Department of Justice.

## VI.    Conclusion

This Order is tailored to give the 26 Plaintiff States some avenue for relief from the possibility of any damage that may result from the misconduct of the Defendants' lawyers and to prevent future harm to any Plaintiff State due to the Government's misrepresentations.  The Court also enters this Order to deter and prevent future misconduct by Justice Department lawyers by ordering an appropriately tailored continuing legal education program, which will not only serve to educate the uninitiated, but more importantly will remind all trial lawyers that their honest and ethical participation is a necessity for the proper administration of justice.  It also compels the Attorney General, or her designee, to take the necessary steps to ensure that DOJ attorneys act honestly in the future.

---

[18] Other courts have noticed these problems as well.  Just in the last six months, both the Fifth Circuit and the Sixth Circuit have questioned the conduct of those employed by the Department of Justice.  *United States  v. Bowen*, 799 F.3d 336 (5th Cir. 2015); *In re United States*, No. 15-3793, 2016 WL 1105077 (6th Cir. Mar. 22, 2016).  The Fifth Circuit went further and suggested that not only was there misleading conduct, but the conduct was followed by an inadequate investigation and a cover-up.  These are just two of an ever-growing number of opinions that demonstrate the lack of ethical awareness and/or compliance by some at the Department of Justice.

The Court does not have the power to disbar the counsel in this case, but it does have the power to revoke the *pro hac vice* status of out-of-state lawyers who act unethically in court.  By a separate sealed order that it is simultaneously issuing, that is being done.

The Court notes that to its knowledge none of the acts cited in this or prior orders were committed by attorneys from the United States Attorney's Office in the Southern District of Texas.  To date, without exception, these attorneys have acted and continue to act, in this Court's experience, with honor, professionalism and forthrightness.  Further, while the misconduct involved at least two or more attorneys from the Justice Department, to this Court's knowledge, no acts occurred during the tenure of the current Attorney General.  The Court cannot help but hope that the new Attorney General, being a former United States Attorney, would also believe strongly that it is the duty of DOJ attorneys to act honestly in all of their dealings with a court, with opposing counsel and with the American people.

All motions for discovery, motions for different sanctions, or requests for further relief (including those made in Doc. Nos. 183 and 188) relating to the misrepresentations of counsel in this case, other than those instituted by this Order, are hereby denied.  Further, all remaining motions filed by any party are denied.

Signed this 19th day of May, 2016.

Andrew S. Hanen
United States District Judge