# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

_____

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. B-14-254 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | (Redacted for Public Filing) |
| | ) | |
| Defendants. | ) | |

_____)

## DEFENDANTS' RESPONSE TO THE COURT'S ORDER OF JUNE 7, 2016

Dated: July 31, 2016

KENNETH MAGIDSON
United States Attorney

DANIEL DAVID HU
Assistant United States Attorney
Chief, Civil Division

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

JOYCE R. BRANDA
Deputy Assistant Attorney General

AUGUST E. FLENTJE
Special Counsel

JENNIFER D. RICKETTS
Director, Federal Programs Branch
Attorney-in-Charge (VA Bar No. 29281)

JAMES J. GILLIGAN
Special Litigation Counsel

DANIEL SCHWEI
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883
Washington, D.C. 20044
Tel.: (202) 305-8693
Fax: (202) 616-8470
Daniel.S.Schwei@usdoj.gov

*Counsel for Defendants*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES .............................................................. iii

INTRODUCTION AND SUMMARY ................................................. 1

BACKGROUND .............................................................................. 4

    The Early Stages of This Litigation and *Arpaio* ....................... 4

    The December 19, 2014, Telephone Conference ...................... 9

    The Government's January 14, 2015, Motion for an Extension of Time ......... 11

    The January 15, 2015, Preliminary Injunction Hearing.................. 13

    The January 30, 2015, Neufeld Declaration ............................. 15

    Post-Injunction Compliance Efforts .......................................... 16

    The Government's February 23, 2015, Motion to Stay Pending Appeal......... 18

    The Government's March 3, 2015, Advisory................................. 19

DISCUSSION .................................................................................. 21

I.    The Declarations Submitted Today Demonstrate that the Government Did Not Commit Any Form of Intentional Misconduct................................. 22

    A.    Imposition of Sanctions Must Be Supported by Clear and Convincing Evidence of Knowing Misrepresentations. ........................ 22

    B.    The Significant Factual Material Submitted Today Shows the Government's Good Faith Throughout this Litigation. ......................... 23

        1.    The Government Did Not Intend to Mislead the Court. .......................... 24

        2.    The Government's Receipt of Information About the Three-Year Terms Early in the Litigation Does Not Show Bad Faith. ...................... 29

        3.    Upon Realizing That Its Statements May Have Created a Misimpression, the Government Took Prompt and Appropriate Remedial Action By Informing the Court................................. 33

    C.    A Finding of Knowing Misrepresentation or Intentional Deceit Cannot Be Supported by This Factual Record....................... 35

D.    Additional Evidence and Context Confirms that There Is No Basis to Find Misconduct.................................................................................................... 37

    1.    The Context of the Statements At Issue Demonstrates Their Intended Scope............................................................................ 37

    2.    The Government's Attorneys Would Not Have Sought to Mislead the Court.................................................................................... 41

II.    The Government Deeply Regrets this Situation, and Will Undertake Additional Training as a Demonstration of its commitment to high Standards of Professionalism......................................................................................................... 45

III.    An Appropriate Range of Sanctions If, Contrary to the Record, The Court Were to Find Intentional Misrepresentations. ............................................................... 46

CONCLUSION.............................................................................................................. 51

# TABLE OF AUTHORITIES

## Cases

*Centrifugal Tech., Inc.*,

    404 F. App'x 899 (5th Cir. 2010) ..................................................... 22, 47

*Chambers v. NASCO*,

    501 U.S. 32 (1991) ..................................................... 22

*Chaves v. M/V Medina Star*,

    47 F.3d 153 (5th Cir. 1995) ..................................................... 22

*City of Alexandria v. CLECO Corp.*,

    547 F. App'x 568 (5th Cir. 2013) ..................................................... 22, 23, 36

*Crowe v. Smith*,

    151 F.3d 217 (5th Cir. 1998) ..................................................... passim

*Crowe v. Smith*,

    261 F.3d 558 (5th Cir. 2001) ..................................................... passim

*Deal v. United States*,

    508 U.S. 129 (1993) ..................................................... 37

*FDIC v. Maxxam, Inc.*,

    523 F.3d 566 (5th Cir. 2008) ..................................................... 22, 47, 50

*Goldin v. Bartholow*,

    166 F.3d 710 (5th Cir. 1999) ..................................................... 23

*Gonzalez v. Trinity Marine Group, Inc.*,

    117 F.3d 894 (5th Cir. 1997) ..................................................... 48

*Hornbeck Offshore Servs., LLC v. Salazar*,

    713 F.3d 787 (5th Cir. 2013) ..................................................... 22, 47

*Hunting Energy Servs. LP v. Inter-Mountain Pipe & Threading Co.*,

    242 F. App'x 257 (5th Cir. 2007) ........................................................ 23

*In re FEMA Trailer Formaldehyde Prods. Liability*,

    401 F. App'x 877 (5th Cir. 2010) .................................................... 47, 48

*In re Moore*,

    739 F.3d 724 (5th Cir. 2014) ................................................... 22, 23, 36

*In re Whitley*,

    737 F.3d 980 (5th Cir. 2013) ............................................................... 48

*Maguire Oil Co. v. City of Houston*,

    143 F.3d 205 (5th Cir. 1998) ......................................................... 23, 36

*Natural Gas Pipeline Co. of America v. Energy Gathering Inc.*,

    86 F.3d 464 (5th Cir. 1996) ................................................................. 48

*Positive Software Solutions, Inc. v. New Century Mortg. Corp.*,

    619 F.3d 458 (5th Cir. 2010) ............................................................... 48

*Roadway Express, Inc. v. Piper*,

    447 U.S. 752 (1980) ....................................................................... 22, 47

*United States v. Harrelson*,

    705 F.2d 733 (5th Cir. 1983) ............................................................... 36

*United States v. Horn*,

    29 F.3d 754 (1st Cir. 1994) ................................................................. 50

*United States v. Sandlin*,

    589 F.3d 749 (5th Cir. 2009) ............................................................... 36

**<u>Rules</u>**

Fed. R. Civ. P. 11(c)(2)................................................................................................ 37

Federal Rule of Civil Procedure 11(b)......................................................................... 49

**<u>Other</u>**

Black's Law Dictionary (10th ed. 2014)

## <u>INTRODUCTION AND SUMMARY</u>

On June 7, 2016, this Court provided the Government an opportunity to submit evidence regarding the events discussed and the conclusions reached in the Court's May 19, 2016 Memorandum Opinion and Orders.  We sincerely appreciate this opportunity, and are submitting today declarations from ███████, ███████, the head of the Department of Justice Civil Division, and seven other attorneys who were involved in the Government's defense of this case. This record explains in detail that counsel for the Government did not intend to mislead or misrepresent the facts to this Court about implementation of the November 20, 2014, Deferred Action Guidance.

We do not dispute that we made mistakes that led to the unfortunate circumstances here: at critical times we provided incomplete information to the Court because of our failure to appreciate the scope of the questions asked of us; and we used imprecise terminology in our oral and written submissions to the Court.  As a result, our submissions left the Court with an incorrect understanding of the facts regarding grants by the Department of Homeland Security ("DHS") of three-year terms of deferred action to individuals qualifying under the 2012 Deferred Action for Childhood Arrival ("DACA") eligibility criteria.  We acknowledge and apologize for these mistakes, and for the valuable time the Court has expended on this matter as a result.  But we did not intend to mislead the Court or to conceal any fact concerning implementation of the Guidance.

In this memorandum, and the accompanying ten sworn declarations, we review the underlying events at length, to convey the context in which the Government's attorneys acted.  In early December 2014, the attorneys working on this case were litigating under the intense pressure of two legally and factually complex cases challenging the November 2014 Guidance. The plaintiffs in both cases had sought preliminary injunctions and both cases were proceeding

simultaneously on expedited timetables.  Only days into the case, among a tremendous amount

of other information that the attorneys had to absorb, ████████████████████████

████████████████████ DHS ████████████████ had already begun issuing three-year terms of

deferred action (instead of two-year terms) to those who qualified under the 2012 DACA

eligibility guidelines.  Department of Justice attorneys did not understand it as relevant, however,

to the preliminary injunction proceedings, in which the Plaintiff States' legal arguments and their

claims of irreparable harm focused on the expansion of the population eligible for deferred

action.  Under the intense pressures of litigation they either forgot, or at least had no further

thoughts about, the fact that DHS, pursuant to the Guidance, had begun granting three-year terms

of deferred action under the 2012 DACA eligibility guidelines.  Only after the Court enjoined

implementation of the Guidance in its entirety, and Government counsel received information—

for the first time—about the number of three-year DACA terms that had been granted

beforehand, did counsel recognize that their prior statements may have left the Court with a

misimpression regarding the three-year grants, and thus the importance of bringing this fact to

the Court's attention.  Counsel then did so promptly, within two business days.

Thus, when the Government's counsel appeared before the Court and stated that they did

not anticipate any changes "in the state of the playing field" before the preliminary injunction

hearing, and that no applications for "revised DACA" would be accepted by DHS before mid-

February 2015, they believed they had been asked about implementation of the expanded

eligibility criteria—which they understood to be the focus of the preliminary injunction

proceedings—and they believed they had given complete and accurate answers to the Court's

questions.  The three-year terms of deferred action under the 2012 DACA eligibility guidelines

did not cross their minds.  Similarly, nothing in the Government's motion for an extension of

time to file a sur-reply, nor its motion for a stay pending appeal, was intended to conceal the fact

that DHS had been granting three-year periods of deferred action, or to mislead the Court into believing otherwise.  Nothing about these filings brought to mind the ongoing three-year grants among the many attorneys throughout the Department of Justice who drafted, reviewed, edited, and approved them before they were filed.

We recognize now that our use of shorthand references in these communications such as "revised DACA," "modified DACA," and "the challenged policy" was a mistake.  Those phrases were imprecise, and, we now comprehend, they led the Court to believe that DHS had not begun to grant three-year terms of deferred action.  But the record submitted today demonstrates that our use of these phrases was never calculated to mislead.

A court's imposition of sanctions under its inherent power requires clear and convincing evidence of bad-faith misconduct.  The record, including the ten sworn declarations submitted today, now establishes the opposite in this case—the absence of bad faith by the Government and its counsel.  We respectfully request, therefore, that the Court rescind both of its May 19, 2016, orders, and the findings on which they rest, in light of the evidence now available to it.

While we unequivocally maintain that neither the Government nor its counsel intentionally misled the Court, we do not wish that conviction to be taken as disregard for the concerns the Court expressed in its May 19 opinion.  To the contrary, we are deeply troubled by any suggestion that the Department of Justice has not lived up to the trust that federal courts place in the Department, or that it has failed to meet the highest standards of candor and forthrightness.  Therefore, as an affirmation of our steadfast commitment to our solemn obligations to this and all tribunals, Principal Deputy Assistant Attorney General Benjamin Mizer has directed that all Civil Division attorneys complete supplemental training designed and led by an outside expert in attorney ethics and professional responsibility.  Declaration of

Benjamin C. Mizer dated July 29, 2016 (Exh. A, hereto) ("Mizer Decl.") ¶ 13-14.  The Civil

Division will conduct this training regardless of how the Court may ultimately rule in this matter.

    Finally, during the hearing on June 7, 2016, and in its subsequent order, the Court again

asked the Government to propose an appropriate range of sanctions should the Court find that the

Government's counsel acted in bad faith to conceal information or mislead the Court about

implementation of the November 2014 Guidance.  It is challenging for us to reconcile the idea of

an "appropriate" sanction with our firm conviction, now supported by an extensive record, that

the Government acted in good faith at all times in the litigation.  Nonetheless, we attempt below

to offer the specific guidance the Court has asked from us.  In the final analysis, however, we

respectfully submit that our filings today confirm that neither the Department of Justice nor its

attorneys breached their duty of candor to this tribunal, and thus that no sanction is warranted.

## BACKGROUND

### The Early Stages of This Litigation and *Arpaio*

    The November 20, 2014, Deferred Action Guidance issued by the Secretary of DHS

directed that the 2012 DACA be expanded by removing the age cap on eligibility and adjusting

the date by which an applicant must have entered the United States from June 15, 2007, to

January 1, 2010.  November 2014 Guidance (ECF No. 38-5) at 3-4.  The Guidance also required,

beginning November 24, 2014, that terms of deferred action provided under DACA be changed

from two to three years.  *Id.* at 4.  And the Guidance further directed the establishment of a

similar process, Deferred Action for Parents of Americans and Lawful Permanent Residents

("DAPA"), to make deferred action available to certain undocumented immigrants whose

children are U.S. citizens or lawful permanent residents.  *Id.* at 4-5.

    The November 2014 Guidance faced immediate legal challenge in *Arpaio v. Obama*, No.

