**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | |
| *Plaintiffs*, | |
| v. | No.: 1:14-CV-00254-ASH |
| UNITED STATES OF AMERICA, *et al.*, | |
| *Defendants*. | |

**[PROPOSED] BRIEF OF ANGELICA VILLALOBOS, JUAN ESCALANTE, JANE DOE
#4 & JANE DOE #5 AS *AMICI CURAE* OPPOSING CERTAIN SANCTIONS
CONTEMPLATED BY THE COURT'S MAY 19 ORDER**

## TABLE OF CONTENTS

**Page No(s)**

TABLE OF AUTHORITIES ........................................................................................ iii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ............................... 1

STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT ............................. 2

SUMMARY OF THE ARGUMENT ........................................................................... 3

I.   ABSENT A FINDING OF CONTEMPT, THE COURT LACKS INHERENT
     AUTHORITY TO IMPOSE A SANCTION PRIMARILY INTENDED TO
     COMPENSATE ............................................................................................ 5

II.  THE SANCTIONS ORDER IS FORECLOSED BY CLOSELY ANALOGOUS FIFTH
     CIRCUIT PRECEDENT ................................................................................ 10

III. IN ANY EVENT, *AMICI*'S CONSTITUTIONALLY PROTECTED PRIVACY
     INTERESTS OUTWEIGHS ANY INTEREST PLAINTIFFS MIGHT DEMONSTRATE
     .................................................................................................................... 14

CONCLUSION .................................................................................................... 19

# TABLE OF AUTHORITIES

**Page No(s)**

**Cases**

*ACLU of Mississippi, Inc. v. State of Miss.*, 911 F.2d 1066 (5th Cir. 1990) ................ 3, 5, 14, 18

*Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574 (5th Cir. 2000) ......................................... 8

*Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053  (9th Cir. 2014) ........................................ 17

*Arizona Dream Act Coal. v. Brewer*, 818 F.3d 901  (9th Cir. 2016) ......................................... 17

*Arizona v. United States*, 132 S. Ct. 2492 (2012) ......................................................... 17

*Buffington v. Baltimore Cty., Md.*, 913 F.2d 113 (4th Cir. 1990) .................................................. 9

*Carroll v. Jaques*, 926 F. Supp. 1282 (E.D. Tex. 1996) ............................................................ 4, 7

*Carroll v. Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290 (5th Cir. 1997) ................................ 4

*Chambers v. Nasco, Inc.*, 501 U.S. 32 (1991) ...................................................... passim

*Conner v. Travis County*, 209 F.3d 794 (5th Cir. 2000) ............................................................ 5, 7

*Doe v. Hobson*, 17 F. Supp. 3d 1141 (M.D. Ala. 2014) ............................................................ 17

*Fadjo v. Coon*, 633 F.2d 1172 (5th Cir. 1981) .................................................... 14, 15

*FDIC v. Maxxam, Inc.*, 523 F.3d 566 (5th Cir. 2008) ............................................................ 3, 6

*Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105 (3d Cir. 1987) ... 19

*In re First City Bancorporation of Tex.*, 282 F.3d 864 (5th Cir. 2002) ................................. 3, 6, 10

*In re Moore*, 739 F.3d 724 (5th Cir. 2014) ................................................................ 2

*Link v. Wabash R. Co.*, 370 U.S. 626 (1962) ...................................................... 6

*Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282 (5th Cir. 2002) ..................................... 5

*Mark Indus., Ltd. v. Sea Captain's Choice, Inc.*, 50 F.3d 730 (9th Cir. 1995) .............................. 8

*Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332 (11th Cir. 2002) ................... 8

*Michael v. Boutwell*, 138 F. Supp. 3d 761 (N.D. Miss. 2015) ....................................................... 8

*NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696 (5th Cir. 1990)...................... 6

*Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.* ["*Nat. Gas Pipeline I*"], 2 F.3d 1397 (5th Cir. 1993). ....................................................................................................4, 6, 7, 9, 10-14

*Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.* ["*Nat. Gas Pipeline II*"], 86 F.3d 464 (5th Cir. 1996).................................................................................... 3, 4, 6, 7, 13

*Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.* ["*Nat. Gas Pipeline III*"], 99 F.3d 1134, 1996 WL 595606 (5th Cir. 1996) ...................................................................... 13

*Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873 (D.C. Cir. 1989).......... 15, 16, 17

*Newby v. Enron*, 302 F.3d 295 (5th Cir. 2002).................................................................. 3, 4, 6, 7

*Plante v. Gonzalez*, 575 F.2d 1119 (5th Cir. 1978) ................................................................. 14

*Positive Software Sols., Inc. v. New Century Mortgage Corp.*, 619 F.3d 458 (5th Cir. 2010)....... 6

*Sherman v. U.S. Dep't of Army*, 244 F.3d 357 (5th Cir. 2001).................................. 11, 14, 15, 16

*Tomblin v. Trevino*, No. SA01CA1160-OG, 2003 WL 24125145 (W.D. Tex. Feb. 19, 2003).... 15

*Toon v. Wackenhut Corr. Corp.*, 250 F.3d 950 (5th Cir. 2001)................................................... 6

*Tucson Woman's Clinic v. Eden*, 379 F.3d 531 (9th Cir. 2004).................................................. 19

*U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487 (1994) ................... 11, 14, 16, 18

*United States v. Horn*, 29 F.3d 754 (1st Cir. 1994) .................................................................. 10

*Williamson v. Recovery Ltd. P'ship*, __ F.3d __, 2016 WL 3209497 (6th Cir. June 10, 2016) ..... 8

*Young Again Products, Inc. v. Acord*, No. MISC. H-09-0282, 2014 WL 1600613 (S.D. Tex. Apr. 21, 2014) .......................................................................................................... 8

## Other Authorities

Department of Homeland Security, Privacy Policy Guidance Memorandum, *available at* https://www.dhs.gov/sites/default/files/publications/privacy-policy-guidancememorandum-2007-01.pdf (Jan. 7, 2009)................................................................................... 15

