**INDEX OF EXHIBITS TO UNOPPOSED MOTION OF JANE DOE #4 & JANE DOE #5 FOR LEAVE TO PROCEED UNDER PSEUDONYMS & MEMORANDUM IN SUPPORT THEREOF**

| | |
|---|---|
| **EXHIBIT A** | Declaration of Jane Doe #4 |
| **EXHIBIT B** | Declaration of Jane Doe #5 |
| **EXHIBIT C** | Melissa Bailey, *City Wins ID Battle*, New Haven Indep. (June 25, 2008), http://www.newhavenindependent.org/index.php/archives/entry/city_wins_id_battle/. |
| **EXHIBIT D** | Jonathan Greenblatt, *When Hateful Speech Leads to Hate Crimes: Taking Bigotry Out of the Immigration Debate*, Huffington Post (Aug. 24, 2015), http://huff.to/1hW90U0. |
| **EXHIBIT E** | Katie Rogers, *2 Valedictorians in Texas Declare Undocumented Status, and Outrage Ensues*, N.Y. Times, June 10, 2016, *available at* http://nyti.ms/1WHYYYE |

# EXHIBIT A

JANE DOE #4

**DECLARATION OF [REDACTED]**

I, [REDACTED], hereby make the following declaration with respect to the above-captioned matter:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows.

2. I am a Petitioner for a Writ of Mandamus in this case, Texas v. United States, No. 14-00254 (S.D. Tex. filed December 3, 2014).

3. I am 26 years old and I live in Austin, Texas.

4. I was born in Mexico, but I was brought to the United States when I was a year old, and I have lived in this country ever since. I have not returned to Mexico since I was brought here.

5. I have lived in Texas for all but a few years of my life. I graduated from high school and a community college in Texas, and I am currently finishing the last of my coursework at the University of Texas in Austin in order to obtain my bachelor of science degree in nursing. I am a registered nurse.

6. I am married to a Lawful Permanent Resident who is in the process of becoming a U.S. citizen.

7. In November of 2012, I applied for deferred action through the Deferred Action for Childhood Arrivals ("DACA") program. At that point, I was undocumented, and had been the entire time I had been in this country.

8. I heard about DACA when it was announced, and I knew other people who applied right away, but I waited a few months to apply because I wanted to make sure that people who applied were actually getting work permits and other documents, and that it was not just a way to get people to admit to the government that they were undocumented. Once I saw that people who applied were getting approved for deferred action and work permits, and were not getting into trouble with the authorities, I felt comfortable appyling for DACA.

9. I received my approval for DACA in February of 2013. Soon thereafter, I received an Employment Authorization Document ("EAD") valid for two years.

10. I applied to renew my deferred action and EAD in early October of 2014.

11. On December 18, 2014, I received a notice that my deferred action and EAD had been renewed for three years. When I applied to renew them, my understanding was that the renewals would be for two years.

12. I currently have a Texas driver's license. Its expiration date is the same day in December 2017 that my current EAD expires.

13. I recently heard about the district court's May 19, 2016 order that requires the Federal Government to give the district court a list with the personal information of DACA recipients like me who received an EAD valid for three years and who live in certain states, including Texas.

14. I am very worried about the Federal Government giving my personal and private information—including my name, address, phone number, and A-file number—to anyone. When I applied for DACA, I submitted evidence in support of my application that included copies of my birth certificate, passport, confirmation certificate, community college identification, high school diploma, associate's degree, and school transcripts among other documents. My understanding when I applied for DACA was that U.S. Citizenship and Immigration Services would keep all of this information confidential.

15. The idea that the Federal Government would give this information to the district court, and that the court might give it to the State of Texas, makes me very anxious, both for myself and for my family.

16. The address that I used in my DACA application is my parents' house, where my three younger siblings also live. My parents are undocumented, and I am worried that they will be harassed or even arrested by Texas officials if my personal information is given out.

17. I am also worried that the State of Texas may try to treat me like I am here undocumented even though I have DACA and an EAD.

