```
 1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3
     STATE OF TEXAS                 )
 4                                  )
                                    )
 5   VS.                            )  CIVIL ACTION NO.
                                    )  1:14-CV-254
 6                                  )
     UNITED STATES, ET AL           )
 7

 8

 9

10                          HEARING
          BEFORE THE HONORABLE ANDREW S. HANEN
11                    AUGUST 31, 2016

12

13                    A P P E A R A N C E S

14

15   FOR THE PLAINTIFF STATES:

16        MR. ADAM BITTER
          OFFICE OF THE ATTORNEY GENERAL
17        PO Box 12548
          Austin, Texas 78711-2548
18        Phone:  512.936.2422

19
     FOR THE GOVERNMENT:
20
          MR. JAMES GILLIGAN
21        U.S. DEPARTMENT OF JUSTICE -
          CIVIL DIVISION
22        20 Massachusetts Avenue NW
          Washington, DC 20001
23        Phone:  202.514.3358

24

25
```

```
 1        MR. DANIEL DAVID HU
          OFFICE OF THE US ATTORNEYS
 2        1000 Louisiana, Suite 2300
          Houston, Texas 77002
 3        Phone:  713.567.9518

 4        MS. JENNIFER D. RICKETTS
          U.S. DEPARTMENT OF JUSTICE -
 5        CIVIL DIVISION
          20 Massachusetts Avenue,
 6        Room 6100
          Washington, DC 20530
 7        Phone:  202.514.3671

 8        DANIEL STEPHEN GARRETT SCHWEI
          U.S. DEPARTMENT OF JUSTICE
 9        PO Box 883
          Washington, DC 20044
10        Phone:  202.305.8693

11        MR. JOHN R. TYLER
          20 Massachusetts Avenue NW
12        Washington, DC 20001
          Phone:  202.514.2356

13
    FOR THE JANE DOE'S:
14
          MS. NINA PERALES
15        MALDEF
          110 Broadway, Suite 300
16        San Antonio, Texas 78205
          Phone:  210.224.5476
17
          MR. CARLOS M. GARCIA
18        GARCIA & GARCIA ATTORNEYS AT
          LAW, P.L.L.C.
19        4905-A N. McColl
          McAllen, Texas 78504
20        Phone:  956.630.3889

21  FOR THE SEALED FILER:

22        MR. MURRAY J. FOGLER
          FOGLER, BRAR, FORD, O'NEIL &
23        GRAY LLP
          711 Louisiana, Suite 500
24        Houston, Texas 77002
          Phone:  713.481.1010

25
```

| | | |
|---|---|---|
| 13:33:58 | 1 | THE COURT:  Thank you.  Be seated. |
| 13:34:01 | 2 | All right.  All right.  We're here in |
| 13:34:08 | 3 | B-54-CV-25 -- B-14-CV-254, Texas versus the |
| 13:34:17 | 4 | United States. |
| 13:34:20 | 5 | Mr. Bitter, you want to introduce yourself |
| 13:34:22 | 6 | for the record? |
| 13:34:22 | 7 | MR. BITTER:  Yes, Your Honor.  Adam Bitter |
| 13:34:24 | 8 | with the Texas Attorney General's office for the |
| 13:34:26 | 9 | Plaintiff states. |
| 13:34:27 | 10 | THE COURT:  All right. |
| 13:34:29 | 11 | Ms. Ricketts or Mr. Schwei? |
| 13:34:33 | 12 | MR. GILLIGAN:  Well, Mr. Gilligan, if it |
| 13:34:35 | 13 | please the Court? |
| 13:34:36 | 14 | THE COURT:  Or, take your pick. |
| 13:34:37 | 15 | MR. GILLIGAN:  James Gilligan with the |
| 13:34:39 | 16 | Department of Justice for the Government, Your Honor. |
| 13:34:40 | 17 | With me at counsel table, as you have noted, |
| 13:34:43 | 18 | are David Schwei, Jennifer Ricketts, as well as |
| 13:34:47 | 19 | John Tyler and Mr. Hu. |
| 13:34:49 | 20 | THE COURT:  Mr. Hu, I -- I know. |
| 13:34:51 | 21 | Ms. Perales? |
| 13:34:52 | 22 | Oh, I'm sorry, and Mr. Smith, I know. |
| 13:34:54 | 23 | MS. PERALES:  Good afternoon, Your Honor. |
| 13:34:56 | 24 | Nina Perales for the Doe Intervenors. |
| 13:34:59 | 25 | And with me today is my co-counsel |

| | | |
|---|---|---|
| 13:35:00 | 1 | Mr. Carlos Garcia. |
| 13:35:02 | 2 | THE COURT:  Okay.  All right. |
| 13:35:04 | 3 | Mr. Fogler, welcome to South Texas. |
| 13:35:07 | 4 | MR. FOGLER:  Good to be here, Your Honor.  I |
| 13:35:09 | 5 | represent the sealed filer. |
| 13:35:11 | 6 | THE COURT:  All right. |
| 13:35:12 | 7 | Okay.  Let me start with what I think is a |
| 13:35:16 | 8 | simple issue first.  And, if it turns out I'm wrong, you |
| 13:35:21 | 9 | know, this hearing may take more time than I think it's |
| 13:35:25 | 10 | going to take. |
| 13:35:26 | 11 | We scheduled this hearing -- or originally |
| 13:35:30 | 12 | it was scheduled for a week or two ago, but we |
| 13:35:33 | 13 | originally scheduled the hearing in August, more or |
| 13:35:36 | 14 | less, as a scheduling conference. |
| 13:35:40 | 15 | The Government, and by "the Government", I |
| 13:35:42 | 16 | mean, the United States Government, has filed a motion |
| 13:35:46 | 17 | for rehearing, basically, in the Supreme Court. |
| 13:35:49 | 18 | Now, I've always been under the impression |
| 13:35:52 | 19 | that that stays the proceeding.  And, so, does anyone |
| 13:35:57 | 20 | under -- is anyone under a different impression? |
| 13:36:01 | 21 | MR. TYLER:  Your Honor, this is John Tyler. |
| 13:36:04 | 22 | Perhaps I can speak to that. |
| 13:36:05 | 23 | THE COURT:  All right. |
| 13:36:05 | 24 | MR. TYLER:  I've had the opportunity to |
| 13:36:08 | 25 | confer with counsel for the states and for the |

13:36:09   1   John Doe's -- Jane Doe's, I'm sorry, and we all agree

13:36:12   2   that it would be appropriate for Your Honor to continue

13:36:14   3   the stay until such time as the Supreme Court does rule

13:36:18   4   on the United States' petition for re-hearing.

13:36:21   5              And, thereafter, to allow the parties 30

13:36:24   6   days to confer amongst ourselves before we come back

13:36:26   7   before the Court on the scheduling matters.

13:36:28   8              THE COURT:  All right.  And that's -- is

13:36:29   9   there any objection to that?

13:36:31   10             MR. BITTER:  No, Your Honor.

13:36:31   11             THE COURT:  All right.  That's what we'll

13:36:33   12   do.

13:36:33   13             MR. TYLER:  Thank you, Your Honor.

13:36:35   14             THE COURT:  All right.  Let me move to -- we

13:36:48   15   have a fairly, what I would call, interesting motion to

13:36:52   16   intervene by some prisoners in the federal prison

13:36:59   17   system.

13:37:03   18             Some of that was interesting, some of it was

13:37:09   19   actually, I mean, when you think about it, one of the

13:37:12   20   prisoners at least claims that they are in jail for

13:37:15   21   violating Title 8 Section 1324, which is transporting

13:37:21   22   illegal aliens, and her argument was, well, if -- why

13:37:25   23   should I be in jail for transporting them if the illegal

13:37:29   24   aliens aren't in trouble for being in the country to

13:37:32   25   begin with?

