IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS, ET AL., § | |
| Plaintiffs, § | |
| § | |
| V. § | CIVIL NO. B-14-254 |
| § | |
| UNITED STATES OF AMERICA, ET AL., § | |
| Defendants. § | |

# **MEMORANDUM OPINION AND ORDER**

After the Supreme Court of the United States denied the Defendant's Motion for Rehearing, the Court ordered the parties to present the Court with an agreed scheduling order that would govern this case through its conclusion. Instead, the parties, due to the upcoming change in administrations, filed a joint motion to stay merits proceedings. [Doc. No. 430]. The Court will address that motion and other outstanding motions in a separate order.

The Court, however, finds this period of inactivity to be the appropriate time to address certain remaining issues—primarily those that concern this Court's stay of its earlier sanctions order based upon the misrepresentations made to the Plaintiffs and the Court by counsel for Defendants. The Court has detailed the facts concerning those misrepresentations in prior orders and sees no need to describe that conduct here. Suffice it to say, while admitting the facts that support the findings of misconduct, the Justice Department has objected to the actual findings of misconduct and the scope of the remedial action the Court has ordered. The Court will briefly revisit the genesis of the Justice Department complaints.

The initial controversy was caused by the four misrepresentations—made in open court and/or in pleadings. As stated above, this Court has detailed them *ad nauseam* and there is no

need to rehash those here. The problem was enhanced by the Justice Department's "strategic" decision not to support its explanation surrounding the misrepresentations with evidence. When the Department offered the argument that these misrepresentations were made inadvertently, the Court pointed out that the Justice Department had filed <u>no</u> proof to support this position.[1] In essence, this Court only had evidence of misconduct (which was conceded in the Government's briefing to have been done knowingly) and no evidence supporting any other conclusion. It is one thing not to file evidence initially, but when a judge points out the omission and gives a litigant a chance to correct it and that litigant does not, that litigant can only blame itself or its lawyers for any adverse outcome.

The Justice Department has most recently complained about the scope of this Court's sanctions order.[2] Tellingly, in its briefing objecting to the order compelling continuing legal

---

[1] [*See, e.g.*, Hr'g Tr., June 23, 2015] in which the following exchange took place:

| | |
|---|---|
| **JUSTICE DEPARTMENT LAWYER:** | Taking a look at the privilege log, the dates in the metadata list chart that we provided, that those in combination with the narrative hopefully lay to rest any concerns that anyone from the government's side was trying to intentionally mislead anyone, certainly not the Court or the plaintiffs; that it was a genuine disconnect in not understanding what the questions were. |
| **THE COURT:** | Where do I get that? I'm not arguing with you that that evidence may show that, <u>but where is that evidence? Help me here.</u> |
| **JUSTICE DEPARTMENT LAWYER:** | The evidence is in the narrative as well as in the - - |
| **THE COURT:** | <u>I mean, do I have any affidavits? Do I have any proof?</u> I mean, that's really what I - - I need to see. |
| **JUSTICE DEPARTMENT LAWYER:** | "Your Honor, no, we haven't provided any affidavits." [Doc. No. 275, at 10] (emphasis added). |

[2] On May 19, 2016, this Court issued two separate orders. The Government objected to the scope of the sanctions order compelling ethics training for its lawyers at Main Justice. [Doc. No. 347]. In contrast, the Government objected to the sealed order in its entirety. [Doc. No. 348]. Though this Order addresses both the sanctions order and the sealed order, they are at times referenced individually. Individual references to the Court's prior orders will be apparent from context throughout this opinion.

ethics education for those lawyers practicing in the main Washington, DC office of the Justice Department, <u>the Department left out the crucial fact that it explicitly asked this Court to implement government-wide sanctions</u> if it chose to implement any sanctions at all. In its Memorandum following the hearing of August 19, 2015 [Doc. No. 305], the Justice Department wrote the following:

> Independent of any of the above discussion, one important point bears emphasizing: the Federal Government as a whole is responsible for the conduct of this litigation. A large team of attorneys at DOJ and DHS, including the latter's components, have worked together throughout this litigation. <u>Whatever the result of these proceedings, therefore, the proper subject for any sanction or equitable order is the Federal Government.</u> Setting aside that no individual attorney has received any notice that he or she may be subject to sanctions, *see* Section I.B, *supra*, it would be fundamentally unfair to sanction any individual—in his or her official or personal capacity—for the Government's unintentional miscommunication in the conduct of this litigation. <u>Thus, whatever the result here, the Government as a whole should be held responsible, not any individual person or attorney.</u>

[Doc. No. 305, at 14] (emphasis added). This Court agreed, at least in part, with the Justice Department's assessment of the proper scope of potential sanctions, and acted accordingly. If anything, this Court's order is much narrower than what the Justice Department requested as the Court limited the ruling to those in the actual office responsible for the faulty representations, and did not include the lawyers from the Department of Homeland Security (DHS) or White House who had been participating behind the scenes.

In summary, the Justice Department made the initial misrepresentations, then it admitted that they were made knowingly—but somehow accidently—yet refused to file any evidence to support the latter claim. It then asked this Court to sanction the entire Government. It should have come to no one's surprise that this Court reached its decision using the only evidence it had, and entered a sanctions order (although not as broad of one as the Justice Department had requested).

The Justice Department's reaction to this Court's orders was equally baffling. Instead of providing the Court with the long overdue evidence explaining its actions, it filed with the Court various pleadings—some of which contained affidavits—but none that explained why the misrepresentations were inadvertent mistakes instead of intentional misconduct.

As the parties have long known, this Court has historically been quite reluctant to sanction lawyers and has only done so sparingly and then only as a last resort. In this case, the Court did not issue sanctions when it first realized that the Plaintiff-States and the Court had not been told the truth. It gave the Government every opportunity to explain the misstatements and even solicited evidence that would demonstrate that the misrepresentations were due to an accident or mistake or through some breakdown in communication between the lawyers and their clients. [*See, e.g.,* Doc. No. 226]. The Justice Department nevertheless chose to forgo filing any exculpatory evidence and elected to stand pat with no evidence explaining the misstatements. [*See* Hr'g Tr. June 23, 2015 filed as Doc. No. 275, as quoted above in part in footnote 1].

Yet, despite the lack of any evidence to explain the statements that the Department conceded were erroneous, the Court did not immediately issue sanctions. It reviewed two sets of *in camera* documents filed by the Defendants. Those documents, while somewhat informative, contained no explanation for the misrepresentations. The Government had also filed two additional sets of documents under seal, but asked the Court not to review those. While this procedure is somewhat unprecedented, this Court honored that request. Since the first two sets of documents contained no explanation for the misstatements and since there were no declarations providing such information, this Court assumed that the explanation must be contained in those documents that it was asked not to review.

4

With that in mind, the Court issued an order signaling to the parties that it was about to rule. In that order, the Court warned the parties that (1) the Court would not base its ruling on evidence it did not have or could not see; and (2) that the Government needed to decide what evidence, if any, the Government wanted the Court to review. [Doc. No. 342]. The Court then returned the two unreviewed *in camera* packets to defense counsel. The Government eventually kept one packet and returned the other packet for the Court to review. Those documents, like the two original sets the Court had previously reviewed, contained no facts that explained the misrepresentations. More importantly, despite having been given a clear indication that the Court was nearing a ruling, the Government persisted in its decision not to file any evidence, declarations or affidavits to explain the statements that it conceded were misrepresentations of the truth.