1:14-cv-01966-BAH (D.D.C.) ("*Arpaio*"), filed on the same date the Guidance was announced.

*See Arpaio*, Complaint (ECF No. 1).  The plaintiff in *Arpaio* soon moved for a preliminary injunction against implementation of the Guidance, on December 4, 2014.  *Id.*, Mot. for Prelim. Inj. (ECF No. 6).

This case was filed on December 3, 2014, Complaint (ECF No. 1), and the Plaintiff States, like the plaintiff in *Arpaio*, sought preliminary relief on December 4, 2014.  Pls.' Mot. for Prelim. Inj. and Mem. in Support (ECF No. 5) ("Pls.' PI Mot.").  Although noting that the November 2014 Guidance had extended the period of deferred action under DACA from two years to three, both the amended complaint and preliminary injunction motion stressed the harms that the Guidance would allegedly inflict on the States by "substantially increas[ing] the number of undocumented immigrants in the Plaintiff States," and by forcing the States "to expend substantial resources on law enforcement, healthcare, and education," and other benefits.  First Amended Complaint (ECF No. 14), ¶¶ 52, 61-68; *see* Pls.' PI Mot. at 20, 25-28.  *See also* Pls.' Reply in Support of Mot. for Prelim Inj. (ECF No. 64) at 42-45, 53, 64-65.

The Federal Programs Branch, an office within the Department of Justice Civil Division, represented the Government in district court in this case and *Arpaio*.  Declaration of ████ ████, dated July 31, 2016 (Exh. E, hereto) ███ Exh. E ███, ¶ 3; *see also* Declaration of Joseph  H. Hunt, dated July 31, 2016 (Exh. D, hereto) ("Hunt Decl."), ¶ 3.  A team of career trial attorneys—initially three, but soon five, including ████████—was assembled to defend the cases.  *Id.*, ¶ 4.  The cases were supervised by Assistant Branch Director ████████.  *Id.* (The trial attorneys and ████████ are referred to herein collectively as "the trial team.")  Due to the cases' importance, ████████, then ████████████ ████████████ and its litigation, was closely involved in the day-to-day handling and supervision of the case.  ███ Exh. E ███ ¶ 5; Declaration of ████████ dated July 31, 2016 (Exhibit F, hereto) ███ Exh. F ███, ¶ 6; *see*

*also, e.g.,* Declaration of ████████████, dated July 31, 2016 (Exh. J, hereto)  ██Exh. J██

██████ ¶ 5.

In addition to the trial team and ██████████, a large number of attorneys in other

Department of Justice components and leadership offices were also involved in the cases,

including the Civil Division Appellate Staff; the Civil Division Office of Immigration Litigation;

the Office of the Assistant Attorney General for the Civil Division; the Office of the Solicitor

General; the Office of Legal Counsel; the Office of the Associate Attorney General; the Office of

the Deputy Attorney General; the Office of the Attorney General, and the United States

Attorney's Office for the Southern District of Texas.  Lawyers from DHS and the White House

Counsel's Office also participated.  ██Exh. E██ ¶ 5; *see also* Mizer Decl., ¶¶ 2-3.  As a result,

virtually all of the trial team's filings in this case and *Arpaio* were subject to extensive review,

editing, and approval prior to being filed.  ██Exh. E██ ¶ 5; *see also* ██Exh. F██ ¶ 10;

Declaration of ████████ dated July 31, 2016 (Exh. G, hereto) ██Exh. G██ ¶ 4;

Declaration of ██████████ dated July 31, 2016 (Exh. I, hereto) ██Exh. I██ ¶ 4;

██Exh. J██ ¶ 5; Declaration of ████████ dated July 31, 2016 (Exh. H, hereto)

██Exh. H██ ¶ 5.[1]

The court in *Arpaio* set a deadline for the Government's opposition brief of December

15, and scheduled a hearing for December 22.  Initially, the Government's opposition to the

Plaintiffs' motion in this case was due on December 24, and the States had requested a hearing

by December 31, 2014.  ██Exh. E██ ¶ 8.  *See also* ECF, Minute Entry dated Dec. 19, 2014.

These simultaneous fast-track schedules, in two-high profile cases, placed intense demands on

---

[1]  As one concrete example, the review, editing, and approval of a single five-page filing
in this case (the March 3 Advisory) generated over 1100 pages of drafts and communications
related to the draft, amongst over 50 people, all in the span of approximately 24 hours.  *See*
Privilege Log of Apr. 30, 2015; Privilege Log Supplement (May 19, 2015); Metadata Chart of
Apr. 30, 2015.  Each filing in this case underwent a similar review and approval process.  *See*
██Exh. E██ ¶ 39.

the trial team and ▮▮▮▮▮▮▮.  They worked exceptionally long hours throughout December

2014, including nights and weekends, to develop the Government's case, draft briefs, and

prepare for hearings in *Arpaio* and possibly this case.  *Id.*, ¶ 9.  They had to digest a vast body of

information received from DHS concerning the administration of the immigration laws, and

evaluate that information's relevance to the complex and novel legal issues they were addressing,

while on a daily basis participating in numerous meetings, conference calls, and e-mail

exchanges with each other and other Department offices, and DHS counsel.  Exh. E ¶ 9;

Exh. F ¶¶ 8-9;  Exh. G ¶ 5.  The extensive review and comment process required

before the Government's briefs and other submissions could be filed by the trial team added to

the complexity of the trial team's tasks, and multiplied the time and attention required to

complete them.  Exh. F ¶ 10;  Exh. J ¶ 6; *see* Exh. I ¶ 5;  Exh. H ¶ 5.

The concurrent proceedings and tight deadlines also presented questions about

scheduling, leading the trial team to seek information ▮▮▮▮▮▮ about the timing for

implementation of the November 2014 Guidance.  Exh. E ¶ 10;  Exh. F ¶ 11.

Because the Plaintiff States' filings ascribed their alleged irreparable harm to the expansion of

the population eligible for deferred action under DACA and DAPA, and not to the change in

duration of deferred action under the unchallenged 2012 DACA guidelines, the trial team

focused on the first date when DHS would begin accepting applications under the expanded

DACA and/or DAPA eligibility guidelines as the pertinent date for scheduling the preliminary

injunction proceedings.  Exh. E ¶¶ 10-11; *see* Exh. F ¶ 12;  Exh. G ¶ 7.

No one understood the change from two to three years of deferred action to be pertinent to

scheduling the preliminary injunction proceedings.  *See, e.g.,* Exh. C ¶ 32; Exh. E

▮▮▮ ¶ 12;  Exh. F ¶ 11.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

█████████████████████████████████████████████████ Exh. E

¶ 10.

On Sunday evening December 7, 2014, as the trial team worked on multiple tasks in this case and *Arpaio*, *e.g.,* ██████ Exh. E ██ ¶ 14; ██████ Exh. G ██ ¶ 8, ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████ DHS had begun granting three- rather than two-year terms of deferred action under the 2012 DACA eligibility guidelines ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████ Exh. E

¶¶ 13-14; ████ Exh. F ████ ¶¶ 15-16; ██████ Exh. G ██ ¶ 8; ████ Exh. I ██ ¶ 7. ████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████ Exh. C

████ ¶ 19; Mizer Decl., ¶ 7.

On the evening of December 7, ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████.[2] █████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[2] ████████████████████████████████████████████ *See* Hunt Decl., ¶ 5; ██████ Exh. I
██████ ¶¶ 8-9; ████ Exh. J ████ ¶ 8.



██████████████████████████████ **Exh. E** ¶ 15; **Exh. G**

¶ 9; *see also* **Exh. F** ¶ 17.

████████████████████████████████████

█████████████████████████████ **Exh. C** ¶ 19.

Because three-year terms were being issued only to people who qualified under the 2012

eligibility guidelines, the primary concern remained ensuring that DHS did not implement the

expanded eligibility guidelines before the Court ruled on the States' preliminary injunction

motion.  Mizer Decl., ¶ 7.

████████████████████████████████████

████████████ **Exh. E** ¶ 16.  The team's attention and efforts then returned to

triaging the other pressing tasks they faced in both cases, and the fact that DHS had actually

begun granting three-year terms of deferred action under the 2012 eligibility guidelines was

given no further thought—at least as a matter pertinent to the proceedings—or discussed by the

team until at least February 27, 2015.  *Id.*, ¶¶ 16-18; **Exh. F** ¶¶ 17-18, 39; **Exh. G**

¶ 9; **Exh. I** ¶ 8; **Exh. H** ¶ 9; **Exh. J** ¶ 8.

### The December 19, 2014, Telephone Conference

The Court held a telephone conference on December 19, 2014, to set a schedule for

briefing and argument of the Plaintiff States' preliminary injunction motion.  *See* ECF, Minute

Entry dated December 19, 2014.  Members of the trial team spoke beforehand with ████████

to prepare for the call.  ████████████████████████████████



No one suggested that this fact should be concealed from the Court, or that the Government should provide anything less than complete and accurate information during the call. ▮Exh. F▮ ¶¶ 19-20; ▮Exh. E▮ ¶ 20; ▮Exh. G▮ ¶ 10; ▮Exh. H▮ ¶ 6; ▮Exh. J▮ ¶ 9.

During the telephone conference the Court proposed a hearing date of January 9, 2015. Tr. of Tel. Conf. dated December 19, 2014 (ECF No. 184) ("Dec. 19, 2014 Hr'g Tr.") at 5. Counsel for the States did not object to the proposed date, but expressed concern about the unknown "speed with which this new federal program has been or will be implemented." *Id.* The Plaintiffs sought assurance "that there won't be any curveballs or surprises about … deferred action documents being issued," or changes in "the state of the playing field" before the hearing, remarking that "the United States has hired a thousand employees in the initial large processing center." *Id.* at 11. ▮

▮ ▮Exh. F▮ ¶ 20; see Pls.' PI Mot. at 2.

In response to the Court's ensuing question, "Okay. ▮, do you anticipate that happening?," ▮ replied, "No, I do not, Your Honor.  The agency was directed to begin accepting requests for deferred action … by mid-February ….  So … I really would not expect anything between now and the date of the hearing." Dec. 19, 2014 Hr'g Tr. at 11.  No reference was made to three-year terms of deferred action during the call. ▮ believed that ▮ was being asked whether DHS would begin accepting deferred action applications under the expanded eligibility criteria before the proposed hearing date, and that is how ▮ intended ▮ statements to be understood. ▮Exh. F▮ ¶ 21. ▮ did not mention the fact that DHS had

already begun granting three-year terms of deferred action under the 2012 eligibility guidelines

████████████████████████████████████████████████ did not recognize the Court's

question as touching on it.  *Id.*, ¶¶ 20, 21.

████████ and ████████ were present in ████████ office during the telephone

conference, and could hear ██ end of the conversation.  ██████████████████████

██████████████████████████████████████—the date the status quo

would change when DHS began accepting applications for deferred action under the 2014

DACA eligibility guidelines.  Nothing they heard brought three-year terms of deferred action

under 2012 DACA to mind.   ¶ 21 ██████ ¶¶ 33-34.  Following the call

████████████████████████ provided a summary of the call to other members of

the trial team and to attorneys in other Department offices.  At no point did any of those

attorneys suggest that ████████ had erred by failing to mention that DHS had begun granting

three-year terms of deferred action, or that ██ had appropriately concealed that fact.  None of

them suggested that ████████ had provided anything less than complete and accurate

information in response to the Court's inquiry.  ██████ ¶ 22; ██████ ¶ 22;

██████ ¶ 10; ██████ ¶ 6; ██████ ¶ 9.

**The Government's January 14, 2015, Motion for an Extension of Time**

On January 5, 2015, the Court granted the Plaintiff States' request for an extension of

time until January 7 to file their reply and to continue the hearing from January 9 to January 15.

Order dated January 5, 2015 (ECF No. 41).  On January 14, 2015, the Government filed a motion

for an extension of time, from January 20 to February 2, to submit its previously authorized sur-

reply, citing the volume (more than 1,000 pages) of declarations and exhibits that the Plaintiffs

had submitted with their reply.  Mot. for Ext. of Time to File a Resp. to Pls.' Prelim. Inj. Reply

Mem., dated January 14, 2015 (ECF No. 90) ("Jan. 14, 2015 Ext Mot.") at 1-2; *see* ECF, Minute

Entry dated Dec. 19, 2014.  The motion argued that "Plaintiffs [would] not be prejudiced by the two-week extension" until February 2, "because [DHS] d[id] not intend to entertain requests for deferred action under the challenged policy until February 18, 2015 …."  Jan. 14, 2015 Ext. Mot. at 3.  ███████, the principal author of the motion, intended that language only to convey that DHS would not accept applications for deferred action under the new DACA eligibility criteria before that date, using terms, although now recognized as imprecise, that the trial team and DHS employed at the time to distinguish deferred action provided under the new eligibility criteria from deferred action accorded under the prior, 2012 guidelines.  ███ did not mean to suggest anything regarding three-year terms of deferred action accorded to persons applying under the 2012 DACA criteria, as ██████████████████████████ ████████████████████ Exh. F ¶¶ 23-25, 27.