Gregory P. Joseph, Sanctions: The Federal Law of Litigation Abuses
§ 28 (4th ed. 2008)............................................................................................................ 7, 9

U.S. Citizenship & Immigration Serv., Form I821-D Instructions, available at
https://www.uscis.gov/sites/default/files/files/form/i-821dinstr.pdf (June 4, 2014) ............... 15

**Rules**

Fed. R. Civ. P. 11 ................................................................................................................ 5, 8

Fed. R. Civ. P. 26 ................................................................................................................... 5

*Amici Curiae*, four young immigrants who have received three-year terms of deferred action, respectfully submit this brief opposing one aspect of the Court's order of May 19, 2016. That order poses a serious threat of the broad disclosure of *Amici*'s sensitive personal information, placing them at risk of identity theft, fraud, discrimination, harassment, and stigma.  As set forth below, this aspect of the order exceeds the Court's inherent sanctions authority under controlling Fifth Circuit precedents and violates the constitutionally protected privacy rights of *Amici* and tens of thousands of similarly situated individuals who are not and have never been parties to this litigation.  *Amici* respectfully submit that this aspect of the Court's order cannot stand.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

On May 19, 2016, this Court entered an order requiring the federal government, as a sanction for what the Court concluded were intentional misrepresentations by Department of Justice attorneys, to compile and produce the personally identifying information of individuals residing in any of the twenty-six Plaintiff States who received a three-year term of deferred action between November 20, 2014 and March 3, 2015.  Mem. Op. & Order (hereinafter, "Sanctions Order"), ECF No. 347, at 22-23.  The information would be provided to the Court under seal, for possible further production to Plaintiffs at a later date.  *Id.* at 23.   Approximately 50,000 individuals, including the four *Amici Curiae*—Angelica Villalobos, Juan Escalante, Jane Doe #4 and Jane Doe #5 ("*Amici*")—fit the aforementioned criteria.  *See* Joint Status Report of July 31, 2015, ECF 285-4, at 7-9.   None of those individuals are or ever have been parties to this case. *Amici* all applied for deferred action, and for the renewal thereof, pursuant to the 2012 DACA

program—which is not and has never been at issue in this case—and did so before the 2014 expansion of DACA was even announced.[1]

On June 7, the Court granted the federal government defendants' motion to stay the Sanctions Order pending an in-person status conference currently scheduled for August 31, 2016.[2] *Amici* submit this brief to explain why, even in the event that the Court finds by clear and convincing evidence that counsel for the federal defendants committed misconduct by intentionally misleading the Court and/or the Plaintiffs, requiring the federal government to compile and produce the personal information of DACA recipients is not an appropriate sanction for the alleged misconduct.[3]

## STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

*Amici* offer this brief to address only one of the issues before the Court: whether that part of the Sanctions Order requiring the federal government to compile and produce a list of the personally identifying information of *Amici* and other non-parties is an appropriate exercise of this Court's inherent authority to sanction misconduct of attorneys before it.  Assuming *arguendo* that misconduct has occurred, *see In re Moore*, 739 F.3d 724, 729-30 (5th Cir. 2014) ("A decision to

---

[1] The same is true of the vast majority of the individuals whose information the Sanctions Order requires the federal government to produce to the Court.  *See* Tr. of H'ring on Mar. 19, 2015, ECF No. 203, at 39 ("Of the 108,081 three year grants that occurred during this time period, 94,681 were applications that were submitted prior to the November 20th memo."); Defs.' Opp'n to Pls.' Mot. for Early Discovery, ECF No. 207, at 3 n.1 (same).

[2] *See* Order dated June 7, 2016, ECF No. 364 (granting stay "pending the outcome" of a hearing scheduled therein for August 22, 2016); Order dated Aug. 5, 2016, ECF No. 390 (resetting status conference to August 31, 2016).

[3] *Amici*, as non-parties who did not participate in this litigation prior to the Sanctions Order, take no position on the other contested issues related to the Sanctions Order, including but not limited to the appropriateness of the other sanctions imposed therein; whether counsel for the federal government committed misconduct; and whether the federal government defendants have been afforded due process.

invoke the inherent power to sanction requires a finding of 'bad faith or willful abuse of the judicial process'" (citation omitted)), any sanction imposed under the court's inherent authority must be tailored to—and is limited by—the court's need to control the litigation before it, *see, e.g.*, *FDIC v. Maxxam, Inc.*, 523 F.3d 566, 590-91 (5th Cir. 2008); *Newby v. Enron*, 302 F.3d 295, 302 (5th Cir. 2002). "[T]he sanction chosen," moreover, "must employ 'the least possible power adequate to the end proposed.'" *Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.* ["*Nat. Gas Pipeline II*"], 86 F.3d 464, 467 (1996) (citation omitted). "In other words, the sanctioning court must use the least restrictive sanction necessary to deter the inappropriate behavior." *In re First City Bancorporation of Tex.*, 282 F.3d 864, 867 (5th Cir. 2002). Moreover, the Constitution requires that a court order requiring disclosure of sensitive personal information is permissible only if a legitimate state interest "outweigh[s] the threat" to privacy interests. *ACLU of Mississippi, Inc. v. State of Miss.*, 911 F.2d 1066, 1070 (5th Cir. 1990) (internal quotation marks omitted).

## SUMMARY OF THE ARGUMENT

For a number of reasons, ordering the federal government to compile and produce the personally identifying information of tens of thousands of non-parties, including *Amici*, even under seal, is not an appropriate sanction under controlling cases that set the parameters on district courts' inherent authority to impose sanctions. *Amici* submit this brief to highlight three such reasons that have not yet been addressed by the parties, at least in the public filings.