18. I am also worried that my family or I could be harassed by private individuals who might obtain my personal information. I am aware of a lot of anti-immigrant sentiment in Texas, and so I worry that if people know my personal information they will try to harm me or my family, either physically or in some other way.

19. I also worry about the possibility of people accessing my personal information because they could use it to harm me by stealing it and using it in ways that would damage my reputation, like stealing my identity.

20. For similar reasons, I am very worried that if my real name were used in this lawsuit, I or my family would be harmed physically or in some other way. I know there are a lot of people in Texas who disagree with the DACA program, and I worry that someone may try to retaliate against me or my family if they know that I have DACA and that I am trying to stop the State of Texas from getting my personal information. I am asking that my name not be made public in this lawsuit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of June, 2016



# EXHIBIT B

JANE DOE #5

**DECLARATION OF [REDACTED]**

I, [REDACTED], herby make the following declaration with respect to the above-captioned matter:

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows.

2. I am a Petitioner for a Writ of Mandamus, Texas v. United States, No. 14-00254 (S.D. Tex. filed December 3, 2014).

3. I am 20 years old and I live in Houston, Texas.

4. I was born in Mexico, but I was brought to the United States in 2003, when I was in the third grade. It was difficult at first, especially learning English. I have always lived in Houston since that time and consider Texas to be my home.

5. This summer I am marrying a U.S. citizen and we will continue to live in Houston.

6. After I graduated from high school, I took a nine-month course at Lone Star College, a community college in the Houston area, and received a diploma as a medical assistant.

7. For the last 2 years, I have been working in patient care at an urgent care facility. I am excited to be starting a job in administration at a local hospital soon.

8. I have continued studying at Lone Star and am currently taking classes there toward an associate's degree. I hope to eventually work as a registered nurse.

9. I first applied for and received Deferred Action for Childhood Arrivals ("DACA") during my senior year in high school. In order to apply, I submitted a lot of documents including copies of my expired visa, school records, and pictures, paid the various fees, and completed the necessary background checks. I thought that the information I provided was going to be kept confidential.

10. In February 12, 2013, I was granted DACA and given an Employment Authorization Document ("EAD") that was valid for two years.

11. I obtained a social security number in April 2013.

12. I applied for a renewal of DACA around November 15, 2015, and was issued an extension of deferred action and a new EAD on December 18, 2014. When I applied to renew DACA and my EAD, I thought the renewal would be for two more years, but instead they are valid for three years. My current EAD expires on December 17, 2017.

13. When I applied for my DACA renewal, I provided again a lot of information and documents again, including my social security number.

14. I am aware of the lawsuit that has been filed by the state of Texas and other states challenging the expansion of the DACA program and the creation of the Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") program. I also understand that due to the date on which my EAD was issued and the fact that it is valid for three years, I am at risk of being included in the list of information required to be produced to the federal district court in Brownsville, Texas by the district court's order of May 19 in this case. Specifically, I understand that the district court has required the United States to turn over a list that would include "all personal identifiers and locators including names, addresses, 'A' file numbers and all available contact information, together with the date the three-year renewal or approval was granted" for individuals who received EADs for three-years around the time that I did if those people live in one of the 26 states that are suing to stop the expanded DACA and DAPA programs.

15. I do not want this personal information about me to be given to the district court. I am fearful of the consequences that the production of this information could have, especially if it is given to the states who are suing to stop the expansion of the DACA program and DAPA, including my home state of Texas. I am scared of the State of Texas or other people using this information against me or parents, or people using it against me at work. I am also concerned that if my personal information is released people could use it to harm by stealing my identity or getting more of my personal information.

16. One of my biggest fears is that when I applied for DACA I included the address of my parents in that application. My parents and my younger sister who lives with them are undocumented. My youngest sister is too young to apply for DACA. I am afraid that if this list is produced with all of my identifying information that the address could put my family at risk for deportation or harassment.

17. I also worry about the production of this information to the district court because I am currently living with my fiancé and the federal government has my current address. I don't know if this will affect him in any way.