13:37:34  1          The other three were convicted of other, as

13:37:38  2  far as I can remember, unrelated immigration crimes.

13:37:42  3          Is there anyone that has any feeling that

13:37:49  4  they have a vested interest in this case, like

13:37:54  5  Ms. Perales' clients, such that they -- they qualify as

13:37:58  6  Intervenors in this case?

13:38:00  7          MR. TYLER:  Again, Your Honor, I think I can

13:38:02  8  address that.  As you're aware, the United States has

13:38:06  9  opposed this motion for intervention.  I mean, there's

13:38:09  10  four requirements that a party seeking to intervene must

13:38:13  11  meet in order to succeed on such motion.

13:38:17  12          And I refer to them as the four felons do

13:38:19  13  not meet --

13:38:20  14          THE COURT:  The four felons.

13:38:22  15          MR. TYLER:  -- do not meet any one of those

13:38:25  16  elements, Your Honor.  So, you know, our -- our

13:38:27  17  opposition was two and a half pages.  We thought that's

13:38:29  18  what it deserves.  And I can respond to any questions

13:38:32  19  Your Honor might have, but I, you know, it's untimely.

13:38:35  20          They don't have a -- a legally protectable

13:38:39  21  interest in DAPA.  And the outcome of this case will not

13:38:43  22  put that interest, if it even existed, in jeopardy.

13:38:49  23          In fact, if the Government were ever to

13:38:50  24  succeed in this case, the four felons would have

13:38:53  25  opportunity at that time to seek the relief they want,

13:38:55  1   which is, amongst other things, they've asked Your Honor

13:38:59  2   to make them millionaires.  Five million a piece I think

13:39:02  3   it is.

13:39:02  4              THE COURT:  All right.

13:39:02  5              MR. TYLER:  So we think this is very

13:39:04  6   straight forward, Your Honor, and we oppose.

13:39:06  7              THE COURT:  Mr. Bitter, is the -- do the

13:39:08  8   states have any objection to the Government's position?

13:39:12  9              MR. BITTER:  No, we share that position.  We

13:39:14  10  did not file a -- a formal response because it didn't,

13:39:16  11  you know, request any relief from the states.  But we --

13:39:19  12  we share in the other party's position that there's no

13:39:21  13  merit behind the motion to intervene and, for that

13:39:25  14  matter, the other -- the other motions that the --

13:39:26  15  that -- that the inmates filed as well.

13:39:27  16             THE COURT:  All right.  Ms. Perales?

13:39:28  17             MS. PERALES:  Your Honor, we also filed an

13:39:30  18  opposition as docket 409 and simply add that we also

13:39:34  19  believe that venue is improper here because the prisoner

13:39:38  20  movants are incarcerated in Fort Worth in the Northern

13:39:41  21  District of Texas.

13:39:42  22             THE COURT:  All right.

13:39:43  23             Well, I don't think I need to venture in on

13:39:49  24  the venue issue.  I -- I'm denying the motion.

13:39:52  25             And I think -- believe they have a related

13:39:56  1    motion, and I can't remember what it was, but I'm also

13:39:58  2    denying that one.

13:39:59  3            Okay.  That brings us to what I think is the

13:40:04  4    last issue, although I'll let counsel brief me if

13:40:08  5    there's some other issue.

13:40:09  6            In our last hearing, which was after I

13:40:12  7    issued a sanctions order, I allowed the United States to

13:40:21  8    file some affidavits.

13:40:23  9            Now, as y'all will recall, as early as June

13:40:27  10   of 2015, I solicited affidavits from the United States

13:40:33  11   and they didn't give me any.

13:40:36  12           In fact, at one point, I had, basically to

13:40:40  13   paraphrase what I said, I said:  Do I have any

13:40:42  14   affidavits?  Do I have any proof?  I mean, that's what I

13:40:45  15   really need to see.  And that was on June 25th of 2015

13:40:50  16   asking for affidavits to support the Government's

13:40:54  17   position.  And I was not favored with any.  And then we

13:40:58  18   had a hearing on August 19th of 2015.

13:41:02  19           On April 8th of 2016, I put out an order

13:41:05  20   that says, look, I'm getting ready to rule.  You know,

13:41:09  21   what do you want me to rule on?  And, even then, I

13:41:12  22   didn't get any affidavits.

13:41:14  23           So, in our hearing last June, June 7th of

13:41:19  24   2016, I said, okay, do you want to file affidavits?  And

13:41:25  25   the Government finally has done that.

13:41:27  1          Now, the question is, and, Mr. Bitter, I'm

13:41:29  2  going to start with you, and my question is twofold:

13:41:36  3  Should I consider the affidavits?  I mean, it's kind of

13:41:39  4  like, you know, we've had the jury trial, now the losing

13:41:44  5  side wants to put on witnesses.  Number one.

13:41:47  6          And then my second question to you is going

13:41:49  7  to be, if I decide to consider it, does -- will it

13:41:53  8  change the ruling?

13:41:56  9          And I -- and, having said that, I -- I

13:41:58  10  realize that you have only seen redacted portions.

13:42:01  11          MR. BITTER:  Right, Your Honor, and that's

13:42:02  12  what I was going to speak to.

13:42:03  13          Consistent with what the Plaintiff states

13:42:06  14  indicated at the -- at the last status conference, we

13:42:08  15  break the May 2016 order into -- into two parts; one

13:42:13  16  being the, you know, the -- the portions regarding legal

13:42:18  17  ethics training and that piece.

13:42:20  18          And as to that piece, although the most

13:42:23  19  recent filing from the Defendants does -- does contain

13:42:26  20  some additional information that we had not seen before

13:42:29  21  and some additional affidavits, we -- we still don't

13:42:32  22  believe we're in a position to make an adversarial

13:42:36  23  presentation on those issues because there's so much

13:42:38  24  information that we don't see.

13:42:39  25          I think as -- as a general matter, the Court

13:42:40  1  allowed the Defendants to submit additional affidavits.

13:42:43  2  I don't think we take any position on whether that was

13:42:47  3  proper or improper for them to submit additional

13:42:50  4  affidavits.  Just that, even with those additional

13:42:53  5  affidavits, we're still not in a position to determine

13:42:55  6  whether the Court's ruling on that issue in terms of the

13:42:59  7  misrepresentations was -- was proper or not.

13:43:02  8          THE COURT:  Let me ask you a question.  And

13:43:03  9  this may not be fair because it's -- it wasn't

13:43:06  10  necessarily the subject matter that maybe you were

13:43:10  11  expecting to address.

13:43:14  12          The crux of the sanctions were certain

13:43:18  13  statements that were made to the court that weren't

13:43:25  14  true.  But the underlying subject matter concerns

13:43:33  15  certain DACA recipients who, instead of what the Court

13:43:37  16  and the states were under the impression were getting

13:43:41  17  two year renewals, actually got three year renewals.

13:43:45  18          We are coming up, basically, on the

13:43:50  19  anniversary, the second anniversary, of those renewals.

13:43:54  20          Do you, as -- and setting aside whether, you

13:43:58  21  know, what the attorney conduct was -- do you have any

13:44:04  22  idea of whether these renewals, the difference between a

13:44:09  23  two year and a three year, has caused any problems to

13:44:11  24  the states?

13:44:12  25          MR. BITTER:  Well, we're not really, at this

13:44:14   1   point, able to determine that.  All we have are hard

13:44:17   2   numbers in terms of how many people -- obviously, we

13:44:19   3   know some additional information on the post-injunction

13:44:22   4   grant, putting -- putting those aside for right now.