Finally, only after the Court issued the sanctions order and more than a year after the Court pointed out that the Justice Department had provided no evidence, the Government decided to actually file the evidence it should have originally filed. The Government filed ten affidavits/declarations from lawyers with some involvement with its trial team, including one from each of the attorneys who made the actual misrepresentations. Traditionally, a court would not accept or consider evidence filed after the trial or after a decision was made. Not surprisingly, most courts reject late-filed evidence—especially in circumstances, such as in the instant case, where the Court had pointed out its absence and where that evidence was easily obtainable.[3]

---

[3] All, but one, of late-filed affidavits were averred to by the Justice Department employees and could have easily been obtained at any time. The lone exception was a former Justice Department lawyer, who according to other declarations, was a friend and colleague of the other affiants. That being the case, that declaration would presumably have been easily obtainable as well.

One does not need a law degree from an elite law school to know that the time to file evidence is before a decision is made. The Government's failure to file evidence before the orders were issued is nothing short of stunning—especially since their briefing admitted the misrepresentations were made by individuals who knew that the statements were wrong. One would have expected the explanation to have been filed almost immediately when the misrepresentations became apparent. The decision not to file evidence after the issue arose but before the Court pointed out the absence was questionable; the decision not to file evidence after the Court pointed out the absence is inexplicable.

Almost as inexplicable is the Justice Department's complaint about the breadth of the sanctions order. While this Court is always concerned about the conduct of the lawyers that appear before it, even in those few instances when it has sanctioned a lawyer, it has never sanctioned an entity or a law firm. It did so in this case for two reasons. First, the Justice Department asked that if sanctions were imposed, that they be imposed on the entire "federal government." [Doc. No. 305, page 14]. Thus, the order entered was much narrower than that requested. Secondly, it was always apparent to this Court, and confirmed by the Department's admissions, that multiple lawyers from several federal entities were involved in almost every presentation to this Court.[4] While it appears the Government believed in a "team approach" when it filed the broad sanctions suggestion, apparently the team approach was jettisoned once the Court actually took the Department at its word. Consequently, the Court is now faced with yet another instance in which the Department is, in effect, conceding: "Yes we said it, but we did not mean it." In essence, this is the fifth time the Court believed what it was told by the

---

[4] Indeed, the Government has stated that over 50 lawyers were involved in the handling and oversight of this case. [Doc. No. 382–5].

Justice Department only to be later informed by its lawyers that the Department's statements were not accurate and were not worthy of the Court's reliance.

Nevertheless, two important factors have arisen since the time the Government finally chose to file the evidence long-requested by the Court. First, the country has held a national election—the result of which has caused the parties to file a motion to stay. As stated above, that issue will be addressed in a separate order. Second, and more directly related to the evaluation of the need for remedial action, the second anniversary for the three-year Deferred Action for Childhood Arrivals (DACA) extensions—the subject matter of the misrepresentations—has come and gone.

In November of 2014, pursuant to DHS's announced policy and according to the now corrected position of the Government, DHS began processing and renewing DACA applications for a three-year period instead of the previously applicable two-year period. This Court in the original sanctions order tried to balance the need for potential remedial action for any Plaintiff-State damaged by these misrepresentations with the rights of those individuals who might ultimately be affected. To create an efficient means of effectuating remedial action while still maintaining the privacy of the aliens participating in the DACA program, the Court ordered identifying information concerning those individuals who were covered by misrepresentations, to be filed under seal. No one, not even the Court, would review this information except in the event of good cause related directly to some damage caused to the Plaintiff-States by the Defendants' misrepresentations and only then if the disclosure would remediate the damage.

Two years have now passed since the three-year renewals were initiated. To date, no Plaintiff-State has made a claim in this Court that it has been harmed by the misrepresentations. The Court concedes that the Plaintiff-States are somewhat handicapped in this matter as they

have not been privy to many of the filings nor do they have a list of those who received the three-year renewals. It also notes that the upcoming year is arguably the "extra" year covered by the misrepresentations. Consequently, Plaintiffs' ability to pinpoint a finite damage claim and to relate it to the misrepresentations may be difficult at best. Nevertheless, the fact remains that no such claim has been made in the past two years, and in the next 12–18 months all such renewals will expire.