Members of the trial team and ████████ reviewed drafts of the January 14, 2015, extension motion before filing.  Nothing in the drafts triggered any thought or recollection in the minds of ██████ that DHS had been granting three-year (rather than two-year) terms of deferred action under the 2012 DACA eligibility criteria; nor did it occur to them that statements in the motion could be regarded as inaccurate or incomplete because they did not mention the three-year terms.  Drafts of the extension motion were also circulated for review and approval to numerous individuals in the other Department of Justice offices involved in the case, and at DHS.  ███████████████████████ the motion's statement that the agency "d[id] not intend to entertain requests for deferred action under the challenged policy until February 18, 2015."  Exh. F ¶ 23.  No one suggested to ████████████ that the draft motion was incorrect or incomplete because it did not mention the three-year terms, or that reference to them should be omitted from the motion.  None ██████████████████ recalls any mention of the three-year terms of deferred

action at all in connection with the January 14, 2015, extension motion.  ¶¶ 23-24; ▮ Exh. F ¶ 26; ▮ Exh. G ¶ 11; ▮ Exh. I ¶ 10; ▮ Exh. J ¶ 10; Exh. C ▮ ¶ 31-32; *see also* Mizer Decl., ¶ 8; Declaration of Joyce R. Branda dated July 20, 2016 (Exh. B, hereto) ("Branda Decl.,"), ¶ 6.

### The January 15, 2015, Preliminary Injunction Hearing

The Court held a hearing on the Plaintiffs' preliminary injunction motion on January 15, 2015. ▮ argued the case for the Government. The trial team assisted ▮ with ▮ preparation for the hearing, including at a formal moot court attended by dozens of attorneys in the Department of Justice, as well as attorneys from DHS, the White House Counsel's Office, and the U.S. Attorney's Office (by telephone). ▮ ▮ ▮ None of the ▮ recalls discussion of the three-year terms of deferred action, or even that the three-year terms crossed their minds, in connection with ▮ preparation for the hearing. Exh. E ▮ ¶ 25; Exh. F ¶ 28; Exh. G ¶ 12; Exh. H ¶ 7; Exh. I ¶ 10; Exh. J ▮ ¶ 10; Exh. C ▮ ¶ 22.[3]

As the preliminary injunction hearing itself drew to a close, the Court addressed the Government's pending motion for an extension of time to file a sur-reply, remarking that before the motion was ruled on the Plaintiffs "[are] going to want to know what's happening when." Tr.

---

[3] As was learned during the preparation of the Defendants' Response to the Court's Order of April 7, 2015 (ECF Nos. 242, 243) ("Defs.' April 30, 2015 Br."), ▮ *Id.* at 11 n.3. The moot court, which lasted nearly three hours, was attended by approximately 50 people, and included a number of side discussions. Exh. E ▮ ¶ 26; *see* Exh. F ▮ ¶ 28; *see also* Defs.' April 30, 2015 Br. at 11 n.3. ▮ ¶ 26; Exh. G ¶ 12; Exh. H ¶ 7; Exh. F ¶ 28; Exh. I ¶ 10; Exh. E Exh. J ▮ ¶ 10; Exh. C ¶ 22.

of Prelim. Inj. Hrg. dated January 15, 2015 ("Jan. 15, 2015 Hr'g Tr.") at 133. ███████

responded that "no applications for the revised DACA … would be accepted until the 18th of

February," 2015, and that DAPA would not be "stood up" until mid-May.  *Id.* at 133-34.  The

Court inquired further, "as far as you know, nothing is going to happen in the next three weeks,"

to which ███████ replied, "No … [i]n terms of accepting applications or granting any up or

down applications … [f]or revised DACA …."  *Id.* at 134.

In making these statements, ███████ used the term "revised DACA" as shorthand for

the expanded eligibility criteria, consistent with the use of that term by other Department of

Justice and DHS attorneys involved in the case. ███ Exh. C ███ ¶¶ 28-29; ███ Exh. F ███ ¶ 30;

███ Exh. E ███ ¶ 35. ███ did not intend the term to refer to three-year (rather than two-year)

grants of deferred action under 2012 DACA. ███████████████████

███ ; nor did ███ then appreciate the potential for misunderstanding arising from ███ use of the

phrase "revised DACA." ███ Exh. C ███ ¶ 28.[4]

Three members of the trial team also attended the hearing—███████████████

███████ All three heard the Court's exchange with ███████ regarding the

Government's extension request, including the Court's inquiries about timing, and ███ response

that applications for "revised DACA" would not be accepted before February 18, 2015. ███████

███████████████████████████ ███ Exh. F ███ ¶¶ 29-31; ███ Exh. I ███

---

[4] At a prior stage of the hearing the Court asked whether or not the Plaintiff States were
challenging "DACA" (as opposed to DAPA), to which Plaintiffs' counsel answered they were
not. Jan. 15, 2015 Hr'g Tr. at 90-91. ███████ then clarified that Plaintiffs were, in fact,
challenging the "revision or expansion," by the November 2014 Guidance, "of the group that
would be eligible to apply for [DACA]." *Id.* at 91.  The Court then asked, "The increase in
years?" *Id.* ███████ did not recognize the Court's question as a reference to the three-year
terms of deferred action, but as a reference to the expanded DACA guidelines under the
November 2014 Guidance—the removal of the age cap, and the adjustment of the date-of-entry-
requirement from 2007 to 2010, *see supra* at 4—both of which could be understood as an
"increase in years." ███ Exh. C ███ ¶ 26.  Thus, in response to the Court's question, ███████
directed the Court's attention to the description of "the[se] revisions to the DACA program" in
the Government's opposition brief.  Jan. 15, 2015 Hr'g Tr. at 91; ███ Exh. C ███ ¶ 26.



█████ ¶ 11; ████████ ¶ 12.  Also present at the hearing were two DHS officials who were knowledgeable about the November 2014 Guidance and had assisted in the Government's defense of the litigation.  Neither indicated during the hearing, or afterward, that █████████ ████████ answers to the Court were inaccurate or incomplete.  ██████ ¶ 11; █████ █████ ¶ 12; ██████ ¶ 32.

Afterward, the team members who attended the hearing reported to the others what had transpired, █████████████████████████████████ █████  None questioned that █████████ had given complete and accurate information by informing the Court that DHS would begin accepting applications for deferred action under the expanded DACA eligibility guidelines no sooner than February 18, 2015.  In addition, the transcript of the hearing was widely circulated to the numerous attorneys throughout the Department of Justice, and at DHS, who were involved in the case.  None suggested to the ██ ████████████████████████ responses had been incomplete or inaccurate.  ████████ ¶ 32; ██████ ¶¶ 27-28; ██████ ¶ 13; ██████ ¶ 7; ██████ ¶ 11; █████ █████ ¶ 12.

**<u>The January 30, 2015, Neufeld Declaration</u>**

The Government filed its sur-reply on January 30, 2015.  Defs.' Sur-Reply in Opp. to Pls.' Mot. for Prelim. Inj. (ECF No. 130) ("Defs.' Sur-Reply").  Among the supporting exhibits (Exhibit 44) was the Declaration of Donald W. Neufeld ("Neufeld Decl.,") (ECF No. 130-11), Associate Director of Service Center Operations for USCIS.  The principal purpose of the Neufeld Declaration was to illustrate the case-by-case discretion exercised by DHS officials when evaluating applications for 2012 DACA, *see* Defs.' Sur-Reply at 30-34, Exh. 44-B at 2-3; Neufeld Decl., ¶¶ 10-15, but it also noted that "[i]f granted, the period of deferred action under the existing DACA program is—depending on the date of the grant—two or three years."

Neufeld Decl., ¶ 12.  A footnote explained that pursuant to the November 2014 Guidance, "as of November 24, 2014, all first-time DACA requests and requests for renewals now receive a three-year period of deferred action."  *Id*., ¶ 12 & n.3.

Drafts of the Neufeld Declaration were reviewed by several members of the trial team before it was filed.  They were still working long hours under intense time pressure to respond to the voluminous submissions that accompanied Plaintiffs' reply, and ██████████████████ ████████████████████ stating that as of November 24, 2014, eligible DACA applicants were then receiving three-year terms of deferred action.  It did not occur ███████ ██████████████████ that it might be considered inconsistent with prior statements the Government had made about implementation of the Guidance, ██████████████████████ ████████████████████████████████████ Moreover, before filing, drafts of the Neufeld Declaration were also circulated for review to numerous attorneys in other Department of Justice offices and at DHS.  None ██████ suggested that the footnote might be in tension with any of the Government's prior statements in the case, or that the information it contained should be withheld from the Court.  ██Exh. E██ ¶¶ 30-31; ██Exh. F██ ¶ 32; ██Exh. H██ ¶¶ 8-9; ██Exh. I██ ¶¶ 13-14; ██Exh. J██ ¶ 15; *see also* Branda Decl., ¶ 5.

**Post-Injunction Compliance Efforts**

The Court issued its preliminary injunction late in the evening on February 16, 2015.  After the injunction issued, the trial team was tasked principally with considering appellate options, preparation of a motion to stay the Court's injunction pending appeal, and developing a strategy for further district court litigation.  On issues pertaining to compliance with the injunction, ██████████ generally worked with attorneys in Department leadership offices and at DHS, in consultation with the White House.  The first priority was ensuring that no actions were

taken in violation of the injunction, which included stopping many items of ongoing work, as DHS had been engaged in extensive preparations for months to intake approximately 4 million new applicants. ██████████████████████████████████████ as the injunction applied to implementation of "any and all changes" to DACA. ████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████ The most immediate concern was preventing any actions going forward that were barred by the injunction. Exh. C ¶¶ 37-39.

The trial team was not involved in or aware of ████████████████████████

████████████████████████████ The trial team was asked to opine, however, ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████ Among these requests, ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████ None ████████ recalls thinking, ████████

████████ that any of the Government's prior statements regarding implementation of the Deferred Action Guidance may have been imprecise, incomplete, or incorrect. Exh. C

¶ 32; Exh. G ¶ 19; Exh. I ¶ 16; Exh. J ¶ 16; Exh. F ¶ 33; Exh. E

██████ ¶ 33; Exh. H ¶ 11.

17

### The Government's February 23, 2015, Motion to Stay Pending Appeal

The trial team prepared and, on February 23, 2015, filed a motion to stay the preliminary injunction pending appeal.  That filing was subject to the same process of review, comment, and approval by attorneys throughout the Department and at DHS.  Defs.' Emergency Expedited Mot. to Stay the Court's Feb. 16, 2015, Order Pending Appeal & Supporting Mem. (ECF No. 150) at 4-5.  The motion stated by way of background that "DHS was to begin accepting requests for modified DACA on February 18, 2015," and, as explanation of the injunction's harm to the Government, that "[t]he Court issued its injunction one business day before USCIS was scheduled to begin accepting requests for deferred action under the modified DACA guidelines." *Id.* at 13.  It did not mention three-year terms of deferred action issued before the injunction. Again, the shorthand phrase "modified DACA" was one used by the trial team, and attorneys at DHS, and was intended only to refer to the expanded eligibility criteria under 2014 DACA, not to the increase in duration from two-year terms to three-year terms.  *See* ███Exh. C███ ¶ 26; ███Exh. E███; ¶ 35; ███Exh. F███ ¶ 14; ███Exh. H███ ¶ 7.

The trial team and ███████ conferred with attorneys in other Department offices regarding the stay motion before it was filed, and circulated drafts of the motion to these offices, and DHS, for review, editing, and approval.  At no point in this process did it occur ███████ ███████, or did anyone suggest, that the motion would be (or was) inaccurate or incomplete because it did not refer to three-year terms of deferred action already issued.  No mention was made of the three-year terms at all in connection with this motion.  The trial team and ███████ understood the statements in the motion regarding implementation of the November 2014 Guidance to be complete and accurate, all the more so considering that the Plaintiffs framed their claims of irreparable harm in terms of expanded eligibility under DACA

and DAPA. ████████ ¶¶ 33-34; ████████ ¶¶ 35-37; ████████ ¶ 12; ████████

¶ 15; ████████ ¶ 17; ████████ ¶ 28; *see also* Mizer Decl., ¶ 8; Branda Decl., ¶ 6.