First, the Court stated that the purpose of the sanction is to offer Plaintiffs a possible avenue for seeking compensatory relief sometime in the future. Sanctions Order at 22-23, 27. But compensation is not a proper objective for sanctions ordered under the district court's inherent authority. To the contrary, any sanction short of contempt that is imposed under a court's inherent authority must be directed at, and limited to, the need to ensure that the court can carry out its

constitutional function of deciding cases before it in an orderly fashion by deterring further misconduct. *See Chambers v. Nasco, Inc.*, 501 U.S. 32, 43-46 (1991); *Newby v. Enron*, 302 F.3d 295, 302 (5th Cir. 2002); *Nat. Gas Pipeline II*, 86 F.3d at 467. If such a sanction provides some compensation to a party who has been damaged by misconduct, the compensatory aspect of such a sanction must be incidental to its primary purpose of punishing misconduct to deter its recurrence. *See Chambers*, 501 U.S. at 46, 53; *see also, e.g.*, *Carroll v. Jaques*, 926 F. Supp. 1282, 1291 (E.D. Tex. 1996) ("Inherent power sanctions are essentially punitive, designed to penalize bad faith abuses of the litigation process. . . . [T]heir compensatory aspect is only incidental." (citation and quotation marks omitted)), *aff'd sub nom. Carroll v. Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290 (5th Cir. 1997)). Here, however, the compensatory purpose is paramount, and any deterrent effect is negligible or non-existent.

Second, requiring the federal government to produce the highly sensitive personal information, even under seal, of some 50,000 private individuals—none of whom has ever been a party to or witness in this case, much less committed any misconduct in this litigation, either directly or through counsel—cannot be reconciled with controlling precedent requiring courts to exercise their inherent authorities with restraint and discretion. Significantly, the Fifth Circuit has squarely held that a district court abused its discretion when it ordered an attorney before it to produce his tax returns as a civil contempt sanction, notwithstanding the clear and convincing evidence that said attorney had engaged in bad faith misconduct warranting contempt sanctions. *Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.* ["*Nat. Gas Pipeline I*"], 2 F.3d 1397, 1411-12 (5th Cir. 1993). In light of that precedent, there can be no doubt that the Court erred in ordering the federal government, as a sanction for *its* alleged misconduct, to produce information at least as sensitive relating to tens of thousands of innocent third parties who are not even before this Court.

Third, even if the Court could properly issue this kind of sanction in appropriate circumstances, it is constitutionally impermissible in this case. Fifth Circuit precedent requires the court to weigh constitutional privacy interests in the protection of sensitive personal information against state interests in disclosure. *ACLU of Mississippi*, 911 F.2d at 1070. *Amici* and the 50,000 similarly situated private individuals have robust privacy interests in the nondisclosure of the extensive personal information they submitted to the federal government in the course of their DACA applications, and the disclosure of even a limited subset of that information could expose them to serious dangers, including identity theft, fraud, discrimination, harassment, and stigma. Plaintiffs, by contrast, have established no legitimate interest in *Amici*'s personal information, and any interest they might in the future assert and prove would be outweighed by the substantial privacy rights of tens of thousands of innocent non-parties. The Court's sanctions order is therefore unconstitutional.

## I. ABSENT A FINDING OF CONTEMPT, THE COURT LACKS INHERENT AUTHORITY TO IMPOSE A SANCTION PRIMARILY INTENDED TO COMPENSATE

Federal district courts unquestionably possess inherent authority to sanction litigants and attorneys before them under appropriate circumstances, and to do so, as here, without resort to contempt proceedings. *See generally Chambers v. Nasco, Inc.*, 501 U.S. 32 (1991).[4] "The purpose of a court's sanctioning power is to enable it to ensure its own proper functioning." *Conner v.*

---

[4] The Sanctions Order twice references the Court's inherent authority. Sanctions Order at 20. And, indeed, there is no other source of sanctions power that would authorize the Order. Invocation of the civil contempt power, for example, would require a violation of a court order, *see Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 291 (5th Cir. 2002), and here there was none. Likewise, the vast majority of Rules authorizing sanctions are plainly inapplicable here. *See, e.g.*, Fed. R. Civ. P. 26(g)(3) (addressing discovery disclosures). The Court did invoke Rule 11, Sanctions Order at 12 n.8, but only as to some of the alleged misconduct, as Rule 11 by its terms applies only to written filings, *see* Fed. R. Civ. P. 11. Like inherent authority sanctions, moreover, those imposed under Rule 11 must serve a deterrent purpose. *See* note 10, *infra*.

*Travis County*, 209 F.3d 794, 800 (5th Cir. 2000) (citing *Chambers*, 501 U.S. at 43).  This authority is "vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'"  *Chambers*, 501 U.S. at 43 (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962) (internal quotations marks omitted)).

But due to the potential for abuse, and because it is "shielded from direct democratic controls," *Nat. Gas Pipeline I*, 2 F.3d at 1409 (citation and quotation marks omitted), the inherent authority of courts to sanction misconduct "is limited and interpreted narrowly." *Newby*, 302 F.3d at 302 (footnote omitted).[5]  The most important such limit is that a court's inherent authority to sanction can be no broader than the need that gave rise to its use in the first place.  As the Fifth Circuit has explained in an oft-quoted passage: "To the extent that inherent power is seen as a product of necessity, it contains its own limits.  It is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." *Maxxam*, 523 F.3d at 590-91 (quoting *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 703 (5th Cir. 1990), *aff'd sub nom. Chambers*, 501 U.S. 32).  Any number of other cases have reiterated the same basic principle,[6] as well as its corollary, that courts must impose the lightest sanction necessary to deter the misconduct from recurring.[7]  "In short, the

---

[5] *See also Toon v. Wackenhut Corr. Corp.*, 250 F.3d 950, 952 (5th Cir. 2001) ("Because of the potency of inherent powers and the limited control of their exercise, however, they must be used with great restraint and caution.  The threshold for the use of the inherent power [to impose] sanction[s] is high." (citation and quotation marks omitted, alterations in original)).