18. I also worry about the possibility of people accessing my personal information because they could use it to harm me by stealing it and using it in ways that would damage my reputation, like stealing my identity.

///

///

///

///

///

19. I am also very worried that if my real name were used in this lawsuit, I or my family would be harmed physically or verbally or in some other way. There is a lot of anti-immigrant sentiment and people are very enraged about immigration so they attack people in the street randomly. I work in a very public place and I don't want people to know about me or recognize me for the same reasons. I worry that someone may try to hurt me or my family if they know that I have DACA and that I am trying to stop the State of Texas from getting my personal information. I am asking that my name not be made public in this lawsuit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3 day of June, 2016

# EXHIBIT C

# City Wins ID Battle

by **MELISSA BAILEY** | Jun 25, 2008 5:38 pm
**(39) Comments** | **Commenting has been closed** | **E-mail the Author**
Posted to: **City Hall, Immigrants**




(Updated) New Haven does not have to give up the names and addresses of immigrants who signed up for the city's immigrant-friendly ID, according to a proposed decision issued Wednesday.

The ruling, by a hearing officer of the state Freedom of Information Commission, came in response to a request to reveal the names and addresses of the 5,000-plus people who have signed up for New Haven's immigrant-friendly municipal ID card since its launch last July.

Journalist Chris Powell and the Community Watchdog Project, a group opposed to illegal immigration led by Dustin Gold (pictured above), originally requested the city to release the names and addresses.

In a decision issued Wednesday, FOIC hearing officer Sherman D. London wrote that the city was right to refuse Gold and Powell's request, because releasing the names would have created a safety risk. His decision is a proposed ruling; it will be voted on at a hearing on July 9 before the Freedom of Information Commission.

Click here to read the decision. Click here and here to read articles about the FOI battle.

"I'd like to thank the FOI Commission for recognizing the safety threat that would be posed by releasing the information of individuals involved," wrote Mayor John DeStefano, Jr. in a press statement Wednesday.

London found that "the ID Card program unleashed a level of vitriol and venom aimed at City officials and illegal immigrants that was far beyond mere political disagreement or healthy civic engagement, according to testimony."

The city "has met its burden of proof that the records are permissively exempt from mandatory disclosure," London concluded. He ruled that neither the city nor the state Department of Emergency Management and Homeland Security violated freedom of information laws by refusing to disclose the records.

That means immigrants who trusted the city with their names and addresses would not be exposed.

"We met the burden of proof and look forward to moving past this so that we can continue to grow this successful program," said Kica Matos, the city's Community Service Administrator, in the city press statement.

"New Haven residents should feel comfortable coming down to City Hall to apply for their Elm City Resident Card with the confidence that their information will be kept safe and secure," Matos said.

The city did get chided on one point: It should have been more prompt in contacting the Department of Public Works regarding its decision not to disclose the records, London concluded.

Gold, of the immigrant watchdog group, said he plans to object to the decision at the July 9 hearing.

"It doesn't seem like a full ruling to me," Gold argued, saying London ruled on the safety-risk exemption, but did not address two other exemptions the city had claimed.

Gold claimed that London "misconstrued the statute" that allows for an exemption due to safety risk. He also took issue with the way London cited excerpts from hateful emails and radio clips to show that officials and immigrants' lives were in danger — quotes such as "I have my Automatic Rifle ready to go an[d] won't hesitate to use it to kill these Rodents."

"Most of the quotes were taken out of context," Gold argued. He argued the comments should be protected under freedom of speech and did not constitute a credible and imminent threat to individuals' safety.

**Commenting has closed for this entry**

# EXHIBIT D

HUFFPOST POLITICS



THE BLOG

# When Hateful Speech Leads to Hate Crimes: Taking Bigotry Out of the Immigration Debate

08/21/2015 05:18 pm ET | Updated Aug 24, 2015



Jonathan Greenblatt
National Director and CEO of the Anti-Defamation League



ASSOCIATED PRESS

When police arrived at the scene in Boston, they found a Latino man shaking on the ground, his face apparently soaked in urine, with a broken nose. His arms and chest had been beaten. One of the two brothers arrested and charged with the hate crime reportedly told police, "Donald Trump was right — all these illegals need to be deported."