13:44:24   5           As the pre-injunction grants, we really just

13:44:26   6   have totals, we have breakdowns between the states, but

13:44:29   7   we really don't have any information to be able to say

13:44:31   8   this particular individual received this particular

13:44:33   9   benefit.  And that's why, you know, going back to some

13:44:36   10  of the -- the states' previous requests that we had

13:44:39   11  sought, not only personal identifiable information, but

13:44:43   12  also that the -- that the Defendants take action to

13:44:45   13  correct the records as to the pre-injunction grantees

13:44:49   14  just like the post-injunction grantees.

13:44:51   15          But the answer to your question, we're

13:44:52   16  really not in a position to say precisely how much, you

13:44:56   17  know, how much in the way of benefits have been

13:44:58   18  conferred on these individuals.

13:44:59   19          THE COURT:  Okay.  All right.  Well, thank

13:45:03   20  you, Mr. Bitter.

13:45:04   21          MR. BITTER:  Thank you, Your Honor.

13:45:05   22          THE COURT:  Ms. Perales, do you -- I know

13:45:07   23  you -- you're concerned about the remedy, but do you

13:45:10   24  want to weigh in on the actual -- whether the Court

13:45:13   25  should consider the affidavits or not?

13:45:14    1          MS. PERALES:  Your Honor, we, too, have only

13:45:19    2    seen redacted versions of the material.  We do not take

13:45:25    3    a position on the -- the -- the sanctions issues related

13:45:30    4    to the portions aside from the DACA portions.

13:45:34    5          That was inartfully put, Your Honor, but the

13:45:36    6    only portion of the May 19 order that we take a position

13:45:39    7    on relates to the DACA information and not to the

13:45:44    8    remaining sanctions for the Department of Justice or --

13:45:47    9    or whether the Court should accept the affidavits.

13:45:52   10          THE COURT:  Let me ask you a question.  I

13:45:54   11    know you're concerned and your clients are concerned and

13:45:58   12    some of the amicus briefs have expressed a concern about

13:46:02   13    a portion of my order that ordered certain biographical

13:46:10   14    information to be filed under seal.

13:46:14   15          Now, I note that the same amicus briefs that

13:46:17   16    were concerned about that filed information under seal

13:46:20   17    that -- so it's the same seal that was protecting them

13:46:23   18    that's protecting the information, but let me ask you a

13:46:28   19    question.  If the Court decided to stick with its order,

13:46:32   20    or at least its order of preparation of that, but

13:46:36   21    ordered it kept by, say, one of the attorneys for the

13:46:46   22    Government until such a time as the states showed that,

13:46:50   23    would -- would your clients have any problem with that?

13:46:53   24          MS. PERALES:  Yes, Your Honor.  I believe

13:46:55   25    referring back to the June 7th argument, and I -- I

13:47:00  1   don't want to repeat any of the argument that we

13:47:02  2   presented then or rehash the brief, the issue of fear

13:47:07  3   and concern about the disclosure of private information,

13:47:12  4   we believe, arises when these affected individuals would

13:47:18  5   learn that their names and addresses were being prepared

13:47:22  6   in a list and held by the Department of Justice for

13:47:25  7   potential disclosure.

13:47:27  8            THE COURT:  Well, the federal Government

13:47:29  9   already has that list.

13:47:30  10           MS. PERALES:  Well, my understanding --

13:47:32  11           THE COURT:  I mean, they already have all

13:47:34  12   the names and addresses.  Unless you're telling me they

13:47:36  13   don't, I'd be shocked.  I mean, but, there's a whole

13:47:39  14   application process to be -- that you have to go through

13:47:43  15   to -- to get into DACA.

13:47:46  16           MS. PERALES:  Yes, Your Honor.  And, without

13:47:48  17   speaking for other parties here, certainly it's true

13:47:52  18   that the recipients of three year work permits know that

13:47:55  19   their personal information resides somewhere within the

13:47:57  20   Department of Homeland Security or within CIS.

13:48:02  21           But the -- the news or the information that

13:48:05  22   that information was then being pulled out of those data

13:48:08  23   bases and assembled and held by the Department of

13:48:12  24   Justice for potential future disclosure would create the

13:48:18  25   kind of fear and worry that we described in the

13:48:20  1   affidavits and in our briefing.  We do believe that it

13:48:24  2   would have a negative effect.

13:48:25  3            And then also, of course, Your Honor, we

13:48:28  4   believe that such an order is not appropriate as a

13:48:33  5   sanction for what the Court has found to be misconduct

13:48:36  6   here.

13:48:37  7            THE COURT:  Okay.  And I can't -- I don't

13:48:39  8   remember which affidavit it was, but -- and whether

13:48:44  9   it -- it was in a redacted or unredacted form, but one

13:48:47  10  of the Government's affidavits said, we weren't

13:48:49  11  concerned about the difference between two or three

13:48:52  12  years because we know we could always get back the extra

13:48:55  13  year.  Now I'm paraphrasing.

13:48:58  14            MS. PERALES:  Uh-huh.

13:48:59  15            THE COURT:  And, obviously, I assume that

13:49:02  16  your clients, as well as the amicus briefs filed on

13:49:05  17  behalf of the DACA people, would find that to be

13:49:09  18  actually more damaging than preparing a list?

13:49:12  19            MS. PERALES:  I -- I couldn't weigh those

13:49:13  20  two things, Your Honor, particularly because, right now,

13:49:17  21  a two year work permit is renewable, just like a three

13:49:21  22  year work permit is.

13:49:22  23            The practical impact on an individual would

13:49:25  24  be having to pay the $465 fee for renewal perhaps a year

13:49:30  25  earlier than otherwise anticipated for somebody with a

13:49:33   1   three year work permit.

13:49:34   2                  THE COURT:  Okay.  So every time they renew

13:49:36   3   it, they'd have to pay that fee?

13:49:38   4                  MS. PERALES:  Yes, Your Honor, that's right.

13:49:40   5                  THE COURT:  Okay.

13:49:40   6                  MS. PERALES:  Whether or not the Government

13:49:42   7   has the discretion, and it always has, to determine the

13:49:47   8   length of deferred action for deferred action

13:49:50   9   recipients, I did want to respond to something that the

13:49:53  10   court said very early in the hearing about the Court's

13:49:57  11   understanding that the petition for rehearing in the

13:49:59  12   U.S. Supreme Court stays the proceedings down here.

13:50:04  13                  And we would say, not only that we agree

13:50:09  14   with that, but point the Court to Supreme Court Rule 45,

13:50:13  15   which says that the pendency of the petition for

13:50:16  16   rehearing, even in an appeal from a federal court, which

13:50:19  17   is what we have here, stays the issuance of a mandate or

13:50:24  18   what would otherwise be the final ruling of the court.

13:50:28  19                  Because of that, and as we argued on June

13:50:31  20   7th, we believe that the kind of order related to DACA

13:50:37  21   recipients' information is so closely related to merits

13:50:42  22   relief in this case, that the Court, at this point in

13:50:46  23   time, does not have jurisdiction to order either the

13:50:52  24   information to be disclosed to the Court or assembled

13:50:55  25   into some kind of list for potential further disclosure.

| | |
|---|---|
| 13:50:58 | 1 |
| 13:51:01 | 2 |
| 13:51:05 | 3 |
| 13:51:07 | 4 |
| 13:51:07 | 5 |
| 13:51:09 | 6 |
| 13:51:09 | 7 |
| 13:51:11 | 8 |
| 13:51:15 | 9 |
| 13:51:19 | 10 |
| 13:51:21 | 11 |
| 13:51:25 | 12 |
| 13:51:28 | 13 |
| 13:51:32 | 14 |
| 13:51:33 | 15 |
| 13:51:34 | 16 |
| 13:51:36 | 17 |
| 13:51:41 | 18 |
| 13:51:44 | 19 |
| 13:51:47 | 20 |
| 13:51:49 | 21 |
| 13:51:57 | 22 |
| 13:52:02 | 23 |
| 13:52:05 | 24 |
| 13:52:07 | 25 |

THE COURT:  Well, except I've already ordered it.  So I'm talking about withdrawing the order.