Given that these misrepresentations have apparently not caused the Plaintiff-States harm since the time they were made, this Court sees no current need for the Defendants to file with the Court the personnel identifiers of those individuals covered by the misrepresentations. The Court does not mean to imply that should good cause arise, it will not take some similar remedial action if a Plaintiff-State is being harmed by the misrepresentations and the identifying information will alleviate or mitigate that damage.

The one remaining sanctions-related issue is whether the sanctions order should be vacated in light of the evidence that the Justice Department has finally filed. This issue actually has two components: (1) should the Court consider the declarations that were filed months after the Court issued the May 19, 2016 orders; and (2) if considered, do the declarations support a different conclusion?

While this Court remains perplexed that the Justice Department originally made the conscious decision not to file any affidavits/declarations or any other evidence to support the claims made in its briefs, the Court has elected to consider the untimely declarations. The reasons for this decision are threefold. Two have already been referenced. First, this Court does not view sanctions as an integral part of any case management scenario. While a sanction is always part of the arsenal that a court has to ensure the orderly and civil disposition of any case,

sanctions are always viewed, at least by this Court, as a weapon of last resort to be utilized only when needed to remediate past harms and/or to prevent further misconduct. This leads to the second reason to consider the ill-timed evidence. As stated above, two years have passed since the first unfortunate representations were made, and the Court has not been presented with any firm and tangible claim that any of the Plaintiff-States have suffered any harm due to these statements.

Finally, as understood by all counsel in this case, the sanctions, while certainly not burdensome for the Justice Department, do have serious secondary consequences. Certainly, attorneys that commit certain untoward, unethical, or illegal acts deserve the consequences that follow from that misconduct. Conversely, the Court has never held that those who have merely committed an unintended misstep or mistake that has either caused no harm or that has caused harm that the offending party has tried to fix in a prompt and professional manner should be punished beyond the level necessary to make the opposing party whole. Given that all three of these reasons exist in the instant case, the Court shall consider the late-filed evidence.

The Court hereby withdraws the sanctions portion of the order it issued on May 19, 2016. [Doc. No. 347]. It does not withdraw the opinion it issued on that date [Doc. No. 347], because, based on the evidence the Court had before it at the time the opinion was written, it was, and is, entirely accurate. Document Number 348, the sealed order, is withdrawn in its entirety. [Doc. No. 348]. This Court remains stunned that the Justice Department, after admitting that its attorneys misrepresented the facts, and did so knowing what the actual facts were, chose to present _no_ exculpatory evidence when faced with the possibility of sanctions. This decision seems even more puzzling given that the briefing filed by the Government effectively conceded misconduct and the fact that this Court pointed out the lack of mitigating evidence.

9

Nevertheless, the Court allowed the Department to file evidence after the fact and it would not have done so merely to waste the time and resources of the litigants. The Court has reviewed each declaration carefully, and with one glaring exception, finds each to be credible. Moreover, the Court, not surprisingly, has viewed the declarations of the two individuals most intimately involved with the representations with great interest. Despite the fact that this Court still does not fully comprehend what led to the individuals in question to the revelation that triggered the subsequent disclosure of the misstatements to the Court and why this epiphany did not occur earlier, this Court finds, given its review of the declarations and the surrounding circumstances and context, that the two individuals in question did not intend their statements to be inaccurate. They acted with no intent to deceive the other parties or the Court.

In this Court's experience, the majority of judges do not subscribe to a "heat of battle/press of business" defense/excuse such as that described in the declarations in question. Work on other projects or cases is never an excuse for intentional or bad faith misconduct. Fortunately, for the declarants in this case, this Court follows the minority view in this area—at least in the circumstances that exist here. Regardless as to how busy a lawyer is, he or she owes the same duty of ethical behavior to his or her fellow litigants, co-counsel, opposing counsel and to the Court. Nevertheless, while the press of business does not excuse misconduct, it goes without saying that the busier one is, the greater the chance that one may inadvertently make a mistake.