### The Government's March 3, 2015, Advisory

████████████████████████████████

████████ on Friday, February 27, 2015, ████████████████

████████████████████████████████

████████████████████████████████

████████ ████████ ¶ 41. ████████████—who had not previously

received any information about the number of three-year terms granted—████████, *id.*, ██

████████████████████████████████

████████ *Id.*,; ████████ ¶¶ 39, 41; ████████ ¶ 36. ████████

████████████████████████████████

████████████████████████████████

████████████████ ████████ ¶ 42. ████████████████

████████████████ *Id.*

On Monday, March 2, 2015, ████████████████████

████████████████████████████████

████████████████████ This was the first time

since shortly after December 7, 2014 (or for some, since reviewing drafts of the Neufeld

Declaration) that it was brought back to ████████ attention that DHS had in fact begun

granting three-year terms of deferred action prior to the injunction. Moreover, it was the first

time ████████ had received any information about the number of three-year terms

granted. ████████████████ Because the Court

had enjoined implementation of the Guidance in its entirety, ████████████████



To that end ██████████ prepared, and the rest of the team reviewed, a draft filing overnight. Throughout the day on March 3, 2015, the draft underwent extensive review throughout the Department of Justice, as well as review at DHS and the White House. No one suggested ██████████████ the Court should not be informed about the pre-injunction three-year grants, or that the advisory should be delayed for purposes of litigation advantage, or any other reason. The advisory was filed that evening, just two business days after ████████ was first informed of the number of three-year terms of deferred action DHS had granted, and thus within two business days of anyone first appreciating the potential confusion associated with the Government's statements. ███Exh. E███ ¶¶ 38-40; ███Exh. F███ ¶¶ 42-43; ███Exh. G███ ¶ 15; ███Exh. H███ ¶ 15; ███Exh. I███ ¶ 17; ███Exh. J███ ¶¶ 18-19; ███Exh. C███ ¶ 43. *See also* Mizer Decl., ¶¶ 8-9; Branda Decl., ¶ 8.

Defendants' Advisory of March 3, 2015 (ECF No. 176) ("March 3, 2015 Advisory") expressly brought to the Court's attention that "between November 24, 2014 and the issuance of the Court's [injunction], [DHS] granted three-year periods of deferred action to approximately 100,000 [eligible] individuals who had requested deferred action under the *original* 2012 DACA guidelines … including the issuance of three-year [employment authorization documents] …." *Id.* at 3. The Advisory also expressly acknowledged that prior submissions by the Government

in which February 18, 2015, had been identified as the date by which DHS planned to accept

requests for deferred action under the expanded DACA eligibility guidelines may have led to

confusion about when DHS began granting three-year (rather than two-year) terms of deferred

action under the 2012 eligibility criteria.  The Advisory specifically cited, by way of example,

the Government's January 14, 2015, motion for an extension of time to file its sur-reply.  *Id.*

### DISCUSSION

The Department acknowledges the gravity of the Court's concerns, and emphasizes that

we are deeply sorry for the events at issue here.  Through the evidentiary record submitted today,

however, we seek to assure the Court that no member of the Department intended to mislead the

Court in any way.  This record is composed of sworn declarations from ten current and former

Department of Justice lawyers involved in the Government's defense of this case.  All of them

agree and substantiate that no one intended to mislead the Court or hide any fact from it.  We

thus respectfully submit that sanctions are not necessary or warranted here, especially given the

impact these events already have had on individual lives and careers.

Nonetheless, it is a matter of acute concern to the Department of Justice that the Court

believes the Department has violated its ethical obligations in this matter.  We describe in

Section II, therefore, voluntary measures we plan to undertake as a further affirmation of the

Government's good faith in this matter and to demonstrate its commitment to the highest

standards of candor and professionalism.  All Civil Division attorneys will be required to

undergo a supplemental one-hour training program designed and provided by an outside expert

in legal ethics and professional responsibility.  All Division attorneys will be required to

complete this training within the next 90 days, regardless of how the Court ultimately rules in

this matter.  As Principal Deputy Assistant Attorney General Mizer states, we "intend this

measure to affirm our steadfast commitment to our solemn obligations to all tribunals," and we

"sincere[ly] hope that this training will help to assure the Court that we are making every effort to maintain the trust placed in the Department of Justice."  Mizer Decl., ¶ 14.

## I.   THE DECLARATIONS SUBMITTED TODAY DEMONSTRATE THAT THE GOVERNMENT DID NOT COMMIT ANY FORM OF INTENTIONAL MISCONDUCT.

### A.   Imposition of Sanctions Must Be Supported by Clear and Convincing Evidence of Knowing Misrepresentations.

A district court has inherent authority to sanction bad-faith conduct in litigation, *Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001) ("*Crowe II*") (citing *Chambers v. NASCO*, 501 U.S. 32, 43-46 (1991)), but that authority "must be exercised with restraint and discretion." *Hornbeck Offshore Servs., LLC v. Salazar*, 713 F.3d 787, 792 (5th Cir. 2013) (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980)).  The inherent sanction power "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." *FDIC v. Maxxam, Inc.*, 523 F.3d 566, 591 (5th Cir. 2008) (citation omitted).  Accordingly, the inherent power "may be exercised only if essential to preserve the authority of the court." *Union Pump Co. v. Centrifugal Tech., Inc.*, 404 F. App'x 899, 905 (5th Cir. 2010) (citation omitted).

To impose a sanction under the Court's inherent authority, a specific finding of bad faith is a "necessary predicate[.]" *City of Alexandria v. CLECO Corp.*, 547 F. App'x 568, 569 (5th Cir. 2013); *see also Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir. 1995) ("In order to impose sanctions against an attorney under its inherent power, a court must make a specific finding that the attorney acted in 'bad faith.'").  That finding "must be supported by clear and convincing proof." *In re Moore*, 739 F.3d 724, 730 (5th Cir. 2014) (quoting *Crowe II*, 261 F.3d at 563).

Clear and convincing evidence is proof, "[v]iew[ed] [in light of] the record as a whole," that is "so clear, direct, and weighty and convincing as to enable the fact finder to come to a clear

conviction, without hesitancy, of the truth of the precise facts of the case." *Crowe II*, 261 F.3d at 565-66 (citation omitted); *see also Hornbeck Offshore Servs.*, 713 F.3d at 792. "[N]ondisclosure and inconsistency, while justifying scrutiny, are not alone clear and convincing evidence of [a party's] bad faith," "nor [does] suspicion alone justif[y] the invocation of the inherent power." *In re Moore*, 739 F.3d at 730, 733; *see also Hunting Energy Servs. LP v. Inter-Mountain Pipe & Threading Co.*, 242 F. App'x 257, 260 (5th Cir. 2007) (reversing sanction where party's bad faith was "not obvious").

Substantively, bad faith is an "extremely high" standard. *Goldin v. Bartholow*, 166 F.3d 710, 722 (5th Cir. 1999). "The court must find that the very temple of justice has been defiled by the sanctioned party's conduct." *Id.* at 722-23. Accordingly, "mere negligence does not trigger a court's inherent sanctioning power"; there must be a showing of "intended deceit[.]" *Maguire Oil Co. v. City of Houston*, 143 F.3d 205, 211-12 (5th Cir. 1998); *see also CLECO Corp.*, 547 F. App'x at 570 ("Inadvertence is inconsistent with a finding of bad faith."). A sanction based on a misrepresentation requires not only an "incorrect response" but a "willfully false response," and a sanction based on an omission requires "a willful breach of some known duty to act." *Crowe v. Smith*, 151 F.3d 217, 237-38 (5th Cir. 1998) ("*Crowe I*"); *see also Maguire Oil Co.*, 143 F.3d at 212 (party's negligent failure to disclose decision "does not support a finding that it deliberately concealed" the decision, and thus "the district court improperly invoked its inherent sanctioning power"). When viewed as a whole, the record here contains no support for a finding that the Government acted in bad faith, much less does it lead to a "firm belief or conviction"— "without hesitancy"—that there was bad faith. *Crowe II*, 261 F.3d at 565.

**B.    The Significant Factual Material Submitted Today Shows the Government's Good Faith Throughout this Litigation.**

The Government is appending a significant volume of factual material to this submission: ten declarations from current and former Department of Justice attorneys, ranging from career

Trial Attorneys assigned to this matter, to career supervisors within the Federal Programs Branch, to Principal Deputy Assistant Attorney General Benjamin C. Mizer, who is currently the head of the Civil Division and who was Counselor to the Attorney General at the time of the preliminary-injunction proceedings in this case.  *See* Exhs. A-J.

We respectfully submit that, after reading these ten declarations, no factfinder could "come to a clear conviction, without hesitancy," that intentional misconduct occurred.  *Crowe II*, 261 F.3d at 565-66 (citation omitted).  These ten declarations demonstrate that, at all times, the Government sought to provide accurate, complete, and correct information to the Court regarding implementation of the November 2014 Guidance; that at all times the Government attorneys believed they were fulfilling that duty; and that as soon as the Government attorneys realized their prior statements may have created a misimpression, they took immediate steps to inform the Court.  In other words, the Government acted in good faith, even though its statements to the Court were, in hindsight, regrettably imprecise and led the Court astray.

### 1.     The Government Did Not Intend to Mislead the Court.

The Court's May 19 public order concluded that the Government made intentional misrepresentations on four occasions.  As the declarations submitted today reflect, however, there was no intent to mislead or misrepresent facts to the Court during any of those four communications with the Court or at any other time.

This case involved review and oversight by a large number of individuals throughout the Department of Justice, and attorneys at DHS and the White House Counsel's Office.  *See, e.g.*, Exh. C ¶ 33; Exh. E ¶ 5.  None of the ten declarants involved in the Government's defense of this case is aware of any intentional effort within the Government to mislead the Court.  *See* Mizer Decl., ¶ 6; Branda Decl., ¶ 4; Exh. C ¶ 50; Hunt Decl., ¶ 6; Exh. E ¶¶ 6-7; Exh. F ¶ 48; Exh. G ¶ 17; Exh. H ¶ 16; Exh. I

██████ ¶ 22; ████████ ¶ 19.  Indeed, despite the many individuals involved in the

Government's defense in this litigation, nobody raised (prior to ████████ doing so on

February 27, 2015) any concern that any statements or filings might have been incorrect or

incomplete because they did not specifically disclose the ongoing three-year terms.  *See* Mizer

Decl., ¶ 8; Branda Decl., ¶ 5; ████ Exh. C ████ ¶ 33; Hunt Decl., ¶ 5; ███ Exh. E ███ ¶¶ 6-7;

███ Exh. F ███ ¶ 27; ███ Exh. G ███ ¶ 17; ███ Exh. H ███ ¶¶ 14-16; ███ Exh. I ███ ¶ 11; ███ Exh. J ███

████ ¶ 13.  That fact underscores the Government's good faith:  although the Government used

imprecise phrasing that, in hindsight, conveyed inaccurate information to the Court regarding

implementation of the 2014 Guidance, *see* ECF No. 347 at 16, the Government did not

appreciate the possibility that these phrases might lead the Court astray, and no one intended the

phrases to have that effect.  We address each of the four statements the Court identified as

misrepresentations in turn.

The first statement the Court identified as a misrepresentation occurred during the

December 19, 2014 teleconference.  When responding to the Court's questions regarding

scheduling, the career attorney who participated in that exchange, ████████, did not

intentionally withhold information about the change from two-year to three-year terms for those

receiving DACA under the 2012 eligibility criteria.  Rather, ███ understood Plaintiffs and the

Court to be asking about when deferred action would be granted to individuals newly eligible by

virtue of the expanded criteria set forth in the November 2014 Guidance.  *See* ███ Exh. F ███

¶¶ 20-21.  That was reasonable, particularly given the questions' context and content, including

the reference, by Plaintiffs' Counsel, to a new DHS facility for processing applications under the

revised DACA and DAPA eligibility guidelines.  *See id.* ███ did not consciously withhold

information about the three-year terms ████████████████████████████

████████████████████████.  *Id.* ¶¶ 19-22.

Neither of the two attorneys who were in ███████ office during that teleconference ████████████████████████████████████████████████████████████ *See* Exh. C ████ ¶ 32; Exh. E ████████ ¶ 21.  Following the teleconference, a number of the attorneys involved in the Government's defense of this case received a summary of what transpired during the teleconference, and none raised any concern ████████████ had acted improperly by not specifically mentioning the three-year terms.  *See, e.g.*, Exh. C ¶ 50; Exh. F ¶ 22 Exh. E ¶ 22; Branda Decl., ¶¶ 7-8.  In fact, nobody recalls anyone mentioning the three-year terms at all in connection with that teleconference.  *See* Exh. C ¶ 41; Exh. F ¶ 22; Exh. E ¶ 22; Exh. G ¶ 10; Exh. H ¶ 6; Exh. J ¶ 17.