[6] *See, e.g.*, *Positive Software Sols., Inc. v. New Century Mortgage Corp.*, 619 F.3d 458, 460 (5th Cir. 2010); *Nat. Gas Pipeline II*, 86 F.3d at 467 ("Such [inherent] powers may be exercised only if essential to preserve the authority of the court . . . .").

[7] *See, e.g.*, *In re First City Bancorporation of Tex.*, 282 F.3d at 867 ("Sanctions must be chosen to employ 'the least possible power to the end proposed.'  In other words, the sanctioning court must use the least restrictive sanction necessary to deter the inappropriate behavior." (citation omitted); *Toon*, 250 F.3d at 952-53 ("Furthermore, '[i]f there is a reasonable probability that a lesser sanction

inherent power springs from the well of necessity, and sparingly so." *Nat. Gas Pipeline I*, 2 F.3d at 1412.

When the Court ordered the federal government to compile and produce the personally identifying information of "each of the individuals in each of the Plaintiff States given benefits (and whose benefits have not been withdrawn) under the 2014 DHS Directive," Sanctions Order at 22-23, it imposed a sanction that is far afield from the types normally imposed in like circumstances,[8] and wholly untethered to any need for the Court "to ensure its own proper functioning." *Conner*, 209 F.3d at 800. Instead, as the Court itself explained, this sanction is intended to compensate Plaintiffs for potential damage caused by their reliance on the federal government's alleged misrepresentations. *See* Sanctions Order at 22-23, 27.

However, inherent authority sanctions short of contempt are only warranted by a court's demonstrated need to protect its own ability to function as a court; accordingly, where, as here, the sanction is imposed without reference to that purpose, it cannot be sustained, even if it might serve some other, even laudable purpose. *See, e.g.*, *Newby*, 302 F.3d at 302 ("The inherent power['s] . . . reach is limited by its ultimate source—the court's need to orderly and expeditiously perform its duties." (footnote omitted)); *Carroll*, 926 F. Supp. at 1292 ("Congruent with the principle that a court's inherent power originates from the necessity of effectively disposing of cases, vindicating judicial authority requires a court to fashion a sanction that deters future misconduct . . . .").

To be sure, there are times when a sanction works to compensate an opposing party, but that compensatory aspect is purely incidental. *See Chambers*, 501 U.S. at 46, 53-54 & n.15. In

---

will have the desired effect, the court must try the less restrictive measure first.'" (citation omitted, alteration in original)); *Nat. Gas Pipeline II*, 86 F.3d at 467.

[8] *See* Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuses* § 28 (4th ed. 2008) (listing types of sanctions short of contempt imposed under courts' inherent authority).

other words, an inherent authority sanction can have an incidental compensatory aspect, but—in contrast to civil contempt sanctions, which can be purely remedial[9]—the appropriateness of the sanction is measured solely by what is necessary to deter future misconduct.[10]  *See id.*; *see also, e.g.*, *Williamson v. Recovery Ltd. P'ship*, __ F.3d __, 2016 WL 3209497, at *7 (6th Cir. June 10, 2016) (rejecting arguments that sanctions insufficiently compensated the victim "because they are premised on the idea that sanctions are meant to be solely restitutive," explaining instead that "a court's inherent power to sanction serves a punitive purpose, based on the need to deter misconduct and vindicate the court's authority."); *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1337 (11th Cir. 2002) ("[W]hen exercising its discretion to sanction under its inherent power, a court must take into consideration the financial circumstances of the party being sanctioned. . . .  A sanction which a party clearly cannot pay does not vindicate the court's authority because it neither punishes nor deters." (citations omitted)); *Mark Indus., Ltd. v. Sea Captain's Choice, Inc.*, 50 F.3d 730, 733 (9th Cir. 1995) ("[T]he amount of an inherent powers sanction is meant to do something very different than provide a substantive remedy to an aggrieved party.  An inherent powers sanction is meant to 'vindicat[e] judicial authority.'" (quoting *Chambers*, 501 U.S. at 55 (alteration in originl))); *Michael v. Boutwell*, 138 F. Supp. 3d 761, 784 (N.D. Miss. 2015) ("Inherent power sanctions are essentially punitive, designed to penalize bad faith abuses of the

---

[9] *See, e.g.*, *Young Again Products, Inc. v. Acord*, No. MISC. H-09-0282, 2014 WL 1600613, at *5 (S.D. Tex. Apr. 21, 2014) ("Monetary sanctions for civil contempt do not serve a punitive purpose, but a remedial one, which is 'to compensate for the damages sustained.'" (quoting *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000))).

[10] Inherent authority sanctions thus share this feature with sanctions imposed pursuant to other sources of judicial authority to sanction.  For example, compensation can be awarded under Rule 11, but any sanction issued pursuant to it "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4); *see also* Fed. R. Civ. P. 11, advisory committee's note to 1993 amendment ("Since the purpose of Rule 11 sanctions is to deter rather than to compensate, the rule provides that, if a monetary sanction is imposed, it should ordinarily be paid into court as a penalty.").

litigation process. While they may be used to compensate the opposing party for fees that should never have been incurred, their compensatory aspect is only incidental." (quoting *Jaques*, 926 F. Supp. at 1292) (internal quotation marks omitted).[11]

Notably, the requirement that the federal government produce a list of the personal information of tens of thousands of non-parties would do little or nothing to serve any punitive or deterrent purpose. Indeed, in articulating its basis for the Sanctions Order, the Court linked this aspect of the Order to possible damage to the Plaintiffs. *See* Sanctions Order at 22-23 (anticipating release of the information upon a "showing by a state of actual or imminent damage"). The financial burden of this requirement on the federal government itself is relatively small. *See* Decl. of León Rodríguez ¶ 24, ECF No. 354-2. Insofar as the sanction has significant deterrent value at all, it is because, as the Director of U.S. Citizenship and Immigration Services (USCIS) has explained, requiring the federal government to disclose the information at issue would significantly damage USCIS' ability to carry out its mission. *See id.* ¶¶ 15-17. Although that outcome might conceivably help deter future misconduct, handicapping a federal agency's ability to do its job is not a legitimate means of sanctioning abuses of the judicial process. *See Nat. Gas Pipeline I*, 2 F.3d at 1411.