The victim, a homeless man, was apparently sleeping outside of a subway station in Dorchester when the perpetrators attacked. His only offense was being in the wrong place at the wrong time. The brothers reportedly attacked him for who he was — simply because he was Latino.

In recent weeks anti-immigrant — and by extension anti-Latino — rhetoric has reached a fever pitch. Immigrants have been smeared as "killers" and "rapists." They have been accused of bringing drugs and crime.

A radio talk show host in Iowa has called for enslavement of undocumented immigrants if they do not leave within 60 days. There have been calls to repeal the 14th Amendment's guarantee of citizenship to people born in the United States, with allegations that people come here to have so-called "anchor babies." And the terms "illegal aliens" and "illegals" — which many mainstream news sources wisely rejected years ago because they dehumanize and stigmatize people — have resurged.

The words used on the campaign trail, on the floors of Congress, in the news, and in all our living rooms have consequences. They directly impact our ability to sustain a society that ensures dignity and equality for all. Bigoted rhetoric and words laced with prejudice are building blocks for the pyramid of hate.

Biased behaviors build on one another, becoming ever more threatening and dangerous towards the top. At the base is bias, which includes stereotyping and insensitive remarks. It sets the foundation for a second, more complex and more damaging layer: individual acts of prejudice, including bullying, slurs and dehumanization.

Next is discrimination, which in turn supports bias-motivated violence, including apparent hate crimes like the tragic one in Boston. And in the most extreme cases if left unchecked, the top of the pyramid of hate is genocide.

Just like a pyramid, the lower levels support the upper levels. Bias, prejudice and discrimination — particularly touted by those with a loud megaphone and cheering crowd — all contribute to an atmosphere that enables hate crimes and other hate-fueled violence. The most recent hate crime in Boston is just one of too many. In fact, there is a hate crime roughly every 90 minutes in the United States today. That is why last week ADL announced a new initiative, #50StatesAgainstHate, to strengthen hate crimes laws around the country and safeguard communities vulnerable to hate-fueled attacks. We are working with a broad coalition of partners to get the ball rolling.

Laws alone, however, cannot cure the disease of hate. To do that, we need to change the conversation. We would not suggest that any one person's words caused this tragedy — the perpetrators did that — but the rhetorical excesses by so many over the past few weeks give rise to a climate in which prejudice, discrimination and hate-fueled violence can take root. Reasonable people can differ about how we should fix our broken immigration system, but stereotypes, slurs, smears and insults have no place in the debate.

Immigrants have been a frequent target of hate, and unfortunately, prejudice and violence are not new. Many of our ancestors faced similar prejudice when they came to the United States. In the 1800s, the attacks were against Irish and German immigrants. Next was a wave of anti-Chinese sentiment culminating with the Chinese Exclusion Act in 1882. Then the hatred turned on the Jews, highlighted by the lynching of Leo Frank in 1915. Then came bigotry against Japanese immigrants

and people of Japanese dissent, which led to the shameful internment of more than 110,000 people during World War II. Today, anti-immigrant bigotry largely focuses on Latinos. The targets have changed, but the messages of hate remain largely the same. It is long past time for that to end.

ADL, as a 501(c)(3), does not support or oppose candidates for elective office, but we have a simple message for all policymakers and candidates: There is no place for hate in the immigration debate.

There is nothing patriotic or admirable about hatred and hate-fueled violence. The only acceptable response to hate crimes is unequivocal, strong condemnation. And the same is true for the bias, prejudice and bigoted speech that have recently permeated the immigration conversation.

**Follow Jonathan Greenblatt on Twitter:** www.twitter.com/JGreenblattADL

# EXHIBIT E

The New York Times | http://nyti.ms/1WHYYYE

U.S.