MS. PERALES:  We would appreciate that, Your Honor.

THE COURT:  Well, do I have jurisdiction to do that?

MS. PERALES:  Yes, I believe the Court does have jurisdiction to do that.  Yes.  To vacate its order pursuant to the motion of -- of the United States.

Or to stay it pending the appeal that's been filed by the Doe's, which is still sitting in the Fifth Circuit at this point, but which has been stayed by the Fifth Circuit in light of the federal Government's motion to vacate.

THE COURT:  All right.

MS. PERALES:  Thank you, Your Honor.

THE COURT:  All right.  Mr. Gilligan, Ms. Ricketts, who wants to address my issues here?

MR. GILLIGAN:  Good afternoon, Your Honor. I will attempt to do so.

If the -- if it please the Court, I'll -- I'll start with the issue regarding whether the Court should consider the additional evidence we submitted on July 31st.

Although the -- the question the Court --

13:52:12  1   the Court posed, I assume it to mean having DHS provide

13:52:18  2   the PII to the Department of Justice for safe keeping

13:52:20  3   for some period of time.  That's -- that -- that is --

13:52:23  4   that's an intriguing one and I'll -- I'll address that

13:52:26  5   as well.

13:52:26  6            Your -- Your Honor, the -- the -- the first

13:52:32  7   thing I'd -- I'd like to say, with the court's

13:52:34  8   indulgence, regarding this court's May 19th order and

13:52:38  9   the sanctions issue, is -- and it's -- and it's the

13:52:43  10  first thing to say, I think, which is that we are sorry

13:52:47  11  for the mistakes that we made that led to this

13:52:53  12  situation.

13:52:53  13           We are sorry for leading this court to

13:52:55  14  believe that it had been deceived and we are sorry for

13:52:59  15  the Court's time and energies that this matter has

13:53:02  16  consumed.  And -- and we hope that the sworn

13:53:06  17  declarations that we have now submitted to the court

13:53:10  18  have provided the assurance that the court was looking

13:53:13  19  for, that none of what has occurred was ever intentional

13:53:17  20  on our part or on the part of any of our attorneys

13:53:21  21  involved in the defense of this case.

13:53:22  22           And -- and we are extraordinarily grateful

13:53:25  23  that the Court extended to us the opportunity to -- to

13:53:30  24  provide that evidence.  We think it shows quite

13:53:35  25  powerfully in detail, in total over a hundred pages of

13:53:42  1   sworn testimony, that demonstrate uniformly that there

13:53:46  2   was never any intent to deceive this court about the

13:53:49  3   three year terms of deferred action or -- or to conceal

13:53:53  4   that fact from the Court.

13:53:55  5             And, so, we think that the just course would

13:54:00  6   be, yes, for the Court to consider that evidence and to

13:54:04  7   come to what we believe is the just result to which that

13:54:08  8   evidence leads, which is that the Court's May 19th

13:54:13  9   sanction orders, both of them, be -- be withdrawn and,

13:54:19 10   as well, the findings on which they rest.

13:54:21 11             We have -- we have tried -- we understand

13:54:27 12   the Court's frustration, as it was expressing earlier,

13:54:33 13   with this process as it has unfolded.  We have

13:54:38 14   attempted, throughout this process, to -- to convince

13:54:42 15   the Court of the department's good faith in this matter,

13:54:46 16   of the department's dedication to its duty of candor and

13:54:50 17   the highest standards of legal ethics.

13:54:54 18             And we recognize, particularly in the wake

13:54:58 19   of the court's May 19th order, that we have failed to do

13:55:01 20   so, at least with our words.  Which is why, regardless

13:55:03 21   of how this court may rule on the sanctions issue

13:55:06 22   ultimately, Mr. Mizer, the head of the civil division,

13:55:12 23   has directed the course of supplemental training for all

13:55:15 24   civil division attorneys, approximately 1,000 of them,

13:55:20 25   if my memory serves, including himself.

| | | |
|---|---|---|
| 13:55:23 | 1 | Because while we are -- |
| 13:55:24 | 2 | THE COURT:  Let me -- let me ask you a |
| 13:55:25 | 3 | question about that.  And -- and I actually greatly |
| 13:55:28 | 4 | appreciate the fact that he's done that.  I mean, I |
| 13:55:31 | 5 | think that's a worthy step. |
| 13:55:36 | 6 | Let me -- let me just ask for my own |
| 13:55:38 | 7 | edification here.  The attorneys at the Department of |
| 13:55:46 | 8 | Justice travel nationwide and appear in courts all over |
| 13:55:51 | 9 | the nation. |
| 13:55:55 | 10 | MR. GILLIGAN:  Correct. |
| 13:55:56 | 11 | THE COURT:  The McDade amendment, whether |
| 13:55:58 | 12 | y'all agree with it or not, and I know there's -- it's |
| 13:56:01 | 13 | not without its own controversy when it -- when it got |
| 13:56:05 | 14 | passed, basically requires the Department of Justice |
| 13:56:08 | 15 | lawyers to abide by any of the local Rules of Ethics in |
| 13:56:16 | 16 | whatever court they appear in.  By local, I mean, state. |
| 13:56:20 | 17 | MR. GILLIGAN:  Right. |
| 13:56:22 | 18 | THE COURT:  What steps do y'all take to even |
| 13:56:25 | 19 | make sure you know what they are?  And I -- and I -- and |
| 13:56:28 | 20 | this is just for my own edification.  This isn't a trap. |
| 13:56:32 | 21 | I mean, does the Department of Justice have |
| 13:56:34 | 22 | any, you know, rule that, okay, you know, you're going |
| 13:56:43 | 23 | to appear in Texas.  You know, before you appear, you |
| 13:56:47 | 24 | need to read the Texas Rules of Ethics so you make sure |
| 13:56:50 | 25 | you're complying with it? |

13:56:52   1           I mean, what do y'all do to make sure you're

13:56:55   2   complying with the McDade amendment?

13:56:57   3           MR. GILLIGAN:  Well, Your Honor, I can only

13:56:58   4   speak to my own experience as a civil division attorney.

13:57:00   5   I don't know that there's a uniformity of practice

13:57:03   6   throughout the entire department.  And I know that, in

13:57:05   7   the civil division, we have annual ethics training

13:57:09   8   requirements which are spelled out in Mr. Mizer's

13:57:11   9   declaration in which I believe we have also described

13:57:14  10   for the court in -- in prior --

13:57:16  11           THE COURT:  No, I've read them online, but

13:57:18  12   those don't necessarily cover a specific state.

13:57:21  13           MR. GILLIGAN:  Correct, Your Honor.

13:57:22  14           THE COURT:  How do you know you're complying

13:57:23  15   with the Rules of Ethics in Texas if you've never read

13:57:26  16   them?

13:57:28  17           MR. GILLIGAN:  Well --

13:57:29  18           THE COURT:  I'm -- I'm -- I'm saying that

13:57:30  19   hypothetically.  I'm not saying you've never read them,

13:57:33  20   but, I mean --

13:57:34  21           MR. GILLIGAN:  Right.  Your -- Your Honor,

13:57:35  22   I -- there's -- I -- I -- I can't -- I don't know the

13:57:39  23   decision making behind the department's determination of

13:57:43  24   what training attorneys require before they -- in order

13:57:50  25   to perform their function as -- as a Government counsel

13:57:55  1    and -- and in order to appear in the various states of

13:57:59  2    the union as -- as they represent the Government where

13:58:03  3    it is -- where it is a Defendant in a litigation.

13:58:08  4              So I can't answer the question insofar as,

13:58:14  5    you know, what is -- what is our leadership's thinking

13:58:17  6    behind the -- the ethics training requirements we have.