This Court does not sanction inadvertent mistakes. While it may award costs or fees where appropriate to an innocent party who suffers harm due to attorney misconduct, that harm, as noted above, has not (yet) occurred here. Furthermore, as this Court has noted in prior orders, such an order in this instance might only serve to penalize the taxpayers. This Court finds based

upon the newly filed evidence, that the statements in question, though repeated on multiple occasions, were not the product of a bad faith intent to deceive the Court or that they were made with malice. The statements were not accurate. Those who made them and those who approved those statements knew the accurate facts and should have corrected them; yet somehow all concerned did not connect the dots between the statements being made and DHS's actual activity. While many would find this disconnect to be nearly impossible absent bad faith or malice, this Court finds based upon the evidence finally produced that the attorneys in question did not intend to be dishonest and would not have made the misrepresentations had they recognized them to be inaccurate. Had the Government come forward with this evidence sooner, all concerned would have been spared a lot of work and anxiety.

This Court cannot end this Order without recognizing two factors (one positive, one decidedly negative). First, the Court was informed by one of the late-filed affidavits that the Justice Department has, since this Court's original orders, instituted an additional one hour ethics class for attorneys in the civil division. This is certainly a positive development, but it is far short of the goal for which the Justice Department should be striving.

The Justice Department is the law firm for every person in the United States. The Court earlier referenced "one glaring exception" that it had concerning the credibility of the declarants in this case. Virtually every affidavit filed by the Justice Department claims in so many words that the Department or its lawyers are committed to the "highest standards of ethical conduct and professionalism." The evidence and the facts revealed in open court in this case do not support that conclusion. It goes without saying that the law requires Justice Department attorneys to act in conformance with the ethical standards of the locales in which they practice. Yet, shockingly, the Department does not have a training program to ensure that the attorneys even read the

applicable rules. That being the case, their actual compliance with the law is more a matter of luck than true dedication to controlling ethical principles.

This also means that the Department is making no concerted attempt to ensure that its lawyers either knowingly comply with the applicable jurisdiction's rules or comply with the McDade Amendment. (How can one knowingly comply with the rules if one does not know what the rules are?) Contrary to the suggestion made to this Court, the similarity among the ethical codes of many states and the generality of shared ethical concepts in those codes does not ensure an attorney's compliance with the McDade Amendment. [*See* Hr'g Tr. 21, Aug. 31, 2016]. In that same in-court exchange, this Court asked the attorney representing the Civil Division of the Justice Department whether the Department had any policy that ensured compliance with the McDade Amendment. [*See* Hr'g Tr. 19–21]. It is worrisome that the attorney could not provide a simple "Yes" to this Court's question. If there is such a policy, that lawyer certainly did not know about it.

The answers given in court, when combined with those facts found in the filed affidavits,[5] certainly indicate that there is no organized Department policy that requires attorneys to keep abreast of variable ethical obligations or even ensures that a given attorney even reads the ethics rules of a specific jurisdiction. Given this state of affairs at Main Justice, it should not have surprised this Court that a Justice Department attorney failed to answer clearly this Court's

---

[5] In a declaration filed by the Justice Department's Designated Ethics Official, the declaration complained that this Court's prior sanctions order would cost the Department additional funds to stay current with all ethical developments in the states in question. [*See* Doc. No. 354-3, at 9]. These costs are specifically attributed under oath to be the result of this Court's order. [*Id.* at 3]. This same individual asserted that in addition to the four hours of professional training required by Department policy (two hours of Department of Justice professional responsibility, one hour of government ethics, and one hour of sexual harassment and non-discrimination training each calendar year), individual Department components *may* require additional training on issues pertinent to attorneys' "specific missions." [*Id.* at 2].

question about whether the Department has any rule that ensures compliance with the law. [*See* Hr'g Tr. 19–22].