Likewise, in filing the January 14, 2015 extension motion, the Government again intended to provide the Court with what it understood to be the pertinent information—*i.e.*, the date on which DHS would begin accepting applications for deferred action from individuals who would be newly eligible under the 2014 DACA criteria.  *See* Mizer Decl., ¶¶ 7-8; Exh. C ¶ 49; Exh. F ¶ 23; Branda Decl., ¶ 6; Exh. E ¶¶ 23-24; Exh. G ¶ 11; Exh. J ¶ 14.  Nobody intentionally withheld information regarding the three-year terms, ██████████████████████████████████████████ *See, e.g.*, Exh. C ¶ 50; Exh. F ¶ 27; Exh. E ¶¶ 23-24.  Despite the extension motion undergoing extensive review and approval—████████████████████████████████████████████████████ ████████████████████none of the many attorneys at the Department of Justice, DHS, or elsewhere mentioned that the motion could be misleading, incomplete, or incorrect because there was no specific mention of the three-year terms.  *See* Mizer Decl., ¶ 8; Branda Decl., ¶ 6; Exh. C ¶ 33; Exh. F ¶ 23, 26-27; Exh. E ¶¶ 23-24; Exh. G ¶ 11; Exh. J ¶ 13.  Indeed, nobody mentioned the three-year terms at all in connection with

the motion.  *See* ████ Exh. C   ¶ 25; ████ Exh. F   ¶ 27; ████ Exh. E   ¶¶ 23-24; ████ Exh. G ████  ¶ 11; ████ Exh. I   ¶ 10; ████ Exh. J   ¶ 13.

The same is true of the representations made at the preliminary injunction hearing.  As ████████ detailed declaration explains, ███ intended at all times to provide the Court with the information that ███ understood the Court to be asking about—*i.e.*, the dates by which DHS would begin accepting (and then deciding whether to approve) requests under the 2014 DACA eligibility guidelines.  ████ Exh. C   ¶ 26. ████████████████████████████████████████████████████████████ ████  *Id.* ¶ 17.  When the Court asked about the "increase in years," Jan. 15, 2015 Hr'g Tr. at 90-91, ████████ did not understand that question to be referring to the change from two-year terms to three-year terms, and ███ response did not seek to mislead the Court or withhold information from the Court on that issue.  *See* ████ Exh. C   ¶ 17; *see supra* n.4.

Attorneys in the courtroom with ████████████████████ ████████████████████.  *See* ████ Exh. F   ¶¶ 30-31; ████ Exh. I   ¶ 11; ████ Exh. J   ¶ 12.  Following the hearing, no one who had been in the courtroom (including knowledgeable DHS officials), who received reports of the hearing, or who reviewed the transcript of the hearing raised any concern about whether ████████ responses had been fully candid, truthful, or complete.  *See* Mizer Decl., ¶ 8; Branda Decl., ¶ 7; ████ Exh. C   ¶ 29; ████ Exh. F   ¶ 31; ████ Exh. I   ¶ 11; ████ Exh. J   ¶ 12; ████ Exh. E   ¶¶ 27-28; ████ Exh. G ████  ¶ 13; ████ Exh. H   ¶ 7.

To be sure, the Government now recognizes that its understanding of the Court's questions at the hearing was mistaken (and similarly that the phrases used in its written submissions were problematic).  *See* ECF No. 347 at 10 (interpreting the Government's representations as stating "that the Government would not begin to implement the revised DACA

(*which includes the three-year extensions*) until mid-February" (emphasis added)).  We deeply regret this mistake.  *See, e.g.*, Mizer Decl., ¶ 5.  But there was no bad faith or intent to deceive.  Although terms like "revised DACA" are ambiguous, counsel understood that term to refer only to changes in eligibility criteria under the November 2014 Guidance, which is also what they understood to be the subject of the Court's inquiries and the key information that was important to timing.  *See* Exh. C ¶ 27; Exh. F ¶ 30.  The Government's counsel were using shorthand, as they and other Department and DHS attorneys had done throughout the litigation, without appreciating that these phrases could create a misimpression for the Court.  *See, e.g.*, Exh. C ¶ 21; Exh. F ¶ 30; Exh. E ¶ 35.  The Government certainly did not use that phrase with an intent to obscure or conceal any information from the Court.  *See* Exh. C ¶ 43; Exh. F ¶¶ 30-31; Exh. E ¶ 35; Exh. G ¶ 19; Exh. H ¶ 7; Exh. I ¶ 10; Exh. J ¶ 19.

The fourth misrepresentation identified by the Court was in the Government's motion to stay, filed on February 23, 2015.  That motion contained the same sort of ambiguous phrasing as prior representations.  But the Government did not appreciate the ambiguity of that phrasing at the time, and instead understood the motion to contain accurate and complete information.  *See, e.g.*, Exh. C ¶ 23; Exh. F ¶ 35; Exh. E ¶¶ 34-35.  The motion underwent significant review throughout the Government, and at no time did any of the numerous attorneys who reviewed, edited, and approved the motion raise a concern about the accuracy or precision of the representations.  *See* Mizer Decl., ¶ 8; Branda Decl., ¶¶ 6, 8; Exh. C ¶ 33; Exh. F ¶ 37; Exh. I ¶ 5; Exh. J ¶ 6; Exh. E ¶¶ 34-35; Exh. H ¶ 12.  To the contrary, the language used in the motion reflected language that Government lawyers often used among themselves when referring to the implementation dates for the new 2014

DACA eligibility criteria.  *See, e.g.*, [Exh. C] ¶¶ 21-22; [Exh. F] ¶ 37; [Exh. E] ¶¶ 34-35.

It bears emphasis, moreover, that Government lawyers were, throughout this time frame, attempting to digest vast amounts of information received from DHS, evaluate the relevance of those facts to the policies recently announced by DHS, and also prepare their legal filings and arguments, subject to an extensive review process.  *See, e.g.*, [Exh. C] ¶ 37; [Exh. F] ¶¶ 8-10; [Exh. E] ¶¶ 6-7.  In the midst of all that, the Government used phrasing in communications with the Court that—unrecognized by the Government at the time—had the potential to convey, and in fact had the effect of conveying, inaccurate information to the Court. That was our mistake, which we deeply regret.  At the time of the communications with the Court, however, everyone understood themselves (and their colleagues) to be providing the Court with accurate and complete information.  *See* Mizer Decl., ¶ 8; Branda Decl., ¶¶ 4, 6; [Exh. C] ¶ 36; Hunt Decl., ¶ 8; [Exh. E] ¶¶ 6-7; [Exh. F] ¶¶ 26, 30, 38; [Exh. G] ¶ 19; [Exh. H] ¶ 16; [Exh. I] ¶ 22; [Exh. J] ¶ 21.  None of the ten attorneys submitting declarations today is aware of any effort within the Government to attempt to mislead the Court.  *See* Mizer Decl., ¶ 11; Branda Decl., ¶ 4; [Exh. C] ¶ 43; Hunt Decl., ¶ 8; [Exh. E] ¶¶ 6-7; [Exh. F] ¶ 48; [Exh. G] ¶ 17; [Exh. H] ¶¶ 16, 18; [Exh. I] ¶ 22; [Exh. J] ¶ 19.  In sum, the Government did not deliberately or intentionally mislead the Court, much less is there clear and convincing evidence of such an effort.

### 2. The Government's Receipt of Information About the Three-Year Terms Early in the Litigation Does Not Show Bad Faith.

As the various rules of professional responsibility cited in the Court's May 19 order reflect, misconduct occurs only when an attorney "knowingly" makes a false statement to the Court.  *See* ECF No. 347 at 14-18.  Thus, the attorney must *actually know* that the statements

were false at the time they were made. *See* Tex. Disciplinary Rules Prof'l Conduct, Terminology at 7 (stating that the word knowingly "denotes *actual knowledge* of the fact in question" (emphasis added)); ABA, Model Rules of Prof'l Conduct, Rule 1.0(f) Terminology (same definition); *see also* "Duty of Candor," Black's Law Dictionary (10th ed. 2014) ("duty to disclose material facts; esp[ecially], a lawyer's duty not to allow a tribunal to be misled by false statements, either of law or of fact, *that a lawyer knows to be false*" (emphasis added)); *Crowe I*, 151 F.3d at 237. Indeed, the rules make clear that sometimes a lawyer may inadvertently misstate the facts to a court and later learn of the inaccuracy, in which case the lawyer has a duty to correct the earlier misstatement. *See* Tex. Disciplinary Rules Prof'l Conduct, Rule 3.03(b); Model Rules of Prof'l Conduct, Rule 3.3(a)(3).

Here, any misstatement regarding implementation of the November 2014 Guidance was not made knowingly. The attorneys intended their statements to address, and thought they were addressing, only the expanded eligibility criteria; thus, at all times they believed they were providing accurate and complete information to the Court. *See, e.g.,* ██████ Exh. C ██████ ¶ 19; ██ Exh. F ██ ¶ 27; ██████ Exh. E ██████ ¶¶ 6-7. Moreover, the ongoing grants of three-year terms for individuals eligible under the 2012 DACA criteria ████████████████████████ ██████████████████████████████ *See, e.g.,* ██ Exh. C ██ ¶ 19; ██ Exh. F ██ ¶ 18; ██ Exh. E ██ ¶ 18.[5] Indeed, between December 7-8, 2014 and entry of the injunction, there was no discussion at all among the attorneys about the three-year terms. *See* Branda Decl., ¶ 5; ██ Exh. C ██ ¶ 22; ██ Exh. F ██, ¶¶ 17-18; ██ Exh. E ██ ¶¶ 18-19; ██ Exh. G ██ ¶ 30; ██ Exh. I ██ ¶ 8.

---

[5] We thus respectfully disagree with the Court's statement that the Government has "admitted that the lawyers who made these statements had knowledge of the truth *when they made these* misstatements." ECF No. 347 at 2 (emphasis added); *see also* June 7 Hr'g Tr. at 29.

There are numerous reasons why the ongoing three-year terms were not on the attorneys' minds or given further thought during the preliminary injunction proceedings, even by attorneys who at one point knew of the information.  The attorneys were receiving a flood of information, ████████████████████████████████████████████████████ *See supra* at 6-7.  On the evening of Sunday, December 7, for example, it was only days into the case, and ██ ████████████████████████████████████████████████████████ ████████████████████████████████████ *See* ██Exh. C██ ¶ 31; ██Exh. F██ ¶ 17; ██Exh. E██ ¶¶ 15-16; ██Exh. G██ ¶ 9; ██Exh. I██ ¶ 10.  More importantly, throughout the case, attorneys throughout the Government understood the preliminary-injunction proceedings, and Plaintiffs' claims of irreparable harm to support such preliminary relief, as tied to the increased number of individuals eligible for deferred action. ██Exh. C██ ¶ 36; ██Exh. F██ ██ ¶ 27; ██Exh. E██ ¶¶ 15-16; ██Exh. G██ ¶ 9; ██Exh. H██ ¶¶ 4, 12, 14; ██Exh. I██ ██ ¶ 6; ██Exh. J██ ¶ 3; *see* Mizer Decl., ¶ 7.  Significantly, unlike the change from two-year terms to three-year terms for individuals eligible under 2012 DACA (which the Guidance stated was effective on November 24, 2014), the Guidance did not specify the earliest date on which either of the two new eligibility criteria might go into effect, but instead provided only outer deadlines—and thus the ████████████████████████████████████████ ████████████████████████████████████████████ DHS would not implement the expanded eligibility guidelines *before* the outer deadlines set forth in the Guidance.  *See, e.g.*, ██Exh. C██ ¶ 32; ██Exh. F██ ¶¶ 19, 21; ██Exh. E██ ¶ 11; *cf.* Mizer Decl., ¶ 7.

Furthermore, Plaintiffs here did not challenge 2012 DACA.  ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████



*See* ███ Exh. E ███ ¶ 15; ███ Exh. G ███ ¶ 9_; ███ Exh. F ███ ¶ 17. ███████████████████████████ ███████████ *See* ███ Exh. E ███ ¶ 15; ███ Exh. G ███ ¶ 9; ███ Exh. F ███ ¶ 17.

The Government recounts this history not to argue whether the thinking on these issues was correct.  The Government regrets making flawed statements to the Court regarding scheduling, and wishes that its statements during the preliminary-injunction proceedings regarding implementation of the November 2014 Guidance had been more precise.  *See* Mizer Decl., ¶ 5; Branda Decl., ¶ 8; ███ Exh. C ███ ¶ 49; ███ Exh. F ███ ¶ 27; Hunt Decl., ¶ 5; ███ Exh. E ███ ¶¶ 7, 43; ███ Exh. G ███ ¶ 19; ███ Exh. H ███ ¶ 18; ███ Exh. I ███ ¶ 6; ███ Exh. J ███ ¶ 8. The above discussion, instead, is meant to show why the Government did not give significant or long-lasting thought to the three-year terms during the preliminary-injunction proceedings.