Moreover, it cannot seriously be doubted that other, more traditional sanctions, such as those the federal government outlined in its recent filing,[12] would have at least as much deterrent value, but without the massive collateral damage that the Sanctions Order inflicts. Indeed, the

---

[11] *Cf. Buffington v. Baltimore Cty., Md.*, 913 F.2d 113, 134 (4th Cir. 1990) ("The fact that this punitive fine had the incidental effect of compensating for the costs of prosecuting the violation is neither surprising nor determinative of its character." (citation omitted)); *see generally* Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuses* § 28 (4th ed. 2008).

[12] Defs.' Resp. to the Court's Order of June 7, 2016, ECF No. 391-1, at 46-51. *Amici* reiterate that they take no position on whether any misconduct occurred.

obvious availability of far less restrictive and far more targeted and effective sanctions only underscores the degree to which the Sanctions Order transgresses *Chambers*' admonition that "inherent powers must be exercised with restraint and discretion."  501 U.S. at 44 (citation omitted); *see also In re First City Bancorporation of Tex.*, 282 F.3d at 867; *United States v. Horn*, 29 F.3d 754, 760 (1st Cir. 1994) ("[I]t is inappropriate for courts to attempt to use [inherent powers] to justify an extreme remedy when, short of such heroic measures, the means are at hand to construct a satisfactory anodyne more narrowly tailored to the objective." (citation omitted)).

## II.   THE SANCTIONS ORDER IS FORECLOSED BY CLOSELY ANALOGOUS FIFTH CIRCUIT PRECEDENT

In addition to violating fundamental principles governing courts' limited authority to sanction abuses of the judicial process, the Sanction Order plainly runs afoul of closely analogous Fifth Circuit precedent.

In *Natural Gas Pipeline I*, the Fifth Circuit considered sanctions imposed by a district court in the Southern District of Texas on John Fox, an attorney appearing before it.  Mr. Fox represented Navarro Crowson, his longtime associate and business partner, in criminal proceedings that resulted in Mr. Crowson pleading guilty to mail fraud, and in a civil case for related conduct that resulted in a default judgment against Mr. Crowson for some $1.28 million.  *Nat. Gas Pipeline I*, 2 F.3d at 1401.  The judgment creditors engaged in post-judgment discovery directed at both Mr. Crowson and Mr. Fox, but with limited success, due in large part to the intransigence of each.  Mr. Fox, for his part, repeatedly claimed that he possessed no records responsive to the discovery requests.[13]  *See id.* at 1403.

---

[13] Mr. Crowson took a different approach.  *See, e.g.*, *id.* at 1403 ("Rather than complying with the various court orders requiring him to surrender his assets, Crowson repaired to Mississippi where he filed for bankruptcy and voluntarily committed himself to a mental hospital.").

Upon the creditors' motion for sanctions against Mr. Fox, the district court held an evidentiary hearing, during which the "extensive business dealings" between Mr. Fox and Mr. Crowson were revealed.[14]  *Id.* at 1401.  Among other things, the district court concluded that Mr. Fox was purposefully withholding documents that would aid the creditors in locating assets of Mr. Crowson, including records relating to their business dealings together; it therefore ordered Mr. Fox "to produce every document in his possession relating to Crowson or business he had done with Crowson."  *Id.* at 1404.  The district court additionally required Mr. Fox to produce his own personal tax returns, on the theory that they would "reflect income from Mr. Crowson, partnerships with Mr. Crowson, and I don't know what else."  *Id.*  When Mr. Fox refused to produce his tax returns, he was held in civil contempt.  *Id.* at 1405 (quotation marks omitted).

On appeal, the Fifth Circuit reversed, holding that "[a]lthough it was proper to invoke inherent powers to sanction Fox, the district judge abused his discretion by ordering Fox to produce his personal tax returns and schedules."  *Id.* at 1411 (citing *Chambers*, 501 U.S. at 44).  The Fifth Circuit gave a number of reasons for that decision, several of which apply to the instant situation with at least as much force as they did there.  Its reasons included:

- that "[i]ncome tax returns are highly sensitive documents" in which the taxpayer has significant privacy interests that are not easily overcome;[15]

---

[14] *See, e.g.*, *id.* at 1404 ("It was revealed, for example, that: the two maintained a joint account at a brokerage firm and had actively traded stocks together as Fox–Crowson Investments; that the two shared an interest in a condominium in Crested Butte, Colorado; and that Crowson had assigned to Fox a natural gas pipeline in Jefferson County, Texas." (footnote omitted)).

[15] *Compare, e.g.*, *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 501 (1994) (concluding that "the individual privacy interest that would be protected by nondisclosure" of names and addresses was "far from insignificant" in light of the "special consideration in our Constitution, laws, and traditions" for the "privacy of the home" (citation omitted)); *Sherman v. U.S. Dep't of Army*, 244 F.3d 357, 365-66 (5th Cir. 2001) ("[A]n an individual's informational privacy interest in his or her SSN is substantial. . . .  [T]he concern is that the simultaneous disclosure of an individual's name and confidential SSN exposes that individual to a heightened risk of identity theft and other forms of fraud." (citation omitted)).