# 2 Valedictorians in Texas Declare Undocumented Status, and Outrage Ensues

By KATIE ROGERS JUNE 10, 2016

When Mayte Lara Ibarra, the valedictorian of her high school's graduating class, revealed her plans to attend the University of Texas at Austin on a scholarship, she did what any graduate would do: She shared her excitement on social media.

Ms. Lara also declared, proudly, that she is undocumented.

"Valedictorian, 4.5GPA, full tuition paid for at UT, 13 cords/medals, nice legs, oh and I'm undocumented," she wrote in a tweet posted last week, hours after she gave her valedictory speech to fellow graduates at David Crockett High School in Austin.

In an era where the presumptive Republican presidential nominee, Donald J. Trump, has vowed to build a wall to keep out undocumented immigrants and many Latinos are rushing to seek citizenship to vote against him, others are finding ways to raise their voices or step out of the shadows.

Ms. Lara, whose path to the United States was not immediately clear and who didn't mention her undocumented status in her speech, chose instead to talk about

AP tests, proms and pep rallies. But on the same day, a few hours north in McKinney, Tex., another valedictorian, Larissa Martinez, did.

Speaking to her class, Ms. Martinez, who says she's headed to Yale, declared that she is undocumented, and indirectly addressed anti-immigrant sentiments voiced by Mr. Trump. According to the website Mic, she crossed the border in 2010 from Mexico with her mother and sister.




"America can be great again without the construction of a wall built on hatred and prejudice," said Ms. Martinez, according to WFAA, a local ABC affiliate. She told the station that she had a full scholarship to Yale with plans to study medicine.

But some observers saw the students' decision to express pride in being undocumented as an affront, and criticized them on social media.






In Ms. Lara's case, the outrage over her tweet led her to delete her Twitter account. One critic, Hillary Shay Davis, who has a daughter who graduated with Ms. Lara, said she believed that the teenager was proud of "taking advantage of the system."

"I have never thought about deporting a child who graduated from a U.S. high school and fought against the odds to be successful. Until this moment," Ms. Davis wrote on Facebook. She added, "Something else that I have NEVER thought I would support until this moment is Trump and #buildthatwall."

Versions of this sentiment echoed throughout social media.




Ms. Lara is departing the Austin Independent School District, where 58 percent of students are Hispanic, and entering a college system where Hispanic students are the second-largest share of the population. The University of Texas also offers support services for undocumented students.

Gary Susswein, a spokesman for the University of Texas, said that federal law prevented him from discussing the cases of individual students, but he offered a statement that said that the university grants two-semester tuition waivers to all valedictorians of Texas public high schools regardless of their residency status.

"State law also does not distinguish between documented and undocumented graduates of Texas high schools in admissions and financial aid decisions," the statement said. "University policies reflect that law."

Jose Antonio Vargas, the Pulitzer Prize-winning journalist and immigration activist who revealed that he is undocumented in The New York Times Magazine in 2011, said that gestures like Ms. Lara's were part of a larger effort on behalf of undocumented people to be open and upfront about their status.

"Being undocumented is part of her identity, as is being a Latina," he said Thursday. He added, "For many undocumented people, this is our way of telling people that we are not who people think we are."

Define American, a project Mr. Vargas started in 2011, holds events and online campaigns where people can share their immigration status, an effort, he said, that

was meant to shape the conversation around immigration "so it's a more 'human' one."

Although people have been using Twitter and YouTube to make their immigration status public for years, Mr. Vargas said he thought the criticism of Ms. Martinez and Ms. Lara was coming at a tense time in the election cycle. In the case of Ms. Lara, he said that people were circulating misinformation, and he referred to the state law granting the waivers to valedictorians.

"This young woman is not taking somebody else's spot," he said of the waivers. "She's not getting special treatment. She is getting that because she graduated as valedictorian, and that's how it is in Texas."

***Correction: June 13, 2016***

An earlier version of this article misstated Mayte Lara Ibarra's surname. She is Ms. Lara, not Ms. Ibarra.

---

© 2016 The New York Times Company