13:58:20  7              But they -- I -- I'm aware, at least as a

13:58:22  8    civil division attorney, that I must annually engage in

13:58:26  9    multiple hours of both attorney and Government ethics

13:58:28  10   training with the purpose being to assure that my

13:58:30  11   conduct is in keeping with the ethical standards, which

13:58:34  12   I -- I think it's fair to say are somewhat uniform from

13:58:38  13   state to state.

13:58:39  14             Yes -- yes, there is a variance, but,

13:58:41  15   certainly, at least the basics are the same.  Certainly

13:58:44  16   concepts such as candor and forthrightness to the

13:58:48  17   tribunal are -- are universal concepts.

13:58:51  18             The -- the --

13:58:51  19             THE COURT:  No, I'm -- I mean, there's no

13:58:56  20   differentiation as it applies to our issue here, but

13:58:57  21   I -- that's why I was trying to make sure you understand

13:58:59  22   I was speaking hypothetically.  I mean, it would seem

13:59:02  23   like it would be a, you know, a good rule for the

13:59:09  24   justice department to have for their own attorneys that,

13:59:12  25   before you appear in the courts of Indiana or the courts

| | | |
|---|---|---|
| 13:59:16 | 1 | of Illinois, that you at least have a familiarity, at |
| 13:59:21 | 2 | least have read the Code of Ethics of by which you're |
| 13:59:23 | 3 | bound. |
| 13:59:23 | 4 | MR. GILLIGAN:  Well, Your Honor, I -- I |
| 13:59:26 | 5 | think I could say this, which is I have some confidence |
| 13:59:28 | 6 | that the transcript of this hearing toady will be widely |
| 13:59:32 | 7 | read within the department and so perhaps your |
| 13:59:33 | 8 | suggestion will be taken note of. |
| 13:59:34 | 9 | THE COURT:  All right.  Let's go back to the |
| 13:59:36 | 10 | issue of should I or should I not consider these |
| 13:59:40 | 11 | affidavits.  And I do appreciate the affidavits.  I -- I |
| 13:59:44 | 12 | wish I'd had them a year ago when I asked for them, but |
| 13:59:48 | 13 | let's talk about that. |
| 13:59:49 | 14 | MR. GILLIGAN:  Well, Your Honor, again, you |
| 13:59:53 | 15 | extended the opportunity to us on June 7th to submit |
| 13:59:57 | 16 | additional evidence and we -- as I say, we were |
| 14:00:01 | 17 | extraordinarily grateful for that opportunity and we -- |
| 14:00:03 | 18 | we seized the opportunity on this occasion and -- and |
| 14:00:07 | 19 | provided the Court with over 100 pages of sworn |
| 14:00:10 | 20 | testimony on the issues that are addressed in the |
| 14:00:12 | 21 | Court's May 19th order. |
| 14:00:17 | 22 | The testimony is uniform, it is mutually |
| 14:00:21 | 23 | corroborating, it is detailed and it explains in great |
| 14:00:26 | 24 | detail the events that led to the various |
| 14:00:29 | 25 | representations that were made to the court and explains |

14:00:32  1  that there was never any intent on the part of any of

14:00:36  2  the attorneys involved to deceive the Court about the

14:00:39  3  three year terms or to withhold information from the

14:00:41  4  court about the three year terms for the simple reason

14:00:44  5  that three year terms simply were not on our counsel's

14:00:48  6  minds at the times in question.

14:00:50  7      Because, as explained in the declaration

14:00:54  8  testimony, that was a -- the information that they

14:00:58  9  received about the three year terms resulted in only a

14:01:06  10  brief awareness about that before it faded from

14:01:12  11  conscious awareness in what can only be called at the

14:01:15  12  time in December of 2014 the Fog of War.

14:01:17  13      The -- the -- the intense pressures of not

14:01:25  14  one but two cases challenging a very important national

14:01:28  15  federal program, the Plaintiffs in both cases had moved

14:01:31  16  for preliminary injunctions, both cases were proceeding

14:01:35  17  on simultaneous fast track timetables.

14:01:37  18      The attorneys were being inundated with

14:01:41  19  tremendous amounts of information from the client agency

14:01:44  20  about the administration and enforcement of the

14:01:46  21  immigration laws.  They were trying to understand how

14:01:49  22  this information bore on complex and, at least to them,

14:01:54  23  novel, legal issues.

14:01:55  24      All while trying to get briefs written

14:01:58  25  and -- and -- and to prepare for hearings, you know,

14:02:00  1  within days.

14:02:02  2          And -- and so there came at one point this

14:02:07  3  blip on the radar, but it quickly fell off the radar

14:02:12  4  because, to those who were at the center of these

14:02:15  5  events, in the serenity of litigation, what appeared to

14:02:19  6  them to be the true issue of moment in light of the

14:02:22  7  arguments that had been made by the states in the case,

14:02:27  8  at least for purposes of the PI proceeding, was when

14:02:31  9  would DHS begin to implement the expanded eligibility

14:02:37  10  guidelines.

14:02:37  11          Because it was the expansion of the

14:02:38  12  population eligible for deferred action to which the

14:02:42  13  states had tethered their claims of irreparable injury,

14:02:47  14  not to an -- an increase in the term of deferred action

14:02:51  15  provided, in particular, under the 2012 DACA guidelines,

14:02:56  16  which were unchallenged in the litigation.

14:02:58  17          So, while it -- it -- it, in retrospect,

14:03:06  18  perhaps, the perspective that they took matters may have

14:03:10  19  been too narrow, the perspective they took was certainly

14:03:13  20  reasonable and perfectly natural.

14:03:15  21          Again, given the -- the -- the issues as

14:03:19  22  they had been framed, not by them, but by the pleadings

14:03:23  23  filed by the states, and the incredible time pressures

14:03:27  24  they were under and the need to focus on what was most

14:03:30  25  obviously relevant and deal -- and deal with those

14:03:33   1   issues, rather than things that, you know, appeared,

14:03:36   2   at -- at best, to be tangentially relevant.

14:03:38   3            So, at the time of the December 19th

14:03:42   4   telephone conference, for example, the -- the three year

14:03:45   5   terms were not on our counsel's mind.  And, so, when the

14:03:50   6   question was raised by the states' counsel about the

14:03:54   7   speed with which the new program would be -- would be

14:03:59   8   implemented and whether anything would happen to change

14:04:02   9   the playing field before the hearing could be had on the

14:04:05   10   states' motion, our counsel took that as a reference to

14:04:10   11   implementing the expanded eligibility guidelines; first,

14:04:14   12   because that was consistent, not just with that

14:04:16   13   individual's view of the case, but with the collective

14:04:20   14   view of the case that the entire team of attorneys at --

14:04:25   15   at the justice department had of the case.

14:04:27   16            And also, it -- that was counsel's

14:04:30   17   understanding of the question that had been posed.

14:04:35   18   Because, at that time, counsel simply had no

14:04:39   19   recollection regarding the three year terms at that

14:04:42   20   point.

14:04:43   21            The -- the same was true at the preliminary

14:04:46   22   injunction hearing where Your Honor was discussing with

14:04:51   23   counsel the question of our request for an extension of

14:04:55   24   time to file a surreply.

14:04:57   25            THE COURT:  Tell me -- let me jump ahead.

14:05:02   1   Right before the March 3rd advisory, it pops up on the

14:05:12   2   radar screen of one of the attorneys because of the

14:05:15   3   number.  And this is what I -- I don't understand and I

14:05:19   4   need some, I guess, clarification on.  Why did that make

14:05:25   5   a difference?

14:05:28   6             You can assume for purposes of this argument

14:05:31   7   that -- that I've -- I've looked at enough of your

14:05:36   8   filings, both in terms of affidavits and in terms of

14:05:39   9   other filings that y'all have made in camera, that I

14:05:46   10  believe that, once it popped up on the radar screen,

14:05:49   11  y'all acted promptly.