The Justice Department owes a duty to the public to not only comply with the law; it owes a moral and ethical duty to uphold the highest standards of the legal profession and to put justice above the pursuit of winning a case. The Seventh Circuit encapsulated this thought in a coherent and succinct manner:

> The Department of Justice wields enormous power over people's lives, much of it beyond effective judicial or political review. With power comes enormous responsibility, moral, if not legal, for its prudent and restrained exercise; and responsibility implies knowledge, experience, and sound judgment, not just good faith.

*United States v. Van Engel*, 15 F.3d 623, 629 (7th Cir. 1993), *abrogated on other grounds by United States v. Canoy*, 38 F.3d 893 (7th Cir. 1994).

In other words, responsible conduct requires knowledge. To act responsibly in the legal arena, one must know and abide by the applicable procedural and evidentiary rules. One must also know and abide by the prevailing ethical standards as well. While the Court is by this Order lifting the portion of its earlier order imposing sanctions on Main Justice, it retains grave concerns about whether the vast majority of attorneys at Main Justice have any knowledge of the rules in the jurisdictions in which they practice. These concerns were obviously heightened by the facts and circumstances in this case. First, there were at least four different misrepresentations. By this Order, this Court is holding that they were not due to malice and bad faith, but the fact remains they were made and approved by those controlling this litigation. Next, there was the decision not to provide explanatory evidence about the misstatements. While this decision remains an enigma to the Court, every trial lawyer is entitled to implement his or her own strategy. In doing so, they must also be willing to live with the consequences, which

clearly the Justice Department was not. Also, as part of its strategy, the Department asked the Court to implement sanctions across the entire government—a statement the Department obviously did not believe since it later objected to the breadth of a much narrower order.

When this Court questioned counsel as to whether Justice Department lawyers even read the ethical codes that they are required by law to comply with prior to appearing in that jurisdiction, the Court was told that someone in Washington would no doubt read the transcript of the hearing and "perhaps" that "suggestion will be taken note of." [Hr'g Tr. 22]. This is clearly no way to run the nation's law firm. The McDade Amendment signaled a historical shift in the duties of a Justice Department attorney. Post-McDade, a Justice Department attorney can no longer argue with a straight face, as has been done before, that he or she is exempt from the state ethical requirements to which every other attorney practicing in that jurisdiction must adhere. *See In re Doe*, 801 F. Supp. 478, 485-86 (D.N.M. 1992). The Department apparently believes that yearly certification of good standing with a state (or the District of Columbia) bar is sufficient to comply with the ethical obligations imposed on the Department's attorneys by law. [Doc. No. 354-3, at 3]. It clearly is not. The wisdom of the McDade Amendment may be the topic of academic or public debate, but it is the law. The Justice Department's relationship with the McDade Amendment should therefore be crystal clear. It must be followed.

The Department's current haphazard approach to ethical standards has not been without certain consequences, although the person who suffers those adverse effects is usually someone other than the Justice Department lawyer. In just the last ten years, there have been a staggering number of cases at Main Justice involving ethical misconduct. The following post-McDade cases illustrate the point:

    1.    *United States v. Stevens*, 715 F. Supp. 2d 1, 8 (D.D.C. 2009) ("[A]nother incident in an ongoing series of incidents in which the Court has relied

        upon information provided by the government only to learn that the government had misled the Court and/or misrepresented the facts.").

2.    *United States v. Kott*, 423 Fed. Appx. 736, 736–37 (9th Cir. 2011) (*Brady* violation required a new trial).

3.    *United States v. Kohring*, 637 F.3d 895, 901 (9th Cir. 2011) (prosecution withheld and suppressed evidence necessitating a new trial).

4.    *Islamic Shura Council of S. California v. F.B.I.*, 779 F. Supp. 2d 1114, 1117 (C.D. Cal. 2011) ("The Government's representations were then, and remain today, blatantly false.").