███████████████████████████████████████ ███████████████████ the critical fact is that the Government did not appreciate the ambiguous nature of the statements made until February 27 or March 2, 2015.  *See* Mizer Decl., ¶ 8; Branda Decl., ¶ 8; ███ Exh. C ███ ¶ 39; ███ Exh. F ███ ¶ 18; Hunt Decl., ¶ 5; ███ Exh. E ███ ¶ 39; ███ Exh. G ███ ¶ 16; ███ Exh. H ███ ¶ 14; ███ Exh. I ███ ¶ 8; ███ Exh. J ███ ¶ 16.  The attorneys did not knowingly make false or misleading statements to the Court, therefore, because they understood the Government's statements to be accurate, and the issue of the three-year terms was not on their minds at the time of the statements.  *See* ███ Exh. C ███ ¶ 41; ███ Exh. F ███ ¶¶ 21, 29; ███ Exh. E ███ ¶ 7; ███ Exh. G ███ ¶ 19; ███ Exh. H ███ ¶ 9; ███ Exh. I ███ ¶ 7; ███ Exh. J ███ ¶ 9.

### 3. Upon Realizing That Its Statements May Have Created a Misimpression, the Government Took Prompt and Appropriate Remedial Action By Informing the Court.

As the Court's May 19 order reflects, the rules of professional responsibility require attorneys to take remedial measures upon learning of a prior misstatement. *See* ECF No. 347 at 15 & n.9 (quoting Tex. Disciplinary Rules Prof'l Conduct R. 3.03(c)).  Here, that is exactly what the Government did:  it promptly filed the March 3 Advisory, within two business days of realizing the ambiguous nature of its prior statements.

After the Court entered its preliminary injunction on the evening of February 16, 2015, each attorney's individual experience was again somewhat unique.  Some Department attorneys, including those in leadership offices, were directly involved in compliance discussions with DHS.  *See* ▮Exh. C▮ ¶ 37.  The trial team, on the other hand, was consulted only on specific compliance matters, ▮▮▮▮▮, and was focused instead on evaluating next steps in the litigation.  *See, e.g.*, ▮Exh. E▮ ¶ 33.   But again, the critical fact is that, prior to February 27, 2015, no one understood that any of the Government's earlier statements may have conveyed inaccurate or incomplete information.  *See* Mizer Decl., ¶ 8; Branda Decl., ¶¶ 5, 8; ▮Exh. C▮ ¶ 43; ▮Exh. F▮ ¶¶ 26-27, 48; Hunt Decl., ¶ 5; ▮Exh. E▮ ¶ 33; ▮Exh. G▮ ¶¶ 16-17; ▮Exh. H▮ ¶ 14; ▮Exh. I▮ ¶ 22; ▮Exh. J▮ ¶ 21.

It was not until February 27 that ▮▮▮ learned the number of individuals who had received three-year terms prior to entry of the Court's injunction.  That information, in conjunction with the scope of the Court's injunction—prohibiting implementation of "any and all changes" to DACA—is what crystallized the issue for the Government, ▮▮▮▮ who acted quickly to drive the process of drafting and filing the March 3 Advisory in a matter of two business days.  *See* Mizer Decl., ¶ 9; Branda Decl., ¶ 8; ▮Exh. C▮ ¶ 44; ▮Exh. F▮ ¶ 39; Hunt Decl., ¶ 5; ▮Exh. E▮ ¶ 37; ▮Exh. G▮ ¶ 15; ▮Exh. H▮

¶ 14; █Exh. I█ ¶ 8; █Exh. J█ ¶ 6.  To be sure, the Court's injunction made clear that

three-year terms needed to cease, *see, e.g.*, Decl., of León Rodríguez (ECF No. 256-1) ¶ 7, and

████████████████████████████████████████████████████████████████

█████████████, *see, e.g.*, █Exh. C█ ¶ 47; █Exh. E█ ¶ 33; *see supra* at 7-8.

No one realized the Government's prior statements were potentially misleading, however, until

February 27 (and March 2) when the trial team ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ that this information

should be brought to the Court's attention immediately to address any misimpression their prior

statements had created.  █Exh. E█ ¶ 37; *see also* Mizer Decl., ¶¶ 8-9; Branda Decl., ¶ 8;

█Exh. C█ ¶ 39; █Exh. F█ ¶ 41; Hunt Decl., ¶ 5; █Exh. G█ ¶ 16; █Exh. H█

¶ 14; █Exh. I█ ¶ 16; █Exh. J█ ¶ 18.

The Court has questioned why the Department of Justice did not bring this issue to the

Court's attention sooner.  *See* ECF No. 347 at 13; June 7 Hr'g Tr. (ECF No. 366) at 22 ("[W]hy

did the Government wait until there were over a hundred thousand?  Why didn't they come

forward when there was 10,000, or 20,000, or 30,000?").  The declarations submitted today

explain that ████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████ until they learned on February 27, 2015, that the number

was 108,000.  *See, e.g.*, █Exh. C█ ¶ 41; █Exh. F█ ¶ 39; █Exh. E█ ¶ 36.  It was this

information ████████████ on February 27, in combination with the scope of the Court's

injunction, that crystallized the issue for the attorneys.  ████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

Rather, after counsel realized the Government's prior statements could be viewed as incomplete or incorrect, they rushed to draft and file the March 3 Advisory. They achieved that objective in approximately twenty-four hours, despite the substantial amount of review, editing, and approval that was required. *See* ██ Exh. C ██ ¶ 42; ██ Exh. F ██ ¶ 42; Hunt Decl., ¶ 5; ██ Exh. E ██ ¶ 38; ██ Exh. G ██ ¶¶ 15-16; ██ Exh. H ██ ¶ 15; ██ Exh. I ██ ¶ 5; ██ Exh. J ██ ██ ¶¶ 5-6; *see also* n.1, *supra*. In addition, they not only disclosed that DHS had been granting three-year terms of DACA under the 2012 eligibility guidelines, they also specifically noted that prior statements by the Government may have created confusion about whether DHS had in fact begun making three-year grants. This prompt filing demonstrates the Government's intent to comply fully with its ethical and professional responsibility obligations, including the candid identification and correction of any prior misstatements. Such voluntary remedial action confirms the Government's lack of misconduct. *Cf.* Fed. R. Civ. P. 11(c)(2) (precluding sanctions motion "if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days" or time set by court). The March 3 Advisory thus supports the Government attorneys' good faith during this litigation.

### C.   A Finding of Knowing Misrepresentation or Intentional Deceit Cannot Be Supported by This Factual Record.

The ten declarations submitted today are detailed, corroborative, and they amply demonstrate that there was no intentional or conscious effort to mislead the Court.

The statements in question were intended to address only the timing of the expanded eligibility criteria, and none of the Government's attorneys was thinking about the ongoing three-year terms at the time of those statements. Thus, whatever brief awareness they may have had regarding the issuance of three-year terms early in the litigation, they did not have *actual knowledge* of the *statements'* falsity *at the time* of the statements in question. *See Crowe I*, 151 F.3d at 239 (upholding sanctions against attorney because "he knew his answer to be incorrect *at*

35

*the time it was offered*" (emphasis added)); *see also, e.g.*, *United States v. Harrelson*, 705 F.2d 733, 736-37 & n.5 (5th Cir. 1983) (statute required proof that defendant "knowingly made a false statement," which required finding "that the defendant knew the statement was false or fictitious *when made*" (emphasis added)).

The Court's May 19 order reflects understandable frustration that DHS's ongoing issuance of three-year rather than two-year terms was not brought to the Court's and Plaintiffs' attention earlier in the litigation.  But that failure, as discussed above, was inadvertent—and "[i]nadvertence is inconsistent with a finding of bad faith."  *CLECO, Corp.*, 547 F. App'x at 570; *see also, e.g.*, *United States v. Sandlin*, 589 F.3d 749, 753 (5th Cir. 2009) (noting that the burden of proving "whether the false statements were 'knowing and willful' . . . is not met with a showing that [the accused party] 'forgot' to list" the relevant information).  Even if the Court viewed the Government's handling of this particular issue as negligent, which the declarations demonstrate was not the case, that still would not be sufficient for imposing sanctions.  *See Maguire Oil Co.*, 143 F.3d at 211-12 ("[M]ere negligence does not trigger a court's inherent sanctioning power.").

The ten declarations submitted today are detailed, thorough, and specific.  Nothing in those declarations suggests misconduct on the part of the Government or its counsel, much less would enable the fact finder to come to "a clear conviction, without hesitancy," that knowing misrepresentations occurred here.  *Crowe II*, 261 F.3d at 565-66; *see also In re Moore*, 739 F.3d at 730 ("[N]ondisclosure and inconsistency, while justifying scrutiny, are not alone clear and convincing evidence of [a party's] bad faith or willful misconduct.").  Thus, the factual record submitted today does not support a finding of misconduct by any standard, let alone by the clear and convincing evidence threshold the law requires.

### D.  Additional Evidence and Context Confirms that There Is No Basis to Find Misconduct.

To the extent there is any doubt about the Government's good faith in this litigation, the overall context and other considerations demonstrate the absence of intentional misconduct.

#### 1.  The Context of the Statements At Issue Demonstrates Their Intended Scope.

As discussed above and in the submitted declarations, the Government and its counsel now recognize that their prior statements were ambiguous and were responsible for leading the Court astray.  To evaluate the intended meaning of the statements, however, it is necessary to evaluate them in context.  *See Deal v. United States*, 508 U.S. 129, 132 (1993) (noting "this fundamental principle . . . of language itself . . . that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used").  The overall context here demonstrates the Government intended to refer only to the expanded eligibility criteria for DACA as beginning on February 18, not to indicate or imply that the issuance of the three-year terms for individuals already eligible under 2012 DACA would be postponed until February 18.

First, all parties understood that 2012 DACA remained ongoing during the pendency of the preliminary-injunction proceedings.  *See, e.g.*, Court's PI Op. (ECF No. 145) at 5 ("The Complaint in this matter does not include the actions taken by Secretary Napolitano, which have to date formalized the status of approximately 700,000 teenagers and young adults."); *id.* at 9-10.  Thus, individuals eligible under 2012 DACA remained free to submit requests during the preliminary injunction proceedings.[6]

Second, all parties understood that the Government was taking at least some steps toward implementing the November 2014 Guidance during the pendency of the preliminary-injunction

---

[6] The change from two-years to three-years was implemented pursuant to the existing processes for accepting and adjudicating DACA applications.  *See* ▮▮▮Exh. C▮▮▮ ¶ 28.  No new infrastructure within DHS was needed to implement that change, whereas new forms and other new processes were necessary for implementing the expanded eligibility criteria.  *Id.*

proceedings.  Plaintiffs' own preliminary injunction motion highlighted this fact.  *See* ECF No. 5 at 2 (noting that aliens were preparing to submit applications and that "Defendants have announced that they will hire 1,000 new employees for a massive new 'operational center' to process those applications"); *see also* Dec. 19, 2014 Hr'g  Tr. at 11.  And as the Court's preliminary injunction opinion recognized, this was the status quo at the time the lawsuit was filed—that DHS had in fact commenced, and was preparing to commence, certain aspects of the November 2014 Guidance.  *See* Court's PI Op. (ECF No. 145) at 76 ("Thus, the DHS Directive has been in effect and action has been taken pursuant to it since November of 2014.").  Within this context, it is clear that the Government did not intend to represent that *no action* had been or would be taken pursuant to the November 2014 Guidance until February 18, 2015; rather, the Government's statements were more limited.

This context underscores the intent behind the Government's statements.  The statements were made against the backdrop of ongoing acceptance and processing of requests from individuals eligible under 2012 DACA.  Thus, when the Government attorneys made forward-looking statements in these proceedings about when DHS would begin to accept *new* applications *in the future*, the context confirms that those statements were not intended to address applications from individuals *already* eligible, under pre-existing guidelines, who indisputably could submit an application at any time—the intent was to address the individuals *newly eligible* under the November 2014 Guidance who could *not* yet submit applications for deferred action under DACA or DAPA.