- that "unanticipated disclosure" of tax returns occasioned by the sanctions order "threatens the effective administration of our federal tax laws given the self-reporting, self-assessing character of the income tax system";[16]

- that "[n]o evidence came to light in the sanction hearings that proved the particular usefulness of Fox's tax returns to indicate Crowson's financial position";[17]

- that the sanctioned attorney "could not have anticipated that his conduct would result in such a sanction";[18] as well as

- the sanction's "novelty."[19]

*Id.* at 1411 (citations omitted).  Additionally relevant here, the Court indicated that the sanction

would have been improper even if the district court had reviewed the tax returns *in camera*.  *Id.*

---

[16] *Compare* Decl. of León Rodríguez ¶¶ 6-21, ECF No. 354-2 (declaration of the Director of USCIS explaining the manner and degree to which forcing it to disclose the private information of *Amici* and those similarly situated, even under seal, would significantly undermine the ability of USCIS to carry out its statutory duties); Decl. of Juan Escalante ¶ 22 (Ex. D) ("If I had known that my personal information could be disclosed to others, I might not have applied for DACA as I divulged confidential extremely detailed, personal information about myself and my family."); Decl. of Jane Doe #4 ¶¶ 8, 14-19 (Ex. A) (describing initial fear regarding applying for DACA and expressing concerns about the federal government sharing the information she provided through the DACA application process with others); Decl. of Jane Doe #5 ¶¶ 15-18 (Ex. B) (expressing concerns about the federal government sharing the information she provided through the DACA application process with others); Decl. of Angelica Villalobos ¶¶ 9-14 (Ex. C) (same).

[17] *Compare* Sanctions Order at 22-23, 27 (explaining that the requirement that the federal government compile and submit the information of *Amici* and others similarly situated "give[s] the 26 Plaintiff States some avenue for relief from the *possibility* of any damage that may result from the misconduct of the Defendants' lawyers . . . ." (emphasis added)).

[18] *Cf.* Decl. of Jane Doe #4 ¶ 14 ("My understanding when I applied for DACA was that U.S. Citizenship and Immigration Services would keep all of this information confidential."); Decl. of Jane Doe #5 ¶ 9 ("I thought that the information I provided was going to be kept confidential."); Decl. of Angelica Villalobos ¶ 9 ("I felt comfortable giving the Federal Government this kind of information because I understood that it would only be used for specific purposes related to my DACA application, and would otherwise be kept confidential."); Decl. of Juan Escalante ¶ 15 ("My understanding when I applied for DACA was that USCIS would keep all of this information confidential").

[19] The Court explained that "[a]lthough novel sanctions are not objectionable per se, they are subject to close examination on review simply because their reasonableness has not been demonstrated."  2 F.3d at 1411.

The Fifth Circuit concluded by noting that the "[t]he ultimate touchstone of inherent powers is necessity," and by holding that necessity did not "compel" the order that the attorney produce his personal tax returns.  *Id.* at 1412 ("Traditional sanctions . . . would have accomplished the court's purpose more properly." (footnote omitted)).[20]

In short, *Natural Gas Pipeline I* directly precludes a district court from ordering an attorney appearing before it to produce his own personal income tax returns as a sanction for his own misconduct, even if the court suspected that those returns would provide an avenue of relief for the victim of the attorney's misconduct, and even if produced only *in camera*.  *Natural Gas Pipeline I* is exactly analogous to this case and this Court is similarly precluded from issuing the aspect of the Sanctions Order at issue here.  The Court's order requires the federal government to produce information *at least* as sensitive as tax returns.  Moreover, that personal sensitive personal information at issue here belongs *not* to the individual who abused the process of the Court, but instead to tens of thousands of non-parties who have never appeared before this Court and who have done nothing to warrant being the target of its inherent authority.  And the exposure of that information is particularly unwarranted because the sanction is premised on the mere possibility that Plaintiffs might someday be able to articulate a theory as to how they have been damaged by

---

[20] The saga of Mssrs. Fox and Crowson returned to the Fifth Circuit twice more.  *See Nat. Gas Pipeline II*, 86 F.3d at 468 ("On remand, however, the district court disregarded our caution that '[t]he ultimate touchstone of inherent powers is necessity.' . . .  [D]espite our finding that the order to produce Fox's personal tax returns was an unwarranted invasion of privacy and unlikely to be useful in producing evidence of Crowson's assets, on remand the district court ordered that Fox produce thousands of checks and deposit slips from his personal checking accounts.  This order was an abuse of discretion, causing an even greater intrusion on privacy than the invalidated order to release tax returns, and the order was not based on evidence that production of these documents would likely reveal the existence or location of additional Crowson assets" (footnote omitted, first alteration in original)); *Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc*. ["*Nat. Gas Pipeline III*"], 99 F.3d 1134, 1996 WL 595606 (5th Cir. 1996) (unpub.) (vacating a contempt order directed at Mr. Crowson).

the alleged misrepresentations, notwithstanding the fact that Plaintiffs have to date been unable to do so.  In sum, *Natural Gas Pipeline I* forecloses this aspect of the Sanctions Order.

## III.   IN ANY EVENT, *AMICI*'S CONSTITUTIONALLY PROTECTED PRIVACY INTERESTS OUTWEIGHS ANY INTEREST PLAINTIFFS MIGHT DEMONSTRATE

Requiring the Defendants to turn over a list of DACA recipients' names and other personal information is also improper for a separate and independent reason: it fails to satisfy the constitutional balancing test that the Fifth Circuit requires in cases involving involuntary disclosure of personal information.  Under the Constitution, a court's "intrusion into the interest in avoiding disclosure of personal information" is permissible only if a legitimate state interest "outweigh[s] the threat" to those privacy interests.  *ACLU of Mississippi*, 911 F.2d at 1070 (5th Cir. 1990) (quoting *Fadjo v. Coon*, 633 F.2d 1172, 1176 (5th Cir. 1981) (internal quotation marks omitted)); *see also Plante v. Gonzalez*, 575 F.2d 1119, 1134 (5th Cir. 1978) (explaining that "more than mere rationality must be demonstrated").  Here, a huge amount of constitutionally protected personal information is at issue, and the Plaintiffs cannot establish any interest in that information that would outweigh the threats posed by its disclosure—including identity theft, fraud, discrimination, harassment, and stigma.