14:05:52   12            But I can't -- I -- I still don't understand

14:05:55   13  why, you know, oh, my God, there's over 100,000 of

14:06:00   14  these, we'd better tell the Judge.

14:06:03   15            I mean, you know, why not 50,000?  Why not

14:06:06   16  30,000?  Why not 10?  I mean, that's -- that's a point

14:06:10   17  I'm having problems with.

14:06:11   18            MR. GILLIGAN:  Well, Your Honor, if -- if --

14:06:13   19  if the question is, or if the question assumes, and

14:06:18   20  correct me if I'm misunderstanding it, but if the

14:06:20   21  question assumes that the Department of Justice was

14:06:24   22  receiving periodic updates on the number of three year

14:06:26   23  terms that had been offered, that was not the case.

14:06:30   24            THE COURT:  No.  No.  That's -- that's --

14:06:32   25  I'm not -- that's not my question really.

14:06:35    1          MR. GILLIGAN:  Okay.

14:06:35    2          THE COURT:  My question is:  The injunction

14:06:42    3    gets entered.  A couple weeks later, all of a sudden,

14:06:45    4    one of the attorneys involved realizes that there have

14:06:50    5    been these three year DACA renewals that have been made

14:06:54    6    and that they exceed 100,000.  Because almost every

14:06:58    7    affidavit I've got said, came on our radar screen when

14:07:01    8    we realized how many there were.

14:07:04    9          And -- and my ruling, as you know, basically

14:07:10    10   took y'all to task on -- on whether, if you say, you

14:07:15    11   know, it's not happening, it doesn't matter whether

14:07:19    12   there's one or there's 100,000, you still haven't told

14:07:22    13   the truth to the Court.

14:07:25    14          And, initially, I agree with you because I

14:07:29    15   didn't understand the facts.  And I may still not

14:07:35    16   understand the facts and that's why I'm asking you for

14:07:37    17   help here.  I was worried that, you know, this was

14:07:40    18   information you sat on.  And I think your evidence you

14:07:46    19   have given me now clearly dispels that notion, so --

14:07:51    20          MR. GILLIGAN:  Thank you, Your Honor.

14:07:51    21          THE COURT:  But -- but here's what I'm

14:07:53    22   trying to figure out.  I'm trying to figure out why -- I

14:07:57    23   mean, if you didn't think it was wrong to begin with,

14:08:02    24   why tell me if there's 100,000?

14:08:04    25          MR. GILLIGAN:  Well, it was -- it was not

14:08:06  1   simply learning the number.  For -- for -- it -- it

14:08:09  2   was -- it was -- at -- at least -- I -- I hesitate here,

14:08:16  3   Your Honor, because I don't want to get into matters

14:08:17  4   that are still under seal.

14:08:19  5            But, to speak in general terms, it was a

14:08:27  6   simultaneity of -- of several factors.

14:08:29  7            It wasn't -- when it was reported that there

14:08:34  8   were 100,000 of these, it -- it was both putting a

14:08:39  9   number to it, but also returning to conscious awareness

14:08:43  10  for these attorneys a fact that they had forgotten

14:08:46  11  entirely.

14:08:47  12            So, if it had been -- if the number reported

14:08:50  13  had been 50,000, or 30, or 10, as the Court as said, it

14:08:54  14  still would have been for the attorneys a matter not

14:08:58  15  only of the number, but being, for some really learning

14:09:08  16  for the first time and others being reminded for the

14:09:11  17  first time since very early in the case, that this was

14:09:14  18  going on at all.

14:09:15  19            And, so, it was really, you know, it was

14:09:20  20  really a package of information there, not just the

14:09:22  21  number.

14:09:22  22            And that was combined further with the fact

14:09:25  23  that the court had not simply enjoined the

14:09:30  24  implementation of the new eligibility guidelines, which

14:09:34  25  had been, at least in the Government's understanding,

14:09:36  1    the focus of the proceedings, but, as we know, the Court

14:09:39  2    had enjoined any and all implementation of the changes

14:09:42  3    to the 2012 DACA program, which, of course, on its face,

14:09:46  4    would -- would include the -- the change from two to

14:09:50  5    three years of deferred action.

14:09:53  6             So, it was that combination of factors that

14:09:56  7    this -- this was a -- a -- an activity that the court

14:10:01  8    had now enjoined and that folks learned that it had been

14:10:06  9    occurring, or at least occurring on such a large scale,

14:10:09  10   that, suddenly, as -- as we tried to explain in the

14:10:11  11   papers we've submitted, that that suddenly gave the

14:10:14  12   three year terms a new relevance that -- that they

14:10:21  13   simply did not have in the minds of our attorneys

14:10:24  14   before.

14:10:24  15            And once -- you know, once -- before, we had

14:10:29  16   blips on the radar.  Now we had a bomb going off.  And

14:10:34  17   our bell was rung, the light went on, and as -- as

14:10:38  18   Your Honor said, once we realized that this was a fact

14:10:40  19   of importance that should be brought to the court's

14:10:42  20   attention, we acted with utmost speeds to get that

14:10:45  21   information to the Court and not only simply said, oh,

14:10:49  22   Your Honor, 100,000 of these three year terms were

14:10:53  23   granted.

14:10:54  24            We went further than that, Your Honor.  I --

14:10:55  25   I want to under score, we went further in the March 3rd

14:10:58   1   advisory and pointed to the fact that this information

14:11:03   2   could be inconsistent with statements we had made

14:11:09   3   inadvertently.  So we hope we have assured the Court

14:11:12   4   previously in the case.

14:11:13   5           So we -- we acted, once the light went on,

14:11:19   6   to comply with, you know, our duty of candor as we

14:11:24   7   understood it and -- and to do what the attorneys with

14:11:29   8   their own sense of -- of right and wrong and integrity

14:11:31   9   felt was the right thing to do.

14:11:33   10           THE COURT:  Okay.

14:11:35   11           MR. GILLIGAN:  And -- and, Your Honor, I --

14:11:38   12   essentially, for -- for that reason, we think that the

14:11:41   13   just result is to consider those declarations because

14:11:45   14   they do support the -- the truth of what we have been

14:11:48   15   saying of the position we have been informing the Court

14:11:52   16   of since the Court's April 7th order.

14:11:55   17           And -- and, therefore, we -- we respectfully

14:12:00   18   request that you, in -- in keeping with the facts

14:12:03   19   demonstrated by those declarations, withdraw both the

14:12:06   20   May 19th orders and the findings that they rest on in

14:12:13   21   the interest of justice.

14:12:14   22           THE COURT:  Okay.  Thank you.

14:12:17   23           MR. GILLIGAN:  Oh, oh, would Your Honor care

14:12:19   24   for me to address the issue regarding the PII?

14:12:23   25           THE COURT:  I -- I didn't hear that.  I'm

14:12:24  1   sorry?

14:12:25  2           MR. GILLIGAN:  I'm sorry.  I -- I -- I told

14:12:27  3   Your Honor at -- at -- at the beginning of my remarks

14:12:30  4   that I would like to address the issue of the PII that

14:12:34  5   you spoke to Ms. -- Ms. Perales about.

14:12:35  6           THE COURT:  Yes, go ahead.

14:12:38  7           MR. GILLIGAN:  As -- as I understand it, the

14:12:40  8   idea would be, instead of having the -- the PII that the

14:12:43  9   Court had talked about in its May 19th order filed under

14:12:46 10   seal with the court, that it would -- that DHS would

14:12:49 11   provide it to the Department of Justice for safe keeping

14:12:53 12   for some period of time.

14:12:53 13           Am I -- am I understanding the Court

14:12:55 14   correctly as far as that goes?