5.    *United States v. Aguilar*, 831 F. Supp. 2d 1180, 1182 (C.D. Cal. 2011) (the government allowed witnesses to testify untruthfully and inserted material falsehoods into affidavits leading to the dismissal of the defendants' indictment).

6.    *Judicial Watch Inc. v. U.S. Dept. of Justice*, 774 F. Supp. 2d 225, 231 (D. D.C. 2011) (Justice Department's failure to respond in a timely manner was unreasonable).

7.    *Judicial Watch, Inc. v. U.S. Dept. of Justice*, 878 F. Supp. 2d 225, 238 (D. D.C. 2012) (Justice Department acted without legal basis).

8.    *United States. v. Bowen*, 969 F. Supp. 2d 546, 588 (E.D. La 2013) (experienced Justice Department attorney embarked on a "reckless course of action" and exercised "gravely poor judgement").

9.    *Dobyns v. United States*, 08-700C, 2014 WL 7934306, at *3 (Fed. Cl. Dec. 1, 2014) (Justice Department lawyers committed fraud on the court).

10.    *United States v. Bagcho*, 151 F. Supp. 3d 60, 63, 76 (D. D.C. 2015) (*Brady* violation required motion for new trial to be partially granted).

The Court has set out above a few examples, but it is far from an exhaustive or definitive list. Further, it has tried to limit the list to those reported cases that indicate involvement with lawyers from Main Justice (though in many cases, the actual employer or the attorney of record can be difficult to determine). This is not the record of a law firm that is dedicated to the highest standards of ethical conduct. In fact, any private law firm with this record would either be deeply ashamed, out of business, or both. Obviously, the incentive structure of the private sector

15

is dissimilar, in many ways, to that of the public sector. For example, the American people cannot fire the Justice Department. Consequently, the Department should spare no effort to adhere to the highest ethical standards.

The Office of Public Responsibility (OPR) at the Justice Department publishes a yearly report detailing the Justice Department's internal investigation of reported misconduct by Department attorneys. *See* U.S. Department of Justice, Office of Professional Responsibility, *Annual Report 2015* 1, *available at* https://www.justice.gov/opr/file/881211/download (hereinafter OPR Annual Report) (last visited Dec. 30, 2016). OPR receives allegations from a wide variety of sources, including judges. All Department employees[6] are obligated to report "non-frivolous" allegations of misconduct to their supervisors or directly to OPR. *Id.* The allegations of misconduct OPR investigates are wide-ranging, including an attorney's failure to satisfy attorney-client duties, abuse of authority and discretion, *Brady* and *Giglio* violations, impermissible conflicts, failure to comply with federal law or internal Department of Justice rules and regulations, lack of fitness to practice law, and as is the case at bar, misrepresentations to the court and opposing counsel. *See id.* at 7, tbl. 2 (listing the forms of misconduct alleged in fiscal year 2015).

For fiscal year 2015, OPR reported 22 allegations of misconduct that were sustained by OPR's own investigation. *Id.* at 10, tbl. 6. In fiscal year 2014, there were 30 sustained allegations of misconduct. OPR Annual Report 2014, at 10, tbl. 6, *available at* https://www.justice.gov/opr/file/798006/download (last visited Dec. 30, 2016). This number totaled 45 sustained allegations in fiscal year 2013, and 35 sustained allegations in fiscal year 2012. OPR Annual Report 2013, at 13, tbl. 6, *available at*

---

[6] OPR also investigates allegations relating to the actions of immigration judges and members of the Board of Immigration Appeals. OPR Annual Report 2015, at 1.

https://www.justice.gov/sites/default/files/opr/legacy/2014/07/08/annualreport2013.pdf (last visited Dec. 30, 2016); OPR Annual Report 2012, at 13, tbl 6, *available at* https://www.justice.gov/sites/default/files/opr/legacy/2013/08/21/annualreport2012.pdf (last visited Dec. 30, 2016). Overall, the Department itself admitted to 132 different ethical violations in just four years.