This intended scope is demonstrated by each of the Government's statements identified by the Court.  For example, during the January 15, 2015 preliminary injunction hearing, when—after Plaintiffs' counsel stated they were *not* challenging DACA, *see* Jan. 15, 2015 Hr'g Tr.

at 90-91—███████████ attempted to correct the record, and in the process of doing so expressly

clarified how the Government understood the focus of the preliminary injunction proceedings:

> And just to be clear on that last point, the memoranda that -- the memorandum, there's one directive that the plaintiffs are challenging in the complaint, and that both is directed toward the DAPA program, but also is a expansion or revision of the DACA program. So *to the extent that there's a revision or expansion of the group that would be eligible to apply for that*, we do understand the plaintiffs to be challenging that.

*Id.* at 91 (emphasis added).  Later in the hearing, when discussing the Government's request for

an extension of time, ███████████ referenced the first date on which *new applications* would be

accepted: "[W]e reiterated that *no applications . . . would be accepted* until the 18th of February,

and that no action would be taken on any of those applications until March the 4th."  *Id.* at 133;

*see also id.* at 134 (stating that nothing would happen in the next three weeks "[i]n terms of

accepting applications or granting any up or down applications").  Again, given the ongoing

processing and approval of applications from individuals eligible under 2012 DACA, these

statements were intended to confirm the *future* date on which *newly eligible* individuals could

submit applications. That is not to say that ███████████ was consciously excluding the three-year

terms in making these statements—in fact, ████████████████████████████████

████████████. *See* ██ Exh. C ██ ¶ 25; *see also* ██ Exh. F ██ ¶ 30.  Rather, the point is that ██

statements fully square with ██ understanding of the scope of the inquiry, which involved when

new applications would be accepted under the expanded eligibility criteria.

Defendants' other statements throughout this litigation reflect the same limited scope.

On December 19, 2014, Plaintiffs expressed concern about "any curve balls or surprises about,

you know, deferred action documents being issued, you know, tomorrow or on the first of the

year," and noting the new USCIS processing center being established. ███████████ then

responded that "[t]he agency was directed *to begin accepting requests* for deferred action I

believe beginning sometime in -- by mid-February but even after that we wouldn't anticipate *any*

*decisions on those* for some time thereafter." Dec. 19, 2014 Hr'g Tr. at 11 (emphasis added).

Just as Plaintiffs' concern was framed around future issuance of deferred action pursuant to the

new application process, so too was the Government's response.  And the same is true of the

Government's written representations.  *See* Mot. for Extension (ECF No. 90) ¶ 6 (discussing the

future date when DHS would begin "*entertain[ing] requests* for deferred action under the

challenged policy" (emphasis added)); Mot. to Stay (ECF No. 150) at 13 ("The Court issued its

injunction one business day before USCIS *was scheduled to begin accepting* requests for

deferred action under the modified DACA guidelines. USCIS had spent the prior 90 days—the

time period established by the Guidance for implementation—*preparing to receive such*

*requests*." (emphases added)).  These statements were not intended to encompass applications

from individuals eligible under 2012 DACA, as those eligibility criteria were already in effect

and DHS continued to accept applications from those individuals.[7]

　　When viewed in context, therefore, the Government's statements themselves do not

suggest intentional misconduct.  As discussed at the June 7 hearing, the Government now

recognizes that its statements were interpreted to include the change in duration from two years

to three years, *see* June 7 Hr'g Tr. at 34-35, but that was not the intended meaning of the

Government's statements, as confirmed by the overall context.[8]

---

[7] An additional contextual point is relevant to the fourth statement in question, regarding
the motion to stay.  That statement was made in the context of arguing that the Government
would suffer irreparable harm from the preliminary injunction, including because the injunction
altered the status quo.  *See* Mot. to Stay at 12-14.  The fact that the motion did *not* mention the
injunction's effect of halting DHS's practice of issuing three-year terms, and instead relied on
setting back preparatory work, *see id.* at 13-14, further confirms that attorneys were not thinking
about the three-year terms as pertinent to the ongoing preliminary-injunction litigation.  *See*
Exh. E ███ 34; Exh. F ███ ¶ 30; Exh. H ███ ¶¶ 11-12; Exh. I ███ ¶ 6; Exh. J ███
¶ 6.

[8] Thus, the Government has not conceded that its attorneys made misrepresentations,
contrary to the May 19 order.  *Cf.* ECF No. 347 at 2; *see also* ECF No. 345 at 1.

A final contextual point also bears emphasizing:  the shorthand phrases used throughout this litigation.  In any complex litigation involving overlapping, multi-part government policies, the parties often seek to refer to those complex policies using simpler, shorter phrases.  Here, as the declarations submitted today reflect, the Government attempted to use phrases like "revised DACA" or "expanded DACA" as shorthand—to make it easier and more efficient to refer to the governmental policies at issue.  *See, e.g.,* ▮Exh. C▮ ¶ 37; ▮Exh. F▮ ¶ 25; ▮Exh. E▮ ▮ ¶ 35.  These types of shorthand phrases permeated not only the Government's thinking about the case, but were also used by DHS in public announcements regarding the November 2014 Guidance, and by Plaintiffs at subsequent stages in the litigation.  *See* ▮Exh. C▮ ▮ ¶ 40; ▮Exh. F▮ ¶ 37; DHS News Alert, "USCIS to Begin Accepting Requests for Expanded DACA on Feb. 18," *available at* https://www.uscis.gov/news/alerts/uscis-begin-accepting-requests-expanded-daca-feb-18 (last visited July 31, 2016); Brief of State Respondents, *United States v. Texas*, No. 15-674, at 10 (March 2016) (describing the entire November 2014 Guidance as "DAPA").  Thus, all parties recognize the utility of linguistic shorthands.  And while the Government's choice of phrases, in retrospect, was problematic given the phrases' lack of clarity, the use of such phrases is not in any way suggestive of bad faith.

### 2.     The Government's Attorneys Would Not Have Sought to Mislead the Court.

To find intentional misconduct here would require an extraordinary assumption—that the many Government attorneys involved in the defense of this matter thought it appropriate and advantageous for some reason to lie about the implementation of the change from two-year terms to three-year terms for individuals indisputably eligible for deferred action under the unchallenged 2012 DACA policy.  That assumption is neither plausible nor supported by the record.

First and most fundamentally, the team of attorneys responsible for the Government's defense in this case consists of public servants and professionals with widely varying backgrounds, different statuses within the Government (*i.e.*, political appointees and career civil servants), and holding different levels of seniority within the Government.  All of these attorneys have ethical obligations and a duty of candor to the courts.  It is extremely unlikely that somebody could have planned to mislead Plaintiffs or the Court, or tried to improperly withhold or conceal information from Plaintiffs or the Court, without any of the numerous professionals working on the matter raising any concern about it at any time.  *See, e.g.*, Hunt Decl., ¶¶ 7-8. Indeed, the attorneys in the Federal Programs Branch are career civil servants, and are responsible for representing the United States' interests across Administrations.  *Id.*  It is still more unlikely that the professionals working on this case throughout the Department of Justice would risk their careers, reputations, and livelihoods for the purpose of allowing individuals eligible under the 2012 DACA policy to receive three-year terms of deferred action rather than two-year terms, with nothing to gain personally or professionally from such deceit.

Moreover, the effective date for this change was stated on the face of the Guidance itself, was expressly included within one of the Government's own filings in this matter, and was being stated publicly by DHS.  *See* Decl. of Donald W. Neufeld (ECF No. 130-11) ¶ 12 n.3; ECF No. 243 at 13.[9]  It would be extraordinary and self-defeating for the Government to intentionally lie about implementation of the three-year terms in the face of the Guidance, which states the

---

[9] At the June 7 hearing, the Court described the Neufeld declaration's footnote as "repeat[ing] what the Government was going to do" but not "say[ing] it was actively doing it." June 7 Hr'g Tr. at 22.  But the footnote is in the present tense, as is the sentence in the main text to which the footnote is appended; and that main sentence expressly describes the *existing* DACA program.  *See* Neufeld Decl., (ECF No. 130-11) ¶ 12 n.3 ("[A]s of November 24, 2014, all first-time DACA requests and requests for renewals *now receive* a three-year period of deferred action." (emphasis added)); *id.* ¶ 12 ("If granted, the period of deferred action *under the existing DACA program* is—depending on the date of the grant—two or three years." (emphasis added)).

effective date, and while simultaneously submitting filings to the Court disclosing the ongoing implementation of that change.

There is also no reason why the Government would attempt to conceal the three-year terms.   The Court's May 19 order concluded that "[t]he misrepresentations of the Government's attorneys were material and directly caused the Plaintiff States to forgo a valuable legal right to seek more immediate relief," because "[i]f Plaintiffs' counsel had known that the Government was surreptitiously acting, the Plaintiff States could have, and would have according to their representations, sought a temporary restraining order pursuant to Federal Rule of Civil Procedure 65(b) much earlier in the process."  ECF No. 347 at 19.  But Plaintiffs have not said that they would have sought temporary relief; they have only said they "would have *explored* seeking a temporary restraining order to block that implementation of the Directive."  ECF No. 183 at 7 (emphasis added).   Even if Plaintiffs had sought and obtained such relief, it would only have prevented DHS from granting three-year instead of two-year terms of deferred action under the 2012 eligibility guidelines, and only for a matter of weeks until the Court ruled on the preliminary injunction motion.  It is equally implausible that the Government, as litigant, would have attempted so risky and illicit a gambit as deceiving the Court for so little to gain.

That theory is also exceedingly unlikely from the *ex ante* perspective.  In December 2014, the Government attorneys would not have been able to confidently predict that the Plaintiff States and their counsel were unaware of the change to three-year terms.  The effective date of the change was listed on the face of the Guidance, on DHS's website, and was also made public elsewhere.  *See* ECF No. 243 at 13.  That effective date also pre-dated the filing of Plaintiffs' lawsuit—yet Plaintiffs never raised the issue directly with Defendants at any point, and had ample opportunity to bring an emergency motion on this matter prior to the first purported misrepresentation on December 19.  Under these circumstances—when, for all the Government

43

attorneys knew, Plaintiffs were already aware of the ongoing three-year terms—it is exceptionally unlikely that the Government attorneys would collectively seek to conceal the three-year terms from the Court and from Plaintiffs.[10]

Finally, any theory that the Government intentionally sought to conceal the three-year terms from the Court and Plaintiffs is belied by events at the January 15 preliminary injunction hearing.  As discussed above, Plaintiffs' counsel at one point stated that "we are not challenging the DACA program," Jan. 25, 2015 Hr'g Tr. at 91, at which point ███████ interjected to confirm that Plaintiffs were, in fact, challenging certain aspects of DACA.  *See id.*  If the Government attorneys here were truly attempting to hide the three-year terms from the Court, it would have been far simpler for ███████ to remain silent.  Yet ██ instead spoke up and attempted to clarify the issue, specifically flagging for the Court that changes to the eligibility criteria were at issue.  *See id.* at 90-91.  As a matter of both logic and fairness, bad-faith motives cannot be ascribed to ███████ after ██ sought to correct Plaintiffs' own statements and ensure that the Court fully understood the scope of Plaintiffs' challenge.

Simply put, the Government attorneys would not have jeopardized their careers and livelihoods by trying to conceal an open fact from the Court, and the Government itself would not have done so, for no conceivable gain.  Rather, as the record shows, the Government attorneys intended their statements to relate to the expanded eligibility criteria and were not

---

[10] Even now, Plaintiffs have not definitively stated (much less submitted evidence supporting an assertion) that none of the twenty-six Plaintiff States was aware of the ongoing three-year terms.  For example, some of the Plaintiff States (and/or their legal counsel) could have become aware of the three-year terms from the 2014 Deferred Action Guidance itself; from other state officials (*e.g.*, those who were actively granting three-year driver's licenses to DACA recipients), *see* Peters Decl., (ECF No. 64-43) ¶ 8; from one of Plaintiffs' other declarants who asserted detailed knowledge of DACA, *see, e.g.*, Decl., of Kenneth Palinkas (ECF No. 64-42); from filings in this case, *see* ECF No. 243 at 13; or from other publicly available sources, *see id.* at 14 & nn.5-8 (citing, *inter alia*, a Frequently Asked Questions page located on DHS's website). Thus, this record also does not support a conclusion that Plaintiffs were actually misled, much less harmed, by the Government's representations.

thinking about the three year terms at all during their communications.  The Government truly regrets these events, and apologizes for them.  But what happened here was not the product of bad intent.

<div align="center">*      *      *      *</div>

The ten sworn declarations submitted today show that the Government did not commit intentional misconduct.  We fully recognize that we used flawed phrasing, which is unfortunate and regrettable, and—quite understandably—has been exasperating for this Court.  But the imprecision was inadvertent, not the product of an intent to deceive.  We therefore respectfully submit there is no basis for imposing sanctions against any person or entity.