The information that would be disclosed under the Sanctions Order—the names, other identifying information, addresses, and immigration status of *Amici* and some 50,000 similarly situated DACA recipients—is extremely sensitive. As a rule, "an individual's informational privacy interest in" personally identifying information is "substantial."  *Sherman*, 244 F.3d at 365 (discussing privacy interest in Social Security Numbers); *see also Fed. Labor Relations Auth.*, 510 U.S. at 501 (concluding that privacy interest in nondisclosure of names and addresses was "far from insignificant").  Consistent with federal privacy laws, the federal government expressly assured *Amici* and other DACA applicants—and *Amici* clearly understood—that the information

they provided to the federal government would be used only for certain specific purposes, underscoring its sensitivity.[21]  *See* Decl. of Angelica Villalobos ¶ 9 (Ex. C); Decl. of Juan Escalante ¶¶ 15, 18 (Ex. D); Decl. of Jane Doe #4 ¶ 14 (Ex. A); Decl. of Jane Doe #5 ¶ 9 (Ex. B); *see also* Decl. of León Rodríguez ¶ 13, ECF No. 354-2; *cf., e.g.*, *Fadjo*, 633 F.2d at 1176 (recognizing privacy claim where plaintiff provided personal information "under a pledge of confidentiality").

First, and as a general matter, the disclosure of sensitive personally identifying information could expose individuals to "a heightened risk of identity theft and other forms of fraud," which weighs heavily against release.  *Sherman*, 244 F.3d at 365; *see also Tomblin v. Trevino*, No. SA01CA1160-OG, 2003 WL 24125145, at *2 (W.D. Tex. Feb. 19, 2003); Decl. of Angelica Villalobos ¶ 14 (Ex. C); Decl. of Juan Escalante ¶ 20 (Ex. D); Decl. of Jane Doe #4 ¶ 19 (Ex. A); Decl. of Jane Doe #5 ¶ 18 (Ex. D).

Moreover, the privacy interests at stake here, already strong as a general matter in light of the nature of the information, are substantially amplified because the Court's order links that sensitive personally identifying information to individual DACA recipients' immigration status and potentially the status of their family members.  *National Association of Retired Federal Employees v. Horner*, 879 F.2d 873 (D.C. Cir. 1989), observed that a list of the names and addresses of many thousands of newly enrolled federal annuitants would not only reveal their

---

[21] *See* U.S. Citizenship & Immigration Serv., Form I821-D Instructions, *available at* https://www.uscis.gov/sites/default/files/files/form/i-821dinstr.pdf (June 4, 2014).   These assurances were made pursuant to the Privacy Act.  The Act does not by its terms apply to noncitizens other than lawful permanent residents, but the Department of Homeland Security maintains all personal information—regardless of immigration status—under Privacy Act standards. *See* Department of Homeland Security, Privacy Policy Guidance Memorandum, *available at* https://www.dhs.gov/sites/default/files/publications/privacy-policy-guidancememorandum-2007-01.pdf (Jan. 7, 2009); *see also* Declaration of León Rodríguez, ECF No. 354-2 at ¶ 11 ("USCIS rigorously guards against the unauthorized disclosure of all" personally identifying information "regardless of the status of the alien").

identifying information, but would also "indicate[] that each is retired or disabled (or the survivor of such a person) and receives a monthly annuity check from the federal Government."  *Id*. at 876.[22]  The court concluded that additional information was "significant" because it would result in harassing solicitations.  *Id*. at 875-76.  Immigration status in general, and DACA or undocumented status in particular, is likewise "significant."  As in *Horner*, the court-ordered list signals to the world that all of the individuals included on the list (and their family members) share a certain characteristic, and the disclosure of that information puts the individuals at a particularly heightened risk.

That the list would involuntarily disclose the fact that *Amici* are DACA recipients and potentially expose their family members' immigration statuses adds yet more weight to the privacy side of the balance.  *Amica* Angelica Villalobos of Oklahoma, for example, worries that any release—whether condoned by the court or leaked—of her personally identifying information could be used by those hostile to DACA or DACA recipients to target her or her family.[23]  Decl. of Angelica Villalobos ¶¶ 12, 13 (Ex. C); *see also* Decl. of Juan Escalante ¶¶ 19-20 (Ex. D) (explaining his fear "that people with ill will toward immigrants like me will gain access to my personal information to try to harm me or my family").  Similarly, *Amica* Jane Doe # 4 of Texas fears that she or her family may be targeted by government officials or private persons if her personal information, including her name, is linked to her receipt of DACA.  Decl. of Jane Doe #4 ¶¶ 15-18, 20 (Ex. A); *see also* Decl. of Jane Doe #5 ¶¶ 15-19 (Ex. B) (explaining her fears of

---

[22] In cases interpreting the Freedom of Information Act, like *Federal Labor Relations Authority*, *Horner*, and *Sherman*, the question is whether the disclosure of records "would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).

[23] While she has decided to publicly share her name and story as a DACA recipient including for purposes of asserting her legal rights in this litigation, Ms. Villalobos asserts her right to keep other sensitive personal information, including her address, confidential.  Decl. of Angelica Villalobos ¶ 15 (Ex. C).

disclosure of her personal information, including her parents' address, in light of anti-immigrant sentiment).  Moreover, several of the Plaintiffs have previously sought to regulate immigrants in ways that are unlawful and unconstitutional—including by seeking to misuse information regarding immigration status.[24]  DACA recipients in particular have been singled out for special status-based regulations—which have been struck down by the federal courts.[25]  Many public officials in the Plaintiff States have declared their opposition to DACA and/or DACA recipients.[26] DACA recipients' undocumented family members—generally unprotected by formal deferred action—face an even more hostile atmosphere in the Plaintiff States.

The other side of the constitutional balance is, by contrast, empty: As noted above, Plaintiffs have never even alleged, much less proven, that they have been harmed in any particular way by the fact that some of their residents currently have EADs and terms of deferred action valid for three years, rather than two.  Nor have Plaintiffs have ever explained how it would benefit them to know the personal information of everyone with three year terms.  In other words, and despite ample opportunity and incentive to do so, Plaintiffs have been unable to articulate any legitimate interest in *Amici*'s personal information, and "something, even a modest privacy interest, outweighs nothing every time."  *Horner*, 879 F.2d at 879.