14:12:56 15           THE COURT:  Well, I was just thinking of

14:12:56 16   giving it to an officer of the court affiliated with the

14:13:00 17   justice department if -- and that's, I thought,

14:13:07 18   apparently wrongfully, according to Ms. Perales, that

14:13:10 19   that would assuage anyone's concern because, you know,

14:13:14 20   the information would still be on this side of the V, so

14:13:18 21   to speak.

14:13:20 22           MR. GILLIGAN:  Your Honor, as I -- as I said

14:13:22 23   a little while ago, that's -- that's an intriguing

14:13:25 24   proposal; one that I confess had not occurred to us

14:13:30 25   before we came into the courtroom today.

| | | |
|---|---|---|
| 14:13:32 | 1 | And -- and, so, what I would beg the Court's |
| 14:13:39 | 2 | indulgence to do is -- is, if possible, speak with my |
| 14:13:42 | 3 | client about this this afternoon and -- and to get back |
| 14:13:46 | 4 | to the court about that as quickly as possible? |
| 14:13:48 | 5 | THE COURT:  Okay.  That's -- you're welcome |
| 14:13:50 | 6 | to do that. |
| 14:13:51 | 7 | MR. GILLIGAN:  All right, Your Honor.  We |
| 14:13:52 | 8 | will -- we will attempt to do that and get back to the |
| 14:13:54 | 9 | court hopefully some time today if we can reach the |
| 14:13:58 | 10 | appropriate personnel in D.C. |
| 14:14:00 | 11 | Thank you, Your Honor. |
| 14:14:01 | 12 | THE COURT:  Okay.  And -- and let me add, if |
| 14:14:03 | 13 | you'll recall from our last hearing, assuming I -- I |
| 14:14:09 | 14 | don't change it, my order was written broadly, but all I |
| 14:14:13 | 15 | was talking about was, you know, basic identifiers. |
| 14:14:16 | 16 | MR. GILLIGAN:  Yes, we -- we -- we -- we do |
| 14:14:18 | 17 | recall that, Your Honor, from -- from the June 7th |
| 14:14:20 | 18 | hearing and we appreciate that clarification as well. |
| 14:14:22 | 19 | That that was -- that came as quite a relief to my |
| 14:14:26 | 20 | client. |
| 14:14:26 | 21 | THE COURT:  Okay.  All right.  Mr. Fogler, |
| 14:14:31 | 22 | you have a client that has an interest in this.  Would |
| 14:14:34 | 23 | you like to say anything? |
| 14:14:35 | 24 | MR. FOGLER:  Yes, Your Honor.  Very briefly. |
| 14:14:40 | 25 | First of all, as a practical matter, I don't -- I don't |

14:14:44  1    think you could be faulted for considering any of the

14:14:47  2    evidence in front of you.  And, of course, you have the

14:14:50  3    discretion to afford it whatever weight you choose.

14:14:53  4            But, from the standpoint of my client, the

14:14:56  5    sealed filer, your opportunity in June of this year is

14:15:01  6    really the first opportunity that the sealed filer had

14:15:05  7    to provide an explanation and an apology separate from

14:15:09  8    the Department of Justice.  And that's --

14:15:12  9            THE COURT:  Well, and you -- and you

14:15:12  10   understand, Mr. Fogler, I've been asking for that, for

14:15:14  11   not an apology, I've been asking for evidence of good

14:15:17  12   faith for over a year?

14:15:19  13           MR. FOGLER:  I -- I can appreciate that and

14:15:20  14   I haven't been involved, but you, from the -- from

14:15:24  15   the -- again, from the standpoint of the sealed filer,

14:15:27  16   once your April of 2015 order was issued, the sealed

14:15:32  17   filer was recused from any further decision making.

14:15:36  18           THE COURT:  No, I understand that.

14:15:38  19           MR. FOGLER:  And so that was the first

14:15:39  20   opportunity, then, that the sealed filer had to make

14:15:40  21   that point.

14:15:41  22           So -- and the other -- the only other point

14:15:44  23   is, because I think it's important based on your

14:15:47  24   comments from the sealed filer's standpoint, the number

14:15:51  25   didn't matter because the sealed filer had no conscious

14:15:55   1    knowledge whether it was one or 100,000 until very late

14:16:00   2    February or early March of -- of 2014.

14:16:04   3              So that's all I -- I wanted to say.

14:16:05   4              THE COURT:  All right.

14:16:07   5              MR. FOGLER:  Thank you, Your Honor.

14:16:08   6              THE COURT:  Thank you, Mr. Fogler.

14:16:09   7              Mr. Bitter, anything you or Ms. Perales want

14:16:15   8    to add?

14:16:15   9              MR. BITTER:  I just want to add one point on

14:16:17   10   the -- the personally identifiable information.

14:16:20   11             I'm not sure immediately that, you know, we

14:16:22   12   have a position on the ministerial act of whether the --

14:16:26   13   the -- the data would go to an officer of the court or

14:16:28   14   to the -- the Court under seal pursuant to the previous

14:16:32   15   order, but the only two points I would raise to that is

14:16:34   16   that, under the Court's May 2016 order, the state still

14:16:39   17   has to make a -- a showing of good cause to be able to

14:16:41   18   obtain that data.

14:16:43   19             And we understand the concerns that have

14:16:44   20   been raised by the Jane Doe's and others with respect to

14:16:48   21   the privacy associated with that data.  We -- we

14:16:52   22   appreciate those concerns.  And I would just point out

14:16:54   23   that, as to the post-injunction grantees, we were able

14:16:57   24   to work out a protective order reflecting -- you know,

14:16:59   25   reflecting certain protections on that data.  And I

14:17:03   1   would certainly point out that, you know, we would

14:17:04   2   certainly be amenable to enter into any kind of

14:17:06   3   protective order regarding that data as well.

14:17:09   4         Those are the only two points I would -- I

14:17:11   5   want to add on that.

14:17:12   6         THE COURT:  All right.  Thank you.

14:17:13   7         MR. BITTER:  Thank you, Your Honor.

14:17:14   8         THE COURT:  Ms. Perales, anything you'd like

14:17:16   9   to add?

14:17:16   10        MS. PERALES:  Yes, Your Honor.  All of the

14:17:18   11  arguments the Jane Doe's presented in oral argument in

14:17:21   12  June, as well as in their brief, apply to an order that

14:17:25   13  would have the DACA recipients' personal information

14:17:31   14  taken out of the current Government records and given to

14:17:35   15  somebody else.  Whether that's the Court, whether that's

14:17:38   16  an officer of the court.  All -- all of the arguments

14:17:40   17  remain the same so I wanted to make sure that I said

14:17:43   18  that.

14:17:43   19        THE COURT:  No, I understood that.

14:17:44   20        MS. PERALES:  And I -- I do not understand,

14:17:46   21  and I'm obviously not a party to whatever Mr. Gilligan

14:17:50   22  is going to say or do with his clients, but, if the

14:17:54   23  Government does file something in response to the

14:17:57   24  Court's suggestion, the Doe's would simply want the

14:18:00   25  opportunity to file something in response.

14:18:02    1          THE COURT:  Okay.  And you have that -- you

14:18:04    2   have my permission to do that.

14:18:05    3          MS. PERALES:  Thank you.

14:18:06    4          THE COURT:  I mean, I -- I think all parties

14:18:10    5   here realize, but maybe I should say it, that my intent

14:18:16    6   here with regard to that filing, was twofold:  One, that

14:18:22    7   was the subject matter of the misrepresentations.  And,

14:18:30    8   as such, you know, fixing it was a -- I won't say a

14:18:38    9   priority -- but part of a -- a remedy, if you will.

14:18:42   10          And -- and then, secondly, if the states

14:18:45   11   were harmed, and I've not been shown any harm, but I

14:18:52   12   would -- and -- and Mr. Bitters is quite correct, even

14:18:59   13   if I decided to order that information be kept with an

14:19:02   14   officer of the court, that -- there's -- I would not

14:19:05   15   change anything as far as putting the burden on the

14:19:09   16   states to come forward, obviously, in a hearing with

14:19:13   17   everyone present to actually show me that they have

14:19:16   18   somehow been harmed by this.