These numbers, while shockingly high even when viewed in insolation, disguise the sheer gravity of the infractions. Misrepresentations to the court or opposing counsel accounted for over 20% of the total sustained allegations between fiscal years 2012 and 2015. Justice Department attorneys are afforded immense power in our federal system, and rightly or wrongly, trial judges have grown accustomed to taking many of their representations on faith. Justice Department attorneys may rightfully be prideful of their individual "win-loss" records, but their satisfactory performance as the legal representatives of this country is not simply contingent on securing a successful outcome. Their goal should be, quite simply, to achieve a just result. Whether this entails turning over *Brady* material that may damage the prosecution's case, or promptly revising and explaining a misrepresentation in the face of professional and personal pressure, attorneys representing the United States must safeguard the legitimacy of the authority given to them by the people through honest and forthcoming representation. The ethical choices of each Justice Department attorney, entrusted with the coercive hand of the federal government, play an important role in determining whether this nation is one that is ruled by law or ruled by something or someone more corruptible. Even if one sets aside the now five misrepresentations made to this Court, the fact that the Justice Department has made so many other different misrepresentations to other courts or opposing counsel within the above-described period should be viewed as an affront to one of the most historically respected legal institutions in the country.

The point, of course, is not the number of infractions. The importance of these examples is that they represent a steady stream of misconduct from the nation's law firm that is theoretically comprised of the cream of the legal profession's crop. Most judges, including the undersigned, hold the Department of Justice in high regard. That regard, however, does not require this Court or any other court to wear blinders to a disconcerting pattern of problematic conduct. The lawyers in positions of responsibility within the Justice Department should likewise shed their blinders. It is clear to the undersigned, as it no doubt was to the judges in the cases list above, that either the Department's ethical training, the emphasis given to compliance with ethical standards, and/or the measures taken to ensure ethical conduct are woefully inadequate.

No attorney, regardless of their employer, should practice in a jurisdiction without reviewing that jurisdiction's ethical rules. It is every lawyer's duty to keep current with the ethical requirements of the jurisdictions in which they practice. For example, Texas lawyers are required to take three hours of legal training per year in ethics. This training is an inherent cost that one must pay to be considered a professional. It is unprofessional not to stay current with prevailing ethical standards. It exposes that attorney to ethical jeopardy. It places innocent parties and counsel in harm's way. Unethical conduct almost invariably obstructs justice. Moreover, for the attorneys who work for the Justice Department, they are also exposed to the claim that they are not complying with the law. If any entity should comply with the law, it ought to be the Justice Department.

It should go without saying that once having read these rules that the attorney in question should then comply with them. Compliance with ethical rules and the law for the nation's law firm should not be a matter of chance; it should be an integral part of its daily

practice and commitment to justice. At the very least, the Justice Department should, in an organized manner, require its attorneys to review and understand each state's ethical rules before those attorneys appear in that state. This is a minimum requirement.

This country is blessed to have so many smart and dedicated lawyers who have chosen to forego more lucrative opportunities in the private sector and instead chose careers in public service. Their good work should not be overshadowed by the misconduct of a few. The Department as a whole should set the ethical bar high—so when attorneys announce in court that they represent our nation, it would not be a simple acknowledgement of their client's identity. For those few attorneys who are granted the privilege of uttering the words "for the United States," the phrase should carry the implicit guarantee that they will conduct themselves ethically, that their words are their bond, and that their goal is a just, and therefore right, result.

This Court hereby withdraws the sanctions portion of the order it issued on May 19, 2016, though this Court does not withdraw the opinion it issued on that date. [Doc. No. 347]. The sealed order contained in Document Number 348 is withdrawn in its entirety.

Signed this 19th day of January, 2017.

                                                  Andrew S. Hanen
                                                  United States District Judge