## II.   THE GOVERNMENT DEEPLY REGRETS THIS SITUATION, AND WILL UNDERTAKE ADDITIONAL TRAINING AS A DEMONSTRATION OF ITS COMMITMENT TO HIGH STANDARDS OF PROFESSIONALISM.

Notwithstanding the Government's unequivocal position that no misconduct occurred, the Department of Justice recognizes the critical importance of avoiding even the possibility of losing the Judiciary's trust and faith in Department attorneys.  For that reason, and "in order to both demonstrate and further the Department's and the Civil Division's commitment to the highest standards expected of us and our utmost regard for the trust extended to the Department by this and other federal courts," the Civil Division has decided to create an additional, mandatory training program this year for all Division attorneys.  Mizer Decl., ¶ 12.

At the outset, we wish to apologize to the Court—not only for using ambiguous language during the preliminary-injunction proceedings, but also for the frustration and dissatisfaction that undoubtedly has accompanied these proceedings.  The declarations submitted today reflect this contrition, in particular the declaration of Principal Deputy Assistant Attorney General Mizer, who apologizes on behalf of the Civil Division and the Department of Justice as a whole.  *See*

Mizer Decl., ¶ 12; *see also* Branda Decl., ¶ 9.  These apologies are offered to demonstrate the Government's complete appreciation for the seriousness and gravity of these proceedings.

Second, in recognition of that gravity and the need to ensure that all courts have the utmost trust in the Department of Justice's integrity, Principal Deputy Assistant Attorney General Mizer has determined that all attorneys within the Civil Division will undertake an additional training program within the next 90 days.  As discussed in the Government's motion to stay, Civil Division attorneys are already required to undergo annual ethics and professionalism training.  *See* ECF No. 354-1 at 6-7; Mizer Decl., ¶ 13.  As Principal Deputy Assistant Attorney General Mizer observed, "this case illustrates the challenge that attorneys in the Civil Division sometimes face in ensuring clear communications to courts about complex factual and legal issues in high-pressure situations," in light of which he has chosen to supplement these training requirements for all Civil Division attorneys.  Mizer Decl., ¶ 12.  The additional training will be one hour long, and will be designed and led by an outside expert in professional responsibility and legal ethics.  *Id.*

This additional, mandatory training is intended "to affirm our steadfast commitment to our solemn obligations to all tribunals," *id.* ¶ 14, and will be required regardless of how the Court rules in this matter.  Accordingly, the Government sincerely hopes that this significant measure will not only demonstrate the Department's good faith generally, but also make evident that no sanctions are necessary in this matter.

III.    **AN APPROPRIATE RANGE OF SANCTIONS IF, CONTRARY TO THE RECORD, THE COURT WERE TO FIND INTENTIONAL MISREPRESENTATIONS.**

In addition to providing the Government an opportunity to submit additional evidence regarding the conclusions reached in the Court's May 19 Memorandum Opinion and Order—an opportunity which the Government sincerely appreciates—the Court also solicited the

Government's input as to what sanctions it could and should impose if it continued to find, notwithstanding additional evidence the Government might submit, that "misrepresentations [had been] made in court."  June 7 Hr'g Tr. at 52, 53.

Respectfully, we reiterate that absent clear and convincing evidence that *intentional* misrepresentations were made, there is neither need nor authority to impose inherent-power sanctions, which must be predicated on the presence of bad faith.  *See supra* at 22-23.  We believe that the record demonstrates beyond doubt the *absence* of any intent to mislead or conceal information from the Court.[11]  Nevertheless, we attempt below to offer the Court the additional guidance it has solicited regarding sanctions that appropriately may be imposed (in lieu of those ordered by the Court on May 19).

A court's inherent sanction power "must be exercised with restraint and discretion." *Hornbeck Offshore Servs.* , 713 F.3d at 792 (quoting *Roadway Express*, 447 U.S. at 764).  Resort to this power in any given circumstance must be "based on the need to control court proceeding[s] and [the] necessity of protecting the exercise of judicial authority in connection with those proceedings."  *In re FEMA Trailer Formaldehyde Prods. Liab.*, 401 F. App'x 877, 882 (5th Cir. 2010) (citation omitted); *Crowe I*, 151 F.3d at 240 .  Accordingly, it "may be exercised only if essential to preserve the authority of the court."  *Union Pump Co. v. Centrifugal Tech., Inc.*, 404 F. App'x 899, 905 (5th Cir. 2010) (citation omitted) *FEMA Trailer*, 401 F. App'x at 883 (same); *Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 619 F.3d 458, 460 (5th Cir. 2010) (same).

---

[11] The Court concluded that the Government's January 14, 2015, motion for an extension of time to file a sur-reply, and its February 23, 2015, motion for a stay of the Court's preliminary injunction pending appeal, both violated Federal Rule of Civil Procedure 11(b) because counsel "knowingly made representations" therein regarding implementation of the November 2014 Guidance "that they knew were not true."  We respectfully submit, again, that the evidence before the Court is decisively to the contrary, and that it supports counsel's good-faith belief that the representations made in these filings were well-founded.  Thus, sanctions under Rule 11 are also foreclosed.  *See Maxxam*, 523 F.3d at 581.

In accordance with the fundamental principles of necessity and restraint that govern exercise of the inherent power, the Fifth Circuit repeatedly has required use of "the least onerous sanction which will address the offensive conduct." *Gonzalez v. Trinity Marine Group, Inc.*, 117 F.3d 894, 899 (5th Cir. 1997); *see also Crowe*, 151 F.3d at 240 (a district court must determine "that the particular sanctions [imposed] are necessary to effectuate the[ ] important goals [of the inherent power] as to the particular defendants under its particular theory"); *cf. In re Whitley*, 737 F.3d 980, 988 (5th Cir. 2013) (a sanction must be "chosen to employ the least possible power to the end proposed") (bankruptcy context).  As the Court of Appeals stated in *Natural Gas Pipeline Co. of America v. Energy Gathering Inc.*, 86 F.3d 464, 467 (5th Cir. 1996):

> [Inherent sanction] powers may be exercised only if essential to preserve the authority of the court, and the sanction chosen must employ the least possible power adequate to the end proposed.  If there is a reasonable probability that a lesser sanction will have the desired effect, the court must try the less restrictive measure first.

We submit that these principles of restraint call upon the Court to consider first the extent to which these proceedings have already succeeded in vindicating its authority.  The Court has powerfully and publicly rebuked the Department of Justice and its attorneys, on multiple occasions, for intentional misrepresentations it has found (and unequivocally condemned) in this matter.  *See, e.g.,* May 19 Mem. Op. & Order at 3, 6-13 & n.8; April 7, 2015 Order at 6-8; June 7 Hr'g Tr. at 16-17, 21-22, 33-37.  The accompanying submissions manifest the gravity with which the Department and its attorneys take the concerns expressed and the conclusions reached in the Court's May 19 decision.  Mizer Decl., ¶ 4; Branda Decl., ¶ 9; ▮Exh. C▮ ¶¶ 49-50; Hunt Decl., ¶ 12; ▮Exh. E▮ ¶ 43; ▮Exh. F▮ ¶ 44; ▮Exh. G▮ ¶ 19; ▮Exh. H▮ ¶ 18; ▮Exh. I▮ ¶22; ▮Exh. J▮ ¶ 21.  The Civil Division is requiring supplemental training for its attorneys this year, as described above, to demonstrate the depth of its concern over this Court's perception that the Department has not met its obligations to the Court.  Mizer Decl., ¶¶ 10-12.


████ Exh. C   ¶ 5; ████ Exh. F   ¶ 45.

Thus, the Court's public denouncements of the Government's actions, *see, e.g.,* Order dated April 7, 2015 (ECF No. 226), have already had the "corrective effect" desired and provided "motivation … to act more appropriately in the future."  May 19 Mem. Op. & Order at 21.  We submit, accordingly, that the steps the Court has taken already have achieved the goals that the exercise of the Court's inherent sanction power is meant to promote.  At most further reiteration of the admonishments the Court has already issued (following vacatur of the May 19 orders) would be sufficient.

If the Court concluded that more is required, it could also choose to monitor completion of the Civil Division's supplemental training requirement.  For example, it would have discretion (whether as a sanction or otherwise) to direct that an appropriate Department of Justice official certify, within 120 days, whether the training ordered by Principal Deputy Assistant Attorney General Mizer has been completed.[12]

In addition, under Fifth Circuit precedent, the Court has authority to require the Department of Justice to compensate the Plaintiff States for their reasonable attorneys' fees and other costs incurred as a result of any intentional misrepresentations ultimately found by the Court. The fees could be measured, for example, by the time counsel devoted to Plaintiffs' Opposed Motion for Early Discovery (ECF No. 183) following Defendants' March 3, 2015, Advisory, together with the time Plaintiffs' counsel invested in the parties' meet-and-confer process

---

[12] We have already explained our position that an order compelling the Department to implement a prescribed program of supplemental legal ethics training, in contrast to the training that the Civil Division will conduct voluntarily, cannot be considered an appropriate exercise of the Court's inherent authority.  *See* Mem. in Support of Defs.' Mot. to Stay May 19, 2016 Order Pending Further Review, dated May 31, 2016 (ECF No. 354-1) at 5-7.

addressing the 108,000 three-year terms of deferred action granted before the Court's injunction. Although the Government's position is that sovereign immunity bars exercise of a court's inherent power to impose monetary sanctions against the United States or its agencies, *see, e.g., United States v. Horn*, 29 F.3d 754, 763-64 (1st Cir. 1994), we recognize that the Fifth Circuit has held otherwise. *See Maxxam*, 523 F.3d at 595-96. We acknowledge the Court's concern that the taxpayers of the Plaintiff States would "foot the bill" for any monetary sanction the Court might award. May 19 Mem. Op. & Order at 19. But we submit that would not be the case if the Government were directed to pay attorneys' fees and costs to the Plaintiff States. Because these expenses would be shifted from one sovereign to the others, the taxpayers in the Plaintiff States would not suffer financial harm.

In all events, whatever the Court determines regarding the Government's conduct in this case, we submit that the imposition of sanctions against individual attorneys would be unnecessary and inappropriate. As the record makes clear, each oral and written submission at issue in this matter was the product of a group effort by a large number of attorneys working in various offices throughout the Department of Justice and elsewhere. Each submission and statement reflected the Government's views about the issues of importance during the preliminary-injunction proceedings, and the information the Government needed to provide to the Court and Plaintiffs as a result. To the extent the Court determines to impose a sanction, therefore, the proper subject would be the Federal Government (or the Department of Justice) as an entity—not any individuals.

Finally, for the reasons previously discussed throughout these proceedings, we respectfully submit that ordering remedial action with respect to the approximately 108,000 three-year terms of deferred action granted by DHS under the unchallenged 2012 DACA eligibility guidelines (to individuals who, in this respect, have committed no wrong) would be

unwarranted.  Plaintiffs have not demonstrated any harm stemming from the three-year (as

opposed to renewable two-year) terms of deferred action.  *See* ECF No. 347 at 23 (providing that

personally identifying information related to these individuals would be disclosed only *after* a

Plaintiff State makes "a showing of good cause (such as a showing by a state of actual or

imminent damage that could be minimized or prevented by release of the information to one of

the Plaintiff States)"); Defs.' Mem. of Sept. 4, 2015 (ECF No. 305) at 5-13 (explaining why a

remedial order directed at the three-year terms is not warranted, and would harm thousands of

third parties).  The Court could consider further proceedings on this issue, to provide each

Plaintiff State with an opportunity to demonstrate harm from the three-year terms, in which case

the parties (including the Intervenors) could submit briefing on an appropriately tailored

remedy.  Any broader order, however—including to release personally identifying information

absent a prior showing of harm—would not be supported by the current record.

## **<u>CONCLUSION</u>**

For the foregoing reasons, and based on the record now before it, the Court should vacate

both the public and the sealed orders issued on May 19, 2016, *see* ECF Nos. 347 and 348,

conclude that no misconduct occurred, and bring these proceedings to a close.

Dated: July 31, 2016

Respectfully submitted,

KENNETH MAGIDSON
United States Attorney

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

DANIEL DAVID HU
Assistant United States Attorney
Chief, Civil Division

JOYCE R. BRANDA
Deputy Assistant Attorney General

AUGUST E. FLENTJE
Special Counsel

JENNIFER D. RICKETTS
Director, Federal Programs Branch
Attorney-in-Charge (VA Bar No. 29281)

JAMES J. GILLIGAN
Special Litigation Counsel

 */s/  Daniel Schwei*                                    
DANIEL SCHWEI
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883
Washington, D.C. 20044
Tel.: (202) 305-8693
Fax: (202) 616-8470
Daniel.S.Schwei@usdoj.gov

*Counsel for Defendants*