---

[24] *See*, *e.g.*, *Arizona v. United States*, 132 S. Ct. 2492, 2507 (2012) (striking down as preempted an Arizona provision purporting to authorize state officials to arrest noncitizens on the basis of possible removability); *Doe v. Hobson*, 17 F. Supp. 3d 1141, 1146, 1149 (M.D. Ala. 2014); Order, Doe v. Hobson, No. 2:13-CV-79-WKW (M.D. Ala. Oct. 14, 2014), ECF No. 68 (consent judgment agreeing to halt enforcement of an Alabama provision requiring the publication of the names of suspected undocumented noncitizens).

[25] *See Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1059 (9th Cir. 2014) (discussing the singling out of DACA recipients for the denial of driver's licenses); *id*. at 1063-67, 1069 (affirming temporary injunction on equal protection grounds); *Arizona Dream Act Coal. v. Brewer*, 818 F.3d 901, 920 (9th Cir. 2016) (affirming permanent injunction on preemption grounds).

[26] *See*, *e.g.*, *Arizona Dream Act Coal.*, 757 F.3d at 1059.

But, in any event, the robust privacy interest of 50,000 innocent non-parties would outweigh whatever interests the States might manage to establish.  Any interest the States might demonstrate associated with the grant of DACA and EAD renewals for three years instead of two would be negligible, if existent at all.  In similar circumstances, Court have consistently held that privacy concerns outweigh minimal state interests in disclosure.  The Supreme Court, for example, has held that federal employees' privacy interests "in nondisclosure of their home addresses" substantially outweighed the "negligible" public interest in providing those addresses to a union that sought the addresses under FOIA.  *Fed. Labor Relations Auth.*, 510 U.S. at 502; *see also ACLU of Mississippi*, 911 F.2d at 1073 (holding that the district court's order "overemphasized" a relatively weak interest in disclosure and "weighed the competing privacy interests too lightly"); *id.* at 1075 (explaining that the district court's broad disclosure order was erroneous in part because, at a minimum, redacting the actual names of individuals "would protect privacy to a considerable extent while likely having almost no adverse effect upon" the stated interest of allowing "victims of unlawful intrusion to gain information concerning that intrusion").[27]  Under such circumstances, the outcome of the weighing required by Fifth Circuit precedent is clear: the Sanction Order's "intrusion into the interest in avoiding disclosure of personal information" is unjustified and unacceptable.  *Id.* at 1070 (citation and internal quotation marks omitted).

Finally, *Amici* are aware that this Court has raised the possibility of narrowing its sanctions order by requiring the government to disclose a more limited set of information about the DACA recipients.  *See* Tr. of H'ring on June 7, 2016, ECF No. 366, at 4.  While any such limitation is

---

[27] Notably, the Federal Government has already submitted a sworn statement from the Director of USCIS indicating that the personal information the Court ordered disclosed is securely and permanently maintained.  Decl. of León Rodríguez ¶ 9(e), ECF No. 354-2.  The possibility that the Plaintiffs might someday make a showing that they have some legitimate need for this information is thus not a reason to order it disclosed now.

certainly preferable to the current form of the order from the perspective of *Amici*'s privacy interests, including *Amici*'s names and addresses on a list identifying them as DACA recipients would unreasonably and unnecessarily expose them to harassment, stigma, and discrimination, would expose their family members to additional risk, and could still facilitate identity theft and other forms of fraud.  A narrower order would thus still fail the balancing test mandated by the Fifth Circuit.[28]

## CONCLUSION

*Amici* respectfully request that the Court vacate that part of the Sanctions Order requiring the federal government to produce the personal information of certain DACA recipients.

Dated: August 12, 2016                              Respectfully submitted,

                                                    /s/ Edgar Saldivar
                                                    Texas Bar No. 00794542
                                                    Federal No. 618958
                                                    Rebecca L. Robertson
                                                    Texas Bar No. 00794542
                                                    Federal No. 20061
                                                    ACLU FOUNDATION OF TEXAS
                                                    1500 McGowen Street, Suite 250
                                                    Houston, TX 77004
                                                    T:  713.942.8146
                                                    F:  713.942.8966
                                                    esaldivar@aclutx.org
                                                    rrobertson@aclutx.org

---

[28] Likewise, although the Sanction Orders' near-total lack of safeguards against the further disclosure of personal information provided to the Plaintiffs is yet another reason it should be vacated, *see, e.g.. Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551-53 (9th Cir. 2004) (rejecting required disclosure provisions that failed to adequately establish safeguards for sensitive personal information); *Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105, 117-18 (3d Cir. 1987) (holding that certain portions of an employment questionnaire were not inherently objectionable on privacy grounds, but leaving in place an injunction against those questions because safeguards in that case were essentially nonexistent); the imposition of such safeguards would not change the fact that *Amici*'s privacy interests in preventing disclosure to the Plaintiffs themselves outweigh any possible interest in requiring disclosure.

*Karen C. Tumlin
CA Bar No. 234691
*Nora A. Preciado
CA Bar No. 239235
NATIONAL IMMIGRATION LAW
CENTER
3435 Wilshire Boulevard, Suite 1600
Los Angeles, CA 90010
T:  213.639.3900
F:  213.639.3911
tumlin@nilc.org
preciado@nilc.org

*Justin B. Cox
GA Bar No. 748945
NATIONAL IMMIGRATION LAW
CENTER
1989 College Avenue, NE
Atlanta, GA 30317
T:  678.404.9119
cox@nilc.org

*Cecilia D. Wang
CA Bar. No. 187782
*Cody Wofsy
CA Bar No. 294179
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
cwang@aclu.org
cwofsy@aclu.org

*Omar C. Jadwat
NY Bar. No. 4118170
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2620
ojadwat@aclu.org

*Pro hac vice motion filed concurrently
herewith

*Attorneys for proposed* Amici Curiae
*Angelica Villalobos, Juan Escalante, and
Jane Does #4-5*