14:19:19   19          Because to date, I -- I can't see the harm.

14:19:27   20   But, out of an abundance of caution, both then and now,

14:19:30   21   I don't want to rule that there is no harm because I

14:19:33   22   don't know that.  I mean, you know, I have no way of

14:19:36   23   knowing whether there's harm or not.

14:19:39   24          And, you know, I -- I kind of sideswiped

14:19:41   25   Mr. Bitter today by asking him that and -- and he not

14:19:45  1  only represents the State of Texas, he represents 25

14:19:48  2  other states and he doesn't know if they're harmed or

14:19:50  3  not either.

14:19:53  4          And -- and, so, it was -- it was more of a

14:19:57  5  precaution than anything else.

14:20:00  6          All right.  I have --

14:20:03  7          MR. GILLIGAN:  Your Honor, may I -- may I

14:20:04  8  just say one thing --

14:20:05  9          THE COURT:  You may.

14:20:06  10          MR. GILLIGAN:  -- in response to what you

14:20:07  11  just said?

14:20:08  12          Regarding the -- how to handle the PII, I

14:20:12  13  just want to under score that the Government considers

14:20:14  14  that to be a -- a matter independent of the sanctions

14:20:17  15  question in that we do not believe that, you know, some

14:20:23  16  sort of resolution of the issues surrounding PII and the

14:20:27  17  demonstration that -- that the states might be able to

14:20:30  18  make of -- of good cause to obtain PII or of harm

14:20:37  19  resulting from the issuance of the three year terms,

14:20:39  20  that any of those matters are necessarily, or -- or for

14:20:42  21  that matter, should be linked to the question of --

14:20:44  22  of -- of sanctions.  We think that -- that those are

14:20:46  23  more appropriately approached and can be dealt with as a

14:20:50  24  matter of the court's equitable powers.

14:20:53  25          And, so, we -- we -- I just wanted to say

14:20:56  1   that we would be prepared to address all of those

14:21:01  2   questions, shall I say, on the assumption that, or on --

14:21:05  3   or in the hope that the Court will withdraw its May 19th

14:21:10  4   orders and then we can proceed separately to deal with

14:21:13  5   those issues regarding the PII and the 108,000.

14:21:20  6              THE COURT:  Okay.  All right.

14:21:21  7              All right.  Here's -- here's the way --

14:21:23  8   I'm -- I'm going to take under submission the issue of,

14:21:29  9   number one, should and will I consider the affidavits

14:21:34  10  that I've finally been given?  And, if so, how does that

14:21:38  11  affect my prior ruling?  So, that, I'm -- I'm taking

14:21:38  12  under submission.

14:21:42  13             The stay with regard to any kind of relief

14:21:44  14  remains in place.

14:21:48  15             Mr. Tyler's agreement with the -- or the

14:21:53  16  Government's agreement as expressed by Mr. Tyler with

14:21:55  17  the states as far as how we're going to move forward

14:22:00  18  with this case, how and if we are, vis-a-vis what the

14:22:05  19  Supreme Court's going to do on the motion for rehearing,

14:22:08  20  I'm -- I -- I will reduce that to an order.

14:22:10  21             But basically it's going to just echo the

14:22:12  22  agreement that -- that y'all indicated you had.

14:22:16  23             And then I'm denying the motion to inter --

14:22:19  24  intervene.  Although, I don't think I'm going to use the

14:22:26  25  Government's nickname for the Intervenors.

14:22:29    1              All right.  Anything else that anybody wants

14:22:33    2    to raise while we're here together?

14:22:35    3              MR. BITTER:  Your Honor, we have one point

14:22:37    4    we want to raise.

14:22:37    5              THE COURT:  All right.

14:22:38    6              MR. BITTER:  Your Honor may already be aware

14:22:40    7    of it, but we wanted to bring it to the court's

14:22:42    8    attention and -- and see if the Defendants had any

14:22:44    9    information they could provide, we have learned that,

14:22:46   10    just in the last, I believe in the last week or so,

14:22:48   11    there was a federal lawsuit filed in the Eastern

14:22:51   12    District of New York by an individual who's within that

14:22:54   13    group of persons who got the three year EAD who was

14:22:59   14    clawed back to a two year term.

14:23:01   15              He's brought suit against some officials of

14:23:04   16    the USCIS challenging the -- the nationwide scope of the

14:23:08   17    injunction issued by this court, which, of course, was

14:23:11   18    affirmed by the -- by the Fifth Circuit and by the

14:23:14   19    Supreme Court.

14:23:14   20              Again, it was -- it was just recently filed.

14:23:16   21    We want to bring it to the court's attention because

14:23:18   22    obviously it is a -- you know, it is certainly an

14:23:21   23    attempted attack on the injunction that was issued here.

14:23:24   24              The State of Texas is not a party, none of

14:23:26   25    the Plaintiff states are a party, but, at this point, we

14:23:28  1   at least just want to, you know, bring the Court's

14:23:31  2   attention to it.

14:23:31  3              We -- we believe, you know, from our reading

14:23:33  4   of it, the -- the complaint has no merit in terms of

14:23:36  5   trying to attack the -- the injunction that was issued

14:23:39  6   here, but we certainly do have concerns on how that case

14:23:42  7   may proceed in terms of the challenge that may be raised

14:23:45  8   against the injunction here.

14:23:46  9              So, again, at this point, we just wanted to

14:23:48  10  bring it to the attention of the Court.

14:23:50  11             THE COURT:  He's a -- a DACA person who,

14:23:52  12  after the injunction, wasn't given a three year renewal

14:23:57  13  and then they -- so they traded back his three year for

14:23:59  14  a two year?

14:24:00  15             MR. BITTER:  That's as we understand it from

14:24:01  16  the complaint that he's in kind of what we've referred

14:24:03  17  to as the gap group of -- of the -- the 2,000 or so

14:24:06  18  individuals that received the two year -- I'm sorry, the

14:24:09  19  three year term after the injunction and part of the

14:24:11  20  group that they were clawed back by the Defendants

14:24:15  21  remedial efforts.  And he's challenging that revocation

14:24:18  22  of the three year term into a -- in a two year term.

14:24:21  23             THE COURT:  Okay.

14:24:23  24             MR. BITTER:  Thank you, Your Honor.

14:24:24  25             THE COURT:  All right.  Do y'all even know

14:24:25  1   about that case?

14:24:26  2              MR. TYLER:  We do, Your Honor.  It was filed

14:24:28  3   in Brooklyn.  And so we are familiar with the complaint

14:24:32  4   and we'll be responding in due course, in the normal

14:24:36  5   course.

14:24:37  6              THE COURT:  Well, presumably, if it's in the

14:24:40  7   same time period, he's about to be renewed for another

14:24:44  8   two years anyway, so his -- he will be beyond the period

14:24:48  9   of problem anyway.

14:24:50  10             But, if and when that becomes an issue in

14:24:53  11  this court, either one of y'all can raise it.

14:24:55  12             MR. TYLER:  Okay.  Thank you, Your Honor.

14:24:58  13             MS. PERALES:  Your Honor, simply to say that

14:24:59  14  we are aware of the lawsuit, we've looked at the

14:25:01  15  complaint, but we don't have any involvement in it.

14:25:04  16             THE COURT:  Okay.  Okay.  All right.  We'll

14:25:07  17  stand adjourned.  Thank y'all.

          18

          19

          20

          21

          22

          23

          24

          25

REPORTER'S CERTIFICATE


      I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled

matter.




                          __/s/ _Sheila E. Perales_____
                          SHEILA E. PERALES, CSR RPR CRR
                          Exp. Date:  Dec. 31, 2016